## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

THE STATE OF LOUISIANA;

THE STATE OF FLORIDA;

THE STATE OF IDAHO;

THE STATE OF KENTUCKY;

THE STATE OF MISSISSIPPI;

THE STATE OF MONTANA;

THE STATE OF NORTH DAKOTA;

THE STATE OF SOUTH CAROLINA;          CIVIL ACTION NO. _____

THE STATE OF TEXAS;

THE STATE OF VIRGINIA;

ACADIA PARISH;

ASCENSION PARISH;

ASSUMPTION PARISH;

AVOYELLES PARISH;

BOSSIER PARISH;

CALDWELL PARISH;

CAMERON PARISH;

CATAHOULA PARISH;

CLAIBORNE PARISH;

CONCORDIA PARISH;

EAST BATON ROUGE PARISH;



EAST FELICIANA PARISH;

EVANGELINE PARISH;

FRANKLIN PARISH;

GRANT PARISH;

IBERVILLE PARISH;

JACKSON PARISH;

JEFFERSON PARISH;

JEFFERSON DAVIS PARISH;

LAFAYETTE PARISH

LAFOURCHE PARISH;

LIVINGSTON PARISH;

MADISON PARISH;

ORLEANS PARISH;

PLAQUEMINES PARISH;

ST. BERNARD PARISH;

ST. CHARLES PARISH;

ST. HELENA PARISH;

ST. JAMES PARISH;

ST. JOHN THE BAPTIST PARISH;

ST. LANDRY PARISH;

ST. MARY PARISH;

ST. TAMMANY PARISH;

TANGIPAHOA PARISH;

TENSAS PARISH;

TERREBONNE PARISH;

VERMILION PARISH;

VERNON PARISH;

WASHINGTON PARISH;

WEBSTER PARISH;

WEST BATON ROUGE PARISH;

WEST FELICIANA PARISH;

WINN PARISH;

TOWN OF JEAN LAFITTE;

TOWN OF GRAND ISLE;

BOSSIER LEVEE DISTRICT;

FIFTH LOUISIANA LEVEE DISTRICT;

GRAND ISLE INDEPENDENT LEVEE
DISTRICT;

LAFOURCHE BASIN LEVEE DIS-
TRICT;

NORTH LAFOURCHE CONSERVA-
TION, LEVEE, AND DRAINAGE
DISTRICT;

PONCHARTRAIN LEVEE DISTRICT;

SOUTHEAST LOUISIANA FLOOD
PROTECTION AUTHORITY—EAST;

SOUTHEAST LOUISIANA FLOOD
PROTECTION AUTHORITY—WEST;

SOUTH LAFOURCHE LEVEE DIS-
TRICT;

ST. MARY LEVEE DISTRICT;

TERREBONNE LEVEE & CONSERVA-
TION DISTRICT;

EAST ASCENSION CONSOLIDATED
GRAVITY DRAINAGE DISTRICT
NO. 1;

ASSOCIATION OF LEVEE BOARDS
OF LOUISIANA;

PLAINTIFFS,

v.

ALEJANDRO MAYORKAS, in his offi-
cial capacity as Secretary of Department
of Homeland Security;

DEPARTMENT OF HOMELAND SE-
CURITY;

DEANNE CRISWELL, in her official ca-
pacity as Administrator of the Federal
Emergency Management Agency;

FEDERAL EMERGENCY MANAGE-
MENT AGENCY;

FEDERAL INSURANCE AND MITIGA-
TION ADMINISTRATION;

DEFENDANTS.

# COMPLAINT

The State of Louisiana; State of Florida; State of Idaho; State of Kentucky; State of Mississippi; State of Montana; State of North Dakota; State of South Carolina; State of Texas; State of Virginia; Acadia Parish; Ascension Parish; Assumption Parish; Avoyelles Parish; Bossier Parish; Caldwell Parish; Cameron Parish; Catahoula Parish; Claiborne Parish; Concordia Parish; East Baton Rouge Parish; East Feliciana Parish; Evangeline Parish; Franklin Parish; Grant Parish; Iberville Parish; Jackson Parish; Jefferson Parish; Jefferson Davis Parish; Lafayette Parish; Lafourche Parish; Livingston Parish; Madison Parish; Orleans Parish; Plaquemines Parish; St. Bernard Parish; St. Charles Parish; St. Helena Parish; St. James Parish; St. John the Baptist Parish; St. Landry Parish; St. Mary Parish; St. Tammany Parish; Tangipahoa Parish; Tensas Parish; Terrebonne Parish; Vermilion Parish; Vernon Parish; Washington Parish; Webster Parish; West Baton Rouge Parish; West Feliciana Parish; Winn Parish; Town of Jean Lafitte; Town of Grand Isle; Bossier Levee District; Fifth Louisiana Levee District; Grand Isle Independent Levee District; Lafourche Basin Levee District; North Lafourche Conservation, Levee, and Drainage District; Ponchartrain Levee District; Southeast Louisiana Flood Protection Authority—East; Southeast Louisiana Flood Protection Authority—West; South Lafourche Levee District; St. Mary Levee District; Terrebonne Levee & Conservation District; East Ascension Consolidated Gravity Drainage District No. 1; Association of Levee Boards of Louisiana (collectively, Plaintiffs) bring this civil action against the above-listed Defendants for declaratory and injunctive relief and allege as follows:

## INTRODUCTION

1.      For decades, the Federal Emergency Management Agency (FEMA) encouraged States, local governments, and their citizens to adopt its preferred regulations and undertake expensive flood mitigation projects by promising affordable flood insurance through the National Flood Insurance Program (NFIP).

2.      The NFIP rates would be much lower than rates available on the private insurance market and would reward communities and individuals for all they had done to reduce the risk of flooding.

3.      FEMA's promise was a big incentive to do what FEMA asked because flood insurance is mandatory under federal law for most home- and small-business owners in flood-prone areas.

4.      The States and local governments kept their side of the bargain. They adopted FEMA's ordinances and carried out major mitigation projects, "regardless of whether those requirements reflect the policies that those communities—without the promise of affordable flood insurance from FEMA—would have chosen to protect themselves from the risks of flooding." Ex. 1, GOHSEP Dec. ¶ 20.

5.      Individuals kept their side of the bargain too, investing their hard-earned money in mitigation projects for their family homes that FEMA promised would result in lower premiums.

6.      But now, "[i]n a cruel bait and switch, FEMA is reversing course" by no longer offering the affordable flood insurance it promised. Ex. 51, S. Shore Recovery Coal. Dec. ¶ 24.

7.     FEMA has adopted a new methodology for calculating flood insurance rates under which most NFIP policyholder's premiums are dramatically increasing, in some areas by an average of 1000%. Ex. 22, Plaquemines Dec. ¶ 54.

8.     FEMA calls this methodology Risk Rating 2.0—Equity in Action.

9.     Equity in Action is deeply unjust, and it defies both law and logic.

10.     In fundamentally changing how it calculates rates for federal flood insurance, FEMA bypassed nearly every substantive and procedural requirement under law.

11.     Perhaps as a result, this new approach makes no sense. While the agency paints a picture of nuanced calculations using massive data repositories that reveal a property's individualized risks, the reality is much simpler: flood insurance is going to be much more expensive for pretty much everybody.

12.     Under Equity in Action, the agency ignores historical observed flood events and demonstrably effective mitigation efforts in favor of future flood hypotheticals to determine the flood risk of each insured property. Those hypotheticals, in turn, determine how much a flood insurance policy is going to cost.

13.     Even in places that have never seen a flood, FEMA has raised premiums for flood insurance.

14.     In the words of one declarant, Equity in Action can't even predict the past, let alone predict the future. Ex. 37, S. Lafourche Levee Dist. Dec.¶ 19.
It is fundamentally flawed.

## HISTORY OF THE NFIP

15.     In the middle of the 20th century, flood insurance was becoming increasingly unavailable in the United States. The private insurance industry was ill equipped to offer flood insurance on a national scale. Insurers lacked an actuarial basis for providing insurance, and people didn't want to purchase flood insurance, in part because of the costs. *See* Staff of Senate Comm. on Banking and Currency, 89th Cong., 2d Sess., *Insurance and Other Programs for Financial Assistance to Flood Victims* 98–99 (Comm. Print 1966) (report from Robert C. Weaver, Secretary of HUD).

16.     Congress responded by creating the NFIP. Through the NFIP, passed into law in 1968, Congress committed the federal government to "making flood insurance coverage available on reasonable terms and conditions to persons who have need for such protection." 42 U.S.C. § 4001(a). Congress "authorized" FEMA to create "a national flood insurance program" that "enable[s] interested persons to purchase insurance against" loss or damage to real or personal property "arising from any flood occurring in the United States." *Id.* § 4011(a). Congress directed FEMA to provide flood insurance at rates that, "insofar as practicable," are "consistent with the objective of making flood insurance available where necessary at reasonable rates so as to encourage prospective insureds to purchase such insurance." *Id.* § 4015(b)(2). The NFIP is now the primary source of flood insurance coverage for residential and small business properties in the United States.

17.     To get people to participate in the program, the NFIP offered numerous incentives that would help lower insurance costs. It encouraged communities to adopt

policies and laws to set minimum standards for elevation. It offered discounts to policyholders who undertook mitigation efforts on their properties. And it offered stability to policyholders who were subject to unanticipated mapping changes, locking them in at their old premium through grandfathering.

18.     In 2020, the NFIP issued more than 5 million flood insurance policies providing over $1.3 trillion in coverage in 22,600 communities across the United States. Ex. 46, Home Builders Assoc. Dec. ¶ 9. These policies have not only helped policyholders rebuild after a flood event but also have incentivized policyholders and the communities in which they reside to undertake significant mitigation efforts. Historically flood-insurance rates have been lower in communities that have undertaken those mitigation efforts.

19.     But in 2021, FEMA turned the NFIP on its head and implemented a new federal approach to flood insurance, which it called "Risk Rating 2.0—Equity in Action." The new Equity in Action approach "represents the biggest change to the way the NFIP calculates flood insurance premiums since the program began in 1968." Horn, A Brief Introduction to the National Flood Insurance Program, Cong. Research Serv., IF10988 (Jan. 4, 2023). It purports to introduce a new method for calculating insurance rates, which is now producing alarming results. Equity in Action is increasing premiums for almost all policyholders, sometimes by ten times or more over the next decade. Instead of more accurately reflecting actual flood-related risks, Equity

in Action is making flood insurance much more expensive and appears to almost completely ignore crucial risk factors such as mitigation efforts—like the way levees and elevation reduce the likelihood of flood damage.

20.     Compounding these problems, it is difficult to ascertain the full extent of this fundamental change in calculating NFIP premiums because FEMA has failed to disclose its methodology and input data. FEMA has made available only (a) high-level summaries of the methodological changes and (b) the new insurance premiums themselves, which are dramatically more expensive. As explained below, policyholders know what their rates were before Equity in Action, but they don't know what their new yearly rate will be under Equity in Action until they receive their renewal notice. And then, they don't know what their full premium increase will be until they receive their Declaration Page after they have renewed their policy. But even at that point, how FEMA got from the old rates to the new ones is still shrouded in mystery.

21.     While FEMA claims to make the NFIP program more transparent, the program is anything but. *See* FEMA Updates Its Flood Insurance Rating Methodology to Deliver More Equitable Pricing, FEMA (Apr. 1, 2021), https://perma.cc/LEZ8-LTEP.

22.     Over the past several years, State and local officials have tried to engage with FEMA to learn more about how FEMA developed the new methodology. *See, e.g.*, Letter from Sen. John Kennedy, Sen. Cornyn, et al. to David I. Maurstad, Deputy Associate Administrator, Federal Insurance & Mitigation Administration Resilience at FEMA (July 27, 2022); Press Release, Scalise to FEMA: Come Clean on Risk Rating

2.0 (May 2, 2023), https://perma.cc/5T7Q-VLLS; Press Release, Cassidy Brings Loui-

siana Voices on Flood Insurance to Senate Floor (Feb. 13, 2023),

https://perma.cc/6A84-S3EV; Ex. 56, D. Bourgeois Dec. ¶ 16 ("I worked directly and

extensively with our State and Federal legislative delegation, the CPRA, and the Gov-

ernor for years to try to get additional information about this 'revolutionary

change'…."); Ex. 42, Coastal Prot. and Restoration Auth. Dec. ¶¶ 18-20.

23.    None of this has mattered. Instead, Equity in Action will take effect

without notice and comment and based on secret ingredients.

24.    FEMA has not made information available on property-level full-risk

rates, and it only released county-level data on these rates more than a year after

Equity in Action was implemented. Reauthorization of the National Flood Insurance

Program: Improving Community Resilience: Hearing Before the S. Committee on

Banking, Housing, and Urban Affairs, 118th Cong. 8 (May 2, 2023) (statement of

Carolyn Kousky) (noting that "many households already cannot afford the current

cost of flood insurance and the number struggling with flood insurance costs will con-

tinue to grow as the rates rise").

25.    In addition, FEMA has not been forthcoming with information about

new full-risk premiums. As part of its renewal process, FEMA issues a renewal notice

with the cost of the next annual premium. *See* Policy Renewals, FEMA (2011),

https://perma.cc/7TND-PC2U.  Once the policyholder opts to renew the policy, FEMA

then sends a Declaration Page with additional information about the policy. *Id.* Be-

cause premiums increased at a predictable and incremental pace each year before

Equity in Action, many policyholders did not object to receiving a Declaration Page after the policy was renewed. *See, e.g.*, Ex. 57, Theriot Dec. ¶ 11; Ex. 56, D. Bourgeois Dec. ¶ 30.

26. After Equity in Action, though, this sequence of events has become problematic because FEMA provides information about the new full-risk premium only after policyholders renew their policy. One policyholder, for example, received her renewal notice indicating that her premium was going to increase significantly. Ex. 57, Theriot Dec. ¶ 11. Only after she renewed, though, did she receive her Declaration Page, which revealed a full-risk premium dramatically higher than the increase she expected. *Id.* ¶ 12. Had she known this information, she might not have renewed her flood insurance policy. *Id.* ¶ 16. By hiding this information, FEMA deprived this policyholder of making an informed decision. *Id.*; *see also* Ex. 56, D. Bourgeois Dec. ¶ 36.

27. That's just one example illustrating FEMA's lack of transparency, but the pattern is common to all policyholders: First, FEMA fails to provide information about its methodology at the outset to help people figure out how much rates will increase. Then, FEMA fails to provide information about the resulting full-risk premium when it comes time to renew a policy. This lack of transparency precludes policyholders and the public from making reasoned decisions and undermines public confidence in the program.

28. This information is also crucial to floodplain managers' work. These floodplain managers "ensur[e] local officials are familiar with flood risk data products such as flood insurance rate maps, flood insurance studies, flood zone designation and

where these designations apply at the local level." Ex. 47, La. Floodplain Mgmt. Assoc. Dec. ¶ 7.

29.     Since FEMA implemented Equity in Action, the number of NFIP policies has dropped from 5 million to under 4.7 million policies. *See* Reauthorization of the National Flood Insurance Program: Improving Community Resilience: Hearing Before the S. Committee on Banking, Housing, and Urban Affairs, 118th Cong. 2 (May 2, 2023) (statement of Carolyn Kousky) ("For those not mandated to purchase flood coverage, many will drop their flood coverage.").

30.     FEMA's fundamental changes to the NFIP flout federal law, are arbitrary and capricious, and were enacted illegally.

31.     Equity in Action injures the Plaintiffs. This Court should hold it unlawful and set aside the agency action.

## PARTIES

### I.   PLAINTIFF STATES

32.     **Plaintiff State of Louisiana** is a sovereign State of the United States of America. Jeff Landry is the Attorney General of the State of Louisiana. He is authorized by Louisiana law to sue on the State's behalf. His offices are located at 1885 North Third Street, Baton Rouge, Louisiana 70802, and the Northeast Louisiana State Office Building, 24 Accent Drive, Suite 117, Monroe, Louisiana, 71202. The State of Louisiana has an interest in managing flood risks and preventing flood damage, and it has expended significant efforts to protect its communities from flood events. Under federal law, FEMA must consult with "State and local agencies having responsibilities for flood control, flood forecasting, [and] flood damage prevention." 42

U.S.C. § 4024. The State of Louisiana has a quasi-sovereign interest in the health, safety, and wellbeing of its residents who face flood risks. *See Missouri v. Illinois*, 180 U.S. 208, 241 (1901); *Pennsylvania v. West Virginia*, 262 U.S. 553, 592 (1923); *Kentucky v. Biden*, 23 F.4th 585, 599 (6th Cir. 2022). The State of Louisiana has an interest in maintaining property value, which directly impacts tax revenue. The State of Louisiana has an interest in maintaining a strong tax base in order to fund future mitigation efforts.

33.    **Plaintiff State of Florida** is a sovereign State of the United States of America. Ashley Moody is the Attorney General of the State of Florida. She is authorized by Florida law to sue on the State's behalf. Her offices are located at PL-01, the Capitol, Tallahassee, Florida 32399. The State of Florida has an interest in managing flood risks and preventing flood damage. Under federal law, FEMA must consult with "State and local agencies having responsibilities for flood control, flood forecasting, [and] flood damage prevention." 42 U.S.C. § 4024. The State of Florida has a quasi-sovereign interest in the health, safety, and wellbeing of its residents who face flood risks. *See Missouri*, 180 U.S. at 241; *Pennsylvania*, 262 U.S. at 592; *Kentucky*, 23 F.4th at 599. The State of Florida has an interest in maintaining property value, which directly impacts tax revenue. The State of Florida has an interest in maintaining a strong tax base in order to fund future mitigation efforts.

34.    **Plaintiff State of Idaho** is a sovereign State of the United States of America. Raúl Labrador is the Attorney General of the State of Idaho. He is authorized by Idaho law to sue on the State's behalf. His offices are located at 700 W.

Jefferson Street, Boise, Idaho 83720. The State of Idaho has an interest in managing flood risks and preventing flood damage. Under federal law, FEMA must consult with "State and local agencies having responsibilities for flood control, flood forecasting, [and] flood damage prevention." 42 U.S.C. § 4024. The State of Idaho has a quasi-sovereign interest in the health, safety, and wellbeing of its residents who face flood risks. *See Missouri*, 180 U.S. at 241; *Pennsylvania*, 262 U.S. at 592; *Kentucky*, 23 F.4th at 599. The State of Idaho has an interest in maintaining property value, which directly impacts tax revenue. The State of Idaho has an interest in maintaining a strong tax base in order to fund future mitigation efforts.

35.    **Plaintiff State of Kentucky** is a sovereign State of the United States of America. Daniel Cameron is the Attorney General of the State of Kentucky He is authorized by Kentucky law to sue on the State's behalf. *See Commonwealth ex rel. Conway v. Thompson*, 300 S.W.3d 152, 173 (Ky. 2009), *as corrected* (Jan. 4, 2010). His offices are located at 700 Capital Avenue, Suite 118, Frankfort, Kentucky 40601. The State of Kentucky has an interest in managing flood risks and preventing flood damage. Under federal law, FEMA must consult with "State and local agencies having responsibilities for flood control, flood forecasting, [and] flood damage prevention." 42 U.S.C. § 4024. The State of Kentucky has a quasi-sovereign interest in the health, safety, and wellbeing of its residents who face flood risks. *See Missouri*, 180 U.S. at 241; *Pennsylvania*, 262 U.S. at 592; *Kentucky*, 23 F.4th at 599. The State of Kentucky has an interest in maintaining property value, which directly impacts tax revenue.

The State of Kentucky has an interest in maintaining a strong tax base in order to fund future mitigation efforts.

36. **Plaintiff State of Mississippi** is a sovereign State of the United States of America. Lynn Fitch is the Attorney General of the State of Mississippi. She is authorized by Mississippi law to sue on the State's behalf. Her mailing address is P.O. Box 220, Jackson, MS 39205. The State of Mississippi has an interest in managing flood risks and preventing flood damage. Under federal law, FEMA must consult with "State and local agencies having responsibilities for flood control, flood forecasting, [and] flood damage prevention." 42 U.S.C. § 4024. The State of Mississippi has a quasi-sovereign interest in the health, safety, and wellbeing of its residents who face flood risks. *See Missouri*, 180 U.S. at 241; *Pennsylvania*, 262 U.S. at 592; *Kentucky*, 23 F.4th at 599. The State of Mississippi has an interest in maintaining property value, which directly impacts tax revenue. The State of Mississippi has an interest in maintaining a strong tax base in order to fund future mitigation efforts.

37. **Plaintiff State of Montana** is a sovereign State of the United States of America. Austin Knudsen is the Attorney General of the State of Montana. He is authorized by Montana law to sue on the State's behalf. His offices are located at 215 N. Sanders St., Helena, MT 59601. The State of Montana has an interest in managing flood risks and preventing flood damage. Under federal law, FEMA must consult with "State and local agencies having responsibilities for flood control, flood forecasting, [and] flood damage prevention." 42 U.S.C. § 4024. The State of Montana has a quasi-sovereign interest in the health, safety, and wellbeing of its residents who face flood

risks. *See Missouri*, 180 U.S. at 241; *Pennsylvania*, 262 U.S. at 592; *Kentucky*, 23 F.4th at 599. The State of Montana has an interest in maintaining property value, which directly impacts tax revenue. The State of Montana has an interest in maintaining a strong tax base in order to fund future mitigation efforts.

38.    **Plaintiff State of North Dakota** is a sovereign State of the United States of America. Drew Wrigley is the Attorney General of the State of North Dakota. He is authorized by North Dakota law to sue on the State's behalf. His offices are located at 600 E. Boulevard Ave., Dept. 125, Bismarck, ND 58505. The State of North Dakota has an interest in managing flood risks and preventing flood damage. Under federal law, FEMA must consult with "State and local agencies having responsibilities for flood control, flood forecasting, [and] flood damage prevention." 42 U.S.C. § 4024. The State of North Dakota has a quasi-sovereign interest in the health, safety, and wellbeing of its residents who face flood risks. *See Missouri*, 180 U.S. at 241; *Pennsylvania*, 262 U.S. at 592; *Kentucky*, 23 F.4th at 599. The State of North Dakota has an interest in maintaining property value, which directly impacts tax revenue. The State of North Dakota has an interest in maintaining a strong tax base in order to fund future mitigation efforts.

39.    **Plaintiff State of South Carolina** is a sovereign State of the United States of America. Alan Wilson is the Attorney General of the State of South Carolina. He is authorized by South Carolina law to sue on the State's behalf. His mailing address is P.O. Box 1149, Columbia, South Carolina 29211. The State of South Carolina has an interest in managing flood risks and preventing flood damage. Under federal

law, FEMA must consult with "State and local agencies having responsibilities for flood control, flood forecasting, [and] flood damage prevention." 42 U.S.C. § 4024. The State of South Carolina has a quasi-sovereign interest in the health, safety, and well-being of its residents who face flood risks. *See Missouri*, 180 U.S. at 241; *Pennsylvania*, 262 U.S. at 592; *Kentucky*, 23 F.4th at 599. The State of South Carolina has an interest in maintaining property value, which directly impacts tax revenue. The State of South Carolina has an interest in maintaining a strong tax base in order to fund future mitigation efforts.

