# EXHIBIT 1

## Declaration of Casey Tingle

1. My name is Casey Tingle. I am over the age of 18 and am competent to make this declaration. The facts set forth in this declaration are based on my personal knowledge.

2. I am the Director of the Louisiana Governor's Office of Homeland Security and Emergency Preparedness (GOHSEP). I have served in that role since January 13, 2022.

3. GOHSEP is the state agency responsible for homeland security and emergency preparedness in Louisiana. To accomplish this, GOHSEP coordinates the State's activities to prepare for, prevent where possible, respond to, recover from and mitigate against future emergencies or disaster events.

4. As the Director of GOHSEP, I coordinate the State's efforts throughout the emergency management cycle for emergency and disaster preparedness, response and recovery for the State of Louisiana. This includes coordination among all agencies and organizations within the State including cooperation with agencies and organizations of other States and of the Federal government. In my role, I serve as the Louisiana Governor's Authorized Representative with the Federal Emergency Management Agency (FEMA).

5. Louisiana's flooding risks are well known. Situated on the Gulf of Mexico, and with much of its coastal area near sea-level, Louisiana is often buffeted by hurricanes and tropical storms that leave death and catastrophic destruction in their wake. Perhaps the most famous example is Hurricane Katrina in 2005, which claimed the lives of 1,577 in Louisiana and caused over $100 billion of damage across the state. A more recent example is Hurricane Laura in 2020, which killed 33 people and caused an estimated $17.5 billion of damage in Louisiana. And in 2021, Hurricane Ida killed 34 people and caused an estimated $55 billion in damage. The August 2016 flood impacted over 20 parishes and resulted from more than two feet of rain falling over a three day period. The flood caused the death of 13 people and approximately $10 billion in damages. Over 6,000 businesses and 109,000 housing units were flooded.

6. Louisiana is prone to flooding due to factors including: (1) proximity to the Gulf Coast, rivers, and lakes, (2) low elevation (3) coastal land loss and (4) drainage of the lower Mississippi River delta, which drains 41% of the continental United States.

7. Each year, the State of Louisiana experiences flooding events.

8. To promote flood mitigation and resiliency within its borders, the State of Louisiana has created the Louisiana Watershed Initiative (LWI) that supports regional watershed management with updated modeling, gage networks,

9. projects and planning. Since 2005, at least 10,764 structures have been elevated, reconstructed, or acquired and returned to greenspace through a variety of grant programs. Louisiana also adopted Statewide Building Codes, to include the recent update to include freeboard requirement statewide within the special flood hazard area.

9. The State expends an average of $120 million in Hazard Mitigation Assistance funding a year in projects like the ones described above. In addition, FEMA Public Assistance, LWI, United States Army Corps of Engineers (USACE), the Coastal Protection and Restoration Authority (CPRA), and the Office of Community Development Disaster Recovery Unit (OCD DRU) also expends funds on recovery and/or mitigation projects.

10. Flood insurance is another important tool for protecting Louisiana's residents and their most important financial assets—their home, business, and possessions. "Floods can happen anywhere," and the Federal Emergency Management Agency (FEMA) estimates that "just one inch of floodwater can cause up to $25,000 in damage."[1]

11. Louisiana has reportedly the highest NFIP participation of any state; 10% of policy holders in the NFIP live in Louisiana.

12. Because most homeowners insurance does not cover flood damage, homeowners need a separate flood insurance policy to cover the building, the contents of the building, or both.

13. The federal National Flood Insurance Program (NFIP) is the primary flood insurer. FEMA manages the NFIP. A network of more than 50 private insurance companies and the NFIP Direct deliver NFIP to the public.[2]

14. "The NFIP provides flood insurance to property owners, renters, and businesses" alike.[3] FEMA acknowledges that having flood insurance coverage helps policyholders recover faster when floodwaters recede.[4] The NFIP requires homes and businesses in high-risk flood areas with mortgages from government-backed lenders to have flood insurance.

