# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| The State of Louisiana, et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| Alejandro Mayorkas, in his official capacity | ) | |
| as Secretary of Department of Homeland | ) | |
| Security, et al., | ) | |
| | ) | |
| **Defendants.** | | |

**DECLARATION OF TRAVIS ALAN VOYLES**

I, Travis Alan Voyles, pursuant to 28 U.S.C. § 1746, declare as follows:

1.       My name is Travis Alan Voyles. I am over the age of 18 and am competent to make this declaration. The facts set forth in this declaration are based on my personal knowledge.

2.       I am the Secretary of Natural and Historic Resources of the Commonwealth of Virginia and have served in that role since March 3, 2023.

3.       Virginia is prone to flooding because of its: (1) geographic location on the Atlantic coast, nearly 50 thousand miles of rivers, and 61 major lakes; (2) proximity to hurricane zone; (3) low elevation in the coastal regions; (4) steep mountain terrain in the western region; (5) 9 percent of land located in Special Flood Hazard Areas; and (6) high rate of coastal land subsidence.

4.       Each year, Virginia experiences an average of 3 to 4 flooding events.

5.       The average annual cost of flood damage in Virginia is $16.1 million.

6.       To promote flood recovery within its borders, Virginia has a state National Flood Insurance Program coordinating program, which operates under the Community Assistance Program – State Supportive Services Element (CAP-SSSE) and Cooperating Technical Partners. Flood recovery efforts have included the development of laws and floodplain ordinances which

1

promote resilience and flood risk reduction, administration of grants to build local capacity to manage flooding, facilitation of post-disaster and preparedness courses to local officials, participation in workgroups to address targeted areas, and coordination with federal partners. Virginia also has a hazard mitigation program to administer grants to reduce future damage, and programs to help communities recover costs following a disaster.

7.     Virginia expends an average of $1.2 million in state funds a year in flood recovery projects like the ones described above. Those efforts include flood resilience and hazard mitigation planning at local, regional, and statewide scales; development of the Virginia Flood Risk Management Standards for state-owned property; promulgation of the Virginia Uniformed Statewide Building Codes; administration of the Community Flood Preparedness Fund; implementation of federal flood risk reduction programs; facilitation of floodplain management training; interagency coordination of hazard reduction programs; and outreach for flood and dam risk awareness.

8.     Virginia supports local governments in applying for and receiving federal hazard mitigation grants. Since 2013, Virginia has brought in $254 million through 340 grant projects and is currently supporting 72 project applications totaling $560 million.

9.     In addition to the approximately $1.2 million a year spent on flood mitigation projects like the ones discussed above, $97 million has been administered through Virginia's Community Flood Preparedness Fund since the beginning of 2021, and $5.67 million has been administered through the Hurley Flood Relief Program. This does not include the cost of state personnel to manage and execute the mitigation projects.

10.     Flood insurance is another important tool for protecting Virginia's residents and their most important financial assets—their home, business, and possessions. "Floods can happen

anywhere," and the Federal Emergency Management Agency (FEMA) estimates that "just one inch of floodwater can cause up to $25,000 in damage."[1]

11.    Because most homeowners insurance does not cover flood damage, homeowners need a separate flood insurance policy to cover the building, the contents of the building, or both.

12.    The federal National Flood Insurance Program (NFIP) is the flood insurer of last resort. FEMA manages the NFIP. A network of more than 50 private insurance companies and the NFIP Direct deliver NFIP to the public.[2]

13.    "The NFIP provides flood insurance to property owners, renters, and businesses" alike.[3] FEMA acknowledges that having flood insurance coverage helps policyholders recover faster when floodwaters recede.[4] The NFIP requires homes and businesses in high-risk flood areas with mortgages from government-backed lenders to have flood insurance.

14.    NFIP insurance is available to anyone living in one of the 23,000 participating NFIP communities.[5] "A community is a governmental body with the statutory authority to enact and enforce development regulations."[6]

15.    There are 291 NFIP communities in Virginia. Across Virginia as a whole, there are 94,920 NFIP policies, representing on average 326 policies per community.

16.    To become an NFIP community, these respective communities' local governments in Virginia have to enact and implement floodplain management regulations aimed at mitigating the effects of flooding and has to enforce those regulations.[7] The Code of Virginia, § 15.2-984 enables localities to regulate floodplain activities, use, or development.

