# EXHIBIT 10

## Declaration of the Cameron Parish Police Jury

1. My name is Joe Dupont, herein representing the Cameron Parish Police Jury. I am over the age of 18 and am competent to make this declaration. The facts set forth in this declaration are based on my personal knowledge.

2. I am the president of the Cameron Parish Police Jury and have served in that role since January 18, 2023.

3. The Cameron Parish Police Jury is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

4. The Parish of Cameron is located in Southwest corner of Louisiana, measures 1932 square miles, and is within less than a mile of the Calcasieu Ship Channel, Calcasieu Lake, Sabine Lake, the Gulf of Mexico, and the Mermentau River.

5. Cameron Parish is prone to flooding because our parish is located on the coast of the Gulf of Mexico, as well as other boarding bodies of water, because of this we are in a very high-risk hurricane zone. We are the first line of defense when hurricanes hit and over 50 hurricanes have been recorded in Cameron Parish since 1930. Much of the property in the parish is located within an AE or VE flood zone. All homes and businesses located in Special Flood Hazard Areas and are required to be elevated.

6. Each year, Cameron Parish experiences flooding and hurricane events.

7. Cameron Parish has experienced 5 nationally declared disasters, Hurricanes Audrey, Rita, Ike, Laura, and Delta.

8. Cameron Parish has authority to mitigate its flood risk and remediate flood damage. Specifically, Cameron Parish has authority to issue grant funding for repairs, rebuilding, and elevation. Established in 1870, our Parish operates under the Policy Jury System, is governed by an elected, 8-member Police Jury, and provides essential public services through its staff. Cameron Parish's information and history can be found on our website at www.cameronpj.org.

9. To promote flood recovery within its borders, Cameron Parish has implemented flood elevation ordinances and regulations and has administered many grants to help with elevation costs.

10. The Parish has special drainage taxing districts to fund drainage projects throughout the parish.

11. The Cameron Parish spends approximately $2.5 million a year on flood mitigation projects.

12. Cameron Parish expends an average of $500,000 a year in flood recovery projects.

13. Flood insurance is another important tool for protecting the Cameron Parish's residents and their most important financial assets—their home, business, and possessions. "Floods can happen anywhere," and the Federal Emergency Management Agency (FEMA) estimates that "just one inch of floodwater can cause up to $25,000 in damage."[1]

14. Because most homeowners' insurance does not cover flood damage, homeowners need a separate flood insurance policy to cover the building, the contents of the building, or both.

15. The federal National Flood Insurance Program (NFIP) is the flood insurer of last resort. FEMA manages the NFIP. A network of more than 50 private insurance companies and the NFIP Direct deliver NFIP to the public.[2]

16. "The NFIP provides flood insurance to property owners, renters, and businesses" alike.[3] FEMA acknowledges that having flood insurance coverage helps policyholders recover faster when floodwaters recede.[4] The NFIP requires homes and businesses in high-risk flood areas with mortgages from government-backed lenders to have flood insurance.

17. NFIP insurance is available to anyone living in one of the 23,000 participating NFIP communities.[5] "A community is a governmental body with the statutory authority to enact and enforce development regulations."[6] A parish can be a community.

18. Cameron Parish is an NFIP community.

19. To become an NFIP community, Cameron Parish had to enact and implement floodplain management regulations aimed at mitigating the effects of flooding and must enforce those regulations.[7] See Chapter 4 ¼ Building Codes and Permits, Chapter 5 ½ Coastal Zone Management and Chapter 7 Flood Damage Prevention Ordinances.

20. Cameron Parish's floodplain management regulations must satisfy state law as well as NFIP requirements.

---

[1] https://www.fema.gov/flood-insurance.
[2] https://www.fema.gov/flood-insurance.
[3] https://www.fema.gov/flood-insurance.
[4] https://www.fema.gov/flood-insurance.
[5] https://www.fema.gov/flood-insurance.
[6] https://www.fema.gov/flood-insurance.
[7] https://www.fema.gov/flood-insurance.

