# EXHIBIT 13

## Declaration of Sharon Weston Broome

1. My name is Sharon Weston Broome. I am over the age of 18 and am competent to make this declaration. The facts set forth in this declaration are based on my personal knowledge.

2. I am the Mayor-President of the City of Baton Rouge - Parish of East Baton Rouge (the "Parish") and have served in that role since January 2, 2017.

3. The Parish is a local consolidated governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

4. The Parish is located in Louisiana, measures four hundred seventy square miles, with its boundaries being the Mississippi River to the West, and the Amite River to the East.

5. The Parish is prone to flooding, as over fifty percent of the Parish lies within the 100-year floodplain, and over seventy-five percent of the Parish lies within the 500-year floodplain.

6. The Parish has authority to mitigate its flood risk and remediate flood damage. Specifically, the Parish operates under a consolidated Plan of Government which authorizes the Metropolitan Council and the Mayor-President to have certain powers and duties under Chapters 3 and 4 of the Plan of Government, respectively, as well as the ordinances and resolutions of the Metropolitan Council adopted in pursuance thereof, and the Constitution and general laws of the State.

7. To promote flood recovery within its borders, the Parish has created a Stormwater Master Plan, which included the adoption of stricter development requirements. In addition, the Parish adopted Base Flood Elevations in conjunction with FEMA's FIRMs to promote smart development. The Parish adopted a stricter Substantial Improvement threshold and Substantial Damage SOP to promote resiliency. The Parish participated in the Flood Mitigation Assistance Grant Program and the Hazard Mitigation Grant Program ("HMGP"). Finally, the Parish expanded our Community Rating System and utilized American Rescue funds to clear and improve our major drainage ways.

8. The Parish currently has $33,378,647.71 in open FMA grants in various stages to elevate or acquire properties. The funds will be released to the recipient at the successful completion of the project.

9. Those efforts include participation in grants from the FEMA Hazard Mitigation Grant Program (fifteen drainage projects), the U.S. Department of Housing and Urban Development Community Development Block Grant

1

Program (at least one drainage project) and the Louisiana Watershed Initiative (four current drainage projects). A 20-year capital improvement plan has also been developed that includes 63 flood risk reduction projects and their conceptual design, cost estimate, benefit-cost-analysis and scoring.

10. The Parish currently has $160,835,304.57 in grant funding, either applied for or partially approved for drainage projects across the city/parish. The Parish expends at least $1,500,000 a year in flood recovery projects like the ones described above.

11. Flood insurance is another important tool for protecting the Parish's residents and their most important financial assets—their home, business, and possessions. "Floods can happen anywhere," and the Federal Emergency Management Agency (FEMA) estimates that "just one inch of floodwater can cause up to $25,000 in damage."[1]

12. Because most homeowners insurance does not cover flood damage, homeowners need a separate flood insurance policy to cover the building, the contents of the building, or both.

13. The federal National Flood Insurance Program (NFIP) is the flood insurer of last resort. FEMA manages the NFIP. A network of more than 50 private insurance companies and the NFIP Direct deliver NFIP to the public.[2]

14. "The NFIP provides flood insurance to property owners, renters, and businesses" alike.[3] FEMA acknowledges that having flood insurance coverage helps policyholders recover faster when floodwaters recede.[4] The NFIP requires homes and businesses in high-risk flood areas with mortgages from government-backed lenders to have flood insurance.

15. NFIP insurance is available to anyone living in one of the 23,000 participating NFIP communities.[5] "A community is a governmental body with the statutory authority to enact and enforce development regulations."[6] A parish can be a community.

16. The Parish of East Baton Rouge is an NFIP community.

17. To become an NFIP community, the Parish had to enact and implement floodplain management regulations aimed at mitigating the effects of flooding

---

[1] https://www.fema.gov/flood-insurance.
[2] https://www.fema.gov/flood-insurance.
[3] https://www.fema.gov/flood-insurance.
[4] https://www.fema.gov/flood-insurance.
[5] https://www.fema.gov/flood-insurance.
[6] https://www.fema.gov/flood-insurance.

