# EXHIBIT 19

## Declaration of Layton Ricks
## Livingston Parish President

1. My name is Layton Ricks. I am over the age of 18 and am competent to make this declaration. The facts set forth in this declaration are based on my personal knowledge.

2. I am the president of the Parish of Livingston and have served three terms in that role since January 2012.

3. The Parish of Livingston is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

4. The Parish of Livingston is located in the State of Louisiana, measures 703 square miles, of which 55 square miles is water. There are more than 400 nautical miles of waterways in Livingston Parish, which includes six rivers.

5. The Parish of Livingston is prone to flooding because of its proximity to lakes Maurepas and Ponchartrain, the rivers within its boundaries, low elevation including large areas of wetlands and serious drainage issues. In addition, Livingston Parish borders Lake Maurepas, which connects to Lake Ponchartrain and then to the Gulf of Mexico. During storm surge events such as hurricanes, the lower end of the Parish is seriously impacted by flooding. A minimum of seventy-five percent (75%) of Livingston Parish is located within a flood hazard area. During the 2016 flood, eighty-percent (80%) of the homes and seventy-five percent (75%) of the businesses in Livingston Parish were impacted.

6. Each year, the Parish of Livingston experiences an average of two flooding events.

7. The average annual cost of flood damage in Livingston Parish is $10,000,000.00 .

8. The Parish of Livingston, as a Home Rule Charter government since 1996, has authority to mitigate its flood risk and remediate flood damage. Specifically, Livingston Parish has authority to enact ordinances and implement projects to reduce impacts due to periods of inundation and storms and other challenges. The government has such other powers, rights, privileges, immunities, authority and functions not inconsistent with the charter as may be conferred on or granted to a local governmental subdivision by the constitution and general laws of the state, and more specifically, the government shall have and is hereby granted the right and authority to exercise any power and perform any function necessary, requisite or proper for the management of its affairs, not denied by the charter, or by general state law, or inconsistent with the constitution. The parish government has the right, power and authority to pass all ordinances requisite or necessary to promote, protect and preserve the general welfare, safety, health, peace and good order of the parish, including, but not by way of limitation, the right power and authority to pass ordinances on all subject

1

matters necessary, requisite or proper for the management of its affairs, and all other subject matter without exception, subject only to the limitation that the same shall not be inconsistent with the constitution or expressly denied by general law applicable to parish government.

9. To promote flood recovery within its borders, the Parish of Livingston has applied for mitigation and drainage grants, both federal and state, that have been applied to debris removal parish wide with more than 800 miles of waterways cleaned since 2016, with additional work planned. In addition, bank stabilization projects are underway at West Colyell and Beaver creeks. Dredging of the mouths of the Blind and Amite rivers is underway and Livingston Parish has applied for a $100 million grant to dredge sediment from the Amite River from Port Vincent to the mouth of the Amite. Culverts and subsurface drainage work has been performed extensively. Acquisitions and elevations are ongoing on flood prone, severe repetitive loss and repetitive loss properties through the Hazard Mitigation Grant Program and Flood Mitigation Assistance Program. Nearly 687 homes are pending, approved, in progress or completed. Since 2016, millions of dollars have been applied to mitigation and drainage activities including debris removal, bank stabilization, bridge replacement, acquisition/elevation, coastal restoration, drainage improvements, erosion and control programs, early warning systems and rain gauges and many American Recovery Plan Act Infrastructure and Drainage projects.

10. The Parish of Livingston expends an average of $10,000,000.00 a year in flood recovery projects like the ones described above. These projects are funded through state and federal grants as well as through the Livingston Parish General fund.

11. Those efforts include adoption of Chapter 115 of the Code of Ordinances detailing flood mitigation efforts, Chapter 105 Land Use, Chapter 100 Building Codes and development of the Livingston Parish Hazard Mitigation Plan adopted by the Livingston Parish Council in 2021. These measures are in addition to the many grants, projects, programs and incentives implemented by the Livingston Parish Grant Department and the Livingston Office of Homeland Security and Emergency Preparedness.

12. The Parish of Livingston spends approximately $19,017,361.25 a year on flood mitigation projects like the ones discussed above. These projects are funded through state and federal grants as well as through the Livingston Parish General fund.

13. Flood insurance is another important tool for protecting Livingston Parish residents and their most important financial assets—their homes, businesses, and possessions. "Floods can happen anywhere," and the Federal Emergency

14. Management Agency (FEMA) estimates that "just one inch of floodwater can cause up to $25,000 in damage."[1]

14. Because most homeowners insurance does not cover flood damage, homeowners need a separate flood insurance policy to cover the building, the contents of the building, or both.

