# EXHIBIT 21

### Declaration of LaToya Cantrell, Mayor, City of New Orleans

1. My name is LaToya Cantrell. I am over the age of 18 and am competent to make this declaration. The facts set forth in this declaration are based on my personal knowledge.

2. I am the Mayor of the City of New Orleans and have served in that role since May 7, 2018.

3. Orleans Parish is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

4. Orleans Parish, located in Louisiana, measures 350 square miles, and is bordered on the north by Lake Pontchartrain. The Mississippi River forms the southern border of most of the Parish, except for Algiers, which is on the river's West Bank. Most of the Parish is within 2 or 3 miles of either the river or the lake.

5. Flooding in New Orleans can be the result of weather events such as hurricanes, thunderstorms (convectional and frontal), river floods, storm surge, and winter storms. Excess precipitation, produced from thunderstorms or hurricanes, is often the major initiating condition for flooding. Flooding in New Orleans can also result from infrastructure failures such as levees, floodwalls, and water main breaks. Federal levees on the Mississippi River and the Hurricane Storm Damage Risk Reduction System protect the city from riverine flooding and storm surge up to the 100-year return frequency.

   Across most of the Parish, elevations vary by only a few feet. Most of New Orleans is below sea level and/or surrounded by flood levees. As such, the entire City is at risk of flooding. As a result of this minimal elevation change, when heavy rainfall events occur, water tends to pool rather than run off rapidly. Elevations below sea level combined with little slope in topography and an extensive levee system mean that rainwater cannot flow out of the Parish and must be pumped out. The Greater New Orleans metropolitan area is served by over 80 pumping stations in four Parishes (Orleans, Jefferson, St. Bernard, and Plaquemines) with a combined capacity of over 30 billion gallons per day. All stations are equipped with pumps that are either directly driven by diesel engines or by electric motors that receive their power from diesel-electric generators. New Orleans is drained by 24 pump stations with a total design capacity of 50,891 cubic feet per second. Because the river levees are higher than the lake levees, most rainwater is pumped into Lake Pontchartrain. Exceptions are the two (2) West Bank pumping stations and two (2) stations in Eastern New Orleans that pump rainwater into the Intracoastal Waterway or the Industrial Canal.

   38% of the parcels in the parish are located in the SFHA.

6. Each year, Orleans Parish experiences several flooding events. Based on data over the past 25 years from 1994-2019, there is a 100% annual probability that there will be a flood in Orleans Parish. Since construction of the HSDDRS levee system, all of the flood events that have occurred have been the result of heavy rainfall.

7. A recent local study using FEMA's HAZUS model estimated structural damage from a 100-year storm event to be approximately $45,000,000.

8. The City of New Orleans has authority to mitigate its flood risk and remediate flood damage. Specifically, the City of New Orleans has authority granted to it through Louisiana Revised Statute 38:84, which allows municipalities of the state to adopt such ordinances, rules, and regulations as are necessary to comply with the requirements of the National Flood Insurance Act of 1968, and the regulations adopted pursuant thereto by the Federal Emergency Management Agency (FEMA). Chapter 78 of the City of New Orleans's Municipal Code contains the various ordinances passed by the City of New Orleans, specific to floods. In order to reduce losses due to floods, the City of New Orleans may *inter alia* (1) restrict or prohibit uses that are dangerous to health, safety or property in times of flood, or cause excessive increase in flood heights or velocities; (2) require that uses vulnerable to floods, including facilities which serve such uses, be protected against flood damage at the time of initial construction; (3) control the alteration of natural floodplains, stream channels, and natural protective barriers, which are involved in the accommodation of floodwaters; (4) control filling, grading, dredging and other development which may increase flood damage; and (5) prevent or regulate the construction of flood barriers which will unnaturally divert floodwaters or which may increase flood hazards to other lands.

9. To promote flood recovery within its borders, in 2016 the City Council adopted an updated Flood Damage Prevention Ordinance, which includes higher standards and additional freeboard above the base flood elevation.
The City has developed several guiding comprehensive plans and strategies, including:

   - 2013 Greater New Orleans Urban Water Plan

   - 2015 Resilience Strategy

   - 2022 Comprehensive Recovery Framework

   The City has implemented pilot green stormwater infrastructure projects including Katrina recovery projects funded through HMGP and the Gentilly Resilience District.

        The City has completed hundreds of residential elevation and reconstruction projects through the HMGP and Flood Mitigation Assistance grants.

        The City participates in the NFIP's Community Rating System, and recently achieved an upgrade to a CRS Class 7.

10. Since 2017, the City of New Orleans has secured roughly $10,000,000 a year in flood mitigation assistance grants for residential and commercial mitigation projects.

11. Those efforts include:

        Climate Adaptation Program: the pilot phase completed installation of 200+ residential green stormwater infrastructure features. The city recently allocated additional funding and plans to expand the program citywide.

        Green Infrastructure design and maintenance standards being developed by Public Works Department.

