# EXHIBIT 22

### Declaration of Plaquemines Parish Government

1.   My name is W. Keith Hinkley. I am over the age of 18 and am competent to make this declaration. The facts set forth in this declaration are based on my personal knowledge.

2.   I am the president of the West Bank, Grand Prairie and Buras Levee Districts and have served in that role since January 1, 2023.

3.   Together, these three levee districts make up the entire territorial limits of the Plaquemines Parish. Under the Charter for Local Self-Government for Plaquemines Parish, "The Parish Government shall succeed to all the jurisdiction, powers, duties, and functions…including…the Buras Levee District, the Grand Prairie Levee District, and the West Bank Levee District, with full authority as governing authority of said districts …" Charter for Local Self-Government Plaquemines Parish Louisiana Section 2.03 A.

4.   Within Plaquemines Parish, the West Bank, Grand Prairie and Buras Levee Districts are political subdivisions of the State of Louisiana that were organized for the purpose and charged with the duty of constructing and maintaining levees within their territorial limits. La. Rev. Stat. 38 § 281.

5.   The areas within Plaquemines Parish are prone to flooding because several areas of the parish are without levee protection, many areas have levees that are currently being repaired/constructed, and a limited geographic portion of the parish is fully protected by levees.  In addition, Plaquemines Parish straddles both sides of the Mississippi River as it enters the Gulf of Mexico is surrounded and bifurcated by water.  Water is the way of life in Plaquemines, it is in close proximity or adjacent to major bodies of water—the Gulf, the Mississippi River, Lake Ponchartrain, coastal lakes, and marshes; it is located as a true, coastal community that can and has taken direct hits by multiple hurricanes each decade; it is low in elevation; well over half of it is located in a flood plain; and, over 20% of percentage of its businesses and houses are located in flood plains.

6.   During hurricanes, the West Bank, Grand Prairie and Buras Levee Districts can experience significant flooding.

7.   To address that flood risk, the Louisiana Legislature has given Plaquemines Parish and its levee districts the authority to impose annual levee district taxes for the purpose of constructing and maintaining levees, levee drainage, flood protection, and hurricane flood protection, although while not collected at this time may be needed to be collected in the future.

8.   Plaquemines Parish receives and spends significant amounts of tax revenues on flood mitigation projects.

9.   Plaquemines Parish Government in partnership with United States Army Corps of Engineers has invested billions of dollars on flood mitigation projects that have successfully reduced flooding throughout the Parish.

10.  It is my understanding that despite Plaquemines Parish's major successes in flood reduction, FEMA has stated that it does not have adequate information about Louisiana's levees to properly consider them under Risk Rating 2.0.

11.  In Plaquemines Parish and across Louisiana, another tried-and-true method of flood protection is elevating structures, which FEMA used to take into account when setting insurance rates for the National Flood Insurance Program.

12. Prior to Risk Rating 2.0, FEMA used the 1% Annual Exceedance Probability (AEP) flood as the basis for the National Flood Insurance Program. The 1% AEP flood is a flood with a water level that has a 1 in 100 chance of being equaled or exceeded in any given year and with an average recurrence interval of 100 years—often referred to as the "100-year flood."

13. Before Risk Rating 2.0, FEMA used Flood Insurance Rate Maps to set rates and, in those maps, determined for each flood zone the elevation of surface water resulting from a flood that has a 1% chance of equaling or exceeding that level in any given year—called the Base Flood Elevation (BFE).

14. FEMA recommended elevating homes at least 1 foot above the BFE because it was thought that FEMA's exposure to flood claims above that level would be very infrequent, and so FEMA would lower the insurance rate accordingly. In fact, the higher a structure was elevated above the BFE level, the lower FEMA's risk for having to pay claims and, therefore, the lower the insurance rate.

15. But under Risk Rating 2.0, elevating a structure above the BFE appears to have only a negligible effect on the insurance rate charged.

