# EXHIBIT 24

**STATE OF LOUISIANA**
**PARISH OF ST. CHARLES**

## DECLARATION OF ST. CHARLES PARISH

1. My name is Matthew L. Jewell. I am over the age of 18 and am competent to make this declaration. The facts set forth in this declaration are based on my personal knowledge.

2. I am the President of the St. Charles Parish, serving in that role since January 13, 2020.

3. St. Charles Parish is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

4. St. Charles Parish is located in the State of Louisiana, measuring approximately 411 square miles, adjacent to major bodies of water, including the Gulf of Mexico, Lake Pontchartrain, and the Mississippi River.

5. St. Charles Parish is prone to flooding for the following reasons: (1) because of its proximity to the coast, the Mississippi River, and Lake Pontchartrain (2) proximity to a hurricane zone; (3) low elevation; (4) 56.4% of St. Charles Parish is located in Special Flood Hazard Areas (83.9% of total parish land excluding water); and (5) nearly 50% of businesses and houses in St. Charles are located in Special Flood Hazard Areas.

6. Each year, St. Charles Parish experiences an average of one flooding event.

7. The average annual cost of flood damage in the St. Charles Parish is $2,873,467.83 at an average of $19,112.00 per claim.

8. St. Charles Parish has authority to mitigate its flood risk and remediate flood damage as set forth by the State of Louisiana in Revised Statute 38:84 which delegated the responsibility of local governmental units to adopt regulations designed to minimize flood losses. Specifically, St. Charles Parish has authority under its Home Rule Charter per the St. Charles Parish Zoning Ordinance of 1981, Appendix A, Section XX Flood Damage Prevention, to adopt such regulations and ordinances designed to minimize flooding.

9. To promote flood recovery within its borders, St. Charles Parish has adopted and implemented the St. Charles Parish Zoning Ordinance of 1981, Appendix A, Section XX Flood Damage Prevention. These ordinances: (1) restrict or prohibit uses that are dangerous to health, safety, or property in times of flood, or cause excessive increases in flood heights or velocities; (2) require that uses vulnerable to floods, including facilities which serve such uses, be protected against flood damage at the time of initial construction; (3) control the alteration of natural floodplains, stream channels, and natural protective barriers, which are involved in the accommodation of flood waters; (4) control filling, grading, dredging, and other development which may increase flood damage; and (5) prevent or regulate the construction of flood barriers which will unnaturally divert flood waters or which may increase flood hazards to other lands.

10. St. Charles Parish expends numerous hours of manpower and funding each year in flood recovery projects like the ones described above.

11. The amount that St. Charles Parish spends on flood recovery projects has steadily decreased year after year because of the success of the St. Charles Parish's flood mitigation efforts.

12. Those efforts include implementing building codes in the St. Charles Parish Zoning Ordinance of 1981, Appendix A, Section XX Flood Damage Prevention; by increasing levee heights; by constructing new levees; by constructing and operating several pump stations; by making drainage conveyance improvements and by implementing and overseeing elevation grant programs such as the St. Charles Residential Mitigation Program.

13. St. Charles Parish has spent over $100,000,000.00 on flood mitigation projects like the ones discussed above since 2014.

14. Flood insurance is another important tool for protecting the St. Charles Parish residents and their most important financial assets—their home, business, and possessions. "Floods can happen anywhere," and the Federal Emergency Management Agency (FEMA) estimates that "just one inch of floodwater can cause up to $25,000 in damage."[1]

15. Because most homeowners insurance does not cover flood damage, homeowners need a separate flood insurance policy to cover the building, the contents of the building, or both.

16. The federal National Flood Insurance Program (NFIP) is the flood insurer of last resort. FEMA manages the NFIP. A network of more than 50 private insurance companies and the NFIP Direct deliver NFIP to the public.[2]

17. "The NFIP provides flood insurance to property owners, renters, and businesses" alike.[3] FEMA acknowledges that having flood insurance coverage helps policyholders recover faster when floodwaters recede.[4] The NFIP requires homes and businesses in high-risk flood areas with mortgages from government-backed lenders to have flood insurance.

18. NFIP insurance is available to anyone living in one of the 23,000 participating NFIP communities.[5] "A community is a governmental body with the statutory authority to enact and enforce development regulations."[6] A parish can be a community.

19. St. Charles Parish is an NFIP community.

---

[1] https://www.fema.gov/flood-insurance.
[2] https://www.fema.gov/flood-insurance.
[3] https://www.fema.gov/flood-insurance.
[4] https://www.fema.gov/flood-insurance.
[5] https://www.fema.gov/flood-insurance.
[6] https://www.fema.gov/flood-insurance.

