# EXHIBIT 31



OFFICE OF THE PARISH PRESIDENT

TERREBONNE PARISH CONSOLIDATED GOVERNMENT
P.O. BOX 6097
HOUMA, LOUISIANA 70361-6097



GORDON E. DOVE
PARISH PRESIDENT

(985) 873-6401
FAX: (985) 873-6409
E-MAIL: gdove@tpcg.org

## Declaration of Terrebonne Parish

1. My name is Gordon E. Dove. I am over the age of 18 and am competent to make this declaration. The facts set forth in this declaration are based on my personal knowledge.

2. I am the president of the Terrebonne Parish and have served in that role since January 9, 2016.

3. The Parish is a local governmental subdivision of the State of Louisiana. La. Const. art. 6 § 44(1).

4. The Parish is located in southern Louisiana, measures a total area of 2,067 square miles, of which 987 square miles is land and 1,080 square miles is water according to the US Census. The Parish is on the Gulf of Mexico and has a system of 5 bayous, the Houma Navigation Canal and the Intracoastal Waterway.



1

5. The Parish is prone to flooding because of the 1) proximity to the Gulf of Mexico that supports our working coast; 2) hurricanes, and 3) low elevation of land. The Parish is 92% environmentally sensitive with marshes and estuaries supporting fishing, tourism, avian nesting grounds, and aquaculture. 71.7 %[i] of the Parish that is located in Special Flood Hazard Areas (954,427 acres); (5) we have 61,965 commercial and residential structures in the parish with 55,424 (45%) located in Special Flood Hazard Areas; and (6) in addition to Gulf storm events, the Parish is also at the bottom of the LWI Region 6 Watershed and is subject to flooding from rain events upstream in parishes such as Lafourche, Assumption, Ascension, and others.

6. Each year, the Parish experiences an average of 1.2 flooding events according to NOAA records.

7. The average annual cost of flood damage in the Parish is $6,844,000. This is based on NOAA data and does not include any preparation by the parish that may be eligible for Public Assistance. [ii]

8. The Parish has authority to mitigate its flood risk and remediate flood damage. Specifically, the Parish has authority under a Home Rule Charter Sec. 1-06. - Special powers:

"The parish government shall have the right, power and authority to pass all ordinances requisite or necessary to promote, protect and preserve the general welfare, safety, health, peace and good order of the parish, including, but not by way of limitation, the right, power and authority to pass ordinances on all subject matters necessary, requisite or proper for the management of parish affairs, and all other subject matter [sic] without exception, subject only to the limitation that the same shall not be inconsistent with the constitution or expressly denied by general law applicable to the parish."

The specific flood risk reduction regulations are captured in the Chapter 9 – Flood Damage Prevention Ordinance.

> The Terrebonne Parish Consolidated Government established in 1984 is the sole government body for the Parish of 104,786 residents.

9. To promote flood recovery within its borders, the Parish has pursued programs to alleviate flood risk and contribute to a stable economy and quality of life since at the latest 1998. The Parish approach is to pursue multiple lines of defense employing layers of protection that have resulted in paradigm changing risk reduction. The Parish has used its own tax dollars and sought grant opportunities at the state and Federal level to acquired homes; elevated homes, businesses and pump stations; relocated critical infrastructure outside the special flood hazard area; and implemented drainage improvements and a

2

levee system. Forced drainage improvements include culvert upgrades; and a system of 88 pump stations with 31 remotely operated and 28 with generator backup. Internal flood gates provide protection from southern winds and storm surge. The Parish instituted a millage specifically to raise taxes that are to be used for risk reduction projects and with those funds and grants funding has built the first lift of 70 miles of the Morganza to the Gulf Levee Protection System at 12-14 feet above sea level. This system includes 10 flood gates, one of which is being transitioned into a lock system anticipating sea level rise and increased risk of daily saltwater intrusion. Partner Parishes to the East have built an adjoining 28 miles of levee to 14 feet high, and to the West, installed a flood gate to reduce backwater flooding from the Atchafalaya. The Parish is completing three pump stations in the northwest of the Parish to keep water from homes and crops as originally conceived of by the USACE. Shell Corporation donated a 4,000-acre lot of marshes that will be encapsulated with a berm and accept fresh water diversions up to billions of gallons for retention and freshwater habitat.



