# EXHIBIT 36

Declaration of the North Lafourche Conservation, Levee, and Drainage District

1. My name is Dwayne Bourgeois. I am over the age of 18 and am competent to make this declaration. The facts set forth in this declaration are based on my personal knowledge.

2. I am the Executive Director of the North Lafourche Conservation, Levee and Drainage District (hereafter the NLCLDD or simply "the District") and I have served in that role since March 1, 2010.

3. The NLCLDD is a political subdivision of the State of Louisiana that was organized for the purpose and charged with the duty of constructing and maintaining levees and drainage within its territorial limits. La. Rev. Stat. 38 § 291(T).  The NLCLDD has authority to take any action within its territorial limits that is incidental to its purpose and duty.

4. The territorial limits of the NLCLDD are all of Lafourche Parish above (generally north of) the Gulf Intracoastal Waterway which bisects Lafourche parish in Larose, LA, and the district measures 597 square miles.

5. Most of the inhabited areas within the NLCLDD are not prone to regular flooding because of our network of Flood Protection Levees and Forced Drainage Areas which have been in place for decades. These Flood Protection features provide daily protection from flooding from threats such as: (1) the Levee District's proximity to the Gulf of Mexico and the Barataria and Terrebonne estuaries, (2) its location in the Louisiana Coastal zone highly subject to hurricane threats, (3) its relatively low elevation throughout, (4) the relatively high annual rainfall rate of over 65 inches in our Parish. (National average rainfall is 38 inches per year.)

6. To continually address those flood risk, the Louisiana Legislature and the citizens of Louisiana have given the NLCLDD and other Louisiana Levee Districts formed prior to 2006 the Constitutional Authority to impose annual Ad Valorem Property Taxes of 5 mills for the purpose of constructing and maintaining flood protection levees and structures, drainage and other flood protection infrastructure. This Louisiana Constitutionally authorized millage is assessed for all property within the NLCLDD territory.

7. Additionally, to further the District's purpose of constructing and maintaining flood protection levees and structures, drainage and other flood protection infrastructure, the residents of the NLCLDD have voted since 1997 to tax themselves an additional 7 mills of Ad Valorem taxes in 10-year increments most recently in 2017 voting in favor of an additional 6 mills of Ad Valorem for a 25-year period beginning in 2018.

1

8.  Additionally, to further the District's purpose of constructing and maintaining flood protection levees and structures, drainage and other flood protection infrastructure, the residents of the NLCLDD voted in 2015 to tax themselves an additional $0.0025 (1/4 cent) of sales and use tax in perpetuity.

9.  The NLCLDD receives an average of $8.3 million a year in Ad Valorem and Sales and Use tax revenues combined and spends on average over $20 million a year on flood mitigation projects. additional funds through a bond issued against these dedicated sales and use taxes and additional State directed state and federal funding sources.

10. Decades of the NLCLDD's flood mitigation projects and efforts have successfully reduced flooding for all but the most extraordinary events. Largely, limited flooding only occurs during extreme tropical (storm surge and rain) and extratropical (rain) events.

11. Between 2005 and 2019, the Terrebonne and Lafourche Levee Districts reduced hurricane flooding by 1000%. Hurricane Rita in 2005 and Hurricane Barry in 2019 each brought a 9.5-foot storm surge to lower Terrebonne and Lafourche Parishes. Hurricane Rita's storm surge flooded 11,000 homes in those parishes. After Rita, the Terrebonne and Lafourche Levee Districts and the State started a levee alignment project that ultimately became the federal Morganza to the Gulf levee system. When Hurricane Barry hit in 2019, it again brought a 9.5-foot storm surge to lower Terrebonne and Lafourche Parishes. But this time, only 11 homes flooded.

12. Despite the NLCLDD's major successes in flood reduction, FEMA has stated that it does not have adequate information about the District's levees to properly consider them under Risk Rating 2.0 despite their moving forward with issuing NFIP policies under this new rating methodology within our District.

