# EXHIBIT 37

## Declaration of South Lafourche Levee District

1. My name is Windell Curole. I am over the age of 18 and am competent to make this declaration. The facts set forth in this declaration are based on my personal knowledge.

2. I am the executive secretary of the South Lafourche Levee District Board of Commissioners and have served in that role since April 2023. Prior to this, I served as General Manager of the South Lafourche Levee District since August 1980.

3. The South Lafourche Levee District is a political subdivision of the State of Louisiana that was organized for the purpose and charged with the duty of constructing and maintaining levees within its territorial limits. La. Rev. Stat. 38 § 281. The South Lafourche Levee District has authority to take any action within its territorial limits that is incidental to its purpose and duty.

4. The territorial limits of the South Lafourche Levee District are on the north from the southern border of the Intracoastal Waterway in Larose, Louisiana south, from the Terrebonne Parish line on the west, the Jefferson Parish Line on the east, and three miles south into the Gulf of Mexico. The Larose to Golden Meadow Hurricane Protection System measures approximately 62 square miles and encompasses 95% of the population of the district.

5. Most of the areas within the Larose to Golden Meadow Hurricane Protection System are not prone to regular flooding due to our flood protection levees and drainage systems. These flood protection features provide daily protection from flooding from threats such as the area's close proximity to the Gulf of Mexico, Bayou Lafourche, and the Intracoastal Waterway. The South Lafourche Levee District experiences an average of 60 inches of rainfall, tidal water and hurricane surge on an annual basis.

6. To continually address those flood risks, the Louisiana Legislature and the citizens of Louisiana have given the South Lafourche Levee District, and other Louisiana Levee Districts formed prior to 2006, the Constitutional Authority to impose annual Ad Valorem Property Taxes of 4.86 mils for the purpose of constructing and maintaining flood protection levees and structures, drainage and other flood protection infrastructure. This Louisiana Constitutionally authorized millage is assessed for all property within the South Lafourche Levee District territory.

7. Additionally, to further the District's purpose of constructing and maintaining flood protection levees and structures, drainage and other flood protection infrastructure, the residents of the South Lafourche Levee District have voted

1

since 1998 to tax themselves an additional 5 mils of Ad Valorem taxes in 10-year increments.

8. Additionally, to further the District's purpose of constructing and maintaining flood protection levees and structures, drainage and other flood protection infrastructure, the residents of the South Lafourche Levee District voted in 2006 to tax themselves an additional $0.01 (1 cent) of sales and use tax in perpetuity to help elevate the levees from Larose to Golden Meadow.

9. The South Lafourche Levee District receives a combined average of $10 million each year in Ad Valorem and Sales and Use tax revenues and spends on average over $20 million each year on flood mitigation projects, receiving additional funds through additional State directed state funding sources.

10. The South Lafourche Levee District has used these funds to build and maintain our Larose to Golden Meadow Hurricane Protection System, which has successfully reduced flooding.

11. Very recently, FEMA recognized how well our levee system protected the enclosed area from flooding. In a September 2019 assessment using FEMA's Levee Analysis Mapping Program (LAMP), FEMA concluded that our levee system would offer effective protection against the 1% Annual Exceedance Probability (100-year) flood event.

12. The difference in storm-surge flooding between Hurricane Juan in 1985 and Hurricane Ida in 2021 provides a real-world example of the South Lafourche Levee District's successful efforts to eliminate flooding and proves that FEMA was correct to conclude in its LAMP assessment that our current levee system provides effective protection.

13. In 1985, Hurricane Juan flooded the federal Larose to Golden Meadow Hurricane Protection System, which was still incomplete at the time. Hurricane Juan was a slow moving, Category 1, 25-year storm that forced a 7-foot storm surge onto that incomplete system and flooded 2,000 homes— 30% of the homes in that system.

14. In 1993, that ring levee protection system was completed and the area within its protection has since suffered no storm surge-related flooding.

15. After 1993, the U.S. Army Corps of Engineers made numerous improvements to the system, and state and local efforts augmented the Army Corps' improvements. The system has been tested many times since then, but none so severe as Hurricane Ida in 2021.

16. Hurricane Ida was a strong Category 4, 300-year flood that followed the worst-case-scenario trajectory and caused a 14-foot storm surge with 16 feet of run-up, plus waves.

17. Yet because of the levee improvements made after Hurricane Juan, Hurricane Ida's storm surge did not flood a single structure. To my knowledge, there was not a single flood insurance claim within the area enclosed within our levee system related to Hurricane Ida. That is a 100% reduction in hurricane storm-surge flooding between 1985 and 2021.

18. Despite this very recent, dramatic example of our levee system's efficacy in protecting against a 300-year flood, and contrary to FEMA's detailed 2019 LAMP study, Risk Rating 2.0 now concludes that our system would not even protect against 100-year flood events.

19. It seems Risk Rating 2.0 can't even predict past observed events, much less predict the future. The only possible explanation is that Risk Rating 2.0 is extraordinarily flawed.

20. As a result of FEMA's new and plainly incorrect determination that our levee system can't protect against even a 100-year flood, properties within our levee system will see skyrocketing NFIP insurance premiums. For instance, the annual NFIP premium for my home is currently under $500. Its full risk rating annual premium under Risk Rating 2.0, however, is around $7,000. These premiums entirely ignore the proven effectiveness of the levee system and undercut the credibility of the entire Risk Rating 2.0 methodology.

