# EXHIBIT 41

## Declaration of the Association of Levee Boards of Louisiana

1. My name is Cory Kief. I am over the age of 18 and am competent to make this declaration. The facts set forth in this declaration are based on my personal knowledge.

2. I am the current President of the Association of Levee Boards of Louisiana (hereafter the ALBL or simply "the Association") and I have served in that role since January of 2017.

3. The ALBL is a non-profit corporation of the State of Louisiana formed in 2004 that was organized for the purpose of promoting the interest of the Levee Boards (or Districts, Authorities or other political subdivisions of the State or a State Agency) of the State of Louisiana, promoting the welfare of the taxpayers, improving the administration of Levee Board affairs, and by mutual cooperation, securing legislation for the general good of the State of Louisiana particularly as it pertains to Levee Board affairs. ALBL further aims to support studies of flood control and relief, and to promote, encourage, and assist in the obtaining of relief therefore and control thereof, either from the State of Louisiana or any agency thereof, or from the United States Government, or any board or agency thereof. It also seeks to assist the State of Louisiana, and any agency thereof in obtaining aid from the United States Government for flood control and for the construction of levees, drainage, and other such work within the State of Louisiana. Finally, ALBL facilitates the formation of common positions, policies or plans on questions of common interest and presents such positions at regional, state, and national discussions, among other purposes.

4. The ALBL is made up from its:

    <u>Member Agencies</u>: Every Levee Board (or any other such named entity as may designate the governing body of any levee and/or drainage, water and conservation district in the State of Louisiana) organized under and in conformity with the laws of the State of Louisiana, which are voting member of the ALBL, currently including:

    Amite River Basin Drainage & Water Conservation

    Atchafalaya Basin Levee District

    Bossier Levee District

    Caddo Levee District

    Chenier Plain Coastal Restoration and Protection Authority

1

*C.H.K.*

City of Baton Rouge, Parish of EBR, DPW

Fifth Louisiana Levee District

Governor's Office of Coastal Activities

Grand Isle Independent Levee District

Lafitte Area Independent Levee District

Lafourche Basin Levee District

Louisiana Department of Transportation & Development

Natchitoches Levee & Drainage District.

Nineteenth Louisiana Levee District

North Lafourche Conservation, Levee, and Drainage District

Plaquemine Parish Government

Pontchartrain Levee District

Red River, Atchafalaya, & Bayou Bouef Levee District

Red River Levee and Drainage District

Southeast Louisiana Flood Protection Authority – East

 East Jefferson Levee District

 Lake Borgne Basin Levee District

 Orleans Levee District

Southeast Louisiana Flood Protection Authority – West

 Algiers Levee District

 West Jefferson Levee District

South Lafourche Levee District

St. Mary Levee District

St. Tammany Levee, Drainage and Conservation District

C.M.K.

>Teche-Vermillion Fresh Water District
>
>Tensas Basin Levee District
>
>Terrebonne Leve and Conservation District
>
><u>Associate Members</u>: All other entities or Individuals, Public or Private, who are interested in and concerned with Levee Board Issues, which are non-voting members of the ALBL: Currently there are 36 Associate Members of the ALBL.

5. The ALBL operates solely from dues and other contributions collected from its membership.

6. The National Flood Insurance Program (NFIP) is a federal flood insurance program primarily sold by the private sector. The Louisiana Department of Transportation and Development (LADOTD), which is the State Coordinating Agency for the NFIP, is tasked with providing local government compliance with NFIP regulations. The LADOTD accomplishes this through undertaking on-site assessments, distributing a quarterly newsletter, conducting workshops, providing technical assistance on local government ordinance development, and participating in post-disaster Flood Hazard Mitigation activities. The State of Louisiana has no agency directly involved in oversite, tracking, and advocating for changes in the NFIP.

