# EXHIBIT 42

## Declaration of the CPRA Board

1.  My name is Kyle R. "Chip" Kline, Jr. I am over the age of 18 and am competent to make this declaration. The facts set forth in this declaration are based on my personal knowledge.

2.  I am the Chairman of the Louisiana Coastal Protection and Restoration Authority Board ("CPRA Board"). I have served as Chairman of the CPRA Board and Louisiana Governor John Bel Edwards's Executive Assistant of Coastal Activities since 2018. In this role, I oversee policy initiatives related to Louisiana's coastal program and manage the day-to-day operations of the Governor's Office as it relates to coastal activities. In this position, I am responsible for integrating the functions of all state agencies as they relate to integrated coastal protection and have been integral in advancing the objectives of the State's Coastal Master Plan in Louisiana and Washington, D.C. I previously served as the Deputy Executive Assistant under both Governor Edwards and Governor Jindal starting in 2008.

3.  The CPRA Board is domiciled in East Baton Rouge Parish, Louisiana.

4.  Further, I represent Governor John Bel Edwards on the Governor's Advisory Commission on Coastal Protection, Restoration, and Conservation and the Gulf Coast Ecosystem Restoration Council.

5.  Pursuant to La. R.S. 49:214.5.2(A)(1), the CPRA Board "represents the State of Louisiana's position relative to the protection, conservation, enhancement, and restoration of the coastal area of the state through oversight of integrated coastal protection projects and programs" and is mandated to develop, implement, and enforce a comprehensive coastal protection and restoration master plan by working with federal, state and local political subdivisions, including levee districts, to establish a safe and sustainable coast that will protect our communities, the nation's critical energy infrastructure and our bountiful natural resources for generations to come.

6.  Under La. R.S. 49:214.5.2(A)(7), the CPRA Board has the power and authority to enter into any contract with any political subdivision of the state for the "study, planning, engineering, design, construction, operation, maintenance, repair, rehabilitation, or replacement of any integrated coastal protection project, and to this end, may contract for the acceptance of any grant of money upon the terms and conditions, including any requirement of matching the grants in whole or part, which may be necessary."

7.  Pursuant to La. R.S. 49:214.6.1, the Coastal Protection and Restoration Authority ("CPRA") is the implementation and enforcement arm of the Board and is directed by the policies set by the CPRA Board. Pursuant to La. R.S. 49:214.6.2 and La. R.S. 49:214.6.3, CPRA shall administer the programs of the CPRA Board and shall implement projects relative to the protection,

conservation, enhancement, and restoration of the coastal area of the State of Louisiana through oversight of integrated coastal projects and programs consistent with the legislative intent as expressed in La. R.S. 49:214.1.

8.    The CPRA is headquartered at The Water Campus, 150 Terrace Avenue, Baton Rouge, LA 70802.

9.    Pursuant to La. R.S. 49:214.1, "it is the public policy of the state to develop and implement, on a comprehensive and coordinated basis, an integrated coastal protection program in order to reduce if not eliminate the catastrophic rate of coastal land loss in Louisiana."

10.   The Louisiana Legislature created the CPRA Board "to provide aggressive state leadership, direction, and consonance in the development and implementation of policies, plans, and programs to achieve comprehensive integrated coastal protection" and is "established, authorized and empowered ... to serve as the single entity responsible to act as the local sponsor for construction, operation and maintenance of all of the hurricane, storm damage reduction, and flood control projects in areas under its jurisdiction, including the greater New Orleans and southeastern area." *See* La. R.S. 49:214.1.

11.   The CPRA Board, through the CPRA, undertakes significant projects to help mitigate the effect of storm surge flooding in the region. The CPRA's mandate is to develop, implement, and enforce a comprehensive coastal protection and restoration Master Plan. By the numbers, the 2023 Coastal Master Plan, which was recently approved by the CPRA Board and the Louisiana Legislature, calls for a $50 billion investment in Coastal Louisiana over the next 50 years. The plan predicts such action would prevent damage for 11,000-15,000 structures annually. It would prevent $11 billion to $15 billion worth of damage to structures annually.

12.   Pursuant to La. R.S.49:214.5.2(A)(6), the CPRA Board is vested with the authority to take actions against any entity, to ensure consistency with the Louisiana's Comprehensive Master Plan for a Sustainable Coast ("Coastal Master Plan") and prevent actions that unduly and unnecessarily impede integrated coastal protection projects from being implemented consistent with the legislative intent as expressed in La. R.S. 49:214.1 *et seq.*

13.   In order to maximize the effectiveness of integrated coastal protection efforts, the CPRA Board "shall use an integrated effort to jointly coordinate master plan and annual plan development with the [CPRA], state agencies, political subdivisions, including flood protection authorities, levee districts, and federal agencies." *See* La. R.S. 49:214.1.

