# EXHIBIT 48

**Declaration of Louisiana Floodplain Management Association**

1.  I am Michelle Gonzales and I am over the age of 18. I am competent to make this declaration. The facts set forth in this declaration are based on my personal knowledge.

2.  I am the Chair of the Board of Directors of the Louisiana Floodplain Management Association (LFMA).

3.  Our Association was founded in 1983. We represent 315 total Members of which more than 200 are Certified Floodplain Managers (CFM). Our members represent the entire state of Louisiana as well as from academia and the consulting world outside of Louisiana's borders. Our members represent the public and private sectors and academia. They are consultants, local floodplain managers, engineers, planners, local building officials, academics, and students. Our Association promotes proper floodplain management through education with our members and other decision makers throughout the state.

4.  A CFM must go through proper training that blends concepts such as land-use planning, mitigation, flood-risk communication, insurance, building safety and complex floodplain management concepts. Upon completion of training, a passing score on a CFM Exam is required to attain the certification of Certified Floodplain Manager. This blending of concepts and critical knowledge ensures that CFM's are experts in regards to local floodplain management, including subjects like flood risk communication and flood insurance.

5.  Floodplain managers, including LFMA's Members, play a crucial role in protecting people and property from flooding by developing and implementing effective floodplain management systems to mitigate the risks posed by flooding.

6.  Our Members have instituted higher standards using floodplain management concepts such as freeboard, Design Flood Elevation (DFE), No-Net-Fill and other non-structural floodplain management concepts to improve and the protect the health, safety and welfare of their local and state communities.

7.  Central to floodplain managers' work is ensuring that the area they are managing is compliant with the standards necessary to become and continue to be a National Flood Insurance Program (NFIP) community so that the area's residents are eligible for NFIP flood insurance. This entails ensuring local officials are familiar with flood risk data products such as flood insurance rate maps, flood insurance studies, flood zone designations and where these designations apply at the local level. They must then effectively and consistently communicate flood risk to the local community in adherence with local, state and federal guidelines to maintain programmatic compliance with

the National Flood Insurance Program (NFIP). This includes understanding flood insurance on a subject matter expert (SME) level.

8. Federal law requires that property owners in Special Flood Hazard Areas purchase flood insurance as a condition of any mortgage backed by the federal government. This requirement applies to mortgages from banks insured by the Federal Deposit Insurance Corporation and mortgages backed by Fannie Mae or Freddie Mac.

9. Additionally, property owners who have accepted various forms of disaster relief from FEMA or participated in flood mitigation grant programs, such as by elevating their homes, are required to purchase flood insurance going forward as a condition of receiving these funds. These program include (but are not limited to) Hazard Mitigation Assistance (HMA) Programs like the Flood Mitigation Assistance (FMA) Program, the Building Resilient Infrastructure and Communities (BRIC) Program and the Hazard Mitigation Grant Program (HMGP).

10. Likewise, property owners who have obtained SBA loans are required to purchase flood insurance as a condition of receiving these loans. This flood insurance must be maintained on the property in perpetuity. This is accomplished via the attachment of a Deed Restriction.

11. Moreover, property owners who do not have flood insurance may not be eligible for certain types of disaster assistance after a flood. This restricts access to a program like the Flood Mitigation Assistance (FMA) Program, which is designed expressly to reduce the amount of NFIP Claims against the program and reduce the number of Repetitive Loss (RL) and Severe Repetitive Loss (SRL) properties.

12. To become an NFIP community, the local government must commit (a) to issue or deny permits to build or develop in the floodplain; (b) to inspect all development to assure it complies with the floodplain management regulations the Parish was required to pass to become an NFIP community; (c) to maintain records of floodplain development; (d) to work with FEMA to prepare and revise floodplain maps; and (e) to help residents obtain information about flood hazards, flood insurance, and proper methods of construction.

13. FEMA reports that the quid pro quo arrangement between communities that participate in NFIP floodplain management, a pre-requisite for them to be eligible to participate in the NFIP, has saved the nation over $100 billion dollars in avoided floods over the last 40 years.

14. Prior to Risk Rating 2.0, FEMA used the 1% Annual Exceedance Probability (AEP) flood as the basis for the National Flood Insurance Program. The 1% AEP flood is a flood that has a 1 in 100 chance of being equaled or exceeded in any given year and an average recurrence interval of 100 years—often referred to as the "100-year flood."

15. Before Risk Rating 2.0, FEMA used Flood Insurance Rate Maps to set rates and, in those maps, determined the AEP flood for each flood zone—called the Base Flood Elevation (BFE).

16. For each flood zone, FEMA advised elevating homes at least 1 foot above the BFE because FEMA expected its exposure to flood claims at or above that level to be very infrequent, and so FEMA lowered insurance rates accordingly. The higher a structure was elevated above the BFE level, the lower FEMA's risk for having to pay claims and, therefore, the lower the insurance rate.

17. For decades LFMA and other flood managers across the country used FEMA's Rate Maps to develop their floodplain management plans and to require buildings to be built at or above 1 foot above FEMA's BFE.

