# EXHIBIT 56

**Declaration of Dwayne Bourgeois**

1. My name is Dwayne Bourgeois. I am over the age of 18 and am competent to make this declaration. The facts set forth in this declaration are based on my personal knowledge.

2. My wife Constance Pitre Bourgeois and I are the owners of a home located at 2330 Highway 1 in Raceland, LA. My home was built in 1935, and I have owned it since December of 1995. We moved into this home with our two young sons just after we purchased it, and my wife and I still live in this home today.

3. My family and my wife's family have lived in this area for generations. We chose this location because of the historical charm of the house, its elevated location on Bayou Lafourche, its large tract of land to the rear, and the two 300+ year old Live Oak Trees that front the property. Our property runs from Bayou Lafourche at the front to the 40 Arpent Canal at the rear and is 144 feet wide and approximately 1.5 miles deep. We raised our two sons in this home, and we now have grandkids who really enjoy the house and property. We plan to live here all our lives.

4. Professionally, I am the Executive Director of the North Lafourche Conservation, Levee, and Drainage District (hereafter the NLCLDD or simply "the District") and I have served in that role since March 1, 2010. In my role as Executive Director for the NLCLDD I have been deeply involved with most aspects of the National Flood Insurance Program (NFIP). In Louisiana, flood protection and flood insurance are closely related, and issues with the NFIP have long been a focus of my work.

5. The NFIP is a federal program primarily sold by the private sector. While the Louisiana Department of Transportation is the State Coordinating Agency for the NFIP, and it plays a role in promoting local compliance with NFIP regulations, the State of Louisiana plays no direct role in the administration or management of the NFIP.

6. As such, the State's levee districts have been forced to take an active role in tracking and advocating for changes in legislation regarding the structure of the NFIP. These levee districts work independently, but they collaborate through their membership in the Association of Levee Boards of Louisiana.

7. I have been involved in the NFIP in multiple capacities.

8. As a local authority on flood protection in all parts of our District, I have been regularly brought into the NFIP process of our community, including when FEMA undertakes its Flood Insurance Study and creates new Flood Insurance Rate Maps. These maps are critical to local communities because, under the Legacy Rating System, they provided the basis for the flood insurance process. Given the significant consequences stemming from FEMA's maps (like mandatory flood insurance), FEMA engaged with local officials and community members, like me, to ensure their accuracy. I have made multiple trips to FEMA's Region 6 office in Denton, Texas, as part of this effort.

9. By working with FEMA and the local community through the Flood Insurance Study process, I and others in our District recognized that there were shortcomings in the process used by FEMA. FEMA only considered levees that were certified to meet the construction standards of 44 CFR 65:10 as having any impact to the propagation of flood waters. If the levees were not so certified, the Flood Insurance Study process required FEMA's mapping partners to act as if the non-certified levee did not exist. This was causing flawed outputs from the mapping process resulting in inaccurate maps. After all, even non-certified levee systems were mitigating some flood damage. I led a scientific appeal of our proposed maps on this basis. As a result of this coordination, we successfully urged Congress to direct FEMA to change some of its mapping methodology regarding the consideration of the impact of all levees in a Flood Insurance Study. To address gaps in information required in the Flood Insurance Study on the impacts of non-accredited levees, Congress requested, and FEMA developed, its Levee Analysis Mapping Procedure (LAMP) first launched in 2013. This updated mapping process was so important to Louisiana that FEMA selected 5 Louisiana parishes of 25 communities nationally to participate in the "pilot" of this new mapping procedure. Lafourche Parish is one of those 5 parishes. I remain involved in this process, and we are still working through the final parts of the LAMP analysis in the production of our new maps today.

10. In 2012, I testified before Congress and argued for a long-term reauthorization of the NFIP and other meaningful reforms to the NFIP.

11. In 2014, I served on FEMA's Technical Mapping Advisory Council.

12. Later in 2012 and 2013, I led the effort and worked with the Louisiana Congressional Delegation in DC to draft and promote passage of the Homeowners Flood Insurance Affordability Act of 2014. (HFIAA-14). This was in direct response to the Biggert-Waters Flood Insurance Reform Act of 2012 (BW-12), which was causing significant harm throughout Louisiana and

the rest of the country. In coordination with the ALBL, I led this 2014 effort to soften the impact of BW-12 by buying the citizens of Louisiana some time before the worst impacts of BW-12 would be felt.

