**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| THE STATE OF LOUISIANA, *et al.,* | CIVIL ACTION NO. |
| | 2:23-CV-01839-DJP-JVM |
| Plaintiff, | |
| | JUDGE DARREL PAPILLON |
| v. | |
| | MAGISTRATE JUDGE JANIS VAN |
| DEPARTMENT OF HOMELAND | MEERVELD |
| SECURITY, *et al.,* | |
| | |
| Defendants. | |

<u>**MEMORANDUM IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ............................................................................................. 1

BACKGROUND .............................................................................................. 5

ARGUMENT ................................................................................................. 11

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS. .......... 11

    A.    Risk Rating 2.0—Equity in Action Is Contrary to Law. ......................... 12

    B.    Risk Rating 2.0—Equity in Action is Arbitrary and Capricious. ............ 17

           1.   *Equity in Action fails to account for important aspects of the*
               *problem.* ............................................................................... 17

           2.   *Equity in Action fails to consider reliance interests.* .......................... 21

           3.   *Equity in Action departs from prior policy.* ........................................ 24

           4.   *Equity in Action is pretextual.* ............................................................ 25

    C.    Equity in Action Failed to Comply with the APA's Notice and Comment
        Requirements. ....................................................................................... 26

    D.    Equity in Action Exceeds FEMA's Statutory Authority. ......................... 29

    E.    Equity in Action Violates the Spending Clause. ..................................... 32

    F.    Equity in Action Violates NEPA. ........................................................... 34

II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION. ....... 36

    A.    Equity in Action Irreparably Harms Parish and Levee District
        Plaintiffs. ............................................................................................... 38

    B.    Equity in Action Irreparably Harms State Plaintiffs. ............................. 40

III.   AN INJUNCTION WOULD NOT HARM DEFENDANTS OR DISSERVE THE PUBLIC
     INTEREST. .............................................................................................. 45

CONCLUSION............................................................................................... 46

# TABLE OF AUTHORITIES

**CASES**

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ................................................................... 27

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
    141 S. Ct. 2485 (2021) ............................................................... 30

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
    522 U.S. 359 (1998) ................................................................... 17

*Azar v. Allina Health Servs.,*
    139 S. Ct. 1804 (2019) ........................................................ 26, 45

*Batterton v. Marshall,*
    648 F.2d 694 (D.C. Cir. 1980) .................................................. 27

*Baylor Univ. Med. Ctr. v. Heckler,*
    758 F.2d 1052 (5th Cir. 1985) .................................................. 27

*Benisek v. Lamone,*
    138 S. Ct. 1942 (2018) ............................................................... 36

*Bennett v. Spear,*
    520 U.S. 154 (1997) ............................................................ 26, 27

*Citizens Against Rails-to-Trails v. Surface Transp. Bd.,*
    267 F.3d 1144 (D.C. Cir. 2001) ................................................ 35

*Dalton v. Specter,*
    511 U.S. 462 (1994) ................................................................... 27

*Daniels Health Sci., LLC v. Vascular Health Scis., LLC,*
    710 F.3d 579 (5th Cir. 2013) .................................................... 45

*Dep't of Com. v. New York,*
    139 S. Ct. 2551 (2019) ............................................................... 25

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020) ............................................................... 21

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ..................................................... 23, 24, 25

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ........................................................ 27

*Ginsberg Sons v. Popkin,*
285 U.S. 204 (1932) ........................................................ 32

*Gregory v. Ashcroft,*
501 U.S. 452 (1991) ........................................................ 30

*Guardian Fed. S & L v. Fed. S & L Ins. Corp.,*
589 F.2d 658 (D.C. Cir. 1978) ........................................ 28

*Indep. U. S. Tanker Owners Comm. v. Lewis,*
690 F.2d 908 (D.C. Cir. 1982) ........................................ 28

*Jifry v. F.A.A.,*
370 F.3d 1174 (D.C. Cir. 2004) ...................................... 27

*King v. Burwell,*
576 U.S. 473 (2015) ........................................................ 30

*League of Women Voters of U.S. v. Newby,*
838 F.3d 1 (D.C. Cir. 2016) ............................................ 45

*Louisiana v. Becerra,*
577 F. Supp. 3d 483 (W.D. La. 2022) ............................. 28

*Louisiana v. Horseracing Integrity & Safety Auth. Inc.,*
617 F. Supp. 3d 478 (W.D. La. 2022) ............................. 27

*Macht v. Skinner,*
916 F.2d 13 (D.C. Cir. 1990) .......................................... 35

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) .......................................................... 17

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012) .................................................. 32, 33

*Opulent Life Church v. City of Holly Springs,,*
697 F.3d 279 (5th Cir. 2012) .......................................... 11

*Pennhurst State Sch. & Hosp. v. Halderman,*
451 U.S. 1 (1981) ...................................................... 32, 33

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
    734 F.3d 406 (5th Cir. 2013) ...................................................... 36, 40

*Sackett v. EPA*,
    No. 21-454, (U.S. 2023) ................................................................ 30

*St. Charles Parish v. FEMA*,
    2:23-cv-01369 (E.D. La. Apr. 25, 2023) ................................. 15, 16

*Texas v. E.P.A.*,
    829 F.3d 405 (5th Cir. 2016) ..................................................... 41, 43

*Texas v. Equal Emp't Opportunity Comm'n*,
    933 F.3d 433 (5th Cir. 2019) ............................................................ 40

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015) .................... 27, 28

*Texas v. Yellen*,
    No. 2:21-cv-079-Z, 2022 WL 989733 (N.D. Tex. Mar. 4, 2022) ...................... 32, 33

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*,
    140 S. Ct. 1837 (2020) .................................................................. 30

*U.S. Telecom Assn. v. FCC*,
    855 F.3d 381 (D.C. Cir. 2017) ........................................................ 29

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ..................................................................... 30

*VanDerStok v. Garland*,
    No. 4:22-cv-691, 2022 WL 4809376 (N.D. Tex. Oct. 1, 2022) .................... 36

*Veasey v. Abbott*,
    870 F.3d 387 (5th Cir. 2017) .......................................................... 40

*Wages & White Lion Invs., LLC v. FDA*,
    16 F.4th 1130 (5th Cir. 2021) ...................................................... 36, 41

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022) .............................................................. 29, 30

**Statutes**

5 U.S.C. § 553 ..................................................................................... 26, 27

5 U.S.C. § 702 ..................................................................................... 27, 38

5 U.S.C. § 706 ........................................................................... 12, 17, 29, 32

42 U.S.C. § 4001 ......................................................................................... 5

42 U.S.C. § 4011 ................................................................................. 4, 6, 12

42 U.S.C. § 4012a ..................................................................................... 28

42 U.S.C. § 4014 ................................................................................ passim

42 U.S.C. § 4015 ................................................................................ passim

42 U.S.C. § 4020 ....................................................................................... 16

42 U.S.C. § 4022 ................................................................................. 32, 33

42 U.S.C. § 4024 ................................................................................... 9, 15

42 U.S.C. § 4101 ......................................................................................... 6

42 U.S.C. § 4102 ................................................................................. 25, 31

42 U.S.C. § 4321 ....................................................................................... 34

42 U.S.C. § 4332 ....................................................................................... 34

**Other Authorities**

*An Evaluation of Risk Rating 2.0 Impacts on National Flood Insurance Program Affordability*, Coalition for Sustainable Flood Insurance 10 (Sept. 2022), https://perma.cc/9UYK-ASJK .............................................................. 14

*Base Flood Elevation*, FEMA (Mar. 5, 2020), https://perma.cc/NA83-TQGJ ........... 22

*Cost of Flood Insurance for Single-Family Homes under Risk Rating 2.0*, FEMA (Apr. 19, 2023), perma.cc/K4NL-Y7M8 ............................ 3, 7, 13, 17, 39

Exec. Order No. 13985, 86 Fed. Reg. 7009 (Jan. 20, 2021) ........................ 10

*FEMA Defines Equity in its Mission of Making Programs More Accessible*, FEMA (Sept. 9, 2021)................................................................................ 10

*FEMA Efforts Advancing Community Driven Relocation*, FEMA (Dec. 2, 2022), https://perma.cc/9J53-Q9F5................................................................ 25

*Flood Insurance and FEMA Assistance*, FEMA (Sept. 30, 2022), https://perma.cc/3S5A-CJFG ........................................................ 28, 29

Flood Insurance Manual, Risk Rating 2.0: Equity in Action Edition (Oct. 2021), bit.ly/3JCVvau................................................................................ 26

*Flood Maps*, FEMA (Mar. 30, 2023), https://perma.cc/YPB7-QHA8 ......................... 3

Greg Larose, *Road Home reaches its end, thousands of lawsuits against recipients pulled*, Louisiana Illuminator (Feb. 16, 2023), https://perma.cc/V5SL-3BC3 ....... 42

Introduction to the National Flood Insurance Program (NFIP), Cong. Res. Servs. (Jan. 6, 2023), https://perma.cc/KS8M-WEPZ ....................................... 18

Letter from Senator Kennedy, et al. to David I. Maurstad, Deputy Associate Administrator, Federal Insurance & Mitigation Administration Resilience (July 27, 2022), https://perma.cc/9DCZ-XG86 ................................................. 36

Letter from the Floodplain Management Division at the Federal Insurance and Mitigation Administration to NFIP Community Officials (Mar. 5, 2019), perma.cc/ZFP4-TT5W ................................................................... 35

Letter to Administrator Criswell from the House Committee on Oversight and Accountability (May 1, 2023) .......................................................... 16

*Mandeville, Louisiana: A City that Stays Afloat by Promoting Elevations*, FEMA (Apr. 17, 2023), https://perma.cc/7B2W-6XXF ....................................... 19

Michael Phillis, *FEMA report: Flood insurance hikes will drive 1M from market*, Associated Press (July 22, 2022), https://perma.cc/JU83-8EX2 .......................... 8

Reauthorization of the National Flood Insurance Program: Improving Community Resilience, Hearing Before the S. Committee on Banking, Housing, and Urban Affairs, 118th Cong. 2 (May 2, 2023) (statement of Carolyn Kousky) ................... 8

Reorganization Plan No. 3 of 1978, §§ 202, 304, 43 Fed. Reg. 41943, 41943–45 (1978) ..................................................................................... 6

*Risk Rating 2.0: Equity in Action*, FEMA (Apr. 2021), perma.cc/V237-Q8UG 3, 12, 17

*Risk Rating 2.0: Equity in Action*, FEMA (June 5, 2023), https://perma.cc/W3R6-93YF..................................................................................................................... 26

*Risk Rating 2.0: Equity in Action*, FEMA (May 22, 2023), https://perma.cc/3BL8-BZUK................................................................................................................ 20, 35

