**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| THE STATE OF LOUISIANA, *et al.*,<br><br><br>*Plaintiffs,*<br><br>v.<br><br>DEPARTMENT OF HOMELAND<br>SECURITY, *et al.*,<br><br><br>*Defendants.* | Action No. 2:23-CV-01839-DJP-JVM<br>Section P<br>District Judge Darrel J. Papillion<br>Magistrate Judge Janis van Meerveld |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

    I.    The National Flood Insurance Program ............................................................... 2

          A.   Program Overview .................................................................................... 2

          B.   Legacy Rating Approach for Premium Calculations ................................ 5

          C.   Issues with the Legacy Rating Approach .................................................. 7

    II.   Risk Rating 2.0 Improvements to the Program ................................................ 11

    III.  Procedural History ............................................................................................ 17

STANDARD OF REVIEW ........................................................................................... 18

ARGUMENT ................................................................................................................. 19

    I.    Plaintiffs Cannot Establish Article III Standing ............................................... 19

          A.   Plaintiffs Assert No Cognizable Sovereign Interests ............................. 19

          B.   Plaintiffs Assert No Cognizable Quasi-Sovereign Interests .................. 22

          C.   Plaintiffs Assert No Cognizable Procedural Injury ............................... 24

          D.   Plaintiffs' Alleged Economic Injuries Are Attenuated and Speculative ...................... 25

               1.   Tax Base Injury .......................................................................... 25

               2.   Enforcement Costs ..................................................................... 36

               3.   Damage to Local Industries ....................................................... 37

               4.   Past Spending on Mitigation ...................................................... 38

               5.   Limited Rate Increases for Parish-Owned Policies ................... 38

    II.   Plaintiffs Lack Standing to Assert Their NEPA Claim ..................................... 41

CONCLUSION .............................................................................................................. 44

## TABLE OF AUTHORITIES

CASES

*Adolph v. Fed. Emergency Mgmt. Agency of the U.S.*,
  854 F.2d 732 (5th Cir. 1988) ................................................................................................. 3

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
  458 U.S. 592 (1982) ........................................................................................................... 22

*Am. Petroleum Inst. v. U.S. Dep't of Interior*,
  No. 2:21-CV-02506, 2022 WL 16704444 (W.D. La. Oct. 5, 2022) ................................. 43

*Arias v. DynCorp*,
  752 F.3d 1011 (D.C. Cir. 2014) ......................................................................................... 35

*Arizona v. Biden*,
  31 F.4th 469 (6th Cir. 2022) .............................................................................................. 24

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) ........................................................................... 21, 32, 36, 37

*Arpaio v. Obama*,
  27 F. Supp. 3d 185 (D.D.C. 2014) ..................................................................................... 36

*Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015) ............................................................................................. 34

*Ashley Creek Phosphate Co. v. Norton*,
  420 F.3d 934 (9th Cir. 2005) ............................................................................................. 43

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................................................... 42

*California v. Texas*,
  141 S. Ct. 2104 (2021) ................................................................................................. 21, 24

*Choice Inc. of Texas v. Greenstein*,
  691 F.3d 710 (5th Cir. 2012) ............................................................................................. 18

*City of L.A. v. Lyons*,
  461 U.S. 95 (1983) ....................................................................................................... 37, 38

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................................................... 19, 21, 26

*Clarke v. Sec. Indus. Ass'n*,
  479 U.S. 388 (1987) ........................................................................................................... 42

*Colo. River Indian Tribes v. Town of Parker*,
   776 F.2d 846 (9th Cir. 1985) ................................................................................23

*Colville v. Becerra*,
   Civ. No. 1:22CV113-HSO-RPM, 2023 WL 2668513 (S.D. Miss. Mar. 28, 2023) ............................41

*Crane v. Johnson*,
   783 F.3d 244 (5th Cir. 2015) ........................................................................ 18, 35

*Crane v. Napolitano*,
   920 F. Supp. 2d 724 (N.D. Tex. 2013) ......................................................................39

*Ctr. for Biological Diversity v. EPA*,
   937 F.3d 533 (5th Cir. 2019) ...............................................................................29

*ED v. Brown*,
   143 S. Ct. 2343 (2023) ....................................................................................25

*Drewett v. Aetna Cas. & Sur. Co.*,
   539 F.2d 496 (5th Cir. 1976) ...............................................................................5

*E.T. v. Paxton*,
   41 F.4th 709 (5th Cir. 2022) ......................................................................... 25, 26

*Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.*,
   729 F. App'x 287 (5th Cir. 2018) .................................................................... 43, 44

*El Paso Cnty., Tex. v. Trump*,
   982 F.3d 332 (5th Cir. 2020) .........................................................................*passim*

*Fednav, Ltd. v. Chester*,
   547 F.3d 607 (6th Cir. 2008) ...............................................................................41

*Florida v. Mellon*,
   273 U.S. 12 (1927) .........................................................................................28

*Food & Water Watch, Inc v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) .............................................................................40

*Gowland v. Aetna*,
   143 F.3d 951 (5th Cir. 1998) ...............................................................................4

*Haaland v. Brackeen*,
   143 S. Ct. 1609 (2023) ..........................................................................23, 24, 37

*Harrison v. Jefferson Par. Sch. Bd.*,
   No. 20-2916, 2022 WL 539277 (E.D. La. Feb. 23, 2022) ....................................................24

*Henderson v. Stalder*,
  287 F.3d 374 (5th Cir. 2002) ........................................................................................... 39

*Highland Vill. Parents Grp. v. U.S. Fed. Highway Admin.*,
  562 F. Supp. 2d 857 (E.D. Tex. 2008) ............................................................................ 41

*Home Builders Ass'n of Miss. v. City of Madison*,
  143 F.3d 1006 (5th Cir. 1998) ......................................................................................... 18

*Hotze v. Burwell*,
  784 F.3d 984 (5th Cir. 2015) ........................................................................................... 28

*In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*,
  481 F.2d 122 (9th Cir. 1973) ........................................................................................... 20

*Iowa ex rel. Miller v. Block*,
  771 F.2d 347 (8th Cir. 1985) ........................................................................................... 35

*Kentucky v. Biden*,
  23 F.4th 585 (2022) ............................................................................................... 22, 23, 24

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) .......................................................................................................... 42

*Louisiana ex rel. Landry v. Biden*,
  64 F.4th 674 (th Cir. 2023) ......................................................................... 24, 26, 29, 40

*Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*,
  70 F.4th 872 (5th Cir. 2023) .......................................................................... 20, 24, 22, 37

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .................................................................................................. 19, 28

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) .................................................................................................. 41, 42

*Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.*,
  823 F.3d 184 (3d Cir. 2016) ............................................................................................ 43

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ...................................................................................................*passim*

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) .................................................................................................. 21, 23

*McGair v. Am. Bankers Ins. Co. of Fla.*,
  693 F.3d 94 (1st Cir. 2012) ............................................................................................... 4

*Menchaca v. Chrysler Credit Corp.*,
 613 F.2d 507 (5th Cir. 1980) ....................................................................................7

*Metro. Edison Co. v. People Against Nuclear Energy*,
 460 U.S. 766 (1983) .............................................................................................41

*NAACP v. City of Kyle, Tex.*
 626 F.3d 233 (5th Cir. 2010) .................................................................................40

*Nat'l Ass'n of Home Builders v. EPA*,
 667 F.3d 6 (D.C. Cir. 2011) ..................................................................................31

*Nat'l Rifle Ass'n of Am., Inc. v. McCraw*,
 719 F.3d 338 (5th Cir. 2013) .................................................................................41

*Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*,
 No. C11-2044-RSM, 2014 WL 5449859 (W.D. Wash. Oct. 24, 2014) ...................3

*New England Power Generators Ass'n v. FERC*,
 707 F.3d 364 (D.C. Cir. 2013) .............................................................................22

*Palmieri v. Allstate Ins. Co.*,
 445 F.3d 179 (2d Cir. 2006) ...................................................................................3

*Pennsylvania v. Kleppe*,
 533 F.2d 668 (D.C. Cir. 1976) ........................................................................24, 35

*Pennsylvania v. New Jersey*,
 426 U.S. 660 (1976) .............................................................................................37

*Racing Enthusiasts & Suppliers Coal. v. EPA*,
 45 F.4th 353 (D.C. Cir. 2022) ...............................................................................29

*Raines v. Byrd*,
 521 U.S. 811 (1997) .............................................................................................19

*Ramming v. United States*,
 281 F.3d 158 (5th Cir. 2001) .................................................................................18

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*,
 415 F.3d 1078 (9th Cir. 2005) ...............................................................................43

*Renne v. Geary*,
 501 U.S. 312 (1991) .............................................................................................18

*Robertson v. Methow Valley Citizens Council*,
 490 U.S. 332 (1989) .............................................................................................42

*Ryan v. Nat'l Football League, Inc.*,
  No. 19-cv-1811, 2019 WL 3430259 (E.D. La. July 30, 2019) .............................................42

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) .........................................................................................................42

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) .................................................................................................. 19, 25

*Studio Frames Ltd. v. Standard Fire Ins. Co.*,
  483 F.3d 239 (4th Cir. 2007) ............................................................................................3

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) .........................................................................................................24

*Tel. and Data Sys., Inc. v. FCC*,
  19 F.3d 42 (D.C. Cir. 1994) .............................................................................................37

*Texas v. EEOC*,
  933 F.3d 433 (5th Cir. 2019) ...........................................................................................25

*Texas v. United States*,
  523 U.S. 296 (1998) .........................................................................................................22

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ...........................................................................................21

*Town of Stratford v. FAA*,
  285 F.3d 84 (D.C. Cir. 2002) ...........................................................................................43

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) .....................................................................................................41

*Trump v. New York*,
  141 S. Ct. 530 (2020) .......................................................................................................24

*United States v. Texas*,
  143 S. Ct. 1964 (2023) ........................................................................................24, 27, 35

*United Transp. Union v. ICC*,
  891 F.2d 908 (D.C. Cir. 1989) .........................................................................................39

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
  435 U.S. 519 (1978) .........................................................................................................41

*Wyoming v. Oklahoma*,
  502 U.S. 437 (1992) .........................................................................................................34

*Zimmerman v. City of Austin*,
   881 F.3d 378 (5th Cir. 2018) ..................................................................37

**STATUTES**

5 U.S.C. § 702 ..................................................................................................41

42 U.S.C. § 4001 ................................................................................................3

42 U.S.C. § 4001(d) ........................................................................................3, 7

42 U.S.C. § 4011(a) ...........................................................................................3

42 U.S.C. § 4012a .............................................................................................4

42 U.S.C. § 4014(a) .......................................................................................4, 10

42 U.S.C. § 4015(a)(1) .......................................................................................5

42 U.S.C. § 4015(c) ...........................................................................................6

42 U.S.C. § 4015(e) ...........................................................................................5

42 U.S.C. § 4022(a)(1) .......................................................................................4

42 U.S.C. § 4022(b) ...........................................................................................6

42 U.S.C. § 4071(a) ...........................................................................................4

42 U.S.C. § 4321 ...............................................................................................41

42 U.S.C. § 4332(2)(C) .....................................................................................41

Pub. L. No. 112-141, 126 Stat. 405 (2012) .......................................................10

Pub. L. No. 113–89, 128 Stat. 1020 (2014) .......................................................10

Pub. L. No. 115-72, 131 Stat. 1224 (2017) .......................................................11

**THE CONSTITUTION**

U.S. Const. art. III, § 2 .....................................................................................19

**REGULATIONS**

24 C.F.R § 203.16a ............................................................................................4

44 C.F.R. pt. 61 .................................................................................................4

44 C.F.R. § 59.1 ................................................................................................4

## OTHER AUTHORITIES

American Academy of Actuaries, *Use of Catastrophe Model Output,* (July 2018),
https://perma.cc/X2V3-GMRS ("*Catastrophe Model Output*") ...................................................... 13, 14

Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Ratemaking* (May 2021),
https://perma.cc/65ZZ-8SVQ.................................................................................................................5

CBO, *The National Flood Insurance Program: Financial Soundness and Affordability* (Sept. 2017),
https://perma.cc/8EB9-QG8A ...............................................................................................................10

Christopher Flavelle, *Climate Advocates Cheer Trump Policy Shift on Flood Insurance*, Bloomberg (Mar. 18,
2019), https://perma.cc/DAN9-2XER. ..................................................................................................11

Diane P. Horn, *National Flood Insurance Program: The Current Rating Structure and Risk Rating 2.0*, Cong.
Research Serv., R45999 (Apr. 4, 2022),
https://perma.cc/2GAT-HN5Z ("*Cong. Rsch. Serv. Rep.*")........................................................... 5, 6, 7

Diane P. Horn & Baird Webel, *Private Flood Insurance and the National Flood Insurance Program*, Cong.
Research Serv., R45242 (Jan. 9, 2023), https://perma.cc/K9X7-LQFA ..............................................4

FEMA, *Discount Explanation Guide* (Apr. 2022),
https://perma.cc/7T46-KY6A ("*Discount Explanation Guide*")............................................................15

FEMA, *FEMA Updates Its Flood Insurance Rating Methodology to Deliver More Equitable Pricing* (Apr.
2021) https://perma.cc/QF9V-V6MR ("*Press Release*") ..............................................................11, 12

FEMA, Flood Insurance Manual, (Apr. 2021),
https://perma.cc/D4WN-F85Q ("*Apr. 2021 Manual*") ................................................................... 5, 6

FEMA, Flood Insurance Manual, (Oct. 2022),
https://perma.cc/9FQL-P2Z4 ("*Oct. 2022 Manual*") ...........................................................12, 14, 15

