**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

THE STATE OF LOUISIANA, *et al.*,

                          *Plaintiffs*,

        v.

DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

                    *Defendants*.

Action No. 2:23-CV-01839-DJP-JVM
Section P
District Judge Darrel J. Papillion
Magistrate Judge Janis van Meerveld

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

STANDARD OF REVIEW ................................................................................................. 3

ARGUMENT ...................................................................................................................... 4

    I.    Plaintiffs Cannot Establish Article III Standing, Let Alone Irreparable Harm ..................... 4

        A.   Plaintiffs Lack Standing ................................................................................... 4

        B.   Plaintiffs Do Not Face Irreparable Harm ...................................................... 5

    II.   Plaintiffs Are Unlikely to Succeed on the Merits.................................................... 10

        A.   Risk Rating 2.0 Is Not Contrary to Law and Does Not Violate FEMA's Statutory Authority........................................................................................... 10

        B.   Risk Rating 2.0 Is Not Arbitrary and Capricious ......................................... 17

            1.   Risk Rating 2.0 considers important aspects of the problem............................ 18

            2.   Risk Rating 2.0 does not disregard relevant reliance interests.......................... 21

            3.   Risk Rating 2.0 does not depart from prior policy without justification ........... 24

            4.   Risk Rating 2.0 is not pretextual ................................................................ 27

        C.   Risk Rating 2.0 Is Not Subject to Notice and Comment ............................. 29

        D.   Risk Rating 2.0 Does Not Violate the Spending Clause................................ 33

        E.   Risk Rating 2.0 Does Not Violate NEPA ..................................................... 39

            1.   Risk Rating 2.0 is not subject to NEPA because it does not affect the physical environment ................................................................................ 39

            2.   Even if NEPA applies, Risk Rating 2.0 is covered under a categorical exclusion .................................................................................................. 42

    III.  The Balance of Equities and Public Interest Weigh Strongly Against a Preliminary Injunction ................................................................................................................ 43

CONCLUSION.................................................................................................................. 47

# TABLE OF AUTHORITIES

### CASES

*Adolph v. FEMA,*
    854 F.2d 732 (5th Cir. 1988) ........................................................................................ 34, 35

*Aeronautical Repair Station Ass'n, Inc. v. FAA,*
    494 F.3d 161 (D.C. Cir. 2007) ............................................................................................ 32

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.,*
    840 F. Supp. 2d 327 (D.D.C. 2012) ..................................................................................... 6

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982) .............................................................................................................. 5

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.,*
    878 F.2d 806 (5th Cir. 1989) ............................................................................................... 4

*Am. Fam. Life Assurance Co. of Columbus v. Aetna Life Ins. Co.,*
    446 F.2d 1178 (5th Cir. 1971) ............................................................................................. 9

*Amin v. Mayorkas,*
    24 F.4th 383 (5th Cir. 2022) .............................................................................................. 29

*Atchison, Trucking Ass'ns v. Atchison, Topeka & Sante Fe Railway Co.,*
    387 U.S. 397 (1967) ........................................................................................................... 25

*Benisek v. Lamone,*
    138 S. Ct. 1942 (2018) ....................................................................................................... 45

*Black Fire Fighters Ass'n of Dall. v. City of Dallas,*
    905 F.2d 63 (5th Cir. 1990) ................................................................................................. 4

*Brown Express, Inc. v. United States,*
    607 F.2d 695 (5th Cir. 1979) ............................................................................................. 29

*California v. Norton,*
    311 F.3d 1162 (9th Cir. 2002) ........................................................................................... 43

*Chambless Enterprises, LLC v. Redfield,*
    508 F. Supp. 3d 101 (W.D. La. 2020) ................................................................................. 7

*Cherokee Pump & Equip., Inc. v. Aurora Pump,*
    38 F.3d 246 (5th Cir. 1994) ................................................................................................. 3

*Citizen Advocs. for Responsible Expansion, Inc. (I-Care) v. Dole,*
    770 F.2d 423 (5th Cir. 1985) ............................................................................................. 42

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ................................................................................................12

*City of Arlington v. FCC,*
    668 F.3d 229 (5th Cir. 2012) ............................................................................ 32, 33

*City of Coll. Station v. U.S. Dep't of Agric.,*
    395 F. Supp. 2d 495 (S.D. Tex. 2005) ..................................................................3

*City of Dallas v. Hall,*
    562 F.3d 712 (5th Cir. 2009) ...............................................................................40

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ...............................................................................................5

*Cornish v. Dudas,*
    540 F. Supp. 2d 61 (D.D.C. 2008) .......................................................................44

*Ctr. for Biological Diversity v. Salazar,*
    706 F.3d 1085 (9th Cir. 2013) .............................................................................42

*Department of Homeland Security v. Regents of the University of California,*
    140 S. Ct. 1891 (2020) ..........................................................................................22

*Dep't of Com. v. New York,*
    139 S. Ct. 2551 (2019) ..............................................................................17, 18, 28

*Dep't of Transp. v. Pub. Citizen,*
    541 U.S. 752 (2004) ...............................................................................................40

*E.T. v. Paxton,*
    19 F.4th 760 (5th Cir. 2021) .................................................................................45

*El Paso Cnty., Tex. v. Trump,*
    982 F.3d 332 (5th Cir. 2020) .................................................................................5

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) ...............................................................................................25

*Ensco Offshore Co. v. Salazar,*
    Civ. A. No. 10-1941, 2011 WL 13203198 (E.D. La. Apr. 26, 2011) .....................3

*Experience Works, Inc. v. Chao,*
    267 F. Supp. 2d 93 (D.D.C. 2003) .......................................................................44

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) .........................................................................................23, 25

*FCC v. Prometheus Radio Project,*
    141 S. Ct. 1150 (2021) ..............................................................................................17

*FERC v. Elec. Power Supply Ass'n,*
    577 U.S. 260 (2016) ..................................................................................................17

*Florida Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) ..................................................................................................27

*Florida v. Mellon,*
    273 U.S. 12 (1927) ......................................................................................................7

*Frederick v. Dep't of Pub. Welfare,*
    157 F. Supp. 2d 509 (E.D. Pa. 2001) .......................................................................39

*Freedom Holdings, Inc. v. Spitzer,*
    408 F.3d 112 (2d Cir. 2005) .......................................................................................6

*Gill v. U.S. Dep't of Just.,*
    913 F.3d 1179 (9th Cir. 2019) ..................................................................................30

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) .............................................................................................47

*Glob. Oil Tools, Inc. v. Expeditors Int'l of Wash., Inc.,*
    Civ. A. No. 16-16372, 2018 WL 263233 (E.D. La. Jan. 2, 2018) .............................8

*Henderson v. Stalder,*
    287 F.3d 374 (5th Cir. 2002) ......................................................................................5

*Holland Am. Ins. Co. v. Succession of Roy,*
    777 F.2d 992 (5th Cir. 1985) ......................................................................................5

*Humana, Inc. v. Jacobson,*
    804 F.2d 1390 (5th Cir. 1986) ....................................................................................5

*In re FCC 11-161,*
    753 F.3d 1015 (10th Cir. 2014) ................................................................................23

*John Doe #1 v. Veneman,*
    380 F.3d 807 (5th Cir. 2004) ....................................................................................47

*Jordan v. Fisher,*
    823 F.3d 805 (5th Cir. 2016) ......................................................................................4

*La Casa Del Convaleciente v. Sullivan,*
    965 F.2d 1175 (1st Cir. 1992) ..................................................................................29

*Lake Carriers' Ass'n v. EPA,*
    652 F.3d 1 (D.C. Cir. 2011)...................................................................................................33

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
    140 S. Ct. 2367 (2020)............................................................................................16, 31, 32

*Loc. 814, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen v. NLRB,*
    546 F.2d 989 (D.C. Cir. 1976) ...............................................................................................3

*Louisiana ex rel. Landry v. Biden,*
    No. 22-30087, 2022 WL 866282 (5th Cir. Mar. 16, 2022)...................................................45

*Louisiana ex rel. Landry v. Biden,*
    64 F.4th 674 (5th Cir. 2023)...................................................................................................5

*Martinez v. Mathews,*
    544 F.2d 1233 (5th Cir. 1976)...............................................................................................45

*Maryland v. King,*
    567 U.S. 1301 (2012)..............................................................................................................44

*Massachusetts v. EPA,*
    549 U.S. 497 (2007)..................................................................................................................4

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997)..................................................................................................................5

*Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.,*
    602 F.3d 687 (5th Cir. 2010) .................................................................................................27

*MediNatura, Inc. v. Food & Drug Admin.,*
    496 F. Supp. 3d 416 (D.D.C. 2020) ......................................................................................23

*Menchaca v. Chrysler Credit Corp.,*
    613 F.2d 507 (5th Cir. 1980) ...................................................................................................3

*Metro. Edison Co. v. People Against Nuclear Energy,*
    460 U.S. 766 (1983)..................................................................................................39, 40, 41

*Miami-Dade Cnty. v. EPA,*
    529 F.3d 1049 (11th Cir. 2008)..............................................................................................33

*Miss. Power & Light Co. v. United Gas Pipe Line Co.,*
    760 F.2d 618 (5th Cir. 1985) ...............................................................................................4, 6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)..................................................................................................................25

*Munaf v. Geren,*
    553 U.S. 674 (2008) ........................................................................................... 10

*N.C. Fisheries Ass'n, Inc. v. Gutierrez,*
    518 F. Supp. 2d 62 (D.D.C. 2007) .................................................................... 18

*National Ass'n of Mfrs. v. Department of Defense,*
    138 S. Ct. 617 (2018) ........................................................................................ 16

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) .......................................................................................... 24

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ........................................................................... 34, 35, 36, 37

*Nat'l Mining Ass'n v. McCarthy,*
    758 F.3d 243 (D.C. Cir. 2014) ......................................................................... 29

*Nat'l Tr. for Historic Pres. in the U.S. v. U.S. Dep't of Veterans Affs.,*
    No. 09-cv-5460, 2010 WL 1416729 (E.D. La. Mar. 31, 2010) ....................... 40

*New York v. United States,*
    505 U.S. 144 (1992) .......................................................................................... 34

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................................ 4

*Olivares v. Transp. Sec. Admin.,*
    819 F.3d 454 (D.C. Cir. 2016) ........................................................................... 3

*Pennhurst State Sch. & Hosp. v. Halderman,*
    451 U.S. 1 (1981) ............................................................................................. 37

*Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott,*
    734 F.3d 406 (5th Cir. 2013) .............................................................................. 7

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) .......................................................................................... 40

*Ross v. Blake,*
    578 U.S. 632 (2016) .......................................................................................... 31

*Russello v. United States,*
    464 U.S. 16 (1983) ............................................................................................ 30

*Sabine River Authority v. Department of Interior,*
    951 F.2d 669 (5th Cir. 1992) ....................................................................... 40, 41

*Sampson v. Murray,*
415 U.S. 61 (1974) ......................................................................................6

*Scott v. Schedler,*
826 F.3d 207 (5th Cir. 2016) ................................................................46, 47

*Sherley v. Sebelius,*
644 F.3d 388 (D.C. Cir. 2011) ...................................................................45

*Shinseki v. Sanders,*
556 U.S. 396 (2009) ..................................................................................32

*Sierra Club v. U.S. Dep't of Interior,*
990 F.3d 909 (5th Cir. 2021) .....................................................................17

*Smiley v. City Bank (South Dakota), N.A.,*
517 U.S. 735 (1996) ..................................................................................24

*Snook v. Tr. Co. of Ga. Bank of Savannah,*
909 F.2d 480 (11th Cir. 1990) .....................................................................6

*Solenex LLC v. Bernhardt,*
962 F.3d 520 (D.C. Cir. 2020) ...................................................................23

*South Dakota v. Dole,*
483 U.S. 203 (1987) .............................................................................34, 38

*State of La., ex rel. Guste v. Verity,*
853 F.2d 322 (5th Cir. 1988) .....................................................................27

*Steward Mach. Co. v. Davis,*
301 U.S. 548 (1937) ..................................................................................37

*Taylor v. Freeman,*
34 F.3d 266 (4th Cir. 1994) .......................................................................45

*Tex. Educ. Agency v. U.S. Dep't of Educ.,*
908 F.3d 127 (5th Cir. 2018) .....................................................................34

*Tex. Landowners Rights Ass'n v. Harris,*
453 F. Supp. 1025 (D.D.C. 1978) ..............................................................35

*Texas v. EPA,*
829 F.3d 405 (5th Cir. 2016) .......................................................................6

*Texas v. United States,*
328 F. Supp. 3d 662 (S.D. Tex. 2018) ......................................................8, 9

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015) ..................................................................................4

*Texas v. Yellen,*
  No. 2:21-CV-079-Z, 2022 WL 989733 (N.D. Tex. Mar. 4, 2022) ................................ 36, 37

*United States v. Johnson,*
  632 F.3d 912 (5th Cir. 2011) ............................................................................ 31, 33

*United States v. Larionoff,*
  431 U.S. 864 (1977) ..............................................................................................43

*United States v. St. Bernard Par.,*
  756 F.2d 1116 (5th Cir. 1985) ...............................................................................37

*Veasey v. Abbott,*
  870 F.3d 387 (5th Cir. 2017) ...................................................................................7

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,*
  435 U.S. 519 (1978) ..............................................................................................39

*W. Houston Air Comm. v. FAA,*
  784 F.2d 702 (5th Cir. 1986) .................................................................................43

*W. Sur. Co. v. PASI of LA, Inc.,*
  334 F. Supp. 3d 764 (M.D. La. 2018) ......................................................................8

*Wages & White Lion Invs., LLC v. FDA,*
  16 F.4th 1130 (5th Cir. 2021) .................................................................................6

*West Virginia v. EPA,*
  142 S. Ct. 2587 (2022) ..........................................................................................16

