# EXHIBIT 6

# United States Senate
WASHINGTON, DC 20510

June 28, 2023

The Honorable Gene L. Dodaro
Comptroller General
U.S. Government Accountability Office
441 G Street, NW
Washington, D.C. 20548

Dear Comptroller Dodaro:

It is our understanding that you intend to release a Government Accountability Office (GAO) study this year on the National Flood Insurance Program's Risk Rating 2.0 methodology.

While we would welcome such an evaluation, we would like to note that our immediate concern with Risk Rating 2.0 is that the method and its supporting data have not been made transparent. The Federal Emergency Management Agency (FEMA) has been and continues to be reluctant to share the important details of its computations. A third-party study of Risk Rating 2.0 may be useful if appropriately scoped, but it cannot be a substitute for FEMA making the method totally transparent and implementing it under the rulemaking process of the Administrative Procedure Act. We are enclosing for your information and use a letter to FEMA from our Senate colleagues that expressed these issues and other concerns about Risk Rating 2.0.

We request that the following be included as one of the major questions to be examined in the GAO study: "To what extent is Risk Rating 2.0 actuarially sound and transparent?" Our concern lies in that the study as designed might resolve the question of "actuarial soundness" into an examination of whether Risk Rating 2.0 is "doing what actuaries do." That concern is further heightened by your intent to assess FEMA's Risk Rating 2.0 models and methodologies against actuarial standards. In our view, the outcome is likely to be answered in the affirmative given that actuaries designed the method, but the answer will provide little insight in our discussions on what NFIP policies should be.

We are also deeply concerned by FEMA's report to the U.S. Treasury (Criswell A. D., 2021) [1] that Risk Rating 2.0 will result in attrition of one in five policyholders from the flood insurance program over the next decade. FEMA's projection raises the dire specter of a million or more homeowners sentenced to living uninsured in their homes. Policyholders' home values will be devalued and unsaleable, and they will essentially be sentenced to live in their uninsured homes with little help or chance of relief. FEMA has yet to disclose how it will meet this challenge which it has identified as resulting from the implementation of Risk Rating 2.0.

---

[1] *National Flood Insurance Program Debt Repayment Report As of March 31, 2021: Report to Congress and the Secretary of the Treasury,* (Dec. 12, 2021).

The era of unaffordable flood insurance ushered in by Risk Rating 2.0 led to a new FEMA proposal to provide a means-tested insurance subsidy program to help moderate-to-low-income homeowners afford actuarial premiums. Of course, such subsidized premiums have historically been financed to a large extent within the flood insurance pool itself with contributions to the deficit from the borrowings of the fund. The FEMA proposed subsidy program would depart from actuarial soundness and sacrifice fiscal soundness to rescue Risk Rating 2.0. If the subsidies must be financed within the insurance pool, then NFIP will move a substantial distance back toward the cross-subsidized premiums that FEMA declared Risk Rating 2.0 would deliver us from – all without any clarity that we are better off than with the legacy premium setting method.

A complete study of Risk Rating 2.0 needs to address these discrepancies between affordability and fiscal balance. We would prefer to have enough transparency in this program to face this reality now in order to adopt flexibility with respect to actuarial niceties, and design a program that balances affordability with other objectives.

Beyond these conceptual concerns that we believe your study should examine, specific concerns that have been raised by many in the industry are listed below. We encourage your office to examine these requests and questions and answer them in your report.

