# EXHIBIT 22



*Assistant Secretary for Legislative Affairs*
**U.S. Department of Homeland Security**
Washington, DC 20528

May 11, 2022

The Honorable Mitch McConnell
Minority Leader
United States Senate
Washington, DC 20510

Dear Minority Leader McConnell:

Enclosed are 17 legislative proposals that would reform the Federal Emergency Management Agency's (FEMA) National Flood Insurance Program (NFIP). I respectfully request that Congress expeditiously take up and enact these proposals.

Congress established the NFIP to enable United States residents to buy insurance to protect their homes in flood-prone areas. For more than 50 years, the NFIP has been essential to the nation's resiliency policy. Today, the NFIP requires structural change to ensure that individuals and communities have a sustainable program to provide the assistance they need when they need it for decades to come.

On September 30, 2022, the NFIP's statutory authority, including the authority to sell and renew flood insurance policies, will expire. Since the NFIP's last multi-year reauthorization expired on September 30, 2017, the NFIP has experienced 21 short-term extensions, including three brief lapses. The frequent short-term extensions are disruptive and cause existing and potential policyholders to lose confidence in the NFIP as a reliable insurance program available to protect their homes and contents from the risk of flooding. As such, the Administration believes that passing a 10-year reauthorization with comprehensive program reform as soon as possible is an imperative.

As Congress considers NFIP reauthorization, the Administration urges Congress to consider several reform principles to ensure more Americans are covered by flood insurance, build the nation's climate resilience, reduce disaster suffering, and establish a sound and transparent financial framework for the NFIP. The principles outlined below reflect the Administration's priorities for multi-year NFIP reauthorization:

- **Ensuring more Americans are covered by flood insurance by making insurance more affordable to low-and-moderate income policyholders.** Under its current authorities, the NFIP can only make rates "reasonable" by offering discounts and cross-subsidies, primarily based on a building's age, flood risk map changes at a building's location, or by considering mitigation activities undertaken by the property owner or community. Such discounts and cross-subsidies make risk communication through the price of flood insurance difficult, contributing to policyholder misunderstanding of flood risk. A targeted assistance program would offer low- and moderate-income current and prospective NFIP policyholders a graduated risk premium discount while providing them with knowledge of the full-risk price in order to communicate the property's true flood risk. The price of a flood insurance policy is an important signal of flood risk. Property owners, families, and communities who do not recognize their true flood risk due

to discounted insurance rates may not take necessary mitigation actions to prepare for and protect themselves against flood events.  Risk-based flood insurance premiums are appropriately higher priced in areas that have the highest flood risk.

• **Building climate resilience by transforming the communication of risk and providing Americans with tools to manage their flood risk.**  The nation's evolving needs require flood hazard information more robust than the special flood hazard area (SFHA) and 1-percent annual chance flood elevation.  Expanding the ways in which the NFIP communicates risk will provide the nation with a more comprehensive understanding of flood risk.  Furthermore, a significant barrier to addressing the nation's flood risk is home buyers' and renters' lack of awareness about flood risk when they complete real estate transactions.  Requiring states to establish certain minimum flood-risk reporting requirements for sellers and lessors before residential transactions close as a condition for participation in the NFIP would address this barrier.

• **Reducing risk, losses, and disaster suffering by strengthening local floodplain management minimum standards and addressing extreme repetitive loss properties.**  The NFIP must have better tools to address insured structures that have experienced multiple flood claims.  Known as repetitive loss (RL) and severe repetitive loss (SRL) properties, these structures are responsible for a disproportionate share of losses and have a high risk of future flooding.  About 2.5% of insured properties are considered unmitigated repetitive loss properties of any category, indicating a high risk for future flooding.  Multiple loss properties contribute to the NFIP's financial challenges and explain some of the public's negative perceptions of the program.

• **Instituting a sound and transparent financial framework that allows the NFIP to balance affordability and fiscal soundness.**  Congress authorized FEMA to borrow from the U.S. Treasury up to $30 billion to pay claims.  The NFIP currently carries $20.5 billion in debt to the U.S. Treasury and pays approximately $300 million in interest expenses annually – using the current premiums to pay for past claims.  As currently structured, the program is unable to pay this debt back in full.  A sound financial framework, essential for establishing a sustainable NFIP, fundamentally challenges the original construct and assumptions that underly the program's existing financial framework.

Comprehensive and transformative reform is necessary to transition the NFIP to a sustainable program that balances affordability and fiscal soundness, builds climate resilience, and reduces risk, loss, and disaster suffering.  It is critical that Congress provide urgently needed multi-year reauthorization and concurrently reform the NFIP.

The Department of Homeland Security and the Administration look forward to working with Congress to develop a long-term solution that addresses the needs of the NFIP, its policyholders, and the nation.  We stand ready to work with you to achieve the objectives described in this letter.

Identical letters will be transmitted to the President and the Majority Leader of the Senate, as well as to the Speaker, the Majority Leader, and the Minority Leader of the House of Representatives.

The Office of Management and Budget advises that, from the viewpoint of the Administration's program, there is no objection to the presentation of this legislative proposal to Congress.

If I may be of further assistance, please contact me at (202) 447-5890.

Respectfully,

Alice Lugo
Assistant Secretary for Legislative Affairs

Enclosure

*Summary of Proposed Reforms*

Below is a summary of proposals to reform the National Flood Insurance Program (NFIP) that the Administration urges Congress to enact:

### *Sound Financial Framework*

1. **Findings in Support of a Sustainable National Flood Insurance Program** – Clarifies legislative intent that is implicit throughout the National Flood Insurance Act of 1968 (NFIA) in support of full-risk rates and other measures to ensure a sound financial framework.

*Legislative text:*

**SEC. __.  FINDINGS IN SUPPORT OF A SUSTAINABLE NATIONAL FLOOD INSURANCE PROGRAM.**

(a) Section 1302 of the National Flood Insurance Act of 1968 (42 U.S.C. 4001) is amended by adding at the end the following:

"(g) Findings in support of a sustainable national flood insurance program.—The Congress further finds that (1) the long-term sustainability of the National Flood Insurance Program depends on the establishment of a sound financial framework, (2) growth in the private market and improvements to the NFIP are both key to expanding coverage across the nation, and (3) the National Flood Insurance Program needs flexibility to make customer-centric changes that encourage community resilience efforts that reduce disaster suffering and minimize federal expenditures on flood disasters."

*Analysis:*

The statutory language below would add a new congressional finding to the National Flood Insurance Act of 1968 (NFIA).  The provision does not change FEMA's authorities under the Act, but rather clearly articulates the legislative intent that is implicit throughout the NFIA. FEMA will be able to draw on this statement as a basis for exercising the authorities granted by the Act.

*Comparative type:*

**42 U.S.C. 4001. CONGRESSIONAL FINDINGS AND DECLARATION OF PURPOSE**

\*   \*   \*   \*

(g) Findings in support of a sustainable national flood insurance program. The Congress further finds that (1) the long-term sustainability of the National Flood Insurance Program depends on the establishment of a sound financial framework, (2) growth in the private market and improvements to the NFIP are both key to expanding coverage across the nation, and (3) the National Flood Insurance Program needs flexibility to make customer-centric changes that

encourage community resilience efforts that reduce disaster suffering and minimize federal expenditures on flood disasters.

2. **Borrowing Authority** – Eliminates interest on future debt and decreases the NFIP's borrowing authority to two-thirds of total expected premiums in force in the following fiscal year.

*Legislative text:*

### SEC. ___. BORROWING AUTHORITY

(a) Interest on Treasury Borrowing. –

   (1) Section 15(e) of the Federal Flood Insurance Act of 1956 (42 U.S.C. 2414(e)) is amended by striking "Such notes or other obligations" through "issuance of such notes or other obligations" and inserting "Such notes or other obligations shall not bear any interest.".

   (2) Section 1310A(a)(3) of the National Flood Insurance Act of 1968 (42 U.S.C. 4017(a)(3)) is amended by striking "(together with interest)".

(b) Reduced Borrowing Authority.—Section 1309 of the National Flood Insurance Act of 1968 (42 U.S.C. 4016) is amended by striking "(1) without the approval of the President, may not exceed $500,000,000, and (2) with the approval of the President, may not exceed $1,500,000,000 through the date specified in section 1319, and $1,000,000,000 thereafter; except that, through September 30, 2021, clause (2) of this sentence shall be applied by substituting "$30,425,000,000" for "1,500,000,000"" and inserting "may not exceed two-thirds (2/3) of total premiums collected in the prior fiscal year.".

(c) Cancellation.—Notwithstanding any other provision of law, including sections 1309, 1310, and 1310A of the National Flood Insurance Act of 1968 (42 U.S.C. 4016-4017a) and section 15(e) of the Federal Flood Insurance Act of 1956 (42 U.S.C. 2414(e)), and any borrowing agreement entered into between the Department of the Treasury and the Federal Emergency Management Agency, all indebtedness of the Administrator of the Federal Emergency Management Agency under any notes or other obligations issued pursuant to section 1309(a) of the National Flood Insurance Act of 1968 (42 U.S.C. 4016(a)) and section 15(e) of the Federal Insurance Act of 1956 (42 U.S.C. 2414(e)) that is outstanding as of the date of the enactment of this Act is hereby canceled. To the extent of the amount cancelled, the Administrator and the National Flood Insurance Fund are relieved of all liability to the Secretary of the Treasury under any such notes or other obligations, including for any interest due, including capitalized interest, and any other fees and charges payable in connection with such notes or other obligations.

(d)  Treatment of Cancelled Debt.—The amount of the indebtedness canceled under subsection (c) may be treated as a public debt of the United States.

(e)  Emergency spending.—

   (1)  Pay-go.—Subsection (b) is designated as an emergency pursuant to section 4(g) of the Statutory Pay-As-You-Go Act of 2010 (2 U.S.C. 933(g)).

   (2)  Balanced budget.— The amount provided in subsection (b) of this section is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985 (2 U.S.C. 901(b)(2)(A)(i)).

*Analysis:*

The National Flood Insurance Program (NFIP) has over $20 billion of debt that is beyond the ability of NFIP policyholders to repay. Canceling the NFIP's debt allows a clean slate for implementing a Sound Financial Framework, a plan for managing a 1-in-20 occurrence exceedance loss level.[1] Key points include:

   i.  The NFIP has been, on average, paying the U.S. Treasury over $400 million[2] of interest expenses annually, the third most important NFIP activity when valued by cost. From 2005 until present, the NFIP has paid over $5 billion of interest. In the next 10 years, the NFIP is projected to have paid nearly $4.2 billion solely for interest on the debt.

   ii.  Both the debt principal and the interest expenses have often been refinanced. Instead of paying down debt, the NFIP has no choice but to defer, at a steep cost, due to the NFIP's fiscal inability to pay down debt.

   iii.  The premiums policyholders pay into the NFIP is currently used to cover the interest on debt from previous losses dating back to claims from as far back as Hurricane Katrina, which occurred in 2005.

   iv.  Starting with the substantial debt associated with several national catastrophes, the NFIP's current debt is beyond the capacity of policyholders to repay. Cancelation of debt is the foundation of achieving a Sound Financial Framework – a framework from which the NFIP will have a greater probability to reach financial resiliency.[3] Without debt cancelation, there is a 2% percent chance the NFIP will have a net positive balance at the end of a projected 10-year period and at the mean, the NFIP is reasonably expected to accrue an additional $15 billion of net debt.[4]

This proposal would eliminate interest on future debt and decrease the NFIP's borrowing authority.

---

[1] The 1-in-20 occurrence exceedance loss level is assumed to be on an occurrence basis, equal to approximately $10.5 billion. This loss level is based on the FEMA actuarial ensemble modeling of 5/31/2018 data and represents NFIP's 5% chance in a given year of meeting or exceeding losses of $10.5 billion from a single event. The 1-in-20 aggregate exceedance loss level is approximately $14 billion and represents NFIP's 5% chance of meeting or exceeding losses of $14 billion in a given year over all events. We recognize that the risk in identifying this 1-in-20 cap on an occurrence basis (currently $10.5 billion) is the possibility of numerous events occurring within the same year, all of which fall under the occurrence cap but with overall total losses for the year exceeding $10.5 billion.

[2] Current interest payments are just under $300 million due to the NFIP being able to refinance at lower rates.

[3] NFIP Financial Resilience is defined as at the end of a 10 year period: (1) there is a 75 percent chance of a positive balance in the NFIP's available funds (National Flood Insurance Fund (NFIF) and National Flood Insurance Reserve Fund (Reserve Fund)), without regard to interest; and (2) the balance in the NFIP's available funds (NFIF and Reserve Fund), without regard to interest, is on average equal to or greater than the starting balance at the beginning of the 10 year period.  More detailed information and analysis can be found in the proposed provisions on Ensuring NFIP Claims Liquidity/Financial Resilience in the legislative proposal below for Establishing Financial Resilience (Proposal 3).

[4] Variation exists dependent upon flood activity where this result could be better or worse.

3

1) The proposal would revise the National Flood Insurance Act of 1968 so NFIP borrowing from the U.S. Treasury would not incur any interest.
2) The proposal would also revise the National Flood Insurance Act of 1968 so the NFIP's borrowing authority would be decreased from $30.425 billion to two-thirds (2/3) of total expected premiums in force in the following fiscal year.

Proposals 2 and 3, when implemented together, would authorize FEMA to establish a sound and transparent financial framework for the NFIP. This would enable the program to manage a flood event of a size that has only a 5% chance of being exceeded in any given year ("the 1-in-20 occurrence exceedance loss level") before requiring Congressional action on an emergency supplemental. FEMA estimates this is about a $10.5 billion event currently, approximately the size of Hurricane Harvey. These financial resilience reforms would allow the NFIP to quickly pay claims during catastrophic events, reduce the probability for future borrowing, and bring increased stability to the program. They would establish a promising and financially well-managed future for the NFIP while recognizing the ceiling to the program's capabilities. The key components of this strategy are the following:

- Setting an expectation that the NFIP has financial capacity to manage events up to the 1-in-20 occurrence exceedance loss level;
- Eliminating interest on current and future debt;
- Eliminating the Reserve Fund Ratio and Homeowner Flood Insurance Affordability Act surcharge;
- Directing annual equalization payments to cover the cost of Congressionally mandated premium discounts;
- Allowing the ability to transfer funds between the National Flood Insurance Fund and the Reserve Fund;
- Canceling the existing debt; and
- Recalibrating the borrowing authority to be consistent with the program's financial capabilities for repayment.

Demarcating the 1-in-20 occurrence exceedance loss level (currently at $10.5 billion) will define the ceiling on events the NFIP is likely capable of financially responding to under this structure. Each of the above components is necessary for FEMA to have 75% confidence that the NFIP can manage flood events under that ceiling without requesting further action from Congress.

***Comparative type:***

### Federal Flood Insurance Act of 1956

\*      \*      \*      \*

**SEC. 15. Issuance of notes by Administrator of Federal Emergency Management Agency; terms and conditions. (42 U.S.C. 2414)**

\*      \*      \*      \*

(e) Issuance of notes by Administrator of Federal Emergency Management Agency; form, terms and conditions; purchase and sale by Secretary of the Treasury; public debt transactions. The Administrator of the Federal Emergency Management Agency is authorized to issue to the Secretary of the Treasury from time to time and have outstanding at any one time, in an amount not exceeding $500,000,000 (or such greater amount as may be approved by the President) notes or other obligations in such forms and denominations, bearing such maturities, and subject to such terms and conditions as may be prescribed by the Administrator of the Federal Emergency Management Agency with the approval of the Secretary of the Treasury. ~~Such notes or other obligations shall bear interest at a rate~~

4

~~determined by the Secretary of the Treasury, taking into consideration the current average market yield on outstanding marketable obligations of the United States of comparable maturities during the month preceding the issuance of such notes or other obligations.~~ <u>Such notes or other obligations shall not bear any interest.</u> The Secretary of the Treasury is authorized and directed to purchase any notes and other obligations to be issued under this subsection and for such purpose he is authorized to use as a public debt transaction the proceeds from the sale of any securities issued under chapter 31 of title 31, and the purposes for which securities may be issued under such chapter are extended to include any purchases of such notes and obligations.

The Secretary of the Treasury may at any time sell any of the notes or other obligations acquired by him under this section. All redemptions, purchases, and sales by the Secretary of the Treasury of such notes or other obligations shall be treated as public debt transactions of the United States.

## National Flood Insurance Act of 1968

\*       \*       \*       \*

### SEC. 1309. Financing. (42 U.S.C. 4016)

(a) Authority to issue notes and other obligations
All authority which was vested in the Housing and Home Finance Administrator by virtue of section 2414(e) of this title (pertaining to the issue of notes or other obligations to the Secretary of the Treasury), as amended by subsections (a) and (b) of section 1303 of this Act, shall be available to the Administrator for the purpose of carrying out the flood insurance program under this chapter; except that the total amount of notes and obligations which may be issued by the Administrator pursuant to such authority ~~(1) without the approval of the President, may not exceed $500,000,000, and (2) with the approval of the President, may not exceed $1,500,000,000 through the date specified in section 1319 of this title, and $1,000,000,000 thereafter; except that, through September 30, 2021, clause (2) of this sentence shall be applied by substituting "$30,425,000,000" for "$1,500,000,000"~~ <u>may not exceed two-thirds (2/3) of total premiums collected in the prior fiscal year</u>. The Administrator shall report to the Committee on Banking, Finance and Urban Affairs of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate at any time when he requests the approval of the President in accordance with the preceding sentence.

\*       \*       \*       \*

### SEC. 1310A. National Flood Insurance Fund. (42 U.S.C. 4017a)

(a) Establishment; availability
To carry out the flood insurance program authorized by this chapter, the Administrator shall establish in the Treasury of the United States a National Flood Insurance Fund (hereinafter referred to as the "fund") which shall be an account separate from any other accounts or funds available to the Administrator and shall be available as described in subsection (f), without fiscal year limitation (except as otherwise provided in this section)-

\*       \*       \*       \*

(3) to repay to the Secretary of the Treasury such sums as may be borrowed from him ~~(together with interest)~~ in accordance with the authority provided in section 4016 of this title; and

*        *        *        *

3. **Establishing Financial Resilience** – Allowing liquidity to quickly pay claims quickly in most situations without future detriment is important to the financial solvency of the program. The combination of NFIP resources, risk-transfer arrangements, and reasonable borrowing authority allows the NFIP to manage events up to a 1-in-20 occurrence exceedance loss level while aligning the Reserve Fund collections more closely to risk.

*<u>Legislative text:</u>*

<u>SEC.___. FINANCIAL RESILIENCY</u>

(a) Repeal of Surcharge.--Section 1308A of the National Flood Insurance Act of 1968 (42 U.S.C. 4015a) is repealed six months from the effective date of this Act.

(b) Financial Resiliency; Emergency Supplemental Appropriation; Annual Equalization Payment made by Congress. – Chapter 1 of the National Flood Insurance Act of 1968 is amended by inserting after section 1309 (42 U.S.C. 4016) the following:

"**SECTION 1309A.  FINANCIAL RESILIENCY.**

"(a) Managing to the 1-in-20 occurrence exceedance loss level. —

"(1) In general. —Subject to the availability of appropriations under subsection (b), the Administrator shall strive to manage the national flood insurance program to the 1-in-20 occurrence exceedance loss level with a 75 percent probability of attaining financial resilience.

"(2) Tools. —In managing to the 1-in-20 occurrence exceedance loss level, the Administrator shall utilize:

"(A) funds made available to the Administrator from the National Flood Insurance Fund under section 1310 (42 U.S.C. 4017) and the National Flood Insurance Reserve Fund under section 1310A (42 U.S.C. 4017a);

"(B) any funds borrowed from the U.S. Treasury under section 1309 (42 U.S.C. 4016);

"(C) appropriations made available to the Administrator under subsection (b) of this section; and

"(D) reinsurance of coverage secured from the private reinsurance and capital markets under section 1345(e) (42 U.S.C. 4081(e)).

"(b) AUTHORIZATION OF APPROPRIATION; AVAILABILITY.—

Emergency Supplemental Appropriation.—If the Administrator finds that a flooding event will exceed the 1-in-20 occurrence exceedance loss level for the National Flood Insurance

Program, with approval of the President, the Administrator shall request an emergency supplemental appropriation, and there is authorized to be appropriated such sums as may be necessary to enable the Administrator to pay such claims and carry out the National Flood Insurance Program.

"(c) PREMIUM EQUALIZATION PAYMENT. — To achieve financial resiliency and in recognition of such reductions in chargeable premium rates mandated under certain subsections of sections 1307 (42 U.S.C. 4014) and 1308 (42 U.S.C. 4015) of this title, there is hereby appropriated to the Administrator, out of any money in the Treasury not otherwise appropriated, an amount termed "annual premium equalization payment," on October 1 of each fiscal year after enactment of this Act, which equals the difference between (1) the risk premium rate estimated under section 1307(a)(1) (42 U.S.C. 4014(a)(1)) and (2) the chargeable risk premium rate that is less than those estimated under section 1307(a)(1) (42 U.S.C. 4014(a)(1)), for deposit in the National Flood Insurance Reserve Fund under section 1310A (42 U.S.C. 4017A) of this title."

(c) Conforming Amendments.

    (1)  Section 1310 of the National Flood Insurance Act (42 U.S.C. 4017) is amended—

        (A) in subsection (a)(7), by striking "and";

        (B) in subsection (a)(8), by striking "." and inserting "; and";

        (C) by adding after subsection (a)(8) the following subsection: "(a)(9) for transfers to the National Flood Insurance Reserve Fund."; and

        (D) in subsection (f)—

            (i)  by striking "purpose" and inserting "purposes"; and

            (ii) by striking "subsection (d)(1)" and inserting "subsections (d)(1) and (a)(9)."

    (2)  Section 1310A of the National Flood Insurance Act (42 U.S.C. 4017a) is amended—

        (A) in subsection (a)(2)—

            (i)  in subparagraph (B), by striking "and";

            (ii)  in subparagraph (C), by striking "." and inserting "; and"; and

            (iii) by inserting after subparagraph (C) the following new subparagraph: "(D) for transfers to the National Flood Insurance Fund."

        (B) by striking subsection (b) in its entirety;

        (C) in subsection (c), by striking " Maintenance of the reserve ratio." and inserting "Maintenance of the Reserve Fund.";

        (D) by redesignating subsection (c) as subsection (b);

        (E) in subsection (b) (as so redesignated)—

            (i)  by striking paragraphs (1)(A) and (1)(B);

      (ii)  by inserting after "necessary" the following: "to manage the national flood insurance program to the 1-in-20 occurrence exceedance loss level in accordance with section 1309A(a) of this title.";

      (iii) by striking paragraph (4) and inserting:

          "(4) Deposit of proceeds related to risk transfer. The Administrator may deposit in the Reserve Fund any amounts collected from risk transfer claim payments pursuant to section 1345(e) (42 U.S.C. 4081(e)) in addition to the authority to deposit these amounts in the National Flood Insurance Fund pursuant to section 1310(b)(6) (42 U.S.C. 4017(b)(6)).

          "(5) Credit from National Flood Insurance Fund. The Administrator shall have the authority to credit the Reserve Fund with such sums as are transferred from the National Flood Insurance Fund.";

    (F)  by striking subsections (d) and (e) in their entirety; and

    (G)  by redesignating subsection "(f)" as subsection "(c)".

  (3)  Section 1370(a) of the National Flood Insurance Act  (42 U.S.C. 4121(a)) is amended—

    (A)  in paragraph (14) by striking "and" at the end;

    (B)  in paragraph (15) by striking the period at the end and inserting ";"; and

    (C)  by adding at the end the following:

"(16) the term "1-in-20 occurrence exceedance loss level" means a flood event with losses having a five percent probability of being equaled or exceeded in any given year; and

"(17) the term "financial resiliency" means at the end of a ten-year period there is a 75 percent probability of a positive net balance in the National Flood Insurance Fund and the National Flood Insurance Reserve Fund with positive net balance meaning the balance in the National Flood Insurance Fund and the National Flood Insurance Reserve Fund is on average equal to or greater than the starting balance at the beginning of the ten-year period.".

***Analysis:***

    The National Flood Insurance Program (NFIP) manages most of its financial risk through authority to borrow from the U.S. Treasury, the repayment of which is beyond the NFIP's current capabilities. The NFIP differs from private insurance in that premiums are subject to statutorily required premium increase limitations and discounts, and the NFIP is administered by a federal agency that cannot diversify the NFIP's risks through all the means available to private insurers. This places an unsustainable debt burden on the NFIP and negatively impacts the federal flood insurance program. This will result in an unmanageable and insolvent NFIP that could lead to unpaid or delayed claims payments.  This will ultimately culminate in the NFIP being ineffective in supporting FEMA's mission of providing assistance before, during, and after disasters.

FEMA is currently unable to adequately manage the risk with the available resources resulting from subsidized premium revenue and a large debt balance. Program reform is required to ensure financial stability for the NFIP to adequately and effectively provide assistance to policyholders to achieve financial security.

A fully implemented sound financial framework would increase the financial resiliency up to a defined benchmark using policyholder premiums, reinsurance, Congressional Equalization, and borrowing authority consistent with the program's financial capabilities for repayment. This proposal seeks to establish a financial framework for the NFIP with clearly defined and measurable metrics. NFIP financial resiliency is defined by evaluating the expected balances of the National Flood Insurance Fund (NFIF) and the National Flood Insurance Reserve Fund (Reserve Fund) at the end of a 10-year period where there is a 75 percent chance of beginning and ending the 10-year period with a net positive balance in the NFIP's available funds.

There are three key aspects to "Establishing Financial Resilience." First, establishing an upper limit for the size of event the NFIP can manage; second, ensuring adequate claims liquidity; and third, rethinking the reserve fund.

I.   _Defining an Upper Limit_

The proposal revises the statute to require the Administrator to strive to manage the NFIP to the 1-in-20 occurrence exceedance loss level. The Administrator would utilize the following to manage to the 1-in-20 occurrence exceedance loss level: the NFIF, Reserve Fund,  annual Congressional Equalization Payments (discussed below), reinsurance, and any other funds made available to the Administrator through appropriations or otherwise for carrying out the flood insurance program. It is crucial to demark the 1-in-20 occurrence exceedance loss level as the benchmark for the NFIP's total financial capabilities and defining financial resilience. There is no limit on the loss a flooding event can cause. The 1-in-20 target loss level provides the NFIP and its stakeholders the upper limit of an event the NFIP is capable of managing based on financial position.

If the Administrator finds that a flooding event will exceed the flood insurance program's 1-in-20 occurrence exceedance loss level, this proposal would require the Administrator to notify Congress and request an emergency supplemental appropriation.
.

II.   _Ensuring Adequate Claims Liquidity_

To enable the program to have claims liquidity that is adequate to achieve the definition of Financial Resiliency, this proposal includes the following:

1) Cancellation of the existing NFIP debt.
2) Elimination of interest on current and future debt while also decreasing the NFIP's borrowing authority to 2/3 collection intake (approximately $3 billion).
   a. The successful implementation of this proposal is contingent on cancellation of all the NFIP's current debt.
3) Institution of Annual Congressional Equalization Payments that are calculated to ensure funding is sufficient to achieve the defined Financial Resiliency.
   a. When the Administrator first carried out the NFIP under Part A of the National Flood Insurance Act of 1968 (NFIA), Congress recognized there would be a shortfall in the collection of premiums between the estimated full risk premium rates and the discounts provided by law. As a result, Congress established a mechanism for FEMA to infuse into the flood insurance pool a premium equalization payment. When the Administrator decided to run the NFIP under Part B of the NFIA, there was no mechanism utilized that would infuse FEMA with funds to make up this same shortfall in revenue. As a result, this proposal would revise the statute to require Congress to make annual equalization payments to the Administrator for deposit in the NFIF to achieve financial resiliency, and in recognition of the discounts and annual limitations on premium increases required by statute.

9

      b.  The definition of "financial resiliency," as discussed above, will be added to the statute.

III.   *Rethinking the Reserve Fund*

- The proposal envisions that by policy FEMA would establish an appropriate level of NFIF Cash-on-Hand, and a trigger for activating the Reserve Fund to pay claims.
  - o The ability to carry out this item is contingent upon adoption of the "Transfer Between the NFIF and Reserve Fund" reform proposal, which requires statutory changes.
  - o By analyzing the level of funds needed to cover incurred obligations, claims and claims expenses and a reasonable margin established by leadership, an appropriate level of funding within the NFIF is established.
  - o The remaining balance would then be transferred to the Reserve Fund in order to maximize investment revenue by investing in U.S. Treasury securities. This process would not be mandated by law.
- Manage the Reserve Fund to the 1-in-20 occurrence exceedance loss level.
  - o This proposal would revise the statute to remove the reserve fund ratio and phase-in requirement. The proposal would also eliminate the Reserve Fund Quarterly Report since the reserve fund ratio and phase-in requirement would no longer be required.
- Align Reserve Fund Collections to Flood Risk
  - o The proposal would revise the statute to repeal the Homeowner Flood Insurance Affordability Act of 2014 (HFIAA) Surcharge. The HFIAA Surcharge was created as a budgetary stop-gap for the foregone revenues from changes passed in HFIAA. The HFIAA Surcharges of $25 and $250 is a flat surcharge and does not align to a policyholder's flood risk or underlying premium. This proposal recommends the elimination of the HFIAA Surcharge.
  - o FEMA would make up for the lost HFIAA Surcharge collection through the Reserve Fund Assessment, which would result in a more equitable collection as the assessment is based on risk and is not flat.  The Reserve Fund Assessment is based on a percentage of the underlying premium. For 2022, the reserve fund assessment is 18% of the underlying premium.  This means an increase in the Reserve Fund Assessment to make up for the lost HFIAA Surcharge will be more equitable as it will be based on the flood risk to the property and the underlying premium.

**Comparative type:**

**National Flood Insurance Act of 1968**

\*   \*   \*   \*

Section 1308A. Premium surcharge. 42 U.S.C. 4015a.

(a) Imposition and collection.  The Administrator shall impose and collect an annual surcharge, in the amount provided in subsection (b), on all policies for flood insurance coverage under the National Flood Insurance Program that are newly issued or renewed after March 21, 2014. Such surcharge shall be in addition to the surcharge under section 4011(b) of this title and any other assessments and surcharges applied to such coverage.

(b) Amount. The amount of the surcharge under subsection (a) shall be-
    (1) $25, except as provided in paragraph (2); and
    (2) $250, in the case of a policy for any property that is-
      (A) a non-residential property; or

10

~~(B) a residential property that is not the primary residence of an individual.~~
~~(c) Termination. Subsections (a) and (b) shall cease to apply on the date on which the chargeable~~
~~risk premium rate for flood insurance under this chapter for each property covered by flood~~
~~insurance under this chapter, other than properties for which premiums are calculated under~~
~~subsection (e) or (f) of section 4014 of this title or section 4056 of this title or under section~~
~~100230 of the Biggert-Waters Flood Insurance Reform Act of 2012 (42 U.S.C. 4014 note), is not~~
~~less than the applicable estimated risk premium rate under section 4014(a)(1) of this title for such~~
~~property.~~

*   *   *   *

**SECTION 1309A.  FINANCIAL RESILIENCY. (42 U.S.C. _____ )**
(a) Managing to the 1-in-20 occurrence exceedance loss level. —
    (1) In general. —Subject to the availability of appropriations under subsection (b), the
    Administrator shall strive to manage the national flood insurance program to the 1-in-20
    occurrence exceedance loss level with a 75 percent probability of attaining financial resilience.
    (2) Tools. —In managing to the 1-in-20 occurrence exceedance loss level, the Administrator
      shall utilize:
      (A) funds made available to the Administrator from the National Flood Insurance Fund
        under section 1310 (42 U.S.C. 4017) and the National Flood Insurance Reserve Fund
        under section 1310A (42 U.S.C. 4017A);
      (B) any funds borrowed from the U.S. Treasury under section 1309 (42 U.S.C. 4016);
      (C) appropriations made available to the Administrator under subsection (b) of this
        section;
      (D) reinsurance of coverage secured from the private reinsurance and capital markets under
        section 1345(e) (42 U.S.C. 4081(e).
(b)  AUTHORIZATION OF APPROPRIATION; AVAILABILITY.—
Emergency Supplemental Appropriation.—If the Administrator finds that a flooding event will
exceed the 1-in-20 occurrence exceedance loss level for the National Flood Insurance Program,
with approval of the President, the Administrator shall request an emergency supplemental
appropriation, and there is authorized to be appropriated such sums as may be necessary to enable
the Administrator to pay such claims and carry   out the National Flood Insurance Program.
(c) PREMIUM EQUALIZATION PAYMENT.—  To achieve financial resiliency and in
recognition of such reductions in chargeable premiums rates mandated under certain subsections
of sections 1307 (42 U.S.C. 4014) and 1308 (42 U.S.C. 4015) of this title, there is hereby
appropriated to the Administrator, out of any money in the Treasury not otherwise appropriated,
an amount termed "annual premium equalization payment," on October 1 of each fiscal year after
enactment of this Act, which equals the difference between (1) the risk premium rate estimated
under section 1307(a)(1) (42 U.S.C. 4014(a)(1)) and (2) the chargeable risk premium rate that is
less than those estimated under section 1307(a)(1) (42 U.S.C. 4014(a)(1)), for deposit in the
National Flood Insurance Reserve Fund under section 1310A (42 U.S.C. 4017A) of this title.

