**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| STATE OF LOUISIANA, *et al.,* | CIVIL ACTION NO. |
| Plaintiffs, | 2:23-CV-01839-DJP-JVM |
| v. | JUDGE DARREL PAPILLON |
| DEPARTMENT OF HOMELAND SECURITY, *et al.,* | MAGISTRATE JUDGE JANIS VAN MEERVELD |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. ii

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ........................................................................................ 1

BACKGROUND ........................................................................................... 1

    I.    HISTORY OF THE NATIONAL FLOOD INSURANCE ACT ......................... 2

    II.    EQUITY IN ACTION ............................................................................. 5

ARGUMENT ................................................................................................ 9

    I.    DEFENDANTS IMPROPERLY RELY ON THE MAURSTAD DECLARATION. ......... 9

    II.    THE PLAINTIFFS HAVE ESTABLISHED ARTICLE III STANDING. ......... 16

        A.    The Parishes Have Article III Standing. ................................... 17

        B.    The Levee Districts Have Article III Standing. ....................... 20

        C.    The States Have Article III Standing. ....................................... 21

            1.    Equity in Action injures the States' important sovereign interests. ......... 21

            2.    Equity in Action injures the State's quasi-sovereign interests. ............... 26

            3.    Equity in Action causes the States to suffer economic harm. .................. 27

            4.    Equity in Action injures the States' proprietary interests. ...................... 29

        D.    Plaintiffs Have Standing Under NEPA. ..................................... 31

CONCLUSION ............................................................................................ 33

## TABLE OF AUTHORITIES

**Cases**

*Alden v. Maine,*
    527 U.S. 706 (1999) ................................................................................. 21

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
    458 U.S. 592 (1982) ............................................................ 21, 22, 26, 27

*Am. Hosp. Ass'n v. Azar,*
    983 F.3d 528 (D.C. Cir. 2020) .............................................................. 10

*Bank of Am. Corp. v. City of Miami,*
    137 S. Ct. 1296 (2017) ........................................................................... 29

*Bennett v. GEO Grp, Inc.,*
    No. 12-60017, 2013 WL 5916765 (5th Cir. May 22, 2013).................... 12

*Biden v. Nebraska,*
    600 U.S. ----, 143 S. Ct. 2355 (2023) ................................................... 16

*California v. Texas,*
    141 S. Ct. 2104 (2021). .......................................................................... 26

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ............................................................................... 11

*Clapper v. Amnesty Int'l,*
    568 U.S. 398 (2013) ......................................................................... 27, 28

*Clarke v. Securities Industry Assn.,*
    479 U.S. 388 (1987) ......................................................................... 31, 32

*Contender Farms, LLP v. Dep't of Ag.,*
    779 F.3d 258 (5th Cir. 2015) ................................................................. 24

*Crosby v. La. Health Serv. and Indem. Co.,*
    647 F.3d 258 (5th Cir. 2011) ........................................................... 11, 12

*Czyzewski v. Jevic Holding Corp.,*
    580 U.S. 451 (2017) ............................................................................... 18

*El Paso Cnty. v. Trump,*
    982 F.3d 332 (5th Cir. 2020) ..................................................... 18, 21, 29

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .................................................................. 10

*Fla. Key Deer v. Paulison*,
    522 F.3d 1133 (11th Cir. 2008) ........................................... 32, 33

*Fla. Key Deer v. Stickney*,
    864 F. Supp. 1222 (S.D. Fla. 1994) ............................ 28, 32, 33

*Georgia v. Tenn. Copper Co.*,
    206 U.S. 230 (1907) ........................................................... 25, 27

*Haaland v. Brackeen*,
    143 S. Ct. 1609 (2023) ............................................................ 26

*Haase v. Sessions*,
    835 F.2d 902 (D.C. Cir. 1987) ......................................... 14, 18

*Irwin v. Veterans Admin.*,
    874 F.2d 1092 (5th Cir. 1989) .............................................. 15

*Irwin v. Dep't of Veterans Affairs*,
    498 U.S. 89 (1990) .................................................................. 15

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022) .................................................. 27

*La. Dep't of Wildlife & Fisheries v. NOAA*,
    70 F.4th 872 (5th Cir. 2023) .................................................. 29

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) .................................................................. 6

*Louisiana v. Biden*,
    64 F.4th 674 (5th Cir. 2023) .................................................. 30

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...................................................... passim

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ....................................................... 21, 22, 24

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) .................................................................. 31

*McGowan v. Maryland,*
    366 U.S. 420 (1961) ........................................................................................ 18

*Minvielle v. Iberia Par. Gov't,*
    317 So.3d 588 (La. Ct. App. 3d Cir. 2019) ...................................... 23, 27

*Paterson v. Weinberger,*
    644 F.2d 521 (5th Cir. 1981) ...................................................................... 15

*Pennsylvania v. West Virginia,*
    262 U.S.553 (1923) ........................................................................................ 26

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,*
    547 U.S. 47 (2006) ............................................................................................ 9

*Spong v. Fidelity Nat'l Prop. & Cas.,*
    787 F.3d 296 (5th Cir. 2014) ........................................................................ 6

*St. Charles Parish v. FEMA,*
    2:23-cv-01369 (E.D. La. Apr. 25, 2023) ................................................ 6, 11

*Summers v. Earth Island Institute,*
    555 U.S. 488 (2009) ...................................................................................... 31

*Superior MRI Servs., Inc. v. All. Healthcare Servs., Inc.,*
    778 F.3d 502 (5th Cir. 2015) ...................................................................... 15

*Tex. Democratic Party v. Benkiser,*
    459 F.3d 582 (5th Cir. 2006) ...................................................................... 17

*Texas v. Equal Empl. Opp. Comm'n,*
    933 F.3d 433 (5th Cir. 2019) ................................................................ 22, 24

*Texas v. United States,*
    50 F.4th 498 (5th Cir. 2022) ...................................................................... 18

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ................................................................ 22, 30

*Trump v. New York,*
    141 S. Ct. 530 (2020) .................................................................................... 26

*United States v. Texas,*
   143 S. Ct. 1964 (2023) ........................................................................ 25

*Warth v. Seldin,*
   422 U.S. 490 (1975) ..................................................................... 10, 14

*Wyoming v. Oklahoma,*
   502 U.S. 437 (1992) ............................................................................ 18

*Young Conservatives of Tex. Found. v. Smatresk,*
   73 F.4th 304 (5th Cir. 2023)............................................................ 17, 18

**Statutes**

5 U.S.C. § 706 ....................................................................................... 11

42 U.S.C. § 4001 ............................................................................ 2, 3, 22

42 U.S.C. § 4002 .......................................................................... 3, 29, 32

42 U.S.C. § 4014 ........................................................................... 4, 5, 6, 8

42 U.S.C. § 4015 ............................................................................ 4, 8, 13

42 U.S.C. § 4022 ................................................................................... 33

42 U.S.C. § 4321 ................................................................................... 32

42 U.S.C. § 5170 ..................................................................................... 3

La. Rev. Stat. § 38:84 ..................................................................... 22, 23

La. Rev. Stat. § 39:94 ........................................................................... 29

Pub. L. 103-325, 108 Stat. 2160 ............................................................ 3

Pub. L. 112-141, § 100202, 126 Stat. 405 ............................................. 3

Pub. L. 112-141, 128 Stat. 1022 ............................................................ 4

Pub. L. 93-288, § 404 ............................................................................. 3

Pub. L. No. 90-448, §§ 1301–1377, 82 Stat. 476 ................................... 2

Pub. L. No. 90-448, 82 Stat. 476 ....................................................................... 2

**Other Authorities**

*Conversations about Risk Rating 2.0 Part I*, Wharton (May 23, 2022),
    perma.cc/Q6VD-BG8J; *id* ...................................................................... 2, 6

*Cost of Flood Insurance for Single-Family Homes under Risk Rating 2.0*, FEMA
    (Apr. 19, 2023), https://perma.cc/K4NL-Y7M8 ............................................. 7, 8, 19

*Questions about the Biggert-Waters Flood Insurance Reform Act of 2012*, FEMA,
    https://perma.cc/H8V9-CYV3 .................................................................... 3

