# EXHIBIT 1



AMERICAN ACADEMY *of* ACTUARIES

June 28, 2012

The Honorable Harry Reid
Majority Leader, U.S. Senate
S-221 Capitol Building
Washington, DC 20510-7020

The Honorable Mitch McConnell
Minority Leader, U.S. Senate
S-230 Capitol Building
Washington, DC 20510-7010

The Honorable John Boehner
Speaker, U.S. House of Representatives
H-232 Capitol Building
Washington, DC 20515-6501

The Honorable Nancy Pelosi
Minority Leader, U.S. House of Representatives
H-204 Capitol Building
Washington, DC 20515-6537

Re: Reform of the National Flood Insurance Program

Dear Majority Leader Reid, Minority Leader McConnell, Speaker Boehner, and Minority Leader
Pelosi:

As you prepare to consider comprehensive reform to the National Flood Insurance Program
(NFIP), the American Academy of Actuaries'[1] Flood Insurance Subcommittee appreciates this
opportunity to provide an actuarial perspective on this legislation and its possible effect on the
NFIP.

First and foremost, we support reauthorization of the NFIP for at least 5 years. We believe that
multiyear reauthorization will help to strengthen the market for flood insurance as the program
regains stability. Additionally, we strongly support efforts to provide a better financial base for
the NFIP. We are encouraged by the provisions of this bill that move toward a rate structure that
will better match potential loss payments and premium income, including an increase in
deductibles for subsidized rate properties, an increase in the maximum annual premium change
allowed, and new rules to phase in "full actuarial rates."

---

[1] The American Academy of Actuaries is a 17,000-member professional association whose mission is to serve the
public and the U.S. actuarial profession. The Academy assists public policymakers on all levels by providing
leadership, objective expertise, and actuarial advice on risk and financial security issues. The Academy also sets
qualification, practice, and professionalism standards for actuaries in the United States.

Terms such as "full actuarial rates" and "actuarially sound rates" are often cited to describe the premiums for programs like the NFIP.  There are no standard definitions for these terms, but the *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, promulgated by the Casualty Actuarial Society, says that a rate should provide "for all costs associated with the transfer of risk."  The NFIP ratemaking process identifies a "full actuarial rate" as one that appropriately covers the expected average annual loss for a property, plus a small risk load.  Also, the Academy's Actuarial Soundness Task Force recently published a public policy report on actuarial soundness[2], which deals, in part, with this issue as it applies to public entities.

The NFIP's existing $17.75 billion debt, its potential for future borrowing, and its rating structure bring into sharp focus a central issue to consider when debating the NFIP's financial future.  Congress's stated purpose in authorizing the creation of the program was, in part: "…so that such flood insurance may be based on workable methods of pooling risks, minimizing costs, and distributing burdens equitably among those who will be protected by flood insurance and the general public."  The NFIP allows for funding using both insurance premiums and other public sources.  Flood insurance premiums for the program have been developed using an approach that focuses on keeping premiums at a level below market rates to encourage participation. Also, many of the non-insurance activities of the NFIP that benefit the public at large are funded with premium revenues.  This structure does not facilitate minimization of the need for borrowing. While there is always the potential need to borrow, if that need is to be minimized, the ratemaking approach and the regulations that circumscribe that approach may need to change.

## **Observations by Section**

Section 100211 specifies the use of "generally accepted actuarial principles" in calculating premium rates.  Generally accepted actuarial principles are designed to estimate the expected cost of future losses.  However, requiring premiums to cover the average historical loss year, including catastrophic losses, does not align with generally accepted actuarial practice.  Although such premium rate estimates would be informed by historical losses, requiring coverage of those losses could, after an unusually large event, such as Hurricane Katrina, result in rates much higher than the expected cost.

Any effort to put the NFIP on sound financial footing would benefit from addressing the program's existing $17.75 billion debt, which was incurred following the catastrophic losses suffered in the 2005 Gulf Coast hurricanes.  Resolving the issue of the outstanding debt is critical to the program becoming more financially sound; however, the bill does not address this issue directly.  Currently, a significant portion of the NFIP premium goes to paying down the debt and interest on the debt.  Even so, it will be decades until this debt is paid off, even if no extreme catastrophic events occur in the meantime.  Ultimately, for the NFIP's financial stability to be improved, the debt would need to be waived, or a specific cost provision to be used for repayment could be added to the premiums.

This debt situation demonstrates a difference between private insurance and the NFIP.  Actuarial practice in private insurance would not support the reimbursement of past deficits by future policyholders, unless specific surcharge, outside the "actuarial rate," was established and dedicated to debt repayment.

---

[2] http://actuary.org/files/publications/Actuarial%20Soundness%20Special%20Report%20FINAL%205%2010%2012.pdf

Section 100212 requires the NFIP administrator to establish a reserve fund, and, when its balance is less than the specified reserve ratio, the reserve fund would be added to at a rate of 7.5 percent of that ratio, per year.  We have three concerns about this provision.  First, given the current scope of the program, it has been estimated that this would add an annual charge to policyholders of approximately $800 million, or about 25 percent of the NFIP's total annual premium.  Second, that $800 million annual charge to policyholders would be increased by an additional 30 to 40 percent because of loadings for various insurance expenses.  Third, it is unclear how this provision would work in combination with the provisions in Section 100213 concerning debt repayment.  If payments to the reserve are not made before the debt is paid down, there seems to be little chance that the reserve will actually be funded, because debt repayment is such a long-term process.

Section 100225 requires a $90 million annual contribution from the Flood Fund for mitigation projects, but prohibits collecting revenue to offset that cost.  Such an expense will reduce the amount available to pay for flood losses and will create a destabilizing element in the flood insurance program.  If the program is to move toward financial soundness, there needs to be an offsetting source of revenue for mitigation projects.

Section 100232 provides for participation from the private market by allowing the administrator to purchase reinsurance or reinsurance equivalents.  The NFIP could potentially benefit from these purchases in certain situations.  However, for the reasons described above, the NFIP's current rating structure likely will not provide enough revenue to purchase a significant level of reinsurance.  Reinsurance providers will likely require a return commensurate with the risk associated with the coverage provided.  Current NFIP rates do not incorporate and reflect a cost of capital commensurate with this risk.  However, enactment of this bill should provide some funds that could be used for reinsurance.

The American Academy of Actuaries' Flood Insurance Subcommittee hopes that you will find these comments helpful and would be pleased to assist you in your efforts to reform and reauthorize the NFIP.  If you have any questions, please feel free to contact Lauren Pachman, the Academy's casualty policy analyst, at pachman@actuary.org.  Again, thank you for this opportunity to comment on the proposed legislation.

Sincerely,

Stuart B. Mathewson, FCAS, MAAA
Chair, Flood Insurance Subcommittee

CC:    Members, U.S. Senate
       Members, U.S. House of Representatives

3