# EXHIBIT 3

# M E M O R A N D U M

**To**:  Members of the Committee on Financial Services

**From**:  Committee Staff

**Date**:  March 7, 2023

**Subject**:  March 10, 2023 Subcommittee on Housing and Insurance Hearing Entitled "How Do We Encourage Greater Flood Insurance Coverage in America?"

On Friday, March 10, 2023, at 9 a.m. in Room 2128 of the Rayburn House Office Building, the Subcommittee on Housing and Insurance will hold a hearing titled "How Do We Encourage Greater Flood Insurance Coverage in America?" This hearing will examine the overall level and availability of flood insurance in America, as well as the steps that can be taken to encourage greater deployment of flood insurance coverage.

This will be a one-panel hearing with the following witnesses:
- **Mr. Patrick Small**, President, DUAL Specialty Flood, on behalf of the Wholesale & Specialty Insurance Association (WSIA)
- **Mr. Christopher W. Heidrick**, Owner and Principal, Heidrick & Company Insurance and Risk Management Services, LLC, on behalf of the Independent Insurance Agents and Brokers of America (The Big I)
- **Mr. Julian A.P. Enoizi**, Global Head of Public Sector, Guy Carpenter
- **Dr. Carlos E. Martín**, David M. Rubenstein Fellow, Brookings Institution and Director of the Remodeling Futures Program, Harvard Joint Center for Housing Studies

**The Use of and Need for Flood Insurance**

Floods are the most common, most expensive, and most deadly natural disaster that communities across the United States experience. It has been reported that approximately 90 percent of all U.S. natural disasters also involve flooding from any number of sources, inducing inland flooding, flash floods, and flooding from seasonal storms.[1] While such events have long been a concern, recent experiences have shown that flooding has become both more frequent and severe. The Federal Emergency Management Agency's (FEMA) 50+ year old National Flood Insurance Program (NFIP), which is by far the nation's leading provider of flood insurance coverage, has experienced two of its top five, four of its top ten, and ten of its top 20 costliest flood

---

[1] The Insurance Information Institute "Facts about Flood Insurance," available at: https://www.iii.org/article/facts-about-flood-insurance.

events all in the last decade alone.[2] The NFIP had only two $1+ billion flood events prior to its most costly flood, which was Hurricane Katrina in 2005. Since then, the NFIP has experienced eight $1+ billion flood events.

The damage from flooding can be extremely costly to both human safety and property. The National Weather Service has reported an average of 98 deaths per year over the last decade due to flooding, including nearly 150 fatalities in 2021 alone.[3] Additionally, according to FEMA, just one inch of flood water in a home can cause up to $25,000 in damage.[4] In 2019, the average NFIP flood claim payout was over $32,000.[5] As a result, the overall economic cost of flood damage in the U.S. was estimated to be approximately $17 billion per year from 2010-2018, more than quadruple from the $4 billion per year cost in the 1980s.[6]

**The Flood Insurance Gap**

Despite the increase in the frequency and severity of flooding in the U.S., household purchases of flood insurance have not kept pace. Generally, flood insurance is not included under a standard homeowner's or renter's policy. Unless an individual specifically purchases flood coverage from the NFIP or a private flood provider, many losses due to flooding are not insured. Data from the Swiss Re Group, a leading provider of global reinsurance, has observed that "*floods cost the global economy $82 billion in 2021 alone, only $20 billion of which was insured.*"[7]

The difference between the number of households that have purchased flood insurance coverage and the number of uninsured households with elevated risk is commonly referred to as the "flood insurance gap." Many households incorrectly believe that if they have never experienced flooding or if they live in an area where flood insurance is not legally mandated, they are not at risk. However, statistics show that 20 percent of all flood claims take place in areas deemed to be low- to moderate-risk.[8] Research conducted by the Wharton Risk Center into this gap found:

> On average nationwide, only 30% of homes in the highest risk areas have flood coverage. Less than 25% of the buildings flooded by Hurricanes Harvey, Sandy,

---

[2] FEMA "Significant Flood Events," available at: https://nfipservices.floodsmart.gov/reports-flood-insurance-data.
[3] National Weather Service "Weather Related Fatality and Injury Statistics," available at: https://www.weather.gov/hazstat.
[4] FEMA "Myths vs Facts: The True Cost of Flooding," January 1, 2022, available at: https://community.fema.gov/PreparednessConnect/s/article/Myths-vs-Facts-The-True-Cost-of-Flooding.
[5] FEMA "Historical Flood Risk and Costs," available at: https://www.fema.gov/data-visualization/historical-flood-risk-and-costs.
[6] Testimony of FEMA's Michael Grimm to Committee on Science, Space and Technology, February 27, 2020, available at: https://www.fema.gov/fact-sheet/michael-grimm-testimony-committee-science-space-and-technology.
[7] Seth Rachlin, "How insurers can – and should – close the global flood protection gap," PropertyCasualty360, December 2, 2022, available at: https://www.propertycasualty360.com/2022/12/02/how-insurers-can-and-should-close-the-global-flood-protection-gap/?slreturn=20230122193107.
[8] The Insurance Information Institute "Facts about Flood Insurance."

and Irma had insurance. Indeed, repeatedly after floods there is evidence of the United States' large and persistent flood insurance gap.[9]

A critical step in strengthening our overall preparedness against devasting flooding is raising awareness. Policymakers should determine how to encourage more households to understand their flood risk and identify the public policy tools to help close the flood insurance gap.

