# EXHIBIT 18



September 28, 2021

The Honorable John Kennedy
United States Senate
Washington, DC 20510

Dear Senator Kennedy:

    Thank you for your August 5, 2021 letter to the Department of Homeland Security, Federal Emergency Management Agency, regarding the implementation of Risk Rating 2.0: Equity in Action.

    Pursuant to the National Flood Insurance Act of 1968, FEMA is required to "undertake and carry out such studies and investigations and receive or exchange such information as may be necessary to estimate, and shall from time to time estimate, on an area, subdivision, or other appropriate basis – (1) the risk premium rates for flood insurance which – (A) based on consideration of – (i) the risk involved and accepted actuarial principles . . . would be **required in order to make such insurance available on an actuarial basis** . . ." 42 U.S.C. 4014(a)(1) (emphasis added).

    FEMA conducted a multi-year study, which conclusively determined its existing rating system is outdated, inequitable, and is no longer capable of producing risk-based, actuarially-sound rates. Based on this study, FEMA developed Risk Rating 2.0: Equity in Action, to ensure rates are equitable and accurate. Risk Rating 2.0: Equity in Action aligns with President Biden's call to action to assess programs for inequities and to immediately address those inequities across all federal programs, while advancing FEMA's mission to reduce disaster suffering. We are fixing longstanding inequities in flood insurance pricing and establishing a system that is better equipped for the reality of frequent flooding caused by climate change.

    In developing Risk Rating 2.0: Equity in Action, FEMA worked with subject matter experts from the U.S. Army Corps of Engineers, U.S. Geological Survey, National Oceanic and Atmospheric Administration, and the insurance and actuarial industry to ensure its new methodology aligns with statute and produces actuarially sound rates. Additionally, FEMA continues to work with Congress, its industry partners, and state, local, tribal, and territorial agencies to ensure clear understanding of these changes.

    As we do every year, FEMA provided information to our industry partners that addresses programmatic changes, modifications, and improvements six months prior to the implementation of new rates. As a first step in the Risk Rating 2.0: Equity in Action implementation process, on April 13, 2021, FEMA provided our industry partners with guidance documents detailing the upcoming Risk Rating 2.0: Equity in Action program changes.

Risk Rating 2.0: Equity in Action sets rates using factors such as replacement cost value of the building, proximity to a flood source, and the unique flood risk of the property. It is important to note that it is not the rating methodology that causes rates to increase or decrease. Rather, it is the property's risk of flooding that is driving NFIP's rate change. FEMA's study revealed that rates for some policyholders need to be increased while others need to be decreased. The existing rating plan, however, does not allow FEMA to target the increases and decreases in a fair or actuarial manner. Under the existing rating plan, no policyholders would not see any reduction in rates, and instead would be subject to rate increases for an indefinite period.

With the existing rating system, some Louisiana policyholders with lower-value homes are paying more than they should based on their actual risk profile, and some policyholders with higher value homes are paying less than they should. Under the existing system, premiums would continue to increase indefinitely, while the Risk Rating 2.0: Equity in Action framework has an upper bound that limits costs on the highest end of the spectrum. This means that no single-family home policies transitioning to the new methodology will see an annual premium of more than $12,125 under Risk Rating 2.0: Equity in Action. With no change, current inequitable rates will remain in place, and many Louisiana policyholders will continue to pay more than they should. Upon implementation of Risk Rating 2.0: Equity in Action, policyholders eligible for lower premiums will immediately be charged the lower premium upon renewal. Under the current methodology no one receives a decrease and all premiums increase on average at about the same rate as Risk Rating 2.0. In fact, 20% of Louisiana policyholders will see immediate premium decreases of, on average, $80 per month, and it will take 10 years for 90% of Louisiana policyholders who experience an increase to reach their full risk rates with an 18% annual increase cap.

