# EXHIBIT 23

**TESTIMONY OF ROBERT G. RASH, PE, PLS**

**CEO AND CHIEF ENGINEER, ST. FRANCIS LEVEE DISTRICT OF ARKANSAS**

**WEST MEMPHIS, ARKANSAS**

**SUBMITTED TO**

**UNITED STATES HOUSE COMMITTEE ON FINANCIAL SERVICES**
**SUBCOMMITTEE ON HOUSING AND INSURANCE**

**"THE REAUTHORIZATION OF THE NATIONAL FLOOD INSURANCE PROGRAM: FEMA'S PERSPECTIVE"**

**APRIL 28, 2023**

The following joint statement is presented on behalf of the St. Francis Levee District of Arkansas, the Mississippi Valley Flood Control Association, the Association of Levee Boards of Louisiana, the Fort Bend County Economic Development Council Flood Management Committee, the Missouri Levee and Drainage District Association, and the Floodplain Alliance for Insurance Reform.

**The St. Francis Levee District of Arkansas** was established in 1893 by the Arkansas Legislature as the first improvement district in the state. It is responsible for operating and maintaining 411 miles of levees in northeast Arkansas, making it the largest levee district in the United States. Our system has passed federal levee inspections for more than 60 consecutive years while reliably protecting residential areas, manufacturing, agriculture, and other infrastructure on more than two million acres of land across seven counties. The St. Francis Levee District, with levees, pumping stations, backwater areas, and floodways is a critical component of the Mississippi River and Tributaries Project that has prevented $2.7 trillion in flood damages, including $194.9 billion in 2020, to generate an extraordinary 131 to 1 return on investment.

**The Mississippi Valley Flood Control Association** was created in 1922 to promote the consensus homeowner, flood protection, and inland navigation interests of the seven-state region participating in Mississippi River Valley Flood Control and Navigation projects, including the States of Illinois, Missouri, Kentucky, Tennessee, Arkansas, Mississippi, and Louisiana.  Since 1980 MVFCA has expanded to include the watershed states from St. Paul, MN to the Gulf of Mexico.  The Association involves over 150 entities including levee boards, drainage districts, municipalities, port and harbor commissions, state agencies, nonprofits, and businesses from the Mississippi River Watershed, a contiguous region that occupies 41% of the land area of the United States.

**The Association of Levee Boards of Louisiana** is made up of the state's 23 individual levee boards and we work closely with Federal and state agencies to contain and manage floodwaters along our major waterways, from the northernmost reaches of Louisiana to the waters of the Gulf of Mexico.  More than half of our precious land is in a flood plain, and 41 percent of the continental U.S. drains into the Mississippi River Basin.  This creates a unique situation in our state, where flooding is a part of the history we share, and a part of the future we are working hard to control.  Thanks to the constant diligence and monitoring by the state's levee boards, rains very rarely have the disastrous results they once had for our state's citizens.  "Without Flood Control, Nothing Else Matters."

**The Fort Bend County Economic Development Council Flood Management Committee of Sugar Land, Texas**, was established in 2021 because of concerns about the long-term systemic effects of the new National Flood Insurance (NFIP) pricing methodology, Risk Rating 2.0.  Our organization includes public and private sector leaders who advocate for our regional flood protection network of 19 major levee and drainage systems.  Over $20 billion in property investment and approximately 150,000 residents are protected by nearly 100 miles of levees and drainage infrastructure, nearly 27 percent of the total taxable value of Fort Bend County.  Our accredited flood protection systems have been funded using only local dollars and more than $750 million has been invested for systems planning, design, construction, and upkeep.

Exemplary floodplain management practices by the two largest cities in Fort Bend County, Sugar Land and Missouri City, have been recognized by the Federal Emergency Management Agency (FEMA) with class 6 and class 7 Community Rating Service ratings, respectively.

