# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| THE STATE OF LOUISIANA, *et al.*,<br><br><br>                     *Plaintiffs*,<br><br>     v.<br><br>DEPARTMENT OF HOMELAND<br>SECURITY, *et al.*,<br><br><br>                     *Defendants*. | Action No. 2:23-CV-01839-DJP-JVM<br>Section P<br>District Judge Darrel J. Papillion<br>Magistrate Judge Janis van Meerveld |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................1

I.    Defendants Appropriately Rely On The Maurstad Declaration ...................................1

II.    Plaintiffs Cannot Establish Article III Standing ..........................................................3

     A.    Plaintiffs Barely Address Their Failures to Plausibly Allege Traceability and Redressability ...........................................................................................................3

     B.    Plaintiffs Fail to Plausibly Allege a Concrete Injury in Fact ...............................8

         1.    No cognizable sovereign injury ...............................................................8

         2.    No cognizable quasi-sovereign injury ...................................................12

         3.    No cognizable economic or proprietary injury .......................................12

         4.    No cognizable procedural injury ............................................................22

         5.    No cognizable organizational or associational injury ............................24

III.    Plaintiffs Lack Standing to Assert Their NEPA Claim ...............................................25

CONCLUSION ...................................................................................................................28

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982) ............................................................................................... 12

*Choice Inc. of Texas v. Greenstein,*
    691 F.3d 710 (5th Cir. 2012) ................................................................................ 24

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ............................................................................................... 8

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ........................................................................................... 3, 12

*Ctr. for Biological Diversity v. EPA,*
    937 F.3d 533 (5th Cir. 2019) ................................................................................ 21

*E.T. v. Paxton,*
    41 F.4th 709 (5th Cir. 2022) .................................................................................. 8

*Ecosystems Inv. Partners v. Crosby Dredging, LLC,*
    729 F. App'x 287 (5th Cir. 2018) ........................................................................ 27

*ED v. Brown,*
    143 S. Ct. 2343 (2023) .......................................................................................... 22

*El Paso Cnty. v. Trump,*
    982 F.3d 332 (5th Cir. 2020) ........................................................................ *passim*

*Fla. Key Deer v. Paulison,*
    522 F.3d 1133 (11th Cir. 2008) ........................................................................... 26

*Fla. Key Deer v. Stickney,*
    864 F. Supp. 1222 (S.D. Fla. 1994) ................................................................ 19, 26

*Florida v. Mellon,*
    273 U.S. 12 (1927) ............................................................................................... 15

*Found. on Econ. Trends v. Lyng,*
    817 F.2d 882 (D.C. Cir. 1987) ............................................................................ 28

*Grunewald v. Jarvis,*
    776 F.3d 893 (D.C. Cir. 2015) ............................................................................ 28

*Haaland v. Brackeen*,
   143 S. Ct. 1609 (2023) ............................................................................................ 7, 12

*Henderson v. Stalder*,
   287 F.3d 374 (5th Cir. 2002) ........................................................................................13

*Hotze v. Burwell*,
   784 F.3d 984 (5th Cir. 2015) .........................................................................................4

*Kansas City S. Indus., Inc. v. ICC*,
   902 F.2d 423 (5th Cir. 1990) .........................................................................................3

*Laufer v. Mann Hosp., LLC*,
   996 F.3d 269 (5th Cir. 2021) .......................................................................................24

*Lexmark Int'l v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) .....................................................................................................25

*Louisiana by & through La. Dep't of Wildlife & Fisheries v. NOAA*,
   70 F.4th 872 (5th Cir. 2023) .............................................................................8, 10, 19

*Louisiana ex rel. Landry v. Biden*,
   64 F.4th 674 (5th Cir. 2023) ..................................................................................22, 23

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ..........................................................................................3, 5, 12, 14

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ..............................................................................................10, 19

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) .....................................................................................................12

*McConnell v. FEC*,
   540 U.S. 93 (2003) .........................................................................................................7

*Menchaca v. Chrysler Credit Corp.*,
   613 F.2d 507 (5th Cir. 1980) .........................................................................................2

*Metro. Edison Co. v. People Against Nuclear Energy*,
   460 U.S. 766 (1983) .....................................................................................................26

*Nat'l Rifle Ass'n of Am., Inc. v. McCraw*,
   719 F.3d 338 (5th Cir. 2013) .......................................................................................25

*Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*,
   636 A.2d 892 (Del. 1994) ............................................................................................14

*O'Neal v. Cargill, Inc.,*
    178 F. Supp. 3d 408 (E.D. La. 2016) ..................................................................6

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ..........................................................................................26

*Rumsfeld v. F. for Acad. & Inst. Rights, Inc.,*
    547 U.S. 47 (2006) ............................................................................................25

*Sierra Club v. Morton,*
    405 U.S. 727 (1972) ....................................................................................26, 27

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ..............................................................................3, 22, 25

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ....................................................................................22, 23

*Taubman Realty Grp. Ltd. v. Mineta,*
    320 F.3d 475 (4th Cir. 2003) ............................................................................26

*Texas & Pac. Ry. Co. v. Laborde,*
    257 F.2d 587 (5th Cir. 1958) ............................................................................11

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021) ......................................................................................14

*United States v. Students Challenging Regul. Agency Procs.,*
    412 U.S. 669 (1973) ..........................................................................................14

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ..........................................................................................14

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992) ..............................................................................15, 17, 22

*Wyoming v. U.S. Dep't of Interior,*
    674 F.3d 1220 (10th Cir. 2012) ........................................................................14

*Young Conservatives of Tex. Found. v. Smatresk,*
    73 F.4th 304 (5th Cir. 2023) ......................................................................13, 14

**CONSTITUTIONAL LAW**

La. Const. art. VI ........................................................................................................15, 21

La. Const. art. VII .........................................................................................................16

## STATUTES

5 U.S.C. § 706 ........................................................................................................................2

42 U.S.C. § 4002(a)(2) ........................................................................................................26

42 U.S.C. § 4014 ..............................................................................................................5, 6

42 U.S.C. § 4015 ..............................................................................................................5, 6

42 U.S.C. § 4321 ..................................................................................................................26

La. Stat. Ann. § 38:84 ......................................................................................................8, 9

La. Stat. Ann. § 39:94 ..........................................................................................................16

## RULES

Fed. R. Civ. P. 12(b)(1) ...................................................................................................24, 26

## REGULATIONS

44 C.F.R. § 60.3 ....................................................................................................................9

## OTHER AUTHORITIES

13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.5 (3d ed.
    2023 update) ....................................................................................................................5

Eli Tan & Aaron Gregg, *Drivers Squeezed As Auto Insurance Costs Soar Across the U.S.*
    (Sept. 5, 2023),
    https://perma.cc/8KBF-69KB ........................................................................................5

Jacob Bogage, *Home Insurers Cut Natural Disaster Policies As Climate Risks Grow*, Wash. Post
    (Sept. 3, 2023),
    https://perma.cc/T9BL-69J6 ..........................................................................................5

Jedidajah Otte, *Florida Rocked By Home Insurance Crisis: 'I May Have to Sell Up and Move,'* The
    Guardian (July 15, 2023),
    https://perma.cc/KRB4-99TX ........................................................................................5

Veronica Dagher, *Americans Are Bailing on Their Home Insurance*, Wall St. J. (Aug. 28, 2023),
    https://perma.cc/8D89-F5QW ........................................................................................5

## INTRODUCTION

Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss (Pls.' Opp'n, Dkt. 75) confirms that each Plaintiff lacks Article III standing. Plaintiffs' Opposition fails to identify plausibly alleged facts sufficient to demonstrate that any Plaintiff has a concrete and particularized injury that is fairly traceable to Risk Rating 2.0 and redressable with the declaratory and injunctive relief that they seek. Plaintiffs barely address traceability or redressability at all. The various sovereignty-based injuries that they identify are not cognizable because Risk Rating 2.0 does not have any impact either on state law or on state territory. And the various economic injuries that Plaintiffs allege are far too speculative and attenuated to support standing. Perhaps recognizing their failures to adequately plead Article III standing under any theory, Plaintiffs wrongly focus much of their Opposition on attacking Defendants' reliance on the Maurstad Declaration. In so doing, Plaintiffs ignore the basic principle that the Court can consider any evidence bearing on its jurisdiction at the Rule 12 stage, not to mention the many declarations that they themselves attach to their Complaint for this purpose. Plaintiffs' declarations fail to plausibly demonstrate their standing, and the Court should therefore dismiss this suit for lack of jurisdiction. The Court should dismiss Plaintiffs' National Environmental Policy Act ("NEPA") claim for the additional, independent reason that Plaintiffs' Opposition fails to identify how their alleged economic injuries fall within NEPA's zone of interests.

