```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2   ***********************************************************
     LOUISIANA STATE, ET AL
 3
                                     Docket No. 23-CV-1839
 4                                   Section "P"
     v.                              New Orleans, Louisiana
 5                                   Thursday, September 14, 2023

 6   DEPARTMENT OF HOMELAND
     SECURITY, ET AL
 7   ***********************************************************

 8       TRANSCRIPT OF MOTION AND PRELIMINARY INJUNCTION PROCEEDINGS
           HEARD BEFORE THE HONORABLE DARREL JAMES PAPILLION
 9                    UNITED STATES DISTRICT JUDGE

10
     APPEARANCES:
11
     FOR THE PLAINTIFF:           LOUISIANA DEPARTMENT OF JUSTICE
12                                OFFICE OF THE ATTORNEY GENERAL
                                  BY:  ELIZABETH B. MURRILL, ESQ.
13                                     MORGAN BRUNGARD, ESQ.
                                       TRACY SHORT, ESQ.
14                                1885 N. Third St.
                                  P.O. Box 94005
15                                Baton Rouge, LA 70802

16                                LOUISIANA DEPARTMENT OF JUSTICE
                                  OFFICE OF THE SOLICITOR GENERAL
17                                BY:  JORDAN B. REDMON, ESQ.
                                       SHAE G. McPHEE, JR., ESQ.
18                                909 Poydras St., Suite 1850
                                  New Orleans, LA 70112
19
     FOR THE STATE OF IDAHO:      CONSOVOY McCARTHY PLLC
20                                BY:  JEFFREY, HETZEL, ESQ.
                                  1600 Wilson Blvd., Suite 700
21                                Arlington, VA 22209

22
     FOR THE DEFENDANTS:          DEPARTMENT OF JUSTICE
23                                CIVIL DIVISION, FEDERAL PROGRAMS
                                  BRANCH
24                                BY:  BENJAMIN T. TAKEMOTO, ESQ.
                                       YOSEPH T. DESTA, ESQ.
25                                P.O. Box 883, Ben Franklin Station
                                  Washington, DC 20044
```

```
 1                                  DEPARTMENT OF JUSTICE
 2                                  ENVIRONMENT & NATURAL RESOURCES
                                    DIVISION
 3                                  BY:  KRYSTAL-ROSE PEREZ, ESQ.
                                    150 M Street NE
 4                                  Washington, DC 20002

 5

 6
     Official Court Reporter:       Karen A. Ibos, CCR, RPR, CRR, RMR
 7                                  500 Poydras Street, B-275
                                    New Orleans, Louisiana 70130
 8                                  (504) 589-7776

 9


10
        Proceedings recorded by mechanical stenography, transcript
11   produced by computer.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2

 3                                           PAGE/LINE:

 4   MOTION TO DISMISS:

 5     Mr. Desta                                7/4
       Ms. Brungard                            16/20
 6     Mr. Desta                               25/14

 7   PRELIMINARY INJUNCTION/OPENING REMARKS:

 8     Ms. Brungard                            29/8
       Mr. Desta                               31/22
 9     Mr. Takemoto                            34/4
       Ms. Murrill                             41/9
10

11   WITNESSES FOR THE PLAINTIFFS:

12

     CASEY TINGLE
13
       Direct Examination by Mr. Short         48/3
14
     MATTHEW JEWELL
15
       Direct Examination by Mr. Redmon       78/18
16
     WENDY THIBODEAUX:
17
       Direct Examination by Mr. McPhee       92/12
18
     DWAYNE BOURGEOIS
19
       Direct Examination by Mr. Hetzel      104/21
20

21   CLOSING STATEMENTS:

22     By Ms. Brungard                        123/23
       By Ms. Murrill                         136/5
23     By Mr. Desta                           143/17
       By Mr. Takemoto                        156/18
24     By Ms. Murrill                         158/22

25
```

```
 1                    P R O C E E D I N G S

 2                (THURSDAY, SEPTEMBER 14, 2023)

 3        (MOTION TO DISMISS AND PRELIMINARY INJUNCTION PROCEEDINGS)

 4

 5        (OPEN COURT.)

 6             THE COURT:  Good morning.  Please be seated.  Ms. Ancar,

 7   can you call the case.

 8             THE DEPUTY CLERK:  Civil Action 23-1839, State of

 9   Louisiana, et al v. Department of Homeland Security, et al.

10             THE COURT:  Good morning.  Counsel, could you go ahead

11   and make your appearances, please.

12             MS. MURRILL:  Your Honor, I'll introduce our whole trial

13   team.

14             I am Liz Murrill, I am the Solicitor General for the

15   State of Louisiana.  It's good to be here with you today.

16             THE COURT:  Good morning, Ms. Murrill.

17             MS. MURRILL:  I want to introduce Morgan Brungard, who

18   will argue the motion to dismiss this morning, and then handle the

19   initial arguments on the PI as you have it scheduled.

20             And then after that, Tracy Short, who is back here, who

21   also works in our office as a Deputy General Counsel; and then

22   Jordan Redmon, Jordan is going to handle Matt Jewell, one of our

23   witnesses; and then Shae McPhee, Deputy Solicitor General, and

24   he'll handle Wendy Thibodeaux; and then Jeff Hetzel, and Jeff is

25   going to handle Dwayne Bourgeois.
```

The timestamps in the left margin:
09:01:49 (line 4)
08:52:51 (line 5)
08:52:51 (line 6)
08:52:54 (line 7)
08:52:54 (line 8)
08:52:59 (line 9)
08:53:03 (line 10)
08:53:03 (line 11)
08:53:06 (line 12)
08:53:08 (line 13)
08:53:08 (line 14)
08:53:10 (line 15)
08:53:12 (line 16)
08:53:15 (line 17)
08:53:18 (line 18)
08:53:22 (line 19)
08:53:25 (line 20)
08:53:29 (line 21)
08:53:34 (line 22)
08:53:40 (line 23)
08:53:45 (line 24)
08:53:51 (line 25)

08:53:53  1          And then we have some other staff with us, we have Monica

08:53:57  2  Reed, is a paralegal with us; and Nicole Hebert, who is a trial

08:54:01  3  support attorney.

08:54:02  4          THE COURT:  Very good.  Thank you.  Counsel.

08:54:06  5          MR. DESTA:  Good morning, your Honor.  Yoseph Desta with

08:54:08  6  the Department of Justice.  I am here alongside my colleagues Ben

08:54:12  7  Takemoto and Krystal-Rose Perez.  And also here with us today

08:54:18  8  Kristina Peck and Sabrina Bride from FEMA.

08:54:19  9          THE COURT:  Good morning.

08:54:19  10          MR. DESTA:  Good morning.

08:54:20  11          THE COURT:  Let me layout what we'll do logistically for

08:54:24  12  today.  The first thing, I think we obviously gave everybody this

08:54:28  13  information during our status conference earlier this week, but

08:54:30  14  first thing the Court is going to do is hear oral argument on the

08:54:34  15  motion to dismiss filed by the Department of Homeland Security.

08:54:37  16  Following that, we will begin the hearing on the motion for

08:54:47  17  preliminary injunction.  And what I'll do, and it's at our option,

08:54:50  18  I'll give you 15 minutes of argument per side.  If you want it in

08:54:53  19  the beginning or if you want to go right into testimony, that's

08:54:56  20  fine with me.

08:54:57  21          And as I said earlier, depending upon how the witnesses

08:55:02  22  go, we'll just sort of -- I'll absolutely give you time for closing

08:55:07  23  remarks or summation, but we'll sort of see how that plays out over

08:55:12  24  the course of the day, and I'll maybe get some input obviously from

08:55:15  25  the lawyers as well.

08:55:16  1          Just while we're going over housekeeping matters.  On the

08:55:25  2     motion in limine, obviously we'll talk about the motion to dismiss

08:55:28  3     first, but on the motion to limine.  I reviewed the motion in

08:55:31  4     limine filed by the defendants, as well as the plaintiffs'

08:55:35  5     opposition memorandum, which I thank you all for filing in really

08:55:38  6     short order, thank you.  I am going to deny the motion in limine,

08:55:42  7     but however, to the extent that it's necessary, I am going to apply

08:55:45  8     the law regarding the admissibility of the testimony as to the

08:55:50  9     plaintiffs' likelihood of success on the merits at the time that I

08:55:53 10     render a ruling on the motion for preliminary injunction.

08:55:55 11          So the denial is only in its capacity as a motion in

08:56:01 12     limine, and so we will just address the argument related to what

08:56:08 13     the record will be later.

08:56:11 14          With that, if you are ready to proceed, we'll start with

08:56:15 15     the motion to dismiss.

08:56:19 16          MR. DESTA:  If possible, I would like to reserve two

08:56:36 17     minutes.

08:56:37 18          THE COURT:  I'm glad you said that.  So the way I would

08:56:40 19     like to handle the time is if you reserve two minutes, my courtroom

08:56:46 20     deputy, case manager, Ms. Ancar is going to tell you when you have

08:56:50 21     two minutes left, she is going to say two minutes.  And would you

08:56:54 22     like a warning when you get --

08:56:55 23          MR. DESTA:  Yeah, if possible at six minutes as well.

08:56:58 24          THE COURT:  Okay.  And then we'll give you -- and then if

08:57:01 25     you are in the middle of a thought, you don't have to stop at that

08:57:05  1   word, please finish your thought.  And if we go over -- I'm looking

08:57:10  2   for compliance with the spirit of the rule -- and I'll give the

08:57:13  3   other side equal time if you go over.

08:57:16  4              MR. DESTA:  Of course.  Thank you.

08:57:19  5              May it please the Court.  The Court should dismiss the

08:57:22  6   complaint because the plaintiff states and local governments lack

08:57:26  7   Article III standing to challenge Risk Rating 2.0.  Risk Rating 2.0

08:57:30  8   if FEMA's actuarial update to premiums for flood insurance that the

08:57:33  9   agency provides under the National Flood Insurance Program.  Risk

08:57:37  10  Rating 2.0 modernizes rate setting by leveraging industry best

08:57:41  11  practices and comprehensive flood risk data.  It corrects key

08:57:45  12  inadequacies in the legacy rating approach, which rates did not

08:57:48  13  adequately reflect flood risks and could rise indefinitely for

08:57:52  14  policyholders.

08:57:53  15             Now, as a result of its numerous improvements to rate

08:57:55  16  setting, Risk Rating 2.0 has resulted in almost 20 percent of NFIP

08:58:01  17  policyholders seeing rate decreases, and another 78 percent of

08:58:03  18  policyholders seeing only short-term minor increases, and no more

08:58:08  19  high and indefinite increases in rates.

08:58:11  20             Despite these improvements across the country, including

08:58:13  21  in plaintiffs' communities, plaintiffs have nonetheless brought

08:58:15  22  this suit.  And they assert four different theories of Article III

08:58:18  23  standing:  That's sovereign, quasi-sovereign, economic, and

08:58:22  24  procedural injuries.  But they fail to plausibly -- identify

08:58:26  25  plausibly alleged facts sufficient to support an injury and fact

08:58:28 1    under any of these theories.

08:58:32 2            A separate basis for dismissals that plaintiffs have

08:58:35 3    failed to plead traceability and redressability for any of their

08:58:38 4    alleged injuries in fact.  And if the Court disagrees with these

08:58:40 5    arguments and finds that one or more of the plaintiffs lack

08:58:43 6    standing, it still should dismiss the remaining plaintiffs.

08:58:46 7            Now, before diving in to these legal arguments, I just

08:58:49 8    want to step back and give for about 30 seconds to a minute a

08:58:53 9    10,000-foot overview of the NFIP.  Through the NFIP, FEMA

08:58:57 10   administers nearly five million flood insurance policies across the

08:59:02 11   country.  The purpose is to make flood insurance, quote, available

08:59:04 12   on a nationwide basis, end quote, and to base insurance, quote, on

08:59:09 13   workable methods of pooling risks, minimizing costs, and

08:59:13 14   distributing burdens equitably among those who will be protected by

08:59:15 15   flood insurance and the public.  So I'm sure, as this will be

08:59:17 16   covered in the preliminary injunction motion, our position is that

08:59:19 17   Risk Rating 2.0 furthers all of these purposes.

08:59:22 18           But what's relevant for the motion to dismiss is three

08:59:25 19   key facts, which we believe are undisputed:  First is that Risk

08:59:29 20   Rating 2.0 is an actuarial update to rates, it's not something that

08:59:34 21   regulates state and parish participation in the NFIP; the second

08:59:38 22   is, as I mentioned, under that actuarial update, 97 percent of

08:59:42 23   policyholders have seen decreases or only minor increases; and the

08:59:45 24   third fact is that without Risk Rating 2.0, rates will still have

08:59:49 25   to increase for certain policyholders.

08:59:51  1          And so with that, I'll jump in, in talking about the
08:59:53  2   different injuries, first with the sovereign injury.  Plaintiffs
08:59:56  3   fail to plead a sovereign injury because they identify no way in
09:00:00  4   which Risk Rating 2.0, which as I just mentioned is an actuarial
09:00:04  5   update to flood insurance rates, in any way affects their sovereign
09:00:08  6   interests.  Case law identifies two sovereign interests that can
09:00:11  7   give rise to an injury under Article III:  The first involves the
09:00:15  8   power of states and governments to enforce and create a legal code,
09:00:21  9   and the second deals with states and governments territory.

09:00:25  10         Now, Risk Rating 2.0 has no impact on state law because,
09:00:28  11  as I just mentioned, it's an update to rates.  States and
09:00:31  12  municipalities remain free to create and enforce legal codes
09:00:35  13  concerning flood mitigation.

09:00:38  14         Now, as for territory, again, as something that just
09:00:42  15  impacts flood insurance rates, it has no impact on plaintiffs'
09:00:47  16  territory.  Plaintiffs remain free to fund and construct flood
09:00:51  17  mitigation projects.  They don't in any way allege that the
09:00:54  18  actuarial update actually directly harms property that they own.
09:01:00  19  Now that's what's required under *Massachusetts v. EPA*.

09:01:04  20         Pivoting now to the quasi-sovereign injuries.
09:01:07  21  Plaintiffs' theory is that they are entitled to assert injuries on
09:01:12  22  behalf of the well-being and health of citizens.  But that butts up
09:01:16  23  against clear-cut Supreme Court precedent that legally bars states
09:01:20  24  from asserting such *parens patriae* injuries against the federal
09:01:24  25  government.  That's the *Alfred L. Snapp* case that we cite and quote

09:01:28  1      in our cases.

09:01:29  2           And just last term, the Supreme Court in the *Brackeen*

09:01:32  3      case clearly says that a state does not have a standing of *parens*

09:01:39  4      *patriae* injury to bring an action against the federal government.

09:01:40  5      That's because the United States has a *parens patriae* relationship

09:01:44  6      to citizens.

09:01:45  7           Third, economic injury, which is I think the bulk of the

09:01:49  8      briefing.  Now, plaintiffs failed to plead any economic injury

09:01:54  9      because the tax base and proprietary injuries that they allege are

09:01:58 10      foreclosed by on-point precedent and they come at the end of a

09:02:01 11      highly attenuated and speculative causal chain.  And the single

09:02:06 12      parish policyholder in this case hasn't plausibly demonstrated that

09:02:10 13      it will lose money under Risk Rating 2.0.

09:02:13 14           So I'll start first with the 50 or so states and local

09:02:16 15      governments who have not alleged that they're policyholders under

09:02:20 16      Risk Rating 2.0.

09:02:20 17           THE COURT:  I was going to ask you whether you, when you

09:02:23 18      say plaintiffs whether they are all the same.  And so it sounds

09:02:28 19      like, obviously, you're going to tell me that they're not, so

09:02:30 20      please continue.

09:02:31 21           MR. DESTA:  Great.  Yeah, and I'll start with the 50 or

09:02:33 22      so plus that are not the same as the one because they're not a

09:02:37 23      policyholder.

09:02:37 24           So their standing -- their lack of standing is clear-cut

09:02:41 25      based on two lines of precedent.  The first is the Fifth Circuit's

09:02:45  1    decision in *El Paso County v. Trump*, and that's the case that says

09:02:50  2    indirect tax base injuries are not cognizable Article III injuries

09:02:55  3    in fact.  And the second strand of precedent is the long-standing

09:02:57  4    cases like *Clapper* and *Lujan* that say an injury that's down the

09:03:01  5    line and depends on a chain of causation and rests on the

09:03:04  6    independent decisions of third parties also can't give rise to

09:03:08  7    Article III standing.

09:03:10  8          Now, I'll start with that first theory I just mentioned,

09:03:16  9    the tax base injury, and I want to quote *El Paso County* directly,

09:03:20 10    the case.  It says, "a county's," quote, "loss of general tax

09:03:24 11    revenues as an indirect result of federal policy is not a

09:03:28 12    cognizable injury in fact."  For a tax base injury to be

09:03:32 13    cognizable, there has to be, quote, a direct link between the

09:03:36 14    plaintiff's status as a collector and recipient of tax revenues and

09:03:40 15    to challenge federal action.  That is the loss of specific tax

09:03:44 16    revenues.

09:03:44 17          What the plaintiffs ask here is --

09:03:47 18          THE DEPUTY CLERK:  Six minutes.

09:03:49 19          MR. DESTA:  Thank you.  -- is for the Court to confer

09:03:50 20    standing based on a mere allegation of general tax revenue

09:03:53 21    reductions as an indirect result of federal policy, and the Fifth

09:03:56 22    Circuit has said virtually all federal policies inevitably have

09:04:01 23    incidental economic repercussions and so conferring standing on

09:04:05 24    this basis could spark a wave of unwarranted litigation.  The

09:04:09 25    plaintiffs ask the Court to ignore this warning.

09:04:12 1        Now, if the Court disagrees and believes that a tax base

09:04:14 2   injury is cognizable even under *El Paso*, plaintiffs still have to

09:04:20 3   confront *Clapper* and *Lujan*.  Now, those cases say that injuries

09:04:22 4   that come at the end of a highly attenuated speculative chain of

09:04:25 5   causation can't give rise to injury.  And they also say that when

09:04:28 6   the injury depends on third parties and the independent choices of

09:04:32 7   those third parties, plaintiffs have to adduce specific facts.

09:04:36 8        Now, here it's our position that all that plaintiffs have

09:04:39 9   done is really substantiate one part of the first step of the

09:04:43 10  causation, they pointed to certain rate increases for certain

09:04:47 11  residents in their states.  They haven't shown that as a result of

09:04:49 12  those increases, rates will rise so high and be so unaffordable

09:04:55 13  that residents in their states will be forced to leave.  And that

09:04:58 14  as a result, tax revenues will decline to such an extent that they

09:05:02 15  won't be able to fund mitigation projects.

09:05:07 16       Now turning to St. Tammany Parish.  The parish bases its

09:05:13 17  standing in part on the fact that its rates for 12 policies have

09:05:16 18  collectively increased by about $2,900 in 2023 to 2024.  Now,

09:05:23 19  setting aside that this is a di minimus amount for a government,

09:05:27 20  the reason why it doesn't allow the parish to confer standing is

09:05:31 21  actually based on a case that plaintiffs themselves cite, which is

09:05:33 22  the *Young Conservatives of Texas Foundation* case from the Fifth

09:05:38 23  Circuit this past year.

09:05:38 24       Now, under that case, the parish is not, quote, handing

09:05:41 25  over money that in the absence of the federal program at issue it

09:05:46  1   would happily retain.  As we point out in our reply brief,

09:05:50  2   plaintiffs ignore that rates went up by incremental amounts before

09:05:55  3   Risk Rating 2.0, and they do nothing to show that the $2,900 across

09:05:59  4   12 policies, which is about $20 a month, is inconsistent with those

09:06:03  5   incremental increases.

09:06:05  6          And as we also point out, the parish actually saves money

09:06:08  7   under Risk Rating 2.0 because it allows them to avoid potential

09:06:12  8   indefinite increases in time; and under their own tax base theory,

09:06:16  9   if their residents are saving money that will confer tax base

09:06:20 10   revenue benefits to them.

09:06:22 11          So it's even under their own theory that their standing

09:06:26 12   fails.

09:06:27 13          And as a final point on the procedural injury, I don't

09:06:30 14   actually think there's much daylight between our position and

09:06:33 15   plaintiffs' position.  I think we both agree that there needs to be

09:06:36 16   a concrete interest that accompanies the procedural injury, you're

09:06:41 17   not allowed to just assert a bare procedural injury.  And as we

09:06:46 18   pointed out, there is no concrete sovereign, quasi-sovereign, or

09:06:50 19   economic injuries as well.

09:06:51 20          Now, if the Court doesn't agree with what I just said

09:06:54 21   about the various injuries in fact, it still can and should dismiss

09:06:59 22   the complaint under the traceability and redressability prongs of

09:07:03 23   Article III.  Those are independent bases for dismissing the case.

09:07:07 24          Now, we've touched upon traceability a bit because we've

09:07:11 25   discussed in our briefing and just now the fact that these injuries

09:07:14 1   depend on a long causal chain and that turn on independent

09:07:18 2   decisions of residents in the plaintiff states and communities to

09:07:21 3   leave their homes.  They've alleged no plausible facts identifying

09:07:25 4   that residents in their states and communities have leave or will

09:07:29 5   leave as a result of Risk Rating 2.0.  I think we point out in a

09:07:33 6   footnote that plaintiffs, the Texas and Florida plaintiffs actually

09:07:39 7   can't show a population decrease because they've experienced the

09:07:43 8   highest population increases in the country under Risk Rating 2.0.

09:07:47 9       And redressability, again, is an independent basis to

09:07:52 10   dismiss the complaint, because even under the legacy approach that

09:07:55 11   plaintiffs seek to return to, they're not going to avoid rate

09:07:59 12   increases.  Those are unavoidable as a result of what FEMA knows to

09:08:04 13   be flood insurance or flood risks across the country and in these

09:08:08 14   plaintiff states and communities.

09:08:09 15       There's two different ways of looking at that.  The first

09:08:12 16   is, as we talked about in the briefing and just now, there's

09:08:15 17   incremental rate increases that happened before Risk Rating 2.0.

09:08:20 18   And the other way of looking at it is that, as we've discussed,

09:08:22 19   FEMA has a statutory obligation to set rates actuarially and to set

09:08:27 20   premiums to cover expected losses, irrespective of how it

09:08:29 21   determines how to allocate those based on the individual risk

09:08:32 22   variables that go into Risk Rating 2.0.

09:08:35 23       So all that enjoining Risk Rating 2.0 does is depriving

09:08:40 24   FEMA the ability to allocate these premium increases that have to

09:08:44 25   occur based on an individualized assessment of a property's risk.

09:08:48 1  Instead, FEMA will have to raise rates across the board based on

09:08:51 2  broad categories of properties.

09:08:55 3          And what's essential is that plaintiffs offer basically

09:08:59 4  nothing to rebut this redressability issue.  They emphasize in

09:09:02 5  their brief that redressability is a remedy issue at the end of the

09:09:06 6  case, but long-standing precedent including the cases from the

09:09:10 7  Supreme Court this past year including *Brackeen* discuss how what's

09:09:15 8  essential in the redressability analysis is the Court in evaluating

09:09:19 9  how it can exercise its power determining whether giving plaintiffs

09:09:23 10 what they ask for in terms of the relief will actually redress

09:09:26 11 their injury.

09:09:27 12         Now, their injuries all boil down to an assertion that

09:09:31 13 some of their residents are experiencing rate increases.  As we

09:09:36 14 just discussed, there's no basis for plaintiffs to say that by

09:09:40 15 implementing the legacy rating approach that all of the rate

09:09:43 16 increases that they complain of for the residents will go away.

09:09:49 17         Now, as a final point, I just want to emphasize that

09:09:55 18 according to the *National Rifle Association* case, it's a Fifth

09:09:59 19 Circuit case from 2013 that we cite, it says, while the Court, "may

09:10:03 20 avoid complex questions of standing in cases where the standing of

09:10:06 21 others makes a case justiciable, it does not follow that these

09:10:11 22 cases permit a court that knows that a party is without standing to

09:10:14 23 nonetheless allow that party to participate in the case."

09:10:16 24         So if the Court believes, for example, that St. Tammany

09:10:19 25 Parish has standing, that parish is unique and different in that

09:10:22  1    it's an NFIP policyholder.  Its standing does not in any way

09:10:27  2    alleviate all of the other plaintiffs from demonstrating a similar

09:10:33  3    injury, and they just don't do that.

09:10:35  4          THE DEPUTY CLERK:  Thirteen minutes.

09:10:37  5          MR. DESTA:  And I just want to preface an argument that

09:10:39  6    will occur in the preliminary injunction stage.

09:10:42  7          So standing and irreparable harm are obviously related,

09:10:46  8    but it's important to note that irreparable harm is necessarily

09:10:49  9    higher, that the burden for showing irreparable harm is necessarily

09:10:52 10    higher than the burden for standing.  And so as you'll hear from me

09:10:55 11    later on today, I just want to emphasize that all of the arguments

09:10:58 12    that I've just presented on standing equally apply to irreparable

09:11:01 13    harm.

09:11:02 14          Thank you.

09:11:02 15          THE COURT:  Thank you.  It looks like you've used an

09:11:07 16    extra 30 seconds, but you'll have the full two minutes for

09:11:11 17    rebuttal --

09:11:11 18          MR. DESTA:  No worries.

09:11:12 19          THE COURT:  -- and I'll hear from the plaintiffs.

09:11:19 20          MS. BRUNGARD:  Thank you, your Honor.  Good morning and

09:11:24 21    may it please the Court, Morgan Brungard on behalf of plaintiffs.

09:11:28 22          Your Honor, it's shocking that defendants have challenged

09:11:30 23    our standing in this case.  We are a group of 10 states, 43

09:11:34 24    parishes, 12 levee districts, two municipalities that have suffered

09:11:39 25    many, many injuries to, as they listed, our sovereign interests,

09:11:43  1    our quasi-sovereign interests, our economic interests, and our

09:11:46  2    procedural interests at the hands of Equity in Action.  We allege

09:11:52  3    those injuries in our complaint and they should be accepted as true

09:11:55  4    and construed in our favor.

09:11:56  5         On top of that, we have backed up our allegations of

09:11:59  6    injury with a similarly large number of declarations.  We stand by

09:12:02  7    all of those injuries and believe that everyone is sufficient to

09:12:06  8    establish standing.

09:12:07  9         But instead of going through all of those injuries, my

09:12:09 10    job here is to simplify an already complex case, and so I'd like to

09:12:14 11    start with our economic injuries, which we believe are the most

09:12:17 12    straightforward way to find standing.

09:12:19 13         We have lost thousands --

09:12:21 14         THE COURT:  Excuse me.  Is it the position of the

09:12:25 15    plaintiffs that the plaintiffs all have equal standing?  And I am

09:12:31 16    using that loosely, so to speak.

09:12:34 17         MS. BRUNGARD:  Correct.  We, all plaintiffs bring all of

09:12:36 18    the claims and are asking for the same relief.

09:12:44 19         THE COURT:  Okay.

09:12:45 20         MS. BRUNGARD:  Thank you.

09:12:47 21         So with the economic injuries, we've lost thousands of

09:12:50 22    dollars because of Equity in Action, but even a loss of just a few

09:12:54 23    dollars would be enough.

09:12:55 24         THE COURT:  I guess just to phrase it another way just to

09:12:57 25    be clear, so Idaho has the same -- the position of the plaintiffs

09:13:02  1   is Idaho has -- and I am not singling out Idaho, I am using it as

09:13:05  2   an example of many plaintiffs -- Idaho has the same standing as

09:13:08  3   Louisiana?

09:13:09  4            MS. BRUNGARD:  Yes.  Correct.

09:13:10  5            THE COURT:  Okay.

09:13:12  6            MS. BRUNGARD:  I would direct the Court's attention to

09:13:14  7   the *Yoder* case from the Supreme Court that we cite in our briefing

09:13:17  8   that establishes a $5.00 loss is sufficient for standing.  We also

09:13:21  9   cite a 2023 case from the Fifth Circuit *Young Conservatives of*

09:13:26  10  *Texas v. Smatresk* that says that an economic injury need be no more

09:13:31  11  than a trifle.  Defendants criticize those cases as outdated.  I am

09:13:36  12  not sure how cases from -- a case from 2023 can be outdated.  But

09:13:40  13  just in case, the Supreme Court in 2021 held 8-1 that a plaintiff

09:13:45  14  may bring a claim for just one dollar in damages, that they would

09:13:48  15  have standing.  And that's the case that nobody can pronounce, I

09:13:52  16  think it's *Uzuegbunam*.

09:13:54  17           But under those cases, if Equity in Action has caused any

09:13:59  18  plaintiff one dollar of increased costs, that's sufficient; and

09:14:04  19  here we have way more than just one dollar, we have thousands of

09:14:08  20  dollars of economic injuries.

09:14:09  21           To start, I'll start with the state plaintiffs, the

09:14:12  22  de-obligation costs.  Equity in Action's rates are costing the

09:14:17  23  State of Louisiana currently as we speak $112,000 that it would not

09:14:24  24  be paying if the legacy rating system were still in place.  As the

09:14:27  25  declaration submitted by GOHSEP Director Mr. Casey Tingle explains

09:14:32 1   that ECF 1-1, and as he will further testify today, the State

09:14:37 2   receives grants from FEMA for disaster mitigation and recovery.

09:14:41 3   The state then decides who to disburse those grants to.  And the

09:14:45 4   recipient is often the parish and then the parish then often

09:14:48 5   disburses those to individuals.

09:14:52 6          And FEMA in those grants imposes a mandatory requirement

09:14:56 7   that anyone the State gives that money to must obtain and maintain

09:15:01 8   flood insurance.  Director Tingle will testify that the NFIP is

09:15:06 9   essentially the only option for flood insurance in Louisiana, and

09:15:09 10  that when an individual violates FEMA's requirement to obtain and

09:15:14 11  maintain flood insurance by dropping their NFIP policy, FEMA comes

09:15:20 12  back to the State to repay that cost, the amount of the grant.  And

09:15:23 13  that process is called de-obligation.

09:15:26 14         Director Tingle's declaration and his testimony today

09:15:29 15  will establish that FEMA's currently de-obligating $112,000,

09:15:34 16  approximately, from the State to repay a grant where the recipient

09:15:38 17  dropped flood insurance because he could not -- or excuse me,

09:15:42 18  dropped his policy because he could not afford it.

09:15:44 19         You will hear from Director Tingle that this is the first

09:15:47 20  time that FEMA has clawed back grant funds from the State because

09:15:51 21  of a recipient's inability to pay flood insurance costs, which

09:15:57 22  means that it never happened under the legacy rating system.  That

09:16:01 23  testimony shows that the state has $112,000 of an injury and it is

09:16:08 24  a direct consequence of Equity in Action's higher rates.  And it's

09:16:12 25  not speculative, it's happening now.  There may be some question

09:16:16  1   about when that money will actually be repaid, but the question is

09:16:20  2   "when" not "if."

09:16:24  3        The State also faces enormous enforcement costs to

09:16:29  4   collect FEMA grants from its residents.  The State has to find the

09:16:34  5   people and often sue them to recover the funds.  And then after

09:16:37  6   expending all of those funds, the recipients may ultimately be

09:16:41  7   judgment proof any way.

09:16:42  8        FEMA's hazard mitigation following Katrina is a perfect

09:16:48  9   example of the economic injury the State sustains when enforcing

09:16:52 10   FEMA grant requirements against recipients.  And those cases

09:16:56 11   settled just last year, more than a decade after Katrina.

09:16:59 12        Moving next to parish plaintiffs.  They as NFIP

09:17:06 13   policyholders are paying increased rates because of Equity in

09:17:09 14   Action.  I would like to pull up a map of the parish-wide average

09:17:13 15   increases for the plaintiff parishes.  Monica, if you'd please pull

09:17:18 16   up Demonstrative No. 3.

09:17:34 17        As she is pulling that up, this map what it shows is an

09:17:38 18   average parish-wide rate increase according to data that FEMA

09:17:42 19   released just a few months before we filed suit.  And parish

09:17:46 20   governments are facing soaring rates on their NFIP policies just

09:17:51 21   like their residents are.

09:17:59 22        If you see St. Tammany Parish is 126 percent average

09:18:04 23   increase across the parish.  So assuming that a policyholder -- and

09:18:09 24   that's an increase.  So assuming a policyholder had paid $100 a

09:18:13 25   year under the legacy rating system, they would now be facing --

09:18:17  1    they would now be paying $226 total because there would be $126

09:18:22  2    increase.

