## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **STATE OF LOUISIANA, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 23-1839** |
| **DEPARTMENT OF HOMELAND SECURITY, ET AL.** | **SECTION: "P" (1)** |

### ORDER AND REASONS

Before the Court are Defendants' Motion to Dismiss Plaintiffs' Complaint (R. Doc. 47) and Plaintiffs' Motion for Preliminary Injunction (R. Doc. 14).  Both motions are opposed and have been fully briefed by the parties.  For the reasons that follow, the Court finds that Defendants' Motion to Dismiss Plaintiffs' Complaint (R. Doc. 47) should be **GRANTED IN PART** and **DENIED IN PART**, and Plaintiffs' Motion for Preliminary Injunction (R. Doc. 14) in advance of trial on the merits should be **DENIED**.

## I.  BACKGROUND

This case arises out of the Federal Emergency Management Agency's ("FEMA") changes to the methodology it uses to calculate premiums for flood insurance provided through the National Flood Insurance Program ("NFIP").  Plaintiffs allege FEMA's new methodology, known as "Risk Rating 2.0—Equity in Action," exceeds FEMA's statutory authority, is not in accordance with law, is contrary to a constitutional right, and was implemented without observance of the procedures required by law.[1]

---

[1] R. Doc. 1 ¶¶ 548–659.

The NFIP is a federal flood insurance program created by Congress for the purpose of making flood insurance available on a nationwide basis.[2]   Before the NFIP, most Americans lacked access to flood insurance and had to rely primarily on federal disaster relief after floods, as most private insurers could not profitably underwrite flood insurance policies with reasonable terms and therefore did not do so.[3]   To remedy this problem and to reduce fiscal pressure on federal relief efforts after recurring flood disasters, Congress created the NFIP though the National Flood Insurance Act of 1968 ("NFIA").[4]

Congress tasked FEMA with administering the NFIP.[5]   FEMA offers flood insurance through the NFIP to all property owners who live in communities that choose to adopt minimum floodplain management standards.[6]   Under the NFIA, FEMA has the authority to estimate and set premium rates for NFIP policies.[7]

In April 2021, FEMA announced it was updating the NFIP's pricing methodology for the first time in 50 years.[8]   According to FEMA's announcement, the new methodology, Risk Rating 2.0—Equity in Action, "allows FEMA to equitably distribute premiums across

---

[2] R. Doc. 1 ¶ 16 (citing 42 U.S.C. § 4001(a)).

[3] R. Doc. 1 ¶¶ 111–12; *see also* 42 U.S.C. § 4001(a)–(b).

[4] R. Doc. 1 ¶ 113; *see also* 42 U.S.C. § 4001(a)–(b).

[5] R. Doc. 1 ¶ 16 (citing 42 U.S.C. § 4011(a)).

[6] R. Doc. 1 ¶ 133 (citing 42 U.S.C. § 4022(a)(1)). According to Plaintiffs, "[k]ey conditions of the NFIP minimum standards include requiring permits for developments in certain areas; requiring elevation of the lowest floor of all new residential buildings in certain areas; restricting development in the regulatory floodway to prevent increasing the risk of flooding; and requiring certain construction materials and methods that minimize future flood damage." *Id.*

[7] R. Doc. 1 ¶ 558 (citing 42 U.S.C. §§ 4014, 4015).

[8] R. Doc. 1 ¶ 172 (citing *FEMA Updates Its Flood Insurance Rating Methodology to Deliver More Equitable Pricing*, FEMA (Apr. 1, 2021), https://perma.cc/QF9V-V6MR [hereinafter *FEMA Announcement*]). Throughout this paragraph, for purposes of providing relevant background information, the Court includes statements made by FEMA in the cited announcement. The Court takes no position on the truth of the matters asserted by FEMA; rather, the Court merely takes judicial notice that FEMA made these statements in its announcement. *See* FED. R. EVID. 201.

all policyholders based on the value of their home and the unique flood risk of their property."[9]  FEMA further explained that under the former rating system (hereinafter, the "Legacy Rating System" or "Legacy"), "many policyholders with lower value homes [were] paying more than they should and policyholders with higher-value homes [were] paying less than they should."[10]  But with Risk Rating 2.0, "FEMA now has the capability and tools to address rating disparities by incorporating more flood risk variables.  These include flood frequency, multiple flood types—river overflow, storm surge, coastal erosion and heavy rainfall—distance to water source and property characteristics such as elevation and cost to rebuild."[11]  According to FEMA, "[t]he cost to rebuild is key to an equitable distribution of premiums across all policyholders because it is based on the value of their home and the unique flood risk of their property[,]" which "has been an industry standard for years."[12]

FEMA then announced it would be taking a phased approach to rolling out the new rates.[13]  In Phase 1, Risk Rating 2.0 premium rates were applied to new policyholders with policies effective on or after October 1, 2021.  For policyholders with policy effective dates between October 1, 2021 and March 31, 2022, Legacy premium rates were applied upon renewal of the policy, with policyholders given the option of instead renewing using Risk

---

[9] *FEMA Announcement*, *supra* note 8.

[10] *FEMA Announcement*, *supra* note 8.

[11] *FEMA Announcement*, *supra* note 8.

[12] *FEMA Announcement*, *supra* note 8.

[13] *FEMA Announcement*, *supra* note 8.

Rating 2.0 pricing.  In Phase 2, Risk Rating 2.0 premium rates were applied to all remaining policyholders at their time of renewal on or after April 1, 2022.[14]

Plaintiffs filed this lawsuit on June 1, 2023, challenging the constitutional, statutory, and procedural validity of Risk Rating 2.0.[15]  Plaintiffs are the State of Louisiana and nine other states;[16] more than sixty Louisiana municipal entities, including parishes, municipalities, and levee and drainage districts; and one Louisiana non-profit organization. According to Plaintiffs, Risk Rating 2.0 fundamentally changes how FEMA calculates rates for federal flood insurance and is producing alarming results.  In the nine-count Complaint, Plaintiffs assert Risk Rating 2.0 is (1) contrary to law in four different ways; (2) arbitrary and capricious for failing to account for important aspects of the problem and considering other inappropriate factors; (3) arbitrary and capricious for failure to consider reliance interests; (4) arbitrary and capricious for departing from prior policy without sufficient justification; (5) arbitrary and capricious because it rests on pretextual bases; (6) in violation of the APA's notice-and-comment requirement; (7) in excess of FEMA's statutory authority; (8) contrary to a constitutional right; and (9) in violation of the National Environmental Policy Act ("NEPA").  Plaintiffs ask this Court to declare and hold that Risk Rating 2.0 is unlawful and to preliminarily and permanently enjoin Defendants from imposing Risk Rating 2.0.  Defendants are the Department of Homeland Security ("DHS"); Alejandro Mayorkas, in his official capacity as Secretary of DHS; FEMA; Deanne

---

[14] *See* R. Doc. 1 ¶ 173; *see also FEMA Announcement*, *supra* note 8.
[15] *See generally* R. Doc. 1.
[16] These are Florida, Idaho, Kentucky, Mississippi, Montana, North Dakota, South Carolina, Texas, and Virginia.  R. Doc. 1 ¶¶ 32–41.

Criswell, in her official capacity as Administrator of FEMA; and the Federal Insurance and Mitigation Administration.

Shortly after Plaintiffs instituted this lawsuit, they filed a motion for preliminary injunction, and Defendants filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Both motions are opposed. Because the Court cannot issue a preliminary injunction unless it has subject matter jurisdiction over Plaintiffs' claims, the Court must first address Defendants' motion to dismiss.

## II. MOTION TO DISMISS

Defendants move the Court to dismiss Plaintiffs' Complaint in its entirety for lack of subject matter jurisdiction because Plaintiffs lack Article III standing to bring any of the claims they raise. Defendants alternatively ask the Court to dismiss Count IX of Plaintiffs' Complaint on the basis that Plaintiffs lack statutory standing to assert their NEPA claim.

### A. ARTICLE III STANDING

#### 1. Legal Standard

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies."[17] "[T]he case-or-controversy limitation is crucial in maintaining the 'tripartite allocation of power' set forth in the Constitution."[18] The doctrine of standing is one of several doctrines that "provides definition to this constitutional limit by 'identify[ing] those disputes which are appropriately resolved

---

[17] U.S. CONST. art. III, § 2.
[18] *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 474 (1982)).

through the judicial process.'"[19]   Plaintiffs, as the parties invoking jurisdiction, bear the burden of satisfying the Article III requirement by demonstrating that they have standing to adjudicate their claims in federal court.[20]

The constitutional minimum of standing, i.e., "Article III standing," contains three elements.[21]   "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."[22]   "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes."[23]   Thus, courts "have repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient."[24]   "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'"[25]   "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"[26]

---

[19] *Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

[20] *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

[21] *See Lujan*, 504 U.S. at 560; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

[22] *Lujan*, 504 U.S. at 560 (citations omitted).

[23] *Clapper*, 568 U.S. at 409 (citing *Lujan,* 504 U.S. at 565 n.2).

[24] *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis added)).

[25] *Lujan*, 504 U.S. at 560 (cleaned up) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)).

[26] *Id.* at 561 (quoting *Simon*, 426 U.S. at 38, 43).

Questions regarding constitutional standing implicate the court's subject matter jurisdiction; thus, challenges to constitutional standing are evaluated as a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.[27]  In determining whether the court has subject matter jurisdiction at the motion to dismiss stage, the court must accept as true the allegations set forth in the complaint.[28]  The court is not limited to the complaint, however, as the court is also "empowered to consider matters of fact which may be in dispute."[29]  The court may dismiss for lack of subject matter jurisdiction based on "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."[30]

## 2.  Law and Analysis

Plaintiffs collectively assert four types of injuries allegedly caused by Risk Rating 2.0: (1) injuries to the Plaintiff States' sovereign interests; (2) injuries to the Plaintiff States' quasi-sovereign interests; (3) various injuries to all Plaintiffs' proprietary interests; and (4) deprivation of all Plaintiffs' procedural rights under the APA.[31]  Defendants argue none of these claimed injuries give rise to standing because they fail to satisfy one or more of the

---

[27] *See* FED. R. CIV. P. 12(b)(1).

[28] *Crane*, 783 F.3d at 250–51 (citing *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 714 (5th Cir. 2012)).

[29] *Id.* at 251 (citing *Ramming*, 281 F.3d at 161).

[30] *Id.* (citing *Wolcott v. Sebelius*, 635 F.3d 757, 762 (5th Cir. 2011)).

[31] All parties appear to agree that a procedural injury without some other concrete injury is an insufficient basis for Article III standing. *See Louisiana v. Biden*, 64 F.4th 674, 683 (5th Cir. 2023). In other words, a procedural injury alone will not confer standing; instead, Plaintiffs must show some other legally protected interest, e.g., a sovereign, quasi-sovereign, or proprietary interest, harmed by Defendants' actions. Accordingly, for purposes of this analysis, the Court will consider Plaintiffs' other, purported bases for standing and will not address Plaintiffs' alleged, procedural injuries.

elements required: injury in fact, traceability, and/or redressability.  In response, Plaintiffs argue they have alleged several different theories of standing and have supported those theories with evidence filed in the record.  The Court addresses Plaintiffs' theories in turn below.

### a.  Plaintiff States' Sovereign Interests

"States have sovereign interests by virtue of their being co-sovereigns in our Nation's federalism."[32]   The Supreme Court has identified two types of sovereign interests.[33]  "First, the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal."[34]  And "second, the demand for recognition from other sovereigns—most frequently this involves the maintenance and recognition of borders."[35]  Only the first is at issue here.  Pursuant to States' sovereign interest in the power to enforce and create a legal code,

> States may have standing based on (1) federal assertions of authority to regulate matters [the states] believe they control, (2) federal preemption of state law, or (3) federal interference with the enforcement of state law, at least where "the state statute at issue regulates behavior or provides for the administration of a state program" and does not "simply purport to immunize state citizens from federal law."[36]

In relevant part, Plaintiffs allege that Risk Rating 2.0: (1) harms the Plaintiff States' sovereign interests by eliminating the parallel role the States have traditionally played in

---

[32] *Louisiana v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 877 (5th Cir. 2023).

