IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| THE STATE OF LOUISIANA *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DEPARTMENT OF HOMELAND SECURITY *et al.*, <br><br> *Defendants*. | Civil Action No. 2:23-CV-01839 <br><br> Section P <br><br> Judge Darrel James Papillion <br><br> Magistrate Judge Eva J. Dossier |

### DECLARATION OF JEFFREY JACKSON IN SUPPORT OF MOTION FOR PROTECTIVE ORDER

1. I, Jeffrey Jackson, am the Deputy Assistant Administrator for the Federal Insurance Directorate, which is housed within the Federal Emergency Management Agency (FEMA), a component agency of the Department of Homeland Security.

2. As the Deputy Assistant Administrator for the Federal Insurance Directorate, I am responsible for leading flood insurance operations for the National Flood Insurance Program (NFIP) at FEMA.

3. Pursuant to this Court's May 7, 2024, order (ECF No. 117), and FEMA's past declarations (ECF Nos. 34-2, 117), Defendants have spent the past several months working to compile the Administrative Record in this case.

4. The Administrative Record is an enormous trove of documents and data. To give the Court spatial perspective, the information reviewed would comprise thousands of file cabinets of documents, and perhaps tens of thousands. FEMA has been working diligently to compile the

    record, including moving numerous personnel from their typical roles within the agency, and hiring additional, temporary workers to complete the task.

5. As FEMA anticipated previously (ECF No. 114 ¶ 11), some of the information that is part of the Administrative Record that FEMA has compiled is not subject to public disclosure. This is because some of the information is confidential proprietary information of third-party vendors or because it contains Personal Identifiable Information (PII).

6. The Administrative Record consists of electronic data and 3 hard drives containing at least 10 terabytes of data. Included throughout this record—both the electronic version and the hard drives—is PII and confidential proprietary data. In fact, based on its compilation of the Administrative Record, FEMA can confirm that the PII consists of policyholder information including names, addresses, policy numbers, geospatial and structural characteristics that are property specific, and so forth. The PII is contained on the hard drives integrated throughout approximately 5 terabytes of zipped data, which would make redaction not feasible. Compilation of the Administrative Record also made clear to FEMA that there is significant confidential proprietary information of third-party vendors—which FEMA hired for catastrophe modeling—included within the electronic portion of the Administrative Record as well as on the hard drives. The proprietary data includes model output, locational-level expected loss estimates, event loss tables detailing estimated losses by each models' event in their catalog, and model documentation that details how each model was developed. That proprietary data is interwoven with other data on the hard drive and electronic portions of the record.

7. Disclosure of PII without a protective order would violate the Privacy Act (5 U.S.C. § 552a).

8. Disclosure of the confidential proprietary data would violate FEMA's agreements with the vendors that assisted in developing the models that formed a substantial basis for the development of Risk Rating 2.0. FEMA has consulted with each of the vendors as part of its compilation of the Administrative Record in this case, as well as its work to litigate the related Freedom of Information Act (FOIA) case concerning certain Risk Rating 2.0 that is also before the Court. *See St. Charles Parish et al v. FEMA*, Case No. 2:23-cv-1369 (E.D. La.). Each of the vendors has made clear that publicly disclosing their confidential, proprietary data in Risk Rating 2.0 violates the terms of FEMA's licenses and contracts with them and would pose tremendous business risk to them.[1]

---

[1] The concerns regarding disclosing the confidential and proprietary data of each of the vendors that assisted in the development of Risk Rating 2.0 are contained in the affidavits attached as a consolidated Exhibit 1 attached herein, which the vendors prepared for the related FOIA case (to support withholdings of confidential commercial information under FOIA Exemption 4). In the declarations, the vendors broadly discuss the need to protect all their intellectual property in Risk Rating 2.0. The following represent the key excerpts of those declarations that explain the need to protect the vendors' confidential data from public disclosure and establish the critical steps the vendors take to protect such data.

