# Exhibit 1 to
# Declaration of Jeffrey Jackson

Declarations of Mikhail Palatnik (CoreLogic, Inc.), Jeffrey Chen (KatRisk LLC), Roger Grenier (Verisk Analytics, Inc.), Matthew Chamberlain (Milliman, Inc.), and Naomi Ondrich (FEMA)

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ST. CHARLES PARISH, A POLITICAL SUBDIVISION OF THE STATE OF LOUISIANA, AND MATTHEW JEWELL, IN HIS OFFICIAL CAPACITY AS ST. CHARLES PARISH PRESIDENT,<br><br>*Plaintiffs*,<br><br>v.<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY,<br><br>*Defendant*. | Civil Action No. 2:23-cv-01369<br><br>Section P<br><br>Judge Papillion<br><br>Magistrate Judge North |

## DECLARATION OF MIKHAIL PALATNIK

I, Mikhail Palatnik, do hereby declare and state as follows:

1.      I am the Senior Vice President for Product and Insurance Solutions (Protect) at CoreLogic and have worked for CoreLogic for over twelve years.  CoreLogic provides data, real estate, mortgage, and insurance solutions.  Our insurance solutions are based on innovative software platforms that enable real-time decision-making by insurers and property owners by providing detailed and comprehensive analyses of potential risk.  CoreLogic's services include, but are not limited to providing precise location information to analyze structure risk, providing claims management services, and providing hazard risk services.  In my role as Senior Vice President, I have responsibility for CoreLogic's product management for the Product and Insurance Solutions (Protect) division.

2.      The Federal Emergency Management Agency ("FEMA") awarded Prime Contract No. 70FA6018P00000005 (the "Contract") to CoreLogic on or about August 24, 2018.  The

Contract required CoreLogic to provide Catastrophe Data Model Software ("Software") for the purposes of developing risk modeling and pricing for the National Flood Insurance Program's ("NFIP") Risk Rating 2.0 program. Under the Contract, CoreLogic provides FEMA licenses to its Software, which analyzes catastrophic data modeling for the purposes of running models for insurance, reinsurance and risk ratings, and reviewing and validating model output related to the NFIP.

3.       The NFIP offers flood insurance coverage to homeowners, renters, and businesses as protection against flood losses. In addition to offering flood insurance, the NFIP identifies communities' flood risks, maps and publishes Flood Insurance Rate Maps of those risks, assists communities in meeting floodplain management requirements, and communicates the benefits of flood insurance protection to facilitate reimbursement for flood damage caused to properties through the NFIP.

4.       CoreLogic provides FEMA licenses to its proprietary and sensitive Software products, services, and models under the trade names of: Risk Meter API; Replacement Cost National File; Replacement Cost Values; Reconstruction Cost Values; First Floor Height data; Structural Geo Coding, and RQE models. CoreLogic offers this Software for sale through the commercial market as well.

5.       The licenses provided by CoreLogic enable FEMA to use its Software platforms to run models for insurance purposes to assess risk in various locations and for designated properties around the country, which FEMA uses to make NFIP-related decisions. It is my understanding that FEMA used its own flood insurance policyholder data as inputs to run its modeling, selected the model analysis options provided by CoreLogic and other vendors, ran the models, and generated flood loss estimates. I also understand that FEMA utilized the results of CoreLogic's

Software modeling, along with other model results and data, in developing Risk Rating 2.0. CoreLogic had no role in preparing the input data, running the models, or extracting, analyzing and utilizing the flood model results.

6.      CoreLogic's Software runs simulated flood and catastrophe models, which include both probabilistic and historical events. The probabilistic events are realistic simulations of events that could occur in any year and the historical events are recreated simulations of actual historical events.  For example, our flood model simulates the footprint of a flood across an affected area, calculates the depth of water at individual building locations, determines the degree of damage for each building type, and applies insurance policy terms to estimate losses.  These simulated losses from events in our model can be utilized to assess the frequency and severity of flooding events, annual expected losses, and large loss scenarios.

7.      Licensees using our Software, such as FEMA, can use our flood model to develop premiums for individual policies and/or groups of policies, create premium rating factors for different structure types or structural features, and create and negotiate reinsurance contracts and other risk transfer mechanisms.

8.      I am generally familiar with the Freedom of Information Act ("FOIA") request and Complaint filed by Plaintiffs St. Charles Parish and parish president Matthew Jewell, seeking the disclosure of records under FOIA related to the Risk Rating 2.0 program, which includes data related to and/or produced by CoreLogic's Software provided under the Contract.

9.      The statements contained in this declaration are based upon my personal knowledge of the Contract, CoreLogic's Software, and the information provided to me in my official capacity, and the conclusions I reached based on that knowledge and information.

### CoreLogic's Software Data in FEMA's Records and CoreLogic's Protection of its Proprietary and Sensitive Software Data

10.     Risk Rating 2.0 is FEMA's actuarial update to the NFIP's pricing methodology, and the Contract was issued to obtain software to facilitate the development of Risk Rating 2.0 and operation of the NFIP.

11.     The Contract set multiple performance specifications and requirements that CoreLogic's Software satisfies, which include, but are not limited to the following:

    a.  To add credibility to Risk Rating Redesign and Reinsurance Programs;

    b.  To run models using NFIP data to understand the program's risk and exposure to flood loss;

    c.  To compare insurance premiums proposed by reinsurers using the same models reinsurers are using to justify their premiums;

    d.  To help the NFIP set rates for its policies; and

    e.  To understand and validate the accuracy and precision of available catastrophic flood models.

12.     CoreLogic's performance of the Contract is ongoing and CoreLogic continues to provide NFIP Risk Rating 2.0 services to FEMA.

13.     CoreLogic's Software used to support the NFIP is based upon multiple proprietary and sensitive algorithms, formulas, models, and related data developed by CoreLogic over many years and used for the purposes of developing risk modeling and pricing for the NFIP and for multiple other purposes for other federal and commercial customers.

14.     CoreLogic only provides to its customers a limited license to its Software for the limited purposes of running its customers' modeling requirements.  With regard to FEMA, the limited license provided to FEMA facilitates modeling in support of the NFIP in the manner

DocuSign Envelope ID: A747106A-98EE-422D-868B-5E37348A93ED

described by the Contract. CoreLogic does not transfer to FEMA or any other customer ownership of CoreLogic's Software or the proprietary and sensitive intellectual property that comprises its Software, and the limited license thus does not permit FEMA to publicly disclose such data.

15.    The Contract requires that the NFIP data used to facilitate the NFIP stay behind FEMA's firewall in a FEMA-secured environment and that all modeling be performed within a FEMA-secure environment. Thus, CoreLogic's Software and any associated codes, protocols, and outputs are contractually protected. This firewall and secured environment are meant to protect the proprietary and sensitive nature of the data and software produced by third party vendors, such as CoreLogic, to support the NFIP, and to protect the proprietary and sensitive data ultimately produced as end product of the NFIP.

16.    CoreLogic has developed its Software suite over approximately 30 years, the development cost of which has exceeded approximately $100M. CoreLogic derives significant annual revenue from licensing our subscription-based Software, which includes our models.

17.    CoreLogic keeps its Software data and related pricing data confidential and does not publicly release such information or share it with any third parties, including the government, without first ensuring that its intellectual property is subject to zealous safeguards imposed by contract.

18.    CoreLogic implements industry-leading security protocols to protect its Software codes, protocols, modeling, related pricing, and other proprietary and sensitive data, which include, but are not limited to: password protections over the data; housing the data in network secure databases; limiting access to such Software data by employees and third parties to only those that have a "need to know" and need to access the Software data for Software development and contract purposes; prohibiting the release of Software data to or by employees and third parties

without a valid contract purpose; requiring employees and third parties to sign nondisclosure agreements before accessing Software data; supervising the safeguarding of such data by a privacy officer; requiring confidentiality as a contract term before providing the information to others, including the government, in licensing and contract agreements; providing only limited licenses to its Software data and intellectual property to third parties, the transfer of which is governed by contract; and by marking the Software data with protective banners indicating that the data is considered proprietary and sensitive, and not to be disseminated in a manner contrary to the agreement with CoreLogic.

19.     The methods CoreLogic uses to protect our intellectual property and data are standard across the modeling industry.

## Withholding of CoreLogic's Confidential Commercial Information

20.     On August 11, 2023, FEMA sent a FOIA Notice to CoreLogic informing it of the FOIA request from Adams and Reese, LLP, submitted on behalf of parish president Matthew Jewell of St. Charles Parish, Louisiana (the "FOIA Notice"), seeking records on the Risk Rating 2.0 modeling and algorithm data, including that used by, and developed by CoreLogic's Software.

21.     The Contract categorizes CoreLogic's scopes of work into various Contract Line Item Numbers, or "CLINS." Specifically, the Contract contains ten CLINS that cover the Contract scope of work for the five-year Contract period of performance – the Base Year, Option Year 1, Option Year 2, and Option Year 3, and Option Year 4.

22.     Each of the five Contract years contain two CLINS covering the same two categories of Software services provided by CoreLogic, the first scope of work being "Catastrophic Data Modeling Software for Inland Flood w/ Training Support," and the second scope of work

being "Catastrophic Data Modeling Software for Storm Surge Modeling capability w/Training Support."

23.     CoreLogic provided pricing to FEMA for each of the Contract's ten CLINS for the Software services that it provided to FEMA.  FEMA incorporated that pricing into the Contract and CoreLogic performed the Contract based on that pricing proposed by CoreLogic and accepted by FEMA.

24.     CoreLogic developed this Contract pricing based on its proprietary and sensitive Software coding, development, operations, and efforts used to develop, test, produce, manage, and maintain the Software for FEMA.

25.     CoreLogic protects its Software data, pricing, modeling, modeling factors, and our user and customer data private and does not disclose such information to third parties unless the disclosure is protected by a non-disclosure agreement or by Contract.  As such, CoreLogic objected to FEMA disclosing its Software data, pricing, modeling-related information, and modeling outputs in response to the FOIA Notice.

