**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| THE STATE OF LOUISIANA, *et al.,* | CIVIL ACTION NO. |
| Plaintiff, | 2:23-CV-01839-DJP-JVM |
| v. | JUDGE DARREL PAPILLON |
| DEPARTMENT OF HOMELAND SECURITY, *et al.,* | MAGISTRATE JUDGE JANIS VAN MEERVELD |
| Defendants. | |

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS

In accordance with Local Rule 56.1, Plaintiffs submit the following material facts, which present no genuine dispute:

1.     As of 2017, approximately 5 million policyholders and 22,249 communities participated in the National Flood Insurance Program (NFIP). AR00029636.

2.     For residents within a community to access federal flood insurance, FEMA required the community to adopt certain minimum flood management standards. AR00029634.

3.     A "community" for purposes of the NFIP (and thus as used throughout this document) is the relevant State, parish or county, and/or municipality. 44 C.F.R. § 59.1.

4.     As part of setting flood insurance premiums, FEMA created Flood Insurance Rate Maps, which recorded areas exposed to a 1% or greater risk of flooding in any given year. AR00029634.

5.     Properties within such areas must purchase flood insurance to have access to any federally backed mortgage products. AR00029634.

6.     Properties within such areas must also purchase flood insurance to have the U.S. Small Business Association's low-interest disaster loans to help homeowners, renters, and businesses of all sizes recover from declared disasters. 13 C.F.R. § 120.170.

7.     Properties within such areas must also purchase flood insurance to receive future federal disaster relief when they received previous aid. National Flood Insurance Program, *Meeting the Flood Insurance Requirement*, perma.cc/4EP6-ZM3M.

8.     FEMA's process for creating a rate map included extensive collaboration with the relevant communities and provided appeal opportunities for those communities. AR00029634.

9.     This community outreach included opportunities for communities to submit information about flood mitigation measures for incorporation into the rate maps. AR00029639-40.

10.     Those mitigation measures included structural measures like levees and sand dunes, and non-structural measures like early warning systems. AR00029639.

11.     Before 2022, FEMA subsidized flood insurance rates for residences built before a community's first rate map was adopted. AR00029634.

12. In addition, FEMA provided "grandfathered" rates for property owners who continuously held insurance in an area where the rate map changed, which allowed those owners to take advantage of the lower, previous rate. AR00029634.

13. As of 2018, FEMA estimated about 9% of NFIP policies, or about 450,000 policies, benefited from grandfathered rates. AR00186141, 00186134.

14. FEMA previously told the Congressional Research Service that "the decision to grandfather rates was based on consideration of (1) equity, (2) ease of administration, and (3) goals of promoting flood plain management." AR00195120.

15. Under the NFIP premium methodology before 2022, FEMA primarily determined insurance premiums based on a structure's specific risk zone on the rate map, its elevation relative to the Base Flood Elevation (BFE), and the occupancy type of the structure. AR00029649.

16. BFE is "the water-surface elevation of the base flood, which is the 1%-annual-chance flood, commonly called the 100-year flood. The probability is 1% that rising water will reach BFE height in any given year." AR00029649 n.83.

17. Under the pre-2022 NFIP methodology, for buildings whose first-floor elevation was below the BFE, the flood insurance premium rate increased significantly compared to rates for buildings whose first-floor elevation was above the BFE. AR00017519; AR00064366.

18. Under the pre-2022 NFIP methodology, for areas prone to flooding, all new buildings, substantially improved buildings, and repaired buildings were required to be elevated to the BFE. AR00017519.

19.    The pre-2022 premium methodology also provided mitigation discounts to premiums "for elevation of property higher than the BFE and some types of commercial property floodproofing." AR00017525, 000186145.

20.    Before 2022, FEMA provided Preferred Risk Policies that allowed owners of property located in areas with low-to-moderate risk of flooding to purchase a lower-cost policy. AR00029646.

21.    FEMA began implementing Risk Rating 2.0: Equity in Action's new premium rates in October 2021 for new NFIP policies and in April 2022 for existing policies. AR00186134.

22.    FEMA said that Equity in Action "will change the way FEMA fundamentally views and evaluates flood risk," ensure that premiums "are distributed more equitably," and "bring generational change to the NFIP." AR00183880-81.

23.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

24.    FEMA used three commercial catastrophe models provided by contractors to estimate future loss. Average annual losses "for inforce policies in mainland states were modeled using the AIR, CoreLogic, and KatRisk models for the perils of Inland Flood and Storm Surge." AR00222612.

25.    One of FEMA's contractors—Milliman—stated that its topographic datasets "are simplified representations of reality and contain varying levels of abstraction and uncertainty." AR00222636.

4

26.    Milliman also stated that "[i]t is certain that actual, real-world values will not conform exactly to estimates provided by our geospatial data products." AR00222636.

