**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| THE STATE OF LOUISIANA, *et al.,* | CIVIL ACTION NO. |
| | 2:23-CV-01839-DJP-JVM |
| Plaintiffs, | |
| | JUDGE DARREL PAPILLON |
| v. | |
| | MAGISTRATE JUDGE JANIS VAN |
| DEPARTMENT OF HOMELAND | MEERVELD |
| SECURITY, *et al.,* | |
| | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

I.   THE NATIONAL FLOOD INSURANCE PROGRAM ...................................................... 3

II.  RISK RATING 2.0: EQUITY IN ACTION ................................................................... 8

III. PROCEDURAL HISTORY .......................................................................................... 11

ARGUMENT ..................................................................................................................... 13

I.   PLAINTIFFS HAVE STANDING. ............................................................................... 15

  A.   The Plaintiff States Have Standing. ............................................................ 15

  B.   The Plaintiff Parishes Have Standing. ........................................................ 19

II.  FEMA DID NOT PROMULGATE EQUITY IN ACTION IN COMPLIANCE WITH THE APA'S
     NOTICE-AND-COMMENT REQUIREMENTS. ............................................................ 21

  A.   Because Equity in Action Implements a New Substantive Rule for the
       NFIP, FEMA Needed to Promulgate that Rule through the Notice-and-
       Comment Process. ....................................................................................... 21

  B.   Equity in Action Does Not Satisfy Any Exception to the Notice-and-
       Comment Requirement. ............................................................................... 25

III. EQUITY IN ACTION IS ARBITRARY AND CAPRICIOUS. ........................................... 28

  A.   Equity in Action Departs from Prior Policy without Sufficient Justification
       or Consideration of Reliance Interests. ...................................................... 28

  B.   Equity in Action Fails to Account for Important Aspects of the NFIP. ....... 40

IV.  EQUITY IN ACTION IS CONTRARY TO LAW. ........................................................... 45

V.   EQUITY IN ACTION VIOLATES THE SPENDING CLAUSE. ......................................... 46

VI.  AN ORDER SETTING ASIDE EQUITY IN ACTION IS THE PROPER REMEDY. ............... 50

CONCLUSION ................................................................................................................... 51

## TABLE OF AUTHORITIES

**Cases**

*A.L. Pharma, Inc. v. Shalala,*
  62 F.3d 1484 (D.C. Cir. 1995) ...................................................................51

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
  522 U.S. 359 (1998) ...................................................................................28

*Allina Health Services v. Sebelius,*
  746 F.3d 1102 (D.C. Cir. 2014) .................................................................50

*Am. Stewards of Liberty v. Dep't of Interior,*
  960 F.3d 223 (5th Cir. 2020) ...............................................................50, 51

*Book People, Inc. v. Wong,*
  91 F.4th 318 (5th Cir. 2024) .....................................................................20

*BST Holdings v. OSHA,*
  17 F.4th 604 (5th Cir. 2021) .....................................................................29

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ...................................................................................13

*Chamber of Com. of U.S. v. SEC,*
  88 F.4th 1115 (5th Cir. 2023) ...................................................................50

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
  603 U.S. 799 (2024) ...................................................................................50

*DHS v. Regents of Univ. of Cal.,*
  591 U.S. 1 (2020) .................................................................................29, 50

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) ...................................................................................29

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ...................................................................................29

*Friends of the Earth, Inc. v. EPA,*
  446 F.3d 140 (D.C. Cir. 2006) ...................................................................51

*Glob. Van Lines, Inc. v. I.C.C.,*
  714 F.2d 1290 (5th Cir. 1983) ...................................................................21

*Howard v. Ashcroft,*
  248 F. Supp. 2d 518 (M.D. La. 2003)......................................................................28

*Indep. U. S. Tanker Owners Comm. v. Lewis,*
  690 F.2d 908 (D.C. Cir. 1982) ...............................................................................26

*Jones v. Am. Council on Exercise,*
  2016 WL 6084636 (S.D. Tex. Oct. 18, 2016) ........................................................26

*Little v. Liquid Air Corp.,*
  37 F.3d 1069 (5th Cir. 1994) .................................................................................13

*Louisiana v. United States Dep't of Energy,*
  90 F.4th 461 (5th Cir. 2024) .................................................................................20

*Mock v. Garland,*
  75 F.4th 563 (5th Cir. 2023) .................................................................................27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .............................................................................................14, 40

*Murthy v. Missouri,*
  603 U.S. 43 (2024) ..................................................................................................16

*NAACP v. Trump,*
  298 F. Supp. 3d 209 (D.D.C. 2018) .......................................................................51

*NFIB v. Sebelius,*
  567 U.S. 519 (2022) ...............................................................................................47

*Niz-Chavez v. Garland,*
  593 U.S. 155 (2021) .................................................................................................1

*Pennhurst State Sch. & Hosp. v. Halderman,*
  451 U.S. 1 (1981) ....................................................................................................47

*Phillips Petroleum Co. v. Johnson,*
  22 F.3d 616 (5th Cir. 1994)..........................................................................22, 24, 25

*Reule v. Jackson,*
  114 F.4th 360 (5th Cir. 2024) ................................................................................16

*Shell Offshore Inc. v. Babbitt,*
238 F.3d 622 (5th Cir. 2001) ................................................................ 14, 22, 23

*Texas v. Biden,*
10 F.4th 538 (5th Cir. 2021) ................................................................ 29, 39, 40

*Texas v. United States,*
787 F.3d 733 (5th Cir. 2015) ............................................................................ 26

*Texas v. United States,*
809 F.3d at 178 (5th Cir. 2015) ....................................................................... 45

*Texas v. Yellen,*
No. 2:21-cv-079-Z, 2022 WL 989733 (N.D. Tex. Mar. 4, 2022) ................... 47, 49

*Town of Chester v. Laroe Estates, Inc.,*
581 U.S. 433 (2017) ......................................................................................... 20

*W & T Offshore, Inc. v. Bernhardt,*
946 F.3d 227 (5th Cir. 2019) ...................................................................21, 22, 24

*Wages & White Lion Invs., LLC v. FDA,*
16 F.4th 1130 (5th Cir. 2021) ......................................................................... 28

*Young Conservatives of Tex. Found. v. Smatresk,*
73 F.4th 304 (5th Cir. 2023) ........................................................................... 15

**Statutes**

42 U.S.C. § 4001, *et seq.* ..................................................................................... 3

42 U.S.C. § 4012a ............................................................................................... 7

42 U.S.C. § 4014 .......................................................................................... 23, 45

42 U.S.C. § 4015 ...................................................................................... 11, 27, 45

42 U.S.C. § 4022(a) ........................................................................................... 47

42 U.S.C. § 4104 ....................................................................................... 9, 46, 49

5 U.S.C. § 500 *et seq.* .......................................................................................... 1

5 U.S.C. § 552(a) ............................................................................................... 22

5 U.S.C. § 553 ........................................................................................................25

5 U.S.C. § 706(2) .......................................................................... passim

Fla. Stat. Ann. § 163.08(4)(a) ............................................................ 10

La. Rev. Stat. § 38:84 ...................................................................... passim

La. Rev. Stat. § 40:1724(B) ...................................................................6

La. Rev. Stat. § 51:912.22(8)(b) ................................................... 10, 37

## Other Authorities

Christine A. Klein, *The National Flood Insurance Program at Fifty: How the Fifth Amendment Takings Doctrine Skews Federal Flood Policy*, 31 Geo. Envtl. L. Rev. 285 (2019) ............................................................................................ 4

Cong. Research Serv., *Introduction to the National Flood Insurance Program* (Mar. 5, 2026), perma.cc/V8U7-Z4QK ............................................................ 4, 5

FEMA, *FEMA Policy Standards for Flood Risk Analysis and Mapping* 17 (Dec. 11, 2019) perma.cc/L7U7-Q28G ................................................................. 42

FEMA, *Historical NFIP Claim Information and Trends*, perma.cc/YN6U-NGLD ... 43

FEMA, *Standards for Flood Risk Analysis and Mapping* 45 (Nov. 22, 2016) perma.cc/49ER-L7WH ................................................................................... 35

National Flood Insurance Program, *Meeting the Flood Insurance Requirement*, perma.cc/4EP6-ZM3M ................................................................................. 7, 49

National Flood Insurance Program, *Rate Comparisons* (Jan. 2013) perma.cc/Q7NW-NZQU ................................................................................ 30

SB 171, 2026 Regular Legislative Session (La. 2026), available at perma.cc/FK8M-ABYA ....................................................... 48

## Rules

Fed. R. Civ. P. 56(a) .................................................................................. 13

## Regulations

13 C.F.R. § 120.170 ...............................................................................3, 7

44 C.F.R. § 59.1 .................................................................................................5

44 C.F.R. § 59.22 .............................................................................................47

44 C.F.R. § 60.25 .................................................................................5, 48, 49

44 C.F.R. § 65.6 ...............................................................................................35

44 C.F.R. § 66.1 ...............................................................................................35

44 C.F.R. § 77.8 ...............................................................................................17

**INTRODUCTION**

"If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021). The Administrative Procedure Act (APA), 5 U.S.C. § 500 *et seq.*, traces out square corners that agencies must turn when creating substantive rules to govern Americans. And FEMA needed to turn square corners when it "change[d] the way FEMA fundamentally views and evaluates flood risk" through Risk Rating 2.0: Equity in Action. AR00183880.

Equity in Action fundamentally changes the way FEMA prices and sells flood insurance through the National Flood Insurance Program (NFIP). In the process, it creates clear winners and losers. First, the winners: The federal government, which has collected and will continue to collect more premiums from policyholders under Equity in Action.

