**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

|  |  |
|---|---|
| THE STATE OF LOUISIANA *et al.*,<br><br>  *Plaintiffs*,<br><br> v.<br><br> DEPARTMENT OF HOMELAND<br> SECURITY *et al.*,<br><br>  *Defendants.*[1] | Action No. 2:23-cv-01839<br> Section P<br> District Judge Darrel J. Papillion<br> Magistrate Judge Eva J. Dossier |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO CONSIDER WHETHER ANOTHER PARTY'S MATERIAL SHOULD BE SEALED

---

[1] The Complaint names as a Defendant Alejandro Mayorkas in his official capacity as then-Secretary of Homeland Security. Under Federal Rule of Civil Procedure 25(d), Markwayne Mullin, current Secretary of Homeland Security, is automatically substituted as a Defendant.

**INTRODUCTION**

Plaintiffs' motion to consider whether another party's material should be sealed retreads old ground that has been settled by this Court. The materials Plaintiffs seek to unseal all derive from confidential business documents that were created by third parties and contain proprietary information relating to those third parties' actuarial and risk models, which are not the subject of Plaintiffs' Administrative Procedure Act ("APA") challenge. That same confidential business information—which the Court has already recognized as warranting protection under the protective order, *see* Order and Reasons at 2–3, ECF No. 133—should remain sealed, and nothing in Fifth Circuit precedent compels the opposite result.

The Fifth Circuit has recognized that courts must "undertake a case-by-case" "balancing of 'the public's common law right of access against the interests favoring nondisclosure.'" *Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410, 419 (5th Cir. 2021). In so doing, courts must consider "compelling countervailing interests" for sealing, which include, for example, the protection of trade secrets, *id.* at 419, 421, as well as materials that "incorporate confidential business information," *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 204 (5th Cir. 2015) (citation omitted). Here, nearly every single page that Plaintiffs seek to unseal contains proprietary, confidential business information of third parties, the disclosure of which "would cause an identifiable, significant harm" to those third parties, Defendant Federal Emergency Management Agency ("FEMA"), and the general public. *Cox Operating, LLC v. Atina M/V*, No. 20-cv-2845, 2023 WL 3092797, at *1 (E.D. La. Apr. 26, 2023). Consequently, the Court should deny Plaintiffs' request to unseal all challenged pages that contain confidential business information.

**BACKGROUND**

In developing Risk Rating 2.0—the improved National Flood Insurance Program ("NFIP") rating methodology that Plaintiffs actually challenge—FEMA contracted with third-party vendors, Verisk Analytics, Inc. ("Verisk") and CoreLogic, Inc. ("CoreLogic"), to license their proprietary flood catastrophe models. Decl. of Naomi Ondrich ("Ondrich Decl.") ¶ 9, ECF No. 119-3.[2] Those proprietary catastrophe models, which reflect decades of research and millions of dollars of investment by third parties, each uniquely "determine the flood hazards exposed to a given property based on its location as well as the vulnerability of the location based on its structural characteristics." *Id.* ¶ 11.

FEMA, upon entering into licensing and confidentiality agreements with those vendors, ran the licensed catastrophe models over representative samples of insurance policies in a given area to establish average annualized losses (*i.e.*, the total expected losses for all policyholders) for each state and location level. *Id.* ¶ 17. FEMA then used those data outputs as inputs for determining rating factors, *i.e.*, the individualized geographic and property characteristics that accounted for proposed adjustments to base insurance premium rates. *Id.* FEMA also ran those licensed catastrophe models using NFIP policyholder data to determine the necessary base target rate levels. *Id.* The resulting base rates and rating factors assisted FEMA in developing its improved rating plan under Risk Rating 2.0.

