**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

THE STATE OF LOUISIANA *et al.*,

*Plaintiffs*,

v.

DEPARTMENT OF HOMELAND SECURITY *et al.*,

*Defendants.*[1]

Action No. 2:23-cv-01839
Section P
District Judge Darrel J. Papillion
Magistrate Judge Eva J. Dossier

**DEFENDANTS' COMBINED MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

[1] The Complaint names as a Defendant Alejandro Mayorkas in his official capacity as then-Secretary of Homeland Security. Under Federal Rule of Civil Procedure 25(d), Markwayne Mullin, current Secretary of Homeland Security, is automatically substituted as a Defendant.

# TABLE OF CONTENTS


INTRODUCTION ........ 1

BACKGROUND ........ 3

I. The National Flood Insurance Program ........ 3

A. Program Overview ........ 3

B. Legacy Rating Approach for Premium Calculations ........ 5

C. Issues with the Legacy Rating Approach and Congressional Intervention ........ 6

II. Risk Rating 2.0 Improvements to the NFIP ........ 10

LEGAL STANDARD ........ 15

ARGUMENT ........ 16

I. Plaintiffs Lack Standing ........ 17

A. The Plaintiff States Have Not Established Standing ........ 17

B. The Plaintiff Parishes Have Not Established Standing ........ 22

II. FEMA Was Not Required to Undergo Notice-and-Comment Claim (Count VI) ........ 24

A. The APA's Notice-and-Comment Requirement Does Not Apply to Risk Rating 2.0 ........ 24

B. Plaintiffs Cannot Establish Any Prejudicial Error from FEMA's Failure to Undergo Notice and Comment ........ 31

III. Risk Rating 2.0 Is Not Contrary to Law and Does Not Violate FEMA's Statutory Authority (Count I) ........ 32

IV. Risk Rating 2.0 Is Not Arbitrary and Capricious (Counts II–IV) ........ 35

A. Risk Rating 2.0 Does Not Depart from Prior Policy ........ 36

1. Plaintiffs Fundamentally Misunderstand the Agency's Use of a Structure's Elevation to Assess Flood Risk ........ 38

2. Risk Rating 2.0 Does Not Narrow the Range of Flood Mitigation Measures But Actually Expands Them ........ 43

3. Congress Mandated the Phasing Out of Grandfathered Rates ........ 47

4. The Public Record Reflects FEMA's Transparency Efforts in Explaining Risk Rating 2.0 ........ 50

B. Risk Rating 2.0 Does Not Ignore Important Aspects of the Problem ........ 54

1. Risk Rating 2.0 Does Not Overestimate the Risk of Loss ........ 55

2. Risk Rating 2.0 Does Not Utilize Unreliable Topographic Data ........ 57

3. Risk Rating 2.0 Does Not Utilize Inaccurate Average Annual Loss Data ........ 59

4. Risk Rating 2.0 Does Not Ignore the Critical Role of Plaintiff Communities ........ 61

V. Risk Rating 2.0 Does Not Violate the Spending Clause (Count VIII) ........ 61

VI. Any Relief, If Granted, Should Be Limited in Scope ........ 67

CONCLUSION ........ 69

## TABLE OF AUTHORITIES

### Cases

*Adolph v. FEMA*,
854 F.2d 732 (5th Cir. 1988) .......... 27, 62, 63

*Aeronautical Repair Station Ass'n, Inc. v. FAA*,
494 F.3d 161 (D.C. Cir. 2007) .......... 32

*Am. Min. Cong. v. Mine Safety & Health Admin.*,
995 F.2d 1106 (D.C. Cir. 1993) .......... 30

*Am. Trucking Ass'ns v. Atchison, Topeka & Sante Fe Ry. Co.*,
387 U.S. 397 (1967) .......... 37

*Amin v. Mayorkas*,
24 F.4th 383 (5th Cir. 2022) .......... 29

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) .......... 21, 68

*Asiana Airlines v. FAA*,
134 F.3d 393 (D.C. Cir. 1998) .......... 25, 26

*Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
745 F.2d 677 (D.C. Cir. 1984) .......... 26

*Baylor Univ. Med. Ctr. v. Heckler*,
758 F.2d 1052 (5th Cir. 1985) .......... 27, 28

*Brown Express, Inc. v. United States*,
607 F.2d 695 (5th Cir. 1979) .......... 29

*Califano v. Yamasaki*,
442 U.S. 682 (1979) .......... 67

*California v. Texas*,
593 U.S. 659 (2021) .......... 68

*Cargill v. Garland*,
57 F.4th 447 (5th Cir. 2023), *aff'd*, 602 U.S. 406 (2024) .......... 68

*Cent. & S.W. Servs., Inc. v. EPA*,
220 F.3d 683 (5th Cir. 2000) .......... 69

*Charles C. Steward Mach. Co. v. Davis*,
301 U.S. 548 (1937) .......... 65

*City of Arlington v. FCC*,
668 F.3d 229 (5th Cir. 2012), *aff'd*, 569 U.S. 290 (2013) ....................32

*City of Coll. Station v. USDA*,
395 F. Supp. 2d 495 (S.D. Tex. 2005) ....................7

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .................... 17, 21

*Colville v. Becerra*,
Civ. No. 1:22CV113-HSO-RPM, 2023 WL 2668513 (S.D. Miss. Mar. 28, 2023) ....................22

*Combat Veterans for Cong. Pol. Action Comm. v. FEC*,
795 F.3d 151 (D.C. Cir. 2015) ....................31

*Crane v. Johnson*,
783 F.3d 244 (5th Cir. 2015) ....................19

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*,
45 F.4th 846 (5th Cir. 2022) ....................68

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ....................35

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ....................49

*Dorsey v. United States*,
567 U.S. 260 (2012) ....................24, 25, 26

*Drewett v. Aetna Cas. & Sur. Co.*,
539 F.2d 496 (5th Cir. 1976) ....................4

*El Paso Cnty. v. Trump*,
982 F.3d 332 (5th Cir. 2020),
*cert. denied sub. nom. El Paso Cnty. v. Biden*, 141 S.Ct. 2885 (July 2, 2021) .................... 18, 19

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ....................36

*Ensco Offshore Co. v. Salazar*,
Civ. A. No. 10-1941, 2011 WL 13203198 (E.D. La. Apr. 26, 2011) ....................7

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ....................37, 50, 51

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ....................35

*Fednav, Ltd. v. Chester*,
547 F.3d 607 (6th Cir. 2008) ........................................................................22

*FERC v. Elec. Power Supply Ass'n*,
577 U.S. 260 (2016) ........................................................................35

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) ........................................................................16

*Flight Training Int'l, Inc. v. FAA*,
58 F.4th 234 (5th Cir. 2023) ........................................................................30

*Franciscan All., Inc. v. Becerra*,
47 F.4th 368 (5th Cir. 2022) ........................................................................68

*Frederick L. v. Dep't of Pub. Welfare*,
157 F. Supp. 2d 509 (E.D. Pa. 2001) ........................................................................65

*Gill v. Whitford*,
585 U.S. 48 (2018) ........................................................................67

*Gowland v. Aetna*,
143 F.3d 951 (5th Cir. 1998) ........................................................................3

*Great Northern R. Co. v. United States*,
208 U.S. 452 (1908) ........................................................................25

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ........................................................................21

*Hertz v. Woodman*,
218 U.S. 205 (1910) ........................................................................25

*Highway J Citizens Grp., U.A. v. U.S. Dep't of Transp.*,
656 F. Supp. 2d 868 (E.D. Wis. 2009) ........................................................................29

*Howard v. Ashcroft*,
248 F. Supp. 2d 518 (M.D. La. 2003) ........................................................................26

*Indep. U. S. Tanker Owners Comm. v. Lewis*,
690 F.2d 908 (D.C. Cir. 1982) ........................................................................28

*In re FCC 11-161*,
753 F.3d 1015 (10th Cir. 2014) ........................................................................50

*James V. Hurson Assocs., Inc. v. Glickman*,
229 F.3d 277 (D.C. Cir. 2000) ........................................................................31

*Jones v. Am. Council on Exercise*,
No. CV H-15-3270, 2016 WL 6084636 (S.D. Tex. Oct. 18, 2016) ........29

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994) ........15

*La Casa Del Convaleciente v. Sullivan*,
965 F.2d 1175 (1st Cir. 1992) ........29

*Landor v. Louisiana Dep't of Corr. & Pub. Safety*,
146 S. Ct. 1931 (2026) ........66

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) ........31, 32

*Loc. 814, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen v. NLRB*,
546 F.2d 989 (D.C. Cir. 1976) ........7

*Louisiana by and through Landry v. Biden*,
64 F.4th 674 (5th Cir. 2023) ........24

*Louisiana Shrimp Ass'n v. Biden*,
789 F. Supp. 3d 467 (E.D. La. 2025) ........15, 16

*Marcello v. Bonds*,
349 U.S. 302 (1955) ........25

*McGair v. Am. Bankers Ins. Co. of Fla.*,
693 F.3d 94 (1st Cir. 2012) ........4

*MediNatura, Inc. v. Food & Drug Admin.*,
496 F. Supp. 3d 416 (D.D.C. 2020), *aff'd*, 998 F.3d 931 (D.C. Cir. 2021) ........49

*Menchaca v. Chrysler Credit Corp.*,
613 F.2d 507 (5th Cir. 1980) ........7

*Miami-Dade Cnty. v. EPA*,
529 F.3d 1049 (11th Cir. 2008) ........32

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........37

*N.C. Fisheries Ass'n v. Gutierrez*,
518 F. Supp. 2d 62 (D.D.C. 2007) ........35

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005) ........36

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) .......... 62, 63, 64, 66

*Nat'l Mining Ass'n v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2014) .......... 29

*Nat'l Rifle Ass'n of Am., Inc. v. McCraw*,
719 F.3d 338 (5th Cir. 2013) .......... 22

*Nat'l Wildlife Fed'n v. Snow*,
561 F.2d 227 (D.C. Cir. 1976) .......... 28

*New York v. United States*,
505 U.S. 144 (1992) .......... 62

*Olivares v. TSA*,
819 F.3d 454 (D.C. Cir. 2016) .......... 7

*Palmieri v. Allstate Ins. Co.*,
445 F.3d 179 (2d Cir. 2006) .......... 3, 27

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) .......... 65, 66

*Pennsylvania v. New Jersey*,
426 U.S. 660 (1976) .......... 21

*Pros. & Patients for Customized Care v. Shalala*,
56 F.3d 592 (5th Cir. 1995) .......... 31

*Reilly v. Ceridian Corp.*,
664 F.3d 38 (3d Cir. 2011) .......... 21

*Ross v. Blake*,
578 U.S. 632 (2016) .......... 25

*Roussell v. Allstate Ins. Co.*,
26 F. Supp. 3d 552 (E.D. La. 2014) .......... 27

*S. Glazer's Distrbs. of Ohio, LLC v. Great Lakes Brewing Co.*,
No. 2:16-CV-861, 2017 WL 5953431 (S.D. Ohio July 14, 2017) .......... 29

*Shinseki v. Sanders*,
556 U.S. 396 (2009) .......... 31

*Shuford v. Fid. Nat'l. Prop. & Cas. Ins. Co.*,
508 F.3d 1337 (11th Cir. 2007) .......... 28

*Sierra Club v. U.S. Dep't of Interior*,
990 F.3d 909 (5th Cir. 2021) ........ 16, 35

*Smiley v. Citi Bank (S.D.), N.A.*,
517 U.S. 735 (1996) ........ 39

*South Dakota v. Dole*,
483 U.S. 203 (1987) ........ 62, 64, 65

*Tex. Educ. Agency v. U.S. Dep't of Educ.*,
908 F.3d 127 (5th Cir. 2018) ........ 62

*Tex. Landowners Rights Ass'n v. Harris*,
453 F. Supp. 1025 (D.D.C. 1978), *aff'd*, 598 F.2d 311 (D.C. Cir. 1979) ........ 63

*Texas v. United States*,
126 F.4th 392 (5th Cir. 2025) ........ 68

*Texas v. Yellen*,
No. 2:21-CV-079-Z, 2022 WL 989733 (N.D. Tex. Mar. 4, 2022) ........ 63, 66

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........ 67

*Trump v. Hawaii*,
585 U.S. 667 (2018) ........ 67

*United States v. Johnson*,
632 F.3d 912 (5th Cir. 2011) ........ 31, 32

*United States v. Par. of St. Bernard*,
756 F.2d 1116 (5th Cir. 1985) ........ 66

*United States v. Texas*,
599 U.S. 670 (2023) ........ 19

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Hum. Servs.*,
985 F.3d 472 (5th Cir. 2021) ........ 55

*Univ. of Texas v. Camenisch*,
451 U.S. 390 (1981) ........ 29

*VanDerStok v. Garland*,
No. 23-10718, 2023 WL 4945360 (5th Cir. July 24, 2023) ........ 68

*Vt. Agency of Nat'l Res. v. United States*,
529 U.S. 765 (2000) ........ 24

*W & T Offshore, Inc. v. Bernhardt*,
946 F.3d 227 (5th Cir. 2019) ..... 30

*Warden, Lewisburg Penitentiary v. Marrero*,
417 U.S. 653 (1974) ..... 25

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ..... 7

**Statutes**

5 U.S.C. § 553 ..... 24, 27, 29

5 U.S.C. § 559 ..... 24

5 U.S.C. § 706 ..... 16, 67

42 U.S.C. § 4001 ..... 3, 6, 27, 64

42 U.S.C. § 4011 ..... 33, 42

42 U.S.C. § 4012a ..... 4

42 U.S.C. § 4013 ..... 26

42 U.S.C. § 4014 ..... *passim*

42 U.S.C. § 4015 ..... *passim*

42 U.S.C. § 4019 ..... 3

42 U.S.C. § 4022 ..... 3, 6

42 U.S.C. § 4071 ..... 3

42 U.S.C. § 4101b ..... 44, 58

42 U.S.C. § 4104 ..... 34

Biggert-Waters Flood Insurance Reform Act of 2012,
Pub. L. No. 112-141, 126 Stat. 405 ("BW-12") ..... 9, 24, 25, 48

Homeowner Flood Insurance Affordability Act of 2014,
Pub. L. No. 113–89, 128 Stat. 1020 ("HFIAA") ..... 10, 48

Additional Supplemental Appropriations for Disaster Relief Requirements Act, 2017,
Pub. L. No. 115-72, 131 Stat. 1224 ..... 10

**Regulations**

24 C.F.R § 203.16a ........ 4

24 C.F.R § 206.45 ........ 4

44 C.F.R. pt. 61 ........ 3

44 C.F.R. § 77.8 ........ 20, 21

**Other Authorities**

AIR Worldwide, A Retrospective On 10 Years of Modeling Hurricane Risk in a Warm Ocean Climate (2015), https://perma.cc/5R7P-5SCM ........ 56

Diane P. Horn & Baird Webel, *Introduction to the National Flood Insurance Program (NFIP)*, Cong. Research Serv., R44593 (updated Jan. 6, 2023), https://perma.cc/9AA9-7MMD ........ 48

Diane P. Horn & Baird Webel, *Introduction to the National Flood Insurance Program (NFIP)*, Cong. Research Serv., R44593 (Apr. 7, 2026), https://perma.cc/934A-XD7N ........ 6

Federal Emergency Management Agency, FEMA Review Council Members, https://perma.cc/KY92-KUSQ ........ 54

FEMA, *FEMA Policy Standards for Flood Risk Analysis and Mapping* (Dec. 11, 2019), https://perma.cc/L7U7-Q28G ........ 58

FEMA, Flood Insurance: Laws & Regulations, Questions about the Bigger-Waters Flood Insurance Reform Act of 2012, https://perma.cc/U5XV-45QC ........ 48

FEMA, Flood Risk Analysis and Mapping (Rev. 14), FEMA Policy #204-078-1 (Nov. 21, 2023), https://perma.cc/N6T5-JNNS ........ 58

FEMA: Levees in Risk Rating 2.0 (Apr. 2025), https://perma.cc/M38A-6G65 ........ 45

FEMA Review Council (FRC), Final Report: The President's Council to Assess the Federal Emergency Management Agency (May 7, 2026), https://perma.cc/5ZTS-N8WT ........ 15, 54

FEMA, *Risk Rating 2.0: Equity in Action – Industry Transition Memorandum* (Sept. 1, 2021), https://perma.cc/EVW8-TUAF ........ 37

FEMA, *Risk Rating 2.0: Equity in Action* (last updated June 5, 2023), https://perma.cc/H7T8-AZU2 .......... 11

GAO, GAO-06-497T, *GAO's High-Risk Program* (Mar. 15, 2006), https://perma.cc/C5JM-HL7M .......... 7

GAO, GAO-23-106203, *High-Risk Series: Efforts Made to Achieve Progress Need to be Maintained and Expanded to Fully Address All Areas* (Apr. 20, 2023), https://perma.cc/K6BB-HCS3 .......... 15

GAO, GAO-23-105977, *FEMA's New Rate-Setting Methodology Improves Actuarial Soundness but Highlights Need for Broader Program Reform* (July 2023), https://perma.cc/39NGPY86 .......... 49

Nat'l Rsch. Council, *Levees and the National Flood Insurance Program: Improving Policies and Practices* (2013), https://doi.org/10.17226/18309 ("*NRC Levees*") .......... 8, 9

NFIP Flood Insurance Manual, Risk Rating 2.0: Equity in Action Edition (October, 2025), https://perma.cc/UDT8-DMMG .......... 34

Pew Rsch. Center, *Pew Commends National Flood Insurance Program for Connecting Premiums and Flood Risk* (Apr. 1, 2022), https://perma.cc/A7RW-YT2B .......... 15

SBA, Lender and Development Company Loan Programs, SOP 50 10 5(K) (Apr. 1, 2019), https://perma.cc/RX3K-QBP4 .......... 4

# INTRODUCTION

In March 2019, Defendant Federal Emergency Management Agency ("FEMA") announced that it would implement an actuarial update to the premiums for flood insurance provided by the National Flood Insurance Program ("NFIP"), the federal program that it administers to protect millions of Americans from the devastating financial impacts of flood disasters. This update, known as Risk Rating 2.0, modernizes the NFIP's outdated rate-setting approach from the 1970s with a 21st century approach that leverages industry best practices, up-to-date technology, better data, and fundamental actuarial principles and methods. Risk Rating 2.0 is the culmination of years of work by FEMA to correct critical inadequacies in its legacy rating approach, and it has enabled FEMA to deliver premium rates that, consistent with congressional mandates, are actuarily sound because they reflect each covered property's true flood risk and are fairly distributed based on individual risk levels.

From day one, FEMA has prioritized transparency with respect to this update: it has engaged in a comprehensive, multi-year effort to communicate with the public, media, state and local governments, and stakeholder groups about Risk Rating 2.0, releasing copious information about the necessary changes it made to the NFIP, what it did not change, its justifications and impacts, and its underlying data sources and methods. In other words, FEMA has dedicated years of effort to develop and implement Risk Rating 2.0 in accordance with congressional mandates and has shown its work.

NFIP policyholders and the American public have reaped the reward. The actuarial update under Risk Rating 2.0 halted the indefinite annual premium increases that would have continued to occur annually under the legacy rates. And the vast majority of policies have seen premium decreases or only slight increases under Risk Rating 2.0, with many policies set to achieve premium rates that actually and fully reflect their properties' risk levels in the coming years. For more than a decade, various stakeholder groups asked for precisely the changes that Risk Rating 2.0 implemented, and

since going into effect, many have heralded it as essential to the NFIP's ability to continue to provide flood insurance coverage across the country and pay out claims.

