# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

<table>
<tr><td>

THE STATE OF LOUISIANA *et al.*,

     *Plaintiffs,*

v.

DEPARTMENT OF HOMELAND SECURITY *et al.*,

     *Defendants.*[1]

</td><td>

Action No. 2:23-cv-01839
Section P
District Judge Darrel J. Papillion
Magistrate Judge Eva J. Dossier

</td></tr>
</table>

**Declaration of Elizabeth Asche**

---

[1] The Complaint names as a Defendant Alejandro Mayorkas in his official capacity as then-Secretary of Homeland Security. Under Federal Rule of Civil Procedure 25(d), Markwayne Mullin, current Secretary of Homeland Security, is automatically substituted as a Defendant.

1

1. My name is Elizabeth Asche, Ph.D., and I am the Assistant Administrator for the Federal Insurance Directorate ("FID"), which is housed within the Federal Emergency Management Agency ("FEMA"), a component agency of the Department of Homeland Security ("DHS"). I have served in this capacity since January 13, 2025. I joined FEMA in 2015 after pursuing a Ph.D. in economics, focused on flood insurance.

2. From March 2019 to October 2019, I served as the Acting Division Director – Policyholder Services. Previously, I served from February 2016 to October 2019 as Chief, Insurance Analytics and Policy Branch, following nine months (June 2015 to February 2016) as an expert in reform with the National Flood Insurance Program ("NFIP"). Between these dates and my current position, I served in additional leadership positions at FEMA.

3. I am the senior executive for the NFIP. I have served in this capacity for one year and five months, assuming the position January 13, 2025.

4. I submit this Declaration in Support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment. This declaration incorporates and expressly adopts the statements made in the Declaration of David Maurstad, dated August 7, 2023, and filed with Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, *see* ECF No. 56-1 ("Maurstad Decl."), and provides further updates, to the extent applicable, on those assertions.

5. Since the filing of the Maurstad Declaration, FEMA has relied exclusively on Risk Rating 2.0 as its premium rating methodology. Accordingly, granting the requested injunction at this stage of its implementation would exacerbate the significant and irreparable harm previously identified to the Court affecting the NFIP, its stakeholders, policyholders, and the American taxpayers.

6. This declaration contains three main updates: first, FEMA's compliance with the 2008 Government Accountability Office ("GAO") Report. As Mr. Maurstad explained, the GAO made a

series of recommendations as to how the NFIP could become more fiscally sound; through Risk Rating 2.0, FEMA has completed these recommendations. Second, this declaration addresses the issuance of the FEMA Council Report, which recommends continued implementation of Risk Rating 2.0 to advise homeowners of their true risk. Third, this declaration details the continued mitigation discounts available to policyholders. These updates demonstrate that the NFIP is fulfilling the intent of Congress and effectively serving its community participants.

7.      Plaintiffs' arguments demonstrate fundamental misunderstandings about the NFIP and FEMA's administration of that program. For instance, Plaintiffs allege that "Equity in Action has… given rise to a novel deobligation of federal grant money that will cause the States to pay back millions of dollars to the federal government." Memorandum in Support of Plaintiffs' Motion for Summary Judgment, ECF No. 195-2 at 16. Per FEMA's Flood Mitigation Assistance program guidance: "Flood insurance coverage must be maintained for the life of the property, regardless of ownership. Failure to maintain flood insurance will result in the denial of *future* federal disaster assistance for that property and *may* require repayment of grant funds." Hazard Mitigation Assistance Program and Policy Guide, version 2.1, Part 4. I. Flood Insurance Requirements. (emphases added). *See also* 44 C.F.R. § 77.6. In other words, the possible repayment of grant funds for failure to maintain flood insurance does not present a "novel issue" but describes routine grants management by the agency. Indeed, grant subapplicants often fail to maintain insurance coverage for a myriad of reasons, and in those instances, FEMA works with the applicants to address those issues.

8.      To date, FEMA has not deobligated any funding on the basis of Risk Rating 2.0, including in Florida and Louisiana communities as Plaintiffs allege. Nor does FEMA currently intend to require the repayment of grant funds solely on the basis that those policyholders refused to obtain NFIP coverage due to increased premiums resulting from Risk Rating 2.0. Nor does FEMA currently track subrecipients that refuse to obtain NFIP coverage due to increased premiums resulting from

3

Risk Rating 2.0.  FEMA does not have visibility or influence over Louisiana's or Florida's decisions to clawback money for grants based on this.

