**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

THE STATE OF LOUISIANA *et al.*,

*Plaintiffs*,

v.

DEPARTMENT OF HOMELAND SECURITY *et al.*,

*Defendants*.

Action No. 2:23-cv-01839
Section P
District Judge Darrel J. Papillion
Magistrate Judge Eva J. Dossier

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS**

In accordance with Local Rule 56.1, Defendants respond to Plaintiffs' Statement of Material Facts, ECF No. 195-1:[1]

1. Undisputed.

2. Undisputed.

3. Undisputed.

4. Undisputed. Defendants additionally note that, to determine flood insurance premiums, Defendant Federal Emergency Management Agency ("FEMA") created Flood Insurance Rate Maps, which recorded areas exposed to a 1% or greater risk of flooding in any given year.

[1] Plaintiffs bring claims under the Administrative Procedure Act ("APA"), and thus, "a motion for summary judgment stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the court's review." *Louisiana Shrimp Ass'n v. Biden*, 789 F. Supp. 3d 467, 477 (E.D. La. 2025) (citations omitted). For this reason, and in light of the Court's instruction that the parties file the joint appendix of the administrative record by November 2, 2026, Defendants do not believe they are required to file a separate statement of material facts. Should the Court require one, Defendants would be happy to provide one upon request. *See* Order, ECF No. 209 (ordering "the parties file a joint appendix with the cited portions of the administrative record" by November 2, 2026).

AR00029634. These areas are known as Special Flood Hazard Areas ("SFHA"). 44 C.F.R. § 59.1. The Flood Insurance Rate Maps are created per the requirements of 42 U.S.C. § 4101b.

5. Undisputed.

6. Undisputed.

7. Undisputed. Defendants further note that, for individuals and households, FEMA pays the required coverage through the Group Flood Insurance Policy. For parish/state-owned facilities in SFHAs, there are separate insurance related requirements for Public Assistance that are outlined in FEMA Recovery Policy FP 206-086-1.

8. Undisputed.

9. Undisputed.

10. Undisputed.

11. Undisputed.

12. Undisputed.

13. Undisputed.

14. Disputed insofar as the quotation suggests that the three quoted factors were the sole considerations. The quotation omits additional considerations that FEMA identified in a footnote, including potential flood insurance opt-outs in the event of higher rates, potential adverse sentiment towards FEMA, the burden on insurance agents, and the likelihood of community resistance to changes. *See* AR00195120.

15. Undisputed.

16. Undisputed.

17. Undisputed. Defendants further note that, under the pre-2022 National Flood Insurance Program ("NFIP") methodology, for buildings whose first-floor elevation was below the Base Flood Elevation ("BFE"), the flood insurance premium rate increased significantly compared to

rates for buildings whose first-floor elevation was above BFE because buildings with first floors below BFE have a higher risk of flooding, while buildings above BFE have a lower risk of flooding. *See* AR00076942.

18. Disputed insofar as the statement is intended to suggest that BFE is no longer used in eligibility determinations. *See* FEMA: Flood Insurance Manual (Oct. 2025) § 2-6, https://perma.cc/6H8X-PL25. The NFIP now uses ground elevation for premium calculations in place of BFE, but BFE is relevant in other parts of the program. *Id.*

19. Disputed. It is inaccurate to state that FEMA's pre-2022 NFIP premium methodology "provided discounts" for elevating property higher than BFE because property elevation in relation to BFE was a rating factor in calculating insurance rates for properties located in SFHAs. AR00017525; AR000186145. Further disputed insofar as the statement suggests that FEMA no longer considers a building's elevation in premiums. Risk Rating 2.0 still considers a building's elevation through the "First Flood Height" rating factor. *See* FEMA: Flood Insurance Manual (Oct. 2025) § 3-21. FEMA currently provides premium discounts for elevating machinery and equipment above the first floor. *Id.* § 3-28. Flood proofing is also a rating factor for non-residential buildings that can lower premiums if certain requirements are met. *Id.* § 3-31.

20. Disputed. Before 2022, FEMA provided Preferred Risk Policies for claim free properties located outside of SFHAs. AR00029646. These areas were not necessarily considered to have low to moderate risk for flooding. *See* Decl. of David Maurstad ¶¶ 129–140, ECF No. 56-1 ("Maurstad Decl."). Improved modeling techniques and awareness of different types of flood perils have allowed FEMA to determine that structures outside of the SFHA do have a quantifiable flood risk. *See id.* ¶¶ 106–112.

21. Undisputed.

22. Undisputed.

23. Disputed. FEMA used additional data sources in creating Risk Rating 2.0, such as Geographic Information System ("GIS") data, United States Geological Survey 3-D elevation data, National Oceanographic and Atmospheric Administration ("NOAA") Sea, Lake, and Overland Surges from Hurricanes Storm Surge data, and U.S. Army Corps of Engineers data. AR00222632; Maurstad Decl. ¶ 26.

24. Disputed. FEMA used additional data sources to develop the rates for Risk Rating 2.0 in conjunction with the catastrophe models for inland flood and storm surges. *See* Maurstad Decl. ¶ 26. These sources include NFIP historical claim data, Mapping Data Integration ("MDI") modeled losses, and the national levee database. *See id.* ¶¶ 135, 162; AR00222632.

