**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

THE STATE OF LOUISIANA *et al.*,

*Plaintiffs*,

v.

DEPARTMENT OF HOMELAND SECURITY *et al.*,

*Defendants*.

Action No. 2:23-cv-01839
Section P
District Judge Darrel J. Papillion
Magistrate Judge Eva J. Dossier

**DEFENDANTS' STATEMENT OF MATERIAL FACTS**

In accordance with Local Rule 56.1, Defendants submit the following material facts, which present no genuine dispute:

1. Through the National Flood Insurance Program ("NFIP"), Federal Emergency Management Agency ("FEMA") offers flood insurance to all property owners who live in communities that choose to adopt minimum floodplain management standards. 42 U.S.C. § 4022(a)(1).

2. The National Flood Insurance Act of 1968, 42 U.S.C. § 4001 *et seq*. (the "NFIA") mandates that homeowners in a special flood hazard area ("SFHA") purchase flood insurance as a condition of receiving a federally backed mortgage, certain federally regulated loans, or certain types of disaster relief. 42 U.S.C. § 4012a.

3. Homeowners are under no obligation to purchase flood insurance through the NFIP; they may instead purchase flood insurance on the private market. 42 U.S.C. § 4012a.

4. FEMA, by statute, must estimate the premiums required to make flood insurance available on an actuarial basis, *i.e.*, "based on consideration of the risk involved and accepted actuarial principles," in accordance with the "principles and standards of practice in ratemaking adopted by the

American Academy of Actuaries and the Casualty Actuarial Society." 42 U.S.C. § 4014(a)(1)(A)(i), (B)(iv).

5. The NFIP has nearly 5 million policies in over 22,000 communities across the country, collects about $4.6 billion in annual revenue from policyholders' premiums (as well as fees and surcharges), and provides roughly $1.3 trillion in flood coverage. *See* Diane P. Horn & Baird Webel, *Introduction to the National Flood Insurance Program (NFIP)*, at 1, Cong. Research Serv., R44593 (Apr. 7, 2026), https://perma.cc/934A-XD7N.

6. The NFIP has estimated that it avoids more than $2.4 billion in flood-related losses annually. Declaration of David I. Maurstad ¶ 10, ECF No. 56-1 ("Maurstad Decl."); AR00177112.

7. FEMA has collected $60 billion in NFIP premiums but has paid $96 billion in costs over the last 50 years due to severe catastrophes. Maurstad Decl. ¶¶ 67–87, 97–101; AR00008069; AR00028804; AR00124646; AR00003573; AR00022733; AR00027324; AR00204638; AR00029884.

8. Between the 1970s and 2021—prior to Risk Rating 2.0—FEMA calculated premiums using a legacy methodology that did not consider an individual property's cost or other factors that fully reflected an individual property's flood risk or cost to rebuild after flooding. *See* AR00173627; AR00186156–AR00186158; AR00186173.

9. Multiple governmental and nonprofit entities, including the Government Accountability Office ("GAO"), the National Research Council ("NRC"), and the Technical Mapping Advisory Council ("TMAC"), have raised serious concerns about NFIP pricing inadequacies and the program's fiscal solvency under the legacy rating method. *See, e.g.*, GAO, GAO-06-497T, *GAO's High-Risk Program* (Mar. 15, 2006), https://perma.cc/C5JM-HL7M; AR00008069–AR00008122; AR00008075–AR00008076; Nat'l Rsch. Council, *Levees and the National Flood Insurance Program: Improving Policies and Practices* (2013), https://doi.org/10.17226/18309; AR00124646–AR00124978; AR00027360.

10. GAO criticized the NFIP, explaining that the legacy rating method "[was] not actuarially sound" due to the "number of policies in force that are subsidized," which in turn "contributed to continuing losses to the program." GAO, GAO-06-497T, *GAO's High-Risk Program*, at 8 (Mar. 15, 2006), https://perma.cc/C5JM-HL7M.

