**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| THE STATE OF LOUISIANA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>Defendants. | CIVIL ACTION NO.<br>2:23-CV-01839<br>SECTION P<br><br>JUDGE DARREL PAPILLON<br><br>MAGISTRATE JUDGE<br>EVA J. DOSSIER |

**PLAINTIFFS' COMBINED MEMORANDUM IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. PLAINTIFFS SATISFY THE REQUIREMENTS FOR STANDING THAT THIS COURT IDENTIFIED IN ITS ORDER DENYING DEFENDANTS' MOTION TO DISMISS. ........ 2

A. The Plaintiff States Have Standing. ........ 2

B. The Plaintiff Parishes Have Standing. ........ 8

II. EQUITY IN ACTION IS NOT EXEMPT FROM THE APA'S NOTICE-AND-COMMENT REQUIREMENTS. ........ 12

A. Equity in Action does not qualify for any statutory exemption from the notice-and-comment process. ........ 12

B. Equity in Action does not satisfy the exacting requirements for harmless error. ........ 20

III. EQUITY IN ACTION IS ARBITRARY AND CAPRICIOUS. ........ 24

IV. EQUITY IN ACTION IS CONTRARY TO LAW. ........ 30

V. EQUITY IN ACTION VIOLATES THE SPENDING CLAUSE. ........ 32

VI. AN ORDER SETTING ASIDE EQUITY IN ACTION IS THE PROPER REMEDY. ........ 35

CONCLUSION ........ 35

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967) ........ 5

*Adolph v. FEMA*,
854 F.2d 732 (5th Cir. 1988) ........ 34

*Asiana Airlines v. FAA*,
134 F.3d 393 (D.C. Cir. 1998) ........ 13, 14

*Matter of Bell Petroleum Servs., Inc.*,
3 F.3d 889 (5th Cir. 1993) ........ 25

*Bennett v. Spear*,
520 U.S. 154 (1997) ........ 3

*City of Arlington v. FCC*,
668 F.3d 229 (5th Cir. 2012) ........ 23

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) (Kavanaugh, J., concurring) ........ 35

*Davis v. FEC*,
554 U.S. 724 (2008) ........ 5

*Elec. Privacy Info. Ctr. v. FAA*,
892 F.3d 1249 (D.C. Cir. 2018) ........ 24

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ........ 25, 27, 29

*Franciscan All. v. Becerra*,
47 F.4th 368 (5th Cir. 2022) ........ 5

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
805 F.2d 1050 (D.C. Cir. 1986) ........ 25

*Geyen v. Marsh*,
775 F.2d 1303 (5th Cir. 1985) ........ 24, 30

*Green Rock LLC v. Internal Revenue Serv.*,
104 F.4th 220 (11th Cir. 2024) ........ 12, 13

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
968 F.3d 454 (5th Cir. 2020) .......... 30

*Indep. U. S. Tanker Owners Comm. v. Lewis*,
690 F.2d 908 (D.C. Cir. 1982) .......... 17

*K.P. v. LeBlanc*,
627 F.3d 115 (5th Cir. 2010) .......... 11

*Lake Carriers' Ass'n v. EPA*,
652 F.3d 1 (D.C. Cir. 2011) .......... 13

*Mann Constr., Inc. v. United States*,
27 F.4th 1138 (6th Cir. 2022) .......... 12, 13, 14

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014) .......... 11

*Miami-Dade County v. EPA*,
529 F.3d 1049 (11th Cir. 2008) .......... 23

*Nat'l Ass'n for Gun Rts., Inc. v. Garland*,
697 F. Supp. 3d 601 (N.D. Tex. 2023) .......... 5

*Nat'l Ass'n of Psychiatric Treatment Centers for Child. v. Weinberger*,
658 F. Supp. 48 (D. Colo. 1987) .......... 17

*Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*,
389 F.3d 491 (5th Cir. 2004) .......... 8

*NFIB v. Sebelius*,
567 U.S. 519 (2012) .......... 32, 34

*Paulsen v. Daniels*,
413 F.3d 999 (9th Cir. 2005) .......... 21

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) .......... 32

*Phillips Petroleum Co. v. Johnson*,
22 F.3d 616 (5th Cir. 1994) .......... 18

*Porter v. Califano*,
592 F.2d 770 (5th Cir. 1979) ........ 24

*Rest. L. Ctr. v. U.S. Dep't of Lab.*,
120 F.4th 163 (5th Cir. 2024) ........ 30

*Roman Cath. Diocese of Dallas v. Sebelius*,
927 F. Supp. 2d 406 (N.D. Tex. 2013) ........ 5

*Rumsfeld v. FAIR*,
547 U.S. 47 (2006) ........ 8

*Shell Offshore Inc. v. Babbitt*,
238 F.3d 622 (5th Cir. 2001) ........ 18, 20

*Sierra Club v. Lynn*,
502 F.2d 43 (5th Cir. 1974) ........ 29

*Speech First, Inc. v. Fenves*,
979 F.3d 319 (5th Cir. 2020) ........ 5, 9, 24

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
289 F.3d 89 (D.C. Cir. 2002) ........ 20, 22

*Texas Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*,
587 F. Supp. 3d 528 (E.D. Tex. 2022) ........ 14, 20, 22

*Texas v. Lyng*,
868 F.2d 795 (5th Cir. 1989) ........ 22

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) ........ 15, 16, 17

*U.S. Steel Corp. v. EPA*,
595 F.2d 207 (5th Cir. 1979) ........ 20, 22

*United States v. Johnson*,
632 F.3d 912 (5th Cir. 2011) ........ 23

*United States v. Reynolds*,
710 F.3d 498 (3d Cir. 2013) ........ 20, 21

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ........ 31

*Vigil v. Andrus*,
667 F.2d 931 (10th Cir. 1982) .......... 15, 16

*W & T Offshore, Inc. v. Bernhardt*,
946 F.3d 227 (5th Cir. 2019) .......... 19

**Statutes**

5 U.S.C. § 553 .......... 15, 22

5 U.S.C. § 706 .......... 24, 35

6 U.S.C. § 313 .......... 17

42 U.S.C. § 4001 .......... 16

42 U.S.C. § 4002 .......... 16

42 U.S.C. § 4014 .......... 14, 32

42 U.S.C. § 4015 .......... 12, 13, 14

42 U.S.C. § 4104 .......... 30, 31

**Other Authorities**

44 C.F.R. § 77.3 .......... 7

44 C.F.R. § 77.6 .......... 6

44 C.F.R. § 77.8 .......... 3, 5, 6

*Homeowner Flood Insurance Affordability Act of 2014*
§4, Pub. Law 113-89, 128 Stat. 1020 (Mar. 21, 2014) .......... 28

## INTRODUCTION

Equity in Action violates the APA four times over. FEMA failed to subject this "generational change" in flood insurance policy to notice and comment without qualifying for any exemption from that process. Equity in Action is also arbitrary and capricious and contrary to law, and it violates the Spending Clause of the Constitution. This Court should set aside the policy in its entirety.

Defendants' arguments for why the Plaintiff States and Parishes lack standing all fall flat. The evidence that Plaintiffs provided at summary judgment suffices to satisfy the legal test for standing that this Court previously set out *in this case*. Defendants cannot add requirements to that test. And Defendants cannot defeat standing with a half-hearted declaration about their "current[]" intent not to recoup deobligated funds under federal regulations or by threatening to impose higher premium increases on Plaintiffs if Equity in Action is vacated.