40.    **Plaintiff State of Texas** is a sovereign State of the United States of America. John Scott is the Provisional Attorney General of the State of Texas. He is authorized by Texas law to sue on the State's behalf. His offices are located at 300 W. 15th Street, Austin, Texas 78701. The State of Texas has an interest in managing flood risks and preventing flood damage. Under federal law, FEMA must consult with "State and local agencies having responsibilities for flood control, flood forecasting, [and] flood damage prevention." 42 U.S.C. § 4024. The State of Texas has a quasi-sovereign interest in the health, safety, and wellbeing of its residents who face flood risks. *See Missouri*, 180 U.S. at 241; *Pennsylvania*, 262 U.S. at 592; *Kentucky*, 23 F.4th at 599. The State of Texas has an interest in maintaining property value, which directly impacts tax revenue. The State of Texas has an interest in maintaining a strong tax base in order to fund future mitigation efforts.

41. **Plaintiff State of Virginia** is a sovereign State of the United States of America. Jason Miyares is the Attorney General of the State of Virginia. He is authorized by Virginia law to sue on the State's behalf. His offices are located at 202 N. 9th Street, Richmond, VA 23219. The State of Virginia has an interest in managing flood risks and preventing flood damage. Under federal law, FEMA must consult with "State and local agencies having responsibilities for flood control, flood forecasting, [and] flood damage prevention." 42 U.S.C. § 4024. The State of Virginia has a quasi-sovereign interest in the health, safety, and wellbeing of its residents who face flood risks. *See Missouri*, 180 U.S. at 241; *Pennsylvania*, 262 U.S. at 592; *Kentucky*, 23 F.4th at 599. The State of Virginia has an interest in maintaining property value, which directly impacts tax revenue. The State of Virginia has an interest in maintaining a strong tax base in order to fund future mitigation efforts.

## II. PLAINTIFF PARISHES

42. **Plaintiff Acadia Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

43. **Plaintiff Ascension Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

44. **Plaintiff Assumption Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

45. **Plaintiff Avoyelles Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

46. **Plaintiff Bossier Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

47.    **Plaintiff Caldwell Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

48.    **Plaintiff Cameron Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

49.    **Plaintiff Catahoula Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

50.    **Plaintiff Claiborne Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

51.    **Plaintiff Concordia Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

52.    **Plaintiff East Baton Rouge Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

53.    **Plaintiff East Feliciana Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

54.    **Plaintiff Evangeline** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

55.    **Plaintiff Franklin Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

56.    **Plaintiff Grant Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

57.    **Plaintiff Iberville Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

58.    **Plaintiff Jackson Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

59.    **Plaintiff Jefferson Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

60.    **Plaintiff Jefferson Davis Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

61.    **Plaintiff Lafayette Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

62.    **Plaintiff Lafourche Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

63.    **Plaintiff Livingston Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

64.    **Plaintiff Madison Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

65.    **Plaintiff Orleans Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

66.    **Plaintiff Plaquemines Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

67.    **Plaintiff St. Bernard Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

68.    **Plaintiff St. Charles Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

69.   **Plaintiff St. Helena Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

70.   **Plaintiff St. James Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

71.   **Plaintiff St. John the Baptist Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

72.   **Plaintiff St. Landry** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

73.   **Plaintiff St. Mary Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

74.   **Plaintiff St. Tammany Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

75.   **Plaintiff Tangipahoa Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

76.   **Plaintiff Tensas Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

77.   **Plaintiff Terrebonne Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

78.   **Plaintiff Vermilion Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

79.   **Plaintiff Vernon Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

80.     **Plaintiff Washington Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

81.     **Plaintiff Webster Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

82.     **Plaintiff West Baton Rouge Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

83.     **Plaintiff West Feliciana Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

84.     **Plaintiff Winn Parish** is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

85.     Each of these Plaintiff parishes is an NFIP community. Each community has agreed to adopt and implement local floodplain management regulations as required by FEMA for NFIP participation.

86.     Some of these Plaintiff parishes participate in the Community Rating System (CRS). Communities that go above and beyond FEMA's minimum requirements are eligible for further discounts under the CRS. Community Rating System Participating Communities, FEMA (Mar. 17, 2022), https://perma.cc/3TEQ-64M5. Through this program, FEMA encourages communities to take initiative and reduce overall risk.

### III.   PLAINTIFF MUNICIPALITIES

87.     **Plaintiff Town of Grand Isle** is a municipality in the State of Louisiana located on the Gulf of Mexico.

88.     **Plaintiff Town of Jean Lafitte** is a municipality in the State of Louisiana located south of New Orleans near the Gulf of Mexico.

## IV.   PLAINTIFF LEVEE DISTRICTS

89.     **Plaintiff Bossier Levee District** is located at 3404 Industrial Drive, Bossier City, Louisiana 71112. It is a political subdivision of the State of Louisiana tasked with constructing and maintaining levees and associated structures, including drainage devices. La. Rev. Stat. § 38:291(B).

90.     **Plaintiff Fifth Louisiana Levee District** is located at 102 Burnside Drive, Tallulah, Louisiana 71282. It is a political subdivision of the State of Louisiana tasked with constructing and maintaining levees and associated structures, including drainage devices. La. Rev. Stat. § 38:291(E).

91.     **Plaintiff Grand Isle Independent Levee District's** mailing address is P.O. Box 757, Grand Isle, Louisiana 70358. It is a political subdivision of the State of Louisiana tasked with constructing and maintaining levees and associated structures, including drainage devices. La. Rev. Stat. § 38:291(S).

92.     **Plaintiff Lafourche Basin Levee District** is located at 21380 LA-20, Vacherie, Louisiana 70090. It is a political subdivision of the State of Louisiana tasked with constructing and maintaining levees and associated structures, including drainage devices. La. Rev. Stat. § 38:291(F).

93.     **Plaintiff North Lafourche Conservation, Levee, and Drainage District (NLCLDD)** is located at 3862 Highway 1, Raceland, Louisiana 70394. It is a political subdivision of the State of Louisiana tasked with constructing and maintaining levees and associated structures, including drainage devices. Ex. 36, N.

Lafourche Conservation Levee and Drainage Dist. Dec. ¶ 3; *see also* La. Rev. Stat. §
38:291(T). This district is responsible for all of Lafourche Parish north of the Intra-
coastal Canal. Ex. 36, N. Lafourche Conservation Levee and Drainage Dist. Dec. ¶ 4.
The NLCLDD has the constitutional authority to impose an ad valorem property tax.
*Id.* ¶ 6. In addition, the residents of NLCLDD have voted to tax themselves above and
beyond the constitutional threshold. *Id.* ¶ 7. This district receives an average of $8.3
million each year in ad valorem and sales and use tax revenues combined, and it
spends over $20 million each year on flood mitigation projects. *Id.* ¶ 9.

94.    **Plaintiff Pontchartrain Levee District** is located at 2069 Railroad
Avenue, Lutcher, Louisiana 70071. It is a political subdivision of the State of Louisi-
ana tasked with constructing and maintaining levees and associated structures,
including drainage devices. La. Rev. Stat. 38 § 291(L). This district is responsible for
115 miles of East Bank Mississippi River Levee and an additional 10 miles of Hurri-
cane Protection Levee in St. Charles Parish. *About*, The Pontchartrain Levee District
(last accessed May 31, 2023), https://perma.cc/UQJ6-TZZ7. It protects half a million
residents and incorporates the evacuation routes for nearly 1.5 million people. *Id.* The
Pontchartrain Levee District is entirely funded through an ad-valorem tax, interest,
and royalties. *Id.* Plaintiff Pontchartrain Levee District has attempted to raise with
FEMA its concerns about Equity in Action, and to ask about the underlying method-
ology, but has been stonewalled at every turn by FEMA. *Id.*

95.    **Plaintiff Southeast Louisiana Flood Protection Authority—East** is located at 6920 Franklin Ave, New Orleans, Louisiana 70122. It is a political subdivision of the State of Louisiana and oversees levee districts within its jurisdiction. La. Rev. Stat. § 38:330.1

96.    **Plaintiff Southeast Louisiana Flood Protection Authority—West** is located at 7001 River Road, Marrero, Louisiana 70072. It is a political subdivision of the State of Louisiana and oversees levee districts within its jurisdiction. La. Rev. Stat. § 38:330.1

97.    **Plaintiff South Lafourche Levee District** is located at 17771 Highway 3235, Galliano, Louisiana 70354. It is a political subdivision of the State of Louisiana tasked with constructing and maintaining levees and drainage. La. Rev. Stat. 38 § 291(P).

98.    **Plaintiff St. Mary Levee District** is located at 7327 Highway 182 East, Morgan City, Louisiana 70380. It is a political subdivision of the State of Louisiana tasked with constructing and maintaining levees and associated structures, including drainage devices. La. Rev. Stat. § 38:291(Z).

99.    **Plaintiff Terrebonne Levee & Conservation District** is located at 220 Clendenning Rd., Houma, Louisiana 70363. It is a political subdivision of the State of Louisiana tasked with constructing and maintaining levees and associated structures, including drainage devices. La. Rev. Stat. § 38:291(U).

## V.   PLAINTIFF DRAINAGE DISTRICTS

100.   **Plaintiff East Ascension Consolidated Gravity Drainage District No. 1** is a drainage district in Ascension Parish. It is headquartered in Gonzales, Louisiana.

## VI.   PLAINTIFF ASSOCIATIONS

101.   **Plaintiff Association of Levee Boards of Louisiana (ALBL)** is a non-profit corporation that represents levee districts and other state and local governmental entities in Louisiana. ALBL aims to promote the welfare of the taxpayers, improve the administration of levee boards, support studies of flood control, and secure legislation for levee boards. ALBL is funded solely from dues and other membership contributions. ALBL has historically participated in the NFIP Flood Insurance Studies and has helped FEMA develop Flood Insurance Rate Maps (FIRMs). ALBL has successfully advocated for several important changes to the program, including its Levee Analysis Mapping Procedure. Ex. 41, Ass'n of Levee Bds. La. Dec. ¶¶ 11, 15. In this lawsuit, ALBL represents the interests of its members. *Id.* ¶ 4.

## VII.   DEFENDANTS

102.   Defendants are officials of the United States government and United States governmental agencies responsible for promulgating or implementing Risk Rating 2.0—Equity in Action.

103.   **Defendant Alejandro Mayorkas** is the Secretary of the Department of Homeland Security. He oversees, among other things, the Federal Emergency Management Agency. He is sued in his official capacity.

104.   **Defendant Department of Homeland Security (DHS)** is an executive department of the United States Government headquartered in Washington, D.C., and responsible for the Risk Rating 2.0—Equity in Action.

105.   **Defendant Deanne Criswell** is the Administrator of the Federal Emergency Management Agency. She is sued in her official capacity.

106.   **Defendant Federal Emergency Management Agency** is an agency within DHS that is headquartered in Washington, D.C., and administers Risk Rating 2.0—Equity in Action.

107.   **Defendant Federal Insurance and Mitigation Administration** is a subcomponent within the Federal Emergency Management Agency that is headquartered in Washington, D.C., and administers Risk Rating 2.0—Equity in Action.

## JURISDICTION AND VENUE

108.   This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 701-06. An actual controversy exists between the parties within the meaning of 28 U.S.C. §§ 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief under 28 U.S.C. §§ 2201-02, 5 U.S.C. §§ 701-06, and its inherent equitable powers.

109.   Venue is proper in this Court under 28 U.S.C. § 1391 because Defendants are United States agencies or officers sued in their official capacities, the State of Louisiana is a resident of this judicial district, and a substantial part of the events or omissions giving rise to the Complaint occur within this judicial district. *See Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1982).

## BACKGROUND

### I.  HISTORY OF THE NATIONAL FLOOD INSURANCE PROGRAM.

110.   Congress created the National Flood Insurance Program in 1968 in the aftermath of Hurricane Betsy, which resulted in significant loss of life and property. Betsy was the first Atlantic storm to cause over $1 billion in damages and made land-fall in Louisiana as a powerful Category 4 hurricane that propelled storm surge into Lake Pontchartrain, breached levees in New Orleans, inundated neighborhoods, in-cluding the lower Ninth Ward. *Hurricane Betsy*, La. State Univ. (last accessed May 31, 2023), https://perma.cc/HH6B-FM8E.

111.   This tragedy revealed the devastating consequences for many Ameri-cans resulting from "the general unavailability of flood insurance from private insurers." Horn, *Private Flood Insurance and the National Flood Insurance Program*, Cong. Research Serv., R45242 (Jan. 9, 2023). "Private flood insurance was offered between 1895 and 1927, but losses incurred from the 1927 Mississippi River floods and additional flood losses in 1928 led most insurers to stop offering flood policies." *Id.* (citing National Research Council of the National Academies, Affordability of Na-tional Flood Insurance Program Premiums: Report 1, 23 (2015), https://perma.cc/SN9D-CW3R. The "withdrawal by private insurers from providing flood insurance coverage [left] flood victims largely reliant on federal disaster assis-tance to recover after a flood." *Id.*

112.   As a result, many Americans lost access to flood insurance. The loss of flood insurance, of course, did not stop catastrophic storms, and soon property owners in these areas relied almost entirely on post-flood financial aid, or disaster relief, after

the floods came.  National Research Council of the National Academies, Affordability of National Flood Insurance Program Premiums: Report 1, 23 (2015), https://perma.cc/SN9D-CW3R.

113.    Congress recognized that this was not sustainable, but it was unable to reach a solution until it promulgated the National Flood Insurance Act of 1968. National Research Council of the National Academies, Affordability of National Flood Insurance Program Premiums: Report 1, 26 (2015), https://perma.cc/SN9D-CW3R. Congress ultimately decided it would guarantee widely available flood insurance through the federal government. Congress provided that "as a matter of national policy, a reasonable method of sharing the risk of flood losses is through a program of flood insurance which can complement and encourage preventive and protective measures," and that the program should "be expanded as knowledge is gained and experience is appraised, thus eventually making flood insurance coverage available on reasonable terms and conditions to persons who have need for such protection." 42 U.S.C. § 4001(a). In other words, if you were an American who needed flood insurance, Congress promised to make sure you had it through the NFIP.

114.    Congress "authorized" the federal government to "enable interested persons to purchase [flood] insurance" through "a national flood insurance program" and required the federal government to offer rates that, "insofar as practicable," are adequate and "consistent with the objective of making flood insurance *available where necessary at reasonable rates so as to encourage prospective insureds to purchase such insurance.*" *Id.* §§ 4011(a), 4015(b)(2) (emphasis added).

115.   To participate in the NFIP, FEMA required that communities adopt or meet minimum standards. 44 C.F.R. § 59.22.

116.   Communities that voluntarily go above and beyond these minimum standards are eligible under the CRS for discounted policy premiums. 42 U.S.C. § 4022.

117.   Communities that fall out of compliance with the minimum standards are subject to suspension from the federal flood insurance program. 44 C.F.R. § 59.24.

## II.   LEGACY RATING SYSTEM

118.   Before Equity in Action, FEMA's "Legacy Rating System"[1] had several key features relevant to this litigation, including the way it evaluated mitigation, the way it mapped flood zones, its grandfathering policy, and its mandatory insurance requirements.

119.   The Legacy Rating System was based on a model that looked at historical events and experiences to inform future risk. This meant that everyone—FEMA, State and local officials, insurance agents, and policyholders—had access to the same information. For example, areas that historically had experienced a high frequency of flood events would be deemed higher risk areas, and the premiums would be higher in anticipation of future flooding. Likewise, areas with low flood risk (based on historical data) could anticipate lower premiums.

120.   Using a historical model made the premiums consistent and predictable because everyone had access to the same information.

---

[1] For ease of reference, we refer to the prior methodology as the "Legacy Rating System." Elsewhere, it may be referred to as the "old" or "prior" Risk Rating System or as "Risk Rating 1.0."

### A. Mitigation Under the Legacy Rating System

121.   The Legacy Rating System rewarded mitigation efforts by offering discounts to communities and policyholders that undertook mitigation efforts. *See* Ex. 55, Scott Dec. ¶¶ 4-5. Such mitigation efforts included building levees, elevating homes, improving drainage systems, and dry floodproofing. Dry floodproofing includes measures that make a structure watertight below the level that needs flood protection to prevent floodwaters from entering." *Dry Floodproofing*, FEMA (last accessed May 31, 2023), https://perma.cc/HXR9-CCWH.

122.   Mitigation reduces the likelihood of floods and damage from floods. Under the Legacy Rating System, FEMA encouraged property owners to undertake mitigation projects by providing lower policy rates that reflected the corresponding reduction in flood risk. Ex. 55, Scott Dec. ¶ 5.

123.   As a result of mitigation efforts, for example, the Terrebonne and Lafourche Parishes in Louisiana saw only 11 homes flood during Hurricane Barry in 2019, compared with 11,000 homes that flooded during Hurricane Rita in 2005. Ex. 36, N. Lafourche Conservation Levee and Drainage Dist. Dec. ¶ 11.

124.   Similarly, in Mandeville, Louisiana, the community retrofitted over 80% of the high-risk flood buildings. Before retrofitting, Mandeville saw 750 flood claims after Hurricane Katrina (2005), but saw only 100 claims after Hurricane Ida (2021). Ex. 55, Scott Dec. ¶ 6. And since Katrina, the flood mitigation industry has elevated 36,000 homes across Louisiana. *Id*. ¶ 14.

125.   To encourage mitigation, FEMA established the CRS, which is a voluntary "incentive" program that offers discounts for community floodplain management

practices exceeding the NFIP's minimum requirements. 42 U.S.C. § 4022(b). Many communities in the Plaintiff States and beyond have taken advantage of these discounts, going above and beyond to mitigate in order to qualify for lower insurance rates. Dec. 46, Home Builders Ass'n Dec. ¶ 12; DEC. 48, La. Floodplain Mgmt. Ass'n Dec. ¶¶ 4-7. The State of Florida, for example, has 243 CRS participating communities, the highest participation of any state. Ex. 2, Fl. Dec. ¶ 13.

126.   When consumers receive mitigation discounts, they are more likely to undertake additional mitigation efforts. Ex. 55, Scott Dec. ¶ 13.

127.   Under the Legacy Rating System, FEMA also considered the effectiveness of levees. If a levee system met FEMA's requirements, the system became accredited and was deemed to reduce the risk of flooding. If FEMA determined the levee system didn't meet its requirements, the system was not accredited.

128.   A levee system becomes accredited if it meets FEMA's standard by providing protection from the base flood, which is a flood with a 1% chance of being equaled or exceeded in any given year. *See* 44 C.F.R. § 65.10; *see also* Base Flood, FEMA (July 7, 2020), https://perma.cc/RZX3-KCCH.

129.   For a while, FEMA only recognized and considered accredited levee systems as having any effect on flooding. Ex. 56, D. Bourgeois Dec. ¶ 9. This caused flawed outputs in the mapping process because it ignored the fact that even noncertified levee systems mitigated some flooding. *Id.*

130.    At the urging of experts in the industry, FEMA developed its Levee Analysis and Mapping Procedure (LAMP), which provided the agency with more refined information about the effect of the unaccredited levee system. Guidance for Flood Risk Analysis and Mapping, FEMA (Nov. 2019), https://perma.cc/DSG5-C7UU.

131.    In 2013, at an Illinois Association for Floodplain and Stormwater Management conference, FEMA explained that the LAMP was necessary to recognize "hazard reduction that some non-accredited levees may still afford." Update on FEMA's Levee Analysis and Mapping Procedure, 2013 IAFSM Conference, FEMA, https://perma.cc/39MR-9TJ4. The agency further explained that in adopting the new approach, the agency had an obligation to be "collaborative" and "understandable and explainable," and its methodology must be "repeatable." *Id.*

132.    FEMA selected 5 Louisiana parishes (of only 25 communities nationally) to participate in this pilot program. Ex. 56, D. Bourgeois Dec. ¶ 9.

133.    The NFIP also developed floodplain maps and standards for communities without floodplain maps. Those maps and standards require communities to adopt and enforce certain management standards. If communities don't adopt and enforce these standards, then their homeowners will not be eligible for insurance. Key conditions of the NFIP minimum standards include requiring permits for developments in certain areas; requiring elevation of the lowest floor of all new residential buildings in certain areas; restricting development in the regulatory floodway to prevent increasing the risk of flooding; and requiring certain construction materials and methods that minimize future flood damage. *See id.* § 4022(a)(1); 44 C.F.R. Part 60;

FEMA, *NFIP Floodplain Management*, at https://perma.cc/G7JP-2665; *see also, e.g.*, Ex. 27, St. Mary Dec. ¶¶ 17-19.

134.  Floodplain managers help communities remain compliant with the applicable standards. Ex. 48, La. Floodplain Mgmt. Ass'n Dec. ¶¶ 5-7. Having access to information about flood insurance risk and applicable floodplain standards, therefore, is "[t]he most critical aspect" of floodplain management. *Id.* ¶ 19.

135.  The Legacy Rating System used the 1% Annual Exceedance Probability (AEP) flood as the basis for setting insurance rates. The 1% AEP flood is a flood that has a 1 in 100 chance of being equaled or exceeded in any given year and an average recurrence interval of 100 years—often referred to as the 100-year flood. *Flood Zones*, FEMA (July 8, 2020), https://perma.cc/KJC9-GBAL.

136.  Based on the AEP for each flood zone, FEMA established the Base Flood Elevation (BFE), which is the elevation at which that 100-year flood will occur. *Flood Zones*, FEMA (July 8, 2020), https://perma.cc/KJC9-GBAL.

137.  In addition, FEMA looks at elevations where there is a 0.2% annual chance of a flood. This is also known as the 500-year flood. *Flood Zones*, FEMA (July 8, 2020), https://perma.cc/KJC9-GBAL.

138.  Areas that are above the BFE but below the 500-year flood mark are considered moderate flood hazard areas. *Flood Zones*, FEMA (July 8, 2020), https://perma.cc/KJC9-GBAL. This means a structure built in this area has somewhere between a 0.2% and 1% chance of flooding each year.

139.    Areas that are elevated above the 500-year flood mark are considered minimal flood hazard areas. *Flood Zones*, FEMA (July 8, 2020), https://perma.cc/KJC9-GBAL. This means that any structure has less than a 0.2% chance of flooding each year.

140.    Under the Legacy Rating System, structures built above the BFE received credit for reducing the risk of flooding and were eligible for flood insurance discounts. This makes sense—if a structure has a 1% chance of flooding each year at a certain elevation, then building above that elevation will lower the risk that the structure will flood.

141.    Finally, an important part of mitigation is the federal grant programs. These grant programs include the Flood Mitigation Assistance (FMA) Program, the Hazard Mitigation Grant Program (HMGP), and the Public Assistance (PA) Program. Ex. 1, GOHSEP Dec. ¶ 30. The FMA Program focuses on projects that reduce or eliminate flood insurance claims. *Id.* ¶ 31. The PA Program provides funds to assist communities respond to and recover from major disasters or emergencies. And the HMGP provides grants for infrastructure projects, including elevating homes and other structures. *Id.* ¶ 33.

142.    Each of these federal grant programs requires the recipient to "maintain flood insurance for the life of the structure, regardless of transfer of ownership." Ex. 1, GOHSEP Dec. ¶ 33.

143.    FEMA relies on the State and its local governments to administer these projects. Ex. 1, GOHSEP Dec. ¶ 38. The States, rather than FEMA, are responsible

for ensuring compliance with the mandatory flood insurance requirement. Ex. 1, GOHSEP Dec. ¶¶ 38-39.