15. NFIP insurance is available to anyone living in one of the 23,000 participating NFIP communities.[5] "A community is a governmental body with the statutory authority to enact and enforce development regulations."[6]

---

[1] https://www.fema.gov/flood-insurance.
[2] https://www.fema.gov/flood-insurance.
[3] https://www.fema.gov/flood-insurance.
[4] https://www.fema.gov/flood-insurance.
[5] https://www.fema.gov/flood-insurance.
[6] https://www.fema.gov/flood-insurance.

2

16. There are 318 NFIP communities in Louisiana. Across Louisiana as a whole, there are 284,095 NFIP policies currently in force.

17. To become an NFIP community, these respective communities' local governments in Louisiana had to enact and implement floodplain management regulations aimed at mitigating the effects of flooding and has to enforce those regulations.[7]

18. The local governments' floodplain management regulations must satisfy state law as well as minimum NFIP requirements.

19. As NFIP communities, these communities in Louisiana have committed: (a) to issue or deny permits to build or develop in the floodplain; (b) to inspect all development to assure it complies with the floodplain management regulations the local government was required to pass to become an NFIP community; (c) to maintain records of floodplain development; (d) to work with FEMA to prepare and revise floodplain maps; and (e) to help residents obtain information about flood hazards, flood insurance, and proper methods of construction.

20. In other words, these local governments in Louisiana have undertaken obligations and projects and implemented policies at FEMA's direction so that their communities could purchase NFIP flood insurance. In order to become and remain NFIP communities, they've had to continually adhere to FEMA's requirements, regardless of whether those requirements reflect the policies that those communities—without the promise of affordable flood insurance from FEMA—would have chosen to protect themselves from the risks of flooding.

21. FEMA reports that the current floodplain management policies and procedures in effect in communities like those in Louisiana that participate in NFIP have saved the nation over $100 billion dollars in avoided floods over the last 40 years.

22. One tried-and-true method for reducing floods across Louisiana is elevating homes and businesses, which FEMA previously prioritized when setting NFIP insurance rates.

23. Prior to Risk Rating 2.0, FEMA used the 1% Annual Exceedance Probability (AEP) flood as the basis for the National Flood Insurance Program. The 1% AEP flood is a flood that has a 1 in 100 chance of being equaled or exceeded in any given year and an average recurrence interval of 100 years—often referred to as the "100-year flood."

---

[7] https://www.fema.gov/flood-insurance.

24. Before Risk Rating 2.0, FEMA used Flood Insurance Rate Maps to set rates and, in those maps, determined the AEP flood for each flood zone—called the Base Flood Elevation (BFE).

25. For each flood zone, FEMA advised elevating homes at least 1 foot above the BFE because FEMA expected its exposure to flood claims at or above that level to be very infrequent, and so FEMA lowered insurance rates accordingly. The higher a structure was elevated above the BFE level, the lower FEMA's risk for having to pay claims and, therefore, the lower the insurance rate.

26. For decades, local governments across Louisiana adopted FEMA's Rate Maps and/or adopted freeboard requirements. Jefferson Parish, for example, requires either 1 foot or 2 feet of freeboard depending on the type and location of construction.

27. One reason the local governments in Louisiana adopted FEMA's Rate Maps and/or adopted freeboard requirements was to take advantage of FEMA's previous policy rate determination method, as described in sections 24-26 above. FEMA's previous policy protected those who built in the communities from huge rate increases if they built in accordance with the Rate Maps' requirements.

28. The homeowners and business owners across Louisiana have relied on FEMA's advice to elevate their homes and businesses in accordance with FEMA's Rate Maps. Most property owners pursuing mitigation projects have done so because of the flood insurance savings resulting from mitigation.

29. FEMA, USACE, CPRA, OCD DRU, and the Department of Housing and Urban Development (HUD), offer different kinds of programs for elevating homes and businesses.