---

[1] https://www.fema.gov/flood-insurance.
[2] https://www.fema.gov/flood-insurance.
[3] https://www.fema.gov/flood-insurance.
[4] https://www.fema.gov/flood-insurance.
[5] https://www.fema.gov/flood-insurance.
[6] https://www.fema.gov/flood-insurance.
[7] https://www.fema.gov/flood-insurance.

17.     The local governments' floodplain management regulations must satisfy state law as well as NFIP requirements. As NFIP communities, these communities in Virginia have committed: (1) to issue or deny permits to build or develop in the floodplain; (2) to inspect all development to assure it complies with the floodplain management regulations the local government was required to pass to become an NFIP community; (3) to maintain records of floodplain development; (4) to work with FEMA to prepare and revise floodplain maps; and (5) to help residents obtain information about flood hazards, flood insurance, and proper methods of construction.

18.     In other words, these local governments in Virginia have undertaken obligations and projects and implemented policies at FEMA's direction so that their communities could purchase NFIP flood insurance. In order to become and remain NFIP communities, they have had to continually adhere to FEMA's requirements, regardless of whether those requirements reflect the policies that these communities—without the promise of affordable flood insurance from FEMA—would have chosen to protect themselves from the risks of flooding.

19.     FEMA reports that the quid pro quo arrangement between communities like those in Virginia that participate in NFIP floodplain management, a pre-requisite for the community to be eligible to participate in the NFIP, has saved the nation over $100 billion dollars in avoided floods over the last 40 years.

20.     Prior to Risk Rating 2.0, FEMA used the 1% Annual Exceedance Probability (AEP) flood as the basis for the National Flood Insurance Program. The 1% AEP flood is a flood that has a 1 in 100 chance of being equaled or exceeded in any given year and an average recurrence interval of 100 years—often referred to as the "100-year flood."

21.     Before Risk Rating 2.0, FEMA used Flood Insurance Rate Maps to set rates and, in those maps, determined the AEP flood for each flood zone—called the Base Flood Elevation (BFE).

22.     For each flood zone, FEMA advised elevating homes at least 1 foot above the BFE because FEMA expected its exposure to flood claims at or above that level to be infrequent, and so FEMA lowered insurance rates accordingly. The higher a structure was elevated above the BFE level, the lower FEMA's risk for having to pay claims and, therefore, the lower the insurance rate.

23.     For decades, local governments across Virginia adopted FEMA's Rate Maps and required buildings to be built at least 1 foot above FEMA's BFE. The 2018 USBC R322.2.1 and R322.3.2 requires buildings and structures erected in flood hazard areas to be elevated 1 foot above the BFE.

24.     One reason the local governments in Virginia adopted FEMA's Rate Maps and required buildings to be built at least 1 foot above the BFE was to take advantage of FEMA's grandfathering policy for its own properties and to make that policy available to all who built in the community. FEMA's grandfathering policy protected those who built in the communities from huge rate increases if they built in accordance with the Rate Maps' requirements.

25.     FEMA, the Department of Housing and Urban Development (HUD), and Virginia itself offer grants for elevating homes and businesses. The Building Resident Infrastructure and Communities, Flood Mitigation Assistance, and Hazard Mitigation Grant Programs all fall within FEMA's Hazard Mitigation Assistance Programs and can be used to support elevations. The Community Flood Preparedness Fund is a state grant which provides funding for mitigation activities including but not limited to elevating homes. Virginia has also established the Resilient Virginia Revolving Fund to support activities that include the hazard mitigation of buildings,

which may include elevating homes. Additionally, Virginia has established the Hurley Flood Relief Program to assist in flood recovery and mitigation activities associated with the impacts to catastrophic flooding in 2021 in Buchanan County.

26.     The Virginia Department of Emergency Management (VDEM), the Virginia Department of Conservation and Recreation (DCR), and the Virginia Department of Housing and Community Development (DHCD) administer and enforce those funding and grant programs. DCR provides grant manual development, training, technical assistance, guidance, application review and recommendations for funding. VDEM provides technical assistance in grant application development, grant writing, and supporting local governments through the implementation of the grant and closeout. DHCD partners with localities to administer funding programs, intake and review applications, process payments, and resolve claims for those eligible homeowners, property owners or businesses.

27.     In my estimation, Virginia spends $500,000 each year to educate its residents about those grant programs, process grant applications, distribute grant funds, and monitor and enforce grantees' compliance with the requirements of those programs.

28.     If a recipient of a FEMA/HUD elevation grant fails to comply with the program's requirements, the recipient must repay the value of that grant to the federal government. If a recipient of a state elevation grant fails to comply with the requirements of the State's grant program, the recipient must repay the value of that grant to the State.