2

21. As an NFIP community, Cameron Parish has committed: (a) to issue or deny permits to build or develop in the floodplain; (b) to inspect all development to assure it complies with the floodplain management regulations the Cameron Parish was required to pass to become an NFIP community; (c) to maintain records of floodplain development; (d) to work with FEMA to prepare and revise floodplain maps; and (e) to help residents obtain information about flood hazards, flood insurance, and proper methods of construction.

22. FEMA reports that the quid pro quo arrangement between communities like Cameron Parish that participate in NFIP floodplain management, a pre-requisite for the Parish to be eligible to participate in the NFIP, has saved the nation over $100 billion dollars in avoided floods over the last 40 years.

23. One tried-and-true method for reducing floods in Cameron Parish and across Louisiana is elevating homes and businesses, which FEMA used to take into account when setting NFIP insurance rates.

24. Prior to Risk Rating 2.0, FEMA used the 1% Annual Exceedance Probability (AEP) flood as the basis for the National Flood Insurance Program. The 1% AEP flood is a flood that has a 1 in 100 chance of being equaled or exceeded in any given year and an average recurrence interval of 100 years—often referred to as the "100-year flood."

25. Before Risk Rating 2.0, FEMA used Flood Insurance Rate Maps to set rates and, in those maps, determined the AEP flood for each flood zone—called the Base Flood Elevation (BFE).

26. For each flood zone, FEMA advised elevating homes at least 1 foot above the BFE because FEMA expected its exposure to flood claims at or above that level to be very infrequent, and so FEMA lowered insurance rates accordingly. The higher a structure was elevated above the BFE level, the lower FEMA's risk for having to pay claims and, therefore, the lower the insurance rate.

27. For decades, parishes across Louisiana adopted FEMA's Rate Maps

28. One reason Cameron Parish adopted FEMA's Rate Maps was to take advantage of FEMA's grandfathering policy for its own properties and to make that policy available to all who built in the Cameron Parish. FEMA's grandfathering policy protected those who built in the Cameron Parish from huge rate increases if they built in accordance with the Rate Maps' requirements.

29. In my estimation, approximately 90% of homeowners and businesses have relied on FEMA's advice to elevate their homes and businesses in accordance with FEMA's Rate Maps, FEMA's grandfathering policy.

30. FEMA, the Department of Housing and Urban Development (HUD), and the State offer grants for elevating homes and businesses, such as FMA and HMA grants.

31. Cameron Parish administers those grant programs.

32. In my estimation, over 130 home and business owners in Cameron Parish have received elevation grants since 2014.

33. In my estimation, Cameron Parish spends $100,000 each year to educate parish residents about those grant programs, process grant applications, distribute grant funds, and monitor and enforce grantees' compliance with the requirements of those programs.

34. If a recipient of a FEMA elevation grant fails to comply with the program's requirements, the Parish must repay the value of that grant to FEMA. If a recipient of a state elevation grant fails to comply with the requirements of the State's grant program, the recipient must repay the value of that grant to the State.

35. Despite the grant programs, Cameron Parish's reliance on FEMA's Rate Maps and grandfathering policy, and Cameron Parish's success in flood reduction from elevating structures, under Risk Rating 2.0, elevating a structure above the BFE appears to have only a negligible effect on the insurance rate charged for elevated homes and businesses.

36. Cameron Parish's flood mitigation efforts have successfully reduced flooding. For example, Cameron Parish reduced flooding between Hurricane Rita in 2005 and Hurricane Laura in 2020. Each hurricane brought a storm surge greater than or equal to 10 feet to the parish. Hurricane Rita's storm surge flooded approximately 90% of coastal homes, but Hurricane Laura's storm surge flooded less than 15%.

37. Despite Cameron Parish's dramatic reduction in flooding and flood damage, Risk Rating 2.0 has increased the cost of flood insurance for all properties in the Parish—both residential and commercial—that are in Special Flood Hazard Areas and are backed by federally insured mortgages.

38. I estimate those properties make up approximately 70% of all properties in Cameron Parish. Risk Rating 2.0 either has already increased the flood insurance rates for those properties or will increase their rates when their NFIP policies renew, regardless of whether the properties are protected by levees or have been elevated—or both.