2

and has to enforce those regulations.[7] [Title 7 (Unified Development Code), Chapter 15 "Floodways, Floodplains, Drainage, and Water Quality"].

18. The Parish's floodplain management regulations must satisfy state law as well as NFIP requirements.

19. As an NFIP community, the Parish has committed to: (a) issue or deny permits to build or develop in the floodplain; (b) inspect all development to assure it complies with the required floodplain management regulations; (c) maintain records of floodplain development; (d) work with FEMA to prepare and revise floodplain maps; and (e) help residents obtain information about flood hazards, flood insurance, and proper methods of construction.

20. FEMA reports that the quid pro quo arrangement between communities like the Parish that participate in NFIP floodplain management, a pre-requisite for the Parish to be eligible to participate in the NFIP, has saved the nation over $100 billion dollars in avoided floods over the last 40 years.

21. One tried-and-true method for reducing floods in the Parish and across Louisiana is elevating homes and businesses, which FEMA used to take into account when setting NFIP insurance rates.

22. Prior to Risk Rating 2.0, FEMA used the 1% Annual Exceedance Probability (AEP) flood as the basis for the National Flood Insurance Program. The 1% AEP flood is a flood that has a 1 in 100 chance of being equaled or exceeded in any given year and an average recurrence interval of 100 years—often referred to as the "100-year flood."

23. Before Risk Rating 2.0, FEMA used Flood Insurance Rate Maps to set rates and, in those maps, determined the AEP flood for each flood zone—called the Base Flood Elevation (BFE).

24. For each flood zone, FEMA advised elevating homes at least 1 foot above the BFE because FEMA expected its exposure to flood claims at or above that level to be very infrequent, and so FEMA lowered insurance rates accordingly. The higher a structure was elevated above the BFE level, the lower FEMA's risk for having to pay claims and, therefore, the lower the insurance rate.

25. For decades, the Parish—just like other parishes across the State—adopted FEMA's Rate Maps and have required buildings to be built at least 1 foot above FEMA's BFE.

26. One reason the Parish of East Baton Rouge adopted FEMA's Rate Maps and required buildings to be built at least 1 foot above the BFE was to take

---

[7] https://www.fema.gov/flood-insurance.

3

advantage of FEMA's grandfathering policy for its own properties and to make that policy available to all who built in the Parish of East Baton Rouge. FEMA's grandfathering policy protected those who built in the Parish of East Baton Rouge from huge rate increases if they built in accordance with the Rate Maps' requirements.

27. Homeowners and business owners have relied on FEMA's advice to elevate their homes and businesses in accordance with FEMA's Rate Maps, FEMA's grandfathering policy, and local substantial damage/improvement ordinances. Currently, there are 82 homeowner properties in approved grant projects and 99 homeowner properties in pending grant projects that are participating in the elevation process.

28. FEMA, the Department of Housing and Urban Development (HUD), and the State offer grants for elevating homes and businesses. The Parish routinely participates in FMA and HMGP grant opportunities on behalf of our flood prone residents. The Parish participates in the annual FMA grant opportunity for repetitive flood loss properties. When available, the Parish participates in HMGP funding for repetitive flood loss or substantially damaged properties.

29. The Parish administers those grant programs, performs yearly outreach to our flood prone residents, assists them with individual applications, and manages the approval and implementation of those grant projects and programs.

30. In my estimation, the Parish spends $250,000 each year to educate parish residents about those grant programs, process grant applications, distribute grant funds, and monitor and enforce grantees' compliance with the requirements of those programs.

31. If a recipient of an elevation grant fails to comply with the program's requirements, the Parish must repay the value of that grant to FEMA/HUD. If a recipient of a state elevation grant fails to comply with the requirements of the State's grant program, the Parish must repay the value of that grant to the State.