15. The federal National Flood Insurance Program (NFIP) is the flood insurer of last resort. FEMA manages the NFIP. A network of more than 50 private insurance companies and the NFIP Direct deliver NFIP to the public.[2]

16. "The NFIP provides flood insurance to property owners, renters, and businesses" alike.[3] FEMA acknowledges that having flood insurance coverage helps policyholders recover faster when floodwaters recede.[4] The NFIP requires homes and businesses in high-risk flood areas with mortgages from government-backed lenders to have flood insurance.

17. NFIP insurance is available to anyone living in one of the 23,000 participating NFIP communities.[5] "A community is a governmental body with the statutory authority to enact and enforce development regulations."[6] A parish can be a community.

18. Livingston Parish is an NFIP community.

19. To become an NFIP community, the Parish of Livingston had to enact and implement floodplain management regulations aimed at mitigating the effects of flooding and has to enforce those regulations.[7]

20. Livingston Parish's floodplain management regulations must satisfy state law as well as NFIP requirements.

21. As an NFIP community, Livingston Parish has committed: (a) to issue or deny permits to build or develop in the floodplain; (b) to inspect all development to assure it complies with the floodplain management regulations Livingston Parish was required to pass to become an NFIP community; (c) to maintain records of floodplain development; (d) to work with FEMA to prepare and revise floodplain maps; and (e) to help residents obtain information about flood hazards, flood insurance, and proper methods of construction.

22. FEMA reports that the quid pro quo arrangement between communities like Livingston Parish that participate in NFIP floodplain management, a pre-

---

[1] https://www.fema.gov/flood-insurance.
[2] https://www.fema.gov/flood-insurance.
[3] https://www.fema.gov/flood-insurance.
[4] https://www.fema.gov/flood-insurance.
[5] https://www.fema.gov/flood-insurance.
[6] https://www.fema.gov/flood-insurance.
[7] https://www.fema.gov/flood-insurance; Livingston Parish Council, Code of Ordinances ch. 115 (Apr. 25, 2023).

23. One tried-and-true method for reducing floods in Livingston Parish and across Louisiana is elevating homes and businesses, which FEMA used to take into account when setting NFIP insurance rates.

24. Prior to Risk Rating 2.0, FEMA used the 1% Annual Exceedance Probability (AEP) flood as the basis for the National Flood Insurance Program. The 1% AEP flood is a flood that has a 1 in 100 chance of being equaled or exceeded in any given year and an average recurrence interval of 100 years—often referred to as the "100-year flood."

25. Before Risk Rating 2.0, FEMA used Flood Insurance Rate Maps to set rates and, in those maps, determined the AEP flood for each flood zone—called the Base Flood Elevation (BFE).

26. For each flood zone, FEMA advised elevating homes at least 1 foot above the BFE because FEMA expected its exposure to flood claims at or above that level to be very infrequent, and so FEMA lowered insurance rates accordingly. The higher a structure was elevated above the BFE level, the lower FEMA's risk for having to pay claims and, therefore, the lower the insurance rate.

27. For decades, Livingston Parish and other parishes across Louisiana adopted FEMA's Rate Maps and/or required buildings to be built at least 1 foot above FEMA's BFE. The Livingston Parish Council recently enacted numerous ordinances and updated Chapter 125 of the Code to provide additional building regulations and requirements. The Livingston Parish Council is also in the process of implementing zoning regulations for the first time in its history.

28. One reason Livingston Parish adopted FEMA's Rate Maps and/or required buildings to be built at least 1 foot above the BFE was to take advantage of FEMA's grandfathering policy for its own properties and to make that policy available to all who built in the Parish. FEMA's grandfathering policy protected those who built in Livingston Parish from huge rate increases if they built in accordance with the Rate Maps' requirements.

29. In my estimation, approximately 19% of homeowners and 25% of business owners have relied on FEMA's advice to elevate their homes and businesses in accordance with FEMA's Rate Maps, FEMA's grandfathering policy.

30. FEMA, the Department of Housing and Urban Development (HUD), and the State offer grants for elevating homes and businesses. As stated earlier, more than 286 homes have been approved or completed for acquisition/elevation since 2012.

31. Livingston Parish administers those grant programs through the Livingston Office of Homeland Security and Emergency Preparedness and the Livingston Parish Grant Dept.

32. In my estimation 1%, of homes and 0% of business owners in Livingston Parish have received elevation grants.

33. Since Risk Rating 2.0 went into effect, the number of grant applications that the Parish of Livingston has decreased by about 15%. The decision not to elevate leaves parish residents and their property in harm's way and increases the amount the Parish will have to spend on flood recovery. The decision not to elevate a home or business also harms the flood mitigation industry in Livingston Parish.

34. In my estimation, Livingston Parish spends $80,000.00 each year to educate parish residents about those grant programs, process grant applications, distribute grant funds, and monitor and enforce grantees' compliance with the requirements of those programs, including federal programs.

35. If a recipient of a FEMA elevation grant fails to comply with the program's requirements, Livingston Parish must repay the value of that grant to FEMA. If a recipient of a federal grant fails to comply with the requirements of the federal grant program, Livingston Parish must repay the value of that grant to FEMA.