        Stormwater Management Ordinance – provides stormwater management requirements for commercial developments of a certain size threshold

        Public Works sustainable infrastructure program: several large-scale projects in design or under construction

12. Orleans Parish spends a significant amount of money each year on flood mitigation projects like the ones discussed above.

13. Flood insurance is another important tool for protecting Orleans Parish residents and their most important financial assets—their home, business, and possessions. "Floods can happen anywhere," and the Federal Emergency Management Agency (FEMA) estimates that "just one inch of floodwater can cause up to $25,000 in damage."[1]

14. Because most homeowners' insurance does not cover flood damage, homeowners need a separate flood insurance policy to cover the building, the contents of the building, or both.

15. The federal National Flood Insurance Program (NFIP) is the flood insurer of last resort. FEMA manages the NFIP. A network of more than 50 private insurance companies and the NFIP Direct deliver NFIP to the public.[2]

---

[1] https://www.fema.gov/flood-insurance.
[2] https://www.fema.gov/flood-insurance.

16. "The NFIP provides flood insurance to property owners, renters, and businesses" alike.[3] FEMA acknowledges that having flood insurance coverage helps policyholders recover faster when floodwaters recede.[4] The NFIP requires homes and businesses in high-risk flood areas with mortgages from government-backed lenders to have flood insurance.

17. NFIP insurance is available to anyone living in one of the 23,000 participating NFIP communities.[5] "A community is a governmental body with the statutory authority to enact and enforce development regulations."[6] A parish can be a community.

18. Orleans Parish is an NFIP community.

19. To become an NFIP community, Orleans Parish had to enact and implement floodplain management regulations aimed at mitigating the effects of flooding and has to enforce those regulations.[7]

    Chromeextension://efaidnbmnnnibpcajpcglclefindmkaj/https://nola.gov/getattachment/Safety-and-Permits/Floodplain-Management/Flood-Ordinance-Revised-6-16.pdf/

20. The Parish's floodplain management regulations must satisfy state law as well as NFIP requirements.

21. As an NFIP community, Orleans Parish has committed: (a) to issue or deny permits to build or develop in the floodplain; (b) to inspect all development to assure it complies with the floodplain management regulations Orleans Parish was required to pass to become an NFIP community; (c) to maintain records of floodplain development; (d) to work with FEMA to prepare and revise floodplain maps; and (e) to help residents obtain information about flood hazards, flood insurance, and proper methods of construction.

22. FEMA reports that the quid pro quo arrangement between communities like Orleans Parish that participate in NFIP floodplain management, a pre-requisite for the Parish to be eligible to participate in the NFIP, has saved the nation over $100 billion dollars in avoided floods over the last 40 years.

23. One tried-and-true method for reducing floods in Orleans Parish and across Louisiana is elevating homes and businesses, which FEMA used to take into account when setting NFIP insurance rates.

---

[3] https://www.fema.gov/flood-insurance.
[4] https://www.fema.gov/flood-insurance.
[5] https://www.fema.gov/flood-insurance.
[6] https://www.fema.gov/flood-insurance.
[7] https://www.fema.gov/flood-insurance.

4

24. Prior to Risk Rating 2.0, FEMA used the 1% Annual Exceedance Probability (AEP) flood as the basis for the National Flood Insurance Program. The 1% AEP flood is a flood that has a 1 in 100 chance of being equaled or exceeded in any given year and an average recurrence interval of 100 years—often referred to as the "100-year flood."

25. Before Risk Rating 2.0, FEMA used Flood Insurance Rate Maps to set rates and, in those maps, determined the AEP flood for each flood zone—called the Base Flood Elevation (BFE).

26. For each flood zone, FEMA advised elevating homes at least 1 foot above the BFE because FEMA expected its exposure to flood claims at or above that level to be very infrequent, and so FEMA lowered insurance rates accordingly. The higher a structure was elevated above the BFE level, the lower FEMA's risk for having to pay claims and, therefore, the lower the insurance rate.

27. Orleans Parish has participated in NFIP since 1974 (or roughly that year). The parish ordinance enforced NFIP minimum standards until adopting an advisory base flood elevation in the years following Hurricane Katrina. A new Flood Insurance Study was completed and adopted in 2016, the same year that the Council adopted the stricter BFE +1' standard.

28. For decades, Orleans Parish and other parishes across Louisiana adopted FEMA's Rate Maps and/or required buildings to be built at least 1 foot above FEMA's BFE.

29. One reason Orleans Parish adopted FEMA's Rate Maps and/or required buildings to be built at least 1 foot above the BFE was to take advantage of FEMA's grandfathering policy for its own properties and to make that policy available to all who built in Orleans Parish. FEMA's grandfathering policy protected those who built in Orleans Parish from huge rate increases if they built in accordance with the Rate Maps' requirements. Insurance premium discounts under the old NFIP rating system were one of the factors involved in adopting the 1 freeboard requirement.

30. A significant number of homeowners and business owners have relied on the advice of FEMA to elevate their homes and businesses. Approximately 2865 homes were mitigated through State-run HMGP programs after Hurricane Katrina. An additional 300-500 have been mitigated through City-administered HMA grants since 2017.