16. Many communities within the Parish and across Louisiana have been adopting FEMA's Rate Maps for decades. Some of those communities have taken additional flood mitigation measures under FEMA's Community Rating System, such as requiring additional free-board above the BFE reported on FEMA's Rate Maps, to receive further discounted flood insurance rates.

17. Many communities in Plaquemines Parish have relied on FEMA's recommendation that they adopt FEMA's Rate Maps so that those who built in accordance with the Rate Maps' requirements would be protected from huge rate increases by FEMA's grandfathering policy.

18. FEMA reports that the quid pro quo arrangement between communities and the NFIP for floodplain management, a pre-requisite for the community to be eligible to participate in the NFIP, has saved the nation over $100 billion dollars in avoided floods in the last 40 years. Risk Rating 2.0, however, kills FEMA's grandfathering policy. Although FEMA's community rating system discounts are still in place for those communities, it is being report that members of those communities still wind up paying much higher rates because, unlike the grandfathering policy, the community rating system discounts do not stop the rates themselves from increasing. So even with the community rating system discounts, members of those communities are likely paying higher rates under Risk Rating 2.0.

19. Despite the above successes, Risk Rating 2.0 has increased the cost of flood insurance for areas protected by levees and elevated properties alike. In my estimation, approximately 50% of the people who live in and 60% of the small business located in the West Bank, Grand Prairie and Buras Levee Districts combined are in a flood plain and are therefore required to purchase flood insurance. Risk Rating 2.0 either has already increased the flood insurance rates for those people and businesses or will increase their rates when their NFIP policies renew.

20. As rates increase, people and businesses in Plaquemines Parish are likely to be priced out of their properties and forced to move to out of Plaquemines Parish which will decrease the West Bank, Grand Prairie and Buras Levee Districts' tax base and its ability to fulfill its statutory charge to construct and maintain levees.

21. And by creating a surplus of available property, this exodus from the Parish will negatively impact the property values of those who remain, further decreasing the Parish's potential tax revenues.

22. Moreover, even if no one were to leave Plaquemines Parish, Risk Rating 2.0 is still likely to negatively affect property values in the Parish by increasing the cost of purchasing mandatory flood insurance that runs with the property, thereby decreasing the Parish's tax revenues.

23. This reduction in tax revenue will inhibit Plaquemines Parish's ability to fulfill their duty to construct and maintain levees that protect their residents and their property. This would be tragic given the proven efficacy of levees in the West Bank, Grand Prairie and Buras Levee Districts especially when one contrasts the immense damage inflicted by Hurricane Katrina prior to the levee improvements.

24. In short, levees effectively protect against flooding. Risk Rating 2.0 apparently fails to account for that. By failing to do so, Risk Rating 2.0 will likely decrease the Parish's potential tax revenues and inhibit the Parish from carrying out its statutory charge to build and maintain levees that defend Plaquemines Parish, LA are charged with protecting.

25. The only logical explanation for why Risk Rating 2.0 is increasing rates for the Parish's levee-protected areas and elevated properties is that the methodology used in setting rates must be flawed.

26. But FEMA's refusal to reveal Risk Rating 2.0's methodology as required by federal law, despite numerous requests from all levels of state government and Louisiana's federal legislators, makes it impossible for Plaquemines Parish to determine where the flaws in FEMA's methodology lie.

27. That lack of transparency harms the Parish's ability to partner with FEMA and other federal agencies, like the Army Corps of Engineers, in constructing and managing levees and other flood mitigation projects.

28. While justification to move towards Risk Rating 2.0 has been stated as an attempt to shore up the funding and overall fiscal health of the NFIP, it is unclear how the Risk Rating 2.0 algorithms work.

29. One thing about the algorithm that is clear is that it does not, in any substantive way, acknowledge FEMA Flood Insurance Rate Maps (FIRMs).