20. To become an NFIP community, St. Charles Parish had to enact and implement floodplain management regulations aimed at mitigating the effects of flooding and has to enforce those regulations.[7] *See also,* St. Charles Parish Zoning Ordinance of 1981, Appendix A, Section XX Flood Damage Prevention.

21. St. Charles Parish's floodplain management regulations must satisfy state law as well as NFIP requirements.

22. As an NFIP community, St. Charles Parish has committed: (a) to issue or deny permits to build or develop in the floodplain; (b) to inspect all development to assure it complies with the floodplain management regulations St. Charles Parish was required to pass to become an NFIP community; (c) to maintain records of floodplain development; (d) to work with FEMA to prepare and revise floodplain maps; and (e) to help residents obtain information about flood hazards, flood insurance, and proper methods of construction.

23. FEMA reports that the quid pro quo arrangement between communities like St. Charles Parish that participate in NFIP floodplain management, a pre-requisite for the Parish to be eligible to participate in the NFIP, has saved the nation over $100 billion dollars in avoided floods over the last 40 years.

24. One tried-and-true method for reducing floods in St. Charles Parish and across Louisiana is elevating homes and businesses, which FEMA used to take into account when setting NFIP insurance rates.

25. Prior to Risk Rating 2.0, FEMA used the 1% Annual Exceedance Probability (AEP) flood as the basis for the National Flood Insurance Program. The 1% AEP flood is a flood that has a 1 in 100 chance of being equaled or exceeded in any given year and an average recurrence interval of 100 years—often referred to as the "100-year flood."

26. Before Risk Rating 2.0, FEMA used Flood Insurance Rate Maps to set rates and, in those maps, determined the AEP flood for each flood zone—called the Base Flood Elevation (BFE).

27. For each flood zone, FEMA advised elevating homes at least 1 foot above the BFE because FEMA expected its exposure to flood claims at or above that level to be very infrequent, and so FEMA lowered insurance rates accordingly. The higher a structure was elevated above the BFE level, the lower FEMA's risk for having to pay claims and, therefore, the lower the insurance rate.

28. Many homeowners and business owners have relied on FEMA's advice to elevate their homes and businesses in accordance with FEMA's Rate Maps, FEMA's grandfathering policy.  Every home and business built since 1983 in St. Charles Parish has have been required to following the St. Charles Parish Zoning Ordinance of 1981, Appendix A, Section XX Flood Damage Prevention as more fully referenced above herein.

---

[7] https://www.fema.gov/flood-insurance.

29. FEMA, the Department of Housing and Urban Development (HUD), and the State offer grants for elevating homes and improving drainage conveyance and levees. St. Charles Parish oversees and operates the St. Charles Residential Mitigation Program which since Hurricane Katrina has successfully mitigated 68 repetitive loss residential properties. Since Hurricane Ida, 47 repetitive loss properties have been awarded funding by FEMA, and 25 additional properties are awaiting funding.

30. St. Charles Parish administers and enforces the above-mentioned grant programs.

31. Since Hurricane Katrina over 115 homes in St. Charles Parish have received elevation grants and 25 additional homes are currently awaiting grant approval.

32. Since the implementation of Risk Rating 2.0, St. Charles Parish expects the number of grant applications it will receive to greatly decrease. The decision not to elevate leaves parish residents and their property in harm's way and increases the amount the Parish will have to spend on flood recovery. The decision not to elevate a home or business also harms the flood mitigation industry in the St. Charles Parish.

33. In my estimation, St. Charles Parish spends numerous man hours and funds each year to educate parish residents about those grant programs, process grant applications, distribute grant funds, and monitor and enforce grantees' compliance with the requirements of those programs.

34. If a recipient of an elevation grant fails to comply with the program's requirements, the Parish must repay the value of that grant to the program. If a recipient of a state elevation grant fails to comply with the requirements of the State's grant program, the recipient must repay the value of that grant to the State.

35. Despite the grant programs, St. Charles Parish's reliance on FEMA's Rate Maps and grandfathering policy, and St. Charles Parish's success in flood reduction from elevating structures, under Risk Rating 2.0, elevating a structure above the BFE appears to have only a negligible effect on the insurance rate charged for elevated homes and businesses.