The Parish has also installed secondary power for pump stations; a SCADA system for remote monitoring and activation; dredging; barrier island restoration; shoreline protection projects; and raised roads for flood protection and evacuation routes.

3

10. Since 1998, the Parish has expended an average of $15,700,000 a year in flood recovery and risk reduction projects like the ones described above. However, most of the expenditures have been since 2006 which would increase the yearly to $23.4 M per year. [iii]

11. The amount that the National Flood Insurance Program spends on flood insurance claims should decrease significantly due to these modifications. See 39 for some comparisons.

12. Through Parish-led programs, 442 structure owners have been offered assistance with elevating to the DFIRM maps not yet adopted plus one foot of freeboard and well over 1,000 have elevated with Increased Cost of Compliance insurance benefits through the Parish or on their own; 124 structures have been acquired and demolished; and 6 structures have been demolished and reconstructed. The Parish has changed the ordinance to disallow hazardous waste storage in the SFHA; to require placement of all manufactured homes with the chassis and all equipment above the base flood elevation; and has eliminated any waivers from the Flood Damage Prevention ordinance. The Variance Board was dissolved in 1985 as a result of the damage from Hurricane Juan to avoid any confusion regarding the ordinance's importance to preventing widespread flooding of structures. The Parish has passed two local sales taxes that have collected $236M to support risk reduction project exclusively.[iv] The Parish recommends the purchase of flood insurance through the Program for Public Information (PPI) developed in 2014[v]. This PPI also included activities to promote freeboard and the economic benefits of being safer that would be reflected in the flood insurance premium reductions. Parish employees took or presented eleven (11) classes that included freeboard not including multijurisdictional discussions through the FLOAT floodplain managers working support group. During a public outreach campaign in 2013 for potential improvements to the Flood Damage Prevention Ordinance to increase safety, over 50% of the respondents supported a freeboard ordinance for safety and savings. Further, 36% supported that those heights would be measured at the lowest horizontal cross member, which generally adds another foot of safety. Each year, uninsured severe repetitive loss and repetitive loss structure owners receive direct mail reminders that grants are available for elevation or reconstruction (not in the V zone) for 100% of the costs. The Parish "FloodSafe Minutes" public messaging campaign also recommend the purchase of flood insurance, freeboard, methods to choose from for elevation, the recommended ways to make flood claims, and the importance making claims to unlock these grants even if they won't pay much due to deductibles; Building Code Compliance insurance for elevation if required due to Substantial Damage; among other topics. The Parish posted approximately 24 messages through FloodSafe Minutes posts regarding freeboard, the benefits of flood insurance, or both. Much of the information presented in these messages incorporated public information from FEMA, non-profits, and the Association

of State Floodplain Managers explaining the benefits of freeboard including data produced by FEMA to promote the FEMA economic argument for elevating with freeboard to save on flood insurance.

13. Flood insurance is another important tool for protecting the Parish's residents and their most important financial assets—their home, business, and possessions. "Floods can happen anywhere," and the Federal Emergency Management Agency (FEMA) estimates that "just one inch of floodwater can cause up to $25,000 in damage."[1] This is the FEMA message though in practice few Terrebonne residents would receive this level of flood payment from the NFIP.

14. Because most homeowner's insurance does not cover flood damage, homeowners need a separate flood insurance policy to cover the building, the contents of the building, or both.

15. The federal National Flood Insurance Program (NFIP) is the flood insurer of last resort. FEMA manages the NFIP. A network of more than 50 private insurance companies and the NFIP Direct deliver NFIP to the public.[2]

16. "The NFIP provides flood insurance to property owners, renters, and businesses" alike.[3] FEMA acknowledges that having flood insurance coverage helps policyholders recover faster when floodwaters recede.[4] The NFIP requires homes and businesses in high-risk flood areas with mortgages from government-backed lenders to have flood insurance.