13. After admitting that FEMA does not have sufficient information to analyze the impact on our levees in setting rates for their new rating methodology Risk Rating 2.0, FEMA suggested that we provide them the information they require for this new rating methodology. But FEMA has not revealed their methodology. Their request, therefore, asks the District to turn over information that will potentially change the NFIP rates for those in the District without telling the District what those changes look like or how they will be calculated.

14. FEMA's request for the NFIP participating community to provide information on our levees that would be compatible with their new rating methodology goes against decades of collaborative efforts between FEMA mapping personnel and the participating community. Historically, the District and FEMA have worked

together during FEMA's Flood Insurance Study to produce Flood Insurance Rate Maps (FIRMs).

15. The production of the FIRMs was and remains a collaborative and appealable process. It is a localized and detailed study by FEMA to make sure they include all available information in considering the setting of Base Flood Elevations (BFE) and the designation of Special Flood Hazard Areas (SFHA), which have mandatory purchase requirements for flood insurance in most cases, in the production of FIRMs.

16. Before Risk Rating 2.0, FEMA used Flood Insurance Rate Maps to set rates. In those maps, FEMA determined for each flood zone the elevation of surface water resulting from a flood that has a 1% chance of equaling or exceeding that level in any given year—called the Base Flood Elevation (BFE).

17. Further, to address gaps in information required in the Flood Insurance Study on the impacts of non-accredited levees in its mapping efforts, FEMA developed its Levee Analysis Mapping Procedure (LAMP). Lafourche Parish was one of five Louisiana parishes selected to participate in the "pilot" of this new mapping procedure. In Lafourche parish, we are still working through the final parts of the LAMP analysis in the production of our new maps today. Again, this is a collaborative and appealable process part of a Flood Insurance Study to produce FIRMs.

18. Once agreed upon by the community and adopted for Floodplain management, these FIRMs have been the go-to tool to communicate flood risk information to the community and set the expectation of reasonable and predictable flood insurance rates if buildings were constructed above the BFE indicated on the maps.

19. Under Risk Rating 2.0, FEMA no longer uses the FIRMs, or the information provided through the LAMP process, for setting flood insurance rates in Lafourche Parish or any other parts of Louisiana or the country. This makes the cost of insurance both unreasonable and unpredictable for our constituents.

20. Under the FEMA legacy rating method, and through the process of working with FEMA during a community Flood Insurance Study producing community wide FIRMs, the District could clearly identify what actions it could take to provide flood protection measures that would be recognized by FEMA in reducing flood risk. These protective measures would have the impact of lowering flood insurance cost or eliminating the need for flood insurance all together.

21. However, FEMA has not specifically revealed how it uses whatever information it does have on levees or information provided by a Levee District stakeholder under Risk Rating 2.0. This prevents the District from

3

        undertaking protective measures that would be recognized by FEMA as reducing the flood risk, which, in turn, lowers the cost of flood insurance for the residents and businesses within our District.

22. The time for FEMA to determine if they had sufficient technical data to make reasonable assumptions on the risk of flooding reduced by the installation of levees was during their development of their new methodology. FEMA could have released a draft of this methodology for public comment. FEMA could have directly engaged one of the dozens of Levee Board Associations throughout the country and their members directly as active stakeholders.

23. The District previously viewed NFIP as a successful program, even though it sought reforms to the program. This was because FEMA collaborated with the District and was transparent about its methodology.

24. Even though the impacts of our levees, certified or otherwise, are recognized using LAMP during the FEMA Flood Insurance Study in the production of FIRMs for our District, our levees have very limited impacts on the cost of flood insurance. There is no correlation between what the well-studied, collaborative, and appealable FIRMs communicate as high and low flood risk areas and the rates being set under Risk Rating 2.0. In fact, some of the highest cost for flood insurance in our District occurs in areas that FEMA indicates on the FIRMs as not being in a flood zone and not having a mandatory purchase requirement for flood insurance. They simply can't both be correct. But again, one is a collaborative and appealable method, the other is neither collaborative nor appealable.