21. In the South Lafourche Levee District and across Louisiana, another tried-and-true method of flood protection is elevating structures, which FEMA used to take into account when setting insurance rates for the National Flood Insurance Program.

22. Prior to Risk Rating 2.0, FEMA used the 1% Annual Exceedance Probability (AEP) flood as the basis for the National Flood Insurance Program. The 1% AEP flood is a flood with a water level that has a 1 in 100 chance of being equaled or exceeded in any given year and with an average recurrence interval of 100 years—often referred to as the "100-year flood."

23. Before Risk Rating 2.0, FEMA used Flood Insurance Rate Maps to set rates and, in those maps, determined for each flood zone the elevation of surface water resulting from a flood that has a 1% chance of equaling or exceeding that level in any given year—called the Base Flood Elevation (BFE).

24. FEMA recommended elevating homes at least 1 foot above the BFE because it was thought that FEMA's exposure to flood claims above that level would be very infrequent, and so FEMA would lower the insurance rate accordingly. In

3

fact, the higher a structure was elevated above the BFE level, the lower FEMA's risk for having to pay claims and, therefore, the lower the insurance rate.

25. But under Risk Rating 2.0, elevating a structure above the BFE appears to have only a negligible effect on the insurance rate charged.

26. Many communities within the South Lafourche Levee District and across Louisiana have been adopting FEMA's Rate Maps for decades. Some of those communities have taken additional flood mitigation measures under FEMA's Community Rating System, such as requiring additional freeboard above the BFE reported on FEMA's Rate Maps, to receive further discounted flood insurance rates.

27. The communities in the South Lafourche Levee District have relied on FEMA's recommendation that they adopt FEMA's Rate Maps so that those who built in accordance with the Rate Maps' requirements would be protected from huge rate increases by FEMA's grandfathering policy.

28. In spite of the successes of the Larose to Golden Meadow Hurricane Protection System, Risk Rating 2.0 has increased the cost of flood insurance for areas protected by levees and elevated properties, alike. In my estimation, over 90% of the people who live in and over 90% of the small businesses located in the South Lafourche Levee District are in a flood plain and are therefore required to purchase flood insurance. Risk Rating 2.0 has already increased the flood insurance rates for those people and businesses and will continue to increase their rates by a factor of 18% each year until their premiums reach their full risk rate.

29. As rates increase, people and businesses in the South Lafourche Levee District are likely to be priced out of their properties and forced to move to out of the South Lafourche Levee District, which will decrease the South Lafourche Levee District's tax base and its ability to fulfill its statutory charge to construct and maintain levees.

30. By creating a surplus of available property, this exodus from South Lafourche Levee District will negatively impact the property values of those who remain, further decreasing the South Lafourche Levee District tax revenues.

31. Moreover, even if no one were to leave the South Lafourche Levee District, Risk Rating 2.0 is still likely to negatively affect property values in the South Lafourche Levee District by increasing the cost of purchasing mandatory flood insurance that runs with the property, thereby decreasing the South Lafourche Levee District tax revenues.

32. This reduction in tax revenue will inhibit the South Lafourche Levee District's ability to fulfill its duty to construct and maintain levees that protect its residents and their property. This would be tragic given the proven efficacy of levees in the South Lafourche Levee District, especially when one contrasts the immense damage inflicted by Hurricane Juan in 1985 prior to the levee improvements discussed above with the relatively minimal damage caused by Hurricane Ida in 2021 after those levee improvements were made.

33. In short, levees effectively protect against flooding. Risk Rating 2.0 apparently fails to account for that. By failing to do so, Risk Rating 2.0 will likely decrease the South Lafourche Levee District's tax revenues and inhibit the South Lafourche Levee District's ability to carry out its statutory charge to build and maintain levees that defend the communities the South Lafourche Levee District is charged with protecting.

34. The only logical explanation for why Risk Rating 2.0 is increasing rates for the South Lafourche Levee District's levee-protected areas and elevated properties is that the methodology used in setting rates must be flawed.

35. FEMA's refusal to reveal Risk Rating 2.0's methodology, as required by federal law, despite numerous requests from all levels of state government and Louisiana's federal legislators, makes it impossible for the South Lafourche Levee District to determine where the flaws in FEMA's methodology lie.

36. That lack of transparency harms the South Lafourche Levee District's ability to partner with FEMA and other federal agencies, like the Army Corps of Engineers, in constructing and managing levees and other flood mitigation projects.

37. Risk Rating 2.0 harms the South Lafourche Levee District by devaluing the significant capital investment the levee district has made in augmenting the levee system. It raises flood insurance premiums in such a dramatic and unexplainable manner that people have and will continue to leave the district. It creates a surplus of available property as people leave and causes prospective buyers to look elsewhere, rather than saddle themselves with exorbitant premiums. It reduces the tax base which inhibits the levee district's ability to fulfill its statutory duty to construct and maintain levees, and it makes a mockery of the federal flood insurance program, which was created to combat these very issues.

38. There is simply no explanation for why Risk Rating 2.0 entirely fails to account for a levee system that protected every single property in the district from a 300-year flood. If the Larose to Golden Meadow Hurricane Protection System is not a successful mitigation project, then it is hard to imagine what kind of mitigation project FEMA would deem successful.

5

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Galliano, Louisiana, this 26th day of May 2023.

_Wendell A. Curole_

6