7. In line with its purpose and acting on behalf of the interest of its members, and at the direction of its members, the Association has closely tracked and advocated for changes in legislation regarding the structure of the NFIP. In Louisiana, flood protection and flood insurance are tightly correlated, and issues with the NFIP have long been a focus of the Association.

8. As local experts on flood protection in all parts of the State of Louisiana, the ALBL members are regularly brought into the process of a community, in our case typically a Parish, being newly or re-mapped by the Federal Emergency Management Agency (FEMA) as part of a NFIP Flood Insurance Study. The intended outcome of a FEMA NFIP Flood Insurance Study is to produce Flood Insurance Rate Maps (FIRMs) that would be adopted and used by the community (Parish) for floodplain management. This is a requirement for the community to participate in the NFIP and is the quid pro quo relationship between the community and FEMA. Historically, if the community adopted the FEMA produced FIRMs and used them as the basis for its local floodplain management, doing so will have mitigated the risk of flooding in the community such that the community could purchase flood insurance at a reasonable and affordable rate.

C.H.K.

9. The production of the FIRMs by FEMA working with experts from the local community was and remains a collaborative and appealable process. It is a localized and detailed study by FEMA to be sure they include all available information possible in considering the setting of Base Flood Elevations (BFE) and the designation of Special Flood Hazard Areas (SFHA). In some cases, SFHA has mandatory purchase requirements for flood insurance.

10. By working with FEMA and the local community through the Flood Insurance Study process, members of the Association recognized that there were shortcomings in the process used by FEMA in their Flood Insurance Study in properly recognizing the impacts of levees. FEMA only considered levees that were certified to meet the construction standards of 44 CFR § 65.10 as having any impact to the propagation of flood waters. If the levees were not so certified, the Flood Insurance Study process precluded FEMA's mapping partners from considering the flood reduction impacts of non-certified levee, even if the levee helped mitigate flood damage. This was causing flawed outputs from the mapping process resulting in inaccurate maps. As such, in coordination with the Association, members of the Association and others in 2011 successfully urged Congress to direct FEMA to change some of its mapping methodology regarding levees.

11. To address gaps in information required in the Flood Insurance Study on the impacts of non-accredited levees in its mapping efforts, at the urging of the ALBL and others, Congress demanded, and FEMA developed, its Levee Analysis Mapping Procedure (LAMP), which first launched in 2013. This updated mapping process was so important to Louisiana that FEMA selected 5 Louisiana parishes of 25 communities nationally to participate in the "pilot" of this new mapping procedure. In Louisiana, several parishes are still working through the final parts of the LAMP analysis in the production of our new Flood Insurance Rate Maps today. Again, this is a collaborative and appealable process.

12. In 2012, in coordination with the Association, Members of the Association testified before Congress arguing for a long-term reauthorization of the NFIP and other meaningful reforms to the NFIP. In 2014, a member of this Association served on FEMA's Technical Mapping Advisory Council.

13. Later in 2012 and 2013, the devastating results of the Biggert-Waters Flood Insurance Reform Act of 2012 (BW-12) were being felt throughout Louisiana. This law extended the NFIP for five years, while requiring significant program reforms. In coordination with the Association, members of the Association worked with the Louisiana Congressional Delegation in DC to draft and promote passage of the Homeowners Flood Insurance Affordability Act of 2014.

4

*C.H.K.*

(HFIAA-14) This 2014 Act softened the impact of BW-12, buying the citizens of Louisiana some time before the worst impacts of BW-12 would be felt.

14. Because a healthy and affordable NFIP was so important to its members and their communities, the Association and its members urged Congress to make meaningful reforms to the NFIP for the next several years. To better organize its approach to Congress, the ALBL Members voted to fund the formation of an independent non-profit entity called the Louisiana Flood Risk Coalition (LFRC). The LFRC was established in 2014 to advocate for reform of the NFIP to develop responsible floodplain management within coastal and riverine communities. The LFRC welcomed the input and engagement from others in working to ensure that coastal Americans have a NFIP that is affordable, sustainable, and fiscally responsible in working to mitigate flood loss.