14.   "Integrated coastal protection" includes overall "plans, projects, policies, and programs intended to provide hurricane protection," flood risk reduction or "coastal conservation or restoration" and "include[s] but is not limited to

2

coastal restoration, coastal protection, infrastructure, storm damage reduction, flood control, water resources development, erosion control measures, marsh management, diversions, saltwater intrusion prevention, wetland and central wetlands conservation, enhancement, and restoration, barrier island and shoreline stabilization and preservation, coastal passes stabilization and restoration, mitigation, storm surge reduction [] beneficial use," and non-structural risk reduction projects. *See* La. R.S. 49:214.2(11).

15.  As the Governor's Executive Assistant for Coastal Activities, I am charged with the duty of "apprais[ing] the adequacy of federal, regional, state, and local programs to achieve the policies and meet the goals of the state with respect to integrated coastal protection, including infrastructure, hurricane protection and wetlands conservation and restoration." *See* La. R.S. 49:214.3.1.

16.  As the Governor's Executive Assistant for Coastal Activities and CPRA Board Chairman, I have been tracking the changes in legislation regarding the structure of the NFIP. In Louisiana, flood protection and flood insurance are tightly correlated, and the issues with the NFIP have long been a focus of the CPRA Board.

17.  On May 15, 2019, the CPRA Board voted unanimously to create an NFIP Subcommittee to track federal reform efforts and provide information to ensure that federal lawmakers and regulators understood the benefits of flood risk reduction projects and their ability to reduce flood insurance premiums.

18.  On September 14, 2019, the CPRA Board's NFIP Subcommittee held a public meeting and received a briefing on the NFIP from David Maurstad, FEMA Deputy Associate Administrator on Insurance and Mitigation. In explaining the goals of Risk Rating 2.0 ("RR2.0"), Mr. Maurstad stated that "we need more insurance coverage, and we need more investment in mitigation."[1] He further stated that these goals "are part of FEMA's strategic plan."[2]

19.  In discussing RR2.0, Mr. Maurstad stated that this effort "will enable us to deliver rates that are fair, easier to understand, and that better reflect a property's unique flood risk. When communities and property owners have a better view and understanding of their risks, and when their costs accurately reflect that risk, they can make informed decisions to buy policies that fit their circumstances and give them the insurance coverage to truly protect the investments they have made in their homes."[3]

---

[1] CPRA Board Subcommittee on NFIP, September 2019 Meeting, Minute 1:59:56, available online at https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2019/sep/0904_19_NationalFlood.
[2] CPRA Board Subcommittee on NFIP, September 2019 Meeting, Minute 2:08:30, available online at https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2019/sep/0904_19_NationalFlood.
[3] CPRA Board Subcommittee on NFIP, September 2019 Meeting, Minute 2:15:15, available online at https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2019/sep/0904_19_NationalFlood.

20.     Mr. Maurstad said further that "FEMA is committed to implementing Risk Rating 2.0 in a transparent way that incorporates feedback from industry experts, government officials, communities, and policy holders."[4]

21.     When asked about whether existing or newly constructed flood risk reduction projects are going to be considered in calculating flood risk and premiums, Mr. Maurstad said that FEMA was designing RR2.0 to be updated based on investments that reduce risk.

22.     On December 19, 2019, the CPRA Board unanimously approved a set of recommendations on approaching federal flood insurance reform. Included in its recommendations, the CPRA Board called for greater transparency on FEMA's environmental factors by which they would assess risk in order for homeowners to understand their risk. The CPRA Board reasoned that "Risk Rating 2.0 will assess risk based on 8-10 environmental factors that incorporate storm water, riverine, and storm surge data, which will determine how the nation now assesses flood risk. FEMA has kept this new mapping process from the public, which prevents homeowners, communities, and states from preparing for implications of analysis results."

23.     The CPRA Board, CPRA, the Association of Levee Boards of Louisiana, members of both the Louisiana legislature and the federal legislature, members of state government, numerous Parish Presidents and their Councils, and many other entities in Louisiana and around the nation have repeatedly raised their concerns to FEMA, have asked FEMA for documentation showing FEMA's underlying methodology, and have been passed from one federal office to the next without receiving any meaningful answers to their questions or any documents showing FEMA's underlying methodology.

24.     While the goals of the NFIP are in line with the 2023 Coastal Master Plan's goal of reducing flood risk, I am concerned about the impact of the implementation of RR2.0 methodology in Louisiana.

25.     From my vantage point, the methodology underpinning RR2.0's calculation of risk and insurance premiums amounts to a "black box" that is not fair, easy for policyholders to understand, or transparent.

26.     Increases to flood insurance rates may make it harder to ensure a stable and affordable housing market which is necessary to not unduly disrupt local revenues, culture, productive fisheries, and the productive economy of Louisiana's working coast. Because the storm surge-based flood risk modeling undertaken for the Coastal Master Plan incorporates the latest details on Louisiana's storm surge risk reduction activities, it could be leveraged by

---

[4] CPRA Board Subcommittee on NFIP, September 2019 Meeting, Minute 2:17:22, available online at https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2019/sep/0904_19_NationalFlood.

FEMA for determining tractable, accurate, and defensible flood risk exposure values for use in NFIP policy-writing within coastal Louisiana.