18. These plans were then implemented—often at significant cost to taxpayers—by local governments. But the promise of affordable flood insurance through the NFIP for the area's residents going forward motivated and justified these investments. As an aspect of the Community Rating System (CRS), communities in Louisiana have implemented a, "Flood Insurance Coverage Assessment," including components for a coverage improvement plan. Committees must be created, convened and the plan developed by stakeholders where policies and at least one outreach project must be completed annually. This represents a significant cost to local communities in order to comply.

19. The most critical aspect of the previous iteration of flood insurance risk rating (Risk Rating 1.0) was the local community's (via their local official's) knowledge of flood insurance premium costs. Using tools like an Elevation Certificate, Flood Insurance Rate Maps and a Flood Insurance Manual, a local CFM could inform any member of the community what the cost of flood insurance would be. Local land use planning was always capable of being accurately informed as a result.

20. Under Risk Rating 2.0, flood insurance rates are rising dramatically, even in areas that—through the guidance of flood plain managers—local governments have implemented floodplain management plans that effectively mitigate the risks posed by flooding, and despite the fact that the promise of affordable NFIP flood insurance was what, in significant part, motivated local governments to make significant investments of taxpayer dollars in implementing these plans. The biggest risk from our perspective is the

inability for local officials to understand and effectively communicate the risk of flooding at the local level to their members of their community and to plan properly for their local officials and elected leadership.

21. According to numerous media reports, NFIP rates are increasing by thousands of dollars from year to year, with no signs of abatement of these increases in sight.

22. While FEMA has refused to release its methodology for Risk Rating 2.0 in a transparent format so that the floodplain managers and the public alike can reasonably understand where the rate increases are coming from, FEMA has revoked several previously offered features of NFIP policies. The absence of those features seems appears to be part of what is driving up rates.

23. For example, Risk Rating 2.0 has eliminated clear discounts in premium rates for properties that are elevated. In recognition of how effectively elevation mitigates the risks associated with flooding, and to encourage more policyholders to elevate their homes and buildings, FEMA used to offer large rate discounts for policyholders with elevated homes or buildings. In Louisiana Parishes, there are dozens of examples of mitigated structures and/or structures currently undergoing mitigation that, now, will see their cost of flood insurance triple, despite using post-mitigation elevation certificates and mitigating the structures from flooding using FEMA's standards based on Federal Flood Risk Management Standard.

24. While Risk Rating 2.0 fails to properly value elevation and its reduction in flood risk, it is difficult to explain all of the reasons for Risk Rating 2.0's drastic price increases because FEMA has refused to divulge Risk Rating 2.0's calculation methods, in a transparent manner. LFMA has done outreach to FEMA Region 6 and published a White Paper to Members to request better outreach, communication and sharing with FEMA, which has not been accomplished. Therefore, not even floodplain managers, including LFMA members—the ones charged with developing floodplain management plans that protect the public and make affordable NFIP flood insurance available to them—know or can explain to the governments they serve what effect any single data point has on a policy's premium.

25. Even with limited information about the methodology FEMA used to formulate Risk Rating 2.0, the only logical explanation for Risk Rating 2.0's failure to place proper value on elevation and other CRS mitigation measures—which are proven to effectively mitigate flooding risks—is that the methodology Risk Rating 2.0 uses in setting rates must be flawed.

26.   Grandfathering was another feature that FEMA offered prior to Risk Rating 2.0. Grandfathering used to be available to policyholders when a map change resulted in a change to either a rating zone or base flood elevation.

27.   But now under Risk Rating 2.0, all existing policies formerly eligible for grandfathering will transition to their new full risk premium.

28.   As a result of Risk Rating 2.0's higher rates, many current NFIP policyholders—including those required to have flood insurance—will likely struggle to afford NFIP flood insurance, with many likely deciding to cancel their policies.

29.   Indeed, many already have: NFIP experienced a loss of 346,778 policies that were in force nationwide from December 31, 2021, to June 30, 2022. And, by some estimations, Risk Rating 2.0 will lead to a 20% reduction in NFIP flood insurance policies nationwide.

30.   Louisiana has seen a reduction in the number of total flood insurance policies in force (PIF) since the implementation of Risk Rating 2.0. We expect this trend to continue. With our state having flood risk products that are not always indicative of best available data, we know that some people that are not required to carry flood insurance are nonetheless still in harm's way. Due to this, we know that some policies that are dropped or not renewed due to a lack of a mandatory purchase requirement will actually increase exposure to at-risk properties in an area that – while perhaps not marked as existing in Special Flood Hazard Area (SFHA) – are at extreme risk to the threat of flooding. Local officials' inability to plan will create potential issues with land use planning and risk communication. Local governments will face difficult decisions without the data to make localized flood risk communication and regulatory documents more accurate. Affordability issues will create issues at the homeowner level as the cost of home ownership continues to increase.

31.   The lack of information in Risk Rating 2.0 and its methodologies has already impacted local floodplain managers in a negative way. They can no longer accurately or adequately communicate risk at the local level to their government or their community and its residents. Flood insurance agents are the only way to access Risk Rating 2.0 information on flood risk and cost of insurance. CFM's are unable to develop effective plans because of the lack of information from FEMA on Risk Rating 2.0.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Jefferson, Louisiana, this 25th day of May, 2023.

_____

Michelle M. Gonzales