13. I led the ALBL effort to better organize its approach to Congress in the formation of its independent non-profit entity called the Louisiana Flood Risk Coalition (LFRC). The LFRC was established in 2014 to advocate for reform of the NFIP by developing responsible floodplain management within coastal and riverine communities. I worked with all members of the ALBL and others through the LFRC from 2014 to its dissolution in 2019. By this time, the Louisiana Coastal Protection and Restoration Authority (CPRA) began taking a more active role on behalf of the State in taking positions on the NFIP's structure, operation, and reform. Eventually the CPRA formed an NFIP committee on which I served as a founding member. Today, I continue to serve on this CPRA committee as well as the CPRA Board of Directors and I am the Chair of the CPRA Coastal Louisiana Levee Coalition, another CPRA committee that has also taken up NFIP issues.

14. Since July 2015, I have been an active member of the Executive Committee of the Mississippi Valley Flood Control Association (MVFCA) whose mission also includes taking up NFIP issues.

15. During this entire period, I have gained significant working knowledge of the history, purpose, structure, operational processes, and laws governing the NFIP. Because of my involvement and leadership in these organizations on NFIP issues, I am invested and well versed in the importance of and the operation of the NFIP.

16. With knowledge gained from the above-described work, I began viewing FEMA as they began to announce the development of their revolutionary new risk-based rating methodology that would eventually be called Risk Rating 2.0 – Equity in Action. I worked directly and extensively with our State and Federal legislative delegation, the CPRA, and the Governor for years to try to get additional information about this "revolutionary change" while FEMA slowly released bits of information about what they were doing as compared to how they were doing it.

17. It is with the knowledge base gained from my various experiences that I began to consider the impacts of RR2.0 on my own home.

18. My home is protected from flooding because it is located on some of the highest ground in Lafourche Parish. My home sits on property that has been built up over time by the prehistoric flood cycles of Bayou Lafourche. In this

distributary delta, the highest land is directly adjacent to the channel, which is where my home is. As you move away from the Bayou, the land naturally gently slopes and drops in elevation. This land was created through nearly 8000 years of the river (Bayou) overflowing its banks every spring. Because annual flooding is not as popular in the present day, Bay Lafourche has been totally disconnected from the Mississippi River since 1903, and it has not been a source of flooding since.

19. My home sits elevated about a foot above grade on well drained, highly sloped, and highly permeable soils. The property sits at an elevation of approximately twelve (12) feet above sea level. It sits on the top of the natural levee formed by the Bayou. Adjacent ditches and gravity drainage cause most of the rainwater on my property to drain to the rear of the property into the 40 Arpent Canal, which typically sits at an elevation of zero (0) feet above sea level. Less than 300 feet of my property to the front of my home drains into Bayou Lafourche which also sits at an elevation of zero (0) feet above sea-level. This is quite typical in our area. Most of the rainfall drains to the rear of the properties with only a small sliver on either side of Bayou Lafourche actually draining into Bayou Lafourche. This tends to keep the elevation in bayou Lafourche very stable even in rather large rain events.

20. Our home is approximately fifty (50) miles from the open waters of the Gulf of Mexico. If conditions are right, and those conditions persist for a long enough period of time, a tropical storm surge can eventually work its way up the myriad of bays, bayous and canals leading to the canal behind my house and in Bayou Lafourche, causing the water elevation in the Canal and Bayou to rise. In the same way, the direction of tropical storm winds can blow the water in these same bays, bayous and canals towards the open Gulf of Mexico lowering the water level in the canal behind our home and in Bayou Lafourche. It is seldom that either of these extremes occur. Generally, because of the change in wind direction as a cyclonic tropical storm passes, we get a bit of both a rise and a fall in the water elevation in the 40 Arpent Canal and in Bayou Lafourche during every storm. These are observations that are generally common knowledge to most people in our area who have weathered many a tropical event. I have known this to be the case all of my life at the several locations which I have lived in our broader area.

21. In my nearly twenty-eight (28) years at my current home, I have never seen the water in Bayou Lafourche rise to a point that it threatened my home with flooding even once. In fact, at the highest level that I have observed, I believe the water would have had to rise an additional nine (9) feet to reach the lowest floor elevation of my home. Likewise, because the canal at the rear of my property is nearly 1.5 miles away from my home, it has never risen to

even remotely threaten my home with flooding. **Simply put, my home is primarily protected from flooding because of its natural relative elevation compared to the elevation of any adjacent flood sources.**

22. Prior to Risk Rating 2.0, FEMA used the 1% Annual Exceedance Probability flood event as a baseline for establishing elevation standards and determining risk. Based on my related expertise, I believe the threat of my home flooding for any event that would be close to the 1% AEP flood event is zero. In fact, my home is indicated by FEMA to be in Zone C on the current FIRM and Zone X (unshaded) on the preliminary new DFIRMs. According to FEMA, "the areas of minimal flood hazard, which are the areas outside the SFHA and higher than the elevation of the 0.2-percent-annual-chance flood, are labeled Zone C or Zone X (unshaded)". As such, FEMA's mapping folks agree that my home has little chance of flooding.