Risk Rating 2.0: Projected Premium Changes by State, Arcgis (last accessed May 31, 2023), perma.cc/4S55-L24L.......................................................................... 7, 13

Staff of Senate Comm. on Banking and Currency, 89th Cong., 2d Sess., Insurance and Other Programs for Financial Assistance to Flood Victims 98–99 (Comm. Print 1966) (report from Robert C. Weaver, Secretary of HUD) (Weaver Report).. 5

*The NFIP Floodplain Management Requirements,* FEMA (last accessed June 14, 2023), https://perma.cc/NS9R-AN4C ...................................................................... 14

## Regulations

12 C.F.R. § 22.7(a)............................................................................................... 28, 38

40 C.F.R. § 1502.3 ..................................................................................................... 34

40 C.F.R. § 1502.9 ..................................................................................................... 34

40 C.F.R. § 1508.1(d) ............................................................................................... 34

44 C.F.R. § 59.22 ....................................................................................................... 32

## Constitutional Provisions

U.S. Const. art. I, § 8 ............................................................................................... 32

**INTRODUCTION**

The Federal Emergency Management Agency's (FEMA's) new approach to flood insurance amounts to nothing more than a classic bait-and-switch. First, the bait. Congress requires flood insurance for almost all properties located in FEMA-designated Special Flood Hazard Areas (SFHAs). This requirement applies to nearly 15 million people and 7.8 million properties and is the result of conditions Congress placed on federally guaranteed mortgages, loans from the U.S. Small Business Association (SBA), and federal disaster mitigation or recovery grants. Because most people accept some form of federally backed financial assistance for their SFHA property, most people are required to obtain flood insurance.[1] But there was a problem with this requirement: private flood insurance was then (and continues to be) prohibitively expensive. Congress solved that problem with the National Flood Insurance Act, promulgated to make flood insurance available, affordable, and appealing to communities in exchange for enacting and enforcing FEMA's land-use regulations.

Over the past 50 years, FEMA has encouraged individuals, communities, and governmental entities to join the National Flood Insurance Program (NFIP). Those stakeholders have rested their decisions to join on what they believed was a fixed point: the National Flood Insurance Act's promise of affordable insurance. Relying on

---

[1] Dkt. 1-1, GOHSEP Dec. ¶ 36 (describing the mandatory flood insurance requirement for those who obtain federal grants); Dkt. 1-46, Home Builders Ass'n Dec. ¶¶ 6-8 (noting that 78% of property buyers finance the purchase of their property with a mortgage and these individuals must purchase flood insurance); Dkt. 1-48, La. Floodplain Mgmt. Ass'n Dec. ¶ 9-10 (describing the mandatory purchase requirement for federal grants, disaster relief recipients, and SBA loan recipients); Dkt. 1-49, Miller Home Mortgage Dec. ¶¶ 5-9 (noting that 63% of current homeowners have a mortgage on their home and those that are federally backed must purchase flood insurance).

that promise, stakeholders built their communities and lives around their expectation that FEMA would make good on Congress' promise. Stakeholders passed and enforced FEMA's land-use regulations—regulations required not only to join the program and make coverage available in the region, but also for the community as a whole to remain in the program whenever FEMA changed those regulations. Stakeholders bought property and built their homes and businesses. Stakeholders invested millions in mitigation efforts, seeking to maximize efforts to prevent flooding at the outset and minimize potential harms from flooding down the road. Those mitigation efforts resulted in lower flood risks, which FEMA rewarded in the form of lower insurance premiums that, in turn, encouraged new development.

Those stakeholders' decisions—made at FEMA's urging—have created a sprawling national program that reaches into the legislature of nearly every State and local government that has flood-prone areas and into nearly every home and small business in those areas. As of 2020, more than 5 million Americans, in 22,600 communities across the United States, had purchased flood insurance through FEMA's program.

FEMA used rate maps to communicate flood risk and premium rates to its stakeholders and would-be stakeholders. FEMA wanted community members to use its flood maps "to make informed decisions about where to live, what to build, and how to protect their family, homes, and businesses" and community governments to use FEMA's maps "to plan development and make infrastructure improvements" and

"decide how to reduce their risk in ways that work best for all." *Flood Maps*, FEMA (Mar. 30, 2023), https://perma.cc/YPB7-QHA8.

Then came the switch. In 2021, FEMA rolled out "Risk Rating 2.0—Equity in Action," completely overhauling its prior methodology for calculating insurance premiums. FEMA claimed that the new methodology would "deliver rates that are equitable, easier to understand and better reflect a property's individual flood risk." *Risk Rating 2.0: Equity in Action*, FEMA (Apr. 2021), perma.cc/V237-Q8UG. For a majority of policyholders nationwide, and nearly all policyholders in Louisiana, Equity in Action resulted in dramatically higher premiums. Approximately 90% of Louisiana ratepayers subject to increased flood insurance premiums can expect to see their rates more than double—and often increase fivefold or more—within ten years. *See Cost of Flood Insurance for Single-Family Homes under Risk Rating 2.0*, FEMA (Apr. 19, 2023), https://perma.cc/K4NL-Y7M8, FEMA Exhibit 3. Property owners who were paying $572 per year will soon be paying $6,461 per year. Dkt. 1-53, S. Bourgeois Dec. ¶¶ 17, 25. Many now must decide whether they can even afford flood insurance, and many communities are now questioning whether they can justify large-scale mitigation efforts that the program's affordable rates used to encourage. In short, communities will soon be hollowed out by the unavailability of affordable flood insurance. And they are doubting whether they would have imposed on themselves the land-use regulations required to gain access to the program if they had known this would happen.

Making matters worse, FEMA imposed this senseless new program without showing its work. It failed to reveal its methodology, its formula, or its input data, and it declined to give stakeholders notice or an opportunity to comment. Instead, FEMA simply started recalculating insurance premiums and notifying longstanding policyholders of their new premiums by mail. Everyone is left scratching their heads at the sharply higher rates, even in areas with relatively low risk.

Equity in Action is an insurance program that appears untethered from sound actuarial principles. Under it, flood insurance rates have become too expensive for the very people who need flood insurance the most. Equity in Action departs from FEMA's statutory mandate and violates the law. By statute, FEMA is "authorized" to create an insurance program that "enable[s]" people "to purchase insurance," 42 U.S.C. § 4011(a), and the flood insurance that FEMA offers must match that authorization. FEMA's flood insurance must be, insofar as practicable, "adequate" or "consistent with the objective of making flood insurance available where necessary at reasonable rates so as to encourage prospective insureds to purchase such insurance." *Id.* § 4015(b)(2). FEMA must also set rates that reflect "flood mitigation activities" and that are "based on a consideration of the respective risks involved, including differences in risks due to land use measures, flood-proofing, flood forecasting, and similar measures." 42 U.S.C. §§ 4014(a)(1)(A)(ii), 4015(b)(1).

But under Equity in Action, FEMA has increased rates and discouraged the purchase of flood insurance where coverage is *most* necessary, all while failing to consider individual and community-wide flood mitigation efforts and how those efforts

reduce risk. The agency has also flouted statutory disclosure mandates; arbitrarily and capriciously failed to consider crucial factors, failed to account for reliance interests, departed from prior policy without justification, and pretextually raised rates to advance an unrelated agenda; unlawfully bypassed notice and comment; exceeded its statutory authority; violated the Spending Clause; and violated the National Environmental Policy Act (NEPA).

The new program irreparably injures states, parishes, levee districts, chambers of commerce, small companies, large companies, insurance groups, homebuilder associations, and individual homeowners alike because it unjustly raises the cost of flood insurance, discourages people from obtaining flood insurance, frustrates mitigation efforts, and pushes people away from the communities they call home. Accordingly, this Court should enjoin Equity in Action.

## BACKGROUND

In 1968, Congress enacted the National Flood Insurance Act to address concerns that the private insurance industry was ill equipped to offer flood insurance on a national scale. 42 U.S.C. § 4001. The report to Congress that formed the basis for the Act explained that the market for flood insurance was unsustainable. *See* Staff of Senate Comm. on Banking and Currency, 89th Cong., 2d Sess., *Insurance and Other Programs for Financial Assistance to Flood Victims* 98–99 (Comm. Print 1966) (report from Robert C. Weaver, Secretary of HUD) (Weaver Report). On the supply side, private insurers did not believe they had an adequate actuarial basis for providing coverage. *Id.* On the demand side, people simply didn't want to purchase flood insurance. *Id.* Even if private insurers offered flood insurance, those who needed insurance the

most—those in high-risk areas—would have been unable to obtain coverage because it was too costly. *Id.*

FEMA soon assumed responsibility for implementing the NFIP. *See* Reorganization Plan No. 3 of 1978, §§ 202, 304, 43 Fed. Reg. 41943, 41943–45 (1978). Congress "authorized" FEMA "to establish and carry out a national flood insurance program which will enable interested persons to purchase insurance." 42 U.S.C. § 4011(a). Then Congress required FEMA to "prescribe" premium rates that, "insofar as practicable," are "consistent with the objective of making flood insurance available where necessary at reasonable rates so as to encourage prospective insureds to purchase such insurance." *Id.* § 4015(a), (b)(2). As a result, NFIP is the primary source of flood insurance coverage for residential and small business properties in the United States.

FEMA establishes and maps "flood hazard areas and flood-risk zones," which are regularly reviewed and updated. 42 U.S.C. § 4101. FEMA distributes this information in the form of Flood Insurance Rate Maps—or "FIRMs"—which designate areas as high risk or low risk. This designation is one of several factors that determines the amount of a policyholder's premium. As part of its risk analysis, FEMA also considers the effectiveness of flood risk reduction systems like levees. Historically, the agency rewarded those projects in the form of lower premiums, aiming to encourage upfront investment to reduce downstream costs resulting from flood damage. *See* Ex. 1, La. Dep't of Ins., ¶ 18 (noting that payment from an NFIP policy is over ten times that of a FEMA recovery grant). After all, Congress requires that the rates

reflect the reduction in risk from those mitigation efforts. 42 U.S.C. §§ 4014(a)(1)(A)(ii), 4015(b)(1).

In addition, FIRM designations determine whether an individual is required by law to purchase flood insurance. Because of the effect FIRM designations have on policyholders, historically, FEMA has collaborated with stakeholders to develop the FIRMs. In addition, FEMA provided a clear avenue for appealing a FIRM determination. Equity in Action turns this process on its head. It replaces the previously sensible and affordable rates with a black-box methodology that results in astronomically high rates. In Louisiana, even FEMA's own estimates project that 79.5% of policyholders will see an immediate premium increase. Risk Rating 2.0: Projected Premium Changes by State, Arcgis (last accessed May 31, 2023), perma.cc/4S55-L24L. Within some communities in Louisiana, homeowners will see an average increase of over 750%. *Cost of Flood Insurance for Single-Family Homes under Risk Rating 2.0*, FEMA (Apr. 19, 2023), perma.cc/K4NL-Y7M8, FEMA Exhibit 3. Under Equity in Action, policies that long cost $1,000 will increase each year until they reach $7,500.