FEMA, *Levees in Risk Rating 2.0* (Feb. 2022),
https://perma.cc/M3KP-UB4S.......................................................................................................14, 15

FEMA, *Frequently Asked Questions* (Feb. 2022),
https://perma.cc/KJ46-F6CY ...............................................................................................................15

FEMA, *National Flood Insurance Program: Risk Rating 2.0 Methodology and Data Sources* (Apr. 16, 2021),
https://perma.cc/K8X6-88W8 ("*RR 2.0 Methodology*")..........................................................12, 13, 15

FEMA, *NFIP Community Rating System Coordinator's Manual* (2017),
https://perma.cc/879C-23Y2 ("*CRS Manual*") .............................................................................. 6, 7

FEMA, *Rate Explanation Guide* (Mar. 2022),
https://perma.cc/TSP3-98C9.................................................................................................................12

FEMA, *Risk Rating 2.0 is Equity in Action* (Apr. 2021),
https://perma.cc/TW62-NXXP ("*RR 2.0 Equity in Action*") .......................................... 11, 12

FEMA, *Risk Rating 2.0 is Equity in Action* (last updated June 5, 2023),
https://perma.cc/H7T8-AZU2 ..................................................................................12

FEMA, *The Watermark: Fiscal Year 2022, Fourth Quarter* (Sept. 30, 2022),
https://perma.cc/EXM4-HDMG ("*The Watermark*") ..............................................2, 7, 11

GAO, GAO-06-497T, *GAO's High-Risk Program*, (Mar. 15, 2006),
https://perma.cc/C5JM-HL7M ............................................................................... 7, 8

GAO, GAO-09-12, *Flood Insurance: FEMA's Rate-Setting Process Warrants Attention,* (Oct. 2008),
https://perma.cc/3UVK-H349 ....................................................................................8

GAO, GAO-16-59, *National Flood Insurance Program: Continued Progress Needed to Fully Address Prior GAO Recommendations on Rate-Setting Methods* (Mar. 17, 2016),
https://perma.cc/WW7A-XZDH ..................................................................................8

GAO, GAO-17-425, *Flood Insurance: Comprehensive Reform Could Improve Solvency and Enhance Resilience*,
at 14–23 (Apr. 27, 2017), https://perma.cc/HT88-X3GR ..................................................8

GAO, GAO-23-106203, *High-Risk Series: Efforts Made to Achieve Progress Need to be Maintained and Expanded to Fully Address All Areas* (Apr. 20, 2023), https://perma.cc/K6BB-HCS3 .....................17

NAIC Center for Insurance Policy and Research, *Catastrophe Models (Property)* (last updated Apr. 3, 2023), https://perma.cc/E4XS-86PV ......................................................................13

Nat'l Rsch. Council, *Levees and the National Flood Insurance Program: Improving Policies and Practices* (2013),
https://doi.org/10.17226/18309 ("*NRC Levees*") ........................................................ 8, 9

Pew Rsch. Center, *Pew Commends National Flood Insurance Program for Connecting Premiums and Flood Risk* (Apr. 1, 2022), https://perma.cc/A7RW-YT2B ................................................................17

SBA, Lender and Development Company Loan Programs, SOP 50 10 5(K) (Apr. 1, 2019),
https://perma.cc/RX3K-QBP4 ....................................................................................4

Simon Moore, *Home Prices Rebound After Recent Declines*, Forbes (May 9, 2023),
https://perma.cc/3CPA-JAUH....................................................................................32

TMAC, *Annual Report* (Dec. 2016),
https://perma.cc/NN2S-6JNG....................................................................................10

U.S. Census Bureau, *Growth in U.S. Population Shows Early Indication of Recovery Amid COVID-19 Pandemic* (Dec. 22, 2022), https://perma.cc/V2RN-2EWP.....................................................34

## INTRODUCTION

In March 2019, Defendant Federal Emergency Management Agency ("FEMA") announced that it would implement an actuarial update to the premiums for flood insurance provided by the National Flood Insurance Program ("NFIP"), the federal program that it administers to protect millions of Americans from the devastating financial impacts of flood disasters. This update, known as Risk Rating 2.0, modernizes the NFIP's outdated rate-setting approach from the 1970s with a 21st-century approach that leverages industry best practices, up-to-date technology, better data, and fundamental actuarial principles and methods. Risk Rating 2.0 is the culmination of years of work by FEMA to correct critical inadequacies in its legacy rating approach, and it has enabled FEMA to deliver premium rates that, consistent with congressional mandates, are actuarially sound because they reflect each covered property's true flood risk and are fairly distributed based on individual risk levels. For new policyholders and existing policyholders who opted in, the updated rates started going into effect on October 1, 2021, and for all other policyholders, the updated rates started going into effect on April 1, 2022. From day one, FEMA has prioritized transparency: It has engaged in a comprehensive, multi-year effort to communicate with the public, media, state and local governments, and stakeholder groups about Risk Rating 2.0, releasing copious information about the necessary changes it made to the NFIP, what it did not change, its justifications and impacts, and its underlying data sources and methods. In other words, FEMA has dedicated years of effort to develop and implement Risk Rating 2.0 and has "shown[] its work." Mem. in Supp. of Mot. for Prelim. Inj., 4, Dkt. 16-1 ("Pls.' Mem.") at 4.

NFIP policyholders and the American public have reaped the reward. The vast majority of policies have seen premium decreases or only slight increases under Risk Rating 2.0; and the update stops the indefinite annual premium increases that were occurring and would continue to occur year after year with the legacy rates, including because many policies in the next three years will reach rates

that fully reflect their properties' risk levels. For more than a decade, various stakeholder groups asked for precisely the changes that Risk Rating 2.0 implemented, and since Risk Rating 2.0 went into effect, many have heralded it as essential to the NFIP's ability to continue to provide flood insurance coverage across the country and pay out claims.

Nonetheless, more than four years after FEMA first announced Risk Rating 2.0, and twenty months after FEMA began applying it to policies, Plaintiffs—a subset of States and communities—filed suit. Their Complaint has no merit. Plaintiffs wrongly ask the Court to upend the status quo—which is that Risk Rating 2.0 has applied to NFIP policies for multiple years and has been fully implemented across the country—and do so simply because some policyholders in their States and communities are now paying higher premiums based on a more accurate, congressionally-mandated assessment of their flood risks, and are no longer being subsidized by policyholders in less flood-prone areas. That some policyholders are now paying higher premiums does not entitle Plaintiffs to relief. Plaintiffs themselves face no concrete, redressable injury that would give them Article III standing. They have no cognizable sovereignty-based interest in individuals' premium rates, no concrete procedural injury, and any down-the-line economic injury they could face from individuals paying higher rates is far too speculative and attenuated to establish standing. Accordingly, the Court should dismiss Plaintiffs' suit for lack of jurisdiction. The Court should dismiss Plaintiffs' National Environmental Policy Act ("NEPA") claim for an additional, independent reason: Plaintiffs lack statutory standing because their alleged injuries do not fall within NEPA's zone of interests.

## BACKGROUND

### I.      The National Flood Insurance Program

#### A.      Program Overview

The NFIP is a federal flood insurance program that services nearly five million policies across the United States. FEMA, *The Watermark: Fiscal Year 2022, Fourth Quarter*, at 2 (Sept. 30, 2022),

https://perma.cc/EXM4-HDMG ("*The Watermark*"). It is the primary source of flood insurance coverage for residential properties in the country, providing roughly $1.3 trillion in coverage. *Id.* The NFIP has three components: (1) the administration of flood insurance policies; (2) the identification of flood hazards and flood risk zones; and (3) the oversight and enforcement of floodplain management criteria designed to reduce the risk of flooding. *See, e.g., Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*, No. C11-2044-RSM, 2014 WL 5449859, at *1 (W.D. Wash. Oct. 24, 2014).

Before the NFIP, most Americans lacked access to flood insurance and had to rely solely on federal disaster relief after floods, as most private insurers could not profitably underwrite flood insurance policies with reasonable terms and therefore did not do so. *See, e.g., Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 183 (2d Cir. 2006). To remedy this issue and reduce fiscal pressure on federal relief efforts after recurring flood disasters, Congress created the NFIP through the National Flood Insurance Act of 1968 (42 U.S.C. § 4001 *et seq.*, "NFIA"), *see, e.g., Studio Frames Ltd. v. Standard Fire Ins. Co.*, 483 F.3d 239, 243 (4th Cir. 2007), with the goal of making flood insurance "available on a nationwide basis" and basing the insurance "on workable methods of pooling risks, minimizing costs, and distributing burdens equitably among those who will be protected by flood insurance and the general public," 42 U.S.C. § 4001(d); *see also* Dkt. 1 ("Compl.") ¶ 113.

Congress tasked FEMA with administering the NFIP. 42 U.S.C. §§ 4011(a), 4019. FEMA offers flood insurance to all property owners who live in communities that choose to adopt minimum floodplain management standards. *See* 42 U.S.C. § 4022(a)(1) (requiring "adequate land use and control measures"). "By conditioning the availability of federally-subsidized insurance" for citizens "upon enactment of local flood-plain management ordinances in accordance with federal standards, the NFIP represents a voluntary federal program." *Adolph v. Fed. Emergency Mgmt. Agency of the U.S.*, 854 F.2d 732, 735 (5th Cir. 1988).

In the NFIP, property owners can purchase a standard flood insurance policy ("SFIP") either directly from FEMA or through a private write your own ("WYO") insurance company that acts as a fiscal agent of the United States. 42 U.S.C. § 4071(a); *see, e.g., Gowland v. Aetna*, 143 F.3d 951, 953 (5th Cir. 1998). In either case, the policy must contain the terms, conditions, exclusions, limitations, and rights of the SFIP found at 44 C.F.R. pt. 61, app. A(1)-(6). The purchase of an SFIP, as with community participation in the NFIP, is voluntary. Although homeowners must purchase flood insurance as a condition of receiving a federally-backed mortgage in a special flood hazard area ("SFHA")—an area that has a 1% or greater risk of flooding each year, 44 C.F.R. § 59.1—and having received SBA loans or certain types of disaster relief, 42 U.S.C. § 4012a, they are under no obligation to do so through the NFIP. They may instead purchase flood insurance on the private market. *See, e.g.,* 42 U.S.C. § 4012a; 24 C.F.R §§ 203.16a, 206.45; SBA, Lender and Development Company Loan Programs, SOP 50 10 5(K), at 342 (Apr. 1, 2019), https://perma.cc/RX3K-QBP4.[1]

FEMA has the authority under the NFIA to estimate and set premium rates. 42 U.S.C. §§ 4014(a), 4015(a). FEMA pays policyholders for any claims using the premiums that it collects, backed by the federal treasury. *See, e.g., McGair v. Am. Bankers Ins. Co. of Fla.*, 693 F.3d 94, 95–96 (1st Cir. 2012) (federal treasury "is responsible for paying claims that exceed the revenue generated by [NFIP] premiums"). Except for certain congressionally-authorized subsidies (more on these below), by statute FEMA must estimate the premiums required to make flood insurance available on an actuarial basis. *See, e.g.,* 42 U.S.C. § 4014(a)(1)(A)(i), (iv) (flood insurance rates must be "based on consideration of the risk involved and accepted actuarial principles," in accordance with the "principles and standards of practice in ratemaking adopted by the American Academy of Actuaries and the Casualty Actuarial

---

[1] Although private options are currently limited, private insurers have expressed increased interest in providing flood insurance. *See, e.g.,* Diane P. Horn & Baird Webel, *Private Flood Insurance and the National Flood Insurance Program*, at 16, Cong. Research Serv., R45242 (Jan. 9, 2023), https://perma.cc/K9X7-LQFA.

Society"); *Drewett v. Aetna Cas. & Sur. Co.*, 539 F.2d 496, 497–98 (5th Cir. 1976). This means that FEMA must calculate NFIP rates to reflect the true flood risks to each property (i.e., the expected value of all future costs due to flooding for each property). *See, e.g.*, Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Ratemaking*, at 2 (May 2021), https://perma.cc/65ZZ-8SVQ. Although FEMA may charge less than the actuarial rate "where necessary," 42 U.S.C. § 4015(a)(1), "it is clear that Congress did not intend" the NFIP "to abrogate standard insurance law principles which affect such estimates and risks," *Drewett*, 539 F.2d at 498. Congress instead intended for the NFIP "to operate much like any private insurance company," where "the premiums actually charged … equal[ed] the actuarial cost of flood insurance." *Id.* One important limitation, however, is that FEMA cannot raise an individual premium rate by more than 18% each year for most policies. 42 U.S.C. § 4015(e).

## B.   Legacy Rating Approach for Premium Calculations

Between the 1970s and 2021, FEMA calculated premiums using a methodology that did not consider an individual property's cost or other factors that fully reflected an individual property's flood risk or cost to rebuild after flooding. Instead, in line with general insurance practices in the 1970s, FEMA established premiums using basic and static geographic and structural characteristics to classify properties, including the following:

(1)   The location of the property on a Flood Insurance Rate Map (FIRM), which is a map that is based on flood studies of river and coastal flooding and that FEMA developed to display, for each community, various flood risk zones;

(2)   The elevation of the structure relative to the Base Flood Elevation ("BFE"), which is the elevation at which there is 1% percent chance of flooding in a given year; and,

(3)   The occupancy type.