*Wildmon v. Berwick Universal Pictures,*
  983 F.2d 21 (5th Cir. 1992) .....................................................................................7

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ................................................................................................ 3, 4

*Wisc. Gas Co. v. FERC,*
  758 F.2d 669 (D.C. Cir. 1985) .................................................................................7

*Wreal, LLC v. Amazon.com, Inc.,*
  840 F.3d 1244 (11th Cir. 2016) ...............................................................................8

**STATUTES**

5 U.S.C. § 553(b)(1)(A) ................................................................................29

5 U.S.C. § 706 ...............................................................................................31

42 U.S.C. § 4001 ....................................................................................11, 38

42 U.S.C. § 4011(a) ...............................................................................10, 44

42 U.S.C. § 4014 ..................................................................... 10, 21, 30, 31

42 U.S.C. § 4015(a) .......................................................... 12, 30, 31, 32

42 U.S.C. § 4020 ....................................................................................15, 16

42 U.S.C. § 4024 ............................................................................................15

42 U.S.C. § 4102(c)(2) ..................................................................................28

42 U.S.C. § 4321 ............................................................................................39

42 U.S.C.A. § 4332 ................................................................................39, 40

Pub. L. No. 112-141, 126 Stat. 405 (2012) ...........................................14, 31

**RULES**

Fed. R. Civ. P. 65(d)(1)(C) ..........................................................................46

**REGULATIONS**

40 C.F.R. § 1508.4 .........................................................................................42

DHS, *Instruction Manual 023-01-001-01, Revision 01, Implementation of the National
Environmental Policy Act (NEPA)*, https://perma.cc/NSK4-KBYD ("*Instruction Manual*") ........ 42, 43

*Guidance Regarding NEPA Regulations,*
48 Fed. Reg. 34,263 (July 28, 1983) ........................................................42

**OTHER AUTHORITIES**

Diane P. Horn & Baird Webel, *Introduction to the National Flood Insurance Program (NFIP)*, Cong.
Research Serv. (updated Jan. 6, 2023), https://perma.cc/9AA9-7MMD ...........................................22

FEMA, *An Affordability Framework for the National Flood Insurance Program* (Apr. 17, 2018),
https://perma.cc/74U5-CB3F ..................................................................14

FEMA, *FEMA Efforts Advancing Community Driven Relocation*, FEMA (Dec. 2, 2022),
https://perma.cc/9J53-Q9F5 ....................................................................27

FEMA, *FEMA Updates Its Flood Insurance Rating Methodology to Deliver More Equitable Pricing* (Apr. 2021), https://perma.cc/QF9V-V6MR...................................................................................26

FEMA, Flood Insurance Manual (Oct. 2022), https://perma.cc/9FQL-P2Z4....................................26

FEMA, *Risk Rating 2.0: Equity in Action – Industry Transition Memorandum* (Sept. 1, 2021), https://perma.cc/EVW8-TUAF................................................................................................26

FEMA, *Risk Rating 2.0 is Equity in Action*, (Apr. 2021), https://perma.cc/TW62-NXXP ("RR *2.0 Equity in Action*")................................................23, 26, 28

GAO, GAO-17-425, *Flood Insurance: Comprehensive Reform Could Improve Solvency and Enhance   Resilience*, (Apr. 27, 2017), https://perma.cc/HT88-X3GR ..................................................................................11

GAO, GAO-23-105977, *FEMA's New Rate-Setting Methodology Improves Actuarial Soundness but Highlights Need for Broader Program Reform* (July 2023), https://perma.cc/39NG-PY86 ....................22

## INTRODUCTION

In March 2019, Defendant Federal Emergency Management Agency ("FEMA") announced that it would implement an actuarial update to the premiums for flood insurance provided by the National Flood Insurance Program ("NFIP"), the federal program that it administers to protect millions of Americans from the devastating financial impacts of flood disasters. This update, known as Risk Rating 2.0, modernizes the NFIP's outdated rate-setting approach from the 1970s with a 21st-century approach that leverages industry best practices, up-to-date technology, better data, and fundamental actuarial principles and methods. Risk Rating 2.0 is the culmination of years of work by FEMA to correct critical inadequacies in its legacy rating approach, and it has enabled FEMA to deliver premium rates that, consistent with congressional mandates, are actuarially sound because they reflect each covered property's true flood risk and are fairly distributed based on individual risk levels. For new policyholders and existing policyholders who opted in, the updated rates started going into effect on October 1, 2021, and for all other policyholders, the updated rates started going into effect on April 1, 2022. From day one, FEMA has prioritized transparency: It has engaged in a comprehensive, multi-year effort to communicate with the public, media, state and local governments, and stakeholder groups about Risk Rating 2.0, releasing copious information about the necessary changes it made to the NFIP, what it did not change, its justifications and impacts, and its underlying data sources and methods. In other words, FEMA has dedicated years of effort to develop and implement Risk Rating 2.0 and has "shown[] its work." Mem. in Supp. of Mot. for Prelim. Inj., 4, Dkt. 16-1 ("Pls.' Mem.") at 4.

NFIP policyholders and the American public have reaped the reward. The vast majority of policies have seen premium decreases or only slight increases under Risk Rating 2.0; and the update stops the indefinite annual premium increases that were occurring and would continue to occur year after year with the legacy rates, including because many policies in the next three years will reach rates

that fully reflect their properties' risk levels. For more than a decade, various stakeholder groups asked for precisely the changes that Risk Rating 2.0 implemented, and since Risk Rating 2.0 went into effect, many have heralded it as essential to the NFIP's ability to continue to provide flood insurance coverage across the country and pay out claims.

Nonetheless, more than four years after FEMA first announced Risk Rating 2.0, and twenty months after FEMA began applying it to policies, Plaintiffs—a subset of States and communities— filed suit and have belatedly brought this Motion to preliminarily enjoin Risk Rating 2.0. Plaintiffs' Motion is without merit. Plaintiffs wrongly ask the Court to upend the status quo—which is that Risk Rating 2.0 has applied to NFIP policies for multiple years and has been fully implemented across the country—and do so simply because some policyholders in their States and communities are now paying higher premiums based on a more accurate, congressionally-mandated assessment of their flood risks, and are no longer being subsidized by policyholders in less flood-prone areas. That some policyholders are now paying higher premiums does not entitle Plaintiffs to relief.

Plaintiffs' Motion should be denied for several reasons. For one, Plaintiffs have not suffered a concrete, redressable Article III injury (as FEMA explained in its Motion to Dismiss, Dkt. 47), let alone any irreparable harm if an agency policy that has already been in effect for years is not immediately enjoined. By contrast, an injunction would seriously harm the government and the American public by preventing FEMA from ensuring the actuarial soundness and fiscal solvency of the NFIP and completely disrupting the program's administration. On the merits, Plaintiffs have little chance of success, as they disregard FEMA's clear statutory mandate to estimate and set premium rates based on actuarial principles, as Risk Rating 2.0 does; conveniently ignore the agency's robust public explanations considering all relevant factors and justifying Risk Rating 2.0 based on legitimate grounds; and distort Risk Rating 2.0 beyond recognition to assert notice-and-comment, Spending

Clause, and National Environmental Policy Act (NEPA) violations where none exist. Accordingly, the Court should deny Plaintiffs' Motion.

## BACKGROUND

To avoid needless repetition, Defendants incorporate by reference the background section of their recently filed Memorandum in Support of Their Motion to Dismiss at 2–18, Dkt. 47-1 ("Defs.' Mot. Dismiss Mem."). As with that filing, this filing also includes as an attachment the Declaration of Mr. David L. Maurstad ("Maurstad Decl.").[1] Defendants also include as an attachment to this filing the Declaration of Mr. Lloyd "Tony" Hake ("Hake Decl."), which details FEMA's extensive public communications regarding Risk Rating 2.0 dating back to March 2019.[2]

## STANDARD OF REVIEW

Preliminary injunctions are extraordinary and drastic remedies. *Cherokee Pump & Equip., Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994). They are "not to be granted routinely, but only when

---

[1] The Court can and should consider the Maurstad Declaration because the declaration elucidates the record before FEMA when the agency developed and implemented Risk Rating 2.0, and therefore facilities judicial review of whether the agency acted reasonably and adequately justified its actions. Courts regularly consider agency declarations under these circumstances. *See, e.g., Olivares v. Transp. Sec. Admin.*, 819 F.3d 454, 463–64 (D.C. Cir. 2016); *Ensco Offshore Co. v. Salazar*, Civ. A. No. 10-1941, 2011 WL 13203198, at *1–2 (E.D. La. Apr. 26, 2011); *City of Coll. Station v. U.S. Dep't of Agric.*, 395 F. Supp. 2d 495, 505 n.4 (S.D. Tex. 2005). The declaration especially facilitates judicial review here since the administrative record is not yet available, and FEMA will need up to eight months to compile it. Defs.' Mem. in Supp. of their Mot. to Extend the Submission Date for Pls.' Mot. for a Prelim. Inj., at 2, Dkt. 34-1; *cf., e.g., Loc. 814, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976) (courts can consider declarations where record cannot illuminate agency's decisionmaking). The declaration is also permissible to explain the harms to FEMA and the public interest if the Court were to enter an injunction, *see, e.g., Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24–25 (2008), and on the question of whether Plaintiffs have plausibly asserted a concrete, redressable injury in fact for standing, *see, e.g., Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980).

[2] The Court can and should consider the Hake Declaration because it also supplies helpful background information on Risk Rating 2.0. Defendants have compiled and prepared numerous appendices documenting the communications described in the declaration. To avoid overburdening the Court and Plaintiffs, Defendants have not attached these appendices to the declaration but can make any supporting document available upon request.

the movant, by a clear showing, carries [the] burden of persuasion." *Black Fire Fighters Ass'n of Dall. v. City of Dallas*, 905 F.2d 63, 65 (5th Cir. 1990) (quotation marks omitted). The moving party must clearly show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that a balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 22; *see also, e.g.*, *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016). When the federal government is the defendant, the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The movant's failure to demonstrate any of the factors is sufficient to deny injunctive relief, *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989), and "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule," *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

## ARGUMENT

## I.   Plaintiffs Cannot Establish Article III Standing, Let Alone Irreparable Harm

### A.   Plaintiffs Lack Standing

As Defendants explain in their recently filed Motion to Dismiss under Rule 12(b)(1), Plaintiffs face no concrete, redressable injury that would confer Article III standing. Plaintiffs fail to plausibly allege each of the four types of injuries purportedly caused by Risk Rating 2.0: (1) injury to States' sovereign interests in flood protection; (2) injury to States' quasi-sovereign interest in the health, comfort, and welfare of their citizens; (3) deprivation of their procedural right to notice and comment; and (4) various economic injuries stemming from the program's regulatory changes.

Plaintiffs assert no cognizable sovereign injury because they fail to allege how Risk Rating 2.0 either invades land that they own or affects their ability to create and enforce their laws. *See, e.g.*, Defs.' Mot. Dismiss Mem., at 19–22 (citing *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007), and *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015)). They assert no cognizable quasi-sovereign injury because established precedent prevents them from suing the federal government on behalf of their citizens.

*Id.* at 22–24 (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 602–03 (1982)). They assert no cognizable procedural injury because they identify no concrete interest affected by the deprivation of an opportunity to notice and comment. *Id.* at 24–25 (citing *Louisiana ex rel. Landry v. Biden*, 64 F.4th 674, 683 (5th Cir. 2023)). And they assert no cognizable economic injury because any downstream financial impacts caused by Risk Rating 2.0, including to their general tax base and enforcement costs, are highly attenuated and speculative, *id.* at 25–38 (relying on, *inter alia, Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10 (2013), and *El Paso Cnty., Tex. v. Trump*, 982 F.3d 332, 340 (5th Cir. 2020)), and because the limited number of Plaintiff policyholders have not plausibly shown either that their de minimis rate increases under Risk Rating 2.0 will result in a net negative fiscal cost to them or that invalidating Risk Rating 2.0 will redress these rate increases, *id.* at 38–41 (relying on, *inter alia, Henderson v. Stalder*, 287 F.3d 374, 381 (5th Cir. 2002), and *Louisiana*, 64 F.4th at 682).

Regardless of whether any of the alleged harms could support standing, as discussed below, they certainly do not constitute irreparable harm.

### B.    Plaintiffs Do Not Face Irreparable Harm

Plaintiffs' burden to show irreparable harm is necessarily higher than for standing. *See, e.g., Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). To the extent Plaintiffs fail to show standing, they thus necessarily fail to show irreparable harm; and even if some or all have standing, they still cannot show that Risk Rating 2.0 poses an irreversible and "imminent" threat of "significant" injury. *Humana, Inc. v. Jacobson,* 804 F.2d 1390, 1394 (5th Cir. 1986); *see also, e.g., Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("Speculative injury is not sufficient" "to make a clear showing of irreparable harm."). Beyond all the reasons described in Defendants' Motion to Dismiss, three additional considerations conclusively demonstrate that Plaintiffs have failed to meet their burden.

*First*, Plaintiffs' allegations of diminished tax revenues and increased enforcement and compliance costs are prototypically not irreparable. Pls.' Mem. at 16-1 at 39–40, 42–43. Courts have

5

routinely characterized the potential loss of money as a quintessential harm that is not irreparable. *See, e.g., Sampson v. Murray*, 415 U.S. 61, 90 (1974); *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005); *Snook v. Tr. Co. of Ga. Bank of Savannah*, 909 F.2d 480, 487 (11th Cir. 1990). That principle remains true even in the APA context, where the federal government "enjoy[s] sovereign immunity from any monetary damages." Pls.' Mem. at 41 (quotation marks omitted) (relying on, *inter alia*, *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021)). Unless the financial injury caused by the regulatory action is so "substantial" that, for instance, it "threatens the very existence of [the movant's] business"—as it did in the *Wages & White Lion Investments*, 16 F.4th at 1142 (quotation marks omitted)—it cannot qualify as irreparable. Otherwise, any APA plaintiff alleging even a trivial financial harm would satisfy the standard, *see, e.g., Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012), risking preliminary injunctions turning from "extraordinary" and rare remedies into ones granted as a matter of course, *Miss. Power*, 760 F.2d at 621.