1. Report the error bands (confidence intervals) from the generalized linear model results for all the rating factors by region. Based on these error bands, evaluate the usefulness of the regressions for estimating flood insurance premiums with an accurate underlying estimate of expected annual damages.
2. Evaluate the soundness of estimating rating factors on a regional, as opposed to a flood plain, basis together with discussion of the errors and biases that such an approach may introduce. FEMA reports estimating rating factors based on geographic data that spans Texas to North Carolina rather than on more granular considerations of floodplain relationships.
3. Collect a significant sample of property-specific average annual damages using traditional hydrology/hydraulics models from U.S. Army Corps of Engineers (USACE) studies (adjusted for price levels) and compare those results with the same property-specific average annual damage estimates calculated within Risk Rating 2.0.
4. Evaluate application of transparent and peer reviewed traditional methods (USACE, Hazard Mitigation) for computing property-specific average annual damages to compute actuarial premiums as compared with the opaque Risk Rating 2.0 methods.
5. Evaluate the economic impact analysis in FEMA's most recent NFIP programmatic environmental impact statement, especially the estimates of impacts on property values. Are these estimates economically sound and do they accurately capture the impacts of eliminating subsidized premiums on property values? Do these estimates accurately depict the impact of the entire Risk Rating 2.0 approach (as opposed to merely eliminating subsidies) on property values?
6. What are the immediate and long-term effects of eliminating grandfathered premiums on home values? What impact would this have on local property tax collections by municipalities?

7. What is GAO's estimate of the expected attrition from the program from increasing cost on policyholders who do not have a mandated purchase requirement or others who simply cannot afford to pay the proposed rates?
8. Does FEMA have the clear Congressional authority to make the draconian premium increases in Risk Rating 2.0?
9. Should FEMA implement Risk Rating 2.0 through the Administrative Procedure Act?
10. Should FEMA conduct an independent peer review of all models and methods in Risk Rating 2.0 as required by the Office of Management and Budget guidance for the Information Quality Act?

Thank you very much for your attention to this matter.

Sincerely,

_____
Cindy Hyde-Smith
U.S. Senator

_____
Roger F. Wicker
U.S. Senator

_____
Bill Cassidy, M.D.
U.S. Senator

# United States Senate
WASHINGTON, DC 20510

July 27, 2022

Mr. David I. Maurstad
Deputy Associate Administrator
Federal Insurance & Mitigation Administration Resilience
FEMA | National Flood Insurance Program
500 C St. SW
Washington, DC 20472

Dear Mr. Maurstad,

Thank you for your June 23, 2022, testimony on National Flood Insurance Program (NFIP) reform before the U.S. Senate Committee on Banking, Housing, and Urban Affairs. We request additional information about the Risk Rating 2.0 pricing methodology for NFIP premiums.

This information is essential to our understanding of the status and operations of the NFIP and the potential benefits and costs of the reforms that the Administration has proposed. Thus far, insufficient data has been disclosed in order to adequately evaluate Risk Rating 2.0 and make judgements about how to address FEMA's implementation of premiums in a reauthorization bill.

To improve public understanding and assessment of Risk Rating 2.0, and to achieve our essential transparency objectives in support of our evaluation of current NFIP practices and issues to be addressed in reauthorization legislation, we ask that FEMA publish all the datasets, programs, models, simulations, complete regression model outputs for rating factors, including associated confidence intervals, and inputs and outputs, including all the data and methods described in FEMA's "Risk Rating 2.0 Methodology and Data Sources, January 18, 2022." We further request that this information be published together with step-by-step user manuals and complete program documentation so that the risk and premium computations performed under Risk Rating 2.0 may be completely replicated to include reproducing a premium computation for any given property as described by a physical location and property and building characteristics (but not identified as a specific actual property to protect the privacy of policyholders).

Given that FEMA has already disclosed information at the county level showing the distribution of premium increases and decreases, we also request that you provide from your datasets the actual premium distribution information as described in Section 2(c)(7) of S. 3934, the "Homeowner Flood Insurance Transparency and Protection Act". If the datasets are available to produce distributions of "increases and decreases" in premiums, then the actual premium distribution data, as requested, are also available and, if provided in the manner requested, will not disclose any individual information.

We are also asking that you answer the following questions related to NFIP expeditiously to assist us in evaluating both the NFIP and the Administration's legislative proposal for reform and reauthorization of the program:

On May 25th of this year in testimony before the House Financial Services Committee, Mr. Ariel Rivera-Miranda, an independent insurer representing the National Association of Professional Insurance Agents, said the following about Risk Rating 2.0—

> "Agents cannot see what effect any single data point has on a rate, making it impossible for them to walk policyholders through the system's process of building an increased rate. Policyholders deserve to understand how their data is being used to calculate their premiums…". He continued, "the lack of transparency in the rating engine makes our work harder because it leaves us with frustrated clients and incomplete information."