**SEC. 1310. National Flood Insurance Fund**. (**42 U.S.C. 4017**)
(a) Establishment; availability.  To carry out the flood insurance program authorized by this
    chapter, the Administrator shall establish in the Treasury of the United States a National Flood
    Insurance Fund (hereinafter referred to as the "fund") which shall be an account separate from
    any other accounts or funds available to the Administrator and shall be available as described
    in subsection (f), without fiscal year limitation (except as otherwise provided in this section)—

*   *   *   *

(7) for transfers to the National Flood Mitigation Fund, but only to the extent provided in section 4104d(b)(1) of this title; ~~and~~

(8) for carrying out section 4104(f) of this title~~.~~; and

(9) for transfers to the National Flood Insurance Reserve Fund.

\* \* \* \*

(f) Availability of funds dependent on future appropriations acts.  The fund shall be available, with respect to any fiscal year beginning on or after October 1, 1981, only to the extent approved in appropriation Acts; except that the fund shall be available for the ~~purpose~~ purposes described in ~~subsection (d)(1)~~ subsections (d)(1) and (a)(9) without such approval.

\* \* \* \*

### SEC. 1310A. Reserve Fund. (42 U.S.C. 4017a)

(a) Establishment of Reserve Fund.  In carrying out the flood insurance program authorized by this subchapter, the Administrator shall establish in the Treasury of the United States a National Flood Insurance Reserve Fund (in this section referred to as the "Reserve Fund") which shall—

(1) be an account separate from any other accounts or funds available to the Administrator; and

(2) be available for meeting the expected future obligations of the flood insurance program, including-

(A) the payment of claims;

(B) claims adjustment expenses; ~~and~~

(C) the repayment of amounts outstanding under any note or other obligation issued by the Administrator under section 4016(a) of this title~~.~~; and

(D) for transfers to the National Flood Insurance Fund.

~~(b) Reserve ratio. Subject to the phase-in requirements under subsection (d), the Reserve Fund shall maintain a balance equal to-~~

~~(1) 1 percent of the sum of the total potential loss exposure of all outstanding flood insurance policies in force in the prior fiscal year; or~~

~~(2) such higher percentage as the Administrator determines to be appropriate, taking into consideration any circumstance that may raise a significant risk of substantial future losses to the Reserve Fund.~~

~~(c) Maintenance of reserve ratio.~~

(b) Maintenance of Reserve Fund.

(1) In general. The Administrator shall have the authority to establish, increase, or decrease the amount of aggregate annual insurance premiums to be collected for any fiscal year necessary to manage the national flood insurance program to the 1-in-20 occurrence exceedance loss level in accordance with section 1309A(a) (42 U.S.C. 4016A(a)) of this title.

~~(A) to maintain the reserve ratio required under subsection (b); and~~

~~(B) to achieve such reserve ratio, if the actual balance of such reserve is below the amount required under subsection (b).~~

\* \* \* \*

~~(4) Deposit of premium surcharges.  The Administrator shall deposit in the Reserve Fund any surcharges collected pursuant to section 4015a of this title.~~

12

(4) Deposit of proceeds related to risk transfer. The Administrator may deposit in the Reserve Fund any amounts collected from risk transfer claim payments pursuant to section 1345(e) (42 U.S.C. 4081(e)) in addition to the authority to deposit these amounts in the National Flood Insurance Fund pursuant to section 1310(b)(6) (42 U.S.C. 4017(b)(6)).

(5) Credit from National Flood Insurance Fund.  The Administrator shall have the authority to credit the Reserve Fund with such sums as are transferred from the National Flood Insurance Fund.

(d) Phase-in requirements.  The phase-in requirements under this subsection are as follows:

(1) In general. Beginning in fiscal year 2013 and not ending until the fiscal year in which the ratio required under subsection (b) is achieved, in each such fiscal year the Administrator shall place in the Reserve Fund an amount equal to not less than 7.5 percent of the reserve ratio required under subsection (b).

(2) Amount satisfied. As soon as the ratio required under subsection (b) is achieved, and except as provided in paragraph (3), the Administrator shall not be required to set aside any amounts for the Reserve Fund.

(3) Exception. If at any time after the ratio required under subsection (b) is achieved, the Reserve Fund falls below the required ratio under subsection (b), the Administrator shall place in the Reserve Fund for that fiscal year an amount equal to not less than 7.5 percent of the reserve ratio required under subsection (b).

(e) Limitation on reserve ratio. In any given fiscal year, if the Administrator determines that the reserve ratio required under subsection (b) cannot be achieved, the Administrator shall submit, on a calendar quarterly basis, a report to Congress that—

(1) describes and details the specific concerns of the Administrator regarding the consequences of the reserve ratio not being achieved;

(2) demonstrates how such consequences would harm the long-term financial soundness of the flood insurance program; and

(3) indicates the maximum attainable reserve ratio for that particular fiscal year.

(f)(c) Investment.  The Secretary of the Treasury shall invest such amounts of the Reserve Fund as the Secretary determines advisable in obligations issued or guaranteed by the United States.

\* \* \* \*

**SEC. 1370(a). Definitions. (42 U.S.C. 4121)**

(a) As used in this chapter-
\* \* \* \*

(14) the term "servicer" means the person responsible for receiving any scheduled periodic payments from a borrower pursuant to the terms of a loan, including amounts for taxes, insurance premiums, and other charges with respect to the property securing the loan, and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan; and

(15) the term "substantially damaged structure" means a structure covered by a contract for flood insurance that has incurred damage for which the cost of repair exceeds an amount specified in any regulation promulgated by the Administrator, or by a community ordinance, whichever is lower.;

(16) the term "1-in-20 occurrence exceedance loss level" means a flood event with losses having a five percent probability of being equaled or exceeded in any given year; and

(17) the term "financial resiliency" means at the end of a ten-year period there is a 75 percent probability of a positive net balance in the National Flood Insurance Fund and the National Flood Insurance Reserve Fund with positive net balance meaning the balance in the National Flood Insurance Fund and the National Flood Insurance Reserve Fund is on average equal to or greater than the starting balance at the beginning of the ten-year period.

\* \* \* \*

*Risk Analysis and Communication*

4. **Risk-Informed Approach for a Modern NFIP** – Simplifies and clarifies FEMA's mapping authority and provides the flexibility to produce regulatory maps and non-regulatory flood hazard and flood risk information products to enhance the nation's understanding of flood risk that include future climate projections.

### *Legislative text:*

**Section ___: Risk Informed Approach for an Informed National Flood Insurance Program.**

(a) Section 1360 of the National Flood Insurance Act of 1968 (42 U.S.C. 4101) is repealed.
(b) Section 100215 of the Biggert-Waters Flood Insurance Reform Act of 2012 (42 U.S.C. 4101a) is amended—
    (1) in subsection (b)(1)(E)—
        (A) by striking the number 16 and replacing it with the number 17.
        (B) in clause (viii), by inserting the words "United States Army" before the words "Corps of Engineers";
        (C) in clause (x), by striking the words "flood insurance rate maps" and replacing them with the words "flood hazard and flood risk information;";
        (D) in clause (xi), by striking the words "flood insurance rate maps" and replacing them with the words "flood hazard and flood risk information;";
        (E) in clause, by striking the word "and" at the end;
        (F) in clause (xiv), by adding at the end of the word "and"; and
        (G) by adding at the end the following: "(xv) a member of a recognized professional real estate brokerage association."
    (2) in subsection (b)(2), by striking "flood insurance rate maps" and inserting "flood hazard and flood risk information;";
    (3) in subsection (c)(1)—
        (A) in subparagraph (A), by striking "insurance rate maps and risk data" and inserting "hazard and flood risk information"; and
        (B) in subparagraph (B), by striking "map" and inserting "identify flood hazard and";
    (4) in subsection (c)—
        (A) in paragraph (2)(A), by striking "flood insurance rate maps" and inserting "collecting and maintaining flood hazard and flood risk information, including but not limited to flood hazard determinations";
        (B) in paragraph (3), by striking "insurance rate maps and flood risk identification" and inserting "hazard and flood risk information.";
        (C) in paragraph (4), by striking both instances of the word "mapping" and inserting "flood hazard and flood risk identification.";
        (D) in paragraph (5)(A), by striking "mapping and flood risk determination" and inserting "and flood risk identification.";
        (E) by redesignating paragraph (6) as paragraph (7) inserting in lieu thereof:
            "(6) provide recommendations in response to specific requests presented to the Council by the Administrator, and";
        (G) in paragraph (7)(B) (as redesignated), by striking "insurance rate maps and mapping" and inserting "hazard and flood risk identification"; and
        (H) in paragraph (7)(B) (as redesignated), by striking "flood insurance rate maps" and inserting "such products";
    (5) in subsection (d)—
        (A) in paragraph (1)(A)(i)—
            (i) by striking "insurance rate maps" and inserting "hazard and flood risk information"; and
            (ii) by striking "incorporate" and inserting "incorporates";

15

(6) in subsection (d)(2), by striking "National Flood Insurance Program rate maps" and inserting "flood hazard and flood risk information"; and

(7) in subsection (l)(2), by striking "flood insurance rate maps and flood risk data" and inserting "flood hazard and flood risk information including flood hazard determinations".

(c) The Biggert Waters Flood Insurance Reform Act of 2012 (42 U.S.C. 4101b) is amended by striking section 100216 and inserting in lieu thereof the following:

### Sec. 100216. National Flood Hazard and Flood Risk Identification Program (42 U.S.C. 4101b)

"(a) Reviewing, updating, and maintaining flood hazard and flood risk information.—  To further enhance the nation's understanding of flood related risk, and to facilitate the identification of areas having special flood hazard as authorized by this section and Section 1361 of P.L.90-448, the Administrator, in coordination with the Technical Mapping Advisory Council established under section 4101a of this title, shall establish an ongoing program under which the Administrator shall review, update, and maintain flood hazard and flood risk information in accordance with this section.

 "(b) Flood Hazard and Flood Risk Identification.

"(1) Authority of the Administrator; grants, technical assistance, acquisition of data and use of other agency data.—In carrying out the program established under subsection (a), the Administrator—

"(A) is authorized to consult with, receive information from, and enter into any agreements or other arrangements with the Secretaries of the Army, the Interior, Agriculture, and Commerce, the Tennessee Valley Authority, and the heads of other Federal departments or agencies, on a reimbursement basis, or with the head of any State or local agency, or enter into contracts with any persons or private firms;

"(B) is authorized, without regard to subsections (a) and (b) of section 3324 of title 31 and section 6101 of title 41, to make grants, provide technical assistance, and enter into contracts, cooperative agreements, or other transactions, on such terms deemed appropriate, or consent to modifications thereof, and to make advance or progress payments in connection therewith.

"(C) wherever necessary, is authorized to acquire new ground elevation data utilizing the most up-to-date methods and technologies in accordance with guidelines and specifications of the Federal Emergency Management Agency

"(D) shall leverage where applicable—

"(i) any relevant information, including information on coastal inundation, from--

"(I) the United States Army Corps of Engineers; and

"(II) the National Oceanic and Atmospheric Administration, including information relating to storm surge modeling;

"(ii) any relevant information of the United States Geological Survey on stream flows, watershed characteristics, and topography that is useful in the identification of flood hazard areas, as determined by the Administrator;

 "(iii) any relevant information on land subsidence, coastal erosion areas, changing lake levels, and other flood-related hazards;

"(iv) any relevant information or data of the National Oceanic and Atmospheric Administration and the United States Geological Survey relating to the best available science regarding future changes in sea levels, precipitation, intensity of hurricanes, or other information or data relevant to the identification of flood related hazards or risk;

 "(v) any other relevant information as may be recommended by the Technical Mapping Advisory Council; and

 "(vi) work with States, local communities, and property owners to identify areas and features described in subsection (b)(2)(E).

"(2) In general. In carrying out the program established under subsection (a), the Administrator shall identify, review, update, and maintain, and publish flood hazard and flood risk information with respect to--

"(A) all populated areas and areas of possible population growth located within the 100-year floodplain;

"(B) all populated areas and areas of possible population growth located within the 500-year floodplain;

"(C) areas of residual risk, including areas where flood hazards are reduced by levees, dams, other flood control structures and non-structural flood mitigation features;

"(D) areas that could be inundated as a result of operation or the failure of a levee, dam, or other flood control structure;

"(E) the level of flood hazard reduction provided by flood control structures and by non-structural flood mitigation features;

"(F) all areas of the United States, for flood hazard types and additional flood frequencies deemed necessary by the Administrator; and

"(G) in consultation with the Technical Mapping Advisory Council, future flood risk to the maximum extent feasible.

"(c) Authorization of appropriations. There is authorized to be appropriated to the Administrator to carry out this section $ 400,000,000 for each of fiscal years 2013 through 2017.

(d)(1) The National Flood Insurance Act of 1968 is amended by striking section 1363 (42 U.S.C. 4104) and inserting in lieu thereof the following:

**"Sec. 1363.  Determinations of flood elevation and area of special flood hazard. (42 U.S.C. 4104)**

"(a)  Publication of information; establishment of areas of special flood hazard and associated flood elevations. The Administrator is authorized to—

"(1)  identify and publish information with respect to all flood plain areas, including coastal areas located in the United States, which have special flood hazards, within five years following the date of the enactment of this Act [enacted Aug. 1, 1968], and

"(2)  establish or update areas of special flood hazard and associated flood elevations in all such areas until the date specified in section 4026 of this title.

"(b)  Standards.  In updating and maintaining areas of special flood hazard and associated flood elevation determinations under this section, the Administrator shall--

"(1)  establish standards to—

"(A)  ensure that such flood hazard determinations are adequate for--

"(i) use in establishing rates of probable flood loss; and

"(ii)  use by State and local governments in managing development to reduce the risk of flooding; and

"(B)  facilitate identification and use of consistent methods of data collection and analysis by the Administrator, in conjunction with State and local governments, in developing maps for communities with similar flood risks, as determined by the Administrator; and

"(2)  publish maps in a format that is--

"(A)  digital geospatial data compliant;

"(B)  compliant with generally accepted open publishing and data exchange standards; and

"(C)  aligned with official data defined by the National Geodetic Survey.

"(3)  Elements. Flood hazard determinations made under this section shall—

"(A)  Be developed following an assessment of the accuracy of current ground elevation data; and

"(B)  be developed on a watershed or other appropriate technical basis--

"(i)  to provide the most technically effective and efficient studies and hydrologic and hydraulic modeling; and

17

"(ii)  to eliminate, to the maximum extent possible, discrepancies between adjacent political subdivisions.

"(4)  use, in identifying, reviewing, updating, maintaining, or publishing any flood hazard determination required under this section or under the National Flood Insurance Act of 1968 (*42 U.S.C. 4011* et seq.), the most accurate topography and elevation data available.

"(5)  use coastal flood models that represent and communicate flood risk in a manner that is--

"(A)  technically and scientifically appropriate; and

"(B)  without regard to any prescribed erosion formula related to the cross-sectional area or primary frontal dunes.

"(c)  Review and updating areas of special flood hazard and associated flood elevations, making data available—

"(1)  Community request to revise flood hazard determinations.  Upon the adoption by the Administrator of any recommendation by the Technical Mapping Advisory Council for reviewing, updating, or maintaining flood hazard determinations in accordance with this section, a community that believes that its flood insurance rates in effect prior to adoption would be affected by the adoption of such recommendation may submit a request for an update of such flood hazard determinations, which may be considered at the Administrator's sole discretion. The Administrator shall establish a protocol for the evaluation of such community requests.

"(2)  Review of flood hazard determinations. Once during each 5-year period (the 1st such period beginning on the date of enactment of the Riegle Community Development and Regulatory Improvement Act of 1994 [enacted Sept. 23, 1994]) or more often as the Administrator determines necessary, the Administrator shall assess the need to revise and update flood hazard determinations identified, delineated, or established under this section, based on an analysis of all natural hazards affecting flood risks.

"(3)  Updating flood hazard determinations. The Administrator shall revise and update areas of special flood hazard and associated flood elevations--

"(A)  upon the determination of the Administrator, according to the assessment under subsection (c)(2), that revision and updating are necessary for the areas; or

"(B)  upon the request from any State or local government stating that flood hazard determinations in the State or locality need revision or updating, if sufficient technical data justifying the request is submitted and the unit of government making the request agrees to provide funds in an amount determined by the Administrator.

"(4)  Availability of flood data.  To promote compliance with the requirements of this title, the Administrator shall make flood hazard determinations and related information available free of charge to the Federal entities for lending regulation, Federal agency lenders, State agencies directly responsible for coordinating the national flood insurance program, and appropriate representatives of communities participating in the national flood insurance program, and at a reasonable cost to all other persons. Any receipts resulting from this subsection shall be deposited in the National Flood Insurance Fund, pursuant to section 4017(b)(6) of this title.

"(5)  Notification of flood hazard determination changes. The Administrator shall cause notice to be published in the Federal Register (or shall provide notice by another comparable method) of any change to special flood hazard areas and associated flood elevations. Such notice shall be published or otherwise provided not later than 30 days after the change becomes effective. Notice by any method other than publication in the Federal Register shall include all pertinent information, provide for regular and frequent distribution, and be at least as accessible to map users as notice in the Federal Register. All notices under this subsection shall include information on how to obtain copies of the changes.

"(6)  Summary of flood hazard determination changes.  The Administrator shall publish separately in their entirety within a summary, all changes and revisions to special flood hazard areas and associated flood elevations for which notice was published in the

Federal Register or otherwise provided during the preceding 6 months. The Administrator shall make such summaries available, free of charge, to Federal entities for lending regulation, Federal agency lenders, and States and communities participating in the national flood insurance program pursuant to section 4017 of this title and at cost to all other parties. Any receipts resulting from this subsection shall be deposited in the National Flood Insurance Fund, pursuant to section 4017(b)(6) of this title.

"(7)  Provision of information.  In the implementation of revisions to and updates to special flood hazard areas and associated flood elevations, the Administrator shall share information, to the extent appropriate, with the Under Secretary of Commerce for Oceans and Atmosphere and representatives from State coastal zone management programs.

"(d) Communication and outreach.

"(1) State, Local, Tribal, Territorial officials. In general. The Administrator shall--

"(A)  before commencement of any flood hazard determination as may be made pursuant to section 1363 of the National Flood Insurance Act of 1968 (as amended) (42 U.S.C. 4104), notify each community affected of the model or models that the Administrator plans to use in such process and provide an explanation of why such model or models are appropriate;

"(B)  provide each community affected a maximum 30-day period beginning upon notification under subparagraph (A) to consult with the Administrator regarding the appropriateness, with respect to such community, of the model or models to be used; provided that consultation by a community pursuant to this subparagraph shall not waive or otherwise affect any right of the community to appeal any flood hazard determinations;

"(C)  upon completion of the first Independent Data Submission, transmit a copy of such Submission to the affected community, provide the affected community a maximum 30-day period during which the community may provide data to Administrator that can be used to supplement or modify the existing data, and incorporate any data that is consistent with prevailing engineering principles;

"(D)  work to enhance communication and outreach to States, local communities, and property owners about the effects--

"(i)  of any potential changes to flood hazard determinations that may result from the program required under this section; and

"(ii)  that any such changes may have on flood insurance purchase requirements;

"(E)  engage with local communities to enhance communication and outreach to the residents of such communities, including tenants (with regard to contents insurance), on the matters described under subparagraph (D);

"(2)  Congress—

"(A)  Not less than 30 days before issuance of any preliminary flood hazard determination, notify the Senators for each State affected and each Member of the House of Representatives for each congressional district affected by the preliminary determination in writing of--

"(i)  the estimated schedule for--

"(I)  community meetings regarding the preliminary determination;

"(II)  publication of notices regarding the preliminary determination in local newspapers; and

"(III)  the commencement of the appeals process regarding the determination; and

"(ii)  the estimated number of homes and businesses that will be affected by changes contained in the preliminary determination, including how many structures will be that were not previously located in an area having special flood hazards will be located within such an area under the preliminary determination; and

"(B)  upon the issuance of any proposed determination and any notice of an opportunity to make an appeal relating to the proposed determination, notify the Senators for each

State affected and each Member of the House of Representatives for each congressional district affected by the proposed action taken by the Administrator with respect to the proposed determination or an appeal relating to the proposed determination.

"(3)  Required activities. The communication and outreach activities required under paragraph (1) shall include—

"(A)  notifying property owners when their properties become included in, or when they are excluded from, an area covered by the mandatory flood insurance purchase requirement under section 4012a of this title;

"(B)  educating property owners regarding the flood risk and reduction of this risk in their community, including the continued flood risks to areas that are no longer subject to the flood insurance mandatory purchase requirement;

"(C)  educating property owners regarding the benefits and costs of maintaining or acquiring flood insurance, including, where applicable, lower-cost preferred risk policies under the National Flood Insurance Act of 1968 (*42 U.S.C. 4011* et seq.) for such properties and the contents of such properties;

"(D)  educating property owners about flood hazard determination revisions and the process available to such owners to appeal proposed changes in flood elevations through their community, including by notifying local radio and television stations; and

"(E)  encouraging property owners to maintain or acquire flood insurance coverage.

"(e)  Publication or notification of proposed flood elevation determinations.  In establishing projected flood elevations pursuant to this section and designating areas having special flood hazards for land use purposes with respect to any community pursuant to section 4102 of this title, the Administrator shall first propose such determinations and designations by publication for comment by direct notification to the chief executive officer of the community, and by publication in a prominent local newspaper or other legal format that the Administrator determines is functionally equivalent following notification to the local government.

"(f)  Publication of flood elevation determinations; appeal of owner or lessee to local government; scientific or technical knowledge or information as basis for appeal; modification of proposed determinations. The Administrator shall publish notification of flood elevation determinations and designations of areas having special flood hazards in a prominent local newspaper or other legal format that the Administrator determines is functionally equivalent following notification to the local government. Any owner or lessee of real property within the community who believes the owner's or lessee's property rights to be adversely affected by the Administrator's proposed determination may appeal such determination to the local government within the 90 days set forth in the notification.  The sole grounds for appeal shall be the possession of knowledge or information indicating that (1) the elevations being proposed by the Administrator with respect to an identified area having special flood hazards are scientifically or technically incorrect, or (2) the designation of an identified special flood hazard area is scientifically or technically incorrect.

"(g)  Appeals by private persons; submission of negativing or contradicting data to community; opinion of community respecting justification for appeal by community; transmission of individual appeals to Administrator; filing of community action with Administrator.  Appeals by private persons shall be made to the chief executive officer of the community, or to such agency as he shall publicly designate, and shall set forth the data that tend to negate or contradict the Administrator's finding in such form as the chief executive officer may specify. The community shall review and consolidate all such appeals and issue a written opinion stating whether the evidence presented is sufficient to justify an appeal on behalf of such persons by the community in its own name. Whether or not the community decides to appeal the Administrator's determination, copies of individual appeals shall be sent to the Administrator as they are received by the community, and the community's appeal or a copy

of its decision not to appeal shall be filed with the Administrator within the ninety days set forth in the notification.

"(h)  Administrative review of appeals by private persons; modification of proposed determinations; decision of Administrator; form and distribution.  In the event the Administrator does not receive an appeal from the community within the ninety days provided, he shall consolidate and review on their own merits, in accordance with the procedures set forth in subsection (j), the appeals filed within the community by private persons and shall make such modifications of his proposed determinations as may be appropriate, taking into account the written opinion, if any, issued by the community in not supporting such appeals. The Administrator's decision shall be in written form, and copies thereof shall be sent both to the chief executive officer of the community and to each individual appellant.

"(i)  Determination by Administrator in the absence of appeals: If the Administrator has not received any appeals, upon expiration of the 90-day appeal period established under subsection (f) of this section, the Administrator's proposed determination shall become final 14 days after the expiration of the 90-day appeal period.  The community shall be given a reasonable time after the Administrator's final determination in which to adopt local land use and control measures consistent with the Administrator's determination.

"(j)  Administrative review of appeals by community; agencies for resolution of conflicting data; availability of flood insurance pending such resolution; time for determination of Administrator; community adoption of local land use and control measures within reasonable time of final determination; public inspection and admissibility in evidence of reports and other administrative information.  Upon appeal by any community, as provided by this section, the Administrator shall review and take fully into account any technical or scientific data submitted by the community that tend to negate or contradict the information upon which his proposed determination is based. The Administrator shall resolve such appeal by consultation with officials of the local government involved, by administrative hearing, or by submission of the conflicting data to the Scientific Resolution Panel provided for in section 4104-1 of this title. Until the conflict in data is resolved, and the Administrator makes a final determination on the basis of his findings in the Federal Register, and so notifies the governing body of the community, flood insurance previously available within the community shall continue to be available, and no person shall be denied the right to purchase such insurance at chargeable rates. The Administrator shall make his determination within a reasonable time. The community shall be given a reasonable time after the Administrator's final determination in which to adopt local land use and control measures consistent with the Administrator's determination. The reports and other information used by the Administrator in making his final determination shall be made available for public inspection and shall be admissible in a court of law in the event the community seeks judicial review as provided by this section.

"(k)  Reimbursement of certain expenses.  When, incident to any appeal under subsection (f) or (g) of this section, the owner or lessee of real property or the community, as the case may be, or, in the case of an appeal that is resolved by submission of conflicting data to the Scientific Resolution Panel provided for in section 1363A (42 U.S.C. 4104-1), the community, incurs expense in connection with the services of surveyors, engineers, or similar services, but not including legal services, in the effecting of an appeal based on a scientific or technical error on the part of the Federal Emergency Management Agency, which is successful in whole or part, the Administrator shall reimburse such individual or community to an extent measured by the ratio of the successful portion of the appeal as compared to the entire appeal and applying such ratio to the reasonable value of all such services, but no reimbursement shall be made by the Administrator in respect to any fee or expense payment, the payment of which was agreed to be contingent upon the result of the appeal. The Administrator may use such amounts from the National Flood Insurance Fund established under section 1310 (42 U.S.C.

4017) as may be necessary to carry out this subsection. The Administrator shall promulgate regulations to carry out this subsection.

"(l)  Judicial review of final administrative determinations; venue; time for appeal; scope of review; good cause for stay of final determinations.  Except as provided in section 4104-1 of this title, any appellant aggrieved by any final determination of the Administrator upon administrative appeal, as provided by this section, may appeal such determination to the United States district court for the district within which the community is located not more than sixty days after receipt of notice of such determination. The scope of review by the court shall be as provided by chapter 7 of title 5. During the pendency of any such litigation, all final determinations of the Administrator shall be effective for the purposes of this title unless stayed by the court for good cause shown.

*Analysis:*

FEMA recognizes that the intent of recent proposed changes to the National Flood Insurance Program (NFIP) are intended to support continued identification of flood hazards, including future flood conditions, and analysis of flood risk that support the operation of the NFIP and enable property owners and State, local, Tribal and Territorial (SLTT) governments to recognize and manage flood risk.  FEMA is also committed to these goals.

This summary is provided as a guide to help maintain a focus on the overall objectives that any proposed legislation should strive to achieve.

In analyzing proposed legislation and in evaluating the effectiveness of FEMA's current authorizations, FEMA is guided by the following set of **principles**:

1. Flood hazard and flood risk information should exist everywhere in the United States at a scale and degree of accuracy appropriate for a given location, based on current and potential flood risk.  Some locations may require highly developed analysis of the Special Flood Hazard Area (SFHA) and other areas of residual risk while other areas may not need such specificity;
2. Flood hazard and flood risk information must be available to everyone and delivered in a format that is easy to use and understand;
3. Congress and FEMA should identify additional opportunities to expand the contribution of SLTT partners and the private sector to work collaboratively to improve flood hazard and flood risk identification techniques and to identify the level of analysis appropriate for each SLTT's unique circumstances; an
4. FEMA should continue to rely on the Technical Mapping Advisory Council (TMAC) to help FEMA develop solutions and strategies for appropriately incorporating emerging priorities and technologies into the flood hazard and flood risk identification process, to serve as an exchange of information between FEMA and its stakeholders, and to maintain sufficient flexibility in FEMA's authorities to implement those solutions.

**While these principles are simple and straightforward** (and likely to receive widespread support from FEMA's stakeholders), **the existing legislation is not**.  In 1968 (and 1973), Congress identified the need to provide for the expeditious identification and dissemination of information concerning "*flood-prone areas*" by authorizing broad authorities to "*identify and publish information*" with respect to "*all flood plain areas*" having "*special flood hazards*" and to establish or update "*flood-risk zone data*."  See 42 U.S.C. 4101(a); 42 U.S.C. 4002(b)(2).

To implement this legislation, the agency (HUD then FEMA) defined the area of special flood hazard (the SFHA) as the 1% annual chance or base flood, created the flood elevation study (Flood Insurance Study), and the Flood Insurance Rate Map.  See 44 C.F.R. 59.1.  These tools were used to develop detailed flood hazard information within the SFHA for over 97 % of the U.S. population, and to establish minimum floodplain management standards that state and local governments must adopt to participate in the NFIP.  In 1973, Congress mandated that structures

located within the SFHA be required to obtain flood insurance if the structure is federally funded or funded by a federally insured mortgage.

The compulsory nature of the requirements associated with the SFHA caused Congress to establish an appropriate level of due process for determinations related to the SFHA, the elements of which were codified in 42 U.S.C. 4104. Flood Disaster Protection Act of 1973, P.L. 93-234, § 110.   However, those same concerns are not as demanding when FEMA is identifying non-regulatory flood data that improves the understanding of flood risk but does not compel a specific course of conduct (such as mandatory purchase of flood insurance and compliance with floodplain management regulations).   As such, **FEMA believes that clarifying the distinction between determinations respecting the SFHA (regulatory) and the identification of flood hazard data in addition to or outside of the SHFA (non-regulatory) would be beneficial and would expedite the delivery of important non-regulatory information to the public**, consistent with the guiding principles outlined above.

The three **primary uses of flood hazard information** developed by FEMA are:

- Identification of the extent of the base flood (SFHA) and specific elevations therein which in turn, determine the extent of the mandatory purchase requirement and inform rates of insurance;
- Identification of floodplain areas that are subject to federal, state, and local land management requirements (and E.O. 11988 as amended by E.O. 13690);
- Identification of areas inside and outside of the SFHA that are subject to flood risks beyond regulatory minimum requirements.

As FEMA has continued to implement the program over the past 50 years, an improved understanding of our customers and their evolving needs has added clarity regarding the importance of providing more robust flood hazard information beyond the SFHA and 1-percent annual chance flood elevation.  While the authority to obtain that data may have existed in the 1968 Act, the Biggert-Waters Flood Insurance Reform Act of 2012 (BW-12), Div. F of Pub. L. 112–141, § 100216(b) (42 U.S.C. 4101b(b)), further clarified the importance of obtaining flood hazard data (Flood-risk zone data), not just in the SFHA, but also in the 0.2 % annual chance flood and other areas of residual risk. In BW-12, Congress also re-established the TMAC to provide various recommendations to FEMA on the identification of flood risk and other aspects of the flood mapping program.  BW-12 § 100215; 42 U.S.C. 4101a.  For the National Flood Mapping Program to satisfy the intent of the current statute and support a modern flood risk management strategy for the NFIP, **less prescriptive legislation and more flexibility is warranted to enable FEMA to leverage past and future investments in flood hazard information to enhance the nation's understanding of flood risk.**

In outlining and enumerating the additional types of data FEMA should be collecting, one of the unintended consequences of BW-12 and other amendments to the National Flood Insurance Act of 1968 (NFIA) has been to blur the distinction between regulatory and non-regulatory flood hazard identification.  In 1973, when Congress first mandated a specific process for flood hazard determinations, the entirety of that process could be found in 42 U.S.C. 4104.  Now, however, additional elements of the process for publishing flood elevation determinations can also be found in 42 U.S.C. 4101(h), and 42 U.S.C. 4101b(d)(1).