Risk Rating 2.0: Projected Premium Changes by State, Arcgis (last accessed May
    31, 2023),
    https://www.arcgis.com/apps/dashboards/ad25fc43b31e46e6a66a4c632d6746f6.... 7

**Regulations**

44 C.F.R. § 60.3 .............................................................................................. 23

44 C.F.R. § 60.5 .............................................................................................. 33

**Constitutional Provisions**

La. Const. art. 6 ........................................................................................ 19, 21

La. Const. art. 7 ............................................................................................ 29

# INTRODUCTION

Equity in Action marks a complete overhaul of how FEMA calculates flood insurance premiums. And not for the better. Equity in Action raises insurance premiums for policyholders past their breaking point, pushing—according to FEMA's own estimates—1 million policyholders from the program. As alleged in Plaintiffs' complaint, Equity in Action applies to nearly 15 million people and 7.8 million properties. It imposes unreasonable and unexpected costs across the board, and as a result, it imposes distinct and direct harms on each Plaintiff. In response, Defendants attempt to parse each of Plaintiffs' injuries to argue that Plaintiffs lack standing. That's wrong. Independently, each claim of injury suffices to establish standing. But more than that, Defendants' motion to dismiss ignores the injuries in the aggregate. Together, Plaintiffs' injuries showcase the breadth of Equity in Action's reach and the crippling effects of its changes. Because Plaintiffs have standing to challenge Equity in Action under the Administrative Procedure Act (APA), this Court should deny Defendants' motion.

# BACKGROUND

Defendants' motion tries to downplay Equity in Action at every turn. They assert that Equity in Action "simply adjusts" or "updates" the methodology for calculating rates. Defs' MTD, ECF No. 47-1 at 12, 20. But Equity in Action changes the entire program: it changes the factors the agency considers, the input data the agency relies upon, the model the agency uses to calculate premiums, how the agency communicates those new premiums to policyholders, and policyholders' ability to question or challenge those new premiums. Don't take Plaintiffs' word for it—FEMA

itself admits that Equity in Action is a "transformational leap." *Conversations about Risk Rating 2.0 Part I*, Wharton (May 23, 2022), perma.cc/Q6VD-BG8J; *id.* ("changing the entire paradigm of flood insurance protection"); *id.* ("FEMA developed two additional models"); *id.* ("[W]e have built an entirely new system from the ground up."). This is no mere tweak, adjustment, or update. In FEMA's words, it's "an entirely new system." *Id.*

The numerous bases for Plaintiffs' standing become apparent when the facts are viewed in context of the NFIP program more broadly. Plaintiffs thus outline that program first, then address Defendants' narrative of Equity in Action.

## I.   HISTORY OF THE NATIONAL FLOOD INSURANCE ACT

In 1968, Congress passed the "Housing and Urban Development Act," which aimed "[t]o assist in the provision of housing for low and moderate income families." Pub. L. No. 90-448, 82 Stat. 476. As part of the national goal of increasing homeownership, Congress included the National Flood Insurance Act, which established the National Flood Insurance Program. Pub. L. No. 90-448, §§ 1301–1377, 82 Stat. 476, 572–89 (codified at 42 U.S.C. §§ 4001–4129). Congress made findings about the hardships of flood disasters and its desire for "a reasonable method of sharing the risk of flood losses . . . through a program of flood insurance which can complement and encourage preventative and protective measures." 42 U.S.C. § 4001(a).

Despite this push to make flood insurance available, communities were still unmotivated to join the program. In response, Congress passed the Flood Disaster Protection Act of 1973, which made flood insurance mandatory in certain

circumstances where other federal funds were involved. Pub. L. No. 93-234, 87 Stat. 975 (codified at 42 U.S.C. § 4002). Specifically, the 1973 Act prohibited most federal assistance for construction in the floodplains of communities not in the NFIP. *Id.* This meant that States with large floodplains relied on the NFIP to develop infrastructure in those communities.

To further fortify the NFIP, Congress passed several other important pieces of legislation. First, the Stafford Act established the Hazard Grant Mitigation Program, which provided "hazard mitigation assistance . . . in connection with flooding" and permitted the acquisition of certain properties. Pub. L. 93-288, § 404 (codified at 42 U.S.C. § 5170c). This, of course, helped increase mitigation efforts to reduce the impact of flooding events. Later, Congress passed the National Flood Insurance Reform Act, which expanded mandatory flood insurance requirements for properties involved with federally insured lenders. Pub. L. 103-325, 108 Stat. 2160 (42 U.S.C. 4001 et seq.).

In 2012, Congress conducted its most massive overhaul of the flood insurance program, passing the Biggert-Waters Act (BW-12). BW-12 eliminated certain subsidies and grandfathering, seeking to make the NFIP "more financially stable." *Questions about the Biggert-Waters Flood Insurance Reform Act of 2012*, FEMA, https://perma.cc/H8V9-CYV3; *see also* Pub. L. 112-141, § 100202, 126 Stat. 405. Specifically, BW-12 barred lower rates for pre-FIRM properties, which had benefitted from lower rates due to the reliance interests on these properties. But in doing so,

policyholder premiums increased dramatically. *See, e.g.*, Letter to Majority Leader Reid, et al. (June 28, 2012), Ex. 1.

A short two years later, in response to the dramatic rate increases, Congress passed the Homeowner Flood Insurance Affordability Act (HFIAA). Pub. L. 112-141, 128 Stat. 1022. As its name suggests, the HFIAA aimed to address affordability, seeking to implement long-term changes to the program while still encouraging homeowners to maintain flood insurance. To do this, Congress established a way to phase-in a new full-risk rating system that would allow policyholders to increase their rates incrementally rather than face a crippling new rate all at once. 42 U.S.C. § 4015(i). In short, the HFIAA sought to return to the original purpose of the law–to make flood insurance affordable for homeowners.

To this day, the NFIP remains the primary way that homeowners secure flood insurance. *See* Memorandum from Republican Financial Services Staff to Republican Members, Committee on Financial Services (Mar. 8, 2023), Ex. 2 (explaining that the NFIP sells roughly 93% of residential flood coverage); *see also* Memorandum from Committee Staff to Members of the Committee on Financial Services (Mar. 7, 2023), Ex. 3. Through the NFIA, FEMA exercises its authority to manage the NFIP by establishing premium rates and conducting studies on floodplain management standards. Specifically, the FEMA Administrator is authorized to estimate premium rates "based on": (1) "consideration of the risk involved and accepted actuarial principles," 42 U.S.C. § 4014(a)(1);(2) what "would be reasonable"; (3) FEMA's mandate to "encourage prospective insureds to purchase flood insurance," 42 U.S.C.

§ 4014(a)(2); and (4) "the extent, if any, to which federally assisted or other flood protection measures initiated after August 1, 1968, affect such rates," 42 U.S.C. § 4014(a)(3). While the Administrator has authority to review and set rates, each of these statutory commands constrains that authority and helps further the NFIA's goal of providing flood insurance to as many people as possible.

Throughout briefing, Defendants focus entirely on the first requirement that the agency evaluate "the risk involved" and calculate premiums based on "accepted actuarial principles." 42 U.S.C. § 4014(a)(1). That requirement is only half of the equation. Defendants ignore the second provision, which authorizes FEMA to set "rates . . . less than the rates estimated under paragraph (1), which would be reasonable, would encourage prospective insureds to purchase flood insurance, and [which] would be consistent with the purposes of this chapter." *Id*. § 4014(a)(2). In other words, Defendants assert the NFIA directs FEMA to adopt rates based on accepted actuarial principles, but they ignore congressional authorization to lower rates when necessary to achieve the law's very purpose—and ignore the way FEMA historically has used that authority in just that way. Defs' MTD, ECF No. 47-1 at 4, 7 (citing Maurstad Decl. ¶ 101). And by focusing entirely on the "actuarial rates" provision and ignoring the "reasonable" rates provision, FEMA was able to overhaul the entire flood insurance program, bypassing Congress entirely.