**The NFIP: the Nation's Dominant Flood Insurance Provider**

The NFIP, created by Congress in 1968, is by far the nation's leading provider of flood insurance coverage. Homeowners and businesses can purchase flood insurance through the NFIP if they are located in one of 22,000 participating communities that have agreed to implement FEMA's local floodplain management regulations and building codes. Under Section 102 of the Flood Disaster Protection Act of 1973, homeowners who have a federally-backed mortgage in certain high-risk areas with a 1 percent or higher chance of annual flooding ("Special Flood Hazard Areas") are <u>required</u> to purchase flood insurance. Properties that are required to purchase flood insurance comprise just over half of all NFIP policies, with the remaining policies purchased voluntarily in areas with lower risks.

The NFIP currently provides coverage to roughly 4.7 million policyholders (4.5 million of which are residential policies) with over $1.3 trillion in total insurance coverage-in-force.[10] Properties insured by the NFIP include single family homes (roughly 70 percent of policies), condos and multifamily buildings (roughly 20 percent), and other non-residential buildings like businesses, churches, and farms. In total, the NFIP collects approximately $4.7 billion in annual combined premiums and fees from its policyholders.

NFIP customers buy policies through insurance agents and companies that participate as third-party administrators in the NFIP's Write Your Own (WYO) program. Under the WYO program, while these companies sell NFIP insurance, they do not assume <u>any</u> financial risk on the policy, which is all borne by taxpayers. All WYO companies sell the same federally-backed NFIP coverage. These policies also have the same pricing and coverage levels. Thus, a consumer cannot leverage competing WYO companies to find a product which meets their unique needs. Additionally, up until an internal policy change by FEMA in 2018, WYO companies were subject to a "non-compete clause." This clause prohibited WYO companies from selling their own private flood policies (where the insurer, not taxpayers, assumed the risk) as a condition of being allowed to sell NFIP policies for the government. Before FEMA removed this clause, many viewed it as a significant barrier to more insurers offering private alternatives to NFIP insurance.

---

[9] Wharton Risk Center "Closing the Flood Insurance Gap," available at: https://riskcenter.wharton.upenn.edu/policy-incubator/upgrading-flood-insurance/closing-the-flood-insurance-gap/.

[10] NFIP "Policies in Force by Occupancy Type/Zone," available at: https://nfipservices.floodsmart.gov/reports-flood-insurance-data.

**Private Flood Insurance Providers**

In contrast to the NFIP and its federally-backed policies, there are some insurers that sell privately-backed flood insurance policies with different rates and expanded coverage options. These private options make up a fraction of the overall flood insurance market, with roughly 562,000 total policies in force at the end of 2021. Of that total, only 360,000 were for residential properties (the rest being commercial), generating about $355 million in total direct written premiums for private flood providers. According to data from the National Association of Insurance Commissioners (NAIC), there were only 24 private insurers that wrote over $1 million in residential private flood insurance in 2021, with the top three alone accounting for more than 37 percent of the market.



There are several factors that have limited the use of private flood insurance as an alternative to the NFIP. First, unlike insurance provided by the NFIP, private flood insurance is a state-regulated product. To sell private flood policies – or any other line of insurance – an insurer must first be approved by a state regulator. The NFIP's dominant market share and barriers like the former non-compete clause make the economic rationale harder to justify for an insurer considering launching a start-up line for flood coverage. Thus, while some states like Florida have multiple domiciled standard ("admitted") insurers that are licensed to sell flood insurance polices within their borders, other states have none. This limitation reduces the options for consumers in those states looking for alternatives to the NFIP's prices and coverage levels and shifts more risk on the NFIP. Removing federal barriers and encouraging more standard insurers to offer private flood insurance would address those problems and help reduce the flood insurance gap.

One alternative to this limitation can be found in the surplus lines market, which functions as a supplement to traditional insurance markets.  The surplus lines market is made up of "non-admitted" insurers, which are companies approved to sell an insurance product across state lines.  Surplus lines providers are regulated by the insurance department in their domestic state and subject to all of the same rules and regulations as admitted insurers for both consumer protection and financial solvency.  However, due to their non-admitted status, surplus lines providers have "rate and form" freedom in other states that admitted insurers do not.  This ability means they can innovate and offer additional pricing and coverage options to meet the needs of consumers.  It also makes it easier to underwrite perils such as flooding that lack things like robust historical claims data typically desired by actuaries.  Increasing surplus lines participation in the private flood market can give consumers additional options in finding non-NFIP insurance coverage that meets their needs and further reduces the flood insurance gap.

**Legislative Proposals**

- *H.R. ___, the National Flood Insurance Program Extension Act of 2023*

This discussion draft would extend the reauthorization and temporary borrowing authority of the NFIP through the end of December 2024.  The current NFIP authorization is set to lapse after September 30th of this year.

- *H.R. ___, the NFIP Participation Study Act of 2023*

This discussion draft would require GAO to conduct a study of the implementation and efficacy of the flood insurance mandatory purchase requirement of Section 102 of the Flood Disaster Protection Act of 1973 to ensure covered homeowners are in compliance with the law.

- *H.R. ___, the Consumer Options for Flood Insurance Act of 2023*

This discussion draft would make permanent FEMA's decision to remove the non-compete clause from its WYO contract with insurers that sell NFIP policies for the government.

- *H.R. 900, to amend the National Flood Insurance Act of 1968 to allow for the consideration of private flood insurance for the purposes of applying continuous coverage requirements, and for other purposes* (Reps. Castor and Luetkemeyer)

This bill would allow NFIP policyholders with discounted rates who opt to purchase private insurance to return to the NFIP at a future date and resume those discounted rates if they have maintained continuous flood insurance coverage on their property without interruption.