FEMA is conscious of the far-reaching economic impacts COVID-19 has had on the nation and existing policyholders, which is why it extended the grace period to pay premiums to renew policies last spring and summer. It is also why FEMA is taking a phased approach to rolling out the new rates. In Phase I, new policies beginning on or after October 1, 2021, will be subject to the new rating methodology. Also beginning October 1, existing policyholders eligible for renewal will be able to take advantage of immediate decreases in their premiums. In Phase II, all remaining policies renewing on or after April 1, 2022, will be subject to the new rating methodology.

This phased approach allows policyholders the opportunity to better understand their new rates. At the same time, the agency can execute its promise to deliver rates that are equitable, easier to understand and reflect each property's unique flood risk.

As to affordability, in April 2018, FEMA delivered an Affordability Framework to Congress to help policymakers consider how to provide targeted assistance to existing and potential policyholders. The Affordability Framework provides options to ensure that the updated premium rates both accurately reflect the current assessment of risk while recognizing that affordability is an issue for many existing and prospective policyholders.

Additionally, the Biggert-Waters Flood Insurance Reform Act of 2012 (BW-12) required certain policyholders to transition to their full risk rating on a faster timeline than Risk Rating 2.0: Equity in Action, which puts a limit on annual increases. Since the implementation of BW-12, statutory premium caps have been implemented, which prevent most existing policyholders from experiencing a premium increase of more than 18% annually with an exception for some policy types including non-primary residences, non-residential properties, properties with severe repetitive loss or substantially improved properties. In the past decade, Congress has updated the NFIP rating system through BW-12 and the Homeowner Flood Insurance Affordability Act of 2014 (HFIAA). Rate increases under Risk Rating 2.0: Equity in Action will align with what is required by legislation.

Finally, FEMA acknowledges and appreciates Louisiana's encouragement of the purchase of flood insurance, including investments in resiliency and flood protection, and fundamental reforms in disaster policies. FEMA believes the Risk Rating 2.0: Equity in Action framework supports the state's goal of proactive disaster preparedness.

Responses to the questions you submitted are listed below.

1. Public involvement and policyholder interests do not seem to be a consideration in the formulation of RR 2.0. RR 2.0 proponents speak about fairer rates, but there has been no meaningful public involvement during the five years it has taken FEMA to establish this proposal.
    a. Specifically, how has the general public been notified or consulted about these significant changes before this once-in-a-generation overhaul of the National Flood Insurance Program (NFIP)? In what ways?
    b. As FEMA began developing RR 2.0, did FEMA ever consider doing a rulemaking process with public notice and comment before this once-in-a-generation NFIP overhaul takes effect in October of this year?
    c. The Administrative Procedure Act ensures that the public is guaranteed a voice and proper insight into proposed government agencies' rules/regulations. Pursuant to the Administrative Procedure Act, why haven't the underlying assumptions, models, and data used to formulate RR 2.0 been released for public comment and input?
    d. It's August. Why hasn't FEMA made rates available to the public at this time?

**Response**: Since 1968, the National Flood Insurance Act has required the Federal Emergency Management Agency (FEMA) to periodically review, and if necessary, revise the way we set non-discounted premium rates. The requirement to estimate and charge actuarial rates, also referred to as, non-discounted premium rates is outlined at 42 U.S.C § 4014(a)(1); 4015(c).

> "The Administrator is authorized to undertake and carry out such studies . . . as may be necessary to estimate, and from time to time estimate on an area subdivision or other appropriate basis (1) the risk premium rates for flood insurance which – (A) based on consideration of –(the risk involved and accepted actuarial principles . . . [that] would

3

>be required in order to make such insurance available on an actuarial basis . . ." 42 U.S.C. § 4014(A)(1).

The Act identifies properties for which FEMA shall charge actuarial rates as Post-FIRM properties: properties built after FEMA has mapped the base flood for an area. 42 U.S.C. § 4015(c). While the Act does outline certain rulemaking requirements, notably 42 U.S.C. § 4014(f)(3), it makes no such requirement for estimation of actuarial rates. As such, there is no statutory mandate for rulemaking.