**The Missouri Levee and Drainage District Association** was established in the immediate aftermath of the Great Flood of 1993, the worst such U.S. disaster since the Great Mississippi Flood of 1927.  Our membership, representing both rural and urban leveed areas, includes levee and drainage districts from areas throughout the Midwest, farming operations, industrial and commercial businesses, and individuals.  We support these and other entities by working closely with federal, state, and local agencies, as well as quasi-public and private organizations, toward improvement of conditions along the Missouri River and its tributaries.

**The Floodplain Alliance for Insurance Reform** is a nonprofit, nonpartisan coalition started in 2009 to advocate for objective flood protection approaches using the best alternatives from multiple means to reduce catastrophic flooding in the United States.  We are organized with local levee, drainage, and conservation districts to generate original analysis in furtherance of consensus, fact-based policy supporting public safety, economic development, and natural resource conservation.

**Summary Statement**

In the United States, where coastal and inland floodplain areas are home to more than 50 percent of the nation's population and gross domestic product, our organizations, now collectively representing nearly 200 levee and drainage districts in 15 states, support long-term reauthorization of the NFIP to ensure the availability of affordable flood insurance.  While there are no easy fixes in the pursuit of flood insurance premium affordability and fairness, NFIP solvency, and economic flood damage reduction, our organizations recognize the important

role that Congress has laid on flood insurance to help protect the nation's financial system, Federal financial guarantees, and the efficiency of real estate markets.

In setting flood insurance premiums, it is essential that our Federal partners be transparent in the computation of premiums and use equivalent, reproducible methods to compute flood losses for setting both NFIP premiums and for making mitigation and infrastructure investment decisions.  We must do this so that we can move our flood responses closer to better choices among the "multiple means" as recommended by the late Gilbert F. White, who many call the "father of floodplain management."

It is regrettable that FEMA has chosen a completely opaque, unchallengeable method to set flood insurance premiums that is not easily correlated with the way organizations like the Corps of Engineers compute average annual flood damage – a method that is transparent, peer reviewed, reproducible, and reliable.  FEMA has not even bothered to compare the expected damage computation of Risk Rating 2.0 with readily available samples of property specific expected damage estimates nor allowed access to their data and methods so that other analysts can carry out these comparisons.  The method used to compute flood insurance premiums should be widely accessible so we can also easily see the relationship between computed flood insurance premiums and flood mitigation.  With "Risk Rating 2.0—Equity in Action" FEMA has failed to reconcile risk speculation with risk observation and is instead heavily substituting modeled for observed probabilities and consequences.  This is a specific failure of transparency.  It is well known that models like those employed by FEMA and its contractors are neither observation nor science and are vulnerable to subjective judgement.  Yet again, FEMA has failed to compare flood insurance premiums based on observed probabilities and consequences with premiums based on speculative models that substitute for observations.  Nor to they make their data available to other analysts to make these comparisons.  From the perspective of the interested public, flood insurance premiums might as well be based on "tea leaves."

The pretense that communities with accredited levees ought to be forced into NFIP egregiously flies in the face of observation. Show us the record of accredited levee failures. Mandatory insurance for communities with accredited levees is nothing more than a levee tax or a mere means to spread administrative costs and would not pass a benefit cost analysis test. Additionally, Risk Rating 2.0 is not honest about risk communication. Actuarial expected damages are shrouded in layers of policy fees, assessments, surcharges, WYO commissions, and reinsurance costs. Contemporary NFIP premiums as prescribed to the policyholder communicate more about insurance industry and other liability-free beneficiaries of the program than the actuarial flood risk faced by a property owner.

The geography and history of the Mississippi River Valley, the Brazos River Valley and Texas Gulf Coast, the entirety of Louisiana, and the Missouri River and its tributaries make clear that our future is tied to successful flood damage avoidance and access to affordable flood hazard insurance. These interdependent objectives have guided our decisionmaking since before inception of the NFIP. Our significant local investment in federally recognized flood projects and local adoption and enforcement of floodplain management standards have given rise to trillions of dollars in land value and improvements. We are concerned that the value of these investments and the future of our communities are being threatened by poorly supported policy proposals, including the approach taken under Section 209 of the House Financial Services Committee (HFSC) NFIP Reauthorization Discussion Draft from the previous Congress and the new FEMA Risk Rating 2.0 (RR2.0) pricing methodology for NFIP premiums. The balance of this testimony will focus on specific concerns related to HFSC Sec. 209 from the previous Congress and FEMA's RR2.0.