## ARGUMENT

## I.     Defendants Appropriately Rely On The Maurstad Declaration

Plaintiffs begin their Opposition with a strawman, claiming that Defendants improperly "urge the Court to consider their own extra-administrative-record evidence" via the declaration of Assistant Administrator David Maurstad. Pls.' Opp'n at 10 (discussing Defs.' Mem. in Supp. of Their Mot. to Dismiss (Defs.' Mem.), Ex. A ("Maurstad Decl."), Dkt. 47-3); *see id.* at 9–16. But from the beginning, Defendants stated that the cited portions of the declaration are helpful in determining whether

"Plaintiffs have plausibly asserted a concrete, redressable injury in fact." Defs.' Mem. at 7 n.2, Dkt. 47. And there can be no dispute that courts may consider declarations to evaluate standing at the Rule 12 stage. *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). Indeed, Plaintiffs have attached scores of declarations to their Complaint, apparently for this very purpose.

What Plaintiffs perceive to be "a sneak attack on the merits of Plaintiffs' claims," Pls.' Opp'n at 10, is actually critical information about Risk Rating 2.0 that is relevant to both jurisdiction and the merits. For example, the financial benefits of Risk Rating 2.0 for St. Tammany Parish's residents, Maurstad Decl. ¶¶ 52–54, 222–29 & n.153, undermines both the alleged injury (increase in residents' premiums) and the merits (Risk Rating 2.0 unreasonably increases premiums). Just because this cost-saving aspect of Risk Rating 2.0 is harmful to Plaintiffs' legal arguments in multiple ways does not make it "a sneak attack."

Ironically, Plaintiffs themselves liberally and impermissibly cite extra-record sources in support of their merits arguments. *See, e.g.*, Pls.' Mem. in Supp. of Mot. Prelim. Inj. at 13, Dkt. 16-1 (citing extra-record evidence to argue that Risk Rating 2.0 unreasonably raises rates). And, with respect to the preliminary injunction briefing, Defendants have lodged the Maurstad Declaration only because Plaintiffs successfully objected to providing FEMA sufficient time to prepare an administrative record. *See* Pls.' Opp'n Defs.' Mot. Extend Submission Date, Dkt. 38. Plaintiffs cannot seriously contend, having so objected and in light of the record-review provision of the Administrative Procedure Act, 5 U.S.C. § 706, that the Court should disregard the Maurstad Declaration, which elucidates the record before FEMA when the agency developed and implemented Risk Rating 2.0, in evaluating the likelihood of success of their APA claims. For all of Plaintiffs' complaints about transparency, *see, e.g.*, Compl. ¶ 21, Dkt. 1, their actions in this litigation—asking to litigate the merits before the administrative record could reasonably be lodged and objecting to a declaration about the development and implementation of Risk Rating 2.0—suggest a desire to suppress information about

2

Risk Rating 2.0 so that they may continue to mischaracterize the program. The Court should not permit this.

## II.     Plaintiffs Cannot Establish Article III Standing

### A.     Plaintiffs Barely Address Their Failures to Plausibly Allege Traceability and Redressability

Plaintiffs almost completely ignore their failures to plausibly demonstrate that any alleged injuries in fact are both "fairly traceable" to Risk Rating 2.0 and "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *see Kansas City S. Indus., Inc. v. ICC*, 902 F.2d 423, 429 (5th Cir. 1990) (the traceability and redressability inquiries "tend to overlap").

As Defendants address in great detail in their opening Memorandum, Plaintiffs fail to plausibly demonstrate traceability because their alleged sovereignty-based and economic injuries rely on a highly attenuated chain of causation, and because that causal chain ultimately hinges on mere speculation about the future, independent decisions of current and potential residents to respond to any Risk Rating 2.0 premium increases by leaving or forgoing moving to the Plaintiff States or communities en masse. Defs.' Mem. at 21–22, 26–29, 39–40 (relying on, *inter alia*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013), and *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) ("When … a plaintiff's asserted injury arises from the government's allegedly unlawful regulation … of someone else," standing is "substantially more difficult to establish," as it "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." (citation, emphasis, and quotation marks omitted)).

Plaintiffs barely address these causation deficiencies in their Opposition. They seek to bypass the attenuated nature of their alleged harms by arguing that "many of the[]" events in the causal chain

"have already taken place." Pls.' Opp'n at 27. But as discussed in greater detail in Part II.B.3 below, Plaintiffs fail to back this up with any "plausibly alleged sufficient facts ... supported ... with sufficient evidence," which they admit is their burden. *Id.* at 31. (For example, as laid out below, Plaintiffs make no attempt to identify any sufficiently alleged and supported fact that Risk Rating 2.0 has caused or will cause premium rates to rise significantly, for more than just a few isolated policies; they simply ignore this key step in their causal theory.) For purposes of traceability, what is particularly telling is Plaintiffs' failure to identify any specific allegations plausibly supporting their claims that, because of Risk Rating 2.0, "people are leaving the area due to the high cost of flood insurance" and these "independent third parties" "have already taken action." *Id.* at 28. They cite to just a single declaration paragraph, which simply states in conclusory fashion, with no substantiation, that "many homeowners, business owners, and renters in Louisiana are likely to be priced out of their properties and forced to move out of Louisiana" because of Risk Rating 2.0. Compl., Ex. 1 (GOHSEP Decl.) ¶ 57. In relying solely on this single, bare and speculative assertion of causation, Plaintiffs fall well short of their burden of adducing facts plausibly showing that independent third parties will in fact decide to leave Louisiana due to Risk Rating 2.0, and do so at a scale that would depress property values, decrease tax revenues significantly, and thereby deprive Plaintiffs of the financial resources necessary to protect against flood damage. *See, e.g.*, *Hotze v. Burwell*, 784 F.3d 984, 995 (5th Cir. 2015) (cited at Defs.' Mem. at 28, unaddressed by Plaintiffs) (noting that "[a] claim of injury generally is too conjectural or hypothetical to confer standing when the injury's existence depends on the decisions of third parties," and granting motion to dismiss because Plaintiff "[s]peculat[ed] about a decision by a third party" that

"constitute[d] an essential link in th[e] chain of causation" (quotation marks omitted).[1] This traceability failure is dispositive and requires dismissal of the Complaint.

Plaintiffs' conclusory attempt to sidestep redressability fares no better. As discussed, Plaintiffs fail to demonstrate redressability for two reasons. First, they themselves admit that premiums increased under the legacy rating approach. Defs.' Mem. at 39. Second, whether FEMA applies the legacy approach or Risk Rating 2.0, it is required by statute to set rates on an actuarial basis and collect sufficient premiums to cover losses.[2] The catastrophe models FEMA used, which are widely accepted

---

[1] The single paragraph that Plaintiffs cite from the Louisiana GOHSEP Declaration (Compl., Ex. 1) says nothing about the independent financial decisions of the residents of any other Plaintiff States. As Defendants have pointed out, these other States do not in any way attempt to substantiate how any premium increases under Risk Rating 2.0 would affect the unfettered decisionmaking of their residents and in turn seriously impact tax revenues. Defs.' Mem. at 34 n.25. Plaintiffs offer no response. Nor do they address how any property value and population decreases in their States and communities could plausibly be caused by factors completely independent of Risk Rating 2.0, such as rising interest rates or rising insurance rates and changes across the private sector. *Id.* at 32; *see, e.g.,* Jacob Bogage, *Home Insurers Cut Natural Disaster Policies As Climate Risks Grow*, Wash. Post (Sept. 3, 2023), https://perma.cc/T9BL-69J6; Eli Tan & Aaron Gregg, *Drivers Squeezed As Auto Insurance Costs Soar Across the U.S.* (Sept. 5, 2023), https://perma.cc/8KBF-69KB; Veronica Dagher, *Americans Are Bailing on Their Home Insurance*, Wall St. J. (Aug. 28, 2023), https://perma.cc/8D89-F5QW; Jedidajah Otte, *Florida Rocked By Home Insurance Crisis: 'I May Have to Sell Up and Move,'* The Guardian (July 15, 2023), https://perma.cc/KRB4-99TX. It is well established that traceability is absent when, as here, the claimed injury "can be traced to an independent and sufficient cause in sources other than the matters complained of by the plaintiff." 13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.5 (3d ed. 2023 update); *see also, e.g., Defs. of Wildlife*, 504 U.S. at 560 (same).