09:18:25  3            St. Tammany Parish itself has NFIP policies on parish

09:18:28  4    property and is experiencing rate increases on the order of

09:18:31  5    thousands of dollars as a result of Equity in Action, and that's in

09:18:35  6    the St. Tammany Parish declaration at ECF 1-28, paragraphs 37 and

09:18:41  7    38.

09:18:42  8            St. Charles Parish, the average increase parish-wide is

09:18:46  9    239 percent.  You'll hear testimony from St. Charles Parish

09:18:51 10    President Matthew Jewell later today that his parish also owns NFIP

09:18:57 11    policies on parish property.  Some of those properties have never

09:19:00 12    flooded and yet the rates are soaring.  President Jewell will

09:19:04 13    testify that the soaring rates are forcing St. Charles Parish to

09:19:08 14    not renew some of its policies.

09:19:09 15            Parishes are also facing loss of specific tax revenue.

09:19:13 16    As was mentioned, *El Paso County* is an important Fifth Circuit

09:19:18 17    case, and *El Paso County* together with *Wyoming v. Oklahoma* from the

09:19:23 18    Supreme Court stand for the proposition that general -- a general

09:19:27 19    loss in overall economic activity that then results in a general

09:19:33 20    loss in tax revenue is insufficient for standing; but when there is

09:19:39 21    a specific tax revenue source that's being lost, that is

09:19:45 22    sufficient.

09:19:48 23            And here President Jewell will testify that St. Charles

09:19:51 24    Parish voted to impose a specific ad valorem tax on itself to build

09:19:56 25    to FEMA's a hundred-year standard and to take advantage of the

promised lower rates and that now the parish is losing ad valorem

tax revenues.  That's a specific tax source.  We're not talking

about just general tax revenue.

          Lafourche Parish Assessor Wendy Thibodeaux, you will hear

testimony from her later today that Equity in Action is decreasing

property values and, therefore, the parish's ad valorem property

tax.  She will also testify that people who are trying to buy

houses are back -- in the parish, in Lafourche Parish are backing

out because of the cost of flood insurance under Equity in Action,

and this is only the first round of renewals.

          Those testimonies together show that Equity in Action is

causing the parishes ad valorem tax revenues to shrink by lowering

property values and forcing people out of the parishes.  There was

a question about whether, you know, is there a break in the -- a

break in the chain of causation because of the third-party action.

Standing can depend on third-party actions as long as the decisions

are predictable.  The Supreme Court said that standing can rest on

speculation about decisions of -- or it doesn't rest on speculation

about the decision of third parties if it is the predictable effect

of government action on the decisions of third parties.  And here,

FEMA's actions of increasing rates by, in these two parishes, by

126 percent and 239 percent average, the predictable effect of that

is to shrink -- to lower property values and to force people out of

the parishes.

          The Levee District plaintiffs also have standing.  Equity

09:21:50 1 in Action is injuring them in ways similar to how it's injuring

09:21:53 2 parishes.  One example is St. Tammany Levee District's loss of its

09:21:56 3 ability to pass an ad valorem tax to build its first levee due to

09:22:01 4 Equity in Action's higher rates.

09:22:03 5     Moving to traceability.  Defendants say that our economic

09:22:07 6 injuries rely on the independent decisions of individual

09:22:11 7 policyholders and taxpayers.  They barely raised the issue in their

09:22:17 8 briefing, the word trace or traceability applies twice in their

09:22:20 9 entire memorandum in support.

09:22:22 10     In any event, that isn't true for the increased rates

09:22:26 11 parishes are paying on their own NFIP policies.  And for the

09:22:30 12 State's clawback injury and the parishes' loss of specific tax

09:22:33 13 revenues, I would point the Court to *Department of Commerce v. New*

09:22:37 14 *York*, 139 S. Ct. 2551, 2019.  Under that case the clawback injury

09:22:43 15 and the loss of specific tax revenues do not rest on mere

09:22:47 16 speculation about the decisions of third parties, but, again, on

09:22:50 17 that predictable effect of government action on the decisions of

09:22:53 18 third parties.

09:22:55 19     Next redressability.  Defendants say that enjoining

09:23:00 20 Equity in Action will not redress plaintiffs' injuries because FEMA

09:23:03 21 will increase rates under the legacy system to make rates

09:23:07 22 actuarially sound.  That argument is speculative and is actually a

09:23:11 23 merits argument about statutory interpretation of what Congress

09:23:15 24 authorized FEMA to do reading the statute as a whole.  And just

09:23:18 25 because rates went up a little here and there under the legacy

09:23:22  1   rating system, that doesn't prevent the draconian increase under

09:23:26  2   Equity in Action from injuring plaintiffs.  That would be like

09:23:29  3   saying that a plaintiff who was traditionally charged $10 a year by

09:23:33  4   the government is not injured when the government increases that

09:23:37  5   charge to a million dollars.  The injury is the difference in

09:23:41  6   price, and here FEMA itself released data showing that each

09:23:45  7   plaintiff is experiencing an average increase in rates under Equity

09:23:49  8   in Action.

09:23:53  9           To close, I would like to point out that there were

09:23:58 10   several factual inaccuracies in the argument that was presented

09:24:03 11   this morning.  Equity in Action is not just an actuarial update.

09:24:11 12   The rate changes are not incremental.  People are dropping

09:24:15 13   policies, property values are dropping, and the dominoes are

09:24:17 14   already falling.  I would point the Court's attention to the

09:24:21 15   declaration from Russell Hebert as support for that chain of events

09:24:27 16   and that it is already occurring, in addition to the many, many

09:24:30 17   other declarations that we have submitted and the testimony that

09:24:32 18   the Court will hear later today.  And we don't have to wait for a

09:24:36 19   catastrophic failure to happen.

09:24:42 20           Can I inquire how much time I have left?

09:24:45 21           THE COURT:  Looks like you have about two minutes.

09:24:48 22           MS. BRUNGARD:  Perfect.  I'll leave it there and give you

09:24:51 23   back the balance of my time.  Thank you very much.

09:24:53 24           THE COURT:  Ms. Murrill has something.

09:24:58 25           MS. BRUNGARD:  One other quick point and this was

09:25:00  1    something that I will address more fully in my remarks on the

09:25:03  2    preliminary injunction motion.  But this is not just a program

09:25:06  3    about insurance, it's also about floodplain management.  There are

09:25:12  4    several components of the National Flood Insurance Program, Equity

09:25:18  5    in Action focuses on the "I," the insurance, but it is a flood

09:25:23  6    management program and it has significant pieces that affect the

09:25:28  7    State, the parish, the levee districts, and that invite those

09:25:36  8    entities to cooperate with FEMA in regulating floodplain

09:25:40  9    management.  And I will explain that more fully in my remarks on

09:25:44  10   the preliminary injunction.

09:25:44  11         THE COURT:  Okay.

09:25:45  12         MS. BRUNGARD:  Thank you very much.

09:25:46  13         THE COURT:  All right.  Thank you.

09:25:50  14         MR. DESTA:  Just picking up where my friend on the other

09:25:58  15   side left off.  We do agree that the NFIP is a program that extends

09:26:03  16   beyond flood insurance, but what's key here is that Risk Rating 2.0

09:26:06  17   is an actuarial rate update, it affects rates, it does not in any

09:26:12  18   way affect the ability of plaintiff states and parishes to adopt

09:26:16  19   any sort of regulations they choose or protect their property in

09:26:20  20   any way they choose.

09:26:20  21         On the example of the de-obligation, as we point out in

09:26:24  22   our briefing, this is just a single example of a clawback.  Nowhere

09:26:27  23   in the declaration of Mr. Tingle does it say that Louisiana had

09:26:32  24   never had to have clawbacks before.  There's nothing that

09:26:36  25   attributes this clawback to Risk Rating 2.0.  And the key fact is I

09:26:41  1    believe that this recoupment was for a pre-Katrina policy and a

09:26:44  2    pre-Katrina flood, so this is obviously a pre-Risk Rating 2.0

09:26:49  3    issue.

09:26:49  4          Now on the issue of the demonstrative, which is still up

09:26:52  5    here.  An important point that is not listed in this demonstrative

09:26:57  6    is that any rate increases are capped at 18 percent annually, so

09:27:01  7    this happens over time.  This is not a single increase.  And also

09:27:06  8    important is the fact that this is just the first step in the chain

09:27:09  9    of causation.  Yes, there are some policyholders that will be

09:27:13  10   paying more in flood insurance rates, but in order for there to be

09:27:17  11   an injury of, quote, thousands of dollars to plaintiffs, there

09:27:20  12   needs to be a series of steps after this, including that

09:27:23  13   plaintiffs' residents will leave their communities en masse and

09:27:29  14   they just have not shown that key fact.

09:27:32  15         My friend on the other side talked about the predictable

09:27:35  16   effect of third-party decisions.  As we point out in our brief,

09:27:39  17   there are a number of reasons irrespective of flood insurance rates

09:27:43  18   why someone would want to leave their community, including high

09:27:48  19   interest rates.  They do nothing to rebut that in their brief.

09:27:50  20         As a last point, I just want to emphasize, we're not

09:27:52  21   asking the plaintiffs to prove in a trial on the merits any of

09:27:55  22   these things, we are simply --

09:27:58  23         THE COURT:  You're at two minutes but just wrap it up --

09:28:01  24   I mean, finish your thought.

09:28:02  25         THE DEFENDANT:  I'll finish this last sentence.  We're

09:28:04  1   simply asking the plaintiffs to identify plausibly alleged facts

09:28:07  2   that support each step in the chain of causation.  Thank you.

09:28:10  3          THE COURT:  Thank you.

09:28:15  4          The Court obviously is going to consider the issues

09:28:18  5   raised in the motion to dismiss along with, obviously it's a

09:28:24  6   threshold question, but for our purposes today, we're going to make

09:28:28  7   a record on everything.

09:28:30  8          And so with that, we will turn to -- and I leave it to

09:28:36  9   you, whether you want to have opening remarks on the motion for

09:28:42 10   preliminary injunction or you want to go right into the testimony,

09:28:45 11   whatever your preference is, the Court is fine with.

09:28:49 12          MS. MURRILL:  Your Honor, I think Morgan is going to just

09:28:52 13   do a quick overview of what we intend to do through the testimony

09:28:55 14   on the PI and then go straight into witnesses.  And if we can

09:28:59 15   reserve the extra time for the back end, it probably will be useful

09:29:03 16   just in tying up everything.

09:29:04 17          And also want to point out, which I failed to do when we

09:29:07 18   introduced our trial team, that there are a number of party

09:29:11 19   representatives here, they can raise their hands, from the parishes

09:29:15 20   I think out here.

09:29:15 21          THE COURT:  I suspected that.  Yes, go ahead.

09:29:17 22          MS. MURRILL:  Parish presidents and people like that.  So

09:29:18 23   if y'all want to just raise your hand if you're from a parish and

09:29:20 24   you're here as a representative of a parish or a levee board.  I

09:29:23 25   wanted to recognize them before we start.

09:29:25  1              THE COURT:  Thank you, Ms. Murrill.

09:29:26  2              MS. MURRILL:  Because we know we can't put them all up

09:29:29  3      today.

09:29:29  4              THE COURT:  And also by just asking what you wanted to do

09:29:32  5      with respect to argument, I am not at all trying to micromanage

09:29:37  6      you, I just wanted to let you know that whatever you want to do is

09:29:38  7      fine.

09:29:40  8              MS. MURRILL:  Well, I think the most beneficial thing is

09:29:43  9      to go more directly into testimony but that a good overview of what

09:29:47  10     we're trying to achieve is a good idea too.

09:29:49  11             THE COURT:  All right, sounds good.  Each side will have

09:29:53  12     15 minutes.  Ms. Brungard, if you want to reserve time, just tell

09:29:57  13     us.

09:30:03  14             MS. BRUNGARD:  I think that is what I would like to do if

09:30:05  15     possible, five minutes for opening, save the balance for the back

09:30:09  16     end after witness testimony.  Is that possible?

09:30:11  17             THE COURT:  Yeah, that's fine.

09:30:12  18             MS. BRUNGARD:  Okay.  Perfect.

09:30:13  19             THE COURT:  No, you'll have more time than that, I'll

09:30:16  20     give more than five minutes at the end.  The question is -- if you

09:30:20  21     need 15 minutes, take it.

09:30:22  22             MS. BRUNGARD:  Yes, your Honor.

09:30:24  23             THE DEPUTY CLERK:  What warning would you like for your

09:30:27  24     time?

09:30:28  25             MS. BRUNGARD:  Just five minutes is fine.

09:30:30  1          THE COURT:  So what we'll do is in the normal course, if

09:30:33  2  this was your only shot you would have some rebuttal time.  What

09:30:37  3  I'll do is I'll hear your opening remarks, I'll hear their opening

09:30:41  4  remarks, and you can use the whole 15 minutes right now and you'll

09:30:44  5  have more time at the end.

09:30:45  6          MS. BRUNGARD:  Oh, perfect.  Okay.

09:30:47  7          THE COURT:  All right.

09:30:47  8          MS. BRUNGARD:  Perfect.  We just spent a good deal of

09:30:49  9  time talking about all of the ways that Equity in Action harms

09:30:53 10  plaintiffs.  As we now shift to why the Court should enjoin Equity

09:30:57 11  in Action, I'd like to layout some big picture concepts that will

09:31:01 12  frame not only our legal argument but also our witness testimony.

09:31:04 13          We are here today because FEMA in its own words built an

09:31:07 14  entirely new system from the ground up for the NFIP.  FEMA calls

09:31:12 15  that new system Equity in Action but it is anything except

09:31:18 16  equitable.  It irreparably harms plaintiffs and was required to go

09:31:21 17  through notice and comment, exceeds FEMA statutory authority,

09:31:24 18  violates the Constitution, and violates the APA.

09:31:27 19          As I mentioned when I was up here just a moment ago, I

09:31:31 20  would like to walk through the major component parts that make up

09:31:35 21  the NFIP focus on program.  Equity in Action, like I said, focuses

09:31:41 22  on the "I," the insurance part, and ignores the "P."  But the NFIP

09:31:47 23  is truly a program with many tentacles reaching all the way down to

09:31:51 24  the heart of state and local governments, and to illustrate these

09:31:54 25  tentacles, I would like to pull up Demonstrative 1.

09:32:01  1        Okay.  There are -- so this is the component, there are

09:32:08  2    one, two, three, four components parts of the NFIP as discussed in

09:32:11  3    our briefing, and I would like to start with the one in the bottom

09:32:16  4    left-hand corner Land Use Regulations.

09:32:19  5        So to enter the NFIP, a community, and in this case in

09:32:23  6    Louisiana parishes, must adopt FEMA's mandatory minimum community

09:32:30  7    floodplain regulations.  And in exchange for adopting those

09:32:34  8    floodplain regulations, the parish is able to enter the NFIP and

09:32:38  9    residents are eligible to purchase NFIP policies.  If the parish

09:32:42 10    doesn't join the NFIP by passing those regulations, then no

09:32:46 11    resident in the parish is eligible to purchase an NFIP policy.

09:32:52 12    Also, residents, only residents that live in an NFIP community are

09:32:58 13    eligible for disaster mitigation and recovery grants.

09:33:04 14        The community rating system is a higher level of

09:33:09 15    regulations that a community can pass to access increased

09:33:15 16    discounts, at least historically that's how it worked.

09:33:18 17        Okay.  Next I'd like to move to the mapping section in

09:33:22 18    the top right-hand corner.  After a parish joins the NFIP, FEMA

09:33:24 19    then maps the parish, and it designates areas of special, moderate,

09:33:29 20    and low flood hazard.  I'll focus on Special Flood Hazard Areas or

09:33:36 21    SFHAs, because that's where the requirement to obtain and maintain

09:33:41 22    flood insurance applies.  And a Special Flood Hazard Area is an

09:33:46 23    area with a one percent chance of flooding every year.

09:33:49 24        Next I'll move to the insurance piece.  And again, this

09:33:52 25    is just one of four component parts of the NFIP.  Insurance is

09:33:56  1    mandatory in SFHA's for everyone who has received FEMA grants, SBA

09:34:05  2    loans, disaster relief, or has a federally backed mortgage.

09:34:09  3           Finally, I'll move on to the fourth piece, component

09:34:11  4    piece of this program, floodplain flood mitigation projects.  Under

09:34:18  5    the legacy system, parishes could secure predictably lower NFIP

09:34:22  6    rates for their residents by undertaking flood mitigation projects

09:34:25  7    like building levees, installing pumps, et cetera.  Individual

09:34:30  8    policyholders could also secure predictably lower rates for

09:34:33  9    themselves by building up their land or even elevating their house

09:34:37 10    or their building.

09:34:40 11           Equity in Action, as our witnesses will explain, is

09:34:43 12    upending the NFIP as a program and is causing economic harm to

09:34:48 13    plaintiff states through grant de-obligation clawbacks and the cost

09:34:51 14    of enforcement, parish plaintiffs through increased rates on their

09:34:55 15    own NFIP policies, and plaintiff parishes and levee districts

09:34:59 16    through the loss of specific tax revenues.  Those economic harms

09:35:02 17    are irreparable.  Defendants sovereign immunity prevents monetary

09:35:10 18    damages.

09:35:11 19           And with that, I will reserve the balance of my time and

09:35:13 20    we can move into witness testimony.  Thank you.

09:35:15 21           THE COURT:  Thank you.

09:35:25 22           MR. DESTA:  My colleague Mr. Takemoto will be addressing

09:35:32 23    the likelihood of the merits, but before we does that, I'll be

09:35:35 24    talking for just a couple of minutes on irreparable harm where my

09:35:38 25    friend from the other side left off.  If I could have a warning

09:35:42  1   when I've gone two minutes.

09:35:42  2            THE COURT:  Okay.

09:35:45  3            MR. DESTA:  Plaintiffs' burden to demonstrate irreparable

09:35:48  4   harm, as we've discussed, is necessarily higher than it is for

09:35:51  5   standing.  Plaintiffs must demonstrate that they face an

09:35:55  6   irreversible and imminent threat of, quote, significant injury, and

09:35:58  7   they failed to do that for two reasons, which we lay out in our

09:36:01  8   briefing; the first is that their economic injuries are not

09:36:03  9   sufficient, and the second is they waited multiple years after

09:36:09 10   learning about Risk Rating 2.0 to bring their suit.

09:36:11 11            So economic injuries are prototypically not irreparable,

09:36:14 12   as numerous cases in our brief make this point, and places position

09:36:20 13   essentially that there is an APA carve-out to case law on the basis

09:36:24 14   of sovereign immunity, but their position would establish

09:36:30 15   irreparable harm in essentially all APA cases, which is an

09:36:32 16   untenable position because all APA cases, all federal programs

09:36:36 17   involve some sort of incidental economic impact, and to say that

09:36:40 18   just because of that, that that's irreparable harm would mean that

09:36:43 19   irreparable harm is met in all cases.  That's untenable with the

09:36:48 20   position that preliminary injunctions are extraordinary remedies

09:36:52 21   reserved for significant impairments.  The *Wages & White Lion* Fifth

09:36:55 22   Circuit case makes that clear, we discuss this in our briefing; it

09:36:58 23   emphasizes that economic losses must be, quote, substantial.  We

09:37:02 24   quote the case, the plaintiffs say that we're misrepresenting it,

09:37:05 25   but all we're doing is quoting and relying on its analysis and

09:37:09  1  holding.

09:37:09  2       Our position is that $2,900 for a parish increasing or

09:37:14  3  having rate increases is not an irreversible and imminent injury,

09:37:20  4  it's di minimus.  And there's an 18 percent statutory cap on any

09:37:25  5  rate increases, so that acts as a safeguard against rate jumps.

09:37:31  6       THE DEPUTY CLERK:  Two minutes.

09:37:32  7       MR. DESTA:  I'll go for one more minute.

09:37:33  8       Now, all of these costs are also recoverable because

09:37:35  9  there is a related case before your Honor in which there are unjust

09:37:39  10  enrichment and taking claims so nothing prevents policyholders in

09:37:43  11  this case from recovering.

09:37:44  12       The last point I'll make is that plaintiffs delayed for

09:37:48  13  multiple years in bringing this suit and that's a factor that

09:37:51  14  decisively undercuts their irreparable harm.  Risk Rating 2.0 was

09:37:56  15  announced more than four years ago, and as the briefing and

09:37:59  16  declaration made clear, FEMA released copious amounts of

09:38:02  17  information on the rates, including when it applied -- began

09:38:06  18  applying them on October 2021 to policies.

09:38:09  19       Now, plaintiffs completely failed to justify their delay.

09:38:13  20  They rely on a couple of readily distinguishable cases, situations

09:38:17  21  where the plaintiffs did not have the information readily available

09:38:21  22  in order to know that they were injured and to bring suit.  Here,

09:38:24  23  for more than four years plaintiffs have known about Risk Rating

09:38:29  24  2.0 and have been able to look at data describing the rate

09:38:33  25  increases.

09:38:33  1          THE DEPUTY CLERK:  Three minutes.

09:38:40  2          THE COURT:  Good morning, Mr. Takemoto.  You have about,

09:38:44  3   if I'm right, Ms. Ancar, about 12 minutes.

09:38:45  4          MR. TAKEMOTO:  Okay.  Your Honor, I would like to address

09:38:47  5   the likelihood of success on the merits prong on the preliminary

09:38:52  6   injunction analysis, which plaintiffs have not yet addressed.  Of

09:38:55  7   course it's their burden to satisfy this prong.

09:38:58  8          Plaintiffs have made a number of APA claims that Risk

09:39:04  9   Rating 2.0 is contrary to law, exceeds statutory authority, is

09:39:09 10   arbitrary and capricious, so on and so forth for a number of

09:39:11 11   reasons, many of which they don't really respond to in their reply

09:39:16 12   brief.

09:39:16 13          So, for example, and I'll just list through these reasons

09:39:19 14   that they give at a high level.  They claim that Risk Rating 2.0

09:39:22 15   doesn't take into account mitigation factors; that's wrong, it does

09:39:27 16   as we pointed out in our brief and as the Maurstad declaration

09:39:32 17   elaborates.  They claim that FEMA failed to consult with state and

09:39:36 18   local agencies; again, wrong.  FEMA has extensively consulted with

09:39:39 19   state and local agencies and has totally fulfilled its statutory

09:39:44 20   obligations, again, as laid out in the Hake declaration and the

09:39:48 21   Maurstad declaration.

09:39:49 22          They claim that FEMA has failed to inform the public

09:39:52 23   about Risk Rating 2.0; again, wrong, as set forth in those

09:39:56 24   declarations.  They don't really have much of a response in their

09:39:58 25   reply brief.  They claim that FEMA failed to consider the impact of

09:40:02  1   Risk Rating 2.0 on the gas and oil industry.  Again, this is not a
09:40:06  2   factor that FEMA's required to consider under the National Flood
09:40:12  3   Insurance Act, and they don't point to any provision of the act
09:40:15  4   that requires them to take that into consideration.
09:40:17  5          They claim that this is, finally, that this is all just
09:40:20  6   pretext for removing people from their communities; that's wrong.
09:40:24  7   They don't point to anything that Risk Rating 2.0 does that
09:40:28  8   expresses such a purpose or any statement that would express such a
09:40:32  9   purpose.
09:40:33  10         Really all of this boils down to plaintiffs' argument
09:40:36  11  that Risk Rating 2.0 makes flood insurance unaffordable.  This is
09:40:41  12  not a factor that, first of all, is in the statute anywhere.  And
09:40:46  13  second of all, Risk Rating 2.0 makes the purpose -- one of the
09:40:51  14  purposes and effects of Risk Rating 2.0 is to make flood insurance
09:40:55  15  not only available to people going into the future but also based
09:40:58  16  on actuarial rates that are predictable and so can make it more
09:41:02  17  affordable to more people.
09:41:04  18         But turning to the statute because that's really how the
09:41:07  19  Court has to analyze a lot of these claims.  Section 4014 sets
09:41:13  20  forth the criteria that FEMA has to apply when estimating premium
09:41:19  21  rates, and it says that the administrator is authorized in
09:41:23  22  subsection A, it says that the administrator is authorized to
09:41:27  23  undertake and carry out studies and investigations which may be
09:41:31  24  necessary to estimate the risk premium rates for flood insurance,
09:41:35  25  which based on consideration of the risk involved and accepted

09:41:39  1    actuarial principles, along with various other factors such as

09:41:43  2    flood mitigation activities, costs and analysis -- and allowances,

09:41:47  3    administrative expenses, various other costs, would be required in

09:41:51  4    order to make such insurance available on an actuarial basis for

09:41:54  5    any types and classes of properties for which insurance coverage is

09:41:57  6    available under Section 1305 of the act.

09:42:02  7            Okay.  So in other words, to condense that into a simple,

09:42:05  8    you know, phrase, FEMA has to estimate premium rates based on

09:42:08  9    accepted actuarial principles, which its done for many years and

09:42:13  10   has updated its analysis through Risk Rating 2.0.

09:42:16  11           Plaintiffs latch on to a phrase in the next section,

09:42:22  12   Section 4015 on chargeable premium rates, and they claim -- they

09:42:27  13   particularly latch on to language regarding reasonable rates.  Now,

09:42:35  14   this section on chargeable premium rates explicitly refers to

09:42:41  15   chargeable rate pre-FIRM chargeable rates, and that's in subsection

09:42:46  16   (c)(1) where it says that any property the construction -- sorry, I

09:42:51  17   should begin from the beginning of this.  Chargeable rates apply to

09:42:56  18   the following properties post-FIRM -- sorry, chargeable -- let me

09:43:01  19   read this in full so I don't paraphrase it.

09:43:04  20           "Subject only to the limitations provided under

09:43:06  21   paragraphs (1) and (2), the chargeable rate shall not be less than

09:43:10  22   the applicable estimated risk premium rate for such area under

09:43:16  23   Section 1307 with respect to the following properties:  Post-FIRM

09:43:19  24   properties, any property the construction or substantial

09:43:21  25   improvement of which the Administrator determines has been started

09:43:25  1    after December 31, 1974."  So in other words, the actuarial rates

09:43:33  2    have to apply to post-FIRM properties, and FEMA has the discretion

09:43:39  3    to apply chargeable rates -- in other words, rates that are less

09:43:43  4    than the actuarial rates -- to pre-FIRM properties, which it still

09:43:45  5    does, as has been pointed out in the briefing.

09:43:49  6         So all of that being said, the argument that FEMA's

09:43:54  7    required to make flood insurance affordable as plaintiffs put it,

09:43:58  8    simply isn't in the statute.  And at any rate, FEMA has complied

09:44:03  9    with, you know, the requirement to provide reasonable rates as far

09:44:08 10    as chargeable rates are concerned.

09:44:13 11         On the arbitrary and capricious arguments the plaintiffs

09:44:21 12    make, they point to four errors in Risk Rating 2.0, all of which

09:44:27 13    are more indicative of policy differences rather than failures of

09:44:31 14    the agency to consider an issue, which of course is the standard

09:44:34 15    under the APA.  You know, arbitrary and capricious review is,

09:44:38 16    quote, narrow and highly differential to the agency, that's the

09:44:44 17    *Sierra Club* case from the Fifth Circuit.  And the agency's action

09:44:47 18    is presumed valid and the Court is limited to considering whether

09:44:51 19    the action was based on consideration of relevant factors and

09:44:54 20    whether there's been a clear error.

09:44:56 21         The four points that plaintiffs make, No. 1, that FEMA

09:45:00 22    failed to consider increased costs.  First of all, as we pointed

09:45:04 23    out, we dispute whether the cost of increases by the amounts that

09:45:09 24    plaintiffs claim, as my colleague pointed out, the statute has --

09:45:14 25    requires in subsection -- so 4015(e)(1), the statute caps

09:45:26 1    chargeable risk premium rates at 18 percent annually and FEMA

09:45:31 2    continues to comply with that.

09:45:32 3        But setting that aside, cost, of course, was central to

09:45:36 4    the analysis of Risk Rating 2.0.  The whole point of Risk Rating

09:45:40 5    2.0 is that FEMA conducted an assessment, estimated risks using

09:45:45 6    updated actuarial principles, you know, more specific risk analysis

09:45:51 7    and determined that costs were going to be an issue, and so it, you

09:45:56 8    know, promulgated Risk Rating 2.0.

09:45:59 9        Plaintiffs also claim that FEMA failed to consider a mass

09:46:03 10    exodus of the program.  That's not -- that's not substantiated in

09:46:10 11    any way.  They also claim again that Risk Rating 2.0 is arbitrary

09:46:14 12    and capricious because it fails to take into account mitigation

09:46:17 13    factors; again, that's not something that actually enures to Risk

09:46:25 14    Rating 2.0, it continues to apply mitigation discounts.

09:46:30 15        Moving on to plaintiffs' notice and comment claim because

09:46:36 16    I think that addresses all of plaintiffs' statutory authority and

09:46:41 17    arbitrary and capricious arguments.

09:46:42 18        Plaintiffs claim that Risk Rating 2.0 should be

09:46:46 19    invalidated because it did not undergo notice and comment rule

09:46:50 20    making.  This is wrong for a number of reasons.  First of all, Risk

09:46:54 21    Rating 2.0 is not a legislative rule.  The Administrative Procedure

09:46:58 22    Act requires notice and comment rule making for legislative rules,

09:47:02 23    which are rules that carry and impose legal consequences.  Risk

09:47:07 24    Rating 2.0 simply updates the methodology for rating.  It does not

09:47:13 25    impose any new substantive legal requirements.  The individuals who

09:47:17 1   are obligated to have flood insurance continue to be obligated to

09:47:22 2   have flood insurance.  And so in that sense it's not a legislative

09:47:24 3   rule.

09:47:25 4          One other reason why this is not a legislative rule

09:47:31 5   that's subject to notice and comment rule making is that Congress

09:47:35 6   has never required in the National Flood Insurance Act FEMA to

09:47:39 7   undergo notice and comment rule making to estimate rates.  Prior to

09:47:45 8   2012, it did require FEMA to undergo notice and comment rule making

09:47:50 9   for chargeable rates, but it changed the text of the statute at

09:47:55 10  FEMA's request so that it no longer had to undergo notice and

09:48:00 11  comment rule making to set chargeable rates.  And that is indicated

09:48:01 12  by the change from prescribed by regulation to provide after

09:48:03 13  providing notice, prescribed after providing notice at the

09:48:07 14  beginning of Section 4015, of course FEMA has provided extensive

09:48:12 15  notice for Risk Rating 2.0.

09:48:14 16         Even if the Court disagrees with FEMA with respect to the

09:48:18 17  notice and comment arguments, the harmless error rule clearly

09:48:22 18  applies here.  Fundamentally, plaintiffs haven't identified a

09:48:26 19  comment that they would have made to FEMA, indeed they've met with

09:48:29 20  FEMA on a number of occasions and didn't provide such a comment,

09:48:33 21  that FEMA could have considered, didn't, and then thereby

09:48:38 22  plaintiffs are prejudiced by it.  That's the rule and so for that

09:48:42 23  reason there's no harmless error.

09:48:44 24         Moving on to plaintiffs spending clause claim.  This

09:48:48 25  claim is squarely foreclosed by the Fifth Circuit's opinion in

09:48:52  1   *Adolph v. FEMA*, 854 F.2d 732.  There the Fifth Circuit rejected a

09:49:00  2   parish's argument that the NFIP, changes to the NFIP amounted to

09:49:07  3   federal coercion; and the Fifth Circuit explained that because it's

09:49:10  4   a voluntary program, by conditioning the availability of federally

09:49:15  5   subsidized insurance upon enactment of local floodplain management

09:49:19  6   ordinances in accordance with federal standards is simply something

09:49:22  7   that they can either accept or if they so choose to decide not to

09:49:27  8   participate in the program.  And so therefore, it's not a spending

09:49:30  9   clause violation.

09:49:31 10        With respect to the NEPA claim that plaintiffs raise.

09:49:41 11   This fails for a lot of the reasons that they lack standing.  But

09:49:44 12   even more so, because NEPA requires that the challenged agency

09:49:51 13   action affects the physical environment, but nothing about Risk

09:49:54 14   Rating 2.0 effects the physical environment, it targets rates.  And

09:49:58 15   plaintiffs chain of causation about how rate setting ultimately

09:50:03 16   will affect the ultimate environment is highly speculative, and so

09:50:07 17   it should be rejected.

09:50:10 18        And unless the Court has any questions.

09:50:13 19        THE COURT:  I don't have any questions at this time.

09:50:15 20        MR. TAKEMOTO:  Great.

09:50:16 21        THE COURT:  All right.  Thank you.  Ms. Murrill, are you

09:50:20 22   ready to proceed?