[33] *Id.* (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)).

[34] *Id.* (citing *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 601).

[35] *Id.* (citing *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 601).

[36] *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) (cleaned up) (footnotes omitted).

the flood insurance program;[37] (2) interferes with the States' ability to manage flood mitigation and relief efforts by discouraging mitigation;[38] and (3) contradicts the goals of the States by discouraging flood mitigation projects and discouraging individuals and businesses from participating in the NFIP.[39]   Defendants argue these allegations fail to plausibly allege an injury to the States' sovereign interest because there is no allegation that Risk Rating 2.0 affects the Plaintiff States' ability *to create or enforce state laws*.   The Court agrees, and Plaintiffs' arguments and examples in their opposition memorandum fare no better in establishing that Plaintiffs have plausibly alleged an injury to the States' sovereign interest in enforcing their legal codes caused by Risk Rating 2.0.

As mentioned above, to be eligible for flood insurance provided through the NFIP, the property being insured must be located in a community that has adopted FEMA's minimum floodplain management standards.   The floodplain management regulations the community must adopt are based on a community's flood insurance rate maps ("FIRMs").   Plaintiffs contend that prior to Risk Rating 2.0, FEMA used FIRMs to establish the floodplain management regulations necessary for participation in the NFIP, and FEMA also set premium rates based on a property's location and elevation in a FIRM flood zone.   Now, under Risk Rating 2.0, FEMA calculates rates using additional geographical and structural variables, but the floodplain management regulations NFIP communities are required to adopt are still based on a community's FIRMs.   This is the change upon which

---

[37] R. Doc. 1 ¶ 279 (all Plaintiff States make same allegation).
[38] R. Doc. 1 ¶ 281 (all Plaintiff States make same allegation).
[39] R. Doc. 1 ¶ 283 (all Plaintiff States make same allegation).

Plaintiffs base their argument that Risk Rating 2.0 harms the Plaintiff States' sovereign interest in enforcing their legal codes.  Plaintiffs use Louisiana as an example.  They contend that after the federal government enacted the NFIA, the State of Louisiana enacted Louisiana Revised Statute § 38:84(A)–(B), which provides:

> A. In order to secure for the citizens of the state of Louisiana the flood insurance coverage provided for by the National Flood Insurance Act of 1968, 42 USC 4001 et seq., all of the parishes and municipalities of the state may adopt such ordinances, rules, and regulations, including zoning and land use regulations, as are necessary to comply with the requirements of said Act and the regulations adopted pursuant thereto by the Federal Emergency Management Agency.
> B. The office of engineering shall cooperate with the Federal Insurance Administrator of the Federal Emergency Management Agency in the planning and carrying out of state participation in the National Flood Insurance Program and shall aid, advise, and cooperate with parishes and municipalities endeavoring to qualify for participation in said program.

According to Plaintiffs, this statute is evidence of the States' cooperative relationship with the federal government in establishing and maintaining a program to promote and encourage flood insurance.  And they argue the federal government has reinforced this cooperative relationship by working with state and local entities to develop floodplain management regulations but that this cooperation has been frustrated by Risk Rating 2.0.  More specifically, because FEMA's own regulations articulate detailed criteria for developing floodplain management regulations based on a community's FIRMs, but Risk Rating 2.0 no longer uses FIRMs to set rates, Plaintiffs contend state and federal law require compliance with something that is no longer relevant to the flood insurance program and that this (1) discourages participation in the program and (2) frustrates the very core of Louisiana's law which is to "secure for the citizens of the state of Louisiana

the flood insurance coverage provided for by the NFIA."[40]  Even accepting Plaintiffs' arguments as true, Plaintiffs still have not shown that Risk Rating 2.0 tangibly interferes with the Plaintiff States' ability to create or enforce state law.[41]

Moreover, Louisiana Revised Statute § 38:84(A), the state law provision upon which Plaintiffs rely, merely authorizes the parishes and municipalities of the State of Louisiana to adopt the floodplain management regulations required by FEMA to be eligible for the flood insurance coverage provided for by the NFIA.  Plaintiffs have neither alleged nor shown that Risk Rating 2.0 interferes in any way with Louisiana's *power* to authorize its parishes and municipalities to adopt such regulations.  For all these reasons, the Court finds the Plaintiff States have failed to plausibly allege any injury to their sovereign interests caused by Risk Rating 2.0.

### b.  Plaintiff States' Quasi-Sovereign Interests

Quasi-sovereign interests "consist of a set of interests that the State has in the well-being of its populace."[42]  The Supreme Court has recognized two types of quasi-sovereign interests.  "First, a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system."[43]

---

[40] R. Doc. 75 at 22–23.
[41] *See Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 770 (5th Cir. 2023) (cleaned up) ("Given that the roots of [sovereign] interests are found in federalism, for a sovereign interest to serve as a cognizable injury for federal standing, 'the acts of the defendant must invade the [state's] sovereign right, resulting in some tangible interference with its authority to regulate or to enforce its laws.'").
[42] *Louisiana v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 877 (5th Cir. 2023) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 602 (1982)).
[43] *Id.* at 877–78 (quoting *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607).

Typically, when a State brings an action based on alleged injuries to its quasi-sovereign interests, the State is deemed to have brought the suit as *parens patriae*.[44]

Defendants argue the Plaintiff States do not have standing as *parens patriae* to bring an action against the federal government.  According to Defendants, this established rule vitally protects the dual sovereignty undergirding federalism: Because the federal government has its own sovereign relationship with its citizens, States are precluded from asserting those citizens' interest against the federal government.[45]  In response, Plaintiffs argue that Defendants ignore the category of cases States are permitted to bring against the federal government under a quasi-sovereign theory of standing—that is, cases wherein the States are actually asserting some injury to their own interests separate and apart from their citizens' interests.[46]  The Court need not determine whether Plaintiffs may sue Defendants based on an alleged injury to their quasi-sovereign interests, because even if they could, the Plaintiff States have failed to plausibly allege any injury in fact to their quasi-sovereign interests caused by Risk Rating 2.0.[47]

In the Complaint, Plaintiffs conclusively allege Risk Rating 2.0 "harms [the States'] quasi-sovereign interests."[48]   In the paragraphs that follow, Plaintiffs allege that the Plaintiff States have "an interest in preserving [their] sovereign territory and [their]

---

[44] *See, e.g.*, *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 602–08; *Harrison*, 78 F.4th at 772.

[45] R. Doc. 47-1 at 23 (first citing *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923); and then citing *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007)).

[46] R. Doc. 75 at 27 (first citing *Georgia v. Tenn. Copper Co.*, 206 U.S. 230 (1907); and then citing *Kentucky v. Biden*, 23 F.4th 585, 596 (6th Cir. 2022)).

[47] *See Harrison*, 78 F.4th at 769 ("'States are not normal litigants for the purposes of invoking federal jurisdiction.' But they, too, are bound by Article III's standing requirements.").

[48] R. Doc. 1 ¶¶ 284 (Louisiana), 305 (Florida), 327 (Idaho), 348 (Kentucky), 368 (Mississippi), 388 (Montana), 409 (North Dakota), 429 (South Carolina), 449 (Texas), 470 (Virginia).

habitability by ensuring adequate flood mitigation infrastructure is built and maintained to protect the land and property in [their] borders, and that compulsory, unaffordable flood insurance does not render the land and property uninhabitable."[49]  The Plaintiff States also allege that they have an "interest in the 'health, comfort, and welfare' of [their] citizens" and that "[t]his interest is particularly pronounced when federal actions are threatening to make housing in [their respective states] entirely unaffordable."[50]  In their opposition memorandum, Plaintiffs slightly alter their position to support their theory of standing based on an injury to a quasi-sovereign interest that falls under the umbrella of cases that Plaintiffs believe are permissible, i.e., asserting an injury to their own interests separate and apart from their citizens' interests.  There, Plaintiffs argue that Risk Rating 2.0 "implicates [S]tates' power to make and enforce policies and regulations related to the health and safety of its citizens" and that "inherent in this power is [the Plaintiff States'] interest in promoting participation in the NFIP."[51]

Although it is difficult to discern precisely what quasi-sovereign interests the Plaintiff States believe are at stake in this litigation, the Court nevertheless construes the allegations in the light most favorable to Plaintiffs and finds that the Plaintiff States are attempting to allege an injury to their quasi-sovereign interests in preserving the land within their respective borders, i.e., their "sovereign territory."[52]  Indeed, relying on

---

[49] R. Doc. 1 ¶¶ 285 (Louisiana), 306 (Florida), 328 (Idaho), 349 (Kentucky), 369 (Mississippi), 389 (Montana), 410 (North Dakota), 430 (South Carolina), 450 (Texas), 471 (Virginia).

[50] R. Doc. 1 ¶¶ 286 (Louisiana), 307 (Florida), 329 (Idaho), 350 (Kentucky), 370 (Mississippi), 390 (Montana), 411 (North Dakota), 431 (South Carolina), 451 (Texas), 472 (Virginia).

[51] R. Doc. 75 at 27.

[52] *See* R. Doc. 1 ¶¶ 270, 271, 272, 274, 281, 283, 285, 286, 291. Presumably due to the confusion in the jurisprudence regarding the concept of quasi-sovereign interests, Plaintiffs' opposition discusses the State

*Massachusetts v. EPA*[53] and *Georgia v. Tennessee Copper Co.*,[54] Plaintiffs argue that "much like the coastlines in Massachusetts and the air in Georgia, the [Plaintiff States] ha[ve] an interest in maintaining mitigation efforts to reduce flooding on [their] land."[55] Plaintiffs further argue that because they have alleged that Risk Rating 2.0 no longer rewards mitigation efforts and that fewer people are undertaking mitigation projects because of Risk Rating 2.0's increased cost of flood insurance, the Plaintiff States have shown that their interest "in all the earth and air within [their] domain" is harmed by Risk Rating 2.0.[56]

In *Georgia v. Tennessee Copper Co.,* the State of Georgia sought to enjoin copper companies in neighboring Tennessee from discharging pollutants that were inflicting "a wholesale destruction of forests, orchards and crops" in bordering Georgia counties.[57] Recognizing Georgia's standing to bring the action, the Supreme Court explained:

> The case has been argued largely as if it were one between two private parties; but it is not. The very elements that would be relied upon in a suit between fellow-citizens as a ground for equitable relief are wanting here. The state owns very little of the territory alleged to be affected, and the damage to it capable of estimate in money, possibly, at least, is small. This is a suit by a state for an injury to it in its capacity of *quasi-sovereign*. In that capacity the state has an interest independent of and behind the titles of its citizens, *in all the earth and air within its domain*. It has the last word as to whether its

of Louisiana's injury to its interest in "all the earth and air within its domain" in the section on injuries to the States' *sovereign* interests. *See* R. Doc. 75 at 24–25. The case law Plaintiffs cite, however, classifies this type of interest as a *quasi-sovereign* interest. *See* R. Doc. 75 at 24–25 (first citing *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007); and then citing *Georgia v. Tenn. Copper Co.*, 206 U.S. 203, 237 (1907)); *see also Alfred L. Snapp & Son, Inc.*, 458 U.S. at 604. Thus, this Court has chosen to analyze Plaintiffs' allegations and arguments in this section of its Order and Reasons as opposed to the sovereign interest section.
[53] 549 U.S. at 519.
[54] 206 U.S. at 237.
[55] R. Doc. 75 at 24–25.
[56] R. Doc. 75 at 25.
[57] 206 U.S. 230, 236 (1907).

mountains shall be stripped of their forests and its inhabitants shall breathe pure air.[58]

In *Massachusetts v. EPA*, the State of Massachusetts and other states, local governments, and private parties challenged the EPA's denial of a rulemaking petition asking the EPA to regulate greenhouse gas emissions that were allegedly contributing to global warming.[59]  The EPA contested the petitioners' standing to challenge its denial, but the Supreme Court disagreed.[60]  Relying on the above-quoted portion of their opinion in *Tennessee Copper Co.*, the Supreme Court stated, "Just as Georgia's independent interest 'in all the earth and air within its domain' supported federal jurisdiction a century ago, so too does Massachusetts' well-founded desire to preserve its sovereign territory today."[61] The Court further explained that the petitioners' submissions as they pertained to Massachusetts established that the "EPA's steadfast refusal to regulate greenhouse gas emissions present[ed] a risk of harm to Massachusetts that [was] both 'actual' and 'imminent.'"[62]  In particular, the Court found that the petitioners' affidavits established global sea levels had risen as a result of global warming, the rising seas "had already begun to swallow Massachusetts' coastal land," and that the severity of the land loss would only continue to increase over the next century.[63]

---

[58] *Id.* at 237 (emphasis added).
[59] 549 U.S. 497, 504–05 (2007).
[60] *Id.* at 505, 516–26.
[61] *Id.* at 518–19.
[62] *Id.* at 521 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).
[63] *Id.* at 521–23.