"CoreLogic implements industry-leading security protocols to protect its Software codes, protocols, modeling, related pricing, and other proprietary and sensitive data, which include, but are not limited to: password protections over the data; housing the data in network secure databases; limiting access to such Software data by employees and third parties to only those that have a 'need to know' and need to access the Software data for Software development and contract purposes; prohibiting the release of Software data to or by employees and third parties without a valid contract purpose; requiring employees and third parties to sign nondisclosure agreements before accessing Software data; supervising the safeguarding of such data by a privacy officer; requiring confidentiality as a contract term before providing the information to others, including the government, in licensing and contract agreements; providing only limited licenses to its Software data and intellectual property to third parties, the transfer of which is governed by contract; and by marking the Software data with protective banners indicating that the data is considered proprietary and sensitive, and not to be disseminated in a manner contrary to the agreement with CoreLogic. . . . CoreLogic modeling factors and outputs [are] . . . commercially sensitive data as they are provided by and/or generated by CoreLogic's Software and could be used to potentially reverse engineer or predict how CoreLogic's Software and modeling methodologies operate or respond to specific inputs and/or what outputs would result from such inputs. A competitor could use the . . . data to understand the proprietary and sensitive interworking of CoreLogic's Software and its modeling methodologies and/or to potentially reverse engineer such Software and modeling to the detriment of CoreLogic, who zealously protects such data and methodologies in the manners described above. CoreLogic zealously protects such data and methodologies, including outputs generated by its model from input data, because outputs like annual expected flood losses are derived directly from our Software and represent our proprietary data. Outputs such as annual expected losses are a core part of our catastrophe modeling commercial offering; our licensees are paying for the ability to have our model generate these loss estimates . . . . If FEMA is unable to maintain the confidentiality of our catastrophe modeling information, we will likely be unwilling to license our catastrophe modeling products to the government in the future in a similar fashion. Public disclosure of our proprietary catastrophe modeling information poses great financial risk to us." Decl. of Mikhail Palatnik ¶¶ 30-32.

3

"[A]ll KatRisk model data, software, and location level results produced by the model are confidential and should not be made publicly available. . . . KatRisk . . . ensures the privacy of the aforementioned information by issuing a non-transferrable license to use the information to its customers, and that this license expires as the end of the applicable contract term. . . . [M]aking its data and modeling available to the public would have a significant financial impact to KatRisk, and result in the loss of the intellectual property associated with this data/modeling. KatRisk does not release its model data, software, modeling factors, user guides and training material publicly and has marked many of the training and documentation material as confidential. We take the protection of our proprietary information very seriously. . . . KatRisk's catastrophe modeling data and software are proprietary commercial products that are being licensed by about 80 customers in the insurance and reinsurance business, thereby demonstrating its intrinsic value. . . . . [O]ur licensees are paying for the ability to have our model generate these loss estimates. And the loss estimates reflect the core underlying assumptions and proprietary aspects of our model; they hinge on our model's unique view of flood hazard and vulnerability. KatRisk, like all of our peer catastrophe modeling companies, keeps all modeling data and methodologies private and does not publicly release the information absent a non-transferrable license. Additionally, KatRisk protects its proprietary information from disclosure across all KatRisk contracts and business activities through Non-Disclosure Agreements and contracts that limit the distribution of KatRisk data to third parties not included in the contract. KatRisk data and models are kept for FEMA in a secure environment managed by Guy Carpenter & Company and are only accessible with a FEMA secured laptop from FEMA badged personal. Catastrophe risk software is a very competitive industry dominated by two very large players and a handful of smaller organizations. KatRisk's competitors always seek to gain an advantage and obtain more of KatRisk's market share, due to KatRisk's position as the market leader in the flood modeling space . . . . Any proprietary information related to our products released to the public would cause severe detriment to KatRisk's business and aid our competitors in their pursuit of taking away KatRisk's market share. In particular, a competitor could use the withheld data to understand the proprietary and sensitive underpinnings of our catastrophe modeling and reverse engineer our commercial offerings. KatRisk takes steps to keep all catastrophe modeling information private and guard against public disclosure across its business activities, because its data, methods and software are the result of extensive internal development work over many years. Making any of our data, software, and model results available to the public could have substantial financial impacts on KatRisk and cause KatRisk to lose the intellectual property associated with its products. . . . KatRisk . . . received assurances from FEMA as part of its work on Risk Rating 2.0 that [its] information would be protected from disclosure. Importantly, the first page of KatRisk's contract with FEMA provides that 'the services to be procured are commercial in nature, and the subject contract is awarded subject to FAR Part 12.' With respect to the acquisition of technical data under commercial contracts, the government may acquire 'only the technical data and the rights in that data customarily provided to the public.' FAR 12.211. Similarly, when acquiring computer software and documentation, the government shall acquire such data 'under licenses customarily provided to the public' and 'shall have only those rights specified in the license contained in any addendum to the contract.' FAR 12.212. KatRisk licensed for a finite period data, model methodologies, and our software platform, and it did so with the expressed expectation that the data, methodologies, and software would not become public. . . . If FEMA is unable to maintain the confidentiality of our catastrophe modeling information, we will likely be unwilling to license our catastrophe modeling products to the government in the future in a similar fashion. Public disclosure of our proprietary catastrophe modeling information poses great financial risk to us." Decl. of KatRisk, LLC ¶¶ 16-25.