26.     Specifically, on September 8, 2023,[1] September 15, 2023, and March 2, 2024 CoreLogic responded to FEMA FOIA Notices and objected to the release of CoreLogic's Software data, pricing, modeling-related information, and modeling outputs.  Specifically, CoreLogic's September 8, 2023 response informed FEMA that:

    a.     CoreLogic "objects to FEMA disclosing any CoreLogic data, algorithms, calculations, pricing, valuations, outputs, deliverables, or related data in response to the FOIA Request as all such information constitutes CoreLogic's: (1) trade secrets; and (2) commercial and

---

[1] A copy of CoreLogic's September 8, 2023, response to FEMA is attached to this declaration.

financial information, which makes such information exempt from disclosure under FOIA pursuant to FOIA Exemption 4";

      b.     The Software that CoreLogic provided to FEMA was "protected data" and was constituted Software under the following specific CoreLogic trade names: "Risk Meter API; Replacement Cost National File; Replacement Cost Values; Reconstruction Cost Values; First Floor Height data; Structural Geo Coding, and RQE models"; and

      c.     "The release of such confidential, proprietary, and competitively sensitive information to a third party and/or competitor of CoreLogic would cause significant competitive and financial harm to CoreLogic by enabling CoreLogic's competitors to gain access to information, which could subsequently be used by that competitor to predict CoreLogic's pricing and methodologies, ascertain in detail competitive differentiators and to potentially reverse engineer its products / services / models. CoreLogic protects such [Software] from disclosure to third parties to avoid such competitive harm and at no point has CoreLogic informed FEMA that it could release such sensitive information to third parties."

27.    As such, CoreLogic requested that FEMA not disclose any of CoreLogic's Software codes, protocols, modeling, and related pricing provided to FEMA in relation to the services provided under the Contract as that data constitutes proprietary and sensitive data that CoreLogic's protects from disclosure to all third parties.

28.    CoreLogic understands that FEMA ultimately redacted certain CoreLogic data in what it ultimately produced to Plaintiffs. Specifically, CoreLogic understands that FEMA redacted CoreLogic's Contract CLIN pricing and Contract funded amounts, as well as CoreLogic modeling factors and outputs provided by and/or generated by CoreLogic's Software.

29.     In particular, CoreLogic's CLIN pricing and funded figures are commercially sensitive data as they are provided by and/or generated by CoreLogic based on the direct costs incurred to develop, manage, and maintain the Software at issue, along with the indirect costs incurred in relation to the Software development.  The release of this contract data would cause significant financial harm to CoreLogic by enabling CoreLogic's competitors to gain access to this information, which could subsequently be used by competitors to predict CoreLogic's pricing and business strategy.  CoreLogic customarily treats this line-item contract data as private; it does not publicly disclose this sensitive business information.

30.     Further, the CoreLogic modeling factors and outputs also commercially sensitive data as they are provided by and/or generated by CoreLogic's Software and could be used to potentially reverse engineer or predict how CoreLogic's Software and modeling methodologies operate or respond to specific inputs and/or what outputs would result from such inputs.  A competitor could use the withheld data to understand the proprietary and sensitive interworking of CoreLogic's Software and its modeling methodologies and/or to potentially reverse engineer such Software and modeling to the detriment of CoreLogic, who zealously protects such data and methodologies in the manners described above.

31.     CoreLogic zealously protects such data and methodologies, including outputs generated by its model from input data, because outputs like annual expected flood losses are derived directly from our Software and represent our proprietary data. Outputs such as annual expected losses are a core part of our catastrophe modeling commercial offering; our licensees are paying for the ability to have our model generate these loss estimates. And the loss estimates reflect the core underlying assumptions and proprietary aspects of our model; they hinge on our model's unique view of flood hazard and vulnerability.

32.     If FEMA is unable to maintain the confidentiality of our catastrophe modeling information, we will likely be unwilling to license our catastrophe modeling products to the government in the future in a similar fashion.  Public disclosure of our proprietary catastrophe modeling information poses great financial risk to us.

I declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on this 13th day of June 2024.

Mikhail Palatnik
SVP – Product Management, Insurance Solutions

DocuSign

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: A747106A08EE432D8C8B5E27348AD3ED | | Status: Completed |
| Subject: Complete with Docusign: St. Charles Parish v. FEMA_CoreLogic Declaration_6.13.2024.pdf | | |
| Source Envelope: | | |
| Document Pages: 10 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Kyara Salmon |
| AutoNav: Enabled | | 2000 Market Street |
| EnvelopeId Stamping: Enabled | | Philadelphia, PA 19103 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | KSalmon@foxrothschild.com |
| | | IP Address: 163.116.146.154 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Kyara Salmon | Location: DocuSign |
| 6/13/2024 2:27:30 PM | KSalmon@foxrothschild.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Mikhail Palatnik | *DocuSigned by:* (signature) 7CC63B86C000448... | Sent: 6/13/2024 2:55:54 PM |
| mpalatnik@corelogic.com | | Viewed: 6/13/2024 11:28:13 PM |
| SVP - Product Management | | Signed: 6/13/2024 11:28:18 PM |
| Marshall & Swift Boeckh, LLC | | |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Drawn on Device | |
| | Using IP Address: 193.92.13.117 | |
| | Signed using mobile | |
| **Electronic Record and Signature Disclosure:** | | |
| Accepted: 6/13/2024 11:28:13 PM | | |
| ID: ce714ab6-b80c-4a30-8f1e-d584f49942b9 | | |
| Company Name: Fox Rothschild LLP | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Doug Hibshman | COPIED | Sent: 6/13/2024 2:55:54 PM |
| dhibshman@foxrothschild.com | | Viewed: 6/14/2024 10:23:19 AM |
| Partner | | |
| Fox Rothschild LLP | | |
| Security Level: Email, Account Authentication (None) | | |
| **Electronic Record and Signature Disclosure:** | | |
| Not Offered via DocuSign | | |
| Jeanette White | COPIED | Sent: 6/13/2024 2:55:54 PM |
| jawhite@corelogic.com | | |
| Associate General Counsel | | |
| Security Level: Email, Account Authentication (None) | | |
| **Electronic Record and Signature Disclosure:** | | |
| Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
| --- | --- | --- |

| Envelope Summary Events | Status | Timestamps |
| --- | --- | --- |
| Envelope Sent | Hashed/Encrypted | 6/13/2024 2:55:54 PM |
| Certified Delivered | Security Checked | 6/13/2024 11:28:13 PM |
| Signing Complete | Security Checked | 6/13/2024 11:28:18 PM |
| Completed | Security Checked | 6/13/2024 11:28:18 PM |

| Payment Events | Status | Timestamps |
| --- | --- | --- |
| Electronic Record and Signature Disclosure | | |

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Fox Rothschild LLP ("we," "us," or the "Firm") may need to provide to you certain written notices, disclosures, authorizations, acknowledgments, agreements, or other transactional documents (collectively, "Documents"). Described below in this Electronic Record and Signature Disclosure ("Disclosure") are the terms and conditions for providing to you such Documents electronically through the DocuSign, Inc. ("DocuSign") electronic signing system, and for using your electronic signature in connection with those Documents rather than obtaining your handwritten signature. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Documents will be sent to you electronically:**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all Documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any Documents, we prefer to provide these Documents to you by the same method and to the same address that you have given us. Thus, you can receive the Documents electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below.

**To advise the Firm of your new e-mail address:**

It is your responsibility to provide us with a current, valid email address and to promptly update any changes to this information. To let us know of a change in your e-mail address where we should send Documents electronically to you, you must send an email message to us at helpdesk@foxrothschild.com and in the body of such request you must state: (1) your previous e-mail address, and (2) your new e-mail address. We do not require any other information from you to change your email address. In addition, you must notify DocuSign to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in the DocuSign system.

**To request paper copies from the Firm:**

At any time, you may request from us a paper copy of any Document or record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing session and, if you elect to create a DocuSign signer account, you may access them for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. To request delivery from us of paper copies of the Documents previously provided by us to you electronically, you must send us an e-mail to helpdesk@foxrothschild.com and in the body of such request you must state your e-mail address, full name, US Postal address and telephone number.

**To decline your consent with the Firm:**

If you do not want to receive Documents from us electronically, you have a right to decline consent and receive Documents only in paper format. If you elect to receive required Documents only in paper format, it may slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required Documents to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper Documents.

To decline consent you may either:

i. Decline to sign a document from within your DocuSign session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. Send us an e-mail to helpdesk@foxrothschild.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number. We do not need any other information from you to withdraw your consent.

This will indicate to us that you have withdrawn your consent to receive required Documents electronically from us and you will no longer be able to use the DocuSign system to receive required Documents electronically from us or to sign electronically documents from us.

**To withdraw your consent with the Firm:**

If you decide to receive Documents from us electronically, you may at any time change your mind and tell us that thereafter you want to receive Documents only in paper format. To indicate to us that you are changing your mind, send us an e-mail to helpdesk@foxrothschild.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number.

**How to contact Fox Rothschild LLP:**

You may contact the Firm with any questions or concerns about DocuSign or this Disclosure by sending an email message to: helpdesk@foxrothschild.com.

**Required hardware, software, and operating systems:**

You are responsible for installation, maintenance, and operation of your computer, browser, and software. The Firm is not responsible for errors or failures from any malfunction of your computer, browser, or software. The Firm is also not responsible for computer viruses or related problem associated with the use of an online system, or any delay or failure in connection with your receipt of email notices or other notices, disclosures, or information from the Firm. The following are minimum hardware, software, and operations requirements necessary to receive electronic Documents through DocuSign.

| Operating Systems: | Windows® 2000, Windows® XP, Windows Vista®; Mac OS® X |
|---|---|
| Browsers: | Final release versions of Internet Explorer® 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); Safari™ 3.0 or above (Mac only) |
| PDF Reader: | Acrobat® or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | Allow per session cookies |

** These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for

your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I agree' box, I confirm that:

- I can access and read this Electronic ELECTRONIC RECORD AND SIGNATURE DISCLOSURE document; and
- I can print on paper the Disclosure or save or send the Disclosure to a place where I can print it, for future reference and access; and
- Until or unless I notify Fox Rothschild LLP as described above, I consent to receive through electronic means all notices, disclosures, authorizations, acknowledgements, and and other transactional documents that are to be provided or made available to me by Fox Rothschild LLP during the course of my relationship with the Firm.


Fox Rothschild LLP
ATTORNEYS AT LAW

2020 K Street, N.W.
Suite 500
Washington, DC  20006
Tel 202.461.3100  Fax 202.461.3102
www.foxrothschild.com

Doug P. Hibshman
Direct No: 202 461-3113
Email: dhibshman@FoxRothschild.com

September 8, 2023

**VIA E-MAIL (stephanie.tucker@fema.dhs.gov)**
Stephanie Tucker
FOIA Team Lead
Disclosure Branch, Information Management Division Mission Support
U.S. Department of Homeland Security
500 C Street, S.W. Mail Stop 3172
Washington, DC 20472-3172

Re:   **CoreLogic's Response to FEMA FOIA Request #2023-FEFO-00111ICO /
        FEMA Appeal #2023-FEAP-00003**

Dear Ms. Tucker:

Our firm represents CoreLogic with regard to the above-referenced FOIA Request submitted to the U.S. Department of Homeland Security, Federal Emergency Management Agency ("FEMA").  Please address all correspondence related to the FOIA Request and this Response to undersigned counsel.