27.    Milliman "relied on data and other information provided to us by FEMA and other sources" and "did not audit, verify or review the data and other information for reasonableness and consistency." AR00222636.

28.    Milliman used Average Annual Loss data provided by FEMA for NFIP claims filed between 1992 and 2018. AR00222608.

29.    During the leadup to Equity in Action's implementation in 2021, Plaintiffs, ECF 1-1 at 9–10, 1-19 at 8, 1-28 at 7–8, and congressional leaders protested that FEMA was not sufficiently transparent about "the types and sources of any data that will be used to calculate risk [and] how risk would be factored into different types of areas." AR00176984.

30.    Insurance agent trade groups otherwise supportive of Equity in Action criticized the fact that FEMA provided "[n]o explanation of breakdown of rates produced by rating engine." AR00180615.

31.    FEMA never submitted Equity in Action to notice and comment rulemaking to solicit stakeholder input on its changes to the NFIP. AR00183703.

32.    And FEMA refused Plaintiffs' requests as co-collaborators in the NFIP for transparency about how Equity in Action was different from the prior methodology, which factors it considered in determining any given property's premium, and the comparative weight it assigned to those factors. ECF 1-41 at 7–10, 1-56 at 4.

5

33.    Under Equity in Action, "flood zones [are] no longer … used to set premiums," and though flood maps are still used to determine which policyholders must buy insurance, rate map updates and appeals will not "have any effect on the premium that a policyholder pays." AR00186145–46.

34.    Under Equity in Action, "BFE is no longer an NFIP rating factor to determine premium." AR00183921. As a result, "insurers are no longer responsible for reporting the [BFE] information to FEMA's system." *Id.*

35.    Under Equity in Action, "the category of Preferred Risk Policy (PRP) is being retired," and holders of these policies will see that their "the premium will begin increasing until it reaches the full risk-based rate." AR00186146.

36.    Under Equity in Action, FEMA eliminated the grandfathered rates it had previously provided to NFIP policyholders who bought and maintained coverage in rate maps that later changed. AR00176981.

37.    Under the Homeowner Flood Insurance Affordability Act of 2014, FEMA can generally increase flood insurance premiums only by 18% in any given year. 42 U.S.C. § 4015(e)(1).

38.    Under Equity in Action, properties no longer receiving exemptions or cross-subsidies allowed under the previous rating methodology will enter a "glide path" to their "full risk premium." AR00176981.

39.    Under Equity in Action, FEMA has stated that policies formerly eligible for grandfathering will "move on a glidepath toward their full risk premium" and summarizes its methodological changes this way: "BFEs and Flood Zones and

6

grandfathering will no longer be used, so instead, a glidepath will be used, subject to the statutory increases." AR00176981.

40.    After being refused the transparency they requested, the Plaintiff States and Parishes filed this lawsuit in June 2023 and moved for a preliminary injunction shortly thereafter. ECF 1, 14-1. Many documents in the administrative record in this case are under a protective order at FEMA's request, ECF 134, designed to protect the "confidential business information" of FEMA's contractors who developed the data and models used to create Equity in Action, ECF 133 at 2.

41.    St. Tammany and Livingston Parishes have suffered monetary loss due to premium increases following the implementation of Equity in Action. St. Tammany Decl. ¶8; Livingston Decl. ¶5.

42.    Plaintiff States have suffered monetary losses associated with policyholders abandoning their policies after the implementation of Equity in Action. For instance, Louisiana's GOHSEP agency is aware of $1.7 million in grant money that the federal government is likely to demand back from the State. Mahfouz Decl. ¶¶17–19.

43.    This "claw-back" process is called deobligation, and it is a novel problem under Equity in Action. Given this novelty, it is unclear whether the State will be able to recover that money from the relevant parish (and in turn the parish recover that money from the end recipient) and, if so, the enforcement process that will be required.  Mahfouz Decl. ¶¶14–16.

Dated: March 25, 2026                    Respectfully submitted,

                                         ELIZABETH B. MURRILL
                                          Attorney General

                                         */s/ Morgan Brungard*
                                         MORGAN BRUNGARD
                                          Deputy Solicitor General
                                         LOUISIANA DEPARTMENT OF JUSTICE
                                         Office of the Attorney General
                                         1885 N. Third Street
                                         Baton Rouge, LA 70804
                                         Tel: (225) 326-6766
                                         MurrillE@ag.louisiana.gov
                                         BrungardM@ag.louisiana.gov

                                         Tyler R. Green
                                         Consovoy McCarthy PLLC
                                         222 S. Main Street
                                         Ste 5th Floor
                                         Salt Lake City, UT 84101
                                         (703) 243-9423
                                         tyler@consovoymccarthy.com

                                         *Counsel for Plaintiffs*

8