Next, the losers: the States, parishes and counties, and individual policyholders (including States and parishes). Most policyholders' premiums indisputably have increased and will continue to rise. In Louisiana alone, FEMA itself acknowledges that 80% of policyholders' premiums will increase. And parishes that invested in mitigation measures have lost the financial benefit previously guaranteed for those measures—now devalued by Equity in Action's premium calculations. Property owners who built or elevated buildings to the 100-year-flood elevation (or BFE), relying on that metric as a previous core component of NFIP premiums, saw that metric discarded in the new premium calculation. And "grandfathered" policyholders who built

1

or purchased homes before a flood map was implemented or changed and have faithfully been paying premiums the entire time will see their policies increase sharply to the full risk premium, even though FEMA previously argued their stable rates were justified based on "equity … and goals of promoting flood plain management." AR00195120. In short, Plaintiffs are left with broken promises. FEMA agreed to provide affordable flood insurance to any community that enacted FEMA's desired land-use regulations.[1] The agreement was supposed to be cooperative federalism at its finest. *See infra* at 3. Plaintiffs accepted FEMA's offer and did their part and more by investing in major mitigation projects like levees, pump stations, and the like. But under Equity in Action, FEMA has abandoned its end of the agreement. That is neither cooperative nor respectful of federalism.

When a federal agency makes this sort of massive, substantive change that creates winners and losers across the flood insurance industry, it must satisfy the APA's procedural requirements. FEMA failed to do that here. It did not submit Equity in Action to the notice-and-comment procedure that the APA requires. Instead, it cloaked the program's development, and FEMA's justifications for its policy choices, in secrecy that persists under the protective order here.

More, FEMA's self-proclaimed attempt to "fundamentally" "change the way [it] views and evaluates flood risk," AR00183880, only affected one aspect of the NFIP—the pricing of flood insurance—but not FEMA's flood maps (that show where flood

---

[1] This motion uses a variety of terms to refer to these regulations, including building regulations, floodplain regulations, land-use regulations, and zoning regulations. Where used, those terms all refer to these local regulations required under the NFIP.

2

risk exists and where flood insurance is required)[2] or its building regulations (that FEMA requires States and/or parishes to enact to join the NFIP), or any other aspect of the NFIP. In so doing, FEMA failed to consider important reliance interests as part of the administrative record, including the hundreds of thousands of grandfathered flood insurance rates that it had previously claimed were justified by "equity." And the result of this process creates a program that violates both the governing statute and the constitution's Spending Clause. To right those wrongs, the Court should grant summary judgment to Plaintiffs on Counts I, II, III, IV, VI, and VIII and "hold unlawful and set aside" Equity in Action. 5 U.S.C. § 706(2).

## BACKGROUND

### I.    THE NATIONAL FLOOD INSURANCE PROGRAM

In 1968, Congress created the NFIP by passing the National Flood Insurance Act (NFIA). 42 U.S.C. § 4001, *et seq*. Congress's goal was to create "a program of flood insurance which can complement and encourage preventive and protective measures" and make "flood insurance coverage available on reasonable terms and conditions to persons who have need for such protection." *Id.* § 4001(a). The NFIP was "an early example of what has been called cooperative federalism," where the federal government (usually with its spending power) induces States "to participate in a coordinated federal program." Christine A. Klein, *The National Flood Insurance Program at Fifty: How the Fifth Amendment Takings Doctrine Skews Federal Flood Policy*, 31 Geo. En-

---

[2] Any property in a FEMA-mapped Special Flood Hazard Area that has a federally backed mortgage, Small Business Association loan, or FEMA mitigation or recovery grant must obtain and maintain flood insurance. AR00029644, 00029655–56; 13 C.F.R. § 120.170.

vtl. L. Rev. 285, 295 (2019) (citation and internal quotation marks omitted). "Consistent with the cooperative federalism design," the NFIA "carved out roles for both federal and state/local governments." *Id.* "[T]he federal government [made] flood insurance available to the public—and, in many cases, at below-cost subsidized rates," and, in exchange, "required a quid pro quo from states and local governments." *Id.* at 295–96. "Federal insurance would be available only to those [State and local governments like Plaintiffs] that agreed to enact permanent zoning or land-use regulations to limit development in areas the federal government mapped as 'special flood hazard areas' at the level of the 1%-chance flood." *Id.* at 296.

More recently, Congress has explained that the general purpose of the NFIP "is both to offer primary flood insurance to properties with significant flood risk, and to reduce flood risk through the adoption of floodplain management standards." Cong. Research Serv., *Introduction to the National Flood Insurance Program* (Mar. 5, 2026), perma.cc/V8U7-Z4QK. As of 2017, approximately 5 million policyholders and 22,249 communities participated in the NFIP. AR00029636.

Communities (like States, parishes, and counties)[3] participate in the NFIP so that their residents can have access to subsidized federal flood insurance; in return, FEMA requires those communities to adopt certain minimum flood management standards. AR00029634. "Communities volunteer to participate in the NFIP in order

---

[3] *See* 44 C.F.R. § 59.1 (defining "Community" as "any State or area or political subdivision thereof … which has authority to adopt and enforce flood plain management regulations for the areas within its jurisdiction").

to have access to federal flood insurance, and in return are required to adopt minimum standards." Cong. Research Serv., *supra*, perma.cc/V8U7-Z4QK.

Federal regulations expressly provide for a "State Coordinating Agency" designated by the Governor or state statute to "assist[] in the implementation of the National Flood Insurance Program in that state." 44 C.F.R. § 59.1. The States must designate such an agency, which provides FEMA with substantial assistance in enforcing its floodplain management criteria, for FEMA to "[c]onsider[] State recommendations prior to implementing Program activities affecting State communities." *Id.* § 60.25(d)(1). The State of Louisiana, for its part, has authorized its parishes to participate in the NFIP and has enacted a statutory scheme governing the federal-State-parish relationship. *See* La. Rev. Stat. § 38:84. The State allows "all of the parishes and municipalities of the state" to "adopt, in coordination with the [State's] chief resilience officer[,] such ordinances, rules, and regulations, including zoning and land use regulations, as are necessary to comply with the requirements of [the NFIA] and the regulations adopted pursuant thereto by [FEMA]." *Id.* § 38:84(A). In certain areas of the State, parishes and municipalities may only enact FEMA's desired "ordinances, rules, and regulations" if they "comply with any statewide floodplain management standards." *Id.* And the State and FEMA "shall cooperate … in the planning and carrying out of state participation in the National Flood Insurance Program and shall aid, advise, and cooperate with parishes and municipalities endeavoring to qualify for participation in said program." *Id.* § 38:84(B).

5

The State requires parishes and municipalities "to participate in and comply with all applicable federal flood plain management and flood insurance programs" before starting "construction of" (a) "any project for local flood protection," (b) "any project for hurricane or storm damage reduction which involves federal assistance from the Secretary of the United States Army," (c) "any project for local flood protection," and (d) "any project for hurricane or storm damage reduction which involves or receives federal assistance." *Id.* § 38:84(C)–(D). The State also requires that all "State-owned buildings shall … comply with the flood zone requirements of the National Flood Insurance Program." *Id.* § 40:1724(B).

As part of setting flood insurance premiums, FEMA creates Flood Insurance *Rate* Maps, which record areas exposed to a 1% or greater risk of flooding in any given year—called Special Flood Hazard Areas (SFHAs)[4]. AR00029634. FEMA calls that 1% chance of flooding the "base flood" or "100-year flood." AR00029649 n.83. The Base Flood Elevation (BFE) is "the water-surface elevation of the base flood, which is the 1%-annual-chance flood, commonly called the 100-year flood. The probability is 1% that rising water will reach BFE height in any given year." *Id.* FEMA establishes the BFE for all SFHAs to determine mandatory building standards (including construction elevation). AR00029638. States and parishes must enact those building standards for them and their residents to be eligible to purchase NFIP policies. Additionally, properties within any SFHA on the rate maps must purchase flood insurance to have access to (a) any federally backed mortgage products; (b) many types of federal

---

[4] SFHAs are identified on the rate maps with letters starting with A (*e.g.*, AE, AO, AH, A1-A30) or V (coastal areas). AR00029637–39.

funding to acquire property or construct buildings, AR00029634, 00029655–56; (c) FEMA mitigation and recovery grants, 42 U.S.C. § 4012a(a); (d) the U.S. Small Business Association's low-interest disaster loans to help homeowners, renters, and businesses of all sizes recover from declared disasters, 13 C.F.R. § 120.170; and (e) future federal disaster relief for properties that received previous aid, National Flood Insurance Program, *Meeting the Flood Insurance Requirement*, perma.cc/4EP6-ZM3M.

The rate-map process, including designation of SFHAs, "provides extensive outreach and appeal opportunities for communities." AR00029634. This community outreach includes opportunities for communities (including States and parishes) to submit information about their own investments in flood mitigation measures for incorporation in the rate maps. AR00029639–40. Those mitigation measures include structural measures like levees, pump stations, and sand dunes, and non-structural measures like early warning systems. AR00029639, 00017598.

Before 2022, FEMA subsidized flood insurance rates for residences built before FEMA issued its first rate map for that community. AR00029634. In addition, FEMA provided "grandfathered" rates for property owners who continuously held insurance in an area where the rate map changed, which allowed those owners to take advantage of the lower, previous rate. AR00029634. As of 2018, FEMA estimated about 9% of NFIP policies, or about 450,000 policies, benefited from grandfathered rates. AR00186141, 00186134. FEMA previously explained to the Congressional Research

Service that "the decision to grandfather rates was based on consideration of (1) equity, (2) ease of administration, and (3) goals of promoting flood plain management." AR00195120.

Under FEMA's pre-2022 methodology for NFIP premiums, FEMA primarily determined insurance premiums based on a structure's specific risk zone on the rate map, its elevation relative to the BFE (again the 100-year-flood elevation), and its occupancy type. AR00029649. The prior premium methodology also discounted premiums "for elevation of property higher than the BFE and some types of commercial property floodproofing." AR00017525, 00186145.

## II.   RISK RATING 2.0: EQUITY IN ACTION

Risk Rating 2.0: Equity in Action represents "the biggest change to the way the NFIP calculates flood insurance premiums … since the inception of the NFIP in 1968." AR00186134. FEMA began implementing Equity in Action's new premium rates in October 2021 for new NFIP policies and in April 2022 for existing policies. AR00186134. FEMA has asserted that Equity in Action "will change the way FEMA fundamentally views and evaluates flood risk," ensure that premiums "are distributed more equitably," and "bring generational change to the NFIP." AR00183880–81.