---

[2] FEMA previously submitted declarations to this Court as part of its summary-judgment submission in the ongoing litigation concerning a Freedom of Information Act request for certain Risk Rating 2.0 records. *See* Defs' Mot. for Summ. J., *St. Charles Parish et al. v. FEMA*, Case No. 2:23-cv-1369 (E.D. La.), ECF No. 31 (declarations are exhibits ECF Nos. 31-5–31-10). FEMA likewise submitted declarations as part of its preliminary-injunction briefing in the above-captioned matter. *See* Defs.' Mem. in Opp'n to Mot. for Prelim. Inj. ("Defs.' PI Opp'n"), ECF No. 56 (declarations are exhibits ECF Nos. 56-1–56-3). The Court may take judicial notice of these public filings. *See, e.g., Krystal One Acquisitions, LLC v. Bank of Am., N.A.*, 805 F. App'x 283, 287 (5th Cir. 2020); *Vallee v. Crown Equip. Corp.*, No. 20-cv-1571, 2020 WL 8265340, at *3 (E.D. La. Nov. 10, 2020).

In the seven years it took to coordinate, develop, and implement Risk Rating 2.0, FEMA took countless steps to apprise the public of its updated rating plan.  It publicly disclosed the full-risk rates for Risk Rating 2.0 at the national, state, county, and zip code levels, as well as the risk-based cost of flood insurance for single-family homes.  *Id.* ¶ 18.  FEMA published an extensive public report, which provides, *inter alia*, a description of each of the data sources used to develop Risk Rating 2.0, as well as the selection of factors made by FEMA in developing the updated algorithm, rates, and rating factors.  *National Flood Insurance Program: Risk Rating 2.0 Methodology and Data Sources* at 1 (Apr. 16, 2021), https://perma.cc/K8X6-88W8; *see also id.*, Apps. A–D (appendices detailing the data sources, assumptions, and rating factors).  FEMA also released several datasets, as well as worksheet examples that explained the various inputs that led to premium rates under Risk Rating 2.0.  *See* Decl. of Lloyd Hake ("Hake Decl.") ¶¶ 14–15, ECF No. 56-3.

In March 2022, FEMA published its "Rate Explanation Guide," which includes graphics and examples of factors impacting premium rates and expands on the building characteristics considered under the Risk Rating 2.0 methodology.  *Id.* ¶ 21.  Those publications allowed the public to "see how factors like distance to flood sources, ground elevation, foundation type, first floor height, number of floors, unit location, building occupancy, construction type, flood openings, the location of machinery and equipment, building replacement cost value, coverage amounts, deductible amounts, and other variables would all affect premium rates and why."  *Id.*  Ultimately, the repository of third-party documents that FEMA released under the Freedom of Information Act (which were re-produced for purposes of this litigation), accompanied by exhibits that were published on FEMA's website, "provide all that is necessary to calculate a Risk Rating 2.0 premium for a specific building in St. Charles Parish or any other location."  Ondrich Decl. ¶ 16.

**LEGAL STANDARD**

Although "[t]he district court's discretion to seal records 'is to be exercised charily' given the public's common law right of access," *N. Cypress Med. Ctr.*, 781 F.3d at 203–04, when issuing sealing orders, courts must balance "'the public's common law right of access against the interests favoring nondisclosure,'" *St. Charles-Guillot Inv., LLC v. One Source Roofing, Inc.*, No. 23-cv-30, 2024 WL 5440833, at *2 (E.D. La. Oct. 21, 2024) (quoting *Binh Hoa Le*, 990 F.3d at 419). That is, "[t]he secrecy of judicial records . . . must be justified and weighed against the presumption of openness that can be rebutted only by compelling countervailing interests favoring nondisclosure." *Binh Hoa Le*, 990 F.3d at 421. Courts within the Fifth Circuit have recognized that "sealing may be appropriate where orders incorporate confidential business information," *N. Cypress Med. Ctr.*, 781 F.3d 204, "trade secret[s] or other confidential research, development, or commercial information"—the disclosure of which "would cause an identifiable, significant harm," *Cox Operating*, 2023 WL 3092797, at *1.