Nonetheless, more than seven years after FEMA first announced Risk Rating 2.0, and nearly six years after FEMA began implementation, Plaintiffs—a subset of States and communities—now seek to vacate Risk Rating 2.0. Plaintiffs' motion is without merit. Plaintiffs wrongly ask the Court to upend the status quo—which is that Risk Rating 2.0 has applied to NFIP policies for multiple years and has been fully implemented across the country—and do so simply because some policyholders in their States and communities are now paying higher premiums based on a more accurate, congressionally mandated assessment of their flood risks, and are no longer being subsidized by policyholders in less flood-prone areas. That some policyholders are now paying higher premiums commensurate with their actual risk does not entitle Plaintiffs to relief.

Plaintiffs' motion should be denied for several reasons. For one, Plaintiffs have not suffered a concrete, redressable Article III injury. By contrast, vacatur would seriously harm the government and the American public by preventing FEMA from ensuring the actuarial soundness and fiscal solvency of the NFIP while also completely disrupting the program's administration. On the merits, Plaintiffs have not met their summary-judgment burden, as they (1) disregard FEMA's clear statutory mandate to estimate and set premium rates based on actuarial principles, as Risk Rating 2.0 does; (2) conveniently ignore the agency's robust public explanations considering all relevant factors and justifying Risk Rating 2.0 based on legitimate grounds; and (3) distort Risk Rating 2.0 beyond recognition to assert notice-and-comment and Spending Clause violations where none exist. Accordingly, the Court should deny Plaintiffs' motion and grant summary judgment to Defendants.

## BACKGROUND

### I. The National Flood Insurance Program

#### A. Program Overview

The NFIP, a federal flood insurance program, is the primary source of flood insurance coverage for residential properties in the country, providing roughly $1.3 trillion in coverage and servicing nearly five million insurance policies across the United States. AR00186799.

Before the NFIP, most Americans lacked access to flood insurance and relied solely on federal disaster relief after floods, as most private insurers could not profitably underwrite flood insurance policies with reasonable terms and therefore did not do so. *See, e.g.*, *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 183 (2d Cir. 2006). To remedy this issue and reduce fiscal pressure on federal relief efforts after recurring flood disasters, Congress created the NFIP through the National Flood Insurance Act of 1968, 42 U.S.C. § 4001 *et seq.* (the "NFIA")—with the goal of making flood insurance "available on a nationwide basis" and basing the insurance "on workable methods of pooling risks, minimizing costs, and distributing burdens equitably among those who will be protected by flood insurance and the general public[,]" 42 U.S.C. § 4001(d). Congress then tasked FEMA with administering the NFIP. *Id.* §§ 4011(a), 4019.

Through the NFIP, FEMA offers flood insurance to all property owners who live in communities that choose to adopt minimum floodplain management standards. *See id.* § 4022(a)(1) (requiring "adequate land use and control measures"). Property owners can purchase a standard flood insurance policy ("SFIP") directly from FEMA or through a private write your own ("WYO") insurance company, which acts as a fiscal agent of the United States. *Id.* § 4071(a); *see, e.g.*, *Gowland v. Aetna*, 143 F.3d 951, 953 (5th Cir. 1998). In either case, the policy must contain the terms, conditions, exclusions, limitations, and rights of the SFIP found at 44 C.F.R. pt. 61, app. A(1)-(6).

Separately, the NFIA mandates that homeowners in a special flood hazard area ("SFHA") purchase flood insurance as a condition of receiving a federally backed mortgage, certain federally regulated loans, or certain types of disaster relief. 42 U.S.C. § 4012a. Homeowners, though, are under no obligation to do so through the NFIP; they may instead purchase flood insurance on the private market. *See, e.g.*, *id.* § 4012a; 24 C.F.R §§ 203.16a, 206.45; SBA, Lender and Development Company Loan Programs, SOP 50 10 5(K), at 342 (Apr. 1, 2019), https://perma.cc/RX3K-QBP4.

Under the NFIA, Congress authorized FEMA to estimate and set premium rates for policies under the NFIP. *See* 42 U.S.C. §§ 4014(a), 4015(a). FEMA pays policyholders for any validly submitted claims using the premiums that it collects, backed by the federal treasury. *See, e.g.*, *McGair v. Am. Bankers Ins. Co. of Fla.*, 693 F.3d 94, 95–96 (1st Cir. 2012) (federal treasury "is responsible for paying claims that exceed the revenue generated by [NFIP] premiums"). Except for certain congressionally authorized subsidies, FEMA, by statute, must estimate the premiums required to make flood insurance available on an actuarial basis, *i.e.*, "based on consideration of the risk involved and accepted actuarial principles," in accordance with the "principles and standards of practice in ratemaking adopted by the American Academy of Actuaries and the Casualty Actuarial Society." 42 U.S.C. § 4014(a)(1)(A)(i), (B)(iv); *Drewett v. Aetna Cas. & Sur. Co.*, 539 F.2d 496, 498 (5th Cir. 1976) ("The [NFIP] also requires ongoing actuarial studies to help set the premiums to be charged." (citing 42 U.S.C. § 4014)). This means that FEMA must calculate NFIP rates to reflect the true flood risks to each property—the expected value of all future costs due to flooding for each property. *See, e.g.*, AR00176964. Although FEMA may charge less than the actuarial rate "where necessary," 42 U.S.C. § 4015(a)(1), "it is clear that Congress did not intend" the NFIP "to abrogate standard insurance law principles which affect such estimates and risks[,]" *Drewett*, 539 F.2d at 498. Congress instead intended for the NFIP "to operate much like any private insurance company," where "the premiums actually charged … equal[ed] the actuarial cost of flood insurance." *Id.* One important limitation, however,

is that FEMA cannot raise an individual premium rate by more than 18% each year for most policies. *See* 42 U.S.C. § 4015(e).[2]

**B. Legacy Rating Approach for Premium Calculations**

Between the 1970s and 2021, FEMA calculated premiums using a methodology that did not consider an individual property's cost or other factors that fully reflected an individual property's flood risk or cost to rebuild after flooding. Instead, in line with general insurance practices in the 1970s, FEMA established premiums using basic and static geographic and structural characteristics to classify properties, including the following:

> (1) The location of the property on a Flood Insurance Rate Map ("FIRM"), which is a map that is based on flood studies of river and coastal flooding and that FEMA developed to display various flood risk zones for each community;
>
> (2) The elevation of the structure relative to the Base Flood Elevation ("BFE"), which is the elevation at which there is 1% percent chance of flooding in a given year; and,
>
> (3) The occupancy type.

AR00173627; AR00186156–AR00186158. FEMA considered these characteristics to calculate expected losses for groups of properties that were similar in flood risk based on their basic structural elements and flood zone—which, pursuant to FEMA's nationwide rating approach, could span many geographic areas—and then assigned the same rate to all policies in a group. As the Congressional Research Service summarized about FEMA's legacy rates:

> [T]wo properties that are rated as the same NFIP risk (e.g., both are one-story, single-family dwellings with no basement, in the same flood zone, and elevated the same number of feet above the BFE), are charged the same rate per $100 of insurance, although they may be located in different states with differing flood histories or rest on different topography, such as a shallow floodplain as opposed to a steep river valley.

---

[2] Under 42 U.S.C. § 4014(a)(2), as modified, the following categories of properties are required to have their premium increased by 25% per year until they reach full risk-based rates: (1) nonprimary residences; (2) nonresidential properties; (3) business properties; (4) properties with severe repetitive loss; (5) properties with substantial cumulative damage; and (6) properties with substantial damage or substantial improvement after July 6, 2012. The 18% annual cap on premium increases does not apply to these properties.

> In addition, two properties in the same flood zone are charged the same rate, regardless of their location within the zone.

AR00186157 (footnotes omitted).

Various subsidies and discounts also affected NFIP premiums in FEMA's legacy pricing system. FEMA offered subsidized rates for properties built or substantially improved before December 31, 1974, or before FEMA published the first FIRM for the relevant community ("pre-FIRM" subsidies), 42 U.S.C. § 4015(c); for certain properties newly mapped into an SFHA, *id.* § 4015(i); and for certain property owners to maintain their old flood insurance rate class (their "grandfathered" rate) if their property was remapped into a new flood rate class, *e.g.*, a higher-risk flood zone, AR00173632–AR00173633. *See also* AR00186160. FEMA also provided discounts to policyholders who take certain qualifying mitigation measures such as elevating their property. AR00186165. For example, FEMA's Community Rating System ("CRS") offered discounts to policyholders who live in communities that voluntarily go beyond FEMA's minimum floodplain management standards and implement projects that reduce flood and erosion risk in various ways. 42 U.S.C. § 4022(b); *see also* AR00027604. (The amount of the discount depended on, among other things, the location of the covered building; for example, buildings outside of an SFHA were eligible only for a 5-10% discount, whereas most buildings inside the area were eligible for discounts up to 45%.)

### C. Issues with the Legacy Rating Approach and Congressional Intervention

Over the years, the NFIP achieved its goal of making flood insurance "available on a nationwide basis," 42 U.S.C. § 4001(d), but has also experienced major issues. On the one hand, the NFIP has nearly 5 million policies in over 22,000 communities across the country, collects about $4.6 billion in annual revenue from policyholders' premiums (as well as fees and surcharges), and provides roughly $1.3 trillion in flood coverage. *See* Diane P. Horn & Baird Webel, *Introduction to the National Flood Insurance Program (NFIP)*, at 1, Cong. Research Serv., R44593 (Apr. 7, 2026), https://perma.cc/934A-XD7N. In all, by supporting flood hazard reduction grant programs and

floodplain management efforts, the NFIP has estimated that it avoids more than $2.4 billion in flood-related losses annually. Declaration of David I. Maurstad ¶ 10, ECF No. 56-1 ("Maurstad Decl."); AR00177112.[3] On the other hand, FEMA has collected $60 billion in NFIP premiums but has paid $96 billion in costs over the last 50 years due to severe catastrophes, leading multiple governmental and nonprofit entities to raise serious concerns about NFIP pricing inadequacies and the program's fiscal solvency. Maurstad Decl. ¶¶ 67–87, 97–101; AR00008069; AR00028804; AR00124646; AR00003573; AR00022733; AR00027324; AR00204638; AR00029884 (summarizing the reports in detail).

The United States Government Accountability Office ("GAO") has authored multiple reports highlighting longstanding issues with FEMA's rate setting and solvency under the NFIP. In 2006, GAO placed the NFIP on its list of high-risk government programs. GAO, GAO-06-497T, *GAO's High-Risk Program*, at 6 (Mar. 15, 2006), https://perma.cc/C5JM-HL7M (noting that Hurricane Katrina, Rita, and Wilma losses in 2005 would dwarf by an estimated $8 billion the cost of claims paid in the NFIP's entire history). GAO explained that the NFIP "is not actuarily sound" due to the "number of policies in force that are subsidized"—subsidies, which in turn "contribute[] to continuing losses to the program." *Id.* at 8. Two years later, GAO issued another report, concluding that FEMA's NFIP rate setting "may not ensure that the rates accurately reflect the actual risk of flood damage,"

[3] The Court can and should consider declarations referenced herein as they elucidate the record before FEMA when the agency developed and implemented Risk Rating 2.0, and therefore facilitate judicial review of whether the agency acted reasonably and adequately justified its actions. Courts regularly consider agency declarations under these circumstances. *See, e.g.*, *Olivares v. TSA*, 819 F.3d 454, 463–64 (D.C. Cir. 2016); *Ensco Offshore Co. v. Salazar*, Civ. A. No. 10-1941, 2011 WL 13203198, at *1–2 (E.D. La. Apr. 26, 2011); *City of Coll. Station v. USDA*, 395 F. Supp. 2d 495, 505 n.4 (S.D. Tex. 2005); *Loc. 814, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976) (courts can consider declarations where record cannot illuminate agency's decisionmaking). The declarations are also permissible to explain the harms to FEMA and the public interest if the Court were to enter an injunction, *see, e.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24–25 (2008), and on the question of whether Plaintiffs have plausibly asserted a concrete, redressable injury in fact for standing, *see, e.g.*, *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980).

because FEMA (1) relied on "outdated or inaccurate" data inputs; (2) allowed for rate grandfathering, which eroded FEMA's ability to set rates that reflect the actual risk of flooding and generate sufficient premiums to cover expected losses; and (3) combined flood zones across many geographic areas, which prevented individual policies from reflecting the unique topographical features that affect flood risk. AR00008075–AR00008076. As a result, GAO concluded that without changes to the rate-setting process, NFIP premiums would be unable to cover claims and expenses as well as the NFIP's mounting debt, "exposing the federal government and ultimately taxpayers to ever-greater financial risks." AR00008076–AR00008077 (noting that after the 2005 hurricanes, NFIP debt had rapidly risen from $2 billion to $17 billion). GAO then recommended that FEMA take "steps to ensure that its rate-setting methods and data used to set rates results in the full-risk premium rates that accurately reflect the risk of losses from flooding." AR00008077. GAO issued subsequent reports with similar findings and recommendations in 2016 and 2017, predating FEMA's implementation of Risk Rating 2.0. *See* AR00028822–AR00028831; AR00025282–AR00025293.

The National Research Council ("NRC")[4] published a 2013 book that also identified several flaws in the NFIP's rating approach. Nat'l Rsch. Council, *Levees and the National Flood Insurance Program: Improving Policies and Practices* (2013), https://doi.org/10.17226/18309 ("*NRC Levees*"). As it explained, the NFIP's outdated system of designating flood rates based on whether a property was mapped in a particular zone resulted in circumstances where two houses next door to each other, but on either side of a zone boundary, "are exposed to essentially a similar hazard" yet charged much different rates. *Id.* at 80. Compounding the problem, the NRC explained, was that FEMA had not identified enough flood zones to reflect, via differentiated rates, the variability of flood risk within a particular zone and between the same type of zone in different geographic areas. *Id.* at 81. The NRC recommended that

[4] The NRC is part of the National Academies, which are non-profit, congressionally chartered organizations that produce independent policy reports.

the NFIP "incorporat[e] more exact and detailed probability-of-inundation calculations instead of using a small number of rating zones and assuming the flood hazard to be uniform across the entire zone across the entire country," and "detailed economic damage models … used in the private risk market" to develop "more risk-based premium at the structure level." *Id.* at 80.[5]

In its December 2016 annual report, the Technical Mapping Advisory Council ("TMAC")[6] similarly critiqued the NFIP legacy rating approach for producing flood insurance premiums that "do not reflect structure-based risk." AR00027360. It explained that the NFIP's methods were developed decades ago and did not take advantage of modern technology, AR00027360, and that FEMA should modernize by moving away from its old mapping process and instead setting rates "based on the nature and severity of the flood hazard, structure elevation and other characteristics, as well as structure damage functions and vulnerability," AR00027361. TMAC recommended leveraging modern technology "to estimate the likelihood of floods of different water elevation and the resulting damage to the individual structure." AR00027362.

Echoing these critiques, in 2017, the Congressional Budget Office ("CBO") released a report detailing concerns with the NFIP's fiscal solvency. AR00029884. The CBO estimated that, based on the difference between expected costs and premiums, the NFIP would face a one-year shortfall of $1.4 billion, on top of its outstanding $24.6 billion in debt. AR00029884; AR00029913. The CBO recommended that FEMA take several steps, including "reducing the use of discounted rates" and "[b]etter align[ing] premiums with risks." AR00029884–AR00029885 (emphasis omitted).

Congress has since intervened multiple times to address some of these NFIP issues. In 2012, Congress passed the Biggert-Waters Flood Insurance Reform Act of 2012, Pub. L. No. 112-141, 126

---

[5] The Council also critiqued the NFIP for considering only "accredited" levees, *i.e.*, those FEMA determined would reduce hazards posed by a 1% chance annual flood, even though unaccredited ones "provide[] some (potentially considerable) protection against flood[s]." *NRC Levees* at 36.
[6] TMAC is a federal advisory committee that reviews and makes recommendations to FEMA.

Stat. 405 ("BW-12"), which enacted major changes to the NFIP to ensure its sustainability, including the phasing out of certain pre-FIRM and other grandfathering subsidies, so that premiums better implemented actuarial principles and more accurately reflected the full expected losses from floods. Two years later, Congress amended BW-12 through the Homeowner Flood Insurance Affordability Act of 2014, Pub. L. No. 113–89, 128 Stat. 1020 ("HFIAA"), which restored grandfathering and put in place the 18% cap on annual premium increases (down from 25%), but also imposed a surcharge on all policies to offset the subsidized ones and required FEMA to increase premiums for most subsidized properties by no less than 5% annually[7] until the premium reaches its full-risk rate. This statutory directive requires FEMA to phase out subsidies and move NFIP policies to full risk rates over time, subject to the annual 18% cap on rate increases.

With this congressional mandate, FEMA developed and implemented Risk Rating 2.0.[8]

## II. Risk Rating 2.0 Improvements to the NFIP

Risk Rating 2.0 represents the culmination of seven years of work by FEMA to coordinate and collaborate with WYO companies, agents, vendors, stakeholder groups, members of Congress and their staff, subject matter experts, and industry groups to improve the NFIP rating methodology. Using industry best practices, improved flood risk data, and modern technology, Risk Rating 2.0 updates the NFIP pricing approach, in accordance with the NFIA's mandate, to calculate expected flood losses more accurately. It utilizes current technology and a more comprehensive set of risk factors than were used for legacy rates, thereby distributing NFIP premiums across all policyholders

---

[7] This 5% increase requirement does not apply to those properties subject to 25% premium increases.

[8] Congress also intervened in October 2017 to forgive $16 billion in NFIP debt. Additional Supplemental Appropriations for Disaster Relief Requirements Act, 2017, Pub. L. No. 115-72, 131 Stat. 1224. The NFIP's debt now stands at $22.525 billion. *See* Defs.' Ex. 1, Declaration of Elizabeth Asche ¶ 64 ("Asche Decl."), attached herein.

more equitably, based on the value of their home and the unique flood risk of their property.[9]

Risk Rating 2.0 updates the NFIP pricing methodology in several key respects. Risk Rating 2.0 does not base premiums solely on a property's location and elevation in a FIRM flood zone, but also considers a wide range of (a) more specific geographic variables and data, including the distance to water and the type of water (*e.g.*, river, lake, or coast), the drainage area of the river, levee data, whether or not the structure is on a barrier island or behind a levee, and the elevation of the structure relative to the flooding source; and (b) more specific structural variables, including foundation type, type of use, floors of interest, and first floor height. *See, e.g.*, Maurstad Decl. ¶¶ 66, 107, 112; AR00186806. *See also* AR00185952.[10] The end result is that Risk Rating 2.0 improves the NFIP by more accurately measuring risk, no longer relying solely on basic rating variables that resulted in policyholders paying different premiums for similar levels of flood risk, or the same amount for different levels of risk, based largely on being located in or out of an SFHA. Maurstad Decl. ¶¶ 73–75, 110–12.