9.      The NFIP currently insures approximately 4.5 million residential and commercial policyholders totaling approximately $1.25 trillion in insurance coverage.  The NFIP is not just an insurance program; it also works to reduce the cost of flood damage through identifying, analyzing, and reducing flood risk.  By supporting flood hazard reduction grant programs and floodplain management efforts, the NFIP has previously estimated that more than $2.4 billion in flood-related losses are avoided annually.[2]

10.      Risk Rating 2.0 corrects the longstanding inequities in NFIP pricing.  Under legacy rates, policyholders in certain coastal states were subsidized by others in less flood-prone areas, leading to unfair distribution of flood risk costs.  Risk Rating 2.0 phases in actuarial rates, ensuring that premiums reflect the true risk to each property.  The National Research Council ("NRC") found that under legacy rates, FEMA's reliance on a small number of flood zones failed to capture significant risk variation within and across zones, resulting in inaccurate premiums and cross-subsidization.[3]  Risk Rating 2.0 moves away from this oversimplified legacy system, using more detailed data and modeling to price risk at the structure level.

## I.      Compliance with GAO Report and Other Industry Recommendations Through Risk Rating 2.0

11.      The Maurstad Declaration explained how Risk Rating 2.0 addressed concerns raised by GAO, the NRC, the Technical Mapping Advisory Committee ("TMAC"), and the Congressional

---

[2] U.S. Congress, Senate Committee on Banking, Housing, and Urban Affairs, Reauthorization of the National Flood Insurance Program, Part II, Statement of David Maurstad, Deputy Associate Administrator for Insurance and Mitigation, Federal Insurance and Mitigation Administration, FEMA, 117th    Cong.,    1st    sess.,    June    17,    2021,    p.    2, https://www.banking.senate.gov/imo/media/doc/Maurstad%20Testimony%206-17-21.pdf.
[3] Cross-subsidies were the result of charging some policyholders rates that are higher than their expected claims so that other policyholders can pay rates that are lower than their expected claims.

Budget Office ("CBO"), as well as those addressed in the Biggert-Waters Flood Insurance Reform Act of 2012 (the "Biggert-Waters Act") and the Homeowner Flood Insurance Affordability Act of 2014 ("HFIAA"). *See* Maurstad Decl., ¶¶ 65-87.

12.    In a report entitled "Flood Insurance: FEMA's Rate-Setting Process Warrants Attention," (Oct. 31, 2008), GAO made five recommendations with respect to FEMA's rate-setting process. Maurstad Decl., ¶¶ 68-69. In 2017, GAO made an additional finding that "NFIP premiums do not reflect the full risk[.]" *Id.* ¶ 70. As Mr. Maurstad previously explained, GAO closed its 2008 recommendation (Recommendation 09-12) by stating that "[b]ased on FEMA's progress in creating a more accurate and modernized rate setting methodology that better reflects the full risk of loss, we are closing this recommendation as implemented." *Id.* **In 2023, after continued implementation of Risk Rating 2.0, FEMA met all five criteria that GAO required it to meet[4] in order to remove NFIP from the GAO High-Risk List.** **Having met all five criteria, the NFIP has transitioned to congressional monitoring only on the GAO High-Risk List.** To make further progress, Congress needs to enact comprehensive reforms to [5]NFIP that would address the program's challenges.[6]

13.    The NRC and TMAC recommended transitioning to structure-specific risk assessments. *See* Maurstad Decl. ¶¶ 76-87. Risk Rating 2.0 now provides these assessments using modern catastrophe models, widely used in the private insurance market, to improve risk assessment and premium accuracy. These models consider a broader range of flood hazards and leverage

---

[4] U.S. Congressional Research Service, *National Flood Insurance Program: The Current Rating Structure and Risk Rating 2.0*, R45999 (April 4, 2022), https://www.congress.gov/crs-product/R45999.

[6] U.S. Gov't Accountability Office*, High-Risk Series: Heightened Attention Could Save Billions More and Improve      Government      Efficiency      and      Effectiveness*,      GAO-25-107743      (Feb. 2025), https://www.gao.gov/assets/gao-25-107743.pdf.

advanced technologies for comprehensive risk analysis. This shift aligns the NFIP with industry best practices and enables more precise, equitable premium calculations.