25. Disputed insofar as the statement is intended to suggest that Milliman's topographic datasets are inaccurate. The statement cites the standard terms and caveats page of the report, but the sentence is not supported by any of the actual analysis. AR00222636. Milliman certified the quality of the data used in their analysis under Actuarial Standards of Procedure 23. AR00222630. Modeling expected flood losses for a hundred years or higher is a necessary requirement for developing insurance rates based on actuarial principles because historical data is limited to a relatively small number of insured policies from the past fifty years. AR00222624. Additionally, historical data is not a complete indication of future losses, rather it is an input used in risk calculation. AR00222624.

26. Disputed insofar as the statement is intended to suggest that Milliman's topographic datasets are inaccurate. The quoted statement is a boilerplate caveat that demonstrates basic understanding of the use of modeling and historical data. Milliman certified the quality of the data used in their analysis and followed Actuarial Standards of Procedures to ensure that the capability of the model was appropriate for its intended purpose. AR00222630; AR00222634.

27. Disputed insofar as the statement is intended to suggest that Milliman did not review the data that was provided. Milliman, in certifying their data under Actuarial Standards of Procedure

23, considered whether the data was internally consistent and reasonable, then made enhancements or judgmental adjustments as appropriate. AR00222630.

28. Disputed insofar as the statement is intended to suggest that Average Annual Loss data provided by FEMA for NFIP claims filed between 1992 and 2018 was the only data Milliman used. Milliman used other sources of data including GIS data, United States Geological Survey 3-D elevation data, NOAA Sea, Lake, and Overland Surges from Hurricanes Storm Surge data, and U.S. Army Corps of Engineers data. AR00222632; Maurstad Decl. ¶ 26.

29. Disputed. The administrative record shows that only one Senator requested a briefing regarding "the types and sources of any data that will be used to calculate risk [and] how risk would be factored into different types of areas." *See* AR00176984.

30. Disputed insofar as the statement is intended to establish that FEMA provided no explanation of breakdown of rates produced by rating engine. A single insurance agent trade group did make this accusation, but that accusation is refuted by the record. *See generally* Declaration of Lloyd Hake, ECF No. 56-3 ("Hake Decl.").

31. Disputed insofar as the statement suggests that stakeholders were denied an opportunity to provide input on Risk Rating 2.0. *See generally* Hake Decl.

32. Disputed insofar as the statement suggests that stakeholders were denied an opportunity to provide input on Risk Rating 2.0. *See generally* Hake Decl.

33. Undisputed.

34. Disputed insofar as the statement is intended to suggest that BFE is no longer relevant to the NFIP. The un-excerpted text states that "BFE continues to be a key factor in determining compliance with NFIP floodplain management regulation." AR00186145–46.

35. Undisputed that "the category of Preferred Risk Policy (PRP) is being retired." Disputed that all holders of those policies will see premium increases, as Risk Rating 2.0 takes into

consideration the effectiveness of levees and each property's individual flood risk. *See* Maurstad Decl. ¶¶ 129–138. Further noted that PRP premiums had been increasing regularly under the legacy rating method and that those increases applied to all PRPs regardless of actual full risk. *See id.* ¶ 45.

36. Disputed. If the insured's premium is more expensive under the new methodology, then they will stay at their current premium and move on a glidepath toward their full risk premium; the grandfathered rates are being phased out and were not immediately eliminated. *See* AR00176981.

37. Undisputed.

38. Undisputed.

39. Undisputed.

40. Undisputed.

41. Disputed insofar as the statement suggests that Risk Rating 2.0 caused monetary loss alone. To the contrary, the St. Tammany and Livingston Parishes would have seen premium increases under the legacy method as well. *See* Maurstad Decl. ¶ 72. Further disputed insofar as the statement suggests that premium increases are a "monetary loss"; payment for flood insurance is a voluntary contractual arrangement pursuant to which the insured receive benefits.

42. Disputed. FEMA is not able to find any evidence that any of the Plaintiffs in this action have suffered monetary losses as a result of policyholders abandoning their policies. FEMA has not made any requests for return of funds from Louisiana's Governor's Office of Homeland Security and Emergency Preparedness ("GOHSEP") after the implementation of Risk Rating 2.0. *See* Defs.' Ex. 1, Declaration of Elizabeth Asche ¶ 8 ("Asche Decl.").

43. Disputed. Policyholders declining to maintain coverage is not a "novel problem." *See* Asche Decl. ¶¶ 7–8. The problem occurs for a variety of reasons. *Id.* Further disputed insofar as the statement implies that FEMA will undertake enforcement actions to recover funds; to the contrary,

FEMA first works with applicants who have declined to maintain coverage to obtain coverage for the property at issue. *Id.*

Date: July 29, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANDREW I. WARDEN
Assistant Branch Director
Civil Division, Federal Programs Branch

/s/ Sarah M. Suwanda
SARAH M. SUWANDA
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Phone: (202) 305-3196
E-mail: sarah.m.suwanda@usdoj.gov

*Counsel for Defendants*