11. GAO concluded that FEMA's NFIP rate setting under the legacy rating "may not ensure that the rates accurately reflect the actual risk of flood damage" because FEMA (1) relied on "outdated or inaccurate" data inputs; (2) allowed for rate grandfathering, which eroded FEMA's ability to set rates that reflect the actual risk of flooding and generate sufficient premiums to cover expected losses; and (3) combined flood zones across many geographic areas, which prevented individual policies from reflecting the unique topographical features that affect flood risk. AR00008075–AR00008076.

12. GAO concluded that without changes to the rate-setting process, NFIP premiums would be unable to cover claims and expenses as well as the NFIP's mounting debt, "exposing the federal government and ultimately taxpayers to ever-greater financial risks." AR00008076–AR00008077.

13. According to GAO, under the legacy method, "FEMA d[id] not require all properties [to be] remapped into higher-risk areas to pay rates based on the new designation. This policy, known as grandfathering, erod[ed the] NFIP's ability to charge rates that reflect the risk of flooding." AR0008070.

14. Prior to Risk Rating 2.0, the Congressional Budget Office ("CBO") released a report detailing concerns with the NFIP's fiscal solvency. AR00029884.

15. In its 2017 report, the CBO estimated that, based on the difference between expected costs and premiums, the NFIP—before Risk Rating 2.0—would face a one-year shortfall of $1.4 billion, on top of its outstanding $24.6 billion in debt. AR00029884; AR00029913. The CBO

recommended that FEMA take several steps, including "reducing the use of discounted rates" and "[b]etter align[ing] premiums with risks." AR00029894–AR00029890 (emphasis omitted).

16. Risk Rating 2.0 does not base premiums solely on a property's location and elevation in a FIRM flood zone, but also considers a wide range of (a) more specific geographic variables and data, including the distance to water and the type of water (*e.g.*, river, lake, or coast), the drainage area of the river, levee data, whether or not the structure is on a barrier island or behind a levee, and the elevation of the structure relative to the flooding source; and (b) more specific structural variables, including foundation type, type of use, floors of interest, and first floor height. *See* AR00186806; AR00185952.

17. Risk Rating 2.0 utilizes catastrophe models that draw on a range of flood risk data—beyond just the limited river and coastal flooding data that the legacy approach considered—to better estimate future potential loss due to flood events. AR00203155–AR00203158.

18. A catastrophe model is a computerized process that simulates potential catastrophic events based on historical event data, scientific research, engineering methods, and statistical analysis; the simulated events generate scenarios of disaster frequency, severity, and location. *See, e.g.*, AR00195077.

19. Catastrophe modeling is the industry standard for estimating flood insurance risk. AR00061244.

20. Catastrophe modeling is necessary because catastrophic risk, such as for floods, tornadoes, and earthquakes, cannot be estimated well from historical losses; single, unpredictable events such as Hurricane Katrina can significantly increase NFIP flood losses in the aggregate and materially alter the distribution of these losses among states. *See* AR00061236.

21. Risk Rating 2.0's catastrophe modeling required FEMA to increase the average annual loss ("AAL")—the calculation of the NFIP's aggregate expected loss amount per year for all

policyholders—which in turn dictates the total amount of premiums FEMA must collect across the NFIP to pay out claims. Maurstad Decl. ¶¶ 29–30.

22. Whereas in the past, FEMA had set the AAL at $3.2 billion based on historical data, it increased the AAL to $4.1 billion based on catastrophe modeling outputs showing that FEMA's aggregate premium calculations have been far below its expected losses and actual losses for almost two decades. AR00071039.

23. Risk Rating 2.0 incorporates the basic variables utilized in the legacy approach, AR00186867–AR00186902, and continues to set rates that reflect the flood risk reduction provided by levees, AR00223291.

24. Risk Rating 2.0 does not eliminate mitigation discounts for policyholders, as it offers premium reductions for those undertaking mitigation activities such as elevating a structure and installing flood openings in foundation walls. AR00186093; AR00186889–AR00186892.