Defendants' merits arguments also fail. They do not clear the high threshold for being exempted from notice and comment or for showing that failure to complete that process was harmless given their failure to complete any form of notice and comment. Equity in Action is arbitrary and capricious because Defendants fail to demonstrate adequate consideration in the administrative record of any of the issues Plaintiffs raised at the time FEMA formulated the policy but instead rely on post hoc justifications in litigation documents. The program is contrary to law because it renders the rate map appeals process a nullity for premium rates, despite clear statutory indications it should be linked to rates. And the program violates the Spending Clause because it changes the terms of the contract with the States in a dramatic way after

providing significant funding for disaster mitigation by state government and inducing significant reliance interest on the part of the States. This Court should set aside Equity in Action in its entirety.

## ARGUMENT

Plaintiffs are entitled to summary judgment on Counts I, II, III, IV, VI, and VIII because FEMA failed to satisfy the APA's requirements when it fundamentally changed its premium-setting methodology.

### I. PLAINTIFFS SATISFY THE REQUIREMENTS FOR STANDING THAT THIS COURT IDENTIFIED IN ITS ORDER DENYING DEFENDANTS' MOTION TO DISMISS.

This Court's order denying Defendants' motion to dismiss articulated a clear legal framework under which the allegations in Plaintiffs' complaint satisfied Article III's standing requirement. Plaintiffs have now submitted evidence at summary judgment substantiating those allegations. Defendants' contrary arguments either misunderstand this Court's order or seek to relitigate arguments that this Court has rejected. This Court should reject Defendants' arguments based on a putative lack of standing.

#### A. The Plaintiff States Have Standing.

This Court previously held that the Plaintiff States successfully alleged standing in their complaint, including injury in fact and redressability. This Court held that the states "plausibly alleged that higher premiums under Risk Rating 2.0 will result in policyholders choosing to drop their NFIP coverage." ECF 100 at 29. This Court explained that "courts have found traceability where the alleged injury relies 'on the predictable effect of Government action on the decisions of third parties.'"

ECF 100 at 29 (citing *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). It explained that based on the "predictable effect" of policyholders dropping NFIP coverage, the States had plausibly alleged that they "will suffer economic injury in the form of increased costs to rebuild after a flood event and increased liability to FEMA for the reimbursement of grant funds." ECF 100 at 29. And this Court held that Plaintiff States had plausibly alleged that their injuries would be redressed by an order vacating Risk Rating 2.0. ECF 100 at 38.

Defendants do not now dispute that the Plaintiff States' injuries would be redressed by the vacatur of Risk Rating 2.0. Instead, they focus their attention on arguing that the injury does not exist in the first place. But Plaintiff States have now submitted evidence substantiating their allegations about injury. Plaintiffs' declarations establish that more than 65,000 NFIP policy holders have dropped their NFIP policies in the state of Louisiana alone since Risk Rating 2.0 took effect. ECF 195-3 at 2 ¶7. In particular, owners of 22 properties that were part of Flood Mitigation Assistance projects have failed to maintain the NFIP policies required under their elevation grants and have informed parish officials that they dropped these policies due to rising flood insurance premiums. ECF 195-3 at 6–8 ¶¶17–19; 195-5 at 2–3 ¶5. They also explain that "[t]he deobligation of these grants is a novel problem for GOHSEP, as deobligation on this scale did not occur prior to the implementation of Risk Rating 2.0." ECF 195-3 at 5 ¶15. Under federal regulations, FEMA can recover from Louisiana the $1.7 million in grant funding associated with these 22 properties. ECF 195-3 at 6–8 ¶¶17–19; 44 C.F.R. § 77.8. Florida also submitted evidence of a

Flood Mitigation Assistance project where a property owner has failed to purchase NFIP flood insurance and the federal funding of over $92,000 associated with that property is likely to be deobligated. ECF 195-4 at 3 ¶5. That declaration likewise explained that the "deobligation of FEMA funds represents a novel problem for" Florida. ECF 195-4 at 3 ¶7. Defendants' own declaration concedes that there has been a "decrease in the number of policies in force" in the past two years, with the result that many states saw a decrease in the number of NFIP policies taking advantage of elevation grants between 2023 and 2025. ECF 213-2 at 10–12.

Defendants' "fundamental[]" argument against this proven injury is that FEMA does not "currently" intend to pursue these deobligated funds. ECF 213-1 at 33. Defendants' sole basis for that claim is a single sentence in a declaration attached to a motion intended to prevent this Court from vacating Equity in Action: "Nor does FEMA *currently* intend to require the repayment of grant funds *solely* on the basis that those policyholders refused to obtain NFIP coverage due to increased premiums resulting from Risk Rating 2.0." ECF 213-2 at 4 (emphasis added). That sentence is riddled with qualifying adverbs, and it gives Plaintiff States no reliable assurances since it's limited to what FEMA says it "currently" plans to do. More to the point, in similar "prosecutorial indecision" cases, where the government has the authority to act against the plaintiff under a statute or regulation and can only disclaim any *current* plans to do so, the Fifth Circuit has held that the injury-in-fact requirement is satisfied. Where the best an agency can offer is that it "'has not to date evaluated'

whether it will enforce" the challenged provision against plaintiffs, the plaintiffs' injury in fact is real. *Cf. Franciscan All. v. Becerra*, 47 F.4th 368, 376–77 (5th Cir. 2022) (applying this standing principle in the mootness context); *see also Nat'l Ass'n for Gun Rts., Inc. v. Garland*, 697 F. Supp. 3d 601, 614 (N.D. Tex. 2023) (holding plaintiffs established standing despite government's arguments that "there are no *current* plans to prosecute the Plaintiffs" ); *Roman Cath. Diocese of Dallas v. Sebelius*, 927 F. Supp. 2d 406, 420 (N.D. Tex. 2013) (government representation that it would not enforce regulations against plaintiff "'in their current form'" did not defeat standing). Similarly, in the mootness context, the Fifth Circuit has explained that a defendant must provide "a controlling statement of future intention" to moot the case; it is not sufficient to state that the Defendant "has no plans to" re-enact the challenged policy. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 328 (5th Cir. 2020). The Supreme Court has also questioned these sorts of post-lawsuit promises of lenient enforcement—where a lawsuit "at its inception was properly brought[,]" such a "subsequent representation of the" relevant agency does not suffice to defeat standing. *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 154 (1967); *see also Davis v. FEC*, 554 U.S. 724, 734 (2008) (standing inquiry is focused on time when the suit was filed).

Defendants also point to the discretionary language in 44 C.F.R. § 77.8(d), which gives FEMA the nuclear option that it "may terminate an award" based on noncompliance. ECF 213-1 at 32. That provision gives FEMA the power to terminate an entire award based on noncompliance, which would be an even more significant blow to Plaintiff States, as they would lose access to the entire federal funding for

these elevation projects. Even adopting Defendants' interpretation of § 77.8(d), this Court previously held that Plaintiffs could show standing based on "increased *liability* to FEMA for the reimbursement of grant funds." ECF 100 at 29 (emphasis added). But more relevant to the deobligation injury discussed in Plaintiffs' motion is 44 C.F.R. § 77.8(c), which provides that "[a]t the time of closeout, FEMA *will recapture* any funds provided to a State or a community under this part if … the completed project does not meet the criteria specified in this part." 44 C.F.R. § 77.8(c) (emphasis added). One of those "criteria" is that the individual structure elevated must have an active NFIP policy and maintain that policy for the life of the structure. 44 C.F.R. § 77.6(a)(2). That mandatory language, "will recapture," permits none of the prosecutorial discretion that FEMA currently invokes to argue that Plaintiff States lack standing.