144.   Before FEMA closes out a project, the State must verify that the completed projects meet FEMA's requirements, including that the property owner maintains flood insurance. *See After You Apply: Things to Know and Do After Applying for Hazard Mitigation Grant Program Funding*, FEMA (Dec. 27, 2022), https://perma.cc/Q6AA-45C4. If a grant recipient fails to obtain flood insurance as required, the State must pay back to FEMA the amount of funding that the non-compliant homeowner received and used for their mitigation project. Ex. 1, GOHSEP Dec. ¶¶ 41-43. State's only recourse, then, is to attempt to recover these funds from the non-compliant homeowner.

145.   Because of these grant programs, communities have been able to undertake large mitigation projects that might otherwise not be possible. *See, e.g.*, Ex. 1, GOHSEP Dec. ¶ 8.

### B.  MAPPING UNDER THE LEGACY RATING SYSTEM

146.   Second, the Legacy Rating System produced risk maps in coordination with State and local governmental entities.

147.   Because FEMA manages the NFIP, it is responsible for identifying flood hazards and communicating those hazards and associated risks to stakeholders. To help communicate those risks, FEMA historically has undertaken Flood Insurance Studies (FIS), which analyze flood hazards in certain communities, and produced FIRMs based on a variety of information.

148.   As part of these maps, FEMA determines the AEP flood for each flood zone, as explained above. Thus, the BFE in a given area is based on the AEP for that flood zone.

149.   Areas that have a 1% chance of being equaled or exceeded in any given year are identified as Special Flood Hazard Areas ('SFHA'). Special Flood Hazard Area, FEMA (July 7, 2020), https://perma.cc/GAN7-FZKW; *see also* Ex. 45, Gulf Coast Bank & Tr. Dec. ¶ 4.

150.   These FIRMs have helped determine flood insurance rates and dictate whether flood insurance needs to be mandatory in certain areas. They communicate flood risk information to the community and help manage expectations about flood insurance rates. Ex. 41, Ass'n of Levee Bds. La. Dec. ¶ 30.

151.   In conducting each FIS, FEMA must consider all available information. This is one of the reasons FEMA must consult with State and local officials. 42 U.S.C. § 4024.

152.   Because FIRMs determine whether an individual property owner is required to purchase flood insurance and what those flood insurance rates will be, FEMA historically has collaborated with State and local entities, including levee districts, to develop FIRMs.

153.   FEMA then proposes a FIRM and property owners or community officials can comment on the proposal or submit an appeal. Appeals and Comments, FEMA (Apr. 2020), https://perma.cc/J9MZ-CJTX. FEMA next reviews the comments and any appeals and issues a Letter of Final Determination. *Id.* After that, property

owners and community officials can appeal the final determination to federal court. *Id.*; *see also* Ex. 56, D. Bourgeois Dec. ¶ 9.

154.   As part of FEMA's risk analysis in producing FIRMs, the agency considered the effectiveness of flood risk reduction systems like levees, discussed above.

155.   Because this process was collaborative, and the mapping process was public, stakeholders "clearly knew and understood what actions they could take" to reduce their flood risk and earn lower premiums for their communities. Ex. 41, Ass'n of Levee Bds. La. Dec. ¶ 32.

## C. GRANDFATHERING UNDER THE LEGACY RATING SYSTEM

156.   Third, the Legacy Rating System offered grandfathering, which was available to policyholders when a map change resulted in either a different rating zone or base flood elevation change. Grandfathering allowed policyholders to keep a reasonable rate and sell their house with the policy to be continued by the new owner under the same rating.

157.   This policy offered specific reductions for properties built before 1974, 42 U.S.C. § 4015(c), certain newly mapped properties, 42 U.S.C. § 4015(i), and certain grandfathered plans, *Grandfathering*, March 2020, https://perma.cc/4AGT-2VKK.

158.   Grandfathering protected policyholders from unexpected rate increases due to risk adjustments reflected in zone changes under new Flood Insurance Rate Maps.

159.   Grandfathering also took into account a policyholder's compliance with the program and recognized the reliance interests of policyholders.

### D. MANDATORY FLOOD INSURANCE UNDER THE LEGACY RATING SYSTEM

160. Property owners, both residential and commercial, are required to purchase flood insurance if their property is located in a Special Flood Hazard Area—which is equivalent to having an estimated 1% or greater risk of flooding every year—and is in a community that participates in the NFIP. Special Flood Hazard Area, FEMA (July 7, 2020), https://perma.cc/GAN7-FZKW; *see also* Ex. 45, Gulf Coast Bank & Tr. Dec. ¶ 4.

161. In 2015, an estimated 15 million people lived in Special Flood Hazard Areas. *See* Dec. 46, Home Builders Ass'n Dec. ¶ 8. Combining SFHAs with other areas exposed to flood risk, an estimated 30 to 40 million people—almost 10% of the United States' population—live in areas with an elevated risk of flooding. Others estimate 40.8 million people, or 12% of the population, are exposed to elevated flood risk. Oliver E.J. Win et al., *Estimates of present and future flood risk in the conterminous United States*, 2018 Env't Res. Lett. 13 (Feb. 28, 2018).

162. While flood insurance is mandatory in these areas, many at-risk households still fail to meet this requirement. *See* An Affordability Framework for the National Flood Insurance Program, FEMA (Apr. 17, 2018), https://perma.cc/H3AK-MVQ8.

163. The failure to maintain mandatory flood insurance has wide-ranging effects on property owners' ability to participate in seemingly unrelated programs.

164. First, property owners who do not obtain flood insurance may not be eligible for certain types of disaster assistance after a flood. 42 U.S.C § 4012a(b); Flood Insurance and FEMA Assistance, FEMA (Sept. 30, 2022),

https://perma.cc/3S5A-CJFG; DEC. 48, La. Floodplain Mgmt. Ass'n Dec. ¶ 11. Yet insurance is crucial to recovery. *See Reauthorization of the National Flood Insurance Program: Improving Community Resilience*: *Hearing Before the S. Committee on Banking, Housing, and Urban Affairs*, 118th Cong. 2 (May 2, 2023) (statement of Carolyn Kousky) ("With limited other options, insurance plays a critical role in getting households financial resources they need to rebuild their homes and replace damaged possessions.").

165.   Second, property owners who have in the past obtained disaster relief are obligated to continue to hold flood insurance going forward. Flood Insurance and FEMA Assistance, FEMA (Sept. 30, 2022), https://perma.cc/3S5A-CJFG; *see also* DEC. 48, La. Floodplain Mgmt. Ass'n Dec. ¶ 9.

166.   Third, property owners who have in the past obtained SBA loans are obligated to continue to hold flood insurance going forward. *Id.*

167.   Fourth, the NFIP is also interwoven with so many other requirements and programs that it is functionally mandatory for many homeowners.

168.   For example, federal agencies, federally regulated lending institutions, and government-sponsored enterprises must require certain property owners to purchase flood insurance as a condition of any mortgage that these entities make, guarantee, or purchase. This includes mortgages from banks insured by the Federal Deposit Insurance Corporation and mortgages backed by Fannie Mae or Freddie Mac, as well as federal entities such as the Federal Housing Administration and the Department of Veterans Affairs. *E.g.*, 42 U.S.C. § 4012a. The mandatory purchase

requirement is enforced by the lender, rather than FEMA, and banking regulators can fine lenders up to $2,000 for each time they fail to require flood insurance or provide notice. Ex. 45, Gulf Coast Bank & Tr. Dec. ¶ 5.

169.   Nationwide, approximately 70% of property buyers finance the purchase of their property with a mortgage. Ex. 49, Miller Home Mortgage Dec. ¶ 7.

170.   As home and building owners become unable to afford flood insurance under Equity in Action, they will default on their mortgages. Ex. 45, Gulf Coast Bank & Tr. Dec. ¶ 12. This harms borrowers and lending institutions alike. *Id.* ¶ 20; *see also* Ex. 49, Miller Home Mortgage Dec. ¶ 25.

171.   The NFIP is currently operating under its 25th short-term reauthorization, until September 30, 2023. P.L. 117-328.

## III.   RISK RATING 2.0—EQUITY IN ACTION

172.   In April 2021, FEMA announced a change to the "pricing methodology" it uses to set rates under the NFIP. *See FEMA Updates Its Flood Insurance Rating Methodology to Deliver More Equitable Pricing*, FEMA (Apr. 1, 2021), https://perma.cc/QF9V-V6MR.

173.   This new methodology went into effect on October 1, 2021, for all new policyholders and existing policyholders eligible for renewal. For existing policies that were not up for renewal by October 1, 2022 (in other words, they had only recently renewed and weren't eligible to renew yet), the requirements went into effect on April 1, 2022.

174.   FEMA called this new methodology "Risk Rating 2.0—Equity in Action."

175.   FEMA explained that it "devoted thousands of hours to develop the new pricing methodology." *Id.*

176.   It hired an outside company—Milliman—to develop the risk model undergirding Equity in Action.

177.   After announcing implementation of this new program, FEMA updated its definition of "equity" to mirror the definition set forth in Executive Order 13985, entitled "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government." *See* FEMA Defines Equity in its Mission of Making Programs More Accessible, FEMA (Sept. 9, 2021). Under this Executive Order, agencies like FEMA must consider factors like race, ethnicity, religion, income, geography, gender identity, sexual orientation, and disability when issuing rules and guidance. Executive Order 13985 (Jan. 20, 2021). The agency confirmed it was "integrating equity" as defined by this Executive Order "into everything we do." *See* FEMA Defines Equity in its Mission of Making Programs More Accessible, FEMA (Sept. 9, 2021), https://perma.cc/RW27-HJRX.

178.   On FEMA's website discussing "Risk Rating 2.0—Equity in Action," FEMA explains *why* it sought to make changes and what it was *not* changing, but FEMA does not provide adequate information about what it *is* changing.

## A.  CATASTROPHIC LOSS MODELING SYSTEM

179.   Compounding this confusion is the fact that Equity in Action employs a catastrophic loss modeling system, which takes into account hypothetical future events in evaluating risk. But the agency fails to explain what hypothetical future

events it is analyzing, and its reliance on such undisclosed, hypothetical, and abstract possibilities results in widely divergent risk assessments as compared to other modeling systems.

180.   For example, under the Legacy Rating System, the public would have had access to the historical flood frequencies in a given area that FEMA used to assess risks and set premium rates. But under Equity in Action, the public has no way of understanding which flood frequency probabilities FEMA used to determine the premium for the policyholder's property.

181.   Under the historical model, the public also knew the flood frequency in a given area based on historical, observed events. But under Equity in Action, the public has no way of knowing whether those calculations are based on observed flood events, probabilities of future flood events, or some combination, nor is there any way to know precisely what those observations or probabilities are.

182.   FEMA has refused to share its statistical analysis underlying the rating factors, including the statistical method and its margin of error. What this means is that FEMA's calculations are impossible to reproduce. In addition, they are nearly impossible to predict. So unlike the Legacy Rating System, under which individuals could anticipate whether premiums would rise based on recent flood events or reductions in risk, Equity in Action makes it nearly impossible to predict premium rates. *See generally, e.g.*, Ex. 53, S. Bourgeois Dec.; Ex. 54, Hebert Dec.; Ex. 57, Theriot Dec.

183.   FEMA has not disclosed what it deems to be the deficiencies of NFIP premium rates under the Legacy Rating System as compared with the new rates under Equity in Action.

**B. M**ITIGATION **U**NDER **E**QUITY IN **A**CTION

184.   Unlike the Legacy Rating System, Equity in Action fails to establish clear standards for evaluating mitigation projects.

185.   For example, Equity in Action reviews where and how the insured structure is built as well as what type of structure it is. But FEMA doesn't explain how it will weigh these factors or how these factors will affect insurance premiums. This injects uncertainty into the process for property owners.

186.   Likewise, FEMA also says it considers a structure's elevation, but it doesn't provide the model for determining how this elevation affects premium rates, nor does it provide the input data. *See* Cost of Flood Insurance for Single-Family Homes Under Risk Rating 2.0, FEMA (Apr. 19, 2023), https://perma.cc/FMS4-8Q8S. Again, this makes it impossible to predict what an insurance premium is going to look like until the policyholder receives the notice from FEMA.

187.   This is particularly discouraging for communities and policyholders that are undertaking their own mitigation efforts and using their own capital.

188.   For example, Plaintiff NLCLDD has invested extraordinary funds in mitigation efforts, and its residents have voted to increase ad valorem taxes and sales and use taxes to help pay for their mitigation efforts. 36, N. Lafourche Conservation Levee and Drainage Dist. Dec. ¶¶ 6-7, 9.

189.   And groups like the Morganza Action Coalition have forged ahead with mitigation efforts under the promise that the federal government would partner with the coalition and other state and local partners. Ex. 50, Morganza Action Coal. Dec. ¶ 9.

190.   The Morganza to the Gulf Hurricane Risk Reduction System (MtG) is a 98-mile levee system. It is estimated to cost $3.2 billion, with $1.4 billion already built or funded. Ex. 50, Morganza Action Coal. Dec. ¶ 3. This system will provide more than 200,000 residents and businesses with flood protection at FEMA's 1% AEP level. *Id.* ¶ 4.

191.   Even though it has not yet been completed, the MtG levee system has already reduced hurricane flooding. As discussed above, the difference between Hurricane Rita in 2005 and Hurricane Barry in 2019 was astounding. Hurricane Rita flooded 11,000 homes, whereas Hurricane Barry flooded only 11 homes. Ex. 50, Morganza Action Coal. Dec. ¶ 9.

192.   Similarly, the Larose to Golden Meadow (LtGM) levee system has reduced hurricane flooding. In 1993, Hurricane Juan flooded 2,000 homes—30% of the homes in that system. Ex. 37, S. Lafourche Levee Dist. Dec. ¶ 13. Hurricane Ida caused a storm surge *twice* as high as Hurricane Juan's surge, yet not a single house flooded. *Id.* ¶ 17. In fact, Hurricane Ida was such a catastrophic storm, it brought along a 300-year flood that followed the worst-case-scenario trajectory. *Id.* ¶ 17.

193.   Yet Equity in Action largely ignores these projects when calculating premiums. FEMA has instead concluded that despite no flooding from a 300-year flood

event, that area could not withstand a 100-year flood event. Ex. 37, S. Lafourche Levee Dist. Dec. ¶ 18. Rather than look at actual observed flood events, Equity in Action instead looks to other unknown and hypothetical future flood events.

194.   Safer homes—as a result of mitigation—reduce the risk of damage, which should reduce premiums. After all, increased mitigation leads to safer homes and fewer claims.

195.   In 2005, three catastrophic storms hit the United States, generating claims for eight times more damage than policyholders claimed the previous year. Ex. 41, Ass'n of Levee Bds. La. Dec. ¶ 17.

196.   But as discussed above, because of substantial mitigation, the flood damage stemming from catastrophic storms was minimal. Again, Terrebonne and Lafourche Parishes saw only 11 homes flood during Hurricane Barry in 2019, compared with Hurricane Rita in 2005, which flooded 11,000 homes. 36, N. Lafourche Conservation Levee and Drainage Dist. Dec. ¶ 11.

197.   Despite these successes, Equity in Action fails to account for mitigation. A home in Mandeville, Louisiana, which is elevated three feet above the BFE level, saw a full risk premium of only $516 under the Legacy Rating System. Ex. 55, Scott Dec. ¶ 16. But now this same home has a full risk premium of $4,615, even though, again, it sits three feet above what FEMA had previously determined is the base flood level. *Id.*

198.  Lower premiums and safer homes retain customers in the NFIP system.

199.  Equity in Action devalues mitigation efforts because it does not explain how FEMA will calculate the way mitigation will reduce a policyholder's premium.

200.  For example, on March 25, 2021, FEMA revealed that the Army Corps of Engineers issued a draft report about its assumptions regarding the impact of levees, but FEMA ultimately excluded this report from Equity in Action. The ALBL reached out to the Corps to get more information about this report but was told the report never existed and that FEMA's mention of the report was a typo. Ex. 41, Ass'n of Levee Bds. La. Dec. ¶ 23.

201.  Although FEMA later revealed some of the tools it was using to assess risk, those tools are inadequate to evaluate 80% of the levees contained in the Army Corps of Engineers National Levee Database. Ex. 41, Ass'n of Levee Bds. La. Dec. ¶ 24. This shows that, at a minimum, the methodology is flawed.

202.  Plaintiff NLCLDD undertook expensive and successful mitigation efforts by building a levee. Ex. 36, N. Lafourche Conservation Levee and Drainage Dist. Dec. ¶¶ 9-10. FEMA now has stated that it does not have adequate information to assess the NLCLDD's levees under Equity in Action. *Id.* ¶ 12. Instead, FEMA has asked the NLCLDD to turn over additional information that it will input into its secret methodology to determine the changed insurance premiums within the district. *Id.* ¶ 13.

203.  FEMA's lack of transparency devalues and discourages mitigation because there is no clear way to understand its actual value or clearly predict a return

on investment. Because of this, many have already chosen not to elevate their homes or undertake other mitigation measures. Ex. 55, Scott Dec. ¶ 17.

204. While Equity in Action considers elevated floors (or First Floor Height, "FFH") as a favorable factor used to evaluate risk, Equity in Action no longer uses the BFE standard. Rather, it credits only elevation above grade. FEMA fails to explain this change.

205. This means that a property with an FFH of 5 feet that floods frequently will receive the same rate as a property at a much higher elevation but that also has an FFH of 5 feet. Ex. 51, S. Shore Recovery Coal. Dec. ¶ 25.

206. Equity in Action does not apply FFH uniformly. Instead, it discriminates by Flood Zone. This means that property owners could elevate their lowest floor but later lose credit for the FFH because of a map or zone change. Ex. 51, S. Shore Recovery Coal. Dec. ¶ 25.

207. Equity in Action does not accurately reflect the value of mitigation measures taken at either the property level or the community level, including the investments in stormwater management and flood protection.

208. For example, Dwayne Bourgeois has lived in his home for twenty-eight years and has never even been threatened by flooding. Ex. 56, D. Bourgeois Dec. ¶ 21. This is due to the location of his home, which sits on some of the highest ground in Lafourche Parish, and is elevated on well-drained, highly-sloped, and highly-permeable soils. *Id.* ¶ 19. Even FEMA agrees that his home has little chance of flooding.

Previously, his home was in Zone C, and in the preliminary new maps, his home will be in Zone X (unshaded). *Id.* ¶ 22. Both Zone C and Zone X (unshaded) are considered "minimal flood hazard" as they have less than 0.2% chance of flooding each year. *Flood Zones*, FEMA (July 8, 2020), https://perma.cc/KJC9-GBAL. In spite of this, his last renewal notice saw a significant increase from his prior total premium. Only after he chose to renew did he receive the full breakdown of his policy from FEMA that showed his full risk premiums was going to be $1,968 per year, a dramatic increase from his current premium of $493 per year. Ex. 56, D. Bourgeois Dec. ¶¶ 26, 30.

209.   One organization that is helping Long Island, New York residents as they continue to recover from Superstorm Sandy (2012) has reviewed approximately 40 FEMA declarations for individual policyowners starting in 2022 to compare the rates under Equity in Action. Ex. 51, S. Shore Recovery Coal. Dec. ¶ 40. The organization concludes that Equity in Action "offers almost no discount for elevation or other mitigation measures." *Id.* ¶ 12. Even people who are raising their deductibles to help offset the cost increase are still seeing dramatically more expensive premiums. *Id.* ¶ 15.

210.   In addition, Equity in Action does away with the CRS discounts, even though many communities, developers, and individuals relied on the discount and entered into the program because of the discounts. *See, e.g.*, Dec. 46, Home Builders Ass'n Dec. ¶ 12; *see also* Ex. 54, Hebert Dec. ¶ 12.

211.   Although the mechanics of the grant program remain the same under Equity in Action, the new methodology is wreaking havoc on the grant program.

212.   In Louisiana, the number of grant applications has decreased, meaning homeowners are not elevating their homes. Ex. 1, GOHSEP Dec. ¶ 35. This leaves communities vulnerable and leads to more costly recovery down the road. *Id.*

213.   In addition, the higher premiums are pushing people to drop their mandatory insurance. Ex. 1, GOHSEP Dec. ¶ 44. This means the State is on the hook for grant funds and must repay FEMA. Ex. 1, GOHSEP Dec. ¶ 43. Its only option to recover these funds is to expend resources in an effort to seek reimbursement from the homeowner. *Id.*

### C. MAPPING UNDER EQUITY IN ACTION

214.   Under Equity in Action, FEMA no longer uses the FIRMs, or the information provided through the LAMP process, for setting flood insurance rates. Ex. 41, Ass'n of Levee Bds. La. Dec. ¶ 31.

215.   By not using FIRMs, the methodology behind flood insurance is no longer transparent or collaborative. Instead, policyholders are seeing skyrocketing rates with little justification. Ex. 41, Ass'n of Levee Bds. La. Dec. ¶ 32.

216.   In fact, some of the priciest regional premiums under the new methodology are in areas that under previous FEMA maps were not even in a high risk flood zone. Ex. 41, Ass'n of Levee Bds. La. Dec. ¶ 35.

217.   By not relying on FIRMs, FEMA has made the process even more secretive and mysterious.

218.   At the same time FEMA appears to be moving away from FIRMs for setting insurance rates, the agency is still relying on FIRMs to enforce community floodplain management regulations. Ex. 22, Plaquemines Dec. ¶ 35.

219.   For example, in Plaquemines Parish, FEMA is in month 16 of a Community Assistance Visit where an agency staff member provides technical assistance to the community and verifies that the community is enforcing its floodplain management regulations. Ex. 22, Plaquemines Dec. ¶ 35. These recommendations are based on the FIRMs, which provide the best insight into the flood risk for that area. *Id.*

220.   If Plaquemines Parish no longer complies with the agency's recommendations and instead enforces the existing FIRMs, the agency would remove Plaquemines Parish from the NFIP altogether.

221.   This means that FEMA gets to enforce the FIRMs against a parish to force that parish to comply with the agency's floodplain management standards, but FEMA gets to ignore those same FIRMs when it comes to setting rates. In other words, the FIRMs reveal the true flood risk of a property for purposes of imposing additional regulations, but not for purposes of setting insurance rates.

222.   In the words of one declarant, if the FIRMs are not good enough to set insurance premiums, then "FEMA has been giving us voodoo engineering calculations for decades." *Id.* ¶ 37.

### D. GRANDFATHERING UNDER EQUITY IN ACTION

223.   As the maps start to change based on unidentifiable factors, the uncertainty of new premium rates is compounded by the fact that Equity in Action eliminates FEMA's grandfathering policy.

224.   Under FEMA's former system, any change to a policyholder's flood zone based on new FIRMs would not dramatically alter the premium on that policy because of grandfathering.

225.   Without grandfathering, flood insurance can become unaffordable virtually overnight, and the value of the now-uninsurable property naturally drops as a result. *See* Dec. 46, Home Builders Ass'n Dec. ¶¶ 15-17.

226.   Grandfathering ensured that existing policyholders stayed in the program, which increased funds available to pay claims and dispersed the risk across more policyholders.