30. The FEMA grant programs that GOHSEP administers that are most relevant to this litigation are the Flood Mitigation Assistance (FMA) program and the Hazard Mitigation Grant Program (HMGP).

31. The Flood Mitigation Assistance program is an annual, nationally competitive grant program funded at least in part by the National Flood Insurance Fund and focuses on funding projects that reduce or eliminate flood insurance claims. States, territories and federally recognized tribes are eligible to apply for FMA assistance. In fiscal year 2022, FEMA made $800M available through this program.

32. All FMA applicants and subapplicants must be participating in the NFIP, and not be withdrawn, on probation, or suspended. Structures identified in the subapplication must have an NFIP policy (including a Group Flood Insurance Policy [GFIP]) in effect prior to the opening of the application period and the

4

policy must be maintained after the completion of the mitigation project for the life of the structure (1) to an amount at least equal to the project cost or (2) to the maximum limit of coverage made available with respect to the particular property, whichever is less. The maximum limit of coverage made available is defined as the replacement cost value of the structure up to $250,000 for residential and $500,000 for non-residential. Insurance must also be maintained regardless of whether the structure is subsequently removed from the SFHA.

33. The Hazard Mitigation Grant Program provides grants for infrastructure projects, including elevating homes and other structures.  HMGP is made available after a presidentially declared disaster.  As described for FMA above, for any structure that remains in the floodplain post mitigation, the property owner must obtain and maintain flood insurance for the life of the structure, regardless of transfer of ownership, in an amount at least equal to the project cost or to the maximum limit of coverage made available with respect to the mitigated property, whichever is less.

34. Approximately 16,000 structures have been mitigated through the HMGP and FMA programs in Louisiana (including elevations, acquisitions, reconstructions, and infrastructure retrofit projects), that now have a federally mandated flood insurance requirement.

35. Since Risk Rating 2.0 went into effect, local jurisdictions are communicating to the State that the number of homeowners interested in mitigation is decreasing.  One parish has stated that approximately 25%-30% of homeowners in recently submitted grant applications are now declining mitigation due the rise in flood insurance costs and the uncertainty of how certain factors post-mitigation will impact their premium. The decision not to elevate leaves Louisiana residents and their property in harm's way and increases the amount the State will have to spend on flood recovery.

36. Through its Hazard Mitigation Assistance programs, FEMA provides funding for projects aimed at mitigating flood risks. These projects include large-scale projects such as levee construction, as well as the elevation of individual homes. As stated above, a condition of receiving FEMA grants to elevate their homes through such projects, homeowners are required to obtain and maintain flood insurance for the life of the structure, regardless of transfer of ownership, in an amount at least equal to the project cost or to the maximum limit of coverage made available with respect to the mitigated property, whichever is less. This requirement runs with the deed. This requirement is in accordance with 44 CFR Section 60.3, 42 U.S.C. 5154a, and Hazard Mitigation Assistance Guidance.

37. Local subapplicants group homes designated for elevation or reconstruction in such projects together, with a range of 1 home to 75+ homes per project.

38. FEMA relies on the State and its local governments to administer these elevation and reconstruction projects. Eligible entities (usually a parish or eligible municipality) submit applications to GOHSEP for review and submission to FEMA. Once FEMA approves the project, the jurisdiction notifies homeowners that they can begin their mitigation projects. The homeowner submits documentation supporting costs to the local jurisdiction for reimbursement, who in turn submits to GOHSEP for reimbursement. The State and local jurisdiction monitors the project through construction to closeout.

39. FEMA also requires the State to ensure that homeowners who receive such grants actually obtain flood insurance. In fact, FEMA will not consider such projects "closed" until the State provides FEMA with proof that every homeowner within such a project has obtained flood insurance as required. FEMA intends to de-obligate all federal funds associated with a mitigation project for which flood insurance is not obtained and maintained.