29.     Despite the grant programs, reliance on FEMA's Rate Maps and grandfathering policy by local governments throughout Virginia, and Virginia's success in flood reduction from elevating structures, under Risk Rating 2.0, elevating a structure above the BFE appears to have only a negligible effect on the insurance rate charged for elevated homes and businesses.

30.     Moreover, Risk Rating 2.0 eliminated FEMA's grandfathering policy. Although FEMA's Community Rating System (CRS) discounts are still in place for the NFIP communities in Virginia, residents of Virginia still wind up paying much higher rates because, unlike the grandfathering policy, the community rating system discounts do not stop the rates themselves from increasing. So even with the community rating system discounts, residents of Virginia pay higher rates under Risk Rating 2.0.

31.     Localities are able to receive credit for CRS through activities conducted by the State including digitally displaying flood hazard data through the Virginia Flood Risk Information System, participation in the Dam Safety Program, freeboard requirements, maintaining open space through state parks, and enforcing freeboard requirements on new construction and substantial improvement.

32.     Virginia's flood mitigation efforts have successfully reduced flooding, but despite Virginia's dramatic reduction in flooding and flood damage, Risk Rating 2.0 has increased the cost of flood insurance for approximately 55.3 percent of policyholders in Virginia—both residential and commercial—that are in Special Flood Hazard Areas and are backed by federally insured mortgages.

33.     I estimate those properties to make up approximately 1.6% of all properties in Virginia. Risk Rating 2.0 either has already increased the flood insurance rates for those properties or will increase their rates when their NFIP policies renew, regardless of whether the properties are protected by levees or have been elevated—or both.

34.     On average, policy increases in Virginia will cost an average of $0-$10 per month.

7

35.     Those rate increases not only affect owners of property in Special Flood Hazard Areas but also those who rent properties in Special Flood Hazard Areas. The NFIP rate increases will likely be passed on to renters in the form of rent increases.

36.     These rate increases harm all property owners, but they of course pose a particular hardship to low and moderate income property owners and their families, many of whom have lived in these areas for generations, and many of whom are disadvantaged communities. Many of these low and moderate income property owners and their families will struggle to pay for their mandatory insurance at its increased price. Indeed, these rate increases are likely to force many of these property owners and their families out of their homes in these areas, and perhaps out of Virginia altogether, thereby threatening the unique communities and cultures that have developed here over the course of generations. This is profoundly unjust, especially considering that it was FEMA's promise of lower insurance rates that convinced many of these vulnerable property owners and their families to make significant investments in elevation and other flood mitigation measures. But apparently FEMA considers this to be "Equity in Action."

37.     As rates increase, many homeowners, business owners, and renters in Virginia are likely to be priced out of their properties and forced to move to out of Virginia, which will decrease Virginia's tax base and therefore its financial ability to protect its residents and their property from flooding and flood damage.

38.     And by creating a surplus of available property, this exodus from Virginia will negatively impact the property values of those who remain, further decreasing Virginia's tax revenues.

39.     Moreover, even if no one were to leave Virginia, Risk Rating 2.0 is still likely to negatively affect property values in Virginia by increasing the cost of purchasing mandatory flood insurance that runs with the property, thereby decreasing Virginia's tax revenues.

40.     Reduction in tax revenue will inhibit Virginia's ability to protect its residents and their property. This would be tragic given the proven efficacy of Virginia's flood mitigation efforts.

41.     Risk Rating 2.0 apparently fails to account for all of Virginia's flood reduction successes. By failing to do so, Risk Rating 2.0 will likely decrease Virginia's tax revenues and inhibit Virginia's ability to protect its residents and their property.

42.     The only logical explanation for why Risk Rating 2.0 is increasing rates for Virginia levee-protected areas and elevated properties is that the methodology used in setting rates must be flawed.

43.     But FEMA's refusal to reveal Risk Rating 2.0's methodology as required by federal law, despite numerous requests from all levels of state government, and Virginia's federal legislators, makes it impossible for Virginia and its local governments to determine where the flaws in FEMA's methodology lie.

44.     That lack of transparency harms Virginia's and its local governments' ability to work with FEMA to prepare and revise floodplain maps, as required by the local governments' commitment as an NFIP community.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on May 30, 2023.

Travis Alan Voyles
Secretary of Natural and Historic Resources
of the Commonwealth of Virginia