39. Those rate increases not only affect owners of property in Special Flood Hazard Areas but also those who rent properties in Special Flood Hazard Areas. The

4

NFIP rate increases will likely be passed on to renters in the form of rent increases.

40. These rate increases harm all property owners, but they of course pose a particular hardship to low and moderate income property owners and their families, many of whom have lived in these areas for generations, and many of whom are racial minorities. Doubtless, many of these low and moderate income property owners and their families will struggle to pay for their mandatory insurance at its increased price. Indeed, these rate increases are likely to force many of these property owners and their families out of their homes in these areas, and perhaps out of our Parish altogether, thereby threatening the unique communities and cultures that have developed here over the course of generations. This is profoundly unjust, especially considering that it was FEMA's promise of lower insurance rates that convinced many of these vulnerable property owners and their families to make significant investments in elevation and other flood mitigation measures. But apparently FEMA considers this to be "Equity in Action."

41. As rates increase, many homeowners, business owners, and renters in Cameron Parish are likely to be priced out of their properties and forced to move to out of the Parish, which will decrease the Parish's tax base and therefore its financial ability to protect its residents and their property from flooding and flood damage.

42. And by creating a surplus of available property, this exodus from Cameron Parish will negatively impact the property values of those who remain, further decreasing the Parish's tax revenues.

43. Moreover, even if no one were to leave Cameron Parish, Risk Rating 2.0 is still likely to negatively affect property values in the Parish by increasing the cost of purchasing mandatory flood insurance that runs with the property, thereby decreasing the Parish's tax revenues.

44. This reduction in tax revenue will inhibit Cameron Parish's ability to protect its residents and their property. This would be tragic given the proven efficacy of Cameron Parish's flood mitigation efforts, especially when one contrasts the immense damage inflicted by Hurricane Rita discussed above with the relatively minimal damage caused by Hurricane Laura after those flood mitigation efforts were made.

45. Risk Rating 2.0 apparently fails to account for all of Cameron Parish's flood reduction successes. By failing to do so, Risk Rating 2.0 will likely decrease Cameron Parish's tax revenues and inhibit the Parish's ability to protect its residents and their property.

46. The only logical explanation for why Risk Rating 2.0 is increasing rates for Cameron Parish levee-protected areas and elevated properties is that the methodology used in setting rates must be flawed.

47. But FEMA's refusal to reveal Risk Rating 2.0's methodology as required by federal law, despite numerous requests from all levels of state government, including parishes, and Louisiana's federal legislators, makes it impossible for Cameron Parish and its floodplain manager to determine where the flaws in FEMA's methodology lie.

48. That lack of transparency harms Cameron Parish's ability to work with FEMA, as required by the Parish's commitment as an NFIP community to work with FEMA to prepare and revise floodplain maps.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Cameron, Louisiana, this 30th day of May, 2023.

_____

Joe Dupont

# Cameron Parish_Declaration

Final Audit Report                                                                 2023-05-30

| | |
|---|---|
| Created: | 2023-05-30 |
| By: | Katie Armentor (karmentor@cameronpj.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAYYaL6dIsWBxtXTS9jhI8ZDh6WeH_-QM7 |

## "Cameron Parish_Declaration" History

📄 Document created by Katie Armentor (karmentor@cameronpj.org)
2023-05-30 - 6:11:36 PM GMT- IP address: 209.163.160.137

✉ Document emailed to Katie Armentor (cppj@cameronpj.org) for signature
2023-05-30 - 6:12:26 PM GMT

📄 Email viewed by Katie Armentor (cppj@cameronpj.org)
2023-05-30 - 6:13:05 PM GMT- IP address: 209.163.160.137

✍ Signer Katie Armentor (cppj@cameronpj.org) entered name at signing as Joe Dupont
2023-05-30 - 6:13:38 PM GMT- IP address: 209.163.160.137

✍ Document e-signed by Joe Dupont (cppj@cameronpj.org)
Signature Date: 2023-05-30 - 6:13:40 PM GMT - Time Source: server- IP address: 209.163.160.137

✅ Agreement completed.
2023-05-30 - 6:13:40 PM GMT

Adobe Acrobat Sign