32. Despite the grant programs, the Parish's reliance on FEMA's Rate Maps and grandfathering policy, and the Parish's success in flood reduction from elevating structures, under Risk Rating 2.0, elevating a structure above the BFE appears to have only a negligible effect on the insurance rate charged for elevated homes and businesses.

33. Moreover, Risk Rating 2.0 eliminated FEMA's grandfathering policy. Although FEMA's Community Rating System discounts are still in place for the Parish of East Baton Rouge, residents of the Parish of East Baton Rouge still wind up paying much higher rates because, unlike the grandfathering policy, the community rating system discounts do not stop the rates themselves from

increasing. So even with the community rating system discounts, members of the Parish of East Baton Rouge pay higher rates under Risk Rating 2.0.

34. The Parish has established Community Defined Flood Elevations for the 100-year storm; enhanced minimum floor elevation requirements, including 1-foot of freeboard; and imposed stricter Substantial Improvement/Damage requirements.

35. Despite the Parish's actions to reduce flooding and flood damage, Risk Rating 2.0 has increased the cost of flood insurance for all properties in the Parish—both residential and commercial—that are in Special Flood Hazard Areas and are backed by federally insured mortgages.

36. I estimate those properties to make up approximately 10 percent of all properties in the Parish. Risk Rating 2.0 either has already increased the flood insurance rates for those properties or will increase their rates when their NFIP policies renew, regardless of whether the properties are protected by levees or have been elevated—or both.

37. Those rate increases not only affect owners of property in Special Flood Hazard Areas but also those who rent properties in Special Flood Hazard Areas. The NFIP rate increases will likely be passed on to renters in the form of rent increases.

38. These rate increases harm all property owners, but they pose a particular hardship to low and moderate income property owners and their families, many of whom have lived in these areas for generations, and many of whom are racial minorities. Doubtless, many of these low and moderate income property owners and their families will struggle to pay for their mandatory insurance at its increased price. Indeed, these rate increases are likely to force many of these property owners and their families out of their homes in these areas, and perhaps out of our Parish altogether, thereby threatening the unique communities and cultures that have developed here over the course of generations. This is profoundly unjust, especially considering that it was FEMA's promise of lower insurance rates that convinced many of these vulnerable property owners and their families to make significant investments in elevation and other flood mitigation measures. But apparently FEMA considers this to be "Equity in Action."

39. As rates increase, many homeowners, business owners, and renters in the Parish are likely to be priced out of their properties and forced to move to out of the Parish, which will decrease the Parish's tax base and therefore its financial ability to protect its residents and their property from flooding and flood damage.

40. And by creating a surplus of available property, this exodus from the Parish will negatively impact the property values of those who remain, further decreasing the Parish's tax revenues.

41. Moreover, even if no one were to leave the Parish, Risk Rating 2.0 is still likely to negatively affect property values in the Parish by increasing the cost of purchasing mandatory flood insurance that runs with the property, thereby decreasing the Parish's tax revenues.

42. Risk Rating 2.0 apparently fails to account for all of the Parish's flood reduction successes. By failing to do so, Risk Rating 2.0 will likely decrease the Parish's tax revenues and inhibit the Parish's ability to protect its residents and their property.

43. The only logical explanation for why Risk Rating 2.0 is increasing rates for the Parish's levee-protected areas and elevated properties is that the methodology used in setting rates must be flawed.

44. But FEMA's refusal to reveal Risk Rating 2.0's methodology as required by federal law, despite numerous requests from all levels of state government, including parishes, and Louisiana's federal legislators, makes it impossible for the Parish and its floodplain manager to determine where the flaws in FEMA's methodology lie.

45. That lack of transparency harms the Parish of East Baton Rouge's ability to work with FEMA, as required by the Parish's commitment as an NFIP community to work with FEMA to prepare and revise floodplain maps.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Parish of East Baton Rouge, Louisiana, this 30th day of May, 2023.

_____
Sharon Weston Broome
Mayor - President

APPROVED AS TO FORM

_____
PARISH ATTORNEY'S OFFICE