36. Despite the grant programs, Livingston Parish's reliance on FEMA's Rate Maps and grandfathering policy, and Livingston Parish's success in flood reduction from elevating structures, under Risk Rating 2.0, elevating a structure above the BFE appears to have only a negligible effect on the insurance rate charged for elevated homes and businesses.

37. Moreover, Risk Rating 2.0 eliminated FEMA's grandfathering policy. Although FEMA's Community Rating System discounts are still in place for Livingston Parish, residents of Livingston Parish still wind up paying much higher rates because, unlike the grandfathering policy, the community rating system discounts do not stop the rates themselves from increasing. So even with the community rating system discounts, members of Livingston Parish pay higher rates under Risk Rating 2.0.

38. Waterway debris removal, bridge replacements, drainage improvements and bank stabilizations, elevations and acquisitions further discounted flood insurance rates under FEMA's Community Rating System—such as requiring additional free-board above the BFE reported on FEMA's Rate Maps

39. Livingston Parish flood mitigation efforts have successfully reduced flooding. Specific numbers are not available, but there are many ongoing drainage improvement projects and approximately 1% of homes have been mitigated since 2012.

40. Despite the Parish's reduction in flooding and flood damage, Risk Rating 2.0 has increased the cost of flood insurance for most properties in the Parish—both residential and commercial—that are in Special Flood Hazard Areas and are backed by federally insured mortgages.

5

41. I estimate those properties to make up approximately 75% to 80% of all properties in Livingston Parish. Risk Rating 2.0 either has already increased the flood insurance rates for those properties or will increase their rates when their NFIP policies renew, regardless of whether the properties are protected by levees or have been elevated—or both.

42. Those rate increases not only affect owners of property in Special Flood Hazard Areas but also those who rent properties in Special Flood Hazard Areas. The NFIP rate increases will likely be passed on to renters in the form of rent increases.

43. These rate increases harm all property owners, but they of course pose a particular hardship to low and moderate income property owners and their families, many of whom have lived in these areas for generations, and many of whom are racial minorities. Doubtless, many of these low and moderate income property owners and their families will struggle to pay for their mandatory insurance at its increased price. Indeed, these rate increases are likely to force many of these property owners and their families out of their homes in these areas, and perhaps out of our Parish altogether, thereby threatening the unique communities and cultures that have developed here over the course of generations. This is profoundly unjust, especially considering that it was FEMA's promise of lower insurance rates that convinced many of these vulnerable property owners and their families to make significant investments in elevation and other flood mitigation measures. But apparently FEMA considers this to be "Equity in Action."

44. These rate increases also directly harm Livingston Parish. The Parish itself must procure flood insurance policies on any parish-owned building located in a Special Flood Hazard Area. These policies are also subject to the rate increases under Risk Rating 2.0.

45. As rates increase, many homeowners, business owners, and renters in Livingston Parish are likely to be priced out of their properties and forced to move to out of the Parish, which will decrease the Parish's tax base and therefore its financial ability to protect its residents and their property from flooding and flood damage.

46. And by creating a surplus of available property, this exodus from Livingston Parish will negatively impact the property values of those who remain, further decreasing the Parish's tax revenues.

47. Moreover, even if no one were to leave Livingston Parish, Risk Rating 2.0 is still likely to negatively affect property values in the Parish by increasing the cost of purchasing mandatory flood insurance that runs with the property, thereby decreasing the Parish's tax revenues.

48. This reduction in tax revenue will inhibit Livingston Parish's ability to protect its residents and their property. This would be tragic given the proven efficacy of Livingston Parish's flood mitigation efforts, especially when one contrasts

the immense damage inflicted by the August 2016 flood event and Hurricane Ida with the damage caused by Hurricane Ida after those flood mitigation efforts were made.

49. Risk Rating 2.0 apparently fails to account for all of Livingston Parish's flood reduction successes. By failing to do so, Risk Rating 2.0 will likely decrease Livingston Parish's tax revenues and inhibit the Parish's ability to protect its residents and their property.

50. The only logical explanation for why Risk Rating 2.0 is increasing rates for Livingston Parish areas and elevated properties is that the methodology used in setting rates must be flawed.

51. But FEMA's refusal to reveal Risk Rating 2.0's methodology as required by federal law, despite numerous requests from all levels of state government, including parishes, and Louisiana's federal legislators, makes it impossible for Livingston Parish and its floodplain manager to determine where the flaws in FEMA's methodology lie.

52. That lack of transparency harms Livingston Parish's ability to work with FEMA, as required by the Parish's commitment as an NFIP community to work with FEMA to prepare and revise floodplain maps.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Livingston, Louisiana, this 15th day of May 2023.

_____
Layton Ricks, Livingston Parish President