31. The Flood Mitigation Assistance program is currently the main source of funding for residential elevation projects in New Orleans.

32. Orleans Parish's Hazard Mitigation Office plans, conducts outreach to residents, develops applications, manages grant awards, and provides program

5

management support to residents to complete mitigation projects with grant funds.

33. In my estimation, approximately 2% of home and business owners in Orleans Parish have received elevation grants.

34. Since Risk Rating 2.0 went into effect, the number of grant applications that the Parish has received has decreased. The decision not to elevate leaves parish residents and their property in harm's way and increases the amount the Parish will have to spend on flood recovery. The decision not to elevate a home or business also harms the flood mitigation industry in Orleans Parish.

35. In my estimation, roughly $500,000 is spent each year to educate parish residents, depending on the number of properties included in grant awards in any given cycle.

36. Under the FMA program, the State or the Parish must repay the value of that grant if the recipient fails to comply with the program's requirements, including maintaining flood insurance. Given that FMA is the main source of funding for residential elevation projects, it is important to the City that the recipients are able to afford insurance.

37. FEMA has not released clear information on the premium reductions associated with elevation-mitigation projects. Compared to the old system, the rate reduction benefits under Risk Rating 2.0 do seem to be less.

38. FEMA has not released clear information on the premium reductions associated with elevation-mitigation projects. Compared to the old system, the rate reduction benefits under Risk Rating 2.0 do seem to be less.

39. In Orleans Parish, since completion of the hurricane protection levee system, there have been no storm surge events that have impacted areas of the parish within the levee system. There is one development outside the levee system, and we have been making steady progress elevating those structures to coastal zone standards.

40. The Parish gets Risk Rating 2.0 policy data from FEMA, and we are currently waiting for FEMA to send us a report for the current year. It is our understanding that rates are going up for most insureds in the City.

41. We saw an increase in the average costs of insurance city-wide before Risk Rating 2.0 went into effect. We are waiting to get more data from FEMA to continue evaluating, but the information released so far, as has been widely noted, seems to show that costs are going to increase even more dramatically.

42. Those rate increases not only affect owners of property in Special Flood Hazard Areas but also those who rent properties in Special Flood Hazard Areas. The NFIP rate increases will likely be passed on to renters in the form of rent increases.

43. These rate increases harm all property owners, but they of course pose a particular hardship to low and moderate income property owners and their families, many of whom have lived in these areas for generations, and many of whom are racial minorities. Doubtless, many of these low and moderate income property owners and their families will struggle to pay for their mandatory insurance at its increased price. Indeed, these rate increases are likely to force many of these property owners and their families out of their homes in these areas, and perhaps out of our Parish altogether, thereby threatening the unique communities and cultures that have developed here over the course of generations. This is profoundly unjust, especially considering that it was FEMA's promise of lower insurance rates that convinced many of these vulnerable property owners and their families to make significant investments in elevation and other flood mitigation measures. But apparently FEMA considers this to be "Equity in Action."

44. As rates increase, many homeowners, business owners, and renters in Orleans Parish are likely to be priced out of their properties and forced to move to out of the Parish, which will decrease the Parish's tax base and therefore its financial ability to protect its residents and their property from flooding and flood damage.

45. And by creating a surplus of available property, this exodus from Orleans Parish will negatively impact the property values of those who remain, further decreasing the Parish's tax revenues.

46. Moreover, even if no one were to leave Orleans Parish, Risk Rating 2.0 is still likely to negatively affect property values in the Parish by increasing the cost of purchasing mandatory flood insurance that runs with the property, thereby decreasing the Parish's tax revenues.

47. This reduction in tax revenue will inhibit the Parish's ability to protect its residents and their property. This would be tragic given the proven efficacy of the Parish's flood mitigation efforts, especially when one contrasts the immense damage inflicted by Hurricanes Katrina and Ida discussed above with the relatively minimal damage caused by other flood events after those flood mitigation efforts were made.

48. Risk Rating 2.0 apparently fails to account for all of Parish's flood reduction successes. By failing to do so, Risk Rating 2.0 will likely decrease Orleans

Parish's tax revenues and inhibit the Parish's ability to protect its residents and their property.

49. The only logical explanation for why Risk Rating 2.0 is increasing rates for Orleans Parish levee-protected areas and elevated properties is that the methodology used in setting rates must be flawed.

50. But FEMA's refusal to reveal Risk Rating 2.0's methodology as required by federal law, despite numerous requests from all levels of state government, including parishes, and Louisiana's federal legislators, makes it impossible for Orleans Parish and its floodplain manager to determine where the flaws in FEMA's methodology lie.

51. That lack of transparency harms Orleans Parish's ability to work with FEMA, as required by the Parish's commitment as an NFIP community to work with FEMA to prepare and revise floodplain maps.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New Orleans, Louisiana, this 30th day of May 2023.

_____
LaToya Cantrell, Mayor
City of New Orleans
Parish of Orleans

8