30. FIRMS are the "[o]fficial map of a community on which FEMA has delineated the Special Flood Hazard Areas (SFHAs), the Base Flood Elevations (BFEs) and the risk premium zones applicable to the community."[1]

31. According to FEMA, "SFHA[s] are defined as the area that will be inundated by the flood event having a 1-percent chance of being equaled or exceeded in any given year. The 1-percent annual chance flood is also referred to as the base flood or 100-year flood. SFHAs are labeled as Zone A, Zone AO, Zone AH, Zones A1-A30, Zone AE, Zone A99, Zone AR, Zone AR/AE, Zone AR/AO, Zone AR/A1-A30, Zone AR/A, Zone V, Zone VE, and Zones V1-V30."[2]

---

[1] https://www.fema.gov/glossary/flood-insurance-rate-map-firm.
[2] https://www.fema.gov/glossary/flood-zones#:~:text=Flood%20hazard%20areas%20identified%20on,exceeded%20in%20any%20given%20year.

32. "The SFHA is the area where the National Flood Insurance Program's (NFIP's) floodplain management regulations must be enforced and the area where the mandatory purchase of flood insurance applies."[3]

33. It is obvious that the failure of FEMA/NFIP to substantively account for the FIRMs in setting insurance rates is proof that FEMA does not believe in the FIRMs that it has been engineering for decades.

34. It is obvious that FEMA insurance and financial experts are no longer listening to the engineering experts employed by FEMA. If this were not true, the FIRMs would be the primary factor in setting insurance.

35. It is obvious that FEMA engineering experts still believe that FIRMs should be the primary factor in determining risk. Here is how we know this:

   a. FEMA is currently in month 16 of a Community Assistance Visit (CAV) with Plaquemines Parish. These are visits to a community by a FEMA staff member that provides technical assistance to the community and verifies that the community is enforcing its floodplain management regulations.

   b. The PP CAV is not being permitted to be closed as FEMA continues to look at violations of floodplain policies related to FIRM compliance.

   c. In fact, FEMA has been diligent about assuming that structures should be compliant with new maps (adopted by Plaquemines Parish Government on 1.15.2021) even after the "roll-out" of Risk Rating 2.0.

   d. Furthermore, we can prove that even FEMA understands that the preeminent factor for mitigating risk is by elevating properties and following the FIRMs.

   e. If Plaquemines were to no longer enforce the FIRMs, Plaquemines Parish Government would be removed completely from the NFIP and all insurance would (essentially) be revoked/denied.

   f. Drastic penalties for failure to enforce the FIRMs is proof that FEMA knows that the FIRMs (building to BFE, raising properties, hardening communities) is the best way to protect.

   g. If this is the best way to protect, why is the computer algorithm not computing?

36. If Risk Rating 2.0 is correct in no longer utilizing FIRMs as the basis for flood insurance rates, then we would expect FEMA to not push Plaquemines Parish to adopt new maps. It does not make any sense that FEMA is simultaneously enforcing its requirement that parishes adopt its FIRMs as a way to reduce flood risks and saying that the FIRMs no longer serve as the basis for determining flood risk.

37. If the maps are not good enough, then Plaquemines Parish Government suggests FEMA has been giving us voodoo engineering calculations for decades.

38. As Plaquemines has, does, and continues to enforce the FIRMs, we understand the maps' importance and believe the maps to be sound engineering. A failure to acknowledge levees, elevation of homes, and mitigation of properties is not only anti-science, but also fundamentally flawed logic.

---

[3] https://www.fema.gov/glossary/special-flood-hazard-area-sfha

39.   If FEMA wants to change the rules now, they should offer to pick up the mortgage tab for anyone that purchased a property and is now forced to buy and keep insurance.  Plaquemines Parish Government believes in mitigating flood risks and has done so for decades with the assistance of the Army Corp. of Engineers and FEMA programs, but our citizens and communities must be rewarded, not penalized, for doing the right thing.

40.   Moreover, for any community, including Plaquemines Parish, to participate in the NFIP, it must adopt and enforce FEMA's FIRMs and floodplain management regulations.

41.   FEMA can unilaterally make changes to the FIRMS or the floodplain management regulations, and all NFIP communities must adopt those changes to continue participating in the NFIP.