36. Moreover, Risk Rating 2.0 eliminated FEMA's grandfathering policy. Although FEMA's Community Rating System discounts are still in place for St. Charles Parish, residents of St. Charles Parish still wind up paying much higher rates because, unlike the grandfathering policy, the community rating system discounts do not stop the rates themselves from increasing. So even with the community rating system discounts, members of St. Charles Parish pay higher rates under Risk Rating 2.0.

37. St. Charles Parish has also taken additional flood mitigation measures to receive further discounted flood insurance rates under FEMA's Community Rating System, such as increasing levee heights, obtaining a CRS Program Rating of 7, improving drainage conveyances, constructing and operating pump stations, and other publicized services such as the St. Charles Residential Mitigation Program.

38. St. Charles Parish's flood mitigation efforts have successfully reduced flooding. For example, prior flood events cost St. Charles Parish annually $2,873,467.83 at an average

4

of $19,112.00 per claim. With the successful flood mitigation efforts, minimal to no flooding occurred in St. Charels Parish as a result of Hurricane Ida.

39. Despite St. Charles Parish's dramatic reduction in flooding and flood damage, Risk Rating 2.0 has increased the cost of flood insurance for all properties in the Parish, both residential and commercial, that are in Special Flood Hazard Areas and are backed by federally insured mortgages.

40. I estimate those properties to make up approximately 100% of all properties in St. Charles. Risk Rating 2.0 either has already increased the flood insurance rates for those properties or will increase their rates when their NFIP policies renew, regardless of whether the properties are protected by levees or have been elevated or both.

41. Those rate increases not only affect owners of property in Special Flood Hazard Areas but also those who rent properties in Special Flood Hazard Areas. The NFIP rate increases will likely be passed on to renters in the form of rent increases.

42. These rate increases harm all property owners, but they of course pose a particular hardship to low and moderate income property owners and their families, many of whom have lived in these areas for generations, and many of whom are racial minorities. Doubtless, many of these low and moderate income property owners and their families will struggle to pay for their mandatory insurance at its increased price. Indeed, these rate increases are likely to force many of these property owners and their families out of their homes in these areas, and perhaps out of our Parish altogether, thereby threatening the unique communities and cultures that have developed here over the course of generations. This is profoundly unjust, especially considering that it was FEMA's promise of lower insurance rates that convinced many of these vulnerable property owners and their families to make significant investments in elevation and other flood mitigation measures. But apparently FEMA considers this to be "Equity in Action."

43. As rates increase, many homeowners, business owners, and renters in St. Charles Parish are likely to be priced out of their properties and forced to move to out of the Parish, which will decrease the Parish's tax base and therefore its financial ability to protect its residents and their property from flooding and flood damage.

44. And by creating a surplus of available property, this exodus from St. Charles Parish will negatively impact the property values of those who remain, further decreasing the Parish's tax revenues.

45. Moreover, even if no one were to leave St. Charles Parish, Risk Rating 2.0 is still likely to negatively affect property values by increasing the cost of purchasing mandatory flood insurance that runs with the property, thereby decreasing the Parish's tax revenues.

46. This reduction in tax revenue will inhibit St. Charles Parish's ability to protect its residents and their property. This would be tragic given the proven efficacy of St. Charles Parish's flood mitigation efforts, especially when one contrasts the immense damage inflicted by prior flood events with the relatively minimal flood damage caused by Hurricane Ida after those flood mitigation efforts were made.

47. Risk Rating 2.0 apparently fails to account for all of St. Charles Parish's flood reduction successes. By failing to do so, Risk Rating 2.0 will likely decrease St. Charles Parish's tax revenues and inhibit the Parish's ability to protect its residents and their property.

48. The only logical explanation for why Risk Rating 2.0 is increasing rates for St. Charles Parish levee-protected areas and elevated properties is that the methodology used in setting rates must be flawed.

49. FEMA's refusal to reveal Risk Rating 2.0's methodology as required by federal law, despite numerous requests from all levels of state government, including parishes, and Louisiana's federal legislators, makes it impossible for St. Charles Parish and its floodplain manager to determine where the flaws in FEMA's methodology lie.

50. That lack of transparency harms St. Charles Parish ability to work with FEMA, as required by the Parish's commitment as an NFIP community to work with FEMA to prepare and revise floodplain maps.

**"I declare under penalty of perjury that the foregoing is true and correct. Executed in Hahnville, Louisiana, this 30th day of May 2023."**

ST. CHARLES PARISH:

*/s/ Matthew Jewell*

By: Matthew L. Jewell, President