17. NFIP insurance is available to anyone living in one of the 23,000 participating NFIP communities.[5] "A community is a governmental body with the statutory authority to enact and enforce development regulations."[6] A parish can be a community.

18. The Parish is an NFIP community.

19. To become an NFIP community, the Parish had to enact and implement floodplain management regulations aimed at mitigating the effects of flooding and has to enforce those regulations.[7] The codes are captured in Chapter 9. Flood Damage Prevention Ordinance.

---

[1] https://www.fema.gov/flood-insurance.
[2] https://www.fema.gov/flood-insurance.
[3] https://www.fema.gov/flood-insurance.
[4] https://www.fema.gov/flood-insurance.
[5] https://www.fema.gov/flood-insurance.
[6] https://www.fema.gov/flood-insurance.
[7] https://www.fema.gov/flood-insurance.

5

20. The Parish's floodplain management regulations must satisfy state law as well as NFIP requirements.

21. As an NFIP community, the Parish has committed: (a) to issue or deny permits to build or develop in the floodplain; (b) to inspect all development to assure it complies with the floodplain management regulations the Parish was required to pass to become an NFIP community; (c) to maintain records of floodplain development; (d) to work with FEMA to prepare and revise floodplain maps; and (e) to help residents obtain information about flood hazards, flood insurance, and proper methods of construction.

22. FEMA reports that the quid pro quo arrangement between communities like the Parish that participate in NFIP floodplain management, a pre-requisite for the Parish to be eligible to participate in the NFIP, has saved the nation over $100 billion dollars in avoided floods over the last 40 years.

23. One tried-and-true method for reducing floods in Parish and across Louisiana is elevating homes and businesses, which FEMA takes into account when setting NFIP insurance rates, but the benefit is diminimus. Under the legacy ratings, this could save the policy holder up to 62% off of the cost of flood insurance in the V zone subject to over 3 feet of wave action energy. Savings under RR 2.0 for the same safety margin is less than $100[vi].

24. Prior to Risk Rating 2.0, FEMA used the 1% Annual Exceedance Probability (AEP) flood as the basis for the National Flood Insurance Program. The 1% AEP flood is a flood that has a 1 in 100 chance of being equaled or exceeded in any given year and an average recurrence interval of 100 years—often referred to as the "100-year flood."

25. Before Risk Rating 2.0, FEMA used Flood Insurance Rate Maps to set rates and, in those maps, determined the AEP flood for each flood zone—called the Base Flood Elevation (BFE).

26. For each flood zone, FEMA advised elevating homes at least 1 foot above the BFE because FEMA expected its exposure to flood claims at or above that level to be very infrequent, and so FEMA lowered insurance rates accordingly. The higher a structure was elevated above the BFE level, the lower FEMA's risk for having to pay claims and, therefore, the lower the insurance rate.

27. The Parish appealed the FEMA maps in 2008 due to the faulty modeling that assumed 3 feet of wave action far into the upland nearly to the City of Houma. Nevertheless, the Parish has posted and presented recommendations that any new structure be built to the DFIRM to take advantage of a 1–3-foot freeboard that would be earned by going above the FIRM that hadn't been changed since 1985. The freeboard would provide savings on flood insurance. Federal elevation programs funded after 2008 all lifted or built houses to the DFIRM

plus one foot of freeboard with the support of the FEMA HQ. The additional margin of safety was believed by all to create such value that the additional cost to the program was still positive in the benefit cost assessment. At the time of this declaration, there is no local ordinance requiring freeboard. The 2021 State Building Code released in Jan 2023, requires 1' of freeboard above the BFE, but it remains to be seen if this requirement is amended out during the 2023 Legislative Session. The Parish is seeking to adopt a 1' freeboard ordinance locally in order to maintain the score necessary to continue to receive the 10%-15% NFIP premium discount through the FEMA Community Rating System program.