25. The disconnect between the decades of history in mapping and the cost of insurance under Risk Rating 2.0 erodes the confidence in our community in either the mapping process or the new rating process as being correct. We have seen over the years that if maps are nonsensical to the folks who live in our District, they will not buy flood insurance or they will drop it as soon as they can. This is contrary to our objective as a levee district in wanting to encourage participation in the NFIP. Further, it erodes the trust our constituents have in our ability as a District to provide meaningful protection using their tax dollars on their behalf given these improvements have no impact on the cost of insurance.

26. In the NLCLDD and across Louisiana, another tried-and-true method of flood protection is elevating structures above the FEMA designated BFE shown on their FIRMs, which FEMA previously took into account when setting insurance rates for the National Flood Insurance Program. In fact, it was far and away the number one most impactful thing a person could do to buy flood insurance at a reasonable rate. The entire NFIP was built on requiring development at elevations above the 1% Annual Exceedance Probability (1%

AEP) floodplain as designated by the BFE on the FIRMs. FEMA reports that the quid pro quo arrangement between communities and the NFIP for floodplain management, a pre-requisite for the community to be eligible to participate in the NFIP, has saved the nation over $100 billion dollars in avoided floods in the last 40 years. *See Hearing Before the Subcomm. on Investigations and Oversight of the H. Comm. on Science, Space, and Technology* 116th Cong. (Feb. 27, 2001) (statement of Michael Grimm, Assistant Administrator for Risk Management), https://perma.cc/U5LT-65BJ.

27. Prior to Risk Rating 2.0, FEMA used the 1% AEP flood event as the basis for the National Flood Insurance Program. The 1% AEP flood is a flood with a water level that has a 1 in 100 chance of being equaled or exceeded in any given year and with an average recurrence interval of 100 years—often inaccurately referred to as the "100-year flood."

28. FEMA recommended constructing homes at least 1 foot above the BFE because it was thought that FEMA's exposure to flood claims above that level would be very infrequent, and so FEMA would lower the insurance rate accordingly. In fact, the higher a structure was elevated above the BFE level, the lower FEMA's risk for having to pay claims and, therefore, the lower the insurance rate.

29. But under Risk Rating 2.0, the elevation of a structure above the BFE appears to have only a negligible effect on the flood insurance rate charged.

30. Many communities across Louisiana have been adopting FEMA's Rate Maps for decades. Some of those communities have taken additional flood mitigation measures under FEMA's Community Rating System (CRS), such as requiring additional freeboard above the BFE reported on FEMA's Rate Maps, to receive further discounted flood insurance rates as a community.

31. The disconnect between the proven flood mitigation strategy of constructing a structure and the cost of insurance under Risk Rating 2.0 erodes the confidence in our community in the new rating process as being correct. We have seen over the years that if flood insurance rates are nonsensical to the folks who live in our District, they will not buy flood insurance or they will drop it as soon as they can. This is contrary to our objective as a levee district to encourage participation in the NFIP. Further, it erodes the trust our constituents have in their ability to provide meaningful protection using their own funds leaving them literally no place to go but out. This is causing an exodus from parts of our District.

32. Many communities in Louisiana have relied on FEMA's existing policies and recommendations when presenting and suggesting that if a community adopts new FEMA's Rate Maps for their community that those residents and

businesses who previously built their homes or businesses in accordance with the Rate Maps' requirements in force at the time of construction, would be protected from huge rate increases by FEMA's grandfathering policy. The understanding was that the NFIP flood insurance policy for a grandfathered home would continue to be rated based on FEMA's risk assessment in force at the time of construction. Additionally, the property owner would be able to sell their home to a buyer who could also continue to be rated under the grandfathered rate thus preserving the value of their home or property.