15. Members of the Association worked with the LFRC from 2014 to its dissolution in 2019. While active, the LFRC visited literally hundreds of Congressional Office in a biparty, bicameral outreach concerning the need for NFIP reforms. By this time, the Louisiana Coastal Protection and Restoration Authority (CPRA), a member of the ALBL and supporter and active participant in the LFRC, began taking a more active role on behalf of the State. The CPRA took positions on the NFIP's structure, operation, and reform, eventually forming the CPRA NFIP committee. During this period, the Association and its members gained significant working knowledge of the history, purpose, structure, operational processes, and laws governing the NFIP. The Association urged Congress to make changes to improve the operations of the NFIP.

16. One significant finding about the challenges faced in the operation of the NFIP included the belief that the NFIP does not have a rate problem. Instead, the prevailing view is that the NFIP has a participation problem concerning those who are supposed to be in the NFIP because of their statutory mandatory purchase requirement but are not. Based on a report generated by FEMA in 2014, nationally only 53% of those obligated by law to carry flood insurance actually comply. This is not significantly better than what was indicated in a 2006 Rand Corporation study which identified that the program had only 49% participation nationally. The FEMA report did indicate that Louisiana had the highest mandatory purchase requirement penetration rate at 80.75% as compared to 10+ states whose mandatory participation rate was below 25%. There is a disconnect between FEMA as the operators of the NFIP and the regulators of US lending institutions who are responsible to enforce the mandatory purchase requirement.

17. Further, in 2005, the program realized three catastrophic storms (Hurricanes Katrina, Rita and Wilma) which generated claims 8 times higher than the previous prior year. As a result, the catastrophic losses forced the program to

C.H.K.

borrow $17.5b from the Treasury – $10b of that total is attributed to the failure of the Corps of Engineers' levees in New Orleans. Often, Congress passes supplemental appropriations measures to deal with catastrophes of this scale, but in this case, NFIP was directed to carry this debt. It is not fair to saddle existing policyholders for debt from catastrophes – especially when participation in the program is so low and much of this debt can be attributed to the Federal Government. Further, these "spike" events are beyond the "100 year" return interval that the program was designed and intended to protect the US taxpayers from. The cost of such catastrophic events beyond the program's scope should be funded by other means. The burden should not fall solely on existing policyholders.

18. Additionally, the Association made recommendations to Congress to codify the FEMA NFIP grandfathering policy. Grandfathering is essential to the consumer and to the banks and real-estate markets. Without this element, flood insurance becomes unaffordable and certain to destroy values on coastal and riverine properties. In some cases, changing the affordability of flood insurance could cause property values to drop below the outstanding debt – forcing owners to walk away from their homes and causing further economic harm. To force those who have followed the rules and have complied with the FEMA requirement to pay "newly revised actuarial rates" to fund the program's risk is patently unfair. In short, grandfathering keeps more individuals in the program and stabilizes insurance rates and the housing market.

19. The previously mentioned findings were just part of the public's, Congress' and the ALBL and its members' lack of confidence that FEMA was properly executing its congressional charge in the creation and operation of the NFIP. This, in turn, reduces confidence in the ALBL and its members. If ALBL's efforts to deliver meaningful flood control measures are not recognized or appreciated and instead result in higher flood insurance premiums, taxpayers lose confidence in the ALBL.

20. The ALBL and its members are knowledgeable about the NFIP and seek to continue investing in its success. But the problems raised above, along with FEMA's skyrocketing operation costs, have caused the ALBL and its members to question FEMA's ability to manage the NFIP. It is through this lens that the ALBL and its members were viewing FEMA as FEMA began to announce the development of their revolutionary new risk-based rating methodology that would eventually be called Risk Rating 2.0 – Equity in Action.