27.   Additionally, the proposed structural and nonstructural risk reduction projects, as well as wetland restoration projects, identified in the 2023 Coastal Master Plan provide a direct path forward for reducing storm surge-based flood risk for coastal residents in Louisiana. The construction of new levees, such as those included in the 2023 Coastal Master Plan, as well as individual nonstructural mitigation activities should be taken into account and regularly updated in the NFIP premium determination process.

28.   However, under RR2.0, the benefits of structural and nonstructural flood protection are no longer tightly coupled to premium rates due to a smaller impact of home elevation (relative to base flood elevation) in the overall rate-setting calculations. Incorporating additional factors such as proximity to water complicates the rate-setting and likely has the unintended consequence of reducing the insurance-related incentive for homeowners to elevate their homes.   For example, FEMA's use of proximity as a rate-setting factor potentially negates the benefits of levees or other flood protection methodologies because levees and other coastal protection projects, by their nature and engineering, are generally constructed in close proximity to water to obtain maximum benefit.

29.   The state, parishes, levee districts, congressional delegates, and Governor John Bel Edwards have all asked for clarity from FEMA; specifically, that details are provided on exactly how the new "full risk-based rates" were determined in our state in areas protected by levees or otherwise. The information that FEMA has provided to date has been insufficient for Louisianans to fully understand how the rates are set and, importantly, what the impact of coastal risk reduction projects would have on premiums.

30.   Risk Rating 2.0 will cause insurance rates to increase across the State of Louisiana. Information released by FEMA on April 19, 2023, indicated an average Louisiana policy increase of 134.1% from $813/year to $1904/year for the 284,095 Single Family Homes that were in effect on September 30, 2022, and rated under Risk Rating 2.0, with the most extreme average increases between 545.3% and 239.2% being found in several coastal area parishes under the jurisdiction of the CPRA Board, including Plaquemines, St. Mary, Lafourche, Terrebonne Vermillion, Iberia, and St. Charles.

31.   FEMA's failure to properly take into account any of the numerous improvements various state agencies, departments, political subdivisions, and local interests have made to the flood protection systems is having a catastrophic effect on Louisiana's flood insurance rates and the ability of Louisiana's homeowners to purchase flood insurance.

32.  However, based on the cost of flood insurance under Risk Rating 2.0, CPRA's integrated coastal protection projects as implemented through the Coastal Master Plan and Annual Plan appear to have very little impact on the overall cost of flood insurance because the benefits are diminished are not considered at all in the "black box" calculations.  This includes significant investment in federal hurricane storm surge, storm damage risk reduction and flood protection projects on which the CPRA Board, CPRA, and a number of local entities are engaged as non-federal sponsors.

33.  In its own right and as a partner with both local and federal agencies, the CPRA undertakes significant projects to help mitigate the effect of storm surge flooding. From the commitments in the Master Plan and Annual Plans above, it is clear to see that the CPRA, along with local and federal agencies, including the United States Army Corps of Engineers, have determined that integrated coastal protection is an effective and essential part of providing flood risk reduction to thousands of residents in Louisiana.

34.  Based on some of the flood insurance rates set for some homes and structures, FEMA's Risk Rating 2.0 rating methodology does not appear to fully recognize this proven risk reduction strategy of integrated coastal protection. The rate setting under Risk Rating 2.0 appears to undervalue the benefits of these State and Federal measures.

35.  As a result of Risk Rating 2.0, the CPRA's ability to develop, implement, and enforce comprehensive coastal protection is inhibited.

36.  The increases in flood insurance costs hurt homeowners, particularly homeowners of lower and middle income, who will not be able to purchase, afford, or obtain flood insurance coverage.

37.  The increased flood insurance rates may lead many homeowners to file for bankruptcy or foreclosure.

38.  The increased flood insurance rates will likely harm the housing industry's ability to build and sell affordable housing.

39.  This may cause people to leave the very homes that have a reduced risk of flooding because of CPRA's integrated coastal protection projects.

40.  Risk Rating 2.0 is causing higher insurance rates, which could decrease the property value within the state, harm homeowners, decrease the property tax revenues generated by the State, the levee boards, and other state, local, and parish-wide governmental entities. The loss of tax revenue would make it harder for State and local governmental entities to provide adequate flood protection.

41.   As described above, much of CPRA's implementation of its Annual Plan, in pursuit of the goals of its Coastal Master Plan, are executed through Cooperative Endeavor Agreements with these same levee boards, and other state, local, and parish-wide governmental entities. The diminished capacity of these local entities to provide flood protection measures directly impacts CPRA's ability to achieve comprehensive coastal protection for Louisiana.

42.   In my role as the Governor's Executive Assistant for Coastal Activities, I have appraised adequacy of the NFIP's RR2.0 and believe it is inadequate and harms the ability of the CPRA Board and CPRA to effectively conduct its program of integrated coastal protection, including infrastructure, hurricane protection and wetlands conservation and restoration for the benefit of coastal Louisiana, its communities, and its residents.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Baton Rouge, Louisiana, this 31st day of May 2023.

-----------------------------------------------------------------

**Kyle R. "Chip" Kline, Jr.**