23. Although my home is eligible to buy flood insurance through the NFIP, my home is not located in a NFIP designated Special Flood Hazard Area. As such, I am not required to purchase flood insurance from the NFIP.

24. Still, I see the value in the having flood insurance, so I decided to purchase flood insurance through the National Flood Insurance program because it was affordable. Purchasing flood insurance also serves as an example to others in my community and in my organizations and encourages those who live in higher risk homes to purchase flood insurance policies themselves.

25. I have had flood insurance on my home through the National Flood Insurance Program for all of the time that we have lived here. Because I have never had any instances of flooding in my home, I have never made a flood insurance claim.

26. My most recent annual insurance premium prior to FEMA's promulgation of Risk Rating 2.0 was $493 per year. In prior years, my annual insurance premium was typically considerably below $450 per year.

27. If FEMA had not promulgated the Risk Rating 2.0, I believe my next annual premium would have been about $520 per year. This is based on typical annual increases over the years.

28. Based on my experience renewing flood insurance and with the anticipation of the impacts of Risk rating 2.0, I waited to receive a renewal notice through my insurance agent. This document typically includes some information about my policy, including my next annual premium. After I renew my insurance, I know that I will receive a Declarations Page, which contains

additional information about my policy. Because any annual increases to my premium have been predictable and small, I have never questioned this process. But I was very curious as to how FEMA would rate my very low risk property under Risk Rating 2.0.

29. At some time in September of 2022, FEMA, through my local Farm Bureau insurance agent, sent me a notice that my flood insurance was about to expire. The renewal notice indicated my next annual premium would be $592 per year, a 20.1% increase from my prior total premium. This notice only included the new renewal rate and the amount of Building and Content Coverage I was carrying and their respective deductibles. Although this was a higher increase than normal, I renewed my flood insurance policy.

30. A few weeks after I renewed my flood insurance policy, I received my Flood Insurance Policy Declaration Page. (See attached Exhibit A). It was at this time that FEMA first revealed to me what my Full-Risk Premium was. The Declaration Page indicated it to be $1,968 per year. It also showed that only the "Annual Increase Cap Discount", a substantial $1,527 discount, was stopping me from having to pay that full risk premium immediately. I had received no information about what this Full-Risk Premium was prior to receiving this Declaration Page. This, of course, was only given to me after I renewed my policy.

31. There is no reason for this dramatic change besides Risk Rating 2.0. I have made no new flood insurance claims, I have remained in the same home, and my non-flood zone mapping and overall risk has remained the same or has been reduced by additional and redundant flood protection measures to our south (the Morganza to the Gulf storm surge protection system).

32. I know that the "Annual Increase Cap Discount" as shown on the Declaration page will continue to drop year after year until this discount is $0 as was required by Congress to keep the rate of increase no higher than 18% per year. As such, this will cause my flood insurance cost to rise each year to the full risk rate.

33. If the other "Fees and Surcharges" as shown on my current Declaration page remain the same during the period when the "Annual Increase Cap Discount" drops to $0, I am expecting my total flood insurance policy to be $2,119 per year. This would indicate a 329.8% increase, a greater than fourfold increase over my pre–Risk Rating 2.0 flood insurance rate.

34. Given the history of this home and my long experience with this home, the fact that I do not even live in an area that FEMA themselves calls a Special

Flood Hazard Area, but in an area that their own maps indicate as having less than a 0.2% AEP of flooding, and all the things mentioned above, this increase at any annual rate of increase, simply makes no sense.

35. If I had received the Declaration page at the time of my renewal notice and knew what my new full-risk premium was under Risk Rating 2.0, I would have considered not renewing my policy. But the agency's failure to be forthcoming with information deprived me of this choice. I am now saddled with an expensive policy that is going to eventually become unaffordable. I did not know this when I renewed.

36. This lack of transparency inhibits my ability to make an informed decision about whether to continue purchasing flood insurance.

37. This totally unjustified rate limits my ability as a leader in my community to encourage everyone to purchase flood insurance.

38. The NFIP is not perfect. Through countless reauthorizations for the NFIP, which carried with them numerous challenges and revealed serious faults of the program, I have remained an outspoken advocate for flood insurance. In good faith, though, I cannot continue to encourage everyone to get flood insurance. For many people like me, the higher premiums are not worth the small increase in protection for low-risk homes.

39. The increased cost of my flood insurance under FEMA's Risk Rating 2.0 will cause me irreparable harm by eventually forcing me out of the insurance pool. In addition, I can no longer encourage everyone to purchase flood insurance. It will harm the NFIP itself by taking out one of their lowest risk, long term premium paying policyholders in the nation. But more than that, the lack of transparency about the increased cost is deceptive and causes me and others in my community to have to make blind decisions that carry with them serious financial ramifications.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Raceland, Louisiana, this 26th day of May 2023.