The effect of FEMA's change in policy is to kick people out of the flood insurance program and leave them uninsured. In fact, NFIP's participation has already fallen in the past year, with some reports of a 20% reduction in participation due to the implementation of Equity in Action—even though the cost increases are spread over ten years and so have only just begun. *See* Reauthorization of the National Flood Insurance Program: Improving Community Resilience, Hearing Before the S. Com-

mittee on Banking, Housing, and Urban Affairs, 118th Cong. 2 (May 2, 2023) (statement of Carolyn Kousky) ("For those not mandated to purchase flood coverage, many will drop their flood coverage."). FEMA itself admitted to the Treasury Department that it expects one million or more NFIP policyholders to drop their NFIP coverage by the end of the decade as the result of Equity in Action. Michael Phillis, *FEMA report: Flood insurance hikes will drive 1M from market*, Associated Press (July 22, 2022), https://perma.cc/JU83-8EX2.

The new rates do not account for actual risk. For example, FEMA long rewarded mitigation efforts, recognizing that levee systems, elevation of homes and businesses, and other projects could lower the risk of flood damage and therefore justified lower rates. *See, e.g.*, Dkt. 1-36, N. Lafourche Conservation Levee and Drainage Dist. Dec. ¶ 11; Dkt. 1-50, Morganza Action Coal. Dec. ¶ 9. Those mitigation efforts significantly reduced the damage that resulted from flood events. *Id.*; *see also* Dkt. 1, ¶¶ 123-26. And FEMA's rates were required by statute to reflect that reduction in risk. 42 U.S.C. §§ 4014(a)(1)(A)(ii), 4015(b)(1). Equity in Action, though, no longer rewards or reasonably accounts for those mitigation efforts. *See* Dkt. 1-52, SouthGroup Ins. Servs. Dec. ¶¶ 22-23, 25; Dkt. 1-36, N. Lafourche Conservation Levee and Drainage Dist. Dec. ¶ 31; Dkt. 1-27, St. Mary Parish Dec. ¶ 32-33; Dkt. 1-53, S. Bourgeois Dec. ¶¶ 8-9, 36.

Equity in Action also abandons FEMA's grandfathering policy that protected people who bought their homes in reliance on FEMA's flood risk maps. Before Equity in Action, FEMA honored existing NFIP policies, which helped maintain stability in

the insurance system and marketability values of homes. *See* Dkt. 1-41, Ass'n of Levee Bds. La. Dec. ¶ 18. When a map change increased rates, the grandfathering policy would protect existing policyholders by keeping their rates steady, despite the mapping change. When a map change designated a property as being in an SFHA—which requires mandatory flood insurance—the grandfathering policy would shield those policies from dramatic rate increases. Policyholders subject to map changes could also appeal those changes under the old system.

As a result of Equity in Action, grandfathering is over. The flood insurance policies that previously benefitted from the grandfathering policy will now transition to their full risk premium at an escalation of 18% per year. And those who suddenly find themselves located in an SFHA have no choice but to acquiesce to these rate increases on their mandatory flood insurance. While the appeals process for map changes is still available, it is now almost meaningless because rates aren't tied to the maps.

Furthermore, Equity in Action was concocted without input from key state and local officials, who historically have been involved in the collaborative development of FIRMs. *See* 42 U.S.C. § 4024 (requiring FEMA to "consult with … State, and local agencies having responsibilities for flood control, flood forecasting, or flood damage prevention, in order to assure that the programs of such agencies and the flood insurance program authorized under this chapter are mutually consistent."). Throughout Equity in Action's development, those officials have sought information from FEMA about the methodology and data behind the calculations, but FEMA has refused to

divulge much information. *See* Dkt. 1, ¶¶ 22-25. When FEMA rolled out the final product, the agency still failed to disclose how it calculated premiums, including how it analyzed certain risk factors and rewarded prior mitigation efforts. Now, more than a year after Equity in Action's implementation began, those affected by the program have no more information than when FEMA first introduced it, except now they are seeing skyrocketing insurance premiums. And the higher prices have already caused hundreds of thousands of policyholders to not renew their coverage, a trend that will continue absent legal intervention.

After announcing its new program, FEMA updated its definition of "Equity" to mirror the definition set forth in Executive Order 13985, entitled "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government." *See FEMA Defines Equity in its Mission of Making Programs More Accessible*, FEMA (Sept. 9, 2021). Under that Executive Order, agencies like FEMA must consider factors like race, ethnicity, religion, income, geography, gender identity, sexual orientation, and disability when issuing rules and guidance. Exec. Order No. 13985, 86 Fed. Reg. 7009 (Jan. 20, 2021). FEMA confirmed it was "integrating equity" as defined by that Executive Order "into everything we do." *See FEMA Defines Equity in its Mission of Making Programs More Accessible*, FEMA (Sept. 9, 2021).

Plaintiffs—the State of Louisiana and nine other States, forty-three parishes, eleven levee districts, two municipalities, and a drainage district—respectfully move this Court to preliminarily enjoin Equity in Action.

## ARGUMENT

To obtain a preliminary injunction, Plaintiffs "must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 288 (5th Cir. 2012). Each factor weighs in Plaintiffs' favor.

## I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

Equity in Action violates the APA in several ways. First, Equity in Action is contrary to law because it escalates flood insurance rates, fails to consider mitigation efforts and their reduction in risk, discourages participation in the program, ignores the input of state and local officials, and hides its methodology and data behind a cloak of secrecy. Second, Equity in Action is arbitrary and capricious. It ignores important aspects of the problem, fails to consider the reliance interests at stake, fails to acknowledge its departure from decades-long policy, and is a pretext to allow FEMA to press unrelated policy goals under the guise of revamping the flood insurance program. Third, Equity in Action unlawfully ignored the APA's notice and comment requirements. Fourth, Equity in Action exceeds FEMA's statutory authority, allowing the agency to do indirectly what Congress prohibits it from doing directly without cooperation from the States. Fifth, Equity in Action changes the terms of the agreements with States and violates the Spending Clause. Finally, Equity in Action ignores other important statutory frameworks like NEPA.

## A. Risk Rating 2.0—Equity in Action Is Contrary to Law.

Courts must "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2). Equity in Action is contrary to law in three independent ways.

<u>First</u>, Congress "authorized" FEMA to create an insurance program that "enable[s] interested persons to purchase insurance" and mandated that FEMA's rates must be "consistent with the objective of making flood insurance available where necessary at reasonable rates so as to encourage prospective insureds to purchase such insurance." 42 U.S.C. §§ 4011(a), 4015(b)(2). That is the program's central mandate and the entire reason why Congress charged FEMA with administering this program in the first place. Unless "impracticable" to achieve, FEMA must make flood insurance affordable where it is needed. *Id.* § 4015(b). FEMA's responsibility to set rates that "provide reserves for anticipated losses" must give way to its responsibility to make insurance "available . . . at reasonable rates" when the amount needed to provide reserves is "less than [the] amount" needed to make insurance available at reasonable rates. *Id.* § 4015(b)(2).

It is hard to imagine an insurance program more inconsistent with Congress' mandate than Equity in Action. Equity in Action makes flood insurance impossible to afford where it is most needed. FEMA's own press releases show that insurance premiums will increase for 77% of all homeowners. *Risk Rating 2.0: Equity in Action*, FEMA (Apr. 2021), perma.cc/V237-Q8UG. In Louisiana specifically, upwards of 79% of policyholders will see an immediate premium increase. Risk Rating 2.0: Projected Premium Changes by State, Arcgis (last accessed May 31, 2023), perma.cc/4S55-

L24L. And in some communities, the rates will experience an average increase of 1097%. *See Cost of Flood Insurance for Single-Family Homes under Risk Rating 2.0*, FEMA (Apr. 19, 2023), perma.cc/K4NL-Y7M8, FEMA Exhibits 3, 4. Many communities in Louisiana where flood insurance is most necessary—where flood damage is common and private insurers do not offer affordable rates—will see *average* increases of over 100%, over 500%, or even over 1,000%. *Id.*

Even more modest increases are already wreaking havoc on communities, which were barely getting by on preexisting rates. For example, Russell Hebert has seen his premiums nearly double since Equity in Action was imposed. Dkt. 1-54, Hebert Dec. ¶¶ 19-21. Mr. Hebert is disabled, on a fixed income, and simply trying to remain in his family home of 51 years. He doesn't believe he will be able to renew his flood insurance on the house his family has called home for the last five decades. *Id.* ¶¶ 34-35. Because of the increased premiums, he is being forced to consider options he never would have considered before—defaulting on his mortgage or declaring bankruptcy. *Id.* ¶¶ 32-33. Local communities, too, are struggling to recruit or attract workers to fill job openings because housing is not affordable because of high flood insurance rates. Dkt. 1-47, Houma-Terrebonne Chamber of Commerce Dec. ¶¶ 16-17; Dkt. 1-43, Terrebonne Econ. Dev. Auth. Dec. ¶¶ 32-34; Ex. 6, S. Cent. Indus. Ass'n, ¶ 10.

FEMA itself acknowledges that Equity in Action's higher rates will chase away 20% of NFIP policyholders in the first 10 years of the program. *See An Evaluation of*

*Risk Rating 2.0 Impacts on National Flood Insurance Program Affordability*, Coalition for Sustainable Flood Insurance 10 (Sept. 2022), https://perma.cc/9UYK-ASJK. But FEMA doesn't have to wait 10 years to see the fallout; Equity in Action has already caused hundreds of thousands of policyholders to leave the program. *Id.* In short, Equity in Action fails to do the things that Congress told FEMA to do: enable people to purchase flood insurance, make flood insurance available at reasonable rates, and encourage participation in the flood insurance program—and to give those mandates priority over covering anticipated losses. Equity in Action is therefore contrary to law.

Second, the law requires FEMA to set rates that reflect "flood mitigation activities" and that are "based on a consideration of the respective risks involved, including differences in risks due to land use measures, flood-proofing, flood forecasting, and similar measures." 42 U.S.C. §§ 4014(a)(1)(A)(ii), 4015(b)(1). Prior to Equity in Action, FEMA's rates reflected those mitigation activities in a transparent, understandable way. *See, e.g.*, Dkt. 1-36, N. Lafourche Conservation Levee and Drainage Dist. Dec. ¶ 20; Dkt. 1-55, Scott Dec. ¶ 5; Dkt. 1-50, Morganza Action Coal. Dec. ¶ 3. And FEMA publicly acknowledged that mitigation activities "work," annually "help[ing] to prevent more than $1 billion in flood damages." *The NFIP Floodplain Management Requirements,* FEMA (last accessed June 14, 2023), https://perma.cc/NS9R-AN4C.