*See* FEMA, Flood Insurance Manual, *3. How to Write* at Section 3.I (Apr. 2021), https://perma.cc/D4WN-F85Q ("*Apr. 2021 Manual*"); *see also, e.g.,* Diane P. Horn, *National Flood Insurance Program: The Current Rating Structure and Risk Rating 2.0*, at 1–3, Cong. Research Serv., R45999

(Apr. 4, 2022), https://perma.cc/2GAT-HN5Z ("*Cong. Rsch. Serv. Rep.*"). FEMA considered these characteristics to calculate expected losses for groups of properties that were similar in flood risk based on their basic structural elements and flood zone—which, pursuant to FEMA's nationwide rating approach, could span many geographic areas—and then it assigned the same rate to all policies in a group. As the Congressional Research Service summarized about FEMA's legacy rates:

> [T]wo properties that are rated as the same NFIP risk (e.g., both are one-story, single-family dwellings with no basement, in the same flood zone, and elevated the same number of feet above the BFE), are charged the same rate per $100 of insurance, although they may be located in different states with differing flood histories or rest on different topography, such as a shallow floodplain as opposed to a steep river valley. In addition, two properties in the same flood zone are charged the same rate, regardless of their location within the zone.

*Cong. Rsch. Serv. Rep.* at 2.

Various subsidies and discounts also affected NFIP premiums in FEMA's legacy pricing system. FEMA offered subsidized rates for properties built or substantially improved before December 31, 1974, or before FEMA published the first FIRM for their community ("pre-FIRM" subsidies), 42 U.S.C. § 4015(c); for certain properties newly mapped into an SFHA, *id.* § 4015(i); and for certain property owners to maintain their old flood insurance rate (their "grandfathered" rate) if their property was remapped into a new flood rate class, e.g., a higher-risk flood zone, *Apr. 2021 Manual* at Section 3.I.B5; *Cong. Rsch. Serv. Rep.* at 5. FEMA also provided discounts to policyholders who take certain qualifying mitigation measures such as elevating their property. *Cong. Rsch. Serv. Rep.* at 10 & n.69. And FEMA's Community Rating System ("CRS") also offered discounts to policyholders who live in localities that voluntarily go beyond FEMA's minimum floodplain management standards and implement projects that reduce flood and erosion risk in various ways. 42 U.S.C. § 4022(b); FEMA, *NFIP Community Rating System Coordinator's Manual* (2017), https://perma.cc/879C-23Y2 (hereafter "*CRS Manual*"). (The amount of the discount depended on, among other things, the location of the covered building; for example, buildings outside of an SFHA were eligible only for a

5-10% discount, whereas most buildings inside the area were eligible for discounts up to 45%. *See CRS Manual* at 110-3.)

### C.    Issues with the Legacy Rating Approach

Over the years, the NFIP achieved its goal of making flood insurance "available on a nationwide basis," 42 U.S.C. § 4001(d), but has also experienced major issues. On the one hand, the NFIP has nearly 5 million policies in over 22,000 communities across the country, collects about $4.6 billion in annual revenue from policyholders' premiums (as well fees and surcharges), and provides over $1.3 trillion in coverage. *The Watermark* at 1; *Cong. Rsch. Serv. Rep.* at 1. And by supporting flood hazard reduction grant programs and floodplain management efforts, the NFIP avoids more than $2.4 billion in flood-related losses annually. Ex. A ("Maurstad Decl.") ¶ 10.[2] On the other hand, FEMA has collected $60 billion in NFIP premiums but has paid $96 billion in costs over the last 50 years, and several reports from multiple government and nonprofit entities have, over the past two decades, raised serious concerns about NFIP pricing inadequacies and the program's fiscal solvency. *Id.* ¶¶ 67–87, 97–101 (summarizing the reports in detail).

The United States Government Accountability Office ("GAO") has authored multiple reports to this effect. In 2006, GAO placed the NFIP on its list of high-risk government programs. GAO, GAO-06-497T, *GAO's High-Risk Program*, at 6 (Mar. 15, 2006), https://perma.cc/C5JM-HL7M (noting that Hurricane Katrina, Rita, and Wilma losses in 2005 would dwarf by an estimated $8 billion

---

[2] The Court can and should consider the Maurstad Declaration, which Defendants have prepared for purposes of their forthcoming preliminary injunction opposition brief, for two reasons. First, the declaration facilitates judicial review because it provides relevant background information on the NFIP and Risk Rating 2.0 in lieu of the administrative record, which will take FEMA up to eight more months to compile in full. Defs.' Mem. in Supp. of their Mot. to Extend the Submission Date for Pls.' Mot. for a Prelim. Inj., at 2, Dkt 34-1. Second, the declaration contains information relevant to whether Plaintiffs have plausibly asserted a concrete, redressable injury in fact for standing. *See, e.g.*, *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). The Court need only consider the specific Maurstad Declaration paragraphs cited herein in evaluating this motion to dismiss.

the cost of claims paid in the NFIP's entire history). GAO explained that the program "is not actuarily sound" due to the "number of policies in force that are subsidized" and "contribute[] to continuing losses to the program." *Id.* at 8. Then in 2008, GAO issued a report that made several findings regarding how FEMA's NFIP rate setting "may not ensure that the rates accurately reflect the actual risk of flood damage." GAO, GAO-09-12, *Flood Insurance: FEMA's Rate-Setting Process Warrants Attention,* at 3 (Oct. 2008), https://perma.cc/3UVK-H349. GAO found that (1) FEMA relied on "outdated or inaccurate" data inputs, *id.*; (2) rate grandfathering eroded FEMA's ability to set rates that reflect the actual risk of flooding and generate sufficient premiums to cover expected losses, *id.* at 4; (3) FEMA combined flood zones across many geographic areas and thereby prevented individual policies from reflecting the many topographical features that affect flood risk, *id.*; and, as a result (4) without changes to the rate-setting process, NFIP premiums would be unable to cover claims and expenses as well as its mounting debt, "exposing the federal government and ultimately taxpayers to ever-greater financial risks," *id.* at 4–5 (noting that after the 2005 hurricanes, NFIP debt had rapidly risen from $2 billion to $17 billion). GAO recommended that FEMA take "steps to ensure that its rate-setting methods and data used to set rates results in the full-risk premium rates that accurately reflect the risk of losses from flooding." *Id.* at 5. GAO issued reports with similar findings and recommendations in 2016 and 2017. GAO, GAO-17-425, *Flood Insurance: Comprehensive Reform Could Improve Solvency and Enhance Resilience,* at 14–23 (Apr. 27, 2017), https://perma.cc/HT88-X3GR; GAO, GAO-16-59, *National Flood Insurance Program: Continued Progress Needed to Fully Address Prior GAO Recommendations on Rate-Setting Methods* 13–24 (Mar. 17, 2016), https://perma.cc/WW7A-XZDH.

The National Research Council[3] published a 2013 book that also identified several flaws in the NFIP's rating approach. Nat'l Rsch. Council, *Levees and the National Flood Insurance Program: Improving*

---

[3] The National Research Council is part of the National Academies, which are non-profit, congressionally-chartered organizations that produce independent policy reports.

*Policies and Practices* (2013), https://doi.org/10.17226/18309 ("*NRC Levees*"). As it explained, the NFIP's simplistic system of designating flood rates based on whether a property was mapped in a particular zone resulted in circumstances where two houses next door to each other, but on either side of a zone boundary, "are exposed to essentially a similar hazard" yet charged much different rates. *Id.* at 80. Compounding the problem, the Council explained, was that FEMA had not identified enough flood zones to reflect, via differentiated rates, the variability of flood risk within a particular zone and between the same type of zone in different geographic areas. *Id.* at 81. The Council recommended that the NFIP "incorporat[e] more exact and detailed probability-of-inundation calculations instead of using a small number of rating zones and assuming the flood hazard to be uniform across the entire zone across the entire country," and "detailed economic damage models … used in the private risk market" to develop "more risk-based premium at the structure level." *Id.* at 80.[4]

In its December 2016 annual report, the Technical Mapping Advisory Council ("TMAC")[5] similarly critiqued the NFIP legacy rating approach for producing flood insurance premiums that "do not reflect structure-based risk." TMAC, *Annual Report* § 3.1 (Dec. 2016), https://perma.cc/NN2S-6JNG. It explained that the NFIP's methods were developed decades ago and did not take advantage of modern technology, *id.* at § 3.2, and that FEMA should modernize by moving away from its old mapping process and instead setting rates "based on the nature and severity of the flood hazard, structure elevation and other characteristics, as well as structure damage functions and vulnerability." *Id.* at § 3.3. TMAC recommended leveraging existing technology "to estimate the likelihood of floods of different water elevation and the resulting damage to the individual structure." *Id.* at § 3.4.

---

[4] The Council also critiqued the NFIP for considering only "accredited" levees, i.e., those FEMA determined would reduce hazards posed by a 1% chance annual flood, even though unaccredited ones "provide[] some (potentially considerable) protection against floods." *NRC Levees* at 36.

[5] TMAC is a federal advisory committee that reviews and makes recommendations to FEMA.

Echoing these critiques, in 2017, the Congressional Budget Office ("CBO") released a report detailing concerns with the NFIP's fiscal solvency. CBO, *The National Flood Insurance Program: Financial Soundness and Affordability* (Sept. 2017), https://perma.cc/8EB9-QG8A. The CBO estimated that, based on the difference between expected costs and premiums, the NFIP would face a one-year shortfall of $1.4 billion, on top of its outstanding $24.6 billion in debt. *Id.* at 1, 26. CBO recommended that FEMA take several steps, including "reducing the use of discounted rates" and "[b]etter align[ing] premiums with risks." *Id.* at 2–3.

Congress has intervened multiple times to address some of these NFIP issues. In 2012, Congress passed the Biggert–Waters Flood Insurance Reform Act of 2012, Pub. L. No. 112-141, 126 Stat. 405 (2012) ("BW-12"). The Act required major changes to the NFIP, including phasing out certain pre-FIRM and other grandfathering subsidies, so that premiums better implemented actuarial principles and more accurately reflected the full expected losses from floods, and the NFIP in turn remained sustainable.[6] Congress amended BW-12 through the Homeowner Flood Insurance Affordability Act of 2014, Pub. L. No. 113–89, 128 Stat. 1020 (2014) ("HFIAA"), which restored grandfathering and put in place the 18% cap on annual premium increases (down from 20%), but also imposed a surcharge on all policies to offset the subsidized ones and required FEMA to increase premiums for most subsidized properties by no less than 5% annually[7] until the premium reaches its

---

[6] Under 42 U.S.C. § 4014(a)(2), as modified by BW-12, the following categories of properties are required to have their premium increased by 25% per year until they reach full risk-based rates: (1) nonprimary residences; (2) nonresidential properties; (3) business properties; (4) properties with severe repetitive loss; (5) properties with substantial cumulative damage; and properties with substantial damage or substantial improvement after July 6, 2012. The 18% annual cap on premium increases does not apply to these properties.

[7] This 5% increase requirement does not apply to those properties subject to 25% premium increases.

full-risk rate. This statutory directive requires FEMA to phase out subsidies and move NFIP policies to full risk rates over time, subject to the annual cap on rate increases.[8]

Against this backdrop, FEMA developed and implemented Risk Rating 2.0.

## II.    Risk Rating 2.0 Improvements to the Program

Risk Rating 2.0 represents the culmination of seven years of work by FEMA to coordinate and collaborate with WYO companies, agents, vendors, stakeholder groups, members of Congress and their staff, subject matter experts, and industry groups to improve the NFIP rating methodology. Using industry best practices, improved flood risk data, and modern technology, Risk Rating 2.0 updates the NFIP pricing approach to better ensure that premiums rates are actuarily sound and equitably (i.e., fairly) distributed based on risk.

FEMA first publicly announced Risk Rating 2.0 in March 2019.[9] Between then and 2021, FEMA disseminated information on Risk Rating 2.0 through a variety of means, and in April 2021 the agency provided an overview of Risk Rating 2.0 on its website. *E.g.*, *id.* ¶¶ 8, 12–15, 27, 43–45, 81, 97–101; *see* FEMA, *Risk Rating 2.0 is Equity in Action* (Apr. 2021), https://perma.cc/TW62-NXXP ("*RR 2.0 Equity in Action*"); FEMA, *FEMA Updates Its Flood Insurance Rating Methodology to Deliver More Equitable Pricing* (Apr. 2021), https://perma.cc/QF9V-V6MR ("*Press Release*"). As the agency explained, Risk Rating 2.0 would allow FEMA to calculate expected flood losses more accurately— using current technology and a more comprehensive set of risk factors than were used for legacy rates—and thereby more equitably distribute NFIP premiums across all policyholders based on the

---

[8] Congress also intervened in October 2017 to forgive $16 billion in NFIP debt. Additional Supplemental Appropriations for Disaster Relief Requirements Act, 2017, Pub. L. No. 115-72, 131 Stat. 1224 (2017). The NFIP's debt now stands at $20.5 billion. *The Watermark* at 1.