Here, Plaintiffs do not plausibly allege that their supposed economic injuries are significant. They only speculate that downstream tax base, industry, and enforcement costs will occur because of Risk Rating 2.0-associated premium increases and therefore (unsurprisingly) offer no specific monetary estimates, leaving the Court with nothing to concretely evaluate. That readily distinguishes both *Wages & White Lion Investments* and *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (cited at Pls.' Mem. at 43). In both, the plaintiffs identified specific and calamitous monetary costs imposed directly by the challenged federal actions. *Wages & White Lion Invs.*, 16 F.4th at 1142 (concerning FDA issuance of marketing denial order for flavored e-cigarette manufacturer, which forced manufacturer to stop production of product that represented 90% of annual revenue, make plans to lay off employees within two weeks, and threatened its existence); *Texas*, 829 F.3d at 416, 433 (concerning EPA rule disapproving States' plans for controlling regional haze, which would cost targeted plaintiff power

plants $2 billion, rendering them uneconomical and forcing them to close). Moreover, any alleged fiscal injury that some Plaintiffs directly incur as policyholders is, as discussed in Defendants' Motion to Dismiss, de minimis, and in any event would be potentially recoverable as unjust enrichment or takings damages in the putative class action also before this Court should those claims ultimately succeed. *Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 24 (5th Cir. 1992) (no irreparable injury where plaintiff had access to "compensatory damages"). Any lost tax revenues and repaid grant funds (*e.g.*, Pls.' Mem. at 42) are recoverable as well. Indeed, "[t]here are several possible means by which [Plaintiffs] could recover" their less-than-hoped-for revenues other than a suit against FEMA because the State, like a public utility, has captive taxpayers and any losses are "recoverable [by adjustments] in the [State]'s [tax] rates." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 675 (D.C. Cir. 1985); *see also Florida v. Mellon*, 273 U.S. 12, 18 (1927). Likewise, nothing prevents "Plaintiffs from suing their [residents] for" FEMA grants that States must pay back on their residents' behalf. *Chambless Enterprises, LLC v. Redfield*, 508 F. Supp. 3d 101, 121 (W.D. La. 2020) (temporary eviction moratorium during pandemic did not prevent plaintiff landlords from suing tenants for unpaid rents); Compl. ¶¶ 144 (discussing State's "recourse" of "attempt[ing] to recover [grant] funds" from homeowners), 213 (same).

*Second*, Plaintiffs cannot claim any irreparable harm from either the alleged economic injuries of homeowners or injury to States' sovereign interest in flood protection. Pls.' Mem. at 36–38. Plaintiffs fail to explain how they can rely on homeowner or sovereign injuries to show harm if they cannot even assert those injuries as a basis to sue. Plaintiffs' reliance on *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017), and *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013), Pls.' Mem. at 40, changes nothing. Unlike the policies at issue in either case, Risk Rating 2.0 does not enjoin or otherwise prohibit Plaintiffs from enacting or enforcing their own laws.

*Third*, Plaintiffs delayed for considerable time after learning about Risk Rating 2.0 and its allegedly problematic methodology before seeking a preliminary injunction, which belies their claim

of irreparable harm. FEMA publicly announced Risk Rating 2.0 in March 2019, released detailed information on it in April 2021, put it into effect for new policyholders beginning in October 2021 (and allowed certain existing policyholders to opt in at this time as well), and put it into effect for all other policyholders beginning on April 1, 2022. Defs.' Mot. Dismiss Mem., at 11–12; Hake Decl. ¶¶ 12–15, 26. Nonetheless, Plaintiffs inexplicably waited until June 2023—more than four years after FEMA announced Risk Rating 2.0 and more than a year and a half after it began applying it to policies nationwide, including in the Plaintiff States and municipalities—to file this Motion. Several courts, including courts in the Fifth Circuit, recognize that delays "militate[] against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *W. Sur. Co. v. PASI of LA, Inc.*, 334 F. Supp. 3d 764, 799 (M.D. La. 2018); *see also, e.g.*, *Glob. Oil Tools, Inc. v. Expeditors Int'l of Wash., Inc.*, Civ. A. No. 16-16372, 2018 WL 263233, at *3 (E.D. La. Jan. 2, 2018) (same); *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (explaining that "[a] delay in seeking a preliminary injunction of even only a few months … militates against a finding of irreparable harm. Indeed, the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits," and collecting cases (citations omitted)); *Texas v. United States*, 328 F. Supp. 3d 662, 738–39 (S.D. Tex. 2018) (same). Plaintiffs cannot plausibly assert the need for urgent relief after waiting *years* to sue over Risk Rating 2.0.

Plaintiffs cannot justify their multi-year delay on the basis that Risk Rating 2.0 became fully implemented as of April 2023, or that FEMA released new information that month showing price increases for some residents. Compl. ¶¶ 234, 256; Pls.' Mem. at 26–27. For one, this explanation ignores that Plaintiffs still delayed two months before bringing this Motion. Regardless, the explanation fails as a factual matter. Even if they did occur, the alleged harms and legal violations that Plaintiffs complain of—*e.g.*, rising premium rates for residents' policies and even their own policies

and falling NFIP participation (Compl. ¶¶ 230–31, 233, 236, 240–41; Pls.' Mem. at 12–14, 17); denial of their alleged procedural right to notice and comment before rate increases started to go into effect (Compl. ¶ 252); and FEMA's alleged pretextual consideration of inappropriate factors (Compl. ¶¶ 177, 589; Pls.' Mem. at 10, 25)—all clearly would have been and actually were readily apparent to Plaintiffs by October 2021 and certainly by 2022. The Complaint's and Motion's reliance on publicly available 2021 and 2022 sources (in the cited parentheticals above) to support these allegations further proves this point. Plaintiffs' own discussion of the April 2023 data release reinforces that the data did not and could not materially change their calculus as to whether to seek injunctive relief, since, by their telling, the release simply confirmed the "devastating" premium increases under Risk Rating 2.0 that they had already known about for more than a year. Compl. ¶ 234.

And as a logical matter, it would make no sense for Plaintiffs to argue that they had to wait to seek injunctive relief until FEMA finished its multi-year process of fully phasing in Risk Rating 2.0— when the unjustified rate changes they complain of would be guaranteed to apply to every policyholder—rather than doing so before or at some point during the phased implementation, when they could totally or partially limit any imminent irreparable harm and in turn stop Risk Rating 2.0 from becoming the status quo. Plaintiffs' delayed injunction Motion supplies no urgent hardship that would justify upsetting this status quo. *See, e.g.*, *Am. Fam. Life Assurance Co. of Columbus v. Aetna Life Ins. Co.*, 446 F.2d 1178, 1180 n.6 (5th Cir. 1971) (explaining that preliminary injunctions are meant to preserve the status quo, which would be preserved if the injunction were denied but would be disrupted and impose hardship if granted); *Texas*, 328 F. Supp. 3d at 742 (similar).

II.     **Plaintiffs Are Unlikely to Succeed on the Merits**[3]

   A.     **Risk Rating 2.0 Is Not Contrary to Law and Does Not Violate FEMA's Statutory Authority**

   Plaintiffs are unlikely to succeed on the merits of Counts I and VII because Risk Rating 2.0 is consistent with the NFIA, and FEMA is faithfully fulfilling its obligations under the statute. The NFIA authorizes FEMA "to establish and carry out a national flood insurance program which will enable interested persons to purchase insurance against loss resulting from physical damage to or loss of real property or personal property related thereto arising from any flood occurring in the United States." 42 U.S.C. § 4011(a). FEMA must study and estimate "the risk premium rates for flood insurance which . . . based on consideration of . . . the risk involved and accepted actuarial principles; and . . . the flood mitigation activities that an owner or lessee has undertaken on a property . . . would be required in order to make such insurance available on an actuarial basis for any types and classes of properties for which insurance coverage is available under [the NFIP]." 42 U.S.C. § 4014(a)(1); *see also id.* (requiring compliance with the "principles and standards of practice in ratemaking adopted by the American Academy of Actuaries and the Casualty Actuarial Society").

   Risk Rating 2.0 is a direct exercise of this authority to study, estimate, and apply actuarially sound rates. It updates the NFIP with up-to-date actuarial methods at a time when the program sorely needs reform. For the past several decades, the NFIP has been losing billions of dollars because premiums have not accurately reflected flood risk. *See* Maurstad Decl. ¶ 97 ("Over the last 50 years, FEMA has collected $60 billion in NFIP premiums, but has paid $96 billion in costs[.]"); *see also id.* ¶¶ 120–22. Much of this shortfall has been attributed to the outdated rating methodology, which was no longer based on "accepted actuarial principles," 42 U.S.C. § 4014(a). Various third parties that had studied the NFIP, including the Government Accountability Office and the National Research

---

[3] Plaintiffs' lack of standing also necessarily means that they are not likely to succeed on the merits. *See, e.g.*, *Munaf v. Geren*, 553 U.S. 674, 690–91 (2008).

Council of the National Academies, determined that the legacy methodology was no longer accomplishing its purpose. *See, e.g.*, GAO, GAO-17-425, *Flood Insurance: Comprehensive Reform Could Improve Solvency and Enhance Resilience*, at 2 (Apr. 27, 2017), https://perma.cc/HT88-X3GR ("NFIP premiums do not reflect the full risk of loss, which increases the federal fiscal exposure created by the program, obscures that exposure from Congress and taxpayers, contributes to policyholder misperception of flood risk (they may not fully understand the risk of flooding), and discourages private insurers from selling flood insurance (they cannot compete on rates)."); Defs.' Mot. Dismiss Mem., at 7–10; Maurstad Decl. ¶¶ 67–87, 97–101.

Risk Rating 2.0 updates premium rates and balances the books through four key reforms: (1) the use of catastrophe modeling, "a computerized process that simulates potential catastrophic events based on historical events," Maurstad Decl. ¶ 28; (2) based on the catastrophe modeling, increasing the average annual loss, which addresses the categorical shortfall in premium collections, *id.* ¶¶ 29–31; (3) using better data to determine property-specific flood risk, *id.* ¶¶ 32–34; and (4) implementing a centralized rating engine, which allows agents and policyholders to quickly and accurately ascertain rates, *id.* ¶¶ 35–39. These changes all reflect best practices in the insurance industry, which is precisely what Congress charged FEMA to do under the NFIA. *See id.* ¶¶ 103, 109.

Furthermore, the geographical distribution of premium payments has been stark: under the legacy rating approach, taxpayers and policyholders in landlocked states were covering the cost of flood risk in a few coastal states. *See id.* ¶¶ 33, 55–63, 99. Risk Rating 2.0 charges every policyholder their fair share based on their property's true flood risk and thus accomplishes the stated purpose of the NFIA, to "provide flexibility in the program so that such flood insurance may be based on workable methods of pooling risks, minimizing costs, *and distributing burdens equitably* among those who will be protected by flood insurance and the general public." 42 U.S.C. § 4001(d) (emphasis added). Risk Rating 2.0 fulfils this congressional purpose.

Plaintiffs nevertheless argue that Risk Rating 2.0 is contrary to law in four ways, none of which has merit.

*First*, Plaintiffs argue that the new rates are unaffordable to some policyholders, which, they assert, is contrary to § 4015(b)(2) (requiring that, "insofar as practicable," rates should be "adequate, on the basis of accepted actuarial principles, to provide reserves for anticipated losses, or, if less than such amount, consistent with the objective of making flood insurance available where necessary at reasonable rates so as to encourage prospective insureds to purchase such insurance and with the purposes of this chapter"). *See* Pls.' Mem. at 12–14. Plaintiffs are wrong on the facts and the law. On the facts, Plaintiffs overstate the financial impact of Risk Rating 2.0 using material that was not before the agency and therefore not part of the administrative record, *see id.* at 13 (citing declarations from various individuals and groups). As an initial matter, the Court cannot consider these materials in evaluating the likelihood of success on the merits because they were not before FEMA when it developed Risk Rating 2.0. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (judicial review in an APA case must be based upon the "full administrative record that was before [the agency] at the time [it] made [its] decision"). But to provide greater context, the vast majority of policyholders will see either a decrease or modest increase in premiums. *See* Maurstad Decl. ¶ 44; *see also id.* ¶ 51 (observing that "a substantial number of policyholders in northern Louisiana parishes are seeing premium decreases" and listing examples). And once again, any increase—modest or not—is the result of taking into account accepted actuarial principles, which FEMA must do under the NFIA. That includes the 3% of policyholders who saw premium increases of greater than $20 per month: those policies previously had rates that were far below what was warranted by the actual property-specific risk. *See id.* ¶ 44. Indeed, Mr. Russell Hebert, the policyholder whom Plaintiffs highlight as facing increased premiums ($3,289 to $5,611 per year), *see* Compl., Ex. 54 ¶ 28, is in fact a perfect example of a policyholder who has benefited from the legacy system's outdated rating approach. From

12

1985 to 2008, Mr. Hebert received payouts totaling $386,331.01 from five flooding events. *See id.* ¶ 13. And yet, for the only period during which he provided data (2018 to 2023), Mr. Hebert paid an average of $3,436.83 in annual premiums. *See id.* ¶¶ 16–21. Assuming that he paid that amount between 1985 and 2008 (which is necessary because of the lack of data in the declaration), Mr. Hebert would have paid a total of $79,047.17, far less than the $386,331.01 in payouts.