Mr. Franklin W. Nutter, the well-known President of the Reinsurance Association of America, in response to a question from Representative Posey of Florida during the same hearing, told the Committee that—

> "More granular [Risk Rating 2.0] data would allow the program and other government programs to target mitigation as well as to understand better who is paying what." Mr. Nutter went on, "there is no question that transparency benefits everyone, both the consumer as well as people looking to understand the consequences of the rating process and the impact that it has."

On June 16, 2022, before the Senate Banking Committee, Senator Kennedy questioned the panel about FEMA's refusal to let Congress or other stakeholders see <u>all</u> the data and methodologies underlying Risk Rating 2.0. The Committee received no meaningful explanation or defense for the lack of transparency surrounding Risk Rating 2.0. Ranking Member Senator Toomey has indicated his support for the new Risk Rating 2.0 price rating approach but on June 16, 2022, he said the following—

> "…the discussion this morning is underscoring the importance of having reforms built into a reauthorization and one of them, certainly, should include an obligation for FEMA to fully disclose their methodology, their algorithms, whatever process they used to establish premiums…".

1. **<u>Transparency</u>**. Bearing in mind what the House Committee was told in May, what Congress was told on June 16, 2022, by Senate Banking witnesses, and the endorsement by the Ranking Member of the Senate Banking Committee for transparency, will you commit to do the right thing and fully disclose all the data and computations being used to compute estimated flood insurance premiums under Risk Rating 2.0? Beyond it being required, transparency should improve the agency approach *and* public confidence, don't you agree?

2. **Administrative Procedure Act.** In your response to written questions following your Senate Banking hearing last year, you argued that the requirements of the Administrative Procedure Act for rulemaking don't apply to your promulgation of risk-based premiums under Risk Rating 2.0.

> Your argued: "Even if the rulemaking requirements outlined in the Administrative Procedure Act (APA) at 5 U.S.C. § 553 were directly applicable, the APA offers exceptions to rulemaking for matters relating to "benefits and contracts" 5 USC § 553(a)(2), and for rules of "procedure and practice" 5 USC § 553(b)(3)(A)—thus offering a considerable amount of discretion as to when rulemaking is undertaken."

This is not a convincing argument. The Administrative Procedure Act at 5 U.S. Code § 551(4) defines a "rule".

> "(4)"rule" means the whole or a part of an agency statement of general or particular applicability and future effect **designed to implement, interpret, or prescribe law or policy** or describing the organization, procedure, or practice requirements of an agency and **includes the approval or prescription for the future of rates**, wages, corporate or financial structures or reorganizations thereof, **prices,** facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;"

Your answer asserted that your activities with respect to Risk Rating 2.0 were directed at complying with Congress' statutory direction to prescribe risk-based premiums. Therefore, there can be no argument that Risk Rating 2.0 is not "designed to implement, interpret, or prescribe law or policy." Neither can it be argued that Risk Rating 2.0 does not "include the approval or prescription of the future of rates" or "prices." Nor is it possible to circumvent the APA by describing the implementation of Risk Rating 2.0 as government "benefits and contracts" or mere agency "procedures and practice." The implementation of Risk Rating 2.0 is setting rates or prices and implements law and policy.

Anything this big and different should fall under the APA. Considering the plain language of the Administrative Procedures Act, is it still your position that implementation of Risk Rating 2.0 is NOT a rule under the Act and subject to rule making as prescribe in 5 U.S.C. § 553?

3. **Levees.** In your answer to a written question at our hearing last year you provided a description of your ongoing attempts to bring levee-protected areas into the NFIP under Risk Rating 2.0.

You described how you are working with the Corps of Engineers to implement 5 key data points to assess the risk reduction provided by a levee: levee centerline, levee crest profile, leveed area, overtopping frequency, and levee performance (which means the

probability of levee failure). You further describe using the USACE-maintained National Levee Database (NLD) and the Levee Screening Tool (LST).