Moreover, prior amendments to the NFIA, and in turn some previous proposed legislation, by adopting certain regulatory concepts or terms unintentionally, lock FEMA into a paradigm that may not be most effective way to deliver flood hazard and flood risk information in the future.  For example, FEMA's mapping authorities presently refer to "National Flood Insurance Rate Map panels" and the "first independent data submission," concepts and terminology that were previously exclusively in FEMA regulation and policy.  This continued codification of specific methods of designating flood risk is contrary to TMAC recommendations as well as the previous intent of Congress as expressed over time, resulting in undue prescriptiveness that inhibits FEMA's ability to leverage emerging science and technology and to deliver flood risk data that supports a modern approach to flood risk management for the NFIP.

23

Stakeholders, TMAC and other consumers of FEMA's flood hazard data have commented on the complexity of the existing statutory scheme.  FEMA agrees with these stakeholders that **the existing statutory scheme for identifying flood hazards could be simplified through the following <u>measures</u>**:

- Replace references in the legislation to "flood maps," "National Flood Insurance program maps," "map panels" and other similar terms with "flood hazard and risk information."  Deleting reference to specific map products in authorizing legislation gives FEMA more flexibility to identify flood hazard and flood risk information and recognizes that maps are only one aspect of the collection, analysis and display of flood hazard information;
- Remove references to undefined terms derived from FEMA's regulations and policy, such as specific lettered hazard zones, as these terms tend to bind FEMA to its existing administrative structure, limiting the opportunity to innovate;
- Separate the regulatory requirements related to the identification of the SFHA from the delivery of non-regulatory flood hazard information in order to expedite the delivery of such information.  The identification and delivery of non-regulatory flood hazard and flood risk information is currently inhibited by the due process requirements associated with regulatory flood hazard data.

These measures are not exhaustive; they are practice tools that FEMA has developed to help inform the process of reauthorizing flood hazard identification provisions of the NFIA.  FEMA believes that these measures go a long way in helping to maintain a focus on the ultimate objectives of NFIP reform and reauthorization as discussed above. FEMA is looking forward to engaging in conversation with Congress and its stakeholders as we work collaboratively towards the goal of reauthorization.

Attached to this summary is a proposed re-working of FEMA's existing statutory authorities that attempts to achieve the objectives set forth above.

Specifically, this proposal would make 42 U.S.C. 4101b, currently titled "National Flood Mapping Program" the home to all of FEMA's authority to undertake flood hazard and flood risk identification. FEMA proposes re-naming the section "National Flood Hazard and Flood Risk Identification Program" and relocating all aspects of 42 U.S.C. 4101 related to those broad authorities into this section.

In addition, 42 U.S.C. 4104 "Flood Hazard Determinations" would become the home of all requirements (including due process) that relate to the creation of the "determinations" (SFHA, BFE)  that relate to mandatory purchase and floodplain management requirements.  Aspects of 42 U.S.C. 4101 related to the regulatory aspects of flood hazard determinations would be relocated to 4104. Because the substance from 42 U.S.C. 4101 would be relocated to one of the two aforementioned sections, 42 U.S.C. 4101 would be deleted.

The proposed changes are fundamentally administrative and are intended to improve efficiency and reduce complexity of the flood hazard and flood risk identification program and to allow flexibility as technology changes over time.  Every effort has been made to maintain the original intent of the various provisions, as understood by FEMA, limiting new language to be consistent with that which has appeared in recent proposed legislation and which appears to have widespread support.[2]  Each proposed change is identified and commented upon in the "track changes" version, whereas the clean version presents a proposed rewrite as it might appear in the United States Code.

***Comparative type:***

### National Flood Insurance Act of 1968

\* \* \* \*

Sec. 1360. Identification of flood-prone areas. (42 U.S.C. 4101)

(a) Publication of information; establishment of flood-risk zones; estimates of flood-caused loss.— The Administrator is authorized to consult with, receive information from, and enter into any agreements or other arrangements with the Secretaries of the Army, the Interior, Agriculture, and Commerce, the Tennessee Valley Authority, and the heads of other Federal departments or agencies, on a reimbursement basis, or with the head of any State or local agency, or enter into contracts with any persons or private firms, in order that he may—

(1) identify and publish information with respect to all flood plain areas, including coastal areas located in the United States, which has special flood hazards, within five years following August 1, 1968, and

(2) establish or update flood-risk zone data in all such areas, and make estimates with respect to the rates of probable flood caused loss for the various flood risk zones for each of these areas until the date specified in section 4026 of this title.

(b) Accelerated identification of flood-risk zones; authority of Administrator: grants, technical assistance, transactions, and payments.— The Administrator is directed to accelerate the identification of risk zones within flood-prone and mudslide-prone areas, as provided by subsection (a)(2) of this section, in order to make known the degree of hazard within each such zone at the earliest possible date. To accomplish this objective, the Administrator is authorized, without regard to subsections (a) and (b) of section 3324 of title 31 and section 6101 of title 41, to make grants, provide technical assistance, and enter into contracts, cooperative agreements, or other transactions, on such terms as he may deem appropriate, or consent to modifications thereof, and to make advance or progress payments in connection therewith.

(c) Priority in allocation of manpower and other available resources for identification and mapping of flood hazard areas and flood-risk zones.— The Secretary of Defense (through the Army Corps of Engineers), the Secretary of the Interior (through the United States Geological Survey), the Secretary of Agriculture (through the Soil Conservation Service), the Secretary of Commerce (through the National Oceanic and Atmospheric Administration), the head of the Tennessee Valley Authority, and the heads of all other Federal agencies engaged in the identification or delineation of flood-risk zones within the several States shall, in consultation with the Administrator, give the highest practicable priority in the allocation of available manpower and other available resources to the identification and mapping of flood hazard areas and flood-risk zones, in order to assist the Administrator to meet the deadline established by this section.

(d) Plan for bringing communities with flood-risk zones into full program status.— The Administrator shall, not later than September 30, 1984, submit to the Congress a plan for bringing all communities containing flood-risk zones into full program status by September 30, 1987.

(e) Review of flood maps.— Once during each 5-year period (the 1st such period beginning on September 23, 1994) or more often as the Administrator determines necessary, the Administrator shall assess the need to revise and update all floodplain areas and flood risk zones identified, delineated, or established under this section, based on an analysis of all natural hazards affecting flood risks.

(f) Updating flood maps.— The Administrator shall revise and update any floodplain areas and flood-risk zones—

(1) upon the determination of the Administrator, according to the assessment under subsection (e), that revision and updating are necessary for the areas and zones; or

(2) upon the request from any State or local government stating that specific floodplain areas or flood-risk zones in the State or locality need revision or updating, if sufficient

~~technical data justifying the request is submitted and the unit of government making the request agrees to provide funds in an amount determined by the Administrator.~~

~~(g) Availability of flood maps.— To promote compliance with the requirements of this chapter, the Administrator shall make flood insurance rate maps and related information available free of charge to the Federal entities for lending regulation, Federal agency lenders, State agencies directly responsible for coordinating the national flood insurance program, and appropriate representatives of communities participating in the national flood insurance program, and at a reasonable cost to all other persons. Any receipts resulting from this subsection shall be deposited in the National Flood Insurance Fund, pursuant to section 4017(b)(6) of this title.~~

~~(h) Notification of flood map changes.— The Administrator shall cause notice to be published in the Federal Register (or shall provide notice by another comparable method) of any change to flood insurance map panels and any change to flood insurance map panels issued in the form of a letter of map amendment or a letter of map revision. Such notice shall be published or otherwise provided not later than 30 days after the map change or revision becomes effective. Notice by any method other than publication in the Federal Register shall include all pertinent information, provide for regular and frequent distribution, and be at least as accessible to map users as notice in the Federal Register. All notices under this subsection shall include information on how to obtain copies of the changes or revisions.~~

~~(i) Compendia of flood map changes.— Every 6 months, the Administrator shall publish separately in their entirety within a compendium, all changes and revisions to flood insurance map panels and all letters of map amendment and letters of map revision for which notice was published in the Federal Register or otherwise provided during the preceding 6 months. The Administrator shall make such compendia available, free of charge, to Federal entities for lending regulation, Federal agency lenders, and States and communities participating in the national flood insurance program pursuant to section 4017 of this title and at cost to all other parties. Any receipts resulting from this subsection shall be deposited in the National Flood Insurance Fund, pursuant to section 4017(b)(6) of this title.~~

~~(j) Provision of information.— In the implementation of revisions to and updates of flood insurance rate maps, the Administrator shall share information, to the extent appropriate, with the Under Secretary of Commerce for Oceans and Atmosphere and representatives from State coastal zone management programs.~~

~~*   *   *   *~~

~~**Sec. 1363. Flood elevation determinations. (42 U.S.C. 4104)**~~

~~(a) Publication or notification of proposed flood elevation determinations~~

~~In establishing projected flood elevations and designating areas having special flood hazards for land use purposes with respect to any community pursuant to section 4102 of this title, the Administrator shall first propose such determinations and designations by publication for comment in the Federal Register, by direct notification to the chief executive officer of the community, and by publication in a prominent local newspaper.~~

~~(b) Publication of flood elevation determinations; appeal of owner or lessee to local government; scientific or technical knowledge or information as basis for appeal; modification of proposed determinations~~

~~The Administrator shall publish notification of flood elevation determinations and designations of areas having special flood hazards in a prominent local newspaper at least twice during the ten-day period following notification to the local government. During the ninety-day period following the second publication, any owner or lessee of real property within the community who believes his property rights to be adversely affected by the Administrator's proposed determination may appeal such determination to the local government. The sole grounds for~~

26

appeal shall be the possession of knowledge or information indicating that (1) the elevations being proposed by the Administrator with respect to an identified area having special flood hazards are scientifically or technically incorrect, or (2) the designation of an identified special flood hazard area is scientifically or technically incorrect.

(c) Appeals by private persons; submission of negativing or contradicting data to community; opinion of community respecting justification for appeal by community; transmission of individual appeals to Administrator; filing of community action with Administrator

Appeals by private persons shall be made to the chief executive officer of the community, or to such agency as he shall publicly designate, and shall set forth the data that tend to negate or contradict the Administrator's finding in such form as the chief executive officer may specify. The community shall review and consolidate all such appeals and issue a written opinion stating whether the evidence presented is sufficient to justify an appeal on behalf of such persons by the community in its own name. Whether or not the community decides to appeal the Administrator's determination, copies of individual appeals shall be sent to the Administrator as they are received by the community, and the community's appeal or a copy of its decision not to appeal shall be filed with the Administrator not later than ninety days after the date of the second newspaper publication of the Administrator's notification.

(d) Administrative review of appeals by private persons; modification of proposed determinations; decision of Administrator: form and distribution

In the event the Administrator does not receive an appeal from the community within the ninety days provided, he shall consolidate and review on their own merits, in accordance with the procedures set forth in subsection (e), the appeals filed within the community by private persons and shall make such modifications of his proposed determinations as may be appropriate, taking into account the written opinion, if any, issued by the community in not supporting such appeals. The Administrator's decision shall be in written form, and copies thereof shall be sent both to the chief executive officer of the community and to each individual appellant.

(e) Administrative review of appeals by community; agencies for resolution of conflicting data; availability of flood insurance pending such resolution; time for determination of Administrator; community adoption of local land use and control measures within reasonable time of final determination; public inspection and admissibility in evidence of reports and other administrative information

Upon appeal by any community, as provided by this section, the Administrator shall review and take fully into account any technical or scientific data submitted by the community that tend to negate or contradict the information upon which his proposed determination is based. The Administrator shall resolve such appeal by consultation with officials of the local government involved, by administrative hearing, or by submission of the conflicting data to the Scientific Resolution Panel provided for in section 4104-1 of this title. Until the conflict in data is resolved, and the Administrator makes a final determination on the basis of his findings in the Federal Register, and so notifies the governing body of the community, flood insurance previously available within the community shall continue to be available, and no person shall be denied the right to purchase such insurance at chargeable rates. The Administrator shall make his determination within a reasonable time. The community shall be given a reasonable time after the Administrator's final determination in which to adopt local land use and control measures consistent with the Administrator's determination. The reports and other information used by the Administrator in making his final determination shall be made available for public inspection and shall be admissible in a court of law in the event the community seeks judicial review as provided by this section.

(f) Reimbursement of certain expenses

27

When, incident to any appeal under subsection (b) or (c) of this section, the owner or lessee of real property or the community, as the case may be, or, in the case of an appeal that is resolved by submission of conflicting data to the Scientific Resolution Panel provided for in section 4104-1 of this title, the community, incurs expense in connection with the services of surveyors, engineers, or similar services, but not including legal services, in the effecting of an appeal based on a scientific or technical error on the part of the Federal Emergency Management Agency, which is successful in whole or part, the Administrator shall reimburse such individual or community to an extent measured by the ratio of the successful portion of the appeal as compared to the entire appeal and applying such ratio to the reasonable value of all such services, but no reimbursement shall be made by the Administrator in respect to any fee or expense payment, the payment of which was agreed to be contingent upon the result of the appeal. The Administrator may use such amounts from the National Flood Insurance Fund established under section 4017 of this title as may be necessary to carry out this subsection. The Administrator shall promulgate regulations to carry out this subsection.

(g) Judicial review of final administrative determinations; venue; time for appeal; scope of review; good cause for stay of final determinations

Except as provided in section 4104-1 of this title, any appellant aggrieved by any final determination of the Administrator upon administrative appeal, as provided by this section, may appeal such determination to the United States district court for the district within which the community is located not more than sixty days after receipt of notice of such determination. The scope of review by the court shall be as provided by chapter 7 of title 5. During the pendency of any such litigation, all final determinations of the Administrator shall be effective for the purposes of this chapter unless stayed by the court for good cause shown.with an explanatory statement.

\*   \*   \*   \*

**§ 1363.  Determinations of flood elevation and area of special flood hazard. (42 U.S.C. 4104)**

(a)  Publication of information; establishment of areas of special flood hazard and associated flood elevations. The Administrator is authorized to—

(1)  identify and publish information with respect to all flood plain areas, including coastal areas located in the United States, which have special flood hazards, within five years following the date of the enactment of this Act [enacted Aug. 1, 1968], and

(2)  establish or update areas of special flood hazard and associated flood elevations in all such areas until the date specified in section 4026 of this title.

(b)  Standards.  In updating and maintaining areas of special flood hazard and associated flood elevation determinations under this section, the Administrator shall--

(1)  establish standards to—

(A)  ensure that such flood hazard determinations are adequate for--

(i) use in establishing rates of probable flood loss; and

(ii)  use by State and local governments in managing development to reduce the risk of flooding; and

(B)  facilitate identification and use of consistent methods of data collection and analysis by the Administrator, in conjunction with State and local governments, in developing maps for communities with similar flood risks, as determined by the Administrator; and

(2)  publish maps in a format that is--

(A)  digital geospatial data compliant;

(B)  compliant with the generally accepted open publishing and data exchange standards; and

(C)  aligned with official data defined by the National Geodetic Survey.

(3)  Elements. Flood hazard determinations made under this section shall—
  (A)  Be developed following an assessment of the accuracy of current ground elevation data; and
  (B)  be developed on a watershed or other appropriate technical basis--
    (i)  to provide the most technically effective and efficient studies and hydrologic and hydraulic modeling; and
    (ii)  to eliminate, to the maximum extent possible, discrepancies between adjacent political subdivisions.
(4)  use, in identifying, reviewing, updating, maintaining, or publishing any flood hazard determination required under this section or under the National Flood Insurance Act of 1968 (*42 U.S.C. 4011* et seq.), the most accurate topography and elevation data available.
(5)  use coastal flood models that represent and communicate flood risk in a manner that is--
  (A)  technically and scientifically appropriate; and
  (B)  without regard to any prescribed erosion formula related to the cross-sectional area or primary frontal dunes.
(c)  Review and updating areas of special flood hazard and associated flood elevations, making data available—
  (1)  Community request to revise flood hazard determinations.  Upon the adoption by the Administrator of any recommendation by the Technical Mapping Advisory Council for reviewing, updating, or maintaining flood hazard determinations in accordance with this section, a community that believes that its flood insurance rates in effect prior to adoption would be affected by the adoption of such recommendation may submit a request for an update of such flood hazard determinations, which may be considered at the Administrator's sole discretion. The Administrator shall establish a protocol for the evaluation of such community requests.
  (2)  Review of flood hazard determinations. Once during each 5-year period (the 1st such period beginning on the date of enactment of the Riegle Community Development and Regulatory Improvement Act of 1994 [enacted Sept. 23, 1994]) or more often as the Administrator determines necessary, the Administrator shall assess the need to revise and update flood hazard determinations identified, delineated, or established under this section, based on an analysis of all natural hazards affecting flood risks.
  (3)  Updating flood hazard determinations. The Administrator shall revise and update areas of special flood hazard and associated flood elevations--
    (A)  upon the determination of the Administrator, according to the assessment under subsection (c)(2), that revision and updating are necessary for the areas; or
    (B)  upon the request from any State or local government stating that flood hazard determinations in the State or locality need revision or updating, if sufficient technical data justifying the request is submitted and the unit of government making the request agrees to provide funds in an amount determined by the Administrator.
  (4)  Availability of flood data.  To promote compliance with the requirements of this title, the Administrator shall make flood hazard determinations and related information available free of charge to the Federal entities for lending regulation, Federal agency lenders, State agencies directly responsible for coordinating the national flood insurance program, and appropriate representatives of communities participating in the national flood insurance program, and at a reasonable cost to all other persons. Any receipts resulting from this subsection shall be deposited in the National Flood Insurance Fund, pursuant to section 4017(b)(6) of this title.
  (5)  Notification of flood hazard determination changes. The Administrator shall cause notice to be published in the Federal Register (or shall provide notice by

another comparable method) of any change to special flood hazard areas and associated flood elevations. Such notice shall be published or otherwise provided not later than 30 days after the change becomes effective. Notice by any method other than publication in the Federal Register shall include all pertinent information, provide for regular and frequent distribution, and be at least as accessible to map users as notice in the Federal Register. All notices under this subsection shall include information on how to obtain copies of the changes.

(6)  Summary of flood hazard determination changes.  The Administrator shall publish separately in their entirety within a summary, all changes and revisions to special flood hazard areas and associated flood elevations for which notice was published in the Federal Register or otherwise provided during the preceding 6 months. The Administrator shall make such summaries available, free of charge, to Federal entities for lending regulation, Federal agency lenders, and States and communities participating in the national flood insurance program pursuant to section 4017 of this title and at cost to all other parties. Any receipts resulting from this subsection shall be deposited in the National Flood Insurance Fund, pursuant to section 4017(b)(6) of this title.

(7)  Provision of information.  In the implementation of revisions to and updates to special flood hazard areas and associated flood elevations, the Administrator shall share information, to the extent appropriate, with the Under Secretary of Commerce for Oceans and Atmosphere and representatives from State coastal zone management programs.

(d)  Communication and outreach.

(1)  State, Local, Tribal, Territorial officials. In general. The Administrator shall--

(A)  before commencement of any flood hazard determination as may be made pursuant to section 1363 of the National Flood Insurance Act of 1968 (as amended) (42 U.S.C. 4104), notify each community affected of the model or models that the Administrator plans to use in such process and provide an explanation of why such model or models are appropriate;

(B)  provide each community affected a maximum 30-day period beginning upon notification under subparagraph (A) to consult with the Administrator regarding the appropriateness, with respect to such community, of the model or models to be used; provided that consultation by a community pursuant to this subparagraph shall not waive or otherwise affect any right of the community to appeal any flood hazard determinations;

(C)  upon completion of the first Independent Data Submission, transmit a copy of such Submission to the affected community, provide the affected community a maximum 30-day period during which the community may provide data to Administrator that can be used to supplement or modify the existing data, and incorporate any data that is consistent with prevailing engineering principles;

(D)  work to enhance communication and outreach to States, local communities, and property owners about the effects--

(i)  of any potential changes to flood hazard determinations that may result from the program required under this section; and

(ii)  that any such changes may have on flood insurance purchase requirements;

(E)  engage with local communities to enhance communication and outreach to the residents of such communities, including tenants (with regard to contents insurance), on the matters described under subparagraph (D);

(2)  Congress—

(A)  Not less than 30 days before issuance of any preliminary flood hazard determination, notify the Senators for each State affected and each Member of

the House of Representatives for each congressional district affected by the preliminary determination in writing of--

(i) the estimated schedule for--

(I)  community meetings regarding the preliminary determination;

(II)  publication of notices regarding the preliminary determination in local newspapers; and

(III)  the commencement of the appeals process regarding the determination; and

(ii)  the estimated number of homes and businesses that will be affected by changes contained in the preliminary determination, including how many structures will be that were not previously located in an area having special flood hazards will be located within such an area under the preliminary determination; and

(B)  upon the issuance of any proposed determination and any notice of an opportunity to make an appeal relating to the proposed determination, notify the Senators for each State affected and each Member of the House of Representatives for each congressional district affected by the proposed action taken by the Administrator with respect to the proposed determination or an appeal relating to the proposed determination.

(3)  Required activities. The communication and outreach activities required under paragraph (1) shall include—

(A)  notifying property owners when their properties become included in, or when they are excluded from, an area covered by the mandatory flood insurance purchase requirement under section 4012a of this title;

(B)  educating property owners regarding the flood risk and reduction of this risk in their community, including the continued flood risks to areas that are no longer subject to the flood insurance mandatory purchase requirement;

(C)  educating property owners regarding the benefits and costs of maintaining or acquiring flood insurance, including, where applicable, lower-cost preferred risk policies under the National Flood Insurance Act of 1968 (*42 U.S.C. 4011* et seq.) for such properties and the contents of such properties;

(D)  educating property owners about flood hazard determination revisions and the process available to such owners to appeal proposed changes in flood elevations through their community, including by notifying local radio and television stations; and

(E)  encouraging property owners to maintain or acquire flood insurance coverage.

(e)  Publication or notification of proposed flood elevation determinations.  In establishing projected flood elevations pursuant to this section and designating areas having special flood hazards for land use purposes with respect to any community pursuant to section 4102 of this title, the Administrator shall first propose such determinations and designations by publication for comment by direct notification to the chief executive officer of the community, and by publication in a prominent local newspaper or other legal format that the Administrator determines is functionally equivalent following notification to the local government.

(f)  Publication of flood elevation determinations; appeal of owner or lessee to local government; scientific or technical knowledge or information as basis for appeal; modification of proposed determinations. The Administrator shall publish notification of flood elevation determinations and designations of areas having special flood hazards in a prominent local newspaper or other legal format that the Administrator determines is functionally equivalent following notification to the local government. Any owner or lessee of real property within the community who believes the owner's or lessee's property rights to be adversely affected by the Administrator's proposed determination

may appeal such determination to the local government within the 90 days set forth in the notification.  The sole grounds for appeal shall be the possession of knowledge or information indicating that (1) the elevations being proposed by the Administrator with respect to an identified area having special flood hazards are scientifically or technically incorrect, or (2) the designation of an identified special flood hazard area is scientifically or technically incorrect.

(g)  Appeals by private persons; submission of negativing or contradicting data to community; opinion of community respecting justification for appeal by community; transmission of individual appeals to Administrator; filing of community action with Administrator.  Appeals by private persons shall be made to the chief executive officer of the community, or to such agency as he shall publicly designate, and shall set forth the data that tend to negate or contradict the Administrator's finding in such form as the chief executive officer may specify. The community shall review and consolidate all such appeals and issue a written opinion stating whether the evidence presented is sufficient to justify an appeal on behalf of such persons by the community in its own name. Whether or not the community decides to appeal the Administrator's determination, copies of individual appeals shall be sent to the Administrator as they are received by the community, and the community's appeal or a copy of its decision not to appeal shall be filed with the Administrator within the ninety days set forth in the notification.

(h)  Administrative review of appeals by private persons; modification of proposed determinations; decision of Administrator; form and distribution.  In the event the Administrator does not receive an appeal from the community within the ninety days provided, he shall consolidate and review on their own merits, in accordance with the procedures set forth in subsection (j), the appeals filed within the community by private persons and shall make such modifications of his proposed determinations as may be appropriate, taking into account the written opinion, if any, issued by the community in not supporting such appeals. The Administrator's decision shall be in written form, and copies thereof shall be sent both to the chief executive officer of the community and to each individual appellant.

(i)  Determination by Administrator in the absence of appeals: If the Administrator has not received any appeals, upon expiration of the 90-day appeal period established under subsection (f) of this section, the Administrator's proposed determination shall become final 14 days after the expiration of the 90-day appeal period.  The community shall be given a reasonable time after the Administrator's final determination in which to adopt local land use and control measures consistent with the Administrator's determination.

(j)  Administrative review of appeals by community; agencies for resolution of conflicting data; availability of flood insurance pending such resolution; time for determination of Administrator; community adoption of local land use and control measures within reasonable time of final determination; public inspection and admissibility in evidence of reports and other administrative information.  Upon appeal by any community, as provided by this section, the Administrator shall review and take fully into account any technical or scientific data submitted by the community that tend to negate or contradict the information upon which his proposed determination is based. The Administrator shall resolve such appeal by consultation with officials of the local government involved, by administrative hearing, or by submission of the conflicting data to the Scientific Resolution Panel provided for in section 4104-1 of this title. Until the conflict in data is resolved, and the Administrator makes a final determination on the basis of his findings in the Federal Register, and so notifies the governing body of the community, flood insurance previously available within the community shall continue to be available, and no person shall be denied the right to purchase such insurance at chargeable rates. The Administrator shall make his determination within a reasonable time. The community shall be given a reasonable time after the Administrator's final determination in which to adopt local land use and control measures consistent with the

Administrator's determination. The reports and other information used by the Administrator in making his final determination shall be made available for public inspection and shall be admissible in a court of law in the event the community seeks judicial review as provided by this section.

(k)  Reimbursement of certain expenses.  When, incident to any appeal under subsection (f) or (g) of this section, the owner or lessee of real property or the community, as the case may be, or, in the case of an appeal that is resolved by submission of conflicting data to the Scientific Resolution Panel provided for in section 1363A (42 U.S.C. 4104-1), the community, incurs expense in connection with the services of surveyors, engineers, or similar services, but not including legal services, in the effecting of an appeal based on a scientific or technical error on the part of the Federal Emergency Management Agency, which is successful in whole or part, the Administrator shall reimburse such individual or community to an extent measured by the ratio of the successful portion of the appeal as compared to the entire appeal and applying such ratio to the reasonable value of all such services, but no reimbursement shall be made by the Administrator in respect to any fee or expense payment, the payment of which was agreed to be contingent upon the result of the appeal. The Administrator may use such amounts from the National Flood Insurance Fund established under section 1310 (42 U.S.C. 4017) as may be necessary to carry out this subsection. The Administrator shall promulgate regulations to carry out this subsection.

(l)  Judicial review of final administrative determinations; venue; time for appeal; scope of review; good cause for stay of final determinations.  Except as provided in section 4104-1 of this title, any appellant aggrieved by any final determination of the Administrator upon administrative appeal, as provided by this section, may appeal such determination to the United States district court for the district within which the community is located not more than sixty days after receipt of notice of such determination. The scope of review by the court shall be as provided by chapter 7 of title 5. During the pendency of any such litigation, all final determinations of the Administrator shall be effective for the purposes of this title unless stayed by the court for good cause shown.

## Biggert-Waters Flood Insurance Reform Act of 2012

### Sec. 100215. Technical Mapping Advisory Council. (42 U.S.C. 4101a)

(a) Establishment.  There is established a council to be known as the Technical Mapping Advisory Council (in this section referred to as the "Council").
(b) Membership.
    (1) In general. The Council shall consist of--
        (A) the Administrator (or the designee thereof);
        (B) the Secretary of the Interior (or the designee thereof);
        (C) the Secretary of Agriculture (or the designee thereof);
        (D) the Under Secretary of Commerce for Oceans and Atmosphere (or the designee thereof); and
        (E) 17 additional members appointed by the Administrator or the designee of the Administrator, who shall be--
           (i) a member of a recognized professional surveying association or organization;
           (ii) a member of a recognized professional mapping association or organization;
           (iii) a member of a recognized professional engineering association or organization;
           (iv) a member of a recognized professional association or organization representing flood hazard determination firms;

(v)  a representative of the United States Geological Survey;
(vi)  a representative of a recognized professional association or organization representing State geographic information;
(vii)  a representative of State national flood insurance coordination offices;
(viii)  a representative of the United States Army Corps of Engineers;
(ix)  a member of a recognized regional flood and storm water management organization;
(x)  2 representatives of different State government agencies that have entered into cooperating technical partnerships with the Administrator and have demonstrated the capability to produce ~~flood insurance rate maps~~ flood hazard and flood risk information;
(xi)  2 representatives of different local government agencies that have entered into cooperating technical partnerships with the Administrator and have demonstrated the capability to produce ~~flood insurance maps~~ flood hazard and flood risk information;
(xii)  a member of a recognized floodplain management association or organization;
(xiii)  a member of a recognized risk management association or organization; ~~and~~
(xiv)  a State mitigation officer; and
(xv)  a member of a recognized professional real estate brokerage association.

(2) Qualifications. Members of the Council shall be appointed based on their demonstrated knowledge and competence regarding surveying, cartography, remote sensing, geographic information systems, or the technical aspects of preparing and using ~~flood insurance rate maps~~ flood hazard and flood risk information. In appointing members under paragraph (1)(E), the Administrator shall, to the maximum extent practicable, ensure that the membership of the Council has a balance of Federal, State, local, tribal, and private members, and includes geographic diversity, including representation from areas with coastline on the Gulf of Mexico and other States containing areas identified by the Administrator as at high risk for flooding or as areas having special flood hazards.

(c) Duties.  The Council shall--
(1) recommend to the Administrator how to improve in a cost-effective manner the--
    (A)  accuracy, general quality, ease of use, and distribution and dissemination of flood ~~insurance rate maps~~ hazard and flood risk ~~data~~ information; and
    (B)  performance metrics and milestones required to effectively and efficiently ~~map~~ identify flood hazard and flood risk areas in the United States;

(2) recommend to the Administrator ~~mapping~~ standards and guidelines for--
    (A)  ~~flood insurance rate maps~~ collecting and maintaining flood hazard and flood risk information, including but not limited to flood hazard determinations; and
    (B)  data accuracy, data quality, data currency, and data eligibility;

(3) recommend to the Administrator how to maintain, on an ongoing basis, flood ~~insurance rate maps~~ hazard and flood risk ~~identification~~ information;
(4) recommend procedures for delegating ~~mapping~~ flood hazard and flood risk identification activities to State and local ~~mapping~~ partners;
(5) recommend to the Administrator and other Federal agencies participating in the Council--
    (A)  methods for improving interagency and intergovernmental coordination on flood ~~mapping and flood risk determination~~ hazard and flood risk identification; and
    (B)  a funding strategy to leverage and coordinate budgets and expenditures across Federal agencies;
(6) provide recommendations in response to specific requests presented to the Council by the Administrator, and
(7~~6~~)  submit an annual report to the Administrator that contains--
    (A)  a description of the activities of the Council;

      (B)  an evaluation of the status and performance of flood ~~insurance rate maps and mapping~~ <u>hazard and flood risk identification</u> activities to revise and update ~~flood insurance rate maps~~ <u>such products</u> as required under section 4101b of this title; and

      (C)  a summary of recommendations made by the Council to the Administrator.

(d)  Future conditions risk assessment and modeling report.