## II.   EQUITY IN ACTION

Defendants' motion to dismiss highlights its central focus: solvency of the NFIP. Defendants openly admit that FEMA raised its average annual loss— the total amount of premiums FEMA must collect across the NFIP to pay out claims—to cover

its growing debt and then worked backwards to establish a model and produce corresponding rates that would achieve that annual loss figure. Defs' MTD, ECF No. 47-1 at 14. As discussed above, though, one of FEMA's two statutory mandates is to make flood insurance affordable. 42 U.S.C. § 4014(a)(2); *see also Spong v. Fidelity Nat'l Prop. & Cas.*, 787 F.3d 296, 304 (5th Cir. 2014) ("Congress enacted the National Flood Insurance Act of 1968 (NFIA) to make flood insurance available at reasonable prices and on reasonable terms."); Statement of David Maurstad Before the Committee on Banking, Housing, and Urban Affairs (June 23, 2022), Ex. 4. Defendants cannot elevate their fiscal desires over the statutory mandate that they make flood insurance accessible and affordable as the program requires. *Lincoln v. Vigil*, 508 U.S. 182 (1993) ("Of course, an agency is not free simply to disregard statutory responsibilities.").

FEMA admits that Equity in Action has dramatically changed the way the flood insurance program operates to address FEMA's debt. *Conversations about Risk Rating 2.0 Part I*, Wharton (May 23, 2022), perma.cc/Q6VD-BG8J. FEMA states that, while the new system maintains "certain aspects of the legacy NFIP rating approach," the agency also purports to "modernize rate setting" by eliminating subsidies and grandfathering and altering the factors that go into premium calculations. Defs' MTD, ECF No. 47-1 at 1, 14. In addition, FEMA hired an outside group to develop the catastrophic risk model it now uses. *Compare* Defs' MTD, ECF No. 47-1 at 12, *with* Compl*., St. Charles Parish v. FEMA*, 2:23-cv-01369, ECF No. 1 (E.D. La. Apr. 25, 2023) (refusing to make that model public). Both parties agree, then, that Equity

in Action is "transformational" and changes how the flood insurance program operates.

The parties disagree, however, about how these changes affect Plaintiffs and policyholders. For example, Defendants assert that Plaintiffs "simply *assume* that rate increases" will be significant and that they rely on "outlier examples of individual premium increases" to highlight their harms. Defs' MTD, ECF No. 47-1 at 29. But these are not "assumptions" at all; they're based on the information FEMA itself provided in April of this year. *See Cost of Flood Insurance for Single-Family Homes under Risk Rating 2.0*, FEMA (Apr. 19, 2023), https://perma.cc/K4NL-Y7M8, FEMA Exhibit 3; *see also* Letter from Representative Graves to Office of Mgmt and Budget, FEMA (Apr. 6, 2022), Ex. 5.

FEMA's own projected rates in certain Louisiana communities will be staggering. For example, St. Charles Parish will see an average 752% increase, Plaquemines Parish will see an average 545% increase, and some communities *within* Plaquemines Parish will experience an average 1,098% increase. *See Cost of Flood Insurance for Single-Family Homes under Risk Rating 2.0*, FEMA (Apr. 19, 2023), https://perma.cc/K4NL-Y7M8, FEMA Exhibit 3. To the extent FEMA labels these as "outlier examples," FEMA's *own data* shows that 79.5% of policyholders in Louisiana will see an immediate premium increase. Risk Rating 2.0: Projected Premium Changes by State, Arcgis (last accessed May 31, 2023), https://www.arcgis.com/apps/dashboards/ad25fc43b31e46e6a66a4c632d6746f6.

Relatedly, Defendants assert that Plaintiffs would experience "incremental" increases each year under the legacy rating system. Defs' MTD, ECF No. 47-1 at 39. Plaintiffs do not dispute that, under the legacy rating system, many individuals experienced slight annual increases as permitted under 42 U.S.C. § 4015(e)(2). But policyholders have never seen rate increases like the ones they are seeing under Equity in Action. *See Cost of Flood Insurance for Single-Family Homes under Risk Rating 2.0*, FEMA (Apr. 19, 2023), https://perma.cc/K4NL-Y7M8, FEMA Exhibit 3. And FEMA has direct control over how much the premiums increase. 42 U.S.C. § 4014(a)(2).

Finally, Defendants seem to suggest that Plaintiffs' purported delay in bringing the lawsuit undermines Plaintiffs' claims of harm. Defs' MTD, ECF No. 47-1 at 18. At the same time, Defendants also assert that Plaintiffs have not provided sufficient evidence to support their claims of harm and that their claims are speculative. *Id.* at 21, 25–37. Before bringing this lawsuit, Plaintiffs tried and tried for years to find other ways of resolving their concerns. And now that Equity in Action has been fully implemented and more policies have come up for renewal subject to the new premiums, Plaintiffs have observed the actual rate increases that FEMA refused to reveal every time Plaintiffs previously asked for that information.[1] In other words, Plaintiffs could not have brought this suit any earlier.

It is these rate increases, shrouded in secrecy for years by FEMA, that impose the most obvious and direct harm on Plaintiffs. Because Plaintiffs suffer from an

---

[1] Defendants assert that Equity in Action has been fully in effect since October 1, 2021. But they admit it was not fully *implemented* until April 1, 2023, merely two months before Plaintiffs sued.

injury in fact as a result of Equity in Action, this Court should deny Defendants'
motion to dismiss.

**ARGUMENT**

Defendants try to raise the legal standards for standing beyond the reach of
any injured party. But under the proper standards, Plaintiffs have done more than
enough to defeat Defendants' motion. Plaintiffs have demonstrated standing for each
Plaintiff, even though it only takes one Plaintiff with standing for this Court to reach
the merits of the dispute. *Rumsfeld v. Forum for Academic and Institutional Rights,
Inc.*, 547 U.S. 47, 52 n.2 (2006). Plaintiffs easily meet that standard.

## I.    DEFENDANTS IMPROPERLY RELY ON THE MAURSTAD DECLARATION.

Defendants attach to their motion a 100-page declaration from David
Maurstad, the Assistant Administrator for the Federal Insurance Directorate within
FEMA. Defendants insist that this Court "can and should consider the Maurstad
Declaration" because it "provides relevant background information . . . in lieu of the
administrative record" and "contains information relevant to whether Plaintiffs have
plausibly asserted a concrete, redressable injury in fact for standing." Defs' MTD,
ECF No. 47-1 at 7 n.2.

Defendants want it both ways. They previously argued that any "judicial
review" in this case must be made on the basis of the administrative record and not
on the basis of Plaintiffs' evidence. Defs' Memo. in Support of Their Mot. To Extend
the Submission Date for Pls' Mot. for a Prelim. Injun., ECF No. 34-1 at 3–4
("Plaintiffs' declarations . . . were not before FEMA when it developed Risk Rating
2.0, and are therefore irrelevant to the merits of Plaintiffs' claims."). Turning 180

9

degrees, Defendants now urge the Court to consider their own extra-administrative-record evidence.

Defendants also attempt to characterize the Maurstad Declaration as relevant to Plaintiffs' standing and assert that the Court "need only consider the specific . . . paragraphs cited" in their motion to dismiss. Defs' MTD, ECF No. 47-1 at 7 n.2. But the Maurstad Declaration is really a sneak attack on the merits of Plaintiffs' claims. The portions of that declaration cited by Defendants' motion focus on how Equity in Action allegedly improved the legacy rating system and on how Equity in Action's harms to Plaintiffs are "outweighed or at least counterbalanced by [its] collective financial benefits." Defs' MTD, ECF No. 47-1 at 39. By arguing that Equity in Action is better than the legacy system, Defendants are covertly arguing that they had "good reasons" for changing from the legacy rating system to Equity in Action and have landed at the very center of the merits of Plaintiffs' claims. "As the Supreme Court has explained, an agency may change its policy position but must . . . 'show that there are good reasons for the new policy.'" *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 539 (D.C. Cir. 2020) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

There are two problems with allowing Defendants to submit evidence on the merits. First, to the extent the "relevant background information" in the Maurstad Declaration departs from the factual assertions *on the merits* that Plaintiffs make in their complaint, the Court must construe those allegations in favor of Plaintiffs, not Defendants. *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

Second, the merits of Plaintiffs' claims must be decided on the basis of the administrative record, as Defendants previously argued. A district court evaluating the sufficiency of a party's claims is limited to materials contained in the administrative record. *Crosby v. La. Health Serv. and Indem. Co.*, 647 F.3d 258, 263 (5th Cir. 2011). This prevents parties from "circumvent[ing] the administrative process" by waiting until after a lawsuit is filed to produce evidence. *Id.* The Maurstad Declaration is wholly outside of the administrative record. So even if (as Defendants claim) it contains information *about* the administrative record, it is not the administrative record but instead "post hoc rationalizations" for the agency's action. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419-20 (1971); *see also* 5 U.S.C. § 706 (requiring the court to review the whole administrative record).