Even if the rulemaking requirements outlined in the Administrative Procedures Act (APA) at 5 U.S.C. § 553 were directly applicable, the APA offers exceptions to rulemaking for matters relating to "benefits and contracts" 5 USC § 553(a)(2), and for rules of "procedure and practice" 5 USC § 553(b)(3)(A)—thus offering a considerable amount of discretion as to when rulemaking is undertaken.

After two earlier delays in implementation, the new administration decided to take a phased approach to the implementation of Risk Rating 2.0: Equity in Action (Risk Rating 2.0) to ensure existing policyholders have ample time to make informed decisions. The approach was announced in April 2021 and allows existing policyholders, beginning in October, to choose to transition to Risk Rating 2.0 if it is financially advantageous. All policyholders, beginning in April 2022, will be transitioned, giving existing policyholders at least one year to understand the transition to Risk Rating 2.0. Additionally, in the current rating paradigm, all policyholders have been and would continue to experience rate increases, whereas with Risk Rating 2.0, 23% of existing policyholders would see rate decrease upon the transition to the new rating methodology and all other policyholders would see the gradual statutory increases mandated by Congress.

- **In Phase I**: New policies beginning Oct. 1, 2021, will be subject to the new rating methodology. Also beginning Oct. 1, 2021, existing policyholders eligible for renewal will be able to take advantage of immediate decreases in their premiums at the next policy renewal.
- **In Phase II**: All remaining policies renewing on or after April 1, 2022, will be subject to the new pricing methodology, with renewing policyholders either immediately decreasing or increasing from their current premium to their full risk premium over time.

This phased approach allows more time for both industry and policyholders to prepare.

The agency has spent significant time over the last three years on outreach and engagement with a variety of industry and non-industry stakeholders, including professional and trade associations, state insurance regulators, state insurance commissioners, various government agencies, and the media. To date, FEMA has conducted more than 500 outreach and engagement activities around Risk Rating 2.0.

Major National Flood Insurance Program changes are announced to the public twice a year, in April and October. Annual rate changes are announced every October, effective the following April. These changes are announced via bulletin to our industry partners and posted to floodsmart.gov. In concert with the NFIP's general practice of announcing major program changes semi-annually, on April 1, 2021, FEMA issued W-21003 bulletin.  The bulletin

4

provided notification of the change to the new pricing methodology, the overall timeline for implementation, and FEMA's expectations of NFIP insurers (i.e., WYO companies and NFIP Direct).

Additionally, FEMA has released several sets of data and information, listed below, for the public to understand the changes that will be made once Risk Rating 2.0 is fully implemented. FEMA released:

- "Risk Rating 2.0 Methodology and Data Sources," released in April of this year provides a consolidated description of the methodology and data sources used to develop Risk Rating 2.0 and information describing how the work complies with relevant actuarial standards. The report also provides the Risk Rating 2.0 algorithm, rates, and rating factors, as well as examples that illustrate how premiums are calculated under the new rating plan.
- Risk Rating 2.0 State Profiles: These state profiles provide a detailed report of the Risk Rating 2.0 transformation on the insurance policies within that state, as well as county-level and zip-code level premium change analysis.
- Risk Rating 2.0 Methodology and Data Sources, this document provides a complete overview of the technical methodology and data used to build Risk Rating 2.0
- Premium Calculation Worksheets. A workbook that shows how the rating calculation produces a premium.
- Appendix D Rating Factor Tables - A workbook that encompasses all the rating factors for the variables.

FEMA will continue to release additional information regarding Risk Rating 2.0. At this time, NFIP policyholders can contact their insurance company or insurance agent to learn more about what Risk Rating 2.0-Equity in Action means to them. FEMA has also provided the Write Your Own companies and NFIP Direct the guidance necessary to implement Risk Rating with their agent workforce. Final guidance was released on September 1, 2021, though industry partners have seen this material in draft form since April. As our efforts move forward, FEMA will continue to partner with the Write Your Own companies and NFIP Direct to ensure their staff, agents, business processes, and technology are implementing the Risk Rating 2.0 changes for both new business and current policyholders.