**(I)        Section 209 "New Zone for Levee-Impacted Areas" HFSC NFIP Reauthorization (117th Congress)**



Levee Locations Across the U.S., Source: U.S. Army Corps of Engineers at https://levees.sec.usace.army.mil/#/map-viewer

Levees Everywhere

The National Levee Database (NLD) managed by the Corps and FEMA indicates that 17.4 million people live or work behind a levee.  Levees help protect more than $2 trillion of property, 4,500 schools that enroll over 2 million students, and 5.47 million buildings.  As depicted in the above NLD graphic and explained by the Corps in a March 2018 report, "these [levee] systems are integral with society, with about a mile of Corps levees for every McDonald's restaurant in the United States."  Communities in all 50 states, the District of Columbia, Puerto Rico, and Guam rely on levees and flood walls to help lessen catastrophic flooding, increase land availability for habitation, agriculture, and industry, and protect the U.S. financial system from instability that might result from large-scale flood events.

Accredited Versus Non-accredited Levees

Importantly, while levees are everywhere, not all levees are the same in terms of their size, the amount of people and treasure they help protect, or performance. Of the 6,895 levee systems registered in the NLD, the Corps and FEMA report that more than 1,555 systems are either accredited by FEMA on NFIP flood maps as substantially reducing the flood hazards posed by a 1-percent-annual-chance-flood or provisionally accredited with as yet incomplete documentation demonstrating compliance with 44 CFR 65.10. By contrast, an estimated 5,340 levee systems are not accredited by FEMA. In approximate terms, this means that only one in five of the red levee location markings shown in the above NLD graphic represents an accredited or provisionally accredited levee system.

The areas landward of accredited levee systems, in general, are not subject to mandatory flood insurance purchase. Non-accredited levee areas are identified on flood maps as high-risk or SFHAs where NFIP floodplain management regulations must be enforced and where the flood insurance purchase mandate applies for residential and commercial properties with mortgages from federally regulated or insured lenders.

The important responsibility of managing floodplain development, frequently involving local land use regulation, flood insurance, building standards, and other nonstructural hazard mitigation approaches, is guided by FEMA in partnership with land use regulation and zoning agencies at the local level. In most cases, those local regulatory agencies are not the same as the owner-operators of flood control projects.

HFSC Draft Section 209 Penalizes Communities with Accredited Levees

Section 209 of the House Financial Services Committee (HFSC) draft NFIP Reauthorization Act (117th Congress) would authorize the FEMA Administrator to determine risk in leveed areas absent rulemaking. It similarly would allow the Administrator to bypass the flood mapping and attendant public notice and congressional notification procedures specified at 42 U.S.C. 4101 while allowing for imminent application of mandatory insurance landward of accredited levees.

Section 209 prescribed a transitional premium level in those areas (which could be expected to increase premiums from low to moderate risk for some leveed areas), directed that FEMA proceed to implement new internally developed (and under Risk Rating 2.0, unchallengeable) "risk-based" premiums in such areas, while also applying SFHA land use regulations.

The HFSC Section 209 approach from the previous Congress failed to recognize the important distinctions between accredited and non-accredited levee systems and the enduring, overwhelmingly effective accreditation process altogether.  For communities that have made the sacrifice to plan, build, operate and maintain world class infrastructure, no good deed would go unpunished under the draft Section 209 from the previous Congress.  Indiscriminate designation of areas behind all levees as SFHA with attendant land use regulations and flood insurance purchase mandates would summarily overturn the decades-long Federal commitment to accommodate diverse local needs and circumstances, incentivize local project funding sufficiency, and foster exemplary local operation and maintenance of projects that contribute optimal, economic flood protection through reliable, high-performance levees.  The unsupported HFSC Section 209 approach risks flouting the teachings of Professor Gilbert White to make use of multiple means, including the full array of sound structural and nonstructural approaches, to reduce the incidence of catastrophic flooding.