[2] Plaintiffs briefly contend in the background section of their Opposition that Defendants focus too much on the statutory requirement that FEMA calculate premiums based on "accepted actuarial principles," and not enough on FEMA's statutory authorization to set rates below the actuarial amount in certain circumstances, where doing so would be "reasonable." Pls.' Opp'n at 5 (quoting 42 U.S.C. § 4014(a)(1), (a)(2)). This argument is not only an irrelevant merits argument; it is also wrong. Plaintiffs inappropriately blur § 4014(a)(1) and § 4014(a)(2). The two provisions set out distinct requirements. Contrary to Plaintiffs' reading, § 4014(a)(2) does not require that FEMA's actuarial rate estimates under § 4014(a)(1) be reasonable to encourage people to buy flood insurance. Rather, § 4014(a)(2) authorizes FEMA to estimate (and in turn charge) less than the actuarial rates only for pre-FIRM properties, i.e., those built before the Flood Insurance Rate Map ("FIRM") or December 31, 1974, whichever is later. This conclusion is made clear by § 4015; this provision comes into play once FEMA has estimated rates under § 4014, and it determines what FEMA is required to charge policyholders in premiums. Under § 4015(c)(1), the "chargeable rate" for post-FIRM properties "shall not be less

in the insurance industry, indicated that FEMA's aggregate premium collections were not sufficient to cover its total losses. Based on this modeling, FEMA had to raise the total average annual loss target, which in turn required an increase in the amount of premiums collected across all policies. These premium increases would have had to occur irrespective of Risk Rating 2.0. As such, FEMA cannot avoid raising premiums for policyholders, including St. Tammany Parish, regardless of whether Risk Rating 2.0 is implemented or not. Defs.' Mem. at 39–40; *see also* Defs.' Mem. in Opp'n to Pls.' Mot. for Prelim. Inj. at 33 n.11 (Defs.' PI Opp'n), Dkt. 56.

Plaintiffs do not address either redressability failure. Plaintiffs ignore that premium increases would occur irrespective of Risk Rating 2.0, and therefore waive any response on this point. *See, e.g.,* *O'Neal v. Cargill, Inc.*, 178 F. Supp. 3d 408, 416 (E.D. La. 2016) (failure to address an issue in opposition brief "constitutes a waiver of the issue"). And Plaintiffs barely acknowledge the premium increases that occurred under the legacy rating approach, contending in passing that these increases are not relevant because "policyholders have never seen rate increases like the ones they are seeing under [Risk Rating 2.0]." Pls.' Opp'n at 8. That contention ignores, however, that premiums can rise by no more than 18% each year under either rating approach. 42 U.S.C. § 4015(e). Plaintiffs' argument also

---

than the applicable estimated risk premium rate" under § 4014(a)(1). It therefore permits charging a less-than-actuarial premium only for pre-FIRM properties, and even then, the premium must still be "based on a consideration of the respective risks involved" and "on the basis of accepted actuarial principles." *Id.* § 4015(b). Additionally, the Biggert-Waters Flood Insurance Reform Act of 2012 further limited FEMA's discretion to charge less than actuarial rates for pre-FIRM properties by (1) prohibiting FEMA from charging less than actuarial rates for new policies covering pre-FIRM non-primary residences and for lapsed policies, *id.* §§ 4014(a)(2)(A)-(E), 4014(g), and (2) requiring FEMA to increase premiums on many other pre-FIRM buildings by 25 percent a year until the buildings reach their actuarial rate, *id.* § 4015(e)(4); Defs.' Mem. at 10.

In any event, FEMA has set rates reasonably across the board. Because of FEMA's holistic rating approach under Risk Rating 2.0, which actually expands the availability of certain discounts, 97% of NFIP policyholders have experienced premium decreases or only minor increases. Defs.' Mem. at 16. Therefore, Plaintiffs cannot rely on the "reasonable" rates statutory provision to overcome their redressability failure.

ignores the undisputed fact that 19% of policyholders under Risk Rating 2.0 have experienced premium *decreases*, 70% have experienced very small or incremental increases of no more than $10 per month, and 8% have seen only incremental increases of between $10-$20 per month. Defs.' Mem. at 16. Plaintiffs make no effort to show that policyholders experiencing such rate increases under Risk Rating 2.0, including St. Tammany Parish, *infra* pp. 13–14, would not experience them under the legacy approach. Nor do they acknowledge that, under the legacy approach, rates would also increase indefinitely and for certain policyholders resulted in premiums up to $55,000, which is far above the maximum Risk Rating 2.0 premium for single-family homes of $12,125. Maurstad Decl. ¶¶ 141–42; *see* Defs.' Mem. at 39.

Plaintiffs' failure to plausibly show redressability, as with their failure to show traceability, independently requires dismissal. It does not, as Plaintiffs suggest, simply concern a relief issue, to be resolved at the end of the case. Pls.' Opp'n at 19 ("Defendants conflate the relief that Plaintiffs seek with the injury that [Risk Rating 2.0] causes them."). "Redressability requires that the court be able to afford relief through the exercise of its power," and it is absent when, as here, the injunctive or declaratory relief sought "would not give [Plaintiffs] legally enforceable protection from the allegedly imminent harm." *Haaland v. Brackeen*, 143 S. Ct. 1609, 1639 (2023) (quotation marks omitted and emphasis omitted)); *see also, e.g.*, *El Paso Cnty. v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020) (similar). Plaintiffs have not shown that granting their requests for declaratory or injunctive relief—which just vaguely ask the Court to declare unlawful and enjoin Risk Rating 2.0 without specifying any particular aspect of Risk Rating 2.0 to enjoin, Defs.' PI Opp'n at 46–47—will result in lower premiums for many or even a notable minority of their residents. Because granting such relief will, as discussed, have precisely the opposite effect—collectively subjecting these residents to the exact same premium rate increases they are currently experiencing—Plaintiffs cannot show redressability. *See, e.g.*, *McConnell v. FEC*, 540 U.S. 93, 229 (2003) (no redressability as a result of invalidation of federal law where

unchallenged, separate law meant that "alleged injury … would remain unchanged"), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010)); *E.T. v. Paxton*, 41 F.4th 709, 721 (5th Cir. 2022) (no redressability where, regardless of injunction against state Attorney General, plaintiffs still faced "the exact same risks" of contracting COVID-19).

**B.    Plaintiffs Fail to Plausibly Allege a Concrete Injury in Fact**

**1.    *No cognizable sovereign injury***

As Defendants explained in their Memorandum, *see* Defs.' Mem. at 19–22, Plaintiffs have not pointed to a cognizable sovereign injury in their capacity as states. There are two types of sovereign interests: (1) "the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code," or (2) "the demand for recognition from other sovereigns—most frequently this involves the maintenance and recognition of borders." *Louisiana by & through La. Dep't of Wildlife & Fisheries v. NOAA*, 70 F.4th 872, 877 (5th Cir. 2023). Plaintiffs have not plausibly invoked either interest.

On the first type of sovereign interest, Plaintiffs have not pointed to any way in which Risk Rating 2.0 interferes with their ability to create and enforce their legal codes. Instead, they cite a single section of the Louisiana Revised Statutes, which permits parishes and municipalities to "adopt such ordinances, rules, and regulations, including zoning and land use regulations, as are necessary to comply with the requirements of said Act and the regulations adopted pursuant thereto by the Federal Emergency Management Agency," La. Stat. Ann. § 38:84(A), and which instructs the office of engineering to "cooperate with the Federal Insurance Administrator of the Federal Emergency Management Agency in the planning and carrying out of state participation in the National Flood Insurance Program" and to "aid, advise, and cooperate with parishes and municipalities endeavoring to qualify for participation in said program," *id.* § 38:84(B). *See* Pls.' Opp'n at 22–23. With respect to § 38:84(A), Risk Rating 2.0 is completely agnostic about municipalities' ability to adopt ordinances that

8

are necessary to comply with the NFIA; it changes the NFIP premium rates, not how or whether local governments cooperate with FEMA. And with respect to § 38:84(B), the office of engineering remains free to cooperate with FEMA in planning and carrying out Louisiana's participation in the NFIP. Again, Risk Rating 2.0 concerns premium rates for policyholders, not local governance.