09:50:24 23        MS. MURRILL:  Yes, your Honor.

09:50:25 24        MR. TAKEMOTO:  Sorry, your Honor, I have one last point.

09:50:27 25        THE COURT:  Yeah, good ahead.

09:50:29  1          MR. TAKEMOTO:  I think under the Federal Rules of

09:50:31  2    Evidence we're required to state a standing objection based on the

09:50:34  3    motion in limine that we had, and so --

09:50:36  4          THE COURT:  Go ahead and do it.  I mean, I had sort of

09:50:39  5    taken the position that your objection was noted, but...

09:50:45  6          MR. TAKEMOTO:  We'll invoke the standing objection under

09:50:47  7    Rule 103 at any rate.

09:50:49  8          THE COURT:  That's fine.  Thank you very much.

09:50:53  9          MS. MURRILL:  Yes, your Honor, if I could take just one

09:50:55 10    minute and then we'll call our first witness.

09:50:59 11          I would like to point out that the statute actually does

09:51:02 12    say that the rates have to be reasonable and enable people to

09:51:05 13    purchase it, so it's absurd to say that they don't have to be

09:51:08 14    affordable.  Of course they have to be affordable.  I mean, you

09:51:11 15    can't -- they're not reasonable if they're not affordable and

09:51:15 16    people can't purchase them, they don't enable people to purchase

09:51:20 17    them if they're not affordable.  So that seems to me to be an

09:51:21 18    argument bordering on the absurd.

09:51:23 19          On FEMA's NEPA argument, and I think we'll get through

09:51:26 20    everything else in the testimony and reference at the end to the

09:51:31 21    decs that we have in evidence.  I think that on the information,

09:51:35 22    the catastrophic loss modeling that they've built-in and that's

09:51:38 23    part of our allegations in our complaint and part of what we will

09:51:40 24    talk about today, there is an algorithm they have not revealed.  So

09:51:45 25    when they say they've given us reams and reams of documents, they

09:51:48 1   still haven't told us what we need to know.  And that's been

09:51:51 2   substantiated over and over again.  The algorithm is what they're

09:51:55 3   not telling anybody.  That's somehow secret, a secret that no one

09:51:59 4   can tell us when the statute says they have to tell us what they

09:52:01 5   used to make the rates, and we should be able to replicate that so

09:52:05 6   that we can see and explain to people how they made their rates.

09:52:11 7   They have to show their work.

09:52:12 8         I mean, under the APA we don't have to substantiate that

09:52:14 9   they didn't do something, it will be evident in their failure to

09:52:18 10  show their work.  So I think that goes to their APA claim.

09:52:21 11        On their NEPA claim, they did conduct a NEPA analysis in

09:52:27 12  2011, you can get it on the internet, they've posted it, it goes

09:52:30 13  through the entire program.  It's actually very helpful in

09:52:33 14  explaining what the overall purposes of this program, including

09:52:37 15  floodplain management.  So that document says things we do,

09:52:42 16  including changing rates, may trigger an update to the NEPA

09:52:46 17  document.  So I think the NEPA itself has taken -- that FEMA itself

09:52:50 18  has taken positions that acknowledge that it can trigger NEPA, and

09:52:55 19  their representation of this program as a whole is that they're

09:52:58 20  transforming the way they do rate making.  So it is absurd to say

09:53:03 21  that they're not potentially triggering NEPA when they are

09:53:06 22  dramatically changing the way that they do their entire rate

09:53:10 23  structure.

09:53:11 24        They would have you believe that this is nothing more

09:53:14 25  than updating their methodology, that's what they said here today,

09:53:16  1   and I think that's part of what we just want to show you is this is

09:53:19  2   so much more than that.  And it does change floodplain management

09:53:23  3   and it does trigger NEPA.  Because when we can't manage our

09:53:27  4   floodplain because they've made everybody drop out of the program,

09:53:31  5   then we now have a problem that is affecting the environment.  So

09:53:35  6   there is a problem here, it's not speculative, it is traceable, and

09:53:39  7   it is redressable.

09:53:41  8        So we're going to go through that and starting with our

09:53:43  9   first witness, which is Casey Tingle, who is the Director of

09:53:47  10  GOHSEP, the Governor's Office of Homeland Security, and Tracy Short

09:53:53  11  is going to handle that witness for us.

09:53:54  12       THE COURT:  Ms. Murrill, just one second before the first

09:53:57  13  witness comes up.  Just for the good of the order, so to speak.  I

09:54:01  14  wanted, obviously, I put you on limited time, and so I didn't want

09:54:03  15  to -- I wanted to let the parties make their arguments without a

09:54:08  16  lot of interruptions from the bench and a bunch of questions.

09:54:12  17       Just for the record, of course, as you know, we have been

09:54:14  18  provided with extensive briefing materials by both sides, which

09:54:18  19  we've read and digested the summaries of the briefing materials are

09:54:22  20  longer than some people's briefing materials.  And so -- in our

09:54:26  21  cases.

09:54:27  22       So obviously there is a lot of material the Court is

09:54:30  23  familiar with and has gone through.  As you present, and I want to

09:54:34  24  let you put on your cases as you see fit, but for both sides, as we

09:54:39  25  go through the day from the plaintiffs, in terms of the sovereign

09:54:44  1   interest argument, whether you do it through testimony or you talk

09:54:48  2   about it later today, I would like everything that you can tell me

09:54:53  3   in terms of with specificity what laws or codes the plaintiffs can

09:55:00  4   enforce as a result of what I am going to call, because you both

09:55:04  5   referred to in different ways, I am going to call it, if I ask a

09:55:07  6   question about it, Risk Rating 2.0.  The plaintiffs at times refer

09:55:11  7   to it as Equity in Action, I believe the full name is Risk Rating

09:55:16  8   2.0 - Equity in Action.  I am not picking a side, I am just using

09:55:19  9   the short version of the way it starts.

09:55:22  10          And so if you could just -- whether through testimony or

09:55:26  11  argument analysis later, help me drill down some on the laws or

09:55:34  12  codes that can't be enforced as a result of Risk Rating 2.0.

09:55:38  13          And for the defendants, the issue where under the legacy

09:55:42  14  approach that rates would have increased indefinitely but that it

09:55:46  15  doesn't under Risk Rating 2.0, just help me understand, I presume

09:55:51  16  in your case it will be by argument and analysis later, but just

09:55:58  17  help me understand that as best you can because those are the

09:56:01  18  places where I had some preliminary questions as we walked into the

09:56:06  19  day today.  And I've used up a lot of words, so go ahead.

09:56:10  20          MS. MURRILL:  And I would just say two things:  One, if

09:56:12  21  they could explain to you how this rate system works, we would love

09:56:15  22  to hear it.  They've never adequately explained it to any of us or

09:56:18  23  all of our congressional delegation or that of New York and New

09:56:22  24  Jersey.  So maybe you can get them to enlighten you and enlighten

09:56:25  25  us in the process.

09:56:26  1          On the codes, I think that it injures our ability to

09:56:30  2  enforce codes that we have adopted and reliance on FEMA's scheme

09:56:33  3  that we set up with regard to floodplain management.  So I don't

09:56:36  4  think that you should so narrowly look at it in terms of whether

09:56:41  5  FEMA has somehow blocked our ability to enforce a law that we

09:56:44  6  adopted, we adopted it.  And part of the whole system induces us to

09:56:50  7  go out and change our ordinances so that we require people to buy

09:56:54  8  flood insurance and they create the maps that say that basically

09:56:58  9  the only place you can buy it from is them.

09:57:01  10          So it is an interactive system and we've been relying on

09:57:06  11  the way that system was structured for decades.  And so it's not

09:57:10  12  something that you can just come in and change the modeling and now

09:57:14  13  all of a sudden dramatically change the rate structure and not

09:57:17  14  undermine our ability to enforce those ordinances and those codes,

09:57:21  15  which were adopted in reliance on the prior structure of the

09:57:25  16  program.  That's what induces people to pay their taxes, that's

09:57:28  17  what we told people when we passed those tax initiatives, and now

09:57:33  18  they have changed the game entirely.

09:57:37  19          And so everything that we told the people that induced

09:57:41  20  them to pay those taxes, to build the Morganza to the Gulf program

09:57:46  21  or to build those levees and contribute their tax dollars to that,

09:57:49  22  they've changed it.  And they've turned us into liars.

09:57:53  23          So it's not just a question of whether we can enforce

09:57:57  24  those codes, it's whether they're injuring our sovereign ability

09:58:01  25  and the parishes' ability who adopted those codes and ordinances,

09:58:06  1   they're legislatures too.  So it's inhibiting our overall ability

09:58:10  2   to manage the whole program.  And I think -- they acknowledged and

09:58:14  3   concede that it's not just about rates, and I think our graphic

09:58:17  4   just very clearly illustrates that it is a program that induces --

09:58:23  5   it does -- we do want people to pay into it.  The people that pay

09:58:26  6   in to it help shoulder some of the burden of the costs of the

09:58:30  7   program.

09:58:30  8          But that's not the totality of the program and it's not

09:58:34  9   all of the purposes of the program.  And their NEPA document

09:58:38  10  expressly acknowledges that.  It says the secondary purpose of this

09:58:42  11  program is floodplain management.  And so when you are harming our

09:58:45  12  ability to engage in floodplain management and you're harming the

09:58:49  13  ability to carry out those and enforce those ordinances and get

09:58:54  14  people to pay the taxes, that they agreed to pay, and you're

09:58:58  15  undermining the representations that we made to them to pay those

09:59:02  16  taxes, you have hurt our sovereign interest and you've hurt our

09:59:06  17  quasi-sovereign interest.

09:59:07  18         So I think that's why it's important to look at the whole

09:59:09  19  picture and not just focus on this representation that all we did

09:59:13  20  was tweak the rates.  That is wildly inaccurate.

09:59:17  21         THE COURT:  Okay.  The Court appreciates that

09:59:19  22  clarification.  Now, by my count, Ms. Murrill used up about five

09:59:24  23  free minutes.  I'll give you five minutes or what I'd prefer is

09:59:28  24  that we go into the testimony and I promise you'll have time at the

09:59:32  25  end of the day.

09:59:33  1          MR. DESTA:  That works for us.

09:59:34  2          THE COURT:  All right.  All of the preceding time was

09:59:45  3   free or accounted for, so now your two and a half hour clocks

09:59:49  4   start.  Go ahead, Counsel.

09:59:51  5          MR. SHORT:  Good morning, Judge.  Tracy Short from the

09:59:53  6   Louisiana Department of Justice, Office for the Attorney General

09:59:57  7   Jeff Landry.  I am here on behalf of the plaintiffs, and I would

10:00:00  8   offer to put my witness on the stand if the Court pleases.

10:00:04  9          THE COURT:  Yes.  Thank you.  Welcome.  Mr. Tingle, come

10:00:07 10   up and be sworn, please.

10:00:18 11          THE DEPUTY CLERK:  Please raise your right hand.

10:00:18 12      (WHEREUPON, CASEY TINGLE, WAS CALLED AS A WITNESS AND

10:00:18 13       TESTIFIED AS FOLLOWS:)

10:00:28 14          THE DEPUTY CLERK:  Please be seated and state and spell

10:00:29 15   your full name for the record.

10:00:30 16          THE COURT:  Mr. Tingle, while you're doing that.  I am

10:00:32 17   going to ask you, if you could get as much as you're comfortable as

10:00:36 18   close to the desk and microphone, that will help us a lot.

10:00:40 19          THE WITNESS:  Yes, sir.

10:00:40 20          THE COURT:  Thank you.

10:00:41 21          THE WITNESS:  My name is Casey Tingle, C-A-S-E-Y

10:00:46 22   T-I-N-G-L-E, and I am the Director of the Governor's Office of

10:00:49 23   Homeland Security and Emergency Preparedness for the State of

10:00:53 24   Louisiana.

10:00:53 25          MR. SHORT:  May I proceed, your Honor?

10:00:55  1                    THE COURT:  Yes, of course.

10:00:56  2                         DIRECT EXAMINATION

10:00:57  3  BY MR. SHORT:

10:00:58  4  Q.  Thank you.  Thank you, Director Tingle.

10:01:03  5          You referenced the fact that you're the Director of the

10:01:05  6  Governor's Office of the Homeland Security and Emergency

10:01:08  7  Preparedness.  Is that otherwise known as GOHSEP?

10:01:12  8  A.  Yes, sir.

10:01:12  9  Q.  To whom do you report directly in your current role?

10:01:16 10  A.  To the governor.

10:01:17 11  Q.  The governor of Louisiana?

10:01:19 12  A.  That's correct.

10:01:21 13  Q.  How long have you served as director?

10:01:23 14  A.  In an acting capacity I served from October of 2021 to

10:01:29 15  January 2022, and then as the full director since January of 2022.

10:01:36 16  Q.  Prior to your current role as director, and in your role as the

10:01:44 17  deputy director and assistant director in hazard mitigation, have

10:01:49 18  you come to be familiar with the Federal Emergency Management

10:01:53 19  Agency?

10:01:53 20  A.  Yes.

10:01:54 21  Q.  Is that otherwise known as FEMA?

10:01:57 22  A.  That's correct.

10:01:57 23          THE COURT:  Mr. Tingle -- I'm sorry, Mr. Short, can I

10:02:01 24  stop you for just a second.  I have a technical issue.

10:02:58 25          Mr. Short, go ahead, I apologize.

10:03:00  1          MR. SHORT:  Thank you, Judge.

10:03:01  2  BY MR. SHORT:

10:03:02  3  Q.  Director Tingle, do you hold any university degrees?

10:03:04  4  A.  Yes, sir, I have a bachelors degree from LSU in Baton Rouge and

10:03:08  5  a masters degree from New Orleans Baptist Theological Seminary.

10:03:12  6  Q.  Now, as director of GOHSEP, what are your responsibilities?

10:03:15  7  A.  So in short, the responsibilities as director of GOHSEP is to

10:03:23  8  on behalf of the State of Louisiana, our parishes, our

10:03:29  9  municipalities, and our citizens to work with our federal partners

10:03:32  10  and our local partners to prepare for, respond to, recover from,

10:03:37  11  and mitigate from all emergencies.

10:03:39  12  Q.  Would that include natural disasters such as hurricanes and

10:03:44  13  floods?

10:03:44  14  A.  Yes, sir.

10:03:45  15  Q.  Are you the Governor's authorized representative as it relates

10:03:50  16  to FEMA?

10:03:51  17  A.  Yes, sir, for most of the disasters I am.

10:03:53  18  Q.  Can you explain to the Court what that means, what that role is

10:03:57  19  as the governor's authorized representative?

10:03:59  20  A.  So when a disaster declaration is requested by the governor and

10:04:05  21  approved by the president, FEMA and the state execute a document

10:04:10  22  called the FEMA State Agreement that is signed by the governor, and

10:04:15  23  it outlines in that document who the governor's authorized

10:04:19  24  representative would be to sign on the governor's behalf and to

10:04:23  25  execute certain activities on behalf of the State for that

10:04:28  1    disaster.

10:04:28  2    Q.  Do you work closely with FEMA in your role as director?

10:04:35  3    A.  Every day.

10:04:36  4    Q.  Can you explain a little bit what you mean by every day and the

10:04:41  5    nature of that role?

10:04:42  6    A.  Yeah.  So FEMA is a valued partner for the State of Louisiana.

10:04:47  7    We have a number of disaster declarations, I'm sure as everybody is

10:04:51  8    aware, and to prepare for, respond to, and recover from those

10:04:57  9    events we rely heavily on that partnership and we work closely with

10:05:01  10   them to ensure that if the State needs to respond to an event that

10:05:07  11   we have the resources necessary to do so.  But also just as

10:05:11  12   importantly, the ability to execute the FEMA recovery mitigation

10:05:17  13   programs that follow those declarations.

10:05:20  14   Q.  Thank you.  Do you also work with -- closely with the parish

10:05:26  15   and city leaders?

10:05:27  16   A.  We do.  So GOHSEP's primary responsibility and -- or I guess

10:05:32  17   what we would view as our primary customer are our 64 parishes and

10:05:37  18   the municipality and stakeholders they represent.

10:05:40  19   Q.  Does that relate to hazard mitigation and things of that

10:05:44  20   nature?

10:05:45  21   A.  It does.

10:05:45  22   Q.  Now I want to turn a little bit to the National Flood Insurance

10:05:51  23   Program.  Are you familiar with FEMA's National Flood Insurance

10:05:55  24   Program?

10:05:55  25   A.  I am generally familiar, yes.

10:05:56  1    Q.  What is the, as they refer to it, the NFIP to your

10:06:04  2    understanding?

10:06:04  3    A.  So the NFIP is the federal program by which communities choose

10:06:07  4    to participate and pass ordinances to be able to participate so

10:06:15  5    that the NFIP, the FEMA's flood insurance program is available in

10:06:21  6    those jurisdictions.

10:06:23  7    Q.  If they don't participate, are FEMA benefits or FEMA grants and

10:06:29  8    so forth available to them?

10:06:30  9    A.  There are consequences.  So while emergency assistance is

10:06:34 10    generally available to my understanding, the funding and the

10:06:39 11    programs to rebuild after a disaster, to mitigate from flood losses

10:06:46 12    in the Special Flood Hazard Area, those programs are limited if

10:06:52 13    that community chooses not to participate.

10:06:53 14    Q.  When you say limited, meaning they would have limited ability

10:06:56 15    to obtain relief through FEMA?

10:06:58 16    A.  That's correct.  Generally those rebuild-type activities would

10:07:00 17    be ineligible.

10:07:01 18    Q.  Did you prepare a declaration in connection with this lawsuit?

10:07:04 19    A.  Yes, sir.

10:07:07 20    Q.  Director Tingle, I am going to show you a document that's

10:07:13 21    marked Plaintiff's Exhibit 1, and for the Court's benefit it's

10:07:18 22    currently in the record as ECF 1-1, it's attached to the complaint.

10:07:22 23            Director Tingle, do you see that document?

10:07:24 24    A.  Yes, sir.

10:07:24 25    Q.  Do you see it before you there on the monitor?

10:07:26 1    A.  I do.

10:07:27 2    Q.  Do you know what that document is?

10:07:30 3    A.  Yes, sir, that's my declaration.

10:07:33 4    Q.  Are you familiar with that document that you see there before

10:07:38 5    you?

10:07:38 6    A.  Yes, sir.

10:07:38 7    Q.  Can you turn to the last page of that document, Director

10:07:43 8    Tingle, I believe that would be on page 10.  Do you see a signature

10:07:51 9    on that last page?

10:07:51 10   A.  I do.

10:07:52 11   Q.  Whose signature is that?

10:07:53 12   A.  That's my signature.

10:07:56 13        MR. SHORT:  Your Honor, at this time I would offer into

10:07:57 14   evidence Plaintiff's Exhibit 1.

10:08:00 15        THE COURT:  Any objection?

10:08:03 16        MS. PEREZ:  No objection, your Honor.

10:08:04 17        THE COURT:  Let it be admitted.  Plaintiff's Exhibit 1

10:08:07 18   admitted without objection.

10:08:08 19        MR. SHORT:  Thank you, Judge.

10:08:09 20   BY MR. SHORT:

10:08:10 21   Q.  Director Tingle, does Louisiana have a high participation rate

10:08:14 22   in the NFIP relative to other states?

10:08:15 23   A.  That's my understanding is that it does.

10:08:18 24   Q.  Do you know what percentage Louisiana has?  And I'll refer you

10:08:22 25   to your declaration at paragraph 11.

10:08:25  1    A.  So based upon my declaration of the total participants across

10:08:36  2    the country, Louisiana makes up roughly ten percent of that.

10:08:39  3    Q.  Director Tingle, do you know roughly how many NFIP policies are

10:08:49  4    in effect in Louisiana?

10:08:50  5    A.  My understanding is that it is, while I noted here 284,000,

10:08:56  6    I've since come to realize that it's in excess of 400,000 policies.

10:09:01  7    I would say that that number is fluid as policies can be renewed,

10:09:06  8    but is important to this context, policies can also be dropped and

10:09:11  9    that's my understanding of what is happening.

10:09:13  10            THE COURT:  Mr. Short, before your next question.  We're

10:09:16  11   having an issue with our -- the transmission of our realtime

10:09:21  12   transcript, which is not absolutely essential but it's helpful, and

10:09:27  13   to the extent that there's anyone who is using any kind of a WiFi

10:09:33  14   device, I would ask that you try and maybe, unless it's absolutely

10:09:38  15   essential, there's a lot of WiFi going on in the courtroom, that

10:09:42  16   might help us, if you could just sort of the disengage your WiFi

10:09:46  17   unless it's critical to what we're doing.

10:09:48  18            MR. SHORT:  Judge, let me disengage my own WiFi and maybe

10:09:52  19   that'll be helpful.  May I have a moment?

10:09:56  20            THE COURT:  Yes.  We're trying to get to the source of

10:09:58  21   what the issue is.  We get some long freezes.  If you see me

10:10:01  22   looking at the screen, I promise I am not checking my e-mail, I am

10:10:05  23   marking your testimony.  But it's lagging and so it's creating a

10:10:12  24   problem.

10:10:25  25            And I candidly admit that the WiFi may not be the problem

10:10:28  1    at all, but I appreciate everyone trying to help us.

10:10:33  2              MR. SHORT:  Thank you, Judge.  May I proceed?

10:10:35  3              THE COURT:  Yes, please.  Thank you.  And I'm sorry.

10:10:37  4              MR. SHORT:  No, you're certainly -- you're fine.  I

10:10:40  5    appreciate that.

10:10:41  6    BY MR. SHORT:

10:10:43  7    Q.  So, Director Tingle, is it your understanding that Louisiana is

10:10:46  8    prone to flooding?

10:10:47  9    A.  Yes, sir.

10:10:49 10    Q.  And why is that?

10:10:50 11    A.  A variety of factors, some of which I've outlined in my

10:10:56 12    declaration, including our geography, topography, location on the

10:10:59 13    Gulf of Mexico, the number of rivers that drain through the State

10:11:04 14    of Louisiana.  There are a number of reasons that contribute to our

10:11:08 15    flood risk.

10:11:09 16    Q.  Thank you.  What is an NFIP community?

10:11:18 17    A.  So a participating community would be a community, whether it

10:11:23 18    is a municipality, a parish that has done the things necessary to

10:11:29 19    be -- to participate in the NFIP; largely to adopt the ordinances

10:11:34 20    and the requirements that FEMA outlines to participate.

10:11:38 21    Q.  According to your declaration, there are roughly 318 NFIP

10:11:43 22    communities in Louisiana; is that accurate?

10:11:45 23    A.  That's my understanding.

10:11:46 24    Q.  Who establishes the requirements for participation in that

10:11:52 25    community?

10:11:52  1    A.  It's my understanding that those would be FEMA requirements

10:11:56  2    that the community would have to comply with.

10:11:59  3    Q.  Are those mandatory?

10:12:00  4    A.  It's my understanding to be a participating community you would

10:12:04  5    have to comply with those requirements.

10:12:06  6    Q.  Do you know if NFIP communities make certain commitments to

10:12:14  7    FEMA to become a member of the community?

10:12:16  8    A.  It's my understanding that they make those commitments in terms

10:12:21  9    of the ordinances that they passed, and I am not sure what else is

10:12:25  10   involved in that application process, but certainly by way of

10:12:28  11   making those ordinances they are tying themselves to those

10:12:32  12   activities.

10:12:32  13   Q.  Would that also be requirements for floodplain management?

10:12:35  14   A.  That's correct.

10:12:36  15   Q.  And also preparation of the floodplain maps along with FEMA?

10:12:41  16   A.  That's my understanding.

10:12:42  17   Q.  What are the benefits of an NFIP community?

10:12:48  18   A.  So the benefits first and foremost are the opportunity for

10:12:54  19   property owners and renters in that jurisdiction to access federal

10:13:01  20   flood insurance program, as well as we mentioned previously, the

10:13:05  21   grant programs that allow for rebuilding and mitigation after a

10:13:10  22   disaster.

10:13:11  23   Q.  Director Tingle, at page 3, paragraph 20, which I have on the

10:13:16  24   screen here and I think you have before you, I'll just outline

10:13:22  25   that.  You state, "Local governments in Louisiana have undertaken

10:13:30  1   obligations and projects and implemented policies at FEMA's

10:13:34  2   direction so that their communities could purchase NFIP flood

10:13:38  3   insurance."  Do you see that?

10:13:39  4   A.  Yes, sir.

10:13:40  5   Q.  What happens if a community falls out of compliance?

10:13:43  6   A.  It's my understanding that there is a process by which FEMA

10:13:47  7   could sanction that community and then ultimately remove them from

10:13:50  8   the NFIP.

10:13:51  9   Q.  And would that have consequences regarding their availability

10:13:57 10   for other FEMA programs?

10:13:59 11   A.  Yes.  In addition to the lack of flood insurance.

10:14:02 12   Q.  And when I say programs, that would be grants and so forth and

10:14:07 13   disaster recovery type monetary --

10:14:09 14   A.  Yes, sir.  I'm sorry.  It would be my understanding that FEMA

10:14:12 15   public assistance, permanent work funding, as well as Hazard

10:14:17 16   Mitigation Grant Program and other mitigation programs that would

10:14:20 17   address building or rebuilding structures within that community.

10:14:25 18   Q.  So I just mentioned grants, we're going to turn to the grant

10:14:30 19   programs for a moment.  Does FEMA administer a Hazard Mitigation

10:14:36 20   Grant Program?

10:14:36 21   A.  Yes.

10:14:37 22   Q.  In your declaration, Director Tingle, at page 4, paragraph 30,

10:14:46 23   you state, the two most relevant FEMA grant programs related to

10:14:53 24   flood mitigation assistance that GOHSEP administers at the state

10:14:57 25   level, you identify the Flood Mitigation Assistance, which is FMA,

10:15:01  1   along with the Hazard Mitigation Grant Program, the HMGP.  Do you

10:15:06  2   see that?

10:15:06  3   A.  Yes, sir.

10:15:06  4   Q.  Could you briefly explain each of those programs?

10:15:09  5   A.  Certainly.  So the Flood Mitigation Assistance program is an

10:15:14  6   annual grant opportunity that FEMA offers.  It's my understanding

10:15:19  7   that that's an annual appropriation of dollars that is somehow

10:15:26  8   generated from the NFIP.  It is a competitive application process

10:15:29  9   nationwide, and Louisiana often -- communities across Louisiana

10:15:35 10   often submit applications for that annual opportunity.

10:15:39 11          The Hazard Mitigation Grant Program, or HMGP, is the

10:15:44 12   program by which FEMA makes available mitigation funds following a

10:15:48 13   disaster, so those are dollars that are directly associated with a

10:15:52 14   given disaster declaration.

10:15:54 15   Q.  Are those substantial funds, substantial number of dollars?

10:15:58 16   A.  Yes, sir.  So FMA has been increasing over the years and

10:16:03 17   Louisiana has generally been successful in that program.  HMGP

10:16:08 18   because of its post disaster component, we have had disasters that

10:16:13 19   have generated more than a billion dollars I believe in Katrina and

10:16:18 20   generally speaking somewhere in the range of 100 to 200 or 300

10:16:23 21   million depending on the size of the disaster.

10:16:25 22   Q.  Tell me a little bit about FEMA's role in this grant process.

10:16:29 23   A.  So FEMA's role generally is to provide the policies and

10:16:35 24   regulations that we should -- that we have to follow in executing

10:16:38 25   those grant programs.  FEMA will -- retains the authority to

10:16:44  1  approve specific projects.  At that point FEMA then will execute

10:16:53  2  and process the close out process once we have completed an actual

10:16:59  3  project.  And so for the most part, FEMA's involvement is in the

10:17:03  4  front end and the back end.  And once a project has been approved,

10:17:07  5  it's up to the State and the subgrantee then to execute that

10:17:11  6  project.

10:17:11  7  Q.  So that leads me to my next question.  What is GOHSEP's role in

10:17:15  8  administering these grants?

10:17:16  9  A.  So for both of those programs, GOHSEP is the entity that

10:17:20  10  officially submits these projects to FEMA.  We work with our

10:17:25  11  subgrantees, most often our parishes, to develop those

10:17:29  12  applications, to collect the data, and to review the data attached

10:17:34  13  to those applications.  The parishes, generally speaking, are the

10:17:39  14  ones who select which projects will be submitted for that funding

10:17:43  15  and GOHSEP's role is to help them in that process.

10:17:47  16  Q.  Can you briefly describe the grant application process?

10:17:50  17  A.  So when a funding opportunity has been made available, we will

10:17:56  18  announce that to the parishes and let them know generally speaking

10:18:00  19  that the opportunity is there and what the deadlines are that we

10:18:03  20  will be asking them to comply with.  And that application process

10:18:09  21  will differ depending upon what type of project it is, but for a

10:18:12  22  residential elevation type project, that will involve the parish

10:18:17  23  working directly with the property owner to gather certain

10:18:21  24  documentation for their project and then submitting that

10:18:25  25  information to us.

10:18:25  1   Q.  So is it important for you to work closely with FEMA and

10:18:32  2   understand the needs of FEMA in any particular grant program

10:18:35  3   project?

10:18:35  4   A.  Yes, sir.

10:18:36  5   Q.  You mentioned structure elevation.  Is structure elevation a

10:18:43  6   critical part of flood mitigation?

10:18:45  7   A.  It is.

10:18:46  8   Q.  Can you explain briefly?

10:18:47  9   A.  So since at least 2005 but probably before that, and certainly

10:18:53 10   in my time with the agency which dates back to 2009, residential

10:19:00 11   mitigation, meaning either the buyout of a flood-prone property,

10:19:04 12   the elevation of a flood-prone property, or the potential

10:19:08 13   demolition and rebuild to the required height has been one of the

10:19:12 14   most popular types of mitigation that we have seen in the State of

10:19:17 15   Louisiana.

10:19:17 16   Q.  Why is it popular?

10:19:19 17   A.  It's generally popular historically because it was seen as the

10:19:28 18   one way to reduce risks for that particular property and combined

10:19:36 19   with that to lower the flood insurance premium for that property.

10:19:44 20   Q.  Do a substantial number of FEMA grants involve raising a

10:19:48 21   structure above the base flood elevation to avoid flooding?

10:19:52 22   A.  They do for Louisiana.

10:19:53 23   Q.  And why specifically for Louisiana?

10:19:55 24   A.  Generally speaking, because our flood risk is the highest risk

10:20:00 25   that we are working with, and it is the type of project and the

10:20:05  1   type of need that most communities are interested in addressing.

10:20:10  2   Q.  So you alluded to this a little bit, but historically has FEMA

10:20:16  3   incentivized homeowners to elevate their homes?

10:20:21  4   A.  FEMA has certainly I think identified that that is an activity

10:20:27  5   that is eligible for these programs.  They have certainly done

10:20:32  6   their part to streamline policies and guidance to be able to more

10:20:36  7   easily facilitate these projects happening, and historically under

10:20:43  8   the legacy system were discounting rates proportional to the amount

10:20:49  9   of elevation that a property completed.

10:20:51 10   Q.  So you refer to the legacy system.  Can you explain a little

10:20:57 11   bit of what the legacy system means?

10:20:59 12   A.  Certainly.  So I mean by that the rate, the FEMA NFIP rate

10:21:07 13   premium process prior to Risk Rating 2.0.

10:21:10 14   Q.  And I think you referenced the fact that in the legacy system,

10:21:16 15   the elevation was related to or correlated with the flood policy

10:21:23 16   premium; is that right?

10:21:24 17   A.  It's my understanding that the main driver for what a rate

10:21:29 18   would be inside the Special Flood Hazard Area is the height of that

10:21:34 19   structure.  And as such, that is how families making a choice to

10:21:39 20   mitigate, to invest the time and money necessary to complete that

10:21:43 21   project, that is one of the reasons why they would do so.

10:21:45 22   Q.  So fast forward to today under Risk Rating 2.0.  Is that still

10:21:50 23   the case, the elevation correlates with the policy premium?

10:21:56 24   A.  While there are discounts involved in mitigation, I believe

10:22:03 25   that from my understanding and talking to parishes and homeowners,

10:22:09 1    it's the correlation piece that has gone away.  They are no longer

10:22:13 2    able to directly correlate elevation to a certain height with a

10:22:18 3    certain level of discount.  And if they are, it is certainly not

10:22:22 4    the same level of discount as they enjoyed previously.

10:22:25 5    Q.  Do you know if Louisiana has enacted state building codes

10:22:31 6    relative to minimum structural elevation to mitigate flooding?

10:22:34 7    A.  Yes, sir.