Here, however, the Plaintiff States have not alleged *any actual or imminent injury to the earth or air within their domain*.[64]  At most, they have alleged a speculative injury that is based on a highly attenuated chain of possibilities.[65]  Piecing together the Plaintiff States' allegations, their theory seems to be that because Risk Rating 2.0 does not provide mitigation discounts, mitigation efforts in their respective states will decrease—either because individual citizens will decline to take mitigation efforts or because citizens will choose to move out of the state due to the high costs of flood insurance, reducing the tax revenues of the political subdivisions responsible for flood mitigation—thereby raising the risk and increasing the probability of severe damage to the land and property within the state.[66]  Contrary to the Plaintiff States' position, though, this theory is unlike the injury to the quasi-sovereign interests that supported standing in *Georgia v. Tennessee Copper Co.* or *Massachusetts v. EPA*.  In both of those cases, the Supreme Court's majority found that actual and concrete harm had occurred and was continuing to occur.[67]  Here, the Plaintiff States have not alleged any actual harm to the earth or air within their respective borders.  Instead, the Plaintiff States base their *parens patriae* standing on a *threatened* injury to the land and property within their borders.  And while a threatened injury can support standing

---

[64] *Cf. Georgia v. Tenn. Copper Co.*, 206 U.S. 203, 238–39 (1907) (finding noxious gas emitted in Tennessee was causing considerable damage to the forests and vegetation in Georgia); *Massachusetts*, 549 U.S. at 522–23 (finding that Massachusetts had lost and would continue to lose its coastal land due to global warming).

[65] *See Louisiana v. Biden*, 64 F.4th 674, 682 (5th Cir. 2023) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)).

[66] *See* R. Doc. 1 ¶¶ 281, 283, 285.

[67] *See Tenn. Copper Co.*, 206 U.S. at 238–39 (finding noxious gas emitted in Tennessee was causing considerable damage to the forests and vegetation in Georgia); *Massachusetts*, 549 U.S. at 522–23 (finding that Massachusetts had lost and would continue to lose its coastal land due to global warming).

if it is "certainly impending,"[68] the Plaintiff States ask this Court to find standing based on an injury that is entirely speculative and that rests on a highly attenuated chain of possibilities. "Allegations of *possible future* injury" are insufficient to support standing.[69] Accordingly, the Plaintiff States have not plausibly alleged an injury to their quasi-sovereign interests sufficient to confer standing.[70]   And as a result, even if the Plaintiff States could invoke *parens patriae* standing in an action against the federal government, they have failed to carry their burden to establish such standing here.

### c.  Proprietary Interests

Like private litigants, States and the other governmental entities also have proprietary interests which may serve as a basis for standing.[71]   Here, Plaintiffs contend their proprietary interests have been harmed based on several forms of economic injury. The Court addresses each in turn below.

### i.   Loss of Tax Revenues

The Plaintiff States allege that the higher insurance premiums under Risk Rating 2.0 will cause residents to leave the Plaintiff States, depress property values within their respective States, and discourage individuals from purchasing property in the Plaintiff States, thereby reducing their tax bases, and lowering their tax revenues, which will ultimately hinder their ability to invest in future mitigation projects.[72]   Relying on this

---

[68] *Clapper*, 568 U.S. at 410 ("[T]hreatened injury must be certainly impending to constitute injury in fact.").
[69] *Louisiana v. Biden*, 64 F.4th 674, 681 (5th Cir. 2023) (citing *Clapper*, 568 U.S. at 409).
[70] *See, e.g.*, *Clapper*, 568 U.S. at 410 ("[R]espondents' theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending.").
[71] *Louisiana v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 878 (5th Cir. 2023).
[72] *See, e.g.*, R. Doc. 1 ¶ 272, 273, 276, 277.

same causal chain, the Plaintiff Parishes allege they "will suffer financial harm as a result of property values decreasing and a lower tax base to fund future mitigation efforts."[73] And the Plaintiff Municipalities, Levee Districts, and Drainage Districts all allege "fewer people and high flood insurance rates mean that property values will decrease, leaving the [respective Plaintiffs] with fewer resources to invest in future mitigation projects."[74]

Under Fifth Circuit precedent, a state or political subdivision's "loss of general tax revenues as an indirect result of federal policy is not a cognizable injury in fact."[75] This is because "virtually all federal policies" "will inevitably have economic impact" on state and local governments.[76] Thus, to avoid "unwarranted litigation against the federal government," courts "require more than incidental economic impact to establish a cognizable injury."[77] The state or local government "must establish a 'direct link between its status as a collector and recipient of revenues and the action being challenged,' such as the loss of a specific tax revenue, to have standing."[78]

Defendants argue Plaintiffs' purported tax base injuries are precisely the type the Fifth Circuit has determined are insufficient for purposes of standing—that is, a loss of general tax revenue as an indirect result of federal policy. In response, Plaintiffs contend they have alleged "a loss of specific tax revenues" sufficient to confer standing. The Plaintiff Parishes, Municipalities, Levee Districts, and Drainage Districts all rely on the

---

[73] R. Doc. 1 ¶¶ 479–521.
[74] R. Doc. 1 ¶¶ 522–537.
[75] *El Paso Cnty. v. Trump*, 982 F.3d 332, 339 (5th Cir. 2020).
[76] *Id.* at 339–40.
[77] *Id.* at 340.
[78] *Id.* at 341.

same argument which differs from the arguments made by the Plaintiff States.  The Court considers these arguments in turn below.

### (1) Plaintiff Parishes, Municipalities, Levee Districts, and Drainage Districts

The Plaintiff Parishes, Municipalities, Levee Districts, and Drainage Districts all contend they have alleged a loss of specific tax revenue because the Louisiana Constitution provides these Plaintiffs with the authority to levy ad valorem taxes, the collection of which will be reduced due to decreased property values caused by Risk Rating 2.0, and therefore the Plaintiffs will have fewer resources to mitigate against flood risks.[79]  Plaintiffs analogize the loss of the ad valorem tax revenue to the loss of the severance tax revenue that the Supreme Court found sufficient to confer standing in *Wyoming v. Oklahoma*.[80]  Defendants contend that, despite having a technical name, ad valorem taxes are simply general property taxes, broadly levied across all taxable Louisiana homeowners.  Thus, Defendants analogize these ad valorem taxes to the general income and sales taxes that the Fifth Circuit in *El Paso County v. Trump* held could not serve as a basis for Article III standing.[81]  Defendants further argue that the alleged loss of ad valorem tax revenue comes at the end of a highly attenuated chain of causation, such that even if the ad valorem taxes are "specific," the alleged loss is still insufficient to confer standing because it is an indirect result of the challenged conduct.

---

[79] R. Doc. 75 at 18–19, 21.
[80] 502 U.S. 437 (1992).
[81] 982 F.3d at 359 (Dennis, J., dissenting) (characterizing the county's sale and use tax revenue as "specific tax revenue," despite the majority's finding that the county had only alleged a loss of general tax revenue).

In *Wyoming v. Oklahoma*, the case upon which Plaintiffs rely, Wyoming challenged an Oklahoma state law that required Oklahoma utility companies to burn at least 10% Oklahoma-mined coal.[82]  Prior to the law's enactment, the Oklahoma utilities purchased virtually all of their coal from Wyoming sources, and Wyoming collected severance tax on all coal extracted from the state.[83]  The Oklahoma law, therefore, caused Wyoming a direct injury in the form of hundreds of thousands of dollars of severance tax revenue on Wyoming-mined coal.[84]

*Wyoming* is distinguishable from the instant case.  Unlike the Oklahoma law's direct impact on Wyoming's severance tax collections, the chain of causation between Risk Rating 2.0 and any reduced ad valorem taxes is highly attenuated.  As the Fifth Circuit explained in *El Paso*, "incidental and attenuated harm is insufficient to grant a state or [local government] standing."[85]  Moreover, this Court finds the Plaintiff Parishes, Municipalities, Levee Districts, and Drainage Districts' tax base theory of standing is akin to the State of Florida's theory in *Florida v. Mellon*, which the Supreme Court found was insufficient to invoke the jurisdiction of the court.[86]  There, Florida sought to enjoin the federal government from collecting an inheritance tax in the state, arguing that it would cause Florida residents to remove property from the state, thereby "diminishing the subjects upon which the state power of taxation may operate."[87]  The Supreme Court found the

---

[82] 502 U.S. at 440.
[83] *Id.* at 442, 445.
[84] *Id.* at 450.
[85] 982 F.3d at 341.
[86] 273 U.S. 12 (1927).
[87] *Id.* at 17–18.

claimed injury to be "purely speculative, and, at most, only remote and indirect."[88] Explaining further, the Court stated, "Plainly, there is no substance in the contention that the state has sustained, or is immediately in danger of sustaining, any direct injury as the result of the enforcement of the act in question."[89]   So too, here, Plaintiffs' claimed economic injuries in the form of a reduction in their ad valorem tax collections are, at most, a remote and indirect consequence of Risk Rating 2.0.   Accordingly, the Plaintiff Parishes, Municipalities, Levee Districts, and Drainage Districts cannot establish standing based on this theory.

### (2) Plaintiff States

The Plaintiff States also argue they have alleged an economic injury in the form of a loss of specific tax revenues.[90]   They rely on two separate arguments, both of which relate only to Louisiana and neither of which show that Louisiana has plausibly alleged an injury to their tax revenues sufficient to confer standing.

First, Louisiana makes the following argument as to how it has alleged a loss of specific tax revenue:

> Louisiana spends significant public funds in response to major flood events. Because of [Risk Rating 2.0], fewer people are undertaking mitigation projects, which leaves many areas more vulnerable to major flood events. The loss of funds directly harms the State's ability to respond to these disasters. The State of Louisiana sets aside special funds to offset any unexpected expenses, and it has previously had to access those funds in response to extreme flooding. *See* La. Rev. Stat. § 39:94.[91]

---

[88] *Id.* at 18.
[89] *Id.*
[90] R. Doc. 75 at 29.
[91] R. Doc. 75 at 29 (citations omitted).