"We object[] to the release of modeling factors or algorithms derived from our model results, noting that our models are confidential and constitute our closely held trade secrets, are not in the public domain, and are not generally known. We note[] that we license models to clients, like FEMA, only under license agreements with strict confidentiality requirements and with limitations on disclosure of the model output. . . . [W]e develop, update, and enhance our proprietary loss models at great expense and . . . we derive substantial economic value from them. . . . FEMA's model contract with Verisk . . . notes that 'Disclosure of output and the user manuals and guides outside of FEMA is prohibited.' . . . Our company was built on and continues to have at its foundation the revenue we derive from licensing subscription-based software, which includes our models, to our clients. A significant portion of our annual revenue is derived from these licenses. We keep our modeling factors, the models themselves, and our user documentation private. We do not publicly release the information. We protect the information from disclosure across our contracts and business activities by specific contract language restricting or limiting access to the data internally and externally; marking the information as confidential; using confidentiality agreements or NDAs where appropriate; implementing

4

9. The attached Declaration of Naomi Ondrich, the Chief of FEMA's Actuarial and Catastrophic Modeling Branch,[2] further explains the critical importance of protecting the vendors' confidential information as it relates to the present and future ability of FEMA to administer the NFIP. Some of the more acute points she makes include:

- FEMA contracted with three vendors to license their flood catastrophe models— CoreLogic, Inc. (an information services company focused on the property industry), Verisk Analytics, Inc. (a data, analytics, and technology provider that works with the insurance industry and government organizations), and KatRisk LLC (a catastrophe modeling company). CoreLogic was also contracted by FEMA to acquire replacement cost values to complete catastrophe modeling work. FEMA also contracted with Milliman, Inc., an industry-leading actuarial firm, to take the catastrophe modeling output from the other vendors and use that output to assist FEMA in developing Risk Rating 2.0. Decl. of Naomi Ondrich ¶ 9;

- The use of catastrophe models has been standard insurance industry practice for over 20 years. *Id.* ¶ 10;