CoreLogic appreciates FEMA providing it the ability to respond to the information requested by the President of St. Charles Parish, Louisiana (the "Parish").  Specifically, the Parish is seeking records on the new pricing approach for the National Flood Insurance Program ("NFIP"), including the risk model from Risk Rating 2.0.

As an initial matter, CoreLogic **objects** to FEMA disclosing any CoreLogic data, algorithms, calculations, pricing, valuations, outputs, deliverables, or related data in response to the FOIA Request as all such information constitutes CoreLogic's: (1) trade secrets; and (2) commercial and financial information, which makes such information exempt from disclosure under FOIA pursuant to FOIA Exemption 4.

By way of background, CoreLogic provides multiple software products, services, algorithms, formulas, models, and related data (hereafter collectively referred to as "CoreLogic Protected Data") to FEMA for the purposes of developing risk modeling and pricing for the NFIP.

A Pennsylvania Limited Liability Partnership

California      Colorado      Delaware      District of Columbia      Florida      Georgia      Illinois      Minnesota      Nevada
New Jersey      New York      North Carolina      Pennsylvania      South Carolina      Texas      Virginia      Washington

149212108.1


Fox Rothschild LLP
ATTORNEYS AT LAW

Stephanie Tucker
FOIA Team Lead
U.S. Department of Homeland Security
September 8, 2021
Page 2

For example, CoreLogic provides FEMA CoreLogic Protected Data including, but not limited to products / services / models generally referred to as: Risk Meter API; Replacement Cost National File; Replacement Cost Values; Reconstruction Cost Values; First Floor Height data; Structural Geo Coding, and RQE models. This CoreLogic Protected Data is used by FEMA to calculate insurance costs and risk ratings for specific geographic locations, among many other uses.

The release of such confidential, proprietary, and competitively sensitive information to a third party and/or competitor of CoreLogic would cause significant competitive and financial harm to CoreLogic by enabling CoreLogic's competitors to gain access to information, which could subsequently be used by that competitor to predict CoreLogic's pricing and methodologies, and to potentially reverse engineer its products / services / models. CoreLogic protects such CoreLogic Protected Data from disclosure to third parties to avoid such competitive harm and at no point has CoreLogic informed FEMA that it could release such sensitive information to third parties. Accordingly, this CoreLogic Protected Data is not disclosable under FOIA and should be withheld from disclosure by FEMA.

To the extent that FEMA is inclined to disclose any CoreLogic information addressed herein, we respectfully request the ability to review that specific information and propose redactions to those documents consistent with FOIA Exemption 4. Further, we will gladly provide your office additional information, as needed, to justify FEMA's refusal to disclose CoreLogic Protected Data to the requester.

I am happy to set up a call with your office to discuss these issues in more detail. Please feel free to contact me at your convenience should you have any questions or wish to discuss this matter in greater detail. Thank you in advance for your cooperation on this matter.

Sincerely,

**FOX ROTHSCHILD LLP**

Doug P. Hibshman
*Attorneys for CoreLogic*

149212108.1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ST. CHARLES PARISH, A POLITICAL
SUBDIVISION OF THE STATE OF
LOUISIANA, AND MATTHEW JEWELL,
IN HIS OFFICIAL CAPACITY AS ST.
CHARLES PARISH PRESIDENT,

                Plaintiffs,

      v.

FEDERAL EMERGENCY MANAGEMENT
AGENCY,

              Defendant.

Civil Action No. 2:23-cv-01369

Section P

Judge Papillon

Magistrate Judge North

## DECLARATION OF KATRISK LLC

I, Jeffrey Chen, do hereby declare and state as follows:

1.      I serve as KatRisk LLC's (KatRisk) Chief Executive Officer. Previously, I served as Verikai Inc.'s ("Verikai") President, CEO, Chief Revenue Officer, and Vice President of Sales. Prior to my time at Verikai, I was the Director of Business Development at Formation and spent nearly six years at Guidewire Software, holding diverse roles, including Senior Director in Cloud Strategy/Delivery and Head of Global Value Consulting.

2.      KatRisk is a catastrophe modeling small business which started in 2012. KatRisk has been licensing proprietary catastrophe model data and software currently under Contract No. 70FA6020C00000005 to the Federal Emergency Management Agency ("FEMA") since 2020 with licensing starting in 2017.  KatRisk data and models cover inland flood, storm surge, tropical cyclone winds, severe convective storm, and other perils.

3. Risk Rating 2.0 is FEMA's pricing approach to the National Flood Insurance Program ("NFIP"). According to FEMA, Risk Rating 2.0 enables the agency to deliver FNIP rates that are actuarially sound, equitable, easier to understand and better reflect a property's flood risk.

4. FEMA hired Milliman Inc. ("Milliman") to assist it with its Risk Rating 2.0 initiative, which consists of developing a new rating plan for the NFIP. According to FEMA, Milliman's work under Risk Rating 2.0 has been documented in over 40 separate actuarial communications including actuarial reports and other formats, such as spreadsheets and electronic data files.

5. Under a non-transferable license, KatRisk provided catastrophe modeling data and software to FEMA, and FEMA in turn provided model results and portions of model data to Milliman, which was used in FEMA's Risk Rating 2.0. The license KatRisk granted FEMA covers inland flood from precipitation and storm surge from tropical cyclones. FEMA used the licensed KatRisk models to import location level information from NFIP flood insurance policy holders as well as from Milliman market baskets (i.e., representative samples of policies in a given area). However, KatRisk was not involved in preparing input data, performing model runs, analyzing KatRisk model output, usage of its data and methods, or the Risk Rating 2.0 design.

6. According to FEMA, FEMA's reasons for licensing KatRisk's modeling software are to: (1) add credibility to Risk Rating Redesign and Reinsurance Programs; (2) provide FEMA with the ability to run the models using NFIP data to understand the program's risk and exposure to flood loss; (3) allow FEMA the ability to draw comparisons against premiums proposed by reinsurers using the same models to justify their premiums; (4) help the NFIP set rates for their policies; (5) understand and validate the accuracy and precision of available catastrophic flood models; and (6) maintain stability by continuing to use catastrophic models to build rates.

7.    KatRisk is familiar with the Freedom of Information Act ("FOIA") request and Complaint filed by St. Charles Parish and parish president Matthew Jewell (collectively, the "Plaintiffs"), seeking disclosure of records. KatRisk has timely responded to FEMA when requested to opine on the releasability of KatRisk data in response to the Plaintiffs' FOIA request. KatRisk's response is attached to this declaration.

8.    The statements contained in this declaration are based upon my personal knowledge, information provided to me in my official capacity, and conclusions I reached based on that knowledge or information.

### KatRisk's Data in FEMA's Records

9.    Plaintiffs' FOIA request seeks "all data including but not limited to modeling data used to calculate NFIP flood insurance premiums in St. Charles Parish, Louisiana, in Risk Rating 2.0," and it is my understanding that Plaintiffs have clarified that they are "requesting the risk model used to assign premiums to St. Charles Parish residents," developed by Milliman. Milliman used KatRisk data and model output from our SpatialKat and SoloKat modeling platforms for Risk Rating 2.0.

10.    While KatRisk was not involved with the Risk Rating 2.0 design by FEMA or Milliman, KatRisk is aware of FEMA and Milliman's usage of KatRisk data for Risk Rating 2.0. KatRisk methodologies have been documented through confidential user guides, documentation, tutorials, and training sessions. FEMA is in possession of all KatRisk data and software platforms that use KatRisk data.

11.    It is my understanding that FEMA applied FOIA Exemption 4 to withhold certain KatRisk confidential commercial modeling data.

3

**Withholding of Confidential Commercial Information**

12.     Exemption 4 protects "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." Exemption 4 affords protection to those submitters who furnish confidential commercial or financial information to the government and safeguards them from the competitive disadvantages and other harms that could result from disclosure.

13.     It is my understanding that FEMA withheld KatRisk's confidential commercial modeling data under Exemption 4. In particular, FEMA withheld KatRisk model results, which include estimated average annual losses generated by KatRisk's catastrophe model software to inform Risk Rating 2.0 premium development. This KatRisk output data appears in the Target Rate Level and Concentration Factor exhibit documents that, as I understand it, was provided to Plaintiffs with redactions applied. The redacted KatRisk data is proprietary company data.

14.     It is also my understanding that FEMA withheld KatRisk's confidential commercial contract information showing the "Quantity," "Unit Price," and "Amount" for the catastrophe model licensing.

15.     Milliman first notified KatRisk about this FOIA request on June 23, 2023. In this notice, Milliman explained that FEMA had received a FOIA request from the Plaintiffs targeting information and data Milliman provided to FEMA, and FEMA was soliciting Milliman's perspective on the necessity to protect this information. With general knowledge that Milliman used KatRisk software and data for Risk Rating 2.0, KatRisk assisted Milliman with crafting its response to FEMA. Subsequently, KatRisk received an email on August 11, 2023 from FEMA concerning Plaintiffs' FOIA request seeking Risk Rating 2.0 data. Specifically, this email stated that KatRisk's Risk Rating 2.0 modeling and algorithm data was the subject of a FOIA request and

4

may contain confidential commercial information protected from disclosure under Exemption 4. KatRisk timely responded to this letter before August 25, 2023. KatRisk then received another FOIA notice letter from FEMA on February 19, 2024, regarding KatRisk contract data, which KatRisk also answered within the requested timeframe.

16. To the first request from FEMA, KatRisk responded that all KatRisk model data, software, and location level results produced by the model are confidential and should not be made publicly available. Further, KatRisk explained that it ensures the privacy of the aforementioned information by issuing a non-transferrable license to use the information to its customers, and that this license expires as the end of the applicable contract term. Lastly, KatRisk explained how making its data and modeling available to the public would have a significant financial impact to KatRisk, and result in the loss of the intellectual property associated with this data/modeling.

17. KatRisk does not release its model data, software, modeling factors, user guides and training material publicly and has marked many of the training and documentation material as confidential. We take the protection of our proprietary information very seriously.

18. The withheld modeling information is commercial because KatRisk's catastrophe modeling data and software are proprietary commercial products that are being licensed by about 80 customers in the insurance and reinsurance business, thereby demonstrating its intrinsic value.

19. When licensees like FEMA use our catastrophe modeling, they generate outputs, such as loss estimates, that are derived directly from our model and represent our proprietary data. These outputs are a core part of our catastrophe modeling commercial offering; our licensees are paying for the ability to have our model generate these loss estimates. And the loss estimates reflect the core underlying assumptions and proprietary aspects of our model; they hinge on our model's unique view of flood hazard and vulnerability.