████████████████████████████████████████████

████████████████████████████████████████████

██████ ████████████████████ In the runup to Equity in Action's implementation in 2021, Plaintiffs, *see* ECF 1-1 at 9–10, 1-19 at 8, 1-28 at 7–8, and congressional leaders decried the lack of transparency concerning "the types and sources of any data that will be used to calculate risk [and] how risk would be factored into different

8

types of areas." AR00176984. Even insurance agent trade groups otherwise supportive of Equity in Action criticized the reality that FEMA provided "[n]o explanation of breakdown of rates produced by [the] rating engine." AR00180615. FEMA never submitted Equity in Action to notice and comment rulemaking to solicit stakeholder input on its transformative changes to the NFIP. AR00183703. And FEMA refused to honor Plaintiffs' requests for information about which factors (including Plaintiffs' own investments in mitigation projects like levees, pumps, etc.) Equity in Action's pricing methodology would and would not honor, how Equity in Action would weigh each factor, and how that methodology differed from the prior methodology. FEMA's refusal to continue collaborating in good faith with Plaintiffs in this cooperative federalism endeavor is what caused Plaintiffs (in great part) to file this lawsuit.

The administrative record confirms that FEMA eliminated many key aspects of the prior NFIP methodology. Under Equity in Action, "flood zones [are] no longer … used to set premiums," and while SFHAs are still used to determine which policyholders must buy insurance and where Plaintiffs must enact and enforce FEMA's building standards and land-use regulations, rate map updates and appeals do not "have any effect on the premium that a policyholder pays." AR00186145–46. FEMA made this change even though the map appeals process is created by statute. 42 U.S.C. § 4104(e). In other words, when Plaintiffs either work with FEMA as co-collaborators to redraw an SFHA based on current risk or successfully appeal as policy-

9

holders to remove their property from an SFHA—both of which mean that the location has less than a 1% chance of flooding in any given year—that decrease in flood risk has zero effect on the premium.

In another fundamental change, under Equity in Action, the "BFE is no longer an NFIP rating factor to determine premium." AR00183921. This even though Plaintiffs have relied on the BFE in exercising their own lawmaking authority. For example, Louisiana has passed laws incorporating the BFE "to incentivize going above [FEMA's] minimum floodplain management standards." La. Rev. Stat. § 51:912.22(8)(b) (allowing "the state and political subdivisions" to require that manufactured and modular homes meet "additional freeboard requirements … based on the Base Flood Elevation established in the currently adopted Flood Insurance Rate Map for the jurisdiction"). Other States have done the same. *See, e.g.*, Fla. Stat. Ann. § 163.08(4)(a) (defining "qualifying improvement" for local financing program to include "raising a structure above the base flood elevation to reduce flood damage").

Additionally, FEMA previously provided Preferred Risk Policies that allowed owners of property located in areas with low-to-moderate risk of flooding to purchase a lower-cost policy. AR00029646. But "the category of Preferred Risk Policy (PRP) is being retired under Risk Rating 2.0," and holders of these policies will see their premium "begin increasing until it reaches the full risk-based rate"—just like any other type of policy. AR00186146. The "full risk premium" is the new, often higher, premium that FEMA has determined under Equity in Action to be the "chargeable pre-

mium for a property based on its determined flood risk and the full cost to pay anticipated losses and expenses for that property." AR00184289. Finally, FEMA eliminated the grandfathered rates it had previously provided to NFIP policyholders who bought and maintained coverage under rate maps that later changed. AR00176981.

Under the Homeowner Flood Insurance Affordability Act of 2014, Congress limited FEMA's ability to increase flood insurance premiums to only 18% in any given year. 42 U.S.C. § 4015(e)(1). But the administrative record confirms that properties no longer receiving exemptions or discounted rates allowed under the previous rating methodology will enter a "glide path" to their "full risk premium." AR00176981. In other words, under Equity in Action, some properties will see their insurance premiums double within six years and keep climbing until FEMA deems them to reflect the full risk of the property.

## III.  PROCEDURAL HISTORY

Before filing this lawsuit, Plaintiffs tried again and again to understand how Equity in Action evaluates flood risk. They tirelessly reached out to the FEMA representatives who had been their co-collaborators in mapping, mitigation projects, and the like. *See* ECF 1-41 at 7–10, 1-56 at 4. After FEMA all the way up the chain shut the door in their faces, Plaintiffs had no choice but to sue to get the information necessary to understand how Equity in Action evaluates flood risk and whether its evaluation is accurate. After all, if Equity in Action is correct about where flood risk exists, then Plaintiffs need to know that as they are the local officials charged with protecting their communities. But FEMA flat out refused.

11

So Plaintiffs filed this lawsuit in June 2023 and moved for a preliminary injunction shortly thereafter. ECF 1, 14-1. FEMA moved to dismiss, arguing that Plaintiffs lacked Article III standing. ECF 47-1. This Court held a hearing in September 2023, at which Plaintiffs presented testimony to support their standing and entitlement to a preliminary injunction. ECF 88.

In March 2024, this Court issued an order denying in part FEMA's motion to dismiss and denying Plaintiffs' motion for a preliminary injunction. ECF 100 at 1. The order held that the Plaintiff States had plausibly alleged an injury in fact by Equity in Action's driving away policyholders in a way that will negatively affect their rebuilding efforts after flood events and their administration of FEMA grant programs. *Id.* at 25–30. And the order held that St. Tammany, Livingston, and Washington Parishes had all established standing because they own NFIP policies on parish property and will experience increased NFIP premium costs under Equity in Action. *Id.* at 30–33. Finally, the order held that these injuries were redressable through the relief that Plaintiffs requested in their Complaint, such as enjoining the enforcement of Equity in Action. *Id.* at 33–38. While the order was silent on Plaintiffs' likelihood of success on the merits, it denied their motion on the irreparable harm and balance-of-the-equities prongs of the preliminary-injunction test. *Id.* at 45–56.

FEMA produced the administrative record in October 2024. ECF 137. The administrative record is voluminous, containing more than 10 terabytes of data that require specialized, technical software to open and analyze. ECF 119-2 at 2. The size and technical nature of the administrative record has required Plaintiffs to engage

12

experts for nearly 18 months. Their expert analysis of the administrative record has required burdensome security protocols given that many of its documents are under a protective order, ECF 134, designed to protect the "confidential business information" of FEMA's contractors that developed the data and models used to create Equity in Action, ECF 133 at 2.

## ARGUMENT

Plaintiffs are entitled to summary judgment on Counts I, II, III, IV, VI, and VIII because FEMA failed to satisfy the APA's requirements when it fundamentally changed its premium methodology. Equity in Action thus must be "h[e]ld unlawful and set aside." 5 U.S.C. § 706(2).

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

Under the APA, courts "set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law." 5 U.S.C. § 706(2). "Determining whether [FEMA's] policy change was a 'rule' for APA purposes is purely a matter of construction of the APA and [courts] review this issue *de novo*." *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622,

13

627 (5th Cir. 2001). A "party may not lawfully be adversely affected by a rule promulgated in violation of the requirements of the APA." *Id.* at 626. Equity in Action is "arbitrary and capricious" if FEMA

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Equity in Action is a substantive rule that affects the rights and obligations of NFIP policyholders. Yet it suffers from a host of APA deficiencies. *First*, FEMA failed to engage in notice and comment rulemaking and does not satisfy any exception to that core APA requirement. *Second*, Equity in Action is arbitrary and capricious because (a) FEMA failed to account for reliance interests—in particular Plaintiffs' reliance on the promise of affordable premiums in exchange for enacting and enforcing FEMA's land-use regulations, which demands significant State and parish resources, as well as the hundreds of thousands of policyholders with grandfathered premiums—and (b) the methodology change fails to account for important aspects of the problem of providing flood insurance in the United States. *And third*, the rule is contrary to the NFIA's requirements and violates the Spending Clause of the Constitution. All these errors individually and together require summary judgment to Plaintiffs on Counts I, II, III, IV, VI, and VIII.

14

## I.    PLAINTIFFS HAVE STANDING.[5]

Both the Plaintiff States and the remaining Plaintiff Parishes have submitted evidence at the summary-judgment and motion-to-dismiss stages that they have lost money as a result of Equity in Action. By itself, this establishes Article III injury, for "an economic injury is the 'quintessential injury upon which to base standing.' And to confer standing, such injury 'need not measure more than an identifiable trifle.'" *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 309 (5th Cir. 2023) (citation omitted). Plaintiffs have incurred significant financial expense as a result of Equity in Action.

Beyond that, causation and redressability are easily satisfied by the relief requested in the Complaint. Plaintiffs are experiencing costs greater than they would have under the previous NFIP methodology as a result of Equity in Action's new method of calculating premiums. And an order setting aside that method, including its catastrophe modeling, would redress those injuries.

### A.    The Plaintiff States Have Standing.

This Court correctly held that the Plaintiff States have standing based on their increased cost and regulatory burden under Equity in Action. ECF 100 at 25–29. The Court should reaffirm that holding here because the Plaintiff States have submitted evidence demonstrating their increased costs. ECF 1-1 ¶¶ 36–44; ECF 1-28 ¶¶ 37–39.

---

[5] While the Court previously rejected Plaintiffs' other theories of standing, *see* ECF 100 at 7–25, Plaintiffs stand by those arguments and thus preserve their right to appeal those issues if or when the opportunity arises. But to avoid duplicative briefing on those legal arguments here, Plaintiffs omit them from this brief and instead focus on their increased-cost and increased-premium injuries that the Court previously endorsed. *See id.* at 26–33.