**ARGUMENT**

I.     **The Challenged Pages Contain Confidential and Proprietary Business Information of Third Parties**

In support of Plaintiffs' motion for summary judgment, Plaintiffs seek to unseal certain administrative record ("AR") pages from three confidential business documents that were created by third parties, Verisk Analytics, Inc. ("Verisk")[3] and CoreLogic, Inc. ("CoreLogic"). Of those three confidential documents, Plaintiffs have identified nine pages[4] for unsealing—AR00043009, AR00042644, AR00042709, AR00042710, AR00042716, AR00042717, AR00042718, AR00042869,

---

[3] The sealed Verisk documents in question refer to AIR Worldwide, which has now been renamed as Verisk Extreme Event Solutions ("VEES"). VEES is now a subsidiary of Verisk. *See* Decl. of Roger Grenier ("Grenier Decl.") ¶ 1, ECF No. 119-3.

[4] Defendants take no position as to the following pages that Plaintiffs seek to unseal: AR00043064, AR00064355, AR00064366, and AR00013223.

and AR00062907, *see* Pls.' Mot. to Consider Whether Another Party's Material Should Be Sealed ("Pls.' Mot.") at 2, ECF No. 190—each of which contain confidential business information and whose public disclosure would significantly harm Verisk, CoreLogic, FEMA, and the general public.

Consistent with the requirements of Local Rule 5.6(D), Defendants provide the following non-confidential descriptions for each Bates page that Defendants maintain should remain under seal.

### A.    Confidential Business Information from Verisk

Defendants oppose the unsealing of eight pages that derive from two confidential Verisk documents, each of which describes Verisk's proprietary AIR Hurricane Models for the United States, AR00042891–43151; AR00042891–42889.   Verisk's catastrophe model descriptions and outputs constitute proprietary, commercially valuable information that is "produced directly from, and are directly reflective of, [Verisk's] proprietary and closely guarded catastrophe models, which [it has] developed at great expense, license[d] in commercial offerings, and depend[ed] on to generate revenue."   Ondrich Decl. ¶ 27.   Put simply, the two Verisk documents and the pages within those documents that Plaintiffs have identified for unsealing contain confidential business information. More specific descriptions of the challenged pages and the confidential business information they each contain are provided below.

#### 1.    AR00043009

AR00043009 contains non-public, confidential trade information that describes Verisk's analysis of the vulnerability of dwellings to storm surge, including certain mitigation measures that Verisk identified as inputs in its proprietary modeling.

#### 2.    AR00042644

AR00042644 includes a depiction of Verisk's proprietary map for its U.S. Air Hurricane Model, as well as Verisk's "Model Abstract."  The Model Abstract contains a non-public, confidential

summary of the functions and uses of the AIR Hurricane Model, *i.e.*, Verisk's proprietary catastrophe model that uses a unique series of factors to capture the risk to insured properties.

### 3.     AR00042709

AR00042709 includes a description of how Verisk adjusted its proprietary catastrophe model when determining how to consider and/or include certain factors or variables that may affect the Sea, Lake, and Overland Surges from Hurricanes ("SLOSH") model developed by the National Hurricane Center.  AR00042709 also contains non-public information that shows the context in which Verisk made its damage estimations—meaning, it includes Verisk's confidential and proprietary analysis of FEMA's processes.  Those calculations represent a vital element of Verisk's model development.

### 4.     AR00042710[5]

AR00042710 features a depiction of a proprietary map for modeled surge depths based on Verisk's AIR Hurricane Model.  It also includes an explanation of how Verisk's AIR Hurricane Model considers certain features of a hurricane when predicting storm surge.  The selection of these factors and the ways in which they are weighed by Verisk constitute confidential and proprietary information that is prohibited from disclosure pursuant to FEMA's contract with Verisk.