Furthermore, Risk Rating 2.0 utilizes catastrophe models that draw on a range of flood risk data—beyond just the limited river and coastal flooding data that the legacy approach considered[11]—to better estimate future potential loss due to flood events. AR00203155–AR00203158; Maurstad Decl. ¶¶ 28, 121, 123 (describing expansion from legacy approach's limited consideration of flood risk

[9] Risk Rating 2.0 premium rates have been in effect for all new policies, as well as existing policies whose policyholders opted to utilize the new rates, since October 1, 2021. FEMA, *Risk Rating 2.0: Equity in Action* (last updated June 5, 2023), https://perma.cc/H7T8-AZU2. Risk Rating 2.0 began to take effect for all other policies on April 1, 2022—applying on their renewal—and was fully implemented as of April 1, 2023. *Id.*

[10] Previously, premiums did not consider replacement cost. FEMA applied the same premium for $250,000 in coverage for a house that cost $250,000 and one that cost $5 million, even though the same flood has a much higher probability of causing $250,000 in damage to the higher-value house. Maurstad Decl. ¶¶ 113–15; AR0018953.

[11] Risk Rating 2.0 considers a broader range of flood frequencies and sources, including pluvial flooding (flooding due to heavy rainfall), flooding due to tsunami, Great Lakes flooding, and flooding in leveed areas. AR203155–AR203161; *see also* Maurstad Decl. ¶ 123.

posed by the 1%-annual-chance riverine flood and the 1%-annual-chance coastal flood). A catastrophe model is a computerized process that simulates potential catastrophic events based on historical event data, scientific research, engineering methods, and statistical analysis; the simulated events generate scenarios of disaster frequency, severity, and location. *See, e.g.*, AR00195077. Such modeling is necessary because catastrophic risk, such as for floods, tornadoes, and earthquakes, cannot be estimated well from historical losses; single, unpredictable events such as Hurricane Katrina can significantly increase NFIP flood losses in the aggregate and materially alter the distribution of these losses among states. *See* AR00061236; Maurstad Decl. ¶¶ 88–89. For example, in the year after Katrina, Louisiana went from accounting for 12% of NFIP payouts to 49%. Maurstad Decl. ¶ 88. So, rather than relying just on historical flood frequencies to calculate potential losses from infrequent and severe events, Risk Rating 2.0 relies on catastrophe modeling to build off the historical data to statistically predict probabilities of future flood events and then calculates premiums each year that account for the current risks these potential flood events pose. *Id.* ¶¶ 126–27. The use of catastrophe models in this manner has become standard practice for insurance companies. AR00061244; Maurstad Decl. ¶¶ 92, 109, 125.

Moreover, FEMA's enhanced understanding of flood risk exposure based on the Risk Rating 2.0 catastrophe modeling required it to increase the average annual loss ("AAL")—the calculation of the NFIP's aggregate expected loss amount per year for all policyholders, which in turn dictates the total amount of premiums FEMA must collect across the NFIP to pay out claims. Maurstad Decl. ¶¶ 29–30. Whereas in the past, FEMA had set the AAL at $3.2 billion based on historical data, it increased the AAL to $4.1 billion based on catastrophe modeling outputs showing that FEMA's aggregate premium calculations have been far below its expected losses and actual losses for almost two decades. *Id.*

Finally, Risk Rating 2.0 implements a centralized rating engine. A rating engine is the software system that insurers use to combine all aspects of the rating data and methodology to generate premiums for a quote or policy. *Id.* ¶ 35 n.32. Whereas before, the NFIP utilized numerous rate tables through which insurers could manually calculate premiums, Risk Rating 2.0 implements a single engine, which streamlines the process for insurance agents to sell policies and for customers to buy them. *Id.* ¶¶ 36–39, 146–51.

Although Risk Rating 2.0 reflects years of technological modernization, it does maintain—*and in fact enhances*—certain aspects of the legacy NFIP rating approach. Risk Rating 2.0 still incorporates the basic variables utilized in the legacy approach, *id.* ¶¶ 160–64; AR00186867–AR00186902, and continues to set rates that reflect the flood risk reduction provided by levees, Maurstad Decl. ¶¶ 165–66; AR00223291.[12] In fact, Risk Rating 2.0 does not eliminate mitigation discounts for policyholders, as it offers premium reductions for those undertaking mitigation activities such as elevating a structure and installing flood openings in foundation walls. Maurstad Decl. ¶¶ 167–68; AR00186093; AR00186889–AR00186892.[13] Risk Rating 2.0 likewise maintains discounts for those residing in a CRS participating community, and it actually expands those discounts by applying them to all policyholders in the community whose structure complied with minimum floodplain management requirements, not just those policyholders residing in an SFHA. Maurstad Decl. ¶¶ 193–94, 199–200; AR00203171;

[12] Risk Rating 2.0 in fact acknowledges *a wider range of levees* than the legacy system by considering unaccredited levees and by incorporating levee data from the United States Army Corps of Engineers' national database of levees in its catastrophe models. Maurstad Decl. ¶¶ 129–40; AR00223295–AR00223296; AR00203158; AR00203167.

[13] Risk Rating 2.0 in fact *increases these discounts nationwide*, and in the Plaintiff States, by making them available outside of SFHAs. Maurstad Decl. ¶ 167; AR00186889–AR00186902. For example, 712,991 policyholders nationwide and 32,456 Louisiana policyholders received mitigation discounts for elevating an insured structure as of September 1, 2021, before Risk Rating 2.0 applied to any policies, and 4,638,600 policyholders nationwide, and 459,626 Louisiana policyholders, received such discounts as of June 21, 2023. Maurstad Decl. ¶¶ 169, 173.

AR00186870.[14] Finally, Risk Rating 2.0 does not eliminate premium discounts for pre-FIRM subsidized properties and properties newly mapped into an SFHA. AR00186095; AR00186870. That does not mean that Risk Rating 2.0 will upend the statutory process that began with BW-12, which requires the phasing out of certain subsidies and placing of all policies on a glide path to ultimately reach full actuarial rates. AR00186095; AR00223257. Regardless of whether FEMA utilizes the 1970s-era legacy rating approach or Risk Rating 2.0, it must—by congressional mandate—move premiums to full risk rates, subject to the 18% cap on annual premium increases (or the 25% cap for certain properties). Maurstad Decl. ¶¶ 155–58.

Risk Rating 2.0 has resulted in 97% of policyholders seeing, on average, either an immediate decrease in monthly premiums or a $20 or less per month increase in premiums. *Id.* ¶ 44 (19% of policyholders saw immediate decrease in premiums; 70% of policyholders saw up to a $10 per month increase; and 8% of policyholders saw between a $10-$20 per month increase). Nationwide, policyholders saw annual decreases totaling approximately $577 million ($627 per policy) upon their first renewal under Risk Rating 2.0. *Id.* ¶ 24. Many policyholders in the Plaintiff States and communities saw such decreases, or alternatively only modest increases of $10 or less per month. In Louisiana, for example, 16% of policyholders saw a decrease in their premiums, and 74% saw an increase of only $10 or less per month. *Id.* ¶ 47. And policyholders in several parishes in Louisiana saw more dramatic savings under Risk Rating 2.0: 94% of policies in Tensas Parish saw a decrease, and the same goes for 85% of policies in Bossier Parish and Catahoula Parish. *Id.* ¶ 51. In Virginia, 42% of policies saw a decrease, and nearly 52% saw an increase of only $10 or less per month. *Id.* ¶ 47. Some policyholders in certain communities have seen and will see more pronounced monthly

[14] Taking just Louisiana as an example: On September 1, 2021, 156,263 policies received CRS discounts that totaled $26,564,761, but as of June 21, 2023, 366,435 policies received CRS discounts that totaled $94,647,067. Maurstad Decl. ¶ 202.

premium increases, however, due to their increased risk of flood damage. That is precisely the result one would expect if premiums track actual flood risk. Indeed, the 3% of policyholders seeing premium increases of greater than $20 per month have policies whose rates had previously been far below what was warranted by the actual property-specific risk because their flood insurance rates were being subsidized by other policyholders with lower flood risk and the taxpayers as well. *Id.* ¶¶ 32–33, 44.

In the ensuing years since implementation, many have heralded Risk Rating 2.0 because it modernizes rate setting to "allow[] FEMA to establish premium rates that more fully reflect the risk of losses due to flooding" and address the NFIP's solvency issues. GAO, GAO-23-106203, *High-Risk Series: Efforts Made to Achieve Progress Need to be Maintained and Expanded to Fully Address All Areas* (Apr. 20, 2023), https://perma.cc/K6BB-HCS3; *see also, e.g.*, Pew Rsch. Center, *Pew Commends National Flood Insurance Program for Connecting Premiums and Flood Risk* (Apr. 1, 2022), https://perma.cc/A7RW-YT2B. Indeed, as recently as May 2026, the President's FEMA Council, through which current and former governmental representatives of Plaintiff States Florida, Mississippi, and Texas served as members, heralded improvements to the NFIP and recommended the "continued implementation of Risk Rating 2.0 and revising [of] flood maps to inform the American people about their true risk." *See* FEMA Review Council (FRC), Final Report: The President's Council to Assess the Federal Emergency Management Agency (May 7, 2026), https://perma.cc/5ZTS-N8WT.

## LEGAL STANDARD

A plaintiff bears the burden of demonstrating that the court has jurisdiction over the claim. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). If the plaintiff fails to carry that burden at any time, the court must dismiss the action, including at the summary-judgment stage. Fed.R. Civ. P. 12(h)(3).

On the merits, "[s]ummary judgment is the appropriate mechanism for reviewing the final action of a government agency under the APA." *Louisiana Shrimp Ass'n v. Biden*, 789 F. Supp. 3d 467,

477 (E.D. La. 2025). "In such a case, a motion for summary judgment stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the court's review." *Id.* (citations omitted). Thus, "[t]he court must decide, as a matter of law, whether an agency's action is supported by the administrative record and consistent with the APA standard of review." *Id.* (citations omitted). *See also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the administrative record."); *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021) (judicial review of arbitrary-and-capricious claims is "narrow and highly deferential" to the agency).

**ARGUMENT**

The Court should enter summary judgment for Defendants on all remaining counts.[15] To begin, neither the Plaintiff States nor the Plaintiff Parishes have established Article III standing. Their reliance on unsubstantiated allegations of a daisy-chain of speculative events demonstrates that their purported injuries are neither certainly impending nor redressable. But even beyond those threshold defects, Plaintiffs err in presuming that notice-and-comment under the APA was required here. To the contrary, Risk Rating 2.0 complies with FEMA's statutory mandate to set premium rates that are actuarily sound. Plaintiffs cannot dispute that fundamental point, and their attempts to emphasize technical differences between the legacy method and Risk Rating 2.0 obscures FEMA's statutory mandate and what the record makes clear: FEMA engaged in a comprehensive, multi-year effort to communicate with the public, media, state and local governments, and stakeholder groups about Risk

---

[15] Plaintiffs moved for summary judgment on certain remaining claims, Counts I–IV, VI, and VIII; they did not move for summary judgment as to Counts V and VII. *See* Pls.' Mot. for Summ. J., ECF No. 195. Defendants presume that Plaintiffs have dropped those claims, and for avoidance of doubt, incorporate by reference their arguments in response to Counts V and VII. *See* Defs.' Mem. in Opp. to Pls.' Mot. for Prelim. Inj. at 16–17, 27–29, ECF No. 56 ("Defs.' PI Opp'n"). On either basis, the Court should enter judgment for Defendants on Counts V and VII.

Rating 2.0's actuarial update, releasing copious information about the necessary changes it made to the NFIP, what it did not change, its justifications and impacts, and its underlying data sources and methods. Put simply, FEMA has dedicated years of effort to develop and implement Risk Rating 2.0 in accordance with its congressional command and has shown its work. The APA requires nothing more.

## I. Plaintiffs Lack Standing

To establish Article III standing, a plaintiff must seek relief for an injury that is: (1) "concrete, particularized, and actual or imminent"—*i.e.*, an "injury in fact"; (2) "fairly traceable to the challenged action"; and (3) "redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation modified). While the Court found that Plaintiffs had adequately alleged standing for purported rebuilding and reimbursement costs at the pleading stage, at summary judgment, a plaintiff "can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts establishing standing." *Id.* at 412 (citation modified). Neither the Plaintiff States nor the Plaintiff Parishes have done so here.[16]

### A. The Plaintiff States Have Not Established Standing

The Plaintiff States' purported injury, at summary judgment, boils down to a single claim: Risk Rating 2.0's increased premium rates (for some) will cause a majority of NFIP policyholders to drop required coverage, which will in turn inflict increased regulatory burden on the Plaintiff States based on the fear that FEMA will seek reimbursement for already distributed federal grants associated with

[16] Plaintiffs preserve the theories of standing rejected by this Court at the motion-to-dismiss stage. *See* Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J. at 15 n.5, ECF No. 195-2 ("Pls.' Br."). Defendants likewise preserve and incorporate by reference their arguments as to those dismissed standing theories for purposes of this suit.

the NFIP.[17] The Court, at the motion-to-dismiss stage, allowed the Plaintiff States to proceed on that "reimbursement cost" theory of injury—despite being predicated on a series of events by third parties—because Plaintiffs *alleged* that "Risk Rating 2.0 results in higher premiums for a *majority* of policyholders and that these higher rates will cause people to drop their policies." Order and Reasons at 27, ECF No. 100 ("Op.") (emphasis added). Three years later, Plaintiffs have not proffered any evidence that a *majority* of policyholders have dropped from the NFIP, let alone that a majority dropped *because of* Risk Rating 2.0. To the contrary, Plaintiffs' updated declarations—identifying, in only *two* of the ten Plaintiff States, a 25% or less drop in policyholders in the NFIP—do not demonstrate a sea change requiring Plaintiffs to incur "greater enforcement costs." *See* Pls.' Br. at 16. *See also, e.g.*, Declaration of Jason Mahfouz ¶ 17, ECF No. 195-3 ("Mahfouz Decl.") (admitting that 47 out of 63 properties have purchased and maintained flood insurance under the NFIP); *id.* ¶ 18 (admitting that 39 out of 44 properties have purchased and maintained flood insurance under the NFIP); *id.* ¶ 19 (admitting that 36 out of 37 properties have purchased and maintained flood insurance under the NFIP). The law requires more than supposition of incidental, downstream fiscal harm—for, as the Fifth Circuit explained, virtually all "federal policies will inevitably have an economic impact on local governments." *El Paso Cnty. v. Trump*, 982 F.3d 332, 340 (5th Cir. 2020), *cert. denied sub. nom. El Paso Cnty. v. Biden*, 141 S.Ct. 2885 (July 2, 2021). Indeed, the Supreme Court similarly has recognized

[17] At the motion-to-dismiss stage, Plaintiffs alleged an injury based on "rebuilding costs," *i.e.*, that they were "financially harmed by Risk Rating 2.0 because it will cause them to spend more money rebuilding after future flood events." Op. at 25–26. The Court allowed the Plaintiff States to proceed on that speculative theory of injury because Plaintiffs alleged that "Risk Rating 2.0 results in higher premiums for a *majority* of policyholders and that these higher rates will cause people to drop their policies." *Id.* at 27 (emphasis added). As with their reimbursement cost injury, Plaintiffs have failed to demonstrate that a *majority* of policyholders have dropped from the NFIP, let alone that a majority dropped *because of* Risk Rating 2.0. And in any event, Plaintiffs have not proffered any evidence at this stage that they are likely to "spend more money rebuilding after future flood events." *Id.* at 25–26. The Court should thus reject Plaintiffs' rebuilding costs theory of injury, to the extent Plaintiffs still assert it now.

that "federal policies frequently generate indirect effects on state revenues or state spending," but a State's reliance on such indirect effects is often too "attenuated" to support standing. *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023). As a result, conferring standing based on attenuated and "incidental economic impact[s]" like what two of the Plaintiff States proffer would undoubtedly spark a slew of "unwarranted litigation against the federal government." *El Paso*, 982 F.3d at 340 (citation omitted). At bottom, Plaintiffs have not substantiated—with actual evidence at the summary-judgment stage—their allegations that premiums will rise significantly for many or even some noteworthy share of their residents, let alone that these premium increases will cause a significant number of these residents—enough to impact state and local enforcement efforts—to violate federal law by shirking grant obligations to maintain flood insurance.

But even if all ten of the Plaintiff States had substantiated the predicate events of third parties necessary to make out their purported injury (they have not), the updated declarations from Louisiana and Florida do not support the actual injury of greater enforcement costs. On this score, the Plaintiff States' declarations merely aver that *two* of the Plaintiff States "may also need to develop new procedures for its closeout process designed to ensure that homeowners do not drop flood insurance or detect when they have dropped flood insurance, in order to prevent the state from needing to repay further funds in the future." Mahfouz Decl. ¶ 16. *See also* Declaration of Laura Dhuwe ¶ 8, ECF No. 184-3 ("Dhuwe Decl.") (similar). That is, in the three years that have passed since the filing of this suit, neither Louisiana nor Florida (nor any other Plaintiff State, for that matter) has actually developed any new procedures to deal with the potential and purportedly widespread reimbursement of federally issued funds. Nor have they given any indication that they will certainly do so in the immediate future. In other words, Plaintiffs' purported injuries remain—three years later—purely speculative. *See Crane v. Johnson,* 783 F.3d 244, 251–52 (5th Cir. 2015) ("[W]e have repeatedly reiterated that 'threatened

injury must be certainly impending to constitute injury in fact,' and that '[a]llegations of possible future injury' are not sufficient." (citation modified)).

That lack of certainly impending injury makes sense, as the Plaintiff States do not actually submit any evidence that FEMA has taken steps to recoup already distributed federal funds based on policyholders dropping from the NFIP as a result of Risk Rating 2.0. Instead, Plaintiffs merely posit that the "federal government is *likely* to demand [grant money] back from the State." Pls.' Br. at 17 (emphasis added). *See, e.g.*, Mahfouz Decl. ¶ 17 ("federal funding ($974,549.25) . . . is *likely* to be deobligated" (emphasis added)); *id.* ¶ 18 ("St. Bernard officials have been informed of the *potential* de-obligation" (emphasis added)); *id.* ¶ 19 "federal funding ($112,300) . . . is likely to be deobligated"). Meaning, the Plaintiff States, in the years since those funds were awarded and since Risk Rating 2.0 has been implemented, have not presented any evidence that FEMA has actually taken steps to take back federal funds that have already been awarded to policyholders within the Plaintiff States. Nor could they. As Dr. Asche attested in her declaration, FEMA has not taken any steps to recoup the federally distributed funds identified in the Mahfouz and Dhuwe declarations. *See* Asche Decl. ¶ 8. That is because neither FEMA's regulations nor applicable guidance *requires* the repayment of grant funds for failure to maintain flood insurance. *Id.*; *see* 44 C.F.R. § 77.8(d) ("FEMA *may* terminate an award or take other remedies for noncompliance in accordance with 2 CFR 200.339 through 200.343." (emphasis added)).[18] Indeed, as FEMA has recognized, grant subapplicants often fail to maintain insurance coverage for a myriad of reasons—including those unrelated to Risk Rating 2.0[19]—and in those instances, FEMA often works with applicants to address those issues.

[18] If the noncompliance can be corrected, FEMA may first attempt to direct the recipient to correct the noncompliance.

[19] That policyholders may drop insurance for a myriad of reasons unrelated to Risk Rating 2.0 (*e.g.*, death of a policyholder) underscores the speculative nature of Plaintiffs' purported injury of increased regulatory burden stemming from dropped policy coverages. The reality is that dropped coverage from the NFIP is not a novel problem.