14.    In September 2017, the CBO recommended increasing premium income and better aligning premiums with risk, recommendations that FEMA is now fulfilling through Risk Rating 2.0. *See* Maurstad Decl. ¶¶ 97-102.    Congress addressed the NFIP's fiscal challenges through the Biggert-Waters Act and HFIAA, which mandated premium increases for certain high-risk properties and capped annual increases to address affordability. Despite these reforms, the legacy rating system cumulative costs had exceeded premiums by about 60%, resulting in significant program debt. *Id.* ¶ 97. Legacy rating caused insufficient rating variables, leading to policyholders paying the same amount for different levels of risk, and lower-value homes subsidizing higher-value homes. For example, premiums did not account for replacement cost value, causing undercharging for expensive homes and overcharging for modest ones. Risk Rating 2.0 incorporates more predictive variables, such as replacement cost, elevation, distance to flooding sources, and prior claims, resulting in more accurate, risk-based premiums.

15.    Legacy rates also created pricing disparities at flood zone boundaries, with neighboring properties facing vastly different premiums despite similar risk profiles. Risk Rating 2.0 addresses these disparities by considering a wider range of risk factors, ensuring premiums are more closely matched to actual flood exposure. Risk Rating 2.0 also corrects for historic inadequacies in total premiums collected, which previously failed to account for all flooding sources and frequencies, contributing to NFIP's debt.

16.    Risk Rating 2.0 leverages industry-standard catastrophe modeling to consider additional sources of flooding, such as heavy rainfall, tsunami, Great Lakes flooding, and coastal erosion. This comprehensive approach ensures that premiums reflect the full spectrum of flood events covered by NFIP policies. The modernization of rating practices also ensures compliance with

current actuarial standards and reduces the financial burden on taxpayers.

17.    Another major improvement through Risk Rating 2.0 is the recognition of varying degrees of flood risk reduction provided by levees.  Legacy rates used a binary classification, offering uniform discounts for accredited levees and ignoring the benefits of non-accredited levees.  Risk Rating 2.0 utilizes data from the National Levee Database and Levee Screening Tool, accounting for the quality and performance of individual levees in premium calculations, resulting in more accurate risk assessments.

18.    FEMA's new Risk Rating Engine streamlines underwriting and policy issuance, replacing multiple legacy systems with a centralized platform that minimizes errors and provides consistent premium determinations.  The new engine uses integrated geospatial software to geo-locate properties and incorporates structural characteristics, coverage choices, and mitigation actions, giving agents and policyholders a clearer understanding of flood risk and available discounts under Risk Rating 2.0.

19.    Finally, Risk Rating 2.0 improves communication about flood risk by considering more perils and offering mitigation discounts to properties outside the Special Flood Hazard Area ("SFHA").  Policyholders are incentivized to reduce their risk through mitigation actions, which can lower premiums.  In sum, the modernization of NFIP rating practices addresses the CBO Report's concerns by ensuring that premiums are actuarially sound, equitable, and reflective of the true risk to each property, which supports the program's financial stability while also reducing taxpayer burden.

## II.    FEMA Council Recommends Continuation of Risk Rating 2.0

20.    On January 24, 2025, President Trump established the Federal Emergency Management Agency Review Council ("FEMA Council" or the "Council") through Executive Order 14180, "Council to Assess the Federal Emergency Management Agency," to advise the President on recommended changes to FEMA.  Per the Executive Order, the Council is comprised of the Secretary

of Homeland Security, the Secretary of Defense, and "relevant agency heads and distinguished individuals and representatives from sectors outside of the Federal Government appointed by the President." *Id.* The governor of Texas and former governor of Mississippi, Plaintiff States in this matter, are members of the Council, as well as W. Nimm Kidd, Chief of the Texas Division of Emergency Management, and Kevin Guthrie, Executive Director of the Florida Division of Emergency Management.[7]

21.    On May 7, 2026, the Council issued their final report, in which they recommended "[m]odernizing risk data with continued implementation of Risk Rating 2.0 and revising flood maps to inform the American people about their true risk."[8]

22.    The Council acknowledged that "Risk Rating 2.0 leveraged advanced technology and data sources to deliver fairer, more individualized rates, must continue to be implemented and updated based on better information and science."[9]

23.    Under Risk Rating 2.0, approximately 23% of policies saw premium decreases totaling $577 million, an average of $627 dollars per policy. These policyholders would have continued to see arbitrary premiums increases under the legacy system.