25. Risk Rating 2.0 maintains discounts for those residing in a Community Rating System ("CRS") participating community, and it actually expands those discounts by applying them to all policyholders in the community whose structure complied with minimum floodplain management requirements, not just those policyholders residing in an SFHA. AR00203171; AR00186870.

26. Risk Rating 2.0 maintains community-level mitigation options, including grants to communities through coordination with states that fund actions to reduce rates both inside and outside an SFHA, such as flood mitigation assistance that prioritizes Multiple Loss Communities, Severe Repetitive Loss and Repetitive Loss Properties, and Community Rating System participation. AR00174705.

27. Risk Rating 2.0 does not eliminate premium discounts for pre-Flood Insurance Rate Map ("pre-FIRM") subsidized properties and properties newly mapped into an SFHA. AR00186095; AR00186870.

28. The currently operative NFIP Flood Insurance Manual confirms that "mitigation discounts to incentivize a policyholder to take steps that meaningfully reduce their property's flood risk" remain available. *See* NFIP Flood Insurance Manual, Risk Rating 2.0: Equity in Action Edition (October, 2025), at 3.28–32, https://perma.cc/UDT8-DMMG.

29. NFIP policyholders may receive a mitigation discount if certain covered machinery and equipment servicing the building is elevated within a foot of the required floor elevation. *See* NFIP Flood Insurance Manual, Risk Rating 2.0: Equity in Action Edition (October, 2025), at 3:28–29. Policyholders may also receive mitigation discounts by creating "[p]roper flood openings (flood vents) in enclosures or crawlspaces" to allow "the hydrostatic flood forces on the walls to equalize and minimize foundation damage to the building" during a flood. *Id.* at 3:30–31.

30. Following the implementation of Risk Rating 2.0, many policyholders in the Plaintiff States and communities saw decreases in premiums, or alternatively only modest increases of $10 or less per month. In Louisiana, for example, 16% of policyholders saw a decrease in their premiums, and 74% saw an increase of only $10 or less per month. Maurstad Decl. ¶¶ 24, 44, 47, 51.

31. FEMA has not taken steps to recoup already distributed federal funds based on policyholders dropping from the NFIP as a result of Risk Rating 2.0. Declaration of Elizabeth Asche ¶ 8 ("Asche Decl.").

32. Grant subapplicants may fail to maintain insurance coverage for a myriad of reasons, including those unrelated to Risk Rating 2.0.

33. The NFIP has always been mandated and designed to tie premium rates to flood risk, in accordance with actuarial principles. 42 U.S.C. § 4015(i).

34. The base flood elevation ("BFE") still remains relevant for purposes of FEMA's flood map data (FIRMs), which in turn, "informed the catastrophe models used in the development of rates under Risk Rating 2.0." Maurstad Decl. ¶ 162.

35. The Mapping Data Integration ("MDI") catastrophe model integrated FEMA's regulatory FIRMs and nonregulatory flood hazard data, AR00172973–AR00173036—and the MDI was then blended with several commercial catastrophe models to develop a composite understanding of flood risk under Risk Rating 2.0, Maurstad Decl. ¶ 162; AR00203155.

36. Risk Rating 2.0 does not move away from the basic principle that "elevation of a building is an important determinant of risk," but rather than correlating premium rates to the BFE alone (the height of flooding during a 1 percent annual-chance-flood), Risk Rating 2.0 adjusts policyholders' rates based on each individual property's ground elevation *and* FFH, *i.e.*, "the height above ground of the lowest floor where the insured would like to get coverage." AR00071605.

37. In the 1970s, catastrophe models for insurance pricing did not exist. Since the 1970s, "[t]he insurance industry's use of catastrophe models to estimate potential future catastrophe losses has gained momentum and has become a standard risk management practice." Maurstad Decl. ¶ 125; AR00061244.