Defendants' other arguments against Plaintiff States' standing likewise lack merit. They claim that the States need to prove that "a *majority* of policyholders have dropped from the NFIP" and that "a majority dropped *because of* Risk Rating 2.0." ECF 213-1 at 30. Plaintiff States have standing because, as the Court concluded correctly, they alleged that "increased rates under Risk Rating 2.0 will cause NFIP policyholders to drop their flood insurance coverage" and these dropped policies will harm the Plaintiff States. ECF 100 at 27. Nowhere did the Court require Plaintiffs to demonstrate that "a majority of NFIP policyholders [will] drop required coverage." *Contra* ECF 213-1 at 29. Instead, as Plaintiffs' evidence now demonstrates, premiums increased "for a majority of policyholders," and as a result, some "people [] drop[ped]

their policies" in a way that negatively affected the Plaintiff States. ECF 100 at 27. Defendants concede that a majority of policyholders saw premium increases under Equity in Action. *See* ECF 213-1 at 26 (conceding that 19% of policyholders say decreased premiums while 78% saw some increase). And Plaintiffs' evidence demonstrates that Plaintiff States have suffered financial injury because of some policyholders dropping coverage. Plaintiffs' evidence satisfies the factual conditions this Court held would prove the Plaintiff States have standing. *See* ECF 100 at 27.

Defendants' attempts to argue that Plaintiff States' injuries are self-inflicted are also unpersuasive. Defendants claim that because FEMA does not "currently track subrecipients that refuse to obtain NFIP coverage," the States' financial injuries "are fundamentally self-inflicted." ECF 213-1 at 33. But FEMA does not have to track subrecipients because the NFIP is a cooperative federalism program in which the federal government imposes certain administrative duties, including tracking subrecipients, on States in exchange for federal funding. "FEMA relies on the State and its local governments to administer elevation and reconstruction projects," and the States "monitor the project throughout construction to closeout." ECF 195-3 at 3 ¶9. Federal regulations confirm that the States or "Recipients" are required under those regulations to "[m]onitor and evaluate the progress of the mitigation activity" and "[c]loseout the subaward in accordance with [federal regulations] and applicable FEMA guidance." 44 C.F.R. § 77.3(b). As part of that "closeout" process, FEMA requires States to "verify that each property has an active NFIP policy"; if it does not,

the State must notify the relevant municipality, and if the homeowner or municipality does not purchase insurance within 90 days, the State then "notifies FEMA, which then begins deobligation of funds associated with the actual elevation/reconstruction and foundation activities." ECF 195-3 at 5 ¶14. Far from "self-inflicted," the monitoring requirements and deobligation of funds are imposed by federal regulations as a condition of the States' citizens gaining access to federal funding that provides important flood mitigation and elevation protections for those citizens' properties.

Finally, because Louisiana and Florida have submitted evidence of their injuries, this Court can affirm the standing of all Plaintiff States. *Contra* ECF 213-1 at 33–34 & n.20. Well-established Supreme Court and Fifth Circuit precedent holds that "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006). In other words, "when one of multiple co-parties raising the same claims and issues properly has standing, [this Court does] not need to verify the independent standing of the other co-plaintiffs." *Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.,* 389 F.3d 491, 501 n.18 (5th Cir. 2004). Given the uniformity of FEMA regulations coopting States into administering the NFIP's cooperative federalism program, this Court need not dwell on the standing of other Plaintiff States.

### B. The Plaintiff Parishes Have Standing.

The injuries of the Plaintiff Parishes also satisfy the legal test that this Court set out in its motion to dismiss order. On injury, this Court held that the Plaintiff Parishes established standing through "financial injury in the form of increased premium rates on policyholders." ECF 100 at 30. Plaintiffs have now provided evidence

that those financial injuries affect St. Tammany and Livingston Parishes, both of which own properties that have seen significant premium increases under Equity in Action. ECF 195-2 at 26–27. Defendants try to shift the goalposts by arguing that the Parishes have not established injury in fact because they purportedly have not provided evidence that "the remaining Plaintiff Parishes (St. Tammany and Livingston) are experiencing annual premium increases that meet or exceed the 18% statutory cap." ECF 213-1 at 34.

*First*, that is wrong—the declarations and policy documentation attached to Plaintiffs' Motion for Summary Judgment demonstrate many Parish properties are on a glide-path to "full risk premiums" that represent a double, triple, or even five-times increase from the premium rates the Parishes paid in 2021. *See, e.g.*, ECF 195-7 at 3 ¶8 (property premiums that have already nearly doubled and will eventually quadruple); ECF 195-8 at 1 ¶5 (Livingston Parish says a 70.7% premium increase under Equity in Action). *Second*, this Court's order did not require Plaintiffs to demonstrate increases of 18% or more; instead, it held that the increased premiums represented a concrete "economic injury that is fairly traceable to Risk Rating 2.0," full stop. ECF 100 at 33. Under this Court's order, the Parishes' documentation establishes injury in fact.

On redressability, Defendants argued at the motion-to-dismiss stage that Plaintiffs "have not plausibly alleged redressability" and "could not possibly establish redressability." ECF 100 at 34. This Court rejected those arguments, holding that the Plaintiff Parishes had successfully alleged redressability by alleging that "Plaintiff

Policyholders … are experiencing rate increases greater than what they experienced under the Legacy Rating System." *Id.* at 37–38. In their Motion for Summary Judgment, Plaintiffs have now provided testimonial and documentary evidence that the policyholder Parishes have seen greater increases under Equity in Action than they did under the legacy system. *See, e.g.*, ECF 195-7 at 2–3 ¶7 (St. Tammany Parish has seen a 9.28% year-over-year premium increase since Equity in Action was implemented where it previously saw an average premium increase of 5.38%); 195-8 at 1 ¶5, 5 ¶14 (Livingston Parish saw more modest premium increases before Equity in Action was implemented). The Parishes thus have provided evidence that they are suffering greater premium increases under Equity in Action, and granting the relief they seek will redress that harm.

This Court also previously rejected Defendants' argument that Plaintiffs would not be "'exempt from these wide-sweeping rate increases absent Risk Rating 2.0'" by reasoning that "if Risk Rating 2.0 is declared unlawful[,] … the Plaintiff Policyholders and the Plaintiff States' residents would not be subject to the 'wide-sweeping rate increases' Defendants contend preclude Plaintiffs from establishing redressability." ECF 100 at 35–36. Defendants nonetheless reiterate that already-rejected argument using the same words here—that Plaintiffs have not shown "they would somehow be exempt from these wide-sweeping rate increases in the absence of Risk Rating 2.0." ECF 213-1 at 35.