227.   But now, all existing policies formerly eligible for grandfathering will transition to their new full risk premium at an escalation of 18% per year.

228.   This means that consumers and businesses who built structures at certain elevations to comply with the laws in place at the time are no longer in compliance. Overnight, many homes in the area became out of compliance and are now below the current elevation requirements.

229.   The elimination of the grandfathering policy also makes it difficult for individuals to sell their home because the high costs of insurance deter potential buyers. *See* Ex. 53, S. Bourgeois Dec. ¶¶ 32-35.

**E. DEMONSTRABLY HIGHER PREMIUMS**

230.   FEMA boasts that "[u]nder the new pricing system, 96% of current policyholders will see either an immediate decrease or $20 or less per month increase in their premiums." *Risk Rating 2.0: Equity in Action*, FEMA, at 1 (Apr. 18, 2022), (Apr. 2021), https://perma.cc/V237-Q8UG. But right after making that claim, FEMA reveals that it will in fact immediately increase costs for a majority of all homeowners. *Id.* (noting that 66% will face $0-$10/month increases and 11% will face increases of more than $10/month).

231.   Breaking this down further, according to NFIP's own estimates, in the first year of Equity in Action, 66% of all policyholders will be charged premiums up to $120 more per year for current coverage levels and 11% of policyholders will be charged annual premium increases ranging from $120 to $240. *Risk Rating 2.0: Equity in Action*, FEMA, at 1 (Apr. 18, 2022), https://perma.cc/V237-Q8UG.

232.   This is even more pronounced for policyholders in Louisiana, where NFIP's own estimates project that 79.5% of policyholders will see an immediate premium increase. Risk Rating 2.0: Projected Premium Changes by State, Arcgis (last accessed May 31, 2023), https://www.arcgis.com/apps/dashboards/ad25fc43b31e46e6a66a4c632d6746f6.

233.   The projected average full-risk premium for a single-family home in Louisiana will increase 122%. Mike Smith, *Flood insurance to rise 122% on average in Louisiana, data shows*, NOLA.com (Aug. 27, 2022), https://perma.cc/2YU7-MZ7Z.

234.   The datasets FEMA released in April 2023 show even more devastating premium increases for those located in certain communities. For example, some communities in St. Charles Parish will experience an average 752% increase in flood insurance, increasing anywhere from $784 to $6,677. *See Cost of Flood Insurance for Single-Family Homes under Risk Rating 2.0*, FEMA (Apr. 19, 2023), https://perma.cc/K4NL-Y7M8, FEMA Exhibit 3. The average community in Plaquemines Parish will see a 545% increase in insurance rates. *Id*., FEMA Exhibit

4. And some specific communities within Plaquemines Parish will experience an average 1,098% increase, increasing anywhere from $635 to $5,915. *Id.*, FEMA Exhibit 3.

235.   Every State will see increases under Equity in Action, although these increases vary widely.

236.   Those premium increases are projected to compound over the coming decade. For example, 90% of Louisiana ratepayers subject to an increase in their flood insurance premiums can expect to see their annual cost increase by 18% per year for the next ten years. In practice, this means that a policy that was zoned to cost $572 per year in 2021 may eventually exceed $8,000 per year thanks to Equity in Action. Letter from Rep. Garrett Graves to Shalanda Young, Director, Office of Management and Budget (Apr. 6 2022).

237.   Ultimately, managing how quickly premiums escalate does little to avoid the financial impact of the premium.

238.   Federal law restricts FEMA from raising rates more than 18% each year, so those with large premium jumps will see an escalation of 18% per year until reaching the full-risk premium. *Renewing Flood Insurance Policies Under Risk Rating 2.0: Equity in Action*, FEMA (Nov. 2022), https://perma.cc/4EM9-VE3F. This means that those who are seeing increases will see increases each year for years to come. In comparison, those seeing a decrease will only experience a decrease once.

239.   To give a few examples of how Equity in Action will hit specific communities: eighty-one percent of Orleans Parish NFIP policyholders will pay higher NFIP

premiums under Equity in Action, with 45,350 policyholders scheduled for first-year rate increases of up to $120. In contrast, FEMA data predicts that only 1,220 Orleans Parish policyholders will see premium reductions of up to $100 per month. *An Evaluation of Risk Rating 2.0 Impacts on National Flood Insurance Program Affordability*, Coalition for Sustainable Flood Insurance 2 (Sept. 2022), https://perma.cc/9UYK-ASJK.

240.   These increased premiums will lead to fewer policies in force and less coverage, creating greater risk exposure. NFIP's participation has already fallen in the past year, with some reports of a possible 20% reduction in participation due to the implementation of Equity in Action—even though the cost increases are just beginning. FEMA itself admitted to the Treasury Department that it expects one million or more NFIP policyholders to drop their NFIP coverage by the end of the decade as the result of Equity in Action. Michael Phillis, *FEMA report: Flood insurance hikes will drive 1M from market*, Associated Press (July 22, 2022), https://perma.cc/JU83-8EX2.

241.   But we don't have to wait to see whether Equity in Action will decrease NFIP participation. NFIP already reported a loss of 346,778 policies in force from December 31, 2021, to June 30, 2022. *An Evaluation of Risk Rating 2.0 Impacts on National Flood Insurance Program Affordability,* Coalition for Sustainable Flood Insurance 2 (Sept. 2022), https://perma.cc/9UYK-ASJK.

242.   This number of policyholders choosing to drop their flood insurance policies has increased steadily as a result of Equity in Action. *See, e.g.*, R.A. Schuetz, *1*

*in 12 Houston-area property owners drop FEMA flood insurance after pricing change*, Houston Chronicle (Oct. 24, 2022), https://perma.cc/H69P-JJSA.

243.    Although the immediate effect of Equity in Action is felt by current property owners, it has an impact on future policyholders. If a homeowner drops their flood insurance policy and the new buyer is required to purchase a new policy, that new homeowner faces the cost of the full-risk premium rather than the 18% year-over-year escalation. Ex. 49, Miller Home Mortg. Dec. ¶ 14. If the seller had an existing policy, though, then the buyer would have just assumed that policy at the current price with an 18% per year escalation rate.

244.    For one property in Metairie, Louisiana, a recent buyer was forced to pay the full risk premium of $3,093 because the seller did not have flood insurance. Ex. 49, Miller Home Mortg. Dec. ¶ 14. Hypothetically, if the current premium rate was $1000, then that new buyer would have ultimately paid $11,132 over the 7-year increase to that full risk premium. *Id.* But because the seller did not have flood insurance, the buyer had to immediately start with the $3,093 rate. If that rate stays steady over the same 7 years, the buyer will pay $21,651 on the exact same policy over the exact same time period. *Id.* That's a difference of $10,519.

245.    While the number of policyholders dropping their flood insurance increases, then, it is causing even higher rates downstream for future policyholders.

246.    FEMA has predicted that it will lose 20% of its policyholders in the first 10 years because of Equity in Action. An Evaluation of Risk Rating 2.0 Impacts on

National Flood Insurance Program Affordability, Coalition for Sustainable Flood Insurance 10 (Sept. 2022), https://perma.cc/9UYK-ASJK.

247.   FEMA is simultaneously transferring more costs to policyholders while at the same time the number of policyholders among whom the costs can be split continues to decline.

248.   These high premiums have a serious impact on these communities.

249.   For example, Steve Bourgeois has already seen his annual premium rise from $572 to $687 in a single year. Ex. 53, S. Bourgeois Dec. ¶ 19. After he chose to renew his flood insurance, he was notified that his new policy will eventually be $6,461. *Id.* ¶ 27. He states that "likely very soon," he will not be able to afford the cost of flood insurance on the home has lived in for fifty-seven years. *Id.* ¶ 30.

250.   Similarly, Russell Hebert has seen his premiums nearly double since Equity in Action was imposed. Hebert Dec. ¶¶ 19-21. His property has not experienced a flood event in fifteen years, and his flood zone has remained the same. *Id.* ¶ 34. But under Equity in Action, he is not receiving a substantial CRS discount, nor is he receiving credit for the other mitigation projects his community has undertaken. *Id.* ¶¶ 29-30. Mr. Hebert is disabled, on a fixed income, and simply trying to remain in his home of 51 years. He doesn't believe he will be able to renew his flood insurance on the home that he and his wife designed and built, the home where he has lived for the last five decades, and the home that now serves as the gathering spot for family

holidays with his children and grandchildren. *Id.* ¶ 34. Because of the increased premiums, he is considering defaulting on his mortgage or declaring bankruptcy. Hebert Dec. ¶¶ 32-33.

251.   FEMA has refused to divulge the calculation methods behind these drastic price increases, instead sharing only general descriptions and technocratic jargon. Even the agents assigned with providing insurance policies under the new program do not know what effect any single data point has on a policy rate. *See* Ex. 52, SouthGroup Ins. Servs. Dec. ¶¶ 20-21.

252.   The Equity in Action methodology would have benefitted significantly from public notice and comment. In developing Equity in Action, Defendants made assumptions about millions of Americans' property, about important scientific questions, about mitigation measures, about the future, about homes, and about how all of these assumptions would all interact. But FEMA did not subject any of those parts of Equity in Action to notice and comment. It instead released only a series of informational documents about the policy, including a report on its methodology and data sources. *See National Flood Insurance Program Risk Rating 2.0 Methodology and Data Sources*, FEMA (Jan. 18, 2022), https://perma.cc/V8SD-KFJ7; *Risk Rating 2.0 State Profiles*, FEMA (Jan. 18, 2022), https://perma.cc/NKD9-2VF5; Flood Insurance Manual, NFIP (Oct. 2022), https://perma.cc/FDB4-SSUR. And when it put the new program into effect, FEMA made millions of Americans' homes less affordable and potentially uninhabitable based on untested assumptions.

253. The federal Office of Management and Budget has a mandatory review process for all federal actions with a significant impact on the economy. Executive Order 12866, *Regulatory Planning and Review* (Apr. 6, 2023) (requiring review for any action having an effect of $200 million or more on the economy or "adversely affect[ing] in a material way the economy"). Equity in Action easily constitutes a federal action with a significant impact on the economy because it upends the entire market for flood insurance. Particularly in coastal communities, the availability of flood insurance makes those communities habitable and, in large part, supports local industries like oil and gas and fishing, which necessarily must be on the coast. In Terrebonne Parish alone, the oil and gas industry employed more than 5,000 individuals with wages of nearly $500 million. Ex. 43, Terrebonne Econ. Dev. Auth. Dec. ¶ 8. But FEMA did not subject Equity in Action to the mandatory OMB review process. Executive Order 12866, *Regulatory Planning and Review*; 58 Fed. Reg 51735 (Sept. 30, 1993).

254. And it did not "consult with ... State, and local agencies having responsibilities for flood control, flood forecasting, or flood damage prevention" in considering and implementing the program. 42 U.S.C. § 4024.

255. The new methodology began governing the pricing of all new insurance policies starting on October 1, 2021, and all others upon their first renewal after April 1, 2022. *Id.* It portends devastating consequences that are already starting to appear.

256. On April 19, 2023, FEMA released datasets that reveal the cost of flood insurance for single-family homes under Equity in Action, comparing full-risk rates

to current premiums. But the datasets included only policies renewed before September 30, 2022. They did not include new policies or renewals written under Equity in Action after September 30, 2022. And this revelation came years after State and local officials requested the information.

## IV.  HARM TO THE PLAINTIFFS AND AMERICANS

257.    Equity in Action harms Plaintiffs in numerous ways.

258.    It fails to protect the policyholder who has been following FEMA's rules within a community for a long period of time—sometimes decades—and ignores reliance interests. Even after mitigating to the maximum standards allowed by local building codes, policyholders are still charged increased premiums.

259.    It reneges on promises made to communities to entice them to adopt new maps in exchange for grandfathered rates. Policyholders in X zones are not receiving preferred risk policies, which is resulting in dramatically higher prices and causing policyholders to cancel their insurance coverage.

260.    It imposes unreasonable and unaffordable costs on policyholders.

261.    It drives individuals out of the insurance pool, including a significant number of low-risk policyholders, which results in a concentrated residual risk pool.

262.    It fails to recognize the statutory obligations as part of the flood insurance program.

263.    It forces people to leave communities that play a role in the national economy and contribute significantly to the nation's GDP. *See* Ex. 53, S. Bourgeois ¶ 40 (explaining that he isn't sure he can afford to live in the area, let alone his home of fifty-seven years, because of the skyrocketing costs of flood insurance). This harms

the industries in the area by making it difficult to attract workers and top talent. Ex. 44, Bayou Indus. Grp. Dec. ¶¶ 9-11 (explaining how "companies are finding it increasingly difficult to find workers"); Ex. 47, Houma-Terrebonne Chamber of Commerce Dec. ¶¶ 7-8 (same); MAC ¶¶ 8 (noting that there is a "tremendous current demand for specialized trades[people] in the fields of shipbuilding and energy production").

A. STATE PLAINTIFFS

**State of Louisiana**

264.    The State of Louisiana will suffer direct proprietary harm because of Equity in Action.

265.    State funds support mitigation efforts before a flooding event and rebuilding efforts after a flooding event.

266.    To promote mitigation, the State created the Louisiana Watershed Initiative that supports regional watershed management. Ex. 1, GOHSEP Dec. ¶ 8. The State expends an average of $120 million in Hazard Mitigation Assistance funding each year. *Id.*

267.    The State has spent significant public funds rebuilding after hurricanes. Hurricane Katrina in 2005 caused over $100 billion of damage in Louisiana. Ex. 1, GOHSEP Dec. ¶ 5. Hurricane Laura in 2020 caused an estimated $17.5 billion of damage in Louisiana. *Id.* And Hurricane Ida in 2021 caused an estimated $55 billion in damage in Louisiana. *Id.*

268.    The State has an interest in maintaining high property values and, correspondingly, increasing tax revenue.

269.   In addition, the State of Louisiana must reimburse FEMA for funds given to and used by grant recipients who fail to maintain their mandatory flood insurance or otherwise comply with the grant conditions. *See supra* ¶¶ 196-97. The State also bears the burden and cost of enforcing the flood insurance requirement that federal grants place on recipients, and that burden will increase now that more recipients are unlikely to be able to afford increasing NFIP rates.

270.   The State has an interest in protecting its own land from flooding by ensuring adequate flood mitigation infrastructure is built and that the land remains usable by the State.

271.   Equity in Action doesn't recognize many mitigation efforts, nor does it clearly explain how rates are calculated based on mitigation efforts. This means that the State's mitigation efforts don't result in lower premiums for policyholders in the State.

272.   Equity in Action's high insurance rates will cause people to leave the State of Louisiana because they can no longer afford to live in the State.

273.   In addition, it will depress property values, particularly in areas where flood insurance is required. Ex. 45, Gulf Coast Bank & Tr. ¶ 16.

274.   The State has an interest in minimizing property damage to encourage businesses and individuals to remain in the State and entice new businesses and individuals to come to the State.

275.    Based on available data, the average household income in Louisiana is $77,025/year. Ex. 49, Miller Home Mortg. Dec. ¶ 21. The average flood insurance premium per policy will go from $813 to $1,904, almost double what it was under the Legacy Rating System. Based on this increase, there will be a 1.42% reduction in home purchase capabilities. *Id.*

276.    Equity in Action's high insurance rates will also discourage individuals from purchasing property in the State. Higher rates signal less desirable property, and people are unwilling to pay the increased prices if the insurance rates suggest there is a greater likelihood the property will be damaged in a storm event. *See, e.g.*, Ex. 49, Miller Home Mortg. Dec. ¶ 21; Ex. 53, S. Bourgeois Dec. ¶ 36.

277.    Fewer residents lead to a reduction in the State's tax base, resulting in lower tax revenue and hampering the State's ability to invest in future mitigation projects.

278.    Equity in Action further creates an increased workload for State officials to coordinate across the State. Equity in Action ignores entirely any assessment of state and local costs.

279.    Equity in Action also directly harms the State of Louisiana's sovereign interests by eliminating the important parallel role the State has traditionally played in the flood insurance program.

280.    The Louisiana State Constitution expressly addresses flood protection, giving the Legislature the authority to establish local flood protection authorities. La. Const. art. VI § 38.1.

281.    Equity in Action interferes with the State's ability to manage mitigation and relief efforts by discouraging mitigation, thereby raising the risk and increasing the probability of severe damage.

282.    Consistent with its responsibilities, Louisiana has established levee districts, which are tasked with constructing and maintaining levees and drainage within their territorial limits. *See generally*, LA Rev. Stat. 38 § 291; *see also generally* Ex. 36, N. Lafourche Conservation Levee and Drainage Dist. Dec.; Ex. 28, St. Tammany Parish Dec.; Ex. 41, Ass'n of Levee Bds. La. Dec. The State oversees the operation of each of these levee districts.

283.    Equity in Action contradicts the goals of the State by discouraging mitigation and discouraging individuals and businesses from participating in the NFIP.

284.    Equity in Action also harms Louisiana's quasi-sovereign interests.

285.    The State has an interest in preserving its sovereign territory and its habitability by ensuring adequate flood mitigation infrastructure is built and maintained to protect the land and property in its borders, and that compulsory, unaffordable flood insurance does not render the land and property uninhabitable.

286.    The State has an interest in the "health, comfort, and welfare" of its citizens. *Kentucky v. Biden*, 23 F.4th 585, 599 (2022). This interest is particularly pronounced when federal actions are threatening to make housing in Louisiana entirely unaffordable.

287.    More generally, the State of Louisiana has an interest in the federal government enforcing its laws that require reasonable rates. Louisiana's laws are

built on the premise that the federal government and the State will cooperate on issues of flood insurance. La. Const. art. VI, § 41.

288.    Equity in Action creates uncertainty for how rates are calculated, undermining the State's ability to combat increased rates through mitigation efforts.

289.    In addition, Equity in Action's lack of transparency inhibits the State's ability to understand that hazards that the agency is considering. *See* 42 U.S.C. § 4014(d). Under the NFIP, FEMA is precluded from raising the rates in certain parishes based on additional hazards resulting from the Atchafalaya Basin Levee System.

290.    Equity in Action cuts the States out of a process that has historically been collaborative, creating a one-size-fits-all methodology that largely ignores ways in which communities have protected against flooding events.

291.    Equity in Action undermines the States' efforts to promote mitigation efforts and reduce the devastating impact of flooding on the communities within its borders.

292.    Finally, Equity in Action disproportionately hurts the citizens of Louisiana. The State has the highest percentage of flood-insured homes, and these residents face some of the highest rates in the county. Ex. 1, GOHSEP Dec. ¶ 11.

**State of Florida**

293.    The State of Florida is prone to flooding because of its geographical location. It has the longest coastline in the contiguous United States, and approximately 76% of the population lives in coastal areas. Ex. 2, Fl. Dec. ¶ 3. There

are 468 NFIP participating communities in Florida. Ex. 2, Fl. Dec. ¶ 12. The State is home to 1,391,288 NFIP policies with a total coverage of $366,678,210,000. *Id.*

294.   The State of Florida has an interest in protecting its own land from flooding by ensuring adequate flood mitigation infrastructure is built and that the land remains usable by the State. "For over forty years, the State has been systematically engaged in the planning, coordinating, and funding of flood mitigation activity throughout Florida." Ex. 2, Fl. Dec. ¶ 6. There are 243 CRS participating communities in Florida, the highest participation of any state. *Id.* ¶ 13.

295.   Equity in Action doesn't recognize many mitigation efforts, nor does it clearly explain how rates are calculated based on mitigation efforts. This means that the State's mitigation efforts don't result in lower premiums for policyholders in the State.

296.   Equity in Action's high insurance rates will cause people to leave the State of Florida because they can no longer afford to live in the State.

297.   In addition, it will depress property values, particularly in areas where flood insurance is required.

298.   The State has an interest in minimizing property damage to encourage businesses and individuals to remain in the State and entice new businesses and individuals to come to the State.

299.   Equity in Action's high insurance rates will also discourage individuals from purchasing property in the State. Higher rates signal less desirable property,

and people are unwilling to pay the increased prices if the insurance rates suggest there is a greater likelihood the property will be damaged in a storm event.

300.    Fewer residents lead to a reduction in the State's tax base, resulting in lower tax revenue and hampering the State's ability to invest in future mitigation projects.

301.    Equity in Action further creates an increased workload for State officials to coordinate across the State. Equity in Action ignores entirely any assessment of state and local costs.

302.    Equity in Action also directly harms the State of Florida's sovereign interests by eliminating the important parallel role the State has traditionally played in the flood insurance program.

303.    Equity in Action interferes with the State's ability to manage mitigation and relief efforts by discouraging mitigation, and thereby raising the risk and increasing the probability of severe damage.

304.    Equity in Action contradicts the goals of the State by discouraging mitigation and discouraging individuals and businesses from participating in the NFIP.

305.    Equity in Action also harms Florida's quasi-sovereign interests.

306.    The State has an interest in preserving its sovereign territory and its habitability by ensuring adequate flood mitigation infrastructure is built and maintained to protect the land and property in its borders and that compulsory, unaffordable flood insurance does not render the land and property uninhabitable.

307.   The State has an interest in the "health, comfort, and welfare" of its citizens. *Kentucky v. Biden*, 23 F.4th 585, 599 (2022). This interest is particularly pronounced when federal actions are threatening to make housing in Florida entirely unaffordable.

308.   Equity in Action creates uncertainty for how rates are calculated, undermining the State's ability to combat increased rates through mitigation efforts.

309.   Equity in Action cuts the States out of a process that has historically been collaborative, creating a one-size-fits-all methodology that largely ignores ways in which communities have protected against flooding events.

310.   Equity in Action undermines the States' efforts to promote mitigation efforts and reduce the devastating impact of flooding on the communities within its borders.

311.   The State of Florida will suffer direct proprietary harm because of Equity in Action.

312.   State funds support mitigation efforts before a flooding event and rebuilding efforts after a flooding event. For example, the State spends approximately $2,000,000 each year to educate its residents on grant programs, process grant applications, distribute grant funds, and monitor and enforce grantees' compliance with the requirements of those programs. Ex. 2, Fl. Dec. ¶ 28.

313.   In addition, the State of Florida must reimburse FEMA for funds given to and used by grant recipients who fail to maintain their mandatory flood insurance

or otherwise comply with the grant conditions. *See supra* ¶¶ 196-97; Ex. 2, Fl. Dec. ¶ 25.

314.   According to a study from First Street Foundation, Florida stands to lose the most money to flood damage, and its residents can expect to pay $8 billion annually on remediating flood damage. Ex. 2, Fl. Dec. ¶ 5. This is because of its high annual precipitation and its expensive properties located in the SFHA. *Id.*

315.   The State has an interest in maintaining high property values and, correspondingly, increasing tax revenue.

**State of Idaho**

316.   The State of Idaho has an interest in protecting its own land from flooding by ensuring adequate flood mitigation infrastructure is built and that the land remains usable by the State.

317.   Equity in Action doesn't recognize many mitigation efforts, nor does it clearly explain how rates are calculated based on mitigation efforts. This means that the State's mitigation efforts don't result in lower premiums for policyholders in the State.

318.   Equity in Action's high insurance rates will cause people to leave the State of Idaho because they can no longer afford to live in the State.