40. The closeout process for HMA grants requires that every dollar spent on the grant is properly supported by contracts, invoices, checks or other such documentation. Other required documentation includes a final elevation certificate, final inspection report, certificate of occupancy, and proof of current flood insurance at time of closeout. For projects that contain, for example, over 100 residential properties, it is difficult to keep up with the rolling expiration/renewal process for each property, as each property completes construction during a different timeframe during the life cycle of that particular grant.

41. If a homeowner who is the recipient of such an elevation grant fails to obtain flood insurance as required, the State is required to pay back to FEMA the amount of funding that the non-compliant homeowner received in order for FEMA to close the project. For example, FEMA is currently in the process of de-obligating $112,300 for one property for which the homeowner is unable to afford the cost of the flood insurance. This is the first instance of FEMA moving forward with a de-obligation based solely on lack of flood insurance at closeout, and we anticipate seeing an increase of those examples from this point forward due to increased rates associated with Risk Rating 2.0.

42. The State may seek to recover these funds from the subapplicant, who would then have to decide whether to recoup their funds from non-compliant homeowners. But doing so involves significant further costs to the State and local jurisdictions, and may/often proves unsuccessful.

43. There are significant enforcement costs associated with seeking to recoup funds from non-compliant homeowners. Should the State or local jurisdiction seek to recover such funds, the State and local jurisdictions will lose money.

44. GOHSEP and local jurisdictions continue to see an increase in homeowners that have not maintained flood insurance through closeout in existing mitigation projects. Up to this point, we have collectively been able to work with homeowners to ensure they purchase a policy prior to submission to FEMA, however, this is growing more challenging since Risk Rating 2.0. Additionally, and as mentioned previously, communities are seeing an increase in homeowners declining new mitigation opportunities due to the increased cost of flood insurance and uncertainty of impacts of rating factors, especially post-mitigation.

45. Many current grant recipients applied for and received grants under the Legacy Rating System with the understanding that they would see lower rates and the availability of information to estimate the rate reduction. Recipients often relied on this understanding and historical data as part of agreeing to the requirements of the grant funding. Since Risk Rating 2.0, they are seeing higher rates, even after spending years and potentially tens of thousands of dollars, factoring in non-federal cost share, mitigating their homes to reduce the risk of flooding.

46. As a result, more people are not applying for grants, and more people are not following through with current mitigation projects.

47. The flood insurance requirement for structures remaining in the floodplain post mitigation is in perpetuity. There is a real concern that FEMA may, post mitigation, attempt to recoup the federal funds, should a homeowner's policy lapse because they could no longer afford the drastically more expensive policy.

48. The State spends State Management Cost funds each year to educate its residents about those grant programs, process grant applications, distribute grant funds, and monitor and enforce grantees' compliance with the requirements of those programs.

49. Despite the grant programs, reliance on FEMA's Rate Maps by local governments throughout Louisiana, and the State's success in flood reduction from elevating structures, under Risk Rating 2.0, elevating a structure above the BFE appears to have only a negligible effect on the insurance rate charged for elevated homes and businesses.

50. Although FEMA's Community Rating System discounts are still in place for the NFIP communities in Louisiana, residents of Louisiana still wind up paying much higher rates because, the community rating system discounts do not stop the rates themselves from increasing. So even with the community

7

rating system discounts, residents of Louisiana pay higher rates under Risk Rating 2.0.

51. The Louisiana flood mitigation efforts have successfully reduced flooding. FEMA's recent Loss Avoidance Study completed after Hurricane Laura, studied 48 mitigated properties and showed that $10.6m in losses were avoided and a similar report following Hurricane Ida, studied 656 mitigated properties and demonstrated $86.3m in losses avoided through mitigation.

52. Despite Louisiana's dramatic reduction in flooding and flood damage, FEMA has stated that Risk Rating 2.0 will increase the cost of flood insurance for approximately 80% of properties in Louisiana—both residential and commercial—that are in Special Flood Hazard Areas and are backed by federally insured mortgages.