42.   If a community declines to adopt or enforce any of FEMA's changes, the community can no longer participate in the NFIP, and no property within that community can purchase an NFIP policy.

43.   A community's ability to receive federal disaster aid or federal funds for local flood-protection or hurricane- or storm-damage-reduction projects is also conditioned on its adoption and enforcement of FEMA's floodplain management regulations. *See* 33 U.S.C. § 701b–12; 42 U.S.C. § 4103 and §4106.

44.   Like all NFIP communities, Plaquemines Parish's participation in the NFIP was conditioned on passing a comprehensive floodplain management regulation "referred to as the Flood Plain Management Regulations of the Parish of Plaquemines, Louisiana." Code of Ordinances, Plaquemines Parish, Louisiana § 9-16.

45.   Plaquemines Parish's "adoption of flood plain management regulations applicable to areas of special flood hazard is required" not only to gain entrance into the NFIP but also "to maintain the eligibility of the parish for participation in the National Flood Insurance Program and for the issuance of flood insurance for all properties within the unincorporated areas." *Id.* § 9-17.

46.   Plaquemines Parish's Flood Plain Management Regulations prohibit any "building" or "land" from being "used or altered" or any "structure or improvement" from being "erected and located" unless those actions are "in full conformity with the provisions" of the Parish's Flood Plain Management Regulations. *Id.* § 9-22(b).

47.   The Parish "shall" not issue any "license," "final subdivision plat," or "approval . . . for any proposed development or use which is not in compliance with the requirements" of the Parish's Flood Plain Management Regulations. *Id.* § 9-22(b).

48.   "Prior to commencement of any construction, site improvements or landscape alterations for any development located partially or entirely within an area of special flood hazard, application for a development permit shall be made to the building permit office." *Id.* § 9-62.

49.   Moreover, residents of Plaquemines Parish "shall" obtain a "development permit . . . for all development in the unincorporated areas of the Parish of Plaquemines to ensure conformity of such development with [the Parish's Flood Plain Management Regulations]. The review of proposed developments for compliance with this article shall be conducted in conjunction with any reviews required by the zoning ordinance and subdivision regulations of the parish, and a single development permit may be issued to indicate compliance with zoning and subdivision requirements, as well as with" the Parish's Flood Plain Management Regulations. *Id.* § 9-22(a).

50.    One provision of those floodplain management regulations mandates that homes—either "[n]ew construction or substantial improvement of any residential structure"—"shall have the lowest floor (including basement) elevated to or above the base flood elevation." *Id.* § 9-83(a).[4]

51.    For non-residential structures, the provision is the same except that it requires either elevation "above the base flood elevation" or flood-proofing measures. *Id.* § 9-84(a).

52.    According to the Census Bureau, the per capita income in Plaquemines Parish is $30,598.[5]

53.    There are people in Plaquemines Parish who cannot afford to elevate their homes to the BFE as required by Section 9-83(a) of the Parish's Flood Plain Management Regulations and so cannot qualify for a permit to connect their homes to electricity under other sections of those regulations.

54.    And now the average increase of full premium rates for NFIP policies exceeds 1000% in some areas of Plaquemines Parish.

55.    This means that FEMA has left people in Plaquemines Parish sitting ducks on the ground right at the start of Hurricane Season. There are people who cannot afford to elevate their homes and so cannot get electricity, and they cannot afford to purchase flood insurance through the NFIP and so will not receive insurance money or federal disaster recovery funds to help them rebuild. This is what FEMA calls "Equity in Action."


I declare under penalty of perjury that the foregoing is true and correct. Executed in Belle Chasse, Louisiana, this 31st day of May, 2023

W. Keith Hinkley
President, Plaquemines Parish Government

---

[4] https://library.municode.com/la/plaquemines_parish/codes/code_of_ordinances?nodeId=PTIICOOR_CH9DRFLCO_ARTIIFLMA.
[5] https://www.census.gov/quickfacts/plaqueminesparishlouisiana