27. One reason the Parish decided not to appeal the current map set completed in 10/2021 though it has obvious errors is due to the fact that it is no longer being used to support the flood insurance premiums. The Parish adopted FEMA's Rate Maps and required Parish-owned buildings or structures built or elevated thru Parish -administered programs to be built at least 1 foot above the BFE was to take advantage of FEMA's grandfathering policy for its own properties and to make that policy available to all who built in the Parish. FEMA's grandfathering policy protected those who built in the Parish from huge rate increases if they built in accordance with the Rate Maps' requirements.

28. In my opinion, parish homeowners and business owners have relied on FEMA's previous advice to elevate their homes and businesses in accordance with FEMA's Rate Maps (including FEMA's grandfathering policy and Chapter 9 Flood Damage Prevention of the Terrebonne Parish Code of Ordinances with the anticipation of a relative reduction in flood insurance premiums.

29. The State Hazard Mitigation Grant Program (FEMA funded) implemented by the Office of Community Development did not recommend elevation above the advisory base flood elevation from 2006 (1 foot higher than the 1985 effective maps), which is still the Parish's regulatory compliance level. Some Road Home applicants (the only group eligible for the State run HMGP project) paid extra to elevate higher or went through the Parish HMGP project to build higher to capture savings on flood insurance. The Parish shared the support from FEMA for the freeboard within the Hazard Mitigation Grant Program, but the state would not incorporate it. The State would not pay for anything above the minimum (no freeboard) out of either thrift or ignorance.

30. The Parish administers all Hazard Mitigation Assistance programs such as Predisaster Mitigation, Flood Mitigation Assistance, and Building Resilient Infrastructure and Communities; and disaster related Hazard Mitigation Grant Programs related to various hurricanes and tropical storms. Much of the promotion, application receipt and customer service has been provided by the Recovery Assistance and Mitigation Planning Division of the Department of Planning and Zoning. Having a small staff, consultants are required to prepare

the final applications and implement the projects in the field. The Parish Division and Department oversee the recommendations for payment, and eligibility for repayment prior to sending any contractor payments, homeowner reimbursements, planning invoices, forward to the Finance Department for payment.

31. 442 of home and business owners in the Parish have received elevation grants through Parish administered programs.

32. Program participation has always been challenging especially due to flood insurance prerequisites, but since Risk Rating 2.0 went into effect, the number of grant applications that the Parish has received has decreased even more. The decision not to elevate leaves parish residents and their property in harm's way and increases the amount the Parish will have to spend on flood recovery. The decision not to elevate a home or business also harms the flood mitigation industry in the Parish. Did not trust FEMA long before this. After Biggert-Waters, trust in FEMA was very low, and the protection of low policy premiums what not considered a stable investment. Applicants eligible for 100% grants have explicitly rejected the grants due to the flood insurance requirement. This used to only come up with the elderly or those on a very low fixed income.

33. In my estimation, the Parish spends $165,000 each year to educate parish residents about those grant programs, process grant applications, distribute grant funds, and monitor and enforce grantees' compliance with the requirements of those programs. [vii]

34. If a recipient of a FEMA-funded elevation grant fails to comply with the program's requirements (some of which such as flood insurance are in perpetuity), the Parish must repay the value of that grant to FEMA. If a recipient of a state elevation grant fails to comply with the requirements of the State's grant program, it is also funded with FEMA disaster funds, and the State or recipient will be required to purchase the required flood insurance at the current rate or pay back the value of the project costs for that particular elevation. The Parish is working to close out all FEMA homeowner grant programs prior to the full public realization of the significant increases in this obligation to avoid any liability related to the projected cancelation of policies when they rise above that in place when the structure was elevated. The Parish is considering including an option to force place flood insurance on new applicants and place the cost on the tax bill. Another option to reduce the liability would be to stop offering the FEMA programs at all until the flood insurance issue is resolved.