33. Risk Rating 2.0, however, kills FEMA's grandfathering policy. Although FEMA's community rating system discounts are still in place for those communities, members of those communities still wind up paying much higher rates because, unlike the grandfathering policy, the community rating system discounts do not stop the rates themselves from increasing. So even with the community rating system discounts, members of those communities who went above and beyond will still pay higher rates under Risk Rating 2.0.

34. FEMA used the grandfathering policy for decades to entice a community to adopt new FEMA-provided maps because the grandfathering policy would protect those existing policyholders from huge flood insurance cost increases. The sudden dropping of the FEMA grandfathering policy under Risk Rating 2.0 erodes the community's confidence in Risk Rating 2.0. Further, it is making the acceptance of new proposed maps in our District nearly impossible. Our existing maps are old, and they need to be updated for improved floodplain management. However, the accuracy of these maps now has to be scrutinized more closely than it did previously because the implications are far more severe. For example, residents or businesses located in an area designated as a SFHA on the proposed maps must comply with a mandatory purchase requirement for most residents. We have seen over the years that if flood insurance rates are nonsensical to the folks who live in our District, they will not buy flood insurance or they will drop it as soon as they can. Further, the reneging on promises and the deletion of successful policy causes a huge distrust of FEMA and the NFIP. This is contrary to our objective as a levee district in encouraging participation in the NFIP. Further, it erodes the trust our constituents have in our ability as a District to provide meaningful protection using their tax dollars on their behalf given these improvements have no impact on the cost of insurance. This too is causing an exodus from parts of our District. And it decreases the incentive for the District to undertake improvement projects.

35. As flood insurance rates increase, people and businesses in the NLCLDD are likely to be priced out of their properties and forced to move to out of the NLCLDD territory, which will decrease the NLCLDD's tax base and its ability to fulfill its statutory charge to construct and maintain levees.

36. And by creating a surplus of available property, this exodus from the District will negatively impact the property values of those who remain, further decreasing the District's tax revenues.

37. Moreover, even if no one were to leave the District, Risk Rating 2.0 is still likely to negatively affect property values in the District by increasing the cost of purchasing mandatory flood insurance that runs with the property, thereby decreasing the District's tax revenues.

38. This reduction in tax revenue will inhibit the NLCLDD's ability to fulfill its duty to construct and maintain levees and drainage infrastructure that protect its residents and their property. This would be tragic given the proven efficacy of levees in the NLCLDD, especially when one contrasts the immense damage inflicted by Hurricanes Juan prior to the levee improvements discussed above with the relatively minimal damage caused by Hurricanes Rita, Ike and Ida after those levee improvements were made in parts of our District as resources allowed.

39. In short, levees effectively protect against flooding. Risk Rating 2.0 apparently fails to account for that. By failing to do so, Risk Rating 2.0 will likely decrease the NLCLDD's tax revenues and inhibit the NLCLDD from carrying out its statutory charge to build and maintain levees that defend the communities the NLCLDD is charged with protecting.

40. Because FEMA has refused to provide its methodology for Risk Rating 2.0, I cannot explain why Risk Rating 2.0 is increasing rates for the NLCLDD's elevated properties and levee-protected areas, areas that are indicated on FEMA's own FIRMs as being outside the flood zone. FEMA's lack of transparency leads me to conclude that the methodology it used to set rates under Risk Rating 2.0 must be flawed.

41. But FEMA's refusal to reveal Risk Rating 2.0's underlying methodology makes it impossible for the NLCLDD to determine where the flaws in FEMA's methodology lie.

42. That lack of transparency harms the NLCLDD's ability to partner with FEMA and other federal agencies, like the Army Corps of Engineers, in constructing and managing levees and other flood mitigation projects.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Raceland, Louisiana, this __8TH__ day of May 2023.

_Dwayne Bourgeois_