21. The ALBL and its members worked with our State and Federal legislative delegation, the CPRA and the Governor for years to try to get additional information about this "revolutionary change" while FEMA slowly released

bits of information about <u>what they were doing</u> as compared to <u>how they were doing</u> it.

22. Although we tried to understand and verify that FEMA had this new rating methodology correct, especially regarding its treatment of levees in determining risk and setting flood insurance rates, we were largely unsuccessful. Using the information FEMA did release we found ourselves heading to dead ends and getting only partial, nonsensical and / or misleading responses to request for additional information made to FEMA.

23. One such example was the methodology document called the *Risk Rating 2.0 Methodology and Data Sources* originally released on March 25th, 2021. This document included the following about Levees.

    *Leveed Areas*

    FEMA requested that the United States Army Corps of Engineers ("USACE") provide assumptions regarding the definition of leveed areas, the probability of overtopping, and the probability of failure prior to overtopping that could be incorporated into the catastrophe modeling. USACE issued the draft report "Levee Risk Assessment Methods for Risk Rating" in June of 2020. FEMA reran the KatRisk model using the USACE assumptions and requested that Atkins rerun the MDI model using the USACE assumptions and provide the updated AALs to Milliman. FEMA advised that it was not possible to rerun the other catastrophe models using the USACE assumptions, and therefore instructed Milliman to exclude them from the leveed analysis.

    This statement gave us tremendous concern about FEMA's ability to properly consider the impacts of levees in their new rating methodology. When we asked the US Army Corps of Engineers (USACE) if they could provide us with a copy of the referenced Draft report, we were told it did not exist and they had produced no such document. When we pressed FEMA on this issue, they simply called it a typo and re-released their methodology document without mention of the report they had previously said they used.

24. Nearly 1 year later in February of 2022, after the initial implementation of Risk Rating 2.0, FEMA released a document called *Levees in Risk Rating 2.0*. Again, this document explained at length <u>what they said they were doing</u> much more so than <u>how they were doing it</u>. That later document did, however, point out that FEMA needed 5 key levee data elements to support Risk Rating 2.0 and that it was looking to get that information from the USACE National Levee Database (NLD). The USACE NLD and the related Levee Screening Tool (LST), a simple web-based risk assessment tool used by USACE that heavily considers consequences of flooding, are laudable goals of the USACE. However, these tools are both incomplete and not intended to be and are not suitable for use by FEMA for Risk Rating 2.0 in the consideration of the impacts of levees. In fact, FEMA admits in the Levees document that at the time they pulled this data from USACE for Risk Rating 2.0, USACE could only

7

C.H.K.

provide the 5 key data points it required on 20% of the levees in the NLD, a data source currently incomplete and a work in progress by the USACE.

25. None of the above gave the ALBL or its member agencies confidence that FEMA was going to get the impacts of levees correct in their new Rating Methodology. As FEMA began the implementation of Risk Rating 2.0, first for new policies and then for policy renewals, our fears were realized.

26. Despite the major successes in flood reduction achieved by the Members of the ALBL, FEMA has stated in meetings with various members of the Association and others that it does not have adequate information about the majority of our levees to properly consider them under Risk Rating 2.0. Yet FEMA continues moving forward with issuing NFIP policies under this new rating methodology within our State.

27. After proving and admitting that FEMA does not have sufficient information to analyze the impact on our levees in setting rates for their new rating methodology Risk rating 2.0, they suggested that we provide them the information they require for this new rating methodology, so that they can include that data in some unrevealed way for future analysis potentially changing rates that would be charged for NFIP coverage within the State.

28. This request for the NFIP participating community to provide information on our levees that would be compatible with their new rating methodology goes against decades of collaborative efforts between FEMA mapping personnel and the participating community in the production of Flood Insurance Rate Maps (FIRMs) as part of a Flood Insurance Study being conducted by FEMA for a participating community.