_Dwayne Bourgeois_

EXHIBIT A



LOUISIANA FARM BUREAU CASUALTY INS CO
PO BOX 1592
RIDGELAND, MS 39157

Agent Phone: (985) 447-3870

NFIP Policy Number:
Company Policy Number:
Agent: BENJAMIN BRAUD
Payor: INSURED
Policy Term: 10/29/2022 12:01 AM - 10/29/2023 12:01 AM
Policy Form: DWELLING POLICY
To report a claim visit or call us at: https://sfb.manageflood.com
(800) 647-8052

## RENEWAL FLOOD INSURANCE POLICY DECLARATIONS
### NATIONAL FLOOD INSURANCE PROGRAM

**DELIVERY ADDRESS**
DWAYNE M BOURGEOIS / CONSTANCE P BOURGEOIS

**INSURED NAME(S) AND MAILING ADDRESS**
DWAYNE M BOURGEOIS / CONSTANCE P BOURGEOIS

**COMPANY MAILING ADDRESS**
SFB INSURANCE PROGRAMS
PO BOX 912519
DENVER, CO 80291-2519

**INSURED PROPERTY LOCATION**

BUILDING DESCRIPTION: MAIN DWELLING
BUILDING DESCRIPTION DETAIL: N/A

**RATING INFORMATION**
BUILDING OCCUPANCY: SINGLE-FAMILY HOME
NUMBER OF UNITS: N/A
PRIMARY RESIDENCE: YES
PROPERTY DESCRIPTION: SLAB ON GRADE (NON-ELEVATED), 1 FLOOR(S), MASONRY CONSTRUCTION
PRIOR NFIP CLAIMS: 0 CLAIM(S)

DATE OF CONSTRUCTION: 01/01/1931
CURRENT FLOOD ZONE: X
FIRST FLOOR HEIGHT (FEET): 1.1
FIRST FLOOR HEIGHT METHOD: FEMA DETERMINED

**MORTGAGEE / ADDITIONAL INTEREST INFORMATION**
FIRST MORTGAGEE: — LOAN NO: N/A
SECOND MORTGAGEE: — LOAN NO:
ADDITIONAL INTEREST: — LOAN NO:
DISASTER AGENCY: — CASE NO: N/A
DISASTER AGENCY:

**RATE CATEGORY — RATING ENGINE**

| | COVERAGE | DEDUCTIBLE |
|---|---|---|
| BUILDING: | $150,000 | $2,000 |
| CONTENTS: | $60,000 | $1,000 |

COVERAGE LIMITATIONS MAY APPLY. SEE YOUR POLICY FORM FOR DETAILS.
Please review this declaration page for accuracy. If any changes are needed, contact your agent. Notes: The "FULL RISK PREMIUM" is for this policy term only. It is subject to change annually if there is any change in the rating elements. Your property's NFIP flood claims history can affect your premium, for questions please contact your agency. "MITIGATION DISCOUNTS" may apply if there are approved flood vents and/or the machinery & equipment is elevated appropriately. To learn more about your flood risk, please visit FloodSmart.gov/floodcosts.

**COMPONENTS OF TOTAL AMOUNT DUE**

| | |
|---|---|
| BUILDING PREMIUM: | $1,179.00 |
| CONTENTS PREMIUM: | $752.00 |
| INCREASED COST OF COMPLIANCE (ICC) PREMIUM: | $37.00 |
| MITIGATION DISCOUNT: | ($0.00) |
| COMMUNITY RATING SYSTEM REDUCTION: | ($0.00) |
| FULL RISK PREMIUM: | $1,968.00 |
| ANNUAL INCREASE CAP DISCOUNT: | ($1,527.00) |
| STATUTORY DISCOUNTS: | ($0.00) |
| DISCOUNTED PREMIUM: | $441.00 |
| RESERVE FUND ASSESSMENT: | $79.00 |
| HFIAA SURCHARGE: | $25.00 |
| FEDERAL POLICY FEE: | $47.00 |
| PROBATION SURCHARGE: | $0.00 |
| TOTAL ANNUAL PREMIUM: | $592.00 |

IN WITNESS WHEREOF, we have signed this policy below and hereby enter into this insurance agreement.

Duff Wallace / President
Jhonny Sargent / Secretary

This declarations page along with the Standard Flood Insurance Policy Form constitutes your flood insurance policy.

We appreciate the opportunity to service your flood insurance needs.

Zero Balance Due - This Is Not A Bill

Southern Farm Bureau Casualty Ins. Co. (NAIC 18325)

File: 21192509    Page 1 of 1    DocID: 176273591

Printed 09/17/2022