But after Equity in Action, it is no longer clear whether FEMA considers local flood-mitigation activities—like enacting FEMA's own land-use regulations, building levees, and elevating homes and businesses—or what role those activities might play

in FEMA's calculations. Whatever consideration FEMA gives to local mitigation activities, it is clear that the new rates do not adequately reflect the substantial decrease in flood risk that those activities provide. *See* Dkt. 1-52, SouthGroup Ins. Servs. Dec. ¶¶ 22-23, 25: Dkt. 1-36, N. Lafourche Conservation Levee and Drainage Dist. Dec.¶ 31; Dkt. 1-27, St. Mary Parish Dec. ¶¶ 32-33; Dkt. 1-56, D. Bourgeois Dec. ¶¶ 8-9, 36. Equity in Action's failure to adequately reflect those decreased risks is contrary to law.

Third, FEMA must "consult with … State[] and local agencies having responsibilities for flood control, flood forecasting, or flood damage prevention, in order to assure that the programs of such agencies and the flood insurance program authorized under this chapter are mutually consistent." 42 U.S.C. § 4024. Historically, FEMA has consulted with local officials to create FIRMs in order to incorporate all relevant information and communicate accurate flood risk information to the communities. *See, e.g.*, Dkt. 1-36, N. Lafourche Conservation Levee and Drainage Dist. Dec.¶¶ 14-18 (describing history of collaboration); Dkt. 1-27, St. Mary Parish Dec. ¶¶ 6-7, 43-44 (describing partnership between St. Mary Parish and FEMA); Dkt. 1-50, Morganza Action Coal. Dec. ¶ 10 (explaining FEMA's failure to consult).

But over the past several years, various state officials repeatedly have asked FEMA for information about Equity in Action to no avail. *See id.*; *see also* Complaint, *St. Charles Parish v. FEMA*, 2:23-cv-01369, Dkt. 1 (E.D. La. Apr. 25, 2023); Dkt. 1-52, SouthGroup Ins. Servs. Dec. ¶ 19-20; Dkt. 1-36, N. Lafourche Conservation Levee and Drainage Dist. Dec. ¶¶ 21, 40; Letter to Administrator Criswell from the House

Committee on Oversight and Accountability (May 1, 2023) (describing the lack of transparency). In fact, the law prohibits FEMA from raising rates in certain parishes in Louisiana—many of which are plaintiffs here—to match "additional flood hazards as a result of the construction or operation of the Atchafalaya Basin Levee System." 42 U.S.C. § 4014(d). But FEMA's refusal to provide information about Equity in Action makes it impossible for state or parish officials to know what role the Atchafalaya Basin Levee System might play in Equity in Action's new calculations or whether Equity in Action complies with that statutory prohibition.

Fourth, FEMA must "from time to time . . . make information and data available to the public, and to any State or local agency or official." 42 U.S.C. § 4020. Contrary to that command, FEMA at every turn has stonewalled state and local officials and organizations seeking this information. *See, e.g.*, Dkt. 1-36, N. Lafourche Conservation Levee and Drainage Dist. Dec.¶ 20; Dkt. 1-27, St. Mary Parish Dec., ¶ 43; Dkt. 1-50, Morganza Action Coal. Dec. ¶ 10; *see also St. Charles Parish v. FEMA*, 2:23-cv-01369 (filed Apr. 25, 2023 E.D. La.) (challenging FEMA's withholding of documents under FOIA).

Equity in Action flouts four foundational statutory mandates, raising rates to draconian levels. In so doing, Equity in Action seems to actively discourage individuals from purchasing insurance, a fact illustrated by the mass exodus of policyholders from the program. And while FEMA has made abundantly clear that flood insurance rates have already risen and will continue to rise, it has failed to disclose how those

rates will be calculated, shielding the input data and methodology from the public and from state and local officials.

## B. Risk Rating 2.0—Equity in Action is Arbitrary and Capricious.

A court must set aside any agency action that is arbitrary or capricious. 5 U.S.C. § 706(2)(A). To clear this statutory hurdle, agencies must engage in "reasoned decisionmaking." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). Equity in Action must be set aside because it fails to account for important aspects of the problem, it ignores reliance interests, it fails to acknowledge its dramatic departure from prior policy, and it rests on a pretextual basis. Each of these reasons is an independent basis for setting aside the agency's decision.

### 1. *Equity in Action fails to account for important aspects of the problem.*

An action is arbitrary and capricious if it fails to take into account important aspects of the problem. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). FEMA failed to account for multiple important aspects of the flood insurance problem.

<u>First</u>, the agency failed to consider the skyrocketing costs generated by the new policy. As explained above, a vast majority of policyholders have seen or are about to see an increase to their insurance premiums when their first renewal under Equity in Action arrives. *Risk Rating 2.0: Equity in Action*, FEMA (Apr. 2021), perma.cc/V237-Q8UG. In some communities in Louisiana, those increases are well over 1,000%, jumping from $673 to $8,058. *See Cost of Flood Insurance for Single-*

*Family Homes under Risk Rating 2.0*, FEMA (Apr. 19, 2023), perma.cc/K4NL-Y7M8, FEMA Exhibits 3, 4.

While this has a disproportionate impact on low-to-moderate-income home-owners or would-be homeowners, its effect reaches much more broadly. Dkt. 1-51, S. Shore Recovery Coal. Dec. ¶ 17. By pressing forward with Equity in Action, knowing that those extraordinary increases will occur, FEMA ignores a critical aspect of the problem. After all, making flood insurance affordable was the program's impetus. *See* Weaver Report, *supra*, at 98–99.

Second, the agency failed to consider the natural and predictable outcome of pushing rates through the roof: a mass exodus from the flood insurance program. That mass exodus, in fact, has already begun. Again, Congress' central purpose in creating the program in the first place was to enable and encourage property owners in flood-prone areas to obtain flood insurance, which was unavailable or unaffordable for most. *Id*. The NFIP is funded, in part, by premiums, fees, and surcharges paid by NFIP policyholders. Introduction to the National Flood Insurance Program (NFIP), Cong. Res. Servs. (Jan. 6, 2023), https://perma.cc/KS8M-WEPZ. Thus, high participa-tion is key to the program's success—it disperses the risk across a more diverse group of policyholders and ensures that there is enough money in the program to pay out claims as they arise. Equity in Action fails to consider the predictable problems asso-ciated with losing 20% or more of its policyholders, including lost mitigation efforts.

Third, the agency failed to consider how its refusal to reward mitigation efforts increases the risk of flood damage. Previously, FEMA rewarded mitigation efforts,

recognizing that levee systems, elevation, and other projects could lower the risk of flood damage, even in higher risk areas. *See, e.g.*, Dkt. 1-36, N. Lafourche Conservation Levee and Drainage Dist. Dec.; Dkt. 1-55, Scott Dec. ¶ 5; Dkt. 1-50, Morganza Action Coal. Dec. ¶ 3. And those mitigation efforts significantly reduced the damage that resulted from flood events. *See e,g.*, Dkt. 1, ¶¶ 184-213. FEMA itself recognizes this, touting the success of elevation projects in the City of Mandeville prior to Hurricane Ida. *Mandeville, Louisiana: A City that Stays Afloat by Promoting Elevations*, FEMA (Apr. 17, 2023), https://perma.cc/7B2W-6XXF. Equity in Action, though, appears to offer very little discount for elevation, and it's not clear how it values other mitigation efforts. *See* Dkt. 1-52, SouthGroup Ins. Servs. Dec. ¶¶ 22-23, 25: Dkt. 1-36, N. Lafourche Conservation Levee and Drainage Dist. Dec.¶¶ 29, 31; Dkt. 1-27, St. Mary Parish Dec. ¶ 36; Dkt. 1-56, D. Bourgeois Dec. ¶¶ 21, 36. This has already caused—and will continue to cause—individuals and communities to bypass mitigation opportunities, which in turn will result in greater damages. FEMA thus appears to recognize the success of mitigation while simultaneously discouraging individuals and communities from mitigating.

Fourth, the agency failed to consider how Equity in Action hollows out crucial American industries. For example, in Terrebonne Parish, the oil and gas industry employs more than 5,000 individuals and supports 93,000 miles of pipeline. Dkt. 1-43, Terrebonne Econ. Dev. Auth. Dec. ¶ 8. This is part of the network that is the State's largest industry and one of the Country's top producers of crude oil and natural gas. *Id.* ¶ 9. Those refineries make up 18% of the Country's total capacity. *Id.* In

addition, Terrebonne Parish is home to a large seafood industry, bringing in the Country's second-largest volume of seafood, second only to Alaska. *Id.* ¶ 10. Those industries are necessarily located along the coast, and Equity in Action drives away the employees those industries must have to continue operations. Driving away employees harms not only those industries but also the local, state, and national economies. *Id.* ¶¶ 33-36.

<u>Fifth</u>, FEMA failed to consider how Equity in Action will affect individuals and families who make low-to-moderate incomes. Dkt. 1-51, S. Shore Recovery Coal. Dec. ¶ 17. For example, landlords in FEMA-designated SFHAs—where obtaining and maintaining flood insurance is a requirement of all federally insured mortgages, SBA loans, and federal disaster mitigation or recovery funds—are often subject to those requirements to purchase flood insurance, which they pass along to their tenants in the form of higher rent. Premium increases are similarly passed along to those tenants, who—by definition—are not homeowners and don't have independent policies.

<u>Sixth</u>, FEMA considered inappropriate factors that exacerbate the problems explained above. While FEMA refuses to show the ingredients it used to cook up Equity in Action, the agency reports that its model considers hypothetical future events to evaluate the risk a property actually faces today. *Risk Rating 2.0: Equity in Action*, FEMA (May 22, 2023), https://perma.cc/3BL8-BZUK. By using this type of model, the agency made assumptions about hypothetical climate change events and concluded that those imagined future events raise the present risk of flooding. Congress did not

give the agency that authority. Instead, it instructed the agency to consider the risk based on accepted actuarial principles using historical data. 42 U.S.C. § 4015(b)(5).