[9] FEMA first announced Risk Rating 2.0 to a group of media outlets. *See, e.g.*, Christopher Flavelle, *Climate Advocates Cheer Trump Policy Shift on Flood Insurance*, Bloomberg (Mar. 18, 2019), https://perma.cc/DAN9-2XER.

value of their home and the unique flood risk of their property. *RR 2.0 Equity in Action* at 1, 5; *Press Release*. FEMA hired Milliman, Inc., an industry-leading actuarial firm, to help develop the risk modeling software undergirding Risk Rating 2.0. Compl. ¶ 176; FEMA, *National Flood Insurance Program: Risk Rating 2.0 Methodology and Data Sources* (Apr. 16, 2021), https://perma.cc/K8X6-88W8 ("*RR 2.0 Methodology*"). Risk Rating 2.0 premium rates have been in effect for all new policies, as well as existing policies whose policyholders opted to utilize the new rates, since October 1, 2021. FEMA, *Risk Rating 2.0: Equity in Action* (last updated June 5, 2023), https://perma.cc/H7T8-AZU2. Risk Rating 2.0 began to take effect for all other policies on April 1, 2022—applying on their renewal—and was fully implemented as of April 1, 2023. *Id.*

Risk Rating 2.0 updates the NFIP pricing methodology in several key respects. First, Risk Rating 2.0 does not base premiums solely on a property's location and elevation in a FIRM flood zone, but also considers a wide range of (a) more specific geographic variables and data, including the distance to water and the type of water (*e.g.*, river, lake, or coast), the drainage area of the river, levee data, whether or not the structure is on a barrier island or behind a levee, and the elevation of the structure relative to the flooding source; and (b) more specific structural variables, including the structure's foundation height, the height of the lowest floor of the structure relative to the BFE, and the structure's replacement cost value. *See, e.g.*, Maurstad Decl. ¶¶ 66, 107, 112; FEMA, Flood Insurance Manual, *3. How to Write* at Section 3.II.B–C (Oct. 2022), https://perma.cc/9FQL-P2Z4 ("*Oct. 2022 Manual*"); FEMA, *Rate Explanation Guide* (Mar. 2022), https://perma.cc/TSP3-98C9; *RR 2.0 Methodology* at 8–14.[10] The end result is that Risk Rating 2.0 improves the NFIP by more accurately measuring risk, no longer relying solely on basic rating variables that resulted in policyholders paying

---

[10] Previously, premiums did not consider replacement cost. FEMA applied the same premium for $250,000 in coverage for a house that cost $250,000 and one that cost $5 million, even though the same flood has a much higher probability of causing $250,000 in damage to the higher-value house. Maurstad Decl. ¶¶ 113–15; FEMA, *Rate Explanation Guide* at 2.

different premiums for similar levels of flood risk, or the same amount for different levels of risk, based largely on being in or out of an SFHA. Maurstad Decl. ¶¶ 73–75, 110–12.

Furthermore, Risk Rating 2.0 utilizes catastrophe models that draw on a range of flood risk data—beyond just the limited river and coastal flooding data that the legacy approach considered[11]—to better estimate future potential loss due to flood events. *RR 2.0 Methodology* at 4–7; Maurstad Decl. ¶ 28; *see id.* ¶¶ 121, 123 (describing expansion from legacy approach's limited consideration of flood risk posed by the 1%-annual-chance riverine flood and the 1%-annual-chance coastal flood). A catastrophe model is a computerized process that simulates potential catastrophic events based on historical event data, scientific research, engineering methods, and statistical analysis; the simulated events generate scenarios of disaster frequency, severity, and location. *See, e.g.*, NAIC Center for Insurance Policy and Research, *Catastrophe Models (Property)* (last updated Apr. 3, 2023), https://perma.cc/E4XS-86PV. Such a model is necessary because catastrophic risk, such as for floods, tornadoes, and earthquakes, cannot be estimated well from historical losses; single, unpredictable events such as Hurricane Katrina can significantly increase NFIP flood losses in the aggregate and materially alter the distribution of these losses among states. American Academy of Actuaries, *Use of Catastrophe Model Output,* at 3, 31–33 (July 2018), https://perma.cc/X2V3-GMRS; Maurstad Decl. ¶¶ 88–89. For example, in the year after Katrina, Louisiana went from accounting for 12% of NFIP payouts to 49%. Maurstad Decl. ¶ 88. So rather than relying just on historical flood frequencies to calculate potential losses from infrequent and severe events, Risk Rating 2.0 relies on catastrophe modeling to build off the historical data to statistically predict probabilities of future flood events, and then calculate premiums each year that account for the current risks these potential flood

---

[11] Risk Rating 2.0 considers a broader range of flood frequencies and sources, including pluvial flooding (flooding due to heavy rainfall), flooding due to tsunami, Great Lakes flooding, and flooding in leveed areas. *RR 2.0 Methodology* at 4–10; Maurstad Decl. ¶ 123.

events pose. Maurstad Decl. ¶¶ 126–27. The use of catastrophe models in this manner has become standard practice for insurance companies. *Catastrophe Model Output* at 5; Maurstad Decl. ¶¶ 92, 109, 125.

Moreover, FEMA's enhanced understanding of flood risk exposure based on the Risk Rating 2.0 catastrophe modeling required it to increase the average annual loss ("AAL"), which is the calculation of the NFIP's aggregate expected loss amount per year for all policyholders and thus what dictates the total amount of premiums FEMA must collect across the NFIP to pay out claims. Maurstad Decl. ¶¶ 29–30. Whereas in the past, FEMA had set the AAL at $3.2 billion based on historical data, it increased the AAL to $4.1 billion based on catastrophe modeling outputs showing that FEMA's aggregate premium calculations have been far below its expected losses and actual losses for almost two decades. *Id.*

Finally, Risk Rating 2.0 implements a centralized rating engine. A rating engine is the software system that insurers use to combine all aspects of the rating data and methodology to generate premiums for a quote or policy. Maurstad Decl. at ¶ 35 n.32. Whereas before, the NFIP utilized five different engines, Risk Rating 2.0 implements a single engine, which streamlines the process for insurance agents to sell policies and customers to buy them. *Id.* ¶¶ 36–39, 146–51.

Despite the multiple NFIP changes that it makes, Risk Rating 2.0 does maintain—*and in fact enhances*—certain aspects of the legacy NFIP rating approach. Risk Rating 2.0 still incorporates the basic variables utilized in the legacy approach. Maurstad Decl. ¶¶ 160–64; *Oct. 2022 Manual* at Section 3.II.B–C. Risk Rating 2.0 continues to set rates that reflect the flood risk reduction provided by levees. Maurstad Decl. ¶¶ 165–66; FEMA, *Levees in Risk Rating 2.0* (Feb. 2022), https://perma.cc/M3KP-

UB4S.[12] Risk Rating 2.0 also does not eliminate mitigation discounts for policyholders, offering premium reductions for those undertaking mitigation activities such as elevating a structure and installing flood openings in foundation walls. Maurstad Decl. ¶¶ 167–68; *see* FEMA, *Discount Explanation Guide* (Apr. 2022), https://perma.cc/7T46-KY6A; *Oct. 2022 Manual* at Section 3.II.C.5.[13] Risk Rating 2.0 also maintains discounts for those residing in a CRS participating community, and it actually expands the discounts by applying them to all policyholders in the community whose structure complied with minimum floodplain management requirements, not just those policyholders residing in an SFHA. Maurstad Decl. ¶¶ 193–94, 199–200; *RR 2.0 Methodology* at 20; *Oct. 2022 Manual* at Section 3.II.B.3.[14] Finally, Risk Rating 2.0 does not eliminate premium discounts for pre-FIRM subsidized properties and properties newly mapped into an SFHA. *Discount Explanation Guide* at 3; *Oct. 2022 Manual* at Section 3.II.B. But FEMA does anticipate that Risk Rating 2.0 will continue the process that began with BW-12 of phasing out these subsidies and placing all policies on a glide path to ultimately reach full actuarial rates. *Discount Explanation Guide* at 3; *Oct. 2022 Manual* at Section 3.II.E; FEMA, *Frequently Asked Questions* (Feb. 2022), https://perma.cc/KJ46-F6CY. Regardless of whether FEMA utilizes the 1970s-era rating approach or Risk Rating 2.0, it must—by congressional mandate—move

---

[12] Risk Rating 2.0 in fact acknowledges *a wider range of levees* than the legacy system by considering unaccredited levees and by incorporating levee data from the United States Army Corps of Engineers' national database of levees in its catastrophe models. Maurstad Decl. ¶¶ 129–40; *Levees in Risk Rating 2.0* at 1–2; *RR 2.0 Methodology* at 7, 16.

[13] Risk Rating 2.0 in fact *increases these discounts nationwide*, and in the Plaintiff States, by making them available outside of SFHAs. Maurstad Decl. ¶ 167; *Oct. 2022 Manual* at Section 3.II.C.5. For example, 712,991 policyholders nationwide and 32,456 Louisiana policyholders received mitigation discounts for elevating an insured structure as of September 1, 2021, before Risk Rating 2.0 applied to any policies, and 4,638,600 policyholders nationwide, and 459,626 Louisiana policyholders, received such discounts as of June 21, 2023. Maurstad Decl. ¶¶ 169, 173.

[14] Taking just Louisiana as an example: On September 1, 2021, 156,263 policies received CRS discounts that totaled $26,564,761, but as of June 21, 2023, 366,435 policies received CRS discounts that totaled $94,647,067. Maurstad Decl. ¶ 202.

premiums to full risk rates, subject to the 18% cap on annual premium increases (or the 25% cap for certain properties). Maurstad Decl. ¶¶ 155–58.

Risk Rating 2.0 has resulted in 97% of policyholders seeing, on average, either an immediate decrease in monthly premiums or a $20 or less per month increase in premiums. *Id.* ¶ 44 (19% of policyholders saw immediate decrease in premiums; 70% of policyholders saw up to a $10 per month increase; and 8% of policyholders saw between a $10-$20 per month increase). Nationwide, policyholders saw annual decreases totaling approximately $577 million ($627 per policy) upon their first renewal under Risk Rating 2.0. *Id.* ¶ 24. Many policyholders in the Plaintiff States and communities saw such decreases, or alternatively only modest increases of $10 or less per month. In Louisiana, for example, 16% of policyholders saw a decrease in their premiums, and 74% saw an increase of only $10 or less per month. *Id.* ¶ 47. And policyholders in several parishes in the state saw more dramatic savings under Risk Rating 2.0: 94% of policies in Tensas Parish saw a decrease, and the same goes for 85% of policies in Bossier Parish and Catahoula Parish. *Id.* ¶ 51. In Virginia, 42% of policies saw a decrease, and nearly 52% saw an increase of only $10 or less per month. *Id.* ¶ 47. Some policyholders in certain communities have seen and will see more pronounced monthly premium increases, however, due to their increased risk of flood damage. That is precisely the result one would expect if premiums track actual flood risk. Indeed, the 3% of policyholders seeing premium increases of greater than $20 per month have policies whose rates had previously been far below what was warranted by the actual property-specific risk because their flood insurance rates were being subsidized by other policyholders with lower flood risk and the taxpayers as well. *Id.* ¶¶ 32–33, 44.

On its website, FEMA has made available projected premium changes by state and county, as well as documents and information comprehensively detailing the justifications, methodology, and data sources supporting Risk Rating 2.0. FEMA began releasing information on Risk Rating 2.0 on its website as early as April 2019. And beyond releasing information on its website, FEMA has made

transparency a key part of Risk Rating 2.0: Since 2019, it has responded to hundreds of requests for information from the public and hundreds of media inquiries; communicated extensively with Congress by holding dozens of briefings and calls with members of Congress and their staff, responding to dozens of requests for information and technical drafting assistance from individual members, and briefing congressional committees; communicated extensively with State and local governments by conducting briefings and presentations on Risk Rating 2.0 methodology and rate changes; and provided a range of presentations and trainings to insurance industry stakeholders such as lenders, insurance agencies, and real estate professionals.[15]

Many have heralded Risk Rating 2.0 because it modernizes rate setting to "allow[] FEMA to establish premium rates that more fully reflect the risk of losses due to flooding" and address the NFIP's solvency issues. GAO, GAO-23-106203, *High-Risk Series: Efforts Made to Achieve Progress Need to be Maintained and Expanded to Fully Address All Areas* (Apr. 20, 2023), https://perma.cc/K6BB-HCS3; *see also, e.g.*, Pew Rsch. Center, *Pew Commends National Flood Insurance Program for Connecting Premiums and Flood Risk* (Apr. 1, 2022), https://perma.cc/A7RW-YT2B. But some have raised concerns, leading to this suit.

## III.   Procedural History

On June 1, 2023, Louisiana and nine other states, more than fifty Louisiana municipal entities, and one Louisiana non-profit organization sued Defendants, challenging the legality of Risk Rating 2.0 in nine counts under the Administrative Procedure Act ("APA"). Compl. ¶¶ 548–659. On June 3, 2023, Russell Hebert, Jr. and Margaret Hebert filed a class action suit against Defendants, raising nearly all the same claims. *Hebert v. Mayorkas*, No. 23-cv-1869 (E.D. La.), ECF No. 1 ¶¶ 155–258. The Heberts designated their suit as related to this case, *id.* ECF NO. 1-2 at 1, and the suit is also currently pending

---

[15] FEMA intends to detail these extensive public communications regarding Risk Rating 2.0 in an additional declaration to support its preliminary injunction opposition.

before the Court.[16] On June 14, 2023, more than four years after FEMA publicly announced Risk Rating 2.0, two years after it released detailed information on Risk Rating 2.0 on its website, 20 months after it began applying it to policies, and two months after it fully went into effect, Plaintiffs filed a motion for a preliminary injunction, asking this Court to enjoin FEMA from implementing the already fully implemented Risk Rating 2.0. Mot. for Prelim. Inj., Dkt. 14.

## STANDARD OF REVIEW

Defendants move to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Under that rule, a court must dismiss a case if it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). As a result, a court should "consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). The burden of proof rests with the party asserting jurisdiction. "[Courts] presume that [they] lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (quotation marks omitted). To survive a Rule 12(b)(1) motion to dismiss, a plaintiff must allege a sufficient set of facts in its complaint that, when accepted as true, plausibly establish jurisdiction. *See, e.g., Choice Inc. of Texas v. Greenstein*, 691 F.3d 710, 714 (5th Cir. 2012). But a court resolving a Rule 12(b)(1) motion is not limited to the face of the complaint; to determine whether in fact subject matter jurisdiction exists, it may view whatever evidence has been submitted on the issue and decide factual questions. *See, e.g., Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015).