In addition, Plaintiffs ignore the fact that *all* policyholders' premiums would increase if Risk Rating 2.0 were enjoined; for many years, the NFIP's costs have exceeded its premiums by billions of dollars, *see* Maurstad Decl. ¶¶ 97–99, 120, 240–44, and without applying accepted actuarial principles, that shortfall would have to be overcome through broad-based increases in premiums, *see id.* ¶¶ 34, 224, 226. Thus, enjoining Risk Rating 2.0 may make flood insurance more affordable to some, but it would also make insurance less affordable for others. And because reverting to the legacy rating approach would prevent FEMA from using accepted actuarial principles, the distribution of those costs would be contrary to the statutory requirements of the NFIA. The reality is that many Plaintiff-States "have high risk of hurricane and coastal flooding, and they have historically accounted for a majority of NFIP claim payments." *Id.* ¶ 59. Yet policyholders in those states have historically had some of the lowest average premiums. *See id.* ¶ 56.

On that score, that policyholders must now pay rates that reflect their property's flood risk does not contradict FEMA's statutory authority; it supports it. Rather than contend with the actuarial principles that support Risk Rating 2.0, Plaintiffs argue that the change in premium costs is itself evidence that FEMA has exceeded its authority. But the *output* of accepted actuarial principles is not the measure of FEMA's statutory authority. Such authority flows from the plain text of the NFIA, which directs FEMA to adopt rates based on "accepted actuarial principles."

Furthermore, FEMA is safely within the affordability limits that Congress has drawn in setting insurance rates. In 2012, Congress passed the Biggert–Waters Flood Insurance Reform Act of 2012,

Pub. L. No. 112-141, 126 Stat. 405 (2012) ("BW-12"), which directed FEMA to review and report to Congress on reforms to set NFIP risk-based rates that would better reflect possible claims. Maurstad Decl. ¶ 93. And two years later, Congress set caps on annual premium increases, generally 18%. *Id.* ¶ 95.[4] Risk Rating 2.0 abides both directives, setting actuarially sound rates and capping rate increases at the congressionally-mandated percentages. FEMA has also delivered an Affordability Framework[5] to Congress to help policymakers consider how to legislatively provide targeted assistance to existing and potential policyholders. And, FEMA submitted an NFIP Flood Insurance Means-Tested Assistance legislative proposal in the Administration's FY22, FY23, and FY24 budgets for the NFIP. *Id.* ¶ 23.

*Second*, Plaintiffs argue that FEMA exceeded its statutory authority by failing to consider flood mitigation activities when setting rates. *See* Pls.' Mem. at 14–15. To the contrary, Risk Rating 2.0 accounts for the *same* mitigation factors as the legacy system, and in fact adds additional discounts for elevating machinery and equipment. The expansion and greater transparency of flood mitigation discounts has had an effect: since Risk Rating 2.0 has come into effect, the number of policyholders taking advantage of mitigation discounts has doubled, tripled, and in some cases quadrupled. *See* Maurstad Decl. ¶ 165–92.

Risk Rating 2.0 also continues to account for floodplain management practices that exceed the minimum requirements of the NFIP. Policyholders who live in communities with such practices continue to receive Community Rating System ("CRS") discounts. *Id.* ¶ 193. Indeed, under Risk Rating 2.0, the type of policies that qualify for a CRS discount has broadened, resulting in a nearly two-fold

---

[4] The 18% cap does not apply to properties subject to 25% premium increases. Defs.' Mot. Dismiss Mem., at 10 n.6. Under the legacy rates, Mr. Hebert faced such increases, Compl., Ex. 54 ¶¶ 16–20, because his property is a severe repetitive loss property, *id.* ¶¶ 7–12.

[5] FEMA, *An Affordability Framework for the National Flood Insurance Program* (Apr. 17, 2018), https://perma.cc/74U5-CB3F.

increase in the number of policyholders receiving this discount. *See id.* ¶¶ 199–211 (describing the increase of policyholders receiving this discount in each Plaintiff State).

*Third*, Plaintiffs argue that FEMA has exceeded its statutory authority by failing to consult with state and local agencies in rolling out Risk Rating 2.0. *See* Pls.' Mem. at 15–16. Specifically, Plaintiffs argue that FEMA has not abided by 42 U.S.C. § 4024, which states as follows:

> In carrying out this chapter, the Administrator shall consult with other departments and agencies of the Federal Government, and with interstate, State, and local agencies having responsibilities for flood control, flood forecasting, or flood damage prevention, in order to assure that the programs of such agencies and the flood insurance program authorized under this chapter are mutually consistent.

There can be no doubt that FEMA has satisfied its obligations under § 4024. Since 2019, FEMA has had dozens of meetings with and conducted nearly a hundred engagements with state and local governments. Hake Decl. ¶ 80. And it gave numerous presentations to its state and local partners on Risk Rating 2.0, including to the Louisiana Governor's Advisory Commission for Coast Protection, Restoration, and Conservation and the Economic Development. *Id.* ¶¶ 81–84.

At bottom, Plaintiffs disagree with Risk Rating 2.0 because some policyholders in their states are finally paying their risk-based flood insurance premiums. That policy disagreement, however, does not mean that FEMA has failed to consult with them.

*Fourth*, Plaintiffs argue that FEMA has exceeded its statutory authority by failing to provide information to the public. *See* Pls.' Mem. 16-17. They point to 42 U.S.C. § 4020, which states as follows:

> The Administrator shall from time to time take such action as may be necessary in order to make information and data available to the public, and to any State or local agency or official, with regard to--
>
> (1) the flood insurance program, its coverage and objectives, and
>
> (2) estimated and chargeable flood insurance premium rates, including the basis for and differences between such rates in accordance with the provisions of section 4015 of this title.

FEMA has more than satisfied its obligations under § 4020, going to great lengths to publicize Risk Rating 2.0. The agency has had over 1,500 engagements with the public, policyholders, federal and local officials, stakeholder groups, industry groups, and insurance companies. Hake Decl. ¶ 6. It has published numerous press releases, fact sheets, Q&A, data sets, premium calculation worksheets, and other materials on its website and elsewhere to inform the public about Risk Rating 2.0 *See id.* ¶¶ 8–24. And it has responded to hundreds of media inquiries from national and local outlets. *See id.* ¶¶ 25–39. These engagements are far more than the "time to time" communications that are required under § 4020.

**✲✲**

Last, Plaintiffs are not likely to succeed on their catchall statutory authority argument, that Risk Rating 2.0 violates the major questions doctrine. *See* Pls.' Mem. at 29–32. Ordinarily, the analysis of an agency's statutory authority "begins with the statutory text"—and, when the text is clear, it "ends there as well." *National Ass'n of Mfrs. v. Department of Defense*, 138 S. Ct. 617, 631 (2018) (citation omitted). Thus, courts ordinarily may not "impos[e] limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020) (upholding HHS's religious and moral exemptions to the contraceptive coverage requirement despite the absence of specific authority to create such exemptions). However, in certain extraordinary circumstances, courts require a clear statement from Congress to authorize agency action "of vast economic and political significance." *West Virginia v. EPA*, 142 S. Ct. 2587, 2605 (2022).

This is not such a case. Unlike the limited set of circumstances where the Supreme Court has required a clear statement—for example, when the EPA relied on "newfound power" in the "vague language" of an "ancillary provision" of its authorizing statute to require a sector-wide shift in electricity production that would have resulted in billions of dollars in compliance costs , *id.* at 2610— Risk Rating 2.0 does not rely on newfound, vague authority to engage in vast economic and political

policy change. Rather, Risk Rating 2.0 updates the rating methodology of the same program that FEMA has managed for decades using the same statutory mandate on which it has always relied. And contrary to Plaintiffs' baseless assertions, it is neither the purpose nor effect of Risk Rating 2.0 to "relocate entire populations." *See* Pls.' Mem. at 30. There is no evidence that large numbers of policyholders are moving because of Risk Rating 2.0, and decreases and modest increases in rates for the vast majority of policyholders indicate otherwise. The Court should apply ordinary statutory interpretation principles when assessing Plaintiffs' claims. And under any construction of Congress's direction to apply "accepted actuarial principles," Risk Rating 2.0 is well within FEMA's statutory authority.

### B.   Risk Rating 2.0 Is Not Arbitrary and Capricious

Plaintiffs face an uphill battle to demonstrate that they are likely to succeed on their arbitrary-and-capricious claims, as judicial review of such claims is "narrow and highly deferential" to the agency. *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021). The agency's action is presumed valid, and the Court is limited to considering whether the action "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* Under this narrow inquiry, the Court does not ask whether an agency's "decision is the best one possible or even whether it is better than the alternatives," *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016), as the Court's role is not to "second-guess[]" an agency's "weighing of risks and benefits" and "substitute its judgment for that of the agency," *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2571, 2572 (2019). The arbitrary-and-capricious standard of review simply "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Here, Risk Rating 2.0 plainly was reasonable and reasonably explained. Plaintiffs' various arguments otherwise—that Risk Rating 2.0 ignores important aspects of the problem and reliance interests, departs from prior policy without justification, and pretextually raises rates to advance unrelated policy

goals—fail, as they represent mere policy "disagreement[s]" with FEMA's decisionmaking, not a basis likely to succeed in setting aside its action as unlawful. *Dep't of Com.*, 139 S. Ct. at 2572; *see also, e.g., N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 95 (D.D.C. 2007).

### 1.    *Risk Rating 2.0 considers important aspects of the problem*

Plaintiffs are unlikely to succeed in their claim that Risk Rating 2.0 ignores important aspects of the problem. *See* Pls.' Mem. at 17–21. The five allegedly overlooked aspects are, in fact, either central to FEMA's reasoning or are impermissible factors under the NFIA.

*First*, Plaintiffs argue that FEMA failed to consider increased costs under Risk Rating 2.0. *See* Pls.' Mem. at 17–18. But premium costs—including raising costs for some—were *central* to the development of Risk Rating 2.0. Because of imprecise and outdated rating data points, the legacy rating approach resulted in FEMA collecting insufficient premiums as a whole, and in many policyholders who did not face significant flood risks subsidizing other policyholders. *See* Maurstad Decl. ¶¶ 32–33, 63. This resulted in a serious budget shortfall: the NFIP is $20.5 billion in debt. *Id.* ¶ 120. One central reason for this shortfall is that the legacy rating approach did not account for all potential flooding sources and frequencies. The historical flood insurance rate maps considered only two sources of flood risk: the 1% annual chance riverine flood and the 1% annual chance coastal flood. *Id.* ¶ 121. But of course, policyholders are protected from a wide range of flooding events, not just those two types of floods. By setting rates based on the expected value of all future costs associated with an insurance plan—a foundational principle of actuarial rate making—Risk Rating 2.0 more faithfully adheres to the NFIA's admonition to apply accepted actuarial principles and closes the $20.5 billion budget shortfall. *Id.* ¶ 123 & n.113.

Baked into the development of Risk Rating 2.0 is the understanding that some policyholders' premiums—particularly those who have historically paid less than the actual risk to their property—will increase. And indeed, since Risk Rating 2.0 has come into effect, FEMA has closely monitored

rate changes. *See id.* ¶¶ 43–60. Contrary to Plaintiffs' exaggerations of "skyrocketing costs," Pls.' Mem. at 17, since Risk Rating 2.0's implementation, 19% of premiums decreased, 70% increased by less than $10 per month, and 8% increased by $10 to $20 per month, and only 3% increased by more than $20 per month. Furthermore, Risk Rating 2.0 has eliminated extreme premium increases. Whereas the legacy rates allowed premiums to increase indefinitely (as high as $55,000), Risk Rating 2.0 limits premiums to $12,125 per year for single family dwellings. *See* Maurstad Decl. ¶¶ 141–42. Once again, Plaintiffs conflate legal error with their policy disagreement. They may disagree with the new premium structure, but that does not mean that FEMA overlooked rising costs for some.

*Second*, Plaintiffs argue that FEMA failed to consider "a mass exodus from the flood insurance program." Pls.' Mem. at 18. This assumes that there is a mass exodus, which there is not: once again, the vast majority of premiums have either decreased or increased by less than $20. Furthermore, contrary to Plaintiffs' baseless assertions, the sustainability of the NFIP (and continued participation in it) was at the fore when FEMA developed Risk Rating 2.0. As referenced above the NFIP was in an $20.5 billion shortfall under the legacy system. And that shortfall grew each year: in 2017, for example, the shortfall increased by $1.4 billion, largely because of premiums falling short of expected costs in coastal counties. *See* Maurstad Decl. ¶ 244. Failure to address this growing debt would pose a threat to the NFIP itself: Congress has limited FEMA's debt obligation to $30.425 billion. *Id.* ¶ 242. By setting the NFIP on a fiscally sound path with rates that are set to reflect actual flood risk, FEMA has not only considered, but prioritized the continued availability of the NFIP for all.

*Third*, Plaintiffs repeat their argument that FEMA failed to consider mitigation efforts in setting rates. *See* Pls.' Mem. at 19. As referenced above, Plaintiffs mischaracterize Risk Rating 2.0, which actually accounts for *more* types of mitigation efforts when setting rates. Maurstad Decl. ¶¶ 167–211. And whether Plaintiffs agree with the discounts associated with these mitigation efforts, there can be no doubt that FEMA *considered* mitigation when developing Risk Rating 2.0.

*Fourth*, Plaintiffs argue that FEMA failed to consider certain industries, such as oil and gas, when developing Risk Rating 2.0. *See* Pls.' Mem. at 19–20. But no provision of the NFIA requires FEMA to consider how premium rates affect the oil and gas or fishing industries. This argument is all the more bizarre because Plaintiffs in the same breath accuse FEMA of considering extra-statutory factors, namely moving "Americans out of homeownership in certain areas," *id.* at 25. Plaintiffs cannot have it both ways: they cannot both insist that FEMA consider extra-statutory factors and criticize the agency for considering extra-statutory factors. At the end of the day, FEMA is a creature of Congress: it considers the factors prescribed to it by Congress. In this case, that is applying accepted actuarial principles, which FEMA has done.