Does the Corps of Engineers concur that the data and methods you are employing to bring levees under Risk Rating 2.0 are reliable enough to be used to compute "expected damages" and therefore risk-based insurance premiums?

Accredited levees have been an excellent substitute for mandatory insurance. Communities with accredited levees make sacrifices and invest in maintaining this "physical insurance." Is there any reason to believe that overlaying Risk Rating 2.0 and mandatory insurance on areas protected by accredited levees who are already paying for both physical and financial protection will materially improve the level of financial protection already afforded by accredited levees?

4. **Policyholder Dispute Resolution**. The implementation of Risk Rating 2.0 has severed premium setting from Flood Insurance Rate Maps and cut policyholders off from an appeals process for premiums. The Congressional Research Service reminds us of this, as does the insurance industry itself. Your own legislative proposal on the NFIP acknowledges this reality by stripping the phrase "Flood Insurance Rate Maps" from the U.S. Code. You can't compare this to auto insurance where people typically don't appeal because, for one thing, there are state insurance commissions. Should communities and policyholders be denied the right to challenge their government on Risk Rating 2.0? Are Risk Rating 2.0 and FEMA beyond reproach?

5. **Affordability**. In your response to Senator Kennedy's written questions at the last hearing, you urged that the affordability of the NFIP would best be served by a means-tested assistance program.

> You said that "in 2021, FEMA developed its NFIP Means-Tested Assistance Program proposal that would offer a graduated discount benefit to current and potential policyholders whole [whose] households make at or below 120% of area median income. This proposal was included in the President's FY22 Budget. FEMA urges Congress to ensure that more individuals are covered by flood insurance by making insurance more affordable to low-and-moderate income policyholders residing in 1-4 family dwellings used as primary residences."

Let's be candid. A means-tested assistance program cannot mitigate the severe future impacts that will befall those who have had grandfathered or steeply discounted premiums under the traditional premium structure. In five to ten years, we will start to see a sizeable number of Americans who can't afford to pay for NFIP under Risk Rating 2.0 and remain in their homes. Many will drop insurance and stay in their homes. As that scenario unfolds, we will see an increasing number of homeowners placing the financial system in greater risk than they have under the old way of setting premiums. Many won't be able to sell their homes. Without affordable insurance coverage, they will be sentenced to financial ruin. This will become an emergency.

Given that FEMA is the emergency manager and planner, what is FEMA planning to do to help these Americans out of the mess that Congress has put them in with risk-based premiums?

6. **Homeowner Flood Insurance Transparency and Protection Act.** Fortunately, some of us have been working together to improve Risk Rating 2.0 to address many of the problems we've been discussing. Legislation (S. 3934) introduced by Senator Hyde-Smith will deal with all these FEMA failures while also giving policyholders the option to have their premiums set under the legacy approach until FEMA completes the following tasks--
   - Release all data and methods used to establish premiums;
   - Provide policyholders with their full-risk actuarial premiums;
   - Publish economic impacts (flood insurance affordability, property values, local revenues, etc.);
   - Perform updated NEPA analysis on premium discount changes;
   - Comply with the Information Quality Act;
   - Provide APA public notice and comment opportunity;
   - Develop a policyholder challenge opportunity;
   - Publish statistical information by county on full-risk actuarial premiums; and
   - Report to the Senate Banking Committee and the House Financial Services Committee on the agency's findings.

A bipartisan House companion by Representative Garret Graves, Bill Pascrell, Frank Pallone, and others (H.R. 7364) has been introduced. Completion of these tasks was required before Risk Rating 2.0 was rolled out and is still required. Will FEMA get behind this straightforward approach to achieve transparency, public input, data quality, and fair policyholder dispute resolution?

We request that this information be made available online within 60 days for public review. Thank you for your cooperation with our request.

Sincerely,

John Kennedy
U.S. Senator

John Cornyn.
U.S. Senator

_____
Bill Cassidy, M.D.
U.S. Senator

_____
Roger Wicker
U.S. Senator

_____
Cindy Hyde-Smith
U.S. Senator

_____
Marco Rubio
U.S. Senator

_____
Ted Cruz
U.S. Senator