  (1)  In general. The Council shall consult with scientists and technical experts, other Federal agencies, States, and local communities to--

    (A)  develop recommendations on how to--

      (i)  ensure that flood ~~insurance rate maps~~ <u>hazard and flood risk information</u> incorporate<u>s</u> the best available climate science to assess flood risks; and

      (ii)  ensure that the Federal Emergency Management Agency uses the best available methodology to consider the impact of--

        (I)  the rise in the sea level; and

        (II)  future development on flood risk; and

    (B)  not later than 1 year after the date of enactment of this Act, prepare written recommendations in a future conditions risk assessment and modeling report and to submit such recommendations to the Administrator.

  (2)  Responsibility of the administrator. The Administrator, as part of the ongoing program to review and update ~~National Flood Insurance Program rate maps~~ <u>flood hazard and flood risk information</u> under section 4101b of this title, shall incorporate any future risk assessment submitted under paragraph (1)(B) in any such revision or update.

(e)  Chairperson.  The members of the Council shall elect 1 member to serve as the chairperson of the Council (in this section referred to as the "Chairperson").

(f)  Coordination.  To ensure that the Council's recommendations are consistent, to the maximum extent practicable, with national digital spatial data collection and management standards, the Chairperson shall consult with the Chairperson of the Federal Geographic Data Committee (established pursuant to Office of Management and Budget Circular A-16).

(g)  Compensation.  Members of the Council shall receive no additional compensation by reason of their service on the Council.

(h)  Meetings and actions.

  (1)  In general. The Council shall meet not less frequently than twice each year at the request of the Chairperson or a majority of its members, and may take action by a vote of the majority of the members.

  (2)  Initial meeting. The Administrator, or a person designated by the Administrator, shall request and coordinate the initial meeting of the Council.

(i)  Officers.  The Chairperson may appoint officers to assist in carrying out the duties of the Council under subsection (c).

(j)  Staff.

  (1)  Staff of FEMA. Upon the request of the Chairperson, the Administrator may detail, on a nonreimbursable basis, personnel of the Federal Emergency Management Agency to assist the Council in carrying out its duties.

  (2)  Staff of other Federal agencies. Upon request of the Chairperson, any other Federal agency that is a member of the Council may detail, on a nonreimbursable basis, personnel to assist the Council in carrying out its duties.

(k)  Powers.  In carrying out this section, the Council may hold hearings, receive evidence and assistance, provide information, and conduct research, as it considers appropriate.

(l)  Report to Congress.  The Administrator, on an annual basis, shall report to the Committee on Banking, Housing, and Urban Affairs of the Senate, the Committee on Financial Services of the House of Representatives, and the Office of Management and Budget on the--

  (1)  recommendations made by the Council;

(2) actions taken by the Federal Emergency Management Agency to address such recommendations to improve ~~flood insurance rate maps and~~ flood <u>hazard and flood</u> risk ~~data~~ <u>information including flood hazard determinations</u>; and

(3) any recommendations made by the Council that have been deferred or not acted upon, together

~~**Sec. 100216. National Flood Mapping Program. (42 U.S.C. 4101b)**~~

~~(a) Reviewing, updating, and maintaining maps.—The Administrator, in coordination with the Technical Mapping Advisory Council established under section 4101a of this title, shall establish an ongoing program under which the Administrator shall review, update, and maintain National Flood Insurance Program rate maps in accordance with this section.~~

~~(b) Mapping~~

~~(1) In general.—In carrying out the program established under subsection (a), the Administrator shall—~~

~~(A) identify, review, update, maintain, and publish National Flood Insurance Program rate maps with respect to—~~

~~(i) all populated areas and areas of possible population growth located within the 100-year floodplain;~~

~~(ii) all populated areas and areas of possible population growth located within the 500-year floodplain;~~

~~(iii) areas of residual risk, including areas that are protected by levees, dams, and other flood control structures;~~

~~(iv) areas that could be inundated as a result of the failure of a levee, dam, or other flood control structure;~~

~~(v) areas that are protected by non-structural flood mitigation features; and~~

~~(vi) the level of protection provided by flood control structures and by non-structural flood mitigation features;~~

~~(B) establish or update flood-risk zone data in all such areas, and make estimates with respect to the rates of probable flood caused loss for the various flood risk zones for each such area; and~~

~~(C) use, in identifying, reviewing, updating, maintaining, or publishing any National Flood Insurance Program rate map required under this section or under the National Flood Insurance Act of 1968 (42 U.S.C. 4011 et seq.), the most accurate topography and elevation data available.~~

~~(2) Mapping elements.—Each map updated under this section shall—~~

~~(A) assess the accuracy of current ground elevation data used for hydrologic and hydraulic modeling of flooding sources and mapping of the flood hazard and wherever necessary acquire new ground elevation data utilizing the most up-to-date geospatial technologies in accordance with guidelines and specifications of the Federal Emergency Management Agency; and~~

~~(B) develop National Flood Insurance Program flood data on a watershed basis—~~

~~(i) to provide the most technically effective and efficient studies and hydrologic and hydraulic modeling; and~~

~~(ii) to eliminate, to the maximum extent possible, discrepancies in base flood elevations between adjacent political subdivisions.~~

~~(3) Other inclusions.—In updating maps under this section, the Administrator shall include—~~

~~(A) any relevant information on coastal inundation from—~~

~~(i) an applicable inundation map of the Corps of Engineers; and~~

~~(ii) data of the National Oceanic and Atmospheric Administration relating to storm surge modeling;~~

(B) any relevant information of the United States Geological Survey on stream flows, watershed characteristics, and topography that is useful in the identification of flood hazard areas, as determined by the Administrator;

(C) any relevant information on land subsidence, coastal erosion areas, changing lake levels, and other flood-related hazards;

(D) any relevant information or data of the National Oceanic and Atmospheric Administration and the United States Geological Survey relating to the best available science regarding future changes in sea levels, precipitation, and intensity of hurricanes; and

(E) any other relevant information as may be recommended by the Technical Mapping Advisory Committee.

(c) Standards.— In updating and maintaining maps under this section, the Administrator shall—

(1) establish standards to—

(A) ensure that maps are adequate for—

(i) flood risk determinations; and

(ii) use by State and local governments in managing development to reduce the risk of flooding; and

(B) facilitate identification and use of consistent methods of data collection and analysis by the Administrator, in conjunction with State and local governments, in developing maps for communities with similar flood risks, as determined by the Administrator; and

(2) publish maps in a format that is—

(A) digital geospatial data compliant;

(B) compliant with the open publishing and data exchange standards established by the Open Geospatial Consortium; and

(C) aligned with official data defined by the National Geodetic Survey.

(d) Communication and outreach

(1) In general.— The Administrator shall—

(A) before commencement of any mapping or map updating process, notify each community affected of the model or models that the Administrator plans to use in such process and provide an explanation of why such model or models are appropriate;

(B) provide each community affected a 30-day period beginning upon notification under subparagraph (A) to consult with the Administrator regarding the appropriateness, with respect to such community, of the mapping model or models to be used; provided that consultation by a community pursuant to this subparagraph shall not waive or otherwise affect any right of the community to appeal any flood hazard determinations;

(C) upon completion of the first Independent Data Submission, transmit a copy of such Submission to the affected community, provide the affected community a 30-day period during which the community may provide data to Administrator 1 that can be used to supplement or modify the existing data, and incorporate any data that is consistent with prevailing engineering principles;

(D) work with States, local communities, and property owners to identify areas and features described in subsection (b)(1)(A)(v);

(E) work to enhance communication and outreach to States, local communities, and property owners about the effects—

(i) of any potential changes to National Flood Insurance Program rate maps that may result from the mapping program required under this section; and

(ii) that any such changes may have on flood insurance purchase requirements;

(F) engage with local communities to enhance communication and outreach to the residents of such communities, including tenants (with regard to contents insurance), on the matters described under subparagraph (E);

(G) not less than 30 days before issuance of any preliminary map, notify the Senators for each State affected and each Member of the House of Representatives for each congressional district affected by the preliminary map in writing of—

37

(i) the estimated schedule for-

(I) community meetings regarding the preliminary map;

(II) publication of notices regarding the preliminary map in local newspapers; and

(III) the commencement of the appeals process regarding the map; and

(ii) the estimated number of homes and businesses that will be affected by changes contained in the preliminary map, including how many structures will be 2 that were not previously located in an area having special flood hazards will be located within such an area under the preliminary map; and

(II) upon the issuance of any proposed map and any notice of an opportunity to make an appeal relating to the proposed map, notify the Senators for each State affected and each Member of the House of Representatives for each congressional district affected by the proposed map of any action taken by the Administrator with respect to the proposed map or an appeal relating to the proposed map.

(2) Required activities.— The communication and outreach activities required under paragraph (1) shall include-

(A) notifying property owners when their properties become included in, or when they are excluded from, an area covered by the mandatory flood insurance purchase requirement under section 4012a of this title;

(B) educating property owners regarding the flood risk and reduction of this risk in their community, including the continued flood risks to areas that are no longer subject to the flood insurance mandatory purchase requirement;

(C) educating property owners regarding the benefits and costs of maintaining or acquiring flood insurance, including, where applicable, lower-cost preferred risk policies under the National Flood Insurance Act of 1968 (42 U.S.C. 4011 et seq.) for such properties and the contents of such properties;

(D) educating property owners about flood map revisions and the process available to such owners to appeal proposed changes in flood elevations through their community, including by notifying local radio and television stations; and

(E) encouraging property owners to maintain or acquire flood insurance coverage.

(e) Community remapping request.— Upon the adoption by the Administrator of any recommendation by the Technical Mapping Advisory Council for reviewing, updating, or maintaining National Flood Insurance Program rate maps in accordance with this section, a community that believes that its flood insurance rates in effect prior to adoption would be affected by the adoption of such recommendation may submit a request for an update of its rate maps, which may be considered at the Administrator's sole discretion. The Administrator shall establish a protocol for the evaluation of such community map update requests.

(f) Authorization of appropriations.— There is authorized to be appropriated to the Administrator to carry out this section $400,000,000 for each of fiscal years 2013 through 2017.

### Sec. 100216. National Flood Hazard and Flood Risk Identification Program. (42 U.S.C. 4101b)

(a) Reviewing, updating, and maintaining flood hazard and flood risk information.— To further enhance the nation's understanding of flood related risk, and to facilitate the identification of areas having special flood hazard as authorized by this section and Section 1361 of P.L.90-448, the Administrator, in coordination with the Technical Mapping Advisory Council established under section 4101a of this title, shall establish an ongoing program under which the Administrator shall review, update, and maintain flood hazard and flood risk information in accordance with this section.

 (b) Flood Hazard and Flood Risk Identification.

(1) Authority of the Administrator; grants, technical assistance, acquisition of data and use of other agency data.—In carrying out the program established under subsection (a), the Administrator—

(A) is authorized to consult with, receive information from, and enter into any agreements or other arrangements with the Secretaries of the Army, the Interior, Agriculture, and Commerce, the Tennessee Valley Authority, and the heads of other Federal departments or agencies, on a reimbursement basis, or with the head of any State or local agency, or enter into contracts with any persons or private firms;

(B) is authorized, without regard to subsections (a) and (b) of section 3324 of title 31 and section 6101 of title 41, to make grants, provide technical assistance, and enter into contracts, cooperative agreements, or other transactions, on such terms deemed appropriate, or consent to modifications thereof, and to make advance or progress payments in connection therewith.

(C) wherever necessary, is authorized to acquire new ground elevation data utilizing the most up-to-date methods and technologies in accordance with guidelines and specifications of the Federal Emergency Management Agency

(D) shall leverage where applicable—

(i) any relevant information, including information on coastal inundation, from--
(I) the United States Army Corps of Engineers; and
(II) the National Oceanic and Atmospheric Administration, including information relating to storm surge modeling;

(ii) any relevant information of the United States Geological Survey on stream flows, watershed characteristics, and topography that is useful in the identification of flood hazard areas, as determined by the Administrator;

(iii) any relevant information on land subsidence, coastal erosion areas, changing lake levels, and other flood-related hazards;

(iv) any relevant information or data of the National Oceanic and Atmospheric Administration and the United States Geological Survey relating to the best available science regarding future changes in sea levels, precipitation, intensity of hurricanes, or other information or data relevant to the identification of flood related hazards or risk;

(v) any other relevant information as may be recommended by the Technical Mapping Advisory Council; and

(vi) work with States, local communities, and property owners to identify areas and features described in subsection (b)(2)(E).

(2) In general. In carrying out the program established under subsection (a), the Administrator shall identify, review, update, and maintain, and publish flood hazard and flood risk information with respect to--

(A) all populated areas and areas of possible population growth located within the 100-year floodplain;

(B) all populated areas and areas of possible population growth located within the 500-year floodplain;

(C) areas of residual risk, including areas where flood hazards are reduced by levees, dams, other flood control structures and non-structural flood mitigation features;

(D) areas that could be inundated as a result of operation or the failure of a levee, dam, or other flood control structure;

(E) the level of flood hazard reduction provided by flood control structures and by non-structural flood mitigation features;

(F) all areas of the United States, for flood hazard types and additional flood frequencies deemed necessary by the Administrator; and

(G) in consultation with the Technical Mapping Advisory Council, future flood risk to the maximum extent feasible.

(c) Authorization of appropriations.  There is authorized to be appropriated to the Administrator to carry out this section $ 400,000,000 for each of fiscal years 2013 through 2017.

5. **Disclosure of Flood Risk Information Prior to Real Estate Transactions** – A significant barrier to addressing the nation's flood risk is home buyers' and renters' lack of awareness about flood risk when they complete real estate and lease transactions. This proposal would increase clarity and provide uniformity regarding disclosures by requiring participating communities to establish certain minimum flood-risk reporting requirements for sellers and lessors before residential transactions close as a condition for participation in the NFIP.

> ***Legislative text:***

**SEC. ___. DISCLOSURE OF FLOOD RISK INFORMATION PRIOR TO REAL ESTATE TRANSACTIONS.**

(a) The National Flood Insurance Act of 1968 is amended by inserting the following new section after section 1323 (42 U.S.C. 4030)--

**"SEC. 1323A. DISCLOSURE OF FLOOD RISK INFORMATION PRIOR TO REAL ESTATE TRANSACTIONS. (42 U.S.C. 4030a)**

"(a)  In general.—

Two years after enactment of this Act, no new flood insurance coverage may be provided under this title for any real property unless an appropriate public body has imposed, by statute or regulation, a duty on any seller or lessor to provide to any purchaser or lessee (with respect to a lease for a term that is not shorter than 60 days) of the property a property flood hazard disclosure that the Administrator has determined meets the requirements of subsection (b). The Administrator may extend this deadline to no more than 5 years after enactment of this Act, upon receiving a request from an appropriate public body that is supported by a description of:

"**(1)**  its efforts taken to fulfill the requirement for participation in the national flood insurance program mandated under this section;

"**(2)** any additional action required to fulfill the requirement under this section; and,

"**(3)**  an estimated completion date.

"(b) Disclosure requirements.—

"(1) REQUIREMENTS FOR SELLERS.—  Subject to any exceptions or limitations authorized by the Administrator, any seller of residential real estate shall provide to the purchaser a flood hazard disclosure that —

"(A) is made in writing;

"(B) discloses any actual knowledge of the seller of any—

"(i) prior physical damage caused by flood to a structure located on the property;

"(ii) prior insurance claim for a loss covered under the national flood insurance program or private flood insurance with respect to the property;

"(iii) previous notification regarding the designation of the property as a repetitive loss structure or severe repetitive loss structure (as defined in section 1366(h)); and

"(iv) Federal legal obligation to obtain and maintain flood insurance running with the property; and

"(C) discloses to the maximum extent feasible, in a manner to be determined by the Administrator:

"(i) the flood risk associated with the property as indicated in flood hazard data maintained by the Administrator under this Act and;

"(ii) the availability of and approximate cost of flood insurance for the property; and

''(D) is delivered by, or on behalf of, the seller to the purchaser before the purchaser becomes obligated under any contract to acquire the property.

"(2) REQUIREMENTS FOR LESSORS.— Subject to any exceptions or limitations authorized by the Administrator, any lessor of a residential rental property with a lease for a term that is not shorter than 60 days shall provide to the lessee a flood hazard disclosure that -

"(A) is made in writing;

"(B) discloses any actual knowledge of the lessor—

"(i) of any Federal legal obligation to obtain and maintain flood insurance running with the property;

"(ii) regarding any prior physical damage caused by flood to the unit being leased; and

"(iii) of the availability of coverage under this title for contents located in a structure on the property; and

"(C) is delivered by, or on behalf of, the lessor to the lessee before the lessee becomes obligated under any contract to lease the property.

"(3) RULE OF CONSTRUCTION. — Nothing in this section may be construed as preventing a State, local, territorial or tribal government from adopting disclosure requirements in addition to the requirements of this section.".

(b) Conforming Amendments.

Section 1305(c) of the National Flood Insurance Act of 1968 (42 U.S.C. 4012(c)) is amended—

(1) in paragraph (1), by striking ", and" at the end and inserting ";";

(2) in paragraph (2), by striking the period at the end and inserting "; and"; and

(3) by adding at the end the following:

"(3) given satisfactory assurance that, not later than five years after enactment of the Act, property flood hazard disclosure requirements will have been adopted for the state or area (or subdivision) that meet the requirements of section 1323A.".

*Analysis:*

This legislative proposal would require participating communities to establish certain minimum flood risk reporting requirements for sellers and lessors prior to transactions as a condition for participation in the National Flood Insurance Program (NFIP). A significant barrier to addressing the nation's flood risk is home buyers' and renters' lack of awareness about flood risk when they complete real estate and lease transactions. FEMA sees a strong public policy interest in there being an affirmative obligation on the seller or lessor of a residential property to disclose information about flood risk to prospective buyers or lessees. This approach would rely on the initiative of states and communities rather than requiring FEMA to directly regulate real estate transactions.

Requiring sellers/lessors to disclose any actual knowledge of their property's flood risk would empower buyers/lessees to make informed decisions. Consistent minimum reporting standards would also provide clarity and reduced legal exposure for the real estate industry as they communicate with consumers around the varied flood risks in communities across the country.

*Comparative type:*

**National Flood Insurance Act of 1968**

SEC. 1323A. DISCLOSURE OF FLOOD RISK INFORMATION PRIOR TO REAL ESTATE TRANSACTIONS. (42 U.S.C. 4030A)

(a) In general.— Two years after enactment of this Act, no new flood insurance coverage may be provided under this title for any real property unless an appropriate public body has imposed, by statute or regulation, a duty on any seller or lessor to provide to any purchaser or lessee (with respect to a lease for a term that is not shorter than 60 days) of the property a property flood hazard disclosure that the Administrator has determined meets the requirements of subsection (b). The Administrator may extend this deadline to no more than 5 years after enactment of this Act, upon receiving a request from an appropriate public body that is supported by a description of:
(1) its efforts taken to fulfill the requirement for participation in the national flood insurance program mandated under this section;
(2) any additional action required to fulfill the requirement under this section; and
(3) an estimated completion date.
(b) Disclosure requirements.—
(1) REQUIREMENTS FOR SELLERS.— Subject to any exceptions or limitations authorized by the Administrator, any seller of residential real estate shall provide to the purchaser a flood hazard disclosure that —
(A) is made in writing;
(B) discloses any actual knowledge of the seller of any—
(i) prior physical damage caused by flood to a structure located on the property;
(ii) prior insurance claim for a loss covered under the national flood insurance program or private flood insurance with respect to the property;

          (iii) previous notification regarding the designation of the property as a repetitive loss structure or severe repetitive loss structure (as defined in section 1366(h)); and

          (iv) Federal legal obligation to obtain and maintain flood insurance running with the property; and

        (C) discloses to the maximum extent feasible, in a manner to be determined by the Administrator:

          (i) the flood risk associated with the property as indicated in flood hazard data maintained by the Administrator under this Act and;

          (ii) the availability of and approximate cost of flood insurance for the property; and

        (D) is delivered by, or on behalf of, the seller to the purchaser before the purchaser becomes obligated to acquire the property.

      (2) REQUIREMENTS FOR LESSORS.— Subject to any exceptions or limitations authorized by the Administrator, any lessor of a residential rental property with a lease for a term that is not shorter than 60 days shall provide to the lessee a flood hazard disclosure that –

        (A) is made in writing;

        (B) discloses any actual knowledge of the lessor—

          (i) of any Federal legal obligation to obtain and maintain flood insurance running with the property;

          (ii) regarding any prior physical damage caused by flood to the unit being leased; and

          (iii) of the availability of coverage under this title for contents located in a structure on the property; and

        (C) is delivered by, or on behalf of, the lessor to the lessee before the lessee becomes obligated under any contract to lease the property.

      (3) RULE OF CONSTRUCTION. — Nothing in this section may be construed as preventing a State, local, territorial or tribal government from adopting disclosure requirements in addition to the requirements of this section.

*    *    *    *

**SEC. 1305. Scope of program and priorities. (42 U.S.C. 4012)**

*    *    *    *

**(c) Availability of insurance in States or areas evidencing positive interest in securing insurance and assuring adoption of adequate land use and control measures.**

The Administrator shall make flood insurance available in only those States or areas (or subdivisions thereof) which he has determined have-

(1) evidenced a positive interest in securing flood insurance coverage under the flood insurance program, and;

(2) given satisfactory assurance that by December 31, 1971, adequate land use and control measures will have been adopted for the State or area (or subdivision) which are consistent with the comprehensive criteria for land management and use developed under section 4102 of this title, and that the application and enforcement of such measures will commence as soon as technical information on floodways and on controlling flood elevations is available.; and

(3) given satisfactory assurance that, not later than five years after enactment of the Act, property flood hazard disclosure requirements will have been adopted for the state or area (or subdivision) that meet the requirements of section 1323A.

*    *    *    *

6. **Use of Replacement Cost Value in Determining Premium Rates** – Accounts for the replacement cost value (RCV) of insured structures when determining premium rates. Use of RCV of insured structures in setting NFIP rates will reduce cross-subsidies and more accurately signal policyholders' true risk. /

### *Legislative text:*

### SEC. ___. USE OF REPLACEMENT COST VALUE IN DETERMINING PREMIUM RATES.

(a) Use of replacement cost value in premium rates; implementation.—

> (1) Estimated rates.—Paragraph (1) of section 1307(a) of the National Flood Insurance Act of 1968 (42 U.S.C. 4014(a)(1)) is amended by inserting after ''flood insurance'' the following: '', which shall incorporate replacement cost value, and''.

> (2) Chargeable rates.—Subsection (b) of section 1308 of the National Flood Insurance Act of 1968 (42 U.S.C. 4015(b)) is amended by inserting after ''Such rates shall, insofar as practicable,'' the following: ''incorporate replacement cost value and,''.

### *Analysis:*

This proposal would mandate FEMA to use a building's replacement cost value when assigning premium rates. The NFIP's ability to identify individual policyholder risk has been improved with FEMA's increased technological and mapping capabilities. As a result of these advances, FEMA now has the capability to consider the cost to rebuild (i.e. replacement cost value). Replacement cost value has been an industry standard for years. It enables us to fulfill our statutory mandate to set actuarially sound rates and clearly communicate flood risk. By incorporating the cost to rebuild into policy premiums, FEMA will equitably issue premiums across all policyholders based on the unique flood risk of their property. By providing policyholders a clear and concise picture of their unique flood risk we are also equipping them with the information necessary to make more informed decisions about taking mitigation actions.

### *Comparative type:*

### National Flood Insurance Act of 1968

\*      \*      \*      \*

### SEC. 1307. Estimates of Premium Rates. (42 U.S.C. 4014)

**(a) Studies and investigations**  The Administrator is authorized to undertake and carry out such studies and investigations and receive or exchange such information as may be necessary to estimate, and shall from time to time estimate, on an area, subdivision, or other appropriate basis-

> (1) the risk premium rates for flood insurance, which shall incorporate replacement cost value, and which-

\* \* \* \*

44

**SEC. 1308. Chargeable premium rates**. **(42 U.S.C. 4015)**

\* \* \* \*

**(b)  Considerations for rates**
    Such rates shall, insofar as practicable, <span style="color:red">incorporate replacement cost value and,</span> be-

\* \* \* \*

7. **Consideration of Coastal and Inland Locations in Determining Premium Rates** – Creates separate classes for coastal versus inland flood zones in the NFIP's rate tables.

   *Legislative text:*

   **SEC. ___. CONSIDERATION OF COASTAL AND INLAND LOCATIONS IN DETERMINING PREMIUM RATES.**

   (a) ESTIMATES OF PREMIUM RATES.—Subparagraph (A) of section 1307(a)(1) of the National Flood Insurance Act of 1968 (42 U.S.C. 4014(a)(1)(A)) is amended—

   (1) in clause (i), by striking ''and'' at the end; and

   (2) by adding at the end the following new clause:

    ''(iii) the differences in flood risk for properties impacted by coastal flood risk and properties impacted by riverine, or inland flood risk; and''.

   (b) ESTABLISHMENT OF CHARGEABLE PREMIUM RATES.—Paragraph (1) of section 1308(b) of the National Flood Insurance Act of 1968 (42 U.S.C. 4015(b)(1)) is amended by inserting ''due to differences in flood risk resulting from coastal flood hazards and riverine, or inland flood hazards and'' after ''including differences in risks''.

   *Analysis:*
        This language would require FEMA to distinguish between coastal and inland flooding when setting rates.  The Special Flood Hazard Area is comprised of both Zones A and V. The A and V zone are distinct. The V zone delineates the special flood hazard area where there is expected to be at least a three-foot breaking wave during the base flood event. The A zone comprises all other special flood hazard area zones and includes areas subject to coastal flooding with less than a three-foot breaking wave during the modeled base flood event and areas subject to inland flooding.
        Coastal areas can differ from inland areas in both the frequency and severity of flooding. In both coastal and riverine areas, flooding ranges from shallow still-water flooding to deep flooding with velocity and wave action. Coastal flood zones may be more prone to velocity and wave action. By requiring FEMA to account for differences between coastal and inland flooding in its rates, FEMA will better differentiate structures exposed to higher risk in both coastal and inland areas.

   *Comparative type:*

   **The National Flood Insurance Act of 1968**

45

\* \* \* \*

**SEC. 1307. Estimates of premium rates**. (**42 U.S.C. 4014**)
(a)   Studies and investigations
The Administrator is authorized to undertake and carry out such studies and investigations and receive or exchange such information as may be necessary to estimate, and shall from time to time estimate, on an area, subdivision, or other appropriate basis-
(1) the risk premium rates for flood insurance which—
(A) based on consideration of-
(i) the risk involved and accepted actuarial principles; ~~and~~
(ii) the flood mitigation activities that an owner or lessee has undertaken  on a property, including differences in the risk involved due to land use measures,  floodproofing, flood forecasting, and similar measures, and
(iii) the differences in flood risk for properties impacted by coastal flood  risk and properties impacted by riverine, or inland flood risk; and

\* \* \* \*

**SEC. 1308. Chargeable premium rates (42 U.S.C. 4015)**

\* \* \* \*
(b)   Considerations for rates
Such rates shall, insofar as practicable, be-
(1) based on a consideration of the respective risks involved, including differences in risks due to differences in flood risk resulting from coastal flood hazards and riverine, or inland flood hazards and due to land use measures, flood-proofing, flood forecasting, and similar measures; (2) adequate, on the basis of accepted actuarial principles, to provide reserves for anticipated losses, or, if less than such amount, consistent with the objective of making flood insurance available where necessary at reasonable rates so as to encourage prospective insureds to purchase such insurance and with the purposes of this chapter;

\* \* \* \*

*Improve Resilience*

8. **Multi-Year Reauthorization** – Extends the NFIP through September 30, 2031, ensures that this reauthorization is backdated to the date of the lapse, if there is a lapse, and ensures that FEMA is able to sell and service policies, even during a lapse of appropriations.

*Legislative text:*

**SEC.\_\_\_. PROGRAM EXTENSION.**

(a) Financing.— Section 1309(a) of the National Flood Insurance Act of 1968 (42 U.S.C. 4016(a)) is amended by striking ''September 30, 2021'' and inserting ''September 30, 2031''.

(b) Program extension.—Section 1319 of the National Flood Insurance Act of 1968 (42 U.S.C. 4026) is amended by striking ''September 30, 2021'' and inserting ''September 30, 2031''.

(c) Retroactive effective date.—If this Act is enacted after September 30, 2021, the amendments made by subsections (a) and (b) shall take effect as if enacted on September 30, 2021.

*Analysis:*

      This legislative proposal would extend the National Flood Insurance Program (NFIP) through September 30, 2031 and ensure that this reauthorization is backdated to the date of the lapse, if there is a lapse, and also ensure that FEMA is able to sell and service policies, even during a lapse of appropriations. A 10-year reauthorization would allow Congress and the public to evaluate many of the program reforms. Many of the reforms will require time to implement, and once implemented, will require additional time to evaluate the effectiveness of achieving the intended goals. Congress can enact reform at any time should the need arise sooner than at the end of the 10-year period.

*Comparative type:*

**National Flood Insurance Act of 1968**

**SEC. 1309. FINANCING. (42 U.S.C. 4016).**
(a)  Authority to issue notes and other obligations.  All authority which was vested in the Housing and Home Financing Administrator by virtue of section 2414(e) of this title (pertaining to the issue of notes or other obligations to the Secretary of the Treasury), as amended by subsections (a) and (b) of section 1303 of this Act, shall be available to the Administrator for the purpose of carrying out the flood insurance program under this chapter; except that the total amount of notes and obligations which may be issued by the Administrator pursuant to such authority (1) without the approval of the President, may not exceed $500,000,000, and (2) with the approval of the President, may not exceed $1,500,000,000 thought he date specified in section 4026 of this title, and $1,000,000,000 thereafter; except that, through September 30, ~~2021~~ 2031, clause (2) of this sentence shall be applied by substituting "$30,425,000,000" for "$1,500,000,000".  The Administrator shall report to the Committee on Banking, Finance and Urban Affairs of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate at any time when he requests the approval of the President in accordance with the previous sentence."

**SEC. 1319.  EXPIRATION OF PROGRAM.** 42 U.S.C. 4026"
No new contract for flood insurance under this chapter shall be entered into after September 30, ~~2021~~ 2031.

9. **Means-Tested Assistance Program** – Establishes a means-tested assistance program offering a graduated discount benefit to current and potential policyholders who meet the Department of Housing and Urban Development's definition of low- and moderate-income household (household income at or below 120% of Area Median Income).

*Legislative text:*

**SEC. ___. TARGETED MEANS-TESTED ASSISTANCE.**
(a) In General.—Chapter I of the National Flood Insurance Act of 1968 is amended by inserting after section 1308A (42 U.S.C. 4015a) the following:

**"SEC. 1308B. FLOOD INSURANCE ASSISTANCE.**

"(a) Definitions.—In this section:

"(1) Covered property.—The term 'covered property' means—

"(A) a primary residential dwelling designed for the occupancy of from 1 to 4 families; or

"(B) personal property located in a primary residential dwelling.

"(2) Eligible policyholder.—The term 'eligible policyholder' means a policyholder with a household income that is not more than 120 percent of the area median income for the area in which the property to which the policy applies is located, and whose household income is not more than 400 percent of the federal poverty guidelines.

"(3) Insurance costs.—The term 'insurance costs' means, with respect to a covered property for a year—

"(A) risk premiums and fees estimated and charged under section 1307 (42 U.S.C. 4014) and section 1308 (42 U.S.C. 4015);

"(B) surcharges assessed under sections 1304 (42 U.S.C. 4011) and 1308A (42 U.S.C. 4015A); and

"(C) any amount established under section 1310A (42 U.S.C. 4017A).

"(b) Authority.—Subject to the availability of appropriations, the Administrator is authorized to carry out a means-tested program under which the Administrator provides assistance to eligible policyholders in the form of graduated discounts for insurance costs with respect to covered properties.

"(c) Eligibility.—To determine eligibility for means-tested assistance under this section, the Administrator may accept any of the following with respect to an eligible policyholder:

"(1) Income verification from the Secretary of the Treasury established under Section 6103(l)(23) of the Internal Revenue Code of 1986 (26 U.S.C. 6103(l)(23);

"(2) Income verification from the National Directory of New Hires established under section 453(i) of the Social Security Act (42 U.S.C. 653(i));

"(3) A self-certification of eligibility by the eligible policyholder that is provided under penalty of perjury pursuant to section 1746 of title 28, United States Code; and

"(4) Any other information or method identified by the Administrator in  establishing a pilot program, or a final rule, issued under subsection (e).