Defendants' concern—that it will take too long to compile the administrative record, so the Maurstad Declaration is a faster way to provide background information on Equity in Action—rings hollow when Plaintiffs have been seeking this precise information for years. *See*  N. Lafourche Conservation Levee and Drainage Dist. Decl., ECF No. 1-36 ¶¶ 14–18 (describing history of collaboration);  St. Mary Parish Decl., ECF No. 1-27 ¶¶ 6–7, 43–44 (describing partnership between St. Mary Parish and FEMA); Morganza Action Coal. Decl., ECF No. 1-50 ¶ 10 (explaining FEMA's failure to consult); *see also, e.g.*, Compl.*, St. Charles Parish*, 2:23-cv-01369, ECF No. 1 (E.D. La. Apr. 25, 2023); Ltr. to Administrator Criswell from the House Committee on Oversight and Accountability (May 1, 2023) (describing the lack of transparency); Letter to Comptroller General from Senator Cassidy, et al. (June 28,

2023), Ex. 6; Letter to Administrator Criswell from Representatives Carter, Pascrell, and Pallone (March 31, 2022), Ex. 7; Letter from Senator Scott to FEMA (May 6, 2023), Ex. 8; Letter from Representative Posey to FEMA on redistricting (July 27, 2021), Ex. 9; Letter from Senator Kennedy to Mr. Maurstad, (Aug. 5, 2021), Ex. 10; Letter from Senator Cornyn to FEMA (Sept. 7, 2021), Ex. 11; Letter from Representatives Graves and Scalise to FEMA (Sept. 14, 2021), Ex. 12; Letter from Senator Cruz to FEMA (Sept. 22, 2021), Ex. 13; Letter from Senators to FEMA (Sept. 22, 2021), Ex. 14; Letter from Representatives to FEMA (Sept. 24, 2021), Ex. 15; Letter from FEMA to Representative Graves (Jan. 24, 2023), Ex. 16; Letter from the Committee on Oversight and Accountability to FEMA (May 1, 2023), Ex. 17. If the background information is necessary for Defendants to move to dismiss this entire case, this background information should have been made publicly available before FEMA finalized and implemented Equity in Action. *See Crosby*, 647 F.3d at 263.

Finally, many of the paragraphs cited in Defendants' motion to dismiss go well beyond providing mere facts and instead serve as additional argument extolling the virtues of Equity in Action. *See Bennett v. GEO Grp, Inc.*, No. 12-60017, 2013 WL 5916765, at *5 (5th Cir. May 22, 2013) (rejecting parts of declaration that were based on "subjective belief, contained legal arguments, or otherwise lacked a sufficient factual basis"). For example:

- Maurstad argues that Equity in Action uses "more comprehensive data . . . that better reflect the flood risk protection by levees." Maurstad Decl., ECF No. 47-3 ¶ 87 (referred to on page 7 of memorandum).

- He asserts that despite a statutory mandate to make "flood insurance available where necessary at reasonable rates," 42 U.S.C. § 4015, FEMA "lacks the statutory authority to make changes to address the affordability of NFIP policies," Maurstad Decl., ECF No. 47-3 ¶ 101 (referenced on page 7 of memorandum).

- He argues that Equity in Action means a more "accurate[]" risk assessment" where "every policyholder pays, or will eventually pay, for their own flood risk, not someone else's flood risk." *Compare id.* ¶¶ 107, 111 (cited on page 12 of memorandum), *with* Compl., ECF No. 1 ¶ 208 (explaining that a home on the highest ground in Lafourche Parish that FEMA agrees has little chance of flooding is going to see a premium increase 400%); D. Bourgeois Decl., ECF No. 1-56.

- And according to Maurstad, these assessments are made by answering "an easy-to-understand set of questions" where agents can "quickly enter and submit the information needed to rate a structure." *Compare* Maurstad Decl., ECF No. 47-3   ¶ 37 (referred to on page 14 of memorandum), *with* SouthGroup Ins. Servs. Decl., ECF No. 1-52 ¶¶ 20–21 (explaining that insurance agents do not understand Equity in Action).

- He further concludes that Equity in Action results in "premiums that are actuarially sound and represent the side range of flooding events for

13

which policyholders may file a claim." Maurstad Decl., ECF No. 47-3 ¶ 123 (referred to on page 13 of memorandum).

Maurstad goes on to assure this Court that Equity in Action actually considers "a wider range of levees" and "mitigation discounts." Defs' MTD, ECF No. 47-3 at 15 (citing Maurstad Decl. ¶¶ 132–34, 168). But Plaintiffs' declarants have explained that they are not seeing these mitigation discounts. *See* Compl., ECF No. 1 ¶¶ 190–93 (citing ECF No. 1-50, ECF No. 1-37 and explaining FEMA's failure to recognize the MtG and LtGM levee systems in premium calculations despite no flooding during a 300-year-flood event). In fact, Maurstad states, "The only thing truly extraordinary about these actions is that FEMA waited almost so long to update its technology and data sources." Maurstad Decl., ECF No. 47-3 ¶ 109 (referred to on page 14 of memorandum).

Even if it were appropriate for Defendants to substitute a declaration for the administrative record, and even if it were appropriate for this Court to consider factual assertions on the merits contained therein at the 12(b)(1) motion-to-dismiss stage, the Court cannot give weight to Defendants' legal arguments contained in the declaration and relied upon in the memorandum. *See Haase v. Sessions*, 835 F.2d 902, 907 (D.C. Cir. 1987); *see also Warth*, 422 U.S. at 501.

To the extent the Maurstad Declaration actually disputes the facts supporting Plaintiffs' standing as laid out in the 63 declarations attached to Plaintiffs' complaint and preliminary injunction motion, Plaintiffs are "obliged to submit facts through some evidentiary method to sustain [their] burden of proof." *Superior MRI Servs.,*

14

*Inc. v. All. Healthcare Servs., Inc.*, 778 F.3d 502, 504 (5th Cir. 2015) (first quoting *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981), then quoting *Irwin v. Veterans Admin.*, 874 F.2d 1092, 1096 (5th Cir. 1989), *aff'd sub nom., Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89 (1990)).

Complying with that obligation, Plaintiffs have attached to this opposition evidence rebutting Defendants' factual allegations. *See* Letter to Majority Leader Reid, et al. (June 28, 2012), Ex. 1; Memorandum from Republican Financial Services Staff to Republican Members, Committee on Financial Services (Mar. 8, 2023), Ex. 2; Memorandum from Committee Staff to Members of the Committee on Financial Services (Mar. 7, 2023), Ex. 3; Statement of David Maurstad Before the Committee on Banking, Housing, and Urban Affairs (June 23, 2022), Ex. 4; Letter from Representative Graves to Office of Mgmt and Budget, FEMA (Apr. 6, 2022), Ex. 5; Letter to Comptroller General from Senator Cassidy, et al. (June 28, 2023), Ex. 6; Letter to Administrator Criswell from Representatives Carter, Pascrell, and Pallone (March 31, 2022), Ex. 7; Letter from Senator Scott to FEMA (May 6, 2023), Ex. 8; Letter from Representative Posey to FEMA on redistricting (July 28, 2021), Ex. 9; Letter from Senator Kennedy to Mr. Maurstad, (Aug. 5, 2021), Ex. 10; Letter from Senator Cornyn to FEMA (Sept. 7, 2021), Ex. 11; Letter from Representatives Graves and Scalise to FEMA (Sept. 14, 2021), Ex. 12; Letter from Senator Cruz to FEMA (Sept. 22, 2021), Ex. 13; Letter from Senators to FEMA (Sept. 22, 2021), Ex. 14; Letter from Representatives to FEMA (Sept. 24, 2021), Ex. 15; Letter from FEMA to Representative Graves (Jan. 24, 2023), Ex. 16; Letter from the Committee on