2. I am deeply concerned about the affordability of flood insurance under the RR 2.0 proposal. This proposal will significantly raise premiums for policyholders in Louisiana.
    a. As you were creating RR 2.0, was flood insurance affordability a consideration in the pricing structure? As was intended with the creation of the NFIP, is FEMA planning to continue to balance the need for affordable rates with capturing risk? How?

**Response**: FEMA recognizes and shares concerns about flood insurance affordability. Pursuant to 42 U.S.C. § 4014(a)(1); 4015(c), FEMA is required to estimate and charge actuarial rates, also known as non-discounted premium rates. Accordingly, rates must be risk based. FEMA will continue to ensure that the transition to new rates under Risk Rating 2.0 is reasonable, equitable, and complies with the gradual 18% statutory rate increase limits put in place by Congress.

In April 2018, FEMA delivered an Affordability Framework to Congress to assist policymakers in considering how to provide targeted assistance to policyholders and potential policyholders. FEMA will continue to work with Congress to examine options to make flood insurance more affordable.

Rates will increase at the same overall levels under either the current rating plan or Risk Rating 2.0, but under the current rating plan they will increase inequitably. Under Risk Rating 2.0 they will increase fairly.

Under the current rating plan, lower value homes pay more than they should for flood insurance, subsidizing higher value homes. And these same low value homes are currently bearing larger increases in premium than higher value homes. Without implementing Risk Rating 2.0 the inequity of the current rating plan will continue to grow, making flood insurance for lower value homes less affordable.

As shown in the attached summary, both at a national level and in Louisiana, under the current rating plan thousands of policyholders are currently seeing increases between $50 and $100 per month. And the average replacement cost value for these homes is around $250,000, well below the average replacement value of approximately $400,000 in Louisiana and $450,000 nationally. Under Risk Rating 2.0, fewer structures will see increases above $50, the few that do have replacement cost values well in excess of the national and state average.

Furthermore, without Risk Rating 2.0, thousands of policyholders who are currently overpaying for flood insurance will not see reduced premiums. The attachment also shows that the average replacement cost value for those with the largest decreases is likewise below the nationwide and state average. Under the current rating plan rates will continue to increase, with large, inequitable increases that are particularly focused on older, lower value homes. Risk Rating 2.0 was designed to address these inequities, not only halting these increases for many of the lower value homes, but actually decreasing their premiums.

Under the current methodology, premiums for all policyholders would continue to increase by an average of 10 percent per year indefinitely, with no upper bound that limits costs on the highest end of the spectrum. Without a transition to Risk Rating 2.0, inequitable rates will remain in place, and many policyholders will continue to pay more than they should.

FEMA supports the Biden Administration's budget proposal for Fiscal Year (FY) 2022 aimed at helping address flood insurance affordability for low-to-moderate income households.

> b. To help keep rates affordable, isn't it essential that we examine not just program *revenues* but also program *costs*? Do you believe that both the program's expenses and revenue should be considered to maintain affordability?

**Response:** FEMA is undertaking three efforts to manage the expenses of the program:

6

1. Expense Analysis Working Group – This working group will perform annual analysis of WYO companies' income and expenses to derive implied profit or loss.

2. Future of Insurance Study – FEMA is planning to issue a contract to study the effects of technological advancements on the future of insurance, including: a) Product offerings; b) Pricing paradigms; c) Delivery mechanisms; d) New technologies; and e) Future of agent and adjuster commission. FEMA plans to award the contract prior to the end of FY 2021.

3. WYO Compensation Study – FEMA has established a working group and placed a contract with RAND to examine WYO compensation. The study will lead to new rulemaking regarding WYO Compensation. FEMA anticipates awarding the contract and commencing the study in the last quarter of FY 2021.

   c. Why is it that the only solution to address the solvency of the program is to raise rates on existing policyholders without trimming the costs run up by agencies and their contractors? Why will policyholders experience a rise in the cost of their premiums while contractors and the agencies will see minimal to no change?