<u>HFSC Section 209 Should Either Be Removed from Further Consideration or Clarified</u>
Some may try to argue that the HFSC Section 209 would maintain the status quo on application of the SFHA mandatory insurance purchase and land use requirements behind accredited levees.  If true, it is unclear what purpose the provision serves.  The lack of clarity and purpose underlying that Section 209 language demands that it be removed from further consideration.  In lieu of removal of Section 209 altogether, Congress must clarify its intent such that nothing in the provision or any other provision shall affect the exemption of properties from mandatory insurance in leveed areas protected by levees accredited under 44 CFR 65.10.  Further, in implementing the proposed HFSC Section 209 approach, it should be specified that the Administrator shall not include any levee-protected area in an SFHA requiring mandatory flood

insurance coverage and land use requirements unless the Administrator first carries out fully all requirements related to identification and mapping of flood-prone areas under the National Flood Insurance Act of 1968 [42 U.S.C. 4001 et seq.].

The Benefits of Accredited Levee Systems

Objective analysis of accredited levee system performance reveals that diligent levee owner-operators, in partnership with local zoning agencies and the Corps and FEMA, have indeed reduced the incidence of flood loss in their communities.  The accredited 11-state Mississippi River and Tributaries Project authorized by the 1928 Flood Control Act has prevented $2.021 trillion in cumulative damages to generate a remarkable 116.8 to 1 return on investment.  During epochal May 2015 rainfall across Texas, accredited Corps flood control projects maintained by local sponsors prevented more than $13 billion in flood damages.  And during the unprecedented 279 days of Midwest flooding in 2019, flood control operations prevented $2.4 billion in damages in Missouri and Kansas.  In January 2022, the German-based global reinsurance company, Munich Re, published a report indicating that Hurricane Ida (Sep 2021) caused $65 billion in damage but that the rebuilt levee system in New Orleans "withstood the storm surges, thereby preventing much higher losses… …and that the investments there were absolutely worth it."  The reality in hundreds of communities is that federally accredited levees continue to serve the areas they protect and the Nation and, with a single notable exception, have not failed.

The horrific losses and suffering experienced by victims of the 2005 Hurricane Katrina-related failure of a levee system in New Orleans are anomalous for certified and federally accredited levees in the United States over the last several decades.  Even considering the New Orleans tragedy caused by an underdesigned floodwall, we have not experienced systemic financial crises or bank failures as the consequence of accredited levee failure.  The inspections, surveillance, and use of technological advancements underlying Federal levee accreditation have worked to both increase life safety and secure the same financial protection outcome as that intended by Congress for application of mandatory insurance under the National Flood

Insurance Act. With New Orleans as an undeniably tragic exception, the Nation has thankfully not experienced a history of accredited levee failures that threaten the financial system or justify the HFSC Section 209 approach which, incidentally, was rejected by Congress 11 years ago during debate on the Biggert-Waters Act of 2012. Our success in areas protected by accredited levees is what the Federal government expected when communities that sacrificed to construct levees and sustain Federal accreditation were given the promise that their sound projects would protect them not only from floods, but also imposition of mandatory insurance and expansive Federal land use regulation.