Having failed to point to a state law that conflicts with Risk Rating 2.0, Plaintiffs fall back on a few convoluted arguments that get them nowhere closer to establishing a sovereign interest. First, they argue that their sovereign interests are damaged because Risk Rating 2.0 no longer relies on flood insurance rate maps (FIRMs) to set premium rates, even though such maps are still used in managing flood prone areas. *See* Pls.' Opp'n at 23–24 (citing 44 C.F.R. § 60.3). It is not clear what exactly Plaintiffs are arguing, but what is clear is that no sovereign interest is implicated. As a threshold matter, FEMA continues to consult FIRMs in setting premium rates; Risk Rating 2.0 uses sources *in addition to FIRMs* to evaluate flood risk because FIRMs consider only two sources of flood risk: the 1%-annual-chance riverine flood and the 1%-annual-chance coastal flood. *See* Maurstad Decl. ¶ 121. Risk Rating 2.0 supplements that data to include risk of a wide range of flooding events, not just the 100-year flooding events depicted on FIRMs. *See id.* FIRMs are therefore still used; they just are not the *only* source for evaluating risk. More fundamentally, Plaintiffs' argument fails because they point to a (nonexistent) conflict between a *federal* regulation that concerns flood plain management criteria for flood-prone areas, 44 C.F.R. § 60.3, and Risk Rating 2.0. Not only does no conflict exist—FIRMs are used in both contexts—*state* sovereign interests do not arise from alleged conflicts between *federal* laws.

Second, Plaintiffs claim that Louisiana *might* be injured because FEMA *may* recoup more money from the state for residents who, in violation of certain grants, do not obtain flood insurance. *See* Pls.' Opp'n at 24. It is rank speculation that (1) a larger number of grantees will fail to obtain flood insurance because of Risk Rating 2.0; (2) Louisiana will be unable to recover the grant funds from the delinquent grantees at a greater rate than before Risk Rating 2.0 came into effect; and (3) FEMA will

decide to recoup more funds than before Risk Rating 2.0 came into effect. Indeed, Plaintiffs' own declaration acknowledges how inchoate this alleged injury is, observing (without substantiation) that "we *anticipate* seeing an increase of those examples from this point forward due to increased rates associated with Risk Rating 2.0." Compl., Ex. 1 ¶ 41 (emphasis added). As Defendants have explained, many policyholders' rates have actually decreased under Risk Rating 2.0, and the vast majority of policyholders have seen zero to minimal increases. *See, e.g.*, Defs.' Mem. at 16. It is therefore pure speculation that Louisiana would incur this injury, let alone as a result of Risk Rating 2.0. This is yet another speculative and attenuated chain of events, cobbled together in an effort to manufacture an Article III injury. *See* Defs.' Mem. at 21. It cannot withstand scrutiny.

Finally, Plaintiffs' argument that their territory is affected by Risk Rating 2.0, Pls.' Opp'n at 24–25, is far too attenuated to establish standing. Plaintiffs' theory that Risk Rating 2.0 "no longer rewards mitigation efforts and that fewer people are undertaking mitigation projects," *id.* at 25, is flawed in multiple respects. First, Plaintiffs have not alleged that the *states'* territory would be damaged by reduced mitigation efforts, which is the linchpin of a state's standing as a sovereign. Instead, they allege that private "property owners" who live in the state would be better protected through mitigation efforts. *See* Compl. ¶ 122; *id.* ¶ 123 (alleging that mitigation efforts led to 11 flooded homes during one hurricane, as opposed to 11,000 during another hurricane). Injury to a third party's property is not "a particularized injury in [the state's] capacity as a landowner." *See Massachusetts v. EPA*, 549 U.S. 497, 522 (2007) (holding that Massachusetts had established standing because *its* "coastal land" would be swallowed by rising seas); *Louisiana*, 70 F.4th at 880 (holding that Louisiana lacked standing because it had not established that there would be fewer shrimp and turtles caught in *its* waters).

Second, even if Plaintiffs had alleged an injury to their territory, their assertion that Risk Rating 2.0 no longer rewards mitigation efforts is incorrect as a legal matter. As Defendants have explained, and contrary to Plaintiffs' assertion, Risk Rating 2.0 not only continues to take mitigation efforts into

account with mitigation discounts, but it also actually expands the amount of mitigation discounts exponentially in terms of both policyholders receiving discounts and the dollar amounts of the discounts. Plaintiffs do not seriously dispute this. In support of their claim that Risk Rating 2.0 "no longer rewards mitigation efforts," they cite allegations in the Complaint and a statement in a declaration regarding the legacy rating approach, not Risk Rating 2.0. *See* Pls.' Opp'n at 25 (citing Compl. ¶¶ 121–145; *id.*, Ex. 55 ¶¶ 5–6). And the portions of the Complaint and declaration that actually concern Risk Rating 2.0 either circularly state that "Risk Rating 2.0 offers almost no discount for elevation or other mitigation measures," *e.g.*, Compl., Ex. 55 ¶ 15, or express confusion about how Risk Rating 2.0 rewards mitigation, *see, e.g.*, Compl. ¶ 185 (asserting that "FEMA doesn't explain how it will weigh these factors or how these factors will affect insurance premiums"). None of this substantiates Plaintiffs' assertion that Risk Rating 2.0 no longer offers mitigation discounts.[3]

Third, even if Plaintiffs alleged an injury to their territory—which they do not—and Risk Rating 2.0 did not reward mitigation efforts—which it does—the chain of causation that allegedly links Risk Rating 2.0 to Plaintiffs' territory is far too attenuated and speculative to establish Plaintiffs' standing. Plaintiffs ask the Court to speculate that (1) a sufficient number of property owners will no longer mitigate against flooding because of Risk Rating 2.0 and, reading between the lines, (2) this collective decision will somehow damage territory owned by the states. But again, there is no basis to assume that fewer policyholders will protect their property against flood risk because of Risk Rating

---

[3] Plaintiffs also claim that there is a factual dispute about whether Risk Rating 2.0 actually rewards mitigation efforts. Not only is there no dispute at all, whether Risk Rating 2.0 offers mitigation discounts is not a factual issue: "law is the standard or rule which the court must apply to the facts," *Texas & Pac. Ry. Co. v. Laborde*, 257 F.2d 587, 591 (5th Cir. 1958). Whether a particular property is elevated is a factual issue. Whether the NFIP generally rewards mitigation efforts (the standard or rule) is a legal question. And whether that property's elevation is sufficient to receive a discount under Risk Rating 2.0 (application) is a mixed question of law and fact. Even without the benefit of an administrative record—which is where one would look to determine whether such discounts exist—public documents and the Maurstad Declaration clarify that, as a matter of law, Risk Rating 2.0 rewards mitigation efforts. *See* Defs.' Mem. at 15.

2.0. And it is utterly unclear how such decisions would affect the states' territory, which the states remain free to protect of their own accord. This type of speculation, particularly when it relies on "the independent action of some third party not before the court," has long been held to vitiate standing. *See Defs. of Wildlife*, 504 U.S. at 561; *Amnesty Int'l USA*, 568 U.S. at 410–11.

### 2.     *No cognizable quasi-sovereign injury*

Plaintiffs insist that they may litigate "the health and well-being" of their citizens against the federal government. *See* Pls.' Opp'n at 26–27 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982)). They may not: "In that field it is the United States, and not the State, which represents [citizens] as *parens patriae*." *Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923) (emphasis added). "That should make the issue open and shut." *Brackeen*, 143 S. Ct. at 1640. Against this bar, Plaintiffs clarify that they are actually asserting an injury to their own interests (i.e., the power to make and enforce laws related to the health and safety of their citizens). *See* Pls.' Opp'n at 27. But "the power to create and enforce a legal code" is a *sovereign* interest, not a quasi-sovereign interest. *See Alfred L. Snapp & Son, Inc.*, 458 U.S. at 601–02 (distinguishing sovereign from quasi-sovereign interests). As discussed above, Risk Rating 2.0 does not interfere with Plaintiffs' lawmaking powers; it simply updates NFIP premium rates to better reflect the flood risks to specific properties. Accordingly, Plaintiffs have not identified a quasi-sovereign interest that is affected by Risk Rating 2.0.

### 3.     *No cognizable economic or proprietary injury*

**Parishes**: Plaintiffs' Opposition confirms that they seek to base the standing of fifty-plus states and local governments almost entirely on the alleged pocketbook injury of a *single* parish: St. Tammany Parish. Pls.' Opp'n at 17 (discussing how "[t]he most straightforward basis for standing is the Parish Plaintiffs' economic injuries" and identifying St. Tammany Parish as "the most obvious example"). As discussed, *supra* pp. 3–8, any alleged financial injury that the Parish faces is neither traceable to Risk Rating 2.0 nor redressable. The Parish has not plausibly alleged anything showing

that it faces higher premiums under Risk Rating 2.0 as compared to under the legacy approach, or that invalidating and enjoining Risk Rating 2.0 would save it from any premium increases.