10:22:35 8    Q.  Was that based on FEMA guidelines?

10:22:37 9    A.  I think it was certainly based on FEMA guidelines, I think it

10:22:44 10   was based on best practices nationally, and I think it was based on

10:22:48 11   the fact that there is a flood risk in Louisiana to address.

10:22:54 12   Q.  So with regard to these grants -- or do they go to homeowners,

10:23:00 13   business owners, corporations, can you explain who the principle

10:23:04 14   recipient of these grants are?

10:23:06 15   A.  Generally speaking, the parish is going to be working with

10:23:11 16   primarily homeowners for their primary residence, who have an

10:23:17 17   interest in elevating their property.  Most of our coastal

10:23:22 18   parishes, for example, will be maintaining a list of property

10:23:25 19   owners that are interested in those elevation opportunities when

10:23:29 20   they come along.  And when we make a funding announcement, they

10:23:33 21   work through their list.

10:23:35 22   Q.  So, Director Tingle, I am showing on the board or on the screen

10:23:39 23   here, and you probably have it before you, a document that's been

10:23:43 24   previously marked as Plaintiff's Exhibit 2.  Do you see that

10:23:46 25   document?

10:23:46  1    A.  Yes, sir.

10:23:47  2    Q.  Can you read the title of that document?

10:23:49  3    A.  It's the Model Acknowledgment of Conditions for Mitigation of

10:23:53  4    Property in a Special Flood Hazard Area with FEMA Grant Funds.

10:23:58  5    Q.  Do you know what this document is?

10:24:00  6    A.  Yes, sir.  We commonly refer to this as the Model

10:24:02  7    Acknowledgment document that homeowners will be required to fill

10:24:06  8    out.

10:24:06  9    Q.  As a part of the grant process?

10:24:08 10    A.  As a part of the grant process.

10:24:09 11    Q.  Is it a fair and accurate representation of a FEMA grant

10:24:14 12    application that you normally see at GOHSEP?

10:24:16 13    A.  Yes, sir.  For a property that's in the Special Flood Hazard

10:24:20 14    Area, they would be required to submit this document.

10:24:22 15              MR. SHORT:  Your Honor, I offer into evidence Plaintiff's

10:24:26 16    Exhibit 2.

10:24:26 17              THE COURT:  Any objection?

10:24:28 18              MS. PEREZ:  No objection, your Honor.

10:24:29 19              THE COURT:  Let it be admitted.  Plaintiff's Exhibit 2

10:24:30 20    admitted without objection.

10:24:32 21              MR. SHORT:  Thank you, your Honor.

10:24:35 22    BY MR. SHORT:

10:24:36 23    Q.  The language of this document that you see before you, is that

10:24:41 24    required by FEMA?

10:24:42 25    A.  That's my understanding, if the property -- if the project is

10:24:45 1  going to involve properties in the Special Flood Hazard Area.

10:24:49 2  Q.  In this document does FEMA have specific requirements as it

10:24:55 3  relates to flood insurance?

10:24:56 4  A.  Yes, there are.

10:25:00 5  Q.  Let me just see if I can highlight this.  I am just

10:25:07 6  highlighting this area, paragraph one.  Is flood insurance

10:25:11 7  mandatory?

10:25:12 8  A.  If the property is in the Special Flood Hazard Area and it's

10:25:16 9  receiving these federal mitigation funds, flood insurance would be

10:25:21 10 required in the amount of the grant or the maximum coverage,

10:25:26 11 whichever is the least.

10:25:29 12 Q.  Does flood insurance once purchased remain binding for the life

10:25:35 13 of the property?

10:25:36 14 A.  Yes.

10:25:36 15 Q.  Does the requirement to purchase flood insurance run with the

10:25:40 16 deed?

10:25:40 17 A.  That's my understanding is that we would have a deed

10:25:42 18 restriction on that property.

10:25:45 19 Q.  And does that mean if it's -- if it runs with a deed, does that

10:25:50 20 mean in perpetuity?

10:25:51 21 A.  That's my understanding that it would pass from owner to owner

10:25:55 22 that requirement.

10:25:55 23 Q.  So if a homeowner sells the home, is the new purchaser required

10:26:00 24 to purchase flood insurance as a condition of that sale?

10:26:04 25 A.  That would be my understanding.

10:26:07  1   Q.  What happens if the recipient fails to abide with the grant

10:26:11  2   requirements?

10:26:11  3   A.  In a situation where we have closed out the grant, the --

10:26:22  4   FEMA's position has been that -- and our position has been that the

10:26:25  5   requirement lives with that homeowner or that property owner, and

10:26:30  6   should they suffer loss from a future federally declared disaster,

10:26:34  7   they would be deemed non-complaint and ineligible for any future

10:26:38  8   federal funds.

10:26:38  9   Q.  Meaning, if they were the victim of a disaster and they sought

10:26:46 10   to get disaster relief funds through FEMA, they would be ineligible

10:26:50 11   if they didn't comply with the requirements of this document?

10:26:53 12   A.  That's correct.  If their loss was associated with flood, they

10:26:57 13   would be ineligible for federal assistance.

10:26:59 14   Q.  I direct your attention to paragraph four of this document.

10:27:08 15   Paragraph four states, "Failure to abide by the above conditions

10:27:12 16   may prohibit the property owner and/or may -- or any subsequent

10:27:16 17   purchasers from receiving the federal disaster assistance with

10:27:19 18   respect to this property."  Is that what you just testified to?

10:27:22 19   A.  Yes, sir.

10:27:22 20   Q.  It further states, "If the above conditions are not met, FEMA

10:27:27 21   may recoup the amount of the grant award with respect to the

10:27:31 22   subject property and the property owner may be liable to repay such

10:27:34 23   amounts."  Can you explain what that means for the property owner

10:27:38 24   if they fail to comply with this requirement?

10:27:41 25   A.  So based upon the reading of this, it would be indicating to

10:27:46 1   them that those funds could be recouped should they not comply.

10:27:52 2   Q.  And what the does that mean to recoup funds?

10:27:55 3   A.  In the context of the grant, FEMA's position is that the proof

10:28:02 4   of the flood insurance coverage has to be submitted by the State as

10:28:07 5   a part of the close out process for that particular project.  And

10:28:12 6   FEMA's position is that if we do not -- if we've completed all of

10:28:16 7   the other requirements, we've elevated the property, we've got all

10:28:18 8   of the other documentation but we don't have proof of insurance,

10:28:22 9   that they would then de-obligate those funds and the State would be

10:28:27 10  required to repay those funds.

10:28:29 11  Q.  How much of the funds would the State be required to repay?

10:28:33 12  A.  The full amount of the federal grant for that property.

10:28:36 13  Q.  We'll talk a little bit about that in a moment.  But in your

10:28:46 14  declaration you indicate at page 5, paragraph 34, that there are

10:28:52 15  approximately 16,000 structures that have been mitigated through

10:28:56 16  the FMA and HMGP programs?

10:29:00 17  A.  Yes, sir, that's an approximate number.  That's fluid and we

10:29:04 18  continue to do mitigation, so that's our approximate count.

10:29:08 19  Q.  Understood.  But for each of those structures, do they still

10:29:12 20  carry with them mandatory flood insurance requirements?

10:29:14 21  A.  My understanding is the vast majority of these would be in the

10:29:17 22  Special Flood Hazard Area and be subject to those requirements.

10:29:22 23  Q.  Does GOHSEP monitor all 16,000 structures for compliance?

10:29:26 24  A.  Once the grant has closed we do not.

10:29:30 25  Q.  But while the grant is open?

10:29:33  1   A.  While the grant is open we do.

10:29:35  2   Q.  Based on your experience, how long generally do these projects

10:29:44  3   take, some of these grant projects?

10:29:46  4   A.  They can take anywhere from two to eight, nine, ten years to

10:29:53  5   complete depending upon how many properties and the complexities.

10:29:56  6   Q.  Who determines whether a project is completed?

10:30:00  7   A.  So we will determine with our subgrantee that the activities

10:30:08  8   have all been complete and then we work with FEMA to effect the

10:30:12  9   close out of that project, officially closing the project and

10:30:18 10   documenting completeness.

10:30:19 11   Q.  So FEMA approval is the last step for the completion of a

10:30:24 12   project?

10:30:24 13   A.  That's correct.  They retain both the responsibility and

10:30:29 14   authority to approve a project and then to close the project at the

10:30:32 15   end.

10:30:32 16   Q.  Who enforces the FEMA grant requirements you previously

10:30:37 17   referenced?

10:30:37 18   A.  As it relates to the grant close out process?

10:30:42 19   Q.  Yes.

10:30:43 20   A.  So that's -- we work with, our partners at FEMA Region 6.

10:30:47 21   Q.  But that would be GOHSEP working with FEMA; is that right?

10:30:50 22   A.  That's GOHSEP working with FEMA; and if additional

10:30:53 23   documentation is required, working with our subgrantees, our

10:30:57 24   parishes.

10:30:57 25   Q.  So you referenced the close out process.  Can you tell us a

10:31:06  1   little bit about what that is and what it means, what it means to

10:31:10  2   close something out?

10:31:12  3   A.  Yeah, it's generally the least exciting part of the process.

10:31:16  4   So it is just the administrative process to provide the

10:31:20  5   documentation files to FEMA for each of the projects that FEMA

10:31:27  6   would have approved funding for documenting that we have the right

10:31:31  7   level of documentation for invoices and proof of payment and all of

10:31:34  8   those things.  So it's simply the administrative process of

10:31:37  9   documenting the funds were expended on eligible activities and all

10:31:42 10   of the documentation to support that is there.

10:31:44 11   Q.  Thank you, Director Tingle.  I am going to turn now to Risk

10:31:50 12   Rating 2.0.  Are you familiar with this new program?  We referenced

10:31:52 13   it earlier and it's referred to as Risk Rating 2.0 - Equity in

10:31:59 14   Action, and then you also reference in your testimony the legacy

10:32:04 15   system.  Can you just briefly describe what you see is the

10:32:09 16   difference between the first -- the 2.0 and the legacy in brief

10:32:15 17   terms?

10:32:16 18   A.  Sure.  So I am not an insurance expert, but from my practice in

10:32:19 19   talking to parishes and homeowners that worked within our grant

10:32:23 20   programs, the main difference is that under the legacy system, the

10:32:30 21   rate was all about the height of the property, and that under Risk

10:32:36 22   Rating 2.0 there are a variety of factors that come into play and

10:32:40 23   not the same level of transparency as to how those factors work.

10:32:46 24   Q.  Would you consider it a significant change from the legacy

10:32:50 25   method?

10:32:51  1    A.   Based upon the feedback that I have received, yes.

10:32:54  2    Q.   Would you consider it transformational?

10:32:56  3    A.   It's certainly been impactful.

10:33:02  4    Q.   My colleague here on the other side referenced Risk Rating 2.0

10:33:09  5    is just an actuarial rate update.  Do you agree with that?

10:33:14  6    A.   I don't know enough to be able to agree or disagree.  From my

10:33:22  7    perspective, under the legacy system it was very clear and somewhat

10:33:28  8    simple for a homeowner to be able to look at their property and

10:33:33  9    their premium, look at the potential that an elevation grant would

10:33:38 10    hold, and understand the savings that they would receive by

10:33:43 11    elevating the property.  And under the new system, that is not the

10:33:48 12    feedback that we're getting.

10:33:51 13    Q.   You mentioned the lack of transparency in the current Risk

10:33:57 14    Rating 2.0.  And you also just testified that you don't really know

10:34:03 15    about whether it's transformational.  Why don't you know about

10:34:09 16    that?

10:34:09 17    A.   What I know about it is sort of known in the aggregate, that

10:34:14 18    generally speaking that these are now the factors that come into

10:34:18 19    play.  The situations that we deal with and the questions that we

10:34:22 20    face are not in the aggregate, they are at the individual property

10:34:28 21    level.  What will someone who has committed themselves with the

10:34:33 22    documents that we've already referenced to a grant process that

10:34:37 23    will require them to maintain flood insurance, they can't be making

10:34:43 24    those decisions in the aggregate.  They're looking specifically for

10:34:47 25    their individual property.  And oftentimes, at least where we sit

10:34:51  1    today, they made a decision to enter into the grant process under

10:34:56  2    the legacy system with the assumption of what their premium would

10:35:00  3    be.  And now that the grant requirement is kicking in, that premium

10:35:04  4    under Risk Rating 2.0 is different than what they had estimated.

10:35:08  5    Q.  Is there a reason that they don't know what the premium is

10:35:13  6    going to be under Risk Rating 2.0?

10:35:16  7    A.  I would say that what they can't do is estimate in the same way

10:35:24  8    that they could estimate previously.  Under the legacy system, they

10:35:29  9    could generally know, and while I am not the numbers expert here,

10:35:33  10   they could generally know historically that each foot they went

10:35:38  11   above the required height, what the risk -- what the flood

10:35:42  12   insurance premium decrease, savings would be for each foot they

10:35:46  13   went above.  And that math no longer works.

10:35:50  14   Q.  So they don't know whether elevation is going to have an impact

10:35:57  15   on their policy premium under the current Risk Rating 2.0?

10:36:04  16   A.  That's correct.  So while there is a savings -- where there's a

10:36:12  17   mitigation credit involved with the mitigation activity or the

10:36:15  18   elevation, it can't be quantified in the same way that it was

10:36:21  19   quantified previously.  Previously it was simply how high above the

10:36:25  20   required height did you go and the savings associated with that.

10:36:29  21        Under the current system because of the variety of

10:36:31  22   factors that are involved, the math is not that simple and the

10:36:36  23   general guidance is you have to consult an agent to find out what

10:36:41  24   your premium is going to be.

10:36:43  25   Q.  And would an agent simply put the zip code or the address into

10:36:47  1   a database, the FEMA database and printout the policy premium?

10:36:54  2   A.  That's my general understanding, but I don't know very much

10:36:57  3   about the agent's process.

10:36:58  4   Q.  You stated, page 5, paragraph 35 of your declaration, "One

10:37:10  5   parish has stated that approximately 25 percent to 30 percent of

10:37:14  6   homeowners in recently submitted grant applications are now

10:37:16  7   declining mitigation due to the rise in flood insurance costs and

10:37:19  8   the uncertainty of certain factors post mitigation will impact the

10:37:25  9   premium."  Do you see that?

10:37:26  10  A.  Yes, sir.

10:37:31  11  Q.  Which parish are you referring to?

10:37:35  12  A.  I believe that is Plaquemines Parish.  I think it's happening

10:37:40  13  in multiple parishes, but Plaquemines Parish is the most recent

10:37:44  14  example that I can remember.

10:37:45  15  Q.  Is that happening to your knowledge in other parishes?

10:37:48  16  A.  It is.  Perhaps not at the same level, but I think the general

10:37:56  17  consensus that we had about elevation as a mitigation activity has

10:38:01  18  changed across the board.

10:38:02  19  Q.  So at page 6, paragraph 41, you describe a noncompliant

10:38:09  20  homeowner where FEMA is currently in the process of de-obligating

10:38:15  21  $112,300 for one property for which the homeowner is unable to

10:38:20  22  afford the cost of the flood insurance.  Do you see that?

10:38:22  23  A.  Yes, sir.

10:38:23  24  Q.  I am just going to highlight that here.  What do you mean by

10:38:28  25  de-obligating, you referenced it earlier, but what does that

10:38:33  1   process look like as it relates to the funds?

10:38:35  2   A.  That's sort of the technical term in the FEMA grant world, when

10:38:38  3   a project is approved and FEMA makes the funding available to the

10:38:42  4   State to reimburse those costs, that award is called an obligation

10:38:47  5   of funds.  And at close out when we reconcile eligible costs, there

10:38:53  6   can be either an additional obligation or a de-obligation meaning

10:38:58  7   FEMA is taking back funds out of the account for the State to be

10:39:02  8   able to utilize.

10:39:03  9   Q.  Does the State have to pay back the funds that FEMA -- has

10:39:08  10  returned to FEMA?

10:39:08  11  A.  In this scenario that I've highlighted here, yes, because those

10:39:12  12  were funds that were expended by the homeowner, reimbursed by the

10:39:19  13  parish, and then reimbursed by the State to the parish.

10:39:22  14  Q.  So is this the first time or first instances of FEMA seeking to

10:39:26  15  de-obligate funds based solely on the lack of flood insurance at

10:39:30  16  close out?

10:39:31  17  A.  That's my understanding.  While de-obligation is a common

10:39:34  18  activity as a part of the close out process generally, in the

10:39:38  19  specific example of a property that has completed all of the other

10:39:40  20  requirements but is refusing or unable to purchase flood insurance,

10:39:46  21  this is the first or certainly the most recent example that we have

10:39:49  22  of a de-obligation for that.

10:39:51  23  Q.  How much of the $112,300 will Louisiana be required to pay

10:39:58  24  back?

10:39:58  25  A.  It's my understanding we would have repay all of it.

10:40:01  1   Q.  Do you anticipate seeing an increase in FEMA de-obligations

10:40:09  2   because of homeowners cannot afford flood insurance under Risk

10:40:13  3   Rating 2.0?

10:40:13  4   A.  That is the feedback that we're receiving from the parishes.

10:40:17  5   Q.  Do you know how FEMA's risk calculations are determined under

10:40:34  6   Risk Rating 2.0 - Equity in Action?

10:40:36  7   A.  Could you repeat that?

10:40:38  8   Q.  Do you know how FEMA's risk calculations are determined under

10:40:42  9   Risk Rating 2.0 - Equity in Action?

10:40:44 10   A.  I know generally the factors that they use, but I don't know

10:40:51 11   for a specific property how those factors are calculated or

10:40:55 12   utilized.

10:40:56 13   Q.  So at page 9, paragraph 64 of your declaration, we'll put that

10:41:04 14   up on the screen and I'll just highlight that (INDICATING).  You

10:41:09 15   say, "Under Risk Rating 2.0, FEMA calculates rates in a black box

10:41:14 16   making rates unpredictable."  Do you see that?

10:41:17 17   A.  Yes.

10:41:17 18   Q.  What do you mean by that?

10:41:18 19   A.  I mean by that in particular to the grant process that when a

10:41:26 20   grant and funding opportunity is made available to a parish and

10:41:30 21   that parish is sitting down with a family that is, you know,

10:41:35 22   already flooded or looking at their flood risk and wanting to

10:41:39 23   elevate their home, under the legacy system they could do the math

10:41:45 24   and take their current premium, calculate how much their share of a

10:41:50 25   grant would be, understand how many feet they're going to be

10:41:54  1   elevated, and then be able to calculate their flood insurance

10:41:58  2   savings.  And it's my understanding that they can't do that now.

10:42:01  3   Q.  Is it your understanding that the Stafford Act has a cost share

10:42:06  4   component?

10:42:06  5   A.  Yes, sir.

10:42:07  6   Q.  Does it cost the state more in a cost share if people drop out

10:42:15  7   of the flood insurance?

10:42:16  8   A.  So to the extent for like a residential project, typically the

10:42:30  9   homeowner is absorbing the cost share and making that investment

10:42:36  10  for their property.  So if they are choosing not to get flood

10:42:41  11  insurance, it would be minimal risk to the state for that.  If it's

10:42:44  12  another type of project for which there is some sort of a

10:42:48  13  requirement, there could be risks.  But the more concerning part of

10:42:53  14  this is the federal share because those are the funds that we have

10:42:56  15  to pay back.

10:42:57  16  Q.  Have you met with FEMA officials to determine their rating

10:43:02  17  methodology under Risk Rating 2.0?

10:43:03  18  A.  I have participated in a variety of meetings with them.

10:43:06  19  Q.  Did you have any concerns or did you raise any questions about

10:43:11  20  the methodology for Risk Rating 2.0 during those meetings?

10:43:15  21  A.  Yes.  Particular to the grant process because for the reasons

10:43:20  22  that I've already outlined, this is such a significant change to

10:43:26  23  how we have historically managed our grant process, the

10:43:31  24  communication that we have had with homeowners across the State of

10:43:35  25  Louisiana, and the likelihood that families would be interested in

10:43:41 1  a mitigation grant was so tied to the legacy premium process that

10:43:47 2  the lack of clarity that now exists had the, you know, real

10:43:52 3  potential and now the actual potential to change that, and those

10:43:55 4  are some of the concerns that I relayed.

10:43:57 5  Q.  Did you relay those concerns to the FEMA representatives that

10:44:01 6  you met with?

10:44:01 7  A.  Yes, in a number of cases.

10:44:03 8  Q.  Did you ever get a response from FEMA that allayed any of those

10:44:07 9  concerns or explained how FEMA arrives at their calculations to

10:44:15 10 address the concerns you had?

10:44:16 11 A.  The responses that I received were in the most cases just

10:44:21 12 general.  Where we're talking about specific properties with

10:44:25 13 specific elevation heights and the fact that that was changed and

10:44:31 14 how the rates are calculated, I would just say that most of the

10:44:36 15 feedback that I received from FEMA was general in nature.

10:44:38 16 Q.  My colleague on the other side indicated that FEMA has

10:44:42 17 extensively consulted with stakeholders.  Do you feel that FEMA

10:44:47 18 extensively consulted with your office, the parish, or local

10:44:50 19 governments concerning Risk Rating 2.0 and its methodology?

10:44:54 20 A.  So I think we would differ in just the substance of what that

10:44:58 21 engagement looks like.  FEMA has generally always been responsive

10:45:03 22 to questions that we would ask in meetings that we would want to

10:45:06 23 hold and what that interaction has.  But in particular with Risk

10:45:12 24 Rating 2.0, it's the level of granularity and the level of detail

10:45:14 25 that's missing from those conversations.

10:45:22  1   Q.  Thank you.  You state at page 8, paragraph 56 of your

10:45:25  2   declaration, and I am just going to highlight it here on the screen

10:45:29  3   (INDICATING), "These rate increases harm all property owners but

10:45:32  4   they, of course, pose a particular hardship to low and moderate

10:45:37  5   income property owners and their families, many of whom have lived

10:45:40  6   in these areas for generations, and many of whom are racial

10:45:44  7   minorities."  Do you see that?

10:45:45  8   A.  Yes, sir.

10:45:46  9   Q.  Why would Risk Rating 2.0 cause a particular hardship to this

10:45:49 10   segment of property owners?

10:45:51 11   A.  At least in Louisiana our coast is commonly referred to as a

10:45:59 12   working coast.  These are not vacation homes, these are not, you

10:46:05 13   know, mansions on the beach.  These are properties that have been

10:46:09 14   passed down from generation to generation for people that work on

10:46:14 15   the land or in the water and are there because that's where their

10:46:18 16   jobs and that's where their families and that's where they are tied

10:46:22 17   to.

10:46:23 18          It's also true through a number of studies that low to

10:46:28 19   moderate income families are increasingly facing higher flood risk

10:46:32 20   because of where their properties are located, the value of that

10:46:36 21   land, the affordability of that land historically, and so that's

10:46:40 22   why I think this is a particular problem for those types of

10:46:44 23   communities.

10:46:44 24   Q.  Director Tingle, in that same paragraph, I am going to

10:46:50 25   highlight just in the beginning in the middle here with the word

10:46:57  1   "indeed" (INDICATING).  Could you read that sentence beginning with

10:47:00  2   "indeed" in paragraph 56?

10:47:02  3   A.  Sure.  Could you take the highlight off?

10:47:08  4   Q.  Done.

10:47:09  5   A.  Thank you, you got it.

10:47:09  6        "So indeed these rate increases are likely to force many

10:47:12  7   of these property owners and their families out of their homes in

10:47:15  8   these areas and out of -- and perhaps out of Louisiana altogether,

10:47:19  9   thereby threatening the unique communities and cultures that have

10:47:22 10   developed here over the course of generations.

10:47:25 11   Q.  You then refer to that in the next sentence as unjust.  Do you

10:47:30 12   see that?

10:47:30 13   A.  I do.

10:47:30 14   Q.  Why is that unjust?

10:47:32 15   A.  I think this is particularly unjust because the timing of this

10:47:38 16   change on the heels of Hurricane Laura in 2020 and Hurricane Ida in

10:47:47 17   2021, which greatly impacted to the map that was up there

10:47:52 18   previously where the rate increases are the highest, that directly

10:47:55 19   overlays with where those families are recovering from recent

10:47:59 20   hurricanes, and they are facing the prospect of either dropping out

10:48:07 21   of a grant process because they can't afford the flood insurance or

10:48:10 22   opting out of that grant process altogether or not complying with

10:48:14 23   the grant process, and so thereby not being able to access recovery

10:48:20 24   funds, not being compliant with those recovery funds requirements,

10:48:25 25   and I think it's particularly impactful for those communities.

10:48:30  1          MR. SHORT:  Thank you, Director Tingle.  Your Honor, I

10:48:32  2   tender the witness.

10:48:34  3          THE COURT:  All right.  Considering the time and the fact

10:48:38  4   that we don't have a jury or anything, and we've been going for a

10:48:42  5   couple of hours, the Court will take a ten-minute recess and --

10:48:47  6   roughly, and we'll resume and you can take the witness -- maybe one

10:48:53  7   thing to find out is if you have any questions, you don't need to

10:48:55  8   tell me now, but we'll resume at 11:10.

10:49:00  9          Sir, we're going to be at a recess, you can step down.

10:49:04 10   Just remember that you are under oath and have a break.  Thank you.

10:49:10 11          THE DEPUTY CLERK:  All rise.

10:49:24 12       (WHEREUPON, A RECESS WAS TAKEN.)

11:04:52 13       (OPEN COURT.)

11:04:53 14          THE COURT:  Please be seated.

11:04:55 15          THE DEPUTY CLERK:  And, sir, please remember that you

11:04:57 16   still remain under oath.

11:04:58 17          THE WITNESS:  Thank you.

11:04:59 18          THE COURT:  All right.  Cross.

11:05:01 19          MS. PEREZ:  No questions, your Honor.

11:05:03 20          THE COURT:  Okay.  Well, you may step down.  Thank you

11:05:05 21   very much.

11:05:06 22          THE WITNESS:  Thank you.

11:05:11 23          THE COURT:  Your next witness.

11:05:13 24          MS. MURRILL:  Your Honor, our next witness is Matt

11:05:15 25   Jewell.

| | | |
|---|---|---|
| 11:05:18 | 1 | THE COURT:  Mr. Jewell, please come up and be sworn. |
| 11:05:29 | 2 | THE DEPUTY CLERK:  Please raise your right hand. |
| 11:05:30 | 3 | (WHEREUPON, MATTHEW JEWELL, WAS SWORN IN AND TESTIFIED AS |
| 11:05:36 | 4 | FOLLOWS:) |
| 11:05:36 | 5 | THE DEPUTY CLERK:  Please be seated.  And state and spell |
| 11:05:38 | 6 | your full name for the record. |
| 11:05:41 | 7 | THE COURT:  Mr. Jewell, the Court takes judicial notice |
| 11:05:45 | 8 | of the fact that you are a tall man.  Are you comfortable? |
| 11:05:51 | 9 | THE WITNESS:  I'm fine, your Honor. |
| 11:05:52 | 10 | THE COURT:  Okay.  If you could, as much as possible, get |
| 11:05:56 | 11 | close to the microphone for the court reporter, I'd appreciate |
| 11:05:58 | 12 | that.  Thank you.  And if there is, in all seriousness, anything |
| 11:06:01 | 13 | that you need, just we'll do our best to try to fix it. |
| 11:06:04 | 14 | THE WITNESS:  Thank you, your Honor. |
| 11:06:05 | 15 | Matthew Jewell, M-A-T-T-H-E-W J-E-W-E-L-L, St. Charles |
| 11:06:13 | 16 | Parish President. |
| 11:06:15 | 17 | DIRECT EXAMINATION |
| 11:06:15 | 18 | BY MR. REDMON: |
| 11:06:16 | 19 | Q.  Good morning, Mr. Jewell. |
| 11:06:16 | 20 | A.  Good morning. |
| 11:06:16 | 21 | COURT REPORTER:  And your name, sir? |
| 11:06:21 | 22 | MR. REDMON:  My name is Jordan Redmon, J-O-R-D-A-N |
| 11:06:25 | 23 | R-E-D-M-O-N. |
| 11:06:27 | 24 | BY MR. REDMON: |
| 11:06:31 | 25 | Q.  Good morning, Mr. Jewell. |

11:06:33  1   A.  Good morning.

11:06:33  2   Q.  Now, you live with your family in St. Charles Parish; is that

11:06:37  3   correct?

11:06:37  4   A.  That's correct.

11:06:37  5   Q.  How long have y'all lived there?

11:06:40  6   A.  My entire life, so 30 years.  And with my family, you know,

11:06:45  7   past six years.

11:06:46  8   Q.  And has your family been there for generations?

11:06:51  9   A.  My family goes back about ten generations in St. Charles

11:06:55 10   Parish, in the vicinity of St. Charles Parish before it was a

11:06:58 11   parish.

11:06:58 12   Q.  And now what's your position in St. Charles Parish?

11:07:02 13   A.  I am the St. Charles Parish President.

11:07:04 14   Q.  And how long have you been St. Charles Parish President?

11:07:07 15   A.  I've been St. Charles Parish President since January 13th of

11:07:13 16   2020.

11:07:13 17   Q.  Could you tell me a little bit about your duties as St. Charles

11:07:16 18   Parish President?

11:07:16 19   A.  The parish president is the chief executive officer of the

11:07:19 20   parish, they're responsible for carrying out the policies of the

11:07:25 21   parish council, as well as whatever statutory requirements are

11:07:29 22   given to political subdivisions of the state, such as providing

11:07:34 23   infrastructure of roads, drainage, levees, et cetera.

11:07:38 24   Q.  And is it fair to say as parish president that you would be

11:07:43 25   familiar with major issue affecting both your parish and your

11:07:47  1   constituents?

11:07:47  2   A.  That's correct.

11:07:47  3   Q.  And would flooding be one of those issues?

11:07:51  4   A.  Yes.

11:07:52  5   Q.  Flood insurance?

11:07:53  6   A.  Yes.

11:07:54  7   Q.  Flood mitigation projects?

11:07:58  8   A.  Absolutely.

11:07:58  9   Q.  Now, Mr. Jewell, I am going to ask you just a couple of

11:08:03 10   questions about Risk Rating 2.0.  Are you familiar with that?

11:08:07 11   A.  Yes, I am.

11:08:09 12   Q.  And what is Risk Rating 2.0, to the best of your understanding?

11:08:13 13   A.  Risk Rating 2.0 is the new methodology in which FEMA assigns

11:08:21 14   flood insurance premiums to properties in NFIP communities.

11:08:25 15   Q.  Are you aware of whether Risk Rating 2.0 has any -- has had any

11:08:33 16   impact on your parish?

11:08:34 17   A.  I am.

11:08:35 18   Q.  And what impact has it had?

11:08:39 19   A.  We've seen sharp increases in risk -- in NFIP premiums for

11:08:46 20   residents, as well as premiums that are enforced at the parish

11:08:50 21   level for St. Charles Parish buildings.

11:08:52 22   Q.  And how do you know that?

11:08:53 23   A.  Well, have had many conversations with our residents, seen dec

11:08:59 24   pages, have had conversations with agents who are responsible for

11:09:03 25   providing those policies to residents; as well as our own policies,

11:09:10 1   we've seen those increases obviously through our financial and

11:09:14 2   budgetary processes.

11:09:15 3   Q.  Ms. Reed, would you please queue up Exhibit 6, Hearing

11:09:22 4   Exhibit 6, please.

11:09:28 5        Now, Mr. Jewell, on the screen in front of you is a

11:09:30 6   document marked as Hearing Exhibit 6.  Is this a map of your

11:09:37 7   parish?

11:09:37 8   A.  Yes, this is a map by zip code.

11:09:41 9   Q.  And is this -- is this document a true and accurate reflection

11:09:48 10  and your understanding of the average full risk premium rate

11:09:54 11  increases in your parish by zip code under Risk Rating 2.0?

11:09:57 12  A.  It is.

11:10:01 13       MR. REDMON:  Your Honor, I would like to offer, file, and

11:10:03 14  introduce into evidence...

11:10:04 15       THE COURT:  As Exhibit 3?

11:10:06 16       MR. Redmon:  As Exhibit 6, your Honor.

11:10:09 17       THE COURT:  All right.  Any objection?

11:10:10 18       MR. DESTA:  No, your Honor.

11:10:11 19       THE COURT:  Let Exhibit 6 be admitted without objection.

11:10:16 20  BY MR. REDMON:

11:10:19 21  Q.  Now, Mr. Jewell, how do you expect rate increases like the ones

11:10:24 22  shown here to impact your parish?