As an initial matter, the Court notes that nowhere in this argument is the contention that Risk Rating 2.0 reduces the State's *collection* of *any* tax revenue, general or specific. Instead, Louisiana seems to make the novel argument that it will sustain a *loss of specific tax revenue* based on the State's *increased spending* on disaster recovery, the money for which will come from a "special fund" the State maintains using excess funds the State receives through tax revenues and other sources.[92]   The Court finds this argument misses the mark for several reasons. First, and critically, *spending* tax revenues and *collecting* tax revenues are not the same thing.   Despite its argument here, the State seems to recognize this point, given that one of the other forms of economic injury the Plaintiff States allege they will suffer is increased spending on flood recovery.[93]   Second, that the money spent comes from a "special fund," as opposed to some general fund, is of no moment.   It is,

---

[92] *See* LA. REV. STAT. § 39:94(A)(1)–(5).
> A. There is hereby created in the state treasury a special fund to be designated as the Budget Stabilization Fund, hereafter referred to in this Section as the "fund", which shall consist of all money deposited into the fund in accordance with Article VII, Section 10.3 of the Constitution of Louisiana. Money shall be deposited in the fund as follows:
> (1) All money available for appropriation from the state general fund and dedicated funds in excess of the expenditure limit, except funds allocated by Article VII, Section 4, Paragraphs (D) and (E) of the Constitution of Louisiana, shall be deposited in the fund.
> (2)(a) All revenues received in each fiscal year by the state in excess of nine hundred fifty million dollars, hereinafter referred to as the "base," as a result of the production of or exploration for minerals . . .
> (3) The greater of twenty-five million dollars from any source, or twenty-five percent of any money designated in the official forecast as nonrecurring as provided in Article VII, Section 10(D)(2) of the Constitution of Louisiana, shall annually be deposited in and credited to the fund.
> (4) Any money appropriated to the fund by the legislature including any appropriation to the fund from money designated in the official forecast as provided in Article VII, Section 10(D)(2) of the Constitution of Louisiana shall be deposited in the fund.
> (5) An amount equivalent to the money received by the state from the federal government for the reimbursement of costs associated with a federally declared disaster, not to exceed the amount of costs appropriated out of the fund for the same disaster pursuant to Paragraph (C)(3) of this Section.

*Id.*

[93] *See* discussion *infra* Section II.A.2.c.iii.

indeed, still money spent and *not a decrease in revenues collected*.   The above-quoted language does not provide any basis for this Court to find that Louisiana has plausibly alleged it will suffer an economic injury in the form of a loss of specific tax revenue as a result of Risk Rating 2.0.

Louisiana next argues that it has alleged a loss of specific tax revenue because, "given the sizeable presence of oil and gas production in the State, the harm to those industries will reduce the severance tax levied on those lands. *See* La. Const. art. 7, § 4."[94] Notwithstanding the fact that the Complaint contains no such allegation, this purported injury is far too attenuated from Risk Rating 2.0 to satisfy the Article III standing requirements.[95]   Indeed, Louisiana's theory requires accepting that because of the increased NFIP premiums under Risk Rating 2.0, residents and businesses will leave the State and potential workers and businesses will choose not to come to the State, and that this population deficit will be significant enough to cause oil and gas production activities to decrease, ultimately resulting in a decrease in the State's collection of severance taxes levied on lands where such operations occur.   This is precisely the sort of incidental and attenuated effect on tax revenue that courts have found fails to satisfy the Article III standing requirements.[96]

---

[94] R. Doc. 75 at 29. The Court notes that the first mentioning of this severance tax, much less Risk Rating 2.0's impacts on the State's severance tax revenues, came in Plaintiffs' memorandum in opposition to Defendants' motion to dismiss. Because it could be argued that the State's more general allegations about its proprietary harm encompass these more specific allegations, the Court considers the argument here. The Court finds such consideration harmless given that Louisiana cannot establish standing based on such injury even if it had been alleged.

[95] *Cf. Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (conferring standing where the challenged action, i.e., Oklahoma's law, had a direct impact on Wyoming's collection of severance taxes).

[96] *See El Paso Cnty. v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020); *Florida v. Mellon*, 273 U.S. 12, 18 (1927).

In summary, the Court finds the Plaintiff States have not plausibly alleged any loss of tax revenue that is a direct result of Risk Rating 2.0. The allegations in the Complaint instead establish that there is a lengthy chain of causation between Risk Rating 2.0 and any possible loss of tax revenue, general or specific. Louisiana's arguments do not show otherwise. Accordingly, this theory of standing fails.

### ii. Past Spending on Mitigation Efforts

All Plaintiffs allege that they have previously spent public funds on mitigation efforts. And while the Plaintiffs do not explicitly articulate this as a basis for standing for any of the Plaintiff groups in their opposition to Defendants' motion to dismiss, the Plaintiff States raised it in their motion for preliminary injunction as irreparable harm they will suffer because of Risk Rating 2.0. The Court therefore considers the argument here as a basis for standing.

Plaintiffs allege that prior to Risk Rating 2.0, they spent public funds on mitigation projects that under the old rating methodology resulted in lower premiums for their residents. Plaintiffs further allege that under Risk Rating 2.0, mitigation efforts are no longer rewarded, resulting in higher premiums for their residents. Thus, Plaintiffs argue, Risk Rating 2.0 "imposes a substantial financial injury" on them because it "devalues" the mitigation efforts they were previously encouraged to undertake.[97] Plaintiffs say very little else about this "financial injury" except that "the States have used significant public funds to support mitigation efforts."[98] Plaintiffs fail to explain how funds they voluntarily spent

---

[97] R. Doc. 14-2 at 41.
[98] R. Doc. 14-2 at 41.

in the past to protect their residents from flood damage constitute an injury in fact that is fairly traceable to Risk Rating 2.0 or redressable by a favorable judicial decision.  And while the Court can see how the purported "devaluing" could make up part of the chain of causation that ultimately leads to some other economic injury,[99] the Plaintiffs have failed to show how the devaluing *alone* constitutes an injury in fact to Plaintiffs.  For these reasons, Plaintiffs have failed to carry their burden to establish standing based on this purported injury.

### iii. Increased Costs to Plaintiff States

The Plaintiff States allege that Risk Rating 2.0 will cause them direct, proprietary harm in two related but distinct ways.  Both theories involve increased costs to the Plaintiff States as a result of Risk Rating 2.0 based on Plaintiffs' allegations that higher premiums under Risk Rating 2.0 will cause fewer of their residents to carry flood insurance.

First, the Plaintiff States allege that "State funds support rebuilding efforts after a flooding event"[100] and that "increased premiums [under Risk Rating 2.0] will lead to fewer policies in force and less coverage, creating greater risk exposure."[101]  Thus, they contend, they are financially harmed by Risk Rating 2.0 because it will cause them to spend more

---

[99] For example, Plaintiffs' tax base theories all begin with the allegation that mitigation efforts are no longer rewarded under Risk Rating 2.0, which Plaintiffs contend leads to higher premiums for policyholders, resulting in lower property values, residents leaving the states, or choosing not to move to the states, ultimately lowering Plaintiffs' tax revenues in one form or another. Of course, the Court found these injuries to be too indirect to support standing; they nevertheless provide an example of how devaluing could, in theory, lead to some other form of economic injury.

[100] R. Doc. 1 ¶¶ 265 (Louisiana), 312 (Florida), 334 (Idaho), 355 (Kentucky), 375 (Mississippi), 395 (Montana), 416 (North Dakota), 436 (South Carolina), 456 (Texas), 477 (Virginia).

[101] R. Doc. 1 ¶ 240.

money rebuilding after future flood events.  The Court will refer to this as Plaintiffs' rebuilding cost theory.

Second, the Plaintiff States allege that although Risk Rating 2.0 does not alter the mechanics of the grant programs mentioned below, the new methodology is nevertheless causing harm related to these programs.[102]  Plaintiffs contend that, through grant programs such as the Flood Mitigation Assistance Program and the Hazard Mitigation Grant Program, FEMA provides funding for projects aimed at mitigating flood risks, like the elevation of individual homes.[103]  One of the conditions of receiving these grant funds is that the homeowner obtain and maintain flood insurance for the life of the structure, regardless of transfer of ownership.[104]  Plaintiffs further contend that FEMA relies on state and local governments to administer the mitigation projects funded through the grant programs,[105] and "if a homeowner who is the recipient of such funds fails to obtain or maintain flood insurance as required, the State is required to pay back to FEMA the amount of funding that the non-compliant homeowner received."[106]  The Plaintiff States thus argue they are harmed by Risk Rating 2.0 because the higher premiums will push people to drop their mandatory flood insurance, which will in turn increase the States' liability to FEMA for the reimbursement of the funds received by the non-compliant homeowners.[107]  The Court will refer to this as Plaintiffs' reimbursement cost theory.  The Plaintiff States

---

[102] R. Doc. 1 ¶ 211.
[103] R. Doc. 1 ¶ 141; R. Doc. 1-1 ¶ 36.
[104] R. Doc. 1 ¶ 142; R. Doc. 1-1 ¶ 36.
[105] R. Doc. 1 ¶ 143; R. Doc. 1-1 ¶ 38.
[106] R. Doc. 1 ¶ 144; R. Doc. 1-1 ¶ 41.
[107] R. Doc. 1 ¶ 213.

acknowledge that they may seek to recover these funds but aver that doing so involves significant further costs to the State and often proves unsuccessful.[108]

For the reasons explained below, and despite Defendants' arguments to the contrary, the Court finds that the Plaintiff States have plausibly alleged the facts necessary to confer standing based on these increased costs theories. As previously discussed, for a plaintiff's injury to satisfy the Article III injury-in-fact requirement, it must be "concrete, particularized, and actual or imminent."[109] There seems to be no disagreement that these alleged costs constitute a concrete and particularized injury. However, because these costs constitute future injuries, the Court must consider whether the Plaintiff States have plausibly alleged they are "certainly impending."[110] Defendants argue Plaintiffs failed to do so because they have not plausibly alleged any mass NFIP or population exodus and, thus, Plaintiffs' injuries are speculative at best. While the Court agrees Plaintiffs have not plausibly alleged any mass population exodus due to Risk Rating 2.0, neither of these injuries rely on a mass population exodus; they depend on decreased NFIP participation. The relevant question, then, is whether Plaintiffs have plausibly alleged that increased rates under Risk Rating 2.0 will cause NFIP policyholders to drop their flood insurance coverage. The Court finds they have. Throughout the Complaint Plaintiffs allege that Risk Rating 2.0 results in higher premiums for a majority of policyholders and that these higher rates will cause people to drop their policies.[111]

---

[108] R. Doc. 1 ¶ 213; R. Doc. 1-1 ¶ 42.
[109] *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2555 (2019).
[110] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) ("[T]hreatened injury must be certainly impending to constitute injury in fact.").
[111] *See, e.g.*, R. Doc. 1 ¶¶ 230–36, 240–42, 246.

To the extent Plaintiffs' allegation that the increased premiums will lead to fewer policies in force is conclusory, the Court also finds that Plaintiffs have plausibly substantiated this allegation in a manner sufficient to carry their burden at the motion to dismiss stage. Indeed, Plaintiffs allege that NFIP participation has already fallen since Risk Rating 2.0 was implemented and that FEMA has admitted it expects one million or more NFIP policyholders to drop their NFIP coverage by the end of the decade as a result of Risk Rating 2.0.[112] Thus, at least as to the Plaintiff States' rebuilding costs theory, the Court finds they have plausibly alleged an injury in fact.