---

policies to guide employees and external parties in reporting data breaches; establishing password protections governing access to our software platforms; housing the model data in secure network databases; prohibiting data release by third parties unless approved in the license for specific data for specific purposes or with our prior written consent; and generally requiring confidentiality in order to protect our trade secrets and the investment we've made in our models. We take these steps to keep our proprietary information confidential because we invest considerable financial and human capital resources to develop, maintain and improve our innovative models. . . . Examples of ways in which our models could be exploited include enabling competitors to develop or substantially improve their own models using Verisk's intellectual property and enabling insurers to develop insurance rating plans without licensing the models, effectively creating a situation where insurers who are paying for lawful access are subsidizing their competitors. . . . Guarding against public disclosure also serves the public interest by enabling innovation and availability of robust models to support a healthy insurance market, leading to stable commercial and homeowner markets generally. . . . If model developers cannot protect their investment, future models may be less granular and predictive of risk, potentially limiting the availability of sophisticated tools that can help encourage a healthy insurance market and maintain availability of insurance coverage. We provided our flood model to FEMA on the expectation that it and the associated modeling factors would be kept private, and we received assurances from FEMA as part of its work on Risk Rating 2.0 that the information would be protected from disclosure. In particular, as cited previously, FEMA's model contract with VEES notes that 'Disclosure of output and the user manuals and guides outside of FEMA is prohibited.' . . . If FEMA is unable to maintain the confidentiality of our catastrophe modeling information, we will likely be unwilling to license our catastrophe modeling products to the government in the future in a similar fashion. As discussed, public disclosure of our proprietary catastrophe modeling information poses great financial risk to us." Decl. of Roger Grenier ¶¶ 18-29.

"In my experience [catastrophe modeling data] is typically only available to those that have a contract with a model vendor or have executed a Non-Disclosure Agreement with the model vendor. Were this data to become public it could put the model vendor at a competitive disadvantage by giving the model vendor's competitors insight into the model and make the model less valuable to potential customers." Decl. of Michael Chamberlain ¶¶ 13-15.

[2] Ms. Ondrich oversees all aspects of the actuarial and catastrophic modeling team, including with respect to Risk Rating 2.0. Her declaration is included in Exhibit 1 to this declaration.

5

- The CoreLogic, KatRisk, and Verisk catastrophe models were run by FEMA and the output was provided to Milliman to create the rating plan. The output of the catastrophe models contains estimated losses by each model vendor, reflecting their underlying assumptions and proprietary data. Loss estimates are derived directly from each catastrophe model vendor and thus reflect each vendor's proprietary data underlying those loss estimates. *Id.* ¶ 11;

- As reflected in the modeling vendors' declarations, their software outputs are plainly considered by the vendors, and the catastrophe modeling industry at large, to be proprietary and private product information that must be and are closely guarded. The model outputs are commercially valuable information produced directly from, and are directly reflective of, the vendors' proprietary and closely guarded catastrophe models, which they have developed at great expense, license in commercial offerings, and depend on to generate revenue. *Id.* ¶ 27;

- This process and information are considered confidential commercial information by each third-party catastrophe model vendor because these model outputs provide valuable insight into the core model assumptions each vendor uses to calculate estimated flood losses. The vendors license their catastrophe modeling software and data to clients such as FEMA as proprietary products; their catastrophe models are developed at great expense and represent their main method of generating revenue. *Id.* ¶ 31;

- The modeling information is confidential because the vendors customarily keep their catastrophe modeling product information private and do not publicly release such information or permit public release of such information. *Id.* ¶ 37;

- The vendors take these steps to closely guard their modeling information so as to protect their commercial interests and protect themselves from competitive and financial harm. Investors and others involved in insurance markets license various catastrophe models and use them to price their products and purchases within the insurance market. If the vendors' modeling information were to be released, others in the insurance market or new entrants then could reverse-engineer the vendors' existing catastrophe models. That, in turn, would seriously impact the vendors' financial prospects, as their catastrophe models and model outputs represent their entire business. *Id.* ¶ 38;

- Each vendor provided FEMA with only a limited license for use of catastrophe modeling software, premised on the agreement that FEMA did not have ownership of the vendors' proprietary data and could not publicly release such data. *Id.* ¶ 40.

10. The vendors' declarations underscore these points, and, indeed, indicate that unfettered disclosure would likely result in vendors refusing to provide their essential services to FEMA in the future.

11. Regardless of whether a disclosure is innocent or nefarious, once the information is out, the damage will likely be done.

    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on July 26, 2024.

_____<br>
Jeffrey Jackson<br>
Deputy Assistant Administrator<br>
Federal Insurance Directorate