20.     The withheld modeling information is confidential because KatRisk, like all of our peer catastrophe modeling companies, keeps all modeling data and methodologies private and does not publicly release the information absent a non-transferrable license. Additionally, KatRisk protects its proprietary information from disclosure across all KatRisk contracts and business activities through Non-Disclosure Agreements and contracts that limit the distribution of KatRisk data to third parties not included in the contract. KatRisk data and models are kept for FEMA in a secure environment managed by Guy Carpenter & Company and are only accessible with a FEMA secured laptop from FEMA badged personal. Catastrophe risk software is a very competitive industry dominated by two very large players and a handful of smaller organizations. KatRisk's competitors always seek to gain an advantage and obtain more of KatRisk's market share, due to KatRisk's position as the market leader in the flood modeling space (with FEMA as a customer). Any proprietary information related to our products released to the public would cause severe detriment to KatRisk's business and aid our competitors in their pursuit of taking away KatRisk's market share. In particular, a competitor could use the withheld data to understand the proprietary and sensitive underpinnings of our catastrophe modeling and reverse engineer our commercial offerings.

21.     KatRisk takes steps to keep all catastrophe modeling information private and guard against public disclosure across its business activities, because its data, methods and software are the result of extensive internal development work over many years. Making any of our data, software, and model results available to the public could have substantial financial impacts on KatRisk and cause KatRisk to lose the intellectual property associated with its products. If our data, software, or model results is made publicly available at no cost, the ability for KatRisk to license our products and remain financially viable would be greatly diminished.

22.     KatRisk always knew and agreed with having high-level model output aggregate results published by FEMA specifically related to and assisting FEMA NFIP annual reinsurance placements. This data, consisting of the following, is available on FEMA's Open FEMA website and includes, among other data, aggregate average annual loss data by state and for the 100 top loss-producing counties.   But KatRisk considers all other catastrophe modeling data to be proprietary, because such data risks revealing commercially valuable aspects of the proprietary catastrophe models that it licenses to generate revenue.   Considering the sensitivity of this information to its business and the private nature of this information, KatRisk's position is that its modeling information, including the modeling output data specifically withheld from Plaintiffs as part of this FOIA litigation, falls under Exemption 4.

23.     KatRisk has provided the withheld modeling information to FEMA on the expectation that the information would be kept private, and it received assurances from FEMA as part of its work on Risk Rating 2.0 that the information would be protected from disclosure. Importantly, the first page of KatRisk's contract with FEMA provides that "the services to be procured are commercial in nature, and the subject contract is awarded subject to FAR Part 12." With respect to the acquisition of technical data under commercial contracts, the government may acquire "only the technical data and the rights in that data customarily provided to the public." FAR 12.211. Similarly, when acquiring computer software and documentation, the government shall acquire such data "under licenses customarily provided to the public" and "shall have only those rights specified in the license contained in any addendum to the contract." FAR 12.212.   KatRisk licensed for a finite period data, model methodologies, and our software platform, and it did so with the expressed expectation that the data, methodologies, and software

would not become public. Lastly, FEMA has never indicated that our data would be distributed, and it kept our products in a secure production environment.

24.    Apart from the modeling data that FEMA withheld on KatRisk's behalf, it is also my understanding that the agency withheld certain KatRisk contract information concerning the pricing, quantity, and amount for licensing our catastrophe modeling. These contract terms are fundamental terms that KatRisk submitted to contract with FEMA, and they relate directly to our commercial agreement. We do not publicly release this type of sensitive business information. The release of this contract data would cause us significant financial harm by revealing our pricing and business strategy to our competitors.

25.    If FEMA is unable to maintain the confidentiality of our catastrophe modeling information, we will likely be unwilling to license our catastrophe modeling products to the government in the future in a similar fashion.  Public disclosure of our proprietary catastrophe modeling information poses great financial risk to us.

I declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on this 13th day of June 2024.

_____
          Jeffrey Chen
          KatRisk CEO



KatRisk
2397 Shattuck Ave., #212
Berkeley, CA 94704

August 17, 2023

Stephanie Tucker
FOIA Team Lead
Disclosure Branch
Information Management Division
Mission Support

Re: FEMA 2023-FEAP-00003

Dear Ms. Tucker,

In response to your letter of August 11, 2023 regarding the subject request for information, KatRisk believes that all KatRisk model data, software, and location level results produced by the model are confidential and should not be made publicly available. Specifically, KatRisk considers the following to be proprietary and trade secret information:

- KatRisk software and model data licensed to FEMA. This includes all KatRisk GIS raster data and derivatives of these data. Examples include return period flood maps and differences between return period flood maps, such as the river class data used in Risk Rating 2.0.
- Any location level output results generated from the KatRisk model. Examples include the average annual loss for each of the about 90 Million locations from the Milliman market basket used in Risk Rating 2.0.

KatRisk licenses our flood model data and software to FEMA under the expectation that the model data, software, and location level results will remain confidential and not be distributed. FEMA has never indicated to us that our data, software, or location level results would be made publicly available. All of our commercial contracts provide a license to use the KatRisk data and software while the license is valid and requires removal of our data and software once a license expires. Additionally, licensed data and software cannot be provided to third parties.

The KatRisk data and software provided to FEMA are the result of extensive internal development work over many years. Making our data, software and location level results available to the public could have substantial financial impacts on our company and cause us to lose the intellectual property associated with our products. If our data or software is made publicly available at no cost, the ability for KatRisk to license our products and remain financially viable would be greatly diminished.

Please let us know if you have any questions regarding this matter.

Sincerely,

Guy C. Morrow
Managing Member

9

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| ST. CHARLES PARISH, A POLITICAL SUBDIVISION OF THE STATE OF LOUISIANA, AND MATTHEW JEWELL, IN HIS OFFICIAL CAPACITY AS ST. CHARLES PARISH PRESIDENT, <br><br> *Plaintiffs*, <br><br> v. <br><br> FEDERAL EMERGENCY MANAGEMENT AGENCY, <br><br> *Defendant*. | Civil Action No. 2:23-cv-01369 <br><br> Section P <br><br> Judge Papillion <br><br> Magistrate Judge North |

**<u>DECLARATION OF ROGER GRENIER, PhD</u>**

I, Roger Grenier, do hereby declare and state as follows:

1.      I am Senior Vice President and lead the Global Resilience Practice of Verisk Extreme Event Solutions ("VEES"), formerly known as AIR Worldwide, a subsidiary of Verisk Analytics, Inc. ("Verisk"). VEES and Verisk are Delaware corporations. VEES is headquartered in Boston. Verisk is headquartered in Jersey City. VEES has subsidiaries or branch offices in the UK, Germany, India, Singapore, China, and Japan. Among my responsibilities in leading the Global Resilience Practice is overseeing our engagement with government entities, including FEMA.

2.      Verisk is a leading data, analytics, and technology provider serving the insurance industry, corporations, governments, and non-governmental organizations. Verisk develops

advanced technologies, builds unique data assets, and leverages deep insurance industry knowledge to build valuable solutions for our clients.

3.      VEES pioneered the field of probabilistic catastrophe modeling used by insurers, reinsurers, intermediaries, financial institutions, governments, and others to manage their risk from extreme events. Our models, which form the basis of our solutions, enable companies to identify, quantify, and plan for the financial consequences of catastrophes.

4.      VEES has developed models for more than 120 countries, including models for floods, hurricanes, earthquakes, winter storms, tornadoes, hailstorms, wildfires, terrorism, and pandemics. We also help our clients to plan for and manage climate and weather-related risk, and serve our customers by providing advanced research, development, and analysis delivered through software platforms available through a subscription license.

5.      FEMA licenses VEES software and models for United States Tropical Cyclone, Inland Flood and Tsunami (collectively, the "VEES flood model") which produce a combined estimate of flood risk from precipitation, storm surge, and earthquake-induced waves.

6.      I am familiar with the Freedom of Information Act ("FOIA") request and the Complaint filed by Plaintiffs St. Charles Parish and parish president Matthew Jewell seeking disclosure of records sought through FOIA.

7.      The statements contained in this declaration are based upon my personal knowledge, information provided to me in my official capacity, and conclusions I reached based on that knowledge or information.

**Verisk's Data in FEMA's Records**

8.      Risk Rating 2.0 is FEMA's actuarial update to the National Flood Insurance Program's pricing methodology.

9.      I am familiar with Plaintiffs' FOIA request seeking "all data including but not limited to modeling data used to calculate NFIP flood insurance premiums in St. Charles Parish, Louisiana, in Risk Rating 2.0". Plaintiff is requesting the risk model used to assign flood insurance premiums to St. Charles Parish residents.

10.       It is my understanding that FEMA used its own flood insurance policyholder data as input for the VEES flood model ("input data"), selected the model analysis options, ran the model, and generated flood loss estimates. I also understand that FEMA and its actuarial consultant, Milliman, Inc. ("Milliman"), utilized the results of the VEES flood model, along with other model results and data, in developing Risk Rating 2.0. VEES had no role in preparing the input data, running the models, or extracting, analyzing, and utilizing the VEES flood model results.

**Withholding of Confidential Commercial Information**

11.      I understand that at our request FEMA withheld VEES confidential commercial information related to modeling factors under FOIA Exemptions 4. By "modeling factors," I mean Verisk model results, which include estimated losses from thousands of simulated floods.

12.      The Verisk simulated floods are incorporated within our licensed software platform and include both probabilistic and historical events. The probabilistic events are realistic simulations of events that could occur in any year. The historical events are recreated simulations of actual historical events.

13.     For each flood in the catalog, our flood model simulates the "footprint" of water depth across the affected area, calculates the depth of water at individual building locations, determines the degree of damage for each building type, and applies insurance policy terms to estimate the loss.

14.     When licensees like FEMA input their flood insurance policyholder data and run our flood model, the software produces estimates of the annual expected losses. These loss estimates are derived directly from our model and represent our proprietary data. They are a core part of our catastrophe modeling commercial offering; our licensees are paying for the ability to have our model generate these loss estimates. And the loss estimates reflect the core underlying assumptions and proprietary aspects of our model; they hinge on our model's unique view of flood hazard and vulnerability.

15.     We were notified via email from Nancy Watkins of Milliman on June 26, 2023, that FEMA received a FOIA request from Adams and Reese, LLP, on behalf of the president of St. Charles Parish regarding Milliman's work on Risk Rating 2.0.

16.     Milliman provided us with a copy of a letter from FEMA to Milliman dated June 21, 2023, which cited the FOIA request and noted that the requestor was seeking records on the Risk Rating 2.0 methodology including modeling and algorithm data. The FEMA letter to Milliman noted that the requested data might contain confidential commercial information protected from disclosure under Exemption 4. The letter inquired about Milliman's perspective on the necessity to protect this information and in particular on whether Milliman customarily kept the data at issue private and provided it to FEMA with assurance of confidentiality.