15

Equity in Action has decreased the number of policies in force in the Plaintiff States—as demonstrated in the declarations attached to their Complaint and Preliminary Injunction motion, the updated declarations attached here, and in the administrative record—by increasing the cost of insurance to a point that makes coverage cost prohibitive. As a result, the Plaintiff States are likely to incur greater enforcement costs. Mahfouz Decl. (Ex. 1) ¶16; Dhuwe Decl. (Ex. 2) ¶8. The Plaintiff States administer the federal government's Flood Mitigation Assistance and Hazard Mitigation Grant Programs, which moneys the federal government grants to the State and the State, in turn, disperses them to individual homeowners. Both grant programs require the end recipient to obtain and maintain flood insurance and the States to pay back grant money to the federal government whenever the end recipient fails to maintain flood insurance. ECF 1-1 ¶¶ 41–44.

As demonstrated by the attached declarations, Equity in Action has increased individual premiums, which in turn has the predictable market effect of increasing the number of grant recipients dropping their required policies and thus has given rise to a novel deobligation of federal grant money that will cause the States to pay back millions of dollars to the federal government. *See Reule v. Jackson*, 114 F.4th 360, 367 (5th Cir. 2024) (causation satisfied where "defendant's actions produce a 'determinative or coercive effect upon the action of someone else,' resulting in injury" (citation omitted)); *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (causation where third-parties "'will likely react in predictable ways' to the defendants' conduct" (citation omitted)).

16

Under Equity in Action, FEMA has indicated it is likely to require at least two Plaintiff States to pay back grant money. *See* Mahfouz Decl. ¶¶17–19; Dhuwe Decl. ¶¶4–5. Louisiana (for example) is already aware of $1.7 million in grant money that the federal government is likely to demand back from the State. Mahfouz Decl. ¶¶17–19. The Louisiana Governor's Office of Homeland Security and Emergency Preparedness (GOHSEP) applies for and receives FEMA grants for building elevation and flood mitigation. *Id.* ¶¶8–12. GOHSEP receives the grant money from the federal government, disperses it to individual end recipients, and will need to repay this money to the federal government if the funds are deobligated. Deobligation is the process by which FEMA reduces or reverses grant funding awarded to a State. 44 C.F.R. § 77.8. An end recipient's failure to comply with the grant's requirements is one reason FEMA deobligates grants. *Id.* Such compliance failures are often discovered long after a grant is awarded as demonstrated by the FEMA grants Louisiana received following Hurricane Katrina in 2005 and Hurricane Issac in 2012 that FEMA is currently closing out. Mahfouz Decl. ¶¶17–19. While FEMA is likely to deobligate those grants, it is unclear whether GOHSEP will successfully recover these funds from the Parishes, which in turn may need to recover money from the end recipients through legal proceedings to make payment to GOHSEP. *Id.* ¶15.

Currently, GOHSEP is aware of three federal grants where funding is likely to be deobligated because 22 different property owners have failed to submit proof of flood insurance as required by the grants' terms. *Id.* ¶¶17–19. One of these grants is based on an elevation project in Plaquemines Parish, where 16 property owners have

17

failed to submit their required proof of flood insurance. Plaquemines Parish Decl. (Ex. 3) ¶5. Those property owners have failed to submit proof of insurance because they no longer hold active, valid NFIP flood insurance. *Id.* They also informed Plaquemines Parish officials that they dropped their flood insurance due to increasing premiums and uncertainty about whether investing in mitigation or elevation will lower their premiums. *Id.*; Mahfouz Decl. ¶17. GOHSEP will have to repay $974,549 to the federal government based on the deobligation of grant funding in Plaquemines Parish alone. Mahfouz Decl. ¶17.

As former GOHSEP Director Tingle previously explained during his tenure: "This is the first instance of FEMA moving forward with a deobligation based solely on lack of flood insurance at closeout, and we anticipate seeing an increase of those examples from this point forward due to increased rates associated with Risk Rating 2.0." ECF 1-1 ¶41. That prediction has been borne out by facts on the ground, as GOSHEP is now in the process of deobligating two additional grants in addition to the one Director Tingle identified in 2023. Mahfouz Decl. ¶¶17–19. Director Mahfouz now affirms that "[t]he deobligation of these grants is a novel problem for GOHSEP, as deobligation on this scale did not occur prior to the implementation of Risk Rating 2.0." Mahfouz Decl. ¶15. In response to this novel problem, GOHSEP may also need to develop new procedures for its grant closeout process to verify whether an end recipient has dropped flood insurance, which will entail further cost to the State. *Id.* ¶16.

18

This economic injury is fairly traceable to Equity in Action and would be re-dressed by an order vacating and setting Equity in Action aside. Equity in Action has caused the "first instance" of FEMA demanding that Louisiana pay back mitigation grants due to end recipients' failure to maintain flood insurance. All evidence indicates this increase in dropped flood insurance policies is being driven by premium increases brought on by Equity in Action. Plaquemines Parish Decl. ¶5; Mahfouz Decl. ¶¶17–19; Bourgeois Decl. (Ex. 4) ¶11. An order "[h]olding Risk Rating 2.0—Equity in Action is unlawful and vacating it," ECF 1 at 143, would redress this injury.

### B.     The Plaintiff Parishes Have Standing.

This Court also correctly held that St. Tammany and Livingston Parishes both have standing because they hold NFIP policies and have paid increased premiums as a result of Equity in Action. ECF 100 at 30–33. Based on the declarations previously submitted and the ones attached to this motion, the Court should reaffirm that holding here.

St. Tammany Parish already demonstrated that its premiums on policies it renewed in 2023 increased $2,887 as a result of Equity in Action. ECF 1-28 ¶37–39. That figure has only worsened in the years since Equity in Action went into effect and will keep increasing into the future. St. Tammany Parish's total NFIP premiums increased from $49,382 in 2022 to $64,426 in 2026. St. Tammany Decl. (Ex. 5) ¶7. This represents an average 9.28% annual increase or total increase of 30%. *Id.* The average annual increase in premiums on those policies in the years before Equity in Action was 5.38%. *Id.* And while a handful of Parish properties saw a decrease in their premiums under Equity in Action, those savings have already been devoured by

19

increases to other properties that have not yet reached their full-risk premiums. St. Tammany Decl. ¶8. Some of these properties will see their premiums grow by four to five times their pre-Equity-in-Action rate over the course of annual increases around 18%. *Id.*

Livingston Parish likewise has seen its NFIP premiums increase from $11,347 in 2021 to $19,366 in 2026, which represents a $8,019 or 70.7% total increase. Livingston Decl. (Ex. 6) ¶5. These premium increases also exceed the increases that the Parish saw before Equity in Action. *Id.* ¶14. These monetary costs are sufficient to establish injury for standing purposes.[6]

Causation and redressability are satisfied here as well. The Plaintiff Parishes are experiencing 18% annual premium increases that will, in some instances, eventually reach a premium four or five times their pre-Equity-in-Action premium, and those increases are more than fairly traceable to Equity in Action's "glidepath" to these policy's "full risk premium." AR00176981. Under the previous NFIP premium methodology, the Plaintiff Parishes (at worst) would have seen more modest increases to their premiums. St. Tammany Decl. ¶7. Among the relief that Plaintiffs seek is an order "[h]olding Risk Rating 2.0—Equity in Action is unlawful and vacating it," ECF

---

[6] Upon further investigation, Washington Parish reports that it does not currently hold any NFIP policies. Given the standing of the Plaintiff States and the other Plaintiff Parishes, Washington can remain a plaintiff. *See Book People, Inc. v. Wong*, 91 F.4th 318, 329 (5th Cir. 2024) ("The presence of any one plaintiff with standing to pursue injunctive relief satisfies Article III's case-or-controversy requirement." (cleaned up)); *Louisiana v. United States Dep't of Energy*, 90 F.4th 461, 467 (5th Cir. 2024) ("When there are multiple plaintiffs, at least *one plaintiff* must have standing to seek each form of relief requested." (brackets omitted) (quoting *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017))).

1 at 143, which would include vacating the catastrophe modeling driving the Parishes' increased costs. As this Court held at the motion to dismiss stage, this relief satisfies the redressability requirement. ECF 100 at 35–38.

## II. FEMA DID NOT PROMULGATE EQUITY IN ACTION IN COMPLIANCE WITH THE APA'S NOTICE-AND-COMMENT REQUIREMENTS.

The Court should grant summary judgment to Plaintiffs on Count VI and set aside Equity in Action because it implements a new substantive rule without having first satisfied the APA's notice-and-comment requirement. "The notice-and-comment provisions of the APA 'enable[] the agency promulgating [a] rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated.'" *Glob. Van Lines, Inc. v. I.C.C.*, 714 F.2d 1290, 1299 n.9 (5th Cir. 1983). That did not happen here. According to FEMA's own statements, Equity in Action imposes a transformative change to how flood insurance is calculated throughout the NFIP and changes the flood insurance rates for millions of Americans, including Plaintiffs. That makes Equity in Action a substantive rule—and the notice-and-comment requirement is the APA's mandatory default requirement for such rules. Yet FEMA developed Equity in Action program in secret and implemented it without the public comment requirements that the APA mandates. And no statutory exceptions apply to excuse FEMA's failure to conduct the notice-and-comment process here.

### A. Because Equity in Action Implements a New Substantive Rule for the NFIP, FEMA Needed to Promulgate that Rule through the Notice-and-Comment Process.

The APA requires federal agencies to "subject their substantive rules to notice and comment." *W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 237 (5th Cir. 2019).

"Legislative or substantive rules are those which 'affect individual rights and obligations.'" *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 628 (5th Cir. 2001). "If a new agency policy represents a significant departure from long established and consistent practice that substantially affects the regulated industry, the new policy is a new substantive rule and the agency is obliged, under the APA, to submit the change for notice and comment." *Id.* at 630. What is "'conclusive'" is not the "'label,'" but "'rather it is what the agency does in fact.'" *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616, 619 (5th Cir. 1994). When an agency fails to satisfy this procedural requirement, a regulated entity may not "be adversely affected by[] a matter required to be published in the Federal Register and not so published." 5 U.S.C. § 552(a).