### 5.     AR00042716

AR00042716 features depictions of two proprietary maps for modeled surge depths for differing geographic areas based on Verisk's AIR Hurricane Model.  AR00042716 includes confidential data, descriptions of how Verisk factors in "extreme conditions" when predicting storm surge, and references to the historical dataset that Verisk used in its proprietary model.  These factors

---

[5] The SLOSH surge depth map, the top figure depicted on AR00042710, reflects public information. Defendants do not oppose the unsealing of that portion of the page.  For the reasons set forth herein, Defendants maintain that the remaining portion of AR00042710—*i.e.*, the bottom figure depicting the AIR Hurricane Model, and the remaining text portion on the page—should remain redacted and/or under seal.

and the ways in which they are weighed by Verisk constitute confidential and proprietary information that is prohibited from disclosure pursuant to FEMA's contract with Verisk.

### 6.    AR00042717[6]

AR00042717 features a proprietary map, which depicts confidential information and illustrates how Verisk's proprietary model shows storm surge.  AR00042717 also includes proprietary analysis by Verisk that addresses FEMA's flood zone maps and the Air Hurricane Model's role in developing the proprietary map.

### 7.    AR00042718

AR00042718 includes images of two proprietary maps, which depict the application of Verisk's proprietary AIR Hurricane Model.  AR00042718 also includes a description of Verisk's selection of factors for designated flood zones as applied through its AIR Hurricane Model and the ways in which NFIP designates flood zones and how that compares to Verisk's AIR Hurricane Model.

### 8.    AR00042869

AR00042869 features a description and graph generated by Verisk's proprietary AIR Hurricane Model and describes Verisk's calculated industry average annual loss ("AAL") for the United States.  The generated graph is confidential and non-public, and the calculations for arriving at Verisk's AAL are likewise confidential and proprietary in nature.

### B.    Confidential Business Information from CoreLogic

Plaintiffs have identified one page for unsealing, AR00062907, which derives from one confidential CoreLogic document, AR00062803–6297.  Like the two confidential and proprietary

---

[6] The National Oceanic and Atmospheric Administration ("NOAA") surge extent map, the top figure depicted on AR00042717, reflects public information.  Defendants do not oppose the unsealing of that portion of the page.  For the reasons set forth herein, Defendants maintain that the remaining portion of AR00042717—*i.e.*, the bottom figure depicting the AIR Hurricane Model, and the remaining text portion on the page—should remain redacted and/or under seal.

Verisk documents described above, the CoreLogic document represents a description of CoreLogic's proprietary principles and methodology for its catastrophe modeling, U.S. Flood Model, RQE® v. 18.0. *Id.* The description and outputs of CoreLogic's proprietary catastrophe modeling inherently constitute confidential business information. *See* Ondrich Decl. ¶ 27; Decl. of Mikhail Palatnik ("Palatnik Decl.") ¶ 26, ECF No. 119-3. That confidential-business-information designation applies with equal force to the single CoreLogic page that Plaintiffs seek to unseal, as described below.

### 1. AR00062907

AR00062907 includes a description of the exercises that CoreLogic used to test the accuracy of its proprietary model that was used to predict flood risk. AR00062907 details the specific analysis that CoreLogic undertook with discrete variables adjusted to test vulnerability of structures, including homes and commercial buildings.

## II. The Significant Harms Stemming from Disclosure of Confidential and Proprietary Business Information Outweigh Any Presumption Against Sealing

As described above, each of the challenged pages that Plaintiffs seek to unseal (and for which Defendants oppose) contain non-public, confidential business information relating to the proprietary catastrophe models licensed by Verisk and CoreLogic. The public disclosure of such confidential business information would likely cause "identifiable, significant harm[s]," *Cox Operating*, 2023 WL 3092797, at \*1, and thus, there are "compelling countervailing interests favoring nondisclosure," *Binh Hoa Le*, 990 F.3d at 421; LR 5.6(D)(2)(b).