More fundamentally, though, FEMA does not currently intend to require the repayment of grant funds solely on the basis that policyholders within the Plaintiff States refused to obtain NFIP coverage due to increased premiums resulting from Risk Rating 2.0. Asche Decl. ¶ 8. Nor does FEMA currently track subrecipients that refuse to obtain NFIP coverage due to increased premiums resulting from Risk Rating 2.0. *Id.* Consequently, what the parties' declarations collectively demonstrate is that the "increased regulatory costs" that two of the Plaintiff States posit are fundamentally self-inflicted. The Plaintiff States "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. *See also Reilly v. Ceridian Corp.*, 664 F.3d 38, 46 (3d Cir. 2011) ("[Plaintiffs'] alleged time and money expenditures to monitor their financial information do not establish standing, because costs incurred to watch for a speculative chain of future events based on hypothetical future criminal acts are no more 'actual' injuries than the alleged 'increased risk of injury' which forms the basis for [Plaintiffs]' claims."). Nor can they assert a regulatory burden injury that is simply predicated on actions entirely within the control of state and local legislative bodies. *Cf. Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (Sutton, C.J., concurring) (no standing based on enforcement costs where these costs depended on "States' own crime-and-punishment decisions" and "social-welfare policy choices"); *Haaland v. Brackeen*, 599 U.S. 255, 294–95 (2023) (no standing where State would incur administrative costs regardless of application of federal statutory provisions). *See also Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (concluding that fiscal injuries were self-inflicted "from decisions by their respective state legislatures").

For these reasons, the Court should dismiss the Plaintiff States—and certainly the eight Plaintiff States who submitted *no* evidence of any alleged injury[20]—for lack of Article III standing.

[20] Plaintiffs cannot piggyback off a handful of States to justify their continued presence in a suit they

### B. The Plaintiff Parishes Have Not Established Standing

The Parish Plaintiffs likewise have not established standing at summary judgment, as their purported injury of increased premiums is not redressable through vacatur. Plaintiffs' redressability argument boils down to an implausible, but-for analysis. In their view, vacatur of Risk Rating 2.0 would redress their annual 18% premium increases under Risk Rating 2.0 because a reversion back to the legacy rating method would have resulted in only *modest* increases in their premiums (presumably at 5.38%). *See* Pls.' Br. at 20 (citing AR00176981 and Declaration of Michael B. Cooper ¶ 7, ECF No. 1-28). But Plaintiffs have not actually proffered evidence that the remaining Plaintiff Parishes (St. Tammany and Livingston) are experiencing annual premium increases that meet or exceed the 18% statutory cap.[21] Indeed, Exhibit A to the St. Tammany Declaration makes clear that in 2022, St. Tammany saw a –16.35% *reduction* in premiums. *See* Ex. A to Declaration of Andrea Kuracka, at 7, ECF No. 195-7. The rates then only modestly increased for each subsequent year: +6.97% (2023), +10.92% (2024), and +9.95% (2025). *Id.* (Plaintiffs did not provide evidence of the purported annual premium percentage increases for Livingston Parish under Risk Rating 2.0.) Regardless, Plaintiffs' attempts to compare the maximum *annual* rate increases that *may* occur under Risk Rating 2.0 (18% statutory cap) to the *average* annual increases before Risk Rating 2.0 (5.38%) reflects nothing more than an apples-to-oranges comparison that cannot plausibly be credited.

---

have no business to be in. *See, e.g.*, *Fednav, Ltd. v. Chester*, 547 F.3d 607, 614 (6th Cir. 2008) (dismissing several but not all of the plaintiffs for lack of standing).

[21] Notably, Plaintiffs concede that Washington Parish does not currently hold any NFIP policies. Pls.' Br. at 20 n.6. Plaintiffs cannot piggyback off a *single* parish or a select few parishes to justify standing. *See, e.g.*, *Fednav,* 547 F.3d at 614 (dismissing several but not all of the plaintiffs for lack of standing); *Colville v. Becerra*, Civ. No. 1:22CV113-HSO-RPM, 2023 WL 2668513, at *9 (S.D. Miss. Mar. 28, 2023) (similar, explaining that "if the standing question is not complex, and the Court '*knows* that a party is without standing,' that plaintiff must be dismissed" (quoting *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 344 n.3 (5th Cir. 2013), which explained that a court need not verify the independent standing of other co-plaintiffs when one has standing, but cannot avoid resolving the standing of these co-plaintiffs when, as was the case with two of the plaintiffs at issue, it knew they had no injury). Accordingly, Washington Parish should be dismissed from this case.

Plaintiffs' unsupported assertion—that vacatur of Risk Rating 2.0 would remedy Plaintiffs' purported injury of increased premiums—only compounds that comparison error, as Plaintiffs ignore what has long been recognized by industry, governmental agencies, and FEMA itself: coastal geographic areas, including many of the parishes that have sought remedy here, were receiving artificial discounts not reflective of risk because, under the legacy rating system:

- FEMA relied on flood probabilities from the 1980s and damage estimates that do not fully reflect recent NFIP damage experience and utilized rate maps that have not been updated.
- FEMA did not require all properties to be remapped into higher-risk areas to pay rates based on the new designation. This policy, known as grandfathering, eroded the NFIP's ability to charge rates that reflect the risk of flooding.
- FEMA uses a nationwide rating system that combines flood zones across many geographic areas, so individual policies do not always reflect topographical features that affect flood risk. In fact, some patterns in historical claims and premium data suggest that NFIP's full-risk rates may not always reflect actual flood risk. Collectively, these factors increase the risk that premiums collected on full-risk policies may be insufficient to cover future losses, adding to concerns about NFIP's financial stability.

AR0008070.

As a result, there is no dispute that FEMA (1) has, for more than a decade, suffered a deficit with the NFIP because it has not collected sufficient premiums to cover risk; and (2) must set NFIP rates on an actuarial basis with the goal of collecting enough premiums to cover the total expected annual loss each year. Thus, even in the absence of Risk Rating 2.0, the *historical* premium rate increases (which Plaintiffs dubiously claim would be 5.38%) would not be reflective of what FEMA would be required to charge. Vacating Risk Rating 2.0 would only deprive FEMA of the ability to assess risk (and thus estimate premiums) at a granular level, *i.e.*, based on an individualized assessment of a property's particular flood risks, Maurstad Decl. ¶¶ 61–62, and subsequently force FEMA to raise premiums indefinitely across wide segments of policyholders whose properties share a limited set of very basic characteristics to ensure that premium rates are actuarily sound, *id.* ¶¶ 30, 155–59, 215–16. Neither St. Tammany's Parish nor Livingston Parish makes any showing whatsoever that they would somehow be exempt from these wide-sweeping rate increases absent Risk Rating 2.0. *Cf. Louisiana by*

*and through Landry v. Biden*, 64 F.4th 674, 682 (5th Cir. 2023) (no standing where "[t]he alleged harms would have occurred with or without the [federal policy]"). This lack of redressability compels dismissal of the Plaintiff Parishes too. *See also Vt. Agency of Nat'l Res. v. United States*, 529 U.S. 765, 771 (2000) (holding that "a plaintiff must show a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact").

## II. FEMA Was Not Required to Undergo Notice and Comment (Count VI)

The Court should grant summary judgment to Defendants on Count VI because the APA's notice-and-comment requirement does not apply to Risk Rating 2.0 for three independent reasons. *First*, Congress displaced the APA's notice-and-comment requirement by amending the NFIA to clarify that chargeable rates need not be "prescribe[d] by regulation," BW-12, Pub. L. No. 112-141, § 10021. *Second*, the APA exempts from its notice-and-comment requirements matters "relating to . . . public property, loans, grants, benefits, or contracts[,]" 5 U.S.C. § 553(a)(2), and Risk Rating 2.0 clearly and directly implicates both public benefits and contracts. *Third*, the APA's notice-and-comment requirements do not apply because Risk Rating 2.0 is not a substantive legislative rule. In all events, and even if the APA's notice-and-comment requirements were applicable, Plaintiffs fail to show any prejudicial error attributable to the absence of notice-and-comment rulemaking given the extensive record of public engagement on Risk Rating 2.0. That failure is independently sufficient to grant summary judgment to Defendants.

### A. The APA's Notice-and-Comment Requirement Does Not Apply to Risk Rating 2.0

1. Although the APA generally requires agencies to engage in notice-and-comment rulemaking when issuing legislative rules, *see* 5 U.S.C. § 553(b), it contemplates situations in which Congress "expressly" authorizes agencies to depart from these procedures, *id.* § 559. Indeed, the Supreme Court has explained that "the word 'expressly' does not require Congress to use any 'magical passwords' to exempt a later statute from the provision." *Dorsey v. United States*, 567 U.S. 260, 274

(2012) (quoting *Marcello v. Bonds*, 349 U.S. 302, 310 (1955)). Rather, "the Court has described the necessary indicia of congressional intent by the terms 'necessary implication,' 'clear implication,' and 'fair implication.'" *Id.* (citing *Great Northern R. Co. v. United States*, 208 U.S. 452, 465, 466 (1908); *Hertz v. Woodman*, 218 U.S. 205, 218 (1910); *Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 660 n.10 (1974)). The requisite intent can be found when, for example, Congress "specifie[s] procedures . . . that cannot be reconciled with the notice and comment requirements of [5 U.S.C.] § 533." *Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998).

That is the case here. While the NFIA initially mandated that chargeable rates be "prescribed by regulation" under 42 U.S.C. § 4015, Congress amended that provision via BW-12, Pub. L. No. 112-141, § 100211, to remove the requirement that chargeable rates be "prescribe[d] by regulation" and simply require FEMA to "provid[e] notice" of the rates "from time to time." Merely issuing the rates "from time to time" with some form of "notice" as currently required under § 4015 "cannot be reconciled with the notice and comment requirements of § 553" of the APA, *Asiana Airlines*, 134 F.3d at 398. And it would be illogical for Congress to require notice-and-comment rulemaking when FEMA issues *estimates* of premium rates pursuant to § 4014(a), but not when Congress prescribes the *actual* premium rates pursuant to § 4015(a). Indeed, the effect of Congress's amendment to § 4015 was to harmonize it with § 4014, authorizing FEMA to issue both estimates and chargeable rates without prescribing either by regulation. Accordingly, this Court must give effect to Congress's explicit decision to remove the rulemaking requirement in § 4015, which confirms that ratemaking is not subject to the notice-and-comment requirements of the APA. *See, e.g.*, *Ross v. Blake*, 578 U.S. 632, 641–42 (2016) ("When Congress amends legislation, courts must presume it intends [the change] to have real and substantial effect." (citation modified)).

Indeed, that Congress did not require notice-and-comment rulemaking when FEMA promulgates premium rate estimates and actual amounts is evident from other parts the NFIA where

Congress *did* mandate that FEMA promulgate formal regulations. The NFIA specifically requires FEMA to promulgate regulations for, *inter alia*, the general terms and conditions of an NFIP policy. *See* 42 U.S.C. § 4013(a). That is for good reason: the general terms and conditions of an NFIP policy dictate the coverage offered, the parties' obligations, and all substantive questions about the policy. Changing these things can fundamentally alter insurance access and the insurance bargain struck, thereby necessitating public input. But Congress recognized that estimating rates under § 4014(a) and setting rates under § 4015 are different, declining to require FEMA to prescribe those estimates or actual rates by regulation. Because Congress expressly provided an alternative, less onerous process by which FEMA may issue chargeable rates, FEMA "was not required to conform to APA § 553 procedures" when issuing Risk Rating 2.0. *See Asiana Airlines*, 134 F.3d at 399.

Plaintiffs offer no reason why the Court should contravene Congress's will and treat Risk Rating 2.0 differently from any other ratemaking change. Instead, Plaintiffs argue that section 4015(a) "does not . . . state that notice under that section excuses compliance with the APA." Pls.' Br. at 27. But Congress need not "use any 'magical passwords' to exempt a later statute from the provision." *Dorsey*, 567 U.S. at 274 (citation omitted). Rather, Congress need only evince a clear "intent to make a substantive change" from the APA's procedural requirements. *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 745 F.2d 677, 686 (D.C. Cir. 1984) (Scalia, Cir. J.) (emphasis omitted). Congress did so here by amending § 4015 to eliminate *any* suggestion that changeable rates must be prescribed through rulemaking. Plaintiffs nevertheless cite two cases for the truism that "[u]nder ordinary circumstances, an agency that wishes to issue a rule must abide by the APA's notice and comment procedures." Pls.' Br. at 27–28 (quoting *Howard v. Ashcroft*, 248 F. Supp. 2d 518, 536 (M.D. La. 2003)). But neither authority answers the relevant question here: whether §§ 4014 and 4014 displace the ordinary circumstances in which the APA's notice-and-comment requirements apply. They do, and Risk Rating 2.0 was lawfully issued without notice-and-comment rulemaking.

2. Independently, the APA's notice-and-comment requirements are inapplicable because 5 U.S.C. § 553(a)(2) exempts from those requirements any "matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts." "[T]he substantive categories listed in section 553(a)(2) are operative" where "any one of the enumerated categories is 'clearly and directly' involved in the regulatory effort at issue." *Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1058–59 (5th Cir. 1985) (citation omitted). Risk Rating 2.0 is therefore exempt twice-over: it clearly and directly implicates both public benefits and public contracts.

To start, the NFIP provides a public benefit: it is a federal flood insurance program that services nearly five million policies across the United States and is the primary source of flood insurance coverage for residential properties in the country. *See* AR00186797. Indeed, Congress created the NFIP through the NFIA with the goal of making flood insurance "available on a nationwide basis" and basing the insurance "on workable methods of pooling risks, minimizing costs, and distributing burdens equitably among those who will be protected by flood insurance and the general public." 42 U.S.C. § 4001(d). And prior to the NFIP, most Americans lacked access to flood insurance and had to rely solely on federal disaster relief after floods, as most private insurers could not profitably underwrite flood insurance policies with reasonable terms and therefore did not do so. *See, e.g.*, *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 183 (2d Cir. 2006). For this reason, courts routinely describe the SFIPs "issued . . . pursuant to the National Flood Insurance Program" as "set[ting] forth requirements for the receipt of *benefits*." *See, e.g.*, *Roussell v. Allstate Ins. Co.*, 26 F. Supp. 3d 552, 553 (E.D. La. 2014) (emphasis added). The Fifth Circuit has likewise referred to the insurance plans provided under the NFIP as "federal benefits." *See Adolph v. FEMA*, 854 F.2d 732, 734 n.2 (5th Cir. 1988) ("The program provides that federally-subsidized insurance and other federal benefits are available . . . ."). Risk Rating 2.0 is therefore no different than "regulations addressing the method and amount of provider reimbursement" under Medicare or Medicaid, which the Fifth Circuit has

long recognized to be "clearly and directly related to the disbursement of benefits." *Baylor Univ. Med. Ctr.*, 758 F.2d at 1059.

But even if Risk Rating 2.0 did not clearly and directly relate to the disbursement of benefits (it does), it would still be exempt from the APA's notice-and-comment requirements because it clearly and directly relates to public contracts. While the NFIP has a myriad of moving parts, Risk Rating 2.0 updates NFIP rating methodology to ensure that premium rates in insurance contracts are actuarily sound and distributed fairly based on risk. And those insurance contracts are public contracts. As the Eleventh Circuit has explained in a different context, "[a] suit for benefits under the National Flood Insurance Program raises the same concerns, under the Appropriations Clause, as a suit against a governmental entity because benefits under the National Flood Insurance Program are paid from the federal treasury." *Shuford v. Fid. Nat'l. Prop. & Cas. Ins. Co.*, 508 F.3d 1337, 1343 (11th Cir. 2007). Because "the regulations challenged in this case are both clearly and directly related" to public contracts, "this excuses" FEMA "from an overall statutory obligation to comply with notice and comment procedures in promulgating the challenged regulations." *Nat'l Wildlife Fed'n v. Snow*, 561 F.2d 227, 232 (D.C. Cir. 1976).

Plaintiffs claim that the contracts exception "extends only to 'deciding when to enter into a contract or award a grant.'" Pls.' Br. at 26 (citation omitted). But the authority on which Plaintiffs rely for that proposition—*Indep. U. S. Tanker Owners Comm. v. Lewis*, 690 F.2d 908, 918 n.43 (D.C. Cir. 1982)—addressed a unique statutory scheme in which "the terms" of the contracts in question "are fixed by statute." The opposite is the case here, as §§ 4014 and 4015 direct FEMA to set rates based on certain factors, but do not fix the terms.

Plaintiffs also argue that FEMA "abandoned this argument by failing to raise it when opposing Plaintiffs' preliminary injunction motion." *See* Pls.' Br. at 26. But "failing to raise an argument at the preliminary injunction stage is not inconsistent with an intent to pursue the argument during later

stages of a case." *Highway J Citizens Grp., U.A. v. U.S. Dep't of Transp.*, 656 F. Supp. 2d 868, 883 (E.D. Wis. 2009); *cf. S. Glazer's Distrbs. of Ohio, LLC v. Great Lakes Brewing Co.*, No. 2:16-CV-861, 2017 WL 5953431, at *8 (S.D. Ohio July 14, 2017) ("the Court is not aware of any authority standing for the proposition that a party in its motion for preliminary injunction must present every theory . . . or risk waiver"). That is because a party is "not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (citations omitted).[22]

3. The APA's notice-and-comment requirements are also inapplicable because Risk Rating 2.0 is not a substantive legislative rule. The APA imposes notice-and-comment requirements only for substantive legislative rules, which are agency actions that purport to create new rights or impose new, legally binding obligations or prohibitions on regulated parties, "the basic tenor of which is not already outlined in the law itself[.]" *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992); *see also, e.g.*, *Amin v. Mayorkas*, 24 F.4th 383, 392 (5th Cir. 2022); *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014). The APA exempts from notice and comment several categories of agency action, including "interpretative rules"—which create no new law and instead only interpret statutory language in particular contexts, *see, e.g.*, *Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979)—as well as "general statements of policy, or rules of agency organization, procedure, or practice[,]" 5 U.S.C. § 553(b)(A).

---

[22] The sole authority that Plaintiffs cite, *see* Pls.' Br. at 26—*Jones v. Am. Council on Exercise*, No. CV H-15-3270, 2016 WL 6084636, at *10 (S.D. Tex. Oct. 18, 2016)—concerned an evidentiary objection to an exhibit appended to a motion for a preliminary injunction. Even assuming such a rule exists for evidentiary objections, it would not preclude Defendants from advancing the merits arguments pursued here because "[a]s indicated by the Supreme Court, a preliminary injunction proceeding is often a hurried affair . . . at which parties reasonably focus on what they consider their best arguments." *Highway J*, 656 F. Supp. 2d at 883. Further development of those arguments (particularly in response to Plaintiffs' further development of their theories) is entirely permissible. *Id.*

Risk Rating 2.0 is not a substantive legislative rule because it creates no *new* legal consequences for current and future policyholders. Just as before, policyholders still pay premiums to participate in the NFIP, still obtain flood insurance as a condition of receiving federally backed mortgages and other federal benefits, and in exchange still get the same flood insurance coverage. Risk Rating 2.0 merely updates how FEMA estimates and sets premium *amounts*, and it does so not to effectuate an extra-statutory transformation of policyholders' rights or obligations, but instead to better align premiums with Congress's longstanding command that FEMA set rates according to standard insurance risk and actuarial studies. *See* 42 U.S.C. § 4014(a)(1). And policyholders paying more or less for coverage based on their individualized actuarial risk is not, as a formal legal matter, a change in their rights or obligations.[23] Accordingly, because Risk Rating 2.0 "clarifies, rather than creates, law[,]" it is not subject to notice and comment. *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 240 (5th Cir. 2023) (citation omitted). Indeed, "[a] rule does not, in this inquiry, become a [legislative rule] merely because it supplies crisper and more detailed lines than the authority being interpreted." *Am. Min. Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). "If that were so, no rule could pass as an interpretation of a legislative rule unless it were confined to parroting the rule or replacing the original vagueness with another." *Id.*

Plaintiffs emphasize language from a FEMA press release describing how Risk Rating 2.0 "transforms a pricing methodology that has not been updated in 50 years by leveraging improved technology and FEMA's enhanced understanding of flood risk." Pls.' Br. at 22 (quoting AR00174135). But an agency's characterization of its own rule is of "minimal" import—instead, "courts 'focus primarily' on the actual characteristics of the agency action." *W & T Offshore, Inc. v. Bernhardt*, 946 F.3d

[23] Even as a practical matter, matter, the Risk Rating 2.0 rates changes will have a limited financial impact; as discussed, FEMA projects that 97% of policyholders will see either a decrease in rates or only a modest increase of up to $20 a month.