**III.    Risk Rating 2.0 Incentivizes Lower Rates Through Continued Discounts for Mitigation**

24.    Unlike with the legacy rates, FEMA, through Risk Rating 2.0, is expanding certain flood insurance policy discounts by making them available to properties located outside of the Special Flood Hazard Area ("SFHA").[10] When property owners take steps to mitigate their property, flood

---

[7]    Federal    Emergency    Management    Agency,    FEMA    Review    Council    Members    at https://www.dhs.gov/fema-review-council-members.

[8] Department of Homeland Security, "FEMA Review Council Final Report" (May 7, 2026) at https://www.dhs.gov/fema-review-council-members.

[9] *Id.*

[10] SFHA or "Area of special flood hazard" is defined in FEMA's regulations as "the land in the flood

insurance policyholders may receive a reduced premium. Mitigation efforts, such as installing proper flood openings in a crawlspace or properly elevating machinery and equipment, will help to reduce flood damage and potentially decrease the cost of flood insurance.[11] For each of these mitigation actions, FEMA has assigned a percentage discount that will be taken off the total premium amount.[12]

25.    Plaintiffs argued that Risk Rating 2.0 would discourage mitigation activities, but this is not the case. The data continues to show that the number of policyholders receiving these discounts is still far higher under Risk Rating 2.0 than under the legacy rating method. While some numbers have decreased between 2023 and 2025, these decreases generally correlate to a decrease in the number of policies in force.

26.    On September 1, 2021, prior to implementation of Risk Rating 2.0, there were 712,991 policies in force nationwide receiving a mitigation discount for elevating the insured structure. Under the Risk Rating 2.0, structures with a first-floor height value above zero receive discounts on their premiums. As of June 21, 2023, there were 4,638,600 policies in force nationwide receiving a discount for elevating the insured structure. As of January 1, 2025, there were 4,625,670 policies in force nationwide receiving a discount for elevating the insured structure.

27.    On September 1, 2021, prior to implementation of Risk Rating 2.0, there were 253,540 Florida policies in force receiving a mitigation discount for elevating the insured structure. As of June 21, 2023, there were 1,639,807 Florida policies in force receiving a discount for elevating the insured structure. As of January 1, 2025, there were 1,756,129 policies in force in Florida receiving a discount

---

plain within a community subject to a 1 percent or greater chance of flooding in any given year." 44 C.F.R. § 59.1.

[11] *See* NFIP Flood Insurance Manual, Risk Rating 2.0: Equity in Action Edition (October 2022), at 3.26-3.31.

[12] Additionally, as part of Risk Rating 2.0, FEMA considers the elevation of the building in relation to the adjacent ground - First Floor Height. The First Floor Height is rating factor that is applied based on the building's first floor height above the ground. The higher the floor is above the ground, the lower the premium.

for elevating the insured structure.

28.    On September 1, 2021, prior to implementation of Risk Rating 2.0, there were 515 Idaho policies in force receiving a mitigation discount for elevating the insured structure.  As of June 21, 2023, there were 5,552 Idaho policies in force receiving a discount for elevating the insured structure.  As of January 1, 2025, there were 5,150 Idaho policies in force receiving a discount for elevating the insured structure.

29.    On September 1, 2021, prior to implementation of Risk Rating 2.0, there were 2,716 Kentucky policies in force receiving a mitigation discount for elevating the insured structure.  As of June 21, 2023, there were 17,604 Kentucky policies in force receiving a discount for elevating the insured structure.  As of January 1, 2025, there were 16,843 Kentucky policies in force receiving a discount for elevating the insured structure.

30.    On September 1, 2021, prior to implementation of Risk Rating 2.0, there were 32,456 Louisiana policies in force receiving a mitigation discount for elevating the insured structure.  As of June 21, 2023, there were 470,900 Louisiana policies in force receiving a discount for elevating the insured structure.  As of January 1, 2025, there were 427,014 Louisiana policyholders receiving a discount for elevating the insured structure.