38. Using the legacy rating method, two properties would be rated the same simply because they were located in the same geographic zone, even if one of the properties already filed a flood claim and is not elevated, and the other has never had a flooding claim, is elevated five feet off the ground, and is located farther from the nearest flooding source. Maurstad Decl. ¶ 111.

39. To issue actuarially based rates, FEMA must take into account the known perils that cause flooding. AR00176964.

40. If a property owner can provide an elevation certificate that warrants a lower premium rate due to reduced risk—*i.e.*, if a property owner can demonstrate mitigation efforts relating to elevation—FEMA will take that mitigation effort into account and will use that calculation to provide the customer with a premium rate that reflects the lower risk. AR00183964.

41. Following the implementation of Risk Rating 2.0, the number of policyholders who have received a mitigation discount for elevating an insured structure has increased from 712,991 (under the legacy system) to 4,625,670 (under Risk Rating 2.0) as of 2025. Plaintiff States Florida, Idaho, Kentucky, Louisiana, Mississippi, Montana, North Dakota, South Carolina, Texas, and Virginia have all seen significantly more mitigation discounts for elevation following the implementation of Risk Rating 2.0. Asche Decl. ¶ 26. *See, e.g.*, *id.* ¶¶ 24–61.

42. Risk Rating 2.0 considers the same structural characteristics used by the legacy rating method, including a particular structure's foundation type, occupancy type, number of floors, the inclusion or exclusion of flood openings, coverage, deductible, whether or not covered machinery and equipment is elevated, and the elevation of the lowest floor of the building. AR00185952.

43. Preferred Risk Policies ("PRPs")—policies that only charged a $500 premium for structures located behind accredited levees, Maurstad Decl. ¶ 130; AR00173660—did not reflect those proprieties' actuarial risk.

44. As FEMA explained, the legacy rating method for PRPs provided an artificially inflated discount for accredited levees (amounting to a total premium of $500) that did not differentiate the degree of flood risk reduction in accordance with the type of levy implemented. Maurstad Decl. ¶ 130; AR00173660.

45. FEMA now recognizes, under Risk Rating 2.0, the actual flood risk reduction provided by individual levees by utilizing the more precise data provided in the National Levee Database and Levee Screening Tool—a federally recognized repository for comprehensive information about the nation's levees—to more accurately reflect the flood risk reduction provided by individual levees. Maurstad Decl. ¶¶ 135–36; AR00223300.

46. This graduated risk approach accounts for flood hazards larger and smaller than the 1%-annual-chance flood by leveraging additional data beyond that depicted on FIRMs, such as more precise levee information from the National Levee Database and the Levee Screening Tool. Consequently, the resulting premium rates more clearly and accurately identify and communicate the flood risk exposure of an individual structure. Maurstad Decl. ¶ 136; AR00223295.

47. Through the Biggert-Waters Flood Insurance Reform Act of 2012, Pub. L. No. 112-141, 126 Stat. 405 ("BW-12") and the Homeowner Flood Insurance Affordability Act of 2014, Pub. L. No. 113–89, 128 Stat. 1020 ("HFIAA"), Congress mandated that FEMA phase out subsidies, such as those for pre-FIRM properties (*i.e.*, grandfathered properties), so that premiums could ultimately reach actuarially sound rates. *See* BW-12, § 100205, as amended by HFIAA, §§ 3, 5.

48. Congress further mandated that FEMA charge full risk rates on all NFIP flood insurance policies, subject to the statutory limits set in HFIAA, which cap premium increases at 15% for any property within a risk class, but no more than 18% annually for any property. 42 U.S.C. § 4015(e)(1)-(2).

49. Risk Rating 2.0 considers rate impacts and safeguards affordability for a considerable share of policyholders. Risk Rating 2.0 has resulted in 19% of policyholders seeing premium decreases and 70% seeing only small increases of $10 or less per month; and sets an upper bound for annual premiums for primary residence single-family home policies ($12,125), whereas the legacy system had no such cap and thus could charge some policies as much as $55,000. Maurstad Decl. ¶¶ 44, 233–34.