The Court correctly rejected that argument the first time. Plaintiffs have established that Equity in Action caused "wide-sweeping rate increases," including to

Parishes' NFIP policies. Granting the relief Plaintiffs seek will redress that harm. Defendants' contrary argument amounts to little more than speculation that they might injure Plaintiffs a different way by raising Plaintiff Parishes' premiums again even if this Court grants the relief Plaintiffs seek. They argue that even if Equity in Action were vacated, FEMA would still need to raise premium rates to keep the NFIP solvent.

How Defendants might respond to a decision in Plaintiffs' favor here is not the redressability standard. "'[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself,'" especially where the defendant "has definite responsibilities relating to the application of" the relevant statute. *K.P. v. LeBlanc*, 627 F.3d 115, 123–24 (5th Cir. 2010) (citation omitted). That redressability standard is more than satisfied here: FEMA is responsible for administering the NFIP, it has harmed the Parishes by promulgating Equity in Action by (among other ways) increasing their rates, and a favorable decision would relieve Plaintiffs from Equity in Action's harmful effects. Indeed, under the logic of Defendants' argument, a plaintiff alleging any sort of substantive or procedural violation under the APA would never have standing, because the agency might reinstitute a similar or identical new regulation that addresses the same problem. That is not the law. *See, e.g.*, *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014) (APA plaintiffs need not "establish that correcting the procedural violation would necessarily alter the final effect of the agency's action on the plaintiffs' interest").

## II. EQUITY IN ACTION IS NOT EXEMPT FROM THE APA'S NOTICE-AND-COMMENT REQUIREMENTS.

Defendants do not contest that FEMA failed to undertake the APA's notice-and-comment process when it implemented Equity in Action. Instead, they argue that Equity in Action was exempt from this procedure, either because it fell within one of three statutory exemptions to the notice-and-comment requirement or because FEMA's failure to solicit comments was harmless error. Each of these four arguments lacks merit.

### A. Equity in Action does not qualify for any statutory exemption from the notice-and-comment process.

Defendants argue that Equity in Action did not require notice and comment because either (1) the NFIA itself exempts premium methodology changes from notice and comment, (2) Equity in Action relates to a benefit or a contract, or (3) Equity in Action is not a substantive rule. Not one of these arguments is correct.

**1.** Congress did not authorize FEMA to skip notice and comment by allowing the agency to prescribe NFIP rates "after providing notice." 42 U.S.C. § 4015(a); ECF 195-2 at 34–35. Notice-and-comment rulemaking is the "baseline assumption," and to avoid it, an agency "must show that Congress 'expressly' carved out the exception" and did so "in a 'clear' or 'plain' way in a later statute." *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1144–45 (6th Cir. 2022) (citations omitted). "The heart of the inquiry is whether Congress has expressly established procedures 'so clearly different from those required by the Administrative Procedure Act that it must have intended to displace' notice and comment." *Green Rock LLC v. Internal Revenue Serv.*, 104 F.4th 220, 226 (11th Cir. 2024) (cleaned up).

Courts have recognized that this "'so clearly different'" standard sets a "'high bar.'" *Id.* (citations omitted). "'[M]agical passwords'" are not required, but the statute must explicitly say that the notice-and-comment requirement does not apply, or create "'specific procedures' that 'differ from those of the APA.'" *Mann Constr.*, 27 F.4th at 1144–45 (citations omitted). The APA's requirements are not clearly abrogated where the statutes contained "'minor variations' from the APA" or established a "scheme that remained 'compatible with the APA,'" or by statutory requirements for public notice and public hearings. *Id.* at 1145 (collecting cases).

Under that precedent, the NFIA did not clearly or plainly exempt FEMA from the APA's notice-and-comment requirements. Defendants hang their hat on the observation that the NFIA tasks the FEMA administrator with, "from time to time[,] prescrib[ing]" premium rates "after providing notice." 42 U.S.C. § 4015(a). But the NFIA does not require any "procedures 'that cannot be reconciled with' notice-and-comment requirements or any other indication within the statutory text that 'plainly expresses a congressional intent to depart from' the normal APA procedures." *Mann Construction*, 27 F.4th at 1146 (quoting *Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998)). For instance, the D.C. Circuit has held that a statutory requirement that the EPA "'establish procedures for public notice'" did not "constitute[] the requisite 'plain express[ion]' of congressional intent to supersede the APA's requirements." *Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 6 (D.C. Cir. 2011). Similarly, a statute that allowed an agency head to "'promulgate any final interim rule'" did not "expressly" or "implicitly" exempt the department from the APA's notice-and-comment

requirement. *Texas Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 587 F. Supp. 3d 528, 544 (E.D. Tex. 2022).

Contrast the NFIA with the statutory scheme in *Asiana Airlines*, which Defendants rely on extensively. ECF 213-1 at 37–38. There, the statute "specifie[d] procedures which differ from those of the APA: the agency was to issue not a proposed rule, but an 'interim final rule,' and comment was to be sought 'pursuant to,' not in anticipation of, that rule." *Asiana Airlines*, 134 F.3d at 398. In other words, the statute specifically instructed the agency to issue its binding rule first and seek comments afterward. No such direct conflict exists between the procedures that the NFIA specifies and the APA. Defendants' "[p]otential inferences layered on top of conjectural implications do not suffice," and FEMA "has not identified any case in which Congress exempted an agency from the APA's requirements via such a winding and elaborate route." *Mann Constr.*, 27 F.4th at 1147.

Defendants also point to the previous section of the NFIA, 42 U.S.C. § 4014, and argue that the lack of a requirement that the FEMA administrator estimate premium rates "by regulation" means that the §§ 4014 and 4015 should be read in parallel, with neither requiring notice-and-comment rulemaking. ECF 213-1 at 37. But section § 4014 does not even contain the statutory requirement to "provid[e] notice," which is what Defendants claim is the basis for § 4015 displacing notice-and-comment rulemaking, ECF 213-1 at 37, so there is no textual reason why together "§§ 4014 and 401[5] [should] displace the ordinary circumstances in which the APA's notice-and-comment requirements apply." ECF 213-1 at 38. Defendants also claim that notice-

and-comment rulemaking is required only for NFIP changes that "fundamentally alter insurance access and the insurance bargain struck, thereby necessitating public input." ECF 213-1 at 38. But Equity in Action does precisely that, for all the reasons explained in Plaintiffs' Motion for Summary Judgment, including by making previous features of the legacy rating system (like flood maps and BFEs) irrelevant for premiums. Notice and comment was vitally necessary here, and the NFIA's requirement to "provid[e] notice" did not displace it.

**2.** Equity in Action also was not exempt from notice-and-comment rulemaking based on the "benefits" or "contracts" exemption. Defendants evidently did not consider this exemption to be one of their "best arguments," ECF 213-1 at 41 n.22, for why they were likely to succeed on the merits at the preliminary injunction stage, because they failed to raise it there, ECF 56 at 40–44, but they now argue it is a reason to grant them summary judgment.

"To avoid 'carv[ing] the heart out of the notice provisions of Section 553,' the courts construe the public-benefits exception very narrowly as applying only to agency action that 'clearly and directly relate[s] to "benefits" as that word is used in section 553(a)(2).'" *Texas v. United States*, 809 F.3d 134, 177 (5th Cir. 2015) (citation omitted). In applying this test, the Fifth Circuit looks to whether the agency claiming the exemption is "an agency managing benefit programs." *Id.* Courts have consequently declined to apply the exemption to policies that implicate benefits or contracts only "incidental[ly]." *Vigil v. Andrus*, 667 F.2d 931, 936 (10th Cir. 1982).