319.   In addition, it will depress property values, particularly in areas where flood insurance is required.

320.   The State has an interest in minimizing property damage to encourage businesses and individuals to remain in the State and entice new businesses and individuals to come to the State.

321.   Equity in Action's high insurance rates will also discourage individuals from purchasing property in the State. Higher rates signal less desirable property, and people are unwilling to pay the increased prices if the insurance rates suggest there is a greater likelihood the property will be damaged in a storm event.

322.   Fewer residents lead to a reduction in the State's tax base, resulting in lower tax revenue and hampering the State's ability to invest in future mitigation projects.

323.   Equity in Action further creates an increased workload for State officials to coordinate across the State. Equity in Action ignores entirely any assessment of state and local costs.

324.   Equity in Action also directly harms the State of Idaho's sovereign interests by eliminating the important parallel role the State has traditionally played in the flood insurance program.

325.   Equity in Action interferes with the State's ability to manage mitigation and relief efforts by discouraging mitigation, and thereby raising the risk and increasing the probability of severe damage.

326.   Equity in Action contradicts the goals of the State by discouraging mitigation and discouraging individuals and businesses from participating in the NFIP.

327.   Equity in Action also harms Idaho's quasi-sovereign interests.

328.   The State has an interest in preserving its sovereign territory and its habitability by ensuring adequate flood mitigation infrastructure is built and maintained to protect the land and property in its borders and that compulsory, unaffordable flood insurance does not render the land and property uninhabitable.

329.   The State has an interest in the "health, comfort, and welfare" of its citizens. *Kentucky v. Biden*, 23 F.4th 585, 599 (2022). This interest is particularly pronounced when federal actions are threatening to make housing in Idaho entirely unaffordable.

330.   Equity in Action creates uncertainty for how rates are calculated, undermining the State's ability to combat increased rates through mitigation efforts.

331.   Equity in Action cuts the States out of a process that has historically been collaborative, creating a one-size-fits-all methodology that largely ignores ways in which communities have protected against flooding events.

332.   Equity in Action undermines the States' efforts to promote mitigation efforts and reduce the devastating impact of flooding on the communities within its borders.

333.   The State of Idaho will suffer direct proprietary harm because of Equity in Action.

334.   State funds support mitigation efforts before a flooding event and rebuilding efforts after a flooding event.

335.   The State has an interest in maintaining high property values and, correspondingly, increasing tax revenue.

**State of Kentucky**

336.    The State of Kentucky has an interest in protecting its own land from flooding by ensuring adequate flood mitigation infrastructure is built and that the land remains usable by the State.

337.    Under Equity in Action, Kentucky's federal flood insurance policies will more than double statewide. Indeed, of the zip codes where Kentuckians have flood insurance through NFIP, over 70% will experience rate increases of over 100%. Forty-one zip codes will experience increases between 200 and 600%. And for the zip code covering Staffordsville and Barnett's Creek in Johnson County, the average cost will increase over 700%. This means that where a single family home was paying $855 per year, FEMA now expects them to pay $7,084. The median household income in Johnson County is $41,489. Flood insurance at the new rate of $7,084 would be 17% of the household income.

338.    Equity in Action doesn't recognize many mitigation efforts, nor does it clearly explain how rates are calculated based on mitigation efforts. This means that the State's mitigation efforts don't result in lower premiums for policyholders in the State.

339.    Equity in Action's high insurance rates will cause people to leave the State of Kentucky because they can no longer afford to live in the State.

340.    In addition, it will depress property values, particularly in areas where flood insurance is required.

341. The State has an interest in minimizing property damage to encourage businesses and individuals to remain in the State and entice new businesses and individuals to come to the State.

342. Equity in Action's high insurance rates will also discourage individuals from purchasing property in the State. Higher rates signal less desirable property, and people are unwilling to pay the increased prices if the insurance rates suggest there is a greater likelihood the property will be damaged in a storm event.

343. Fewer residents lead to a reduction in the State's tax base, resulting in lower tax revenue and hampering the State's ability to invest in future mitigation projects.

344. Equity in Action further creates an increased workload for State officials to coordinate across the State. Equity in Action ignores entirely any assessment of state and local costs.

345. Equity in Action also directly harms the State of Kentucky's sovereign interests by eliminating the important parallel role the State has traditionally played in the flood insurance program.

346. Equity in Action interferes with the State's ability to manage mitigation and relief efforts by discouraging mitigation, and thereby raising the risk and increasing the probability of severe damage.

347. Equity in Action contradicts the goals of the State by discouraging mitigation and discouraging individuals and businesses from participating in the NFIP.

348. Equity in Action also harms Kentucky's quasi-sovereign interests.

349.   The State has an interest in preserving its sovereign territory and its habitability by ensuring adequate flood mitigation infrastructure is built and maintained to protect the land and property in its borders and that compulsory, unaffordable flood insurance does not render the land and property uninhabitable.

350.   The State has an interest in the "health, comfort, and welfare" of its citizens. *Kentucky v. Biden*, 23 F.4th 585, 599 (2022). This interest is particularly pronounced when federal actions are threatening to make housing in Kentucky entirely unaffordable.

351.   Equity in Action creates uncertainty for how rates are calculated, undermining the State's ability to combat increased rates through mitigation efforts.

352.   Equity in Action cuts the States out of a process that has historically been collaborative, creating a one-size-fits-all methodology that largely ignores ways in which communities have protected against flooding events.

353.   Equity in Action undermines the States' efforts to promote mitigation efforts and reduce the devastating impact of flooding on the communities within its borders. The Kentucky Legislature, for example, has required the Secretary of the Commonwealth's Energy and Environment Cabinet to adopt regulations for flood control. Ky. Rev. Stat. § 151.125.

354.   The State of Kentucky will suffer direct proprietary harm because of Equity in Action.

355.   State funds support mitigation efforts before a flooding event and rebuilding efforts after a flooding event.

356.    The State has an interest in maintaining high property values and, correspondingly, increasing tax revenue.

**State of Mississippi**

357.    The State of Mississippi has an interest in protecting its own land from flooding by ensuring adequate flood mitigation infrastructure is built and that the land remains usable by the State.

358.    Equity in Action doesn't recognize many mitigation efforts, nor does it clearly explain how rates are calculated based on mitigation efforts. This means that the State's mitigation efforts don't result in lower premiums for policyholders in the State.

359.    Equity in Action's high insurance rates will cause people to leave the State of Mississippi because they can no longer afford to live in the State.

360.    In addition, it will depress property values, particularly in areas where flood insurance is required.

361.    The State has an interest in minimizing property damage to encourage businesses and individuals to remain in the State and entice new businesses and individuals to come to the State.

362.    Equity in Action's high insurance rates will also discourage individuals from purchasing property in the State. Higher rates signal less desirable property, and people are unwilling to pay the increased prices if the insurance rates suggest there is a greater likelihood the property will be damaged in a storm event.

363.   Fewer residents lead to a reduction in the State's tax base, resulting in lower tax revenue and hampering the State's ability to invest in future mitigation projects.

364.   Equity in Action further creates an increased workload for State officials to coordinate across the State. Equity in Action ignores entirely any assessment of state and local costs.

365.   Equity in Action also directly harms the State of Mississippi's sovereign interests by eliminating the important parallel role the State has traditionally played in the flood insurance program.

366.   Equity in Action interferes with the State's ability to manage mitigation and relief efforts by discouraging mitigation, and thereby raising the risk and increasing the probability of severe damage.

367.   Equity in Action contradicts the goals of the State by discouraging mitigation and discouraging individuals and businesses from participating in the NFIP.

368.   Equity in Action also harms Mississippi's quasi-sovereign interests.

369.   The State has an interest in preserving its sovereign territory and its habitability by ensuring adequate flood mitigation infrastructure is built and maintained to protect the land and property in its borders and that compulsory, unaffordable flood insurance does not render the land and property uninhabitable.

370.   The State has an interest in the "health, comfort, and welfare" of its citizens. *Kentucky v. Biden*, 23 F.4th 585, 599 (2022). This interest is particularly

pronounced when federal actions are threatening to make housing in Mississippi entirely unaffordable.

371.    Equity in Action creates uncertainty for how rates are calculated, undermining the State's ability to combat increased rates through mitigation efforts.

372.    Equity in Action cuts the States out of a process that has historically been collaborative, creating a one-size-fits-all methodology that largely ignores ways in which communities have protected against flooding events.

373.    Equity in Action undermines the States' efforts to promote mitigation efforts and reduce the devastating impact of flooding on the communities within its borders.

374.    The State of Mississippi will suffer direct proprietary harm because of Equity in Action.

375.    State funds support mitigation efforts before a flooding event and rebuilding efforts after a flooding event.

376.    The State has an interest in maintaining high property values and, correspondingly, increasing tax revenue.

**State of Montana**

377.    The State of Montana has an interest in protecting its own land from flooding by ensuring adequate flood mitigation infrastructure is built and that the land remains usable by the State.

378.    Equity in Action doesn't recognize many mitigation efforts, nor does it clearly explain how rates are calculated based on mitigation efforts. This means that

the State's mitigation efforts don't result in lower premiums for policyholders in the State.

379.   Equity in Action's high insurance rates will cause people to leave the State of Montana because they can no longer afford to live in the State.

380.   In addition, it will depress property values, particularly in areas where flood insurance is required.

381.   The State has an interest in minimizing property damage to encourage businesses and individuals to remain in the State and entice new businesses and individuals to come to the State.

382.   Equity in Action's high insurance rates will also discourage individuals from purchasing property in the State. Higher rates signal less desirable property, and people are unwilling to pay the increased prices if the insurance rates suggest there is a greater likelihood the property will be damaged in a storm event.

383.   Fewer residents lead to a reduction in the State's tax base, resulting in lower tax revenue and hampering the State's ability to invest in future mitigation projects.

384.   Equity in Action further creates an increased workload for State officials to coordinate across the State. Equity in Action ignores entirely any assessment of state and local costs.

385.   Equity in Action also directly harms the State of Montana's sovereign interests by eliminating the important parallel role the State has traditionally played in the flood insurance program.

386.    Equity in Action interferes with the State's ability to manage mitigation and relief efforts by discouraging mitigation, and thereby raising the risk and increasing the probability of severe damage.

387.    Equity in Action contradicts the goals of the State by discouraging mitigation and discouraging individuals and businesses from participating in the NFIP.

388.    Equity in Action also harms Montana's quasi-sovereign interests.

389.    The State has an interest in preserving its sovereign territory and its habitability by ensuring adequate flood mitigation infrastructure is built and maintained to protect the land and property in its borders and that compulsory, unaffordable flood insurance does not render the land and property uninhabitable.

390.    The State has an interest in the "health, comfort, and welfare" of its citizens. *Kentucky v. Biden*, 23 F.4th 585, 599 (2022). This interest is particularly pronounced when federal actions are threatening to make housing in Montana entirely unaffordable.

391.    Equity in Action creates uncertainty for how rates are calculated, undermining the State's ability to combat increased rates through mitigation efforts.

392.    Equity in Action cuts the States out of a process that has historically been collaborative, creating a one-size-fits-all methodology that largely ignores ways in which communities have protected against flooding events.

393.    Equity in Action undermines the States' efforts to promote mitigation efforts and reduce the devastating impact of flooding on the communities within its borders.

394.    The State of Montana will suffer direct proprietary harm because of Equity in Action.

395.    State funds support mitigation efforts before a flooding event and rebuilding efforts after a flooding event.

396.    The State has an interest in maintaining high property values and, correspondingly, increasing tax revenue.

**State of North Dakota**

397.    The State of North Dakota is prone to flooding because of its geographical location. Within its boundaries are the Missouri River, which is dammed to create Lake Sakakawea, the nation's third largest man-made lake. Ex. 3, N.D. Dec. ¶ 3. In addition, the State is home to the Red River of the North, which experiences unique snowmelt-driven flood events in the spring, and several other significant lakes and rivers. *Id.* There are 337 NFIP communities in North Dakota, and there are 5,832 NFIP policies in effect across the State. *Id.* ¶ 15. On average, policies for single family homes will increase 68%. *Id.* ¶ 29.

398.    The State of North Dakota has an interest in protecting its own land from flooding by ensuring adequate flood mitigation infrastructure is built and that the land remains usable by the State.

399.    Equity in Action doesn't recognize many mitigation efforts, nor does it clearly explain how rates are calculated based on mitigation efforts. This means that the State's mitigation efforts don't result in lower premiums for policyholders in the State.

400.    Equity in Action's high insurance rates will cause people to leave the State of North Dakota because they can no longer afford to live in the State.

401.    In addition, it will depress property values, particularly in areas where flood insurance is required.

402.    The State has an interest in minimizing property damage to encourage businesses and individuals to remain in the State and entice new businesses and individuals to come to the State.

403.    Equity in Action's high insurance rates will also discourage individuals from purchasing property in the State. Higher rates signal less desirable property, and people are unwilling to pay the increased prices if the insurance rates suggest there is a greater likelihood the property will be damaged in a storm event.

404.    Fewer residents lead to a reduction in the State's tax base, resulting in lower tax revenue and hampering the State's ability to invest in future mitigation projects.

405.    Equity in Action further creates an increased workload for State officials to coordinate across the State. Equity in Action ignores entirely any assessment of state and local costs.

406.    Equity in Action also directly harms the State of North Dakota's sovereign interests by eliminating the important parallel role the State has traditionally played in the flood insurance program.

407.  Equity in Action interferes with the State's ability to manage mitigation and relief efforts by discouraging mitigation, and thereby raising the risk and increasing the probability of severe damage.

408.  Equity in Action contradicts the goals of the State by discouraging mitigation and discouraging individuals and businesses from participating in the NFIP.

409.  Equity in Action also harms North Dakota's quasi-sovereign interests.

410.  The State has an interest in preserving its sovereign territory and its habitability by ensuring adequate flood mitigation infrastructure is built and maintained to protect the land and property in its borders and that compulsory, unaffordable flood insurance does not render the land and property uninhabitable.

411.  The State has an interest in the "health, comfort, and welfare" of its citizens. *Kentucky v. Biden*, 23 F.4th 585, 599 (2022). This interest is particularly pronounced when federal actions are threatening to make housing in Florida entirely unaffordable.

412.  Equity in Action creates uncertainty for how rates are calculated, undermining the State's ability to combat increased rates through mitigation efforts.

413.  Equity in Action cuts the States out of a process that has historically been collaborative, creating a one-size-fits-all methodology that largely ignores ways in which communities have protected against flooding events.

414.  Equity in Action undermines the States' efforts to promote mitigation efforts and reduce the devastating impact of flooding on the communities within its borders.

415.   The State of North Dakota will suffer direct proprietary harm because of Equity in Action.

416.   State funds support mitigation efforts before a flooding event and re-building efforts after a flooding event. For example, the average annual cost of flood damage tied to a presidential flood disaster declaration in North Dakota is $40.9 million. Ex. 3, N.D. Dec. ¶ 5. And the State expends an average of $2.7 million a year in flood recovery projects. *Id.* ¶ 6.

417.   The State has an interest in maintaining high property values and, correspondingly, increasing tax revenue.

**State of South Carolina**

418.   The State of South Carolina has an interest in protecting its own land from flooding by ensuring adequate flood mitigation infrastructure is built and that the land remains usable by the State.

419.   Equity in Action doesn't recognize many mitigation efforts, nor does it clearly explain how rates are calculated based on mitigation efforts. This means that the State's mitigation efforts don't result in lower premiums for policyholders in the State.

420.   Equity in Action's high insurance rates will cause people to leave the State of South Carolina because they can no longer afford to live in the State.

421.   In addition, it will depress property values, particularly in areas where flood insurance is required.

422.   The State has an interest in minimizing property damage to encourage businesses and individuals to remain in the State and entice new businesses and individuals to come to the State.

423.   Equity in Action's high insurance rates will also discourage individuals from purchasing property in the State. Higher rates signal less desirable property, and people are unwilling to pay the increased prices if the insurance rates suggest there is a greater likelihood the property will be damaged in a storm event.

424.   Fewer residents lead to a reduction in the State's tax base, resulting in lower tax revenue and hampering the State's ability to invest in future mitigation projects.

425.   Equity in Action further creates an increased workload for State officials to coordinate across the State. Equity in Action ignores entirely any assessment of state and local costs.

426.   Equity in Action also directly harms the State of South Carolina's sovereign interests by eliminating the important parallel role the State has traditionally played in the flood insurance program.

427.   Equity in Action interferes with the State's ability to manage mitigation and relief efforts by discouraging mitigation, and thereby raising the risk and increasing the probability of severe damage.

428.   Equity in Action contradicts the goals of the State by discouraging mitigation and discouraging individuals and businesses from participating in the NFIP.

429.   Equity in Action also harms South Carolina's quasi-sovereign interests.

430.   The State has an interest in preserving its sovereign territory and its habitability by ensuring adequate flood mitigation infrastructure is built and maintained to protect the land and property in its borders and that compulsory, unaffordable flood insurance does not render the land and property inhabitable.

431.   The State has an interest in the "health, comfort, and welfare" of its citizens. *Kentucky v. Biden*, 23 F.4th 585, 599 (2022). This interest is particularly pronounced when federal actions are threatening to make housing in South Carolina entirely unaffordable.

432.   Equity in Action creates uncertainty for how rates are calculated, undermining the State's ability to combat increased rates through mitigation efforts.

433.   Equity in Action cuts the States out of a process that has historically been collaborative, creating a one-size-fits-all methodology that largely ignores ways in which communities have protected against flooding events.

434.   Equity in Action undermines the States' efforts to promote mitigation efforts and reduce the devastating impact of flooding on the communities within its borders.

435.   The State of South Carolina will suffer direct proprietary harm because of Equity in Action.

436.   State funds support mitigation efforts before a flooding event and rebuilding efforts after a flooding event.

437.   The State has an interest in maintaining high property values and, correspondingly, increasing tax revenue.

**State of Texas**

438.    The State of Texas has an interest in protecting its own land from flooding by ensuring adequate flood mitigation infrastructure is built and that the land remains usable by the State. The State gives levee districts authority to impose annual levee district property taxes to help encourage new infrastructure to protect against flood damage. Ft. Bend Dec. ¶ 8. The Fort Bend County Levee Improvement District No. 2, for example, receives an average of $7,500,000 a year in levee district tax revenues and has spent an average of $12,000,000 a year on flood mitigation over the past five years. *Id.* ¶ 9.

439.    Equity in Action doesn't recognize many mitigation efforts, nor does it clearly explain how rates are calculated based on mitigation efforts. This means that the State's mitigation efforts don't result in lower premiums for policyholders in the State.

440.    Equity in Action's high insurance rates will cause people to leave the State of Texas because they can no longer afford to live in the State.

441.    In addition, it will depress property values, particularly in areas where flood insurance is required.

442.    The State has an interest in minimizing property damage to encourage businesses and individuals to remain in the State and entice new businesses and individuals to come to the State.

443.    Equity in Action's high insurance rates will also discourage individuals from purchasing property in the State. Higher rates signal less desirable property,

and people are unwilling to pay the increased prices if the insurance rates suggest there is a greater likelihood the property will be damaged in a storm event.

444. Fewer residents lead to a reduction in the State's tax base, resulting in lower tax revenue and hampering the State's ability to invest in future mitigation projects.

445. Equity in Action further creates an increased workload for State officials to coordinate across the State. Equity in Action ignores entirely any assessment of state and local costs.

446. Equity in Action also directly harms the State of Texas's sovereign interests by eliminating the important parallel role the State has traditionally played in the flood insurance program.

447. Equity in Action interferes with the State's ability to manage mitigation and relief efforts by discouraging mitigation, and thereby raising the risk and increasing the probability of severe damage.

448. Equity in Action contradicts the goals of the State by discouraging mitigation and discouraging individuals and businesses from participating in the NFIP.

449. Equity in Action also harms Texas's quasi-sovereign interests.

450. The State has an interest in preserving its sovereign territory and its habitability by ensuring adequate flood mitigation infrastructure is built and maintained to protect the land and property in its borders and that compulsory, unaffordable flood insurance does not render the land and property uninhabitable.

451.   The State has an interest in the "health, comfort, and welfare" of its citizens. *Kentucky v. Biden*, 23 F.4th 585, 599 (2022). This interest is particularly pronounced when federal actions are threatening to make housing in Texas entirely unaffordable.

452.   Equity in Action creates uncertainty for how rates are calculated, undermining the State's ability to combat increased rates through mitigation efforts.

453.   Equity in Action cuts the States out of a process that has historically been collaborative, creating a one-size-fits-all methodology that largely ignores ways in which communities have protected against flooding events.

454.   Equity in Action undermines the States' efforts to promote mitigation efforts and reduce the devastating impact of flooding on the communities within its borders.

455.   The State of Texas will suffer direct proprietary harm because of Equity in Action.

456.   State funds support mitigation efforts before a flooding event and rebuilding efforts after a flooding event.

457.   The State has an interest in maintaining high property values and, correspondingly, increasing tax revenue.

**State of Virginia**

458.   The State of Virginia is prone to flooding because of its proximity to the Atlantic coast. Ex. 4, Va. Dec. ¶ 3. In addition, the State is home to nearly 50,000

miles of rivers and 61 major lakes. *Id.* There are 291 NIP communities in Virginia with a total of 94,920 NFIP policies. *Id.* ¶ 15.

459.    The State has an interest in protecting its own land from flooding by ensuring adequate flood mitigation infrastructure is built and that the land remains usable by the State.

460.    Equity in Action doesn't recognize many mitigation efforts, nor does it clearly explain how rates are calculated based on mitigation efforts. This means that the State's mitigation efforts don't result in lower premiums for policyholders in the State.

461.    Equity in Action's high insurance rates will cause people to leave the State of Virginia because they can no longer afford to live in the State.

462.    In addition, it will depress property values, particularly in areas where flood insurance is required.

463.    The State has an interest in minimizing property damage to encourage businesses and individuals to remain in the State and entice new businesses and individuals to come to the State.

464.    Equity in Action's high insurance rates will also discourage individuals from purchasing property in the State. Higher rates signal less desirable property, and people are unwilling to pay the increased prices if the insurance rates suggest there is a greater likelihood the property will be damaged in a storm event.

465.    Fewer residents lead to a reduction in the State's tax base, resulting in lower tax revenue and hampering the State's ability to invest in future mitigation projects.

466.    Equity in Action further creates an increased workload for State officials to coordinate across the State. Equity in Action ignores entirely any assessment of state and local costs.

467.    Equity in Action also directly harms the State of Virginia's sovereign interests by eliminating the important parallel role the State has traditionally played in the flood insurance program.

468.    Equity in Action interferes with the State's ability to manage mitigation and relief efforts by discouraging mitigation, and thereby raising the risk and increasing the probability of severe damage. For example, since 2013, Virginia has brought in $254 million through 340 federal grant projects and is currently supporting 72 project applications totaling $560 million. Ex. 4, Va. Dec. ¶ 8. In addition, the State spends $500,000 each year to educate its residents about these grant programs, process grant applications, distribute grant funds, and monitor and enforce grantees' compliance with the requirements of those programs. *Id.* ¶ 28.

469.    Equity in Action contradicts the goals of the State by discouraging mitigation and discouraging individuals and businesses from participating in the NFIP.