53. Risk Rating 2.0 either has already increased the flood insurance rates for those properties or will increase their rates when their NFIP policies renew, regardless of whether the properties are protected by levees or have been elevated—or both.

54. On average, policies in Louisiana are expected to increase 122%.

55. Those rate increases not only affect owners of property in Special Flood Hazard Areas but also those who rent properties in Special Flood Hazard Areas. The NFIP rate increases will likely be passed on to renters in the form of rent increases.

56. These rate increases harm all property owners, but they of course pose a particular hardship to low and moderate income property owners and their families, many of whom have lived in these areas for generations, and many of whom are racial minorities. Doubtless, many of these low and moderate income property owners and their families will struggle to pay for their mandatory insurance at its increased price. Indeed, these rate increases are likely to force many of these property owners and their families out of their homes in these areas, and perhaps out of Louisiana altogether, thereby threatening the unique communities and cultures that have developed here over the course of generations. This is unjust, especially considering that it was FEMA's promise of lower insurance rates that convinced many of these vulnerable property owners and their families to make significant investments in elevation and other flood mitigation measures. This falls well short of the equity goals promised under Risk Rating 2.0.

57. As rates increase, many homeowners, business owners, and renters in Louisiana are likely to be priced out of their properties and forced to move to out of Louisiana, which will decrease Louisiana's tax base and therefore its

financial ability to protect its residents and their property from flooding and flood damage.

58. And by creating a surplus of available property, this exodus from Louisiana will negatively impact the property values of those who remain, further decreasing the State's tax revenues.

59. Moreover, even if no one were to leave Louisiana, Risk Rating 2.0 is still likely to negatively affect property values in Louisiana by increasing the cost of purchasing mandatory flood insurance that runs with the property, thereby decreasing the State's tax revenues.

60. This reduction in tax revenue will inhibit the State's ability to protect its residents and their property. This would be tragic given the proven efficacy of the State's flood mitigation efforts.

61. Moreover, the lack of affordable housing in flood zones brought on by Risk Rating 2.0, will severely harm industries in Louisiana that are located in or near these flood zones, and depend on the availability of affordable housing for their work force.

62. Risk Rating 2.0 apparently fails to account for all of Louisiana's flood reduction successes. By failing to do so, Risk Rating 2.0 will likely decrease the State's tax revenues and inhibit Louisiana's ability to protect its residents and their property.

63. Communities and homeowners are unable to determine how any benefits were factored in for elevated properties, as the mitigated properties are seeing rate increases as high or higher than non-elevated properties. One community stated that despite structures being elevated, the flood insurance policies seemed to indicate that the homes were still slab on grade, and no benefits were provided for being elevated.

64. Risk Rating 2.0 makes it hard to estimate what future risk premiums will be. Under the Legacy Rating System, homeowners, brokers, insurance agents, and regulators could generally figure out how much premiums would change each year. But under Risk Rating 2.0, FEMA calculates rates in a black box, making rates unpredictable.

65. Risk Rating 2.0 also makes it impossible for GOHSEP and local partners to effectively communicate information about expected future premiums to grant applicants. This inhibits GOHSEP from explaining the risks and rewards before a homeowner commits to a project, increasing the likelihood that the homeowner chooses not to comply with the grant program requirements in the future.

66. Risk Rating 2.0 doesn't seem to appropriately account for elevation, and hurts GOHSEP's and FEMA's credibility in local communities. Previously, we encouraged them to undertake these projects, as the lower premiums that were supposed to follow were additional incentive to mitigate.

67. This loss of credibility could hamper GOHSEP's efforts to protect Louisiana in the future. Homeowners, particularly those in disadvantaged communities and/or those with low to moderate income, will likely be unable to afford to elevate their homes even through a grant program, due to the significant rise and unpredictability of flood insurance costs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Baton Rouge, Louisiana, this 31st day of May, 2023.

_____