35. Despite the grant programs, the Parish's reliance on FEMA's Rate Maps and grandfathering policy, and the Parish's success in flood reduction from elevating structures, under Risk Rating 2.0, elevating a structure above the

8

BFE appears to have only a negligible effect on the insurance rate charged for elevated homes and businesses. The RR 2.0 system balances the proven benefits of freeboard with seemingly random criteria with little to no causal connection to lowered flood risk. Rather than lowering the rate a specific percentage, after identifying all other risk reduction activities are credited toward an application for insurance, the safety margin is considered and then overrun by other considerations of lesser importance/ connection to value.

36. Moreover, Risk Rating 2.0 eliminated FEMA's grandfathering policy. Although FEMA's Community Rating System discounts are still in place for the Parish, residents of the Parish still wind up paying much higher rates because, unlike the grandfathering policy, the community rating system discounts do not stop the rates themselves from increasing. So even with the community rating system discounts, members of the Parish pay higher rates under Risk Rating 2.0. The Parish is not immune to the rate increases either. For those Parish-owned properties and structures with flood insurance policies, all of the premiums have increased as a result of Risk Rating 2.0.

37. Terrebonne Parish has undergone a number of projects such as Repetitive Loss Studies of three residential areas; participation in a Multijurisdictional PPI; the adoption of a Flood Response Plan developed by the Office of Emergency Preparedness; engagement series; and other efforts to reduce the Community Rating Score and help offset the never-ending increases in flood insurance. With the changes in the last manual, the efforts that the Parish has taken are not prioritized and the Parish now is a 7 instead of a 6, thereby lowering our community wide benefit from CRS investments.

38. The Parish's flood mitigation efforts have successfully reduced flooding. For example, none of the 63 structures elevated after Isidore and Lili flooded during Gustav, Ike, Barry, Zeta, or Lee. The land inundated by Rita storm surge was not flooded for Hurricane Barry, which was the first storm with the majority of the MTTG built. In Hurricane Rita in 2005 there were 2,917 NFIP claims make and 2,478 paid for a total of $110,881,527. For Hurricane Barry in 2019 which has a comparable path and recorded wave height, there were 76 claims, 68 of which were paid for a total of $2,620,173. Each hurricane brought a 9.5-foot storm surge to Lafourche and Terrebonne parishes. LSU AgCenter ran models using the current Flood Insurance Study prior to the implementation of the Morganza to the Gulf levee system, and a model of Hurricane Ike that included the levee and floodgate system (images below). The results projected a 90% decrease in surge into the Parish with 49% of the parish value affected without the levee system using the FEMA model and 4.9% affected by the Hurricane Ida scenario with the levees in place. A model run with the levees against the Hurricane Ike scenario (with the levees) reduced the footprint of that storm to 5.4% affected. The modeling efficacy is

9

supported by the known results in the comparison of Rita and Barry damages showing similar changes in risk.

## FEMA FIS Damages Scenario



## Hurricane Ida Scenario with Levees from LSU Ag Center



10

39. Despite the Parish's efforts resulting in dramatic reductions in flooding and flood damage, Risk Rating 2.0 has increased the cost of flood insurance for all properties in the Parish—both residential and commercial—that are in Special Flood Hazard Areas and are backed by federally insured mortgages.

40. In my opinion, FEMA Risk Rating 2.0 will have a dramatic increase on flood insurance policy premiums for structures both in and outside of SFHA. Some examples collected by the CSFI show over 300% increases.

41. Those rate increases not only affect owners of property in Special Flood Hazard Areas but also those who rent properties in Special Flood Hazard Areas. The NFIP rate increases will likely be passed on to renters in the form of rent increases.

42. These rate increases harm all property owners, but they of course pose a particular hardship to low to moderate income property owners and their families, many of whom have lived in these areas for generations, and many of whom are racial minorities. Doubtless, many of these low to moderate income property owners and their families will struggle to pay for their mandatory insurance at its increased price. Indeed, these rate increases are likely to force many of these property owners and their families out of their homes in these areas, and perhaps out of our Parish altogether, thereby threatening the unique communities and cultures that have developed here over the course of generations. This is profoundly unjust, especially considering that it was FEMA's promise of lower insurance rates that convinced many of these vulnerable property owners and their families to make significant investments in elevation and other flood mitigation measures. But apparently FEMA considers this to be "Equity in Action."