29. Before Risk Rating 2.0, FEMA used Flood Insurance Rate Maps to set rates and, in those maps, determined for each flood zone the elevation of surface water resulting from a flood that has a 1% chance of equaling or exceeding that level in any given year—called the Base Flood Elevation (BFE).

30. Once agreed upon by the community and adopted for Floodplain management, these FIRMs have been the go-to tool to communicate flood risk information to the community and set the expectation of reasonable and predictable flood insurance rates if buildings were constructed above the BFE indicated on the maps.

31. Under Risk Rating 2.0, FEMA no longer uses the FIRMs, or the information provided through the LAMP process for setting flood insurance rates in Louisiana or other parts of the country. This makes the cost of insurance both unreasonable and non-predictable for our constituents.

C.H.K.

32. Under the FEMA legacy rating method and through the process of working with FEMA during a community Flood Insurance Study producing community wide FIRMs, the ALBL members clearly knew and understood what actions they could take in their efforts to provide flood protection measures that would be recognized by FEMA in reducing flood risk. If FEMA recognized these efforts as it should, it would lower the cost of flood insurance or potentially eliminate the need for flood insurance all together.

33. However, FEMA has not specifically revealed how it uses whatever information it does have on levees or that we as Levee District stakeholders in Louisiana might ultimately provide under Risk Rating 2.0 so that the ALBL Member Agencies could consider options in our efforts to protect our community from flooding in a way that would be recognized by FEMA. This has a direct impact on flood insurance in the form of higher premiums because FEMA does not account for the reduced flood risk.

34. Clearly, the time for FEMA to determine if they had sufficient technical data to make reasonable assumptions on the risk of flooding reduced by the installation of levees was during their development of their new methodology at a time well before the implementation of Risk Rating 2.0. There was plenty of time to get this right beforehand. FEMA could have released a draft of this methodology for public comment through the traditional rulemaking process. FEMA could have directly engaged the ALBL or one of the dozens of Levee Board Associations throughout the country and their members directly as active stakeholders. Prior to Risk Rating 2.0, these Levee District stakeholders and their Associations viewed the NFIP as a successful program even though they often sought meaningful reforms to the program. As such, they would have been collaborative partners in the development of any new rating methodology. Additionally, FEMA could have followed existing Executive Orders and the Administrative Procedures act to be sure that their new rating methodology was developed in a collaborative and completely transparent way. They chose not to do any of this.

35. Even though the impacts of our levees, certified or otherwise, are now being recognized using LAMP during the FEMA Flood Insurance Study in the production of FIRMs in most of our ALBL Member Agencies, our levees have very limited impacts on the cost of flood insurance. There is no correlation between what the well-studied, collaborative, and appealable FIRMs communicate as high and low flood risk areas and the rates being set under Risk Rating 2.0. In fact, some of the highest cost for flood insurance in our Districts occurs in areas that FEMA indicates on the FIRMs as not being in a flood zone and not having a mandatory purchase requirement for flood insurance. They simply can't both be correct. But again, one is a collaborative and appealable method, the other is neither collaborative nor appealable.

36. The disconnect between the decades of history in mapping and the cost of insurance under Risk Rating 2.0 erodes the confidence in our communities in either the mapping process or the new rating process as being correct. We have seen over the years that if maps are nonsensical to the folks who live in our Districts, they will not buy flood insurance or they will drop it as soon as they can. This is contrary to our objectives as an Association and that of our member agencies in wanting to encourage participation in the NFIP. Further, it erodes the trust our constituents have in our ability as an Association or its member agencies to provide meaningful protection using their tax dollars on their behalf given these improvements have no impact on the cost of insurance.