2. *Equity in Action fails to consider reliance interests.*

An agency also must set aside an action that fails to consider the reliance interests of those affected by it. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). Under FEMA's prior methodology, the agency honored existing NFIP policies through grandfathering, which helped maintain stability in the insurance system and the marketability values of homes. *See* Dkt. 1-41, Ass'n of Levee Bds. La. Dec. ¶18. When a map change under the old system resulted in higher insurance rates, the grandfathering policy protected policyholders by keeping their rates steady, despite the mapping change. Under Equity in Action, those policies will steadily increase to the new full premium rates, which are unaffordable to many policyholders even before they reach their full premium rate. *See generally* Dkt. 1-53, S. Bourgeois Dec. (explaining that he will soon no longer be able to afford flood insurance); Dkt. 1-54, Hebert Dec. (same); Dkt. 1-57, Theriot Dec. (same). Those with grandfathered policies relied on those rates in their decisionmaking—from choosing to undertake mitigation efforts to choosing to accept certain disaster assistance. *See* Dkt. 1, ¶ 159; Dkt. 1-27, St. Mary Parish ¶¶ 27-31; Dkt. 1-36, N. Lafourche Conservation Levee and Drainage Dist. Dec. ¶¶ 32-33; Dkt. 1-46, Home Builders Ass'n Dec. ¶¶ 15-17. The agency was required to consider the strength of these reliance interests and weigh them against any countervailing policy interests. *Dep't of Homeland Sec. v. Regents*, 140 S. Ct. at 1914. FEMA did not.

Policyowners also relied on the predictable, known reduction in rates that FEMA promised if they elevated their homes above the base flood elevation—the elevation of surface water with a 1% chance of occurring in any given year—that FEMA's maps set for their area. *Base Flood Elevation*, FEMA (Mar. 5, 2020), https://perma.cc/NA83-TQGJ. Relying on FEMA's promise, policyowners invested tens and sometimes hundreds of thousands of dollars to elevate their homes above the base flood elevation, only to have the rug pulled out from underneath their investment by Equity in Action. *See, e.g.*, Dkt. 1-55, Scott Dec. ¶ 16 (noting that an elevated home in Mandeville, Louisiana, built three feet above the base flood elevation saw a premium increase of 794%).

In addition, communities relied on FEMA's promise that (1) passing and enforcing FEMA's land-use regulations required for entry into the NFIP would make affordable flood insurance available to their residents and (2) undertaking additional mitigation efforts would lower their insurance rates. When FEMA said, "Elevate," the communities asked, "How high?" And they did so with the understanding that the investments they made today would be rewarded in the form of affordable insurance through the NFIP for their residents.

No community illustrates this bait-and-switch more so than Plaquemines Parish. Plaquemines Parish, like all NFIP communities, passed FEMA's land-use regulations to gain access to the program so that its residents could purchase what were promised to be affordable NFIP policies. But once a community passes the required

land-use regulations, FEMA can come back and unilaterally require the community to pass additional regulations to stay in the program.

For Plaquemines Parish to remain in the Program, FEMA unilaterally required the Parish to pass an onerous land-use ordinance (1) prohibiting development of any structure unless the structure is elevated above the base flood elevation and (2) requiring the Parish to enforce the elevation requirement before giving residents the necessary permit to connect their structure to electricity. Dkt. 1-22, Plaquemines Dec. ¶ 53. In other words, FEMA conditioned the Parish's NFIP participation—and therefore also its residents ability to qualify for disaster mitigation or recovery grants—on leaving its community members in the dark without air conditioning or refrigeration just because they cannot afford the tens and often hundreds of thousands of dollars it would take to elevate their homes.

The promise of affordable rates through the NFIP was the bait for the Parish to adopt and enforce that regulation. And the switch? Equity in Action no longer uses the Base Flood Elevation standard to assess risk. Dkt. 1, ¶ 204; *see also* Dkt. 1-51, S. Shore Recovery Coal. Dec. ¶ 25. Individuals who undertake the costly burden of elevating their structures to reduce risks are "rewarded" with even higher insurance premiums. *See* Dkt. 1-46, ¶¶ 12-15; Dkt. 1-55, Scott Dec. ¶ 16.

FEMA knew that its prior rating system had "engendered" the vast national network of "serious" interconnecting "reliance interests" described above. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). After all, FEMA was the one that encouraged or even required those reliance interests as a condition of participating

in the NFIP. But rather than giving the "reasoned explanation [that] is needed," *id.* at 516, FEMA actively plugged its ears to public input and refused to tell anyone exactly what it considered in adopting Equity in Action. FEMA willfully ignored the Supreme Court's admonition that "[i]t would be arbitrary or capricious to ignore such matters." *Id.* at 515.

### 3. *Equity in Action departs from prior policy.*

An agency cannot depart from prior policy without sufficient justification. *Id.* at 515. A reasoned explanation requires the agency to "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *Id.* As explained above, FEMA significantly departed from its prior policy in a number of ways. To begin with, the agency didn't consult with state or local officials at the outset, and it failed to uphold its prior practice of grandfathering existing policies.

More than that, though, FEMA has cloaked the risk-rating formula for Equity in Action in secrecy. Yet what can be readily discerned is that Equity in Action completely and fundamentally changes the method by which FEMA calculates insurance premiums. It is obvious that FEMA, under Equity in Action, has stopped counting certain mitigation efforts when calculating the premium. For example, FEMA hasn't considered certain levee systems, *see, e.g.*, Dkt. 1-41, Ass'n of Levee Bds. La. Dec. ¶¶ 26-27, and Equity in Action no longer uses the Base Flood Elevation standard to assess risk. Dkt. 1, ¶ 204. Equity in Action now uses First Floor Height, which is the difference between the top first floor and the lowest adjacent grade. Dkt. 1-51, S. Shore Recovery Coal. Dec. ¶ 25. This means that an individual could have elevated

his or her structure—something that would result in lower premiums under the old methodology—and actually see an increase in the premium. *Id.*

This change marks a significant departure from FEMA's prior methodology, and FEMA fails to acknowledge, let alone explain the "good reasons" for, the new policy. *Fox Television*, 556 U.S. at 515.

### 4. *Equity in Action is pretextual.*

Finally, an agency action is arbitrary and capricious if "it rest[s] on a pretextual basis." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019). Here, FEMA claimed to impose Equity in Action to modernize its risk-rating formula in accordance with its statutory obligations. In reality though, FEMA seeks to drive Americans out of homeownership in certain areas. *See FEMA Efforts Advancing Community Driven Relocation*, FEMA (Dec. 2, 2022), https://perma.cc/9J53-Q9F5. While simultaneously calling for "community-driven relocation," particularly in coastal communities, FEMA has raised insurance rates beyond what people can afford. *See id.* FEMA cannot do indirectly what the law prohibits it from doing directly by forcing people to leave their homes and communities. *See* 42 U.S.C. § 4102(c)(2) (giving FEMA authority to encourage States to "guide the development of proposed construction away from locations which are threatened by flood hazards"). FEMA's explanation calling for an updated formula is "incongruent" with what the agency has demonstrated its priorities to be. *Dep't of Com.*, 139 S. Ct. at 2575.

## C.   EQUITY IN ACTION FAILED TO COMPLY WITH THE APA'S NOTICE AND COMMENT REQUIREMENTS.

The APA requires agencies to publish notice of all "proposed rule making" in the Federal Register and "give interested persons an opportunity to participate in the rule making through the submission of written data, views, or arguments." 5 U.S.C. § 553(b)-(c). This process benefits both the public and the agency. The public benefits from a "fair warning of potential changes" and an opportunity to weigh in on those changes. *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1816 (2019). This process, in turn, "affords the agency a chance to avoid errors and make a more informed decision." *Id.* Here, FEMA bypassed this procedural requirement altogether, implementing Equity in Action without public input, to the detriment of millions of policyholders and to FEMA's ability to make a fully informed decision.

Equity in Action is final agency action subject to the notice-and-comment requirement. *See* 5 U.S.C. § 553. An action becomes final when it "marks the 'consummation' of the agency's decisionmaking process" and either determines "rights or obligations" or imposes "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). FEMA's Equity in Action satisfies both requirements. First, Equity in Action shows a culmination of FEMA's decisionmaking process. It is not "merely tentative or interlocutory." *Id.* at 178. As the agency itself attested, Equity in Action resulted from "thousands of hours" of work over "three years." Flood Insurance Manual, Risk Rating 2.0: Equity in Action Edition (Oct. 2021), bit.ly/3JCVvau. It marked a "significant[] transform[ation]" that "change[s] the way FEMA fundamentally views and evaluates flood risk." *Id.* As of April 1, 2023, FEMA has fully implemented Equity in

Action, and the agency intends Equity in Action to continue in effect for the foreseeable future. *Risk Rating 2.0: Equity in Action*, FEMA (June 5, 2023), https://perma.cc/W3R6-93YF.

Second, Equity in Action imposes legal consequences and determines the rights and obligations of current and future policyholders. It is not a "tentative recommendation," *Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992), where the affected party has absolute discretion to accept or reject the recommendation, *Dalton v. Specter*, 511 U.S. 462, 469-71 (1994). Rather, FEMA "expect[s] conformity[,]" and the premium rate set for each individual policy is the mandatory and "direct . . . consequence[]" of Equity in Action. *Abbott Labs. v. Gardner*, 387 U.S. 136, 150 (1967); *Bennett*, 520 U.S. at 178.

While courts recognize limited exceptions to the APA's notice-and-comment requirement, none applies to Equity in Action. No good cause exists for FEMA's failure to undertake notice and comment. No emergency situation exists, nor would a delay in introducing new methodology result in serious harm. *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004). The final rule is not related to internal practice or procedure. *See Batterton v. Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980). Rather, it is a final rule that determines who can get flood insurance and how much their premiums will cost.

Finally, the final rule is not a benefit or contract. 5 U.S.C. § 553(a)(2). Courts construe this exemption "very narrowly." *Texas v. United States*, 809 F.3d 134, 177 (5th Cir. 2015), *as revised* (Nov. 25, 2015); *see also Louisiana v. Horseracing Integrity & Safety Auth. Inc.*, 617 F. Supp. 3d 478, 495 (W.D. La. 2022). The regulation at issue

must be "clearly and directly related to the disbursement of benefits." *Baylor Univ.* *Med. Ctr. v. Heckler*, 758 F.2d 1052, 1058-59 (5th Cir. 1985). For example, the conferral of lawful status to illegal aliens is not a benefit falling within this exception when conferred by an agency that does not confer the follow-on benefits. *Texas*, 809 F.3d at 148-49. Similarly, a vaccination conditioned on federal Head Start funding is not a grant or benefit falling within this exception. *Louisiana v. Becerra*, 577 F. Supp. 3d 483, 499 (W.D. La. 2022). And the D.C. Circuit, at least, has narrowed the exception further, limiting its application to when an agency is "merely deciding when to enter into a contract or award a grant" and requiring notice and comment whenever an agency is "filling in the statutory scheme[]" to "set[] the conditions under which" such contracts or grants are awarded and administered in general. *Indep. U. S. Tanker Owners Comm. v. Lewis*, 690 F.2d 908, 918 n.43 (D.C. Cir. 1982). Allowing substantive amendments to *how* a benefit is conferred without notice and comment "would open the door to substantive regulation without public participation." *Guardian Fed. S & L v. Fed. S & L Ins. Corp.*, 589 F.2d 658, 664 (D.C. Cir. 1978).