---

[16] The Plaintiffs also attached a declaration from Mr. Hebert to their Complaint. Compl. Ex. 54.

## ARGUMENT

### I.     Plaintiffs Cannot Establish Article III Standing

Article III of the Constitution limits the judicial power of federal courts to deciding "Cases" and "Controversies," U.S. Const. art. III, § 2, and standing is "an essential and unchanging part of" this requirement, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). As the parties "invoking federal jurisdiction," Plaintiffs "bear[] the burden of establishing" standing. *Id.* at 561. They must demonstrate "an injury in fact" that is "fairly traceable to the challenged conduct" and "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The injury in fact must be "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Defs. of Wildlife*, 504 U.S. at 560 (quotation marks omitted). An "imminent" threatened injury "must be *certainly impending* to constitute injury in fact"; "[a]llegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis added and quotation marks omitted). Because Plaintiffs assert that an executive agency acted unconstitutionally, Dkt. 1 at 138, the Court's standing inquiry must be "especially rigorous." *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997).

Plaintiffs collectively assert four types of injuries allegedly caused by Risk Rating 2.0: (1) injury to States' sovereign interests in flood protection; (2) injury to States' quasi-sovereign interest in the health, comfort, and welfare of their citizens; (3) deprivation of their procedural right to notice and comment; and (4) various economic injuries stemming from the program's regulatory changes. But, as discussed below, none of these claimed injuries gives rise to standing, and the Court therefore lacks jurisdiction hear Plaintiffs' suit.

### A.     Plaintiffs Assert No Cognizable Sovereign Interests

Binding precedent forecloses the plausibility of State Plaintiffs' allegation that Risk Rating 2.0 injures their sovereign interests by "interfer[ing] with [their] ability to manage [their] political

subdivisions and protect against future flood risk" and "eliminat[ing] the important parallel role [that they] ha[ve] traditionally played in the flood insurance program." Compl. ¶ 279; Pls.' Mem. at 40. States have a sovereign interest—giving rise to an injury-in-fact if invaded—only in "the power to create and enforce [their] legal code," *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) (quotation marks omitted), and in their "sovereign territory," *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007).[17] The State Plaintiffs make no allegation that Risk Rating 2.0 either affects their ability to create and enforce state laws, *cf. Texas*, 809 F.3d at 153 (holding that agency program granting deferred action status to certain undocumented immigrants injured States' sovereign interest by "imposing substantial pressure on them to change their laws, which provide for issuing driver's licenses to some aliens and subsidizing those licenses"), or invades land that they own, *cf. Massachusetts*, 549 U.S. at 522 (holding that because Massachusetts owned "substantial" coastal property and greenhouse gas emissions incontrovertibly would cause rising sea levels to subsume much of that land, EPA's inaction in regulating emissions gave Massachusetts a "concrete" and "particularized injury in its capacity as a landowner" (quotation marks omitted)). Nor could they, as Risk Rating 2.0 simply adjusts the methodology undergirding the NFIP's premium calculations and therefore does not concern state land or impose changes to state law. *See, e.g., Louisiana*, 70 F.4th at 880–81 (similar, where Louisiana did not substantiate that final rule requiring shrimping vessels in its waters to use turtle excluder devices affected its ownership interest in marine resources or pressured it to change its wildlife and fisheries laws). State Plaintiffs' broad and generic assertions about their interest in managing

---

[17] Only States have such sovereign interests. *See Louisiana State by & through Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 877 (5th Cir. 2023) ("States have sovereign interests by virtue of their being co-sovereigns in our Nation's federalism."); *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 131 (9th Cir. 1973) (describing the power of "political subdivisions" to be "derivative and not sovereign"). Thus, to the extent the parish and levee districts discuss injuries to their ability "to partner with" FEMA, *e.g.*, Compl. ¶ 530; Pls.' Mem. at 39, that is not a cognizable sovereign injury. In any event, these claimed sovereign injuries are as deficient as those offered by their State counterparts.

subdivisions and participating in flood insurance therefore amount to precisely the type of "abstract questions of political power, of sovereignty, of government" that the Supreme Court has long held cannot give rise to Article III jurisdiction. *Massachusetts v. Mellon*, 262 U.S. 447, 485 (1923); *see also, e.g., Texas v. United States*, 523 U.S. 296, 297, 301–02 (1998).

Even if the State Plaintiffs' sovereign injuries were cognizable as something more than "abstract" questions, they rest entirely on a speculative and attenuated chain of events—and one that depends on independent third parties to boot. *See, e.g., Amnesty Int'l USA*, 568 U.S. at 410 (plaintiffs cannot "rel[y] on a highly attenuated chain of possibilities" to show that threatened injury is "certainly impending"); *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (similar).

The State Plaintiffs allege that Risk Rating 2.0 will devalue mitigation efforts, which will in turn cause increased rates, which will then discourage individuals and businesses from undertaking mitigation projects and potentially even NFIP participation altogether, and these discrete decisions will, when aggregated, prevent the States from ensuring that adequate flood infrastructure is built and that flood events do not render land and property in their borders uninhabitable. *See, e.g.*, Compl. ¶¶ 199, 203, 270–71, 281–83. But once again, this is not an injury to the states as sovereign entities (i.e., "in [their] capacit[ies] as … landowners"). *See Massachusetts*, 549 U.S. at 522. And at any rate, it does not allege a concrete injury at all. There are far too many steps in the causal chain, and the Plaintiff States can only speculate that independent individuals or businesses (or participating NFIP communities) will, because of Risk Rating 2.0, abandon the NFIP en masse, reject private flood insurance en masse, and thereby leave swaths of property in Plaintiff States' borders uninsured and unprotected from flood disasters. Critically, Plaintiffs do not plausibly allege facts showing how Risk Rating 2.0 actually interferes with states or local communities' ability to mitigate risk of floods. Jurisdictions remain free to mitigate risk flooding as they see fit. *Cf. Arizona v. Biden*, 40 F.4th 375, 383 (6th Cir. 2022) (no standing on State sovereignty grounds where agency immigration enforcement

memo "does not regulate the States by telling them what they can or cannot do in their jurisdictions"); *Louisiana*, 70 F.4th at 881 (similar). All the States can muster is that Risk Rating 2.0 creates "uncertainty" about rates that "undermin[es] [their] ability to combat increased rates through mitigation efforts," Compl. ¶ 288, but regulatory uncertainty does not establish standing, *see, e.g.*, *New England Power Generators Ass'n v. FERC*, 707 F.3d 364, 369 (D.C. Cir. 2013), let alone on sovereignty grounds.

In any event, it is clear from the pleadings that Plaintiffs' primary concern is not protecting sovereign interests, but rather preventing purported harm to their citizens. *See, e.g.,* Compl. ¶¶ 247–50, 257–63, 577–83; Pls.' Mem. at 36 ("Most glaring is the harm [Risk Rating 2.0] inflicts on individual policyholders.") As discussed below, Plaintiffs' allegations on this score represent inappropriate assertions of quasi-sovereign standing.

### B.     Plaintiffs Assert No Cognizable Quasi-Sovereign Interests

The State Plaintiffs allege that they have a "quasi-sovereign" "interest in the 'health, comfort, and welfare' of [their] citizens." Compl. ¶ 286 (quoting *Kentucky v. Biden*, 23 F.4th 585, 599 (2022)). Throughout the Complaint and preliminary injunction brief, they repeatedly raise concerns about the affordability of premiums under Risk Rating 2.0 for their citizens and the ability of citizens to remain in their homes. *See, e.g.*, *id.* ¶¶ 230–50, 257–286; Pls.' Mem. at 3, 7, 13, 36–38. As *parens patriae*, a State can bring suit on behalf of its citizens against a private party, to protect its "quasi-sovereign interest" in the health and well-being of its citizens. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 602–03 (1982). But it is well settled that a State cannot bring such a suit against the federal

22

government. *See, e.g., id.* at 610 n.16 ("A State does not have standing as *parens patriae* to bring an action against the Federal Government."); *Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023) (same).[18]

The State Plaintiffs run headlong into this established rule, which vitally protects the dual sovereignty undergirding federalism: The Federal Government has its own sovereign relationship with its citizens, which precludes States from asserting those same citizens' interests *against* the Federal Government. *See, e.g., Mellon*, 262 U.S. at 485–86. ("[I]t is no part of [a state's] duty or power to enforce [the rights of its citizens] in respect of their relations with the federal government," because "[i]n that field[,] it is the United States, and not the state, which represents [the citizens] as *parens patriae*."); *Massachusetts*, 549 U.S. at 520 n.17 (similar). In expressly invoking the flood-insurance-related interests of their residents and quasi-sovereign interests in their well-being, the States invite the Court to ignore this long-standing rule.

Even if a *parens patriae* theory were available, the State Plaintiffs' do not plausibly allege one. They have not identified a state interest that exists "apart from the interests of particular private parties," as they must to sustain a *parens patriae* action. *Snapp*, 458 U.S. at 607; *see also, e.g., Harrison v. Jefferson Par. Sch. Bd.*, No. 20-2916, 2022 WL 539277, at *12 (E.D. La. Feb. 23, 2022), *aff'd and remanded*, No. 22-30143, 2023 WL 4723702 (5th Cir. July 25, 2023). That readily distinguishes this case from *Kentucky*, 23 F.4th at 599. The *Kentucky* court held that those states asserted distinct, cognizable sovereign and quasi-sovereign interests in following their vaccination policies over the federal government's contrary policy (mandating COVID-19 vaccines for employees of federal contractors).

---

[18] To the extent the municipal Plaintiffs also assert injuries on behalf of residents, *see, e.g.,* Compl. ¶ 495 (discussing affordability of premiums for residents); Pls.' Mem. at 39 (similar), they lack standing to do so for the additional reason that they are not sovereigns and thus cannot sue as *parens patriae. See, e.g., El Paso Cnty., Tex. v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020); *Colo. River Indian Tribes v. Town of Parker*, 776 F.2d 846, 848 (9th Cir. 1985).

*Id.* The court concluded that these interests were significant in preventing federal intrusion in this "area traditionally left to the states." *Id.* The Plaintiff States in this case identify no such intrusion.

Finally, where the rights and injuries of private individuals are really what is at issue, the private individuals themselves are better positioned to pursue available remedies on their own behalf, and prudence cautions against relying on *parens patriae* standing. *See Pennsylvania v. Kleppe*, 533 F.2d 668, 675 n.42 (D.C. Cir. 1976). Two Louisiana homeowners allegedly harmed by Risk Rating 2.0 have brought a putative class action raising the exact same APA claims against Defendants in a separate case before the Court. *Hebert*, Case No. 2:23-cv-01869. They, and all other potential homeowners potentially injured by Risk Rating 2.0, do not need the State Plaintiffs to vindicate their interests.[19]

### C.   Plaintiffs Assert No Cognizable Procedural Injury

The State Plaintiffs contend in conclusory fashion that Risk Rating 2.0 deprives them of their statutorily guaranteed procedural rights under the APA to notice and comment. Compl. ¶¶ 251–52, 619–26; Pls.' Mem. at 40. But as the Fifth Circuit recently explained: "[I]t is well established that the 'deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing.' Merely being 'denied the ability to file comments' is 'insufficient to create Article III standing." *Louisiana*, 64 F.4th at 683 (footnotes omitted) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)); *see also, e.g., ED v.*

---

[19] The State Plaintiffs are entitled to no "special solicitude in the standing analysis" based on their assertion of sovereign and quasi-sovereign interests. *Louisiana ex rel. Landry v. Biden*, 64 F.4th 674, 683 (5th Cir. 2023) (quotation marks omitted). Not only have they not proven such interests exist here, those interests also do not allow them to bypass the basic Article III requirement that they demonstrate a concrete, actual or imminent injury to, for example, their economic interests. *Id.* 683, 684 n.59 (citing *Massachusetts*, 549 U.S. at 521, and *Arizona v. Biden*, 31 F.4th 469 (6th Cir. 2022)); *Louisiana*, 70 F.4th at 882 (similar). The Supreme Court has in several recent cases required of States the same Article III injury as non-state litigants, with no mention of special solicitude. *See, e.g., United States v. Texas*, 143 S. Ct. 1964, 1970–71, 1972 n.3 (2023); *Brackeen*, 143 S. Ct. at 1640; *California v. Texas*, 141 S. Ct. at 2116–20; *Trump v. New York*, 141 S. Ct. 530, 534-37 (2020). As discussed below, Plaintiffs identify no such injury.

*Brown*, 143 S. Ct. 2343, 2351–52 (2023); *Spokeo*, 578 U.S. at 341. The State Plaintiffs ignore this fundamental rule. They identify no accompanying "concrete interest that is affected by the deprivation," and instead simply make the bare assertions that they lacked the opportunity to comment and that Risk Rating 2.0 would have benefitted from public input. Compl. ¶¶ 252, 622; Pls.' Mem. at 40. That stands in stark contrast with *Texas v. Equal Employment Opportunity Commission*, 933 F.3d 433, 447 (5th Cir. 2019), in which the court held that the guidance document at issue undercut the State's sovereign interest in maintaining compliance in its laws by "encourag[ing] employers … to deviate from state law" that excluded persons with felony convictions from many public jobs. Plaintiffs identify no similar intrusion into or incompatibility with States' ability to maintain compliance with their own laws.

If State Plaintiffs will, in response, now argue that the lack of notice and comment contributed to the fiscal burdens that Risk Rating 2.0 allegedly imposes on them, and that these burdens supply the necessary concrete interest, that argument fails. As discussed below, the Plaintiffs have failed to plausibly allege any concrete or imminent economic injury.

### D.    Plaintiffs' Alleged Economic Injuries Are Attenuated and Speculative

Plaintiffs allege several economic injuries, but none is availing.