*Fifth*, Plaintiffs accuse FEMA of failing to consider how Risk Rating 2.0 affects low- or moderate-income individuals. *See id.* at 20. Once again, Plaintiffs insist that FEMA consider a factor that it is not required to consider. Plaintiffs point to no statute that requires FEMA to consider low- or moderate-income individuals when setting rates; no part of the NFIA directs FEMA to apply accepted actuarial principles to establish premiums, but only for policyholders who earn more than $60,000 per year. Plaintiffs also fail to identify the source of income information upon which FEMA could rely to assess affordability. And at any rate, Risk Rating 2.0 benefits low- and moderate-income individuals by creating a more sustainable NFIP; setting more transparent rates that, for the vast majority of policyholders, are either cheaper or modestly more expensive; and basing rates in part on the covered structure's replacement cost value, so that policyholders with lower value homes are no longer subsidizing homeowners with higher value homes. Moreover, by reducing the need to turn to taxpayers to cover the NFIP budget shortfalls, Risk Rating 2.0 also helps low- and moderate-income individuals who are *not* policyholders.

*Sixth*, Plaintiffs assert that FEMA inappropriately considered "hypothetical future events to evaluate the risk a property actually faces today." *See id.* As a general matter, considering hypothetical

future events is not only a permissible factor for FEMA to consider; it is the foundation of actuarial analysis. Premiums are, after all, based on the *expected* value of *future* costs. *See* Maurstad Decl. ¶ 13. Considering historical losses alone would paint an incomplete picture of risk, since circumstances of course change over time. *See id.* ¶ 92 ("Historical data alone is insufficient to make projections for future catastrophe losses."). FEMA has long considered hypothetical future events, such as storm surge, when setting premiums. *Id.* The only difference with Risk Rating 2.0 is that it uses updated modeling to account for additional risks, such as pluvial flooding. *See id.*; *see also id.* ¶ 124 (explaining that the 1970s rating methodology could not use catastrophe modeling because it did not exist).

Plaintiffs also suggest that FEMA inappropriately considers climate change in setting premiums. While catastrophe models are capable of incorporating future climate change from a technical perspective, Risk Rating 2.0 does not. *See id.* ¶ 126. This is because NFIP policies are sold in one-year increments, and premium rates reflect current, not future conditions. *See id.* ¶ 127. There is accordingly no need to consider future climate change; any such changes are realized as conditions change in real time.

### 2. *Risk Rating 2.0 does not disregard relevant reliance interests*

Plaintiffs are unlikely to succeed in their claim that Risk Rating 2.0 fails to consider the reliance interests of policyholders. Their arguments boil down to the assertion that, by phasing out grandfathering and implementing other changes, Risk Rating 2.0 upends policyholders' reliance interest in "[]affordable premiums." Yet both the law and the facts foreclose this claim.

Legally, NFIP premium rates must be established "based on consideration of the risk involved and accepted actuarial principles," 42 U.S.C. § 4014(a)(1)(A), meaning that rates must reflect the true flood risk to each property. Under BW-12 and HFIAA, FEMA must eventually phase out subsidies such as those for pre-FIRM properties so that premiums ultimately reach actuarially sound rates. Defs.' Mot. Dismiss Mem., at 10–11, 15; Maurstad Decl. ¶¶ 17–20, 155–57. As a result, FEMA has no

statutory authority to ignore necessary premium increases for certain policyholders based simply on affordability concerns. *See, e.g.*, Diane P. Horn & Baird Webel, *Introduction to the National Flood Insurance Program (NFIP)*, Cong. Research Serv., R44593, at 21 (updated Jan. 6, 2023), https://perma.cc/9AA9-7MMD. It is for this reason that FEMA and others have on several occasions submitted legislative proposals and called for Congress to implement an NFIP means-tested affordability program. *See, e.g.*, *id.* at 10; Maurstad Decl. ¶ 23; GAO, GAO-23-105977, *FEMA's New Rate-Setting Methodology Improves Actuarial Soundness but Highlights Need for Broader Program Reform* (July 2023), https://perma.cc/39NG-PY86 (commending Risk Rating 2.0 for significantly improving ratemaking but recommending congressional action to enact means-based assistance program to address affordability). Absent legislative action, FEMA is constrained in its ability to consider policyholders' reliance interests in affordability and expectations they could hold onto prior rates that are no longer actuarily sound. Plaintiffs must take up these concerns with Congress, not FEMA.

Moreover, the facts show that Risk Rating 2.0 has not unjustifiably upended reliance interests. For one, premium increases occurred prior to Risk Rating 2.0, Compl. ¶ 25; *id.*, Ex. 54 ¶¶ 17–19 (notable premium increases pre-Risk Rating 2.0), and would have to continue even if it had not been implemented, Maurstad Decl. ¶¶ 29–30, 155–59, 215–16, so Plaintiffs cannot reasonably claim a reliance interest in maintaining the same rates. Furthermore, Risk Rating 2.0 considers rate impacts and safeguards affordability for a considerable share of policyholders. As discussed, it (1) has resulted in 19% of policyholders seeing premium decreases and 70% seeing only small increases of $10 or less per month; and (2) sets an upper bound for annual premiums for primary residence single-family home policies ($12,125), whereas the old system had no such cap and thus could charge some policies as much as $55,000. *Id.* ¶¶ 44, 233–34. And Risk Rating 2.0 has not ignored the reality that some policyholders had previously relied on rate grandfathering. *Cf. Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891, 1913–14 (2020) (cited at Pls.' Mem. at 21) (finding that

memorandum rescinding DACA completely failed to consider legitimate reliance interest of recipients, their families, and their schools and employers)*; MediNatura, Inc. v. Food & Drug Admin.*, 496 F. Supp. 3d 416, 458 (D.D.C. 2020) (distinguishing *Regents* on this basis). FEMA has long been aware of and grappled with this issue, and it expressly determined that grandfathering had to be phased out in Risk Rating 2.0 so that NFIP premium rates could, in accordance with the NFIA's statutory mandates, be more actuarially sound and equitably distributed based on individualized flood risks. FEMA, *Risk Rating 2.0 is Equity in Action*, at 6 (Apr. 2021), https://perma.cc/TW62-NXXP ("*RR 2.0 Equity in Action*"). FEMA specifically identified how Risk Rating 2.0 would have minimal impact on grandfathered policies, since only 5% of the 3.5 million single-family homes covered by the NFIP "are actually grandfathered," and since premium increases for these policies would be "gradual." *Id.* That reasoned, explicit tradeoff to eliminate grandfathering for full-risk premiums shows that FEMA did not disregard policyholder reliance interests. *See, e.g., FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515– 16 (2009); *In re FCC 11-161*, 753 F.3d 1015, 1143 (10th Cir. 2014).

As for Plaintiffs' assertions that FEMA has upended State and community reliance interests in the legacy NFIP rating approach—including by "bait[ing]" communities to adopt stringent ordinances and costly mitigation in exchange for NFIP participation and affordable rates for their citizens, and then unilaterally imposing unaffordable rates and costs on policyholders via Risk Rating 2.0, Pls.' Mem. at 22–23; Compl. ¶¶ 597–99—these claims are too nebulous to support an arbitrary-and-capricious claim. *See, e.g., Solenex LLC v. Bernhardt*, 962 F.3d 520, 529 (D.C. Cir. 2020) ("[U]nidentified and unproven reliance interests are not a valid basis on which to undo agency action. Instead, the harm occasioned must be specifically identified, reasonably incurred, and causally tied to the [agency action]."). As discussed, Plaintiffs lack standing to assert either any sovereign interest in Risk Rating 2.0 based on its alleged impact on their statutes and ordinances, or any quasi-sovereign interest in Risk Rating 2.0 because of its alleged impact on residents. If these types of interests are

insufficient to confer an injury in fact, then they are certainly not legitimate reliance concerns that would justify setting aside an agency action.

> ### 3.    *Risk Rating 2.0 does not depart from prior policy without justification*

For two reasons, Plaintiffs are unlikely to succeed in their claim that Risk Rating 2.0 "significantly" departed from prior policy on ratemaking without sufficient justification. Pls.' Mem. at 24; *see* Compl. ¶¶ 603–08.

*First*, Risk Rating 2.0 is consistent with prior FEMA policy and practices, not a significant departure from them. The NFIP has always been mandated and designed to tie premium rates to flood risk, in accordance with actuarial principles. Risk Rating 2.0 simply represents FEMA's efforts to improve the NFIP's ability to achieve these goals: to adapt to the demands of providing flood insurance to policyholders as catastrophic flood losses increase and to modernize its actuarial methods with better flood risk data and better technology already being leveraged across the private insurance market. Courts have found "nothing arbitrary" about this type of "fresh analysis." *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1001–02 (2005) (finding no arbitrary change in policy in declaratory ruling reflecting "changed market conditions"). Indeed, the inadequacies of the legacy rating approach "show, if anything, … that there was good reason for" FEMA to phase in Risk Rating 2.0. *Cf. Smiley v. City Bank (South Dakota), N.A.*, 517 U.S. 735, 742–43 (1996) (rejecting argument that there was a "change of official agency policy" when notice of proposed rulemaking was initiated to reflect current law and interpretive letters and regulation were necessary "to eliminate uncertainty and confusion").

Although "transformational" in the sense that it brings the NFIP into the 21st century, Compl. ¶ 608 (quotation marks omitted), Risk Rating 2.0 does not radically transform the NFIP by, for example, "abandoning its decades-old practice of" of calculating premiums on a basis other than flood risk. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 216 (2016) (cited at Compl. ¶ 602, concerning

Department of Labor's complete reversal of its longtime position that service advisors are not exempted from overtime wage provision). Instead, FEMA has simply updated its technology to utilize catastrophe modeling, the use of which is well established in the private insurance industry and endorsed by leading industry groups. Maurstad Decl. ¶¶ 92, 124–25. Additionally, rather than relying primarily on base flood elevation or historical flood data to set rates—the variables FEMA had available to use in the 1970s, and which are by themselves not sufficient to accurately reflect flood risk for individual properties—Risk Rating 2.0 refines the NFIP premium rating to rely on additional geographic and structural flood risk variables that are collectively more predictive of flood risk. *Id.* ¶¶ 66, 107, 110–12, 160–64. This is no more of a departure from prior policy than the agency's choice to provide employees with cell phones and laptops to promote a mobile work force appropriate to an agency charged with disaster response duties. Because "regulatory agencies do not establish rules of conduct to last forever," *Atchison, Trucking Ass'ns v. Atchison, Topeka & Sante Fe Railway Co.*, 387 U.S. 397, 416 (1967), FEMA deserves "ample latitude to adapt" the NFIP "to the demands of changing circumstances," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (quotation marks omitted).

*Second,* FEMA has more than amply justified any departures from prior policy. Far from "cloak[ing]" Risk Rating 2.0 "in secrecy," Pls.' Mem. at 24, FEMA has provided a range of information on Risk Rating 2.0, *see* Hake Decl. (detailing FEMA's extensive communications), giving the public a "reasoned explanation for" the program and the particular changes with which Plaintiffs take issue, *Fox*, 556 U.S. at 515 (agency must simply "show that there are good reasons for the new policy" and that "the agency believes it to be better").

As the agency publicly explained when it rolled out Risk Rating 2.0—on FEMA webpages that Plaintiffs themselves cite—changes to premium rating were necessary so that FEMA could move the NFIP into the 21st century and "deliver rates that are equitable" and "better reflect a property's

individual flood risk." *RR 2.0 Equity in Action* at 1 (cited at Compl. ¶ 203). Otherwise, existing inequities, such as how many policyholders in lower-value homes pay more than they should and in effect subsidize policyholders with higher-value homes, "would continue[,] widening the gap between rate payments and claims payouts and making it harder to meet the needs of [FEMA's] customers." *Id.* at 5; *see also*, *e.g.*, FEMA, *FEMA Updates Its Flood Insurance Rating Methodology to Deliver More Equitable Pricing* (Apr. 2021), https://perma.cc/QF9V-V6MR (cited at Compl. ¶ 172); FEMA, *Risk Rating 2.0: Equity in Action – Industry Transition Memorandum*, at 1 (Sept. 1, 2021), https://perma.cc/EVW8-TUAF.

Gradually phasing out the limited number of grandfathered policies as part of the Risk Rating 2.0 shift was necessary, FEMA explained, so that the NFIP could achieve "more appropriate premiums that reflect each property's individualized flood risk." *RR 2.0 Equity in Action* at 6. So too for incorporating more risk variables, such as flood frequency and distance to water source, and considering different flood types beyond just the 1% chance of river and coastal flooding (*e.g.*, heavy rainfall flood types) by leveraging industry standard modeling technology that allows FEMA to account for multiple perils that cause flooding. *See, e.g.*, *id.* at 1, 5; FEMA, Flood Insurance Manual, *3. How to Write* at Section 3.II.B–C (Oct. 2022), https://perma.cc/9FQL-P2Z4 (cited at Compl. ¶ 252). Years of policy reports and recommendations from government and nonprofit groups support these explanations. *See* Defs.' Mot. Dismiss Mem., at 7–10; Maurstad Decl. ¶¶ 67–87, 97–101. The APA requires nothing more from FEMA to justify Risk Rating 2.0.[6]

---

[6] In support of their claim, Plaintiffs briefly state in their Complaint that FEMA "acknowledged" in 2013 that it "lacks the authority to change the NFIP." Compl. ¶ 607. But they fail to themselves acknowledge that the particular statement referenced was from a slide in a decade-old presentation concerning FEMA's role in mapping levees (and its decisionmaking process for determining how to update that mapping), not FEMA's role in setting rates and modifying its rating methodology. As discussed, FEMA unquestionably had the authority to change rates and its methodology via Risk Rating 2.0. *See supra* § II.A.