"(d) Discount.—The Administrator shall establish graduated discounts available to eligible policyholders under this section, which may be based on the following factors:

"(1) The percentage by which the household income of the eligible policyholder is equal to, or less than, 120 percent of the area median income for the area in which the property to which the policy applies is located;

"(2) The number of eligible policyholders participating in the program established under this section;

"(3) The availability of funding; and

"(4) Any other factor that the Administrator finds reasonable and necessary to carry out the purposes of this section.

"(e) Implementation.—

"(1) In general.—The Administrator shall implement this section by regulation.

"(2) Pilot Program.—

"(A) In general.—Notwithstanding subsection (e)(1), until such time as the Administrator promulgates regulations to implement this section, the Administrator may waive notice and comment rulemaking, if the Administrator determines the waiver is necessary to expeditiously implement this section, and may carry out alternative procedures under this section as a pilot program.  In establishing a pilot program under this subsection the Administrator shall include—

"(i) a description of how the Administrator will determine—

"(I) eligibility for households to participate in the program established under this section; and

"(II) assistance levels for eligible households to which assistance is provided under this section;

"(ii) the methodology that the Administrator will use to determine the amount of assistance provided to eligible households under this section; and

"(iii) any requirements to which eligible policyholders to which assistance is provided under this section will be subject; and

"(3) Requirement on Timing.—Not later than 24 months after the date of the enactment of this section, the Administrator shall implement this subsection which shall expire on the later of—

"(A) the date that is 60 months after the date of the enactment of this section; or

"(B) the date on which a final rule issued to implement this subsection takes effect.

"(4) REPORTING. – Not less than 15 months after the implementation of a program under this section, and biennially thereafter, the Administrator shall report to the House Committee on Financial Services and the Senate Committee on Banking, Housing, and Urban Affairs on the program authorized under this section, including the number of assisted policyholders, distribution of income levels of assisted policyholders, average amount of assistance, and cost of assistance provided.

"(f) Funding.—

"(1) Authorization of appropriations.—There is authorized to be appropriated to the Administrator $XXX,XXX,XXX for each fiscal year to carry out this section to be available until expended.

"(2) Notification.—If, in a fiscal year, the Administrator determines that the amount made available to carry out this section is insufficient to provide assistance under this section, the Administrator shall notify Congress of the remaining amounts necessary to provide that assistance for that fiscal year.

"(3) Distribution of premium.—With respect to the amount of the discounts provided under this section in a fiscal year, and any administrative expenses incurred in carrying out this section for that fiscal year, the Administrator shall, from amounts made available to carry out this section for that fiscal year, deposit in the National Flood Insurance Fund established under section 1310 (42 U.S.C. 4017) an amount equal to those discounts and administrative expenses, except to the extent that section 1310A (42 U.S.C. 4017A) applies to any portion of those discounts or administrative expenses, in which case the Administrator shall deposit an amount equal to those amounts to which section 1310A applies in the National Flood Insurance Reserve Fund established under section 1310A (42 U.S.C. 4017A).".

(b) National Flood Insurance Act of 1968.—The National Flood Insurance Act of 1968 is amended—

(1) in section 1308(e) (42 U.S.C. 4015(e))—

(A) in paragraph (1)—

(i) in subparagraph (B), by striking "or" at the end;

(ii) in subparagraph (C)(iii), by inserting "or" at the end; and

(iii) by adding at the end the following:

"(D) in the case of a property with respect to which assistance is provided under section 1308B, if—

"(i) the applicable policyholder is no longer eligible to receive assistance under that section;

    "(ii) the assistance so provided has been decreased under that section; or

    "(iii) the Administrator is not authorized, or lacks appropriated funds, to carry out that section;"; and

   (B) in paragraph (3), by striking "period; and" and inserting the following: "period, except in the case of a property with respect to which assistance is provided under section 1308B if a condition described in clause (i), (ii), or (iii) of paragraph (1)(D) is applicable; and"; and

  (2) in section 1366 (42 U.S.C. 4104c)—

   (A) in subsection (a)—

    (i) in paragraph (2), by striking "and" at the end;

    (ii) in paragraph (3), by striking the period at the end and inserting "; and"; and

    (iii) by adding at the end the following:

 "(4) to a private nonprofit organization, in the form of grants under this section for carrying out mitigation activities.";

   (B) in subsection (d)—

    (i) by redesignating paragraph (3) as paragraph (4); and

    (ii) by inserting after paragraph (2) the following:

 "(3) Flood insurance assistance.—In the case of mitigation activities to structures insured by policyholders that are eligible for assistance under section 1308B, in an amount up to 100 percent of all eligible costs."; and

   (C) in subsection (h), by redesignating paragraphs (2) and (3) as paragraphs (3) and (4), respectively; and

   (D) by inserting after paragraph (1) the following:

 "(2) Private nonprofit organization.—The term 'private nonprofit organization' means any nongovernmental agency or entity—

  "(A) currently has:

   "(i) an effective ruling letter from the Internal Revenue Service granting an exemption from taxation under subsection (c), (d), or (e) of section 501 of the Internal Revenue Code of 1986; or

   "(ii) satisfactory evidence from a State that the organization or entity is a nonprofit organization organized or doing business under the laws of that State; and

  "(B) meet any other criteria that the administrator considers appropriate."

(c) Information Comparisons With the National Directory of New Hires for Flood Insurance Assistance Income Verification.—Section 453(j) of the Social Security Act (42 U.S.C. 653(j)) is amended by adding at the end the following:

 "(12) Information comparisons for flood insurance assistance.—

  "(A) Furnishing of information by FEMA.—The Administrator of the Federal Emergency Management Agency (in this paragraph, referred to as the 'Administrator') shall furnish to the Secretary, on such periodic basis as determined by the Administrator in consultation with the Secretary, information in the custody of the Administrator for comparison with information in the National Directory of New Hires, in order to obtain information in such Directory with respect to individuals who are applying for, or receiving benefits under, section 1308B of the National Flood Insurance Act of 1968.

  "(B) Requirement to seek minimum information.—The Administrator shall seek information pursuant to this paragraph only to the extent necessary to verify the employment and income of individuals described in subparagraph (A).

  "(C) Duties of the secretary.—

   "(i) Information disclosure.—The Secretary, in cooperation with the Administrator,

shall compare information in the National Directory of New Hires with information provided by the Administrator with respect to individuals described in subparagraph (A), and shall disclose information in such Directory regarding such individuals to the Administrator, in accordance with this paragraph, for the purposes specified in this paragraph.

"(ii) Condition on disclosure.—The Secretary shall make disclosures in accordance with clause (i) only to the extent that the Secretary determines that such disclosures do not interfere with the effective operation of the program under this part.

"(D) Use of information by FEMA.—The Administrator may use information resulting from a data match pursuant to this paragraph only—

"(i) for the purpose of verifying the employment and income of individuals described in subparagraph (A); and

"(ii) after removal of personal identifiers, to conduct analyses of the employment and income reporting of individuals described in subparagraph (A).

"(E) Disclosure of information by FEMA.—

"(i) Purpose of disclosure.—The Administrator may make a disclosure under this subparagraph only for the purpose of verifying the employment and income of individuals described in subparagraph (A).

"(ii) Disclosures permitted.—Subject to clause (iii), the Administrator may disclose information resulting from a data match pursuant to this paragraph only to contractors of the Federal Emergency Management Agency, private insurance companies participating in the Write Your Own Program of the Federal Emergency Management Agency, the Inspector General of the Department of Homeland Security, and the Attorney General, in connection with the administration of a program described in subparagraph (A). Information obtained by the Administrator pursuant to this paragraph shall not be made available under section 552 of title 5, United States Code.

"(iii) Conditions on disclosure.—Disclosures under this paragraph shall be—

"(I) made in accordance with data security and control policies established by the Administrator and approved by the Secretary;

"(II) subject to audit in a manner satisfactory to the Secretary; and

"(III) subject to the sanctions under subsection (l)(2).

"(iv) Restrictions on redisclosure.—A person or entity to which information is disclosed under this subparagraph may use or disclose such information only as needed for verifying the employment and income of individuals described in subparagraph (A), subject to the conditions in clause (iii) and such additional conditions as agreed to by the Secretary and the Administrator.

"(F) Reimbursement of HHS costs.—The Administrator shall reimburse the Secretary, in accordance with subsection (k)(3), for the costs incurred by the Secretary in furnishing the information requested under this paragraph.

"(G) Consent.—The Administrator shall not seek, use, or disclose information under this paragraph relating to an individual without the prior written consent of such individual (or of a person legally authorized to consent on behalf of such individual).".

(c) Authorizing Disclosures to the Federal Emergency Management Agency.  Section 6103(l) of the Internal Revenue Code of 1986 (26 U.S.C. 6103(l)) is amended by inserting at the end the following new paragraph:

"(23) Disclosure of return information to Federal Emergency Management Agency to carry out

the Section 1308B of the National Flood Insurance Act. —

"(A) The Secretary, upon written request from the Administrator of the Federal Emergency Management Agency (FEMA), shall disclose to officers, employees, and contractors of FEMA return information of any taxpayer, for the taxable years specified in the request, for the purposes of and to the extent necessary in administering the means-tested assistance program requiring a determination of household income eligibility under the Section 1308B of the National Flood Insurance Act. Such return information shall be limited to:

   "(i) Taxpayer identity information;

   "(ii) Adjusted gross income ;

   "(iii)The taxable year with respect to which the preceding information relates;
and

   "(iv)If applicable, the fact that such information is not available.

   "(B) Restriction on use of disclosed information. Return information disclosed under subparagraph (A) may be used by officers, employees, and contractors of FEMA only for the purposes of, and to the extent necessary in, determining eligibility for the program described in subparagraph (A).

   "(C) Redisclosure. Officers, employees, and contractors of FEMA may redisclose return information of a taxpayer obtained under subparagraph (A) of this subsection to that taxpayer or contractors of FEMA, private insurance companies participating in the Write Your Own Program of FEMA, the Inspector General of the Department of Homeland Security, and the Attorney General,  only for the purposes of, and to the extent necessary: (1) in verifying household income; (2) determining eligibility; (3) informing the taxpayer of their eligibility for the program described in subparagraph (A); or (4) in connection with the administration of the program described in subparagraph (A).  Information obtained by the Administrator pursuant to subparagraph (A) shall not be made available under section 552 of title 5, United States Code."

(d)  Conforming Amendments —

(1) Section 6103 of the Internal Revenue Code of 1986 (26 U.S.C. 6103) is amended —

 (A) in subsection (a)(3) is amended by striking "or (21)" and inserting "(21), or (23)"; and

 (B) in subsection (p)(4)—

  (i) by striking "or (22)" in each place it appears and inserting "(22) or (23)";

  (ii) by striking "or (16)" in each place it appears and inserting "(16), or (23)"; and

  (iii) by striking "or (20)" in each place it appears and inserting "(20), or (23)".

(2) Section 7213(a)(2) of such Code (26 U.S.C. 7213(a)(2)) is amended by striking "or (21)" and inserting "(21), or (23)".

(f) Direct Appropriation.—

(1) IN GENERAL.—There is appropriated, out of any money in the Treasury not otherwise appropriated, in addition to amounts otherwise available, for each of fiscal years 20XX through 20XX, $XXX,XXX,XXX to the National Flood Insurance Fund established under section 1310 of the National Flood Insurance Act of 1968 (42 U.S.C. 4017), which, subject to paragraph (2), shall be used to carry out section 1308B of that Act, as added by subsection (a) of this section.

(2) Failure to Establish a Pilot Program.—If the Administrator of the Federal Emergency Management Agency fails to establish a pilot program required under section 1308B(e)(2) of the National Flood Insurance Act of 1968, as added by subsection (a) of this section, the amounts made available under paragraph (1) may be used to provide financial assistance under section 1366 of the National Flood Insurance Act of 1968 (42 U.S.C. 4104c).

*Analysis:*

This legislative proposal would establish a targeted means-tested assistance program for 1-4 family primary residences where the household income is such that federal flood insurance under the National Flood Insurance Program (NFIP) is unattainable and to provide financial assistance for policyholders who cannot afford flood insurance. The Department of Housing and Urban Development (HUD) defines households earning 80 percent or less than area median income as "low income" and households earning 120 percent or less than area median income as "moderate income." Eligibility is capped at 400% of the Federal Poverty Guideline. This would create an upper limit on eligibility. This targeted assistance program would serve to offer low- and moderate-income current and prospective NFIP policyholders a graduated risk premium discount benefit. The graduation of discount 1) ensures that the amount of benefit scales with need and 2) guards against a benefits cliff.

Since establishing the NFIP, Congress has sought to achieve multiple, and sometimes conflicting, goals including: ensuring reasonable insurance premiums for all policyholders; determining NFIP risk-based premiums to inform households of their property's flood risk and the resulting cost of flood insurance; promoting awareness of the consequences of development in floodplains; securing widespread community participation in the program; encouraging insurance policy purchases by property owners; and earning premium and fee income to cover claims paid and program expenses over time. These goals have been in constant tension over the past 50 years. When premiums increased to reflect risk-based rates for discounted and subsidized properties as they did under the Biggert-Waters Flood Insurance Reform Act of 2012 (BW-12), some policyholders objected that the rates were unaffordable, and others dropped their coverage. The Federal Emergency Management Agency (FEMA) would implement the program such that eligible low- and moderate-income policyholders see both the full-risk price and the means-tested assistance they receive so they understand their true flood risk. FEMA anticipates there will be administrative costs, which will be paid out of the program appropriations.

FEMA considers the market for flood insurance to be all potential flood insurance purchasers, regardless of their mortgage status or location within or outside of Special Flood Hazard Areas (SFHAs). This is because a significant portion of flood losses occur outside SFHAs.

In its current structure, the NFIP makes rates "reasonable" by offering discounts and cross subsidies primarily based on a building's age, map changes at a building's location, or by considering mitigation activities undertaken by the property owner or community. The NFIP does not offer means-tested discounts or consider the ability to pay when rates are established. Building-specific and community-wide mitigation activities such as elevating a home or other types of flood proofing can change the risk of flooding and should result in a change to the price of insurance.

The price of a flood insurance policy is an important signal to a homeowner, renter, or business about the flood risk they face. Property owners, families and communities who do not recognize their true flood risk due to discounted insurance rates may not take necessary mitigation actions to prepare for and protect themselves against flood events. Risk-based flood insurance premiums are appropriately expensive in areas that have the highest flood risk.

*Comparative type:*

**SEC. 1308B. FLOOD INSURANCE ASSISTANCE. (42 U.S.C.        )**
(a) Definitions.—In this section:
    (1) Covered property.—The term 'covered property' means—

(A) a primary residential dwelling designed for the occupancy of from 1 to 4 families; or
(B) personal property located in a primary residential dwelling.
(2) Eligible policyholder.—The term 'eligible policyholder' means a policyholder with a household income that is not more than 120 percent of the area median income for the area in which the property to which the policy applies is located, and whose household income is not more than 400 percent of the federal poverty guidelines.
(3) Insurance costs.—The term 'insurance costs' means, with respect to a covered property for a year—
(A) risk premiums and fees estimated and charged under section 1307 (42 U.S.C. 4014) and section 1308 (42 U.S.C. 4015);
(B) surcharges assessed under sections 1304 (42 U.S.C. 4011) and 1308A (42 U.S.C. 4015A); and
(C) any amount established under section 1310A (42 U.S.C. 4017A).
(b) Authority.—Subject to the availability of appropriations, the Administrator is authorized to carry out a means-tested program under which the Administrator provides assistance to eligible policyholders in the form of graduated discounts for insurance costs with respect to covered properties.
(c) Eligibility.—To determine eligibility for means-tested assistance under this section, the Administrator may accept any of the following with respect to an eligible policyholder:
(1) Income verification from the Secretary of the Treasury under section 6103(l)(23) of the Internal Revenue Code of 1986 (26 U.S.C. 6103(l)(23));
(2) Income verification from the National Directory of New Hires established under section 453(i) of the Social Security Act (42 U.S.C. 653(i));
(3) A self-certification of eligibility by the eligible policyholder that is provided under penalty of perjury pursuant to section 1746 of title 28, United States Code; and
(4) Any other information or method identified by the Administrator in establishing a pilot program, or a final rule, issued under subsection (e).
(d) Discount.—The Administrator shall establish graduated discounts available to eligible policyholders under this section, which may be based on the following factors:
(1) The percentage by which the household income of the eligible policyholder is equal to, or less than, 120 percent of the area median income for the area in which the property to which the policy applies is located;
(2) The number of eligible policyholders participating in the program established under this section;
(3) The availability of funding; and
(4) Any other factor that the Administrator finds reasonable and necessary to carry out the purposes of this section.

(e) IMPLEMENTATION
(1) IN GENERAL.—The Administrator shall issue final rules to implement this section.

(2) PILOT PROGRAM.—

(A) IN GENERAL.— Notwithstanding subsection (e)(1), until such time as the Administrator promulgates regulations to implement this section, the Administrator may waive notice and comment rulemaking, if the Administrator determines the waiver is necessary to expeditiously implement this section, and may carry out alternative procedures under this section as a pilot program.  In establishing a pilot program under this subsection the Administrator shall include—

(i) a description of how the Administrator will determine—

(I) eligibility for households to participate in the program established under this section; and

(II) assistance levels for eligible households to which assistance is provided under this section;

(ii) the methodology that the Administrator will use to determine the amount of assistance provided to eligible households under this section; and

(iii) any requirements to which eligible policyholders to which assistance is provided under this section will be subject; and

(3) REQUIREMENT ON TIMING.—Not later than 24 months after the date of the enactment of this section, the Administrator shall implement this subsection which shall expire on the later of—

(A) the date that is 60 months after the date of the enactment of this section; or

(B) the date on which a final rule issued to implement this subsection takes effect.

(4) REPORTING. – Not less than 15 months after the implementation of a program under this section, and biennially thereafter, the Administrator shall report to the House Committee on Financial Services and the Senate Committee on Banking, Housing, and Urban Affairs on the program authorized under this section, including the number of assisted policyholders, distribution of income levels of assisted policyholders, average amount of assistance, and cost of assistance provided.

(f) Funding.—

(1) Authorization of appropriations.—There is authorized to be appropriated to the Administrator $XXX,XXX,XXX for each fiscal year to carry out this section to be available until expended.

(2) Notification.—If, in a fiscal year, the Administrator determines that the amount made available to carry out this section is insufficient to provide assistance under this section, the Administrator shall notify Congress of the remaining amounts necessary to provide that assistance for that fiscal year.

(3) Distribution of premium.—With respect to the amount of the discounts provided under this section in a fiscal year, and any administrative expenses incurred in carrying out this section for that fiscal year, the Administrator shall, from amounts made available to carry out this section for that fiscal year, deposit in the National Flood Insurance Fund established under section 1310 (42 U.S.C. 4017) an amount equal to those discounts and administrative expenses, except to the extent that section 1310A (42 U.S.C. 4017A) applies to any portion of those discounts or administrative expenses, in which case the Administrator shall deposit an amount equal to those amounts to which section 1310A applies in the National Flood Insurance Reserve Fund established under section 1310A (42 U.S.C. 4017A).

\* \* \* \*

## SEC. 1308. Chargeable premium rates. (42 U.S.C. §4015)

\* \* \* \*

**(e) Annual limitation on premium increases**

Except with respect to properties described under paragraph (2) of subsection (c), and notwithstanding any other provision of this chapter—

(1) the chargeable risk premium rate for flood insurance under this chapter for any property may not be increased by more than 18 percent each year, except-

(A) as provided in paragraph (4);

(B) in the case of property identified under section 4014(g) of this title; or

(C) in the case of a property that-

    (i) is located in a community that has experienced a rating downgrade under the community rating system program carried out under section 4022(b) of this title;

      (ii) is covered by a policy with respect to which the policyholder has-

        (I) decreased the amount of the deductible; or

        (II) increased the amount of coverage; or

      (iii) was misrated; or

    (D) in the case of a property with respect to which assistance is provided under section 1308B, if—

      (i) the applicable policyholder is no longer eligible to receive assistance under that section;

      (ii) the assistance so provided has been decreased under that section; or

      (iii) the Administrator is not authorized, or lacks appropriated funds, to carry out that section;

\* \* \* \*

   (3) the chargeable risk premium rates for flood insurance under this chapter for any properties within any single risk classification may not be increased by an amount that would result in the average of such rate increases for properties within the risk classification during any 12-month period exceeding 15 percent of the average of the risk premium rates for properties within the risk classification upon the commencement of such 12-month period; and period, except in the case of a property with respect to which assistance is provided under section 1308B if a condition described in clause (i), (ii), or (iii) of subparagraph (1)(D) is applicable; and

\* \* \* \*

**SEC. 1366. Mitigation assistance. (42 U.S.C. 4104c)**

(a) Authority.—The Administrator shall carry out a program to provide financial assistance to States and communities, using amounts made available from the National Flood Mitigation Fund under section 4104d of this title, for planning and carrying out activities designed to reduce the risk of flood damage to structures covered under contracts for flood insurance under this chapter. Such financial assistance shall be made available-

   (1) to States and communities in the form of grants under this section for carrying out mitigation activities;

   (2) to States and communities in the form of grants under this section for carrying out mitigation activities that reduce flood damage to severe repetitive loss structures; and

   (3) to property owners in the form of direct grants under this section for carrying out mitigation activities that reduce flood damage to individual structures for which 2 or more claim payments for losses have been made under flood insurance coverage under this chapter if the Administrator, after consultation with the State and community, determines that neither the State nor community in which such a structure is located has the capacity to manage such grants.; and

   (4) to a private nonprofit organization, in the form of grants under this section for carrying out mitigation activities.

\* \* \* \*

(d) Matching requirement.—The Administrator may provide grants for eligible mitigation activities as follows:

   (1) Severe repetitive loss structures.—In the case of mitigation activities to severe repetitive loss structures, in an amount up to—

> (A) 100 percent of all eligible costs, if the activities are approved under subsection (c)(2)(A)(i); or
>
> (B) the expected savings to the National Flood Insurance Fund from expected avoided damages through acquisition or relocation activities, if the activities are approved under subsection (c)(2)(A)(ii).

(2) Repetitive loss structures.—In the case of mitigation activities to repetitive loss structures, in an amount up to 90 percent of all eligible costs;.

(3) Flood insurance assistance.—In the case of mitigation activities to structures insured by policyholders that are eligible for assistance under section 1308B, in an amount up to 100 percent of all eligible costs.

(34) Other mitigation activities.—In the case of all other mitigation activities, in an amount up to 75 percent of all eligible costs.

* * * *

(h) Definitions.—For purposes of this section, the following definitions shall apply:

(1) Community.—The term "community" means-

> (A) a political subdivision that-
>> (i) has zoning and building code jurisdiction over a particular area having special flood hazards; and
>> (ii) is participating in the national flood insurance program; or
>
> (B) a political subdivision of a State, or other authority, that is designated by political subdivisions, all of which meet the requirements of subparagraph (A), to administer grants for mitigation activities for such political subdivisions.

(2) Private nonprofit organization.—The term 'private nonprofit organization' means any nongovernmental agency or entity that—

> (A) currently has:
>> (i) an effective ruling letter from the Internal Revenue Service granting an exemption from taxation under subsection (c), (d), or (e) of section 501 of the Internal Revenue Code of 1986; or
>> (ii) satisfactory evidence from a State that the organization or entity is a nonprofit organization organized or doing business under the laws of that State; and
>
> (B) meet any other criteria that the Administrator considers appropriate."

(2)(3) Repetitive loss structure.—The term "repetitive loss structure" has the meaning given such term in section 4121 of this title.

(3)(4) Severe repetitive loss structure.—The term "severe repetitive loss structure" means a structure that—

> (A) is covered under a contract for flood insurance made available under this chapter; and
>
> (B) has incurred flood-related damage—
>> (i) for which 4 or more separate claims payments have been made under flood insurance coverage under this chapter, with the amount of each such claim exceeding $5,000, and with the cumulative amount of such claims payments exceeding $20,000; or
>> (ii) for which at least 2 separate claims payments have been made under such coverage, with the cumulative amount of such claims exceeding the value of the insured structure.

* * * *

## SEC. 453. Federal Parent Locator Service. (42 U.S.C. §653.)

* * * *

**(j) Information comparisons and other disclosures**

\* \* \* \*

(12) Information comparisons for flood insurance assistance.—

    (A) Furnishing of information by FEMA.—The Administrator of the Federal Emergency Management Agency (in this paragraph, referred to as the 'Administrator') shall furnish to the Secretary, on such periodic basis as determined by the Administrator in consultation with the Secretary, information in the custody of the Administrator for comparison with information in the National Directory of New Hires, in order to obtain information in such Directory with respect to individuals who are applying for, or receiving benefits under, section 1308B of the National Flood Insurance Act of 1968.

    (B) Requirement to seek minimum information.—The Administrator shall seek information pursuant to this paragraph only to the extent necessary to verify the employment and income of individuals described in subparagraph (A).

    (C) Duties of the secretary.—

        (i) Information disclosure.—The Secretary, in cooperation with the Administrator, shall compare information in the National Directory of New Hires with information provided by the Administrator with respect to individuals described in subparagraph (A), and shall disclose information in such Directory regarding such individuals to the Administrator, in accordance with this paragraph, for the purposes specified in this paragraph.

        (ii) Condition on disclosure.—The Secretary shall make disclosures in accordance with clause (i) only to the extent that the Secretary determines that such disclosures do not interfere with the effective operation of the program under this part.

    (D) Use of information by FEMA.—The Administrator may use information resulting from a data match pursuant to this paragraph only—

        (i) for the purpose of verifying the employment and income of individuals described in subparagraph (A); and

        (ii) after removal of personal identifiers, to conduct analyses of the employment and income reporting of individuals described in subparagraph (A).

    (E) Disclosure of information by FEMA.—

        (i) Purpose of disclosure.—The Administrator may make a disclosure under this subparagraph only for the purpose of verifying the employment and income of individuals described in subparagraph (A).

        (ii) Disclosures permitted.—Subject to clause (iii), the Administrator may disclose information resulting from a data match pursuant to this paragraph only to contractors of the Federal Emergency Management Agency, private insurance companies participating in the Write Your Own Program of the Federal Emergency Management Agency, the Inspector General of the Department of Homeland Security, and the Attorney General, in connection with the administration of a program described in subparagraph (A). Information obtained by the Administrator pursuant to this paragraph shall not be made available under section 552 of title 5, United States Code.

        (iii) Conditions on disclosure.—Disclosures under this paragraph shall be—

            (I) made in accordance with data security and control policies established by the Administrator and approved by the Secretary;

            (II) subject to audit in a manner satisfactory to the Secretary; and

            (III) subject to the sanctions under subsection (l)(2).

        (iv) Restrictions on redisclosure.—A person or entity to which information is disclosed under this subparagraph may use or disclose such information only as needed for verifying the employment and income of individuals described in

subparagraph (A), subject to the conditions in clause (iii) and such additional conditions as agreed to by the Secretary and the Administrator.

(F) Reimbursement of HHS costs.—The Administrator shall reimburse the Secretary, in accordance with subsection (k)(3), for the costs incurred by the Secretary in furnishing the information requested under this paragraph.

(G) Consent.—The Administrator shall not seek, use, or disclose information under this paragraph relating to an individual without the prior written consent of such individual (or of a person legally authorized to consent on behalf of such individual).

\* \* \* \*

**26 U.S.C. Section 6103. Confidentiality and Disclosure of Returns and Return Information.**

*(*a) General rule

Returns and return information shall be confidential, and except as authorized by this title-

(1) no officer or employee of the United States,

(2) no officer or employee of any State, any local law enforcement agency receiving information under subsection (i)(1)(C) or (7)(A), any local child support enforcement agency, or any local agency administering a program listed in subsection (l)(7)(D) who has or had access to returns or return information under this section or section 6104(c), and

(3) no other person (or officer or employee thereof) who has or had access to returns or return information under subsection (c), subsection (e)(1)(D)(iii), paragraph (10), (13), (14), or (15) of subsection (k), paragraph (6), (10), (12), (13) (other than subparagraphs (D)(v) and (D)(vi) thereof), (16), (19), (20), or (21), (21), or (23) of subsection (l), paragraph (2) or (4)(B) of subsection (m), or subsection (n),shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section. For purposes of this subsection, the term "officer or employee" includes a former officer or employee.

\* \* \* \*

(l) Disclosure of returns and return information for purposes other than tax administration.—

\* \* \* \*

(23) Disclosure of return information to Federal Emergency Management Agency to carry out the National Flood Insurance Program.

(A) The Secretary, upon written request from the Administrator of the Federal Emergency Management Agency (FEMA), shall disclose to officers, employees, and contractors of FEMA return information of any taxpayer, for the taxable years specified in the request, for the purposes of and to the extent necessary in [administering the means-tested assistance program requiring a determination of household income eligibility under the Section 1308B of the National Flood Insurance Act. Such return information shall be limited to:

(i) Taxpayer identity information;
(ii) Adjusted gross income;
(iii)The taxable year with respect to which the preceding information relates; and
(iv)If applicable, the fact that such information is not available.

(B) Restriction on use of disclosed information. Return information disclosed under subparagraph (A) may be used by officers, employees, and contractors of the FEMA only for the purposes of, and to the extent necessary in, determining eligibility for the program described in subparagraph (A).

(C) Redisclosure. Officers, employees, and contractors of FEMA may redisclose return information of a taxpayer obtained under subparagraph (A) of this subsection to that taxpayer or contractors of FEMA, private insurance companies participating in the Write Your Own Program of FEMA, the Inspector General of the Department of Homeland Security, and the Attorney General,  only to the extent necessary: (1) in verifying household income; (2) determining eligibility; (3) informing the taxpayer of their eligibility for the program described in subparagraph (A); or (4) in connection with the administration of the program described in subparagraph (A).  Information obtained by the Administrator pursuant to subparagraph (A) shall not be made available under section 552 of title 5, United States Code.

\* \* \* \*

(p)(4) Safeguards.

Any Federal agency described in subsection (h)(2), (h)(5), (i)(1), (2), (3), (5), or (7), (j)(1), (2), or (5), (k)(8), (10), (11), or (15), (l)(1), (2), (3), (5), (10), (11), (13)(A), (13)(B), (13)(C), (13)(D)(i), (14), (17), or (22) (22), or (23), (o)(1)(A), or (o)(3), the Government Accountability Office, the Congressional Budget Office, or any agency, body, or commission described in subsection (d), (i)(1)(C), (3)(B)(i), or (7)(A)(ii) or (k)(10), (l)(6), (7), (8), (9), (12), (15), or (16) (16), or (23), any appropriate State officer (as defined in section 6104(c)), or any other person described in subsection (k)(10) or (15), subsection (l)(10), (13)(A), (13)(B), (13)(C), (13)(D)(i), (16), (18), (19), or (20) (20) ,or (23), or any entity described in subsection (l)(21), shall, as a condition for receiving returns or return information-

\* \* \* \*

(F) upon completion of use of such returns or return information-

(i) in the case of an agency, body, or commission described in subsection (d), (i)(3)(B)(i), (k)(10), or (l)(6), (7), (8), (9), or (16) (16), or (23), any appropriate State officer (as defined in section 6104(c)), or any other person described in subsection (k)(10) or (15) or subsection (l)(10), (13)(A), (13)(B), (13)(C), (13)(D)(i), (16), (18), (19), or (20) (20), or (23) return to the Secretary such returns or return information (along with any copies made therefrom) or make such returns or return information undisclosable in any manner and furnish a written report to the Secretary describing such manner,

(ii) in the case of an agency described in subsection (h)(2), (h)(5), (i)(1), (2), (3), (5) or (7), (j)(1), (2), or (5), (k)(8), (10), (11), or (15), (l)(1), (2), (3), (5), (10), (11), (12), (13)(A), (13)(B), (13)(C), (13)(D)(i), (14), (15), (17), or (22) (22), or (23), ,2 (o)(1)(A), or (o)(3) or any entity described in subsection (l)(21), the Government Accountability Office, or the Congressional Budget Office, either-

\* \* \* \*

## 26 U.S.C. Section 7213. Unauthorized Disclosure of Information.

\* \* \* \*

(a)(2) State and other employees

It shall be unlawful for any person (not described in paragraph (1)) willfully to disclose to any person, except as authorized in this title, any return or return information (as defined in section 6103(b)) acquired by him or another person under subsection (d), (i)(1)(C), (3)(B)(i), or (7)(A)(ii), (k)(10), (13), (14), or (15), (l)(6), (7), (8), (9), (10), (12), (15), (16), (19), (20), or (21) (21) or (23) or (m)(2), (4), (5), (6), or (7) of section 6103 or under section 6104(c). Any violation of this paragraph shall be a felony punishable by a fine in any amount not exceeding $5,000, or

imprisonment of not more than 5 years, or both, together with the costs of prosecution.