Oversight and Accountability to FEMA (May 1, 2023), Ex. 17; Letter from FEMA to Senator Kennedy (Sept. 28, 2021), Ex. 18; Letter from Members of Congress to Speaker Pelosi and Minority Leader McCarthy (Sept. 16, 2021), Ex. 19; Letter from Gov. Edwards to Administrator Criswell (Nov. 19, 2021), Ex. 20; Letter from Ft. Bend Cnty Mayor & Council Assoc. to U.S. House and Senate Members (Aug. 19, 2021), Ex. 21; Letter from Assistant Secretary Lugo to Senate Minority Leader McConnell (May 11, 2022), Ex. 22; *The Reauthorization of the National Flood Insurance Program: FEMA's Perspective*, Testimony of Robert G. Rash to U.S. House Comm. on Fin. Servs. Subcommittee on Hous. and Ins. (Apr. 28, 2023), Ex. 23; Letter from FEMA to Senator Kennedy (Sept. 26, 2022), Ex. 24; Senator Kennedy and Senator Cornyn Letter to FEMA (July 27, 2022), Ex. 25; NFIP Legislative Proposals (May 2022), Ex. 26; Letter from Fort Bend Chamber of Commerce to Representative Green (Aug. 2, 2021), Ex. 27.

And Plaintiffs will continue to present evidence of their standing at the upcoming evidentiary hearing.

## II.   THE PLAINTIFFS HAVE ESTABLISHED ARTICLE III STANDING.

To establish Article III standing, "the plaintiff must have suffered an injury in fact . . . that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Biden v. Nebraska*, 600 U.S. ----, 143 S. Ct. 2355, 2365 (2023) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Standing is an "'indispensable part of the plaintiff's case," but a plaintiff need support its claim of standing only "with the manner and degree of evidence required at the successive stages of litigation." *Lujan*, 504 U.S. at 561.

Here, Plaintiffs articulate several different theories of standing in their complaint, have backed up each with evidence filed in the record, and will continue to present evidence of their standing at the upcoming hearing. Each of Plaintiffs' theories of standing suffices in its own right; taken together, they confirm Equity in Action's vast reach over and injury to Plaintiffs.

## A.      The Parishes Have Article III Standing.

The most straightforward basis for standing is the Parish Plaintiffs' economic injuries. Economic injury is the "quintessential injury upon which to base standing." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006). Where, as here, the parish plaintiffs challenge a government program that causes them to "hand[] over money," they "have standing" to challenge the program. *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 310–11 (5th Cir. 2023).

St. Tammany Parish provides the most obvious example. The Parish itself has 18 NFIP policies in place on several of its parish-owned properties. *See* St. Tammany Decl.,, ECF No. 1-28 ¶ 37. At the time of filing, 12 of those policies had already come up for renewal for the 2023-2024 period. *Id.* Under the new rates established by Equity in Action, St. Tammany Parish will have to pay an additional $2,877. *Id.* ¶¶ 37–39. Based on what St. Tammany Parish has seen in its own policies and its residents' policies, it anticipates at least several of the remaining 6 policies will increase when they come up for renewal. *Id.* ¶ 39.

In response, Defendants merely assert that this is a "de minimis cost to the parish," which Defendants assure the court will be "outweighed or at least counterbalanced by the collective financial benefits that Risk Rating 2.0 confers."

Defs' MTD, ECF No. 47-1 ¶¶ 38–39. Defendants' attempt to minimize these harms is irrelevant.

The Parishes' economic injury here is not small, but even if it were, the dollar amount has no bearing on whether Plaintiffs have alleged facts that—taken as true—establish standing. *Haase*, 835 F.2d at 907; *see also Lujan*, 504 U.S. at 561. In any case, there exists no "de minimis" exception to standing. *See Texas v. United States*, 50 F.4th 498, 518 (5th Cir. 2022) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" (quoting *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017))); *Smatresk*, 73 F.4th at 311 (an economic injury "need not measure more than an identifiable trifle"); *see also McGowan v. Maryland*, 366 U.S. 420, 430-31 (1961) (five-dollar loss). While Defendants base their motion on the difference in value between the claims of economic injury to St. Tammany Parish and the fiscal cost in *Texas v. United States*, the magnitude of the economic injury matters not at all for purposes of standing.

In addition, Equity in Action causes a loss of specific tax revenues to the parishes and municipalities. *See El Paso Cnty. v. Trump*, 982 F.3d 332, 339 (5th Cir. 2020). Under Supreme Court precedent, a loss to a "specific tax revenue" is distinct from a "decline in general tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 447–48 (1992). There, Wyoming alleged that the challenged law "deprive[d] Wyoming of severance tax revenues," and the Court held Wyoming "clearly" had Article III standing. *Id.* Likewise, here, Equity in Action deprives the parishes and municipalities of specific tax revenue. The Louisiana Constitution expressly provides

18

parishes and municipalities with the authority to levy an ad valorem tax annually. La. Const. art. 6, §§ 26–27. These taxes are used to mitigate against flood events, which means that depressed property values and a reduced population will limit the funds collected. *See* Compl., ECF No. 1 ¶¶ 479–573.

Defendants mount a final attack on the Parish Plaintiffs' standing, arguing that the Parishes have failed to establish redressability because their policy rates also increased from time to time under the legacy rating system. Defs' MTD, ECF No. 47-1 at 39–40. According to Defendants, any rate increases that occurred under the legacy system mean that enjoining Equity in Action will not grant Plaintiffs the relief they request.

Defendants conflate the relief that Plaintiffs seek with the injury that Equity in Action causes them. Plaintiffs seek to enjoin Equity in Action because it violates the APA in numerous ways. Plaintiffs have standing to seek that relief because one way Equity in Action harms them is by imposing surprise increases in their full premium rates by some 500%, 700%, and even 1000%—something that didn't happen under the predictable legacy rating system. *See Cost of Flood Insurance for Single-Family Homes under Risk Rating 2.0*, FEMA (Apr. 19, 2023), https://perma.cc/K4NL-Y7M8, FEMA Exhibit 3. Just because Plaintiffs' rates may have experienced modest increases now and again under the legacy system—a fact not in dispute—it is unclear why Defendants think that enjoining Equity in Action will not redress Equity in Action's new drastic rate increases and the injury those drastic increases are causing to Plaintiffs.

Throughout briefing, Defendants seem to suggest that Plaintiffs have somehow failed to provide facts to support their assertions. But at the motion to dismiss stage, Plaintiffs need only plausibly allege facts sufficient to establish standing—Plaintiffs need not *prove* these facts as Defendants suggest. *Lujan*, 504 U.S. at 561. Here, Plaintiffs have satisfied their burden. *See* Compl., ECF No. 1 ¶¶ 479-573.

## B.     The Levee Districts Have Article III Standing.

Like the parishes, the Levee District Plaintiffs are injured by Equity in Action because they are no longer rewarded for mitigation efforts. Take, for example, the LtGM levee system. This levee system was funded, in part, by the South Lafourche Levee District, which imposed an Ad Valorem tax along with a sales and use tax. *See, e.g.*, South Lafourche Levee District Decl., ECF No. 1-37 ¶¶ 6–10. As a result of the levee system, the flood damage from Hurricane Ida was minimal. Not a single structure flooded. *Id.* ¶ 16. In fact, two years before Hurricane Ida, FEMA expressly recognized that the levee system offered protection against a 100-year flood event— a recognition proved correct after Hurricane Ida. *Id.* ¶ 11. As a result, Lafourche Parish saw discounts baked into their premium rates. *Id.* ¶ 20 After all, those areas were protected against a 100-year flood event.