**Response:** FEMA is continuously undertaking efforts to manage expenses of the program. For example, the recently completed modernization of our IT system saves the NFIP over $22 million per year in operations and maintenance expenses. Risk Rating 2.0 is essential to reducing costs as it is expected to create efficiencies through simplification of delivery.

   d. Over the past decade, the NFIP's debt has shot up exponentially. To reduce or eliminate the NFIP debt, do you agree we also need to reform payments to write-your-own insurers, NFIP operating expenses, and interest on NFIP debt payments to the U.S. Treasury?

**Response:** As discussed above, FEMA is undertaking efforts to manage programmatic expenses to WYO insurers, and this includes examination of the most appropriate way to compensate WYO companies. Though important, WYO compensation and administrative costs are not what is driving the NFIP's debt, it is the payment of claims on large, catastrophic events. Addressing the debt requires a comprehensive approach, which addresses structural flaws in the way the NFIP is designed. We look forward to working with Congress on a sound financial framework that addresses interest and debt payments to the U.S. Treasury that cost current NFIP policyholders $287 million annually.

The NFIP's structural flaws have been apparent since the historic 2005 hurricane season. Since that time, a series of catastrophic floods have highlighted the failures of current flood policy, including the fact that the NFIP is not fiscally sustainable in its present form. The NFIP manages most of its financial risk through authority to borrow from the U.S. Treasury, the repayment of which is beyond the NFIP's current capabilities. Congress did not design the program to handle catastrophic losses from events such as Hurricane Katrina (2005), Hurricane Sandy (2012), and Hurricane Harvey (2017). When disasters have exceeded the NFIP's capacity to pay, Congress

has repeatedly raised the NFIP's borrowing authority (from its 2005 level of $1.5 billion to the current level of $30.425 billion) rather than address this structural flaw of the program.

Historically, the NFIP's borrowing authority limit has only been raised when significant disaster events occur causing large levels of loss. Reliance on increasing borrowing authority to pay for valid claims is not sustainable. Large debt accrues large accrued interest payments, hampering the NFIP's balance sheet. Since 2005, the NFIP has paid $5.26 billion in interest payments alone. In the current NFIP financial situation, even with Risk Rating 2.0 premiums, there is only a 4% chance of ending a ten-year window with a positive net balance.

Establishing a sound and transparent financial framework for the NFIP would require statutory changes that would require the Administrator to strive to manage the NFIP to the 1-in-20 occurrence exceedance loss level (approximately $10.5B) utilizing the following: the National Flood Insurance Fund, Reserve Fund, annual Congressional Equalization Payments, reinsurance, and any other funds made available to the Administrator through appropriations or otherwise for carrying out the flood insurance program. If the Administrator finds that a flooding event will exceed the flood insurance program's 1-in-20 occurrence exceedance loss level, emergency supplemental appropriation should be instituted. If the NFIP were to institute necessary reforms for a sound financial framework, there is a 75% chance of ending a ten-year window with a positive net balance. Looking 18-years out, there is only a 5% chance of having a negative net balance, with a $16B positive average balance.

      e.  How much has FEMA paid Milliman for their work in developing RR 2.0?

**Response:** FEMA paid Milliman $10,988,650 from June 2017 to October 2020. Milliman is the leading actuarial consulting firm for natural catastrophic insurance perils. In addition of providing valuable insight into industry best practices, they provided top actuarial and geospatial talent to assist the FEMA actuaries in developing a nation-wide flood rating plan, which is a very complex natural catastrophe peril.

3. According to FEMA's website, FEMA is developing flood hazard models using private sector data sets, catastrophe models, and evolving actuarial science.
    a. For the public, it is not enough to just describe and cite a model. How does FEMA plan to communicate to policy holders that their premiums are derived from their flood risks in plain English?
    b. Are policy holders aware of their flood risk's influence over the cost of premiums? And are they aware of the correlation between the two?