The extremely low current risk to the financial system and its stability posed by accredited levees can also be put into a much larger context. On May 10, 2022, the Senate Banking Committee received testimony from Secretary of Treasury Janet Yellen on the annual report of the Financial Stability Oversight Council. During the hearing Senator Toomey, the Ranking Member of the Committee, asked the Secretary, "Can you name a single financial institution in America that has failed as a result of a severe weather event in the last 50 years?" The Secretary could not name such an event. Senator Toomey went on, "Every single year we have blizzards, we have hurricanes, we have wildfires and sometimes they are horrendous, and some of them have been recent. But we've never had a single financial institution fail much less the entire financial system. So, I think it's pretty clear and actually I think Chairman Powell acknowledged there's no physical risk that's even remotely imminent." Any risks posed to the Federal interest in our financial system from accredited levees could unfold over time, but at present they are certainly not imminent, nor even apparent.

<u>HFSC Section 209 Unintended Consequences</u>
The HFSC Section 209 from the previous Congress represents a sudden hard turn on decades-long policy for leveed areas that essentially mandates a new form of taxation in the guise of arbitrary insurance premiums, seemingly levied for revenue rather than actuarial purposes. It could easily incentivize residents to demand that levee districts, after satisfying debt service obligations, cease levying taxes for operation and maintenance and instead rely solely on the

"protection" provided by the NFIP to avoid paying a tax for levee maintenance and another for flood hazard coverage.  Critically, the HFSC Section 209 from the 117th Congress would result in a precipitous decline in residential and commercial property values, depressed realtor commissions, a reduction in overall taxable market value and necessitate reduction in governmental services or increased tax rates, while frustrating local performance of sound community floodplain management practices.

Levee owner-operators of accredited systems have spent considerable time, effort, and resources over the decades to achieve reliable, economic flood protection for their residents and business owners.  Earning and keeping FEMA accreditation of levees on flood maps to avoid SFHA designation and associated mandates and regulations have further incentivized levee owner-operator commitments to levee system operation and investment.  There is no known Federal analysis demonstrating that accredited levees pose a substantial risk for protected communities nor is there any known Federal analysis to justify termination of the longstanding exemption from mandatory flood insurance or land use requirements for areas protected by accredited levees.

**(II)     FEMA Risk Rating 2.0 Methodology**

The NFIP pricing overhaul by FEMA, called "Risk Rating 2.0—Equity in Action" (RR2.0), went into effect for existing policyholders on April 1, 2022, despite broad bipartisan concerns over how RR2.0 has been developed, tested, and presented to the public.  There are also concerns about the long-term impacts that RR2.0-calculated premiums are already having on premium affordability, property values, property resale, and local revenues.  For many, the ultimate full-risk actuarial cost that FEMA represents as being captured under RR2.0 is being hidden by an 18 percent annual price increase limit installed by Congress after explosive FEMA premium hikes in 2012-2013.

FEMA's Data Disclosure Gap

FEMA's drastic changes under RR2.0 are represented as better reflecting flood risk using a blend of public and proprietary information and tools, but neither the policyholders nor flood management science practitioners are permitted to scrutinize the underlying data and processes of calculating premiums to assess its accuracy or make contributions to improving accuracy.  We are reminded of the regrettable outcomes that arose from implementation of NFIP rate reforms authorized in the Flood Insurance Reform and Modernization Act of 2012. The immediate, exorbitant premium rate increases of the 2012 Act prompted Congress to mitigate the harmful effects less than two full years later, in 2014.  Clearly the unprecedented overhaul now being executed by FEMA through RR2.0, which risks precipitous declines in residential and commercial property values with derivative impacts, warrants closer scrutiny by Congress.

The internally developed RR2.0 plan plainly lacks the transparency that policyholders and government decisionmakers require to test FEMA methodologies and verify the accuracy and fairness of their methods, data, and future premiums.