For similar reasons, St. Tammany Parish has failed to plausibly show any pocketbook injury in fact as a policyholder. The Parish has not shown "a loss of even a small amount of money" under Risk Rating 2.0, Pls.' Opp'n at 18 (quotation marks omitted), because it is not "handing over money that, in the absence of [Risk Rating 2.0], [it] would happily retain," *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 310 (5th Cir. 2023) (quoted at Pls.' Opp'n at 17). This is because Risk Rating 2.0 (1) simply subjects the Parish in the very near term to the same type of incremental premium increases ($20 per month) that it and many other NFIP policyholders already faced under the legacy rating approach; (2) saves the Parish and other policyholders over the long term from indefinite premium increases; and (3) lowers premiums for many residents across the Parish and the state of Louisiana, which, on Plaintiffs' own causal theory of harm, would strengthen the Parish's tax base and increase its available funds for mitigation. The cumulative effect of these factors—each of which Plaintiffs completely ignore—is that the Parish actually comes out ahead financially under Risk Rating 2.0. Because St. Tammany Parish fails to show a *net* fiscal cost under Risk Rating 2.0, and thus simply speculates that it will be financially harmed, it has not sufficiently pleaded an injury in fact. Defs.' Mem. at 39 (relying on, *inter alia*, *Henderson v. Stalder*, 287 F.3d 374, 381 (5th Cir. 2002)).

Plaintiffs' attempt to sidestep this critical failure is unpersuasive. Plaintiffs disclaim the offsetting financial benefits that Risk Rating 2.0 confers on the Parishes as "irrelevant" because, they argue, even a de minimis monetary injury suffices for standing. Pls.' Opp'n at 18. But Plaintiffs do not even plead such an injury. They have not plausibly alleged that St. Tammany Parish or any other Parish policyholder has suffered a de minimis injury like a "five-dollar loss," *id.*, given their failure to plausibly demonstrate that they are subject to *net* premium increases under Risk Rating 2.0 or that any increases likely outweigh the collective financial benefits they enjoy under Risk Rating 2.0. None of the cases

that Plaintiffs cite at page 18 of their Opposition involved plaintiffs that similarly failed to show a net fiscal cost. What is more, Plaintiffs cannot hide behind the notion that an "identifiable trifle" is enough to satisfy the requirements of Article III, Pls.' Opp'n at 18 (quoting *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 309 (5th Cir. 2023), which ultimately quotes *United States v. Students Challenging Regul. Agency Procs. ("SCRAP")*, 412 U.S. 669, 689 n.14 (1973)). That notion ultimately derives from a footnote in a half-century-old Supreme Court case, *SCRAP*, that predates the Court's repeated insistence over the past three decades that an injury in fact must be "concrete." *Defs of Wildlife*, 504 U.S. at 560; *see, e.g.*, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021) ("No concrete harm, no standing."); *Whitmore v. Arkansas*, 495 U.S. 149, 159 (1990) (calling into question the standing analysis in *SCRAP*); *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 904 n.16 (Del. 1994) (*SCRAP* "ha[s] long been called into question, and narrowed to the point of invalidation" (citing, *inter alia*, *Whitmore*)).

Finally, Plaintiffs do not identify how Risk Rating 2.0 "causes a loss of specific tax revenues to the parishes and municipalities." Pls.' Opp'n at 18. Plaintiffs fail to point to any plausibly alleged facts concerning the size or even the general magnitude of this tax revenue impact. Defs.' Mem. at 29; *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1235 (10th Cir. 2012) (no standing where state and county offered "no evidence that specific loss of tax revenues have occurred," such as allegations of actual dollar amounts, and instead offered mere speculation). That is unsurprising since, as discussed, any tax losses come at the end of a fragile and lengthy causal chain that requires the Court to accept—without any substantiation—that NFIP policyholders will respond to any Risk Rating 2.0 premium increases by leaving or forgoing moving to the Plaintiff States or communities en masse. Beyond these factual shortfalls, Plaintiffs also fail to legally support their tax-base argument.

Plaintiffs argue that the Louisiana Constitution provides the Plaintiff parishes and municipalities the authority to levy ad valorem taxes, and that Risk Rating 2.0 deprives them of this

"specific tax revenue" by depressing property values and populations and thus limiting the ad valorem funds collected. Pls.' Opp'n at 18. But the ad valorem taxes are simply general property taxes, broadly levied across all taxable Louisiana homeowners and usable for "for general purposes." La. Const. art. VI, §§ 26–27. These taxes are therefore just like the general income and sales taxes that the Fifth Circuit in *El Paso* held could not be a basis Article III standing. 982 F.3d at 338–41; *see id.* at 359 (Dennis, J., dissenting). And they bear no resemblance to the "specific tax" at issue in *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (cited at Pls.' Opp'n at 18)—a Wyoming "severance tax" imposed just on mining companies and persons, for the specific privilege of extracting coal within its borders. Plaintiffs cannot escape these conclusions by engaging in a linguistic sleight of hand. They cannot simply label as specific—with no explanation—a general property tax that is described by the Louisiana Constitution itself as "general." (In doing so, Plaintiffs just recycle the *El Paso* dissent's similarly unexplained characterization of sales and income tax revenue as "specific tax revenue." 982 F.3d at 359 (Dennis, J., dissenting).)

And even if the Louisiana ad valorem taxes are "specific," Plaintiffs ignore that any alleged reduction of this tax revenue cannot confer an Article III injury in fact if, like here, that reduction is only the *indirect result* of the challenged conduct. *See, e.g.*, *El Paso*, 982 F.3d at 339. In *Wyoming*, the challenged Oklahoma law gave rise to Article III injury because the law required Oklahoma utility companies that had previously purchased virtually all their coal from Wyoming sources to instead use Oklahoma-mined coal, and it therefore "*directly*" reduced Wyoming's severance tax collection on Wyoming-mined coal. 502 U.S. at 450 (emphasis added). By contrast, the plaintiffs in *El Paso* and *Florida v. Mellon*, 273 U.S. 12 (1927), which similarly concerned a claim of injury based on reduced state property taxes, could only show that the challenged conduct had a remote tax revenue impact. So too here, given the daisy chain of events upon which Plaintiffs' tax-base theory hinges. Defs.' Mem. at 26–28.

By asking the Court to base their standing on an attenuated and speculative chain of events, at the end of which is the (unsubstantiated) diminution of broadly applicable, general-purpose property taxes, Plaintiffs invite the Court to ignore *El Paso*'s clear warning: The "loss of general tax revenues as an indirect result of federal policy" cannot suffice under Article III because "virtually all federal policies" "inevitably" have incidental economic repercussions on them, and allowing these repercussions to confer standing could "spark a waive [sic] of unwarranted litigation against the federal government." 982 F.3d at 339–40 (quotation marks omitted).

**States**: Plaintiffs fail in their Opposition to demonstrate that the States have plausibly established economic harm in the form of lost tax revenue.

Like the Parish Plaintiffs, the State Plaintiffs cannot circumvent *El Paso* by engaging in unexplained semantic wordplay. As just discussed, Plaintiffs cannot simply characterize the alleged loss of "significant public funds" from Risk Rating 2.0's purported impact on general tax revenues as the "loss of *specific* tax revenues." Pls.' Opp'n at 29. Neither the "special funds" that Louisiana sets aside to "offset any unexpected [disaster] expenses" nor the oil and gas severance taxes that Louisiana collects can save the States' failed attempt to show the direct loss of specific taxes. *Id.* (citing La. Stat. Ann. § 39:94, and La. Const. art. VII, §4). Plaintiffs never explain how these special funds or severance taxes, which they do not raise in their Complaint or preliminary injunction briefing (Dkts. 16-1, 61-1), are *directly* reduced because of Risk Rating 2.0. Nor could they. The special funds consist of, among other things, "[a]ll money available for appropriation from the state general fund and dedicated funds in excess of the expenditure limit," and "revenues received in each fiscal year by the state in excess of nine hundred fifty million dollars … as a result of the production of or exploration for minerals." La. Stat. Ann. § 39:94(A). Nothing in the pleadings suggests that Risk Rating 2.0 has any impact on these or any other special-funds sources, and Louisiana cannot manufacture standing based on its own appropriation and budget decisions to use the funds in response to flood events. Defs.' Mem. at 37.