11:10:27 23  A.  Well, we've already seen an impact from new buildings.  So my

11:10:34 24  understanding is that on October 1st of 2021, the first phase of

11:10:38 25  Risk Rating 2.0 went into effect, which affected all new policies.

11:10:42  1    And as of April 1st of 2022, any policies in force were then under

11:10:50  2    Risk Rating 2.0.  So we've already seen a slow down in areas for

11:10:55  3    new building and we've seen a lot of outcry from our residents as

11:11:00  4    far as what they're seeing as their full risk premiums.

11:11:02  5    Q.  When you say a slow down in new building, can you just

11:11:05  6    elaborate on that a little bit for the Court?

11:11:08  7    A.  Especially in areas that are in X flood zones, building has

11:11:13  8    almost completely stopped; and actually, real estate agents are

11:11:19  9    going through a lot of extreme measures to try to get building to

11:11:23 10    take place within areas that are in X flood zones.

11:11:27 11    Q.  And you mentioned I believe an outcry from residents.  Can you

11:11:32 12    tell us a little bit about that?

11:11:33 13    A.  Yeah.  Well, so they've already seen their 18 percent increase

11:11:38 14    but they've been shown their full risk premium.  For example, we

11:11:45 15    see policies that were previously preferred risk policies that were

11:11:48 16    400 to $500, and under their full risk premium it shows where

11:11:51 17    they're going to be 3,000 and above.  And we've seen policies as

11:11:55 18    high as seven, 8,000, $10,000, depending on where you are located

11:11:59 19    in St. Charles Parish.

11:12:00 20    Q.  And how do you expect these rates to affect residents'

11:12:08 21    decisions to remain in your parish?

11:12:10 22    A.  I would expect that most of them won't be able to afford to

11:12:15 23    remain in St. Charles Parish.

11:12:17 24    Q.  And why is that?

11:12:18 25    A.  Because the rates are unaffordable.  When they get to that full

11:12:24 1    risk premium they're going to be unaffordable.

11:12:26 2    Q.  Will those that decide to remain in your estimation be able to,

11:12:30 3    for example, sell their homes?

11:12:32 4    A.  I think at some point folks will not be able to sell their

11:12:38 5    homes.

11:12:38 6    Q.  Now, Mr. Jewell, I would like to ask you just a couple of

11:12:44 7    questions about your parish's funding of flood mitigation projects.

11:12:50 8    Now, St. Charles Parish does do some flood mitigation projects,

11:12:55 9    correct?

11:12:55 10   A.  Yes.

11:12:56 11   Q.  Could you tell us a little bit about those?

11:12:58 12   A.  So we have -- do a whole host.  We work on building levee

11:13:04 13   protection, we work on building pump stations, conveyances,

11:13:09 14   detention areas, all the way down to the catch basins in front of

11:13:14 15   residents' homes.  So from where rain touches the property all the

11:13:18 16   way to getting it out of the water shed completely.

11:13:21 17   Q.  And how are those projects funded?

11:13:23 18   A.  Levee projects are funded through a levee millage and drainage

11:13:28 19   projects are funded through the general fund and other millages.

11:13:31 20   Q.  Is it a separate fund or is it one -- it's a separate fund?

11:13:37 21   A.  The levee millage is a separate fund, yes, the 2015 millage to

11:13:43 22   build levees.

11:13:44 23   Q.  So there would be another fund for drainage?

11:13:48 24   A.  Yeah.  They are separate as to what we can use those moneys

11:13:53 25   for.  Levee millages are pretty much exclusively for outer flood

11:13:58  1    protection for the parish, and those other moneys are able to take

11:14:03  2    care of the other drainage within St. Charles Parish.

11:14:06  3    Q.  Has the parish ever voted to raise its millage rate to fund a

11:14:14  4    flood mitigation project?

11:14:15  5    A.  Yes.  The entire levee millage was implemented in 2016 but the

11:14:22  6    vote to implement that levee millage was in 2015.

11:14:26  7    Q.  And do you know why that vote to increase the millage passed,

11:14:35  8    are you familiar?

11:14:35  9    A.  Yeah, we were coming off of the heels of the Biggert Waters

11:14:40 10    fiasco where in a similar situation to now residents were seeing

11:14:45 11    enormous increases in flood insurance, and as a result of that, we

11:14:51 12    were told by FEMA if we could achieve hundred-year flood protection

11:14:54 13    or better flood protection that we would see a decrease in our

11:15:00 14    flood risk premiums.

11:15:02 15    Q.  And have you seen a decrease in your flood risk premiums?

11:15:06 16    A.  No.  We've seen sharp increases, under Risk Rating 2.0.

11:15:09 17    Q.  Predictable increases?

11:15:12 18    A.  No.

11:15:13 19    Q.  Mr. Jewell, I would like to ask you just a couple of questions

11:15:23 20    about your parish's flood insurance policies, on parish owned

11:15:28 21    buildings.

11:15:28 22    A.  Sure.

11:15:29 23    Q.  Does your parish have any of those policies?

11:15:32 24    A.  Yes.  We have about I'd say 30 to 35 policies.

11:15:35 25    Q.  Do you know how much coverage?

11:15:39  1    A.  I'm not as familiar with the exact amount of coverage, but I

11:15:43  2    know it's about $100,000 worth of premiums that we have to pay.

11:15:47  3    Q.  Have any of those -- sorry -- buildings with an NFIP policy

11:15:54  4    ever flooded?

11:15:54  5    A.  No.

11:15:55  6    Q.  Have any of those policies come up for renewal under Risk

11:16:01  7    Rating 2.0?

11:16:01  8    A.  Yes.  They're all starting to come up now.

11:16:03  9    Q.  And have the premium rates changed?

11:16:06 10    A.  Yes.

11:16:07 11    Q.  How have they changed?

11:16:10 12    A.  We've seen them increase.

11:16:11 13    Q.  Increase to what extent?

11:16:15 14    A.  Well, every one of them have gone up by at least 18 percent,

11:16:20 15    and to the point where the recommendation by our risk management

11:16:24 16    and financial office is to drop the coverage, drop the policies.

11:16:29 17    Q.  Drop the policies on the buildings that are presently covered

11:16:35 18    by National Flood Insurance policies?

11:16:37 19    A.  That's correct.

11:16:37 20    Q.  And you intend to follow that recommendation?

11:16:43 21    A.  Yes.

11:16:49 22    Q.  President Parish Jewell, I would like to move you just quickly

11:16:51 23    from your flood insurance policies to your parish's participation

11:16:54 24    in the National Flood Insurance Program.  Now, is your parish a

11:16:59 25    participant --

11:16:59 1   A.  Yes, it is.

11:17:00 2   Q.  -- in that program.

11:17:01 3           And what does it mean to be a participant in the National

11:17:05 4   Flood Insurance Program?

11:17:05 5   A.  If you are -- if you pass the required ordinances that FEMA

11:17:11 6   requires, they designate you as an NFIP community, which allows for

11:17:17 7   residents in that community to obtain flood insurance through the

11:17:19 8   NFIP program.

11:17:21 9   Q.  And why is it important to be a member of the NFIP program?

11:17:26 10  A.  If you want to write a mortgage within the parish, you most

11:17:31 11  likely have to have flood insurance on the home.

11:17:34 12  Q.  So without the NFIP program, would people be able to obtain

11:17:41 13  flood insurance in St. Charles Parish?

11:17:42 14  A.  Not to my knowledge, no.

11:17:44 15  Q.  And why is that?

11:17:46 16  A.  Because if you don't follow the rules that the NFIP -- that

11:17:52 17  FEMA sets forth for the NFIP program, you are not allowed to

11:17:56 18  participate.

11:17:56 19  Q.  And how do you know that?

11:17:58 20  A.  That's through conversations with FEMA, we've had several

11:18:04 21  conversations, you know, post Ida and what not on what the

11:18:08 22  requirement is, and it's always, if you don't follow these

11:18:13 23  standards or these rules set forth, that you jeopardize your

11:18:17 24  ability to participate in NFIP.

11:18:19 25  Q.  So is your participation in NFIP voluntary?

11:18:25  1   A.  About as voluntary as paying taxes.

11:18:37  2   Q.  Ms. Reed, would you please queue up Exhibit 7.  Mr. Parish

11:18:56  3   President, on the screen in front of you is a document marked as

11:18:59  4   Hearing Exhibit 7.  Are you familiar with this document?

11:19:03  5   A.  I am.

11:19:03  6   Q.  What is it?

11:19:06  7   A.  This is a letter from FEMA regarding the flood maps in

11:19:12  8   Terrebonne Parish.

11:19:14  9   Q.  Is this document a true and accurate representation of the

11:19:18 10   letter that you did testify that you're familiar with?

11:19:21 11   A.  Yes.

11:19:24 12        MR. REDMON:  Your Honor, I would like to offer,

11:19:27 13   introduce -- offer, file, and introduce this.

11:19:29 14        THE COURT:  As Exhibit?

11:19:31 15        MR. REDMON:  As Exhibit 7.

11:19:32 16        THE COURT:  As Exhibit 7.  Any objection?

11:19:35 17        MR. DESTA:  We'll object just to a lack of foundation as

11:19:38 18   to the witness's knowledge of this letter.  I believe it's

11:19:41 19   addressed to a different parish president.

11:19:43 20        THE COURT:  All right.  I will sustain the objection,

11:19:46 21   subject to follow-up.  Just lay a foundation.

11:19:51 22   BY MR. REDMON:

11:19:53 23   Q.  Mr. Jewell, do you have conversations with other parish

11:20:00 24   presidents?

11:20:01 25   A.  I do.

11:20:01  1    Q.  Do you have conversations about Risk Rating 2.0 with other

11:20:09  2    parish presidents?

11:20:10  3    A.  Many.

11:20:10  4    Q.  Did you become familiar with this letter in the course of

11:20:18  5    those --

11:20:19  6    A.  Not through a conversation, but through the media coverage on

11:20:25  7    this issue.

11:20:30  8              THE COURT:  The Court will allow it.

11:20:33  9              MR. REDMON:  Thank you, your Honor.

11:20:36 10    BY MR. REDMON:

11:20:37 11    Q.  Mr. Jewell, could you please read for me --

11:20:41 12              THE COURT:  Excuse me.  Let's let the record reflect that

11:20:45 13    Exhibit 7 is being admitted.

11:20:50 14    BY MR. REDMON:

11:20:51 15    Q.  Ms. Reed, would you please scroll to the second page.  Now,

11:21:00 16    Mr. Jewell, I wanted to direct your attention, if I could, to the

11:21:04 17    second to last paragraph.

11:21:07 18    A.  Yep.

11:21:08 19    Q.  Could you read for me just that --

11:21:16 20              THE COURT:  Would it be possible just to zoom it in.  I

11:21:24 21    am having trouble, it's a little hard to see.  Oh, great.

11:21:41 22    BY MR. REDMON:

11:21:44 23    Q.  Could you just read for me that paragraph, please, Mr. Jewell?

11:21:49 24    A.  Sure.  "In the event your community does not adopt and/or

11:21:53 25    submit the necessary floodplain management measures that meet or

11:21:57 1  exceed the minimum NFIP requirements, I must take the necessary

11:22:01 2  steps to suspend your community from the NFIP.  This letter is

11:22:05 3  FEMA's final notification before your community is suspended from

11:22:10 4  the program."

11:22:11 5  Q.  And what does this letter tell you about your participation --

11:22:15 6  your parish's participation in the NFIP program?

11:22:19 7  A.  That it's not voluntary.

11:22:26 8  Q.  Now, Mr. Jewell, I would like to direct your attention, just

11:22:32 9  briefly, to conversations with FEMA about Risk Rating 2.0.  Have

11:22:41 10  you ever met with FEMA representatives to discuss Risk Rating 2.0?

11:22:46 11  A.  Yes.

11:22:46 12  Q.  On about how many occasions?

11:22:50 13  A.  I would say about four occasions that we've had conversations

11:22:54 14  either in person or over the phone.

11:22:56 15  Q.  During any of those conversations, did you all discuss

11:23:04 16  St. Charles Parish's levee system?

11:23:08 17  A.  Yes.

11:23:09 18  Q.  And what were the nature of those discussions?

11:23:12 19  A.  We were asking, pretty much from the very beginning, whether or

11:23:18 20  not our levees were being counted, what overtopping rate were they

11:23:24 21  being counted at, what storm frequency were they being counted as,

11:23:29 22  and just general questions about the modeling, as well as raising

11:23:32 23  concerns over the increased rates that we were seeing.

11:23:35 24  Q.  And when you say you discussed your levees being counted, what

11:23:40 25  do you mean?

11:23:41   1    A.   Under the -- under NFIP -- the legacy NFIP system, they only

11:23:51   2    accounted for accredited levees, meaning levees that were built by

11:23:55   3    the Corps or accredited as having a rating -- a designation by the

11:24:01   4    Corps as hundred year, thousand year, whatever frequency that the

11:24:05   5    Corps would designate that as.   Under Risk Rating 2.0, we were told

11:24:09   6    that all levees within our parish would be counted towards the

11:24:13   7    premiums.   And so we wanted to know were they actually accounting

11:24:19   8    for our levees; and if so, what was the information, we asked for

11:24:24   9    that data on several occasions.

11:24:26   10   Q.   And what was the response from --

11:24:28   11   A.   It took a lot of meetings to get that, we finally did receive

11:24:35   12   information on our levees.   And I will speak for St. Charles

11:24:38   13   Parish, we had a lot of missing or incorrect information regarding

11:24:42   14   the levees that were counted.

11:24:44   15   Q.   And did you raise that with FEMA?

11:24:47   16   A.   Yes, we did.

11:24:48   17   Q.   And what response did you receive, if any?

11:24:52   18   A.   Well, they were glad that we were having that conversation at

11:24:55   19   that point in time to know that the information was incorrect, but

11:25:00   20   the problem was that the program was already implemented and so we

11:25:05   21   were already being charged premiums under incorrect information.

11:25:12   22   Q.   Thank you, Mr. Jewell.   Just stepping back to return to

11:25:17   23   something you testified to earlier, I believe.   You mentioned that

11:25:23   24   premiums on parish properties had increased at least 18 percent.

11:25:30   25   What about the average full risk premiums, are you familiar with,

11:25:39  1    you know, what happened with those under Risk Rating 2.0?

11:25:42  2    A.  To my understanding, the full risk premiums pretty much fall in

11:25:46  3    line with that zip code data released by FEMA on average about how

11:25:50  4    much they will increase.  So anywhere from 50 to 100 to 300 percent

11:25:56  5    increases, and that's why the recommendation was given to me to

11:26:00  6    eliminate those policies on buildings that haven't flooded before.

11:26:07  7            MR. REDMON:  Thank you, Mr. Jewell.  Just the Court's

11:26:10  8    indulgence for one second.  No further questions.  We tender the

11:26:24  9    witness, your Honor.

11:26:25  10           THE COURT:  Okay.  Cross?

11:26:26  11           MR. DESTA:  No cross, your Honor.

11:26:28  12           THE COURT:  All right.  Sir, you may step down.

11:26:38  13           Next -- let me do this.  It's 11:35.  Can you guys give

11:26:44  14   me some insight into who we have next, how long?  I would like to

11:26:54  15   go a little longer, but I know we're going to take a lunch break at

11:26:58  16   some point, but I just want to try to manage it in the best way.

11:27:02  17   Any insight you could give me would be helpful.

11:27:06  18           MR. McPHEE:  Good morning, your Honor, I'm Shae McPhee.

11:27:09  19   The next witness is Wendy Thibodeaux, and I don't expect her to

11:27:12  20   take very long.  Probably less time than the previous witness.

11:27:12  21           THE COURT:  All right.  Why don't we obviously start that

11:27:15  22   witness and then we can see how the direct exam goes and make a

11:27:18  23   call at that time.  Okay.

11:27:22  24           MR. McPHEE:  Thank you, your Honor.

11:27:23  25           THE COURT:  Yes, please come up and be sworn.

11:27:40  1          Come on up, Ms. Thibodeaux, just watch your step around

11:27:42  2  there.  And when you get up to the witness chair, Ms. Ancar will

11:27:45  3  swear you in.

11:27:46  4          THE DEPUTY CLERK:  Please raise your right hand.

11:27:48  5      (WHEREUPON, WENDY THIBODEAUX, WAS SWORN IN AND TESTIFIED AS

11:27:53  6      FOLLOWS:)

11:27:53  7          THE DEPUTY CLERK:  Please be seated and state and spell

11:27:55  8  your name for the record.

11:27:56  9          THE WITNESS:  My name is Wendy Thibodeaux, W-E-N-D-Y

11:28:03 10  T-H-I-B-O-D-E-A-U-X.

11:28:08 11                      DIRECT EXAMINATION

11:28:09 12  BY MR. McPHEE:

11:28:10 13  Q.  Good morning.  And I am Shae McPhee, S-H-A-E M-C-P-H-E-E, and I

11:28:17 14  represent the plaintiffs in this matter.

11:28:21 15          Good morning, Ms. Thibodeaux.

11:28:22 16  A.  Good morning.

11:28:23 17  Q.  You live in Lafourche Parish; is that right?

11:28:26 18  A.  I do.

11:28:26 19  Q.  In fact, you're the parish assessor; is that correct?

11:28:30 20  A.  I am.

11:28:30 21  Q.  How long have you been in that job?

11:28:33 22  A.  I have been in the assessor's office for 26 and a half years.

11:28:37 23  I have been the assessor for the last nine.

11:28:40 24  Q.  And were you elected to that position?

11:28:44 25  A.  I was.

11:28:44  1   Q.  And you said you've been in the office for 26 years.  What were

11:28:50  2   you doing before you were the parish assessor, in that office?

11:28:54  3   A.  Before I was in the assessor's office?

11:28:58  4   Q.  Before you were the assessor while you were in the office.

11:29:00  5   A.  Oh, I was the chief deputy before that.

11:29:02  6   Q.  Can you tell me a little bit about your parish, how many people

11:29:11  7   live there?

11:29:11  8   A.  97,000 people.

11:29:13  9   Q.  And can you tell me about your tax base?

11:29:17 10   A.  My tax base, on average we collect around $120 million in ad

11:29:29 11   valorem revenue annually; that's on average, I mean, it goes up and

11:29:32 12   down.  A lot is based on the oil and gas industry, I would say that

11:29:38 13   is the main industry that makes my tax base fluctuate the most.

11:29:43 14   Q.  And can you tell me about that industry, is it important to the

11:29:48 15   parish?

11:29:48 16   A.  It's vital.  We can't survive without it.

11:29:51 17   Q.  Is it important to the state?

11:29:53 18   A.  It's important to the parish, it's important to the state, it's

11:29:57 19   important to the country.  We have Port Fourchon in the southern

11:30:01 20   part of Lafourche Parish, which is the fifth largest port in the

11:30:04 21   United States, which a third of America's oil comes through

11:30:10 22   Lafourche Parish through Port Fourchon.

11:30:13 23   Q.  So you think it's fair to say that y'all are doing important

11:30:16 24   work in that parish?

11:30:17 25   A.  Yes.

11:30:18  1  Q.  Could you please tell me about your responsibilities, what
11:30:22  2  responsibilities do you have as parish assessor?
11:30:25  3  A.  As the assessor it's my responsibility to discover, list, and
11:30:30  4  value all property within the boundaries of Lafourche Parish, be it
11:30:37  5  real property or personal property.  That valuation is part of the
11:30:43  6  calculation for the determination of ad valorem taxes that are
11:30:50  7  collected.
11:30:51  8  Q.  And could you just explain what ad valorem taxes means?
11:30:55  9  A.  Ad valorem is a Latin term that means "according to value."  So
11:30:58 10  I value everything within the parish boundaries in order to put on
11:31:04 11  the tax role and the millages that are determined by the voters in
11:31:08 12  certain districts is multiplied by the taxable assessed value that
11:31:13 13  I get, I determine, and revenue is collected by the sheriff and
11:31:18 14  distributed to the different taxing districts throughout the parish
11:31:22 15  to provide governmental services.
11:31:23 16  Q.  So is one of your responsibilities then assessing the fair
11:31:29 17  market value of the properties in the parish?
11:31:31 18  A.  Yes.
11:31:31 19  Q.  And how often do you do that?
11:31:35 20  A.  I do it every year I reassess personal property, that's by the
11:31:42 21  Louisiana Constitution, and it is mandated that I reassess real
11:31:48 22  property at least once every four years.  I can reassess it every
11:31:54 23  year, but it's mandated that I must do it at least once every four
11:31:59 24  years.
11:31:59 25  Q.  And where are you now in that four-year cycle?

11:32:02  1    A.   This is the last year, next year will be a mandated, state

11:32:06  2    mandated reassessment year so I'll have to reassess property next

11:32:11  3    year, real property next year.

11:32:13  4    Q.   And you touched on this a little bit, but what is that

11:32:16  5    assessment used for specifically?  Sorry.  Once you assess a

11:32:21  6    property, how do you use that assessment?

11:32:26  7    A.   The reassessment is a re-valuation of the property, so once

11:32:31  8    every four years, next year I'll go and take all of the real

11:32:34  9    property within Lafourche Parish and I'll bring it up to market

11:32:37 10    value.  Whatever the market value is for the last four years, I

11:32:41 11    will get an average dollar per square foot in different areas and

11:32:45 12    I'll apply it to all of the property in that area.

11:32:47 13    Q.   Are you aware that FEMA has -- we've heard a lot this morning,

11:32:56 14    but are you aware that FEMA has implemented Equity in Action 2.0?

11:33:03 15    A.   Yes, I am.

11:33:04 16    Q.   Are many properties in Lafourche Parish subject to mandatory

11:33:07 17    flood insurance requirements?

11:33:09 18    A.   Yes.

11:33:09 19    Q.   Have you heard of Equity in Action 2.0 increasing anybody's

11:33:13 20    flood insurance rates in your parish?

11:33:15 21    A.   Yes.

11:33:15 22    Q.   Can you tell me about that, what have you heard?

11:33:18 23    A.   So I've been doing this for a very long time, and, you know,

11:33:22 24    you hear about insurance increases and so forth, especially when

11:33:25 25    the tax bills go out.  But this last year in 2022, when people

11:33:31 1  would come in questioning or complaining about their taxes, part of

11:33:37 2  the argument and the discussion was their increase in flood

11:33:41 3  insurance, the letters that they got, the first round of letters

11:33:44 4  that went out.  And when I started investigating it and people

11:33:48 5  would send me copies of it, I started looking into this, and I

11:33:55 6  became very concerned on the negative impact that it will have on

11:33:59 7  property valuations moving forward, especially in 2024.

11:34:03 8  Q.  Okay.  And just to be very clear, you said that these letters

11:34:07 9  started coming in 2022 and 2023, so very recently?

11:34:11 10  A.  That's when people came to my office with them.  It was for the

11:34:16 11  2022 tax bills.

11:34:17 12  Q.  Okay.  Ms. Reed, would you mind pulling up Exhibit 8.

11:34:30 13       Ms. Thibodeaux, on the screen in front of you, you should

11:34:34 14  see a document marked as hearing Exhibit 8.  Is this a map of your

11:34:38 15  parish?

11:34:38 16  A.  It is.

11:34:38 17  Q.  And does this map reflect your understanding of average premium

11:34:44 18  rate increases in your parish by zip code under Risk Rating 2.0?

11:34:49 19  A.  Yes, it does.

11:34:52 20       MR. McPHEE:  Your Honor, I would like to offer, file, and

11:34:55 21  introduce Exhibit 8 into evidence.

11:34:58 22       THE COURT:  Any objection?

11:35:00 23       MR. TAKEMOTO:  No, your Honor.

11:35:01 24       THE COURT:  Let it be admitted without objection.

11:35:04 25  Exhibit 8 is admitted.

11:35:06  1          MR. McPHEE:  Thank you, your Honor.

11:35:09  2  BY MR. McPHEE:

11:35:10  3  Q.  Ms. Thibodeaux, if a property's flood insurance premium rose

11:35:17  4  752 percent from $513 a year to $6,677 per year, would that lower

11:35:27  5  the property's value?

11:35:29  6  A.  Well, it doesn't automatically lower the property's value just

11:35:33  7  by the insurance.  But what happens is that these people that have

11:35:42  8  federally backed loans, it's required that they have an escrow and

11:35:46  9  these flood insurance premiums are included in their escrows.  When

11:35:51 10  people cannot afford their house notes, it will -- people can

11:35:57 11  either abandon their home, the banks -- they can't afford their

11:36:02 12  house notes so the bank is going to foreclose on the loan, or what

11:36:05 13  I am more afraid of as far as in the capacity of assessor is that

11:36:09 14  the people are going to sell their properties at a less than market

11:36:14 15  value.  They're going to sell it under duress; that if it's

11:36:19 16  $100,000 home so that they don't have bad credit and they don't

11:36:23 17  foreclose on their property, they'll sell it for, say, $50,000 just

11:36:27 18  to get rid of it because they can't afford it.  And if the

11:36:32 19  Louisiana Constitution does not allow me to make any concessions in

11:36:37 20  a reassessment for that depreciation.

11:36:41 21          If I have enough $50,000 sales in an area, that becomes

11:36:45 22  the market and the Constitution requires me to put that on at

11:36:50 23  $50,000.  So what happens is that I'm no longer valuing the

11:36:56 24  $100,000, I am valuing $50,000, which in turn gets these

11:37:02 25  governmental districts, these taxing districts less funding and

11:37:06  1   they have less money and revenue to -- for their budgets to provide

11:37:11  2   governmental services.

11:37:13  3   Q.  And let's just talk about that for a second.  What governmental

11:37:17  4   services?

11:37:17  5   A.  You have police, fire, levee districts, hospitals, schools.  I

11:37:24  6   mean, it's all of my vital governmental services that I fund.  I

11:37:30  7   have 54 different taxing districts in Lafourche Parish.

11:37:34  8   Q.  And based on your understanding of the economic situation of

11:37:40  9   Lafourche Parish, do you think people, say, in zip code 70030 could

11:37:48 10   afford a 752 percent increase in their flood insurance premium?

11:37:54 11   A.  No.

11:37:54 12          MR. TAKEMOTO:  Objection, your Honor, this calls for

11:37:56 13   speculation.

11:37:58 14          THE COURT:  Overruled.  You can answer.

11:38:05 15   BY MR. McPHEE:

11:38:06 16   Q.  You can answer the question.

11:38:07 17   A.  Oh, I'm sorry.  No, I do not believe that they can afford it.

11:38:12 18   Q.  So do you think that those harms to the parish that you were

11:38:15 19   just describing are those speculative?

11:38:17 20   A.  No.  I've been doing this for a very long time, and just --

11:38:24 21   I've been through Katrina, Ida, because I am originally from

11:38:28 22   St. Bernard Parish and I understand how this trickle-down effect

11:38:35 23   happens, whether it's an act of God or an act of man.  The numbers

11:38:40 24   are the numbers.  This isn't an emotional thing, it is data.  And

11:38:44 25   this is what happens when something negatively impacts a tax base,

11:38:50   1   it decreases, there's no way around it.  It's never been any

11:38:55   2   different in my experience.

11:38:57   3   Q.  When people can't afford to pay their house notes, do they ever

11:39:01   4   abandon their properties?

11:39:03   5   A.  Yes.

11:39:03   6   Q.  And how does abandonment affect the parish?

11:39:08   7   A.  Abandonment, when we have abandonment in large numbers like

11:39:15   8   that, it's blighted areas and which draws crime, squatters, so

11:39:22   9   forth.  And the very people the governmental services that this

11:39:26  10   money, this revenue, this ad valorem revenue supports is going to

11:39:32  11   be depleted but we're going to have -- an increase in crime for

11:39:37  12   these blighted areas but yet we're not going to fund the police to

11:39:43  13   take care of the crime.

11:39:47  14   Q.  In your job as assessor, do you monitor whether properties are

11:39:51  15   selling in a particular area?

11:39:53  16   A.  Yes.

11:39:53  17   Q.  And what have you observed with respect to property sales in

11:39:58  18   the last year?

11:39:59  19   A.  So I -- part of my responsibility, I keep in touch with

11:40:04  20   different lending institutions, brokers, contractors just to kind

11:40:10  21   of keep a thumb on the temperature, you know, for my parish.  And

11:40:16  22   speaking to several lending institutions, they have seen out of the

11:40:22  23   applications for new sales, sales of property, whether it be

11:40:27  24   commercial or residential, that the 40 percent of the applications

11:40:32  25   that they get that do not close are directly because of insurance

11:40:37  1    increases.

11:40:40  2    Q.  So is it -- just to recap that, is it fair to say that you're

11:40:44  3    hearing that 40 percent of people who are trying to close on a home

11:40:48  4    back out and the homes don't close --

11:40:49  5    A.  Correct.

11:40:50  6    Q.  -- because of insurance increases?

11:40:52  7    A.  And it caused great concern for me because this is just the

11:40:56  8    first round of letters that went out, increases in premiums, and

11:40:59  9    we're already at 40 percent of new sales.  I'm very concerned about

11:41:03 10    the new sales.  But I'm more concerned about the people that

11:41:08 11    already have mortgages and their incomes are not going to allow for

11:41:13 12    that great of an increase, which is whereby going to trigger the

11:41:19 13    abandonment or the foreclosures.

11:41:22 14    Q.  Have you spoken with other parish assessors about what's

11:41:26 15    happening in Lafourche Parish?

11:41:28 16    A.  Yes.  My immediate assessor, surrounding assessors St. Charles,

11:41:32 17    Terrebonne, and St. Mary; and the lending institutions that I spoke

11:41:36 18    to, they service those same areas that I -- those same parishes

11:41:40 19    that I just listed.

11:41:42 20    Q.  And would you say those other parishes are in a similar

11:41:45 21    situation to Lafourche Parish, are they also suffering?

11:41:47 22    A.  Correct.

11:42:11 23            MR. McPHEE:  No further questions at this time, your

11:42:12 24    Honor.

11:42:12 25            THE COURT:  Any cross?

| | | |
|---|---|---|
| 11:42:13 | 1 | MR. TAKEMOTO:  No, your Honor. |
| 11:42:15 | 2 | THE COURT:  You may step down. |
| 11:42:16 | 3 | THE WITNESS:  Thank you. |
| 11:42:30 | 4 | THE COURT:  Next -- why don't we do this, it's ten to 12. |
| 11:42:35 | 5 | The Court will stand in recess until 1:00 P.M.  Thank you very |
| 11:42:40 | 6 | much. |
| 11:42:40 | 7 | THE DEPUTY CLERK:  All rise. |
| 11:42:43 | 8 | (WHEREUPON, A LUNCH RECESS WAS TAKEN.) |
| 11:42:43 | 9 | |
| 11:42:43 | 10 | P R O C E E D I N G S |
| 11:42:43 | 11 | (AFTERNOON SESSION) |
| 11:42:43 | 12 | |
| 13:03:38 | 13 | (OPEN COURT.) |
| 13:03:38 | 14 | THE COURT:  Please be seated.  So we're going to resume |
| 13:03:42 | 15 | testimony in a moment.  I wanted to just for the good of the order. |
| 13:03:46 | 16 | First, I am going to let my case manager, Ms. Ancar, give everybody |
| 13:03:52 | 17 | an update on where they stand with time, and then I want to sort of |
| 13:03:56 | 18 | just make a statement for the record. |
| 13:03:57 | 19 | THE DEPUTY CLERK:  Sure.  Plaintiff counsel has an hour |
| 13:04:01 | 20 | 12 minutes and 18 seconds left, and defense counsel has not used |
| 13:04:05 | 21 | any of their time on this. |
| 13:04:09 | 22 | THE COURT:  Okay.  So I want everyone to understand that, |
| 13:04:12 | 23 | of course, we are here in a hearing on a preliminary injunction, |
| 13:04:17 | 24 | which is a non-jury proceeding.  We have a lot of evidence that |
| 13:04:22 | 25 | came in without objection, we have numerous filings with exhibits |

13:04:26  1    that are part of the record, we have declarations that are in the

13:04:30  2    record.

13:04:31  3         The Court has made -- I just want to make sure to the

13:04:35  4    extent that people are not familiar with me or just so that

13:04:39  5    everyone would understand, the Court has made a number of

13:04:43  6    evidentiary rulings, a handful, that in all candor in a jury trial

13:04:48  7    might have resulted in a different ruling.  But to the extent that

13:04:52  8    the Court will in rendering a decision on the issues before it pass

13:04:59  9    over the relevance or quality or level of speculation of testimony,

13:05:07 10    the Court is of a mind because of the manner in which the

13:05:13 11    proceeding had gone earlier that it was being perhaps more liberal

13:05:20 12    in the allowing of evidence, and I wouldn't want anyone to get sort

13:05:25 13    of a mis-appreciation of the meaning of that.