The Court will address a separate argument made by the Defendants with respect to the Plaintiff States' reimbursement cost theory. According to Defendants, this theory is even more conjectural than the rebuilding cost theory because it depends on NFIP policyholders who have received federal grant funds to violate federal law by failing to maintain NFIP coverage, and Defendants assert that policyholders violating the law is "hardly a predictable third-party result of Risk Rating 2.0." In so arguing, Defendants essentially ask this Court to require Plaintiffs to have specifically alleged every fact and piece of evidence they may later present at a trial on the merits of their claims to show injury.[113] The Court rejects Defendants' invitation to do so. At the motion to dismiss stage,

---

[112] R. Doc. 1 ¶ 240.

[113] Take, *Department of Commerce v. New York,* for example. 139 S. Ct. 2551 (2019). There, the Supreme Court considered whether the States had standing to challenge the federal government's reinstatement of a citizenship question on the census questionnaire. *Id.* at 2565. The States argued the reinstatement of the citizenship question would depress the census response rate, thereby undercounting the States' populations, resulting in a number of injuries, including loss of federal funds that are distributed on the basis of population. *Id.* The Government challenged the States' standing, in part, on the basis that their injuries were not fairly traceable to the challenged action because they were dependent upon the independent action of third parties choosing to violate their legal duty to respond to the census. *Id.* at 2565–66. But, based on

28

courts "presume that general allegations embrace those specific facts that are necessary to support the claim."[114]  And as previously discussed, the Court has found that Plaintiffs have plausibly alleged that higher premiums under Risk Rating 2.0 will result in policyholders choosing to drop their NFIP coverage.  This allegation is sufficient to support the Plaintiff States' reimbursement cost theory at this stage.

The Court likewise finds that the Plaintiff States have plausibly alleged that their economic injuries are "fairly traceable" to Risk Rating 2.0. While the fairly traceable requirement cannot be satisfied "if the injury complained of is the result of the *independent* action of some third party not before the court," courts have found traceability where the alleged injury relies "on the predictable effect of Government action on the decisions of third parties."[115] Here, the Plaintiff States have alleged: (1) that fewer of their residents will choose to renew their NFIP policies as a result of the increased premiums under Risk Rating 2.0; (2) that FEMA itself admitted that it expects NFIP participation to decrease over the next decade as a result of Risk Rating 2.0; and (3) that, as a result, the Plaintiff States will suffer economic injury in the form of increased costs to rebuild after a flood event and increased liability to FEMA for the reimbursement of grant funds.  In other words, the Plaintiff States have plausibly alleged that Risk Rating 2.0 will have a

---

the evidence presented at trial, the Supreme Court found that the States satisfied their burden in showing that the third parties will likely react in predictable ways to the citizenship question.  *Id.* at 2566.  Thus, traceability was satisfied.  *Id.*  Under the argument made by Defendants, here, *Department of Commerce v. New York* would have never made it past the motion to dismiss stage.

[114] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

[115] *See e.g.*, *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (cleaned up) (citations omitted); *New York*, 139 S. Ct. at 2566 (finding the traceability requirement satisfied where the states' theory of standing "relie[d] . . . on the predictable effect of Government action on the decisions of third parties").

determinative effect on their citizens and that as a result the Plaintiff States will suffer economic injury.  Traceability is therefore satisfied.[116]

### iv. Increased Premium Rates for NFIP Policyholders

Throughout their briefing, Plaintiffs reiterate that Risk Rating 2.0 causes financial injury in the form of increased premium rates on policyholders.  The only Plaintiffs that could possibly establish standing based on this injury, however, are those who are policyholders themselves.[117]  Upon review of the allegations in Plaintiffs' Complaint, the only Plaintiffs to allege being NFIP policyholders are St. Tammany Parish, Livingston Parish, and Washington Parish (collectively referred to herein as "Plaintiff Policyholders").[118]  Of the three, St. Tammany Parish provides the most detail with respect to the rate increases it faces under Risk Rating 2.0, alleging that  "the Parish itself has seen increases to its own policies, costing the Parish an additional $2,877 as a result of Risk Rating 2.0."[119]  Livingston Parish and Washington Parish each merely allege that "the Parish itself has to procure flood insurance on its parish-owned buildings, which are subject to [Risk Rating 2.0's] rate increases."[120]

---

[116] Defendants also challenge the redressability of the Plaintiff States' injuries.  The Court will consider Defendants' challenge after the Court has analyzed all individual Plaintiffs' standing arguments, as the redressability challenge applies equally to all Plaintiffs that the Court ultimately finds have satisfied the first two standing requirements.

[117] *See generally Spokeo, Inc. v. Robins*, 578 U.S. 330, 229 (2016) (cleaned up) ("To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical. . . . For an injury to be 'particularized,' it "must affect the plaintiff in a personal and individual way.").

[118] R. Doc. 1 ¶¶ 500 (Livingston Parish), 511 (St. Tammany Parish), 517 (Washington Parish).

[119] R. Doc. 1 ¶ 511.

[120] R. Doc. 1. ¶¶ 500, 517.

Defendants contend that these Plaintiff Policyholders have not plausibly alleged a concrete injury based on rate increases under Risk Rating 2.0 for three reasons.  First, only St. Tammany Parish provides any specific and concrete information about Risk Rating 2.0 rate increases it will experience.  Second, the additional $2,877 St. Tammany Parish will have to spend represents a de minimis cost to the Parish, unlike for a resident policyholder.  And third, any minimal financial impact on St. Tammany Parish's individual policies is likely to be outweighed or at least counterbalanced by the collective financial benefits that Risk Rating 2.0 confers on it based on the net effect Risk Rating 2.0 has on its residents' premiums, which Defendants contend will result in many of its residents experiencing decreases in policy premiums or avoiding indefinite year-to-year premium increases.

As to Defendants' first argument, the Court reiterates that the burden at the motion to dismiss stage is low, and the allegations of Livingston and Washington Parish, while bare, establish that under Risk Rating 2.0, these Parishes have seen an increase in flood insurance rates and that the flood insurance policies they must procure to insure parish-owned buildings are subject to Risk Rating 2.0's rate increases.  The Court finds these allegations sufficiently allege an economic injury to the respective parishes in the form of increased policy premiums under Risk Rating 2.0.

The Court likewise finds no merit in Defendants' second argument.  Defendants argue that the fiscal cost to St. Tammany Parish is a far cry from the "several million dollar" loss that the Fifth Circuit found sufficient to confer standing on Texas in the State's suit over the federal Deferred Action for Parents of American's and Lawful Permanent

Residents ("DAPA") program in *Texas v. United States*.[121]   Unlike the State's injury in *Texas*, however, the Parishes here allege Risk Rating 2.0  imposes direct economic injury on them in their proprietary capacity as policyholders, unrelated to any impact Risk Rating 2.0 has on their residents or the downstream effects of such impact on the Parishes.[122] Thus, to the extent the significance of the financial harm had any bearing on the State's standing to sue in *Texas*, it is irrelevant here.[123]   Moreover, the Court is unaware of any support for Defendants' argument, which is essentially that because of a parish's status as a governmental entity, i.e., regardless of the capacity in which it is injured, the parish policyholders must allege *significant* economic harm to have standing to challenge Risk Rating 2.0.  Under Defendants' theory, St. Tammany Parish does not have standing to challenge Risk Rating 2.0 because the $2,877 increase in rates is a de minimis cost to the Parish, but a multi-million-dollar corporation that carries an NFIP policy on its property and that experienced the same $2,877 rate increase would have standing to challenge Risk Rating 2.0.  The Court finds no support for this outcome in *Texas* or any other case law.

Lastly, Defendants ask this Court to engage in an accounting exercise to find that any financial impact Risk Rating 2.0 has on St. Tammany Parish's individual policies will likely be outweighed by the net effect Risk Rating 2.0 will have on its residents' premiums. More specifically, Defendants contend that as a result of Risk Rating 2.0, many of St.

---

[121] 809 F.3d 134, 155 (5th Cir. 2015).

[122] *Cf. id.* (finding Texas had standing to challenge DAPA because DAPA would enable at least 500,000 illegal aliens in Texas to qualify for driver's licenses under Texas law and that Texas would incur significant costs in issuing driver's licenses to DAPA beneficiaries because it subsidizes its licenses and would lose a minimum of $130.89 on each license issued to a DAPA beneficiary).

[123] *Cf. OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("[T]he injury alleged as an Article III injury-in-fact need not be substantial.").

Tammany Parish's residents will experience decreases in policy premiums or avoid indefinite year-to-year premium increases, and thus, based on Plaintiffs' own theory of economic impact, Risk Rating 2.0 would strengthen the Parish's tax base.  To the extent it is appropriate to consider such an argument at the motion to dismiss stage, for the same reasons the Court found the Plaintiff Parishes' tax base theory too conjectural, Defendants' argument, which relies on the same chain of possibilities, likewise fails.[124]

In summary, the Court finds that the Plaintiff Policyholders have all alleged an economic injury that is fairly traceable to Risk Rating 2.0.

### v.  Redressability of Plaintiffs' Economic Injuries

For the reasons explained herein, the Court has found that the Plaintiff States have plausibly alleged an economic injury that is fairly traceable to Risk Rating 2.0 in the form of rebuilding costs and reimbursement costs, and the Plaintiff Policyholders have likewise satisfied the first two elements of standing based on the alleged increase in premium rates they have paid or will have to pay as a result of Risk Rating 2.0.  The third and final element of constitutional standing is that "it must be likely" that the plaintiff's injury "will be redressed by a favorable decision."[125]   Because the Defendants' challenges to the

---

[124] *See Texas*, 809 F.3d at 155–56 (rejecting a similar argument made by the federal government on the basis that none of the benefits identified by the government were sufficiently connected to the costs to be incurred by Texas to qualify as an offset and even the ones that were conceivably relevant were based on the independent decisions of DAPA beneficiaries and not a direct result of the issuance of the licenses) ("In the instant case, the states have alleged an injury, and the government predicts that later decisions of DAPA beneficiaries would produce offsetting benefits. Weighing those costs and benefits is precisely the type of 'accounting exercise' in which we cannot engage. Texas has shown injury.") (citations omitted).

[125] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)).

redressability of Plaintiffs' injuries apply equally to the Plaintiff States and Plaintiff Policyholders, the Court considers the arguments below as to both groups.

Plaintiffs seek various forms of declaratory and injunctive relief.[126] Particularly relevant here, Plaintiffs ask the Court to hold that Risk Rating 2.0 is unlawful and to preliminarily and permanently enjoin Defendants from imposing Risk Rating 2.0. Defendants argue that Plaintiffs have not shown that granting their requests for declaratory or injunctive relief will redress their injuries, and Defendants further argue that Plaintiffs cannot make such showing because, according to Defendants, rates would increase even if Defendants were enjoined from using Risk Rating 2.0.  The Court will first address Defendants' latter argument that Plaintiffs could not possibly establish redressability. Because the Court ultimately rejects this argument, finding that it is possible for Plaintiffs to establish redressability, the Court will then consider Defendants' first argument that Plaintiffs have not plausibly alleged redressability.

In support of their latter argument, Defendants contend that, "[b]y statute, FEMA must set NFIP rates on an actuarial basis with the goal of collecting enough premiums to cover the total expected annual loss each year" and that "FEMA has, for more than a decade, run the NFIP at a deficit because it has not collected sufficient premiums to cover risk."[127]  The catastrophe models FEMA used to evaluate its risk indicated FEMA's aggregate premium collections were not sufficient to cover its total losses.  As a result, FEMA had to raise its total average annual loss ("AAL") target, which, in turn, required

---

[126] R. Doc. 1 at 142–43.
[127] R. Doc. 47-1 at 40.

an increase in the amount of premiums FEMA must collect across all policyholders.[128]  For these reasons, regardless of which rating methodology is used—Risk Rating 2.0 or the Legacy Rating System—FEMA will have to raise rates.[129]  Defendants go on to argue that Risk Rating 2.0 allows FEMA to raise rates "based on an individualized assessment of a property's particular flood risks" and that if they are enjoined from using Risk Rating 2.0, then "FEMA will have to raise premiums indefinitely across wide segments of policyholders whose properties share a limited set of very basic characteristics."[130]  And because neither the Plaintiff Policyholders nor the Plaintiff States have shown that they or their residents, respectively, would be "exempt from these wide-sweeping rate increases absent Risk Rating 2.0," Defendants contend they cannot establish redressability.