17.     In their follow-on June 26, 2023, letter to VEES, Milliman noted they were preparing a list of data included in the work products that Milliman had provided to FEMA that

Milliman believed to be confidential, which included our modeling results. Milliman invited us to comment on the list.

18.     We responded via email and letter to Milliman on June 27, 2023, outlining our position. We objected to the release of modeling factors or algorithms derived from our model results, noting that our models are confidential and constitute our closely held trade secrets, are not in the public domain, and are not generally known. We noted that we license models to clients, like FEMA, only under license agreements with strict confidentiality requirements and with limitations on disclosure of the model output.

19.     Our response to Milliman also noted that we develop, update, and enhance our proprietary loss models at great expense and that we derive substantial economic value from them. We noted that we are careful to label them and the user documentation prominently as confidential.

20.     Our response to Milliman included an excerpt of FEMA's model contract with Verisk, which notes that "Disclosure of output and the user manuals and guides outside of FEMA is prohibited." We also noted that we asked FEMA to confirm the confidentiality and nondisclosure aspects of our license and that FEMA's contracting officer did so by email on September 28, 2017. We followed up with another email to Milliman on July 6, 2023, to inquire whether Milliman required any additional information from us. Nancy Watkins from Milliman replied later that day and stated that our response was included in the information provided to FEMA.

21.     We are aware that FEMA specifically withheld modeling factors developed from our model results in their response to the FOIA request.

22.     We develop, update, and enhance our proprietary loss models at great expense. Our company was built on and continues to have at its foundation the revenue we derive from licensing

subscription-based software, which includes our models, to our clients. A significant portion of our annual revenue is derived from these licenses.

23.     We keep our modeling factors, the models themselves, and our user documentation private. We do not publicly release the information. We protect the information from disclosure across our contracts and business activities by specific contract language restricting or limiting access to the data internally and externally; marking the information as confidential; using confidentiality agreements or NDAs where appropriate; implementing policies to guide employees and external parties in reporting data breaches; establishing password protections governing access to our software platforms; housing the model data in secure network databases; prohibiting data release by third parties unless approved in the license for specific data for specific purposes or with our prior written consent; and generally requiring confidentiality in order to protect our trade secrets and the investment we've made in our models.

24.     I believe that the methods through which we protect our intellectual property and data are standard across the modeling industry including but not limited to our competitors and business partners, and are aligned to the strict protections our clients use for their own proprietary and private customer data.

25.     We take these steps to keep our proprietary information confidential because we invest considerable financial and human capital resources to develop, maintain and improve our innovative models. Our investments contribute significantly to the understanding of risk, to the benefit of many stakeholders. These investments only make business sense if we have protections to ensure that our intellectual property will not be exposed to unauthorized parties and/or impermissibly exploited by other organizations, around the country, and around the world.

26.     Examples of ways in which our models could be exploited include enabling competitors to develop or substantially improve their own models using Verisk's intellectual property and enabling insurers to develop insurance rating plans without licensing the models, effectively creating a situation where insurers who are paying for lawful access are subsidizing their competitors. The loss estimates from our model, coupled alongside the FEMA input policyholder data, is a specific example of how our confidential modeling information could be exploited.

27.     Guarding against public disclosure also serves the public interest by enabling innovation and availability of robust models to support a healthy insurance market, leading to stable commercial and homeowner markets generally. Sophisticated models are an improvement over historical methods for determining risk, and models continue to improve, fostered by competition. If model developers cannot protect their investment, future models may be less granular and predictive of risk, potentially limiting the availability of sophisticated tools that can help encourage a healthy insurance market and maintain availability of insurance coverage.

28.     We provided our flood model to FEMA on the expectation that it and the associated modeling factors would be kept private, and we received assurances from FEMA as part of its work on Risk Rating 2.0 that the information would be protected from disclosure. In particular, as cited previously, FEMA's model contract with VEES notes that "Disclosure of output and the user manuals and guides outside of FEMA is prohibited." FEMA specifically agreed to the confidentiality and nondisclosure aspects of the contact in an email from FEMA's contracting officer on September 28, 2017.

29.     If FEMA is unable to maintain the confidentiality of our catastrophe modeling information, we will likely be unwilling to license our catastrophe modeling products to the

government in the future in a similar fashion. As discussed, public disclosure of our proprietary catastrophe modeling information poses great financial risk to us.

I declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on this 13th day of June 2024.

_____
Roger Grenier
Senior VP, Verisk Extreme Event Solutions

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

ST. CHARLES PARISH, A POLITICAL
SUBDIVISION OF THE STATE OF
LOUISIANA, AND MATTHEW JEWELL,
IN HIS OFFICIAL CAPACITY AS ST.
CHARLES PARISH PRESIDENT,

        *Plaintiffs*,

        v.

FEDERAL EMERGENCY MANAGEMENT
AGENCY,

        *Defendant.*

Civil Action No. 2:23-cv-01369

Section P

Judge Papillion

Magistrate Judge North

## DECLARATION OF MATTHEW CHAMBERLAIN

I, Matthew Chamberlain, do hereby declare and state as follows:

1.    Milliman, Inc. ("Milliman") is a risk management, benefits and technology firm that provides actuarial and related products and services to a wide range of clients.

2.    Milliman is a contractor for the Federal Emergency Management Agency ("FEMA") and provided actuarial services to FEMA related to the "Risk Rating 2.0" initiative. I am the Lead Actuary for those contracts. I am a Principal and Consulting Actuary at Milliman and have been at the firm since 2011.

3.    I am familiar with the Freedom of Information Act ("FOIA") request and Complaint filed by Plaintiffs St. Charles Parish and parish president Matthew Jewell, seeking disclosure of records sought through FOIA.

4.     The statements contained in this declaration are based upon my personal knowledge, information provided to me in my official capacity, and conclusions I reached based on that knowledge or information.

### Milliman's Data in FEMA's Records

5.     Risk Rating 2.0 is FEMA's actuarial update to the National Flood Insurance Program's pricing methodology.

6.     The Plaintiffs' FOIA request sought "all data including but not limited to modeling data used to calculate NFIP flood insurance premiums in St. Charles Parish, Louisiana, in Risk Rating 2.0" and clarification that they were "requesting the risk model used to assign premiums to St. Charles Parish residents. I believe Milliman was the company that did the modeling for FEMA[.]"

7.     Verisk, KatRisk, and CoreLogic are catastrophe modeling firms. FEMA licenses their flood models and used their models as part of the Risk Rating 2.0 initiative.

8.     FEMA provided this data to Milliman and Milliman used it as part of its work on behalf of FEMA. Milliman's work on Risk Rating 2.0 is described in detail in the January 18, 2022, report on FEMA's website titled *National Flood Insurance Program: Risk Rating 2.0 Methodology and Data Sources.*[1]

### Withholding of Milliman Confidential Commercial Contract Information

9.     Milliman contract information was redacted in Milliman contracts that were provided as part of this FOIA litigation.

10.     The redacted information includes detailed information on the estimated number of hours and billing rates that were used to determine the price proposal Milliman submitted in

---

[1] https://www.fema.gov/sites/default/files/documents/FEMA_Risk-Rating-2.0_Methodology-and-Data-Appendix__01-22.pdf.

response to a FEMA Request for Proposals. This information would be valuable to our competitors who may respond to future Request for Proposals.

11.  Because of the sensitivity of the information, it is Milliman's business practice to only provide cost estimates to external parties with a bona fide need to know. In general, this means that it is provided to clients, but not to third parties.

### Withholding of Other Vendors' Confidential Commercial Information

12.  It is my understanding that FEMA withheld confidential commercial information records obtained from CoreLogic, KatRisk, and Verisk under FOIA Exemptions 4.

13.  Catastrophe model data withheld may include the Average Annual Loss for specific locations, flood depths at specific locations, and other data. This data could provide valuable information about the vendor models.

14.  In my experience this data is typically only available to those that have a contract with a model vendor or have executed a Non-Disclosure Agreement with the model vendor.

15.  Were this data to become public it could put the model vendor at a competitive disadvantage by giving the model vendor's competitors insight into the model and make the model less valuable to potential customers.

16.  FEMA asked Milliman whether this data was exempt for disclosure under FOIA. Milliman responded to FEMA that the data does not belong to Milliman and therefore Milliman cannot assert an exemption under FOIA, however it is our belief that the data includes confidential commercially valuable information, and we suggested that FEMA contact the model vendors.

3

I declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on this 13th day of June 2024.

_Matthew Chamberlain_
Matthew Chamberlain
Principal and Consulting Actuary

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

ST. CHARLES PARISH, A POLITICAL
SUBDIVISION OF THE STATE OF
LOUISIANA, AND MATTHEW JEWELL,
IN HIS OFFICIAL CAPACITY AS ST.
CHARLES PARISH PRESIDENT,

          *Plaintiffs*,

     v.

FEDERAL EMERGENCY MANAGEMENT
AGENCY,

         *Defendant*.

Civil Action No. 2:23-cv-01369

Section P

Judge Papillion

Magistrate Judge North

## <u>DECLARATION OF NAOMI ONDRICH</u>

I, Naomi Ondrich, do hereby declare and state as follows:

1.     I am the Branch Chief of the Actuarial and Catastrophic Modeling Branch of the Federal Emergency Management Agency ("FEMA"), a component of the United States Department of Homeland Security ("DHS"). The Actuarial and Catastrophic Modeling Branch sits within the Flood Insurance Directorate ("FID"), the organization within FEMA that manages the National Flood Insurance Program ("NFIP"). In my capacity as the Branch Chief of the Actuarial and Catastrophic Modeling Branch, I oversee all aspects of the actuarial and catastrophic modeling team, including overseeing actuarial analysis, rate development and implementation, and program reporting. In addition, where needed, I provide technical direction and support coordination of the team's work initiatives. I have held this position since September, 2023. I have over 30 years of experience as an actuary, 6 of which are with the Federal Government. I am an Associate of the

Casualty Actuary Society ("ACAS"), and a Member of the American Academy of Actuaries ("MAAA").

2.      The Actuarial and Catastrophic Modeling Branch is responsible for developing the NFIP's insurance rating program, establishing insurance premium rates, and providing actuarial support to the NFIP. Because of its responsibilities and subject matter expertise, the Actuarial and Catastrophe Modeling Branch works with FEMA's Disclosure Branch, which handles all Freedom of Information Act ("FOIA") requests for the agency, on FOIA searching and processing for FOIA requests that pertain to the NFIP and in particular to NFIP premiums and risk modeling.

3.      Due to my official duties as the Branch Chief of the Actuarial and Catastrophic Modeling Branch, I am familiar with this case, catastrophe modeling, and how FEMA rates policies as part of the NFIP.