Equity in Action "'produce[s]'" "'significant effects on private interests.'" *W & T Offshore*, 946 F.3d at 237. It is a "purposeful development of a comprehensive new policy to address an industry-wide problem and [an] application of that new policy across the board." *Id.* at 239. The administrative record explains how Equity in Action "transforms a pricing methodology that has not been updated in 50 years by leveraging improved technology and FEMA's enhanced understanding of flood risk." AR00174135. In the agency's own words, it represents "the generational change we need to spur action now in the face of changing climate conditions, build individual and community resilience, and deliver on the Biden Administration's priority of providing equitable programs for all." *Id.* Far from a routine adjustment of premium rates, Equity in Action is a "generational change" to the NFIP's "methodology." *Id.*

22

FEMA's own statements eliminate any serious argument otherwise: Equity in Action is a substantive rule that should have been subjected to notice and comment.

But FEMA claims that these requirements do not apply to Equity in Action because it does not implement a substantive rule. In the administrative record, FEMA claimed that, while the NFIA "does outline certain rulemaking requirements, notably 42 U.S.C. § 4014(f)(3), it makes no such requirement for estimation of actuarial rates. As such, there is no statutory mandate for rulemaking." AR00183703. The agency also claimed that "[r]ates are not substantive rules." AR00183722.

But those purported justifications ignore settled precedent about what makes an agency's rule a substantive one—whether it "'affect[s] individual rights and obligations.'" *Shell Offshore Inc.*, 238 F.3d at 628. Equity in Action does just that; its stated purpose is to affect individual rights and obligations across the flood insurance program. The administrative record confirms that FEMA designed Equity in Action to "transform[] the NFIP into a financially resilient and sustainable program" and represented a "significant opportunity to [u]pdate FEMA's current rating methodology." AR00214021–23. It heralded the fact that Equity in Action "significantly transform[s] the ways we manage the National Flood Insurance Program" and "will change the way FEMA fundamentally views and evaluates flood risk." AR00183880. And it explained that "Equity in Action will allow us to bring generational change to the NFIP." AR00183881. The administrative record reiterates these grand assertions of "generational change" throughout. *See* AR00174135, 00174741, 00214442, 00214463, 00214532, 00216888. Contrary to FEMA's litigation protestations, Equity in Action

23

is not a routine adjustment of actuarial rates; it is a self-proclaimed generational transformation of the NFIP and its methodology.

In fact, the Fifth Circuit has already concluded that methodological changes affecting the amounts that regulated parties pay to the government must go through notice and comment. In *Johnson*, it held that an agency "paper" had a substantial impact and was required to go through notice-and-comment because it affected the "royalty-valuation procedure" that determined which payments mineral miners owed the federal government. 22 F.3d at 617. A "change in the [pricing] method used," the Court held, is substantial. *Id.* at 619.

The Fifth Circuit recently reaffirmed this holding in a similar case that reversed an order allowing an agency to tweak its pricing methodology without completing notice and comment. *W&T Offshore*, 946 F.3d at 239. *W&T Offshore* drew upon *Johnson's* holding that a "new valuation methodology [that] effect[ed] a change in the method used by [the Department of the Interior] in valuing natural gas products … constituted a new substantive rule." *Id.* at 237–38 (citation omitted). In *Johnson* and other controlling precedent, the Fifth Circuit concluded that "the Department of the Interior's creation and uniform application of a new [pricing] methodology" could "only be a substantive rule" and "not an adjudicatory application of an existing rule to the facts of a specific case." *Id.* at 239. No meaningful distinction exists between those adjustments to governmental pricing methodologies and FEMA's new pricing methodology here. Equity in Action is thus a substantive rule—meaning

FEMA had to promulgate it through notice-and-comment rulemaking. There's no dispute: FEMA failed to do so. That failure alone warrants an order setting Equity in Action aside.

### B. Equity in Action Does Not Satisfy Any Exception to the Notice-and-Comment Requirement.

As a fallback to its position that Equity in Action's methodological change is not substantive, FEMA claimed in the administrative record that, "[e]ven if the rulemaking requirements outlined in the Administrative Procedures Act (APA) at 5 U.S.C. § 553 were directly applicable, the APA offers exceptions to rulemaking for matters relating to 'benefits and contracts,' 5 USC § 553(a)(2), and for rules of 'procedure and practice,' 5 USC § 553(b )(3)(A), thus offering a considerable amount of discretion as to when rulemaking is undertaken." AR00183703. But neither the "benefits and contracts" nor "procedure and practice" exception applies here.

Taking those exceptions in reverse order, Equity in Action is no mere rule of agency "procedure," and the "fact that it may guide [FEMA] procedures does not mean that [Equity in Action] is a 'procedural' rule for purposes of the APA." *Johnson*, 22 F.3d at 620. "The exemption of § 553(b)(A) from the duty to provide notice by publication does not extend to those procedural rules that depart from existing practice and have a substantial impact on those regulated." *Id.* Equity in Action will have a new and substantial impact on regulated parties—which include the States and Parishes, together, as (a) compliance enforcers of FEMA grants requiring the maintenance of flood insurance, (b) promulgators and enforcers of floodplain management regulations required to become an NFIP community, (c) investors in flood-protection

25

infrastructure, and (d) NFIP policyholders—by changing how flood insurance premiums are calculated across the NFIP; FEMA intends that very outcome. *Cf.* AR00174135. So for the same reason that Equity in Action implements a substantive rule requiring notice and comment, it is also not eligible for the APA's exception for rules of agency practice or procedure.

As for the APA's "benefits and contracts" exception, FEMA abandoned this argument by failing to raise it when opposing Plaintiffs' preliminary injunction motion. *See* ECF 56 at 29–33; *Jones v. Am. Council on Exercise*, 2016 WL 6084636, at \*10 (S.D. Tex. Oct. 18, 2016) (concluding at summary judgment that a party forfeited an objection to a preliminary injunction exhibit by not previously challenging it). In all events, the Fifth Circuit has explained that this exception must be "'narrowly construed'" and applied "only to agency action that 'clearly and directly relate[s] to 'benefits' as that word is used in section 553(a)(2).'" *Texas v. United States*, 787 F.3d 733, 762, 767 (5th Cir. 2015) (citation omitted). This exception extends only to "deciding when to enter into a contract or award a grant" and not to agency decisions "filling in the statutory scheme." *Indep. U. S. Tanker Owners Comm. v. Lewis*, 690 F.2d 908, 918 n.43 (D.C. Cir. 1982). To hold otherwise and allow FEMA to promulgate rules simultaneously altering the terms of all existing NFIP contracts across the nation without completing notice-and-comment procedures "'would open the door to substantive regulation without public participation.'" *Id.* (citation omitted). Equity in Action embodies much more than a sole discretionary decision to contract with or award a benefit to a particular property owner. Instead, it is a sweeping prospective change

26

that alters the methodology for calculating premiums paid under every existing contract and governs how the NFIP functions under FEMA's statutory authority to implement the NFIA. Equity in Action thus does not meet the APA's contracts and benefits exception.

FEMA also claimed in the administrative record that a statutory amendment allowing the agency "to prescribe rates 'after providing notice'" exempted the agency from notice-and-comment rulemaking. AR00183722 (quoting 42 U.S.C. § 4015(a)). The NFIA states that the FEMA administrator "shall from time to time prescribe, after providing notice … chargeable premium rates." 42 U.S.C. § 4015(a). According to FEMA, the Administrator's ability to prescribe rates "after providing notice" excuses him from the APA's notice-and-comment requirement because § 4015(a)(1) previously allowed him to prescribe rates "by regulation." ECF 56 at 42.

But nothing in § 4015(a)'s text suggests that Congress used that statute to override the APA's notice-and-comment requirement. Section 4015(a) does not, for example, state that notice under that section excuses compliance with the APA, or deem such undefined "notice" a substitute for APA notice-and-comment rulemaking. Because nothing in § 4015(a) overrides (or even mentions) the APA's default requirement of notice-and-comment rulemaking, that NFIA notice requirement has nothing to do with the APA. After all, all agencies—including FEMA—"*must* follow the APA's procedural requirements for notice and comment, which includes providing the public with a meaningful opportunity to comment on the proposed rule." *Mock v. Garland*, 75 F.4th 563, 583 (5th Cir. 2023) (emphasis added); *see also Howard v. Ashcroft*, 248

27

F. Supp. 2d 518, 536 (M.D. La. 2003) ("Under ordinary circumstances, an agency that wishes to issue a rule must abide by the APA's notice and comment procedures."). Nothing in the U.S. Code or the administrative record excuses FEMA's failure to follow that requirement here. And had FEMA properly followed APA notice and comment here, it very well may have provided the information Plaintiffs are entitled to as FEMA's co-collaborators and thus prevented this lawsuit.

## III.   EQUITY IN ACTION IS ARBITRARY AND CAPRICIOUS.

The APA requires courts to "set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). This statutory benchmark obliges agencies to engage in "reasoned decisionmaking," meaning "[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). "In reviewing an agency's action," courts are allowed to "consider only the reasoning 'articulated by the agency itself;' [they] cannot consider [the agency's] post hoc rationalizations." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021). Equity in Action is arbitrary and capricious and irrational because it departs from prior policy without sufficient justification, fails to account for reliance interests, and fails to account for important aspects of the NFIP.

### A.   Equity in Action Departs from Prior Policy without Sufficient Justification or Consideration of Reliance Interests.

When an agency changes its position, "the agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new

policy.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). "It follows that an '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Id.* at 222. In other words, "it is generally 'arbitrary or capricious' to 'depart from a prior policy *sub silentio*.'" *BST Holdings v. OSHA*, 17 F.4th 604, 614 (5th Cir. 2021). Equity in Action flunks this standard, and the Court should grant summary judgment to Plaintiffs on Counts III and IV.

It is undisputed that Equity in Action is a revolutionary departure from FEMA's long-established method of measuring food risk as reflected in insurance rates. AR00183880. FEMA thus had to "provide a more detailed justification" for that departure and "take[] into account" the "serious reliance interests" "engendered" by its prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). FEMA was "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915 (2020). In so doing, it had to consider "options" for "accommodating particular reliance interests." *Id.* Because FEMA failed to "show specific, meaningful consideration of the States' [and Parishes'] reliance interests," Equity in Action is arbitrary and capricious. *Texas v. Biden*, 10 F.4th 538, 553 (5th Cir. 2021). Equity in Action fails to account for reliance interests in four ways.