Verisk and CoreLogic have expended significant resources to develop and license their proprietary models and have repeatedly (and resoundingly) resisted attempts at public disclosure due to its attendant harms. As the Senior Vice President of Verisk Extreme Event Solutions explained by declaration, Verisk "develop[s], update[s], and enhance[s] [its] proprietary loss models at great expense." Grenier Decl. ¶¶ 1, 22; *see also id.* ¶ 25 (explaining that Verisk has "invest[ed] considerable financial and human capital resources to develop, maintain and improve [its] innovative models").

8

Similarly, CoreLogic has "developed its Software suite over approximately 30 years, the development cost of which has exceeded approximately $100M." Palatnik Decl. ¶ 16. Unsurprisingly, those proprietary models, and the licensing of those models, form a "significant portion" of these vendors' annual revenue. Grenier Decl. ¶ 22; Palatnik Decl. ¶ 16 ("CoreLogic derives significant annual revenue from licensing our subscription-based Software, which includes our models."). As a result, both companies have taken great pains to ensure that their proprietary models and confidential business information—*i.e.*, their "trade secrets" and "intellectual property," Grenier Decl. ¶¶ 23–25; Palatnik Decl. ¶¶ 14, 26—are protected from public disclosure through contracts, like the ones FEMA entered into, which require, *inter alia*, confidential treatment, password protection, and prohibitions on disclosure, Grenier Decl. ¶ 23; Palatnik Decl. ¶ 18 (explaining that "CoreLogic implements industry-leading security protocols to protect its Software codes, protocols, modeling, related pricing, and other proprietary and sensitive data, which include," *inter alia*, password protections, secure databases, need-to-know access, prohibitions on release, and nondisclosure agreements).

Such protective measures against disclosure are critical to Verisk and CoreLogic, because public disclosure carries significant business harms. For example, as recognized by Verisk, disclosure of proprietary modeling and related confidential business information would likely "enabl[e] competitors to develop or substantially improve their own models using Verisk's intellectual property and enabl[e] insurers to develop insurance rating plans without licensing the models, effectively creating a situation where insurers who are paying for lawful access are subsidizing their competitors." Grenier Decl. ¶ 26. CoreLogic has similarly identified, under penalty of perjury, that "[t]he release of such confidential, proprietary, and competitively sensitive information . . . would cause significant competitive and financial harm to CoreLogic by enabling CoreLogic's competitors to gain access to information, which could subsequently be used by that competitor to predict CoreLogic's pricing and

methodologies, ascertain in detail competitive differentiators and to potentially reverse engineer its products / services / models." Palantik Decl. ¶ 26.

To be sure, the consequential business harms are not limited to the forced disclosure of the descriptions of the proprietary models themselves. The outputs of those models likewise represent "commercially sensitive data[,] as they are provided by and/or generated by CoreLogic's Software and could be used to potentially reverse engineer or predict how CoreLogic's Software and modeling methodologies operate or respond to specific inputs and/or what outputs would result from such inputs." *Id.* ¶ 30. As CoreLogic explained:

> [O]utputs like annual expected flood losses are derived directly from [CoreLogic's] Software and represent [its] proprietary data. Outputs such as annual expected losses are a core part of [CoreLogic's] catastrophe modeling commercial offering; [CoreLogic's] licensees are paying for the ability to have [CoreLogic's] model generate these loss estimates. And the loss estimates reflect the core underlying assumptions and proprietary aspects of [CoreLogic's] model; they hinge on [CoreLogic's] model's unique view of flood hazard and vulnerability.

*Id.* ¶ 31. Put differently, "[a] competitor could use the [sealed] data to understand the proprietary and sensitive interworking of CoreLogic's Software and its modeling methodologies and/or to potentially reverse engineer such Software and modeling to the detriment of CoreLogic." *Id.* ¶ 30; Grenier Decl. ¶ 14 ("When licensees like FEMA input their flood insurance policyholder data and run [Verisk's] flood model, the software produces estimates of the annual expected losses. These loss estimates are derived directly from [Verisk's] model and represent [Verisk's] proprietary data. They are a core part of [Verisk's] catastrophe modeling commercial offering; [those] licensees are paying for the ability to have [Verisk's] model generate these loss estimates. And the loss estimates reflect the core underlying assumptions and proprietary aspects of [Verisk's] model; they hinge on [Verisk's] model's unique view of flood hazard and vulnerability.").