227, 237 (5th Cir. 2019) (quoting *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995)). Plaintiffs also argue that Risk Rating 2.0 must be a substantive rule because it has "significant effects on private interests." Pls.' Br. at 22. But a rule does not become "a substantive one, for notice-and-comment purposes, simply because it imposes a burden on regulated parties." *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 281 (D.C. Cir. 2000).

### B. Plaintiffs Cannot Establish Any Prejudicial Error from FEMA's Failure to Undergo Notice and Comment

In all events, and "[e]ven assuming that the APA require[d]" FEMA to undergo notice and comment before issuing Risk Rating 2.0, Defendants would still be entitled to summary judgment on Count VI because "there was no 'prejudicial error' here." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 684 (2020) (quoting 5 U.S.C. § 706). Courts routinely apply harmless error to excuse an agency's failure to comply with notice-and-comment requirements. *See, e.g.*, *id.*; *United States v. Johnson*, 632 F.3d 912, 930–33 (5th Cir. 2011). "The party claiming injury bears the burden of demonstrating harm; the agency need not prove its absence." *Combat Veterans for Cong. Pol. Action Comm. v. FEC*, 795 F.3d 151, 157 (D.C. Cir. 2015); *see also Shinseki v. Sanders*, 556 U.S. 396, 409–11 (2009) (the "burden of showing that an error is harmful normally falls upon the party attacking the agency's determination"). Plaintiffs fail to do so for two independent reasons.

*First*, Plaintiffs received ample information and input opportunity on Risk Rating 2.0 outside of the APA's notice-and-comment procedures. FEMA publicly announced the Risk Rating 2.0 changes in March 2019 and released detailed information on Risk Rating 2.0 on its website in April 2021; implemented the changes for new policies and existing ones who opted to utilize the new rates since October 2021 and for all other existing policies beginning in April 2022; and in the meantime publicly released a bevy of information on the Risk Rating 2.0 data and methodology, the specific changes to the premium calculation, and the projected impacts to premiums at the state, county, and zip code level. Indeed, Plaintiffs pleaded that they have had the opportunity "[o]ver the past several

years" to engage with FEMA on Risk Rating 2.0. *See* Complaint ¶ 22, ECF No. 1 ("Compl."); *see* Declaration of the Association of Levee Boards of Louisiana ¶¶ 21–26, ECF No. 1-41 ("ALBL Decl."). In other words, Plaintiffs "certainly had . . . notice" of Risk Rating 2.0 under 42 U.S.C. § 4015(a) and the opportunity to raise concerns, *Little Sisters*, 591 U.S. at 684. Under these circumstances, they "do not come close to demonstrating that they experienced any harm" from lack of a published notice in the Federal Register, "let alone that they have satisfied th[e] harmless error rule." *Id.*; *see also, e.g.*, *City of Arlington v. FCC*, 668 F.3d 229, 245 (5th Cir. 2012) (noting that "[t]he purpose of notice-and-comment rulemaking is to assure fairness and mature consideration of rules having a substantial impact on those regulated," and holding that these goals were satisfied and harmless error occurred where agency explained its action publicly and already had input from plaintiff (citation omitted)), *aff'd*, 569 U.S. 290 (2013); *Aeronautical Repair Station Ass'n, Inc. v. FAA*, 494 F.3d 161, 171 (D.C. Cir. 2007) (similar).

*Second*, Plaintiffs do not identify any specific comment that they or others were prevented from sharing with FEMA, and that FEMA therefore did not consider in developing Risk Rating 2.0. *See City of Arlington*, 668 F.3d at 245 (no prejudice where plaintiffs did not identify any specific issue not already considered by agency); *Johnson*, 632 F.3d at 932–33 (similar); *Miami-Dade Cnty. v. EPA*, 529 F.3d 1049, 1061 (11th Cir. 2008) (no prejudicial error where plaintiff does not "indicate with reasonable specificity, the aspect of the rule to which it objects and how it might have responded if given the opportunity" with a "credible challenge" (citation modified)). Plaintiffs simply state that Risk Rating 2.0 "would have benefitted significantly from public notice and comment." Compl. ¶ 252. That is plainly insufficient to show prejudice.

### III. Risk Rating 2.0 Is Not Contrary to Law and Does Not Violate FEMA's Statutory Authority (Count I)

Plaintiffs' claim that Risk Rating 2.0 is contrary to the NFIA misreads both Risk Rating 2.0 and the NFIA. The NFIA authorizes FEMA "to establish and carry out a national flood insurance

program which will enable interested persons to purchase insurance against loss resulting from physical damage to or loss of real property or personal property related thereto arising from any flood occurring in the United States." 42 U.S.C. § 4011(a). FEMA must study and estimate "the risk premium rates for flood insurance which . . . based on consideration of . . . the risk involved and accepted actuarial principles; and . . . the flood mitigation activities that an owner or lessee has undertaken on a property . . . would be required in order to make such insurance available on an actuarial basis for any types and classes of properties for which insurance coverage is available under [the NFIP]." *Id.* § 4014(a)(1); *see also id.* (requiring compliance with the "principles and standards of practice in ratemaking adopted by the American Academy of Actuaries and the Casualty Actuarial Society"). Risk Rating 2.0 is a direct exercise of this authority to study, estimate, and apply actuarially sound rates. As detailed below, Plaintiffs' arguments to the contrary are unavailing, and this Court should therefore grant summary judgment to Defendants on Plaintiffs' contrary-to-law claim.

A. Plaintiffs first argue that Risk Rating 2.0 contravenes the NFIA by "significantly reduc[ing]" or "eliminat[ing]" the way FEMA considers mitigation measures in NFIP premiums. *See* Pls.' Br. at 45–46. Not so. As the record demonstrates, Risk Rating 2.0 accounts for the *same* mitigation factors as the legacy system, and in fact adds additional discounts for elevating machinery and equipment. AR00174703–AR00174708. Indeed, contrary to Plaintiffs' characterizations, FEMA actually "expand[ed] policy discounts" for mitigation efforts "by making them available to properties located outside of high-risk flood areas." AR00174705. Risk Rating 2.0 also maintained community-level mitigation options, including grants to communities through coordination with states that fund actions to reduce rates both inside and outside an SFHA, such as flood mitigation assistance that prioritizes Multiple Loss Communities, Severe Repetitive Loss and Repetitive Loss Properties, and Community Rating System participation. AR00174705.

The currently operative NFIP Flood Insurance Manual confirms that "mitigation discounts to incentivize a policyholder to take steps that meaningfully reduce their property's flood risk" remain available. *See* NFIP Flood Insurance Manual, Risk Rating 2.0: Equity in Action Edition (October, 2025), at 3.28–32, https://perma.cc/UDT8-DMMG. Specifically, policyholders may receive a mitigation discount if certain covered machinery and equipment servicing the building is elevated within a foot of the required floor elevation. *See id.* at 3:28–29. Policyholders may also receive mitigation discounts by creating "[p]roper flood openings (flood vents) in enclosures or crawlspaces" to allow "the hydrostatic flood forces on the walls to equalize and minimize foundation damage to the building" during a flood. *Id.* at 3:30–31. Risk Rating 2.0 therefore "encourage[s] individual policyholders to do *more* to mitigate the flood risk for their property by introducing credit for a wider range of mitigation activities." AR00186145 (emphasis added). That more than satisfies the NFIA's direction to FEMA to account for "the flood mitigation activities that an owner or lessee has undertaken on a property, including differences in the risk involved due to land use measures, floodproofing, flood forecasting, and similar measures." 42 U.S.C. § 4014(a)(1)(A)(ii). The NFIA does not require FEMA to maintain indefinitely any particular discounts for any particular mitigation measures, so long as the rates generally are "based on consideration of . . . flood mitigation activities." *Id.* Risk Rating 2.0 indisputably does so.

B. Plaintiffs also argue that Risk Rating 2.0 is contrary to the NFIA because Plaintiffs claim it renders the "statutorily required administrative appeal process" for map appeals a "nullity." Pls.' Br. at 46. To be sure, 42 U.S.C. § 4104(e) sets forth an appeal process for flood elevation determinations, and Plaintiffs are correct that those determination "will not be used in calculating a property's flood insurance premium following the introduction of Risk Rating 2.0." AR00186145. But that does not render the appeals process a nullity. As the very next sentence states in the Congressional Research Service report that Plaintiffs cite, flood elevation determinations remain relevant "for floodplain

management purposes; for example all new construction and substantial improvements to buildings in Zone V must be elevated on pilings, posts, piers, or columns" and "[t]he boundary of the SFHA will still be required for the mandatory purchase requirement." AR00186145. Plaintiffs identify no statutory provision (and none exists) that requires that the administrative appeal process implicate premium discounts. Their arguments reflect nothing more than an attempt to conflate premium adjustments with FEMA's mapping process, the latter of which is not at issue in this case.

## IV. Risk Rating 2.0 Is Not Arbitrary and Capricious (Counts II–IV)

Plaintiffs have not demonstrated their arbitrary-and-capricious claims, as judicial review of such claims is "narrow and highly deferential" to the agency. *Sierra Club*, 990 F.3d at 913 (citation omitted). The agency's action is presumed valid, and the Court is limited to considering whether the action "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (citation omitted). Under this narrow inquiry, the Court does not ask whether an agency's "decision is the best one possible or even whether it is better than the alternatives," *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016), as the Court's role is not to "second-guess[]" an agency's "weighing of risks and benefits" and "substitute its judgment for that of the agency," *Dep't of Com. v. New York*, 588 U.S. 752, 777 (2019). The arbitrary-and-capricious standard of review simply "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Here, FEMA's implementation of Risk Rating 2.0 was plainly reasonable and reasonably explained. Plaintiffs' various arguments otherwise—that Risk Rating 2.0 departs from prior policy without justification and ignores important aspects of the problem and certain reliance interests—fail, as they represent mere policy "disagreement[s]" with FEMA's decisionmaking, not a basis for setting aside its action as unlawful. *Dep't of Com.*, 588 U.S. at 778; *see also, e.g.*, *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 95 (D.D.C. 2007).

### A. Risk Rating 2.0 Does Not Depart from Prior Policy

Contrary to Plaintiffs' unfounded assertions, Risk Rating 2.0 is consistent with prior FEMA policy. The NFIP has always been mandated and designed to tie premium rates to flood risk, in accordance with actuarial principles. 42 U.S.C. § 4015(i). Risk Rating 2.0 simply represents FEMA's efforts to improve the NFIP's ability to achieve these goals: to adapt to the demands of providing flood insurance to policyholders as catastrophic flood losses increase and to modernize its actuarial methods with better flood risk data and better technology already being leveraged across the private insurance market. Courts have found "nothing arbitrary" about this type of "fresh analysis." *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1001–02 (2005) (finding no arbitrary change in policy in declaratory ruling reflecting "changed market conditions").

Plaintiffs nevertheless point to a series of technical differences in how the agency complies with its longstanding statutory mandate to determine actuarily sound rates. But those technical differences in *methodology* does not mean that Risk Rating 2.0 radically transforms the NFIP by, for example, "abandoning its decades-old practice of" of calculating premiums on a basis other than flood risk, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 218 (2016) (cited at Pls.' Br. at 28–29, concerning Department of Labor's complete reversal of its longtime position that service advisors are not exempted from overtime wage provision). Instead, FEMA has simply updated its rating method to utilize catastrophe modeling, the now industry-standard risk management practice for determining flood risk, according to the American Academy of Actuaries. Maurstad Decl. ¶¶ 92, 124–25; AR00186153; AR00058063. That is, rather than rely primarily on the variables available in the 1970s (BFE and historical losses)—which are by themselves not sufficient to accurately reflect flood risk for individual properties—Risk Rating 2.0 refines the NFIP premium rating by incorporating *additional* geographic and structural flood risk variables that collectively are more predictive of flood risk. Marstaud Decl. ¶¶ 66, 107, 110–12, 125, 160–64; AR00185952, AR00186215; AR00203149. This is

no more of a departure from FEMA's prior policy of setting actuarily sound rates (and doing so annually) than the agency's choice to provide employees with more updated and accurate technology through cell phones and laptops to promote a mobile work force appropriate to an agency charged with disaster response duties. Because "regulatory agencies do not establish rules of conduct to last forever," *Am. Trucking Ass'ns v. Atchison, Topeka & Sante Fe Ry. Co.*, 387 U.S. 397, 416 (1967), FEMA deserves "ample latitude to adapt" the NFIP "to the demands of changing circumstances," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (citation omitted).

But even if improperly characterized as a "departure" from FEMA's longstanding and congressionally mandated policy to tie premium rates to flood risk, FEMA has more than amply justified its implementation of Risk Rating 2.0. When an agency changes a policy, it need not demonstrate "that the reasons for the new policy are better than the reasons for the old one[,]" but only that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better[.]" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). Far from cloaking Risk Rating 2.0 in secrecy, FEMA has provided a range of information on Risk Rating 2.0, *see* Declaration of Lloyd Hake, ECF No. 56-3 ("Hake Decl.") (detailing FEMA's extensive communications), giving the public a "reasoned explanation for" the program and the particular changes with which Plaintiffs take issue. That is, as the agency publicly explained when it rolled out Risk Rating 2.0, changes to premium rating were necessary so that FEMA could move the NFIP into the 21st century and "deliver rates that are equitable" and "better reflect a property's individual flood risk." AR00203149 (cited at Compl. ¶ 203). Otherwise, existing inequities—including policyholders in lower-value homes subsidizing policyholders with higher-value homes—"would continue[,] widening the gap between rate payments and claims payouts and making it harder to meet the needs of [FEMA's] customers." AR00203157; *see also*, *e.g.*, AR00174137 (cited at Compl. ¶ 172); FEMA, *Risk*

*Rating 2.0: Equity in Action – Industry Transition Memorandum*, at 1 (Sept. 1, 2021), https://perma.cc/EVW8-TUAF.

Plaintiffs' attempts to invent a departure in policy based on technical differences in rate setting should be squarely rejected.

### 1. Plaintiffs Fundamentally Misunderstand the Agency's Use of a Structure's Elevation to Assess Flood Risk

Unable to point to any real change in policy, Plaintiffs complain that FEMA abandoned BFE's central role in determining premium rates. Pls.' Br. at 31–32 (citing AR00183921, for the proposition that "BFE is no longer an NFIP rating factor to determine premium"). That argument misses the mark both factually, and as a matter of law.

As Plaintiffs concede, BFE still remains relevant for purposes of FEMA's flood map data (FIRMs), which in turn, "informed the catastrophe models used in the development of rates under Risk Rating 2.0." Maurstad Decl. ¶ 162. Specifically, the Mapping Data Integration ("MDI") catastrophe model integrated FEMA's regulatory FIRMs and nonregulatory flood hazard data, *see* Maurstad Decl. ¶ 162; AR00172973–AR00173036—and the MDI was then blended with several commercial catastrophe models to develop "a composite understanding of flood risk" under Risk Rating 2.0, Maurstad Decl. ¶ 162; AR00203155. In other words, "both the data used in determining flood zones on NFIP flood maps, as well as the maps themselves were utilized in establishing Risk Rating 2.0 premium rates." Maurstad Decl. ¶ 162; AR00203149. That necessarily means that BFE still remains part and parcel of the risk model that sets the NFIP rating factors for determining premiums, as BFE was incorporated by the FIRMs data, which directly fed into the MDI. Maurstad Decl. ¶ 162; AR00203149.

More fundamentally, though, Plaintiffs misunderstand how the agency continues to use the inputs of BFE to set premium rates. As the agency explained, "[h]istorically, the NFIP has taken First Floor Height (FFH) into account by determining rates based on "elevation of lowest floor above or

below BFE (or in some limited cases above or below the ground)." AR00071605. Risk Rating 2.0 does not move away from the basic principle that "elevation of a building is an important determinant of risk," but rather than correlating premium rates to the BFE alone (the height of flooding during a 1 percent annual-chance-flood), Risk Rating 2.0 adjusts policyholders' rates based on each individual property's ground elevation *and* FFH, *i.e.*, "the height above ground of the lowest floor where the insured would like to get coverage." AR00071605. The bottom line is that Risk Rating 2.0 utilizes elevation as a rating factor, similar to legacy rates, while also allowing the agency to "assess the risk from additional perils that cause flooding, such as pluvial flooding, that were not previously accounted for in the legacy rates." Maurstad Decl. ¶¶ 28, 160. Put simply, Plaintiffs' BFE argument rests on a technicality, which obscures the fundamental fact that Risk Rating 2.0 continues to assess the key aspect of elevation—in addition to another known flood risk perils—when determining risk and corresponding rates.

Even taking Plaintiffs' BFE arguments at face value, though, the inadequacies of the legacy rating approach "show, if anything, … that there was good reason for" FEMA to consider additional variables beyond BFE when determining risk and premium rates. *Cf. Smiley v. Citi Bank (S.D.), N.A.*, 517 U.S. 735, 742–43 (1996) (rejecting argument that there was a "change of official agency position" when notice of proposed rulemaking was initiated to reflect current law and interpretive letters and regulation were necessary "to eliminate uncertainty and confusion").

FEMA's primary reliance on BFE in the legacy rating approach was predicated on the fact that in the 1970s, catastrophe models for insurance pricing did not exist. Maurstad Decl. ¶ 118; AR00195077. FEMA's rudimentary rating method from five decades ago—which "relied on dividing the country into a small number of flood zones and assuming simple relationships about the probability of the different flood depths and the resulting damages," Maurstad Decl. ¶ 118; AR00021327; AR00019149—utilized inadequate rating variables resulting in policyholders paying the

same amount for different levels of risk, Maurstad Decl. ¶ 111; AR00065155 (explaining that inclusion of BFE as rating variable "[c]ommunicates false precision in risk" and "does not usually reflect pluvial" flooding). Consider, for example, two properties with the same structure and occupancy type, both of which are located outside of the SFHA. Maurstad Decl. ¶ 111. Property A has already filed a flood claim and is not elevated. Property B has never had a flooding claim, is elevated five feet off the ground, and is located farther from the nearest flooding source. Maurstad Decl. ¶ 111. Using the legacy rating method, both properties would be rated the same simply because they were located in the same geographic zone. Maurstad Decl. ¶ 111; AR00065154 (explaining that "FIRMs show only one picture of hazard in time (the 1% annual chance flood) and do not communicate the uncertainty in mapping the extent or severity of flood"). Under Risk Rating 2.0, by contrast, the NFIP also considers the distance to the nearest flooding source, prior claims activity, and elevation of a structure in the determination of a policyholder's full-risk premium. AR00185952; AR00186158. In other words, FEMA is now able to consider elevation, as it did with legacy rates, while also being able to accurately discern that Property B, which is elevated *and* has no prior claims history, is far less likely to suffer from a future flooding loss than Property A. Maurstad Decl. ¶ 111; AR00185952; AR00186158. FEMA, through Risk Rating 2.0, thus incorporated *more* data points, and additional rating variables, which are better correlated with flood risk to a specific structure, such as the replacement cost value of the building, the distance to the nearest flooding source, drainage area, the elevation of the ground at a structure compared with the elevation at the flooding source, the first floor height,[24] prior claims, and the building materials (frame vs. masonry), among others. Maurstad Decl. ¶ 112; AR00185952; AR00186158. Ultimately, Risk Rating 2.0 reflects the understanding that there are more sources of flood hazard and risk than the 1% annual chance of flood (BFE). Maurstad

[24] Elevation of a home *was* considered in legacy rates, but only in the SFHA.