31.    On September 1, 2021, prior to implementation of Risk Rating 2.0, there were 9,462 Mississippi policies in force receiving a mitigation discount for elevating the insured structure.  As of June 21, 2023, there were 55,843 Mississippi policies in force receiving a discount for elevating the insured structure.  As of January 1, 2025, there were 52,280 Mississippi policies in force receiving a discount for elevating the insured structure.

32.    On September 1, 2021, prior to implementation of Risk Rating 2.0, there were 167 Montana policies in force receiving a mitigation discount for elevating the insured structure.  As of June 21, 2023, there were 4,009 Montana policies in force receiving a discount for elevating the insured

structure. As of January 1, 2025, there were 3,834 Montana policyholders receiving a discount for elevating the insured structure.

33.     On September 1, 2021, prior to implementation of Risk Rating 2.0, there were 128 North Dakota policies in force receiving a mitigation discount for elevating the insured structure. As of June 21, 2023, there were 7,254 North Dakota policies in force receiving a discount for elevating the insured structure. As of January 1, 2025, there were 6,235 North Dakota policies in force receiving a discount for elevating the insured structure.

34.     On September 1, 2021, prior to implementation of Risk Rating 2.0, there were 75,061 South Carolina policies in force receiving a mitigation discount for elevating the insured structure. As of June 21, 2023, there were 196,061 South Carolina policies in force receiving a discount for elevating the insured structure. As of January 1, 2025, there were 192,154 South Carolina policies in force receiving a discount for elevating the insured structure.

35.     On September 1, 2021, prior to implementation of Risk Rating 2.0, there were 41,768 Texas policies in force receiving a mitigation discount for elevating the insured structure. As of June 21, 2023, there were 681,974 Texas policies in force receiving a discount for elevating the insured structure. As of January 1, 2025, there were 634,093 Texas policies in force receiving a discount for elevating the insured structure.

### A.     Increases in Policyholders Receiving Discounts for Installing Flood Openings Under Risk Rating 2.0

36.     On September 1, 2021, prior to implementation of Risk Rating 2.0, there were 53,884 policies in force nationwide receiving a mitigation discount for installing flood openings. As of June 21, 2023, there were 147,175 policies in force nationwide receiving this mitigation discount. As of January 1, 2025, there were 139,234 policies in force nationwide receiving this mitigation discount.

37.     On September 1, 2021, prior to implementation of Risk Rating 2.0, there were 15,510 Florida policies in force receiving a mitigation discount for installing flood openings. As of June 21,

11

2023, there were 30,061 Florida policies in force receiving this discount.  As of January 1, 2025, there were 30,718 Florida policies in force receiving this discount.

38.    On September 1, 2021, prior to implementation of Risk Rating 2.0, there were 35 Idaho policies in force receiving a mitigation discount for installing flood openings.  As of June 21, 2023, there are 107 Idaho policies in force receiving this discount.  As of January 1, 2025, there were 71 Idaho policies in force receiving this discount.

39.    On September 1, 2021, prior to implementation of Risk Rating 2.0, there were 140 Kentucky policies in force receiving a mitigation discount for installing flood openings.  As of June 21, 2023, there were 502 Kentucky policies in force receiving this discount.  As of January 1, 2025, there were 451 Kentucky policies in force receiving this discount.

40.    On September 1, 2021, prior to implementation of Risk Rating 2.0, there were 1,963 Louisiana policies in force receiving a mitigation discount for installing flood openings.  As of June 21, 2023, there were 7,843 Louisiana policies in force receiving this discount.  As of January 1, 2025, there were 7,535 Louisiana policies in force receiving this discount.

41.    On September 1, 2021, prior to implementation of Risk Rating 2.0, there were 410 Mississippi policies in force receiving a mitigation discount for installing flood openings.  As of June 21, 2023, there were 2,388 Mississippi policies in force receiving this discount.  As of January 1, 2025, there were 2,383 Mississippi policies in force receiving this discount.

42.    On September 1, 2021, prior to implementation of Risk Rating 2.0, there were 9 Montana policies in force receiving a mitigation discount for installing flood openings.  As of June 21, 2023, there were 26 Montana policies in force receiving this discount.  As of January 1, 2025, there were 15 Montana policies in force receiving this discount.

43.    On September 1, 2021, prior to implementation of Risk Rating 2.0, there were 12 North Dakota policies in force receiving a mitigation discount for installing flood openings.  As of

12

June 21, 2023, there were 5 North Dakota policies in force receiving this discount. As of January 1, 2025, there were 4 North Dakota policies in force receiving this discount.