50. By April 2021, FEMA had released several data sets and documents on its website, including a 64-page NFIP technical document entitled "Risk Rating 2.0 Methodology and Data Sources." AR00172973; AR00174961. *See also* Declaration of Lloyd Hake ¶ 14, ECF No. 56-3 ("Hake Decl."). This comprehensive report provided a description "of the methodology and data sources used to develop Risk Rating 2.0" like "GIS data, Market Basket data, NFIP in-force exposure, NFIP

loss and exposure data, and catastrophe model output." Hake Decl. ¶ 14. The report also included algorithms, rates, rating factors, and illustrative examples of rate calculation and actuarial soundness under Risk Rating 2.0. *Id.*

51. Between March 2019 and February 2023, FEMA fielded dozens of meetings, briefings, calls, and requests for technical drafting assistance with members of Congress and/or their staff. *See* Hake Decl. ¶¶ 43–78. In that same time period, FEMA fielded more than 40 separate requests for information ("RFIs") from individual members of Congress, covering, *inter alia*, the effects of flood insurance policy sales, the percentage of policy increases or decreases under Risk Rating 2.0, the initial delay in implementation of Risk Rating 2.0, grandfathered policies, and the cost to rebuild as a rating factor. *Id.* ¶ 40.

52. On September 4, 2019, FEMA gave a presentation to the Louisiana Governor's Advisory Commission for Coast Protection, Restoration, and Conservation. The presentation provided information about Risk Rating 2.0 and its application to the State of Louisiana, as well as reiterating the need for mitigation and closing the insurance gap. Hake Decl. ¶ 81.

53. On April 14, 2021, FEMA gave a presentation on Risk Rating 2.0 to the Economic Development Council of Greater Fort Bend County, Texas at the Council's request. The presentation covered topics such as premium changes, the phased-in approach to implementation of Risk Rating 2.0, levees, and the Building Resilient Infrastructure and Communities grants. Following the presentation, FEMA answered multiple follow-up questions from the Council by correspondence. Hake Decl. ¶ 83.

54. On July 27, 2021, FEMA gave a presentation to North Carolina officials on Risk Rating 2.0. FEMA presented information comparing rating variables used in Risk Rating 2.0 to those used under the legacy rating, as well as expected premium rate changes and ways to learn more information through FEMA's website publications. Hake Decl. ¶ 84.

55. In August of 2021, FEMA Region 4 staff (covering Florida, Mississippi, South Carolina, North Carolina, Kentucky, Alabama, and Tennessee) provided eight in-depth briefings to update state executives, including Emergency Management Directors, Governor's offices, and Insurance Commissioners within Region 4 on state-specific impacts of the Risk Rating 2.0 rollout. Representatives from the States of Florida, Mississippi, South Carolina, North Carolina, Kentucky, Alabama, and Tennessee were all provided with briefings. Hake Decl. ¶ 85.

56. On August 3, 2021, FEMA Region 3 staff (covering Virginia, Pennsylvania, West Virginia, Maryland, and District of Columbia) provided a presentation on Risk Rating 2.0 at the State Directors Meeting. This presentation covered topics such as the variables FEMA uses to establish premium rates. Hake Decl. ¶ 86.

57. On August 18, 2022, FEMA headquarters and regional staff met with Archie Chaisson, LaFourche Parish President, and Dwayne Bourgeois, Executive Director of the North LaFourche Levee District, to discuss Risk Rating 2.0, how levee information is incorporated into premium rates, how to provide levee information for inclusion in the National Levee Database, and affordability issues. Hake Decl. ¶ 90.

58. On January 25, 2023, FEMA representatives met with several Louisiana officials, including LaFourche Parish President Archie Chiasson, Tangipahoa Parish President Robby Miller, St. Charles Parish President Matt Jewell, Jefferson Parish President Cynthia Lee Sheng, North LaFourche Levee District Director Dwayne Bourgeois, and Meg Bankston of the Parish Presidents of Louisiana. Attendees submitted questions in advance of the meeting, which were addressed. Some of the topics discussed were rating variables, technology and mapping, statutory premium rate increase caps, and future planning. Hake Decl. ¶ 91.