The NFIP does not consist merely of a series of proprietary contracts with and benefits paid by the federal government. The NFIA instead articulates a more comprehensive program designed to set a national disaster relief policy; it was intended to provide, "as a matter of national policy, a reasonable method of sharing the risk of flood losses [] through a program of flood insurance which can complement and encourage preventive and protective measures." 42 U.S.C. § 4001(a). As explained in Plaintiffs' Motion for Summary Judgment, the NFIP also was designed to *force* states and individuals to buy flood insurance as part of a national disaster relief policy, including "requir[ing] States or local communities, as a condition of future Federal financial assistance, to participate in the flood insurance program and to adopt adequate flood plan ordinances" and "requir[ing] the purchase of flood insurance by property owners who are being assisted by Federal programs." 42 U.S.C. § 4002(b). Viewed within this context, any contractual element of the NFIP is "only an incidental means to the end of providing" a comprehensive disaster relief policy. *Vigil*, 667 F.2d at 936. Requiring notice and comment for major changes to this national policy program does not represent an interference in the government's "proprietary" interest or an effort by private parties "to participate in the government's conduct of its own business affairs." *Id.* And FEMA is not a conventional "agency managing benefit programs[,]" either. *Texas*, 809 F.3d at 177. FEMA's primary mission under federal law is to "reduce the loss of life and property and protect the Nation from all hazards, including natural disasters … by leading and supporting the Nation in a

risk-based, comprehensive emergency management system of preparedness, protection, response, recovery, and mitigation." 6 U.S.C. § 313(b)(1). It does not resemble any of the agencies that the Fifth Circuit recognized as providing benefits such as Medicare or food stamps. *See Texas*, 809 F.3d at 177 n.155.

The need to "construe the public-benefits exception very narrowly," *Texas*, 809 F.3d at 177, means that this exemption applies only to agencies "deciding when to enter into a contract or award a grant," not agency decisions "filling in the statutory scheme," *Indep. U. S. Tanker Owners Comm. v. Lewis*, 690 F.2d 908, 918 n.43 (D.C. Cir. 1982). Defendants' attempts to distinguish *Independent U.S. Tanker Owners* on the grounds that the contracts there were "fixed by statute" are unpersuasive. ECF 213-1 at 40. The D.C. Circuit explained that the exemption would apply only to "deciding to whom subsidies should be granted," but once the agency moved into establishing new procedures and "sets the conditions under which those terms may be amended, it is filling in the statutory scheme." *Indep. U. S. Tanker Owners Comm.*, 690 F.2d at 918 n.43. This same rule applies here. Equity in Action represents the sort of unexempted "prescriptive changes in overall contents of all [flood insurance] agreements—which amount to policy changes of significant import." *Nat'l Ass'n of Psychiatric Treatment Centers for Child. v. Weinberger*, 658 F. Supp. 48, 54 (D. Colo. 1987). In light of the global, prescriptive change in rating methodology that Equity in Action represents, any notional relationship to government "contracts" or "benefits,"

ECF 213-1 at 39–40, does not suffice to bring it within the benefit and contract exemption. Defendants cannot invoke that exemption to enact a transformation of the NFIP without completing the APA's notice-and-comment procedures.

**3.** Equity in Action is also a substantive legislative rule that had to go through notice and comment, not an "interpretative rule" that can skip the process. Defendants' characterization of the difference between a substantive rule and an interpretative rule cannot be reconciled with the Fifth Circuit's holding that "[i]f a new agency policy represents a significant departure from long established and consistent practice that substantially affects the regulated industry, the new policy is a new substantive rule." *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 630 (5th Cir. 2001). Equity in Action is a new substantive rule under this test; it has dramatically altered FEMA's methodology for calculating flood insurance premiums. Defendants err by arguing that Equity in Action is an interpretative rule because it interprets the NFIA ECF 213-1 at 41–42. A legislative rule "'create[s] law, *usually implementary to an existing law*; whereas interpretative rules are statements as to what the administrative officer thinks the statute or regulation means.'" *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616, 619 (5th Cir. 1994) (emphasis added). Equity in Action implements a new interpretation of the NFIA that significantly departs from FEMA's prior practice.

Nor do Defendants respond to Plaintiffs' arguments that Fifth Circuit precedent holds methodological changes affecting the amounts that regulated parties pay to the government must go through notice and comment. ECF 195-2 at 31–32. The

agency in one of those cases also argued that its methodological change "merely applied the relevant statute" and was thus an interpretative rule, but the Fifth Circuit rejected that argument, reasoning that the "creation and uniform application of a new methodology is not an adjudicatory application of an existing rule to the facts of a specific case, and … the new methodology can only be a substantive rule." *W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 239 (5th Cir. 2019).

Defendants strain to avoid the fact that the administrative record is full of statements from FEMA calling Equity in Action a "generational change" to the NFIP methodology. ECF 195-2 at 29–30. Defendants quote a passage in *W&T Offshore* that courts show "minimal" deference to an agency's characterization of its rule, but that passage speaks to whether courts should accept an agency's characterization of its rule as substantive or as an interpretive rule. 946 F.3d at 237. They do not accept the agency's legal conclusions and instead look to "'what the agency does in fact.'" *Id.* (citation omitted). That does not mean that the Court should discount what the administrative record reveals *in the agency's own words* about what the policy "does in fact." More to the point, FEMA's own representation *to this Court* is that Equity in Action is a major methodological update of the NFIP: "Risk Rating 2.0[] modernizes the NFIP's outdated rate-setting approach from the 1970s with a 21st century approach that leverages industry best practices, up-to-date technology, better data, and fundamental actuarial principles and methods." ECF 213-1 at 13. Defendants' own

description of Equity in Action from their summary judgment papers confirms it "represents a significant departure from long established and consistent practice that substantially affects the regulated industry." *Shell Offshore*, 238 F.3d at 630.

### B. Equity in Action does not satisfy the exacting requirements for harmless error.

Harmless-error analysis cannot excuse Defendants' failure to conduct notice and comment. Harmless error applies under the APA "only 'when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached.'" *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 215 (5th Cir. 1979) (citation omitted). When the error affected the agency's procedure, courts "cannot assume that there was no prejudice to petitioners. Absence of such prejudice must be *clear* for harmless error to be applicable." *Id.* (emphasis added). "Courts should rarely find harmless error for failure to provide notice and comment because the vast majority of agency rulemaking, which produces nuanced and detailed regulations, greatly benefits from expert and regulated entity participation." *Texas Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 587 F. Supp. 3d 528, 546–47 (E.D. Tex. 2022) (cleaned up). And "an utter failure to comply with notice and comment cannot be considered harmless if there is *any uncertainty at all* as to the effect of that failure." *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002) (emphasis added).

Courts have also distinguished between "technical failure" cases, where the agency provides some avenues for notice and comment, and "complete failure" cases, where the agency does not engage in notice and comment at all. *United States v.*

*Reynolds*, 710 F.3d 498, 516 (3d Cir. 2013). When, as here, the agency fails to comply with notice and comment completely, "the petitioner does not need to show that he would have offered comments that would have invalidated the rationale underlying the promulgated rule." *Id.* In addition, the reviewing court "'focus[es] on the process as well as the result'" because "'if the harmless error rule were to look solely to result, an agency could always claim that it would have adopted the same rule even if it had complied with the APA procedures.'" *Id.* at 517.