470.    Equity in Action also harms Virginia's quasi-sovereign interests.

471.    The State has an interest in preserving its sovereign territory and its habitability by ensuring adequate flood mitigation infrastructure is built and maintained to protect the land and property in its borders and that compulsory, unaffordable flood insurance does not render the land and property uninhabitable.

472.    The State has an interest in the "health, comfort, and welfare" of its citizens. *Kentucky v. Biden*, 23 F.4th 585, 599 (2022). This interest is particularly pronounced when federal actions are threatening to make housing in Virginia entirely unaffordable.

473.    Equity in Action creates uncertainty for how rates are calculated, undermining the State's ability to combat increased rates through mitigation efforts.

474.    Equity in Action cuts the States out of a process that has historically been collaborative, creating a one-size-fits-all methodology that largely ignores ways in which communities have protected against flooding events.

475.    Equity in Action undermines the States' efforts to promote mitigation efforts and reduce the devastating impact of flooding on the communities within its borders.

476.    The State of Virginia will suffer direct proprietary harm because of Equity in Action.

477.    State funds support mitigation efforts before a flooding event and rebuilding efforts after a flooding event. The average annual cost of flood damage in Virginia is $16.1 million. Ex. 4, Va. Dec. ¶ 5. The State expends an average of $1.2 million in state funds each year in flood recovery projects. *Id.* ¶7.

478.    The State has an interest in maintaining high property values and, correspondingly, increasing tax revenue.

### B. Plaintiff Parishes

479.    **Acadia Parish** is prone to flooding because of its proximity to the coast. Ex. 5, Acadia Dec. ¶ 5. The Parish has undertaken mitigation efforts to reduce the effects of flooding, yet Risk Rating 2.0 increases flood insurance premiums across the Parish. These increased premiums cause harm to the Parish as people will not be able to afford flood insurance. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

480.    **Ascension Parish** spends approximately $10 million per year on flood mitigation projects, and it currently has plans for over $150 million in future mitigation projects. Ex. 6, Ascension Dec. ¶ 11.   These efforts include conducting a Hydrologic and Hydraulic modeling study, creating a G.I.S. map of all drainage channels, and increasing drainage standards for new developments. *Id.* ¶ 11. The Parish has adopted FEMA's rate maps and implemented a 2-foot freeboard requirement for all properties located in special and non-special flood hazards. *Id.* ¶ 26. Its residents have relied on FEMA's recommendations to elevate their homes, yet they are not seeing any discounts. *Id.* ¶ 28. Ascension Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates, despite reduced risks. *Id.* ¶¶ 27, 35-36. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

481.  **Assumption Parish** spends approximately $900,000 a year on flood mitigation projects. Ex. 7, Assumption Dec. ¶ 9. The Parish adopted parish ordinances and regulations at FEMA's request to become an NFIP community. *Id.* ¶ 16. And 100% of the Parish's homeowners and businessowners have relied on FEMA's recommendation—through FIRMs, the grandfathering policy, and the required ordinances—to mitigate against flood damages. *Id.* ¶ 26. Yet flood insurance rates have increased dramatically in the Parish, and it is likely many policyholders will leave the area as a result. *Id.* ¶ 31. Assumption Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates, despite reduced risks. *Id.* ¶¶ 26-28. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

482.  **Avoyelles Parish** is prone to flooding. The Parish has undertaken mitigation efforts to reduce the effects of flooding, yet Risk Rating 2.0 increases flood insurance premiums across the Parish. These increased premiums cause harm to the Parish as people will not be able to afford flood insurance. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

483.  **Bossier Parish** is prone to flooding as 40% of the Parish is located in an SFHA. Ex. 8, Bossier Dec. ¶ 5. The Parish participates in the federal grant programs and has implemented the required floodplain management regulations. *Id.* ¶

19. The Parish does so to protect property, lower risk of flooding, and make its properties insurable. *Id.* ¶ 28. Although only a few properties received elevation grants before, since Equity in Action, the Parish has not received a single grant application for mitigation projects. *Id.* ¶ 33. At the same time, insurance premiums are rising in the Parish. *Id.* ¶¶ 37-39. Bossier Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates, despite its mitigation efforts. *Id.* ¶¶ 35-38. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

484. **Caldwell Parish** experiences flooding as a result of heavy rainfall, but overall, it does not experience major flood events each year. Ex. 9, Caldwell Dec. ¶ 5. In addition, the Parish's flood mitigation efforts have successfully reduced flooding. *Id.* ¶ 30. Despite its lower risk of flooding, the Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates. *Id.* ¶¶ 26-27, 30-31. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

485. **Cameron Parish** is prone to flooding because of its proximity to the Gulf of Mexico. Ex. 10, Cameron Dec. ¶ 5. The Parish's flood mitigation efforts have successfully reduced flooding, and its participation in the federal grant program allows individual homeowners to undertake mitigation as well. *Id.* ¶¶ 11, 29-32. Despite the decreased risk of flooding as a result of these efforts, the Parish has seen

a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates. *Id.* ¶¶ 28-29, 35. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

486.  **Catahoula Parish** is prone to flooding because of the number of bodies of water located in the parish. Catahoula Dec. ¶¶ 4-5. The Parish's flood mitigation efforts have successfully reduced flooding yet the Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates. *Id.* ¶¶ 20, 23. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts. *Id.* ¶¶ 24-26.

487.  **Claiborne Parish** experiences flash flooding, but overall, it does not experience major flood events each year. Ex. 11, Claiborne Dec. ¶¶ 5-7 (noting the average annual cost of flood damage is $250,000). In addition, the Parish's flood mitigation efforts have successfully reduced flooding. *Id.* ¶ 27-29. Despite its lower risk of flooding, the Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates. *Id.* ¶¶ 26-27, 30-31. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

488.  **Concordia Parish** is prone to flooding because of its proximity to the Mississippi River. Ex. 12, Concordia Dec. ¶ 5. The Parish participates in the federal

grant programs and has implemented the required floodplain management regulations. *Id.* ¶ 16. The Parish does so to protect property, lower risk of flooding, and make its properties insurable. *Id.* ¶ 25. Despite mitigation efforts, insurance premiums are rising in the Parish. *Id.* ¶¶ 27-29. Concordia Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates, despite its mitigation efforts. *Id.* ¶¶ 27-29. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts. *Id.* ¶¶ 34-37.

489.  **East Baton Rouge Parish** is prone to flooding, as a majority of the Parish lies within the 100-year and 500-year floodplains. Ex. 13, E. Baton Rouge Dec. ¶ 5. The Parish has partnered with FEMA in the past to adopt Base Flood Elevations and participate in federal grant programs. *Id.* ¶ 7. In addition, the Parish adopted even stricter requirements than what FEMA requires to promote flood resiliency. *Id.* Like many other parishes, East Baton Rouge sought to promote mitigation efforts and comply with FEMA's requirements so its residents could take advantage of the grandfathering policy. *Id.* ¶ 26. The Parish also participates in the federal grant programs and currently has $160,835,304.57 in grant funding across the parish. *Id.* ¶10. The Parish spends at least $1.5 million each year in flood recovery projects. *Id.* ¶ 10. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

490.  **East Feliciana Parish** is prone to flooding. The Parish has undertaken mitigation efforts to reduce the effects of flooding, yet Risk Rating 2.0 increases flood

insurance premiums across the Parish. These increased premiums cause harm to the Parish as people will not be able to afford flood insurance. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

491. **Evangeline Parish** is prone to flooding because the most populated areas are below sea level. Ex. 14, Evangeline Dec. ¶ 5. The Parish has implemented the required floodplain management regulations and participates in federal grant programs. *Id.* ¶¶ 18, 28. While the Parish has successfully reduced flooding, insurance premiums are rising in the Parish. *Id.* ¶¶ 30. The Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates, despite its mitigation efforts. *Id.* ¶¶ 30-33. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts. *Id.* ¶¶ 37-40. In addition, Equity in Action's lack of transparency inhibits the Parish's ability to understand that hazards that the agency is considering. *See* 42 U.S.C. § 4014(d). Under the NFIP, FEMA is precluded from raising the rates in Evangeline Parish based on additional hazards resulting from the Atchafalaya Basin Levee System. Based on the unavailability of data for Equity in Action, Evangeline Parish is unable to confirm whether FEMA is meeting this statutory command. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

492. **Franklin Parish** is prone to flooding because the most populated areas are below sea level. Ex. 15, Franklin Dec. ¶¶ 8-9. The Parish has implemented the

required floodplain management regulations and participates in federal grant pro-grams. *Id.* ¶¶ 13-14. While the Parish has successfully reduced flooding, insurance premiums are rising in the Parish. *Id.* ¶¶ 32-33. The Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates, despite its mitigation efforts. *Id.* The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts. *Id.* ¶¶ 38-40.

493.  **Grant Parish** is prone to flooding because it is located within a mile of several rivers. Ex. 16, Grant Dec. ¶ 4. The Parish has implemented the required flood-plain management regulations and participates in federal grant programs. *Id.* ¶¶ 6-7, 15. While the Parish has successfully reduced flooding, insurance premiums are rising in the Parish. *Id.* ¶¶ 26-27. The Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an in-crease of flood insurance rates, despite its mitigation efforts. *Id.* ¶¶ 27-28. This is particularly problematic because the parish is already "very poor" and "rural," and its residents will be forced from the area. *Id.* ¶ 33. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts. *Id.* ¶¶ 30-33.

494.  **Iberville Parish** is prone to flooding. The Parish has undertaken miti-gation efforts to reduce the effects of flooding, yet Risk Rating 2.0 increases flood insurance premiums across the Parish. These increased premiums cause harm to the

Parish as people will not be able to afford flood insurance. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

495. **Jackson Parish** is prone to flooding. The Parish has undertaken mitigation efforts to reduce the effects of flooding, yet Risk Rating 2.0 increases flood insurance premiums across the Parish. These increased premiums cause harm to the Parish as people will not be able to afford flood insurance. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

496. **Jefferson Parish** is prone to flooding because of its proximity to Lake Pontchartrain, the Mississippi River, and the Gulf of Mexico. Ex. 17, Jefferson Dec. ¶ 5. In a period of 22 years, the Parish has recorded 54 flood events. *Id.* ¶ 6. The Parish President estimates 2000 homes and businesses in the Parish have relied on FEMA's advice to elevate their homes and businesses. *Id.* ¶ 31. Like other parishes, Jefferson Parish administers and enforces federal grant programs, which exposes the Parish to financial liability if grant recipients fail to meet the necessary federal conditions. *Id.* ¶ 33. Under Equity in Action, Jefferson Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates, despite reduced risks. *Id.* ¶¶ 35, 39, 42, 44. This has discouraged individuals from undertaking new mitigation projects. *Id.* ¶ 35. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

497.   **Jefferson Davis Parish** is prone to flooding. The Parish has undertaken mitigation efforts to reduce the effects of flooding, yet Risk Rating 2.0 increases flood insurance premiums across the Parish. These increased premiums cause harm to the Parish as people will not be able to afford flood insurance. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

498.   **Lafayette Parish** is prone to flooding. The Parish has undertaken mitigation efforts to reduce the effects of flooding, yet Risk Rating 2.0 increases flood insurance premiums across the Parish. These increased premiums cause harm to the Parish as people will not be able to afford flood insurance. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

499.   **Lafourche Parish** is also prone to flooding because of its location. In fact, approximately two-thirds of Lafourche Parish is in a SFHA. Ex. 18, Lafourche Dec. ¶ 5. The Parish is home to two independent levee districts that construct and maintain flood protection systems. *Id.* ¶ 9. Lafourche Parish is participating in FEMA's LAMP process, but FEMA has scrapped the FIRM process. *Id.* ¶¶ 28-29. Like other parishes, Lafourche Parish engages in the federal grant program, meaning the parish expends resources to education residents about the grant programs and incurs financial liability if the recipient of the grant fails to meet its obligations. *Id.* ¶ 35. In addition, its residents have—for years—paid local sales and property taxes to fund the MtG and LtGM levee systems in an effort to lower their insurance premiums.

Ex. 50, Morganza Action Coal. Dec. ¶ 10. Now these same residents are paying more for their flood insurance because Equity in Action no longer gives discounts for these levee systems, thereby ignoring the hundreds of millions of public funds that helped build those levees in the first place. *Id.* Lafourche Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates, despite reduced risks. *Id.* ¶¶ 36-37, 43. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

500. **Livingston Parish** is prone to flooding because of its proximities to lakes and rivers. Ex. 19, Livingston Dec. ¶ 5. The Parish has undertaken significant mitigation efforts, including drainage projects and bank stabilization projects. *Id.* ¶ 9. The Parish spends over $19 million a year on flood mitigation projects, including debris removal, bank stabilization, elevations, and drainage. *Id.* ¶¶ 9, 12. It has also adopted various ordinances and regulations to comply with FEMA's requirements for maintaining its status as a NFIP community. *Id.* ¶¶ 18-22. Livingston Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates, despite reduced risks. *Id.* ¶¶ 36-37, 40-41. In addition, the Parish itself has to procure flood insurance on its parish-owned buildings, which are subject to the rate increases. *Id.* ¶ 43. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

501.   **Madison Parish** is prone to flooding. Ex. 20, Madison Dec. ¶ 5. The
Parish has undertaken mitigation efforts to reduce the effects of flooding, yet Risk
Rating 2.0 increases flood insurance premiums across the Parish. These increased
premiums cause harm to the Parish as people will not be able to afford flood insur-
ance. The Parish will suffer financial harm as a result of property values decreasing
and a lower tax base to fund future mitigation efforts.

502.   **Orleans Parish** is prone to flooding as 38% of the parcels in the parish
are located in the SFHA. Ex. 21, Orleans Dec. ¶ 5. The Parish has undertaken miti-
gation efforts to reduce the effects of flooding, yet Risk Rating 2.0 increases flood
insurance premiums across the Parish. These increased premiums cause harm to the
Parish as people will not be able to afford flood insurance. The Parish will suffer fi-
nancial harm as a result of property values decreasing and a lower tax base to fund
future mitigation efforts.

503.   **Plaquemines Parish** is prone to flooding because the Parish straddles
both sides of the Mississippi River as it enters the Gulf of Mexico. Ex. 22, Plaquemines
Dec. ¶ 5. The Parish has undertaken mitigation efforts to reduce the effects of flood-
ing, yet Risk Rating 2.0 increases flood insurance premiums across the Parish. And
many of these mitigation efforts have been mandated by FEMA. *Id.* ¶¶ 44-53. The
Parish's participation in the NFIP was conditioned on passing comprehensive flood-
plain management regulations. *Id.* These regulations, which FEMA required
Plaquemines Parish to pass, prohibit development of any structure unless the struc-
ture is elevated. *Id.* ¶ 50. More than that, the regulations prohibit any resident from

connecting to electricity unless their structure is elevated. *Id.* ¶ 53. In addition, many of these properties are in SFHA, which means they must maintain flood insurance. *Id.* ¶¶ 5, 22. The per capita income in the Parish is $30,598, yet these individuals are facing some of the steepest increases (over 1000%) of anywhere in the country. *Id.* ¶¶ 52-54. These individuals can't afford mandatory flood insurance. They can't afford mandatory elevation requirements. So this means they can't make improvements on their property or even connect to electricity. This new methodology and these increased premiums are wreaking havoc on the Parish. The residents of the Parish are now sitting ducks on the ground at the start of Hurricane Season. *Id.* ¶ 55. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

504. **St. Bernard Parish** is prone to flooding and experiences an average of 10 flooding events a year. Ex. 23, St. Bernard Dec. ¶ 6. The Parish participates in the federal grant programs and has implemented the required floodplain management regulations. *Id.* ¶ 19. The Parish does so to protect property, lower risk of flooding, and make its properties insurable. *Id.* ¶ 28, 32-35. Since Equity in Action went into effect, the number of grant participants has decreased by about 60%. *Id.* ¶ 33. At the same time, insurance premiums are rising in the Parish. *Id.* ¶ 36. St. Bernard Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates, despite its mitigation efforts. *Id.* ¶¶ 36-40. The Parish will suffer financial harm as a result of

property values decreasing and a lower tax base to fund future mitigation efforts. *Id.* ¶¶ 44-47.

505.   **St. Charles Parish** is prone to flooding because of its proximity to the coast, the Mississippi River, and Lake Pontchartrain. Ex. 24, St. Charles Dec. ¶ 5. The Parish participates in the federal grant programs and has implemented the required floodplain management regulations. *Id.* ¶¶ 20, 29. The Parish does so to protect property, lower risk of flooding, and make its properties insurable. The Parish expects the number of grant applications to decrease as a result of Equity in Action. *Id.* ¶ 32. At the same time, insurance premiums are rising in the Parish. *Id.* ¶ 39. St. Charles Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates, despite its mitigation efforts. *Id.* ¶¶ 36-38. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts. *Id.* ¶¶ 43-46.

506.   **St. Helena Parish** is prone to flooding. The Parish has undertaken mitigation efforts to reduce the effects of flooding, yet Risk Rating 2.0 increases flood insurance premiums across the Parish. These increased premiums cause harm to the Parish as people will not be able to afford flood insurance. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

507.   **St. James Parish** is prone to flooding. The Parish has undertaken mitigation efforts to reduce the effects of flooding, yet Risk Rating 2.0 increases flood

insurance premiums across the Parish. These increased premiums cause harm to the Parish as people will not be able to afford flood insurance. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

508.    **St. John the Baptist Parish** is prone to flooding due to its proximity to the Mississippi River and Lake Pontchartrain. Ex. 25, St. John Dec. ¶ 4. The Parish has enacted the required floodplain management regulations. *Id.* ¶¶ 11-13. Despite undertaking mitigation efforts, insurance premiums are rising in the Parish. *Id.* ¶¶ 21-22. St. John the Baptist Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates, despite its mitigation efforts. *Id.* The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts. *Id.* ¶¶ 25-27.

509.    **St. Landry Parish** is prone to flooding because over half the parish is located in a SFHA with 13 major bayous and the Atchafalaya River. Ex. 26, St. Landry Dec. ¶ 26. The Parish has undertaken mitigation efforts to reduce the effects of flooding, yet Risk Rating 2.0 increases flood insurance premiums across the Parish. These increased premiums cause harm to the Parish as people will not be able to afford flood insurance. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts. In addition, Equity in Action's lack of transparency inhibits the Parish's ability to understand that hazards that the agency is considering. *See* 42 U.S.C. § 4014(d). Under the NFIP,

FEMA is precluded from raising the rates in St. Landry Parish based on additional hazards resulting from the Atchafalaya Basin Levee System. Based on the unavailability of data for Equity in Action, St. Landry Parish is unable to confirm whether FEMA is meeting this statutory command. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

510. **St. Mary Parish** is prone to flooding because of how close it is to the coast, the Atchafalaya River, and the Wax Lake Outlet. Ex. 27, St. Mary Parish Dec. ¶ 5. Indeed, 92% of the land in the parish is in SFHA. *Id.* St. Mary Parish has applied for, received, and administered many grants that go towards mitigation effort, and as a result, St. Mary's flood recovery costs have decreased steadily. *Id.* ¶¶ 7-8. It is an NFIP community, which requires St. Mary Parish to enact and enforce certain floodplain management regulations, including building elevation requirements. *Id.* ¶¶ 16-17. This allowed St. Mary Parish's homeowners and businesses to benefit from lower insurance rates. *Id.* ¶ 24. Under Equity in Action, these elevation requirements are not rewarded, and they have only a negligible effect on insurance rates. *Id.* ¶ 30. St. Mary Parish also adopted FEMA's Rate Maps because of FEMA's grandfathering policy that would, again, permit homeowners and businesses to benefit from lower insurance rates. *Id.* ¶¶ 26-27. Equity in Action no longer recognizes this grandfathering policy. *Id.* ¶ 31. As a result, St. Mary Parish residents will pay increasing rates each year. *Id.* Under Equity in Action, the rates will increase for 90% of properties in St. Mary Parish. *Id.* ¶ 34. This has a disproportionate impact on low

and moderate income property owners. *Id.* According to FEMA's own data, the average increase for policies in St. Mary Parish is 386%. Federal Emergency Management Agency, Cost of Flood Insurance for Single-Family Homes under Risk Rating 2.0 (Apr. 19, 2023), https://perma.cc/K4NL-Y7M8, Exhibit 4. As rates increase, homeowners will be displaced or choose to leave the area, depressing property values, lowering the tax base of the parish and inhibiting the parish's ability to undertake future mitigation efforts. *Id.* ¶¶ 37-41. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

511.   **St. Tammany Parish** is prone to flooding because of its proximity to Lake Pontchartrain. Ex. 28, St. Tammany Parish Dec. ¶ 5. The Parish participates in the federal grant programs, the CRS program, and has implemented the required floodplain management regulations to become an NFIP community. *Id.* ¶¶ 13-14, 23. It spends more than $80 million per year on mitigation projects. *Id.* ¶ 15. Despite elevating a significant number of homes and undertaking other mitigation projects, 90% of NFIP policies in the parish are increasing. *Id.* ¶¶ 27, 44. The Parish itself has seen increases to its own policies, costing the Parish an additional $2,877 as a result of Risk Rating 2.0. *Id.* ¶¶ 45-46. It anticipates that its premiums will continue to increase at the next renewal, although FEMA has not provided enough information for the Parish to figure out how rates will change over time. *Id.* ¶¶ 47-48. St. Tammany Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates, despite its mitigation efforts. *Id.* ¶¶ 40-41. The Parish will suffer financial harm as a

result of property values decreasing and a lower tax base to fund future mitigation efforts. *Id.* ¶¶ 47-50.

512. **Tangipahoa Parish** is prone to flooding due to its proximity to the Gulf of Mexico. Ex. 29, Tangipahoa Dec. ¶ 4. The Parish has enacted the required floodplain management regulations and participates in the federal grant programs. *Id.* ¶¶ 10, 21-22. Despite undertaking mitigation efforts, insurance premiums are rising in the Parish. *Id.* ¶¶ 37, 40. The discounts and grandfathering policies, which are no longer available, incentivized people to stay in the flood insurance program. *Id.* ¶ 30, 38. Tangipahoa Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates, despite its mitigation efforts. *Id.* ¶¶ 38-40. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts. *Id.* ¶¶ 45-47.

513. **Tensas Parish** is prone to flooding due to its proximity to the Mississippi River. Dec. 39, Tensas Dec. ¶ 4. The Parish has enacted the required floodplain management regulations and participates in the federal grant programs. *Id.* ¶¶ 13-15. Despite undertaking mitigation efforts, insurance premiums are rising in the Parish. *Id.* ¶ 26. In addition, the number of grant applications has decreased by about 100%. *Id.* ¶ 25. Tensas Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates, despite its mitigation efforts. *Id.* ¶¶ 26-28. The Parish will suffer

financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts. *Id.* ¶¶ 32-34.