43. As rates increase, many homeowners, business owners, and renters in Parish are likely to be priced out of their properties and forced to move to out of the Parish, which will decrease the Parish's tax base and therefore its financial ability to protect its residents and their property from flooding and flood damage.

44. And by creating a surplus of available property, this exodus from Parish will negatively impact the property values of those who remain, further decreasing the Parish's tax revenues.

45. Moreover, even if no one were to leave Parish, Risk Rating 2.0 is still likely to negatively affect property values in the Parish by increasing the cost of purchasing mandatory flood insurance that runs with the property, thereby decreasing the Parish's tax revenues.

46. This reduction in tax revenue will inhibit Terrebonne's ability to protect its residents and their property. This would be tragic given the proven efficacy of

11

Terrebonne's flood mitigation efforts, especially when one contrasts the immense damage inflicted by Hurricane Rita discussed above with the relatively minimal damage caused by Hurricane Barry after those flood mitigation efforts were made.

47. Risk Rating 2.0 apparently fails to account for all of Terrebonne's flood reduction successes. By failing to do so, Risk Rating 2.0 will likely decrease Terrebonne's tax revenues and inhibit the Parish's ability to protect its residents and their property. Ironically, the sales taxes will also likely have reduced revenue as population and land value is reduced thereby decreasing the money available for mitigation.

48. In my opinion, the only logical explanation for why Risk Rating 2.0 is increasing rates for Parish levee-protected areas and elevated properties is that the methodology used in setting rates must be flawed and has failed to account for levees built to USACE standards and paid for by tax-payers of Terrebonne. By example, in Aug 2021 Hurricane Ida (one of the worst in the state history) hit Terrebonne Parish and there were zero homes flooded. By comparison, Katrina/Rita in 2005 resulted in over 11,000 flooded homes and businesses in Terrebonne Parish. In my opinion our Morganza to the Gulf Levee System that is federally authorized under 33 USC 702a-3 and the associated 2013 Final Post Authorization Change (PAC) report have been proven to reduce the risk of flooding as further explained in the PAC Report and under Item 12 above.

49. But FEMA's refusal to reveal Risk Rating 2.0's methodology and underlying data as required by federal law, despite numerous requests from all levels of state government, including parishes, and Louisiana's federal legislators, makes it impossible for Parish and its floodplain manager to determine where the flaws in FEMA's methodology lie.

50. That lack of transparency harms Terrebonne's ability to work with FEMA, as required by the Parish's commitment as an NFIP community to work with FEMA to prepare and revise floodplain maps.

51. The lack of transparency undermines the authority and integrity of Floodplain Administrations across the country including Terrebonne Parish. Risk reduction activities long proven to reduce risk like freeboard have been promoted by FEMA, state and local governments, trade associations, and academia. The public relies on their local officials to identify the level of safety required to maintain a stable and safe environment. Safety is a key part of the Parish's police powers, and the Parish is responsible for identifying not only behavior to be avoided, but affirmative actions to avoid harm. The new flood insurance premium calculator apparently defaults to the standard that moving away from all flood sources is the only way to avoid sufficient risk to reduce a


13

flood policy premium to legacy rates. This is a mockery of the efforts of individuals, governments, nonprofits, builders, and academia that have studied the benefits of risk reduction activities and undermines the partners that FEMA has engaged to spread the message of safety and economic value in these risk reduction efforts.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Houma, Louisiana on May 22, 2023.

*[signature]*

Gordon E. Dove
Parish President

---

[i] TPCG GIS Mapping System Data

[ii] PA Expenditures from TPCG Finance Dept.

[iii] TPCG and TLCD Financial Records

[iv] TLCD (April 1, 2013 – Collected $119M at ½%) and TPCG (July 1, 2002 – Collected $117M at ¼% - Funds to TLCD)

[v] TPCG Floodplain Administrator - 1st FLOAT PPI meeting was April 2014

[vi] CSFI Presentation Materials

[vii] TPCG Recovery Assistance and Mitigation Planning Division cost