37. Yet we know from many real-world experiences that construction of levees reduces the incidences of flooding. One example is the Morganza to the Gulf Storm surge protections system in Terrebonne and Lafourche Parishes of coastal Louisiana. This now Federal project was started through necessity by the State and local Parishes before the Federal government joined the effort. In 2005 Hurricane Katrina forced a 9-foot storm surge on lower Terrebonne and Lafourche Parishes. Unfortunately, approximately 11,000 homes were flooded. The State and Local Parishes, working with the Local Levee Districts began work on what would eventually become this federal storm surge protection system with 98 miles of levees and dozens of deployable flood control structures. Although far from complete, the system was already making a difference in reducing flooding. Proof of this flood protection was realized in 2019 when Hurricane Barry caused a similar 9-foot storm surge on lower Terrebonne and Lafourche Parishes. But this time, because of the levee improvements made, only 11 homes were flooded.

38. Across Louisiana, another tried-and-true method of flood protection is elevating structures above the FEMA designated BFE shown on their FIRMs, which FEMA used to take into account when setting insurance rates for the NFIP. In fact, it was far and away the number one most impactful thing a person could do to buy flood insurance at a reasonable rate. The entire NFIP was built on requiring development at elevations above the 1% Annual Exceedance Probability (1% AEP) floodplain as designated by the BFE on the FIRMs. FEMA reports that the quid pro quo arrangement between communities and the NFIP for floodplain management, a pre-requisite for the community to be eligible to participate in the NFIP, has saved the nation over $100 billion dollars in avoided floods in the last 40 years.

39. Prior to Risk Rating 2.0, FEMA used the 1% AEP flood event as the basis for the NFIP. The 1% AEP flood is a flood with a water level that has a 1 in 100 chance of being equaled or exceeded in any given year and with an average recurrence interval of 100 years—often inaccurately referred to as the "100-year flood."

C.M.K.

40. Traditionally, FEMA recommended elevating homes at least 1 foot above the BFE because it was thought that FEMA's exposure to flood claims above that level would be very infrequent, and so FEMA would lower the insurance rate accordingly. In fact, the higher a structure was elevated above the BFE level, the lower FEMA's risk for having to pay claims and, therefore, the lower the insurance rate.

41. But under Risk Rating 2.0, elevating a structure above the BFE appears to have only a negligible effect on the insurance rate charged.

42. Further, many communities across Louisiana have been adopting FEMA's Rate Maps for decades. Some of those communities have taken additional flood mitigation measures under FEMA's Community Rating System (CRS), such as requiring additional freeboard above the BFE reported on FEMA's Rate Maps, to receive further discounted flood insurance rates.

43. The disconnect between the proven flood mitigation strategy of elevating a structure and the cost of insurance under Risk Rating 2.0 erodes the confidence in our communities in the new rating process as being correct. We have seen over the years that if flood insurance rates are nonsensical to the folks who live in our State, they will not buy flood insurance or they will drop it as soon as they can. This is contrary to our objective as an Association and its member agencies to encourage participation in the NFIP. Further, it erodes the trust our constituents have in their own ability to provide meaningful protection using their own funds leaving them literally no place to go but out. This is causing an exodus from parts of our State.

44. Many communities in Louisiana have relied on FEMA's existing policies and recommendations when presenting and suggesting that if a community adopts new FEMA's Rate Maps for their community that those residents and businesses who previously built their homes or businesses in accordance with the Rate Maps' requirements in force at the time of construction, would be protected from huge rate increases by FEMA's grandfathering policy. In essence, the NFIP policy for a grandfathered home would continue to be rated based on the FEMA provided risk assessment in force at the time of construction. Additionally, the property owner would be able to sell their home to a buyer who could also continue to be rated under the grandfathered rate thus preserving the value of their home or property and keeping these property owners in the NFIP.

45. Risk Rating 2.0, however, kills FEMA's grandfathering policy. Although FEMA's CRS discounts are still in place for those communities, members of those communities still wind up paying much higher rates because, unlike the grandfathering policy, the CRS discounts do not stop the rates themselves from

increasing. So even with the CRS discounts, members of those communities who went above and beyond will still pay higher rates under Risk Rating 2.0.