Here, Equity in Action is mandatory for many policyholders. FEMA has sole discretion to designate areas as SFHAs, and Congress requires everyone in an SFHA to obtain and maintain flood insurance if they have federally backed mortgages or SBA loans or have ever received federal disaster recovery funds. *See* 42 U.S.C. § 4012a; *Flood Insurance and FEMA Assistance*, FEMA (Sept. 30, 2022), https://perma.cc/3S5A-CJFG. If those with federally backed mortgages drop their flood insurance, they become ineligible for certain disaster relief, and the lender can

force place flood insurance. 12 C.F.R. § 22.7(a); *see also* Dkt. 1-48, La. Floodplain Mgmt. Ass'n Dec. ¶ 9.

FEMA also makes flood insurance a condition of any assistance it grants to any property in an SFHA, regardless of the property's mortgage status. *See Flood Insurance and FEMA Assistance*, FEMA (Sept. 30, 2022), https://perma.cc/3S5A-CJFG. The same is true for disaster mitigation or recovery grants from other federal agencies and for SBA loans. Recipients of federal disaster grants or SBA loans who fail to maintain coverage may have to repay their loans or grants. Other programs and enterprises also require flood insurance as a condition of participation. Dkt. 1-48, La. Floodplain Mgmt. Ass'n Dec. ¶ 9; Dkt. 1, ¶¶ 163-67.

The new program, therefore, forces people to pay exorbitant rates with no way out. That is the opposite of a "benefit," and is the last thing that Congress would have wanted to exempt from the notice-and-comment process. FEMA failed to notify the public of the specific changes it sought to make to its risk-rating formula—to this day, no one knows what that formula is—and FEMA failed to provide an opportunity for the public to comment on those changes. Accordingly, the agency failed to comply with the APA's requirements.

## D. Equity in Action Exceeds FEMA's Statutory Authority.

Equity in Action exceeds FEMA's statutory authority by forcing people to leave coastal communities. 5 U.S.C. § 706(2)(C). Courts "presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (quoting *U.S. Telecom Assn. v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en

banc)). Congress, therefore, must speak clearly when authorizing an agency to take an action with "deep economic and political significance." *King v. Burwell*, 576 U.S. 473, 486 (2015). It also must make its intent "unmistakably clear" when enacting statutes that may shift the balance between the federal government and the States. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991); *see also Sackett v. EPA*, No. 21-454, slip op. at 23 (U.S. 2023). When Congress wants to shift that balance in the context of government power "over private property," it must make that intent "exceedingly clear." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (quoting *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1850 (2020)). Courts should—and must—be skeptical when an agency makes major policy decisions, like Equity in Action. *West Virginia*, 142 S. Ct. at 2609. The burden lies with the government to "point to 'clear congressional authorization' to regulate in that manner." *Id.* (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). A "colorable textual basis" is insufficient. *Id.* The question is whether the authority comes from "clear" congressional authorization. *Id.*

Here, FEMA has invoked the NFIP to do something that is plainly of deep economic and political significance and that treads on traditional state power. It has invoked the NFIP to relocate entire populations. *See, e.g.*, Dkt. 1-53, S. Bourgeois Dec. ¶ 40 (explaining that he isn't sure he can afford to live in the area); Dkt. 1-54, Hebert Dec. ¶¶ 32-34; Dkt. 1-44, Bayou Indus. Grp. Dec. ¶¶ 9-11 (explaining how "companies are finding it increasingly difficult to find workers"); Dkt. 1-47, Houma-Terrebonne Chamber of Commerce Dec. ¶¶ 7-8 (same); Dkt. 1-50, Morganza Action

Coal. Dec. ¶ 8 (noting "tremendous current demand for specialized trades[people] in the fields of shipbuilding and energy production"). After decades of encouraging cities and communities to develop in flood-prone areas by offering affordable rates in exchange for land-use regulations, FEMA has invoked its modest power to "prescribe . . . chargeable premium rates," 42 U.S.C. § 4015(a), to force people out of those communities and redraw America's population map. The population decline threatens many coastal industries—including oil and gas, fishing, and shipping—and those industries are concerned about maintaining the workforce necessary to sustain operations. Dkt. 1-43, Terrebonne Econ. Dev. Auth. Dec. ¶¶ 32-33; *see also* Ex. 3, Port of S. La. Dec. ¶¶ 14-16; Ex. 4, Greater Lafourche Port Comm'n Dec. ¶¶ 12-15; Ex. 2, Terrebonne Port Dec. ¶¶ 16-17. Parishes are in dismay at the anticipated mass exodus due to the lack of affordable housing. *See e.g.,* Dkt. 1-43, Terrebonne Econ. Dev. Auth. Dec. ¶ 31.

While the NFIP gives FEMA broad authority to "prescribe . . . chargeable premium rates," 42 U.S.C. § 4015(a), this authorizes mild adjustments, not considerable premium hikes that have significant economic effects and force mass migration. In fact, Congress provided a separate, more limited authority for FEMA when it seeks to move large populations. *Id.* § 4102(c)(2). FEMA has the authority to encourage States and municipalities to adopt ordinances that "guide the development of proposed construction away from locations which are threatened by flood hazards." *Id.* When FEMA wants to move people away from certain communities, Congress directs it to do so by "encourag[ing] the application and the adoption" of FEMA's land-use

ordinances. *Id.* NFIP's general language about setting rates does not apply to this "matter specifically dealt with in another part of the same enactment. *Ginsberg Sons v. Popkin*, 285 U.S. 204, 208 (1932).

### E.     Equity in Action Violates the Spending Clause.

The Court must set aside any agency action that is contrary to the Constitution. 5 U.S.C. § 706(2)(B). Equity in Action violates the Spending Clause because it upends the terms and conditions of the flood insurance program and imposes coercive conditions on the States and their political subdivisions. U.S. Const. art. I, § 8.

<u>First</u>, FEMA violated the Spending Clause because the States and their political subdivisions cannot be said to have "voluntarily and knowingly" accepted the terms of Equity in Action. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see also Texas v. Yellen*, No. 2:21-cv-079-Z, 2022 WL 989733, at *4 (N.D. Tex. Mar. 4, 2022) (holding that States as "co-sovereign[s] in our constitutional structure have the right to 'bargain' in accordance with constitutionally imposed strictures of 'good faith'" and that they are "entitled to [adequate information] under the Constitution"). It also cannot be said that Plaintiffs would have taken FEMA's offer of NFIP participation in exchange for extensive land-use regulations in the first place had they known FEMA would later change the terms of the program to Equity in Action. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583-84 (2012).

Historically, the NFIP required Plaintiffs to adopt mitigation measures and implement land-use regulations before Plaintiffs could participate in the NFIP. 42 U.S.C. § 4022; 44 C.F.R. § 59.22. If a Plaintiff fell out of compliance with these requirements, FEMA could suspend that Plaintiff's participation in the NFIP. But if

a Plaintiff complied, FEMA rewarded that Plaintiff with lower insurance premiums. 42 U.S.C. § 4022(b). As expected, Plaintiffs complied. *See* Dkt. 1, ¶¶ 265-489.

Under Equity in Action, FEMA has decided not to offer discounts based on the same criteria, and despite Plaintiffs' compliance with the previous terms of the program, they no longer receive the discounts they did before Equity in Action. As a result, insurance premiums are significantly higher, and States and their political subdivisions are suffering widespread harm. Equity in Action, therefore, deprives Plaintiffs of the opportunity to make an informed decision about whether participation in the NFIP is still in the best interest of each State. *See Yellen*, 2022 WL 989733, at *4.

In short, States and their political subdivisions did not voluntarily or knowingly enter the NFIP under Equity in Action. And because of FEMA's refusal to answer Plaintiffs' calls for information to understand how Equity in Action works, they cannot make a voluntary or knowing decision as to whether they should remain in the NFIP or what measures within their own authority they could take to reduce rates for their citizens. FEMA has forced the States into a situation that violates the Spending Clause. *See Pennhurst State Sch. & Hosp.*, 451 U.S. at 17; *Yellen*, 2022 WL 989733, at *4.

<u>Second</u>, FEMA violated the Spending Clause because Equity in Action now imposes coercive conditions on Plaintiffs. *Sebelius*, 567 U.S. at 577. As discussed above, FEMA baited States into joining the NFIP with promises of lower-than-private-market premiums and federal funds. After the switch, though, Plaintiffs no

longer receive those same benefits. But they cannot simply walk away for many reasons. Plaintiffs rely on the federal grant program to help flood mitigation and reduce flood risk. Dkt. 1-1, ¶¶ 142-43. Second, flood insurance—and therefore participating in the NFIP—is imperative for communities. Without it, people would be unable to secure mortgages or federal loans. *Id.* ¶¶ 167-70 (noting 70% of property buyers finance their purchase with a mortgage). They also would be ineligible for disaster relief. *Id.* ¶¶ 165-66. Plaintiffs, therefore, have no choice but to remain in the NFIP—regardless of what conditions FEMA imposes or what benefits FEMA removes.

## F.     Equity in Action Violates NEPA.

Equity in Action fails to comply with NEPA, which requires agencies to consider the environmental effects of major federal actions. 42 U.S.C. § 4321. When an agency considers taking a major federal action, it first looks to see whether that action is categorically excluded from the NEPA process. 40 C.F.R. § 1508.1(d). If the action is not categorically excluded, then the agency must prepare an Environmental Assessment (EA) to determine whether the proposed action has the potential to cause significant environmental effects. *Id.* § 1501.5. If the answer to that question is no, then the agency issues a Finding of No Significant Impact (FONSI). *Id.* § 1501.6. If the answer is yes, then the agency must prepare a draft Environmental Impact Statement (EIS), the requirements of which are more rigorous than those of an EA. 42 U.S.C. § 4332(c); 40 C.F.R. § 1502.3. Much like the APA process for a proposed rule, a draft EIS is published for public review and comment. 40 C.F.R. § 1502.9. The agency must then issue a final EIS, which provides responses to the comments the agency received. *Id.*

Equity in Action constitutes a major federal action. It has deep economic and political significance for millions of Americans and is having widespread economic and population-related consequences across the county. It threatens entire industries, disrupts mitigation efforts, and could remake America's population maps. In FEMA's own words, "changes to the NFIP are considered to be a major federal action." Letter from the Floodplain Management Division at the Federal Insurance and Mitigation Administration to NFIP Community Officials (Mar. 5, 2019), perma.cc/ZFP4-TT5W. Moreover, Equity in Action is not the type of action categorically excluded from NEPA. Rather, it constitutes a "transformational leap" that establishes an entirely new system for calculating flood insurance rates. *Risk Rating 2.0: Equity in Action*, FEMA (May 22, 2023), https://perma.cc/3BL8-BZUK.