#### 1.    *Tax Base Injury*

All of the government Plaintiffs allege that Risk Rating 2.0 financially injures them by lowering their tax base to fund future mitigation efforts and thereby exposing them to greater risk of future, costly flood events. *See, e.g.*, Compl. ¶¶ 268, 270–77; Pls.' Mem. at 39, 42–43. Plaintiffs frame this theory of standing as "direct proprietary harm," Compl. ¶ 264, yet it is anything but direct, *see E.T. v. Paxton*, 41 F.4th 709, 717 (5th Cir. 2022) ("[F]ederal courts must consider plaintiffs' actual injury— not the labels plaintiffs put on that injury.").

Plaintiffs' theory requires the Court to accept that a lengthy daisy chain of events will occur: *First*, that Risk Rating 2.0 will devalue mitigation efforts and relatedly result in higher premiums for Plaintiffs' residents; *second*, that these changes will be so severe that they will cause residents to stop undertaking mitigation efforts and also to leave the NFIP, increasing the risk of damage for properties in the event of flooding and further raising premiums; *third*, that the increased premiums will be so high that current residents won't be able to afford to live in the Plaintiff communities and will be forced to leave, and potential new residents and businesses will be disincentivized from moving there; *fourth*, that this population loss will depress property values and do so to the extent that businesses will close and Plaintiffs' tax base and tax revenues will be significantly lowered; and *finally* that, as a result, Plaintiffs will lack the resources necessary to sufficiently invest in future mitigation, be forced to leave residents exposed to greater flood damage, have to devote significant public funds to rebuild after more damaging flood events, and ultimately endure a "repeating … cycle" of economic harm (Pls.' Mem. at 43) as property damage and depressed property values from floods cause rates to increase further. *See, e.g.*, Compl. ¶¶ 268, 270–77, 552–57, 574–86; Compl., Ex. 1 ¶¶ 44–46, 57–61.

This theory cannot support an economic injury-in-fact because it relies on a "highly attenuated chain of possibilities." *Amnesty Int'l USA*, 568 U.S. at 410 (similarly involving a five-step chain of injury); *see also, e.g., Louisiana*, 64 F.4th at 682 (injury too attenuated where it required court to accept that federal agency would factor interim estimates of greenhouse gas emissions into deliberations on a rule, and that the rule would harm the plaintiff States). Each successive link along the path from increased premiums to decreased tax bases and greater flood damage requires further contingencies and inferences, which severely undermine Plaintiffs' ability to prove, as they must, that they face a particularized financial harm that is "*certainly* impending." *Amnesty Int'l USA*, 568 U.S. at 410 (emphasis added); *see also, e.g., Paxton*, 41 F.4th at 715. For example, accepting Plaintiffs' theory on its own terms requires accepting not just that some premiums will rise, but that *many* will rise *substantially*, for a

*significant* number of Plaintiffs' residents, perhaps for many years. *See, e.g.*, Compl. ¶¶ 230 (discussing "increase[d] costs for a majority of all homeowners"), 260–61 (describing "unreasonable" and unaffordable costs for policyholders), 553–54 (similar). And on its own terms Plaintiffs' theory similarly requires accepting not just that some of Plaintiff's tax base may be affected, but that the apparently substantial and significant premium changes will cause a *major* exodus of tax-paying property owners from Louisiana and other Plaintiff States and communities and wholly deprive Plaintiffs of necessary funds for mitigation projects. *See, e.g.*, *id.* ¶¶ 261–62, 272, 277. These inferences and contingencies are far from self-evident, and Plaintiffs do not plausibly allege supporting facts. Plaintiffs rely on limited examples of rate increases and isolated circumstances where a resident may leave their home. *See, e.g.*, *id.* ¶¶ 249–250. But identifying a limited number of people who may ultimately move and in turn deprive Plaintiff States of minimal tax revenues does not add up to a sea change in the tax base. Indeed, the law requires more than supposition of incidental, downstream fiscal harm. As the Fifth Circuit has explained, virtually all "federal policies will inevitably have an economic impact on local governments." *El Paso*, 982 F.3d at 340. The Supreme Court similarly has recognized that "federal policies frequently generate indirect effects on state revenues or state spending," but a State's reliance on such indirect effects can be too "attenuated" to support standing. *Texas*, 143 S. Ct. at 1972 n.3. As a result, conferring standing based on attenuated and "incidental economic impact[s]" like what Plaintiffs allege—as opposed to direct, measurable, and significant impacts to specific tax revenues—could spark a slew of "unwarranted litigation against the federal government." *El Paso*, 982 F.3d at 340 (quotation marks omitted).

Plaintiffs' tenuous chain of causation also hinges on the future decisions of independent third parties—current and potential residents and businesses—to leave or forgo moving en masse to the Plaintiff States and communities because of Risk Rating 2.0. But when a plaintiff's "asserted injury arises from the government's allegedly unlawful regulation … of *someone else,*" standing is "substantially

more difficult to establish," as it "depends on the unfettered choices made by independent actors …

whose exercise of broad and legitimate discretion the courts cannot presume either to control or to

predict." *Defs. of Wildlife*, 504 U.S. at 562 (citations omitted). As the Fifth Circuit has explained, "[i]t is

well settled that [a] claim of injury generally is too conjectural or hypothetical to confer standing when

the injury's existence depends on the decisions of third parties." *Hotze v. Burwell*, 784 F.3d 984, 995

(5th Cir. 2015). This longstanding principle applies with special force to suits by States: Where the

possible effects of the federal policy on a State are mediated through the actions of, or the policy's

effects on, the State's own inhabitants—here, the financial decisions of taxpayers—the structure of

the Constitution counsels strongly against concluding that those incidental effects on the State are

fairly traceable to the federal policy. *Cf. Florida v. Mellon*, 273 U.S. 12, 17–18 (1927) (rejecting challenge

to federal tax law that would assertedly cause "tax-payers to withdraw property from the state,"

thereby diminishing its tax revenues, because the State's asserted injury was, "at most, only remote

and indirect" and State could make up any tax deficiency through its own taxation power).

To show that independent third-party decisions buttress their standing, plaintiffs must still

"adduce facts showing that those choices have been or will be made in such manner as to produce

causation and permit redressability of [the] injury," *El Paso*, 982 F.3d at 341 (quoting *Defs. of Wildlife*,

504 U.S. at 562). They fail to do so.

Plaintiffs' declarations do not suffice and cannot cure Plaintiffs' standing infirmities. The

portions that Plaintiffs cite in the Complaint[20] and motion[21] to support their claimed injuries—drawn

---

[20] *See, e.g.*, Compl. ¶¶ 264–278 (the economic harm allegations offered by Louisiana, which mirror those raised by each of the other State Plaintiffs except that many lack declaration support), 481 (the harm section for Assumption Parish, which, as with most of the other municipal plaintiffs, relies on a supporting declaration to support how Risk Rating 2.0 causes financial harm as a result of "property values decreasing and a lower tax base to fund future mitigation efforts"); *see also, e.g., id.* ¶¶ 170, 225, 229, 243–44 (containing other Complaint allegations citing declarations).

[21] *See, e.g.*, Pls.' Mem. at 13, 39, 42–43.

from duplicative state and local government, industry, and homeowner declarations—come nowhere close to plausibly substantiating all the linkages in their tax-base theory of harm. The Court should hold that the declarations are insufficient to establish standing because they consist of conclusory and nonspecific statements that largely parrot Plaintiffs' similarly bare allegations, or at best rely on a handful of outlier examples of individual premium increases to extrapolate in conjectural fashion— without any factual explanation—devastating tax-base injuries across communities and States. *See, e.g.*, *Louisiana*, 64 F.4th at 683 n.52 (rejecting declaration's "speculative and nonspecific" "assertion of harm"); *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 545 (5th Cir. 2019) (explaining that "Article III demands more than … conclusory" and "unsupported" declaration assertions, and "[r]epeating the conclusory allegations of a complaint is not enough" (alteration in original and quotation marks omitted)); *Racing Enthusiasts & Suppliers Coal. v. EPA*, 45 F.4th 353, 357–58 (D.C. Cir. 2022) (similar).

Collectively, Plaintiffs' state and local government declaration excerpts state in sweeping and conclusory terms that Risk Rating 2.0 will (a) subject Plaintiffs' residents to "huge rate increases" that did not occur in the legacy rating approach, *see, e.g.*, Compl., Ex. 17 ¶ 30; *id.*, Ex. 25 ¶ 20, which will in turn cause (b) "an increase in homeowners … not maintain[ing] flood insurance," turning down mitigation projects, "be[ing] priced out of their properties and forced to" leave their communities, *id.*, Ex. 1 ¶¶ 44, 57; *see, e.g.*, *id.*, Ex. 27 ¶¶ 36–37; *id.*, Ex. 12, ¶¶ 33–34; *id.*, Ex. 14, ¶ 37, and correspondingly (c) a "decrease" in their "tax revenues" to protect against and remediate flood damage, *see, e.g.*, *id.*, Ex. 27 ¶ 37; *id.*, Ex. 12 ¶ 34. As a result, these declaration excerpts offer zero corroboration of the similar statements that they ostensibly support in the Complaint and preliminary injunction brief. Most critically, most of the cited excerpts give no specifics on the actual magnitude of the rate increases for most or all their residents, the number of residents expected to leave, or the anticipated tax revenue impact, and instead, like the Complaint and motion, simply *assume* that rate increases will be major enough across the board such that residents will be forced to abandon their communities in droves

and communities will experience significant tax revenue loss. Consider, for example, the declaration of St. Mary's Parish, which Plaintiffs cite to support the contention in their motion that Risk Rating 2.0 rate increases "make[] flood insurance unaffordable for policy-holders and decreases the value of property within parishes and so also property tax revenues." Pls' Mem. at 39. The cited declaration paragraphs simply parrot this causal chain, stating with no support that "[a]s rates increase, many homeowners, business owners, and renters" in the parish will "likely" be "forced to move out of the Parish which will decrease the Parish's tax base and therefore its financial ability to protect its residents and their property from flooding and flood damage." Compl., Ex. 27 ¶¶ 37-41; *see also, e.g.,* Pls' Mem. at 43 (citing Compl., Ex. 1 ¶¶ 44–45, Louisiana declaration containing sweeping and speculative assertions regarding homeowner decisions).

A small handful of the cited government declarations gesture at more specific facts on rate increases, but they too fail to plausibly substantiate any tax-base injury. For instance, Plaquemines Parish offers a specific figure on rate increases—it states that "the average increase of full premium rates NFIP policies exceeds 1000% in some areas." Compl., Ex. 22 ¶ 54 (cited at Compl. ¶¶ 7, 503). But it never substantiates this alleged increase. Nor does it explain whether the increase, which would be over the entire life of a policy and capped at 18% increases annually, is typical for the area or out of step with the minor premium increases that most policyholders across the country face. (Remember, 70% of policy holders saw a premium increase of $0-$10 per month, 8% saw a $10-$20 increase, and only 3% saw a greater increase. *See supra* p. 16; *see also* Maurstad Decl. ¶¶ 46–50 (detailing the premium decreases or minor increases in the Plaintiff States.)) Winn Parish offers another figure on rate increases: it states that Risk Rating 2.0 will cause some policy premiums to increase by 92%. Compl., Ex. 35 at ¶ 11 (cited at Compl. ¶ 521). But it also never explains how many policies this includes and whether and how this type of increase over the life of a policy would exceed policyholders' budgets. These assertions therefore cannot credibly substantiate the allegations they are

cited to support: that Risk Rating 2.0 imposes "*dramatically*" high costs on "many" properties in the Parishes and therefore will wreck "havoc" and seriously impact their "tax base[s]." Compl. ¶¶ 503, 521 (emphasis added); *see also, e.g.*, *id.*, Ex. 3 at ¶ 29 (cited at Compl. ¶ 397); *id.*, Ex. 27 ¶ 34 (cited at Compl. ¶ 510) (similar instances where Plaintiffs fail to connect rate data to community-wide tax-base effects). In other words, these declarations and others lack the critical data connecting increased premiums to unaffordable housing for many or even a sizeable segment of their residents, to say nothing of how they simply "assume [the subsequent] missing links" between individual resident decisions and the community-wide fiscal impacts that they "generally" allege. *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 15 (D.C. Cir. 2011); *compare, e.g.*, *Massachusetts*, 549 U.S. at 522–23 (highlighting robust affidavits, including state official affidavit that connected (a) rising sea levels attributable to lack of regulation, with (b) damage to state coastal property that could take hundreds of millions of dollars to remediate).[22]

The cited industry declarations fare no better. The cited excerpts also state in speculative and conclusory fashion that Risk Rating 2.0 premium increases "threaten[] to raise the cost of housing in the[ir] communities beyond what people can afford," Compl., Ex. 50 ¶ 8; *id.*, Ex. 47 ¶ 7; make it "difficult" or "impossible for local industries to attract workers to move here and fill job openings," *id.*, Ex. 50 ¶ 8; *id.*, Ex. 44 ¶ 9; cause current residents to "find themselves upside down on their mortgage" and leave to find work elsewhere, *id.*, Ex. 44 ¶ 11; Pls.' Mem., Ex. 7 ¶ 10; and "deplete" home values, and thereby result in a "lower tax basis" with which to provide "basic services," Compl., Ex. 44 ¶ 11; Pls.' Mem., Ex. 7 ¶ 10. And they too largely parrot the Complaint and motion assertions that they ostensibly support. For instance, Plaintiffs offer the bare allegation in the Complaint's

---

[22] The FEMA data that Plaintiffs cite does not tell a different story. *See, e.g.*, Dkt. 1 at 54–56, 107. Again, Plaintiffs fail to plausibly tie isolated figures of rate increases to community-wide or statewide migrations that can meaningfully impact tax bases.

discussion of Louisiana's harms that Risk Rating 2.0 "will depress property values, particularly in areas where flood insurance is required," Compl. ¶ 272, and as support they cite the equally bare assertion by Gulf Coast Bank and Trust that "many" potential first-time home purchasers that would borrow from them "will likely decide not to purchase property when they learn of the heightened cost of purchasing NFIP flood insurance under Risk Rating 2.0," *id.*, Ex. 45 ¶ 16.