4.      *Risk Rating 2.0 is not pretextual*

Plaintiffs fail to plausibly substantiate their claim that FEMA has implemented Risk Rating 2.0 as a pretext to drive Americans out of homeownership in certain areas.

Plaintiffs base their entire preliminary injunction argument on a single FEMA webpage describing FEMA's efforts—separate and apart from Risk Rating 2.0—to assist voluntary community-driven relocation from particularly flood-prone areas. Pls.' Mem. at 25 (discussing FEMA, *FEMA Efforts Advancing Community Driven Relocation*, FEMA (Dec. 2, 2022), https://perma.cc/9J53-Q9F5). For starters, the website post-dates the introduction and phased implementation of Risk Rating 2.0; it thus appears to be evidence that is outside of the administrative record and not relevant or appropriate for the Court to consider. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record …." (quotation marks omitted)); *State of La., ex rel. Guste v. Verity*, 853 F.2d 322, 327 (5th Cir. 1988) (similar). The website is from December 2, 2022, more than a year after FEMA announced Risk Rating 2.0 and began applying it to new policies and certain existing ones, and nine months after FEMA began applying it to all other existing policies. Plaintiffs identify no reason for why or how the webpage or its contents were before the relevant decisionmakers and directly or indirectly considered by the agency in developing and implementing Risk Rating 2.0. Nor do they identify *any* basis for why the Court should consider this extra-record evidence. *Cf., e.g.*, *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010) (detailing circumstances for consideration of extra-record evidence, such as the need for background information).

Even considering the webpage, it does not support Plaintiffs' pretext claim. The webpage describes how FEMA has multiple competitive grant programs for states, local communities, and federally recognized tribes and territories to undertake particular flood mitigation projects, including buying out hazard-prone properties so that owners can relocate to safer areas. The webpage does not

27

relate to Risk Rating 2.0 at all; it does not even mention the initiative, let alone how FEMA sets premium rates. Moreover, the grant programs it identifies are legitimate, congressionally-authorized funding streams that effectuate FEMA's statutory mandate to encourage preventive and protective measures against flood damage.[7] That mandate is distinct from FEMA's statutory obligation to set actuarial rates for policyholders, which is the agency's only stated basis for implementing Risk Rating 2.0. *See, e.g.*, Maurstad Decl. ¶¶ 31, 55, 74, 96, 115, 125, 156–58, 248–59; *RR 2.0 Equity in Action* at 5. It is no surprise, then, that Plaintiffs make zero connection between these two separate aspects of the NFIP and offer no explanation for what is apparently "incongruent" about the agency's justification for Risk Rating 2.0.[8]

Given their meager showing, Plaintiffs err in citing to *Department of Commerce*, 139 S. Ct. at 2575, to support their pretext argument. There, "several points" of evidence and an "extensive" record "reveal[ed] a significant mismatch between the decision the [Commerce] Secretary made" to reinstate a citizenship question for the 2020 census and his "rationale" that the Department of Justice ("DOJ") had requested "improved citizenship data to better enforce the [Voting Rights Act ("VRA")]." *Id.* As the Supreme Court summarized, the Secretary's VRA rationale was pretextual, because the Secretary began taking steps to reinstate the citizenship question "about a week into his tenure," with "no hint" that he had VRA enforcement in mind; his staff unsuccessfully attempted to elicit requests for citizenship data from agency entities that had no responsibility for enforcing the VRA; and DOJ's

---

[7] Plaintiffs cannot and do not legally challenge the programs, or FEMA's separate mandate under them to facilitate voluntary relocation from areas threatened by flood hazards. *See* 42 U.S.C. § 4102(c)(2).

[8] In their Complaint, Plaintiffs also argue that FEMA acted pretextually because it imposed Risk Rating 2.0 to further the Administration's climate-change agenda. Compl. ¶¶ 613–14. They do not raise this argument in their Motion. Nonetheless, the argument fails since it misapprehends how Risk Rating 2.0 considers climate change. As discussed, *supra* p. 21, Risk Rating 2.0's catastrophe models do not consider and predict "future climate change," but instead consider the current risk caused by climate change (or any other factor) and bake that into the premiums set each year.

28

Civil Rights Division did not request the data until after the Commerce Secretary personally contacted the Attorney General. *Id.* Here, by contrast, Plaintiffs make no attempt to identify any mismatch between FEMA's rationale for Risk Rating 2.0 and its methodology. Nor could they. FEMA's rationale has been clear and consistent from the moment it conceived of Risk Rating 2.0 to when it rolled out the program: the NFIP rate methodology had to be modernized to set more actuarially sound premiums. FEMA did not contrive this rationale out of thin air; it is the agency's best effort to implement its statutory mandate by relying on a broader set of flood variables and catastrophe risk models to better predict risk.

### C.        Risk Rating 2.0 Is Not Subject to Notice and Comment

Plaintiffs are unlikely to succeed on their claim that FEMA failed to comply with the APA's notice-and-comment requirement. Compl. ¶¶ 251-52, 616–29; Pls.' Mem. at 26–29. The APA requires notice and comment only for substantive legislative rules: agency actions that purport to create new rights or impose new, legally binding obligations or prohibitions on regulated parties, "the basic tenor of which is not already outlined in the law itself." *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992); *see also, e.g., Amin v. Mayorkas*, 24 F.4th 383, 392 (5th Cir. 2022); *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014). It exempts from notice and comment several categories of agency action, including "interpretative rules"—which create no new law and instead only interpret statutory language in particular contexts, *see, e.g., Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979)—as well as "general statements of policy, or rules of agency organization, procedure, or practice," 5 U.S.C. §§ 553(b)(1)(A).

Risk Rating 2.0 is plainly not a substantive legislative rule. It creates no *new* "legal consequences" for "current and future policyholders." Pls.' Mem. at 27. Just as before, policyholders still pay premiums to participate in the NFIP, still obtain flood insurance as a condition of receiving federally-backed mortgages and other federal benefits, and in exchange still get the same flood

insurance coverage. Risk Rating 2.0 merely updates how FEMA estimates and sets premium *amount*s, and it does so not to effectuate an extra-statutory transformation of policyholders' rights or obligations, but instead to better align premiums with Congress's longstanding command that FEMA set rates according to standard insurance risk and actuarial studies. *See* 42 U.S.C. § 4014(a)(1).[9]

Additional statutory text confirms that Risk Rating 2.0 is not a substantive rule subject to notice and comment. The NFIA explicitly outlines when rulemaking is required, and it does not do so for rate setting under 42 U.S.C. §§ 4014 (requiring rate estimates based on accepted actuarial principles), 4015 (requiring setting chargeable rates based on accepted actuarial principles). *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another … , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quotation marks omitted)). Instead, the Act requires FEMA to promulgate regulations for, *inter alia*, the minimum floodplain management criteria that communities must satisfy for their citizens to have NFIP access (*see* 42 U.S.C. § 4014(f)(3)), and for the general terms and conditions of an NFIP policy (*see id.* § 4013(a)). And for good reason: The floodplain criteria control individuals' right to obtain flood insurance coverage, and the terms and conditions dictate the coverage offered, the parties' obligations, and all substantive questions about the policy. Changing these things can fundamentally alter insurance access and the insurance bargain struck, thereby necessitating public input.

---

[9] Plaintiffs cite no contrary authority. Each of the cases they cite to support how Risk Rating 2.0 apparently "determines the rights and obligations of current and future policyholders," Pls.' Mem. at 29, concerned whether agency conduct was a final agency action, not whether that conduct was subject to notice and comment. Whether something is a "tentative" or final, binding action is a distinct inquiry from whether it is a substantive legislative rule requiring notice and comment. Courts routinely find that agency actions are final but are not legislative and thus did not require public input. *See, e.g.*, *Gill v. U.S. Dep't of Just.*, 913 F.3d 1179, 1184–87 (9th Cir. 2019).

Updating FEMA's actuarial methodology for premium calculations, by contrast, works no such substantive change. Policyholders paying more or less for coverage based on their individualized actuarial risk is not, as a formal legal matter, a change in their rights or obligations.[10] And as a practical matter, the Risk Rating 2.0 rates changes will have a limited financial impact; as discussed, FEMA projects that 97% of policyholders will see either a decrease in rates or only a modest increase of up to $20 a month. In any event, the NFIA does not mandate rulemaking for rate estimates under 42 U.S.C. § 4014(a), and FEMA has never engaged in such rulemaking. Neither does the NFIA mandate rulemaking for setting chargeable rates under § 4015; in fact, Congress amended the provision via BW-12 (Pub. L. No. 112-141, § 100211) to remove the requirement that chargeable rates be "prescribe[d] by regulation" and simply require FEMA to "provid[e] notice" of the rates "from time to time." The Court must give effect to this amendment. Congress's explicit decision to remove the rulemaking requirement in § 4015, harmonizing it with § 4014, removes any possible doubt that subjecting ratemaking to notice and comment aligns with the NFIA. *See, e.g., Ross v. Blake*, 578 U.S. 632, 641–42 (2016) ("When Congress amends legislation, courts must presume it intends [the change] to have real and substantial effect." (quotation marks omitted)). Plaintiffs offer no reason why the Court should contravene Congress's will and treat Risk Rating 2.0 differently from any other ratemaking change.

Finally, "[e]ven assuming that the APA require[d]" FEMA to undergo notice and comment before issuing Risk Rating 2.0, "there was no 'prejudicial error' here." *Little Sisters*, 140 S. Ct. at 2385 (quoting 5 U.S.C. § 706). Courts routinely apply harmless error to excuse an agency's failure to comply with notice-and-comment requirements. *See, e.g., id.; United States v. Johnson*, 632 F.3d 912, 930–33 (5th

---

[10] Across insurance industries, policyholders must pay more or less in premiums each year based on their actuarial risk, and even before Risk Rating 2.0, policyholders experienced fluctuations in their premium rates. *See, e.g.,* Defs.' Mot. Dismiss Mem., at 39.

Cir. 2011). The party asserting error must demonstrate prejudice, *see, e.g.*, *Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009), and here Plaintiffs fail to do so for two independent reasons.

*First*, Plaintiffs received ample information and input opportunity on Risk Rating 2.0 outside of the APA's notice-and-comment procedures. FEMA publicly announced the Risk Rating 2.0 changes in March 2019 and released detailed information on Risk Rating 2.0 on its website in April 2021; implemented the changes for new policies and existing ones who opted to utilize the new rates since October 2021 and for all other existing policies beginning in April 2022; and in the meantime publicly released a bevy of information on the Risk Rating 2.0 data and methodology, the "specific changes" to the premium calculation, and the projected impacts to premiums at the state, county, and zip code level. Pls.' Mem. at 29; *see* Hake Decl. (detailing extensive public communications from 2019 onward regarding Risk Rating 2.0). Plaintiffs admit that they have had the opportunity "[o]ver the past several years" to engage with FEMA on Risk Rating 2.0. Compl. ¶ 22; *see id.*, Ex. 41 ¶¶ 21–26; *see also* Hake Decl. ¶¶ 81, 84, 85, 90–91, 125 (detailing how many of the Plaintiffs had meetings with FEMA to discuss questions and concerns). In other words, Plaintiffs "certainly had . . . notice" of Risk Rating 2.0 under 42 U.S.C. § 4015(a) and the opportunity to raise concerns, *Little Sisters*, 140 S. Ct. at 2385. Under these circumstances, they "do not come close to demonstrating that they experienced any harm" from lack of a published notice in the Federal Register, "let alone that they have satisfied th[e] harmless error rule." *Id.*; *see also, e.g.*, *City of Arlington, Tex. v. FCC*, 668 F.3d 229, 245 (5th Cir. 2012) (noting that "[t]he purpose of notice-and-comment rulemaking is to assure fairness and mature consideration of rules having a substantial impact on those regulated," and holding that these goals were satisfied and harmless error occurred where agency explained its action publicly and already had input from plaintiff), *aff'd*, 569 U.S. 290 (2013); *Aeronautical Repair Station Ass'n, Inc. v. FAA*, 494 F.3d 161, 171 (D.C. Cir. 2007) (similar).

*Second*, Plaintiffs do not identify any specific comment that they or others were prevented from sharing with FEMA, and that FEMA therefore did not consider in developing Risk Rating 2.0. *City of Arlington*, 668 F.3d at 245 (no prejudice where plaintiffs did not identify any specific issue not already considered by agency); *Johnson*, 632 F.3d at 932–33 (similar); *Miami-Dade Cnty. v. EPA*, 529 F.3d 1049, 1061 (11th Cir. 2008) (no prejudicial error where plaintiff does not "indicate with reasonable specificity, the aspect of the rule to which it objects and how it might have responded if given the opportunity" with a "credible challenge" (quotation marks omitted)).[11] Plaintiffs simply state that Risk Rating 2.0 "would have benefitted significantly from public notice and comment." Compl. ¶ 252. That is plainly insufficient to show prejudice.