Draft Appropriations language for new section 1308B Means-Tested Assistance Program:

(d) Direct Appropriation.—
    (1) IN GENERAL.—There is appropriated, out of any money in the Treasury not otherwise appropriated, in addition to amounts otherwise available, for each of fiscal years 20XX through 20XX, $XXX,XXX,XXX to the National Flood Insurance Fund established under section 1310 of the National Flood Insurance Act of 1968 (42 U.S.C. 4017), which, subject to paragraph (2), shall be used to carry out section 1308B of that Act, as added by subsection (a) of this section.
    (2) Failure to Establish A Pilot Program.—If the Administrator of the Federal Emergency Management Agency fails to establish a pilot program required under section 1308B(e)(2) of the National Flood Insurance Act of 1968, as added by subsection (a) of this section, the amounts made available under paragraph (1) may be used to provide financial assistance under section 1366 of the National Flood Insurance Act of 1968 (42 U.S.C. 4104c).

10. **Excessive Loss Properties** – Creates a new category of Excessive Loss Properties (XLP), defined as structures with four or more paid losses of at least $10,000 each, and prevents FEMA from offering coverage for XLPs. Allows a structure to be removed from an XLP classification if the structure is mitigated in line with state and local requirements. Updates the definitions of Repetitive Loss Structures and Severe Repetitive Loss Structures.

### _Legislative text:_

**Sec. _____. Multiple Loss Properties.**

(a)  Elimination of coverage for properties with excessive claims.—Chapter II of the National Flood Insurance Act of 1968 (42 U.S.C. 4011 et seq.) is amended by adding at the end the following:

**"Sec. 1323. ELIMINATION OF COVERAGE FOR PROPERTIES WITH EXCESSIVE CLAIMS.**

"(a) In general.— Except as provided pursuant to subsection (b), no new or renewal of coverage may be provided under this title to any property that becomes an excessive loss property as defined under section 1370 (42 U.S.C. 4121) due to losses occurring after the effective date of this Act.

"(b) Exception for newly declared properties.—The Administrator may renew flood insurance policies made available under this title for one year following the occurrence of the fourth claim qualifying a property as an excessive loss property.

"(c) Notification.—No later than 30 days after the occurrence of the fourth claim qualifying a property as an excessive loss property, the Administrator shall notify the policyholder insuring the property that—

"(1) the property qualifies as an excessive loss property; and

"(2) excessive loss properties are not entitled to purchase or renew flood insurance under this title, except as permitted under subsection (b).".

(b) The National Flood Insurance Act is amended—

(1) in section 1370(a) of the National Flood Insurance Act of 1968 (42 U.S.C. 4121)—

(A) by redesignating paragraphs (8) through (15) as paragraphs (10) through (17), respectively; and

(B) by striking paragraph (7) and inserting the following new paragraphs after paragraph (6):

"(7) the term 'repetitive loss property' means a structure that has incurred flood-related damage for which 2 or more separate claims payments of any amount in excess of the loss-deductible for damage to the covered structure have been made under flood insurance coverage under this title;

"(8) the term 'severe repetitive loss property' means a structure that has incurred flood-related damage for which—

"(A) 4 or more separate claims payments have been made under flood insurance coverage under this title, with the amount of each such claim exceeding \$5,000, and with the cumulative amount of such claims payments exceeding \$20,000; or

"(B) at least 2 separate claims payments have been made under flood insurance coverage under this title, with the cumulative amount of such claims payments exceeding the value of the structure;

"(9) the term 'excessive loss property' means a structure that has incurred flood damage for which at least four separate claims have been made under flood insurance coverage under this title, with each claim receiving an aggregate payment of at least \$10,000 and occurring after the date of enactment of this section. Once an excessive loss property has been mitigated to protect against flood either by bringing the building into compliance with local and state floodplain ordinances or through flood mitigation measures that meaningfully reduces flood risk, the Administrator may not consider claims that occurred before the mitigation of a structure for purposes of determining a structure's continued status as an excessive loss property.  Nothing in this definition shall be interpreted to prohibit the Administrator from considering claims that occur after the mitigation to the structure to determine if a structure subsequently meets the definition of a multiple loss property.

(2) in section 1304(b)(1) (42 U.S.C. 4011(b)(1)), by striking "repetitive loss structures" and inserting "repetitive loss properties";

62

(3) in section 1307 (42 U.S.C. 4014), by striking subsection (h);

(4) in section 1315(a)(2)(A)(i) (42 U.S.C. 4022(a)(2)(A)(i)), by striking "repetitive loss structure" and inserting "repetitive loss property"; and

(5) in section 1366 (42 U.S.C. 4104c)—

    (i) in subsection (a)(2), by striking "severe repetitive loss structures" and inserting "severe repetitive loss properties";

    (ii) in subsection (c)(2)(A)(ii), by striking "severe repetitive loss structures" and inserting "severe repetitive loss properties and repetitive loss properties";

    (iii) in subsection (d)—

        (I) in paragraph (1)—

            (aa) in the paragraph heading, by striking "Severe repetitive loss structures" and inserting "Severe repetitive loss properties"; and

            (bb) in the matter preceding subparagraph (A), by striking "severe repetitive loss structures" and inserting "severe repetitive loss properties"; and

        (II) in paragraph (2)—

            (aa) in the paragraph heading, by striking "Repetitive loss structures" and inserting "Repetitive loss properties"; and

            (bb) by striking "repetitive loss structures" and inserting "repetitive loss properties"; and

    (iv) by striking subsection (h) and adding the following:

"(h) Definition of community.— For purposes of this section, the term "community" means—

    "(1) a political subdivision that—

        "(A) has zoning and building code jurisdiction over a particular area having special flood hazards; and

        "(B) is participating in the national flood insurance program; or

    "(2) a political subdivision of a State, or other authority, that is designated by political subdivisions, all of which meet the requirements of paragraph (1), to administer grants for mitigation activities for such political subdivisions.".

*Analysis:*

    The National Flood Insurance Program (NFIP) is the primary source of flood insurance coverage for residential properties in the United States, with more than five million policies in more than 22,000 communities across the country. The NFIP was established by the National Flood Insurance Act of 1968 with the general purpose of offering primary flood insurance to properties with significant flood risk and reducing flood risk through the adoption of floodplain management standards.

    Following unsuccessful efforts by insurance companies to create and sustain a private flood insurance market, the NFIP was created to provide insurance to property owners to speed recovery

from flood events. In the history of the NFIP, FEMA has never denied flood insurance coverage to any eligible structure. Recognizing that certain structures may (1) pose potential life-safety concerns, (2) negatively impact the financial soundness of the program, or (3) conflict with the goals of the NFIP to preserve natural and beneficial functions of the floodplains, FEMA requests a statutory change to permit it to deny flood insurance coverage to certain structures.

In the private sector, industry chooses which properties to extend insurance coverage based on their operating business model. While there are some limitations based on state regulation, private carriers have discretion about what risks they assume and frequently choose to not renew coverage on the riskiest policies on their books. Because previous losses are a significant indicator of risk level, carriers non-renew policies that have a claim, particularly in catastrophic lines.

Unlike private industry, FEMA has never denied flood insurance coverage to any eligible structure. Since 1978, nearly 100,000 structures have had two or more paid losses; nearly 1,000 have suffered 10 or more losses. As of December 2021, FEMA has paid $35.1 billion in claims to properties with two or more loses compared to the total of $73.4 billion paid on all claims. In the past thirty years, one of every six dollars paid out in claims has gone to a building with a history of multiple floods.

The risk posed by multiple loss properties has a broader impact on the nation as well. Families living in areas that repeatedly flood face life, health, and safety issues. The NFIP has been criticized that making flood insurance available leads to unwise decisions in the floodplain. The availability of flood insurance creates a moral hazard with downstream repercussions on the natural and beneficial functions of floodplains and exacerbating flood problems downstream. The NFIP must have better tools to address insured structures that have experienced multiple flood claims.

*Future State*

FEMA proposes that the NFIP have an objective threshold to deny coverage to the most egregiously flood prone structures. This proposal, named "Excessive Loss Properties (XLP)", would, through selective underwriting, reduce the disaster suffering caused by repetitive floods, discourage rebuilding in areas with a history of untamed flooding without taking appropriate flood mitigation measures, and reduce financial risk to the NFIP while ensuring that coverage is still widely available to individuals and businesses who might not be eligible for private market coverage. This proposal does not address all the issues associated with properties with multiple losses; however, it is a first step towards a holistic solution to reduce repeated disaster suffering.

*Proposal Details*

FEMA proposes statutory changes to limit coverage to XLPs. These changes, outlined below, prevent FEMA from offering coverage to structures with four or more paid losses following enactment of the act, include a "grace period" period to allow an additional year of coverage after a disqualifying loss, sets a loss threshold of $10,000 to be considered a qualifying loss because FEMA has not historically provided "deterrents" for making small claims, and allows a structure to be removed from an XLP classification if the structure is mitigated in line with state and local requirements.

- **Simplifies definition of Repetitive Loss and Severe Repetitive Loss Properties**

The proposal would enable the NFIP to more effectively identify multiple loss properties by updating the definitions of repetitive loss and severe repetitive loss properties. The proposal establishes standardized definitions of "repetitive-loss property" and "severe repetitive-loss property." These terms have been used inconsistently in statute and regulation. This proposal would standardize them across the NFIP.

These designations primarily affect mitigation grant prioritization and cost share allowances. FEMA Hazard Mitigation Assistance (HMA) grants - which include the Hazard Mitigation Grant Program (HMGP), the Pre-Disaster Mitigation (PDM) grant program, and the Flood Mitigation Assistance (FMA) grant programs – typically require a 25% cost share match to 75% federal share for all awards. However, under the FMA program, mitigation projects for

SRL designated properties receive a 100% federal cost share and RL designated properties require a 10% cost match to 90% federal share. The enhanced federal cost shares for SRL and RL properties dramatically reduces the funding burden on communities and homeowners in carrying out mitigation through the FMA grant program. Further, SRL and RL properties that make up more than 50% of the properties in a submitted FMA project are prioritized so are more likely to be funded during the annual cycle of the program. In addition to the FMA program there have been some instances of the SRL designation impacting insurance rates. In 2019, FEMA implemented an additional premium on SRL properties. The triggers for both the SRL and RL designations are complicated.

This proposal creates the XLP designation based on four paid losses exceeding $10,000. Four losses would give policyholders ample information about their risk and the importance of mitigation and would have placed the property on the RL or SRL list and given them additional mitigation opportunities. With data as of July 31, 2019, approximately 20,000 properties would be designated as excessive loss properties.

- **Prevents FEMA from Offering Coverage to XLPs**

The heart of the proposal, once a property is labeled as an excessive loss property, FEMA is prohibited from offering these properties insurance coverage.

- **Implementation and Grace Period**

A property's past claim/loss history would be "grandfathered" and not count towards the XLP status. Only qualifying losses after enactment of the statute would be considered. This would allow existing policyholders ample time to consider appropriate mitigation measures and to truly understand not only the flood risk they face but also their potential future financial risk.

A grace period upon the fourth qualifying loss that triggers the XLP designation would ensure that policyholders do not suddenly and unexpectedly bear flood risk. This would allow for one final policy term after the completion of their present term.

- **Sets a Qualifying Threshold of $10,000 per-loss**

This proposal includes a $10,000 per-loss as the minimum threshold for a qualifying loss as an XLP. This is considered a nominal value—the average payment for properties with four losses is $35,700—but is in place because FEMA has not historically provided any disincentives (such as increased premiums, surcharges, or dropped coverage) for filing a claim. This threshold reduces the penalty for previous dollar trading activities.

- **Removal of XLP Status Upon Mitigation**

The proposal also includes a provision to allow structures to drop the XLP designation if they are made compliant with state and local floodplain management requirements. This is the same as RL and SRL designations. If a structure is mitigated to floodplain management standards, they are able to remove the XLP designation and receive NFIP coverage until such time as they receive another four qualifying losses.

### *Comparative type:*

### SEC. 1304. AUTHORIZATION TO ESTABLISH AND CARRY OUT PROGRAM. (42 U.S.C. 4011)

$$* \qquad * \qquad * \qquad *$$

(b) Additional coverage for compliance with land use and control measures.—The national flood insurance program established pursuant to subsection (a) shall enable the purchase of insurance to cover the cost of implementing measures that are consistent with land use and control measures established by the community under section 4102 of this title for—

(1) properties that are ~~repetitive loss structures~~ repetitive loss properties;

\*       \*       \*       \*

**SEC. 1307. Estimates of premium rates. (42 U.S.C. 4014)**
\*       \*       \*       \*

~~(h) Definition~~
~~In this section, the term "severe repetitive loss property" has the following meaning:~~
~~(1) Single-family properties~~
~~In the case of a property consisting of 1 to 4 residences, such term means a property that~~
~~(A) is covered under a contract for flood insurance made available under this chapter; and~~
~~(B) has incurred flood-related damage~~
~~(i) for which 4 or more separate claims payments have been made under flood insurance coverage under this subchapter, with the amount of each such claim exceeding $5,000, and with the cumulative amount of such claims payments exceeding $20,000; or~~
~~(ii) for which at least 2 separate claims payments have been made under such coverage, with the cumulative amount of such claims exceeding the value of the property.~~
~~(2) Multifamily properties~~
~~In the case of a property consisting of 5 or more residences, such term shall have such meaning as the Director shall by regulation provide.~~

\*       \*       \*       \*

**SEC. 1315. State and local land use controls. (42 U.S.C. 4022)**
(a) Requirement for participation in flood insurance program
\*       \*       \*       \*
(2) Agricultural structures
(A) Activity restrictions
Notwithstanding any other provision of law, the adequate land use and control measures required to be adopted in an area (or subdivision thereof) pursuant to paragraph (1) may provide, at the discretion of the appropriate State or local authority, for the repair and restoration to predamaged conditions of an agricultural structure that-
(i) is a ~~repetitive loss structure~~ repetitive loss property; or

\*       \*       \*       \*

**Sec. 1323. ELIMINATION OF COVERAGE FOR PROPERTIES WITH EXCESSIVE CLAIMS. (42 U.S.C.       )**
(a) In general.— Except as provided pursuant to subsection (b), no new or renewal of coverage may be provided under this title to any property that becomes an excessive loss property as defined under section 1370 (42 U.S.C. 4121) due to losses occurring after the effective date of this Act.
(b) Exception for newly declared properties.—The Administrator may renew flood insurance policies made available under this title for one year following the occurrence of the fourth claim qualifying a property as an excessive loss property.

(c)Notification.—No later than 30 days after the occurrence of the fourth claim qualifying a property as an excessive loss property, the Administrator shall notify the policyholder insuring the property that—

(1) the property qualifies as an excessive loss property; and

(2) excessive loss properties are not entitled to purchase or renew flood insurance under this title, except as permitted under subsection (b).

*   *   *   *

### SEC. 1370. Definitions. (42 U.S.C. 4121)

(a) As used in this chapter-

(1) the term "flood" shall have such meaning as may be prescribed in regulations of the Administrator, and may include inundation from rising waters or from the overflow of streams, rivers, or other bodies of water, or from tidal surges, abnormally high tidal water, tidal waves, tsunamis, hurricanes, or other severe storms or deluge;

(2) the terms "United States" (when used in a geographic sense) and "State" includes the several States, the District of Columbia, the territories and possessions, the Commonwealth of Puerto Rico, and the Trust Territory of the Pacific Islands;

(3) the terms "insurance company", "other insurer" and "insurance agent or broker" include any organization or person that is authorized to engage in the business of insurance under the laws of any State, subject to the reporting requirements of the Securities Exchange Act of 1934 [15 U.S.C. 78a et seq.] pursuant to section 13(a) or 15(d) of such Act (15 U.S.C. 78m(a) and 78o(d)), or authorized by the Administrator to assume reinsurance on risks insured by the flood insurance program;

(4) the term "insurance adjustment organization" includes any organizations and persons engaged in the business of adjusting loss claims arising under insurance policies issued by any insurance company or other insurer;

(5) the term "person" includes any individual or group of individuals, corporation, partnership, association, or any other organized group of persons, including State and local governments and agencies thereof;

(6) the term "Administrator" means the Administrator of the Federal Emergency Management Agency;

(7) the term "repetitive loss structure" means a structure covered by a contract for flood insurance that—

(A) has incurred flood-related damage on 2 occasions, in which the cost of repair, on the average, equaled or exceeded 25 percent of the value of the structure at the time of each such flood event; and

(B) at the time of the second incidence of flood-related damage, the contract for flood insurance contains increased cost of compliance coverage.

(7) the term 'repetitive loss property' means a structure that has incurred flood-related damage for which 2 or more separate claims payments of any amount in excess of the loss-deductible for damage to the covered structure have been made under flood insurance coverage under this title;

(8) the term 'severe repetitive loss property' means a structure that has incurred flood-related damage for which—

(A) 4 or more separate claims payments have been made under flood insurance coverage under this title, with the amount of each such claim exceeding $5,000, and with the cumulative amount of such claims payments exceeding $20,000; or

(B) at least 2 separate claims payments have been made under flood insurance coverage under this title, with the cumulative amount of such claims payments exceeding the value of the structure;

(9) the term 'excessive loss property' means a structure that has incurred flood damage for which at least four separate claims have been made under flood insurance coverage under this title, with each claim receiving an aggregate payment of at least $10,000 and occurring after the date of enactment of this section. Once an excessive loss property has been mitigated to protect against flood either by bringing the building into compliance with local and state floodplain ordinances or through flood mitigation measures that meaningfully reduces flood risk, the Administrator may not consider claims that occurred before the mitigation of a structure for purposes of determining a structure's continued status as an excessive loss property.  Nothing in this definition shall be interpreted to prohibit the Administrator from considering claims that occur after the mitigation to the structure to determine if a structure subsequently meets the definition of a multiple loss property.

(8)(10) the term "Federal agency lender" means a Federal agency that makes direct loans secured by improved real estate or a mobile home, to the extent such agency acts in such capacity;

(9)(11) the term "Federal entity for lending regulation" means the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Comptroller of the Currency, the National Credit Union Administration, and the Farm Credit Administration, and with respect to a particular regulated lending institution means the entity primarily responsible for the supervision of the institution;

(10)(12) the term "improved real estate" means real estate upon which a building is located;

(11)(13) the term "lender" means a regulated lending institution or Federal agency lender;

(12)(14) the term "natural and beneficial floodplain functions" means–

    (A) the functions associated with the natural or relatively undisturbed floodplain that (i) moderate flooding, retain flood waters, reduce erosion and sedimentation, and mitigate the effect of waves and storm surge from storms, and (ii) reduce flood related damage; and

    (B) ancillary beneficial functions, including maintenance of water quality and recharge of ground water, that reduce flood related damage;

(13)(15) the term "regulated lending institution" means any bank, savings and loan association, credit union, farm credit bank, Federal land bank association, production credit association, or similar institution subject to the supervision of a Federal entity for lending regulation;

(14)(16) the term "servicer" means the person responsible for receiving any scheduled periodic payments from a borrower pursuant to the terms of a loan, including amounts for taxes, insurance premiums, and other charges with respect to the property securing the loan, and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan; and

(15)(17) the term "substantially damaged structure" means a structure covered by a contract for flood insurance that has incurred damage for which the cost of repair exceeds an amount specified in any regulation promulgated by the Administrator, or by a community ordinance, whichever is lower.

*    *    *    *

## SEC. 1366. MITIGATION ASSISTANCE. (42 U.S.C. 4104c)

(a) Authority.—The Administrator shall carry out a program to provide financial assistance to States and communities, using amounts made available from the National Flood Mitigation Fund under section 4104d of this title, for planning and carrying out activities designed to reduce the risk of flood damage to structures covered under contracts for flood insurance under this chapter. Such financial assistance shall be made available—

*    *    *    *

(2) to States and communities in the form of grants under this section for carrying out mitigation activities that reduce flood damage to ~~severe repetitive loss structures~~ <u>severe repetitive loss properties</u>; and

\*       \*       \*       \*

(c) Eligible mitigation activities

\*       \*       \*       \*

(2) Requirements of technical feasibility, cost effectiveness, and interest of National Flood Insurance Fund

    (A) In general.—The Administrator may approve only mitigation activities that the Administrator determines—

        (i) are technically feasible and cost-effective; or

        (ii) will eliminate future payments from the National Flood Insurance Fund for ~~severe repetitive loss structures~~ <u>severe repetitive loss properties</u> through an acquisition or relocation activity.

\*       \*       \*       \*

(d) Matching requirement.—The Administrator may provide grants for eligible mitigation activities as follows:

  (1) ~~Severe repetitive loss structures~~ <u>Severe repetitive loss properties.</u>—In the case of mitigation activities to ~~severe repetitive loss structures~~ <u>severe repetitive loss properties</u>, in an amount up to—

\*       \*       \*       \*

  (2) ~~Repetitive loss structures~~ <u>Repetitive loss properties.</u>—In the case of mitigation activities to ~~repetitive loss structures~~ <u>repetitive loss properties</u>, in an amount up to 90 percent of all eligible costs.

\*       \*       \*       \*

~~(h) Definitions.   For purposes of this section, the following definitions shall apply:~~

  ~~(1) Community.   The term "community" means~~

    ~~(A) a political subdivision that—~~

      ~~(i) has zoning and building code jurisdiction over a particular area having special flood hazards; and~~

      ~~(ii) is participating in the national flood insurance program; or~~

    ~~(B) a political subdivision of a State, or other authority, that is designated by political subdivisions, all of which meet the requirements of subparagraph (A), to administer grants for mitigation activities for such political subdivisions.~~

  ~~(2) Repetitive loss structure.   The term "repetitive loss structure" has the meaning given such term in section 4121 of this title.~~

  ~~(3) Severe repetitive loss structure.   The term "severe repetitive loss structure" means a structure that—~~

    ~~(A) is covered under a contract for flood insurance made available under this chapter; and~~

    ~~(B) has incurred flood-related damage—~~

      ~~(i) for which 4 or more separate claims payments have been made under flood insurance coverage under this chapter, with the amount of each such claim exceeding $5,000, and with the cumulative amount of such claims payments exceeding $20,000; or~~

      ~~(ii) for which at least 2 separate claims payments have been made under such coverage, with the cumulative amount of such claims exceeding the value of the insured structure.~~

(h) <u>Definition of community.</u>— For purposes of this section, the term "community" means—

  (1) A political subdivision that—

    (A) has zoning and building code jurisdiction over a particular area having special flood hazards; and

    (B) is participating in the national flood insurance program; or

(2) a political subdivision of a State, or other authority, that is designated by political subdivisions, all of which meet the requirements of paragraph (1), to administer grants for mitigation activities for such political subdivisions.

11. **Flood Compliance and Mitigation Coverage** – Enables policyholders to purchase higher coverage limits to cover the cost of complying with floodplain management ordinances or laws.

### _Legislative text:_

Section _____. Flood compliance and mitigation coverage.

(a) Section 1304(b) of the National Flood Insurance Act of 1968 (42 U.S.C. 4011(b)) is

amended—

(1) in paragraph (4), by redesigning subparagraphs (A) through (D) as clauses (i) through

(iv), respectively;

(2) by redesignating paragraphs (1) through (4) as subparagraphs (A) through (D),

respectively;

(3) by inserting before "The national flood insurance program" the following:

"(1) In general.—";

(4) by striking the unnumbered paragraph at the end; and

(5) by adding at the end the following:

"(2) Coverage amounts.—

"(A) Basic coverage.—Unless a policyholder chooses additional coverage pursuant to

subparagraph (B), the Administrator shall make available coverage provided under

paragraph (1) in an amount equal to 20 percent of a policy's amount of building

coverage.

"(B) Additional coverage.—The Administrator may offer, and a policyholder may choose

to purchase for an additional premium, coverage provided under paragraph (1) in an

amount greater than that offered pursuant to subparagraph (A), but not exceeding an

amount equal to 40 percent of a policy's amount of building coverage.

"(C) Treatment of coverage limits.—Any amount of coverage for a property provided

pursuant to this subsection shall not be considered or counted for purposes of any

limitation on coverage applicable to such property under section 1306(b) and any

claim on such coverage shall not be considered a claim for purposes of identifying

properties with multiple losses.

"(3) Premiums.—The Administrator shall charge risk premium rates for coverage made

available pursuant to this section in accordance with section 1307(a)(1).

"(4) Assignment of coverage for mitigation grant cost share requirement.—

"(A) In general.— A policyholder may assign the rights or benefits of the coverage made available under this subsection to a governmental entity for the purposes of using payments made for a claim against coverage made available under this subsection to satisfy a required non-federal contribution for a flood-related mitigation project funded by mitigation assistance programs described in paragraphs (1)(E)(i)-(iii).

"(B) Eligible expenses.—If a policyholder assigns rights or benefits of coverage pursuant to subparagraph (A), then a required non-federal contribution for a flood-related mitigation project funded by mitigation assistance programs described in paragraph (1)(E)(i)-(iii) shall be an eligible expense for coverage made available under this subsection.

"(C) Terms and conditions.—The Administrator may adopt procedures for assigning rights or benefits of coverage pursuant to subparagraph (A)."

(4) Implementation.— Notwithstanding any other provision of law, the Administrator may implement this subsection by adopting one or more standard endorsements to the Standard Flood Insurance Policy by publication of such standards endorsement in the Federal Register or by comparable means.

*Analysis:*

As part of its Standard Flood Insurance Policy (SFIP), FEMA offers a coverage called "Increased Cost of Compliance" (ICC), or Coverage D. ICC coverage is a coverage that is designed to help aid policyholders who have had a flood loss and as a result of that loss have been declared "substantially damaged" by the community and are required to follow higher floodplain ordinance standards. This coverage, which is designed to allow people to build back in more resilient manners to more stringent standards, is so limited and convoluted that it is rarely used. Only 3% of all NFIP historical claims have involved ICC coverage.

Current ICC coverage is limited in multiple ways. This coverage provides up to $30,000 per claim, subject to eligibility requirements, regardless of type of policy or coverage needs. However, that $30,000 applies to the statutory structural coverage limit ($250,000 for residential, $500,000 for non-residential and commercial). That is, for any residential loss above $220,000, the available ICC coverage decreases dollar for dollar. According to NFIP data, between 2009 and October 30, 2019, 10,144 residential homes had more than $220,000 in paid structural damage and would have had limited or no available ICC coverage, despite paying premiums for this coverage.

ICC coverage is only available to individuals after they have completed eligible work, commonly known as FRED (Floodproof, Relocate, Elevate, or Demolish). Given the magnitude and cost of eligible work, policyholders are often stuck in a situation where they are required to comply to reconstruct in a better way but have no funding availability. The money isn't there upfront, necessitating loans.

Even if the money was available up front and wasn't capped by statutory limits, $30,000 is inadequate for most FRED activities for most people. The overall ICC limit was set back in 1994. FEMA should be offering approximately $53,000 to simply match inflation. As the other statutory coverage limits show, placing a fixed value in statute creates economic and marketplace anomalies.

*Future State*

To create a bold new vision of the National Flood Insurance Program (NFIP) for the next fifty years of its existence, FEMA is proposing a revamp to ICC to make it available, usable, and

useful. This proposal renames ICC as "Flood Compliance and Mitigation (FCM)" coverage to emphasize both the trigger and what it pays for, includes statutory language to provide a better product for policyholders, who, after suffering a loss, can rebuild to a more resilient state and mitigate future flood losses.  Greater resiliency and mitigation of future flood losses benefits policyholders, their communities, and taxpayers. This proposal still maintains FCM as a fundamentally insurance-based product—based on fortuitous loss—and provides the customer the ability to choose the appropriate amount of coverage at actuarially sound rates of insurance.

If policyholders have a loss, FEMA wants to put them in a position to make resilient decisions in the future.

*Proposal Details*

To meet this lofty goal, FEMA proposes statutory changes to improve FCM. These changes, outlined below, remove FCM from the statutory structural limit so FCM can be used even on structures whose damage exceeds statutory caps, increase the available limits of FCM, allow FEMA to offer additional FCM coverage as an endorsement, remove premium caps on FCM so FEMA can make actuarially sound pricing, and allow FEMA to pay FCM prior to completion of work if the proceeds are used as the cost share for eligible grant activities.

- **Removes FCM coverage from the statutory structural coverage limit**
  Currently, payments to policyholders for their structure and ICC cannot exceed the statutory cap on available coverage. For residential homes, that total is $250,000 and the most coverage that FEMA offers for structures is $250,000. This creates situations where people are paying for coverage that they might not be able to use, even if there is a covered loss.  The new FCM proposal removes this constraint. If a policyholder has $50,000 in FCM and has $250,000 of eligible losses, they will receive that FCM money to put towards compliance and mitigation, regardless of how much money was spent to repair the underlying structure to the pre-loss condition.

- **Allows FEMA to offer FCM at 20% of the statutory structural coverage limit**
  ICC coverage amounts have remained at $30,000 since 2003. Housing costs and repair costs have increased in those 25 years, making $30,000 of coverage barely adequate, particularly to elevate structures, the most effective form of mitigation. The FCM proposal changes amount of coverage to be 20% of the statutory limit on structural coverage. That is, with current statutory limits, residential buildings would be eligible for $50,000 of FCM and non-residential buildings would be eligible for $100,000 of FCM. If the statutory limits are raised in the future, FCM would automatically adjust upwards.

- **Allows FEMA to offer an endorsement for FCM at 40% of the statutory structural coverage limit.**
  ICC coverage limits are fixed at $30,000 regardless of the type of property, the value of the property, or any policyholder choice. The FCM proposal would allow FEMA to offer an endorsement increasing FCM coverage to up to 40% of the statutory limit on structural coverage. Not only would this provide more coverage if there was a covered loss, but it would give policyholders a choice.

- **Removes caps on FCM premium and directs FEMA to offer as much coverage as possible.**
  Currently, there is a statutory cap on the amount of premiums that FEMA can charge for ICC coverage set at $75. This creates a scenario in which FEMA cannot raise the amount of ICC coverage offered without running a direct subsidy or by creating a cross subsidy by raising the rates on properties unlikely to use the coverage. FCM is contingent upon the idea that there is no specific cap on the amount of chargeable premium for FCM. FEMA may charge rates for FCM that are actuarially appropriate for the risk. This removes the potential for subsidies, pure or cross, from the coverage. The proposal goes further and states that FEMA shall offer as much coverage as possible.

72

- **Allow FCM to be used as cost share and provide up front funding.**
  After catastrophic floods, there is often a surfeit of grant money available to states and communities to provide to individuals to rebuild in a more resilient manner. While policyholders can currently assign their ICC claim to communities, it creates a first mover problem where grantors want to provide grants after the cost share has been met while FEMA only pays ICC claims after the costs are incurred. To solve this problem, the FCM proposal explicitly allows for individuals to assign their FCM claim for cost-share purposes. It also allows FEMA to pay the FCM loss upfront; if it is used in this context and meets certain eligibility requirements. This will allow for people who need the money to receive it more quickly.