But after Equity in Action, FEMA no longer recognizes the LtGM levee system as effective. Instead, Equity in Action concludes that this levee system could not protect against a 300-year flood, despite observed evidence that it can withstand such an event. *Id.* ¶ 18. As a result, premiums in the area are increasing significantly. *Id.* ¶ 20 (showing that a $500 annual NFIP policy is expected to increase to a $7,000 annual policy).

In addition, Equity in Action causes a loss of specific tax revenues to the levee districts. *El Paso Cnty.*, 982 F.3d at 339. As explained in Plaintiffs' complaint, the Louisiana Constitution gives levee districts the authority to assess and impose ad valorem taxes for the specific "purpose of constructing and maintaining levees, levee drainage, flood protection, hurricane flood protection, and for all other purposes incidental thereto." *See* Compl., ECF No. 1 ¶¶ 93–94; *see also* La. Const. art. 6, § 39. As Levee District Plaintiffs explain in their declarations, flood insurance rates are increasing because of Equity in Action, and in response, people are leaving the area and property values are dropping. *See, e.g.*, North Lafourch Conservation, Levee, and Drainage District Decl., ECF No. 1-36 ¶¶ 5–11, 24; SE La-East Decl., ECF No. 1-40 ¶¶ 16–21; South Lafourche Levee District Decl., ECF No. 1-37 ¶¶ 29–33; *see also* Letter from Fort Bend Chamber of Commerce to Representative Green (Aug. 2, 2021), Ex. 27. This directly harms the Districts' ability to secure funds to mitigate against flood risk.

### C.   The States Have Article III Standing.

*1.     Equity in Action injures the States' important sovereign interests.*

Plaintiffs have established standing based on their sovereign interests as States. States are "not normal litigants." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). Unlike other litigants, a State has important interests inherent in its capacity as a sovereign to "create and enforce a legal code" and "demand [] recognition from other sovereigns." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982); *see also Alden v. Maine*, 527 U.S. 706, 748 (1999) (explaining that States are "residuary sovereigns and joint participants in the governance of the Nation").

So when the federal government asserts "authority to regulate matters [that the States] believe they control" or otherwise "interfer[es] with the enforcement of state law," States have standing to file suit. *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015); *see also Alfred L. Snapp & Son, Inc.*, 458 U.S. at 601. States need only show "an increased regulatory burden" or "pressur[e] to change state law" to establish standing, *Texas v. Equal Empl. Opp. Comm'n*, 933 F.3d 433, 446 (5th Cir. 2019), which is not a high burden, particularly at the motion to dismiss stage, *Lujan*, 504 U.S. at 560–61. State plaintiffs can also establish standing by showing a "desire to preserve [their] sovereign territory." *Massachusetts v. EPA*, 549 U.S. at 519.

As alleged in Plaintiffs' complaint, Equity in Action harms Louisiana's sovereign interest in enforcing its own legal code. Compl.. ECF No. 1 ¶¶ 279–282; *see Alfred L. Snapp & Son, Inc.*, 458 U.S. at 601. The States and FEMA historically have worked together as co-sovereigns to establish and maintain a program to promote and encourage flood insurance. To be sure, the federal government enacted the National Flood Insurance Act, 42 U.S.C. §4001 et seq., but the State of Louisiana has enacted laws that provide parishes and municipalities with express authority to adopt their own regulations consistent with the NFIA itself and FEMA regulations, La. Rev. Stat. § 38:84(A).

Louisiana further instructs its "office of engineering" to cooperate with FEMA in "carrying out" state participation and encouraging local government participation. *Id.* § 38:84(B). The federal government reinforces this cooperative relationship by working with state and local entities to develop flood plain management regulations.

*See, e.g.*, 44 C.F.R. § 60.3 ("In all cases the minimum requirements . . . depend on the amount of technical data formally provided to the community by the Federal Insurance Administrator."); *Id.* § 60.3(a)–(c) (directing communities to undertake certain measures when the Federal Insurance Administrator has failed to provide specific data).

Equity in Action frustrates this cooperation. FEMA's own regulations articulate detailed criteria for developing floodplain management regulations based on a community's FIRMS. 44 C.F.R. § 60.3. But as Plaintiffs explained, Compl., ECF No. 1 ¶¶ 214–222, and Defendants admit, Defs' MTD, ECF No. 47-1 at 12, Equity in Action no longer uses FIRMs to set rates. Whereas Louisiana law directs state and local governmental entities to comply with the NFIA's requirements, La. Rev. Stat. § 38:84(A), which expressly rely on community FIRMs, 44 C.F.R. § 60.3, the flood insurance program that the NFIA established no longer relies on community FIRMs. In other words, state and federal laws require compliance with something that is no longer relevant to the flood insurance program. This further discourages participation in the program because local governments are forced to enact local ordinances based on FIRMs while being subjected to an entirely new criteria for setting flood insurance rates. *See, e.g.*, Assumption Decl., ECF No. 1-7 ¶¶ 9, 26–28,; Plaquemines Decl., ECF No. 1-22 ¶¶ 5, 44–53. This situation frustrates the very core of Louisiana's law, which is to "secure for the citizens of the state of Louisiana the flood insurance coverage provided for by the [NFIA]." La. Rev. Stat. § 38:84(A); *see also Minvielle v. Iberia Par. Gov't*, 317 So.3d 588, 597 (La. Ct. App. 3d Cir. 2019)

(describing the State's "legitimate government objectives," which include the "safety, security, and economic well-being of its citizens—specifically eligibility for flood insurance"). In addition, Equity in Action imposes an "increased regulatory burden." *Texas v. Equal Empl. Opp. Comm'n*, 933 F.3d at 446; *see also Contender Farms, LLP v. Dep't of Ag.*, 779 F.3d 258, 266 (5th Cir. 2015) ("An increased regulatory burden typically satisfies the injury in fact requirement."). As alleged in Plaintiffs' complaint, Equity in Action is increasing the number of FEMA grant recipients who fail to maintain their mandatory flood insurance because of the new, prohibitive costs. Compl., ECF No. 1 ¶¶ 213, 269. Because the State, not FEMA, is responsible for enforcing the flood insurance requirement, more defaults mean the State will need to increase enforcement efforts. GOHSEP Decl., ECF No. 1-1 ¶¶ 43–44.

As GOHSEP explained, when a homeowner fails to obtain or maintain flood insurance, the State must pay back to FEMA the funds the non-compliant homeowner received in order for FEMA to "close" the project. *Id.* ¶ 41. The State then may seek to recover these funds from the non-compliant homeowner, which can prove to be a costly and futile endeavor. *Id.* ¶ 42. As homeowners fail to maintain flood insurance due to the rising costs, it becomes "more challenging" to work with homeowners, and the State continues to be liable for more and more de-obligated grants. *Id.* ¶ 44.

Finally, Equity in Action encroaches on the State's "desire to preserve its sovereign territory." *Massachusetts v. EPA*, 549 U.S. at 519. In the most basic sense, much like the coastlines in Massachusetts and the air in Georgia, the State of Louisiana has an interest in maintaining mitigation efforts to reduce flooding on its

land. *See id.*; *see also Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907). Plaintiffs have alleged that Equity in Action no longer rewards mitigation efforts and that fewer people are undertaking mitigation projects because of Equity in Action's increased cost of flood insurance. *See* Compl., ECF No. 1 ¶¶ 121–145; Scott Decl., ECF No. 1-55 ¶¶ 5–6.

As an initial matter, Defendants disagree with Plaintiffs' factual allegation that Equity in Action rewards mitigation efforts. *See* Defs' MTD, ECF No. 47-1 at 15. That is a factual dispute that goes to the merits, not a serious dispute about the State's standing. Accepting Plaintiffs' allegations of decreased mitigation efforts as true (as must be done at this stage of litigation), the State of Louisiana has shown that its interest "in all the earth and air within its domain" is harmed by Equity in Action. *Georgia*, 206 U.S. at 237.

Defendants next assert that "[b]inding precedent forecloses the plausibility of State Plaintiffs' allegation that Risk Rating 2.0 injures their sovereign interests." Defs' MTD, ECF No. 47-1 at 19–20. After all, they say, Equity in Action "simply adjusts the methodology." *Id.* at 20. But as explained, Plaintiff States' sovereign injuries from Equity in Action fall squarely within the cases permitting standing based on harms to sovereign interests, particularly when a federal agency ignores the APA's safeguards and overhauls an entire regulatory program.