**Response:** FEMA will deliver flood insurance rates under Risk Rating 2.0 that are easier to understand and better reflect a property's unique flood risk. Risk Rating 2.0 uses a series of rating variables to describe the flooding risk at the structure level, such as the structure's distance from a flooding source, elevation, and the cost to rebuild a property. Therefore, the connection between a policyholder's flood risk and insurance premium should be clearer than in the past.

For the last 3+ years, FEMA has spent significant time on outreach and engagement with a variety of industry and non-industry partners as well as the media. This has ensured these groups can effectively assist the public in understanding both Risk Rating 2.0 and the factors that drive the price of flood insurance. In addition, insurance agents are essential partners in communicating the value of flood insurance to the public. FEMA has worked to ensure the agent community is well-versed in Risk Rating 2.0and are ready to communicate to their customers in plain language how flood insurance works.

As of September 3, 2021, FEMA has trained over 15,258 agents on the fundamentals of Risk Rating 2.0., so they can begin to work with current and prospective policyholders. Beginning August 2021, current National Flood Insurance Program policyholders have had the ability to contact their insurance company or insurance agent to learn more about what Risk Rating 2.0-Equity in Action means to them.

4. Insurance companies have been required by FEMA to sign Non-Disclosure Agreements (NDA) before seeing the details on Risk Rating 2.0.
   a. Please provide a detailed explanation regarding why FEMA decided to require insurance companies to sign an NDA. Additionally, please provide my office with a copy of the NDA.

**Response:** Write Your Own (WYO) industry partners are critical in delivery of the NFIP, and FEMA worked closely with them throughout the development of Risk Rating 2.0.

Given that the development of Risk Rating 2.0 was a fluid process and FEMA wanted to include industry expertise from the WYOs, it was necessary to put a Non-Disclosure Agreement (NDA) in place prior to the official release of any implementing guidance. FEMA wanted to ensure that when the design of Risk Rating 2.0 was complete, FEMA and industry partners could implement it in a consistent fashion. The NDA was designed to keep deliberative information confidential as well as ensure that information regarding the methodology and the implementation timeline was consistent and disseminated only once decisions were finalized. FEMA lifted the NDA requirement in April of this year. At that time, FEMA had provided public notification of the change to the new pricing methodology, the overall timeline for implementation, and FEMA's expectations of NFIP insurers. A copy of the NDA is attached.

5. On April 30, you received a letter from the American Property Casualty Insurance Association (APCIA). In the letter, APCIA posed many questions about when the WYOs would receive the final information they need to implement this initiative effectively. In your response, dated May 14, you told them that the information they have received is "substantively final and will be finalized with sufficient time to implement prior to October 1."
   a. Can you please tell me what is "sufficient time to implement prior to October 1" in your mind? Is there a specific date?
   b. What is the current timeline for providing WYOs with the final information needed to implement RR 2.0?

9

**Response:** Since May 14, FEMA has worked continuously with WYOs to provide information related to the implementation of Risk Rating 2.0. Beginning August 2021, current NFIP policyholders were able to contact their insurance company or insurance agent to learn more about what Risk Rating 2.0: Equity in Action means to them.

6. FEMA has acknowledged significant gaps in reliable levee risk data. It is my understanding that only one of the five or six Risk Rating 2.0 models could be adapted for use on levees.
   a. Please provide a detailed explanation about why FEMA's evaluation will be able to accurately determine risk and risk-rated premiums behind levees.

**Response:** Prior to undertaking Risk Rating 2.0, there were significant gaps in consistent levee data across the nation that could be used to assess flood risk for the purposes of rate setting. For Risk Rating 2.0, FEMA partnered with the United States Army Corps of Engineers (USACE) to close those gaps by identifying and using credible and consistently available data and methods to account for the level of risk reduction provided by levees. Through the partnership with USACE, FEMA was able to provide the first comprehensive modeling of flood risk reduction provided by levees, leading to a more reliable quantification of the remaining risk behind the nation's levees. The rates for Risk Rating 2.0 were set using this information.