The minimum data needed for communities to assess Risk Rating 2.0 include—
   1.   The flood elevations and flood frequency curves at the locations in each community used (or assumed) to generate the full array of premiums from rating factors;
   2.   The estimated average annual losses (with confidence intervals or error bands) at the locations in each community used to develop the premiums;
   3.   The results of the "generalized linear models" used to develop the rating factors based on such parameters as "distance from the water," "elevation above the water," "foundation type," etc., including the confidence intervals, error bands and p-values (i.e., measure of the probability that an observed difference could have occurred just by random chance) for the estimates;

    4.      Documentation of how the flood and storm models use Monte Carlo methods to draw artificial years from an imaginary set of probability relationships together with the assumed events, consequences, and probabilities (Casino Premiums) to forecast possible outcomes; and

    5.      The extent to which estimates of premiums reflect modeled events, consequences and probabilities that have rarely, perhaps never, occurred in the flood history, e.g., levee failures and over-topping, unobserved flood flows, unobserved flood stages, etc.

<u>S. 721, the "Homeowner Flood Insurance Transparency and Protection Act"</u>

Until such time that requisite information is made publicly available and adequately tested, NFIP policyholders should be provided the option to select either the legacy approach or the new RR2.0 approach, depending on their individual circumstances.  FEMA must be compelled to provide this information that is so fundamental to assessing the soundness of the premiums being prescribed to policy holders.

Legislation to achieve this policyholder protection outcome was introduced and referred to the Senate Banking Committee on March 8, 2023.  S. 721 by Senator Hyde-Smith and others would require FEMA to—

- Make the new RR2.0 chargeable premium rates optional vs. mandated, giving policyholders the option to request the legacy (or lower) premium calculation approach until FEMA justifies its program overhaul by satisfying all requirements;
- Inform policyholders of their legally available premium options;
- Make available to the public and demonstrate all data, methods, and assumptions used to establish chargeable premium rates under RR2.0;
- Fully disclose the actual, unhidden RR2.0 costs to individual NFIP policyholders by providing two expressions of the new FEMA approach for their home or other property: (a) their total full-risk actuarial premium as unconstrained by the annual (temporary) premium increase cap set by federal law (not currently available from FEMA); and (b)

- the upcoming 12-month chargeable premium rates that are lowered (temporarily) by federal law;
- Complete and publish a comprehensive assessment of the broad economic and social impacts of implementing RR2.0 over a 20-year period, accounting for affordability and availability of NFIP flood insurance, property values, and non-federal government revenues otherwise used to support local services (e.g., public education, first responders, public works, and parks and recreation);
- Supplement and revise, as appropriate, the 2018 (pre-RR2.0) Record of Decision for the final Nationwide Programmatic Environmental Impact Statement associated with impacts from RR2.0-related modifications to the NFIP;
- Demonstrate that the chargeable premiums under RR2.0 are based on data and methods of sufficient quality, objectivity, utility, and integrity to be reliable under government-wide Office of Management and Budget (OMB) guidance used to implement the Federal Information Quality Act;
- Conduct a public notice and comment rulemaking consistent with the Federal Administrative Procedure Act, which would also include a fair, transparent, and streamlined process to manage policyholder disputes over chargeable premium rates and other factors under the new overhauled RR2.0 approach;
- Publish the distribution of chargeable premium rates by county with and without the premium rate caps to permit short and long-term assessment of the economic impacts of RR2.0; and
- Submit a report to Congress detailing the findings and outcomes of having completed the preceding disclosure, economic and environmental analysis, data quality assurance, public notice and comment, and cost distribution requirements.

A matter of urgent concern is that every policyholder be given a process to appeal his or her NFIP premium along with the data necessary to assess how accurate the premium is in reflecting expected flood damage for his or her home.  Under the legacy premium method, policyholders had access to appeal of mapping decisions through their local NFIP participating

community.  This appeal process addressed both the designation of residence as being within the special flood hazard area (SFHA) as well as the assignment of the residence to a SFHA zone that was correlated with a prescribed premium.  In essence, the appeal process permitted a policyholder to appeal his or her flood insurance premium.  The program operated in this manner for decades and this process gives strong evidence to the position that the intent of Congress in the Flood Insurance Act was to provide a policyholder with access to an appeal of his premium.  Risk rating 2.0 severed the mapping process from premium setting but failed to replace the premium appeal process within the new Risk Rating 2.0 regime.  This deficiency must be remedied.  The conditions of the Hyde-Smith bill (S. 721) must retain a requirement that FEMA provide a process for each policyholder to appeal his or her premium and also grant the policyholder full access to the data necessary to pursue such an appeal.  FEMA sets flood insurance premiums as a virtual monopoly that sells a product that many homeowners must buy if they are to own and finance a home.  FEMA's premium setting is not subject to review by a regulatory commission as in the case of a public utility monopoly.  To overcome this alarming deficiency, an appeal process is vital.