Relatedly, nothing in the pleadings suggests that Risk Rating 2.0 directly targets or affects oil and gas severance taxes, like the state law at issue did in *Wyoming*, 502 U.S. at 448 (Oklahoma law directly targeted Wyoming severance tax on Wyoming-mined coal because it forced Oklahoma utilities that had previously bought all coal from Wyoming to instead buy at least 10% Oklahoma-mined coal). Risk Rating 2.0 does not regulate or address oil and gas production *at all*. Plaintiffs' theory requires accepting that Risk Rating 2.0 will cause such drastic premium increases, for such a significant share of policyholders, that residents and businesses will leave the State in droves and thereby *indirectly* "reduce" oil and gas production and corresponding severance taxes. Pls.' Opp'n at 29. That sort of incidental and attenuated effect on taxes is precisely what *El Paso* warns cannot give rise to an Article III injury in fact. 982 F.3d at 339–40.

What is more, the State Plaintiffs fail to plausibly allege that the daisy chain of events from high premiums to diminished tax revenues has occurred or will imminently occur. According to Plaintiffs, the allegations show that "many of these events have already taken place," Pls.' Opp'n at 28, but the four causal links they identify in the Opposition fall well short of the mark.

*First*, Plaintiffs have not sufficiently "alleged that [Risk Rating 2.0] will devalue mitigation efforts." Pls.' Opp'n at 28 (quotation marks omitted) The Complaint paragraphs and single declaration excerpt that Plaintiffs cite as support in their Opposition do not address mitigation under Risk Rating 2.0 at all. *Id.* (citing Compl. ¶¶ 121–45, which addresses mitigation under the legacy rating approach, and *id.*, Ex. 55 ¶¶ 5–6, which similarly discusses flood mitigation generally and past mitigation efforts in Mandeville, Louisiana). Nor do Plaintiffs address the myriad ways in which Risk Rating 2.0 greatly expands mitigation discounts and other discounts that take into account flood prevention efforts. Defs.' Mem. at 15 & nn.12–14; Maurstad Decl. ¶¶ 165–92; *see also supra* pp. 10–11.

*Second*, Plaintiffs have not sufficiently "alleged that [Risk Rating 2.0] has result[ed] in higher premiums" and "high" flood insurance "cost[s]" for many or even a sizable segment of their residents.

Pls.' Opp'n at 28. As in their Complaint, Plaintiffs' proof of significant premium increases comes from just a couple of homeowner declarations describing individual rate increases. *Id.* (citing Compl., Exs. 55 ¶ 16, 56 ¶¶ 26, 30). But as Defendants have explained, these declarations describe isolated examples of rate increases that stand in stark contrast with what the vast majority of NFIP policyholders across the country and in Louisiana have experienced under Risk Rating 2.0: 19% of policyholders nationwide and 14% of Louisiana policyholders saw premium decreases, and 70% of policyholders nationwide and 74% of Louisiana policyholders saw only slight increases of up to $10 per month. Defs.' Mem. at 16, 27, 33. Plaintiffs never respond to these flaws in their argument, instead resting on the fact that some premiums have increased under Risk Rating 2.0. But that is not enough on their tax-base harm theory: Plaintiffs must identify plausibly alleged facts showing that, as they argue, premiums have risen and will rise so high that they will be unaffordable for many residents. Plaintiffs have not done so.

*Third*, and relatedly, Plaintiffs have not "alleged facts sufficient to show that people are leaving the area" due to unaffordable premiums. Pls.' Opp'n at 28. They cite just one declaration paragraph (Compl., Ex. 1 ¶ 57), which simply parrots the argument in conclusory terms and does not engage at all with the Defendants' observation that this paragraph and others like it in the other declarations are simply too conclusory and unsupported to survive a motion to dismiss. Defs.' Mem. at 29–30. Nor does the Opposition address the fact that states like Texas and Florida have experienced the biggest population growths in the country while Risk Rating 2.0 has been in effect. *Id.* at 34 n.25.

*Fourth*, Plaintiffs have not "alleged facts sufficient to show that property values are depressed as a result" of Risk Rating 2.0-based population flight. Pls.' Opp'n at 28. Once again, they cite just one declaration paragraph that states in conclusory and speculative fashion that purchasers "will likely decide not to purchase property when they learn of the heightened cost of purchasing NFIP flood insurance under Risk Rating 2.0." Compl., Ex. 45 ¶ 16. Neither that paragraph nor the Opposition provides any plausible substantiation either of the alleged causal inputs (*e.g.*, significantly higher

premiums, meaningful population flight that could in theory affect tax revenues) or the property value reduction that allegedly results. *Cf. Massachusetts*, 549 U.S. at 522–23 (standing where robust state affidavits plausibly substantiated, with actual estimates, damage to state coastal property on the order of hundreds of millions of dollars).[4]

Perhaps recognizing that they cannot plausibly substantiate any concrete and imminent economic injury, Plaintiffs briefly pivot in the Opposition to arguing that Risk Rating 2.0 harms States' "proprietary interests in two related but distinct ways." Pls.' Opp'n at 30. Neither suffices, for the reasons already explained—and that Plaintiffs completely ignore—in Defendants' Memorandum.

Plaintiffs have not offered any substantiation that Risk Rating 2.0 will (1) cause a meaningful number of private homeowners who have received FEMA grants to drop the mandatory flood insurance coverage that the grants entail, and (2) make States "*increasingly liable* for reimbursing" the grants. Pls.' Opp'n at 30 (emphasis added); *see* Defs.' Mem. at 36–37. Plaintiffs cite to just one allegedly current example where Louisiana is paying back a grant for a single property. Pls.' Opp'n at 30 (citing Compl., Ex. 1 ¶ 41). They never address whether and how this single example plausibly illustrates increasing state liability for grant reimbursements under Risk Rating 2.0, as opposed to the types of reimbursements that Louisiana or any other States paid under the legacy rating approach. *See supra* pp. 9–10; *cf. Louisiana*, 70 F.4th at 883 (quoted at Pls.' Opp'n at 29) (state lacked standing where it relied

---

[4] *Florida Key Deer v. Stickney*, 864 F. Supp. 1222 (S.D. Fla. 1994), which Plaintiffs cite to support their claim that they "have submitted evidence showing that the harms they feared have now in fact occurred," Pls.' Opp'n at 28, has nothing to do with Plaintiffs' ability (and failure here) to plausibly substantiate standing. In providing background information on the NFIP, *Florida Key Deer* observed in passing that, "[i]f a community elects not to participate in this federal program, residents of that community face significant consequences." 864 F. Supp. at 1230. Plaintiffs' standing does not depend on or concern their election not to participate in the NFIP, and on the corresponding impact to their residents; they all participate. Plaintiffs' standing depends on whether they have alleged specific facts showing that they as States and local governments directly face concrete and imminent economic injuries (and other injuries) based on Risk Rating 2.0's update to the rating approach for their residents' premiums. As discussed, Plaintiffs have failed to meet their burden.

on "speculative" affidavit assertions regarding increased burden on state enforcement resources due to agency final rule).

For similar reasons, Plaintiffs also have not offered any plausible allegation that they face increased "cost[s] of rebuilding" after flood events "as fewer people obtain coverage for insurance" under Risk Rating 2.0. *Id.* Again, Plaintiffs have not plausibly substantiated any NFIP or population exodus. The Complaint allegations they cite to support their argument merely indicate that Louisiana spends public funds to rebuild after hurricanes and support watershed management and mitigation. Compl. ¶¶ 264–67. They do not explain how their past, present, or future appropriations and budgetary decisions, which rest entirely with the States and with which Risk Rating 2.0 does not interfere, could confer a cognizable injury. Defs.' Mem. at 37.