13:05:29 14         And so with that, we will proceed.  Ms. Murrill.

13:05:36 15         MS. MURRILL:  Your Honor, if I can just ask for a

13:05:39 16    clarification on that comment.

13:05:41 17         I understand you to be saying that the rules are more lax

13:05:45 18    for the PI hearing, you've made rulings that they may not apply

13:05:49 19    later in the proceedings.  Is that what you mean?

13:05:50 20         THE COURT:  Yes, for example, to be specific, and even

13:05:52 21    these comments are not a ruling, for example, or an indication of

13:05:57 22    what the Court would do.  When there's a question, for example,

13:06:00 23    about whether the parishioners of a parish could afford a certain

13:06:08 24    premium or premium increase and there's an objection to

13:06:12 25    speculation, the Court is familiar with what assessors do, what

13:06:16  1  they know.  I let the witness answer the question.  I might not

13:06:19  2  have in a jury trial, I might have insisted on a tighter

13:06:24  3  foundation.  The other is the document, the letter that the parish

13:06:27  4  president, one parish had, he is the parish president, it's a

13:06:30  5  letter that went to another parish president.  I understand what

13:06:35  6  the intent of the testimony is.  If there were a jury sitting in

13:06:41  7  there, I would have called a tighter game.

13:06:43  8        And I wouldn't want anyone to think that, well,

13:06:47  9  everything is just coming in, it's a free-for-all.  That's not what

13:06:49 10  is happening.  The Court is going to assess all of the evidence

13:06:52 11  later.

13:06:53 12        MS. MURRILL:  Thank you.  And we also understand that

13:06:56 13  this is a streamlined live hearing, that we submitted a substantial

13:07:00 14  amount of support and attached to our motion for preliminary

13:07:04 15  injunction.  I think it's already in the record, but to the extent

13:07:07 16  it's not, we would move that it be placed in the record; but I

13:07:12 17  believe that it is because we filed it attached to our motion for

13:07:15 18  preliminary injunction.

13:07:16 19        And the letter, I mean, President Dove was in the room,

13:07:20 20  we could have brought him.  I think we just know you have limited

13:07:22 21  time for this hearing and we've tried to streamline it.

13:07:25 22        THE COURT:  We are making a record that lays it all out.

13:07:29 23  And, yes, my understanding is everyone's exhibits to their filings

13:07:32 24  in this case form the record of this proceeding.

13:07:34 25        But I just want to be clear so there was no

13:07:37 1    misunderstanding one way or the other.

13:07:41 2                MS. MURRILL:  Yes, sir.

13:07:42 3                THE COURT:  Thank you very much.  All right.

13:07:43 4                MS. MURRILL:  So our next witness is Dwayne Bourgeois.

13:07:46 5                THE COURT:  Please come up and be sworn.

13:08:00 6                THE DEPUTY CLERK:  Please raise your right hand.

13:08:02 7           (WHEREUPON, DWAYNE BOURGEOIS, WAS SWORN IN AND TESTIFIED AS

13:08:08 8           FOLLOWS:)

13:08:08 9                THE DEPUTY CLERK:  Please be seated.  And state and spell

13:08:11 10   your name for the record.

13:08:12 11               THE WITNESS:  My name is Dwayne Bourgeois, D-W-A-Y-N-E

13:08:19 12   B-O-U-R-G-E-O-I-S.  I am the executive director for the North

13:08:26 13   Lafourche Levee District.

13:08:28 14               THE COURT:  Counsel, before you make your appearance and

13:08:31 15   begin.  By the same token, please don't let the prior statement

13:08:35 16   mean that you shouldn't make objections.  Please continue to make

13:08:40 17   objections that you deem appropriate.  Thank you.

13:08:44 18               MR. HETZEL:  Thank you.  I am Jeff Hetzel, J-E-F-F

13:08:48 19   H-E-T-Z-E-L.

13:08:50 20                          DIRECT EXAMINATION

13:08:50 21   BY MR. HETZEL:

13:08:51 22   Q.  Mr. Bourgeois, you mentioned that you were the executive

13:08:53 23   director of the North Lafourche Levee District.  Can I call it the

13:08:57 24   Levee District?

13:08:57 25   A.  Please.

13:08:57 1    Q.  And what kind of legal entity is the levee district?

13:09:01 2    A.  It's a political subdivision of the State of Louisiana.

13:09:03 3    Q.  And just very briefly, what does a levee district do?

13:09:06 4    A.  It is charged with flood protection and drainage, taking flood

13:09:11 5    protection and drainage measures within the jurisdictional

13:09:15 6    boundaries of the levee district.

13:09:16 7    Q.  Can you give us an example of the kind of project it would do?

13:09:19 8    A.  Really it's limited to three types of projects:  We would build

13:09:22 9    or improve levees, we would build pump stations or improve pump

13:09:26 10   stations, and drainage channels leading to and from and outside of

13:09:32 11   the levee systems throughout to improve those for better conveyance

13:09:37 12   of water.

13:09:37 13   Q.  And can you give us a brief sense of the system of levees in

13:09:41 14   your district?

13:09:42 15   A.  We have about 200 miles of levees in total, in aggregate that

13:09:49 16   consists of a number of forced drainage areas, which are rain

13:09:54 17   levees or levees that return to high ground to isolate storm water.

13:09:58 18   Q.  And how long have you been the executive director?

13:10:00 19   A.  Since March 1st of 2010.

13:10:04 20          MR. HETZEL:  I would like to introduce as Exhibit 3 your

13:10:08 21   declaration on behalf of North Lafourche Conservation Levee and

13:10:11 22   Drainage District.  This is in the record at ECF 1-36.

13:10:16 23          THE COURT:  Any objection?

13:10:18 24          MS. PEREZ:  No objection.

13:10:18 25          THE COURT:  It's already in the record, but do you want

13:10:22  1   to introduce it again?

13:10:24  2              MR. HETZEL:  Yes, your Honor.

13:10:25  3              THE COURT:  Let it be admitted.

13:10:27  4              MR. HETZEL:  Thank you.

13:10:29  5   BY MR. HETZEL:

13:10:29  6   Q.  On paragraph 10 in this declaration you say that decades of the

13:10:36  7   levee district's flood mitigation projects and efforts have

13:10:40  8   successfully reduced flooding for all but the most extraordinary

13:10:43  9   events.  Briefly can you tell us about those projects and efforts?

13:10:46  10  A.  Right.  Basically we go through a process where we determine

13:10:51  11  where our weakest link is, if you will, and we do things to either

13:10:56  12  fortify the flood protection in those areas.  And we've been fairly

13:11:00  13  successful, we have not had regular flooding throughout the

13:11:03  14  district except for extraordinary events.

13:11:05  15  Q.  And can you tell us how you know that you've been successful in

13:11:08  16  the last 15, 20 years?

13:11:10  17  A.  Mother nature has tested us.  Most recently Hurricane Ida,

13:11:15  18  very, very large storm, put extraordinary storm surge on to

13:11:21  19  portions of our district.  A couple of areas were overwhelmed, the

13:11:26  20  levees didn't fail, but the storm surge was of sufficient height

13:11:31  21  that it topped the levees for awhile and caused some flooding.  At

13:11:35  22  the same time that same storm surge on other levees that were

13:11:38  23  different elevations prevented and held back that storm surge.  And

13:11:42  24  so largely, we don't see flooding in our district except for those

13:11:46  25  extreme events.

13:11:47  1   Q.  And in paragraph 11 you talk a little bit about Hurricane Rita

13:11:52  2   and Hurricane Barry and kind of what you learned from those two

13:11:55  3   events.  Can you tell us a little more about that?

13:11:58  4   A.  Yeah.  I think the purpose of that in the declaration was to

13:12:01  5   point out that even if you don't have the perfect levee, what you

13:12:07  6   do have makes a difference.  And we've seen it historically, in

13:12:12  7   2005 Hurricane Rita made landfall about 250 miles to our west, but

13:12:17  8   it put a 9 1/2 foot storm surge on lower Terrebonne and lower

13:12:21  9   Lafourche.  And in 2005, we didn't have the levee systems we have

13:12:24 10   in place at this time.  11,000 homes flooded in that event.

13:12:30 11          Fast forward to 2019 where we made some improvements to

13:12:34 12   these levees, it's not where we want them yet but it was

13:12:37 13   substantial improvements, and Hurricane Barry comes along and it's

13:12:41 14   more of a direct hit for us, it winds up putting the same

13:12:46 15   9 1/2-foot storm surge in lower Lafourche and Terrebonne Parishes;

13:12:50 16   and in this case, we only flood 11 homes.

13:12:52 17          The point is, levees, all levees have an impact on

13:12:56 18   flooding that we would like to have recognized.

13:12:59 19   Q.  So same storm surge and you reduced the number of flooded homes

13:13:05 20   by about 1,000 times; is that right?

13:13:07 21   A.  1,000 percent.

13:13:08 22   Q.  In paragraph 12 of your declaration you say that now FEMA does

13:13:14 23   not have sufficient information to analyze the impact on your

13:13:18 24   levees and setting rates for their new rating methodology Risk

13:13:26 25   Rating 2.0.  What do you mean by this?

13:13:27  1   A.  Well, that's what they had indicated to us.

13:13:29  2   Q.  And tell me about how you learned that?

13:13:30  3   A.  Well, we were able to get a conversation between, it was a Zoom

13:13:34  4   call actually between myself and Parish President Archie Chaisson,

13:13:39  5   and Andy Neal, who is FEMA's chief actuary, and Susan Vamire

13:13:45  6   (PHONETIC), who is in the engineering section in Risk Rating 2.0.

13:13:48  7   And we had a call where the single question to be answered by FEMA

13:13:53  8   was, what -- how did FEMA consider the impacts of the levees in

13:13:57  9   Lafourche Parish on setting the rates in Risk Rating 2.0.

13:14:03 10        And from that conversation, the short answer is they

13:14:07 11   thought we were in the National Levee Database because they saw it

13:14:10 12   listed in there.  That was only a line on the map, there was no

13:14:13 13   geotechnical, no cross-sectional, no elevation data, but something

13:14:17 14   we put in for another FEMA mapping process called LAMP.  Then they

13:14:22 15   thought they would see our levees through Lidar when they found out

13:14:27 16   that it wasn't through -- that's L-I-D-A-R -- that's when they

13:14:31 17   found out it wasn't through the National Levee Database, and we

13:14:37 18   pointed out that the Lidar they used had insufficient resolution to

13:14:41 19   see some of our levees.

13:14:43 20        And they basically circled back to something similar that

13:14:47 21   was said by Parish President Jewell that, well, we're glad to hear

13:14:52 22   that, you know, we're having this conversation so that you can

13:14:55 23   point out where the information is missing.  And if we can get that

13:14:58 24   information in the future, we might be able to change your rates,

13:15:02 25   but we were already under Risk Rating 2.0 for new structures at

13:15:09  1   that time.

13:15:09  2   Q.  Okay.  So just breaking that down a little bit.  They mentioned

13:15:12  3   two things:  A database and a Lidar system that they thought should

13:15:18  4   have accounted for the levees, and it turned out that --

13:15:21  5   A.  Right.  The National Levee Database is a database held by the

13:15:26  6   U.S. Army Corps of Engineers.  It's a laudable purpose, it is to

13:15:30  7   try to catalog all of the levees in the nation.  Unfortunately it's

13:15:33  8   incomplete.  And in the ones that like FEMA admits in the

13:15:40  9   methodology document that for only 42 percent of the levees in the

13:15:43  10  National Levee Database, which is in itself incomplete, did they

13:15:46  11  have the five points of information they need to analyze the

13:15:51  12  propagation of water across these levees.

13:15:54  13        And so ours were in there, again, because we put them in

13:15:58  14  there for the LAMP process, but it was just to delineate the forced

13:16:02  15  drainage areas, which was needed in the levee analysis mapping

13:16:08  16  procedure so that those folks could at Region 6, who were working

13:16:11  17  on the flood insurance study for Lafourche Parish, could identify

13:16:15  18  those levees.

13:16:17  19  Q.  And then the Lidar also didn't account for your levees?

13:16:20  20  A.  The Lidar was just insufficient resolution.  The National

13:16:24  21  Elevation Data set Lidar, the USGS NED Lidar has a three-meter

13:16:29  22  resolution, so for every three meters by three meters, they return

13:16:32  23  only one averaged elevation point.  And so we could have, as I

13:16:37  24  pointed out, a 28-foot flood wall and it would not be seen by this

13:16:43  25  system.  So you can't basically assess our levees from those

13:16:47  1    processes.

13:16:47  2    Q.  Because your flood wall might be fewer than three meters in

13:16:51  3    length?

13:16:51  4    A.  Yeah, it could be three-feet wide.  Even such our levees would

13:16:56  5    have maybe two points across it, not enough to truly analyze it.

13:16:59  6    Q.  And so the Risk Rating 2.0 system is not taking into account

13:17:02  7    your levees?

13:17:03  8    A.  According to them.

13:17:04  9    Q.  And before Risk Rating 2.0, did the NFED program take into

13:17:16 10    account your levees?

13:17:17 11    A.  Well, not initially.  We first got into revised mapping in

13:17:22 12    Lafourche Parish in 2008, and we found that things weren't exactly

13:17:28 13    making sense.  And when we didn't have maps that made sense, the

13:17:32 14    people would question it, they wouldn't buy flood insurance, they

13:17:35 15    would have lack of faith in the program.  So we talked about why

13:17:38 16    they didn't make sense through this -- FEMA's process for flood

13:17:42 17    insurance study, which is collaborative and appealable and we can

13:17:45 18    work through things, and we found that they were not taking into

13:17:48 19    consideration levees that were not certified to 44 CFR 6510.  Our

13:17:54 20    levees, a lot of levees weren't, but in fact they do have an

13:17:58 21    impact.

13:17:58 22         So Congress pressured FEMA to change that, and FEMA in

13:18:04 23    2011 agreed they would develop a process called the Levee Analysis

13:18:08 24    Mapping Procedure, LAMP, that would take into account unaccredited

13:18:15 25    levees in their flood insurance study.  And they started that in

13:18:19  1    2013.  And in Lafourche Parish, we're actually still working

13:18:22  2    through that process today, but it seems like it is doing something

13:18:27  3    to change its base flood elevations throughout the district, and

13:18:30  4    the parish for that matter, that were beneficial to us and it was

13:18:33  5    that.  That's different than what we're seeing in Risk Rating 2.0.

13:18:40  6    Q.  And what are the rate increases in your district as a result of

13:18:43  7    Risk Rating 2.0?

13:18:44  8    A.  I think the parish average was 321 percent increases.  In our

13:18:49  9    district, I don't know what the specific average is, but we make up

13:18:53  10   a large portion of the parish.

13:18:55  11   Q.  You might have heard a previous witness, President Matt Jewell

13:19:06  12   mention the Biggert Waters fiasco.  Can you tell us a little bit

13:19:08  13   more about that?

13:19:08  14   A.  Yeah.  Well, I was actually very much involved in the flood

13:19:11  15   insurance program, the mapping efforts, and in 2012 I was actually

13:19:15  16   called to testify before I believe it was Senate Banking hearing

13:19:18  17   about the re-authorization of the flood insurance program in 2012.

13:19:23  18   That became Biggert Waters 2012.

13:19:26  19            And FEMA found afterwards that there were some, quote

13:19:30  20   unquote, unintended consequences in that program that caused the

13:19:33  21   rates to skyrocket.  And from that point, the other things that

13:19:40  22   they did in that language was done in that language Biggert Waters

13:19:44  23   2012 was killing grandfathering and that was a very important thing

13:19:49  24   for our parish and most of South Louisiana.

13:19:51  25   Q.  And what's grandfathering?

13:19:52  1   A.  So grandfathering is a policy that FEMA put in place a long,

13:19:57  2   long time ago that allows a person whose been in the flood

13:20:02  3   insurance program for years and finds themselves newly mapped,

13:20:07  4   meaning there's a new set of maps coming in, and they find

13:20:09  5   themselves below the base flood elevation that's set on those maps,

13:20:13  6   they're able to maintain their insurance at a rate that was based

13:20:16  7   off of how they were mapped initially when they made this very

13:20:20  8   large investment in their home.

13:20:22  9          That was fair and I think it was a good policy because it

13:20:26  10  also preserved the value of the home because the homeowner could

13:20:31  11  sell this home and the policy would transfer to the new owner but

13:20:38  12  would still be rated at the maps, based on the maps that were

13:20:41  13  presented at the time that they were building their home.

13:20:47  14         So Biggert Waters '12 reversed that in forcing FEMA to

13:20:54  15  not do some of the cross-subsides and discounts that they did

13:20:59  16  across certain rate classes, and that had some immediate impacts

13:21:03  17  that threw the rates straight up as well.

13:21:06  18  Q.  And then did things get better again after Biggert Waters and

13:21:09  19  before Risk Rating 2.0?

13:21:12  20  A.  Right.  I worked very closely with our legislative delegation

13:21:14  21  on the language for what was eventually became the Homeowner's

13:21:15  22  Flood Insurance Affordability Act in 2014.  That Act basically

13:21:20  23  didn't change the ultimate rates that FEMA was going towards, but

13:21:25  24  it reversed the grandfathering, it reversed the language that

13:21:31  25  killed grandfathering.  And so FEMA continued to do grandfathering

13:21:35  1   from that point up until Risk Rating 2.0.

13:21:38  2           It also put on the 18 percent per year statutory limit

13:21:44  3   for the increased costs of flood insurance that has been mentioned

13:21:50  4   several times today.

13:21:51  5   Q.  How does Risk Rating 2.0 hurt floodplain management as a whole?

13:21:58  6   A.  Well, I think the biggest thing it hurts is we're sitting here

13:22:03  7   as a parish, not necessarily the levee district but the parish is

13:22:06  8   actually the flood insurance community, they're trying to get

13:22:10  9   everyone to understand and buy flood insurance and understand the

13:22:15 10   benefits of flood insurance, as is the levee district.  The

13:22:19 11   program's been very successful in those regards as a program.  And

13:22:24 12   when mapping doesn't make sense, then it reduces the constituents'

13:22:30 13   ability to have faith in the maps.  This isn't right, why should I

13:22:34 14   buy flood insurance?

13:22:35 15   Q.  When you say mapping doesn't make sense, you mean like if a

13:22:38 16   levee isn't taken account for anymore?

13:22:40 17   A.  The flood insurance maps do not correlate to real world

13:22:45 18   features.  Again, through the process we've been doing, appealable

13:22:49 19   collaborative, the maps were looking a lot better in Lafourche

13:22:52 20   Parish than they were before that process, so through LAMP and the

13:22:56 21   flood insurance study.

13:22:56 22   Q.  Just for context here, the appealable collaborative process

13:22:59 23   you're talking about was the process that was in place in the years

13:23:03 24   before Risk Rating 2.0?

13:23:05 25   A.  Right.  And the basis for setting rates under what we've been

13:23:10  1    calling the legacy method here is tied to the elevations that are

13:23:13  2    determined in the map.  The old quid pro quo is simple:  You build

13:23:17  3    above the base flood level elevation that FEMA has told you was

13:23:21  4    represents the one percent annual exceedance probability for a

13:23:23  5    flood event, and you'll have mitigated FEMA's risk of paying a

13:23:29  6    flood claim to you, therefore, you buy a good rate.  We're not

13:23:33  7    seeing that under Risk Rating 2.0 for whatever reason.

13:23:36  8    Q.  If FEMA put Risk Rating 2.0 through notice and comment, would

13:23:39  9    the district have commented?

13:23:40 10    A.  Absolutely.  We commented a whole bunch of things through this

13:23:43 11    whole process.  FEMA put a pretty big effort into public outreach,

13:23:50 12    but what we found in every bit of that public outreach was they did

13:23:55 13    a really good job of telling us what they did, but for a person

13:23:59 14    like us, they didn't go into the details of how they did that,

13:24:02 15    right.

13:24:03 16    Q.  So can you just tell us maybe just one or two of the things

13:24:06 17    that you would have commented if you had an opportunity to comment?

13:24:09 18            MS. PEREZ:  Objection, speculation.

13:24:10 19            THE COURT:  Overruled, go ahead.

13:24:15 20            THE WITNESS:  Well, obviously the question of how they

13:24:18 21    treat levees, right.  There's documents that they eventually did

13:24:22 22    put out.  We were actually always expecting this to go before rule

13:24:26 23    making just because we kind of thought it would.  But the documents

13:24:30 24    they put out, the methodology document and the document on levees

13:24:35 25    raised as many questions as it answered to us.  And so we would

13:24:38  1   have asked a ton of questions related to exactly how they treated

13:24:42  2   levees.

13:24:43  3           They mentioned in the methodology document that as

13:24:46  4   compared to other areas, their catastrophe models where they maybe

13:24:50  5   ran up to five models in some places, they could only run one in

13:24:54  6   the levee areas.  So those are things that we would have certainly

13:24:58  7   have questioned.  We would have questioned the reasoning behind

13:25:01  8   grandfathering as well, why kill grandfathering as a function of

13:25:05  9   Risk Rating 2.0.

13:25:08 10   Q.  And did you learn in those meetings after Risk Rating 2.0 went

13:25:15 11   into effect that they were not aware of your points about their

13:25:19 12   levee methodology that you would have brought to their attention?

13:25:20 13   A.  Well, they indicated that where they thought the levees were

13:25:25 14   reflected in the National Levee Database, they, in fact, weren't.

13:25:28 15   They thought that they could pick up our levees with sufficient

13:25:31 16   resolution through Lidar and we --

13:25:32 17           THE COURT:  Stop.  Go ahead, I'm sorry.

13:25:32 18           MS. PEREZ:  Objection, that it is speculation, the

13:25:37 19   answer, your Honor.

13:25:38 20           THE COURT:  I am going to sustain that, because -- well,

13:25:43 21   sustained.  Try and phrase it another way.

13:25:48 22   BY MR. HETZEL:

13:25:48 23   Q.  At what point did you have that conversation with FEMA about

13:25:51 24   what they understood about their levee methodology?

13:25:53 25   A.  I want to say it was in the summer of '22, August, September

13:25:59  1   time frame.

13:26:00  2   Q.  That's all I need.  Did you also submit a personal declaration

13:26:06  3   in this case?

13:26:06  4   A.  I did.

13:26:08  5           MR. HETZEL:  Can we bring up Exhibit 4.  This is already

13:26:14  6   in the record at ECF 1-56, we would like to move it into evidence

13:26:19  7   so we can display it on the projector.

13:26:23  8           MS. PEREZ:  No objection, your Honor.

13:26:23  9           THE COURT:  Thank you, let it be admitted.

13:26:23 10   BY MR. HETZEL:

13:26:29 11   Q.  Do you personally have an NFIP policy?

13:26:31 12   A.  I do.

13:26:32 13   Q.  In paragraph 29 of your declaration you say that under Risk

13:26:44 14   Rating 2.0 you were told that your next annual premium would be

13:26:48 15   $592.  What was your previous annual premium?

13:26:51 16   A.  Well, the time that this declaration was written, our previous

13:26:54 17   policy was $493 a year, and when I wrote this declaration we were

13:27:01 18   told that the next premium would be $592, 20.1 percent overall

13:27:08 19   increase in the policy.  I've since got another one, but that's the

13:27:11 20   answer to this question.

13:27:12 21   Q.  And about how much had your premiums been increasing per year

13:27:15 22   before that?

13:27:16 23   A.  Well, we started -- we've had it since I've owned the house in

13:27:21 24   1995, we started in the $400 range, and it was slightly increasing

13:27:25 25   year to year.  I would have expected under the old system of rating

13:27:30  1    that it would have been about $520 a year, but that's just a guess.

13:27:37  2    Q.  In paragraph 30 of this declaration you mentioned the full risk

13:27:41  3    premium.  What's that?

13:27:43  4    A.  So once you've received a renewal notice, at least that's how

13:27:48  5    it works for the insurance company that we work with, you receive a

13:27:51  6    few weeks later a declaration page.  And on that declaration page

13:27:55  7    is the first time you'll get to see what your full risk premium was

13:28:00  8    calculated at under Risk Rating 2.0.

13:28:03  9            In my case, the full risk premium was calculated as

13:28:07 10    $1,968 per year.  The thing that stops me from having to pay that

13:28:13 11    immediately is a substantial annual increase cap discount.  So

13:28:16 12    we've got that 18 percent per year cap and, therefore, that becomes

13:28:22 13    a deducted figure that eventually will go to zero; but right now it

13:28:27 14    was a pretty substantial discount.  So that's what got us to the

13:28:31 15    $592.

13:28:31 16    Q.  You mean the deduction will go to zero, which means your

13:28:35 17    premium will go up?

13:28:36 18    A.  Correct.

13:28:37 19    Q.  Why do you have an NFIP policy?

13:28:40 20    A.  Well, I don't feel that I have a risk of flooding.  In my role

13:28:45 21    as the director for the Levee District, I feel it's very important

13:28:48 22    for everybody to buy flood insurance.  Initially I bought it

13:28:53 23    because it was a good value, it wasn't very expensive at all, I

13:28:56 24    treated it like a rider.  But I also wanted to use it to convey to

13:29:01 25    others who I am encouraging to buy flood insurance to buy flood

13:29:05  1    insurance, and so basically to send a message.

13:29:08  2    Q.  How long have you lived at your home?

13:29:09  3    A.  So since 1995.

13:29:13  4    Q.  And did you have NFIP insurance even before you were in this

13:29:16  5    role?

13:29:17  6    A.  Yes.  I didn't start until 2010, so I had flood insurance from

13:29:22  7    the very beginning.

13:29:23  8    Q.  And you've maintained it the entire time?

13:29:25  9    A.  Yes.

13:29:25  10   Q.  Have you ever had a flood event on your property?

13:29:28  11   A.  No, I have not.  And the home was built in 1935, so that's like

13:29:33  12   88 years old and we've never -- the home has never had a flood.

13:29:44  13              MR. HETZEL:  I would like to mark as Exhibit 5

13:29:48  14   Mr. Bourgeois's personal 2023 renewal notice.

13:29:51  15              THE COURT:  Any objection?

13:29:52  16              MS. PEREZ:  No objection, your Honor.

13:29:54  17              THE COURT:  Let it be admitted as Exhibit No. 5.

13:30:00  18   BY MR. HETZEL:

13:30:01  19   Q.  What is this document?

13:30:02  20   A.  I am trying to figure out -- this is very small.  So this was

13:30:08  21   the renewal for -- that became effective 10/29/2022.

13:30:15  22   Q.  And what's the renewal date on this notice?

13:30:18  23   A.  Well, that would be the renewal.  It's effective from

13:30:24  24   10/29/2022 till 10/29/2023.

13:30:27  25   Q.  And is this what you get every year, do you get one of these?

13:30:33  1    A.  Yes.

13:30:33  2    Q.  And if the rates are frozen, what would you do with your flood

13:30:37  3    insurance policy for the upcoming year?

13:30:39  4    A.  I think we've pretty much reached our limit as to how much

13:30:42  5    we're willing to put in it.  I didn't get to mention it, but my

13:30:47  6    particular property is not in a Special Flood Hazard Area, it is

13:30:52  7    not in the one percent area, it is not in the .2 percent or

13:30:57  8    500-year floodplain.  It's Zone C so there is absolutely no

13:31:01  9    requirement for me to purchase it.

13:31:03 10            In the new maps, it will be a Zone X unshaded because

13:31:07 11    FEMA in their flood insurance study have indicated that it is of a

13:31:11 12    very, very low risk of flooding.

13:31:12 13    Q.  So if the rates were frozen, would you renew or not?

13:31:16 14    A.  Yes, I would renew.

13:31:16 15    Q.  And now that they're increasing at the rate you described, are

13:31:22 16    you going to renew?

13:31:23 17    A.  No.  Our new renewal that came in in September of this year for

13:31:27 18    the October renewal was $700, and I just think that that's too much

13:31:32 19    money for me to be able to afford to send a message.

13:31:37 20    Q.  And those rate increases are similar to those of other people

13:31:40 21    in your district?

13:31:42 22            MS. PEREZ:  Objection, calls for speculation.

13:31:45 23            THE COURT:  Hold on.  Why don't you lay a foundation.

13:31:50 24    Sustained subject to a foundation.

13:31:52 25    BY MR. HETZEL:

13:31:53  1   Q.  You mentioned earlier what was the rate increase in your

13:31:56  2   district on average?

13:31:57  3   A.  In the parish it was 321 percent of an increase.

13:32:02  4   Q.  Okay.  That's all I need.

13:32:04  5         Last question, what are the aspects of Risk Rating 2.0

13:32:08  6   from which the people of your district need most immediate relief?

13:32:13  7   A.  Well, I think a few things.  The rate for one.  I would think

13:32:18  8   it would be great if we could go back to either freezing the rates

13:32:23  9   as they are now, which is under Risk Rating 2.0 for everyone in the

13:32:27 10   district, go back to what the rates were on the last renewal that

13:32:35 11   everybody paid before Risk Rating 2.0; so the 2020 insurance manual

13:32:41 12   would be a good thing.

13:32:43 13         I think restoring grandfathering for those people who

13:32:48 14   played by the rules and bought flood insurance for a long time and

13:32:52 15   also built in accordance with the maps that were in place, the

13:33:00 16   post-FIRM properties for sure.

13:33:02 17         And the other thing that's pretty damaging to us right

13:33:06 18   now is these declaration pages that are out there based off of Risk

13:33:10 19   Rating 2.0 that are indicating these very, very high rates.  While

13:33:13 20   the policyholder isn't paying that rate as of yet because of the 18

13:33:16 21   percent --

13:33:16 22   Q.  You mean the full risk premium?

13:33:19 23   A.  The full risk premium rate.  They haven't paid that rate as of

13:33:21 24   yet because of the 18 percent statutory limit, it's out there and

13:33:25 25   it's something that's influencing the value of their home, their

13:33:28  1    ability to sell their home, and all of the things were also

13:33:33  2    previously testified about.

13:33:36  3                MR. HETZEL:  No further questions.

13:33:37  4                THE COURT:  Okay.  Cross?

13:33:39  5                MS. PEREZ:  No, your Honor.

13:33:40  6                THE COURT:  Okay.  Thank you.  Ms. Murrill.  You may step

13:33:45  7    down, sir.

13:33:46  8                THE WITNESS:  Your Honor, this is a set of glasses that

13:33:49  9    was left on this --

13:33:50 10                THE COURT:  Did someone lose some glasses?

13:33:53 11                THE WITNESS:  I'm thinking it might be Wendy's.  I'll

13:33:56 12    take it with me.

13:33:57 13                THE COURT:  All right.  Thank you.

13:33:57 14                MS. MURRILL:  Your Honor, I think those are all of the

13:34:06 15    witnesses that we planned to bring because of the time constraints

13:34:09 16    that we had today.

13:34:10 17                THE COURT:  Okay.

13:34:11 18                MS. MURRILL:  But we certainly have a lot of other

13:34:14 19    declarations that were placed into evidence as part of the record

13:34:19 20    on the preliminary injunction.  So we would also rely on those.

13:34:23 21                THE COURT:  Just so the record is clear, Ms. Ancar, how

13:34:26 22    much time does the State of Louisiana have left to present

13:34:29 23    testimony?

13:34:31 24                THE DEPUTY CLERK:  Let's see.  I believe it's roughly

13:35:09 25    48 minutes.

13:35:10   1          THE COURT:  So it looks like you have another 48 minutes

13:35:15   2   under the sort of -- obviously if you needed more than

13:35:22   3   48 minutes --

13:35:22   4          MS. MURRILL:  No, no, we don't.  I think, you know, I

13:35:26   5   wanted to wait for her to calculate because I wasn't exactly sure

13:35:29   6   what you were going to do with the number.  I don't think that it

13:35:32   7   matters because we planned -- because we knew we were under some

13:35:35   8   time constraints, we tried to narrow who we were preparing to

13:35:39   9   testify today.  We don't have anybody else that we prepped, and I

13:35:42  10   don't want to just throw people up on the witness stand.

13:35:44  11          THE COURT:  Fair enough, I appreciate the streamlining.

13:35:46  12          MS. MURRILL:  I know there are a number of parish

13:35:48  13   presidents who would probably love to let you hear from them, but

13:35:50  14   in the interest of not being duplicative and complying with your

13:35:57  15   expectations, we prepared a narrow number.

13:36:00  16          THE COURT:  Fair enough.