Breaking Defendants' argument down to its foundation, the entire argument relies on the use of catastrophe modeling to set the AAL target.  But Defendants completely ignore that one aspect of Risk Rating 2.0 challenged by Plaintiffs is the use of catastrophe modeling to set rates.  Indeed, Plaintiffs allege Risk Rating 2.0 is arbitrary and capricious, in part, because of its use of catastrophe modeling.[131]  Moreover, Plaintiffs ask this Court to declare Risk Rating 2.0 arbitrary and capricious and to enjoin Defendants from imposing Risk Rating 2.0—this necessarily includes FEMA's use of catastrophe modeling to set the AAL target.  It remains to be determined whether Plaintiffs will be successful on their claims challenging Risk Rating 2.0's use of catastrophe modeling; however, there is no

---

[128] R. Doc. 81 at 6.
[129] R. Doc. 47-1 at 40; R. Doc. 81 at 6.
[130] R. Doc. 47-1 at 40.
[131] *See* R. Doc. 1 ¶¶ 587–88; 603–05.

question that a favorable decision on those claims would preclude Defendants' use of catastrophe modeling.  Thus, based on Defendants' own purported chain of events, if an injunction is issued restraining FEMA's use of catastrophe modeling (or if Risk Rating 2.0 is declared unlawful based on such use), the Plaintiff Policyholders and the Plaintiff States' residents would not be subject to the "wide-sweeping rate increases" Defendants contend preclude Plaintiffs from establishing redressability.  Accordingly, the Court rejects Defendants' argument that Plaintiffs could not possibly establish redressability.[132]

The Court will now consider whether Plaintiffs have plausibly alleged that it is likely that their injuries will be redressed by a favorable decision.  The injuries of the Plaintiff States and the Plaintiff Policyholders, though different, ultimately result from the increase in premiums under Risk Rating 2.0.  Defendants contend Plaintiffs have not established redressability because Plaintiffs have not shown that policyholders experiencing rate increases under Risk Rating 2.0 would not experience such rate increases under the Legacy Rating System.  The Court recognizes that this argument has similar undertones to Defendants' argument discussed directly above. To generalize Defendants'

---

[132] Defendants relied on facts and information outside of the Complaint to support this argument. More specifically, Defendants relied on the declaration signed by David Maurstad ("Maurstad Declaration") that was attached to their motion to dismiss.  *See* R. Doc. 47-3.  Defendants insisted that although the Maurstad Declaration was prepared for the purpose of Defendants' preliminary injunction opposition brief, the Court can and should consider the portions of the Maurstad Declaration cited by Defendants in their motion to dismiss briefing because it contains information relevant to whether Plaintiffs have plausibly asserted a concrete, redressable injury in fact for standing.  R. Doc. 47-1 at 6 n.2.  Plaintiffs challenged whether it was appropriate for the Court to consider even the limited, cited paragraphs of the Maurstad Declaration because, according to Plaintiffs, "many of the paragraphs go well beyond providing mere facts and instead serve as additional argument extolling the virtues of [Risk Rating 2.0]."  R. Doc. 75 at 12.  Because Defendants' legal argument itself fails even assuming the factual assertions used to support it are true, the factual assertions themselves are irrelevant to the outcome of the motion to dismiss. Accordingly, the Court need not and has not considered the Maurstad Declaration and pretermits any analysis as to the appropriateness of such action.

instant argument for purposes of distinguishing it from the prior one, the Court understands the present argument to be that, given the allegations in the Complaint and what Defendants contend are "undisputed facts," Plaintiffs have not shown that the rates they complain of are any different from the rates they or their residents previously experienced under Legacy or that FEMA could impose if it reverted to the Legacy Rating System, and, therefore, Plaintiffs have not shown their injuries are redressable by a favorable decision enjoining the Defendants' use of Risk Rating 2.0 to set rates.

In support of this argument, Defendants point specifically to the fact that "Plaintiffs themselves admit that prior to Risk Rating 2.0, policies were subject to 'incremental' increases each year."[133]  Indeed, Plaintiffs alleged that "premiums increased at a predictable  and incremental pace each year before [Risk Rating 2.0]."[134]  In the next paragraph, however, Plaintiffs provide an example of a policyholder experiencing "a full-risk premium dramatically higher than she expected" under Risk Rating 2.0.[135]  In addition, Plaintiffs devote an entire section of their Complaint to the "demonstrably higher premiums" policyholders face under Risk Rating 2.0.[136]  The Court finds that, considering the allegations in the Complaint as a whole, and especially the allegations specifically referencing increased rates, it is reasonable to infer that the increases Plaintiffs complain of under Risk Rating 2.0 are more significant than the increases they or their residents experienced under the Legacy Rating System.  Defendants have not provided any facts to

---

[133] R. Doc. 47-1 at 39 (citing R. Doc. 1 ¶ 25).
[134] R. Doc. 1 ¶ 25.
[135] R. Doc. 1 ¶ 26.
[136] *See* R. Doc. 1 ¶¶ 230–239.

sufficiently contradict the allegations that, under Risk Rating 2.0, the Plaintiff Policyholders and Plaintiff States' residents are experiencing rate increases greater than what they experienced under the Legacy Rating System.[137] At this stage, the Court accepts Plaintiffs' allegations that these increases are a result of Risk Rating 2.0. Accordingly, the Court finds that the Plaintiff States and Plaintiff Policyholders have alleged concrete injuries caused by Risk Rating 2.0 that are redressable by a favorable decision.

### d.  Standing of Association of Levee Boards of Louisiana

There remains one Plaintiff whose standing has yet to be addressed—the Association of Levee Boards of Louisiana ("ALBL").  In a lengthy footnote in the memorandum in support of Defendants' motion to dismiss, Defendants argue that ALBL, the sole non-government Plaintiff, lacks both associational and organizational standing to challenge Risk Rating 2.0.  Plaintiffs did not respond to this argument.  The Court will nevertheless consider the merits of Defendants' arguments to resolve for itself the issue of whether ALBL has standing.

"An association or organization can establish an injury-in-fact through either of two theories, appropriately called 'associational standing' and 'organizational standing.' 'Associational standing' is derivative of the standing of the association's members."[138] "By contrast, 'organizational standing' does not depend on the standing of the

---

[137] Of course, the Court recognizes that not all residents of the Plaintiff States have experienced increases under Risk Rating 2.0. Nevertheless, it is undisputed that Risk Rating 2.0 raised rates for a majority of their residents.
[138] *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) (citations omitted).

organization's members. The organization can establish standing in its own name if it 'meets the same standing test that applies to individuals.'"[139]

Turning first to associational standing, ALBL must satisfy three elements: "(1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members."[140]  ALBL's associational standing theory fails at the first element. Indeed, ALBL has not shown that its members would independently meet the Article III standing requirements.  At most, ALBL, conclusively alleges its "members are harmed by [Risk Rating 2.0]."[141]  And while ALBL does also allege that "[m]any of its members are plaintiffs in this litigation,"[142] the Court has already found that those members, which consist of the Plaintiff Levee and Drainage Districts, have failed to satisfy the Article III standing requirements.  Thus, to the extent ALBL seeks to satisfy the first element based on the allegations of its members, this approach also fails.  Neither the allegations of ALBL nor the allegations of its members are sufficient to establish ALBL's members would independently meet the Article III standing requirements.  Consequently, ALBL has not established that it has associational standing.

Turning next to organizational standing, ALBL alleges it is harmed by [Risk Rating 2.0's] lack of transparency because "[i]t has had to divert its resources trying to get

---

[139] *Id.* (citations omitted).
[140] *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) (citing *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 343 (1977)).
[141] R. Doc. 1 ¶ 538.
[142] R. Doc. 1 ¶ 538.

information from FEMA about the new methodology."[143]   Indeed, "[t]he Supreme Court has recognized that when an organization's ability to pursue its mission is 'perceptibly impaired' because it has 'diverted significant resources to counteract the defendant's conduct,' it has suffered an injury under Article III."[144]   Here, however, ALBL's bare allegation is insufficient to establish that the organization itself has suffered such an injury, and ALBL's "support" for this allegation is not support at all.

ALBL cites to two paragraphs from its declaration that was attached to the Complaint.   These paragraphs explain that various members of the ALBL have met with FEMA, FEMA stated it did not have adequate information about the majority of the members' levees to properly consider them under Risk Rating 2.0, and FEMA suggested that the members provide FEMA with the necessary information.[145]   That various members of the ALBL met with FEMA to discuss how the levees within the respective members' territory would impact rates under Risk Rating 2.0 does not show that ALBL itself diverted any resources, and certainly not "significant resources," such that the ALBL's ability to pursue its mission has been "perceptibly impaired."

### 3.  Article III Standing Conclusion

The Plaintiff States and Plaintiff Policyholders have plausibly alleged they have experienced, or will experience, direct harm as a result of Risk Rating 2.0 and that such harm is redressable by a favorable judicial decision.   The Court therefore finds that, at this

---

[143] R. Doc. 1 ¶ 538.
[144] *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).
[145] R. Doc. 1-41 ¶¶ 26–27.

stage, these Plaintiffs have satisfied the Article III requirements necessary to pursue this case in federal court.

The remaining Plaintiffs—that is, the Plaintiff Parishes (except St. Tammany Parish, Livingston Parish, and Washington Parish), Plaintiff Municipalities, Plaintiff Levee Districts, Plaintiff Drainage Districts, and Plaintiff Association (ALBL)—have failed to establish standing for the reasons articulated herein. Accordingly, their claims must be dismissed without prejudice.

To the extent the Court has not specifically addressed any of the parties' remaining arguments regarding Article III standing, it has considered them and determined that they would not alter the result.

## B.  STATUTORY STANDING: ZONE-OF-INTERESTS TEST

The Court now turns to Defendants' additional argument that, for the Plaintiffs that have established Article III standing and therefore have not been dismissed, the Court should nevertheless dismiss their NEPA claims (Count IX) for lack of statutory standing. In Count IX of their Complaint, which is brought pursuant to the APA, Plaintiffs claim that Risk Rating 2.0 is contrary to law because, under NEPA, FEMA was required to conduct an environmental assessment to determine the effects Risk Rating 2.0 may have on the environment, and FEMA failed to do so.[146] Defendants contend that Plaintiffs' interests at issue in this litigation do not fall within the "zone of interests" protected by NEPA and therefore Plaintiffs' NEPA claims (Count IX) must be dismissed.

---

[146] R. Doc. 1 ¶¶ 652–56.

### 1.  Legal Standard

Defendants move this Court to dismiss Plaintiffs' NEPA claims for lack of statutory standing pursuant to Federal Rule of Civil Procedure 12(b)(1).  The Fifth Circuit has explained, however, that "unlike a dismissal for lack of constitutional standing, which should be granted under Rule 12(b)(1), a dismissal for lack of . . . statutory standing is properly granted under Rule 12(b)(6)."[147]  The Court will therefore apply the Rule 12(b)(6) standard to determine whether Plaintiffs' NEPA claims should be dismissed.

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough facts that, if accepted as true and viewed in the light most favorable to the plaintiff, "state a claim for relief that is plausible on its face."[148]  A claim is "plausible on its face" when the pleaded facts allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."[149]  If it is apparent from the face of the complaint that an insurmountable bar to relief exists, the court must dismiss the claim.[150]

### 2.  Law and Analysis

Because "NEPA does not provide a private right of action," "challenges to NEPA-mandated decisionmaking are pursued through the APA."[151]  To establish standing to sue under the APA, a plaintiff must show that the challenged agency action caused plaintiff to

---

[147] *Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 291 n.1 (5th Cir. 2018) (citing *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011)).