4.      I am familiar with the Complaint filed by Plaintiffs St. Charles Parish and parish president Matthew Jewell, seeking disclosure of records sought through FOIA.

5.      The statements contained in this declaration are based upon my personal knowledge; upon information provided to me in my official capacity, including information provided by members of the Disclosure Branch, the Actuarial and Catastrophic Modeling Branch, and other FEMA employees involved in searching for and processing records in this case, and by third-party vendors that submitted information subject to the FOIA request at issue; and upon conclusions I reached based on that knowledge or information.

**FEMA's Search for Responsive Records**

6.      I understand that Plaintiffs submitted a FOIA request to FEMA requesting "all data including but not limited to modeling data used to calculate NFIP flood insurance premiums in St. Charles Parish, Louisiana, in Risk Rating 2.0." I also understand that Plaintiffs clarified their

request, stating: "[t]he NFIP uses risk modeling to determine how much premium to charge participants who participate in the flood insurance program. I am requesting the risk model used to assign premiums to St. Charles Parish residents. I believe Milliman was the company that did the modeling for FEMA[.]"

7.      The NFIP is a federal flood insurance program, administered by FEMA, that services nearly five million policies across the United States.

8.      Risk Rating 2.0 is FEMA's actuarial update to the NFIP's pricing approach. FEMA formally announced Risk Rating 2.0 on its website in April 2021 and began applying it to NFIP policies on October 1, 2021.

9.      FEMA contracted with three vendors to license their flood catastrophe models—CoreLogic, Inc. (an information services company focused on the property industry), Verisk Analytics, Inc. (a data, analytics, and technology provider that works with the insurance industry and government organizations, and that helped pioneer the field of probabilistic catastrophe modeling used by insurers), and KatRisk LLC (a catastrophe modeling company). CoreLogic was also contracted by FEMA to acquire replacement cost values to complete catastrophe modeling work. FEMA also contracted with Milliman, Inc., an industry-leading actuarial firm, to take the catastrophe modeling output from the other vendors and use that output to assist FEMA in developing Risk Rating 2.0.

10.      The use of catastrophe models has been standard insurance industry practice for over 20 years. The National Association of Insurance Commissioners ("NAIC") describes a catastrophe model as "a computerized process that simulates potential catastrophic events based on historical events. The simulated events generate scenarios of frequency, severity, and location.

Catastrophe models incorporate data, technology, scientific research, engineering methods, and statistical analysis to model complex scenarios and events."[1]

11.    The CoreLogic, KatRisk, and Verisk catastrophe models were run by FEMA and the output was provided to Milliman to create the rating plan; as a result, all of the relevant Risk Rating 2.0 modeling data was under Milliman's possession. The output of the catastrophe models contains estimated losses by each model vendor, reflecting their underlying assumptions and proprietary data. NFIP policyholder insurance data, containing geospatial location information about a structure and the selected coverage of insurance applied to that structure, is imported into each vendor's catastrophe model. Those vendor models determine the flood hazards exposed to a given property based on its location as well as the vulnerability of the location based on its structural characteristics. Each model's view of hazard and vulnerability is unique to that model's assumptions and the data sourced by that model and vendor to inform the riskiness of the properties being analyzed. Together those components allow a model to estimate losses in a given year that the structure could experience. These loss estimates are derived directly from each catastrophe model vendor and thus reflect each vendor's proprietary data underlying those loss estimates.

12.    The declaration of Tammi Hines (Senior Director of the Information Management Division, Office of the Chief Administrative Officer at FEMA, and acting Chief of the Disclosure

---

[1] NAIC Center for Insurance Policy and Research, *Catastrophe Models (Property)* (last updated Mar. 20, 2024), https://content.naic.org/cipr-topics/catastrophe-models-property. The Actuarial Standards Board ("ASB") sets standards for appropriate actuarial practice in the United States through the development and promulgation of Actuarial Standards of Practice ("ASOPs"). ASOP 38 provides recommendations to actuaries when selecting or using catastrophe models for assessing risk. ASB, *ASOP No. 38, Catastrophe Modeling (for All Practice Areas* (July 2021), https://www.actuarialstandardsboard.org/asops/actuarial-standard-of-practice-no-38-revised-edition/. Both FEMA and Milliman actuaries adhered to ASOP 38 in the development process of Risk Rating 2.0 premiums.

Branch) describes in detail the full search process for locating the modeling data responsive to Plaintiffs' request. Below, I reiterate just a few of the salient points.

13.     FID and the Disclosure Branch determined that records that FEMA had previously collected but had not yet released for a prior FOIA request (request number 2022-FEFO-00776) from a separate requester contained all the data potentially responsive to Plaintiffs' request.

14.     In November 2022, FID conducted a FOIA search for the 2022-FEFO-00776 request by locating a shared electronic database repository containing all actuarial communications, reports, spreadsheets, data files, and other records provided to FEMA by Milliman in connection with Milliman's work for Risk Rating 2.0. FID had used the repository to organize and store all final deliverables that Milliman had produced for FEMA as part of its contract and had provided to FEMA electronically. Under the supervision of FID's Branch Chiefs for the Actuarial and Catastrophic Modeling Branch and the Reinsurance Branch,[2] FID reviewed the repository to ensure that all final deliverables had been included and reviewed their emails from Milliman to ensure no files were missing. FID transferred all the data files to the Disclosure Branch via a shared electronic folder. At the time that FEMA was considering Plaintiffs' FOIA request and appeal, it had not processed or produced the repository materials for the 2022-FEFO-00776 request.

15.     Between March 24, 2023 and April 3, 2023, the Disclosure Branch and FID reviewed the 2022-FEFO-00776 request materials and the shared folder containing the Milliman data for this prior request, and they concluded from their review that the database had all the records potentially responsive to Plaintiffs' request. The Disclosure Branch and FID reached this

---

[2] Andy Neal and John Kulik respectively. Andy Neal is no longer at FEMA. Naomi Ondrich has assumed his role.

conclusion based on four considerations. First, FID had previously confirmed the shared folder contained all Milliman data. Second, Plaintiffs specifically identified Milliman data in their FOIA request. Third, in response to FEMA's attempt to clarify their request, Plaintiffs further specified they were requesting the Risk Rating 2.0 "risk model used to assign premiums," which they identified "Milliman" as the source for. And fourth, the data sought—the "risk model used to assign premiums to St. Charles Parish"—does not exist at the parish level. The risk data outputs of the catastrophe models are produced at the location level and aggregated to the state and line-of-business level in the "Target Rate Level" exhibit produced to Plaintiffs, discussed below. Target rate levels, *i.e.*, target NFIP premiums, are set at the state and occupancy level, rather than at the parish level. FEMA does not aggregate to parish or county levels when developing its rating algorithm.

16.     Nonetheless, the records in the repository of Milliman documents (all of which FEMA has produced), accompanied by publicly-available exhibits on FEMA's website, provide all that is necessary to calculate a Risk Rating 2.0 premium for a specific building in St. Charles Parish or any other location. The set of documents comprising the "Target Rate Level" exhibit[3] summarizes the final target premiums without fees assigned to each of FEMA's lines of business.[4] "Appendix F.1 NT" contained therein summarizes final target premiums by line of business. These final target premiums are used to create the base rates for the respective lines of business, which are the foundational rates for policyholders' flood insurance premiums. Those base rates are found

---

[3] Those documents are noted in the *Vaughn* index documenting withholdings FEMA made in its sixth and final production of records to Plaintiff.

[4] "Lines of business" is defined as segments of FEMA's policyholders, separated by occupancy (single-family home vs. non-single family home), levee status (leveed vs. non-leveed structures), peril (for example, inland flood, storm surge, and other sub-perils), and type of coverage (coverage A for building coverage, coverage C for contents coverage).

online via the "Appendix D – Rating Factors" document that FEMA has published online for several years.[5] The base rates are then adjusted based on the geographic, building, and coverage characteristics (*i.e.*, policyholder input variables), which are also contained online on Appendix D. The set of documents comprising the "Concentration Factor" exhibit[6] supports the creation of the concentration risk factor, which is also included in Appendix D online and reflects FEMA's efforts to account for differences in risk due to differences in policy concentration (*i.e.*, the greater flood risk in areas with a higher concentration of policies). Together, these documents provide the necessary data to understand how flood insurance premiums are calculated under Risk Rating 2.0, including in St. Charles Parish. FEMA's methodology in calculating rates is fully explained in its January 2022 online report titled *Risk Rating 2.0 Methodology and Data Sources*.

17.     As the report makes clear, catastrophe modeling is foundational to Risk Rating 2.0 premium development. The NFIP runs catastrophe models, licensed by third-party vendors, over various market baskets (which are representative samples of policies in a given area) to establish average annualized losses (*i.e.*, the total expected losses for all policyholder) at a state and location level. This data is then used as inputs for determining rating factors, *i.e.*, the individualized geographic and property characteristics to adjust base rates. Catastrophe models are also run on NFIP-policyholder data to determine the necessary target rate levels described above. The resulting base rates and rating factors make up the rating plan. The NFIP rating engine was developed based on this rating plan; geospatial layers (distance to coast, elevation, etc.) were created in order to assign geographic and structural characteristics to a policyholder's property upon obtaining a quote

---

[5] https://www.fema.gov/sites/default/files/documents/fema_appendix-d-rating-factor-tables_02242023.xlsx.

[6] Those documents are noted in the *Vaughn* index documenting withholdings FEMA made in its sixth and final production of records to Plaintiff.

for a policy. Those characteristics are then assigned their respective rating factors to determine applicable premium.

18.     The FOIA search tasker form documenting FEMA's search here also provided the following explanation regarding the records located, to include in FEMA's response to the FOIA request:

> The Target Rate Level Exhibit shows the catastrophe model results, the derivation of the selected Average Annualized Losses (AALs) by state from the modeled results, how those AALs were rescaled by Occupancy type and Location, and the allocation of AALs by Coverage type (A/C) and Peril. Exhibits 10 and 11[7] show the derivation of each territory factor by Peril.
>
> Also, we would like to provide additional information that will be useful in gaining a better understanding of Risk Rating 2.0. FEMA has released full-risk rates data at the National, State, County, and Zip Code Levels for the public. The attached exhibits show the risk-based cost of flood insurance or the full actuarial rate for single-family homes under Risk Rating 2.0, using data from single-family policies renewed before Sept. 30, 2022. These exhibits will be updated and revised once data is available for all policyholders who have renewed their policies under Risk Rating 2.0.
>
> We will advise that the requester visit the Online resources for more information concerning full-risk rates under Risk Rating 2.0. The full-risk rates data can be found at: https://www.fema.gov/flood-insurance/work-with-nfip/riskrating/ single-family-home.