*First*, Equity in Action abandons without justification the use of the BFE that previously played a central role in determining flood risk as reflected equally across

29

*all three* legs of the NFIP: the rate maps (again, these are *Flood Insurance Rate Maps*), the insurance rates themselves, and the building requirements. The BFE is "the water-surface elevation of the base flood, which is the 1%-annual-chance flood, commonly called the 100-year flood. The probability is 1% that rising water will reach BFE height in any given year." AR00029649 n.83. Both before and after Equity in Action, the BFE determined high-risk flood zones on the rate maps where (a) the lowest floor of a structure typically must be elevated to or above the BFE and (b) any property with a federally backed mortgage, SBA loan, certain types of federal construction grants, and/or repeat disaster recovery grants must have flood insurance.

Before Equity in Action, the BFE also determined insurance rates and provided a predicable table of discounts. For buildings whose first floor was above the BFE, the rates were low, and for buildings whose first-floor elevation was below the BFE, the rate increased. AR00017519; AR00064366 ███████████████████████ ████████████████████████████████████████; *see also* National Flood Insurance Program, *Rate Comparisons* (Jan. 2013) perma.cc/Q7NW-NZQU (NFIP information sheet showing significant premium decreases for every foot elevated above the BFE). Indeed, new buildings, substantially improved buildings, and repaired buildings located in areas prone to flooding all had to be elevated to the BFE. AR00017519. This BFE-centered approach clearly and predictably depicted the risk of flooding, the factors controlling the risk, and the basis for the insurance premium.

30

The administrative record is filled with prior statements from FEMA about the importance of considering the BFE, which was considered the "fundamental event of interest in FEMA flood insurance studies." AR00021151. ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Outside experts agreed that, because rate maps under the prior NFIP methodology "represent the best-in-class modeling techniques and information at the local level… the FEMA BFE is a useful check for any flood risk assessment." AR00102243. ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████  ████████████████████████  ████████████████████

████████████████████████████████████████████████ In other words, the relationship between a building's first floor and the BFE was central to all three legs of the NFIP under the previous NFIP premium methodology–(1) mapping a building's flood risk on the rate maps, and so also (2) its corresponding insurance rate and eligibility for mitigation discounts, and (3) compliance with FEMA's building regulations.

Equity in Action abandons without sufficient justification the BFE's central role in determining flood insurance premiums—while keeping the BFE central to the

NFIP's other two legs—thus irrationally destabilizing the NFIP's prior, long-standing three-legged approach. Under Equity in Action, the "BFE is no longer an NFIP rating factor to determine premium," though it still determines how high the 1%-chance flood within any SFHA will rise, which in turn determines mandatory building elevations (but not discounts anymore), and compliance with floodplain management regulations. AR00183921. As a result, "insurers are no longer responsible for reporting the [BFE] information to FEMA's system." *Id.* And as explained below, flood mitigation credits for elevating a building are no longer determined based on BFE under Equity in Action. *See infra* at 37.

FEMA does not sufficiently explain this change in methodology and does not account for the reliance interests of Plaintiffs who incorporated the BFE into their own laws, regulations, and ordinances at least in part to guarantee the prior above-BFE discounts to their residents and policyholders (including Plaintiffs) who bought or renovated property with reference to the BFE. For instance, property owners who decided to purchase or retain a property based on FEMA's assurance that the policyholder would receive favorable NFIP rates because it is elevated above the BFE have now seen that fact become irrelevant to how FEMA calculates their flood insurance under Equity in Action. And some property owners who paid to elevate their home or build an elevated home above the BFE have now lost FEMA's promised favorable premium treatment and the mitigation benefit for that investment. And a successful appeal of a particular property's location in a flood zone on the rate map has no effect

on the rate. *See* AR00213870 (explaining "under Risk Rating 2.0, an appeal or comment to the FIRM resulting in a change in BFE, flood zone, or location in the Special Flood Hazard Area (SFHA), will not directly reflect a change in a rate").

FEMA's decision to abandon the BFE in calculating premiums and mitigation discounts is more baffling because FEMA continues to use the metric in other aspects of Equity in Action. For instance, the BFE still "defin[es] a building's eligibility for NFIP coverage when partially underground or under construction" and "determin[es] compliance with NFIP floodplain management regulations." AR00183921. And as part of developing Equity in Action, FEMA and its contractors examined the relationship between a building's elevation relative to the BFE and that building's expected loss ratio. These files addressed the relationship between the Expected Loss Ratios and the BFEs for inland and storm-surge flooding for the country and separately for Louisiana. *See, e.g.*, AR00157759. Despite examining this data, FEMA does not explain its decision to abandon the use of BFE as one of the major, direct factors in calculating NFIP premium rates.

Note the unexplained irrationality of this system—a property can be removed from an SFHA on the rate map, thus completely eliminating any federal requirement to hold flood-insurance as well as FEMA's building requirements (including to elevate the structure to the BFE), and yet, if the owner voluntarily elects to maintain flood insurance, the flood risk communicated by the premium doesn't change. The mismatch here means that one of these things—either the rate maps' SFHAs with their corresponding federal insurance requirements, BFEs, and building regulations or the

rates themselves—no longer accurately represent flood risk and instead are communicating something else. But FEMA has refused to tell its NFIP co-collaborators (including current and former Plaintiffs) which one reflects something other than flood risk or what that something else might be.

*Second*, Equity in Action dramatically narrows without justification the range of flood mitigation measures considered in determining insurance premiums. "A portfolio of structural and nonstructural mitigation measures can reduce the likelihood and/or impact of flooding." AR00017516. Structural flood mitigation measures change the course of a flood or reduce the chances of flooding. *Id.* They include "levees, floodwalls, seawalls, dams, floodways and spillways, channels, controlled overtopping, levee armoring, and seepage control." *Id.* (cleaned up). Nonstructural flood mitigation measures reduce the impact or consequences of flooding. *Id.* They include "structure elevation, natural systems, risk mapping, hazard forecasting, early warning systems, emergency plans, dry and wet floodproofing, land-use planning and zoning, construction standards and building codes, acquisition and relocation, and insurance." *Id.* (cleaned up).

FEMA's previous NFIP premium methodology predictably rewarded mitigation measures in several ways. It provided immediate premium reductions "for elevation of property higher than the BFE and some types of commercial property floodproofing." AR00017525, 186145. Even more important, FEMA's previous NFIP methodology took a wider range of structural and nonstructural mitigation measures into

account using the program's rate maps. The rate maps were a key aspect of a property's insurance premium calculation, along with its occupancy type and elevation above the BFE. AR00186136–37. As part of drawing and updating the rate maps, FEMA regulations required the agency to take into account structural and nonstructural mitigation measures. The agency had to take account of local governmental investments in "changes to flood protection systems (e.g., levees and sand dunes)," and "mitigation plans to avoid potential flood hazards." AR00029639; *see also* 44 C.F.R. § 66.1 (requiring administrator to request "plans to avoid potential hazards"); *id.* § 65.6(c)(2)(i) (requiring description of "channelization or new bridge, culvert, or levee"). FEMA had to evaluate "levees, floodwalls, closure structures, berms, embankments, or dikes that have been designed for flood control." FEMA, *Standards for Flood Risk Analysis and Mapping* 45 (Nov. 22, 2016) perma.cc/49ER-L7WH. The agency was also required to engage in "a discussion with stakeholders regarding risk identification, mitigation capabilities and actions, planning, and risk communication." *Id.* at 9. Communities (like Plaintiffs) therefore invested in those mitigation measures, relying on FEMA's promise that they would be rewarded in FEMA's updating of its rate maps. And NFIP policyholders raised their properties above the BFE, relying on FEMA's promise that their choice would be directly rewarded with a predictable discount to their premiums.

Equity in Action abandoned that framework without adequately explaining the change or accounting for the reliance interests of communities or individual policyholders. Under Equity in Action, "flood zones [are] no longer … used to set premiums";

and while FEMA still uses rate maps to determine which policyholders must buy insurance, rate map updates and appeals will not "have any effect on the premium that a policyholder pays." AR00186145–46. So a property that is removed from a flood zone through a successful appeal of the rate map will not see a lower insurance premium.

This change shreds the reliance interests of Plaintiffs as communities and individual policy holders that implemented mitigation measures resulting in lower premiums under the now-disregarded rate maps. Additionally, FEMA previously provided Preferred Risk Policies that allowed policyholders located in areas with low-to-moderate risk of flooding to purchase a lower-cost policy. AR00029646. But "the category of Preferred Risk Policy (PRP) is being retired under Risk Rating 2.0," and holders of those policies will see that their "the premium will begin increasing until it reaches the full risk-based rate." AR00186146. Additionally, holders of Preferred Risk Policies who previously received a premium discount and capped increases on their policies no longer benefit from those increased caps and instead will see their premiums increase to the full-risk rate. AR00213933, 00237055; *see* AR00240312 (providing example where a former Preferred Risk Policy property premium increases from $500 to $1,400 under Equity in Action). Equity in Action rewrote the NFIP premium methodology without accounting for these critical community and policyholder reliance interests.

In addition, Equity in Action provides mitigation credits only for installing flood openings; elevating a structure on posts, piles, and piers; or elevating machinery

and equipment "above the lowest floor." AR00186145. Unlike the previous methodology, Equity in Action does not base the mitigation discount for elevating the structure on whether it is elevated above the BFE, but on whether machinery is elevated "to at least the elevation of the floor above the building's first floor." AR00183968. This change upends the reliance interests of Plaintiffs who enacted statutes, regulations, or ordinances with reference to the BFE, *see* La. Rev. Stat. § 51:912.22(8)(b), and built flood-protective infrastructure with reference to the BFE. This change also upends the reliance interests of property owners (including Plaintiffs) who invested in mitigation infrastructure with reference to the BFE; and elevated their properties with reference to the BFE rather than to the first floor of the building. The Congressional Research Service has already criticized Equity in Action for this narrow focus: "Risk Rating 2.0 could encourage individual policyholders to do more to mitigate the flood risk for their property by introducing credit for a wider range of mitigation activities." AR00186145. Equity in Action changes the NFIP's treatment of direct premium discounts for mitigation measures without explaining or accounting for the critical reliance interests of communities like Plaintiffs who exercised their law-making authority or invested in community-wide flood infrastructure based on the previous methodology and property owners (including Plaintiffs) who bought or made flood-mitigation changes to their property based on the previous methodology.