At bottom, the public disclosure of the challenged pages, which, at minimum "incorporate confidential business information," *N. Cypress*, 781 F.3d at 204; *supra* § I, would cause "an identifiable,

significant harm" to these third parties' financial livelihood, while at the same time directly benefit their competitors, *Cox Operating*, 2023 WL 3092797, at \*1.  *See also Mitchell v. Metro. Life Ins. Co.*, No. 03 CIV.10294 (WHP), 2004 WL 2439704, at \*2 (S.D.N.Y. Nov. 2, 2004) (recognizing that "internal financial analyses, business plans and other sensitive company information" could be valuable to company's competitor); *Lepage's Inc. v. 3M*, No. CIV.A. 97-3983, 1997 WL 736866, at \*1 (E.D. Pa. Nov. 19, 1997) ("A showing that materials are trade secrets or other confidential business information and would provide competitive advantage to third parties thereby resulting in particularized harm upon disclosure does demonstrate good cause."); *United States v. Chromatex, Inc.*, No. CIV. 91-1501, 2010 WL 2696759, at \*2, \*6–\*8 (M.D. Pa. July 6, 2010) (protective order granted as to confidential business information provided to EPA by its contractors, which, if released, could cause them competitive harm); *Silverton Mountain Guides LLC v. U.S. Forest Serv.*, No. 3:22-cv-00048-HRH, 2022 WL 16553223, at \*12–\*14 (D. Alaska Oct. 31, 2022) (protective order granted concerning confidential company business information in agency administrative record, which, if released, could create competitive disadvantages for company).  Those significant and identifiable business harms weigh heavily against the presumption of public disclosure.

The harms stemming from public disclosure of the challenged confidential business information, however, do not stop there.  As then-Deputy Administrator for the Federal Insurance Directorate Jeffery Jackson averred via declaration, Verisk and CoreLogic granted FEMA "a limited license for use of catastrophe modeling software, premised on the agreement that FEMA did not have ownership of the vendors' proprietary data and could not publicly release such data."  Decl. of Jeffery Jackson ("Jackson Decl.") ¶ 9, ECF No. 119-2.  *See also* Grenier Decl. ¶ 28 (Verisk "provided [its] flood model to FEMA on the expectation that it and the associated modeling factors would be kept private, and [Verisk] received assurances from FEMA as part of its work on Risk Rating 2.0 that the information would be protected from disclosure."); Palantik Decl. ¶ 27 ("CoreLogic requested that

11

FEMA not disclose any of CoreLogic's Software codes, protocols, modeling, and related pricing provided to FEMA in relation to the services provided under the Contract as that data constitutes proprietary and sensitive data that CoreLogic's protects from disclosure to all third parties."). That is, the public disclosure of Verisk's and CoreLogic's confidential business information would not only violate FEMA's confidentiality agreements with those vendors, but also significantly damage FEMA's ability to keep licensing proprietary models from those vendors. As CoreLogic explained via declaration: "If FEMA is unable to maintain the confidentiality of [CoreLogic's] catastrophe modeling information, [CoreLogic] will likely be unwilling to license [its] catastrophe modeling products to the government in the future in a similar fashion." Palantik Decl. ¶ 32. *See also* Jackson Decl. ¶ 10 ("The vendors' declarations . . . indicate that unfettered disclosure would likely result in vendors refusing to provide their essential services to FEMA in the future."). FEMA's inability to obtain licensing agreements with vendors developing proprietary catastrophe models—due to the unsealing of proprietary, confidential business information—would severely hamper FEMA's ability to keep pace with the insurance-premium industry, contrary to the directives of the Biggert-Waters Flood Insurance Reform Act and the Homeowner Flood Insurance Affordability Act. *See* Ondrich Decl. ¶¶ 9–10, 27; Biggert-Waters Flood Insurance Reform Act of 2012, Pub. L. No. 112-141, 126 Stat. 405, 919 (2012) (mandating that "any property located in an area that is participating in the national flood insurance program shall have the risk premium rate charged for flood insurance on such property adjusted to accurately reflect the current risk of flood to such property").