Decl. ¶ 161; AR00072204.

FEMA's use of additional variables beyond BFE to calculate flood risk likewise brings it in line with the industry standard and statutory mandates. Since the 1970s, "[t]he insurance industry's use of catastrophe models to estimate potential future catastrophe losses has gained momentum and has become a standard risk management practice." Maurstad Decl. ¶ 125; AR00061244. That is because while "historical data does bring valuable insight about catastrophe losses, it is insufficient in many cases to make proper projections for future catastrophe losses." Maurstad Decl. ¶ 125 (citation omitted); AR00061271. Under Risk Rating 2.0, FEMA leveraged industry best practices, including catastrophe modeling, to set rates that would be adaptable to future conditions and changes to flood risk as those changes are realized. Maurstad Decl. ¶ 127; AR00174703. In other words, Risk Rating 2.0's updated methodology addresses the inadequacies of the 1970s legacy rating method by employing a rating system that adjusts to any changes to the current risk caused by climate change or any other factors as they happen. Maurstad Decl. ¶ 127; AR00174703. That updated approach of including additional risk variables, as the agency explained, was further justified because FEMA is statutorily required to charge actuarial rates on most NFIP flood insurance policies, subject to the statutory limits set in BW-12 for pre-FIRM properties and in HFIAA, which set a cap of 18% on premium increases for most policies. 42 U.S.C. § 4015(e). To issue actuarially based rates, FEMA must take into account the known perils that cause flooding. AR00176964. FEMA can no longer ignore the existence of other known risk variables such as expected losses for low-frequency, high-severity events—as captured by catastrophe modeling—because doing so would flout its statutory mandate to calculate risk in an actuarily sound way. Maurstad Decl. ¶ 158; AR00061244.

Plaintiffs nevertheless complain that BFE is still relevant for eligibility NFIP coverage and for determining compliance with NFIP floodplain management regulations. Pls.' Br. at 33 (citing AR00183921). In their view, the adhesion to BFE in the other "two prongs" of the NFIP—which

are not at issue in this litigation—demonstrates that the legacy method's rate maps and corresponding requirements (BFE) do not actually approximate risk. *Id.* at 33–34. That is exactly the point. For as FEMA repeatedly explained, BFE represents only a rudimentary proxy for flood risk, because it measures the 1% chance of a flood happening in any given year. And while rudimentary proxies for risk were appropriate five decades ago when catastrophe modeling did not exist (let alone before it became the industry standard), FEMA has since identified *additional* metrics for better assessing risk (and mitigation efforts)—including the actual level of risk associated with an individual structure's elevation. That third parties have characterized BFE as "a useful check for any flood risk assessment" in other aspects of the NFIP, *see* AR00102243, does not undermine FEMA's mandated and reasonable efforts to comply with congressional instruction that premium rates be actuarily sound.

Finally, Plaintiffs argue that FEMA's Risk Rating 2.0 does not account for the reliance interests of Plaintiffs who incorporated BFE into their own laws, regulations, and ordinances. Pls.' Br. at 32, 37. To be sure, the Plaintiff States have not demonstrated any policyholder injury (and thus lack standing). But regardless, Plaintiffs' invocation of a lone Louisiana statute that merely provides that "the state and political subdivisions may adopt laws, rules, ordinances, building codes, or other measures to regulate installations that include additional freeboard requirements beyond the minimum standards adopted by the National Flood Insurance Program, 42 U.S.C. 4011 et seq. in order to incentivize going above the minimum floodplain management standards," La. Rev. Stat. § 51:912.22(8)(b), does not make out a relevant reliance interest, let alone a legitimate reliance interest on behalf of *all* Plaintiff States, *see* Op. at 10–11 (concluding, even at the motion-to-dismiss stage, that "Plaintiffs still have not shown that Risk Rating 2.0 tangibly interferes with the Plaintiff States' ability to create or enforce state law"). *See also* La. Rev. Stat. § 51:912.22(8)(a) ("Nothing in this Paragraph shall be construed to prohibit state or local jurisdictions from adopting more stringent elevation or

freeboard requirements than those contained in the FEMA manual, consistent with Subparagraph (b) of this Paragraph.").

Nevertheless, even if Plaintiffs had proffered evidence of policyholders who purchased or retained property on the assurance that they would receive favorable rates due to elevation above the BFE (they have not), FEMA explained that nothing in Risk Rating 2.0 precludes the agency from taking into account the types of elevation mitigation efforts tied to BFE. To the contrary, FEMA's regulations make clear that if a property owner can provide an elevation certificate—*i.e.*, if a property owner can demonstrate mitigation efforts relating to elevation—FEMA will take that mitigation effort into account and will use that calculation to provide the customer with the better premium rate. AR00183964. Indeed, it is baffling for Plaintiffs to assert that discounts for elevating above BFE are not being honored under Risk Rating 2.0, when the number of policyholders who have received a mitigation discount for elevating an insured structure has increased from 712,991 (under the legacy system) to 4,625,670 (under Risk Rating 2.0) as of 2025. Asche Decl. ¶ 26. *See, e.g.*, *id.* ¶¶ 24–61 (demonstrating that Plaintiff States Florida, Idaho, Kentucky, Louisiana, Mississippi, Montana, North Dakota, South Carolina, Texas, and Virginia have all seen significantly more mitigation discounts for elevation following the implementation of Risk Rating 2.0).

FEMA's flexibility in accounting for mitigations efforts that were credited under the legacy rating method eliminates any reliance concern that Plaintiffs have proffered. Risk Rating 2.0 simply reflects the reality that the BFE cannot be the only risk signal that accounts for flood risk, while recognizing and honoring legacy mitigation efforts that continue to address the key risk concern of elevation.

### 2. Risk Rating 2.0 Does Not Narrow the Range of Flood Mitigation Measures But Actually Expands Them

Plaintiffs next contend that FEMA "dramatically narrow[ed] without justification the range of flood mitigation measures considered in determining insurance premiums." Pls.' Br. at 34. Plaintiffs,

though, do not identify any of the specific flood mitigation measures that FEMA presumably dropped from the legacy rating method—let alone any particular mitigation measure that any particular *Plaintiff* purportedly relied on. *See id.* at 34 (identifying BFE and "some types of commercial property flood-proofing" without any specificity). Instead, they merely rehash their BFE and rate map claims, arguing—without evidence—that some "[c]ommunities" invested in certain unidentified legacy mitigation measures and were thus denied expected mitigation discounts. *See id.* (alleging, without evidence, that the legacy method took "a wider range of structural and nonstructural mitigation measures into account using the program's rate maps"). That argument, however, fundamentally conflates FEMA's two unrelated statutory obligations: on the one hand, to create rate maps, 42 U.S.C. § 4101b, and, on the other, to ensure that rates are actuarily sound, 42 U.S.C. § 4014. Regardless, as the record demonstrates, Risk Rating 2.0 accounts for the *same* mitigation factors as the legacy rating system, and then adds new discounts for elevating machinery and equipment. *See, e.g.*, AR00186145[25]; AR00186134 ("The [legacy] rating system includes two sources of flood risk: the 1 %-annual-chance fluvial (river) flood and the 1 %-annual-chance coastal flood. Risk Rating 2.0 will incorporate a broader range of flood frequencies and sources than the current system, as well as geographical variables such as the distance to water, the type and size of nearest bodies of water, flood frequency and the elevation of the property relative to the flooding source."); AR00185952 (Risk Rating 2.0 considers the same structural characteristics used by the legacy rating method, including a particular structure's foundation type, occupancy type, number of floors, the inclusion or exclusion of flood openings, coverage, deductible, whether or not covered machinery and equipment is elevated, and the

[25] Ironically, Plaintiffs cite AR00186145 for the proposition that CRS sought to criticize the purportedly "narrowed" mitigation credits under Risk Rating 2.0. Pls.' Br. at 37. The context of that document, however, makes clear that the legacy method only credits elevated structures and "flood-proofing under certain circumstances" and that Risk Rating 2.0 actually encourages policy holders "to do to do more to mitigate the flood risk for their property" because Risk Rating 2.0 "introduc[es] credit for a *wider range of mitigation activities*." AR00186145 (emphasis added).

elevation of the lowest floor of the building). Consequently, since Risk Rating 2.0 has come into effect, the number of policyholders taking advantage of mitigation discounts has doubled, tripled, and in some cases quadrupled. *See* Maurstad Decl. ¶ 165–92; Asche Decl. ¶¶ 24–61.

Plaintiffs also argue that Risk Rating 2.0 retired Preferred Risk Policies ("PRPs")—policies that only charged a $500 premium for structures located behind accredited levees, Maurstad Decl. ¶ 130; AR00173660—without justification. In so arguing, Plaintiffs presume (without evidence) that those PRP policyholders were entitled to a lower-cost policy because those properties were located in areas with low-to-moderate risk of flooding. Pls.' Br. at 36. But therein lies Plaintiffs' error. FEMA retired PRPs—not arbitrarily—but because those policies did not reflect those proprieties' actuarial risk.

In seeking to modernize its assessment of risk, FEMA sought to utilize more comprehensive data about levees to ensure that the flood risk reduction provided by levees was adequately considered in the development of premium rates. AR00223309; FEMA: Levees in Risk Rating 2.0 (Apr. 2025), https://perma.cc/M38A-6G65. That is because, as the agency explained, the legacy rating method for PRPs provided an artificially inflated discount for accredited levees (amounting to a total premium of $500) that did not differentiate the degree of flood risk reduction in accordance with the type of levy implemented. Maurstad Decl. ¶ 130; AR00173660.

To understand how the premium rate for a PRP fell far short of the expected flooding losses, consider the example of a property with $350,000 of coverage ($250,000 in building; $100,000 in contents) that could suffer a total loss when a levee is overtopped or fails due to a 1% annual chance flood. Maurstad Decl. ¶ 140. A rough calculation for the average annualized loss for this property would be $3,500 = $350,000 (the value of the property coverage) x .01 (the 1% risk of flooding for that year). This basic arithmetic—which does not reflect the process that the NFIP uses to calculate premiums, nor accounts for the expenses the NFIP would otherwise have to pay—makes exceedingly

clear that the $500 premium under the legacy rates for PRPs grossly underestimated the expected losses. Maurstad Decl. ¶ 140. Put differently, the steep discounts received by PRP policyholders under the legacy rating method were artificially inflated based on whether the structure was located behind an accredited levee, which, as the agency explained, did not accurately reflect the effectiveness of such mitigation efforts. *See* Maurstad Decl. ¶ 130; AR00174153 (explaining that the legacy rating reflected a binary classification of levees (accredited vs. non-accredited) in which the policies for structures behind levees were either uniformly given a reduction in premium, or premiums were not reduced at all, and the determination of which of the two applied was based on whether the levee was accredited or not). *See also* Maurstad Decl. ¶ 131; AR00186173 (explaining that the old legacy rating did not consider the varying degrees of flood risk reduction that different levees may provide). The NRC identified this critical weakness too, noting that under the legacy rates, nonaccredited levees were treated as providing lesser or no flood protection, despite the fact that "these nonaccredited levees may provide some protection against the 50 percent and 10 percent annual chance exceedance floods, which contribute significantly to losses for negatively elevated structures." Maurstad Decl. ¶ 131; AR00022749.

In light of these inflated premium discounts for PRPs under legacy rates, FEMA now recognizes, under Risk Rating 2.0, the actual flood risk reduction provided by individual levees by utilizing the more precise data provided in the National Levee Database and Levee Screening Tool—a federally recognized repository for comprehensive information about the nation's levees—to more accurately reflect the flood risk reduction provided by individual levees. Maurstad Decl. ¶¶ 135–136; AR00223300. FEMA incorporated this more granular levee data into its catastrophe modeling, which serves as the foundation for rates calculated under Risk Rating 2.0. Maurstad Decl. ¶ 135; AR00223296. This graduated risk approach accounts for flood hazards larger and smaller than the 1%-annual-chance flood by leveraging additional data beyond that depicted on FIRMs, such as more

precise levee information from the National Levee Database and the Levee Screening Tool. Consequently, the resulting premium rates more clearly and accurately identify and communicate the flood risk exposure of an individual structure. Maurstad Decl. ¶ 136; AR00223295. As FEMA explained:

> Levee data helps to inform the benefits and risks that a levee provides to businesses, communities, and the public for purposes of modeling the losses due to floods. A levee reduces – but does not eliminate – flood risk. The limitations of a levee system, in both its capacity to reduce flooding in leveed areas (informed by overtopping frequency) and its ability to perform adequately during flood events (levee performance) are fundamental to [the] graduated risk approach [utilized by] Risk Rating 2.0. As such, more robust and better performing levees yield a quantifiable benefit to insurance policy holders.

AR00223296; Maurstad Decl. ¶ 137. Put simply, even if viewed as going beyond FEMA's congressionally mandated role to set actuarily sound rates (it does not), FEMA has more than amply justified the shift to more accurately credit the actual flood risk reduction of individual levees through the retirement of PRPs.

### 3. Congress Mandated the Phasing Out of Grandfathered Rates

Plaintiffs argue that FEMA failed to justify the elimination of grandfathered rates for certain insurance policies. Pls.' Br. at 37. Gradually phasing out the limited number of grandfathered policies in existence as part of the Risk Rating 2.0 shift was necessary, FEMA explained, so that the NFIP could achieve "more appropriate premiums that reflect each property's individualized flood risk." AR00174119. As years of policy reports and recommendations from government and nonprofit groups detailed, FEMA's use of grandfathered rates "erode[d] NFIP's ability to charge rates that reflect the risk of flooding." AR00008070. *See also* AR00186200 (explaining that "grandfathering does intentionally allow policyholders to pay premiums that are less than their actuarial rate"). Consequently, "[e]liminating rate subsidies by requiring all rates to reflect the full risk of loss would address an underlying cause of NFIP's debt and minimize federal fiscal exposure." Maurstad Decl. ¶ 70; AR00028804. *See also* AR00019149; AR00065153.

That justification is further buttressed by more recent statutory mandates, which post-date many of Plaintiffs' arguments. *See* Pls.' Br. at 38 (citing a report, at AR00195120, that predated the passage of BW-12). As the agency recognized, NFIP premium rates must, statutorily, be established "based on consideration of the risk involved and accepted actuarial principles," 42 U.S.C. § 4014(a)(1)(A)—meaning that rates must reflect the true flood risk to each property. BW-12 and HFIAA further mandated that FEMA phase out subsidies, such as those for pre-FIRM properties (*i.e.*, grandfathered properties), so that premiums could ultimately reach actuarially sound rates. *See* BW-12, § 100205, as amended by HFIAA, §§ 3, 5.[26] Congress further mandated that FEMA charge full risk rates[27] on all NFIP flood insurance policies, subject to the statutory limits set in HFIAA, which cap premium increases at 15% for any properties within a risk class, but no more than 18% annually for any property. 42 U.S.C. § 4015(e)(1)-(2). Accordingly, all premiums for pre-FIRM properties will eventually reach actuarially sound rates, *i.e.*, the rate equivalent structures would pay without a subsidy, or a rate that reflects true flood risk. As a result, FEMA has no statutory authority to ignore necessary premium increases for certain grandfathered policyholders based simply on affordability concerns. *See, e.g.*, Diane P. Horn & Baird Webel, *Introduction to the National Flood Insurance Program (NFIP)*, Cong. Research Serv., R44593, at 21 (updated Jan. 6, 2023), https://perma.cc/9AA9-7MMD. It is for this reason that FEMA and others have on several occasions submitted legislative proposals and called for Congress to implement an NFIP means-tested affordability program. *See, e.g.*, *id.* at 10; Maurstad Decl.

---

[26] Under BW-12, the following categories of pre-FIRM properties must have their premium increased by 25% per year until they reach actuarial rates: (1) nonprimary residences; (2) nonresidential properties; (3) business properties; (4) properties with severe repetitive loss; (5) properties with substantial cumulative damage; and (6) properties with substantial damage or substantial improvement after July 6, 2012. 42 U.S.C. §§ 4014(a)(2), 4015(e)(4).

[27] FEMA defines full-risk rates as those charged to a group if policies that generate premiums sufficient to pay the group's anticipated losses and expenses. *See* FEMA, Flood Insurance: Laws & Regulations, Questions about the Bigger-Waters Flood Insurance Reform Act of 2012, https://perma.cc/U5XV-45QC.

¶ 23; GAO, GAO-23-105977, *FEMA's New Rate-Setting Methodology Improves Actuarial Soundness but Highlights Need for Broader Program Reform* (July 2023), https://perma.cc/39NGPY86 (commending Risk Rating 2.0 for significantly improving ratemaking but recommending congressional action to enact means-based assistance program to address affordability). Absent legislative action, FEMA is constrained in its ability to consider policyholders' reliance interests in affordability and expectations they could hold onto prior rates that are no longer actuarily sound. Plaintiffs must take up these concerns with Congress, not FEMA.

Moreover, the facts show that Risk Rating 2.0 has not unjustifiably upended reliance interests. For one, premium increases occurred prior to Risk Rating 2.0, Compl. ¶ 25; *id.*, *see also id.* Ex. 54, Decl. of Russell Herbert, Jr. ¶¶ 17–19, ECF No. 1-54 (notable premium increases pre-Risk Rating 2.0), and would have to continue even if it had not been implemented, so Plaintiffs cannot reasonably claim a reliance interest in maintaining the same rates, *see* Maurstad Decl. ¶¶ 29–30, 155–59, 215–16; AR00195077; AR00235159; AR00174119. Furthermore, Risk Rating 2.0 considers rate impacts and safeguards affordability for a considerable share of policyholders. As discussed, Risk Rating 2.0 (1) has resulted in 19% of policyholders seeing premium decreases and 70% seeing only small increases of $10 or less per month; and (2) sets an upper bound for annual premiums for primary residence single-family home policies ($12,125), whereas the legacy system had no such cap and thus could charge some policies as much as $55,000. Maurstad Decl. ¶¶ 44, 233–34.