44.    On September 1, 2021, prior to implementation of Risk Rating 2.0, there were 5,418 South Carolina policies in force receiving a mitigation discount for installing flood openings. As of June 21, 2023, there are 21,066 South Carolina policies in force receiving this discount. As of January 1, 2025, there were 19,563 South Carolina policies in force receiving this discount.

45.    On September 1, 2021, prior to implementation of Risk Rating 2.0, there were 4,786 Texas policies in force receiving a mitigation discount for installing flood openings. As of June 21, 2023, there were 8,407 Texas policies in force receiving this discount. As of January 1, 2025, there were 7,648 Texas policies in force receiving this discount.

**B.    Increases in Policyholders Receiving Discounts for Elevating Machinery and Equipment**

46.    Risk Rating 2.0 also credits mitigation activities that were not credited when legacy rates were used, such as elevating machinery and equipment.

47.    While no policyholders were receiving discounts relating to elevating machinery and equipment when FEMA's legacy rating was in place, there are 536,543 policies in force[13] receiving this discount nationwide under Risk Rating 2.0 as of 2025, including 238,279 policies in force in Florida, 803 policies in force in Idaho, 2,266 policies in force in Kentucky, 44,207 policies in force in Louisiana, 4,943 policies in force in Mississippi, 362 policies in force in Montana, 350 policies in force in North Dakota, 23,427 policies in force in South Carolina, and 58,287 policies in force in Texas.

**C.    Community Rating System**

48.    Risk Rating 2.0 did not eliminate the discounts applied to standard flood insurance policies through the Community Rating System ("CRS"). Communities in Florida, Idaho, Kentucky,

---

[13] As of January 1, 2025.

Louisiana, Mississippi, Montana, North Dakota, South Carolina, and Texas all participate in CRS, and policyholders in good standing in those communities receive discounted premiums.

49.    CRS is a voluntary incentive program that recognizes and encourages community floodplain management practices that exceed the minimum requirements of NFIP.  Over 1,500 communities participate nationwide.

50.    Flood insurance premium discounts in CRS communities range from 5% to 45% and are discounted in increments of 5%.  For example, a Class 10 community is one that is not participating in CRS and receives no discount.  A Class 9 community receives a 5% discount for all policies, a Class 8 community receives a 10% discount, and so on—all the way to a Class 1 community, which receives a 45% premium discount. [14]

51.    The applicability of the CRS discount was actually expanded under Risk Rating 2.0. Under the legacy rating, the percentage of the CRS discount in a community depended on the location of the building, compliance with floodplain ordinances, and eligibility for certain rates.  Under Risk Rating 2.0, CRS discounts are applied to the full risk premiums for policies of all eligible[15] policyholders in the community.  **In other words, more policyholders are receiving CRS discounts under Risk Rating 2.0.**  On September 1, 2021, prior to the implementation of Risk Rating 2.0, there were 1,863,089 policies in force nationwide that received a CRS discount totaling $336,051,985.  As of May 23, 2023, there are 3,344,140 policies in force receiving a CRS discount totaling $800,903,705.  That is a 79.5% increase in policyholders receiving CRS discounts and a 138% increase in the amount of CRS discounts being provided.

52.    On September 1, 2021, prior to the implementation of Risk Rating 2.0, there were

---

[14] Federal Emergency Management Agency, Community Rating System, at
https://www.fema.gov/floodplain-management/community-rating-system.
[15] An eligible policyholder is one whose structure is built in compliance with the minimum floodplain management requirements at 44 C.F.R. Part 60.

156,263 Louisiana policies in force that received a CRS discount totaling $26,564,761. As of June 21, 2023, there are 376,061 Louisiana policies in force receiving a CRS discount totaling $96,628,418.00. That is a 141% increase in policyholders receiving CRS discounts, and a 264% increase in the amount of CRS discounts being provided. As of January 1, 2025, there are 336,124 Louisiana policyholders receiving a CRS discount totaling $86,064,232.00.

53.    On September 1, 2021, prior to the implementation of Risk Rating 2.0, there were 1,042,544 Florida policies in force that received a CRS discount totaling $179,621,953. As of June 21, 2023, there are 1,541,196 Florida policies in force receiving a CRS discount totaling $391,330,071. As of January 1, 2025, there are 1,631,964 Florida policies in force receiving a CRS discount totaling $434,756,738.00.