59. The governor of Texas and former governor of Mississippi, as well as W. Nimm Kidd, Chief of the Texas Division of Emergency Management, and Kevin Guthrie, Executive Director of

the Florida Division of Emergency Management, joined the Secretary of Homeland Security and the Secretary of Defense in advocating for the continuation of Risk Rating 2.0. *See* Federal Emergency Management Agency, FEMA Review Council Members, https://perma.cc/KY92-KUSQ.

60. Verisk Inc.'s Air Hurricane model reflects the industry standard and is the preferred model for reinsurance. *See* AIR Worldwide, A Retrospective On 10 Years of Modeling Hurricane Risk in a Warm Ocean Climate (2015), https://perma.cc/5R7P-5SCM (noting that "AIR Worldwide (AIR) is the scientific leader and most respected provider of risk modeling software and consulting services," modeling natural catastrophes in more than 90 countries and providing services to "[m]ore than 400 insurance, reinsurance, financial, corporate, and government clients").

61. FEMA utilized several commercial models to create a composite understanding of catastrophic risk. *See* AR00222612 (explaining that for storm surge losses, FEMA compared the AIR *and* KatRisk results to the NFIP's historical experience and then selected adjustment factors to rescale the AALs); AR00174967.

62. Milliman utilized more than fifteen actual geographic data sources—including, *inter alia*, USGS elevation data for all states and territories; geological and geophysical surveys from Alaska; the national drainage network relating to rivers, streams, lakes, and coastlines; and national shoreline data from the National Oceanic and Atmospheric Administration ("NOAA")—to create a composite estimate of geospatial data that can provide the spatial context needed to understand hazards, exposure, vulnerability, and potential losses associated with natural and human-induced disasters across different regions and asset portfolios. AR00222642–AR00222643.

63. The standards for drawing and revising flood maps differ from the standards for designing catastrophic modeling because they achieve different functions. *See* FEMA, *FEMA Policy Standards for Flood Risk Analysis and Mapping*, at 2 (Dec. 11, 2019), https://perma.cc/L7U7-Q28G. Risk Rating 2.0 uses sophisticated modeling to understand how multiple factors influence different types

of flooding. AR00072954.

64. Milliman's use of the twenty-six-year date range for calculating AAL was entirely reasonable and in keeping with relevant Actuarial Standards of Practice ("ASOPs"), Statement of Principles and other guidance promulgated by the Actuarial Standards Board, the American Academy of Actuaries, and the Casualty Actuarial Society. AR00222628.

65. As Milliman explained, in keeping with ASOP 39, it "considered the applicability of historical insurance data for the insured coverage, including," among other things, "whether there is a sufficient number of years of comparable, compatible historical insurance data." AR00222632. Adjustments were then made to the historical insurance data to reflect the conditions likely to be present during the period in which Risk Rating 2.0 will be in effect. *Id.*

66. Had Milliman excluded the Hurricane Katrina data, the available historical insurance data would not have sufficiently represented the exposure of the NFIP to catastrophe-related losses. *See* AR00222624 (explaining that exclusion of Hurricane Katrina data would have left an insufficient number of claims to be credible).

67. FEMA conducted over 1500 engagements with the public, policyholders, stakeholder groups, congressional members and staff, the media, industry groups, WYO companies, and/or insurance agents. Hake Decl. ¶ 6.

Date: July 29, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANDREW I. WARDEN
Assistant Branch Director
Civil Division, Federal Programs Branch

*/s/ Sarah M. Suwanda*
SARAH M. SUWANDA
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Phone: (202) 305-3196
E-mail: sarah.m.suwanda@usdoj.gov

*Counsel for Defendants*