Courts consider it important in weighing prejudice that "interested parties received some notice that sufficiently enabled them to participate in the rulemaking process *before the relevant agency adopted the rule*." *Paulsen v. Daniels*, 413 F.3d 999, 1007 (9th Cir. 2005) (emphasis added). The timeline as Defendants themselves lay it out undermines the idea that Plaintiffs had any meaningful opportunity to influence the contours of Equity in Act before FEMA formulated it. As FEMA tells the story, it announced Risk Rating 2.0 in March 2019, when it had already been formulated, released more specific details in April 2021, and began implementing the policy in October 2021. ECF 213-1 at 43–44. But most of the transparency and public engagement examples that Defendants provide occurred in 2021 and 2022, after the policy had already been formulated, its specific details had been announced, and in some cases after FEMA had already begun implementing it. ECF 213-1 at 62–66. The declaration that Defendants cite to document this public engagement also makes clear that Risk Rating 2.0 was formulated by 2019, the earliest date that Defendants list, because FEMA was seeking to provide "explanations for why the changes to premium rates

were needed" and justify the methodology that it had developed with contractors and agency staff. ECF 53-5 at 1 ¶3, 3–4 ¶¶9–10. The Fifth Circuit leaves no doubt: "[p]ermitting the submission of views after the effective date is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way." *U.S. Steel Corp.*, 595 F.2d at 214. *U.S. Steel Corp* "precludes a finding of harmless error where the agency fails to allow any public comment before reaching a decision, thus circumventing the entire purpose of the APA notice and comment provisions." *Texas v. Lyng*, 868 F.2d 795, 799 (5th Cir. 1989).

Under Defendants' telling, the informal submission of the views of NFIP policyholders and communities, almost all from 2021 and 2022, neutralizes any possibility of prejudice to Plaintiffs. "The Fifth Circuit, however, has twice rejected the argument that a 'post-promulgation comment period cure[s] whatever procedural error may have been committed,' concluding that such a position would 'allow any agency to dispense with pre-promulgation notice and comment whenever it so desired.'" *Texas Med. Ass'n*, 587 F. Supp. 3d at 548. The logical implication of Defendants' argument would be to "virtually repeal section 553's requirements: if the government could skip those procedures, engage in informal consultation, and then be protected from judicial review unless a petitioner could show a new argument—not presented informally—section 553 obviously would be eviscerated." *Sugar Cane Growers*, 289 F.3d at 96. And on the substance, Defendants do not present any examples from the administrative record where FEMA decisionmakers explicitly weighed the defects in

Equity in Action that Plaintiffs identified, such as eliminating grandfathering or preferred risk policies and eliminating the use of flood zones and base flood elevation (BFE) in setting premiums, and provided reasoned explanation for why FEMA rejected those concerns.

The cases that Defendants cite where courts held harmless a failure to complete APA rulemaking only prove the point. ECF 213-1 at 44. In *City of Arlington v. FCC*, the agency published a request for comments in the Federal Register but merely mistitled it as "a 'Petition for Declaratory Ruling' rather than as a 'Notice of Proposed Rulemaking.'" 668 F.3d 229, 244 (5th Cir. 2012). The Fifth Circuit emphasized that the agency still "received and considered comments from dozens of interested parties" and then "addressed those issues in its Declaratory Ruling," thus completing an APA notice-and-comment procedure in all but name. *Id.* at 244–45. And in *United States v. Johnson*, the Fifth Circuit concluded the error was harmless because there "the interim rule publication addressed counter-arguments and set forth the basis and purpose of the rule." 632 F.3d 912, 931 (5th Cir. 2011). Here, no interim rule set out the justification for Equity in Action in any systematic way, much less addressed Plaintiffs' concerns around abolishing grandfathering and preferred risk policies, eliminating the use of rate maps for insurance premiums, or removing the central role of BFE for determining premiums. *Miami-Dade County v. EPA* was also a case where the agency published a proposed rule in the Federal Register, collected comments on that proposal, and responded to those comments in a final rule. 529 F.3d 1049, 1054–57 (11th Cir. 2008). Defendants cannot even present a case in which a

court found harmless error in an agency's complete failure to set out the reasons for its policy change and collect any official comments about the change. This Court should hold that Defendants' failure to comply with the APA's notice-and-comment requirements was not harmless error and set aside Equity in Action.

## III. EQUITY IN ACTION IS ARBITRARY AND CAPRICIOUS.

Equity in Action also must be vacated because it is arbitrary and capricious for failing to properly weigh reliance interests and to account for important aspects of the problem of providing a national flood insurance program. Defendants raise a host of factual responses to Plaintiffs' arguments, but those responses run headlong into three guiding principles of APA review of agency action. *First*, "[r]eview of agency action under § 706(2)'s 'arbitrary or capricious' standard is limited to the record before the agency *at the time of its decision*." *Geyen v. Marsh*, 775 F.2d 1303, 1309 (5th Cir. 1985) (emphasis added). Defendants rely extensively on three declarations prepared as part of this litigation specifically to support Equity in Action on the merits, including using facts that occurred after Equity in Action was implemented, in an about-face from their previous position that only the administrative record should be considered. *See, e.g.*, ECF 53-2 at 23.[1] *Second*, the agency's policy choices must be justified "on the basis of the rationale relied on by the [agency] as contained in the administrative record" and not the agency's "post-hoc rationalizations in justification

[1] Plaintiffs acknowledge that they submitted declarations in support of their motion for summary judgment to support Plaintiffs' standing and constitutional claim. *See Elec. Privacy Info. Ctr. v. FAA*, 892 F.3d 1249, 1256 (D.C. Cir. 2018) (standing); *Porter v. Califano*, 592 F.2d 770, 778–80 (5th Cir. 1979) (constitutional claims). They were not post hoc justifications for a policy on the merits that were not part of the administrative record.

of its decision." *Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889, 905 (5th Cir. 1993). *Third*, the agency must provide a reasoned explanation for the policy choices it made at the end of the day; "[s]tating that a factor was considered, however, is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). This is especially true where reliance interests are implicated: "when its prior policy has engendered serious reliance interests that must be taken into account … [i]t would be arbitrary or capricious to ignore such matters." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). With these principles in mind, Plaintiffs address each of Defendants' responses.

**Reliance on BFE**. Defendants rely extensively on post-implementation declarations to justify FEMA's decision to deemphasize the use of BFEs in setting insurance premiums. ECF 213-1 at 50–55. Perhaps most egregiously, they rely on statistics *from 2025* to show that more policyholders are now taking advantage of elevation discounts (now based on elevation above first floor rather than BFE), data that could not have been before the agency when it made its decision. ECF 213-1 at 55.