514. **Terrebonne Parish** is prone to flooding. Ex. 31, Terrebonne Dec. ¶ 5. The Parish has undertaken mitigation efforts to reduce the effects of flooding, yet Risk Rating 2.0 increases flood insurance premiums across the Parish. The Parish is home to many coastal industries, including oil and gas and seafood. Ex. 43, Terrebonne Econ. Dev. Auth. Dec. ¶¶ 8-10. In addition, the Parish has numerous historic sites that are "paramount for culture and tourism." *Id.* ¶ 12. In addition, its residents have—for years—paid local sales and property taxes to fund the MtG and LtGM levee systems in an effort to lower their insurance premiums. Ex. 50, Morganza Action Coal. Dec. ¶ 10. Now these same residents are paying more for their flood insurance because Equity in Action no longer gives discounts for these levee systems, thereby ignoring the hundreds of millions of dollars of public funds that helped build those levees in the first place. *Id.* These increased premiums cause harm to the Parish as people will not be able to afford flood insurance. As a result, the Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

515. **Vermilion Parish** is prone to flooding. The Parish has undertaken mitigation efforts to reduce the effects of flooding, yet Risk Rating 2.0 increases flood insurance premiums across the Parish. These increased premiums cause harm to the

Parish as people will not be able to afford flood insurance. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

516. **Vernon Parish** is prone to flooding. The Parish has undertaken mitigation efforts to reduce the effects of flooding, yet Risk Rating 2.0 increases flood insurance premiums across the Parish. These increased premiums cause harm to the Parish as people will not be able to afford flood insurance. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

517. **Washington Parish** is prone to flooding. Ex. 32, Washington Dec. ¶ 4. The Parish has enacted city ordinances and spent significant funds on mitigation efforts. *Id.* ¶¶ 7-8. The amount the Parish spends on flood recovery projects has decreased every year because of mitigation efforts. *Id.* ¶ 11. The Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates, despite reduced risks. *Id.* ¶¶ 39-42, 40-41. In addition, the Parish itself has to procure flood insurance on its parish-owned buildings, which are subject to the rate increases. *Id.* ¶ 43. Washington Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates, despite its mitigation efforts. *Id.* ¶¶ 37, 40. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts. *Id.* ¶¶ 45-48.

518. **Webster Parish** is prone to flooding. The Parish has undertaken mitigation efforts to reduce the effects of flooding, yet Risk Rating 2.0 increases flood insurance premiums across the Parish. These increased premiums cause harm to the Parish as people will not be able to afford flood insurance. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

519. **West Baton Rouge** is prone to flooding due to both backwater flooding from the Atchafalaya Spillway and flash flooding. Ex. 33, W. Baton Rouge Dec. ¶ 5. The Parish has undertaken mitigation efforts to reduce the effects of flooding, yet Risk Rating 2.0 increases flood insurance premiums across the Parish. These increased premiums cause harm to the Parish as people will not be able to afford flood insurance. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts.

520. **West Feliciana** is prone to flooding because of its proximity to the Mississippi River. Ex. 34, West Feliciana Dec. ¶ 4. The Parish implemented the required floodplain management regulations. *Id.* ¶ 14. Despite its mitigation efforts, insurance premiums are rising in the Parish. *Id.* ¶¶ 24, 26. West Feliciana Parish has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates, despite its mitigation efforts. *Id.* ¶ 24. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts. *Id.* ¶ 27-29.

521.  **Winn Parish** is located near several water sources, and while it does not experience regular flooding, there are at least 66 NFIP policies in the parish. Ex. 35, Winn Parish Dec. ¶¶ 5-8. Despite its overall low risk of flooding, premium rates are increasing dramatically under Equity in Action. *Id.* ¶ 11. The Parish participates in the federal grant programs and has implemented the required floodplain management regulations. *Id.* ¶ 19. Some policies will increase by 92%. *Id.* By making flood insurance policies unaffordable, people will choose not to renew their policies and will be priced out of the area. *Id.* ¶ 12. The Parish will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts. *Id.* ¶¶ 12-14.

C.  PLAINTIFF MUNICIPALITIES

522.  **Town of Jean Lafitte** has taken significant mitigation efforts to protect the town from flood damage. Equity in Action does not take these mitigation efforts into consideration and instead imposes higher insurance premiums on property owners in the town. As the insurance premiums increase, people will be forced to leave the area, causing harm to the town. Fewer people and high flood insurance rates mean that property values will decrease, leaving the town with fewer resources to invest in future mitigation projects.

523.  **Town of Grand Isle** has taken significant mitigation efforts to protect the town from flood damage. Equity in Action does not take these mitigation efforts into consideration and instead imposes higher insurance premiums on property owners in the town. As the insurance premiums increase, people will be forced to leave the area, causing harm to the town. Fewer people and high flood insurance rates

mean that property values will decrease, leaving the town with fewer resources to invest in future mitigation projects.

### D. PLAINTIFF LEVEE DISTRICTS

524.    The levee district Plaintiffs are political subdivisions of the State. La. Const. art. VI § 38.1; La. Rev. Stat. § 38:291.

525.    The levee district Plaintiffs, which have the authority to assess taxes, will suffer from a smaller tax base and lower tax revenue which goes to support flood management projects, including the construction and maintenance of levees themselves. La. Const. art. VI § 39.

526.    **Bossier Levee District** has taken significant mitigation efforts to protect the district from flood damage. Equity in Action does not take these mitigation efforts into consideration and instead imposes higher insurance premiums on property owners in the district. As the insurance premiums increase, people will be forced to leave the area, causing harm to the levee district. Fewer people and high flood insurance rates mean that property values will decrease, leaving the district with fewer resources to invest in future mitigation projects.

527.    **Fifth Louisiana Levee District** has taken significant mitigation efforts to protect the district from flood damage. Equity in Action does not take these mitigation efforts into consideration and instead imposes higher insurance premiums on property owners in the district. As the insurance premiums increase, people will be forced to leave the area, causing harm to the levee district. Fewer people and high flood insurance rates mean that property values will decrease, leaving the district with fewer resources to invest in future mitigation projects.

114

528.   **Grand Isle Independent Levee District** has taken significant mitigation efforts to protect the district from flood damage. Equity in Action does not take these mitigation efforts into consideration and instead imposes higher insurance premiums on property owners in the district. As the insurance premiums increase, people will be forced to leave the area, causing harm to the levee district. Fewer people and high flood insurance rates mean that property values will decrease, leaving the district with fewer resources to invest in future mitigation projects.

529.   **Lafourche Basin Levee District** has taken significant mitigation efforts to protect the district from flood damage. Equity in Action does not take these mitigation efforts into consideration and instead imposes higher insurance premiums on property owners in the district. As the insurance premiums increase, people will be forced to leave the area, causing harm to the levee district. Fewer people and high flood insurance rates mean that property values will decrease, leaving the district with fewer resources to invest in future mitigation projects.

530.   **North Lafourche Conservation, Levee, and Drainage District (NLCLDD)** has undertaken significant mitigation efforts even though the inhabited areas within the NLCLDD are not prone to regular flooding. NLCLDD Dec. ¶¶ 5-11. Equity in Action does not consider the full extent of these mitigation efforts. Ex. 36, N. Lafourche Conservation Levee and Drainage Dist. Dec. ¶ 24. Equity in Action also imposes the highest insurance rates in areas in NLCLDD that are not in a flood zone and do not carry with it mandatory purchase requirements. In addition, members of

the community have agreed to and adopted FIRMS and adapted their mitigation efforts in accordance with these FIRMS. *Id.* ¶ 18. Equity in Action creates an entirely new—but secretive—methodology that ignores this history and the community members' expectations. *Id.* ¶ 18-21. NLCLDD relied on FEMA's grandfathering policy, which Equity in Action no longer honors. *Id.* ¶¶ 32-34. Even though some discounts are still in place, the rates will now increase year after year, resulting in dramatically higher rates. *Id.* ¶ 33. As flood insurance rates increase, people and businesses in the NLCLD will be forced to leave, which will decrease the NLCLDD's tax base and its ability to meet its statutory mandate construct and maintain levees. *Id.* ¶¶ 35-37. The lack of transparency also harms NLCLDD's ability to partner with FEMA and other agencies to undertake mitigation efforts in the future. *Id.* ¶ 42.

531. **Ponchartrain Levee District** has taken significant mitigation efforts to protect the district from flood damage. Equity in Action does not take these mitigation efforts into consideration and instead imposes higher insurance premiums on property owners in the district. As the insurance premiums increase, people will be forced to leave the area, causing harm to the levee district. Fewer people and high flood insurance rates mean that property values will decrease, leaving the district with fewer resources to invest in future mitigation projects.

532. **Southeast Louisiana Flood Protection Authority—East** is prone to flooding because of its proximity to the Gulf of Mexico, the Mississippi River, and Lake Pontchartrain. Ex. 40, SE La—East Dec. ¶ 5. The Flood Protection Authority receives an average of $55 million a year in levee tax revenues and spends an average

116

of $35 million a year on flood mitigation projects. *Id.* ¶ 9. Despite its mitigation efforts, insurance premiums are rising in the Flood Protection Authority. *Id.* ¶¶ 16-18. The Southeast Louisiana Flood Protection Authority—East has seen a decrease in community rating system discounts, a complete elimination of the grandfathering policy, and an increase of flood insurance rates, despite its mitigation efforts. *Id.* The Flood Authority will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts. *Id.* ¶¶ 18-21.

533. **Southeast Louisiana Flood Protection Authority—West** has taken significant mitigation efforts to protect the district from flood damage. Equity in Action does not take these mitigation efforts into consideration and instead imposes higher insurance premiums on property owners in the district. As the insurance premiums increase, people will be forced to leave the area, causing harm to the Flood Authority. Fewer people and high flood insurance rates mean that property values will decrease, leaving the Flood Authority with fewer resources to invest in future mitigation projects.

534. **South Lafourche Levee District** has taken significant mitigation efforts to protect the district from flood damage. The District has received significant funding through self-imposed taxes to help fund mitigation projects. Ex. 37, S. Lafourche Levee Dist. Dec. ¶¶ 7-8. These taxes helped fund the LtGM levee system, which prevented Hurricane Ida's 14-foot storm surge from flooding a single structure. *Id.* ¶¶ 10, 16-17. Equity in Action does not take these mitigation efforts into consideration and instead imposes higher insurance premiums on property owners in the

district. As the insurance premiums increase, people will be forced to leave the area, causing harm to the levee district. Fewer people and high flood insurance rates mean that property values will decrease, leaving the district with fewer resources to invest in future mitigation projects.

535. **St. Mary Levee District** has taken significant mitigation efforts to protect the district from flood damage. Equity in Action does not take these mitigation efforts into consideration and instead imposes higher insurance premiums on property owners in the district. As the insurance premiums increase, people will be forced to leave the area, causing harm to the levee district. Fewer people and high flood insurance rates mean that property values will decrease, leaving the district with fewer resources to invest in future mitigation projects.

536. **Terrebonne Levee & Conservation District** has taken significant mitigation efforts to protect the district from flood damage. Equity in Action does not take these mitigation efforts into consideration and instead imposes higher insurance premiums on property owners in the district. As the insurance premiums increase, people will be forced to leave the area, causing harm to the levee district. Fewer people and high flood insurance rates mean that property values will decrease, leaving the district with fewer resources to invest in future mitigation projects.

E. DRAINAGE DISTRICTS

537. **East Ascension Consolidated Gravity Drainage District No. 1** has taken significant mitigation efforts to protect the drainage district from flood damage. Equity in Action does not take these mitigation efforts into consideration and instead imposes higher insurance premiums on property owners in the drainage district. As

the insurance premiums increase, people will be forced to leave the area, causing harm to the drainage district. Fewer people and high flood insurance rates mean that property values will decrease, leaving the drainage district with fewer resources to invest in future mitigation projects.

## F. PLAINTIFF ASSOCIATIONS

538. **Plaintiff ALBL** is harmed by Equity in Action's lack of transparency. Ex. 41, Ass'n of Levee Bds. La. Dec. ¶ 54. It inhibits the Association's ability to partner with FEMA and other federal agencies in constructing and managing levees and other flood mitigation projects. *Id.* In addition, it hampers the ALBL's ability to communicate flood risk information to the community, which is a core part of the ALBL's mission. *Id.* ¶¶ 3, 30. It has had to divert its resources to trying to get information from FEMA about the new methodology. *Id.* ¶¶ 26-27. And the new methodology frustrates the organizational mission of the ALBL, which is to promote the welfare of the taxpayers and improve the administration of levee boards. *Id.* ¶ 3. In addition, the ALBL "aims to support studies of flood control and relief, and to promote, encourage, and assist in the obtaining of relief" from the federal government. *Id.* Equity in Action frustrates these goals by making flood insurance less affordable, disincentivizing levee districts from mitigation, and ignoring prior flood studies when evaluating risk. In addition, ALBL's members are harmed by Equity in Action. Many of its members are plaintiffs in this litigation. *Id.* ¶ 4. These levee districts have seen decreases in community rating system discounts, a complete elimination of the grandfathering policy, and increases of flood insurance rates, despite reduced risks in each of the levee districts.

### G. OTHER HARMS

539.  More broadly, Equity in Action eliminated the mitigation discount given for retrofitting at-risk buildings by installing flood protection products, even though millions of at-risk buildings remain. This disincentivizes property owners to retrofit at-risk buildings and try to mitigate potential future damage. Existing property owners in mitigation grant programs are seeing the negative effect of this and, as a result, 20% have already backed out of grant programs in 2023 because of the elimination of mitigation discounts.

540.  The Plaintiffs have relied on the flood insurance rate maps and invested in flood management pursuant to those maps. Not only does the new methodology undercut these management efforts, but FEMA cut out the very individuals with knowledge of these management efforts from the administrative process entirely.

541.  Forced migration, lost revenue, and a smaller tax base cause economic harm that will be felt across the country. Ex. 43, Terrebonne Econ. Dev. Auth. Dec. ¶ 10. More than 50% of GDP is generated near coastal zones of the eastern and western seaboards as well as the Gulf of Mexico, yet these are exactly the areas in which Equity in Action causes harm.

542.  Local communities will not be able to recruit or attract workers to fill job openings because housing is not affordable. Ex. 47, Houma-Terrebonne Chamber of Commerce Dec. ¶¶ 16-17; Ex. 43, Terrebonne Econ. Dev. Auth. Dec. ¶ 6. These industries cannot survive with a remote workforce. *Id.* ¶ 11.

543.  Furthermore, Equity in Action will cause harm to historic sites, which showcase local culture and history. Ex. 43, Terrebonne Econ. Dev. Auth. Dec. ¶ 12.

Rising insurance rates make it harder to afford preservation, and the decreased mitigation efforts threaten the survival of historic structures. *Id.*

544.    Equity in Action has a disproportionate impact on low to moderate income homeowners or would-be homeowners. Ex. 51, S. Shore Recovery Coal. Dec. ¶ 17. But its effect also reaches more broadly. All but the ultra-wealthy have been impacted. The higher premiums make it more difficult to sell homes because would-be buyers don't want to pay for flood insurance. *Id.* ¶ 18.

545.    And homeowners that have already had to pay for extensive repairs due to mitigation, or invest in mitigation to reduce risk, now face even higher premiums. In fact, some of these families have had to tap into their children's college funds to pay for disaster repairs, and increased flood insurance only exacerbates this problem. Ex. 51, S. Shore Recovery Coal. Dec. ¶ 19.

546.    Defendants' enactment of Risk Rating 2.0—Equity in Action constitutes a final agency action that is judicially reviewable under the APA. 5 U.S.C. §§ 704, 706.

547.    Defendants' enactment of Equity in Action was the culmination of Defendants' decisionmaking process and it is being used as the basis for new plans and renewals now.

**CLAIMS FOR RELIEF**
**COUNT I**
**Risk Rating 2.0—Equity in Action Is Contrary to Law**
**(5 U.S.C. § 706)**

548.    Plaintiffs repeat and incorporate by reference each of the Complaint allegations stated above.

549.   Courts must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory ... authority." 5 U.S.C. § 706(2)(A), (C).

550.   Equity in Action is a final agency action.

551.   *First*, FEMA is "authorized" to "enable interested persons to purchase insurance," and its rates must, "insofar as practicable," be "consistent with the objective of making flood insurance available where necessary at reasonable rates so as to encourage prospective insureds to purchase such insurance." 42 U.S.C. §§ 4011(a), 4015(b)(2).

552.   The new policy flouts that objective by making flood insurance functionally unavailable in many communities. *See* Federal Emergency Management Agency, Cost of Flood Insurance for Single-Family Homes under Risk Rating 2.0 (Apr. 19, 2023), https://perma.cc/K4NL-Y7M8, Exhibits 3, 4.

553.   FEMA itself acknowledges that the cost of flood insurance will rise for most policyholders, discouraging existing and prospective policyholders from maintaining coverage. An Evaluation of Risk Rating 2.0 Impacts on National Flood Insurance Program Affordability, Coalition for Sustainable Flood Insurance 10 (Sept. 2022), https://perma.cc/9UYK-ASJK.

554.   A methodology that raises insurance premiums to unaffordable levels is inconsistent with the goals of the NFIP and with Congress's statutory command.

555.   In at least one zip code in Louisiana, rates will increase by an average of 1098%. *See* Federal Emergency Management Agency, Cost of Flood Insurance for Single-Family Homes under Risk Rating 2.0 (Apr. 19, 2023), https://perma.cc/K4NL-

Y7M8, Exhibit 3. Likewise, in at least one zip code in Kentucky, rates will increase by 728% on average. Forty-one zip codes will experience average increases between 200 and 600%.

556.    Fewer than 10 zip codes in Louisiana will see their rates remain the same under Equity in Action. *See* Federal Emergency Management Agency, Cost of Flood Insurance for Single-Family Homes under Risk Rating 2.0 (Apr. 19, 2023), fhttps://perma.cc/K4NL-Y7M8, Exhibit 3. Every other zip code will see an increase in rates. Not a single zip code will see a decrease. *Id.* Likewise, in Kentucky, only one zip code will remain the same, and the rest will see increases. Not a single zip code will see a decrease to flood insurance rates.

557.    Many property owners, like the Heberts, will see their rates increase dramatically. Mr. Hebert, for example, has seen his rates increase from $3,289 in 2021 to $5,611 in 2023. Ex. 54, Hebert Dec. ¶ 28.

558.    *Second*, FEMA must set rates based on "the risk involved" and "the flood mitigation activities that an owner or lessee has undertaken on a property, including differences in the risk involved due to land use measures, floodproofing, flood forecasting, and similar measures." 42 U.S.C. §§ 4014-15.

559.    Here, FEMA has failed to properly consider the mitigation efforts taken by policyholders to reduce risks on their property.

560.    For example, it fails to account for the significant reduction in flood risk accomplished by the MtG levee system and the LtGM levee system. Ex. 50, Morganza Action Coal. Dec. ¶ 19; Ex. 37, S. Lafourche Levee Dist. Dec. ¶ 13.

561.   *Third*, FEMA must "consult with . . . State, and local agencies having responsibilities for flood control, flood forecasting, or flood damage prevention" in considering and implementing the program. 42 U.S.C. § 4024.

562.   It has failed to do so.

563.   In fact, State officials, parishes, levee board districts, and individuals have tried to get more information. But these efforts have been unsuccessful. *See* Ex. 52, SouthGroup Ins. Servs. Dec. ¶ 19-20; Ex. 36, N. Lafourche Conservation Levee and Drainage Dist. Dec. ¶¶ 21, 40; Ex. 42, Coastal Prot. and Restoration Auth. Dec. ¶¶ 18-20; *see also* Letter to Administrator Criswell from the House Committee on Oversight and Accountability (May 1, 2023) (describing the lack of transparency).

564.   *Fourth*, FEMA must "from time to time ... make information and data available to the public, and to any State or local agency or official," regarding the flood insurance program, coverage, and objectives, and flood insurance premium rates, including the basis for and differences between such rates. *Id.* § 4020.

565.   FEMA has failed to do so, despite numerous and persistent attempts by affected parties and their representatives. *See* Letter to Administrator Criswell from the House Committee on Oversight and Accountability (May 1, 2023) (describing the lack of transparency).

566.   For example, the agency has failed to disclose the risk factors it considers when setting rates and how it weighs those risks. Under the catastrophe model, the agency considers future climate change events, yet it does not reveal what those events or assumptions are. In addition, the agency has failed to make information

available explaining why insurance premiums are rising in places that have never seen a flood. *See, e.g.* Ex. 53, S. Bourgeois Dec. ¶¶ 17, 27; Ex. 54, Hebert Dec. ¶ 34.

567.    FEMA has also flipped this burden to injured parties, requiring them to provide information about risk-reducing measures—such as levees—while ignoring anything not reported to FEMA. Ex. 36, N. Lafourche Conservation Levee and Drainage Dist. Dec. ¶¶ 12-13.

## COUNT II
### Risk Rating 2.0—Equity in Action Is Arbitrary and Capricious
### (Failure to Account for Important Aspects of the Problem)
### (5 U.S.C. § 706)

568.    Plaintiffs repeat and incorporate by reference each of the Complaint allegations stated above.

569.    Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary or capricious or otherwise not in accordance with law or contrary to the Constitution. 5 U.S.C. § 706(2)(A).

570.    An action is arbitrary and capricious if it fails to take into account important aspects of the problem. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*, 463 U.S. 29, 43 (1983).

571.    "[A]gency action is lawful only if it rests on a consideration of the relevant factors" and "important aspects of the problem." *Michigan v. EPA*, 576 U.S. 743, 750-52 (2015) (requiring "reasoned decisionmaking"). This means agencies must "examine all relevant factors and record evidence." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).

572.   Further, agencies must actually analyze the relevant factors. "'Stating that a factor was considered . . . is not a substitute for considering it.'" *Texas v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021). The agency must instead provide more than "conclusory statements" to prove it considered the relevant statutory factors. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016).

573.   FEMA failed to take into account six important aspects of the problem.

574.   *First*, the agency failed to account for the ways that mitigation efforts, like levees, decrease flood risk. And it has admitted as much. The agency has stated in meetings that it does not have adequate information about the majority of ALBL members' levee systems to consider them under Equity in Action, even though it previously considered them under the legacy system. Ex. 41, Ass'n of Levee Bds. La. Dec. ¶¶ 26-27. Failure to clearly account for levees—which dramatically reduce flood risks—disincentivizes Louisiana, other entities, and individual taxpayers from investing in mitigation projects, like building levees to reduce overall risk.

575.   *Second*, the agency failed to take into account that the pricing increases would cause mass withdrawals, or the effects of those withdrawals on the financial state of the program and on the program's goal of expanding access to affordable insurance. *Cf. Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*, 345 F. Supp. 2d 1151, 1156 (W.D. Wash. 2004) ("The NFIP is not the only source of flood insurance, but flood coverage for residential homeowners in particular is difficult to acquire from the private insurance market.").

576.    FEMA's own 2018 NFIP Affordability Study acknowledged the negative relationship between the cost of a NFIP policy and a consumer's decision to purchase or renew coverage. *FEMA Releases Affordability Framework for the National Flood Insurance Program*, FEMA (Apr. 17, 2018).

577.    *Third*, the agency failed to take into account the extent of the skyrocketing costs generated by its new policy.

578.    In Louisiana, for example, the average full-risk premium for a single-family home will increase 122%, and 90% of ratepayers can expect an annual increase in 18% per year over the next ten years.

579.    *Fourth*, the agency failed to take into account that the price increases would cause evictions, especially for low-income families.

580.    Landlords in SFHAs are required to purchase flood insurance, and they pass along premium rate increases to their tenants by raising the rent.