46. FEMA used the grandfathering policy for decades to entice communities to adopt new FEMA provided maps in exchange for protection from higher premiums. The sudden dropping of the FEMA grandfathering policy under Risk Rating 2.0 erodes the community's confidence in Risk Rating 2.0. Further, it is making the acceptance of new proposed maps in our State nearly impossible. Many of our existing maps are old, and they need to be updated for improved floodplain management. However, the accuracy of these maps now must be scrutinized more closely because of the huge implications in the cost of flood insurance under risk Rating 2.0 if residents or businesses find themselves in an area designated as a SFHA on the proposed maps. Again, an SFHA carries a mandatory purchase requirement for most residents. The Association and its members have seen over the years that if flood insurance rates are nonsensical to the folks who live in our Districts, they will not buy flood insurance or they will drop it as soon as they can. Further, the reneging on promises and the deletion of successful policy causes a huge distrust of FEMA and the NFIP. This is contrary to our objective as an Association and its member agencies in encouraging participation in the NFIP. Further, it erodes the trust our constituents have in our ability as an individual member agency to provide meaningful protection using their tax dollars on their behalf given these improvements have no impact on the cost of insurance. This too is causing an exodus from parts of our State.

47. As flood insurance rates increase, people and businesses in the State are likely to be priced out of their properties and forced to move to out of the individual ALBL Member Agency territory, which will decrease the tax base for that Member Agency and its ability to fulfill its statutory charge to construct and maintain levees.

48. And by creating a surplus of available property, this exodus from the Member Agency District will negatively impact the property values of those who remain, further decreasing the District's tax revenues.

49. Moreover, even if no one were to leave a particular Member Agency District, Risk Rating 2.0 is still likely to negatively affect property values in that District by increasing the cost of purchasing mandatory flood insurance that runs with the property, thereby decreasing that District's tax revenues.

50. This reduction in tax revenue will inhibit the Member Agencies of the ALBL's ability to fulfill their duties to construct and maintain levees and drainage infrastructure that protect its residents and their property. This would be tragic given the proven efficacy of levees in the state of Louisiana, especially when one contrasts the immense damage inflicted by past hurricanes prior to

C.H-K.

the levee improvements discussed above with the relatively minimal damage caused by the more recent hurricane Ida after those levee improvements were made in parts of our State as resources allowed.

51. In short, levees effectively protect against flooding. Risk Rating 2.0 apparently fails to account for that. By failing to do so, Risk Rating 2.0 will likely decrease the tax revenues of the ALBL Member Agencies and inhibit the same Member Agencies from carrying out their statutory charge to build and maintain levees that defend the communities the State of Louisiana they are charged with protecting.

52. The only logical explanation for why Risk Rating 2.0 is increasing rates for the State's levee-protected areas, areas that are indicated on FEMA's own FIRMs as being outside the flood zone and elevated properties is that the methodology used in setting rates under Risk Rating 2.0 must be flawed.

53. But FEMA's refusal to reveal Risk Rating 2.0's underlying methodology as required by federal law, despite numerous requests from all levels of state government and Louisiana's federal legislators, makes it impossible for the Association or its Member Agencies to determine where the flaws in FEMA's methodology lie.

54. That lack of transparency directly harms the ALBL's Member Agencies ability to partner with FEMA and other federal agencies, like the Army Corps of Engineers, in constructing and managing levees and other flood mitigation projects.

55. FEMA's Risk Rating 2.0 weakens the ability of the Member Agencies of the ALBL and this directly weakens the ability of the ALBL itself to fulfill its purpose of promoting the interest of the Levee Boards (or Districts) of the State of Louisiana, promoting the welfare of the taxpayers, improving the administration of Levee Board affairs, and by mutual cooperation, endeavor to secure legislation for the general good of the State of Louisiana.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Raceland, LA this 25th day of May 2023.

_____
Cory Kief

13