To the extent FEMA has discretion to set the premiums and establish the methodology for setting rates, *see* 42 U.S.C. § 4015(b), this provides further evidence that FEMA must comply with the NEPA review process, *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001) ("The touchstone of whether NEPA applies is discretion."). The twofold purpose of NEPA is "to inject environmental considerations into the federal agency's decisionmaking process and to inform the public that the federal agency has considered environmental concerns in its decisionmaking process." *Macht v. Skinner*, 916 F.2d 13, 18 (D.C. Cir. 1990). Only if the agency "does not have sufficient discretion to affect the outcome of its actions, and its role is merely ministerial," does NEPA not apply. *Citizens Against Rails-to Trails*, 267 F.3d at 1151. Given the discretion claimed by FEMA, it is hard

to imagine that the agency can bypass the NEPA process. *See* Letter from Senator Kennedy, et al. to David I. Maurstad, Deputy Associate Administrator, Federal Insurance & Mitigation Administration Resilience (July 27, 2022), https://perma.cc/9DCZ-XG86.

Had FEMA undertaken NEPA review, Plaintiffs would have been able to participate in the process and offer critiques of Equity in Action at the outset. Instead, FEMA has continually stonewalled Plaintiffs and doubled down on a deeply flawed methodology.

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION.

To meet their burden of showing irreparable injury, Plaintiffs need only show they are "likely to suffer irreparable harm in the absence of preliminary relief." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018). While monetary harm is typically not considered irreparable, "[w]here costs are nonrecoverable because the government-defendant enjoys sovereign immunity from monetary damages, as is the case here, irreparable harm is generally satisfied." *VanDerStok v. Garland*, No. 4:22-cv-691, 2022 WL 4809376, at *3 (N.D. Tex. Oct. 1, 2022) (citing *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021)). Likewise, injuries to sovereign interests are "necessarily" irreparable. *See, e.g.*, *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013). The evidence here confirms that Equity in Action will cause Plaintiffs to suffer significant irreparable harms.

Most glaring is the harm Equity in Action inflicts on individual policyholders. In the case of Russell Hebert, for example, Equity in Action has raised his premiums

so high that he does not believe he will be able to remain in his home. Mr. Hebert first enrolled in the NFIP in 1972 when he and his wife designed and built their current home. Dkt. 1-54, Hebert Dec. ¶¶ 4-6. While Mr. Hebert's home used to flood during major hurricanes, the construction of a levee protection system has eliminated all flooding for the last fifteen years. *Id.* ¶ 14. Despite the fact that the home no longer floods and is not likely to flood, Mr. Hebert's mandatory flood insurance has increased from $3,289 in 2021 to $5,611 in 2023, and FEMA offered him only a paltry $11 in Community Rating System (CRS) discounts. *Id.* ¶¶ 15, 19, 21, 29.

Now, at 79, Mr. Hebert must decide whether to default on his mortgage or declare bankruptcy as a result of Equity in Action. *Id.* ¶¶ 32-33. He has done everything he can to combat rate increases and remain in his home. He signed a reverse mortgage to help his fixed income go further, he increased his deductible to offset the increasing rates, and he even considered elevating his home, despite his physical disabilities. *See id.* ¶¶ 24, 27, 14. Whichever route he takes, he is certain that he will not be able to afford to renew his flood insurance on January 27, 2024. *Id.* ¶ 7. Yet FEMA calls this equitable.

Policyowners like Mr. Hebert will not be able to recoup the increased rates they pay over the course of litigation, undo their foreclosures or bankruptcies, or reverse the hits on their credit scores. For the large number of property buyers with federally backed mortgages, *see* Dkt. 1-46, Home Builders Ass'n Dec. ¶¶ 6-7, those who cannot

afford to keep their NFIP coverage will not be able to unwind the financial consequences of having their lender force place a policy on their property. 12 C.F.R. § 22.7(a).

A.    **Equity in Action Irreparably Harms Parish and Levee District Plaintiffs.**

Much like individual policyholders, parishes and levee districts will also suffer irreparable harm. For starters, some parishes own property and must procure flood insurance through the NFIP. *See* Dkt. 1-28, St. Tammany Parish Dec. ¶¶ 37-39. For example, St. Tammany Parish has seen increases to its own NFIP policies, costing the Parish an additional $2,877 under Equity in Action. *Id.* The Parish anticipates its premiums will continue to increase at the next renewal, although FEMA has not provided enough information for the Parish to figure out how its rates will change over time. *Id.* ¶ 39. Just like individual homeowners, these parish-owned policies are facing rate increases, imposing a financial harm on the parishes that they cannot recover under the APA. *Id.*; 5 U.S.C. § 702.

Equity in Action also fails to recognize mitigation efforts. Some Plaintiffs' mitigation efforts were mandated by FEMA itself, an "entrance fee" for their participation in the NFIP. *See, e.g.*, Dkt. 1-27, St. Mary Parish Dec. ¶¶ 24, 30; Dkt. 1-32, Washington Dec. ¶ 7-8; Dkt. 1-13, E. Baton Rouge Dec. ¶ 26. Other times, Plaintiffs' mitigation efforts went above and beyond to secure deeper rate discounts through the CRS. *See, e.g.*, Dkt. 1-13, E. Baton Rouge Parish Dec. ¶ 7 (adopting stricter requirements to promote flood resiliency); Dkt. 1-46, Home Builders Ass'n Dec. ¶ 11 (describing parish efforts to go above FEMA's minimum requirements); Dkt. 1-36, N.

Lafourche Conservation Levee and Drainage Dist. Dec. ¶ 7 (residents opting to pay higher taxes to promote mitigation and secure further discounts). But now—even though Plaintiffs' mitigation projects have a demonstrated track record of decreasing flood risk—FEMA does not meaningfully account for those projects.

Third, Equity in Action eliminates the grandfathering policy, causing a gradual increase to rates that were guaranteed to remain steady. *See, e.g.*, Dkt. 1-27, St. Mary Parish Dec. ¶¶ 26-27, 31. This makes flood insurance unaffordable for policyholders and decreases the value of property within parishes and so also property tax revenues. *See, e.g.*, Dkt. 1-46, Home Builders Ass'n Dec. ¶¶ 15-17; Dkt. 1-7, Assumption Dec. ¶ 26-28; Dkt. 1-13, E. Baton Rouge Dec. ¶ 26; Dkt. 1-27, St. Mary Parish Dec. ¶¶ 37-41.

Fourth, Equity in Action imposes unbearably high costs on individuals residing within the parishes. *See generally Cost of Flood Insurance for Single-Family Homes under Risk Rating 2.0*, FEMA (Apr. 19, 2023), perma.cc/K4NL-Y7M8, FEMA Exhibits 3, 4. This is a result of losing mitigation discounts, grandfathered discounts, and CRS discounts. *See, e.g.*, Dkt. 1-7, Assumption Dec. ¶ 26; Dkt. 1-17, Jefferson Dec. ¶¶ 36-39.

Finally, the lack of transparency restricts the ability of parishes and levee districts to partner with the federal government. Dkt. 1-36, N. Lafourche Conservation Levee and Drainage Dist. Dec. ¶ 42. Most parishes work with FEMA or the Army Corps of Engineers to distribute grants to policyholders. *See, e.g.*, Dkt. 1-27, St. Mary Parish Dec. ¶¶ 7-8; Dkt. 1-18, Lafourche Dec. ¶¶ 30-31; Dkt. 1-17, Jefferson Dec. ¶ 32-

33. The increased rates are causing recipients to forgo using the grants, which exposes parishes to liability for repaying the grants in full and for enforcing the grants. *See, e.g.*, Dkt. 1-18, Lafourche Parish ¶ 35 (explaining that if a recipient fails to meet its obligations, the parish incurs financial liability).

**B.    Equity in Action Irreparably Harms State Plaintiffs.**

Equity in Action harms the States' sovereign interests—an injury that is "necessarily" irreparable. *See, e.g.*, *Planned Parenthood of Greater Tex. Surgical Health Servs.*, 734 F.3d at 419. Louisiana's Constitution, for example, expressly addresses flood protection and establishes political subdivisions to help manage mitigation and relief efforts. La. Const. art. VI, § 38.1. Equity in Action interferes with the Louisiana's ability to manage its political subdivisions and protect against future flood risk because it discourages flood insurance and mitigation. *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) ("[T]he State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws."). Equity in Action, moreover, eliminates the important parallel role that the States have traditionally played in the flood insurance program by cutting the States out of the process for developing flood maps and evaluating existing mitigation.

Second, Equity in Action deprives the States of their statutorily guaranteed procedural rights. *See Texas v. Equal Emp't Opportunity Comm'n*, 933 F.3d 433, 447 (5th Cir. 2019) (quotations and alterations omitted). "A violation of the APA's notice-and-comment requirements is one example of a deprivation of a procedural right." *Id.* Here, the States were denied multiple procedural rights, including receiving notice of the new methodology and having the opportunity to comment on Equity in Action.

That denial of procedural rights harms the States' ability to protect its wide range of concrete interests tied to flood insurance. If the procedurally defective Equity in Action remains in effect, the States will have no remedy.

Equity in Action also harms States' economic interests. Costs stemming from invalid regulations or agency actions "almost always produces the irreparable harm of nonrecoverable compliance costs." *Texas v. E.P.A.*, 829 F.3d 405, 433 (5th Cir. 2016) (internal quotation marks omitted). As the Fifth Circuit recently explained, that is "because federal agencies generally enjoy sovereign immunity for any monetary damages," so an injured party has no redress. *Wages & White Lion Invs., LLC*, 16 F.4th at 1142.

The new regulatory regime imposes a substantial financial injury on States. It devalues the States' prior mitigation efforts and pushes people to leave the State due to the unaffordable insurance rates. On the former point, the States have used significant public funds to support mitigation efforts. *See, e.g.*, Dkt. 1-1, GOHSEP Dec. ¶¶ 5, 9; Dkt. 1-2, Fl. Dec. ¶ 6; Dkt. 1-3, N.D. Dec. ¶ 6-9; Ex 5, Ft. Bend Dec. ¶¶ 8-9. Naturally, mitigation expenditures have led States to spend less on rebuilding after major flood events. Under the new system, though, mitigation efforts are not rewarded, meaning FEMA has devalued the very projects it encouraged States to undertake.