To the extent that some of the cited industry declarations attempt to offer "illustrat[ions]" to substantiate their assertions, they fail. *Id.*, Ex. 46 ¶ 15 (cited at Compl. ¶ 225). Even taken as true, these limited examples do not come close to plausibly showing that premiums within the Plaintiff States or communities will rise dramatically for some notable share of residents, let alone that their work forces and tax bases will then noticeably shrink as a result. For instance, the Home Builders Association states that the average home price in New Orleans dropped 1.6% between April 2022-April 2023 and that the number of policies decreased by 6% in moderate flood risk zones of its service, *id.*; yet it does not discuss the magnitude of premium rate increases under Risk Rating 2.0 or how these increases— as opposed to, say, sharply rising interest rates during this period[23]—contribute to the limited statistical trends it identifies, *cf., e.g., Arizona*, 40 F.4th at 384 (no standing where "[o]ther explanations exist"). The Miller Home Mortgage Corporation states that in Louisiana the average premium "is currently $813 but will increase to $1904 at full risk pricing," Compl., Ex. 49 ¶ 21 (cited at Compl. ¶ 275); yet it fails to mention that any increase for a policyholder is capped at 18% annually, and in any event fails to plausibly substantiate—*e.g.*, with firsthand accounts from its experience with potential buyers or data on current and projected reduced transactions—that potential increases in monthly premiums will actually be "enough to stop borrowers from purchasing properties," *id.* And a handful of the cited

---

[23] *See, e.g.*, Simon Moore, *Home Prices Rebound After Recent Declines*, Forbes (May 9, 2023), https://perma.cc/3CPA-JAUH (discussing how falling home prices since summer 2022 were largely caused by driving up mortgage rates and hurting affordability).

industry declarations offer a few, cherry-picked examples of policies that will experience significant rate increases as their premiums increase up to 18% per year towards their full actuarial rate, *see, e.g.,* Compl., Ex. 44 ¶ 10; *id.,* Ex. 47 ¶ 8, with no acknowledgement that these examples are significant outliers from the vast majority of policyholders and no explanation for how these outliers can be considered representative of the policies in the Plaintiff communities or predictors of tax-base trends.

For this very reason, the few homeowner declarations that Plaintiffs cite to support their tax base theory of harm fail to move the needle as well. *See, e.g.,* Compl. Ex. 53 (cited at Compl. ¶¶ 229, 263, 276; Pls.' Mem. at 3, 21, 30, 42–43); *id.,* Ex. 54 (cited at Compl. ¶¶ 210, 250, 557; Pls.' Mem at 13, 21, 30, 36–37). At most, they indicate that a Louisiana homeowner may in isolated circumstances— based on individualized community, geographic, and property characteristics that place their property at particularly high flood risk[24]—could eventually choose to move as rates increase along the glide path to full actuarial rates. Neither the declarations nor the Complaint nor the preliminary injunction brief explain why or how these isolated examples are representative of a notable number of residents, let alone an amount that would cause a tax-base injury. In other words, in no way do the declarations support the proposition they are cited for: that, in the aggregate, "higher insurance rates will continue to lower property values and force people to leave the State, reducing the State's tax revenues, which are used to fund future mitigation efforts." Pls.' Mem. at 42; *see also, e.g.,* Compl. ¶¶ 229, 263. Even if the Court were to "assume" based on these declarations and others that Risk Rating 2.0 "increase[s] rates" considerably for some individuals, it "cannot further infer that [Risk Rating 2.0] increase[s]"

---

[24] Mr. Hebert's declaration reinforces the necessity of higher premiums for those facing high flood risks. Over the 40 years that he has been an NFIP policyholder, FEMA has paid $386,331.01 in claims, but has collected significantly less in fees (roughly $155,000, if one assumes that his 2021 policy rate of $3364 applied over the course of the past four decades). Compl., Ex. 54 ¶¶ 13, 19.

meaningful population and job flight in the Plaintiff States and municipalities. *Arpaio v. Obama*, 797 F.3d 11, 22 (D.C. Cir. 2015).[25]

In any event, the declarations do not give the Plaintiffs license to circumvent case law squarely foreclosing their tax-base theory of injury. Indeed, precedent establishes that even if the Court accepts Plaintiffs' highly-attenuated chain of events, the diminished tax revenues at the end of this chain cannot give rise to a cognizable injury in fact.

In *El Paso*, 982 F.3d at 339, the Fifth Circuit held that a county's "loss of general tax revenues as an indirect result of federal policy is not a cognizable injury in fact." El Paso sued the federal government to enjoin it from diverting funds appropriated for military construction projects to construct the border wall, and it alleged that the cancellation of one project, a $20 million construction project at Fort Bliss, caused economic harm by depriving it of tax revenues. *Id.* at 338–39. The Court determined that this alleged harm was not a cognizable injury in fact because, contrary to the Supreme Court precedent, El Paso did not show a "direct link between [its] status as a collector and recipient of [tax] revenues" and the "challenged federal action"—that is, "a loss of *specific* tax revenues" "due to the [project] cancellation." *Id.* at 339–40 (quotation marks omitted) (emphasis added). To reach this holding, the Fifth Circuit relied on *Wyoming v. Oklahoma*, 502 U.S. 437 (1992). It explained that there, Wyoming had standing because the State challenged an Oklahoma statute that required local electricity producers to use a certain amount of Oklahoma coal and thereby "direct[ly]" reduced Wyoming's collection of "hundreds of thousands of" a specific tax, a "severance tax," on all coal from its state. *El Paso*, 982 F.3d at 339 (quotation marks omitted). But El Paso County, much like the

---

[25] It is also worth noting that the vast majority of declarations come from Louisiana; states like Florida and Texas do not in any way attempt to substantiate how any premium increases under Risk Rating 2.0 would significantly impact their tax bases, which have actually expanded more than any other State while Risk Rating 2.0 has been in effect. *See, e.g.*, U.S. Census Bureau, *Growth in U.S. Population Shows Early Indication of Recovery Amid COVID-19 Pandemic* (Dec. 22, 2022), https://perma.cc/V2RN-2EWP.

Plaintiffs here, simply alleged that the cancellation would reduce "general tax revenues" it could generate from workers spending money in their community. *Id.* at 338, 340. As the Court warned, allowing such an allegation to confer standing could spark a wave of "unwarranted litigation against the federal government," *id.* at 340 (quotation marks omitted), because virtually all federal policies will "inevitably" have indirect and incidental economic impacts on States and local governments. *Id.* (relying on *Kleppe*, 533 F.2d at 670, which held that State's claim that insufficient disaster relief funds from federal government would reduce state tax revenues was insufficient to confer standing, as State failed to make necessary connection between collection of specific taxes and challenged federal action); *accord Texas*, 143 S. Ct. at 1972 n.3 (emphasizing that "federal policies frequently generate indirect effects on state revenues or state spending" and that such effects do not automatically confer standing).

*El Paso*'s warning applies with equal measure to this case. Plaintiffs, like El Paso, allege not that Risk Rating 2.0 targets specific tax revenues, but instead that its changes to the NFIP will ultimately result in fewer tax-paying residents and business in their communities. If every State and local government could sue anytime a federal action indirectly results in reduced tax revenues—even if "diminution of tax receipts is largely an incidental result" of the challenged action—the standing inquiry would be meaningless. *Id.* at 339 (quotation marks omitted).

Other cases confirm what *El Paso* teaches and further foreclose Plaintiffs' tax-base theory of standing. Several confirm its core holding that courts must dismiss State and municipal suits against the federal government when, as here, they fail to allege a direct link between the challenged action and the loss of specific tax revenue. *See, e.g.*, *id.* at 340 n.39; *Arias v. DynCorp*, 752 F.3d 1011, 1015 (D.C. Cir. 2014); *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985). And many confirm its broader lesson that State and municipal plaintiffs lack a cognizable injury simply because a federal program like Risk Rating 2.0 may indirectly "cost [them] money." *Crane*, 783 F.3d at 252 (Mississippi

lacked standing to challenge DACA policy under a theory that DACA would cause increases in illegal immigration and "cost the state money because the state provides social benefits to illegal immigrants," since State's claim of increased expenditures was "speculative" and unsupported by "evidence of costs" directly attributable to the policy); *see Arizona*, 40 F.4th at 386 (States lacked standing to challenge DHS memo outlining immigration enforcement priorities on theory that memo would lead to fewer removals and impose social welfare and law enforcement costs on them, since "[m]ost regulations have costs," and allowing "downstream" and "peripheral costs on a State [to] create[] a cognizable Article III injury" would make State standing "boundless"); *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014) (similar).

### 2.  *Enforcement Costs*

The Plaintiffs' claims that Risk Rating 2.0 imposes increased enforcement costs on them fails to support a cognizable Article III injury for much the same reasons. As with Plaintiffs' tax base theory, it depends on an attenuated chain of events, and that chain turns on the conduct of many third parties (policyholders).

According to Plaintiffs, Risk Rating 2.0 will cause increased premiums; these high rates will in turn force individuals to decline to obtain and maintain flood insurance; these policy decisions will mean that a greater number of their residents that receive federal disaster mitigation or recovery grants will be out of compliance with grant requirements to maintain flood insurance; and, as a result, parishes and States will have to step up their efforts to monitor compliance, repay improperly used grant funds to the federal government, and then recoup them from the noncompliant homeowners. *See, e.g.*, Compl. ¶¶ 144, 213, 269; Pls.' Mem. at 42. This theory fails because, as with Plaintiffs' tax base theory of harm, Plaintiffs have not plausibly substantiated that premiums will rise significantly for many or even some noteworthy share of their residents, let alone that these premium increases will cause a significant number of these residents—enough to impact state and local enforcement efforts—to

violate federal law by shirking grant obligations to maintain flood insurance. Policyholders violating the law en masse is hardly a predictable third-party result of Risk Rating 2.0. *See, e.g.*, *Tel. and Data Sys., Inc. v. FCC*, 19 F.3d 42, 48 (D.C. Cir. 1994) (refusing to "presume illegal activities on the part of actors not before the court" in order to find standing); *City of L.A. v. Lyons*, 461 U.S. 95, 104–05 (1983) (similar). As a result, Plaintiffs' increased enforcement cost theory is speculative. *See Louisiana*, 70 F.4th at 883 (rejecting enforcement-based theory on this basis).

Plaintiffs cannot frame their enforcement injury as concrete and direct because they may incur increased administrative "workload." Compl. ¶ 278; *see, e.g.*, *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976); *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018). Decisions about how much of the public fisc to allocate to coordinating flood protection rest entirely with the State and local legislative bodies, and nothing about Risk Rating 2.0 interferes with or dictates those decisions. *Cf. Arizona*, 40 F.4th at 386 (no standing based on enforcement costs where these costs depended on "States' own crime-and-punishment decisions" and "social-welfare policy choices"); *Brackeen*, 143 S. Ct. at 1640 (no standing where State would incur administrative costs regardless of application of federal statutory provisions).

### 3.   Damage to Local Industries

Plaintiffs' contention that Risk Rating 2.0 threatens local industries, such as Louisiana's port industries, by "making it difficult for those Ports to recruit workers" is also just their tax-base theory redux. Pls.' Mem. at 44; *see also, e.g.*, Compl. ¶¶ 263, 542, 636; *id.*, Ex. 1 ¶ 61; *id.*, Ex. 44 ¶ 11. It represents another failed attempt by Plaintiffs to claim injury using an attenuated chain of causation that turns on independent choices by third parties—who, in this telling of Plaintiffs' theory, are workers who increasingly will not live in communities neighboring Louisiana ports because of increased NFIP premiums.

### 4.      Past Spending on Mitigation

Plaintiffs cannot rest their claim of injury on the fact that they previously spent significant public funds to support mitigation projects. *See, e.g.*, Compl. ¶¶ 266–67, 271; Pls.' Mem. at 38, 41–42. They do not explain how their past, voluntary payment of funds to protect residents against flood damage gives rise to "a real and immediate threat of injury necessary to make out a case or controversy." *Lyons*, 461 U.S. at 103.

As for Plaintiffs' allegation that Risk Rating 2.0 devalues those projects because they will not result in lower premiums for Plaintiffs, *see, e.g.*, Compl. ¶¶ 197–208; Pls.' Mem. at 41, that is simply another doomed permutation of their tax-base theory—another way of claiming that the program will, by affecting premium rates, lower populations in their communities and indirectly reduce tax revenues. Whatever way Plaintiffs try to spin this theory, it fails for the reasons described above.

### 5.      Limited Rate Increases for Parish-Owned Policies

Finally, Plaintiffs assert that "some parishes" are NFIP policyholders themselves and allege that, "[j]ust like [for] individual homeowners," the premium increases that these parishes will experience under Risk Rating 2.0 represents a "financial harm." Pls.' Mem at 38. But these allegations are insufficient to confer standing, for two reasons.

*First*, only one parish, St. Tammany Parish, actually provides any specific and concrete information about Risk Rating 2.0 rate increases that it itself will experience. *Compare* Compl., Ex. 28 ¶¶ 37–38 *with id.*, Ex. 19 ¶ 44 (simply stating that its policies are "subject to the rate increases under Risk Rating 2.0," without any detail).