### D.    Risk Rating 2.0 Does Not Violate the Spending Clause

Plaintiffs contend that Risk Rating 2.0 violates the Spending Clause in two related ways. First, Plaintiffs argue that they did not "voluntarily and knowingly" accept the NFIP under Risk Rating 2.0, since "it cannot be said that [they] would have taken FEMA's offer of NFIP participation in exchange

---

[11] Nor can Plaintiffs belatedly identify any such comment now. Any rate increases under Risk Rating 2.0 resulted in the aggregate from FEMA's use of catastrophe modeling, which is widely accepted technology for predicting losses due to infrequent and severe disaster events, and which therefore informs the average annual amount of premiums FEMA must collect across all policies to cover losses. Maurstad Decl. ¶¶ 28–31, 90. Use of this standard technology does not alter the substance of the NFIP—it is simply a software tool, and one that enhances FEMA's ability to follow its statutory mandate to set rates based on actuarial principles. As such, catastrophe modeling must remain regardless of whether Plaintiffs succeed in invalidating some other aspect of Risk Rating 2.0, such as its use of more specific rating factors to tie premiums to specific property and geographic risk characteristics. *Id.* ¶¶ 157–58, 215, 223, 257. In that circumstance, premium increases (flowing from catastrophe modeling's indication of increased annual average losses) would still occur for particular policies, but they would occur across the board for wide swaths of Plaintiffs' communities, rather than being distributed equitably based on individual property's particular flood risks. That too violates FEMA's statutory mandate to set rates actuarily. And it would not redress Plaintiffs' alleged substantive injury—increased rates for residents and resulting tax-base losses. Risk Rating 2.0 "correctly" implements FEMA's statutory mandate to set rates actuarily, and Plaintiffs have not identified any particular comment they were unable to provide, beyond complaining about some policyholders having to pay for flood insurance based on an accurate assessment of their flood risk. *Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 10 & n.10 (D.C. Cir. 2011).

for extensive land-use regulations in the first place had they known FEMA would later change the terms of the program" by imposing "significantly higher" insurance premiums. Pls.' Mem. at 32–33; *see* Compl. ¶¶ 644–46. Second, Plaintiffs argue that Risk Rating 2.0 "now imposes coercive conditions" on them, since they depend on the NFIP for flood mitigation and flood insurance for their citizens and therefore "have no choice but to remain in [it]," regardless of FEMA's bait-and-switch. Pls.' Mem. at 33–34.

Both of Plaintiffs' arguments fail under settled law. Longstanding precedent plainly permits Congress (and federal agencies implementing Congressional directives) to set and modify the conditions for participation in voluntary federal programs. *See, e.g.*, *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) ("Incident to [its] power [to Tax and Spend], Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." (quotation marks omitted)); *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 136 (5th Cir. 2018) (similar); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583 (2012) (Congress can "make adjustments" to Medicaid program and has in the past conditioned old and new funding on acceptance of these adjustments). "If a State's citizens view" the conditions and the "federal policy as sufficiently contrary to local interests, they may elect to decline" participation, meaning no Spending Clause violation exists. *New York v. United States*, 505 U.S. 144, 168 (1992).

*Adolph v. FEMA*, 854 F.2d 732 (5th Cir. 1988), applied these basic principles to the NFIP and forecloses Plaintiffs' claim here. There, the Fifth Circuit rejected a parish's argument that having to enact allegedly onerous ordinances to comply with FEMA standards and participate in the NFIP amounted to federal coercion. *Id.* at 740. As the court explained, "[b]y conditioning the availability of federally-subsidized insurance upon enactment of local flood-plain management ordinances in accordance with federal standards, *the NFIP represents a voluntary federal program*." *Id.* at 735 (emphasis

added). Because of its voluntary nature, the NFIP and the obligations it imposes on communities could not, according to the court, amount to impermissible coercion. For support, the court drew on several Supreme Court case examples—"cases upholding imposition of speed-limit reductions, minority set-asides," nondiscrimination requirements in federally assisted schools, and "drinking-age requirements as a condition of federal highway funding"—where "Congress traditionally has been sustained in enacting such programs to encourage state and local participation in the achievement of federal legislative goals." *Id.* at 735–36; *see also id.* at 736 n.3 (explaining that "[t]he federal government traditionally obtains state cooperation and participat[i]on in federal regulatory program[s] by offering the states a sufficiently attractive incentive or by threatening to withdraw a federal benefit they are presently receiving" (quoting *Tex. Landowners Rights Ass'n v. Harris*, 453 F. Supp. 1025, 1031 (D.D.C. 1978))). Because parishes could "weigh the advantages of [the NFIP] federal benefits against the limitations" that the program imposed and voluntarily decide whether to participate or withdraw, there could be no coercion. *Id.* at 736. So too here.

If States and municipalities truly believe that Risk Rating 2.0 represents a bait and switch overhaul of the NFIP—one that imposes intolerable and opaque conditions that outweigh the benefits the NIFP provides them in terms of floodplain management for their land and federally-subsidized insurance for their citizens—they can choose to no longer be participating NFIP communities. *See id.* (no parish is compelled to participate in NFIP). In fact, because participation in the NFIP is voluntary, a community may withdraw at any time. That critical fact readily distinguishes the coercion cases that Plaintiffs cite (Pls.' Mem. at 32); in those cases, States had no voluntary choice because the threatened loss of billions of dollars of State funding clearly prevented them from turning down the federal government's conditions. *See Sebelius*, 567 U.S. at 581–82 (holding that Congress threatening to withhold all of States' Medicaid grants unless they accepted expanded Medicaid funding and associated conditions functioned as a "gun to the head," since "[t]he threatened loss of over 10 percent of a

State's overall budget … is economic dragooning that leaves the States with no real option but to acquiesce"); *Texas v. Yellen*, No. 2:21-CV-079-Z, 2022 WL 989733, at *4 (N.D. Tex. Mar. 4, 2022) (similar, regarding conditioning States' access to billions in COVID-19 relief funds, comprising sizeable portions of their annual budgets, on their agreement to not use the funds to lower state taxes by enacting tax cuts). *Sebelius* is further distinguishable because it concerned an abrupt "shift *in kind*, not merely in degree," to the Medicaid program that States had originally agreed to participate in. 567 U.S. at 583 (emphasis added) (whereas original Medicaid program "was designed to cover medical services for four particular categories of the needy," "[u]nder the Affordable Care Act, Medicaid is transformed into … an element of a comprehensive national plan to provide universal health insurance coverage," which unfairly "surpris[ed] participating States" (quotation marks omitted)). Here, by contrast, Risk Rating 2.0 has neither made any NFIP changes abruptly nor altered the program in kind. Risk Rating 2.0 predictably continues Congress's efforts beginning through BW-12 to phase out premium subsidies and move to the full risk, actuarially based rates that the NFIA mandates, so that rates better communicate flood risks to policyholders and policyholders can take necessary measures to mitigate that risk. And by modifying the underlying methodology for calculating these rates by, for example, considering more known flood risk factors and using better risk modeling technology, Risk Rating 2.0 simply improves the NFIP's existing operation through reasonable adjustments; that is a far cry from the seismic and "dramatic" "transform[ations]" to program "coverage" and terms in *Sebelius. Id.* at 583–84.

Plaintiffs' claim fails for the additional reason that it does not even fall within the Spending Clause's ambit, as States and municipalities themselves stand to lose no federal funding if they do not accept Risk Rating 2.0's allegedly onerous terms. As the Supreme Court has explained, the "spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions," and the key question is whether a State voluntarily and knowingly

accepted the contract terms. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (citing, *inter alia*, *Steward Mach. Co. v. Davis*, 301 U.S. 548, 585–98 (1937) (holding that to comply with a condition attached to a federal benefit is not to be equated with federal coercion)). But "the NFIP does not form a contract between participating communities and the United States." *United States v. St. Bernard Par.*, 756 F.2d 1116, 1121 (5th Cir. 1985). Participating communities are not themselves accepting federal funds for flood insurance, and the Court is thus not being asked to evaluate whether the federal-state bargain struck for those funds was appropriate—as it would be tasked with doing in a conventional Spending Clause case. Instead, the federal government contracts with individual policyholders, and what Plaintiffs are really concerned with and asking the Court to evaluate is the "significantly higher" premiums imposed on homeowners under Risk Rating 2.0. That Plaintiffs are, in effect, asserting contractual injuries on behalf of their residents makes the NFIP and Risk Rating 2.0 an awkard fit for Plaintiffs' Spending Clause claim.

The cases that Plaintiffs cite at page 32 of their Motion are distinguishable on this basis. They each involved circumstances where Congress disbursed federal funds directly to States in exchange for certain conditions, and where the Court could thus evaluate the contract-like bargain directly struck between these "co-sovereigns" to ensure voluntariness and transparency. *Yellen*, 2022 WL 989733, at *4 (concerning pandemic relief funds to states); *see also, e.g.*, *Pennhurst*, 451 U.S. at 15–27 (concerning whether funding to States provided via the Developmentally Disabled Assistance and Bill of Rights Act of 1975 permissibly imposed an obligation on the States to provide, at their own expense, certain kinds of treatment for disabled individuals); *Sebelius*, 567 U.S. at 576–77 (concerning Medicaid grants to States). None involved consideration of the bargain struck between the federal sovereign and its citizens, and of State interests incidental to that bargain.

Even setting this aside, Plaintiffs' Spending Clause claim fails because the NFIP under Risk Rating 2.0 continues to provide a voluntary and worthwhile bargain to Plaintiffs' residents and, in

turn, to Plaintiffs themselves. Plaintiffs cannot and do not deny that the NFIP has historically promoted "the general welfare," *Dole*, 483 U.S. at 207 (quotation marks omitted), by (1) providing a "reasonable method of sharing the risk of flood losses" in a national program that "complement[s] and encourage[s] preventive and protective measures," and "mak[es] flood insurance coverage available on reasonable terms and conditions"; and (2) as a result mitigates the "personal hardship" and national economic "burden" that flood disasters create. 42 U.S.C. § 4001(a); *see id.* § 4001(d). Risk Rating 2.0 furthers these purposes by, among other things, ensuring that premium rates are individualized and thereby more clearly communicate specific flood risks (and therefore necessary protective measures) to policyholders; eliminating subsidies that did not reasonably distribute the costs of insuring against flood risks because they resulted in policyholders in lower value homes and at lower flood risk unfairly subsidizing other policies; expanding CRS discounts and other mitigation discounts; reducing premiums for many policyholders and ensuring that those with premium increases do not experience them suddenly, indiscriminately, or indefinitely; and, finally, improving the NFIP's financial solvency and stemming the growth of its more than $20 billion in debt. Plaintiffs ignore these many benefits.

Plaintiffs may feel that these benefits do not outweigh the premium increases that some of their residents may experience under Risk Rating 2.0, but that does not transform Risk Rating 2.0 into a Spending Clause violation. Again, they remain free to no longer be participating NFIP communities.[12] While they may have "tempting" incentives not to leave the NFIP—flood insurance coverage for their residents is certainly a "powerful" motivation—the NFIP "remains merely an offer"

---

[12] That they have remained in the program for years after FEMA announced premium projections for Risk Rating 2.0, despite clear communications FEMA provided to each policyholder's declarations page about the full risk premium for every insured structure, suggests that they have knowingly and voluntarily chosen to accept the NFIP under Risk Rating 2.0, "cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (quotation marks omitted).

under Risk Rating 2.0. *Frederick v. Dep't of Pub. Welfare*, 157 F. Supp. 2d 509, 523 (E.D. Pa. 2001).

  **E.**  **Risk Rating 2.0 Does Not Violate NEPA**

  Congress enacted NEPA, 42 U.S.C. §§ 4321-4370m-12, to establish a process for federal agencies to consider the environmental impacts of major federal actions. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 558 (1978). Agency actions that directly affect the physical environment are generally subject to NEPA and are analyzed in either an environmental impact statement, an environmental assessment, or fall within a categorical exclusion. *See Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983) ("NEPA was designed to promote human welfare by alerting governmental actors to the effect of their proposed actions on the physical environment."); 42 U.S.C. § 4332(2)(C).

  Plaintiffs are unlikely to succeed on the merits of their NEPA claim for three reasons. First, as explained in Defendants' Motion to Dismiss, Plaintiffs' NEPA claim is disconnected from the environment and therefore fall outside of NEPA's zone of interests. Defs.' Mot. Dismiss Mem., at 41–44. Second, Risk Rating 2.0 is not subject to NEPA because it has no environmental impacts. Third, even if Risk Rating 2.0 were subject to NEPA, FEMA's categorical exclusion covering "revisions to flood insurance rates and premium schedules" applies.

    **1.**  ***Risk Rating 2.0 is not subject to NEPA because it does not affect the physical environment***

  NEPA requires that agencies assess only the "reasonably foreseeable adverse *environmental* effects" of their actions. 42 U.S.C. § 4332(C)(ii) (emphasis added). NEPA does not require federal agencies to assess every possible outcome and effect of their decisions. *Metro. Edison*, 460 U.S. at 772, 776 (rejecting a broad reading of "adverse environmental effects" to protect against "virtually any

consequence of a governmental action that some one thought 'adverse.'"). Consequently, alleged effects that do not affect the physical environment fall outside NEPA. *Id.* at 778.

Agency actions must be connected to environmental impacts by a "reasonably close causal relationship" resembling proximate cause in tort law to trigger NEPA analysis. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004). "But-for causation" cannot support the causal relationship between agency action and environmental impact. *Id.* As the Supreme Court explained in *Metropolitan Edison*, mere risk of an impact "lengthens the causal chain beyond the reach of NEPA." 460 U.S. at 775. Similarly, "highly speculative" effects are insufficient to show proximate cause. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 356 (1989); *City of Dallas, Tex. v. Hall*, 562 F.3d 712, 719 (5th Cir. 2009) (noting that "reasonable foreseeability" does not include "highly speculative harms"); *Nat'l Tr. for Historic Pres. in the U.S. v. U.S. Dep't of Veterans Affs.*, No. 09-cv-5460, 2010 WL 1416729 (E.D. La. Mar. 31, 2010) (finding that agency was not required to study impacts based on projected population growth because they were too speculative).

This Circuit interprets the "causal link" strictly. For example, the plaintiff in *Sabine River Authority v. Department of Interior*, challenged an agency's easement acquisition because the plaintiff claimed that the easement "virtually nullified" a proposed reservoir's development. 951 F.2d 669, 675 (5th Cir. 1992). The plaintiff argued that blocking the reservoir's development caused "substantial risk" of water shortages and decreased water quality, but the Fifth Circuit found that the connection between agency action and future environmental impact stretched the "parameters of predictability to their limits" and that the connection imposed unreasonable "environmental clairvoyance" on the agency. *Id.* at 673-75.