*Comparative type:*

**National Flood Insurance Act of 1968**

**Sec. 1304. Authorization to establish and carry out program. (42 U.S.C. 4011)**

**(b) Additional coverage for compliance with land use and control measures**
  (1) In general.—The national flood insurance program established pursuant to subsection (a) shall enable the purchase of insurance to cover the cost of implementing measures that are consistent with land use and control measures established by the community under section 4102 of this title for-
  (1) (A) properties that are repetitive loss structures;
  (2) (B) properties that are substantially damaged structures;
  (3) (C) properties that have sustained flood damage on multiple occasions, if the Administrator determines that it is cost-effective and in the best interests of the National Flood Insurance Fund to require the implementation of such measures; and
  (4) (D) properties for which an offer of mitigation assistance is made under-

(A) (i) section 4104c of this title (Flood Mitigation Assistance Program);

(B) (ii) the Hazard Mitigation Grant Program authorized under section 5170c of this title;

(C) (iii) the Predisaster Hazard Mitigation Program under section 5133 of this title; and

(D) (iv) any programs authorized or for which funds are appropriated to address any unmet needs or for which supplemental funds are made available.

The Administrator shall impose a surcharge on each insured of not more than $75 per policy to provide cost of compliance coverage in accordance with the provisions of this subsection.

(2) Coverage amounts.—

(A) Basic coverage.—Unless a policyholder chooses additional coverage pursuant to subparagraph (B), the Administrator shall make available coverage provided under paragraph (1) in an amount equal to 20 percent of a policy's amount of building coverage.

(B) Additional coverage.—The Administrator may offer, and a policyholder may choose to purchase for an additional premium, coverage provided under paragraph (1) in an amount greater than that offered pursuant to subparagraph (A), but not exceeding an amount equal to 40 percent of a policy's amount of building coverage.

(C) Treatment of coverage limits.—Any amount of coverage for a property provided pursuant to this subsection shall not be considered or counted for purposes of any limitation on coverage applicable to such property under section 1306(b) and any claim on such coverage shall not be considered a claim for purposes of identifying properties with multiple losses.

(3) Premiums.—The Administrator shall charge risk premium rates for coverage made available pursuant to this section in accordance with section 1307(a)(1).

(4) Assignment of coverage for mitigation grant cost share requirement.—

(A) In general.— A policyholder may assign the rights or benefits of the coverage made available under this subsection to a governmental entity for the purposes of using payments made for a claim against coverage made available under this subsection to satisfy a required non-federal contribution for a flood-related mitigation project funded by mitigation assistance programs described in paragraph (1)(E)(i)-(iii).

(B) Eligible expenses .—If a policyholder assigns rights or benefits of coverage pursuant to subparagraph (A), then a required non-federal contribution for a flood-related mitigation project funded by mitigation assistance programs described in paragraph (1)(E)(i)-(iii) shall be an eligible expense for coverage made available under this subsection.

(C) Terms and conditions.—The Administrator may adopt procedures for assigning rights or benefits of coverage pursuant to subparagraph (A).

12. **Increase Maximum Coverage Limits** – Increases the NFIP's maximum coverage limits for structures and contents and index them to Fannie Mae/Freddie Mac conforming loan limits so that they can adjust periodically with housing costs.

_**Legislative text:**_

**Section___.  Amend coverage limits.**

74

(a) Streamlining maximum coverage limit amounts.—Section 1306 of the National Flood Insurance Act of 1968 (42 U.S.C. 4013) is amended by striking subsection (b) and inserting the following:

"(b) Available coverage.—

"(1) Maximum amount of coverage available.—

"(A) In general.—The Administrator shall make available flood insurance coverage for buildings and contents in various amounts of aggregate liability as follows:

"(i) 1-4 dwelling residential buildings.—If a building is a 1-4 dwelling residential building, then the Administrator shall make available flood insurance coverage for—

"(I) the building up to a share of the baseline amount, as determined by the Administrator; and

"(II) the contents contained within the building up to 40 percent of the baseline amount.

"(ii) (Multifamily residential buildings.—If a building is a multifamily residential building, then the Administrator shall make available flood coverage for—

"(I) the building up to 200 percent of the baseline amount; and

"(II) the contents contained within the building up to 200 percent of the baseline amount.

"(iii)  Non-residential building.— If a building is a non-residential building, then the Administrator shall make available flood coverage for—

(I) the building up to 200 percent of the baseline amount; and

 (II) the contents contained within the building up to 200 percent of the baseline amount.

"(B) Authority to provide lower amounts of coverage.—The Administrator may offer coverage in amounts less than those indicated by subparagraph (A) upon providing public notice of such limits in the Federal Register or through a comparable method.

"(2) Coverage limitation on pre-FIRM rates.—

"(A) Residential buildings.—Except as provided by subparagraph (B), for residential buildings,—

"(i) building coverage amounts in excess of $35,000 in aggregate liability for any single-family dwelling, and $100,000 for any residential structure containing more than one dwelling unit shall be based only on

chargeable premium rates under section 1308 which are not less than the estimated premium rates under section 1307(a)(1); and

"(ii) contents coverage amounts in excess of $10,000 in aggregate liability per dwelling unit shall be based only on chargeable premium rates under section 1308 which are not less than the estimated premium rates under section 1307(a)(1).

"(B) Residential buildings in high-cost areas.—For residential buildings located in the States of Alaska and Hawaii, and in the Virgin Islands and Guam,—

"(i) building coverage amounts in excess of $50,000 in aggregate liability for any single-family dwelling, and $150,000 for any residential structure containing more than one dwelling unit shall be based only on chargeable premium rates under section 1308 which are not less than the estimated premium rates under section 1307(a)(1); and

"(ii) contents coverage amounts in excess of $10,000 in aggregate liability per dwelling unit shall be based only on chargeable premium rates under section 1308 which are not less than the estimated premium rates under section 1307(a)(1).

"(C) Non-residential buildings.—For non-residential buildings,—

"(i) building coverage amounts in excess of $100,000 in aggregate liability shall be based only on chargeable premium rates under section 1308 which are not less than the estimated premium rates under section 1307(a)(1); and

"(ii) contents coverage amounts in excess of $100,000 in aggregate liability per unit shall be based only on chargeable premium rates under section 1308 which are not less than the estimated premium rates under section 1307(a)(1).

"(3) Definitions.—In this subsection,—

"(A) the term "1-4 dwelling residential building" means a building designed for use as a residence for no more than four families or a single-family unit in a building under a condominium form of ownership;

"(B) the term "baseline amount" means the amount determined by the Administrator that is equal to the maximum original principal obligation of conventional mortgages secured by a single-family residence eligible for purchase by Federal National Mortgage Association, as established pursuant to the 7th sentence of section 302(b)(2) of the Federal National Mortgage Association Charter Act, but for which the Administrator shall not ---

"(i) increase the amount more than once every five years;

76

"(ii) increase the amount for any property pursuant to the 11th and 12th sentence of section 302(b)(2) of the Federal National Mortgage Association Charter Act; or

"(iii) decrease the amount.

"(C) the term "multifamily residential building" means a residential building that is designed for use as a residential space for five or more families; and

"(D) the term "non-residential building" means a commercial or mixed-use building where the primary use is commercial or non-habitational.

(b) Technical amendment.—Section 1305 of the National Flood Insurance Act of 1968 (42 U.S.C. 4012) is amended by striking subsection (d).

(c) The Administrator shall implement this subsection without regard to 5 U.S.C. Chapter 5.

(c)

*Analysis:*

Subsection 1306(b) of the National Flood Insurance Act of 1968 (42 U.S.C. § 4013(b)) establishes statutory caps limiting the amount of coverage available for purchase under the National Flood Insurance Program (NFIP) and directs FEMA to adopt corresponding regulations.  As required, FEMA adopted 44 CFR § 61.6, which limits the amount of coverage available to the maximum amounts imposed by 42 U.S.C. § 4013(b).  As the statute is currently structured, FEMA cannot increase the available coverage amounts until (1) Congress increases the statutory caps, and (2) FEMA amends 44 CFR § 61.6 through the notice-and-comment rulemaking process.

Given the increase in housing prices across the country, the existing maximum coverage limits do not provide the same level of protection to NFIP policyholders today as they did when Congress last updated them 25 years ago.  Over half (61%) of NFIP-insured single family residences have $250,000 of building coverage, suggesting that the upper limits on coverage bind households that would otherwise purchase greater protection.   Many policyholders are underinsured and will not be able to replace their home or belongings in the event of a total loss. Customers who are unable to fully insure the value of their home through the NFIP are left with two options from a customer experience perspective: either remain underinsured or buy a second policy for their home from another insurer.  There is a small private market that enables some NFIP policyholders to purchase excess coverage above the NFIP's current coverage limits (for 1-4 family structures) of $250,000 for structure and $100,000 for contents.

FEMA proposes increasing coverage limits to enable policyholders to better manage their risk and recover more quickly and more fully after flood events.  The draft statute below would accomplish this and allow for faster implementation, better align with the NFIP's current regulatory framework, and ensure coverage limits keep up with the needs and expectations of NFIP policyholders in the future.

The language provided below restates the NFIP's statutory coverage limits in a much clearer way.  It expresses all coverage limits as a percentage of a 'baseline amount' linked to the Fannie Mae/Freddie Mac conforming loan limit for single-family dwellings (currently $647,200 as of January 1, 2022) with no regional variation.  The draft statute would allow FEMA to offer coverage for 1- to 4-dwelling residences beyond the current $250,000 limit, up to 100% of the conforming loan limit, with commensurate increases for multifamily and commercial structures

and associated contents coverage.  Indexing NFIP maximum coverage limits to the Fannie Mae/Freddie Mac conforming loan limit, which tracks inflation in housing prices, would ensure that NFIP coverage keeps pace with changes in future home values.  The NFIP would provide coverage above the current maximum coverage limits at full-risk premium rates, with some limited exceptions.[5]  Although expected claims payouts would increase, that increase would be relatively minor and aggregate premiums would increase to match the increased expected claims payout.

This language is written to be self-executing, which would allow FEMA to offer the increased maximum coverage limits without undergoing the lengthy rulemaking process.  FEMA would adjust the indicated amounts every five years to keep up with increases in the conforming loan limit.  Such a time interval would ensure that the limits keep up with inflation while alleviating any concern about stakeholder or policyholder confusion resulting from too-frequent changes in the limits.

*Comparative type:*

### National Flood Insurance Act of 1968

### SEC. 1305.  SCOPE OF PROGRAM AND PRIORITIES.  (42 U.S.C. 4012)

*   *   *   *

(d) Availability of insurance for multifamily properties
   (1) In general. The Administrator shall make flood insurance available to cover residential properties of 5 or more residences. Notwithstanding any other provision of law, the maximum coverage amount that the Administrator may make available under this subsection to such residential properties shall be equal to the coverage amount made available to commercial properties.
   (2) Rule of construction.   Nothing in this subsection shall be construed to limit the ability of individuals residing in residential properties of 5 or more residences to obtain insurance for the contents and personal articles located in such residences.

### SEC. 1306. NATURE AND LIMITATIONS OF INSURANCE COVERAGE. (42 U.S.C. 4013)

*   *   *   *

---

[5] For the great majority of NFIP policies, both full-risk and pre-Flood Insurance Rate Map (pre-FIRM) discounted, any additional coverage would be at full-risk rates.  Policyholders with existing pre-FIRM discounts would continue to receive those discounts on coverage below the current maximum limits but any additional coverage enabled by this reform would be at full-risk rates.  However, policyholders with Newly Mapped discounts (with property remapped into a Special Flood Hazard Area) would receive that discount on both their original coverage and the increased amount.  Policies eligible for A99 discounts would receive the same treatment.  Newly Mapped policies constitute only 3.6% of current NFIP policies, and those with A99 discounts represent fewer than 0.8% of NFIP policies.  Moreover, while such policyholders would receive some discount on additional coverage, the premium would be commesurate with the amount of coverage they select.

(b) Regulations respecting amount of coverage.  In addition to any other terms and conditions under subsection (a), such regulations shall provide that—

(1) any flood insurance coverage based on chargeable premium rates under section 4015 of this title which are less than the estimated premium rates under section 4014(a)(1) of this title shall not exceed—

(A) in the case of residential properties—

(i) $35,000 aggregate liability for any single-family dwelling, and $100,000 for any residential structure containing more than one dwelling unit,

(ii) $10,000 aggregate liability per swelling unit for any contents related to such unit, and

(iii) in the States of Alaska and Hawaii, and in the Virgin Islands and Guam, the limits provided in clause (i) of this sentence shall be: $50,000 aggregate liability for any single-family dwelling, and $150,000 for any residential structure containing more than one dwelling unit;

(B) in the case of business properties which are owned or leased and operated by small business concerns, an aggregate liability with respect to any single structure, including any contents thereof related to premises of small business occupants (as that term is defined by the Administrator), which shall be equal to (i) $100,000 plus (ii) $100,000 multiplied by the number of such occupants and shall be allocated among such occupants (or among the occupant or occupants and the owner) under regulations prescribed by the Administrator; except that the aggregate liability for the structure itself may in no case exceed $100,000; and

(C) in the case of church properties and any other properties which may become eligible for flood insurance under section 4012 of this title—

(i) $100,000 aggregate liability for any single structure, and

(ii)  $100,000 aggregate liability per unit for any contents related to such unit; and

(2)  in the case of any residential building designed for the occupancy of from 1 to 4 families for which the risk premium rate is determined in accordance with the provisions of section 4014(a)(1) of this title, additional flood insurance in excess of the limits specified in clause (i) of subparagraph (A) of paragraph (1) shall be made available, with respect to any single such building, up to an aggregate liability (including such limits specified in paragraph (1)(A)(i)) of $250,000;

(3) in the case of any residential property for which the risk premium rate is determined in accordance with the provisions of section 4014(a)(1) of this title, additional flood insurance in excess of the limits specified in clause (ii) of subparagraph (A) of paragraph (1) shall be made available to every insured upon renewal and every applicant for insurance so as to enable any such insured or applicant to receive coverage up to a total amount (including such limits specified in paragraph (1)(A)(ii)) of $100,000;

(4) in the case of any nonresidential building, including a church, for which the risk premium rate is determined in accordance with the provisions of section 4014(a)(1) of this title, additional flood insurance in excess of the limits specified in subparagraphs (B) and (C) of paragraph (1) shall be made available with respect to any single such building, up to an aggregate liability (including such limits specified in subparagraph (B) or (C) of paragraph (1), as applicable) of $500,000, and coverage shall be made available up to a total of $500,000 aggregate liability for contents owned by the building owner and $500,000 aggregate liability for each unit within the building for contents owned by the tenant; and

(5) any flood insurance coverage which may be made available in excess of the limits specified in subparagraph (A), (B), or (C) of paragraph (1), shall be based only on chargeable premium rates under section 4015 of this title, which are not less than the estimated premium rates under section 4014(a)(1) of this title, and the amount of such excess coverage shall not in any case exceed an amount equal to the applicable limit so specified (or allocated) under paragraph (1)(C), (2), (3), or (4), as applicable.

79

(b)  Available coverage.—
  (1) Maximum amount of coverage available.—
    (A) In general.—The Administrator shall make available flood insurance coverage for buildings and contents in various amounts of aggregate liability as follows:
      (i) 1-4 dwelling residential buildings.—If a building is a 1-4 dwelling residential building, then the Administrator shall make available flood insurance coverage for—
        (I) the building up to a share of the baseline amount, as determined by the Administrator; and
        (II) the contents contained within the building up to 40 percent of the baseline amount.
      (ii) Multifamily residential buildings.—If a building is a multifamily residential building, then the Administrator shall make available flood coverage for—
        (I) the building up to 200 percent of the baseline amount; and
        (II) the contents contained within the building up to 200 percent of the baseline amount.
      (iii) Non-residential building.— If a building is a non-residential building, then the Administrator shall make available flood coverage for—
        (I) the building up to 200 percent of the baseline amount; and
        (II) the contents contained within the building up to 200 percent of the baseline amount.
    (B) Authority to provide lower amounts of coverage.—The Administrator may offer coverage in amounts less than those indicated by subparagraph (A) upon providing public notice of such limits in the Federal Register or through a comparable method.
  (2) Coverage limitation on pre-FIRM rates.—
    (A) Residential buildings.—Except as provided by subparagraph (B), for residential buildings,—
      (i) building coverage amounts in excess of $35,000 in aggregate liability for any single-family dwelling, and $100,000 for any residential structure containing more than one dwelling unit shall be based only on chargeable premium rates under section 1308 which are not less than the estimated premium rates under section 1307(a)(1); and
      (ii) contents coverage amounts in excess of $10,000 in aggregate liability per dwelling unit shall be based only on chargeable premium rates under section 1308 which are not less than the estimated premium rates under section 1307(a)(1).
    (B) Residential buildings in high-cost areas.—For residential buildings located in the States of Alaska and Hawaii, and in the Virgin Islands and Guam,—
      (i) building coverage amounts in excess of $50,000 in aggregate liability for any single-family dwelling, and $150,000 for any residential structure containing more than one dwelling unit shall be based only on chargeable premium rates under section 1308 which are not less than the estimated premium rates under section 1307(a)(1); and
      (ii) contents coverage amounts in excess of $10,000 in aggregate liability per dwelling unit shall be based only on chargeable premium rates under section 1308 which are not less than the estimated premium rates under section 1307(a)(1).
    (C) Non-residential buildings.—For non-residential buildings,—
      (i) building coverage amounts in excess of $100,000 in aggregate liability shall be based only on chargeable premium rates under section 1308 which are not less than the estimated premium rates under section 1307(a)(1); and

(ii) contents coverage amounts in excess of $100,000 in aggregate liability per unit shall be based only on chargeable premium rates under section 1308 which are not less than the estimated premium rates under section 1307(a)(1).

(3) Definitions.—In this subsection,—

(A) the term "1-4 dwelling residential building" means a building designed for use as a residence for no more than four families or a single-family unit in a building under a condominium form of ownership;

(B) the term "baseline amount" means the amount determined by the Administrator that is equal to the maximum original principal obligation of conventional mortgages secured by a single-family residence eligible for purchase by Federal National Mortgage Association, as established pursuant to the 7th sentence of section 302(b)(2) of the Federal National Mortgage Association Charter Act, but for which the Administrator shall not—
(i) increase the amount more than once every five years;
(ii) increase the amount for any property pursuant to the 11th and 12th sentence of section 302(b)(2) of the Federal National Mortgage Association Charter Act; or
(iii) decrease the amount.

(C) the term "multifamily residential building" means a residential building that is designed for use as a residential space for five or more families; and

(D) the term "non-residential building" means a commercial or mixed-use building where the primary use is commercial or non-habitational.

\* \* \* \*

13. **Study the Efficacy of the Mandatory Purchase Requirement**– Direct the Government Accountability Office to study how well the NFIP's mandatory purchase requirement meets the Congress' intent to increase the number of Americans covered by flood insurance, including renters and property owners in low-income areas.

*Legislative text:*

**Section. ___.   Study the efficacy of the Mandatory Purchase Requirement.**
(a) MANDATORY PURCHASE STUDY; GUIDELINES ---
(1) STUDY.—
(A) IN GENERAL.—The Comptroller General of the United States shall conduct a study of the implementation and efficacy of the requirements of section 102 of the Flood Disaster Protection Act of 1973 (42 U.S.C. 4012a). Such study shall at minimum consider the following questions:
(i) How effectively do Federal agencies, regulated lending institutions, and Federal entities for lending regulation implement the requirements of section 102 of the Flood Disaster Protection Act of 1973?
(ii) Does the current implementation of the Flood Disaster Protection Act of 1973 align with the congressional findings and purposes described in section 2(b) of such Act (42 U.S.C. 4002)?
(iii) What, if any, unintended consequences have resulted from the requirements and implementation of section 102 of such Act?
(B) REPORT.—Not later than the expiration of the 18-month period beginning on the date of the enactment of this Act, the Comptroller General shall submit a report to the Committee on Financial Services of the House of Representatives and the Committee

on Banking, Housing, and Urban Affairs of the Senate regarding the findings and conclusions of the study conducted pursuant to this paragraph.

*Analysis:*

The language below would direct the Government Accountability Office (GAO) to study the efficacy of the NFIP's mandatory purchase requirement at meeting Congress' intent in the Flood Disaster Protection Act of 1973 to increase the number of Americans covered by flood insurance. Once completed, the GAO's findings and recommendations could inform the federal entities responsible for implementing the mandatory purchase requirement as well as the NFIP's efforts to increase flood insurance uptake more broadly.  FEMA would welcome a study exploring the effectiveness of the mandatory purchase requirement.

FEMA recognizes that this proposal in combination with other proposals in this legislative package may have impacts on the supply of affordable housing in and around areas at risk of flooding. FEMA recognizes there is a severe housing supply crisis across the nation, and disasters exacerbate this crisis. The lowest income households – who are most vulnerable to disasters – are also the most affected by this housing crisis. After enactment, FEMA will engage and assist HUD to conduct a rigorous evaluation of the impacts of this legislation on the supply and pricing of housing in SFHAs and neighboring areas."

*Comparative type:*

Not applicable

14. . **Prohibit Coverage for New Construction in High-Risk Areas/Commercial Properties** – Prohibits NFIP coverage for new construction in the highest-risk areas and commercial properties to promote the growth of the private market by creating an inventory for new flood risk properties for which private insurance companies could compete. .

*Legislative text:*

**Section ____. prohibit coverage for new construction in high-risk areas.**
The National Flood Insurance Act of 1968 is amended in section 1305 (42 U.S.C. 4012) by adding at the end the following:
"(e) Prohibition of coverage for new construction in high-risk areas.—
   "(1) Except as provided in paragraph (2), and notwithstanding any other provision of this
      title, on or after two years after the enactment of this Act, the Administrator shall not
      make available flood insurance coverage under this title as follows:
         "(A) NEW STRUCTURES BUILT IN THE FLOOD HAZARD ZONES.—For any
            property for which new construction is commenced on or after such date and that,
            upon completion of such construction, is located in an area having special flood
            hazards.
         "(B) IMPLEMENTATION.—The Administrator may implement this subsection without
            regard to 5 U.S.C. Chapter 5, except that any such implementation shall include

82

publication of notice in the Federal Register or by another comparable method, such as posting on an official website of the Administrator.

"(2) Availability of otherwise prohibited flood insurance.—

"(A) AUTHORITY.  Upon a determination under subparagraph (B), the Administrator may temporarily make available in participating NFIP communities for residential properties that are described in subparagraph (e)(1)(A), and are located in such area, coverage for flood insurance under this Act, notwithstanding paragraph (e)(1), during the period that begins upon such determination under paragraph (B) and ends upon the termination date with respect to such period determined under subparagraph (C) of this subsection.

"(B) DETERMINATION OF MARKET CONDITIONS.  A determination under this subparagraph is a determination made by the State insurance regulator for the affected geographic area that the availability or affordability of private flood insurance coverage for properties described in subparagraph (e)(1)(A) in the geographical area does not exist.

"(C) TERMINATION.  The authority to make flood insurance coverage available pursuant to this subsection shall cease to exist for the affected geographic areas when the State insurance regulator for the affected area determines affordable private flood insurance is available for the area."

"(f) PROHIBITION OF NEW COVERAGE FOR NON-RESIDENTIAL BUSINESS PROPERTIES.—

"(1) Except as provided in paragraph (2) and notwithstanding any other provision of this title on or after two years after enactment of the Act, the Administrator shall not make available flood insurance coverage under this title as follows:

"(A) NON-RESIDENTIAL BUSINESS PROPERTY POLICIES.— For any non-residential business properties, unless a newly issued policy covers a property with continuous flood insurance coverage.

"(B) IMPLEMENTATION.—The Administrator may implement this subsection without regard to 5 U.S.C. Chapter 5, except that any such implementation shall include publication of notice in the Federal Register or by another comparable method, such as posting on an official website of the Administrator.

"(2) AVAILABILITY OF OTHERWISE PROHIBITED FLOOD INSURANCE WHERE PRIVATE MARKET COVERAGE IS UNAVAILABLE. –

"(A) AUTHORITY.  Upon a determination under subparagraph (B) the Administrator may temporarily make available in participating NFIP communities for small business properties that are described in subparagraph (f)(1)(A), and are located in such area, coverage for flood insurance under this Act, notwithstanding paragraph (f)(1), during the period that begins upon such determination under paragraph (B) and ends upon the termination date with respect to such period determined under subparagraph (C) of this subsection.

"(B) DETERMINATION OF MARKET CONDITIONS.  A determination under this subparagraph is a determination made by the State insurance regulator for the affected geographic area that the availability or affordability of private flood insurance coverage for properties described in subparagraph (f)(1)(A) in the geographical area does not exist.

"(C) TERMINATION.  The authority to make flood insurance coverage available pursuant to this subsection shall cease to exist for the affected geographic areas when the State insurance regulator for the affected area determines affordable private flood insurance is available for the area.".

*Analysis:*

Congress should prohibit the NFIP from selling flood insurance policies on new structures built in Special Flood Hazard Areas on or after a statutorily mandated date, effectively creating an inventory of new flood risk properties that private property insurance companies could compete for in a marketplace without a subsidized government program. The private insurance market would likely find insuring new construction built in compliance with NFIP minimum standards an attractive business proposition. NFIP can work with private industry through its existing relationships with Write Your Own (WYO) companies and other partners to remove barriers to a robust private market. However, there must be ample time for the private market to develop products, receive necessary state approvals, and for communities and developers to adapt to the new flood insurance market. Allowing for a phasing in period by making the effective date be on or after a date two years after enactment could smooth the transition to a new flood insurance market and give citizens, insurers, communities, and the NFIP time to adjust. It is also important to provide a process to allow state insurance commissioners who identify a lack of a viable private flood insurance market to engage the Federal Government to seek an exception allowing NFIP coverage for new construction for a period of time.

Congress should likewise prohibit the NFIP from selling new flood insurance policies for commercial structures (regardless of date of construction or location in or outside Special Flood Hazard Areas). The NFIP should continue offering flood insurance for commercial properties with existing continuous flood coverage (running with the property versus the specific owner), but not take on any new business. Business owners seeking coverage could turn to existing commercial flood insurance markets.  As with the new construction proposal above, allowing for a phasing in period, on or after a date two years after enactment of the legislation, would smooth the transition for business owners, private insurers, and the NFIP.

*Comparative type:*

**Sec. 1305. Scope of program and priorities. (42 U.S.C. 4012.)**

\*   \*   \*   \*

(e) Prohibition of coverage for new construction in high-risk areas.—
   (1) Except as provided in paragraph (2), and notwithstanding any other provision of this title, on or after two years after the enactment of this Act, the Administrator shall not make available flood insurance coverage under this title as follows:
      (A) NEW STRUCTURES BUILT IN THE FLOOD HAZARD ZONES.— For any property for which new construction is commenced on or after such date and that, upon completion of such construction, is located in an area having special flood hazards.
      (B) IMPLEMENTATION.—The Administrator may implement this subsection without regard to 5 U.S.C. Chapter 5, except that any such implementation shall include publication of notice in the Federal Register or by another comparable method, such as posting on an official website of the Administrator.
   (2) Availability of otherwise prohibited flood insurance.—
      (A) AUTHORITY.  Upon a determination under subparagraph (B), the Administrator may temporarily make available in participating NFIP communities for residential properties that are described in subparagraph (e)(1)(A), and are located in such area, coverage for flood insurance under this Act, notwithstanding paragraph (e)(1), during

the period that begins upon such determination under paragraph (B) and ends upon the termination date with respect to such period determined under subparagraph (C) of this subsection.

(B) DETERMINATION OF MARKET CONDITIONS.  A determination under this subparagraph is a determination made by the State insurance regulator for the affected geographic area that the availability or affordability of private flood insurance coverage for properties described in subparagraph (e)(1)(A) in the geographical area does not exist.

(C) TERMINATION.  The authority to make flood insurance coverage available pursuant to this subsection shall cease to exist for the affected geographic areas when the State insurance regulator for the affected area determines affordable private flood insurance is available for the area.

(f) PROHIBITION OF NEW COVERAGE FOR NON-RESIDENTIAL BUSINESS PROPERTIES.—

(1) Except as provided in paragraph (2) and notwithstanding any other provision of this title on or after two years after enactment of the Act, the Administrator shall not make available flood insurance coverage under this title as follows:

(A) NON-RESIDENTIAL BUSINESS PROPERTY POLICIES.— For any non-residential business properties, unless a newly issued policy covers a property with continuous flood insurance coverage.

(B) IMPLEMENTATION.—The Administrator may implement this subsection without regard to 5 U.S.C chapter 5, except that any such implementation shall include publication of notice in the Federal Register or by another comparable method, such as posting on an official website of the Administrator.

(2) AVAILABILITY OF OTHERWISE PROHIBITED FLOOD INSURANCE WHERE PRIVATE MARKET COVERAGE IS UNAVAILABLE. –

(A) AUTHORITY.  Upon a determination under subparagraph (B) the Administrator may temporarily make available in participating NFIP communities for small business properties that are described in subparagraph (f)(1)(A), and are located in such area, coverage for flood insurance under this Act, notwithstanding paragraph (f)(1), during the period that begins upon such determination under paragraph (B) and ends upon the termination date with respect to such period determined under subparagraph (C) of this subsection.

(B) DETERMINATION OF MARKET CONDITIONS.  A determination under this subparagraph is a determination made by the State insurance regulator for the affected geographic area that the availability or affordability of private flood insurance coverage for properties described in subparagraph (f)(1)(A) in the geographical area does not exist.

(C) TERMINATION.  The authority to make flood insurance coverage available pursuant to this subsection shall cease to exist for the affected geographic areas when the State insurance regulator for the affected area determines affordable private flood insurance is available for the area.

### *Technical and Operational Enhancements*

15. **Clarify Period to File Suit** – Requires that policyholders exhaust the administrative appeals process prior to initiating a lawsuit. Revises the statute of limitations to allow policyholders to sue FEMA not

later than 90 days after the appeal decision date, rather than the current timeframe of one year after denial of a claim.

### *Legislative text:*

**Sec. ___. Enhanced Dispute RESOLUTION Process.**
(a) Enhanced policyholder appeals process.—
    (1) Part C of chapter II of the National Flood Insurance Act of 1968 (42 U.S.C. 4081 et seq.) is amended by adding at the end the following new section:

**"Sec. 1349. Appeal of Decisions Relating to Flood insurance Coverage.**
"(a) In general.—The Administrator shall establish an appeals process to enable holders of a flood insurance policy provided under this title to appeal the decisions of their insurer, with respect to the disallowance, in whole or in part, of any claims for proved and approved losses covered by flood insurance. Such appeals must be filed not later than 180 days after the disallowance, in whole or in part, of any claims for proved and approved losses covered by flood insurance and shall be limited to the claim or portion of the claim disallowed by the insurer.
"(b) Appeal decision.—Upon a decision in an appeal under subsection (a), the Administrator shall provide the policyholder with a written appeal decision. The appeal decision shall explain the Administrator's determination to uphold or overturn the decision of the flood insurer. The Administrator may direct the flood insurer to take action necessary to resolve the appeal, to include re-inspection, re-adjustment, or payment, as appropriate.
"(c) Rules of construction.—This section shall not be construed as—
    "(1) making the Federal Emergency Management Agency or the Administrator a party to the flood insurance contract; or
    "(2) creating any action or remedy not otherwise provided by this title.".

    (2) Repeal.—Section 205 of the Bunning-Blumenauer-Bereuter Flood Insurance Reform Act of 2004 (42 U.S.C. 4011 note) is hereby repealed.

(b) Judicial review reform.—Section 1341 of the National Flood Insurance Act of 1968 (42 U.S.C. 4072) is amended—
    (1) by striking "In the event the program" and inserting:
"(a) In general.—In the event the program";
    (2) in subsection (a), by striking "and upon the disallowance by the Administrator of any such claim," and inserting "and upon the disallowance by the Administrator or the Administrator's fiscal agent of any such claim,";
    (3) in subsection (a), by striking "within one year after the date of mailing of notice of disallowance or partial disallowance by the Administrator" and inserting "not later than 90 days after exhausting available administrative remedies pursuant to subsection (b)";
    (4) in subsection (a), by striking "may institute an action against the Administrator on such claim" and inserting "may institute an action against the insurer on such claim"; and
    (5) adding at the end the following:

"(b) Exhaustion of administrative remedies.—For the purposes of this section, administrative remedies are exhausted if a claimant—
    "(1) submits an appeal and complies with all requirements of the appeal process established by section 1348 and other applicable requirements; and
    "(2) either—
        "(A) the Administrator issues a final decision on the appeal that partially or fully concurs with the insurer's disallowance or partial disallowance of the claim; or

"(B) the Administrator makes no finding regarding the appeal within 365 days from the date the Administrator acknowledges receipt and acceptance of the appeal.