Defendants counter that somehow recent Supreme Court decisions have eviscerated this type of standing. *See, e.g.*, Defs' MTD, ECF No. 47-1 at 24 n.19. But Defendants' cases are inapposite. *United States v. Texas* involved a challenge to an

Executive Branch policy and was not a case arising under the APA, which the Court suggested was important to its analysis. 143 S. Ct. 1964, 1973 (2023). *Haaland v. Brackeen* determined that the State plaintiffs only alleged *parens patriae* standing and did not press any independent protectable state interests. 143 S. Ct. 1609, 1640 (2023). *California v. Texas* concluded that the States failed to show a causal link between the injury and the challenged action, not that standing was entirely unavailable. 141 S. Ct. 2104, 2117 (2021). *Trump v. New York* determined that it was speculative how the President would implement a "general statement of policy," which differs from a concrete agency action here. 141 S. Ct. 530, 535 (2020).

Defendants next assert that, even if Plaintiffs could assert a sovereign interest, they fail to plausibly allege sufficient facts. Defs' MTD 21, ECF No. 47-1. Plaintiffs' complaint and attached declarations confirm otherwise. As explained throughout this brief, Plaintiffs have easily satisfied their burden at the motion to dismiss stage. *See Lujan*, 504 U.S. at 561.

### 2.     *Equity in Action injures the State's quasi-sovereign interests.*

Plaintiffs have established standing based on their quasi-sovereign interests, which "consist of a set of interests that the State has in the well-being of its populace." *Alfred L. Snapp & Son*, 458 U.S. at 602. This includes an "interest in the health and well-being" of a State's residents or in the State "not being discriminatorily denied its rightful status within the federal system." *Id.*; *see also Pennsylvania v. West Virginia*, 262 U.S.553, 592 (1923). As to the former, courts consider whether the injury is one "the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *Alfred L. Snapp & Son*, 458 U.S at 607. With respect to the

latter, the State has "an interest in securing observance of the terms under which it participates in the federal system" and "assuring that the benefits of the federal system are not denied to its general population." *Id.* at 607–08.

Defendants argue that it is "well settled" that a State cannot bring these claims against the federal government. Defs' MTD, ECF No. 47-1 at 22–23. But this ignores the category of cases under a quasi-sovereign theory of standing that States are permitted to bring against the federal government. *See, e.g.*, *Georgia*, 206 U.S. at 237. Under this umbrella of cases, States are really "asserting some injury to their *own* interests separate and apart from their citizens' interests." *Kentucky v. Biden*, 23 F.4th 585, 596 (6th Cir. 2022).

Here, Equity in Action "implicates [S]tates' power to make and enforce policies and regulations" related to the health and safety of its citizens. *Id.* at 599 (citing *Alfred L. Snapp & Son*, 458 U.S. at 601, 603–04). Inherent in this power is Louisiana's interest in promoting participation in the NFIP. *See Minvielle*, 317 So.3d at 597 (describing the State's interest in citizens being able to secure flood insurance).

3. *Equity in Action causes the States to suffer economic harm.*

Plaintiffs have established standing based on their economic interests. Defendants describe Plaintiffs' allegations as a "lengthy daisy chain of events" and rely on *Clapper v. Amnesty Int'l*, 568 U.S. 398 (2013) to reject what they believe to be an attenuated causal chain. Defs' MTD, ECF No. 47-1 at 25–26. What is missing from Defendants' argument, however, is the fact that many of these events have already taken place.

Plaintiffs have alleged that Equity in Action "will devalue mitigation efforts." *Compare id.*, *with* Compl., ECF No. 1 ¶¶ 121-145; Scott Decl., ECF No. 1-55 ¶¶ 5–6. Plaintiffs have alleged that Equity in Action has "result[ed] in higher premiums." *Compare* Defs' MTD, ECF No. 47-1 at 26, *with* D. Bourgeois Decl., ECF No. 1-56 ¶¶ 26, 30,; Scott Decl., ECF No. 1-55 ¶ 16; GOHSEP Decl., ECF No. 1-1 ¶¶ 52–53. Plaintiffs have alleged facts sufficient to show that people are leaving the area due to the high cost of flood insurance. *Compare* Defs' MTD, ECF No. 47-1 at 26,*with* GOHSEP Decl., ECF No. 1-1 ¶ 57. Plaintiffs have alleged facts sufficient to show that property values are depressed as a result. *Compare* Defs' MTD, ECF No. 47-1 at 26, *with* Gulf Coast Bank & Tr. Decl., ECF No. 1-45 ¶16.

Plaintiffs' factual allegations show that Equity in Action is harming the public funds available for the State to address flood concerns. Unlike *Clapper*, where each of the purported links in the chain of events was a mere "possibilit[y]" because it had not yet happened, 568 U.S. at 410, Plaintiffs here have submitted evidence showing that the harms they feared have now in fact occurred. *See also Fla. Key Deer v. Stickney*, 864 F. Supp. 1222, 1230 (S.D. Fla. 1994) (concluding that if flood insurance is not available, "residents of that community face significant consequences").

Defendants next claim that each of these purported injuries "hinges on the future decisions of independent third parties." Defs' MTD, ECF No. 47-1 at 27. Not so. As discussed above, those third parties have already taken action, and the State is experiencing harms as a result. In fact, Congress correctly predicted that these harms would come to fruition, finding that "the availability of Federal . . . insurance,

and other forms of financial assistance are often determining factors in the utilization of land and the location and construction of . . . facilities." 42 U.S.C. § 4002(a)(2), (6) (finding that "it is in the public interest for persons already living in flood-prone areas to have both an opportunity to purchase flood insurance and access to more adequate limits of coverage").

In addition, Plaintiffs here assert a loss of *specific* tax revenues. *El Paso Cnty.*, 982 F.3d at 339; *see also Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1303 (2017). As alleged in Plaintiffs' complaint, Louisiana spends significant public funds in response to major flood events. *See, e.g.*, Compl., ECF No. 1 ¶¶ 266–67. Because of Equity in Action, fewer people are undertaking mitigation projects, which leaves many areas more vulnerable to major flood events. *See Id.* ¶ 291. The loss of funds directly harms the State's ability to respond to these disasters. The State of Louisiana sets aside special funds to offset any unexpected expenses, and it has previously had to access those funds in response to extreme flooding. *See* La. Rev. Stat. § 39:94. In addition, given the sizeable presence of oil and gas production in the State, the harm to those industries will reduce the severance tax levied on those lands. *See* La. Const. art. 7, §4.

### 4. *Equity in Action injures the States' proprietary interests.*

Plaintiffs have alleged facts establishing standing based on their proprietary interests. These rules of standing treat a State "much like a private litigant." *La. Dep't of Wildlife & Fisheries v. NOAA*, 70 F.4th 872, 877–78 (5th Cir. 2023). States, after all, "can enter into contracts, own land, and participate in business ventures." *Id.* at 878. In particular, courts have recognized standing when a "change in federal

29

law" requires the State to effectively subsidize federal programs or offer state government services at a loss. *See, e.g.*, *id.*; *Texas v. United States*, 809 F.3d at 153 (explaining that such an injury amounts to an "institutional injury to [the State's] lawmaking authority").

Here, Equity in Action harms the State's propriety interests in two related but distinct ways. First, as homeowners undertake mitigation projects but are unable to maintain the mandatory flood insurance, the State is increasingly liable for reimbursing FEMA for the grant money given to private homeowners. *See* GOHSEP Decl., ECF No. 1-1 ¶¶ 41–44. This means that the State is ultimately paying for—or at least subsidizing—mitigation projects that may or may not be completed but that have been de-obligated from the federal grant program. *Id.* Second, as explained above, as fewer people obtain coverage for insurance, the cost of rebuilding after a flood event will fall to the State. *See* Compl., ECF No. 1 ¶¶ 264–267.