- Five key data points were used to assess the risk reduction provided by a levee: levee centerline, levee crest profile, leveed area, overtopping frequency, and levee performance.
- FEMA used readily available data from the USACE-maintained National Levee Database (NLD) and the Levee Screening Tool (LST). All levees identified in the NLD (Spring 2020) were considered for Risk Rating 2.0. The NLD is a dynamic database that is continually updated.
- The quantity and quality of levee information in the NLD and LST varies, and FEMA used the most detailed and highest quality data available from these sources. Levees that USACE routinely inspects generally have more high quality and detailed information available, and that data was used for Risk Rating 2.0. For other levees lacking that detailed information, available data from the NLD was used and enhanced using consistent methods.
- For each levee, the overtopping frequency and levee performance were directly incorporated into the catastrophe models to determine average annualized losses. Leveed areas have a separate rating algorithm than non-leveed areas.
- USACE and FEMA jointly developed an approach that increased the ability to evaluate risk behind 42 percent of levees in the country, which account for 90 percent of buildings behind levees.
- FEMA will continue working with USACE to improve levee data and to refine risk assessment methodologies in support of annual rate updates and a risk-informed NFIP.

   b. How can FEMA ensure that RR 2.0 will offer accurate pricing for policyholders and their premiums?

10

**Response:** As described in FEMA's detailed documentation of the analytical basis for the rating plan found here: Risk Rating 2.0 Methodology and Data Sources Final Report (fema.gov). By using flood risk models and data from commercial catastrophe models as well as data from FEMA, USACE, the National Oceanic and Atmospheric Administration, and the United State Geological Survey, FEMA can ensure that rates reflect the best available data. Furthermore, the rating plan has been tested using historical data to ensure the flood risk aligns with NFIP's best and complete analysis.

      c. What will become of the Levee Analysis Mapping Procedure (LAMP) developed at the urging of Congress to give due consideration to the impacts of non-accredited levees in providing flood protection during a Flood Insurance Study? What will happen under RR 2.0 as a result of the LAMP work for the five communities in south Louisiana that were working on the pilot of the LAMP program?

**Response:** As part of Risk Rating 2.0: Equity in Action, FEMA has not proposed any changes to the levee analysis and mapping procedures for non-accredited levees (LAMP), which are documented in FEMA's guidelines and standards for identifying the 1% annual chance flood hazard on a Flood Insurance Rate Map (FIRM). In addition, FEMA has not proposed any changes to levee certification/accreditation criteria set forth in 44 CFR 65.10. Risk Rating 2.0: Equity in Action does not change the mandatory purchase requirement, which is tied to the Special Flood Hazard Area (SFHA) as identified by each participating community's FIRM.

The outcomes of the LAMP analyses and the 1% annual chance flood hazard boundary shown on the FIRM will still determine where mandatory flood insurance and floodplain management requirements apply. FEMA uses additional data and analyses beyond those required for LAMP in order to set flood insurance rates for structures behind levees. Through Risk Rating 2.0: Equity in Action, FEMA is accounting for the risk reduction that a levee provides against a full range of flood events that are more and less frequent than the 1% annual chance flood.

The status of the FIRM updates for the five Louisiana Parishes where FEMA initiated LAMP are:

- Plaquemines Parish – FEMA issued effective FIRMS dated 1/15/21, which reflect the results of LAMP
- St. Charles Parish – FEMA is still engaging communities to implement LAMP
- St. Tammany Parish – FEMA is currently updating the flood hazard analyses for coastal areas and will engage communities to implement LAMP in levee-impacted areas
- Lafourche Parish – FEMA issued preliminary FIRMs on 6/16/21, which reflect the results of LAMP; FEMA held a meeting with community leaders on 8/9/2021 to discuss the FIRM update
- Terrebonne Parish – FEMA issued preliminary FIRMs on 6/16/21, which reflect the results of LAMP; FEMA will issue a revised preliminary FIRM on 8/31/2021 *to include updated flood hazard information provided by communities in levee-impacted areas*

7. FEMA clearly demonstrates intentions to do away with grandfathering with the implementation of RR 2.0. FEMA states that "all policies formerly eligible for grandfathering will transition to their full-risk premium." This change in policy has a huge impact on the people of Louisiana. In other released information, FEMA states that it will offer some policy "discounts" under certain conditions. Notwithstanding the uncertainty of what full-risk premiums will ultimately be, as expressed above, please answer the following questions.
   a. How many Louisiana policyholders are currently receiving grandfathering discounts?