FEMA is acting with astonishing disregard for the rights of individual citizens to understand and, if necessary, challenge their government.  FEMA implemented the new premium computation method outside the rulemaking process required by the Administrative Procedure Act and has refused to acknowledge any obligation – moral or legal – to do so.  The agency has likewise failed to adhere to the data quality assurance requirements of the Information Quality Act.  Policyholders from coast-to-coast have the right to understand the data and processes used by FEMA to calculate the estimated flood risk and government-issued insurance costs for their homes or commercial properties.  It is unconscionable that the technical underpinnings and real-world costs and benefits of RR2.0 are being concealed by our government.  Allowing for full transparency, data reliability, policyholder appeals, and public participation on the government-run NFIP is not only in keeping with federal law, but also increases the chance for successful outcomes.  RR2.0 is not exempt from these realities.  Doing otherwise risks public mistrust,

swift declines in residential and commercial property values, failure to accurately communicate flood risk, and further harm at the expense of the policyholder and affected communities.

NFIP policyholders should be provided the option to select the legacy approach or the new RR2.0 approach, depending on their individual circumstances, until FEMA provides the necessary information that is fundamental to assessing the accuracy of premiums and a just premium appeal process.

**Conclusion**

We have laws and administrative guidelines promulgated by OMB to protect the quality, objectivity, utility, and integrity of information disseminated and used by Federal agencies. Longstanding, bipartisan administrative requirements are in place under the Administrative Procedure Act to ensure good government and open and transparent consideration of regulatory actions.  These requirements are being bypassed as the agencies seek to overhaul their treatment of levees in Federal programs.  Both FEMA and the U.S. Army Corps of Engineers, who are working together on key NFIP elements, continue to restrict public information disclosure, formal peer review, and solicitation and consideration of public input.  Too many of these important public protections are being set aside.

Some proponents find that the FEMA RR2.0 approach represents change that is "long overdue" and that it should "increase public confidence in the program" while "putting NFIP on stronger financial footing."  Others, including FEMA, are making similar claims about the need to charge rates that more accurately reflect risk.  All those statements might be true, but no one can know because the core underlying data and assumptions used to produce RR2.0 have not been made available and there can be no confidence that new premiums are reproducible for an individual property or that leveed areas are fairly treated.  A policyholder can't even examine the data and make an appeal.

As we work together to address the damages and financial impacts of flooding, we must keep in mind that the social purpose of insurance is to provide a means of distributing risk to those willing to assume it for a price so that economic agents like households and firms can undertake activities with net economic benefits that their financial survival constraints would not permit them to undertake without the insurance coverage. In short, insurance exists to permit the pursuit of greater economic efficiency and benefits. Insurance does not come into existence to be a tool to control or prevent beneficial flood plain occupancy. NFIP also plays an important role in our social safety net and its impact on household income and property values is a critical component of evaluating its future. FEMA's premium setting and the impacts of this premium setting need additional attention and scrutiny. This essential scrutiny can only occur if FEMA opens up its books and shares the underlying data and computations behind Risk Rate 2.0.

We request that Congress step in before it is too late. Pass the legislation introduced by Senator Hyde-Smith, S. 721, to compel FEMA to fill the RR2.0 data gaps, abide by the terms of peer review and reproducibility under the Information Quality Act, reinstate effective rights of appeal for policyholder premium-setting, and guarantee meaningful public participation opportunities through rulemaking.

Thank you for the opportunity to submit these views.