*Levee Districts*: Plaintiffs' Opposition fails to identify any alleged facts plausibly showing that the Levee District Plaintiffs have a cognizable Article III injury, because it largely recycles the insufficient mitigation-based arguments in the Complaint. Plaintiffs contend that the Levee District Plaintiffs are injured by Risk Rating 2.0 because it "no longer reward[s] [them] for mitigation efforts" and thus causes "premiums in the area [to] increase[e] significantly." Pls.' Opp'n at 20. But Plaintiffs do not back up this sweeping claim. They rely on bare and isolated allegations, drawn from a single declaration, that Risk Rating 2.0 does not take into account *one* levee system (the levee system of the South Lafourche Levee District) and has put *one* NFIP policy on a glide path for significant premium increases over the course of the policy term to reach the full risk rate. *Id.* (relying on South Lafourche Levee District Declaration, Compl., Ex. 37 ¶¶ 18, 20). What is more, Plaintiffs are wrong regarding the impact of Risk Rating 2.0 on the South Lafourche Levee District's system. Risk Rating 2.0 *expands* the levee systems considered in the NFIP calculations by incorporating into its catastrophe models *all* levees, Defs.' Mem. at 14–15 & n.12—including those, such as the District's system, that are not accredited to "protect against 100-year flood events," Compl., Ex. 37 ¶ 18, and were thus previously

excluded from the legacy rating approach. (The same holds true for other mitigation efforts as well. Risk Rating 2.0 greatly expands premium reductions for mitigation efforts such as elevating a structure. *Id.* at 15.)

Even if Plaintiffs' allegations could plausibly show that Risk Rating 2.0 devalues one or more levee systems or other unidentified mitigation efforts, they would still not suffice to show a concrete and imminent economic injury. By arguing that devalued mitigation will cause premiums to rise, and in turn cause residents to "leav[e] the area," "property values [to] drop[]," and available "funds to mitigate against flood risk" to disappear, Pls.' Opp'n at 21, Plaintiffs simply offer another doomed permutation of their attenuated theory of tax-base harm, Defs.' Mem. at 38. Plaintiffs fail to plausibly substantiate this latest permutation, since the declaration allegations that they cite at page 21, as with the other state and local government declarations that Plaintiffs cite in the Complaint, simply parrot the steps in the causal chain in conclusory and speculative fashion and with no factual support. *See, e.g.*, Compl., Ex. 37 ¶¶ 29–30 ("As rates increase, people and business in the South Lafourche Levee District are likely to be priced out of their properties and forced to move out of the [District], which will decrease [its] tax base" and "negatively impact the property values of those who remain, further decreasing [its] tax revenues."); *id.*, Ex. 40 ¶¶ 18–19 (same); Compl. ¶ 534 (similar); Defs.' Mem. at 29–30 (explaining how virtually identical allegations in other state and local government declarations are insufficient under, *inter alia*, *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 545 (5th Cir. 2019)).

Finally, the Levee District Plaintiffs cannot circumvent *El Paso* by claiming that the Louisiana Constitution gives them the power to levy ad valorem taxes "for the specific 'purpose of constructing and maintaining levees'" and other flood protection activities. Pls.' Opp'n at 21 (quoting La. Const. art. VI, § 39). As discussed, ad valorem taxes are general property taxes, levied against "all" qualifying "taxable propert[ies]," La. Const. art. VI, § 39—just like the "general" sales and income taxes in *El Paso* that applied to all county consumers and workers. That conclusion does not change simply

21

because Levee Districts must use these broadly applicable and levied taxes for flood protection purposes. This use limitation does not bring the property taxes any closer to the severance taxes that gave rise to a cognizable injury in *Wyoming*. The severance taxes there applied only to a single industry (coal mining), type of taxpayer (mining companies that extract coal within state borders), and transaction (coal extraction), whereas here, the Levee Districts' property taxes apply across all qualifying homes and homeowners. In any event, even if specific, the property taxes cannot give rise to standing because, as discussed, Plaintiffs cannot and do not show how Risk Rating 2.0 *directly* targets or affects these taxes. *Supra* pp. 15, 17. On Plaintiffs' own telling, any tax-base impact comes at the end of a multi-step causal chain, and not as a direct consequence of Risk Rating 2.0 targeting or regulating the homes of Plaintiffs' residents. *Cf. Wyoming*, 502 U.S. at 448 (Wyoming had standing where law directly reduced purchase of, and therefore taxes collected on, its coal).

### 4.    *No cognizable procedural injury*

Plaintiffs lack a cognizable Article III injury based on their inability to comment on Risk Rating 2.0 because binding Supreme Court and Fifth Circuit precedent requires them to identify a concrete injury that accompanies that alleged procedural deprivation, which they have not done. Defs.' Mem. at 24–25 (relying on *ED v. Brown*, 143 S. Ct. 2343, 2351–52 (2023); *Spokeo*, 578 U.S. at 341; *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *Louisiana ex rel. Landry v. Biden*, 64 F.4th 674, 683 (5th Cir. 2023)).

Plaintiffs' only response is to focus entirely on distinguishing—on inapplicable grounds—just one of the cases that Defendants rely on. Plaintiffs argue that *Louisiana* did not "establish the broad rule that [Defendants] suggest," and they contend that the Fifth Circuit determined that the "plaintiffs' harms were speculative" and insufficient for standing "because the [challenged federal conduct] 'd[id] not *require* any action from federal agencies.'" Pls.' at 30 (quoting *Louisiana*, 64 F.4th at 681). Plaintiffs misunderstand the case and Defendants' reliance on it. *Louisiana* held that the state plaintiffs lacked

any cognizable fiscal or sovereign injury from the challenged executive order and guidance (on estimating the impact of greenhouse gas emissions) because these actions did not require agencies to factor in emission estimates into rulemaking deliberations or have anything to do with the states' administration of their own laws. *Louisiana*, 64 F.4th at 682–84 (discussing how (1) economic injury was absent because it depended on a "highly attenuated chain of possibilities," including that agency factored in emission estimates into future rule and did so in a way that affected states' goods, services, and industries, and (2) sovereign injury was absent because states faced no pressure to change their laws). While that holding, which Plaintiffs home in on, certainly supports rejecting Plaintiffs' economic and sovereignty-based harms, *see, e.g.*, Defs.' Mem. at 26 (citing the holding), it is not the "rule" on which Defendants rely to rebut Plaintiffs' standing to assert a notice-and-comment violation. Defendants instead rely on *Louisiana*'s additional analysis rejecting such a standing claim. The *Louisiana* court explained that plaintiffs lacking any economic, sovereignty-based, or other concrete interest— like the state plaintiffs in that case and Plaintiffs here—cannot base their standing merely on an allegation that they were denied the opportunity to file comments. 64 F.4th at 683 ("[I]t is well established that the 'deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing.' Merely being 'denied the ability to file comments' is 'insufficient to create Article III standing.'" (footnotes omitted, quoting *Summers*, 555 U.S. at 496)). This principle is neither novel nor contested; it is based on settled precedent that Plaintiffs themselves embrace. Pls.' Opp'n at 31 (citing *Summers*, 555 U.S. at 498). Under that settled precedent, Plaintiffs cannot base their standing simply on the bare assertion that they could not file comments on Risk Rating 2.0.[5]

---

[5] As discussed in the preliminary injunction briefing, Plaintiffs had a great deal of notice regarding Risk Rating 2.0 and many opportunities to comment on Risk Rating 2.0 in many meetings with the agency, and they have not identified any specific comments that they or others were prevented from

**5.**    *No cognizable organizational or associational injury*

Plaintiffs never address the failure of the sole non-government Plaintiff, the Association of Levee Boards of Louisiana, to plausibly allege a cognizable organizational or associational injury in fact. They have therefore waived any response.

⁂

Plaintiffs have failed to "allege a plausible set of facts establishing jurisdiction," and the Court should dismiss the Complaint. *Laufer v. Mann Hosp., LLC*, 996 F.3d 269, 271 (5th Cir. 2021) (quotation marks omitted); *see also, e.g.*, *Choice Inc. of Texas v. Greenstein*, 691 F.3d 710, 714 (5th Cir. 2012) (courts should dismiss under Fed. R. Civ. P. 12(b)(1) when it is apparent that "plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief" (quotation marks omitted)). Because Plaintiffs have relied only on conclusory, speculative, and legally unsupported Complaint and declaration allegations to support each of their theories of Article III standing, they have not plausibly alleged standing under any theory. In pointing out these deficiencies in the pleadings, Defendants have not improperly "raise[d] the pleading standard" by requiring Plaintiffs to "*prove*" any supporting facts. Pls.' Opp'n at 20, 31. Rather, Defendants have simply demonstrated that Plaintiffs have fallen well short of the pleading standard that Plaintiffs themselves tout and that the law plainly establishes. Amorphous and irrelevant assertions of sovereignty-based interests, half-baked and highly attenuated assertions of incidental fiscal harm, and bare assertions of procedural violations hardly rise to the level of "plausibly allege[d] facts sufficient to establish standing." *Id.* at 31.