13:36:01  17          MS. MURRILL:  We do have their declarations in evidence,

13:36:03  18   or at least in support of our motion for preliminary injunction as

13:36:06  19   declarations, and we rely on those, too.

13:36:09  20          THE COURT:  Thank you.

13:36:10  21          MS. MURRILL:  What we're going to do, I think, is have

13:36:13  22   Morgan argue if you're ready to move into closing.

13:36:16  23          THE COURT:  And if you need a moment to organize

13:36:18  24   yourselves, why don't we take a ten-minute break and then you can

13:36:23  25   come up and argue.  How much time -- because everyone used their

13:36:26  1   time really efficiently, how much time would you like for summation

13:36:30  2   or for final argument on this?

13:36:39  3        MS. MURRILL:  She's going to handle, you know, most of

13:36:43  4   the important parts of our burden of proof on the PI and then I am

13:36:47  5   going to close.  So I don't expect to need a whole lot of time to

13:36:50  6   do that.  I think she expects to use about 15 or 20 minutes.  We're

13:36:55  7   still expecting to fall within the constraints of what you had set

13:36:59  8   before of 30 for each side.  And if you have questions, then, you

13:37:03  9   know, we're happy to entertain those, too.

13:37:04 10        THE COURT:  Perfect.  It was actually I think 15 per

13:37:08 11   side, but I will give each side 25 minutes.  And obviously, if you

13:37:13 12   need a couple more minutes, that's fine.

13:37:13 13        MS. MURRILL:  Perfect.

13:37:15 14        THE COURT:  So we'll take a ten-minute break, we'll be

13:37:17 15   back at ten to two.

13:37:19 16        MS. MURRILL:  Thank you.

13:37:20 17        THE COURT:  Thank you.  Thank you all.

13:37:21 18        THE DEPUTY CLERK:  All rise.

13:37:22 19     (WHEREUPON, A RECESS WAS TAKEN.)

13:51:34 20     (OPEN COURT.)

13:51:34 21        THE COURT:  Please be seated, I'm sorry.  Ms. Murrill,

13:51:39 22   whenever you're ready.

13:51:45 23        MS. BRUNGARD:  We've had quite a full day today.  We've

13:51:58 24   heard from lots of witnesses that have given testimony about the

13:52:01 25   injuries that the different plaintiff groups are facing, the

13:52:06  1  irreparable harm from Equity in Action that they are facing, as

13:52:11  2  well as likelihood of success on the merits in some instances.  And

13:52:14  3  I would like to address the last two of those - irreparable injury

13:52:24  4  and likelihood of success on the merits.

13:52:31  5       I'll start with irreparable harm.  As we discussed,

13:52:42  6  Equity in Action is upending the NFIP as a program and is

13:52:45  7  undermining the considerable investments from both the State and

13:52:49  8  the parishes into flood mitigation and floodplain regulation.

13:52:58  9  Specifically, Equity in Action is causing economic -- irreparable

13:53:06 10 economic harm to plaintiff states as we discussed through grant

13:53:10 11 de-obligation, clawbacks, and the cost of enforcement.  Director

13:53:14 12 Tingle testified at length about those harms.  Plaintiff parishes

13:53:20 13 are also experiencing irreparable harm through increased rates on

13:53:23 14 their own NFIP policies.  Parish President Matt Jewell testified in

13:53:29 15 length about those injuries.  Plaintiff parishes and levee

13:53:31 16 districts also through the loss of specific tax revenues, Assessor

13:53:35 17 Thibodeaux and Mr. Dwayne Bourgeois testified at length about those

13:53:41 18 irreparable harms.

13:53:41 19      And the reason that they're irreparable is because

13:53:44 20 defendant's sovereign immunity prevents monetary damages.

13:53:49 21 Defendants say that plaintiffs can recover those economic harms

13:53:51 22 through an unjust enrichment or taking claims, like the ones in the

13:53:54 23 class action.  They haven't shown that those claims are meritorious

13:53:59 24 or that recovery would succeed under those theories.  And I can't

13:54:03 25 imagine that my friends on the other side intend to offer to waive

13:54:07  1  any defense that their clients may have to those claims, including

13:54:13  2  sovereign immunity.  And plaintiffs don't the have the ability to

13:54:16  3  just increase taxes to make up for their economic losses caused by

13:54:20  4  Equity in Action as defendants suggest.  That would require voter

13:54:22  5  approval.

13:54:22  6         Defendants also say that the State should sue its own

13:54:26  7  residents to recoup the de-obligated funds.  As I mentioned before,

13:54:32  8  the State's efforts to recover grant moneys following Hurricane

13:54:38  9  Katrina show that going after recipients of federal grants is an

13:54:41  10  extremely costly endeavor that may not ultimately result in any

13:54:45  11  recovery at all.  Equity in Action's higher prices are also

13:54:51  12  lowering property values within the states and parishes which

13:54:53  13  results in two irreparably harmful scenarios:  Either lower

13:54:59  14  property values will force people to leave, if they can find a

13:55:02  15  buyer willing to pay the higher rates.  Forcing people to leave

13:55:06  16  will break up communities that have been there for generations, as

13:55:13  17  President Jewell testified, and will cause a loss of valuable

13:55:18  18  cultural heritage.

13:55:19  19         Finding a buyer willing to pay higher insurance rates

13:55:22  20  likely means selling at below the market value the property had

13:55:25  21  under the legacy system and sacrificing equity to induce the sale

13:55:29  22  as Assessor Thibodeaux testified.  Lower property values also

13:55:33  23  impair the states and parishes' ability to protect their people and

13:55:36  24  provide for the welfare -- for their welfare by decreasing the

13:55:39  25  amount of property tax revenues that fund police, fire, schools,

13:55:43  1    hospitals.  Assessor Thibodeaux testified at length about that

13:55:49  2    chain of events that is not speculative.  It's already happening.

13:55:55  3    She begins her assessment very soon.

13:55:59  4         If people can't find a buyer willing to pay higher tax

13:56:03  5    rates, then they will be forced into default or foreclosure, as she

13:56:07  6    testified.  The Court can look to the declaration of Russell

13:56:09  7    Hebert, who is currently considering default or foreclosure at his

13:56:13  8    next renewal.  If the banks also can't find buyers, then there will

13:56:19  9    blighted properties, as Assessor Thibodeaux testified.  The loss of

13:56:23 10    generations-old communities decrease stability to protect people

13:56:25 11    and provide for their welfare.  Communities fold and blighted

13:56:30 12    properties are harms that can't be fixed when this case reaches

13:56:34 13    final judgment.

13:56:35 14         Equity in Action's higher rates are also causing

13:56:37 15    plaintiffs to lose critical industries.  Louisiana's home to ports

13:56:41 16    that are critical to not only the state economy but the national

13:56:45 17    economy as Assessor Thibodeaux testified and are highlighted in the

13:56:52 18    decs that the ports themselves have submitted.  I'll highlight just

13:56:54 19    two examples:  The Port of South Louisiana is the country's top

13:56:58 20    grain exporter, that's in the Port of South Louisiana dec at

13:57:00 21    paragraph 19.  Port Fourchon handles 10 to 15 percent of the

13:57:04 22    country's domestic oil and plays a role in 50 percent of the

13:57:08 23    country's refining capacity, that's in the Greater Lafourche Port

13:57:12 24    Commission dec at paragraph 16.

13:57:14 25         Obviously those ports must be located on the water and

13:57:16  1   their employees must live nearby.  Equity in Action's higher prices
13:57:21  2   are making it difficult for those ports to stay fully staffed, as
13:57:24  3   they explained in their declarations.  If one of those ports can't
13:57:27  4   operate for even one day, the national GDP loses hundreds of
13:57:31  5   millions of dollars and the oil and gas industry loses tens of
13:57:36  6   millions of dollars.  And I'll cite you to the Greater Lafourche
13:57:40  7   Port Commission paragraphs 16 and 17.

13:57:42  8          A favorable ruling on the merits for plaintiffs will not
13:57:45  9   remedy the loss of critical industries and their contributions to
13:57:49  10  state and national economies.  Defendants say that those harms are
13:57:53  11  insignificant and speculative.  Our deep evidentiary record, both
13:57:58  12  our written declarations and the testimony heard today, say the
13:58:02  13  opposite.  Those harms disproportionately fall on people at the
13:58:07  14  economic margins, low and middle income people who are working to
13:58:10  15  put food on the table and keep a roof over their heads.  It is not
13:58:15  16  insignificant to force a working mom to choose between paying for
13:58:18  17  flood insurance and buying groceries or paying the mortgage.

13:58:22  18         As far as speculation goes, what defendants don't say is
13:58:25  19  that plaintiffs' harms are already happening.  People like Russell
13:58:28  20  Hebert are already facing default or foreclosure.  Assessor
13:58:32  21  Thibodeaux testified that the new rates are lowering property
13:58:35  22  values, which in turn lowers a specific tax revenue stream, the ad
13:58:42  23  valorem tax which funds critical government programs - police,
13:58:46  24  schools, hospitals, fire departments, et cetera.

13:58:50  25         Defendants also say that we delayed bringing this suit.

13:58:53   1   There's actually a lot of double speak going on here.  They say

13:58:56   2   that we're both too early and too late.  Neither is true.  As

13:59:00   3   explained before, they say that our injuries are speculative, that

13:59:03   4   they haven't yet occurred, and aren't certain to occur.  If that's

13:59:07   5   true, which it's not, then we don't have standing now, which means

13:59:11   6   that we definitely didn't have standing before and couldn't have

13:59:15   7   brought this suit any earlier.

13:59:17   8        Then they turn around and say in the same breath that we

13:59:20   9   waited too long.  But by their own time line, we filed suit two

13:59:24  10   months to the day after Equity in Action was fully implemented for

13:59:28  11   all policies.  And I point the Court to their memo in support of

13:59:32  12   the motion to dismiss at page 1.

13:59:34  13        And here is FEMA's time line.  In October 2021, Equity in

13:59:39  14   Action took effect for only new policies and policies that opted

13:59:44  15   in, a subset; in April 2022, Equity in Action started to go into

13:59:52  16   effect for all other policies; in April 2023, Equity in Action was

13:59:58  17   fully in effect for all policies; and in June 2023, we filed our

14:00:03  18   complaint.  And even though in April 2023 the program was fully in

14:00:08  19   effect for all policies, each individual policy has its own renewal

14:00:12  20   time line.  So individual policyholders received their renewal

14:00:18  21   dates -- excuse me, their renewal notices on different dates.

14:00:23  22        It's important to keep in mind that every policy has its

14:00:26  23   own renewal date, as I just explained, and it's only now that

14:00:31  24   plaintiffs are seeing just how harmful Equity in Action is.  If

14:00:33  25   FEMA had answered our questions or released their model in response

14:00:37  1    to even one of the many times we asked, we would have had a better

14:00:40  2    idea of what was going to happen before now.  As it turns out, we

14:00:44  3    are right on time.

14:00:46  4          Finally, defendants say that most policies have seen

14:00:50  5    decreases or increases of no more than $20 a month.  Those numbers

14:00:54  6    are misleading and conflict with what plaintiffs are experiencing.

14:00:57  7    It appears that FEMA is citing numbers for only the first year when

14:01:02  8    increases are capped at 18 percent.  That FEMA's own data shows

14:01:06  9    that full premium rates in plaintiff states and parishes have

14:01:10 10    skyrocketed, and just the first 18 percent step towards those full

14:01:15 11    premium rates is already unaffordable for many people, including

14:01:19 12    parish policyholders as President Jewell testified.

14:01:25 13          Ms. Reed, would it be possible to pull up Demonstrative

14:01:29 14    No. 2?

14:01:30 15          MS. REED:  I am no longer connected.

14:01:35 16          MS. BRUNGARD:  Never mind.

14:01:35 17          THE COURT:  I'll stop the clock and let you get

14:01:38 18    connected.

14:01:38 19          MS. REED:  It says I don't have access.  I didn't know if

14:01:43 20    you turned it off.

14:01:45 21          MS. BRUNGARD:  We've already seen them.  We can do it

14:01:47 22    without it.  Thank you very much.

14:01:49 23          What I was going to show you was the map of Louisiana

14:01:53 24    with the parishes and the average increase per parish.  Again,

14:01:58 25    those are the average increases in the plaintiff states, meaning,

14:02:01 1  again, that 100-year policy in Mississippi under the legacy system

14:02:04 2  would increase by $149 for a total of $249.  And in Plaquemines

14:02:11 3  Parish, for example, a 100-year policy will increase by $545 for a

14:02:16 4  total of $645.  Those are certainly irreparable injuries that

14:02:23 5  cannot be recovered by plaintiffs in the event that we succeed on

14:02:28 6  the merits at final judgment.

14:02:29 7          Moving on to likelihood of success on the merits.  Let's

14:02:33 8  start with notice and comment.  If the APA applies to this case,

14:02:36 9  the notice and comment applies and FEMA has admitted that it did

14:02:41 10  not follow notice and comment for the roll out of Equity in Action.

14:02:45 11  Defendants give three reasons why they think notice and comment

14:02:48 12  doesn't apply to Equity in Action.  First, they say that Equity in

14:02:51 13  Action is not a legislative rule.  And just to give an example of

14:02:57 14  something that is not a legislative rule, meaning that it's purely

14:03:03 15  procedural, would be something like changing a form or going from a

14:03:07 16  mail format to an online format.  This clearly is not that.

14:03:12 17          Equity in Action is a legislative rule because it has a

14:03:15 18  substantial impact on those it regulates, and the case we cite in

14:03:19 19  our brief for that proposition is *Phillips Petroleum v. Johnson*,

14:03:23 20  it's a Fifth Circuit, 1994.  And in *Johnson*, the holding was that

14:03:28 21  the procedure for pricing royalties had to go through notice and

14:03:32 22  comment.  Very similar to what's happening here.

14:03:35 23          Equity in Action is also legislative because it produces

14:03:38 24  significant effects on private interests.  That's *Bernhardt*,

14:03:42 25  another Fifth Circuit case from 2019.  Here Equity in Action

14:03:47  1    clearly has a substantial impact on those it regulates and a

14:03:50  2    significant affect on private interests.  It's hard to imagine a

14:03:53  3    more significant affect on private interests or substantial impact

14:03:56  4    on those regulated than the possible scenarios that plaintiffs are

14:04:01  5    facing as a consequence of Equity in Action.

14:04:03  6          The first scenario is the individuals are being priced

14:04:06  7    out of their homes and forced to sell below market value and lose

14:04:11  8    the equity they've built up in their homes, if they can even find a

14:04:15  9    buyer who can afford the higher rates.  Assessor Thibodeaux

14:04:20 10    testified to that effect.

14:04:21 11          The second scenario is the individuals are being

14:04:21 12    handcuffed to homes that they can't afford to insure because

14:04:25 13    they're required to maintain flood insurance.  That requirement

14:04:28 14    runs with the property in perpetuity.  They can't find a buyer who

14:04:33 15    is willing to pay the higher rates and so they're being forced into

14:04:34 16    default or foreclosure.  The declaration from Russell Hebert

14:04:38 17    supports that proposition.

14:04:39 18          Second, my friends on the other side say that FEMA's

14:04:39 19    statutory provisions regarding notice control how FEMA is supposed

14:05:03 20    to give notice about changes to the NFIP.  Of course, FEMA statutes

14:05:03 21    cannot implicitly repeal the APA, an entirely separate statute, and

14:05:26 22    its requirement that all final agency action go through notice and

14:05:26 23    comment.

14:05:26 24          Third, they say FEMA's failure to put Equity in Action

14:05:26 25    through notice and comment does not prejudice plaintiffs.  I would

14:05:26  1    point the Court to *Mock v. Garland*, a Fifth Circuit case from 2023,

14:05:37  2    that holds the failure to provide an opportunity to comment is

14:05:37  3    prejudicial if plaintiffs would have commented.  And as Mr. Dwayne

14:05:49  4    Bourgeios testified, he would have submitted a comment if FEMA had

14:05:49  5    gone through notice and comment on behalf of his jurisdiction.

14:05:49  6        Equity in action is an enormously complicated endeavor

14:05:49  7    that affects a lot of people, which is what notice and comment is

14:06:05  8    made for.  The massive amounts of declarations and briefing here

14:06:05  9    show that plaintiffs wanted an opportunity to comment on Equity in

14:06:05 10    Action and weren't able to.  Defendants say that they met with us

14:06:05 11    and that those meetings fulfilled notice and comment.  We may have

14:06:05 12    had meetings with FEMA, but our declarations and witness testimony

14:06:05 13    show that those meetings didn't provide any additional information.

14:06:05 14    They were not the functional equivalent of a proposed rule

14:06:05 15    published in the *Federal Register* that explained the new model, how

14:06:10 16    it would work, or what rates would look like.  Mr. Dwayne Bourgeois

14:06:16 17    testified to that effect.  FEMA refused to answer our questions

14:06:19 18    when we met with them.

14:06:22 19        And also, individual meetings are not how notice and

14:06:26 20    comment works.  If that were the rule, than an agency could avoid

14:06:29 21    any notice and comment suit from a particular plaintiff by sitting

14:06:32 22    down and talking with him or her.  Even if the agency provided any

14:06:37 23    zero information or answered any answers at the meeting.

14:06:40 24        A final point on notice and comment.  We argued that

14:06:42 25    vacating the rule is the normal remedy for a notice and comment

14:06:45   1   violation.   Defendants didn't respond to that argument and so have

14:06:49   2   forfeited it.

14:06:51   3           Next, Equity in Action exceeds FEMA statutory authority.

14:06:56   4   Congress imposed statutory requirements on the NFIP and Equity in

14:07:02   5   Action violates those requirements.   First, Congress requires

14:07:04   6   affordability.   Congress, and I quote, authorized FEMA to, quote,

14:07:11   7   enable interested persons to purchase insurance.   That's 42 U.S.C.

14:07:17   8   Section 4011(a) --

14:07:19   9           THE DEPUTY CLERK:   Fifteen minutes.

14:07:21  10           MS. BRUNGARD:   Thank you.   -- at reasonable rates that

14:07:24  11   Section 4015 and that accurately reflect risk involved.

14:07:29  12           FEMA cannot focus on the actuarial side of this program

14:07:37  13   and -- while ignoring the mandate to provide insurance to enable

14:07:42  14   people to purchase insurance at reasonable rates.   Here Equity in

14:07:49  15   Action does not enable people to purchase insurance at reasonable

14:07:52  16   rates that accurately reflect risk involved.   In fact, we heard

14:07:56  17   today that people are leaving the program because of Equity in

14:08:01  18   Action.

14:08:01  19           Second, Congress requires transparency.   Congress told

14:08:07  20   FEMA to consult with states and local agencies, that's 42 U.S.C.

14:08:13  21   Section 4024, and from time to time make information available to

14:08:15  22   the public, that's Section 4020.   Here FEMA did not consult with

14:08:23  23   the plaintiff states and local agencies or make information

14:08:30  24   available to the public when creating Equity in Action.

14:08:30  25           I'll quickly touch on our spending clause claim, and then

14:08:37  1    I will turn the balance of my time over to Solicitor General

14:09:03  2    Murrill.

14:09:03  3         The spending clause grants Congress the power to pay the

14:09:03  4    debts and provide for the general welfare of the United States.

14:09:03  5    The ACA *Sebelius* case held that Congress may use its spending power

14:09:03  6    to create incentives for states to act in accordance with federal

14:09:19  7    policies.  But when pressure turns into compulsion, the legislation

14:09:19  8    runs contrary to our system of federalism.

14:10:41  9         The Court went on, the Constitution simply does not give

14:10:41 10    Congress the authority to require the states to regulate.  That is

11    true whether Congress directly commands a state to regulate or

12    indirectly coerces a state to adopt a federal regulatory system as

13    its own.  The states political subdivisions can bring a spending

14    clause claim.  All cases that we're aware of to address the

15    question have held that local government entities can bring

16    spending clause challenges.  And I would cite *City of Philadelphia*

17    *v. Sessions*, 280 F.Sup. 3d 579, Eastern District of Pennsylvania,

18    2017; *City of Los Angeles v. Barr*, 929 F.3d 1163, Ninth Circuit,

19    2019; and *County of Santa Clara v. Trump*, 250 F.Sup. 3d 497,

20    Northern District of California, 2017.

21         And applying that here as explained by Director Tingle,

22    and the many declarations of the parish presidents, the testimony

23    of Director Tingle and Matthew Jewell today only state residents

24    who live in parishes that have joined the NFIP by passing FEMA's

25    floodplain management regulations are eligible to purchase NFIP

1    policies.  If a parish doesn't pass FEMA regulations, then nobody

2    in the parish is eligible to purchase an NFIP policy.

3           FEMA incentivized the state to authorize parishes to

4    adopt FEMA's floodplain management regulations by offering

5    participation in the NFIP in exchange.  And the citation for that

6    state law is LA Revised Statute 38:84.  The incentivized parish,

7    plaintiff parishes to exercise the authority they got from the

8    state to adopt FEMA's regulations and which FEMA encouraged by

9    offering participation in the NFIP in exchange.

10           Once a parish passes FEMA's floodplain management

11   regulations to gain entry into the NFIP, FEMA can unilaterally

12   condition the parish's continued participation in the program on

13   passing any new floodplain management regulation that FEMA wants.

14   If the parish pushed back, FEMA threatens to kick them out of the

15   NFIP and strip the state and the parish of the benefit that induced

16   them to adopt FEMA's regulations in the first place.

17           If FEMA kicks a parish out of the NFIP, not only are its

18   residents no longer eligible to purchase NFIP policies, they are

19   also no longer eligible for disaster mitigation or recovery grants

20   as Director Tingle testified.  This bait-and-switch is coercive.

21   Equity in Action strips states and parishes of the benefit that

22   induced them to pass FEMA's regulations in the first place.

23           And I'll pass the balance of my time over.

24           THE COURT:  Thank you, Counsel.  Ms. Murrill.

25           MS. MURRILL:  Your Honor, do you want to do their

14:48:06  1  response on the PI and then do closing, or do you want us to go

14:48:06  2  ahead and wrap up?

14:48:06  3      THE COURT:  Why don't you go ahead and wrap up and then

14:48:06  4  I'll hear from them.  Thank you.

14:48:06  5      MS. MURRILL:  Your Honor, you were here, I was here

14:48:06  6  during Hurricane Katrina, and what we saw when an entire community

14:48:06  7  was destroyed virtually overnight was the devastating impacts to a

14:48:06  8  community when you tear a community apart.  And we're still

14:48:06  9  recovering from it.  And we've had multiple storms hit us since

14:48:06 10  then and we're still recovering from those.

14:48:06 11      This is a hurricane of its own.  This is Risk 2.0, a

14:48:06 12  hurricane that is a slower moving storm, and we know that that

14:48:06 13  tears things apart, just as devastatingly but more slowly.

14:48:06 14      And so I think it is important to look, again, we talked

14:48:08 15  about the big picture, and the graphic that we showed you about all

14:48:08 16  of the pieces of NFIP.  Because the government -- the

14:48:08 17  government's -- really their argument and their briefing centers on

14:48:08 18  all we're doing is tweaking the rates.  It's nothing much to see

14:48:08 19  here and it's just an actuarial update.  Oh, and I loved this one,

14:48:09 20  unaffordable is not in the statute.  That's a shocking statement.

14:48:09 21  The statute actually says that Congress authorized FEMA to enable

14:48:09 22  interested persons to purchase insurance at reasonable rates that

14:48:09 23  accurately reflect the risk that's involved.  They have violated

14:48:09 24  those statutory duties.  Flatly violated those statutory duties.

14:48:09 25      They violated a duty to be transparent with us.  The

14:48:09  1    black box that Director Tingle talked about is where we all are --

14:48:09  2    I mean, our hands are tied.  People are coming to us and saying

14:48:09  3    what do we do, what do we do, why is this happening to us, and we

14:48:09  4    can't tell them.  Because FEMA won't tell us.  And there were 30

14:48:09  5    letters in our declarations, letters that came from Congressman

14:48:09  6    Scalise, from Senator Kennedy, and Senator Cassidy, and Congressman

14:48:09  7    Carter, Congressman Graves.  Every one of them has sent letters

14:48:10  8    saying this hurts us.  Tell us what, tell us why, tell us how.  And

14:48:10  9    we're told we don't have to.  So the black box just sits there and

14:48:10 10    they're -- they don't come and say we're sorry, we can't.  They say

14:48:10 11    we don't have to, which is even more mystifying.

14:48:10 12          President Jewell talked about the Biggert Waters fiasco,

14:48:10 13    he mentioned the Biggert Waters fiasco, and Mr. Bourgeois explained

14:48:10 14    a little bit more about what that is.  The Biggert Waters fiasco

14:48:10 15    really is a reference to the fact that Congress changed and kicked

14:48:10 16    a bunch of people out of the program and then two years later they

14:48:10 17    came back because they realized what they did was a disaster, that

14:48:10 18    kicking all of these people out of the program and jacking their

14:48:10 19    rates up like they did with Biggert Waters caused enormous

14:48:11 20    consequences.  And so we might be able to say that those

14:48:11 21    consequences weren't quite predictable then, but they are

14:48:11 22    predictable now because we know what happened and Congress came

14:48:11 23    back and reinstated all of those people to fix that problem.  And

14:48:11 24    so everything that's happening is entirely predictable.

14:48:11 25          And to Ms. Brungard's point, if we had done this at the

14:48:12  1    beginning, the government would be here saying this is wildly

14:48:12  2    speculative, they have no proof that it's going to happen.  We have

14:48:12  3    proof today and in all of our declarations that it is happening.

14:48:12  4         But you can stop this storm and it is redressable.  It is

14:48:13  5    redressable through injunctive relief, which will either stop them

14:48:13  6    from implementing this program in this manner, or at least freeze

14:48:13  7    rates and reinstate people at their grandfathered in rates.  So

14:48:13  8    there are -- there is relief that redresses this injury.

14:48:13  9         And so I think that that is a very important thing that

14:48:13 10    we haven't really talked very much about today, but it's clearly

14:48:13 11    redressable by injunctive relief.  And if you were not inclined to

14:48:13 12    enjoin the whole program, which really is what should happen here,

14:48:13 13    there are some more ways to narrow it now, freeze it in place,

14:48:13 14    reinstate those people who had been grandfathered in at their

14:48:13 15    grandfathered rates, stop them from raising rates any further, and

14:48:13 16    make them go back and fix this.

14:48:13 17         And that's why we're here, because they have doggedly

14:48:13 18    refused to do it.  They've acknowledged that they didn't do an

14:48:13 19    economic impact study, they've acknowledged they didn't do a NEPA

14:48:13 20    study, they said they don't have to do that even though they've

14:48:13 21    done one in the past.  And their own documents acknowledge that

14:48:13 22    they can make decisions that would impact the environment.

14:48:13 23         The floodplain management side of this is where it hits

14:48:13 24    the environment.  And so when you have all of these people who no

14:48:13 25    longer participate in the program and they're either not part of

14:48:13 1  our tax base, that's going to slow our flood management because we

14:48:13 2  won't have the money to do it.  And the taxpayers aren't going to

14:48:13 3  approve it anymore because we have re-up these authorizations, and

14:48:13 4  so they're not going to pay for if they are not getting any bargain

14:48:13 5  from it.  And now that hurts our floodplain management and it hurts

14:48:13 6  theirs.

14:48:13 7        And it's not just us, it's all of the states that are in

14:48:13 8  this case.  So if we have standing, they have standing.  If one

14:48:13 9  parish has standing, all of the parishes have standing.  And the

14:48:14 10  truth is, we wildly, dramatically demonstrated not only standing

14:48:14 11  but irreparable harm.  And you can redress that injury by at least

14:48:14 12  telling them to stop the bleeding.

14:48:14 13        I would just finish by saying that FEMA doesn't get to

14:48:14 14  just move the goal posts.  They don't get to just break their

14:48:14 15  promises upon which we have substantial, substantial reliance.

14:48:14 16  This is -- the big picture graphic is what shows the level of

14:48:14 17  reliance that is built-in to this program.  It's hazard mitigation,

14:48:14 18  money that is attached to deed restrictions, it's mortgages, it's

14:48:14 19  SBA loans, it's VHA and FHA backed loans, and it's all ability for

14:48:14 20  someone to be able to -- and parishes to be able to qualify for

14:48:14 21  future assistance, which we know that we will need.

14:48:14 22        And so it is simply astonishing to suggest that those

14:48:14 23  reliance interests don't matter.  They do matter under the APA.  It

14:48:14 24  doesn't have to say that in the statute, it says it in the APA, it

14:48:14 25  says it in reams of case law that our reliance interests do matter,

14:48:14  1   and the reliance interest of the people who changed, who voted to

14:48:14  2   change our codes and ordinances and laws and reliance on the

14:48:16  3   promise that this would help them and our reliance on those same

14:48:16  4   representations that caused us to go out and asked them to approve

14:48:16  5   those taxes and ordinance changes and lock themselves into this for

14:48:16  6   the life, for lifetime and for the lifetime of their property for

14:48:16  7   everybody else who wants to buy that property.

14:48:20  8          So the APA and all of the case law on the APA, I mean, we

14:48:20  9   have statutory violations, we have APA violations, and violating

14:48:20 10   the statute rolls up into the APA.  But it ignores reliance

14:48:20 11   interest, that's an APA violation.  It fails to take into account

14:48:28 12   important aspects of the problem, including the impact on

14:48:28 13   floodplain management, which they say doesn't matter because Risk

14:48:28 14   2.0 and adjusting actuarial rates doesn't have to take that into

14:48:28 15   account.  That's false.

14:48:28 16          The scope of the impact is what triggers the NEPA

14:48:28 17   analysis, the economic impact analysis, and the floodplain

14:48:28 18   management impact, and failing to take those things into account is

14:48:29 19   a failure to take account of important aspects of the problem.

14:48:29 20          The mass exodus from the program.  Congress and FEMA have

14:48:29 21   already recognized that a mass exodus from the program impacts the

14:48:29 22   program overall, and they've acknowledged that that's already

14:48:29 23   happening.

14:48:29 24          They've taken into account factors that Congress did not

14:48:29 25   direct them to take into account by using the catastrophic modeling

14:48:29  1    and refusing to disclose even what that is, that's the black box,

14:48:29  2    that's part of the black box is the modeling that they say is

14:48:29  3    protected by some trade secret, which Congress said you don't get.

14:48:30  4    I haven't seen them cite to anything that says that they get to

14:48:30  5    rely on trade secrets that somebody of somebody else's data when

14:48:30  6    they built the box.  If they built the box and they put our rates

14:48:30  7    into it and they're forcing us to pay them, then they have to tell

14:48:30  8    us.

14:48:30  9            So I don't see any basis on which they can refuse to

14:48:30 10    produce that information and use the data to force us to pay higher

14:48:30 11    rates.  They don't get it both ways.  They could consider it and

14:48:30 12    not use it and say, well, we can't disclose that information but we

14:48:30 13    didn't use it so it didn't matter.  Here they did use it and they

14:48:30 14    acknowledged they used it.  It's having a huge impact on the

14:48:30 15    baseline, not just your individual rates or anybody's individual

14:48:30 16    rates, but the baseline calculations.  So when you look at the

14:48:30 17    calculations, every state has a baseline calculation.  And then you

14:48:30 18    go into zip codes and then you go into your individual.  So it

14:48:30 19    isn't even true to say this is a one-to-one, I am going to figure

14:48:30 20    out what your individual risk is, because it's stacked before we

14:48:30 21    ever get to your individual risk.

14:48:30 22            And finally, it just doesn't adequately explain their

14:48:30 23    departure from prior policy.  And that's such an understatement

14:48:30 24    that it's hard to even just rely on that statement, but that's the

14:48:30 25    APA violation when you fail to explain your departure from prior

14:48:30  1    policy.

14:48:30  2            And I think that also feeds into our other argument that

14:48:30  3    it's a constitutional violation because they are attempting to do

14:48:30  4    what Congress did not ask them to do or permit them to do.  They

14:48:31  5    are transforming the program into something else.  And when

14:48:31  6    Congress came back and put all of those grandfathered people back

14:48:31  7    in, it acknowledged that there is a very, very dramatic impact when

14:48:31  8    you kick people out of this program this way.  And so I think that

14:48:31  9    that change, it illustrates that Congress has always been very

14:48:31 10    involved in this program, that it did go back and reinstate people

14:48:31 11    who were grandfathered in.  It's never given them permission to

14:48:31 12    kick them all out again on the basis of some justification to make

14:48:31 13    things actuarial sound.  They are required to try, but they are

14:48:31 14    also required to balance that with their other statutory

14:48:31 15    obligations.