[148] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).

[149] *Id.*

[150] *Lormand v. U.S. Unwired, Inc.*, 565 F. 3d 228, 255–57 (5th Cir. 2009).

[151] *Highland Vill. Parents Grp. v. U.S. Fed. Highway Admin.*, 562 F. Supp. 2d 857, 860 (E.D. Tex. 2008) (citing *Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 367 (5th Cir. 2006)).

be "adversely affected or aggrieved . . . within the meaning of a relevant statute."[152] Specifically, "the plaintiff must establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint."[153]

Although Plaintiffs peppered the Court with theories of injuries upon which they could bring their claims, the Court, for the reasons articulated above, determined that the only alleged injuries that satisfy the Article III injury-in-fact requirement are the economic injuries of the Plaintiff States and Plaintiff Policyholders.  Thus, the Court's zone-of-interests analysis is limited to whether these plausibly alleged economic injuries fall within the "zone of interests" NEPA was created to protect.[154]

According to the Fifth Circuit, "Congress's purpose in enacting NEPA was to 'declare a national policy which will encourage productive and enjoyable harmony between man and his environment; . . . promote efforts which will prevent or eliminate damage to the environment and biosphere . . . ; [and] enrich the understanding of the ecological systems and natural resources important to the Nation."[155]  "Naturally, NEPA's zone of interests covers environmental injuries and not purely economic ones."[156]  That said, courts have found that a "plaintiff with both economic and environmental injuries

---

[152] *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) (citing 5 U.S.C. § 702).

[153] *Id.* (citing *Clarke v. Secs. Indus. Ass'n,* 479 U.S. 388, 396–97 (1987)).

[154] *See Sierra Club v. Morton*, 405 U.S. 727, 733 (1972) (requiring a link between the Article III injury in fact and the interest asserted under the zone-of-interests test).

[155] *Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 294 (5th Cir. 2018) (citing 42 U.S.C. § 4321).

[156] *Id.* at 294–95 (citing *Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993) (collecting cases from the Fourth, Eighth, Ninth, and D.C. Circuits)).

falls within the NEPA's zone of interests even if the plaintiff's economic interests are the real 'impetus' for its lawsuit.'"[157]   Economic injuries alone, however, cannot establish statutory standing under NEPA.[158]

Plaintiffs' injuries here are purely economic.  As such, they fall outside of NEPA's zone of interests, and Plaintiffs lack statutory standing to assert their NEPA claims.

### 3.  Statutory Standing Conclusion

Because the Plaintiff States and Plaintiff Policyholders lack statutory standing under the APA, their NEPA claims (Count IX) must be dismissed without prejudice.  The NEPA claims of the other Plaintiffs will necessarily be dismissed without prejudice because, as previously discussed, those Plaintiffs lack Article III standing.

## III.   MOTION FOR PRELIMINARY INJUNCTION

Having resolved all issues raised in Defendants' motion to dismiss, the Court now turns to Plaintiffs' motion for preliminary injunction.

### A.  Legal Standard

A preliminary injunction is an "extraordinary and drastic remedy" that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.[159]   A plaintiff seeking a preliminary injunction must establish: "(1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the

---

[157] *Id.* at 294 n.6 (citing *Realty Income Tr. v. Eckerd*, 564 F.2d 447, 452 (D.C. Cir. 1977)).
[158] *See id.* at 296 (concluding that the party's injuries were not within NEPA's zone of interests where the party alleged an economic injury but no environmental injury).
[159] *Munaf v. Geren*, 553 U.S. 674, 689 (2008).

threatened harm the injunction may do to the defendant, and (4) that granting the preliminary injunction will not disserve the public interest."[160]

The decision to grant or deny a preliminary injunction is discretionary with the district court.[161]   Nevertheless, because a preliminary injunction is an extraordinary remedy, it "should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements."[162]   Consequently, the decision to grant a preliminary injunction "is the exception rather than the rule."[163]

## B. Law and Analysis

### 1. Requested Injunction

Plaintiffs ask the Court to issue an injunction "restraining Defendants from implementing and enforcing Risk Rating 2.0."[164]   Defendants began using Risk Rating 2.0 to set policy premiums for certain policies as early as October 2021 and for all other policies at their time of renewal beginning on or after April 1, 2022.   Risk Rating 2.0 was fully implemented as of April 1, 2023.   Plaintiffs did not file the instant motion for preliminary injunction until June 2023.

Practically speaking, then, because Risk Rating 2.0 was fully implemented by the time Plaintiffs filed their motion, any injunction the Court issues cannot restrain defendants from *implementing* Risk Rating 2.0 and, thus, can only restrain defendants from *enforcing* Risk Rating 2.0.   But without the ability to enforce the currently implemented rating

---

[160] *Canal Auth. of Fla. v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974).
[161] *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).
[162] *Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012).
[163] *Miss. Power & Light Co.*, 760 F.2d at 621.
[164] R. Doc. 14 at 2.

methodology, there would be no method for FEMA to enforce the payment of premiums for all currently issued NFIP policies—essentially leaving millions of properties insured at the federal government's expense and at no cost to the policyholders.  Presumably recognizing this problem, Plaintiffs merely assume that upon the issuance of an injunction restraining Defendants' enforcement of Risk Rating 2.0, Defendants will revert to using the Legacy Rating System.[165]  There are two issues with this.  First, Plaintiffs have not asked the Court to order Defendants to reinstate the Legacy Rating System as part of the Court's injunction.  Thus, the Court is not certain that such reinstatement would be the result of a prohibitory injunction restraining the enforcement of Risk Rating 2.0—though, in all fairness to Plaintiffs, it does seem like the likely result.  Second, even if Plaintiffs had requested such relief, or if the Court had the ability to order such relief despite Plaintiffs' failure to request it, Defendants have shown that reinstating the Legacy Rating System is not nearly as simple or harmless as Plaintiffs describe.  For all these reasons, and those discussed more specifically below, the Court finds that Plaintiffs have failed to show they are entitled to a preliminary injunction restraining Defendants from enforcing Risk Rating 2.0.

## 2. Preliminary Injunction Factors

To be entitled to a preliminary injunction, in addition to showing a likelihood of success on the merits, Plaintiffs must demonstrate they are likely to suffer irreparable injury in the absence of an injunction, that the irreparable injury Plaintiffs will suffer without an

---

[165] *See* R. Doc. 14-2 at 45–46 (contending "the only harm to Defendants from an injunction would be to reinstate the flood insurance system they had in place for decades," i.e., the Legacy Rating System).

injunction would be greater than the injuries an injunction would impose on the Defendants, and that an injunction would not disserve the public's interest.[166]  Because the only remaining Plaintiffs are the Plaintiff States and Plaintiff Policyholders, the Court will not consider the arguments made by the other, now-dismissed Plaintiffs.

After careful review of each of the elements Plaintiffs must establish and the evidence and argument presented by the parties, the Court finds that Washington Parish has failed to show that it is likely to suffer irreparable injury between now and a trial on the merits, and the Plaintiff States, St. Tammany Parish, and Livingston Parish have each failed to show that any irreparable injury they are likely to suffer outweighs the harm Defendants and the public would suffer if an injunction was granted at this stage. Accordingly, because Plaintiffs are not entitled to the extraordinary relief of a preliminary injunction regardless of whether they will ultimately succeed at a trial on the merits of their claims, the Court pretermits any analysis of Plaintiffs' likelihood of success on the merits.

### a.  Irreparable Harm

To establish irreparable harm, the Plaintiff States and Plaintiff Policyholders rely on many of the same injuries that they asserted as bases for standing in their opposition to Defendants' motion to dismiss.[167]  For the same reasons those injuries failed to satisfy the Article III standing requirements, they likewise fail to constitute "irreparable harm" that warrant the issuance of a preliminary injunction.[168]  The only remaining injuries, then, are

---

[166] *Canal Auth. of Fla. v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974).

[167] R. Doc. 14-2 at 38–43.

[168] *See* discussion *supra* Section II.A.2.

47

the Plaintiff States' rebuilding and reimbursement costs and the Plaintiff Policyholders' increased premiums.  Although financial injuries such as increased costs are not generally considered irreparable, the Fifth Circuit has found costs to be irreparable where the government-defendant enjoys sovereign immunity from monetary damages, as is the case here.[169]  Nevertheless, the mere fact that these injuries are irreparable does not alone satisfy the requirement.  To be entitled to a preliminary injunction, Plaintiffs must show they are likely to suffer an irreparable injury in the absence of such interlocutory relief, i.e., before a decision on the merits can be rendered.[170]  The Court will therefore consider whether the Plaintiff States and Plaintiff Policyholders have satisfied this requirement.

### i.  Plaintiff States

The Plaintiff States' purported injuries—increased reimbursement costs and rebuilding costs—rely on their theory that fewer of their residents will carry flood insurance because of the increased premiums under Risk Rating 2.0.  Indeed, the Plaintiff States claim that NFIP premiums have increased drastically under Risk Rating 2.0, causing policyholders to cancel their insurance coverage.  The record contains declarations from a handful of homeowners in Louisiana who have NFIP policies and have experienced rate increases under Risk Rating 2.0, wherein they declare that the premiums under Risk Rating

---

[169] See *Wages & White Lion Invs., LLC*, 16 F.4th 1130, 1142 (5th Cir. 2021).

[170] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."); *see also* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (3d ed. 2013) ("Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered. Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief. Therefore, if a trial on the merits can be conducted before the injury would occur there is no need for interlocutory relief.").

2.0 are unaffordable. Generally, though, the rates these policyholders claim to be unaffordable are the "full-risk" premiums assessed under Risk Rating 2.0. And the Court cannot ignore that, subject to a few exceptions, FEMA can only increase rates by 18% per year.[171] Thus, even if a property has been assessed a full-risk premium, say, 122% greater than what the policyholders were previously paying under the Legacy Rating System,[172] the actual rate the policyholder is being charged every year upon renewal can only be 18% greater than the year before. Accordingly, and important for purposes of the Plaintiff States' "irreparable harm," it will take years before these policyholders are actually charged the drastic, unaffordable rates of which they complain, which thus counsels against a preliminary injunction in advance of a hearing on the merits.[173] To be sure, FEMA's data shows that once all policyholders transitioned to Risk Rating 2.0, 19% of policyholders experienced premium decreases, 70% of policyholders experienced premium increases of $0–$10 per month, 8% experienced premium increases of $10–$20 per month, and 3% experienced premium increases of greater than $20 per month.[174]

Additionally, the Court notes that although Plaintiffs alleged the NFIP "already" reported a loss of 346,778 policies in force from December 31, 2021 to June 30, 2022,[175]

---

[171] 42 U.S.C. § 4015(e)(1).

[172] *See* R. Doc. 1 ¶ 233 (alleging the projected average full-risk premium for a single-family home in Louisiana will increase 122% under Risk Rating 2.0).

[173] *See Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974) ("[O]nly those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction.").

[174] R. Doc. 56-1 ¶ 47.