19.     FEMA's explanation noted that the "Target Rate Level Exhibit" and Exhibits 10 and 11 together show the catastrophe model results," the derivation of AALs by state from model results, how AALs were rescaled, the allocation of AALs by coverage type and peril, and the derivation of territory factors by peril in order to specifically direct Plaintiffs to the local level information they are seeking. As described above, target rate levels are determined at the state and occupancy level, rather than the parish or county level. The respective target premiums for St.

---

[7] Exhibits 10 and 11 are documents that FEMA produced to Plaintiffs in its second and third monthly productions to Plaintiffs.

Charles Parish stakeholders can be found within the Louisiana state target premiums in "Appendix F.1 NT" of the "Target Rate Level" exhibit based on which occupancy they fall into (single-family home or non-single family home), and which peril and coverage they are seeking. That target premium informs the St. Charles Parish base rates that would fall under the Louisiana base rates for the respective line of business. There are no individual base rates at the parish or county-level. The base rates are found online in the Appendix D document discussed above. St. Charles Parish stakeholders seeking their respective territory factors referenced in the tasker explanation above would reference the Appendix D territory factor exhibits based on their respective Hydrologic Unit Code ("HUC," here HUC12)[8] and levee ID if applicable. These factors are applied to individuals within these boundaries. These factors can be found in Appendix D, and a description of these factors (and other technical terms used here and elsewhere) can be found in the *Risk Rating 2.0 Methodology and Data Sources* report on FEMA's website.[9] Any other factors relating to the derivation of flood insurance premiums are applied at the structure level (for example, First Floor Height, Ground Elevation, or Distance to Coast).

### Justifications For Application of FOIA Exemptions to Withhold Information

20.     FEMA withheld records under Exemptions 4 and 5 to withhold certain information in the records that it produced to Plaintiffs.

21.     Attached to the declaration of Tammi Hines is FEMA's *Vaughn* index, describing each specific FOIA withholding and the basis for that withholding.

---

[8] HUC's are a positioning system utilized to establish various regions; the number afterwards identifies how zoomed in the map is, as each additional digit moves the map in even more. For example, HUC08 is the lower Mississippi region encompassing parts of multiple states; when one moves down to the HUC12 level the map becomes much more localized.

[9] https://www.fema.gov/sites/default/files/documents/FEMA_Risk-Rating-2.0_Methodology-and-Data-Appendix__01-22.pdf.

A.      **Exemption 4**

22.      Exemption 4 protects "trade secrets and commercial or financial information obtained from a person which is privileged or confidential." 5 U.S.C. § 552(b)(4).

23.      Under Exemption 4, a trade secret "is a secret, commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort." *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1288 (D.C. Cir. 1983).

24.      FEMA initially invoked Exemption 4 to protect from disclosure trade-secret geospatial data underlying the risk rating engine for Risk Rating 2.0.

25.      After Plaintiffs' appeal caused FEMA to reevaluate their FOIA request and determine that Plaintiffs did not seek trade-secret rating-engine data and instead sought non-publicly-available modeling data undergirding Risk Rating 2.0, FEMA applied Exemption 4 to protect from disclosure portions of the data that are not trade secrets.

26.      To apply Exemption 4 when withheld records do not contain trade secrets, an agency must establish that the records are (1) commercial or financial; (2) obtained from a person; and (3) privileged or confidential. *See* 5 U.S.C. § 552(a)(8)(A)(i).

27.      As reflected in FEMA's *Vaughn* index, the agency invoked Exemption 4 to protect confidential commercial "contract" information and "modeling" information. The "modeling" information withholdings refer to catastrophe model outputs. As explained below and in further detail in the modeling vendors' declarations, these outputs are plainly considered by the vendors, and the catastrophe modeling industry at large, to be proprietary and private product information that must be and is closely guarded. The model outputs are commercially valuable information produced directly from, and are directly reflective of, the vendors' proprietary and closely guarded

10

catastrophe models, which they have developed at great expense, license in commercial offerings, and depend on to generate revenue.

### 1.   *Catastrophe Modeling Data*

28.     The Exemption 4 withholdings described as "confidential commercial modeling factor(s)" in the *Vaughn* index all refer to various redacted elements of the "Target Rate Level" exhibit documents and "Concentration Factor" exhibit documents—produced as part of FEMA's sixth and final production of records—in which catastrophe modeling output is contained.

29.     Catastrophe modeling output in this case is modeled Average Annual Losses ("AALs") and scale factors applied to those AALs at the state and line-of-business level. An AAL is defined as an estimated loss that could occur in a given year from the modeled flooding peril sources (such as storm surge, inland flood, etc.). FEMA obtained estimated AALs from CoreLogic, KatRisk, and Verisk from the catastrophe models that it licensed from these vendors, and it then applied scale factors to the AALs generated by the vendors from their models. A scale factor is simply an adjustment to the modeled AALs when FEMA compared those vendor-generated loss estimates to historical NFIP experience; if a model had an upward or downward bias in its modeled loss estimates relative to what the NFIP has reasonably experienced in historical events, then the modeled losses for each vendor were adjusted to bring the modeled losses (without overfitting the modeled data to the historical experience). The resulting output are scaled AALs, which is simply the modeled AALs straight out of each of the model vendors' proprietary models, multiplied by the applicable scale factors. The scaled AALs then become the basis for deriving the target level premium in the "Target Rate Level" exhibit. Scaled AALs were not withheld, so as to provide Plaintiffs with a sense of the variation between the catastrophe modeled loss estimates. FEMA

only withheld the modeled AALs generated by CoreLogic, KatRisk, and Verisk through use of their catastrophe models.

30.    In other words, the withheld information relating to "confidential commercial modeling factor(s)" was provided to FEMA by third-party vendors; their third-party catastrophe model software generated estimated modeled losses that FEMA redacted.

31.    The withheld AALs are considered confidential commercial information by each third-party catastrophe model vendor because these model outputs provide valuable insight into the core model assumptions each vendor uses to calculate estimated flood losses. The vendors license their catastrophe modeling software and data to clients such as FEMA as proprietary products; their catastrophe models are developed at great expense and represent their main method of generating revenue. Thus, the vendors naturally treat the core assumptions undergirding their proprietary models as proprietary as well. Were these assumptions to become public, it would cause large financial damage to the vendors, which is why they closely safeguard their catastrophe modeling information.[10] As part of FEMA's ordinary process for handling FOIA requests that implicate Exemption 4, the vendors have each explained to FEMA these considerations and has made clear the vital importance of protecting their catastrophe modeling information.

32.    In accordance with DHS FOIA regulatory guidance, 6 C.F.R. § 5.7(c), FEMA reached out to each vendor to (a) provide them written notice that their Risk Rating 2.0 modeling and algorithm data was the subject of a FOIA request and may contain confidential commercial

---

[10] As part of its withholdings, FEMA also withheld the scale factors used to go from modeled AALs to scaled AALs. As discussed, FEMA did not withhold the scaled AALs themselves. (Those are available in Appendix G.5 of the "Target Rate Level" exhibit.) Because the scaled AALs are simply a multiplication of the modeled AALs by the scale factors, knowing the scale factors would allow Plaintiffs and others to divide the scaled AALs by the scale factor to back into the modeled AALs for each third-party vendor. Again, the release of modeled AALs would also cause financial damage to the catastrophe modelers.

information protected from disclosure under Exemption 4, and (b) solicit their perspective on the necessity to protect this information and on whether they customarily kept the data at issue private and provided it to FEMA with assurance of confidentiality. These written notices are known as "submitter's notices." The correspondences are summarized in the Hines declaration and the vendors' own declarations.

33.      All release recommendations from KatRisk, CoreLogic, and Verisk regarding modeling data were applied accordingly.

34.      The following is information that I have determined based on review of FEMA's correspondences with the modeling vendors and subsequent consultation with them. Each vendor has confirmed the necessity of the specific Exemption 4 withholdings of vendor modeling information reflected in FEMA's *Vaughn* index.

35.      The withheld modeling information in the sixth and final FOIA production to Plaintiffs is the vendors' commercial information because it reflects and reveals proprietary assumptions at the heart of the proprietary catastrophe models that they develop at great expense and license for profit, in a highly technical and competitive industry, to various clients seeking to price insurance products. The catastrophe models are the vendors' commercial products, and as such their model outputs, reflecting sensitive intellectual property undergirding their products, are highly commercially valuable. The model outputs are a fundamental aspect of the vendors' catastrophe modeling commercial offerings; their clients, including FEMA, specifically license the vendors' catastrophe models in order to have those models generate the vendors' loss estimates.

36.      As explained above, the redacted outputs of the catastrophe models contain estimated losses by each model vendor, reflecting their underlying assumptions and proprietary data. Although NFIP policyholder insurance data (containing geospatial location information

about a structure and the selected coverage of insurance applied to that structure) is imported into each vendor's model, the models determine the flood hazards exposed to a given policyholder's property based on its location as well as the vulnerability of the location based on its structural characteristics. Each model's view of hazard and vulnerability is unique to that model's assumptions and the data sourced by that model and vendor to inform the riskiness of the properties being analyzed. Together those components allow a model to estimate losses in a given year that the structure could experience. These loss estimates are derived directly from each catastrophe model vendor and thus reflect each vendor's proprietary data underlying those loss estimates.

37.     The withheld modeling information is confidential because the vendors customarily keep their catastrophe modeling product information private and do not publicly release such information or permit public release of such information. That includes modeling outputs generated by their catastrophe models, which their clients can generate only through limited software licenses. The vendors generally protect their catastrophe models and modeling factors and outputs from disclosure across their contracts and business activities by, among other things, using specific contract language restricting or limiting access to the data internally and externally; marking modeling information as confidential; implementing policies to guide employees and external parties in reporting modeling data breaches; establishing password protections governing access to their software platforms; housing the model data in secure network databases and requiring others to do so as well; and prohibiting data release by third parties unless approved in the license for specific data for specific purposes or with prior written consent.

38.     The vendors take these steps to closely guard their modeling information, including the modeling output information at issue here, so as to protect their commercial interests and protect themselves from competitive and financial harm. Investors and others involved in

insurance markets license various catastrophe models and use them to price their products and purchases within the insurance market. If the vendors' modeling information were to be released, others in the insurance market or new entrants then could reverse-engineer the vendors' existing catastrophe models. That, in turn, would seriously impact the vendors' financial prospects, as their catastrophe models and model outputs represent their entire business.