*Third*, FEMA failed to justify its decision to eliminate grandfathered rates for policies. Under the previous NFIP premium methodology, FEMA would "recognize policyholders who have built in compliance with the [rate map] and/or maintained

37

continuous coverage" by providing for "'grandfather rules'" that "allow such policy-holders to benefit in the rating for that building." AR00029389. In other words, "FEMA allow[ed] property owners to maintain their old flood insurance rate class if their property [was] remapped into a new flood rate class." AR00029652; *see also* AR00186140–41. "As of September 2018, about 9% of NFIP policies were grandfathered." AR00186141. Out of five million total policies, AR0183908, that represents approximately 450,000 grandfathered policies when FEMA implemented Equity in Action. FEMA previously told the Congressional Research Service that "the decision to grandfather rates was based on consideration of (1) *equity*, (2) ease of administration, and (3) goals of promoting flood plain management." AR00195120 (emphasis added).

In the administrative record, FEMA never accounts for this critical reliance interest or even tries to justify its decision to eliminate the grandfathering policy. It simply states that policies formerly eligible for grandfathering will "move on a glidepath toward their full risk premium" and summarizes its methodological changes this way: "BFEs and Flood Zones and grandfathering will no longer be used, so instead, a glidepath will be used, subject to the statutory increases." AR00176981. Those statutory increases are 18% per year, so some grandfathered policies will see their flood insurance premiums more than double within six years. *Cf.* AR00214597. Again, if BFEs and flood zones aren't part of the rate calculation for formerly grandfathered policies, then the new rates must represent something other than the flood risk of a given property—but that is not what the term "full risk premium" implies.

This disjointed system does not make sense. And FEMA's treatment of grandfathered policies falls far short of the "specific, meaningful consideration of … reliance interests" that the APA requires. *Texas*, 10 F.4th at 553.

*Fourth*, FEMA departed from its prior policy by changing its methodology for calculating flood insurance premiums without adequately explaining that change or the reasons for the specific changes to the methodology. Equity in Action is a new FEMA policy that overhauls FEMA's prior methodology for calculating insurance premiums. But neither FEMA's public statements nor the administrative record here tries to justify those sweeping changes in any systematic way. Instead, FEMA started recalculating insurance premiums based on its proprietary methodology and notifying longstanding policyholders of their new premiums by mail. █████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████

In the leadup to the implementation of Equity in Action, congressional leaders decried the lack of transparency concerning "the types and sources of any data that will be used to calculate risk [and] how risk would be factored into different types of areas." AR00176984. And even insurance agent trade groups otherwise supportive of Equity in Action criticized the reality that FEMA provided "[n]o explanation of breakdown of rates produced by rating engine." AR00180615. Worse, FEMA did not consult former or current Plaintiffs who are supposed to be FEMA's co-collaborators in the

NFIP and, when Plaintiffs found out about FEMA's plans, it rebuffed Plaintiffs' requests for information. Still today, FEMA hides Equity in Action behind a protective order. ECF 134. FEMA's failure to explain and justify the premium methodology for Equity in Action renders the program arbitrary and capricious.

### B. Equity in Action Fails to Account for Important Aspects of the NFIP.

An agency makes "'a clear error of judgment'" when it has "entirely failed to consider an important aspect of the problem" under review. *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A reviewing court "must set aside any action premised on reasoning that fails to account for relevant factors." *Texas*, 10 F.4th at 552 (quotation omitted). The Court thus should grant summary judgment to Plaintiffs on Count II for four reasons.

*First*, FEMA failed to consider ways in which catastrophe modeling misrepresents the current risk of flooding. Equity in Action "leverages catastrophe modeling, geospatial technology, and NFIP mapping data to estimate risk and determine the cost of flood insurance for each individual building." AR00183882. FEMA used three commercial catastrophe models provided by contractors to estimate future loss. Average annual losses "for inforce policies in mainland states were modeled using the AIR, CoreLogic, and KatRisk models for the perils of Inland Flood and Storm Surge." AR00222612.

But those catastrophe models consistently overestimated the risk of loss when their predictions for historical periods are compared both to other models and the actual losses experienced during those periods. ██████████████████████

41

By definition, FEMA's use of flawed catastrophe modeling that consistently overstates the risk of actual flooding fails to account for important aspects of the NFIP program.

*Second*, FEMA used unreliable topographic data to create Equity in Action. Several sections of a 2022 report by FEMA's principal contactor Milliman raise

doubts about the reliability of that topographic data. Milliman stated that its topographic datasets "are simplified representations of reality and contain varying levels of abstraction and uncertainty." AR00222636. Milliman also stated that "[i]t is *certain* that actual, real-world values will not conform exactly to estimates provided by our geospatial data products." *Id.* (emphasis added). And Milliman "relied on data and other information provided to us by FEMA and other sources" and "did not audit, verify or review the data and other information for reasonableness and consistency." *Id.*

These qualifications of the data FEMA gave to Milliman to create Equity in Action are inconsistent with FEMA's own standards. For instance, in the standards that FEMA previously provided for drawing and revising rate maps, the agency required: "Engineering analyses must be documented and easily reproducible and must include study methods, reasoning for method selection, input data and parameters, sources of data results, and justifications for major changes in computed flood hazard parameters." FEMA, *FEMA Policy Standards for Flood Risk Analysis and Mapping* 17 (Dec. 11, 2019) perma.cc/L7U7-Q28G. Because FEMA's principal contractor failed to verify the topographic data it used to build the Equity in Action model, FEMA failed to account for an important aspect of the NFIP.

*Third*, Equity in Action uses inaccurate average annual loss data. FEMA's principal contractor Milliman used an artificially and unnecessarily narrow date range for assessing past loss from storms. The firm "utilized NFIP historical losses

42

and exposures from January 1, 1992[,] to June 30, 2018. For these historical exposures the Building Replacement Cost Value ('RCV') from FEMA's database was used." AR00222608. Neither FEMA nor Milliman explains why the Equity in Action methodology uses average annual loss data from the period of 1982 to 2018. This period is significantly shorter than the FEMA flood claims data period of 1978 to 2022, *see* AR00012209, and exaggerates the average annual losses due to the impact of Hurricane Katrina. In fact, Milliman admits the distorting effect of Hurricane Katrina on Louisiana data:

> In order for an [historical loss ratio] analysis to be appropriate, it is important that it not be unduly influenced by the inclusion or exclusion of a small number of historical events. Nearly half of policies in leveed areas are in Louisiana and therefore were affected by the inclusion of Katrina in the historical data. However, if these policies were excluded, the remaining number of policies in leveed areas was too small to have a sufficient number of claims to be credible.

AR00222624.

The fact that Milliman "did not perform an [historical loss] analysis for leveed areas" did not remove this distortion, *id.*, because Hurricane Katrina affected large portions of coastal Louisiana, Alabama, and Mississippi outside of leveed areas, FEMA, *Historical NFIP Claim Information and Trends*, perma.cc/YN6U-NGLD; █

█     █     The distortive effects of Hurricane Katrina made FEMA's selection of an artificially narrowed date range for historical losses a failure to account for important aspects of the problem.

*Fourth*, FEMA has failed to consider the critical role that communities like current and former Plaintiffs are supposed to serve in providing NFIP information

43

and technical assistance to policyholders. Under the previous NFIP methodology, FEMA guidelines required the agency "to conduct extensive communication and outreach efforts with the community during the [rate] mapping process" to make it "a collaborative process with local communities to encourage a joint sense of 'ownership' of the maps." AR00029639–40. And the NFIA includes other "legal requirements allowing communities and individuals to appeal during the process of updating" rate maps. AR00029640.

The NFIA's requirements that FEMA collaborate with local communities are far from theoretical: FEMA had a long history of collaborating with former and current Plaintiffs to get their rate maps just right. ECF 1-18 at 4–5, 1-28 at 4–5. State and local agencies, especially in coastal States, are filled with technical experts on flooding, flood mitigation, and local topography and hydrology, and FEMA had long worked with them to root out inaccuracies in its rate maps. ECF 1-41 at 4–5. Yet FEMA cut them out of the development of Equity in Action. When Plaintiffs got wind, they did not wait around for FEMA to come to them. ECF 1-41 at 7–10, 1-56 at 4. But when Plaintiffs came knocking, FEMA closed its ears to Plaintiffs and refused to tell them anything. *Id.*

Perhaps that is because Equity in Action eliminates Plaintiffs' role in updating rate maps through the appeals process to accurately reflect a true risk premium: "[t]he FIRM map appeal process will still exist, but once Risk Rating 2.0 begins, map appeals are not to have any effect on the premium that a policyholder pays."

44

AR00186145. FEMA's decision to disregard the importance of community engagement with current and former Plaintiffs is yet another reason why its implementation of Equity in Action is arbitrary and capricious.

## IV.   EQUITY IN ACTION IS CONTRARY TO LAW.

Courts must "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2). Where an agency action is "foreclosed by Congress's careful plan," and thus "'manifestly contrary to the statute,'" the reviewing court will hold it unlawful and set it aside. *Texas v. United States*, 809 F.3d at 178, 186 (5th Cir. 2015) (citation omitted). The Court should grant summary judgment to Plaintiffs on Count I.

The NFIA requires FEMA to set "premium rates for flood insurance" based on "the flood mitigation activities that an owner or lessee has undertaken on a property, including differences in the risk involved due to land use measures, floodproofing, flood forecasting, and similar measures." 42 U.S.C. § 4014(a)(1)(A)(ii). It also requires that premium rates be "based on a consideration of the respective risks involved, including differences in risks due to land use measures, flood-proofing, flood forecasting, and similar measures." *Id.* § 4015(b)(1). And the statute requires that during the process of updating rate maps, "[u]pon appeal by any community … the Administrator shall review and take fully into account any technical or scientific data submitted by the community"—and that until the FEMA Administrator resolves that appeal, "flood insurance previously available within the community shall continue to be avail-

45

able, and no person shall be denied the right to purchase such insurance at chargeable rates." *Id.* § 4104(e). Equity in Action should be set aside because it fails to comply with these statutory directives.