Broader public interest harms would likely flow from disclosure as well. "Guarding against public disclosure also serves the public interest by enabling innovation and availability of robust models to support a healthy insurance market, leading to stable commercial and homeowner markets generally." Grenier Decl. ¶ 27. Put more concretely, the "[s]ophisticated catastrophic models" developed by Verisk and LogicCore (among other vendors in this space) represent "an improvement

over historical methods for determining risk." *Id.* Those models have continued to advance through competition, and if "model developers cannot protect their investment" due to forced public disclosure, "future models may be less granular and predictive of risk, potentially limiting the availability of sophisticated tools that can help encourage a healthy insurance market and maintain availability of insurance coverage." *Id.*

On the other side of the ledger, Plaintiffs have done little to nothing to explain why disclosure of confidential business information supports the public's common law right of access, other than to assert that such information is "presumptively public." Pls.' Mem. in Supp. of Mot. to Consider Whether Another Party's Material Should Be Sealed ("Pls.' Mem.") at 3, ECF No. 190-1. Nor can they credibly contend that the challenged materials implicate matters of public interest. Plaintiffs' APA challenge does not center on the underlying third-party models and proprietary information that Defendants used to conduct an actuarial update to flood insurance rates in the NFIP through Risk Rating 2.0. *See* Ondrich Decl. ¶ 16 (explaining that the public has access to "all that is necessary to calculate a Risk Rating 2.0 premium for a specific building in St. Charles Parish or any other location"). *See also St. Charles-Guillot Inv.*, 2024 WL 5440833, at *2 (recognizing that "[t]he public's interest in the sensitive financial information of the non-party individual who is Plaintiffs' managing member is, at best, minimal"). And in any event, as explained herein and in prior briefing before this Court, FEMA has gone through great lengths to inform the public about Risk Rating 2.0 objectives, coverage, and rates. *See supra*; Defs.' PI Opp'n at 16. The agency has had over 1,500 engagements with the public, policyholders, federal and local officials, stakeholder groups, industry groups, and insurance companies; it has published numerous press releases, fact sheets, Q&A, data sets, premium calculation worksheets, and other materials on its website and elsewhere to inform the public about Risk Rating 2.0; and it has responded to hundreds of media inquiries from national and local outlets. *See* Defs.' PI Opp'n at 16. The availability of these communications and public disclosures of data that are actually

13

relevant for assessing Risk Rating 2.0 more than blunt any presumptive concerns of public access, particularly when weighed against the compelling and countervailing harms to Verisk, CoreLogic, FEMA, and the general public if disclosure is allowed. *See St. Charles-Guillot Inv.*, 2024 WL 5440833, at *2 (granting sealing because the designating party has a "strong interest in keeping the[ ] detailed financial information in the third party's confidential business plan sealed," and the public has only a "relatively minimal interest in [that] particular information" (citation and internal brackets omitted)).

## <u>CONCLUSION</u>

For these reasons, the Court should deny Plaintiffs' motion and maintain the challenged pages containing confidential business information under seal until further order of the Court.

Date: June 16, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director
Civil Division, Federal Programs Branch

*/s/ Sarah M. Suwanda*
SARAH M. SUWANDA
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Phone: (202) 305-3196
E-mail: sarah.m.suwanda@usdoj.gov

*Counsel for Defendants*

14