At bottom, Risk Rating 2.0 has not ignored the reality that some policyholders had previously relied on rate grandfathering. *Cf. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 31–32 (2020) (finding that memorandum rescinding DACA completely failed to consider legitimate reliance interest of recipients, their families, and their schools and employers); *MediNatura, Inc. v. Food & Drug Admin.*, 496 F. Supp. 3d 416, 458 (D.D.C. 2020) (distinguishing *Regents* on this basis), *aff'd*, 998 F.3d 931 (D.C. Cir. 2021). FEMA has long been aware of and grappled with this issue, and it expressly

determined that grandfathering had to be phased out in Risk Rating 2.0 so that NFIP premium rates could, in accordance with the NFIA's statutory mandates, be more actuarily sound and equitably distributed based on individualized flood risks. AR00174702; AR00216015. FEMA specifically identified how Risk Rating 2.0 would have minimal impact on grandfathered policies, since only 5% of the 3.5 million single-family homes covered by the NFIP "are actually grandfathered," and since premium increases for these policies would be "gradual." *Id.* That reasoned, explicit tradeoff to eliminate grandfathering for full-risk premiums shows that FEMA did not disregard policyholder reliance interests. *See, e.g.*, *Fox*, 556 U.S. at 515–16; *In re FCC 11-161*, 753 F.3d 1015, 1143 (10th Cir. 2014).

#### 4. The Record Reflects FEMA's Transparency Efforts in Explaining Risk Rating 2.0

Plaintiffs half-heartedly contend that FEMA departed from its prior policy of setting actuarily sound rates by changing its methodology for calculating flood insurance premiums without providing adequate explanation. Pls.' Br. at 39. They characterize FEMA's proprietary methodology as one shrouded in secrecy and protective orders. *Id.* The record shows otherwise.

FEMA has publicly disclosed troves of information on Risk Rating 2.0, *see generally* Hake Decl. (detailing FEMA's extensive communications), giving the public a "reasoned explanation for" the program and the particular changes with which Plaintiffs take issue, *Fox*, 556 U.S. at 515 (agency must simply "show that there are good reasons for the new policy" and that "the agency believes it to be better"). *E.g.*,:

- Between July 2019 and July 2022, FEMA responded to hundreds of Requests for Information ("RFIs") from the public and academia regarding Risk Rating 2.0, including changes in premium rates, incorporating more factors that inform flood risk in the premium rate determinations, premium rate caps and discounts, related environmental concerns, and the like. Hake Decl. ¶ 8.

- By April 2021, FEMA had released several data sets and documents on its website, including a 64-page NFIP technical document entitled "Risk Rating 2.0 Methodology and Data

Sources." AR00172973; AR00174961. *See also* Hake Decl. ¶ 14. This comprehensive report provided a description "of the methodology and data sources used to develop Risk Rating 2.0" like "GIS data, Market Basket data, NFIP in-force exposure, NFIP loss and exposure data, and catastrophe model output." Hake Decl. ¶ 14. The report also included algorithms, rates, rating factors, and illustrative examples of rate calculation and actuarial soundness under Risk Rating 2.0. *Id.*

- In April 2021, FEMA also released two additional documents: "Risk Rating 2.0 Methodology and Data Sources - Premium Calculation Worksheet Examples" and "Risk Rating 2.0 Methodology and Data Sources - Appendix D Rating Factors." *Id.* ¶ 15. The "Worksheet Examples" spreadsheet provided four sample worksheets explaining various inputs that led to premium rates using Risk Rating 2.0. *Id.* The "Appendix D Rating Factors" spreadsheet provided numerical rating values for structural relative elevation, drainage area, distance to coasts, oceans, lakes, and more to help the public understand how premiums would be calculated under Risk Rating 2.0. *Id.*

Plaintiffs nevertheless point to a single purported outcry by a member of Congress regarding "the types and sources of any data that will be used to calculate risk [and] how risk would be factored into different types of areas." AR00176984 (cited at Pls.' Br. at 39). That lone congressional letter from Senator Scott of Florida, dated May 6, 2021, however, predates FEMA's staff-level briefing with Senator Scott's staff, in which FEMA conducted a question-and-answer session and provided a presentation with an overview of rating variables, the phased approach to implementation of Risk Rating 2.0, and the technology and resources used to develop Risk Rating 2.0. Hake Decl. ¶ 56. Indeed, the Hake declaration is riddled with examples of FEMA's communications with Congress, which included FEMA briefings with committees and individual congressional offices, responses to questions and RFIs, and opportunities for congressional staff to provide their input on Risk Rating 2.0 and its proposed implementation. *Id.* ¶¶ 40–79. Between March 2019 and February 2023, FEMA fielded dozens of meetings, briefings, calls, and requests for technical drafting assistance with members of Congress and/or their staff. *Id.* ¶¶ 43–78. In that same time period, FEMA fielded more than 40 separate RFIs from individual members of Congress, covering, *inter alia*, the effects of flood insurance policy sales, the percentage of policy increases or decreases under Risk Rating 2.0, the initial delay in

implementation of Risk Rating 2.0, grandfathered policies, and the cost to rebuild as a rating factor. *Id.* ¶ 40.

Plaintiffs next tout a letter from an insurance agent trade group, noting that the group's letter, dated September 15, 2021, raised concerns that FEMA had not provided an "explanation of breakdown of rates produced by rating engine." AR00180615. To be sure, that trade group, in that same letter, noted that it "strongly supports Risk Rating 2.0" because it will "hasten the progress of the National Flood Insurance Program (NFIP) toward the universal application of actuarial rates that correspond with individual properties' level of flood risk." AR00180615. But in any event, that purported complaint was limited to snapshot in time. In the months and years leading up to implementation—and certainly after September 2021, when the concern was initially raised—FEMA launched a robust transparency campaign, which cumulatively addressed those past concerns. *E.g.*,:

- Starting in late 2021 and into 2022, FEMA released four educational videos on its website and the platform YouTube. The first one, "Risk Rating 2.0 - Equity in Action: FEMA's New Rating Methodology," provided an overview of the simplified quoting process. "Risk Rating 2.0 - Equity in Action: Rating Variables (Part 1)" and "Risk Rating 2.0 - Equity in Action: Rating Variables (Part 2)" described variables used pursuant to Risk Rating 2.0 that would impact premium rates, including examples and possible premium rating scenarios. "Risk Rating 2.0 - Equity in Action: What is Built and Covered" detailed the calculation of a covered building's replacement cost value, levels of coverage available, and deductible options. Hake Decl. ¶ 18.

- In February 2022, FEMA published another fact sheet entitled "FEMA Fact Sheet - Understanding Risk Rating 2.0: Equity in Action." This fact sheet broadly discussed new rating variables, such as proximity to flood sources and first floor height, that would be utilized to determine premium rates under Risk Rating 2.0. The fact sheet also provided graphics showing that 96% of policyholders were projected to either see premium decreases or increases of $20 a month or less under Risk Rating 2.0. Hake Decl. ¶ 18; AR00185622.

- In March 2022, FEMA shared, via the Risk Rating 2.0 website, a "Rate Explanation Guide" with graphics and examples of factors impacting premium rates under Risk Rating 2.0. It expanded on the concept of the "Where, How, and What" - the building characteristics considered under the Risk Rating 2.0 methodology. AR00185952. Readers could clearly see how factors like distance to flood sources, ground elevation, foundation type, first floor height, number of floors, unit location, building occupancy, construction type, flood openings, the location of machinery and equipment, building replacement cost value, coverage amounts, deductible amounts, and other variables would all affect premium rates and why.

Finally, Plaintiffs complain that FEMA did not consult former or current Plaintiffs who are supposed to be FEMA's co-collaborators in the NFIP. Pls.' Br. at 39–40. They likewise contend, without any evidence, that FEMA rebuffed Plaintiffs' requests for information. Here too, the record shows otherwise. As the Hake Declaration explains, FEMA held dozens of meetings and engagements with state, local, tribal, and territorial governments about Risk Rating 2.0—inclusive of those States that are now Plaintiffs here. Hake Decl. ¶ 80. In the ten FEMA regions alone, FEMA held almost 100 engagements with these governmental entities and provided them with an opportunity to ask questions and provide input on Risk Rating 2.0. *Id.* *E.g.*,:

- On September 4, 2019, FEMA gave a presentation to the Louisiana Governor's Advisory Commission for Coast Protection, Restoration, and Conservation. The presentation provided information about Risk Rating 2.0 and its application to the State of Louisiana, as well as reiterating the need for mitigation and closing the insurance gap. *Id.* ¶ 81.

- On April 14, 2021, FEMA gave a presentation on Risk Rating 2.0 to the Economic Development Council of Greater Fort Bend County, Texas at the Council's request. The presentation covered topics such as premium changes, the phased-in approach to implementation of Risk Rating 2.0, levees, and the Building Resilient Infrastructure and Communities grants. Following the presentation, FEMA answered multiple follow-up questions from the Council by correspondence. *Id.* ¶ 83.

- On July 27, 2021, FEMA gave a presentation to North Carolina officials on Risk Rating 2.0. FEMA presented information comparing rating variables used in Risk Rating 2.0 to those used under the legacy rating, as well as expected premium rate changes and ways to learn more information through FEMA's website publications. *Id.* ¶ 84.

- In August of 2021, FEMA Region 4 staff (covering Florida, Mississippi, South Carolina, North Carolina, Kentucky, Alabama, and Tennessee) provided eight in-depth briefings to update state executives, including Emergency Management Directors, Governor's offices, and Insurance Commissioners within Region 4 on state-specific impacts of the Risk Rating 2.0 rollout. Representatives from the States of Florida, Mississippi, South Carolina, North Carolina, Kentucky, Alabama, and Tennessee were all provided with briefings. *Id.* ¶ 85.

- On August 3, 2021, FEMA Region 3 staff (covering Virginia, Pennsylvania, West Virginia, Maryland, and District of Columbia) provided a presentation on Risk Rating 2.0 at the State Directors Meeting. This presentation covered topics such as the variables FEMA uses to establish premium rates. *Id.* ¶ 86.

- On August 18, 2022, FEMA headquarters and regional staff met with Archie Chaisson, LaFourche Parish President, and Dwayne Bourgeois, Executive Director of the North LaFourche Levee District, to discuss Risk Rating 2.0, how levee information is incorporated into premium rates, how to provide levee information for inclusion in the National Levee Database, and affordability issues. *Id.* ¶ 90.

- On January 25, 2023, FEMA representatives met with several Louisiana officials, including LaFourche Parish President Archie Chiasson, Tangipahoa Parish President Robby Miller, St. Charles Parish President Matt Jewell, Jefferson Parish President Cynthia Lee Sheng, North LaFourche Levee District Director Dwayne Bourgeois, and Meg Bankston of the Parish Presidents of Louisiana organization. Attendees submitted questions in advance of the meeting, which were addressed. Some of the topics discussed were rating variables, technology and mapping, statutory premium rate increase caps, and future planning. *Id.* ¶ 91.

More recently, and following the implementation of Risk Rating 2.0, the governor of Texas and former governor of Mississippi, as well as W. Nimm Kidd, Chief of the Texas Division of Emergency Management, and Kevin Guthrie, Executive Director of the Florida Division of Emergency Management, joined the Secretary of Homeland Security and the Secretary of Defense in advocating for the continuation of Risk Rating 2.0. *See* Federal Emergency Management Agency, FEMA Review Council Members, https://perma.cc/KY92-KUSQ. Indeed, on May 7, 2026, the FEMA Review Council issued its final report, in which it recommended "[m]odernizing risk data with continued implementation of Risk Rating 2.0 and revising flood maps to inform the American people about their true risk." *See* FEMA Review Council (FRC), Final Report: The President's Council to Assess the Federal Emergency Management Agency (May 7, 2026), https://perma.cc/5ZTS-N8WT.

Put simply, the record refutes Plaintiffs' unsupported assertions of FEMA's purported lack of transparency. The reality is that FEMA implemented Risk Rating 2.0 with transparency and engaged in significant efforts to solicit and engage co-collaborators in the NFIP.

### B. Risk Rating 2.0 Does Not Ignore Important Aspects of the Problem

At the preliminary-injunction stage, Plaintiffs asserted more than six theories upon which Risk Rating 2.0 purportedly ignored important aspects of the problem. *See* Defs.' PI Opp'n at 18–21. Three years later, Plaintiffs do not appear to resuscitate any of those merits arguments. And for good reason:

the record reflects that Risk Rating 2.0 represents the culmination of years of work by FEMA to correct critical inadequacies in its legacy rating approach, by enabling FEMA to deliver premium rates that, consistent with congressional mandates, are actuarily sound because they reflect each covered property's true flood risk and are fairly distributed based on individual risk levels. Indeed, all Plaintiffs muster at this stage—where their burden is higher—are technical quibbles over certain loss calculations and a rehashing of FEMA's public transparency efforts. Neither actually amounts to any "relevant factors that FEMA failed to consider," and in any event both assertions lack merit on their face. FEMA has dedicated years of effort to develop and implement Risk Rating 2.0; it has shown its work, and the record evinces that FEMA "did not 'entirely fail[ ] to consider an important aspect of the problem' that it seeks to address." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 985 F.3d 472, 475 (5th Cir. 2021).

**1. Risk Rating 2.0 Does Not Overestimate the Risk of Loss**

Plaintiffs first point to the difference in storm surge depth predictions between the AIR Hurricane model (the proprietary model developed by Verisk Inc.) and the SLOSH model (a FEMA model first developed in the 1970s) for Hurricane Sandy to argue that FEMA's catastrophe models overestimated the risk of loss. *See* Pls.' Br. at 41. That comparison is categorically inapt, as neither the AIR Hurricane model nor the SLOSH model reflects actual storm surge depths. Both models simply represent estimates of storm surge depths, which is why FEMA chose to use composites of different models, rather than rely on a single model, when implementing Risk Rating 2.0. Indeed, Plaintiffs' attempt to highlight the difference between the two models for a single catastrophic event ignores what Plaintiffs have already conceded—that FEMA's Risk Rating 2.0 used "three commercial catastrophe models" "to estimate future loss." *Id.* at 40. Put simply, Plaintiffs' cherry-picked example of a single model for a single event does not reflect the actual losses estimated by Risk Rating 2.0, and in any event, ignores the reality that the Air Hurricane model reflects the industry standard and

preferred model for reinsurance. *See* AIR Worldwide, A Retrospective On 10 Years of Modeling Hurricane Risk in a Warm Ocean Climate (2015), https://perma.cc/5R7P-5SCM (noting that "AIR Worldwide (AIR) is the scientific leader and most respected provider of risk modeling software and consulting services," modeling natural catastrophes in more than 90 countries and providing services to "[m]ore than 400 insurance, reinsurance, financial, corporate, and government clients").

Plaintiffs' attempts to draw comparisons between Verisk Inc.'s Air Hurricane model and historical U.S. Geological Survey ("USGS") event data similarly fall flat. In Plaintiffs' view, FEMA's catastrophe modeling overestimated risk of loss because, for Hurricane Rita, the AIR Hurricane model's predicted surge elevations and losses were higher than actual, observed elevation and losses. *See* Pls.' Br. at 41. But here too, Plaintiffs' narrow focus obscures what FEMA actually did. FEMA did not merely compare the AIR Hurricane model's predicted results with historical elevations and losses to spit out an estimate of risk (and therefore commensurate premium rates).[28] Rather, FEMA utilized several commercial models to create a composite understanding of catastrophic risk. *See* AR00222612 (explaining that for storm surge losses, FEMA, through Milliman, compared the AIR *and* KatRisk results to the NFIP's historical experience and then selected adjustment factors to rescale the AALs). *See also* AR00174967. Plaintiffs' attempt to manufacture a "clear error in [the agency's] judgment" ignores that FEMA did not merely assume the results of the AIR Hurricane model data (as Plaintiffs contend); it compared the Air Hurricane model results *and* KatRisk results to the NFIP's historical experience and then selected adjustment factors to rescale the AALs. AR00222612; AR00174971.

[28] To be sure, the historical average annual loss for Hurricane Katrina predicted by the AIR Hurricane model does not mean that premiums increased at similar rates.

### 2. Risk Rating 2.0 Does Not Utilize Unreliable Topographic Data

Plaintiffs next point to boilerplate language in the Milliman report, in an attempt to "raise doubts about the reliability of [the] topographic data" used to develop Risk Rating 2.0. *See* Pls.' Br. at 41–42 (quoting AR00222636 for the following disclosures: "[a]ll geospatial datasets are simplified representations of reality" and that "actual, real-world values will not conform exactly to estimates provided by [Milliman's] geospatial data products"). That (half-hearted) argument, however, wholly misses the mark. It is of course true that the geospatial datasets used in the catastrophe models for Risk Rating 2.0 do not match reality, because they are meant to reflect estimates of composite geospatial data. *See* AR00173013 ("Geographic Information Systems ('GIS') is a framework for gathering, managing, manipulating, and analyzing spatial datasets. GIS has been a major component of both the risk rating redesign process and finalized rating plan. GIS variables are necessary for the development of rating factors and determination of final territory factors."). That is how catastrophe modeling works. *See, e.g.*, AR00030074. Milliman's boilerplate language merely represents a common understanding of inputs for catastrophe modeling that are standard to the industry. Indeed, as Milliman explained (and Plaintiffs conveniently ignore), Milliman utilized more than fifteen actual geographic data sources—including, *inter alia*, USGS elevation data for all states and territories; geological and geophysical surveys from Alaska; the national drainage network relating to rivers, streams, lakes, and coastlines; and national shoreline data from the National Oceanic and Atmospheric Administration ("NOAA")—to create a composite estimate of geospatial data that can provide the spatial context needed to understand hazards, exposure, vulnerability, and potential losses associated with natural and human-induced disasters across different regions and asset portfolios. AR00222642–AR00222643. Plaintiffs' mere parroting of boilerplate disclosures that accompany any industry-standard dataset for such modeling does nothing to undermine the veracity of the inputs or the model itself.

Plaintiffs likewise take issue with Milliman's failure to "audit, verify or review the data and other information for reasonableness and consistency." Pls.' Br. at 42 (citing AR00222636). But here too, Milliman's boilerplate disclosure is merely standard for any contractor whose role is to rely on data provided by the principal (here, FEMA) for purposes of carrying out the contracted analysis. And in any event, Plaintiffs' reliance on cherry-picked boilerplate language ignores the next paragraph, which clearly states that Milliman "performed a limited review of the data used directly in our analysis for reasonableness and consistency . . . [and] did not find material defects in the data." AR00222636.

Finally, Plaintiffs contend that Milliman flouted FEMA's mapping standards because it failed to independently verify the topographic data provided by FEMA to build Risk Rating 2.0. Pls.' Br. at 42 (citing FEMA's 2019 Policy Standards for Flood Risk Analysis and Mapping). To state the obvious, the standards for drawing and revising rate maps (which Plaintiffs cite) differ from the standards for designing catastrophic modeling because they achieve different functions. *See* FEMA, *FEMA Policy Standards for Flood Risk Analysis and Mapping*, at 2 (Dec. 11, 2019), https://perma.cc/L7U7-Q28G (cited by Plaintiffs but recognizing that standards "must be followed in the delivery of the Risk MAP program"). Risk Rating 2.0 uses sophisticated modeling to understand how multiple factors influence different types of flooding. AR00072954. By contrast, the very nature of drawing and revising Flood Insurance Rate Maps requires the understanding of topographical data to define the 1% flood zone—thereby making verification of topographical data necessary. 42 U.S.C. § 4101b(b)(1)(C); FEMA, Flood Risk Analysis and Mapping (Rev. 14), FEMA Policy #204-078-1 (Nov. 21, 2023), https://perma.cc/N6T5-JNNS. Plaintiffs cannot simply graft mapping standards onto catastrophe modeling and claim that the agency failed to consider an important aspect of the problem. The reality is that FEMA, through Milliman, followed industry standards when using topographic datasets that reflect "representations of reality." *See* AR00012073; AR00058063. The NFIA requires nothing more, and nothing less.