54.    On September 1, 2021, prior to the implementation of Risk Rating 2.0, there were 1,625 Idaho policies in force that received a CRS discount totaling $152,639. As of June 21, 2023, there are 2,631 Idaho policies in force receiving a CRS discount totaling $356,676. As of January 1, 2025, there are 2,206 Idaho policies in force receiving a CRS discount totaling $331,275.00.

55.    On September 1, 2021, prior to the implementation of Risk Rating 2.0, there were 5,892 Kentucky policies in force that received a CRS discount totaling $2,338,618. As of June 21, 2023, there are 8,078 Kentucky policies in force receiving a CRS discount totaling $2,962,557. As of January 1, 2025, there are 7,622 Kentucky policies in force receiving a CRS discount totaling $2,963,552.00.

56.    On September 1, 2021, prior to the implementation of Risk Rating 2.0, there were 16,070 Mississippi policies in force that received a CRS discount totaling $1,779,368. As of June 21, 2023, there are 36,139 Mississippi policies in force receiving a CRS discount totaling $8,243,452. As of January 1, 2025, there are 33,764 Mississippi policies in force receiving a CRS discount totaling $7,104,753.00.

15

57.     On September 1, 2021, prior to the implementation of Risk Rating 2.0, there were 874 Montana policies in force that received a CRS discount totaling $128,470. As of June 21, 2023, there are 2,487 Montana policies in force receiving a CRS discount totaling $310,135. As of January 1, 2025, there are 2,365 Montana policies in force receiving a CRS discount totaling $247,047.00.

58.     On September 1, 2021, prior to the implementation of Risk Rating 2.0, there were 810 North Dakota policies in force that received a CRS discount totaling $135,066. As of June 21, 2023, there are 5,295 North Dakota policies in force receiving a CRS discount totaling $970,282. As of January 1, 2025, there are 4,555 North Dakota policies in force receiving a CRS discount totaling $874,386.00.

59.     On September 1, 2021, prior to the implementation of Risk Rating 2.0, there were 102,561 South Carolina policies in force that received a CRS discount totaling $18,600,678. As of June 21, 2023, there are 177,426 South Carolina policies in force receiving a CRS discount totaling $40,930,052. As of January 1, 2025, there are 174,331 South Carolina policies in force receiving a CRS discount totaling $42,701,723.00.

60.     On September 1, 2021, prior to the implementation of Risk Rating 2.0, there were 144,464 Texas policies in force that received a CRS discount totaling $26,318,354. As of June 21, 2023, there are 414,432 Texas policies in force receiving a CRS discount totaling $94,235,425. As of January 1, 2025, there are 395,123 Texas policies in force receiving a CRS discount totaling $ 93,127,888.00.

61.     Also of note, a number of the Plaintiff Parishes claiming to have suffered from the loss of CRS discounts due to Risk Rating 2.0 do not actually participate in the CRS program; those parishes include Caldwell Parish, Cameron Parish, Catahoula Parish, Claiborne Parish, Concordia Parish, Evangeline Parish, Franklin Parish, Grant Parish, Tensas Parish, Washington Parish, and West

16

Feliciana Parish.[16] Additionally, due to compliance issues, LaFourche Parish and communities within Livingston Parish have been retrograded to a CRS class 10, which means they do not receive any premium discounts.[17]

## IV.    Potential Harms/Conclusion

62.    To reemphasize, if the implementation of the current rates is enjoined by the Court, five adverse impacts are readily identifiable:

63.    *Impact on Policyholders.* If Risk Rating 2.0 were halted and the legacy rating system from the 1970s were to be reinstated, policyholders would face premiums based on outdated and inaccurate risk assessments.  Approximately 19% of single-family home policyholders who have benefited from lower premiums under Risk Rating 2.0 would see their costs rise, paying more for the same coverage and reverting to higher rates than warranted.  Owners of lower-value homes would continue subsidizing those with higher-value properties.  Similarly, policyholders in inland areas would subsidize those in coastal regions, and residents in northern Louisiana would bear costs for the elevated flood risks in southern Louisiana.  Some individuals could face extremely high premiums ranging from $15,000 to $55,000.  Overall, premiums would continue to climb indefinitely, as the legacy system lacks the technological capability to accurately assess property risk, leaving FEMA unable to ensure premiums are sufficient to cover losses.  Furthermore, policyholders would need to engage in a lengthy reverting-application process to disclose additional technical information about their properties as required to underwrite policies under the legacy rating methodology.