Defendants try to minimize Plaintiffs' arguments by equating discounts based on BFE with those considering a building's elevation above its first floor, but as Plaintiffs explained in their motion for summary judgment, the legacy system gave more predictable discounts for elevating a structure above the BFE while also using the same concept in rate maps, which Plaintiffs have a statutorily protected right to appeal. ECF 195-2 at 37–41. Indeed, the one administrative record document that De-

fendants cite addressing the problem explains several advantages to retaining consideration of BFE in premiums, including "[1] Maintain[ing] explicit connection to [rate maps] through a rating variable keyed on BFE; [2] For some stakeholders it may be politically unpalatable to eliminate a direct tie between [rate maps] and rates; [3] Within the SFHA, it produces a change in rates when a map is changed; [4] Reflects the granular engineering of [rate maps] in rates." AR00065155. FEMA did not explain how it weighed these advantages against the disadvantages of retaining BFE as a premium variable, and instead merely noted that its executive panel decided to disregard the variable. *Id.* This bare conclusion falls short of the reasoned decision making required by the APA.

**Mitigation Measures**. Equity in Action abandons important measures for recognizing mitigation measures, including a mitigation discount for elevating a structure above the BFE and mitigation measures that can be incorporated into a community's rate map on an ongoing basis. *See* ECF 195-2 at 41–44. Defendants respond to this argument primarily by pointing to a handful of new mitigation discounts available under Equity in Action and citing post-enactment declarations claiming that the number of policyholders taking advantage of mitigation discounts has increased. ECF 213-1 at 56–57. But these declarations do not reflect the record before the agency when it eliminated consideration of mitigation measures and do not consider reliance interests on those measures.

Defendants also claim that they based their decision to retire preferred risk policies on an argument that those policies overstated the protection provided by accredited levees. ECF 213-1 at 57–59. But Defendants fail to identify an explicit link between levee data and preferred risk policies in the administrative record, much less the type of explicit analysis of tradeoffs necessary to overcome important reliance interests under the APA. *Fox*, 556 U.S. at 515. For that link, Defendants rely entirely upon the Maurstad Declaration, executed in 2023 as part of this litigation and long post-dating FEMA's formulation and implementation of Equity in Action.

**Grandfathering**. Defendants claim that FEMA "explained" the need to eliminate grandfathering for policies, but the evidence that they cite shows the opposite. ECF 213-1 at 59–62. Most of the administrative record documents that Defendants cite are outside studies about the general need to reform the NFIP (but not necessarily eliminate grandfathering) or public announcements that grandfathering had been eliminated. Indeed, all the reasoned explanations for why FEMA abandoned grandfathering come from the post-implementation Maurstad Declaration. The one administrative record document that contains consideration of grandfathering includes several advantages of the policy: grandfathering operates "to increase take-up rates and encourage continuous coverage" and formed "an implied agreement that if a policyholder builds a home in compliance with one of FEMA's maps … any changes in risk (either based on the NFIP's understanding of risk or actual changes in risk) are, in perpetuity, not assigned to the homeowner/policyholder (or any future owners), but are borne by the Program as a whole." AR00065153. The document does not

include an explicit weighing by agency decisionmakers of the advantages and disadvantages of grandfathering, but only records the Executive Panel's final-line decision that "FEMA will not include a rating variable tied explicitly to the maps," and will thus eliminate grandfathering. AR00065155.

Defendants make much of the statutory requirements of the Biggert-Waters Act, but they neglect to mention that the HFIAA actually *repealed* Biggert-Waters's provision terminating grandfathering. Homeowner Flood Insurance Affordability Act of 2014 §4, Pub. Law 113-89, 128 Stat. 1020, 1022 (Mar. 21, 2014) ("Restoration of Grandfathered Rates"). Thus, regardless of what Biggert-Waters has to say about "nonprimary residences" and other similar properties, the most recent signal from Congress supported FEMA *maintaining* grandfathered rates for homeowners.

None of this suffices to justify FEMA's decision to disregard the significant reliance interests created by grandfathered rates, especially without any reasoned explanation in the administrative record for why FEMA acted against those reliance interests. Defendants try to minimize those reliance interests by arguing Equity in Action "would have minimal impact on grandfathered policies, because only 5% of the 3.5 million single-family homes covered by the NFIP 'are actually grandfathered.'" ECF 213-1 at 62. That statistic shows nothing of the sort; as the record page Defendants cite shows, 151,409 grandfathered policies were affected, AR00174708, and those policies saw much more than a "minimal impact," because they will all experience an 18% per year increase to their full risk premiums.

**Risk of Loss, Unreliable Topographic Data, and Average Annual Loss Data**. On these three points raised in Plaintiffs' motion for summary judgment, Defendants rely entirely on reports prepared by their contractors. ECF 213-1 at 67–72. In short, they provide no information about how *the agency itself* considered the data being provided by its contractors and found it adequate or inadequate. Defendants' attempts to conflate the two are unconvincing and legally unsupportable. *See* ECF 213-1 at 68 ("FEMA, *through Milliman*, compared the AIR and KatRisk results to the NFIP's historical experience and then selected adjustment factors to rescale the AALs" (emphasis added)). As the Fifth Circuit has held in APA and NEPA cases involving federal agencies and contractors, an "agency must independently perform its reviewing, analytical and judgmental functions and participate actively and significantly in the preparation and drafting process." *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974). Pointing to Milliman's efforts does not fulfill that requirement, especially when Milliman expressly stated significant limitations to its analysis as a contractor. *See* ECF-195-2 at 48–49. And besides the examples provided *supra* 22–23, this is just one further example where following the APA's notice-and-comment requirement would have given FEMA an opportunity to address Plaintiffs' concerns.

**Transparency Efforts**. Defendants cannot satisfy the APA's "reasoned explanation" requirement by pointing to public information sessions from outside the administrative record, almost all of which post-date the formulation of Equity in Action and the implementation of the first policies under the program. ECF 213-1 at 62 (citing *Fox*, 556 U.S. at 515), 73. Indeed, all of the evidence supporting this section of

Defendants' cross-motion comes from the post-implementation Hake Declaration, ECF 213-1 at 62–66, 73, and none of it is based on "record before the agency *at the time of its decision*." *Geyen*, 775 F.2d at 1309 (emphasis added).

## IV. EQUITY IN ACTION IS CONTRARY TO LAW.

Equity in Action is also contrary to law. The new rating methodology nullifies portions of the NFIA by eliminating any effect on premiums of rate maps or appeals of those maps. It also eliminates important mitigation discounts that were available under the legacy rating system.

Both before and after *Loper Bright*, courts will reject "an agency interpretation that is 'inconsistent with the design and structure of the statute as a whole.'" *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 466 (5th Cir. 2020). "Whatever benefit may result from" the agency's policy, courts "are guided instead by the 'core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.'" *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 120 F.4th 163, 174–75 (5th Cir. 2024) (citation omitted).

The NFIA includes detailed provisions governing the process of setting rate maps, how FEMA can modify those maps, and how communities or individuals can appeal those modifications. The statute requires FEMA to provide notice of any changes to the rate map elevation or boundaries in the Federal Register, directly to community leaders, and in a local newspaper. 42 U.S.C. § 4104(a). Any property owner "who believes his property rights to be adversely affected" by the change may then appeal either the elevation or boundary determination. *Id.* § 4104(b). While this appeal is ongoing, "flood insurance previously available within the community shall

continue to be available, and no person shall be denied the right to purchase such insurance at chargeable rates." *Id.* § 4104(e).