581.    This disproportionately harms low-income families.

582.    FEMA's 2018 NFIP Affordability Study concluded that those with the lowest median incomes live in the highest hazard areas—in other words, the areas that are susceptible to the highest premiums under Equity in Action.

583.    *Fifth*, the agency failed to take into account the follow-on effects of making flood insurance more costly.

584.    Individuals who cannot afford the increased costs of the insurance will leave the area, lowering the tax base and reducing tax revenue used to invest in flood mitigation.

585.   It will become harder to recruit individuals to the area to enter the work-force because the cost of home insurance is too high.

586.   Fewer workers means lower economic productivity, which will harm the overall GDP across the United States because the most affected regions make up a majority of the nation's GDP.

587.   *Sixth*, the agency considered inappropriate factors.

588.   It considered the inappropriate factor of future climate change, which does not relate to the risk a property actually faces *today*. Equity in Action uses catastrophe modeling, which takes into account future hypothetical events, including hypothetical events resulting from climate change. The agency does not disclose what these hypothetical events are, nor does the agency explain how the hypothetical events change based on hypothetical future climate activity.

589.   It also considered the inappropriate factor of how its program would advance an unrelated identity-politics agenda. It "integrat[ed]" into its approach to flood insurance factors like race, ethnicity, religion, income, geography, gender identity, sexual orientation, and disability when issuing rules and guidance. FEMA Defines Equity in its Mission of Making Programs More Accessible, FEMA (Sept. 9, 2021); Executive Order 13985 (Jan. 20, 2021).

## COUNT III
## Risk Rating 2.0—Equity in Action Is Arbitrary and Capricious
## (Reliance Interests)
## (5 U.S.C. § 706)

590.   Plaintiffs repeat and incorporate by reference each of the Complaint allegations stated above.

591.   Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary or capricious or otherwise not in accordance with law or contrary to the Constitution. 5 U.S.C. § 706(2)(A).

592.   An action is arbitrary and capricious if it does not consider the reliance interests of those affected by it. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020).

593.   FEMA previously grandfathered certain NFIP policies, which were used to entice people to stay in the communities and pay into the program itself.

594.   FEMA did not consider the reliance interests of homeowners with grandfathered NFIP policies. Instead, it took away their grandfathered rates and subjected them to unexpected higher rates, thereby throwing their life plans into turmoil.

595.   FEMA did not consider the reliance interests of homeowners who had already accepted disaster assistance, SBA loans, or other forms of assistance that would require them to maintain qualifying flood insurance for the duration of their agreements. It blind-sided them with unexpected higher and often unaffordable rates, when they had reasonably planned around the rates under the preexisting program.

596.   FEMA did not consider the reliance interests of policyholders whose future applications for disaster assistance would be conditioned on obtaining and maintaining flood insurance.

597.   FEMA did not consider the reliance interests of communities that adopted ordinances and regulations in exchange for participation in the NFIP.

598.   FEMA did not consider the reliance interests of communities that went above and beyond the minimum federal standards in exchange for CRS discounts.

599.   FEMA did not consider the reliance interests of States that have restructured their laws to do things like (a) authorize local governments to participate in the NFIP, (b) mandate that state agencies "cooperate with [FEMA] in the planning and carrying out of state participation in the [NFIP] and aid, advise, and cooperate with parishes and municipalities endeavoring to qualify for participation in said program," and (c) command local governments to adopt FEMA's maps and floodplain management regulations before engaging in local flood, hurricane, or storm damage projects. *See* La. Rev. Stat. § 38:84.   FEMA, instead, swept the rug out from policyholders, communities, and States by eliminating virtually all incentives and sticking the policyholders with bills for exorbitant premiums.

## COUNT IV
### Risk Rating 2.0—Equity in Action Is Arbitrary and Capricious (Departure from Prior Policy) (5 U.S.C. § 706)

600.   Plaintiffs repeat and incorporate by reference each of the Complaint allegations stated above.

601.   Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary or capricious or otherwise not in accordance with law or contrary to the Constitution. 5 U.S.C. § 706(2)(A).

602.   An action is arbitrary and capricious if it departs from prior policy without sufficient justification. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016).

603.    FEMA departed from its prior policy and failed to adequately explain its reasons for doing so.

604.    As an initial matter, FEMA itself acknowledged that Equity in Action is "a new pricing methodology." *Risk Rating 2.0: Equity in Action*, FEMA (last accessed March 21, 2023), https://perma.cc/25SC-SM4B. FEMA further describes this methodology as "not just a minor improvement, but a transformational leap forward." *Id.* Yet it refused to explain what the methodological change was, or what new data the agency relied on, let alone why it undertook those precise changes.

605.    Specifically, Equity in Action purports to employ a catastrophic loss model rather than a historical model. FEMA does not provide justification for ignoring historical data related to flooding.

606.    In addition, FEMA eliminated the BFE standard, which it had previously used, and on which people relied. FEMA fails to provide justification for this shift.

607.    But as recent as 2013, FEMA acknowledged that the agency lacks the authority to change the NFIP. *See* Update on FEMA's Levee Analysis and Mapping Procedure, 2013 IAFSM Conference, FEMA, https://perma.cc/39MR-9TJ4.

608.    Such a "transformational leap" without any explanation violates the APA.

## COUNT V
### Risk Rating 2.0—Equity in Action Is Arbitrary and Capricious
### (Pretext)
### (5 U.S.C. § 706)

609. Plaintiffs repeat and incorporate by reference each of the Complaint allegations stated above.

610. Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary or capricious or otherwise not in accordance with law or contrary to the Constitution. 5 U.S.C. § 706(2)(A).

611. An action is arbitrary and capricious if "it rest[s] on a pretextual basis." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019).

612. An action rests on pretextual basis whenever there is "a significant mismatch between the decision the [agency] made and the rationale [it] provided." *Id.* at 2575.

613. *First*, FEMA acted pretextually because it claimed to be imposing Equity in Action in order to further its statutory obligations but instead imposed it to drive Americans out of homeownership and away from certain areas.

614. *Second*, FEMA acted pretextually because it imposed Equity in Action to further the Administration's climate-change agenda. Rather than look at historical data and observed flooding events to determine the risks a property faces at this time, the FEMA's methodology considers a host of undisclosed hypothetical events, including events related to future climate change. Its new methodology employs a catastrophic modeling system instead of a historical modeling system. Rather than consider the risks a given property actually faces today, its catastrophic modeling

system forecasts hypothetical events, including those related to climate change, and uses those hypothetical events to evaluate the risk of a property. For example, home-owners who have never experienced flooding and live in low-risk areas now are seeing skyrocketing insurance premiums as a result of Equity in Action's consideration of future climate change. By folding these inappropriate considerations into FEMA's methodology, the agency is tweaking flood insurance rates to meet its separate objective of addressing future climate change. *See, e.g.*, *FEMA Strategic Plan, Building the FEMA our Nation Needs and Deserves*, FEMA (Dec. 9, 2021), perma.cc/QD8L-GY2R.

615.    To the extent that FEMA discloses its reliance on these factors, it acted arbitrarily and capriciously by relying on inappropriate factors. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Congress did not intend FEMA to consider future climate change in setting these present rates. *See* 42 U.S.C. § 4015(b) (outlining the considerations for setting rates).

**COUNT VI**
**Risk Rating 2.0—Equity in Action Violates the APA's Notice-and-Comment Requirement**
**(5 U.S.C. § 706)**

616.    Plaintiffs repeat and incorporate by reference each of the Complaint allegations stated above.

617.    A "reviewing court shall ... hold unlawful and set aside agency action ... found to be ... without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

618.    Risk Rating 2.0—Equity in Action is a final agency action and legislative rule that requires notice-and-comment rulemaking procedures under the APA.

619. It was the culmination of Defendants' decisionmaking process and it is being used as the basis for new plans and renewals now.

620. But FEMA published it without notice or comment.

621. Notice-and-comment rulemaking "give[s] interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments …." 5 U.S.C. § 553(c).

622. The notice-and-comment process also benefits the agency by affording the agency the "chance to avoid errors and make a more informed decision." *Azar v. Alina Health Servs.*, 139 S. Ct. 1804, 1816 (2019).

623. No exceptions apply.

624. No good cause exists for failure to undertake notice-and-comment. No emergency situation exists, nor would a delay result in serious harm. *Jifry v. F.A.A.*, 370 F.3d 1174, 1179 (D.C. Cir. 2004).

625. The final rule is not related to internal practice or procedure. *See Batterton v. Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980). Rather, it is a final rule determinative of who can get flood insurance and how much their premiums will cost.

626. The final rule is not a benefit or contract. 5 U.S.C. § 553(a)(2). It is effectively mandatory for policyholders, and the agency's black-box methodology is dispositive of policyholders' obligations to procure the requisite policy. Moreover, only property-owners who live in communities that have enacted FEMA's maps and flood-plain management regulations are eligible to purchase an NFIP policy, which is a much more involved program than a mere benefit or contract.

627.    To the extent the agency announced that it sought to update the ratings system broadly, the public did not have fair notice of the specific methodology the agency was considering. *See CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081 (D.C. Cir. 2009).

628.    The final rule was not a logical outgrowth of any proposed rule because "[s]omething is not a logical outgrowth of nothing." And here, the agency provided nothing in advance of its final rulemaking. *Kooritzky v. Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994). This, by definition, fails the logical outgrowth test, which violates the notice-and-comment rulemaking process.

629.    Because the agency failed to issue a notice of proposed rulemaking and undertake the process outlined in the APA, the agency could not consider important aspects of the problem. *See supra* Count V.

## COUNT VII
### Risk Rating 2.0—Equity in Action Exceeds FEMA's Statutory Authority
### (5 U.S.C. § 706)

630.    Plaintiffs repeat and incorporate by reference each of the Complaint allegations stated above.

631.    Under the APA, a court must "hold unlawful and set aside agency action" that is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. § 706(2)(C).

632.    Courts "presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" *W. Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). When an agency asserts power to take an action with "deep economic

and political significance," courts are skeptical of its claimed statutory authority. *King v. Burwell*, 576 U.S. 473, 486 (2015).

633.   "To overcome that skepticism, the Government must—under the major questions doctrine—point to 'clear congressional authorization' to regulate in that manner." *W. Virginia v. EPA*, 142 S. Ct. at 2609.

634.   It is not enough for an agency action to have "a colorable textual basis." *Id.* at 2609. Instead, Congress's authorization for that action must be "clear." *Id.*

635.   Separately, Congress also must "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849–50 (2020); *accord Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991); *see also Sackett v. EPA*, No. 21-454, slip op. at 23 (S. Ct. 2023). States have "broad power to regulate housing conditions" *Yee v. City of Escondido*, 503 U.S. 519, 528 (1992).

636.   Here, FEMA has invoked NFIP to do something that is plainly of deep economic and political significance *and* that treads on traditional state power *and* increases federal power over private property. It has invoked the NFIP to relocate entire populations. After decades of affordable rates allowed cities and communities to develop along coasts, FEMA has invoked its modest power to "prescribe … charge-able premium rates" to force people out of those communities and dramatically redraw America's population map. The population decline threatens many coastal industries, including oil and gas and fishing, and those industries have expressed

concern with maintaining the necessary workforce to sustain operations. Ex. 43, Terrebonne Econ. Dev. Auth. Dec. ¶¶ 32-33. Parishes are in dismay at the anticipated mass exodus due to the lack of affordable housing. *E.g.*, *id.* ¶ 31.

637.   Therefore, if there is any ambiguity over FEMA's statutory authority to resettle large populations, then it cannot be held to have that authority.

638.   The NFIP gives FEMA only the authority to "prescribe … chargeable premium rates." 42 U.S.C. § 4015(a). It authorizes mild adjustments, not sudden turbocharged rates that force mass migration and resettlement of entire communities.

639.   In fact, Congress separately provided (far more limited) authority for FEMA when it seeks to move large populations. FEMA has the authority to encourage States to adopt ordinances that "guide the development of proposed construction away from locations which are threatened by flood hazards." 42 U.S.C. § 4102(c)(2). When FEMA wants to move people away from certain communities, Congress directs it to do so by "encourag[ing] the application and the adoption" of floodplain management ordinances. *Id.*

640.   That provision would make little sense if FEMA could simply force those people out en masse by suddenly increasing their insurance rates tenfold. *See, e.g.*, *Ginsberg Sons v. Popkin*, 285 U.S. 204, 208 (1932) ("General language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment."); *SEC v. Hallam*, 42 F.4th 316, 337 (5th Cir. 2022) ("[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.").

641.   For all of these reasons, FEMA did not have the statutory authority to fundamentally relocate large portions of the American population.

## COUNT VIII
### Risk Rating 2.0—Equity in Action is Contrary to a Constitutional Right
### (5 U.S.C. § 706)

642.   Plaintiffs repeat and incorporate by reference each of the Complaint allegations stated above.

643.   Under the APA, a court must "hold unlawful and set aside agency action" that is contrary to constitutional right. 5 U.S.C. § 706(2)(B).

644.   When the federal government provides funds conditioned on the recipient meeting certain conditions, it violates the Spending Clause if the recipient cannot be said to have "voluntarily and knowingly" accepted the terms, *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981), or if the funding regime gives the State no choice but to accept, *NFIB v. Sebelius*, 567 U.S. 519, 577 (2022).

645.   The federal government provides funds to Plaintiffs through NFIP and the CRS in exchange for their adoption of mitigation measures and implementing floodplain management protocols. 42 U.S.C. § 4022; 44 C.F.R. § 59.22. FEMA can suspend communities from access to federal flood insurance, and deny them funds, if they do not adhere to these requirements.

646.   Here, the States and their subdivisions cannot be said to have voluntarily and knowingly accepted the terms of NFIP and the CRS; they have no choice but to accept those terms. FEMA conditions participation in the NFIP on communities meeting basic requirements, including elevating structures and imposing regulations. It incentivizes communities to undertake these measures by offering them

affordable flood insurance. But after communities dedicated time and resources to implement many of these measures, Equity in Action removed the promised affordability. State subdivisions have committed so many resources to compliance that they cannot just walk away now. But when they committed those resources, they did not know that the government would not deliver on its side of the deal.

647.   Only by restoring the earlier rates can this funding relationship be characterized as knowing and voluntary.

648.   Furthermore, States as "co-sovereign[s] in our constitutional structure have the right to 'bargain' in accordance with constitutionally imposed strictures of 'good faith,'" and they are "entitled to [adequate information] under the Constitution." *Texas v. Yellen*, No. 2:21-cv-079-Z, 2022 WL 989733, at *4 (N.D. Tex. Mar. 4, 2022). This allows the States to determine whether the "[Spending Clause] deal presented is in the best interests of their citizens." *Id.* In short, the federal government must "express clearly the terms of the deal that it is offering to the States." *State v. Yellen*, 539 F. Supp. 3d 802, 814 (S.D. Ohio 2021).

649.   Here, FEMA unilaterally changed the terms of the bargain after the States and local government have kept their side of the deal by undertaking significant mitigation efforts. Whereas the quid pro quo relationship between States and their political subdivisions and FEMA might have been in the best interests of the State's citizens at the time of the agreement, the States lack adequate information to determine whether the Spending Clause deal is still in the best interests of their citizens.

650.    Many State subdivisions' local economies and infrastructures are too dependent on the availability of flood insurance to leave the entire program. Without these grants, these communities would not have the resources to protect against flooding.

651.    They therefore have no choice but to accept the program's requirements, and the federal government should not be permitted to force its flood-insurance regime on them without the benefit that were once integral to the relationship.

**COUNT IX**
**Risk Rating 2.0—Equity in Action is Contrary to Law**
**(5 U.S.C. § 706)**

652.    Plaintiffs repeat and incorporate by reference each of the Complaint allegations stated above.

653.    Under the APA, a court must "hold unlawful and set aside agency action" that is without observance of procedure required by law. 5 U.S.C. § 706(2)(D).

654.    NEPA requires agencies to consider the environmental effects of major federal actions. When the agency considers taking a major federal action, NEPA asks whether that action is categorically excluded from the NEPA process. If the action is not categorically excluded, then the agency must prepare an Environmental Assessment to determine whether the proposed action has the potential to cause significant environmental effects. If the action will not have an effect, then the agency issues a Finding of No Significant Impact. But if the action will have an effect, then the agency must prepare a draft Environmental Impact Statement. Much like the APA process, this draft is then published for public review and comment. The agency must then issue a final EIS, which provides responses to these comments.

655.   Equity in Action constitutes a major federal action. It has deep economic and political significance for millions of Americans and is having widespread economic and population-related consequences across the county. It threatens entire industries, disrupts mitigation efforts, and could remake America's population maps. In FEMA's own words, "changes to the NFIP are considered to be a major federal action." Letter from the Floodplain Management Division at the Federal Insurance and Mitigation Administration to NFIP Community Officials (Mar. 5, 2019), perma.cc/ZFP4-TT5W.

656.   To the extent that FEMA has discretion to set the premiums and establish the methodology, *see* 42 U.S.C. § 4015(b), that further shows that it must comply with the NEPA review process. *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001) ("The touchstone of whether NEPA applies is discretion."). The twofold purpose of NEPA is "to inject environmental considerations into the federal agency's decisionmaking process and to inform the public that the federal agency has considered environmental concerns in its decisionmaking process." *Macht v. Skinner*, 916 F.2d 13, 18 (D.C. Cir.1990). If the agency "does not have sufficient discretion to affect the outcome of its actions, and its role is merely ministerial, the information that NEPA provides can have no affect on the agency's actions, and therefore NEPA is inapplicable." *Citizens Against Rails-to Trails*, 267 F.3d at 1151. For example, NEPA doesn't apply when the decision is "whether to certify and whether to fund" a project. *Atlanta Coalition on the Transp. Crisis, Inc v. Atlanta*

*Regional Comm'n*, 599 F.2d 1333 (5th Cir. 1979); *see also Sac & Fox Nation of Missouri v. Norton,* 240 F.3d 1250, 1262 (10th Cir.2001); *Sierra Club v. Babbitt,* 65 F.3d 1502, 1513 (9th Cir.1995).

657.   The NEPA process would have likely affected FEMA's actions because stakeholders could have participated in the review process and pointed out all the flaws in Equity in Action.

658.   Equity in Action is not categorically excluded from the NEPA process because it constitutes an entirely new system for calculating flood insurance rates and does not satisfy any relevant exceptions.

659.   FEMA was therefore required to preliminarily review Equity in Action and issue an Environmental Assessment discussing the effect Equity in Action may have on the environment. It failed to do so and therefore acted without observance of procedure required by law.

## PRAYER FOR RELIEF

**NOW, THEREFORE,** Plaintiffs request an order and judgment:

a.   Declaring, under 28 U.S.C. § 2201, that Risk Rating 2.0—Equity in Action is arbitrary and capricious and unlawful under the APA;

b.   Declaring, under 28 U.S.C. § 2201, that Risk Rating 2.0—Equity in Action is contrary to law under the APA;

c.   Declaring, under 28 U.S.C. § 2201, that Risk Rating 2.0—Equity in Action violates the APA because it was promulgated without notice and comment;

d.   Declaring that Risk Rating 2.0—Equity in Action violates the Constitution;

e. Holding Risk Rating 2.0—Equity in Action is unlawful and vacating it;

f. Preliminarily and permanently enjoining, without bond, Defendants from imposing Risk Rating 2.0—Equity in Action;

g. Enjoining Defendants to fully disclose the methodology and input data for Risk Rating 2.0—Equity in Action to bring Defendants in compliance with Congress's mandate that they "consult with . . . State[] and local agencies," 42 U.S.C. § 4024, and to give Plaintiffs the ability to understand how Equity in Action works, which mitigation efforts it recognizes (if any), and whether continued participation in NFIP "is in the best interests of their citizens." *Texas*, 2022 WL 989733, at *4; *see also* 5 U.S.C. 706(1) (authorizing the court to "compel agency action unlawfully withheld or unreasonably delayed"); 42 U.S.C. § 4020 (requiring FEMA to make NFIP rate setting information and data available to the public, States, and local government).

h. Granting all other relief to which Plaintiff States are entitled, including but not limited to attorneys' fees and costs.

Dated:  June 1, 2023

Respectfully submitted,

**JEFF LANDRY**
  ATTORNEY GENERAL

By:*/s/ Elizabeth B. Murrill*

ELIZABETH B. MURRILL (La #20685)
  Solicitor General
MORGAN BRUNGARD (La #40298)
  Assistant Solicitor General
TRACY SHORT (La #23940)
  Assistant Attorney General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70802
Tel: (225) 326-6766
murrille@ag.louisiana.gov
brungardm@ag.louisiana.gov
shortt@ag.louisiana.gov

*Counsel for the State of Louisiana,
Plaintiff Parishes, Plaintiff Municipali-
ties, Plaintiff Levee Districts, Plaintiff
Drainage Districts, and Plaintiff Associ-
ations*

ASHLEY MOODY
  Attorney General
JAMES H. PERCIVAL*
  Chief of Staff
Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

DREW H. WRIGLEY
  Attorney General
PHILIP AXT (ND Bar No. 09585)*
  Solicitor General
North Dakota Attorney General's Office
600 E Boulevard Avenue, Dept. 125
Bismarck, ND 58505
(701) 328-2210
pjaxt@nd.gov

*Counsel for the State of North Dakota*

RAÚL LABRADOR
  Attorney General
THEODORE J. WOLD *
  Solicitor General
OFFICE OF THE IDAHO ATTORNEY
GENERAL
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 999-0910
Email: Theodore.Wold@ag.idaho.gov

*Counsel for State of Idaho*

DANIEL CAMERON
  Attorney General of Kentucky
LINDSEY KEISER*
  Assistant Attorney General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5517

*Counsel for the State of Kentucky*

LYNN FITCH
  Attorney General
JUSTIN L. MATHENY*
  Deputy Solicitor General
OFFICE OF THE MISSISSIPPI
ATTORNEY GENERAL
550 High Street, Suite 1200
Jackson, MS 39201
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

ALAN WILSON
  South Carolina Attorney General
ROBERT D. COOK
  Solicitor General
J. EMORY SMITH, JR.*
Deputy Solicitor General
THOMAS T. HYDRICK*
Assistant Deputy Solicitor General
JOSEPH D. SPATE*
Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

JOHN SCOTT
  Provisional Attorney General
RALPH MOLINA
  Deputy Attorney General for Legal
Strategy
LEIF A. OLSON*
Chief, Special Litigation Division
Office of the Attorney General of Texas
P.O. Box 12548
Austin, Texas 78711
(512) 463-4139
Leif.Olson@oag.texas.gov

*Counsel for the State of Texas*

AUSTIN KNUDSEN
  Attorney General
CHRISTIAN B. CORRIGAN*
  Solicitor General
PETER M. TORSTENSEN, JR.*
  Assistant Solicitor General
Montana Department of Justice
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
Christian.Corrigan@mt.gov
Peter.Torstensen.@mt.gov

*Counsel for the State of Montana*

JASON S. MIYARES
  Attorney General
ANDREW N. FERGUSON
  Solicitor General
KEVIN M. GALLAGHER*
  Deputy Solicitor General
Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
aferguson@oag.state.va.us
kgallagher@oag.state.va.us

*Counsel for Plaintiff Commonwealth of Virginia*

*Pro hac vice* application forthcoming