The States have also invested significant public funds in protecting the communities, people, structures, and property within its borders. *See, e.g.*, Dkt. 1-1, GOHSEP Dec. ¶¶ 5-8; Dkt. 1-3, N.D. Dec. ¶¶ 5-6; Dkt. 1-4, Va. Dec. ¶¶ 3, 8. As people

leave the NFIP and stop undertaking mitigation efforts, the risk levels for properties will increase, causing rates to inflate further. And as people opt not to address these increased risks, flood events will cause more damage. *See, e.g.* Dkt. 1-36, N. Lafourche Conservation Levee and Drainage Dist. Dec. ¶ 11 (explaining the differences in damage from Hurricane Barry in 2019 compared to Hurricane Rita in 2005). The States will be on the hook for a large portion of the bill for these catastrophic events. Dkt. 1, ¶¶ 196-97, 213, 269 (citing Dkt. 1-1, GOHSEP Dec. ¶¶ 44-45).

Equity in Action also imposes significant enforcement costs on the States. Like with the parishes discussed above, States must enforce the requirement that recipients of federal disaster mitigation or recovery grants obtain and maintain flood insurance. Dkt. 1-1, GOHSEP Dec. ¶¶ 41-43. As Equity in Action pushes more and more people out of compliance with that requirement, the States will be on the hook for both enforcing the requirement and repaying those funds to FEMA. The Road Home is a perfect example of the unrecoverable economic harm States face—both from the cost of enforcement and the cost of repaying the funds themselves—when subgrantees do not comply with every term of a federal grant. *See* Greg Larose, *Road Home reaches its end, thousands of lawsuits against recipients pulled*, Louisiana Illuminator (Feb. 16, 2023), https://perma.cc/V5SL-3BC3; Dkt. 1-1, GOHSEP Dec. ¶¶ 41-43.

In addition, the higher insurance rates will continue to lower property values and force people to leave the State, reducing the State's tax revenues, which are used to fund future mitigation efforts. *See* Dkt. 1, ¶ 263 (citing Dkt. 1-53, S. Bourgeois Dec.

¶ 40; Dkt. 1-44; Bayou Indus. Grp. Dec. ¶¶ 9-11; Dkt. 1-47, Houma-Terrebonne Chamber of Commerce Dec. ¶¶ 7-8; Dkt. 1-50, Morganza Action Coal. Dec. ¶ 8). As mitigation declines, the State will sustain greater damage, which in turn lowers property values and raises insurance rates further. Dkt. 1, ¶¶ 196-97, 213, 269 (citing Dkt. 1-1, GOHSEP Dec. ¶¶ 44-45). All of this makes it difficult for States to recruit people to move there, further lowering the tax base and repeating the cycle. *See* Dkt. 1-47, Houma-Terrebonne Chamber of Commerce Dec. ¶¶ 16-17; Dkt. 1-43, Terrebonne Econ. Dev. Auth. Dec. ¶ 6. Ultimately, the States' increased spending on damaged property, decreased property values, falling tax revenues, and shrinking tax base will result in businesses closing, causing further harm to the State's economy. *See Texas v. E.P.A.*, 829 F.3d at 434 (holding that the "threatened harms" of unemployment and permanent business closure constituted irreparable harm).

These harms reverberate across the Plaintiff States and the entire country. For example, the State of Louisiana is home to three large Ports, which are political subdivisions of the State and contribute significantly to the Country's GDP. Ex. 3, Port of S. La. Dec. ¶¶ 7-11; Ex. 4, Greater Lafourche Port Comm'n ¶¶ 5-9; Ex. 2, Terrebonne Port Dec. ¶¶ 5-8. The Port of South Louisiana, for example, is one of the largest tonnage ports in the Western Hemisphere and is the Country's top grain exporter. Ex. 3, Port of S. La. Dec. ¶¶ 19. It handles over $83 billion in trade annually and serves as the gateway to the Gulf for many industries. *Id.* ¶ 10. Terrebonne Port provides over 10,000 jobs and supports significant industries, including marine fabrication and repair, oil and gas, and wind energy. Ex. 2, Terrebonne Port Dec. ¶¶ 6-

8. Likewise, Port Fourchon handles 10-15% of the Nation's domestic oil and is connected to 50% of the Nation's refining capacity. Ex. 4, Greater Lafourche Port Comm'n Dec. ¶ 6.

Equity in Action is harming those national and international markets in two distinct ways. First, it is imposing increased costs on those political subdivisions, which have their own NFIP policies in place. Ex. 2, Terrebonne Port Dec. ¶¶ 5, 13-15. Second, the higher insurance premiums are making it difficult for those Ports to recruit workers. Ex. 3, Port of S. La. Dec. ¶¶ 14-16; Ex. 4, Greater Lafourche Port Comm'n ¶ 16; Ex. 2, Terrebonne Port Dec. ¶¶ 16-17. Due to the critical nature of these industries and their need to be on the water, it is imperative that workers live in neighboring communities. Ex. 3, Port of S. La. Dec. ¶¶ 14-16; Ex. 4, Greater Lafourche Port Comm'n Dec. ¶ 14; Ex. 2, Terrebonne Port Dec. ¶¶ 18 (stating that workers need to live within 25 miles). Higher insurance premiums are driving these workers away from the Ports, threatening the stability of the industries that rely on the Ports' infrastructure. Ex. 3, Port of S. La. Dec. ¶¶ 18-19; Ex. 4, Greater Lafourche Port Comm'n Dec. ¶ 15; Ex. 2, Terrebonne Port Dec. ¶¶20-23. If one of those ports has to shut down or reduce operations for a single day, the effects are felt across the country, and even the world. *See, e.g.*, Ex. 3, Port of S. La. Dec. ¶¶ 18-19 (noting that it exports over 98 million tons of grain to more than 90 countries each year); Ex. 4, Greater Lafourche Port Comm'n ¶¶ 16-17 (explaining the Port's closure after Hurricane Ida resulted in *per day* losses of $500 million to national GDP and $46 million to oil and

gas industry); Ex. 2, Terrebonne Port Dec. ¶¶ 20-23 (noting that after Hurricane Ida, gas prices increased nationwide "by over $2 a gallon").

## III. AN INJUNCTION WOULD NOT HARM DEFENDANTS OR DISSERVE THE PUBLIC INTEREST.

Finally, the public interest and balance of equities weigh decisively in favor of granting a preliminary injunction. As explained above, the entire Country will feel the harms imposed by Equity in Action. FEMA's change in policy threatens to bring critical infrastructure to a grinding halt, and it imposes costs on those residing in Plaintiff jurisdictions and elsewhere. *See, e.g.*, Ex. 3, Port of S. La. Dec. ¶¶ 18-19; Ex. 4, Greater Lafourche Port Comm'n Dec. ¶¶ 16-17; Ex. 2, Terrebonne Port Dec. ¶¶ 21-23. The harm to the public is as widespread as it is severe.

In addition, "the public is served when the law is followed." *Daniels Health Sci., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). And the public is served when an agency's decision is transparent and accessible. *See Allina Health Servs.*, 139 S. Ct. at 1816 (2019) (noting that the purpose of notice and comment rulemaking is to give "affected parties fair warning of potential changes in the law and an opportunity to be heard on those changes"). Here, FEMA has violated the law and hid the ball at every turn, and an injunction will restore lawful order.

While the public at large will be irreparably harmed by Equity in Action's continued application, the only harm to the Defendants from an injunction would be to

reinstate the flood insurance system they had in place for decades while they reconfigure a methodology in a manner consistent with the law. Thus, these factors strongly favor the Plaintiffs.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Motion for a Preliminary Injunction.


Dated: June 14, 2023                    Respectfully submitted,

**JEFF LANDRY**
  **ATTORNEY GENERAL**

By: */s/ Elizabeth B. Murrill*
ELIZABETH B. MURRILL (La #20685)
  Solicitor General
MORGAN BRUNGARD (La #40298)
  Assistant Solicitor General
TRACY SHORT (La #23940)
  Assistant Attorney General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70802
Tel: (225) 326-6766
murrille@ag.louisiana.gov
brungardm@ag.louisiana.gov
shortt@ag.louisiana.gov

*Counsel for the State of Louisiana, Plaintiff Parishes, Plaintiff Municipalities, Plaintiff Levee Districts, Plaintiff Drainage Districts, and Plaintiff Associations*

ASHLEY MOODY
    Attorney General
JAMES H. PERCIVAL*
    Chief of Staff
Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

RAÚL LABRADOR
    Attorney General
THEODORE J. WOLD *
    Solicitor General
OFFICE OF THE IDAHO ATTORNEY
GENERAL
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 999-0910
Email: Theodore.Wold@ag.idaho.gov

*Counsel for State of Idaho*

DANIEL CAMERON
    Attorney General of Kentucky
LINDSEY KEISER*
    Assistant Attorney General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5517
lindsey.keiser@ky.gov

*Counsel for the State of Kentucky*

DREW H. WRIGLEY
    Attorney General
PHILIP AXT (ND Bar No. 09585)*
    Solicitor General
North Dakota Attorney General's Office
600 E Boulevard Avenue, Dept. 125
Bismarck, ND 58505
(701) 328-2210
pjaxt@nd.gov

*Counsel for the State of North Dakota*

ALAN WILSON
    South Carolina Attorney General
ROBERT D. COOK
    Solicitor General
J. EMORY SMITH, JR.*
Deputy Solicitor General
THOMAS T. HYDRICK*
Assistant Deputy Solicitor General
JOSEPH D. SPATE*
Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

JOHN SCOTT
    Provisional Attorney General
RALPH MOLINA
    Deputy Attorney General for Legal
Strategy
LEIF A. OLSON*
Chief, Special Litigation Division
Office of the Attorney General of Texas
P.O. Box 12548
Austin, Texas 78711
(512) 463-4139
Leif.Olson@oag.texas.gov

*Counsel for the State of Texas*

LYNN FITCH
  Attorney General
JUSTIN L. MATHENY*
  Deputy Solicitor General
OFFICE OF THE MISSISSIPPI
ATTORNEY GENERAL
550 High Street, Suite 1200
Jackson, MS 39201
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

JASON S. MIYARES
  Attorney General
ANDREW N. FERGUSON
  Solicitor General
KEVIN M. GALLAGHER*
  Deputy Solicitor General
Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
aferguson@oag.state.va.us
kgallagher@oag.state.va.us

*Counsel for Plaintiff Commonwealth of Virginia*

AUSTIN KNUDSEN
  Attorney General
CHRISTIAN B. CORRIGAN*
  Solicitor General
PETER M. TORSTENSEN, JR.*
  Assistant Solicitor General
Montana Department of Justice
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
Christian.Corrigan@mt.gov
Peter.Torstensen.@mt.gov

*Counsel for the State of Montana*

***Pro hac vice* application forthcoming**