*Second*, St. Tammany Parish is not "[j]ust like" an individual homeowner. For starters, the $2,877 additional dollars it will allegedly have to spend for 2023-2024 across 12 of its policies (roughly $240 per policy for the year, or $24 per month) represents a de minimis cost to the parish, unlike for a resident: That represents 0.0036% of its expenditures on flood mitigation projects. Compl., Ex. 28

at ¶¶ 15, 38. This fiscal cost is a far cry from the "several million dollar[]" loss that the Fifth Circuit found sufficient to confer standing on Texas in the State's suit over the federal Deferred Action for Parents of American's and Lawful Permanent Residents program. *Texas,* 809 F.3d at 155. What is more, any minimal financial impact on Tammany Parish's individual policies is likely be outweighed or at least counterbalanced by the collective financial benefits that Risk Rating 2.0 confers on it based on the net effect of Risk Rating 2.0 on its residents' premiums: Many of its residents will, as a result of the same Risk Rating 2.0 methodology that Plaintiffs complain of, experience *decreases* in policy premiums or avoid indefinite year-to-year premium increases, which on Plaintiffs' own theory of economic impact would strengthen the parish's tax base. Maurstad Decl. ¶¶ 52–54, 222–29 & n.153; *see id.* ¶¶ 173, 184, 192, 202 (detailing increases in Louisiana policyholders receiving mitigation and CRS discounts under Risk Rating 2.0); *cf. Henderson v. Stalder*, 287 F.3d 374, 381 (5th Cir. 2002) (no standing where taxpayers sued to challenge Louisiana law authorizing license plates bearing pro-life message, because extra fees paid by drivers who purchased plates could cover the associated expenses that taxpayers alleged caused a pecuniary injury); *Crane v. Napolitano*, 920 F. Supp. 2d 724, 731 (N.D. Tex. 2013) (finding no standing, where Mississippi failed to show a "*net* fiscal cost [to] the state" (emphasis added)), *aff'd*, 783 F.3d 244 (5th Cir. 2015); *cf. United Transp. Union v. ICC*, 891 F.2d 908, 914 (D.C. Cir. 1989) ("indeterminacy" about effect of challenged policy "is enough to defeat … standing").

Finally, even if any Plaintiff policyholder plausibly alleges a concrete injury because of rate increases, they have made zero effort to establish redressability. Plaintiffs themselves admit that prior to Risk Rating 2.0, policies were subject to "incremental" increases each year. Compl. ¶ 25; *see also id.*, Ex. 54 ¶¶ 17–19 (Mr. Hebert detailing notable pre-Risk Rating 2.0 premium increases, from $2,217 in 2019 to $2,715 in 2020 to $3,364 in 2021). Neither St. Tammany's Parish nor any other parish policyholder has shown that the moderate rate increase they anticipate for their policies under Risk Rating 2.0 would not have occurred as an "incremental increase" under the legacy system and would

39

not occur if Risk Rating 2.0 were enjoined. Nor could they. By statute, FEMA must set NFIP rates on an actuarial basis with the goal of collecting enough premiums to cover the total expected annual loss each year; yet it is indisputable that FEMA has, for more than a decade, run the NFIP at a deficit because it has not collected sufficient premiums to cover risk. *Supra* pp. 4, 7–10. In other words, regardless of which rating methodology it uses—Risk Rating 2.0, or the legacy rating approach— FEMA has had to raise rates. Maurstad Decl. ¶¶ 30, 155–59, 215–16. All that enjoining Risk Rating 2.0 will accomplish is to deprive FEMA of the ability to do so to a granular degree, based on an individualized assessment of a property's particular flood risks. *Id.* at 61–62. Instead, FEMA will have to raise premiums indefinitely across wide segments of policyholders whose properties share a limited set of very basic characteristics, and policyholders with lower flood risks and lower value homes will end up subsidizing policyholders with greater flood risks and higher value homes. *Id.* St. Tammany's Parish makes no showing whatsoever that it would somehow be exempt from these wide-sweeping rate increases absent Risk Rating 2.0. *Cf. Louisiana*, 64 F.4th at 682 (no standing where "[t]he alleged harms would have occurred with or without the [federal policy]").

Even if the Court disagrees and finds that a parish Plaintiff's allegations as a policyholder are sufficient to confer standing, the Court still has an obligation to dismiss all the other Plaintiffs.[26]

---

[26] The standing of the sole non-government Plaintiff, the Association of Levee Boards of Louisiana ("ALBL"), requires little attention. Because none of the municipal Plaintiffs making up ALBL, have any type of sovereign, quasi-sovereign, or economic injury, ALBL lacks associational standing. *See, e.g.*, *NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 237 (5th Cir. 2010) (for associational standing, the members must independently have standing). ALBL also lacks organizational standing because it has not plausibly alleged that Risk Rating 2.0 has required it to "divert[] significant resources to counteract [FEMA]'s conduct" and has thus "significantly and perceptibly impaired the organization's ability to provide its activities." *Id.* (quotation marks omitted). Although ALBL states in its declaration that it has experienced issues in getting adequate information from FEMA on Risk Rating 2.0, *e.g.*, Compl., Ex. 41 ¶ 22, it nowhere explains how this or its desire for increased collaboration with FEMA has caused it to significantly divert resources away from supporting flood control and relief. Instead, ALBL simply gloms onto the failed tax-base injury claimed by its members: namely, that rate increases under Risk Rating 2.0 will reduce members' tax revenues and ability to protect against flood damage,

"[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021); *see also, e.g., Fednav, Ltd. v. Chester*, 547 F.3d 607, 614 (6th Cir. 2008) (explaining that standing "is both plaintiff- and provision-specific"). Here, 50-plus Plaintiffs cannot piggyback off a *single* parish or a select few parishes to justify their continued presence in a suit they have no business to be in. Because they clearly lack standing for the reasons explained above, they must be dismissed. *See, e.g., Fednav,* 547 F.3d at 614 (dismissing several but not all of the plaintiffs for lack of standing); *Colville v. Becerra*, Civ. No. 1:22CV113-HSO-RPM, 2023 WL 2668513, at *9 (S.D. Miss. Mar. 28, 2023) (similar, explaining that "if the standing question is not complex, and the Court '*knows* that a party is without standing,' that plaintiff must be dismissed" (quoting *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 344 n.3 (5th Cir. 2013), which explained that a court need not verify the independent standing of other co-plaintiffs when one has standing, but cannot avoid resolving the standing of these co-plaintiffs when, as was the case with two of the plaintiffs at issue, it knew they had no injury).

## II.     Plaintiffs Lack Standing to Assert Their NEPA Claim

Even if the Court does not dismiss all or some of the Plaintiffs on Article III standing grounds, it should still dismiss Plaintiffs' NEPA claims for lack of statutory standing.

Congress enacted NEPA, 42 U.S.C. §§ 4321-4370m-12, to establish a process for federal agencies to consider the environmental impacts of major federal actions. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 558 (1978); *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983); 42 U.S.C. § 4332(2)(C). "NEPA does not provide a private right of action.

---

and this undermines citizens' "confidence" in ALBL and its ability to fulfill its purpose of promoting levee boards' interests and the welfare of taxpayers. *Id.* ¶¶ 46–55. This type of abstract and attenuated injury to ALBL's mission—devoid of any specificity as to harmed organizational activities and reliant on the failed injury claims of its members—is insufficient to confer organizational standing. *See, e.g., Food & Water Watch, Inc v. Vilsack*, 808 F.3d 905, 921 (D.C. Cir. 2015).

Instead, challenges to NEPA-mandated decision-making are pursued through the APA." *Highland Vill. Parents Grp. v. U.S. Fed. Highway Admin.*, 562 F. Supp. 2d 857, 860 (E.D. Tex. 2008). Under the APA, a plaintiff must establish that an "agency action" caused an adverse effect "within the meaning of a relevant statute" before a court can reach the merits of a claim. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) (quoting 5 U.S.C. § 702). The alleged adverse effect has to arguably fall within the "zone of interests" protected by the statutory provision invoked in the suit. *Bennett v. Spear*, 520 U.S. 154, 162 (1997).

The "zone of interests" test prevents claimants from using NEPA's requirements to vindicate grievances unrelated to the statute's purpose. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987) ("The 'zone of interest' test is a guide for deciding whether … a particular plaintiff should be heard to complain of a particular agency decision."). Referring to this test as "statutory standing," this District has recognized that the "zone of interests" test eliminates "generalized grievances," and "the assertion of the right of a third party." *Ryan v. Nat'l Football League, Inc.*, No. 19-cv-1811, 2019 WL 3430259, at *2 (E.D. La. July 30, 2019) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)).

The purpose of the statute at issue here, NEPA, is to promote environmental quality through its procedural mandates. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA's zone of interests then encompasses only environmental concerns like air and water quality, aesthetic enjoyment, and recreational use of land. *See Nat'l Wildlife Fed'n*, 497 U.S. at 886 (deciding that "recreational use and aesthetic enjoyment" are among the sorts of interests that NEPA was "specifically designed to protect"); *Robertson*, 490 U.S. at 332 (considering impacts to air quality, water quality, and wildlife); *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972) (examining damage to scenery and historical objects that would impair enjoyment). Because NEPA's zone of interests relates only to environmental concerns, plaintiffs must first establish an environmental interest to obtain relief. "Mere

'interest in a problem'" is insufficient, and a party "cannot simply rely on its or the public's free-floating interest in environmental stewardship" to bring a NEPA claim. *Sierra Club*, 405 U.S. at 739; *see Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 299 (5th Cir. 2018) Instead, a concrete and specific environmental interest is necessary to move on to analysis of impact. *Ecosystem*, 729 F. App'x at 299; *accord Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1103 (9th Cir. 2005); *Town of Stratford v. FAA*, 285 F.3d 84, 88 (D.C. Cir. 2002).

Purely economic effects fall outside NEPA's zone of interests in the Fifth Circuit. *Ecosystem*, 729 F. App'x at 294 (affirming dismissal of NEPA claim because plaintiff's claim "relates to its pocketbook not the environment"); *Am. Petroleum Inst. v. U.S. Dep't of Interior*, No. 2:21-CV-02506, 2022 WL 16704444, at *9 (W.D. La. Oct. 5, 2022) ("The majority of NEPA authority nationwide makes clear that economic injury alone does not satisfy the statute's zone of interest test."). For example, the Fifth Circuit dismissed the *Ecosystem* plaintiffs' challenge to the Army Corps of Engineers' decision to build new wetlands. 729 F. App'x at 289. Despite the environmental impact from building new wetlands and the impact on the plaintiff, the Fifth Circuit found the plaintiff's harm to be too attenuated from any environmental harm. *Ecosystem*, 729 F. App'x at 300; *see also Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 194 (3d Cir. 2016) ("To be among those that Congress intended to bring suit under NEPA, a plaintiff's actual interests must substantially align with the protection of our physical environment."); *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 945 (9th Cir. 2005) (holding that "a purely economic injury that is not intertwined with an environmental interest" is not contemplated by NEPA's zone of interests).

Here, to the extent Plaintiffs' alleged economic harms are at all connected to the environment, that connection is long and attenuated. Plaintiffs argue that the new insurance rates will cause people to leave the Plaintiff States and discourage individuals from purchasing property in the Plaintiff States, thereby depressing property values and reducing Plaintiffs' tax base and therefore their tax revenue,

and then as a consequence, allegedly harm Plaintiffs' ability to *invest* in future flood-mitigating projects. *See* Compl. ¶¶ 296–300. Plaintiffs appear to argue that, eventually, the consequences of the new rate calculation will discourage flood mitigation, "thereby raising the risk and increasing the probability of severe damage." *Id.* ¶ 303.

This conclusory causal chain is far too attenuated from FEMA's action. In addition, Plaintiffs fail to explain why the flood mitigation projects that they allegedly can no longer invest in would benefit the environment such that foregoing those projects would cause any environmental harm. Purely economic harm cannot support a NEPA claim, so Plaintiffs' failure to allege an environmental impact prevents success on the merits. *Ecosystem*, 729 F. App'x at 294.

Further, even where Plaintiffs arguably allege an environmental interest, it is insufficient to support their NEPA claim. Plaintiffs claim vague interests in preserving "sovereign territory and habitability" and protecting against "flooding by ensuring adequate flood mitigation infrastructure is built," Compl. ¶ 270, 285, but Plaintiffs fail to tether these "free-floating interests" to FEMA's decision to revise premiums, just as the plaintiff in *Ecosystem* failed to connect its interest to the challenged agency action. 729 F. App'x at 299.

**CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' motion to dismiss.

Dated:  August 7, 2023

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

LESLEY FARBY
Assistant Branch Director
Civil Division, Federal Programs Branch

*Benjamin Takemoto*
BENJAMIN TAKEMOTO
(DC Bar # 1045253)
YOSEPH T. DESTA
(CA Bar # 332179)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883, Ben Franklin Station
Washington, DC 20044
Tel: (202) 532-4252
Email: benjamin.takemoto@usdoj.gov

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment & Natural Resources
Division

KRYSTAL-ROSE PEREZ,
(TX Bar # 24105931)
Trial Attorney
P.O. Box 7611, Ben Franklin Station,
Washington, D.C. 20044
Tel: (202) 305-0486
Email: krystalrose.perez@usdoj.gov

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 7, 2023, the foregoing was filed electronically through ECF/CM.  On this same date, electronic service will be made to all counsel of record through the Court's ECF/CM system.

*Benjamin Takemoto*
_____
BENJAMIN T. TAKEMOTO
Trial Attorney, U.S. Department of Justice