Here, Plaintiffs myopically focus on NEPA's definition of a "major federal action," Pls.' Mem. at 34, ignoring the reality that insurance rates do not "significantly [affect] the quality of the human environment," 42 U.S.C. § 4332. For the same reasons that Risk Rating 2.0 is not subject to the APA's

notice-and-comment requirement, it is not a "major federal action" within the meaning of NEPA. *See supra* § II.C (explaining the Risk Rating 2.0 merely updates how FEMA estimates and sets premium amounts). Risk Rating 2.0 cannot be connected to environmental impacts by a "reasonably close causal chain" because Risk Rating 2.0 does not affect the physical environment. Plaintiffs' NEPA claim is, at best, linked to FEMA's decision by speculative events. Plaintiffs speculate that the increased insurance rates will decrease the Plaintiff States' populations, causing a "reduction in the State's tax base, resulting in lower tax revenue and hampering the State's ability to invest in future mitigation projects." Compl. ¶ 300. Based on this long, uncertain chain of events, Plaintiffs assert that the new rate calculation discourages mitigation projects, "thereby raising the risk and increasing the probability of severe damage." Compl. ¶ 303. The unsupported claim that Risk Rating 2.0 affects the physical environment by discouraging mitigation, which purportedly increases flood risk, is far too speculative to prove a "reasonably close" causal chain.

Indeed, Risk Rating 2.0 is even less connected to the physical environment than the agency's easement acquisition in *Sabine River*, which directly prevented use of the land. 951 F.2d at 680. Because NEPA concerns impacts to "the physical environment," Plaintiffs cannot base a NEPA claim on a flood insurance revision that does not change the "character or function of the land." *Id. Rather,* Plaintiffs must show a concrete environmental impact stemming from the agency action and cannot rely on attenuated hypotheticals. *Metro. Edison*, 460 U.S. at 776. Risk Rating 2.0 does not dismantle dams, level levees, or dribble a single drop of water onto Plaintiffs' lands. Nor can Plaintiffs show that flood mitigation projects benefit the physical environment. Instead, their alleged harms materialize only after a long hypothetical chain of possibilities, culminating in decreased mitigation due to decreased property purchases due to consumer fear of flood risk due to higher insurance rates. As stated by the Supreme Court, an "unrealized risk" flowing from a federal action is "too far removed

… to be covered by NEPA." *Id.* at 775, 777. This unrealized risk is a "necessary middle link" in Plaintiffs' causal chain and "lengthens the causal chain beyond the reach of NEPA." *Id.*

Risk Rating 2.0, by changing insurance rate calculations, simply does not "affect the quality of the human environment." *Citizen Advocs. for Responsible Expansion, Inc. (I-Care) v. Dole*, 770 F.2d 423, 432 (5th Cir. 1985). Plaintiffs cannot connect Risk Rating 2.0 to any environmental effect with a "reasonably close causal link" because insurance rates do not change the physical environment. Consequently, Risk Rating 2.0 is not subject to NEPA.

### 2. *Even if NEPA applies, Risk Rating 2.0 is covered under a categorical exclusion*

Categorical exclusions (CEs) are classes of actions that "do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency." 40 C.F.R. § 1508.4; *see Guidance Regarding NEPA Regulations*, 48 Fed. Reg. 34,263, 34,265 (July 28, 1983) (directing agencies to develop CEs using "broadly defined criteria which characterize types of actions that, based on the agency's experience," normally do not have "significant environmental effects"). CEs allow agencies to focus their attention and resources on major projects posing significant effects on the environment. *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013) (describing a CE as "a form of NEPA compliance" that "requires less than where an environmental impact statement or an environmental assessment is necessary"). The Department of Homeland Security (DHS), under which FEMA is organized, has several CEs grouped by the type of agency action. *See* DHS, *Instruction Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA)*, at Appendix A, https://perma.cc/NSK4-KBYD ("*Instruction Manual*"). Relevant here, FEMA's revisions to flood insurance rates and premium schedules are categorically excluded from further NEPA review. *See id.* at A-21.

42

Courts defer to agency expertise in applying CEs, invalidating the application only if the agency decision is plainly erroneous or inconsistent with the relevant regulations. *United States v. Larionoff,* 431 U.S. 864, 872 (1977); *W. Houston Air Comm. v. F.A.A.*, 784 F.2d 702, 75 (5th Cir. 1986) ("[C]ourts should defer to the agency's interpretation of its own categorical exclusion regulations"). When applying CEs, agencies need to analyze "extraordinary circumstances" only if "substantial evidence in the record" suggests their existence. *California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002) (noting that a heightened standard of review is only invoked when "substantial evidence in the record" suggests that an exception to CE applies).

Even if Risk Rating 2.0 falls under the purview of NEPA, which it does not, Plaintiffs remain unlikely to succeed on the merits of their NEPA claim because FEMA can properly apply a CE covering "revisions to flood insurance rates and premium schedules." *Instruction Manual* at A-22. Plaintiffs claim in conclusory fashion that Risk Rating 2.0 is "not the type of action categorically excluded from NEPA." Pls.' Mem. at 35. To the contrary, Risk Rating 2.0 satisfies the express language of FEMA's CE. By updating its flood insurance methodology and actuarial principles, FEMA revised an existing flood insurance program through Risk Rating 2.0. Further, Plaintiffs have not established that extraordinary circumstances exist.

## III.   The Balance of Equities and Public Interest Weigh Strongly Against a Preliminary Injunction

The remaining preliminary injunction factors tilt decisively in favor of denying Plaintiffs' Motion. Put simply, Plaintiffs have not and cannot establish that they will suffer any hardships that outweigh the harms that their requested relief inflict on the Defendants and the public interest. As discussed, Plaintiffs have failed to allege any concrete, redressable injury caused by Risk Rating 2.0, much less any irreparable harm. Defs.' Mot. Dismiss Mem., at 19–41; *supra* § I. On the other side of the scale, enjoining Risk Rating 2.0 would quite clearly harm the federal government and its operation

of the NFIP, upset the status quo, and injure FEMA, policyholders, and taxpayers—all of which Defendants lay out in extensive detail in the Maurstad Declaration (¶¶ 213–325).

"[A]ny time [the government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Here, Congress has charged FEMA with "carry[ing] out a national flood insurance program," 42 U.S.C. § 4011(a), and the agency developed and implemented Risk Rating 2.0 to make critical improvements to enhance the accuracy and equity of rates of NFIP rates and the program's solvency. "[W]ere this Court to enter injunctive relief at this time—with the transition" to Risk Rating 2.0 finally completed—"there would be great disruption and uncertainty in the administration … of" the NFIP, in contravention of Congress's intent. *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 99 (D.D.C. 2003). Enjoining Risk Rating 2.0 would not, as Plaintiffs suggest, simply "reinstate" legacy rating with the flick of a switch. Pls.' Mem. at 46. FEMA would have to reimplement old NFIP systems, infrastructure, guidance, and training; figure out how to reimpose an elevation certification requirement on existing policyholders that Risk Rating 2.0 had eliminated; and rewrite and re-underwrite the nearly 5 million policies in the program—all of which would take multiple years, and leave policyholders and the NFIP's operations in flux in the meantime. Maurstad Decl. ¶¶ 260–73. Moreover, Congress has charged FEMA with setting NFIP rates that are risk-based, actuarially sound to cover expected losses and costs of running the program, and reasonable. As discussed, Risk Rating 2.0 has enabled FEMA to comply with these statutory mandates, *supra* § II.A, and enjoining it therefore irreparably harms the public interest. *See, e.g., Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008) ("[T]here is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop."); Maurstad Decl. ¶¶ 248–59.

An injunction here would further undermine the public interest by completely upending, rather than maintaining, the status quo. *See, e.g.*, *Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) (preliminary injunction is "against the public interest" where injunction would not simply preserve the relative positions of the parties until trial); *Sherley v. Sebelius*, 644 F.3d 388, 398 (D.C. Cir. 2011) (similar). Risk Rating 2.0 has been in effect for multiple years; as discussed, it has applied to policies beginning since October 1, 2021, and was fully implemented as of April 1, 2023. Courts have long warned that preliminary injunctions in these circumstances are "particularly disfavored." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976); *see also, e.g.*, *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994).

Enjoining Risk Rating 2.0 would also harm FEMA beyond just "the irreparable harm of denying the public interest in the enforcement of" its lawful regulatory program. *E.T. v. Paxton*, 19 F.4th 760, 770 (5th Cir. 2021); *see also, e.g.*, *Louisiana ex rel. Landry v. Biden*, No. 22-30087, 2022 WL 866282, at *3 (5th Cir. Mar. 16, 2022), *appeal to vacate denied*, 142 S. Ct. 2750, (2022). Risk Rating 2.0 has been a five-year effort that has cost FEMA over $80 million. Maurstad Decl. ¶ 261. Undoing it, and reprocuring and renegotiating the contractor and vendor support necessary to even temporarily revert back to the old NFIP systems, infrastructure, guidance, and training, will take FEMA multiple years and require it to spend tens of millions of additional dollars. *Id.* ¶¶ 260–73. The WYO companies that sell and service most NFIP policies have, as with the NFIP's own sales and service contractor, similarly spent years and $150-200 million, not including vendor costs, to implement Risk Rating 2.0, and would have to spend substantially more even to temporarily pause it. *Id.* ¶¶ 282–322; *see id.*, App'x A (June 30, 2023, Letter from American Property Casualty Insurance Association) at 1.

Policyholders and taxpayers will also suffer. Those who remain in the NFIP will be forced during the pendency of an injunction to pay premiums based on inaccurate flood risk data, to the detriment of many policyholders. The 19% of policyholders who saw rate decreases under Risk Rating 2.0 will have to pay higher premiums for the same level of coverage; and homeowners with lower

value homes and in inland communities will continue to subsidize those in higher value homes and those in coastal communities. Maurstad Decl. ¶¶ 217–39 (detailing these inequities, as well as others). In fact, policyholders across the board will be subject to higher premiums, some of them quite extreme, as FEMA's legacy rating approach did not allow the agency to accurately determine individual property risks and thus forces the agency to uniformly raise premiums for broad swaths of policy classes to try and cover costs. *Id.* ¶¶ 222–29, 233–35 . Since 2005, the legacy rates seriously failed to achieve this goal, and the NFIP's debt now stands at more than $20 billion. *Id.* ¶¶ 240–42. Enjoining Risk Rating 2.0 will, during the pendency of the injunction, contribute to this debt by preventing FEMA from collecting the premiums necessary to fully insure against flood risks. Ultimately, taxpayers will foot the bill, just as they have in the past when they financed billions of dollars of NFIP debt cancellation. *Id.* ¶¶ 97, 107, 120, 243.

Finally, Plaintiffs' requested injunction is unworkable. Rule 65 requires that a preliminary injunction "describe in reasonable detail—and not by referring to the complaint or other document— the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C). "The drafting standard has been described as that an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed." *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (quotation marks omitted) (explaining that an injunction violates this standard if it is overly vague on the specifics on what activity is prescribed or overly broad on the range of prescribed activities). Plaintiffs' requested injunction fails to meet this standard. Plaintiffs ask the Count to issue an injunction "restraining Defendants from implementing and enforcing Risk Rating 2.0," Mot. for Prelim. Inj., at 2; *see* Pls.' Mem. at 5, but the Court cannot enter an order containing such "broad generalities," *Scott*, 826 F.3d at 213. Plaintiffs offer zero specificity on what enjoining Risk Rating 2.0 would entail. For example, they do not identify whether an injunction would require FEMA to stop (a) using catastrophe modeling, which is standard insurance technology; (b) considering additional

geographic and structural rating factors, which are known to improve flood risk assessments; (c) using a centralized rating engine that streamlines how FEMA actually generates premiums based on inputs such as the rating factors; or (d) implementing any or all premium increases, even though FEMA is required by law to set rates actuarily and to raise some rates at a set amount each year. Because it is unclear precisely what Plaintiffs are seeking, Plaintiffs' requested injunction "does not satisfy the specificity requirements outlined in [Rule] 65(d)," *Scott*, 826 F.3d at 214, and should not be entered by the Court, *see John Doe #1 v. Veneman*, 380 F.3d 807, 819–20 (5th Cir. 2004).

If the Court grants Plaintiffs any relief—which it should not—any remedy must be appropriately limited. Because a federal court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018). Any interim relief should be limited to the particular Plaintiffs who have demonstrated standing and to particular legal errors the Court determines that FEMA may have made in developing and implementing Risk Rating 2.0. Declaratory relief identifying any such errors and remanding to the agency to address them would be sufficient. To the extent the Court is inclined to issue a preliminary injunction, Defendants request the opportunity to brief the Court on the scope of relief, and further request that the Court automatically stay its order for 30 days to allow FEMA to consider its appellate options.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction should be denied. If the Court enters a preliminary injunction, the Court should automatically stay its order for 30 days.

Dated: August 8, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General
Civil Division

TODD KIM
Assistant Attorney General Environment &
Natural Resources Division

KRYSTAL-ROSE PEREZ,
TX Bar # 24105931

LESLEY FARBY
Assistant Branch Director
Civil Division, Federal Programs Branch

*Benjamin Takemoto*
BENJAMIN TAKEMOTO
(DC Bar # 1045253)
YOSEPH T. DESTA
(CA Bar # 332179)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883, Ben Franklin Station
Washington, DC 20044
Tel: (202) 532-4252
Email: benjamin.takemoto@usdoj.gov

Trial Attorney
P.O. Box 7611, Ben Franklin Station,
Washington, D.C. 20044
Tel: (202) 305-0486
Email: krystalrose.perez@usdoj.gov

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 8, 2023, the foregoing was filed electronically through ECF/CM.  On this same date, electronic service will be made to all counsel of record through the Court's ECF/CM system.


*Benjamin Takemoto*
BENJAMIN TAKEMOTO
Trial Attorney, U.S. Department of Justice