"(c) Limitations.—For the purposes of this section,

"(1) actions under this section shall not be instituted for any issue of the claim not presented to the Administrator on appeal; and

"(2) disposition of any appeal by the Administrator shall not be competent evidence of liability or amount of damages.

"(d) Strict Construction.—The limitations and requirements of this section are to be strictly construed."

(c) Effective date.—The amendments made by subsections (a) and (b) shall apply to any claim related to a flood insurance policy made available under the National Flood Insurance Act of 1968 (42 U.S.C. 4001 et seq.) issued or renewed on or after January 1, 2022.

*Analysis:*

The current language in Section 1341 of the National Flood Insurance Act of 1968, as amended, establishing a statute of limitations for filing a lawsuit to dispute a flood insurance claim, is a heavily litigated issue in the National Flood Insurance Program (NFIP) because of confusion as to when the statute of limitations begins and ends. The draft statute provided below codifies and clarifies the existing NFIP appeal authorities and would require policyholders to exhaust the NFIP appeals process prior to filing a lawsuit in federal court challenging the disallowance or partial disallowance of a flood insurance claim. Policyholders would be required to submit an appeal in compliance with the NFIP appeals process. Policyholders would be able to file suit no later than 90 days after exhausting the NFIP appeals process. The NFIP appeals process is exhausted if either FEMA sends a final appeal determination or fails to issue a final appeal determination within 365 days of acknowledging receipt of and accepting the policyholders' appeal.

This reform would enable FEMA to improve oversight of NFIP insurers, encourage efficient and consistent litigation, and provide policyholders with greater clarity on their course of action after receiving a denial letter and the amount of time they have to file an appeal of that denial letter or file suit after appeal. Driving claim disputes through the appeals process would allow FEMA to proactively collect and track trends and issues in the claims handling process, identify systemic issues, and intervene in the claim process when necessary. It would ensure a consistent interpretation and application of the Standard Flood Insurance Policy. If a claim continued to litigation, both sides would benefit from the prior appeals process because the factual and legal issues in dispute would already be developed and ready for resolution. Basing the statute of limitations on the exhaustion of administrative remedies would ensure uniformity and predictability of claims by identifying a clear date on which the statute of limitations begins and a clear date on which it has run, while ensuring the resolution of issues in a cost effective and efficient manner.

*Comparative type:*

SEC. 205. BUNNING-BLUMENAUER-BEREUTER FLOOD INSURANCE ACT OF 2004 (42 U.S.C. 4011 NOTE). APPEAL OF DECISIONS RELATING TO FLOOD INSURANCE COVERAGE

Not later than 6 months after the date of enactment of this Act [June 30, 2004], the Director shall, by regulation, establish an appeals process through which holders of a flood insurance policy may appeal the decisions, with respect to claims, proofs of loss, and loss estimates relating to such flood insurance policy, of——

(a)      any insurance agent or adjuster, or insurance company; or
4.   any employee or contractor of the Federal Emergency Management Agency.

**National Flood Insurance Act of 1968**

**Sec. 1341. Adjustment and payment of claims; judicial review; limitations; jurisdiction. (42 U.S.C. 4072)**

In the event the program (a) In General. –In the event the program is carried out as provided in section 1340 [42 U.S.C. § 4071], the Administrator shall be authorized to adjust and make payment of any claims for proved and approved losses covered by flood insurance, and upon the disallowance by the Administrator of any such claim, and upon the disallowance by the Administrator or the Administrator's fiscal agent of any such claim, or upon the refusal of the claimant to accept the amount allowed upon any such claim, the claimant, within one year after the date of mailing of notice of disallowance or partial disallowance by the Administrator not later than 90 days after exhausting available administrative remedies pursuant to subsection (b), may institute an action against the Administrator on such claim may institute an action against the insurer on such claim in the United States district court for the district in which the insured property or the major part thereof shall have been situated, and original exclusive jurisdiction is hereby conferred upon such court to hear and determine such action without regard to the amount in controversy.

(b) Exhaustion of administrative remedies.—For the purposes of this section, administrative remedies are exhausted if a claimant—

    (1) submits an appeal and complies with all requirements of the appeal process established by section 1349 and other applicable requirements; and

    (2) either—

        (A) the Administrator issues a final decision on the appeal that partially or fully concurs with the insurer's disallowance or partial disallowance of the claim; or

        (B) the Administrator makes no finding regarding the appeal within 365 days from the date the Administrator acknowledges receipt and acceptance of the appeal.

(c) Limitations.—For the purposes of this section,

    (1) actions under this section shall not be instituted for any issue of the claim not presented to the Administrator on appeal; and

    (2) disposition of any appeal by the Administrator shall not be competent evidence of liability or amount of damages.

(d) Strict Construction.—The limitations and requirements of this section are to be strictly construed.

**Sec. 1349. Appeal of Decisions Relating to Flood insurance Coverage. (42 U.S.C.      )**

(a) In general.—The Administrator shall establish an appeals process to enable holders of a flood insurance policy provided under this title to appeal the decisions of their insurer, with respect to the disallowance, in whole or in part, of any claims for proved and approved losses covered by flood insurance. Such appeals must be filed not later than 180 days after the disallowance, in whole or in part, of any claims for proved and approved losses covered by flood insurance and shall be limited to the claim or portion of the claim disallowed by the insurer.

(b) Appeal decision.—Upon a decision in an appeal under subsection (a), the Administrator shall provide the policyholder with a written appeal decision. The appeal decision shall explain the Administrator's determination to uphold or overturn the decision of the flood insurer. The Administrator may direct the flood insurer to take action necessary to resolve the appeal, to include re-inspection, re-adjustment, or payment, as appropriate.

(c) Rules of construction.—This section shall not be construed as—

    (1) making the Federal Emergency Management Agency or the Administrator a party to the flood insurance contract; or

    **(2) creating any action or remedy not otherwise provided by this title.**

**Bunning-Blumenauer-Bereuter Flood Insurance Act of 2004**

~~SEC. 205. APPEAL OF DECISIONS RELATING TO FLOOD INSURANCE COVERAGE. (42 U.S.C. 4011 NOTE).~~

~~Not later than 6 months after the date of enactment of this Act [June 30, 2004], the Director shall, by regulation, establish an appeals process through which holders of a flood insurance policy may appeal the decisions, with respect to claims, proofs of loss, and loss estimates relating to such flood insurance policy, of —~~

~~(1) any insurance agent or adjuster, or insurance company; or~~
~~(2) any employee or contractor of the Federal Emergency Management Agency.~~

16. **Reduce Reporting Complexity** – Reducing the reporting complexity for the NFIP means that, in a two-year period, reports due to the Congress decrease from 15 to 4 while providing similar and more timely information.

*Legislative text:*

**Sec. __.  Streamlining and consolidation of financial Reporting requirements.**

(a) Fiduciary responsibility; annual reports (Retrospective and prospective).—

(1) In general.—Chapter I of the National Flood Insurance Act of 1968 (42 U.S.C. 4011 et seq.) is amended by inserting after section 1309 a new section to read as follows:

"**SEC. 1309B.  FINANCIAL RESPONSIBILITY AND REVIEW**.

"(a) Annual Retrospective report on the National Flood Insurance Program.—

"(1) In general.—The Administrator shall provide an annual retrospective report on the National Flood Insurance Program on—

"(A) the activities and operations of the National Flood Insurance Program;

"(B) the total actual National Flood Insurance Program revenue and expenses for the year, in comparison to prior years;

"(C) objective benchmarks to evaluate the Program's financial position;

"(D) factors that FEMA can control (under current authorities, within parameters set by Congress) to influence National Flood Insurance Program revenue and expenses, including changes implemented during the year; and

"(E) recommended changes to make the National Flood Insurance Program more effective and financially sound.

"(2) Mandatory components.—The report required under paragraph (1) shall include at a minimum—

"(A) the cumulative volume of policies that have been underwritten during the fiscal year for which the report is submitted;

89

"(B) the amount of premiums paid;

"(C) the number of policies with premiums that exceed one percent of the total coverage pursuant to section 1308(j)

"(D) the amount of administrative expenses;

"(E) the progress of any repayment of funds borrowed from the U.S. Treasury;

"(F) information on any actuarial deficits (the difference between expected annualized losses and expenses, and annualized premium for the year) that occurred during the reporting period;

"(G) an assessment of the impacts of rate increases implemented during the reporting period, including

"(i) the Administrator's assessment of the impact, if any, of the rate increases required under subparagraphs (A) and (D) of section 1307(a)(2) and the surcharges required under section 1308A on the affordability of flood insurance for—

"(I) small businesses with less than 100 employees;

"(II) non-profit entities;

"(III) houses of worship; and

"(IV) residences with a value equal to or less than 25 percent of the median home value of properties in the State in which the property is located; and

"(ii) the Administrator's recommendations, if any, upon determining that the rate increases or surcharges described in clause (i) are having a detrimental effect on affordability, including with respect to lapsed policies, late payments, or other criteria related to affordability as identified by the Administrator, for any of the properties identified in subparagraphs (A) through (D) of section 1307(a)(2);

"(H) an overall assessment of the financial status of the National Flood Insurance Program, including—

"(i) the capacity to pay claims, and

"(ii) for any year in which the Administrator exercises the authority under section 1335(a)(2) to secure reinsurance of coverage provided by the National Flood Insurance Program from the private market, information relating to the use of private sector reinsurance and reinsurance equivalents by the Administrator whether or not the Administrator used the borrowing authority under section 1309; and

"(I) if the Administrator determines that the reserve fund ratio required under section 1310A cannot be achieved, the reserve fund ratio that was achieved, any specific

concerns the Administrator has regarding the consequences, and discussion of how such consequences would harm the long-term financial soundness of the flood insurance program;

"(J) the number of claims;

"(K) the number of claims involving damages in excess of the maximum amount of flood insurance available under the National Flood Insurance Program and the sum of the amount of all damages in excess of such amount;

"(L) a description and summary of the losses attributable to repetitive or severe repetitive loss properties;

"(M) a description and summary of all losses incurred by the National Flood Insurance Program due to—

"(i) hurricane-related damage; and

"(ii) non-hurricane related damage;

"(N) the status of mitigation activities carried out with assistance provided under section 1366; and

"(3) Transmission of report.—

"(A) In general.—The Administrator shall send the report required under paragraph (1) to—

"(i) the Committee on Financial Services of the House of Representatives;

"(ii) the Committee on Banking, Housing, and Urban Affairs of the Senate; and

"(iii) the Secretary of the Treasury.

"(B) Deadline.—The Administrator shall send the report pursuant to subparagraph (A) at the time of the submission of the President's budget to Congress.

"(b) Annual Prospective Report on the national Flood Insurance Program—

"(1) In general—The Administrator shall provide an annual prospective report on the National Flood Insurance Program on—

"(A) the projected activities and operations of the National Flood Insurance Program;

"(B) the total projected National Flood Insurance Program revenue and expenses expected for the coming year, in comparison to prior years;

"(C) objective benchmarks to evaluate the Program's financial position;

"(D) factors that FEMA can control (under current authorities, within parameters set by Congress) to influence National Flood Insurance Program revenue and expenses including planned changes for the upcoming year; and

"(E) recommended changes to make the National Flood Insurance Program more effective and financially sound.

91

"(2) Mandatory components.—The report required under paragraph (1) shall include at a minimum—

"(A) the amount of expected claim payments;

"(B) the amount of anticipated program activity and administrative costs reflected in risk premium rates;

"(C) a schedule for repayment of amounts borrowed from the U.S. Treasury;

"(D) any actuarial deficit(s) (the difference between expected annualized losses and expenses, and annualized premium for the year) that the Administrator determines may occur in the upcoming year;

"(E) if for the reporting period the Administrator projects that the reserve fund ratio or the phase-in requirement required under section 1310A cannot be achieved, any specific concerns the Administrator has regarding the consequences, discussion of how such consequences would harm the long-term financial soundness of the flood insurance program, and the likely amount projected to be placed in the Reserve Fund for that particular fiscal year; and

"(F) a disclosure explaining the bases for, and methodology used to determine, the chargeable premium rates to be effective for flood insurance coverage under this title, which shall align, to the extent practicable, to industry patterns and practices applicable to similar rate disclosure.

"(3) Transmission of report.—

"(A) In general.—The Administrator shall send the report required under paragraph (1) to—

"(i) the Committee on Financial Services of the House of Representatives;

"(ii) the Committee on Banking, Housing, and Urban Affairs of the Senate; and

"(iii) the Secretary of the Treasury.

"(B) Deadline.—The Administrator shall send the report pursuant to subparagraph (A) at the time of the submission of the Mid-Session Review of the President's budget to Congress."

(b) Authorization to offer recommendations.— As part of the reports required under subsection (a), the Administrator may recommend adjustments to the National Flood Insurance Program the Administrator finds necessary to ensure that the National Flood Insurance Program maintains a sound financial framework, including changes to underwriting standards, program eligibility, and premiums.

(c) Eliminating duplicative financial reporting requirements—

92

(1) Amendments to National Flood Insurance Act of 1968.—Chapter I of the National Flood Insurance Act of 1968 is amended—

    (A) in section 1308 (42 U.S.C. 4015)—

        (i) in subsection (j), by striking the words "and reports" from the heading and striking the last sentence; and

        (ii) by striking subsection (m); and

    (B) in subsection 1309 (42 U.S.C. 4016),—

        (i) in subsection (a), by striking "shall report" and inserting "shall notify"; and

        (ii) by striking subsections (c) and (d);

    (C) in section 1310A (42 U.S.C. 4017a(e))--

        (i) by striking subsection (e); and

        (ii) redesignating subsection (f) as subsection (e);

    (D) by repealing section 1320 (42 U.S.C. 4027); and

    (E) in section 1366 (42 U.S.C. 4104c)—

        (i) by striking subsection (f); and

        (ii) redesignating subsections (g) and (h) as subsections (f) and (g), respectively;.

(2) Amendments to the Biggert-Waters Flood Insurance Reform Act of 2012.—The Biggert-Waters Flood Insurance Reform Act of 2012 is amended—

    (A) by striking subsection (b) in section 100231 (42 U.S.C. 4027a); and

    (B) by striking subsection (e) in section 100232 (42 U.S.C. 4027b).

(d) Effective date.—

(1) In general.—The amendments made by subsections (a) and (b) shall become effective **[October 1, 2021]**.

(2) Transition.—Any information required to be reported for fiscal year 2021 shall be provided in accord with the authorities operative prior to **[October 1, 2021].**


*Analysis:*

    Over a two-year period, the NFIP is responsible for completing and submitting 15 Congressional Reports:

- Quarterly Reserve Fund (8 per 2-year period)
- Semi-Annual Debt Repayment (4 per 2-year period)
- Annual (2 per 2-year period)
- Biennial (1 per 2-year period)

Much of the information in the Quarterly and Semi-Annual Reports is redundant with the Annual Report.

    This reform proposes the consolidation of all these congressional reporting requirements from 15 to two annual NFIP reports:

- Retrospective Annual Report – Update Congress and stakeholders on the past year's events.
- Prospective Annual Report – Update Congress and stakeholders on what the NFIP expects to experience in the coming years, including budget projections.

This reform would reduce the NFIP's reporting complexity by decreasing the number of these reports due to Congress in a two-year period from 15 to 4, each of which is subject to concurrence loops, while providing similar yet more timely information.

*Comparative type:*

## National Flood Insurance Act of 1968

**SEC. 1309B.  FINANCIAL RESPONSIBILITY AND REVIEW**. **(42 U.S.C.        )**
(a) Annual Retrospective report on the National Flood Insurance Program.—
(1) In general.—The Administrator shall provide an annual retrospective report on the National Flood Insurance Program on—
   (A) the activities and operations of the National Flood Insurance Program;
   (B) the total actual National Flood Insurance Program revenue and expenses for the year, in comparison to prior years;
   (C) objective benchmarks to evaluate the Program's financial position;
   (D) factors that FEMA can control (under current authorities, within parameters set by Congress) to influence National Flood Insurance Program revenue and expenses, including changes implemented during the year; and
   (E) recommended changes to make the National Flood Insurance Program more effective and financially sound.
(2) Mandatory components.—The report required under paragraph (1) shall include at a minimum—
   (A) the cumulative volume of policies that have been underwritten during the fiscal year for which the report is submitted;
   (B) the amount of premiums paid;
   (C) the number of policies with premiums that exceed one percent of the total coverage pursuant to section 1308(j)
   (D) the amount of administrative expenses;
   (E) the progress of any repayment of funds borrowed from the U.S. Treasury;
   (F) information on any actuarial deficits (the difference between expected annualized losses and expenses, and annualized premium for the year) that occurred during the reporting period;
   (G) an assessment of the impacts of rate increases implemented during the reporting period, including
      (i) the Administrator's assessment of the impact, if any, of the rate increases required under subparagraphs (A) and (D) of section 1307(a)(2) and the surcharges required under section 1308A on the affordability of flood insurance for—
      (I) small businesses with less than 100 employees;
      (II) non-profit entities;
      (III) houses of worship; and
      (IV) residences with a value equal to or less than 25 percent of the median home value of properties in the State in which the property is located; and
      (ii) the Administrator's recommendations, if any, upon determining that the rate increases or surcharges described in clause (i) are having a detrimental effect on affordability, including with respect to lapsed policies, late payments, or other criteria related to affordability as identified by the Administrator, for any of the properties identified in subparagraphs (A) through (D) of section 1307(a)(2);

94

(H) an overall assessment of the financial status of the National Flood Insurance Program, including—

(i) the capacity to pay claims, and

(ii) for any year in which the Administrator exercises the authority under section 1335(a)(2) to secure reinsurance of coverage provided by the National Flood Insurance Program from the private market, information relating to the use of private sector reinsurance and reinsurance equivalents by the Administrator whether or not the Administrator used the borrowing authority under section 1309; and

(I) if the Administrator determines that the reserve fund ratio required under section 1310A cannot be achieved, the reserve fund ratio that was achieved, any specific concerns the Administrator has regarding the consequences, and discussion of how such consequences would harm the long-term financial soundness of the flood insurance program;

(J) the number of claims;

(K) the number of claims involving damages in excess of the maximum amount of flood insurance available under the National Flood Insurance Program and the sum of the amount of all damages in excess of such amount;

(L) a description and summary of the losses attributable to repetitive or severe repetitive loss properties;

(M) a description and summary of all losses incurred by the National Flood Insurance Program due to—

(i) hurricane-related damage; and

(ii)non-hurricane related damage;

(N) the status of mitigation activities carried out with assistance provided under section 1366; and

(3) Transmission of report.—

(A) In general.—The Administrator shall send the report required under paragraph (1) to—

(i) the Committee on Financial Services of the House of Representatives;

(ii) the Committee on Banking, Housing, and Urban Affairs of the Senate; and

(iii) the Secretary of the Treasury.

(B) Deadline.—The Administrator shall send the report pursuant to subparagraph (A) at the time of the submission of the President's budget to Congress.

(b) Annual Prospective Report on the national Flood Insurance Program—

(1) In general—The Administrator shall provide an annual prospective report on the National Flood Insurance Program on—

(A) the projected activities and operations of the National Flood Insurance Program;

(B) the total projected National Flood Insurance Program revenue and expenses expected for the coming year, in comparison to prior years;

(C) objective benchmarks to evaluate the Program's financial position;

(D) factors that FEMA can control (under current authorities, within parameters set by Congress) to influence National Flood Insurance Program revenue and expenses including planned changes for the upcoming year; and

(E) recommended changes to make the National Flood Insurance Program more effective and financially sound.

(2) Mandatory components.—The report required under paragraph (1) shall include at a minimum—

(A) the amount of expected claim payments;

(B) the amount of anticipated program activity and administrative costs reflected in risk premium rates;

(C) a schedule for repayment of amounts borrowed from the U.S. Treasury;

(D) any actuarial deficit(s) (the difference between expected annualized losses and expenses, and annualized premium for the year) that the Administrator determines may occur in the upcoming year;

(E) if for the reporting period the Administrator projects that the reserve fund ratio or the phase-in requirement required under section 1310A cannot be achieved, any specific concerns the Administrator has regarding the consequences, discussion of how such consequences would harm the long-term financial soundness of the flood insurance program, and the likely amount projected to be placed in the Reserve Fund for that particular fiscal year; and

(F) a disclosure explaining the bases for, and methodology used to determine, the chargeable premium rates to be effective for flood insurance coverage under this title, which shall align, to the extent practicable, to industry patterns and practices applicable to similar rate disclosure.

(3) Transmission of report.—

(A) In general.—The Administrator shall send the report required under paragraph (1) to—

(i) the Committee on Financial Services of the House of Representatives;

(ii) the Committee on Banking, Housing, and Urban Affairs of the Senate; and

(iii) the Secretary of the Treasury.

(B) Deadline.—The Administrator shall send the report pursuant to subparagraph (A) at the time of the submission of the Mid-Session Review of the President's budget to Congress."

## Sec. 1308. Chargeable premium rates. (42 U.S.C. 4015)

\* \* \* \*

**(j) Premiums ~~and reports~~**

In setting premium risk rates, in addition to striving to achieve the objectives of this chapter the Administrator shall also strive to minimize the number of policies with annual premiums that exceed one percent of the total coverage provided by the policy. ~~For any policies premiums that exceed this one percent threshold, the Administrator shall report such exceptions to the Committee on Financial Services of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate.~~

\* \* \* \*

~~**(m) Protection of small businesses, non-profits, houses of worship, and residences**~~

~~**(1) Report**~~

~~Not later than 18 months after March 21, 2014,[1] and semiannually thereafter, the Administrator shall monitor and report to Committee on Financial Services of the House Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate, the Administrator's assessment of the impact, if any, of the rate increases required under subparagraphs (A) and (D) of section 4014(a)(2) of this title and the surcharges required under section 4015a of this title on the affordability of flood insurance for~~

~~(A) small businesses with less than 100 employees;~~

~~(B) non-profit entities;~~

~~(C) houses of worship; and~~

~~(D) residences with a value equal to or less than 25 percent of the median home value of properties in the State in which the property is located.~~

~~**(2) Recommendations**~~

~~If the Administrator determines that the rate increases or surcharges described in paragraph (1) are having a detrimental effect on affordability, including resulting in lapsed policies, late payments, or other criteria related to affordability as identified by the Administrator, for any of the properties identified in subparagraphs (A) through (D) of such paragraph, the Administrator shall, not later than 3 months after making such a determination, make such recommendations as the Administrator considers appropriate to improve affordability to the Committee on Financial Services of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate.~~

**Sec. 1309. Financing. (42 U.S.C. 4016)**
  **(a) Authority to issue notes and other obligations**
       All authority which was vested in the Housing and Home Finance Administrator by virtue of section 2414(e) of this title (pertaining to the issue of notes or other obligations to the Secretary of the Treasury), as amended by subsections (a) and (b) of section 1303 of this Act, shall be available to the Administrator for the purpose of carrying out the flood insurance program under this chapter; except that the total amount of notes and obligations which may be issued by the Administrator pursuant to such authority (1) without the approval of the President, may not exceed $500,000,000, and (2) with the approval of the President, may not exceed $1,500,000,000 through the date specified in section 4026 of this title, and $1,000,000,000 thereafter; except that, through September 30, 2021, clause (2) of this sentence shall be applied by substituting "$30,425,000,000" for "$1,500,000,000". The Administrator ~~shall report~~ shall notify to the Committee on Banking, Finance and Urban Affairs of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate at any time when he requests the approval of the President in accordance with the preceding sentence.
  **(b) Deposit of borrowed funds**
       Any funds borrowed by the Administrator under this authority shall, from time to time, be deposited in the National Flood Insurance Fund established under section 4017 of this title.
  ~~**(c) Schedule of repayments**~~
       ~~Upon the exercise of the authority established under subsection (a), the Administrator shall transmit a schedule for repayment of such amounts to—~~
       ~~(1) the Secretary of the Treasury;~~
       ~~(2) the Committee on Banking, Housing, and Urban Affairs of the Senate; and~~
       ~~(3) the Committee on Financial Services of the House of Representatives.~~
  ~~**(d) Reports on repayment**~~
       ~~In connection with any funds borrowed by the Administrator under the authority established in subsection (a), the Administrator, beginning 6 months after the date on which such funds are borrowed, and continuing every 6 months thereafter until such borrowed funds are fully repaid, shall submit a report on the progress of such repayment to—~~
       ~~(1) the Secretary of the Treasury;~~
       ~~(2) the Committee on Banking, Housing, and Urban Affairs of the Senate; and~~
       ~~(3) the Committee on Financial Services of the House of Representatives.~~

**Sec. 1310A. Reserve Fund. (42 U.S.C. 4017a)**

*   *   *   *

  ~~**(e) Limitation on reserve ratio**~~
       ~~In any given fiscal year, if the Administrator determines that the reserve ratio required under subsection (b) cannot be achieved, the Administrator shall submit, on a calendar quarterly basis, a report to Congress that—~~

~~(1) describes and details the specific concerns of the Administrator regarding the consequences of the reserve ratio not being achieved;~~

~~(2) demonstrates how such consequences would harm the long-term financial soundness of the flood insurance program; and~~

~~(3) indicates the maximum attainable reserve ratio for that particular fiscal year.~~

**~~(f)~~ (e) Investment**

The Secretary of the Treasury shall invest such amounts of the Reserve Fund as the Secretary determines advisable in obligations issued or guaranteed by the United States.

**~~Sec. 1320. Biennial report to President. (42 U.S.C. §4027)~~**

**~~(a) In general~~**

~~The Administrator shall biennially submit a report of operations under this chapter to the President for submission to the Congress.~~

**~~(b) Effects of flood insurance program~~**

~~The Administrator shall include, as part of the biennial report submitted under subsection (a), a chapter reporting on the effects on the flood insurance program observed through implementation of requirements under the Riegle Community Development and Regulatory Improvement Act of 1994.~~

## Sec. 1366. Mitigation assistance. (42 U.S.C. 4104c)

\*   \*   \*   \*

**~~(f) Reports~~**

~~Not later than 1 year after July 6, 2012, and biennially thereafter, the Administrator shall submit a report to the Congress describing the status of mitigation activities carried out with assistance provided under this section.~~

**~~(g)~~ (f) Failure to make grant award within 5 years**

For any application for a grant under this section for which the Administrator fails to make a grant award within 5 years of the date of the application, the grant application shall be considered to be denied and any funding amounts allocated for such grant applications shall remain in the National Flood Mitigation Fund under section 4104d of this title and shall be made available for grants under this section.

**~~(h)~~ (g) Definitions**

For purposes of this section, the following definitions shall apply:

\*   \*   \*   \*

### Biggert-Waters Flood Insurance Reform Act of 2012

**~~Sec. 100231(b). Report of the Administrator on activities under the National Flood Insurance Program~~**

**~~(1) In general~~**

~~The Administrator shall, on an annual basis, submit a full report on the operations, activities, budget, receipts, and expenditures of the National Flood Insurance Program for the preceding 12-month period to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives.~~

**~~(2) Timing~~**

~~Each report required under paragraph (1) shall be submitted to the committees described in paragraph (1) not later than 3 months following the end of each fiscal year.~~

**~~(3) Contents~~**

~~Each report required under paragraph (1) shall include-~~

(A) the current financial condition and income statement of the National Flood Insurance Fund established under section 4017 of this title, including—

(i) premiums paid into such Fund;

(ii) policy claims against such Fund; and

(iii) expenses in administering such Fund;

(B) the number and face value of all policies issued under the National Flood Insurance Program that are in force;

(C) a description and summary of the losses attributable to repetitive loss structures;

(D) a description and summary of all losses incurred by the National Flood Insurance Program due to—

(i) hurricane related damage; and

(ii) nonhurricane related damage;

(E) the amounts made available by the Administrator for mitigation assistance under section 4104c(c)(4) of this title, as so redesignated by this Act, for the purchase of properties substantially damaged by flood for that fiscal year, and the actual number of flood damaged properties purchased and the total cost expended to purchase such properties;

(F) the estimate of the Administrator as to the average historical loss year, and the basis for that estimate;

(G) the estimate of the Administrator as to the maximum amount of claims that the National Flood Insurance Program would have to expend in the event of a catastrophic year;

(H) the average—

(i) amount of insurance carried per flood insurance policy;

(ii) premium per flood insurance policy; and

(iii) loss per flood insurance policy; and

(I) the number of claims involving damages in excess of the maximum amount of flood insurance available under the National Flood Insurance Program and the sum of the amount of all damages in excess of such amount.

**Sec. 100232(c). Assessment of claims-paying ability. (42 U.S.C. 4027b)**

**(1) Assessment**

**(A) Assessment required**

**(i) In general**

Not later than September 30 of each year, the Administrator shall conduct an assessment of the ability of the National Flood Insurance Program to pay claims.

**(ii) Private market reinsurance**

The assessment under this paragraph for any year in which the Administrator exercises the authority under section 4055(a)(2) of this title, as added by this section,[1] to secure reinsurance of coverage provided by the National Flood Insurance Program from the private market shall include information relating the use of private sector reinsurance and reinsurance equivalents by the Administrator, whether or not the Administrator used the borrowing authority under section 4016 of this title.

**(iii) First assessment**

The Administrator shall conduct the first assessment required under this paragraph not later than September 30, 2012.

**(B) Considerations**

In conducting an assessment under subparagraph (A), the Administrator shall take into consideration regional concentrations of coverage written by the National Flood Insurance Program, peak flood zones, and relevant mitigation measures.

**(2) Annual report of the Administrator of activities under the National Flood Insurance Program**

The Administrator shall—

~~(A) include the results of each assessment in the report required under section 4027a of this title; and~~

~~(B) not later than 30 days after the date on which the Administrator completes an assessment required under paragraph (1), make the results of the assessment available to the public.~~

**17. Remove Barriers to Switching to Private Policies** – Allows flood insurance coverage to satisfy any continuous coverage requirements imposed by the NFIP.

> *Legislative text:*

> **SEC. ___.  REMOVE BARRIERS TO SWITCHING TO PRIVATE POLICIES.**

> Section 1308 of the National Flood Insurance Act of 1968 (42 U.S.C. 4015) is amended by adding at the end the following:

> > "(n) Effect of Private Flood Insurance Coverage on Continuous Coverage Requirements.—
> > For  purposes of applying any statutory, regulatory, or administrative continuous
> > coverage requirement, including under section 1307(g)(1), the Administrator shall
> > consider any period during which a property was continuously covered by private flood
> > insurance (as defined in section 102(b)(7) of the Flood Disaster Protection Act of 1973
> > (42 U.S.C. 4012a(b)(7))) to be a period of continuous coverage.".

> *Analysis*:

> Policyholders must maintain continuous NFIP flood insurance coverage to keep certain premium discounts.  The NFIP generally may not continue providing discounted premiums for properties that have experienced a lapse in NFIP coverage. *See* NFIA § 1307(g) (42 U.S.C. 4014(g)).  As a result, if an individual moves to a private flood insurance policy, they may not be eligible to regain their premium discounts should they need to return to the NFIP.  This is seen as a barrier to the expansion of the private flood insurance market.

> This proposal amends Section 1308 of the National Flood Insurance Act of 1968 (42 U.S.C. 4015) to include a new subsection that would allow private flood insurance coverage to satisfy any continuous coverage requirements imposed by the NFIP.  This would allow an individual to move to the private market without the risk of losing premium discounts should they decide to return to the NFIP.

> *Comparative type:*

> **SEC. 1308. Chargeable premium rates. (42 U.S.C. 4015)**

> *       *       *       *

> (n) EFFECT OF PRIVATE FLOOD INSURANCE COVERAGE ON CONTINUOUS COVERAGE
>     REQUIREMENTS.—For purposes of applying any statutory, regulatory, or administrative

continuous coverage requirement, including under section 1307(g)(1), the Administrator shall consider any period during which a property was continuously covered by private flood insurance (as defined in section 102(b)(7) of the Flood Disaster Protection Act of 1973 (42 U.S.C. 4012a(b)(7))) to be a period of continuous coverage.

\*   \*   \*   \*