     *5.*    *Equity in Action causes the State a procedural injury.*

Defendants assert that Plaintiffs cannot establish standing based on Plaintiffs' inability to file comments. Defs' MTD, ECF No. 47-1 at 24. As an initial matter, Defendants' cited case— *Louisiana v. Biden*, 64 F.4th 674 (5th Cir. 2023)–does not establish the broad rule they suggest. In that case, the States challenged an Executive Order and associated Interim Estimates.   *Id.* at 677. The Fifth Circuit concluded that because the Executive Order "d[id] not *require* any action from federal agencies," the plaintiffs' harms were speculative. *Id.* at 681.

Here, of course, FEMA took action. It revised its entire system for identifying risks and calculating premiums. Furthermore, as explained in great detail above,

Plaintiffs have established numerous "*concrete interests*" of the kinds explained in *Summers v. Earth Island Institute*, 555 U.S. 488, 498 (2009). As discussed, Plaintiffs have plausibly alleged harm to their sovereign, quasi-sovereign, and economic interests.

*

In sum, Plaintiffs are suffering many injuries at the hands of Equity in Action. Each of their injuries—laid out point by point above—is sufficient to establish standing. And particularly at the motion to dismiss stage, Plaintiffs have plausibly alleged sufficient facts and have supported those allegation with sufficient evidence to support each of their injuries. This Court should reject Defendants' attempt to raise the pleading standard beyond what the federal rules require and any injured party could attain.

### D.    PLAINTIFFS HAVE STANDING UNDER NEPA.

Defendants argue that Plaintiffs lack standing to bring a NEPA claim. Defendants' argument skips past the Supreme Court's instruction that th test for NEPA standing is "not meant to be especially demanding." *Ecosys. Inves. Partners v. Crosby Dredging, LLC*, 729 Fed. App'x 287, 294  (5th Cir. 2018) (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)). NEPA claims raised in APA actions are "presumptively reviewable." *Patchak*, 567 U.S. at 225 (quoting *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 399 (1987)). Only "when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that

Congress intended to permit the suit" will a court deny standing on this basis. *Id.* (quoting *Clarke*, 479 U.S. at 399).

NEPA broadly declares "a national policy which will encourage productive and enjoyable harmony between man and his environment." 42 U.S.C. § 4321. But a plaintiff "with both environmental and economic injuries falls within NEPA's zone of interests even if the plaintiff's economic interests are the real 'impetus' for its lawsuit." *Ecosys. Inves. Partners*, 729 Fed. App'x at 294 n.6.

Here, Plaintiffs establish NEPA standing by asserting both economic and environmental interests. As discussed extensively above, Plaintiffs' economic injuries are significant. Contrary to Defendants' claims, the harms stemming from Equity in Action are also environmental as they directly relate to the "harmony between man and his environment." 42 U.S.C. § 4321. Congress already found that "the availability of Federal . . . insurance . . . [is] often [the] determining facto[r] in the utilization of land and the location and construction of public and private industrial, commercial, and residential facilities." 42 USC § 4002(a)(2).

Courts have agreed with this congressional finding. *See Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1142–44 (11th Cir. 2008); *see also Stickney*, 864 F. Supp at 1233. In *Stickney*, for example, the court concluded that "Section 7 of the [Endangered Species Act] does apply to FEMA's activities in implementing the NFIP" because of the environmental impacts of new developments. 864 F. Supp. at 1232. The Eleventh Circuit reversed, concluding that FEMA had to comply with the ESA because FEMA has significant discretion over land use in flood prone areas and because Congress

directed FEMA to protect the "natural and beneficial floodplain functions." *Paulison*, 522 F.3d at 1143 (quoting 42 U.S.C. § 4022(b)). The Eleventh Circuit further determined that this conclusion was consistent with FEMA's *own* NFIP regulations that acknowledge the impact of the agency's actions on wildlife and the environment. *Id.* (citing 44 C.F.R. § 60.5(b)(2)).

Applied here, both *Stickney* and *Paulison* confirm that the NFIP impacts the environment and that changes to the NFIP program must undergo an environmental analysis. Plaintiffs have showed that FEMA's transformation of the NFIP has an impact on the floodplains. As mitigation slows, damage to land and property increases. *See* Compl., ECF No. 1 ¶¶ 122–24. And as fewer people can afford to live in coastal areas, the types of development and construction change as well. *See, e.g.*, Home Builders Assoc. Decl., ECF No. 1-46 ¶ 9; Scott Decl., ECF No. 1-55 ¶¶ 4–5. Under *Stickney* and *Paulison*, FEMA was required, but failed to, conduct an environmental analysis before implementing Equity in Action.

## CONCLUSION

For these reasons, Plaintiffs have standing, and this Court should deny Defendants' motion to dismiss.

33

Dated:  August 31, 2023

Respectfully submitted,

**JEFF LANDRY**
 ATTORNEY GENERAL

By:*/s/ Elizabeth B. Murrill*
ELIZABETH B. MURRILL (La #20685)
  Solicitor General
MORGAN BRUNGARD (La #40298)
  Assistant Solicitor General
TRACY SHORT (La #23940)
  Assistant Attorney General
LOUISIANA     DEPARTMENT     OF
JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70802
Tel: (225) 326-6766
murrille@ag.louisiana.gov
brungardm@ag.louisiana.gov
shortt@ag.louisiana.gov

*Counsel for the State of Louisiana, Plaintiff Parishes, Plaintiff Municipalities, Plaintiff Levee Districts, Plaintiff Drainage Districts, and Plaintiff Associations*

ASHLEY MOODY
  Attorney General
JAMES H. PERCIVAL*
  Chief of Staff
Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

DREW H. WRIGLEY
  Attorney General
PHILIP AXT (ND Bar No. 09585)*
  Solicitor General
North Dakota Attorney General's Office
600 E Boulevard Avenue, Dept. 125
Bismarck, ND 58505
(701) 328-2210
pjaxt@nd.gov

*Counsel for the State of North Dakota*

RAÚL LABRADOR
  Attorney General
THEODORE J. WOLD *
  Solicitor General
OFFICE OF THE IDAHO ATTORNEY
GENERAL
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 999-0910
Email: Theodore.Wold@ag.idaho.gov

*Counsel for State of Idaho*

ALAN WILSON
  South Carolina Attorney General
ROBERT D. COOK
  Solicitor General
J. EMORY SMITH, JR.*
Deputy Solicitor General
THOMAS T. HYDRICK*
Assistant Deputy Solicitor General
JOSEPH D. SPATE*
Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

DANIEL CAMERON
  Attorney General of Kentucky
LINDSEY KEISER*
  Assistant Attorney General
Kentucky Office of the Attorney
General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5517

*Counsel for the State of Kentucky*

JOHN SCOTT
  Provisional Attorney General
RALPH MOLINA
  Deputy Attorney General for Legal
Strategy
CHARLES ELDRED*
Chief, Special Litigation Division
Office of the Attorney General of Texas
P.O. Box 12548
Austin, Texas 78711
(512) 936-1706
charles.eldred@oag.texas.gov

*Counsel for the State of Texas*

LYNN FITCH
  Attorney General
JUSTIN L. MATHENY*
  Deputy Solicitor General
OFFICE OF THE MISSISSIPPI
ATTORNEY GENERAL
550 High Street, Suite 1200
Jackson, MS 39201
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*


AUSTIN KNUDSEN
  Attorney General
CHRISTIAN B. CORRIGAN*
  Solicitor General
PETER M. TORSTENSEN, JR.*
  Assistant Solicitor General
Montana Department of Justice
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
Christian.Corrigan@mt.gov
Peter.Torstensen.@mt.gov

*Counsel for the State of Montana*

*Pro hac vice*

JASON S. MIYARES
  Attorney General
ANDREW N. FERGUSON
  Solicitor General
KEVIN M. GALLAGHER*
  Deputy Solicitor General
Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
aferguson@oag.state.va.us
kgallagher@oag.state.va.us

*Counsel for Plaintiff Commonwealth of Virginia*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this date, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participating attorneys. All other counsel will be served by U.S. Mail, postage paid.

This the 31st day of August, 2023.

*/s/ Elizabeth B. Murrill*
ELIZABETH B. MURRILL (La #20685)
   Solicitor General