**Response**: Unlike the other discounts, grandfathering is administrative and not statutory.

Grandfathering is available to ease rate changes when a map change results in either a change in rating zone or base flood elevation. Grandfathering allows policyholders to keep the zone and/or base flood elevation prior to the map change.

While many maps have changed for many policyholders, very few policyholders are grandfathered. Fewer than 5% of single- family homes are grandfathered, and most of those are only marginally grandfathered – that is, grandfathered by only a small amount. As of March 2020, there are approximately 151,409 grandfathered properties nationwide. These policies represent a small percentage of the 3.5 million single-family, non-leveed properties insured under the NFIP.

Of the nearly 500,000 NFIP contracts in-force in the state of Louisiana, 44,000 (9%) are currently receiving grandfathering discounts. Out of these, approximately 5,000 policyholders are receiving "built in-compliance" discounts, and 39,000 are receiving "continuous coverage" discounts.

Under Risk Rating 2.0: Equity in Action all existing policies will move toward their full risk rates based on statutory glidepaths. The increase and target premiums for grandfathered policies are similar to those for non-grandfathered policies – some will see decreases, some will see smaller increases, and some will see larger increases in similar proportion to non-grandfathered policyholders.

Existing policies formerly eligible for grandfathering will transition to their new full-risk premium under Risk Rating 2.0: Equity in Action. Most increases for existing policies will be gradual and within the 18% annual cap imposed by Congress. Decreases will apply upon first renewal on or after Oct. 1, 2021. The average annual premium for these grandfathered properties is $1,077, which is lower than the average annual premium for subsidized NFIP policies (Pre-FIRM) at $1,875.

   b. With RR 2.0 in effect, how many Louisiana policyholders will find themselves now in the equivalent of an SFHA requiring mandatory purchase of flood insurance where they had not been before?

**Response**: Risk Rating 2.0: Equity in Action does not change the mandatory purchase requirement, which is tied to the Special Flood Hazard Area (SFHA) as identified by each participating community's Flood Insurance Rate Map.

      c. With RR 2.0 in effect, how many policyholders will find themselves newly below the required BFE?

**Response**: Risk Rating 2.0: Equity in Action will not change the Base Flood Elevation anywhere nor will it change a structure's elevation; therefore, no policyholders will be newly below the BFE. The BFE is only identified in Special Flood Hazard Areas. Flood Insurance Rate Maps (which show SFHA and BFEs) will still be used for floodplain management and mandatory purchase requirements.

      d. With Risk Rating 2.0 in effect, how many Louisiana policyholders will find themselves:

**Response**: Risk Rating 2.0: Equity in Action does not use the BFE for rating purposes.

      i. More than 1 foot below BFE, and what will a standard policy cost? (addressed above)
      ii. More than 2 feet below BFE, and what will a standard policy cost?
      iii. 3 feet? (addressed above)
      iv. 4 feet? (addressed above)
      v. 5 feet or more, and what impact will that have on their ultimate full-risk premium? (addressed above)

FEMA will continue working with USACE to improve levee data and to refine risk assessment methodologies in support of annual rate updates and a risk informed NFIP.

Thank you again for your letter. If you need additional information or assistance, please have a member of your staff contact the Office of External Affairs, Congressional and Intergovernmental Affairs Division, at (202) 646-4500.

                                          Sincerely,

                                          David I. Maurstad
                                          Deputy Associate Administrator
                                          Federal Insurance and Mitigation Administration