Finally, the Court has an obligation to dismiss any Plaintiffs that lack standing, even if it determines that one or more Plaintiffs may have plausibly alleged standing. Defs.' Mem. at 40–41. As

---

sharing with FEMA. Defs.' PI Opp'n at 32–33. These considerations further show that Plaintiffs have not suffered any cognizable injury based on their inability to offer comments through notice-and-comment rulemaking.

discussed, standing is not dispensed in gross. *Id.* at 41. *Each* Plaintiff must establish a particularized and redressable Article III injury fairly traceable to Risk Rating 2.0—"affect[ing] the plaintiff in a personal and individual way," *Spokeo*, 578 U.S. at 339—for each claim raised and form of relief sought, Defs.' Mem. at 41. As a result, 50-plus Plaintiffs cannot piggyback off the allegations of just one Plaintiff or a select few Plaintiffs to stay in this suit despite clearly lacking standing. *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) (cited at Pls.' Opp'n at 9), is not to the contrary. While *Rumsfeld* and similar cases may "give courts license to *avoid* complex questions of standing in cases where the standing of others makes a case justiciable, it does not follow that these cases permit a court that *knows* that a party is without standing to nonetheless allow that party to participate in the case." *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 344 n.3 (5th Cir. 2013) (quoted at Defs.' Mem. at 41).

## III.  Plaintiffs Lack Standing to Assert Their NEPA Claim

Plaintiffs lack statutory standing to pursue their NEPA claim because they fail to demonstrate that they have environmental interests under NEPA that may be affected by Risk Rating 2.0. *See Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (presumption of statutory standing "extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'"). In addition to their failure to identify a single environmental injury to themselves, Plaintiffs allege economic harms to third parties (such as homeowners) that depend on speculation about the independent choices those non-parties will make in response to Risk Rating 2.0. Therefore, the Court should dismiss Plaintiffs' NEPA claim for lack of statutory standing.

Plaintiffs identify no environmental injury. Instead, Plaintiffs rely on two out-of-circuit cases to argue that "the NFIP impacts the environment and that changes to the NFIP program must

undergo an environmental analysis." Pls.' Opp'n at 33.[6] Even assuming *arguendo* that Risk Rating 2.0 triggers NEPA review, which it does not, Plaintiffs fail to explain the environmental interests they seek to protect under NEPA or how Risk Rating 2.0 impacts those interests. *See Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 778 (1983) ("If a *harm* does not have a sufficiently close connection to the physical environment, NEPA does not apply." (emphasis added)). That the NFIP and Risk Rating 2.0 may relate to "the utilization of land" is of no moment without Plaintiffs describing any harm *to them* that falls within NEPA's zone of interests. Pls.' Opp'n at 32 (quoting 42 U.S.C. § 4002(a)(2)).

As explained in Defendants' opening Memorandum, NEPA aims to promote, through procedural mandates, the quality of air and water, wildlife, recreational use, and aesthetic enjoyment. Defs.' Mem. at 42 (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972)); *see also* 42 U.S.C. § 4321 (declaring that NEPA's purpose is partly to "promote efforts which will prevent or eliminate damage to the environment and biosphere"). NEPA is *not* intended to guard against potential economic losses. *See e.g., Taubman Realty Grp. Ltd. v. Mineta*, 320 F.3d 475, 481 (4th Cir. 2003) (affirming Rule 12(b)(1) dismissal and finding that "the potential devaluation of privately held commercial property is insufficient to trigger NEPA"). But that is exactly what Plaintiffs ask this Court to find—that NEPA protects non-parties' financial well-being. For example, Plaintiffs rely on the statement of Dan Mills, who is the Chief Executive Officer of the Home Builders Association of Greater New Orleans, Inc. and a non-party to this suit. *See* Pls.' Opp'n at 33 (citing Compl., Ex. 46). Mr. Mills states that "[b]y decreasing the *value* of elevated properties, Risk Rating 2.0 has harmed members of the HBAGNO and developers nationwide by preventing

---

[6] Both cases are inapposite because at issue in those cases was whether the NFIP was a "relevant cause" of harm to a particular species in which the plaintiffs claimed an interest. *Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1144 (11th Cir. 2008); *Fla. Key Deer*, 864 F. Supp. at 1224. But here, by contrast, Plaintiffs point to no environmental impact resulting from Risk Rating 2.0.

them from *selling* elevated homes and buildings or forcing them to *sell them at a loss*." Compl., Ex. 46 ¶ 16 (emphasis added). Similarly, Plaintiffs' declarant Roderick Scott, who is a consultant in "the flood hazard mitigation industry" and also a non-party to this suit, asserts that his business of "consulting on flood mitigation projects and education programs" will be harmed by a decrease in consumer demand for "elevation and other flood mitigation measures in vulnerable homes and buildings . . . ." Compl., Ex. 55 ¶¶ 2, 19; *see* Pls.' Opp'n at 33 (citing Compl., Ex. 55). Mr. Scott further claims that "[t]he harms to the flood mitigation industry inflicted by Risk Rating 2.0 will likely lead to a large loss of *jobs and revenue* from the development and sale of flood mitigation products." Compl., Ex. 55 ¶ 19 (emphasis added).

These alleged harms are exactly the type of economic impacts unrelated to environmental protection that the Fifth Circuit rejected in *Ecosystems Investment Partners v. Crosby Dredging, LLC*, 729 F. App'x 287 (5th Cir. 2018). In that case, the plaintiff challenged the Army Corps of Engineers' decision to construct new wetlands because the plaintiff stood to gain financially in the absence of the agency's construction. *Id.* at 296. Though the agency's decision clearly had a nexus to the physical environment, the Fifth Circuit determined that the plaintiff's economic harm lacked a sufficient connection to NEPA's purpose to establish statutory standing. *Id.* at 298 (observing that the plaintiff's "clearest assertion of injury" related to "its pocketbook not the environment.").

To the extent Plaintiffs argue that flood mitigation protects property owners' homes and businesses, Plaintiffs still fail to meet their burden. Plaintiffs appear to be concerned about the purported economic harm in the event a flood causes damage to properties owned by non-parties. *See e.g.*, Compl., Ex. 55 ¶ 20 (Scott declaration referring to "homes and buildings that would be protected by elevation"). Not only is this alleged economic impact far removed from environmental protection; it also is a harm to third parties, not Plaintiffs, and it rests on speculation about the independent choices those third parties will make in response to Risk Rating 2.0. *See Sierra Club*, 405 U.S. at 734–

35 ("[T]he 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured."). Moreover, Plaintiffs do not allege that property owners are *solely* motivated by the NFIP premium discounts to implement flood mitigation; nor can they—obviously, property owners are motivated to protect their homes for the sake of protection. Thus, Plaintiffs cannot establish that Risk Rating 2.0 will in fact lead to more properties susceptible to flood damage and do not demonstrate how an increase in premiums would harm them (as opposed to homeowners). Simply put, Plaintiffs have no environmental interests at stake in this litigation. *See Grunewald v. Jarvis*, 776 F.3d 893, 903 (D.C. Cir. 2015) ("NEPA is 'not a suitable vehicle' for airing grievances about the substantive polices adopted by an agency, as 'NEPA was not intended to resolve fundamental policy disputes.'" (quoting *Found. on Econ. Trends v. Lyng,* 817 F.2d 882, 886 (D.C. Cir. 1987)).

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion to Dismiss.

Dated:  September 7, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

TODD KIM
Assistant Attorney General
Environment & Natural Resources
Division

LESLEY FARBY
Assistant Branch Director
Civil Division, Federal Programs Branch

KRYSTAL-ROSE PEREZ,
(TX Bar # 24105931)
Trial Attorney
United States Department of Justice
Environment & Natural Resources
Division
P.O. Box 7611, Ben Franklin Station,
Washington, D.C. 20044
Tel: (202) 305-0486
Email: krystalrose.perez@usdoj.gov

*Benjamin Takemoto*
BENJAMIN TAKEMOTO
(DC Bar # 1045253)
YOSEPH T. DESTA
(CA Bar # 332179)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883, Ben Franklin Station
Washington, DC 20044
Tel: (202) 532-4252
Email: benjamin.takemoto@usdoj.gov

*Counsel for Defendants*

29

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 7, 2023, the foregoing was filed electronically through ECF/CM.  On this same date, electronic service will be made to all counsel of record through the Court's ECF/CM system.

*Benjamin Takemoto*
Benjamin T. Takemoto
Trial Attorney, U.S. Department of Justice