14:48:31 16            So it is simply wrong to stand up here and say we have to

14:48:31 17    make it actuarial sound.  You actually have to make it actuarial

14:48:31 18    sound, you have to balance that with your floodplain management

14:48:31 19    obligations, and your obligation to make it reasonable and

14:48:31 20    accessible.  So that wasn't the only directive that they were

14:48:31 21    given, and they have violated all of those other directives and

14:48:31 22    focused only on one.

14:48:31 23            And so I will sit down and settle down, but I would take

14:48:31 24    you back to the fact that this is a hurricane, it is starting, it

14:48:31 25    is a slow moving storm, it is catastrophic in its own right, and we

14:48:31   1    can redress it today.  We can stop it from moving further and we

14:48:31   2    can fix some of the damage and we can make them go back and fix the

14:48:31   3    rest, which they were always legally obligated to do.

14:48:31   4            THE COURT:  Thank you, Solicitor General Murrill.

14:48:31   5            Obviously these are matters of great importance that

14:48:31   6    affect the lives and property of millions of Americans.  I gave you

14:48:31   7    extra time, obviously, and so --

14:48:31   8            MS. MURRILL:  Thank you.

14:48:31   9            THE COURT:  -- the United States has 31 -- 32 minutes --

14:48:31  10            MR. DESTA:  Thank you.

14:48:31  11            THE COURT:  -- if you need it.  Mr. Desta, are you going

14:48:31  12    to do the entire argument?

14:48:31  13            MR. DESTA:  No.  So, Mr. Takemoto, my colleague, will be

14:48:31  14    handling the likelihood of success on the merits and I'll be

14:48:31  15    handling everything else.

14:48:31  16            THE COURT:  Fair enough.  Thank you, sir.

14:48:31  17            MR. DESTA:  I guess on that note, just to give a road map

14:48:31  18    for the Court.  I'll address five things in this closing argument:

14:48:31  19    The first and second are to address the questions that you asked of

14:48:31  20    both parties before the witness testimony; the third thing I'll do

14:48:31  21    is address the witness testimony and how that relates to standing;

14:48:32  22    fourth, I'll address the witness testimony and how that relates to

14:48:32  23    irreparable harm; and then finally, I'll conclude by discussing the

14:48:32  24    balance of equities and the public interest and how what plaintiffs

14:48:32  25    seek is to upend the status quo.

14:48:32  1          So first you asked plaintiffs a question about their

14:48:32  2    sovereign injury and you asked specifically what laws can

14:48:32  3    plaintiffs no longer enforce as a result of Risk Rating 2.0.  And

14:48:32  4    we heard a lot of testimony and argument and yet plaintiffs still

14:48:32  5    have identified no law that they can't enforce as a result of Risk

14:48:32  6    Rating 2.0.  Risk Rating 2.0 is an actuarial update for rates, it's

14:48:32  7    completely agnostic about states and municipalities' ability to

14:48:32  8    adopt ordinances that are necessary to comply with the NFIP.

14:48:32  9          You've heard a lot of testimony and argument about how

14:48:32 10    the NFIP involves a number of different things and that's true, but

14:48:32 11    this case is about rate updates and rate updates don't affect

14:48:32 12    states' ability to create or enforce a legal code.

14:48:32 13          Now, you asked us a question about comparing rates under

14:48:32 14    the legacy rating approach and under Risk Rating 2.0.  And we have

14:48:32 15    a clear answer.  So under Risk Rating 2.0, there is a cap on the

14:48:32 16    amount of premiums that a single family home can be charged in a

14:48:32 17    year, that's $12,000, or a little more than $12,000.  That's the

14:48:32 18    maximum amount that anyone can be charged.  And now both FEMA and

14:48:32 19    policyholders know the full risk rates from an individual policy,

14:48:32 20    it's listed on the declaration page.  Policyholders cannot be

14:48:32 21    charged any more than that full risk rate amount.

14:48:32 22          Now, under the legacy rating approach, there is no cap,

14:48:32 23    there was no cap.  Rates could rise as high as $55,000 for a single

14:48:32 24    family home.  And under the legacy rating approach, there was no

14:48:32 25    individualized assessment of the risk, so FEMA did not have the

14:48:32  1    ability to say this and only this is the amount that a policyholder

14:48:32  2    would have to pay.  Instead, what FEMA had to do was raised rates

14:48:32  3    across broad categories of properties that shared characteristics

14:48:32  4    in terms of their elevation and their location on a flood map.  And

14:48:33  5    there was no stopping point.  FEMA had to raise rates every time it

14:48:33  6    experienced these shortfalls in the amount of premiums it was

14:48:33  7    collecting.

14:48:33  8             And so I think that addresses your question.  And to

14:48:33  9    direct you to where exactly that is in the materials, that's

14:48:33 10    paragraph 34 of the Maurstad declaration, as well as paragraphs 141

14:48:33 11    and 143.

14:48:33 12             THE COURT:  Just -- thank you.  Under the prior system,

14:48:33 13    did those maximum rates that you described ever come to fruition?

14:48:33 14             THE DEFENDANT:  Yes.  FEMA knows that certain

14:48:33 15    policyholders were charged as much as $55,000.  And that's not a

14:48:33 16    sort of cap that it self-instituted, it's just how high the rates

14:48:33 17    got for some people.

14:48:33 18             THE COURT:  And with respect to the $12,000 cap as you

14:48:33 19    set forth, what analysis, if you can say, did FEMA do to try and

14:48:33 20    determine the tolerance, if you will of -- there are many states

14:48:33 21    who are parties to this action, but I'll use, for example,

14:48:33 22    obviously most of the testimony we heard related to people in South

14:48:33 23    Louisiana.  In some of the affected parishes, for example, from

14:48:33 24    whom we heard testimony today, their representatives, their

14:48:33 25    governmental officials, to what extent did FEMA do any type of

14:48:33  1   assessment of the sort of premium tolerance of those communities?

14:48:34  2          MR. DESTA:  So some of that answer is going to be in the

14:48:34  3   administrative record, which is currently unavailable.  But I would

14:48:34  4   direct the Court to the Maurstad declaration.  There is a section

14:48:34  5   on rate increases by the numbers across these jurisdictions,

14:48:34  6   including particularly Louisiana parishes describing the rate

14:48:34  7   increases, and for many of these parishes, policy decreases or only

14:48:34  8   minor increases.

14:48:34  9          I can't speak to FEMA specific analysis as to each

14:48:34 10   individual policyholder, but as was covered initially, FEMA has

14:48:34 11   data for, you know, across the NFIP and across many jurisdictions,

14:48:34 12   and what that data has told FEMA is that for basically every

14:48:34 13   policyholder, Risk Rating 2.0 is affordable.  97 percent of

14:48:34 14   policyholders are either having a premium decrease or only minor

14:48:34 15   increases of up to $20 a month.

14:48:34 16          THE COURT:  I understand that FEMA has told them that,

14:48:34 17   but is it true?  I am not suggesting that they're not being honest,

14:48:34 18   but --

14:48:34 19          THE DEFENDANT:  Yeah.  I mean, this is, you know, data

14:48:34 20   that will be borne out not just the administrative record, but it's

14:48:34 21   on FEMA's web site.  FEMA had estimates before these rate increases

14:48:34 22   went into effect and then now these are not just estimates, this is

14:48:34 23   actual data that FEMA has.

14:48:34 24          THE COURT:  And I promise, you can punt any of these to

14:48:34 25   Mr. Takemoto.  But tell me why Solicitor General Murrill is wrong

14:48:34  1  when she says this is more about a program or as much about a

14:48:34  2  program as it is about the rates?  What's FEMA's response to that?

14:48:34  3           MR. DESTA:  So FEMA's response to that is that Risk

14:48:34  4  Rating -- I think the word transformational has been used a lot

14:48:34  5  today --

14:48:34  6           THE COURT:  It has.

14:48:34  7           MR. DESTA:  -- and FEMA's position is that Risk Rating

14:48:34  8  2.0 is transformational in its impacts, it's not transformational

14:48:34  9  in terms of methodological changes.  And I believe one of the

14:48:34 10  witnesses, it was either Mr. Tingle or Mr. Jewell, actually used

14:48:34 11  the phrase transformational impacts, he did not say it was

14:48:34 12  transformational, it was methodological changes.

14:48:34 13           Now, I can point you paragraph 109 of the Maurstad

14:48:34 14  declaration that goes into that, but just to summarize briefly.

14:48:34 15  What Risk Rating 2.0 is doing is incorporating catastrophe models.

14:48:34 16  These models are used across the private insurance industry,

14:48:35 17  they're also used by Louisiana in calculating rates.  There's

14:48:35 18  nothing controversial about using catastrophe modeling to assess

14:48:35 19  flood risks.

14:48:35 20           It's also not a transformational change in the

14:48:35 21  methodology because the lodestar is actuarial rates.  There's not

14:48:35 22  some different principle being used, it's can we calculate rates on

14:48:35 23  an actuarial basis.  So Risk Rating 2.0 is just taking into account

14:48:35 24  additional variables that we all know bear on flood risk.

14:48:35 25           Now, the prior system mainly considered elevation and

14:48:35  1    mainly considered placement on a flood map.  As we've laid out in

14:48:35  2    the briefing and in the declarations, there's a host of other

14:48:35  3    variables that bear on flood risk, and we haven't heard testimony

14:48:35  4    or anything in the briefing to dispute why any of those variables

14:48:35  5    matter.  What you've heard is testimony discussing how, well, for

14:48:35  6    example, I believe multiple witnesses testified to how levees or

14:48:35  7    their specific levee isn't taken into account.  Some specific

14:48:35  8    witnesses have testified or said in their declarations that

14:48:35  9    elevation discounts aren't being taken into account.

14:48:35 10         Let's set aside that those are merits arguments, they're

14:48:35 11    just factually wrong.  To take one example, let's talk about --

14:48:35 12    let's talk about the elevation discounts.  So under Risk Rating

14:48:35 13    2.0, there has been an increase of 400,000 policies receiving

14:48:35 14    elevation discounts in Louisiana from 32,000 to 472 -- 470,000

14:48:35 15    receiving those discounts, that's in paragraph 173 of the Maurstad

14:48:35 16    declaration.  So it's difficult to reconcile that statistic with a

14:48:35 17    claim that's unsubstantiated, that Risk Rating 2.0 isn't taking

14:48:35 18    into account elevation.

14:48:35 19         I think you also in the declarations have some discussion

14:48:35 20    about how Risk Rating 2.0 isn't adequately taking into account the

14:48:35 21    CRS discounts.  But again, that's disputed in the Maurstad

14:48:35 22    declaration.  In Louisiana alone, under Risk Rating 2.0 they went

14:48:35 23    from 156,000 policies receiving these discounts to 376,000

14:48:35 24    receiving discounts.  And that's not just a trivial amount of

14:48:35 25    policies in dollars, that's 70 million more dollars in CRS

14:48:35  1    discounts under Risk Rating 2.0, that's in the Maurstad declaration

14:48:35  2    at paragraph 202.

14:48:35  3              So there's these tremendous improvements that aren't

14:48:35  4    really being disputed by the plaintiffs.  And these improvements

14:48:35  5    are the result of increased variables getting at how to calculate

14:48:35  6    actuarial rates.  There is not some different principle that FEMA

14:48:36  7    is using as part of its methodology.

14:48:36  8              THE COURT:  Thank you.  You have a lot of time, you have

14:48:36  9    about 25 minutes.

14:48:36 10              MR. DESTA:  Great.

14:48:36 11              So I think we covered the first two questions I wanted to

14:48:36 12    discuss.  The third thing I wanted to discuss is the witness

14:48:36 13    testimony and how that bears on standing, which is not only

14:48:36 14    relevant to the motion to dismiss but also relevant to the

14:48:36 15    likelihood of success on the merits.  We heard a lot of witness

14:48:36 16    testimony, but I think as demonstrated by what the Court heard, we

14:48:36 17    didn't hear really anything more than what they had in their

14:48:36 18    declarations, which are not only before the Court but were also

14:48:37 19    admitted into evidence here.  We view the testimony as basically

14:48:37 20    just a recitation of what was in the declaration -- in the

14:48:37 21    declarations.  We discussed those declarations at length in the

14:48:37 22    briefing, so I am not going to cover that already covered ground.

14:48:37 23              But I do want to cover some specific things that came out

14:48:37 24    in each of the witness's testimony.  So beginning with Mr. Tingle.

14:48:37 25    His testimony focused a great deal on the recoupment process, but

14:48:37  1   what was missing from that testimony was any substantiation that

14:48:37  2   there's any sort of increased enforcement burdens on Louisiana, and

14:48:37  3   other states, because of Risk Rating 2.0.  It's just one example.

14:48:37  4   And it's hard to believe that this is the first time in the history

14:48:37  5   of this program that a policyholder in Louisiana has decided not to

14:48:37  6   maintain their flood insurance for rates.  And so this one example

14:48:37  7   just can't be used to show the chain of causation that the

14:48:37  8   plaintiffs rely on.

14:48:37  9          What's also critical is in the testimony there was a

14:48:37 10   number of statements by Mr. Tingle talking about how rates will

14:48:37 11   increase and as a result there will be unaffordable premiums,

14:48:37 12   property values will be reduced, and there will be tax-base harm.

14:48:37 13   I just want to reiterate that you had no specific testimony from

14:48:37 14   him except on certain rate increases.

14:48:37 15          And I believe there was a map shown during his testimony

14:48:37 16   and also a map shown during the testimony of other plaintiffs, I'll

14:48:37 17   just reiterate that those are percent changes that would happen

14:48:37 18   over the life of a policy, that's not a change that would happen in

14:48:37 19   a given year.  And so that really doesn't show irreparable harm

14:48:37 20   given that any policy rate increases would happen -- would be

14:48:37 21   capped at 18 percent in a given year.

14:48:37 22          Moving on to St. Charles Parish, the testimony of

14:48:37 23   Mr. Matthew Jewell.  You heard testimony --

14:48:37 24          THE COURT:  I don't want to belabor it, but would you

14:48:37 25   concede that homelessness is irreparable harm if these people can't

14:48:37  1  afford to pay the premiums that have been set by the federal

14:48:37  2  government?

14:48:37  3          MR. DESTA:  I would agree in the abstract that

14:48:37  4  homelessness is an irreparable harm, but the issue for plaintiffs

14:48:37  5  here is that their states and local governments, they need to

14:48:37  6  demonstrate their irreparable harm.

14:48:37  7          THE COURT:  But, I mean, I am asking from the perspective

14:48:38  8  of the Solicitor General's arguments about it all being wrapped

14:48:38  9  together that the impact upon that on the state in a global way is

14:48:38 10  the question essentially.

14:48:38 11          MR. DESTA:  Sure, yeah.  I understand the point.  If the

14:48:38 12  State had substantiated the chain of causation to reach

14:48:38 13  homelessness, we would be in a different position and I think I

14:48:38 14  would have to concede that.  But they just have not substantiated

14:48:38 15  that Risk Rating 2.0 premium increases will be so dramatic for such

14:48:38 16  a large population of people that they will be forced to leave

14:48:38 17  their homes and not obtain housing, period.

14:48:38 18          THE COURT:  Thank you.

14:48:38 19          MR. DESTA:  So you heard testimony from Mr. Matthew

14:48:38 20  Jewell from St. Charles Parish speaking about a letter talking

14:48:38 21  about NFIP participation.  I just want to emphasize that this case

14:48:38 22  is not about NFIP participation and the conditions and ordinances

14:48:38 23  that a parish like St. Charles Parish has to adopt.  Again, this is

14:48:38 24  about the rate increases.  And you heard no testimony from him

14:48:38 25  speaking to an inability to adopt increases.

14:48:38  1          We heard for the first time today that St. Charles Parish

14:48:38  2   is also a policyholder, that was not something in the declaration.

14:48:38  3   That being said, his testimony didn't substantiate any premium

14:48:38  4   increase, didn't offer any specifics as to the policies.  And even

14:48:38  5   if that weren't the case, they would still be in the same position

14:48:38  6   as St. Tammany Parish.

14:48:38  7          Now, Mr. Bourgeois was the last witness to testify, and

14:48:38  8   I'll just reiterate that his testimony was consistent with his

14:48:38  9   declaration.  And he identified a limited premium increase that he

14:48:38 10   had, I believe it was on somewhere close to $590.  That's a minimal

14:48:39 11   premium increase and he's also not a plaintiff in this case.  And

14:48:39 12   so if they want to take that minimal premium increase and argue

14:48:39 13   that that's what shows a chain of causation leading to a tax base

14:48:39 14   injury, that's a pretty weak thing to rely on.

14:48:39 15          The last witness, Mrs. Wendy Thibodeaux, we had no

14:48:39 16   declaration from her, so we did not know what to expect from her

14:48:39 17   testimony.  That being said, her testimony was not all that

14:48:39 18   different from what was offered.  And I want to focus on two things

14:48:39 19   that she said:  The first is she said that these ad valorem taxes,

14:48:39 20   quote, apply to everything within parish boundaries, end quote.

14:48:39 21   And she talked about it as valuing "real property" within Lafourche

14:48:39 22   District, Lafourche Parish.  That's a general tax, it's something

14:48:39 23   that applies in the same way that income tax applies to everyone

14:48:39 24   and sales tax applies to everyone.

14:48:39 25          Now, Ms. Thibodeaux also said that, quote, rates, quote,

14:48:40  1    don't lower home values.  She admitted that there's no direct

14:48:40  2    effect between rates and home values.  She used the phrase

14:48:40  3    trickle-down.  She said that the ways in which these rate increases

14:48:40  4    could affect the tax base is if rate increases lead to foreclosures

14:48:40  5    and people selling under duress, and then as a result, there's less

14:48:40  6    money, tax money in the district and as a result there's less money

14:48:40  7    for government services.  That's just squarely foreclosed by the *El*

14:48:40  8    *Paso County* case that we discussed.

14:48:40  9          The fourth thing I want to discuss is irreparable harm.

14:48:40 10    What's critical is, again, even despite the great number of

14:48:40 11    declarations and the number of witnesses that testified today,

14:48:40 12    there was basically no explanation as to why the plaintiffs here

14:48:40 13    waited multiple years to bring this suit.  As was discussed, this

14:48:40 14    was announced in March 2019, Risk Rating 2.0.  In April 2021, FEMA

14:48:40 15    released a data sources and methodology document to, quote, show

14:48:40 16    its work as plaintiff said, where they lifted up the hood and

14:48:40 17    described all of the different methodological changes or

14:48:40 18    calculations that they were doing.

14:48:40 19          This began to apply to policies in October of 2021 in a

14:48:40 20    phased approach.  And in October of 2021, it was with new policies

14:48:40 21    and certain policed that opted in.  April 2022 for existing

14:48:40 22    policies.  Plaintiffs waited all the way -- you know, they waited

14:48:40 23    basically -- or not basically, they waited until Risk Rating 2.0

14:48:40 24    applied to every single policy.  In other words, they waited until

14:48:40 25    Risk Rating 2.0 was the status quo.

14:48:40  1          Now, they seek to justify this delay in a number of

14:48:40  2   different ways.  We didn't really hear any of those ways from the

14:48:40  3   witnesses, they were mainly presented in attorney argument.  They

14:48:40  4   said that the April 2023 data set that FEMA released that was the

14:48:42  5   first time that they really could understand the rate increases,

14:48:42  6   but that's just not true for a variety of means.  If you look at

14:48:42  7   the complaint, you see that they cite 2021 and 2022 sources

14:48:42  8   describing these rate increases.  If they went on FEMA's web site,

14:48:42  9   anyone can go to FEMA's web site, we cite these sources in 2021 and

14:48:43  10  2022, there are Excel data files showing at the state level, at the

14:48:43  11  county level, and at the zip code level average rate increases,

14:48:43  12  what the average full risk rate is.  So it's just difficult to

14:48:43  13  believe that they had to wait well after the phrased approach began

14:48:43  14  until this applied to all policies in order to bring this

14:48:43  15  preliminary injunction motion.

14:48:43  16          Now, as to economic harm.  I think we already covered

14:48:43  17  this, but $2,900 for an individual parish is not the type of thing

14:48:43  18  that is the significant sort of imminent and irreparable harm that

14:48:43  19  the cases recognize as warranting a preliminary injunction.

14:48:43  20          There was a number of other things that were raised in

14:48:43  21  the argument that I just wanted to briefly touch upon.  There was

14:48:43  22  discussion of the de-obligation costs.  Those are by definition

14:48:43  23  recoverable.  Mr. Tingle admitted in testimony that this is

14:48:43  24  something that the state can recover.

14:48:43  25          The NFIP policyholders in this case, the one or two

14:48:44  1    parishes, are part of the class in the class action before this

14:48:44  2    court.  Tax revenues are by definition recoverable.  There's no

14:48:44  3    legal basis for the states to say we are not -- states and parishes

14:48:44  4    to say we are not allowed to raise rates.  The *Florida v. Mellon*

14:48:44  5    Supreme Court case identifies this as a reason why tax based

14:48:44  6    injuries are not irreparable.

14:48:44  7          And I think that covers basically everything under

14:48:44  8    irreparable injury.

14:48:44  9          The last point is the balance of equities in the public

14:48:44 10    interest, and there really hasn't been much discussion of that from

14:48:44 11    the other side.  I'll emphasize that, you know, we spent a number

14:48:44 12    of pages on that in our opposition brief.  Plaintiffs have zero

14:48:44 13    response on that.

14:48:44 14          And so while we could rest on the briefing, I do want to

14:48:44 15    emphasize one important point that really goes to some of the

14:48:44 16    fairness in equity concerns that we've been talking about today.

14:48:44 17    If Risk Rating 2.0 is preliminarily or permanently enjoined, that

14:48:44 18    has real harms for people in Louisiana and across the country.  The

14:48:44 19    19 percent of policyholders across the country or the 14 percent of

14:48:44 20    policyholders in Louisiana that had rate decreases, that would go

14:48:44 21    away.

14:48:44 22          If Risk Rating 2.0 is set aside, what would end up

14:48:44 23    happening is unfortunately policyholders in Northern Louisiana who

14:48:44 24    have rate decreases as a result of Risk Rating 2.0 being able to

14:48:44 25    take into account their lesser flood risk, they would go back to

14:48:44  1  subsidizing unfairly policyholders in Southern Louisiana and across

14:48:44  2  the country.  So there's a lot of talk about equity and fairness

14:48:44  3  here, and we just want to emphasize that those concerns are not

14:48:44  4  just on their end, they're on our end as well.  And the plaintiffs

14:48:44  5  offer no response to those concerns.

14:48:44  6       They also offer no response to the fact that their own

14:48:44  7  taxpayers would suffer if Risk Rating 2.0 is set aside.  It's no

14:48:44  8  secret that the NFIP has been running at a deficit for awhile

14:48:44  9  because of its inability to cover sufficient premiums to cover

14:48:44 10  expected losses, and Congress has from time to time bailed out the

14:48:44 11  NFIP in that regard.  Those bailouts fall on the taxpayers.

14:48:44 12       And so this is a program that benefits a great many

14:48:45 13  people and it's in the public interest and the plaintiffs offer no

14:48:45 14  response on that.

14:48:45 15       With that, I will pass that to my colleague Mr. Takemoto.

14:48:45 16       THE COURT:  Thank you.  Thank you very much.

14:48:45 17  Mr. Takemoto, Mr. Desta left you about 13 minutes.

14:48:45 18       MR. TAKEMOTO:  Thank you.  I'll be brief, and I don't

14:48:45 19  think I'll require all 13 of those minutes.

14:48:45 20       I just wanted to, first, on the statutory authority

14:48:45 21  issue.  When I was previously talking about, you know, what the

14:48:45 22  National Flood Insurance Act authorizes, I don't want to give the

14:48:45 23  impression that FEMA isn't sympathetic to affordability as an

14:48:45 24  issue.  The reality is that rates actually haven't changed all that

14:48:45 25  much under Risk Rating 2.0, as my colleague already pointed out.

14:48:45  1    The vast majority of policyholders either see rate decreases or

14:48:45  2    modest increases in their rates.

14:48:45  3         The fact of the matter is that the statute, again, just

14:48:45  4    plainly does not authorize FEMA to take affordability into account

14:48:45  5    when estimating actuarial rates.  What my friend on the other side

14:48:45  6    continuously refers to as reasonable rates is actually a very small

14:48:45  7    subsection of rates called chargeable rates that are for pre-FIRM

14:48:45  8    properties.  For actuarial rates, it's based on accepted actuarial

14:48:45  9    principles, and so that's what Risk Rating 2.0 does.

14:48:45 10         I also want to briefly address the notice and comment

14:48:45 11    claim.  We heard testimony from Mr. Bourgeois that he would have

14:48:45 12    commented on levees as an issue.  I just wanted to point out that

14:48:45 13    according to Mr. Bourgeois's own declaration and other information

14:48:45 14    that we have, he's met extensively with FEMA regarding Risk Rating

14:48:45 15    2.0 and had ample opportunity to raise this as a concern.

14:48:45 16         The reality is is that FEMA not only recognizes levees as

14:48:45 17    an important part of mitigation, but it continues to recognize

14:48:45 18    levees in awarding mitigation discounts under Risk Rating 2.0.  And

14:48:45 19    so for that reason, he not only had an opportunity to offer his

14:48:48 20    opinion to FEMA, but it would not be prejudicial to the plaintiffs

14:48:57 21    to allow Risk Rating 2.0 not to undergo notice and comment rule

14:49:02 22    making because they still have not identified a comment that they

14:49:05 23    would have raised and are prejudiced by not having raised it.

14:49:08 24         Just another brief legal point on notice and comment rule

14:49:13 25    making.  I noticed in my friend on the other side's argument and

14:49:17 1   also in their briefing, they're referring to the substantial impact

14:49:21 2   test to distinguish between legislative rules and non-legislative

14:49:25 3   rules.  As your Honor may be aware, this is a test that used to be

14:49:30 4   applied and that most courts no longer apply.  The Fifth Circuit in

14:49:36 5   a 2015 opinion appears to have returned to that rule to distinguish

14:49:40 6   procedural rules from legislative rules, that's not really an issue

14:49:43 7   in this case.  But anyone, you know, if you open up an

14:49:47 8   administrative law textbook, you'll find a discussion on the

14:49:52 9   substantive impact test and how courts no longer apply that test to

14:49:55 10  make that distinction.

14:50:00 11          And that's all I had unless your Honor has any questions.

14:50:03 12          THE COURT:  I don't have any questions.  Thank you.

14:50:05 13  Thank you very much, Mr. Takemoto.

14:50:08 14          Ms. Murrill, each side had a substantial amount of time.

14:50:15 15  Obviously, the normal way that we do this is to allow some

14:50:21 16  rebuttal.  I will say that the Court having received everything

14:50:21 17  that it has I think is aware and abreast of all of the issues and

14:50:26 18  doesn't really need any, but I don't want to deprive you of

14:50:35 19  argument, of course.  And so I'll give you --

14:50:35 20          MS. MURRILL:  Can I have one minute?

14:50:35 21          THE COURT:  I'll give you two.

14:50:35 22          MS. MURRILL:  Thank you.  Very generous.

14:50:41 23          I'll just say these last couple of things.  The

14:50:41 24  government conceded that it's transformational in its impacts.

14:50:46 25  What my colleague on the other side said there's not -- it's not

14:50:50   1   methodological changes, but in the very next sentence he said they

14:50:54   2   used catastrophic modeling.  And if you look at FEMA's own

14:50:57   3   document, I've referred to it many times on that NEPA document, and

14:51:01   4   I'm sure in a lot of other of FEMA's own documents, it explains the

14:51:05   5   whole program as based on historical actual flooding.  And I think

14:51:10   6   our witnesses have talked about that, too, that that is a dramatic

14:51:15   7   change.  The fact that they do that in private insurance modeling

14:51:18   8   and that it may be something that insurance industry does, does not

14:51:24   9   make it a nothing to see here change in this program.  It is a huge

14:51:31  10   change in this program because it's always been based on historical

14:51:36  11   actual data on flooding and now they're going to forward-looking

14:51:39  12   flooding.  And that very NEPA document that I was talking about

14:51:42  13   talks about what a big difference this makes, that they've not made

14:51:45  14   this change and that that actually is a huge change because it's

14:51:49  15   forward-looking and it's predicting what's going to happen in the

14:51:51  16   future instead of relying on what we already know has happened in

14:51:55  17   the past.  So that is transformational.  And at the end of the day,

14:51:59  18   he conceded that there's transformational impacts, and so I am not

14:52:03  19   sure how he gets out of this or FEMA gets out of this by saying

14:52:07  20   that they didn't -- the methodology is not really that different,

14:52:10  21   which is clearly not even accurate.

14:52:12  22        The use of -- the fact that they've given a lot of

14:52:16  23   information to us doesn't mean that we understand how they came up

14:52:20  24   with the base rate calculations or the algorithm.  They have never,

14:52:23  25   ever, ever acknowledged that they haven't given us the algorithm.

14:52:33  1   We don't know how they built the rate structure. We can see what

14:52:33  2   it spits out, but we can't see what it's using to figure out what

14:52:42  3   it spits out. And we are entitled to know that.

14:52:42  4           I wanted to point you to a couple of cases that I think

14:52:43  5   are important, the *Hornbeck* case and *Louisiana v. Biden*, they're

14:52:47  6   both leasing moratorium cases, and they were in Louisiana, they

14:52:51  7   both related -- one related to the leasing moratorium after the oil

14:52:57  8   spill, the other one relates to the more recent one in the

14:52:57  9   President's executive order; they were both enjoined and the

14:53:29 10   economic injuries that were projected to occur to the state on the

14:53:29 11   basis of the millet drilling moratorium, they're very similar to

14:53:29 12   what we claim will happen here, they are predictable, they are not

14:53:29 13   speculative, and I think the courts accepted that there. But we

14:53:29 14   really only need to show $1 of cost and we certainly have shown

14:53:29 15   that.

14:53:29 16           They continue -- FEMA continues to say that the rates

14:53:29 17   have haven't changed that much, but we showed you evidence to the

14:53:29 18   contrary. So I'll end with that.

14:53:29 19           THE COURT: Thank you, thank you. Okay. Is there

14:53:34 20   anything that either side -- I don't believe there is, but I just

14:53:45 21   want to make sure while we have everyone, is there anything that

14:53:45 22   anyone wants to put in the record that you've not put into the

14:53:45 23   record? It seems to me that the record is complete, but I just

14:54:47 24   wanted to check.

14:54:47 25           The Court has -- first of all, I would like to thank the

14:54:47  1    lawyers, this is a very well-argued case.  You have provided us

14:54:47  2    with extensive briefing papers, we've heard the testimony of

14:54:47  3    governmental officials from Louisiana, we've heard arguments that

14:54:48  4    relate to the State of Louisiana, other states, a number of

14:54:48  5    communities in this state, and so obviously when one looks around

14:54:48  6    the gallery at the persons gathered here today, these are very

14:54:48  7    important issues of great public concern that affect the lives and

14:54:48  8    property of a lot of people and that go to very important questions

14:54:48  9    regarding the relationship between the federal government, states,

14:54:48 10    and the local governments on very important issues.

14:54:48 11         And so the Court is going to very carefully study and

14:54:51 12    continue to review everything and will take this, all of these

14:54:55 13    issues, which the Court deems now submitted under advisement, and

14:55:01 14    will render a decision as promptly as possible.

14:55:03 15         I really do want to thank the lawyers for your hard and

14:55:08 16    professional work.  You did things the way the Court asked you to

14:55:14 17    do them and very promptly, and I really appreciate that.  I

14:55:17 18    appreciate you streamlining the case.  And I also fully recognize

14:55:23 19    the great public concern by -- evidenced obviously by the

14:55:29 20    collection of citizens in our courtroom today.

14:55:32 21         So thank you.  And with that, the Court will stand

14:55:36 22    adjourned.

14:55:37 23         MS. MURRILL:  Thank you, your Honor.

14:55:37 24         THE DEPUTY CLERK:  All rise.

14:55:52 25    (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

1

2                               * * * * * *

3

4

5                          REPORTER'S CERTIFICATE

6

7          I, Karen A. Ibos, CCR, Official Court Reporter, United

8     States District Court, Eastern District of Louisiana, do hereby

9     certify that the foregoing is a true and correct transcript, to the

10    best of my ability and understanding, from the record of the

11    proceedings in the above-entitled and numbered matter.

12

13

14                    ___/s/ Karen A. Ibos_____

15                    Karen A. Ibos, CCR, RPR, CRR, RMR

16                    Official Court Reporter

17

18

19

20

21

22

23

24

25