[175] *See* R. Doc. 1 ¶ 241 (citing *An Evaluation of Risk Rating 2.0 Impacts on National Flood Insurance Program Affordability*, Coalition for Sustainable Flood Insurance, 2 (Sept. 2022), https://perma.cc/9UYK-ASJK [hereinafter *NFIP Affordability*]).

the source they cite, in fact, indicated that NFIP participation was in decline prior to 2022.[176]  Thus, there is no basis for the Court to find that all, or even a meaningful share, of this lost participation was due to Risk Rating 2.0.  This is especially true considering FEMA's phased approach to rolling out the new rates under Risk Rating 2.0, such that the only policyholders that would have been subject to Risk Rating 2.0's rates during the period cited by Plaintiffs are those who intentionally chose to opt into the new rating methodology or those whose policies were subject to renewal in the short time span between April 1, 2022 and June 30, 2022.[177]  And lastly, FEMA's alleged admission that it predicts 20% of policyholders will "drop their NFIP coverage *by the end of the decade* as a result of Risk Rating 2.0" only further supports the Court's finding that, to the extent there will be a mass NFIP exodus, there is no substantial threat it will occur before a trial on the merits.[178]

Of course, the Court recognizes there are exceptions to the general sentiment that it will take years before premiums under Risk Rating 2.0 are considered "unaffordable" by policyholders.  The record contains a declaration from a Louisiana homeowner who falls into the 3% of policyholders who experienced increases of greater than $20 per month under Risk Rating 2.0.[179]  Indeed, for low-income policyholders whose premiums cost

---

[176] *See NFIP Affordability*, *supra* note 175, at 2 ("*The decline* in NFIP policies in force *has continued* in 2022, with NFIP experiencing a loss of 346,778 policies in force from December 31, 2021, through June 30, 2022.") (emphasis added).

[177] *See* R. Doc. 56-1 ¶ 40 ("In Phase 1, Risk Rating 2.0 premium rates were applied to new policyholders with policies effective on or after October 1, 2021.  For policyholders with policy effective dates between October 1, 2021 and March 31, 2022, Legacy premium rates were applied upon renewal of the policy, with policyholders given the option of instead renewing using Risk Rating 2.0 pricing.  In Phase 2, Risk Rating 2.0 premium rates were applied to all remaining policyholders at their time of renewal on or after April 1, 2022.").

[178] R. Doc. 1 ¶ 240 (emphasis added).

[179] *See* R. Doc. 1-54.

thousands of dollars prior to Risk Rating 2.0 and whose full-risk premiums under Risk Rating 2.0 are even higher, an 18% cap (or 25%, in certain instances) does little to suppress the effects.[180]   Moreover, any new policyholders do not get the benefit of the gradual increase.  Thus, for anyone considering purchasing an NFIP policy, they would be required to pay the full-risk premium assessed under Risk Rating 2.0.  It is because of these exceptions that the Court finds the Plaintiff States have shown it is likely that at least some of their residents will either choose not to renew or not to obtain flood insurance during the pendency of this litigation due to increased rates under Risk Rating 2.0.  They have thus shown that there is a substantial threat that they will incur increased reimbursement costs or rebuilding costs absent the issuance of an injunction.[181]

Though this evidence satisfies the irreparable harm requirement, it fails to show that the irreparable harm the Plaintiff States are likely to suffer in the absence of an injunction outweighs the significant harm the Defendants have shown they will suffer if an injunction is issued.  Instead, it merely shows there is a likelihood that, before a decision on the merits can be rendered, a small portion of the Plaintiff States' residents will choose not to renew or obtain flood insurance and that, as a result, the Plaintiff States are likely to incur some *unknown* amount in increased costs that they would not have otherwise had to pay.

---

[180] *See* R. Doc. 1-54.

[181] As to the reimbursement costs, Plaintiffs submitted a declaration signed by the Director of the Louisiana Governor's Office of Homeland Security and Emergency Preparedness ("GOHSEP"), wherein he explains that GOHSEP administers the FEMA grant programs for the State and that GOHSEP has seen an increase in homeowners that have not maintained flood insurance through closeout in existing mitigation projects. *See* R. Doc. 1-1 ¶ 44.  As of May 2023, GOHSEP had been able to work with homeowners to ensure they purchase a policy prior to submission to FEMA, but the Director stated it was growing more challenging to do so since Risk Rating 2.0.  R. Doc. 1-1 ¶ 44.  As to the rebuilding costs, Defendants admit that at least four of the Plaintiff States have high risk of hurricane and coastal flooding. *See* R. Doc. 56-1 ¶ 59.

### ii. Plaintiff Policyholders

The Plaintiff Policyholders have presented varying degrees of evidence to support their respective, alleged injuries of increased premiums under Risk Rating 2.0.  The Court begins with St. Tammany Parish.  In addition to the allegations in the Complaint, the record also includes a declaration signed by the St. Tammany Parish President, which states that the Parish has 18 NFIP policies, 12 of which had come up for renewal for the 2023–2024 policy period at the time the declaration was prepared.[182]  Of those 12 policies, premium rates decreased for 3 policies and increased for the 9 others, resulting in a total premium increase of $2,877 compared to what the Parish paid for those same 12 policies for the 2022–2023 policy period.[183]  The Parish contends it is concerned that FEMA will continue to raise premiums each year but that the lack of information about how FEMA calculates these premiums makes it nearly impossible to predict how much these premiums may change again for the 2024–2025 renewal period.[184]  The Court finds St. Tammany Parish has shown it is likely to suffer irreparable harm prior to a trial on the merits due to the increased rates that it will pay over the course of this litigation.

Turning now to Livingston and Washington Parish, both of which allege that they must "procure flood insurance on [their] parish-owned buildings, which are subject to [Risk Rating 2.0's] rate increases."[185]  Both Parishes also cite to declarations signed by their parish presidents that were attached to the Complaint.[186]  Nevertheless, upon review of the

---

[182] R. Doc. 1-28 ¶ 37.
[183] R. Doc. 1-28 ¶ 38.
[184] R. Doc. 1-28 ¶ 40.
[185] R. Doc. 1 ¶¶ 500, 517.
[186] R. Doc. 1 ¶¶ 500, 517.

declarations, the Court finds that the Livingston Parish declaration contains support for its allegation,[187] but the Washington Parish declaration lacks any statement that the Parish itself carries any NFIP policies, much less that its policies are subject to rate increases under Risk Rating 2.0.[188] As such, Washington Parish has failed to establish that it is likely to suffer any irreparable harm. But because the Livingston Parish President declared that the Parish's policies are subject to rate increases under Risk Rating 2.0, the Court finds Livingston Parish has shown it is likely to suffer irreparable harm prior to a trial on the merits due to the increased rates that it will pay over the course of this litigation.

### b.  Balancing Hardship to the Parties and the Public Interest

The award of preliminary relief is never "strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff," but is rather "a matter of sound judicial discretion" and careful balancing of the interests of—and possible injuries to—the respective parties.[189] Thus, Plaintiffs must show that they would suffer more harm without the injunction than would Defendants if it were granted.[190] Plaintiffs must also show that, if granted, a preliminary injunction would not be adverse to public interest.[191] For the reasons explained below, the Court finds Plaintiffs have failed to do so.

As an initial matter, St. Tammany Parish is the only Plaintiff to provide any information regarding the extent of the irreparable harm it will suffer prior to a trial on the merits. Indeed, although the information presented by the Plaintiff States and Livingston

---

[187] R. Doc. 1-19 ¶ 44.
[188] *See* R. Doc. 1-32.
[189] *Yakus v. United States*, 321 U.S. 414, 440 (1944).
[190] *Canal Auth. of Fla. v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974).
[191] *Star Satellite, Inc. v. Biloxi,* 779 F.2d 1074, 1079 (5th Cir. 1986).

Parish was sufficient to satisfy the irreparable harm requirement, it does little to show the extent of such irreparable harm. Turning first to Livingston Parish, the evidence merely indicates the Parish's NFIP policies are subject to rate increases under Risk Rating 2.0, but there is no indication as to how much the rates have increased or the significance of those increases on the Parish's fisc.  Similarly, the Plaintiff States have only shown that some small percentage of their residents are likely to choose not to carry flood insurance during the pendency of this litigation, due to the increased rates under Risk Rating 2.0.  They have provided no evidence, or even argument, as to what the resulting costs to the Plaintiff States might be.  Nevertheless, in addition to the harms the Plaintiffs contend they will individually suffer, they insist "the entire Country will feel the harms imposed by [Risk Rating 2.0]" and that "[t]he harm to the public is as widespread as it is severe."[192]  Plaintiffs further argue that the public is served when the law is followed. Plaintiffs submit that these harms outweigh the "only" harm to Defendants to reinstate the Legacy Rating System.[193]

Defendants, on the other hand, contend that an injunction would quite clearly harm the federal government and its operation of the NFIP, upset the status quo, and injure FEMA, policyholders, and taxpayers.  According to Defendants, Risk Rating 2.0 has been a five-year effort that has cost FEMA over $80 million, and to undo it would require much more than Plaintiffs describe. In particular,

> Enjoining Risk Rating 2.0 would not, as Plaintiffs suggest, simply "reinstate" legacy rating with the flick of a switch. FEMA would have to reimplement old NFIP systems, infrastructure, guidance, and training; figure out how to reimpose an elevation certification requirement on existing policyholders

---

[192] R. Doc. 14-2 at 45.
[193] R. Doc. 14-2 at 45–46.

> that Risk Rating 2.0 had eliminated; and rewrite and re-underwrite the nearly
> 5 million policies in the program—all of which would take multiple years[]
> and leave policyholders and the NFIP's operations in flux in the meantime.[194]

In addition to the time it would take to reinstate the Legacy Rating System and the state of uncertainty the NFIP would be in during this period, Defendants estimate it would cost FEMA "tens of millions of additional dollars" to fully revert back to the old system.[195] Defendants also assert that most NFIP policies are sold and serviced by "Write Your Own" ("WYO") companies, and just as with the NFIP's own sales and service contractor, the WYO companies similarly spent years and nearly $200 million to implement Risk Rating 2.0 and that they too would have to spend substantially more even to temporarily pause it.[196]

Considering the arguments and evidence put forth by the parties, the Court finds the injuries Defendants would suffer upon the issuance of an injunction substantially outweigh the harm the Plaintiff States, St. Tammany Parish, or Livingston Parish will suffer without an injunction.  The Court also finds that, in light of the particular claims in this case and to the extent Plaintiffs are likely to succeed on any of them, any interest the public has in the need for federal agencies to follow the law is outweighed by the public's interest in the stability of the administration of the National Flood Insurance Program, which would be greatly disrupted if this Court were to issue a preliminary injunction restraining Defendants from enforcing the rating methodology that was fully implemented prior to Plaintiffs' filing of this lawsuit.

---

[194] R. Doc. 56 at 44 (citing R. Doc. 56-1 ¶¶ 260–73).
[195] R. Doc. 56 at 45 (citing R. Doc. 56-1 ¶¶ 260–73).
[196] R. Doc. 56 at 45 (citing R. Doc. 56-1 ¶¶ 282–322).

The Plaintiff States and Plaintiff Policyholders have failed to establish they are entitled to preliminary injunctive relief. Accordingly, their motion for preliminary injunction must be denied.

## IV.    CONCLUSION

For all the foregoing reasons,

**IT IS ORDERED** that Defendants' Motion to Dismiss Plaintiffs' Complaint (R. Doc. 47) is **GRANTED IN PART and DENIED IN PART**. All claims brought by the Plaintiff Parishes (except St. Tammany Parish, Livingston Parish, and Washington Parish), Plaintiff Municipalities, Plaintiff Levee Districts, Plaintiff Drainage Districts, and Plaintiff Association are **DISMISSED WITHOUT PREJUDICE**. Plaintiffs' NEPA claim (Count IX) is **DISMISSED WITHOUT PREJUDICE**. The only claims that remain are Counts I–VIII brought by the Plaintiff States and Plaintiff Policyholders (St. Tammany Parish, Livingston Parish, and Washington Parish).

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction (R. Doc. 14) is **DENIED**.

New Orleans, Louisiana, this 28th day of March 2024.

**DARREL JAMES PAPILLION**
**UNITED STATES DISTRICT JUDGE**