39.    As CoreLogic put in its September 8, 2023 submitter notice response letter, disclosure "would cause significant competitive and financial harm to CoreLogic by enabling CoreLogic's competitors to gain access to information, which could subsequently be used by that competitor to predict CoreLogic's pricing and methodologies, and to potentially reverse engineer its products / services / models." KatRisk echoed this sentiment in its August 17, 2023 submitter notice response letter, explaining that the "data and software provided to FEMA are the result of extensive internal development work over many years. Making our data, software and location level results available to the public could have substantial financial impacts on our company and cause us to lose the intellectual property associated with our products. If our data or software is made publicly available at no cost, the ability for KatRisk to license our products and remain financially viable would be greatly diminished." And as Verisk explained in its June 27, 2023, letter, "[w]e develop, update and enhance our proprietary loss models at great expense. We derive economic value (in fact nearly all our revenue) from them. We are careful to label them and the user documentation prominently as confidential." Each of the vendors' own declarations further reinforces and explains the commercial and confidential interests at stake in the withholdings at issue.

40.    The vendors also each provided the withheld modeling information to FEMA on the expectation that their modeling information would be kept private, and they each received

assurances from FEMA as part of their work on Risk Rating 2.0 that the information would be protected from disclosure. Each vendor provided FEMA with only a limited license for use of catastrophe modeling software, premised on the agreement that FEMA did not have ownership of the vendors' proprietary data and could not publicly release such data. As Verisk noted to FEMA in its June 27, 2023 letter, the parties' 2017 contract explicitly had confidentiality as a contract term (which stated that "Disclosure of output and the user manuals and guides outside of FEMA is prohibited"). The KatRisk and CoreLogic contracts implicitly contain such a confidentiality guarantee, as they both provide FEMA with only a limited license to run catastrophe modeling and do not give FEMA any right over the vendors' proprietary data in the models.

41.     The vendors have all indicated that if FEMA is not able to protect their catastrophe modeling information from public disclosure, they will likely be unwilling to license their catastrophe modeling products and services to the government in the future in a similar fashion, thus harming the ability of FEMA and other agencies to improve risk assessment through modern technology.

### 2.     *Contract Information*

42.     The declaration of Tammi Hines describes the Exemption 4 withholdings FEMA made to vendors' contract information.

### B.     **Exemption 5**

43.     Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The exemption protects internal agency documents that are subject to the deliberative process privilege. *See, e.g.*, *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 512 (D.C. Cir. 2011). Exemption 5 also has been construed to exempt all documents that

are normally privileged in the civil discovery context. *See, e.g.*, *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799–800 (1984). As a result, the exemption protects "trade secret or other confidential … commercial information." Fed. R. Civ. P. 26(c)(7); *see, e.g.*, *Fed. Open Mkt. Comm. v. Merrill*, 443 U.S. 340, 360 (1979). Additionally, for any Exemption 5 withholding, an agency must demonstrate foreseeable harm from disclosure. *See* 5 U.S.C. § 552(a)(8)(A)(i).

### 1. *Deliberative Process Information*

44.     An agency may withhold information subject to the deliberative process privilege under Exemption 5 if it demonstrates that the information is pre-decisional and deliberative.

45.     As reflected in the *Vaughn* index, FEMA invoked Exemption 5 to protect portions of one draft FEMA document containing pre-decisional and deliberative information that was neither approved nor used in the final development of Risk Rating 2.0 to generate premiums (or for any purpose). This draft document refers to a prior iteration of the "Target Rate Level" exhibit that was included in the responsive documents but is superseded by the final "Target Rate Level" exhibit, also provided to Plaintiffs. The draft exhibit is therefore pre-decisional and not final.

46.     Release of this pre-decisional and deliberative risk rating data would cause confusion to the public because this information is not incorporated in the final risk rating calculations, and because part of the information is incorrect. As explained above, much of the information involved in rate setting is made publicly available, as FEMA attempts to be as transparent as possible. However, releasing pre-decisional and inaccurate target rate levels could lead to members of the public looking to those target rate levels in determining how their flood insurance is priced. This would create an inaccurate conclusion, as the target rate level would be incorrect. FEMA's openness and transparency would then be undercut by the release of this inaccurate information, as it would prevent the public from engaging with, and understanding, rate

making by confusing some of them with inaccurate information. These types of foreseeable harms fall within the ambit of Exemption 5's core concerns. *See, e.g.*, *Reps. Comm. for Freedom of the Press v. United States Customs & Border Prot.*, 567 F. Supp. 3d 97, 122 (D.D.C. 2021).

### 2. *FEMA Confidential Commercial Information*

47. An agency may withhold inter-agency or intra-agency information as confidential commercial information under Exemption 5 if it demonstrates that the information is government-generated information that is commercial in nature (e.g., because it relates to the buying and selling of goods and is implicated in business transactions) and is sensitive and otherwise unavailable because, if disclosed, it would put the government at a competitive disadvantage in contracting or other business transactions or otherwise harm its commercial interests. *See, e.g.*, *Merrill*, 443 U.S. at 360–63 ; *Gov't Land Bank v. Gen. Servs. Admin.*, 671 F.2d 663, 665–66 (1st Cir. 1982); *Hoover v. U.S. Dep't of the Interior*, 611 F.2d 1132, 1140–42 (5th Cir. 1980); *Morrison-Knudsen Co. v. Dep't of the Army of U.S.*, 595 F. Supp. 352, 355 (D.D.C. 1984), *aff'd sub nom. Morrison-Knudsen Co. v. Dep't of Army*, 762 F.2d 138 (D.C. Cir. 1985).

48. FEMA manages flood risks in the NFIP and the program's future exposure in part by "secur[ing] reinsurance coverage . . . from private reinsurance and capital markets." 42 U.S.C. § 4081(e). FEMA contracts with private insurers to transfer some NFIP flood risks to them; FEMA pays them premiums, and in return these reinsurers agree to provide annual coverage for losses above an agreed-upon amount (as with an ordinary insurance arrangement). Each year sine 2017, FEMA has negotiated with and contracted with several private reinsurance companies to secure, in some years, more than $1 billion in coverage for certain NFIP losses. And FEMA also secures reinsurance coverage through the issuance of bonds to the capital markets; as part of this coverage, FEMA also pays premiums in exchange for reinsurance coverage for a set term.

18

49. In obtaining reinsurance coverage, FEMA, as any insurance purchaser, attempts to target certain rates and coverage amounts based on its understanding of the probability that it will incur financial losses.

50. In negotiations with reinsurers, reinsurance buyers recognize and accept that reinsurers require certain data to assess the risks that reinsurers would assume if they entered into reinsurance agreements with buyers. Thus, in negotiations with reinsurers, FEMA provides reinsurers with detailed but summarized catastrophe model input data and key statistics with a summary of key adjustments made to the model input data, as well as the summarized output data directly from each vendor model using the same input data provided.

51. Reinsurance buyers including FEMA typically withhold from reinsurers any adjustments they make to the model output data based on their internal analysis of that model and its output; and reinsurers similarly withhold the same type of information from buyers based on the reinsurers' own internal analysis. Since the buyer's objective is to minimize the price paid for reinsurance coverage and maximize the amount of coverage offered, the buyer withholds components of the model output where the buyer may have increased the loss output to a level higher than the reinsurer estimated, as this could lead reinsurers to use the buyer's estimate for components with a higher buyer estimate and their own estimate for components with a lower buyer estimate, thus increasing their quoted rate and/or reducing their offered amount of reinsurance coverage for the proposed transaction. Since the reinsurer's objective is to maximize the price received for the coverage, the reinsurer withholds the same type of information from the buyer, as the buyer strategy applied in reverse could lead to a lower offered price for the proposed transaction.

19

52.     As reflected in the *Vaughn* index, the agency invoked Exemption 5 to protect confidential commercial FEMA information: contract in-force dates.

53.     The contracts in-force date is, simply put, the date for which all NFIP insurance policies in effect on that date are included in the data used for input into the catastrophe models for the analysis in question. Since the overwhelming majority of NFIP policies provide coverage for one year, the data used for model input generally includes NFIP policies that previously became effective after the date one year prior to the contracts in-force date and remain effective on the contracts in-force date. Thus, the model input data excludes NFIP policies that have expired on or before the contracts in-force date, and it excludes NFIP policies for which coverage may have been bound on or before the contracts in-force date but became effective after the contracts in-force date.

54.     The withheld contract in-force date information is commercial because it is contract information that is fundamental to the contracts and would provide access to internal proprietary model output with the precise valuation date. If disclosed, it would reveal to reinsurers that FEMA negotiates with the exact or approximate adjustment factors applied internally by FEMA for model vendor output that has already been provided to reinsurers with a contracts in-force date exactly on or relatively close to that date. The adjustment factors for applicable output components could be calculated or approximated by the reinsurers by simply comparing the adjusted model vendor output in the Target Rate Level exhibit with the direct unadjusted model vendor output (where it differs) that FEMA provides to reinsurers for the applicable reinsurance transaction. As explained above, that would result in higher quoted rates and/or lowered offered coverage amounts in negotiations with reinsurers. Paying higher prices would reduce FEMA's funding to pay for losses to NFIP policyholders and expenses to operate the NFIP. FEMA having to pay higher reinsurance

rates would also likely be reflected in higher NFIP rates to policyholders. And less reinsurance coverage would reduce NFIP reinsurance recoveries if a triggering event were to occur. These consequences logically explain why FEMA would treat the in-force date as private if it identified the underlying data already provided to reinsurers that would reveal the exact or approximate adjustment factors applied for internal FEMA use (as it would do here).

55.      The contract in-force date is confidential because it contains sensitive information that is not otherwise available, as its disclosure would compromise price negotiations with NFIP reinsurers. At its core, a reinsurance transaction represents one party transferring some of their insurance risk to another party for a negotiated price. The NFIP does this through the issuance of bonds to the capital markets, and through contracts with major reinsurers which operate somewhat like an insurance plan for an insurance plan. Should the contract in-force information in these records be released and reinsurers accessed it, the release would provide them with a substantial advantage in negotiations for reinsurance rates. Here, disclosure of the in-force dates would identify the underlying data already provided to reinsurers that would reveal the exact or approximate adjustment factors applied for internal FEMA use, thus compromising reinsurance negotiations. To safeguard its bargaining position in these negotiations, FEMA never publicly discloses the approximate adjustment factors it applies for internal FEMA use; nor does it publicly disclose any information that could readily reveal such adjustment factors.

**\*\***

56.      FEMA conducted a line-by-line review of all the withheld information to ensure that it contained no segregable, nonexempt information. With respect to each piece of information withheld, no further information could be reasonably segregated from the exempt information and released, for the reasons stated above.

21

I declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on this 13th day of June 2024.

NAOMI S ONDRICH

Digitally signed by
NAOMI S ONDRICH
Date: 2024.06.13
17:56:01 -04'00'

Naomi Ondrich ACAS, MAAA
Branch Chief, Actuarial and Catastrophic Modeling