As Plaintiffs have explained, *supra* at 34–37, Equity in Action significantly reduces—and in some ways effectively eliminates—the way FEMA considers mitigation measures in NFIP premiums by changing the mitigation discounts and eliminating the use of rate maps to set premiums. Equity in Action eviscerates the significance of the rate map review and appeal process for premiums, and this process was designed to allow communities to submit evidence about measures mentioned in the statute, like "land use measures" and "flood forecasting." *See* AR00029639–40.

Further, because "map appeals are not to have any effect on the premium that a policyholder pays" under the new methodology, AR00186145, Equity in Action renders the statutorily required administrative appeal process a nullity, as it now neither provides the statutorily required protection from premium increases while the appeal is ongoing nor provides a premium discount when an appeal successfully contests important aspects of the rate map. *See* AR00213870 (explaining that successfully appealing the "BFE, flood zone, or location in the Special Flood Hazard Area (SFHA), will not directly reflect a change in a rate"). Because Equity in Action contradicts these requirements, it violates the NFIA and must be set aside under the APA. 5 U.S.C. § 706(2).

## V.   EQUITY IN ACTION VIOLATES THE SPENDING CLAUSE.

Courts likewise "hold unlawful and set aside agency action" that is "contrary to [a] constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2). This

Court should grant summary judgment to Plaintiffs on Count VIII and set aside Equity in Action because it violates the Spending Clause. Federal funding conditioned on the recipient's satisfaction of certain conditions violates the Spending Clause if the recipient cannot be said to have "voluntarily and knowingly" accepted the terms, *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981), or if the funding regime gives the State no choice but to accept, *NFIB v. Sebelius*, 567 U.S. 519, 577 (2022). Equity in Action fails on both counts.

*First*, FEMA violated the Spending Clause because the States and their political subdivisions cannot be said to have "voluntarily and knowingly" accepted the terms of Equity in Action. *Pennhurst State Sch. & Hosp.*, 451 U.S. at 17; *see also Texas v. Yellen*, No. 2:21-cv-079-Z, 2022 WL 989733, at *4 (N.D. Tex. Mar. 4, 2022) (States as "co-sovereign[s] in our constitutional structure have the right to 'bargain' in accordance with constitutionally imposed strictures of 'good faith'" and are "entitled to [adequate information] under the Constitution."). Plaintiffs would not have taken FEMA's offer of NFIP participation in exchange for extensive land-use regulations in the first place had they known FEMA would later change the terms of the program to those enforced through Equity in Action. *Sebelius*, 567 U.S. at 583–84; La. Rev. Stat. § 38:84(A).

The NFIA provides that communities are ineligible for NFIP coverage unless they adopt "adequate land use and control measures," as defined through statute and regulation. 42 U.S.C. § 4022(a); 44 C.F.R. § 59.22. FEMA's regulatory scheme in turn depends on a "state coordinating agency" to implement and enforce these land use

47

measures. 44 C.F.R. § 60.25. States must supply this enforcement assistance for FEMA to consider their recommendations on how to implement NFIP activities within the State. *Id.* § 60.25(d)(1). FEMA also provides substantial funding for these agencies in exchange for their compliance with federal regulations and FEMA guidance. Ledet Decl. (Ex. 7) ¶¶6–7. The State of Louisiana, for its part, allows itself and its parishes to accept the NFIA's offer but only "in coordination with the [State's] chief resilience officer." La. Rev. Stat. § 38:84(A).[7] "A community that has been found failing to enforce the floodplain management standards may be placed on probation and ultimately suspended from the NFIP." AR00029642.

To comply with these conditions as they existed for 50 years, Plaintiff States and Parishes have invested significant resources into mitigation measures and land use regulations. Equity in Action changes all of that. It no longer considers prior NFIP mitigation measures to an equivalent extent or allows for grandfathered premium rates and thus does not result in lower premiums for the State's NFIP policyholders. *See supra* at 34–38. Premiums also have risen dramatically for many parish properties. St. Tammany Decl. ¶7; Livingston Decl. ¶5. This change in method means that Plaintiffs did not knowingly engage in mitigation measures to be eligible for a program that no longer provides federally backed lower insurance premiums that appro-

---

[7] Pending Senate Bill 171 (SB 171) would amend § 38:84 to return that power to the Louisiana Department of Transportation and Development. SB 171, 2026 Regular Legislative Session, at 3 (La. 2026), available at perma.cc/FK8M-ABYA.

priately recognize mitigation measures. Equity in Action, therefore, deprives Plaintiffs of the opportunity to make an informed decision about whether participation in the NFIP is still in the best interest of each State. *See Yellen*, 2022 WL 989733, at \*4.

*Second*, Equity in Action coerces Plaintiffs to participate in NFIP grant programs, which are essential to their flood prevention and disaster recovery measures. The attached declarations establish that Equity in Action has caused residents to abandon their policies due to drastically rising premiums, which in turn forces the States to repay this grant money and face significant uncertainty on whether it will be able to recoup this money from the end recipient. ECF 1-1 ¶¶41–44; Mahfouz Decl. ¶¶15–19; Plaquemines Decl. ¶5. But the States cannot reject the grants or abandon their role in administering the grants because this noncompliance would result in the federal government recapturing millions of dollars in mitigation funds from the States. 42 U.S.C. § 4104c(e); Mahfouz Decl. ¶¶15–19. In addition, if the States ceased providing the services of their state coordinating agencies, they would lose input into how NFIP programs are implemented in the state, and many communities depend on these programs. 44 C.F.R. § 60.25(d)(1). And flood insurance—and therefore participating in the NFIP—is imperative for communities. Without it, people would be unable to secure federally backed mortgages or federal loans. AR00029644. They also would be ineligible for disaster relief. *Meeting the Flood Insurance Requirement*, perma.cc/4EP6-ZM3M. And parishes would be ineligible under Louisiana law to un-

49

dertake "any project for hurricane or storm damage reduction which involves or receives federal assistance." La. Rev. Stat. § 38:84(D). This threatened loss of funds is an archetypical coercion-type Spending Clause violation.

## VI.   AN ORDER SETTING ASIDE EQUITY IN ACTION IS THE PROPER REMEDY.

The APA gives reviewing courts the power "to hold unlawful and set aside agency action[s]." 5 U.S.C. § 706(2). This language "incorporated th[e] common and contemporaneous meaning of 'set aside,'" which meant to "'cancel, annul, revoke'"— in essence, "the vacatur of agency actions." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 829–30 (2024) (Kavanaugh, J., concurring). Not only is vacatur authorized by the APA, but "vacatur is the normal remedy." *Allina Health Services v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014); *see also Regents of Univ. of Cal.*, 591 U.S. at 8 (holding that "the [DACA] rescission must be vacated" after finding it arbitrary and capricious); *Chamber of Com. of U.S. v. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023) (vacating because the SEC "acted arbitrarily and capriciously, in violation of the APA"). Vacatur merely "restores the status quo before the invalid agency action took effect." *Am. Stewards of Liberty v. Dep't of Interior*, 960 F.3d 223, 230 (5th Cir. 2020) (cleaned up).

In addition, vacatur is necessary to provide the Plaintiffs with practical relief in this case. As Justice Kavanaugh noted in *Corner Post*, "[t]he absence of vacatur would … create an asymmetry." 144 S. Ct. at 2464 (Kavanaugh, J., concurring). If this Court merely enjoined FEMA officials from enforcing Equity in Action against the Plaintiff States and Parishes, FEMA would administer two forms of the NFIP in this Country: the old methodology within the Plaintiff States and Equity in Action

50

outside of them. Such a patchwork for a national flood insurance program is untenable. Thus, vacatur of Equity in Action is (1) authorized, (2) appropriate, and (3) necessary under the APA to grant Plaintiffs relief in this case. This Court should therefore vacate Equity in Action.

Plaintiffs are not deaf to the concerns this Court expressed about the "stability of the administration of the National Flood Insurance Program" flowing from a vacatur order. ECF 100 at 55. To assuage those concerns, the Court should stay its vacatur order to give FEMA time to reimplement the previous NFIP methodology without a lapse in flood insurance coverage caused by the vacatur of Equity in Action. Courts regularly vacate final agency rules with stays so that the regulated area is not left standardless while the agency corrects its mistakes. *See, e.g.*, *Friends of the Earth, Inc. v. EPA*, 446 F.3d 140, 148 (D.C. Cir. 2006); *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995); *NAACP v. Trump*, 298 F. Supp. 3d 209, 249 (D.D.C. 2018). And here, vacating Equity in Action would not leave FEMA standardless but merely revert to the former pricing methodology. *See Am. Stewards of Liberty*, 960 F.3d at 230. Plaintiffs thus respectfully suggest that staying the vacatur order for a period of three months would allow FEMA sufficient time to revert to its prior methodology while ensuring that the NFIP program remains operational and thus able to provide the cooperative federalism program that Congress intended.

## CONCLUSION

For any or all of these reasons, this Court should grant Plaintiffs' Motion for Summary Judgment and set aside Equity in Action, thus restoring FEMA's prior methodology.

51

52

Dated: March 25, 2026                    Respectfully submitted,

 

ELIZABETH B. MURRILL
 Attorney General

*/s/ Morgan Brungard*
MORGAN BRUNGARD
 Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
Office of the Attorney General
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
MurrillE@ag.louisiana.gov
BrungardM@ag.louisiana.gov

Tyler R. Green
Consovoy McCarthy PLLC
222 S. Main Street
Ste 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

*Counsel for Plaintiffs*[8]

---

[8] The Commonwealth of Virginia intends to dismiss its claims pursuant to Federal Rule of Civil Procedure 41 and takes no position.