### 3. Risk Rating 2.0 Does Not Utilize Inaccurate Average Annual Loss Data

Plaintiffs argue that Risk Rating 2.0 utilizes inaccurate average annual loss data because FEMA used a "narrow" date range of 1992–2018 to estimate historical losses and exaggerated the impact of Hurricane Katrina. Pls.' Br. at 42–43. Such criticisms of FEMA's use of data, however, ultimately fall short. To be sure, Plaintiffs do not actually explain why FEMA needed to use flood claims data dating back to 1978 to ensure accurate estimates of average annual loss. *See id.* at 43. Indeed, Plaintiffs' only record cite for this proposition is based on a 2011 FEMA coastal zone analysis study, which has nothing to do with rate development and merely identifies the two data sources (policy-in-force data from 1998–2008 and individual claim records for each claim filed from 1978–2008) that reflect even shorter time periods than the one utilized by Risk Rating 2.0. AR00012209. Nor does Plaintiffs' lone record cite provide any support for their unsupported assertion that FEMA should have included loss data for the period *post-dating* the period of inforce exposures utilized for the catastrophe modeling and dislocation analysis, *i.e.*, from 2018–2022.

Regardless, Milliman's use of the twenty-six-year date range was entirely reasonable and in keeping with relevant Actuarial Standards of Practice ("ASOPs"), Statement of Principles and other guidance promulgated by the Actuarial Standards Board, the American Academy of Actuaries, and the Casualty Actuarial Society. AR00222628. As Milliman explained, in keeping with ASOP 39, it "considered the applicability of historical insurance data for the insured coverage, including," among other things, "whether there is a sufficient number of years of comparable, compatible historical insurance data." AR00222632. Adjustments were then made to the historical insurance data to reflect the conditions likely to be present during the period in which Risk Rating 2.0 will be in effect. *Id.* *See also* AR00222608 (explaining that Milliman utilized the FEMA inforce exposures from May 31, 2018 for the catastrophe modeling and dislocation analysis" and "NFIP historical losses and exposures from January 1, 1992 to June 30, 2018"); AR00222612 (explaining that the 2018 inforce exposures

date "was chosen because the [Replacement Cost Value] for these exposures had already been obtained and the catastrophe modeling data prep performed as part of the NFIP's reinsurance placement"). Thus, in selecting the relevant period, Milliman accounted for "the impact of changes in the exposure to loss, including coverage differences, the underlying portfolio of insured risks, building codes and practices; population shifts; and costs." AR00222632. Milliman likewise considered the extent to which the rates would change when using different historical experience periods and modified their procedures to reduce sensitivity. *Id.*

Plaintiffs further take issue with Milliman's inclusion of Hurricane Katrina data in its historical loss analysis. In their view, Milliman's refusal to perform historical analysis on leveed areas did not remove the Hurricane Katrina "distortion" because Hurricane Katrina affected large portions of coastal Louisiana, Alabama, and Mississippi located outside of levied areas. *See* Pls.' Br. at 43. But as FEMA explained, had Milliman excluded the Hurricane Katrina data (as Plaintiffs seemingly suggest), the available historical insurance data would not have sufficiently represented the exposure of the NFIP to catastrophe-related losses. *See* AR00222624 (explaining that exclusion of Hurricane Katrina data would have left an insufficient number of claims to be credible). Thus, Milliman minimized the overall distortion effect of Hurricane Katrina data by (1) considering historical loss ratios filtered by state groups based on historical events, AR00222623; (2) not performing a historical loss ratio on leveed areas, which would have mostly covered Louisiana, as affected by Hurricane Katrina, AR00222624; and (3) supplementing the available historical insurance data (which did not sufficiently represent the exposure to catastrophe losses) with noninsurance data, such as the geospatial data used in the ratemaking procedures, AR00222632. The record is thus clear that FEMA adequately considered the issues raised by Plaintiffs and provided justifiable reasons for the relevant twenty-six-year loss period and modifications to the Hurricane Katrina data. The APA does not require more.

#### 4. Risk Rating 2.0 Does Not Ignore the Critical Role of Plaintiff Communities

Finally, Plaintiffs argue that FEMA failed to consider the critical role that communities like current and former Plaintiffs serve in providing NFIP information. The core of their argument revolves around the idea the FEMA eliminated Plaintiffs' role in updating rate maps and, by doing so, took away their ability to weigh in on anything that influences true risk premiums. Pls.' Br. at 44. Plaintiffs further argue that FEMA cut States and local communities out of the development of Risk Rating. Both assertions are patently false.

As detailed above, FEMA was extremely transparent and communicative throughout the development of Risk Rating 2.0. During its development, FEMA conducted over 1500 engagements with the public, policyholders, stakeholder groups, congressional members and staff, the media, industry groups, WYO companies, and/or insurance agents. Hake Decl. ¶ 6. In meetings with state, local, tribal, and territorial governments, FEMA offered a breadth of information regarding Risk Rating 2.0 and also provided those governmental entities with opportunities to ask questions and provide input (technical and otherwise). *Id.* ¶ 105. Regardless, Plaintiffs' unsupported assertions ignore that Risk Rating 2.0 sets premium estimates, while also allowing FEMA to refine those estimates based on information provided by the policyholder. Plaintiffs cannot meaningfully establish that FEMA ignored Plaintiffs' role, when the record reflects extensive efforts by the agency to solicit and incorporate feedback from governmental entities, while also allowing policyholders, like Plaintiffs, to participate in the ratemaking process itself.

### V. Risk Rating 2.0 Does Not Violate the Spending Clause (Count VIII)

Plaintiffs argue that Risk Rating 2.0 violates the Spending Clause because Plaintiffs did not "voluntarily and knowingly" accept the NFIP under Risk Rating 2.0, and because the "funding regime gives [Plaintiffs] no choice but to accept." Pls.' Br. at 46–49. Both formulations of their Spending

Cause claim are foreclosed by precedent, and this Court should therefore grant summary judgment to Defendants on Count VIII.

A. Congress (and federal agencies implementing Congressional directives) may set and modify the conditions for participation in voluntary federal programs. *See, e.g.*, *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) ("Incident to [its] power [to Tax and Spend], Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." (citation modified)); *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 136 (5th Cir. 2018) (similar); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583 (2012) (Congress can "make adjustments" to Medicaid program and has in the past conditioned old and new funding on acceptance of these adjustments). "If a State's citizens view" the conditions and the "federal policy as sufficiently contrary to local interests, they may elect to decline" participation. *New York v. United States*, 505 U.S. 144, 168 (1992).

*Adolph v. FEMA*, 854 F.2d 732 (5th Cir. 1988), applied these basic principles to the NFIP and forecloses Plaintiffs' claim here. There, the Fifth Circuit rejected a parish's argument that having to enact allegedly onerous ordinances to comply with FEMA standards and participate in the NFIP amounted to federal coercion. *Id.* at 740. As the court explained, "[b]y conditioning the availability of federally-subsidized insurance upon enactment of local flood-plain management ordinances in accordance with federal standards, *the NFIP represents a voluntary federal program*." *Id.* at 735 (emphasis added). Because of its voluntary nature, the NFIP and the obligations it imposes on communities could not, according to the court, amount to impermissible coercion. For support, the court drew on several Supreme Court "cases upholding imposition of speed-limit reductions, minority set-asides," nondiscrimination requirements in federally assisted schools, and "drinking-age requirements as a condition of federal highway funding"—where "Congress traditionally has been sustained in enacting

such programs to encourage state and local participation in the achievement of federal legislative goals." *Id.* at 735–36; *see also id.* at 736 n.3 (explaining that "[t]he federal government traditionally obtains state cooperation and participat[i]on in federal regulatory program[s] by offering the states a sufficiently attractive incentive or by threatening to withdraw a federal benefit they are presently receiving" (quoting *Tex. Landowners Rights Ass'n v. Harris*, 453 F. Supp. 1025, 1031 (D.D.C. 1978), *aff'd*, 598 F.2d 311 (D.C. Cir. 1979))). Because parishes could "weigh the advantages of [the NFIP] federal benefits against the limitations" that the program imposed and voluntarily decide whether to participate or withdraw, there could be no coercion. *Id.* at 736 (citation omitted).

That holding controls here: if States and municipalities truly believe that Risk Rating 2.0 represents a bait-and-switch overhaul of the NFIP—one that they believe imposes opaque conditions that outweigh the benefits the NIFP provides them in terms of floodplain management for their land and federally-subsidized insurance for their citizens—they can choose to no longer participate in NFIP. *See id.* (no parish is compelled to participate in NFIP). In fact, because participation in the NFIP is voluntary, a community may withdraw at any time. That critical fact readily distinguishes the coercion cases that Plaintiffs cite. *See* Pls.' Br. at 47. In those cases, the States had no voluntary choice because the threatened loss of billions of dollars of State funding clearly prevented them from turning down the federal government's conditions. *See Sebelius*, 567 U.S. at 581–82 (holding that Congress threatening to withhold all of the States' Medicaid grants unless they accepted expanded Medicaid funding and associated conditions functioned as a "gun to the head," since "[t]he threatened loss of over 10 percent of a State's overall budget … is economic dragooning that leaves the States with no real option but to acquiesce"); *Texas v. Yellen*, No. 2:21-CV-079-Z, 2022 WL 989733, at *4 (N.D. Tex. Mar. 4, 2022) (similar, regarding conditioning the States' access to billions in COVID-19 relief funds, comprising sizeable portions of their annual budgets, on their agreement to not use the funds to lower

state taxes by enacting tax cuts).[29]

Here, by contrast, Risk Rating 2.0 has neither made any NFIP changes abruptly nor altered the program in kind. Risk Rating 2.0 predictably continues Congress's efforts beginning with BW-12 to phase out premium subsidies and move to the full risk, actuarially based rates that the NFIA mandates, so that rates better communicate flood risks to policyholders and policyholders can take necessary measures to mitigate that risk. And by modifying the underlying methodology for calculating these rates by, for example, considering more known flood risk factors and using better risk modeling technology, Risk Rating 2.0 simply improves the NFIP's existing operation through reasonable adjustments. That is a far cry from the seismic and "dramatic" "transform[ations]" to program "coverage" and terms in *Sebelius*. 567 U.S. at 583–84.

Indeed, the NFIP under Risk Rating 2.0 continues to provide a voluntary and worthwhile bargain to Plaintiffs' residents and, in turn, to Plaintiffs themselves. Plaintiffs cannot and do not deny that the NFIP has historically promoted "the general welfare," *Dole*, 483 U.S. at 207 (citation omitted), by (1) providing a "reasonable method of sharing the risk of flood losses" in a national program that "complement[s] and encourage[s] preventive and protective measures," and "mak[es] flood insurance coverage available on reasonable terms and conditions"; and (2) as a result mitigates the "personal hardship" and national economic "burden" that flood disasters create, 42 U.S.C. § 4001(a); *see id.* § 4001(d). Risk Rating 2.0 furthers these purposes by, among other things, ensuring that premium rates are individualized and thereby more clearly communicate specific flood risks (and therefore necessary protective measures) to policyholders; eliminating subsidies that did not reasonably distribute the costs

[29] *Sebelius* is further distinguishable because it concerned an abrupt "shift *in kind*, not merely in degree," to the Medicaid program that States had originally agreed to participate in. 567 U.S. at 583 (emphasis added) (whereas original Medicaid program "was designed to cover medical services for four particular categories of the needy," "[u]nder the Affordable Care Act, Medicaid is transformed into … an element of a comprehensive national plan to provide universal health insurance coverage," which unfairly "surpris[ed] participating States" (quotation marks omitted)).

of insuring against flood risks because they resulted in policyholders in lower-value homes and at lower flood risk unfairly subsidizing other policies; expanding CRS discounts and other mitigation discounts; reducing premiums for many policyholders and ensuring that those with premium increases do not experience them suddenly, indiscriminately, or indefinitely; and, finally, improving the NFIP's financial solvency and stemming the growth of its more than $20 billion in debt. Plaintiffs ignore these many benefits.

Plaintiffs may feel that these benefits do not outweigh the premium increases that some of their residents may experience under Risk Rating 2.0, but that does not transform Risk Rating 2.0 into a Spending Clause violation. Again, they remain free to no longer be participating NFIP communities.[30] While they may have "tempting" incentives not to leave the NFIP—flood insurance coverage for their residents is certainly a "powerful" motivation—the NFIP "remains merely an offer" under Risk Rating 2.0. *Frederick L. v. Dep't of Pub. Welfare*, 157 F. Supp. 2d 509, 523 (E.D. Pa. 2001).

B. Plaintiffs' Spending-Clause claim fails for the independent reason that it does not even fall within the Spending Clause's ambit. States and municipalities themselves stand to lose no federal funding if they do not accept Risk Rating 2.0's allegedly onerous terms. And as the Supreme Court has explained, the "spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions," so the key question is whether a State voluntarily and knowingly accepted the contract terms. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (citing, *inter alia*, *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 585–98 (1937) (holding that to comply with a condition attached to a federal benefit is not to be equated with federal

[30] That they have remained in the program for years after FEMA announced premium projections for Risk Rating 2.0, despite clear communications FEMA provided to each policyholder's declarations page about the full risk premium for every insured structure, suggests that they have knowingly and voluntarily chosen to accept the NFIP under Risk Rating 2.0, "cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (citation omitted).

coercion)). But "the NFIP does not form a contract between participating communities and the United States." *United States v. Par. of St. Bernard*, 756 F.2d 1116, 1121 (5th Cir. 1985). Participating communities do not directly receive federal funds for flood insurance, and the Court is thus not being asked to evaluate whether the federal-state bargain struck for those funds was appropriate, as it would be tasked with doing in a conventional Spending Clause case. *See Landor v. Louisiana Dep't of Corr. & Pub. Safety*, 146 S. Ct. 1931, 1940 (2026) ("Often, Congress attaches conditions to the funds it distributes. And typically, if a recipient violates those conditions, Congress may terminate its agreement to provide funds." (internal quotations omitted)). Instead, the federal government contracts with individual policyholders, and what Plaintiffs are really concerned with and asking the Court to evaluate is the "significantly higher" premiums imposed on homeowners under Risk Rating 2.0. That Plaintiffs are, in effect, asserting contractual injuries on behalf of their residents makes the NFIP and Risk Rating 2.0 an awkward fit for Plaintiffs' Spending Clause claim.

The cases that Plaintiffs cite are distinguishable on this basis. *See* Pls.' Br. at 46–47. They each involved circumstances where Congress disbursed federal funds directly to States in exchange for certain conditions, and where the Court could thus evaluate the contract-like bargain directly struck between these "co-sovereigns" to ensure voluntariness and transparency. *Yellen*, 2022 WL 989733, at *4 (concerning pandemic relief funds to states); *see also, e.g.*, *Pennhurst*, 451 U.S. at 15–27 (concerning whether funding to States provided via the Developmentally Disabled Assistance and Bill of Rights Act of 1975 permissibly imposed an obligation on the States to provide, at their own expense, certain kinds of treatment for disabled individuals); *Sebelius*, 567 U.S. at 576–77 (concerning Medicaid grants to States). None involved consideration of the bargain struck between the federal sovereign and its citizens, and of State interests incidental to that bargain.

## VI. Any Relief, If Granted, Should Be Limited in Scope

If the Court grants Plaintiffs any relief—which it should not—any remedy must be appropriately limited to redress Plaintiffs' injuries. Because a federal court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). That is because "[i]n no circumstance can a court award relief beyond that necessary to redress the plaintiffs' injuries." *Trump v. CASA, Inc.*, 606 U.S. 831, 854 (2025); *see also id.* at 862 (Thomas, J., concurring) ("The complete-relief principle operates as a ceiling… it is the maximum a court can provide." (citation omitted)).

These principles limit the relief that this Court can provide to those particular Plaintiffs who have demonstrated standing and to the particular legal errors the Court may determine that FEMA made in developing and implementing Risk Rating 2.0. In other words, if this Court concludes that only certain Plaintiffs have standing, this Court possesses jurisdiction only to "vindicate the individual rights" of those Plaintiffs, *Gill*, 585 U.S. at 73, because broader relief would be "more burdensome to the defendant than necessary to provide complete relief to the plaintiffs[,]" *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

The availability of vacatur under the APA does not alter that analysis. Although Defendants acknowledge that the Fifth Circuit has authorized a court reviewing an APA challenge to vacate universally agency action that is, among other things, found to be not in accordance with law, Defendants here preserve the argument that 5 U.S.C. § 706(2) does not authorize *any* particular form of relief; it merely directs a reviewing court to disregard any "agency action, findings, and conclusions" that it finds unlawful when resolving an individual APA challenge. *See United States v. Texas*, No. 22-58 (U.S. Sept. 12, 2022), Br. for Petitioners at 39–44. Moreover, traditional principles of equity are counter to awarding the sweeping relief of universal vacatur. *See Trump v. Hawaii*, 585 U.S. 667, 717 (2018)

(Thomas, J., concurring) (explaining that English and early American "courts of equity" typically "did not provide relief beyond the parties to the case"). When Congress adopted the "unremarkable" "set aside" language in § 706(2), there is no reason to think it "meant to upset the bedrock practice of case-by-case judgments with respect to the parties in each case." *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring); *see also California v. Texas*, 593 U.S. 659 (2021) (explaining that remedies "ordinarily 'operate with respect to specific parties,'" rather than "'on legal rules in the abstract'" (citation omitted)).

Defendants recognize that the Fifth Circuit has characterized vacatur as the "default" remedy under the APA. *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859–60 (5th Cir. 2022). But the Fifth Circuit has made clear that even in those cases where vacatur is an available remedy, a court need not *universally* vacate the challenged agency action as Plaintiffs request here. Indeed, the Fifth Circuit has on multiple occasions after deciding *Data Marketing Partnership* rejected universal vacatur under the APA. *See, e.g.*, *Texas v. United States*, 126 F.4th 392, 419–20 (5th Cir. 2025) (reversing the district court's wholesale vacatur of DACA for failure to sever and preserve the forebearance provisions); *VanDerStok v. Garland*, No. 23-10718, 2023 WL 4945360, at *1 (5th Cir. July 24, 2023) ("The ATF is likely correct, however, that the vacatur was overbroad."); *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality opinion) (concluding without contradiction from any other member of the court that the district court could consider on remand "a more limited remedy" than universal vacatur, and instructing the district court to "determine what remedy . . . is appropriate to effectuate" the judgment), *aff'd*, 602 U.S. 406 (2024); *id.* (recognizing that "'[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury'"); *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75, 375 n.29 (5th Cir. 2022) (stating that "[v]acatur is the only statutorily prescribed remedy for a successful APA challenge," but not suggesting that universal vacatur is mandatory, and acknowledging

circumstances where courts do not vacate successfully challenged actions); *see also Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (declining to enter vacatur in favor of remand).

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment to Defendants on all remaining counts and dismiss this suit.

Date: July 29, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANDREW I. WARDEN
Assistant Branch Director
Civil Division, Federal Programs Branch

*/s/ Sarah M. Suwanda*
SARAH M. SUWANDA
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Phone: (202) 305-3196
E-mail: sarah.m.suwanda@usdoj.gov

*Counsel for Defendants*