64.    *Impact on Taxpayers and NFIP Financial Stability.* Reverting to the legacy rating where the NFIP only collected premiums covering only 60% of operational costs, would worsen the financial instability of the NFIP, which currently carries a debt of $22.525 billion.  This debt, accrued

---

[16] *See* FEMA, Community Status Book Report for Louisiana, at https://www.fema.gov/cis/LA.pdf.
[17] *Id.*

from catastrophic loss years, would likely increase if Risk Rating 2.0 were to be enjoined, as the NFIP would miss out on additional premiums that should be collected if risks were properly rated. Taxpayers, who have already funded significant debt cancellation, would likely be required to cover further losses if the NFIP continues to operate unsustainably.

65.    *Violation of the National Flood Insurance Act.*  An injunction would force FEMA to disregard the National Flood Insurance Act ("NFIA"), which mandates that premiums be risk-based, actuarially sound, sufficient to cover expected losses, and reasonable to operate the program.

66.    *Impact on FEMA.*  If enjoined, FEMA would need to undertake a complex, costly, and multi-year process to dismantle Risk Rating 2.0 and restore the legacy rating system.  This would involve renegotiating contracts, procuring elevation certificates, extensive system and form updates, revising policies and guidance, training new staff and retraining existing staff, retraining Write Your Own ("WYO") carrier staff, re-underwriting over 4.4 million flood insurance policies, and launching a major communication campaign with WYO companies, stakeholders, and policyholders.  Reverting to the legacy system would also cause major disruption to current policy premiums, both in terms of labor and effect.  Through Risk Rating 2.0, low-value residential properties in low-risk flood areas received significant premium reductions reflective of their actual flood risk.  If enjoined, FEMA would need to reverse course and shift those accurate premium reductions from low-risk properties back to higher-value, high-risk structures—thereby undoing Risk Rating 2.0's accurate redistribution of risk. Under the legacy system, rating a single policy involved a lengthy manual process, which included complex rating tables, costly elevation certificates for the majority of zone designations, special rating situations, and unequal distribution of premium. The complexity of the rules and tables led to inconsistent application of rating guidance among Write-Your-Own (WYO) companies, creating confusion for both agents and policyholders. If forced to revert back to the legacy system, FEMA would not only lose the accurate redistribution of risk under Risk Rating 2.0 but would

18

also incur the significant burden of reassessing and re-rating policies under the more cumbersome and manual legacy system. Reverting back to that cumbersome legacy method would likewise create confusion and hardship for policyholders, undermine public trust, and further complicate FEMA's relationships with stakeholders, policyholders, WYO companies, the public, and its own staff— potentially eroding trust for years and impeding FEMA's ability to fulfill its mission.

67.    *Impact on Write Your Own ("WYO") Companies.* WYO companies, which have already invested in implementing Risk Rating 2.0, would be forced to spend even more resources to dismantle it and revert to the legacy system. This would require renegotiating vendor contracts, obtaining elevation certificates, extensive system updates, increased communication with policyholders, and retraining insurance agents, especially those unfamiliar with the legacy rating. WYO companies and agents could suffer reputational damage, potentially resulting in loss of business and, for some agents, the loss of their entire client base.

68.    It should also be noted that while FEMA could technically take steps to dismantle Risk Rating 2.0 and return to the legacy system, a complete reversion is not possible. Industry-standard catastrophe modeling has enabled FEMA to more accurately identify previously unaccounted sources of flood risk in its premium calculations. While the NFIP covers flood losses from various perils, the legacy rates only considered two sources of flood risk. Incorporating additional sources of flood risk has led to higher premiums to reflect expected losses where warranted. Now that FEMA has identified these risks, ignoring them would not only violate statutory requirements under the NFIA, but also contradict the NFIP's mission. In essence, even if Risk Rating 2.0 were enjoined, FEMA could not disregard catastrophe modeling in setting its premium rates without violating the law.

I, Elizabeth Asche, swear under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the above statements are true and correct to the best of my knowledge.

Executed this 8 day of July, 2026

20