The NFIA's statutory scheme thus provides that individuals will have an incentive to challenge the elevation as determined in the rate maps and anticipates that this elevation will affect the flood insurance available to those property owners. The required continued availability of "flood insurance previously available within the community" must include the existing rate of that insurance. 42 U.S.C. § 4104(e). But as FEMA concedes, under Equity in Action, rate maps have no role in determining premiums and instead only affect construction requirements for new properties and which properties must purchase flood insurance. ECF 213-1 at 46–47. Contrary to FEMA's argument, this entire statutory appeals process makes sense only if it "implicate[s] premium discounts," ECF 213-1 at 46–47, because property owners would have an incentive to appeal the elevations as determined in the flood maps only when those elevations affected their premium rates. And the statutory requirement that the community's existing insurance remain available during the appeal process makes sense only if the existing rate map helps determine premium rates. Equity in Action's deemphasis of rate maps effectively writes these provisions out of the statute. Indeed, "the need to rewrite clear provisions of the statute should have alerted [FEMA] that it had taken a wrong interpretive turn." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

Equity in Action is also contrary to law because it removes important flood mitigation discounts to premium rates. The legacy rating system gave premium discounts for elevating the structure higher than the BFE, a mitigation discount that Equity in Action no longer provides. AR00017525, 00186145. And mitigation measures incorporated through community submissions to rating maps no longer affect flood insurance premiums either. *See* ECF 195-2 at 41–43. In arguing that Equity in Action nevertheless complies with the statute, Defendants focus on the community mitigation grants that FEMA "maintained" after Equity in Action and point to the fact that mitigation discounts are now available outside high-risk flood areas. ECF 213-1 at 45. But maintaining existing mitigation grants and expanding some mitigation credits to properties outside flood zones where they are less necessary does not account for the mitigation discounts that FEMA eliminated. Those significant cuts violate the NFIA's requirement that premiums be based on "the flood mitigation activities that an owner or lessee has undertaken on a property." 42 U.S.C. § 4014(a)(1)(A)(ii).

## V. EQUITY IN ACTION VIOLATES THE SPENDING CLAUSE.

Equity in Action is also unlawful because it violates the Spending Clause. The federal government's Spending Clause power "'does not include surprising participating States with post-acceptance or "retroactive" conditions.'" *NFIB v. Sebelius*, 567 U.S. 519, 584 (2012) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981)). The federal government also may not offer a financial inducement that is "'so coercive as to pass the point at which "pressure turns into compulsion."'" *Id.* at 580 (citation omitted).

As Plaintiffs already explained, "FEMA [] provides substantial funding for [State] agencies in exchange for their compliance with federal regulations and FEMA guidance." ECF 195-2 at 55. For example, the Louisiana program responsible for co-ordinating flood plain management receives 75% of its funding from FEMA. ECF 195-9 at 3 ¶6. In exchange, the state agency "is obligated to conduct all the activities listed in the annual plan and must comply with all [federal regulations] concerning the NFIP as well as FEMA guidance." *Id.* State government NFIP coordinating offices also accept hundreds of thousands of dollars per year of FEMA funding to help update and remap state floodplain maps. *Id.* at 3 ¶7. If the state agencies did not accept this federal funding, they "would be less effective at ensuring the type of floodplain ordinance compliance that mitigates the destruction caused by major storm and flooding events." *Id.* at 4 ¶8.

This reality sweeps the legs out from under Defendants' claim that this case falls outside the Spending Clause's ambit. Defendants are wrong to argue "States and municipalities themselves stand to lose no federal funding if they do not accept Risk Rating 2.0's allegedly onerous terms." ECF 213-1 at 77. Defendants' efforts to distinguish cases like *Yellen* also come up short because of this fact, since the NFIP actually *does* "involve[] circumstances where Congress disbursed federal funds directly to States in exchange for certain conditions, and where the Court could thus evaluate the contract-like bargain directly struck between these 'co-sovereigns' to ensure voluntariness and transparency." ECF 213-1 at 78. This case consequently falls squarely

in the territory in which courts have previously found violations of the Spending Clause.

In addition to these heartland Spending Clause violations, Equity in Action is also unduly coercive because it changes the terms of a well-established program for disaster relief and flooding mitigation. States and their citizens have come to rely on the NFIP; it provides needed flood insurance, they have adopted the flood mitigations and land use regulations that it requires, and their citizens cannot obtain federally backed lending without flood insurance coverage. *See* ECF 195-2 at 54–57. Changing the terms of the program at this juncture "'surpris[es] participating States with post-acceptance or "retroactive" conditions.'" *Sebelius*, 567 U.S. at 584. This lawsuit is thus distinguishable from *Adolph v. FEMA*; that case's very brief discussion of the spending clause issue concluded only that a single parish (not a State) had the opportunity to "'weigh the advantages of [FEMA's] federal benefits against the limitations on future development in the communities, which must be done in a safe manner, so that there will be no damage from flooding in the future.'" 854 F.2d 732, 736 (5th Cir. 1988) (citation omitted). Whether the NFIP's land use restrictions were coercive in the first instance when a parish agreed to them with full information and adopted them in the 1980s is distinct from whether FEMA unlawfully changed fundamental terms of the program after it has been integrated into the fabric of state and local government for more than 50 years. *Adolf*'s holding does not "control here," *contra* ECF 213-1 at 75, and Equity in Action should be set aside because it violates the Spending Clause.

## VI. An Order Setting Aside Equity in Action Is the Proper Remedy.

Vacatur of Equity in Action is the only appropriate remedy if the Court holds that the program is unlawful under the APA. *See* ECF 195-2 at 57–58. The APA gives reviewing courts the power "to hold unlawful and set aside agency action[s]." 5 U.S.C. § 706(2). This language "incorporated th[e] common and contemporaneous meaning of 'set aside,'" which meant to "'cancel, annul, revoke'"—in essence, "the vacatur of agency actions." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 829–30 (2024) (Kavanaugh, J., concurring). If this Court desires to take equitable account of the practical difficulties of unwinding the program, ECF 213-2 at 18–19, it should stay its vacatur order to give FEMA time to reimplement the legacy rating system, ECF 195-2 at 58.

Defendants concede that "the Fifth Circuit has authorized a court reviewing an APA challenge to vacate universally agency action" and "the Fifth Circuit has characterized vacatur as the 'default' remedy under the APA." ECF 213-1 at 79–80. They still seek to "preserve the argument that 5 U.S.C. § 706(2) does not authorize any particular form of relief[,]" presumably for Fifth Circuit en banc or Supreme Court review. *Id.* at 79. Plaintiffs don't dispute that they've now preserved that argument for those purposes, but this Court should apply the Fifth Circuit's binding precedent on APA remedies.

## CONCLUSION

This Court should grant Plaintiffs' Motion for Summary Judgment, deny Defendants' Cross-Motion, and set aside Equity in Action, thus restoring FEMA's prior methodology.

Dated: September 11, 2026

Respectfully submitted,

ELIZABETH B. MURRILL
Attorney General

/s/ Morgan Brungard
MORGAN BRUNGARD
Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
Office of the Attorney General
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
MurrillE@ag.louisiana.gov
BrungardM@ag.louisiana.gov

Tyler R. Green
Consovoy McCarthy PLLC
222 S. Main Street
Ste 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

*Counsel for Plaintiffs*[2]

[2] The Commonwealth of Virginia intends to dismiss its claims pursuant to Federal Rule of Civil Procedure 41 and takes no position.