**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

THE STATE OF LOUISIANA *et al.*,

*Plaintiffs*,

v.

DEPARTMENT OF HOMELAND SECURITY *et al.*,

*Defendants*.[1]

Action No. 2:23-cv-01839
Section P
District Judge Darrel J. Papillion
Magistrate Judge Eva J. Dossier

# JOINT APPENDIX – PART I

[1] The Complaint names as a Defendant Alejandro Mayorkas in his official capacity as then-Secretary of Homeland Security. Under Federal Rule of Civil Procedure 25(d), Markwayne Mullin, current Secretary of Homeland Security, is automatically substituted as a Defendant.

NATIONAL ACADEMIES Sciences Engineering Medicine

NATIONAL ACADEMIES PRESS Washington, DC

This PDF is available at http://nap.nationalacademies.org/9971




# Risk Analysis and Uncertainty in Flood Damage Reduction Studies (2000)

BUY THIS BOOK

FIND RELATED TITLES

## DETAILS

216 pages | 6 x 9 | PAPERBACK
ISBN 978-0-309-07136-9 | DOI 10.17226/9971

## CONTRIBUTORS

Committee on Risk-Based Analysis for Flood Damage Reduction; Water Science and Technology Board; Commission on Geosciences, Environment, and Resources; National Research Council

## SUGGESTED CITATION

National Research Council. 2000. *Risk Analysis and Uncertainty in Flood Damage Reduction Studies*. Washington, DC: The National Academies Press. https://doi.org/10.17226/9971.

Visit the National Academies Press at nap.edu and login or register to get:

- Access to free PDF downloads of thousands of publications
- 10% off the price of print publications
- Email or social media notifications of new titles related to your interests
- Special offers and discounts

All downloadable National Academies titles are free to be used for personal and/or non-commercial academic use. Users may also freely post links to our titles on this website; non-commercial academic users are encouraged to link to the version on this website rather than distribute a downloaded PDF to ensure that all users are accessing the latest authoritative version of the work. All other uses require written permission. (Request Permission)

This PDF is protected by copyright and owned by the National Academy of Sciences; unless otherwise indicated, the National Academy of Sciences retains copyright to all materials in this PDF with all rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# RISK ANALYSIS AND UNCERTAINTY IN FLOOD DAMAGE REDUCTION STUDIES

Committee on Risk-Based Analysis for Flood Damage Reduction
Water Science and Technology Board
Commission on Geosciences, Environment, and Resources
National Research Council

NATIONAL ACADEMY PRESS
Washington, D.C.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

NOTICE: The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. The members of the committee responsible for the report were chosen for their special competencies and with regard for appropriate balance.
Support for this project was provided by the U.S. Army Corps of Engineers under DACW72-98-C-0003.

International Standard Book Number 0-309-07136-4
Library of Congress Catalog Card Number 00-108527
*Risk Analysis and Uncertainty in Flood Damage Reduction Studies* is available from the National Academy Press, 2101 Constitution Avenue, N.W., Washington, D.C. 20418; (800) 624-6242 or (202) 334-3313 (in the Washington metropolitan area); Internet <http://www.nap.edu>.

Sketch on the book cover is courtesy of the California State Library. It is a contemporary sketch of the city of Sacramento during the high water of the winter of 1849-1850.
Copyright 2000 by the National Academy of Sciences. All rights reserved.

Printed in the United States of America.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# THE NATIONAL ACADEMIES

National Academy of Sciences
National Academy of Engineering
Institute of Medicine
National Research Council

The **National Academy of Sciences** is a private, nonprofit, self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare. Upon the authority of the charter granted to it by the Congress in 1863, the Academy has a mandate that requires it to advise the federal government on scientific and technical matters. Dr. Bruce M. Alberts is president of the National Academy of Sciences.

The **National Academy of Engineering** was established in 1964, under the charter of the National Academy of Sciences, as a parallel organization of outstanding engineers. It is autonomous in its administration and in the selection of its members, sharing with the National Academy of Sciences the responsibility for advising the federal government. The National Academy of Engineering also sponsors engineering programs aimed at meeting national needs, encourages education and research, and recognizes the superior achievements of engineers. Dr. William A. Wulf is president of the National Academy of Engineering.

The **Institute of Medicine** was established in 1970 by the National Academy of Sciences to secure the services of eminent members of appropriate professions in the examination of policy matters pertaining to the health of the public. The Institute acts under the responsibility given to the National Academy of Sciences by its congressional charter to be an adviser to the federal government and, upon its own initiative, to identify issues of medical care, research, and education. Dr. Kenneth I. Shine is president of the Institute of Medicine.

The **National Research Council** was organized by the National Academy of Sciences in 1916 to associate the broad community of science and technology with the Academy's purposes of furthering knowledge and advising the federal government. Functioning in accordance with general policies determined by the Academy, the Council has become the principal operating agency of both the National Academy of Sciences and the National Academy of Engineering in providing services to the government, the public, and the scientific and engineering communities. The Council is administered jointly by both Academies and the Institute of Medicine. Dr. Bruce M. Alberts and Dr. William A. Wulf are chairmen and vice chairmen, respectively, of the National Research Council.

**www.national-academies.org**

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# COMMITTEE ON RISK-BASED ANALYSES FOR FLOOD DAMAGE REDUCTION

GREGORY B. BAECHER, *Chair*, University of Maryland, College Park
EFI FOUFOULA-GEORGIOU, University of Minnesota, Minneapolis
RALPH L. KEENEY, University of Southern California, Los Angeles
LESTER B. LAVE, Carnegie Mellon University, Pittsburgh, Pennsylvania
HARRY F. LINS, U.S. Geological Survey, Reston, Virginia
DANIEL P. LOUCKS, Cornell University, Ithaca, New York
DAVID R. MAIDMENT, University of Texas, Austin
MARTIN W. MCCANN, Jack R. Benjamin and Associates, Inc., Menlo Park, California
JERY R. STEDINGER, Cornell University, Ithaca, New York
BEN CHIE YEN, University of Illinois, Urbana-Champaign

**National Research Council Staff**

JEFFREY W. JACOBS, Study Director
ELLEN A. DE GUZMAN, Senior Project Assistant

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# WATER SCIENCE AND TECHNOLOGY BOARD

HENRY J. VAUX, Jr., *Chair*, Division of Agriculture and Natural Resources, University of California, Oakland
RICHARD G. LUTHY, *Vice-Chair*, Stanford University, Stanford, California
RICHELLE M. ALLEN-KING, Washington State University, Pullman
GREGORY B. BAECHER, University of Maryland, College Park
JOHN BRISCOE, The World Bank, Washington, D.C.
EFI FOUFOULA-GEORGIOU, University of Minnesota, Minneapolis
STEVEN P. GLOSS, University of Wyoming, Laramie
WILLIAM A. JURY, University of California, Riverside
GARY S. LOGSDON, Black & Veatch, Cincinnati, Ohio
DIANE M. MCKNIGHT, University of Colorado, Boulder
JOHN W. MORRIS, J.W. Morris Ltd., Arlington, Virginia
PHILIP A. PALMER, (Retired) E.I. du Pont de Nemours & Co., Wilmington, Delaware
REBECCA T. PARKIN, The George Washington University, Washington, D.C.
RUTHERFORD H. PLATT, University Massachusetts, Amherst
JOAN B. ROSE, University of South Florida, St. Petersburg
JERALD L. SCHNOOR, University of Iowa, Iowa City
R. RHODES TRUSSELL, Montgomery Watson, Pasadena, California

## Staff

STEPHEN D. PARKER, Director
LAURA J. EHLERS, Senior Staff Officer
CHRIS ELFRING, Senior Staff Officer
JEFFREY W. JACOBS, Senior Staff Officer
MARK C. GIBSON, Staff Officer
WILLIAM S. LOGAN, Staff Officer
M. JEANNE AQUILINO, Administrative Associate
PATRICIA A. JONES, Study/Research Associate
ANITA A. HALL, Administrative Assistant
ELLEN A. DE GUZMAN, Senior Project Assistant
ANIKE L. JOHNSON, Project Assistant

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# COMMISSION ON GEOSCIENCES, ENVIRONMENT, AND RESOURCES

GEORGE M. HORNBERGER, *Chair*, University of Virginia, Charlottesville
RICHARD A. CONWAY, Union Carbide Corporation (Retired), S. Charleston, West Virginia
LYNN GOLDMAN, Johns Hopkins School of Hygiene and Public Health, Baltimore, Maryland
THOMAS E. GRAEDEL, Yale University, New Haven, Connecticut
THOMAS J. GRAFF, Environmental Defense, Oakland, California
EUGENIA KALNAY, University of Maryland, College Park
DEBRA KNOPMAN, Progressive Policy Institute, Washington, D.C.
BRAD MOONEY, J. Brad Mooney Associates, Ltd., Arlington, Virginia
HUGH C. MORRIS, El Dorado Gold Corporation, Vancouver, British Columbia
H. RONALD PULLIAM, University of Georgia, Athens
MILTON RUSSELL, Joint Institute for Energy and Environment and University of Tennessee (Emeritus), Knoxville
ROBERT J. SERAFIN, National Center for Atmospheric Research, Boulder, Colorado
ANDREW R. SOLOW, Woods Hole Oceanographic Institution, Woods Hole, Massachusetts
E-AN ZEN, University of Maryland, College Park
MARY LOU ZOBACK, U.S. Geological Survey, Menlo Park, California

## Staff

ROBERT M. HAMILTON, Executive Director
GREGORY H. SYMMES, Associate Executive Director
JEANETTE SPOON, Administrative and Financial Officer
SANDI FITZPATRICK, Administrative Associate

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# Preface

Any review of the U.S. Army Corps of Engineers's approach to technical issues and their applications tends to be complicated because of the Corps's size, its lengthy and rich history, its relations with other federal agencies, and controversies that have followed the Corps for decades. This review and study were no different. Our study committee was challenged to analyze the Corps's risk analysis techniques in its flood damage reduction studies, a challenge that was magnified by the need to understand several related issues. Our committee experts in hydrology, engineering, and statistics found themselves analyzing not only risk analysis applications, but also considering levee certification policy and history, federal flood insurance programs, and U.S. floodplain management strategies. The committee undertook these peripheral investigations partly because of the need to adequately address its statement of task and partly out of intellectual curiosity. In any event, one implicit conclusion of our study is that an appreciation of the Corps's historical roles in addressing the nation's flood problems is necessary to understand the current issues the Corps faces in engineering and hydrologic applications.

The Corps's relatively new applications of risk analysis represent a significant departure from long-held, traditional approaches to addressing hydrologic, hydraulic, and geotechnical uncertainties. The former approach of adding freeboard to its levees was for several decades a sound strategy for coping with unquantifiable uncertainties. Because of historical momentum, this former approach has left a legacy that is not easily jettisoned. Several Corps of Engineers techniques and policies

Copyright National Academy of Sciences. All rights reserved.

were based upon the concept of freeboard, and it will take some time for the agency to fully adjust to the new techniques.

In watching these changes within the agency, our committee gained an appreciation for the dedication of several Corps of Engineers staff members who assisted with this study. Much of the development of the risk analysis techniques has taken place at the Corps's Hydrologic Engineering Center in Davis, California. The committee expresses its gratitude and appreciation to Darryl Davis, the Center's director. Darryl has been a leader in promoting risk analysis applications within the Corps. The committee appreciates Darryl's frankness and cooperation during this study. David Goldman, also of the Hydrologic Engineering Center, has been central to tailoring the risk analysis techniques to Corps applications and deserves major credit for advancing risk analysis within the Corps.

Several other Corps of Engineers staff members shared their knowledge and views with the committee. Earl Eiker and Harry Kitch at Corps Headquarters in Washington, D.C., and David Moser of the Corps's Institute for Water Resources, spoke with the committee at its first meeting in Washington in December 1998. Staff from the Corps's Louisville district office hosted a visit by a committee member in the summer of 1999 and provided information for the committee's Beargrass Creek case study. The committee thanks Neil O'Leary, Richard Pruitt, and Matt Scheuler in the Louisville district office for their assistance.

The committee thanks Joe Countryman of MBK Consultants (Sacramento), Michael Grimm of the Federal Emergency Management Agency (Washington, D.C.), and Doug Plascencia of Kimley-Horn (Phoenix) and member of the Association of State Floodplain Managers—all of whom spoke with the committee at its second meeting in Davis in February 1999. Joe, Mike, and Doug provided compelling remarks that helped the committee consider wider implications of the Corps's use of risk analysis.

Peter Andrysiak, U.S. Army, and Mitchell Laird of the Louisville district also provided significant assistance in acquiring project documents and data.

The committee also thanks Stephen Parker, director of the Water Science and Technology Board (WSTB). Steve followed the progress of this committee closely, and the committee frequently drew upon his knowledge of risk analysis and the Corps of Engineers planning procedures. His experience in managing numerous WSTB reports was useful in helping the committee reach agreement on some key technical issues.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Finally, the entire committee expresses its gratitude to project assistant Ellen de Guzman. Ellen demonstrated superb organizational skills, reviewed and organized several drafts of the committee's report, and also showed a great deal of patience and aplomb in dealing with too many last-minute requests from the chair and study director.

This report has been reviewed by individuals chosen for their diverse perspectives and technical expertise, in accordance with procedures approved by the Report Review Committee of the National Research Council (NRC). The purpose of this independent review is to provide candid and critical comments that will assist the authors and the NRC in making the published report as sound as possible and to ensure that the report meets institutional standards for objectivity, evidence, and responsiveness to the study charge. The contents of the review and draft manuscripts remain confidential to protect the integrity of the deliberative process. We wish to thank the following individuals for their participation in the review of this report:

Paul Barton, U.S. Geological Survey
Leo Beard, Professor Emeritus, University of Texas
Stephen Burgess, University of Washington
John Cassidy, consultant, Concord, California
Susan Cutter, University of South Carolina
Des Hartford, British Columbia Hydro
Debra Knopman, Progressive Policy Institute
Eric Wood, Princeton University

Although the individuals listed above provided many constructive comments and suggestions, responsibility for the final content of this report rests solely with the authoring committee and the NRC.

GREGORY B. BAECHER
Chair
JEFFREY W. JACOBS
Study Director

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# Contents

EXECUTIVE SUMMARY 1

1 THE CORPS AND U.S. FLOOD DAMAGE REDUCTION PLANNING, POLICIES, AND PROGRAMS 12
Risk Analysis Approach 14
The Corps's Water Resource Project Planning Procedures 15
U.S. Federal Flood Preparedness, Mitigation, and Response Activities 24

2 DECISION MAKING AND COMMUNICATION ISSUES 29
The Goal of Floodplain Management 30
Multiple Objectives 31
Comparing Project Alternatives 33
Floodplain Management Alternatives 36
Risk Communication 37

3 RISK ANALYSIS CONCEPTS AND TERMS 40
Uncertainty 40
Consistency Across Program Areas 45
Risk Analysis and Decision Making 47

4 RISK ANALYSIS TECHNIQUES 51
Corps Framework 53
Natural Variability and Imperfect Knowledge 54
Risk Analysis 59
Monte Carlo Simulation 62
Assessment of Engineering Performance 64

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Geotechnical Reliability 67

5 CASE STUDIES 71
Beargrass Creek 72
Red River of the North at East Grand Forks, Minnesota, and Grand Forks, North Dakota 98

6 EVALUATION AND PROPOSED IMPROVEMENTS 114
Concerns with the Risk Analysis Methods 114
Engineering Performance 115
Hydrologic Analysis 119
Geotechnical Reliability 122
Economic Performance 123
Interdependence in Risk Analysis for Flood Damage Assessment 127
Correlation Length 128
Spatial Aggregation 129
Computational Alternatives to Minimize Correlation Effects 133

7 LEVEE CERTIFICATION 139
History of Levee Certification 139
Current Certification Criterion 147
Analysis of Levee Sizing Criteria 149
Technical Corrections to the Current Certification Procedure 155
An Alternative Criterion: A Longer-Term Change 156

8 CONCLUSIONS AND RECOMMENDATIONS 159
Risk Analysis Techniques 161
Consistent Terminology 164
Levee Certification 165
Floodplain Management 166

REFERENCES 168

APPENDIXES

A Glossary 175

B Corps–FEMA Levee Certification Documentation 181

C Economic and Environmental Principles for Water Related Land Resources Implementation Studies 193

D Functions of Random Variables 196

E Biographical Information 199

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# Executive Summary

Reducing flood damages is a complex task that requires multidisciplinary understanding of the earth sciences and civil engineering. In addressing this task, the U.S. Army Corps of Engineers employs its expertise in hydrology, hydraulics, and geotechnical and structural engineering. Dams, levees, and other river works must be sized to local conditions; geotechnical theories and applications help ensure that structures will safely withstand potential hydraulic and seismic forces; and economic considerations must be balanced to ensure that reductions in flood damages are commensurate with project costs and associated impacts on social, economic, and environmental values.

Many flood damage reduction projects involve the construction of levees. The Corps's historical approach to coping with hydrologic and hydraulic uncertainties of large floods was based on a best estimate of the levee height required to withstand a given flood, which was then augmented by a standard increment of levee height called "freeboard." The best estimate has traditionally been based on the expected height of a design flood (e.g., a 100-year flood, the magnitude of which has a 1 percent chance of being equaled or exceeded in any given year, and which is here called the "1% flood"). Freeboard was then added above the expected height. Many Corps flood damage reduction projects used a standard of 3 feet of freeboard. "Three feet of freeboard" became an engineering tradition within the Corps and was employed in hundreds of Corps flood damage reduction studies and projects.

Challenges to the concept of a standard levee freeboard emerged in the early 1990s. For instance, it was noted that a standard freeboard did

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

not account for geographic and hydrologic differences at different locations and may thus have provided different levels of flood protection in different localities. Procedures for calculating the economic benefits conferred by levee freeboard were also questioned.

The Corps felt that development and application of *risk analysis* techniques held great promise in addressing these issues, as these techniques aim to quantify and explicitly incorporate uncertainties in hydrologic, hydraulic, and geotechnical parameters into levee design analysis. It was envisioned that proper application of risk analysis could replace the need for a standard 3 feet of freeboard.

Risk analysis also became part of a federal levee certification procedure jointly conducted by the Corps and the Federal Emergency Management Agency (FEMA). Within the National Flood Insurance Program, FEMA identifies areas subject to varying degrees of flood risk on flood insurance rate maps. One of these areas is the Special Flood Hazard Area (SFHA), defined as the area that is inundated by a flood having a 1 percent chance of being equaled or exceeded in any given year (the 1% flood). Property within a Special Flood Hazard Area is subject to mandatory flood insurance purchase requirements and may be subject to local land use regulations, as well.

Floodplain property can avoid the Special Flood Hazard Area designation, and the mandatory flood insurance requirements that attend it, if it is protected by a levee certified to provide protection against the 1% flood. The Corps of Engineers is responsible for certifying levees as meeting this safety standard. As levee certification could exempt a community from flood insurance purchase requirements (and possible exemptions from local land use requirements), this certification procedure has great local economic and public policy significance.

The historical standard for levee certification had been that levees must provide protection to the average stage (height) of the 1% flood, plus 3 feet of freeboard. With the Corps's adoption of risk analysis techniques in the early 1990s, the freeboard standard for levee certification was abandoned in favor of the new risk analysis standard.

The public, however, was not entirely comfortable with the replacement of a time-tested standard by relatively new techniques. These issues came to a head in a Corps flood damage reduction project planning study in Portage, Wisconsin in the early 1990s. The Corps study recommended a levee of elevation 798.3 feet for the city of Portage. But this recommended levee (the "National Economic Development" levee project alternative) would not have been high enough to be certified as providing protection from the 1% flood. Because the calculations for

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

levee height were based on the new risk analysis techniques, in 1993 the city of Portage, the Wisconsin Department of Natural Resources, and the Association of State Floodplain Managers challenged the study's results. An outcome of the ensuing discussions was that the U.S. Congress requested a National Academy of Sciences study of the Corps's use of risk analysis techniques. (The National Academy of Sciences was subsequently subsumed—in 1999—as part of the National Academies. The National Academies includes the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine.)

The charge to the National Academies was included in the Water Resources Development Act of 1996 (WRDA 96) from the 104th Congress of the United States. Public Law 104-303 of WRDA 96 stated the following (Section 202h):

> The Secretary (Army) shall enter into an agreement with the National Academy of Sciences to conduct a study of the Corps of Engineers' use of risk-based analysis for the evaluation of hydrology, hydraulics, and economics in flood damage reduction studies. The study shall include—

a) an evaluation of the impact of risk-based analysis on project formulation, project economic justification, and minimum engineering and safety standards; and

b) a review of studies conducted using risk-based analysis to determine—

i) the scientific validity of applying risk-based analysis in these studies; and

ii) the impact of using risk-based analysis as it relates to current policy and procedures of the Corps of Engineers.

To carry out this assignment, the Water Science and Technology Board (WSTB) of the National Academies's National Research Council (NRC) appointed the Committee on Risk-Based Analyses for Flood Damage Reduction to conduct the study, with sponsorship provided by the U.S. Army Corps of Engineers.

## APPLICATION OF RISK ANALYSIS TECHNIQUES

Recognition of engineering and economic uncertainties and their ex

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

plicit quantification in flood damage reduction studies leads to projects that are better tailored to local conditions and available data than did the earlier, deterministic levee freeboard standard. **The new techniques are a significant step forward and the Corps should be greatly commended for embracing contemporary, but complicated, techniques and for departing from a traditional approach that has been overtaken by modern scientific advances.** While some technical issues are not yet fully resolved, the Corps has taken a significant step forward with the development of its risk analysis methods for flood damage reduction studies. The committee also notes that these advances have been made with a relatively modest investment of resources. There should be no turning back from this accomplishment.

The former approach of using standard levee freeboard did not provide consistent levels of flood protection across the nation. A consistent protection standard must properly account for local and regional differences in topography, hydrology, and hydraulics, which the standard freeboard approach did not. In some areas, for instance, as little as 2 feet of freeboard may be required to provide adequate flood protection, while in other areas, as much as 6 feet may be required. The traditional 3 feet of freeboard standard masks a significant degree of variation of risk of levee failure for citizens protected by these levees. This variation in risk of failure can be quantified by the Corps's new risk analysis procedure.

The committee divided its recommendations for improvement into the following areas: (1) refine methods relating to probabilistic and statistical modeling of floods, performance of flood damage reduction systems (e.g., levees), and flood damage assessment, (2) adopt a consistent terminology for communicating risk analysis concepts within the Corps and to the public, (3) simplify and improve the complex and somewhat confusing criteria for certifying levees for inclusion in the National Flood Insurance Program (NFIP), and (4) move toward a more comprehensive decision making approach in flood damage reduction studies.

## Risk Measures and Modeling

The committee reviewed a computer program developed by the Corps's Hydrologic Engineering Center (HEC) in Davis, California. This computer program, the Hydrologic Engineering Center Flood Damage Assessment (HEC-FDA) program, is the principal tool used in Corps district offices to calculate flood damage risks. This program implements the Corps's risk analysis and builds upon a deterministic approach

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

to flood damage estimation that evolved over several decades. Although it benefits from this experience, the Corps's risk analysis method suffers from the difficulty of translating deterministic practice into a risk analysis application. Assessing the risk analysis method's validity rests on the following questions:

1. Are the performance measures generated by the risk analysis method useful and complete?
2. Are all the important uncertainties included in the analysis?
3. Is the specification of these uncertainties proper?
4. Are probabilistic and statistical methods used correctly?

Risk analysis is applied to economic performance measures (project net benefits and benefit–cost ratio) and to engineering performance measures (probability of flooding). While the measures of economic performance in the new method are generally practical and informative, there are too many types of engineering performance measures to be clearly understood by most citizens. Standardization to one or two key measures of engineering performance measures would represent an improvement.

**The committee recommends that the Corps use *annual exceedance probability* as the performance measure of engineering risk.** This is a measure of the likelihood that people will be flooded (including the probability of failure of flood damage reduction structures, such as levees) in any given year, considering the full range of floods that can occur and all sources of uncertainty.

For engineering purposes, it is useful to calculate other system reliability measures, such as the conditional nonexceedance probability for the 1 percent (100-year) flood. But such measures are difficult to understand and are not as clear as the measure of annual probability of flooding, and they should not be used in communicating flood risks to the public.

Evaluation of the uncertainty in economic benefits that are attributed to knowledge uncertainties represents an important advance for the Corps. Such an evaluation is performed using a Monte Carlo procedure that evaluates expected annual damages using different possible parameter combinations for hydrologic, hydraulic, geotechnical, and economic models. While the Corps's conceptual approach to modeling flood hazard and associated damages—using relationships between flood frequency, stage–discharge, and damage–stage—is consistent with long

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 22 of 858

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

standing scientific understanding, certain improvements to this method are needed. Risk analysis measures for a project must rest upon complete and accurate specification of the uncertainties in each component of an analysis and upon correct probabilistic methods to quantify and combine those uncertainties. **As the current method has shortcomings in these areas, the committee recommends that the Corps improve its analysis of hydrologic, hydraulic, geotechnical, and economic uncertainties.**

The Corps's conceptual approach of distinguishing between natural variability and knowledge uncertainty is reflected in the engineering modeling components of its risk analysis method, but the conceptual approach needs refinement. Natural variability is variability assumed to be inherent in natural processes, such as flood frequencies or properties of geotechnical materials. Knowledge uncertainty is attributed to limitations of scientific understanding of natural processes. In some cases, such as the hydraulic relationship between a river's stage (height) and its discharge, the risk analysis method appears to include natural variability under knowledge uncertainties; in others, such as geotechnical levee performance, knowledge uncertainties appear to be included under natural variability. This is a critical issue, because knowledge uncertainties and natural variability each affect the calculations of risk in different ways.

**The committee recommends that the Corps focus greater attention on the probabilistic issues of identifying, estimating, and combining uncertainties.** Better specification of knowledge uncertainties in flood frequencies is needed. The uncertainty in the skewness coefficient for log-Pearson Type III distribution models of flood frequency (which are used by the Corps and other federal agencies for describing return periods of floods) should be explicitly included in the risk analysis. Some measure of the uncertainty inherent in computing flood–frequency curves from rainfall–runoff modeling is also needed.

**The committee recommends that the Corps strive to reduce the considerable variation in the estimates of water surface elevation when using different models of river hydraulics.** The Corps's experiences in applying alternative methods to estimate flood stage indicate that there can be substantial differences in the results.

**The committee recommends that the Corps's risk analysis method evaluate the performance of a levee as a spatially distributed system.** Geotechnical evaluation of a levee, which may be many miles long, should account for the potential of failure at any point along the levee during a flood. Such an analysis should consider multiple modes of levee failure (e.g., overtopping, embankment instability), correlation

Copyright National Academy of Sciences. All rights reserved.

No RR2.0-AR00003593

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

of embankment and foundation properties, hazards associated with flood stage (e.g., debris, waves, flood duration) and the potential for multiple levee section failures during a flood. The current procedure treats a levee within each damage reach as independent and distinct from one reach to the next. Further, within a reach, the analysis focuses on the portion of each levee that is most likely to fail. This does not provide a sufficient analysis of the performance of the entire levee. This has important implications for not only geotechnical and economic analysis of flood damages, but also for levee certification.

The Corps's new geotechnical reliability model would benefit greatly from field validation. The nation has many years of experience with levee performance and, unfortunately, also with levee failures. Much of this experience is documented and much is accessible to federal agencies. **The committee recommends that the Corps undertake statistical ex post studies to compare predictions of geotechnical levee failure probabilities made by the reliability model against frequencies of actual levee failures during floods. In addition, the committee recommends that the Corps conduct statistical ex post studies with respect to the performance of other flood damage reduction structures (e.g., embankments, detention basins, hydraulic facilities). These latter studies should be conducted in order to identify the vulnerabilities (failure modes) of these systems and to verify engineering reliability models.**

## Economics

In the current Corps method (and as mandated by the federal *Principles and Guidelines*), flood damage is calculated for each set of project alternatives by aggregating over all existing structures (buildings) in the floodplain. Then, reduction in flood damage is calculated by taking the difference between this aggregate number and the corresponding aggregate damage without the project. Correlations among the random variables can introduce serious errors in the analysis. Each structure in a floodplain is modeled as if that structure exists in isolation from all others. The result is that the analysis incorrectly computes uncertainties associated with differences in economic damages that result from different project alternatives.

**The committee recommends that the Corps calculate the risks associated with flooding, and the benefits of a flood damage reduc**

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

**tion project, structure by structure, rather than conducting risk analysis on damage aggregated over groups of structures in damage reaches.** Furthermore, the practice of summing and subtracting percentile values of probability distributions of flood damage in reaches to obtain risk measures of project economic performance is unsound and produces output measures of unknown accuracy. The outputs of the economic risk analysis using the current procedure are thus of questionable value.

## CONSISTENT TERMINOLOGY

The committee noted that a variety of terms describing aspects of risk and uncertainty are often used interchangeably within and between the Corps's water resources programs. **The committee thus recommends that the Corps adopt a consistent vocabulary for describing risk analysis concepts, specifically distinguishing between risk, natural variability, knowledge uncertainty, and measures of system reliability.** The Corps should clearly distinguish between natural variability (based on the random nature of physical systems) and knowledge uncertainty (uncertainties attributable to limitations in the current state of knowledge).

## LEVEE CERTIFICATION

In the early 1990s the Corps and FEMA adopted a risk analysis approach to replace the practice of certifying levees that had 3 feet of freeboard above the 1% flood level. This risk analysis approach and the levels of flood protection it provided were controversial. Negotiations between the Corps and FEMA led to the current practice of certifying a levee based on a three-tiered decision rule, using: (1) 3 feet of freeboard, (2) a conditional nonexceedance probability of 90 percent of passing a 1% flood, or (3) a conditional nonexceedance probability of 95 percent of passing a 1% flood. Although this three-tiered criterion represents a reasonable transition from the former certification criterion into the risk analysis framework, it has the following deficiencies: (1) it still leads to different levels of flood protection for different projects, (2) the three-tiered decision rule is unnecessarily complicated, (3) the method evaluates levees individually rather than as a levee system that is intended to provide flood protection for a community, and (4) certification is incomplete in that it considers only the 100-year flood, not the full range of

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

floods.

**The committee recommends that the federal levee certification program focus not upon some level of assurance of passing the 100-year flood, but rather upon "annual exceedance probability"—the probability that an area protected by a levee system will be flooded by any potential flood. This annual exceedance probability of flooding should include uncertainties derived from both natural variability and knowledge uncertainty.**

The criterion for certifying a levee should be that it provides satisfactory protection against failure of the flood damage reduction system, expressed as an annual probability of flooding. This new criterion should promote better communication among the Corps, FEMA, other regulatory and expert groups, and communities and local cosponsors.

Substantial resources and time may be required to implement the annual exceedance probability approach for certifying a levee. **Until the measure of annual exceedance probability is adopted as the key criterion for levee certification, the committee recommends that the Corps and FEMA set a single conditional nonexceedance probability for levee certification.**

The former certification criterion was flawed in that it produced vastly different levels of flood protection for different communities. **The committee recommends that the certification criterion provide a uniform level of flood protection.** Which level of protection to choose is not obvious. Insisting on the highest level of protection would mean that only a small proportion of levees would be certified. **In the committee's judgment, the certification criterion should be the level of protection provided to most people in the past—the median level historically provided.** Based upon a small sample of all Corps flood damage reduction projects, the committee found that the median annual exceedance probability of Corps flood damage reduction projects is approximately 1/230.

This is the committee's best estimate of the median annual exceedance probability. **To obtain a more reliable measure of the median annual exceedance probability of approved projects, the committee recommends that the Corps examine a larger number of flood damage reduction projects and audit the process of estimating the annual exceedance probability for these projects.**

**The committee recommends that the Corps develop a table showing percentiles of variability in the annual exceedance probability of its flood damage reduction projects.** By choosing an appro

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

priate percentile value in this range, a corresponding level of assurance can be obtained that the expected level of protection is at least 100 years, as required. It was the lack of allowance for this variability that led to the abandonment of the annual exceedance probability criterion during the 1990s.

## FLOODPLAIN MANAGEMENT

Neither the U.S. Congress nor the Corps of Engineers have defined an explicit goal for management of the nation's floodplains. In the committee's opinion, the goal of floodplain management should be to use the land for the greatest social benefit. Broadening the scope of the Corps's risk analysis and expanding the types of alternatives considered would provide more useful insight about how best to achieve this goal.

As currently specified by the federal *Economic and Environmental Principles and Guidelines for Water and Related Land Resources Implementation Studies*, flood damage reduction studies emphasize direct economic damage reductions and the costs of alternatives; these are quantified in the Corps's risk analysis methodology. **To ensure that the Corps's flood damage reduction projects provide adequate social and environmental benefits, the committee recommends that the Corps explicitly address potential loss of life, other social consequences, and environmental consequences in its risk analysis.** Furthermore, the Corps's risk analysis should not be limited to structural alternatives such as levees, dikes, and dams. Nonstructural alternatives such as warning systems and zoning regulations should also be considered, both separately and in conjunction with structural alternatives.

Given the breadth of federal agencies and programs devoted to U.S. floodplain and flood hazard management, the Corps clearly cannot implement these recommendations alone. Further, it is not likely that such a broadening of the Corps's risk analysis methods will occur over a short period of time. To include a broader range of social and environmental implications in the benefit–cost calculations of flood damage reduction studies, appropriate revisions of existing legislation and planning guidance, consistent with these recommendations, may have to be enacted by the U.S. Congress.

**To appropriately include such consequences and their relative importance, the committee recommends that the ecological, health, and other social effects of Corps flood damage reduction studies, and the tradeoffs between them, be quantified to the extent possible and**

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

**included in the National Economic Development Plan.** More explicit efforts at including these types of consequences and values in the Corps's benefit–cost calculations should result in increased social benefits of the Corps's flood damage reduction studies. The Corps should seek guidance from the Office of Management and Budget and seek consistency with other federal agencies on the use of alternative metrics for incorporating potential loss of life, environmental impacts, and other effects of floods.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# 1

# The Corps and U.S. Flood Damage Reduction Planning, Policies, and Programs

Organized in 1802, the U.S. Army Corps of Engineers has long been a key player in helping reduce flood damages in the United States. The Corps's role in addressing the nation's flood problems was solidified with passage of the Flood Control Act of 1936. This act established flood control (generally referred to today as “flood damage reduction” by the Corps) as a nationwide policy on navigable waters and their tributaries, and it deemed flood control as an appropriate activity for the federal government.

One of the Corps's primary means for helping reduce flood damages has been levee construction. The Corps has constructed thousands of miles of levees that reduce flood damages for hundreds of American cities and thousands of acres of farmland. Uncertainties in the frequency of floods, changes in land use, climate variability and change, and the structural and geotechnical performance of levee systems complicate the levee design process. Furthermore, levee certification criteria and federal flood insurance policies, factor into flood hazard mitigation strategies.

The Corps has long recognized that uncertainties affect levee design and performance. To account for uncertainties, the Corps has historically established levee heights to pass a flood of a given recurrence probability. This flood has often been the flood with a probability of 1/100 of being exceeded in any given year, commonly called the “100-year flood” and herein referred to as the 1%-flood. An increment of levee height, called “freeboard,” was then added to the levee design height. This freeboard was intended to account for operational contingencies, level-of-protection assurance, embankment settlement, and the like. But in his

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 29 of 858


torical Corps guidance, freeboard was not considered as a "factor of safety," per se. As described by Huffman and Eiker (1991),

> "Conceptually, freeboard is provided to reasonably assure that the project design flow will be contained, given the uncertainty of water surface profile computation, and to minimize the damage and any threat to life in the event the levee is overtopped. In the design of freeboard it is convenient to consider that freeboard has two primary purposes (1) to achieve specific design objectives, and (2) to allow for the uncertainty inherent in the computation of a water surface profile."

A river at flood stage bears little resemblance to a lake on a calm day. It flows swiftly with rapids and waves, carrying trees, ice, and other flotsam. Waves or floating objects can overtop a levee, breeching it and causing flooding. Freeboard is a measure to prevent overtopping caused by higher water (river stage) than was forecast for the design flood, as some uncertainties may not have been explicitly considered. For decades, the Corps added 3 feet of freeboard to the design height of its levees, a principle that became a staple of Corps flood damage reduction studies and projects. The practice was also used by the Federal Emergency Management Agency (FEMA) in certifying levees under the National Flood Insurance Act of 1968 (which created the National Flood Insurance Program) and two subsequent revisions (the Flood Disaster Protection Act of 1973 and the National Flood Insurance Reform Act of 1994).

Many levees have been designed, built, and certified to a standard equal to the 100-year flood plus 3 feet of freeboard. Nonetheless, this approach has drawbacks, and Corps engineers and planners, flood damage reduction project cosponsors, and others called this traditional standard into question during the 1990s. In particular, this fixed-freeboard approach provided inconsistent degrees of flood protection to different communities and provided substantially different levels of protection in different regions. In a narrow channel with variable hydraulics, a 3 foot safety margin may yield an unacceptably high probability of being overtopped. In a broad basin with overflow into storage areas, 3 feet may result in an exceptionally low probability of being overtopped.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 30 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

## RISK ANALYSIS APPROACH

In the early 1990s the Corps began to explore an alternative analytical approach to fixed freeboard. This alternative, referred to as *riskbased analysis* (RBA) by the Corps, is more generally known as *risk analysis.* A risk analysis approach uses probabilistic descriptions of the uncertainty in estimates of important variables, including flood–frequency, stage–discharge, and stage–damage relationships, to compute probability distributions of potential flood damages. These computed estimates can be used to determine a levee height that provides a specified probability of containing a given flood.

The Corps unveiled its basic proposal for using risk analysis techniques to substitute for fixed levee freeboard at a 1991 workshop in Monticello, Minnesota (USACE, 1991a). In 1992, the Corps issued a draft engineering circular (EC) *Risk-Based Analysis for Evaluation of Hydrology/Hydraulics and Economics in Flood Damage Reduction Studies* (EC 1105-2-205). In 1994, the Corps updated this engineering circular. In March 1996, the Corps issued engineering regulation (ER) 1105-2-101, which represents current Corps policy and procedures for risk analysis (USACE, 1996a). The Corps currently employs risk analysis across several of its civil works activities for water resources project planning. In addition to the Corps's internal planning procedures, risk analysis also influences the levee certification process that the Corps conducts jointly with FEMA.

As part of the Water Resources Development Act of 1996 (WRDA 96), the National Academy of Sciences (now part of the National Academies) was requested to conduct a study of the Corps's risk analysis methodology in its flood damage reduction studies. The 104th Congress of the United States passed Public Law 104-303 on October 12, 1996, which states in Section 202h the following:

> The Secretary (Army) shall enter into an agreement with the National Academy of Sciences to conduct a study of the Corps of Engineers' use of risk-based analysis for the evaluation of hydrology, hydraulics, and economics in flood damage reduction studies. The study shall include—

a) an evaluation of the impact of risk-based analysis on project formulation, project economic justification, and minimum engineering and safety standards; and
b) a review of studies conducted using risk-based analysis to

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 31 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

determine—

i) the scientific validity of applying risk-based analysis in these studies; and
ii) the impact of using risk-based analysis as it relates to current policy and procedures of the Corps of Engineers.

A committee of the National Research Council's (NRC) Water Science and Technology Board (WSTB) was convened in late 1998 to address this charge, completing its study in May 2000.

## THE CORPS'S WATER RESOURCES PROJECT PLANNING PROCEDURES

The Corps's use of risk analysis techniques is applied to certain hydrologic, hydraulic, geotechnical, and economic aspects of Corps planning decisions for flood damage reduction studies. Development, refinement, and application of these risk analysis techniques occur within a larger context of Corps planning procedures, federal planning guidelines, and other considerations. This section describes Corps planning and decision making in its water resources projects and draws partly from a recent National Research Council study (NRC, 1999a) of the Corps's planning procedures.

The Corps has been conducting studies and constructing projects to manage the nation's waterways for nearly 200 years. In addition to its flood damage reduction responsibilities, the Corps enhances and maintains navigability on the nation's rivers (some Corps dams also generate hydroelectric power). In its Civil works program for water resources development, the Corps is also involved in harbor improvements, hurricane damage prevention, and beach and shoreline protection. The Corps is also becoming more involved in ecosystem restoration; for example, the Corps plays a key role in the current effort to restore aquatic ecosystems in Florida's Everglades.

Several pieces of federal legislation and internal Corps planning documents guide Corps water resources project planning. One important document is the federal *Economic and Environmental Principles and Guidelines for Water and Related Land Resources Implementation Studies* (USWRC, 1983), familiarly known as the *Principles and Guidelines*, or simply the *P&G*. The Corps's *Planning Guidance Notebook* (USACE, 2000) is another key document, and contains advice on implementing the *Principles and Guidelines* within Corps planning studies. Corps plan

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

ning procedures are further governed by the *Digest of Water Resources Policies and Authorities* (USACE, 1999a), guidance letters, and the Corps's own engineering regulations, engineering circulars, and engineering manuals (EM). The Corps is also obliged to conduct its studies pursuant to federal and state legislation and regulations, such as the National Environmental Policy Act of 1969.

## From Principles and Standards to Principles and Guidelines

The predecessor to the *P&G* was the *Principles and Standards* (*P&S*). Adopted as regulations in 1973, the *Principles and Standards* is formally known as *Water and Related Land Resources: Establishment of Principles and Standards for Planning* (USWRC, 1973). This document defined four sets of objectives for U.S. federal water resources project plans: (1) national economic development (NED), (2) environmental quality (EQ), (3) regional economic development (RED), and (4) other social effects (OSE).

According to the *Principles and Standards*, water resources projects were to be evaluated primarily by their effects on the first two objectives—national economic development and environmental quality. The National Economic Development alternative was the water development plan that maximized economic development benefits for the nation, while the Environmental Quality alternative was the plan designed to minimize negative environmental impacts. The two secondary objectives, regional economic development and other social effects, could be assessed but were not required for all projects. The *Principles and Standards* also required that nonstructural alternatives be considered, that environmental mitigation measures be evaluated, and that a water conservation plan be included among the alternatives.

Although the *Principles and Standards* represented "the most detailed attempt to insure a broad range of choice in United States water planning" (Wescoat, 1986), they were repealed in 1982 and replaced by the *Principles and Guidelines* in 1983. The *Principles and Guidelines* represented an important departure from the *Principles and Standards* in at least two ways. First, with the change from "standards" to "guidelines," the planning document became merely recommended guidance rather than a requirement, thereby losing much of its regulatory force. Second, the *Principles and Guidelines* required the development of only one water project alternative, the National Economic Development alternative. According to the *P&G*, this alternative is to "contribute to the

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 33 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

national economic development consistent with protecting the Nation's environment, pursuant to national environmental statutes, applicable executive orders, and other Federal planning requirements" (USWRC, 1983). Box 1.1 provides further discussion of the *Principles and Guidelines* and the National Economic Development alternative, especially as that alternative relates to flood damage reduction studies.

The *Principles and Standards* and the *Principles and Guidelines* were both established by the U.S. Water Resources Council (WRC[1]). The Water Resources Council was an executive-level agency created in 1965 to help coordinate and centralize federal-level water resource planning. The Water Resources Council was zero-funded in 1981 and therefore effectively terminated.

The *Principles and Guidelines* describe a six-step planning process:

1. specify problems and opportunities,
2. inventory and forecast conditions,
3. formulate alternative plans,
4. evaluate effects of alternative plans,
5. compare alternative plans,
6. select recommended plan.

The Corps uses these steps in its water resources planning, although they are not necessarily applied in this sequence. Formulation of plan alternatives, for example, may occur at various stages throughout a planning study.

The Corps conducts its water resources project planning studies in two separate phases: a reconnaissance phase and a feasibility phase. An idealized time line showing these two study phases is depicted in Figure 1.1. (See NRC 1999a for a more detailed discussion of the Corps's water resources planning procedures).

The reconnaissance phase of a Corps planning study is conducted to determine whether a water or related land resources problem warrants federal participation in feasibility studies and to define the federal interest, consistent with U.S. Army policies (USACE, 1999a). The reconnaissance phase ends with a recommendation to either terminate or continue the study. This phase is to be completed in no more than 12 months, is to cost no more than $100,000, and is fully funded by the federal government. The reconnaissance phase of a Corps planning study is also used to create a project study plan, which describes the arrangements between the Corps and the project cosponsor for tasks beyond the reconnaissance study.

[1] The Water Resources Council originally consisted of the secretaries of Agriculture, the Army, Commerce, Energy, Housing and Urban Development, the Interior, and Transportation and (starting in 1970) the administrator of the Environmental Protection Agency.

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 34 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

**BOX 1.1**

**THE PRINCIPLES AND GUIDELINES: NATIONAL ECONOMIC DEVELOPMENT AND FLOOD DAMAGE REDUCTION STUDIES**

The *Principles and Guidelines* (or *P&G*) is a key guidance document for all Corps of Engineers water resources project planning studies, including flood damage reduction studies, and has been referred to as the Corps's "philosophical source document" (Yoe and Orth, 1996). The *Principles and Guidelines* has its roots in the 1970 Flood Control Act, in which Congress identified four equal national development objectives for water resources project planning: 1) national economic development, 2) regional economic development, 3) environmental quality, and 4) social well-being.

In 1971 the Water Resources Council (WRC) issued the ***Proposed*** *Principles and Standards for Planning Water and Related Land Resources.* Major changes from the 1970 Flood Control Act were that social well-being was dropped as an objective, and that a plan maximizing contributions to national economic development would be required. After two years of review, the WRC in 1973 published the *Principles and Standards for Planning Water and Related Land Resources* in the Federal Register. The *Principles and Standards* placed environmental concerns on an equal basis with national economic development.

In 1983 the *Principles and Standards* were replaced by the *Economic and Environmental Principles and Guidelines for Water and Related Land Resources Implementation Studies (P&G).* A major change from the *Principles and Standards* was that environmental quality was dropped as a planning objective, leaving national economic development as the sole required water resources project plan.

The "principles" comprise a two-page statement (Appendix C) that ensures consistent planning by the federal agencies that conduct water resources planning studies (the Corps, the Bureau of Reclamation, the Natural Resources Conservation Service, and the Tennessee Valley Authority). The "guidelines" consist of a) standards, b) National Economic Development (NED) procedures, and c) environmental quality evaluation procedures.

Chapter 2 of the *Principles and Guidelines* describes the procedures for estimating benefits for a range of water resource project planning studies. The approach and philosophy to estimating benefits under the National Economic Development is to "estimate changes in national economic development that occur as a result of differences in project outputs with a plan, as opposed to national economic development without a plan" (Yoe and Orth, 1996). Chapter 2 of the *P&G* describes specific procedures for estimating National Economic Develop

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

ment benefits for the following types of water resources planning studies: Municipal and Industrial (M&I) Water Supply; Agriculture; Urban Flood Damages; Hydropower; Inland Navigation; Deep-Draft Navigation; Recreation; Commercial Fishing; Other Direct Benefits; Unemployed or Underemployed Labor Resources; and NED Costs.

The economics analysis in Corps flood damage reduction studies is conducted using a discount rate that reduces future benefits so that they can properly be compared to present costs. All benefit-cost comparisons are made using annualized benefits and costs over an expected project life. The discount rate is used so that the annualized cost in any year reflects the actual timing of the years in which the benefits and costs actually occur (this is discussed in greater in detail in Chapter 5 of this report).

Section IV of Chapter 2, "NED Benefit Evaluation Procedures: Urban Flood Damage," provides specific steps (see flow chart in Figure 1) for calculating benefits in a flood damage reduction study, as well as specific guidance on the types of benefits that can be included in calculating the NED alternative (see Table 1 below). Regarding the benefits in a flood damage reduction study allowed within the *P&G* planning framework, Section IV states "Benefits from plans for reducing flood hazards accrue primarily through the reduction in actual or potential damages associated with land use" (USWRC, 1983, p. 32). Section IV identifies three benefit categories: 1) inundation reduction benefit, 2) intensification benefit, and 3) location benefit. The Corps has applied these steps (Figure 1) and benefit estimation guidelines in its flood damage reduction studies for nearly twenty years without significant modification.

While the *Principles and Guidelines* represented the state-of-the-art in water resources planning when they were enacted in 1983, there have since been significant advances in economic and other analytical techniques, advances in aquatic biology, and shifts in public values related to water and related resources. A previous National Research Council (NRC) committee, formed in part to discuss possible revisions to the *P&G*, recommended "that the federal *Principles and Guidelines* be thoroughly reviewed and modified to incorporate contemporary analytical techniques and changes in public values and federal agency programs" (NRC, 1999a, p. 4). That NRC committee also reviewed the guidance offered by the *P&G* for federal flood damage reduction programs, and concluded: "the *P&G* do not allow for the benefits of primary flood damages avoided to be claimed as benefits in all nonstructural projects. The committee recommends that the benefits of flood

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.




FIGURE 1 The Corps uses these ten steps to compute benefits. They are designed to determine land use and to relate use to the flood hazard from a NED perspective.

damages avoided be included in the benefit-cost analysis of all flood damage reduction projects—including nonstructural projects—and that these benefits be calculated in a uniform and consistent fashion" (NRC, 1999a, p. 8).

There appears to be some movement toward broadening water resources project planning as defined within the *Principles and Guidelines.* For example, the Corps's "Challenge 21" program (part of the 1999 Water Resources Development Act) seeks to include conservation and restoration of natural ecological functions as benefits of flood damage reduction studies. And just as this report was going to press, President Clinton issued a draft memorandum to the departments of Army, Interior, Agriculture, Commerce, and to the Council on Environmental Quality, to EPA, and to FEMA, in which he noted that he was directing the Secretary of the Army to develop proposed revisions to the 1983 *Principles and Guidelines.*

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

| Type of Benefit (And Step) | Structural | Floodproofing | Evacuation |
|---|---|---|---|
| *Inundation* | | | |
| Incidental flood damages (step 6) | Claimable | Claimable | Claimable |
| Primary flood damages (step 6) | Claimable | Claimable | Not claimable |
| Floodproofing costs reduced (step 7) | Claimable | Not claimable | Not claimable |
| Reduction in insurance overhead (step 7) | Claimable | Claimable | Claimable |
| Restoration of land value (step 9) | Claimable | Claimable | Not claimable |
| Intensification (steps 7 and 9) | Claimable | Claimable | Not claimable |
| *Location* Difference in use (step 9) | Claimable | Claimable | Not claimable |
| New use (step 9) | Not claimable | Not claimable | Claimable |
| Encumbered title (step 9) | Not claimable | Not claimable | Claimable |
| Open space (step 9) | Not claimable | Not claimable | Claimable |

At the end of the reconnaissance stage, the Corps and the project cosponsor sign a feasibility cost sharing arrangement describing the details of project cost-sharing. Many terms of the feasibility cost-sharing arrangement are nonnegotiable, having been specified in legislation (e.g., the Water Resources Development Act of 1986).

Feasibility study costs are divided equally between the federal government and the project cosponsor. Risk analyses are conducted in the feasibility phase of a Corps flood damage reduction study. Alternative plans are identified at the beginning of the planning process and these

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.




FIGURE 1.1 Recommended Corps planning study timeline. SOURCE: NRC (1999).

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

plans are screened and refined in subsequent iterations (USACE, 1999a, p. 5-4). As the *Principles and Guidelines* state, however, "A plan recommending Federal action is to be the alternative plan with the greatest net economic benefit consistent with protecting the Nation's environment (the NED plan), unless the Secretary of a department or head of an independent agency grants an exception to this rule" (USWRC, 1983).

The National Economic Development alternative does not necessarily represent the Corps's or the local sponsor's preferred alternative. The Corps will construct water resources projects in accord with a project sponsor's wishes and will share the costs of that project. Corps water resources project cost-sharing guidelines are specified in the Water Resources Development Act of 1986 (WRDA 86) and are modified in WRDA 96. But if a local sponsor desires a project that is larger or more costly than the National Economic Development alternative, then the local sponsor is responsible for at least a portion of the extra cost. For example, a local project sponsor is responsible for 100 percent of the extra costs of levees built higher than the elevation of the National Economic Development levee alternative.

The *Principles and Guidelines* requirement that the Corps select the alternative that maximizes net economic benefits to the nation has important implications for risk analysis applications and the construction of Corps levees. In a Corps flood damage reduction study, levee height is determined according to the National Economic Development criterion (i.e., based on prescribed benefit calculation procedures), rather than according to a levee's ability to withstand a flood of a given magnitude. As the Corps's *Digest of Water Resources Policies and Authorities* states, "There is no minimum level of performance or reliability required for Corps projects; therefore, any project increments beyond the NED plan represent explicit risk management options" (USACE, 1999a).

These issues can be problematic when, for example, a community requests the Corps to construct a levee for protection against an extreme flood, such as a 200-year flood (e.g., the flood with a probability of 1/200 of occurring in any given year). The Corps will pay the federal share of the National Economic Development levee (a minimum of 50 percent and a maximum of 65 percent of levee construction, pursuant to WRDA 86 and WRDA 96 cost-sharing guidelines); the local community, however, must bear the additional cost of constructing a levee higher than the level designated in the National Economic Development alternative. For instance, assume the Corps's National Economic Development alternative calls for a levee that provides protection only up to the 85-year flood. In this case the local sponsor would be required to pay

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

100 percent of the additional cost of raising the levee to protect against floods that exceed the 85-year flood. Such costs can be significant even when the additional levee height appears to be small. Engineers remind us that levees are raised from the bottom, not from the top.

Corps of Engineers levees figure prominently in the National Flood Insurance Program, which is conducted under the authority of FEMA. The following section describes the roles played by FEMA and other federal agencies in flood hazard mitigation, response, and recovery activities, and Chapter 7 discusses the Corps–FEMA levee certification program in more detail.

## U.S. FEDERAL FLOOD PREPAREDNESS, MITIGATION, AND RESPONSE ACTIVITIES

Just as land use planning in the United States is not a federal responsibility, neither is comprehensive land use planning in the nation's floodplains. Nonetheless, federal agencies conduct extensive flood hazard reduction programs. Despite an impressive array of activities, however, no one agency coordinates these programs and there are no comprehensive floodplain management plans at the federal level. Although it is a key federal agency involved in flood hazard management, the Corps's flood damage reduction activities are but a part of a larger effort—which includes other federal, state, tribal, and local governments—toward managing flood risks. Box 1.2 summarizes flood-related activities conducted by other federal agencies.

The Corps of Engineers today uses the term “flood damage reduction,” as opposed to flood control. This is consistent with recognition that no flood damage reduction program can provide complete protection against all floods. As demonstrated in the Mississippi River flooding of 1993 and in the extreme flooding in eastern North Carolina in 1999, there are classes of floods that exceed most, if not all, human experience and simply cannot be fully controlled by reasonable engineering structures. Thus, despite the best efforts of several federal, state, tribal, and local agencies and organizations, it bears repeating that no program or set of engineering structures can provide absolute control of all floods.

The Corps's flood-related programs have historically been in the realm of “structural measures”: dams, reservoirs, levees, walls, diversion channels, bridge modifications, channel alterations, pumping, land treatment, and related structures intended to modify the flow of flood waters through storage or diversion. The Corps has also implemented “non-

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

structural" flood damage reduction projects. Section 212 of the Water Resources Development Act of 1999, for example, authorized the Corps's "Challenge 21" initiative. This legislation calls for the Corps (in cooperation with FEMA) to "undertake a program for the purpose of conducting projects to reduce flood hazards and restore the natural functions and values of rivers throughout the nation" (H.R. document 106-298, 1999). It further states that "the studies and projects shall emphasize, to the maximum extent practicable and appropriate, nonstructural approaches to preventing or reducing flood damages."

### The "Galloway Report"

A comprehensive review of U.S. floodplain management activities was conducted by a special Interagency Floodplain Management Review Committee following the tremendous Mississippi River flooding in the summer of 1993. The committee was headed by U.S. Army Brigadier General Dr. Gerald Galloway; its report is thus more familiarly known as the "Galloway Report."

The report pointed out the lack of inter-agency coordination in floodplain management, identifying this fragmentation as one of the nation's major flood management problems: "the division of responsibilities for floodplain management among federal, state, tribal, and local governments needs clear definition. Currently, attention to floodplain management varies widely among and within federal, state, tribal, and local governments" (IFMRC, 1994, p. vii).

The Galloway Report emphasized that floodplain management is a responsibility that must be shared among all levels of government. To help promote better coordination, the report recommended the following actions:

- The president should enact a Floodplain Management Act which establishes a national model for floodplain management, clearly delineates federal, state, tribal, and local responsibilities, provides fiscal support for state and local floodplain management activities, and recognizes states as the nation's principal floodplain managers;
- Issue an Executive Order clearly defining the responsibility of federal agencies to exercise sound judgement in floodplain activities; and
- Activate the Water Resources Council to coordinate federal and federal-state-tribal activities in water resources; as appropriate, reestablish basin commissions to provide a forum for federal-state-tribal coordination on regional issues.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

**BOX 1.2**

**U.S. FEDERAL FLOOD HAZARD AND FLOODPLAIN MANAGEMENT**

Several federal agencies other than the Corps of Engineers and FEMA conduct flood damage mitigation, response, and recovery activities. This box does not describe all such programs but indicates the variety of federal-level activities.

The *U.S. Department of Agriculture* (USDA) provides emergency loans to farmers impacted by floods. The loans cover losses to crops, livestock, and farm buildings and machinery. The USDA's Natural Resource Conservation Service (NRCS) operates an Emergency Watershed Protection Program, which conducts local-level damage assessment and recovery planning (sometimes in cooperation with FEMA). The NRCS also provides technical assistance to local sponsors in a variety of watershed protection and conservation programs, some of which aim to reduce the magnitude of floods. The USDA's Farm Service Bureau oversees the Flood Risk Reduction Program, in which farmers contract to receive USDA payments on flood-prone lands in return for foregoing certain USDA program benefits. The USDA's Risk Management Agency sponsors a crop insurance program; about 22% of crop losses in the U.S. are caused by “excess moisture” (USDA, undated).

The *Department of Health and Human Services* (HHS) has federal responsibility for assisting citizens with health and medical problems during floods and other emergencies. The HHS Office of Emergency Preparedness (OEP) coordinates federal health and medical response and recovery activities for HHS, working with other federal agencies and the private sector. HHS is the primary agency for health, medical and health-related social services under the Federal Response Plan, which provides for medical, mental health and other human services to disaster victims.

The *Department of Housing and Urban Development* (HUD) provides Community Development Block Grants to communities damaged by floods and other disasters. HUD's Disaster Recovery Initiative (DRI) Grants provide financial assistance to low- and moderate-income families that may have extreme difficulties in rebuilding after floods and other disasters. HUD employees also provide technical expertise in housing and construction to local officials as they develop strategies to rebuild and renovate communities after floods.

The *Department of Transportation* (DOT) operates the Federal-Aid Highways Emergency Relief (ER) program within the Federal Highway Administration. The ER program provides states up to $100 million in emergency relief funding for highways damaged by floods or other natural disasters.

Copyright National Academy of Sciences. All rights reserved.

The *Federal Emergency Management Agency's* (FEMA) flood-related responsibilities revolve around flood mitigation, response, and recovery activities and its administration of the National Flood Insurance Program. Communities can participate in the National Flood Insurance Program if they agree to regulate future floodplain construction by assuring that future structures are built to safe standards. For participating communities, FEMA makes federal flood insurance policies available to property owners (flood insurance is not underwritten by private insurers). As of May, 2000, federal flood insurance through the NFIP was available in over 19,000 communities in the U.S. and Puerto Rico. FEMA also conducts a variety of other programs related to flood hazard mitigation and response activities. For example, FEMA's Flood Mitigation Assistance (FMA) provides funding to assist states and communities in implementing measures to reduce or eliminate the long-term risk of flood damage to buildings, manufactured homes, and other structures insurable under the National Flood Insurance Program.

The *National Aeronautics and Space Administration* (NASA) is involved in flood hazard reduction through an agency-wide effort, the “Natural Disaster Reduction Program: Space Access and Technology, Management Systems and Facilities, Life Sciences, and Space Communication.” Within this program, NASA's Solid Earth and Natural Hazards Program aims to improve local and regional flood forecasts by incorporating satellite-derived data on parameters such as topography, land cover, and soil moisture into watershed modeling research. NASA also conducts research on the consequences of inter-annual climate variability for rainfall and storm patterns.

The *National Weather Service* (NWS) sponsors the Hydrologic Information Center (HIC), which prepares national summaries of hydrologic conditions, including river conditions with emphasis on extreme events such as floods. In late winter and early spring, the HIC issues national outlooks for flood conditions based on data from its river forecast centers, weather forecast offices, and national Centers. The NWS also provides data on fatalities and some loss estimates in floods.

The *Small Business Adminstration* (SBA) operates a Disaster Loan Program that offers financial assistance through low-interest (4-8%) loans for renters, and home and business owners, who have suffered damages from a flood or other natural disaster.

The *U.S. Geological Survey* (USGS) operates a nation-wide system of stream gages that provides data used in making flood forecasts. The USGS is currently helping FEMA update its flood inundation maps through the use of geographic information system (GIS) technology, high-accuracy digital elevation data and models, and existing hydraulic models. The USGS also compiles and reports information on major floods across the nation.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

The report also recommended goals for floodplain management: "Establish, as goals for the future, the reduction of the vulnerability of the nation to the dangers and damages that result from floods and the concurrent and integrated preservation and enhancement of the natural resources and functions of floodplains. Such an approach seeks to avoid unwise use of the floodplain, to minimize vulnerability when floodplains must be used, and to mitigate damages when they do occur" (IFMRC, 1994, p. viii).

This chapter has described the planning, policy, and inter-agency context in which the Corps executes its flood damage reduction studies and plans. Although the Corps plays several important roles, they clearly are but a part of larger efforts in flood damage reduction. And, as the Galloway Report stressed, the different components of that effort require much better coordination than they have had to date. These inter-agency relations are further examined in Chapter 7, which describes coordination between the Corps and FEMA in a federal levee certification program within the National Flood Insurance Program.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# 2

# Decision Making and Communication Issues

Floodplains constitute about 7 percent of the U.S. land area (Kusler and Larson, 1993) and represent a valuable national resource. Floodplains store flood waters during high flows (helping recharge groundwater supplies in the process); are a source of biological productivity and diversity; and are used for many human activities, including agriculture, grazing, parks and recreation, transportation, housing, and commercial development. However, because most of these activities preclude water storage during high flows, they need to be properly managed.

Individuals, local authorities, state governments, and several federal agencies make decisions about floodplain management. Even though it is in the national interest to do so, coordinating these decisions is exceedingly difficult, as different decision-making authorities have different interests and mandates. Furthermore, the overall goals of U.S. floodplain management are neither clearly specified nor well organized. Floodplain management decisions thus tend to be fragmented, as pointed out in the Galloway Report and elsewhere.

The Corps's risk analysis techniques and flood damage reduction studies will produce their greatest benefits if these techniques and studies are executed within a comprehensive planning paradigm and framework designed to make the best social, economic, and environmental uses of the nation's floodplain resources. Even the best analytical techniques will fall short of their potential contributions if flood damage reduction project goals are not consistent with public values, which can often be better determined through public participation and communication. This chapter reviews goals, multiple project objectives and trade-offs, decision making, and communication in floodplain management.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

## THE GOAL OF FLOODPLAIN MANAGEMENT

Neither the U.S. Congress nor the Corps of Engineers has identified an explicit goal for management of the nation's floodplains. Perhaps the closest that any federal water planning document comes to identifying a goal for floodplain management is the *Principles and Guidelines* (USWRC, 1983), which states that flood damage reduction projects (and other federal water projects) are to "contribute to the national economic development, consistent with protecting the Nation's environment."

The committee believes that the goal for management of the nation's floodplains should be broader: *to use the land for the greatest social benefit*, accounting for the risks of flooding and steps that can be taken to reduce those risks. In contrast, a goal such as minimizing damages from floods necessitates removal of people and activities from the floodplain. Removing people and activities from the floodplain, however, forfeits the many benefits of floodplain use and may thus be economically and socially undesirable.

The goal of maximizing social benefit in floodplain management leads to a strategy that recognizes the availability of land not in danger of flooding, the probabilities and magnitudes of potential floods, the availability of insurance, and the costs of flood damage reduction structures to reduce damages should a flood occur. As geographer Gilbert White stated: "It is striking that in a century of evolving public policy the prevailing aim has been to minimize losses from floods and not to optimize the net social benefits from using floodplain resources . . . . In simplest terms, it is the contrast between 'loss reduction' and 'wise use' (White, 2000).

It is unclear whether this approach promotes the wisest use of the nation's floodplains. The issue is important not only in its historical context, but also because of the damages exacted by floods: in most years, floods cause more deaths and damages than any other natural phenomenon, and the damages from floods in the U.S. are increasing over time (Richards, 1999). The distribution, frequency, and intensity of extreme weather events are changing in ways that are difficult to understand and predict (Karl et al., 1996), and an increasing Gross Domestic Product and population make it natural to expect greater demand for land in the floodplain. This in turn means greater damages in future extreme floods. Increases in wealth and increases in population in the nation's floodplains put more property at risk from floods. The trend of increasing damages thus does not necessarily imply a failure of the nation's approach to flood management (cf. Lave et al., 1990; Pielke, 1999).

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 47 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Floodplain structures should not be considered fixed and immutable. In some areas the probabilities of flooding are sufficiently large, and the ability to mitigate flooding so expensive, that structures in the floodplain should be removed and activities relocated. Such a floodplain could be devoted to the highest-value uses consistent with periodic flooding (e.g., parks and recreation areas). In contrast, some currently underused floodplains are becoming increasingly valuable because of increasing population and economic activity. If after paying the costs of the protection structures and accounting for the costs of periodic flooding, net social benefits remain, these floodplains should be developed.

Land use controls, zoning, and planning are other important factors that complicate floodplain management. As much of the land in the nation's floodplains is privately owned, decisions about uses of those lands lies beyond the direct responsibilities of the Corps and most water management agencies. On these lands, there are often few incentives that encourage proper flood planning and preparedness (e.g., devoting lands to outdoor recreation activities, or elevating buildings above the 100-year flood stage). There are often also inadequate regulations that limit or prohibit development in flood-prone areas.

In the United States, strong tensions often exist between regulation and zoning on the one hand, and individual property rights on the other. But some U.S. communities have enacted programs for the purchase of floodplain properties that have sustained repetitive flood damages. These buyout programs aim to move susceptible property and its inhabitants out of high-hazard areas, while zoning these areas for land uses such as golf courses and hiking trails (which also serve as stormwater retention basins). For example, results from a comprehensive flood hazard mitigation and zoning program in Tulsa, Oklahoma are impressive: Tulsa's flood insurance rates have dropped by 25 percent and are now the lowest in the nation. In 1992, Tulsa received the nation's highest rating in the National Flood Insurance Program's Community Rating System (National Wildlife Federation, 1998). The Tulsa experience demonstrates the importance of local-level planning and decisions in effective floodplain management.

## MULTIPLE OBJECTIVES

Although the *Principles and Guidelines* focus on economic benefits, issues other than economic damages should figure in the design and function of flood damage reduction projects. These issues include water

Copyright National Academy of Sciences. All rights reserved.

No RR2.0-AR00003618

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

quality, recreation, ecological protection, biodiversity, the quality of life, and life itself. In addition to the planning requirements of the *Principles and Guidelines,* the Corps is required by the National Environmental Policy Act to identify environmental implications of its projects. The Endangered Species Act requires the Corps to give special attention to select species whose survival might be compromised by a project. Many aspects of flood damage reduction projects transcend strict National Economic Development concerns.

Making decisions within this multiobjective framework is challenging. In some cases a single alternative dominates across all flood damage reduction objectives, making for an easy decision. In practice, however, the situation is seldom so agreeable. If a dominant alternative is quickly identified, it is likely that not enough thought was given to identify alternatives that are either less expensive but provide less flood protection, or are more expensive but provide more flood protection. The flood damage reduction project that provides the most benefits on one of the objectives seldom provides most benefits on all of them. In most cases, there are a range of project alternatives, all of which contain a complex mix of benefits and costs that must be weighed against each other.

If all people agreed on the values to be assigned to all project consequences, and if all these values allowed translation into a single dimension (e.g., dollars), multiobjective decisionmaking would be easy. For example, if a dollar value could be unequivocally assigned to extinction of a species, another dollar value to increases in water pollution, and so forth, the decision would come down to choosing the proposal with the greatest monetary net benefit, where each dimension is measured in dollars. However, there generally is little agreement about, for example, the social and economic consequences of species extinction, of reduced salmon migration, or of frequent flooding, and less agreement about how to express such outcomes in monetary units. At its worst, the inability to reduce complex issues to a small number of variables makes the situation akin to an environmental impact statement in which hundreds or thousands of impacts are identified, but there is no way to compare the impacts with one another.

The committee does not wish the Corps to become mired in such a morass. However, to the extent possible, the Corps should account for important social consequences of each project alternative, such as lives at risk in the event of flooding, and important environmental consequences, such as loss of wetlands or biodiversity. The *Principles and Guidelines* mandate the Corps to adopt the National Economic Development (NED)

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

alternative in its water resources project planning studies (the alternative with the largest net economic benefits to whomever they accrue). However, the range of benefits to be counted in flood damage reduction studies, as specified by the *Principles and Guidelines,* may be narrowly construed (see Box 1.1). For instance, a previous NRC committee charged to review the Corps's water project planning procedures concluded, "Today, ecological and social considerations are often of great importance in project planning and should not necessarily be considered secondary to the maximization of economic benefits. Strict adherence to the NED account may discourage consideration of innovative and nonstructural approaches to water resources planning . . . . The notion of NED as formulated in 1983 may not fit contemporary planning and social realities" (NRC, 1999a, p. 4). That committee went on to recommend a comprehensive review and modification of the *Principles and Guidelines.*

To enhance social benefits of floodplain management, this committee recommends that the Corps account for (or, more properly, be guided by the *Principles and Guidelines* to account for) a broad range of social and environmental considerations in its flood damage reduction studies and projects. Environmental, health, safety, and other social considerations of flood damage reduction projects should be quantified to the extent possible and included in floodplain management decisions.

## COMPARING PROJECT ALTERNATIVES

The specific purposes of using risk analysis for flood damage reduction studies are to define project objectives, create desirable alternatives, evaluate those alternatives, guide analytical efforts, and facilitate communication. The ultimate intent should be good decisions that maximize net social benefits.

Complex decisions like those involved in flood damage reduction studies can be analyzed with a two-part decision model. The first part of the model relates decision alternatives to possible consequences. The second part assesses the relative desirability of the possible consequences. The two parts of the model are combined to establish relative desirability among a set of alternatives. This ranking derives from (1) the likelihood that particular consequences will result from an alternative, and (2) the relative desirability of those consequences. The likelihoods of consequences are estimated using scientific reasoning from data, while the desirabilities are based on value judgments. Clearly, the

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

approaches to quantifying likelihoods and desirabilities are different, as are the people who should be making the quantifications.

Sound and comprehensive floodplain management is not solely a technocratic process. The values that society places on its rivers, floodplains, wetlands, and water resources should be central to comprehensive flood damage reduction studies. The foundation for specifying public values is a logical set of specific concerns. As these concerns define the scope of public values relevant to a decision, it is important to directly involve citizens or representatives of citizen groups.

A value model can be constructed in four steps (Keeney, 1992): (1) identify values appropriate for the problem being addressed, (2) define and structure specific objectives related to those values, (3) specify attributes (i.e., metrics) with which to measure each objective, and (4) specify trade-offs among objectives. A specific objective might be stated as, “minimize economic damages,” or “avoid loss of natural habitat.” The attributes associated with these objectives might be, “damage measured in dollars,” and “destruction of habitat measured in acres.”

The objectives can typically be categorized into four types (Keeney et al., 1996): (1) fundamental objectives, the ends used to describe consequences that are of concern to the public; (2) means objectives, the objectives that affect eventual consequences but which are themselves important only for their influence on the fundamental objectives; (3) process objectives, those concerned with how a decision is made rather than what decision is made; and (4) organizational objectives, those influenced by the complete set of decisions made over time by the organization with responsibility for acting in the public interest. type="internal">Table 2.1 gives examples of these different types of objectives in the context of flood damage reduction.

The final step is to articulate value trade-offs among the objectives. Value trade-offs indicate willingness to forgo the achievement of one objective in order to increase achievement on another objective. Value trade-offs can be determined directly from the public or its representatives, and an experienced analyst can facilitate the assessments.

Schemes for making value trade-offs have been developed by, for example, Fishburn (1970), Keeney and Raiffa (1976), von Winterfeldt and Edwards (1986). Multiattribute decisionmaking is used to indicate the superiority of one alternative versus another, even when there are multiple attributes that cannot be compared quantitatively. Valuing non-market attributes, such as injury, disease, or polluted air, is done by looking at related decisions that involve market values. Examples in

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

clude willingness to take more dangerous jobs in return for greater compensation, the increased value of property that is less polluted, the greater safety of some cars, and the willingness to pay for private campgrounds that are less crowded or less polluted.

A previous NRC committee charged to review the strategic plan of the U.S. Department of Interior's Grand Canyon Monitoring and Research Center noted the value of trade-off analysis in water resources management decisions: “It should be recognized that adaptive management for the Grand Canyon ecosystem will require trade-offs among management objectives favored by different stakeholder groups. The committee recommends that the Adaptive Management Work Group begin to consider mechanisms for equitable weighting of competing interests . . . . The Center's revised Strategic Plan should include a strategy for scientific evaluation of management alternatives, both in terms of ecological outcomes and satisfaction of stakeholder groups” (NRC, 1999b, p. 9).

TABLE 2.1 Representative Objectives and Their Relationships for Setting Public Policy for Levee Design

| Category | Specific objective |
|---|---|
| Fundamental objectives | Maximize net economic benefit |
| | Maximize public health and safety |
| | Minimize construction costs |
| | Minimize environmental impacts |
| | Minimize social disruption |
| | Promote equity and fairness |
| | Protect agriculture |
| Means objectives | Ensure quality control |
| | Prevent damages |
| | Promote conservation of resources |
| | Minimize accidents |
| | Minimize construction impacts |
| Process objectives | Communicate with all stakeholders |
| | Coordinate with other decisions |
| | Involve the public |
| | Use reliable and accurate information |
| Corps organizational objectives | Contribute to public trust |
| | Ensure public acceptance |

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 52 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Reasonable value trade-offs can help decisionmakers make good public policy decisions. For other problems, they allow for the justifiable elimination of some inferior alternatives, leaving a smaller set of better alternatives.

## FLOODPLAIN MANAGEMENT ALTERNATIVES

The Corps's flood-related programs have traditionally focused on structures intended to modify flood flows through storage or by changing channel and floodplain hydraulics. These include dams and reservoirs, levees, walls, diversion channels, bridge modifications, channel alterations, pumping, and land treatment. The alternatives considered are typically combinations of possible structures that will reduce flood frequency and magnitude. However, water resources project planning studies may benefit by considering, both alone and in combination with structural alternatives, alternatives that manage possible consequences of floods just prior to or during a potentially serious flood. These alternatives include warning systems, evacuation plans, and flood triage.

One way to lessen potential loss of life and flood damages is to warn people in sufficient time so that they, and even some of their possessions, can be removed from harm's way. Even a short warning time can be sufficient to avert loss of life from floods (Brown and Graham, 1988; Paté-Cornell, 1984). For example, the National Weather Service reports the formation of tropical depressions that could develop into hurricanes. It gives periodic warnings as the storm develops and indicates whether it appears likely that the storm will strike land. As time passes the quality of information concerning the storm's intensity and path increases. People can interpret this information to take steps to protect their lives and property, even when it is not certain that a damaging storm will strike them. Periodic updates help individuals make decisions about when the risk is high enough to take actions such as evacuation, boarding up windows, and buying emergency food and water supplies. This warning system has developed to the point where even a major hurricane may cause few deaths and where property damages are significantly reduced.

When a large flow threatens the integrity of a flood damage reduction system, a variety of trade-offs must be faced. For example, levees protecting farmland could be breached to lower the chance that levees protecting an urban area will fail. Even levees protecting one urban area could be breached to prevent levee failure in another urban area, where failure could result in much more catastrophic damage or loss of life.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Such triage decisions are difficult, because they may involve subjecting one area to flooding in order to lessen the chance that another will be flooded. These difficult decisions are often easier to make if they are discussed before flood conditions are imminent.

## RISK COMMUNICATION

Identifying sound, credible, and effective risk reduction priorities and solutions depends greatly on a well-informed public. The public should be knowledgeable about risk issues and should be given opportunities to express opinions and become involved in risk assessment and risk management activities. This involves risk communication: the effective understanding of risks and the transfer of risk information to the public, and the transfer of information from the public to decisionmakers.

Risk communication covers a range of activities directed at increasing the public's knowledge of risk issues and its participation in risk management. It includes, for example, public education about hazards and public hearings on risk management. Much risk communication research has been conducted since the early 1980s, when risk communication emerged as a distinct element of risk analysis (Fischhoff et al., 1981; Morgan et al., 1992).

The intent is to explain how the public perceives and interprets risks and to identify ways to improve the transfer of information to the public. A large fraction of the public is unfamiliar with the nature of the risks to which they are exposed. As the Galloway Report concluded: “As the Midwest Flood of 1993 has shown, people and property remain at risk, not only in the floodplains of the upper Mississippi River Basin but also throughout the nation. Many of those at risk neither fully understand the nature and potential consequences of that risk nor share fully in the fiscal implications of bearing that risk” (IFMRC, 1994, p. xxi).

Risk management decisions should not simply be made by technical experts and public officials and then imposed on, and justified to, the public after the fact. Risk communication involves a dialogue among interested parties —risk experts, policy makers, and affected citizens. It also involves the news media, as citizens often receive their information from the media. If the media do not report knowledgeably and accurately, constructive public involvement becomes more difficult.

The public's response to risk issues is complex because “the public”

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

contains groups with different values and stakes. The risk assessment process should be opened to participation and scrutiny by affected stakeholders. This will increase the need to facilitate the public's ability to understand risk information and the ability of policy makers to understand public perception of risk. It is worth noting that public involvement including large numbers of stakeholder groups requires a significant commitment of time and effort from members of the public, as well as staff members from the agencies involved in flood damage reduction. With larger and more expensive projects, years of commitment may be required to help facilitate communications.

Decisions about appropriate floodplain management strategies differ from decisions about proper communication of those decisions. The goal of floodplain management should be to use the floodplain for the greatest social benefit. The goal of the communication decisions is to involve and inform the public and to have them understand what floodplain management decisions were made and why. These decisions are ideally addressed simultaneously, as it is important to establish two-way communication with interested parties in the course of developing and analyzing floodplain management plans.

Ideal communication decisions involve several steps:

1. identify the audiences that should be communicated with and involved in the decision process about floodplain management,
2. specify the objectives of communication, including the information people should provide and should receive, and what requires action and what those actions are,
3. create alternatives for communication that include oral and written communication (and possibly internet options) for experimenting with models, and
4. select the best combination of alternatives after appraisal.

The quality of communication is greatly enhanced when trust exists among the parties involved in the communication. This trust is built through an open process in floodplain management decision making and by involving stakeholders early in the process (which the Corps often does in many of its water resources project planning studies). If individuals feel they are involved in analyzing floodplain alternatives that affect them, they are more likely to understand and accept the implications of “their study.”

The methods for analyzing the complexities of floodplain manage

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

ment are not simple to understand. This makes it difficult to communicate with citizens who are unfamiliar with scientific principles (e.g., hydrology, structural design) necessary to design floodplain management facilities. Indeed, few of the individuals involved in floodplain management understand all these principles well. It is thus a challenge to have individuals understand the full details of a flood damage reduction planning study.

It is important to use simple models to describe methodological ideas and the results of analysis rather than, for instance, models that focus on the mathematical and scientific concepts used in the analysis. Indeed, most of the public is more concerned about a specific application of a method than about the method itself. It is thus often easier to illustrate both the ideas of a method and the specific application together.

Once an analysis is completed, the critical factors that influenced the selection of recommendations can usually be identified. Simple models that illustrate these key ideas in simple situations that can be more easily understood might be especially useful. For instance, imagine a complex computer model involving more than 20 stages that analyzes alternative plans. The recommended plan depends strongly on the interaction of upstream and downstream management strategies. In this case it should be possible to build a simple two-or three-stage model with hypothetical, but realistic, information that reproduces the key interactions that are critical to the recommendations for the real problem. A simple situation model may also be very helpful in communicating key insights from a more complex analysis. This should enhance the likelihood that individuals will understand the interaction and hence be able to see how it is relevant to them. In illustrating these simple models, it is important to explicitly include all important assumptions and judgments, about both facts and values, that are relevant to the results.

Documentation of floodplain management studies is another critical aspect of communication. The standard for documentation is that an interested party should be able to understand everything that was done, why it was done, how it was done, and the range of implications. All assumptions and summaries of the value judgments and data used should be provided for anyone to examine. In the end, while they do not have to agree with all agency (the Corps and others) planning decisions, stakeholders should fully understand all the steps involved in the flood damage reduction study.

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 56 of 858

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# 3

# Risk Analysis Concepts and Terms

This chapter describes the Corps's progress in its risk analysis applications, the methods and terms the Corps employs in those applications, and provides recommendations regarding standardization of risk terminology and concepts.

Water resources project planning involves many types of uncertainties. Some of these relate to the natural environment, such as the variability of precipitation, stream flow, and river stage. Others relate to the performance of engineered systems, such as the reliability of levees, pumps, locks, and gates, or to variations in transit times of barges. Still others relate to the economic value of floodplain property, the probability distribution used to describe flood frequency, or the costs of alternative transportation modes.

The Corps has made significant strides in the use of risk analysis. In the committee's judgment, it would be advantageous for the Corps to consistently use terms describing uncertainty and to standardize risk and uncertainty concepts throughout its civil works programs. This would result in a clearer understanding of risk analysis issues among Corps personnel, most of whom work across program areas. It would also facilitate communication with other federal agencies, consultants, contractors, and the public.

## UNCERTAINTY

The term “uncertainty” is used by different people to mean different things. A review of Corps documents describing risk-related planning

Copyright National Academy of Sciences. All rights reserved.
No RR2.0-AR00003627

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

activities suggests that a consistent set of terms can be readily developed, and this set should be agreeable to most of those involved in risk analyses (Table 3.1). This set of terms, as discussed below, is consistent with the usage of others, including Morgan and Henrion (1990), Haimes (1998), and the Corps's Institute for Water Resources (USACE, 1992a,b).

The term *uncertainty* is normally used to describe a lack of sureness about something or someone, ranging from just short of complete sureness to an almost complete lack of conviction about an outcome. Doubt, dubiety, skepticism, suspicion, and mistrust are common synonyms. Each synonym expresses an aspect of uncertainty that comes to play in risk analysis. Uncertainty with respect to natural phenomena means that an outcome is unknown or not established and is therefore in question. Uncertainty with respect to a belief means that a conclusion is not proven or is supported by questionable information. Uncertainty with respect to a course of action means that a plan is not determined or is undecided.

In many, but not all, situations a lack of sureness can be described by probability distributions. The definition of uncertainty found in the *Principles and Guidelines* is that uncertainty describes only situations wherein the lack of sureness is not describable by probabilities. This narrow definition is no longer commonly used. The term *uncertainty* should be used to describe situations without sureness, whether or not described by a probability distribution.

Generally speaking, uncertainty can be attributed to two sources: (1) the inherent variability of natural processes (“natural variability”), or (2) incomplete knowledge (“knowledge uncertainty”). These two sources arise for different reasons and are usually evaluated in different ways (Morgan and Henrion, 1990). Moser (1998) and a National Research Council committee (NRC, 1996) describe these two types of uncertainty as follows:

*Natural variability*—sometimes called aleatory uncertainty—deals with inherent variability in the physical world; by assumption, this “randomness” is irreducible. The word *aleatory* comes the Latin *alea*, meaning a die or gambling device. In the water resources context, uncertainties related to natural variability include things such as stream flow, assumed to be a random process in time, or soil properties, assumed to be random in space. Natural variability is also sometimes referred to as external, objective, random, or stochastic uncertainty.

*Knowledge uncertainty*—sometimes called epistemic uncertainty— deals with a lack of understanding of events and processes, or with a lack of data from which to draw inferences; by assumption, such lack of

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 58 of 858

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

knowledge is reducible with further information. The word *epistemic* is derived from the Greek "to know." Knowledge uncertainty is also sometimes referred to as functional, internal, or subjective uncertainty (see Box 3.1).

TABLE 3.1 Alternative Terms from the Professional Literature Describing Categories of Uncertainties

| Type of Variability | Terms from Literature |
|---|---|
| Natural Variability | Aleatory uncertainty |
| | External uncertainty |
| | Objective uncertainty |
| | Random uncertainty |
| | Stochastic uncertainty |
| Knowledge Uncertainty | Epistemic uncertainty |
| | Functional uncertainty |
| | Internal uncertainty |
| | Subjective uncertainty |

IACWD (1981) provides an example of the distinction between natural variability and knowledge uncertainty found in flood–frequency calculations, wherein the frequency curve (i.e., probability distribution) describes natural variability, and the error bounds about the curve (i.e., uncertainty in the parameters of the probability distribution) reflect knowledge uncertainty. Natural variability is presumed to be an uncertainty of the world, a natural or inherent randomness. Knowledge uncertainty, in contrast, is presumed to be an uncertainty of the mind, a function of models and data.

Although the distinction between natural variability and knowledge uncertainty is both convenient and important, it is at the same time hypothetical. The division of uncertainty into a component related to natural variability and a component related to knowledge uncertainty is attributable to the model developed by the analyst. Consider flood frequency. In the future—at least in principle—the sophistication of atmospheric models might improve sufficiently such that flood time series could be modeled and forecast with great accuracy. All the uncertainty currently ascribed to natural variation might become knowledge uncertainty in the modeling, and thus reflect incomplete knowledge rather than randomness. Modeling assumptions may cause "natural randomness" to become knowledge uncertainties, and vice versa.

In its risk analysis framework, the Corps should be clear about which

Copyright National Academy of Sciences. All rights reserved.

No RR2.0-AR00003629

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

**BOX 3.1**

**EVALUATING KNOWLEDGE UNCERTAINTIES**

There are several examples from civil engineering in which risk analyses have involved the assessment of natural variability and knowledge uncertainty. One area of considerable development is earthquake engineering. Here, the assessment of seismic hazards and performance of civil, mechanical and electrical systems has involved comprehensive probabilistic analyses in which full analyses of natural and knowledge uncertainties are conducted as part of seismic risk studies. These analyses are performed for critical facilities such as nuclear power plants, chemical weapon demilitarization facilities, insurance risk assessments, and lifeline systems (e.g., water, gas, communication, and transportation).

In probabilistic seismic hazard assessments, assessment of knowledge uncertainties has significantly matured in two areas (although seismic hazard analysis is fundamentally an earth science endeavor, probabilistic modeling of seismic hazards was initiated and has been largely advanced by civil engineers (e.g., Budnitz et al., 1997; Cornell, 1968; and Cornell and Vanmarcke, 1969)). These are the development of models for estimating the spatial and temporal rate of earthquake occurrences (seismic source characterization), and the prediction of earthquake ground motions. The characterization of the seismic source is particularly challenging. While considerable historic and instrumental data are available, estimates of the spatial and temporal rate of earthquake occurrences must rely on scientific evaluations and probabilistic assessments in which indirect evidence of the potential for future earthquake occurrences are gathered and evaluated. As part of these evaluations, formal elicitations are conducted with the earth scientist who must quantitatively evaluate knowledge uncertainties in modeling the location, magnitude and frequency of future earthquake occurrences.

variables it treats as natural variability, which it treats as knowledge uncertainty, and why and how it makes this distinction. Furthermore, the Corps should establish a risk analysis framework that permits quantification of each source of uncertainty and properly incorporates each uncertainty in the analysis. Differences in the effects of these sources of uncertainty on risk calculations can be large. For example, variations in stream flow, treated as natural variability, average out in a calculation from one year to the next (high flows in one year balance against low flows in another). In contrast, uncertainty in the mean annual flow parameter, treated as knowledge uncertainty, introduces a systematic effect

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

into a calculation. If the mean flow is overestimated in one year, it is overestimated in every year of the calculation.

It is not always obvious which uncertainties in a risk analysis should be ascribed to natural variability and which should be ascribed to knowledge uncertainty. Although most engineers and planners are familiar with natural variability, they are often less familiar with knowledge uncertainty. To understand how knowledge uncertainty enters a risk analysis, one might think of the analysis as being built upon a mathematical model describing the behavior of the natural world. Mathematical relationships in this model include parameters that determine how output varies with input—for example, the stability of a levee as water rises behind it. In its simplest form, knowledge uncertainty can be thought of as comprising uncertainty in the appropriate parameter values for the model, combined with uncertainty in the model itself. Parameter uncertainty relates to the accuracy and precision with which parameters can be inferred from field data, judgment, and the technical literature. Model uncertainty relates to the degree to which a chosen model accurately represents reality.

Parameter uncertainty derives from statistical considerations and is usually described either by confidence intervals when using traditional (frequentist) statistical methods, or by probability distributions when using Bayesian statistical methods. Data uncertainties, which are the principal contributors to parameter uncertainty, include (1) measurement errors, (2) inconsistent or heterogeneous data sets, (3) data handling and transcription errors, and (4) nonrepresentative sampling caused by time, space, or financial limitations.

Model uncertainty can result from the use of surrogate variables, from excluded variables, and from approximations and the use of the incorrect mathematical expressions for representing the physical world. An NRC committee argued that model uncertainty should be addressed with sensitivity analysis (NRC, 1994); however, this view is not unanimously shared by the scientific community.

Another type of knowledge uncertainty might be called *decision model uncertainty*, which describes an inability to understand the objectives that society holds important or to understand how alternative projects or designs should be evaluated. Such uncertainty, for example, would include uncertainty in discount rates and the appropriate length of planning horizons.

The Corps's risk analysis approach in flood damage reduction studies is mandated in ER 1105-2-101, *Risk-Based Analysis for Evaluation of Hydrology/ Hydraulics, Geotechnical Stability, and Economics in Flood*

Copyright National Academy of Sciences. All rights reserved.

*Damage Reduction Studies* (USACE, 1996a), and further discussed in EM 1110-2-1619, *Risk-Based Analysis for Flood Damage Reduction Studies* (USACE, 1996b). While this latter document provides a clear definition of parameter uncertainty and model uncertainty, neither document discusses fundamental differences between natural variability and knowledge uncertainty.

The distinction between natural variability and knowledge uncertainty is particularly important for flood damage calculations of expected annual damage (EAD) of the form found in the Corps's risk analysis procedure. Such calculations of expected annual damage lead to different numerical results depending upon which uncertainties—natural variability, knowledge uncertainty, or both—are included in the probabilistic averaging. In the Corps's method, expected annual damage is calculated by averaging natural variations among floods and in levee performance. Thus, the expected annual damage so calculated contains no contribution from knowledge uncertainty. To incorporate knowledge uncertainty, a probability distribution is specified over expected annual damage. This probability distribution over expected annual damage reflects the influence of parameter uncertainties in the flood–frequency distribution, stage–discharge curve, and stage–damage function. The expectation of expected annual damage itself reflects only natural variability, while the probability distribution of expected annual damage reflects only knowledge uncertainty. Due to nonlinearities in the calculations, this procedure of separately treating natural variability and the knowledge uncertainty can lead to different results compared to the approach of incorporating both types of uncertainty from the beginning.

An NRC committee that reviewed flood risk management in the American River (California) basin (NRC, 1995) recommended that the Corps be clearer about which variables it treats as natural variability in the computation, which it treats as knowledge uncertainty, and why it makes the choice it does.

## CONSISTENCY ACROSS PROGRAM AREAS

Risk analysis is based upon (1) the magnitude and likelihood of consequences, (2) defined risk acceptance criteria, and (3) a balance between implementation costs and avoided costs (Moser, 1998). In addition, such analyses should provide insight and understanding of likely failure modes and of significant economic issues.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Corps documents use a variety of terms to describe what in this report is called *risk analysis* (Table 3.2). Among these are risk analysis, risk-based analysis, and risk and uncertainty analysis. All of these use probability to assess likelihoods of events occurring. The terms appear to be used interchangeably to describe efforts involving probabilistic analyses. Flood damage reduction studies use “risk-based analysis” and “risk and uncertainty.” Rehabilitation studies have often used “risk-based analysis.” Environmental and ecosystem restoration studies typically use “risk and uncertainty analysis.”

“Risk analysis” is the more general term that includes risk assessment and risk management (NRC, 1983) and sometimes also includes hazard identification, risk characterization, and risk communication (NRC, 1994, 1996). The Corps should adopt “risk analysis” as the most general term. For Corps water resources project planning purposes, no distinction should be made between risk analysis, risk-based analysis, and risk and uncertainty analysis.

“Risk” is generally understood to describe the probability that some undesirable event occurs, and is sometimes used to describe the combination of that probability and the corresponding consequence of the event. The Corps measures risk by the probability that system operation is undesirable (e.g., the probability that a levee fails or that an ecosystem restoration project fails to meet a standard). The complement of risk is *reliability*, the probability that a system operates without failing. In an economic risk analysis, the consequences of undesirable performance are also computed (e.g., expected flood damage).

An important document in the Corps's rehabilitation program area is *Tools for Risk Based Economic Analysis* (USACE, 1999c). In describing what constitutes a risk analysis, this document presented only knowledge (parameter) uncertainty. The discussion neglects natural variability. This is noteworthy because natural variability was the only uncertainty

TABLE 3.2 Terms employed in Corps program areas

| Program Area | Term Used | Term Sometimes Used |
|---|---|---|
| Risk analysis course | Risk analysis | |
| Rehabilitation | Risk-based analysis | |
| Flood damage reduction | Risk-based analysis | Risk and uncertainty analysis |
| Environmental restoration | Risk and uncertainty analysis | |
| Dam safety | Risk analysis | |

Copyright National Academy of Sciences. All rights reserved.

Risk Analysis and Uncertainty in Flood Damage Reduction Studies
Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 63 of 858


included in the other risk analysis programs described in that publication (rehabilitation for hydropower and for locks, channel improvements in waterways, and dike maintenance).

Efforts to develop risk analysis for environmental and ecosystem restoration projects have proceeded carefully in clarifying terminology and the conceptualization of uncertainty (USACE, 1996c). The Corps refers to a taxonomy suggested by Morgan and Henrion (1990) for categorizing different kinds of quantities in modeling (USACE, 1996c, 1996d). That taxonomy is then used to categorize instead different types of uncertainty (USACE, 1996c). The Corps correctly applies the taxonomy to quantities (USACE, 1996d); however, much of the confusion is retained in another Corps document (USACE, 1996c).

The terminology and concepts that underlie the use of risk analyses across Corps program areas are not always well documented and not always consistently applied. There would be clear advantages to having a consistent, well-documented conceptual framework and a consistent set of terms to support those analyses. With relatively little effort, this situation can be improved by adopting a set of terms similar to those in Figure 3.1.

## RISK ANALYSIS AND DECISION MAKING

Improved decision making is emphasized in the Corps's risk analysis literature, and there is widespread interest in how these tools can be used more effectively. Table 3.3 shows four civil works program areas using risk analysis, and the performance metrics important to each. The choice of decision criteria is generally related to risks to human welfare or to large economic losses.

Many flood damage reduction studies and projects implicitly include some risk to human life. Such risk is described by the annual exceedance probability. Yet the primary decision criterion employed by the Corps, as specified by the *Principles and Guidelines*, is national economic development (NED). Supplemental criteria are the conditional nonexceedance probability for various design events and the expected annual damages (EAD). The current analytical approach does not address the question of which uncertainties are the more important.

Environmental restoration projects typically do not focus upon loss of life or on reducing flood damages. However, such projects have inherently low reliability, because habitat suitability models are often poorly developed and investment levels tend to be modest (USACE,

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

No RR2.0-AR00003634

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

1997a). Adaptive management has been suggested as one approach for addressing uncertainties associated with ecological complexity (such as in Corps's environmental restoration efforts in the Florida Everglades and in Missouri River dam operations). It appears that formal risk analyses have been uncommon in environmental restoration studies.




FIGURE 3.1 Taxonomy of uncertainties in risk analysis.

Rehabilitation studies are typically not concerned with loss of life or even with large economic loss. As mandated by the *Principles and Guidelines*, national economic development serves as the primary decision criterion in rehabilitation studies. But the NED criterion can be supplemented by other performance metrics because, if expected costs of alternatives are essentially equal, a plan that minimized disruption is generally preferred. Risk analyses that explain the dynamics of a system and explain opportunities for interventions that improve system operation can be useful. At a minimum, risk analysis should identify which uncertainties are the most important.

Across these four areas, basic analyses have been formulated to compute primary and secondary criteria. To achieve the objective of using risk analyses to improve decision making, the remaining challenge is to compute other criteria that provide insight into system operation and into where cost-effective changes can be made to improve performance. It is similarly important to determine which uncertainties are important.

Does risk analysis aid decision making in flood damage reduction studies? The new risk and uncertainty analysis method developed for flood damage reduction studies is different from earlier methods in that it includes a wider range of parameter uncertainties in the stochastic Monte Carlo analysis that generates expected project damages. It is thus important that the distributions describing parameter uncertainty be appropriate; otherwise, the expected annual damages criterion upon which projects are selected and justified will be distorted. This concerned both an NRC committee (NRC, 1995) and Stedinger (1997), who challenged the description of uncertainty in the parameters of the flood–frequency distribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

TABLE 3.3 Performance Metrics in Corps Program Areas Using Risk Analysis

| Program Area | Primary Criteria | Secondary Criteria | Threat to Human Life | Other Criteria |
|---|---|---|---|---|
| Rehabilitation | Expected costs (NED) | | Low | • Annual failure rates<br>• Hours/year for unscheduled outage<br>• Trip transit time |
| Environmental Restoration[1] | Change in habitat units Expected costs Cost per habitat unit | Distribution of Habitat Units | Low | • Probability exceeds standard<br>• Flexibility: ability to make adjustments |
| Dam Safety[2] | Annual loss of life Failure probability | Expected costs (NED) | High | • Cost per life saved |
| Flood Damage Reduction[3] | Expected damages (NED) | Probability of flooding (AEP) | Medium | • Conditional non-exceedance probabilities<br>• Estimated Annual Damage quantiles |

[1] The current criterion for ecosystem restoration projects is cost effectiveness or incremental cost analysis. The incremental analysis generally ignores uncertainty except when it is reflected in the value of specified characteristics of a site (e.g., water fluctuation, average temperature, annual maximum pH). The Corps (e.g., 1997a, p. 93–98) suggests use of the mean habitat unit change, minimum and maximum changes, and the distribution of the change as output from a risk and uncertainty study. The Corps is conducting additional research in this area.

[2] These are the anticipated performance metrics for this area.

[3] The failure probability is the probability of flooding, also called the annual exceedance probability (AEP). Expected damages are used in calculating the National Economic Development (NED) objective.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

The question has arisen whether adding parameter uncertainty to flood damage reduction calculations leads to potentially different project decisions or to greater insight into project performance. Some have noted that because the primary decision criterion is average expected annual damages, parameter uncertainty should have little impact. Stedinger (1997), for example, showed that with small sample sizes and high levels of protection, hydrologic parameter uncertainty can significantly increase expected damages; yet, Al-Futaisi and Stedinger (1999) found that adding hydrologic parameter uncertainty to the design process had little effect. Thus, while including uncertainty in economic analyses may impact performance indices, it may not impact the designs selected.

The influence of uncertainty on the expected value of performance criteria depends upon the nonlinearity of the models being used. A small uncertainty in the flow–stage relationship, or in the stage at which a levee fails, for example, can make a large difference in the reliability of a levee system and thus in project decisions. Anecdotal evidence from the American River (California) project suggests that risk analysis led to potentially significant changes in the operating rules for Folsom Reservoir, based on the capacity of a flood bypass and levee system downstream (M. Burnham, U.S. Army Corps of Engineers, personal communication, 1999). Further study is needed to assess how risk analysis can best be used in making project decisions for flood hazard damage reduction.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# 4

# Risk Analysis Techniques

Multidisciplinary factors contribute to the risk of flooding in riverine systems. Yet levee safety planning in the United States has traditionally been conducted along disciplinary lines. For instance, in hydrology, levees are evaluated for their ability to withstand the flood of a given magnitude, usually defined by a return period. In geotechnical engineering, levees are assessed for their stability and potential for failure by seepage through the embankment. This disciplinary approach has inhibited the development of quantitative procedures that evaluate the total risk of flooding, reflecting possible contributions of various operational, hydrologic, hydraulic, and geotechnical factors and how they might act individually and jointly.

Among the various sources contributing to flood risk, only the flood–frequency component has traditionally been considered probabilistically. This component is indeed a major factor contributing to the flood risk, often accounting for more than 50 percent of the failure risk. But several other factors are significant and should be accounted for quantitatively. In addition, even for the flood–frequency component, conventional evaluation procedures may be incomplete.

Many factors contribute to flooding of protected areas, depending upon the hydrology and hydraulics of different riverine systems. Before starting a flood damage reduction study, it is important to differentiate between significant and insignificant factors. The following list addresses factors that are often important in determining flood risks.

*Hydrologic factors* — flood frequency and volume and time distribution of the flood along the stream, which in turn depend on snow melt and/or rainfall characteristics, rainfall–runoff relationships of the water

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 68 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

shed, and the characteristics of the stream network. Rainfall factors include spatial and temporal distributions of the precipitation, the sample representativeness, accuracy and adequacy of the rainfall data, and the methods of analysis or simulation. Likewise, there are uncertainties in the representativeness, accuracy, and adequacy of the flood data in both space and time, and in the methods used to analyze these uncertainties. Watershed-stream factors include storage in lakes, reservoirs, and wetlands. There are also uncertainties in soil moisture, rain interception, and changing land uses.

*Hydraulic factors* — the nature of flood propagation in the channel and the equations and methods to simulate the flood propagation, which in turn depend on channel geometry, the roughness and slope of the channel bed, and the nature of the floodplain. Also included are the effects of hydraulic structures in the watershed, such as dams and spillways, levees, locks, weirs, sluices, gates, valves, bridges, intakes, and other diversion structures; also included are effects of sediment in the river, including erosion, scour, and deposition along the channel. Effects of wind and waves should also be considered.

*Structural and geotechnical factors* — geologic properties of the foundation, seepage through and cutoff beneath levees, internal erosion or piping of levee materials, strength instabilities in embankments or the subsurface, deep seepage failure away from the levee, and other soil mechanics issues.

*Seismic factors (on dams and levees)* — frequency and magnitude of earthquakes, fault and tectonic characteristics, earthquake-induced ground motion at the dam or levee site and liquefaction of foundation soil, and flooding probability associated with earthquake-induced dam or levee failure.

*Materials and construction factors* — type and quality of materials used for dams and levees, thermal and moisture variations affecting dam or levee quality during its service period and during its construction, and construction quality control.

*Other geophysical factors* — ice action in the river and on dams, levees or other structures, flash flooding from failure of dams, levees, or other facilities; thunder/lightning destruction; and tornado and other weather-related impacts.

*Operational and maintenance factors* — operational procedures on water diversion and release prior to and during flooding; operational procedures when an incident occurs; safety inspections of the river system; regulations on boat traffic and fishing during flooding; repair and main

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

tenance rules; grazing and other land uses; and vegetation cover and type.

## CORPS FRAMEWORK

The notion of using risk analysis to study the magnitude of floods is not new. Indeed, the relationship between the magnitude of a flood and its likely return period was established years ago by Gumbel (Gumbel, 1941), who drew on statistical theory developed during the 1920s concerning the distributions of extreme events. Standardized procedures for determining flood–frequency curves were defined by the Corps of Engineers during the 1950s (Beard, 1962). In the United States, passage of the National Flood Insurance Act of 1968, which created the National Flood Insurance Program (NFIP), also led to a period of comprehensive study of methods for determining flood frequency curves. This culminated in the publication in 1981 of the widely-used *Bulletin 17B* (IACWD, 1981). A similar comprehensive study of flood frequency was made in the United Kingdom at about the same time (NERC, 1975; Institute of Hydrology, 1999). Although the methods that evolved in the U.S. and U.K. studies are different, they have become standards adhered to since that time and are widely emulated in other countries.

A formal risk analysis includes seven phases. First, the level of unacceptable flooding performance is defined to allow a probabilistic failure analysis. Second, a method is identified that can be used to combine the different processes or events that lead to unacceptable performance. Third, the parameters involved in each of the processes or events is identified. Fourth, uncertainty analysis is performed for each of the parameters. Fifth, the component parameter uncertainties are combined to yield a system failure probability. Sixth, an economic damage function of flooding is determined along with associated uncertainty. Finally, the failure probability and damage function are combined to yield expected annual damage. This analysis is performed for each protection alternative considered.

The first five phases—finding the system failure probability, without considering the consequences of failure—are referred to as reliability analysis. A prerequisite of a successful reliability analysis is a comprehensive understanding of the problem and of the significant parameters involved. More than seventy years ago, industrial engineers applied some reliability techniques for quality control of manufactured products. In response to high failure rates and damages of military airborne and

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

electronic equipment during World War II, the U.S. Joint Army–Navy Committees on Parts Standards and on Vacuum Tube Development were established in June 1943 to improve military equipment reliability. Carhart (1953) produced an early state-of-the-art report on reliability engineering. In November 1953 the U.S. Department of Defense set up the Advisory Group on the Reliability of Electronic Equipment to monitor and promote reliability evaluation and analysis. Textbooks on reliability engineering started to appear in the early 1960s (Bazovsky, 1961; Calabro, 1962). Concerns regarding the safety of nuclear power plants and the reliability of space vehicles further accelerated the development of this topic. In civil engineering, structural engineers have made considerable advances in understanding the risks that earthquakes and high winds pose to structures. Progress has also been made in geotechnical and water resources engineering (Yen and Tung, 1993).

## NATURAL VARIABILITY AND IMPERFECT KNOWLEDGE

A risk analysis of flood hazards needs to address uncertainties associated with natural variability, engineering or economic models, and statistical relationships. Figure 4.1 provides a conceptual model (also known as an event tree) for describing the transformation of hydrologic risk, to variation in reservoir operations, to river-stage-to-reservoiroutflow relationship, to levee reliability, and finally to estimates of economic damages should a levee fail. This figure essentially represents the current Corps framework.

Some of the relationships in Figure 4.1 relate to natural variability. These relationships might be called *random* or *stochastic* because they are treated as random processes over time or space. For example, possible values of annual flood flows are treated as random events in time, and levee failures related to geotechnical weaknesses are treated, in part, as random events over space.

Other relationships in Figure 4.1 relate to engineering calculations or functional rules. These relationships might be called *deterministic* because a fixed dependent variable is assigned with a fixed value of an independent variable. For example, damages resulting from a given water level in a given structure are treated as deterministic. In this case, however, an estimation error is applied to the result to reflect imprecision in the physical survey of properties in the floodplain.

Finally, other relationships relate to empirical correlations. These relationships might be called *statistical* because they are treated as statisti

Copyright National Academy of Sciences. All rights reserved.

Risk Analysis and Uncertainty in Flood Damage Reduction Studies
Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 71 of 858



About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

cal regression functions. For example, river stage as a function of floodflow is treated as statistical. The estimation error applied to the damage– stage relationship mentioned previously is also modeled as a statistical error.




FIGURE 4.1. Event tree describing the transformation of flood discharge into damage. Some of the steps in this process are deterministic; others are stochastic. SOURCE: NRC (1995).

For each phase of Figure 4.1 there is thus a mathematical relationship that translates input variables to output variables, and each relationship introduces uncertainties. Some of the uncertainties derive from natural variations, others from engineering calculations, and still others from statistical estimation. For each relationship in the event tree of Figure 4.1 there is a set of parameters that define the corresponding equation or curve. The values of these parameters are uncertain. Consider two phases in the event tree (which shows five phases) as illustrative; the flood–frequency relationship on the left (the first phase), and the stage– discharge relationship in the middle (the third phase).

The possible values of the annual flood flow *Q* are represented by an exceedance probability distribution. These flood flows are assumed to be naturally variable and are describable with probabilities. This requires a set of parameters to specify the distribution shape and location along the axis of river flows (discharges). The parameters used are usually the mean, variance, and skewness coefficient of the logarithms of the flows. On the other hand, the shape and the location of the probability distribution are themselves uncertain because of imperfect knowledge about which distribution model to fit to historical data and about the best

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

values of distribution parameters for that model. Thus, the flood flows involve both natural variability and knowledge uncertainty.

The stage–discharge relationship is represented by a regression equation. This requires a set of parameters to describe the shape and location of the relationship on a graph of stage vs. discharge. The parameters used are usually an intercept, slope, and maybe some form of shape factor. To some extent, the stage–discharge relationship reflects natural variability over time or within the river reach (e.g., variability caused by water temperature, by scour and deposition or by stages of tributaries). On the other hand, the regression equation is estimated from limited data. The shape and the location of the regression curve are themselves uncertain because of imperfect knowledge about which equation to fit to historical data and about the best values of regression parameters for that equation. As with the flood–frequency curve, there is imperfect knowledge about which probability distribution model to fit to natural variations of historical stage data, about the regression curve, and about appropriate values of the distribution parameters for that model. Thus, the stage–discharge relationship also involves both natural variability and knowledge uncertainties. The largest knowledge uncertainties are for uncommon, extremely large floods.

The Corps's objective in flood damage reduction studies is to determine the expected annual damage (EAD) along a section of river caused by possible floods, and to compare changes in those damages as a function of project alternatives. The Corps's method for such calculations starts with flood discharge, $Q$, which is equaled or exceeded—on average—once in $T$ years. $T$ is said to be the return period of the flood discharge $Q$. Corresponding to this return period $T$ is a probability $p$ that the discharge $Q$ is equaled or exceeded in any given year. This annual exceedance probability is the reciprocal of the return period, $T$, and is given by

$$p = \frac{1}{T}. \qquad (4.1)$$

For a flood of annual probability p, a corresponding value of flood damage $D(p)$ can be estimated. This is based on the depth of inundation of the floodplain and on the value of the inundated structures. The EAD is the average value of such damages taken over floods of all different annual exceedance probabilities and over a long period of years. Stated mathematically, the EAD is,

Copyright National Academy of Sciences. All rights reserved.

$$EAD = \int_0^1 D(p)dp \,. \tag{4.2}$$

The current Corps method divides the calculation of Equation 4.2 into three steps (Figure 4.2):

1. *determining flood frequencies*, which describe the probability of floods equal to or greater than some discharge $Q$ (i.e., volume of flow) occurring within a given period of time—shown in the upper-right panel of Figure 4.2,
2. *determining stage–discharge relations*, which describe how high the flow of water in a reach of river (the stage) might be for a given volume of flow (discharge)—shown in the upper-left panel of Figure 4.2, and
3. *determining damage–stage relations*, which describe the amount of damage that might occur, given a certain height of flow—shown in the lower left panel of Figure 4.2.

The lower-right panel of Figure 4.2 relates annual damage to exceedance probability, $p$. The shaded area under the curve is the expected annual damage, given by Equation 4.2. To find the damage for a given probability $p$, the discharge $QT$ for that probability is first taken from the flood–frequency curve, given in the upper-right panel. Then the stage height (water surface elevation) for that discharge, $H$, is found from the upper-left panel. From the value of $H$, the damage $D$ for stage height is found from the lower-left panel. By plotting this damage on the lower-right panel for the given probability, and by repeating this process for a sequence of flood probabilities, the damage–frequency curve is established. This curve is then integrated to give expected annual damage. In the Corps's method, annual exceedance probabilities of $p$ = 0.5, 0.2, 0.1, 0.04, 0.02, 0.01, 0.004, and 0.002 are the values used in the computation.

Uncertainties enter the calculations in each step of the analysis and are propagated from one step to the next, ultimately accumulating in the EAD—the estimate of damages that might occur in a given year. These uncertainties in damage estimates are expressed as a frequency curve of damages—analogous to a frequency curve of flooding—describing the probability of damages of a given magnitude being exceeded in a given period of time (e.g., annually). This frequency curve of damages is

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

shown in the lower right panel of Figure 4.2. The Corps's conceptual approach to modeling flood hazard and associated damages—using the relationships between flood frequency, stage–discharge, and damage– stage—is consistent with longstanding scientific understanding.




$$EAD = \int_0^1 D(p)dp$$

FIGURE 4.2 Basis of the Corps's computation of expected annual damage (EAD). The logic of this figure flows counterclockwise starting from the upper right panel and ending in the lower right panel. SOURCE: Adapted from Moser (1997).

The computational procedure in the Corps's method uses Monte Carlo sampling to perform numerical integration of the damage exceedance probability curve for a damage reach. The damage-exceedance probability function is obtained from the discharge-exceedance probability, stage-discharge, and damage-stage functions. The numerical inte

Copyright National Academy of Sciences. All rights reserved.

Risk Analysis and Uncertainty in Flood Damage Reduction Studies
Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 75 of 858



About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

gration is necessary because the damage-exceedance probability function in not defined by a continuous analytic function. In this procedure, (pseudo-) random numbers are used to generate a single realization of each of the three relationships: discharge-exceedance probability function, stage-discharge function, and stage-damage function. From these, a single realization of the damage-exceedance probability curve is calculated. The expected annual damage (EAD) is calculated for this realization by integrating the damage-exceedance probability curve. This process is repeated many times and statistically averaged. The numerical results can be made arbitrarily precise, at least from a statistical point of view, by increasing the number of realizations calculated in this way.

The Corps's approach is a reasonable risk analysis procedure that deserves consideration for wider adoption in the flood management community. It provides a mechanism for combining uncertainty in estimating flood discharge and stage with the inherent risk of different flood severities, to give overall risk measures of the system's engineering performance that are more complete than those customarily used.

## RISK ANALYSIS

Determination of EAD in Equation 4.2, as historically performed, considered the range of flood magnitudes that could occur, but it did not consider uncertainties in hydrologic, hydraulic, or economic information used in the damage calculation. The curves of Figure 4.2 were treated as known. The traditional approach, as illustrated by Figure 4.2, does not tell us how sure we can be that the calculated expected annual damages will not be exceeded. This is because there are uncertainties in the probability distribution of annual peak flood flows, in the relationship between flood flow and flood stage, and in the relationship between flood stage and economic damage. Just how accurate is the calculated estimate of EAD damage? The Corps's new risk analysis for flood damage assessment attempts to quantify both the natural variability and the knowledge uncertainty in the above procedure.

Risk analysis provides a means of estimating a range of expected annual flood damages, each of which is associated with a level of assurance that it will not be exceeded. Similarly, risk analysis can be employed to calculate the range of expected probabilities of levee failure, each of which is associated with a level of assurance that that probability will not be exceeded. Consider the upper-right quadrant in Figure 4.2. The peak flow expected once in 100 years, on average, is the flow corresponding

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

to an annual exceedance probability of $p = 0.01$. How sure can we be that if we protect ourselves from a flow of that particular magnitude, we will actually be protecting ourselves from all flows that occur less frequently, on average, than once in 100 years? Risk analysis addresses such questions.

Assume that the probability distribution capturing the uncertainty about the probability of exceedance of the peak flows at the potential damage site (as shown in the upper-right quadrant of Figure 4.2) was determined as part of a risk analysis. Figure 4.3 shows a portion of that function. To be, say, 90 percent sure that protection is provided for the 100-year return period flow, $Q_{100}$ depends on the uncertainty in the estimated flow probabilities (see Figure 4.3), stage–discharge relationship, and in the levee system reliability.

Risk, uncertainty, and variability are inherent in flood damage reduction planning. There is uncertainty in any forecast of stream or river flood flows and the resulting damage simply because we cannot know enough about all the factors that contribute to them. Uncertainties in the stage–damage function in the lower-left quadrant of Figure 4.2 include:

- economic activities and the economic condition or value of the property on the floodplain during a flood,
- warning time and response of floodplain inhabitants,
- velocity of the floodwaters and the amount of mud and debris, and
- time required to repair damaged property.

Uncertainties in the discharge–stage function in the upper-left quadrant of Figure 4.2 include:

- physical characteristics of channel,
- winds that may affect flood stages associated with given flows, and
- vegetation, debris, and other obstructions including ice in the channel.

Uncertainties in the probability of exceedance distribution of annual peak flows in the upper-right quadrant of Figure 4.2 include:

- limited data from which to statistically estimate hydrographs,
- when and how severe a rain storm or other event (e.g., upstream dam failure or upstream or downstream levee failure) may be that could

Copyright National Academy of Sciences. All rights reserved.

Risk Analysis and Uncertainty in Flood Damage Reduction Studies



result in a flood,

- duration and distribution of rainfall on an area draining a potential flood damage site, and the precise rainfall–runoff and flow routing events (such as watershed topography, land use and cover, soil moisture content) that exist during such a storm,
- the likelihood of levee or upstream dam (structural) failures or operator (nonstructural) "failures" at upstream dams, and
- actions (temporary measures) taken upstream during a flood to protect upstream sites.




FIGURE 4.3. The darkest of these three curves represents the expected probability of exceedance of peak flow derived from a floodfrequency analysis. The two lighter lines that bound this curve define the 10% and 90% confidence bounds, respectively, around the expected probability of exceedance. $Q_{100}$ represents discharge that has a 0.01 probability of being exceeded, while $Q_{100}$ $+\Delta q$ is the discharge level for which there is a 90 percent confidence that the 100-year flow will not exceed this level. In terms of expected probability, this discharge has a 0.01-/$\Delta p$ probability of being exceeded. This approach corresponds to a safety factor that accounts for the uncertainty in the hydrologic analysis and the assessment of flood frequencies.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Peak flow records are commonly used to estimate the chance of a flood of a given or greater magnitude. But such estimates are uncertain for at least two reasons. One is the limited (and perhaps inaccurate) number of observations of past peak flows used to estimate the likelihood of equaling or exceeding a particular peak flow in any year. The other is the changing and varying character of the drainage basin that influences the peak flow resulting from a specific rainfall. In many cases the probability distribution of peak flows is changing, even assuming, perhaps incorrectly at least in the long run, that the probabilistic character of the rainfall is not.

The Corps's search for a better method of quantifying flood risk was prompted by issues related to riverine levee freeboard, described at a workshop held in Monticello, Minnesota (USACE, 1991a). There were concerns that arbitrarily defined safety margins were not explicitly related to the causes of uncertainty in levee performance and that the additional height (freeboard) required to meet these safety margins was not properly accounted for in the evaluation of project benefits. At the Monticello meeting a methodology was presented for quantifying uncertainty in discharge, stage, and damage, (Davis, 1991) from which the current procedure has evolved. At first, the risk analyses for flood damage assessment were computed with a spreadsheet with an add-in, commercial-off-the-shelf program, as described by Davis (1991). In January 1998 the Corps's Hydrologic Engineering Center (HEC) released Version 1.0 of the HEC-Flood Damage Assessment computer program (HECFDA) (HEC, 1998a), which provided an improved Windows program for carrying out the computations.

## MONTE CARLO SIMULATION

Figure 4.4 shows a sequence of three graphs describing uncertainties in discharge, stage, and damage. The uncertainty in these quantities is signified by the probability distributions and dashed confidence-limit lines drawn around each curve and also by the dash–dot lines on each graph, which are possible alternative locations of the curves. The first graph shows the uncertainty in discharge $Q$ for a given exceedance probability $p$, $f_1(Q|p)$. This uncertainty, $f_1(Q|p)$, can be specified rather precisely using the noncentral t distribution if the flood–frequency curve is described by the log normal distribution, and approximately so if the flood–frequency curve is described by other methods. A flood–frequency curve based on the log normal distribution is completely speci

Copyright National Academy of Sciences. All rights reserved.

fied by its mean and standard deviation, so if the mean and standard deviation are varied, then different flood–frequency curves result. The statistical uncertainty in the mean and standard deviation can be quantified based on the number of data values used in calculating them. By using Monte Carlo simulation to generate different means and standard deviations and then plotting the resulting flood–frequency curves, different "realizations" of the flood–frequency curve are defined, one example of which is shown by the dash–dot line in $f_1(Q|p)$ in Figure 4.4. It should be noted that several methods could be used for risk value computations, and that the Corps uses the Monte Carlo method.




FIGURE 4.4 Uncertainties in the discharge (*Q*), stage (*H*), and damage (*D*) relationships that are part of the risk analysis method. The *first figure* shows the relationship between discharge vs. exceedance probability (p). The solid curve is the best estimate of this relationship, while the dash-dot curve represents one potential realization that the actual curve might assume. The dotted lines show probability contours of the function f1 (Q|p), which is the probability density function describing uncertainty in discharge for a given exceedance probability. The *second figure* shows the relationship between discharge and water height (i.e., the rating curve). The solid line is the best estimate and the dash-dot curve is one potential realization that the actual curve might assume. The function f2 (H| Q) is the probability density function of height given discharge. The *third figure* shows the relationship between damage and water height. The solid line is the best estimate of this relationship and the dash-dot curve is one potential realization that the actual curve might assume. The function f3(D|H) is the probability density function of damage given water height.

Similarly, the uncertainty in the rating curve, or relationship between the stage height *H* and the discharge *Q*, is symbolized by the probability distribution around the $f_2(H|Q)$ curve in Figure 4.4 and by the alternative realization of that curve shown by the dash–dot line in that figure. In this

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

case, the Monte Carlo analysis uses only a single random variable that serves to vertically displace the average rating curve.

Finally, the uncertainty in the damage–stage function is symbolized by the probability distribution around the $f_3(D|H)$ curve in Figure 4.4 and the alternative realization of that curve, given by the dash–dot line. This function combines the effects of several different kinds of uncertainty, including the likelihood of levee failure, uncertainty in elevations of structures in the floodplain, lack of knowledge of the degree of flood damage for a given depth of inundation in a structure, and uncertainty in property and content values within the structures.

Monte Carlo simulation is used to generate new realizations of each of the three curves in Figure 4.4. For each of these sets of realizations, a new value of expected annual damages (EAD) is found by the same process as described in Figure 4.2, as if each realization were the true value of the curve. In other words, for each exceedance probability interval $dp$, a representative exceedance probability $p^*$ is used, from which the flood discharge $Q^*$ is found using the flood–frequency curve, the corresponding stage height $H^*$ from the discharge–stage curve, and the consequential damage $D^*$ from the damage–stage function. By continuing this process across the exceedance probability axis and then integrating the results using Equation 4.2, the EAD is found. The Monte Carlo simulation is continued for a few thousand cycles of generating realizations and computing EAD, until the statistics of the EAD values are sufficiently accurate. This form of Monte Carlo simulation is more sophisticated than the simpler approach of simply generating a flood, finding the stage and damage, generating a new flood, finding the stage and damage, and so on. Thus, the Monte Carlo simulation uses random numbers to perturb the relationships linking the key variables, rather than to generate random floods and examine their consequences.

As the Corps's risk analysis methods evolve, it is possible that a direct Monte Carlo approach will become impractical. The approach requires large numbers of repetitive calculations, and should the analysis models become more involved, alternative calculation approaches may be desirable.

## ASSESSMENT OF ENGINEERING PERFORMANCE

The engineering performance of a flood damage reduction project is measured by the probability that the land to be protected by the project will be flooded in any given year. Such probabilities are estimated for

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

each damage reach in the project and consider hydrologic, hydraulic, and geotechnical uncertainties. Engineering performance is not concerned with estimates of economic damage, which are assessed separately. The performance measures require the definition of a target stage for each damage reach, as shown in Figure 4.5. The target stage is defined as the water surface elevation in a reach at which significant economic damage occurs. To determine the target stage, the damage–frequency curve is obtained for the damage reach by the process shown in Figure 4.2, transforming the flood–frequency curve through the damage–stage curve without consideration of errors in these curves. The 1 percent chance of flooding damage is found from this damage–frequency curve. A fraction of this damage (usually 10 percent) is taken and is used to determine the corresponding stage from the damage–stage curve, which then becomes the target stage for the reach.

As Figure 4.6 shows, engineering performance can be stated in two ways—either as a risk of failure, measured by the exceedance probability of a target stage, or as a reliability, measured by the nonexceedance probability of the target stage. Performance can also be measured by conditional probabilities dependent on the occurrence of a flood of a given severity (e.g., the 100-year flood) or dependent on the annual probabilities integrated over all the floods that could occur within a given year. In the Corps's method, the two main engineering performance measures combine the two sets of distinctions into the following measures:

- *annual exceedance probability*—the probability that the target stage will be exceeded in any year considering all potential floods and
- *conditional nonexceedance probability*—the probability that the target stage will not be exceeded given a specific flood severity.




FIGURE 4.5 Definition of a target stage used in assessing engineering performance.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.




FIGURE 4.6 Exceedance and nonexceedance probabilities.

The assessment of engineering performance to create the annual exceedance and conditional nonexceedance probabilities is carried out as illustrated in Figure 4.7. The first two panels in Figure 4.7 show the flood–frequency curve and the stage–discharge curve. In each cycle of the Monte Carlo procedure, a new realization of the flood–frequency curve $f_1(Q|p)$ and the stage- damage curve $f_2(H|Q)$ ) is generated, where H represents stage height and $Q$ represents discharge. The flood–frequency curve is defined at discrete intervals of annual flood probability, $p$ ($p$ = 0.5, 0.2, 0.1, 0.04, 0.02, 0.01, 0.004, 0.002). If a particular value of p is chosen, say p*, the corresponding flood discharge $Q^*$ can be found from the flood–frequency curve, and the resulting stage height $H^*$ can be found from the stage–discharge curve. By combining these pairs of ($H^*$, $p^*$) values, a stage–frequency curve can be constructed, $f_3(H|p)$, as shown in the third panel in Figure 4.7.

The annual exceedance probability, $p_e$, is estimated from the stage–frequency curve as that probability corresponding to the target stage for the damage reach. This computation is repeated for $N$ cycles of Monte Carlo simulations, and the expected value of the annual exceedance probability is found as the average over the $N$ sample values from the

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 83 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

simulations. The median annual exceedance probability is the 50 percent value of this distribution.




FIGURE 4.7 Computation of risk measures using a target stage.

Conditional nonexceedance probabilities are also determined from the stage–frequency curve. For each value of *p**, there corresponds an *H**, determined in the manner just described. After all the Monte Carlo simulations are complete, a set of *N* values of *H** exists, of which a subset, *n*, have stages not exceeding the target stage. The conditional nonexceedance probability of the target stage is given by *n/N*. The HEC-FDA program presents such conditional nonexceedance probabilities for each damage reach for annual event probabilities of 0.1, 0.04, 0.02, 0.01, 0.004, and 0.002, shown in the following chapter in Figure 5.10. Figure 5.10 also shows the chance that the target stage will be exceeded at least once in 10, 25, and 50 years, computed as $1 - (1-p_e)^n$, where $n$ = 10, 25, or 50, respectively.

## GEOTECHNICAL RELIABILITY

Even if not overtopped by floods, levees may fail for geotechnical reasons. The Corps's risk analysis procedure incorporates the chance of such failures through a geotechnical reliability model. This model leads to a relationship between water height and probability of geotechnical failure, which is then applied individually to each damage reach of river. The logic of this calculation is that damages accrue in one of two ways— either the river becomes high enough that a levee is overtopped, or even though the river does not overtop a levee, it is high enough to cause geotechnical failure.

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 84 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

The Corps's geotechnical reliability model is a sound first step in balancing scientific understanding with the practical needs of planning studies and risk analysis. This is a difficult problem. The geotechnical performance of a levee depends on local soil conditions and construction details, neither of which are known in detail during the planning study. Many of the levees of concern to risk analysis studies were not designed by the Corps and are neither owned nor maintained by federal agencies.

The Corps's original geotechnical reliability model is a simple relationship based on two critical stage heights for the levee: the probable failure point (PFP) and the probable nonfailure point (PNP) (USACE, 1991b). The probable failure point is the stage height associated with a high probability of failure. Numerically, this probability is set at 0.85. The probable nonfailure point is the stage height associated with a negligible probability of failure. Numerically, this probability is set at 0.15. A line is drawn between the PFP and PNP, as shown in Figure 4.8. These points are assessed for local conditions of the project area, and they may change from reach to reach. To avoid complications arising from failures in multiple locations on a long levee, the Corps models the damage such that the reach covers the whole length of the levee under consideration. Thus, the risk function in Figure 4.8 refers to the chance of failure at only the weakest point over this reach. This original model appears to be still widely used in the Corps's district offices.

The original reliability model has been updated (USACE, 1999b) to reflect more sophisticated understanding of geotechnical performance. The updated model considers multiple modes of geotechnical failure, including underseepage, through seepage, and strength instability. This results in a composite curve that varies smoothly between probabilities of 0 and 1, rather than being anchored to a probable failure point and a probable nonfailure point (Figure 4.9).

Although the updated model is based on better scientific understanding of levee performance, the numerical difference in risk analysis results compared to the initial model may not be large. The updated model, however, supports a more complete geotechnical analysis and should to replace the initial model.

The risk measures for engineering performance, including geotechnical reliability, are calculated as shown in Figure 4.10. The first panel of this figure shows the stage–frequency curve, $f_3(H|p)$, from Figure 4.7, which is determined from the hydrologic and hydraulic models and their attendant uncertainties. For each frequency value ($p^*$ = 0.5, 0.2, 0.1, 0.04, 0.02, 0.01, 0.004, 0.002), a corresponding stage height $H^*$ is de

Copyright National Academy of Sciences. All rights reserved.

$$p_e = \int_0^1 R(p)dp \,. \tag{4.3}$$

termined. The middle panel of Figure 4.10 is the risk of levee failure $R$ as a function of stage, $f_4(R|H)$, derived from Figure 4.8 or Figure 4.9 using this function. For the given value of $H^*$, the corresponding risk of failure $R^*$ is determined. The pairs of values ($R^*$, $p^*$) are combined to form a risk–frequency curve, $R(p)$, as shown in the last panel of Figure 4.10. The annual exceedance probability $p_e$ including geotechnical uncertainty is then found in an analogous manner to the expected annual damage using Equation (4.3):




FIGURE 4.8 Two-point model of geotechnical levee reliability. PFP is probable failure point; PNP is the probable nonfailure point.

The conditional nonexceedance probability for any given value of $p^*$ is simply $1 - R^*$ in Figure 4.10.

By repeating this computation many times using a Monte Carlo simulation, a set of of $p_e$ and $1 - R^*$ values is obtained. The $p_e$ values are averaged to find the expected value of the annual exceedance probability, and the $1 - R^*$ values are averaged to find the expected value of the conditional-nonexceedance probability. Consider, for example, the construction of a levee with a specified conditional nonexceedance probability of, for example, 90 percent or 95 percent for a 100-year flood. In

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

this instance, the above procedure is executed with a specified value of $p^* = 0.01$, and the levee height is raised or lowered until the required conditional nonexceedance probability is obtained.




FIGURE 4.9 Continuous model of geotechnical levee reliability.




FIGURE 4.10 Computation of risk measures including geotechnical reliability.

The Corps's analysis combines uncertainty about the parameters and analysis models with the variability inherent in natural systems. Applications are discussed in Chapter 5.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# 5

# Case Studies

This chapter illustrates the Corps of Engineers's application of risk analysis by reviewing two Corps flood damage reduction projects: Beargrass Creek in Louisville, Kentucky, and the Red River of the North in East Grand Forks, Minnesota, and Grand Forks, North Dakota. The Beargrass Creek case study describes the entire procedure of risk-based engineering and economic analysis applied to a typical Corps flood damage reduction project. The Red River of the North case study focuses on the reliability of the levee system in Grand Forks, which suffered a devastating failure in April 1997 that resulted in more than $1 billion in flood damages and related emergency services.

The Corps of Engineers has used risk analysis methods in several flood damage reduction studies across the nation, any of which could have been chosen for detailed investigation. Given the limits of the committee's time and resources, the committee chose to focus upon the Beargrass Creek and Red River case studies for the following reasons: committee member proximity to Corps offices, a high level of interest in these two studies, and the availability of documentation from the Corps that adequately described their risk analysis applications.

Differences in approaches taken at Beargrass Creek and along the Red River of the North to reducing flood damages are reflected in these studies. At Beargrass Creek, the primary flood damage reduction measures were detention basins; at the Red River of the North, the primary measures were levees. The Corps uses rainfall-runoff models in nearly all of its flood damage reduction studies to simulate streamflows needed for flood-frequency analysis, and a rainfall-runoff model was employed in the Beargrass Creek study. In the Red River study, however, the goal

Copyright National Academy of Sciences. All rights reserved.

Risk Analysis and Uncertainty in Flood Damage Reduction Studies


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

was to design a system that would, with a reasonable degree of reliability, contain a flood of the magnitude of 1997's devastating flood. The Corps focused on traditional flood–frequency analysis and manipulated the frequency curve at a gage location to derive frequency curves at other locations (vs. using a rainfall-runoff model to derive those curves).

## BEARGRASS CREEK

In 1997 the Corps held a workshop (USACE, 1997b) at which experience accumulated since 1991 in risk analysis for flood damage reduction studies was reviewed. O'Leary (1997) described how the new procedures had been applied in the Corps's Louisville, Kentucky, district office. In particular, O'Leary described an application to a flood damage reduction project for Beargrass Creek, economic analyses for which were done both under the old procedures without risk and uncertainty analysis and under the new procedures that include those factors. Conclusions of the Beargrass Creek study are summarized in two volumes of project reports (USACE, 1997c,d). These documents, plus a site visit to the Louisville district by a member of this committee, form the basis of this discussion of the Beargrass Creek study. The Beargrass Creek data are distributed with the Corps's Hydrologic Engineering Center Flood Damage Assessment (HEC-FDA) computer program for risk analysis as an example data set. The Beargrass Creek study is also used for illustration in the HEC-FDA program manual and in the Corps's Risk Training course manual. Although there are variations from study to study in the application of risk analysis, Beargrass Creek is a reasonably representative case with which to examine the methodology.

As shown Figure 5.1, Beargrass Creek flows through the city of Louisville, Kentucky, and into the Ohio River on its south bank. The Beargrass Creek basin has a drainage area of 61 square miles, which encompasses about half of Louisville. The basin currently (year 2000) has a population of about 200,000. This flood damage reduction study's focal point is the lower portion of the basin shown in Figure 5.1 —the South Fork of Beargrass Creek and Buechel Branch, a tributary of the South Fork.

Locally intense rainstorms (rather than regional storms) cause flooding in Beargrass Creek. A 2-year return period storm causes the creek to overflow its banks and produces some flood damage. Under existing conditions, the Corps estimates that a 10-year flood will impact

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

about 300 buildings and cause about $7 million in flood damages, while a 100-year flood will impact about 750 buildings and cause about $45 million in flood damages (USACE, 1997c). The expected annual flood damage under existing conditions is approximately $3 million per year.




FIGURE 5.1 The Beargrass Creek basin in Louisville, Kentucky. SOURCE: USACE (1997a) (Figure II-1).

### Flood Damage Reduction Measures

Beargrass Creek has several flood damage reduction structures, the most notable of which is a very large levee at its outlet on the Ohio River (Figure 5.2a). This levee was built following a disastrous flood on the Ohio in January 1937, and the levee crest is an elevation of 3 feet above the 1937 flood level on the Ohio River. During the 1937 flood it was reported that "at the Public Library, the flood waters reached a height such that a Statue of Lincoln appeared to be walking on water!" (USACE, 1997b, p. III-2). Near the mouth of Beargrass Creek, a set of

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

gates can be closed to prevent water from the Ohio River from flowing back up into Louisville. In the event of such a flood, a massive pump station with a capacity of 7,800 cubic feet per second (cfs) is activated to discharge the flow of Beargrass Creek over the levee and into the Ohio River.

Between 1906 and 1943, a traditional channel improvement project was constructed on the lower reaches of the South Fork of Beargrass Creek. It consists of a concrete lined rectangular channel with vertical sides, with a small low-flow channel down the center (Figure 5.2b). The channel's flood conveyance capacity is perhaps twice that of the natural channel it replaced, but the concrete channel is a distinctive type of landscape feature that environmental concerns will no longer permit. Other structures have been added since then, including a dry bed reservoir completed in 1980, which functions as an in-stream detention basin during floods.

The proposed flood damage reduction measures for Beargrass Creek form an interesting contrast to traditional approaches. The emphasis of the proposed measures is on altering the natural channel as little as possible and detaining the floodwaters with detention basins. These basins are either located on the creek itself or more often in flood pool areas adjacent to the creek into which excessive waters can drain, be held for a few hours until the main flood has passed, and then gradually return to the creek. Figure 5.2c shows a grassed detention pond area with a concrete weir (in the center of the picture) adjacent to the creek. Figure 5.2d shows Beargrass Creek at this location (a discharge pipe from the pond is visible on the right side of the photograph). Water flows from the creek into the pond over the weir and discharges back into the creek through the pipe. The National Economic Development flood damage reduction alternative on Beargrass Creek called for a total of eight detention basins, one flood wall or levee, and one section of modified channel. Other alternatives such as flood-proofing, flood warning systems, and enlargement of bridge openings were considered but were not included in the final plan.

The evolution of flood damage reduction on Beargrass Creek represents an interesting mixture of the old and the new—massive levees and control structures on the Ohio River, traditional approaches (the concrete-lined channel) in the lower part of the basin, more modern instream and off-channel detention basins in the upstream areas, and local channel modifications and floodwalls. Maintenance and improvement of stormwater drainage facilities in Beargrass Creek are the responsibility of the Jefferson County Metropolitan Sewer District, which is the principal local partner working with the Corps to plan and develop flood damage reduction measures.

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 91 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.



(a) Levee on the Ohio River



(b) Concrete-lined channel

Copyright National Academy of Sciences. All rights reserved.



(c) Detention pond



(d) Beargrass Creek at the detention pond

FIGURE 5.2 Images of Beargrass Creek at various locations: (a) the levee on the Ohio River, (b) a concrete-lined channel, (c) a detention pond, and (d) the Beargrass Creek at the detention pond.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 93 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

In some locations, development has been prohibited in the floodway; but in other places, buildings are located adjacent to the creek. The Corps's feasibility report includes the following comments: “Urbanization continues to alter the character of the watershed as open land is converted to residential, commercial and industrial uses. The quest for open area residential settings in the late 1960s and early 1970s caused a tremendous increase in urbanization of the entire basin. Several developers have utilized the aesthetic beauty of the streambanks as sites for residential as well as commercial developments. This has resulted in increased runoff throughout the drainage area as development has occasionally encroached on the floodplain and, less frequently, the floodway” (USACE, 1997b, p. II-2).

## Damage Reaches

To conduct the flood damage assessment, the two main creeks— South Fork of Beargrass Creek and Buechel Branch—are divided into damage reaches. Flood damage and risk assessment results are summarized for each damage reach, and the expected annual damage for the project as a whole is found by summing the expected annual damages for each reach. As shown in Figure 5.3, the South Fork was divided into 15 damage reaches and the Buechel Branch into 5 reaches (a sixth damage reach on Buechel Branch is not shown in this figure). Approximately 12 miles of Beargrass Creek, and 2.2 miles of Buechel Branch are covered by the these damage reaches. The average length of a damage reach is thus 0.8 miles for the South Fork of the Beargrass Creek, and the average length for Buechel Branch is 0.4 miles. The shorter reaches on Buechel Branch are adjacent to similarly short, upstream reaches in Beargrass Creek where most flood damage occurs. Longer damage reaches are used downstream on Beargrass Creek where less damage occurs.

The highest expected annual flood damage is on Reach SF-9 on the upper portion of the South Fork of Beargrass Creek. Results from this damage reach are used for illustrative purposes at various points in this chapter.

Copyright National Academy of Sciences. All rights reserved.

No RR2.0-AR00003664

Risk Analysis and Uncertainty in Flood Damage Reduction Studies
Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 94 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.




FIGURE 5.3 Damage reaches on the South Fork of Beargrass Creek and Buechel Branch. SOURCE: USACE (1997a) (Figure III-3).

## Flood Hydrology

Most of the flood damage reduction measures being considered are detention basins, which diminish flood discharge by temporarily storing floodwater. It follows that the study's flood hydrology component has to be conducted using a time-varying rainfall–runoff model because this allows for the routing of storage water through detention basins. In this case, the HEC-1 rainfall–runoff model from the Corps's Hydrologic Engineering Center (HEC) was used to quantify the flood discharges. The Hydrologic Engineering Center has subsequently released a successor rainfall-runoff model to HEC-1, called HEC-HMS (Hydrologic Modeling System), which can also be used for this type of study (HEC, 1998b).

In each damage reach, and for each alternative plan considered, the risk analysis procedure for flood damage assessment requires a flood– frequency curve defining the annual maximum flood discharge at that location which is equaled or exceeded in any given year with a given probability. In this study all these flood–frequency curves were produced through rainfall–runoff modeling. In other words, a storm of a given

Copyright National Academy of Sciences. All rights reserved.

No RR2.0-AR00003665

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

return period was used as input to the HEC-1 model, the water was routed through the basin, and the magnitude of the discharge at the top end of each damage reach was determined (Corps hydrologists have assumed, based on experience in the basin, that storms of given return periods produce floods of the equivalent return period). By repeating this exercise for each of the annual storm frequencies to be considered, a flood–frequency curve was produced for each damage reach. There are eight standard annual exceedance probabilities normally used to define this frequency curve: $p = 0.5$, 0.2, 0.1, 0.04, 0.02, 0.01, 0.004, and 0.002, corresponding to return periods of 2, 5, 10, 25, 50, 100, 250, and 500 years, respectively. In this study, because even small floods cause damage, a 1-year return period event was included in the analysis and assigned an exceedance probability of 0.999.

Considering that there are 21 damage reaches in the study area and 8 annual frequencies to be considered, each alternative plan considered requires the development of 21 flood–frequency curves involving 168 discharge estimates. During project planning, as dozens of alternative components and plans were considered, the sheer magnitude of the tasks of hydrologic simulation and data assembly becomes apparent.

The hydrologic analysis is further complicated by the fact that the design of detention basins is not simply a cut-and-dried matter. A basin designed to capture a 100-year flood requires a high–capacity outlet structure. Such a basin will have little impact on smaller floods because the outlet structure is so large that smaller events pass through almost unimpeded. If smaller floods are to be captured, a more confined outlet structure is needed, which in turn increases the required storage volume for larger floods. This situation was resolved in the Beargrass Creek study by settling on a 10-year flood as the nominal design event for sizing flood ponds and outlet works. The structures designed in this manner were then subjected to the whole range of floods required for the economic analysis.

## Rainfall–Runoff Model

The HEC-1 model was validated by using historical rainfall and runoff data for four floods (March 1964, April 1970, July 1973, February 1990). Modeling results were within 5 percent to 10 percent of observed flows at two U.S. Geological Survey (USGS) streamflow gaging stations: South Fork of Beargrass Creek at Trevallian Way and Middle Fork

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

of Beargrass Creek at Old Cannons Lane, which have flow records beginning in 1940 and 1944, respectively, and continuing to the present. A total of 42 subbasins were used in the HEC-1 model, and runoff was computed using the U.S. Soil Conservation Service (renamed the Natural Resources Conservation Service in 1994) curve number loss rates and unit hydrographs. The Soil Conservation Service curve numbers were adjusted to allow the matching of observed and modeled flows for the historical events. A 6-hour design storm was used, which is about twice the time of concentration of the basin. The design storm duration chosen is longer than the time of concentration of the basin so that the flood hydrograph has time to rise and reach its peak outflow at the basin outlet while the storm is still continuing. If the design storm is shorter than the time of concentration, rainfall could have ceased in part of the basin before the outflow peaks at the basin outlet. The storm rainfall hydrograph was based on National Weather Service 1961 Technical Paper 40 (NWS, 1961) and on a Soil Conservation Service storm hydrograph, and a 5-minute time interval of computation was used for determining the design discharges.

There is a long flood record of 56 years of data (1940–1996) available in the study area (USGS gage on the South Fork of Beargrass Creek at Trevallian Way). A comparison was made of observed flood frequencies at this site with those simulated by HEC-1, with some adjustment of the older flood data to allow for later development. Traditional flood frequency analysis of observed flow data had little impact in the study. This may have been the case because there was only one gage available within the study area, or because the basin has changed so much over time that the flood record there does not represent homogeneous conditions. Furthermore, the alternatives mostly involve flood storage, which requires computation of the entire flood hydrograph, not just the peak discharge.

## Uncertainty in Flood Discharge

Uncertainty in flood hydrology is represented by a range in the estimated flood–frequency curve at each damage reach. In the HEC-FDA program, there are two options for specifying this uncertainty: an analytical method based on the log-Pearson distribution and a more approximate graphical method. The log-Pearson distribution is a mathematical function used for flood–frequency analysis, the parameters of which are determined from the mean, standard deviation, and coefficient

Copyright National Academy of Sciences. All rights reserved.

of skewness of the logarithms of the annual maximum discharge data. The graphical method is a flood frequency analysis performed directly on the annual maximum discharge data without fitting them with a mathematical function. In this case the graphical method was used with an equivalent record length of 56 years of data, the length of the flood record of the USGS gage station at Trevallian Way at the time of the study. Figure 5.4 shows the flood–frequency curve for damage reach SF-9 on the South Fork of Beargrass Creek, with corresponding confidence limits based on ± 2 standard deviations about the mean curve.

The confidence limits in this graph are symmetric about the mean when the logarithm to base 10 of the discharge is taken, rather than the discharge itself. This can be expressed mathematically as:

$$\log Q = \overline{\log Q} + K\sigma_{\log Q}, \qquad (5.1)$$

where $Q$ is the discharge value at the confidence limit, $\log Q$ is the expected flood discharge, $\sigma_{\log Q}$ is the standard deviation (shown in the rightmost column of Table 5.1), and $K$ is the number of standard deviations above or below the mean that the confidence limit lies. Because these confidence limits are defined in the log space, it follows that they are not symmetric in the real flood discharge space. As Table 5.1 shows, the expected discharge for the 100-year flood ($p$ = 0.01) is 4,310 cfs, the upper confidence limit is 6,176 cfs, and the lower limit is 3,008 cfs. The difference between the mean and the upper confidence limit is thus about 40 percent larger than the difference between the mean and the lower confidence limit. The confidence limits for graphical frequency analysis are computed using a method based on order statistics, as described in USACE (1997d). In this method, a given flood discharge estimate is considered a sample from a binomial distribution, whose parameters $p$ and $n$ are the nonexceedance probability of the flood and the equivalent record length of flood observations in the area, respectively. In this case, $n$ = 56 years, since this is the record length of the Trevallian Way gage.

## River Hydraulics

Water surface profiles for all events were determined using the HEC-2 river hydraulics program from the Corps's Hydrologic Engineering Center in Davis, California. Field-surveyed cross sections were obtained

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 98 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

at all bridges and at some stream sections near bridges. Maps with a scale of 1 inch = 100 feet with contour intervals of 2 feet were used to define cross sections elsewhere on the stream reaches and were used for measuring the distance between cross sections on the channel and in the left and right overbank areas. Manning's *n* values for roughness were based on field inspection, on reproduction of known high-water marks from the March 1964 flood on Beargrass Creek, and on reproduction of the rating curve of the USGS gage at Trevallian Way. Manning's equation relates the channel velocity to the channel's shape, slope, and roughness. Manning's *n* is a numerical value describing the channel roughness. Manning's *n* values in the concrete channel ranged from 0.015 at the channel invert to 0.027 near the top of the bank. In the natural channels, Manning's *n* values ranged from 0.035 to 0.050. In the overbank areas, these values ranged from 0.045 to 0.065. Where buildings blocked the flow, the cross sections were cut off at the effective




FIGURE 5.4 The flood–frequency curve and its uncertainty at damage reach SF-9 on the South Fork of Beargrass Creek.

Copyright National Academy of Sciences. All rights reserved.

TABLE 5.1 Uncertainties in Estimated Discharge Values at Reach SF-9

| Exceedance Probability | Mean Discharge (cfs) | Mean−2 Std Dev. (cfs) | Mean+ 2 Std Dev. (cfs) | $\sigma_{\log Q}$ |
|---|---|---|---|---|
| 0.01 | 4,310 | 3,008 | 6,176 | 0.0781 |
| 0.1 | 2,620 | 2,051 | 3,346 | 0.0531 |
| 0.5 | 1,220 | 1,098 | 1,356 | 0.0229 |

flow limits. A total of 201 cross sections were used for the South Fork of Beargrass Creek, and 61 cross sections were used for Buechel Branch. The average distance between cross sections was 330 feet on the South Fork of Beargrass Creek and 245 feet on Buechel Branch. Cross sections are spaced more closely than this near bridges and more sparsely in reaches where the cross section is relatively constant.

Figure 5.5 shows the water surface profiles along Beargrass Creek for the eight flood frequencies considered, under existing conditions without any planned control measures. The horizontal axis of this graph is the distance in miles upstream from Beargrass Creek's outlet on the Ohio River. The vertical axis is the elevation of the water surface in feet above mean sea level. The bottom profile in this graph is the channel invert or channel bottom elevation. The top profile is for $p$ = 0.002—the 500-year flood. This particular profile shows a sharp drop near the bottom end of the channel, caused by a bridge at that location that constricts the flow. The flat water surface elevation upstream of the bridge is a backwater effect produced by the inadequate capacity of the bridge opening to convey the flow that comes to it.

For each flood profile computed, the number of structures flooded and the degree to which they are flooded must be assessed. Figure 5.6 shows the locations of the first-floor elevations of structures affected by flooding on the South Fork of Beargrass Creek in relation to several flood water surface profiles under existing conditions. Damage reach SF-9 is located between river miles (RM) 9.960 and 10.363, near the point where there is a sharp drop in the channel bed and water surface elevation on Beargrass Creek. It can be seen that the density of development varies along the channel. Flood damage reduction measures are most effective when they are located close to damage reaches with significant numbers of structures, and they are least effective when they are distant from such reaches.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.




FIGURE 5.5 Water surface profiles for design floods in Beargrass Creek under existing conditions.

Each damage reach has an index location, which is an equivalent point at which all of the damages along the reach are assumed to occur. On reach SF-9, this index location is at river mile 10.124. To assess damages to structures within each reach, an equivalent elevation is found for each structure at the index location such that its depth of flooding at that location is the same as it would have been at the correct location on the flood profile, as shown in Figure 5.7.

The technique of assigning an elevation at the index location can be far more complex than Figure 5.7 implies, because allowance is made in the HEC-FDA program for the various flood profiles to be nonparallel and also to change in gradient upstream of the index location compared to downstream. In the Beargrass Creek study, a single flood profile for the $p = 0.01$ event was chosen, and all other profiles were assumed parallel to this one. One damage reach on Beargrass Creek was subdivided into three subreaches to make this assumption more nearly correct. A spatial distribution of buildings over the damage reach is thus converted

Copyright National Academy of Sciences. All rights reserved.

Risk Analysis and Uncertainty in Flood Damage Reduction Studies



About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.




FIGURE 5.6 Locations of structures on floodwater surface profiles along the damage reaches of the South Fork of Beargrass Creek. SOURCE: USACE, 1997c.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.




FIGURE 5.7 Assignment of structures to an index location.

into a probability distribution of buildings at the index location, where the uncertainty in flood stage is quantified.

### Uncertainty in Flood Stage

The uncertainty in the water surface elevation was quantified by assuming that the standard deviation of the elevation at the index location for the 100-year discharge is 0.5 feet. The 100-year discharge at reach SF-9 is 4,310 cfs, which is the next to last set of points in Fugure 5.8. To the right of these points, between the 100-year and 500-year flood discharges, the uncertainties are assumed to be constant. For discharges lower than the 100-year return period, the uncertainties in stage height are reduced linearly in proportion to the depth of water in the channel. The various lines shown in Figure 5.8 are drawn as the expected water surface elevation ± 1 or 2 standard deviations determined in this manner.

### Economic Analysis

The Corps's analysis of a flood damage reduction project's economic costs and benefits is guided by the *Principles and Guidelines* (Box 1.1 provides details on the *P&G's* application to flood damage reduction

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 103 of 858

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

studies). According to the *P&G*, the economic analysis of damages avoided to floodplain structures because of a flood damage reduction project is restricted to *existing* structures (i.e., federal policy does not allow damages avoided to prospective future structures to be counted as benefits). The *P&G* do, however, call for the benefits of increased net income generated by floodplain activities after a project has been constructed (so-called "intensification benefits") to be included in the economic analysis.




FIGURE 5.8 Uncertainty in the flood stage for existing conditions at reach SF-9 of the South Fork of Beargrass Creek.

Economic analysis of flood damages considers various sorts of flood damage, principal among them being the damage to flooded structures. Information about the structures is quantified using a "structure inventory," an exhaustive tabulation of every building and other kind of structure subjected to flooding in the study region. A separate computer program called Structure Inventory for Damage Analysis (SID) was used

Copyright National Academy of Sciences. All rights reserved.

to evaluate the number of structures flooded as a function of water surface elevation. Structures are divided into four categories: single-family residential, multifamily residential, commercial, and public. A structure is considered to be flooded if the computed flood elevation is above its first-floor elevation. The amount of damage *D* is a function of the depth of flooding *h* and the type of structure, and is expressed by a factor, $r(h)$, which is equal to a percentage of the value of the structure (*V*) and of its contents (C). This analysis can be expressed as

$D = r_1(h)V + r_2(h)C$. (5.2)

For residential structures, these damage factors were quantified in 1995 by the Federal Emergency Management Agency (FEMA) using data from flood damage claims. For example, for a one-story house without a basement flooded to a depth of 3 feet, the FEMA estimate is that the damage factors are $r_1 = 27\%$ of the value of the structure and $r_2 = 35\%$ of the value of the contents. For the same house flooded to a depth of 6 feet, the corresponding damage factors are $r_1 = 40\%$ for the structure, and $r_2 = 45\%$ for the contents, respectively. The Marshall and Swift Residential Cost Handbook (Marshall and Swift, 1999) was used to estimate the value of single- and multi-family structures (it bears mentioning that the use of standard references such as the Marshall and Swift handbook may potentially represent another source of "knowledge uncertainty"). The values of their contents were assumed to be 40 percent to 44 percent of the value of the structure. For commercial and public buildings, the values of the structures and their contents were established through personal interviews by Corps personnel. About 85 percent of the structures subject to flood damage are residential buildings.

Types of flood damages beyond those to structures were also considered. For instance, there are several automobile sales lots in the floodplain, and prospective damages to cars parked there during a flood were estimated. Nonphysical damage costs include the costs of emergency services and traffic diversion during flooding. Damage to roads and utilities were also considered.

## Uncertainty in Flood Damage

The economic analysis has three sources of uncertainty:

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

- the elevation of the first floor of the building,
- the degree of damage given the depth of flooding within the building, and
- the economic value of the structure and its contents.

For most structures in Beargrass Creek, the first-floor elevation was estimated from the ground elevation on maps with a scale of 1 inch = 100 feet and with contour intervals of 2 feet. For a sample of 195 structures (16% of the total number), the first-floor elevations were surveyed. It was found that the average difference between estimated and surveyed first-floor elevations of these structures was 0.62 feet.

Corps Engineering Manual (EM) 1110-2-1619 (USACE, 1996b) was used to estimate values for the uncertainties in economic analysis. A standard deviation of 0.2 feet was used to define the uncertainty in first-floor elevations. The uncertainty in the degree of damage given a depth of inundation was estimated by varying the percent damage factor described previously. For residential structures the value of the structure was assigned a standard deviation of 10 percent of the building value, and the ratio of the value of the contents to the structure was allowed to vary with a standard deviation of 20 percent to 25 percent.

For commercial property a separate damage estimate, based on interviews with the owners, was made for each significant property and was expressed as a triangular distribution with a minimum, expected, and maximum damage value for the property. Because every individual structure potentially affected by flooding is inventoried in the damage estimate data, the amount of work required to collect all these damage data was extensive.

The end result of these estimates at each damage reach and damage category is a damage–stage curve (such as Figure 5.9) that accumulates the damage to all multifamily structures in this damage reach for various water surface elevations at the index location, denoted by stage on the horizontal axis. This curve is prepared by first dividing the range of the stage (476–486 feet) into increments—increments of 0.5 feet in this case. For each structure, a cycle of 100 Monte Carlo simulations is carried out in which the first-floor elevation and the values of the structure and contents are randomly varied. From these simulations estimates are formed for each 0.5-foot stage height increment of what the expected damage and standard deviation of the damage to that structure would be if the flood stage were to rise to that elevation. For each stage increment, these means and standard deviations are accumulated over all structures in the

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 106 of 858


reach to form the estimate of the mean and standard deviation of the reach damage (Figure 5.9).

A similar function is prepared for each of the damage categories. At any flood stage, the sum of the damages across all categories is the total flood damage for that reach.

## Project Planning

The discussion of the Beargrass Creek study reviewed the technical means by which a particular flood damage reduction plan is evaluated. A plan consists of a set of flood damage reduction measures, such as detention ponds, levees or floodwalls, and channel modifications, implemented at particular locations on the creek. The base plan against which all others are considered is the "without plan," which means a plan that considers existing conditions in the floodplain and the development expected to occur even in the absence of a flood damage reduction plan. Such development must meet floodplain management policies and have structures elevated out of the 100-year floodplain. A base year of 1996 was chosen for the Beargrass Creek study.

In carrying out project planning, the spatial location of the principal damage reaches is important because flood damage reduction measures located just upstream of or within such reaches have greater economic impact than do flood damage reduction measures located in areas of low flood damage. Project planning also involves a great deal of interaction with local and state agencies, in this case principally the Jefferson County Metropolitan Sewer District.

The Beargrass Creek project planning team consisted primarily of three individuals in the Corps's Louisville district office: a project planner from the planning division, a hydraulic engineer from the hydrology and hydraulics design section, and an economic analyst from the economics branch. The HEC-FDA computer program with risk analysis was carried out by the economic analyst using flood–frequency curves and water surface profiles supplied by the hydrology and hydraulics section and using project alternatives defined by the project planner. The hydrology and hydraulics section was also responsible for the preliminary sizing of potential project structures being considered as plan components. The bulk of the work of implementing the risk analysis aspects of flood damage assessment thus fell within the domain of the Corps economic analyst.

The HEC-FDA program is applied during the feasibility phase of

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

No RR2.0-AR00003677

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

flood damage reduction planning. This had been preceded by a reconnaissance phase, a preliminary assessment of whether reasonable flood damage reduction planning can be done in the area. As explained in Chapter 2, the reconnaissance phase is fully funded by the federal government, but the feasibility phase must have half the costs met by a local sponsor. Assuming the feasibility phase yields an acceptable plan and additional funds are authorized, the project proceeds to a detailed design and construction phase, which also requires local cost sharing. The Beargrass Creek project is now (as of May 2000) in the detailed design phase.




FIGURE 5.9 The damage–stage curve with uncertainty for multifamily residential property in Reach SF-9 of the South Fork of Beargrass Creek.

## Evaluation of Project Alternatives

Expected annual flood damages in Beargrass Creek under existing conditions are estimated to be $3 million. Project benefits are calculated as the difference between this figure and the lower expected annual damages that result with project components in place. Project costs are annualized values of construction costs discounted over a 50-year period using an interest rate of 7.625 percent. Project net benefits are the differ

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 108 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

ence between project benefits and costs. For components to be included in the project, they must have positive net benefits.

The first step in evaluating project alternatives is to consider each component flood damage reduction measure by itself to see if it yields positive net benefits. A total of 22 components were examined individually, 11 on the South Fork of Beargrass Creek and 11 on Buechel Branch. All 11 of the South Fork components were economically justified on a stand-alone basis. Only 3 of the 11 components on Buechel Branch were justified individually: the other 8 components were thus deleted from further consideration.

The next step is to formulate the National Economic Development (NED) plan. In theory, this is supposed to proceed by selecting first the component with the largest net benefits, adding the component with the next largest net benefits, evaluating them together, and continuing to add more components until the combined set of components has the largest overall net benefits. It turned out that this idealized approach could not be used at the South Fork of Beargrass Creek because of economic and hydraulic interactions among the components. The study team commented: “Therefore, the formulation process was different and more complicated than originally anticipated. The study team could not follow the incremental analysis procedure to build up the NED plan because the process became a loop of H&H computer runs. Our component with the greatest net benefits is located near the midpoint of the stream; thus, each time we would add a component upstream it would affect all components downstream and vice versa. We could never truly optimize or identify the plan which produces the greatest net benefits” (USACE, 1997c, p. IV-62).

The problems were further complicated by the fact that there are three separate sections of the study region: the South Fork of Beargrass Creek and Buechel Branch upstream of their junction and the South Fork downstream of this junction (Figure 5.3). In the downstream region, flood damage reduction measures on the upper South Fork and Buechel Branch compete for project benefits by reducing flood damages. The result of these complications is that the plan was built up incrementally by separately considering the three sections of the region. First, the most upstream control structure in each section was selected, then structures downstream were added. At the end—when the components from the three sections had been aggregated into a single overall plan—it was determined whether the plan could be improved by omitting individual marginal components. The end result of this iterative process was a recommended plan with 10 components: 8 detention basins, 1 floodwall,

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

and 1 channel improvement.

Each plan has to be evaluated using the Monte Carlo simulation process. The number of simulations varies by reach, with 10,000 required for Reach SF-9 and with a range of 10,000–100,000 required for the other reaches. On a 300 MHz Pentium computer, evaluation of a single plan takes about 25 minutes of computation time.

## Risk of Flooding

The HEC-FDA program also produces a set of statistics that quantify the risk of being flooded in any reach for a given plan, as shown in Table 5.2. For reach SF-9, the target elevation is 477.2 feet, which is the elevation of the overbank area in this reach. The probability estimates shown are annual exceedance probability and conditional nonexceedance probability. The *annual* exceedance probability refers to the risk that flooding *will occur* considering all possible floods in any year. The *conditional* nonexceedance probability describes the likelihood that flooding *will not occur* during a flood of defined severity, such as the 100-year (1 percent chance) flood.

There is a subtle but important distinction between these two types of risk measures. The annual exceedance probability accumulates all the uncertainties into a single estimate both from the natural variability of the unknown severity of floods and from the knowledge uncertainty in estimating methods and computational parameters. The conditional non-exceedance probability estimate divides these two uncertainties, because it is conditional on the severity of the natural event and thus represents only the knowledge uncertainty component. In this sense, the conditional nonexceedance probability corresponds most closely to the traditional idea of adding 1 foot or 3 feet on the 100-year base flood elevation, while the annual exceedance probability corresponds more closely to the goal of ensuring that the chance of being flooded is less than a given value, such as 1 percent, considering all sources of uncertainty.

The "target stage annual exceedance probability" values in Table 5.2 are the median and the expected value or mean of the chance that flooding will occur in any given year for the various reaches. Thus, for reach SF-9, there is approximately a 36 percent chance that flooding will occur beyond the target stage in any given year, while in reach SF-14 upstream, that chance is only about 9 percent. The "long term risk" values in the

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

TABLE 5.2 Risk of Flooding in Damage Reaches Calculated Uncertainty for 1996 at Beargrass Creek

| Damage Reach | Damage Reach Description | Target Stage (ft) | Target Stage Annual Exceedance Probability | | Long-Term Risk (years) | |
|---|---|---|---|---|---|---|
| | | | Median | Expected | 10 | 25 |
| SF-8 | Bashford Manor Lane to Bardstown Road | 470.8 | 0.0920 | 0.0920 | 0.6182 | 0.9099 |
| SF-9 | Bardstown Road to Downing Way | 477.2 | 0.3570 | 0.3640 | 0.9892 | 1.0000 |
| SF-10 | Downing Way to Goldsmith Lane | 482.2 | 0.4240 | 0.4550 | 0.9977 | 1.0000 |
| SF-11 | Goldsmith Lane to Hikes Lane | 487.7 | 0.0720 | 0.0780 | 0.5566 | 0.8691 |
| SF-12 | Hikes Lane to Klondike Lane | 491.6 | 0.1220 | 0.1230 | 0.7310 | 0.9625 |
| SF-13 | Klondike Lane to Mid Dale Lane | 495.1 | 0.1220 | 0.1200 | 0.7230 | 0.9596 |
| SF-14 | Mid Dale Lane to Breckin-ridge Lane | 500.8 | 0.0990 | 0.0950 | 0.6237 | 0.9182 |
| SF-15 | Breckin-ridge Lane to Hunsinger | 509.4 | 0.1030 | 0.1010 | 0.6561 | 0.9306 |

Note: Without project base year performance target criteria: event exceedance probability = 0.04 and residual damage = 5.00%.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.
Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

figure refer to the chance (Rn) that there will be flooding above the target stage at least once in n years, determined by the formula

$R_n = 1 - (1 - p_e)^n$, (5.3)

where $p_e$ is the expected annual exceedance probability. For example, for reach SF-9, where $p_e$ = 0.3640, for $n$ = 10 years, $R_{10} = 1 - (1 - 0.3640)^{10}$ = 0.9892, as shown in Table 5.2.

The conditional nonexceedance probability values shown on the right-hand side of Table 5.2 are conditional risk values that correspond to the reliability that particular floods can be conveyed without causing damage in this reach. Thus, in reach SF-9, a 10 percent chance event (10-year flood) has about a 0.27 percent chance of being conveyed without exceeding the target stage, while for a 1 percent chance event (100-year flood), there is essentially no chance that it will pass without exceeding the target stage. By contrast, in Reach SF-14 at the upstream end of the study area, the conditional nonexceedance probability of the reach passing the 10-year flood is about 52 percent; that of the reach passing the 100-year flood is about 100 percent. As the flood severity increases, the chance of a reach being passed without flooding diminishes.

## Effect on Project Economics of Including Risk and Uncertainty

The HEC-FDA program that includes risk and uncertainty factors in project analysis became available to the Beargrass creek project team late in the study period. Before then, the team used an earlier economic analysis program (Expected Annual Damage, or EAD) which computed expected annual damages without these uncertainties. O'Leary (1997) presented the data shown in Table 5.3 to compare the two approaches. It is evident that including risk and uncertainty increases the expected annual damage both with and without flood damage reduction plans. The net effect of their inclusion on the Beargrass Creek project is to increase the annual flood damage reduction benefits from $2.078 million to $2.314 million. The study team made a comparison between the components included in the National Economic Development plan in the two computer programs and found that there was no change. Hence, although the inclusion of risk and uncertainty increased project benefits, it did not result in changing the flood damage reduction components included in the National Economic Development plan.

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 113 of 858

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

O'Leary (1997) also presented statistics of the project benefits derived from the HEC-FDA program for the National Economic Development plan. The expected annual benefits of the National Economic Development plan—$2.314 million—are the same in Table 5.3 and Table 5.4. The net benefits in the fourth column of Table 5.4 are found by subtracting the annual project costs from the expected annual benefits; the benefit-to-cost ratio is the ratio of the expected benefits to costs.

The 25th percentile, median (50th percentile), and 75th percentile of the expected annual benefits are also shown. The project net benefits are positive at all levels of assessment, and all benefit-to-cost ratios are greater than 1.00. It is interesting to see that the median expected annual benefits ($2.071 million) are nearly the same as the expected value of these benefits without considering uncertainty ($2.078 million). Moreover, the expected value ($2.314 million) is greater than the median, and the difference between the 75th percentile and the median is greater than the difference between the median and the 25th percentile. All these characteristics point to the fact that the distributions of flood damages and of expected annual benefits are positively skewed when uncertainties in project hydrology, hydraulics, and economics are considered. This is why the project benefits increase when these uncertainties are considered. The project benefits for the 25th percentile, 50th percentile, and 75th percentile in Table 5.4 should be read with caution because they are compiled for the project by adding together the corresponding values for all the damage reaches. The percentile value of a sum of random variables is not necessarily equal to the sum of the percentile values of each variable.

TABLE 5.3 Expected Annual Damages (EAD) With and Without Uncertainty in Damage Computations (millions of dollars per year)

| Analysis Program | EAD Without Plan | EAD With NED Plan | Expected Annual Benefits |
|---|---|---|---|
| EAD Program (no uncertainty) | 3.015 | 0.937 | 2.078 |
| HEC-FDA (considering uncertainty) | 3.998 | 1.684 | 2.314 |

SOURCE: O'Leary (1997).

Copyright National Academy of Sciences. All rights reserved.

TABLE 5.4 Statistics of project benefits under the NED plan using the HEC-FDA Program

| Statistic | Expected Annual Benefits | Annual Project Costs | Net Benefits | Benefit to Cost Ratio |
|---|---|---|---|---|
| Expected Mean | 2.314 | 0.810 | 1.504 | 2.86 |
| 25th Percentile | 1.365 | 0.810 | 0.555 | 1.69 |
| Median (50%) | 2.071 | 0.810 | 1.261 | 2.56 |
| 75th Percentile | 3.054 | 0.810 | 2.244 | 3.77 |

SOURCE: O'Leary (1997).

## RED RIVER OF THE NORTH AT EAST GRAND FORKS, MINNESOTA, AND GRAND FORKS, NORTH DAKOTA

A devastating flood occurred at East Grand Forks, Minnesota, and Grand Forks, North Dakota, in April 1997. After the flood, flood damage reduction studies previously done for the two cities were combined into a joint study, and risk analysis was performed to evaluate the reliability of the proposed alternatives and to evaluate their economic impacts. A risk analysis study performed before the flood was presented in a paper at the Corps's 1997 Pacific Grove, California, workshop (Lesher and Foley, 1997). This paper and subsequent analysis (USACE, 1998a, b, c), as well as a visit to the Corps's St. Paul district office by a member of this committee, form the basis of this discussion of the East Grand Forks–Grand Forks study.

East Grand Forks, Minnesota, and Grand Forks, North Dakota, are located on opposite banks of the Red River of the North and are approximately 300 miles above the river's mouth at Lake Winnipeg, Manitoba, Canada (Figure 5.10). The East Grand Forks–Grand Forks metropolitan area has a population of approximately 60,000 and is located about 100 miles south of the U.S.–Canadian border. The total drainage area of the East Grand Forks–Grand Forks basin is 30,100 square miles. Included in this drainage area is the Red Lake River subbasin that effectively drains about 3,700 square miles in Minnesota and joins the mainstream of the Red River at East Grand Forks. The study area of East Grand Forks–Grand Forks lies in the middle of the Red

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

River Valley. The valley is exceptionally flat with a gradient that slopes 3–10 feet per mile toward the river with the north–south axis having a gradient of about three-quarters of a foot per mile. The valley extends approximately 23 miles west and 35 miles east of East Grand Forks– Grand Forks and is a former glacial lake bed.




FIGURE 5.10 Schematic of the Red River of the North (RRN) and Red Lake River (RLR) at the East Grand Forks, Minnesota and Grand Forks, North Dakota study area. Numbers indicate USGS stream gages.

Both cities have a long history of significant flooding from the Red River of the North and the Red Lake River. The most damaging flood of record occurred in April 1997 (see Table 5.5), when the temporary levee systems and flood-fighting efforts of both communities could not hold back the floodwaters of the Red River. The resulting damages were disastrous and affected both cities dramatically. Total damages to existing structures and contents during the 1997 flood were estimated to exceed $800 million. An additional $240 million was spent for emergency-related costs.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

TABLE 5.5 Maximum Recorded Instantaneous Peak Flows; Red River of the North at Grant Forks, North Dakota

| Order | Date | Discharge (cfs) |
|---|---|---|
| 1 | April 18, 1997 | 136,900 |
| 2 | April 10, 1897 | 85,000 |
| 3 | April 26, 1979 | 82,000 |
| 4 | April 18, 1882 | 75,000 |
| 5 | April 21, 1996 | 58,400 |
| 6 | April 4, 1966 | 55,000 |
| 7 | April 11, 1978 | 54,200 |
| 8 | May 12, 1950 | 54,000 |
| 9 | April 16, 1969 | 53,500 |
| 10 | April 24, 1893 | 53,300 |

SOURCE: USACE (1998a).

## Risk Analysis

A risk analysis for the proposed flood damage reduction project for the Red River of the North at East Grand Forks, Minnesota, and Grand Forks, North Dakota, used a Latin Hypercube analysis to sample interactions among uncertain relationships associated with flood discharge and elevation estimation. Latin Hypercube is a stratified sampling technique used in simulation modeling. Stratified sampling techniques, as opposed to Monte Carlo-type techniques, tend to force convergence of a sampled distribution in fewer samples. Because the Hydrologic Engineering Center Flood Damage Analysis program (HEC-FDA) was new at the time, and in the interest of saving time, the analysis was performed using a spreadsheet template. The flood damage reduction alternatives analyzed included levees of various heights and a diversion channel in conjunction with levees. The project reliability option in the HEC risk spreadsheet was used to determine the reliability of the alternative levee heights and of the diversion channel in conjunction with levees. The following sections discuss the sensitivity in quantifying the uncertainties and the representation of risk for the alternatives.

### Discharge–Frequency Relationships

The log-Pearson Type III distribution, recommended in the Water Resource Council's *Bulletin 17B* (IACWD, 1981) and incorporated

Copyright National Academy of Sciences. All rights reserved.

Risk Analysis and Uncertainty in Flood Damage Reduction Studies
Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 117 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

within the Corps's HEC Flood Frequency Analysis (HEC-FFA) computer program, was used for frequency analysis of maximum annual streamflows, and the noncentral t distribution was used for the development of confidence limits. Discharge–frequency relationships were needed for both the levees and the diversion channel in combination with levees. An analysis (coincidental frequency) was performed to develop the discharge–frequency curves for the Red River of the North downstream and upstream of the Red Lake River for the levees only condition. A graphical method was used to develop the discharge–frequency curves for the diversion channel in combination with levees. Details of these procedures can be found in a Corps instruction manual from the St. Paul district (USACE, 1998a). A brief discussion of these procedures is provided below.

The Grand Forks USGS stream gage (XS 44) is currently located 0.4 miles downstream from the Red Lake River in Grand Forks, North Dakota (Figure 5.10). The discharge–frequency curve for this station along with the 95 percent and 5 percent confidence limits (90% confidence band) are plotted in Figure 5.11. An illustration of the noncentral t probability density function for the 1 percent event is also shown in that figure. Selected quantities of that discharge–frequency relationship are shown in column 2 of Table 5.6. The coincidental discharge–frequency relationship for the Red River just upstream of the mouth of the Red Lake River (column 3 of Table 5.6) was computed with the HEC-FFA computer program. The basic flow values were obtained by routing the 96 years of available data on Red Lake River flows from Crookston (55 miles upstream of the mouth) downstream to Grand Forks. The resulting flows were subtracted from the Red River at Grand Forks flows to obtain coincident discharges on the Red River upstream of Red Lake River. The two-station comparison method of *Bulletin 17B* was used to adjust the logarithmic mean and standard deviation of this short record (96 years) based on regression analysis with the long-term record at the Grand Forks station (172 years). Correlation of coincident flows for the short record with concurrent peak flows for the long record produced a correlation coefficient of 0.975.

Adjustment of the statistics yielded an equivalent record length of 165 years. The adopted coincidental discharge–frequency curve for the Red River upstream of the Red Lake River is shown in column 3 of Table 5.6 for selected annual exceedance probabilities. The coincidental discharge–frequency curve for the Red Lake River at the mouth was determined by computing the difference in Red River flows both upstream and downstream of Red Lake River (see column 4 in Table 5.6). Statistics for the adopted relationship were approximated by synthetic methods presented in *Bulletin 17B* (for more details, see USACE (1998a)).

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.




FIGURE 5.11 Flood (discharge) frequency curve for the Red River at Grand Forks.

Copyright National Academy of Sciences. All rights reserved.

TABLE 5.6 Instantaneous Annual Peak Discharges (cfs) and their Annual Exceedance Probabilities (%) — Existing Conditions

| | Instantaneous Annual Peak Discharges (cfs) | | |
|---|---|---|---|
| Annual Exceedance Probability in Percent | Red River of the North Below Red Lake River | Red River of the North Above Red Lake River | Red Lake River at the Mouth [based on difference] |
| 0.2 | 169,000 | 128,000 | 41,000 |
| 0.47 | 136,900 | 102,000 | 34,900 |
| 0.5 | 134,000 | 100,000 | 34,000 |
| 1.0 | 110,000 | 81,700 | 28,300 |
| 2.0 | 89,000 | 64,900 | 24,100 |
| 5.0 | 63,900 | 45,500 | 18,400 |
| 10.0 | 47,300 | 32,900 | 14,400 |
| 20.0 | 32,600 | 21,900 | 10,700 |
| 50.0 | 15,500 | 9,590 | 5,910 |
| 80.0 | 7,150 | 3,970 | 3,180 |
| 90.0 | 4,700 | 2,450 | 2,250 |
| 95.0 | 3,290 | 1,620 | 1,670 |
| 99.0 | 1,660 | 726 | 934 |

The Plan Comparison Letter Report developed in February 1998 for flood damage reduction studies for East Grand Forks, Minnesota, and Grand Forks, North Dakota, evaluated an alternative flood damage reduction plan that included a split-flow diversion channel along with permanent levees. The discharge–frequency relationships for the modified conditions, shown in Table 5.7, were developed as follows. The modified-condition discharge–frequency curve for the Red River upstream of Red Lake River was graphically developed based upon the operation of the diversion channel inlet. Red River flows are not diverted until floods start to exceed those having return periods of 5 years (20% annual exceedance probability). The channel is designed to continue to divert Red River flows at a rate that allows the design flood (0.47%) discharge of 102,000 cfs (upstream of the diversion) to be split such that 50,500 cfs is diverted and 51,500 cfs is passed through the cities. This operation is reflected in the modified discharge–frequency relationship shown in Table 5.7 for the Red River upstream of Red Lake River (columns 2 and

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

3).Synthetic statistics (mean, standard deviation, and skewness) in accordance with methodology presented in *Bulletin 17B* were computed for the discharge-frequency relationships of the below-diversion flows.

TABLE 5.7 Instantaneous Annual Peak Discharges (cfs) and their Annual Exceedance Probabilities (%)—Condition with Diversion Channels

| | Instantaneous Annual Peak Discharges (cfs) | | | |
|---|---|---|---|---|
| | Red River of the North Above Red Lake River | | | |
| Annual Exceedence Probability in Percent | Above Diversion | Below Diversion | Red Lake River at the Mouth | Red River of the North Below Red Lake River |
| 0.2 | 128,000 | 55,000 | 41,000 | 96,000 |
| 0.47 | 102,000 | 51,500 | 34,900 | 86,400 |
| 0.5 | 100,000 | 51,000 | 34,000 | 85,000 |
| 1.0 | 81,700 | 47,500 | 28,300 | 75,800 |
| 2.0 | 64,900 | 43,000 | 24,100 | 67,100 |
| 5.0 | 45,500 | 36,500 | 18,400 | 54,900 |
| 10.0 | 32,900 | 30,000 | 14,400 | 44,400 |
| 20.0 | 21,900 | 21,900 | 10,700 | 32,600 |
| 50.0 | 9,590 | 9,590 | 5,910 | 15,500 |

The modified-condition discharge–frequency curve for the Red River downstream of Red Lake River was graphically computed based upon the operation of the diversion channel. The modified-condition Red River discharges upstream of Red River were added to the coincident flows on Red Lake River (column 4). The resulting discharges were plotted for graphical development of the modified-condition discharge– frequency relationship for the Red River downstream of Red Lake River and are summarized in Table 5.7 (column 5). Synthetic statistics for this discharge–frequency relationship were computed for use in the risk analysis.

## Elevation–Discharge Relationships

The water surface elevations computed using the HEC-2 computer program are shown in Table 5.8 for three cross sections (7790, 7800, and 7922) corresponding to the previous USGS gage locations and for cross

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

section 44, which corresponds to the current USGS gage location (see Figure 5.10 for the cross section locations). These computed water surface elevations (CWSE) were based on the expected discharge quantities from the coincidental frequency analysis performed in June 1994 for the Grand Forks Feasibility Study. These data were used to transfer observed elevations from previous USGS gage sites to the current site (cross section 44) at river mile 297.65, and they were used in determining the elevation–discharge uncertainty. The water surface profile analysis was performed using cross-sectional data obtained from field surveys. Data were also obtained from field surveys and from USGS topographic maps. The HEC-2 model was calibrated to the USGS stream gage data and to high-water marks for the 1969, 1975, 1978, 1979 and 1989 flood events throughout the study area. Note that these water surface elevations assume the existing East Grand Forks and Grand Forks emergency levees are effective. The levees were assumed effective because through extraordinary efforts, they have generally been effective for past floods with the exception of the 1997 flood.

Ratings at stream gage locations provide an opportunity to directly analyze elevation–discharge uncertainty. The measured data are used to derive the "best fit" elevation-discharge rating at the stream gage location, which generally represents the most reliable information available. In this study, the adopted rating curve for computing elevation uncertainty is based on the computed water surface elevations from the calibrated HEC-2 model shown in Table 5.8.

This adopted rating curve for cross section 44 at the current USGS gage is shown in Figure 5.12. Measurements at the gage location were used directly to assess the uncertainty of the elevation–discharge relationship. The normal distribution was used to describe the distribution of error from the "best-fit" elevation–discharge rating curve. The observed gage data (for the four cross sections presented in Table 5.8) were transferred to the current gage site at river mile 297.65 based on the gage location adjustments presented in Table 5.9, which were computed from the water surface elevations in Table 5.8. These adjustments were plotted against the corresponding discharge below the Red Lake River, and curves were developed to obtain adjustments for other discharges.

The deviations of the observed elevations from the fitted curve were used to estimate the uncertainty of the elevation–discharge rating curve shown in Figure 5.11. The deviations reflect the uncertainty in data values as a result of changes in flow regime, bed form, roughness/resistance to flow, and other factors inherent to flow in natural streams. Errors also

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

TABLE 5.8 Computed Water Surface Elevations of the Red River of the North at Grand Forks, North Dakota (units in feet above sea level)

| | | | Floods | | | | | |
|---|---|---|---|---|---|---|---|---|
| Cross Section Number | River Mile | Minimum Channel Bottom in Feet | 20% (5-year) | 10% (10-year) | 4% (25-year) | 2% (50-year) | 1% (100-year) | 0.2% (500-year) |
| 7790 | 295.70 | 773.15 | 817.20 | 821.70 | 825.00 | 827.30 | 829.60 | 834.80 |
| 7800 | 296.00 | 774.2 | 817.39 | 821.87 | 825.19 | 827.52 | 829.83 | 835.01 |
| 7922 | 297.55 | 774.60 | 818.26 | 822.74 | 826.27 | 828.83 | 831.58 | 837.25 |
| 44[a] | 297.65 | 772.40 | 818.39 | 822.91 | 826.67 | 829.18 | 831.84 | 837.59 |

[a] Current Location of USGS gage.

Copyright National Academy of Sciences. All rights reserved.




FIGURE 5.12 Rating curve (water elevation vs. discharge)for the Red River at Grand Forks.

$$\sigma = \sqrt{\frac{\Sigma(X-M)^2}{N-1}}, \tag{5.4}$$

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

result from field measurements or malfunctioning equipment. A minimum of 8–10 measurements is normally required for meaningful results. The measure used to define the elevation–discharge relationship uncertainty is the standard deviation:

Where $X$ = observed elevation adjusted to current gage location (if 5.12 necessary), $M$ = computed elevation from adopted rating curve, and $N$ = number of measured discharge values (events).

TABLE 5.9 Adjustments Used in Transferring Observed Elevations from Previous USGS Gage Sites to Current Gage Site at RM 297.65 (XS 44)

| | Expected Probability Discharge (cfs) | | Adjustment Factor (cfs) | | |
|---|---|---|---|---|---|
| Probability | Below Red Lake River | Above Red Lake River | XS 7790, RM 295.70 | XS 7800, RM 296.00 | XS 7922, RM 297.55 |
| 38% | 20,000 | 12,500 | 1.28 | 1.06 | 0.12 |
| 27% | 25,000 | 16,100 | 1.23 | 1.02 | 0.12 |
| 20% | 30,600 | 20,300 | 1.19 | 1.00 | 0.13 |
| 10% | 43,900 | 30,300 | 1.21 | 1.04 | 0.17 |
| 4% | 63,500 | 45,800 | 1.67 | 1.48 | 0.40 |
| 2% | 81,500 | 58,800 | 1.88 | 1.66 | 0.35 |
| 1% | 101,000 | 73,500 | 2.24 | 2.02 | 0.26 |

The elevation uncertainty was computed for two different discharge ranges for this analysis. Based on the observed elevations plotted on the adopted rating curve, it appeared that there was greater uncertainty for discharges less than about 10% of annual exceedance probability event due to ice effects on flow. Therefore, the standard deviation was computed for discharges greater than between 22,000 cfs, which corresponds approximately to the zero damage elevation based on the adopted rating curve, and 44,000 cfs, which is slightly greater than the 10 percent annual exceedance probability. The standard deviation was also computed for discharges greater than 50,000 cfs. During the period of record, there were 25 events with a discharge between 22,000 and 44,000 cfs and 10 events with a discharge greater than 50,000 cfs. The standard deviation was 1.66 feet for discharges between 22,000 and 44,000 cfs and was 1.55

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

feet for discharges greater than 50,000 cfs. In the risk and uncertainty simulations, the standard deviation was linearly interpolated between 1.66 and 1.55 feet for discharges between 44,000 and 50,000 cfs. (See USACE (1998b) for more details.)

In an earlier risk analysis that was performed for the Grand Forks Feasibility Study, a much lower standard deviation of 0.50 feet was used for discharges greater than 50,000 cfs. However, adding the 1997 flood to the analysis resulted in a standard deviation of 1.55 feet, which is similar to that computed for discharges less than 44,000 cfs. It should be noted that the discharge and elevation used in this analysis for the 1997 flood was the peak discharge of 136,900 cfs occurring on April 18, 1997 (see Table 5.4), and an elevation of 831.21 feet (Stage 52.21). The peak elevation of 833.35 feet (Stage 54.35) occurred on April 22, 1997 at a discharge of 114,000 cfs. The elevation of 831.21 feet was almost 5 feet below the rating curve at a discharge of 136,900 cfs; however, the peak elevation of 833.35 feet at a discharge of 114,000 cfs was essentially on the adopted rating curve. Both of these points are plotted on the rating curve in Figure 5.12. Lines representing ± 2 standard deviations for the normal distribution, which encompasses approximately 95 percent of all possible outcomes, are also shown on the rating curve. An illustration of the normal distribution at the 1 percent (100-year) event for the project levee condition is also shown in Figure 5.12.

### Risk and Uncertainty Analysis Results

Four index locations were selected to evaluate project performance and project sizing. These locations are cross sections 57, 44 (current USGS gage), 27, and 15 (Figure 5.10). The four locations were selected based on economic requirements for project sizing (see USACE, 1998c). The elevation–discharge rating curves (based on HEC-2 analysis) for existing and project conditions at these locations can be found in the USACE (1998b). Each of these rating curves shows three conditions, where applicable: (1) existing conditions, (2) removal of the pedestrian bridge at cross sections 7920-7922 and with project levees ("levee only"); and (3) with removal of the pedestrian bridge, with project levees, and with the diversion channel ("diversion channel"). Existing conditions means that the existing emergency levees are assumed to be effective up to and including the 5 percent (20-year) event and are ineffective for larger floods. The 5 percent (20-year) event was selected based

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

on comparison of water surface profiles with effective and probable failure point (PFP) levee elevations provided by the Geotechnical Design Section analysis (see USACE, 1998b, paragraph A.2.11 and Appendix B of this report). The pedestrian bridge was removed based on input from the cities of East Grand Forks and Grand Forks. The rating curves for the diversion channel alternative were based on limited information. The Red River to the North would start to divert into the diversion channel at the 20 percent (5-year) flood; therefore, up to this point the rating curve for existing conditions with levees was used.

An additional location was also selected to evaluate the performance of the levee only and diversion channel with 1 percent (100-year) levee alternatives. This location is at cross section 7700 at the downstream end of the project levees (see Figure 5.10). Cross section 7700 was selected based on hydraulic analysis as the least critical location—the location where the levees in combination with the diversion channel would first overtop from downstream backwater (see USACE, 1998b).

## Project Reliability

The project reliability results are summarized in Table 5.10, Table 5.11 through Table 5.12. Table 5.9 contains the results for the levees-only alternatives. Table 5.11 contains the results for the diversion channel in combination with 1 percent (100-year) levees. Note that in Table 5.10, three different alternative top-of-levee heights are evaluated, whereas in Table 5.11, it is always the same alternative—diversion channel with 1 percent levees— but for the three different events. The top-of-levee elevations were computed based on a water surface elevation profile to ensure initial overtopping would occur at the least-critical location (here, cross section 7700). The downstream top-of-levee elevations were selected with the intent of having 90 percent probability of containing the specified flood and were based on previous risk analysis for the Grand Forks Feasibility Study preliminarily updated to include the 1997 flood. The 2 percent (50-year), 1 percent (100-year), and 0.47 percent (210-year/1997 flood) top-of-levee profiles are 3.2, 3.4, and 2.7 feet above their respective water surface profiles at the downstream end (Table 5.10).

As seen in Table 5.10, the intent of having 90 percent probability of containing the specified flood is generally realized. The 2 percent levees have a 92 percent probability of containing the 2 percent flood. The 1 percent levees have a 90 percent probability of containing the 1 percent

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

flood. The 0.47 percent levees have an 87 percent probability of containing the 0.47 percent flood.

TABLE 5.10 Reliability at Top of Levee for Three Top-of-Levee Heights

| | 2 % (50-year) Levee[a] | | 1% (100-year) Levee[b] | | 0.47% (210-year) Levee[c] | |
|---|---|---|---|---|---|---|
| Gage Location | Top of Levee (ft.) | Reliability (%) | Top of Levee (ft.) | Reliability (%) | Top of Levee (ft.) | Reliability (%) |
| XS 7700[d] | 830.2 | 92.5 | 832.7 | 90.7 | 834.8 | 87.7 |
| XS 57 | 832.0 | 92.0 | 834.2 | 90.5 | 836.2 | 86.4 |
| XS 44 | 833.2 | 93.2 | 835.6 | 91.3 | 837.5 | 86.3 |
| XS 27 | 834.3 | 92.1 | 836.9 | 89.5 | 839.0 | 86.5 |
| XS 15 | 835.2 | 92.7 | 837.7 | 90.0 | 839.7 | 85.5 |

[a]Top of levee for the 2% levee is computed water surface elevation plus 3.2 feet.
[b]Top of levee for the 1% levee is computed water surface elevation plus 3.4 feet.
[c]Top of levee for 0.47% levee is computed water surface elevation plus 2.7 feet.
[d]Downstream end of project.

TABLE 5.11 Project Reliability at Top of Levee for Diversion Channel with 1 Percent (100-Year) Levees for Three Different Events

| Gage Location | Top of Levee (ft) | Reliability 2% (50-year) Event | 1% (100-year) Event | 0.47% (210-year) Event |
|---|---|---|---|---|
| XS 7700[a] | 832.7[b] | 99.9 | 99.6 | 98.9 |
| XS 57 | 834.2 | 100.0 | 99.6 | 99.2 |
| XS 44 | 835.6 | 99.9 | 99.6 | 99.4 |
| XS 27 | 836.9 | 99.6 | 99.5 | 99.1 |
| XS 15 | 837.7 | 99.7 | 99.6 | 99.2 |

[a]Downstream end of project.
[b]Top of levee is computed water surface elevation plus 3.4 feet.

Reliability results for the diversion channel with 1 percent levees are summarized in Table 5.11. Note again that the levees constructed in combination with the diversion are the same as for the 1 percent flood without the diversion channel and are the same for all three floods analyzed. As seen in the table, there is a 99 percent or greater probability of containing the flood for all three floods considered when the project includes the diversion channel.

As previously noted, the most critical location for project performance is at cross section 7700 at the downstream end of the project. Table 5.12

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

summarizes the results for all the alternatives considered and for numerous floods. The probability of the diversion channel in combination with 1 percent levees for the 0.2 percent event is listed in the table as greater than 95%. A more specific reliability was not cited for the 0.2 percent event for two reasons: (1) the discharge–frequency curve based on the approximate statistics starts to diverge from the graphical curve for extreme events and, (2) there was limited information available to develop the Red River to the North rating curves for the diversion alternative. These reasons are also why more extreme events were not analyzed.

TABLE 5.12 Conditional Exceedance Probability of Alternative for Various Events (based on analysis at downstream end of project—XS 7700)

| | Alternative | | | |
|---|---|---|---|---|
| Event | 2% (50-year) Levees | 1% (100-year) Levees | 0.47% (210-year) Levees | Diversion with 1% (100-year) Levees |
| 4 % (25-year) | 99.5 | 100.0 | 100.0 | 100.0 |
| 2% (50-year) | 92.5 | 99.1 | 99.7 | 99.9 |
| 1% (100-year) | 64.3 | 90.7 | 98.3 | 99.6 |
| 0.52% (192-year) | 29.5 | 65.6 | 89.8 | —[a] |
| 0.5% (200-year) | 28.2 | 64.4 | 88.7 | —[a] |
| 0.47% (210-year) | 25.3 | 61.9 | 87.7 | 98.9 |
| 0.2% (500-year) | 4.4 | 21.5 | 48.0 | >95 |
| 0.1% (1,000-year) | 0.7 | 6.0 | 20.7 | —[b] |

[a]Event not analyzed.
[b]Event not analyzed because (1) the discharge–frequency curve based on the approximate statistics starts to diverge from the graphical curve for extreme events and (2) there was limited information to develop the RRN rating curves for the diversion alternative.

Table 5.13 presents the simulated conditional exceedance probabilities from the economic project sizing analysis. The without-project condition is also included in this table for comparison purposes. The without-project condition is based on a zero damage elevation of 824.5 feet, assumes credit is given to the existing levees, and assumes all properties that were substantially damaged (50% or more damage) in the 1997 flood have been removed.

Based on the above analysis of alternative plans and further economic and environmental considerations, the recommended National

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Economic Development (NED) plan consists of a permanent levee and floodwall system designed to reliably contain the 210-year flood event. This equates to an 87.7 percent reliability of containing the 210-year flood event (Table 5.12) and would reliably protect against a flood of the magnitude of the 1997 flood.

TABLE 5.13 Residual Risk Comparison

| Alternative | Annual Performance (Expected Annual Probability of Design Being Exceeded) |
|---|---|
| Without Project | 0.0918 |
| 2% (50-Year) Levees | 0.0086 |
| 1% (100-Year) Levees | 0.0036 |
| 0.47% (210-Year) Levees | 0.0010 |
| Diversion with 1% (100-Year) Levees | 0.0002 |

The recommended plan would remove protected areas from the regulatory floodplain, increase recreational opportunities, and enhance the biological diversity in the open space created. The recommended plan anticipates the need to acquire over 250 single-family residential structures, 95 apartment or condominium units, and 16 businesses along the current levee/floodwall alignment.

The total cost of the recommended multipurpose project is $350 million including recreation features and cultural resources mitigation costs. The federal share of the project would be $176 million and the nonfederal share would be $174 million. The benefit-to-cost ratio has been calculated as 1.07 for the basic flood reduction features of the project and as 1.90 for the separable recreation features (USACE, 1998b). The recommended project has an overall benefit-to-cost ratio of 1.10.

The cities of East Grand Forks, Minnesota, and Grand Forks, North Dakota, will serve as the project's nonfederal sponsors. Through legislation, the State of Minnesota has committed to provide financial support in the form of bonds and returned sales taxes to the city of East Grand Forks. In verbal and written comments from its governor, the State of North Dakota has committed to provide financial assistance to the city of Grand Forks.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# 6

# Evaluation and Proposed Improvements

Explicit recognition of modeling uncertainty in the Corps of Engineers's risk analysis methods should result in a better understanding of the accuracy of both flood risk and flood damage reduction estimates. Early applications of the risk analysis methods, however, illustrate that inadequacies must be overcome before the methods can be expected to yield consistent, defensible results.

This chapter recommends improvements the Corps should make in its risk analysis methods for flood damage reduction studies to overcome the shortcomings identified in previous chapters. This chapter addresses three broad issues: (1) the completeness of the set of uncertainties included in the analysis, (2) the importance of recognizing and effectively dealing with differences between natural variability and knowledge uncertainty, and (3) the treatment of interrelationships among the uncertainties.

## CONCERNS WITH THE RISK ANALYSIS METHODS

The three key questions to be asked of risk analysis methods are:

- Is the set of uncertainties included in the analysis complete?
- Are uncertainties of different types treated appropriately?
- Are the interrelationships among uncertainties correctly quantified?

In addressing these questions, the current methods are only partially satisfactory. There are important ways in which the methods should be

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

improved.

To some extent, improvements needed in the Corps's risk analysis methods arise from a lack of clearly articulated goals of the risk analysis. As noted in a 1995 National Research Council report (NRC, 1995, pp. 120–21, 136–43), "A framework is needed to understand the structure of risk and uncertainty analysis efforts for flood protection project evaluation, and to understand the relative roles of the natural variability of flood volumes, reservoir operations, hydraulic system performance, stage–discharge errors, and uncertainty in hydrologic, hydraulic, and economic parameters."

This recommendation remains relevant. The current framework does not span the full range of uncertainties important to flood risk and flood damage reduction, it does not clearly differentiate between natural variability and knowledge uncertainty or the relative roles of these uncertainties, and it does not recognize the importance of spatial structure and correlation among uncertainties. A clear a priori articulation of the goals of the risk analysis approach would help illuminate the needed structure of the analysis and help identify conceptual gaps.

## ENGINEERING PERFORMANCE

The Corps's risk analysis methods in its flood damage reduction studies use probability concepts in several ways. These might be classified using three levels, as shown in Table 6.1. At the uppermost level, natural variability arising from inter-annual variations in flood severity is quantified by the flood–frequency curve and is indexed by a flood's annual probability of exceedance. At the middle level, project performance measures are defined using probabilities for engineering performance and dollars for economic performance. These measures incorporate both natural variability and knowledge uncertainty. At the lowest level, uncertainty in performance measures is specified. This is knowledge uncertainty in the output measures resulting from knowledge uncertainty in the input information. The input information pertains to hydrologic, hydraulic, geotechnical, and economic factors.

### Knowledge Uncertainty

For economic performance, knowledge uncertainty is measured by percentile values of the expected annual damage and expected annual

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

benefits of the project plan. A key omission in the Corps's risk analysis procedure is that there is no comparable quantification of knowledge uncertainty in the engineering performance. Variations in flood–frequency and stage–discharge relationships are defined based on uncertain knowledge of the analysis parameters, but there is no comparable specification of the resulting variation in the risk measures defining engineering performance.

TABLE 6.1 Levels of Inclusion of Probability in Risk Analysis

| | Engineering Performance | Economic Performance |
|---|---|---|
| Natural Variability | Range of flood frequency | Range of flood frequency |
| Performance Measure | Annual exceedance probability, Conditional nonexceedance probability | Expected annual damage, Expected annual benefit |
| Uncertainty of the Performance Measure | No specification | Percentile values of annual damage and benefit<br>Variance of expected annual damage, and of expected annual benefit |

In the previous chapter, Table 5.2 shows the results of a risk analysis calculation made using the Hydrologic Engineering Center Flood Damage Assessment (HEC-FDA). The table lists 11 probability measures of engineering performance, but each is a variation on the basic themes of annual exceedance probability or conditional nonexceedance probability. It is axiomatic that every measure of uncertainty is itself uncertain. Knowledge uncertainty in the economic performance measures is described by the percent variation in estimated values. There is presently no comparable presentation of knowledge uncertainty in the engineering performance measures reported by the analysis (with the exception that both the mean and the median of the annual exceedance probability are

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

reported).

This omission had an important impact on the use of risk analysis in the procedures for levee certification. In 1993 the Federal Emergency Management Agency (FEMA) and the Corps agreed that a levee could be certified as providing adequate flood protection in the event the annual exceedance probability was less than 1 percent. In effect, they chose the mean value of this measure, ignoring uncertainties in the annual exceedance probability. After several years of this practice, some levees certified by this procedure provided inadequate levels of flood protection when compared to the previous criterion used (100-year flood plus 3 feet of freeboard), and the Corps and FEMA abandoned the 1 percent mean annual exceedance probability criterion for a more complicated scheme (described in Chapter 7). This policy change might not have been necessary had it been recognized from the beginning that the annual exceedance probability contains knowledge uncertainty, which can be quantified using percentile values like those used for the economic performance measures.

The Monte Carlo simulation upon which the risk analysis is based generates a set of *N* values of the annual exceedance probability of the target stage for each reach. Such a distribution computed for an arbitrary location in the Beargrass Creek study is shown in Figure 6.1. The vertical axis is the annual exceedance probability of the target stage at a damage reach. The horizontal axis is its cumulative probability distribution, which is found using the Monte Carlo simulation. The median value of the annual exceedance probability in this damage reach is 0.05, and the range is from 0.005 to 0.157, which measures the extent of the knowledge uncertainty of this statistic. The distribution is slightly positively skewed and the mean annual exceedance probability is 0.055. This means that in any year, the annual expected exceedance probability of flooding exceeding the target stage is about 5.5 percent, so the return period of flooding in this reach is approximately 18 years (1/0.055). This is the “chance of getting wet” for somebody living next to the creek in this reach.

Suppose one wished to define a conservative criterion limiting the “chance of getting wet.” One such criterion could be the one-sided 90 percent confidence level value of the annual exceedance probability, shown in Figure 6.1 to be 0.113. This means that a person living next to the creek can be 90 percent sure that the chance of flooding in any given year is less than 11.3 percent. Equivalently; this citizen could be 90 percent sure that flooding would occur not more frequently than an average of once every 8.8 years (1/0.113). Thus, 8.8 years would be the level of

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

protection afforded to this citizen if the level of protection was defined to be the annual exceedance probability achieved with 90 percent confidence.




FIGURE 6.1. The distribution of the annual exceedance probability for a location in the Beargrass Creek study.

Engineering performance is currently measured by many different criteria (annual exceedance probability, both expected and median; estimated long-term risk for 10, 25, and 50 years; and conditional nonexceedance probability for $p =$ 0.1, 0.04, 0.02, 0.01, 0.004, and 0.002). The result is a range of risk measures in which the user can easily get lost. The concept of conditional nonexceedance probability is particularly confusing to the public, as pointed out by an earlier NRC committee (NRC, 1995, p. 162). By measuring engineering performance in a manner directly conformal to the way economic performance is measured, the effects of a project on both types of performance can be more readily stated and compared.

The committee recommends that the Corps standardize the annual exceedance probability as its principal engineering performance measure for decision making in flood damage reduction studies. The range of variation of this measure resulting from knowledge uncertainty should be specified by a table of percentile values in the same way as is currently

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

done for the economic performance measures.

## HYDROLOGIC ANALYSIS

Analysis of hydrologic and hydraulic uncertainties in the risk analysis method proceeds according to the interlinking relationships discussed in Chapter 3 and illustrated in Figure 3.1. This method is based on the Corps's traditional deterministic procedures and is validated by a long history of use. However, a number of specific improvements are needed, most of them reflecting inadequacies in the treatment of natural variability vs. knowledge uncertainty.

### Parameter Uncertainty for the LP3 Distribution

The current algorithm described in Appendix F of the HEC-FDA manual for generating parameter uncertainty for the log-Pearson Type III (LP3) distribution first generates an uncertain mean and variance as if the logarithms of the floods are normally distributed. This can be done using the known sampling distribution for these parameters with normal samples. However, the algorithm then applies a transformation to generate the corresponding mean and standard deviation for an LP3 distribution, because the exact sampling distribution of the mean and variance of the LP3 distribution is not available. However, the approximation that is used, based upon an expected probability adjustment in *Bulletin 17B* (IACWD, 1981), has no theoretical justification of which the committee is aware. The sampling scheme implemented in HEC-FDA is intended to provide consistent estimates between traditional estimates of the expected probability frequency curve historically used by the Corps, and that derived from the Monte Carlo procedure. This allows consistent comparisons between risk analysis studies and the historical approach.

Additional uncertainty enters the calculation of flood damage due to knowledge uncertainty regarding the choice of model to use for the statistical distribution of floods. One way the Corps might attempt to address model uncertainty is by assessing whether the LP3 distribution, or some other family of distributions, is more appropriate for describing floods. This, however, would represent a challenge for which there is little guidance in the scientific literature. Furthermore, it is not clear that much would be gained by incorporating that uncertainty, as compared to working with the LP3 distribution and exploring thoroughly the joint

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

uncertainty of all three parameters of the distribution. In the committee's judgment, use of the LP3 distribution is reasonable, but a procedure should be developed that more adequately captures the true posterior distribution of the LP3 distribution parameters in a Bayesian sense (Bobee and Ashkar, 1991; Chowdhury and Stedinger, 1991; Stedinger, 1983a).

## Neglecting Skew Uncertainty

Hydrologic uncertainty is simpler to deal with than other sources of uncertainty when the analysis is based upon a stationary gauged record. For the most part, hydrologic uncertainty in estimators of the parameters is determined by the limited length of the flood series available to estimate the values of the parameters of the LP3 distribution commonly used in the Corps's method. In that sense, the uncertainty is objective and is described by standard statistical sampling theory (Chow et al., 1988; Chowdhury and Stedinger, 1991; IACWD, 1981;).

When a flood record must be corrected for land use changes, storage, or channel changes, the length of record is still likely to be the primary determinant of hydrologic uncertainty, although subjective assessments of the quality of any adjustments to measured flows are also important. Possible nonstationarity due to subtle shifts in climate and storm paths, which are difficult to document, is sometimes a concern. If regional relationships are used to develop flood curves, then the corresponding estimates of prediction error should be employed (Tasker and Stedinger, 1989).

In its analysis for gauged sites, the Corps bases its description of hydrologic uncertainty upon the confidence interval calculation procedure in *Bulletin 17B* (IACWD, 1981), a document that contains procedures that federal agencies agreed to employ in the mid-1970s. The *Bulletin 17B* procedure for calculating confidence intervals employs the assumption that the coefficient of skewness of the logarithms of the floods is correctly specified, independent of the data (Stedinger, 1983b). The actual coefficient of skewness employed is generally a weighted average of the at-site sample skewness and a regional or generalized skewness estimator (IACWD, 1981). The weighted skewness estimators clearly incorporate estimation error because of sampling error in the at-site skewness estimators and also in the regional skewness estimators (McCuen, 1979; Tasker and Stedinger, 1986). As a result, the intervals calculated with the *Bulletin 17B* procedure are too small. Equations that incorpo

Copyright National Academy of Sciences. All rights reserved.

Risk Analysis and Uncertainty in Flood Damage Reduction Studies
Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 137 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

rate variability in weighted skewness estimators are available (Chowdhury and Stedinger, 1991; Stedinger et al., 1993) and should be used.

It is not appropriate for the Corps to ignore the large uncertainty in the estimated coefficient of skewness of the LP3 distribution used to describe flood risk. Clearly, an operational procedure to adjust uncertainty in the skewness coefficient can be developed using available sampling theory (Bobee and Ashkar, 1991).

### Errors in Flood Frequency Curves Derived from Rainfall–Runoff Modeling

Although classical flood–frequency analysis is based on analysis of observed discharge data, practical requirements in Corps flood damage reduction project planning often lead to the use of rainfall–runoff modeling to synthesize the flood–frequency curves used in planning studies. In its risk analysis, the Corps treats these synthetic flood–frequency curves as being of equivalent accuracy to flood–frequency curves derived from a graphical fit to a set of observed flood discharge data. However, synthetic flood–frequency curves have additional error in them because of uncertainties involved in rainfall–runoff modeling. This additional error can be estimated by the difference between the flood–frequency curve developed from observed discharge data at a gauging station, and a flood–frequency curve synthesized at the same location by rainfall–runoff modeling. The committee recommends that the Corps further examine this approach as a way of quantifying the additional error introduced by using rainfall–runoff modeling to produce flood frequency curves at ungauged sites.

### Errors in the Stage-Discharge Relationship

The Corps's Engineering Manual (EM) for risk analysis, EM 1110-2-1619 (USACE, 1996b), describes several methods for estimating errors in the stage–discharge relationship: using variability of observed gaging data and rating curves at stream gaging stations, comparing observed high-water marks during historical floods with those produced by water surface profile computation, by sensitivity studies of the effects of variations in Manning's *n* on water surface elevation, and by standard estimates of error in cross-section profile elevations. When these alternative

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

methods are applied, there can be substantial differences in the results. The Corps's Engineering Manual recommends taking the highest and lowest estimated water surface elevation for a specified discharge from all the methods and dividing the result by 4 to estimate the standard deviation, on the basis that two standard deviations above and below the mean contain 95 percent of the variability of normal distribution of errors.

## GEOTECHNICAL RELIABILITY

Geotechnical reliability is an important consideration in flood damage reduction projects involving levees. The reliability computation accounts for the potential of the levee to breach through soil failure even when the water surface elevation is not sufficiently high to overtop the levee. The method for quantifying geotechnical reliability is described in Chapter 4 and is applied in the case of the Grand Forks case study described in Chapter 5.

As is the case with other parts of the Corps's risk analysis, the geotechnical reliability model does not separate natural variability from knowledge uncertainty. This has important implications. The natural variability (treated as stochastic variability) arises from spatial variations in soil conditions and levee construction. The knowledge uncertainty arises from modeling assumptions made in calculating geotechnical performance. The former varies independently, or nearly so, from one reach to another. The latter is systematic, or nearly so, across all reaches. Probabilistically, the natural variability in site conditions may be independent from one reach to another (presuming large enough reaches to neutralize spatial autocorrelation effects in modeling natural variations), while the knowledge uncertainties are highly correlated. The important implication arises when one calculates the probability of at least one levee failing anywhere along the river. If the reaches are independent, then conceptually, this probability rises according to a relation of the form,

$$\Pr\{\geq 1 \text{ levee failure}\} = 1 - (1 - p)^n, \quad (6.1)$$

where p is the probability of failure in any one reach and n is the number of reaches. This probability rises quickly with increasing n. Alternatively, if the reaches are perfectly correlated, the probability of at least

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

one levee failing anywhere along the river is given by Pr {≥1 levee failure}= p. Just as natural variability and knowledge uncertainty are distinguished in the hydrologic and hydraulic modeling, so too should these types of uncertainty be treated distinctly and differently in the geotechnical modeling.

Levee failures caused by seepage under or through the levee—and even slope instabilities, which are influenced by pore pressures internal to the levee—depend not just on water height, but also on the duration of flooding. Flood duration is not considered in the current geotechnical reliability model, and indeed may be difficult to accommodate in the risk analysis method at all. To this extent, the geotechnical reliability model is an approximation. This is not a crucial limitation, given other approximations in the risk method, but the geotechnical calculations might be significantly improved if duration information were generated by the hydrology and hydraulics model and incorporated in the geotechnical model.

Although the geotechnical reliability model is a sound first step, it is also a new approach. The model would benefit greatly from field validation. The nation has many years of experience with levee performance and, unfortunately, also with levee failures. Much of this experience is documented, and much is accessible to federal agencies. The Corps should undertake statistical ex post studies to compare predictions of geotechnical failure probabilities made by the reliability model against frequencies of actual levee failures during floods.

It should also be pointed out that geotechnical failure of a levee(s) is not the only way in which a flood damage reduction project might fail; for example, hydraulic facilities may fail or detention basins may overflow. The committee thus recommends that the Corps also conduct statistical ex post studies with respect to the performance of other flood damage reduction measures (e.g., detention basins, hydraulic facilities). These studies should be conducted to identify the vulnerabilities (failure modes) of these systems and to verify engineering reliability models.

## ECONOMIC PERFORMANCE

The assessment of economic performance of a project is measured by project net benefits. Net benefits are the difference between benefits and costs, where benefits are defined as the reduction in flood damage resulting from the project. Assessment of economic performance builds upon hydrologic, hydraulic, and geotechnical factors that enter into the

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

assessment of engineering performance, plus the computation of flood damage to structures or other activity in the floodplain. While engineering performance is focused on risk at each damage reach, economic assessment is more complex, involving the integration of information at several spatial scales.

In the Beargrass Creek case study (Chapter 5) there are five spatial scales of analysis, as shown in Table 6.2. The three main scales are the following:

- project scale at which all the economic analysis is summarized,
- damage reach scale used for most analysis in HEC-FDA, and
- structure scale where the assessment of damage to structures is carried out.

The single project is subdivided into 21 damage reaches, which contain 2051 structures. In between these three main scales are two others:

- three main river reaches, used to identify the components of the project plan, and
- hydraulic cross sections (263), used for determining the water surface profile.

At Beargrass Creek, there are, on average, about 100 structures per damage reach.

Monte Carlo simulation is repeated, independently, 100 times for each structure. Four variables are randomized for each structure: first-floor elevation, value of the structure, value of the contents, and other valuesof the facility. The results of these simulations are aggregated by damage category (e.g., single-family residential, multifamily residential)

TABLE 6.2 Scales of Spatial Analysis in the Beargrass Creek Study

| Spatial Scale | Uses of Spatial Unit |
|---|---|
| Project (1) | Expected Annual Damage (EAD) and Benefit-Cost analysis |
| Main River Reaches (3) | Incremental analysis to get National Economic Development (NED) plan |
| Damage Reaches (21) | Basic unit for analysis using HEC-FDA, including flood–frequency curves |
| Hydraulic Cross Sections (263) | Water surface elevation profile computation |
| Structures (2,051) | Structure inventory |

Copyright National Academy of Sciences. All rights reserved.

Risk Analysis and Uncertainty in Flood Damage Reduction Studies
Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 141 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

to form a damage-stage function with uncertainty for each category of damage. The category damage functions are aggregated to form a damage–stage function for each reach. In effect, about 400 random variables are accumulated into a single random variable for each reach, which is damage as a function of stage. This process is illustrated in Figure 6.2 for damage to multifamily structures in damage reach SF-9 at Beargrass Creek.

Development of the distribution of damages considering each structure in a reach is the first stage of the risk analysis. In the second stage, Monte Carlo simulation is done 10,000–100,000 times for each damage reach. Three functions are randomized in this second stage: the flood discharge–probability curve for flood magnitude, the stage–discharge curve for water surface elevation, and the damage–stage curve for the degree of damage. For each randomization in stage 2, the damage curve is integrated across the probability range of flood severity to determine the expected annual damage for that replicate. The ensemble of all the expected annual damage estimates so formed from the 10,000–100,000 simulations yields the probability distribution of the flood damage at that reach for each plan being considered.

Once this analysis is complete, the expected annual damage (EAD) for the project is found by summing the mean values of the expected annual damages for each reach. Statistics of the percentile distribution (25%, 50%, 75%) of the expected project damage for this plan are currently computed by summing the corresponding percentile values of the distributions of each reach. Hence, the values of 22 random variables at the damage reach scale are aggregated to form a single random variable at the project scale, which defines the flood damage for a given plan.

The Engineering Regulation that guides the evaluation process for flood damage reduction projects (USACE, 1996b) calls for a table showing the probability distribution of the reduction in expected annual damage due to the project plan, with percentiles at 5%, 25%, 50%, 75%, 95%, and it calls for a similar table for the percentile distribution of project plan net benefits. The reduction in expected annual damage is found in each case by subtracting the damage with the plan from that without the plan. Thus, a percentile distribution describing project benefits is computed as the difference between with-plan and without-plan percentile distributions of flood damage.

The procedure of adding and subtracting percentile values of statistical distributions of flood damage as if they were arithmetic quantities is statistically unsound because it ignores the degree of interdependence or correlation among these distributions.

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 142 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.




FIGURE 6.2 Aggregation of damage to multifamily structures in Reach SF-9 at Beargrass Creek.

Copyright National Academy of Sciences. All rights reserved.

Risk Analysis and Uncertainty in Flood Damage Reduction Studies
Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 143 of 858



About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

## INTERDEPENDENCE IN RISK ANALYSIS FOR FLOOD DAMAGE ASSESSMENT

The principal variables of the flood damage assessment—flood discharge, stage, and damage—are functionally dependent on one another through the stage–discharge curve and the damage–stage curve at each damage reach. Because all these curves also contain uncertainty determined independently for discharge, stage, and damage, the end result is that discharge, stage, and damage are strongly correlated variables. The principle of transforming the flood–frequency curve into a stage–frequency curve, and then into a damage–frequency curve takes account of that interdependence.

However, care must still be taken to sample each function correctly, and there are several choices as to how the derived damage functions should be selected. The choice will affect the computed variance of expected damages for the reach due to economic uncertainty. Understanding the correct error structure for generating damage functions requires understanding correlation between errors in structural value and content value at individual structures, and it requires understanding correlation errors in first-floor elevations of structures at different locations. These issues are not addressed in the current implementation of HEC-FDA.

It appears that apart from treating the interdependence and the interaction among the three main variables at each damage reach, the current version of the risk analysis procedure assumes that all the random variables are statistically independent. In the Engineering Manual describing the procedure (USACE, 1996a), correlation is mentioned only twice: once on p. 5-1 (“Any correlation of separate factors should also be considered in the analysis and accounted for in the combination of individual uncertainties”) and once on p. 5-4, which shows a relationship between the uncertainty in the stage–discharge relationship and the slope of the river. The flow charts describing t.he computational procedure in this manual make no further reference to correlation or interdependence, and the input data to the HEC-FDA program do not include correlation coefficients or other representations of interdependence.

It would appear, at least on the surface, that some of the input variables used in the analysis are highly dependent. For example, the value of a structure and the value of its contents would usually be correlated, such that if a particular structure is actually more valuable than an estimate would indicate, most likely its contents are also more valuable than the estimate. Similarly, if the first-floor elevation of a structure is in error by some margin, say one foot too high, it is likely the first-floor ele

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

vation of an adjacent structure is also too high by a similar amount. This is because both structures have their elevations estimated from topographic mapping, and errors in mapping tend to be systematic over some distance.

These two examples introduce two different types of interdependence—cross-correlation between two variables (e.g., value of structure and value of contents) and spatial interdependence of the same variable at two locations (e.g., first floor elevations of adjacent structures). The spatial correlation issue has special significance in flood damage assessment because of the different spatial scales at which the various components of the problem are being analyzed (Table 6.2).

## CORRELATION LENGTH

There are several measures to describe the degree of spatial correlation $\rho_w$ as a function of distance $w$ between two locations. The simplest of these is the correlation length, $L_r$, also called the scale of fluctuation (Vanmarcke, 1983), which is the integral of the area under the spatial correlation function (Figure 6.3) and which is calculated as,

$$L_r = \int_0^\infty \rho_w dw. \qquad (6.2)$$

Because correlation is a dimensionless quantity while distance has the dimension of length, the value of $L_r$ also has the dimensions of length; hence the name correlation length. There are other measures of spatial correlation available, most notably the variogram used in geostatistics (Cressie, 1993), but correlation length sufficiently describes the degree of spatial correlation for purposes of this discussion.

In the Beargrass Creek study, for example, the first-floor elevations of the structures were estimated from 1-inch-to-100-feet topographic mapping, using a contour interval of 2 feet. As a check, the first-floor elevations of 195 structures were determined by land surveying from which it was concluded that "the average of the absolute values of the differences between the estimated and surveyed first floor elevations for this sample is 0.62 ft."(USACE, 1997c, p. B-5). Because the $(x,y)$ location of each structure is determined through surveying, as well as the elevation $z$, it follows that the horizontal distance between each pair of structures can be found, and a spatial correlation function of the errors

Copyright National Academy of Sciences. All rights reserved.

Risk Analysis and Uncertainty in Flood Damage Reduction Studies
Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 145 of 858



About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

could have been constructed with the information gathered in the flood damage reduction study.




FIGURE 6.3 The spatial correlation function, $\rho_w$, and correlation length, $L_r$.

## SPATIAL AGGREGATION

Spatial aggregation refers to the assembly of a set of random variables within a defined region into a single variable representative of that region. This happens within each damage reach when damage to structures is aggregated into a damage–stage curve for the reach, and it happens at the project scale when statistical measures of damage at the reach level are accumulated to form measures of the damage for the project.

The three basic spatial scales of analysis in flood damage assessment are shown in Figure 6.4 for the South Fork of Beargrass Creek. This figure shows water surface profiles for four different flood severities, with the locations of the structures superimposed. The river reach of approximately 12 miles in length is divided into 15 damage reaches for statistical analysis, averaging 0.8 miles in length. If a larger-than-anticipated precipitation depth corresponds to a specified exceedance

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

probability, it will result from an unusually severe storm over most, if not all, of the drainage area. The corresponding uncertainties in the project flood discharge are those likely to systematically propagate throughout all the damage reaches.

Similarly, the laws of hydraulics impose a significant degree of continuity of water surface profiles through damage reaches. The backwater effect of the bridge constriction at the upper end of damage reach SF-1 propagates some distance upstream, perhaps through damage reaches SF-2 and SF-3 but probably not any farther. Backwater effects extend for longer distances in flatter terrain. Although there are likely to be correlations between errors in damages between adjacent structures within a damage reach, it is unlikely that these correlations in structure damage would extend over long distances. It is expected that the correlation length for errors in the flood discharge estimates may be on the order of the length of the whole river reach, and that the correlation length for errors in flood stage is of the order of one damage reach. The correlation length of errors in structure damage, however, is probably much less than the length of a damage reach.

An important principle in spatial aggregation is that when quantities are averaged over nonoverlapping intervals, the correlation between the averaged quantities goes to zero when the averaging interval becomes much larger than the correlation length (Vanmarcke, 1983, p. 199). In other words, if the length of the damage reach, ΔL, is significantly larger than the correlation length of the errors in structure damage, $L_r$, then the stage–damage curves in adjacent damage reaches can be considered statistically independent. However, the representation of the variance of variables within each reach will still be in error.

Because the correlation length of errors in hydrology and hydraulics is probably much longer than that of errors in the damages, it is likely that the assumption of independence of the flood–frequency curves and stage–discharge curves for each damage reach is invalid. Indeed, the opposite argument can probably be made, namely that errors in flood– discharge and stage–discharge relationships are highly correlated between adjacent damage reaches.

In the HEC-FDA program (USACE, 1998a, p. 7-15) the 25 percent, 50 percent, and 75 percent values of the damage reduced by project plans are displayed, computed by subtracting the corresponding percentiles of the damages with and without the plan and summing the results over all reaches in the project. This process of adding and subtracting percentiles of distributions as if they were expected values is not statistically sound. The values of percentiles of distributions depend on the variance and

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 147 of 858





FIGURE 6.4 Spatial scales of analysis in flood damage reduction studies for the South Fork of the Beargrass Creek.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

other moments of the distribution. As shown in Equations 6 and 9 of Appendix D, the variance of a sum or difference of a pair of random variables depends in part on the correlation between them. Because these correlations have not been accounted for in the risk analysis procedure, there is no guarantee that the percentile variabilities of project flood damages and benefits determined in the current manner correctly reflect the actual variability of the damage reduced by the project plan.

The procedure of adding up the percentile values at each reach to get values for the project is valid in the event that the damage distributions at each reach are perfectly correlated. In that case, if the project damage is at its 25 percent value, the reach damages are also all identically at their 25 percent values, and the values for the reaches can legitimately be summed to give the value for the project. The long correlation length of the hydrologic and hydraulic uncertainties makes it likely that the reach damages are correlated, but that correlation will not be perfect. Indeed, the Monte Carlo simulations for each reach are based on the assumption that the reaches are independent.

There is thus an internal contradiction in the method—to determine variability in project reduced damage and net benefits, the summation made over values at the damage reaches relies on the assumption that reach damages are perfectly correlated from reach to reach; however, the computational procedure used to create the damage values treats each reach completely independently of its neighboring reaches upstream and downstream. If the reaches are perfectly correlated, they all behave in complete statistical cohesion, with damage errors everywhere being equally higher or lower than expected values. Such perfect correlation is rare in nature and unlikely in this instance because of the random events that occur as a flood moves through a river system.

Consider again the basic questions asked at the beginning of this chapter. For risk analysis of economic performance, is the computational procedure theoretically valid? The answer is that it is not. The basic procedure of integrating the discharge, stage, and damage through Monte Carlo simulation is reasonable; however, there are several unresolved issues regarding correlation and spatial aggregation at the structure scale, correlation from the structure scale to the damage reach scale, and correlation from the damage reach scale to the project scale. The second question raised at the beginning of the chapter is whether there are ways of improving the precision of the probability estimates. The following section suggests some ways of doing that.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

## COMPUTATIONAL ALTERNATIVES TO MINIMIZE CORRELATION EFFECTS

The addition of formal measures of risk to the flood damage assessment procedure is a necessary step, which recognizes the inherent uncertainty in the computations and their results. It is also a complex procedure. Unfortunately, the rigors of treatment of combinations of random variables allow only a limited number of standard operations, far fewer than if the uncertainty in the variables is ignored.

In effect, the current risk analysis procedure evolved from an earlier deterministic procedure by randomizing uncertain variables, solving equations for each randomization, and then averaging over the results to get expected values. This is a valid process provided that correlation is introduced where appropriate in generating random variables. There may also be some ways to change the computational process to minimize or eliminate the effects of correlation, as discussed below.

### Determine the Scale of Randomization

The Monte Carlo analysis should be conducted at the spatial scale at which the results are required. If results are required for the project, the Monte Carlo replicates should be constructed at the project. In other words, a Monte Carlo *project realization* would be defined by a set of random variables specifying everywhere in the project the errors in flood discharge, stage, and damage to each structure. Then, the resulting engineering and economic performance measures can be determined for this realization. By repeatedly generating such project realizations, the statistical variability in the project engineering and economic performance measures can be determined. As a part of this project realization calculation, corresponding performance measures can also be determined for each damage reach so that the distribution of damages by category and reach could be defined. In addition, this approach also allows quantification of the project benefits and of the reduced risk of flooding at each individual structure in the project. Advances in computing power mean that methodological approximations employed in past practice, such as aggregation of all the structure computations to the damage reach scale, may no longer be needed.

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 150 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

## Introduce Correlation in Monte Carlo Simulation

Correlation in random variables should be introduced where necessary by selecting the random variables in Monte Carlo analysis using a system for generating correlated sets of variables rather than using a system that generates independent sets of variables. This practice is common in groundwater modeling where correlated sets of hydraulic conductivities and other aquifer properties are generated by Monte Carlo simulation. Similarly, there is a long history of generating correlated random variables to describe stream flow in a basin or region (Salas, 1993).

## Randomize Structures Jointly

The damage reach mainly functions as a place of aggregation of structures to an index location, and this should be considered in the context of other structures. If the view shown in Figure 6.2 is adopted, each structure can be left at its original location and can be attributed with the computed water surface elevations with and without the plan for different flood severities. In that manner, each structure can be randomized in association with its near neighbors. The damage reach is really a labeling device to show how damage varies along the river. If the Corps elects to retain the two-stage Monte Carlo simulation process (simulate the structures first, then the damage reaches), the method should generate appropriate flood stage–damage functions for each reach. If a set of structure elevations, structure values, and content values are generated jointly to create a realization of the economics for a reach, one obtains one realization of the damage function for the reach. These empirical reach–damage functions computed at the first stage can be generated and stored for use at the second-stage reach-level Monte Carlo analysis. Thus, instead of using some artificial method for generating reach–damage functions, one can sample from the 100 functions generated randomly at the first stage. These would be combined with descriptions of flood–frequency and flow–stage relationships. This would retain the economic spatial interdependencies within a reach for use in the second-stage analysis.

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 151 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

## Randomize Hydrology and Hydraulics for River Reaches

The flood hydrology and hydraulics should be randomized at the scale of the river reach rather than at the damage reach. In this manner the flood profiles for a given event would move randomly up and down in cohesion over the whole reach, as regional hydrology and hydraulics suggest they should. This concept would also allow quantification of uncertainty in the spatial extent of the floodplain boundary. There is some upper limit on how long a river reach can be to be considered as a single statistical entity. The whole Upper Mississippi River basin, for example, would need to be subdivided significantly for such an analysis.

## Analyze Statistical Variability in Project Benefits Rather than Damage

For the economic analysis, the project benefits are measured by the reduced damage at each structure. For each project plan and cycle of randomization, the issue of prime concern is the difference between the damage with the plan compared to the damage without it. That calculation is presently conducted by determining the flood damage for all structures in a damage reach and then aggregating over the damage reaches to get the expected annual damage for the project. Finally, after all aggregation is complete, the project benefits are determined by taking the difference in damage with and without the project plan. An alternative to this computation is to consider the project benefits structure by structure and then to aggregate those benefits over the project.

Figure 6.5 shows the water surface profiles for existing conditions and under a proposed flood damage reduction plan for the 10-year and 100-year floods in a damage reach. The box symbols shown in the figure are the first-floor elevations of the structures in this damage reach. In each case, the proposed water surface profiles (shown by the solid lines) lie beneath the existing profiles (shown by the dashed lines), more so at the downstream end of the reach than at the upstream end. The difference in elevation between the water surface profile and the first floor elevation of the structure measures the depth of flooding at each structure, which is then related to the flood damage.

If the flood severity is indexed by its annual probability $p$ ($p = 1/T$, where $T$ is return period of the flood) and by its location $x$ in river miles along the river, then the damage at that location can be denoted as $D(p, x)$. If the damages under existing conditions and with-plan conditions are

Copyright National Academy of Sciences. All rights reserved.

No RR2.0-AR00003722

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 152 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

denoted by $D_e$, and $D_w$, respectively, then the project benefit $B$ for a particular flood at location $x$ is given by

$$B(p,x) = D_e(p,x) - D_w(p,x). \quad (6.3)$$




FIGURE 6.5 Comparison of water surface profiles for existing conditions and with a proposed flood damage reduction plan. This profile is from damage reach SF-9, Beargrass Creek.

The annual benefits of the plan for this severity over the whole project are then determined by integration over the length $L$ of river affected by the project:

$$B(p) = \int_0^L B(p,x)dx. \quad (6.4)$$

If the project benefit is determined for a set of floods, $p$, then the expected annual benefit (EAB) of the project considering all floods is found by integrating the benefits over the range of $p$:

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

$$EAB = \int_0^1 B(p)dp \tag{6.5}$$

By comparing this value to the project costs, the economic value of the project is determined.

This method of determining the project benefits does not require any more information than is used in the current procedure. It just manipulates that information according to a different computational sequence. This method has some advantages:

1. It permits localized benefits and the risk of flooding to be determined down to the level of individual structures, instead of lumping all structures into a damage reach value
2. It visually shows the difference between the existing and proposed flood profiles so that the effects of the plan at particular locations and for different flood severities can easily be seen.
3. The computation in Equations 1–3 in Appendix D can be done for each Monte Carlo replicate of the flood water surface profile considering random errors in the profile and in the elevations of the structures. By summing across the whole project the damage reduced at each structure, Monte Carlo replicates for benefits for the whole project can be found, and their mean and percentile distribution can be determined once the Monte Carlo simulations are complete. This is a valid statistical procedure not confounded by the problem of aggregating probability distributions from each damage reach as is now done in HEC-FDA.
4. By calculating the difference between the existing-conditions and with-plan damage estimates at each structure, the effects of errors in elevation and in values of the structure and its contents at a particular structure will be diminished. In other words, if the first-floor elevation of a structure is in error, the damage to a structure under existing and proposed conditions will be affected by nearly the same amount, so when the benefits are determined by taking the difference in the two damage values, the effect of the error in first-floor elevation will nearly be cancelled out. Similar considerations apply to the effects of all other errors being considered. It is also possible that this approach will significantly diminish the effects of correlation in the errors.

It is possible that this approach to determining the variability in the project benefits will result in significantly smaller variance estimates than those currently being determined because the current estimates are

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

being made by taking the differences between two large and highly variable numbers—the project damage estimates with and without the plan after all randomization is complete. The key point is that what matters in economic assessment of flood damage is not so much the absolute magnitude of the flood damage, but rather the extent to which the proposed plan will reduce that damage. The committee recommends that the computational procedure for risk analysis of economic performance focus on the uncertainty in the project benefits rather than on the uncertainty in the project flood damage.

## Statistically Compare Net Benefits from Alternative Plans

If an accurate estimate of the variance of the damage reduced by a project plan can be found, it could be used to determine whether one project plan has expected annual net benefits that are better than those of another plan in a statistical sense. In other words, it is possible that the addition of a marginal component to a plan slightly increases the expected annual net benefits but that the increase is not statistically significant when compared to the uncertainty of estimating the annual benefits. In this manner, the statistical measures of the variability of the benefits could have a greater influence on project decision making than they currently do.

It is perhaps impossible to achieve complete statistical rigor in a complex problem like risk analysis for flood damage assessment. The key is to be able to construct an analysis capturing the critical aspects of the statistical variability of the problem without excessive investment in details, which may have an insignificant impact on the final risk estimates. Alternative computational methods need to be tested in further case studies of flood damage reduction projects so that a deeper appreciation is obtained of the advantages and limitations of these alternatives in risk analysis.

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 155 of 858


# 7

# Levee Certification

The National Flood Insurance Act of 1968 sought to reduce suffering and economic damage from floods. This congressional act created the National Flood Insurance Program (NFIP). Revisions to this act have included the Flood Disaster Protection Act of 1973 and the Flood Insurance Reform Act of 1994. The National Flood Insurance Program was originally placed under the authority of the secretary of Housing and Urban Development (program authority today lies with the administrator of the Federal Insurance Administration). In 1979 the Federal Insurance Administration and its programs, including the National Flood Insurance Program, were transferred to the newly created Federal Emergency Management Agency (FEMA).

## HISTORY OF LEVEE CERTIFICATION

Congress sought to accomplish two main goals in the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973. Congress wanted property owners to purchase flood insurance to (1) provide them with financial relief should they suffer losses in a flood and (2) lessen the financial burden on federal, state, and local governments to provide grants and low-interest loans to cover the losses of uninsured property owners. These acts also sought to reduce damage from moderate-sized floods by encouraging construction of levees and other flood damage reduction structures. To achieve these goals, Congress offered incentives to communities whose flood damage reduction structures were

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

certified to prevent damage from a moderate-sized flood. Levee certification allows communities and structures to be removed from "Special Flood Hazard Areas" (defined as areas subject to inundation during a 100-year flood), thereby removing mandatory flood insurance purchase regulations (the 1973 Flood Disaster Protection Act requires those who are buying, building, or improving property in special flood hazard areas within NFIP communities to purchase flood insurance as a prerequisite for federal financial assistance (e.g., loan, grant, disaster assistance) when the building or personal property is the subject of or security for such assistance). Levee certification could thus exempt a community from flood insurance purchase requirements and could also remove some local land use restrictions. As certification could exempt a community from thousands, perhaps millions, of dollars of flood insurance premiums, this certification procedure (and the risk analysis therein) has great local economic and public policy significance. Unfortunately, Congress gave only vague guidance as to what size event the levees were to withstand.[1] The National Flood Insurance Act of 1968, as amended, and the Flood Disaster Protection Act of 1973, as amended, do not contain detailed statements regarding the hydrological or statistical significance of the 100-year flood, and contain but one significant reference to the 100-year flood: "Notwithstanding any other provision of law, any community that has made adequate progress, acceptable to the Director, on the construction of a flood protection system which will afford flood protection for the one-hundred year frequency flood as determined by the Director, shall be eligible for flood insurance under this chapter . . . . at premium rates not exceeding those which would be applicable under this section if such flood protection system had been completed" (42 U.S.C. 4001 *et. seq*; the "Director" is the Director of FEMA).

Congress was less than explicit in providing direction to the Corps concerning the desired level of flood protection for the nation. Congress directed the Corps to map 100-year floodplains as the areas that needed protection (Box 7.1 describes the adoption of the 100-year flood for

[1] For levees for which risk analysis has not been performed, FEMA continues to specify (as of May 2000) that a minimum of 3 feet above the base flood is needed for certification (44 CFR 1 §65.10). Some requirements related to additional freeboard (such as an additional 1 foot of freeboard near structures and ½ foot of freeboard at the upstream end of the levee) and requirements related to maintenance, closures, embankments, foundations, and drainage are also imposed.

Copyright National Academy of Sciences. All rights reserved.

floodplain management and insurance purposes). Congress could have specified the 200- or 500-year floodplains. The committee infers that Congress desired protection against the 100-year flood. If they had wanted protection against the 200- or 500-year floods, they would have directed the Corps to map the 200- or 500-year floodplains.

Confusion crept in, however, concerning whether levees were to protect against the 100-year flood or whether they were to lower the likelihood of flooding to 1/100 per year. FEMA focused on protecting against the 100-year flood and (for certification purposes) required that 3 feet of freeboard be added to the stage (height) of the 100-year flood, to be confident that the levees could pass this flow. In the absence of risk analysis, freeboard was sensible: levees built only to the elevation of the 100-year flood would not necessarily survive it (because of waves, wind, and other uncertainties). Adding 3 feet of freeboard to levees, however, turns out to be equivalent (on average) to reducing the likelihood of flooding to roughly 1/230 per year, a much more stringent standard than Congress apparently intended.

The Corps's use of risk analysis resulted in a qualitative change in both the theory and practice of certifying levee systems. Risk analysis permits the Corps and FEMA to address problems resulting from uneven safety levels and from expenses inherent in the criterion of having the levee sized to the 100-year flood plus 3 feet of freeboard. As shown in Column 2 of Table 7.1, the 3-feet-of-freeboard criterion resulted in very different levels of protection in different communities. For example, a levee satisfying this criterion would have only a 45.3 percent chance of passing a 100-year flood in East Peoria, Illinois, but would have a 99.9 percent chance of passing a 100-year flood in West Sacramento, California; Portage, Wisconsin; and Hamburg, Iowa. When the Corps and FEMA used 3 feet of freeboard to certify a levee, they were using a criterion that provided less protection in some communities than in others. Similarly, the criterion resulted in excessive expenditures on some levees.

Higher levees may provide greater levels of flood protection, but levee heights are limited by the additional costs of higher levees and by their ecological and aesthetic effects on water bodies and floodplains. In particular, the three communities with more than a 99.9 percent chance of passing a 100-year flood (see Table 7.1) have flood damage reduction systems that, all other things being equal, are too expensive and impose high ecological and aesthetic costs. Communities whose levees have only a 45.3 percent chance of passing the 100-year flood have a much lower degree of flood protection. A community forced to upgrade its levees to the 99.9 percent level would likely find levee certification very expensive. A community that had its levees certified despite having only a 45.3 percent chance of passing the 100-year flood would be lured into complacency, as they are likely to experience a costly flood resulting in losses to individuals and in losses to the NFIP.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

**BOX 7.1**

**WHY THE 100-YEAR FLOOD?**

**GILBERT WHITE ILLUMINATES**

The concept of the 100-year flood is central to the National Flood Insurance Program and to many of the Corps's flood damage reduction activities. Hundreds of government officials administer and work within these flood mitigation and damage reduction programs, to which millions of taxpayer dollars have been devoted. Many consultants are employed in mapping the nation's 100-year floodplains and scores of university professors analyze the hydrological, statistical, and public policy implications of the 100-year flood. Given the economic and social importance of these efforts, one would assume that the selection of the 100-year flood as a defining hydrological event is based on sound scientific and statistical foundations.

Gilbert White, professor emeritus of geography at the University of Colorado, is widely recognized as a leader in promoting sound U.S. flood management strategies. In 1993, Professor White provided an oral interview to Martin Reuss, the Corps of Engineers's senior historian. In that interview, White's response to a question about the selection of the 100-year flood sheds some light on the rationale for its selection. Given his knowledge of and experience in U.S. floodplain management, Gilbert White's account may be among the better explanations we have for the prominence of the 100-year flood in U.S. floodplain management and policy.

In response to the question, “How do you take into account the so-called catastrophic flood—the once-in-100-years flood?”, White stated:

“There was a very interesting development of the notion that there could be a flood of sufficiently low frequency that no effort should be made to cope with it. The Federal Insurance Administration picked one percent [or] a recurrence interval of a hundred years. And some of us were involved in that because we recognized they initially had to have some figure to use. The one-percent flood was chosen. I think Jim Goddard and TVA colleagues would be considered parties to the crime. With the lack of any other figure, the concept taken from TVA's “intermediate regional flood” seemed a moderately reasonable figure. We generally use the term “catastrophic flood” for events of much lesser frequency.

This goes back to my earlier criticism of the FIA and its determination to cover the country promptly. In covering the country promptly they established one criterion—the 100-year flood. I think it would have been much more satisfactory if they had not tried to impose a single criterion but had recognized that there could be different criteria for different situations. This could have been practicable administra

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

tively even though a federal administrator would say it's far easier, cleaner, to have a single criterion that blankets the country as a whole.

What's the effect of having a criterion of 100 if in doing so a local community is encouraged to regulate any development up to that line and then to say we don't care what happens above that line? We know that in a community like Rapid City the floods were of a lesser frequency than 100 years, and a community ought to be aware of this possibility.

A simplified national policy tended to discourage communities from looking at the flood problem in a community-wide context, considering the whole range of possible floods that would occur.

So I would say that any community ought to be sensitive to the possibility of there being a 500-year flood or 1,000-year flood. It should try to consider what it would do in that circumstance, and wherein it could organize its development so that if and when that great event does occur it will have the minimum kind of dislocation."

Gilbert White referred to several risk-related topics addressed in this report. For example, his comment regarding the value of using different criteria for different situations buttresses the Corps's adoption of risk analysis techniques and the abandonment of the levee freeboard principle. As White pointed out, different geographical areas are subject to different levels of flood risk and uncertainty and thereby require different margins of safety. The committee also agrees with Professor White's comments regarding flood hazard preparedness for floods of *all* magnitudes. This committee recommends that rather than focusing on a single event—the 100-year flood—that the Corps examine the risks of flooding from the full range of possible floods.

An additional difficulty with the 3-feet-of-freeboard certification criterion is that it could impose unnecessarily large costs on communities. Congress instructed the Corps to build water projects only if the benefits exceed the costs. In its flood damage reduction studies, the

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

TABLE 7.1 Elevation, Freeboard, and Expected Level of Protection Provided by Various Methods of Levee Sizing[a]

| Levee Project | Base Elevation (ft) | FEMA 3 ft-Freeboard Conditional Nonexceedance Probability | NED PLAN[b] Elev (ft) | NED PLAN[b] Freebd (ft) | NED PLAN[b] Return period[d] (yrs) | 1% Expected AEP[c] Elev (ft) | 1% Expected AEP[c] Freebd (ft) | 1% Expected AEP[c] Return period[d] (yrs) |
|---|---|---|---|---|---|---|---|---|
| Column | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| Pearl River, MS | 41.6 | 0.976 | 47.0 | 5.4 | 770 | 41.8 | 0.2 | 100 |
| American River, CA | 46.1 | 0.919 | 52.0 | 5.9 | 230 | 47.1 | 1.0 | 100 |
| West Sacramento, CA | 29.2 | 0.999 | 33.5 | 4.3 | 1,670 | 29.6 | 0.4 | 100 |
| Portage, WI | 795.3 | 0.999 | 797.0 | 1.7 | 10,000 | 795.6 | 0.3 | 100 |
| Grand Forks, ND | 831.4 | 0.908 | N/A | N/A | N/A | 831.5 | 0.1 | 100 |
| Hamburg, IA | 909.2 | 0.999 | 911.5 | 2.3 | 910 | 909.8 | 0.6 | 100 |
| Pender, NE | 1,326.3 | 0.763 | 1,330.0 | 3.7 | 380 | 1,328.0 | 1.5 | 100 |
| Muscatine, IA | 557.8 | 0.901 | 561.5 | 3.7 | 330 | 558.8 | 1.0 | 100 |
| Cedar Falls, IA | 861.7 | 0.900 | 866.0 | 4.3 | 360 | 862.6 | 0.9 | 100 |
| Sny Island LDD, IL | 471.1 | 0.567 | N/A | N/A | N/A | 471.5 | 0.4 | 100 |
| East Peoria, IL | 455.1 | 0.453 | 462.6 | 7.5 | 10,000 | 458.3 | 3.2 | 100 |
| Guadalupe River, TX | 54.9 | 0.872 | 56.8 | 1.9 | 110 | 56.5 | 1.6 | 100 |
| White River, IN | 712 | 0.980 | 713.2 | 1.2 | 250 | 712.3 | 0.3 | 100 |
| Mean | | 0.864 | | 3.8 | | | 0.9 | |
| Median | | 0.908 | | 3.7 | 380 | | 0.6 | 100 |
| Minimum | | 0.453 | | 1.2 | 110 | | 0.1 | 100 |
| Maximum | | 0.999 | | 7.5 | 1,000 | | 3.2 | 100 |

[a] Bold faced type indicates levee height required for certification within the NFIP.
[b] NED plan is the National Economic Development Plan.
[c] AEP is annual exceedance probability; 1/AEP is expected level of protection.
[d] Return period is calculated as 1 divided by the annual exceedance probability.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Corps executes these instructions by estimating the heights of levees that will maximize economic benefits and are consistent with protecting the nation's environment (the National Economic Development (NED) alternative). By law, the Corps will build a levee to this height, with the federal government paying its share of the construction costs (according to the cost-sharing guidelines of the Water Resources Development Acts of 1986 and 1996). But if the community would like a levee higher than the NED levee, they must pay for *all* the additional construction costs. As Table 7.1 shows, the FEMA 3-feet-of-freeboard certification criterion required levee elevations greater than the NED elevation in 4 of the 11 communities in this group. If a community's levees were not certified, that community (if located in a zone subject to inundation by the 100-year flood) would remain in a Special Flood Hazard Area and would therefore be subjected to mandatory flood insurance purchase regulations, as well as relevant local land use regulations.

The 3-feet-of-freeboard concept was used as a design parameter to account for uncertainties associated with hydrologic and hydraulic analysis (Huffman and Eiker, 1991). If these uncertainties were accounted for, exceptions to the 3-feet-of-freeboard requirement were granted. One way to account for these uncertainties was to follow the Corps's risk analysis method. As documented in Appendix B, this gave rise in 1996 to a subsequent Corps–FEMA proposal for levee certification, which combined the 3-feet-of-freeboard requirement when risk analysis was *not* performed with a probabilistic estimate of protection using annual exceedance probability (AEP) when risk analysis *was* performed. The annual exceedance probability is calculated by determining the probabilities of flooding for flows of all possible exceedance probabilities (e.g., the 10-year flood, 50-year flood, 100-year flood, 200-year flood), then integrating over them to obtain a total probability of flooding from all floods. An expected value (i.e., the mean value) of the annual exceedance probability of one percent was selected as a decision criterion: if a levee had an expected annual exceedance probability of less than 1 percent, it was certified; otherwise, it was not.

In principle, the annual exceedance probability approach to levee certification enjoyed many benefits. It allowed a broader spectrum of uncertainties to enter the analysis than did the 3-feet-of-freeboard criterion. The data in Table 7.1 show that the NED elevation is greater than the 1 percent expected annual exceedance probability elevation for all communities in this group. If the Corps thus built to the NED elevation, all areas would be certified as satisfying the 1 percent annual exceedance probability criterion. No community would have to spend tens or hun

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

dreds of millions of dollars raising the elevation of their levees in order to be certified. Finally, the 1 percent expected annual exceedance probability criterion was simple to understand and to communicate.

But floodplain managers feared that the new annual exceedance probability criterion would not provide adequate protection against flooding. FEMA concluded, “for the 12 USACE projects [studied] the simulation exceedance (true) probability standard of 0.01 referenced in our April 1993 letter produced levee designs with only 0.1 to 1.5 feet of freeboard and contained the FEMA base flood with a reliability of between only 50 and 75%” (Krimm, 1996; see Appendix B). Thus, after three years, FEMA and the Corps rescinded the 1 percent expected annual exceedance probability criterion. In effect, they interpreted this criterion as something that should be satisfied with a high degree of assurance on each project, rather than just on the average over many projects.

Unfortunately, the risk analysis procedure at that time was embryonic. The annual exceedance probability itself has a range of uncertainty arising from uncertainties in the methods and data used to calculate it. By choosing the expected value of the annual exceedance probability, this range of uncertainty was not directly incorporated into the decision process. If the Corps had accounted for the various sources of uncertainty, as well as quantifying reasons for levee failure other than overtopping, the levels of freeboard and probability of containing a base flood would have been greater. In the committee's judgement, the major reasons for the difficulties with this 1 percent expected annual exceedance probability criterion were the Corps's method, the procedures that were followed to implement it, and the Corps's lack of experience (at that time) in using risk analysis.

## CURRENT CERTIFICATION CRITERION

In March 1997 the Corps issued a new guidance circular (USACE, 1997e) based on the estimated probability that a levee would be able to pass a 100-year flood (the conditional nonexceedance probability; the circular is reproduced in Appendix B). The Corps considered three elevations for the levee: the elevation with a 90 percent conditional nonexceedance probability, a 95 percent conditional nonexceedance probability, and the elevation based on the old criterion of 3 feet of freeboard above the 100-year flood. The Corps and FEMA agreed to certify a levee if its elevation was at least (1) at the 90 percent conditional nonex

Copyright National Academy of Sciences. All rights reserved.

Risk Analysis and Uncertainty in Flood Damage Reduction Studies



ceedance probability elevation, if the old criterion resulted in a conditional nonexceedance probability of less than 90 percent, (2) at the 95 percent conditional nonexceedance elevation, if the old criterion resulted in a conditional non-exceedance probability greater than 95 percent, or (3) at the old criterion's elevation, if the old criterion resulted in a conditional nonexceedance probability between 90 percent and 95 percent.

Figure 7.1 illustrates the levee certification decision tree. The FEMA level (FL) denotes the 100-year flood plus 3 feet of freeboard, and Corps Level 90 percent (CL90) and Corps Level 95 percent (CL95) denote the levels that have assurance (conditional nonexceedance probability) of 90 percent and 95 percent, respectively, of passing the 100-year flood. This mixture of the former 3-feet-of-freeboard approach and the reliability (90% or 95%) of passing the 100-year flood reflects a standard in most engineering designs—that is, a desired performance (lower limit) and avoidance of overdesign (upper limit).

This new certification criterion would require greater levee freeboard for East Peoria and other sites that formerly had lower likelihoods of passing a 100-year flood, and it would require less levee freeboard for West Sacramento and other sites that formerly had higher likelihoods of passing a 100-year flood. Like the criterion of 3 feet of freeboard, for some communities, the levee elevation required to satisfy the criterion is above the National Economic Development height. These communities would thus have to pay the entire cost of raising the levees to the certification height. In addition, the present criterion is awkward and confusing to the public.




FIGURE 7.1 Current Corps–FEMA levee certification procedure.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

## ANALYSIS OF LEVEE SIZING CRITERIA

Data for 13 flood damage reduction projects in nine states were assembled in 1996 by the Corps's Hydrologic Engineering Center (HEC) in Davis, California (Table 7.1). No special effort was made to select particular kinds of projects or regions of the country in preparing this data set. The "base elevation" in Column (1) is the water surface elevation above mean sea level of the median 100-year flood discharge. For each levee sizing alternative, three data values are shown: (1) the levee elevation, (2) the corresponding freeboard above the base elevation, and (3) the inverse of the expected annual exceedance probability for this elevation, which is a measure in years of the expected return period between failures of the levee. This value is sometimes called the levee's "level of protection." To acknowledge that this quantity is a random variable with a range of variation, it is called here the "expected level of protection."

Data for six methods of levee sizing are presented in Table 7.1 : (1) the National Economic Development (NED) plan level, (2) the 1 percent annual exceedance probability level (the 1993–1996 certification criterion), (3) the 90 percent conditional nonexceedance probability level (CL90 in Figure 7.1), (4) the FEMA standard level (base elevation plus 3 feet; FL in Figure 7.1), (5) the 95 percent conditional nonexceedance probability level (CL 95 in Figure 7.1), and (6) the current Corps–FEMA certification level combining the CL 90, FL, and CL95 values (90%-3ft-95%). Summary statistics of the freeboard and level of protection provided by each alternative are provided at the bottom of Table 7.1.

The freeboard required for levees having an expected annual exceedance probability of 1 percent averages 0.9 feet and ranges from 0.1 to 3.2 feet (Column 7). The discrepancy between these values and the traditional three feet of freeboard led the Corps and FEMA in 1996 to abandon the mean 1 percent expected annual exceedance probability criterion.

Columns (9), (12), and (15) of Table 7.1 show the three calculated levee elevations associated with the new criterion for the 13 communities. Column (9) indicates the elevation with a 90 percent likelihood of passing the 100-year flood. Column (12) indicates the 100-year flood elevation plus 3 feet of freeboard. Column (15) indicates the elevation with a 95 percent likelihood of passing the 100-year flood. In each case, bold type indicates the levee height required for certification, shown in Column (18). The combined criterion agreed to by the Corps and FEMA results in a certification level determined by 3 feet of freeboard for three communities, by a 90 percent chance of passing the 100-year flood for

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

five communities, and by a 95 percent chance of passing the 100-year flood for five communities. Thus, for five communities, the likelihood of the levees passing the 100-year flood is 90 percent, for three communities, it is between 90 percent and 95 percent, and for five communities, it is 95 percent. However, the seemingly close agreement among the three criteria concerning levee height masks large cost differences in modifying levees to attain these heights.

The statistics summarized at the bottom of Table 7.1 show that:

- the FEMA standard of 3 feet of freeboard provides a median expected level of protection of approximately 230 years, with a range of <100 years to >10,000 years,
- the Corps–FEMA 90%-3ft-95% criterion provides an average of 3.3 feet of freeboard and yields a median expected level of protection of approximately 250 years, with a range of 190 to 10,000 years,
- the 90 percent conditional nonexceedance probability provides an average of 3.0 feet of freeboard, and a median expected level of protection of approximately 230 years, with a range of 170 to 5,000 years, and,
- the 95 percent conditional nonexceedance probability provides an average of 4.0 feet of freeboard and a median expected level of protection of approximately 370 years, with a range of 210 to 10,000 years.

These data indicate that over the range of these 13 projects, the current Corps–FEMA criterion is slightly more conservative than the FEMA standard 3-feet criterion, and that the 95 percent conditional nonexceedance probability level is significantly more conservative. Levees designed to the 90 percent conditional nonexceedance probability level have approximately the same median level of safety as the traditional standard of 3 feet of freeboard.[2]

The range in the freeboard required for the Corps–FEMA combined criterion (90%-3ft-95%) compared to the FEMA standard 3-feet criterion

[2] The risk analysis method adopted by the Corps involves a process that is considerably more complicated and requires much more data and analysis than the former procedure of adding 3 feet of freeboard. Is it possible that some type of a simple freeboard requirement would be a good approximation to the risk analysis results? Columns (10) and (16) of Table 7.1 show the amount of freeboard that would be required for each site to pass the 100-year flood with likelihoods of 90% and 95%. For a likelihood of 90%, the freeboard requirement ranges from 1.3 feet to 5.8 feet. For a likelihood of 95%, the freeboard requirement ranges from 1.6 feet to 6.6 feet. No simple freeboard measure gives a good approximation to the risk analysis measure.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

is illustrated in Figure 7.2. It can be seen that the current Corps-FEMA combined criterion requires freeboard ranging from 1.6 feet in Hamburg, Iowa, to 5.8 feet in Sny Island Levee Drainage District (LDD), Illinois. For most projects on the right of the figure, the 90 percent conditional nonexceedance probability level defines the certified elevation. On the left of the figure, there are several projects where either the 3-feet or 95 percent criterion prevails, adding approximately 0.6 feet of freeboard to the 90 percent level. It is clear from Figure 7.2 that except for American River, California, the range in required freeboard between the 90 percent and 95 percent values is small when compared to the variation in these elevations from project to project. To reiterate, however, "small" differences in levee height can translate into large differences in the cost of the levees.

Figure 7.2 is an impressive demonstration of the value of risk analysis in assessing the required height of levees. It shows that to meet a consistent national standard of levee safety, as little as 2 feet of freeboard may be required in one location, while as much as 6 feet may be required in another. This raises serious questions regarding the degree of safety being provided by the current FEMA standard freeboard of 3 feet required for non-Corps projects. It shows that the traditional 3 feet of freeboard masks a significant degree of variation of risk of failure in levees built to this standard for the citizens protected by these levees. This variation in risk of failure can be quantified by the Corps's risk analysis procedure.

Figure 7.3 compares the elevation required for the National Economic Development plan with that for the three levee certification criteria for 11 of the 13 levee projects in Table 7.1 for which an National Economic Development plan elevation exists. On average, the National Economic Development plan provides approximately 0.5 feet of additional freeboard beyond the Corps-FEMA 90%-3ft-95% criterion, but in 4 of the 11 projects (Portage, Wisconsin; Pender, Nebraska; Guadalupe River, Texas; White River, Indiana), the National Economic Development plan would not provide sufficient elevation for the levee to be certifiable. In these cases, the Corps's local partners would be required to pay the entire cost of raising the levee to the certifiable level. Few communities would likely be able or willing to do this. As a result, the levees will not be certified, part or all of the community will remain in the Special Flood Hazard Area (SFHA) and will thus be subject to mandatory flood insurance purchase guidelines—and to generally higher flood insurance premiums than communities located outside of SFHAs (loca

Copyright National Academy of Sciences. All rights reserved.

Risk Analysis and Uncertainty in Flood Damage Reduction Studies


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

tion within an SFHA may also subject a community to more stringent land use regulations). With higher premiums, fewer people are likely to purchase flood insurance and, when the inevitable flood occurs, they may face financial ruin. The federal government will, consequently, have little choice but to offer grants and low-interest loans, which is precisely what Congress wanted to eliminate by establishing the National Flood Insurance Program.




FIGURE 7.2 Current Levee Certification Criterion (90%-3ft-95%) and the FEMA Standard Three Feet.

There are two consequences of using an annual exceedance probability of 1/230 rather than 1/100 as the certification criterion. The first has to do with whether the flood insurance premiums are actuarially fair. If the premiums are based on floods with a probability of 1/100 and the actual probability is 1/230, the premiums are far too high. These premiums would thus discourage people from buying flood insurance, which is the opposite of what Congress desired. The second is that Congress gave benefits to communities whose levees are certified, benefits such as lower insurance rates and an exemption from having to buy flood

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

insurance. If the certification criterion is more stringent than Congress desired, some communities will have to pay higher insurance rates and will have to buy flood insurance that they need not have purchased.




FIGURE 7.3 Comparison of freeboard requirements for the National Economic Development plan elevation and those arising from the levee certification criteria.

The data for the 13 flood damage reduction projects in Table 7.1 are plotted in Figure 7.4 to illustrate the relationship between levee freeboard and the expected level of protection for a number of levee sizing criteria. The expected level of protection is the inverse of the expected value of the annual exceedance probability. As anticipated, the expected level of protection increases with the amount of freeboard required. However, the data for the Portage, Wisconsin, flood damage reduction project in the dashed box on the lower right of the diagram represent an anomaly. These values indicate that the expected level of protection provided by about 2 feet of freeboard at Portage is much higher at this location than in the other 12 projects surveyed. This anomaly may be a result of some peculiarity in the topography at Portage, or the risk analysis for this project may have been done differently for this project than for the other projects.

Part of the stimulus for this committee's establishment arose from a conflict among the Corps and state and local interests in Wisconsin con

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

cerning the appropriate levee height for the Portage project. Figure 7.4 suggests that the Portage project is not representative of the general relationship between freeboard and expected level of protection provided by Corps projects. According to the Corps's risk analysis, requiring 3 feet of freeboard on the levee at Portage led to an abnormally expensive project. Assuming that the Corps's risk analysis was correct, the Corps was correct in resisting so expensive a project that went beyond the levee called for in the National Economic Development alternative.




FIGURE 7.4 The expected level of protection provided by levee freeboard.

All Corps flood damage reduction studies prepared by Corps offices across the country are reviewed at Corps Headquarters in Washington, D.C. As part of that review process, the committee recommends that the Corps maintain an inventory from past projects of the amount of freeboard provided for the base flood and of the resulting expected level of protection provided by project levees.

To summarize, the former 3-feet-of-freeboard criterion for certifying levees (1) provided quite different levels of flood protection to different communities, (2) was unnecessarily expensive in some communities, and (3) was above the National Economic Development elevation in some communities, requiring these communities to pay for all the costs of the

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

additional levee elevation. The new certification criterion is an improvement, as it results in a narrower range of protection (90% to 95% chance of passing a 100-year flood, rather than 45% to 99.9%). The new criterion, however, does not solve the problems associated with the former 3-feet-of-freeboard criterion.

One possible certification criterion based on risk analysis is the use of a conditional nonexceedance probability for the 100-year flood that must be at least some appropriate value, such as 0.90. This criterion focuses on the best estimate of the 100-year flood and can be used in both unprotected areas (delineation of the floodplain with some extra safety factor) and areas protected by levees. However, this measure is unnecessarily complicated and difficult to understand.

In summary, and based upon this review, the committee recommends that the Corps and FEMA promptly develop an improved levee certification procedure. The committee recommends a roughly equivalent criterion be used: the annual exceedance probability (the probability that the area will be flooded during a year). The committee recognizes that considerable resources and time will be required to modify and implement this recommendation. In this interim period, the committee therefore recommends that the Corps and FEMA adopt a single conditional nonexceedance probability for use in their joint levee certification program.

A sample of 13 projects is of limited size for drawing general conclusions about the equivalence of risk measures among different levee sizing criteria. The committee therefore also recommends that the Corps and FEMA compile comparable data to those in Table 7.1 for a significantly larger number of levee projects, with a view to replacing the current 90%-3ft-95%.levee certification rule with a rule based on the annual probability of flooding.

## TECHNICAL CORRECTIONS TO THE CURRENT CERTIFICATION PROCEDURE

The current Corps–FEMA levee certification procedure is an important step toward implementing a rational approach to assessing the degree of flood protection provided by a levee system. The procedure accounts for uncertainty in assessing the frequency and severity of future flooding, and it estimates the probability that the levee system will perform as intended. The committee recognizes the difficulties the Corps

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

and FEMA face in attempting to establish a rational, workable procedure for certifying levee systems. The Corps and FEMA are to be commended for deciding to directly face these challenges.

In reviewing the current certification procedure, the committee identified four technical issues that should be addressed in the near term to improve the risk analysis method. First, the procedure does not use straightforward probabilistic measures, such as annual probabilities of flooding, that are easily interpreted and easily compared to program mandates. The procedure is difficult for the public, and for the informed technical community, to understand and to communicate.

Second, the current certification procedure examines the base (100-year) flood alone and not the range of floods that can occur. For example, the process does not consider the potential that the levee system could fail due to wind and waves leading to overtopping, embankment failure, or other related factors during the 90-year event. Wind, waves, debris, and ice could lead to the 90-year flood overtopping the levee, or absence of them could lead to the 110-year flood not overtopping the levee. The current procedure thus gives a probability of flooding, assuming that the 100-year flood occurs. A more relevant measure would be the probability of flooding, given the distribution of floods of all sizes.

Third, evaluation of the uncertainties in levee performance does not comprehensively address sources of knowledge uncertainty in the geotechnical evaluation of levee system reliability, river hydraulics, and foundation or embankment failure; thus, an arbitrary level of reliability is being evaluated as part of the certification process.

Fourth, the current procedure focuses on the portion of each levee that is most likely to fail, which may not provide a sufficient analysis of the performance of levees as a system. Assessment of the levee system should account for the potential for failure at any point along the levee during a flood event, considering multiple modes of levee failure—including overtopping, piping, embankment instability, foundation instability, and other geotechnical considerations. These technical corrections do not require a review of policy implications or cost. They could therefore be implemented immediately.

## AN ALTERNATIVE CRITERION: A LONGER-TERM CHANGE

Beyond the improvements to the current procedure suggested above, the Corps and FEMA should work toward an alternative criterion based

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

on a simple "annual probability of levee system failure (annual exceedance probability)" accounting for both natural variation and knowledge uncertainty and accounting for threats to the levee system other than just overtopping. Levee system failure is equated here with the failure to prevent inundation of any area that should be protected (i.e., the expected level of protection). Such a criterion would have direct benefits compared to the current criterion: (1) there would be a direct measure of the level of protection, (2) the criterion would be focused on protection from all floods, not just on the 100-year flood, and (3) the criterion would be easier for the public, Congress, and the engineering community to understand.

The committee believes that earlier difficulties encountered with an annual-probability-of-flooding approach can now be overcome because of the Corps's greater experience with risk analysis and because the Corps can now consider target annual probabilities in light of historical practice. The criterion for certifying a levee should be that it provides adequate protection against failure of the flood damage reduction system. Because the old criterion for levee certification produced different levels of flood protection for different communities, there is no reason to replicate its levels of protection in the new criterion.

The former certification criterion of 3 feet of freeboard provided an expected annual exceedance probability of roughly 0.00435 (return period of 230 years), while the 90 percent nonexceedance probability levee provided the same expected annual exceedance probability of 0.00435. The committee recommends that levees provide a uniform level of protection across communities. It is not obvious which level of protection should be chosen. In the committee's judgment, the criterion should aim to provide the level of protection provided to the most people in the past—the median level historically provided. Based on a small sample of Corps flood damage reduction projects, that median annual exceedance probability is roughly 1/230.

The committee also recommends that the Corps develop a table showing percentiles of variability in the annual exceedance probability or showing levels of protection similar to that used for the measures of economic performance in project planning. By choosing an appropriate percentile value in this range, a corresponding level of assurance can be obtained that the expected level of protection is at least 100 years, as required. It was the lack of allowance for this variability that led to the abandonment of the annual exceedance probability criterion during the 1990s.

A difficulty with establishing a criterion based on an expected annual

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

exceedance probability of 1/230 (0.00435) is that the resulting elevation often exceeds the elevation of the National Economic Development (NED) alternative levee. Few if any of these communities would elect to spend tens or hundreds of millions of dollars to raise their levees above the NED elevation to become certified. However, the judgment regarding the level at which to certify levees is a political, not a technical judgment.

The alternative criterion changes the focus from the 100-year flood to the expected probability of flooding. Although the committee judges the latter to be what Congress intended in the National Flood Insurance Act of 1968 and its later amendments, we recognize that it has not been the criterion used in federal regulations. It is therefore recognized that review and discussion will likely be required before implementing the alternative criterion. Although shifting the focus to the annual probability of flooding is the more desirable alternative, the committee does not want to delay implementation of the technical corrections. All of these corrections are required for implementing the alternative criterion. Thus, nothing is wasted by immediate implementation of the corrections. At the same time, the committee recommends the alternative criterion, recognizing that its implementation will require examination and discussion.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# 8

# Conclusions and Recommendations

The Committee on Risk-Based Analyses for Flood Damage Reduction embarked upon this study assuming that it would produce a technical report regarding the application of risk analysis within the Corps of Engineers's flood damage reduction studies. The charge to the committee was:

> The Secretary (Army) shall enter into an agreement with the National Academy of Sciences to conduct a study of the Corps of Engineers' use of risk analysis for the evaluation of hydrology, hydraulics, and economics in flood damage reduction studies. The study shall include—

a) an evaluation of the impact of risk-based analysis on project formulation, project economic justification, and minimum engineering and safety standards; and

b) a review of studies conducted using risk-based analysis to determine—

i) the scientific validity of applying risk-based analysis in these studies; and

ii) the impact of using risk-based analysis as it relates to current policy and procedures of the Corps of Engineers.

As the committee proceeded with its study and its discussions, it learned that the issues of risk analysis within the Corps were quite complicated, and that a full understanding of these methods and their applications required a broader investigation than the committee antici

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

pated at the outset. To adequately address its charge, the committee ultimately examined several topics in addition to its technical analysis of risk-based techniques.

Thus, while this study presented several challenges, it also offered a unique opportunity to analyze a host of critical, emerging issues in statistical hydrology, geotechnical engineering, economics, communications, and public policy. In this study, these multiple disciplines, and the committee members representing them, were bound by common interests in risk analysis, floods, Corps of Engineers practices, and floodplain management.

The Corps of Engineers's adoption of risk analysis procedures that explicitly recognize and quantify hydrologic, hydraulic, geotechnical, and economic uncertainties should lead to projects better tailored to local conditions and to available information, thus better achieving social objectives and flood damage reduction goals. For example, the new procedures represent a significant advance over traditional levee freeboard requirements that led to inconsistent levels of flood protection among projects. The replacement of this long standing approach with new risk analysis methods required significant conceptual and methodological development. **The new techniques are a significant step forward and the Corps should be greatly commended for embracing contemporary, but complicated, techniques and for departing from a traditional approach that has been overtaken by modern scientific advances.** There should be no turning back from this important step forward.

It bears repeating that the former levee freeboard standard did not provide consistent levels of flood protection across the nation. A consistent protection standard must properly account for local and regional differences in topography, hydrology, and hydraulics, which the standard freeboard approach did not. For instance, as little as 2 feet of freeboard may be required to provide adequate flood protection in some areas, while in others, as much as 6 feet may be required. The traditional freeboard standard masks a significant degree of variation of risk of levee failure for citizens protected by these levees. This variation in risk of failure can be quantified by the Corps's new risk analysis procedure.

While the Corps is to be strongly commended, it is important that the Corps promptly address and resolve issues identified in this report in order for risk analysis methods to eventually become well founded, well documented, and correctly executed. Risk analysis methods need to be clearly understood and clearly documented, and results effectively com

Copyright National Academy of Sciences. All rights reserved.

Risk Analysis and Uncertainty in Flood Damage Reduction Studies
Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 177 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

municated to the public, its elected officials, other federal agencies, the U.S. Congress, and to the engineering community.

## RISK ANALYSIS TECHNIQUES

The committee reviewed the Corps's risk-based applications, including the Hydrologic Engineering Center's Flood Damage Assessment (HEC-FDA) computer program for calculating flood damage risk. The new method builds upon the deterministic approach to flood damage estimation that evolved over decades of use. The new method benefits from these decades of experience, but also suffers from the difficulty of translating deterministic practice into a probabilistic framework. While the Corps is to be praised for its adoption and implementation of the risk analysis methods, several technical issues remain only partially addressed. Particular concerns relate to models of hydrologic, hydraulic, and geotechnical uncertainties, performance metrics, and the economic uncertainty analysis.

### Risk Measures and Modeling

According to the U.S. federal *Principles and Guidelines*, estimates of expected annual damages (EAD) are the primary criterion (performance metric) for project selection. These are supplemented by the annual exceedance probability (AEP), which describes the likelihood of flooding in areas that should be protected. These two project performance metrics are important and appropriately summarize economic and safety dimensions of system performance. They adequately characterize the performance of flood damage reduction projects.

For levee certification and engineering purposes, it is useful to calculate other system reliability measures, such as the conditional nonexceedance probability for the 1 per cent flood (this describes the uncertainty in the water height of the flood with a 0.01 probability of occurring in a given year). In the committee's view, however, such engineering reliability measures, which are difficult to understand, should not be used to communicate flood risk to the public. Conditional nonexceedance probabilities are an awkward combination of traditional and new risk-based concepts and are easily misunderstood. The concept of annual exceedance probability is clearer and provides the needed information. **The committee thus recommends that the Corps use *annual exceed***

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

***ance probability* as the performance measure of engineering risk.**

The construction of risk measures rests upon complete and accurate specification of the uncertainties in each component of an analysis, and upon correct implementation of procedures to: (1) estimate knowledge uncertainties, (2) incorporate those uncertainties in the risk analysis, and (3) properly propagate the uncertainties in individual parts of the analysis to the final results. **As the current method has shortcomings in these areas, the committee recommends that the Corps improve its analysis of economic, hydrologic, hydraulic, and geotechnical engineering uncertainties.**

The committee reviewed the Corps's risk analysis model and the HEC-FDA computer code used to perform calculations. A concern is whether all of the important uncertainties are included in the analysis and if those uncertainties are appropriately represented. The Corps's method should clearly distinguish between natural variability and knowledge uncertainty. In some cases, such as stage-discharge relations, uncertainties due to natural variability appear to be incorrectly subsumed within knowledge uncertainties; in other cases, such as geotechnical levee performance, knowledge uncertainties are incorrectly subsumed within natural variability.

**The committee thus recommends that the Corps focus greater attention on the probabilistic issues of identifying, estimating, and combining uncertainties.** This recommendation is important because, in the way the analyses are conducted, knowledge uncertainties (lack of scientific understanding of events and processes) explicitly affect project performance measures, but natural variability does not.

**The committee recommends that the Corps strive to reduce the considerable variation in the estimates of water surface elevation when using different models of river hydraulics.** The Corps's experiences in applying alternative methods to estimate flood stage indicate that there can be substantial differences in the results.

**The committee recommends that the Corps's risk analysis method evaluate the performance of a levee as a spatially distributed system.** The geotechnical evaluation of a levee, which may be many miles long, should account for the potential for failure at any point along the levee during a flood. Multiple modes of failure (e.g., overtopping, embankment instability), correlation of embankment and foundation properties, and the potential for multiple levee section failures during a flood should also be considered. The current procedure treats a levee within each damage reach as independent and distinct from one reach to the next. Further, within a reach, the analysis focuses on the portion of

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

each levee that is most likely to fail. This does not provide a sufficient analysis of the performance of the entire levee. This has important implications for not only geotechnical and economic analysis of flood damages, but also for levee certification.

The Corps's new geotechnical reliability model would benefit greatly from field validation. The nation has many years of experience with levee performance and, unfortunately, also with levee failures. Much of this experience is documented and accessible to federal agencies. **The committee recommends that the Corps undertake statistical ex post studies to compare predictions of geotechnical failure probabilities made by the reliability model against frequencies of actual levee failures during floods. The committee also recommends that the Corps conduct statistical ex post studies with respect to the performance of other flood damage reduction structures. These latter studies should be conducted in order to identify vulnerabilities (failure modes) of these systems and to verify engineering reliability models.**

## Economics

A key innovation of the Corps's new risk analysis procedures is the derivation of the uncertainty in economic benefits due to knowledge uncertainties. This analysis is performed using a Monte Carlo procedure that evaluates expected annual damages using different possible combinations for hydrology, hydraulics, geotechnical and economic model parameters. This uncertainty analysis is currently performed as if the errors for each individual structure that might suffer damage are independent of one another. This fails to include the correlations and interaction among these parameters and thus misrepresents the uncertainty in damages in individual reaches, and for the project as a whole. For example, if a house has a higher economic value than estimated, or is surveyed to be at too low an elevation, similar houses on the same block are likely to experience similar errors. Unfortunately, the current Corps procedures neglect these sources of correlation and as a result misrepresent the overall uncertainty in project damages and benefits.

For similar reasons, the Corps's procedure incorrectly computes the uncertainty associated with differences in benefits from alternative projects components. The current practice of summing and subtracting percentiles of uncertainty distributions for damages in different reaches, and for alternative project components, is statistically incorrect unless there is

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

perfect correlation among the values. This is not the case, although there are strong interrelationships. As a result, the uncertainty assigned to the computed annual project damages and benefits is incorrect.

The assessment of uncertainty in economic performance could be significantly simplified to yield more precise measures of uncertainty by focusing on uncertainty in project benefits for each individual structure, while considering the interrelationships among those uncertainties instead of accumulating damages over damage reaches. What is critical is not accurate assessment of flood damage, but rather accurate assessment of the degree to which the project will reduce flood damage. If the flood damage to each structure in the floodplain is estimated both with and without the project plan, the benefit provided by the plan to this structure is the amount of reduced damage. Errors in estimating flood damage arise from errors in flood discharge, water surface elevation and the structure's economic value. These errors affect the damages both with and without the plan in nearly the same way; thus, when the benefit is calculated, the effects of these errors may nearly be cancelled out. The uncertainty in estimation of project benefits accumulated over all structures could thus be significantly less than the uncertainty in estimating project damage. Moreover, the impact of correlation among the analysis errors may be similarly diminished. Detailed study of alternatives to the current method of accounting for uncertainty in economic performance is needed to identify more efficient and statistically robust procedures.

**The committee recommends that the Corps calculate the risks associated with flooding, and the benefits of a flood damage reduction project, structure by structure, rather than conducting risk analysis on damage aggregated over groups of structures in damage reaches.**

## CONSISTENT TERMINOLOGY

**The committee recommends that the Corps adopt and use a consistent vocabulary for distinguishing among natural variability, knowledge uncertainty, and measures of system reliability.** Although difficult to assess, the distinction between natural variability and knowledge uncertainty is important because of the different roles these sources of uncertainty play in risk analysis.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

## LEVEE CERTIFICATION

In the early 1990s the Corps adopted a risk analysis approach to replace the practice of certifying levees that had 3 feet of freeboard above the 100-year flood. This former criterion provided different levels of flood protection to different sites. Both the new risk analysis approach and the levels of flood protection it provided were controversial. Negotiations with the Federal Emergency Management Agency (FEMA) led to the current practice of certifying a levee based on a three-tiered decision rule, using either 3 feet of freeboard, or a 90 percent conditional nonexceedance probability of passing a 100-year flood, or a 95 percent conditional nonexceedance probability. This criterion is a step forward and a reasonable transition from the older levee certification criterion into the new risk analysis framework. It has problems, however: (1) it still leads to different levels of flood protection for different projects, (2) the three-tiered decision rule is unnecessarily complicated, (3) the method evaluates levees individually and not as a system, and (4) certification considers only the 100-year flood, not the full range of floods.

**The committee recommends that the federal levee certification program focus not upon some level of assurance of passing the 100-year flood, but rather upon "annual exceedance probability."** This is the probability that an area protected by a levee system will be flooded by any potential flood. **This annual exceedance probability of flooding should include uncertainties derived from both natural variability and knowledge uncertainty.**

The adoption and implementation of annual exceedance probability as the key criterion in levee certification will require significant resources and time. **Until the measure of annual exceedance probability approach is adopted as the key criterion for levee certification, the committee recommends that the Corps and FEMA adopt a single conditional nonexceedance probability for levee certification.**

The former certification criterion was flawed in that it produced vastly different levels of flood protection for different communities. **The committee recommends that the certification criterion provide a uniform level of flood protection.** Which level of protection to choose is not obvious. Insisting on the highest level of protection would mean that only a very small proportion of levees would be certified. **In the committee's judgment, the certification criterion should be the level of protection provided to most people in the past—the median level historically provided.** Based upon a small sample of all Corps flood damage reduction projects, the committee found that the median annual ex

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

ceedance probability of Corps flood damage reduction projects is approximately 1/230.

This is the committee's best estimate of the median annual exceedance probability. **To obtain a more reliable measure of the median annual exceedance probability of approved projects, the committee recommends that the Corps examine a larger number of flood damage reduction projects and audit the process of estimating the annual exceedance probability for these projects.**

**The committee also recommends that the Corps develop a table showing percentiles of variability in the annual exceedance probability of its flood damage reduction projects.** By choosing an appropriate percentile value in this range, a corresponding level of assurance can be obtained that the expected level of protection is at least 100 years, as required. The lack of allowance for this variability led to the abandonment of the annual exceedance probability criterion during the 1990s.

## FLOODPLAIN MANAGEMENT

Neither the U.S. Congress nor the Corps of Engineers have identified an explicit goal for management of the nation's floodplains. The committee is of the view that the goal of floodplain management should be to use the land for the greatest social benefit. Broadening the scope of Corps risk analysis and expanding the types of alternatives considered would provide more useful insight about how to best achieve this goal.

If conducted using the best information available, risk analysis can provide substantial insight for making floodplain management decisions. The Corps's risk analysis method quantitatively considers only direct damage reductions and costs of alternatives. It does not consider potential loss of life or environmental and social consequences. The benefits that can be claimed within Corps water resources project planning studies are specified by the federal *Principles and Guidelines* and not by the Corps.

**To ensure that the Corps's flood damage reduction projects provide adequate social and environmental benefits, the committee recommends that potential loss of life, other social consequences, and environmental consequences be explicitly addressed in the Corps's risk analysis.** This will improve the ability to make informed decisions about floodplain management and should ultimately lead to better use of our nation's floodplains. Floodplain management alternatives should not be limited to structural alternatives such as levees, dikes, and dams. In

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

formation and communication alternatives, such as warning systems and zoning regulations, should be considered both separately and in conjunction with structural alternatives. The committee recognizes that the Corps alone cannot implement these recommendations, nor is such a broadening of the risk analyses likely to occur over a short period of time.

**To appropriately include such consequences and their relative importance, the committee recommends that the ecological, health, and other social effects of Corps flood damage reduction studies, and the tradeoffs between them, be quantified to the extent possible and included in the National Economic Development Plan.** More explicit efforts at including these types of consequences and values in the Corps's benefit–cost calculations should increase social benefits of the Corps's flood damage reduction studies. Examples of these consequences that are not included in the current benefit–cost guidelines contained within the *Principles and Guidelines* include lives saved (by structural and nonstructural projects), damages avoided to structures in floodplain evacuation projects, and preservation of biodiversity. Appropriate revisions of existing legislation, consistent with this recommendation, may have to be enacted by the U.S. Congress. The Corps should seek guidance from the Office of Management and Budget and seek consistency with other federal agencies on the use of alternative metrics for incorporating potential loss of life, environmental impacts, and other effects of floods.

The U.S. Army Corps of Engineers is a national and international leader in addressing flood-related problems. The committee applauds the agency's commitment and applauds Corps personnel in adopting, developing, and implementing the risk analysis approach. It is imperative that the Corps take the time needed to complete this new approach so that it achieves its potential. This new approach represents a significant step forward for the Corps, and for flood damage reduction studies, in general.

The committee commends the Corps for recognizing the limitations of the former procedures and for having the courage to undertake the development of a new, controversial, and technically difficult risk analysis approach. We offer this report in the spirit of constructive advice and in hopes of promoting wiser use of the nation's floodplains.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# References

Al-Futaisi, A., and J. Stedinger. 1999. Integrating hydrologic and economic uncertainties into flood risk management project design. Journal of Water Resources Planning and Management 125(6):314-324.

Bazovsky, I., 1961. Reliability Theory and Practice. Englewood Cliffs, N.J.: Prentice-Hall.

Beard, L.R. 1962. Statistical Methods in Hydrology. Revised from an earlier edition published in 1952 under Civil Works Investigations Project CW-151 by the U.S. Army Engineer District. Sacramento, Calif.: U. S. Army Corps of Engineers.

Bobee, B.. and F. Ashkar. 1991. The Gamma Family and Derived Distributions Applied in Hydrology Littleton, Colo.: Water Resources Publications.

Brown, C. A., and W. J. Graham. 1988. Assessing the threat to life from dam failure. Water Resources Bulletin 24:1303-1309.

Budnitz, R. J., G. Apostolakis, D. M. Boore, L. S. Cluff, K. J. Coppersmith, C. A. Cornell, and P. A. Morris. 1997. Recommendations for Probabilistic Seismic Hazard Analysis: Guidance on Uncertainty and Use of Experts. Prepared for the U.S. Nuclear Regulatory Commission, NUREG/CR-6372. Washington, D.C.: U.S. Nuclear Regulatory Commission.

Calabro, S.R. 1962. Reliability Principles and Practices. New York , N.Y.: McGraw-Hill.

Carhart, R. R. 1953. A Survey of the Current Status of the Electronic Reliability Problem. Research Memo RM-1131. Santa Monica, Calif: Rand Corporation.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Chow, V. T., D. R. Maidment, and L. W. Mays. 1988 . Applied Hydrology. New York, N.Y.: McGraw-Hill.

Chowdhury, J. U., and J. R. Stedinger. 1991. Confidence intervals for design floods with estimated skew coefficient. Journal of Hydraulic Engineering 117(7):811-831.

Cornell, C. A. 1968. Engineering seismic risk analysis. Bulletin of the Seismological Society of America 58:1583-1606.

Cornell, C. A., and E. H. Vanmarcke. 1969. The major influences on seismic risk. Pp. 69-93 in Proceedings of the Fourth World Conference on Earthquake Engineering. Santiago, Chile.

Cressie, N. A. 1991. Statistics for Spatial Data. New York, N.Y.: John Wiley.

Davis, D.W. 1991. A risk and uncertainty based concept for sizing levee projects. Pp. 231-249 in Proceedings of a Hydrology and Hydraulics Workshop on Riverine Levee Freeboard. Davis , Calif.: U.S. Army Corps of Engineers Hydrologic Engineering Center.

Fischhoff, B., S. Lichtenstein, P. Slovic, S. L. Derby, and R. L. Keeney. 1981. Acceptable Risk. Cambridge, Mass.: Cambridge University Press.

Fishburn, P.C. 1970. Utility Theory for Decision-Making. New York, N.Y.: John Wiley.

Gumbel, E. J. 1941. The return period of flood flows. The Annals of Mathematical Statistics 12 (2):163-190.

Haimes, Y.Y. 1998. Risk Modelling, Assessment and Management. New York, N.Y.: John Wiley.

Huffman, R. G., and E. Eiker. 1991. Freeboard design for urban levees and floodwalls. Pp. 5-11 in Proceedings of a Hydrology and Hydraulics Workshop on Riverine Levee Freeboard, Monticello, Minnesota. Davis, Calif.: U.S. Army Corps of Engineering Hydrologic Engineering Center.

Hershfield, D. M. 1961. Rainfall frequency atlas of the United States for Durations from 30 Minutes to 24 Hours and Return Periods from 1 to 100 Years. Technical Paper 40. Washington, D.C.: US Dept of Commerce, Weather Bureau.

Hydrologic Engineering Center. 1998a. HEC-FDA Flood Damage Reduction Analysis, Users Manual, Version 1.0. Davis, Calif.: US Army Corps of Engineers, Hydrologic Engineering Center.

Hydrologic Engineering Center. 1998b. HEC-HMS Hydrologic Modeling System, Users Manual, Version 1.0. Davis, Calif.: U.S. Army Corps of Engineers, Hydrologic Engineering Center.

Copyright National Academy of Sciences. All rights reserved.

IACWD (Interagency Advisory Committee on Water Data). 1981. Guidelines for Determining Flood Flow Frequency, Hydrology Subcommittee, Bulletin # 17B (Revised and Corrected). Reston, Vir.: U.S. Geological Survey.

IFMRC (Interagency Floodplain Management Review Committee). 1994. Sharing the Challenge: Floodplain Management into the 21st Century. Report of the Interagency Floodplain Administration Floodplain Management Task Force. Washington, D.C.: U.S. Government Printing Office.

Institute of Hydrology. 1999. Flood Estimation Handbook. 5 Vols . Wallingford, United Kingdom: Institute of Hydrology.

Karl, T. R., R. W. Knight, D. R. Easterling, and R. C. Quayle. 1996. Indices of climate change for the United States. Bulletin of the American Meteorological Society 77 (2):279-292.

Keeney, R.L. 1992. Value-Focused Thinking. Cambridge, Mass.: Harvard University Press.

Keeney, R. L., and H. Raiffa. 1976. Decisions with Multiple Objectives. New York, N.Y.: John Wiley. Republished in 1993 . New York, N.Y.: Cambridge University Press.

Keeney, R. L., T. L. McDaniels, and V. L. Ridge-Cooney. 1996. Using values in planning wastewater facilities for Metropolitan Seattle. Water Resources Bulletin 32:293-303.

Krimm, R. 1996. Letter from Richard W. Krimm, Federal Emergency Management Agency to Major General Stanley G. Genega, U.S. Army Corps of Engineers. March 21, 1996.

Kusler, J., and L. Larson. 1993. Beyond the ark: A new approach to U.S. floodplain management. Environment 35(5):7-11, 31-34.

Lave, L., D. Resendiz-Carillo, and F. McMichael. 1990. Safety goals for high-hazard dams: Are dams too safe? Water Resources Research 26:1383-1391.

Lesher, M., and P. Foley. 1997. Risk-based analysis for evaluation of alternatives: Grand Forks, North Dakota and Crookston, Minnesota. In Proceedings of Hydrology and Hydraulics Workshop on Risk-based Analysis for Flood Damage Reduction Studies. Davis, Calif.: U.S. Army Corps of Engineers Hydrologic Engineering Center

Marshall and Swift. 1999. Residential Cost Handbook, Marshall and Swift Co. http://www.marshallswift.com/realestateproductpages/RCH.htm (limited access).

McCuen, R.H. 1979. Map skew. Journal of the American Society of Civil Engineers Water Resources Planning and Management Division 105 (WR2):269-277 (with Closure 107 (WR2:582, 1981)).

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

Morgan M. G., B. Fischhoff, A. Bostrom., C. Atman, and L. Lave. 1992. Communicating risk to the public. Environmental Science and Technology 26:2048-2055.

Morgan, M. G., and M. Henrion. 1990. Uncertainty: A Guide to Dealing with Uncertainty in Quantitative Risk and Policy Analysis. New York, N.Y.: Cambridge University Press.

Moser, D. A. 1997. The Use of Risk Analysis by the U. S. Army Corps of Engineers. In Proceedings of a Hydrology and Hydraulics Workshop on Risk-Based Analysis for Flood Damage Reduction Studies. Davis, Calif.: U.S. Army Corps of Engineers Hydrologic Engineering Center.

Moser, D.A. 1998. Risk Analysis for Water Resources Planning and Management, PROSPECT Training Course Notes. Control No. 349. Washington, D.C.: U.S. Army Corps of Engineers.

NERC (Natural Environment Research Council). 1975. Hydrological Studies. Vol. 1 of Flood Studies Report . London: Natural Environmental Research Council.

NRC (National Research Council). 1983. Risk Assessment in the Federal Government: Managing the Process. Washington, D.C.: National Academy Press.

NRC. 1994. Science and Judgement in Risk Assessment. Washington, D.C.: National Academy Press.

NRC. 1995. Flood Risk Management and the American River Basin: An Evaluation. Washington, D.C.: National Academy Press.

NRC. 1996. Understanding Risk: Informing Decision in a Democratic Society. P. S. Stern , and Fineberg, H. V. (eds.). Washington, D.C.: National Academy Press.

NRC. 1999a. New Directions in Water Resources Planning for the U.S.. Army Corps of Engineers. Washington, D.C.: National Academy Press.

NRC. 1999b. Downstream: Adaptive Management of Glen Canyon Dam and the Colorado River Ecosystem. Washington, D.C.: National Academy Press.

NWF (National Wildlife Federation). 1998. Higher Ground: A Report on Voluntary Property Buyouts in the Nation's Floodplains. Vienna,Vir.: National Wildlife Federation.

O'Leary, N. 1997. Risk Based Analysis of Beargrass Creek, Kentucky. Pp. 101-116 in Proceedings of a Hydrology and Hydraulics Workshop on Risk-Based Analysis for Flood Damage Reduction Studies. Davis, Calif.: U.S. Army Corps of Engineers Hydrologic Engineering Center.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Paté-Cornell, M. E.. 1984. Warning systems: applications to the reduction of risk costs for new dams. Pp. 73-83 in J. L. Sarafim (ed.) Safety of Dams. Amsterdam: Balkema.

Pielke, R. 1999. Nine fallacies of floods. Climatic Change 42:413-438.

Richards, F. 1999. A twentieth century history of flooding in the U.S. and what the future might hold. Pp. 144-151 in Second Symposium of Environmental Applications. Boston, Mass. American Meteorological Society.

Salas, J. D. 1993. Analysis and modeling of hydrologic time series. Chapter 19 in Maidment , D. R. (ed.). Handbook of Hydrology. New York, N.Y.: McGraw-Hill.

Stedinger, J.R. 1983a. Confidence intervals for design events. American Society of Civil Engineers Journal of Hydraulic Engineering 109 (HY1):13-27.

Stedinger, J. R. 1983b. Design events with specified flood risk. Water Resources Research 19 (2):511-522.

Stedinger, J.R. 1997. Expected probability and annual damage estimators. Journal of Water Resources Planning and Management 123(2):125-35.

Stedinger, J. R., R. M. Vogel, and E. Foufoula-Georgiou. 1993. Frequency analysis of extreme events. Chapter 18 in Maidment, D. R. (ed.) Handbook of Hydrology. New York, N.Y.: McGraw-Hill, Inc.

Tasker, G. D., and J. R. Stedinger. 1986. Estimating generalized skew with weighted least squares regression. American Society of Civil Engineers Journal of Water Resources Planning and Management 112(2):225-237.

Tasker, G. D., and J. R. Stedinger. 1989. An operational GLS model for hydrologic regression. Journal of Hydrology 111(1-4):361-375.

USACE. 1991a. Proceedings of a Hydrology and Hydraulics Workshop on Riverine Levee Freeboard. August 27-29, Monticello, Minnesota. Davis, Calif.: U. S. Army Corps of Engineers Hydrologic Engineering Center.

USACE. 1991b. Benefit Determination Involving Existing Levees. Policy Guidance Letter No. 26. Washington, D.C.: U.S. Army Corps of Engineers.

USACE. 1992a. Guidelines for Risk and Uncertainty Analysis in Water Resources Planning. Volume I: Principles with Technical Appendices. Report 92-R-1. Alexandria, Vir.: U.S. Army Corps of Engineers Institute for Water Resources.

USACE. 1992b. Guidelines and Procedures for Risk and Uncertainty Analysis in Corps Civil Works Planning. Volume II: Example

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Cases, Guidelines for Risk and Uncertainty Analysis in Water Resources Planning. Report 92-R-2. Alexandria, Vir.:

U.S. Army Corps of Engineers Institute for Water Resources.

USACE. 1996a. Risk-Based Analysis for Evaluation of Hydrology/Hydraulics, Geotechnical Stability, and Economics in Flood Damage Reduction Studies. ER 1105-2-101. Washington, D.C. : U.S. Army Corps of Engineers.

USACE. 1996b. Risk-Based Analysis for Flood Damage Reduction Studies. Manual, EM 1110-2-1619. Washington, D.C. : U.S. Army Corps of Engineers.

USACE. 1996c. An Introduction to Risk and Uncertainty Evaluation of Investments. Report 96-R-8. Alexandria, Vir.: U.S. Army Corps of Engineers Institute for Water Resources.

USACE. 1996d. Incorporating Risk and Uncertainty into Environmental Evaluation: An Annotated Bibliography. Report 96-R-9. Alexandria, Vir.: U.S. Army Corps of Engineers Institute for Water Resources.

USACE. 1997a. Risk and Uncertainty Analysis Procedures for the Evaluation of Environmental Outputs. Institute for Water Resources Report 97-R-7. Alexandria, Vir.: U.S. Army Corps of Engineers Institute for Water Resources.

USACE. 1997b. Hydrology and Hydraulics Workshop on Risk-Based Analysis for Flood Damage Reduction Studies. Publication SP-28. Davis, Calif.: U.S. Army Corps of Engineers Hydrologic Engineering Center.

USACE. 1997c. Metropolitan region of Louisville, Kentucky, Beargrass Creek Basin, Final Feasibility Report, Vol. 1 , Main Report. Louisville, Kent.: U.S. Army Corps of Engineers.

USACE. 1997d. Metropolitan region of Louisville, Kentucky, Beargrass Creek Basin. Final Feasibility Report. Volume II: Technical Appendices. Louisville, Kent.: U.S. Army Corps of Engineers.

USACE. 1997e. Guidance on Levee Certification for the National Flood Insurance Program. CECW-P/CECW-E. 25 March 1997. Washington, D.C. : U.S. Army Corps of Engineers.

USACE. 1998a. Flood Reduction Studies for East Grand Forks, Minnesota and Grand Forks, North Dakota. Sub-Appendix A1, Hydrologic Analysis. St. Paul, Minn.: U.S. Army Corps of Engineers.

USACE. 1998b. Flood Reduction Studies for East Grand Forks, Minnesota and Grand Forks, North Dakota. Sub-Appendix A2, Hydraulic Analysis. St. Paul, Minn.: U.S. Army Corps of Engineers.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

USACE. 1998c. Flood Reduction Studies for East Grand Forks, Minnesota and Grand Forks, North Dakota. Sub-Appendix A3, Risk – Based Analysis. St. Paul, Minn. : U.S. Army Corps of Engineers.

USACE. 1998d. HEC-FDA Flood Damage Reduction Analysis. Users Manual CPD-72, Version 1 . Davis, Calif.: U.S. Army Corps of Engineers. Hydrologic Engineering Center.

USACE. 1999a. Digest of Water Resources Policies and Authorities. Washington, D.C. : U. S. Army Corps of Engineers.

USACE. 1999b. Tools for Risk Based Economic Analysis. Report 99-R-2. Alexandria, Vir.: U.S. Army Corps of Engineers Institute for Water Resources.

USACE. 1999c. Risk Analysis in Geotechnical Engineering for Support of Planning Studies. ETL 1110-2-556. Washington, D.C.: U.S. Army Corps of Engineers.

USACE. 2000. Planning Guidance Notebook. ER 1105-2-100. Washington, D.C.: U.S. Army Corps of Engineers. U.S. Department of Agriculture (undated). Managing Risk: Being Prepared. Washington, D.C.: U.S. Department of Agriculture.

USWRC (U.S. Water Resources Council). 1973. Water and Related Land Resources: Establishment of Principles and Standards for Planning. Federal Register 38:24784, 248222-248223.

USWRC. 1983. Economic and Environmental Principles and Guidelines for Water and Related Land Resources Implementation Studies. Washington, D.C.: Water Resources Council.

Vanmarcke, E. 1983. Random Fields. Cambridge, Mass.: MIT Press.

Von Winterfeldt, D. and W. Edwards. 1986. Decision Analysis and Behavioral Research. New York, N.Y.: Cambridge University Press.

Wescoat, J. L. 1986. Expanding the range of choice in water resources management: An evaluation of policy approaches. Natural Resources Forum 10(3):239-254.

White, G. F. 2000. Water science and technology: Some lessons from the 20th century. Environment 42(1):30-38.

Yen, B. C., and Y. K. Tung. 1993. Some recent progress in reliability analysis for hydraulic design. Pp. 35-79 in Yen, B. C. , and Y. K. Tung (eds.) Reliability and Uncertainty Analyses in Hydraulic Design. Reston, Vir.: American Society of Civil Engineers.

Yoe, C. E., and K. D. Orth. 1996. Planning Manual. Report 96-R-21. Alexandria, Vir.: U.S. Army Corps of Engineers Institute for Water Resources.

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 191 of 858


About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# Appendix A

# Glossary

**Aggregated stage–damage function with uncertainty –** A composite median stage–damage function for a damage reach. The function is developed by damage categories at the damage reach index location. The stage–damage functions of individual structures are aggregated using a series of water surface profiles to account for the slope in the profiles throughout the reach. Uncertainty, the error in the damage estimates, may also be computed.

**Aleatory uncertainty –** See "natural variability."

**Annual exceedance probability –** The probability that flooding will occur in any given year considering the full range of possible annual flood discharges.

**Base flood –** The median flood discharge having a 1 percent chance of being equaled or exceeded in any given year.

**Bulletin 17B –** A U.S. Geological Survey publication entitled *Guidelines for Determining Flood Flow Frequency* (USGS, 1982). The publication describes procedures for developing discharge–frequency functions using stream flow records. These procedures are recommended for all federal agency applications.

**Conditional nonexceedance probability –** The probability that failure will not occur during a flood of a given frequency. For example, a levee

Copyright National Academy of Sciences. All rights reserved.

may have a 90 percent chance of not being overtopped when exposed to a 100-year flood.

**Confidence limit curves –** *Error limit curves* about a log-Pearson Type III discharge–probability function developed using the noncentral *t* distribution. Confidence limit curves are used to define the discharge–exceedance probability function's uncertainty.

**Design flood –** The flood that a flood damage reduction project, such as a levee, is based upon. Often the 100-year flood.

**Discharge–exceedance probability –** The relationship of peak discharge to the probability of that discharge being exceeded in any given year.

**Egress** – The ability to evacuate an area threatened by flood.

**Epistemic uncertainty –** See “knowledge uncertainty.”

**Equivalent record length** – Number of years of a systematic record of recorded peak discharges at a stream gage. For probability functions derived at ungaged locations using model or other data, the equivalent record length is estimated based on the overall “worth” or “quality” of the frequency function expressed as the number of years of record. This parameter is important in risk-based analysis because it relates directly to the uncertainty of the flood–discharge probability function.

**Exceedance probability event –** The probability that a specific event will be equalled or exceeded in any given year. For example, the 0.01 exceedance probability event has 1 chance in 100 of occurring in any given year.

**Expected annual damage –** In risk-based analysis, the average or mean of all possible values of damage determined by Monte Carlo sampling of discharge–exceedance probability, stage–discharge, and stage–damage relationships and their associated uncertainties. Calculated as the integral of the damage–probability function.

**FEMA –** U.S. Federal Emergency Management Agency. FEMA administers the National Flood Insurance Program (NFIP) and is jointly responsible (with the U.S. Army Corps of Engineers) for levee certification within the NFIP.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

**FIA** – Flood Insurance Administration. The federal entity within the Federal Emergency Management Agency responsible for administering the National Flood Insurance Program.

**Flood damage reduction actions** – Measures and actions taken to reduce flood damage. These may include implementation of reservoirs, detention storage, channels, diversions, levees and floodwalls, interior systems, flood-proofing, raising, relocation, and flood warning and preparedness actions.

**Flood–frequency curve** – A graph showing the average interval time (or recurrence interval) within which a flood of a given magnitude will be equaled or exceeded in any given year.

**Freeboard** – An addition to a levee's design height to ensure against overtopping during the design flood.

**Hydrology and hydraulics** – Hydrology involves the estimation of the amount and shape of the runoff–discharge hydrographs throughout the study area. It also includes the frequency of the events. Hydraulics involves analysis of stream water surface profiles, flood inundation boundaries, and other technical studies of stream flow characteristics.

**Knowledge uncertainty** – Uncertainty arising from imprecision in analysis methods and data.

**Level of protection** – A measure in years of the average interval between failures of a flood prevention system such as a levee.

**Log normal distribution** – A two-parameter probability distribution defined by the mean and standard deviation. A nonsymmetrical distribution applicable to many kinds of data sets where the majority (more than half) of values are less than the mean but where values greater than the mean can be extreme, such as with stream flow data.

**Monte Carlo analysis** – A method that produces a statistical estimate of a quantity by taking many random samples from an assumed probability distribution, such as a normal distribution. The method is typically used when experimentation is infeasible or when the actual input values are difficult or impossible to obtain.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

**Natural variability –** Uncertainty arising from variations inherent in the behavior of natural phenomena (e.g., severity of the maximum flood in any year).

**NED –** National Economic Development. The water resources project planning alternative designed to maximize national economic development, consistent with protecting the nation's environment, and pursuant to national environmental statutes, applicable executive orders, and other federal planning requirements. The NED alternative is required by the *Principles and Guidelines* (*P&G*, see below) to be identified in Corps feasibility studies.

**NFIP –** National Flood Insurance Program, enacted by the federal government in 1968 to provide flood insurance for communities and structures at risk of flooding.

**Nonstructural measures –** Measures such as raising, relocating, flood-proofing, and regulatory and emergency actions associated with structures and damageable property that modify the existing and/or future damage susceptibility. Nonstructural measures are not designed to directly affect the flow of flood waters.

**Normal distribution –** A two-parameter probability distribution defined by the mean and standard deviation. A symmetrical "bell shaped" curve applicable to many kinds of data sets where values are equally as likely to be greater than and less than the mean. Also called the Gaussian distribution.

**One-hundred-year flood –** A median flood discharge having a 1 percent chance of being equaled or exceeded in any given year.

**P&G – Principles and Guidelines.** A 1983 U.S. Water Resources Council document that provides water resource project planning guidance to the U. S. Corps of Engineers, the Bureau of Reclamation, the Natural Resources Conservation Service, and the Tennessee Valley Authority.

**Probability function –** A discharge–exceedance or stage–exceedance probability relationship for a reach developed by traditional, site-specific, hydrologic engineering analysis procedures.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

**Residual risk –** The portion of the flood risk that still exists with the flood damage reduction project implemented.

**Return period –** The average time interval between occurrences of a hydrological event of a given or greater magnitude, usually expressed in years.

**Risk** – The probability of failure during a flood event. For reaches without levees, failure means exceeding a target stage. For reaches with levees, it means a levee failure.

**Skewness coefficient** – A statistic used as a measure of the symmetry of the statistical distribution of data. It is the third moment of a distribution. It is estimated as the number of values times the sum of the cubes of the deviations from the mean divided by the number of values minus 1, times the number of values times 2, times the standard deviation cubed.

**Stage** – The vertical distance in feet (meters) above or below a local or national elevation datum.

**Stage associated with the median 1-percent chance flood discharge –** The stage taken from the stage–discharge curve that corresponds to a discharge taken from the discharge–probability curve of 1 percent.

**Stage–damage function –** Relationship of depth of water to damage at a structure. Damage is normally specified as a percentage of the structure or content value. The functions are generic for similar structures and are not tied to the structure location.

**Stage–damage functions with uncertainty** – Stage–damage functions with uncertainty are computed at each structure and aggregated by damage category to damage reach index locations. Stage is elevation or locally referenced stage associated with the structure and index location. Damage is the median estimate of structure, content, and other inundation reduction damage associated with the stage of floodwaters at the location. Uncertainty in the stage–damage function arises from to errors in estimating the depth–damage function, first-floor stage, structure value, and content-to-structure-value ratio.

**Stage–discharge function** – A graphical relationship that yields the stage for a given discharge at a specific location on a stream or river.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Referred to as a rating function or curve. These relationships are usually developed by computing water surface profiles for several discharges and plotting the stages vs. discharge relationship at a specific stream location.

**Stage–discharge functions with uncertainty** – Relationship of the water surface stage and discharge. Uncertainty is the distribution of the errors of stage estimates about a specific discharge.

**Standard deviation –** A statistical measure of the spread of a distribution around the mean.

**Structural measures –** Those water resources project measures designed to modify the flow of flood waters.

**Uncertainty** – A measure of the imprecision of knowledge of variables in a project plan.

Copyright National Academy of Sciences. All rights reserved.

# Appendix B

# Corps–FEMA Levee Certification Documentation

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 198 of 858


DEPARTMENT OF THE ARMY
U.S. Army Corps of Engineers
WASHINGTON, D.C. 20314-1000

REPLY TO
ATTENTION OF:

Policy and Planning Division 3 AUG 1992

Policy and Planning Division 3 AUG 1992 Mr. John L. Matticks Assistant Administrator Office of Risk Assessment Federal Energency Management Agency 500 C Street, SW. Washington, DC 20472 Dear Mr. Matticks:

The Army Corps of Engineers has developed new guidance titled: "Risk Analysis Framework For Evaluation of Hydrology/Hydraulics and Economic In Flood Damage Reduction Studies." Once adopted, the procedure outlined in that document will be used in the Corps flood damage reduction studies. This recently completed effort, in the form of an Engineering Circular, has been transmitted to our field offices for their final review and comment.

As you recall, this effort began as a result of discussions at the August 1991 Hydrology and Hydraulics Workshop in Riverwood, Minnesota. Your participation in that workshop was extremely beneficial and provided a much needed FEMA perspective.

Because of the Corps extensive involvement in and support of the National Flood Insurance Program, and the potential significiant impact of this new guidance on Corps methods for hydrologic and hydraulic analyses, your review of this document is important to us. I have enclosed copies for your use and would appreciate any comments you may have.

Mr. Jerry Peterson of my staff will contact you in the near future regarding the need for a meeting to discuss the new guidance in future detail. Feel free to contact Mr. Peterson if you have any question in the interim.

Sincerely,

Jimmy F. Bates Chief, Policy and Planning Division Directorate of Civil Works Enclosures

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

**Federal Emergency Management Agency**
Washington, D.C. 20472

APR 23 1993

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. Jimmy F. Bates
Chief, Policy and Planning Division
Directorate of Civil Works
Department of the Army
U.S. Army Corps of Engineers
Washington, DC 20314-1000

This letter was simply forwarded to Corps field offices for guidance in performing levee certification in RBA studies.
[signature] 5/26/99

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. Jimmy F. Bates Chief, Policy and Planning Division Directorate of civil work Department of the Army U.S. Army Corps of Engineers Washington, DC 20314-1000 Dear Mr. Bates:

This is in response to your letter dated August 3, 1992, regarding new guidance and procedures outlined in your draft circular entitled, "Risk Analysis Framework for Evaluation of Hydrology / Hydraulic and Economic in Flood Damage Reduction Studies," dated June 30, 1992. Thank you for allowing us to review information presentation conducted by the U.S. Army Corps of Engineers (ACE) at our offices on March 2, 1993. By having the opportunity to ask questions, Federal Insurance Administration personnel gained a better understanding of the new procedures. Please relay our thanks to Messrs. Jerome Peterson, Earl Eiker, Bob Daniel, and Ken Zwickl of your staff.

We recognize that the new procedures contained in this circular are designed to account for the uncertainties inherent in hydrologic and hydraulic analyses when determining risk of failure of a flood control structure. As you know, our particular interest is whether we should recognize, on our maps, that a flood control structure provides protection from the base flood. Our regulations define the base flood as the condition of inundation having a one-percent chance of being equalled or exceeded during any given year. We have enclosed copies of the pertinent portion of our regulations for your convenience.

Our policy has been to recognize on our maps that a levee provides protection from the base flood if the ACE certifies that the levee provides that level of protection, It has been suggested that implementing the new procedures would restrict future certifications by the ACE by qualifying the level of protection in terms of reliability. For example, the ACE could determine that a levee will safely convey the 100-year discharge with 90-percent reliability. Contrary to

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

that suggestion, we belive the circular allows the ACE to be quite explict. The new procedure determine the value that fills the blank in the following statement:

The levee has a ___ percent chance of being overtopped in any given year.

If the value is equal to or greater than 1.0 then we do not credit the levee on our maps; if it is less than 1.0 then we do credit the levee on our maps.

Traditionally, the term base flood hass been synonymous with 100-year discharge. Because the methods used to define the base flood elevations essentially are one-to-one relationships between the discharge and elevation, no distinction was necessary between the base flood and the 100-year discharge. However, accounting for the uncertainties inherent in hydrologic and hydraulic analysis as described in the draft circular eliminates that convenient relationship. That is, a distinction must be made between the base flood and the 100-year discharge.

Because our definition of a base flood does not depend on a particular discharge, we belive that the ACE can certify that a levee has been adequately designed and constructed to provide protection from the base flood without the aforementioned qualification. The basis of such a certification would be a determination that the levee is structurally sound and everywhere higher than the elevations determine to have a one-percent chance of being equally or exceeded in any given year. That would be the elevation corresponding to a simulation exceedance (true) probablity of 0.01 in Table 3 of Appendix B to the draft circular.

In addition to the Federal Emergency Management Agency (FEMA), other programs, particular at the State and local levels, will be affected by your proposed procedures. At the annual meeting of the Association of State Floodplain Managers(ASFPM) in Atlanta, Georgia, in March 1993, many officers of the ASFPM expressed a concern about the ACE's new riskbased analysis for levee certification. Additionally, several other members of the ASFPM with responsibility for floodplain management activities at the State and local shared similar concerns with members of my staff. It was explained that many of the states have adopted legislation or regulations that require the State and local bodies of goverment to assure that a specific number of feet of freeboard exist before a levee can be accredited. These ASFPM officers and members were very concerned that the new ACE procedures would put them in conflict with their own State and local statutes. I would urge you to obtain public comments on the ACE procedures before you finalize this engineering circular. Perhaps a briefing of the ASFPM comparable to that which you conducted in our offices would be of great benefit. Or, you may want to consider proposed and final rule-making with a public comment period to adopt the circular as ACE regulations. Otherwise, I fear you may be a target for some undesired congressional intercession.

We trust that this letter clarifies how your new procedures fit into the National Flood Insurance Program and, in particular, that the ACE can still certify levees for flood insurance purposes

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 201 of 858

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

without qualifying that certification. Again, thank you for the opportunity to review and comment on this draft circular. Mr. William R. Locke of my staff will serve as liaison during the implementation phase of these new procedures outlined in the draft circular. If you have any questions, you may contact him either by telephone at (202) 646-2754 or by facsimile at (202) 646-3445.

Sincerely,

John L. Matticks Assistant Administrator Office of Risk Assessment Federal Insurance Administration

Enclosure

cc: Mr. Jerome Peterson Chief, Floodplain Management Services and Coastal Resources Branch U.S. Army Corps of Engineers

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

**Federal Emergency Management Agency**
Washington, D.C. 20472

Major General Stanley G. Genega
Director of Civil Works
Department of the Army
U.S. Army Corps of Engineers
Washington, DC 20314-1000

Dear General Genega:

MAR 21 1996 Major General Stanley G. Genega Director of Civil Works Department of the Army U.S. Army Corps of Engineers Washington, DC 20314-1000 Dear

This is regarding our letter to the U.S. Army Corps of Engineers (USACE) dated April 23, 1993, concerning our comments on your draft circular entitled Risk *Analysis Framework for Evaluation of Hydrology/Hydraulics and Economics in Flood Damage Reduction Studies*, dated June 30, 1992. We had the opportunity to meet with USACE staff on September 13, 1995, to discuss the Federal Emergency Management Agency's (FEMA's) re-evaluation on Risk-Based Analysis with respect to FEMA's current levee certification policy.

It has come to my attention that the USACE has adopted a new levee design policy predicated on a risk-based approach. This risk-based analysis no longer incorporates freeboard as a design parameter.

In May 1995, we sent you a letter stating we were reviewing our position on Risk-Based Analysis as it pertains to our current levee certification policy and the comments in our April 1993 letter. As part of this ongoing review, a member of our staff attended a week-long training course in Risk-Based Analysis procedure. In addition, we reviewed the final results of analyses for 12 USACE projects provided to us by your staff. Based on this initial review, it became apparent that the criteria discussed in our April 1993 letter may not, in themselves, be the most appropriate standard for use by the USACE when certifying to FEMA that a levee may be credited for the purposes of removing the Special Flood Hazard Area (SFHA) designation from areas protected by that levee.

Our April 1993 letter pointed out that when using the Risk-Based Analysis procedures, the USACE could certify to FEMA that a levee provides protection from a base (1-percent) or less frequent flood without the use of a percent reliability That letter was not intended to indicate that the USACE must certify levees to

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

FEMA if the simulation exceedance (true) probability was 0.01 or less. For the 12 USACE projects, the simulation exceedance (true) probability standard of 0.01 referenced in our April 1993 letter produced levee designs with only 0.1 to 1.5 feet of freeboard and contained the FEMA base flood with a reliability of between only 50 and 75 percent. I am concerned that there may be a potential for conflict between levee projects designed by the USACE and by other Federal Agencies and Private Engineering firms. It is conceivable that levee designs (especially levee heights) would differ significantly between the USACE and others, although both would be designed to provide protection against the one-percent chance event. At this point, we are asking that the USACE continue to use the engineering and judgment expertise you are known for when certifying levees to FEMA, and not rely merely on the simulation exceedance probability if that, in the opinion of the USACE, results in unacceptable freeboard height.

Although we are rescinding the April 1993 letter and restoring the previous certification criteria, I believe that would be in the best interests of FEMA and the National Flood Insurance Program to continue dialoguing on this issue. Until such time as detailed criteria can be developed (which may include the concepts of annual exceedance probability and reliability), FEMA will continue to accept letters of certification from the USACE stating that a particular levee has been adequately designed and constructed to provide protection against the FEMA base flood as a means of removing the SFHA designation from areas behind the levee.

I look forward to discussions with you on this matter and other issues of mutual interest.

Sincerely,



Richard W. Krimm Acting Associate Director Mitigation Directorate cc:
Jerome Peterson, USACE

Copyright National Academy of Sciences. All rights reserved.

DEPARTMENT OF THE ARMY
U.S. Army Corps of Engineers
WASHINGTON, D.C. 20314-1000

REPLY TO
ATTENTION OF:

Planning Division
Flood Plain Management Services
and Coastal Resources Branch

Mr. Richard W. Krimm Associate Director Mitigation Directorate Federal Emergency Management Agency Washington, DC 20472 Dear Mr. Krimm:

This concerns your letter of March 21, 1996, and our recent discussions regarding the use of risk-based analyses in flood damage reduction project planning and levee certification for National Flood Insurance Program (NFIP) purposes.

I strongly believe that the risk-based approach to project formulation provides important information on potential levee performance that should be utilized in levee certification decisions. As we have discussed, our desire to introduce these concepts into levee certification decisions must be tempered with your need to maintain consisteacy with existing regulations. With that in mind, we have developed specific guidanc to ensure application of engineering principles and judgement when the U.S. Army Corps of provides levee certification information to your agency in support of the

I would appreciate your commems on the enclosed guidance. It is our intent to provide the guidance to our districts and divisions as soon as possible to eliminate any confusion that may exist on this issue.

Sincerely,

John P. D'Aniello, P.E. Deputy Director of Civil Works Enclosure

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

DEPARTMENT OF THE ARMY
U.S. Army Corps of Engineers
WASHINGTON, D.C. 20314-1000

REPLY TO
ATTENTION OF:

CECW-P/CECW-E

MEMORANDUM FOR ALL MAJOR SUBORDINATE COMMANDS

SUBJECT: Guidance on Levee Certification for the National Flood Insurance Program

1. Use of risk-based analysis by the U.S. Army Corps of Engineers in flood damage reduction project formulation studies has created a disconnect between the Corps analysis and the Federal Emergency Management Agency's (FEMA) levee certification policy. FEMA's policy requires that levees be structurally sound, properly maintained, and have at least three feet of freeboard above the 100-year flood profile elevations before FEMA will recognize that the levees provide protection. The Corps risk-based analysis eliminates the concept of arbitary freeboard by incorporating risk and uncertainty throughout the formulation process.
2. To ensure that levee certification to FEMA is performed by the Corps in a consistent manner, the enclosed guidance has been developed for use by all Major Subordinate Commands (MSC). This guidance has been reviewed and accepted by FEMA, and establishes Corps-wide standard procedures applicable to all future levee certification decisions.
3. It is recognized that levee certification commitments based on existing FEMA regulations have been made to non-Federal sponsors for some projects in progress. Exceptions to the new guidance will be considered for uncertified projects for which levee certification commitments already have been made. Each MSC should submit a list of projects that fall into this category, along with a justification for the exception, to CECW-EH by NLT 30 April 1997.
4. Points of contact for this guidance are Mr. Earl Eiker, telephone (202) 761-8500, or Mr. Ken Zwickl, telephone (202) 761-1855.

FOR THE COMMANDER:

Encl

RUSSELL L. FUHRMAN
Major General USA
Director of Civil Works

DISTRIBUTION: See next page.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

**CECW-P/CECW-E**

**25 March 1997**

**GUIDANCE ON LEVEE CERTIFICATION**

**FOR THE**

**NATIONAL FLOOD INSURANCE PROGRAM**

1. **PURPOSE AND APPLICABILITY:** This document provides guidance to be used for certifying levees to the Federal Emergency Management Agency (FEMA) for their administration of the National Flood Insurance Program (NFIP). This guidance does not affect plan formulation and evaluation procedures. It is intended to provide a consistent methodology for levee certification by the Corps of Engineers. This guidance applies to all Corps District and Division offices. Note that levee certifications are provided to FEMA at the District/Division option and within available funds.
2. **BACKGROUND:** By letter dated 21 March 1996, FEMA requested that the Corps review its criteria for levee certification in order to ensure consistency in administration of the NFIP by FEMA. This concern has arisen as a result of the Corps application, of Risk-Based Analysis (RBA) in flood damage reduction project formulation studies. FEMA's policy requires that levees be structurally sound, properly maintained, and have at least 3 feet of freeboard above the 100-year flood profile elevations before FEMA will recognize that the levees provide protection from the 100-year flood. The FEMA requirements are fully explained in 44 CFR, Chapter 1, Part 65.10 of the Code of Federal Regulations. The FEMA requirements include data and analysis submission requirements for design criteria (freeboard, closures, embankment protection, embankment and foundation stability, settlement, interior drainage), operations plans and maintenance plans. 44 CFR Part 65.10 also states that in lieu of the structural requirements and data and analysis requirements, a Federal agency with responsibility for levee design may certify that a levee has been adequately designed and constructed to provide 100-year protection.

Levee certification for NFIP purposes can best be explained as follows. FEMA may request a "levee certification" from the Corps by letter directly to the Corps District office. The letter normally contains language such as:

> "...Please provide this office with current certification as to whether the design and maintenance of this levee are adequate to credit it with 100-year flood protection. Please note that such a statement does not constitute a warranty of performance, but rather the Corps current position of the levee system's design adequacy..."

3. **POLICY:** The Corps will continue to work with FEMA to ensure that Risk-Based Analysis provides improved information for levee certification decisions. The following guidance and decision tree should be used until further notice.

(Page 1 of 3)

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

**CECW-P/CECW-E**

**25 March 1997**

**GUIDANCE ON LEVEE CERTIFICATION FOR THE NATIONAL FLOOD INSURANCE PROGRAM**

a. Existing Levees, No Risk-Based Analysis Available: For certification purposes, the Corps should evaluate the levees based primarily on FEMA criteria contained in 44 CFR Chapter 1, Part 65.10. Thus, the general rule will be that if a levee will contain the median one percent chance flood, with three feet of freeboard, it should be certified as being capable of passing the FEMA base flood, as long as it is adequate based on a geotechnical and structural evaluation, as described below. Exceptions to the three feet of freeboard requirement may be pursued, based on the FEMA policy of permitting other Federal agencies responsible for levee construction to certify that levees will pass the FEMA base flood. Such exceptions should be based on careful evaluation of the hydrologic, hydraulic, structural and geotechnical uncertainties, and current levee condition as discussed below.

b. Existing and Proposed Levees, Risk Based Analysis Available: In these cases, output on project performance from the Risk-Based Analysis should be used to arrive at a decision regarding levee certification for FEMA. Existing and proposed levees will be certified as capable of passing the FEMA base flood if the levees meet the FEMA criteria of 100-year flood elevation plus three feet of freeboard, with two exceptions, as follows. When the FEMA criteria results in a "Conditional Percent Chance Non-exceedance" (Reliability) of less than 90%, the minimum levee elevation for certification will be that elevation corresponding to a 90% chance of non-exceedance. When the FEMA criteria results in a reliability of greater than 95%, the levee may be certified at the elevation corresponding to a 95% chance of non-exceedance. For existing levees, the certification decision is also contingent upon a structural and geotechnical evaluation, as described below. For proposed levees, the geotechnical and structural issues are assumed to be accounted for during design and construction of the levees.

c. Engineering Evaluation: A geotechnical and structural evaluation will be used to determine the water elevation at which the levee is not likely to fail. In some cases, this water level will be the determining factor in the decision to certify the levee system. The procedures to be used in the evaluation of a levee system for NFIP levee certification should consist of an engineering evaluation to determine if the levee system meets the Corps design, construction, operation and maintenance standards, regardless of levee ownership or responsibility. The District will examine available existing information and data, such as original design, surveys of levee top profile, levee cross-sections, records of modifications and changes, performance during past flood events, and remedial measures. It will also include a field inspection of the levee, structures, closure devices and pumping stations to evaluate the adequacy of maintenance. The engineering analysis should examine the project with respect to embankment stability, underseepage, through seepage, and erosion protection. Existence of closure devices will necessitate a review of the adequacy of flood warning time for the complete operation of all closure structures.



Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

## LEVEE CERTIFICATION DECISION TREE




FEMA Criteria = 1% chance median annual flood event plus three feet of freeboard
RELIABILITY = % chance non-exceedance given the 1% chance annual event occurs

(Page 3 of 3)

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# Appendix C

# Economic and Environmental Principles for Water Related Land Resources Implementation Studies

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

These Principles are established pursuant to the Water Resources Pl anning Act of 1965 (Pub. L. 89– 80), as amended (42 U.S.C. 1962a–2 and d–1). These Principles supersede the Principles established in connection with promul gation of principles, standards and procedures at 18 CFR, Parts 711, 713, 714 and 716.

**1. Purpose and Scope**

These principles are intended to ensure proper and consistent planning by Federal agencies in the formulation and evaluation of water and related land resources i mplementation studies.

Implementati on studies of the following agency activities are covered by these principles:

(a) Corps of Engineers (Civil Works) water resources project plans:
(b) Bureau of Reclamation water resources project plans;
(c) Tennessee Valley Authority water resources project plans;
(d) Soil Conservati on Service water resources project plans.

Implementati on studies are pre- or postauthori zati on project formulation or evaluation studies undertaken by Federal agencies.

**2. Federal Objective**

The Federal objective of water and related land resources project planni ng is to contribute to national economic development consistent with protecting the Nation's environment, pursuant to national environmental statutes, applicable executive orders, and other Federal planning requirements.

(a) Water and retated land resources project plans shall be formulated to alleviate problems and take advantage of opportunities in ways that contribute to this objective.
(b) Contri butions to national economic development (NED) are increases in the net value of the national output of goods and services, expressed in monetary uni ts. Contri buti ons to NED are the direct net benefits that accrue in the planning area and the rest of the Nation. Contributions to NED include increases in the net value of those goods and services that are marketed, and also of those that may not be marketed.

**3. State and Local Concerns**

Federal water resources planni ng is to be responsive to State and local concerns. Accordingly, State and local participation is to be encouraged in all aspects of water resources planni ng. Federal agencies are to contact Governors or designated State agencies for each affected State before initiating studies, and to provide appropriate opportunities for State participation. It is recognized, however, that water projects which are local, regional, statewide, or even interstate in scope do not necessarily require a major role for the Federal Government; non-Federal, voluntary arrangements between affected jurisdictions may often be adequate. States and localities are free to initiate planning and implementation of water projects.

**4. Int ernat ional Conce rns**

Federal water resources planni ng is to take into account internationalimplications, including treaty obligations. Timely consultati ons with the relevant foreign government should be undertaken when a Federal water project is likely to have a significant impact on any land or water resources within its territorial boundaries.

**5. Alternative Plans**

Various alternative plans are to be formul ated in a systematic manner to ensure that all reasonable alternatives are evaluated.

(a) A plan that reasonably maxi mi zes net national economi c development benefits, consistent with the Federal objective, is to be formulated. This plan is to be identified as the NED plan.
(b) Other plans which reduce net NED benefits in order to further address other Federal, State, local, and internati onal concerns not fully addressed by the NED plan should also be formulated.
(c) Plans may be formulated which require changes in existing statutes, administrative regulations, and established common law; such required changes are to be identified.
(d) Each alternative plan is to be formul ated in consideration of four criteria: completeness, effectiveness, effici ency, and acceptability. Appropriate mi tigation of adverse effects is to be an integral part of each alternative plan.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

(e) Existing water and related land resources plans, such as State water resources plans, are to be considered as alternative plans if within the scope of the planning effort.

**6. Plan Selection**

A plan recommending Federal action is to be the alternative plan with the greatest net economic benefit consi stent with protecti ng the Nation's environment (the NED plan), unless the Secretary of a department or head of an independent agency grants an exception to this rule. Exceptions may be made when there are overriding reasons for recommending another plan, based on other Federal. State, local and internati onal concerns.

**7. Acc ount s**

Four accounts are established to facilitate evaluation and display of effects of alternative plans. The national economic development account is required. Other information that is required by law or that will have a material bearing on the decisionmaki ng process should be included in the other accounts, or in some other appropriate format used to organi ze information on effects.

(a) The national economic development (NED) account displays changes in the economic value of the national output of goods and services.

(b) The environmental quality (EQ) account displays nonmonetary effects on signifi cant natural and cultural resources.

(c) The regional economic devel opment (RED) account registers changes in the distribution of regional economic activity that result from each alternative plan. Evaluations of regional effects are to be carried out usi ng nationally consistent projections of income, employment, output, and population.

(d) The other social effects (OSE) account registers plan effects from perspectives that are relevant to the planni ng process, but are not reflected in the other three accounts.

**8. Discount Rate**

Discounting is to be used to convert future monetary values to present values.

**9. Period of Analysis**

The period of analysis to be be the same for each alternative plan.

**10. Risk and Uncertainty**

Planners shall identify areas of risk and uncertainty in their analysis and describe them clearly, so that decisions can be made with knowledge of the degree of reliability of the estimated benefits and costs and of the effectiveness of alternative plans.

**11. Cost Allocation**

For allocating total project financial costs among the purposes served by a plan, separable costs will be assigned to their respective purposes, and all joint costs will be allocated to purposes for which the plan was formul ated. (Cost shari ng policies for water projects will be addressed separately.)

**12. Planning Guide line s**

In order to ensure consistency of Federal agency planni ng necessary for purposes of budget and policy decisions and to aid States and the public in evaluation of project alternatives, the Water Resources Council (WRC), in cooperation with the Cabinet Council on Natural Resources and Environment, shall issue standards and procedures, in the form of guidelines, implementing these Principles. The head of each Federal agency subject to this order will be responsible for consi stent application of the guidelines. An agency may propose agency guidelines which differ from the guidelines issued by WRC. Such agency guidelines and suggesti ons for improvements in the WRC guidelines are to be submi tted to WRC for review and approval. The WRC will forward all agency proposed guidelines which represent changes in established policy to the Cabinet Council on Natural Resources and Environment for its consideration.

**13. Effective Date**

These Principles shall apply to implementati on studies completed more than 120 days after issuance of the standards and procedures referenced in Section 12, and concommitant repeal of 18 CFR, Parts 711, 713, 714, and 716.

These economic and environmental Principles are hereby approved.



February 3. 1983

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# Appendix D

# Functions of Random Variables

A random variable *X* is a variable whose probability of taking on a particular value *x* in an infinitesimal range is described by a probability density function, f(x). The mean or expected value of *X* is given by

$$E(X) = \mu_x = \int_{-\infty}^{\infty} x f(x) dx, \qquad (1)$$

in which the product $f(x)dx$ is the probability of $x$ occurring in an interval $[x, x + dx]$. The variance, $\sigma^2_x$, is similarly

$$\sigma_x^2 = E(x - \mu_x)^2 = \int_{-\infty}^{\infty} (x - \mu_x)^2 f(x) dx. \qquad (2)$$

When Monte Carlo simulation of a random variable is carried out, a set of n independent values is generated to yield a set of replicates $\{x_1, x_2, \ldots, x_n\}$, from which the mean is estimated as

$$\bar{x} = \sum_{i=1}^{n} \frac{1}{n} x_i = \frac{1}{n} \sum_{i=1}^{n} x_i. \qquad (3)$$

The weight, $1/n$, implies each value is as likely as any other. Equation 3 represents the process actually used in the Corps's risk analysis procedure, in that the weight, $1/n$, approximates the theoretical probability, $f(x)dx$, and the summation in Equation 3 replaces the integral in

Copyright National Academy of Sciences. All rights reserved.

Equation 1.

When a sum $Z$ of two random variables, $X$ and $Y$, is required, the process is more complex. For two variables, $x$ and $y$, the corresponding $z$ is

$z = x + y$, (4)

and the expected value of $Z$ is the sum of the expected values of $X$ and $Y$:

$\mu_z = \mu_x + \mu_y$.(5)

However, the variance of $Z$ is

$\sigma^2_z = \sigma^2_x + \sigma^2_y + 2\rho_{xy}\sigma_x\sigma_y$, (6)

where $\rho_{xy}$ is the correlation coefficient of $x$ and $y$ ($-1 \leq \rho_{xy} \leq 1$). The correlation coefficient introduces a new element into the picture and represents the degree of association of values of $x$ and $y$. When the variables are statistically independent, $\rho_{xy} = 0$, and the variance of the sum is simply the sum of the variances. When the variables are positively correlated, the variance of the sum is increased by an amount proportional to the degree of correlation.

Similarly, when the difference, $Z$, between two random variables, $X$ and $Y$, is found, the value of the variate $z$ can be found as:

$z = x - y$ (7)

and the expected value as

$\mu_z = \mu_x - \mu_y$, (8)

while the variance of the difference is given by

$\sigma^2_z = \sigma^2_x + \sigma^2_y - 2\rho_{xy}\sigma_x\sigma_y$. (9)

In this case, if the variables are positively correlated, the variance of the difference is diminished by an amount proportional to the degree of correlation.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

The significance of all these definitions is that Monte Carlo simulation works at the level of replicates, or individually generated values of variables $x$ and $y$. At that level, the normal rules of arithmetic for sums and differences apply, as specified by equations 4 and 7, and they can also be applied to the expected means of those variables, as given by Equations 5 and 8. However, the variability of a sum or difference of random variables depends in part on the variability in the individual variables and also on the degree of correlation or interdependence between the variables. Properly quantifying variability in a problem involving the interaction of several random variables requires an understanding and a correct representation of their interdependence or correlation.

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

# Appendix E

# Biographical Information

**GREGORY B. BAECHER** (*Chair*) is a professor in and the chair of the civil engineering program at the University of Maryland. Prior to joining the faculty at Maryland in 1995, Dr. Baecher served on the faculty of civil engineering at the Massachusetts Institute of Technology from 1976 to 1988, and he served as the CEO and founder of ConSolve Incorporated, Lexington, Massachusetts, from 1988–1995. His fields of expertise include risk analysis, water resources engineering, and statistical methods. Dr. Baecher received his B.S. degree in civil engineering from the University of California-Berkeley and his M.S. and his Ph.D. degrees in civil engineering from the Massachusetts Institute of Technology.

**EFI FOUFOULA-GEORGIOU** is a professor of civil engineering and the director of the St. Anthony Falls Laboratory, University of Minnesota. Her research focuses on understanding and modeling the complex spatio-temporal organization and interactions of hydrologic processes, including precipitation and landforms. Dr. Foufoula-Georgiou obtained her diploma in civil engineering from the National Technical University of Athens, Greece, and her Ph.D. degree in environmental engineering from the University of Florida. She has chaired and served on many national and international committees and government advisory panels and has served on the editorial boards of several journals.

**RALPH KEENEY** is a professor of business and a professor of systems engineering with the Center for Telecommunications Management at the University of Southern California. His areas of expertise include deci

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

sion analysis, risk analysis, and management decision making. His experience includes large-scale siting studies, risk analysis, energy policy, and environmental studies. Groups to which he has served as a consultant include Seagate Technology, American Express, British Columbia Hydro, Pacific Gas and Electric, and the U.S. EPA. Dr. Keeney received his B.S. degree in engineering from the University of California, Los Angeles, his S.M. degree and his E.E. degree in electrical engineering from the Massachusetts Institute of Technology, and his Ph.D. degree in operations research from the Massachusetts Institute of Technology. Dr. Keeney is a member of the National Academy of Engineering.

**Lester Lave** is a professor of engineering and public policy in the engineering school and the Higgins Professor of Economics in the business school at Carnegie Mellon University. Dr. Lave's research has focused on the use of risk analysis as it relates to a range of health, safety, and environmental issues, including carcinogenic chemicals, natural resource valuation, and global climate change. He has served as a consultant to several federal and state government agencies, including the U.S. Environmental Protection Agency, Office of Safety and Health Administration, Human Health Services, as well as to many corporations, including General Motors and Xerox. Dr. Lave is a past member of the Water Science and Technology Board and is a member of the Institute of Medicine.

**Harry F. Lins** is a hydrologist with the U.S. Geological Survey in Reston, Virginia. Dr. Lins's principal research interests are in the areas of hydroclimatology, surface water hydrology, and multivariate statistics. Dr. Lins has served since 1989 as the coordinator of the Global Change Hydrology Program of the Geological Survey's Water Resources Division. Dr. Lins received his B.S. degree from the University of Maryland, his M.S. degree from the University. of Delaware, and his Ph.D. degree from the University of Virginia.

**Daniel P. Loucks** is a professor of civil and environmental engineering at Cornell University. Dr. Loucks's primary research interests are in water resource systems planning and analysis, decision support systems, and applications of engineering methods to water and environmental problems. He has taught at a number of universities in the United States and abroad and has served as a consultant to both public and private sector organizations. He received his B.S. degree from Pennsylvania

Copyright National Academy of Sciences. All rights reserved.

Risk Analysis and Uncertainty in Flood Damage Reduction Studies
Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 217 of 858



About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

State University, his M.F. degree from Yale University, and his Ph.D. degree from Cornell University. Dr. Loucks is a member of the National Academy of Engineering.

**David R. Maidment** is the Ashley H. Priddy Centennial Professor of Engineering and the Director of the Center for Research in Water Resources at the University of Texas, Austin. Dr. Maidment's primary areas of research and teaching include water resources engineering, geographic information systems, and statistical methods in hydrology and water resources. He received his bachelor of agricultural engineering degree (first-class honors) at the University of Canterbury, New Zealand, and his M.S. and Ph.D. degree in civil engineering from the University of Illinois.

**Martin W. McCann** is the president of Jack R. Benjamin and Associates, Inc., in Menlo Park, California. He is also a consulting professor of civil and environmental engineering at Stanford University, where he is the chair of the National Performance of Dams Program (NPDP). The NPDP, founded at Stanford by Dr. McCann, is a program that has created a national network to report dam incidents and to archive this information for use by the profession. Dr. McCann's professional background includes probabilistic hazards analysis, including hydrologic events, risk assessment, reliability analysis, uncertainty analysis, and systems analysis. Dr. McCann has been a consultant to several government and private sector groups in the United States and abroad. He received his B.S. degree from Villanova University and his M.S. and his Ph.D. degrees from Stanford University.

**Jery R. Stedinger** is a professor of civil and environmental engineering at Cornell University. His research focuses on the optimal operation of reservoir systems, efficient use of hydrologic data, risk analysis, and stochastic hydrology. Dr. Stedinger has served on several NRC committees, including the Committee on Flood Control Alternatives in the American River Basin and the Committee on American River Flood Frequencies. He earned his B.A. degree in applied mathematics from the University of California, Berkeley and his M.S. and his Ph.D. degrees from Harvard University.

**Ben Chie Yen** is a professor of water resources engineering at the University of Illinois at Urbana-Champaign since 1966. His areas of exper

Copyright National Academy of Sciences. All rights reserved.

About this PDF file: This new digital representation of the original work has been recomposed from XML files created from the original paper book, not from the original typesetting files. Page breaks are true to the original; line lengths, word breaks, heading styles, and other typesetting-specific formatting, however, cannot be retained, and some typographic errors may have been accidentally inserted. Please use the print version of this publication as the authoritative version for attribution.

tise include urban storm drainage, watershed hydrology, risk and reliability analysis, and open channel and river hydraulics. In the past 35 years he has been a consultant to public and private sectors in the United States and abroad, and he has been visiting or guest professor at a dozen universities in four continents. He received his B.S.C.E. degree from the National Taiwan University and his M.S. and Ph.D. degrees from the University of Iowa.

## STAFF

**Jeffrey W. Jacobs** is a senior staff officer with the National Research Council's Water Science and Technology Board and served as this committee's study director. Dr. Jacobs's research interests include institutional and policy arrangements for water resources management and international cooperation in water development. He has studied these issues extensively in the Mekong River basin of Southeast Asia and has also conducted comparative studies in water policy in the Mekong and Mississippi River systems. Dr. Jacobs received his Ph.D. degree in geography from the University of Colorado-Boulder.

**Ellen A. De Guzman** is a senior project assistant at the National Research Council's Water Science and Technology Board. She received her B.A. degree from the University of the Philippines and is majoring in economics at the University of Maryland University College. She has worked with a number of studies including *Watershed Management for Potable Water Supply, Issues in Potable Reuse, Valuing Ground Water, New Directions in Water Resources Planning for the U.S. Army Corps of Engineers, and Improving American River Flood Frequency Analyses.*

Copyright National Academy of Sciences. All rights reserved.

United States Government Accountability Office

GAO

Report to the Ranking Member, Committee on Banking, Housing, and Urban Affairs, U.S. Senate

October 2008

# FLOOD INSURANCE

# FEMA's Rate-Setting Process Warrants Attention

G A O

Accountability * Integrity * Reliability

GAO-09-12

October 2008

GAO
Accountability·Integrity·Reliability

# Highlights

Highlights of GAO-09-12, a report to the Ranking Member, Committee on Banking, Housing, and Urban Affairs, U.S. Senate

# FLOOD INSURANCE

## FEMA's Rate-Setting Process Warrants Attention

### Why GAO Did This Study

Questions about the financial status of the National Flood Insurance Program (NFIP) have increased since the 2005 hurricanes, which left the program with an unprecedented $17.4 billion deficit—a debt that resulted in GAO placing NFIP on its high-risk list in March 2006. Among the concerns are the subsidized rates NFIP must provide for about 25 percent of the policies, mostly for older buildings in high-risk flood zones. And although fully risk-based rates are supposed to reflect actual flood risk, concerns have been raised that they do not. This report evaluates (1) the Federal Emergency Management Agency's (FEMA) process for setting full-risk rates to determine whether it produces rates that accurately reflect the risk of flooding and (2) the process that FEMA uses to set subsidized rates and their effect on the financial condition of NFIP. To do this work, GAO evaluated the NFIP rate model, examined data from FEMA, surveyed relevant literature, and interviewed other relevant agencies and risk-modeling firms.

### What GAO Recommends

GAO recommends that FEMA (1) ensure that its rate-setting methods result in rates that accurately reflect flood risks and (2) collect data to analyze the impact of newly created grandfathered properties on the NFIP. FEMA generally concurred with both recommendations but expressed two reservations with our recommendation regarding rate setting.

To view the full product, including the scope and methodology, click on GAO-09-12. For more information, contact Orice M. Williams at (202) 512-8678 or williamso@gao.gov.

### What GAO Found

FEMA's method for setting its full-risk rates may not ensure that the rates accurately reflect the actual risk of flood damage. The NFIP model combines estimated flood risk with expected flood damage, but a number of factors may affect the accuracy of the rates the model generates. First, some data inputs are outdated or inaccurate. FEMA relies on flood probabilities from the 1980s and damage estimates that do not fully reflect recent NFIP damage experience. Moreover, while FEMA has made updating its flood maps a priority, most of the maps used in rate setting have not yet been updated. Second, FEMA does not require all properties remapped into higher-risk areas to pay rates based on the new designation. This policy, known as grandfathering, erodes NFIP's ability to charge rates that reflect the risk of flooding. The policy is intended to increase participation, but FEMA does not track the number of grandfathered properties and cannot determine their financial impact on the program. Third, FEMA uses a nationwide rating system that combines flood zones across many geographic areas, so individual policies do not always reflect topographical features that affect flood risk. In fact, some patterns in historical claims and premium data suggest that NFIP's full-risk rates may not always reflect actual flood risk. Collectively, these factors increase the risk that premiums collected on full-risk policies may be insufficient to cover future losses, adding to concerns about NFIP's financial stability.

FEMA's rate-setting process for subsidized properties depends in part on the accuracy of the full-risk rates, raising concerns about how these rates are calculated as well. To set subsidized rates, FEMA first subtracts the total amount it expects to collect in full-risk premiums from the average historical loss year—that is, the minimum (target) amount that the program needs to collect from all premiums to cover at least average annual losses, as determined by historical data. The remainder becomes the aggregate target amount the program must collect in subsidized premiums. To set individual subsidized rates, FEMA officials then consider their knowledge of flood risk, previous rate increases for various locations, and statutory limits on increases. The resulting subsidized premiums continue to be a financial strain on the NFIP and contribute to its ongoing financial instability. Evidence suggests that flooding is likely to become more severe in the future, resulting in increased risk exposure, the potential for more catastrophic losses, and ongoing financial instability for the program. Currently, the annual amount that NFIP collects in both full-risk and subsidized premiums is not enough to cover its operating costs, claim losses, and principal and interest payments to the Department of the Treasury, thereby exposing the federal government and ultimately taxpayers to ever-greater financial risks, especially in years of catastrophic flooding.

# Contents

**Letter** 1

Results in Brief 3
Background 5
FEMA's Method of Setting Full-Risk Premiums May Not Ensure That Rates Accurately Reflect Risk 10
FEMA's Process for Setting Subsidized Rates May Further Compromise the Ongoing Financial Stability of the Program 27
Conclusions 30
Recommendations for Executive Action 32
Agency Comments and Our Evaluation 32

**Appendix I** **Scope and Methodology** 37

**Appendix II** **State-by-State Analysis of Claims and Premiums Data** 39

**Appendix III** **Comments from FEMA** 42

**Appendix IV** **GAO Contact and Staff Acknowledgments** 49

**Tables**

Table 1: Amounts of NFIP Insurance Available, as of May 1, 2008 7
Table 2: Average Premium per Policy in Force by Flood Zone, 1997-2006 8
Table 3: States Where Claims Frequently or Rarely Exceeded Premiums, 1978–2007 25
Table 4: Claims and Premiums Data (in constant 2007 dollars), 1978–2007 39

**Abbreviations**

| | |
|---|---|
| BFE | base flood elevation |
| CBO | Congressional Budget Office |
| CRS | Congressional Research Service |
| DELV | damage by elevation |
| DHS | Department of Homeland Security |
| FEMA | Federal Emergency Management Agency |
| FIRM | Flood Insurance Rate Map |
| GAAP | Generally Accepted Accounting Principles |
| GDP | gross domestic product |
| NFIP | National Flood Insurance Program |
| PELV | probability of elevation |
| SFHA | Special Flood Hazard Area |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

GAO
Accountability * Integrity * Reliability

**United States Government Accountability Office**
**Washington, DC 20548**

October 31, 2008

The Honorable Richard C. Shelby
Ranking Member
Committee on Banking, Housing,
and Urban Affairs
United States Senate

Dear Senator Shelby:

As of June 2008, the National Flood Insurance Program (NFIP) owed approximately $17.4 billion to the U.S. Treasury, primarily as a result of loans that the program received to pay claims resulting from the 2005 hurricane season. According to the Federal Emergency Management Agency (FEMA) of the Department of Homeland Security (DHS), which administers the program, this debt is greater than the sum of all previous losses since the program's inception in 1968. Until 2004, NFIP was able to cover most of its losses with the premiums it collected and occasional loans from the Treasury that were either repaid or retired by Congress. However, after the 2005 hurricanes—primarily Hurricane Katrina—the program borrowed $16.8 billion from the Treasury to cover the enormous number of claims. As a result, in part because of the level of indebtedness, we placed NFIP on our high-risk list in March 2006.[1]

As a result of this unprecedented deficit, questions have been raised about the fiscal sustainability of the flood insurance program, particularly given the potential for similar natural disasters in the future. Congress and others have raised questions about the scope of the information and quality of the data on which the program relies to set premium rates and the accuracy of the maps NFIP uses to assess the risk of flooding.[2] FEMA's process for setting premium rates determines how much policyholders will pay for their flood insurance policies and thus the income available to FEMA for losses and expenses. By statute, NFIP was not designed to be actuarially sound. Premium rates for most properties—around 75

[1]GAO, *High-Risk Program: National Flood Insurance Program*, GAO-06-497T (Washington D.C.: Mar. 15, 2006).

[2]To assess the risk of flooding, FEMA uses Flood Insurance Rate Maps (FIRM) that show the level of flood risk in communities that participate in NFIP.

percent—are intended to fully reflect the risk of flooding, but the remaining 25 percent are subsidized, as mandated by statute. While these subsidized premiums do not contribute sufficient revenues to cover potential losses, according to FEMA officials, they promote participation in the program, an important program goal. But as a result, the program does not collect sufficient premium income to build capital to cover flood losses.

In response to the questions that have been raised about NFIP's financial condition, this report evaluates (1) FEMA's process for setting full-risk premiums to determine whether it produces rates that accurately reflect the risk of flooding and (2) the process that FEMA uses to set subsidized rates and their financial impact on NFIP.

To address these objectives, we obtained and reviewed FEMA's flood risk model and related methods for assessing risk and setting premium rates for policyholders. We discussed FEMA's method for setting rates with officials from FEMA, the National Oceanic and Atmospheric Administration, U.S. Army Corps of Engineers (the Corps), and the U.S. Geological Survey. We also met with risk-modeling firms, academics, and the American Academy of Actuaries and reviewed studies of flood risk and flood insurance, including reviews from the Congressional Research Service (CRS) and the Congressional Budget Office (CBO). We also analyzed premiums received and losses paid by NFIP for the period from 1978 to 2007. We assessed the reliability of these data, and found them to be reliable for the purposes of this report. In addition, we obtained and reviewed information on FEMA's current and past borrowings and repayments. We also analyzed FEMA's premiums and claims data to determine the number of high-loss years on a state-by-state basis in order to assess each state's financial impact on NFIP. In order to conduct the state loss analysis, we reviewed the claims and premium data from NFIP's BureauNet database.[3] Appendix I provides additional details about our scope and methodology.

We conducted this performance audit from December 2007 to September 2008 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for

[3]BureauNet is the system that FEMA uses to collect, manage, and access its policy, claims, and policyholder data.

our findings and conclusions based on our audit objectives. The evidence we obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Results in Brief

FEMA's method for setting full-risk rates may not ensure that the rates accurately reflect the actual risk of flood damage.[4] FEMA's model for setting these rates incorporates data on flood risks generated by a hydrologic model that is based on largely the same principles as hazard risk models used by private insurers and other federal agencies.[5] More specifically, FEMA generates rates for flood insurance according to estimates of flood risk and expected flood damage. However, a number of factors may affect the accuracy of rates generated by the process. First, the data that FEMA uses to define flood probabilities are outdated or inaccurate. For example, some of the data used to estimate the probability of flooding have not been updated since the 1980s. Similarly, the claims data used as inputs to the model may be inaccurate because of incomplete claims records and missing data. Further, the maps FEMA uses to set premium rates remain substantially out of date despite recent modernization efforts. In addition, an NFIP policy decision allows certain properties remapped into riskier flood zones to keep their previous lower rates, which, like subsidized rates, do not reflect the actual risk of flooding to the properties and do not generate sufficient premiums to cover

[4]We use the term "full risk" to describe rates that FEMA refers to as "actuarial." These are the risk premium rates specified in the National Flood Insurance Act of 1968, which FEMA maintains accurately reflect flood risk and thus are not explicitly subsidized—that is, these rates contemplate the full range of loss potential including catastrophic levels, according to FEMA. The National Flood Insurance Act of 1968, as amended, is codified at 42 U.S.C. §§ 4001 *et. seq.*

[5]A hydrologic model is a static or dynamic representation of the process that affects surface water runoff. Hydrologic models are used to describe present conditions or predict future behavior of the hydrologic regime at a specific area of land that "caches" and "releases" surface water runoff (referred to as catchment.) Examples of hydrologic model inputs are precipitation and snow melt and example outputs are stream discharge and evapotranspiration. According to insurance market participants, to generate the loss estimates, private insurance companies and state authorities use models, which are computer programs with large databases that catalog the past incidence and severity of natural catastrophes, as well as proprietary insurance company data on policies written in particular states or areas. Using the estimates provided by these computer programs, insurers can attempt to manage their exposures in particular high-risk areas. See GAO, *Catastrophe Risk: U.S. and European Approaches to Insure Natural Catastrophe and Insurance Risks*, GAO-05-199 (Washington, D.C.: Feb. 28, 2005)

expected losses.[6] Moreover, FEMA does not collect data on these properties—known as grandfathered properties—or measure their financial impact on the program and does not know how many of these properties exist, their exact location, or how much they generate in losses. FEMA's rate-setting process also does not fully take into account ongoing and planned development, long-term trends in erosion, or the effects of global climate change, although private sector models are incorporating some of these factors. Finally, FEMA sets flood insurance rates on a nationwide basis, combining and averaging many topographic factors that are relevant to flood risk, so that these factors are not specifically accounted for in setting rates for individual properties. Moreover, some patterns in historical claims and premium data suggest that NFIP's rates may not accurately reflect differences in flood risk. Collectively, these factors increase the risk that full-risk premiums may be insufficient to cover future losses, adding to concerns about NFIP's financial stability.

FEMA's rate-setting process for subsidized properties depends in part on the accuracy of the full-risk rates, raising concerns about how subsidized rates are calculated as well. To determine subsidized rates, FEMA first subtracts the total amount that it expects to collect on full-risk rate premiums from the average historical loss year target. This target is the minimum amount of premiums the program needs to collect to cover at least average annual losses, as determined by historical loss data. The amount remaining from this calculation is the aggregate target amount of subsidized premiums that the program needs to collect. To set individual subsidized rates, FEMA officials then consider their knowledge of flood risks, previous rate increases for various areas, and statutory limits on increases. According to FEMA documents, the method for determining the average historical loss year target was changed in 2006 because fully incorporating the 2005 loss year, with its catastrophic losses, would have resulted in substantial increases in subsidized rates. Currently, the annual amount that NFIP collects in both full-risk and subsidized premiums is not enough to cover its operating costs, claim losses, and principal and interest payments to the Department of the Treasury. Evidence suggests that flooding is likely to become more severe in the future, resulting in increased risk exposure, the potential for more catastrophic losses, and ongoing financial instability for the program. Without changes to its current rate-setting processes, NFIP premiums will be unlikely to be able

[6] A flood zone is an area that is designated to have a predicted likelihood of experiencing flood damage.

to cover the program's claims, expenses, and debt, exposing the federal government and ultimately taxpayers to ever-greater financial risks, especially in years of catastrophic flooding.

This report makes two recommendations aimed at helping improve NFIP's rate-setting process. First, we recommend that FEMA take steps to ensure that its rate-setting methods and data used to set rates result in full-risk premiums rates that accurately reflect the risk of losses from flooding. Second, we recommend that FEMA collect information on the location, number, and losses associated with existing and newly created grandfathered properties and analyze the financial impact of these properties on the program.

We provided the Secretary of Homeland Security with a draft of this report for review and comment. On October 14, 2008, FEMA provided written comments on a draft of this report (see appendix III). FEMA generally concurred with both of the report's recommendations but had two reservations about our recommendation to ensure that FEMA's rate-setting methods result in full-risk rates that accurately reflect the risk of losses from flooding. FEMA also took exception to some of our analyses and characterizations, which it believes overstate the potential effect of different factors on the accuracy of the rate-setting process. While we acknowledge the complexity of FEMA's rate-setting process, the issues we have identified raise questions about the accuracy of the resulting premium rates and highlights areas that warrant additional analysis by FEMA. FEMA's comments are summarized near the end of this report, and FEMA's letter is reprinted in appendix III. FEMA also provided us with technical comments, which we incorporated as appropriate.

## Background

NFIP is a federal program created by the National Flood Insurance Act of 1968 that enables property owners in participating communities to purchase insurance protection against losses from flooding. This program is administered by FEMA. Participation in NFIP is based on an agreement between local communities and the federal government. The federal government makes flood insurance available to any community that adopts and enforces a floodplain management ordinance to reduce future flood risks to new construction in areas known as Special Flood Hazard

Areas (SFHA).[7] Property owners located in the SFHA with mortgages from federally regulated lenders are required to purchase and maintain flood insurance policies. In these areas, new construction and substantial improvements must conform to NFIP's building standards.[8] For example, the lowest floor of a structure must be elevated to or above the base flood elevation (BFE)—the level at which there is a 1 percent chance of flooding in a given year.[9]

NFIP offers two types of flood insurance premiums: subsidized and full risk. The National Flood Insurance Act of 1968 requires that NFIP offer subsidized premiums to owners of certain properties. These subsidized rates are not based on flood risk and, according to FEMA, represent only about 35 to 40 percent of the full flood risk. Subsidized properties account for about 25 percent of all NFIP policies, while those with full-risk premiums account for the remaining 75 percent. The type of policy and the subsequent rate a policyholder pays depend on several property characteristics—for example, whether the structure was built after or prior to the development of the community's Flood Insurance Rate Map (FIRM) and where the structure is located relative to the floodplain. NFIP studies and maps flood risks, assigning flood zone designations based on the risk level for flooding. For our purposes, in this report we generally refer to risk levels as moderate- to low-risk, high-risk, high-risk coastal, and undetermined risk.[10] Potential policyholders can purchase both

[7]SFHAs, which are depicted on NFIP maps, represent the land area that would be submerged by the floodwaters of the "base," or 1 percent annual chance of flood. The SFHA is also referred to as the 100-year or 1 percent floodplain. NFIP's floodplain management regulations must be enforced in, and the mandatory purchase of flood insurance applies to, SFHAs.

[8]A substantial improvement is any reconstruction, rehabilitation, addition, or other improvement of a structure, the cost of which equals or exceeds 50 percent of the market value of the structure before the "start of construction" of the improvement. If a building is "substantially damaged" or "substantially improved," it must be brought into compliance with local flood damage prevention regulations, including elevating the building to or above the 100-year flood elevation.

[9]The BFE is the elevation relative to mean sea level at which there is a 1 percent chance of floodwaters rising in a given year. The level of the BFE within a community can change throughout the floodplain.

[10]Some programs are also designated as having Emergency Program status. The Emergency Flood Insurance Program is intended as a program to provide a first layer amount of insurance on all insurable structures before the effective date of the initial FIRM.

building and contents flood insurance for residential and commercial properties (table 1).[11]

**Table 1: Amounts of NFIP Insurance Available, as of May 1, 2008**

| | | Regular program | | |
|---|---|---|---|---|
| Type of coverage | Emergency program | Basic limit | Additional limit | Total limit |
| **Building coverage** | | | | |
| Single-family dwelling | $35,000 | $50,000 | $200,000 | **$250,000** |
| Two- to-four-family dwelling | 35,000 | 50,000 | 200,000 | **250,000** |
| Other residential | 100,000 | 150,000 | 100,000 | **250,000** |
| Nonresidential | 100,000 | 150,000 | 350,000 | **500,000** |
| **Contents coverage** | | | | |
| Residential | 10,000 | 20,000 | 80,000 | **100,000** |
| Nonresidential | $100,000 | $130,000 | $370,000 | **$500,000** |

Source: NFIP rate manual.

Note: Alaska, Hawaii, Guam and the U.S. Virgin Islands have different amounts of coverage for the first and second layers of coverage; however, their total limit is also $250,000. The Emergency Flood Insurance Program is intended as a program to provide a first layer amount of insurance on all insurable structures before the effective date of the initial FIRM.

Congress mandated the use of subsidized premiums to encourage communities to join the program and mitigate concerns that charging rates that fully and accurately reflected flood risk would be a burden to some property owners. The Flood Disaster Protection Act of 1973 made the purchase of flood insurance mandatory for the protection of properties within SFHAs that are secured by mortgages from federally regulated lenders, thus expanding the use of subsidized premiums. In addition, NFIP was authorized to begin charging full-risk premiums for all construction built after 1974 or the date of the community's initial FIRM. According to FEMA, Congress made these changes to encourage further participation in NFIP through low premiums. More recently, legislation has been

[11]The rate-setting methods discussed in this report are used for the building structure as well as the insured's personal belongings, or the "contents," contained within the structure. Rates differ for these types of coverage, and insurance buyers specifically purchase each type of coverage in order to be covered for both. However, most of our discussion focuses on coverage for the structure.

introduced that would limit NFIP subsidies aimed at improving the financial stability of the program.[12]

Pre-FIRM structures generally are more prone to flood damage (that is, riskier) than structures built later because they were not constructed according to the program's building standards. Owners of post-FIRM structures generally are not eligible to receive subsidized rates. Largely because subsidized properties tend to be riskier than properties insured at full-risk premiums, in 2007, the average annual premium for a subsidized policy was about $869, while the average annual premium for a full-risk policy was about $378.[13] Flood insurance rates are calculated for each flood zone. However, as shown in table 2, flood insurance rates also depend on flood zone.

**Table 2: Average Premium per Policy in Force by Flood Zone, 1997-2006**

(In constant 2006 dollars)

| Calendar year | High-risk | High-risk coastal | Moderate- to low-risk | Undetermined risk level |
|---|---|---|---|---|
| 1997 | $521 | $1,039 | $377 | $794 |
| 1998 | 538 | 1,041 | 384 | 814 |
| 1999 | 525 | 1,053 | 380 | 824 |
| 2000 | 497 | 1,049 | 363 | 788 |
| 2001 | 482 | 1,059 | 350 | 766 |
| 2002 | 472 | 1,118 | 343 | 775 |
| 2003 | 478 | 1,232 | 349 | 824 |
| 2004 | 492 | 1,343 | 344 | 842 |
| 2005 | 502 | 1,398 | 340 | 912 |
| 2006 | $521 | $1,463 | $336 | $980 |

Source: GAO analysis of NFIP data.

The insurance operations of NFIP differ from those of most private insurers in a number of ways. First, unlike private insurers that can reject applicants with properties whose potential losses would not be offset by

[12]The Flood Insurance Reform and Modernization Act, H.R. 3121, 110th Cong. (2007) and the Flood Insurance Reform and Modernization Act, S. 2289, 110th Cong. (2007), both include provisions aimed at limiting subsidized properties.

[13]Various factors such as flood zone, structure elevation, type of structure, and amount of coverage affect the premiums.

premiums, NFIP is required to accept virtually all applications for insurance. Therefore, NFIP is less able to offset the effects of adverse selection—that is, the phenomenon that those who are most likely to purchase insurance are also most likely to experience losses.[14] Adverse selection may lead to a concentration of policyholders in the riskiest areas; the problem is compounded by the fact that those at greatest risk are required to purchase NFIP insurance if they have a mortgage from a federally insured lender.

Second, NFIP's ability to adjust premiums is limited by statute. While most states regulate premium prices, they tend to allow private insurers considerable flexibility in their ability to set prices. Third, NFIP assumes all the risks for the policies it sells. Private insurers typically retain only part of the risk that they accept from policyholders, ceding a portion of the risk to reinsurers.[15] This mechanism is particularly important in the case of insurance for catastrophic events, because the availability of reinsurance allows an insurer to limit the possibility that it will experience losses beyond its ability to pay.

Finally, NFIP is not authorized to charge premiums that are sufficient to build the capital that most private insurers have to offset losses or purchase reinsurance in the private global market. For example, private insurers have a capital surplus that they use to pay expected claims. In contrast, NFIP operates on a cash flow basis, backed by borrowing authority from the U.S. Treasury. As a result, NFIP does not follow all of the traditional accounting practices that private insurers use—for example, NFIP reports using only Generally Accepted Accounting Principles (GAAP ) accounting, which is an ongoing operations accounting basis, while private insurers must report both GAAP and statutory accounting basis.[16]

[14]Adverse selection occurs when insurers cannot distinguish between less risky and more risky properties, although homeowners can. When premiums do not reflect differences in risk that are known to potential policyholders, those who buy insurance are often those at greatest risk for the hazards covered. Adverse selection in the market for natural catastrophe suggests that homeowners who are at the highest risk of experiencing a natural catastrophe will buy available insurance.

[15]Reinsurance is essentially insurance for insurers—that is, companies buy coverage for all or a part of a policy's liability from other insurers in order to offset exposure.

[16]This is on a conservative basis required by state insurance regulators.

## FEMA's Method of Setting Full-Risk Premiums May Not Ensure That Rates Accurately Reflect Risk

FEMA uses a rate model to generate prices for flood insurance according to flood risk and expected flood damage. However, we found that in some cases these full-risk premiums may not accurately reflect actual risk because of limitations in the data used as inputs for the model and the effects of certain policy decisions. For instance:

- Some data FEMA used in rate setting are outdated or inaccurate, including data on flood probabilities, damage estimates, and flood maps.
- FEMA allows some properties that were remapped into riskier flood zones to keep their previous lower rates.
- FEMA's rate-setting process does not fully take into account ongoing and planned development, long-term trends in erosion, and effects of global climate change.
- FEMA sets rates on a nationwide basis, combining and averaging across many geographically diverse areas.[17]

Furthermore, our analysis of the difference between claims payments and premiums collected for all 50 states and the District of Columbia suggests that NFIP's pricing has not accurately reflected differences in flood risk. Collectively, these factors increase the risk that premiums collected on full-risk rates do not accurately reflect the risks of flooding and therefore may not be sufficient to cover future losses.

[17]Two properties that are of the same NFIP risk class (for example, both are one-story, single-family homes with no basement and are elevated a certain number of feet above a reference level) are charged the same rate per $100 of insurance although they may be located in different states with differing flood experiences or rest on different topography such as a shallow floodplain versus a steep, mountainous valley.

## FEMA's Rate-Setting Process Uses a Model That Is Based on Flood Risk and Expected Flood Damage

According to FEMA, rates that are based on the probability of a given level of flooding, damage estimates based on that level of flooding, and accepted actuarial principles are considered to be "full risk."[18] To set rates for flood insurance that accurately reflect risk, information about the differential risk of flooding is key, with greater flood risks resulting in higher rates. Rates also vary depending on how much insurance is purchased. As claims are more likely to be made against the first several thousand dollars of coverage than against much higher levels of coverage (that is, smaller dollar-value losses are generally expected to occur more frequently than larger ones and thus pose a greater risk), rates per $100 of insurance coverage are lower for higher levels of coverage.[19]

FEMA uses a model to set rates for flood insurance for post-FIRM construction within the 1 percent, or 100-year, floodplain according to flood risk and expected resulting flood damage.[20] This method of estimating flood damage is based on the hydrologic model described in a 1966 report by the Department of Housing and Urban Development, which was based on studies conducted in the 1960s and developed and used by

[18]A premium system for a given insurance coverage typically takes into account expected claims costs, based on projections from relevant, credible prior experience; the administrative cost of providing the coverage, including but not limited to underwriting, sales, and claims administration; and, a margin for profits and for losses that are worse than expected. In addition, for a rate-setting system to be considered actuarially based, the premium charged to each insured should be reasonably related to the risk posed by coverage of that insured.

[19]For example, for a given property type, the rate per $100 of insurance on the first $50,000 of coverage for a single-family structure in the Regular Program (that is, what NFIP terms "basic" coverage) is $1.31. The rate per $100 of insurance on amounts in excess of $50,000 (that is, what NFIP terms "additional" coverage) is $0.10.

[20]The "1 percent annual chance flood," also known as the "100-year flood," is a statistical construct: It is a flood that has a certain discharge that produces a specific flood elevation and an estimated 1 percent chance of occurrence in any one year. In reality, the 1 percent flood represents a range of discharge and elevation values because of the uncertainties and other limitations in the information available for its computation and the resulting need to use specific types of probability distributions to portray the possibilities. The SFHA flood zones on the FIRMs can reflect varying degrees of analysis, in some cases using approximate methods while in others using more detailed methods. The accuracy of the flood hazard data depicted on the FIRMs and the delineation of the SFHA are dependent on the data limitations of the computation of the 1 percent flood and the topographic information available for the area being mapped. The variety of factors and uncertainties involved in generating flood maps render these maps less definitive and authoritative than communities frequently assume them to be—for example, many interpret the 1 percent flood line as an assurance that development above that elevation or outside that line is guaranteed to be safe from the 1 percent flood. The 1 percent flood zones reflect only existing conditions and not future development.

the Corps for a number of years.[21] While the Corps has revised its model for estimating flood damage, it still makes use of the hydrologic model to estimate flood damage.

In the high-risk and high-risk coastal zones, the model combines estimates of the frequency of flooding with estimates of the magnitude of damage caused by flooding, producing "pure premium" costs intended to cover the actual flood losses. FEMA uses such inputs as the elevation of the lowest floor of the building, the type of building, the number of floors, the presence of a basement, claims data, and mapping information to generate the estimates. This pure premium amount is then adjusted to capture certain program costs, compensate for underinsurance by policyholders, and reflect the fact that the program has a deductible.[22] For the moderate- to low-risk and other full-risk premium zones, rates have been developed based on actuarial and engineering judgments, using the rates generated by the model and the historical experience of the high-risk zones as benchmarks.[23]

While other entities employing flood models may use more sophisticated computer modeling techniques, the NFIP rate model is based largely on the same principles. In 2000, FEMA completed a feasibility study on using private market reinsurance to cover a portion of its flood risk that required modeling the frequency and size of catastrophic flood events, and determined that the results of the study were not inconsistent with the results of NFIP's rating structure. For other lines of catastrophe insurance, private insurers rely heavily on computer models of simulated damage

[21]U.S. Department of Housing and Urban Development, "Insurance and Other Programs for Financial Assistance to Flood Victims: A Report from the Secretary of the Department of Housing and Urban Development to the President, as Required by the Southeast Hurricane Disaster Relief Act of 1965," Public Law 89-339, 89th Congress, H.R. 11539, Nov. 8, 1965 (Washington, D.C.: August 1966).

[22]Property owners are underinsured when they purchase insurance coverage for less than the value of the property, either by or because of limits on the amount of available coverage. To compensate for this possibility, FEMA increases premium rates by an "underinsurance factor" that is based on claims data going back to 1978 for different zones and types of structures. More recent experience is given a greater weight in determining the factors.

[23]FEMA has taken this approach for pricing in these zones because it believes the cost of obtaining the information necessary to develop detailed flood frequency-magnitude relationships for use in the hydrologic model would be extremely high in relation to the benefits.

over many possible events to price their products.[24] Like NFIP, other federal agencies and private insurers involved in flood modeling also rely on flood maps and data on the likelihood of flooding and damages. According to FEMA, it has contracted for actuarial services with an external consultant to assess the current state of hazard modeling and the possible applicability of those models to NFIP.

## Some Key Data Elements Used in the Rate-Setting Model Are Outdated or Based on Erroneous Information

Questions remain about the age and quality of the underlying data FEMA uses in its model to calculate full-risk premiums. The NFIP model for setting full-risk premium rates relies on flood probability estimates and expected damage data, which rely in part on outdated or potentially inaccurate information, including outdated FIRMs. As discussed more fully below, flood probability estimates have not been updated since the 1970s and 1980s, most FIRMs are out of date despite FEMA's recent modernization efforts, and the claims data used to calculate full-risk premiums may be inaccurate. As a result, the premium rates set by NFIP may not fully reflect the risk of loss due to flooding.

### Data Used to Determine Flood Probabilities Have Not Been Updated since the 1970s and 1980s

FEMA's estimates of probabilities that floods of different severities (relative to the BFE) will occur in a given year, or "probability of elevation" (PELV) values, were generated in the 1970s. Within any zone, the risk that floodwaters will reach the BFE in any year is 1 percent, but across zones the likelihood that floodwaters will reach a foot above or below that level varies. PELV tables provide detailed information, by zone, about the frequency with which floods of different elevations are expected to occur. These data were generated using detailed engineering studies, available flood data, simulations, and professional judgment and were established for each flood zone to meet generally accepted scientific parameters and legal considerations of the time. FEMA later concluded that flood probabilities were likely underestimated in some cases because of the short flood histories used in some of the studies. As a result, according to FEMA officials, some of the original PELV values were modified in the early 1980s to account for this statistical bias. They have not been revisited or updated since that time.

[24]Highly variable events (events with losses varying widely from year to year) and greatly skewed events (very rare but very large catastrophic events) such as floods, hurricanes, and earthquakes do not lend themselves to traditional actuarial pricing techniques. Results can vary dramatically from year to year and average results have little predictive value even when gathered over a long period of time, thus rendering the use of historical flood loss experience for setting rates problematic.

FEMA currently uses both the original and modified PELV values in the rate-setting process. The original PELV values contribute 80 percent to the ultimate results and the modified values 20 percent, reflecting weights set out by policies from the early 1980s, according to FEMA officials. Flood risk experts have suggested that flood probabilities (and thus flood insurance rates) are likely to change as land use (such as urban or suburban development), infrastructure (such as new bridges and culverts), and weather patterns change. FEMA could capture such changes by updating its flood probability data but has not done so.

FEMA officials also acknowledged that the weighting for the original and modified PELV values was likely out of date but said that other competing priorities, including supporting post-Katrina-related activities and other studies had been given priority.[25] Moreover, a FEMA official noted that the weighting might introduce a degree of "conservatism" to the rate-setting process because it would lead to higher rather than lower premium rates.[26] Further, according to the officials, the geographic mix of NFIP policies had become more concentrated in Florida and other communities where the PELV values were more accurate. Nevertheless, FEMA has not updated the PELV data since the 1980s or updated the weighting of the original and modified PELV data. As a result, the accuracy of the flood probability estimates and the probability of elevation values are uncertain, and we could not determine whether the rates based on such data were accurate. Moreover, FEMA was not able to provide any analysis that it had done to determine that the current weighting remained appropriate or that the probabilities had not changed in over 30 years.

## The Claims Data Used in the Model May Be Inaccurate

In addition, some claims data—which are updated on a periodic basis—may suffer from errors and thus misinform damage estimates and, in turn, the rates generated by the model. FEMA relies on estimates of the percentage of the value of a structure that is expected to be damaged

[25]Studies include those by CRS, CBO, GAO, and the DHS Office of Inspector General.

[26]A FEMA official explained to us that by not updating the PELV data, NFIP essentially was assuming that the difference between the 10 percent annual chance of flood (that is, the 10-year flood) and the 1 percent annual chance of flood has not changed since the data were published in the 1970s and 1980s. FEMA told us that the PELV data have been used in such a way as to make the rates less sensitive to factors such as changes in land use, structural development, or climate trends. FEMA also noted that actuarial judgments during rate setting deal with a variety of uncertainties, such as those that go beyond simply relying on the calculation based on the hydrologic model. According to FEMA, other efforts, such as contingency loading or across-the-board rate increases on a zone, and improved floodplain management, have been made to compensate for the impact of these factors.

when a flood occurs, or the "damage by elevation" (DELV) values. DELV information is measured in 1-foot increments of the flood level within the structure and is expressed as the expected percentage of the property's value that will be damaged by a flood of that elevation.[27] As with the PELV data, information used in establishing DELV values was obtained primarily from engineering studies. In 1973, data for DELVs were selected on the basis of studies done by the Corps and available flood claims at that time. Currently, FEMA modifies the Army Corps DELV values based on its NFIP claims experience. When FEMA determines that its own loss data are "credible," it uses these data rather than the original data generated by the Corps.[28] However, FEMA also currently uses updated Corps damage data to supplement NFIP claims data where it lacks sufficient credible loss data. According to a FEMA official, for the most common type of property insured by NFIP, the claims process has become fully credible for a wide range of water depths in the structure.

However, evidence suggests that there are inaccuracies in the actual claims data used to update the DELV values. An external study noted some internal control problems with NFIP's claims database.[29] For instance, claims records were often incomplete because the claims data had been collected in the field by local adjustors for purposes of processing claims. As a result, many records did not indicate BFE or depth of flooding, clearly differentiate between wind and water losses, or capture losses above the insurance limit when damage exceeded coverage limits. In addition, Corps officials told us that they had reviewed FEMA's claims between 1998 and 2000 databases and found the data to be unreliable for their purposes. For example, according to the Corps, in some cases the claims data indicated flood damage, but flood height data were missing. FEMA's database recorded these missing height data as a flood height of zero. Our analysis of NFIP claims paid between 1978 and 2007 further

[27]For DELV estimates, if water reached a depth of 2 feet relative to the BFE within a one-story, no-basement structure located in the high-risk zone, 25 percent of the property's value would be damaged; however, if water reached a depth of 4 feet within the same structure, 30 percent of the property's value would be damaged.

[28]"Credible" refers to the degree of belief that the entity's prior experience is a valid predictor of future costs.

[29]American Institutes for Research, *Assessing the Adequacy of the National Flood Insurance Program's 1 Percent Flood Standard*, American Institutes for Research, prepared under subcontract to the American Institutes for Research as part of the 2001-2006 Evaluation of the National Flood Insurance Program, Water Policy Collaborative, (College Park, Md.: University of Maryland, October 2006).

supports what the Corps told us. We found an increasing percentage of claims with "0" water depth until they leveled off at between 44 and 49 percent from 1998 until 2004. In 2005 when the Gulf Coast hurricanes occurred, this percentage dropped to about 13 percent, but has risen above 22 percent in the more recent years. Thus, an erroneous data combination of positive flood damage and zero flood height was being used to develop damage curves. As a result, the Corps began to collect its own damage data, which FEMA now uses to supplement its own data.

While FEMA has acknowledged that some problems exist, it believes that these types of errors relate primarily to the most severe flooding events, which have a lower probability of occurring, involve greater water depths, and would contribute only marginally to insurance rates. FEMA officials said that they had reviewed the possible impact of such data errors and did not consider them to be significant because they believed that the zero-elevation water depth errors would overstate the amount of damage from zero amount of water in a property.[30] However, this analysis is incomplete because it does not evaluate the impact of omitting these damage amounts from the actual flood depth levels. As a result, FEMA may be unable to fully assess the overall impact of these errors or omissions on its full-risk rates, creating a risk that these premiums may not accurately reflect the actual risk of flood loss.

## Maps That Provide Information for Base Flood Elevations Remain Substantially Out of Date despite Modernization Efforts

FIRMs provide the information that determines BFEs, a key input in the rate-setting model. FEMA formally undertook map modernization efforts in fiscal year 2003. According to FEMA, the agency undertook map modernization for several reasons:

- Flood hazard conditions are dynamic, and many NFIP maps may not reflect recent development and/or natural changes in the environment.
- Updated NFIP maps can take advantage of revised data and improved technologies for identifying flood hazards.
- Up-to-date maps support a flood insurance program that is more closely aligned with actual risk, encourages wise community-based floodplain management, and improves citizens' flood hazard awareness.

[30]According to FEMA officials, zero elevation water is a depth that encompasses up to the first 5 inches of floodwater in a property. This depth is also sometimes referred to as a "carpet soaker" flood.

- Local communities and various stakeholders want more timely updates of flood maps and easier access to the flood hazard data used to create the maps.

In 2005, FEMA adjusted its goals and currently expects to provide updated flood boundaries for 75 percent of stream miles reflected on FEMA's issued maps and 0.30 percent of those mapped stream miles will be based on new or updated engineering studies by the end of the program in 2010. FEMA also revised its goal of having digitized maps that covered 100 percent of the population to having digitized maps for 92 percent of the population so that it could better focus its efforts and thus improve map quality. FEMA undertook these changes in response to concerns expressed by Congress and DHS's Inspector General's office and in response to our prior work on this issue.[31] FEMA officials stated that changes in land use and structural development that had occurred over time would be captured when FEMA updated the FIRMs, each of which is required to be reassessed every 5 years.[32]

According to FEMA, as of May 2008, approximately 4 percent of U.S. counties had maps that accurately reflect the current risk of flooding (fully updated) and were newly digitized and 2 percent had old maps that may or may not accurately reflect the actual risk of flooding but were newly digitized. For the remaining 94 percent of U.S. counties, the maps were a combination of new and old mapping data that were in production or have not yet begun the process. According to FEMA officials, although maps for 94 percent of U.S. counties had not been fully updated or newly digitized, all counties had received a partial update to their flood hazard information and more than a third had received updates that exceeded one of FEMA's

[31]See GAO, *Flood Map Modernization: Program Strategy Shows Promise, but Challenges Remain*, GAO-04-417 (Washington, D.C.: Mar. 31, 2004).

[32]FEMA has produced FIRMs that depict SFHAs for approximately 20,000 communities nationwide. The SFHA represents the flood that has a 1 percent annual chance of occurring in any given year, sometimes referred to as the "base flood." The base flood is the national standard used by NFIP and all federal agencies for the purposes of regulating development and requiring the purchase of flood insurance. Reliance on the 100-year flood as an adequate standard was brought into question in a recent report. See American Institutes for Research, *Assessing the Adequacy of the National Flood Insurance Program's 1 Percent Flood Standard.*

national map quality targets.[33] FEMA further stated that in March 2008, approximately 68 percent of the nation's population had received a map that met, exceeded or at least approached map quality targets of map modernization. An additional 27 percent of the population has received a preliminary map. FEMA informed us that it anticipates that 92 percent of the nation's population will have a modernized map by 2010.

However, although FEMA has been working to update FIRMs and improve their quality, a significant portion of the maps reflect data at least 15 years old, which may or may not accurately reflect actual risk of flooding. As of April 2008, 50 percent of the nation's approximately 105,700 flood maps were at least 15 years old, 58 percent were more than 10 years old, and 70 percent were at least 5 years old. To the extent that these older maps are inaccurate and the risk of flooding has changed, reliance on these older maps could lead to inaccurate flood risk assessments, which in turn could lead to inaccurate premium rates.

## FEMA Does Not Track the Number or Location of Remapped Grandfathered Properties That Pay Less than Full-Risk Premiums

FEMA made a policy decision to grandfather into the program certain properties, that is, it allowed properties that have been remapped into riskier flood zones to keep their previous lower rates. FEMA is in the process of updating FIRMs through its Map Modernization program, but these new maps may not lead to more accurate pricing due to this policy decision, which was based primarily on concerns about the affordability of the resulting rates.[34] FEMA documents state that properties are grandfathered in order to recognize policyholders who have complied with their original FIRM, have remained loyal NFIP customers, or both. In general, two categories of buildings may be grandfathered into the program: (1) those built in compliance with the FIRM that was in effect at

[33]FEMA has established national map quality targets under Map Modernization by tracking compliance with the Floodplain Boundary Standard and the new, validated, or updated Engineering metric. Compliance with the boundary standard indicates that the mapped floodplain matches the underlying topographic information. Compliance with the engineering metric indicates that engineering analyses used to determine the extent of the flood hazard have been either newly established or updated. The national map quality targets under Map Modernization are 75 percent of mapped stream miles compliant with boundary standard and 30 percent of mapped stream miles compliant with the engineering metric.

[34]According to FEMA, an important reason for making the grandfathering decision was that policyholders who were in compliance with their existing FIRMs should not be required to pay higher prices for new conditions of which they were previously unaware.

the time of construction and (2) those built before a FIRM was in effect or that were not in compliance at the time of construction.[35] For those buildings in compliance at the time of construction, property owners need to provide documentation of the date of the original FIRM and the property's flood zone, BFE, and other map-related information. Properties that were not in compliance generally can be grandfathered if they have had continuous flood insurance and if the building has not been altered in certain ways. FEMA officials told us that while grandfathering can work as a disincentive for sound floodplain management, the decision to grandfather rates was based on consideration of (1) equity, (2) ease of administration, and (3) goals of promoting flood plain management.[36]

While FEMA does not consider the premiums on these properties to be subsidized because they are based on the average risk for the whole class to which they had been assigned previously, they share two characteristics with subsidized rates. First, rates based on new FIRMs should more accurately reflect flood risk, but grandfathered properties will not be charged those rates. Second, the grandfathered status of a property continues indefinitely, even when the property is sold. FEMA officials acknowledged that property owners that obtain grandfathered rates for their homes are being cross-subsidized by other policyholders in the same zone that are paying higher rates.[37] For example, under grandfathering, repetitive loss properties remapped into a higher-risk zone instead would pay a rate generally charged to lower-risk properties.

[35]These are pre-FIRM properties that were built before detailed flood hazard data and flood elevations were provided to the community and usually before the community enacted comprehensive regulations on floodplain regulation.

[36]FEMA officials stated that grandfathering presented a disincentive for sound floodplain management because grandfathered owners would be unaware of the true risk of flooding to their properties and would therefore be less likely to mitigate. But the officials also stated that in making this decision they took into consideration several concerns: (1) potentially higher rates that could cause property owners not to buy insurance or to lose their properties, (2) adverse reactions to FEMA as the result of these higher rates, (3) the burden on insurance agents of obtaining new map determinations and information for every policyholder, and (4) the likelihood of communities resisting new maps due to the potential for large rate increases.

[37]In most property and casualty insurance lines, state assessments are often passed through to policyholders. As a result, policyholders living in less risky locations also contribute to cover the shortfall—a scenario known as cross-subsidization. In those states where assessments cannot be passed through in some manner, private insurers must pay the assessments while at the same time paying large claims from their own policyholders. In such instances, some companies may be reluctant to continue offering coverage in the state or may become insolvent.

While grandfathered rates are used to keep existing policyholders, FEMA has not taken steps to measure the impact of these rates on the program's financial condition. FEMA officials said that they currently had limited data on new or existing grandfathered properties and are just beginning to explore ways to track these properties. For example, they had not tracked the number of grandfathered properties or calculated how much lower grandfathered premiums are than the actual rates. As a result, they did not know the effect of grandfathered properties on the program's total premium collection and the extent to which these rates deviate from fully risk-based rates. Without this information, FEMA's ability to address the financial impact of such properties on NFIP's financial health is limited. FEMA officials acknowledged the importance of tracking information related to grandfathered properties and told us they plan to start a tracking process in May 2009.[38] However, they said that this process will not capture the inventory of existing grandfathered properties.

## FEMA Does Not Consider Risk Factors Such as Erosion and Climate Change when Setting Flood Insurance Rates

Some experts with whom we spoke have suggested that incorporating ongoing and planned development, erosion trends, and climate change into flood risk modeling would more fully capture longer-term flood risk exposure, but FEMA does not take these variables into account. FEMA's present policy is to map SFHAs based on current development conditions. However, as floodplains are developed and more ground surfaces are paved or made impervious (nonabsorbent), the risks and expected elevations of flooding increase. As the predicted elevation of the base flood increases, SFHAs subsequently spread beyond mapped boundaries. As a result, in rapidly developing watersheds or where characteristics change significantly due to flood control projects or other natural events, some FIRMs may become outdated shortly after their completion. In addition, some properties could be constructed without proper protection from the flood hazard they may face throughout their life span, and others could be uninsured or subject to insurance rates that do not accurately reflect flood risk.

[38]The two types of policies in the moderate- to low-risk zones are referred to as preferred risk policies and the standard policy. The preferred risk policyholders generally pay the lowest flood rates. Preferred risk policies are available on buildings that are outside of the SFHA and have not flooded more than once.

FEMA's current flood hazard mapping procedures for coastal areas incorporate storm-induced coastal erosion but not long-term erosion.[39] While shorelines, dunes, and bluffs can retreat during a single storm, long-term erosion at a shoreline is the net result of a variety of factors such as sediment losses from storms and inundation from sea level rise, averaged over several decades.[40] A 2000 study conducted for FEMA by the H. John Heinz Center estimated that over the next 60 years, losses due to the effects of coastal erosion would average $80 million annually.[41] If coastal development continues at its current pace, or if sea levels rise as some scientists have predicted, such losses could be even greater. In the absence of the authority needed to establish erosion zones, FEMA has taken action based on the results of the study, namely, a steady annual increase in rates for the high-risk coastal zone at a pace it says is commensurate with the study's projections.[42] In addition, according to FEMA officials, they formed an internal working group to determine additional actions that could be taken to implement the report's recommendations under the existing laws and regulations that govern NFIP. The working group concluded that because of the statutory limitations, implementing the recommendations would require direct congressional authorization.[43] Therefore, FEMA, which does not currently map erosion hazard areas, is unable, through its rate-setting process, to inform policyholders of the risk to their property from erosion. Consequently, in some cases flood insurance rates may send a false signal

[39]Coastal erosion is long-term erosion such that a shoreline retreats at or around an average rate over a period of decades.

[40]Shorelines rarely recede at a constant rate; instead, erosion occurs in a cyclic fashion, with seasonal and episodic influences resulting in periods of erosion, periods of stability, and periods of accretion. On shorelines suffering from long-term erosion, the periods of erosion outweigh or overwhelm the periods of stability and accretion.

[41]The H. John Heinz III Center for Science, Economics and the Environment, *Evaluation of Erosion Hazards*, Prepared for the Federal Emergency Management Agency Contract EMW-97-CO-0375, (Washington D.C.: April 2000).

[42]The National Flood Insurance Act of 1968, as amended, authorizes FEMA to carry out NFIP to enable persons to buy insurance against losses arising from flood. The statute defines flood as including sudden, flood-event-triggered collapses or subsidences of land along the shore of a body of water, but the statute's definition of flood does not include the gradual, long-term erosion that may endanger coastal communities. See 42 USC 4001, 4002 and 42 USC 4121(c).

[43]FEMA officials told us that they could likely map erosion hazard areas on FIRMs for informational, but not rate-setting, purposes under its existing authority. However, FEMA estimates the total cost of this effort could range between $50 million and $100 million.

that understates the risk exposure faced by current policyholders or prospective development.

FEMA also does not incorporate the potential effects of climate change into its rate-setting considerations. Our 2007 report on climate change discussed the effects of climate change on weather-related events and, subsequently, insured and uninsured losses. We found that leading scientific bodies expect warmer temperatures to increase the frequency and severity of damaging extreme weather-related events.[44] In addition, population growth in hazard-prone areas and the resulting development and increasing real estate values have increased the exposure of federal and private insurers. In particular, heavily populated areas along the Northeast, Southeast, and Texas coasts, which are at the highest risk for major hurricanes, also have some of the highest value properties in the United States. Because of these and other factors, our report estimates that NFIP's exposure has grown substantially, quadrupling since 1980 and nearing $1 trillion.

While many private insurers are beginning to take climate change into account, FEMA has done little to develop the kind of information needed to understand the long-term exposure of NFIP to climate change for a variety of reasons. For instance, NFIP's goals are fundamentally different from those of private insurers. Specifically, private insurers stress the financial success of their business operations, but the law authorizing the federal flood insurance program promotes affordable coverage and broad participation by individuals at risk. In addition, although FEMA manages its risk within statutory guidelines, unlike private insurers, NFIP is neither required nor permitted to limit its catastrophic risk strictly within its ability to pay claims on an annual basis. One important implication of this lack of limits on managing catastrophic risk is that FEMA has little reason to develop information on NFIP's long-term exposure to the potential risk of increased low-frequency, high-severity weather events associated with climate change. NFIP's risk management processes adapt to near-term changes in weather as they affect existing data. As a result, NFIP is designed to assess and insure against current—not future—risks and currently does not have the information necessary to adjust rates for the potential impacts of events associated with climate.[45] FEMA told us that it

[44]GAO, *Climate Change: Financial Risks to Federal and Private Insurers in Coming Decades Are Potentially Significant*, GAO-07-285 (Washington, D.C.: Mar. 16, 2007).

[45]This is consistent with standard actuarial practice for pricing 1-year term insurance.

has commissioned a study to assess the long-term exposure to climate change that will investigate changes in sea levels, intensity and frequency of hurricanes, and precipitation patterns.

## FEMA's Rating System Combines and Averages Many Different Risks to Create Nationwide Rates

FEMA classifies properties according to flood risk using a single, nationwide class-rating system rather than an individual property or community-by-community rating system. That is, all properties grouped into a class—based on structure type and elevation relative to the BFE—are assumed to have the same risk.[46] Further, FEMA charges the same rate for a given class in the high-risk zone (or separately, in the high-risk coastal zone) regardless of location within the zone. Thus, two properties in the same class but located on vastly different terrain—for example, one in a shallow floodplain and the other in a steep and narrow mountain valley—are charged the same rate per $100 of insurance coverage despite the fact that they may have different expected loss.

The NFIP model can incorporate specific topographic (that is, flood zone) information in rate setting. However, according to FEMA, it was determined that more averaging could be justified, because the differences in rates across flood zones were not significant enough to warrant that level of detail. According to FEMA officials, the class-rating approach balanced the need to recognize significant differences in risk with a simplified process for determining rates that was easier for the sales force and others to use. FEMA has not revisited its class-rating approach since its inception although certain program elements have changed since that time. For example, program participation has more than doubled from just over 2 million policies to more than 5.2 million from the late 1980s to 2007 and increased numbers of properties have been constructed on SFHAs. As a result of the growth in the program, the rate classes may not accurately reflect the actual flood risk to individual properties and averaging may no longer accurately reflect differences in rates within zones.

[46]NFIP implemented the nationwide class-rating system because of the nature of the program and the desire to make it less complex and easier for agents and customers to understand. In the early years of the program, rates were set on a community-by-community basis. But as the number of communities participating grew, this system became unwieldy and costly to maintain. FEMA analysis indicated that from a technical perspective, this system was not essential to the estimation of flood damages since, for example, flood frequency data were found to be similar across communities.

## Our Analysis of Historical Claims and Premium Data Raises Questions about a Potential Mismatch between Rates and Risk

We analyzed 30 years of NFIP data on claims and premiums and found patterns based on differences among states indicating that NFIP rates may not have always accurately reflected differences in flood risk.[47] As we have seen, FEMA sets premium rates that apply nationwide. Our state-by-state analysis of annual claims and premiums data dating back to 1978 showed that some states consistently had more years in which claims exceeded premiums than did other states over this period, raising questions about a potential mismatch between rates and risk.[48] It is important to note that claims equaling premiums in a given year would not indicate a break-even year, because in addition to covering expected claims in a year, a portion of premiums is also intended to cover expenses necessary to operate NFIP. For example, in the year ending May 1, 2008, NFIP projects about 53 percent of its total expenses would pay for claims, while the rest would cover other expenses such as interest on debt, loss adjustment expense, and agents' commissions. For the purposes of this report, we assigned the title of high-loss year to any year in which a state's claims exceeded its premiums, because in these years, these states would not have had any premium dollars left over to contribute toward administrative expenses once claims had been paid.

On an annual basis, we found that for 1978-2007, nine states had high-loss years more often than once every 4 years (table 3). Missouri and West Virginia had the most high-loss years, with 11; Alabama, Illinois, Louisiana, Mississippi, New Hampshire, Ohio, and Texas followed, with from 8 to 10 such years. Other states had very few high-loss years, and some had none. For example, Alaska, Colorado, and New Mexico had no high-loss years, while Florida, Idaho, Oregon, South Carolina, and Vermont had 1, and Nevada, Utah, and Wyoming had 2.[49] The consistency with which some states were at one extreme of the high-loss-year distribution or the other since the late 1970s suggests that NFIP's method of setting flood insurance rates on a nationwide basis may not accurately reflect differences in flood risk among states, because rates for similar properties do not vary by state.

[47]We computed the difference between the dollar amount of losses on claims paid out in that state by NFIP and the dollar amount of premiums collected in that state by NFIP.

[48]Because of the data limitations, our analysis was performed using claims and premiums data from both full-risk and explicitly subsidized policies.

[49]See appendix II for a full listing of states.

**Table 3: States Where Claims Frequently or Rarely Exceeded Premiums, 1978–2007**

In constant 2007 dollars

| State | 1978-2004 premiums minus claims | 1978-2007 premiums minus claims | 1978-2007 Number of years that claims exceeded premiums |
|---|---|---|---|
| Missouri | ($384,344,855) | ($350,344,220) | 11 |
| West Virginia | (146,896,812) | (118,874,830) | 11 |
| Mississippi | (40,584,822) | (2,498,544,520) | 10 |
| Louisiana | 428,383,041 | (11,777,260,456) | 10 |
| Texas | (728,796,632) | (222,265,084) | 9 |
| Alabama | (505,212,107) | (746,166,995) | 9 |
| Illinois | 90,321,291 | 162,050,972 | 9 |
| Ohio | 101,547,985 | 100,111,514 | 9 |
| New Hampshire | 36,648,547 | 21,531,170 | 8 |
| Utah | 15,372,336 | 21,207,776 | 2 |
| Wyoming | 16,597,320 | 21,134,460 | 2 |
| Nevada | 70,283,808 | 82,293,838 | 2 |
| Vermont | 23,425,436 | 30,590,342 | 1 |
| Idaho | 32,991,914 | 42,892,136 | 1 |
| Oregon | 104,014,018 | 133,186,375 | 1 |
| South Carolina | 313,400,772 | 590,371,633 | 1 |
| Florida | 8,035,673,802 | 9,938,638,592 | 1 |
| Alaska | 23,003,446 | 27,770,628 | 0 |
| New Mexico | 79,909,374 | 97,876,034 | 0 |
| Colorado | $135,763,975 | $170,139,136 | 0 |

Source: GAO analysis of FEMA data.

Note: We analyzed two time periods so we could separately consider the impact of the 2005 Hurricanes Katrina, Rita, and Wilma. The numbers in parenthesis denote negative values

We recognize that flooding is a highly variable event, with losses varying widely from year to year, and that even an analysis of nearly three decades of historical data could lead to unreliable conclusions about the actual flood risk faced by a given state. In addition, we note that Florida, Texas, and Louisiana are among the states with the most NFIP policies, and therefore have a more significant impact on the amount of premiums collected than other states. Some discrepancies in high-loss years among states are to be expected and do not necessarily indicate that NFIP premium rates are mispriced. However, if some states frequently have high-loss years or rarely or never have such years, questions arise about

the rate structure, because policyholders in states with frequent high-loss years are paying the same rates as policyholders with similar properties in states with fewer losses.

Additional study would be required to determine whether policyholders in some states with lower losses are paying a higher premium than is appropriate for their risk, and others paying too little. For example, our analysis did not control for differences in the type of policy purchased, such as the mix of certain property types across states and insurance coverage amounts, which could affect both premiums and claims. In addition, we did not control for differences in the mix of subsidized and full-risk policies or the impact of subsidized premiums on our results, which could also affect the results.[50] Despite these limitations, however, this analysis raises a number of questions that may warrant further study that could provide useful insights into the use of nationwide rates as well as other aspects of the program.

Collectively, these factors raise questions about FEMA's rate-setting process and increase the risk that NFIP full-risk premiums rates may not accurately reflect the underlying risk of flood loss. As a result, the premiums collected by FEMA for full-risk policies may not be sufficient to cover the risks associated with those policies. If the premiums are not sufficient, FEMA will likely have to continue to borrow from the Treasury and could face a future of financial instability because of its ongoing inability to cover claims and expenses.

[50]Some states have a relatively large number or proportion of subsidized properties (including grandfathered properties) that generally would lead to higher expected claims relative to premiums, but we were unable to link the separate NFIP claims and premiums data at the state and zone levels in a way that would allow us to perform a more refined analysis. The limitations in setting full-risk rates that we have discussed could result in systematic mispricing relative to risk that becomes apparent only over long periods; however, our analysis included both subsidized and full risk properties, and so the results should be considered in this context.

## FEMA's Process for Setting Subsidized Rates May Further Compromise the Ongoing Financial Stability of the Program

FEMA's rate-setting process for subsidized properties, which depends in part on the accuracy of the full-risk rates, has evolved over time. Currently, to determine subsidized rates, FEMA first subtracts the total amount that it expects to collect on full-risk rate premiums from the average historical loss year target—the minimum amount of premiums the program needs to collect to cover at least average annual losses based on historical loss data. The amount remaining from this calculation is the aggregate target amount of subsidized premiums that the program needs to collect. Then to set individual subsidized rates, FEMA officials consider their knowledge of flood risks, previous rate increases for various areas, and statutory limits on rate increases. Currently, the annual amount that NFIP collects in both full-risk and subsidized premiums is not enough to cover its operating costs, claim losses, and principal and interest payments to the Department of the Treasury. Without changes to its current rate-setting processes, NFIP premiums will be unlikely to be able to cover the program's claims, expenses, and debt, exposing the federal government and ultimately taxpayers to ever-greater financial risks, especially in years of catastrophic flooding.

### The Process Used to Set Subsidized Rates Has Evolved over Time

In designing NFIP, Congress required that premiums for certain properties be offered at prices below those for full-risk premiums to encourage participation in the program and to ensure that premiums were affordable for existing structures in the floodplain. However, the statute does not provide a formula or methodology for setting the subsidies, leaving it up to the program to develop one. When the program began, NFIP administrators set the subsidized rates on the basis of what they believed would be affordable, but this process resulted in losses that had to be covered by borrowings as discussed previously. Some of the resulting deficit was later forgiven by Congress.

In 1981, NFIP administrators, after discussions with Congress, started setting NFIP's subsidized premium rates based on the average historical loss year calculations.[51] According to FEMA, this change allowed the agency to resist external pressures in setting premium rates and provided a more objective standard for determining subsidized rates. FEMA documents from most years between 2001 and 2006 state that the average historical loss year target, which is based on losses from previous years

[51]The average historical loss is calculated by adjusting the loss payouts of prior years to account for inflation and increases in the number of NFIP policies.

averaged over time, generally is considered a floor for premium collection. To account for the potential of catastrophic losses, and the additional funds required to pay such losses, FEMA sets premium rates so that the total premiums collected will be approximately 15 to 25 percent greater than the average historical loss year estimate.

However, FEMA can adjust, and has recently adjusted, the way it calculates the average historical loss year. Although loss years can vary markedly, none of those taken into account before 2005 included the kinds of catastrophic losses seen after Katrina, Rita, and Wilma. According to FEMA officials, including the 2005 losses in calculations of the average historical loss year would have resulted in premium increases well above the 10 percent statutory limit.[52] As a result, FEMA officials instituted a weighting factor for the 2005 losses, and as a result the full amount of the losses was not incorporated into the rate-setting model. According to FEMA officials, they incorporated losses of $2.1 billion of the estimated $23.2 billion in losses from 2005.[53] NFIP set the 2007 and 2008 flood insurance rates based on this modified methodology.

Although FEMA has incorporated more objective criteria against which to set rates for subsidized premiums, the process also depends on the accuracy of calculations for full-risk premiums.[54] After FEMA derives the full-risk premiums, it deducts the total amount of full-risk premiums that it expects to collect from the average historical loss year target; the remainder is the amount in premiums that it needs to collect from subsidized policies. Subsidized rates are then set based on this amount. Thus, the level of subsidized rates charged to policyholders depends, in part, on the full-risk premiums determined by FEMA. For example, if full-risk premiums are too low because they do not accurately reflect flood risk, the total amount FEMA will need to collect from subsidized policies will be higher, resulting in higher subsidized premiums.

[52]By statute, rates may not be increased by an amount that would result in the average of such rate increases for properties within the risk classification during any 12-month period exceeding 10 percent of the average of the risk premium rates for properties within the zone.

[53]FEMA officials told us that through various calculations, they updated the $17.4 billion in losses from Katrina in 2006 to $23.2 billion presently. These calculations included an increase of 20 percent in NFIP policies and an increase of 10 percent for inflation.

[54]According to FEMA, this process was established jointly by Congress and FEMA.

Finally, according to FEMA, the rate-setting process for subsidized premiums also involves other considerations. Officials said once they had calculated the aggregate amount of subsidized premiums they would need, they determined the subsidized rate increases and ultimately the rates for the individual zones based on their knowledge and understanding of flood risks. FEMA officials told us that their decisions on how much to raise rates on various zones took into account concerns about the effect of increases on policyholders, the level and extent of past rate increases, and knowledge of relative flood risks in those areas. FEMA did not provide us with any written documentation describing how these decisions were reached. As mentioned previously, by law FEMA can raise rates on each zone by no more than 10 percent a year. Our review of FEMA documents show that FEMA raised rates significantly for a small number of policies and by very little for a large number of policies from 2002 through 2006. For example, FEMA raised rates by an average of more than 9 percent on about 1 percent of all NFIP policies—specifically, on certain subsidized policies located in high-risk coastal zones. In contrast, FEMA raised rates by an average of around 2 percent on 40 percent of total policies in high-risk zones that were paying full-risk rates. Ultimately, the generally small increases will not help ensure NFIP's financial stability and may in fact decrease it by adding to its operating deficit.

## NFIP's Current Rate-Setting Processes Result in Premiums That Are Not Sufficient to Cover Current Debt and Future Claims

The processes and policies that FEMA uses to set both full-risk and subsidized premium rates have contributed to NFIP's inability to generate enough in premiums to cover the program's operating costs, claims losses, and debt to the Treasury. From 1978 through 2004, NFIP had a net loss of $2 billion. These years had historically low flooding, but NFIP had yearly deficits for about half of these years. Over that period, Congress retired about $1.2 billion of this total debt. However, the introduction of average historical loss year targets in the 1980s resulted in a series of rate increases that contributed to a sizeable reduction of the net loss.

The 2005 hurricanes significantly altered NFIP's financial landscape. The 2005 hurricanes, especially Katrina, left the program with debt of more than $17.4 billion as of June 2008. To service the debt to the Treasury, FEMA owes two annual interest payments of around $365 million that are generally due in April and October of each year. FEMA officials told us that they were able to make the two payments in 2007 without borrowing because, according to FEMA documents, NFIP faced unusually light flooding in 2006 and 2007. In addition, FEMA made an unscheduled principal payment of $225 million in November 2007. However, in April 2008, FEMA borrowed $50 million to pay the $364 million interest payment

owed to the Treasury. FEMA estimates that it will owe a total of $734 million in interest charges in fiscal year 2008.

FEMA officials informed us that they did not know whether NFIP would be able to make future interest payments without borrowing because of uncertainty about future flooding. According to FEMA documents, FEMA has paid $1.6 billion in interest to the Treasury since 2005. NFIP currently has about 5.6 million policies in force, resulting in approximately $2.6 billion in total premium. Historically, program expenses (excluding loss and allocated loss adjustment expenses) have averaged around 38 percent of premiums, or $1 billion of current total premium collection. As of June 2008, NFIP's average noncatastrophic historical loss year (which excludes Hurricanes Katrina, Rita, and Wilma) is about $1.3 billion. The combined outlays for loss and loss adjustment expenses of around $1.3 billion, administrative expenses of approximately $1 billion, and interest payments of approximately $0.7 billion exceed the program's current premium collection of approximately $2.6 billion. Under current conditions, it is unlikely that NFIP will be able to meet its interest payments in most years, and the program's debt will likely grow as the program borrows to meet the interest payments.

## Conclusions

Over the years, FEMA has taken a number of steps to improve the rate-setting process, which was established more than two decades ago, but a number of factors raise questions about whether the resulting rates reflect the actual flood risk. First, potentially outdated and inaccurate data about flood probabilities, damage claims, and flood maps are increasing the risk that full-risk premiums do not reflect actual risk of flooding. Second, unlike many insurers in the private sector, FEMA has done little to understand the long-term impact of planned and ongoing development on damage estimates. While this is due, in part, to the fact that FEMA lacks the authority to factor potential or long-term development into potential flood damage, FEMA has not, for example, evaluated how such developments could affect the accuracy of its maps. Finally, FEMA's continued use of a nationwide rating structure that combines zones across geographic areas despite the substantial growth of the program introduces additional uncertainties. While additional analysis of the data is needed, our analysis found that some patterns in historical claims and premiums collected raise questions about whether this approach is still appropriate and reasonable given the growth in the program. Collectively, these factors call into question the accuracy of the full-risk rates generated by FEMA's rate model. By updating elements of its flood rate model and certain rate-setting policies, FEMA could help ensure that data used in its

model such as flood probabilities, damage estimates, and information from flood maps are as accurate as possible. In addition, by reconsidering risk aggregation across flood zones and the effects of development and climate change into the rate-setting process, FEMA has the opportunity to make its model more robust and increase the accuracy of its rates.

Similarly, FEMA's policy of allowing properties that have been remapped to higher-risk zones to retain lower rates results in rates that do not accurately reflect flood risk. Because the premiums are not based on the actual risk of flooding, these policyholders are receiving a subsidy from other policyholders in the same zone and the federal government—and ultimately from taxpayers. We are encouraged that FEMA plans to implement a monitoring process for grandfathered properties, which would allow it to better determine the impact of these properties on the program's financial stability. However, because FEMA plans to track only grandfathered properties in the future, not existing properties, it will not be able to fully evaluate whether grandfathering actually is fulfilling the desired goals in a cost-effective way. Unless there is a full accounting of grandfathered properties, these properties expose the program to an unknown level of risk. Prompt attention to this issue could allow NFIP to refine its rate-setting process in the short term and provide valuable information on the effects of its policy decision on the financial stability of the program.

Finally, FEMA's rate-setting process for subsidized properties depends in part on the accuracy of full-risk rates, raising concerns about how these rates are calculated as well. While FEMA is statutorily required to subsidize rates, the method used for setting subsidized rates has evolved from one that is based largely on affordability to one based on the average historical loss year estimate. The resulting subsidized premiums continue to be a financial strain on NFIP and contribute to its ongoing financial instability. Based on NFIP's current premium collections, it is not only unlikely that NFIP will be unable to repay its debt but also unlikely that it will be able to make interest payments in years with any significant amount of flood activities, and the program's debt will likely grow as it borrows to meet the interest payments, as was the case in mid-2008. Unless NFIP addresses issues with its rate-setting processes, premiums collected will remain insufficient in the face of future flood losses—even in average flood loss years—leaving both the program and taxpayers at increased financial risk. While a robust rate-setting process that accurately reflects underlying flood risk is a key step in helping to improve the long-term financial stability of NFIP, no process can ensure that premiums will always cover losses because of the potential for large claim losses

associated with catastrophic events. However, any efforts to improve the accuracy of the premiums charged by the program will help reduce the financial risk to which the federal government and, ultimately, taxpayers are exposed from the flood insurance program.

## Recommendations for Executive Action

We recommend that the Secretary of the Department of Homeland Security direct FEMA to take steps to ensure that its rate-setting methods and the data it uses to set rates result in full-risk premiums rates that accurately reflect the risk of losses from flooding. These steps should include, for example, verifying the accuracy of flood probabilities, damage estimates, and flood maps; ensuring that the effects of long-term planned and ongoing development, as well as climate change, are reflected in the flood probabilities used; and reevaluating the practice of aggregating risks across zones.

We also recommend that the Secretary of the Department of Homeland Security direct FEMA to ensure that information is collected on the location, number, and losses associated with existing and newly created grandfathered properties in NFIP and to analyze the financial impact of these properties on the flood insurance program.

## Agency Comments and Our Evaluation

We provided the Secretary of Homeland Security with a draft of this report for review and comment. On October 14, 2008, FEMA provided written comments on a draft of this report. FEMA generally concurred with both of the report's recommendations but had two reservations about our recommendation to ensure that FEMA's rate-setting methods result in full-risk rates that accurately reflect the risk of losses from flooding. Moreover, while FEMA noted that the report makes a number of constructive suggestions, it took exception to some of our analyses and characterizations, which it believes overstate their potential impact on the accuracy of the rate-setting process. These comments are summarized below and FEMA's letter is reprinted in appendix III. FEMA also provided us with technical comments, which we incorporated as appropriate.

FEMA generally concurred with our recommendation that it take steps to ensure that FEMA's rate-setting methods result in full-risk rates that accurately reflect the risk of losses from flooding, but expressed two reservations. First, it said that the report taken as a whole presents a view of the accuracy of the current FEMA rate-setting process that is "far too negative," especially given the complexity and difficulty of setting flood insurance premium rates. We recognize that determining full-risk

premium rates for flood insurance is an inherently challenging process, especially given the potential for catastrophic losses in any given year. However, in objectively reviewing the rate-setting process and applying generally accepted principles of insurance and actuarial rate setting, we found a number of areas that, when considered collectively, raise questions about the accuracy of the resulting rates and highlight areas that warrant additional analysis by FEMA. For example, for the period of 1978-2003, prior to the catastrophic losses resulting from the hurricanes of 2005, the low to moderate full-risk zones had a cumulative deficit of approximately $685 million. This deficit would seem to indicate that the rates for these risk classes were not adequate to cover the expected losses—a basic actuarial principle. And while the entire full-risk portion of the program did have an overall surplus of approximately $382 million over the same period, this would appear only to indicate the existence of a large cross subsidy between the rated zones, which reinforces our recommendation that FEMA revisit its nationwide class-rating system.

Second, FEMA said that the report does not accurately present the status of its map modernization efforts and their impact on premium rates. Specifically, with respect to map modernization, FEMA stated that (1) our characterization of the progress on the updating of flood maps was misleading; (2) we overstate the impact of older maps on rate setting; and (3) we failed to note that FEMA allows communities to reflect future conditions in flood maps the communities help develop. With respect to the progress of map modernization, FEMA provided the data that we presented in the report, which represents a status of modernization efforts to date. FEMA appears to take issue with measuring the status of map modernization in terms of the number of flood maps that had been updated. We note that in its comment letter, FEMA analyzed progress in terms of the population living within areas covered by updated maps. Each form of analysis provides a different picture of the progress of map modernization, and we have now added FEMA's data to reflect population measures in order to present an additional perspective. With respect to the impact of older maps on rate setting, FEMA states that older maps are not always outdated, and that in many areas the flood hazard has not changed or is possibly decreasing. While some maps may not have changed over the past 10 to 15 years, it is uncertain how many maps fall into this category and FEMA provided no analysis to support this contention. In addition, as we note in our report, FEMA stated that it undertook map modernization for several reasons, including that flood hazard conditions are dynamic and many flood maps may not reflect recent development or environmental changes; updated maps can take advantage of revised data and improved technologies for identifying flood hazards; and up-to-date maps support a flood insurance program that is

more aligned with actual risks. These reasons would seem to reflect a concern that older maps can become outdated. Moreover, we also note that FEMA plans to update its maps every 5 years to make sure they remain accurate. With respect to allowing communities to voluntarily reflect future conditions in flood maps, we were not made aware of these efforts in time to evaluate them for inclusion in this report but we plan to review these efforts in future work. FEMA had additional comments on how we characterized its rate-setting process. We address these comments below.

First, FEMA stated that our finding that probability curves for floodwaters exceeding a specific elevation had not been updated since the 1980s was unfounded because these probabilities are relative to the base flood elevation (BFE), and BFEs are revised as flood maps are updated. As we noted in our report, flood risk experts told us that flood probabilities are likely to change as land use, infrastructure, and weather patterns change. As a result, even if the probability curves are adjusted to reflect a new BFE, other changes since the 1980s could result in the probability curves themselves no longer being accurate. FEMA stated that it prepared a sensitivity analysis that showed that reestimating the probability curves would have a minimal impact on rates. We were not provided this analysis until FEMA gave us its comments on this report, and therefore cannot comment on the accuracy of the analysis. Nonetheless, it illustrates the type of analysis that FEMA should perform periodically to ensure the integrity of its rate-setting process and are encouraged by this effort. Finally, while we understand that the data used to develop probability curves were based on detailed engineering studies, available flood data, simulations, and professional judgments, neither FEMA nor the Corps was able to provide us with the specific data set used to develop the original probability curves. As a result, we could not review the reliability of those data.

Second, in response to FEMA comments about the Corps' use of the hydrologic model that underlies FEMA's flood insurance rate-setting process, we have clarified the language in our report to make clear that while the Corps has revised its model for estimating flood damage, it continues to use the hydrologic model.

Third, FEMA stated that we dismissed its contention that it is adequately pricing the premiums for the class of business that includes grandfathered properties. Considering the class of grandfathered properties as a subset of policyholders, owners of grandfathered properties pay less than full-risk premiums. Although FEMA may raise premiums for others to compensate for the potential shortfall from this subset, the extent and effect of this

cross-subsidization deserves scrutiny and should be analyzed. FEMA concurred with our recommendation to gather additional information on grandfathered properties and analyze their financial impact on NFIP.

Fourth, FEMA challenged our discussion about the number of risk groups used for rate setting and contended that we failed to consider the complexity and cost of using more refined risk classifications. We did recognize and consider the challenges associated with using more refined risk groups and therefore did not specifically recommend that FEMA change its risk rating system. Instead, we recommended that FEMA reevaluate its practice of aggregating risks across zones in light of the program's expansion to determine whether the current risk groups are still relevant. As we noted in our report, FEMA has not revisited its class rating approach since its inception, when it had around 2 million policyholders. The program currently has over 5.5 million policyholders. Since then, there have been significant changes in both the number and location of properties insured by NFIP that would warrant revisiting of FEMA's approach to aggregating risks.

Finally, concerning our analysis of historical claims data, FEMA commented that we did not compare historical losses across states to a theoretical distribution and stated that it believed that the distribution we observed could be explained by analyzing the interaction of the variability of flood risk and the declining number of policyholders receiving discounted premiums. However, FEMA provided no analytical basis for this belief and has not conducted any such analysis to support this assertion. Moreover, FEMA also commented that until such analysis is done, it cannot be sure of the results. We would encourage FEMA to build upon our analysis and continue to explore ways to leverage existing data to evaluate the effective of its rate-setting process and identify ways to strengthen the process. In addition, FEMA expressed its disappointment that we did not include the results of our analysis of losses across states in our report. While we included a shorter version of this analysis in the body of the report, we continued to present the full results of our analysis in appendix II of the report.

As agreed with your office, unless you publicly announce the contents of this report earlier, we plan no further distribution of this report until 30 days from the report date. At that time, we will provide copies to the Chairman, Senate Committee on Banking, Housing and Urban Affairs; the Chairman and Ranking Member of the Senate Committee on Homeland Security and Governmental Affairs; the Chairman and Ranking Member of the House Committee on Financial Services; the Chairman and Ranking

Member of the House Committee on Homeland Security; and other interested committees. We are also sending a copy of this report to the Secretary of Homeland Security and other interested parties. In addition, the report will available at no charge on our Web site at http://www.gao.gov.

If you or your staff have any questions regarding this report, please contact me at (202) 512-8678 or williamso@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made major contributions to this report are listed in appendix IV.

Sincerely,



Orice Williams
Director, Financial Markets and
Community Investment

# Appendix I: Scope and Methodology

To assess the Federal Emergency Management Agency's (FEMA) rate-setting process and determine whether it produces rates that accurately reflect the risk of flooding for properties that do not receive subsidies, we reviewed and analyzed FEMA's model for evaluating potential flood damage to properties as well as the methods used for assessing risk and setting premium rates for policyholders. We discussed FEMA's method for rate setting with officials from FEMA, the National Oceanic and Atmospheric Administration, U.S. Army Corps of Engineers (the Corps), and the U.S Geological Survey. We met with risk-modeling agencies, academics and the American Academy of Actuaries to obtain views on FEMA's model and information on private sector flood-risk-modeling methods and data sources. We met with FEMA officials to obtain relevant information and data on FEMA's Map Modernization program. We reviewed FEMA documents and met with FEMA officials in order to understand FEMA's process and policies for grandfathering properties and the impact on the program. We analyzed FEMA's premiums and claims data to determine the number of high-loss years on a state-by-state basis in order to assess each state's financial impact on NFIP. In order to conduct the state loss analysis, we reviewed the claims and premium data from NFIP's BureauNet database. For premium data, we used "Historical Policy Summary" and "All States" each year, individually from 1978 through 2007. For the claims data, we used "Claims Data Summary" and obtained Closed Claims, CWOP, and Open Claims by using the "State Name" and "Calendar Year" sort fields. These numbers were then adjusted for inflation using historic calendar year gross domestic product (GDP) data. Finally, we subtracted claims values from the premiums values, and sorted the states by the number of years in which each state experienced a high-loss year, or a year in which claims exceeded premiums. We also calculated aggregate inflation adjusted claims amounts for each state. Because of the catastrophic effects of the 2005 hurricanes, we also calculated pre-Katrina (1978 through 2004) numbers, which were displayed in table 3. To assess the impact of the rate-setting process and other factors on NFIP's long-term financial stability, we interviewed officials to obtain specific information on NFIP's current and past financial status. We also collected and analyzed information on NFIP's financial status and reviewed existing FEMA documents.

To evaluate the process that NFIP uses to set subsidized rates, we interviewed officials from FEMA to obtain the methodology used to assess total premium needs and set subsidized rates. We collected and analyzed information on FEMA's process for setting rates for subsidized flood insurance and reviewed documents on NFIP program subsidies and recommendations to eliminate them. We also reviewed academic and

other studies of studies of flood risk and flood insurance including reviews from the Congressional Research Service and the Congressional Budget Office.

We conducted this work from December 2007 to September 2008 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We note that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Appendix II: State-by-State Analysis of Claims and Premiums Data

Because rare but large events can account for a large portion of the long-term aggregate experience, we supplemented the aggregate data analysis with the annual high-loss year analysis. Nevertheless, on a cumulative basis for 1978-2004, a period before Hurricanes Katrina and Rita policyholders in several states received markedly more in claims paid out than NFIP collected from them in premiums.[1] Five of the nine states with at least 8 high-loss years—Alabama, Missouri, Mississippi, Texas, and West Virginia—had more in aggregate claims than policyholders paid out in aggregate premiums. Five other states—Kentucky, Minnesota, North Carolina, North Dakota, and Oklahoma—had aggregate claims exceeding aggregate premiums, all of them experiencing between 5 and 7 high-loss years. By expanding the totals to include all years through 2007, Louisiana joins the other nine states with aggregate claims exceeding aggregate premiums, primarily because of Hurricanes Katrina and Rita. On the other extreme, three states—California, Florida, and New Jersey—had aggregate premiums exceed aggregate claims by more than $1 billion, with Florida having an $8 billion surplus.

**Table 4: Claims and Premiums Data (in constant 2007 dollars), 1978–2007**

| State | 1978-2004 Premiums minus claims | 1978-2007 premiums minus claims | 1978-2007 Number of years that claims exceeded premiums |
|---|---|---|---|
| Missouri | ($384,344,855) | (350,344,220) | 11 |
| West Virginia | (146,896,812) | (118,874,830) | 11 |
| Mississippi | (40,584,822) | (2,498,544,520) | 10 |
| Louisiana* | 428,383,041 | (11,777,260,456) | 10 |
| Texas* | (728,796,632) | (222,265,084) | 9 |
| Alabama | (505,212,107) | (746,166,995) | 9 |
| Illinois | 90,321,291 | 162,050,972 | 9 |
| Ohio | 101,547,985 | 100,111,514 | 9 |
| New Hampshire | 36,648,547 | 21,531,170 | 8 |
| Oklahoma | (18,199,240) | (25,642,039) | 7 |
| South Dakota | 5,295,971 | 8,404,092 | 7 |
| Kansas | 20,948,695 | 20,247,134 | 7 |
| Washington | 85,320,803 | 66,244,958 | 7 |

[1]We found qualitatively similar results for the period 1978-2007, which includes the effects of Hurricanes Katrina, Rita, and Wilma.

| State | 1978-2004 Premiums minus claims | 1978-2007 premiums minus claims | 1978-2007 Number of years that claims exceeded premiums |
|---|---|---|---|
| Indiana | 131,316,681 | 166,958,946 | 7 |
| North Carolina | (169,814,330) | (8,457,439) | 6 |
| Minnesota | (63,190,911) | (52,511,837) | 6 |
| Arkansas | 52,001,936 | 74,966,251 | 6 |
| Pennsylvania | 84,458,562 | 23,509,354 | 6 |
| Connecticut | 209,580,515 | 266,043,856 | 6 |
| North Dakota | (111,305,692) | (103,851,773) | 5 |
| Kentucky | (56,850,302) | (42,009,555) | 5 |
| District of Columbia | 1,030,982 | 1,734,592 | 5 |
| Maine | 39,784,737 | 46,807,732 | 5 |
| Tennessee | 47,004,528 | 82,337,301 | 5 |
| Virginia | 60,909,715 | 172,548,603 | 5 |
| Rhode Island | 127,856,579 | 152,323,748 | 5 |
| New York | 574,475,012 | 648,183,499 | 5 |
| Iowa | 15,016,861 | 32,394,824 | 4 |
| Massachusetts | 165,750,753 | 227,224,840 | 4 |
| New Jersey* | 1,071,199,191 | 1,271,686,111 | 4 |
| California* | 2,042,968,575 | 2,431,519,768 | 4 |
| Montana | 20,618,089 | 26,387,334 | 3 |
| Maryland | 63,198,089 | 139,162,073 | 3 |
| Wisconsin | 68,781,850 | 90,093,940 | 3 |
| Nebraska | 77,523,305 | 98,540,480 | 3 |
| Delaware | 79,318,937 | 115,022,170 | 3 |
| Michigan | 173,141,113 | 222,803,680 | 3 |
| Hawaii | 185,512,050 | 245,450,036 | 3 |
| Arizona | 204,216,092 | 251,713,046 | 3 |
| Georgia | 265,586,974 | 389,183,828 | 3 |
| Utah | 15,372,336 | 21,207,776 | 2 |
| Wyoming | 16,597,320 | 21,134,460 | 2 |
| Nevada | 70,283,808 | 82,293,838 | 2 |
| Vermont | 23,425,436 | 30,590,342 | 1 |
| Idaho | 32,991,914 | 42,892,136 | 1 |
| Oregon | 104,014,018 | 133,186,375 | 1 |
| South Carolina | 313,400,772 | 590,371,633 | 1 |

| State | 1978-2004 Premiums minus claims | 1978-2007 premiums minus claims | 1978-2007 Number of years that claims exceeded premiums |
|---|---|---|---|
| Florida* | 8,035,673,802 | 9,938,638,592 | 1 |
| Alaska | 23,003,446 | 27,770,628 | 0 |
| New Mexico | 79,909,374 | 97,876,034 | 0 |
| Colorado | $135,763,975 | $170,139,136 | 0 |

Source: GAO analysis of FEMA data.

Note: We analyzed two time periods so we could separately consider the impact of the 2005 Hurricanes Katrina, Rita, and Wilma. *Denotes the five states with the highest number of subsidized policies.

As noted in the report, additional study would be required to determine whether policyholders in some states with lower losses are paying a higher premium than is appropriate for their risk, and others paying too little. For example, our analysis did not control for differences in the type of policy purchased, such as the mix of certain property types across states and insurance coverage amounts, which could affect both premiums and claims. In addition, we did not control for differences in the mix of subsidized and full-risk policies or the impact of subsidized premiums on our results, which could also affect the results. For example, some states have a relatively large number or proportion of subsidized properties (including grandfathered properties) that generally would lead to higher expected claims relative to premiums, but we were unable to link the separate NFIP claims and premiums data at the state and zone levels in a way that would allow us to perform a more refined analysis. The limitations in setting full-risk rates that we have discussed could result in systematic mispricing relative to risk that becomes apparent only over long periods; however, our analysis included both subsidized and full-risk properties, and so the results should be considered in this context.

# Appendix III: Comments from FEMA

Washington, DC 20528

Homeland Security

October 14, 2008

Ms. Orice M. Williams
Director
Financial Markets and Community Investment
U.S. Government Accountability Office
441 G St., NW
Washington, DC 20548

Dear Ms. Williams:

The U.S. Department of Homeland Security (DHS) appreciates the opportunity to review and comment on the U.S. Government Accountability Office's (GAO) draft report GAO-09-12 titled *FLOOD INSURANCE: FEMA's Rate-Setting Process Warrants Attention* (250387).

While the GAO raises valid concerns, DHS believes that the analysis does not grasp some generally accepted principles of insurance and actuarial rate-setting and misrepresents the status of the Map Modernization effort and its impact on rate adequacy. We appreciate GAO presenting a generally accurate description of the methodology and National Flood Insurance Program (NFIP) premium rates. Few individuals understand the model and methodology and we appreciate GAO staff learning many of the intricacies of the rate-setting process. The report has made a number of constructive suggestions, some of which DHS is actively pursuing, others that we will take under advisement and, as discussed below, a few with which we disagree.

GAO raised concerns in several areas of the NFIP rate-setting methodology, including: (1) data quality of probability estimates, claim severity estimates, and maps; (2) future conditions impacted by climate change, erosion, and future development; and (3) underwriting results. DHS believes that GAO is overestimating the potential impact of each of these areas. Below, is our response to the major points highlighted in the report; they are sorted by the headings used in the report.

Data Used to Determine Flood Probabilities Have Not Been Updated Since the 1970s and 1980s

GAO expressed concern that the probability curves for floodwater exceeding a specific elevation had not been updated since the 1980s. Since these probabilities are expressed relative to the Base Flood Elevation (BFE), GAO concerns are unfounded. As flood maps are updated to reflect revised BFEs, the PELV curves are automatically re-benchmarked to the revised BFEs. Since the various PELV curves for zones A01 through A30 are based on the relative elevation difference between a "10-year flood" and a "100-year flood" it is very likely

that the floodwater depths for the "250-year flood" or the "500-year flood" remain stable within a specific zone. If the water depth for the "500-year flood" changes significantly in relation to the BFE, then it is likely that the "10-year flood" has also changed in relation to the BFE, resulting in a flood zone change. When the zone changes, the PELV associated with the new zone would be reflected in the appropriate probabilities. FEMA updates its probabilities by re-estimating the annual chance of exceeding the one percent flood (i.e., the BFE). FEMA prepared a sensitivity analysis of the impact on rates and preliminarily concluded there would be a minimal impact.

The Claims Data Used in the Model May Be Inaccurate

*Water Depth Data*

FEMA agrees with the suggestion to improve the collection of data on water depth in the structure. GAO correctly describes FEMA's method of handling claims where the depth of water is missing or erroneously reported as zero in the claims database. As GAO notes, the effect will be to overstate the flood damage for flood events with only a few inches of water in the structure. However, GAO points out that the impact is unknown for the flood events of greater water depth. FEMA believes this is worth investigating and will conduct a sensitivity analysis of the impact of this type of claim on the rate setting method. As the GAO report points out, FEMA has reviewed the impact of such errors in the past and believes that they generally would result in more conservative premium rates.

*Army Corps of Engineers Use of NFIP Claims Data*

GAO contends that the United States Army Corps of Engineers (USACE) has moved away from the hydrologic model that underlies the NFIP rate model and developed independent damage estimates for their use.

We reviewed the USACE document ER-1105-2-101. We disagree with the characterization that it no longer relies on the hydrologic model described in FEMA material. The document describes the change they made to their methodology. The "Standard Project Flood" (SPF) is defined in several documents. In the context of ER 1105-2-100 and risk analysis guidance, the SPF is no longer a valid design target. Instead, a full range of floods, including those that would exceed the SPF is to be used in formulation and evaluation of alternatives. Based on that description, we believe that their revision now much more closely follows FEMA methodology. The USACE's historical methodology seems to model only one possible loss event, which they labeled the SPF. By contrast, the NFIP Rate Model has always considered "a full range of floods" by use of the PELV and PELV500 curves. Instead, based on our read of that document, it appears that the U.S. Army Corps of Engineers has revised its model to resemble closely the NFIP Rate Model. We believe that new approach, which considers a full range of floods, is a much more robust approach which is the reason why we have always used it.

GAO states that "As a result [of NFIP claims data quality issues], the Corps began to collect its own damage data, which FEMA now uses to supplement its own data." It is true that FEMA has always used the USACE's data to supplement NFIP claims data where NFIP claims data is too thin to be actuarially credible. However, we provide in Table 1 an analysis of the previous and newly revised USACE data compared to NFIP claims data. It appears

either that the USACE is still using NFIP data or that the alternative data that they now use is very similar to NFIP data.

**Table 1 - Comparison of USACE Studies to NFIP Data**
One story, no basement structures
Percent damage by depth

| Depth | 1973 USACE Study | Revised USACE Study | NFIP Experience |
|---|---|---|---|
| -1 | - | 2.50 | 11.23 |
| 0 | 7.00 | 13.40 | 19.52 |
| 1 | 10.00 | 23.30 | 22.34 |
| 2 | 14.00 | 32.10 | 31.16 |
| 3 | 26.00 | 40.10 | 37.55 |
| 4 | 28.00 | 47.10 | 48.26 |
| 5 | 29.00 | 53.20 | 60.11 |
| 6 | 41.00 | 58.60 | 58.43 |
| 7 | 43.00 | 63.20 | 70.50 |
| 8 | 44.00 | 67.20 | 68.73 |
| 9 | 45.00 | 70.50 | 72.23 |
| 10 | 46.00 | 73.20 | 79.68 |

Maps that Provide Information for Base Flood Elevations Remain Substantially Out-of-Date Despite Modernization Efforts

Maps will never be fully up-to-date everywhere in the country and thus never fully reflect the current flood risk. FEMA believes that GAO significantly understates the overall quality of current maps and, as a result, is over-estimating the possible impact of these older maps on pricing. FEMA believes that the Hydrologic Rate Model used in estimating rates has sufficient additional conservatism to compensate for these factors and can state with confidence that the premiums from the Rate Model are a reasonable estimate of the full risk premium based on the full range of flood loss probabilities.

FEMA is concerned that the figures GAO references regarding the number of maps that are at least 5, 10, or 15 years old may be misleading. Many of those maps are still being updated as part of Map Modernization. It generally takes between two to three years to finalize flood map changes in coordination with state and local governments. That being the case, current map age can be misleading. As of March 2008, approximately 68% of the nation's population has already received updated maps that met, exceed, or at least approach the map quality targets of Map Modernization, while another 27% of the population has received a preliminary map. By the end of FY 2010, FEMA anticipates that at least 92% of the nation's population will have a modernized flood map.

GAO seems to have a concern that an old map is an incorrect map that understates the flood risk and therefore adversely affects insurance pricing. Older maps are not always outdated. In many areas with older flood maps, the flood hazard has not significantly changed or is

possibly decreasing. Further, there are instances where areas have not been re-studied because the stream gauge or historical data does not include any new flooding events, even of small magnitude, so there is no additional data with which to update the maps.

GAO has also expressed concern about the possible deterioration of a map's quality between the scheduled five-year update. While this happens in some areas of the country for a variety of reasons, it is also true that some States or local communities attempt to lessen the impact of the changes in the flood risk. When deterioration of the flood risk occurs, local communities are required to communicate to FEMA as soon as practical, but no later than six months, appropriate data to use to update the community's maps to reflect current flooding conditions. In this way, FEMA assures that maps are updated more frequently than every five years to reflect changing conditions. These and other changes to the maps are usually done through the Letter of Map Amendment/Letter of Map Revision process. These amendments and revisions currently average about 22,000 a year.

GAO fails to note the advancements FEMA has made in allowing communities to reflect future conditions in maps they develop. Currently, communities can choose to use future conditions hydrology for mapping per a Federal Register notice published on November 27, 2001. Future conditions hydrology are based on projected land-use conditions of the watershed, which could increase surface water runoff such as an increase in impervious areas created by future parking lots or structures or future construction/improvement of drainage networks that accompany urbanization. While FEMA does not require future conditions mapping, we are working to encourage local communities to adopt it voluntarily through these procedures and through NFIP Community Rating System credits.

FEMA Does Not Track the Number or Location of Remapped Grandfathered Properties That Pay Less Than Full Risk Premiums

The report correctly describes the current FEMA program of grandfathering currently. GAO acknowledges FEMA's belief that it is adequately pricing the premiums for the class of business which includes the grandfathered policies because the methodology that the NFIP uses in setting rates for the X-Standard risk group includes these grandfathered properties. However, GAO dismisses this contention. We allow X-Standard policies to continue to use the X-Zone for rating purpose but set the overall premium level that we estimate to reflect the full-risk of that risk group as a whole. The report does not mention that the grandfathered X-Standard premium is substantially higher than the previous X-Preferred Risk that most of these policyholders had been charged. FEMA provided GAO premium charts that showed that the X-Zone standard premium is now higher than the premium for some AE-Zone compliant structures. In addition a significant portion of these grandfathered policies are older Pre-FIRM policies that would be eligible for subsidized premiums and would no longer be part of a risk class that is charged on average their full-risk premiums.

FEMA Does Not Consider Risk Factors Such as Erosion and Climate Change When Setting Flood Insurance Rates

Although FEMA has not investigated the issue of climate change and its impact on the NFIP in totality, we conducted a study in 1991 that focused on one aspect of climate change, sea level rise. The study, titled *Projected Impact of Relative Sea Level Rise on the National*

*Flood Insurance Program*[1], concluded that the NFIP would not be impacted significantly under sea level rise scenarios put forth in the first Intergovernmental Panel on Climate Change (IPCC) report released in 1990. FEMA has initiated a new study on climate change titled, *Impact of Climate Change on the NFIP and Improving Coastal Floodplain Mapping*. The study will include an investigation of the impacts of sea level rise, changes in hurricane frequency and intensity, and changes in precipitation patterns and how they might affect the NFIP. FEMA will use the latest information contained in the most recent IPCC and Climate Change Science Program (CCSP) projections and findings in the conduct of this study. We expect to complete the study in early 2010 and will carefully evaluate its findings to determine how to best account for climate change in setting flood insurance rates.

In the absence of the authority to establish erosion zones, FEMA has taken actions based on the Heinz Center[2] study on coastal erosion, which projected increased damages due to the effects of long-term coastal erosion over a 60-year period. We have increased rates for all V-Zone properties at a pace commensurate with the Heinz Center projections, since we cannot explicitly identify those properties most at risk from erosion.

<u>The FEMA Rating System Combines and Averages Many Different Risks to Create Nationwide Rates</u>

GAO concerns regarding the current amount of risk groups are misplaced. GAO correctly notes that the flood risk for individual policyholders varies within the current risk groups. This is also true for risk groups in the private insurance industry. In establishing risk groups, FEMA must balance the administrative complexity of a highly refined number of risk groups against the degree of heterogeneity of risk within those groups. FEMA continues to believe that we have found the appropriate balance. GAO does not consider the amount of complexity that their recommendation for more highly refined risk groups would create. The size of the rate manual would increase many-fold, as would the difficulty of making accurate zone determinations in those communities that have a variety of A-numbered zones.

FEMA has considered the implications on our current risk group classifications if future legislative changes require the NFIP to reduce significantly the classes of buildings that are eligible for premium subsidies. Whereas, the current risk groups may not result in significant cross-subsidization among compliant structures that will probably not be true for older non-compliant structures. Simply extending the current practice of manually rating non-compliant structures to these older structures, will not work since FEMA does not have the staff to support the increased workload. FEMA has begun considering how to revise its rate structure if future subsidy reduction is mandated.

<u>Our Analysis of Historical Claims and Premium Data Raises Questions about a Potential Mismatch between Rates and Risk</u>

GAO conclusions from this analysis appear to inject its expectations as to how the results should have behaved if rates were actuarial. We believe the NFIP actual experience compares to estimates of the theoretical distribution, which GAO did not do. Unfortunately, FEMA did

---

[1] FEMA, *Projected Impact of Relative Sea Level Rise on the National Flood Insurance Program*, October 1991, available at http://www.epa.gov/climatechange/effects/downloads/flood_insurance.pdf.
[2] The Heinz Center, *Evaluation of Erosion Hazards*, April 2000, available at http://www.fema.gov/pdf/library/erosion.pdf.

not have time to develop a theoretical distribution to make this comparison. We believe that the distribution of the results that GAO observed in their analysis is explained by understanding the interaction of the variable flood risk and the greatly declining percentage through the years of policyholders who receive discounted premiums. However, until a more refined model is constructed, we will not know which is correct.

GAO had prepared an analysis of how often the annual loss experience for a state was above or below the median result for the year. We were disappointed to see GAO did not include this analysis in the report. FEMA believes that with more refinement and adjustments the analysis had the potential to be useful.

The FEMA Process for Setting Subsidized Rates May Further Compromise the Ongoing Financial Stability of the Program

The report is critical of FEMA methodology for setting the premium rates for the subsidized policies. The process used to set subsidized rates has evolved over time, and the report accurately describes the current process. We consider many factors in setting subsidized rates, and the 2005 hurricanes have had a major impact on those considerations. FEMA is in the process of reviewing its methodology with respect to the premium rates of the subsidized business. We are looking for guidance from the Congress on who should continue to be eligible for subsidized rates and the level of subsidy provided to them.

DHS generally concurs with both of the report's recommendation with two reservations. Following are our recommendation-specific comments; technical comments were provided under separate cover.

**GAO Recommendation 1:** We recommend that FEMA take steps to ensure that its rate setting methods and data used to set rates result in full-risk premiums rates that accurately reflect the risk of losses from flooding. For example, verifying the accuracy of flood probabilities, damage estimates, and flood maps; ensuring that the effects of long-term planned and ongoing development, as well as climate change, are reflected in the flood probabilities used; and reevaluating the practice of aggregating risks across zones.

**DHS Response:** Concur with reservation. In general, FEMA concurs with the first recommendation with two reservations. One, the GAO commentary taken as a whole presents far too negative a picture of the accuracy of the current NFIP pricing model and methodology. FEMA notes that the NFIP rate-setting process has evolved over a number of years and is dependent on many complicated inputs, estimations, modeling techniques and actuarial judgments. This type of process is always an inexact science, and we are always looking for, and will continue to incorporate, improvements in each of those areas as the needs and our resources allow. Two, FEMA believes that the report does not accurately present the status of the Map Modernization effort and its impact on rate adequacy.

There are many lines of insurance where precise measurement is practically impossible. As an example, in Workers' Compensation insurance there is uncertainty as to how workplace safety will vary over time due to technological advancements, workplace safety measures, the size of court awards to injured plaintiffs, future interest rates that will affect benefit levels, and future medical costs. The challenges and practical impossibility of precisely quantifying these factors do not mean that workers compensation insurance is not actuarially sound.

Rather in workers compensation insurance, like flood insurance, actuaries make judgments to establish rates that deal with a variety of uncertainties. Like Workers' Compensation insurance, where there is imprecision in estimating the parameters of the Rate Model or in the application of those indicated rates in the real world of selling flood insurance, FEMA actuaries have a history of consulting with other subject matter experts, such as hydrologic and/or hydraulic scientists, and the building science and mapping experts within FEMA. This has allowed them to estimate appropriately the impact of these parameters of the rate model.

**GAO Recommendation 2:** We also recommend that the Secretary of Homeland Security direct FEMA to ensure that information is collected on the location, number, and losses associated with existing and newly created grandfather properties in NFIP and to analyze the financial impact of these properties on the flood insurance.

**DHS Response:** Concur. DHS agrees with the need to start identifying the number of grandfather policies. While there are sound public policy reasons why the NFIP introduced and has maintained its grandfathered policies, there are also benefits to charging these policyholders a premium that is close to their specific risk instead of a premium based on a wider class of risks. Such as change would more fully communicate to the property owner the flood risk faced and encourage the property owner to take action to reduce that risk.

We are implementing a data collection effort for all newly grandfathered policies effective on or after May 1, 2009. However, collecting such data on currently insured structures is far more difficult. FEMA intends to work out a methodology to do that and to develop the financial analysis recommended.

FEMA believes that the NFIP rate setting process is sound and is conducted in accordance with the body of statutory and regulatory authority governing the NFIP and within the standards of actuarial practice and acknowledge there is always room for improvement. We thank the GAO staff for presenting in this report a number of constructive suggestions for improvements in our rate-setting process.

U.S. Department of Homeland Security would like to thank you for the opportunity to review and provide comments on the draft report. We look forward to working with you on future homeland security issues.

Sincerely,

Jerald E. Levine
Director
Departmental DHS GAO/OIG Liaison Office

# Appendix IV: GAO Contact and Staff Acknowledgments

## GAO Contact

Orice M. Williams, (202) 512-8678 or williamso@gao.gov

## Staff Acknowledgments

In addition to the contact named above, Lawrence Cluff (retired) and Patrick Ward, Assistant Directors, Nima Patel Edwards, Christopher Forys, Emily Chalmers, Martha Chow, Melvin Thomas, Joseph Applebaum, Tania Calhoun, Christopher Krzeminski and Rudy Chatlos and Richard Vagnoni made significant contributions to this report.

## GAO's Mission

The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability.

## Obtaining Copies of GAO Reports and Testimony

The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday afternoon, GAO posts on its Web site newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to www.gao.gov and select "E-mail Updates."

### Order by Phone

The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's Web site, http://www.gao.gov/ordering.htm.

Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.

Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information.

## To Report Fraud, Waste, and Abuse in Federal Programs

Contact:

Web site: www.gao.gov/fraudnet/fraudnet.htm
E-mail: fraudnet@gao.gov
Automated answering system: (800) 424-5454 or (202) 512-7470

## Congressional Relations

Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400
U.S. Government Accountability Office, 441 G Street NW, Room 7125
Washington, DC 20548

## Public Affairs

Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800
U.S. Government Accountability Office, 441 G Street NW, Room 7149
Washington, DC 20548

ACTUARIAL STANDARDS BOARD

# Actuarial Standard of Practice No. 39

# Treatment of Catastrophe Losses in Property/Casualty Insurance Ratemaking

Developed by the
Subcommittee on Ratemaking of the
Casualty Committee of the
Actuarial Standards Board

Adopted by the
Actuarial Standards Board
June 2000
Updated for Deviation Language Effective May 1, 2011

(Doc. No. 156)

**ASOP No. 39—June 2000**

## TABLE OF CONTENTS


Transmittal Memorandum iii

**STANDARD OF PRACTICE**

Section 1. Purpose, Scope, Cross References, and Effective Date 1
- 1.1 Purpose 1
- 1.2 Scope 1
- 1.3 Cross References 1
- 1.4 Effective Date 1

Section 2. Definitions 2
- 2.1 Catastrophe 2
- 2.2 Catastrophe Ratemaking Procedures 2
- 2.3 Contagion 2
- 2.4 Demand Surge 2

Section 3. Analysis of Issues and Recommended Practices 2
- 3.1 Identification of Catastrophe Perils or Events 2
- 3.2 Identification of Catastrophe Losses 2
- 3.3 The Use of Data in Determining a Provision for Catastrophe Losses 3
  - 3.3.1 Use of Historical Insurance Data 3
  - 3.3.2 Use of Noninsurance Data and Models 4
- 3.4 Using a Provision for Catastrophe Losses 5
- 3.5 Loss Adjustment Expenses 5

Section 4. Communications and Disclosures 5
- 4.1 Conflict with Law or Regulation mentation and Disclosure 5
- 4.2 Documentation and Disclosure 5
- 4.3 Disclosures 6

**APPENDIXES**

Appendix 1—Background and Current Practices 7
- Background 7
- Current Practices 8

Appendix 2—Comments on the 1999 Exposure Draft and Subcommittee Responses 10

**ASOP No. 39—June 2000**

June 2000

**TO:** Members of Actuarial Organizations Governed by the Standards of Practice of the Actuarial Standards Board and Other Persons Interested in the Treatment of Catastrophe Losses in Property/Casualty Insurance Ratemaking

**FROM:** Actuarial Standards Board (ASB)

**SUBJ:** Actuarial Standard of Practice (ASOP) No. 39

This booklet contains the final version of Actuarial Standard of Practice No. 39, *Treatment of Catastrophe Losses in Property/Casualty Insurance Ratemaking*.

## Background

Many property/casualty insurance products are, by their nature, subject to large aggregate losses resulting from relatively infrequent events or natural phenomena, i.e., from catastrophes. These losses can cause extreme volatility in historical insurance data and generally require separate and different treatment from other losses in ratemaking methodologies. Historically, the most common method was to calculate the ratio of actual catastrophe losses to noncatastrophe losses over a longer experience period, and apply that ratio to expected noncatastrophe losses in the ratemaking formula.

In 1992 and 1994, two events occurred that changed the actuarial profession's view of catastrophe losses. The Hurricane Andrew and Northridge Earthquake catastrophes clearly demonstrated the limitations of relying exclusively on historical insurance data in estimating the financial impact of potential future events. In addition, property/casualty insurers (including self-insurers) and their actuaries began to focus on the impact that large individual events or sequences of events could have on the insurers' solvency, cash flow, and earnings.

This actuarial standard of practice is intended to provide guidance to actuaries in evaluating catastrophe exposure and in determining a provision for catastrophe losses and loss adjustment expenses in property/casualty insurance ratemaking.

## Exposure Draft

This standard was exposed for review in February 1999, with a comment deadline of June 15, 1999. Fourteen comment letters were received. The Subcommittee on Ratemaking reviewed all the comments carefully, and many of the suggestions were incorporated in the final standard. In particular, the subcommittee did the following: (1) revised the title and the scope of the standard to more explicitly recognize that the standard applied to ratemaking; (2) revised the text to

indicate that the actuary was estimating a catastrophe provision not estimating actual catastrophe losses; and (3) more explicitly recognized that, in the end, the procedure that the actuary uses must reflect the expected frequency and severity distribution of catastrophes, as well as the anticipated class, coverage, geographic and other relevant exposure distributions. For a summary of the substantive issues contained in these fourteen comment letters and the task force's responses, please see appendix 2.

The subcommitee and Casualty Committee thank all those who commented on the exposure draft.

The subcommittee also thanks former member Robert W. Gossrow for his contributions during the development of this proposed ASOP.

The ASB voted in June 2000 to adopt this standard.

Subcommittee on Ratemaking of the Casualty Committee

Patrick B. Woods, Chairperson

| | |
|---|---|
| Mark S. Allaben | R. Michael Lamb |
| Charles H. Boucek | Marc B. Pearl |
| Frederick F. Cripe | Jonathan White |
| Gregory L. Hayward | Paul E. Wulterkens |

Casualty Committee of the ASB

Michael A. LaMonica, Chairperson

| | |
|---|---|
| Christopher S. Carlson | Robert S. Miccolis |
| Anne Kelly | Karen F. Terry |
| Ronald T. Kozlowski | William J. VonSeggern |
| Robert J. Lindquist | Patrick B. Woods |

Actuarial Standards Board

Alan J. Stonewall, Chairperson

| | |
|---|---|
| Phillip N. Ben-Zvi | Roland E. King |
| Heidi R. Dexter | William C. Koenig |
| David G. Hartman | James R. Swenson |
| Ken W. Hartwell | Robert E. Wilcox |

ACTUARIAL STANDARD OF PRACTICE NO. 39

# TREATMENT OF CATASTROPHE LOSSES IN PROPERTY/CASUALTY INSURANCE RATEMAKING

## STANDARD OF PRACTICE

### Section 1. Purpose, Scope, Cross References, and Effective Date

1.1 Purpose—The *Statement of Principles Regarding Property and Casualty Insurance Ratemaking* of the Casualty Actuarial Society states that consideration should be given to the impact of catastrophes and that procedures should be developed to include an allowance for catastrophe exposure in the rate. The purpose of this actuarial standard of practice (ASOP) is to provide guidance to actuaries in evaluating catastrophe exposure and in determining a provision for catastrophe losses and loss adjustment expenses in property/casualty insurance ratemaking.

1.2 Scope—This standard provides guidance to actuaries when performing professional services in connection with ratemaking for property/casualty insurance coverages including property/casualty risk financing systems, such as self-insurance or securitization products, which provide similar coverage.

If the actuary departs from the guidance set forth in this standard in order to comply with applicable law (statutes, regulations, and other legally binding authority), or for any other reason the actuary deems appropriate, the actuary should refer to section 4.

1.3 Cross References—When this standard refers to the provisions of other documents, the reference includes the referenced document as it may be amended or restated in the future, and any successor to it, by whatever name called. If the amended or restated document differs materially from the originally referenced document, the actuary should consider the guidance in this standard to the extent it is applicable and appropriate.

1.4 Effective Date—This standard will be effective for work performed on or after December 15, 2000.

## Section 2. Definitions

The definitions below are defined for use in this actuarial standard of practice.

2.1 Catastrophe—A relatively infrequent event or phenomenon that produces unusually large aggregate losses.

2.2 Catastrophe Ratemaking Procedures—Ratemaking procedures that adjust for the impact of catastrophe losses in the experience data and determine a provision for catastrophe losses and loss adjustment expenses.

2.3 Contagion—A lack of independence between the occurrence of losses among different entities.

2.4 Demand Surge—A sudden and usually temporary increase in the cost of materials, services, and labor due to the increased demand for them following a catastrophe.

## Section 3. Analysis of Issues and Recommended Practices

In evaluating catastrophe exposure and in determining a provision for catastrophe losses and loss adjustment expenses in property/casualty insurance ratemaking, the actuary should be guided by the following sections.

3.1 Identification of Catastrophe Perils or Events—The actuary should take reasonable steps to identify the perils or events that have the potential to generate catastrophe losses that differ materially from the expected aggregate losses or the expected distribution of losses. These perils or events have at least one of the following characteristics:

a. The Potential to Display Contagion—Examples of perils that display contagion include windstorms, earth movement, and freezing.

b. Infrequent Occurrence—Some events that occur infrequently have the potential to produce losses that can significantly distort the historical experience. An example of such an event is an explosion that results in the release of toxic material. If the experience data contain such events, using this experience data without adjustment may overstate the catastrophe provision in the rates. If the experience data do not contain such events, using this experience data without adjustment may understate the catastrophe provision in the rates.

3.2 Identification of Catastrophe Losses—The actuary should identify, where practicable, the catastrophe losses in the historical insurance data. In doing so, the actuary should consider how accurately the catastrophe losses can be identified, and the extent to which they may have a material impact on the results of the analysis.

3.3 The Use of Data in Determining a Provision for Catastrophe Losses—The actuary may use historical insurance data and noninsurance data, as described in sections 3.3.1 and 3.3.2 below.

3.3.1 Use of Historical Insurance Data—The actuary should consider the following when using data available from insurance sources:

a. Evaluating Historical Insurance Data—The actuary should consider comparing historical insurance data to noninsurance data to determine the extent to which the available historical insurance data are fully representative of the long-term frequency and severity of the perils or events identified in section 3.1 that produced the catastrophe losses. Thus, in determining a provision for catastrophe losses, the actuary should consider the sensitivity of the provision to changes in the historical insurance data relating to the following: (1) the frequency of catastrophes; (2) the severity of catastrophes; and (3) the geographic location of catastrophes.

b. The Applicability of Historical Insurance Data—The actuary should consider the applicability of historical insurance data for the insured coverage. This includes determining (1) whether catastrophe losses are likely to differ significantly among elements of the rate structure, such as construction type and location; (2) whether such differences should be reflected in the ratemaking procedures; and (3) how to reflect such differences, taking into account both homogeneity and the volume of data. In addition, the actuary should consider whether there is a sufficient number of years of comparable, compatible historical insurance data.

c. Adjustments to Historical Insurance Data to Reflect Future Conditions—The actuary should consider making adjustments to the historical insurance data to reflect conditions likely to prevail during the period in which the rate will be in effect. Such adjustments should take into account the impact of changes in the exposure to loss, including coverage differences, the underlying portfolio of insured risks, building codes and the enforcement of these codes, and building practices; population shifts; costs; and demand surge during both the historical period and the period for which the rate will be in effect. These considerations become more important when a longer experience period is used because they can have a greater effect over longer time periods.

d. Stability of Outcomes Based on Historical Insurance Data—The actuary should consider the extent to which the provision for catastrophe losses would change if the catastrophe ratemaking procedure were to be carried out using different historical experience periods. If, in the actuary's judgment, the procedure is too sensitive to the inclusion or exclusion of an

individual catastrophe or sets of years, the actuary should consider modifying the procedure to reduce the sensitivity.

e. Differing Trends in Loss Data—Historical insurance data used to determine a provision for catastrophe losses will often extend over much longer time periods than data used in most other ratemaking procedures; thus, the effect of small differences in annual trend rates will be magnified. The actuary should consider the potential for catastrophe losses to trend at a rate materially different than the noncatastrophe losses and reflect such differences in the ratemaking process as appropriate.

f. Consistent Definition of a Catastrophe—In utilizing a catastrophe ratemaking procedure, the actuary often uses two sets of historical insurance data. The first set may be comprised of data from the ratemaking experience period from which the catastrophe losses have been removed. The second set may contain longer term experience for catastrophe losses. Collecting a greater volume of data for this second data set may be accomplished in various ways, such as by using a greater number of relevant years or by using relevant data for a broader segment of business.

The actuary should consider the catastrophe definition pertaining to, and the catastrophe potential in, both of these data sets to ensure that the definitions are not materially inconsistent. Specific areas to consider are consistency of the thresholds used to determine catastrophe losses and consistency in identifying specific catastrophes.

3.3.2 Use of Noninsurance Data and Models—If, after considering the items contained in section 3.3.1(a–f), the actuary believes that the available historical insurance data do not sufficiently represent the exposure to catastrophe losses, the actuary should consider doing one of the following:

1. use noninsurance data to adjust the historical insurance data;

2. use noninsurance data (including models based thereon) as input to ratemaking procedures; or

3. use models based on a combination of historical insurance data and noninsurance data.

The actuary should be satisfied that the resulting ratemaking procedures appropriately reflect the expected frequency and severity distribution of catastrophes, as well as anticipated class, coverage, geographic, and other relevant exposure distributions.

3.4 Using a Provision for Catastrophe Losses—In ratemaking, actuaries generally use historical data or modeled losses to form the basis for determining future cost estimates. The presence or absence of catastrophes in any historical data used to form future cost estimates can create biases that diminish the appropriateness of using that data as the basis for future cost estimates. The actuary should address such biases by adjusting the historical data used to form future cost estimates and determining a provision for catastrophe losses (after consideration of the issues and practices found in sections 3.1–3.3).

The actuary may employ other considerations and methods to adjust for catastrophes associated with casualty coverages. For example, such adjustments may include limiting losses in the underlying data and using increased limits factors or excess loss factors based on industry data or other sources, or adjusting for legislative changes, legal decisions, changes in the distribution of policy limits, and coverage provisions. In addition, other adjustments, such as supplementing state-specific data with countrywide data or company-specific data with industry information, may be appropriate.

3.5 Loss Adjustment Expenses—The actuary should be aware that the relationship of loss adjustment expense to incurred loss can be significantly different for catastrophe losses and for noncatastrophe losses. In some cases, the historical relationships of overall loss adjustment expense to overall incurred losses may produce inappropriate loss adjustment expense estimates for catastrophe losses. Similarly, the historical relationship of overall loss adjustment expense to overall incurred losses may produce inappropriate loss adjustment expense estimates for noncatastrophe losses if the historical period was impacted by catastrophe losses. The actuary should modify the loss adjustment expense procedure where necessary to develop a reasonable estimate of prospective loss adjustment expense for both catastrophe and non-catastrophe losses.

## Section 4. Communications and Disclosures

4.1 Conflict with Law or Regulation—If a law or regulation conflicts with the provisions of this standard, the actuary should develop a rate in accordance with the law or regulation, and disclose any material difference between the rate so developed and the actuarially-determined rate to the client or employer.

4.2 Documentation and Disclosure—The actuary should be guided by the provisions of ASOP No. 9, *Documentation and Disclosure in Property and Casualty Insurance Ratemaking, Loss Reserving, and Valuations*. If the actuarial work product includes mathematical modeling developed by someone other than the actuary, the documentation should include the source of the model and how the model was used in the analysis. In addition, if the model is outside the actuary's area of expertise, the actuary should be guided by the documentation and disclosure requirements of ASOP No. 38, *Using Models Outside the Actuary's Area of Expertise*.

4.3 Disclosures—The actuary should include the following, as applicable, in an actuarial communication:

a. in addition to the disclosure covered in section 4.1, the disclosure in ASOP No. 41, *Actuarial Communications*, section 4.2, if any material assumption or method was prescribed by applicable law (statutes, regulations, and other legally binding authority);

b. the disclosure in ASOP No. 41, section 4.3, if the actuary states reliance on other sources and thereby disclaims responsibility for any material assumption or method selected by a party other than the actuary; and

c. the disclosure in ASOP No. 41, section 4.4, if, in the actuary's professional judgment, the actuary has otherwise deviated materially from the guidance of this ASOP.

## Appendix 1

## Background and Current Practices

*Note:* This appendix is provided for informational purposes, but is not part of the standard of practice.

### Background

Historical Procedures—Prior to Hurricanes Hugo and Andrew, the predominant ratemaking procedures used to determine a catastrophe provision involved calculating the long-term ratio of such losses to noncatastrophe losses over a twenty- to thirty-year span. Catastrophes were identified either by some industry-dollar or loss-ratio threshold, and typically represented weather-related perils such as hurricanes, tornadoes, or snow storms. Other physical catastrophes such as floods and earthquakes were usually covered by separate policies designed to specifically include such perils. A provision for casualty-related catastrophes was typically not included separately in the rates, but was implicitly included with the contingency provision.

Issues—In the late 1980s and early 1990s, catastrophes produced record levels of damage, and it became evident that adjustments to historical ratemaking procedures were necessary. Hurricanes Hugo, Andrew, and Iniki produced aggregate losses exceeding previously expected possibilities. These huge losses brought to light other issues such as population shifts, non-adherence to building codes, and exposure concentration, none of which had been addressed previously. In addition, the occurrence of earthquakes in both San Francisco and Northridge, and a major flood in the Midwest during this period heightened the need for development of improved ratemaking procedures for these perils. Finally, catastrophes that had not been contemplated previously, such as the World Trade Center bombing and the Oakland Hills fires, raised other questions concerning how to provide for such losses in the rate.

In addressing these issues, catastrophe models, which previously were used by companies to determine their probable maximum loss under various scenarios, were adjusted for use in ratemaking. However, since these models were often multidisciplinary in nature or proprietary, it was often difficult to (1) ascertain the underlying assumptions of the model, and (2) obtain regulatory approval of rates based on these models.

Other issues have also emerged, making assessment of catastrophe exposure even more difficult. Examples of such issues include coverage changes, such as the greater use of guaranteed replacement cost on homeowner policies or the use of separate wind deductibles; the emergence of state-run catastrophe funds; and the availability of catastrophe options.

Current Practices

Subsequent to Hurricanes Hugo and Andrew, numerous enhancements and alternatives have been developed that improve on the traditional, long-term catastrophe ratemaking procedure.

One procedure uses the traditional excess wind approach but supplements or replaces the historical insurance data with hypothetical losses from an infrequent event (for example, a fifty-year event) as calculated by a catastrophe simulation model. Historical events of greater severity than the modeled fifty-year event are eliminated. Separate excess factors are calculated from the historical insurance data and for a hypothetical year constructed to include the modeled fifty-year event. The excess factor is calculated as a weighted average of those two separate factors.

A second procedure involves loading catastrophe reinsurance costs into the rate calculation. With this procedure, the rates are initially calculated using losses net of the catastrophe reinsurance. The company's overall catastrophe reinsurance costs are allocated to state and line, and those allocated costs are added to the calculated rate net of reinsurance.

A third procedure separates catastrophes into hurricane and nonhurricane components and treats each separately. This enables the actuary to focus on the particular difficulties, low frequency and high severity, in estimating hurricane losses. One specific procedure that is used for nonhurricane catastrophes is to relate catastrophe losses to amount of insurance years. A long-term ratio of catastrophe losses to amount of insurance years is calculated and used to load the ratemaking experience period for expected catastrophe losses. This procedure has also been used for hurricanes, using noninsurance data such as long-term hurricane frequencies to adjust the historical insurance data.

A fourth procedure that has been used for nonhurricane catastrophes is based on frequency. With this procedure, daily frequencies are calculated over a long period and each day is ranked using that frequency. A set percentage of days with the highest frequencies is considered excess. The losses incurred on those excess days are compared to the losses incurred on all other days in order to calculate an excess factor.

In considering earthquakes and hurricanes, the predominant approach currently used to calculate expected catastrophe losses is computer simulation models. These models make extensive use of noninsurance data to estimate the overall frequency of these events, as well as the frequency of the key defining characteristics of these events. Based on these estimated frequencies, a large number of catastrophes are simulated across a broad geographic area. For each simulated catastrophe, the model translates the event or phenomenon into a specific "hazard" parameter, such as wind speed or ground shaking, at all locations impacted by the event. Based on engineering analysis and prior catastrophe losses, the hazard parameter is translated into a damage ratio, i.e., ratio of losses to amount of insurance. These damage ratios are applied to the current or projected amounts of insurance and, when adjusted by the estimated frequencies of the specific catastrophes, produce the expected catastrophe losses.

Since our knowledge of catastrophes is not complete and is still evolving, computer simulation models are also evolving. The expected catastrophe losses calculated from these models can be

subject to significant variation, since different models (i.e., both models from different developers and different versions of models from the same developer) will obviously provide different answers.

All of these procedures may or may not be supplemented with a risk load calculated in accordance with ASOP No. 30, *Treatment of Profit and Contingency Provisions and the Cost of Capital in Property/Casualty Insurance Ratemaking*.

## Appendix 2

## Comments on the 1999 Exposure Draft and Subcommittee Responses

The exposure draft of this actuarial standard of practice (ASOP)—formerly titled *Treatment of Catastrophe Losses in Property/Casualty Insurance*—was issued in February 1999, with a comment deadline of June 15, 1999. Fourteen comment letters were received. The Subcommittee on Ratemaking carefully considered all comments received. Summarized below are the significant issues and questions contained in the comment letters, printed in roman type. The subcommittee's responses are printed in **boldface**.

General Comments

One commentator notes that, in the end, the definition of a catastrophe is driven by frequency. High frequency loss processes should produce credible estimates of future losses without adjustment. Low frequency events do not provide these estimates and adjustments are needed. **The subcommittee disagrees and believes that the most important facts are that the event or phenomenon not only should be relatively infrequent but should also produce unusually large aggregate losses.**

Two commentators suggested that the title of the standard should be *Treatment of Catastrophe Losses in Property/Casualty Insurance Ratemaking*. **The subcommittee agreed and changed the title.**

Two commentators believed that the standard too often specified what the actuary *should* do, suggesting the use of *may* as more appropriate. **The subcommittee disagrees, since the standard generally is specifying what the actuary needs to consider. The standard does not say the actuary needs to do something after the consideration if the item has no material impact on the results. In performing this work, the actuary needs to consider all items that may materially impact or bias the results.**

One commentator noted that the standard permits the actuary to rely on the work of nonactuaries without proper review and disclosure, particularly as it pertains to models developed by others. **The subcommittee disagrees that an actuary can rely on the work of a nonactuary without review and disclosure. The subcommittee prepared this standard fully aware of ASOP No. 38, *Using Models Outside the Actuary's Area of Expertise (Property and Casualty),* which was being exposed concurrently.**

One commentator suggested that the definitions and explanations should be phrased more in statistical terms whenever possible. **The subcommittee believes that, given the wide variation in available methodologies, a statistically-based definition would too narrowly restrict current acceptable practices.**

Another commentator suggested that the term *procedures* should be replaced by *models*. **The subcommittee believes that *procedures* is appropriate, particularly since *models*, in this case, could be too narrowly read to mean computer models.**

One commentator stated that the standard does nothing to help an actuary who uses a computer model to develop estimated catastrophe losses and is challenged by individuals who refuse to accept the validity of these models. **The subcommittee disagrees. The standard provides the analytical steps that the actuary should follow in examining the available data. Based on the analysis, the actuary can determine and demonstrate to others whether the data need to be supplemented by additional data or, alternatively, whether models that consider various sources of data should be used.**

Transmittal Memorandum

The transmittal memorandum of the exposure draft asked readers to address several key questions. One question asked, "Is the application of the standard to casualty (i.e., nonproperty) insurance appropriate, and has the subject been addressed adequately?" One commentator stated that catastrophes should be limited to first party coverages, particularly since the considerations listed in 3.3.1 and 3.3.2 were property related in nature. The commentator also noted that the methodologies referenced were predominantly for property coverages. The commentator did suggest, that if the standard were to apply to casualty coverages, it would need to include considerations such as limiting losses to basic limits; using excess loss factors; adjusting for changes in limits, coverages, or reinsurance; and supplementing state data with countrywide data. **The subcommittee intends that the requirements of this ASOP should also apply to casualty catastrophe losses when such a catastrophe is identified. The subcommittee has included the suggested language for casualty catastrophes in section 3.4.**

The subcommittee also drew its readers' attention to several provisions in particular: section 2.1, Catastrophe; section 3.1, Identification of Catastrophe Perils or Events; section 3.3.2, Use of Noninsurance Data; and section 4.1, Conflict with Law or Regulation. Please see those sections below for discussion of any pertinent readers' comments and subcommittee responses.

Section 1. Purpose, Scope, and Effective Date

Section 1.1, Purpose—One commentator stated that no guidance has been given regarding a unique or separate loss adjustment expense for catastrophe. The commentator suggested that the standard delete reference to loss adjustment expenses or provide explicit guidance on this aspect. **The subcommittee agreed and added section 3.5, Loss Adjustment Expenses, to address the issues surrounding loss adjustment expenses.**

Section 1.2, Scope—One commentator noted that the purpose section specifically makes reference to insurance ratemaking, but the scope section says that the standard applies to many more professional services. The commentator asked, "Does this standard apply to those entities cited in the scope section, only when they are related to property/casualty ratemaking?" **The**

**standard has been retitled to specify that it applies to property/casualty insurance ratemaking. The services referred to for risk financing systems, such as self-insurance and securitization products, are considered to be ratemaking when estimates for future costs are being determined.**

Section 2. Definitions

Section 2.1, Catastrophe—One commentator believed that the definition of catastrophe should relate to how the event or phenomenon violated the general insurance ratemaking model assumption of independent events. **The subcommittee believes that the use of a qualitative definition is more broadly applicable and useful in terms of current accepted practices.**

Another commentator believed that the phrase "or natural phenomenon"should be removed, as the phrase "relatively infrequent events" included natural and manmade phenomena. **The subcommittee agreed and deleted the word "natural" from the definition.**

Another commentator believed that "relatively" should modify high amounts, instead of infrequent events. **The subcommittee believes that it is more important to emphasize the frequency aspects of the definition as opposed to the amount of loss dollars.**

Another commentator stated that serious damage to a very large risk would be considered a catastrophe according to the definition. In the commentator's view, this did not seem appropriate since a large number of claims might not have resulted. **The subcommittee does not believe that the event needs to produce a large number of claims in order for it to be defined as a catastrophe.**

One commentator believed that the definition need not include the adjective "insured" to modify losses. **The subcommittee agrees and removed it.**

Another commentator suggested the definition eliminate the phrase, "the potential to" produce, as an event either is or is not a catastrophe. **The subcommittee agreed and eliminated the phrase "the potential to" in the definition.**

Section 2.2, Catastrophe Ratemaking Procedures—One commentator believed that the use of the term "adjust" was defensive in nature and that the definition should be something like "to provide a better expected value estimate than could be developed with the limited actual history." **The subcommittee believes that the original definition is more descriptive of the actual practices in use, while still being consistent with the more theoretical expression of the commentator.**

Another commentator expressed the concern that the current use of the word "adjust" would limit the ability of the actuary to consider any method that includes supplementing or credibility-weighting the losses. **The subcommittee believes that the current wording does not limit the ability of the actuary to use any techniques that, in the opinion of the actuary, produce appropriate estimates of catastrophes losses.**

Two commentators suggested editorial changes in the definition to clarify the timing of the catastrophe losses. **The subcommittee agreed with the suggestions and revised the definition.**

Section 2.3, Contagion—One commentator expressed the concern that some casualty catastrophes may result in claims against a single entity. **The subcommittee is aware of this issue and believes that the standard addresses the issue by providing guidance in section 3.4.**

Section 2.4, Demand Surge—Several commentators suggested editorial changes to sharpen the definition. **The subcommittee changed the definition to reflect the fact that demand surge is a sudden and temporary increase, not only in material and labor but also in services.**

Section 3. Analysis of Issues and Recommended Practices

Section 3.1, Identification of Catastrophe Perils or Events—Several commentators expressed concern about the original language, which seemed to require the actuary to identify all perils or events that might have the potential to generate insured catastrophe losses. **The subcommittee agreed and revised the language to include the idea that the actuary should take reasonable steps to identify the perils or events that would generate material losses.** Another commentator believed that it was appropriate to add a condition of suddenness, either in the discovery or occurrence of loss to the list of characteristics. **The subcommittee did not think that any additional characteristics were needed.**

Some commentators suggested clarifications to section 3.1(b). One commentator suggested replacing the last two sentences with the phrase "the presence or absence of such events in the experience period may result in materially different perceptions of future loss estimates." **While the subcommittee agrees that the original two sentences were awkward, the revision retains the parallel treatment because the subcommittee believes that a more explicit explanation of the impacts is appropriate.** Another commentator suggested that *infrequent occurrence* should be defined in terms like the frequency of the event over a longer time period than the experience period. **The subcommittee concluded that it was important for the actuary to be able to evaluate the materiality of the loss and frequency of events relative to the long term in the context of the methodology being used.**

Section 3.2, Identification of Catastrophe Losses—Two commentators suggested that the language should be clarified to indicate that the actuary may not be able to identify the catastrophe losses in all the historical data used. **The subcommittee agreed and modified this section to reflect such a possible limitation.** Another commentator believed that the standard provided no guidance to the actuary as to how to identify catastrophe losses in the historical insurance data. **The subcommittee believes that the perils insured and the events covered provide sufficient guidance for the identification of catastrophe losses.**

Section 3.3, The Use of Data in Determining a Provision for Catastrophe Losses—The subcommittee made an editorial revision to the order of the items (a), (b), (c) and (d). Item (d)

was placed first and relabeled as (a) to emphasize the importance of the frequency component of historical data in making use of the historical data in determining a provision for catastrophe losses. One commentator noted that computer simulations are not data. **The subcommittee agreed and revised this section.** Another commentator believed that sections 3.3.1(b) and 3.3.1(a), and 3.3.1(c) and 3.3.1(e), could be combined. **The subcommittee notes that 3.3.1(b) refers to a comparison over time within the set of insurance data, whereas 3.3.1(a) addresses a comparison of the insurance data to external sources. With regard to 3.3.1(c) and 3.3.1(e), the subcommittee believes that 3.3.1(c) refers to the distribution of the exposure to loss in the experience period, compared to the prospective period, whereas 3.3.1(e) refers to possible differing trends in the costs by peril over the available period.**

Two commentators noted that the language in section 3.3.1(a) created an obligation that may not be possible to satisfy in all cases. **The subcommittee agreed and revised this section to say that the actuary should consider comparing historical insurance data to noninsurance data.** Another commentator noted that this section implies that one uses historical data only if the data give comparable results to modeling, since use of modeling will give the full spectrum of loss distribution. **The subcommittee notes that this section is alerting the actuary to be sure that he or she believes that the data underlying his or her procedure sufficiently reflect the long-term frequency and severity of events producing insured catastrophe losses. If the actuary does not believe that the data are sufficient, section 3.3.2 states that the actuary should consider using a modeling procedure.**

In section 3.3.1(b), one commentator suggested changing the language to say "whether catastrophe losses are likely to differ significantly among elements." **The subcommittee agreed and made the change.**

In section 3.3.1(c), one commentator suggested the use of a bullet-point list to highlight the importance of each element, particularly items related to coverage, such as limits, co-insurance, deductibles, etc. **The subcommittee agrees that it is important to highlight aspects of coverage and has explicitly mentioned changes in coverage as a consideration.**

In section 3.3.1(d), one commentator believed that if the indicated rate change is sensitive to the number of years in the historical experience period, then one should not use the historical period at all. The commentator believed that this section implies one would modify the current procedure, not switch to using computer simulation. **The subcommittee disagrees. In fact, the subcommittee views modifying procedures to include adopting computer simulation models.**

In section 3.3.1(e), one commentator noted that the section should be revised to say "when noncatastrophe losses are expected to change at a rate materially different from that for catastrophe losses." **The subcommittee agreed with this and revised the text to cover the potential aspects as referring to past and future time periods.**

Another commentator stated that the phrase "most catastrophe ratemaking procedures" should be revised to "traditional catastrophe ratemaking procedures," since generally the standard is

referring to procedures that have existed in the past. **The subcommittee revised this section to remove the reference to any specific type of procedure.**

One commentator suggested several editorial changes for section 3.3.1(f) that generalized the section as well as broadened the suggested conditions for increasing the amount of data in the second set. **The subcommittee agreed with this comment and revised the text.**

Two commentators suggested that the term "consistent" be replaced by "not materially inconsistent." **The subcommittee agreed with this suggestion and made the revision.** Another commentator suggested that the last sentence should be revised to remove the word "dollar" and changing the "or" to "and." **The subcommittee agreed and revised the text.**

Section 3.3.2, Use of Noninsurance Data—One commentator suggested that the standard is giving the false impression that one should adjust past insurance data for all catastrophe perils. This commentator suggests that the adjustments are impossible to do adequately, giving false hope that meaningful results can be obtained. The commentator suggested that the standard be restructured to separate the treatment of catastrophes, such as hurricanes and earthquakes, from all others. **The subcommittee disagrees with these comments. The standard provides the actuary with a framework for evaluating the usability of the available data and developing appropriate catastrophe treatments. The standard identifies the issues for the actuary and gives sufficient freedom for the actuary to demonstrate the appropriateness of the resolution of the issues.**

*The exposure draft contained sections 3.3.2(a) and (b). The revisions made as a result of comments received combined parts (a) and (b). All responses to comments received in this section refer to the original section references.*

In section 3.3.2(a), one commentator suggested the addition of the phrase "and other relevant." **The subcommittee agreed with this suggestion**. The same commentator suggested that the section be modified to say "expected" frequency and catastrophes "for the current or prospective periods." **The subcommittee disagreed as the expected frequency and severity of catastrophes was felt to be sufficiently descriptive.**

In section 3.3.2(b), two commentators believed the section implied that the actuary was capable of making decisions on when the historical insurance data best capture the range of frequency and severity of catastrophes. **The subcommittee recognizes that an actuary may not know these facts without consultation with outside experts. The subcommittee believes that the actuary could become aware of the issues by referring to such experts, and make intelligent decisions about the representativeness of the data.**

One commentator suggested that in section 3.3.2(b) the phrase "if the results of the simulation" was inappropriate. The commentator's point was that the process—not the results—was most important here. **The subcommittee agreed and has deleted any reference to results of the simulation and has focused the actuary on addressing the appropriateness of the procedures used.**

Section 3.4, Using a Provision for Estimated Catastrophe Losses—One commentator believed that the section demanded that the actuary *always* replace the actual data with estimated data, and suggested that the phrase "should adjust" be changed to "may consider adjusting." **The subcommittee disagrees and believes that if the actuary has biased data, the actuary needs to estimate what the values should be excluding the bias.**

Section 4. Communications and Disclosures

Section 4.1, Conflict with Law or Regulation—Several commentators felt that the requirement that the actuary disclose material differences between the rate developed in accordance with law or regulation and the actuarially-determined rate was unnecessarily burdensome. One commentator suggested that this disclosure burden was unique among all ASOPs. **The subcommittee believes that the potential range of differences could be so large that disclosing the difference to the client or employer would be necessary. The subcommittee also notes that this same requirement exists in ASOP No. 30, *Treatment of Profit and Contingency Provisions and the Cost of Capital in Property/Casualty Insurance Ratemaking*.**



# The Impact of Climate Change on the National Flood Insurance Program and Improving Coastal Floodplain Mapping

## Primary Frontal Dune VE Zone Study *and* Coastal Special Flood Hazard Area Study

*prepared for*

*prepared by*

*in association with*
Christopher P. Jones, P.E.
Deloitte Consulting, LLP
Michael Baker Jr., Inc.

May 2011

FEMA-Supplement-001999

# The Impact of Climate Change on the National Flood Insurance Program and Improving Coastal Floodplain Mapping

# Primary Frontal Dune VE Zone Study and Coastal Special Flood Hazard Area Study

**May 2011**

*prepared for*

FEMA

*prepared by*

AECOM

*in association with*

Christopher P. Jones, P.E.
Deloitte Consulting, LLP
Michael Baker Jr., Inc.

# About the FEMA Climate Change and Coastal Studies Project

This report presents the findings of two of the three components of a project entitled *The Impact of Climate Change on the National Flood Insurance Program and Improving Coastal Floodplain Mapping.* Initiated in the fall of 2008, the project is sponsored by the Federal Emergency Management Agency (FEMA) and conducted under a contract with AECOM. The project has significant implications for the protection of life and property nationwide, with three primary objectives:

1. The first and most complex objective was to evaluate the likely impact of climate change on the National Flood Insurance Program (NFIP).
2. The second objective was to evaluate FEMA's Primary Frontal Dune (PFD) regulations and policies. This involved evaluating current flood insurance and hazard identification regulations, policies, and guidelines that require the PFD to be included entirely within the coastal high hazard area (VE Zone).
3. The third objective was to evaluate the potential modification of the coastal Special Flood Hazard Area (SFHA) to include new AE Zone mapping and standards for the Limit of Moderate Wave Action (LiMWA). The LiMWA defines the inland boundary of the area of Moderate Wave Action (MoWA), where coastal wave heights are between 1.5 and 3 feet. This portion of the coastal floodplain is also known as the Coastal A Zone (CAZ).

These three components of the project were addressed in three distinct studies. This report includes studies related to items 2) PFD issues and 3) coastal SFHA issues.

## Primary Frontal Dune (PFD) Study

NFIP regulations are published in the Code of Federal Regulations (CFR) under Title 44 for Emergency Management and Assistance (44 CFR), and are defined within Chapter 1. In May 1988, FEMA published new regulations that defined the PFD with respect to its inclusion in the VE Zone, redefined the Coastal High Hazard Area (CHHA) to include the PFD to a specific landward limit, and provided guidance on mapping sand dunes that are subject to erosion. A PFD is defined in 44 CFR Section 59.1 as *"a continuous or nearly continuous mound or ridge of sand with relatively steep seaward and landward slopes immediately landward and adjacent to the beach and subject to erosion and overtopping from high tides and waves during major coastal storms."* The PFD is included in the CHHA in 44 CFR Section 59.1, which defines the CHHA as *"an area of special flood hazard extending from offshore*

*to the inland limit of the primary frontal dune along an open coast and any other area subject to high velocity wave action from storms or seismic sources."*

For this study, the effectiveness of PFD mapping criteria and NFIP floodplain management requirements was evaluated in order to determine whether these dune areas are protected from man-made alterations and whether they are accurately mapped as coastal high hazard areas (VE Zones) on flood maps. The study is focused on the hazard identification and mapping criteria established by NFIP regulations and FEMA's coastal *Guidelines and Specifications*. The report presents an evaluation of how current regulations protect frontal dune areas from man-made alterations. The study addressed the requirements for identification and delineation of PFD areas within the VE Zone. It also examined how the PFD procedures have led to perceived inconsistencies with its implementation and application in areas with large dunes and along sheltered shorelines. An assessment of economic impacts of current mapping criteria and proposed changes to the NFIP regarding VE Zones and PFD mapping requirements is also included. This report concludes with policy recommendations for floodplain mapping, floodplain management, and insurance.

## Coastal Special Flood Hazard Area (SFHA) Study

This report addresses the coastal SFHA. Currently, coastal hazard areas under the NFIP are primarily identified as either VE Zones or AE Zones for stillwater elevation (SWEL) with wave effects (such as wave height and wave runup), and as AO Zones for wave overtopping. Areas that are identified as AE Zones may experience flooding from either storm surges (coastal AE Zones) or riverine flooding (riverine AE Zones). NFIP regulations impose the same design and construction requirements, and the same flood insurance premium rates, for coastal AE Zones and riverine AE Zones. However, building science evidence suggests that design and construction requirements in some portions of coastal AE Zones should be similar to VE Zone requirements. This conclusion is supported by post-storm investigations and laboratory tests, but is not necessarily supported in the insurance claim data due to the inability to differentiate the riverine and coastal AE/A Zone damage claims data, and the type of damage claims for impacted structures within coastal SFHA.

This report examines the issues involved in creating a new flood hazard zone, such as the MoWA or CAZ, as part of the coastal SFHA. Such a designation would account for the additional hazard possible from wave heights of between 1.5 and 3 feet. Neither the current VE Zone nor the current AE Zone addresses this wave hazard: It is below the threshold of the VE Zone, but is not currently accounted for in the current designation of the AE Zone.

In addition to assessing inclusion of new flood mapping requirements (for LiMWA) in the coastal SFHA, this study also examined whether revised building standards and flood insurance premium rates are indicated by available evidence. Policy recommendations for all three categories are included.

# Contacts

**Federal Emergency Management Agency**

Mark Crowell, Contracting Officer's Technical Representative
500 C Street, SW
Washington, DC 20472
Phone: 202-646-3432
Email: mark.crowell@dhs.gov

**Federal Emergency Management Agency**

Jonathan Westcott, Task Leader
500 C Street, SW
Washington, DC 20472
Phone: 202-646-2478
Email: jonathan.westcott@dhs.gov

**AECOM**

Perry Rhodes, Project Manager
3101 Wilson Boulevard
Arlington, VA 22201
Phone: 703-682-4914
Email: perry.rhodes@aecom.com

**AECOM**

Darryl Hatheway, Project Technical Leader
1420 Kettner Boulevard, Suite 500
San Diego, CA 92101
Phone: 619-905-9488
Email: darryl.hatheway@aecom.com

# Senior Review Panel Members

### Federal Emergency Management Agency

Mark Crowell, FEMA HQ Risk Analysis Division
Jonathan Westcott, FEMA HQ Risk Analysis Division
Emily Hirsch, FEMA HQ Risk Analysis Division
Lois Forster, FEMA HQ Risk Reduction Division
Tom Hayes, FEMA HQ Risk Insurance Division
Andy Neal, FEMA HQ Risk Insurance Division
John Ingargiola, FEMA HQ Risk Reduction Division
Mike Goetz, FEMA Region I Risk Analysis Division
Tucker Mahoney, FEMA Region IV Risk Analysis

### Other Federal Agency Representative

Doug Marcy, National Oceanic and Atmospheric Administration (NOAA) Coastal Services Center

### State Floodplain Representatives

Tony Pratt, Delaware Department of Natural Resources and Environmental Control
Ken Ashe, North Carolina Emergency Management, Floodplain Management Program

# Project Team

### AECOM

Scott Edelman, Principal-in-Charge
Perry Rhodes, Project Manager
Manas Borah, Assistant Project Manager
Darryl Hatheway, Project Technical Leader
Kevin Coulton, Senior Coastal Engineer
Dan Deegan, Senior Coastal Engineer
Susan Phelps, Geographic Information Systems (GIS) Team Leader
Andy Wohlsperger, GIS Specialist
Kristen MacDougall, GIS Specialist
Shannon McQuary, Technical Editor

### Independent Consultant

Christopher P. Jones, Senior Coastal Engineer

### Deloitte Consulting, LLP

Susan Pino, Economic/Actuarial Director
Joshua Merck, Economic/Actuarial Manager

### Michael Baker Jr., Inc.

Krista Collier Conner, Coastal Scientist
Mark Osler, Senior Coastal Engineer

# Acknowledgments

The project team would like to acknowledge the support and coordination for the PFD Study and Coastal SFHA Study provided by FEMA staff, especially Mark Crowell and Jonathan Westcott who oversaw both studies and provided critical review and guidance throughout the entire project. We also wish to thank Sandra Knight, Doug Bellomo, Roy Wright, and Dan Spafford of FEMA for their detailed review of the report, and substantive comments, suggestions, and contributions. Special thanks are due to Linda Bernhardt of CreativePages, LLC, who provided editorial support.

We would also like to acknowledge the contribution of Rebecca Haney at the Massachusetts Office of Coastal Zone Management for her valuable comments and insight based on her experience with local PFD identification and mapping methodologies.

## Role of the Senior Review Panel

The project team especially wishes to acknowledge the Senior Review Panel, which played a key role in the study through a process of policy, alternatives, recommendations, and report reviews. The panel participated in a kick-off meeting to outline the proposed study plan, provided an interim review of technical white papers, and attended a final review meeting held prior to preparation of the draft report. Following distribution of the draft report, the panelists provided written comments and suggestions. While the panel's comments were incorporated as much as possible, the panel's efforts should not, in any way, be construed as an endorsement of the study's findings by them or by their several agencies and organizations; their role was solely advisory, and responsibility for the work remains with the project team.

# Foreword

The National Flood Insurance Program (NFIP) plays a critical role in FEMA's mission to prepare for, protect against, respond to, recover from, and mitigate all hazards. Floods, including hurricanes and major storms, cause more damage to our Nation's infrastructure, people, and property than any other natural disaster.

In addition to their environmental benefits, sand dunes play a key role in defending our nation from storm surges. In recognition of this and to assist in the preservation of these important features, the "primary frontal dune" (PFD) has been included in our definition of the Coastal High Hazard Area (CHHA) since 1988.

Despite obvious differences in both the environment and cause of flooding between riverine and coastal areas, FEMA's floodplain management requirements are identical, aside from the special designation for coastal high hazard areas (Zone VE). Post-flood event assessments and recent technical studies have demonstrated that portions of coastal floodplains (outside of the coastal high hazard area or VE zone) are subject to moderate wave action, and experience damages most closely aligned with flooding under surge and wave conditions rather than those associated with riverine flows. FEMA has responded to these findings by issuing guidance on how to determine areas of Moderate Wave Action (MoWA) and thus delineate an estimated Limit of Moderate Wave Action (LiMWA) during the 1%-annual chance storm surge event. These applications are not being used to change flood insurance requirements, and are currently being provided only for informational purposes with the aim of improving floodplain management and reducing flood risk at the local level.

This report identifies and evaluates alternatives to our current practices for determining and mapping PFDs and coastal AE Zones, and presents thought-provoking sets of options and recommendations to address these issues and to improve the coastal mapping program under the NFIP. This report begins a much broader dialogue whose aim is to refine the program and further help protect the safety of our citizens living, working, and recreating along our Nation's coastlines.

Sandra Knight, Ph.D., P.E., D.WRE
Deputy Administrator
Federal Insurance and Mitigation Administration, Mitigation

# Table of Contents

About the FEMA Climate Change and Coastal Studies Project ..... i
Primary Frontal Dune (PFD) Study ..... i
Coastal Special Flood Hazard Area (SFHA) Study ..... ii
Contacts ..... iv
Senior Review Panel Members ..... v
Project Team ..... vi
Acknowledgments ..... vii
Foreword ..... viii
Table of Contents ..... ix
List of Figures ..... xii
List of Tables ..... xiii
Appendices ..... xiv

**Executive Summary** ..... ES-1
First Study: Primary Frontal Dune (Sections 3.0 to 6.0 of this report) ..... ES-1
Short-Term PFD Recommendations ..... ES-3
Long-Term PFD Recommendations ..... ES-4
Additional Long-Term PFD Recommendations ..... ES-4
Second Study: Coastal SFHA – Coastal AE Zone and CAZ (Sections 7.0 to 10.0 of this report) ..... ES-4
Coastal SFHA Recommendations ..... ES-5

**1.0 Introduction** ..... 1-1
1.1 PFD Criteria and VE Zone Mapping Overview ..... 1-1
1.2 Overview of Coastal SFHAs and Coastal AE Zones ..... 1-2

**2.0 Background and History of PFD and Coastal SFHA** ..... 2-1
2.1 Primary Frontal Dunes and Dune Erosion ..... 2-2
2.1.1 The Primary Frontal Dune Study ..... 2-5
2.2 Coastal SFHAs and AE Zones ..... 2-6
2.2.1 The Coastal SFHA Study ..... 2-8

**3.0 PFD Implementation Issues** .... 3-1
3.1 Overview of PFD Definitions .... 3-1
3.2 Application of PFD Mapping Criteria .... 3-5
3.3 Challenges with the PFD .... 3-8
3.3.1 Median Erosion Value .... 3-8
3.3.2 Identification of the PFD (Landward Limit) .... 3-10
3.3.3 Application of the CHHA (VE Zone) Criteria .... 3-10
3.3.4 Mapping and Floodplain Management .... 3-12
3.4 Summary: Strengths and Weaknesses of the PFD Criteria .... 3-13

**4.0 Primary Frontal Dune Alternatives** .... 4-1
4.1 PFD Alternatives Considered .... 4-1

**5.0 Assessment of PFD Alternatives** .... 5-1
5.1 Discussion of Alternatives to Eliminating the PFD .... 5-1
5.2 Detailed Assessment of Alternatives and Impacts .... 5-2
5.3 Economic Assessments .... 5-10
5.3.1 NFIP Ratemaking and Insurance .... 5-10
5.3.2 Use of PFD for VE Zone Mapping .... 5-11
5.3.3 PFD Policy Analysis .... 5-11
5.3.4 Considerations for Changes in Ratemaking Procedures .... 5-12
5.3.5 Estimate of NFIP Premium Losses from PFD Elimination Alternative .... 5-13
5.3.6 Estimate of NFIP Claims Liability from PFD Elimination Alternative .... 5-15

**6.0 PFD Findings and Recommendations** .... 6-1
6.1 PFD Issues .... 6-1
6.2 PFD Definitions and Delineation .... 6-1
6.3 PFD Flood Insurance Pricing Mismatch .... 6-2
6.4 PFD Options and Alternatives .... 6-3
6.5 Final Recommendations .... 6-4

**7.0 Coastal SFHA and Coastal A Zone Implementation Issues ................ 7-1**
7.1 Use of the Term "Coastal A Zone" ..................................................... 7-1
7.2 Definitions of the Coastal SFHA and CAZ .......................................... 7-2
7.3 Guidelines for Mapping CAZ and LiMWA ........................................... 7-3
7.4 NFIP Insurance Issues......................................................................... 7-4
7.5 Building Standards for CAZ ............................................................... 7-5
7.6 Implementation of CAZ in Areas Prior to Delineation of the LiMWA .... 7-5
7.6.1 CAZ Language in Codes and Standards.................................. 7-6
7.6.2 Absent a LiMWA, Where is the CAZ? ...................................... 7-7
7.7 CAZ Implications for HMA Grant Programs ........................................ 7-7

**8.0 Coastal SFHA and Coastal A Zone Alternatives.................................. 8-1**
8.1 CAZ Alternatives Considered............................................................. 8-1
8.2 Details for CAZ Alternatives 4 and 5 ................................................... 8-4
8.2.1 Building Standards ................................................................... 8-4
8.2.2 Flood Insurance Premium Rates.............................................. 8-5
8.2.3 Discussion of Alternatives 4 and 5 ........................................... 8-6

**9.0 Assessment of Coastal A Zone Alternatives ....................................... 9-1**
9.1 Coastal SFHA and CAZ Terminology Assessment............................. 9-2
9.2 Coastal SFHA Economic Assessments .............................................. 9-2
9.2.1 Economic Analysis ................................................................... 9-2
9.2.2 Background of NFIP Ratemaking and Coastal SFHA ............... 9-2
9.2.3 Coastal AE Zone Analysis........................................................ 9-3
9.2.4 Summary and Conclusions ..................................................... 9-17
9.3 CAZ and Coastal AE Zone Alternatives Assessment......................... 9-17
9.3.1 CAZ Alternative 3 (Modify Inland Limit of VE Zone)................ 9-19
9.3.2 CAZ Alternative 4 (Divide Coastal AE Zone into Three Zones: MoWA, MiWA, and Riverine AE Zone) ............ 9-19
9.3.3 CAZ Alternative 5 (Divide Coastal AE into Four Zones: Open Coast and Non-Open Coast for MoWAs, MiWA, and Riverine AE Zone)......................................................... 9-20

**10.0 Coastal SFHA Findings and Recommendations** ............................... 10-1
10.1 Coastal SFHA Issues ............................................................ 10-1
10.2 Coastal SFHA and CAZ Terminology ............................................ 10-1
10.3 Coastal SFHA Insurance Pricing ................................................ 10-2
10.4 Coastal SFHA Building Standards ............................................... 10-2
10.5 Coastal SFHA Alternatives ........................................................ 10-2
10.6 Coastal SFHA Recommendations ................................................. 10-3

**11.0 PFD and Coastal SFHA Project Summary** ........................................ 11-1
11.1 PFD Alternatives and Recommendations ........................................ 11-2
11.1.1 PFD Alternatives ............................................................... 11-2
11.1.2 PFD Final Recommendations .................................................. 11-2
11.2 Coastal SFHA (CAZ) Alternatives and Recommendations ................. 11-4
11.2.1 Coastal A Zone Alternatives .................................................. 11-4
11.2.2 Coastal A Zone Recommendations .......................................... 11-4

**12.0 References** ........................................................................... 12-1

## List of Figures

Figure 1-1. The coastal SFHA is divided into VE and AE Zones .......................... 1-3
Figure 1-2. Plan view of coastal SFHA and various terms and zones used in this report ........................................................................ 1-4
Figure 1-3. PM-50 illustration of a FIRM with the LiMWA delineated and the corresponding entries in the Legend and "Notes to Users" .......... 1-5
Figure 2-1. Illustration of coastal flood hazard zones prior to the 1988 PFD requirement ................................................................ 2-3
Figure 2-2. Illustration of coastal flood hazard zones after the 1988 PFD requirement was adopted ................................................ 2-4
Figure 2-3. This photograph shows a typical PFD feature along the Gulf of Mexico open coast in Gulf County, Florida ...................................... 2-4
Figure 3-1. Illustration of the 1988 PFD inland limit definition in NFIP regulations ...................................................................... 3-2
Figure 3-2. Illustration of the 1988 "Coastal High Hazard Area" definition ........... 3-2
Figure 3-3. Illustration of the 1988 PFD erosion criteria using the 540-square-foot methodology ......................................................... 3-4

Figure 3-4. Primary frontal dune reservoir sketch ............................................ 3-5

Figure 3-5. Median erosion volume above stillwater flood level versus storm recurrence interval ............................................................... 3-6

Figure 3-6. Coastal mapping example: Sandy beach backed by high dune, where PFD controls VE Zone limits ................................................ 3-8

Figure 3-7. Example of a situation where previously existing dune was removed prior to FEMA updating the flood mapping (pre-FIRM) ..... 3-12

Figure 7-1. Existing terminology related to the coastal SFHA and the CAZ ........ 7-3

## List of Tables

Table 3-1. Strengths and weaknesses of current PFD-related definitions and terminology ........................................................... 3-14

Table 5-1. Summary of impacts of PFD alternatives ......................................... 5-3

Table 5-2. Summary of V and X Zone premiums and exposures in-force for all States as of December 31, 2008 ............................... 5-14

Table 6-1. List of PFD options and alternatives considered ............................... 6-4

Table 9-1. Countrywide A/AE Zone data (all post-FIRM claims) ........................ 9-5

Table 9-2. Countrywide A/AE Zone data (post-FIRM claims only, occupancy type = 1) ............................................................... 9-6

Table 9-3. Countrywide A/AE Zone data (post-FIRM claims only, non-condominiums)............................................................... 9-7

Table 9-4. Average severity for post-FIRM claims ........................................... 9-10

Table 9-5. Average loss per claim by water depth (all years, post-FIRM only) . 9-11

Table 9-6. Average loss per claim by water depth (post-FIRM only and all years, excluding 2005) ....................................................... 9-12

Table 9-7. Average loss per claim by structure type and inclusion/exclusion of a basement (all years, post-FIRM only) ..................................... 9-13

Table 9-8. Average loss per claim by structure type and inclusion/exclusion of a basement (all years, excluding 2005) ...................................... 9-14

Table 9-9. Average loss per claim by water depth for structures with one or two floors, no basement (all years, excluding 2005) ............ 9-15

Table 9-10. 2008 policy-in-force data and non-condominium policies ................ 9-16

Table 9-11. CAZ alternatives assessment of impacts on flood mapping, flood insurance, and floodplain management ................................. 9-21

Table 10-1. List of Coastal SFHA alternatives considered ................................ 10-3

Table 10-2. Recommended building standards and insurance premium rates.... 10-4

## Appendices

Appendix A: List of Acronyms ..... A-1

Appendix B: Study Team and Review Team Meeting Notes ..... B-1

Appendix C: Geocoding of 2008 Study of PFD Demographics and Flood Policies ..... C-1

Appendix D: Guidance Documents ..... D-1

Appendix E: Use and Significance of Terms Related to "Coastal A Zone," 1975–2010 ..... E-1

Appendix F: Coastal SFHA and Coastal A Zone Terminology – Discussion and Options ..... F-1

Appendix G: Preliminary Literature Review for Open Coasts and Sheltered Waters ..... G-1

# Executive Summary

# Executive Summary

The Federal Emergency Management Agency (FEMA) initiated a project in the fall of 2008, entitled *The Impact of Climate Change on the National Flood Insurance Program & Improving Coastal Floodplain Mapping*. From that project emerged three studies and subsequent reports. This report addresses two of the three study areas and focuses on improving the coastal mapping program under the National Flood Insurance Program (NFIP).

The first study evaluated regulations and policies for the identification, mapping, and management of the Primary Frontal Dune (PFD) and its inclusion in the VE Zone.

The second study evaluated potential modification of the coastal Special Flood Hazard Area (SFHA) to include new building standards and flood insurance premium rates for the area between the Limit of Moderate Wave Action (LiMWA) and the VE Zone boundary. This area, where coastal wave heights are between 1.5 and 3 feet, is known both as the Moderate Wave Action (MoWA) area and as the Coastal A Zone (CAZ).

These studies examine current policies and procedures, and analyze potential alternatives. Economic assessments of the impacts to the NFIP are included in the analyses. Summaries for each study follow.

## First Study: Primary Frontal Dune (Sections 3.0 to 6.0 of this report)

Unlike other VE Zone mapping criteria that are based on flood risk, PFDs are delineated based on definitions in the NFIP regulations and in more general terms by dune morphology, i.e., by physical dune size and shape rather than by risk-based measures such as hazard calculations of wave and erosion effects. This statement is not meant to imply that dune areas are without risk, but that the manner by which VE Zones are mapped is different.

PFD mapping was added to compensate for what was believed to be erosion-modeling deficiencies, which failed to adequately identify the risks of coastal erosion and flooding. The PFD VE Zone has likely prevented damages to structures that may have been built on dunes using lesser building standards had the VE Zone protections of the PFD criteria not been in place.

The resulting methodological difference between morphologic and risk-based mapping has led to concerns over VE Zone consistency and suitability, particularly in areas with wide and tall dunes or dune fields. Some of these concerns can be addressed by improved delineation of flood and erosion risks in coastal dune areas.

Other PFD issues have also emerged since the 1988 rule establishing PFDs, most notably, the median erosion criterion (540 square feet) for PFD erosion modeling, and pricing mismatches between PFD VE Zone flood insurance premium rates and actual risk. The 540-square-foot erosion criterion was established coincidentally with the PFD VE Zone mapping criterion. While not directly related, the use of a median erosion value has been identified as a source of underestimation of coastal hazard risks and the primary reason for adopting the 1988 PFD VE Zone mapping criterion. The flood insurance pricing mismatch is based on how one portion of the VE Zone on a dune is based on quantitative procedures, while the other PFD VE Zone area is qualitative and represents an area where the risks may be overstated.

These issues can undermine the NFIP in the eyes of policyholders and communities, who may perceive inconsistent or inequitable treatment between PFD and nearby non-PFD properties. On the other hand, establishing a PFD VE Zone and adopting a floodplain management criterion in the NFIP regulations has provided a mechanism for protecting the physical integrity of the dune. This is based on prevention of man-made alterations to the dunes (without special studies) and incorporation of that as an NFIP requirement in community-adopted floodplain management criteria. This dune protection is only provided through NFIP floodplain management regulations when the dune is mapped as a VE Zone.

A total of 14 individual alternatives were considered in order to resolve the PFD issues. These alternatives can be grouped as follows:

- No change – maintain current PFD VE Zone mapping and implementation;
- Modify the current dune erosion methodology, which can be implemented whether PFD VE Zone is retained, modified, or eliminated;
- Retain, but modify, the PFD VE Zone and its implementation; and
- Eliminate the PFD VE Zone, either by itself or in conjunction with other standards and protections to delineate and manage actual risk in dune areas.

The evaluation of the PFD alternatives showed that some alternatives are advantageous to immediate NFIP goals of providing risk-based flood mapping, but might not be feasible in the short term. Thus, recommendations are provided that

phase in the implementation of some alternatives as quickly as possible, with the understanding that other alternatives may follow at some future date. Recommended alternatives are therefore classified as "short term" or "long term."

The immediate and complete elimination of the PFD VE Zone (without other mapping, flood insurance, and floodplain management changes) would result in an understatement of coastal risk in many areas, and would have undesirable consequences to the NFIP, its policyholders, and its participating communities. Therefore, this alternative is not recommended as a first step, or by itself, but can and should be pursued over the long term in concert with other alternatives that better capture the extent and nature of flood and erosion hazards in coastal dune areas.

Implementation of certain alternatives over the short term should proceed, whether or not the PFD designation is eliminated. These alternatives should help resolve or reduce problems associated with current PFD implementation. Implementing longer-term alternatives should facilitate the ultimate replacement of the PFD designation, and allow the possible expansion of dune protection and building standards into part of the former PFD footprint.

The following sequence for implementing the mapping alternatives is recommended:

## Short-Term PFD Recommendations:

- Better define the alongshore and inland extents of the PFD VE Zone. This will include distinguishing between open coast and sheltered water shorelines. Test the FEMA-approved method for delineating PFDs, developed by the Massachusetts Office of Coastal Zone Management, in other geographic areas.
- Increase the required dune reservoir value in coastal flood study erosion assessments (to an above-median value) to establish more appropriate dune removal criteria. An increase in the dune reservoir area (the area above the 1-percent chance stillwater elevation and seaward of dune crest), above the median 540-square-foot value, will increase the likelihood of dune removal criteria in the detailed erosion assessment, and will create a larger eroded profile and increase in coastal hazard in the detailed analysis of wave effects. This will better duplicate the extents of dune erosion and associated flood hazards documented during base flood events.
- Subdivide the VE Zone in the Digital Flood Insurance Rate Map (DFIRM) database into a (seaward) hazard-based section (based on detailed wave and erosion analyses) and a PFD geomorphic-based (landward "footprint") section. This will reduce ambiguity and confusion over the basis for current VE mapping in dune

areas. It will also set the stage for treating the PFD footprint area differently for dune protection, building standards, and insurance rating purposes.

- Initiate the evaluation of alternative flood hazard mapping techniques to better characterize and map risks in coastal dune areas, and to better manage development in the PFD area.

## Long-Term PFD Recommendations:

- Eliminate the PFD criteria in the NFIP regulations and the PFD portion of the VE Zone mapping guidance, and develop procedures to provide improved mapping, insurance, and floodplain management provisions in the former PFD footprint.

## Additional Long-Term PFD Recommendations:

- Incorporate future conditions into flood hazard mapping, floodplain management, and flood insurance. Continuing to map flood hazards based on conditions that exist at the time of the mapping leads to preventable damage, flood insurance claims, and community disruption.
- Implementation of PFD alternatives should be coordinated with other recommendations of the study entitled *The Impact of Climate Change on the National Flood Insurance Program*.

## Second Study: Coastal SFHA – Coastal AE Zone and CAZ (Sections 7.0 to 10.0 of this report)

Current NFIP mapping practices do not delineate riverine and coastal AE Zones separately, and both areas are identified as AE Zones on Flood Insurance Rate Maps (FIRMs). Likewise, floodplain management and flood insurance programs treat both of these areas the same. Studies have shown that there may be important differences between riverine and coastal AE Zones, and there are important differences between sub-areas of moderate and minimal wave action in the coastal AE Zone.

This study examined:

- Differences between riverine AE Zones and coastal AE Zones.
- Differences between sub-areas of the coastal AE Zone – the MiWA (Minimal Wave Action) area and the MoWA (CAZ) area – in relation to the VE Zone.
- Options for managing the MiWA and MoWA areas using building standards and flood insurance premium rates that better reflect the risk within those areas.

A number of alternatives were considered in order to resolve these issues. These alternatives can be grouped into the following categories:

- No change;
- Eliminate the CAZ (MoWA) analysis and mapping criteria; and
- Modify building standards and/or insurance premium rates, by zone.

The third category has been divided into three alternatives:

- Modify the VE Zone inland limit (from 3-foot wave height to 1.5-foot wave height);
- Divide the AE Zone into three distinct zones: MoWA, MiWA, and riverine AE Zone; and
- Divide the AE Zone into four distinct zones: as above, but classify coastal shorelines as "open coast" or non-open coast (sheltered water) and establish two MoWAs, a MoWA-O for open coast and a MoWA-S for non-open coast (sheltered).

## Coastal SFHA Recommendations:

The recommendations of this study of the coastal SFHA can be summarized as follows:

- Divide the AE Zone into four areas: a riverine AE Zone and three coastal AE Zones: MiWA, MoWA-S, and MoWA-O.
- Have graduated building standards in the coastal AE Zones:
  - Treat the MiWA like the riverine AE Zone, but change the lowest floor reference (from top of floor to bottom of lowest horizontal supporting member) or add freeboard to achieve the same result.
  - Treat the MoWA-O like a VE Zone for building standard purposes.
  - Relax some of the VE Zone/MoWA-O building standards for the MoWA-S.
- Have graduated insurance premium rates in the coastal zones:
  - Charge structures in the MiWA the same AE Zone premium rates as structures in the riverine AE Zone.
  - Institute a new premium rate for MoWA-S and MoWA-O structures that is between VE Zone and AE Zone rates (and charge the same insurance rate for all MoWA areas).
- For the purposes of relating flood hazard mapping and building codes/standards, define "Coastal A Zone" (as referenced by building codes and standards) as the MoWA-O. Do not include MoWA-S in this definition.

While there is not currently substantial flood policy claims data for establishing a new flood zone for insurance rating purposes, the separation of the coastal and riverine

AE Zones, and the subdividing of the coastal AE Zone, would improve the future tracking of claims history in the respective coastal and riverine floodplains. Such delineation would also facilitate further testing and refinement of the above coastal SFHA/CAZ recommendations.

Adoption of the recommendations from both the PFD study and the coastal SFHA study may require changes in NFIP procedural guidance, policies, and/or regulations for determining and mapping coastal SFHAs and Coastal High Hazard Areas (CHHAs); thus, the authors recommend that the changes be implemented concurrently. This will allow flood mapping improvements to be initiated comprehensively, flood insurance premiums to be developed and implemented together, and any changes and revisions to the NFIP regulations to proceed through due process together.

# 1.0
# Introduction

# 1.0 Introduction

## 1.1 PFD Criteria and VE Zone Mapping Overview

This report examines the guidance and procedures for determining and mapping coastal flood hazards related to the flood with a 1-percent chance of occurrence in any year. This flood is also known as the base (100-year) flood event. Areas subject to the 1-percent annual chance flood are referred to as Special Flood Hazard Areas (SFHAs). The Coastal High Hazard Area (CHHA) is identified along coastlines within the SFHA to account for high velocity wave action that can result in additional damages from erosion and scour. The CHHA zone is mapped and designated on Flood Insurance Rate Maps (FIRMs) as V1-30 Zones (numbered V Zones in old procedures) or as a VE Zone (current procedures). The remainder of the SFHA is mapped and designated as A1-30 Zones (numbered A Zones in old procedures) or as an AE Zone (current procedures). The AE Zone designation is currently used for mapping SFHAs and Base Flood Elevations (BFEs) in both coastal and riverine studies. Throughout this report, the terms AE Zone and VE Zone will be used when discussing the coastal SFHA.

The VE Zone is an area subject to high velocity waters and waves where the landward boundary is determined by the landward-most extent of the following FEMA criteria (taken from the NFIP regulations or either of these *Guidelines and Specifications: Atlantic Ocean and Gulf of Mexico Coastal Guidelines Update* (FEMA, Final Draft 2007a), Great Lakes guidance in Appendix D (FEMA, 2003a), and *Pacific coastal guidance in Final Draft Guidelines for Coastal Flood Hazard Analysis and Mapping for the Pacific Coast of the United States* (FEMA, Final Draft 2005a)):

1. the limit at which a 3-foot-high wave might occur (G&S),
2. the location where the eroded or non-eroded ground profile is 3 feet below the computed wave runup elevation (G&S),
3. the wave overtopping splash zone (G&S),
4. the areas subject to high velocity flows, Pacific coast only (G&S), and
5. the inland limit of the Primary Frontal Dune (NFIP regulations, G&S).

The first four criteria are empirical- and/or model-based engineering criteria described in the G&S and have specific quantitative methods and means for VE Zone determinations. They represent results from tested and accepted engineering methods and modeling that consider various flood-risk factors. The fifth criterion is a geomorphic criterion defined in the NFIP regulations. It is this PFD criterion that is the subject of the first coastal study in this report.

The PFD criterion for VE Zone mapping was established by FEMA in 1988 and has been widely implemented along parts of the Atlantic Ocean and Gulf of Mexico coastlines. Some regions (e.g., New England) have seen more limited implementation to date. That being said, the landward extent of the PFD VE Zone was not always easy to identify or quantify, and this has led to questions by homeowners and local officials. This PFD study was initiated in the aftermath of two separate inquiries to FEMA in 2006 concerning perceived inequities and inconsistencies in the use of the PFD in VE Zone mapping. These inquiries are described below:

- A May 2006 letter from Senator Thomas Carper of Delaware expressed the opinion "that the regulatory definition of a VE Zone unfairly penalizes residents who have a particularly wide frontal dune protecting their homes," compared to homes in neighboring areas that do not have such dunes and are mapped as AE Zones.
- A September 2006 letter from North Carolina State Senator Marc Basnight expressed additional concerns regarding inconsistencies in PFD VE Zone mapping in dune fields for which a continuous or nearly continuous sandy ridge is not present (the NFIP regulation definition.

## 1.2 Overview of Coastal SFHAs and Coastal AE Zones

The subject of the second study in this report is the coastal SFHA and mapped AE Zones. As noted before, the AE Zone currently includes flood hazards from both riverine and coastal storm flooding. Damages in riverine AE Zones largely result from inundation. However, in the coastal AE Zone, buildings can be damaged not only by inundation, but also from velocity flows and wave action, usually from waves less than 3 feet in height. Damage by waves in coastal AE Zones has been noted by building science experts and engineers who comprise the FEMA Mitigation Assessment Teams (MATs) conducting post-disaster evaluations of building performance.

The American Institutes for Research (AIR) released the *Evaluation of the National Flood Insurance Program's Building Standards* in October 2006. It recommended that coastal AE Zones be mapped separately from riverine AE Zones to account for the additional risks of coastal flooding from waves. This includes the Coastal A Zone (CAZ) portion of the coastal AE Zone (also defined as the area of Moderate Wave Action [MoWA]) where the waves are 1.5 to 3 feet in height. It also recommended that many of the VE Zone floodplain management and building standards should apply in this CAZ. The AIR recommendations served as an impetus for the current study.

A 2009 report by the National Research Council, *Mapping the Zone: Improving Flood Map Accuracy,* went even further and recommended that the criteria for the VE Zone be changed to include wave heights equal to or greater than 1.5 feet instead of the current limit of 3 feet or greater. This recommendation was considered by the present study.

Terms used in this report are described below:

- **Special Flood Hazard Area** (SFHA) defines areas with a 1-percent chance, or greater, of flooding in any given year.
- **coastal SFHA** is the portion of the SFHA where the source of flooding is coastal surge or inundation. It includes VE Zones and coastal AE Zones.
- **riverine AE Zone** is that portion of the SFHA where the source of flooding is riverine, not coastal.

In response to these documents and the evidence of potential wave damage in coastal AE Zones, FEMA issued Procedure Memorandum (PM) 50 on December 3, 2008, which provides guidance and direction on the mapping of the Limit of Moderate Wave Action (LiMWA). The details of this new guidance are shown in Figure 1-1 and Figure 1-2, which also illustrate the relationships among the different zones and wave heights for the 1-percent annual chance stillwater elevation (SWEL) in the coastal SFHA.




Figure 1-1. The coastal SFHA is divided into VE and AE Zones. PM 50 now divides the coastal AE Zone into the MoWA and MiWA. The MoWA is also known as the CAZ.

For clarification of Figure 1-1, the LiMWA determination procedure and mapping guidance is inclusive of the entire coastal SFHA where wave action is calculated. The limits of the coastal SFHA are designated on the FIRM with a mapped boundary line to annotate and show where the coastal-riverine merge has been established, based on the intersection of the respective 1-percent annual chance elevations. In addition, the practice of determining the LiMWA for mapping purposes is intended to be applied in coastal areas subject to wave action.




Figure 1-2. Plan view of coastal SFHA and various terms and zones used in this report.

The LiMWA is the landward limit of the MoWA. The coastal AE Zone area landward of the LiMWA is designated as the area of Minimal Wave Action (MiWA). As noted above, the MoWA has also been referred to as the CAZ in earlier FEMA publications.

PM 50 directs the LiMWA to be mapped as an informational layer on all coastal FIRMs (see Figure 1-3) started after October 1, 2008. The community will be encouraged, but not required, to adopt higher building standards for the MoWA areas

that lie between the VE Zone and the LiMWA. This study of the coastal SFHA will examine options and alternatives for formalizing the MoWA with its own set of building requirements, floodplain management criteria, and insurance ratings.




Figure 1-3. PM-50 illustration of a FIRM with the LiMWA delineated and the corresponding entries in the Legend and "Notes to Users."

# 2.0

## Background and History of PFD and Coastal SFHA

FEMA-Supplement-002034

# 2.0 Background and History of PFD and Coastal SFHA

The first FIRMs and Flood Insurance Studies (FISs) produced in the 1970s determined and mapped coastal SFHAs but did not include wave effects. In both of those early FIRM and FIS products with a coastal SFHA, the regulatory BFE was the 1-percent annual chance SWEL. This represented, in a simplified description, the storm surge from hurricanes or the storm tide level resulting from low pressure systems (northeaster), and also the extreme highs of astronomical tides. Direct effects from wave action such as increased surface elevations from wave heights or wave runup were not included. There were CHHAs identified as approximate V Zones or V1-30 Zones with BFEs that did not include wave effects (SWEL only). However, the CHHA still required construction on pilings with the lowest horizontal structural member at or above the BFE, and required the space below to be either free of obstruction or built with open lattice work, insect screening, or breakaway walls. The coastal SFHA outside the CHHA (the coastal AE Zone) had the same requirements as riverine SFHAs in which the lowest floor is at or above the BFE. Buildings in the coastal AE Zone could be built on solid foundation walls and fill in addition to piles and columns.

While the floodplain management and building standards did not change, in 1976 FEMA asked the National Academy of Sciences (NAS) to investigate whether methodologies existed that could determine the 1-percent annual chance flood elevation with wave heights via a consistent nationwide application. If such methodologies did exist, FEMA asked NAS to recommend an appropriate methodology. NAS provided a report to FEMA in 1977 that recommended a basic method for computing wave height elevations along one-dimensional transects taken perpendicular to the shore. The NAS methodology also provided some basic guidelines on mapping the results

Following the 1978 Northeaster and Hurricane Frederic in 1979, Congress directed the Federal Insurance Administration (FIA) to conduct a benefit-cost analysis to determine whether wave action should be included in the BFEs. As a result of the analysis, FEMA determined that it was appropriate to include effects of wave action in the coastal BFE within all impacted areas of the coastal SFHA (VE and AE Zones) for storm surges, and adopted the NAS methodology for computing the wave heights.

## 2.1 Primary Frontal Dunes and Dune Erosion

The initial 1977 NAS guidance on the treatment of dune erosion left the matter largely to the judgment of the contractor conducting the FIS. It directed that dune erosion should be considered if there was a history of dune erosion at the site. This resulted in many dunes not showing erosion as part of the flood study and detailed analysis. Also, many dunes were mapped outside of (above) the CHHA and coastal SFHA because the dune height and crest elevation were greater than the flood elevation – even with the inclusion of wave heights.

With the dune, and especially the frontal dune, mapped outside of any regulatory flood hazard zone, these natural resources would be subject to development practices with little or no requirements for structure elevation or foundation type. This often resulted in degradation of the protective quality of the dunes. Furthermore, it put future structures at risk because slab-on-grade, and potentially basement foundations, could be built on the vulnerable dunes and beaches. As a result, States and floodplain administrators requested more definitive guidance for dune erosion assessments and protection of the frontal dune.

NFIP regulations are published in the Code of Federal Regulations (CFR) under Title 44 for Emergency Management and Assistance (44 CFR), and are defined within Chapter 1. In May 1988, FEMA published new regulations that defined the PFD with respect to its inclusion in the VE Zone, redefined the CHHA to include the PFD to a specific landward limit, and provided guidance on mapping sand dunes that are subject to erosion. (See Appendix D for copies of the proposed and final rule establishing the PFD regulations.)

The portion of these regulations that currently define and address the mapping of the "Primary Frontal Dune" (PFD) and its erosion as part of the "Coastal High Hazard Area" (CHHA) are located within 44 CFR Section 59.1 Definitions, and 44 CFR Section 65.11 Evaluation of sand dunes in mapping coastal flood hazard areas. Figure 2-1 shows the zone designations for a typical coastal cross-section prior to the 1988 regulation changes.

A PFD is defined in 44 CFR Section 59.1 as *"a continuous or nearly continuous mound or ridge of sand with relatively steep seaward and landward slopes immediately landward and adjacent to the beach and subject to erosion and overtopping from high tides and waves during major coastal storms."* The PFD is included in the CHHA in 44 CFR Section 59.1, which defines the CHHA as *"an area of special flood hazard extending from offshore to the inland limit of the primary*

*frontal dune along an open coast and any other area subject to high velocity wave action from storms or seismic sources."*




Figure 2-1. Illustration of coastal flood hazard zones prior to the 1988 PFD requirement. The VE and AE Zone limits were a function of the calculated wave height or wave runup above the 1-percent annual chance SWEL based on calculations or modeling results. Before the 1988 PFD requirement was adopted, the remainder of the dune ridge would typically be mapped as being outside the SFHA.

Erosion of the PFD is addressed in 44 CFR Section 65.11, "Evaluation of Sand Dunes in Mapping Coastal Hazard Areas." This section of CFR is based on a FEMA assessment of erosion procedures for coastal Flood Insurance Studies prior to NFIP regulations changes (FEMA 1988), and defines the average expected erosion from the 1-percent annual chance storm to be a cross-sectional area of 540 square feet measured along a transect perpendicular to the shore, above the SWEL and seaward of the dune crest. This regulation allows an exception to the 540-square-foot criteria based on historical documentation. While it is important to consider the 540-square-foot criteria in detailed coastal analyses, the erosion assessment does not capture the full potential of coastal flood, wave, and erosion risk along the open coastlines. The PFD criteria were partly conceived to help address erosion modeling deficiencies and underestimation of coastal risk. Figure 2-2 shows typical zone designations following the 1988 regulation changes.

While 44 CFR provides a definition of the PFD, identification in the field is not always easy, because dunes are often irregular features, and generally not homogeneous. The PFD feature varies in appearance from county to county and State to State. Figure 2-3 is an example of a typical PFD in Gulf County, Florida.




Figure 2-2. Illustration of coastal flood hazard zones after the 1988 PFD requirement was adopted. After establishing the PFD criteria in 1988, the mapped VE Zone could be extended inland based on definitions of the PFD and not on detailed wave calculations or modeling results. This change greatly increased the coastal SFHA.



Figure 2-3. This photograph shows a typical PFD feature along the Gulf of Mexico open coast in Gulf County, Florida. This dune serves as a protective feature to adjacent inland roads and residential areas. Although linear features, dunes vary in both in width and crest elevation along each reach and may change seasonally with weather patterns.

Subject to funding for detailed studies and restudies, the PFD criterion has been used to map VE Zones since it was established by the NFIP in 1988. Where implemented, these PFD VE Zones have reduced degradation of coastal dune areas. The natural protection of the PFD has been preserved as best as possible, and this in turn has undoubtedly resulted in less storm damage to the structures that are located landward of the PFD. The PFD VE Zone has also prevented damages to structures that may have been built on the dune at lesser building standards had the VE Zone protections of the PFD criteria not been in place. This report will look at areas where the original intent of the criterion can be strengthened. To do that requires examining what have been identified as issues or problems with the PFD criterion, and then looking at methods for improvement.

As noted in the Introduction, two Congressional inquires in 2006 questioned the application of the PFD criterion in specific locales. To better understand the impact of the PFD, FEMA contracted AECOM to conduct a demographics study of the coastal SFHA and PFD in conjunction with a larger nationwide coastal demographics study conducted in 2007 and 2008. The findings were published in a report titled *Coastal AE Zone and VE Zone Demographics Study and Primary Frontal Dune Study to Support the NFIP* (FEMA, 2008a), which is referenced as the *2008 Coastal Demographics Study*. Detailed results are included in Appendix C of this report. Key findings from that study include the following:

- There are an estimated 89 counties along the Gulf of Mexico and Atlantic Ocean shoreline where PFDs have been mapped or would, under the current guidelines, be mapped (in future flood study updates) as part of the CHHA. Notable exclusions (due to a lack of sand dunes) are along the majority of the coasts of Louisiana and Mississippi, and a portion of Florida's west coast.
- Analysis of U.S. Census data and population trends indicate that there may be a 55 percent increase in population – from 67,000 people in 2000 to 104,000 people in 2030 – within PFD VE Zone areas alone.
- There is adequate open space and vacant beachfront land (for infill development) such that the number of housing units in PFD areas may increase by 54 percent over a 30-year period – from 107,000 housing units in 2000 to 165,000 housing units in 2030.

### 2.1.1 The Primary Frontal Dune Study

The PFD Study builds upon the *2008 Coastal Demographics Study* by addressing the need to improve coastal floodplain mapping of VE Zones in the NFIP. The demographics study data and findings have been expanded upon (where applicable) to assess impacts of changes to PFD VE Zone mapping, and to examine the role of these definitions in identifying overall coastal hazards.

## 2.2 Coastal SFHAs and AE Zones

The inclusion of wave heights in the BFE has been a part of coastal SFHAs since the early 1980s. Areas subject to wave heights 3 feet or greater are designated VE Zones, while areas subject to coastal flooding and wave heights less than 3 feet are designated AE Zones. This coastal AE Zone designation is the same as for riverine areas (with no wave heights), and has the same building standards and insurance ratings. Since the adoption of those criteria, there has been an increased understanding of coastal risks, which developed largely as a result of post-disaster field assessments and studies that examined wave and erosion damage to buildings in coastal areas.

There is a growing recognition in the building science and engineering community that different design and construction standards are appropriate for buildings in AE Zones that are subject to coastal wave hazards versus those flood zones that are subject to little or no wave hazards[1] (zones either in riverine areas or in the MiWA area of the AE Zone). To date, however, neither NFIP building or floodplain management regulations, nor flood insurance premium rates, have been revised to distinguish between AE Zones with additional wave hazards and AE Zones without such hazards.

One term that has been proposed and is in use as a way to distinguish between coastal and non-coastal flood hazards is the "Coastal A Zone." The CAZ refers to the portion of the coastal AE Zone generally located between the VE Zone and the LiMWA, where the waves are between 1.5 and 3 feet in height. The CAZ is generally taken to be the same as the MoWA area. The term "Coastal A Zone" has been integrated into national building standards and codes, and into numerous FEMA building science guidance documents. The most current use and wide-scale FEMA introduction of the term came during the update and publication in June 2000 of the FEMA *Coastal Construction Manual: Principles and Practice of Planning, Siting, Designing, Constructing, and Maintaining Residential Buildings in Coastal Areas* (also known as the *Coastal Construction Manual,* or FEMA 55).

However, "Coastal A Zone" is similar to the term "coastal AE Zone," which refers to any SFHA determined by coastal analyses rather than riverine analyses. This

[1] See findings and recommendations related to the following events: Hugo (1989), Opal (1995), Fran (1996), Ivan (2004), Dennis (2005), Katrina (2005), and Ike (2008). These are summarized in Appendix E. Also, see the discussion of breakaway wall laboratory tests on page 10 of NFIP Technical Bulletin 9-08, *Design and Construction Guidance for Breakaway Walls Below Elevated Coastal Buildings* (http://www.fema.gov/library/viewRecord.do?id=1722).

similarity in terms can cause and has caused confusion in use (see Appendix E for a history of the use and significance of these terms). To avoid continued confusion, the term "Coastal A Zone" will be used in this report only when referring to reference documents that use it. The discussions and recommendations in this report will address the coastal AE Zones individually as either the MoWA or MiWA areas, or collectively combined with the VE Zone as the coastal SFHA[2].

While responding to coastal flooding disasters, FEMA MATs have found that many structures in coastal AE Zones experienced more damage than would typically be expected in AE Zones. Although these structures were subjected to waves less than 3 feet in height, they were damaged at levels consistent with damage that would be expected to buildings on shallow or solid wall foundations in VE Zones (where wave heights are equal to or greater than 3 feet). These conclusions are consistent with expected damages predicted by depth-damage curves for AE and VE Zones. These findings have been true in post-storm assessments spanning over a decade and covering a large geographic range.

Several groups, including the American Society of Civil Engineers (ASCE) Standard Committee for Flood Resistant Design and Construction (ASCE-24), have considered the best approaches to resist coastal wave damage. This standard requires elevating structures above the BFE on open foundations in Coastal A Zone areas. The International Building Code® (IBC®) requires compliance with ASCE-24, and the International Residential Code® (IRC®) allows use of ASCE 24 as an alternate design method.

FEMA has also recognized the need to change building standards in order to reduce flood losses from wave hazards. The June 2000 update of the *Coastal Construction Manual* supports the CAZ concept. This manual suggests establishing the new zone and using the VE Zone design and construction methods there. The *Coastal Construction Manual* also identifies the need to map a new CAZ on FIRMs.

The Community Rating System (CRS) also supports the adoption of higher regulatory standards in the CAZ. The CRS offers rating points for CAZ implementation, which can lead to additional community flood insurance premium rate reductions.

---

[2] Elimination of use of the term "Coastal A Zone" from building codes and standards (and numerous other documents) and replacement with the term "Moderate Wave Action" (MoWA), will take years to accomplish if it is later determined that such action is appropriate. Revision cycles for codes and standards typically take 3 to 5 years or more.

### 2.2.1 The Coastal SFHA Study

As noted previously, the main impetus for the study of the coastal SFHA and CAZ was the 2006 AIR report, *Evaluation of the National Flood Insurance Program's Building Standards*. The AIR report recommended that FEMA move forward with mapping coastal AE Zones separately from riverine AE Zones. In addition, the authors recommended applying different floodplain management criteria and construction standards to buildings located in the CAZ. Specific recommendations included:

- The NFIP flood hazard mapping criteria should be revised so that a new designation – CAZ – is delineated on all new FIRMs. The CAZ would account for the higher risks in those areas.
- The NFIP criteria for local floodplain management programs should be revised. Communities should be required to adopt and enforce foundation standards in CAZs that are equivalent to those in VE Zones.
- The NFIP should mandate that VE Zone design and construction practices also apply in CAZs. Buildings should be designed for the simultaneous forces of flood and wind. For example, it should be required that buildings be constructed on open foundations and the area below the BFE of an elevated building be free of obstructions. The point of reference for the lowest floor elevation should be the bottom of the lowest horizontal structural member supporting the lowest floor.
- NFIP requirements for buildings with non-supporting breakaway walls should be revised. The requirements for the openings for these buildings, specified in 44 CFR 60.3 (c)(5), should be altered in coastal AE Zones.

The present study of the coastal SFHA has looked at the AIR recommendations, MAT reports, insurance claims data, and other information to develop recommendations that will modify design and construction requirements for certain buildings – to reduce flood losses, protect lives, reduce taxpayer funded assistance, and minimize Federal flood insurance claims – thereby contributing to the economic soundness of the NFIP.

# 3.0
## PFD Implementation Issues

# 3.0 PFD Implementation Issues

This section describes the technical and policy issues concerning the definition, identification, and mapping of the PFD; it covers:

- overview of PFD definitions,
- application of PFD and CHHA mapping criteria,
- challenges with the PFD, and
- summary of strengths and weaknesses of PFD criteria.

## 3.1 Overview of PFD Definitions

In 1988, FEMA revised its regulations so that specific dune erosion assessments would become part of coastal FISs. A new section, 44 CFR 65.11, was added to the NFIP regulations, and new definitions were added to 44 CFR 59.1. The revisions were needed to implement the new erosion assessment criteria and the inclusion of the PFD term in the CHHA references. The 1988 revisions to 44 CFR 59.1 for the first time defined the PFD, as per NFIP regulations, as:

> *"Primary frontal dune means a continuous or nearly continuous mound or ridge of sand with relatively steep seaward and landward slopes immediately landward and adjacent to the beach and subject to erosion and overtopping from high tides and waves during major coastal storms. The inland limit of the primary frontal dune occurs at the point where there is a distinct change from a relatively steep slope to a relatively mild slope."* Refer to Figure 3-1.

The CHHA was defined in the 1976 version of 44 CFR 59.1 as:

> *"Coastal high hazard area means the area subject to high velocity waters, including but not limited to hurricane wave wash and tsunamis. The area is designated on a FIRM as Zone V1-30, VE, or V."*

The 1988 revisions to 44 CFR 59.1 included the PFD in the CHHA definition:

> *"Coastal high hazard area means an area of special flood hazard extending from offshore to the inland limit of a primary frontal dune along an open coast and any other area subject to high velocity wave action from storms or seismic sources."* Refer to Figure 3-2 for an illustration.




Figure 3-1. Illustration of the 1988 PFD inland limit definition in NFIP regulations. The inland limit is the landward heel of the dune and in many situations includes areas above the base flood.




Figure 3-2. Illustration of the 1988 "Coastal High Hazard Area" definition. It should be noted that the high velocity wave action above the 100-year SWEL is computed from and based on a quantitative assessment of wave effects. The VE Zone definition by way of the 1988 regulations is based on physical qualities and usually does not include any calculations or computations to determine its landward limit.

In addition to those changes in Section 59.1, the revisions in 1988 also introduced the connection between the PFD and CHHA in the new Section 44 CFR 65.11, *Evaluation of sand dunes in mapping coastal flood hazard areas*:

> *"(a) General conditions. For purposes of the NFIP, FEMA will consider storm-induced dune erosion potential in its determination of coastal flood hazards and risk mapping efforts. The criterion to be used in the evaluation of dune erosion will apply to primary frontal dunes as defined in § 59.1, but does not apply to artificially designed and constructed dunes that are not well-established with long-standing vegetative cover, such as the placement of sand materials in a dune-like formation."*
>
> *"(b) Evaluation criterion. Primary frontal dunes will not be considered as effective barriers to base flood storm surges and associated wave action where the cross-sectional area of the primary frontal dune, as measured perpendicular to the shoreline and above the 100-year stillwater flood elevation and seaward of the dune crest, is equal to, or less than, 540 square feet."*
>
> *"(c) Exceptions. Exceptions to the evaluation criterion may be granted where it can be demonstrated through authoritative historical documentation that the primary frontal dunes at a specific site withstood previous base flood storm surges and associated wave action."*

Figure 3-3 illustrates the PFD erosion evaluation criteria based on a 540-square-foot eroded area. This example does not illustrate the mapping criteria associated with the PFD VE Zones, but does show that erosion assessment of PFDs was inclusive of only the fore dune area and not the heel. This simplified approach to erosion assessment also uses the median dune erosion value[3] of 540 square feet per linear foot of dune in the regulations. While this approach seemingly accounts for the erosion hazard on the seaward side of the dune, there have been many post-storm accounts of underprediction of erosion. Another aspect of underprediction is that the approach leaves much of the landward side of the dune outside of the coastal SFHA and/or the CHHA after analyses are completed for wave effects (inclusive of erosion assessment).

[3] Half of the erosion values analyzed were above this value and half were below.




Figure 3-3. Illustration of the 1988 PFD erosion criteria using the 540-square-foot methodology.

The 540-square-foot dune reservoir criterion was established in studies that examined pre- and post-storm profiles for storms that affected Dutch and U.S. coasts (FEMA, 1986, 1989). In those studies, the median erosion volume above the SWEL was plotted against the recurrence interval for each event, and a best-fit line was drawn through the data points (see Figure 3-5). Hallermeier and Rhodes (1988) determined that the equation of the best-fit line is:

**Median erosion (ft3/ft) = 85.6 * (recurrence interval in years) 0.4**

Thus, for a base flood (1-percent annual chance) event, the median erosion volume predicted – and the minimum dune reservoir size required to prevent dune removal – is 540 square feet, as measured along a perpendicular profile or transect.[4] A dune reservoir area greater than 540 square feet is required to perform dune retreat erosion procedures, and dune reservoirs with areas less than 540 square feet will trigger the dune removal erosion assessment procedures. As noted in the equation, the volume is actually measured as cubic feet per linear foot of beach, which is reduced to square feet. FEMA has developed and recommended similar dune erosion procedures for application in the Great Lakes (FEMA, 2003a), with median erosion volumes of 270 square feet on Lakes Erie, Huron, Michigan, and Superior; and 190 square feet on Lake Ontario.

[4] FEMA (2007b) PM 47 used the same relationship to determine the median erosion volume for the 0.2-percent annual chance event – 1,030 square feet.

Similar to Figure 3-3, Figure 3-4 illustrates how the 540-square-foot cross-section criterion stated in 44 CFR 65.11(b) was presented in the 1988 Federal Register and currently appears in FEMA coastal guidance documents.




Figure 3-4. Primary frontal dune reservoir sketch. The "heel" represents the PFD inland limit of VE Zone mapping. The illustration attempts to show two examples of PFD application on varying dune types (ridge and mound). (Figure D.2.9-5 from FEMA, 2007a).

## 3.2 Application of PFD Mapping Criteria

The application of the PFD criteria is presented in:

- *Atlantic Ocean and Gulf of Mexico Coastal Guidelines Update* (FEMA, Final Draft 2007a),
- Great Lakes guidance in Appendix D (FEMA, 2003a), and
- *Pacific coastal guidance in Final Draft Guidelines for Coastal Flood Hazard Analysis and Mapping for the Pacific Coast of the United States* (FEMA, Final Draft 2005a).




Figure 3-5. Median erosion volume above stillwater flood level versus storm recurrence interval (Hallermeier and Rhodes, 1988). This graph was included in the Federal Register publication regarding changes to the NFIP regulations for new erosion assessment criteria.

These guidelines promote general consistency in PFD delineation. The guidance documents for the Atlantic and Gulf areas, as well as those for the Pacific areas, include PFD mapping requirements consistent with each other and with the NFIP regulations. FEMA and the U.S. Army Corps of Engineers (USACE), Detroit District, are working to update Appendix D, so further revisions are expected on the Great Lakes guidance. However, the wide variety in dune conditions and morphology along the nation's coasts – not to mention the significant effort and resources required to complete a detailed PFD delineation – has led to widely variable PFD implementation.

With the addition of the PFD criterion for establishing the CHHA (VE Zone), FEMA's current mapping guidance contains several criteria by which the inland limit of the VE Zone can be determined, with the most landward VE Zone mapped:

- wave height criterion,
- wave runup depth criterion,
- wave overtopping splash zone criterion,
- high velocity flow zone criterion (Pacific coast only), and
- PFD criteria.

Note that in every case, the VE Zone is based on a discrete physical process occurring during the base flood, captured either through analytical and numerical models (wave height, wave runup, wave overtopping, and high velocity criteria), or through morphological recognition of areas vulnerable to erosion (PFD criterion). The current delineation of the PFD VE Zone is based on dune configuration and location, in recognition of the previously mentioned underestimation of erosion and flood hazards at the time the PFD regulation was instituted. Although the PFD criterion is not based on numerical analyses *per se*, it can be considered a proxy for those analyses in many cases.

Figure 3-6, taken from the *Atlantic Ocean and Gulf of Mexico Coastal Guidelines Update* (FEMA, 2007a) illustrates a case where the PFD limit is farther inland than wave effects occur on the eroded profile, and thus governs the inland limit of the VE Zone[5]. In this mapping example, the eroded dune profile (dune retreat) and wave runup analysis are considered with results showing the risk-based assessment and mapping of VE and AE Zone hazard areas and BFEs would end at the seaward side of the dune face. However, the application PFD VE Zone mapping criteria exceeds the detailed analysis in extending the VE Zone and BFE to the PFD landward limit (dune heel). Although not shown as a coastal mapping example, if the dune erosion assessment resulted in a dune removal, then the VE Zone limits due to wave runup and overtopping might extend further landward of the PFD landward limit and then it would override the PFD VE Zone mapping criteria. More coastal mapping examples are included in *Atlantic Ocean and Gulf of Mexico Coastal Guidelines Update* (FEMA, 2007a).

[5] Note that the eroded profile is predicted on a single erosion event, and the erosion procedure does not account for multiple events, long-term erosion, and sea level rise.




Figure 3-6. Coastal mapping example: Sandy beach backed by high dune, where PFD controls VE Zone limits. This illustrates how calculations and modeling results from FIS coastal analyses are superseded by the PFD analysis. (Figure D.2.11-5a from FEMA, 2007a).

## 3.3 Challenges with the PFD

The greatest challenge regarding the PFD criteria for VE Zone mapping is that it is established by a physical feature that is often difficult to identify based on the current PFD definition and available mapping guidance. This is in contrast to the other more defined erosion and wave effects procedures typically applied in coastal studies to determine VE Zone areas and BFEs.

There are four primary issues associated with the PFD:

1. median erosion value,
2. identification of the PFD (landward limit),
3. application of the CHHA (VE Zone) criteria, and
4. mapping and floodplain management.

### 3.3.1 Median Erosion Value

The PFD definition and inclusion in the CHHA was adopted by FEMA at the same time as the erosion criteria for dunes because the justifications for both are tied

together. FEMA made the decision to adopt the median erosion value rather than a higher value for consistency with other program directives. Two responses from 1987 on the proposed rule[6] recommended using the 90- to 95-percentile erosion volume (which would be approximately 1,000 square feet) rather than the 50-percentile (median) value. FEMA's 1988 response[7] to the comments stated:

> *"The risk analysis methodology decisions incorporated in the NFIP have traditionally been based on selection of a median value, i.e., an estimate that has an equal chance of being too high or too low. . . . It would be inconsistent to select a criterion for evaluating dune integrity which would overestimate dune erosion more than 50% of the time."*

The use of the median value would result in potential erosion exceeding that value approximately 50 percent of the time and in some cases by a significant amount. The PFD definition was developed, in part, to "protect" the dune in those cases where the erosion exceeded the median value. This is also noted in the responses to the proposed rule, where FEMA justified the PFD with:

> *"There are many areas where dune erosion has not been considered **or has been clearly underestimated.** In these instances, the inappropriate crediting of sand dunes has resulted in the unrealistic delineation of coastal hazard zones that terminate at the seaward face of the dune for many barrier islands and other open coastal areas."* (Emphasis added.)

However, since 1988, FEMA has deviated from its exclusive use of the median value for certain calculations:

- The FEMA (2005a) *Pacific Coast Guidelines and Specifications* and the FEMA (2007a) *Atlantic Ocean and Gulf of Mexico Guidelines Update* call for calculating the $R_{2\%}$ (98 percentile) wave runup value rather than the $R_{50\%}$ (median) value used in previous guidelines.
- Since 2000, FEMA's guidance for coastal building design recommends estimating base flood dune erosion potential by using a larger dune reservoir: 1,100 square feet instead of 540 square feet[8]. This recommendation from the *Coastal Construction Manual* was based on several studies that found a high degree of variability in maximum-to-median erosion volumes above the SWEL (maximum erosion 1.5 to 6.6 times greater than median erosion). It was also based upon the severe consequences to coastal buildings when erosion exceeds the median value.

---

[6] Federal Register, Vol. 52, No. 212, November 3, 1987, p. 42117.
[7] Federal Register, Vol. 53, No. 88, May 6, 1988, p. 16272, item 1.
[8] Section 7.8.1.4 of FEMA's *Coastal Construction Manual* (2000).

This review of the PFD and erosion criteria leads to a preliminary conclusion that if the erosion criteria were increased to reflect a higher value of expected dune erosion, then the PFD criteria may no longer be necessary to compensate for the underestimation of dune erosion. This preliminary conclusion should be tested using field data before the PFD VE Zone mapping criteria can be safely eliminated.

### 3.3.2 Identification of the PFD (Landward Limit)

There are some issues with the definition of the PFD and the CHHA that raise questions as to how the PFD is identified. The PFD is described as a "nearly continuous mound or ridge," but this classic, single-peak, continuous sand dune does not exist in many locations. Some areas have multiple dune ridges of varying heights, widths, and lengths; some have aggregations of sand mounds of varying heights and extents; and some have dune remnants and intervening gaps resulting from erosion, pedestrian/vehicle access, or development activities. An interpretation of the "near continuous mound or ridge of sand" is necessary for PFD identification, but is often difficult to apply.

Another problem with the definition is that identifying the location on the back side of a dune where the slope changes from "relatively steep" to "relatively mild" is difficult. On a drawing of a typical dune, this is easy to identify; in the field it can vary from lot to lot. Furthermore, many dunes do not have a clean break on the leeward side, as aerial deposits often make the slope vary gradually from dune peak to the "heel' of the dune. The Massachusetts Office of Coastal Zone Management (Massachusetts CZM) has completed studies to standardize the calculation of the inland extent of the PFD, which led to FEMA Region I approval and recommended use of the method. Application of the FEMA-approved method developed by the Massachusetts CZM office in other areas may yield reproducible results where dune ridges are relatively continuous, but the methodology has not yet been tested sufficiently enough to determine its applicability elsewhere.

Given the wide variability and migrating nature of natural sand dunes, the current definitions are not sufficient for clearly identifying PFDs in the field on a nationwide basis.

### 3.3.3 Application of the CHHA (VE Zone) Criteria

As previously noted, 44 CFR 59.1 defines the CHHA as *"an area of special flood hazard extending from offshore to the inland limit of* ***a primary frontal dune along an open coast and any other area subject to high velocity wave action*** *from storms or seismic sources"* (Emphasis added). The 2006 Delaware letter questioned

whether there should be a comma between *"open coast"* and *"and any other area."* This change would revise the application of the CHHA to only open coast PFDs and not those on more sheltered coasts, such as bays and inlets.

Problems in application can also occur when dunes are not present, or when there are large gaps or cuts through a dune. This problem is more of a "fairness" or equity issue in that it is possible for areas having significant natural protection in the form of large sand dunes to have higher insurance premiums and more restrictive and costly building standards than low areas with no dunes.

Consider a case where a continuous, natural dune ridge is adjacent to an area where a dune never existed or the dune has been eroded or destroyed (as a result of coastal storm erosion and wave forces, development, and/or installation of protective measures [e.g., seawall]). This situation results in the natural dune area being identified as a PFD VE Zone, and the flood zone on the adjacent area (with no dune) being identified based strictly on wave heights[9]. See Figure 3-7 for a detailed illustration. If the base flood wave heights on the adjacent land (with no dune) are low, then the coastal area will be mapped as an AE Zone. The VE Zone boundary will extend farther inland where the natural dune ridge exists than it will on the adjacent property. This situation exists as a case example in Lewes, Delaware, and represents an area of Congressional concern regarding PFD VE Zone mapping that helped initiate this study.

A similar concern with the application of the PFD criteria is that it gives no consideration to dunes that are of sufficient height and width to survive erosion and overtopping during the base flood event. As a result of the PFD criteria, the dunes providing the most natural storm protection end up being mapped as the largest VE Zones. The widest dunes result in the widest PFD VE Zones, while the areas with the least amount of natural protection have significantly smaller PFD VE Zones.

For example, the PFD VE Zone mapping criteria and NFIP regulations regarding what constitutes the primary frontal dune have no dimensional criteria (size limitation). The guidance only addresses mapping criteria based on dune definition and the heel location of dune (at a point where there is a distinct change from a relatively steep slope to relatively mild slope). This would mean that any large dunes – of any dimension that meet the PFD VE Zone mapping criteria as a continuous or nearly continuous mound or ridge of sand along an open coast adjacent to a beach – will have to be mapped as a PFD VE Zone. Areas with extremely large dunes, such

[9] This scenario is similar to the Lewes, Delaware, case.

as those found in Monterey County, California, (near Marina and Seaside) and Sleeping Bear Dunes on Lake Michigan, might meet the dune definition and are subject to some erosion, but would never be subject to overtopping or failure (removal) due to erosion. It may not be appropriate to map such areas as PFD VE Zones in their entirety. Yet, the PFD VE Zone mapping criteria would have to be applied because it is stipulated in the NFIP regulations, and those requirements cannot be waived. This is one of the problems facing mapping contractors that are trying implement the PFD VE Zone mapping criteria. Intuitively, it may not be appropriate in some cases, but the NFIP regulations allow no such discretion..




Figure 3-7. Example of a situation where a previously existing dune was removed prior to FEMA updating the flood mapping (pre-FIRM). As indicated, a higher mapping standard applies in the area at left with protective dune features than in the area at right where the dune was removed (by development, natural processes, or storm impacts). .

### 3.3.4 Mapping and Floodplain Management

There are two principal issues regarding PFD mapping addressed in this report. The first concerns the BFE designated for a PFD area, while the second concerns the uncertainty in determining whether a PFD was the factor that determined the inland limit of the VE Zone.

- **BFEs:** FEMA's mapping guidance calls for extending the BFE on the seaward dune face through the dune to the landward limit of the PFD. This can cause

confusion in permitting when the building grade (top of dune) is greater than the BFE but the area is still designated as an SFHA. Another concern deals with the area located beyond the landward limit of the PFD where the BFE is determined by dune overtopping and sheet flow, or by flooding from the back side of the dune. In the latter case, the vertical difference between the BFE in the PFD VE Zone and the BFE landward of the PFD limit can be several feet. This "waterfall" effect can also cause permitting confusion in identification of the proper BFE, and has resulted in some "split-elevation" structures.

- **Controlling VE Zone Criteria:** In many cases, it is difficult, if not impossible, to determine whether the PFD was the factor that determined the landward limit of the VE Zone. That information is not shown on FIRMs or DFIRMs. This lack of information complicates FIS updates and FIRM revisions. It also adds a complication to processing requests for Letters of Map Amendment (LOMAs) in VE Zones.

## 3.4 Summary: Strengths and Weaknesses of the PFD Criteria

This section has examined some issues with the current PFD criteria that could be considered weaknesses. This is not to imply that the regulations that have been in place since 1988 have not produced the intended results. Dunes are the best natural protection against the effects from storms and flooding, and the PFD criteria through the NFIP has been a major factor in the preservation of the dunes. Development on and near dunes has been regulated to minimize any negative impacts to the dunes and to preserve their natural protection. The issues discussed in this section are meant to identify the potential areas within the regulations and guidance where improvements can be proposed and the intent of the original designation strengthened.

To that end, Table 3-1 summarizes the definitions that include the PFD, and includes a brief description of the "strengths" and "weaknesses" of each definition as it relates to the PFD.

Table 3-1. Strengths and weaknesses of current PFD-related definitions and terminology. This table provides some context around the current regulations for PFD and CHHA that could benefit from revisions.

| Term | Source | Strength | Weakness |
|---|---|---|---|
| **Primary Frontal Dune** | 44 CFR Sec. 59.1 | Provides maximum protection for the PFD. | Use of the inland limit of the PFD for the VE Zone boundary is a proxy for physical flood processes, but may overstate the actual inland extent of those processes when dunes or dune fields are very high and/or wide. |
| **Coastal High Hazard Area** | 44 CFR Sec. 59.1 | Includes PFD and "any other area subject to high velocity wave action," allowing for technical judgment in defining VE Zones. | Has no reference to a wave condition as a basis for the VE Zone criteria, and does not equate PFD criteria with high velocity wave action. |
| **High velocity wave action** | 44 CFR Sec. 59.1 | Defines the high velocity wave without wave height criteria, which allows for future interpretation of a lower wave condition for threshold of VE Zone criteria (such as 1.5-foot wave height). | Does not clearly reference the PFD criteria as a function of high velocity wave action, and does not reference wave condition as a basis of VE Zone criteria. |
| **540-square-foot dune reservoir criterion** | 44 CFR Sec. 65.11(b) | Criterion is relatively easy to measure and define during flood insurance studies. | Criterion is based on the *median* erosion volume, which has a 50% probability of being exceeded in every event. |
| **Exceptions** | 44 CFR Sec. 65.11(c) | Provides for exceptions to using the 540-square-foot criterion in the regulations. | Relies on "authoritative historical documentation," which is not clearly defined. |

# 4.0

## Primary Frontal Dune Alternatives

FEMA-Supplement-002060

# 4.0 Primary Frontal Dune Alternatives

A number of alternatives were considered in order to resolve the issues identified in Section 3.0. These alternatives can be grouped as follows:

- No change – maintain current PFD VE Zone mapping and implementation; Alternative 1.
- Modify the current dune erosion methodology, which can be implemented whether the PFD VE Zone is retained, modified, or eliminated; Alternatives 2 and 3.
- Retain, but modify, the PFD VE Zone and its implementation; Alternatives 4 through 7.
- Eliminate the PFD VE Zone; Alternatives 8 through 14.

## 4.1 PFD Alternatives Considered

A total of 14 individual alternatives were proposed and considered by the Project Team and Project Review Panel. They are separated into groups and described below. Combinations of the individual alternatives may be appropriate and are considered in this study.

***No Change to Present PFD Mapping:***

1. **Status Quo.** There would be no change to current PFD mapping or to associated floodplain management/building standards and flood insurance programs.

***Modify Dune Erosion Methodology:***

2. **Increase the dune reservoir (required to prevent dune removal) to a value greater than the 540-square-foot median value specified in 44 CFR § 65.11.** This alternative would be consistent with other FEMA guidance to use a value other than the median value. FEMA coastal FIS guidelines (FEMA, 2005a) call for mapping the 2 percent wave runup elevation, and FEMA Coastal Construction Manual (FEMA, 2000) recommends using a higher-than-median dune erosion value for building design purposes. Even though a value of 1,100 square feet is recommended by FEMA in the Coastal Construction Manual, a procedure memorandum would be needed for study contractors and mapping partners before it could implemented for application in coastal FISs. In that capacity, the 1,100 square feet criterion could be used as an interim value (over the 540-square-foot criterion) in coastal FIS erosion assessments until such time as new erosion methodology options for coastal studies are completed. Note that this alternative is consistent with current FEMA mapping methodologies in that it is based on conditions at the time of mapping studies. It would not account for

future conditions. This alternative could be implemented if PFD mapping is retained, modified, or eliminated.

3. **Incorporate future conditions when determining the dune reservoir necessary to prevent dune removal.** Current flood hazard mapping procedures do not consider the effects of multiple storm events, future long-term erosion, sea-level rise, or other future conditions on dune erosion. This alternative could be implemented using the median erosion volume (540 square feet) or could be implemented using a higher-than-median value (Alternative 2). This alternative could be implemented if PFD mapping is retained, modified, or eliminated.

### *Retain/Modify the PFD:*

4. **Define the alongshore limits of PFD areas.** Guidance is needed to define the alongshore limits of areas where a PFD could be mapped, based on wave exposure during the base flood and based on dune configuration. A Procedure Memorandum or other guidance should define terms presently used – but not defined – in 44 CFR 59.1 (*Coastal High Hazard Area* and *Primary Frontal Dune*), specifically, *"open coast"* [10] and *"continuous or nearly continuous mound or ridge of sand."* Gaps and interruptions in dunes should be considered in this analysis. The FEMA-approved method for delineating alongshore limits of the PFD, developed by Massachusetts CZM, should be reviewed, and testing of the method elsewhere should be considered. This alternative could be combined with Alternatives 5 and 6.

5. **Define the inland limit of PFD areas.** Guidance is needed to define the inland limit of the PFD. A Procedure Memorandum or other guidance should specify how to determine the inland limit described in 44 CFR 59.1 (*Primary Frontal Dune*), specifically, *"… the point where there is a distinct change from a relatively steep slope to a relatively mild slope."* The FEMA-approved method for delineating the inland limit of the PFD, developed by Massachusetts CZM, should be reviewed, and testing of the method elsewhere should be considered. This alternative could be combined with Alternatives 4 and 6.

6. **Develop additional indicators of PFD inland limits.** In some instances, strictly applying the "relatively steep to relatively mild" test may result in delineation of the PFD inland limit hundreds of feet from the beach. This can include entire dune fields in the PFD, with the landward-most dunes not commonly considered part of the active beach-dune system. Thus, some applications of the "relatively steep to relatively mild" criterion can result in PFD delineations apparently at odds with other language contained in the 44 CFR 59.1 definition of the primary frontal dune, i.e., *"immediately landward and adjacent to the beach"* and *"subject to erosion and overtopping from high tides and waves during major coastal storms."* Guidance is needed to define reasonable alternate PFD inland limits, possibly overriding the "relatively steep to relatively mild" limit in some cases. These alternate limits might be based on physical or biological indicators,

---

[10] See Appendix G for the results of a preliminary literature review of definitions for "open coast," "sheltered waters," etc.

distance from the beach, ground elevation, or dune cross-sectional area, etc., but should be fundamentally tied to potential erosion and wave hazards. This alternative could be combined with Alternatives 4 and 5.

7. **Divide the PFD VE Zone (in the DFIRM database) into a (seaward) hazard-based VE section and a geomorphic-based (landward "footprint") section.** The application of the PFD criteria frequently results in VE Zones that extend landward of modeled flood, wave, and erosion hazards. This alternative would split the PFD VE Zone into two areas: a seaward VE area established based on modeled hazards (risk), and a landward VE area designated as a geomorphic VE Zone (V-PFD or PFD footprint[11]. Alternative 7 would not affect determination of inland PFD limits, which would be delineated using current or modified methods (e.g., Alternatives 1, 5, and 6).

### *Eliminate the PFD:*

8. **Eliminate the PFD VE Zone.** This alternative would eliminate any reference to and mapping of the PFD VE Zone, and would not substitute anything in its place. It would require modifying the definition in 44 CFR 59.11 and erosion assessment guidance in 44 CFR 65.11. If this alternative is implemented, VE Zones in new studies and restudies would be mapped based solely on flood, wave and erosion hazards. PFD footprint areas would lose NFIP dune protection, VE Zone design and construction requirements, and VE Zone flood insurance premium rates.

9. **Eliminate the PFD VE Zone, maintain 44 CFR 60.3(e)(7) dune protection in former PFD footprint.** VE Zone regulations "prohibit man-made alteration of sand dunes and mangrove stands within Zones V1–30, VE, and V on the community's FIRM which would increase potential flood damage.[12]" Thus, areas mapped as VE based on the PFD rather than on flood and erosion hazards would lose this dune protection if the PFD is eliminated. This alternative would seek ways to restore dune protection to PFD footprint areas by moving the 44 CFR 60.3(e)(7) dune provision to another section of 44 CFR 60.3. Building standards and flood insurance premium rates would be based on modeled flood hazard zones (VE, AE, AO, X). Implementation of this alternative would still require the PFD limits to be determined or approximated for enforcing the floodplain management criteria in a defined area.

10. **Eliminate the PFD VE Zone, institute a "Dune-way."** This alternative would create a layer or overlay on the FIRM as a way to maintain dune protection and/or VE Zone building standards and/or VE Zone flood insurance premium rates in PFD footprint areas. It is similar to the concept of "dune districts" previously discussed by FEMA and NOAA (1983). Careful development of this

---

[11] PFD footprint: An area that was formerly mapped or would have been mapped as a PFD VE Zone, landward of modeled flood and erosion hazards.

[12] Unfortunately, this requirement is vague and its actual utility is in question as a result. Nevertheless, elimination of the PFD VE Zone could result in some loss of protection to these areas.

alternative would be required to avoid some of the problems and concerns currently raised regarding PFD delineation.

11. **Eliminate the PFD VE Zone, make use of Zone E.** NFIP regulations define the Area of Special Flood Related Erosion Hazard (Zone E) as *"the land within a community which is most likely to be subject to severe flood-related erosion losses."* Zone E has not been mapped and no building standards or flood insurance premium rates have been developed for this zone. However, this alternative would make use of Zone E authority to identify dune areas that would be subject to future flood-related erosion and could reasonably be mapped as VE. In effect, this alternative would shift the inland limit of the VE Zone farther landward in some cases. This alternative would be consistent with a recommendation of the National Research Council (2009, pp. 90, 91). Careful development of this alternative would be required to avoid some of the problems and concerns currently raised regarding PFD delineation.

12. **Eliminate the PFD VE Zone but devise a way to retain VE building standards in former PFD footprint.** This alternative would require VE Zone building standards to be applied in the former PFD footprint (provided the dune has not been destroyed by coastal storm impacts), but would not affect base flood insurance premium rates on the modeled flood hazard zones. Implementation of this alternative would still require the (now eliminated) PFD limits to be determined or approximated.

13. **Eliminate the PFD VE Zone and map the former PFD footprint as CAZ.** This alternative would replace the PFD footprint with a CAZ[13] designation, thereby reducing flood insurance premium rates from VE rates to AE rates[14], while eliminating VE building standards for most single-family and small multi-family residential buildings[15]. The NFIP criteria for floodplain management would be revised to require building standards equivalent to those in VE Zones – if not revised, building standards for large buildings (governed by the IBC®) would include CAZ requirements, but building standards for smaller residential buildings (governed by the IRC®) would not. Implementation of this alternative would still require the (now eliminated) PFD limits to be determined or approximated. This alternative would complicate terminology and the currently challenging implementation and integration of CAZ requirements through building codes and standards.

14. **Eliminate the PFD VE Zone, map the former PFD footprint as Coastal X Zone.** This alternative would replace the PFD footprint with a new Coastal X Zone designation, unless another hazard zone designation governed (e.g., AE

---

[13] Terminology may change, depending on outcome of another portion of the study titled "The Impact of Climate Change on the National Flood Insurance Program."

[14] CAZ premium rates to be determined by NFIP following completion of another part of the climate change study.

[15] VE Zone building standards would be maintained for large buildings, since those buildings are governed by the International Building Code®, which requires application of VE building standards in the CAZ.

for low-lying area near the landward heel of a PFD). Coastal X would be a new zone intended to differentiate X Zones in coastal areas from X Zones in inland areas. Building standards, flood insurance premiums, and floodplain management requirements would need to be developed for the Coastal X Zone. Implementation of this alternative could still require the (now eliminated) PFD limits to be determined or approximated. Changes to the NFIP regulations would be needed to allow extending NFIP regulations into the Coastal X Zone. Since many communities, designers, owners, and other stakeholders mistakenly believe that X Zone is “safe” and do not understand the actual risks in X Zone, effective outreach efforts must be included with this alternative.

# 5.0
# Assessment of PFD Alternatives

# 5.0 Assessment of PFD Alternatives

This section describes the technical and policy assessments conducted in order to develop recommendations related to current PFD practices.

## 5.1 Discussion of Alternatives to Eliminating the PFD

Maintaining floodplain management benefits associated with the PFD is important whether or not the PFD VE designation is removed from the NFIP regulations. Various alternatives and aspects of this concern are discussed below.

- **Building Standards:** Current NFIP regulations and building codes require that buildings in VE Zones be supported on pile or column foundations embedded sufficiently to prevent building collapse. This is required even in areas where ground elevations lie above the BFE. In areas where the PFD VE designation is removed, the SFHA designation would be reduced to AE Zone or an X Zone , and foundation standards could be inadequate or largely non-existent in some locations. Many coastal states and communities have adopted coastal construction standards that exceed the minimum required by the NFIP; however, few have adopted regulations for building foundations in dune areas that exceed the minimum requirements of the NFIP, and adequate foundation requirements could be lost if the PFD VE designation is removed.

  If the PFD VE Zone is removed, the provisions of the NFIP regulations in 60.3(e)(7) would need to be changed and made general provisions in 60.3(c) in order to capture dune protection within the AE Zone[16].

- **Dune Protection:** Many states have dune protection programs, although some coastal states and probably most communities rely on the minimum FEMA dune protection criteria, or on FEMA maps to implement more restrictive dune protection standards. Changes to FEMA maps could affect some of these State and local programs.

- **Zone E Mapping:** This SFHA is defined in the NFIP regulations as “flood related erosion” and could be a mechanism to map PFDs in place of PFD mapping criteria. More research on standards and criteria for Zone E would be needed before it could be considered and implemented. Use of this SFHA to replace PFD mapping would likely need further definition if the NFIP regulations are revised.

- **“Dune-way” Concept:** This concept would be similar to Zone E as a supplemental mapping method for areas removed from PFD mapping criteria. The areas would be mapped based on technical analyses, with a “Dune-way” overlay applied that is based on criteria similar to, but more robust and accurate than, the PFD mapping criteria. This would still allow for VE Zone building standards and dune protection criteria to be enforced. Revisions to the NFIP regulations would be needed for this approach.

[16] These dune protection requirements within the AE Zone must be better defined.

## 5.2 Detailed Assessment of Alternatives and Impacts

Four basic options were developed and then expanded to create a set of 14 PFD alternatives. Each of the four options offers separate broad-based considerations:

1. The first is to maintain the status quo of all existing PFD VE Zone mapping criteria addressed in 44 CFR regulations and mapping guidance.
2. The second option involves a modification of the current dune erosion methodology, which can be implemented whether PFD VE Zone is retained, modified, or eliminated.
3. The third option involves retaining the PFD concept but modifying certain aspects of the PFD requirements with several variations on that alternative – all of which would require a FEMA Procedural Memorandum to explain changes to the existing PFD approach.
4. The fourth focuses on the elimination of the PFD requirement in all future flood map updates, with a number of variations based on that alternative.

The 14 specific alternatives related to these four basic options were each evaluated with respect to their advantages and disadvantages, and in light of their impacts on flood hazard mapping, flood insurance, and floodplain management. The impacts of the 14 PFD alternatives are summarized in Table 5-1. PFD Findings and Recommendations (Section 6.0) combine and revise some of the alternatives in a way that improves their formulation and coherence.

Table 5-1. Summary of impacts of PFD alternatives.

| ALTERNATIVE | IMPACTS ON: Flood Mapping | Flood Insurance | Floodplain Management |
|---|---|---|---|
| **1** Status Quo | • No change.<br>• Lack of detailed guidance for determination of areas subject to PFD mapping, and for location of PFD inland limit where PFD is mapped. | • No change.<br>• There may be a pricing mismatch between actual flood premiums and the rates that a risk-based analysis would indicate. | • No change.<br>• New construction and substantial improvements must comply with Zone VE building standards; dune alteration prohibition remains in place. |
| | • Anticipate continued policyholder and community/State inquiries and complaints regarding perceived mapping, flood insurance, and building standard inequities.<br>• LOMA requests (based on PFD ground elevations above BFE) will continue. | | |
| | • Provides better match to observed dune erosion during severe coastal flood events. Increases the incidence of dune removal during flood mapping.<br>• May shift calculated VE Zone and AE Zone limits landward, and shrink X Zone extents in some cases.<br>• Little or no impact on flood maps in cases where very large dunes exist. | • Increases the area where the flood hazard zone and BFE are established quantitatively.<br>• Because flood premiums are modeled using zone and BFE distinctions, the premiums would be more likely to reflect the actual risks to structures. | • No change to floodplain management requirements or implementation.<br>• Areas subject to specific regulations will change as flood hazard zone boundaries shift. |
| | • This alternative can be implemented whether FEMA decides to retain/modify PFD or eliminate PFD.<br>• Use of the median dune reservoir value understates erosion hazards during base flood events. Post-storm studies referenced in Sec. 7.8.1.4 of FEMA (2000) have documented maximum erosion volumes ranging from 1.5 to 5.6 times the median volume.<br>• FEMA has modified other coastal mapping guidance recently, and now maps the 2% wave runup elevation rather than the median wave runup elevation.<br>• A new, interim dune reservoir value could be obtained from the same data set used to determine the 540-sq-ft median value. However, it is recommended that a study be undertaken to update the stillwater level versus dune erosion relationship.<br>• This alternative would require changing the NFIP regulations. | | |

Table 5-1. Summary of impacts of PFD alternatives, continued.

| | IMPACTS ON: | | |
|---|---|---|---|
| **ALTERNATIVE** | **Flood Mapping** | **Flood Insurance** | **Floodplain Management** |
| **3**<br>**Incorporate Future Conditions when Determining the Dune Reservoir Necessary to Prevent Dune Removal** | • Better estimation of dune erosion resulting from coastal flood events over time, by incorporating effects of long-term shoreline change rates and/or sea-level rise. Increases the incidence of dune removal during mapping analyses.<br>• Likely landward shift in calculated flood hazard zones.<br>• New mapping procedures and guidance would be required. Could result in new flood hazard zones.<br>• See Heinz Center (2000) Study for mapping cost estimates. | • Increases the area where the flood hazard zone and BFE are established quantitatively.<br>• Because flood premiums are modeled using zone and BFE distinctions, the premiums would be more likely to reflect the actual risks to structures.<br>• May or may not affect flood insurance, depending on whether existing flood hazard zones are used, or whether new flood hazard zones are mapped. | • May or may not affect floodplain management, depending on whether existing flood hazard zones are used, or whether new flood hazard zones are mapped.<br>• Areas subject to specific regulations will change as flood hazard zone boundaries shift. |
| | • This alternative can be implemented whether FEMA decides to retain/modify PFD or eliminate PFD.<br>• Requires shoreline change rates and/or sea-level rise estimates to be implemented.<br>• Treatment of dune erosion and shoreline change could vary from how the NFIP estimates, manages, and insures against other flood hazards, depending on whether and how the NFIP addresses climate change. | | |
| | | | |
| | • Clear guidance on how to implement 44 CFR 59.1 (PFD definition) would be developed.<br>• This alternative would clarify areas where PFD mapping should (and should not) be undertaken, i.e., by defining "open coast," "near continuous mound or ridge of sand," etc. | • As in Alternative 1 (Status Quo), even though shoreline areas subject to PFD mapping will be better defined, there may still be a pricing mismatch between actual flood premiums and the rates that a risk-based analysis would indicate. | • No change in floodplain management regulations or implementation.<br>• Some areas formerly mapped as PFD could be remapped as Zone X, and NFIP dune protection and building regulations could be lost in areas no longer classified as PFD VE Zone. |
| | • This alternative could be combined with Alternatives 5 and 6. Alternative 4 by itself does not resolve PFD flood insurance or floodplain management issues, but does improve flood mapping.<br>• Policyholder response to change from VE Zone to Zone X may result in canceled flood policies. | | |

Table 5-1. Summary of impacts of PFD alternatives, continued.

| ALTERNATIVE | IMPACTS ON: Flood Mapping | Flood Insurance | Floodplain Management |
|---|---|---|---|
| **5** **Define the Inland Limit of PFD Areas** | • Clear guidance on how to locate the 44 CFR 59.1 PFD inland limits (where slope changes from relatively steep to relatively mild) would be developed so as to be less qualitative.<br>• FEMA-approved method developed by Massachusetts CZM for PFD mapping procedure is more quantitative and should be tested in other areas outside of Region 1. | • As in Alternative 4 (Define PFD Alongshore Limit), even though areas subject to PFD mapping will be better defined, there may still be a pricing mismatch between actual flood premiums and the rates that a risk-based analysis would indicate. | • No change in floodplain management regulations or implementation.<br>• Some areas formerly mapped as PFD could be remapped as Zone X, and NFIP dune protection and building regulations could be lost in areas no longer classified as PFD VE Zone. |
| | • This alternative could be combined with Alternatives 4 and 6. Alternative 5 by itself does not resolve PFD flood insurance or floodplain management issues, but does improve flood mapping.<br>• Policyholder response to change from Zone VE to Zone X may result in canceled flood policies. | | |
| | • Clear guidance on how to interpret the 44 CFR 59.1 PFD phrases "immediately landward and adjacent to the beach" and "subject to erosion and overtopping from high tides and waves during major coastal storms" would be developed.<br>• Reasonable maximum inland limits of the PFD would be established, and could override the "relatively steep to relatively mild" (Alternative 5) determination. | • As in Alternatives 4 and 5, even though areas subject to PFD mapping will be better defined, there may be a pricing mismatch between actual flood premiums and the rates that a risk-based analysis would indicate.<br>• This alternative would reduce potential pricing mismatches that could still remain after implementation of Alternatives 4 and 5 only. | • No change in floodplain management regulations or implementation.<br>• Some areas formerly mapped as PFD could be remapped as Zone X, and NFIP dune protection and building regulations could be lost in areas no longer classified as PFD VE Zone. |
| | • This alternative could be combined with Alternatives 4 and 5. Alternative 6 by itself does not resolve PFD flood insurance or floodplain management issues, but does improve flood mapping.<br>• Defining alternate inland PFD limits would be technically challenging.<br>• Policyholder response to change from Zone VE to Zone X may result in canceled flood policies. | | |

Table 5-1. Summary of impacts of PFD alternatives, continued.

| ALTENATIVE | IMPACTS ON Flood Mapping | IMPACTS ON Flood Insurance | IMPACTS ON Floodplain Management |
|---|---|---|---|
| **7** **Divide the PFD VE Zone (in the DFIRM database) into a seaward (risk-based) VE Zone , and a landward (geomorphic-based) footprint, the "V-PFD" section** | • Dune erosion and flood hazards would be mapped for the base flood (risk-based analysis) and shown separately from the landward portion of the PFD.<br>• The non-risk-based PFD footprint would be mapped as a "V-PFD" geomorphic zone to allow for improved identification of PFD area.<br>• V-PFD may be too narrow to map. | • Different premium rates (lower than Zone VE) could be developed for the "V-PFD" area since the risks tend to be overstated in the geomorphic PFD area.<br>• Further studies would be required to understand risks in the "V-PFD" footprint area. To the extent that risks in the PFD footprint are significantly disparate, rating inequities may still remain within the rate class and as compared to other rate classes. | • Maintaining a VE Zone and "V-PFD" designation throughout the entire PFD area would retain Zone VE building standards and dune protection in the geomorphic-based zone.<br>• Although generally a good idea – and not much more expensive – for new construction (including substantially damaged structures), certain exceptions to full VE Zone requirements in "V-PFD" areas should be considered. Requiring full compliance with VE Zone requirements in the PFD footprint would not resolve objections related to substantial improvement of older, existing buildings that are not at risk during base flood events. Requiring these buildings to be razed and rebuilt to VE standards would be unnecessarily expensive and disruptive, with no real benefit to the owners, community, or NFIP.<br>• Building standards in the "V-PFD" footprint could be revised upon further study and possible regulation changes. |
| | • Dividing the PFD VE Zone into two areas – and determining and implementing premium rates and building standards in the landward V-PFD area – could be complex, and would require changes to the NFIP regulations.<br>• This alternative could result in more accurate insurance pricing and reduced premiums in the "V-PFD" footprint. As a standalone alternative, Alternative 7 would also improve floodplain mapping and floodplain management since it would clearly distinguish the risk-based from non–risk-based areas of the PFD. | | |

Table 5-1. Summary of impacts of PFD alternatives, continued.

<table>
<tr><th rowspan="2">ALTERNATIVE</th><th colspan="3">IMPACTS ON:</th></tr>
<tr><th>Flood Mapping</th><th>Flood Insurance</th><th>Floodplain Management</th></tr>
<tr><td colspan="4"></td></tr>
<tr><td rowspan="2"></td><td>• Mapping would be simplified, and all coastal maps would be risk-based.</td><td>• Absent other changes to mapping and building standards, premiums for some structures in the former PFD footprint would not reflect the true risk to those structures.<br>• The NFIP could incur liability for some new, insured structures built in the former PFD to less than VE Zone standards.</td><td>• No change in floodplain management regulations or implementation.<br>• Some areas formerly mapped as Zone VE could be remapped as Zone X, and NFIP 44 CFR 60.3(e) dune protection and building regulations would no longer apply in previously mapped PFD VE Zone areas.</td></tr>
<tr><td colspan="3">• Implementation of this alternative would eliminate policyholder and community complaints about NFIP inequities between risk-based zones and the former PFD footprint area.<br>• NFIP regulations would have to be revised to eliminate PFD references in 44 CFR 59.1 and 65.11.<br>• Policyholder response to change from Zone VE to Zone X, or Zone AE may result in canceled flood policies.<br>• Implementation of this alternative alone, without improving flood mapping procedures, could expose the NFIP to increased liability and reduced premium base (pricing mismatch) if existing VE Zone policyholders maintain policies but get re-rated as Zone X policies, and if new construction in the former PFD footprint obtains new Zone X policies.<br>• Implementation of this alternative alone would remove dune protection standards for those areas where neither States nor communities regulate dune alterations.</td></tr>
<tr><td rowspan="2">9<br>Eliminate PFD, Maintain 44 CFR 60.3(e)(7) VE Zone Dune Protection Provisions in Former PFD Footprint</td><td>• Would require that the PFD limits still be identified (to determine the area where dune protections would be instituted), or would require other means to identify protected dunes (e.g., see Alternative 7).<br>• Flood hazard zones would be mapped based on calculated hazards.</td><td>• Better than simply eliminating PFD (Alternative 8) since dune protections would help reduce the risk/rate mismatch, but the mismatch would still remain.<br>• The NFIP could incur liability for some new and for substantially improved, insured structures built in the former PFD area to less than Zone VE standards.</td><td>• Dune protections would remain throughout PFD footprint and would be designated as an SFHA. However, these designations should be more clearly characterized by better defining “man-made alterations of sand dunes that increase potential flood damage.”<br>• Building standards for mapped flood hazard zones would not change, but there would be some loss of control over building standards in former PFD footprint due to loss of Zone VE designation.</td></tr>
<tr><td colspan="3">• NFIP regulations would have to be revised to eliminate PFD references in 44 CFR 59.1 and 65.11, and to continue dune protection in the former PFD footprint area outside the revised Zone VE.<br>• It is unclear how the NFIP would protect dunes in Zone AE and Zone AO, or outside the SFHA, and this could fall on State and local governments.<br>• Policyholder response to change from Zone VE to Zone X, or Zone AE may result in canceled flood policies or reduced premium base, accompanied by a reduction of building standards for new construction.</td></tr>
</table>

Table 5-1. Summary of impacts of PFD alternatives, continued.

<table>
<tr><th rowspan="2">ALTERNATIVE</th><th colspan="3">IMPACTS ON:</th></tr>
<tr><th>Flood Mapping</th><th>Flood Insurance</th><th>Floodplain Management</th></tr>
<tr><td rowspan="2"></td>
<td><ul><li>The “Dune-way” concept would be analogous to the “Floodway” concept in riverine areas, but could extend beyond the SFHA.</li><li>It would likely be mapped as a layer or overlay on the FIRM.</li><li>This may or may not require that the PFD limits still be identified.</li><li>Potential point of confusion: The “Dune-way” would indicate an area less hazardous than the mapped Zone VE, while the “Floodway” indicates the area closest to the riverine flood hazard source.</li></ul></td>
<td><ul><li>Better than simply eliminating PFD (Alternative 8) since dune protections would help reduce the risk/rate disparity, but the disparity could still remain.</li><li>Depending on premium rates and building standards required in the “Dune-way,” the mismatch could result in the NFIP incurring liability for some new, insured structures built in the former PFD area to less than Zone VE standards.</li></ul></td>
<td><ul><li>Adoption of new floodplain management regulations (dune protection and building standards) would be needed for the “Dune-way” area.</li></ul></td></tr>
<tr><td colspan="3"><ul><li>NFIP regulations would have to be revised to eliminate PFD references in 44 CFR 59.1 and 65.11, and to institute NFIP requirements in a “Dune-way” area.</li><li>Dune protection, building standards, and insurance premiums in the “Dune-way” would need to be determined.</li><li>It is unclear how the NFIP would implement dune protection and building standards in zones outside the SFHA.</li><li>Some aspects of this alternative might fall on State and local governments.</li><li>Careful development of this alternative would be required to avoid some of the problems and concerns currently raised regarding PFD delineation.</li></ul></td></tr>
<tr><td rowspan="2">11<br>Eliminate PFD, Make use of Zone E</td>
<td><ul><li>New procedures for calculating erosion hazards and for mapping erosion hazard areas would be required.</li><li>Would need to differentiate long-term erosion from event erosion.</li></ul></td>
<td><ul><li>Mapping Zone E may reveal that current premiums understate actual risks to structures, both inside and outside currently mapped SFHA and PFD.</li><li>Premium/risk disparity associated with elimination of PFD may or may not be overcome by new rates instituted for Zone E.</li></ul></td>
<td><ul><li>Would need building standards and dune protection for Zone E areas.</li><li>There could be an enlargement or loss of area subject to NFIP building standards, depending on erosion hazards and PFD widths.</li></ul></td></tr>
<tr><td colspan="3"><ul><li>NFIP regulations would have to be revised to eliminate PFD.</li><li>44 CFR 59.1 defines “Area of special flood-related erosion hazard” (Zone E), but mapping procedures, floodplain management requirements, and insurance premium rates have not been defined.</li><li>Careful development of this alternative would be required to avoid some of the problems and concerns currently raised regarding PFD delineation.</li></ul></td></tr>
</table>

Table 5-1. Summary of impacts of PFD alternatives, continued.

<table>
<tr><th rowspan="2">ALTERNATIVE</th><th colspan="3">IMPACTS ON:</th></tr>
<tr><th>Flood Mapping</th><th>Flood Insurance</th><th>Floodplain Management</th></tr>
<tr><td rowspan="2"></td><td>• Would require that the PFD limits still be identified (to determine the area where "V-PFD" building standards would be instituted).<br>• Flood hazard zones would be mapped based on calculated hazards.</td><td>• Better than simply eliminating PFD (Alternative 8) since building standards would help reduce the risk/rate mismatch, but the mismatch could still remain.<br>• Depending on premium rates and building standards required in the PFD footprint, the mismatch could result in the NFIP incurring liability for some new, insured structures built in the former PFD to less than Zone VE standards.</td><td>• No change in building standards for mapped flood hazard zones.<br>• Building standards for former PFD footprint would be needed.<br>• Dune protection afforded through 44 CFR 60.3(e)(7) would be lost.</td></tr>
<tr><td colspan="3">• NFIP regulations would have to be revised to eliminate PFD references in 44 CFR 59.1 and 65.11, and to extend building standards into the former PFD footprint area outside the SFHA.<br>• Insurance premium rates would be needed for former PFD footprint.</td></tr>
<tr><td rowspan="2">13<br>Eliminate PFD, Map Former PFD Footprint as Coastal A Zone</td><td>• This alternative would replace the PFD footprint with the Coastal A Zone (CAZ).<br>• As in the case of the current PFD, flood hazard zones would not be based on calculated hazards alone.<br>• Mapping the former PFD footprint as CAZ would result in confusion over the basis for CAZ mapping. The limit of moderate wave action (LiMWA) is mapped at the 1.5 ft wave height location and corresponds to the CAZ boundary cited currently by building codes and other FEMA building science guidance.</td><td>• At present, premium rates for CAZ are not specified by FEMA and are the same as Zone AE.<br>• To the extent actual CAZ risk is more like Zone VE, the Zone AE premiums would underestimate the actual risk.<br>• To the extent the actual probability of flooding in portions of PFD/ CAZ is less than 1%, the Zone AE premiums would overestimate the actual risk.<br>• To the extent that risks in the PFD/CAZ Zone are significantly disparate, rating inequities may still remain within the rate class and as compared to other rate classes.</td><td>• At present, Zone VE building standards are being implemented for risk-based (1.5 ft wave height) CAZ largely through building codes, and less frequently through local floodplain management ordinances.<br>• NFIP building science guidance recommends, but does not mandate, Zone VE building standards in the risk-based CAZ.<br>• NFIP floodplain management requirements for the CAZ need to be developed.</td></tr>
<tr><td colspan="3">• NFIP regulations would have to be revised to eliminate PFD and to create the CAZ.<br>• This alternative would result in trading the geomorphic-based zone (non-risk-based PFD) for another one (CAZ), and may not eliminate perceived inequity or other problems associated with current PFD.<br>• This alternative would confuse the current LiMWA (CAZ risk-based limit) with a different non-risk-based CAZ.<br>• CAZ regulations and insurance premium rates have not been developed.<br>• This alternative would complicate terminology, and the currently challenging implementation and integration of CAZ requirements through building codes and standards.</td></tr>
</table>

Table 5-1. Summary of impacts of PFD alternatives, continued.

| | IMPACTS ON: | | |
|---|---|---|---|
| **ALTERNATIVE** | **Flood Mapping** | **Flood Insurance** | **Floodplain Management** |
| | • This alternative would replace the PFD footprint with the Coastal Zone X.<br>• There is no Coastal Zone X at present. It would have to be created, and also be differentiated on FIRMs from non-coastal Zone X. | • This would give the NFIP the option to charge higher premiums for this Coastal Zone X than in non-coastal Zone X areas.<br>• Coastal Zone X premium rate structure would have to be developed.<br>• To the extent that risks in the PFD/Coastal Zone X are significantly disparate, rating inequities may still remain within the rate class and as compared to other rate classes. | • There are no NFIP mandated dune protections or building standards outside the SFHA.<br>• Absent a change in NFIP regulations, dune protections and building standards in Coastal Zone X areas can only be encouraged through insurance premiums, CRS, etc. |
| | • NFIP regulations would have to be revised to eliminate PFD and to create the Coastal Zone X.<br>• Implementation of dune protections and building standards in the Coastal Zone X may depend on State/local governments, and on flood insurance incentives.<br>• Since many communities, designers, owners, and other stakeholders mistakenly believe that Zone X is "safe" and likely do not understand the actual risks in Zone X, effective outreach efforts must be included with this alternative. | | |

## 5.3 Economic Assessments

This section describes the background, assessments, and evaluations associated with the insurance and economic analyses.

### 5.3.1 NFIP Ratemaking and Insurance

NFIP underwriting, ratemaking, and claim processing were developed to support the mission of the NFIP. The NFIP is intended to 1) maintain a sound rating and coverage structure, and 2) generate premiums that at least cover expenses and losses for the "historical average loss year." For these reasons, rates for flood insurance are reviewed annually by NFIP management.

FEMA uses an actuarial rate model to calculate the rate for insuring post-FIRM individual structures located in either an AE Zone or VE Zone. The actuarial rate model relies on a frequency-severity approach in which actual historical claims and the estimated flood damage for modeled event years are considered. Events are modeled based on their predicted frequency: Larger events have a recurrence that is less frequent while smaller events have a relatively higher probability of occurring

in a given year. The severity of a modeled event is determined by modeling the water surface elevation. For example, the specific water surface elevation that occurs in a storm event having a 1-percent chance of occurring in a given year (the BFE) is considered in the model.

### 5.3.2 Use of PFD for VE Zone Mapping

Through the years FEMA has modified the rating structure to increase premium rates for VE Zone policies to reflect the higher risk of damages for structures in VE Zone areas relative to other rating areas. If there are changes in the mapping and management of PFD VE Zones, it is likely that changes will be required in the premium rating structure of the program. The changes will account for the potentially different risk profiles of structures within a PFD Zone compared with those not in a PFD Zone. The methodology to identify which portion of the dune is in the VE Zone would be based on quantitative analysis, and the remaining portion would be identified by the geomorphic PFD criteria using qualitative measures. Such an improvement in the coastal mapping and hazard identification of the PFD VE Zone would be necessary if a new rating zone is recommended for the NFIP revision.

### 5.3.3 PFD Policy Analysis

The impacts of proposed revisions to rates, forms/coverages, and underwriting were examined. In conducting these assessments, it was important to assess which portion of the VE Zone is related to the PFD mapping criteria, and to assess the number of structures having NFIP flood insurance policies within that target area. The various impacts to the NFIP that were evaluated included:

- ratemaking considerations,
- possible overall loss of premiums to the NFIP if the PFD criterion is eliminated, and
- historical claims in the PFD VE Zone area.

Currently, the PFD criterion applied to VE Zone mapping has no available claims data since the footprint of the PFD VE Zone area cannot be distinguished from other VE Zones on the DFIRM. The NFIP should consider establishing the policy data and associated claims history for the PFD areas of the VE Zone to gain a more accurate understanding of the rate structure that best represents the risk of this hazard area.

For the purpose of this report, some results contained in the *2008 Coastal Demographics Study* were used to estimate the number of policies in the PFD VE Zone. (See detailed analysis of that study in Appendix C.) The study estimated that there were 107,000 housing units in the PFD VE Zone in 2000. This was projected

to grow by 54 percent to 165,000 by 2030. The study also estimated that 29 percent of the housing units in the PFD VE Zone had flood insurance policies-in-force for a total of 31,000 nationwide.

These estimates were based on policy addresses where the provided location was the "curb" of the property. To refine these estimates and get a more accurate estimate, the analysis was revised using the centroid of the property (a geocoding procedure). This provides a better representation of the actual location of the structure on the property. The results of the new analysis indicated that there were approximately 25,000 policies-in-force in the PFD VE Zone. With a total of 61,100 VE Zone policies, this documents that approximately 41 percent of the VE Zone policies-in-force are in the PFD VE Zone.

### 5.3.4 Considerations for Changes in Ratemaking Procedures

From a pricing perspective, the goal of the NFIP is to set rates commensurate with expected losses under a variety of flood conditions. This follows the ratemaking principles established by The Board of Directors of the Casualty Actuarial Society (CAS), which issues the standards by which ratemaking (and other actuarial analysis) should abide. Specifically, the CAS principles state that a "rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer."[17]

The alternatives in this report that recommend separately identifying rating zones for PFD VE and non-PFD VE Zones can more directly address the goal of actuarially sound rates. Specifically, separate rating zones would exist from which the NFIP could distinguish loss and exposure information between policies within a PFD VE Zone and those in a non-PFD VE Zone. FEMA would be able to review the historical loss experience for PFD VE Zone policies separately from non-PFD VE Zone policies, and use that analysis in estimating the future costs for each type of policy. If a credible and significant difference exists in the expected future loss for a given structure within a PFD VE Zone compared with a similar structure within a non-PFD VE Zone, then that difference could be directly translated to the difference in the rate charged.

[17] *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, CAS, 1988.

Determining the amount and significance of the difference, if any, in expected future losses between the PFD and non-PFD VE Zones is beyond the scope of this study. However, some considerations for this difference include:

- The difference in the chance of flood waters reaching a similar structure at a given height relative to BFE in both a PFD VE Zone and a non-PFD VE Zone.
- The difference in damage to a particular structure, given a level of flood water that enters the structure in a PFD VE Zone and in a non-PFD VE Zone.
- Potential changes to building requirements for structures within PFD VE Zones as compared to requirements currently in place for VE Zones, and the impact of those changes to the loss expectations.

### 5.3.5 Estimate of NFIP Premium Losses from PFD Elimination Alternative

There are two classes of potential financial impacts to the NFIP resulting from reducing or eliminating the PFD designation:

- Reduction of flood premiums collected, through replacement of VE Zone premiums by AE or X Zone premiums.
- Increase in flood claims liability, resulting from adoption of construction standards in the areas formerly mapped as PFD VE Zones that are less strict than the current VE Zone requirements in those areas.

The former represents a reduction in program income. This can be computed by multiplying the number of premium-paying PFD VE Zone structures that could be removed from the program and possibly reclassified as X Zone (or Zone AE) structures, by the expected difference in average earned premium per structure. The latter represents increased costs of claims, as reduced construction standards lead to more damages.

For example, if the alternative is selected that removes PFD VE Zones from the NFIP, this action would remove only an estimated 25,000 PFD VE Zone flood policies-in-force (and the earned premium from those policies) from the program. To support this alternative assessment, Table 5-2 provides a summary of premiums and exposures in-force as of December 31, 2008. These data are useful when considering possible loss of flood policy premiums due to removal of the PFD VE Zone mapping criteria.

- If the average annual premium cost for non-condominium policies is $0.678 per $100 of insurance coverage (amount of insurance, or “AOI”) in VE Zones, and $0.229 per $100 of AOI in B,C, and X Zones:
  - Then the loss of premium per each policy is:
    $.678 - $.229 = $0.449 per $100 of AOI.

- For the average non-condominium unit in a VE Zone, the AOI is $241,180.
  - Therefore, the loss of premium could be estimated as approximately: $0.449 * $241,180 / 100 = $1,082 per policy.
- A similar calculation would follow for the condominium units, and the estimated loss of premium per policy would be $174 per policy.

Table 5-2. Summary of V and X Zone premiums and exposures in-force for all States as of December 31, 2008.

| Type of Policy | Written Premium (1000) | Total Exposure Units | Total Coverage (100) | Average Premium per Unit | Average Amount of Insurance | Average Premium per $100 AOI |
|---|---|---|---|---|---|---|
| | | | | | | |
| V Zone | $99,175 | 60,674 | $146,333,367 | $1,635 | $241,180 | $0.678 |
| B, C, X Zones | $12,951 | 22,787 | $56,591,779 | $568 | $248,351 | $0.229 |
| | | | | | | |
| V Zone | $28,178 | 66,467 | $103,265,178 | $424 | $155,363 | $0.273 |
| B, C, X Zones | $1,225 | 5,588 | $7,601,273 | $219 | $136,029 | $0.161 |

The total loss of premiums to the NFIP is determined by multiplying the total number of policies by the average loss of premium per policy. As illustrated above, the change in premium is significantly different for non-condominium policies and condominium policies. Within the 25,000 policies estimated in the demographics report, the breakdown of the different types of policies is not known. However, for illustrative purposes: Assuming that all polices are non-condominium policies and that all current insured property owners were to purchase X Zone policies, the loss of premiums to the program would be approximately $27 million annually.

Other considerations would potentially increase or decrease this estimate of the loss of premiums. For example, one consideration is that all of the policies would not necessarily be changed to an X Zone, but that some would be reclassified as AE Zones. AE Zone rates are higher than those rates charged in an X Zone, and therefore the loss of premiums to the NFIP would be less than the estimate above. Conversely, if policies affected by the proposed changes were no longer required to purchase insurance, there could be potential losses of the full premium from 25,000 policies. Building on the illustration above, and assuming that all 25,000 of those policies are non-condominium policies, the loss of premium to the program would be approximately $41 million annually.

The scenarios discussed above estimate losses to the program of approximately $27 million to $41 million on an annual basis. These estimates are based on average charged premiums over the entire portfolio of insurance policies and are based on estimates of the number of policies impacted by the changes in PFD regulations. The actual loss of premiums to the insurance program could possibly fall outside of this range of estimates. It should be noted, however, that the total amount of premiums earned annually by the NFIP for all policies is approximately $3 billion, of which less than 2.5 percent is from VE Zone policies. The portion of VE Zone polices ultimately affected by changes in PFD regulations – and thus the resulting impact on the overall premium to the NFIP – is most likely not significant. Furthermore, if the change in premium collected by the NFIP is a result of ratings of policies being more actuarially sound for their appropriate level of risk, then any loss or gain of premium is appropriate.

### 5.3.6 Estimate of NFIP Claims Liability from PFD Elimination Alternative

In addition to the loss in premium for the NFIP, there is also the potential for increased claims liability to the NFIP. This increased claims liability is a more difficult estimate to calculate since it relates to the change in costs on potential future claims, whereas the change in premium estimate is based on the current known policies. However, the potential increased liability to the NFIP could have a more significant impact than the loss of premium.

The historical claims data in VE Zones does not distinguish between those claims within a PFD area and those claims outside of a PFD area. As future PFD VE Zones are identified and mapped, the NFIP should capture loss and policy data in order to identify policies and losses within PFD VE Zones.

It is assumed that the conversion of the PFD VE Zone policies to an X Zone (or AE Zone) rate would allow new development or redevelopment after an extreme flood event to be built to more lenient standards. Therefore, the risk of flood damages would increase. The structures built to AE Zone standards, or to no standard (X Zone structures), will be more likely to suffer collapse and total loss in a flood event that exceeds the BFE. What might have been a minor claim against the NFIP could then result in a claim up to the policy limit.

The average claim amount from post-FIRM and pre-FIRM actuarial VE Zone policies over the last 20 years, excluding 2005[18], is approximately $22,000. That amount includes the loss experience on those claims that would be considered PFD VE Zone policies. The average severity of potential future claims for PFD policies, assuming lower building standards, would potentially be higher than this amount. On the other hand, the average PFD VE Zone policy could have less overall potential for loss since the average number of claims for PFD VE Zone policies is less than the average number of claims for a standard VE policy, due to the physical presence of the PFD. The magnitude of these considerations cannot be estimated without a precise collection of data for PFD VE Zone and non-PFD VE Zone policies.

Another possibility is that the PFD VE Zone policyholders are no longer required to purchase a policy. If those current policyholders do not continue to purchase coverage, the NFIP would lose the premium amount, but those owners would not be able to make a claim against the NFIP.

It is possible that a lower premium charged to PFD policies is more accurately aligned with the potential loss for those policies, which would be an appropriate outcome of the ratemaking process. However, the loss of premium to NFIP could impact the current balance of the overall premium that is charged to policyholders. The non-PFD VE Zones might need a higher premium to account for the loss of higher-premium PFD Zone properties leaving the VE Zones.

In the X Zones, the current average premium does not consider the higher loss potential for structures built with X Zone building standards near the open coast. The possible alternative of a PFD-specific policy would most accurately reflect the differences in loss potential for these structures. Furthermore, the ability to separately apply rates to different policies in a way that more accurately reflects the loss potential, i.e. risk, is a more actuarially sound approach.

[18] The 2005 year has such a significant impact on the claim data because 1) the severity of claims for that year was much higher than historical averages and 2) the number of claims from Katrina is significant, giving the 2005 loss experience a lot of weight in the overall average.

# 6.0
# PFD Findings and Recommendations

# 6.0 PFD Findings and Recommendations

This section provides a summary of the key issues and findings. It provides specific short-term and long-term recommendations for FEMA, including a recommended sequence for implementation and for improving flood hazard mapping, floodplain management, and flood insurance treatment of PFD areas.

## 6.1 PFD Issues

PFDs were instituted to compensate for limitations in dune erosion modeling and to better capture the extent and nature of flood and erosion hazards in coastal dune areas. The PFD VE Zone has likely prevented damages to structures that may have been built on the dune using lesser building standards had the VE Zone protections of the PFD criteria not been in place.

However, several aspects of current PFD implementation are problematic, most notably the definition and delineation of PFD areas, and pricing mismatches between PFD VE flood insurance premium rates and actual risk. These problems can result in mapping inconsistencies and can undermine the NFIP in the eyes of policyholders and communities, who may perceive inconsistent or inequitable treatment between PFD and nearby non-PFD properties.

Notwithstanding the above issues, it is apparent from Review Team comments received throughout the project that solving these PFD problems by eliminating the PFD could lead to additional problems – namely the elimination of dune protections outside of mapped VE Zones in some states and communities, and weakening of building standards in some erosion-prone areas. Future NFIP actions related to the PFD should weigh all of these viewpoints.

## 6.2 PFD Definitions and Delineation

The 44 CFR 59.1 definitions of CHHA and PFD contain five terms or phrases that are not defined elsewhere in the regulations, and whose definitions are important to PFD mapping. The terms and phrases are highlighted in the definitions below:

> *"Coastal high hazard area means an area of special flood hazard extending from offshore to the inland limit of a primary frontal dune along an* ***open***

> ***coast** and any other area subject to high velocity wave action from storms or seismic sources."*[19]
>
> *"Primary frontal dune means a **continuous or nearly continuous mound or ridge of sand** with relatively steep seaward and landward slopes **immediately landward and adjacent to the beach** and **subject to erosion and overtopping from high tides and waves during major coastal storms**. The inland limit of the primary frontal dune occurs at the point where there is a **distinct change from a relatively steep slope to a relatively mild slope**."*

If the PFD is not eliminated, resolving PFD issues will require developing NFIP definitions and/or guidance related to these five terms and phrases. Considerable effort has been expended by the Massachusetts CZM to resolve these definition and delineation issues, and the NFIP should review and test the FEMA-approved Massachusetts CZM approach elsewhere if the PFD is not eliminated.

## 6.3 PFD Flood Insurance Pricing Mismatch

From a pricing perspective, the goal of the NFIP is to set rates commensurate with expected losses under a variety of flood conditions. The coastal rate model takes into consideration:

- the elevation of a structure relative to the BFE,
- the probability of flood waters reaching different elevations relative to the BFE, and
- the presence of damaging waves or erosion (that dictate different building standards than would be required in an inland flood hazard area).

Although flood hazard maps and building standards are tied to the base flood, the coastal rate model considers more severe flood events in order to establish premium rates that will cover the wide range of expected flood events.

In the case of the PFD, understating the flood and erosion risk due to adoption of the median dune erosion value leads to insufficient premiums to cover the expected losses. Failure to include future shoreline conditions may also lead to understated risk in many instances. On the other hand, applying VE premium rates to buildings atop high and wide dune areas (that are not truly at risk) leads to premium rates that are higher than required.

---

[19] See Appendix G for the results of a preliminary literature review of definitions for "open coast," "sheltered waters," etc.

Given that flood insurance maps and premium rates both communicate risk and insure risk, it is important that the maps and premium rates accurately reflect risk, or at least communicate uncertainty. Unfortunately, this may not be occurring in many cases. Preliminary analyses performed as part of the *2008 Coastal Demographics Study* and as part of the present study suggest that a significant number of policies in the PFD VE Zone could be mispriced (i.e., risk overstated) when they are located landward of the portion of open-coast VE Zone that is determined based on NFIP erosion, wave, and flood-mapping procedures.

## 6.4 PFD Options and Alternatives

Options to address the PFD issues described above can be separated into the following broad categories:

- No Change to PFD Mapping and Implementation (Status Quo).
- Retain but Modify the PFD.
- Eliminate the PFD.
- Modify Dune Erosion Methodology (could be implemented whether or not PFD is retained, modified, or eliminated).

These categories can be further separated into 14 specific alternatives. See Table 6-1 for a listing of the 14 alternatives, as well as Section 4.1 for a detailed description, and Table 5-1 for a summary of their impacts on flood hazard mapping, flood insurance, and floodplain management.

Table 6-1. List of PFD options and alternatives considered.

| | |
|---|---|
| **No Change to Present PFD Mapping** | |
| Alternative 1 | Status Quo. |
| **Modify Dune Erosion Methodology** | |
| Alternative 2 | Increase the dune reservoir (required to prevent dune removal) to a value greater than the 540-square-foot median value specified in 44 CFR 65.11. |
| Alternative 3 | Incorporate future conditions when determining the dune reservoir necessary to prevent dune removal. |
| **Retain/Modify the PFD** | |
| Alternative 4 | Define the alongshore limits of PFD areas. |
| Alternative 5 | Define the inland limit of PFD areas. |
| Alternative 6 | Develop additional indicators of PFD inland limits. |
| Alternative 7 | Divide the PFD VE Zone in the DFIRM database into a (seaward) hazard-based VE section and a geomorphic-based (landward "footprint") section. |
| **Eliminate the PFD** | |
| Alternative 8 | Eliminate the PFD VE Zone. |
| Alternative 9 | Eliminate the PFD VE Zone, define and maintain 44 CFR 60.3(e)(7) dune protection in former PFD footprint. |
| Alternative 10 | Eliminate the PFD VE Zone, institute a "Dune-way". |
| Alternative 11 | Eliminate the PFD VE Zone, make use of Zone E. |
| Alternative 12 | Eliminate the PFD VE Zone but devise a way to retain VE building standards in former PFD footprint. |
| Alternative 13 | Eliminate the PFD VE Zone, map the former PFD footprint as CAZ. |
| Alternative 14 | Eliminate the PFD VE Zone, map the former PFD footprint as Coastal X Zone. |

Implementation of any of these 14 alternatives, either individually or in combination with other alternatives, will affect the NFIP, its policyholders, and its participating communities. Thus, each alternative was considered carefully in light of known PFD issues and problems. Final recommendations regarding these alternatives are contained in the next section.

## 6.5 Final Recommendations

The evaluation of the PFD alternatives showed that some alternatives, while desirable, may not be feasible in the short-term. Thus, recommendations are provided that phase in the implementation of some alternatives as quickly as possible, with the understanding that others may follow at some future date. Recommended alternatives are therefore classified as "short-term" or "long-term."

The fundamental recommendation of this study is to modify flood hazard mapping procedures to better capture the extent and nature of flood and erosion hazards (possibly including future conditions), to eliminate the PFD VE Zone, and to develop procedures to provide improved hazard identification, flood insurance, and floodplain management procedures just landward of the risk-based SFHA. Alternative 1 (Status Quo) is rejected.

The immediate elimination of the PFD VE Zone (without other mapping, flood insurance, and floodplain management changes) would result in undesirable consequences to the NFIP, its policyholders and its participating communities. Therefore, Alternative 8 is not recommended as a first step, or by itself, but can be achieved in concert with other alternatives.

Implementation of certain alternatives over the short-term should proceed, whether or not PFD elimination occurs. These alternatives should help resolve or reduce problems associated with current PFD implementation. Implementation will also facilitate the elimination of the PFD and the possible expansion of dune protection and building standards into part of the former PFD footprint.

The following sequence of alternatives implementation is recommended.

***Short-Term Recommendations:***

- **Implement Alternatives 4, 5, and 6:** Better define the alongshore and inland extents of the PFD VE Zone; test the FEMA-approved method for delineating PFD VE Zones (developed by Massachusetts CZM) in other geographic areas.
- **Implement Alternative 2:** Increase the dune reservoir required to prevent dune removal to an above-median value. This will better duplicate the extents of erosion documented during base flood events.
- **Implement Alternative 7:** Subdivide the PFD VE Zone (in the DFIRM database) into a (seaward) hazard-based section and a geomorphic-based (landward "footprint") section. This will reduce ambiguity and confusion over the basis for current VE mapping in dune areas. It will also set the stage for treating the PFD footprint area differently for dune protection, building standards, and insurance purposes.
- **Implement Alternative 14:** Although Alternative 14 (Coastal X Zone) was listed initially as a PFD-elimination alternative, it should be implemented whether or not the PFD is eliminated. A sizeable portion of NFIP policies and liability are in the X Zone. There is probably some risk associated with development in this zone, and yet there are no NFIP dune protection or building standards in this zone. Outreach efforts would be required to educate stakeholders about the hazards associated with Zone X, which most groups likely assume do not exist.

### *Long-Term Recommendations:*

- **Implement Alternative 8, with some combination of Alternatives 9, 10, and 12:** Eliminate the PFD, and develop procedures to provide improved mapping, insurance, and floodplain management provisions in the former PFD footprint. Note that implementation of Alternatives 9, 10, and 12 may be especially difficult to achieve since they would require NFIP regulations outside the SFHA, or would require a redefinition of areas subject to NFIP regulations. The best way to achieve implementation of these alternatives may be through partnerships with State and local governments. Relying on Alternative 9 will require defining the language contained in 60.3(e)(7): "man-made alterations of sand dunes which will increase potential flood damage."

### *Additional Long-Term Recommendations:*

- **Implement Alternatives 3 and/or 11:** Continuing to map flood hazards based on conditions that exist at the time of the mapping leads to preventable damage, flood insurance claims, and community disruption. Incorporation of future conditions into flood hazard mapping, floodplain management, and flood insurance is needed. Implementation of these alternatives should be coordinated with recommendations of the study *The Impact of Climate Change on the National Flood Insurance Program*.

There is one alternative that has not been mentioned in the discussion above – Alternative 13, which is to replace the PFD footprint with the CAZ. Alternative 13 is rejected in its present form, given the confusion that would result from having a hazard-based (>1.5 ft wave height) definition in national building codes and standards, and a geomorphic zone with the same name on flood hazard maps.

# 7.0

# Coastal SFHA and Coastal A Zone Implementation Issues

# 7.0 Coastal SFHA and Coastal A Zone Implementation Issues

This section describes the technical and policy issues in the coastal SFHA concerning the definition, identification, mapping, and application of the CAZ (MoWA), including:

1. existing use of the term "Coastal A Zone,"
2. definitions of the coastal SFHA and CAZ,
3. guidelines for mapping CAZ,
4. NFIP insurance issues, including Community Rating System (CRS) treatment,
5. building standards in coastal SFHA and CAZ,
6. implementation of CAZ in areas prior to delineation of the LiMWA, and
7. use of ASCE-24 (with its CAZ requirements) as a minimum standard for Hazard Mitigation Assistance (HMA) grants.

## 7.1 Use of the Term "Coastal A Zone"

The coastal SFHA includes the mapped hazard areas and BFEs for the VE Zone and AE Zone. For this study, the main focus is on the portion of the coastal SFHA mapped AE Zone subject to coastal flooding and wave effects. Specifically, this will include floodplain mapping revisions needed to map of the CAZ (MoWA) within the coastal AE Zone.

The term "Coastal A Zone" has been used for several years – in buildings codes, standards, and guidance – to indicate that portion of the SFHA that lies outside the VE Zone but is subject to damaging waves. Early use of the term (see Appendix E) did not assign a specific wave height associated with CAZ, but later use referred to the 1.5-foot wave height threshold:

- ASCE 7 *Minimum Design Loads for Buildings and Other Structures* (the national standard for loads, referenced by model building codes) used the CAZ term in 1998 (although it did not define an associated wave height limit) and required buildings in the CAZ to be designed with load combinations used for VE Zone buildings. The 2005 edition added the 1.5-foot wave height limit, which is still included in the latest (2010) edition.
- FEMA's *Coastal Construction Manual* (CCM) has used the CAZ term since 2000 (although it did not define an associated wave height limit), and recommended that

buildings constructed in the CAZ meet VE Zone requirements. Numerous other FEMA Building Science publications since this time have recommended applying VE Zone requirements to CAZ buildings; and since 2004 several Building Science guidance documents have defined CAZ using the 1.5-foot wave height limit. The 2011 edition of the CCM will use the 1.5-foot wave height limit to define the CAZ.

- The latest edition of ASCE 24 *Flood Resistant Design and Construction* (Standard No. 024-05) defines the CAZ term using the 1.5-foot wave height threshold, and requires buildings in the CAZ to meet VE Zone requirements.
- Starting in 2006, the *International Building Code* (IBC®) has required conformance with ASCE 24 (2005) and load combinations to be consistent with ASCE 7. Thus, since 2006, the model building code in the United States has required CAZ buildings[20] to meet VE Zone requirements.
- The 2009 edition of the *International Residential Code* (IRC®) defined the CAZ using the 1.5-foot wave height limit, and required buildings in the CAZ to be constructed with the lowest floor 1 foot above the BFE (see Sec. R322.2.1).

Thus, the design and construction community has been using the “Coastal A Zone” term for some time, and any changes to the term, its meaning or its use could lead to confusion. This is not to say that changes in CAZ terminology, meaning, or use cannot be undertaken. It means that any changes must be coordinated with building codes and standards, and that it could take several years for the changes to appear in codes and in standards and practice.

## 7.2 Definitions of the Coastal SFHA and CAZ

Section 1.2 described various terms related to the coastal SFHA and Coastal A Zones. Figure 7-1 summarizes current use of these terms. Appendix F provides additional detail regarding definitions of terms, current use, and terminology recommendations.

[20] The IBC® does not govern most 1- and 2-family dwellings. Those are governed by the *International Residential Code* (IRC®), which permits (but does not require) the use of ASCE 24.




Figure 7-1. Existing terminology related to the coastal SFHA and the CAZ.

## 7.3 Guidelines for Mapping CAZ and LiMWA

The *Atlantic Ocean and Gulf of Mexico Coastal Guidelines Update* (FEMA, 2007a) will need revision to support requirements for the CAZ identification and mapping. Other issues for consideration include:

- **PM 50 (finalized December 3, 2008):** PM 50 will be incorporated into the next update of Appendix D of FEMA's *Guidelines and Specifications for Flood Hazard Mapping Partners* with coastal guidelines for Atlantic, Gulf, Great Lakes, and Pacific regions. Since CAZs are based on overland wave heights and not wave runup, these zones are not appropriate for many Great Lakes and Pacific shorelines. However, in wave runup dominated areas, PM 50 does call for mapping the LiMWA "immediately landward of the mapped VE/AE Zone boundary."[21]

- **Data Capture Standards for LiMWA:** The new FIRMs for Mississippi coastal counties (Hancock, Harrison, and Jackson) and Suffolk and Nassau Counties in New York included mapping of the LiMWA. This mapping will help to establish the MoWA and MiWA areas and establish standards for collecting and submitting data for the CAZ. These Data Capture Standards have not yet been developed for LiMWA since PM 50 was implemented in December 2008.

[21] It is not known how this directive will be handled, given map scale limitations and how those limitations affect minimum zone widths.

- **Appendix D updates for identification and mapping:** New coastal studies are underway and many more are planned for coming years. In each study, PM 50 will be applied and LiMWAs will be an optional data layer on the DFIRM.
  - Atlantic and Gulf coasts: The “Coastal A Zone” is most likely to be applied in wide geographic areas along open coasts; its mapping along inland bays and sheltered waters is a matter of discussion (see Recommendations).
  - Great Lakes region: The “Coastal A Zone” may or may not be identified and mapped in this region (FEMA’s March 2009 *Great Lakes Coastal Guidelines Update* makes no mention of the LiMWA or CAZ).
  - Pacific coast: The “Coastal A Zone” may be identified and mapped in limited areas within this region, most likely in limited application along the open coast, inland bays, and sheltered waters.
- **Identification and mapping for coastal AE Zone-only areas (without VE Zone):** In some cases, the “Coastal A Zone” will not be adjacent to any mapped VE Zones and will be entirely within the coastal AE Zone. Similar mapping standards could apply based on overland wave heights and MoWA and MiWA boundaries. This issue has yet to be resolved (see Recommendations).
- New LiMWA Mapping Information:
  - Evaluation of applying PM 50: A recent study of the Atlantic coast in Nassau and Suffolk Counties (Long Island, New York) included mapping of the LiMWA on revised preliminary DFIRMs. This project represents the second wide-scale application of “Coastal A Zones” per PM 50.
  - Updated Coastal Demographics: The results from the Nassau and Suffolk Counties project were compared with the Mississippi mapping effort. This was done to validate the assumptions and the estimates of the percent of coastal AE Zone floodplains.

## 7.4 NFIP Insurance Issues

There are several issues related to NFIP insurance premiums that FEMA will need to consider before adopting the CAZ (MoWA) areas for insurance ratemaking.

- **CAZ (MoWA) flood insurance premium rates relative to VE Zone, MiWA, and riverine AE Zone rates:** The most important insurance decision will be how to establish premium rates for the MoWA area, relative to other risk hazard zones. MoWA rates, like other rates, should reflect actual risk. Actual risk should be determined based on a combination of claims data analysis, post-storm observations, and engineering studies.
- **CRS discounts for CAZ:** The CRS currently awards discount points for implementation of CAZ requirements. The number of discount points has been a subject of discussion by the CRS Task Force (see Appendix E, June 2010 entry), and may necessitate further change to modify the CRS discount point allocation,

depending on whether and how coastal SFHA and CAZ recommendations from this study are implemented.

## 7.5 Building Standards for CAZ

FEMA presently requires only AE Zone building standards to be met in the CAZ (MoWA) area:

- Any type of foundation that meets the basic performance requirement (preventing flotation, collapse, and lateral movement) is allowed.
- Fill can be used to elevate a building and provide structural support.
- No free-of-obstruction or breakaway wall requirements exist.
- The lowest floor reference elevation = top of floor.
- No engineering certification (that the building can withstand simultaneous wind and flood loads) is required.

As pointed out in Section 7.1, building standards and codes require VE Zone standards be met for IBC®-governed (and therefore, ASCE-24-governed) buildings in the CAZ, and numerous FEMA publications recommend higher CAZ building standards for all buildings. These requirements and recommendations have resulted from post-storm investigations and laboratory tests that indicate minimally compliant AE Zone buildings can sustain damage when subjected to waves less than 3 feet high.

However, these requirements and recommendations could be adjusted or modified in the future as additional engineering analyses, post-storm investigations, sea level rise impacts, and flood claims reviews occur. Such adjustments or modifications might relax certain VE Zone provisions for certain MoWA situations. Furthermore, even if some are relaxed, it is anticipated that the fundamental premise will remain unchanged – wave damage typically extends landward of the 3-foot wave limit, and AE Zone building standards are inadequate in most situations.

## 7.6 Implementation of CAZ in Areas Prior to Delineation of the LiMWA

LiMWAs have been mapped in five counties to date, making a nationwide determination of areas subject to CAZ conditions problematic. As new maps are completed, more LiMWAs will be mapped, but the problems remain during the interim period:

- What do building codes and standards require?
- Where is the CAZ?

Until such time as LiMWAs are delineated[22] and codes and standards' CAZ requirements are made uniform, it is up to States and communities to interpret CAZ language and to decide what triggers enforcement of CAZ building standards, and where these standards will be enforced. Specifically, will CAZ requirements be enforced without a LiMWA; if so, how will CAZ areas be determined; will individual or community-wide CAZ determinations required for all new construction in the AE Zone; will CAZ determinations be subject to challenge; how will requests for CAZ revisions be handled; etc.?

### 7.6.1 CAZ Language in Codes and Standards

Section 4.1.1 of ASCE 24-05 states *(emphasis added)*, "For the purposes of this standard, "Coastal A Zones" shall mean those locations where the ***stillwater depth*** of the base flood above the eroded ground elevation is greater than or equal to 1.9 ft (sufficient to support a wave height equal to or greater than 1.5 feet), and ***where conditions are conducive*** to the formation and propagation of such waves." Note that the language is unclear as to whether the CAZ must be shown on a map adopted by the community,

Section 5.2 of ASCE 7-05 states *(emphasis added)*, "To be ***classified*** as a CAZ, the principal source of flooding must be astronomical tides, storm surges, seiches, or tsunamis, not riverine flooding, and ***the potential for breaking wave heights*** greater than 1.5 feet (0.46 m) must exist during the base flood." How would a community official interpret "classified" or "potential"? This language is also unclear as to whether the CAZ area must be mapped.

In instances where the IRC® (2009) governs, section R322.2 states *(emphasis added)*, "Flood hazard areas ***that have been delineated*** as subject to wave heights between 1.5 feet and 3 feet shall be designated as Coastal A Zones." This language is explicit – until the CAZ is delineated, the CAZ provisions will not be required by the IRC®. The 2006 IRC® remained silent on the CAZ issue.

Section 1612.4 of the 2006 and 2009 IBC® requires all new construction to comply with ASCE 24-05.

[22] As used herein, "delineate" means the LiMWA has been mapped on the FIRM, or a State or community has undertaken a study to identify and clearly depict/describe the LiMWA location.

### 7.6.2 Absent a LiMWA, Where is the CAZ?

At least one State (Rhode Island) has adopted a 1- and 2-Family Building Code that requires all new IRC®-type structures in the SFHA comply with ASCE 24-05 (which requires designers to estimate CAZ if not delineated on a map). Thus, CAZ requirements would be enforced even if the CAZ/LiMWA has not been mapped on the FIRM. Unfortunately, some of the Rhode Island coastal FIRMs are dated and calculations made in one Rhode Island coastal community show that the location of the estimated LiMWA can vary by several hundred feet, depending on the method used to calculate its location.

The Rhode Island example points out the following that should apply to all situations where FIRMs are old and are based on inexact or obsolete topographic data:

- It is likely that a LiMWA drawn based on effective flood hazard zones and BFE information will be inconsistent with actual terrain and base flood depths (just as the effective flood hazard zones and BFEs would be found inconsistent with actual terrain).
- It is likely that a LiMWA drawn using actual terrain and FEMA-approved mapping methods will be inconsistent with effective flood hazard zones and BFEs.

New flood insurance studies are in progress in Rhode Island, so the uncertainty over CAZ limits should be short-lived there (2 to 3 years) – but it is a difficult issue to resolve until LiMWAs appear on the FIRMs.

State regulators, community building officials, floodplain managers, surveyors, and designers in other States will have similar difficulties until LiMWAs are mapped or otherwise delineated in an unambiguous fashion. The difficulties may not be insurmountable, but they will complicate and increase uncertainty for many land use and design decisions.

## 7.7 CAZ Implications for HMA Grant Programs

Current Hazard Mitigation Assistance (HMA) Grant Program guidance (e.g., see *http://www.fema.gov/library/viewRecord.do?id=4225*) requires certain projects, or aspects thereof, to meet the provisions of ASCE 24-05. Thus, affected projects or portions thereof will have to meet the CAZ provisions of ASCE 24-05. In addition, policy is being evaluated presently (December 2010) that would require all flood-related grant projects to meet ASCE 24-05.

HMA policy and its incorporation of ASCE 24-05 will have to be reconciled with any changes to CAZ mapping or management resulting from the present coastal SFHA/CAZ study.

# 8.0

## Coastal SFHA and Coastal A Zone Alternatives

FEMA-Supplement-002104

# 8.0 Coastal SFHA and Coastal A Zone Alternatives

A number of alternatives were considered in order to resolve the issues identified in Section 7.0. These alternatives can be grouped as follows:

- Status Quo alternative,
- Eliminate CAZ alternative, and
- Modify Building Standards and/or Insurance Premium Rates, by Zone.

The third grouping has been divided into three alternatives:

1. Modify the VE Zone inland limit (from 3-foot wave height to 1.5-foot wave height).
2. Divide the AE into three distinct zones: MoWA, MiWA, and riverine AE.
3. Divide the AE into four distinct zones: as above, but classify coastal shorelines as "open coast" or non-open coast (sheltered water) and establish two MoWAs, a MoWA-O for open coast MoWA and a MoWA-S for non-open coast (sheltered) MoWA.

Note that even though riverine AE Zones and VE Zones are shown in the figures that follow, this report makes no recommendations regarding building standards or flood insurance premium rates in those zones. However, some reports have recommended changes to building standards in these zones (e.g., *http://www.fema.gov/library/viewRecord.do?id=2592*, *Evaluation of NFIP Building Standards*).

## 8.1 CAZ Alternatives Considered

For the coastal SFHA, the main focus was on the CAZ (MoWA) portion of the AE Zone floodplain mapping. A total of five major CAZ alternatives were proposed and considered. These are described below.

### *No Change to Present CAZ Treatment:*

1. **Status Quo:** maintain present mapping and use of LiMWA, maintain current AE Zone flood insurance premium rates, maintain current AE Zone NFIP building regulations (but maintain non-mandatory, voluntary compliance recommendation to employ VE Zone building standards in CAZ). This alternative would require no further action by FEMA.

| Alternative 1: Status Quo | | | | |
|---|---|---|---|---|
| **Map, Insurance Premium Rates** | **AE** | | | **VE** |
| **Hazard** | **Riverine AE** | **MiWA** | **MoWA** | **VE** |

↑
LiMWA

### *Eliminate CAZ:*

2. **Eliminate all NFIP references to CAZ:** discontinue mapping the LiMWA, eliminate references to CAZ in Building Science guidance, maintain current AE Zone NFIP building regulations, and maintain current AE Zone flood insurance premium rates. This alternative would restore the NFIP posture to pre-PM 50 and pre-CCM (2000), but would not eliminate CAZ provisions that have been incorporated into building standards and/or codes since 1998.

| Alternative 2: Eliminate CAZ and LiMWA | | | |
|---|---|---|---|
| **Map, Insurance Premium Rates** | **AE** | | **VE** |
| **Hazard** | **Riverine AE** | **Coastal AE** | **VE** |

### *Modify Building Standards and/or Insurance Premium Rates, by Zone:*

For each of the following alternatives, both building standards and flood insurance premium rates should reflect the actual risks to new construction in each identified flood hazard zone, and thus should be related. For example, if analysis shows increasing building standards (to reflect actual risk) for a building in the CAZ is warranted, then this change should be accompanied by insurance premium rates that are higher than those presently associated with AE Zones. If analysis of insurance claims data shows no distinction between risks in the MoWA and the MiWA, this would argue against instituting VE Zone building standards in the MoWA. This coincidence allows the number of specific alternatives to be reduced – although many results still should be evaluated.

3. **Modify VE Zone criteria:** change the inland limit of the VE Zone from a 3-foot wave height to a 1.5-foot wave height. This option would not require modification to flood insurance premium rates or NFIP building standards per se, since the change in the VE Zone limit would accomplish these changes. However, FEMA mapping guidance and numerous other FEMA publications would require revision to address the change. Coastal FIRMs and DFIRMs based on the current 3-foot criteria would be inconsistent with the new VE criteria.

| Alternative 3: Expand VE to 1.5-foot Wave Height | | | |
|---|---|---|---|
| Map, Insurance Premium Rates | AE | | VE |
| Hazard | Riverine AE | MiWA | VE ($\geq$ 1.5-foot wave height) |

LiMWA

4. **Divide the AE into three distinct zones: MoWA, MiWA, and riverine AE Zone**, each with its own set of NFIP building standards and flood insurance premium rates (see Section 8.2).

| Alternative 4: Divide AE into 3 Zones, Vary Building Standards and Insurance Premiums by Zone | | | | |
|---|---|---|---|---|
| Map, Insurance Premium Rates | Vary by Zone | | | VE |
| Hazard | Riverine AE | MiWA | MoWA | VE |

LiMWA

5. **Divide the AE into four distinct zones:** **“**Open Coast” MoWA[23] (MoWA-O), non-Open Coast (sheltered water) MoWA (MoWA-S), MiWA, and riverine AE, each with its own set of NFIP building standards and flood insurance premium rates (see Section 8.2).

   The “Open Coast” and non-Open Coast (sheltered water) classification should be consistent with that recommended in the PFD study. The determination made for PFD purposes should also be used for CAZ purposes. Designating certain shore-lines as “open coast” will require careful study, and may not be straightforward in all instances.[24] Objective criteria and mapping guidance will be required, or yet another avenue will be opened for challenging preliminary FIRMs and their underlying studies.

| Alternative 5: Divide AE into 4 Zones, Vary Building Standards and Insurance Premiums by Zone | | | | |
|---|---|---|---|---|
| Map, Insurance Premium Rates | Vary by Zone | | | VE |
| Hazard | Riverine AE | MiWA | MoWA-O<br>MoWA-S | VE |

↑ LiMWA

## 8.2 Details for CAZ Alternatives 4 and 5

Alternatives 4 and 5 can be subdivided using many combinations of building standards and flood premium rate options. A discussion follows.

### 8.2.1 Building Standards

Principal building standards parameters that could be varied by zone include:

- Lowest Floor Elevation Reference (AE, top of floor versus VE, bottom of lowest horizontal structural supporting member).
- Freeboard.

[23] The distinction between open coast and sheltered waters may be important for improving the differentiation of building standards and flood insurance premiums. Open coast waves have longer wave periods, more energy, and greater destructive power than locally generated waves in sheltered waters. Although full-scale laboratory tests (Tung, Kasal, Rogers, and Yeh, 1999) demonstrate that short-period, 1.5-ft high breaking waves are capable of destroying connections in wood-frame walls designed to withstand high winds, the incidence of high impact breaking waves will be less in sheltered waters than near the open coast, and it may be reasonable to treat the two MoWA areas differently.

[24] See Appendix G for the results of a preliminary literature review of definitions for “open coast,” “sheltered waters,” etc.

- Foundation Type (VE, pile/column, versus AE fill/slab/foundation wall/pile/column).
- Free of Obstructions requirement (presently required in VE Zone only).
- Design for Simultaneous Wind and Water requirement (presently required in VE Zone only).
- Design Certification (presently required in VE Zone only).
- Openings in Enclosure Walls (presently required in AE Zone only).
- Dry-Floodproofing Allowance (presently allowed for non-residential buildings in AE, prohibited in VE).

### 8.2.2 Flood Insurance Premium Rates

The NFIP presently has two sets of flood premium rates for the SFHA: AE Zone rates and VE Zone rates. The AE Zone rates presently are constant across all AE Zones (riverine AE Zone, MiWA, and MoWA). AE Zone rates are substantially lower than VE Zone rates.

Options that are available with a subdivision of AE Zone include:

If Alternative 4 is chosen, a variety of rate options exist. Several of those options are listed here, but others may be indicated following completion of more detailed studies:

- same rates for riverine AE Zone, MiWA, MoWA (Status Quo);
- graduated rates in three steps: riverine AE Zone, higher rates in MiWA, higher rates in MoWA;
- make MiWA rate same as riverine AE Zone rate, set MoWA between riverine AE Zone/MiWA rate and VE Zone rate;
- make MiWA and MoWA rates the same, and set it between the riverine AE rate and the VE rate;
- make MoWA rate same as VE Zone rate, with MiWA rate between riverine AE rate and MoWA/VE rate; or
- make all coastal SFHA rates (MiWA, MoWA, and VE) equal to VE Zone rate.

If Alternative 5 is chosen, a different set of rate options exist. Several of those options are listed here, but others may be indicated following completion of more detailed studies:

- same rates for riverine AE Zone, MiWA, MoWA-S, and MoWA-O (Status Quo);
- graduated rates in four steps: riverine AE Zone, higher rates in MiWA, higher rates in MoWA-S, higher rates in MoWA-O;

- make MiWA rate same as riverine AE Zone rate, set MoWA-S and MoWA-O rates between riverine AE Zone/MiWA rate and VE Zone rate, with MoWA-O rate being higher than MoWA-S;
- make MiWA rate same as riverine AE Zone rate, set MoWA-S and MoWA-O rates equal to and between riverine AE Zone/MiWA rate and VE Zone rate;
- make MoWA-O same as VE Zone rate, set MoWA-S rate lower, etc.; or
- make MoWA-S rate equal to MiWA rate, or between MiWA and MoWA-O.

### 8.2.3 Discussion of Alternatives 4 and 5

As presently implemented in building codes and standards (and in FEMA Building Science guidance), the CAZ would be equivalent to the MoWA (Alternative 4), and certain buildings therein would be subject to VE Zone building standards (but AE premium rates) through the building code. This alternative only requires the mapping of a LiMWA to implement known building standards (flood insurance premium rates would still need to be determined).

Alternative 5 options are similar to Alternative 4 options, except the building standards and insurance premium rates may not be the same for all MoWA areas (i.e., they may be different for sheltered water MoWA areas and open coast MoWA areas). This alternative would allow more flexibility in the designation of the CAZ for building code purposes. For example, the CAZ could be designated as open coast MoWA areas (not MoWA-S areas), yet would not require changes in LiMWA mapping procedures. Alternative 5 would require open coast shorelines and associated LiMWAs to be differentiated from sheltered water shorelines and LiMWAs.

# 9.0
## Assessment of Coastal A Zone Alternatives

# 9.0 Assessment of Coastal A Zone Alternatives

This section describes the technical and policy assessments conducted in order to develop recommendations related to CAZ implementation. The section discusses both CAZ terminology and specific alternatives related to building standards and flood insurance premium rates.

Five major alternatives were outlined in Section 8.0:

1. Status Quo alternative;
2. Eliminate CAZ alternative;
3. Modify the VE Zone inland limit (from 3-foot wave height to 1.5-foot wave height);
4. Divide the AE Zone into three distinct hazard zones: MoWA, MiWA, and riverine AE; and
5. Divide the AE Zone into four distinct hazard zones – as Alternative 4, but classify coastal shorelines as "open coast" or non-open coast (sheltered water), and establish two MoWAs, a MoWA-O for open coast MoWA and a MoWA-S for non-open coast (sheltered) MoWA.

Alternatives 4 and 5 were each divided into seven sub-alternatives, each with different combinations of building standards and insurance premium rates for different hazard zones. More sub-alternatives could be described, but the seven identified seemed to be those that best balance the need to differentiate risk (and associated building standards and premium rates) with available information. Given the fact that AE sub-areas (riverine AE, MiWA, MoWA-S, and MoWA-O) have not been mapped in the past, this precludes fine distinctions being drawn using flood policy and claims data.

Assessment of these alternatives must be carried out within the context of CAZ terminology issues and history (see Section 7.0 and Appendix E), and in light of available engineering and flood insurance claims data. This context and available information may limit the ability to make judgments about and select between some of the fine-grained alternatives. However, sufficient data exist to draw conclusions and make recommendations regarding basic alternatives (see Section 10.0).

## 9.1 Coastal SFHA and CAZ Terminology Assessment

Appendix F lists and assesses terminology options. This report makes no hard-and-fast terminology recommendations, other than standardization and clarity are needed going forward (see Section 10.2). Final terminology decisions should be made after mapping, building science, and insurance issues are resolved.

## 9.2 Coastal SFHA Economic Assessments

### 9.2.1 Economic Analysis

This section describes the background, analyses, and conclusions related to the insurance and economic impacts of the coastal SFHA related to CAZ (where possible) and coastal AE Zones.

### 9.2.2 Background of NFIP Ratemaking and Coastal SFHA

NFIP underwriting, ratemaking, and claim processing were developed to support the mission of the NFIP. The NFIP is intended to 1) maintain a sound rating and coverage structure, and 2) generate premiums that at least cover expenses and losses for the "average historical loss year." For these reasons, rates for flood insurance are reviewed annually by NFIP management.

FEMA uses an actuarial rate model to calculate the rate for insuring post-FIRM individual structures located in either an A / AE Zone or V / VE Zone. The A or AE Zone and V or VE Zone terminology is considered interchangeable as a reference to FEMA flood maps hazard zones. References in this chapter and tables to the "Coastal A Zone" are intended to be related to the mapped coastal A/AE Zones within the coastal SFHA and not the CAZ.

The actuarial rate model relies on a frequency-severity approach in which actual historical claims and the estimated flood damage for modeled events are considered. Events are modeled based on their predicted frequency; larger events occur less frequently while smaller events have a relatively higher probability of occurring in a given year. The full range of flood events, from routine to extreme (i.e., 10% annual chance event to 2.0% to 1.0%, 0.4%, 0.2%, and beyond) is considered when flood premium rates are set.

The NFIP does not currently distinguish properties located in a coastal AE Zone from those in a non-coastal, i.e., "riverine" AE Zone. The goals of the economic analysis are to 1) identify differences in historical loss experienced in coastal versus riverine

AE Zones, and 2) determine the potential need for FEMA to develop a rating structure that would distinguish between coastal AE and riverine AE Zones.

### 9.2.3 Coastal AE Zone Analysis

The actuarial and economic analysis considers several different measures of historical claim cost, potential future claim costs and premium needs for riverine AE and coastal AE Zones. The analysis makes reference to certain key terms, which are specific to the insurance discussion, including:

- Loss(es) – Amounts paid or payable to claimants under the terms of an insurance policy. With respect to NFIP policies, these amounts paid or payable relate to building or contents damages caused by floods.
- Premium – Dollars collected by the insurance program to pay for annual expected losses and expenses associated with the administration of the insurance program.
- Exposure – The basic unit underlying insurance premium. The selected measure usually relates directly to loss potential. For property coverages in general (and including flood), this is often expressed as the value insured, which can also be written as the "total coverage amount" or amount of insurance ("AOI").
- Covered Unit – Number of dwellings covered under a single insurance policy. A policy for a single-family home would represent one unit; a policy for a condominium would cover several condominium units.
- Pure Premium – The amount of loss per exposure. The measure can be calculated in several ways, including loss per covered unit, loss per policy, or loss per coverage amount. For example, if the expected loss cost for a structure is $1.25 and exposure represents $100 of insured value, the expected loss (i.e., annual payments) for a $100,000 structure is $1,250. Mathematically, it is also the product of the frequency of claims per unit of exposure and severity. The analysis measures the change in loss cost over the time period included in the study.

Specifically, the analysis considers loss experience for insured properties using "pure premiums", severity of claims, and frequency of claims for riverine AE and coastal AE Zones. The goal of the analysis is to determine if there is a difference in underlying claim potential for those structures located within coastal AE Zones, which are exposed to wave action and potentially high water levels, compared with claims in riverine AE areas.

The following data were used to perform this analysis:

- Policy-in-force data by year from 1998 – 2008.
- Individual claim records for each claim filed from 1978 – 2008.

For each record, the first step in the analysis was to designate each as being either a Riverine record or a Coastal record. This was determined from the location codes included in each record, cross referenced with maps indicating which areas were considered Riverine or Coastal.

### *Pure Premium:*

The economic analysis examined Pure Premium by year and in total for the period 1998 – 2008 for post-FIRM (i.e., after the issuance of the Flood Insurance Rate Map) properties only. The analysis covers only 1998 – 2008 due to the number of years available for policy data. Also, only post-FIRM properties are considered because pre-FIRM properties were built before the issuance of the FIRM and are not built with the same building standards as post-FIRM properties. Therefore, inclusion of pre-FIRM properties would potentially distort this analysis of differences in loss experience between riverine and coastal areas.

Included are the following different groupings:

- all policies,
- all non-condominium policies, and
- all policies with occupancy type 1, which represents single family homes.

For each of the above groupings, the analysis examined:

- Total loss for building and contents divided by total exposure value for building and contents.
- Loss related to building damages only, divided by building exposure values.

Summary of this analysis is shown in Table 9-1, Table 9-2, and Table 9-3. The tables are shown both including and excluding the 2005 year (“x 2005”). The loss experience in 2005 and its impact on this analysis is discussed later this section.

Table 9-1. Countrywide A/AE Zone data (all post-FIRM claims).

| | Zone | Total Loss | Non-Zero Claim Counts | Total Coverage Amount | Total Covered Units | Loss Per Claim | Loss Per $100 Coverage | Loss Per Unit | Claims Per $100k Coverage |
|---|---|---|---|---|---|---|---|---|---|
| **Total Loss and Total Coverage** | | | | | | | | | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| | | *Data* | *Data* | *Data* | *Data* | *(2) / (3)* | *(2) / [(4) / 100]* | *(2) / (5)* | *(3)/[(4)/100,000]* |
| **1998-2008** | Riverine A | $723,415,763 | 22,133 | $6,604,150,298 | 3,630,287 | $32,685 | $11.0 | $199 | 0.34 |
| | Coastal A | $5,966,682,965 | 93,021 | $18,045,291,092 | 10,040,571 | $64,143 | $33.1 | $594 | 0.52 |
| | V Zone | $535,552,507 | 10,800 | $947,354,531 | 548,503 | $49,588 | $56.5 | $976 | 1.14 |
| | **Total** | **$7,225,651,235** | **125,954** | **$25,596,795,921** | **14,219,361** | **$57,367** | **$28.2** | **$508** | **0.49** |
| **1998-2008, x05** | Riverine A | $592,558,403 | 19,966 | $5,498,398,285 | 3,065,899 | $29,678 | $10.8 | $193 | 0.36 |
| | Coastal A | $1,005,033,385 | 40,830 | $16,337,082,832 | 9,157,341 | $24,615 | $6.2 | $110 | 0.25 |
| | V Zone | $291,514,860 | 7,931 | $838,569,185 | 489,696 | $36,756 | $34.8 | $595 | 0.95 |
| | **Total** | **$1,889,106,649** | **68,727** | **$22,674,050,302** | **12,712,936** | **$27,487** | **$8.3** | **$149** | **0.30** |
| **Building Losses and Building Coverage Amounts** | | | | | | | | | |
| | Zone | Total Loss | Bldg Non-Zero Claim Counts | Total Coverage Amount | Total Covered Units | Loss Per Claim | Loss Per $100 Coverage | Loss Per Unit | Claims Per $100k Coverage |
| | | *Data* | *Data* | *Data* | *Data* | *(2) / (3)* | *(2) / [(4) / 100]* | *(2) / (5)* | *(3)/[(4)/100,000]* |
| **1998-2008** | Riverine A | $564,445,243 | 21,257 | $5,493,484,421 | 3,630,287 | $26,553 | $10.3 | $155 | 0.39 |
| | Coastal A | $4,696,366,301 | 86,473 | $14,780,940,237 | 10,040,571 | $54,310 | $31.8 | $468 | 0.59 |
| | V Zone | $464,111,582 | 10,434 | $827,445,879 | 548,503 | $44,481 | $56.1 | $846 | 1.26 |
| | **Total** | **$5,724,923,125** | **118,164** | **$21,101,870,537** | **14,219,361** | **$48,449** | **$27.1** | **$403** | **0.56** |
| **1998-2008, x05** | Riverine A | $464,860,411 | 19,272 | $4,568,014,142 | 3,065,899 | $24,121 | $10.2 | $152 | 0.42 |
| | Coastal A | $805,995,496 | 38,750 | $13,394,485,247 | 9,157,341 | $20,800 | $6.0 | $88 | 0.29 |
| | V Zone | $259,398,868 | 7,685 | $732,156,776 | 489,696 | $33,754 | $35.4 | $530 | 1.05 |
| | **Total** | **$1,530,254,776** | **65,707** | **$18,694,656,165** | **12,712,936** | **$23,289** | **$8.2** | **$120** | **0.35** |

Table 9-2. Countrywide A/AE Zone data (post-FIRM claims only, occupancy type = 1).

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| **1998-2008** | Riverine A | $523,780,912 | 19,014 | $5,098,277,723 | 2,715,899 | $27,547 | $10.3 | $193 | 0.37 |
| | Coastal A | $4,812,396,442 | 80,214 | $12,408,437,785 | 5,802,856 | $59,994 | $38.8 | $829 | 0.65 |
| | V Zone | $364,432,776 | 8,860 | $528,694,177 | 230,355 | $41,132 | $68.9 | $1,582 | 1.68 |
| | **Total** | **$5,700,610,131** | **108,088** | **$18,035,409,685** | **8,749,110** | **$52,740** | **$31.6** | **$652** | **0.60** |
| | | | | | | | | | |
| **1998-2008, x05** | Riverine A | $416,378,973 | 17,128 | $4,262,737,981 | 2,319,732 | $24,310 | $9.8 | $179 | 0.40 |
| | Coastal A | $670,758,436 | 34,957 | $11,218,913,158 | 5,282,939 | $19,188 | $6.0 | $127 | 0.31 |
| | V Zone | $200,296,439 | 6,658 | $466,689,059 | 204,869 | $30,084 | $42.9 | $978 | 1.43 |
| | **Total** | **$1,287,433,848** | **58,743** | **$15,948,340,198** | **7,807,540** | **$21,916** | **$8.1** | **$165** | **0.37** |
| | | | | | | | | | |
| | | | | | | | | | |
| **1998-2008** | Riverine A | $404,291,863 | 18,442 | $4,168,805,529 | 2,715,899 | $21,922 | $9.7 | $149 | 0.44 |
| | Coastal A | $3,731,182,022 | 75,330 | $9,565,723,348 | 5,802,856 | $49,531 | $39.0 | $643 | 0.79 |
| | V Zone | $310,592,698 | 8,707 | $430,912,512 | 230,355 | $35,672 | $72.1 | $1,348 | 2.02 |
| | **Total** | **$4,446,066,582** | **102,479** | **$14,165,441,389** | **8,749,110** | **$43,385** | **$31.4** | **$508** | **0.72** |
| | | | | | | | | | |
| **1998-2008, x05** | Riverine A | $323,636,607 | 16,700 | $3,487,712,842 | 2,319,732 | $19,379 | $9.3 | $140 | 0.48 |
| | Coastal A | $518,699,355 | 33,735 | $8,658,582,829 | 5,282,939 | $15,376 | $6.0 | $98 | 0.39 |
| | V Zone | $176,669,405 | 6,554 | $380,178,410 | 204,869 | $26,956 | $46.5 | $862 | 1.72 |
| | **Total** | **$1,019,005,366** | **56,989** | **$12,526,474,081** | **7,807,540** | **$17,881** | **$8.1** | **$131** | **0.45** |

Table 9-3. Countrywide A/AE Zone data (post-FIRM claims only, non-condominiums).

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **1998-2008** | Riverine A | $693,207,257 | 21,681 | $5,996,231,789 | 3,038,666 | $31,973 | $11.6 | $228 | 0.36 |
| | Coastal A | $5,677,892,800 | 89,155 | $13,830,354,731 | 6,304,882 | $63,686 | $41.1 | $901 | 0.64 |
| | V Zone | $428,973,284 | 9,641 | $577,498,439 | 247,891 | $44,495 | $74.3 | $1,730 | 1.67 |
| | **Total** | **$6,800,073,341** | **120,477** | **$20,404,084,959** | **9,591,439** | **$56,443** | **$33.3** | **$709** | **0.59** |
| **1998-2008, x05** | Riverine A | $568,031,710 | 19,566 | $5,032,004,185 | 2,598,177 | $29,032 | $11.3 | $219 | 0.39 |
| | Coastal A | $822,116,904 | 38,198 | $12,501,951,607 | 5,738,192 | $21,523 | $6.6 | $143 | 0.31 |
| | V Zone | $230,528,459 | 7,177 | $509,867,125 | 220,485 | $32,120 | $45.2 | $1,046 | 1.41 |
| | **Total** | **$1,620,677,073** | **64,941** | **$18,043,822,917** | **8,556,854** | **$24,956** | **$9.0** | **$189** | **0.36** |
| | | | | | | | | | |
| **1998-2008** | Riverine A | $535,661,796 | 20,860 | $4,908,916,742 | 3,038,666 | $25,679 | $10.9 | $176 | 0.42 |
| | Coastal A | $4,429,648,065 | 83,533 | $10,712,116,423 | 6,304,882 | $53,029 | $41.4 | $703 | 0.78 |
| | V Zone | $364,531,659 | 9,457 | $469,387,149 | 247,891 | $38,546 | $77.7 | $1,471 | 2.01 |
| | **Total** | **$5,329,841,521** | **113,850** | **$16,090,420,314** | **9,591,439** | **$46,815** | **$33.1** | **$556** | **0.71** |
| **1998-2008, x05** | Riverine A | $441,283,826 | 18,918 | $4,121,048,310 | 2,598,177 | $23,326 | $10.7 | $170 | 0.46 |
| | Coastal A | $633,161,720 | 36,680 | $9,692,705,579 | 5,738,192 | $17,262 | $6.5 | $110 | 0.38 |
| | V Zone | $201,408,952 | 7,053 | $414,162,367 | 220,485 | $28,556 | $48.6 | $913 | 1.70 |
| | **Total** | **$1,275,854,498** | **62,651** | **$14,227,916,256** | **8,556,854** | **$20,364** | **$9.0** | **$149** | **0.44** |

In Tables 9-1 through 9-3, columns (7) and (8) represent measures of loss relative to exposure, specifically exposed units and exposed amount of insurance. To the extent which these values for coastal AE Zones are different than for riverine AE Zones, the assumption that there is a difference in the loss potential is supported. At the same time, as the tables show, the results of this analysis are not entirely conclusive. In particular, the inclusion of the 2005 year in the loss experience has a significant impact on the analysis. This year (2005) includes the damage caused by Hurricane Katrina, which cost FEMA in excess of $17 billion. This single storm caused more damage than that reflected by the cumulative loss payments made by the NFIP since its inception up to the time of the storm. The impact of 2005 is a significant factor in the economic analysis and is discussed in more detail in a later section.

### *Loss Severity:*

Loss severity is a measure of the amount of loss paid per claim. This analysis used the entire available claims history of the NFIP (it was not restricted to comparing loss paid per claim to policy data, which were limited in the number of years available). Pure premium was examined by year and in total for post-FIRM properties only and in several different groupings, including:

- the height of the water within the structure during the event for where a claim was filed,
- the type of building, which considers the number of floors and whether or not there is a basement,
- claims associated with specific events, such as a specific hurricane, and
- the height of the structure relative to the base flood elevation.

Table 9-4 shows the average severity of claims with payment by year for B, C, and X Zones (single group), and for riverine AE, coastal AE, and VE Zones. The overall weighted average for each group shows that coastal AE claims have a higher average severity than riverine AE claims (where the weighted average is equal to the sum of all losses over all claims, where the average shown at the bottom is the average of the average severities for each year). The averages are also shown for all years combined, excluding 2005, and for the 20-year from 1989 – 2008. The average total claim size for claims within the coastal AE Zone, $54,405, is approximately double the average within a riverine AE Zone, $27,541. This relationship is also true of the average severity for building damages (i.e., excluding payments on contents). However, when 2005 claim data are removed from the calculation, the coastal AE Zone average of $22,059 is less than the riverine AE Zone average of $25,928. The 2005 year has such a significant impact on this comparison because 1) the severity of claims in 2005 was much higher than historical averages and 2) the number of claims from Katrina is significant, giving the 2005 loss experience a lot of weight in the overall average.

An analysis including all of the 2005 claims data produces a definitive difference in the observed loss experience (i.e., pure premiums, severities) of coastal AE and riverine AE structures. Specifically, coastal AE Zones have worse loss experience. However, completely excluding the 2005 loss experience would reverse the comparison. Neither approach is ideal, and the following factors should be considered when performing this type of comparison:

- The 2005 claims related to Katrina (and other storms) are part of the overall loss experience and therefore should be included in some way in the analysis.

- The time period for which NFIP historical claim experience is available is relatively short, given the highly variable nature of flood losses. This causes the experience in 2005 to significantly distort the overall results.
- The damage caused by Hurricane Katrina was unlike many other flood events. Damages were increased due to the unusual circumstances, primarily related to the levees. After the levees broke, water entered the residential and commercial properties, and stayed at higher levels longer than normal for flood losses because there was no means for runoff. This significantly increased the amount of damage caused; however, the increase in damages was not the result of wave action, which, together with higher water levels, is usually cited as one the main reasons for potentially higher coastal AE Zone loss experience.
- The NFIP's ratemaking process currently considers Katrina losses by giving partial weight to the 2005 experience. This approach is a reasonable way of including the damages that occurred in that year and is consistent with similar applications of catastrophic loss experience in ratemaking.

The analysis also included a review of loss severity categorized in the following ways:

- Table 9-5: Average severity by the water level reached within structure for all years.
- Table 9-6: Average severity by the water level reached within structure for all years excluding 2005.
- Table 9-7: Average severity by the type of structure and inclusion/exclusion of a basement for all years.
- Table 9-8: Average severity by the type of structure and inclusion/exclusion of a basement for all years excluding 2005.
- Table 9-9: Average severity, for structures with only one or two floors and no basement, by water level reached within the structure for all years excluding 2005.
- Average severity grouped by the structure location relative to BFE. Results of this analysis are not included in the overall summary because it encountered a significant number of records with BFE values that did not appear reasonable.

Table 9-4. Average severity for post-FIRM claims.

| Year | B, C, X Zones | Riverine A | Coastal A | V Zones | Year | B, C, X Zones | Riverine A | Coastal A | V Zones |
|---|---|---|---|---|---|---|---|---|---|
| 1978 | $8,129 | None | None | None | 1978 | $7,644 | None | None | None |
| 1979 | $12,717 | $17,565 | $10,016 | $14,281 | 1979 | $10,723 | $13,308 | $8,496 | $13,840 |
| 1980 | $6,379 | $4,302 | $5,813 | $3,365 | 1980 | $5,672 | $4,100 | $4,811 | $3,294 |
| 1981 | $6,584 | $6,237 | $1,209 | $5,896 | 1981 | $4,772 | $5,157 | $1,096 | $5,896 |
| 1982 | $7,818 | $5,176 | $5,645 | $4,133 | 1982 | $6,065 | $4,754 | $4,515 | $3,038 |
| 1983 | $9,686 | $12,247 | $8,219 | $9,342 | 1983 | $7,910 | $10,094 | $6,602 | $7,650 |
| 1984 | $9,090 | $12,577 | $6,435 | $2,440 | 1984 | $6,870 | $9,625 | $5,441 | $2,239 |
| 1985 | $12,990 | $6,252 | $15,981 | $6,308 | 1985 | $9,287 | $5,278 | $11,581 | $6,033 |
| 1986 | $9,393 | $14,155 | $2,421 | $2,860 | 1986 | $7,909 | $12,220 | $2,038 | $2,788 |
| 1987 | $6,195 | $7,913 | $4,068 | $4,461 | 1987 | $5,115 | $5,734 | $3,910 | $4,246 |
| 1988 | $5,675 | $7,565 | $8,900 | $12,224 | 1988 | $5,202 | $6,149 | $6,168 | $10,809 |
| 1989 | $15,437 | $13,547 | $18,724 | $22,672 | 1989 | $13,193 | $10,994 | $17,074 | $21,890 |
| 1990 | $9,209 | $10,490 | $5,765 | $8,395 | 1990 | $7,795 | $7,812 | $4,666 | $8,395 |
| 1991 | $11,900 | $12,417 | $14,559 | $17,066 | 1991 | $10,214 | $10,243 | $12,713 | $15,009 |
| 1992 | $21,976 | $15,087 | $12,363 | $29,987 | 1992 | $18,901 | $12,070 | $10,958 | $26,553 |
| 1993 | $28,168 | $17,220 | $6,797 | $6,184 | 1993 | $20,873 | $14,243 | $5,877 | $5,974 |
| 1994 | $18,026 | $27,746 | $7,654 | $8,202 | 1994 | $14,030 | $22,770 | $6,136 | $8,173 |
| 1995 | $29,860 | $16,129 | $21,895 | $30,138 | 1995 | $26,023 | $13,155 | $17,633 | $28,633 |
| 1996 | $16,700 | $18,307 | $13,096 | $13,895 | 1996 | $14,303 | $14,165 | $12,552 | $13,129 |
| 1997 | $14,712 | $17,355 | $6,223 | $11,391 | 1997 | $12,450 | $14,153 | $5,242 | $8,864 |
| 1998 | $17,905 | $23,349 | $8,357 | $17,267 | 1998 | $14,291 | $18,747 | $7,331 | $16,429 |
| 1999 | $18,911 | $28,422 | $7,727 | $9,380 | 1999 | $15,243 | $24,869 | $6,233 | $9,117 |
| 2000 | $19,597 | $15,170 | $14,845 | $1,255 | 2000 | $13,554 | $10,393 | $10,738 | $1,024 |
| 2001 | $21,371 | $40,403 | $8,424 | $4,000 | 2001 | $16,816 | $31,402 | $6,639 | $3,868 |
| 2002 | $22,769 | $28,837 | $7,651 | $6,894 | 2002 | $18,039 | $23,464 | $6,239 | $6,369 |
| 2003 | $16,277 | $16,591 | $13,272 | $14,502 | 2003 | $13,698 | $13,944 | $11,906 | $13,316 |
| 2004 | $49,419 | $25,133 | $62,502 | $70,168 | 2004 | $43,530 | $20,375 | $54,882 | $66,845 |
| 2005 | $93,701 | $60,386 | $95,067 | $85,060 | 2005 | $81,640 | $50,169 | $81,520 | $74,468 |
| 2006 | $24,691 | $26,053 | $14,380 | $15,619 | 2006 | $20,881 | $22,402 | $12,752 | $13,646 |
| 2007 | $21,920 | $32,639 | $18,298 | $5,331 | 2007 | $18,512 | $27,050 | $15,275 | $5,330 |
| 2008 | $32,275 | $27,740 | $32,738 | $39,356 | 2008 | $24,993 | $23,524 | $26,494 | $34,790 |
| Wght Avg | $39,012 | $27,541 | $54,405 | $40,422 | Wght Avg | $32,013 | $22,398 | $45,837 | $36,475 |

| | B, C, X Zones | Riverine A | Coastal A | V Zones | | B, C, X Zones | Riverine A | Coastal A | V Zones |
|---|---|---|---|---|---|---|---|---|---|
| All years | | | | | All years | | | | |
| Average | $19,338 | **$18,900** | **$15,301** | $16,069 | Average | $16,005 | **$15,412** | **$12,917** | $14,722 |
| Wght Avg | $39,012 | **$27,541** | **$54,405** | $40,422 | Wght Avg | $32,013 | **$22,398** | **$45,837** | $36,475 |
| Stnd Dev | $16,727 | **$11,884** | **$18,906** | $19,104 | Stnd Dev | $14,585 | **$9,853** | **$16,323** | $17,286 |
| 1989 - 2008 | | | | | 1989 - 2008 | | | | |
| Average | $25,241 | **$23,651** | **$19,517** | $20,838 | Average | $20,949 | **$19,297** | **$16,643** | $19,091 |
| Wght Avg | $40,872 | **$28,334** | **$56,260** | $42,236 | Wght Avg | $33,541 | **$23,007** | **$47,463** | $38,094 |
| Stnd Dev | $18,306 | **$11,619** | **$21,931** | $21,847 | Stnd Dev | $16,170 | **$9,755** | **$18,934** | $19,721 |
| 1989 - 2008, Excl 2005 | | | | | 1989 - 2008, Excl 2005 | | | | |
| Average | $21,638 | **$21,718** | **$15,540** | $17,458 | Average | $17,755 | **$17,672** | **$13,228** | $16,176 |
| Wght Avg | $24,693 | **$25,928** | **$22,059** | $31,705 | Wght Avg | $20,428 | **$21,067** | **$18,665** | $29,254 |
| Stnd Dev | $8,924 | **$7,973** | **$13,186** | $16,205 | Stnd Dev | $7,784 | **$6,687** | **$11,501** | $15,205 |

The analysis for each of the above groups yielded results similar to the overall severity analysis. That is, when 2005 is included with the data, the coastal AE Zones show higher loss severities than riverine AE Zones; and when 2005 is excluded from the data, the riverine AE Zones show a higher severity of loss than do the coastal AE Zones. Given the fact that storms such as Rita and Katrina and other extreme coastal storms can and do occur, excluding the 2005 data completely is not recommended.

Table 9-5. Average loss per claim by water depth (all years, post-FIRM only).

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| B, C, X | Less Than 0 | $17,134,346 | $4,276,695 | $0 | $2,085 | 1,985 | 10,269 | 3% |
| | 0 to 1 | $412,353,814 | $106,739,805 | $745,190 | $24,750 | 23,323 | 21,004 | 37% |
| | 1 to 2 | $242,832,257 | $81,308,620 | $394,358 | $14,543 | 12,307 | 22,316 | 22% |
| | 2 to 3 | $127,657,850 | $42,338,325 | $151,821 | $4,232 | 4,005 | 40,205 | 6% |
| | 3 to 4 | $91,849,973 | $31,792,779 | $171,450 | $2,563 | 2,433 | 48,308 | 4% |
| | 4 to 5 | $93,171,063 | $33,136,785 | $202,998 | $2,137 | 2,034 | 59,200 | 3% |
| | 5 to 10 | $355,245,765 | $119,837,996 | $904,279 | $5,194 | 4,983 | 91,642 | 8% |
| | 10 to 15 | $257,509,828 | $84,895,025 | $540,015 | $2,877 | 2,790 | 119,202 | 4% |
| | Exclude | $404,860,217 | $121,728,595 | $1,225,997 | $9,112 | 8,697 | 57,925 | 14% |
| B, C, X Total | | $2,002,615,114 | $626,054,627 | $4,336,109 | $67,493 | 62,557 | 39,012 | 100% |
| Riverine_A | Less Than 0 | $9,255,089 | $2,183,154 | $49,430 | $1,224 | 1,177 | 9,385 | 4% |
| | 0 to 1 | $232,280,519 | $64,301,215 | $921,345 | $12,562 | 12,035 | 23,683 | 39% |
| | 1 to 2 | $116,290,170 | $33,204,353 | $231,534 | $6,744 | 6,402 | 22,201 | 21% |
| | 2 to 3 | $57,608,644 | $17,018,438 | $160,025 | $2,353 | 2,229 | 31,784 | 7% |
| | 3 to 4 | $34,477,711 | $10,230,804 | $182,206 | $1,336 | 1,278 | 33,601 | 4% |
| | 4 to 5 | $26,411,171 | $8,295,246 | $140,563 | $918 | 886 | 37,960 | 3% |
| | 5 to 10 | $69,673,191 | $20,354,140 | $421,992 | $1,850 | 1,800 | 48,892 | 6% |
| | 10 to 15 | $31,538,225 | $8,903,083 | $170,813 | $827 | 795 | 49,108 | 3% |
| | Exclude | $120,241,532 | $30,286,172 | $1,218,764 | $4,721 | 4,552 | 32,143 | 15% |
| Riverine_A Total | | $697,776,251 | $194,776,605 | $3,496,673 | $32,535 | 31,154 | 27,541 | 100% |
| Coastal_A | Less Than 0 | $21,565,416 | $4,642,740 | $60,000 | $3,434 | 3,259 | 7,649 | 3% |
| | 0 to 1 | $622,015,201 | $147,053,083 | $2,380,268 | $36,321 | 34,311 | 21,240 | 31% |
| | 1 to 2 | $654,656,434 | $205,932,351 | $3,069,573 | $25,343 | 21,620 | 34,079 | 22% |
| | 2 to 3 | $315,295,720 | $94,163,880 | $1,329,715 | $7,026 | 6,710 | 58,467 | 6% |
| | 3 to 4 | $291,876,298 | $85,426,835 | $897,703 | $5,226 | 5,048 | 72,369 | 5% |
| | 4 to 5 | $383,483,806 | $96,455,707 | $2,756,887 | $5,024 | 4,914 | 96,078 | 4% |
| | 5 to 10 | $1,090,636,096 | $269,102,008 | $4,376,011 | $12,009 | 11,735 | 113,591 | 10% |
| | 10 to 15 | $620,933,253 | $163,517,607 | $2,794,930 | $6,196 | 6,042 | 127,057 | 5% |
| | Exclude | $975,565,082 | $245,836,592 | $6,447,704 | $15,445 | 14,920 | 79,498 | 13% |
| Coastal_A Total | | $4,976,027,307 | $1,312,130,802 | $24,112,792 | $116,024 | 108,559 | 54,405 | 100% |
| V | Less Than 0 | $5,429,234 | $356,810 | $30,000 | $658 | 629 | 8,839 | 4% |
| | 0 to 1 | $108,716,637 | $11,095,420 | $336,396 | $5,222 | 5,049 | 23,008 | 34% |
| | 1 to 2 | $51,452,567 | $5,235,939 | $350,722 | $2,492 | 2,420 | 22,889 | 16% |
| | 2 to 3 | $20,247,697 | $3,683,509 | $96,748 | $694 | 656 | 34,622 | 5% |
| | 3 to 4 | $15,041,435 | $2,709,760 | $94,445 | $573 | 559 | 31,144 | 4% |
| | 4 to 5 | $12,623,971 | $1,984,225 | $113,226 | $516 | 504 | 28,530 | 3% |
| | 5 to 10 | $56,786,229 | $9,672,538 | $948,203 | $1,496 | 1,447 | 45,058 | 10% |
| | 10 to 15 | $90,609,544 | $15,496,568 | $488,389 | $939 | 907 | 113,519 | 6% |
| | Exclude | $179,757,006 | $25,381,803 | $1,130,840 | $2,745 | 2,652 | 75,144 | 18% |
| V Total | | $540,664,319 | $75,616,571 | $3,588,968 | $15,335 | 14,823 | 40,422 | 100% |

Table 9-6. Average loss per claim by water depth
(post-FIRM only and all years, excluding 2005).

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| B, C, X | Less Than 0 | $15,495,230 | $3,927,514 | $0 | 2,008 | 1,909 | 9,673 | 4% |
| | 0 to 1 | $362,134,223 | $93,702,049 | $500,139 | 22,760 | 21,585 | 20,050 | 43% |
| | 1 to 2 | $143,385,488 | $41,187,262 | $246,559 | 10,615 | 10,079 | 17,411 | 20% |
| | 2 to 3 | $67,283,327 | $20,781,368 | $67,161 | 3,336 | 3,156 | 26,418 | 6% |
| | 3 to 4 | $44,003,626 | $13,830,301 | $42,000 | 1,954 | 1,847 | 29,619 | 4% |
| | 4 to 5 | $37,430,850 | $12,701,082 | $112,998 | 1,483 | 1,403 | 33,881 | 3% |
| | 5 to 10 | $81,597,378 | $22,201,480 | $319,144 | 2,559 | 2,435 | 40,687 | 5% |
| | 10 to 15 | $40,137,033 | $10,684,827 | $235,914 | 1,045 | 1,000 | 48,859 | 2% |
| | Exclude | $181,346,742 | $43,863,015 | $489,802 | 6,842 | 6,529 | 32,987 | 13% |
| B, C, X Total | | $972,813,895 | $262,878,897 | $2,013,717 | 52,602 | 49,943 | 23,530 | 100% |
| Riverine_A | Less Than 0 | $9,019,263 | $2,118,679 | $49,430 | 1,192 | 1,147 | 9,385 | 4% |
| | 0 to 1 | $222,823,984 | $62,112,645 | $816,345 | 12,084 | 11,580 | 23,647 | 40% |
| | 1 to 2 | $101,352,238 | $28,604,547 | $188,729 | 6,197 | 5,965 | 21,001 | 20% |
| | 2 to 3 | $49,445,515 | $14,188,993 | $130,025 | 2,167 | 2,054 | 29,425 | 7% |
| | 3 to 4 | $28,522,711 | $7,905,723 | $92,206 | 1,223 | 1,167 | 29,862 | 4% |
| | 4 to 5 | $21,529,941 | $6,733,735 | $110,563 | 832 | 804 | 34,104 | 3% |
| | 5 to 10 | $50,905,623 | $13,779,203 | $227,375 | 1,623 | 1,580 | 39,995 | 5% |
| | 10 to 15 | $20,608,380 | $5,745,774 | $105,313 | 722 | 692 | 36,647 | 2% |
| | Exclude | $93,983,764 | $23,278,845 | $812,619 | 4,328 | 4,180 | 27,282 | 14% |
| Riverine_A Total | | $598,191,419 | $164,468,143 | $2,532,606 | 30,368 | 29,169 | 25,197 | 100% |
| Coastal_A | Less Than 0 | $16,758,829 | $3,714,432 | $60,000 | 3,213 | 3,050 | 6,391 | 5% |
| | 0 to 1 | $424,259,939 | $98,784,792 | $1,608,086 | 30,207 | 28,796 | 17,369 | 47% |
| | 1 to 2 | $159,262,310 | $44,246,086 | $795,049 | 12,195 | 11,652 | 16,753 | 19% |
| | 2 to 3 | $63,889,114 | $21,683,198 | $213,558 | 3,320 | 3,135 | 25,839 | 5% |
| | 3 to 4 | $47,002,387 | $15,585,331 | $95,500 | 2,208 | 2,102 | 28,389 | 3% |
| | 4 to 5 | $42,741,680 | $9,994,357 | $384,490 | 1,578 | 1,516 | 33,663 | 2% |
| | 5 to 10 | $98,303,362 | $20,229,111 | $798,772 | 2,867 | 2,745 | 41,622 | 4% |
| | 10 to 15 | $49,715,346 | $10,588,097 | $312,472 | 1,111 | 1,030 | 54,560 | 2% |
| | Exclude | $183,723,536 | $34,944,428 | $927,057 | 7,134 | 6,810 | 30,781 | 11% |
| Coastal_A Total | | $1,085,656,502 | $259,769,833 | $5,194,985 | 63,833 | 60,836 | 21,159 | 100% |
| V | Less Than 0 | $5,082,917 | $292,768 | $30,000 | 630 | 601 | 8,580 | 5% |
| | 0 to 1 | $92,891,116 | $9,861,287 | $269,831 | 4,684 | 4,529 | 21,994 | 38% |
| | 1 to 2 | $35,078,488 | $3,017,276 | $110,059 | 1,984 | 1,927 | 19,257 | 16% |
| | 2 to 3 | $11,026,480 | $1,407,812 | $15,000 | 544 | 513 | 22,885 | 4% |
| | 3 to 4 | $7,510,772 | $1,262,554 | $45,000 | 473 | 464 | 18,643 | 4% |
| | 4 to 5 | $8,547,760 | $1,209,767 | $53,226 | 425 | 418 | 23,084 | 3% |
| | 5 to 10 | $37,090,844 | $4,788,708 | $748,731 | 1,217 | 1,184 | 35,027 | 10% |
| | 10 to 15 | $56,836,563 | $7,672,452 | $211,775 | 652 | 636 | 99,265 | 5% |
| | Exclude | $81,886,667 | $8,641,525 | $242,836 | 1,857 | 1,802 | 48,880 | 15% |
| V Total | | $335,951,606 | $38,154,149 | $1,726,457 | 12,466 | 12,074 | 30,149 | 100% |

Table 9-7. Average loss per claim by structure type and inclusion/exclusion of a basement (all years, post-FIRM only).

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| B, C, X | One-No | $1,202,950,771 | $458,179,958 | $3,319,022 | 41,477 | 40,129 | 57% |
| | Two-No | $544,625,554 | $155,706,913 | $1,160,580 | 17,268 | 40,624 | 24% |
| | Three+-No | $213,938,891 | $25,512,633 | $58,614 | 4,074 | 58,790 | 6% |
| | Split-No | $11,548,748 | $3,682,571 | $45,000 | 498 | 30,675 | 1% |
| | Row-No | $4,163,375 | $188,825 | $0 | 74 | 58,814 | 0% |
| | Mobile-No | $13,493,298 | $3,749,699 | $62,788 | 1,468 | 11,789 | 2% |
| | One-Yes | $334,357 | $56,630 | $0 | 21 | 18,618 | 0% |
| | Two-Yes | $74,685,821 | $15,435,310 | $182,050 | 4,905 | 18,410 | 7% |
| | Three+-Yes | $71,729,982 | $8,197,349 | $153,500 | 3,092 | 25,899 | 4% |
| | Split-Yes | $3,132,551 | $542,970 | $0 | 308 | 11,934 | 0% |
| | Row-Yes | $183,367 | $191 | $0 | 11 | 16,687 | 0% |
| | Mobile-Yes | $519,359 | $148,869 | $0 | 43 | 15,540 | 0% |
| B, C, X Total | Total | $2,141,306,074 | $671,401,917 | $4,981,554 | 73,239 | 38,473 | 100% |
| Riverine_A | One-No | $310,123,929 | $99,211,139 | $1,352,534 | 15,323 | 26,802 | 57% |
| | Two-No | $150,388,356 | $32,928,362 | $696,264 | 6,141 | 29,965 | 23% |
| | Three+-No | $19,668,293 | $4,111,243 | $75,000 | 905 | 26,359 | 3% |
| | Split-No | $4,825,428 | $2,758,447 | $0 | 191 | 39,706 | 1% |
| | Row-No | $405,650 | $38,156 | $0 | 15 | 29,587 | 0% |
| | Mobile-No | $6,189,747 | $1,155,735 | $72,135 | 641 | 11,572 | 2% |
| | One-Yes | $167,634 | $100,981 | $0 | 7 | 38,374 | 0% |
| | Two-Yes | $30,498,206 | $4,948,908 | $411,776 | 2,127 | 16,859 | 8% |
| | Three+-Yes | $31,922,440 | $3,315,887 | $213,518 | 1,196 | 29,642 | 4% |
| | Split-Yes | $1,385,182 | $140,784 | $0 | 115 | 13,269 | 0% |
| | Row-Yes | $213 | $0 | $0 | 1 | 213 | 0% |
| | Mobile-Yes | $447,129 | $52,788 | $0 | 34 | 14,703 | 0% |
| Riverine_A Total | Total | $556,022,206 | $148,762,429 | $2,821,228 | 26,696 | 26,506 | 100% |
| Coastal_A | One-No | $2,675,089,916 | $797,284,738 | $15,104,131 | 64,234 | 54,293 | 55% |
| | Two-No | $1,590,039,149 | $405,944,821 | $4,865,658 | 33,146 | 60,365 | 29% |
| | Three+-No | $400,901,366 | $51,358,786 | $995,586 | 6,855 | 66,120 | 6% |
| | Split-No | $26,134,779 | $7,173,008 | $71,500 | 513 | 65,067 | 0% |
| | Row-No | $2,852,692 | $343,725 | $0 | 79 | 40,461 | 0% |
| | Mobile-No | $17,331,434 | $5,184,667 | $663,155 | 1,345 | 17,234 | 1% |
| | One-Yes | $513,643 | $76,046 | $0 | 39 | 15,120 | 0% |
| | Two-Yes | $152,737,637 | $31,226,539 | $2,076,907 | 6,096 | 30,519 | 5% |
| | Three+-Yes | $103,086,712 | $12,291,446 | $305,855 | 3,410 | 33,925 | 3% |
| | Split-Yes | $993,776 | $156,776 | $30,000 | 47 | 25,118 | 0% |
| | Row-Yes | $135,460 | $21,485 | $0 | 15 | 10,463 | 0% |
| | Mobile-Yes | $388,871 | $131,395 | $0 | 20 | 26,013 | 0% |
| Coastal_A Total | Total | $4,970,205,435 | $1,311,193,431 | $24,112,792 | 115,799 | 54,452 | 100% |
| V | One-No | $129,138,544 | $24,706,284 | $1,433,335 | 4,390 | 35,371 | 29% |
| | Two-No | 166,771,976 | 26,277,195 | 1,338,587 | 4,747 | 40,950 | 31% |
| | Three+-No | 109,969,964 | 9,762,072 | 244,199 | 1,943 | 61,748 | 13% |
| | Split-No | 2,248,111 | 280,479 | - | 68 | 37,185 | 0% |
| | Row-No | 210,233 | 7,432 | - | 11 | 19,788 | 0% |
| | Mobile-No | 1,024,551 | 305,812 | - | 59 | 22,549 | 0% |
| | One-Yes | 305,695 | 84,209 | - | 12 | 32,492 | 0% |
| | Two-Yes | 83,677,158 | 10,231,698 | 362,846 | 2,665 | 35,374 | 17% |
| | Three+-Yes | 45,850,951 | 3,934,962 | 210,000 | 1,404 | 35,610 | 9% |
| | Split-Yes | 583,905 | 122,504 | - | 20 | 35,320 | 0% |
| | Row-Yes | 1,041,624 | 20,000 | - | 8 | 132,703 | 0% |
| | Mobile-Yes | 35,000 | 7,500 | - | 1 | 42,500 | 0% |
| V Total | Total | 540,857,712 | 75,740,149 | 3,588,968 | 15,328 | 40,461 | 100% |

Table 9-8. Average loss per claim by structure type and inclusion/exclusion of a basement (all years, excluding 2005).

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| B, C, X | One-No | $504,562,210 | $186,652,279 | $1,513,024 | 31,187 | 22,212 | 54% |
| | Two-No | $253,474,799 | $64,224,614 | $660,278 | 13,632 | 23,354 | 24% |
| | Three+-No | $159,315,019 | $15,283,977 | $28,614 | 3,544 | 49,274 | 6% |
| | Split-No | $5,790,732 | $1,524,729 | $15,000 | 413 | 17,749 | 1% |
| | Row-No | $2,587,781 | $91,598 | $0 | 63 | 42,530 | 0% |
| | Mobile-No | $10,316,255 | $2,650,080 | $62,788 | 1,298 | 10,038 | 2% |
| | One-Yes | $327,214 | $50,341 | $0 | 19 | 19,871 | 0% |
| | Two-Yes | $57,013,553 | $11,267,446 | $62,600 | 4,367 | 15,650 | 8% |
| | Three+-Yes | $60,433,875 | $6,879,360 | $93,500 | 2,753 | 24,485 | 5% |
| | Split-Yes | $2,877,932 | $497,816 | $0 | 288 | 11,721 | 0% |
| | Row-Yes | $183,367 | $191 | $0 | 11 | 16,687 | 0% |
| | Mobile-Yes | $485,926 | $136,869 | $0 | 41 | 15,190 | 0% |
| B, C, X Total | Total | $1,057,368,663 | $289,259,301 | $2,435,804 | 57,616 | 23,415 | 100% |
| Riverine_A | One-No | $284,083,809 | $91,417,189 | $1,112,325 | 14,537 | 25,907 | 58% |
| | Two-No | $138,034,222 | $30,575,101 | $285,764 | 5,823 | 29,005 | 23% |
| | Three+-No | $18,752,922 | $4,028,216 | $75,000 | 867 | 26,362 | 3% |
| | Split-No | $4,532,185 | $2,637,898 | $0 | 179 | 40,056 | 1% |
| | Row-No | $365,650 | $38,156 | $0 | 13 | 31,062 | 0% |
| | Mobile-No | $5,687,055 | $1,060,181 | $72,135 | 612 | 11,143 | 2% |
| | One-Yes | $167,634 | $100,981 | $0 | 7 | 38,374 | 0% |
| | Two-Yes | $27,943,721 | $4,445,593 | $381,776 | 1,979 | 16,559 | 8% |
| | Three+-Yes | $30,330,982 | $3,151,759 | $183,518 | 1,118 | 30,113 | 4% |
| | Split-Yes | $1,279,994 | $136,197 | $0 | 109 | 12,993 | 0% |
| | Row-Yes | $213 | $0 | $0 | 1 | 213 | 0% |
| | Mobile-Yes | $447,129 | $52,788 | $0 | 34 | 14,703 | 0% |
| Riverine_A Tota | Total | $511,625,515 | $137,644,057 | $2,110,519 | 25,279 | 25,768 | 100% |
| Coastal_A | One-No | $435,904,130 | $152,325,602 | $2,711,901 | 31,810 | 18,577 | 50% |
| | Two-No | $286,728,303 | $70,596,721 | $1,460,539 | 18,324 | 19,580 | 29% |
| | Three+-No | $219,291,579 | $18,503,088 | $63,503 | 5,299 | 44,887 | 8% |
| | Split-No | $4,198,124 | $1,142,678 | $41,500 | 268 | 20,083 | 0% |
| | Row-No | $1,468,728 | $89,476 | $0 | 47 | 33,153 | 0% |
| | Mobile-No | $6,814,158 | $1,868,567 | $117,529 | 776 | 11,341 | 1% |
| | One-Yes | $160,373 | $25,020 | $0 | 21 | 8,828 | 0% |
| | Two-Yes | $57,688,454 | $9,056,946 | $610,306 | 4,325 | 15,574 | 7% |
| | Three+-Yes | $70,502,440 | $5,581,452 | $189,707 | 2,737 | 27,868 | 4% |
| | Split-Yes | $483,355 | $73,493 | $0 | 34 | 16,378 | 0% |
| | Row-Yes | $97,277 | $1,085 | $0 | 13 | 7,566 | 0% |
| | Mobile-Yes | $249,026 | $100,139 | $0 | 13 | 26,859 | 0% |
| Coastal_A Total | Total | $1,083,585,948 | $259,364,267 | $5,194,985 | 63,667 | 21,175 | 100% |
| V | One-No | $63,451,644 | $11,402,266 | $472,927 | 3,464 | 21,746 | 28% |
| | Two-No | $85,216,362 | $10,101,098 | $901,345 | 3,779 | 25,461 | 30% |
| | Three+-No | $86,115,772 | $6,046,303 | $207,399 | 1,658 | 55,711 | 13% |
| | Split-No | $1,218,090 | $138,605 | $0 | 59 | 22,995 | 0% |
| | Row-No | $123,468 | $7,432 | $0 | 6 | 21,817 | 0% |
| | Mobile-No | $542,260 | $190,296 | $0 | 35 | 20,930 | 0% |
| | One-Yes | $301,273 | $84,209 | $0 | 11 | 35,044 | 0% |
| | Two-Yes | $65,316,992 | $7,629,410 | $24,786 | 2,249 | 32,446 | 18% |
| | Three+-Yes | $32,123,886 | $2,512,203 | $120,000 | 1,175 | 29,580 | 9% |
| | Split-Yes | $325,505 | $22,504 | $0 | 18 | 19,334 | 0% |
| | Row-Yes | $1,026,467 | $0 | $0 | 6 | 171,078 | 0% |
| | Mobile-Yes | $35,000 | $7,500 | $0 | 1 | 42,500 | 0% |
| V Total | Total | 335,796,719 | 38,141,826 | 1,726,457 | 12,461 | 30,147 | 100% |

Table 9-9. Average loss per claim by water depth for structures with one or two floors, no basement (all years, excluding 2005).

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| B, C, X | Less Than 0 | 10,236,247 | 2,933,494 | - | 1,404 | 1,326 | 9,380 | 3% |
| | 0 to 1 | 298,193,273 | 91,426,449 | 569,894 | 20,109 | 19,136 | 19,404 | 45% |
| | 1 to 2 | 129,162,029 | 41,370,929 | 275,059 | 9,641 | 9,165 | 17,717 | 22% |
| | 2 to 3 | 56,397,500 | 20,542,143 | 64,488 | 2,962 | 2,796 | 25,997 | 7% |
| | 3 to 4 | 37,252,579 | 13,485,992 | 42,000 | 1,643 | 1,550 | 30,907 | 4% |
| | 4 to 5 | 29,548,890 | 11,437,330 | 108,398 | 1,160 | 1,106 | 35,426 | 3% |
| | 5 to 10 | 62,267,581 | 21,378,124 | 279,644 | 2,050 | 1,944 | 40,939 | 5% |
| | 10 to 15 | 28,537,729 | 9,829,988 | 175,914 | 803 | 764 | 48,000 | 2% |
| | Exclude | 106,441,180 | 38,472,442 | 657,905 | 5,047 | 4,798 | 28,843 | 11% |
| B, C, X Total | | 758,037,009 | 250,876,892 | 2,173,302 | 44,819 | 42,585 | 22,559 | 100% |
| Riverine_A | Less Than 0 | 5,204,992 | 1,690,388 | 19,430 | 653 | 629 | 10,589 | 3% |
| | 0 to 1 | 149,429,725 | 46,026,356 | 430,555 | 8,186 | 7,815 | 23,929 | 40% |
| | 1 to 2 | 81,822,537 | 23,178,459 | 65,330 | 4,516 | 4,346 | 23,265 | 22% |
| | 2 to 3 | 39,576,615 | 11,638,782 | 80,025 | 1,595 | 1,505 | 32,160 | 8% |
| | 3 to 4 | 20,607,173 | 5,008,091 | 92,206 | 823 | 786 | 31,236 | 4% |
| | 4 to 5 | 15,279,556 | 4,710,923 | 35,563 | 524 | 506 | 38,218 | 3% |
| | 5 to 10 | 33,976,235 | 8,800,512 | 175,900 | 1,040 | 1,008 | 41,301 | 5% |
| | 10 to 15 | 13,780,316 | 3,415,692 | 99,379 | 464 | 449 | 37,275 | 2% |
| | Exclude | 62,440,882 | 17,523,087 | 399,702 | 2,559 | 2,450 | 31,404 | 13% |
| Riverine_A Total | | 422,118,031 | 121,992,289 | 1,398,089 | 20,360 | 19,494 | 26,793 | 100% |
| Coastal_A | Less Than 0 | 11,527,779 | 3,068,169 | 30,000 | 2,272 | 2,162 | 6,437 | 5% |
| | 0 to 1 | 282,694,833 | 84,107,090 | 1,246,411 | 24,522 | 23,465 | 15,009 | 49% |
| | 1 to 2 | 120,891,670 | 40,227,187 | 619,968 | 9,968 | 9,529 | 16,226 | 20% |
| | 2 to 3 | 50,376,834 | 19,143,563 | 183,558 | 2,645 | 2,505 | 26,353 | 5% |
| | 3 to 4 | 35,944,387 | 13,996,142 | 95,500 | 1,689 | 1,606 | 29,625 | 3% |
| | 4 to 5 | 27,671,687 | 8,716,100 | 384,490 | 1,134 | 1,095 | 32,427 | 2% |
| | 5 to 10 | 62,337,643 | 16,537,143 | 676,487 | 1,948 | 1,883 | 40,837 | 4% |
| | 10 to 15 | 31,680,545 | 8,011,557 | 233,605 | 750 | 708 | 53,234 | 1% |
| | Exclude | 99,507,055 | 29,115,374 | 702,421 | 5,206 | 4,974 | 24,842 | 10% |
| Coastal_A Total | | 722,632,433 | 222,922,323 | 4,172,440 | 50,134 | 47,927 | 18,944 | 100% |
| V | Less Than 0 | 2,449,719 | 121,770 | 30,000 | 354 | 336 | 7,349 | 5% |
| | 0 to 1 | 41,860,049 | 6,374,782 | 189,321 | 2,835 | 2,771 | 17,081 | 39% |
| | 1 to 2 | 17,616,805 | 1,505,631 | 110,059 | 1,172 | 1,147 | 16,410 | 16% |
| | 2 to 3 | 3,718,313 | 918,483 | - | 342 | 318 | 13,558 | 5% |
| | 3 to 4 | 3,138,403 | 681,617 | 45,000 | 261 | 255 | 14,809 | 4% |
| | 4 to 5 | 4,579,105 | 806,692 | 53,226 | 244 | 240 | 22,291 | 3% |
| | 5 to 10 | 19,655,967 | 2,446,869 | 650,731 | 663 | 651 | 34,319 | 9% |
| | 10 to 15 | 22,012,899 | 3,402,279 | 145,386 | 310 | 303 | 82,453 | 4% |
| | Exclude | 33,636,746 | 5,245,240 | 150,550 | 1,062 | 1,037 | 36,754 | 15% |
| V Total | | 148,668,007 | 21,503,364 | 1,374,272 | 7,243 | 7,058 | 23,684 | 100% |

### *Claim Frequency:*

Claim frequency is a measure of the number of claims relative to an exposure measure. Table 9-1, Table 9-2, and Table 9-3 include this calculation in column (9) as number of claims per $100,000 in coverage. Consistent with the analysis of claim

severity, the frequency of coastal AE Zone claims is higher when 2005 is included in the data and lower when 2005 is excluded from the data.

Another way to estimate the claim frequency for flood claims is through the use of the NFIP's PELV curves, which are curves developed by the U.S. Army Corps of Engineers that measure the probability of the water surface reaching or exceeding a certain elevation relative to BFE. The 30 different PELV curves are distinguished by the topography of an area, which influences the chance of water reaching a certain elevation. In the current ratemaking process, NFIP uses six different curves (which are intended to be representative of all the possible PELV curves) and weights the results of the six curves based on an estimated distribution of policies by curve. The estimated distribution is based on the actual distribution of policies assigned to a numbered AE Zone, where each numbered AE Zone represents a specific PELV curve. Approximately 16 percent of all AE Zone policies are within a numbered AE Zone.

Based on 2008 policy-in-force data and non-condominium policies only, the distribution of coastal AE policies within numbered AE Zones is different than the distribution of riverine policies within numbered AE Zones. This distribution of policies is shown in Table 9-10. The cells shaded red highlight the six numbered zones with the highest concentration of policies for each: riverine areas, coastal areas, and in total. This difference in which

Table 9-10. 2008 policy-in-force data and non-condominium policies. Number of policies by riverine and coastal area.

| | | | |
|---|---|---|---|
| **A1** | 5.5% | 7.0% | 6.5% |
| A2 | 10.5% | 6.7% | 7.9% |
| A3 | 10.6% | 6.1% | 7.5% |
| **A4** | 10.2% | 9.3% | 9.6% |
| A5 | 11.0% | 5.8% | 7.4% |
| A6 | 8.7% | 4.5% | 5.8% |
| A7 | 7.4% | 16.7% | 13.9% |
| A8 | 7.1% | 13.3% | 11.5% |
| **A9** | 6.2% | 2.5% | 3.7% |
| A10 | 3.4% | 6.1% | 5.3% |
| A11 | 3.7% | 4.9% | 4.5% |
| **A12** | 2.9% | 3.6% | 3.4% |
| A13 | 2.5% | 8.0% | 6.4% |
| A14 | 1.7% | 2.2% | 2.0% |
| **A15** | 1.8% | 2.1% | 2.0% |
| A16 | 1.2% | 0.3% | 0.6% |
| A17 | 1.1% | 0.0% | 0.3% |
| A18 | 1.1% | 0.3% | 0.5% |
| A19 | 0.4% | 0.4% | 0.4% |
| **A20** | 0.9% | 0.0% | 0.3% |
| A21 | 0.8% | 0.1% | 0.3% |
| A22 | 0.3% | 0.0% | 0.1% |
| A23 | 0.3% | 0.0% | 0.1% |
| A24 | 0.0% | 0.0% | 0.0% |
| A25 | 0.2% | 0.0% | 0.1% |
| A26 | 0.0% | 0.0% | 0.0% |
| A27 | 0.0% | 0.0% | 0.0% |
| A28 | 0.2% | 0.0% | 0.1% |
| A29 | 0.0% | 0.0% | 0.0% |
| A30 | 0.1% | 0.0% | 0.0% |
| **Number of Policies** | | | |
| **Numbered A** | **113,090** | **263,317** | **376,407** |
| **Total A** | **955,824** | **1,399,256** | **2,355,080** |
| **Total V** | **870** | **51,314** | **52,184** |
| **Total Other** | **1,758,932** | **35,554** | **1,794,486** |
| **GRAND TOTAL** | **2,715,626** | **1,486,124** | **4,201,750** |

curves have the highest concentration of policies implies that the expected probability (i.e., chance) of water reaching structures within coastal AE Zones is different than the expected probability of water reaching structures within riverine AE Zones.

### 9.2.4 Summary and Conclusions

The result of the economic analysis is mixed with respect to determining whether or not this is a credible difference in the loss expectation for structures within a coastal AE Zone compared with a riverine AE Zone. As discussed previously, the complete inclusion or exclusion of 2005 drives the results of loss experience comparisons.

***Conclusions:***

- The NFIP should consider developing a separate rating group for riverine AE and coastal AE Zones. Though the rates charged to each group may be the same, the collection of data into distinct groupings will allow NFIP to begin tracking the data separately for future analysis.
- While the average claim cost of coastal AE Zones is impacted by 2005, even with 2005 claims excluded, the analysis shows that coastal AE Zones have greater variability in claims severities. The increased variability in loss experience in the coastal areas may support a different rate structure – one that would consider the increased risk for these properties in these areas. This approach would also be consistent with actuarial methods in ratemaking.
- The NFIP should consider potential fairness issues to policyholders in analyzing structures separately for coastal AE or riverine AE Zones. To the extent that one area is subsidizing the long-term expected loss levels of the other area, NFIP should attempt to quantify this subsidy, even if the rating structure is not modified to eliminate the subsidy.
- The NFIP should consider potential differences between future conditions in riverine areas and future conditions in coastal areas, as land area exposed to open coast may change differently than land area exposed to riverine areas. Any potential future difference and its impact on expected losses could influence NFIP's decision whether or not to rate the zones separately.

## 9.3 CAZ and Coastal AE Zone Alternatives Assessment

Within the coastal SFHA, the major CAZ and coastal AE Zone alternatives considered in this study include:

1. Status Quo alternative;
2. Eliminate CAZ alternative;
3. Modify the VE Zone inland limit (from 3-foot wave height to 1.5-foot wave height);

4. Divide the AE into three distinct zones: MoWA, MiWA, and riverine AE; and
5. Divide the AE into four distinct zones – follow Alternative 4, but classify coastal shorelines as "open coast" or non-open coast (sheltered water) and establish two MoWAs, MoWA-O for open coast MoWA and a MoWA-S for non-open coast (sheltered) MoWA.

A few general comments will be made, followed by a discussion of each alternative:

- Because FIRMs are used to set flood insurance premiums and mandate floodplain management requirements, an argument can be made that the maps and terminology should reflect the needs of the insurance and floodplain management programs.
- This study has been hampered by the fact that flood maps do not distinguish between all the sub-areas considered in the coastal SFHA and CAZ alternatives. Despite this, general risk trends are known as one moves from VE to riverine AE Zones.
- Limited evaluation of flood insurance data has not yet indicated the need to divide the AE Zone (forming the MoWA and MiWA) at the LiMWA, although building science studies have already suggested the need to do so.
- Future insurance and building science studies may or may not indicate the need to divide the AE Zone at the coastal/riverine boundary. If not, there would be no reason to distinguish between the riverine AE Zone and the MiWA Zone (other than for mapping completeness); if so, the division would be necessary and the terminology considerations would be complicated.
- Other issues may be associated with dividing the AE Zone at the coastal/riverine boundary. For example, the boundary may not be at the same location for the 1-percent annual chance (base) flood and the 0.2-percent annual chance flood.
- Use of terms such as "moderate" and "minimal" to describe wave heights in the MoWA and MiWA areas seem appropriate, given the use of the terms "high velocity wave action" and "coastal high hazard area" to describe the VE Zone. However, this practice is not consistent with the nomenclature adopted by FEMA to describe flood hazards in general terms (on right side of Figure 7-1, see FloodSmart.gov column), which labels both VE and AE Zones as "High Risk Areas." *(NOTE: This inconsistency already exists, even without the CAZ discussion.)*

With these and earlier comments in mind, the following statements can be made:

- Alternative 1 is rejected since Building Science and insurance analyses indicate that minimally compliant structures in AE Zones do sustain greater losses than nearby compliant VE Zone structures. Changes to the NFIP are justified.

- Alternative 2 is rejected, both for the reasons indicated for Alternative 1, and because building codes and standards already make use of (and communities enforce) VE Zone standards for many new structures in CAZs.
- That leaves Alternatives 3, 4 and 5 – or some combination thereof – as likely alternatives for the NFIP to implement. The evaluation of these alternatives will also inform CAZ terminology decisions.

Table 9-11 provides the summary assessment of the coastal SFHA alternatives for CAZ (and coastal AE Zone) as the impact they would have on flood mapping, flood insurance, and floodplain management. Discussion of CAZ Alternatives 3, 4, and 5 are included below to provide additional details on the alternatives assessment.

### 9.3.1 CAZ Alternative 3 (Modify Inland Limit of VE Zone)

This alternative would be relatively simple to implement (compared to other alternatives) – no new zones would be created, no regulatory change would be required (the 3-foot wave height limit is stipulated in guidance, not regulations), and building standards and insurance premium rates already exist for the VE Zone. The alternative is consistent with a recommendation of the National Research Council (NRC, 2009) report, *Mapping the Zone*. Many current building codes and standards[25] treat the CAZ (area subject to wave heights between 1.5 and 3 feet) as a VE Zone.

### 9.3.2 CAZ Alternative 4 (Divide Coastal AE Zone into Three Zones: MoWA, MiWA, and Riverine AE Zone)

This alternative would require changes to regulations and insurance premium rates to coincide with changes in zone designations. Further study should reveal whether building standards and premium rates must be unique within each of the three zones, or if some can be made the same.

The key decisions to be made with Alternative 4 would involve whether and how to distinguish building standards and premium rates between VE and MoWA, MoWA and MiWA, and MiWA and riverine AE Zones.

[25] The IBC®, ASCE-7, and ASCE-24 treat CAZ like VE; the IRC®, however, does not.

### 9.3.3 CAZ Alternative 5 (Divide Coastal AE into Four Zones: Open Coast and Non-Open Coast for MoWAs, MiWA, and Riverine AE Zone)

If indicated by the analysis of alternatives, Alternative 5 could allow the NFIP to refine or limit the CAZ area through a revision to PM 50 and without major changes to building codes and standards. Further study should reveal whether building standards and premium rates must be unique within each of the four zones, or if some can be made the same.

The key decisions to be made with Alternative 5 would involve whether and how to distinguish building standards and premium rates between VE and MoWA-O, MoWA-O and MoWA-S, MoWA and MiWA, and MiWA and riverine AE Zones.

Table 9-11. CAZ alternatives assessment of impacts on flood mapping, flood insurance, and floodplain management.

| ALTERNATIVE | IMPACTS ON: Flood Mapping | Flood Insurance | Floodplain Management |
|---|---|---|---|
| | | | |
| **1** Status Quo | • No change.<br>• LiMWA delineation for separation of MoWA and MiWA areas of coastal SFHA will remain focus of floodplain mapping as per PM 50 guidance.<br>• Still informational only layer when shown on DFIRM. | • No change.<br>• There are no flood insurance requirements for the LiMWA and CAZ – or for the mapping of MoWA and MiWA areas. | • No change to floodplain management regulations or implementation since LiMWA not recognized in NFIP regulations.<br>• As presently shown as informational layer on DFIRM, there are no floodplain management requirements.<br>• Communities are encouraged by FEMA to adopt the LiMWA (MoWA and MiWA) mapping for enforcement of VE Zone building standards in MoWA mapped coastal AE Zones.<br>• If adopted for voluntary enforcement of VE Zone building standards in MoWA, the communities can acquire Community Rating System points for exceeding minimum FEMA requirements. |
| | • Alternative 1 is rejected since building science and insurance analyses indicate minimally compliant structures in AE Zones do sustain greater losses than nearby compliant VE Zone structures. Changes to the NFIP are justified. | | |
| | | | |
| | • No LiMWA from wave height analyses would be needed.<br>• No distinguishing mapping feature, line, or area on DFIRM would be shown to let communities know where the inland wave damages may occur in coastal AE Zone during 1-% annual chance event. | • No change. | • No change to floodplain management regulations or implementation.<br>• Implementation of building codes and standards' CAZ requirements would be at odds with NFIP actions. |
| | • Alternative 2 is rejected, both for the reasons indicated for Alternative 1, and since building codes and standards already make use of, and communities enforce, VE Zone standards for many new structures in CAZs. | | |

Table 9-11. CAZ alternatives assessment of impacts on flood mapping, flood insurance, and floodplain management, continued.

| ALTERNATIVE | IMPACTS ON: Flood Mapping | Flood Insurance | Floodplain Management |
|---|---|---|---|
| **3** **Modify Wave Height Criteria for VE Zone Inland Limits** | • Provides better match to observed wave damages during severe coastal flood events.<br>• It will shift calculated Zone VE limits landward, and shrink coastal AE Zone extents in most cases.<br>• There will be major impacts on floodplain mapping since all of the wave height analyses would need to be updated along open coast.<br>• This alternative would negate the need for mapping guidance for LiMWA (MoWA and MiWA) and eliminate PM 50 application.<br>• If PFD mapping criteria remain in effect, it may reduce the PFD mapping effects of inland mapping extent of VE Zone and produce a more defendable quantitative method for risk-based mapping in lieu of PFD. | • Adjusting the VE Zone from 3 to 1.5 foot wave height will increase the VE Zone floodplains along open coast and inland bays.<br>• DFIRM and FIS updates to implement the new VE Zone criteria will place many AE Zone inhabitants into the VE Zone floodplain increasing premiums for new structures.<br>• There will be a increase in VE Zone policies under this alternative and decrease in the number of PFD-based VE Zone policies.<br>• Because flood premiums are modeled using quantitative methods for VE Zone and BFE distinctions, the premiums would be more likely to reflect the actual risks to structures. | • No change to floodplain management regulations or implementation.<br>• Areas subject to specific regulations will change as flood hazard zone boundaries shift.<br>• This alternative will negate need for additional NFIP changes and guideline revisions that address CAZ concepts.<br>• This alternative will help ease community burden of voluntary enforcement of building standards and regulation of mapped of MoWA and MiWA. |
| | • This alternative would be relatively simple to implement (compared to other alternatives) – no new zones would be created, no regulatory change would be required (3-ft wave height limit is in guidance, not regulations), building standards and insurance premium rates already exist for VE Zone. The alternative is consistent with a recommendation of the NRC (2009) report, *Mapping the Zone*. Many current building codes and standards[26] treat the CAZ (area subject to wave heights between 1.5 and 3 ft) as VE Zone. | | |

[26] The IBC®, ASCE-7, and ASCE-24 treat CAZ like VE; the IRC®, however, does not.

Table 9-11. CAZ alternatives assessment of impacts on flood mapping, flood insurance, and floodplain management, continued.

| ALTERNATIVE | IMPACTS ON: Flood Mapping | Flood Insurance | Floodplain Management |
|---|---|---|---|
| | | | |
| | • This alternative would need to be officially adopted in the mapping G&S for implementation beyond voluntary status.<br>• It would establish clear hazard zone areas for CAZ implementation of mapping and determination requirements.<br>• New guidance on the subdivision of SFHA between coastal and riverine will be needed.<br>• Guidance on mapping of MoWA and MiWA can be found in PM 50.<br>• A method for hazard zone labeling or shading would be needed to help map user distinguish the coastal AE Zone MoWA from MiWA. | • Because flood premiums are modeled using zone and BFE distinctions, the premiums would be more likely to reflect the actual risks to structures.<br>• If new flood insurance rating and premiums are adopted by FEMA for CAZ, then the MoWA and MiWA in coastal SFHA will be easier to track for claims and policy base, as well as separation between coastal SFHA and Riverine SFHA.<br>• With flood insurance for CAZ, an increase in premium base would be likely since the current premiums are not reflective of actual risks to coastal damage in the MoWA.<br>• Change in the flood insurance program may also lead banks to require more new flood policies for existing structures with an understanding that there is an increase in risk. | • The floodplain management regulations and implementation will need to be modified in NFIP regulations to reflect the CAZ concepts, including definition of MoWA and MiWA, and criteria for separating coastal SFHA from Riverine SFHA.<br>• Areas subject to specific regulations will change as flood hazard zone boundaries are revised to capture LiMWA, MoWA, and MiWA hazard areas.<br>• Enforcement of the MoWA building standards to match those of VE Zone structures will need special attention in floodplain management guidance. |
| | • This alternative would require changes to regulations and insurance premium rates to coincide with changes in zone designations. It is possible that some zones would not require unique building standards and premium rates (theirs would be identical to another zone) – study is required.<br>• The key decisions to make with Alternative 4 would involve whether and how to distinguish building standards and premium rates between VE and MoWA, MoWA and MiWA, and MiWA and riverine AE Zones. | | |

Table 9-11. CAZ alternatives assessment of impacts on flood mapping, flood insurance, and floodplain management, continued.

| ALTERNATIVE | IMPACTS ON: Flood Mapping | Flood Insurance | Floodplain Management |
|---|---|---|---|
| **5** **Divide the coastal SFHA into four zones** | • This alternative would need to be officially adopted in the mapping G&S for implementation beyond voluntary status.<br>• It would establish clear hazard zone areas for CAZ implementation of mapping and determination requirements.<br>• New guidance on the subdivision of SFHA between coastal and riverine will be needed.<br>• Guidance on mapping of MoWA and MiWA can be found in PM 50.<br>• New guidance needs to distinguish between open coast MoWA and sheltered waters MoWA (no change for MiWA or riverine AE Zone).<br>• A method for hazard zone labeling or shading would be needed to help map user distinguish the coastal AE Zone MoWA-O and MoWA-S from MiWA areas. | • Because flood premiums are modeled using zone and BFE distinctions, the premiums would be more likely to reflect the actual risks to structures.<br>• If new flood insurance rating and premiums are adopted by FEMA for CAZ, then the MoWA-O, MoWA-S, and MiWA will be easier to track for claims and policy base, as well as separation between coastal SFHA and Riverine SFHA.<br>• Identifying and separating the MoWA-O from MoWA-S will help track claims and policies in areas subject to different wave forces and flooding conditions.<br>• With flood insurance for "Coastal A Zone," an increase in premium base would be likely since the current premiums are not reflective of actual risks to coastal damage in the MoWA-O versus MoWA-S areas.<br>• Change in the flood insurance program may also lead banks to require more new flood policies for existing structures with understanding that there is an increase in risk. | • The floodplain management regulations and implementation will need to be modified in NFIP regulations to reflect the "Coastal A Zone" concepts, including definition of MoWA-O, MoWA-S, and MiWA, and criteria for separating coastal SFHA from Riverine SFHA.<br>• Areas subject to specific regulations will change as flood hazard zone boundaries are revised to capture LiMWA, MoWA-O, MoWA-S, and MiWA hazard areas.<br>• Enforcement of the MoWA-O and MoWA-S building standards to match those of VE Zone structures will need special attention in floodplain management criteria. |
| | • If indicated by alternatives analysis, allows the NFIP to refine or limit the "Coastal A Zone" area through a revision to PM 50, and without major changes to building codes and standards. | | |

# 10.0
## Coastal SFHA Findings and Recommendations

# 10.0 Coastal SFHA Findings and Recommendations

This section provides a summary of the key issues and findings. It provides short-term and long-term recommendations for improving flood hazard mapping, floodplain management, and flood insurance treatment of the CAZ and adjacent flood hazard areas.

Available data frequently are of insufficient detail or quality to result in evidence-based recommendations. Therefore, the findings and recommendations contained herein are based on a combination of flood insurance premium and claims data, post-hurricane building performance assessments, and expert opinion.

## 10.1 Coastal SFHA Issues

There are several issues related to mapping, regulating, and insuring coastal flood hazard areas not classified as VE Zones. Some of these issues are long-standing, and some have evolved recently, but all need to be addressed and resolved. The issues are listed below and were discussed in Section 7.0.

- existing use of the term "Coastal A Zone,"
- definitions of the coastal SFHA and CAZ,
- guidelines for mapping CAZ,
- NFIP insurance issues,
- building standards in coastal SFHA and CAZ, and
- implementation of CAZ in areas prior to mapping the LiMWA on the FIRM.

The issues can be reduced to three basic issues:

1. terminology,
2. pricing of insurance in the coastal SFHA, and
3. building standards in the coastal SFHA.

## 10.2 Coastal SFHA and CAZ Terminology

Coastal SFHA terminology is confusing. This situation is not helped by the fact that the FEMA mapping program, FEMA Building Science program, other NFIP programs, and building codes and standards, each have their own terminology related to coastal flood hazard areas. Ultimate standardization of terminology is needed, and some sort of "dictionary" relating mapping, building science, and building code language would be helpful in the interim.

## 10.3 Coastal SFHA Insurance Pricing

As was the case with the PFD study, the coastal SFHA analysis was undertaken to identify where risk and pricing are mismatched in portions of the coastal SFHA. Although not a rate setting study for new flood insurance areas like the MoWA and MiWA within the coastal SFHA, this study examined insurance and building science information to identify and characterize any such mismatches.

The economic analysis (section 9.2) determined that FEMA should consider distinguishing between the riverine AE Zone and the coastal AE zone for insurance pricing purposes. At the same time, building science evidence to support this determination is lacking, due to a lack of quantifiable field observations and related study data, not to the fact that the premise is without merit. More detailed mapping (indicating the riverine-coastal boundary) and future post-event building science and insurance studies should determine whether insurance pricing differences are justified at this boundary.

## 10.4 Coastal SFHA Building Standards

FEMA Building Science field observation and post-storm experience indicates that the MiWA and the MoWA areas should be treated differently (MoWA areas are at higher risk than MiWA), but insurance premium and claims data analyzed during the course of this study are insufficient to corroborate this change. This is primarily because the MoWA and MiWA hazard areas are not widely mapped yet, and historical claims/damage data cannot be associated with those specific areas.

FEMA Building Science post-storm data collection efforts also indicate that (at least some) MoWA areas should be treated similarly to VE Zones for building standards purposes. This premise has been the basis of CAZ building codes and standards that have been in place for the past decade. The present study took a more thorough look at whether all MoWAs should be subject to all VE Zone requirements.

## 10.5 Coastal SFHA Alternatives

Options to address the coastal SFHA issues were described in Chapter 8 and alternatives assessments presented in Chapter 9, and can be grouped into the following three broad categories:

1. No Change to Present CAZ Mapping (Status Quo),
2. Eliminate the CAZ, and
3. Modify Building Standards and/or Insurance Premium Rates, by Zone.

The third category can be separated into three alternatives (see Table 10-1). Alternatives 4 and 5 can be subdivided into a large number of building standard and insurance premium options. These options are not listed here, but were detailed in Section 8.2.

Table 10-1. List of coastal SFHA alternatives considered.

| | |
|---|---|
| **No Change to Present CAZ Mapping** | |
| Alternative 1 | Status Quo. |
| **Eliminate the CAZ** | |
| Alternative 2 | Eliminate the CAZ (LiMWA) mapping, do not change NFIP building standards or insurance premium rates for Zones AE or VE. |
| **Modify Building Standards and/or Insurance Premium Rates, by Zone** | |
| Alternative 3 | Change the inland limit of the VE Zone from a 3-foot wave height to a 1.5-foot wave height (resulting zones = VE, MiWA, riverine AE). |
| Alternative 4 | Divide AE into three distinct zones (resulting zones = VE, MoWA, MiWA, riverine AE). |
| Alternative 5 | Divide AE into four distinct zones (resulting zones = VE, MoWA-O, MoWA-S, MiWA, riverine AE). |

## 10.6 Coastal SFHA Recommendations

In keeping with the prior discussions and with data limitations, the recommendations of this study of the coastal SFHA can be summarized as follows:

- **Select Alternative 5** (divide AE into four areas: riverine AE and three coastal zones: MiWA, MoWA-Sheltered, and MoWA-Open Coast)[27]. See Table 10-2 for a depiction of the following details:
- Have graduated building standards in the coastal zones:
  - Treat the MiWA like the riverine AE, but change the lowest floor reference (from top of floor to bottom of lowest horizontal supporting member) or add freeboard to achieve the same result.
  - Treat the MoWA-O like VE for building standard purposes.
  - Relax some of the VE/MoWA-O building standards for the MoWA-S. (These are shown as MoWA building standards in Table 10-2).

[27] See Appendix G for the results of a preliminary literature review of definitions for "open coast," "sheltered waters," etc.

- Have graduated insurance premium rates in the coastal zones:
  - Charge structures in the MiWA the same AE premium rates as structures in the riverine AE.
  - Institute a new premium rate for MoWA-S and MoWA-O structures, between VE and AE rates (and charge the same insurance rate for all MoWA areas).
- For the purposes of relating flood hazard mapping and building codes/standards, define "Coastal A Zone" (as referenced by building codes and standards) as MoWA-O. Do not include MoWA-S in this definition.

Table 10-2. Recommended building standards and insurance premium rates.

| | | Hazard | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | (Riverine) AE | | *MiWA* | | *MoWA-S* | | *MoWA-O* | | VE | |
| | | B | I | B | I | B | I | B | I | B | I |
| Building Standards, Insurance Premium Rates applied | VE | | | | | | | ■ | | ■ | ■ |
| | *MoWA* | | | | | ■ | ■ | | ■ | | |
| | *MiWA* | | | ■ | | | | | | | |
| | Riverine AE | ■ | ■ | | ■ | | | | | | |

Notes: B = Building Standards applied.
I = Insurance Premium Rates charged.
Riverine AE and VE Zones are shown for context. No changes to building standards or premium rates are recommended for these zones by this study.

# 11.0

## PFD and Coastal SFHA Project Summary

# 11.0 PFD and Coastal SFHA Project Summary

In Sections 5 and 6 for PFD and Sections 9 and 10 for the study of the coastal SFHA and CAZ, alternatives and recommendations were presented. They are presented again below to allow for an assessment of areas where the two studies are interrelated and may have impacts that affect each other.

The alternatives and final recommendations presented in previous chapters for PFD and CAZ both address their respective impacts on flood mapping, flood insurance, and floodplain management. The key area of possible overlap in impacts would be on the open coast along the frontal dune ridge where the PFD VE Zone is mapped and regulated. This area does not have a CAZ component yet because the mapping is informational and optional for inclusion on the DFIRM.

In general, there is no direct connection between the two study topics since one involves the VE Zone on the primary frontal dune and the other the coastal portion of the AE Zone areas of the coastal SFHA. These two mapping methods can be easily applied together as demonstrated in recent DFIRM updates in Mississippi and New York. Since PFD VE Zone are limited to open coast areas only, the two study topics would have no impact on each other for inland bays and sheltered waters application of the CAZ criteria for MoWA and MiWA mapping. However, in eliminating the PFD VE Zone, much of this open coast hazard area will revert to AE Zone and/or X Zone depending upon the wave analysis and erosion assessments. It is at this point the two study topics start having an effect on each other.

Since the *Guidelines and Specifications* (FEMA, 2003a) for coastal flood studies and selected NFIP regulations will need to be updated and/or revised for both study topics, the recommendations adopted for both studies should be implemented together. This will allow flood mapping improvements to be initiated together, flood insurance premiums to be developed and implemented together, and any changes and revisions to the NFIP regulations can proceed through due process together.

In consideration of this summary topic, the alternatives and recommendations for each study (PFD and CAZ) are reiterated in the sections below.

## 11.1 PFD Alternatives and Recommendations

### 11.1.1 PFD Alternatives

A number of alternatives were considered in order to resolve the issues identified in Section 3.0. These alternatives can be grouped as follows:

- No change – maintain current PFD VE Zone mapping and implementation; Alternative 1.
- Modify the current dune erosion methodology, which can be implemented whether PFD VE Zone is retained, modified, or eliminated; Alternatives 2 and 3.
- Retain, but modify, the PFD VE Zone and its implementation; Alternatives 4 through 7.
- Eliminate the PFD VE Zone, with or without additional efforts to replace certain PFD VE Zone functions; Alternatives 8 through 14.

### 11.1.2 PFD Final Recommendations

The evaluation of the PFD alternatives showed that some alternatives, while desirable, may not be feasible in the short-term. Thus, recommendations are provided that phase in the implementation of some alternatives as quickly as possible, with the understanding that other alternatives may follow at some future date. Recommended alternatives are therefore classified as "short-term" or "long-term."

The fundamental recommendation of this study is to modify flood hazard mapping procedures to better capture the extent and nature of flood and erosion hazards (possibly including future conditions), to eliminate the PFD VE Zone, and to develop procedures to provide improved hazard identification, flood insurance, and floodplain management procedures just landward of the risk-based SFHA. Alternative 1 (Status Quo) is rejected.

The immediate elimination of the PFD VE Zone (without other mapping, flood insurance, and floodplain management changes) would result in undesirable consequences to the NFIP, its policyholders, and its participating communities. Therefore, Alternative 8 is not recommended as a first step, or by itself, but can be achieved in concert with other alternatives.

Implementation of certain alternatives over the short-term should proceed, whether or not PFD elimination occurs. These alternatives should help resolve or reduce problems associated with current PFD implementation. Implementation will also facilitate the elimination of the PFD and the possible expansion of dune protection and building standards into part of the former PFD footprint.

The following sequence of alternatives implementation is recommended.

### *Short-Term Recommendations:*

- **Implement Alternatives 4, 5, and 6:** Better define the alongshore and inland extents of the PFD VE Zone; test the FEMA-approved method for delineating PFDs (developed by Massachusetts CZM) in other geographic areas.
- **Implement Alternative 2:** Increase the dune reservoir required to prevent dune removal to an above-median value. This will better duplicate the extents of erosion documented during base flood events.
- **Implement Alternative 7:** Subdivide the PFD VE Zone (in the DFIRM database) into a (seaward) hazard-based section and a geomorphic-based (landward "footprint") section. This will reduce ambiguity and confusion over the basis for current VE mapping in dune areas. It will also set the stage for treating the PFD footprint area differently for dune protection, building standards, and insurance purposes.
- **Implement Alternative 14:** Although Alternative 14 (Coastal X Zone) was listed initially as a PFD-elimination alternative, it should be implemented whether or not the PFD is eliminated. A sizeable portion of NFIP policies and liability are in the X Zone. There is probably some risk associated with development in this zone, and yet there are no NFIP dune protection or building standards in this zone. Outreach efforts would be required to educate stakeholders about the hazards associated with Zone X, which most groups likely assume do not exist.

### *Long-Term Recommendations:*

- **Implement Alternative 8, with some combination of Alternatives 9, 10, and 12:** Eliminate the PFD, and develop procedures to provide improved mapping, insurance, and floodplain management provisions in the former PFD footprint. Note that implementation of Alternatives 9, 10, and 12 may be especially difficult to achieve since they require NFIP regulations outside the SFHA, or require a redefinition of which areas are subject to NFIP regulations. The best way to achieve implementation of these alternatives may be through partnerships with State and local governments. Relying on Alternative 9 will require defining the language contained in 60.3(e)(7): "man-made alterations of sand dunes which will increase potential flood damage."

### *Additional Long-Term Recommendations:*

- **Implement Alternatives 3 and/or 11:** Continuing to map flood hazards based on conditions that exist at the time of the mapping leads to preventable damage, flood insurance claims, and community disruption. Incorporation of future conditions into flood hazard mapping, floodplain management, and flood insurance is needed. Implementation of these alternatives should be coordinated with recommendations of the study titled *The Impact of Climate Change on the National Flood Insurance Program.*

One alternative has not been mentioned in the discussion above – Alternative 13, which is to replace the PFD footprint with the Coastal A Zone. Alternative 13 is rejected in its present form, given the confusion that would result from having a hazard-based (>1.5 ft wave height) definition in national building codes and standards, and simultaneously a geomorphic zone with the same name on flood hazard maps.

## 11.2 Coastal SFHA (CAZ) Alternatives and Recommendations

### 11.2.1 Coastal A Zone Alternatives

A number of alternatives were considered in order to resolve the issues identified in Section 7.0. These alternatives can be grouped as follows:

- Status Quo alternative,
- Eliminate CAZ alternative, and
- Modify Building Standards and/or Insurance Premium Rates, by Zone.

The third grouping has been divided into three alternatives:

- Modify the VE Zone inland limit (from 3-foot wave height to 1.5-foot wave height).
- Divide the AE into three distinct zones: MoWA, MiWA, and riverine AE.
- Divide the AE into four distinct zones: as above, but classify coastal shorelines as "open coast" or non-open coast (sheltered water) and establish two MoWAs, a MoWA-O for open coast MoWA and a MoWA-S for non-open coast (sheltered) MoWA.

### 11.2.2 Coastal A Zone Recommendations

In keeping with the prior discussions and with data limitations, the recommendations of this study of the coastal SFHA for CAZ can be summarized as follows:

- Select Alternative 5 (divide AE into four areas: Riverine AE and three coastal zones: MiWA, MoWA-S, and MoWA-O). See Table 10-2 for graphic depiction of the following details:
- Have graduated building standards in the coastal zones:
  - Treat the MiWA like the riverine AE, but change the lowest floor reference (from top of floor to bottom of lowest horizontal supporting member) or add freeboard to achieve the same result.
  - Treat the MoWA-O like VE for building standard purposes.
  - Relax some of the VE/MoWA-O building standards for the MoWA-S. (These are shown as MoWA building standards in Table 10-2).

- Have graduated insurance premium rates in the coastal zones:
  - Charge structures in the MiWA the same AE premium rates as structures in the riverine AE.
  - Institute a new premium rate for MoWA-S and MoWA-O structures, between VE and AE rates (and charge the same insurance rate for all MoWA areas).
- For the purposes of relating flood hazard mapping and building codes/standards, define "Coastal A Zone" (as referenced by building codes and standards) as MoWA-O. Do not include MoWA-S in this definition.

# 12.0
References

# 12.0 References

AIR. 2006. *Evaluation of the National Flood Insurance Program's Building Standards*. C.P. Jones, W.L. Coulbourne, J. Marshall and S.M. Rogers, Jr. Published by the American Institutes for Research. *http://www.fema.gov/library/viewRecord.do?id=2592*

ASCE. 1998a. *Minimum Design Loads for Buildings and Other Structures*. ASCE-7-98.

ASCE. 1998b. *Flood Resistant Design and Construction*. ASCE 24-98.

ASCE. 2005a. *Minimum Design Loads for Buildings and Other Structures*. ASCE-7-05.

ASCE. 2005b. *Flood Resistant Design and Construction*. ASCE 24-05.

ASCE. 2010. *Minimum Design Loads for Buildings and Other Structures*. ASCE-7-10.

Coastal Planning & Engineering, and URS. 1992. *Coastal Structure Damage Methodology, Final Report*. Submitted to USACE, Philadelphia District.

FEMA. 1980. *Elevating to the Wave Crest Level, A Benefit : Cost Analysis*. FIA-6.

FEMA. 1981. *Design and Construction Manual for Residential Buildings in Coastal High Hazard Areas*. FIA-7.

FEMA. 1986. *Coastal Construction Manual*. FEMA-55.

FEMA. 1988. *Basis of Erosion Assessment Procedures for Coastal Flood Insurance Studies*.

FEMA. 1991. *Flood Insurance Study Guidelines and Specifications for Study Contractors*. FEMA-37.

FEMA. 1996. *Hurricane Opal in Florida: A Building Performance Assessment*. FEMA-281.

FEMA. 1997. *A Building Performance Assessment: Hurricane Fran in North Carolina*. FEMA-290.

FEMA. 1999. *Hurricane Georges in the Gulf Coast: A Building Performance Assessment*. FEMA-388.

FEMA. 2000. *Coastal Construction Manual: Principles and Practices of Planning, Siting, Designing, Constructing, and Maintaining Residential Buildings in Coastal Areas (3rd ed.).* FEMA-55.

FEMA. 2003a. *Guidelines and Specifications for Flood Hazard Mapping Partners, Appendix D, Guidance for Coastal Flooding Analyses and Mapping*. April 2003.

FEMA. 2003b. HMTAP Task 274 Report, *Hurricane Isabel Rapid Response, Coastal Engineering and Building Science Assessment.*

FEMA. 2005a. *Guidelines for Coastal Flood Hazard Analysis and Mapping for the Pacific Coast of the United States.* Final Draft. January 2005.

FEMA. 2005b. *Mitigation Assessment Team Report: Hurricane Ivan in Alabama and Florida*. FEMA-489.

FEMA. 2005c. *Home Builders Guide to Coastal Construction*. FEMA-499.

FEMA. 2005d. *NFIP Floodplain Management Requirements Study Guide and Desk Reference.*

FEMA. 2006a. *Mitigation Assessment Team Report: Hurricane Katrina in the Gulf Coast*. FEMA-549.

FEMA. 2006b. HMTAP Task 402 Report. *Hurricane Dennis (2005) Coastal A Zone Preliminary Damage Assessment.*

FEMA. 2006c. *Recommended Residential Construction for the Gulf Coast: Building on Strong and Safe Foundations*. FEMA-550.

FEMA. 2007a. *Atlantic Ocean and Gulf of Mexico Coastal Guidelines Update*, Final Draft. February 2007.

FEMA. 2007b. Procedure Memorandum No. 47 – *Guidance for the Determination of the 0.2-Percent-Annual-Chance Wave Envelope along the Atlantic Ocean and Gulf of Mexico Coasts*. September 6, 2007.

FEMA. 2007c. *Risk Management Series, Design Guide for Improving Critical Facility Safety from Flooding and High Winds*. FEMA-543.

FEMA. 2008a. *Coastal AE Zone and VE Zone Demographics Study and Primary Frontal Dune Study to Support the NFIP*, Final Technical Report – September 2008, version 1.1, revised November 7, 2008.

FEMA. 2008b. Procedure Memorandum No. 50 – *Policy and Procedures for Identifying and Mapping Areas Subject to Wave Heights Greater than 1.5-feet as an Informational Layer of Flood Insurance Rate Maps (FIRMs)*. December 3, 2008.

FEMA. 2008c. *Guidance for Coastal Flood Hazard Analyses and Mapping in Sheltered Waters*. Technical Memorandum. February 2008.

FEMA. 2009. *Hurricane Ike in Texas and Louisiana: Mitigation Assessment Team Report, Building Performance Observations, Recommendations, and Technical Guidance*. FEMA P-757.

FEMA. 2008c. *Design and Construction Guidance for Breakaway Walls*. NFIP Technical Bulletin 9.

FEMA. 2009. *Local Officials Guide to Coastal Construction*. FEMA-P-762.

FEMA. 2010. *Hazard Mitigation Assistance Unified Guidance*. *http://www.fema.gov/library/viewRecord.do?id=4225*

Hallermeier, R. J. and P.E. Rhodes. 1988. *Generic treatment of dune erosion for 100-year event.* Proceedings of the 21st International Conference on Coastal Engineering, II, ASCE, pp. 1197-1211.

H. John Heinz III Center for Science, Economics, and the Environment. April 2000. *Evaluation of Erosion Hazards*. Washington, D.C. *http://www.heinzctr.org/publications/index.shtml*

Hwang. D. 2005. *Hawaii Coastal Hazard Mitigation Guidebook*. Hawaii Sea Grant.

IBHS. 2008. *Fortified Builders Guide*.

ICC. 2000a. International Building Code. (Other editions have been published in 2003, 2006, 2009).

ICC. 2000b. International Residential Code. (Other editions have been published in 2003, 2006, 2009).

Jackson, N, K. F. Nordstrom, I. Eliot, and G. Masselink. 2002. *Low energy sandy beaches in marine and estuarine environments: a review*. Geomorphology, Vol. 48 (2002) pp. 147-162. Elsevier Publishing.

Jones, C., B. Coulbourne, and P. Tertell. 2001. *Consideration of a New Flood Hazard Zone: the Coastal A Zone*. Proceedings of the 25th Annual Conference of the Association of Floodplain Managers. pp. 21-25.

Mahoney, M. 1990. *The Effects of Coastal Construction Standards in Reducing Damages from Hurricane Hugo*. Proceedings of the 14th Annual Conference of the Association of Floodplain Managers. pp. 195-198.

National Institute of Building Sciences. 2000. *HAZUS Flood – Preview Model Final Technical Report*.

National Research Council. 1990. Managing Coastal Erosion. Committee on Coastal Erosion Zone Management. The National Academies Press, Washington, D.C. *http://www.nap.edu/catalog.php?record_id=1446*

National Research Council. 2007. *Mitigating Shore Erosion along Sheltered Coasts*. Committee on Mitigating Shore Erosion Along Sheltered Coasts. The National Academies Press, Washington, D.C. *http://www.nap.edu/catalog.php?record_id=11764*

National Research Council. 2009. *Mapping the Zone: Improving Flood Map Accuracy*. Committee on FEMA Flood Maps. The National Academies Press, Washington, D.C. *http://books.nap.edu/catalog.php?record_id=12573*

NFIP. 2000. *Call for Issues Status Report*. *http://www.fema.gov/library/file;jsessionid=931E417D2FEE87BF622DFD33A697E852.Worker2Library?type=publishedFile&file=calliss.pdf&fileid=6a9bb720-a29c-11dc-af7a-000bdba87d5b*

NFIP. 2002. *CRS Coordinators Manual*. (See also, 2007 and later editions.)

Tung, C.C., B. Kasal, S.M. Rogers, Jr., and S.C. Yeh. 1999. *Behavior of Breakaway Wall Subjected to Wave Forces: Analytical and Experimental Studies*. North Carolina Sea Grant, North Carolina State University. Raleigh, NC.

USACE. 1975. Guidelines for Identifying Coastal High Hazard Zones. Galveston District.

# Appendices

Appendix A: List of Acronyms

Appendix B: Study Team and Review Team Meeting Notes

Appendix C: Geocoding of 2008 Study of PFD Demographics and Flood Policies

Appendix D: Guidance Documents

Appendix E: Use and Significance of Terms Related to "Coastal A Zone," 1975–2010 (See report Section 12.0 for reference citations)

Appendix F: Coastal SFHA and Coastal A Zone Terminology – Discussion and Options

Appendix G: Preliminary Literature Review for Open Coasts and Sheltered Waters

# Appendix A

## List of Acronyms

# Appendix A: List of Acronyms

| Acronym | Definition |
|---|---|
| 44 CFR | Code of Federal Regulations, National Flood Insurance Program, Title 44 for Emergency Management and Assistance |
| AIR | American Institutes for Research |
| AOI | Amount of Insurance |
| ASCE | American Society of Civil Engineers |
| ATC | Applied Technology Council |
| BFE | Base Flood Elevation |
| CAS | Casualty Actuarial Society |
| CAZ | Coastal A Zone |
| CCM | [FEMA's] Coastal Construction Manual |
| CFR | Code of Federal Regulations |
| CHHA | Coastal High Hazard Area |
| DE DNREC | Delaware Department of Natural Resources and Environmental Control |
| DFIRM | Digital Flood Insurance Rate Map |
| FEMA | Federal Emergency Management Agency |
| FHBM | Flood Hazard Boundary Map |
| FIA | Federal Insurance Administration |
| FIRM | Flood Insurance Rate Map |
| FIS | Flood Insurance Study |
| GAO | Government Accountability Office |
| IBC® | International Building Code® |
| ICC® | International Code Council® |
| IRC® | International Residential Code® |
| LiMWA | Limit of Moderate Wave Action |
| LOMA | Letter of Map Amendment |
| LOMC | Letter of Map Change |
| MA CAZ | Massachusetts Office of Coastal Zone Management |
| MAT | Mitigation Assessment Team |
| MiWA | Minimal Wave Action |

| Acronym | Definition |
|---|---|
| MoWA | Moderate Wave Action |
| MoWA-O | Open coast MoWA |
| MoWA-S | Non-open coast (sheltered) MoWA |
| NAS | National Academy of Sciences |
| NCFMP | North Carolina Floodplain Mapping Program |
| NFIP | National Flood Insurance Program |
| NIBS | National Institute of Building Sciences |
| NOAA | National Oceanic and Atmospheric Administration |
| NOAA CSC | National Oceanic and Atmospheric Administration Coastal Service Center |
| NOAA OCRM | National Oceanic and Atmospheric Administration Office of Ocean and Coastal Resource Management |
| NRC | National Research Council |
| OCC | Office of Chief Counsel |
| PFD | Primary Frontal Dune |
| PM | Procedure Memorandum |
| SFHA | Special Flood Hazard Area |
| SWEL | Stillwater Elevation |
| TB | Technical Bulletin |
| TSDN | Technical Support Data Notebook |
| USACE | U.S. Army Corps of Engineers |
| WHAFIS | Wave Height Analysis for Flood Insurance Studies |

# Appendix B

## Study Team and Review Team Meeting Notes


**B.1** **Summary of the Study Kick-off Meeting Held October 30, 2008** ***(pp. B-1 – B-5)***

**B.2** **Summary Notes for State-Stakeholder Discussions 1, 2 and 3** ***(pp. B-7 – B-14)***

**B.3** **Summary Notes for FEMA Regional Engineers Discussions 1 and 2** ***(pp. B-15 – B.18)***

**B.4** **Summary Peer Review and Project Team Meeting Notes from January 13, 2009** ***(pp. B-19 – B-31 )***

# SUMMARY OF MEETING

**RE: FEMA Climate Change & Coastal Studies Project: Primary Frontal Dune and Coastal A Zone Kick-off Meeting**

DATE: October 30, 2008 from 9:00 AM – 4:00 PM

LOCATION: AECOM, 3101 Wilson Blvd., Arlington, VA 22201

ATTENDEES:

Mark Crowell/FEMA
Jonathan Westcott/FEMA
Lois Forster/FEMA
Tom Hayes/FEMA
John Ingargiola/FEMA
Roy Wright/FEMA
Mike Goetz/FEMA Reg I (via phone/WebX)
Scott Edelman/AECOM
Perry Rhodes/AECOM
Kevin Coulton/AECOM
Cheryl Johnson/AECOM
Darryl Hatheway/AECOM
Manas Borah/AECOM
Andy Wohlsperger/AECOM
Chris Jones/CJ Associates
Krista Collier/Baker
Sharma Sabade/Deloitte
Tony Pratt/DE DNREC
Ken Ashe/NC FMP (via phone/WebX)
Doug Marcy/NOAA CSC

---

1. Introductions & Project Organization (M. Crowell & S. Edelman)

   Mark Crowell welcomed Peer Review and Project Work Teams and guests.

   a) Clarified that John Westcott is PM on Coastal Studies and Mark is COTR for entire study and PM for Climate Study.
   b) Provided a brief overview of all three studies including the reason for doing these studies, mentioned the 1991 FEMA SLR study.
   c) Provided an overview of Loss and Expenses in NFIP policies in different categories for the period 1986-2006.

   Scott Edelman emphasized the importance of this study and how profoundly it will impact national programs and discussed project organization.

2. PFD & Coastal A Zone Background (J. Westcott)

   Jonathan Westcott provided a detailed overview of Coastal Studies project and his experience with PFD and Coastal A zones.

   a) Provided an overview of relevant regulations for PFD.
   b) Explained that Procedure Memo for Coastal A Zones is drafted and mandates the mapping to show LiMWA (it is in legal department now).

3. Meeting Objectives & Project Overview (D. Hatheway)

Darryl Hatheway presented the study objectives and agenda for kick-off meeting.

a. Coastal Mapping Review Panel (P. Rhodes)
Perry Rhodes talked about the project team.
    i. Re-emphasized the importance of the study.
    ii. Described the set up of Project Work Team and Peer Review Team and their roles.

4. Coastal Demographics Report: Key Results & Summary (K. Coulton)

Kevin Coulton presented coastal demographics study information (Mark termed it as Phase 1) and provided a summary discussion of the background, study methods, results from the final Coastal Demographics Study Report.

Open discussion included:

a) Need consistency between agencies in the definition of coastal counties (and PFD and Coastal A Zone).
b) Discussed interest in extending the demographics information beyond the 100-yr to also include the 500-yr SFHA.
c) Consider claim distributions by census block vs. census block group to refine results.
d) Consider redefining and updating the existing results on population and housing densities data using census block information.
e) Discussed additional study needs to:
    i. Distinguish between coastal and riverine zones.
    ii. Refine division in Coastal AE Zones between MoWA and MiWA wave action zones.
    iii. Refine VE Zone division of PFD area and non-PFD areas.
f) Since the original Coastal Demographics Study was completed, there may be more than 500 counties loaded into that data base and some of them may be coastal counties.
    i. Instead of using Q3 data, consider updating report using this new information NFHL.
g) Discussed need to consider MoWA and MiWA estimates for coastal counties if new data is received, or should they only be based on Mississippi pilot study.
h) Discussed issue of Coastal Demographics data for further use:
    i. How good is good enough related to coastal demographics to continue into Phase 2 comfortably?
    ii. Determine how accurate data has to be for Phase 2 study.
    iii. How close are policy geocoding to real location?
    iv. Are the Mississippi pilot LiMWA study really representative of the nation.
    v. Should new NFHL data be included in demographics study?

**ACTION ITEMS:**

a) **ACTION 1: Provide copy of final (September 2008) Coastal Demographics Report to entire panel with note "FEMA Internal Document - Not For Distribution" (Mark Crowell)**
b) **ACTION 2: Distribute copy of recent USGS report on tsunami study with related assessments of seasonal housing demographics (Kevin Coulton).**
c) **ACTION 3: Contact First American to get a quote for using geo-coded policies instead of using block level census data to refine and update pilot study on PFD in Coastal Demographics Report data (Scott Edelman).**
d) **Action 4: Find out and report back information on how many more coastal counties have been loaded in NFHL since report and study completed (Kevin Coulton).**
e) **Action 5: Find out and report back information on how many coastal counties are currently under contract and/or in production where the LiMWA Procedure Memorandum guidance could be adopted for mapping (Darryl Hatheway & Krista Collier).**

5. Primary Frontal Dune Study (D. Hatheway)

Darryl Hatheway presented the scope of work and issues for the new PFD Study under the Climate Change/Coastal Studies contract, and provided an overview of the study schedule.

Open discussion included recommendations and ideas for consideration as we move into Task 2 assessment of PFD concept and application in NFIP:

a) Consider mapping PFD limits with actual calculated BFEs and keep as VE Zones.
b) Establish a building standard for PFD to be adopted by communities.
c) Establish PFD BFEs to be closer representation of flood depths as VE Zone.
d) Provide an improved definition of the slope at heel (current = relatively steep to relatively mild slope).
e) Increase dune erosion area (above the 540 SF criteria) used in wave analyses.
f) Establish a limit on size and inland distance of a PFD VE Zone, or use the number of rows of homes landward of PFD as VE Zone limit (first 2 rows?)
g) Consider adopting the "dune way" concept recommended in Phase 1 (Coastal Demographics Study).
h) Improve models and methods used for wave runup and storm surge flooding analysis over PFD areas.
i) Eliminate the "one size fits all" approach to PFD VE Zone mapping criteria.
j) Let State regulations take care of new construction standards and setbacks in PFD areas (instead of NFIP regulations).
k) Consider geo-referencing the PFD to a certain topographic contour with a set inland distance limit.
l) Consider difficulty in mapping a moving object/resource like a PFD (and inlets).

m) Consider adding to methodology the analysis of historical dune and shoreline locations in setting PFD VE Zone limits.
n) Determine how coastal structures (seawalls and revetments) should be handled relative to impact on PFD VE Zones (increase or decrease).
o) Should the PFD VE Zone be used to only protect dunes or identify risk?
p) Is it possible to capture PFD VE Zone flood risks by applying long-term erosion rates in the NFIP mapping?
q) Use state-of-the-art 2-D models to capture erosion of PFD due to interaction of wave and surge (instead of old 1-d approach).
r) Consider using the geometric dune erosion model guidance for Pacific Region in the Atlantic and Gulf Regions.
s) Need to map risk and look at dune erosion probabilities.
t) Consider a residual risk analysis for PFD areas like used for levee protected areas.
u) How would FEMA identify risks and map flood zones without PFD VE Zones?

6. Coastal A Zone Study (D. Hatheway)

Darryl Hatheway presented the scope of work and issues for the new Coastal A Zone Study under the Climate Change/Coastal Studies contract, and provided an overview of the study schedule.

Open discussion included recommendations and ideas for consideration as we move into Task 2 assessment of Coastal A Zone mapping criteria and application in NFIP:

a) Keep FEMA Strategic Plan objectives in mind during all phases of the study and potential recommendations.
b) How does the NFIP catch up with Coastal A hazard mapping consistent with building standards in place or forthcoming in building codes?
c) How can mapping standard be created and adopted to help communities show where Coastal A Zones are actually located.
d) Keep the terminology of Coastal A Zone consistent with other programs (also with other related trade groups and agencies).
e) Determine how we can avoid conflict of terminology using Coastal AE SFHAs with that for Coastal A Zone LiMWA mapping criteria (as well as MoWA and MiWA concepts).
f) Change VE Zone wave height requirements for hazard identification and mapping (also for wave runup and overtopping?).
g) Base floodplain mapping in coast on morphological and global NFIP changes to hazards.
h) Make all barrier islands a VE Zone SFHA.
i) Consider what is the "right thing to do" and "how do we do it"?
j) How do we distinguish differences in PFD VE Zone mapping criteria from coastal mainland VE Zones?
k) Consider coastal X Zone floodplain areas in future risk assessments and mapping criteria.
l) Mapping needs to communicate risk and source of flooding.

m) How can we change PFD VE Zone mapping requirements and definitions without NFIP regulatory changes?

7. Wrap Up Session & Action Items (D. Hatheway)

Darryl Hatheway presented that the next combined meeting of the Peer Review and Project Work Teams would be early in January 2009 probably via Web-X and telephone conference, and that there would be periodic updates via email.

# SUMMARY OF MEETING

**RE: FEMA Climate Change & Coastal Studies Project:**
**Primary Frontal Dune and Coastal A Zone – Task 2 State Stakeholders Tel. Conf. #1**

DATE: November 19, 2008 from 1:00 PM – 2:30 PM (ET)

LOCATION: via telephone conference

ATTENDEES:

| | |
|---|---|
| Jonathan Westcott/FEMA | Darryl Hatheway/AECOM |
| Tony Pratt/DE DNREC | Ken Ashe/NC FMP |

---

As follow-up to the Kick-Off Meeting on Oct. 30 and as part of Task 2, a series of State Stakeholders telephone conferences took place with selected members of the Peer Review Panel and Project Work Team. This allowed for a follow-up on action items from Oct. 30, continued discussions of topics as require for the Task 2 assessments, and assisted in the refinement of the options related to PFD and Coastal A Zone issues.

For this State Stakeholders telephone conference (#1), here are meeting highlights from our discussion. The notes are as follows:

**Coastal A Zones:**

(1) Concurrence that DE and NC current and future DFIRM coastal mapping projects will include Coastal A Zone LiMWA as per the forthcoming Procedure Memorandum (Tony wanted to deifer to Mike Powell for further discussion);
(2) need for outreach (at scoping and other opportunities before prelim DFIRMs are released) on what the Coastal A Zone means as an informational layer;
(3) research with MS on how the Coastal A Zone has been accepted or adopted locally in coastal county updates;
(4) look further into how building officials interpret Coastal A Zones, and the code issues and inconsistencies on Coastal A Zones at State and National level (expand discussion when Chris is available to participate); and
(5) discuss how needs and implementation plans for Coastal A Zone building standards can change in post-disaster environment.

**PFD:**

(1) Discussed existing State rules and regulations that could prevent dune alternations and set building standards in lieu of PFD VE Zone mapping;
(2) need for better coastal erosion and wave modeling technical solutions which could improve the ability to identify risk for entire dune area, and would supplement need for a PFD VE Zone (as originally needed back in 1988 because models were inadequate); and

(3) discussed that a PFD VE Zone mapping criteria should not be a State or Regional option under NFIP, and should be consistently mapped and enforced, or removed from program.

**ACTIONS:**

(1) Convene another call on (perhaps on Friday this week or Monday next week) with DE DNREC so Mike Powell can add in his insights; and

(2) Convene another group call next week with FEMA, NC FMP, DE DNREC, and Chris Jones to discuss these issues further and get Chris' insights.

# SUMMARY OF MEETING

**RE: FEMA Climate Change & Coastal Studies Project:**
**Primary Frontal Dune and Coastal A Zone – Task 2 State Stakeholders Tel. Conf. #2**

DATE: November 24, 2008 from 11:00 AM – 12:30 PM (ET)

LOCATION: via telephone conference

ATTENDEES:

| | |
|---|---|
| Perry Rhodes/AECOM | Darryl Hatheway/AECOM |
| Chris Jones/CJ Associates | Tony Pratt/DE DNREC |
| Ken Ashe/NC FMP | Mike Powell/DE DNREC |

---

As follow-up to the Kick-Off Meeting on Oct. 30 and as part of Task 2, a series of State Stakeholders telephone conferences took place with selected members of the Peer Review Panel and Project Work Team. This allowed for a follow-up on action items from Oct. 30, continued discussions of topics as require for the Task 2 assessments, and assisted in the refinement of the options related to PFD and Coastal A Zone issues.

For this second State Stakeholders telephone conference, here are meeting highlights from this discussion (a follow-up discussion to the State-Stakeholders meeting #1 on Nov. 19). The notes are as follows:

**Coastal A Zones:**

(1) We reviewed the notes from the telephone conference on Nov. 19 and to get insight from Chris Jones on building standard discussions since he was unavailable on that date.
(2) Chris clarified some building standard items regarding IBC guidance (reference to ASCE 24, which requires Coastal A Zone buildings to meet V zone requirements), and he noted that current IRC guidance does not mandate Coastal A Zone building standards, but the new 2009 IRC will require 1 ft of freeboard above the BFE in V zones and Coastal A zones recommendation.
(3) Further discussion of IBC and IRC guidance noted that, in DE and NC, the communities adopt the codes independently of State, and in NC the communities could amend the code to remove certain requirements if deemed appropriate (e.g., they could adopt IRC 2009 when it comes out, but amend it to remove the 1 ft freeboard if they wanted).
(4) Discussed need to have coastal community floodplain managers in direct coordination with building officials, especially when Coastal A Zones are to be included on DFIRMs to help them understand what the LiMWA delineation is and is not.
(5) The group did not recommend that Coastal A Zone be an option for individual FEMA Regions or State CTPs to adopt, and that it should be a requirement to map as an informational layer when PM finalized and released.

(6) It would be good to know the cost impact if a LiMWA is required for new mapping (based on new detailed wave studies) in order to help FEMA Regions and State CTPs understand cost impacts to existing and proposed studies.
(7) The group agreed that (beside obvious open coast needs) Coastal A Zones should also be mapped in the areas of inland bays and sheltered waters where the criteria can be met for inclusion (wave heights greater than 1.5 ft), with idea that the building standard require an "open foundation" but not necessarily the same as for open coast VE Zones.
(8) Discussed need for outreach to explain any differences of a new coastal A Zone building standard from VE Zone standards if recommended).
(9) It was recommended that Jonathan and Darryl expand the State insights on Coastal A Zones by contacting the State of MS (al Goodman) to determine how the LiMWA adoption process (outreach and understanding) was going for the new (post-Katrina) coastal DFIRMs.

**PFD:**

(1) We reviewed the notes from the telephone conference on Nov. 19 and continue discussions.
(2) Discuss the DE (Building Line) and NC (CAMA) coastal programs that regulate construction on and protection of dunes along the coast.
(3) Discussed need to address future risk in mapping, possibly through the inclusion of new FEMA mapping of erosion hazards (long-term shoreline change).
(4) Since some of thoughts behind the 1988 adoption of the PFD VE Zone requirement was to overcome coastal analysis limitations to identify coastal hazard risks on dunes, FEMA should consider adopting new and improved coastal hazard identification methods and models to improve dune erosion analysis and surge-wave interactions (consideration of 2-D modeling requirements instead of standard 1-D approaches now used).
(5) Discussed whether a PM could override the NFIP regulations if it attempted to clarify the regulatory intent and establish new PFD definitions and/or mapping requirements that are in conflict with NFIP regulations.
(6) Discussed the type of documentation that is submitted to determine if dune alterations increase potential flood hazards – as commonly required in community, State and NFIP regulations.
(7) It was discussed that the easiest way to modify PFD requirements would be through NFIP regulation revisions, but it was unclear if the current FEMA effort to update and revise the NFIP regulations in 44CFR was going to include part 59, 60, or 65 (where PFD issues are included).
(8) We discussed that, at a minimum, a PM could at least clarify the definition of "open coast" in the 59.1 definition of PFD and improve methods to identify the landward "heel" of the dune.

**ACTIONS:**

(1) Chris will provide a status and summary report on state-local adoption of IBC and IRC (and date) for coastal states.

(2) Chris will research and document/summarize the concept of the "open foundation" requirement for Coastal A Zones that would be different from open coast VE Zones guidance.
(3) Jonathan was going to check within FEMA to determine if PM was sufficient to override/clarify the NFIP regulations on PFD definitions and mapping requirements.
(4) Jonathan and Darryl will coordinate with Lois Forster on which NFIP regulations are being considered for change in current effort.
(5) Jonathan and Darryl will follow-up these discussions with similar FEMA Regional Engineer coordination.
(6) Jonathan and Darryl will contact Al Goodman at the State of MS to determine how the new LiMWA adoption on DFIRMs was going.

# SUMMARY OF MEETING

**RE: FEMA Climate Change & Coastal Studies Project:**
**Primary Frontal Dune and Coastal A Zone – Task 2 State Stakeholders Tel. Conf. #3**

DATE: December 2, 2008 from 11:00 AM – 12:00 PM (ET)

LOCATION: via telephone conference

ATTENDEES:
Jonathan Westcott/FEMA
Al Goodman, MS/MEMA
Darryl Hatheway/AECOM

---

As follow-up to the Kick-Off Meeting on Oct. 30 and as part of Task 2, a series of State Stakeholders telephone conferences took place with selected members of the Peer Review Panel and Project Work Team. This allowed for a follow-up on action items from Oct. 30, continued discussions of topics as require for the Task 2 assessments, and assisted in the refinement of the options related to PFD and Coastal A Zone issues.

For this third State Stakeholders telephone conference, here are meeting highlights from this discussion (a follow-up discussion to the State-Stakeholders meetings #1 and #2 on Nov. 19 and 24, respectively). The notes are as follows:

**Coastal A Zones:**

(1) Jonathan provided Al with background information on the PFD and Coastal A Zone Studies as part of the FEMA sponsored Climate Change Project. It was noted that the draft Procedure Memorandum on Coastal A Zones used for guidance in MS is still in review before it will be finalized (expected within next 30 days).

(2) Al provided insight on the model ordinance created for communities to adopt regarding the Coastal A Zone informational layer shown on new FEMA maps (LiMWA). He noted that only two communities formally adopted model ordinance to date (Pascagoula and Ocean Springs).

(3) In the model ordinance, MS requires that VE Zone building standards be followed in Coastal A Zone areas. The building standards are recommended in all coastal communities even if model ordinance not adopted yet, and local building codes require that new construction in Coastal A Zones meet VE Zone building standards.

(4) Currently in MS, the Community Rating System (CRS) provides for a credit when higher standards for building construction are enforced for Coastal A Zones. Al noted that in areas without a LiMWA mapped, the community can prepare a map of the Coastal A Zone areas.

(5) Discussion followed on what happens when the Coastal A Zone area shifts from informational to an "NFIP requirement." Jonathan mentioned that when it becomes a requirement of the NFIP associated with new building standards and/or flood insurance

premiums, then the floodplain ordinances will change and have to be formally adopted and other Federal NFIP regulations will have to be revised to include Coastal A Zones.

(6) A question came up on whether a P.E. would be need for building designs in VE Zones and Coastal A Zones to ensure building standard are incorporated properly.

(7) Al pointed out that outreach (from pre-scoping through to map release) for the new flood maps and the Coastal A Zone (LiMWA) was very critical to its current successful implementation. He recommended that other states consider the same to avoid surprises. The local building officials and floodplain management officials on the coast work close together so they are in sync with each other on the Coastal A Zone issues and implementation.

(8) Even though the Coastal A Zone are based on detailed wave analysis (as required in draft FEMA Procedure Memorandum), the delineation of the LiMWA can be protested but not appealed. This would change if the Coastal A Zone becomes an official special flood hazard area with BFEs established and insurance premiums adopted for this area.

**PFD:**

(1) It was noted that in MS, PFD VE Zones are not an issue at all historically or on new flood maps (only one small area in Jackson County presently mapped as PFD VE Zones). Therefore, the discussions were focused on Coastal A Zones.

**ACTIONS:**

(1) Keep Al informed on progress of the studies and advise him when the Procedure Memorandum is signed and official.

# SUMMARY OF MEETING

**RE: FEMA Climate Change & Coastal Studies Project:**
**Primary Frontal Dune and Coastal A Zone – FEMA Regional Engineers Tel Conf. #1**

DATE: December 1, 2008 from 2:30 PM – 3:30 PM (ET)

LOCATION: via telephone conference

ATTENDEES:

| | |
|---|---|
| Jonathan Westcott/FEMA | Darryl Hatheway/AECOM |
| Jon Janowicz/FEMA Reg III | Mark Vieira/FEMA Reg IV |
| Gary Zimmerer/FEMA Reg VI | Ed Curtis/FEMA Reg IX |
| Dave Ratté/FEMA Reg X | |

---

As follow-up to the Kick-Off Meeting on Oct. 30 and as part of Task 2, a series of State Stakeholders telephone conferences took place with selected members of the Peer Review Panel and Project Work Team. Additional insight from FEMA Regional Engineers in charge of coastal studies was deemed appropriate as follow-up. This discussion also allowed for a follow-up on action items from Oct. 30 (of which Mike Goetz/FEMA Reg I was a Peer Review Panel participant), continued discussions of topics as required for the Task 2 assessments, and assisted in the refinement of the options related to PFD and Coastal A Zone issues.

For this first FEMA Regional Engineer Stakeholders telephone conference, here are meeting highlights from this discussion (a follow-up discussion to the State-Stakeholders meetings #1 and #2 on Nov. 19 and 24, respectively). The notes are as follows:

**Coastal A Zones:**

(1) Jonathan provided everyone with background information on the program evaluation of PFD VE Zones and Coastal A Zones. These studies are part of the FEMA sponsored Climate Change Project. It was noted that the draft Procedure Memorandum on Coastal A Zones used for guidance in MS is still in review before it will be finalized (expected within next 30 days).

(2) Jonathan mentioned that an expanded briefing on the project will be conducted during the upcoming FEMA Risk Analysis Division meeting in Philadelphia, including a Coastal Integrated Performance Team meeting on this and other coastal topics.

(3) With the Coastal A Zone PM adoption coming soon, Jonathan asked which Regions had projects ready or planned for implementation:

   a. Region VI – Texas coastal studies have already been scoped and did not include LiMWA mapping. LA coastal studies already released and did not include LiMWA due to expansive wave hazard zones and many transitions from VE to AE Zones throughout area.

b. Region IV – Not sure if any of the new coastal studies underway would include Coastal A Zones. Mississippi first official mapping of LiMWA based on draft PM. They would like to add to new contracts and any existing if not too costly to implement.
c. Region III – They will consider adding Coastal A Zones to new coastal studies as well, provided PM guidance not too costly to implement. Some concern expressed on NFIP impacts if informational area (as proposed for Coastal A Zone) becomes a requirement inclusive of new insurance premium adjustments. Any requirement for Coastal A Zone enforcement would also likely require floodplain ordinance changes, which are difficult.
d. Region IX – No experience on the Coastal A Zone issues, since most dominant wave action is wave runup above SWEL (not overland wave heights where LiMWA is mapped). If needed, Region IX would include in new coastal studies.

(4) We discussed plans to include outreach in new coastal studies starting at pre-scoping where Coastal A Zones are going to be added.
(5) The concept of changing the VE Zone criteria to be a 1.5 foot wave height instead of 3 foot was considered, but the impacts to models and guidelines would be considerable – and there would be mismatch with 3 foot wave runup height criteria (which is not included in Coastal A Zone or LiMWA mapping.
(6) The building standards in the Coastal A Zones will still be the same as VE Zones, as per NFIP regulations and other guidance.

**PFD:**

(1) Discussed existing rules and regulations that could prevent dune alternations and set building standards in lieu of PFD VE Zone mapping;
(2) None of the regions expressed any notable experience with applying the PFD VE Zone criteria in coastal studies since it was generally a high risk coastal dune area subject to wave effects, erosion, and overtopping not always captured by coastal modeling. The exception related to PFD problems have been found in Lewes, DE and Currituck County, NC due to some unique primary frontal dune scenarios.
(3) Any change in PFD criteria would have impacts on study contracts, and would need to be assessed to avoid regional problems and maintain consistency in approach.

**ACTIONS:**

(1) We will convene another call on Dec. 2 to discuss issues with Dave Ratté in Region X, since he could not join call today. Attempt to do the same with Paul Weberg in Region II.
(2) Group would like to be kept updated on study progress especially if any changes to current coastal guidelines will be forthcoming.

# SUMMARY OF MEETING

**RE: FEMA Climate Change & Coastal Studies Project:**
**Primary Frontal Dune and Coastal A Zone – FEMA Regional Engineers Tel. Conf. #2**

DATE: December 2, 2008 from 10:30 AM – 11:00 AM (ET)

LOCATION: via telephone conference

ATTENDEES:

| | |
|---|---|
| Jonathan Westcott/FEMA | Dave Ratté/FEMA Reg X |
| Darryl Hatheway/AECOM | |

---

As follow-up to the Kick-Off Meeting on Oct. 30 and as part of Task 2, a series of State Stakeholders telephone conferences took place with selected members of the Peer Review Panel and Project Work Team. Additional insight from FEMA Regional Engineers in charge of coastal studies was deemed appropriate as follow-up. This discussion also allowed for a follow-up on action items from Oct. 30 (of which Mike Goetz/FEMA Reg I was a Peer Review Panel participant), continued discussions of topics as required for the Task 2 assessments, and assisted in the refinement of the options related to PFD and Coastal A Zone issues.

For the first FEMA Regional Engineer Stakeholders telephone conference on Dec. 1, the representative from FEMA Region X was unable to attend, so we wanted to provide an update and discuss Region-specific issues. Here are meeting highlights from this discussion (a follow-up discussion to FEMA Regional Engineers Stakeholders telephone conference #1 on Dec. 1), as follows:

**Coastal A Zones:**

(1) Jonathan provided Dave with background information on the PFD and Coastal A Zone Studies as part of the FEMA sponsored Climate Change Project. It was noted that the draft Procedure Memorandum on Coastal A Zones used for guidance in MS is still in review before it will be finalized (expected within next 30 days).

(2) Jonathan mentioned that an expanded briefing on the project will be conducted during the upcoming FEMA Risk Analysis Division meeting in Philadelphia, including a Coastal Integrated Performance Team meeting on this and other coastal topics.

(3) Region X has several coastal study efforts underway in Oregon (Coos and Tillamook County), Washington (King County), and Alaska (Juneau), but the Coastal A Zone criteria would not be a critical component (likely due to extreme wave runup dominating overland wave propagation).

**PFD:**

(1) Discussed existing State rules and regulations that could prevent dune alternations and set building standards in lieu of PFD VE Zone mapping;

(2) There are PFD Zone mapping criteria in the Pacific guidelines so it would be required criteria for VE Zones and implemented as-is in all new coastal studies (underway or planned).
(3) Discussed need for better coastal erosion and wave modeling technical solutions which could improve the ability to identify risk for entire dune area, and would supplement need for a PFD VE Zone (as originally needed back in 1988 because models were inadequate); and
(4) Discussed that a PFD VE Zone mapping criteria should not be a State or Regional option under NFIP, and be consistently mapped and enforced or unilaterally removed from program.

**ACTIONS:**

(1) Region X would like to be kept updated on study progress especially if any changes to current coastal guidelines will be forthcoming.

# FEMA Climate Change & Coastal Studies Project: Primary Frontal Dune and Coastal A Zone Studies

**Meeting Subject:** Task 2 Assessments - Summary Telephone Conference

**Date:** Tuesday, January 13, 2009
**Time:** 10:00 AM – Noon (ET)

**ATTENDEES:**
Mark Crowell/FEMA
Jonathan Westcott/FEMA
Lois Forster/FEMA
John Ingargiola/FEMA
Mike Goetz/FEMA Region I
Perry Rhodes/AECOM
Kevin Coulton/AECOM
Cheryl Johnson/AECOM
Darryl Hatheway/AECOM
Manas Boras/AECOM
Andy Wohlsperger/AECOM
Krista Collier/Baker
Sharma Sabade/Deloitte
Tony Pratt/State of DE (DNREC)
Ken Ashe/State of NC (NCEM)
Doug Marcy/NOAA CSC
Dan Spafford/FEMA

**INVITED – NOT AVAILABLE:**
Scott Edelman/AECOM
Tom Hayes/FEMA
Susan Pino/Deloitte
Emily Hirsch/FEMA
Roy Wright/FEMA
Chris Jones/CJ Associates

**MEETING TOPICS AND DISCUSSION:**

1. **Introductions** (J. Westcott)
   Jonathan introduced all the attendees on the call, and noted that John Ingargiola was going to join the call in progress.

2. **Meeting Objectives & Progress Report** (J. Westcott)
   Jonathan explained that the purpose of this meeting was to bring the entire Coastal Mapping working group – Project Team and Peer Review Team - on the activities since the kick-off meeting on Oct. 30. He updated the group on the call that was conducted as stakeholder outreach with both State and FEMA Regional Engineer representatives. The purpose was to dig deeper into the Coastal A Zone and PFD issues raised at the kick-off meeting. With the Task 2 assessments wrapping up, discussions amongst the entire working group were needed to try and reach consensus and narrow down the options and alternatives to be explored in the Task 3 economic and actuarial analyses. This telephone conference would provide a Task 2 update, explain assessment topics, and provide a forum to discuss alternatives and options.

3. **Primary Frontal Dune Study Task 2 Assessment** (D. Hatheway)
   a. PFD VE Zones – Background & Update
      i. Federal Regulations on PFD – Discussion included the project team efforts to review the existing NFIP regulations on the PFD. This review culminated with a conference call with the FEMA Office of Chief Counsel (OCC) regarding possible scenarios of waiving the requirement to map the PFD VE Zone. The resulting answer was that there were no mechanisms to waive the NFIP regulations, if a primary frontal dune is present it must be mapped as a VE Zone.
      ii. Proposed 1987 & Final 1988 PFD Rulemaking – Discussion included the Federal Register proposed 1987 and final 1988 rulemaking on the issue of PFD VE Zone mapping (along with erosion methods). The project team explored interpretations and intent of the NFIP regulatory program to see if any program actions contradicted the intent and could be clarified in a procedural or technical memorandum. The definitions adopted were as subject of focus.
      iii. 1976 versus 1988 Coastal High Hazard Area (CHHA) Definitions:
         1. 1976 44CFR 59.1 Definitions. In 1976, the CHHA was defined as: "***Coastal high hazard area*** means the area subject to high velocity waters, including but not limited to hurricane wave wash and tsunamis. The area is designated on a FIRM as Zone V1-30, VE, or V."
         2. 1988 44CFR 59.1 Definitions. - In the 1988, the revised definitions were: "***Coastal high hazard area*** means an area of special flood hazard extending from offshore to the inland limit of a primary frontal dune along an open coast and any other area subject to high velocity wave action from storms or seismic sources."
         3. Discussions amongst the project team and with FEMA OCC pointed out that the 1988 definition was describing two different VE Zones; one the inland limit of a primary frontal dune along an open coast; and the other being, and any other area subject to high velocity wave action from storms or seismic sources. This clarification changes previous interpretations that influenced the Lewes, DE PFD application. Lewes is clearly not on the open coast, but was subject to high velocity wave action on the dunes along Delaware Bay. FEMA OCC agreed that a "comma" should have been inserted and that the definition was for two separate areas. Further coordination with FEMA Region III and State of Delaware on correcting (eliminating) the PFD mapping in Lewes would be a follow-up action to that clarification.
      iv. Current 44CFR Regulation Review – There was discussion of team review of possible changes that would be needed to revise, modify and change the NFIP regulations regarding PFD mapping, to either clarify technical issues or remove mapping requirement. The areas in need of focus for changes would be as follows:

1. 59.1 Definitions of PFD and CHHA
2. 60.3(e)(7) Floodplain Ordinances
3. 65.11 Primary Frontal Dune & LOMCs

v. Appendix D Coastal Guidelines – The review of the Atlantic/Gulf, Great Lakes, and Pacific guidelines was discussed relative to the consistency of describing the PFD requirements. It was noted that the Atlantic/Gulf and Pacific both have PFD mapping requirements consistent with each other and the NFIP regulations. Further work is underway on the Great Lakes since new guidance is under development by Region II and the USACE Detroit District.

b. Task 2 Assessment Topics – The following topics were a focus of the assessment task to resolve PFD issues and concerns.

i. Refining Definition – Improved definitions could help avoid inappropriate and unintended inclusion of PFD VE Zone areas in mapping.

1. Open Coast – Provide a supporting definition in NFIP regulations or guidelines to explain what open coast means for PFD VE Zones. This includes using other non-NFIP coastal engineering references with existing open coast definitions. Defining open coast long wave periods, extreme wave forces, and duration of significant wave events could improve understanding of what differentiates open coast areas from sheltered waters and inland bay when application of PFD criteria are considered.
2. Significant Wave Action – A definition of significant wave action would correspond to coastal storm event duration and wave periods associated with the event.
3. Detailed Engineering Analyses – This was considered as an alternative to applying PFD criteria by using more detailed and complex 1-D and/or 2-D coastal models. While improved modeling could help in erosion and overtopping detailed analyses, the PFD criteria could not be waived as per NFIP regulations.

ii. Modeling Issues & Deficiencies – In areas where PFD criteria application are questionable, improved coastal modeling (1-D and/or 2-D) could better identify true risk to flooding on PFD. Although each was considered, the PFD criteria as per NFIP regulations could not be waived

1. Erosion – Improving existing 540-SF method could help erosion assessment.
2. Wave Runup – New and improved wave runup method of 2% analysis may eliminate previous underestimation of wave runup using mean runup levels.
3. Wave Overtopping – This topic was not clearly resolved, but it may be that new 1-D and/or 2-D coastal modeling approaches may better define wave overtopping during base flood event.
4. Overland Wave Height – The existing WHAFIS still provides the only guidance for overland wave analysis.

iii. Life Without PFD – The team considered how to maintain certain benefits of the PFD criteria if it were removed from NFIP Regulations.
   1. Building Standards – VE Zone building standards prevent building damages on dune provided PFD is applied. In many areas, if PFD is not applied the SFHA designation is reduced to AE Zone or removed altogether Zone X (Zone C, or Zone B). Provisions of NFIP Regulations in 60.3(e)(7) would need to be made general provisions of floodplain ordinance. It was noted by Peer Review Team (L. Forster) that 1976 NFIP floodplain ordinances (prior to 1988 PFD changes) required building standards and dune protection, but they were only enforced in VE Zones. Many coastal States also have programs to guide coastal construction and should be adequate in lieu of NFIP Regulations, but not all States have their own mandatory programs and rely on FEMA criteria (need to document which States have programs to enforce building standards).
   2. Dune Protection – Like building standards, many States have dune protection programs, but some coastal States rely on FEMA criteria (need to document which States have programs to enforce building standards).
   3. Enforcement – Without PFD criteria in NFIP Regulations, there would be nothing to enforce regarding building standards
   4. Zone E Mapping – This SFHA is defined in the NFIP Regulations as "flood related erosion" and could be a mechanism to map primary frontal dunes in lieu of PFD criteria. The Peer Review Panel (M. Crowell) noted that more research on Zone E is needed before it could be considered. Use of this SFHA to replace PFD mapping would likely need further definition if NFIP Regulations are revised.
   5. "Dune Way" Concept – This concept would be similar to Zone E as a supplemental mapping method for areas removed from PFD criteria, and still allow for VE Zone building standards and dune protection criteria to be enforced. NFIP Regulations revisions would be needed for this approach too.
   6. A new topic of discussion was presented by Peer Review Panel (D. Marcy) for identifying inlet hazard areas, and if they should be included in coastal mapping program and PFD criteria. More research on this topic is needed.

iv. Mapping PFD VE Zones & BFEs – If PFD VE Zone mapping is to be retained, the mapping criteria should be reconsidered to better reflect the BFE relative to the ground elevation over the dune. The problem identified was that the dune profiles change alongshore and would negate transect specific BFEs. A better description of which seaward BFE should be extended landward to the heel of dune is needed in the guidelines – last

computed AE Zone wave height or last computed VE Zone wave height from seaward wave analysis.

1. Extend Last VE Zone BFE – This mapping option is considered the standard mapping recommendation. If so, it needs to be clarified why it would be applicable in all occurrences of PFD mapping.
2. BFE Profile Over Dune – This would be an ideal approach if all dunes were uniform in height and width between transects, and would help alleviate LOMA applications based on lowest adjacent grade relative to mapped VE Zone BFE. Unfortunately, dunes are highly variable and there would still be occurrences where dune elevations would exceed the mapped BFEs between transects (and trigger PFD VE Zone LOMA applications).
3. Refer to Technical Bulletin 5 Update (Structural Foundations) – Even without PFD VE Zones mapped according to a transect BFE profile to help guide construction, the update to FEMA Technical Bulletin 5 will help provide guidance on how to establish structure foundations in VE Zone where existing grade elevations are above the BFE. This update will require VE Zone construction in those scenarios for lowest horizontal structural member being 1 foot above the ground elevation or BFE, whichever is higher.

v. Unfairness Issues – There are several unfairness issues included in the assessment that may or may not get resolved based on final recommendations of this study.

1. Pre- and Post-Storm Dune Analysis – The start of a coastal study can't be predicated by when or if a coastal storm disaster has occurred. However, it was noted that a method for PFD VE Zone mapping in both pre- and post-storm scenarios should be established as part of the guidelines.
2. Dune Gap Issue (e.g., Lewes, DE) – The dune gap issue can be more a result of pre- and post-development than a result of a coastal storm event. However, it was noted that a method for PFD VE Zone mapping in both pre- and post-dune loss scenarios should be established as part of the guidelines.
3. Eroded Dunes (Complete/Partial)
4. Detailed Analysis Trigger (versus Standard PFD) – While this topic had some promise for waiving the PFD requirement, OCC determined it was not possible. Combining the detailed analysis with PFD would be acceptable and provide better analysis of wave, erosion, and overtopping effects and may negate need to apply PFD (if VE Zone extends over entire dune area).
5. New Models for Detailed Analysis – These models should be considered as detailed analysis methods that exceed current FEMA minimum requirements (WHAFIS, 540-SF erosion, and TAW 2% runup):

a. SBEACH – A USACE modeling system for erosion processes in conjunction with designated storm events. Not on FEMA's accepted models list.
b. Delft 3-D – An overtopping methodology recently applied in Long Island (Fire Island to Montauk Study) along with ADCIRC. Not on FEMA's accepted models list, but accepted by FEMA Region II.
c. SWAN-STWAVE (for 2-D Waves) – SWAN is 2-D wave model accepted by FEMA for use on coastal studies (wave setup and initial wave conditions for WHAFIS) developed by Delft. STWAVE is a 2-D model developed by USACE and also accepted by FEMA for coastal studies (wave setup and initial wave conditions for WHAFIS).

6. Increase/Decrease in 540 SF Erosion Criteria – A supporting study to revise the 1988 adopted criteria, as published in the NFIP Regulations, is needed if the 540-SF is to be modified. Historical erosion evidence can supersede 540-SF criteria if quantified and documented. It was noted by Peer Review Panel (D. Marcy) the historical data requirements should be clarified, and a question came up about use of Great Lakes historical data. The 270-SF criteria adopted from Great Lakes erosion assessments was based on historical pre- and post-storm erosion analysis correlated to the event return period in the Great Lakes region, identical to the process by which the 540-SF criteria was developed.

vi. Another new topic was raised by the Peer Review panel (K. Ashe) regarding justification and NFIP Regulation references to support LOMA denials in VE Zone with PFD. More research was needed on this topic to clarify VE Zone and PFD map revision criteria and it application to LOMA process.

c. Task 2 Options & Alternatives – The following were described but no action taken. Further review of each is required before final consideration in Task 3.
   i. Status Quo = no change in PFD regulations or mapping criteria.
   ii. Status Quo + Procedure Memorandum = no change in PFD regulations or mapping criteria + Procedure Memorandum to clarify methods to apply that would waive certain elements of implementation of PFD criteria (not available after OCC discussions)
   iii. Status Quo + PM + Clarify Inland Limit & May 1988 NFIP Regulation Changes = no change in PFD regulations or mapping criteria + Procedure Memorandum to clarify methods to apply that would waive certain elements of implementation of PFD criteria (not available after OCC discussions) + refine and clarify the definition of the landward heel of dune as per NFIP regulations
   iv. Eliminate PFD Altogether (new NFIP Regulations) = remove all references of the PFD VE Zone mapping criteria in NFIP regulations

v. Eliminate PFD Altogether + Retain 44CFR 60.3(e)(7) Dune Protection & Building Standards = remove all references of the PFD VE Zone mapping criteria in NFIP regulations + copy building and dune protection language into the general provisions of regulations in 44CFR 60.3

vi. Eliminate PFD Altogether + Adopt "Dune Way" Concept (or Zone E) = remove all references of the PFD VE Zone mapping criteria in NFIP regulations + adopt new mapping criteria for area removed from PFD VE Zone to reflect potential risk to flooding if it exists

d. Other - NFIP Regulations revisions
   i. Possible changes to 44CFR
      1. Part 59.1 – modify definitions to reflect intent and recommendations of the Coastal Mapping team.
      2. Part 60.3(e)(7) – clarify dune protection and building standards for PFD whether in a VE Zone or not.
      3. Part 65.11 – change language to reflect intent and recommendations of the Coastal Mapping team.

e. Next Steps –
   i. Coastal Demographics
      1. Refine PFD VE Zone analysis of housing units & population
         a. Conduct geo-coding effort for open coast VE Zone with First America support for 89 PFD VE Zone Coastal Counties.
   ii. Schedule for Tasks 3, 4 and 5
      1. Only 2 to 3 weeks behind schedule overall
      2. Task 3 to begin by end of January
      3. Task 4 to begin mid- to late-March
      4. Task 5 to begin late-March to early-April

4. **Coastal A Zone Study – Task 2 Assessment** (D. Hatheway)
   a. Coastal A Zones – Background & Update
      i. FEMA 55 Coastal Construction Manual – The current guidance within FEMA 55 was discussed and upcoming revisions to FEMA 55. All support Coastal A Zones and when FEMA 55 is adopted by local building departments, the Coastal A Zone construction standards will be enforced. Guidance includes P.E. design for buildings in VE Zone and Coastal A Zone, and foundation standards.
      ii. Post-Katrina Design & Construction Guidance in Coastal A Zones – This document was discussed since it provides a list of acceptable foundation types for various flood zones and is a useful guidance document for Coastal A Zone implementation and outreach.
      iii. MS Katrina Advisory Mapping – This topic was briefly discussed as the first mapping of Coastal A Zone for community use and subject of extension outreach in coastal MS.

iv. ASCE 7 (loads) & ASCE 24 (design/construction) – These document and reference material recommends Coastal A Zone building standards and are specific citations within International Building Code explaining the need for the new hazard zone.

v. Procedure Memorandum #50 (PM #50) – The discussion on this topic was focused on how it will be implemented since signed December 3, 2008 as new requirement for FEMA coastal flood studies and mapping projects. The information in PM #50 supplements the coastal guidance in Appendix D.

vi. Mapping Limit of Moderate Wave Action (LiMWA) – The mapping criteria for LiMWA was discussed relative to wave analysis and graphic standards described within PM #50. The current standard has been implemented in the coastal MS preliminary DFIRMs and with good outreach has been widely accepted.

b. Task 2 Assessment Topics

i. NFIP Insurance Issues – As related to Coastal A Zones, there will be several issues on NFIP insurance premiums if adopted by FEMA.

1. Existing Structures

a. Grandfathering – There will be many existing structures in the Coastal A Zone (MoWA area) when initially mapped as an informational layer, and again when (and if) insurance rates are applied to that unique SFHA. This issue needs to be addressed as part of the rating structure for Coastal A Zones. A grandfathering program would be necessary since all structures are likely compliant with finished first floor elevations at top of slab as per BFE on DFIRM at time of construction.

b. Rating Structures for All Zone AE areas – Once the limit of coastal AE Zone is established relative to the riverine AE Zone, it would be possible to establish a new insurance rating for all coastal AE Zones (inclusive of MoWA and MiWA areas). The rating is considered to at or above the BFE for elevation of lowest horizontal structural member in Coastal A Zone (MoWA) and finished first floor elevation in MiWA area of rest of coastal AE Zone.

c. Reference at Finished First Flood Elevation – ASCE 7 & ASCE 24 have both recommended that the reference for structure rating in Coastal A Zone would be like the VE Zone SFHA using the lowest horizontal structural member. Since post-FIRM structures comply with current AE Zone requirements of being at or above the BFE for finished first elevation, this issue will be a problem to figure out. New construction would have to comply with effective requirements in each respective coastal AE Zone.

2. New NFIP Insurance Issues

a. *Moderate Wave Action (MoWA)* Areas (1.5 to 3 ft waves)
   i. Rating at Lowest Horizontal Member – This follows the ASCE 7 & ASCE 24 guidance, and that presented in the IBC and FEMA 55.
   ii. Substantial Damage Trigger – If an existing structure were to be subject to substantial damages from a coastal storm (or substantially improved?), the reconstruction would have to be compliant with Coastal A Zone guidance if in the MoWA area.
   iii. Lapsed Policy & Re-Rating of Structure – If the insurance premium lapses, the structure would have to be re-rated to the new insurance premium based on Coastal A Zone if located within MoWA area.
   iv. IRC and Freeboard for Coastal A Zones – In communities where IRC is adopted but not IBC, the recommendation for Coastal A Zone is to add 1 foot of freeboard above DFIRM BFE. The IRC does not establish foundation standards for Coastal A Zone.
b. *Minimal Wave Action (MiWA)* Areas (0.0 to 1.5 ft waves)
   i. Rating at Finished First Floor Elevation – This would be status quo for this area.
   ii. Should be different insurance than riverine – There is not much supporting documentation for having different insurance rates for the MiWA area, but there is still some wave action present which represents an increase of risk over riverine. Not sure if river flood velocity (discharge at 100-yr level) poses an increase or decrease in risk as compared to coastal flooding with moderate waves and low flow velocity.
c. No other changes – Keep status quo with MoWA and MiWA equal to riverine AE Zones for insurance rating. History of damage claims and policy premiums show inequity that supports increase in policy premiums for Coastal A Zone.

3. Coastal A Definitions
   a. The "Coastal A Zone" is defined in publications currently as the area landward of the V Zone and inland to the limit of the 1.5-ft breaking wave.
      i. This limit is defined as a mapping boundary known as the Limit of Moderate Wave Action (LiMWA), and identified in accordance to PM #50.
      ii. For the purpose of this study the "Coastal A Zone" includes the MoWA, but the coastal AE Zone would include both the MoWA and MiWA Zones.

The terminology of Coastal A Zone has been confusing, hence the use of MoWA and MoWA. Coastal A Zone also could be said to reference the area encompassed by MoWA. This is within the SFHA known as AE Zone, where coastal flooding is present with 1.5 to 3 feet of wave action.

ii. Building Standards
   1. Information Sources on Coastal Construction as References to Support Coastal A Zones – The listing of information sources was posted to the Share Point site, and will be included in report as citations where applicable or a list of reference documents for use by others.
   2. Examples of Foundation Types – The final report should have graphic examples included for all the foundation types acceptable for the Coastal A Zone (MoWA) as per the Post-Katrina Design & Construction Guidance in Coastal A Zones document. Foundation types for the non-Coastal A Zone areas subject to 0 to 1.5 feet wave action (MiWA) will be included as well.
   3. Identify Consistency and Inconsistency in Adopted Building Codes & Standards – This topic is important as IBC recommends Coastal A Zone and VE Zone building standards, and IRC only recommends 1 foot of freeboard in Coastal A Zones. Since no one building codes is adopted nationally, a table or map of the current status of building code adoptions for the following:
      a. State
      b. County
      c. Local

iii. Guidelines for Coastal A Zones
   1. PM # 50 (finalized Dec 3, 2008) – This PM will be incorporated in the next update of Appendix D with coastal guidelines for Atlantic, Gulf, Great Lakes, and Pacific regions. Since Coastal A Zones are identified based overland wave heights and not wave runup, a majority of the Great Lakes and Pacific regions will most likely not have Coastal A Zones mapped. The guidelines will be consistent in the PM #50 application in all regions in case overland waves are present and the dominant coastal mapping hazard.
   2. Data Capture Standards for LiMWA – The MS mapping of LiMWA in the new DFIRM will help establish the data capture standards for the Coastal A Zone, but the actual standards have not been developed since PM #50 was implemented in December 2008.
   3. Appendix D Updates for ID and Mapping – As new coastal studies are underway and many more planned in upcoming years, the PM50 will be applied as appropriate in each study area subject to overland wave heights in mappable areas. In some cases, the

Coastal A Zone (MoWA) may not be adjacent to any mapped VE Zones, and be entirely with the coastal AE Zone SFHA.

a. Atlantic & Gulf Coasts – Most likely to be applied in wide geographic areas along open coast, inland bays, and sheltered waters.
b. Great Lakes Region – Some limited areas of Coastal A Zone identification and mapping may occur in this region.
c. Pacific Coast - Some limited areas of Coastal A Zone identification and mapping may occur in this region, most likely within inland bays and sheltered waters.

4. ID and Mapping for coastal AE Zone-only Areas (without VE Zone) – As noted above, there will coastal regions where there will be Coastal A Zones but no adjacent VE Zones (coastal SFHAs with wave heights not exceeding 3 feet).
5. New LiMWA Mapping Information
   a. NY – In a recent coastal study for the Atlantic Ocean Long Island areas of Nassau & Suffolk Co's, a LiMWA has been identified and currently being mapped on revised preliminary DFIRMs. Once released for community review and then subject to due process, this will be only the second wide-scale application of Coastal A Zones as per PM50.
   b. Update Coastal Demographics – The results from the Nassau and Suffolk County LiMWA mapping will be compared with the MS mapping effort to validate the assumptions and estimation of the percent of coastal AE Zone floodplain of MoWA and MiWA areas.

c. Task 2 Options & Alternatives - Mapping & Insurance in Coastal A Zones – It was noted in these discussions by the Peer Review Team (K. Ashe) that grandfathering would still be an issue for improving risk reduction since existing buildings would not have to comply with Coastal A Zone requirements unless substantially damages or improved. It was discussed that grandfathering should be considered as being eliminated form new program changes to force wider implementation. Another Peer Review Team comment (D. Spafford) recognized that a timeline for insurance program changes and their effective implementation would need to be established (likely in Task 3). Other Peer Review comments (L. Forster, D. Marcy, and J. Ingargiola) noted that floodplain ordinances need to be addressed for any program changes beyond informational, impact of costs of Coastal A Zone mapping need to be addressed, and that outreach should include building code workshops. Here are the alternatives presented:
   i. Entire coastal AE Zone should be considered as Coastal A Zone for Insurance Rating – This was discussed a possible option for ease of implementation, but would characterize the Coastal A Zone (MoWA) area as the same risk as the MiWA area. It should be evaluated as an alternative though.

ii. Split coastal AE Zone at LiMWA with Higher Insurance Rating in MoWA and Lower Rating in MiWA (equal to riverine AE Zones) – This was discussed a viable alternative since the MiWA area risks are more like riverine AE Zones than any other SHFA.
iii. Split coastal AE Zone at LiMWA with Higher Insurance Rating in MoWA and Lower Rating in MiWA (but higher than riverine AE Zones) – This was discussed as not a likely alternative for same reason as first alternative. There is little supporting evidence that MiWA risks are any higher than riverine AE Zones.
iv. Status Quo – This was presented in scenario that if Coastal A Zones implemented as "Informational Only" there would be no insurance changes needed. This would not resolve the inequity of insurance premium base in Coastal A Zone and damage/claim history.
v. Modify VE Zone Criteria – The Peer Review Team (M. Crowell) raised another option/alternative to consider. This discussion centered around the idea of instead of creating an new flood layer, building standard, and insurance premium for Coastal A Zones, the NFIP could modify the inland limit of the VE Zone. This would involve changing the definition in the coastal guidelines from the 3 feet wave height (or higher) criteria to a 1.5 feet wave height (or higher) criteria for VE Zone limits. It would satisfy the building requirements, eliminate need for insurance program changes, and establish a more reasonable risk classification. Many other changes were noted if VE Zone changed to 1.5 foot wave height criteria, including wave models (WHAFIS), Appendix D guidance, and all coastal DFIRMs in Atlantic and Gulf based on old 3 feet criteria (probably 90% of the VE Zone SFHA currently mapped). If NFIP adopts the Erosion Hazard Mapping program, this would identify the area of highest risk on the open coasts, and may provide relief in premiums for mapped VE Zones up to the 1.5 foot wave height limit.

d. Other discussion – The Peer Review team (K. Ashe) asked to have inlet hazard zones identified as VE Zones on future mapping updates. Technical analysis methods need to be established. This would provide consistency in coastal states were they are mapped for regulatory applications.
e. Next Steps (D. Hatheway)
   i. Coastal Demographics
      1. MoWA & MiWA update based on new LiMWA mapping in New York (Long Island)
      2. The new option/alternative of change VE Zone from 3 feet to 1.5 foot limit of wave height criteria needs to be explored in more detail.
   ii. Schedule for Tasks 3, 4, and 5
      1. Only 2 to 3 weeks behind schedule overall
      2. Task 3 to begin by end of January
      3. Task 4 to begin mid- to late-March
      4. Task 5 to begin late-March to early-April

5. **Next Meeting Date** (all)
   a. After Task 3 Completed and During Task 4 Effort
      i. Estimated for Early April
      ii. Include Early Task 4 Recommendations for Consensus Approval
   b. Telephone Conference and/or Face-to-Face Meeting in Wash DC/VA area

**ADJORN**

FEMA-Supplement-002196

# Appendix C

## Geocoding of 2008 Study of PFD Demographics and Flood Policies

# Appendix C: Geocoding of 2008 Study of PFD Demographics and Flood Policies

The November 2008 Coastal Demographics Report (ver. 1.1 update to the 2008 Coastal Demographics Report) describes how a PFD "footprint" polygon was created to separate model-based VE Zones from PFD VE Zones for the coastal areas. Although there are an estimated 89 coastal counties along the Atlantic and Gulf coasts where a PFD VE Zone would be mapped, detailed mapping information of PFD VE Zones was only available in 8 counties. As part of the 2008 Coastal Demographics Report, these 8 counties formed the basis of a pilot study that examined PFD criteria on existing maps in order to determine the variations in the PFD footprints in each county. The assessment of policies and demographics within the mapped PFD VE Zones included the following 8 counties:

- Atlantic County, NJ,
- Charleston County, SC,
- Currituck County, NC,
- Essex County, MA,
- Galveston County, TX,
- Pinellas County, FL,
- St. Johns County, FL, and
- Sussex County, DE.

Once PFD footprints were established, it was then possible to calculate the number of structures within the PFD portion of the VE Zone and determine how many of those structures had flood insurance policies. The PFD footprint assessment was matched with Census Block Group data to conclude that a population of 67,000 lived within the PFD VE Zone in 2000. It was projected to grow about 55%, to 104,000 people, by the year 2030. In order to define the number of flood policies-in-force in the PFD VE Zone for the economic assessment, the pilot study data was extrapolated based on the Census Block Group data.

A comparison of the data sets showed that there are 9,628 housing units in the PFD footprint VE Zone hazard area within the 8 pilot counties, but only 2,801 have policies in force. Therefore, only 29% of all housing units appear to have flood policies in what was determined to be the PFD VE Zone. The total number of

housing units within the PFD VE Zone was determined by geospatial analysis of Census Block Group data to be 107,000 in 2000, and according to the 2000 Census was projected to grow by 54% to approximately 165,000 by 2030.

If only 29% of the Census-based nationwide total of PFD VE Zone housing units (107,000 in 2000) have flood policies, then one could estimate that approximately 31,000 of the PFD VE Zone housing units have a flood policy-in-force. This estimate is based on geospatial analysis of the housing units within the PFD VE Zone using street addresses listed on policies-in-force. However, there was an issue of accuracy related to using flood policy addresses and locations (latitude-longitude) since they are actually "curb" locations and do not indicate the physical locations of the structures relative to the PFD VE Zone. This required a refinement of the original study using a geo-coding process. The analysis is detailed below.

# Refinement of the 2008 Study

The goal was to establish a better understanding of the PFD footprint demographics and policy-base for further economic assessments. The problem was that the 2008 study was based on the geospatial analysis of street addresses alone and not the specific structure or property location relative to the PFD. (See explanation of PFD footprint in the Figure C-1).

Using the street address listed in the policy database typically places the policy location at the street curb and not the "centroid" of the property. In many cases, the PFD VE Zone limits can be located at the centerline of the roadway and the location of the "curb" address. Therefore, some housing units may be on one side or the other of the mapped VE Zone limits, but can't be distinguished from each other without further assessments. To further refine the housing units with PFD VE Zone policies, a geo-coding effort was undertaken to locate the centroid of the parcel lot for those policy locations. Proxix Solutions (a First America subsidiary) conducted the geo-coding for this study.

Proxix Solutions used approximately 109,000 addresses acquired from the 2005 FIA database of policies-in-force for VE Zones within the 89 coastal counties. Proxix Solutions then geo-coded those addresses and returned results as point features for conversion into shapefiles (from the tabular result format). Not all supplied VE Zone flood policy addresses returned centroid locations, as about 7% had faulty addresses and could not be geo-coded or geo-referenced based on the data provided in the 2005 FIA database of policies-in-force.




Figure C-1. The PFD footprint was a measure used to estimate the PFD area of mapped VE Zone along coastal areas in 8 pilot counties. In these areas, the FIRM does not show where PFD mapping is located within SFHA. It is not intended to define the PFD footprint in any exact terms, but is useful in the economic and demographic assessments.

After the geo-coding was completed, a geospatial analysis of geo-coding locations was conducted for the PFD VE footprint areas identified for the 8 pilot counties. This allowed street address locations to be checked against the centroid locations to determine which housing and flood policy locations fell within the PFD VE Zone hazard layer.

Figure C-2 on the following page illustrates an example of the geo-coding effort for Currituck County, NC.




Figure C-2. Example of geo-coded NFIP policy locations in Currituck County, NC. The blue dots represent the street address (curb locations) from the 2005 FIS flood policy database before geo-coding. The orange dots show the refined geo-coded locations based on parcel centroids, which are closer approximations of the policy locations relative to the housing units.

The blue dots show the street addresses directly mapped from coordinates in the FEMA 2005 FIA flood policy database, and the orange dots show the geo-coding locations from the Proxix Solutions analysis. Note that in the examples shown, the beachfront housing units with geo-coding locations are actually shown as being seaward of the buildings shown on the aerial photograph. This is due to the limitation of the geo-coding process that relies on the parcel lot geometry to locate a centroid of each lot, and in many cases the lots are platted out into the nearshore zone. The geo-coding still provides a more accurate depiction of the flood policy locations relative to the PFD VE Zones to aid the refined analysis.

Next, the PFD VE Zone limits were overlaid with the results. An attempt was made to avoid counting housing units/flood policies that were clearly outside of the VE Zone altogether. See further explanation in Figure C-3.




Figure C-3. Example of geo-coded data within PFD area in Currituck County, NC. In this case, the geo-coded housing units within the mapped PFD VE Zone (shaded area) can be identified and distinguished from those housing units clearly outside the PFD VE Zone and outside the coastal SFHA altogether. The refined geo-coding assessment improves the count of actual housing units with flood policies that might be impacted by any revisions or changes to the PFD criteria in the NFIP.

Table C-1 provides a summary of the results of this spatial analysis. For the 89 coastal counties anticipated to have PFD areas, a reduction of approximately 25% of housing units/flood policies located in VE Zones after geo-coding was estimated. The team also estimated a reduction of approximately 21% of housing units/flood policy locations in PFD VE Zones within the 8 pilot counties. Therefore, the previous assumption of 31,000 of the total 107,000 housing units that have a PFD VE Zone flood policy-in-force is reduced by 21-25%.

Table C-1. Summary of NFIP policies in PFD VE Zones before and after geo-coding. There were estimates based on all 89 counties, as well as the more detailed 8 pilot counties, which are the basis for the overall PFD VE Zone policy count. The range is 23,000 to 25,000 after geo-coding reductions are factored into the analysis.

| Spatial Extent | Number of Policies in PFD VE Zone Before Geo-Coding | Number of Policies in PFD VE Zone After Geo-Coding | Percent Reduction in PFD VE Zone Policies After Geo-Coding | Total (Percent) Housing Units in PFD VE Zones (as of December 2008 Flood Policy Database) |
|---|---|---|---|---|
| All 89 Counties | 31,000 | 23,000 | 25% | 25,000 (41%) |
| 8 Pilot Counties | 2,801 | 1,950 | 21% | (n/a) |

A more recent geospatial analysis of the 2008 FIS flood policy database estimated that there are about 61,000 VE Zone flood policies in effect across the U.S. If an estimated 25,000 of those policies are for housing units located in the PFD VE Zone, that represents about 41% of the total VE Zone policies within the NFIP as being within the qualitative area defined as the PFD VE Zone. The remaining 36,000 (59% of total) policies are located in hazard mapping areas based on quantitative assessments of VE Zones, such as wave height, wave runup, or wave overtopping analyses. For further economic assessments on the impact of the PFD criteria on the NFIP, the estimate of 25,000 will be used as the representative total number of PFD VE Zone flood policies-in-force.

# Appendix D

## Guidance Documents

**D.1** **1987 Proposed Rule on PFD VE Zones and 1988 Final Rule on PFD VE Zones** ***(pp. D-1 through D-20)***

**D.2** **December 2008 FEMA Procedure Memorandum No. 50** ***(pp. D-21 through D-27)***

defined in Executive Order 12291 and that a regulatory impact analysis therefore is not required.

Although this document is a notice of proposed rulemaking that solicits public comment, the Internal Revenue Service has concluded that the regulations proposed herein are interpretative and that the notice and public procedure requirements of 5 U.S.C. 553 do not apply. Accordingly, this proposed regulation does not constitute a regulation subject to the Regulatory Flexibility Act (5 U.S.C. chapter 6).

**Drafting Information**

The principal author of these proposed regulations is Robert Beatson of the Legislation and Regulations Division of the Office of Chief Counsel, Internal Revenue Service. However, personnel from other offices of the Internal Revenue Service and the Treasury Department participated in developing the regulations both on matters of substance and style.

**Comments and Requests for a Public Hearing**

Before adoption of these proposed regulations, consideration will be given to any written comments that are submitted (preferably eight copies) to the Commissioner of Internal Revenue. Comments are encouraged both with respect to the matters addressed in these proposed regulations and any other issues arising under section 42 with respect to which guidance is needed. All comments will be available for public inspection and copying. A public hearing will be held upon written request to the Commissioner by any person who has submitted written comments. If a public hearing is held, notice of the time and place will be published in the **Federal Register**. The collection of information requirements contained herein have been submitted to the Office of Management and Budget (OMB) for review under section 3504(h) of the Paperwork Reduction Act. Comments on the requirements should be sent to the Office of Information and Regulatory Affairs of OMB, Attention: Desk Officer for Internal Revenue Service, New Executive Office Building, Washington, DC 20503. The Internal Revenue Service requests persons submitting comments to OMB to also send copies of the comments to the Service.

**Lawrence B. Gibbs,**

*Commissioner of Internal Revenue.*

[FR Doc. 87-25445 Filed 10-30-87; 9:56 am]

BILLING CODE 4830-01-M

**FEDERAL EMERGENCY MANAGEMENT AGENCY**

**44 CFR Parts 59, 60, 61, 62, 65, 70, and 72**

**National Flood Insurance Program**

**AGENCY:** Federal Insurance Administration (FIA), Federal Emergency Management Agency (FEMA).

**ACTION:** Proposed rule.

**SUMMARY:** This proposed rule would revise the National flood Insurance Program (NFIP) regulations dealing with: Flood plain management standards; criteria for the identification of coastal high hazard areas, more commonly referred to as V zones, and delineated as Zone V, VO, VI-30 or VE on NFIP maps; criteria under which communities may permit flood plain and floodway developments which could increase base flood elevations; requirements for maintenance of altered watercourses; procedures for map correction; reimbursement procedures for the review of *proposed* projects to determine if they would qualify for NFIP map revisions upon their completion; and changes in the Standard Flood Insurance Policy (SFIP) terms and provisions.

**DATE:** Comments must be received on or before January 4, 1988.

**ADDRESSES:** Send comments to Rules Docket Clerk, Office of General Counsel, Federal Emergency Management Agency, 500 C Street SW., Washington, DC 20472.

**FOR FURTHER INFORMATION CONTACT:** Charles M. Plaxico, Federal Emergency Management Agency, Federal Insurance Administration, 500 C Street SW., Washington, DC 20472; telephone number (202) 646-3422.

**SUPPLEMENTARY INFORMATION:** These proposed amendments are the result of a continuing reappraisal of the National Flood Insurance Program (NFIP) to achieve greater administrative and fiscal effectiveness in the operation of the NFIP and to encourage sound flood plain management so that reductions in loss of life and to property can be realized.

**Coastal High Hazard Area and Erosion Considerations for Sand Dunes**

Flood Insurance Rate Maps (FIRM's) have been published by the Federal Emergency Management Agency (FEMA) depicting coastal high hazard areas (Zones V, VO, VE and V1-30) for approximately 700 communities along the Atlantic and Pacific Oceans and the Gulf of Mexico. These FIRM's were developed in recognition of flood hazards associated with storm surges from hurricanes and other coastal storm events. In addition, flooding caused by tsunamis (seismic sea waves) have been considered, where appropriate, for Pacific Coast communities. For communities along the Atlantic and Gulf of Mexico Coasts, base flood elevations, where appropriate, include an adjustment to reflect the increase in water level associated with waves as they pass through areas inundated by storm surges. Areas of significant wave action are designated as coastal high hazard areas (V-Zones).

The depth of water at a partcular site is a critical factor in determining the lateral extent of the areas subject to significant wave action. Generally speaking, the greater the depth, the more significant the wave action. Efforts to define ground elevations, particularly in sandy beach and dune areas which are subject to significant degrees of storm-related erosion, have been hindered due to the lack of methodology for estimating the extent of erosion which would be associated with a one percent annual chance (100-year) flood event. Attempts have been made to account for storm-induced erosion in the present mapping of areas subject to coastal flood hazards, including the application of simplified analytical models and use of engineering judgment. However, there are many areas where dune erosion has not been considered or has been clearly underestimated.

In these instances, the inappropriate crediting of sand dunes has resulted in the unrealistic delineation of coastal flood hazard zones that terminate at the seaward face of the dune for many barrier islands and other open coastal areas. Consequently, it is estimated that the extent of coastal high hazard areas may be understimated in approximately 250 communities along the open coast that are subject to this phenomenon.

In the recent past, FEMA has received numerous comments, from state and local governments, criticizing the mapping of V-Zone in such areas. FEMA responded to these comments by conducting an investigation to evaluate the extent of dune erosion in many historical flood events. It was concluded that the primary frontal dune would, in most cases, be completely eroded during 100-year storm surge conditions. For example, following Hurricane Hazel (1954) the U.S. Weather Bureau (now the National Weather Service) reported that between the South Carolina-North Carolina state line and Cape Fear "grass covered dunes some 10 to 20 feet high

D-1

. . . simply disappeared." Hurricane Hazel produced an average storm surge in that section of the coast comparable to the 100-year surge elevation. Once dunes are destroyed, storm surge and waves are free to move inland causing extreme hazards where development typically occurs.

The investigation of sand dunes led to the development of an empirical relationship between the quantity of sand that would be removed from a frontal dune and the recurrence interval of the local storm tide as is shown in Figure 1.




MEDIAN CROSS-SECTIONAL EROSION ABOVE FLOOD ELEVATION VERSUS FLOOD RECURRENCE INTERVAL BASED ON 38 CASES OF DUNE RETREAT DURING VARIOUS COASTAL STORMS.

Figure 1.

This relationship established that primary frontal sand dunes with a cross-sectional area of 540 square feet or less above the 100-year storm tide stillwater level and seaward of the dune crest would be swept away during a 100-year storm surge event.

The investigation also determined that there are some instances where the quantity of sand in the frontal dune is great enough to preclude total destruction of the dune (i.e., cross-sectional areas greater than 540 square feet). Under these conditions, the remaining dune would act as a barrier, preventing the inland propagation of wave action. However, the dunes themselves are not free of coastal high hazards. Wave runup on the dune face and overtopping of the dune crest is a factor that would cause a serious hazard to exist on the entire dune. Wave runup is a component of wave action that is the result of wave breaking on a sloping surface, such as a dune, and literally running up and over the surface. This phenomenon is different from that analyzed in the current V-Zone mapping where wave crest elevations have been determined at the point of breaking. What happens after breaking has generally not been considered, with the exception of areas of steeply sloping beaches such as are found in northern New England and the Pacific Coast where wave runup can be a very significant factor. However, the wave runup and overtopping phenomena do occur to some degree in almost all coastal areas with sand because of their relatively steep slopes.

Under current coastal mapping procedures, there are many instances where frontal dunes have been designated as A, B, or C Zones because errosion potential and wave runup have not been considered. Structures built on dunes using standards permissible in A, B, and C Zones are subject to total destruction by undermining and failure of the foundation system by these phenomena.

It is therefore, prudent to classify all primary frontal dunes as V-Zones. This would insure that adequate insurance rates apply and that appropriate construction standards are imposed, should building on primary frontal dunes be permitted by state or local

ordinances. In addition, NFIP regulations at § 60.3(e)(7), prohibition and alteration of sand dunes in V-Zones which would increase potential flood damage, would be made more effective in protecting frontal sand dunes.

The proposed rule revises the definition of "coastal high hazard area" to include primary frontal sand dunes along barrier islands and other similarly exponsed open coasts. Additionally, a definition is proposed for "primary frontal sand dune" to provide greater clarification of the revised definition for "coastal high hazard area." Also, a new section is proposed at Part 65 which identifies a cross-sectional area of 540 square feet as the basic criterion to be used in evaluating whether a primary frontal dune will act as an effective barrier during base flood storm surge events.

The 540 square foot criterion will be applied in designating coastal flood hazard zones as new flood insurance studies and restudies are performed. Thus, adoption of this criterion will not be followed by wholesale and immediate change to the FIRM's that have already been published for coastal communities.

**Requirements for Maintenance of Altered Watercourses**

One important aspect of flood hazard management, particularly in rapidly developing areas, is adequate maintenance of altered or relocated watercourses, specifically of modified channels, which were built to reduce flood hazards. This maintenance consists of a comprehensive program of periodic inspections, routine channel clearing and dredging, and other related functions. Inadequate maintenance could result in more significant flood hazards than depicted on the NFIP maps, therefore, FEMA must have assurance that communities participating in the NFIP will assume ultimate responsibility for the maintenance of any altered watercourses intended for flood hazard mitigation that are reflected on NFIP maps. These assurances should specify all maintenance activities, the frequency of their performance, and the community officials responsible for their performance.

Currently, as a condition of participation in the NFIP, communities must adopt ordinances which contain the provision of § 60.3(b)(7). This provision requires that the community "assure that the flood carrying capacity within the altered or relocated portion of any watercourse is maintained". In the past, FEMA has found that communities have not always known or understood their responsibilities under the NFIP to maintain such watercourses. In addition, communities do not always follow through on their maintenance responsibilities; often communities have not committed adequate funds or are not fully aware of the necessary maintenance procedures. This has resulted in situations such as severe overgrowth or sediment deposition in channelized streams, causing reduced conveyance and increased flood hazards. In other cases, inadequate maintenance has resulted in erosion and scour problems within altered watercourses, thereby increasing potential floodwater velocities and downstream flood damage. For these reasons, it is imperative that appropriate assurances of maintenance of altered watercourses be provided prior to FEMA depicting the accompanying flood hazard mitigation effects of NFIP maps. Threfore, the proposed rule would change the NFIP criteria regarding revision of base flood elevation determinations in § 65.6 to enable FEMA to obtain specific documentation that the provisions of 60.3(b)(7) will be met prior to FEMA's revising NFIP maps to reflect the flood hazard mitigation effects of specific flood control projects.

**Flood Plain Management Criteria for Regulatory Floodways**

Current NFIP criteria at § 60.3(d)(3) require communities to prohibit encroachments, including fill, new construction, substantial improvements, and other development within the adopted regulatory floodway, that would result in any increase in flood levels within the community during the occurrence of the base flood elevation. These criteria as written contain no provision for requiring that a community base its decisions to allow encroachments in an adopted regulatory floodway only after hydrologic and hydraulic analyses have been performed in accordance with standard engineering practice that demonstrate the proposed encroachment does not increase base flood elevations by more than the amount specified in § 60.3. These analyses are required by § 65.7 when a community is seeking to have its adopted regulatory floodway revised and they are required in order for a community to be considered fully compliant by FEMA with the intent of § 60.3(d)(3). Accordingly, the proposed rule amends § 60.3(d)(3) to add clarity to the criteria specified therein and to ensure consistency with § 65.7 by incorporating the requirement that these analyses be preformed before a community can permit encroachments to occur in its adopted regulatory floodway.

**Revision of Flood Insurance Rate Maps to Reflect Base Flood Elevation (BFE) Increases Exceeding NFIP Standards**

Current NFIP criteria at § 60.3(c)(10) require communities, which have no regulatory floodway established, to prohibit encroachments within the floodplain which would cumulatively result in a Base Flood Elevation (BFE) increase greater than one foot. When a regulatory floodway has been established, NFIP criteria at § 60.3(d)(3) require communities to prohibit encroachments within the floodway which would result in any increase in the BFE. No mechanism is provided in the current NFIP regulations to allow for exceptions to these provisions and corresponding revisions of community flood maps. Yet, there are circumstances under which encroachments in the flood plain and floodway that exceed these limits can result in reduced flood hazards or have a net public benefit. For example, the construction of dams or levees may increase BFE's in some locations, and yet, in other areas, reduce the overall flood hazard. Additionally, many communities are now requiring developers to mitigate the increased runoff expected from development by providing stormwater detention facilities. Although such facilities may prevent increased flood hazards to downstream development, they must be placed in the floodway and usually result in BFE rises greater than one foot, thereby conflicting with the provisions of § 60.3(c)(10) and (d)(3).

In other instances, projects may be constructed which, although lacking direct flood hazard reduction benefits, offer benefits in excess of the costs associated with their resulting BFE increase. Examples of such cases include increasing the height of existing dams to provide hydroelectric power, and the construction of bridges. The cost of bridge construction to completely span floodways without having supports such as piers or columns that encroach on the floodway can often be economically prohibitive, yet, in some instances, the construction of structures that do not completely span the floodway might provide significant net public benefits where no existing development would be impacted by the BFE increase resulting from the project. Often, agencies proposing to construct such facilities are willing to purchase or relocate potentially impacted structures and purchase flooding easements to mitigate the impacts of increased BFE's.

These examples serve to establish the need for a mechanism within the NFIP regulations to allow for exceptions to the limitations on BFE increases contained in § 60.3 (c)(10) and (d)(3). At the same time, the protection of the conveyance capacity of a watercourse is vital to ensuring proper flood plain management and avoiding exacerbation of flood hazards. Likewise, protection of the interests of property owners that might be affected by BFE increases continues to remain a paramount concern to FEMA. Unless carefully managed, BFE increases could also result in increased exposure of the National Flood Insurance Fund (NFIF) to losses because of increased risks to existing insured or insurable structures which are "grandfathered" at risk premium rates based on their flood risk at date of construction. Therefore, the proposed rule contains provisions that, while allowing BFE increases in certain situations, are intended to prevent or compensate for the adverse impacts on property owners and the NFIF and to assure that regulatory floodways and BFE's are not revised without proper notification of all affected property owners.

The provisions of the proposed rule would be incorporated into Part 65 and would also modify § 60.3. Cases involving BFE increases and/or floodway revisions would be processed under map revision procedures established at Parts 65 and 72 and would require all scientific and technical information specified in those Parts be provided to FEMA in support of the request. The proposed rule also requires that the requester of an exception from the NFIP floodway standards, currently established at § 60.3 (c)(10) and (d)(3), show evidence that a BFE increase is justified, that all engineering alternatives have been considered and determined to be unsuitable, that community approval has been obtained, that no structures are impacted, and that any property owners adversely impacted are properly notified.

## Procedure for Map Correction

The present regulations at §§ 70.3 and 70.4 are inconsistent regarding the data an applicant is required to submit and the data which is reviewed by the Federal Insurance Administrator (the Administrator) in connection with applications for map corrections.

According to § 70.3, the applicant submits "* * * the elevation of the lowest floor (including basement) of the structure or structures located on the property in question * * *" However, in § 70.4, the Administrator notifies the applicant "* * * that either the ground elevations of an entire legally defined parcel of land or the elevation of the lowest adjacent grade to a structure have been compared with the elevation of the base flood * * *" In essence, the applicant is required to submit the elevation of the losest floor (including basement) which is not used by the Administrator in making his determination, but is not asked to provide the elevation of the lowest adjacent grade which is used by the Administrator in making his determination.

During rulemaking in 1986, §§ 70.3 and 70.4 were amended by a final rule that was published (51 FR 30317) on August 25, 1986, and became effective on October 1, 1986. Through an administrative oversight, § 70.3(b) was not properly amended to be compatible with the amendment made to § 70.4. The proposed rule will eliminate the need for an owner or lessee of real property (applicant) to provide the elevation of the lowest floor (including basement) of the structure in question and will instead specify that the applicant provides the elevation of the lowest adjacent grade to the structure in question. This change will eliminate the inconsistency between the previously mentioned paragraphs and will correct § 70.3(b) to read as it was intended to read when it was previously amended.

## Procedures and Fees for Obtaining Conditional Approval of Map Changes

FEMA is obligated by Parts 65 and 70 of the NFIP regulations to revise Flood Insurance Studies and maps as a result of appeals by communities and individuals. Many of these requests come about as a result of structural flood control projects. FEMA's review of and response to appeals based on in-place projects is totally funded out of appropriated monies. However, FEMA is often requested to provide the service of reviewing plans for proposed projects to determine if they would qualify for map revisions upon their completion. Conditional Letters of Map Amendment (CLOMAs) and Conditional Letters of Map Revision (CLOMRs) have been used to provide FEMA's determinations to individuals, developers, and communities as to whether their projects would be accepted for map revision upon completion. Furthermore, CLOMAs and CLOMRs are often needed by developers to obtain construction loans and building permits and attract prospective buyers.

To reduce expenses to the general taxpayer, a procedure for charging the beneficiaries of these services was published under Part 72 on September 4, 1985, as final rulemaking which was implemented on January 1, 1986. This reimbursement procedure shifted the cost from the general taxpayer to those who benefit from FEMA's review and ultimate acceptance of the project.

Section 72.5 of these procedures specifies that Federal, State, and local governments may be exempt from fees for projects they sponsor if the requester certifies that the particular project is for the public benefit and primarily intended for flood loss reduction to existing development in identified flood hazard areas, as opposed to planned flood plain development.

Many requests for proposed projects which obviously met the exemption of fees criteria have been received since these regulations were implemented, but lacked the required certification. Since the regulations are binding and do not grant FEMA discretion in deciding when fees may be waived, much time and effort are lost in preparing and exchanging correspondence to obtain the necessary certification.

The proposed rule will amend § 72.5 to grant the Federal Insurance Administrator discretion in waiving the collection of fees when he has determined, through any means, that the proposed project satisfies the exemption criteria, but the required certification has not been provided as part of the original submission by the requester. This amendment will allow the expeditious processing of requests of this nature, will improve the administrative effectiveness of the NFIP, and will reduce the administrative burden on the requester.

## Standard Flood Insurance Policy

The NFIP does not allow for the purchase of duplicate policies, i.e., more than one policy for a building or the contents in a building. The proposed rule would state this in the Standard Flood Insurance Policy (SFIP), along with the corrective procedure when this is discovered.

The Dwelling Form of the SFIP provides for reimbursement of the labor of the insured for moving insured property to protect it from the imminent danger of flood; for certain other specified mitigative measures, such as sandbags, in the event of imminent danger of flooding; and for the removal of debris directly caused by flood. The proposed rule would extend reimbursement to include the labor of members of the household of the insured in all these cases.

A recent district court decision held that damage caused by the destabilization of land resulting from the

D-4

accumulation of water in subsurface land areas was covered by the SFIP. Because this was never intended by the NFIP, the SFIP would be revised by the proposed rule to specifically exclude such damage.

Antique furniture is included in a list of contents items in the SFIP for which there is a limitation of $250. The NFIP interpretation of this limitation regarding antique furniture is that it does not apply where antique furniture is replaced by furniture of equivalent functional value, but with no antique value. The SFIP would be revised by the proposed rule to reflect this by deleting antique furniture (and antique silver) from the limitation provision and adding in the insuring agreement a provision that the SFIP does not cover antique value.

The SFIP, in providing for premium refunds under certain conditions, specifies that the expense constant is to be retained by the NFIP when the policy is being cancelled because it has been determined that the insured property is not in a special flood hazard area and the insurance had been required under the mandatory purchase requirements of Pub. L. 93-234, section 102. FEMA has now decided that it would be more appropriate in this case not to retain the expense constant because in these cases the insurance had been purchased due to a mistaken application of Pub. L. 93-234, section 102.

For renewal without a lapse in coverage, the SFIP currently requires renewal premium payments to be mailed prior to the expiration date of the previous policy term and to be received within five days of that expiration date, or to be mailed by certified mail prior to that expiration date with no requirement in that case for when it must be received by the NFIP. To provide better service to the NFIP policyholder, to encourage retention of flood insurance business for the NFIP, and to facilitate the Write-Your-Own Program by making NFIP practices more compatible with private insurance industry practices, the proposed rule would provide in the SFIP for a 30-day grace period for the receipt of renewal premium payments, with continuation of the certified mail alternative.

In addition to the changes described above, the proposed rule would also make a few other changes for consistency between the Dwelling Form and the General Property Form or of an editorial nature, including incorporating the separate condominium endorsements, one for the Dwelling Form and one for the General Property Form, that became effective June 1, 1987, into those two policy forms and deleting them as endorsements separate from those two policy forms.

FEMA has determined, based upon an Environmental Assessment, that this proposed rule will not have significant impact upon the quality of the human environment. As a result, an Environmental Impact Statement will not be prepared. A finding of no significant impact is included in the formal docket file and is available for public inspection and copying at the Rules Docket Clerk, Office of General Counsel, Federal Emergency Management Agency, 500 C Street SW., Washington, DC 20472.

This proposed rule will not have a significant economic impact on a substantial number of small entities and hence, has not undergone regulatory flexibility analysis.

This proposed rule is not a "major rule" as defined in Executive Order 12291, dated February 27, 1981, and, hence, no regulatory analysis has been prepared.

FEMA has determined that this proposed rule does not contain a collection of information requirement as described in section 3504(h) of the Paperwork Reduction Act.

**List of Subjects in 44 CFR Parts 59, 60, 61, 62, 65, 70, and 72**

Flood insurance, Flood plains, Claims.

Accordingly, it is proposed to amend 44 CFR Chapter 1, Subchapter B as follows:

## PART 59—GENERAL PROVISIONS

1. The authority citation for Part 59 continues to read as follows:

**Authority:** 42 U.S.C. 4001, *et seq.*; Reorganization Plan No. 3 of 1978; E.O. 12127.

**§ 59.1 [Amended]**

2. Section 59.1 is amended as follows:

a. By revising the definition of "Coastal high hazard area" to read as follows:

* * * * *

"Coastal high hazard area" means an area of special flood hazard extending from offshore to the inland limit of a primary frontal dune along an open coast and any other area subject to high velocity wave action from storms or seismic sources.

* * * * *

b. By adding, alphabetically, a definition of "Primary frontal dune" to read as follows:

* * * * *

"Primary frontal dune" means a continuous or nearly continuous mound or ridge of sand with relatively steep seaward and landward slopes immediately landward and adjacent to the beach and subject to erosion and overtopping from high tides and waves during major coastal storms. The inland limit of the primary frontal dune occurs at the point where there is a distinct change from a relatively steep slope to a relatively mild slope.

* * * * *

## PART 60—CRITERIA FOR LAND MANAGEMENT AND USE

3. The authority citation for Part 60 continues to read as follows:

**Authority:** 42 U.S.C. 4001, *et seq.*; Reorganization Plan No. 3 of 1978; E.O. 12127.

**§ 60.3 [Amended]**

4. Section 60.3 is amended as follows:

a. By redesignating paragraph (c)(11) and (c)(12) as (c)(12) and (c)(13), respectively, and adding a new paragraph (c)(11) to read as follows:

* * * * *

(c) * * *

(11) Notwithstanding any other provisions of § 60.3, a community may approve certain development in Zones A1-30, AE, and AH, on the community's FIRM which increase the water surface elevation of the base flood by more than one foot, provided that the community first applies for a conditional FIRM revision, fulfills the requirements for such a revision as established under the provisions of § 65.12, and receives the approval of the Administrator.

* * * * *

b. By removing in paragraph (d)(3) the phrase "that would" and adding in its place the phrase "unless it has been demonstrated through hydrologic and hydraulic analyses performed in accordance with standard engineering practice that the proposed encroachment would not".

c. By adding new paragraph (d)(4) to read as follows:

* * * * *

(d) * * *

(4) Notwithstanding any other provisions of § 60.3, a community may permit encroachments within the adopted regulatory floodway that would result in an increase in base flood elevations, provided that the community first applies for a conditional FIRM and floodway revision, fulfills the requirements for such revisions as established under the provisions of § 65.12, and receives the approval of the Administrator.

* * * * *

## PART 61—INSURANCE COVERAGE AND RATES

5. The authority citation for Part 61 continues to read as follows:

**Authority:** 42 U.S.C. 4001, *et seq.*; Reorganization Plan No. 3 of 1978; E.O. 122127.

**§ 61.4 [Amended]**

6. Section 61.4 is amended by removing in paragraph (c) the phrase "or from earthquakes" and adding in its place the phrase ", destabilization or movement of land resulting from the accumulation of water in subsurface land areas, earthquakes,".

**§ 61.5 [Amended]**

7. Section 61.5 is amended by removing in paragraph (f)(4) the words "driveways and other surfaces outside the foundation walls of the building;" and adding in their place the words "walkways, driveways, patios, and other surfaces, all of whatever kind of construction, located outside the perimeter, exterior walls of the insured building;" and by adding new paragraph (j) to read as follows:

* * * * *

(j) Duplicate policies are not allowed. Property may not be insured under more than one policy issued under the National Flood Insurance Act of 1968, as amended. If a policy is issued under that Act for any property when another policy issued under that Act is in effect for the same property, the policy with the later effective date is void from its effective date, and a refund shall be made of the premium paid, less expense constant, for that policy for the entire period for which it was in effect without any lapse in coverage. For purposes of this paragraph (j), the term "effective date" means the date coverage that has been in effect without any lapse was first placed in effect. When the duplicate policies are discovered by the insurer, the insurer shall by written notice give the insured an opportunity to add the coverage limits of the later policy to those of the earlier policy, as of the effective date of the later policy, by paying the pro rata premium for the increased coverage within 30 days of the written notice; provided, the resulting coverage limits shall in no event exceed the statutorily permissible limits of coverage under the Act or the insured's insurable interest, whichever is less.

### Appendix A(1) of Part 61—[Amended]

8. Appendix A(1) of Part 61, Standard Flood Insurance Policy, is amended as follows:

a. The Dwelling Form—Insuring Agreement (appearing immediately before Article I) is amended by adding after the phrase "42 U.S.C. 4001, *et seq.*" and within the parentheses the phrase ", hereinafter called the Act" and by removing the clause beginning with the words "we insure" and ending with the words "property at the time of loss", and adding in its place the following: "we insure you and your legal representatives against all "Direct Physical Loss by or from Flood", as defined in Article II of this Agreement, to the insured property, to the extent of the actual cash value, not including any antique value, of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after the loss."

b. In Article II—Definitions, the definition of "Direct Physical Loss by or from Flood" is amended by adding in the first sentence after the word "labor" and before the word "at" the words "and the labor of members of your household".

c. In Article III—Losses Not Covered, paragraph A.1 is amended by adding after "landslide," and before "gradual erosion" the follow: "destablization or movement of land resulting from the accumulation of water in subsurface land areas,".

d. In Article IV—Property Covered (Subject to "Property Not Covered" Provisions), paragraph A.1 is amended by removing the comma and the words "if your" after the words "building's common elements" and adding in their place the following: "and the common elements of any other building of your condominium association covered by insurance that is: (i) In the name of your condominium association, (ii) provided under the Act, and (iii) in an amount at least equal to the actual cash value of the building's common elements at the beginning of the current policy term or the maximum building coverage limit available under the Act, whichever is less; provided that the insurance under this policy shall be excess over any insurance in the name of your condominium assocation covering the same property covered by this policy; provided, your condominium" and by removing after the words "one family and" the word "if".

e. In Article IV—Property Covered (Subject to "Property Not Covered" Provisions), paragraph A.7 is amended by adding after the word "labor" and before the word "at" the words "and the labor of members of your household".

f. In Article IV—Property Covered (Subject to "Property Not Covered" Provisions), paragraph C is amended by removing in the first sentence the words "antique furniture" and the words "antique silver".

g. In Article IV—Property Covered (Subject to "Property Not Covered" Provisions), paragraph D is amended by adding after the word "labor" and before the word "at" the words "and the labor of members of your household".

h. In Article V—Property Not Covered, paragraph D is amended by removing the words "driveways and other surfaces, outside the foundation walls of the building" and adding in their place the words "walkways, driveways, patios, and other surfaces, all of whatever kind of construction, located outside the perimeter, exterior walls of the insured building."

i. In Article VIII—General Conditions and Provisions, paragraph E is amended by removing the words ", but with retention of the expense constant" at the end of paragraph 1.b; and by removing the words "on a short-rate basis" and adding in their place the words "pro rata but with retention of the expense constant" in paragraph 1.c.

j. In Article VIII—General Conditions and Provisions, paragraph G is amended by revising the second paragraph to read as follows:

* * * * *

This policy shall not be renewed and the coverage provided by it shall not continue into any successive policy term unless the renewal premium payment is received by us at the office of the NFIP within 30 days of the expiration date of this policy, subject to Article VIII.F of this appendix. If the renewal premium payment is mailed by certified mail to the NFIP prior to the expiration date, it shall be deemed to have been received within the required 30 days. The coverage provided by the renewal policy is in effect for any loss occurring during this 30-day period even if the loss occurs before the renewal premium payment is received, so long as the renewal premium payment is received within the required 30 days. In all other cases, this policy shall terminate as of the expiration date of the last policy term for which the premium payment was timely received at the office of the NFIP, and in that event, we shall not be obligated to provide you with any cancellation, termination, policy lapse, or policy renewal notice advising you of any such cancellation, termination, policy lapse, or policy renewal; provided, however, with respect to any mortgagee (or trustee) named in the declarations form attached to this policy, this insuraoce shall continue in force only for the benefit of such mortgagee (or trustee) for 30 days after written notice to the mortgagee (or trustee) of termination of this policy, and shall then terminate.

k. Article VIII—General Conditions and Provisions is amended by adding new paragraph T to read as follows:

* * * * *

T. *Duplicate policies not allowed.* Property may not be insured under more than one policy issued under the Act. If a policy is issued under the Act for any property when another policy issued under the Act is in effect for the same property, the policy with the later effective date is void from its effective date, and we shall make a refund to you of the premium paid, less the expense constant, for that policy for the entire period for which it was in effect without any lapse in coverage. For purposes of this paragraph T, the term "effective date" means the date coverage that has been in effect without any lapse was first placed in effect. When the duplicate policies are discovered by us, we shall by written notice give you an opportunity to add the coverage limits of the later policy to those of the earlier policy, as of the effective date of the later policy, by paying the pro rata premium for the increased coverage within 30 days of the written notice; provided, the resulting coverage limits shall in no event exceed the statutorily permissible limits of coverage under the Act or your insurable interest, whichever is less.

## Appendix A(2) of Part 61—[Amended]

9. Appendix A(2) of Part 61, Standard Floor Insurance Policy is amended as follows:

a. The statement in brackets immediately following the heading "Standard Flood Insurance Policy" is amended by adding after the word "Thereof" and before the comma the phrase "(hereinafter called the Act)".

b. The paragraph immediately following the heading "General Property Form" is amended by adding after the words "actual cash value" the phrase ", not including any antique value,".

c. The following headings are amended by adding article numbers as indicated below:

*Article I—Persons Insured*
*Article II—Definitions*
*Article III—Perils Excluded*
*Article IV—Property Covered (Subject to "Property Not Covered" Provisions)*
*Article V—Property Not Covered*
*Article VI—Deductibles*
*Article VII—General Conditions and Provisions*

d. In newly designated Article III—Perils Excluded, paragraph D is amended by adding after "landslide," and before "gradual erosion" the following: "destabilization or movement of land resulting from the accumulation of water in subsurface land areas,".

e. In newly designated Article IV—Property Covered, paragraph B.2 is amended by removing in the last paragraph the words "antique furniture" and the words "antique silver".

f. In newly designated Article V—Property not covered, paragraph D is amended by removing the words "driveways and other surfaces outside the foundation walls of the building."

And adding in their place the words "walkways, driveways, patios, and other surfaces, all of whatever kind of construction, located outside the perimeter, exterior walls of the insured building."

g. In newly designated Article VII—General Conditions and Provisions, paragraph J is amended by revising the second and third paragraphs to read as follows:

* * * * *

This policy shall not be renewed and the coverage provided by it shall not continue into any successive policy term unless the renewal premium payment is received by the National Flood Insurance Program (NFIP) at its office within 30 days of the expiration date of this policy, subject to Article VII.E of this appendix. If the renewal premium payment is mailed by certified mail to the NFIP prior to the expiration date, it shall be deemed to have been received within the required 30 days. The coverage provided by the renewal policy is in effect for any loss occurring during this 30-day period even if the loss occurs before the renewal premium payment is received, so long as the renewal premium payment is received within the required 30 days.

In all other cases, this policy shall terminate as of the expiration date of the last policy term for which the premium payment was timely received at the office of the NFIP, and in that event, the Insurer shall not be obligated to provide the Insured with any cancellation, termination, policy lapse, or policy renewal notice advising the Insured of any such cancellation, termination, policy lapse, or policy renewal; provided, however, with respect to any mortgagee (or trustee) named in the Declaration form attached to this policy, this insurance shall continue in force only for the benefit of such mortgagee (or trustee) for 30-days after written notice to the mortgagee (or trustee) of termination of this policy, and shall then terminate.

h. In newly designated Article VII—General Conditions and Provisions, paragraph K is revised to read as follows:

* * * * *

K. *Cancellation of policy by insured.* 1. The Insured can cancel this policy at anytime but a refund of premium will be made only when:

a. The Insured cancels because the Insured has transferred ownership of the insured property to someone else. In this case, the Insurer will refund to the Insured, once the Insurer receives the Insured's written request for cancellation (signed by the Insured) the excess of premiums paid by the Insured which apply to the unused portion of the policy's term, pro rata but with retention of the expense constant.

b. The Insured cancels because it has been determined that the insured property is not, in fact, in a special flood hazard area; and the Insured was required to purchase flood insurance coverage by a private lender or Federal agency pursuant to Pub. L. 93-234, section 102; and the lender or Federal agency no longer requires the retention by the Insured of the coverage. In this event, if no claims have paid or are pending, the premium payments will be refunded to the Insured in full, according to our applicable regulations.

c. The Insured cancels a policy having a term of three (3) years, on an anniversary date, and the reason for the cancellation is:

(i) A policy of flood insurance has been obtained or is being obtained in substitution for this policy and the Insurer has received a written concurrence in the cancellation from any mortgagee of which the Insurer has actual notice, or (ii) the Insured has extinguished the insured mortgage debt and is no longer required by the mortgagee to maintain the coverage.

Refund of any premium under this subparagraph "c" shall be pro rata but with retention of the expense constant.

* * * * *

i. Newly designated Article VII—General Conditions and Provisions is amended by adding new paragraph X to read as follows:

* * * * *

X. *Duplicate policies not allowed.* Property may not be insured under more than one policy issued under the Act. If a policy is issued under the Act for any property when another policy issued under the Act is in effect for the same property, the policy with the later effective date is void from its effective date, and the Insurer shall make a refund to the Insured of the premium paid, less expense constant, for that policy for the entire period for which it was in effect without any lapse in coverage. For purposes of this paragraph X, the term "effective date" means the date coverge that has been in effect without any lapse was first placed in effect.

When the duplicate policies are discovered by the Insurer, the Insurer shall be written notice give the Insured an opportunity to add the coverge limits of the later policy to those of the earlier policy, as of the effective date of the later policy, by paying the pro rata premium for any increased coverage within 30 days of the written notice; provided, the resulting coverage limits shall in no event exceed the statutorily permissible limits of coverage under the Act or the Insured's insurable interest, whichever is less.

j. The Condominium Association Endorsement is amended by adding new paragraph 8 to read as follows:

* * * * *

8. The Insurer shall not be liable for any loss or any portion of any loss for which payment is made under any insurance in the name of any condominium unit owner, i.e., any member of the condominium association.

## Appendix A(3) of Part 61—[Removed]

10. Part 61 is amended by removing Appendix A(3).

## Appendix A(4) of Part 61—[Removed]

11. Part 61 is amended by removing Appendix A(4).

## PART 62—SALE OF INSURANCE AND ADJUSTMENT OF CLAIMS

12. The authority citation for Part 62 is revised to read as set forth below and the authority citations following all the sections in Part 62 are removed.

Authority: 42 U.S.C. 4001, *et seq.;* Reorganization Plan No. 3 of 1978; E.O. 12127.

* * * * *

### § 62.5 [Amended]

13. Section 62.5 is amended by removing in the last sentence the words "on a short-rate basis." and adding in their place the words "pro rata but with retention of the expense constant."

## PART 65—IDENTIFICATION AND MAPPING OF SPECIAL HAZARD AREAS

12. The authority citation for Part 65 continues to read as follows:

Authority: 42 U.S.C. 4001, *et seq.;* Reorganization Plan No. 3 of 1978; E.O. 12127.

### § 65.6 [Amended]

13. Section 65.6 is amended by adding a new paragraph (a)(12) to read as follows:

* * * * *

(a) * * *

(12) If a community or other party seeks recognition from FEMA, on its FHBM or FIRM, that an altered or relocated portion of a watercourse provides protection from, or mitigates potential hazards of, the base flood, the Administrator may request specific documentation from the community certifying that, and describing how, the provisions of § 60.3(b)(7) of this subchapter will be met for the particular watercourse involved. This documentation, which may be in the form of a written statement from the Community Chief Executive Officer, an ordinance, or other legislative action, shall describe the nature of the maintenance activities to be performed, the frequency with which they will be performed, and the title of the local coummunity official who will be responsible for assuring that the maintenance activities are accomplished.

### § 65.11 [Amended]

14. Part 65 is amended by redesignating § 65.11 as § 65.13 and adding new §§ 65.11 and 65.12 to read as follows:

### § 65.11 Evaluation of sand dunes in mapping coastal flood hazard areas.

(a) *General conditions.* For purposes of the NFIP, FEMA will consider storm-induced dune erosion potential in its determination of coastal flood hazards and risk mapping efforts. The criterion to be used in the evaluation of dune erosion will apply to primary frontal dunes as defined in § 59.1, but does not apply to artifically designed and constructed dunes that are not well-established with long-standing vegetative cover, such as the placement of sand materials in a dune-like formation.

(b) *Evaluation crierion.* Primary frontal dunes will not be considered as effective barriers to base flood storm surges and associated wave action where the cross-sectional area of the primary frontal dune as measured perpendicular to the shoreline and above the 100-year stillwater flood elevation and seaward of the dune crest is equal to, or less than, 540 square feet.

(c) *Exceptions.* Exceptions to the evaluation criterion may be granted where it can be demonstrated through authoritative historical documentation that the primary frontal dunes at a specific site withstood previous base flood storm surges and associated wave action.

### § 65.12 Revision of flood insurance rate maps to reflect base flood elevations caused by proposed encroachments.

(a) When a community proposes to permit encroachments upon the flood plain when a regulatory floodway has not been adopted or to permit encroachments upon an adopted regulatory floodway which will cause base flood elevation increases in excess of those permitted under paragraphs (c)(10) or (d)(3) of § 60.3 of this subchapter, the community shall apply to the Administrator for conditional approval of such action prior to permitting the encroachments to occur and shall submit the following as part of its application:

(1) A request for conditional approval of map change and the appropriate initial fee as specified by § 72.3 of this subchapter or a request for exemption from fees as specified by § 72.5 of this subchapter, whichever is appropriate;

(2) An evaluation of alternatives which would not result in a base flood elevation increase above that permitted under paragraphs (c)(10) or (d)(3) of § 60.3 of this subchapter demonstrating why these alternatives are not feasible;

(3) Documentation of individual legal notice to all impacted property owners within and outside of the community, explaining the impact of the proposed action on their property.

(4) Concurrence of the Chief Executive Officer of any other communities impacted by the proposed action;

(5) Certification that no structures are located in areas which would be impacted by the increased base flood elevation;

(6) A request for revision of base flood elevation determination according to the provisions of § 65.6 of this part;

(7) A request for floodway revision in accordance with the provisions of § 65.7 of this part;

(b) Upon receipt of the Administrator's conditional approval of map change and prior to approving the proposed encroachments, a community shall provide evidence to the Administrator of the adoption of flood plain management ordinances incorporating the increased base flood elevations and/or revised floodway reflecting the post-project condition.

(c) Upon completion of the proposed encroachments, a community shall provide as-built certifications in accordance with the provisions of § 65.3 of this part. The Administrator will initiate a final map revision upon receipt of such certifications in accordance with Part 67 of this subchapter.

## PART 70—PROCEDURE FOR MAP CORRECTION

15. The authority citation for Part 70 continues to read as follows:

Authority: 42 U.S.C. 4001, *et seq.;* Reorganization Plan No. 3 of 1978; E.O. 12127.

### § 70.3 [Amended]

16. Section 70.3 is amended as follows:

a. By removing the phrase "floor (including basement) of the" in paragraph (b)(2)(iv) and adding in its place the phrase "adjacent grade to a".

b. By revising paragraph (b)(4) to read as follows:

* * * * *

(b) * * *

(4) A certification by a Registered Professional Engineer or Licensed Land Surveyor that the lowest grade adjacent to the structure is above the base flood elevation.

## PART 72—PROCEDURE AND FEES FOR OBTAINING CONDITIONAL APPROVAL OF MAP CHANGES

17. The authority citation for Part 72 is revised to read as follows:

Authority: 42 U.S.C. 4001, *et seq.;* Reorganization Plan No. 3 of 1978; E.O. 12127.

### § 72.5 [Amended]

18. Section 72.5 is amended by adding after the word "if", the phrase "the Administrator determines or".

| Sections in 42 CFR that contain collections of information | Current OMB control numbers |
|---|---|
| 433.117 | 0990-0058 and 0938-0247 |
| 433.138 | 0938-0502 |
| 433.139 | 0938-0459 |
| 434.6–434.20, 434.23–434-27, 434.30, 434.32, 434.36, 434.50, 434.53, 434.55 | 0938-0326 |
| 435.910, 435.919, 435.920, 435.940 | 0938-0467 |
| 435.945 | 0938-0467 and 0938-0502 |
| 435.948, 435.952, 435.955 | 0938-0467 |
| 435.960 | 0938-0467 and 0938-0502 |
| 435.965 | 0938-0467 |
| 441.56, 441.58, 441.60, 441.61 | 0938-0354 |
| 441.255–441.259 | 0938-0481 |
| 441.301 | 0938-0449 |
| 441.302 | 0938-0268 and 0938-0449 |
| 441.303 | 0938-0272 and 0938-0449 |
| 442.118 | 0938-0488 |
| 442.307, 442.308, 442.309, 442.311, 442.313, 442.314, 442.318, 442.319, 442.320 | 0938-0370 |
| 442.402, 442.404–442.407, 442.412, 442.413, 442.417, 442.421, 442.423–442.425, 442.427, 442.430, 442.434, 442.441, 442.443, 442.457, 442.460, 442.463, 442.466, 442.468, 442.475, 442.482–442.487, 442.490, 442.492, 442.497, 442.500–442.503, 442.505, 442.506, 442.512 | 0938-0366 |
| 447.30 | 0938-0067 |
| 447.31 | 0938-0287 |
| 447.53 | 0938-0429 |
| 447.253(a) | 0938-0193 |
| 447.255 | 0938-0193 |
| 456.654 | 0938-0445 |
| 466.70, 466.72, 466.74, 466.78, 466.80, 466.94 | 0938-0445 |
| 473.18, 473.34, 473.36, 473.42 | 0938-0443 |
| 474.36, 474.38–474.40 | 0938-0444 |
| 476.104, 476.105, 476.116, 476.134 | 0938-0426 |
| 482.12, 482.22, 482.27, 482.30, 482.41, 482.53, 482.56, 482.57 and 482.60–482.62 | 0938-0328 |
| 488.56, 488.60, 488.64 | 0938-0267 |
| 498.22, 498.40, 498.58, 498.82 | 0938-0508 |

(Catalog of Federal Domestic Assistance Program No. 13.714, Medical Assistance Programs; No. 13.773, Medicare—Hospital Insurance; No. 13.774, Medicare—Supplementary Medical Insurance)

Dated: March 16, 1988.

**William L. Roper,**

*Administrator, Health Care Financing Administration.*

Approved: April 6, 1988.

**Otis R. Bowen,**

*Secretary.*

[FR Doc. 88-10083 Filed 5-5-88; 8:45 am]

BILLING CODE 4120-01-M

## DEPARTMENT OF THE INTERIOR

## Bureau of Land Management

### 43 CFR Public Land Order 6675

**[NM-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-10; NM NM 66022]**

### Withdrawal of Public Land for Protection of Recreational Values Along the Rio Grande; New Mexico

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Public Land Order.

**SUMMARY:** This order withdraws 264.39 acres of public land from surface entry and mining for a period of 20 years for the Bureau of Land Management to protect, preserve, and maintain existing and future recreational values located along the "Pilar" section of the Rio Grande. The lands have been and remain open to mineral leasing.

**EFFECTIVE DATE:** May 6, 1988.

**FOR FURTHER INFORMATION CONTACT:** Clarence Hougland, BLM, New Mexico State Office, P.O. Box 1449, Santa Fe, New Mexico 87504-1449, 505-988-6554.

By virtue of the authority vested in the Secretary of the Interior by section 204 of the Federal Land Policy and Management Act of 1976, 90 Stat. 2751; 43 U.S.C. 1714, it is ordered as follows:

1. Subject to valid existing rights, the following described public lands are hereby withdrawn from settlement, sale, location, or entry under the general land laws, including the United States mining laws (30 U.S.C., Ch. 2), but not from leasing under the mineral leasing laws, to protect two sites important for recreational use on the Rio Grande:

New Mexico Principal Meridian

County Line Site

T. 23 N., R. 10 E.,
Sec. 14, lot 4;
Sec. 15, lot 4.

Fishing Hole Site

T. 24 N., R. 11 E.,
Sec. 32, lots 5, 6, 7, 8, SW¼SE¼.

The areas described aggregate 264.39 acres in Taos and Rio Arriba Counties.

2. The withdrawal made by this order does not alter the applicability of those public land laws governing the use of the lands under lease, license, or permit or governing the disposal of their mineral or vegetative resources other than under the mining laws.

3. This withdrawal will expire 20 years from the effective date of this order unless, as a result of a review conducted before the expiration date pursuant to section 204(f) of the Federal Land Policy and Management Act of 1976, 43 U.S.C. 1714(f), the Secretary determines that the withdrawal shall be extended.

May 3, 1988.

**James W. Ziglar,**

*Assistant Secretary of the Interior.*

[FR Doc. 88-10087 Filed 5-5-88; 8:45 am]

BILLING CODE 4310-FB-M

## FEDERAL EMERGENCY MANAGEMENT AGENCY

### 44 CFR Parts 59, 60, 61, 62, 65, 70, and 72

### National Flood Insurance Program; Flood Plain Management Standards

**AGENCY:** Federal Insurance Administration (FIA), Federal Emergency Management Agency (FEMA).

**ACTION:** Final rule.

**SUMMARY:** This final rule revises the National Flood Insurance Program (NFIP) regulations dealing with: flood plain management standards; criteria for the identification of coastal high hazard areas, more commonly referred to as V-zones, and delineated as Zone V, VO, V1–30 or VE on NFIP maps; requirements for maintenance of altered watercourses; criteria under which communities may permit flood plain and floodway developments which could increase base flood elevations; procedures for map correction; reimbursement procedures for the review of proposed projects to determine if they would qualify for NFIP map revisions upon their completion; and changes in the Standard Flood Insurance Policy (SFIP) terms and provisions.

**EFFECTIVE DATE:** October 1, 1988.

**FOR FURTHER INFORMATION CONTACT:** Charles M. Plaxico, Federal Emergency Management Agency, Federal Insurance Administration, 500 C Street SW., Washington, DC 20472; telephone number (202) 646-3422.

**SUPPLEMENTARY INFORMATION:** On November 3, 1987, FEMA published for comment in the **Federal Register** (Vol. 52, page 42117) a proposed rule containing revisions to the NFIP which were the result of a continuing reappraisal of the NFIP to achieve greater administrative and fiscal effectiveness in the operation of the program and to encourage sound flood plain management so that reductions in loss to life and property and in disaster expenditures can be realized. This reappraisal included the risk assessment (i.e., mapping of flood hazard areas) component of the NFIP, the loss

reduction (i.e., flood plain management) component and the claims, coverage, rating and sale of insurance component of the NFIP.

In the process of developing this final rule 32 comments were received, logged and analyzed based on the 7 subject areas discussed in the proposed rule supplementary information. The tally of comments included 1 individual, 17 representatives of private companies, 3 associations (including one on behalf of three associations), 4 local governments and 7 State governments. Many of the comments generally concurred with the proposed rule while specifically addressing one or more of its provisions. The comment contents ranged from strong support for, to strong opposition to, one or more of the proposed changes.

The analysis of the comments resulted in language clarification, a minor change to the numbering of provisions and, due to editorial oversight in the proposed rule, inclusion of changes to §§ 60.3(d) and 60.3(e) to incorporate appropriate cross references for consistency. Also, the Standard Flood Insurance Policy duplicate policy provision in the proposed rule was revised to make it more flexible. The comments received are addressed under the subject headings below.

**Community Ordinances**

Two commentators expressed a general concern that the final rules will require corresponding changes in community ordinances. In fact, the final rules are primarily procedural and will not require ordinance revisions at the local level. However, the new provisions at §§ 60.3(c)(13) and 60.3(d)(4), requiring a community to apply to FEMA for a conditional Flood Insurance Rate Map (FIRM) revision prior to permitting development or encroachments within the special flood hazard areas or within the regulatory floodway that would result in an increase in base flood elevations exceeding NFIP's standards, are voluntary and need only be adopted by a community if it wishes to permit such development. FEMA believes these situations should affect relatively few communities.

As for the final rule amending § 60.3(d)(3) which specifies use of hydraulic and hydrologic analyses in connection with a community's review of proposed development in floodways, this requirement is a clarification of the meaning implicit in the current regulations and, therefore, local ordinances do not need to be changed to reflect this clarification.

**Coastal High Hazard Area and Erosion Considerations for Sand Dunes**

Six commentators addressed this proposed rule and all expressed general support for including primary frontal dunes in V-zones and considering dune erosion during the base flood event in order to better reflect coastal areas actually at risk. However, clarification of the intent of the final rule is necessary to resolve apparent misunderstandings of the proposed rule as expressed by several of the commentators.

The final rule definition of coastal high hazard area includes all primary frontal dunes. Therefore, the boundary line of the V-zone, at a minimum, becomes the landward "toe" of the dune. Figure 1 clarifies the evaluation criterion for considering such dunes as effective barriers to base flood storm surges and associated wave action and depicts the inland limit of the dune. This figure also illustrates another provision of the rule that the cross-sectional area of the dune, as measured from the ocean side of the dune crest and above the 100-year stillwater flood level (SWFL), must be at least 540 square feet in order for the dune to be considered effective in attenuating wave action. Under the rule all dunes with a cross-sectional area less than 540 square feet will be treated as completely eroded during the 100-year storm in the preparation of FIRMs. Such a dune will not be credited with offering any protection against flooding or wave action to areas on the landward side of that dune. For dunes with a cross-sectional area smaller than 540 square feet, the methods used to determine areas subject to wave action will be employed as if the dune did not exist. Conversely, any dune with a cross-sectional area greater than 540 square feet may not be totally destroyed during the 100-year event and the dune will be credited with offering some level of protection to areas on its landward side. In this case, the method used to determine areas subject to wave action will be employed in conjunction with a dune erosion model which predicts how much of the dune will be eroded and how much protection it provides.

BILLING CODE 6718-01-M




FACTORS TO BE CONSIDERED IN DETERMINING DUNE FAILURE POTENTIAL AND V ZONE MAPPING

FIGURE 1




MEDIAN CROSS-SECTIONAL EROSION ABOVE FLOOD ELEVATION VERSUS FLOOD RECURRENCE INTERVAL BASED ON 38 CASES OF DUNE RETREAT DURING VARIOUS COASTAL STORMS.

FIGURE 2

BILLING CODE 6718-01-C

1. One State government and one association commented that by choosing the 50 percentile (median) cross-sectional area of 540 square feet as a criterion, FEMA has, by definition, underestimated dune erosion in half of all base (100-year) flood events (see figure 2). The commentators suggested using the 90–95 percentile in figure 2, which represents a cross-sectional area of 1,000 square feet or more.

The risk analysis methodology decisions incorporated in the NFIP have traditionally been based on selection of a median value, i.e., an estimate that has an equal chance of being too high or too low. Such has been the case in estimation of 100-year flood discharges and base flood elevations. It would be inconsistent to select a criterion for evaluating dune integrity which would overestimate dune erosion more than 50% of the time. Further, a value other than the median value would be inequitable in the determination of actuarial insurance rates.

In addition, dunes that meet the cross-sectional criteria of 540 square feet will not necessarily be considered as providing total protection from the 100-year flood. A post-flood eroded profile of the dune will be considered in computing wave runup on the dune face and overtopping on the dune crest when appropriate.

It is important to note that a criterion of 540 square feet for the cross-sectional area above the storm surge elevation and seaward of the dune crest represents a dune of significant size. FEMA believes use of this area is appropriate because it is consistent with other median values utilized in the NFIP and is based on an empirical relationship between the quantity of sand that would be removed from a frontal dune and the recurrence interval of the local storm tide.

2. Several commentators expressed concern that site-specific conditions should be analyzed in determining potential dune erosion rather than adopting a criterion for general dune integrity. FEMA has assessed the state-of-the-art in erosion modeling approaches and determined that they are not always effective in differentiating between local conditions. Moreover, site specific analyses will be considered in each flood risk analysis performed. Measurements of dunes will be taken locally to determine the volume of sand in the dune and whether the dune meets the 540 square feet criterion. Where the dune does not meet the 540 square feet criterion, site specific conditions will be considered in estimating a post-storm dune profile for wave runup and overtopping computations. Where the dune does meet the criterion, the protection afforded by the post-storm configuration of the dune will be factored into the wave runup calculations.

3. A State commentator suggested that FEMA develop provisions which take into account long-term erosional retreat rates of oceanfront shorelines in its mapping. The issue of using future risk conditions, such as long-term erosion effects, in flood risk analysis and mapping has been previously examined by FEMA. The NFIP legislation has not previously addressed long-term erosion, and a consistent data set does not now exist to allow FEMA to uniformly consider long-term erosion in the mapping of flood risks. FEMA has addressed this issue in the past by striving to maintain the accuracy of its maps through periodic map revisions. Additional efforts in erosion risk analysis and management will be forthcoming as FEMA implements the provisions of section 544 of the Housing and Community Development Act of 1987 pertaining to erosion.

4. Several associations and a State agency commented that FEMA should incorporate restrictive building requirements in areas subject to wave action. Language to amend § 60.3(e)(7) was suggested. It was also suggested that FEMA establish regional coastal construction requirements for structural foundations and that FEMA incorporate its Coastal Construction Manual into the final rule. Revision of flood plain management regulations for coastal areas is not being considered by FEMA during FY 1988 rulemaking. Presently, the NFIP regulations for construction in V-zones at § 60.3(e)(4) and § 60.3(a)(5)(ii) do require more rigorous construction standards such as piling or column foundations and anchoring for wind and water forces designed to exceed 100-year values for wind and water loading. With the final rule, these restrictive standards will become more comprehensive in geographic extent by the inclusion of all primary frontal dunes in the V-zone, and the extension of V-zones into areas behind dunes which do not have substantial cross sections.

Further, § 60.3(e)(7) prohibits any man-made alteration of sand dunes in V-zones which would increase potential flood damage. Most development that currently alters frontal dunes occurs on dunes mapped as outside the V-zone. The final rule incorporates all primary frontal dunes into the V-zone and thereby makes § 60.3(e)(7) much more encompassing and effective in protecting the integrity of frontal dune systems. It is envisioned that, as new V-zone delineations are established under the rule, construction activity (e.g., excavation and grading) which would jeopardize the integrity of primary frontal dunes will be prohibited by communities participating in the NFIP.

With regard to coastal foundation construction, while § 60.3(e)(4) does not specifically state that foundation design should incorporate an increase in foundation loadings due to erosion of supporting soil during a base flood event, this requirement is implicit in subparagraph (ii) of this section.

The current regulation is in agreement with the Coastal Construction Manual and, thus, the latter does not need to be incorporated into the rule. However, communities and interested parties are encouraged to utilize the manual for additional design considerations. Further, FEMA recognizes and encourages those local and State governments that wish to adopt more restrictive requirements than FEMA's standards to do so.

5. Another State suggested that FEMA include a definition in the rule for "alterations of sand dunes." FEMA believes the term, "man-made alteration of sand dunes" as used in § 60.3(e)(7), is self-explanatory; therefore, a definition is not necessary.

6. A joint comment submitted by three associations suggested that bluffs, secondary dunes, wetlands and other coastal barriers be included in V-zones. This suggestion is outside the realm of the proposed rule. Further, the definition of coastal high hazard area (V-zone) remains related to areas impacted by significant wave action. Primary frontal dunes are being included in V-zones because they are features that absorb the brunt of the wave action. Areas such as coastal wetlands, secondary dunes, and bluffs are not consistently affected by wave action during flood events and, thus, should not be included in V-zones by definition. Where such features can be shown to be subject to significant wave action in major storms through the engineering analyses performed in a flood risk study, they will be included in V-zones.

7. A State agency suggested that FEMA immediately provide revised FIRM's reflecting the new criterion for erosion consideration for sand dunes to any coastal community requesting such a revision, rather than waiting to incorporate the changes in new flood risk assessment studies or restudies. It is FEMA's intention to eventually revise all FIRM's where the V-zones may be presently underestimated. These revisions must be processed through the

normal map revision procedures rather than by special restudy effort because of current budgetary constraints. Priorities for performing map updates through the restudies and revisions procedures for communities impacted by the new erosion criteria will be based on cost/benefit considerations, as is presently the case with determining priorities for other types of restudies. A community's need for revised V-zone mapping will be a factor in determining its priority. Where costs can be reduced through local cost-sharing, or other approaches, adjustments in priority will be made.

**Requirements for Maintenance of Altered Watercourses**

Seven commentators addressed this proposed rule including three State governments, two local governments and two associations. Four commentators generally supported the rule but proposed modifications or substitute language; one commentator did not directly address the issue; and two commentators objected to the proposed rule, citing problems with access to private property, cost and legal liability associated with mandatory maintenance.

1. Two local governments and two associations pointed out that not all altered or relocated watercourses will require maintenance of their flood carrying capacity by virtue of their design. They asserted that the design criteria for a watercourse may include factors that account for regrowth of vegetation, sediment deposition, etc., thus obviating the need for maintenance. FEMA agrees that such situations should be addressed in the final rule and a new paragraph (a)(13) has been added to § 65.6.

The new paragraph provides that in lieu of the requirement to submit documentation that the provisions of § 60.3(b)(7) will be met prior to FEMA's revising the NFIP map to reflect the flood hazard mitigation effects of the altered or relocated watercourse, a community may submit certification by a registered professional engineer that the project has been designed to retain its flood carrying capacity without periodic maintenance.

2. A local government and an association suggested that altered or relocated watercourses on open space areas such as golf courses where no existing development will be impacted should be exempted from the maintenance requirement. FEMA's concern in this rule deals only with the maintenance of modifications of watercourses for which flood control benefits have been reflected or are proposed to be reflected on flood maps. This is very rarely, if ever, the case in undeveloped areas. Further, if a map revision is not sought on the basis of watercourse alteration, then FEMA agrees that the data submission requirement regarding watercourse maintenance does not apply and FEMA would not request a community to make such a submission.

3. Comments from a local government and an association suggested that the proposed amendments to § 65.6 be deleted or revised due to problems of access to private property, cost, legal liability and environmental impacts. It is important to note that FEMA is not creating a new requirement for maintenance of altered or relocated watercourses by the final rule. Such a requirement has existed for many years under § 60.3(b)(7). Instead, the final rule merely establishes a procedure whereby FEMA can verify that maintenance, where appropriate, will be carried out for new watercourse alterations for which map revisions are being sought. The final rule enables FEMA to obtain documentation as to the nature of the maintenance activities to be performed, the frequency with which they will be performed, and the title of the local official who will be responsible for assuring that the maintenance activities are accomplished. If it is prohibitive for a community to maintain its altered or relocated watercourses (for whatever reason), FEMA will not credit the flood control benefit of those projects on its maps. It is up to each community to evaluate the benefit of lower BFE's and reduced Special Flood Hazard Areas versus the costs of maintaining its watercourse modifications originally intended for these purposes.

4. A local government, a State agency and two associations addressed the environmental considerations connected with maintenance of altered watercourses. Some commented that implementation policies for maintenance of altered watercourses should be developed in concert with other Federal agencies and that such policies should specify criteria which is environmentally sensitive. While FEMA agrees that there is a need for better coordination among appropriate Federal agencies in regard to environmental issues and the Federal permitting process in connection with the maintenance of altered watercourses, the final rule is not the appropriate mechanism by which to address these issues. Further, it is unlikely that situations will arise where the alteration of watercourses for flood control purposes would be permitted, but maintenance of such alterations would not. Should such situations occur, then FEMA will not revise the map to reflect the mitigating effects of the altered watercourse and, therefore, no maintenance responsibilities will be imposed.

5. A State government and an association suggested that FEMA should require communities to report periodically regarding their maintenance activities and the continued effectiveness of their altered watercourses. FEMA agrees with the concept of monitoring community compliance with this requirement and is considering modification of the Community Assistance Visit Program to include elements relative to the maintenance of altered watercourses. However, establishing a formal reporting requirement would create an unnecessary paperwork burden on NFIP communities and an unnecessary administrative burden on the Agency. Therefore, reporting requirements will not be included in the final rule.

6. The same two commentators suggested that in rapidly urbanizing areas, future development of the watershed upstream from the altered watercourse should be considered in estimating design flows and flood plain limits. They asserted that with any flood control project, there is a potential for the benefits to be partially or completely negated by upstream development which increases runoff and the 100-year flood discharge. FEMA has taken these comments under advisement. A study is presently underway to examine the feasibility of considering future development in flood risk determinations. However, certain administrative issues become immediately apparent. First is the issue of equitable charging of actuarial premium rates for flood insurance coverage when rates are based on future rather than current risk conditions. Secondly, the estimation of future development and its effects on hydrologic conditions adds an additional level of uncertainty on the regulatory data established. This data remains subject to individual rights to appeal, and therefore, must be scientifically, technically and legally defensible. While FEMA is aware of the impact of possible future urbanization on the flood risk, these significant administrative concerns may prove too complex to implement effectively. Nevertheless, communities are encouraged to address the issue of the impacts of upstream future development on the potential benefits of a flood control project and adopt more restrictive local standards as necessary.

7. One State suggested that FEMA require proof from any applicant for a map revision, based on an altered watercourse, that a State permit has been granted before FEMA modifies the flood plain delineation on the FIRM. Requiring proof of a State permit is not an appropriate FEMA function in this activity. Typically, permitting processes occur in advance of installation of a flood control project, whereas a FEMA map revision occurs after the project's completion. To require proof of a State permit would be an after-the-fact effort solely to police compliance with State laws. Instead, FEMA requires at § 60.3(a)(2) that communities review all proposed developments to assure that all necessary permits have been received from those governmental agencies from which approval is required by Federal or State law. Further, in correspondence with applicants for map revisions, FEMA emphasizes the responsibility of the applicant to obtain all required permits, and to assure that the community has been informed of the revision request.

8. Another State suggested that by delineating to local citizenry the potential adverse consequences and benefits of sound watershed management, it is possible to increase the likelihood of gaining local support for the maintenance of watercourse issue. FEMA recognizes the virtues of this suggestion; however, the issue of public awareness activities is beyond the scope of this rulemaking. Nevertheless, FEMA encourages State and local governments to conduct public awareness efforts regarding sound watershed management.

**Flood Plain Management Criteria for Regulatory Floodways**

Five comments were received on this issue from three States and two associations. One commentator found the proposed language insufficient and suggested substitute language; three commentators supported the proposed rule; and one commentator objected to allowing any encroachment within the floodway.

The final rule to amend § 60.3(d)(3) is intended to make clear the intent that hydrologic and/or hydraulic analyses be performed as a part of a community's decision making regarding proposed encroachments in the floodway. Development actions that result in no rise in BFE's have always been allowed by the NFIP regulations and their prohibition was not addressed in this rulemaking. Therefore, the comment opposing encroachment in the floodway is not being considered at this time. Further, standards more restrictive than the NFIP can always be adopted by States or communities and FEMA encourages such action.

1. One State and an association suggested specific hydraulic modeling procedures for demonstrating that the proposed encroachment does not result in any increase in the BFE's. The procedures suggested are consistent with those set forth in § 65.7 and they are suitable; however, under certain situations, alternate analytical approaches may also suffice. FEMA does not want to establish procedures that would preclude the use of alternative approaches. Rather, the final rule is an effort to ensure that communities base their floodway encroachment decisions on hydrologic and hydraulic analyses performed in accordance with standard engineering practice which demonstrate that the proposed encroachments do not result in any increase in BFE's.

2. Substitute language was provided by an association that would give the local flood plain administrator the option of determining when and if a hydraulic or hydrologic analysis would be necessary. To allow the community to have the option of requiring an engineering analysis would result in perpetuation of the current situation which has proven unsuitable, i.e., unsupported decision making. Instead, the final rule assures that the community obtains an engineering analysis on which to base the decision regarding proposed development in the floodway. The final rule does not preclude the analysis from being performed by the local flood plain administrator if he or she has the technical expertise to do so. The local flood plain administrator does have the authority to specify the depth of the analysis which should be governed by common sense and the level of detail dependent on the nature of the proposed action. Computer modeling may not be required in every instance; however, supporting documentation sufficient to show that a zero rise in BFE's would result should be obtained by the community and maintained on file.

3. The same association asked whether other methods of mitigating the impact of the encroachment such as public land acquisition of the impacted area or hold harmless agreements would be acceptable in lieu of an engineering analysis. FEMA believes that before determining the appropriate form of compensatory action, an engineering analysis to determine the impact of the encroachment would still be necessary. Further, FEMA would not encourage hold harmless agreements because such agreements are likely to be between the project sponsor and the affected properties' owners and are likely to exclude indemnification of the National Flood Insurance Fund which would likely be susceptible to increased payments to individual policyholders when they submit claims for the increased flood damages caused by the project. Before approving such a project, FEMA would require assurances that no insurable structures are adversely impacted. This assurance is discussed in greater detail in the following subheading.

One commentator incorrectly analyzed the effect of the amendment to § 60.3(d)(3) by stating that *all* floodway encroachments will require that analyses be submitted to FEMA prior to issuance of a flood plain use permit to assure a community's compliance in the NFIP. The final rule amending § 60.3(d)(3) retains decision making for permitting encroachments that cause no rise in BFE's at the local level. The commentator is referring to amendments adding § 60.3(c)(13) and § 60.3(d)(4) which pertain to development that would result in BFE increases exceeding the NFIP standards. These amendments are discussed under the following subheading.

**Revision of FIRMs To Reflect BFE Increases Exceeding NFIP Standards**

Six comments on this rule were received from four States and two associations. Three commentators agreed with the concept but expressed concerns, two supported the amendment and one objected to any change to § 60.3 at the present time.

The intent of the final rule is to establish a mechanism within the NFIP regulations to allow for exceptions to the limitations on BFE increases contained in § 60.3 (c)(10) and (d)(3) to accommodate situations where the proposed flood plain actions can result in reduced flood hazards or have a net public benefit. The final rule also prevents, or compensates for, adverse impacts on property owners and the National Flood Insurance Fund, and assures proper notification of all affected property owners. This is achieved through the submission to FEMA of an application for conditional map revision for such action prior to permitting the encroachments to occur. The application will include scientific and technical information to support the request, evidence that a BFE increase is justified, that all engineering alternatives have been considered and determined to be unsuitable, that community approval has been obtained,

that no insurable structures are impacted, and that any property owners adversely impacted are properly notified.

1. An association submitted the following questions regarding this issue. First, must the community pay FEMA for the review of the conditional map revision request? The appropriate initial fee or a request for exemption from the fee would be required as specified by § 72.5 of the existing rule. Second, will FEMA establish a schedule for review of the request in order to process it without undue delay and hardship to the applicant? Such a schedule presently exists at § 72.4 of the NFIP regulations. Third, will FEMA allow the determination to be made by the State Coordinator for the NFIP or by the FEMA Regional Offices? Authority to make such a determination is not being delegated at this time.

2. A State agency and an association suggested that the final rule not be limited to areas where no existing development would be impacted by the BFE increases. FEMA points out that in cases where structures may be impacted by proposed projects exceeding the allowable BFE's, the applicant always has the option of purchasing and removing them, elevating them to the new base flood elevation that would result from construction of the proposed project, or providing other forms of mitigation.

The commentators further suggested that adverse impacts to the National Flood Insurance Fund could be avoided by assessing actuarial rates to any structure whose owner agrees to the increase. The final rule limits conditions to areas where no insurable structures are impacted because no workable mechanism exists for indemnifying the National Flood Insurance Fund to compensate for the increased claims likely to result from insured or potentially insurable structures. The creation of such mechanisms would be prohibitively complex from an administrative standpoint.

3. These commentators also stated that simple notification to all affected property owners of an impending increase in BFE's is insufficient and that FEMA should verify that appropriate legal arrangements have been made before such a project is permitted. The final rule provides for legal notification to all impacted property owners within and outside the community, explaining the impact of the proposed action on their property. In connection with many such projects, the community will also be seeking revisions to the floodway designation and BFE determinations. Such actions will involve due process requirements specified under Parts 65 and 67 of the NFIP regulations, as well. FEMA believes that these combined procedures provide for sufficient notification to affected property owners and an opportunity for them to either publicly participate in the community's decision making or to avail themselves of a legal recourse, if desired.

FEMA does not believe it is appropriate for this agency to identify what constitutes "appropriate legal arrangements" or verify that such arrangements have been made in each case.

4. Regarding the requirement in the final rule at § 65.12(a)(2) for submission of an evaluation of alternatives which do not result in BFE increases and demonstration why such alternatives are not feasible, another association suggested alternate language. The commentator is concerned that communities will be required to submit detailed economic analyses of numerous alternatives. FEMA believes that the alternate wording offered by the commentator does not represent a significant difference from the language of the proposed rule. The intent of the final rule is not to require detailed economic analyses, but instead to ensure that communities have considered possible engineering alternatives which would not raise flood levels, and that they were rejected for legitimate reasons.

5. A State agency objected to including provisions which would allow certain development exceeding the NFIP standards for BFE increases in the flood plain management criteria section of the regulations. The commentator feared that such exceptions will become part of all NFIP participating communities' local regulations and will then subject communities to increasing requests for floodway revisions. Further, the commentator stated that § 65.7, pertaining to floodway revisions, was adequate and that exceptions to § 60.3 (c) and (d) should not be incorporated into the NFIP regulations.

With regard to local adoption of the final rule amendments, the provisions of § 60.3 (c)(13) and (d)(4) of the final rule need only be adopted in local ordinances if a community elects to take advantage of them. No mandatory inclusion of these amendments in all local ordinances adopted by communities participating in the NFIP will occur. FEMA estimates receiving fewer than 50 requests per year for conditional map revisions for floodway encroachments.

As for the adequacy of § 65.7, FEMA believes that the existing provisions of § 65.7 do not sufficiently accommodate projects which by their nature must be included in floodways such as stormwater detention basins, dams and bridges. Section 65.7 enables communities to revise the boundaries of a floodway, if certain criteria are met, so as to no longer include certain proposed projects within the floodway. In addition, under § 65.7 the revised floodway limits must be set so that neither the effective BFE's nor the proposed BFE's are increased by more than one foot at any point. Projects such as detention basins, dams and certain bridges cannot be located outside the floodway and in some cases the BFE increases caused by them may be greater than one foot. Thus, § 65.7 does not accommodate all situations and the final rule amending § 60.3 is necessary.

The current regulations constitute a complete prohibition of any development in the floodway which would cause any rise in BFE's. The current regulations also prohibit any action in a flood plain which would cause more than a one foot rise in BFE's when a floodway has not been adopted. Because of the need to allow for exceptions to the limitations on BFE increases in cases where floodway or flood plain projects reduce flood hazards and/or result in a net public benefit, a mechanism for such exceptions must be established in the NFIP regulations. Without such a mechanism, communities cannot accommodate such proposed projects and FEMA cannot approve map revisions for them. The need to allow exceptions such as these will increase as more States and communities require stormwater management facilities to offset increased runoff rates due to development.

**Procedure for Map Correction**

Eleven comments addressing this proposed rule were received from two States, one association, one individual, five private companies, and two local government agencies. Three commentators supported the proposed rule, one objected and the remainder expressed concerns as a result of their misinterpreting the proposed rule.

Seven commentators from Texas expressed the same concern that the proposed rule would impact commercial structures with loading areas below the BFE. The commentators apparently did not understand that the amendment has the effect of deleting an unnecessary requirement for the data needed to support a request for a Letter of Map Amendment (LOMA). The rule change eliminates the need for appellants, seeking a LOMA, to incur the cost of

obtaining and providing extraneous information that FEMA does not use in making LOMA determinations.

The commentators appear to have construed the amendment to affect the Letter of Map Revision (LOMR) process, which it does not. The two procedures are explained below to remedy the confusion.

The LOMA process pertains to any owner or lessee of property who believes his or her property (at natural grade) has been inadvertently included (i.e., mapped) in a designated Special Flood Hazard Area (SFHA). The governing criterion for granting the LOMA, which technically removes a structure from the SFHA and lifts the Federal requirement for mandatory flood insurance purchase, is whether the lowest adjacent grade to the structure is at or above the base flood elevation.

The LOMR process applies when alterations of topography have occurred and specifically pertains to structures which have been elevated by fill. Requests for LOMRs are processed under 44 CFR Part 65. The governing criteria when fill is involved are whether the lowest adjacent grade to, and the lowest floor (including basement) of, the structure are at or above the BFE.

The final rule amending § 70.3(b) does not affect the LOMR process or the flood plain management regulations which communities must enforce. To be compliant with § 60.3(c) of the NFIP regulations, communities must require new construction in the SFHA to have the lowest floor elevated (by whatever means) to or above the BFE. The lowest adjacent grade to the structure can be below the BFE and still be compliant with § 60.3(c), but it would not qualify for a LOMR.

**Procedure and Fees for Conditional Approval of Map Changes**

Three commentators made up of two States and one association expressed support for this rule.

**Standard Flood Insurance Policy**

There were three comments on the proposed changes to the Standard Flood Insurance Policy (SFIP). Two expressed support for these proposed changes, and one stated that the language of the change specifically excluding coverage for damage caused by destabilization of land resulting from the accumulation of water in subsurface land areas was not clear. Since this proposed change was in response to a recent court decision, FEMA feels it is necessary to use the language of the court, which the proposed rule did, and so this final rule makes no change in the language of the proposed rule.

Also, FEMA has concluded that the duplicate policy provision in the proposed rule should be made more flexible. The proposed rule specified that, when duplicate policies (i.e., more than one policy for a building or the contents in a building) were discovered, the earlier policy had to be the one that was kept in effect. The final rule permits the policyholder to choose which policy to keep in effect. One situation in which this could be useful is where a lender purchases a flood insurance policy on behalf of the borrower when the borrower already had a flood insurance policy. In such cases, it may be more convenient to the parties to keep the later policy purchased by the lender in effect.

This duplicate policy provision applies to all NFIP policies, whether with the same or different Write-Your-Own companies or with the direct NFIP business or with both the direct NFIP business and a Write-Your-Own company.

FEMA has determined, based upon an Environmental Assessment, that this rule will not have significant impact upon the quality of the human environment. As a result, an Environmental Impact Statement will not be prepared. A finding of no significant impact is included in the formal docket file and is available for public inspection and copying at the Rules Docket Clerk, Office of General Counsel, Federal Emergency Management Agency, 500 C Street SW., Washington, DC 20472.

This rule will not have a significant economic impact on a substantial number of small entities and, hence, has not undergone regulatory flexibility analysis.

This rule is not a "major rule" as defined in Executive Order 12291, dated February 27, 1981, and, hence, no regulatory analysis has been prepared.

FEMA has determined that this rule does not contain a collection of information requirement as described in section 3504(h) of the Paperwork Reduction Act.

**List of Subjects in 44 CFR Parts 59, 60, 61, 62, 65, 70, and 72**

Flood insurance, Flood plains, Claims.

Accordingly, 44 CFR Chapter I, Subchapter B, is amended as follows:

## PART 59—GENERAL PROVISIONS

1. The authority citation for Part 59 continues to read as follows:

Authority: 42 U.S.C. 4001 *et seq.*; Reorganization Plan No. 3 of 1978; E.O. 12127.

**§ 59.1 [Amended]**

2. Section 59.1 is amended as follows:

a. By revising the definition of "Coastal high hazard area" to read as follows:

* * * * *

"Coastal high hazard area" means an area of special flood hazard extending from offshore to the inland limit of a primary frontal dune along an open coast and any other area subject to high velocity wave action from storms or seismic sources.

* * * * *

b. By adding, alphabetically, a definition of "Primary frontal dune" to read as follows:

* * * * *

"Primary frontal dune" means a continuous or nearly continuous mound or ridge of sand with relatively steep seaward and landward slopes immediately landward and adjacent to the beach and subject to erosion and overtopping from high tides and waves during major coastal storms. The inland limit of the primary frontal dune occurs at the point where there is a distinct change from a relatively steep slope to a relatively mild slope.

* * * * *

## PART 60—CRITERIA FOR LAND MANAGEMENT AND USE

3. The authority citation for Part 60 continues to read as follows:

Authority: 42 U.S.C. 4001, *et seq.*; Reorganization Plan No. 3 of 1978; E.O. 12127.

**§ 60.3 [Amended]**

4. Section 60.3 is amended as follows:

a. By adding a new paragraph (c)(13) to read as follows:

* * * * *

(c) * * *

(13) Notwithstanding any other provisions of § 60.3, a community may approve certain development in Zones Al-30, AE, and AH, on the community's FIRM which increase the water surface elevation of the base flood by more than one foot, provided that the community first applies for a conditional FIRM revision, fulfills the requirements for such a revision as established under the provisions of § 65.12, and receives the approval of the Administrator.

b. By removing in paragraph (d)(1) the phrase "(12)" and adding in its place the phrase "(13)".

c. By removing in paragraph (d)(3) the phrase "that would" and adding in its place the phrase "unless it has been demonstrated through hydrologic and hydraulic analyses performed in accordance with standard engineering

practice that the proposed encroachment would not".

* * * * *

d. By adding a new paragraph (d)(4) to read as follows:

* * * * *

(d) * * *

(4) Notwithstanding any other provisions of § 60.3, a community may permit encroachments within the adopted regulatory floodway that would result in an increase in base flood elevations, provided that the community first applies for a conditional FIRM and floodway revision, fulfills the requirements for such revisions as established under the provisions of § 65.12, and receives the approval of the Administrator.

e. By removing in paragraph (e)(1) the phrase "(12)" and adding in its place the phrase "(13)".

## PART 61—INSURANCE COVERAGE AND RATES

5. The authority citation for Part 61 continues to read as follows:

**Authority:** 42 U.S.C. 4001, *et seq*; Reorganization Plan No. 3 of 1978; E.O. 12127.

### § 61.4 [Amended]

6. Section 61.4 is amended by removing in paragraph (c) the phrase "or from earthquakes" and adding in its place the phrase ", destabilization or movement of land resulting from the accumulation of water in subsurface land areas, earthquakes,".

### § 61.5 [Amended]

7. Section 61.5 is amended by removing in paragraph (f)(4) the words "driveways and other surfaces outside the foundation walls of the building;" and adding in their place the words "walkways, driveways, patios, and other surfaces, all of whatever kind of construction, located outside the perimeter, exterior walls of the insured building;" and by adding a new paragraph (j) to read as follows:

* * * * *

(j) *Duplicate policies not allowed.* Property may not be insured under more than one policy issued under the National Flood Insurance Act of 1968, as amended. When the insurer finds that duplicate policies are in effect, the insurer shall by written notice give the insured the option of choosing which policy is to remain in effect. If the insured chooses to keep in effect the policy with the earlier effective date, the insurer shall by the same written notice give the insured an opportunity to add the coverage limits of the later policy to those of the earlier policy, as of the effective date of the later policy. If the insured chooses to keep in effect the policy with the later effective date, the insurer shall by the same written notice give the insured the opportunity to add the coverage limits of the earlier policy to those of the later policy, as of the effective date of the later policy. In either case, the insured must pay the pro rata premium for the increased coverage limits within 30 days of the written notice. In no event shall the resulting coverage limits exceed the statutorily permissible limits of coverage under the Act or the insured's insurable interest, whichever is less. The insurer shall make a refund to the insured, according to applicable NFIP rules, of the premium for the policy not being kept in effect. For purposes of this paragraph (j), the term "effective date" means the date coverage that has been in effect without any lapse was first placed in effect. In addition to the provisions of this paragraph (j) for increasing policy limits, the usual procedures for increasing policy limits by mid-term endorsement or at renewal time, with the appropriate waiting period, are applicable to the policy the insured chooses to keep in effect.

### Appendix A(1) of Part 61—[Amended]

8. Appendix A(1) of Part 61, Standard Flood Insurance Policy, is amended as follows:

a. The Dwelling Form—Insuring Agreement (appearing immediately before Article I) is amended by adding after the phrase "42 U.S.C. 4001, *et seq.*" and within the parentheses the phrase ", hereinafter called the Act" and by removing the clause beginning with the words "we insure" and ending at the end of the sentence, and adding in its place the following: "we insure you and your legal representatives against all "Direct Physical Loss by or from Flood", as defined in Article II of this Agreement, to the insured property, to the extent of the actual cash value, not including any antique value, of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after the loss."

b. In Article II—Definitions, the definition of "Direct Physical Loss by or from Flood" is amended by adding in the first sentence after the word "labor" and before the word "at" the words "and the labor of members of your household".

c. In Article III—Losses Not Covered, paragraph A.1 is amended by adding after "landslide," and before "gradual erosion" the following: "destabilization or movement of land resulting from the accumulation of water in subsurface land areas,".

d. In Article IV—Property Covered (Subject to "Property Not Covered" Provision), paragraph A.1 is amended by removing the comma and the words "if your" after the words "building's common elements" and adding in their place the following: "and the common elements of any other building of your condominium association covered by insurance that is: (i) in the name of your condominium association, (ii) provided under the Act, and (iii) in an amount at least equal to the actual cash value of the building's common elements at the beginning of the current policy term or the maximum building coverage limit available under the Act, whichever is less; provided that the insurance under this policy shall be excess over any insurance in the name of your condominium association covering the same-property covered by this policy; provided, your condominium" and by removing after the words "one family and" the word "if".

e. In Article IV—Property Covered (Subject to "Property Not Covered" Provisions), paragraph A.7 is amended by adding after the word "labor" and before the word "at" the words "and the labor of members of your household".

f. In Article IV—Property Covered (Subject to "Property Not Covered" Provisions), paragraph C is amended by removing in the first sentence the words "antique furniture," and the words ", antique silver".

g. In Article IV—Property Covered (Subject to "Property Not Covered" Provisions), paragraph D is amended by adding after the word "labor" and before the word "at" the words "and the labor of members of your household".

h. In Article V—Property Not Covered, paragraph D is amended by removing the words "driveways and other surfaces, outside the foundation walls of the building" and adding in their place the words "walkways, driveways, patios, and other surfaces, all of whatever kind of construction, located outside the perimeter, exterior walls of the insured building."

i. In Article VIII—General Conditions and Provisions, paragraph E is amended by removing the words ", but with retention of the expense constant" at the end of paragraph 1.b; and by removing the words "on a short-rate basis" and adding in their place the words "pro rata but with retention of the expense constant" in paragraph 1.c.

j. In Article VIII—General Conditions and Provisions, paragraph G is amended

by revising the second paragraph to read as follows:

* * * * *

This policy shall not be renewed and the coverage provided by it shall not continue into any successive policy term unless the renewal premium payment is received by us at the office of the NFIP within 30 days of the expiration date of this policy, subject to Article VIII.F of this appendix. If the renewal premium payment is mailed by certified mail to the NFIP prior to the expiration date, it shall be deemed to have been received within the required 30 days. The coverage provided by the renewal policy is in effect for any loss occurring during this 30-day period even if the loss occurs before the renewal premium payment is received, so long as the renewal premium payment is received within the required 30 days. In all other cases, this policy shall terminate as of the expiration date of the last policy term for which the premium payment was timely received at the office of the NFIP, and in that event, we shall not be obligated to provide you with any cancellation, termination, policy lapse, or policy renewal notice advising you of any such cancellation, termination, policy lapse, or policy renewal; provided, however, with respect to any mortgagee (or trustee) named in the declarations form attached to this policy, this insurance shall continue in force only for the benefit of such mortgagee (or trustee) for 30 days after written notice to the mortgagee (or trustee) of termination of this policy, and shall then terminate.

k. Article VIII—General Conditions and Provisions is amended by adding a new paragraph T to read as follows:

* * * * *

T. *Duplicate policies not allowed.* Property may not be insured under more than one policy issued under the Act. When we find that duplicate policies are in effect, we shall by written notice give you the option of choosing which policy is to remain in effect. If you choose to keep in effect the policy with the earlier effective date, we shall by the same written notice give you an opportunity to add the coverage limits of the later policy to those of the earlier policy, as of the effective date of the later policy. If you choose to keep in effect the policy with the later effective date, we shall by the same written notice give you the opportunity to add the coverage limits of the earlier policy to those of the later policy, as of the effective date of the later policy. In either case, you must pay the pro rata premium for the increased coverage limits within 30 days of the written notice. In no event shall the resulting coverage limits exceed the statutorily permissible limits of coverage under the Act or your insurable interest, whichever is less. We shall make a refund to you, according to applicable NFIP rules, of the premium for the policy not being kept in effect. For purposes of this paragraph T, the term "effective date" means the date coverage that has been in effect without any lapse was first placed in effect. In addition to the provisions of this paragraph T for increasing policy limits, the usual procedures for increasing policy limits by mid-term endorsement or at renewal time, with the appropriate waiting period, are applicable to the policy you choose to keep in effect.

## Appendix A(2) of Part 61—[Amended]

9. Appendix A(2) of Part 61, Standard Flood Insurance Policy is amended as follows:

a. The statement in brackets immediately following the heading "Standard Flood Insurance Policy" is amended by adding after the word "Thereof" and before the comma the phrase "(hereinafter called the Act)".

b. The paragraph immediately following the heading "General Property Form" is amended by adding after the words "actual cash value" the phrase ", not including any antique value,".

c. The following headings are amended by adding article numbers as indicated below:

*Article I—Persons Insured*

*Article II—Definitions*

*Article III—Perils Excluded*

*Article IV—Property Covered (Subject to "Property Not Covered" Provisions)*

*Article V—Property Not Covered*

*Article VI—Deductibles*

*Article VII—General Conditions and Provisions*

d. In newly designated Article III—Perils Excluded, paragraph D is amended by adding after "landslide," and before "gradual erosion" the following: "destabilization or movement of land resulting from the accumulation of water in subsurface land areas,".

e. In newly designated Article IV—Property Covered, paragraph B.2 is amended by removing in the last paragraph the words "antique furniture," and the words "antique silver,".

f. In newly designated Article V—Property Not Covered, paragraph D is amended by removing the words "driveways and other surfaces outside the foundation walls of the building" and adding in their place the words "walkways, driveways, patios, and other surfaces, all of whatever kind of construction, located outside the perimeter, exterior walls of the insured building."

g. In newly designated Article VII—General Conditions and Provisions, paragraph J is amended by revising the second and third paragraphs to read as follows:

* * * * *

This policy shall not be renewed and the coverage provided by it shall not continue into any successive policy term unless the renewal premium payment is received by the National Flood Insurance Program (NFIP) at its office within 30 days of the expiration date of this policy, subject to Article VII.E of this appendix. If the renewal premium payment is mailed by certified mail to the NFIP prior to the expiration date, it shall b deemed to have been received within the required 30 days. The coverage provided b the renewal policy is in effect for any loss occurring during this 30-day period even if the loss occurs before the renewal premium payment is received so long as the renewal premium payment is received within the required 30 days.

In all other cases, this policy shall terminate as of the expiration date of the last policy term for which the premium payment was timely received at the office of the NFIP, and in that event, the Insurer shall not be obligated to provide the Insured with any cancellation, termination, policy lapse, or policy renewal notice advising the Insured of any such cancellation, termination, policy lapse, or policy renewal; provided, however, with respect to any mortgagee (or trustee) named in the Declaration form attached to this policy, this insurance shall continue in force only for the benefit of such mortgagee (or trustee) for 30 days after written notice to the mortgagee (or trustee) of termination of this policy, and shall then terminate.

h. In newly designated Article VII—General Conditions and Provisions, paragraph K is revised to read as follows:

* * * * *

K. *Cancellation of policy by insured.* 1. The Insured can cancel this policy at anytime but a refund of premium will be made only wh

a. The Insured cancels because the Insu has transferred ownership of the insured property to someone else. In this case, the Insurer will refund to the Insured, once the Insurer receives the Insured's written request for cancellation (signed by the Insured) the excess of premiums paid by the Insured which apply to the unused portion of the policy's term, pro rata but with retention of the expense constant.

b. The Insured cancels because it has been determined that the insured property is not, in fact, in a special flood hazard area; and the Insured was required to purchase flood insurance coverage by a private lender or Federal agency pursuant to Pub. L. 93-234, section 102; and the lender or Federal agency no longer requires the retention by the Insured of the coverage. In this event, if no claims have been paid or are pending, the premium payments will be refunded to the Insured in full, according to applicable regulations.

c. The Insured cancels a policy having a term of three (3) years, on an anniversary date, and the reason for the cancellation is:

(i) A policy of flood insurance has been obtained or is being obtained in substitution for this policy and the Insurer has received a written concurrence in the cancellation from any mortgagee of which the Insurer has actual notice, or (ii) the Insured has extinguished the insured mortgage debt and is no longer required by the mortgagee to maintain the coverage.

Refund of any premium under this subparagraph "c" shall be pro rata but with retention of the expense constant.

* * * * *

i. Newly designated Article VII—General Conditions and Provisions is amended by adding a new paragraph X to read as follows:

* * * * *

X. *Duplicate policies not allowed.* Property may not be insured under more than one policy issued under the Act. When the Insurer finds that duplicate policies are in effect, the Insurer shall by written notice give the Insured the option of choosing which policy is to remain in effect. If the Insured chooses to keep in effect the policy with the earlier effective date, the Insurer shall by the same written notice give the Insured an opportunity to add the coverage limits of the later policy to those of the earlier policy, as of the effective date of the later policy. If the Insured chooses to keep in effect the policy with the later effective date, the Insurer shall by the same written notice give the Insured the opportunity to add the coverage limits of the earlier policy to those of the later policy, as of the effective date of the later policy. In either case, the Insured must pay the pro-rata premium for the increased coverage limits within 30 days of the written notice. In no event shall the resulting coverage limits exceed the statutorily permissible limits of coverage under the Act or the Insured's insurable interest, whichever is less. The Insurer shall make a refund to the Insured, according to applicable NFIP rules, of the premium for the policy not being kept in effect. For purposes of this paragraph X, the term "effective date" means the date coverage that has been in effect without any lapse was first placed in effect. In addition to the provisions of this paragraph X for increasing policy limits, the usual procedures for increasing limits by mid-term endorsement or at renewal time, with the appropriate waiting period, are applicable to the policy the Insured chooses to keep in effect.

j. The Condominium Association Endorsement is amended by adding a new paragraph 8 to read as follows:

* * * * *

8. The Insurer shall not be liable for any loss or any portion of any loss for which payment is made under any insurance in the name of any condominium unit owner, i.e., any member of the condominium association.

**Appendix A(3) of Part 61—[Removed]**

10. Part 61 is amended by removing Appendix A(3).

**Appendix A(4) of Part 61—[Removed]**

11. Part 61 is amended by removing Appendix A(4).

## PART 62—SALE OF INSURANCE AND ADJUSTMENT OF CLAIMS

12. The authority citation for Part 62 is revised to read as set forth below and the authority citations following all the sections in Part 62 are removed.

Authority: 42 U.S.C. 4001; *et seq.*; Reorganization Plan No. 3 of 1978; E.O. 12127.

* * * * *

**§ 62.5 [Amended]**

13. Section 62.5 is amended by removing in the last sentence the words "on a short-rate basis." and adding in their place the words "pro rata but with retention of the expense constant."

## PART 65—IDENTIFICATION AND MAPPING OF SPECIAL HAZARD AREAS

14. The authority citation for Part 65 continues to read as follows:

Authority: 42 U.S.C. 4001, *et seq.*; Reorganization Plan No. 3 of 1978; E.O. 12127.

**§ 65.6 [Amended]**

15. Section 65.6 is amended by adding new paragraphs (a)(12) and (a)(13) to read as follows:

* * * * *

(a) * * *

(12) If a community or other party seeks recognition from FEMA, on its FHBM or FIRM, that an altered or relocated portion of a watercourse provides protection from, or mitigates potential hazards of, the base flood, the Administrator may request specific documentation from the community certifying that, and describing how, the provisions of § 60.3(b)(7) of this subchapter will be met for the particular watercourse involved. This documentation, which may be in the form of a written statement from the Community Chief Executive Officer, an ordinance, or other legislative action, shall describe the nature of the maintenance activities to be performed, the frequency with which they will be performed, and the title of the local community official who will be responsible for assuring that the maintenance activities are accomplished.

(13) Notwithstanding any other provisions of § 65.6, a community may submit, in lieu of the documentation specified in § 65.6(a)(12), certification by a registered professional engineer that the project has been designed to retain its flood carrying capacity without periodic maintenance.

**§ 65.13 [Redesignated from § 65.11]**

16. Part 65 is amended by redesignating § 65.11 as § 65.13 and adding new § 65.11 and § 65.12 to read as follows:

**§ 65.11 Evaluation of sand dunes in mapping coastal flood hazard areas.**

(a) *General conditions.* For purposes of the NFIP, FEMA will consider storm-induced dune erosion potential in its determination of coastal flood hazards and risk mapping efforts. The criterion to be used in the evaluation of dune erosion will apply to primary frontal dunes as defined in § 59.1, but does not apply to artificially designed and constructed dunes that are not well-established with long-standing vegetative cover, such as the placement of sand materials in a dune-like formation.

(b) *Evaluation criterion.* Primary frontal dunes will not be considered as effective barriers to base flood storm surges and associated wave action where the cross-sectional area of the primary frontal dune, as measured perpendicular to the shoreline and above the 100-year stillwater flood elevation and seaward of the dune crest, is equal to, or less than, 540 square feet.

(c) *Exceptions.* Exceptions to the evaluation criterion may be granted where it can be demonstrated through authoritative historical documentation that the primary frontal dunes at a specific site withstood previous base flood storm surges and associated wave action.

**§ 65.12 Revision of flood insurance rate maps to reflect base flood elevations caused by proposed encroachments.**

(a) When a community proposes to permit encroachments upon the flood plain when a regulatory floodway has not been adopted or to permit encroachments upon an adopted regulatory floodway which will cause base flood elevation increases in excess of those permitted under paragraphs (c)(10) or (d)(3) of § 60.3 of this subchapter, the community shall apply to the Administrator for conditional approval of such action prior to permitting the encroachments to occur and shall submit the following as part of its application:

(1) A request for conditional approval of map change and the appropriate initial fee as specified by § 72.3 of this subchapter or a request for exemption from fees as specified by § 72.5 of this subchapter, whichever is appropriate;

(2) An evaluation of alternatives which would not result in a base flood elevation increase above that permitted under paragraphs (c)(10) or (d)(3) of § 60.3 of this subchapter demonstrating why these alternatives are not feasible;

(3) Documentation of individual legal notice to all impacted property owners within and outside of the community, explaining the impact of the proposed action on their property.

(4) Concurrence of the Chief Executive Officer of any other communities impacted by the proposed actions;

(5) Certification that no structures are located in areas which would be impacted by the increased base flood elevation;

(6) A request for revision of base flood elevation determination according to the provisions of § 65.6 of this part;

(7) A request for floodway revision in accordance with the provisions of § 65.7 of this part;

(b) Upon receipt of the Administrator's conditional approval of map change and prior to approving the proposed encroachments, a community shall provide evidence to the Administrator of the adoption of flood plain management ordinances incorporating the increased base flood elevations and/or revised floodway reflecting the post-project condition.

(c) Upon completion of the proposed encroachments, a community shall provide as-built certifications in accordance with the provisions of § 65.3 of this part. The Administrator will initiate a final map revision upon receipt of such certifications in accordance with Part 67 of this subchapter.

## PART 70—PROCEDURE FOR MAP CORRECTION

17. The authority citation for Part 70 continues to read as follows:

Authority: 42 U.S.C. 4001, *et seq.*; Reorganization Plan No. 3 of 1978; E.O. 12127.

§ 70.3 [Amended]

18. Section 70.3 is amended as follows:

a. By removing the phrase "floor (including basement) of the" in paragraph (b)(2)(iv) and adding in its place the phrase "adjacent grade to a".

b. By revising paragraph (b)(4) to read as follows:

* * * * *

(b) * * *

(4) A certification by a Registered Professional Engineer or Licensed Land Surveyor that the lowest grade adjacent to the structure is above the base flood elevation.

## PART 72—PROCEDURE AND FEES FOR OBTAINING CONDITIONAL APPROVAL OF MAP CHANGES

19. The authority citation for Part 72 is revised to read as follows:

Authority: 42 U.S.C. 4001, *et seq.*; Reorganization Plan No. 3 of 1978; E.O. 12127.

§ 72.5 [Amended]

20. Section 72.5 is amended by adding after the word "if", the phrase "the Administrator determines or".

Dated: May 2, 1988.

Harold T. Duryee,

*Federal Insurance Administrator.*

[FR Doc. 88-10064 Filed 5-5-88; 8:45 am]

BILLING CODE 6718-01-M

## DEPARTMENT OF DEFENSE

## Department of the Navy

## 48 CFR Parts 5215 and 5252

## Navy Acquisition Regulations Supplement; Policy Concerning the Use of Cost or Pricing Data and Cost Evaluation Where Adequate Price Competition Exists

**AGENCY:** Department of the Navy, DOD.

**ACTION:** Final Rule.

**SUMMARY:** The Department of the Navy is adding Part 5215 and amending Part 5252 of the Navy Acquisition Regulations Supplement (NARSUP) to the Federal Acquisition Regulations (FAR). Part 5215 of the NARSUP is being supplemented to clarify existing language contained in FAR Part 15 on Adequate Price Competition, and on the type of data and evaluation that might be required even when there is adequate price competition. A provision is also being added to Part 5252 of the NARSUP for use in all solicitations where it is anticipated that an award will be based on adequate price competition.

As a result of the public comments received on the proposed rule (52 FR 48550, December 23, 1987), several minor changes have been made.

**EFFECTIVE DATE:** May 6, 1988.

**FOR FURTHER INFORMATION CONTACT:** Ed Callaway, 202-692-3324.

**SUPPLEMENTARY INFORMATION:**

### A. Background

As a result of the passage of the Competition in Contracting Act of 1984, competition has become the rule of doing business in DoD; negotiations supported by detailed cost analysis have become the exception. Competition is the cornerstone of Navy acquisition policy. As a result, the Navy has found that not only does competition generate more favorable prices, but significant time and effort can be saved by relying on the forces of competition to establish prices, as opposed to the use of detailed cost analysis.

Even though the Navy has been a strong advocate of competition, there is still a tendency for some contracting officers to require the submission of cost or pricing data when there is an expectation that adequate price competition will result, or has resulted on a given procurement. Both the Assistant Secretary of the Navy, Shipbuilding and Logistics (ASN)(S&L) and the Deputy Assistant Secretary of Defense, Procurement (DASD)(P), issued memorandums stating that contracting officers were not to require certified cost or pricing data, other than selected data for cost realism evaluation purposes, when adequate price competition is anticipated. This practice undermines the competitive process, increases bid and proposal costs, unnecessarily burdens the government support offices with requirements for detailed audit and proposal reviews, and extends procurement lead time.

The principal cause of this problem is a failure to distinguish between requiring detailed cost or pricing data necessary in a sole source situation to negotiate a fair and reasonable price versus a requirement for only that data necessary to conduct a cost realism evaluation in a competition for the purposes of determining the realism of the offeror's price. The current coverage offers little guidance to distinguish between these two types of situations. The clarifying language provides needed guidance.

### B. Regulatory Flexibility Act

The rule does not have a significant impact on a substantial number of small entities within the meaning of the Regulatory Flexibility Act, 5 U.S.C. 601, et seq. because, although most contracts are awarded to small entities on a competitive basis, the dollar value of these contracts is usually under $100,000, which has been the threshold at which the detailed cost or pricing data has been erroneously required.

### C. Paperwork Reduction Act Analysis

Because the majority of small businesses generally do not receive contracts where the requirement to submit the detailed cost or pricing data would be applicable ($100,000 or greater), the Paperwork Reduction Act analysis is not applicable.

### List of Subjects in 48 CFR Parts 5215 and 5252

Government procurement.

For the reasons set out in the preamble, Part 52 of Title 48 of the Code of Federal Regulations is amended as follows:

1. Part 5215 is added to read as follows:

## PART 5215—CONTRACTING BY NEGOTIATION

### Subpart 5215.4—Solicitation and Receipt of Proposals and Quotations

Sec.
5215.402 General.
5215.407 Solicitation provisions.

U.S. Department of Homeland Security
500 C Street, SW
Washington, DC 20472

FEMA

December 3, 2008

**MEMORANDUM FOR:** Regional Mitigation Division Directors
Regions I – X

**FROM:** Michael K. Buckley, Acting Assistant Administrator
Mitigation Directorate

**SUBJECT:** Procedure Memorandum No. 50 – Policy and Procedures for Identifying and Mapping Areas Subject to Wave Heights Greater than 1.5 feet as an Informational Layer on Flood Insurance Rate Maps (FIRMs)

**EFFECTIVE DATE:** Immediately

**Background:** Flood hazard identification under the National Flood Insurance Program (NFIP) divides coastal flood hazard areas into two flood zones: Zone VE and Zone AE. Present NFIP regulations make no distinction between the design and construction requirements for coastal AE Zones and riverine AE Zones. However, evidence suggests that design and construction requirements in some portions of coastal AE zones should be more like VE Zone requirements. Post-storm investigations have shown that typical AE Zone construction techniques (e.g., wood-frame, light gauge steel, or masonry walls on shallow footings or slabs, etc.) are subject to damage when exposed to waves less than 3-feet in height. One of the hazard identification criteria for VE Zone designation is where wave heights are estimated to be equal to or greater than 3 feet. Laboratory tests and field investigations confirm that wave heights as small as 1.5 feet can cause failure of the above-listed wall types. Other flood hazards associated with coastal waves (e.g., floating debris, high velocity flow, erosion, and scour) also damage AE Zone-type construction in these coastal areas.

In the past, some Flood Recovery Maps, developed in response to significant coastal flooding events, have shown the landward limit of the area subject to wave heights greater than 1.5 feet. This limit has been provided to communities and shown on the recovery maps as an informational layer to assist in safe rebuilding practices. The NFIP Community Rating System provides credits for communities that adopt and enforce more stringent floodplain management requirements in these areas. The 2006 *International Building Code* references the American Society of Civil Engineers (ASCE) 24-05 *Flood Resistant Design and Construction* standard, which has specific design requirements that apply to areas which may be affected by waves greater than 1.5 feet (which ASCE 24 refers to as Coastal A Zones). In addition, every Federal Emergency Management Agency (FEMA) coastal construction publication since the issuance of "FEMA 55 Coastal Construction Manual," dated June 2000, has recommended the use of VE

Zone construction practices in areas subject to wave heights greater than 1.5 feet.

**Issue:** The AE Zone areas subject to wave heights between 1.5 and 3 feet are not differentiated from other AE Zone areas on FIRMs. Because it has been shown that typical AE Zone construction techniques are subject to damage when exposed to waves between 1.5 and 3 feet in height, this information has been provided to some communities during disaster recovery mapping to assist with mitigating these risks. FEMA Regional Offices, in coordination with State and local officials would benefit from the delineation of the landward limit of waves 1.5 feet in height as an informational layer on the FIRM.

**Action Taken:** For all new detailed coastal study starts in Fiscal Year 2009, the landward limit of waves 1.5 feet in height will be delineated on the FIRMs and included in the DFIRM database as an informational layer with no NFIP floodplain management requirements or special insurance ratings. Communities are encouraged but not required to adopt higher standards than the minimum NFIP requirements in these areas. The limit will be included on the preliminary FIRM; however, if a community does not want to delineate the limit on its final FIRMs, the community may provide a written request to their Regional Project Officer (RPO) with justification for such a request. All community requests to have the limit removed from the FIRM must be received prior to the issuance of the Letter of Final Determination. A community's NFIP eligibility and rates will not be affected if it opts not to include the limit on its final FIRMs. The limit will be included in the DFIRM database regardless of whether it is shown on the printed FIRM.

The attachment to this memorandum provides Mapping Partners with guidance for determining the limit of the area exposed to wave heights greater than 1.5 feet during the base (1-percent-annual-chance) flood during the development of updated flood hazard information. The attached guidance can be applied to open coast and sheltered water shorelines subject to wave propagation. This attachment provides graphic specifications for identifying the landward limit of this area on the FIRM. Also included is explanatory information to be included in the Notes To Users on the FIRM and in the Flood Insurance Study.

cc: See Distribution List

**Distribution List** (electronic distribution only):

Office of the Mitigation Directorate, Acting Assistant Administrator

Risk Reduction Division, Mitigation Directorate

Risk Analysis Division, Mitigation Directorate

Risk Insurance Division, Mitigation Directorate

Federal Insurance and Mitigation Divisions in FEMA Regional Offices

Office of Legislative Affairs

Office of Chief Counsel

National Service Provider

Systems Engineering and Technical Assistance Contractor

Map Service Center

Cooperating Technical Partners

FEMA Contractors

## ATTACHMENT
## Delineation of the Limit of Moderate Wave Action

### Introduction

In coastal areas, Zone AE, one of the Special Flood Hazard Area (SFHA) designations, may be subdivided by a limit of moderate wave action boundary at the landward extent of the propagation of waves higher than 1.5 feet. Damages to structures from wave heights between 1.5 and 3 feet are similar to, but less severe than, those in areas where wave heights are greater than 3 feet, typically designated as Zone VE on the FIRM. Damages to structures from wave heights less than 1.5 feet are more similar to those in riverine or lacustrine floodplains.

The inland limit of the area affected by waves greater than 1.5 feet is called the Limit of Moderate Wave Action (LiMWA). A simplified method for identifying the LiMWA is based on the established criteria for mapping coastal Base Flood Elevations (BFEs) described in the Federal Emergency Management Agency's *Guidelines and Specifications for Flood Hazard Mapping Partners,* Appendix D: "Guidance for Coastal Flooding Analyses and Mapping." In areas where the predominant coastal flood hazard is overland wave propagation, the BFE for both AE and VE Zones is determined by the stillwater elevation and wave setup plus a wave height component.

### Mapping

The National Academy of Sciences (1977) recommended approximating the wave crest elevation for Flood Insurance Studies as 70 percent of the controlling wave height above the mean water (stillwater including wave setup) elevation; this recommendation is incorporated into FEMA's overland wave propagation model, Wave Height Analysis for Flood Insurance Studies (WHAFIS). Therefore, for a 1.5-foot controlling wave height, the wave crest elevation is approximately 1.0 foot (0.7 x 1.5 feet) above the mean water elevation. As such, the limit of the 1.5-foot wave occurs where the wave crest is approximately 1 foot above the mean water elevation. This location is indicated in the WHAFIS model output along each transect; however, the Mapping Partner will need to interpolate between transects according to coastal flood hazard mapping procedures found in Appendix D. In areas where the topography is sufficiently steep and the width of Zone AE is too narrow to be subdivided by the LiMWA, it may be necessary to locate the LiMWA immediately seaward of the limit of the base floodplain boundary.

Laboratory tests led to different conclusions for areas affected by wave runup. In areas where wave runup elevations dominate over wave heights, such as areas with steeply sloped beaches, bluffs, and/or shore-parallel flood protection structures, there is no evidence to date of significant damage to residential structures by runup depths less than 3 feet. As such, there is no need to delineate the limit of the 1.5-foot wave in areas where wave runup elevations dominate. However, it is not uncommon for coastal study reaches to alternate between wave runup-dominated and wave height-dominated flood hazard areas, and a procedure for delineating a continuous and easily understandable LiMWA in these areas has been developed.

To aid end-user understanding and application of the LiMWA, it may be advantageous for the Mapping Partner to continue the LiMWA across runup-dominated areas. In these situations, the LiMWA should be placed immediately landward of the mapped VE/AE Zone boundary.

Similarly, if coastal study reaches alternate between wave height-dominated flood hazard areas and areas where the VE Zone designation is based on the presence of a primary frontal dune or wave overtopping, the Mapping Partner will delineate the LiMWA immediately landward of the mapped VE/AE Zone Boundary. However, if a Zone X is mapped immediately landward of the Zone VE, the LiMWA should not be extended through the Zone X.

Graphically, the LiMWA will be a boundary distinguished by a distinctive pattern of dots.

| Example | Feature | Specification |
|---|---|---|
| •• •• •• •• | Limit of Moderate Wave Action Delineation | Dashed white line, 0.0183" in line weight, with three dashes between two-dot clusters. Dot diameter 0.0764", with spacing of 2 points between dots within each cluster. |
| LIMIT OF MODERATE WAVE ACTION | Limit of Moderate Wave Action Label | 10 Pt. Arial, ALL CAPS |

A new line layer will be added to the Digital Flood Insurance Rate Map (DFIRM) Database to accommodate the LiMWA features. This Standard DFIRM Database layer, S_LiMWA, contains the following elements.

| | | | |
|---|---|---|---|
| LIMWA_ID | R | E | Primary key for table lookup. Assigned by table creator. |
| SOURCE_CIT | R | E | Source Citation. Abbreviation used in the metadata file when describing the source information for the S_LiMWA table. |

The LiMWA will be identified in the DFIRM legend as "Limit of Moderate Wave Action" (Figure 1). A note will be added to the Notes To Users on the DFIRM panel to explain the LiMWA boundary. The note will be printed only on the panels where the feature appears. There is no specific priority order for the listing of the note. The note will be as follows:

> The AE Zone category has been divided by a **Limit of Moderate Wave Action (LiMWA)**. The LiMWA represents the approximate landward limit of the 1.5-foot breaking wave. The effects of wave hazards between the VE Zone and the LiMWA (or between the shoreline and the LiMWA for areas where VE Zones are not identified) will be similar to, but less severe than those in the VE Zone.

The following is an example FIRM that has the LiMWA delineated. The area shown in Plot "a" shows the delineation of the LiMWA in a region where the predominant coastal flood hazard is overland wave propagation. Plot "b" shows delineation of the LiMWA in a region where the predominant coastal flood hazard is wave runup.




Figure 1. Sample plots of a FIRM with the Limit of Moderate Wave Action (LiMWA) delineated and the relevant entries in the Legend and Notes to Users.

**FIS Standard Language**

It has been shown in laboratory tests and observed in field investigations that wave heights as little as 1.5 feet can cause damage to and failure of typical Zone AE construction. Therefore, for advisory purposes only, a Limit of Moderate Wave Action (LiMWA) boundary has been added in coastal areas subject to wave action. The LiMWA represents the approximate landward limit of the 1.5-foot breaking wave.

The effects of wave hazards in the Zone AE between the Zone VE (or shoreline in areas where VE Zones are not identified) and the limit of the LiMWA boundary are similar to, but less severe than, those in Zone VE where 3-foot breaking waves are projected during a 1-percent-annual-chance flooding event.

In areas where wave runup elevations dominate over wave heights, such as areas with steeply sloped beaches, bluffs, and/or shore-parallel flood protection structures, there is no evidence to date of significant damage to residential structures by runup depths less than 3 feet. However, to simplify representation, the LiMWA was continued immediately landward of the VE/AE boundary in areas where wave runup elevations dominate. Similarly, in areas where the Zone VE designation is based on the presence of a primary frontal dune or wave overtopping, the LiMWA was also delineated immediately landward of the Zone VE/AE boundary.

**References**

American Society of Civil Engineers. 2006. *Flood Resistant Design and Construction Standard (ASCE 24-05).* Reston, VA.

Federal Emergency Management Agency. 1996. *Mitigation Assessment Team Report: Hurricane Opal in Florida (FEMA 281).* Washington, DC.

Federal Emergency Management Agency. 1999. *Design and Construction Guidance for Breakaway Walls Below Elevated Coastal Buildings (TB 9-99).* Washington, DC.

Federal Emergency Management Agency. 2000. *Coastal Construction Manual: Principles and Practices of Planning, Siting, Designing, Constructing, and Maintaining Residential Buildings in Coastal Areas (FEMA 55 3rd ed.).* Washington DC.

Federal Emergency Management Agency. 2005. *Mitigation Assessment Team Report: Hurricane Ivan in Alabama and Florida (FEMA 489).* Washington, DC.

Federal Emergency Management Agency. 2006. *Hurricane Katrina in the Gulf Coast: Mitigation Assessment Team Report, Building Performance Observations, Recommendations, and Technical Guidance (FEMA 549).* Washington DC.

Federal Emergency Management Agency. 2006. *Recommended Residential Construction for the Gulf Coast: Building on Strong and Safe Foundations (FEMA 550).* Washington, DC.

Federal Emergency Management Agency. 2006. *Hurricane Katrina Recovery Advisory Design and Construction in Coastal A Zones* (http://www.fema.gov/rebuild/mat/mat_katrina.shtm). Washington DC.

National Academy of Sciences. 1977. *Methodology for Calculating Wave Action Effects Associated with Storm Surges.* Washington, DC.

FEMA-Supplement-002234

# Appendix E

## Use and Significance of Terms Related to "Coastal A Zone," 1975–2010

**(See report Section 12.0 for reference citations)**

FEMA-Supplement-002236

| Publication | Term Used | Definition (<u>emphasis added</u>) | Significance | Date |
|---|---|---|---|---|
| **Guidelines for Identifying Coastal High Hazard Zones, *USACE Galveston District*** | ***Coastal High Hazard Zone (CHHZ), critical wave*** | **p.1**. *"Coastal High Hazard Zones (CHHZ)* are those portions of the Special Flood Hazard Area that are subject to significant wave action for which specific building restrictions and special flood insurance rates are warranted."<br>**p.3**. "Critical Wave – a wave possessing sufficient energy to cause major damage on contact with conventional structures." | Appendix B, p.1. "The selection of the 3-foot breaking wave is based on a study which included a literature search, a review of storm damage surveys, and a structural analysis of wave pressures on a typical dwelling. . . . <u>the determination of the minimum critical wave size was largely based on a structural analysis of a typical wood-frame structure</u>."<br>Appendix B, p.2-3. ". . <u>. a wave slightly greater than 2 ft would cause the typical structure to fail through shear or bending</u>. <u>However, there are several reasons that justify the adoption of a 3-ft wave as the critical wave for establishing the Coastal High Hazard Area</u>: 1) The calculations were based on ideal conditions with the wave breaking directly on the structure, 2) The maximum total force exerted by a breaking wave on a vertical wall is known to vary considerably, 3) The energy or dynamic pressure that can be exerted by a breaking wave depends largely on the steepness of the slope of the terrain where the wave breaks, increasing with steeper slopes, 4) The pressure or force produced when waves strike the vertical face of a structure at an oblique angle is less than for those that strike normal to the face, 5) trees, shrubs and other landscape features around a typical residence provide some protection from wave action. | 1975 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| **Santa Rosa Island Authority** ***Land Development Regulations***<br><br>***and***<br><br>***Escambia Co., FL, Land Development Regulations*** | — | (CAZ term not used) | Following hurricane Frederic, SRIA instituted requirements that mandated piling foundations and across the entire barrier island at Pensacola Beach, including mapped A zones.<br><br>The requirement was later incorporated into the Escambia County, FL, Land Development Regulations, Section 13.20.08.B. *"Specific standards for AE zones. In all areas of special flood hazard where base flood elevation data have been provided, the following provisions shall apply: Residential structures. All new construction or substantial improvements of residential structures in Zones AE shall be elevated on pilings so that the bottom of the lowest horizontal structural member of the lowest floor (excluding the pilings) is elevated to at least three feet above the base flood elevation." See http://www.sria-fla.com/pdf/updates.pdf* | ~1979 |

| **Publication** | **Term Used** | **Definition** (emphasis added) | **Significance** | **Date** |
|---|---|---|---|---|
| **FIA-7** *Coastal Construction Manual* | ***coastal A zone,*** ***wave action*** | Term not defined, but used in a generic sense, to represent A Zones in coastal areas. The term "wave action" denotes breaking wave heights 3 feet high or greater. | p.4. "The V zone (velocity zone) is defined as that portion of the 100-year flood plain which would be inundated by tidal surge with velocity wave action. The A zone indicates that portion of the 100-year flood plain not subject to wave action, although the residual momentum of the breaking wave may be present." p.7. "In coastal A zones, the FIRM will identify the appropriate 100 year flood elevation. The A zone is that portion of the 100 year coastal flood plain which is less subject to turbulent wave action, it is important to note that high velocity water may be experienced due to the forward momentum of breaking waves, especially in the vicinity of the V zone/A zone interface. A zones may also be subject to wave action during floods more severe than the 100-year flood. | 1981 |
| **FEMA 55** *Coastal Construction Manual* | ***coastal A zone,*** ***wave action*** | Term not defined, but used in a generic sense, to represent A Zones in coastal areas. The term "wave action" denotes breaking wave heights 3 feet high or greater. | The 1986 edition maintains the 1981 text, with editorial changes, e.g., Sec. 1.2.5, "In coastal A zones, the FIRM identifies the appropriate 100 year flood elevation. The A zone is that portion of the 100 year coastal flood plain subject to wave action of lesser severity. It is important to note that because of momentum of breaking waves, water may be moving at high velocities in this zone, especially in the vicinity of the V zone/A zone interface. The 1986 edition also added a Sample Coastal Construction Code (see CCM Appendix G), which states, "The purpose of this Coastal Code is to provide minimum standards for the design and construction of residential structures in Coastal High Hazard Areas and adjacent coastal A zone areas where wave action can be expected." | 1986 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| **Santa Rosa Co., FL, *Land Development Code*** | — | (CAZ term not used) | Sec. 12.04.00 requires all new major structures on Navarre Beach to meet V zone construction requirements. | 1986 |
| **ASFPM (Nashville)**<br>Paper by Mahoney: *The Effects of Coastal Construction Standards in Reducing Damages from Hurricane Hugo* | ***Coastal A-Zone*** | **"Velocity damage in Coastal A-Zones**: While a V-zone ends where wave heights drop below 3 feet, wave damage can extend into adjacent A zones. The NFIP does not differentiate between riverine and coastal A-zones. However, not all construction techniques permitted in riverine A-zones are appropriate in coastal areas, and more restrictive building requirements are needed. This issue can be addressed by either: 1) revising the V-zone definition by using a more restrictive criteria, such as a two foot wave, or 2) designating a "Coastal A Zone," with building requirements that meet certain V-zone standards, such as use of a pile of column foundation." | First use (?) of the term "Coastal A-Zone" to indicate that portion of the SFHA not mapped as V zone that is subject to damaging waves and where more restrictive building requirements are appropriate. | 1990 |
| **Managing Coastal Erosion** (National Research Council) | — | (CAZ term not used) | p. 75 (Experience with Hazard Delineation in the NFIP), "In general, V-zones are narrowly drawn. The V-zones frequently exclude adjoining areas with virtually indistinguishable hazard characteristics. The adjacent A-zones are not subject to as stringent development controls as V-zones." | 1990 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| **Coastal Structure Damage Methodology** | — | (CAZ term not used) | Report by CPE/URS to USACE Philadelphia District, determined erosion and wave attack failure thresholds for coastal buildings on typical A zone foundations (e.g., shallow piles, masonry piers, slabs, masonry walls). The report determined that such buildings would be subject to failure for shallow erosion and/or wave heights < 2-3 feet. | 1992 |
| **Users Guide version 1.0,** *BCA of Hazard Mitigation Projects, Vol. 2, Coastal A-Zone Flood* | ***Coastal A-Zone*** | Term not defined. Software uses flood elevation data from coastal FIS, but is otherwise similar to BCA Riverine Model (e.g., uses same depth-damage functions as riverine). Term apparently refers to entire Coastal AE Zone. | First FEMA BCA software and User's Guide | 1995 |
| **FEMA 281** *Hurricane Opal (1995) BPAT report* | ***Coastal A Zone*** | Term not defined, but used in a generic sense, to represent A Zones in coastal areas. | Sec. 3.1 discusses how FIRMs go out of date as a result of erosion, and how some A Zones can be subject to V Zone conditions.<br>Sec. 3.1.2 reviews performance of buildings at Pensacola Beach (where all new construction – V Zone and A Zone – had to be elevated on pile foundations and with freeboard) and recommends that communities consider adoption of V Zone requirements in other flood zones. | 1996 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| **FEMA 290** *Hurricane Fran (1996) BPAT report* | ***Coastal A zone*** | Term not defined, but used in a generic sense, to represent A Zones in coastal areas. | Sec. 3.1.4 discusses how buildings in A, B, C and X zones that were elevated on pilings, with the bottom of the lowest horizontal structural member above the BFE, sustained less damage than A, B, C and X zone buildings constructed to minimum requirements.<br>The report notes that "coastal A zones subjected to velocity flow and wave action are not distinguished from other A zones on FIRMs" and "communities on barrier islands may want to consider adopting stricter standards in areas of known high coastal hazard, whether or not they are identified as V zones." | 1997 |
| **Delaware Coastal Vulnerability and Construction Standards Study** | ***Wave-Overwash Zone*** | Zone inland of the landward limit of storm-induced erosion, and subject to one or more of the following: damaging waves, high-velocity flows and deposition of overwash sediments | Recommendation to State: In the Wave/Overwash Zone, the bottom of the lowest structural member of the lowest floor shall be at or above the (design) flood elevation, and all new and substantially improved buildings shall be constructed on a piling foundation, designed by a professional engineer or architect. | 1997 |
| **ASCE 24** *Flood Resistant Design and Construction* | — | (CAZ term not used) | First national consensus standard for flood resistant design and construction, mentions CHHA (V zones) and flood hazard areas (A zones), but not CAZ. | 1998 |
| **ASCE 7** *Minimum Design Loads for Buildings and Other Structures* | ***Coastal A Zone*** | **Sec. 5.3.1**. *"Coastal A Zone: An area within a Special Flood Hazard Area, landward of a V Zone or landward of an open coast without mapped V Zones. To be classified as a coastal A Zone, the principal source of flooding must be astronomical tides, storm surges, seiches or tsunamis, not riverine flooding."* | First use of CAZ term in national consensus standard, although no guidance (e.g., wave height) is provided to determine CAZ limit. Chapter 2 defines higher load combinations for coastal A zones than for non-coastal A zones.<br>CAZ only established along coasts with mapped V zones, and along "*open coasts*" without V zones. | 1998 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| Behavior of Breakaway Wall Subjected to Wave Forces: Analytical and Experimental Studies, ***UNC Sea Grant Report 99-03*** | — | (CAZ term not used) | The study determined that wave heights less than 2 ft high were capable of destroying wood-frame walls designed to satisfy building code wind load requirements. | 1999 |
| **FEMA 388** *Hurricane Georges (1998) in the Gulf Coast BPAT report* | ***Coastal A zone*** | Term not defined, but used in a generic sense, to represent A Zones in coastal areas. | Sec. 7.1 notes that "the application of V-Zone standards is credited with significantly reducing damages to A-Zone buildings caused by Hurricane Opal and Hurricane Georges" and "On Dauphin Island, Alabama, builders used V-Zone construction standards on many homes located in A-Zones on the landward side of the island. Even though the area is shown as an A-Zone, the area is subject to some velocity wave action and overwash as evidenced by the observed scour and debris damage." | 1999 |
| **International Building Code** | — | (CAZ term not used) | Although Sec. 1612 (Flood Hazard Areas) does not mention CAZ, Sec. 1605 (Load Combinations) requires use of load combinations from ASCE 7-98, thus, CAZ load combinations become part of the building code. | 2000 |
| **International Residential Code** | — | (CAZ term not used) | | 2000 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| **HAZUS Flood** *Preview Model Final Technical Report* | ***coastal A-zone*** | Term not defined, but used to represent A Zones on the Pensacola Beach barrier island. | The report documents a detailed comparison of hurricane Opal flood damage and FIA damage functions at 81 homes (63 in mapped A zone, 18 in mapped V zone) at Pensacola Beach, FL. Using flood claims data, the study found that A zone damage functions under-predicted flood damage (by over half) to homes in A zones, but that V zone damage functions applied to the same A zone homes provided a good fit to flood damage. | 2000 |
| **FEMA 55** *Coastal Construction Manual* | ***Coastal A Zone*** | **Sec. 1.4**. *"Coastal A zone – The portion of the SFHA landward of a V zone or landward of an open coast without mapped V zones (e.g., the shorelines of the Great Lakes), in which the principal sources of flooding are astronomical tides, storm surges, seiches, or tsunamis, not riverine sources. Like the flood forces in V zones, those in coastal A zones are highly correlated with coastal winds or coastal seismic activity. Coastal A zones may therefore be subject to wave effects, velocity flows, erosion, scour, or combinations of these forces. The forces in coastal A zones are not as severe as those in V zones but are still capable of damaging or destroying buildings on inadequate foundations."* | Notes on p. 1-7 state the manual uses ASCE 7-98 coastal A zone classification, and, "Although the NFIP regulations do not differentiate between coastal and non-coastal A zones, this manual recommends that buildings in coastal A zones be designed and constructed to be more resistant to flood forces — including wave effects, velocity flows, erosion, and scour—than buildings in non-coastal A zones (see Section 6.5 in Chapter 6). Chapter 6 *recommends* V zone design and construction techniques for Coastal A Zones. No wave height criteria stated. | 2000 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| **NFIP Call For Issues Status Report** | ***A-Zones in coastal areas*** | **Issue:** Shallow flooding in A-Zones in coastal areas can present significantly different hazards than flooding in A-Zones affected by riverine flooding<br>**Respondent's Recommendation(s):** The respondent suggested that velocity and wave action of these coastal A zones can cause significant damage to buildings that is not recognized by current map designations.<br>**FEMA's Response:** Evaluation/Study Required<br>**Explanation:** In post-disaster assessments, FEMA continues to see damages to buildings in A-zones in coastal areas that appear to result from the velocity of the floodwaters or from wave action. These damages include scour and collapse of short crawl-space walls that are not usually seen in shallow riverine flooding. The revised Coastal Construction Manual (FEMA 55, 3rd edition) specifically recognizes hazards that may be present in A-zones in coastal areas. While FEMA doesn't plan a rule change at this time, we agree that this issue needs evaluation and continue to develop technical guidance and reevaluate coastal building foundation systems based on post-disaster assessments. FEMA has conducted laboratory research to complete FEMA Technical Bulletin 9-99, *Design and Construction Guidance for Breakaway Walls Below Elevated Coastal Buildings*. This bulletin clearly identifies the extreme loads that can be transmitted to buildings by breaking waves outside of identified V-zones. Also, FEMA worked to revise the American Society of Civil Engineers standards ASCE 7 and ASCE 24 to include breaking wave loads on piles and vertical surfaces. FEMA continues to monitor post-disaster performance of coastal building foundation systems and will use this information if required changes to the rule become needed. In addition, FEMA is considering future research to test masonry walls under breaking wave loads as well as other coastal and riverine targeted studies. | | 2000 |
| **Sullivan's Island, SC, *Code of Ordinances*** | ***Coastal A-Zone*** | Term not defined, but used to represent A Zones on the island. | Sec. 5-81 requires pile foundations in A zones, engineer/architect certification;<br>The Coastal-A Zone Certification Information document describes the various A zone construction standards and certifications required. http://www.sullivansisland-sc.com/Files/onlineforms/A-ZoneCertificate.pdf | 2000-2003 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| **Evaluation of Erosion Hazards** | — | CAZ term not used in this report by the H.J. Heinz Center for FEMA. | Chapter 5 identifies and discusses impacts of erosion, including, "Higher and more powerful waves in areas not previously subjected to high velocity waves. Houses that were constructed in lower risk A-zones with less-stringent building codes can be subjected to waves of V-zone intensity."<br>In Chapter 6, various options are evaluated. Option 6 considered this specific issue, "6. Flood-related regulatory changes in erosion zones. Erosion not only causes damage directly, but also, over time, increases the risk from flooding. The likelihood of damage could be lowered somewhat if FEMA directed communities to apply building standards appropriate to the flood conditions expected several decades from now, rather than conditions today." | 2000 |
| **ASFPM (Charlotte)** Paper by Jones, Coulbourne, Tertell*: Consideration of a New Flood Hazard Zone: the Coastal A Zone* | ***coastal A zone*** | Term not defined, but paper states (p.1), *"there is a growing body of evidence that design and construction requirements in coastal A zones should be more like those in V zones than those in riverine A zones"* and *"coastal A zone flood hazards are similar to those in V zones, not riverine A zones."* | This paper summarizes the rationale for CAZ, including an evaluation of V zone and A zone flood claims data for Pensacola Beach homes damaged by hurricane Opal (the evaluation was part of the HAZUS Flood Model proof-of-concept study). | 2001 |
| **ASCE 7** *Minimum Design Loads for Buildings and Other Structures* | ***Coastal A Zone*** | No change from ASCE 7-98 definition. | Same CAZ provisions as 1998 for load combinations.<br>CAZ not tied to wave height, landward boundary not identified. | 2002 |

| **Publication** | **Term Used** | **Definition** (emphasis added) | **Significance** | **Date** |
|---|---|---|---|---|
| **CRS Coordinator's Manual** | ***Coastal AE Zone (CAZ)*** | **Sec. 431.p** states the *"Coastal AE Zone is the coastal SFHA that is not mapped as V Zone."* | CRS awards up to 650 points if a community enforces 44CFR-60.3(e) V zone standards farther inland. The actual number of points depends on the specific standards applied and the fraction of the Coastal AE Zone over which the higher standards apply. | 2002 |
| **International Building Code** | — | (term not used) | Sec. 1605 (Load Combinations) continues to require use of load combinations from ASCE 7-02, thus, CAZ load combinations continue to be part of the building code.<br>Sec. 1612.4 requires buildings governed by the IBC and in located in flood hazard areas to comply with the requirements of ASCE 24-98 (but no CAZ provisions). | 2003 |
| **International Residential Code** | — | (term not used) | | 2003 |
| **FEMA HMTAP Task 274 Report,** *Hurricane Isabel Rapid Response, Coastal Engineering and Building Science Assessment* | ***coastal A zone*** | Term not defined, but report references A zones subject to waves and erosion. | "As in prior coastal storms, wave damage was noted in coastal buildings with shallow water depths where wave heights lower than three feet, the present A/V boundary criteria, were likely to have occurred. It is recommended that FEMA further investigate the wave height threshold for damage to solid wall A-zone type foundations and building walls. | 2003 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| **FEMA 424** *Risk Management Series, Design Guide for Improving School Safety* | ***Coastal A Zone*** | **Sec. 5.2.3** discusses but does not define term: **"** *The principal sources of flooding in Coastal A Zones are astronomical tides, storm surges, seiches, or tsunamis. These zones extend inland to include areas where the potential for breaking wave heights exists during conditions of the base flood. Coastal A Zones are not delineated on NFIP maps; this zone is identified in ASCE 7 and ASCE 24 because waves sufficient to contribute to damage are present.*" **Figure 5-2** indicates wave heights are between 1.5 and 3.0 ft in the Coastal A Zone. | The report discusses hazard identification (including CAZ) but does not provide design or construction standards to resist CAZ conditions.<br>NOTE: the definition is revised in later Risk Management Series reports, and additional discussion is provided. | 2004 |
| **Pierce Co., WA,** ***Coastal Hazard Area Regulations*** | — | **Pierce Co., 2004, Title 18E.70**. The FIRMs have unnumbered A (and a few V) zones, but the County has established "**Coastal Flood Hazard Areas:** Areas that are adjacent to Puget Sound marine waters that are designated as "A" or "V" zones as defined by FEMA and depicted on the FEMA maps or other maps adopted by Pierce County. For coastal flood hazard areas, the base flood elevation shall be the estimated highest tide level plus 2 feet to account for wave risk, established in Figures 18E.70-11 and 18E.70-12 in Chapter 18E.120. On coastal properties where the maximum wave fetch is 1,600 feet or less, the wave risk value can be reduced to 1 foot based on a professional engineer's certification."<br>http://www.co.pierce.wa.us/xml/Abtus/ourorg/council/code/title%2018e%20pcc.pdf | Sec. 18E.70.040.E essentially requires all new construction in the CFHA to be designed and constructed to meet V zone standards. | 2004 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| **Coastal Flood Studies Flyer, *NC Floodplain Mapping Program*** | ***coastal AE zone*** | **p.3.** "*Coastal area with wave heights less than three feet are mapped as AE zones.*" | p.3. "The coastal AE and VE zones are further subdivided by lines that separate areas with different BFEs." The flyer goes on to state that different construction requirements and insurance rates apply to VE and AE zones | 2004 |
| **FEMA 499** *Homebuilders Guide to Coastal Construction* | ***A Zones in Coastal Areas with potential for breaking waves and erosion*** | **Fact Sheet 2**, footnote "b" to Table. "*In these areas, buildings are subject to flooding conditions similar to, but less severe than, those in V zones. These areas can be subject to breaking waves > 1.5 feet high (which can destroy conventional wood-frame and unreinforced masonry wall construction) and erosion (which can undermine shallow foundations).*" | Variation in terminology, although "coastal A zone" is mentioned in FS 2 and elsewhere in HGCC.<br>Key issue on page 1 of FS 2 states, "It is strongly recommended that buildings in A zones subject to breaking waves and erosion be designed and constructed to V-zone standards." | 2005 |
| **ASCE 7** *Minimum Design Loads for Buildings and Other Structures* | ***Coastal A Zone*** | **Sec. 5.2**. "*Coastal A Zone: An area within a Special Flood Hazard Area, landward of a V-Zone or landward of an open coast without mapped V-Zones. To be classified as a Coastal A-Zone, the principal source of flooding must be astronomical tides, storm surges, seiches or tsunamis, not riverine flooding, and the potential for breaking wave heights greater than or equal to 1.5 ft (0.46 m) must exist during the base flood.*" | Definition is similar to previous ASCE 7-98 and 7-02 definition, except the > 1.5 ft wave height criterion was added.<br>This is the first mention of the 1.5 ft wave height in a national consensus standard or national building code. | 2005 |

| Publication | Term Used | Definition (<u>emphasis added</u>) | Significance | Date |
|---|---|---|---|---|
| **Hawaii Coastal Hazard Mitigation Guidebook** | ***coastal A zone*** | **Glossary:** *"Coastal A zone – The portion of the SFHA landward of a V zone or landward of an open coast without mapped V zones in which the principal sources of flooding are astronomical tides, storm surges, seiches, or tsunamis, not riverine sources. The flood forces in coastal A zones are highly correlated with coastal winds or coastal seismic activity. Coastal A zones may therefore be subject to wave effects, velocity flows, erosion, scour, or combinations of these forces. . . (Note: The National Flood Insurance Program regulations do not differentiate between coastal A zones and non-coastal A zones)."* <u>http://www.soest.hawaii.edu/seagrant/communication/HCHMG/hchmg.htm</u> | The report suggests hazard assessments consider the effects of shoreline erosion on mapped flood hazard areas; Table 11.2 states, "<u>Treat A zone areas likely to migrate into the V zone by erosion as V zones.</u>" | 2005 |
| **FEMA 489** *Hurricane Ivan (2004) MAT Report* | ***Coastal A Zone*** | **Sec. 2.1.2**, footnote 2. Working definition, "*that area <u>near the shoreline</u> with exposure <u>to breaking wave heights between 1.5 and 3.0 feet</u>.*" | Sec. 8.1.3 of the Report recommends: 1) <u>elevating the bottom of the lowest structural member above the BFE for coastal A Zones</u>, 2) <u>requiring V-Zone design and construction for new construction in coastal A Zones subject to erosion, scour, velocity flow, and/or wave heights greater than 1.5 feet</u>, 3) <u>using a deep pile and/or column foundation anywhere on a barrier island – including B, C, and X Zones – if erosion/or scour are possible</u>, and 4) using deep foundations for homes along bay/sound shorelines not mapped as V zones (<u>NOTE: this Sec. allows solid [stemwall] foundations in Coastal A Zones, provided the foundation is deep enough to resist erosion and scour</u>). | 2005 |

| **Publication** | **Term Used** | **Definition** (emphasis added) | **Significance** | **Date** |
|---|---|---|---|---|
| **Santa Rosa Co., FL, *Land Development Code*** | — | (CAZ term not used) | Sec. 10.03.02 requires V zone standards be met along portions of the shoreline along Santa Rosa Sound, Pensacola Bay and East Bay, "V-zone requirements shall be imposed on all lands within two hundred (200) feet from the mean high tide line in the areas identified in exhibit A."<br>(Note: this represents an expansion of the ~1989 requirement and was instituted after hurricane Ivan). | 2005 |
| **ASCE 24** *Flood Resistant Design and Construction* | ***Coastal A Zone*** | **Sec. 1.2**. *"Coastal A Zone – area within a special flood hazard area, landward of a V Zone or landward of an open coast without mapped V Zones. In a Coastal A Zone, the principal source of flooding must be astronomical tides, storm surges, seiches or tsunamis, not riverine flooding. During base flood conditions, the potential for breaking wave heights shall be greater than or equal to 1.5 ft."* | Editorial variation from ASCE 7-05 definition, but essentially the same. Sets 1.5 ft breaking wave height criterion.<br>Siting, elevation, design and construction requirements for Coastal A Zones are – with one exception for flood openings in breakaway walls – the same as those for Coastal High Hazard Areas (V Zones). | 2005 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| **FEMA 480** *NFIP Floodplain Management Requirements Study Guide and Desk Reference* | ***Coastal AE Zone*** | Term not defined but **Sec. 5.F (New Buildings in V Zones, Coastal AE Zone)** references the entire AE zone subject to coastal flooding. | Sec. 5.F (New Buildings in V Zones, Coastal AE Zone) indicates NFIP minimum construction standards for AE zones may not provide adequate protection in coastal AE zones subject to wave effects, velocity flows, erosion, scour, or a combination of these forces. The text also indicates breaking wave heights less than the 3-ft height used to define VE zones can cause considerable damage.<br>Text states, "If your community contains Coastal AE Zones, you are encouraged to revise your ordinances to apply all or some of the VE zone standards to these areas."<br>Sec. 6.C (Higher Regulatory Standards, Foundations) states, "Coastal AE Zones are of particular concern, since they are subject to wave action of up to three feet in height and the NFIP A Zone construction standards do not address this hazard." | 2005 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| **HMTAP Task 402** *Hurricane Dennis (2005) Coastal A Zone Preliminary Damage Assessment* | ***coastal A Zone*** | Term not defined, but used to represent coastal areas subject to “moderate wave heights” (waves less than 3 feet high). | Teams were sent out following Hurricane Dennis specifically to document damage from moderate wave conditions along the Gulf of Mexico shoreline and along bay shorelines. The teams visited 50 sites.<br>The report concludes, “surge and wave conditions produced by Hurricane Dennis, as well as the nature of the existing building stock, provided only limited opportunities to document in detail the impacts of moderate waves on structures. In those few cases where circumstances converged to allow moderate wave forces to affect A Zone-type structures (most of which appeared to be constructed pre-FIRM), the following conditions or damage was commonly observed:<br>• Moderate waves dislodged or damaged vertical walls, including load-bearing walls on both seaward and landward sides of structures.<br>• Moderate waves were capable of breaking insufficiently protected windows and doors, allowing penetration of surge waters, waves, and/or sand into interior spaces.<br>• Scour and erosion, including that caused by wave runup/overtopping and sheetflow, was significant enough to cause severe undermining and, on at least one site, catastrophic failure of slab-on-grade structures” | 2006 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| **FEMA 549** *Hurricane Katrina (2005) MAT Report* | ***Coastal A Zone*** | **Appendix E, Recovery Advisory 3** (Design and Construction in Coastal A Zones). "*Coastal A Zone: area landward of a V Zone, or landward of an open coast without mapped V Zones. In a Coastal A Zone, the principal source of flooding will be astronomical tides, storm surges, seiches or tsunamis, not riverine flooding. During base flood conditions, the potential for breaking wave heights between 1.5 feet and 3.0 feet will exist.*" | Recovery Advisory 1 (Reconstruction Guidance Using Hurricane Katrina Surge Inundation and Advisory Base Flood Elevations) shows the "approximate limit of the 1.5 ft wave zone" on a sample Flood Recovery Map, and shows a generic transect with the "Coastal A Zone" experiencing wave heights between 3.0 and 1.5 feet.<br>Table 11-4 recommends V Zone standards be required for new construction, per ASCE 24-05, in Coastal A Zones subject to erosion, scour, velocity flow, and/or subject to wave heights greater than 1.5 feet.<br>Recovery Advisory 3, whose foundation recommendations are patterned after Ivan MAT Report sec. 8.1.3, states "V Zone design, construction, and certification practices are recommended for Coastal A Zones" and provides foundation recommendations in Table 1 (NOTE: the Table allows solid [stemwall] foundations in Coastal A Zones, provided the foundation is deep enough to resist erosion and scour). | 2006 |
| **Users Guide version 2.0** (2005) *BCA of Hazard Mitigation Projects, Coastal A-Zone Flood* | ***Coastal A-Zone*** | Term not defined. Software uses flood elevation data from coastal FIS, but is otherwise similar to BCA Riverine Model (e.g., uses same depth-damage functions as riverine). Term apparently refers to entire Coastal AE Zone. | Update to 1995 User's Guide. Accompanies BCA software v. 3.0. No apparent change to meaning of terminology. | 2006 |

| Publication | Term Used | Definition (<u>emphasis added</u>) | Significance | Date |
|---|---|---|---|---|
| **International Building Code** | — | (term not used) | Sec. 1605 (Load Combinations) continues to require use of load combinations from ASCE 7-02, thus, <u>CAZ load combinations continue to be part of the building code</u>.<br>Sec. 1612.4 requires <u>buildings governed by the IBC and in located in flood hazard areas to comply with the requirements of ASCE 24-05</u> (which requires CAZ construction to be like V Zone construction). | 2006 |
| **International Residential Code** | — | (term not used) | | 2006 |
| **FEMA 550** *Recommended Residential Foundations for the Gulf Coast* | ***Coastal A Zone*** | **Sec. 2.2.** *A zone in coastal area subject to breaking waves and erosion.* | Sec. 2.2 states, "<u>Some coastal areas mapped as A Zones may also be subject to damaging waves and erosion (referred to as "Coastal A Zones</u>"). Buildings in these areas that are constructed to minimum NFIP A Zone requirements may sustain major damage or be destroyed during the base flood. <u>It is strongly recommended that buildings in A Zones subject to breaking waves and erosion be designed and constructed with V Zone type foundations</u>." | 2006 |
| **Pascagoula and Ocean Springs, MS *Code of Ordinances*** | ***Coastal A Zone (2006),*** | **2006,** *"Coastal A zone means the portion of the SFHA landward of a V zone or landward of an open coast without mapped V zones, in which the principal sources of flooding are astronomical tides, storm surges, seiches, or tsunamis, not riverine sources. <u>Coastal A zones</u> may be subject to wave effects, velocity flows, erosion, scour, or combinations of these forces and <u>are treated as V zones</u>."*<br><u>See **2009** entries for Coastal AE Zone definitions</u> | **2006**. Definition requires conformance with V zone standards in <u>Coastal **A** Zone</u>, no specific CAZ standards listed later.<br><u>See **2009** entries for Coastal **AE** Zone requirements</u> | 2006 |

| **Publication** | **Term Used** | **Definition** (emphasis added) | **Significance** | **Date** |
|---|---|---|---|---|
| **Evaluation of NFIP Building Standards** | ***Coastal A Zone*** | **Sec. 1.2.4**. "*The "Coastal A zone" is a non-regulatory term that has been used in recent years to draw a distinction between coastal and inland A zones, and to highlight similarities between V zones and A zones in coastal areas," . . . defined herein as "Area landward of a V zone, or landward of an open coast without mapped V zones. In a coastal A zone, the principal source of flooding will be astronomical tides, storm surges, seiches or tsunamis, not riverine flooding. During base flood conditions the potential for breaking wave heights between 1.5 feet and 3.0 ft will exist.*" | Recommendation B-3. "The NFIP should mandate V zone design and construction practices in Coastal A zones (e.g., requiring open foundations and the area below the BFE to be free of obstructions, making the lowest floor reference elevation the bottom of the lowest horizontal structural member supporting the lowest floor, designing for simultaneous action of flood and wind)." | 2006 |
| **FEMA 543** *Risk Management Series, Design Guide for Improving Critical Facility Safety from Flooding and High Winds* | ***Coastal A Zone*** | **Sec. 2.1.1.2. "***This zone, which is not delineated on NFIP maps, is where the potential of breaking wave heights is between 1.5 feet and 3 feet during base flood conditions. Coastal A Zones are landward of the mapped V Zone, or landward of open coasts that do not have a V Zone because breaking waves are predicted to be less than 3 feet high. In these areas, the principal sources of flooding are tides, storm surges, seiches, or tsunamis, not riverine flooding."* | The report provides an expanded discussion (over FEMA 424) of Coastal A Zones, including hazards associated with the zone, and ASCE 24-05 and building code requirements for critical facilities in this zone. | 2007 |
| **CRS Coordinator's Manual** | ***Coastal A Zone (CAZ)*** | (NOTE: change in terminology from "Coastal AE Zone" used in the 2002 through 2006 editions)<br>**Sec. 431.p** states the *"Coastal A Zone is the coastal SFHA that is not mapped as V Zone."* | CRS still awards up to 650 points if a community enforces V zone standards farther inland. The actual number of points depends on the specific standards applied and the fraction of the Coastal A Zone over which the higher standards apply. NOTE: **See 2010 CRS item near end of table.**<br>Page 430-25 of the Manual includes a 1-page fact sheet on Coastal A Zones – this was adapted from the Hurricane Katrina Recovery Advisories. | 2007 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| **Coastal No Adverse Impact Handbook, *ASFPM*** | ***Coastal A Zone*** | **Chapter 2**. *The Coastal A Zone is landward of the V Zone or it may be shown along an open coast where a V Zone has not been mapped. Like the V Zones, Coastal A Zones are subject to wave effects, high velocity flows, scour, or a combination of these effects. Coastal A Zones are areas where the resulting wave run-up elevations above storm surge are between 1.5 and 3 feet. Although the forces in Coastal A Zones are not as severe as in V Zones, they still are capable of damaging and destroying structures. Currently, the NFIP does not map Coastal A Zones and it has not been established as a Special Flood Hazard Area for regulatory purposes."*<br>(Note: underlined text above is an incorrect interpretation of CAZ wave effects. The same incorrect interpretation is repeated elsewhere, although the text is correct on p.32, *Coastal A Zones* section.).<br>http://www.floods.org/CNAI/CNAI_Handbook.asp | P.22. The report recommends that Coastal A Zone delineation be requested by communities when flood maps are updated.<br>p.32. The report recommends using pile or column foundation wherever waves are present | 2007 |
| **Middlesex Co., VA, *Floodplain Ordinance*** | ***Coastal A Zone*** | **Article II.** *"Coastal A Zone – Flood hazard areas inland of and contiguous to flood hazard areas subject to high velocity wave action. Areas subject to this classification are those where the still water depth is greater than or equal to 2-feet, and the breaking wave heights are greater than or equal to 1.5 feet."* | Article 4.5 requires new construction in Coastal A zones to meet V zone requirements | 2007 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| **New York City Building Code, *Appendix G*** | ***Coastal A Zone*** | | The City Code adopted a modified version of ASCE 24-05 to eliminate the Coastal A Zone provisions and to eliminate freeboard for Category I and II structures:<br>Coastal A-Zones. ASCE 24 would have introduced the concept of a coastal A-Zone, so that many A-Zones near the shore would be required to meet V-Zone construction standards. The concept of coastal A-zones is eliminated by modifications, so that the current NYCBC requirements are unchanged in this regard. | 2007 |
| **Rhode Island State Building Code** | ***Coastal A Zone*** | No definition, but new section of code requires all new buildings in A or V zone to meet ASCE-24-05 requirements, thereby requiring ***Coastal A Zone*** construction where wave heights are > 1.5 ft. | (new) R323.4 General**. "**All buildings and structures erected in areas prone to flooding as identified in Table R301.2(1) and classified as either flood hazard areas (including A Zones) or coastal high hazard areas (including V-Zones) shall be constructed and elevated as required by the provisions contained in this section and ASCE 24-05." | 2007 |
| **Quick Guide** *Floodplain Management in South Carolina* | ***Coastal A Zone*** | **p. 17**. "*The term **Coastal A Zone** means the portion of the SFHA landward of the V Zone or landward of a shoreline that does not have a mapped V Zone. The principle sources of flooding are associated with astronomical tides, storm surges, seiches or tsunamis. Coastal A Zones may be subject to wave effects, velocity flows, erosion, scour, or combinations of these forces and may be treated as V Zones.*" | One of a series of *Quick Guides* prepared for State floodplain management programs. Note that some earlier *Quick Guides* used the term Coastal AE Zone, e.g., Mississippi (2006) Quick Guide, p. 10. | 2008 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| **Fortified Builder's Guide**, IBHS | ***Coastal A Zone*** | **Sec. 4**. *"A zone landward of a V zone, or landward of an open coast without mapped V zones (e.g., the shorelines of the Great Lakes), in which the principal sources of flooding are astronomical tides, storm surges, seiches, or tsunamis - not riverine sources."*<br>Figure 4-1 is taken from FEMA 55 (2000) and shows the Coastal A Zone extending from the V zone to the X zone.<br>NOTE: the *Guide* also requires conformance with ASCE 24-05, which uses the 1.5 ft wave height as the landward limit of the CAZ – there is a conflict between the *Guide* definition and 24-05.<br>http://www.disastersafety.org/resource/resmgr/pdfs/builders_guide.pdf | Sec. 4 Flood Criteria: "The foundations in Coastal A zones must adhere to the same requirements as those in V zones. That is, only open elevated foundations are allowed in the Coastal A zone in the *Fortified* program." and, "In the Coastal V or Coastal A Zones, the bottom of the lowest horizontal structural member of the lowest habitable floor shall be above the FDFE." | 2008 |
| **NFIP Procedure Memorandum 50** – *Policy and Procedures for Identifying and Mapping Areas Subject to Wave Heights Greater than 1.5 feet as an Informational Layer on Flood Insurance Rate Maps (FIRMs)* | ***Coastal A Zone*** | Term used to mean "AE Zone areas subject to wave heights between 1.5 and 3 feet" | In coastal areas, Zone AE, one of the Special Flood Hazard Area (SFHA) designations, may be subdivided by a limit of moderate wave action boundary at the landward extent of the propagation of waves higher than 1.5 feet.<br>The inland limit of the area affected by waves greater than 1.5 feet is called the Limit of Moderate Wave Action (LiMWA).<br>The memo provides guidance to mapping contractors for determining and delineating the LiMWA. | 2008 |

| Publication | Term Used | Definition (<u>emphasis added</u>) | Significance | Date |
|---|---|---|---|---|
| **TB-1** *Openings in Foundation Walls and Walls of Enclosures* | ***Coastal A Zone*** | **p. 10.** *Open foundations are also recommended in <u>A zones in coastal areas where breaking wave heights can be between 1.5 and 3.0 feet (called Coastal A Zones)</u>* | p.10. <u>Flood openings are required in breakaway walls in A zones in order to comply with the NFIP requirements</u>. | 2008 |
| **TB-9** *Design and Construction Guidance for Breakaway Walls* | ***Coastal A Zone (CAZ), LiMWA*** | **Glossary:** ***"Coastal A Zone*** *– An area within a special flood hazard area, landward of a V zone or landward of an open coast without mapped V zones; in a Coastal A Zone, the principal source of flooding must be astronomical tides, storm surges, seiches, or tsunamis, not riverine flooding. During the base flood conditions, the potential for wave heights shall be greater than or equal to 1.5 feet. Coastal A Zones are not normally designated on FIRMs".*<br>***"Limit of Moderate Wave Action (LiMWA)*** *– The boundary line given by FEMA on coastal map studies marking the extents of Coastal A Zones."* | Recommendations for Coastal A Zones:<br>• FEMA's MAT reports consistently show that buildings in areas mapped as AE zones and subject to tidal flooding, wave forces, scour, and debris impacts often are severely damaged.<br>• <u>FEMA strongly recommends that structures in CAZs be designed and constructed to meet V Zone requirements</u>, including requirements for breakaway walls. However, the NFIP regulations also require flood openings in walls surrounding enclosures below elevated buildings in CAZs (see Technical Bulletin 1). Breakaway walls used in CAZs must have flood openings that allow for the automatic entry and exit of floodwaters to minimize damage caused by hydrostatic loads. | 2008 |
| **Coastal AE Zone and VE Zone Demographics Study and Primary Frontal Dune Study to Support the NFIP** | ***Coastal AE Zone, LiMWA, MoWA Zone, MiWA Zone*** | **Sec. 4.2.1**. ". . . we have defined <u>"Coastal AE Zone" as AE Zones dominated by coastal flood hazard extending from the area landward of the VE Zone to riverine A Zones and X Zones where minimal flood hazards exist</u>."<br><br>**Sec. 4.2.2**. "It was suggested that <u>the zone between the LiMWA and V Zone be called the "Moderate Wave Action (MoWA) Zone</u>." | The study developed methods to separate coastal AE zones from riverine AE zones, and methods to estimate the fraction of the Coastal AE comprised by MoWA and MiWA zones. The study identified some mapping and floodplain management alternatives for addressing the Coastal AE Zone. | 2008 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| **State of Mississippi, Model "B" – "E" Flood Damage Prevention Ordinance** | ***Coastal AE Zone, Limit of Moderate Wave Action*** | **Article 2.** "***Coastal AE Zone*** *means the portion of the Special Flood Hazard Area (SFHA) landward of a Velocity (V) Zone or landward of an open coast or back-bay area without mapped V-Zones, in which the principle sources of flooding are astronomical tides, storm surges, seiches or tsunamis; not riverine sources. Coastal AE Zones may be subject to wave effects, velocity flows, erosion, scour or combinations of these forces and are treated as V Zones. All community-identified portions of the Special Flood Hazard Area (SFHA) between the landward limit of the 1.5-foot breaking wave and the V Zone boundary shall be treated in a regulatory sense as V Zones. Where no V Zone is mapped in back-bay areas, the Coastal AE Zone is the portion between shore and the landward limit of the 1.5-foot breaking wave."*<br>***"Limit of Moderate Wave Action (LiMWA)*** *is the limit of the AE Zone category area exposed to wave attack from waves greater than 1.5 feet during the base (one percent chance) flood on open coastal and inland areas exposed to erosion and wave propagation. Base flood conditions between the VE Zone and the LiMWA will be similar to, but less severe than those in the VE Zone."* | Article 5, Section G, requires new construction in Coastal AE zones to meet V zone requirements. | 2008 |

| Publication | Term Used | Definition (<u>emphasis added</u>) | Significance | Date |
|---|---|---|---|---|
| **Pascagoula, MS, *Code of Ordinances, Appendix C*** | ***Coastal AE Zone, Limit of Moderate Wave Action*** | **Article 2**. *"Coastal AE zone means the portion of the special flood hazard area (SFHA) landward of a velocity (V) zone or landward of an open coast or back-bay area without mapped V-zones, in which the principal sources of flooding are astronomical tides, storm surges, seiches, or tsunamis, not riverine sources. Coastal AE zones may be subject to wave effects, velocity flows, erosion, scour, or combinations of these forces and are treated as V-zones. All community -identified portions of the special flood hazard area (SFHA) between the landward limit of the moderate wave action delineation and the V-zone boundary shall be treated in a regulatory sense as V-zones. Where no V-zone is mapped in back-bay areas, the Coastal AE Zone is the portion between shore and the landward limit of the moderate wave action delineation as noted in the legend on the preliminary flood insurance rate maps."*<br>*"Limit of moderate wave action (LiMWA) is the limit of the AE Zone category area exposed to wave attack from waves greater than 1.5 feet during the base (one percent chance) flood on open coastal and inland areas exposed to erosion and wave propagation. Base flood conditions between the VE Zone and the LiMWA will be similar to, but less severe than those in the VE Zone."*<br><br>*NOTE: several MS communities that had adopted CAZ requirements have or are considering dropping those due to inadequate CRS credit. CRS Task Force addressed the issue in March 2010 (see 2010 CRS table entry).* | Article 5, Section E, <u>requires new construction in Coastal AE zones to meet V zone requirements</u>. | 2008 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| **Reducing Flood Losses through the International Codes**, 3rd. ed. | ***Coastal A Zone*** | **Sec. 3.6**. *"Coastal A Zone – an area where flood conditions include waves that are less than required for the NFIP to designate the area a V Zone, but that field research has identified as sufficient to cause building damage."* | Report identifies links between NFIP requirements, the NFIP CRS, the I-Codes and the code reference standards.<br>The report notes that the 2006 IBC requires compliance with ASCE 24-05, thereby mandating V Zone standards be met in Coastal A Zones. | 2008 |
| **Ocean Springs, MS, *Flood Damage Prevention Ordinance*** | ***Coastal AE Zone*** | **Chapter 2.** ***"Coastal AE Zone*** *means the portion of the (SFHA) landward of a Velocity (V) zone or landward of an open coast or back-bay area without mapped V zones, in which the principal sources of flooding are astronomical tides, storm surges, seiches, or tsunamis, not riverine sources. Coastal AE zones may be subject to wave effects, velocity flows, erosion, scour, or combinations of these forces and are treated as V zones. All community-identified portions of the Special Flood Hazard Area (SFHA) between the landward limit of the 1.5-foot breaking wave and the V Zone boundary shall be treated in a regulatory sense as V Zones. Where no V Zone is mapped in back-bay areas, the Coastal AE Zone is the portion between shore and the landward limit of the 1.5-foot breaking wave."* | Article 5, Section G, requires new construction in Coastal AE zones to meet V zone requirements | 2006 |
| **Biloxi, MS, *Flood Damage Prevention Ordinance*** | ***Coastal AE Zone*** | | Sections 8.3.5 and 8.3.7 require new construction in Coastal AE zone to meet V zone requirements | 2009 |
| **International Building Code** | — | (term not used) | No change from 2006 edition regarding CAZ load combinations (Sec. 1605) and Sec. 1612 requirement to use ASCE 24-05. | 2009 |

| **Publication** | **Term Used** | **Definition** (<u>emphasis added</u>) | **Significance** | **Date** |
|---|---|---|---|---|
| **International Residential Code** | ***Coastal A Zone*** | **Sec. R322.2**. "*Flood hazard areas that have been delineated as subject to wave heights between 1.5 feet and 3 feet shall be designated as Coastal A Zones*." | Sec. R322.2.1(2) says, "<u>Buildings and structures in flood hazard areas designated as Coastal A Zones shall have the lowest floors elevated to or above the base flood elevation plus 1 foot</u> (305 mm), or to the design flood elevation, whichever is higher." <u>First code requirement for freeboard for 1- and 2-family buildings in Coastal A Zones</u>.<br>Sec. R301.2.4.1 permits use of ASCE 24-05 (which requires CAZ buildings to meet V zone standards) as an alternative provision to IRC A zone design and construction requirements. | 2009 |
| **FEMA P-762** *Local Officials Guide for Coastal Construction* | ***Coastal A Zone*** | **Sec. 3.1.3.3**. "*The term "Coastal A" refers to the area within the A Zone where breaking waves are between 3 feet and 1.5 feet high. These areas are not specifically delineated on FIRMs.*" | Sec. 3.1.3.3. "The NFIP regulations currently do not differentiate between coastal and non-coastal A Zones. Because Coastal A Zones may be subject to the types of hazards present in V Zones (such as wave effects, velocity flows, erosion, scour, and high winds), <u>this guide recommends that buildings in Coastal A Zones meet the NFIP regulatory requirements for V Zone buildings</u> (i.e., the performance requirements concerning resistance to flotation, collapse, and lateral movement, as well as the prescriptive requirements for elevation, foundation type, engineering certification of design and construction, enclosures below the BFE, and the use of structural fill)." | 2009 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| **FEMA P-577** (NHC ed.) *Hurricane Ike (2008) MAT Report* | ***Coastal A Zone, LiMWA*** | **Sec. 2.1.1** (Description of flood Zones). "*The Coastal A Zone is an area within Zone A that is shown as an advisory layer on newer digital FIRMS (DFIRMS) using the Limit of Moderate Wave Action (LiMWA) line.*"<br>**Appendix D, Recovery Advisory** (Design and Construction in Coastal A Zones). "*Coastal A Zone: area landward of a V zone, or landward of an open coast without mapped V zones. In a Coastal A zone, the principal source of flooding will be astronomical tides, storm surges, seiches or tsunamis, not riverine flooding. During base flood conditions, the potential for wave heights between 1.5 and 3.0' will exist. At least 2 to 4' of stillwater depth is necessary to support these wave heights.*" and "*Flood insurance studies produced after Hurricane Katrina may include an advisory line indicating the limit of the 1.5' wave height during the base flood. This line is known as the Limit of Moderate Wave Action (LiMWA), and the area between this line and the VE zone boundary is the Coastal A zone.*" | Sec. 2.1.1. Flood forces in the Coastal A Zone are not as severe as in Zone V, but are still capable of damaging or destroying buildings on shallow foundations. For this reason, different design and construction standards are recommended (by the MAT and others) in the Coastal A Zone than in the riverine Zone A.<br>Sec. 7.1.1 recommendation #6: "Enforce ASCE 24-05's Coastal A Zone design and construction requirements in areas presently mapped as Zone A on the effective FIRM. This recommendation should be implemented before the adoption of new DFIRMs; following adoption, Coastal A Zone requirements should be adopted in the area between the LiMWA and Zone V."<br>Recovery Advisory 2 – which was taken from the Katrina RA and modified – states, "Because of the presence of damaging waves, V-zone design, construction, and certification practices are recommended for Coastal A zones" and provides foundation recommendations in Table 1 (NOTE: the Table is different than the Katrina RA Table – this one does **not** allows solid [stemwall] foundations in Coastal A Zones). | 2009 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| **Mapping the Zone: Improving Flood Map Accuracy** (National Research Council) | ***Coastal A Zone*** | Term not defined but references an area subject to wave damage. | **Chapter 7. Coastal A Zone.** "Two flood insurance rate zones apply to coastal areas: (1) V zones along the water's edge, which are subject to damage from both inundation and wave heights greater than 3 feet; and (2) A zones further inland, which are subject to damage from inundation and waves of less than 3 feet. At some distance inland, the waves dissipate and damage is caused by inundation alone. Historically, waves in the A zone have been assumed to be non-damaging."<br>The report identifies studies which challenge this assumption, and goes on to discuss two mapping options to address observed damages in A zones in coastal areas:<br>• Lower the V zone boundary definition to a 1.5-foot breaking wave, which would expand V zone insurance rates and construction standards across the coastal A zone.<br>• Retain the breaking wave threshold of 3 feet in the V zone and formally define the coastal A zone as areas subject to breaking waves between 1.5 and 3 feet.<br>Recommendation. FEMA should redefine the V zone boundary based on a 1.5-foot breaking wave rather than the present 3-foot wave. | 2009 |
| *CRS Credit for Areas with Moderate Wave Action and Coastal A Zones* | ***Coastal A Zone**, **LiMWA, Coastal AE Zone*** | | CRS Task Force changed how points are awarded for implementation of Coastal A Zone, partly in response to feedback from communities that the current impact adjustment procedure resulted in very few points being awarded. | June 2010 |

| Publication | Term Used | Definition (emphasis added) | Significance | Date |
|---|---|---|---|---|
| Various other communities that do or have enforced V zone standards in some portion of A Zone: | *?* | ***Wrightsville Beach, NC; Treasure Island, FL; Harrison Co, MS; D'Iberville, MS*** | | ? |
| **Glossary**, NOAA Risk and Vulnerability Assessment Tool | ***Coastal A Zone*** | http://www.csc.noaa.gov/rvat/glossary.html<br>*"**Coastal A zone** — For the purposes of this manual, the portion of the Special Flood Hazard Area landward of a V zone or landward of an open coast without mapped V zones (e.g., shorelines of the Great Lakes), in which the principal sources of flooding are astronomical tides, storm surge, seiches, or tsunamis, not riverine sources. The flood forces in coastal A zones are highly correlated with coastal winds or coastal seismic activity. Coastal A zones may therefore be subject to wave effects, velocity flows, erosion, scour, or combinations of these forces. See A zone and Non-coastal A zone. (Note: the National Flood Insurance Program regulations do not differentiate between coastal A zones and non-coastal A zones.)"* | It is not known how the Tool uses the CAZ term | ? |

# Appendix F

## Coastal SFHA and Coastal A Zone Terminology – Discussion and Options

**F.1 Coastal SFHA and CAZ Terminology**

**F.2 Coastal SFHA and CAZ Terminology Options**

# Appendix F: Coastal SFHA and Coastal A Zone Terminology – Discussion and Options

## F.1 Coastal SFHA and CAZ Terminology

The coastal SFHA is the mapped area on the DFIRM which has backwater flooding or combined backwater flooding and wave effects from a primary coastal flood source (ocean) or secondary coastal flood source (inland bay, estuary, or lagoon).

The "Coastal A Zone" (CAZ) is a delineation within the coastal SFHA defined in current building code and FEMA Building Science publications as the area landward of the VE Zone and inland to the limit of the 1.5-foot wave height. However, some communities and some FEMA (non-Building Science) publications have used the term "Coastal A Zone" interchangeably with the term "coastal AE Zone." Thus, the terminology surrounding the CAZ has been confusing. Figure 7-1 illustrates how various terms have been defined and implemented by documents and programs over the years.

FEMA has therefore defined the terms "MoWA" and "MiWA," as described in the overview of coastal SFHA in Section 1.2:

- The area of Moderate Wave Action (MoWA) is defined as the area where coastal flooding is present with 1.5 to 2.9-foot wave heights. For the purpose of this study, the "Coastal A Zone" refers to the MoWA area that is within the coastal SFHA and is mapped as an AE Zone.
- The area of Minimal Wave Action (MiWA) is defined as the area where coastal flooding is present with wave heights less than 1.5 feet. For the purposes of this study, the MiWA area is also within the coastal SFHA and is mapped as an AE Zone, but has lesser wave effects and is not considered part of the "Coastal A Zone."
- The limit of the 1.5-foot wave height is defined as a mapping boundary known as the Limit of Moderate Wave Action (LiMWA) and identified in accordance with Procedure Memorandum (PM) 50. This limit defines the boundary of the CAZ (see example given in Figure 7-1). PM 50 states that delineating the LiMWA will be standard mapping practice, although a community may request that the LiMWA not be shown on the FIRM. The community must provide a rationale for such a request to FEMA.

- The current, non-VE Zone coastal SFHA is mapped as AE Zone and includes both the MoWA and MiWA; that is, areas that experience flooding with no wave action, up to areas experiencing up to 3 feet of wave action. If the limits of the “Coastal A Zone” are adopted as the LiMWA and MoWA, then the remaining coastal AE Zone within coastal SFHA will encompass only the MiWA area up to the limits of coastal flooding.
- The riverine AE Zone is defined as the area where flooding is caused by rivers rather than tides, storm surges, or tsunamis. Riverine floodplains have channels that can be easily identified and that reflect differing flood sources from the coastal SFHA. However, the riverine AE Zones are not easily distinguished from the coastal portion of the mapped AE Zone.

## F.2 Coastal SFHA and CAZ Terminology Options

There appear to be four main terminology options, not counting the Status Quo option (three of the options are shown in Figure F-1):

1. Adopt the Coastal Demographics Study and PM 50 terminology, which use “coastal AE Zone” to represent that portion of the SFHA not mapped as Zone VE and where coastal flooding dominates. This option would subdivide the AE Zone into the coastal AE Zone (composed of the MoWA zone and the MiWA zone), and a riverine AE Zone.
2. Adopt the building codes and standards approach, which uses “Coastal A Zone” to represent that portion of the coastal AE Zone subject to damaging waves (i.e., the portion between the VE Zone boundary and the LiMWA). This approach uses the terms “A” Zone and “V” Zone generically, to mean AE or VE or any numbered or unnumbered zone. Where wave heights are greater than 1.5 feet, the approach does not distinguish between open coast and non-open coast flood hazard areas.
3. Adopt a hybrid approach, where the AE Zone will be divided into the MoWA, MiWA, and riverine AE (if present), and where the MoWA will be divided into an open coast MoWA and a non-open coast (sheltered) MoWA. This option drops use of the term “coastal AE Zone” and raises the possibility of a more limited “Coastal A Zone;” but it would require only limited changes to building codes and standards definitions of CAZ (e.g., if the detailed alternatives evaluation concludes that only open coast MoWA areas should be classified as CAZs for building code purposes).
4. Expand the VE Zone to incorporate the MoWA zone, i.e., redefine the landward limit of the VE Zone as the 1.5-foot wave height. This alternative would result in an AE Zone with two parts, the MiWA zone and the riverine AE Zone (if present).




Figure F-1. Terminology options.

The framework from one of the options listed above could also be used, with or without variations on some of the terms. For example, any of the terms, such as "LiMWA," "MoWA," "MiWA," "Coastal A Zone," "coastal AE Zone," or "riverine AE Zone," could be revised. None of these terms are defined in the NFIP regulations or the standard flood insurance policy.

### F.2.1 Assessment of Terminology Options

**Option 1: Adopt Coastal Demographics Study/PM 50 terminology.** Subdivide the AE Zone into the coastal AE Zone [composed of the MoWA Zone and the MiWA Zone], and a riverine AE Zone.

Advantages:

- Terminology separates AE by flood source: coastal and non-coastal.
- Terminology divides SFHA into areas of high (VE), moderate (MoWA), and minimal (MiWA) wave action.

Disadvantages:

- Confusion with "Coastal A Zone" terminology used in FEMA Building Science publications, in building codes and standards, and by local/state governments enforcing building codes. The "Coastal A Zone" term has been in widespread use for over a decade, and in recent years has come to mean the area labeled as the MoWA Zone by the Coastal Demographics Study and PM 50.
- Changing building codes and standards to use PM 50 terminology could require several years, given the lead time to achieve change and the sequencing that would be required (ASCE 7-10 was just published, and the next edition is not planned until 2015); ASCE 24-05 is just beginning its revision cycle, and could be revised within two to three years; the 2012 I-Codes are in process now and are almost final; the next edition of the I-Codes is scheduled for 2015; building codes reference both ASCE 7 and ASCE 24, so coordination with changes to the standards would be required.

**Option 2: Adopt Building Codes and Standards approach.** Use "Coastal A Zone" to represent that portion of the AE Zone subject to damaging waves.

Advantages:

- Identifies a zone of intermediate flood hazard: between the VE Zone and the landward portion of the AE Zone. This delineation has been identified as being important for building performance, and has already been incorporated into FEMA Building Science guidance and into building standards and codes.
- Building codes and standards would not require revision.

Disadvantages:

- Use of the term "Coastal A Zone" may imply that the rest of the AE Zone is non-coastal. In fact, only part of the remaining A/AE Zone is associated with a non-coastal flood source. Significant changes to FEMA guidance and terminology could be required.
- There is no subdivision between the MiWA Zone and the riverine AE Zone. It is not yet known whether this distinction is important, but if it is, additional terminology changes would be required (see Option 3).
- Some jurisdictions and documents use the term "coastal AE Zone" to represent the MoWA portion of the AE Zone subject to damaging waves.

**Option 3: Use Hybrid Approach**

Advantages:

- Maintains the dual terminology (NFIP, building codes) system that has been in use informally, and does not require major terminology changes on the part of the NFIP or building codes.
- Identifies a zone of intermediate flood hazard: between the VE Zone and the more landward portion of the AE Zone.
- Separates AE by flood source: coastal and non-coastal.
- Allows building standards and flood premium rates to distinguish between open coast and sheltered water MoWA areas.

Disadvantages:

- Could require regulatory, guidance and insurance changes if the AE Zone is redefined as only the portion of the AE Zone not subject to damaging waves.
- Use of the term "Coastal A Zone" may imply that the rest of the A/AE Zone is non-coastal. In fact, only part of the remaining A/AE Zone is associated with a non-coastal flood source.
- If insurance studies show the need to differentiate between the VE Zone and Coastal A/AE Zone, or between Coastal A/AE Zone and MiWA, then NFIP regulations changes and flood insurance policy language changes would be required.
- Would require "open coast" areas to be identified

**Option 4: Expand the VE Zone to incorporate the MoWA Zone**

Advantages:

- Building Science guidance, and building codes and standards (which currently call for treating CAZs like VE Zones), would require only minor/editorial changes.
- Since the landward limit of the VE Zone is not defined by regulation, no regulations change would be required for this option.
- Is consistent with the recommendation of the National Research Council (2009) study*, Mapping the Zone* *http://books.nap.edu/openbook.php?record_id=12573&page=R1.*

Disadvantages:

- This option would not allow for different building standards and insurance premiums to be charged in different portions of the MoWA or new VE Zone, unless the NFIP subdivided the VE Zone.
- If a decision is made to differentiate between open coast and sheltered water MoWA areas, this option would preclude that distinction. With an expanded VE Zone to the 1.5-foot limit, the MoWA would not be needed in context of the CAZ recommendations.
- Expansion of the VE Zone, and of its higher flood insurance premium rates, would be sure to garner significant opposition. Moreover, this expansion may be unnecessary in low-energy, sheltered water MoWA areas where base flood wave periods are small.

# Appendix G

## Preliminary Literature Review for Open Coasts and Sheltered Waters

G.1 FEMA, Section D.4.2.2.1 of Jan. 2005 Final Draft Guidelines for Coastal Flood Hazard Analysis and Mapping for the Pacific Coast of the United States

G.2 FEMA, Section D.2.2.2 of Feb. 2007 Draft FEMA Guidelines and Specifications, Appendix D, Atlantic Ocean and Gulf of Mexico Update

G.3 FEMA Technical Memorandum (February 2008), Guidance for Coastal Flood Hazard Analyses and Mapping in Sheltered Waters

G.4 USACE Coastal Engineering Manual

G.5 Mitigating Shore Erosion along Sheltered Coasts. National Research Council 2007

G.6 "'Low Energy' Sandy Beaches in Marine and Estuarine Environments: A Review"

G.7 UK Joint Nature Conservation Committee

G.8 Open Coast Beaches (New Zealand Environment Waikato)

G.9 Coastline Complexity: A Parameter for Functional Classification of Coastal Environments

# Appendix G: Preliminary Literature Review for Open Coasts and Sheltered Waters

## G.1 FEMA, Section D.4.2.2.1 of Jan. 2005 Final Draft Guidelines for Coastal Flood Hazard Analysis and Mapping for the Pacific Coast of the United States

***http://www.fema.gov/library/viewRecord.do?id=2188***

**D.4.2.2.1 Open Coast and Sheltered Water**

A primary consideration is the exposure of the shoreline: either open coast or sheltered water. Open coast settings are exposed to the full influence of the Pacific Ocean and include processes such as sea, swell, astronomical tides, and El Niño. In sheltered water, the waves are primarily due to local processes, while on the open coast, waves may be generated by both local and distant weather conditions. On the open coast, the interrelationships among waves and water-level processes may be quite complex. As a result, simultaneous measurements and/or hindcasts of these processes are recommended to avoid reconstructing the complex interrelationships. This is a key point for the Pacific Coast. Methodologies prescribed in Appendix D.4 recognize the complexity of describing the interactions between waves and water levels, and as such these processes are analyzed simultaneously in time as they naturally occur in nature.

In sheltered water, the waves are typically generated by local weather, which simplifies the interrelationships. As a result, it may be possible to employ statistical or simulation techniques to analyze these processes. However, additional considerations in sheltered water such as tidal amplification, currents, and the effects of river inflows must be considered. While most methods for open coasts are also applicable for sheltered water, a number of special considerations for sheltered water exist.

Also, see Pacific Guidelines Focused Study Report on Sheltered Waters *http://www.fema.gov/library/file;jsessionid=0740910963999CACC09F0F46BE1EDE5B.WorkerLibrary?type=publishedFile&file=frm_psum.pdf&fileid=d881ae20-9519-11db-b057-000bdba87d5b*

## G.2 FEMA, Section D.2.2.2 of Feb. 2007 Draft FEMA Guidelines and Specifications, Appendix D, Atlantic Ocean and Gulf of Mexico Update

***http://www.fema.gov/library/viewRecord.do?id=2458***

### D.2.2.2 Setting

The study area setting and hazard history will determine which methods and data are necessary and/or appropriate. Important considerations include the coastal exposure to hurricanes and northeaster storm events (both on **open ocean coasts** and in **inland bays** or **other sheltered waters**), the shoreline morphology (small or large dune fields, barrier islands, inlets and river mouths, coastal bluffs or cliffs, etc.), and the shore conditions (topography, development, etc.). Consideration of each of these conditions frames the data requirements and the appropriate analysis methods.

#### D.2.2.2.1 Open Ocean Coasts, Inland Bays, and Sheltered Waters

A primary consideration is the exposure of the shoreline, which can be classified into three groups: open ocean coasts, inland bays, and other sheltered waters. **Open ocean coasts** are exposed to the full influence of the Atlantic Ocean or the Gulf of Mexico and include processes such as prolonged and substantial hurricane and northeaster storm surges, large fluctuations of astronomical tides, and large wave effects accompanying storm surges. For most **inland bays**, storm surge and wave effects result from an exposure to open ocean processes and weather conditions, combined with local processes and weather conditions. In more isolated portions of **sheltered waters and inland bays**, the waves and flood levels may be primarily caused by local weather and tide conditions and require special hazard analysis considerations, such as timing of peak surge levels with peak wind-driven wave effects.

On the **open ocean coast**, the interrelationships between storm surge and wave processes, such as the influence that wave setup exerts upon storm surge flood levels, may be quite complex. Depending upon the scope of the coastal restudy, the simultaneous assessment of wave setup processes is recommended during the hydrodynamic modeling of wind setup from hurricanes and northeasters, to avoid underestimating the contribution of wave setup processes to total stillwater flood levels. This is a key point for the Atlantic and Gulf coasts that cannot be addressed properly in Appendix D. The methodologies presented here will be for independent

assessments of each process, until the time when Appendix D can be cross-referenced to new guidance for the complex processes involved with hydrodynamic modeling and statistical analyses prior to the more simplified analyses for wave effects and erosion assessments.

In **sheltered waters**, the waves are typically generated by local weather, which simplifies the interrelationships. As a result, statistical or simulation techniques may be used to analyze these processes. However, tidal amplification, currents, and the effects of river inflows must be considered differently for sheltered waters than for larger inland bays. While most methods for open ocean coasts and inland bays are also applicable for sheltered waters, a number of special considerations exist for sheltered waters which have been addressed in the Pacific Coast guidelines.

## G.3 FEMA Technical Memorandum (February 2008), Guidance for Coastal Flood Hazard Analyses and Mapping in Sheltered Waters

***http://www.fema.gov/library/viewRecord.do?id=3252***

**Sheltered waters** in this document refers to bays, sounds, estuaries, fjords, and other water bodies that are hydraulically connected to open coast waters during flood conditions. Sheltered water shorelines can be exposed to the same types of flood-producing processes as **open coastlines** (i.e., high winds, storm surge, wave generation and overland propagation, wave runup, and wave overtopping). However, sheltering implies the inland propagation of open coast flooding and a modification of these processes by land masses or other obstructions. In many cases, sheltered water shorelines are subject only to locally generated waves.

## G.4 USACE Coastal Engineering Manual
## *http://chl.erdc.usace.army.mil/cem*

The USACE *Coastal Engineering Manual* does not define open coast, sheltered coast, etc.

## G.5 Mitigating Shore Erosion along Sheltered Coasts. National Research Council 2007, Committee on Mitigating Shore Erosion Along Sheltered Coasts, Ocean Studies Board, The National Academies Press, Washington, D.C.

***http://www.nap.edu/catalog.php?record_id=11764***

**Open coast**: tidal shores that have little or no protection from wave action.

**Sheltered coast**: a coastal area sheltered by headlands, coves, natural or harbor breakwaters, tidal inlets, and river mouths and estuaries which have a limited distance between banks (fetch) and hence limited exposure to wind-driven waves. This area is usually characterized by low wave energies and stresses. These lower energy conditions foster habitats and ecological communities, such as marshes and mudflats, not typically found on open coasts.

## G.6 "'Low Energy' Sandy Beaches in Marine and Estuarine Environments: A Review"

**Authors:** Nancy L. Jackson, Karl F. Nordstrom, Ian Eliot, and Gerdhard Masselink

**Journal:** Geomorphology, Vol. 48 (2002) pp. 147-162.
*http://www.elsevier.com/wps/find/journaldescription.cws_home/503334/description#description*

This paper represents a recent and comprehensive review of coastal classification schemes and terminology. Many authors tend to use the terms **low energy**, **sheltered**, and **fetch-limited** synonymously.

## G.7 UK Joint Nature Conservation Committee

**Wave exposure**: These categories take account of the **aspect** of the coast (related to direction of prevailing or strong winds), the fetch (distance to nearest land), its **openness** (the degree of open water offshore) and its **profile** (the depth profile of water adjacent to the coast). Estimation of wave exposure requires inspection of charts and maps. *http://www.jncc.gov.uk/page-3246*

| | |
|---|---|
| **Extremely exposed** | This category is for the few open coastlines which face into prevailing winds and receive oceanic swell without any offshore breaks (such as islands or shallows) for several thousand km and where deep water is close to the shore (50 m depth contour within about 300 m, e.g. Rockall). |
| **Very exposed** | These are open coasts which face into prevailing winds and receive oceanic swell without any offshore breaks (such as islands or shallows) for several hundred km but where deep water is not close (>300 m) to the shore. They can be adjacent to extremely exposed sites but face away from prevailing winds (here swell and wave action will refract towards these shores) or where, although facing away from prevailing winds, strong winds and swell often occur (for instance, the east coast of Fair Isle). |
| **Exposed** | At these sites, prevailing wind is onshore although there is a degree of shelter because of extensive shallow areas offshore, offshore obstructions, a restricted (<90 ) window to open water. These sites will not generally be exposed to strong or regular swell. This can also include open coasts facing away from prevailing winds but where strong winds with a long fetch are frequent. |
| **Moderately exposed** | These sites generally include open coasts facing away from prevailing winds and without a long fetch but where strong winds can be frequent. |
| **Sheltered** | At these sites, there is a restricted fetch and/or open water window. Coasts can face prevailing winds but with a short fetch (say <20 km) or extensive shallow areas offshore or may face away from prevailing winds. |
| **Very sheltered** | These sites are unlikely to have a fetch greater than 20 km (the exception being through a narrow (<30°) open water window, they face away from prevailing winds or have obstructions, such as reefs, offshore. |
| **Extremely sheltered** | These sites are fully enclosed with fetch no greater than about 3 km. |
| **Ultra sheltered** | Sites with fetch of a few tens or at most 100s of meters. |

## G.8 Open Coast Beaches (New Zealand Environment Waikato)

Open coast beaches are exposed to constant wave action and sand is constantly moving within the dynamic beach and dune system. Open coast animals are especially adapted to live in these conditions.
*http://www.ew.govt.nz/Environmental-information/Our-coast/Coastal-ecosystems/Open-coast-beaches/*

## G.9 Coastline Complexity: A Parameter for Functional Classification of Coastal Environments

**Authors:** Bartley J.D.; Buddemeier R.W.; Bennett D.A.

**Location:**
*http://www.kgs.ku.edu/Hexacoral/Products/Documents/BARTLEYFIN3.html*

**Source:** *Journal of Sea Research*, Volume 46, Number 2, September 2001, pp. 87-97(11)

**Publisher:** Elsevier

**Keywords:** Complexity, coastal morphology, habitat, classification, biogeochemical fluxes, typology

**Document Type:** Research article

**DOI:** 10.1016/S1385-1101(01)00073-9

responsible for mitigating the associated risks and costs to both human communities and ecosystems. LiDAR mapping plays a central role in evaluating the vulnerability of low-lying coastal regions to inundation caused by relative sea-level rise. Most maps of potential inundation along coastlines have been based on out-dated coarse elevation data, and accordingly amount to only crude representations that may serve to mislead decision makers. The high vertical accuracy and spatial resolution of elevation data derived from LiDAR leads to improved identification and delineation of vulnerable lands.

**Other Benefits from USGS's use of enhanced elevation data for this Functional Activity:**

| Public/Social: Major | Environmental: Major | Strategic/Political: Major |
|---|---|---|

- Hurricanes are another serious coastal hazard along the Atlantic and Gulf coasts of the U.S., and airborne LiDAR mapping of beaches and dunes has been used extensively over the last decade in studies of barrier island vulnerability to severe storms. If, during hurricane landfall, the storm-induced mean water level overtops the crest of the primary dune, the entire beach system will be submerged, resulting in exposure to processes that can cause extreme coastal change, including wholesale dune removal, island breaching, and inlet formation. Recognizing the importance of dunes in predicting barrier island response to hurricane impact, coastal geologists have devised approaches to use LiDAR surveys in identifying the crest of the most seaward sand dune, the feature that defines the landward boundary of the beach system. Hurricane storm surge also threatens coastal communities and watersheds, for example, the landfall of Hurricane Katrina near the Mississippi-Louisiana border at the Gulf Coast caused the largest natural disaster in U.S. history, with the loss of more than 1,800 lives and $81 billion in property damage. The use of the data assimilation techniques that combine various dissimilar LiDAR data sets and thereby create a uniform 3-m elevation grid throughout coastal regions affected by storm surge allow rapid map creation, resulting in more rapid recovery efforts and emergency response.
- The benefits of elevation data meeting the characteristics specified for coastal applications include providing data that does not currently exist for some locations, decreasing reliance on costly field surveys (which result in less dense data than LiDAR surveys), and more accurately delineating areas subject to the effects of sea level rise.

The National Academies of | SCIENCES ENGINEERING MEDICINE
THE NATIONAL ACADEMIES PRESS

This PDF is available at http://nap.edu/18309

SHARE




# Levees and the National Flood Insurance Program: Improving Policies and Practices (2013)

## DETAILS

274 pages | 8.5 x 11 | HARDBACK
ISBN 978-0-309-38721-7 | DOI 10.17226/18309

[redacted]

FIND RELATED TITLES

## CONTRIBUTORS

Committee on Levees and the National Flood Insurance Program: Improving Policies and Practices; Water Science and Technology Board; Division on Earth and Life Studies; National Research Council

## SUGGESTED CITATION

National Research Council 2013. *Levees and the National Flood Insurance Program: Improving Policies and Practices*. Washington, DC: The National Academies Press. https://doi.org/10.17226/18309.

**Visit the National Academies Press at NAP.edu and login or register to get:**

- Access to free PDF downloads of thousands of scientific reports
- 10% off the price of print titles
- Email or social media notifications of new titles related to your interests
- Special offers and discounts

Distribution, posting, or copying of this PDF is strictly prohibited without written permission of the National Academies Press. (Request Permission) Unless otherwise indicated, all materials in this PDF are copyrighted by the National Academy of Sciences.

Copyright © National Academy of Sciences. All rights reserved.

# Levees and the National Flood Insurance Program

## Improving Policies and Practices

Committee on Levees and the National Flood Insurance Program:

Improving Policies and Practices

Water Science and Technology Board

Division on Earth and Life Studies

NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 586 of 858

**THE NATIONAL ACADEMIES PRESS 500 Fifth Street, NW Washington, DC 20001**

NOTICE: The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. The members of the panel responsible for the report were chosen for their special competences and with regard for appropriate balance.

Support for this study was provided by the U.S. Federal Emergency Management Agency under grant contract number HSHQDC-11-D-00009 and task order HSFEHQ-11-J-0001. Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the author(s) and do not necessarily reflect the views of the organizations or agencies that provided support for the project.

International Standard Book Number-13: 978-0-309-28290-1
International Standard Book Number-10: 0-309-28290-X
Library of Congress Control Number 2013940694

Cover image courtesy of the U.S. Army Corps of Engineers, Mississippi Valley Division.

Additional copies of this report are available from the National Academies Press, 500 Fifth Street, NW, Keck 360, Washington, DC 20001; (800) 624-6242 or (202) 334-3313 (Washington metropolitan area); http://www.nap.edu.

Copyright 2013 by the National Academy of Sciences. All rights reserved.

Printed in the United States of America.

Copyright National Academy of Sciences. All rights reserved.

# THE NATIONAL ACADEMIES

*Advisers to the Nation on Science, Engineering, and Medicine*

The **National Academy of Sciences** is a private, nonprofit, self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare. Upon the authority of the charter granted to it by the Congress in 1863, the Academy has a mandate that requires it to advise the federal government on scientific and technical matters. Dr. Ralph J. Cicerone is president of the National Academy of Sciences.

The **National Academy of Engineering** was established in 1964, under the charter of the National Academy of Sciences, as a parallel organization of outstanding engineers. It is autonomous in its administration and in the selection of its members, sharing with the National Academy of Sciences the responsibility for advising the federal government. The National Academy of Engineering also sponsors engineering programs aimed at meeting national needs, encourages education and research, and recognizes the superior achievements of engineers. Dr. C. D. (Dan) Mote, Jr., is president of the National Academy of Engineering.

The **Institute of Medicine** was established in 1970 by the National Academy of Sciences to secure the services of eminent members of appropriate professions in the examination of policy matters pertaining to the health of the public. The Institute acts under the responsibility given to the National Academy of Sciences by its congressional charter to be an adviser to the federal government and, upon its own initiative, to identify issues of medical care, research, and education. Dr. Harvey V. Fineberg is president of the Institute of Medicine.

The **National Research Council** was organized by the National Academy of Sciences in 1916 to associate the broad community of science and technology with the Academy's purposes of furthering knowledge and advising the federal government. Functioning in accordance with general policies determined by the Academy, the Council has become the principal operating agency of both the National Academy of Sciences and the National Academy of Engineering in providing services to the government, the public, and the scientific and engineering communities. The Council is administered jointly by both Academies and the Institute of Medicine. Dr. Ralph J. Cicerone and Dr. C. D. (Dan) Mote, Jr.,s are chair and vice chair, respectively, of the National Research Council.

**www.nationalacademies.org**

Copyright National Academy of Sciences. All rights reserved.

## COMMITTEE ON LEVEES AND THE NATIONAL FLOOD INSURANCE PROGRAM: IMPROVING POLICIES AND PRACTICES

**GERALD E. GALLOWAY**, *Chair*, University of Maryland, College Park
**PATRICK L. BROCKETT**, University of Texas, Austin
**SUSAN L. CUTTER**, University of South Carolina, Columbia
**DAVID T. FORD**, David Ford Consulting Engineers, Sacramento, California
**CLIVE Q. GOODWIN**, FM Global Insurance Company, Johnston, Rhode Island
**KARIN M. JACOBY**, Spica Consulting, LLC, Kansas City, Missouri
**DAVID I. MAURSTAD**, OST Inc., McLean, Virginia
**MARTIN W. McCANN**, Jack R. Benjamin and Associates, Inc, Menlo Park, California
**ANDRE D. McDONALD**, Fort Bend Flood Management Association, Sugar Land, Texas
**EARTHEA A. NANCE**, University of New Orleans, Louisiana
**KENNETH W. POTTER**, University of Wisconsin, Madison
**J. DAVID ROGERS**, Missouri University of Science and Technology, Rolla

## NRC STAFF

**LAURA J. HELSABECK**, Senior Program Officer
**MICHAEL J. STOEVER**, Research Associate



Copyright National Academy of Sciences. All rights reserved.

## WATER SCIENCE AND TECHNOLOGY BOARD

**DONALD I. SIEGEL**, *Chair*, Syracuse University, New York
**LISA ALVAREZ-COHEN**, University of California, Berkeley
**EDWARD J. BOUWER**, Johns Hopkins University, Baltimore, Maryland
**YU-PING CHIN**, Ohio State University, Columbus
**M. SIOBHAN FENNESSY**, Kenyon College, Gambier, Ohio
**BEN GRUMBLES**, Clean Water America Alliance, Washington, D.C.
**GEORGE R. HALLBERG**, The Cadmus Group, Watertown, Massachusetts
**KENNETH R. HERD**, Southwest Florida Water Management District, Brooksville, Florida
**GEORGE M. HORNBERGER**, Vanderbilt University, Nashville, Tennessee
**CATHERINE L. KLING**, Iowa State University, Ames
**DEBRA S. KNOPMAN**, RAND Corporation, Arlington, Virginia
**LARRY LARSON**, Association of State Floodplain Managers, Madison, Wisconsin
**RITA P. MAGUIRE**, Maguire & Pearce PLLC, Phoenix, Arizona
**DAVID H. MOREAU**, University of North Carolina, Chapel Hill
**ROBERT SIMONDS**, The Robert Simonds Company, Culver City, California
**FRANK H. STILLINGER**, Princeton University, Princeton, New Jersey
**MARYLYNN V. YATES**, University of California, Riverside
**JAMES W. ZIGLAR, SR.**, Van Ness Feldman, Washington, D.C.

### STAFF

**JEFFREY W. JACOBS**, Director
**LAURA J. EHLERS**, Senior Program Officer
**LAURA J. HELSABECK**, Senior Program Officer
**STEPHANIE E. JOHNSON**, Senior Program Officer
**M. JEANNE AQUILINO**, Financial and Administrative Associate
**MICHAEL J. STOEVER**, Research Associate
**ANITA A. HALL**, Senior Program Associate



Copyright National Academy of Sciences. All rights reserved.

Copyright National Academy of Sciences. All rights reserved.

# Acknowledgment of Reviewers

This report has been reviewed in draft form by individuals chosen for their diverse perspectives and technical expertise, in accordance with procedures approved by the National Research Council's Report Review Committee. The purpose of this independent review is to provide candid and critical comments that will assist the institution in making its published report as sound as possible and to ensure that the report meets institutional standards for objectivity, evidence, and responsiveness to the study charge. The review comments and draft manuscript remain confidential to protect the integrity of the deliberative process. We wish to thank the following individuals for their review of this report:

**GREGORY B. BAECHER**, University of Maryland
**RUDOLPH BONAPARTE**, Geosyntec Consultants
**MARK BROWNE**, University of Wisconsin
**MICHAEL K. BUCKLEY**, Dewberry
**TIMOTHY A. COHN**, U.S. Geological Survey
**DARRYL W. DAVIS**, U.S. Army Corps of Engineers
**JEROME B. GILBERT**, Consulting Engineer
**HOWARD KUNREUTHER**, University of Pennsylvania
**LARRY LARSON**, Association of State Floodplain Managers
**LEWIS E. LINK**, University of Maryland
**JEFFREY F. MOUNT**, University of California
**TIMOTHY TINKER**, Booz Allen Hamilton

Although the reviewers listed above have provided many constructive comments and suggestions, they were not asked to endorse the conclusions or recommendations nor did they see the final draft of the report before its release. The review of this report was overseen by **Henry J. Vaux**, University of California, and **Michael C. Kavanaugh**, Geosyntec Consultants. Appointed by the National Research Council, they were responsible for making certain that an independent examination of this report was carried out in accordance with institutional procedures and that all review comments were carefully considered. Responsibility for the final content of this report rests entirely with the authoring committee and the institution.



Copyright National Academy of Sciences. All rights reserved.

Copyright National Academy of Sciences. All rights reserved.

# Preface

Over the last decades, the United States has seen significant increases in disastrous flooding and rising losses in both human and property damage along rivers and coastlines from extreme storms and hurricane events. Hurricanes Katrina and Sandy will long be remembered for their human toll and economic costs—two of the most destructive natural disasters in U.S. history. These events not only had extensive personal and economic consequences for those directly and indirectly affected, but also threaten the nation's long-standing efforts to reduce the impacts of such events. Nations around the world face similar challenges.

Many of the damages that have resulted from flooding have involved either the failure of levees and related structures to withstand flood and hurricane stress, the overtopping of these levees once their design height was exceeded, or both. The majority of losses in New Orleans during Hurricane Katrina in 2005 stemmed from levee failures and overtopping. Many levees along the Missouri and Upper Mississippi rivers and their tributaries that were hit by historic floods in 2008 and 2011 experienced overtopping and failure. In 2007, the U.S. Army Corps of Engineers (USACE) reported that 122 levees under its oversight were at risk of failing, and later that year, the Congress passed the National Levee Safety Act. In 2009, a National Committee on Levee Safety, formed by the Act, stressed the threatening nature of this situation and indicated that a significant number of levees across the country are not well maintained and do not meet the standards required by the National Flood Insurance Program (NFIP), USACE levee programs, or accepted engineering practices. Also in 2009, the Infrastructure Report Card of the American Society of Civil Engineers assigned a grade of "D–" to the nation's levees and cited a maintenance backlog of nearly $50 billion.

The National Research Council (NRC) and its Water Science and Technology Board were asked by the Federal Emergency Management Agency (FEMA) to examine the manner in which levees are addressed in the NFIP and to provide advice as to what actions might be taken to improve program efficiency and effectiveness. The NRC established the *Committee on Levees and the National Flood Insurance Program: Improving Policies and Practices* to carry out this task. Committee members spent 16 months reviewing the program's history, examining numerous documents and reports, receiving briefings from relevant stakeholders including FEMA and other government agency officials. It held 12 virtual and in-person meetings in Washington, D.C., and in the Houston Texas, Sacramento, California, and St. Louis, Missouri areas to meet with those who supervise, operate, and maintain or are affected by levees.

For the most of the last three centuries, the nation has relied heavily on using structural means such as levees and dams to deal with flooding. Levees that are properly constructed, maintained, and upgraded when necessary



Copyright National Academy of Sciences. All rights reserved.

have prevented inundation of major communities in the face of major flood events and have helped avert billions of dollars in damages. The performance of the levees on the Lower Mississippi River during the record 2011 floods provided strong testimony to the value of levees.

Beginning with studies in the 1940s and 1950s, including work from the late geographer Gilbert F. White, it was increasingly appreciated that a comprehensive approach to managing flooding that complemented levees and dams with nonstructural measures such as land-use planning, zoning, floodproofing, and flood insurance was needed. Over the last two decades of the 20th century, the comprehensive approach advocated by White began a transition to the concept of flood risk management that is founded on the understanding that no matter what actions are taken to reduce structural system risks, the residual risk of structural failure will always remain and that management strategies will take advantage of a broad portfolio of mitigation measures. This approach has been increasingly adopted around the globe and forms the basis of the European Union's 2007 Flood Directive. This report focuses on technical and programmatic aspects of the NFIP's treatment of levees and leveed areas that exist within the context of flood risk management and recognizing that NFIP-related levees represent only 5 to 10 percent of the nation's levees.

This report does not address standards for levels of flood protection. The one percent annual chance (100-year) flood originally was used by USACE and the Tennessee Valley Authority as one measure of explaining flood threat. This recurrence interval was later legislated by the Congress to designate areas that would be regulated in the NFIP. Over time, however, this standard has frequently been presumed also to be a flood safety standard for floodplain occupancy. Although an important topic, the committee concluded that it would be outside the charge to recommend a safety standard for levees in heavily urbanized area, but did note that many other expert reports have suggested that the one percent annual chance flood standard is inadequate for large urban areas. For example, a 2009 report from a committee of the NRC recommended that the protection system for the City of New Orleans be designed for a hurricane storm surge event with an expected recurrence interval of 400 to 1,000 years. The committee also discussed the natural and beneficial functions of floodplains and the impacts that activities in the floodplain have on these functions, but determined that this topic also was outside the charge.

In this report, the committee has been asked to not only address an overall subject, "Levees and the NFIP," but also to examine separate, but somewhat interdependent, topic areas. As a result, the report provides both a continuous discussion of the levee issues in general and individual chapters focused on the different topic areas. Although the recommendations and conclusions offered in this report are focused on levees in the NFIP and the land behind them, they may also offer insights for the NFIP as a whole. To illustrate, the majority of losses from Hurricane Sandy in late 2012 were not levee related, as there are few levees or similar structures on the Delaware, New Jersey, and New York coastline. However, Sandy resulted in significant claims under the NFIP, and recovery efforts will involve a thorough examination of possible new risks and how to appropriately balance a range of possible structural and nonstructural alternatives for addressing these flood and storm risks. Many of the conclusions and recommendations offered by this report have been drawn and offered in the past, and the committee has identified these earlier reports (Appendix G). Unfortunately, some of these historical lessons have yet to be fully appreciated and respected.

From the beginning of our effort, Doug Bellomo and Roy Wright, senior officials at FEMA, made themselves available to the committee and for that, the committee is most appreciative. Their openness accelerated the committee's ability to quickly gain an understanding of the key issues that they faced. The committee also extends its appreciation to the numerous individuals who provided highly informative presentations and information regarding their collective experience with levees and the NFIP (Appendix D). The committee extends thanks to FEMA staff for its transparency and generosity of time in answering the hundreds of questions posed by the committee. The work of Siamak Esfandiary, the FEMA liaison to the committee was especially helpful and ensured that the information needed by the committee was made available. David Bascom, Bill Blanton, Kelly Bronowicz, Paul Huang, Andy Neal, Dave Stearrett, and Jeff Woodward of FEMA and Ray Alexander, Bryan Baker, Eric Halpin, and Mike Jordan of USACE gave considerable assistance to the committee. The committee appreciates the challenges that both FEMA and stakeholders face and current and past efforts made to overcome these challenges. The committee offers this report in the hope that it will assist FEMA in executing its most important mission.

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 595 of 858



Finally, the committee owes much to the untiring efforts of our NRC Study Director, Dr. Laura J. Helsabeck, whose intellectual acumen, organizational skills, writing abilities, collaborative temperament, and exceptionally long hours brought the report together and kept us focused on our mission. She was ably assisted by our research associate, Michael Stoever, who deftly handled research and logistics activities for the committee over its term. Dr. Jeff Jacobs, the Director of the Water Science and Technology Board, provided much appreciated oversight of and support to the committee.

Gerald E. Galloway, *Chair*
Committee on Levees and the
National Flood Insurance Program:
Improving Policies and Practices

Copyright National Academy of Sciences. All rights reserved.

Copyright National Academy of Sciences. All rights reserved.

# Contents


SUMMARY 1

1 INTRODUCTION 11
The Current Study, 16
References, 18

2 TREATMENT OF LEVEES WITHIN THE NATIONAL FLOOD INSURANCE PROGRAM 21
Moving Ahead with Levees in the NFIP, 23
Map Modernization and Levee Decertification, 24
Levee Deaccreditation, 28
References, 30

3 MOVING TO FLOOD RISK MANAGEMENT AND A MODERN FLOOD RISK ANALYSIS 33
Advantages of a Modern Risk-Based Approach to Flood Risk Analysis and Insurance, 38
Summary Description of a Modern Risk-Based Approach, 41
A Modern Risk-Based Analysis: The Foundational Basis, 42
Risk Analysis Results, Products, and Uses, 48
Steps to Development and Implementation of a Risk-Based Approach, 48
References, 54

4 LEVEE ANALYSIS AND MAPPING PROCEDURE 57
Proposed Procedure, 57
Public Comments, 59
Evaluation of LAMP, 59
Dealing with the Current Situation, 60
A Caution, 61
References, 62




Copyright National Academy of Sciences. All rights reserved.

5 INSURING PROPERTIES BEHIND LEVEES 63
Basics of Insurance Pricing, 64
Current Rate-Setting Practices Within the NFIP, 66
Role and Utility of Mandatory Insurance Behind Levees, 82
References, 93

6 IMPLEMENTING FLOOD RISK MANAGEMENT STRATEGIES 97
Mitigation and Risk Transfer Measures, 99
Developing Community Strategies for Areas Behind Levees, 108
Effective Flood Risk Management: Administration of Levees, 115
References, 122

7 UNDERSTANDING AND COMMUNICATING FLOOD RISK BEHIND LEVEES 127
Understanding Flood Risk Perception, 128
Brief History of Risk Communication in the NFIP, 129
Current Flood Risk Communication Efforts, 132
Contemporary Flood Risk Mapping, 136
Effective Flood Risk Communication, 140
A Way Forward, 141
References, 143

8 SHARED RESPONSIBILTY IN MOVING TO FLOOD RISK MANAGEMENT 145
Coordination Challenges at the Federal Level, 146
Increasing Awareness of Shared Flood Risk Responsibilities at the Federal, State, and Local Levels, 149
In Conclusion, 150
References, 153

APPENDIXES

A Title 44: Emergency Management and Assistance, §65.10 Mapping of Areas Protected by Levee Systems or "44 CFR §65.10" 157
B Biographical Information, Committee on Levees and the National Flood Insurance Program: Improving Policies and Practices 161
C Glossary of Terms 165
D Contributors to the Report 171
E Flood Zone Designations 175
F Levee-Related Observations, Conclusions, and Recommendations from Previous Reports 177
G FEMA Procedure Memorandums 34, 43, and 53 195
H Risk Analysis Background 231
I USACE System-Wide Improvement Frameworks Program 243

Copyright National Academy of Sciences. All rights reserved.

# Acronyms and Initialisms

| | |
|---|---|
| AMPO | Association of Metropolitan Planning Organizations |
| ASFPM | Association of State Floodplain Managers |
| BFE | base flood elevation |
| CA DWR | California Department of Water Resources |
| CEA | California Earthquake Authority |
| CLD | California Levee Database |
| CRS | Community Rating System |
| DELV | damage by elevation |
| DFIRM | Digital Flood Insurance Rate Map |
| DRMS | Delta Risk Management Study |
| FBFM | Flood Boundary and Floodway Map |
| FEMA | Federal Emergency Management Agency |
| FHBM | Flood Hazard Boundary Map |
| FIA | Federal Insurance Administration |
| FIS | Flood Insurance Study |
| FIMA | Federal Insurance and Mitigation Administration |
| FIRM | Flood Insurance Risk Map |
| FMA | flood mitigation assistance |
| GFIP | group flood insurance policy |
| GIS | geographic information system |
| HMA | hazard mitigation assistance |
| HMGP | Hazard Mitigation Grant Program |
| HUD | U.S. Department of Housing and Urban Development |



Copyright National Academy of Sciences. All rights reserved.

| | |
|---|---|
| IFMRC | Interagency Floodplain Management Review Committee |
| LAMP | Levee Analysis and Mapping Procedure |
| LFC | levee fragility curve |
| Lidar | light detection and ranging |
| MLI | Mid-Term Levee Inventory |
| MPO | metropolitan planning organization |
| MPR | mandatory purchase requirement |
| NAFSMA | National Association of Flood & Stormwater Management Agencies |
| NCLS | National Committee on Levee Safety |
| NFIP | National Flood Insurance Program |
| NLD | National Levee Database |
| NRC | National Research Council |
| PAL | Provisionally Accredited Levee |
| PDM | Pre-Disaster Mitigation |
| PE | professional engineer |
| PELV | probability of elevation |
| PRA | probabilistic risk assessment |
| PRP | preferred risk policy |
| RFC | repetitive flood claim |
| SFHA | Special Flood Hazard Area |
| SPF | standard project flood |
| SPFC | State Plan of Flood Control |
| SRL | severe repetitive loss |
| TVA | Tennessee Valley Authority |
| USACE | U.S. Army Corps of Engineers |

Copyright National Academy of Sciences. All rights reserved.

# Summary

The Federal Emergency Management Agency's (FEMA) Federal Insurance and Mitigation Administration manages the National Flood Insurance Program (NFIP), which is a cornerstone in the U.S. strategy to assist communities to prepare for, mitigate against, and recover from flood disasters. The NFIP was established by the Congress with passage of the National Flood Insurance Act in 1968, to help reduce future flood damages through NFIP community floodplain regulation that would control development in flood hazard areas, provide insurance for a premium to property owners, and reduce federal expenditures for disaster assistance. The flood insurance is available only to owners of insurable property located in communities that participate in the NFIP.[1] Currently, the program has 5,555,915 policies[2] in 21,881 communities[3] across the United States.

The NFIP defines the one percent annual chance flood (100-year or base flood) floodplain as a Special Flood Hazard Area (SFHA).[4] The SFHA is delineated on FEMA's Flood Insurance Rate Maps (FIRMs) using topographic, meteorologic, hydrologic, and hydraulic information. Property owners with a federally backed mortgage within the SFHAs are required to purchase and retain flood insurance, called the mandatory purchase requirement (MPR).

Levees and floodwalls, hereafter referred to as levees, have been part of flood management in the United States since the late 1700s because they are relatively easy to build and a reasonable infrastructure investment. A levee is a "man-made structure, usually an earthen embankment, designed and constructed in accordance with sound engineering practices to contain, control, or divert the flow of water so as to provide protection from temporary flooding."[5] A levee system is a "flood protection system which consists of a levee, or levees, and associated structures, such as closure and drainage devices, which are constructed and operated in accordance with sound engineering practices."[6] Under NFIP regulations, homes and commercial buildings located in the SFHA within a participating community may be exempted from the MPR and land-use regulations when located behind a levee system that has been recognized by FEMA as providing protection against the one percent annual chance flood

[1] The NFIP primarily insures residential properties (single- and multifamily homes) but does insure a smaller number of commercial properties.
[2] As of December 2012.
[3] As of June 2012.
[4] One percent annual chance flood, base flood, and the 100-year flood are terms commonly used to describe a hydrologic event that has a 100-year (average) recurrence interval. That is, a flood that has in any year a 1 in 100 chance of being equaled or exceeded.
[5] See Code of Federal Regulations, Title 44, Section 59.1 (44 CFR §59.1).
[6] See 44 CFR §59.1.



Copyright National Academy of Sciences. All rights reserved.

event, that is, "accredited." Certification is the technical evidence provided by a levee owner to FEMA demonstrating that the levee system meets the requirements to reduce risk from at least the one percent annual chance flood.[7]

Recognizing the need for improving the NFIP's treatment of levees, FEMA officials approached the National Research Council's (NRC) Water Science and Technology Board and requested this study. The NRC responded by forming the ad hoc Committee on Levee and the National Flood Insurance Program: Improving Policies and Practices, charged to examine current FEMA treatment of levees within the NFIP and provide advice on how those levee-related policies and activities could be improved. The study addressed four broad areas—risk analysis, flood insurance, risk reduction, and risk communication—regarding how levees are considered in the NFIP. Specific issues within these areas include current risk analysis and mapping procedures behind accredited and nonaccredited levees, flood insurance pricing and the MPR, mitigation options to reduce risk for communities with levees, flood risk communication efforts, and the concept of shared responsibility. For the full statement of task, see Chapter 1, Box 1-4. The report's principal conclusions and recommendations are highlighted in bold in this Summary.

## TREATMENT OF LEVEES WITHIN THE NATIONAL FLOOD INSURANCE PROGRAM

After the establishment of the NFIP, efforts to identify the nation's flood hazard began. Because many flood protection works, mostly levees, had, in the past, successfully passed what had been considered a one percent annual chance flood, both local communities and contractors raised the issue of excluding areas protected by a one percent annual chance or greater structure from the SFHA. As a result, areas behind levees were not labeled on early flood maps as being within the SFHA where levees had provided or were thought to have provided protection from the one percent annual chance flood or had been constructed by U.S. Army Corps of Engineers (USACE) to withstand the one percent or higher annual chance flood.

As the program evolved, levees were required to be certified and accredited in order for the areas behind them to be mapped out of the SFHA. When a levee in a community provides less than 1 percent protection, it is not shown on a FIRM as providing protection and the flood risk is assessed as if the levee does not exist. Not recognizing levees that are not accredited on FIRMs is referred to in this report as a "without levee" analysis. An all-or-nothing approach, this either gives communities credit for a one percent annual chance levee (through exclusion from the SFHA and exemption from the MPR, etc.) or does not; that is, a levee that is not accredited is not recognized on the FIRM.

In 2003, with the support of communities and organizations to improve the quality of flood mapping, FEMA moved forward with a program to modernize maps by converting to a digital format and, when possible, providing a new engineering analysis. During "Map Mod," FEMA officials became concerned that the levees encountered in this process might not meet the one percent annual chance standard despite being labeled as such. Affected communities, faced with the potential movement of the previously exempt areas into the floodplain and the mandatory requirement to purchase flood insurance at rates that might be the same as areas without protection, argued that some credit should be given to the presence of the deficient levees (i.e., some protection less than the one percent annual chance flood). Members of the Congress urged FEMA to discontinue use of the without-levee analysis in updating FIRMs. In agreement, FEMA is currently developing a new approach, the Levee Analysis and Mapping Procedure (LAMP), to replace the without-levee approach.

## MOVING TO FLOOD RISK MANAGEMENT AND A MODERN RISK ANALYSIS

Flood risk management represents efforts to continuously carry out analyses, assessments, and related mitigation implementation activities to reduce flood risk. It focuses on assessment of flood hazards, the consequences resulting from flooding, the significance of risks identified, and the development of risk management strategies to deal with flood risk, which is gaining momentum across the global floodplain management community. Effective flood risk management requires use of the best available science in its execution. A flood risk analysis is that

[7] Certification may be accomplished by a registered professional engineer or a federal agency with levee responsibilities.

Copyright National Academy of Sciences. All rights reserved.

analytical part of flood risk management that provides information about or quantifies consequences and probabilities of a flood event.

The current NFIP flood hazard analysis is a partial risk-based analysis used with respect to performance of levee systems, where many parts of the analysis are deterministic in fashion. A levee system that is not accredited is not considered in the analysis used to quantify flood risk, even though it provides some (potentially considerable) protection against floods. This encourages communities to construct levee systems that protect only to the one percent annual exceedance flood, enabling new development in areas with significant, but unquantified exposure to catastrophic flood risk. Thus, protection against the one percent annual chance flood event is the de facto design standard for most levees seeking accreditation in the United States, with limited attention given to the consequences ("residual risk") should a levee fail or be overtopped. Furthermore, levee systems that only marginally meet certification standards are vulnerable to loss of accreditation status. If not properly maintained, the performance of levee systems degrades over time due to erosion, rodent damage, subsidence, and other factors. Further, the frequency and magnitude of flood hazards can increase over time due to natural and anthropogenic causes. Loss of accreditation status can be very disruptive to the affected communities in terms of safety and insurance cost.

Thus, the current NFIP approach to flood hazard analyses leads to an incomplete description of the flood hazard in many areas. This is not unknown to FEMA or relevant stakeholders, including policy makers. A more modern approach to flood risk analysis addresses problematic aspects of the without-levee analysis.[8] The elements of a modern risk-based approach include:

- flood hazard analysis or an estimate of the frequency and magnitude of flooding;
- levee and other system component fragility analysis, which estimates structure performance as a function of flood levels;
- systems analysis, which includes all features that impact flooding along a levee system;
- levee breach and inundation assessment; and
- consequence analysis that estimates the damage to structures that are inundated in a flood event.

All elements of this analysis are subject to uncertainty; the evaluation of these uncertainties is also integral to a modern risk analysis.

The modern risk-based analysis offers several advantages. It would provide an in-depth technical evaluation of flood hazards and directly account for the performance of levee flood protection systems whether accredited within the NFIP or located within an NFIP community. It would account for all features of the flood protection system (levees, gates, other structures) that significantly affect flood risk, as long as they meet minimum design, operation, and maintenance standards. Hence credit could be given for establishing flood insurance rates for flood protection systems that do not protect to the one percent annual chance standard, but at the same time provide some level of protection. In other words, the modern risk-based approach acknowledges that risk across a floodplain varies across the landscape. It has the impact of softening, but not eliminating, the one percent annual chance decision line.

Also, a risk-based approach would estimate flood risk for lands protected by levee systems that do protect to the one percent annual chance standard or higher. In these circumstances, the risk analysis results would inform communities of the flood protection system limitations and potential vulnerabilities, the actual flood risk being faced, and inform flood insurance ratings. Risk analysis results would also differentiate between protection provided by one percent annual chance levees and 0.2 percent levees. It would be able to recognize difference between low areas behind levees and higher ground. It would also provide guidance to the communities for development of new regulations that would encourage floodplain management. **The NFIP should move to a modern risk analysis that makes use of modern methods and computational mapping capacity to produce state-of-the-art risk estimates for all areas that are vulnerable to flooding.**

[8] In this report the term "modern" is used to indicate characterization and analysis of risk using the best science available to the risk management field.

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 604 of 858



### Levee Analysis and Mapping Procedure

The LAMP approach is based on sound algorithms and is a reasonable first cut at dealing with the potential contributions of levees that do not meet the standards for protection against the one percent annual chance flood. LAMP represents a response to the issues raised by members of Congress that, given funding and personnel constraints, will likely take several years to fully implement. However, it represents a diversion from the need to move the NFIP to a modern risk-based analysis. Because it would be highly unlikely for the NFIP to move forward concurrently with implementation of LAMP and development of a modern risk-based approach, a move to LAMP would simply postpone the inevitable need to move the NFIP to the risk-based foundation that other agencies and nations have already endorsed. **FEMA should move directly to a modern risk-based analysis for dealing with areas behind levees and not implement the Levee Analysis and Mapping Procedure (LAMP).** Should a decision be made not to implement LAMP, dealing with the current situation is still necessary; interim steps are proposed in Chapter 4 of the report.

## INSURING PROPERTIES BEHIND LEVEES

Flood insurance is an essential part of the NFIP used to address catastrophic loss potential from floods. It provides a method for prefunding (usually over time) the adverse consequences of potential flood losses. FEMA evaluates the flood risk of policyholders and determines rates for the "full-risk" class through a balance of factors including the extent and type of flood hazard, the base elevation of the insured structure and the structure type,[9] the contents location (first floor, second flood, etc.), and whether or not the community participates in the Community Rating System (CRS)[10] that provides discounts for communities that actively manage their flood risk.

The notion of actuarial soundness in the context of the NFIP is somewhat subtle and elusive because of the differences between a government-run program with mandated discounts, no profit requirement, no significant interest income, and reliable, significant borrowing power and the private sector from which the notions of actuarial soundness arose and are routinely applied. The major structural drawback to the fiscal soundness of the NFIP is *not* actuarial unsoundness due to inappropriate or inadequate rate-setting methodology or inadequacies, but rather the fiscal unsoundness caused by not being able to apply actuarial principles uniformly across all classes. The NFIP mandated "discounted risk" class was anticipated to eventually decrease substantially over time, and this has indeed been the case.[11] Still, there are a substantial number of discounted policies in the NFIP. The difference between the full-risk premium for a discounted policy and the discounted premium for the policy is revenue lost to the NFIP (this lost revenue is not compensated for in any other part of the premium structure). FEMA is legally unable to raise premiums in a manner sufficient to allow the NFIP to be financially sound or to build a contingency reserve fund sufficient to pay for a catastrophic future loss. Without this ability, the NFIP is destined by law not by actuarial methodology inadequacy to run short of money in the long run, with occasional dramatic shortfalls. Furthermore, repetitive loss properties continue to drain the fiscal soundness of the NFIP. **The NFIP is constructed using an actuarially sound formulaic approach for the full-risk classes of policies, but is financially unsound in the aggregate because of constraints (i.e., legislative mandates) that go beyond actuarial considerations.** The Biggert-Waters Flood Insurance Reform Act directs adjustment of fiscal practices to move the NFIP to a more fiscally sound approach.

Risk-based insurance pricing is key to efficient and equitable financial transfer of the risk. With a modern

[9] Condominium, single- or multifamily home, residential or commercial use, number of floors, with or without a basement, ventilated crawlspace, etc.

[10] FEMA's Community Rating System (CRS) is a voluntary incentive program that encourages floodplain management activities exceeding the minimum NFIP requirements.

[11] The discounted risk class applies when (1) a structure was built before the flood insurance maps were available, that is, a "pre-FIRM" structure or built before December 31, 1974; (2) a structure was built in a V zone before 1981 and before maps that consider wave height were adopted in setting flood insurance rates; (3) a structure is in an AR or A99 zone for levees in the course of reconstruction or construction (and so their current actuarial risk does not correspond to their current risk charge); or (4) the policyholder participates in a group flood insurance policy. Currently, approximately 20 percent of NFIP policies are discounted policies.

Copyright National Academy of Sciences. All rights reserved.

risk-based analysis, a gradation of probabilities that can differ from property to property even within the same geographic area or flood zone can be applied. **Rate setting for properties behind levees, accredited or not accredited, should be improved by using a modern risk analysis method employing advances in hydrology, meteorology, and geotechnical engineering to more precisely calculate the probability of water inundation levels and the associated damage estimates throughout the area behind the levee in a graduated fashion.** This will replace the current approach and more appropriately reflect the risk.

## The Mandatory Purchase Requirement

When the NFIP was established, property owners could purchase insurance voluntarily. In 1973, given the limited voluntary purchase that had taken place to that date, the mandatory purchase requirement (MPR) was implemented to ensure that the exposure of the federal government through mortgages on properties within the SFHA was covered by insurance, thus decreasing the financial burden on the federal government for uninsured losses. Although the MPR applies to properties within the SFHA that hold a federally backed mortgage, apart from those behind accredited levees, the NFIP encourages all those living in areas subject to flooding to purchase insurance.

The effectiveness of the MPR can be explored by examining the percentage of those living within the SFHA who have insurance (i.e., market penetration) and the percentage of those living within the SFHA with a federally backed mortgage who have insurance (i.e., MPR compliance). Review of studies indicate that national market penetration in the SFHA is between 30 and 50 percent and national MPR compliance is between 50 and 78 percent. The more recent and more detailed information indicates that penetration and compliance are likely closer to the lower values in both ranges.

The development of market penetration and compliance estimates are confounded by several factors including varied structure type across assessment (single-family homes versus all residential structures), whether or not the structure owner carries a mortgage, and whether or not the structure is insured with a federal lender. Regardless, national market penetration and compliance studies call into question the efficacy of the MPR. **The current policy of mandatory flood insurance purchase appears to be ineffective in achieving widespread purchase of NFIP flood insurance policies.** To date, relying on federal supervisory agencies to oversee and lenders to require purchase has not achieved widespread compliance with the MPR. Extending the MPR to areas behind levees where there are large numbers of structures, incomplete determination of flood risk, and varied evidence supporting its effectiveness is imprudent. **At this time, there is no sound reason to institute mandatory purchase of flood insurance in areas behind accredited levees.**

A perception exists that if the NFIP simply sold more policies, the program's fiscal issues (e.g., debt to the U.S. Treasury) would be solved. However, simply adding new policies does not automatically improve the program's fiscal soundness. Adding new polices could lower the program's overall risk *if* the policies increased the program's diversification of risk acquired through those policies. However, adding new policies very well may increase the NFIP's overall risk through concentration of policies in, for example, high-risk areas such as the SFHA. Furthermore, adding new policies would also increase the program's exposure to risk accumulation, or the additive risk of multiple events occurring at the same time. If NFIP policies continue to be concentrated in the same high-risk areas around the country, the diversification of risk and the fiscal soundness of the program will remain relatively unchanged.

Upon implementation of a modern risk analysis, insurance rates will more accurately reflect flood risk behind a levee. If the insurance rate goes up, it indicates that the property is at more peril than previously understood to be; if the insurance rate goes down, it indicates the property is at less peril than previously understood to be. Thus, FEMA's moving to a modern risk-based analysis and pricing premiums accordingly will have an impact on NFIP policy purchase. (The Biggert-Waters Flood Insurance Reform Act directs full, risk-based premiums and elimination of certain discounts, also promoting a change to the NFIP that affects policy purchase.) More accurate pricing and more information created by a modern risk analysis has the potential to prompt additional policy purchase. Property owners would be more favorably inclined to buy flood insurance if individual risk is well known and understood and insurance rates are priced to match the probability of flooding and financial impact of flooding events. This includes areas behind levees, both accredited and not accredited, in the SFHA at large, and also non-

Copyright National Academy of Sciences. All rights reserved.

SFHA areas. It is likely that if a lender has more information through a risk-based analysis, the lender is more aware that requiring flood insurance purchase is in line with its fiduciary responsibility. However, this premise is challenged by nuances in risk communication principles, specifically, that awareness does not necessarily lead to actions to mitigate risk.

As the use of risk-based pricing becomes widespread, the thinking behind the necessity of the MPR in the SFHA may change, along with the decision of waiving the MPR behind an accredited levee. **A modern risk-based analysis has the potential to impact the purchase of flood insurance, diversify the NFIP's exposure to flood risk, and generate a fiscally sounder program. Once the risk-based approach has been put in place and matures, FEMA should review and study the necessity of the mandatory purchase requirement behind levees and throughout the SFHA.**

## IMPLEMENTING FLOOD RISK MANAGEMENT STRATEGIES

There is some level of risk to all locations within the floodplain. The magnitude of that risk is a function of the flood hazard, the characteristics of a particular location (e.g., elevation, proximity to the river or coast, and susceptibility to fast-moving flows and surges), measures that have been taken to mitigate the potential impact of flooding, the vulnerability of people and property, and the consequences that result from a particular flood event. The initial risk to an area is represented by the area's characteristics without consideration of mitigation and risk transfer measures and the vulnerability of the population. Mitigation and risk transfer measures reduce the overall risk to some degree, but it is impossible to completely eliminate risk, resulting in residual risk.

A flood risk management strategy identifies and implements measures that reduce the overall risk. Available measures include structural (levees, dams, pumps, etc.), nonstructural (elevation, relocation, etc.), and risk transfer methods, that is, insurance. In developing a flood risk management strategy, those responsible judge the costs and benefits of each measure taken and its overall impact in reducing the risk. Levees represent one method of reducing the impacts of flooding on a community or a region.

There are varied circumstances that dictate flood risk behind levees. These circumstances can include anything from proximity to the coast, local climate, population growth, existing infrastructure, to community preparedness. Some risk scenarios are associated with long time horizons, such as flooding associated with climate change, and might be less perceptible to the at-risk community compared with, for example, a design deficiency in a levee discovered during the Map Mod process. The importance of climate change and population growth is further highlighted when considering the future impact on the size of the nation's floodplain, both geographically and in terms of population, and the corresponding number of insurance policies needed in the floodplain.[12] Complicated scenarios arise as communities grapple with unique situations. A mix of flood management mitigation and risk transfer measures tailored to the risk of a particular community is the most effective flood risk reduction strategy. **There is a clear need for a comprehensive, tailored approach to flood risk management behind levees that (1) is designed and implemented at the local level; (2) involves federal and state agencies, communities, and households; (3) takes into account possible future conditions; and (4) relies on an effective portfolio of structural measures, nonstructural measures, and insurance to reduce the risk to those behind levees.**

**To reduce the flood risk to those behind levees, FEMA should encourage communities to develop and implement multimeasure risk management strategies for areas behind accredited levees.** This strategy would contemplate the full range of foreseeable flood scenarios involving levee overtopping or failure and future conditions. The development of new risk management analysis tools will facilitate the identification of risks and suggest feasible approaches to dealing with the risks to those behind levees.

Development and maintenance of supporting policies affecting the portfolio of mitigation measures are both critical and effective floodplain management strategies. In the case of levees, the principal regulatory document that establishes the procedures for inclusion of levees in the program is Title 44 of the *Code of Federal Regulations*, which contains several parts pertaining to levees in the NFIP. There is a need for revisions to this document that address the handling of embankments (i.e., railroads or existing roads) in a levee system, provide a unique

[12] Hydrologic nonstationarity associated with environmental change makes these uncertainties even more complex.

Copyright National Academy of Sciences. All rights reserved.

designation for areas behind accredited levees on FIRMs, require actions to verify to FEMA that an accredited levee maintains integrity, and expand requirements for maintenance to ensure the carrying capacity of the river channel.

A modern risk analysis and effective flood management strategy options require knowledge of the location, condition, and ownership of levees. Currently, the majority of the knowledge of the extent of levees in the United States is at the federal level. The USACE's National Levee Database (NLD) is the biggest single resource for levee data in the United States and currently includes more than 2,500 levees and associated structures (also known as levee systems) totaling more than 14,500 miles in length, catalogued in digital format. The FEMA Mid-Term Levee Inventory (MLI) database, designed to complement the NLD, contains data on 5,100 miles of NFIP-accredited levees and an additional 24,700 miles of other levees identified by FEMA.

There is currently no method to determine whether a levee in the NLD is also in the FEMA MLI except through a one-to-one comparison of certain levee characteristics. Because some data elements in the two inventories are different, USACE and FEMA have been attempting to manually look for overlaps, but have yet to complete the effort. A preliminary analysis by both agencies indicates that approximately 3,400 miles of levees, or 66 percent, may be operating under oversight of both agencies. There is a reasonable understanding of the number of federally owned and operated levees in the country, although opportunities for improvement exist. Efforts to inventory levees at the state level vary widely, with the majority of the states not having levee inventories. The definition of what constitutes a levee also varies widely in inventory efforts, ranging from structures built under federal and state supervision to other structures, such as embankments, highways, railroads, irrigation water and supply canals, that work to reduce flooding. A comprehensive inventory of the nation's levees, along with a consistent definition of a levee, is needed to ensure public safety and develop appropriate floodplain management strategies. The states have an important role in inventorying the number of levees within their respective borders. This information can then be combined with a federal inventory to create an accurate assessment and inventory of the nation's levees.

## RISK COMMUNICATION

Development of appropriate strategies for risk communication is part of the overarching formulation of flood risk management strategies. Challenges associated with the public perception of flood risk need to be considered when developing risk communication strategies, including:

- The meaning of the 100-year floodplain and, to a lesser degree, the one percent annual chance flood is often misunderstood.
- Awareness of risk does not always lead to actions to reduce or mitigate risk.
- People assume that flood control structures are "safe," with no need to take additional actions to mitigate risk.
- Experience with floods matters and influences the actions that residents and communities take to mitigate the impacts.
- People will seek advice from friends, family, and neighbors on the determination of risk and actions to reduce flood risk.
- Personalizing risk on the basis of the experience and feelings is more likely to motivate behavioral action than simply providing technical information about risks and consequences.

Communicating the concept of residual risk behind a levee presents an additional challenge. Furthermore, the variety of levee-related stakeholders, including several federal agencies with different roles and responsibilities who are sources and recipients of risk information, adds additional complexity. So, rather than one entity confronted with the challenge of communicating risk to the public, levee-related flood risk communication efforts face the challenge of presenting unified, effective communication among all the governmental agencies, as well as between agencies and the public.

Historically, there has been little information about hazards associated with levees available to local communities, other than Flood Hazard Boundary Maps and FIRMs that reflect only the flood hazard area (the area flooded by the one percent annual chance event). However, this is changing with continued efforts to communicate flood

Copyright National Academy of Sciences. All rights reserved.

risk behind levees, largely with nonregulatory products.[13] To be effective, risk communication efforts need to be anchored in several principles:

- delivered at the local level;
- tailored to individual households, communities, and other stakeholders;
- delivered from a credible and trusted source;
- long term;
- have consistent, correct, and nonconflicting content;
- encourage or motivate some behavior;
- account for the values of target audiences or communities;
- employ multimodal networks; and
- provide repeat messaging.

**FEMA and others involved in risk communication at all levels should incorporate contemporary risk communication principles in the development of flood risk communication strategies and implementation efforts.**

It appears that risk communication efforts surrounding NFIP levees have an advantageous window of attention during three situations: (1) after a flood disaster, (2) through the mapping programs, and (3) when a community participates in FEMA's CRS program. It also appears that during these three situations, in particular situations 1 and 2, considerable confusion and controversy or considerable success in communicating risk can occur. **FEMA should communicate flood risk through a collaborative approach that works with and provides strong support to local communities.**

## SHARED RESPONSIBILITY IN MOVING TO FLOOD RISK MANAGEMENT

Several federal agencies, state and local governments, and other stakeholders play important roles in managing the nation's flood risk. Federal roles are dictated by their legislated authorities and presidential guidance. As such, coordination challenges exist. Collaborative and coordinated efforts that share responsibility for levee-related flood risk across the federal, state, and local levels are not as robust as they could be. Increased coordination and cooperation among and between governmental agencies, state and local entities, and the public at large would result in increased effectiveness of and improved efficiency within the NFIP, and would improve the nation's approach to floodplain management and treatment of levees. Promising developments do exist, but more progress is necessary. A coordinated, national approach that shares responsibility across federal, state, and local entities is necessary to appropriately manage the nation's flood risk behind levees.

FEMA and USACE are challenged by different approaches to risk analysis. The technical and programmatic differences between FEMA and USACE as they relate to the evaluation of flood hazards and levee systems have been and continue to be an issue that compromises interagency communication and causes confusion and frustration in the local communities that work with the agencies and in the public that is being served. **FEMA and USACE should jointly develop a common, risk-based approach to levee assessment in a timely manner and apply this approach to all levees assessed by the two agencies. This includes a joint methodology, procedure, and where feasible, the sharing of models and other risk analysis tools.**

The utility of levee-related flood risk communication developed and communicated at the federal level is challenged by uncoordinated messaging. **One federal message using consistent terminology, transparent data, and open discussion and decisions about the determination of flood risk is critical to inform the affected communities who, in turn, communicate and manage risk at the local level. FEMA should assume a leadership role in providing direction for research, development, and release of flood risk communication products and maps.**

[13] The committee interprets regulatory flood risk communication products as FIRMs and nonregulatory products as all other FEMA products that communicate leveerelated flood risk.

Copyright National Academy of Sciences. All rights reserved.

## MOVING FORWARD

This report provides advice on the current treatment of levees within the NFIP. Key to this advice is the transition of FEMA to a flood risk management approach and the use of a modern, risk-based analysis of flood risk. This transition will, no doubt, be challenging. New or revised regulations, procedures, and training systems will need to be established, and clear, consistent messaging to those affected by the new approaches is critical. A modern risk analysis will bring about changes in insurance ratings and modify current perceptions of risk. Communicating flood risk in general and flood risk behind levees will require close collaboration among all levels of government and within governmental agencies. There are currently legal challenges and more will most likely arise. The appropriate balance between public and private investment will continually be considered. Despite these challenges, the advice in this report is provided to move FEMA's NFIP toward floodplain management anchored in a modern risk-based analysis, a move that is increasingly recognized as imperative in the floodplain management community.

Copyright National Academy of Sciences. All rights reserved.

Copyright National Academy of Sciences. All rights reserved.

# 1

# Introduction

The Federal Emergency Management Agency's (FEMA) Federal Insurance and Mitigation Administration[1] manages the National Flood Insurance Program (NFIP), which is a cornerstone in the nation's strategy to assist communities in preparing for and recovering from flood disasters. The NFIP was established by Congress with passage of the National Flood Insurance Act in 1968, because despite the nation's efforts to address flood hazards through construction of civil engineering works such as dams, levees, and floodwalls and seawalls, flood losses were rising and unwise development within floodplains was continuing. The Act was passed to reduce future flood damages through implementation of community floodplain ordinances that would control development in flood hazard areas, provide flood insurance for a premium to property owners, and, as a result, reduce federal expenditures for disaster assistance. The flood insurance is available only to owners of insurable property located in communities that participate in the NFIP.

Today, most of the nation's communities with significant flood hazards have joined the NFIP. Currently, the program has approximately 5,555,915 policies[2] in 21,881 communities[3] across the United States (Siamak Esfandiary, FEMA, personal communication, February 2013). Although community participation is voluntary, communities must agree to a floodplain management ordinance that requires that new buildings be built at or above the level of the one percent annual chance flood.[4] In turn, FEMA will issue Flood Insurance Rate Maps (FIRMs) and make flood insurance available throughout the community (FEMA, n.d.).

A key feature of the NFIP is that structures in areas within a community that are determined to be located within the one percent annual chance flood (100-year or base flood) floodplain are referred to as being within the Special Flood Hazard Area (SFHA) (Box 1-1). These areas are subject to mandatory flood insurance purchase requirements.

The SFHA is delineated on FEMA's FIRMs using topographic, meteorologic, hydrologic, and hydraulic information. It is difficult to estimate the degree of exposure to flood risk in the United States. FEMA currently estimates that 6.5 percent of U.S. housing units, or 5.8 percent of the population, are located in SFHAs, which equates to about 7.3 percent of the nation's area (Table 1-1).

Levees and floodwalls, hereafter referred to as levees, have been part of flood management in the United States since the late 1700s because they are relatively easy to build and a reasonable infrastructure investment. A levee

[1] See http://www.fema.gov/what-mitigation/federal-insurance-and-mitigation-administration-fima#0.
[2] As of December 2012.
[3] As of June 2012.
[4] The requirements related to this ordinance are found in Title 44 of the *Code of Federal Regulations*, including Parts 59 and 60.



Copyright National Academy of Sciences. All rights reserved.

**BOX 1-1**
**One Percent Annual Chance Flood**

One percent annual chance flood, base flood, and the 100-year flood, are terms commonly used to describe a hydrologic event that has a 100-year (average) recurrence interval, that is, a flood that has in any year a 1 in 100 chance of being equaled or exceeded. The National Flood Insurance Program (NFIP) refers to properties in the one percent annual chance floodplain as those in the Special Flood Hazard Area. An illustration showing the impact of a one percent annual chance flood on a natural floodplain with various levee heights is shown in Figure 1-1. Over the lifetime of a 30-year mortgage, this equates to at least a 26 percent chance that the property will be flooded if the property is in the one percent annual chance floodplain. Probability theory is used to derive the value 26 percent, where each of the 30 years is accounted for as having a one percent annual chance flood (USGS, 2010.)

Similarly, hydrologic events of any size are described using the same nomenclature, for example, the"50-year" or "500-year" describing events that have a 1 in 50 chance or 1 in 500 chance of occurring (2 percent annual chance flood and 0.2 percent annual chance flood, respectively). Levees are also classified in the same way; that is, a 100-year levee is of adequate height to withstand the one percent annual chance flood.

There is a degree of interchangeability in general use of these terms. However, the use of certain recurrence interval terms, such as the "100-year flood," can cause confusion because it is interpreted as a flood that occurs once every 100 years (USGS, 2010).




FIGURE 1-1 Illustration of the one percent annual chance flood (Q100) and the impact on a natural floodplain with various levee heights.

is a "man-made structure, usually an earthen embankment, designed, and constructed in accordance with sound engineering practices to contain, control, or divert the flow of water so as to provide protection from temporary flooding."[5] Levees are generally designed to control water up to a given water elevation and, unlike dams, levees do not typically have spillways to reduce structural damages when water levels exceed the design criteria and overtop the structure (Box 1-2). A levee system is a "flood protection system which consists of a levee, or levees, and associated structures, such as closure and drainage devices, which are constructed and operated in accordance with sound engineering practices."[6] Under NFIP regulations, homes and commercial buildings located in the SFHA

[5] See Code of Federal Regulations, Title 44, Section 59.1 (44 CFR §59.1).

[6] See 44 CFR §59.1. An expanded definition of a levee system, adapted from the National Committee on Dam and Levee Safety, is as follows: A levee system comprises one or more components that collectively provide flood risk reduction to a defined area. Breach or malfunction of one component within a system constitutes breach or malfunction of the entire system. The levee system is inclusive of all components that are interconnected and necessary to ensure exclusion of floodwaters from the associated leveed area. The leveed area may also be considered as the associated separable floodplain or separable consequence area. Structures and features include levee and floodwall sections, closure structures, pumping stations, culverts, interior drainage works, and other structures and features, such as highway and railroad embankments that function as components of the system whether or not intentionally constructed as part of the system.

Copyright National Academy of Sciences. All rights reserved.

TABLE 1-1 National Special Flood Hazard Area (SFHA) Population, Housing Units, and Square Miles Distribution

| | Total in SFHA | | | Total | |
|---|---|---|---|---|---|
| | Coastal | Riverine | Total | Outside SFHA | Total National |
| Population within SFHA (million) | 6.9 | 11.3 | 18.2 | 294.2 | |
| National percentage population in SFHA | 2.2 | 3.6 | 5.8 | 94.2 | 312.4 |
| Housing units within SFHA (million) | 3.8 | 4.9 | 8.6 | 124.7 | |
| National percentage housing units within SFHA | 2.8 | 3.7 | 6.5 | 93.5 | 133.3 |
| Area within SFHA (square miles) | 42,677 | 222,621 | 265,299 | 3,375,949 | |
| National percentage area in SFHA | 1.2 | 6.1 | 7.3 | 92.7 | 3,641,247 |

SOURCE: RAMPP (2012).

**BOX 1-2**
**Use of the Word "Protection"**

In the literature, the word "protection" is often used to describe a levee that "protects" against a one percent annual chance flood. For example, from 44 CFR §65.10 when describing levee design criteria, "For levees to be recognized by FEMA, evidence that adequate design and operation and maintenance systems are in place to provide reasonable assurance that protection from the base flood exists must be provided." This type of language leads to the inaccurate conclusion that levees are "safe" and protect, without fail, to the one percent annual chance flood. However, all levees, even accredited levees, can fail or be overtopped—that is, achieving zero risk is not a possibility. Thus, in trying to make areas safer, in reality, the potential for catastrophic losses is increased (Burby, 2006).

The use of the word protection is unavoidable in discussion of levee-related flood risk. However, it is important to keep in mind that although levees do offer "protection" from floodwaters, they only separate the area behind a levee from floodwaters until the point where the levee fails or is overtopped.

within a participating community may be exempted from the mandatory purchase requirement and land-use regulations when located behind a levee system that has been recognized by FEMA as providing protection against the one percent annual chance flood event, that is, accredited.

For a levee system to gain accreditation status, a community or other party must submit an accreditation package to FEMA (Figure 1-2). This package includes certification by a registered Professional Engineer (P.E.) or federal agency with responsibility for levee design that the levee system has been adequately designed and constructed to provide protection against the base flood according to the structural requirements of the FEMA criteria as found in Title 44, Section 65.10 of the *Code of Federal Regulations* (44 CFR §65.10; see Appendix A of this report for the full text of this regulation). Accreditation also requires an operation plan and a maintenance plan for the levee system, the details of which are also found in 44 CFR §65.10. FEMA's Procedure Memorandum 63, *Guidance for Reviewing Levee Accreditation Submittals*, discusses the process of review for compliance with 44 CFR §65.10 and accreditation (FEMA, 2010).

Levees can provide some flood control benefits that range from minor to substantial. For example, during record-setting floods in 2011, the levee system on the Lower Mississippi River was credited with preventing over $110 billion dollars in damages to the lands behind them (MRC, 2011). At the same time, no levee can provide absolute protection against all floods and failures of levee systems, such as those that occurred during Hurricane Katrina, which can cause billions of dollars worth of damages and threaten lives. All levees are subject to struc-

Copyright National Academy of Sciences. All rights reserved.




FIGURE 1-2 FEMA's levee system accreditation/recognition process.
NOTES: Recognition is used in parallel with accreditation in 44 CFR §65.10; design criteria for levee systems to be recognized by FEMA are provided in 44 CFR §65.10(b)(1)-(7).

tural failure. Thus, there are always risks to property, infrastructure, and inhabitants located behind levees, that is, residual risk (Box 1-3).[7]

The concept of residual risk behind levees confounds and complicates many public policy and investment decisions. For example, a levee may provide benefits in the form of flood damages prevented, but such benefits must be balanced against the costs of building and maintaining a levee and the potential costs of a levee being overtopped or failing. If a levee is capable of controlling the water flow of the one percent annual chance flood event, there is still a 26 percent probability that the levee will be overtopped at least once in the next 30 years. There is also some probability that the levee will not maintain its structural integrity as the flood waters rise against it, or that because of poor maintenance or operation it will not function as designed. Also, initial levee construction may have been faulty.

Moreover, residual risk generally changes over time with changes in land-use patterns, development, and hydrologic variability. If development behind a levee substantially increases, the consequences of a levee failure or overtopping will also substantially increase. If development upstream of the levee site increases, the rainfall

[7] Overtopping is the condition that occurs when floodwaters exceed the levee height. Levee failure is when the design component of a levee is reached. Overtopping and failure occur in a variety of scenarios related to the performance of the levee, including breach before or after overtopping, overtopping without a breach, and malfunction of system components (e.g., gates, pumping plants, or floodwalls). These scenarios result in different degrees of inundation, with failure causing the most severe flooding.

Copyright National Academy of Sciences. All rights reserved.

**BOX 1-3**
**Risk, Residual Risk, and Uncertainty**

Many definitions of risk (i.e. disaster risk) exist in the literature (Peduzzi et al., 2009; IPCC, 2012; NRC, 2012). A broad definition of risk is adopted in this report when dealing with physical hazards and their consequences. Risk is the potential for adverse effects from the occurrence of a particular hazardous event, which is derived from the probable combination of physical hazards (physical characteristics), the exposure and vulnerabilities of people and property subject to danger or damage from the hazard, and the consequences (impact or damage) caused by the hazard. In the context of this report, the physical hazard discussed is flooding.

Note, however, that in insurance nomenclature, risk is the term used to designate the loss consequence of the realization of the uncertain peril, and it may be financial or nonfinancial in nature (e.g., reputational loss). The cause of loss is called a peril, and a condition or situation that increases either the likelihood or severity of the peril occurring is called a hazard. This latter definition is used in Chapter 5 in discussing insurance rating.

Similarly, many definitions of residual risk exist in the literature (USACE, 2006; UNISDR, 2009). A broad definition of residual risk is adopted in this report. Residual risk is the risk that remains after considering the mitigating effects of structural, nonstructural, and other risk reduction measures. Residual risk is always present behind a levee, because no levee is fail-safe.

Determination of risk requires analyses that are dependent on knowledge of the factors that influence the risk. There is uncertainty connected with the definition of these factors. A 2010 National Research Council committee examining risk for the Department of Homeland Security found that

> uncertainty is always present in our ability to predict what might occur in the future, and is present as well in our ability to reconstruct and understand what has happened in the past. This uncertainty arises from missing or incomplete observations and data; imperfect understanding of the physical and behavioral processes that determine the response of natural and built environments and the people within them; and our inability to synthesize data and knowledge into working models able to provide predictions where and when we need them. (NRC, 2010)

The specific nature of the elements of uncertainty are examined in detail in Chapter 3.

runoff into the river and the level of the flow increase. An additional challenge to federal, state, and local officials is that the concept of residual risk behind levees causes confusion for residents living or working behind levees. Because areas behind the 100-year levee are not shown on FIRMs as subject to the one percent annual chance flood and residents are not subject to the MPR, many residents assume that they are protected against all flooding, not just the one percent annual chance flood.

Stationarity is the idea that hydrologic systems fluctuate in an unchanging envelope of variability. Water management systems have been designed on the basis of this assumption throughout the world (Milly et al., 2008). However, factors such as climate change, land use, and demographic change impact the water cycle and are causing the Earth's hydrologic system to depart from the historical behaviors (NRC, 2011). Changes in hydrology could dramatically change exposure to flood risk. Furthermore, nonstationarity means that the elevation of the one percent annual chance flood will change over time. For programs based on the one percent annual chance flood, this has the potential to cause conflict and confusion.

Copyright National Academy of Sciences. All rights reserved.

## THE CURRENT STUDY

In 1982, the NRC issued a FEMA-sponsored report regarding levee policies for use in administering floodplain management, insurance, and risk mapping aspects of the NFIP (NRC, 1982). The report's recommendations were taken into account in 1986 when requirements for levee system accreditation were established (44 CFR §65.10; see Appendix A). The regulations focus on requirements that must be met if a community or levee owner requests that a levee system be recognized on the NFIP FIRMs.

The most recent mapping techniques for accredited and not accredited levees were developed and published in 2002 (FEMA, 2002). During its Map Modernization Program or "Map Mod,"[8] funded for fiscal years 2003 to 2008, FEMA determined that analysis of the role of levees in flood risk reduction would be an important part of the effort and noted that the status of the nation's levees was not well understood and the condition of many levees had not been assessed since their original inclusion in the NFIP, if at all. FEMA also learned that a large number of accredited levees might no longer meet the requirement of 44 CFR §65.10 because of either structural deficiencies or insufficient information on which to base continued compliance with regulatory requirements. Deaccrediting a number of large levees that were previously accredited and making distinctions between a levee versus road or railroad embankments that have served as part of the levee system are topics with significant social and political ramifications and are top priorities for FEMA.

Recognizing the need for improving the risk assessment and mapping techniques for areas behind levees, improving regulations governing levees in NFIP, raising public awareness of the levee risk, and enhancing institutional relationships, FEMA officials approached the NRC Water Science and Technology Board and requested the present study. The NRC responded by forming the ad hoc Committee on Levee and the National Flood Insurance Program: Improving Policies and Practices (Appendix B). The committee's charge was to examine current FEMA treatment of levees within the NFIP and provide advice on how those levee-related policies and activities could be improved. The study addressed risk analysis, flood insurance, risk reduction, and risk communication regarding how levees are considered in the NFIP (Box 1-4).

This report offers conclusions and recommendations to improve the science and engineering behind the NFIP's treatment of levees. Often, nonscientific issues are integral to solving challenging questions such as those captured in the statement of task for this report, for example, available resources; social and cultural values; and a variety of federal, state, and local regulations and laws. Defining and adhering to the boundary between science and engineering and policy is challenging for scientists, decision makers, and stakeholder groups. There is a role for science and engineering to inform policy decisions, a role that is explored in this report.

The NFIP offers insurance to all property owners in communities that participate in the program regardless of where the property is located. This includes properties behind levees and those not behind levees but within the SFHA. This also includes geographic areas that are vulnerable to flooding that might extend beyond the SFHA. This report provides guidance on FEMA's treatment of levees in the NFIP, considering risk analysis, risk reduction, insurance rates, and risk communication. Many of the issues covered in this report are not limited to managing property and life risk behind levees—FEMA grapples with these issues throughout the SFHA and often beyond. Thus, some of the content of this report can be extended throughout both the SFHA and the surrounding floodplain despite the fact that it was written within the framework of levees. The report explicitly states when observations relate to the SFHA, rather than just the area behind levees. The report also distinguishes between the SFHA and the floodplain at large, when appropriate.

Despite relevance to the report, providing specific advice on some topics was determined to be outside of the scope of the statement of task. For example, the report does not provide conclusions or recommendations related to the appropriateness of the current standard for the NFIP (i.e., the base flood elevation or the one percent annual chance flood event). However, the report does provide perspective on the current view of this standard in the scientific literature and identifies efforts to utilize alternative standards. The report also does not specifically address fiscal issues associated with construction, maintenance, and upgrades of levees within the NFIP, other than to identify where such issues may arise. The report does not address the subjects of fiscal responsibility for disaster

[8] Map Mod was a 5-year program to modernize FEMA flood maps by converting from paper to digital format and updating out-of-date maps, when possible. Map Mod is discussed further in Chapter 2.

Copyright National Academy of Sciences. All rights reserved.

**BOX 1-4**
**Statement of Task**

An ad hoc committee will examine current FEMA treatment of levees within the National Flood Insurance Program, and provide advice on how those levee-related policies and activities could be improved. The study will address the following topics regarding how levees are considered in the NFIP: (1) risk analysis, (2) flood insurance, (3) risk reduction, and (4) risk communication. More specifically, within this framework the committee will consider the following key issues and topics:

(1) RISK ANALYSIS
- Current risk analysis and mapping procedures and guidelines of levees implemented to determine risk premium rate zones for flood insurance purposes.
- Existing Special Flood Hazard Areas (SFHA) and their corresponding risk premium rates for areas behind accredited and non-accredited levees.
- Existing requirements for levee accreditation under 44 CFR §65.10.

(2) FLOOD INSURANCE
- Flood insurance pricing options for areas behind levees.
- Direct annualized flood loss estimates for residential and commercial structures behind levees.
- Waiving mandatory flood insurance purchase requirements for areas behind accredited levees.

(3) RISK REDUCTION
- Floodplain management, building standards, and land use practices employed behind levees across the nation.
- Engineered overtopping and breaches as a risk reduction or mitigation measure for levee systems.
- Existing and proposed levee-related grants and personal assistance policies. How can communities maximize benefits and reduce risks by using these?
- Mitigation options for communities with levees to help offset risks as investments grow in them and in areas behind levees

(4) RISK COMMUNICATION
- Existing FEMA levee outreach activities, programs, and material.
- The concept of "shared responsibility" for flood risk management and how it might be promoted.
- Incentives for communities to participate in mitigation activities that reduce levee-related risks.
- Non-regulatory products that can complement regulatory products in terms of risk communication.

The study and report will examine the efficacy of these practices and policies, make observations regarding levee policies, and analyze options for improving FEMA's treatment of levees within the National Flood Insurance Program. All conclusions and recommendations will be grounded in physical and social science and engineering concepts and evidence.

assistance or the relationship between federal disaster assistance and flood insurance, flood damage mitigation, or "affordability" of levees for a community.

In the course of deliberations and information-gathering efforts, it became clear that use and interpretation of critical levee-related terminology varies across relevant stakeholders, in the scientific literature, and among committee members from different backgrounds. The committee adopted definitions for each relevant term, which are defined upon first usage and used consistently throughout most of the report; where terminology is not consistent,

Copyright National Academy of Sciences. All rights reserved.

the reasoning is discussed upon first usage. Appendix C contains a glossary of terms, and a list of acronyms is provided in the front matter of the report.

The Committee on Levees and the National Flood Insurance Program: Improving Policies and Practices met five times during the 20-month study period. In its information-gathering activities, the committee spoke to a variety of federal, state, and local flood experts and practitioners. Numerous persons contributed to the development of this report (Appendix D). The following report is a result of this work and contains consensus advice from the committee to help FEMA in pursuing its responsibilities related to levees in the context of the NFIP. The report is also designed to be of use to FEMA contractors, government agencies at all levels, various other entities, academics, and the public in understanding and dealing with risks from flooding in levee-protected areas.

The report is organized in eight chapters. Chapter 2 provides a history of and background information on the treatment of levees within the NFIP. Chapter 3 and 4 discuss the NFIP's approach to risk analysis, both currently and the committee's vision for the future. Chapter 5 explores the program's current approach to setting flood insurance rates and provides advice for improving the approach in the context of the committee's vision for risk analysis in the future. Flood risk management strategies, including mitigation measures, are explored in Chapter 6. Communicating flood risk behind levees is explored in Chapter 7. Finally, the shared responsibility at the local, state, and federal levels in managing flood risk and implementing the NFIP is discussed in Chapter 8. The report's conclusions and recommendations are highlighted in bold throughout the report.

## REFERENCES


Burby, R. J. 2006. Hurricane Katrina and the paradoxes of government disaster policy: Bringing about wise governmental decisions for hazardous areas. Annals of the American Academy of Political and Social Science 604: 171-191.

FEMA (Federal Emergency Management Agency). 2002. Guidance for mapping areas protected by levee systems. Appendix H in Guidelines and Specifications for Flood Hazard Mapping Partners. Available online at http://www.fema.gov/library/viewRecord.do?id=2206. Accessed August 7, 2012.

FEMA. 2010. Guidance for Reviewing Levee Accreditation Submittals. Procedure Memorandum No. 63. Available online at http://www.fema.gov/library/viewRecord.do?id=4331. Accessed January 14, 2013.

FEMA. n.d. Managing Floodplain Development Through the National Flood Insurance Program. Home Study Course. Available online at http://www.fema.gov/sites/default/files/orig/fema_pdfs/pdf/floodplain/is_9_complete.pdf. Accessed December 7, 2012.

IPCC (Intergovernmental Panel on Climate Change). 2012. Managing the Risks of Extreme Events and Disasters to Advance Climate Change Adaptation. A Special Report of Working Groups I and II, C. B. Field, V. Barros, T. F. Stocker, D. Qin, D. J. Dokken, K. L. Ebi, M. D. Mastrandrea, K. J. Mach, G.-K. Plattner, S. K. Allen, M. Tignor, and P. M. Midgley, eds. Cambridge, UK, and New York: Cambridge University Press.

Milly, P. C. D., J. Betancourt, M. Falkenmark, R. M. Hirsch, Z. W. Kudzewicz, D. P. Lettenmaier, and R. J. Stouffer. 2008. Stationarity is dead: Whither water management? Science 319: 573-574.

MRC (Mississippi River Commission). 2011. 2011 MR&T Flood Report. Available online at http://www.mvd.usace.army.mil/mrc/pdf/MRC_2011_Flood_Report.pdf. Accessed November 14, 2012.

NRC (National Research Council). 1982. A Levee Policy for the National Flood Insurance Program. Washington, DC: National Academy Press.

NRC. 2010. Review of the Department of Homeland Security's Approach to Risk Analysis. Washington, DC: The National Academies Press.

NRC. 2011. Global Change and Extreme Hydrology: Testing Conventional Wisdom. Washington, DC: The National Academies Press.

NRC. 2012. Disaster Resilience: A National Imperative. Washington, DC: The National Academies Press.

Peduzzi, P., H. Dao, C. Herold, and F. Mouton. 2009. Assessing global exposure and vulnerability to hazards: The Disaster Risk Index. Natural Hazards Earth System Science 9: 1149-1159.

RAMPP (Risk Assessment, Mapping, and Planning Partners). 2012. Analysis and Update of National Flood Hazard Layer Demographics and NFIP Policy and Claims Data. Project Report for Task Order #HSFEHQ-11-J-002. Washington, DC: FEMA.

USACE (U.S. Army Corps of Engineers). 2006. Risk Analysis for Flood Damage Reduction Studies. Regulation No. 1105-2-101. Available online at http://www.corpsnedmanuals.us/FloodDamageReduction/FDRID042_ER11052101Sumry.asp. Accessed November 27, 2012.


Copyright National Academy of Sciences. All rights reserved.

USGS (U.S. Geological Survey). 2010. 100-Year Flood—Its All About Chance. Haven't We Already Had One This Century? Available online at http://pubs.usgs.gov/gip/106/pdf/100-year-flood-handout-042610.pdf. Accessed March 12, 2013.

UNISDR (United Nations International Strategy for Disaster Reduction). 2009. UNISDR Terminology on Disaster Risk Reduction. Available online at http://www.unisdr.org/files/7817_UNISDRTerminologyEnglish.pdf. Accessed November 20, 2012.

Copyright National Academy of Sciences. All rights reserved.

Copyright National Academy of Sciences. All rights reserved.

# 2

# Treatment of Levees Within the National Flood Insurance Program

Along with the establishment of the National Flood Insurance Program (NFIP), the passage of the National Flood Insurance Act of 1968 established a requirement for the U.S. Department of Housing and Urban Development (HUD) to "identify and publish information with respect to all floodplain areas, including coastal areas located in the United States, which ha[ve] special flood hazards, within five years following August 1, 1968. . . ."[1] This direction led to the establishment within HUD and subsequently within the Federal Emergency Management Agency (FEMA) of programs to map flood-prone areas in communities wishing to participate in the NFIP.

As the NFIP and mapping began, there was no established standard for what constituted a special flood hazard area, although the one and two percent annual chance floodplains had been identified as benchmark levels of flood control in some efforts of the U.S. Army Corps of Engineers (USACE) and the Tennessee Valley Authority in connection with their floodplain management activities. In 1969, HUD asked the University of Chicago to convene a group of experts to recommend what might be a logical definition of the special flood hazard area. The group recommended that the one percent annual chance flood be considered *as an initial standard for the NFIP.* After some consideration within federal agencies, in 1971, HUD issued a rule establishing the one percent annual chance flood as the minimum standard for the regulation required by the NFIP, that is, the Special Flood Hazard Area (SFHA).

The Federal Insurance Administration (FIA), which had been established as an element of HUD, began mapping the nation's flood risk through contractors and federal agencies. Flood Hazard Boundary Maps (FHBMs), delineating the SFHA, and Flood Insurance Rate Maps (FIRMs), delineating the SFHA and risk premium zones, were established. Also, land was classified according to flood risk on FIRMs and FHBMs as high-, moderate-, or low-risk zones (Appendix E). The SFHA is considered high-risk, and this land is depicted as either Zone A or V (A, AE, A1-A30, AH, AO, AR, A99, V, VE, and V1-V30). Moderate- to low-risk areas, those outside the SFHA that are still subject to some level of flooding, are depicted as Zones B, C, or X. Those with undetermined flood risk can be classified as Zone D.

The mapping entities encountered existing flood protection works that were considered to have reduced the flood threat to the communities located behind them. Because many of these structures, mostly levees, had, in the past, successfully passed what had been considered a one percent annual chance flood, both local communities and the contractors raised the issue of excluding areas with a one percent annual chance or greater structure from

[1] The National Flood Insurance Act of 1968, §1360, 42 U.S.C. §4101.



Copyright National Academy of Sciences. All rights reserved.

**BOX 2-1**
**"Without-Levee" Analysis**

The practice of not recognizing nonaccredited levee systems on FIRMs, and recognizing areas behind these structures as part of the SFHA, is referred to in this report as FEMA's "without-levee" analysis. An all-or-nothing approach, it either gives communities credit for a one percent annual chance levee system, exclusion from the SFHA, and exemption from the mandatory purchase requirement or it does not; that is, a levee that is not accredited is not depicted on the FIRM as having any flood reduction impact. A levee system that is not accredited is not considered in flood hazard analyses to determine the reduction of risk behind the levee system, even though some risk reduction at a level below that offered by an accredited levee system might be provided.

the SFHA. Following 1973 congressional hearings that raised similar points, FIA concurred in this approach and authorized the removal of areas behind levees from the SFHA where the levees provided 100-year protection (Richard W. Krimm, personal communication, 2012; Box 2-1). It is not apparent that any regulations or rules were developed to formalize this practice.

Because the focus was on mapping the unprotected areas, little attention was given to the physical status of many of the levees. In many cases, there were no specific inspections or analyses of the levees. Their acceptance was based primarily on having been constructed by the federal government or having previously withstood a significant flood. In a 1974 amendment to the 1968 National Flood Insurance Act, the Congress affirmed the one percent annual chance flood as the minimum standard for the program. The amendment, known as the Brooks Amendment, was made a part of the Housing and Community Development Act of 1974[2] and also included provisions for allowing certain structures to be accredited if work was under way to achieve recognition.

While the one percent annual chance standard was being used in mapping areas subject to regulation under the Act, discussion continued between HUD and USACE over the appropriateness of the standard. In 1977, USACE indicated to HUD that setting the design of levees in urban areas at the one percent annual chance level could be imprudent because that is not a high degree of protection (IFMRC, 1994). At the same time, senior engineering officials within HUD recommended to FIA management that it strongly consider a federal policy that would recognize only levees designed to provide protection against the standard project flood (SPF)[3] (Crompton, 1977). USACE recommended use of a larger design flood such as the SPF for new levees (Wilson, 1978). USACE headquarters also issued guidance to its field elements indicating "on the assumption that exceedance of the design flow would cause a catastrophe, the standard project flood (SPF) is the desirable minimum level of protection that should be recommended for high levees, high floodwalls and high velocity channels in urban areas" (Wilson, 1978).

In 1977, Executive Order 11988 was issued, requiring federal agencies to "avoid to the extent possible the long and short term adverse impacts associated with the occupancy and modification of floodplains and to avoid direct or indirect support of floodplain developments wherever there is a practicable alternative. . . ." It required each agency to "provide leadership and take action to reduce the risk of flood loss, to minimize the impacts of floods on human safety, health, and welfare, and to restore and preserve the natural and beneficial values served by floodplains in carrying out its responsibilities . . . ."

In 1979, responsibility for the NFIP was transferred from HUD to the newly established FEMA, and FIA became a part of FEMA. In 1980, the FIA administrator recommended to the FEMA director "consideration of a standard in excess of the 100-year flood, such as the Standard Project Flood, for local protection works to be recognized by FEMA." The FIA administrator also noted that USACE had recommended this to FIA (Jimenez, 1980). FIA's concerns were focused on the following:

[2] Public Law 93-383.

[3] The SPF is a derived discharge estimate that represents a flood that can be expected from the combination of the most severe meteorologic and hydrologic conditions that are considered reasonably characteristic of a region (USACE, 1965).

Copyright National Academy of Sciences. All rights reserved.

- "It is estimated that levee overtopping or failure [was] involved in approximately 1/3rd of all flood disasters;
- "The 100-year flood is generally found to be a low design standard for structures protecting densely populated areas;
- "Only a fraction all earthen levees built at the computed hundred year flood elevation can be expected to provide protection to the true 1 percent elevation;[4]
- "The degree of protection to be expected from a 100 year levee is less than that obtained by elevating individual buildings to hundred year flood elevation;
- "Crediting a levee with protection against the hundred year flood would remove essentially all NFIP floodplain management requirements;
- "Results of USACE nonfederal dam inspections suggest that a large percentage of private or locally built levees as well as dams are or can be expected to be poorly designed and maintained" (NRC, 1982).

FEMA was also concerned that "the use of a 100 year standard was encouraging construction of levees to the 100 year design level for the sole purpose of removing an area from the special flood hazard designation" (Jimenez, 1980).

## MOVING AHEAD WITH LEVEES IN THE NFIP

As FEMA worked to integrate levees into the NFIP, the White House, the Congress, and FEMA directed that several studies be conducted to provide insights into the role of levees in the NFIP. Recommendations from these studies are found in Appendix F, and summaries of the most relevant are found in subsequent paragraphs in this chapter.

### The 1982 National Research Council Study

As a result of concerns within FEMA and USACE in the late 1970s, FEMA issued an interim levee policy in 1981 and asked the National Research Council (NRC) to examine the levee issue and recommend provisions for a "comprehensive levee policy for use in administering floodplain management, insurance, and risk mapping aspects of the National Flood Insurance Program" (NRC, 1982). In 1982, the NRC committee submitted its report to FEMA. The report contained recommendations covering engineering criteria for levee recognition, levee inspection and evaluation, requirements of levee owners, requirements of local communities, liability of local governments and levee districts, floodplain mapping approaches, and treatment of levees in the insurance aspects of the NFIP.

The NRC report concluded that because the basic objective of the NFIP was to mitigate flood damages and that the basic program prohibits construction below the 100-year level, FEMA should require construction of all new levees to at least the one percent annual chance flood. Existing levees that provided protection against 25-year or larger floods should be recognized for the purposes of reducing insurance rates. However, all levees that are given credit for reducing flood risks should meet standard minimum engineering criteria with respect to geometric parameters, freeboard,[5] soils and foundation, interior drainage,[6] closure devices, and rights-of-way. Recognizing the residual risk behind levees, the committee recommended that FEMA require, "purchase of flood insurance in all areas where the ground is lower than the unconfined 100 year flood level except where protected by levee built to contain the 500 year flood."

---

[4] The accuracy of the one percent annual chance flood elevation on a FIRM is affected by a variety of uncertainties in mapping data, for example, the choice of contour interval for terrain. Thus, the "true" one percent annual chance flood elevation is rarely, if ever, known (NRC, 2007).

[5] As defined in 44 CFR §59.1, freeboard is: "a factor of safety usually expressed in feet above a flood level for purposes of floodplain management. Freeboard tends to compensate for the many unknown factors that could contribute to flood heights greater than the height calculated for a selected size flood and floodway conditions, such as wave action, bridge openings, and the hydrological effect of urbanization of the watershed."

[6] The drainage that is required to evacuate rainwater from areas behind levees.

Copyright National Academy of Sciences. All rights reserved.

The committee also recommended that each levee be individually evaluated, hydrologically and structurally, and that FEMA should inventory all levees previously credited as providing protection from the one percent annual chance flood, set priorities, and schedule communities for restudy to reevaluate the levees.

As a follow-up to the NRC report and other internal actions, in 1983 FEMA initiated a system to maintain an inventory of levees, by community name, that were accredited as providing 100-year protection on NFIP maps. In 1985, FEMA issued regulations prescribing the criteria for levee recognition by the NFIP but did not reevaluate existing levees, alter the required level of protection, or move on other nonengineering recommendations (Galloway et al., 2006). The regulations were codified as Title 44, Section 65.10, of the *Code of Federal Regulations* (44 CFR §65.10; see Appendix A for the text of this section) and established that to be recognized as removing an area from floodplain regulation and mandatory purchase requirements in the NFIP, a levee must provide protection at the 100-year or higher level plus a specified level of freeboard; must meet engineering design standards similar to those used by the USACE; and must be properly maintained and operated under the control of a government entity. The regulations also require that a professional engineer certify the data submitted to support a given levee system's compliance with the structural requirements set forth in the regulation and must submit certified as-built plans of the levee. Where appropriate, a federal agency with responsibility for levee design may certify that the levee has been adequately designed and constructed to provide protection against the base flood. No provisions were made to reduce the rates for those behind levees providing less than one percent annual chance flood protection or to conduct periodic inspections, and 44 CFR §65.10 has remained unchanged since 1985.

## Interagency Floodplain Management Review Committee

From April to October of 1993, the Mississippi and Missouri rivers and their tributaries inundated the surrounding floodplain, causing one of the costliest and most devastating floods in U.S. history. The flood of 1993 brought new attention to the condition of levees both within and outside of the NFIP. In 1994, a White House–based committee studying the 1993 flood reported that activities in floodplains of the United States, even with levee protection, remain at risk, finding that during the Mississippi-Missouri river floods:

> • Many locally constructed levees breached and/or overtopped. Frequently, these events resulted in considerable damage to the land behind the levees through scour and deposition [of material from the river channel and the levee itself];
> • Levees can cause problems in some critical reaches by backing water up on other levees or lowlands;
> • The current flood damage reduction system in the upper Mississippi River Basin represents a loose aggregation of Federal, local, and individual levees and reservoirs;
> • Many levees are poorly sited and [as a result] will fail again in the future. (IFMRC, 1994)

The White House study committee also indicated that the SPF flood should be the target flood for population centers and critical facilities protected by levees and that the government should require those behind levees who provide protection against less than the SPF discharge to purchase actuarially based insurance. It also found that federal agencies should ensure proper siting, construction, and maintenance of nonfederal levees. No action was taken by either Congress or the administration on these recommendations.

## MAP MODERINIZATION AND LEVEE DECERTIFICATION

As a result of pressure from communities and professional organizations to improve the quality of flood mapping, the President proposed and the Congress, in 2003, authorized FEMA to undertake a 5-year billion-dollar program to modernize its maps by converting existing paper maps to a digital format and in the process, and where possible, provide new engineering analysis. As work began in 2004 on map modernization or "Map Mod," FEMA representatives became concerned that many of the levees encountered in the mapping process might not, under review, meet the standards of 44 CFR §65.10 and, as a result formed a committee to examine the issue. In April 2005, a small internal Interim Levee Coordination Committee reported that treatment of levees in Map Mod across FEMA regions was inconsistent and that guidance should be issued immediately to ensure that appropriate

Copyright National Academy of Sciences. All rights reserved.

information about levees was obtained and considered in the map modernization process. It also recommended that a levee coordination committee be established to address this issue (FEMA, 2005).

On August 22, 2005, a week before Hurricane Katrina (Box 2-2), FEMA issued Procedure Memorandum 34, Interim Guidance for Studies Including Levees, which established that as Map Mod was implemented, currently credited levees should be checked against the 44 CFR §65.10 criteria (see Appendix G). When combined with a requirement to review "grandfathered" levees, this action sought to ensure that the accreditation status for all levees in the program was validated. The memorandum further indicated that when the levee owner was not able to produce data or was unable to otherwise substantiate that the levee met criteria, the area protected by the levee would be mapped as being in the floodplain and the requirements for mandatory purchase of insurance and regulation would go into effect when the revised map became effective.

In 2005, the Interagency Levee Policy Review Committee was established by FEMA to develop further guidance on treatment of levees in the NFIP. Membership on the committee included representatives of 10 federal agencies.[7] The committee reported in 2006 that:

> • Many levees shown on current NFIP maps as providing protection from the 100-year flood have never been evaluated against the criteria of 44 CFR 65.10 . . . . For levees that are found not to meet 44 CFR 65.10, the areas behind the levees will be identified as SFHAs. The impacts on the community of such an action will be significant.
>
> • The protection afforded by many certified levees decays over time due to various factors, such as changed hydrology or channel characteristics, erosion or deterioration of the embankment due to rodents or tree growth, general lack of proper maintenance, subsidence, or partial levee failures. However, there is no mechanism in place to regularly verify continuing accreditation of levees against 44 CFR 65.10. . . .
>
> • FEMA does not certify levees, but rather relies on certification provided by Federal agencies or State, local, or other parties seeking accreditation on NFIP maps. . . . Frequently, communities do not have the requisite resources or technical expertise to properly evaluate the levees against the 44 CFR 65.10 requirements and will have to hire engineering firms to do this work. . . .
>
> • As Procedure Memorandum 34 is implemented, many levees ultimately will not meet the criteria of 44 CFR 65.10 and will have to be shown as "failed" on FIRMs. The performance of detailed levee failure analysis as required by . . . Guidelines and Specifications will be costly, particularly for countywide [digital flood insurance rate map (DFIRM)] conversion projects and in counties and communities with large numbers of levees. . . .
>
> • The regulatory requirements of 44 CFR 65.10 lack adequate specificity for minimum operation and maintenance standards. . . .
>
> • Risks in areas behind certified levees are not adequately communicated to map users. . . .
>
> • Current requirements treat levees in a binary manner—either they meet 44 CFR 65.10 or they do not. Therefore, residual risk is greatly under-represented, and differences in risk that may exist to those behind certified levees are disregarded. In addition, no distinction between graceful versus chaotic capacity exceedance exists in the way levees are mapped, and there is no identification of the most highly hazardous areas immediately behind/along levees in the event of levee failure. (ILPRC, 2009, pp. 22-23)

The Interagency Levee Policy Review Committee urged FEMA and, as appropriate, other federal agencies to take the following actions immediately:

> • When communities are not immediately able to document whether currently certified levees can be recertified and the levees are not known to be at risk, FEMA should notify the communities of the need for a more detailed examination of the levees and provide a specific schedule for that activity. FEMA should require these communities to notify all people in areas behind the levees of the reexamination and identify for them the residual risks and the lack of information about the levees.
>
> • FEMA should define, as a matter of policy, a new flood insurance zone (Zone XL) for areas behind levees that meet the requirements for inclusion in the NFIP. Zone XL would include those areas behind the levee that would be subject to inundation by the 100-year flood if there were no levee. The area between the 100-year and 500-year lines should be shown as a shaded Zone X.

[7] Representatives from six nongovernmental organizations and four states observed committee meetings.

Copyright National Academy of Sciences. All rights reserved.

## BOX 2-2
## Hurricane Katrina

Hurricane Katrina was one of the deadliest and costliest hurricanes in U.S. history. Forming over the Bahamas, Katrina crossed Florida as a Category 1 storm and strengthened in the Gulf of Mexico. It made landfall in southeastern Louisiana on August 29, 2005, impacting Louisiana as well as Mississippi, Alabama, Georgia, and the Florida panhandle to various degrees. The hurricane's storm surge that pushed ashore from the Gulf of Mexico was over 29 feet, the highest ever recorded in the United States. In total, over 1,700 people were killed and hundreds of thousands were displaced (New York Times, 2012).

The levee system protecting New Orleans, Louisiana, built by USACE and operated and maintained by the local levee districts, failed in the aftermath of Katrina, and a significant portion of the city and surrounding areas were flooded (Figure 2-1). The NFIP experienced an unprecedented number of claims, 212,235, in the 2005 calendar year and over $17 billion dollars in loss dollars paid.[a] The levee failure cast a spotlight on USACE, prompting litigation, congressional investigation, and a variety of investigations regarding the levee failure.

The impacts of Katrina have been long-lasting economically, environmentally, and from the perspective of human and societal welfare of the city and surrounding area. Levee-related policy was reformed; for example, the National Levee Safety Program Act (2007), which directs USACE to carry out activities to enhance the safety of U.S. levees, was amended, and the USACE Levee Design Manual (USACE, 2000) was revised to incorporate risk-based concepts into levee design.



FIGURE 2-1 Aerial photograph of flooding as a result of breached levees in New Orleans in the wake of Hurricane Katrina.

[a]See http://www.fema.gov/policy-claim-statistics-flood-insurance/policyclaim-statistics-flood-insurance/policy-claim-13-17.

SOURCE: Taken by Marty Bahamonde on August 29, 2005, available online at http://www.fema.gov/photolibrary/photoCollectionView.do?id=81, accessed December 6, 2012.

Copyright National Academy of Sciences. All rights reserved.

- FEMA should initiate the revision of 44 CFR 65.10 and other appropriate FEMA guidance and specification documents, to address the technical changes recommended [in] this report.
- As a matter of policy, FEMA should require levee sponsors to conduct annual inspections of their levee systems; biennially submit to FEMA the results of the annual inspections, levee system operation and maintenance records, and an assessment of the levee systems during any flood events that occurred within the reporting period; and every 10 years submit a report that recertifies the engineering and geotechnical conditions of the levee system.
- FEMA and USACE, recognizing the important State and local roles, should develop incentives and support mechanisms to ensure that State and local agencies effectively carry out their responsibilities with respect to levee operation and maintenance.
- FEMA should exclude embankments, such as roads and railroads, from the accreditation of new levee systems unless those embankments are engineered specifically to provide damage/risk reduction from flooding and meet the engineering criteria required of levees. (ILPRC, 2006, pp. 61-62)

The Interagency Levee Policy Review Committee, recognizing the need for additional study and regulation development, urged FEMA to initiate action on the following longer term recommendations:

- . . . [R]evise 44 CFR 65.10 to phase out, over the next 10 years, the freeboard-based approach and to substitute the risk analysis methodology, with a 90-percent assurance of passing the 100-year flood, to determine the required levee heights. . . .
- . . . [T]ake immediate steps to examine the feasibility of not recognizing, for NFIP purposes, levees that protect highly urbanized areas unless they provide protection from events greater than 100-year floods (e.g., 500-year floods).
- . . . [A]ddress the challenge of the residual risk to structures behind levees by seeking legislative change to require property owners to purchase some level of flood insurance for structures behind levees (in the new Zone XL).
- FEMA, working closely with other Federal agencies, States, and communities, should examine how best to deal with climate change, sea-level rise, linked levee systems, and future development as major drivers of future conditions [hydraulics and hydrology (H&H)], with a goal of determining a BFE based on possible, but not fully quantifiable, future conditions.
- FEMA, in coordination with other Federal agencies, States, and communities, should initiate studies to determine how levees could be identified under a scientifically based levee risk-classification system (e.g., high, medium, or low). This system would be based on factors that include the potential depth of flooding in the event of failure or overtopping; the type and density of development in protected areas behind the levee; steps taken to ensure that levee failure does not occur when the levee capacity is exceeded (overtopping); warning times; and the number and types of egress so that people who may be inundated may move out of harm's way. This levee risk classification would be designated on the FIRM and published in the FIS report. (ILPRC, 2006, p. 62)

(For additional information regarding the advice of the Interagency Levee Policy Review Committee, see Appendix F.) In 2009, FEMA completed the initial Map Modernization Program, digitizing FIRMs covering areas containing 92 percent of the U.S. population (NRC, 2009).

### Report of the National Committee on Levee Safety

Title IX of the 2007 Water Resources Development Act (Public Law 110-114), the National Levee Safety Act, directed the establishment of a federal, state/tribal, local/regional, and private-sector committee on levee safety to "develop recommendations for a national levee safety program, including a strategic plan for implementation of the program." In January, 2009, the committee submitted its report to the Administration (NCLS, 2009).

The report provided a framework for developing a long-term approach to levee safety management, recommending establishment of a National Levee Safety Commission. It also recommended the development of a levee hazard potential classification system, tolerable risk guidelines,[8] and national levee safety standards; peer review

[8] Tolerable risk guidelines "categorize the nature of risks in ways that can assist in assessing their acceptability or non-acceptability, and in prioritizing actions for reducing risks" (USACE, 2010).

Copyright National Academy of Sciences. All rights reserved.

of the FEMA levee certification process; development of a national levee risk communication campaign; establishment of a national levee rehabilitation, improvement, and flood mitigation fund; delegation of levee safety responsibilities to the states; and mandating purchase of risk-based flood insurance in leveed areas. Other recommendations can be found in Appendix F.

## LEVEE DEACCREDITATION

Issuance of Procedure Memorandum 34 (FEMA, 2005) and the potential of many levees under study at the time no longer being accredited caused a strong pushback from levee owners and affected communities. Recognizing the need to give those responsible for providing certification information the opportunity to gather that information, in September 2006, FEMA issued Procedure Memorandum 43, *Guidelines for Identifying for Provisionally Accredited Levees* (PAL), which provided a 2-year period for affected levee owners to complete those actions necessary to retain their accreditation (Appendix G). The Memorandum, which was reissued the following March, provides more detailed guidelines that allow

> mapping partners to issue preliminary and effective versions of DFIRMs while the levee owners or communities are compiling the full documentation required to show compliance with 44 CFR Section 65.10. . . . If the levee qualifies for the PAL designation, FEMA will provide the community 90 days to sign and return an agreement indicating that the full documentation for 44 CFR Section 65.10 will be provided within 24 months of the signed agreement.

The Memorandum also provided guidelines for levees whose maintenance was deficient, allowing time for these deficiencies to be remediated (FEMA, 2006).

In April 2009, FEMA issued Procedure Memorandum 53, *Guidance for Notification and Mapping of Expiring Provisionally Accredited Levee Designations* (see Appendix G). This Memorandum provided instructions to FEMA field units concerning the steps that were to be taken if PAL-designated levees had not completed the required activity within the 24-month period. In these cases, the mapping partners were instructed to map the area as being within the SFHA or as "without levee," thus removing areas previously exempted from compliance with mandatory insurance and regulatory actions from this status (FEMA, 2009).

Affected communities, faced with the potential movement of the previously exempt areas into the floodplain and the necessity to purchase flood insurance at rates that might be the same as those without any protection argued that some credit physically and fiscally should be given to the presence of the deficient levees in any analysis of without-levee conditions. In February 2011, 27 U.S. senators sent a letter to FEMA, urging the Administrator:

> "to use your current authorities to discontinue the Federal Emergency Management Agency's (FEMA) use of "without levees" analysis to determine new Flood Insurance Rate Maps (FIRMs) in cases where a final determination has not been made and an affected community objects to such analysis in favor of more precise methods of flood modeling . "Without levee" modeling methods assume that a levee or flood control structure that exists in physical reality does not exist for the purposes of modeling, reducing the precision or flood maps and eroding public confidence in the mapping process itself." (U.S. Senate, 2011)

At the same time, 49 members of the U.S. House of Representatives sent a similar letter to Administrator Fugate.

In response, FEMA Administrator Fugate directed FEMA staff to replace the without-levee modeling approach with a suite of methodologies that would be technically sound, credible, and cost-effective, and would better meet the needs of citizens while providing more precise results that better reflect the impact of levees on flood risk. This procedure would not replace the need for levee owners or the associated communities to remain engaged in flood risk management activities or change the existing requirements for them to provide levee certification information as outlined in 44 CFR §65.10 (Fugate, 2011a). The development and current status of this new approach, the Levee Analysis and Mapping Procedure, is discussed in Chapter 4.

In June 2011, testifying before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, FEMA Administrator Fugate pointed out that

Copyright National Academy of Sciences. All rights reserved.

> while FEMA is committed to working closely with communities to develop the most accurate flood maps possible, the current "in or out" nature of the SFHAs (one is either in an SFHA or not) has left the program with a perceived credibility problem, as there is no gradation of risk identified within a flood zone. (Fugate, 2011b)

### The Biggert-Waters Flood Insurance Reform and Modernization Act

The Biggert-Waters Flood Insurance Reform and Modernization Act of 2012 (heretofore known as the Biggert-Waters Act) was signed into law on June 29, 2012, extending the NFIP until September 30, 2017.[9] Reforms and modernization directives in the Biggert-Waters Act call for a variety of changes that apply to the NFIP, many of which are relevant to this report. These changes are discussed throughout the chapters, when relevant, and summarized here.

Section 100207 of the Biggert-Waters Act directs full, risk-based premiums or a "premium adjustment to reflect the current risk of flood" in area participating in the NFIP:

> any property located in an area that is participating in the national flood insurance program shall have the risk premium rate charged for flood insurance on such property adjusted to accurately reflect the current risk of flood to such property, subject to any other provision of this Act. Any increase in the risk premium rate charged for flood insurance on any property that is covered by a flood insurance policy on the effective date of such an update that is a result of such updating shall be phased in over a 5-year period, at the rate of 20 percent for each year following such effective date.

Related to this report, the FEMA administrator is also directed to contract with the National Academy of Sciences to study exploring methods for understanding graduated risk behind levees and the associated land development, insurance, and risk communication dimensions.[10]

The FEMA administrator is required to form a Technical Mapping Advisory Council to deal with map modernization issues.[11] This includes recommendations on how to "ensure that flood insurance rate maps incorporate the best available climate science to assess flood risks" and that the impact of sea level rise is considered. The Biggert-Waters Act directs FEMA to review, update, and maintain NFIP rate maps with respect to

(i) all populated areas and areas of possible population growth located within the 100-year floodplain;
(ii) all populated areas and areas of possible population growth located within the 500-year floodplain;
(iii) areas of residual risk, including areas that are protected by levees, dams, and other flood control structures;
(iv) areas that could be inundated as a result of the failure of a levee, dam, or other flood control structure; and
(v) the level of protection provided by flood control structures.[12]

The Biggert-Waters Act also requires FEMA to use the most accurate topography and elevation data available and "any relevant information . . . relating to the best available science regarding future changes in sea levels, precipitation, and intensity of hurricanes" and coastal inundation, land subsidence and coastal erosion when updating maps.[13]

Several requirements in the Biggert-Waters Act call for changes that adjust or study fiscal practices of the program. For example, the Act calls for phasing out both subsidies and grandfathering for some properties,[14] establishment of a reserve fund,[15] requiring the FEMA administrator to develop a plan for repaying the debt

[9] Moving Ahead for Progress in the 21st Century Act, H.R. 4348, Title II, Subtitle A, Flood Insurance Reform and Modernization, 112th Cong. (2012).
[10] Section 100231.
[11] Section 100215.
[12] Section 100216(b)(1)(A).
[13] Section 100216(b)(3).
[14] For example, subsidies for nonprimary residences, severe repetitive loss properties, and businesses.
[15] Section 100212.

Copyright National Academy of Sciences. All rights reserved.

largely incurred by Hurricane Katrina,[16] assess opportunities associated with privatization and reinsurance,[17] and imposition of minimum deductibles.[18]

The Biggert-Waters Act directs the study of the impact, effectiveness, and feasibility of amending the NFIP to include building codes as part of floodplain management criteria developed under NFIP.[19]

The administrator is called to contract with the National Academy of Sciences to study full-risk–based premiums and means-tested federal assistance in comparison with the current system of flood insurance rates and federally funded disaster relief:

> shall conduct . . . an economic analysis of the costs and benefits to the Federal Government of a flood insurance program with full risk-based premiums, combined with means-tested Federal assistance to aid individuals who cannot afford coverage, through an insurance voucher program. The analysis shall compare the costs of a program of risk-based rates and means-tested assistance to the current system of subsidized flood insurance rates and federally funded disaster relief for people without coverage.[20]

With respect to levee communication, the Biggert-Waters Act directs the administrator to enhance communication efforts. This includes outreach to states and local communities about map changes and associated insurance rate changes and education of property owners about continued flood risk even when no longer subject to the mandatory purchase requirement.[21] Interagency collaboration is also promoted. The Biggert-Waters Act directs the FEMA administrator and the secretary of the Army, acting through the chief of engineers, in cooperation with the National Committee on Levee Safety, to establish a Flood Protection Structure Accreditation Task Force to develop a process to better align the information and data collected by or for USACE's Inspection of Completed Works (ICW) Program with the flood protection structure accreditation requirements so that information and data collected for either purpose can be used interchangeably and information and data collected by or for USACE under the ICW Program are sufficient to satisfy the FEMA flood protection structure accreditation requirements.[22]

## The Past and Present

Over the past 40 years, the treatment of levees within the NFIP has been a continuous topic of discussion and often, of controversy. Many studies have examined what should be done to ensure that when levees are brought into the NFIP, their presence does not increase the risk faced by those who are located behind them. For fiscal, administrative, and political reasons, few of the recommendations from these studies have been fully adopted. The chapters that follow examine once again many of these recommendations, and offer new recommendations in the interest of improving the NFIP and floodplain management in the United States.

## REFERENCES

Crompton, F. M. 1977. Memorandum to Richard Krimm on HUD Policy on Levees, Engineering Division Recommendations. Washington, DC: HUD.

FEMA (Federal Emergency Management Agency). 2005. Interim Guidance for Studies Including Levees. Procedure Memorandum 34. Washington, DC: FEMA.

FEMA. 2006. Guidelines for Identifying Provisionally Accredited Levees. Procedure Memorandum 43. Washington, DC: FEMA.

FEMA. 2009. Guidance for Notification and Mapping of Expiring Provisionally Accredited Levee Designations. Procedure Memorandum No. 53. Washington, DC: FEMA.

[16] Section 100213.
[17] Section 100232.
[18] Section 100201.
[19] Section 100235.
[20] Section 100236(b).
[21] Section 100243.
[22] Section 100226.

Copyright National Academy of Sciences. All rights reserved.

Levees and the National Flood Insurance Program: Improving Policies and Practices
Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 631 of 858



Fugate, C. 2011a. Letter to Senator Thad Cochran regarding discontinuation of without-levees analysis. Washington, DC: FEMA. Available online at http://www.pnwa.net/new/Articles/Fugate%20response%20to%20Senator%20Cochran.pdf. Accessed March 7, 2013.

Fugate, C. 2011b. Testimony on the National Flood Insurance Program Reform, June 9, Before the Senate Committee on Banking, Housing, and Urban Affairs. Available online at http://www.banking.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=c6f08bf5-5daa-4406-b461-1781159ec9c1.

Galloway, G. E., G. B. Baecher, D. Plasencia, K. G. Coulton, J. Louthain, M. Bagha, and A. R. Levy. 2006. Assessing the Adequacy of the National Flood Insurance Program's 1 Percent Flood Standard. Washington, DC: American Institutes for Research. Available online at http://www.fema.gov/library/viewRecord.do?id=2595.

IFMRC (Interagency Floodplain Management Review Committee). 1994. Sharing the Challenge: Floodplain Management into the 21st Century. Washington, DC: IFMRC.

ILPRC (Interagency Levee Policy Review Committee). 2006. The National Levee Challenge: Levees and the FEMA Flood Map Modernization Initiative. Available online at http://www.fema.gov/library/viewRecord.do?id=2677. Accessed August 8, 2012.

Jimenez, G. M. 1980. Memorandum to John W. Macy, Director of FEMA; Subject: Levees, February 1. Washington, DC: Federal Insurance Administration.

NCLS (National Committee on Levee Safety). 2009. Recommendations for a National Levee Safety Program. Washington, DC: NCLS.

NRC (National Research Council). 1982. A Levee Policy for the National Flood Insurance Program. Washington, DC: National Academy Press.

NRC. 2007. Elevation Data for Floodplain Mapping. Washington, DC: The National Academies Press.

NRC. 2009. Mapping the Zone: Improving Flood Map Accuracy. Washington, DC: The National Academies Press.

New York Times. 2012. Hurricane Katrina. Available online at http://topics.nytimes.com/top/reference/timestopics/subjects/h/hurricane_katrina/index.html. Accessed December 10, 2012.

USACE (U.S. Army Corps of Engineers). 1965. Standard Project Flood Determinations, EM 110-2-14-11. Washington, DC: USACE.

USACE. 2000. Design and Construction of Levees. EM 1110-2-1913. Washington, DC: USACE.

USACE. 2010. Proceedings of the Workshop Exploration of Tolerable Risk Guidelines for the USACE Levee Safety Program. Institute for Water Resources Report 10-R-9. Washington, DC: USACE.

U.S. Senate. 2011. Letter to Administrator Fugate. Available online at http://www.fema.gov/library/viewRecord.do?id=4984. Accessed March 15, 2013.

Wilson, D. 1978. Letter to Richard Krimm. Washington, DC: U.S. Army Corps of Engineers.

Copyright National Academy of Sciences. All rights reserved.

No RR2.0-AR00014489

Copyright National Academy of Sciences. All rights reserved.

# 3

# Moving to Flood Risk Management and a Modern Flood Risk Analysis

Society has been attempting to deal with flooding for several millennia. Initially, those at risk of flooding moved out of the way of rising waters. If that became impractical, leaders would turn to methods that would control floods by keeping them away from the population through use of embankments, channels, and elevating structures. This emphasis on flood control began in the third millennia B.C. and continued through to the middle of the 20th century when it was recognized that structures alone could not overcome the flood challenges (Sayers et al., in press). In the mid-20th century, other tools such as floodproofing, building codes, land-use management, and early warning systems joined flood control structures in flood damage reduction efforts. However, as population and development grew, flood losses continued to rise and the need for the establishment of priorities for the use of scarce resources became apparent (Figure 3-1).

Following in the path of several centuries of experience in the insurance and financial industries, flood management professionals across the globe began to examine risk management methodologies that could be used to assess the flood hazards that had to be faced and the consequences that would result from flooding, and the relative significance of the risks that were identified. By the end of the 20th century, the concept of flood risk management had been widely accepted in Europe and was beginning to take hold in the United States. This evolution of approaches to dealing with floods is described in Figure 3-2.

Flood risk is a function of the characteristics of the hazard, the exposure to the hazard, the vulnerability[1] of that which is exposed, and the consequences that could occur should the hazard reach the exposed, and vulnerable elements of the potentially flooded area. Probabilities are a part of all elements of risk—the probability of the event taking place, the probability that the exposed area will be flooded, the probability that the flood mitigation systems in place will successfully reduce vulnerability, the probability that the people and property in the target area will remain in the area and be subject to flooding, and the probability that they have insurance, etc. Flood risk management represents comprehensive efforts, to *continuously carry out analyses, assessments, and related mitigation implementation activities to reduce flood risk* (FLOODsite, 2004; Sayers et al., 2012).

Movement to flood risk management requires that those responsible enter into an iterative process that seeks to identify the hazards faced by the community and assess the exposure, vulnerability, and potential consequences of these hazards should a flood event occur. Provided with this information, the community then develops and

[1] Vulnerability is "the potential for harm to the community and relates to physical assets (building design and strength), social capital (community structure, trust, and family networks), and political access (ability to get government help and affect policies and decisions). Vulnerability also refers to how sensitive a population may be to a hazard or to disruptions caused by the hazard" (NRC, 2012b).



Copyright National Academy of Sciences. All rights reserved.




FIGURE 3-1 Estimated Total Flood Damages in the United States, 1934-2000, billions of dollars. Data adjusted to inflation by using the Construction Cost Index (CCI) from the McGraw-Hill Construction Engineering News-Record. To adjust each year's number, the 2011 CCI was divided by the CCI of the year in question and then multiplied by the raw damage amount for that year.
SOURCE: NOAA (2012).




FIGURE 3-2 The evolution of flood management practice through history. It can be anticipated that in the years ahead, advances in technology will provide capabilities that will permit more effective and efficient capabilities to identify and deal with risk. At the same time, increased communications capabilities will better prepare the population at large to understand and participate in the development and use of risk strategies.
SOURCE: Sayers et al. (in press).

Copyright National Academy of Sciences. All rights reserved.

Levees and the National Flood Insurance Program: Improving Policies and Practices




implements a strategy for coping with the risk. The strategy and implementation remain under continuous review, and when circumstances dictate, adjustments are made to the strategy. Risk communication is a continuous effort throughout the process (Figure 3-3). The effectiveness of the flood risk management process is linked to sound data and modern computational tools.

A risk analysis is a detailed examination:

> performed to understand the nature of adverse consequences from a particular event to human life, property, or the environmental; an analytical process that provides information about or quantifies probabilities and consequences of an unwanted event. Oftentimes broad definitions of risk analysis include examination of risk communication, risk perception, and risk management alternatives. (NRC, 2010)

A subset of a risk analysis, a flood risk analysis is an analytical process that provides information about or quantifies probabilities and consequences of a flood event. A flood risk analysis is a subset of the broader risk-based approach to flood risk management described throughout this report (Figure 3-3).

The use of risk-based methods to evaluate the performance of civil infrastructure systems such as nuclear power plants and dams (URS/JBA, 2008; ASME/ANS, 2009) and to serve as the basis for building codes (DOE, 2002), evaluation of terror threats (NRC, 2010) is now well established. Similarly, in the context of the insurance industry, risk analysis methods are used routinely to conduct portfolio assessments (AIR, 2012; RMS, 2012). The advancement of risk analysis methods to evaluate major infrastructure systems and extensive portfolios parallels the improvement in technology; software, hardware, and key datasets (e.g., Lidar, building inventories). As a consequence, software tools and hardware to support risk-based analyses have advanced to the point that evaluation of large portfolios has been performed (URS/JBA, 2008; IPET, 2009; AIR, 2012; RMS, 2012).




FIGURE 3-3 The flood risk management cycle illustrates the multistep flood risk management process.
SOURCE: Sayers et al. (in press), NRC (2012a), Moser et al. (n.d).

Copyright National Academy of Sciences. All rights reserved.

The use of risk analysis methods to evaluate flood risks and specifically to consider the performance of levees has been ongoing and improving for over a decade (USACE, 1996; URS/JBA, 2008; IPET, 2009). In the 1990s, USACE developed a probabilistic approach and software tools to evaluate flood damages (USACE, 1996). This methodology was used as part of planning studies to evaluate flood loss reduction benefits. The National Research Council (NRC) reviewed the USACE flood loss reduction methodology and reported on its findings in 2000 (NRC, 2000). The NRC found the USACE techniques a significant step forward and commended the agency for embracing risk analysis techniques. The NRC also noted that the USACE approach was technically sound, but aspects of the methodology as it related to the evaluation of uncertainties required improvement.

Following Hurricane Katrina, USACE established the Interagency Performance Evaluation Task Force (IPET) to determine the causes of levee and floodwall failures in New Orleans. Early work by the IPET, which involved over 300 professionals from government agencies, academe, and the private sector, used risk-based techniques in its analysis and the IPET recommended that USACE begin a move to risk-based approaches, to include geotechnical analyses in its work. Shortly thereafter, USACE announced that it would become a risk-based organization and that efforts would be made to accelerate the use of risk-based techniques not only in studies of future work but in analysis of existing structures (USACE, 2008).

Title 44, Section 65.10, of the *Code of Federal Regulations* (44 CFR §65.10) refers to the "risk study" that is performed when a community is seeking recognition of a levee system. Although the regulation does not specifically spell out what is meant by a risk study, in practice, it is a flood hazard analysis. The flood hazard analysis currently used within the NFIP to assess flood risk establishes a legislated level of protection (the one percent annual chance flood), using standard hydrologic methods that compute the expected elevation of that flood at a given location and assumes that any flood protection structures at that location designed to pass the one percent annual chance flood will in fact do so. To account for uncertainty, structures are required to be built to the one percent annual chance flood elevation plus a specified number of feet of freeboard.

To elaborate, under current NFIP policies a partial risk-based analysis is used with respect to performance of levee systems, where many parts of the analysis (e.g., the geotechnical component) are deterministic in fashion. A levee system is only recognized for its benefits if it is "accredited," meaning that the levee system has been determined to meet minimum design, operation, and maintenance standards that are consistent with a level of protection associated with the ability to pass the one percent annual chance flood, as specified in section 65.10 . In other words, the levee system is only considered if it performs perfectly up to standard; if not, it is ignored. Thus, if a levee system is accredited, its potential failure is included in the flood hazard analysis and it is simply considered as part of the river hydraulics. A levee system that does not meet accreditation standards is not considered in the analysis used to quantify flood risk, even though it provides some (potentially considerable) protection against flooding.

The current approach to flood risk analysis does not address certain components that are critical to a modern flood risk analysis. These include the uncertainties in the hydrology, the probabilities that a protection structure might fail at less than the design elevation, the consequences that will result from the actual flooding, and the probabilities of the success of actions such as, for example, evacuation of the elderly and disabled. Capturing these factors in the NFIP's approach to flood risk analysis is the source for the committee's advice that the program move to a modern risk-based analysis.

To elaborate on these issues, communities construct levee systems to protect up to the one percent annual chance flood, enabling new development in areas with significant, but un-quantified exposure to catastrophic flood risk. Thus, protection against the one percent annual chance flood event is the de facto standard for most levees in the United States, with limited regard to residual risk—that is, the consequence of capacity exceedence.[2] Furthermore, levee systems that only marginally meet certification standards are vulnerable to decertification. If not properly maintained, the performance of levee systems degrades over time due to erosion, rodent damage, and subsidence. Further, the frequency and magnitude of flood hazards can increase over time due to natural and anthropogenic causes.

[2] The State of California recently legislated that levees protecting urban areas should provide protection against the 0.5 percent annual chance flood (200-year) (California Government Code § 65007(l)).

Copyright National Academy of Sciences. All rights reserved.

Under current NFIP policies, lands behind accredited levee systems are not designated as being in a Special Flood Hazard Area (SFHA) and are not required to manage flood risk, even though the risk can be significant. Floods greater than the one percent annual chance flood can and do occur. Accredited levees can fail and have failed during smaller floods, causing catastrophic damage to structures and endangering residents. For example, in February 1986 the Linda-Olivehurst levee, a certified levee located on the Lower Yuba River in California, failed (Figure 3-4). Economic and life-safety risks associated with accredited levee systems are not accounted for in the current NFIP policy, which generally means that flood risks have not been effectively evaluated and, as a result, not effectively managed.



FIGURE 3-4 Images of the certified Linda-Olivehurst levee failure in 1986. The failure occurred after the flood had crested 8.6 feet below the levee crest. (*Top*) The breach was 170 feet wide and (*bottom*) entire neighborhoods were flooded in the surrounding community. The economic loss was $1.5 billion and lives were lost.
SOURCE: Rogers (2012).

Copyright National Academy of Sciences. All rights reserved.

The summation of these factors is that, under current FEMA policies and flood hazard analyses, the flood risk for many lands is not described completely, for a variety of reasons. This is not unknown to FEMA or relevant stakeholders including policy makers. In its 2006 report, the Interagency Levee Policy Review Committee recommended that within 5 years FEMA should, in the evaluation of levees, begin to use the risk-based hydrologic techniques being employed by USACE (ILPRC, 2006). In 2007, USACE, in coordination with FEMA, established the National Flood Risk Management Program, emphasizing the intention of the USACE to move to risk-based approaches to flood management. In 2009, with the creation of the Risk MAP program, FEMA identified risk-based analysis as a critical element in efforts to accurately identify the risk to those who occupy flood-prone areas.[3] As indicated in Chapter 2, the Biggert-Waters Act placed emphasis on risk analysis in NFIP activities and directed the formation of the USACE-FEMA Flood Protection Structure Accreditation Task Force to better coordinate the data development of the two agencies in levee accreditation.[4]

## ADVANTAGES OF A MODERN RISK-BASED APPROACH TO FLOOD RISK ANALYSIS AND INSURANCE

In this report, a modern flood risk analysis is defined as a risk analysis using the best available science and analytical methods to evaluate flood risk. This is more precisely defined as an analysis where the likelihood of adverse consequence (loss, personal injury) is quantitatively evaluated, taking into account

1. the likelihood of flood events occurring (the randomness of future events);
2. the likelihood that the capacity of levee and other flood protection systems may be overwhelmed by the flood (be overtopped) or fail (the randomness of structure performance for given levels of loading), leading to flooding of protected areas; and,
3. given flooding has occurred, an assessment of the consequences that occur.

Each element of the analysis is subject to uncertainty; neither the chance that different-size flood events can occur nor their magnitude can be estimated exactly—they are uncertain. These uncertainties and the related implications to the estimate of risk are quantitatively evaluated in a modern risk-based analysis.

There are a number of clear and specific attributes of a flood risk analysis that are not inherent to the definition, but at the same time, define what it means to perform such an analysis. For instance, the analysis considers the occurrence and consequences for a full range[5] of flood events that can occur, impact a community, and affect the assessment of insurance rates; it models and analyzes the hydrologic system, including levees and flood protection systems as systems, physically and logically integrated features that impact the outcome of future events; and it quantitatively evaluates the sources of uncertainty that affect the results and the estimation of future losses.

The ILPRC (2006) and many others (Appendix F) recommend that the NFIP should move to implement a more complete approach to the risk analysis that is the cornerstone of its mapping and insurance program. The committee concurs with these recommendations. A modern risk analysis would take advantage of new computational and mapping capacity to produce state-of-the art risk estimates for all areas that are vulnerable to flooding hazards. The analysis would provide a foundation for the NFIP to directly evaluate flood hazards and the performance of levee and other flood control systems and assess the consequences of flooding using sound engineering assessment and scientific and probabilistic methods. Specifically, the modern risk analysis would

[3] Although Risk MAP is focused on new and better analysis to support existing criteria and methodologies of the NFIP, this focus does not prevent the program from considering risk in the broader sense. The committee considers this program an important step in FEMA's attempt to move toward risk-based analysis.

[4] Section 100221, Interagency Coordination Study.

[5] The term "full range" is used in general terms to reflect that the likelihood of small as well as large flood events are considered in the analysis, not just a single event. The range that is considered should be broad enough to include the frequency and consequences of events that are meaningful to floodplain management and determination of insurance rates.

Copyright National Academy of Sciences. All rights reserved.

- provide direct engineering- and reliability-based assessment of the performance of flood protection systems in the evaluation of flood hazards in protected and unprotected areas;[6]
- account for the performance of risk reduction that is attributable to nonstructural measures;
- provide a means to establish an insurance program that is based on a continuum of flood risks as opposed to the current approach that is partially deterministic;
- offer a clear and informed basis for risk communication;
- provide a reliability-based means for the assessment of levees and flood protection systems and their integrity;
- improve the long-term stability of flood hazard and risk estimates that are a basis for insurance pricing, presuming that uncertainty and changing conditions are accounted for properly throughout the analyses;
- require that levees and appurtenant structures and subsystems be evaluated and modeled as part of flood protection "systems" whose reliability has a significant impact on the flood risks that communities face;
- afford the opportunity for communities and others to understand their flood risks at the community level and to assess the economic benefit of alternative floodplain management options; and
- provide risk information at a community as well as an individual property scale, which would offer the opportunity for communities to more clearly understand the value of community participation in the NFIP.

Such an analysis would provide an in-depth technical evaluation of flood hazards and directly account for the performance of levee flood protection systems, whether accredited within the NFIP or located within an NFIP community (i.e., levee systems that protect against the one percent annual chance flood or not). It would account for all elements of the flood protection system (levees, gates, other structures, etc.) that significantly affect flood risk, as long as they meet minimum design, operation, and maintenance standards. Hence credit could be given when establishing flood insurance rates for flood protection systems that do not protect to the one percent annual chance standard (or any new standard), but at the same time provide some level of protection. Risk analysis results would also differentiate between protection provided by levees that protect to the one percent annual chance flood and higher, for example, 0.2 percent levees. It would be able to recognize the difference in risk between low areas behind levees and higher ground.

In addition to the foregoing, a risk-based analysis offers other advantages. A modern risk-based analysis will account for the uncertainties that affect the quantitative representation of the flood hazard and the estimated performance of flood protection systems. The current analysis for flood risk estimation neglects significant sources of uncertainty in the hydrologic and hydraulic modeling and it does not account for any aspect concerning the performance of flood protection systems other than the binary aspect (meets or fails to meet criteria). And it does not account for uncertainties in the consequences of flooding. The proposed modern flood risk analysis directly accounts for these uncertainties, building on techniques that have been developed and applied in the evaluation of risks associated with other natural phenomena (e.g., earthquakes) and that have been used in the flood and levee areas (USACE, 2006; URS/JBA, 2008; IPET, 2009).

In a broader context, utilizing a modern risk analysis will provide a sound foundation for transitioning to risk-informed floodplain management. For example, it will provide flood hazard and risk information (at the individual property and at the community level) to communities in areas protected by levees and will identify their risk. The present system has implied to communities that live behind accredited levees that they are "safe." This implication and the lack of specific risk information can be addressed with risk analysis products that are designed, with the support of risk communication experts, to better inform communities and decision makers about flood risks. Also, a modern risk analysis would provide guidance to the communities for development of new strategies that would encourage wise floodplain management.

In addition to advancing the technical basis for flood risk analysis, the approach described here is, in many ways consistent with the methods being developed and implemented by USACE (Box 3-1). However,

[6] The terms "reliability" and "performance" are used differently across the flood risk community. For the purposes of this report, the geotechnical behavior of levees is referred to as performance. Reliability is used to refer to the likelihood under a given condition that the levee or levee system will perform in a way for which it was designed (IPET, 2009).

Copyright National Academy of Sciences. All rights reserved.

## BOX 3-1
## USACE Risk-Related Guidance

USACE began to develop an approach to using modern risk concepts in the evaluation of flood management projects in the early 1990s. In 1996, the agency published its first formal guidance document on risk, *Risk-Based Analysis for Flood Damage Reduction Studies* (USACE, 1996). This manual describes how the risk concepts would be used in USACE flood damage reduction studies in the conduct of hydrologic, hydraulic, geotechnical, and other analyses. The manual became the standard for conduct of hydrologic and hydraulic analyses for planning studies but was not adopted by the geotechnical and other communities within USACE. In 2000, USACE issued *Design and Construction of Levees* to promulgate the basic principles that should be used in design and construction of levees (USACE, 2000). That manual noted the use of a risk-based approach and hydrologic and hydraulic design, but indicated that geotechnical would continue to use a deterministic methodology.

In 2006, in the wake of Hurricane Katrina, USACE issued *Risk Analysis for Flood Damage Reduction Studies*, to update the 1996 manual on risk-based analysis, noting that

> The ultimate goal is a comprehensive approach in which the values of all key variables, parameters, and components of flood damage reduction studies are subject to probabilistic analysis. Not all variables are critical to project justification in every instance. In progressing toward the ultimate goal, the risk analysis and study effort should concentrate on the uncertainties of the variables having a significant impact on study conclusions. (USACE, 2006).

Structural and geotechnical analyses were to be included in overall risk-based analyses.

In 2006, in the wake of levee failures during Hurricane Katrina, USACE directed the conduct of an evaluation of the performance of the New Orleans hurricane protection system. The results of this evaluation, which was carried out by the Interagency Performance Evaluation Task Force, highlighted the need for the use of modern risk analyses in the design and construction of levees and related flood damage reduction structures. This evaluation led to the establishment of the USACE Levee Safety Program with the mission "to assess the integrity and viability of levees and recommend courses of action to make sure that levee systems do not present unacceptable risks to the public, property, and environment." In response to congressional and administration direction, it also initiated a levee inventory project that has been transformed into the National Levee Database (NLD) (see Chapter 6).

Faced with the need to evaluate many levees that were part of both the USACE and NFIP programs, in 2010, USACE issued the *USACE Process for the National Flood Insurance Program (NFIP) Levee System Evaluation*. This document provided guidance to field activities on the evaluation of NFIP levees to determine if USACE would certify that the levees met the standards of 44 CFR §65.10. The document indicated that it was "USACE policy to apply a probability and uncertainty analysis framework to NFIP levee system evaluations." It noted however that, "Probability of exceedance and uncertainty-based methodologies are under development and emerging for structural and geotechnical engineering elements but are not yet sufficiently mature for direct application in NFIP levee system" (USACE, 2010).

In 2008, USACE established a Risk Management Center to develop policies, methods, tools and systems to enhance its risk management activities overall, including as this applied to levees and dams. As part of its tool and policy development activity, the Risk Management Center is developing processes by which levee safety can be analyzed in the field and levee safety classifications determined for use in levee management.

USACE is currently using risk analysis in its programs and continues to develop, along multiple paths, its approach to use of these concepts in levee planning, design, and evaluation. No single approach has been promulgated, but all are founded on the use of risk-based methodologies. Although USACE's goal is to ultimately develop an integrated approach to risk analysis across its flood risk reduction portfolio, the agency has not yet issued fully coordinated policy guidance and technical instructions that would define the approach and how it will be implemented.

Copyright National Academy of Sciences. All rights reserved.

some differences may exist in the USACE approach and the analysis proposed here (e.g., in the evaluation of uncertainties). Yet, by adopting a risk-based approach, the NFIP and USACE can develop a common technical basis for evaluating flood protection systems and defining their future working relationship as it relates to levees in the NFIP.

Thus, the proposal to adopt a modern risk analysis is considerably more than implementing a different technical approach to the determination of insurance rates, but rather a program-wide adoption of and engagement in risk-informed management principles and practices. As such, the implementation of risk analysis methods will be an integrated program activity that extends beyond the NFIP actuaries and risk analysts.

## SUMMARY DESCRIPTION OF A MODERN RISK-BASED APPROACH

The elements of a modern, flood risk analysis are schematically illustrated in Figure 3-5. The elements of the analysis are summarized here and more fully described in Appendix H. They include:

- Flood Hazard Analysis. The hazard analysis estimates the frequency of occurrence and the magnitude of flooding (flood elevations, flow velocities, forces) that may impact a region. A key component of the hazard analysis is an assessment of the sources of epistemic uncertainty and the effect that these uncertainties have on the estimate of the frequency of occurrence and the magnitude of future flood events.
- Levee and Other Hydraulic Structure and Component Fragility Analysis. The purpose of the fragility analysis for structures and components that make up a flood protection system is to estimate their performance as a function of the flood levels (elevations, forces, etc.) that may occur. The elements of the flood protection system may include structures (levees, floodwalls, gates, etc.), mechanical or electrical components (pumps, emergency power systems, etc.) and operators (personnel responsible for gate closures, pump system operation, etc.). The hazard level that causes failure of a structure or component is not exactly known; therefore, the conditional prob-




FIGURE 3-5 Elements of the modern flood risk analysis.
SOURCE: Modified from IPET (2009).

Copyright National Academy of Sciences. All rights reserved.

ability of failure or damage (the fragility) is uncertain. A fragility curve shows the variation of the conditional probability of structure or component failure, given a level of flooding. At low levels of flooding, the conditional probability is zero. As flood levels increase, the conditional probability of failure increases, until a point is reached where failure is certain. There are a number of uncertainties in estimating the fragility of a structure or component, thus making the assessment of conditional probability of failure uncertain.

- Systems Analysis. The potential for flooding in a region, and in particular, protected areas, depends on the performance (response) of the natural and man-made system during a flood event. This includes all features that affect flooding along the river system, for example, the hydrologic impact of upstream structures and non-structural measures. A system model defines the relationship between the hazard and the combination of events (levee performance including failure, nonfailure, and overtopping) that can lead to different flooding outcomes. A system model describes the relationships between different elements of the flood protection system and their performance and the interaction with the flood event itself and the likelihood that protected areas may experience flooding. These relationships may be physical/causal, functional (systems operations), or probabilistic (correlation of different factors).
- Inundation Analysis Including Levee Breach and Inundation. For a flood event that is modeled, the inundation that may occur in a region is a function of the flooding level, the performance of the structures and components that provide protection to a region, the interrelationship of structures and their performance, and the hydraulic assessment of inundation that may occur. In the event of levee or floodwall failures, an assessment of the breaching that may occur is considered. This includes the size and timing of the breach, as well as its location. When a breach occurs, properties that are located in the resulting inundation are likely to experience greater damage than if the same area had been flooded in a without-levee situation. There are a number of reasons for this. First, if there are structures in the area adjacent to the breach, these structures will be impacted by high-velocity flows. In addition, these structures may be completely destroyed as a result of the scour that takes place as the breach forms. Similarly, structures located beyond the scour zone will also experience high-velocity flows that otherwise might not have occurred in a without-levee case.
- Consequence Assessment. The purpose of the consequence assessment is to estimate the damage to structures that are inundated in a flood event. At this time, the routine consequence analysis estimates direct damages to structures. Indirect losses and such aspects as loss of life and social cultural impacts are in the earlier stages of evolution (IPET, 2009). The assessment of damage is often based on models derived from empirical loss data. However, as part of the consequence analysis, it is important to consider the range and type of damages that may occur for events where there are limited loss data. For instance, if a levee breaches, structures in the flooded area will be inundated to a certain level. Some structures may experience greater damage if they are located close to the breach scour zone.
- Risk and Uncertainty Quantification. This part of the risk analysis probabilistically combines the elements of the analysis and calculates the frequency of occurrence of flood events and the consequences (damage to structures). As part of the quantification, the epistemic uncertainties, discussed below, are also propagated through the analysis to estimate the uncertainty in the risk results.

## A MODERN RISK-BASED ANALYSIS: THE FOUNDATIONAL BASIS

As a starting point for the development of an NFIP flood risk analysis, a conceptual framework for a flood risk analysis can be defined as

$$R = f(H,V,C) \tag{3-1}$$

where risk ($R$) is a function of

$H$ = flood hazard,
$V$ = vulnerability, and
$C$ = consequence (e.g., economic impact, public safety).

Copyright National Academy of Sciences. All rights reserved.

This basic conceptualization of flood risk analysis has been adopted by the Department of Homeland Security and is consistent with Box 1-3 (NRC, 2010). In this context, risk is a function of the flood hazard to which a community is exposed, the vulnerability of flood protection systems, and the consequences associated with flooding and system failures and the damage to a community, including economic impact and life safety. Implicit in this conceptual framework is the probability that consequences may occur.

This conceptual framework is extended to the assessment of the probability (also expressed as a frequency of occurrence) of adverse consequences that could occur as a result of a flood hazard. In other words, this extension incorporates the concept of uncertainty into the framework by an expanded, quantitative definition of risk (Kaplan and Garrick, 1981; ASME/ANS, 2009; IPET 2009):

$$R = f(H,V,C,\nu,\rho) \qquad (3\text{-}2)$$

where

$\nu$ = frequency of occurrence or exceedance and is a measure of the aleatory uncertainty (the randomness of events),

$\rho$ = probability as a measure of the confidence to which an estimate of $\nu$ is the true value, or the epistemic uncertainty in the estimate of $\nu$.

Equation 3-2 is consistent with the definition adopted for the entire report in the sense that the estimate of risk takes into account the occurrence of the flood hazard, the exposure and vulnerabilities of people and property to the hazard, the consequences caused by the hazard, and the uncertainty about all these parameters. But most importantly, it establishes the quantitative representation of risk.

As mathematically depicted above, a flood risk analysis is an evaluation that is made on the basis of available information, in which all aspects of the analysis are subject to uncertainties: the flood hazard analysis, the assessment of levee system performance, the assessment of flooding/inundation, and the estimate of consequences. In its recent review of the DHS approach to risk analysis, the National Research Council (NRC, 2010) noted that the evaluation of uncertainties is integral to a risk analysis. In building a risk analysis capability and risk-informed culture within the NFIP, how uncertainty is defined and incorporated is critical. Experience in other fields suggests that there is considerable benefit to defining these fundamentals so that they become a core element of the methods and tools that are developed (SSHAC, 1997; USNRC, 2011).

There are different types of uncertainty to consider in a flood risk analysis. The first type is attributed to the inherent randomness of events in nature—aleatory uncertainty—and is, in principle, irreducible. Examples of this type of uncertainty are the outcome of a roll of the dice, the occurrence (the time and place) and magnitude of a flood event, the spatial variation of levee properties, and the performance of a levee during a flood. In the context of engineering or statistical models, aleatory uncertainty can also correspond to unique (often small-scale) details that are not explained by a "model." For a given model, one cannot reduce the aleatory uncertainty by collection of additional information. One may be able, however, to better quantify the aleatory uncertainty by using additional data.

The second type of uncertainty is attributed to lack of understanding (e.g., knowledge) about physical processes or a system that must be modeled. This source of uncertainty is referred to as epistemic (knowledge-based) uncertainty. There are a number of sources of epistemic uncertainty, including limited data to estimate model parameters, incomplete understanding of physical processes or systems, the limited ability of models (engineering or statistical) to predict events or outcomes of interest (modeling uncertainty), and the potential that multiple, alternative, technically defensible models or modeling approaches exist that give different results that affect the final assessment of risk. In principle, epistemic uncertainties can be reduced with improved knowledge and/or the collection of additional information.

The process of identifying and evaluating sources of epistemic uncertainties can vary, depending on the subject, the state of scientific or engineering understanding, observational and modeling experience, etc. For example, in a field or topical area where considerable observational experience exists and statistical models are used to develop predictive tools, the analysis of epistemic uncertainties may be an integral and in-depth part of

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 644 of 858



the state-of-practice. In other fields, direct observational evidence may be limited and predictive models are based on theoretical understanding (i.e., analytical models), estimates of the model parameters, the analysts' experience, comparisons of model predictions with observations, etc. In areas where direct observation of events/parameters of interest is limited, competing models and/or scientific interpretations may exist, it is often necessary to elicit input from experts to evaluate and quantify epistemic uncertainties (Morgan and Henrion, 1990; SSHAC, 1997; USNRC, 2011).

One result from a flood risk analysis is the likelihood that a levee system will fail or a measure of the randomness of the flood hazard and the future performance of the levee system, that is, aleatory uncertainty (Figure 3-6, *top*). There is also epistemic uncertainty about the true value of the levee system failure, denoted as $\nu_{\text{Levee}}$ System Failure ($\nu$ in equation 3-2). As a result, there is a distribution of the estimate (Figure 3-6, *bottom*), which is an appropriate description of the true value of likelihood that the levee system would fail. This distribution can be viewed as a means to estimate confidence intervals on the estimate of the frequency of levee system failure.

With respect to levees, the current NFIP approach addresses epistemic uncertainty in the assessment of the frequency of flooding, that is, the flood hazard analysis, through requirements for levee freeboard. However, the




FIGURE 3-6 Estimate of the frequency of levee system failure as a single or best estimate, aleatory uncertainty (top), and an estimate that includes the quantification of both the aleatory and epistemic uncertainty (bottom) of one result from a flood risk analysis; the frequency of occurrence per year that a levee system would fail. The bottom figure can be used to make confidence statements about the estimate of the frequency of levee failure.

Copyright National Academy of Sciences. All rights reserved.

No RR2.0-AR00014502

requirement for levee freeboard has been an ad hoc way of recognizing there are epistemic uncertainty in the assessment of the flood hazard (the one percent flood level). In other words, adding freeboard only implicitly accounts for uncertainty in a manner that does not make best use of the information and technology currently available that takes a "one size fits all" approach.[7] Thus, in some communities, more freeboard is needed and in others, less freeboard may be required. A more thorough assessment of the uncertainties in the flood hazard assessment and in levee performance would derive a situation-specific estimate of necessary freeboard.

An NFIP flood hazard analysis estimates future flood damages to insured properties for rate-setting purposes by taking into account the frequency of flooding, the performance of a levee system (in a binary fashion), and the damages that might occur to insured residences. The result of the analysis will be a distribution on the economic consequences, or the probability of certain values of loss (Figure 3-7, *top*). The result can be used to estimate expected annual flood losses, which is a measure of the flood risks that is used to determine flood insurance rates.

However, because of epistemic uncertainties in each of the elements of the risk analysis—in the NFIP flood hazard analysis, the evaluation of levee system performance, and the assessment of consequences—there is epistemic uncertainty in the distribution of economic consequences. A more modern flood risk analysis captures how epistemic uncertainty manifests in the estimate of the expected losses (Figure 3-7, *bottom*). This allows consideration of a range of values related to the confidence of a certain dollar loss (rather than a dollar value, Figure 3-7, *top*), which can be explicitly considered in the determination of insurance rates.

### A Modern Risk Analysis: The IPET Risk and Reliability Analysis

As part of the IPET study commissioned by USACE, a risk analysis was performed that included both the aleatory and epistemic uncertainties in the hurricane analysis (i.e., storm surge and wave height analysis) and the levee fragility analysis (IPET, 2009). The IPET analysis is a recent, cutting-edge example of a risk-based approach to flood analysis utilizing the two different types of uncertainty; thus it is used as an example to further illustrate a modern risk analysis.

The concepts of aleatory and epistemic uncertainty are not always intuitive and thus can be difficult to visualize. In the IPET example, aleatory uncertainty is characterized in terms of a single, best estimate of hurricane storm surge, which is expressed in terms of the annual frequency of exceedance of peak surge elevations (Figure 3-8*A*, *top*). Similarly, in the levee fragility analysis, the aleatory uncertainty in levee performance is quantified in terms of the estimate of the conditional probability of levee failure as a function of this peak elevation (Figure 3-8*A*, *middle*). The results of the hurricane and levee fragility analyses can be combined to determine a point estimate of the annual frequency of levee system failure (Figure 3-8*A*, *bottom*). This part of the IPET analysis is consistent with the current NFIP flood hazard analysis.

The sources of epistemic uncertainty in the IPET example were based on the knowledge available in assessing the occurrence of hurricanes and sources of uncertainty in the hurricane modeling. There were a number of sources of epistemic uncertainty that were considered in the IPET hurricane analysis:

- uncertainty in the storm surge model ability to predict the storm surge and wave height;
- limits in available data including the estimated annual frequency of occurrence of hurricane events in the Gulf of Mexico, the frequency of hurricane central pressure deficits, and accuracy of bathymetry and near-shore and onshore hydraulic properties; and
- limits in knowledge of atmospheric processes, specifically the hurricane central pressure deficit and the radius to maximum winds.

The estimate of levee fragility in the IPET analysis evaluated two primary failure modes: stability failure of

[7] In section 65.10, the minimum standard for freeboard in NFIP communities is described: "(1) Freeboard. (i) Riverine levees must provide a minimum freeboard of three feet above the water-surface level of the base flood. An additional one foot above the minimum is required within 100 feet in either side of structures (such as bridges) riverward of the levee or wherever the flow is constricted. An additional one-half foot above the minimum at the upstream end of the levee, tapering to not less than the minimum at the downstream end of the levee, is also required."

Copyright National Academy of Sciences. All rights reserved.

Levees and the National Flood Insurance Program: Improving Policies and Practices







FIGURE 3-7 (*Top*) F/N curve illustrating the estimate of the frequency distribution on economic consequences without epistemic uncertainty . This shows the frequency that the annual maximum damage exceeds a specific value; this curve is the underpinning of the NFIP Hazus Multi Hazard (Hazus-MH) calculation of Average Annualized Losses due to flooding. (*Bottom*) Estimate of economic consequences that includes the quantification of the epistemic uncertainty.

Copyright National Academy of Sciences. All rights reserved.




FIGURE 3-8 IPET description of the flood hazard (*top*); performance of the levee, that is, levee fragility curve (*middle*); and potential for flooding (*bottom*). Incorporation of aleatory uncertainty only is shown on the left. Both aleatory and epistemic uncertainty are shown on the right, giving a more complete estimate of the likelihood of inundation.

Copyright National Academy of Sciences. All rights reserved.

the levee embankment (for flood levels below the levee crest) and failure due to overtopping. The assessment of the fragility for these failure modes is subject to epistemic uncertainties; that is, an estimate of the conditional probability of failure given a peak storm surge and wave height elevation cannot be estimated exactly (Figure 3-8*B, middle*). For instance, epistemic uncertainties that affect the levee stability analysis include:

- uncertainty in the geotechnical stability model (model uncertainty),
- limits in available data including the estimate of soil properties and overtopping resistance of levees,
- limits in the knowledge of the levee feature.[8]

Given the epistemic uncertainty in the estimate of the frequency of hurricane surge and wave heights and in the estimate of levee fragility, there is a corresponding uncertainty in the IPET estimate of the frequency of level system failure. That is, rather than making a single point estimate of the frequency of failure, a distribution of estimates is made that quantitatively reflects the epistemic uncertainty in both the hurricane hazard and in the levee system fragility analyses. This distribution of levee failure frequency estimates is shown in Figure 3-8*B*, *bottom*, as a probability density function on the estimate of the frequency of levee system failure. From this result, the mean frequency of failure can be determined. In addition, the analyst can make "confidence" statements about the uncertainty in the levee system frequency failure.

## RISK ANALYSIS RESULTS, PRODUCTS, AND USES

The NFIP is a unique government program that has a specific mandate and, at the same time, provides information to a wide range of users, establishes a standard of practice for flood hazard analysis, and floodplain mapping, and, by default, establishes what has been seen as a public safety standard for communities behind levees. The implementation of a more modern risk analysis as a part of the NFIP, as proposed and described earlier in this report, yields enhanced information about flood hazards, performance of flood protection measures, and consequences. With that information, FEMA can further support efforts to reduce flood losses in the United States (see Figure 3-9).

Table 3-1 shows a sample of the risk analysis products, uses, and users. Although uses are limited to FEMA's main missions (risk communication, insurance, and mitigation; column 3), this information is useful to the public or to public agencies meeting other objectives. For example, a local or state agency seeking to reduce flood risk could use information on levee performance to make investment decisions for strengthening levees or implementing a property buy-out program in areas of greatest potential damage.

## STEPS TO DEVELOPMENT AND IMPLEMENTATION OF A RISK-BASED APPROACH

Realigning the NFIP to undertake a modern risk analysis, use products of such an analysis, and account for uncertainty in the inputs is a shift from "business as usual." Current NFIP analyses focus on hazard—primarily on the 1 percent and 0.2 percent annual chance exceedance events. Current analyses limit consideration of consequence of flooding to insurance rate setting, without geographic specificity that is possible as proposed here. Levee performance is considered in current practice in a standards-based manner, with accredited levees considered as surely protecting against inundation and unaccredited levees as surely not protecting. What is proposed herein expands the risk assessment to consider explicitly the entire range of flood events, integrates the hazard assessment with economic consequence estimation throughout the analysis and decision making, and accounts in a more robust manner for levee performance throughout the range of hazards. **The NFIP should move to a modern risk analysis that makes use of modern methods and computational mapping capacity to produce state-of-the-art risk estimates for all areas that are vulnerable to flooding.**

The analysis of flood risks is multidisciplinary (hydrologists, geotechnical and structural engineers, operations personnel, etc.). As procedures for the implementation of a modern NFIP risk analysis are developed, these pro-

[8] Estimate of the correlation length of levee properties. Correlation length refers to the length along a levee over which properties of the levee are estimated to be homogeneous and therefore its performance during the hurricane will be uniform.

Copyright National Academy of Sciences. All rights reserved.




FIGURE 3-9 With results of risk analysis as proposed, annual exceedence probability for individual elements of floodplains can be mapped, shading those elements with probability > regulatory threshold. Darker elements have a greater probability of inundation; lighter elements have less. The A transect illustrates a cross section of the channel at which the flow moves from the channel onto the floodplain. This illustrates the shading with a fixed-grid two-dimensional floodplain flow model, coupled with a one-dimensional channel flood model. Thus, the probability of inundation for any location in the floodplain behind a levee could be computed and mapped, considering the natural hazard and the performance of the levee. This would enable quick inspection to determine areas of greater hazard.

cedures need to clearly define the responsibilities of the professionals involved in the study, the interdisciplinary coordination that is required, the evaluations they are expected to perform, and the results they need to generate. This report does not address these issues specifically, but does discuss steps toward the development and implementation of a risk-based program.

### Implementing a Risk-Based Approach

The following tasks are necessary in order for FEMA to implement a modern risk-based approach successfully:

1. Develop, test, and deploy—with the same care and rigor with which standard procedures for hydrologic and hydraulic analysis and mapping have been developed, tested, and deployed—a procedure for the complete risk analysis. This procedure should be consistent in concept with that described in the *Summary Description of the Risk-Based Approach* section of this chapter, including all components shown. This includes algorithms and computational methods that consider the likely users of the risk analysis procedures.
2. Develop, test, and deploy a consistent procedure for assessing levee systems (rather than individual levee segments) and for describing levee performance with a fragility curve.
3. Design, develop, test, and deploy a software application that can be used for FEMA's risk analysis by agency staff, affected public agency staff, and contractors. This application may incorporate features of FEMA's Hazus application—particularly the consequence assessment features and databases.
4. Emphasize and expand FEMA's program of collecting and analyzing flood damage data, including insur-

Copyright National Academy of Sciences. All rights reserved.

TABLE 3-1 Products Useful for FEMA's Insurance, Risk Communication, and Mitigation Programs Yielded by a Modern Risk-Based Analysis .

| Information Category | Risk Analysis Product | Use | Description |
|---|---|---|---|
| Flood hazard (floodplain) | Floodplain stage frequency distributions for locations in the floodplain; including at the individual property level. This result will also include an estimate of the uncertainty in the flood frequency estimate. | Risk communication | Report on likelihood of inundation to various depths for individual parcels, census tracts, or other subdivisions, better communicating risk to occupants, owners. |
| Flood hazard (floodplain) | Flood stage frequency distributions for locations in the floodplain; including at the individual property level. This result will also include an estimate of the uncertainty in the flood frequency estimate. | Mitigation | Provide information on depths, velocities, and other flood properties throughout floodplain, for specified events, to inform emergency evacuation and safe shelter planning by government agencies, industry, and public. |
| Flood hazard (floodplain) | Flood stage frequency distributions for locations in the floodplain; including at the individual property level. This result will also include an estimate of the uncertainty in the flood frequency estimate. | Risk communication, mitigation | Support wise land-use decision making by identifying annual exceedence probability of a parcel, tract, etc. in interior floodplain. This is consistent with earlier recommendations by NRC (2000) that "the Corps use annual exceedance probability as the performance measure of engineering risk . . . and the federal levee certification program focus not upon some level of assurance of passing the 100-year flood, but rather upon 'annual exceedence probability.'" For convenience, and in keeping with tradition, this information can be displayed on a map similar to existing FEMA maps (Figure 3-9). |
| Flood hazard (floodplain) | Flood stage frequency distributions for locations in the floodplain, including at the individual property level. This result will also include an estimate of the uncertainty in the flood frequency estimate. | Risk communication, mitigation | Similar to above, but conditional flooding can be displayed to answer question: Given channel flood flow or stage of specified annual exceedence probability, will a parcel, tract, etc. on the floodplain be inundated? For convenience, this answer too can be mapped. For example, properties with annual exceedence probability >0.01 can be identified and shaded, yielding a map similar to current FEMA maps, but taking into account performance of levees in other than a binary manner (Figure 3-9). |
| Deaggregation of the flood hazard (floodplain) | Conditional probability distribution on the relative contribution of different flood scenario types (levee overtopping, levee breach, breach locations, interior drainage and ponding, etc.) to the frequency and depth of flooding. | Risk mitigation, emergency preparedness | Report on the relative contribution of different events (flood events, levee failure events, etc.) that contribute to flooding in a community. This detailed information provides insight into the hazards to which a community is exposed and can guide the selection of mitigation measures and emergency preparedness and support risk communication. |

Copyright National Academy of Sciences. All rights reserved.

TABLE 3-1 Continued

| Information Category | Risk Analysis Product | Use | Description |
|---|---|---|---|
| Levee system performance | Levee system fragility estimates, including an estimate of the uncertainty in the system fragility. | Risk communication | A levee system fragility curve provides quantitative information on the performance of a levee system, which may comprise multiple levee reaches, gate structures, etc. It provides direct information on the reliability of infrastructure performance and the protection it is intended to provide for a community. This can be integrated with hazard information to provide information on combined probability that a certain flood level will occur and that the levee will protect from interior area flooding. |
| Levee system performance | Levee system fragility estimates, including an estimate of the uncertainty in the system fragility | Mitigation | Provides information useful for identification of deficiencies and for setting priorities on repairs or upgrades to existing infrastructure, especially when integrated with hazard information. |
| Frequency distribution on consequences | Frequency distribution on the consequences of flooding. This will also include an estimate of the uncertainty in the frequency of exceeding levels of consequences. | Insurance | Enables computation of expected annual damage for use with premium determination procedures described in Chapter 5. This information can be provided at the individual structure level and community level. |
| Frequency distribution on consequences | Frequency distribution on the consequences of flooding. This will also include an estimate of the uncertainty in the frequency of exceeding levels of consequences. | Mitigation | Enables computation of expected annual damage for comparison with cost estimated for flood management alternatives to assess feasibility of investment for federal, state, and local mitigation planning. |
| Frequency distribution on consequences | Frequency distribution on the consequences of flooding. This will also include an estimate of the uncertainty in the frequency of exceeding levels of consequences. | Risk communication | Provides property owner or floodplain occupant with information about flood losses that they may expect on average for any year or over a longer duration. |

NOTE: Risk analysis products are results of or intermediate products of the risk analysis described in this chapter. Uses are limited to FEMA's main missions: risk communication, insurance, and mitigation.

ance claim data and corresponding flood properties, and adding to that damage and flood property data collected from other agencies, including USACE and state and local government agencies. Depth-damage models commonly used for assessing consequence as a component of risk analysis are best calibrated and verified with actual damage data. Completing this task will ensure that models for consequence estimates are accurate and reliable.

5. Develop, test, and deploy consistent procedures for describing the uncertainty in all inputs to the risk analysis, include uncertainty about flow frequencies, water surface elevations, levee performance models, and consequence estimates.

6. Refine and enhance the methods of communication of information on flood risk, including now information on consequence. With the revised risk analysis approach proposed here, the information to be communicated offers an estimate of direct, tangible, economic impact of flooding—the cost to a property owner and information on potential life-safety consequences. (The risk analysis conducted by IPET for New Orleans indicated the potential

Copyright National Academy of Sciences. All rights reserved.

deaths that could be encountered for various levels of flooding.) The revised analysis will also offer information about the probability that water will exceed specified depths in any year; this can be expanded easily to describe the probability that flood depths will exceed specified depths over the life of a mortgage or another informative duration.

7. Work closely with other federal agencies to ensure that techniques are consistent across agencies so that communities are not faced with using multiple approaches to evaluate a levee system. (See Chapter 8 for further discussion.)

### New Technology and Cost

FEMA can leverage new technology to share the information now available. For example, in 2000 the state of North Carolina was designated a Cooperating Technical State by FEMA, a decision largely driven by the impact of Hurricane Floyd in 1999 highlighting the need for accurate flood maps for the state. North Carolina's Floodplain Mapping Program began updating and acquiring high-resolution flood hazard data, specifically light detection and ranging (Lidar) to generate digital elevation data, and creating new Digital Flood Insurance Rate Maps (DFIRMs) (North Carolina Floodplain Mapping Program, n.d.). This information is available on the Web through North Carolina's Floodplain Mapping Information System, which includes access to DFIRMs and other features such as data export capability and a property address search function to enable viewing of flood risk to a specific property (Figure 3-10).

The cost to FEMA of developing procedures for and implementing a program based on modern risk analysis cannot be predicted with certainty without information from pilot applications, which are a valuable pursuit. However, in the absence of pilot studies, a comparison between the costs for a modern risk analysis that would be above that incurred for a Flood Insurance Study (FIS) using current methods (i.e., the incremental cost) is drawn.[9]

Current FIS procedures require many of the same hydrologic and hydraulic inputs required for a modern risk-based analysis, which indicates that the incremental cost for pilot studies should not be significant. Similarly, information on exposure and vulnerability of floodplain property is available in FEMA's Hazus database, and so the incremental cost of gathering information should not be significant (unless a community prefers more recent information, in which case the cost of conducting a new structure inventory would be included). Topographic data are necessary for establishing the relationship between flood hazard and consequence; these are collected for current FIS studies, and so no additional cost will be incurred for this portion of the modern risk analyses.

The greatest cost, not currently incurred for a FIS, is the cost of developing system fragility curves—the functions that represent the likelihood that levees and appurtenant structures will provide the protection for which they were designed. Developing the curves requires information about the materials, methods of construction, operation and maintenance, performance history, and so on. Much of the information required to develop fragility curves is also required to meet the current requirements for certification and accreditation under 44 CFR §65.10. However, the manner of interpretation of the information is different when compared with the proposed modern risk analysis approach. No longer can an engineer compare the system or levee state to a standard, finding that the standard is or is not met. Instead, a qualified geotechnical engineer will evaluate the integrity of a levee system and incorporate this quantitatively in the conditional performance of the system. This can be done, as the State of California demonstrated with its Central Valley Flood Protection Plan. For risk analyses to support that study, engineers developed fragility curves at approximately 300 locations in approximately 1 year, following an extensive data collection effort (CA DWR, 2012). Similarly, USACE has developed levee fragility curves for use in ongoing planning studies, all of which now employ a risk analysis along with procedures and guidance for the development of appropriate levee fragility curves (USACE, 2006; Schultz et al., 2010).

---

[9] A FIS is an examination of flood hazards with a specific legislative definition (Appendix C). From the FIS, FEMA's FIRMs are produced. A flood hazard study, which is discussed in this chapter, is a consideration of the frequency of flooding included in the FIS.

Copyright National Academy of Sciences. All rights reserved.




FIGURE 3-10 A screen shot of an area subject to flood risk in North Carolina according to high-resolution flood hazard data gathered. The menu bar at the top of the image allows the user to explore exposure of an individual structures to the flood hazard as well as other options such as a DFRIM export function. Pink depicts areas subject to one percent annual chance flooding (AE zone, floodway), blue areas are subject to 1 percent annual chance flooding (AE zone, has base flood elevation established), and green areas are subject to the 0.2 percent annual chance flooding (shaded X zone).
SOURCE: http://www.ncfloodmaps.com, accessed January 7, 2012.

## A Living, Risk-Based Analysis: Maintenance and Agents of Change

A modern risk-based analysis will serve a very different role than FEMA's current analysis of the flood hazard, which yields a flood map that is not updated with regularity. The modern risk-based approach will be an integral part of all aspects of the NFIP: mapping, floodplain management, portfolio analysis, and insurance rate assessment. As such, the risk-based analysis will be a living, integral part of the NFIP; something that is used regularly by the program actuaries and analysts. By its very nature, the modern risk-based analysis will be a regularly updated, preferably online, resource for FEMA.

When a modern risk analysis is performed for a community, it would be based on information that is available at the time. Following its completion, there are factors that may change the risk profile of a community, and therefore require maintenance (updating of certain data) and possibly revision of hazard, performance, and consequence components and the resulting risk analysis products shown in Table 3-1. Given the role the risk analysis will play in the NFIP, it is important that FEMA develop and implement procedures to periodically review, maintain, and update the risk-based analysis, as necessary. There are a number of agents of change that may affect future flood risks: climate change, community development and changes in land use, changes in population, condition of flood mitigation systems (success of system maintenance, changes in system configuration, etc.), changes in the watershed, and so on. As such, FEMA's implementation plan needs to take these factors into account.

Copyright National Academy of Sciences. All rights reserved.

The processes for maintenance and review needs to include

- periodic review of the elements of the risk analysis (hydrologic analyses that describe the flood hazard, geotechnical engineering studies that yield description of levee system performance, inventory of properties, etc.);
- standards that define the steps and basis to revise, refine, or replace one or more elements of the risk analysis for a community, and that establish schedules for periodically reviewing and revising
  - individual property information,
  - levee and flood mitigation system properties and condition, and
  - hydrologic and hydraulic modeling.

Within its current program, FEMA has requirements for archiving hydrologic and hydraulic models used in the FIS (FEMA, 2003) and requiring that information on levees be maintained and certification be periodically updated. With the development and implementation of a risk-based analysis to evaluate community flood risks, FEMA needs to extend these practices to a community risk-based approach and faithfully maintain them.

FEMA policy with regard to levees is spelled out in 44 CFR §65.10. In addition to defining the base flood as the one percent annual chance exceedance flood, the regulation states that a community must provide evidence of a flood protection system's ability to provide protection from the base flood. As noted in Chapter 1, the requirements that determine whether FEMA recognizes a levee system on NFIP maps include (1) design criteria, (2) operation plan criteria, and (3) maintenance plan criteria. If the levee system satisfies the criteria and is certified, it is recognized on NFIP maps, with the protected floodplain "mapped out" of the hazard area. If the levee system does not meet the criteria, the levee system is assumed to provide no protection.

Within the context of a risk-based analysis to evaluate the floodplain and flood protection systems in particular, the analysis would quantify the residual risk in the area behind every flood protection system, and develop insurance pricing based on the level of protection that is provided. For instance, communities will be given credit for the level of protection that is provided, even if this level is below the base flood standard—the estimated risk analysis and corresponding rates will recognize this change.

## REFERENCES

AIR (American Institutes for Research). 2012. AIR Models Overview. Available online at http://www.air-worldwide.com/Models/Overview/. Accessed November 28, 2012.

ASME/ANS (American Society of Mechanical Engineers and American Nuclear Society). 2009. Standard for Level 1/Large Early Release Frequency Probabilistic Risk Assessment for Nuclear Power Plant Applications, Addenda to ASME/ANS RA-S-2009. LaGrange Park, IL: ANS.

CA DWR (California Department of Water Resources). 2012. 2012 Central Valley Flood Protection Plan, Attachment 8E Levee Performance Curves. Sacramento, CA: CA DWR.

DOE (Department of Energy). 2002. Natural Phenomena Hazards Design and Evaluation Criteria for Department of Energy Facilities. DOE-STD-1020-2002. Washington, DC: DOE.

FEMA (Federal Emergency Management Agency). 2003. Guidelines and Specifications for Flood Hazard Mapping Partners. Available online at http://www.fema.gov/library/viewRecord.do?id=2206. Accessed December 12, 2012.

FLOODsite. 2004. Flood Risk Management. Available online at http://www.floodsite.net/html/flood_risk.htm. Accessed August 14, 2012).

ILPRC (Interagency Levee Policy Review Committee). 2006. The National Levee Challenge: Levees and the FEMA Flood Map Modernization Initiative. Available online at http://www.fema.gov/library/viewRecord.do?id=2677. Accessed August 8, 2012.

IPET (Interagency Performance Evaluation Task Force). 2009. Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System: Final Report of the Interagency Performance Evaluation Task Force. Available online at https://ipet.wes.army.mil/. Accessed December 4, 2012.

Kaplan, S., and B. J. Garrick. 1981. On the quantitative definition of risk. Risk Analysis 1(1):11-27.

Morgan, G. M., and M. Henrion. 1990. Uncertainty: A Guide to Dealing with Uncertainty in Quantitative Risk and Policy Analysis. Cambridge, UK: Cambridge University Press.

Copyright National Academy of Sciences. All rights reserved.

Moser, D., T. Bridges, S. Cone, Y Haimes, B. K. Harper, L. Shabman, and C. Yoe. n.d. Transforming the Corps into a Risk Managing Organization. White Paper. Available online at http://corpsriskanalysisgateway.us/data/docs/ref/Explore%20 Resources/IWR%20Reports/White_Paper-Transforming_the_Corps_into_a_Risk_Managing_Org.pdf. Accessed February 5, 2013.

NOAA (National Oceanographic and Atmospheric Administration). 2012. Hydrologic Information Center—Flood Loss Data. Available online at http://www.nws.noaa.gov/hic/. Accessed February 27, 2013.

North Carolina Floodplain Mapping Program. n.d. LIDAR and Digital Elevation Data. Fact Sheet. Available online at http://www.ncfloodmaps.com/pubdocs/lidar_final_jan03.pdf. Accessed February 21, 2013.

NRC (National Research Council). 2000. Risk Analysis and Uncertainty in Flood Damage Reduction Studies. Washington, DC: National Academy Press.

NRC. 2010. Review of the Department of Homeland Security's Approach to Risk Analysis. Washington, DC: The National Academies Press.

NRC. 2012a. Dam and Levee Safety and Community Resilience: A Vision for Future Practice. Washington, DC: The National Academies Press.

NRC. 2012b. Disaster Resilience: A National Imperative. Washington, DC: The National Academies Press.

RMS (Risk Management Solutions). 2012. RMS Models. Available online at http://www.rms.com/models/. Accessed November 28, 2012.

Rogers, J. D. 2012. GE 301 Lectures—Evolution and Development of Flood Control Engineering. Available online at http://web.mst.edu/~rogersda/umrcourses/ge301/. Accessed November 15, 2012.

Sayers, P., G. Galloway, E. Penning-Rowsell, F. Shen, K. Wang, Y. Chen, and T. Le Quesne. 2012. Flood risk management: A Strategic Approach—Consultation Draft. UNESCO on behalf of World Wildlife Fund–UK/China and the General Institute of Water Design and Planning, China.

Schultz, M. T., B. P. Gouldby, J. D. Simm, and J. L. Wibowo. 2010. Beyond the Factor of Safety: Developing Fragility Curves to Characterize System Reliability. Washington, DC: U.S. Army Corps of Engineers.

SSHAC (Senior Seismic Hazard Analysis Committee). 1997. Recommendations for Probabilistic Seismic Hazard Analysis—Guidance on Uncertainty and Use of Experts. Rockville, MD: U.S. Nuclear Regulatory Commission.

USACE (U.S. Army Corps of Engineers). 1996. Risk-Based Analysis for Flood Damage Reduction Studies. EM 1110-2-1619. Washington, DC: USACE.

USACE. 2000. Design and Construction of Levees. EM 1110-2-1913. Washington, DC: USACE.

USACE. 2006. Risk Analysis for Flood Damage Reduction Studies. ER 1105-2-101. Washington, DC: USACE.

USACE. 2008. Improving Public Safety—From Federal Protection to Shared Risk Reduction. Letter to J. Nussle, Director, Office of Management and Budget, April 16, 2008. Washington, DC: USACE.

USACE. 2010. USACE Process for the National Flood Insurance Program (NFIP) Levee System Evaluation. EC-1110-2-6067. Available online at http://publications.usace.army.mil/publications/eng-circulars/EC_1110-2-6067.pdf. Accessed November 27, 2012.

USNRC (U.S. Nuclear Regulatory Commission). 2011. Practical Implementation Guidelines for SSHAC Level 3 and 4 Hazard Studies, NUREG-2117. Washington, DC: USNRC.

URS/JBA (URS Corporation/Jack R. Benjamin & Associates, Inc.). 2008. Delta Risk Management Strategy (DRMS), Phase 1, Risk Analysis Report (Draft). Sacramento, CA: California Department of Water Resources.

Copyright National Academy of Sciences. All rights reserved.

Copyright National Academy of Sciences. All rights reserved.

# 4

# Levee Analysis and Mapping Procedure

As indicated in Chapter 2, the examination of levees under the Map Modernization Program identified many levees that no longer met the requirements of Title 44, Section 65.10 of the *Code of Federal Regulations* (44 CFR §65.10). As a result, the areas behind these levees in the one percent annual chance floodplain were to be remapped as being in the Special Flood Hazard Area (SFHA) and would be subject to the mandatory purchase requirements of the NFIP. In response to congressional requests, the administrator directed FEMA staff to develop an approach to mapping nonaccredited levees that would reflect any risk reduction and the commensurate rates that nonaccredited levees might afford the communities. In March 2011, FEMA issued a public notice stating that

> The new approach [being developed] will provide a more precise assessment of flood risk in areas impacted by levees. Because the new modeling methods may affect the treatment of a levee, FEMA will temporarily withhold issuing flood risk study final determinations for those communities whose levees do not meet accreditation requirements of 44 CFR §65.10. This temporary delay will allow FEMA to give proper consideration to levees under the new modeling procedures. (FEMA, 2011b)

Between, March 2011 and February 2012, FEMA developed and circulated for public comment the Levee Analysis and Mapping Procedure (LAMP) to identify where risk reductions might occur from evaluation of the performance of levees below the one percent annual chance standard. The LAMP was designed to be implementable without statutory or regulatory changes, or changes to the insurance program. The LAMP is currently being prepared for use in pilot analyses in communities around the country.

## PROPOSED PROCEDURE

The proposed procedure is characterized by FEMA as being

> a cost-effective, repeatable, and flexible approach that (1) complies with all statutory and regulatory requirements governing the NFIP, most notably 44 CFR §65.10, (2) leverages local input, knowledge, and data through proactive stakeholder engagement; (3) aligns available resources for engineering analysis and mapping commensurate with the level of risk in the leveed area; and (4) considers the unique flooding and levee characteristic (solely from an engineering perspective) of each levee system. (FEMA, 2011a)



Copyright National Academy of Sciences. All rights reserved.

Under the existing approach, when a levee is no longer accredited, all land areas that would be subject to inundation by the one percent annual chance flood if the levee system was not present are designated as SFHAs. Under the proposed approach, based on analyses of levee reaches,[1] some lands areas may be determined to be still protected against inundation by the one percent annual chance flood. These land areas would be designated as Zone D, an existing designation that indicates undetermined, but possible flood hazard (Appendix E). Zone D areas are not subject to mandatory flood insurance purchase requirements, although structures in this zone may be subject to lenders' flood insurance requirements. Rates under the NFIP would be adjusted from the preferred rate to a rate that reflects the undetermined risk for structures in Zone D.

The proposed approach makes use of five "procedures." The Freeboard Deficient Procedure, Overtopping Procedure, and Structural-Based Inundation Procedure deal with common deficiencies in nonaccredited levee systems *as they affect specific reaches*. The Sound Reach Procedure deals with continuous reaches that were "designed, constructed, and maintained to withstand and reduce the flood hazards posed by a 1-percent-annual-chance flood" (FEMA, 2011a). The Natural Valley Procedure is applied to entire levee systems and assumes that "the levee system would not obstruct the river from flowing within the entire natural valley of the floodplain during the 1-percent-annual-chance flood event" (FEMA, 2011a).

The Freeboard Deficient Procedure is applied to levee reaches for which the only deficiency is inadequate freeboard. In this case, the Natural Valley Approach would be used to map the affected area. This area would be designated as Zone D, except for any portions that are affected by levee reaches with other deficiencies or are subject to flooding due to interior drainage.

The Overtopping Procedure is to be applied to levee reaches for which the one percent annual chance flood is higher than the crest, but overtopping will not result in structural failure. In this procedure the levee is modeled as a lateral weir, using a one percent annual chance flood plus a factor of safety. The inundated area is designated as an SFHA, and could be smaller than the inundated area that would result without consideration of the levee, as determined by the Natural Valley Procedure. If so, the remaining area is designated as Zone D, except for any portions subject to flooding due to internal drainage.

The Structural-Based Inundation Procedure is applied to levee systems that are not accredited because of structural integrity issues, such as insufficient foundation strength or vulnerability to seepage failure. In this procedure, possible failure locations are identified and evaluated to determine the inundated area. The modeling will be based on the one percent annual chance flood, without a factor of safety. Breaches will be assumed to occur at multiple locations. The inundated area will be designated as SFHA. This area could be smaller than the inundated area that would result without consideration of the levee, as determined by the Natural Valley Procedure. If so, the remaining area is designated as Zone D, except for any portions subject to flooding due to interior drainage.

The Sound Reach Procedure is applied to continuous sections of levee that have been designed, constructed, and maintained to withstand and reduce the flood hazards posed by a one percent annual chance flood. The areas landward of these levees are mapped using the Natural Valley Analysis and designated as Zone D, except where there is inundation due to internal drainage or to flows from the nonaccredited levee reaches.

LAMP also includes a stakeholder engagement process. Once FEMA has determined that a levee system does not meet the certification requirements, it will engage stakeholders to assist in the data collection phase. When appropriate, it will establish a Local Levee Working Group to provide additional data as well as feedback on the analysis and mapping. Depending on the nature of levee deficiencies, this data collection may involve considerable responsibility on the part of the local sponsors for technical data development, the costs of which may place a significant burden on their resources.

[1] A levee reach is a portion of a levee system (usually a length of a levee) that may be considered as a unit taken for analytical purposes to have approximately uniform representative properties. A levee reach will be the unique entity having properties different than other reaches of the levee system that may be used to evaluate the performance of a portion of the levee system. No maximum length is associated with a reach (USACE, 2010).

Copyright National Academy of Sciences. All rights reserved.

## PUBLIC COMMENTS

As part of the development of the LAMP, FEMA solicited input on a preliminary version of the procedure and received over 1,400 comments. The main criticisms of the proposed method had to do with the identification of a Zone D and the probability that the insurance rates in Zone D would rise and thus discourage insurance purchase. Suggestions were made to use the Zone X designation which carries less of a negative connotation.[2]

Technical comments addressed such issues as the failure of the Natural Valley method to account for local backwater effects caused by flow impediments such as levee tiebacks, confusion over the definition of a reach, use of the Freeboard Deficient Procedure believing that it "would remove elevation and insurance requirements behind a levee that has only one inch of freeboard and no armoring," and failure in the Overtopping Procedure "to consider that the true one percent chance flood stage may be substantially higher than the median one percent stage," suggesting that the Overtopping Procedure be replaced by the Structural-Based Procedure which does not appear to use a factor of safety. Fears were expressed that the new approach might "mislead the public and mortgage lenders about their risk, result in more risky development and fewer insurance policies, and dis-incentivize levee investments." Other comments noted that Zone D lacks elevation data that could be useful to homeowners, builders, mortgage lenders, and communities.

## EVALUATION OF LAMP

The committee examined LAMP, met with key FEMA staff to discuss its possible implementation, and reviewed its components. The LAMP is founded on sound algorithms with sound science and engineering behind them and follows established approaches to hydrology and hydraulics. It is a first cut at an approach to dealing with the hazards associated with levees that do not meet the standards for protection against the one percent annual chance flood.

LAMP represents a response to the issues raised by members of Congress that, given funding and personnel constraints, it will likely take several years to fully implement. It represents a diversion of NFIP effort away from the long-recognized need to move the NFIP to risk-based analysis. Because it would be highly unlikely for the NFIP to move forward concurrently with implementation of LAMP and development of a modern risk-based approach as described in Chapter 3, a move to LAMP would simply postpone the inevitable need to move the NFIP to the risk-based foundation that other agencies and nations have already endorsed (Kobayashi and Porter, 2012; Serra-Llobet et al., 2013).

The implementation of LAMP would be a time-consuming and expensive endeavor for FEMA and communities.[3] It will not yield the desired results of describing flood risks more accurately for the purposes of flood risk communication, mitigation, and insurance rate setting compared with a modern risk analysis. The LAMP approach does not identify or evaluate the properties at risk or the potential for losses and it does not consider levels of risk. In addition, it is not clear that the timescale for implementation of LAMP would contribute to resolving the flood mapping issues that currently exist.

Should the decision be made to implement LAMP, the implementation will not be simple or without controversy. It will require time for FEMA and communities to assess its viability and to establish the steps required for its systematic implementation. The steps in this process will necessarily involve

1. conducting a series of trial applications of LAMP at a number of locations to understand its impact, benefits, and the considerations in its broader implementation;
2. development of guidance for implementation of LAMP on a national scale, which might have a number of elements such as preparation of lessons from the trial applications, development of guidelines, preparation of training materials, Frequently Asked Question documents, holding of training seminars, etc.; and
3. implementation of a finalized LAMP across the nation, which may require
    a. new hydraulic and hydrologic evaluations for levee reaches under evaluation,

[2] Zone X designates an area of moderate to low risk (see Appendix F).
[3] Although no cost estimates were available for the implementation of LAMP, this statement is based on the judgment of the committee.

Copyright National Academy of Sciences. All rights reserved.

b. significant time and resource commitments by local communities and experts to develop local knowledge and data, and

c. resource-intensive FEMA review and evaluation of community submittals (acceptance or rejection).

It is not apparent to the committee how FEMA can reasonably and defensibly price flood insurance for the range of circumstances it will encounter with the LAMP approach. Criticisms that have been levied against the NFIP concerning high premiums may persist with such an implementation of LAMP. The implementation of LAMP and the concurrent actions that are required by the Biggert-Waters Flood Insurance Reform and Modernization Act of 2012 would likely lead to confusion among communities (e.g., the repackaging of Zone D) and will have a negative impact with respect to public engagement, risk communication, and NFIP viability and public acceptance of the program. **FEMA should move directly to a modern risk-based analysis for dealing with areas behind levees and not implement the Levee Analysis and Mapping Procedure.**

## DEALING WITH THE CURRENT SITUATION

If LAMP is not implemented, what should FEMA do until a modern risk-based approach can be fully implemented? NFIP-related levees fall into four categories. The first group includes levees that are currently fully accredited. A second group encompasses deaccredited levees with deficiencies that the community intends to remediate in order to bring the levee back into compliance with the provisions of 44 CFR §65.10. Depending on the nature of the deficiency and the costs associated with remediation, such actions may take a few to several years. The third group of levees includes those with deficiencies that the community recognizes cannot reasonably be remediated and that the community does not intend to remediate. This situation develops when the levee deficiencies are severe or the potential costs for repair or upgrade are so substantial that it would be impossible for the community to bear such costs. The fourth group of levees includes those that are not now accredited or that are proposed to be built at less than 44 CFR §65.10 standards to provide some level of protection to those behind levees against more frequent than one percent annual chance floods (e.g., 2 percent annual chance or 50-year floods).

Should a decision be made not to implement LAMP and to develop and a modern risk-based analysis, dealing with the current situation is still necessary. **Pending development and completion of a modern risk-based analysis, FEMA should implement and promote these interim steps:**

1. Communities with currently certified levees not in the mapping process and not having been declared deaccredited would be expected to take necessary actions to remediate any deficiencies that have been brought to their attention as a result of USACE or FEMA programs so that when the community is remapped, the levee would meet standards.

2. If the community indicates that it will take steps to restore accreditation, the following action would be taken with respect to its levees:

   a. Communities would commit to an aggressive but reasonable program to remediate all deficiencies in the levees using a program similar to the USACE System-Wide Improvement Framework (SWIF) policy (Appendix I) or an integration of the SWIF and an NFIP remediation program. The SWIF policy requires participating levee sponsors to

      i. provide a "description of deficiencies or issues that will be included in the SWIF and discussion of how a system-wide approach will improve and optimize overall flood risk reduction";

      ii. demonstrate "that significant nonfederal resources have been, or will be, committed for developing and/or implementing the SWIF (e.g., state legislative action, bond financing)";

      iii. identify "risk reduction measures that will be implemented throughout the SWIF process, including [an] overall risk communication approach that addresses [how] the risk to life increased by system-wide deficiencies" is being mitigated during the remediation period"; and

Copyright National Academy of Sciences. All rights reserved.

iv. describe "existing or planned interagency collaborative efforts that will contribute positively to SWIF development, implementation and oversight" (USACE, 2011).

b. Issuance of preliminary maps would be suspended until remedial action was completed. These levees would be left in the current program and any actions to remove them from accreditation would be suspended temporarily. Areas behind levees would remain outside of the SFHA and would be considered in Zone X.

c. To ensure the protection of the health, welfare, and property of those in the leveed areas, communities would be required to carry out the following actions:

i. individually inform all residents living behind the subject levees of the failure of the levee to meet FEMA and/or USACE standards, the nature of the deficiencies, resultant risks that exist, and steps being taken by the community to remediate the deficiencies;

ii. review and exercise emergency plans to include plans for the evacuation of residents from behind the levees; and

iii. encourage those behind levees to purchase insurance policies.

3. If communities do not intend to seek reaccreditation of deaccredited levees:

a. Mapping efforts would continue through issuance of the effective maps indicating that areas behind the levees are in the SFHA and subject to mandatory purchase requirements and land development regulations. At the time the new maps go into effect, the rate charged would be that for the SFHA.

b. After FEMA completes the development of a new risk-based analysis approach, the rates for these areas would be reassessed to reflect the degree of risk reduction provided by the less-than-compliant levees.

c. To ensure the protection of the health, welfare, and property of those in the leveed areas, communities would be required to carry out the following actions:

i. individually inform all residents living behind the subject levees of the failure of the levee to meet FEMA and/or USACE standards, the nature of the deficiencies, resultant risks that exist and the intention of the community to not remediate the deficiencies;

ii. review and exercise emergency plans to include plans for the evacuation of residents from behind the levees;

iii. encourage the purchase by those behind levees of insurance policies at the preferred risk rate;

iv. provide FEMA with reports of locally funded periodic inspections of the assessed levees to ensure that they continue to maintain the degree of protection used in the risk analysis.

4. Communities wishing to build a new levee in an existing SFHA or in an area where there is no flood designation should be required to construct the new levees to NFIP standards. Where a participating community has within its geographic bounds and within the SFHA levees that do not currently meet NFIP standards and that have never been proposed for certification, it would be possible, on completion of the development of risk-based analysis, for these communities to request, at community expense, FEMA evaluation of the levees to determine risk-based SFHA insurance pricing for properties affected by these levees.

## A CAUTION

Levees were introduced into the NFIP because, at the time, decision makers reasoned that because new construction within the SFHA would be required to be at or above one percent annual chance flood level in order to be removed from the mandatory purchase requirement, equity dictated that those protected by a one percent annual chance "flood control" structure should also be removed from the requirements of mandatory insurance and land management behind the structures. It was assumed that these structures would provide protection equal to or in excess of the protection provided by requiring the first flood of new development in the SFHA to be at or above the one percent annual chance flood level. As indicated in Chapter 2, because the decision that areas behind levees are not subject to the mandatory purchase requirement and land regulation, studies and internal deliberations between USACE and FEMA since the early 1970s have highlighted that the aggregate risk to those behind levees may be greater than the risk to those in front of the levees (FEMA, 2006; Galloway et al., 2006; NFIP Evaluation Final Report Working Group, 2006; ASFPM, 2007; CA DWR, 2007).

Copyright National Academy of Sciences. All rights reserved.

## REFERENCES

ASFPM (Association of State Floodplain Managers). 2007. National Flood Policy Challenges Levees: The Double-Edged Sword. Madison, WI: ASFPM.

CA DWR (California Department of Water Resources). 2007. A California Challenge: Flooding in the Central Valley. Sacramento, CA: Department of Water Resources.

FEMA (Federal Emergency Management Agency). 2006. The National Levee Challenge: Levees and the FEMA Flood Map Modernization Initiative. Washington, DC: FEMA.

FEMA. 2011a. Analysis and Mapping Procedures for Non-Accredited Levees. Proposed Approach for Public Review. Available online at http://www.fema.gov/library/viewRecord.do?id=4954. Accessed November 28, 2012.

FEMA. 2011b. National Flood Insurance Program: Answers to Questions About the NFIP. FEMA F-084. Available online at http://www.fema.gov/library/viewRecord.do?fromSearch=fromsearch&id=1404. Accessed February 15, 2013.

Galloway, G. E., G. B. Baecher, D. Plasencia, K. G. Coulton, J. Louthain, M. Bagha, and A. R. Levy. 2006. Assessing the Adequacy of the National Flood Insurance Program's 1 Percent Flood Standard. Washington, DC: American Institutes for Research. Available online at http://www.fema.gov/library/viewRecord.do?id=2595.

Kobayashi, K., and J. W. Porter. 2012. Flood Risk Management in the Peoples Republic of China: Learning to Live with Flood Risk. Mandaluyon City, Philippines: Asian Development Bank.

NFIP Evaluation Final Report Working Group. 2006. The Evaluation of the National Flood Insurance Program: Final Report. Washington, DC: American Institutes for Research.

Serra-Llobet, A., J. D. Tàbara, and D. Sauri. 2013. The Tous Dam disaster of 1982 and the origins of integrated flood risk management in Spain. Natural Hazards 65: 1981-1998.

USACE (U.S. Army Corps of Engineers). 2010. USACE Process for the National Flood Insurance Program (NFIP) Levee System Evaluation. Available online at http://publications.usace.army.mil/publications/eng-circulars/EC_1110-2-6067.pdf. Accessed November 27, 2012.

USACE. 2011. Memorandum for Commanders, Major Subordinate Commands, and Districts—Policy for Development and Implementation of System-Wide Improvement Frameworks (SWIFs). Washington, DC: USACE.

Copyright National Academy of Sciences. All rights reserved.

# 5

# Insuring Properties Behind Levees

Insurance is a method of prefunding (usually over time) the adverse consequences of a loss so as to have available funds to pay damages when they arise. It is a legal contract that transfers some of the financial consequences of an uncertain low-probability but high-consequence peril to another party (called an insurer) in return for periodic relatively low payments (premiums). If an event covered by the insurance contract occurs, and if coverage is triggered by conditions detailed in the contract, then the insurer will indemnify the insurance purchaser up to the limits of the insurance policy in accordance with the terms of the contract (e.g., the deductible, the policy limits, proof of loss, etc.). Thus, the value of insurance arises at the time of a covered loss, and can thus be viewed as a hedging instrument against the financial consequences of a loss.

In insurance nomenclature, the causes of loss is called a peril, and a condition or situation that increases either the likelihood or severity of the peril occurring is called a hazard. Risk, on the other hand, is the term used to designate the loss consequence of the realization of the uncertain peril, and it may be financial or nonfinancial in nature (e.g., reputational loss). Thus for example, fire is a peril, storing oily rags next to a gas water heater is a hazard for the peril of fire, and the loss of property and the financial losses due to fire-related property destruction is the risk. Concerning the peril of flooding, building unelevated property below the base flood elevation in a floodplain is a hazard, and the financial consequences of partial or total destruction of property due to flooding is the risk that the property owner faces. Risk is an adverse consequence of uncertainty concerning perils, and without uncertainty there can be no risk.

Not all risk can be insured in the private market (i.e., by private insurers) but when available, insurance can be part of an effective risk management strategy. Other parts of the risk management process include risk identification, risk assessment, risk mitigation or control, and risk communication. Insurance is not a risk mitigation technique, however, because the legal insurance contract does not change the physical probability or the severity of a realized peril, but rather it just allocates the cost to another party.[1]

From the perspective of the purchaser, insurance is a viable risk transfer technique when the probability of the event occurring, $p$, is relatively small and the consequence or loss, $L$, is relatively large (so as to be difficult to financially assume all at once by the purchaser without insurance), but such that the expected value in any given

[1] Insurance that is truly risk-based priced can motivate policyholders to mitigate risks to lower premium costs, but it is not that insurance itself that mitigates the risk, but rather the affirmative actions of the policyholder to lower frequency or severity.



Copyright National Academy of Sciences. All rights reserved.

year $p \times L$ is affordably small as a basic for an annual insurance premium calculation.[2] This expected value is called the "pure premium" in insurance and is subsequently "loaded" or modified to reflect insurance underwriting costs, claim adjusting and settlement costs, and returns to the providers of capital to the insurance organization. An additional loading is added to reflect the level of uncertainty in the estimation of the pure premium. Once loaded, the result is the actual premium charged to the purchaser of insurance.

As part of the National Flood Insurance Program (NFIP), the insurance component is one pillar to address catastrophic loss potential from floods (other pillars include motivating building and land-use restrictions in vulnerable areas and construction of dams, levees, and other structures). NFIP insurance is available to all property owners in communities that participate in the program. Coverage for flood damages extends up to $250,000 dollars for residential structures and $100,000 dollars for residential contents and $500,000 for business structures and $500,000 dollars for business contents.[3] Those that require greater amounts of coverage than available from the NFIP have access to additional flood insurance through private industry, e.g., their property insurance carrier.

## BASICS OF INSURANCE PRICING

Pricing is done in essentially the same manner in all areas of insurance with some differences in models and assumptions corresponding to the characteristics of the different types of insurance. Property and casualty insurance (also known as hazard insurance or general insurance in some areas) generally has a shorter contract duration, usually exists in a more highly regulated environment than life insurance, and has more complicated claims structure (with more correlated losses, the potential for multiple claims within the policy period, etc.). These characteristics have led financial/actuarial pricing formulas specifically tailored to the property or liability arena, which are somewhat distinct from the models used for pricing life and health insurance. A brief introduction to various aspects of property insurance pricing including manual rate setting and individual risk rating is presented. (More detailed examination of pricing of general property insurance is given by Ai and Brockett [2008] and by the Casualty Actuarial Society [1990].)

An (oversimplified) essential representation of pricing of insurance policies is that prices (or charged rates) should equal the expected present value of the future losses on the contract augmented by a load for expenses, plus an insurer profit load, plus a load to compensate the insurer for risk bearing (see equation (5-1)). Hence, the price for insuring a risk exposure is given by

$$P = E[\sum_{i=1}^{N} L_i V(T_i)](1+k_1)((1+k_2)(1+k_3), \quad (5\text{-}1)$$

where $P$ is the price, $E$ is the expectation operator representing the taking of the statistical expectation of the random variables involved in the brackets, and where

$k_1$ = the load for expenses (marketing underwriting, administration, taxes, claims adjusting, commissions, and general operating expenses);

[2] For insurance to be a viable alternative for an insurer to offer, there needs to be additional conditions that mitigate the financial hazard being assumed by the insurer so that the risk-assuming insurer itself does not go insolvent and can adequately manage the financial exposure they take on. These ideal conditions for a risk to be insurable include that (1) there be a large number of independent homogeneous exposure units to be insured (so the law of large numbers and the central limit theorem from statistics is available to the insurer for pooling and spreading risk among clients); (2) losses that occur are accidental; (3) a catastrophe cannot occur that affects a large number of exposure units simultaneously (this high correlation between losses thus defeating the independence of the exposure units and mitigating the insurers' use of the law of large numbers and the central limit theorem); (4) losses must be definite and measurable (so they can be priced); and (5) the probability distribution for losses should be determinable (so prices can be set). In addition to the above characteristics of a risk to be insurable, there are behavioral conditions that the customer can create which will make the insurer reluctant to offer insurance. One of these is adverse selection, which can occur when the individuals who have a higher likelihood of experiencing losses are disproportionately drawn to buying insurance defeating the risk pooling needed by insurers (e.g., if only high-flood-risk property owners seek flood insurance). Finally moral hazard also needs to be considered by insurers, where moral hazard is the term used to describe the behavioral property that can arise wherein the people who are insured will take fewer precautions than those who are not insured simply because they have insurance and are not fuly responsible for their losses. This escalates costs to insurers, and if severe moral hazard or adverse selection is anticipated, then insurance will not be offered (Baranoff et al., 2009).

[3] See floodsmart.gov.

Copyright National Academy of Sciences. All rights reserved.

$k_2$ = profit load (included so as to allow the capital suppliers to obtain a "fair" or competitive rate of return on capital);
$k_3$ = load for bearing uncertainty in future cash flows;
$T_i$ = (possibly random) time until payment of the *i*th claim during the policy coverage period;
$L_i$ = (possibly random) dollar severity realized in the *i*th claim, also called the severity (or size of loss) of the loss exposure;
$N$ = (possibly random) number of claims incurred during the policy period, also called the frequency;
$V(T_i)$ = the discounted present value of $1 payable at time $T_i$ (a priori this being a random stochastic process or a random variable).

Usually $V(T_i)$ is taken to have the form $V(T_i) = v^{T_i}$ where $v = 1/(1 + r)$ is the discount factor based on an interest rate $r$. Stochastic models taken for $N$ often include Poisson (for rare events) and binomial distributions. Statistical distributions chosen for $L_i$ generally depend on the particular hazard situation or peril involved. Indeed, the determination of appropriate statistical distributions and the dependence structure for $N$ and $L_i$ is a crucial part of property insurance pricing. (See Klugman et al. [2008] for explicit loss distributions models used in insurance pricing.)

Once calculated, these theoretical prices may be modified for political, social, or market competition reasons. For example, political or regulatory considerations may force the company to deviate from the theoretically derived prices and constrain or suppress rates (Witt and Hogan, 1993). Such regulatory intervention (and social influences) upon the mathematically derived pricing formulas occurs more in property insurance lines wherein purchase is mandated by contractual obligations (e.g., homeowners' insurance on mortgaged homes, comprehensive collision insurance on financed automobiles, etc.) and whose purchase is deemed .mandatory for social reasons (e.g., automobile insurance, workers' compensation, flood insurance[4]) (Ai and Brockett, 2008). Most state regulations impose the conditions that rates (or premiums) cannot be inadequate (to ensure solvency), excessive (to prevent excessive profits), or of an unfairly discriminatory nature (for social equity) (Ai and Brockett, 2008).

## Pricing Property Insurance Using "Manual Rates"

The notion of "manual rating" is setting the rate (or price) based on a basic rating table (or tables) that produces a price per unit for different classes of risks. From such tables the user can obtain a numerical value (say, dollars to charge per $1,000 of coverage) that is then applied to obtain a price for any designated risk within the class of risks covered by the table. Such manual rates are used generally to price homogeneous groups of exposure risks and are not tailored to the idiosyncratic characteristics of any specific individual. For such manually rated policies, the issue is how to determine the table entries from which the appropriate rates can be read.

Manual rate encompasses two basic methods: the loss ratio method and the pure premium method (Casualty Actuarial Society, 1990). The pure premium method bases the rate on the expected fundamental loss exposure probability distribution itself. Mathematically,

$$R = \frac{E[L] + F}{1 - V - Q}, \tag{5-2}$$

In equation (5-2), $R$ denotes the rate per unit of exposure, $E[L]$ denotes the expected loss per unit of exposure (called the pure premium or actuarial value), $F$ denotes the per-exposure unit fixed expense, $V$ is a variable expense factor, and $Q$ is a risk contingency factor that also incorporates anticipated profit. Essentially, this is analogous to equation (5-1) in that it says the rate should be sufficient to pay expected losses after allowing for required profits and fixed and variable expenses (Ai and Brockett, 2008).

The expected loss per unit of exposure is calculated as the discounted present value of the loss(es) per exposure

[4] According to the Federal Emergency Management Agency revised edition of the Mandatory Purchase of Flood Insurance Guidelines (FEMA, 2007), "The mandatory purchase law directed the Federal agency lender regulators and Government-Sponsored Enterprises (GSEs) to develop and adopt regulations requiring lenders subject to their jurisdiction not to make, increase, renew, or extend any loan on applicable property unless flood insurance is purchased and maintained to protect that property securing loans in high flood risk areas."

Copyright National Academy of Sciences. All rights reserved.

unit, $E[\sum_{i=1}^{N} L_i V(T_i)]$. After calculating this value for each possible rating class, a table (or set of tables) of values is created such that every possible exposure unit is uniquely found within a table. The coverage rate for a new exposure is ascertained by first determining the exposure's class, and then reading the multiplicative factor for this class from the corresponding table. Ultimately, by multiplying the number of exposure units encompassed by the risk exposure to be priced times this factor, a premium is determined. The difficulty in applying this method is appropriately stochastically modeling the frequency, $N$, and severity, $L_i$, variables and their dependencies. Many books on statistical analysis have been devoted entirely to this topic (cf. Klugman et al., 2008).

The second method, called the loss ratio method, is really a premium adjustment method as opposed to a premium-setting method. It assumes a current rate ($R_0$) and determines a rate change for the next year by multiplying by an adjustment factor ($A$) to obtain a new rate $R = AR_0$. The adjustment factor ($A$) is the ratio of the experienced loss ratio ($Y$) to a prespecified target loss ratio ($T$). Mathematically, $R = AR_0$, where $R_0$ is the current rate, $A = Y/T$, and $Y = L/[(R_0)(e)]$, where $L$ denotes the current period experienced losses and $e$ is earned exposure for the experience period. The target $T = (1 - V - Q)/(1 + M)$, where $V$ denotes the premium-related expense factor, $Q$ is the factor for contingencies and profit, and $M$ is the ratio of nonpremium-related expenses to losses. The loss ratio method (by construction) is not applicable when a current rate is unavailable (such as for new lines of business). Still, it allows the insurer to obtain new rates for the next period by updating the previous period's rates. Brockett and Witt (1982) show that "when current prices are set by a regression methodology based on past losses, and the loss ratio method is used to adjust prices, then an autoregressive series is obtained, thus partially explaining insurance pricing cycles". Although the loss ratio method and the pure premium method are constructed from different perspectives, one can show that the methods yield the same prices given the same data (cf. Casualty Actuarial Society, 1990).

### Individual Risk Rating

To obtain prices for individual exposure units, one can make modifications to the manual rates to accommodate for individual characteristics. A basic approach is to use a so-called credibility formula,[5] where individual loss experience is incorporated with an estimation of expected losses for the risk class derived from some other source to obtain a blended or averaged rate concatenating individual loss experience and exogenous derived expected losses (Ai and Brockett, 2008). Two such rating schemes are prospective rating and retrospective experience rating (Casualty Actuarial Society, 1990), where the rate for a future period is determined using a weighted combination of expected losses (from some other source such as industry data) an individual experienced losses.

In addition to the above methods, a somewhat different method for individual risk rating is called schedule rating (Ai and Brockett, 2008). It adjusts the manual rates to reflect individual risk characteristics that may affect future losses. Unlike the above individual risk rating methods, however, it does not necessarily use individual loss experience to make this adjustment, but instead creates a factor to apply to the manual rate to account for characteristics known to affect the likelihood of losses (e.g., a certain building standard, such as height of first floor, may result in a multiplicative factor less than one being applied to the manual table rates for flood insurance) (Ai and Brockett, 2008).

## CURRENT RATE-SETTING PRACTICES WITHIN THE NFIP

FEMA's National Flood Insurance Program (NFIP) has approximately 5.6 million policies insuring over a trillion dollars in assets. Currently, 21,881 communities participate in the NFIP.[6] Broken down by structure type, this includes

[5] The concept of credibility theory, which dates back to Mowbray (1914), is said to be "the casualty actuaries' most important and enduring contribution to casualty actuarial science" (Rodermund, 1990).

[6] As of June 2012.

Copyright National Academy of Sciences. All rights reserved.

- 3,839,254 single-family policies,
- 281,508 nonresidential (i.e., commercial) policies,
- 341,607 multifamily (non-condominium) policies,
- 1,123,427 units (in 78,821 contracts or buildings) Residential Condominium Building Association policies.

The above numbers include all NFIP policies regardless of flood zone designation and 10,361 properties that have been designated as severe repetitive loss properties[7] (Andy Neal, FEMA, personal communication, July 19, 2012).

The purpose of this section is to explain the current process by which the NFIP sets rates and discuss the similarities and differences related to traditional private insurance processes for setting risk-based rates. Next, comments on the actuarial and fiscal soundness of the NFIP on the basis of the risk premium methodology used are presented. Finally, improvements and advancements that can be made to better serve the goals of the NFIP and the pricing of flood insurance are discussed.

## Full-risk Class Rates

FEMA evaluates the flood risk of policy holders and determines rates for the "full-risk" class through a balance of elements including the extent and type of flood hazard, the base elevation of the insured structure and the structure type,[8] the contents location (first floor, second flood, etc.), and whether or not the community participates in the Community Rating System[9] that provides discounts for communities that actively manage their flood risk (Box 5-1).

At the core of FEMA's risk-based rate setting is the calculation of the expected loss for a property. FEMA calculates community losses using average annualized loss data (Box 5-2). In theory, this is calculated for each property by conditioning upon the floodwater level and the probability of that level of water inundation occurring during the year. Thus, they assess the frequency or probability that the floodwaters will reach an elevation of $i$ (which they denote by probability of elevation or $PELV_i$). This number is then multiplied by the "loss severity" that would occur at the structure if the floodwaters reached level $i$ (i.e., damage based on water depth in a given structure), which they denote by damage by elevation ($DELV_i$). This is then summed over all possible water elevation levels to arrive at an expected loss.[10]

$$\text{Expected Loss} = \left[\sum_{i=\text{Min}}^{\text{Max}} (\text{PELV}_i \times \text{DELV}_i)\right] \quad (5\text{-}3)$$

This is consistent with a standard actuarial method for calculating the expected loss due to flooding similar to the pure premium method described in equation (5-2) earlier. In practice, properties having similar risk-related covariates (flood risk elevation, construction type, zone, etc.) are grouped together, and a single rate is given to all properties in this class nationwide. This is essentially similar to risk-based rate setting by private insurers in property insurance and automobile insurance where entities having the same set of underwriting classification characteristics are grouped together and given the same rate. Risk pooling in this regard is also used by private insurers to spread the risk.[11]

---

[7] Severe repetitive loss properties, as established in Section 1361A of the National Flood Insurance Act, as amended, 42 U.S.C. § 4102a) is defined as a residential property that is covered under an NFIP insurance policy and has at least four claim payments and for which two of these payments in total have exceeded the market value of the property. See http://www.fema.gov/severe-repetitive-loss-program.

[8] Condominium, single or multi-family home, residential or commercial use, number of floors, with or without a basement, ventilated crawlspace, etc.

[9] The discounts given under the Community Rating System are modeled back in to the expected aggregate premium calculation for the NFIP by adjusting all premiums upward so that the aggregate premium collected is sufficient to cover expected losses accounting for CSR discounts for the CSR discounts. Thus, CRS discounts constitute a relative discount which is adjusted for in the aggregation and is not an uncompensated for diminution of income as occurs with other types of non-full-risk class policies. (Andy Neal, FEMA, personal communication, August 22, 2012).

[10] See Hayes and Neal (2011, Appendix).

[11] Although risk pooling is used in private insurance, there have been questions about the appropriateness of the breadth (nationwide) of NFIP's grouping of all properties within the same zone classification for the purpose of obtaining a single rate applicable to all properties in the

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 668 of 858



**BOX 5-1**
**FEMA's Community Rating System**

FEMA's Community Rating System (CRS) is a voluntary incentive program that encourages floodplain management activities exceeding the minimum NFIP requirements. The CRS has 1,211 participating communities among the approximately 21,000 communities participating in the NFIP. However, policies held within CRS communities represent 68 percent of the policies in force (Bill Blanton, FEMA, personal communication, July 10, 2012).

Typically, communities receive between a 5 and 15 percent discount for participating in the program with a maximum discount of approximately 45 percent (FEMA, n.d.a; Bill Blanton, personal communication, July 10, 2012). Discounts are calculated based on a credit point system for actions that help save lives and property in the event of a flood—and that exceed the minimum NFIP requirements. There are four categories of activities that are credited: (1) public information programs that advise the public about the hazard, flood insurance, and strategies for reducing the hazard; (2) mapping and regulation programs that increase protection to development that postdates existing maps; (3) flood damage reduction programs, such as relocating or retrofitting vulnerable structures); and (4) flood preparedness programs, such as flood warning and dam and levee safety programs (FEMA, n.d.a). For additional insight regarding the CRS, see Chapter 7.

**BOX 5-2**
**Average Annualized Flood Losses**

Average annualized losses (AALs) due to flooding represent the estimated value of flood losses in any given year in a selected region. Analysis of such data provides information on changes in losses by geographic area that are useful in identifying loss trends and geographic anomalies in loss patterns. The data are also useful to leaders in establishing policies and priorities and developing flood risk management strategies.

FEMA's Hazus-Multi Hazard (Hazus-MH) offers analysts the opportunity to quantify annualized flood losses in a given community over multiple flood recurrence intervals. The Hazus-MH program, which can calculate damages, casualties, and economic losses, is based on national data from U.S. government agencies. It may also use, when available, higher resolution data available within the communities. For flood AALs, it calculates losses under each of five flood recurrence intervals (10, 25, 1.0, 0.5, and 0.2 annual chance floods or 10, 50, 100, 200, and 500 years, respectively) and then multiplies the loss values by their respective annual frequencies of occurrence, then summing the values for an annual average. This approach is focused on the recurrence intervals within the bounds of FEMA FIRMs' upper delineation, the 0.2 percent flood. Additional calculations using recurrence intervals for extreme events (>0.2 percent) would provide a more robust portrayal of the potential AALs but would likely increase the costs of the AAL process.

FEMA began the calculation AALs in 2009. Pilot data on flood AALs have been released for initial review within the floodplain management community but release of the entire report is awaiting final FEMA review. The use of Hazus-MH provides a relatively straightforward and simple but time-consuming method of making such calculations. Because the quality and resolution of the data used are subject to considerable variation across the country, the resultant AAL figures should be taken as general estimates and not high-resolution information. Such an approach is appropriate for the management uses envisioned by FEMA.

Copyright National Academy of Sciences. All rights reserved.

The determination of the components in the above expected-value calculation is as follows: The event frequency (probability) or PELV is obtained by reference to a collection of PELV probability curves created to describe the probability of various water depths relative to the 1 percent flood depth, that is, at this property the probability of a flood during the year reaching the height +2 (2 feet above the base flood level of the one percent annual chance flood) is a certain point on the PELV curve.[12] The PELV curves provide probabilities up to the 0.2 percent annual chance event (flood recurrence interval of 1 in 500 years). For all flood events greater than the 0.2 percent level, the program assumes a "catastrophic" water depth level by doubling the 0.2 percent depth. Because of the low likelihood of this "catastrophic" water depth level and because of the generally small marginal increase in the damage assumption between the 0.2 percent water depth and the damage at the assumed catastrophic depth, this approximation does not affect the rate significantly. Currently, "residual risk" resulting from the likelihood of overtopping a levee, levee failure, human development resulting in other topographic changes affecting inundation probability, and so on are not mapped or considered in the PELV determinations (FEMA, 2006).

The second component in the above expected-value calculation, the damage estimate as a function of the water depth elevation, or DELV, is based on historical damage data obtained by FEMA associated with different water depths in the given zone, and varies with structure content and location. When the NFIP's historical damage data are sufficiently credible[13] based on the number of claims and the variability of those claims, the NFIP data are used to develop the statistical damage estimate. When historical NFIP data are absent, U.S. Army Corps of Engineering (USACE) data are used. When some historical NFIP data are available but are is not fully credible (in an actuarial sense), the NFIP program uses a blend of NFIP data and USACE data to determine the DELV variable. This is consistent with standard property and casualty actuarial practice in private insurance.[14]

Once the expected loss is determined, the actual premiums or rates for the NFIP are determined by "loading" the expected losses in a manner similar to equation (5-3). Specifically, the charged rate for the group charged at the full-risk costs is determined by the formula

$$\text{Rate} = \left[\sum_{i=\text{Min}}^{\text{Max}} (\text{PELV}_i \times \text{DELV}_i)\right] \times \frac{\text{LADJ} \times \text{DED} \times \text{UINS}}{\text{EXLOSS}} \qquad (5\text{-}4)$$

where LADJ is the loss adjustment expense loading, similar to the factor $k_1$ in equation (5-1), and DED is a factor that adjusts the DELV variable to compensate for the amount of the deductible chosen (so that the loss actually paid reflects the deductible amount) (Hayes and Neal, 2011). The variable UINS represents an adjustment to account for the underinsurance amount because not all properties can (or do) insure to their full value. The UINS factor is determined by the NFIP using a review of past insurance claims data. Incurred losses are a nonlinear function, with most losses being smaller and relatively fewer losses being much larger (i.e., the loss distribution is skewed); hence the variable UINS adjusts the loss for the percentage coverage to account for this nonlinearity (Hayes and Neal, 2011). This is similar to traditional homeowners insurance. Currently the value used for LADJ is 1.05 and

---

zone nationwide, without regard to state or topography. For example, the comparison of losses to premiums over time differs dramatically across states even within similar zones. This suggests that some properties in one state are cross-subsidizing other properties in other states because they are charged the same rate but have much different loss probabilities or risks (GAO, 2008). In a competitive insurance market with many participants, such cross-subsidization would be arbitraged away because an insurer who can identify those policyholders being overcharged relative to their risk (the subsidizers) would recruit such policyholders by offering lower premiums until perceived discrepancies disappear. Because the NFIP is essentially a monopolistic insurance provider, this cross-subsidization may continue to exist, and innovation to identify better pricing methods and cross-subsidization opportunities may not be pursued with the same vigor as in the private competitive market.

[12] The curve for a given flood zone (A01-A30) is based on the difference between the 1 percent flood elevation and the 10 percent flood elevation with each policyholder being assigned a PELV curve. The original PELV curves are based on studies conducted at the time the program was established. FEMA is currently collecting data to reevaluate the original PELV curves (Andy Neal, FEMA, personal communication, November 7, 2011).

[13] In actuarial practice "creditability theory" delineates when there is sufficient historical data to give a confident assessment of losses for estimation purposes, and how to augment the estimate of loss using auxiliary datasets when there are not sufficient historical data. See Casualty Actuarial Society (1990).

[14] The accuracy of the loss data used for determining the values of DELV has been questioned since many entries in the NFIP data set obtained from claims history have loss values but are missing data on elevation at the site. In these cases NFIP uses a zero elevation in their calculation, which will bias the losses experienced at zero elevation, and distort the DELV curve values. See GAO (2008) for details and references to further studies validating this criticism.

Copyright National Academy of Sciences. All rights reserved.

the value used for DED is 0.98 (Andy Neal, FEMA, personal communication August 22, 2012). Finally, the factor EXLOSS represents the expected loss ratio and contingency loading[15] and adjusts the rate to accommodate commissions, acquisition costs, and other costs such that the rate times the expected loss ratio is sufficient to cover the expected loss accounting for the loss adjustment expenses as well as the idiosyncratic choices by the purchaser of the deductible and underinsurance amount. Again, this formula is actuarially appropriate given the constraints and attributes of the program (absence of bankruptcy risk, ability to borrow from the government, etc.).

### Discounted Rates

By statute, Congress mandated that the NFIP make flood insurance available to certain properties at less than their full-risk rates, that is, at discounted rates below those specified by equation (5-2). This occurs. for example. if (1) a structure was built before the flood insurance maps were available, that is, it was a "pre-FIRM" (Flood Insurance Rate Map) structure or built before December 31, 1974; (2) a structure was built in a V zone before 1981 and before maps that consider wave height were adopted in setting flood insurance rates; (3) a structure is in an AR or A99 zone for levees in the course of reconstruction or construction (so their current actuarial risk does not correspond to their current risk charge); or (4) the policyholder participates in a group flood insurance policy.

Discounts for structures that were built pre-FIRM or where the NFIP does not have any elevation information are by far the largest group—with 1,082,201 policies or a little less than 20 percent of policyholders. Only 7,508 policies are discounted because of entering the program prior to including wave height in rate setting, that is, pre-1981 V zones. Discounted rates are applied to approximately 24,907 policies for property owners behind levees in construction or deaccredited levees but where the community is showing a good-faith effort to construct levees or repair the levees (AR/A99).

#### Pre-FIRM Policies

The largest group of discounted policies consists of those that predate the existence of the flood insurance maps. By legislative directive, pre-FIRM policies were given a discount in order to encourage community participation in the NFIP, to help maintain property values for homeowners who might not have known of their flood risk at the time of purchase, and to encourage NFIP participation among those with a higher risk of floods (Michel-Kerjan, 2010). Currently, of the 5.6 million NFIP policies, there are 1,082,201 or approximately 19.3 percent of the policies that are pre-FIRM discounted policies (Andy Neal, FEMA, personal communication, July 19, 2012). These can be further decomposed as

- 736,066 single-family policies (150,674 of those are nonprincipal residences),
- 82,387 nonresidential policies (commercial) policies,
- 93,669 multifamily (non-condominium) policies, and
- 170,079 Residential Condominium Building Association policies (corresponding to 11,516 contracts or condominium buildings).

By statute, highly discounted premiums have been made available for pre-FIRM buildings in the Special Flood Hazard Area (SFHA). Not all structures that were built in SFHAs prior to the FIRM are discounted, however, because some structures meet more stringent building codes and qualify for better rates on a full-risk basis because of elevation above the base flood level than they would receive taking the discount off the higher SFHA rate. For the discounted older buildings, the average full-risk premium is about five times greater than the average full-risk premium for compliant buildings. With the discounted premium level, the noncompliant NFIP discounted buildings only pay between 40 percent and 45 percent of what they should pay would they be charged using the actuarially determined full-risk premium for being in the SFHA. Even so, their discounted premiums are still much

[15] Currently, the contingency loading incorporated into the EXLOSS factor includes a 10 percent additional load in nonvelocity zones and 20 percent in velocity zones (cf. Hayes and Neal, 2011).

Copyright National Academy of Sciences. All rights reserved.

higher than those that would be paid by actuarially rated policyholders for buildings constructed in compliance with the building codes.

The status of the pricing subsidies given to certain policyholders will change in the future. The Biggert-Waters Flood Insurance Reform Act of 2012 included provisions that were intended to help the fiscal soundness of the NFIP by eliminating certain pre-FIRM discounts and increasing the ability of the NFIP to raise rates to achieve fiscal soundness (Nechamen and Inderfurth, 2012). Effective July 1, 2012, pre-FIRM discounts are being removed from certain types of properties, with permissible increases in their flood insurance rates of up to 25 percent per year until the actuarial rate level is achieved for the property. Discounted policies losing their discount include nonprimary residences (e.g., second homes), severe repetitive loss properties,[16] all business properties, homes that have had substantial damage or improvements (of over 30 percent of the market value of the property) after the implementation of the Act, and several other classes of properties (Nechamen and Inderfurth, 2012).

### Group Flood Insurance Policies

A group flood insurance policy is a discounted policy offered after a presidentially declared flood event for property owners who qualify for federal individual assistance. Qualifications include low-income property owners who do not qualify for a Small Business Administration disaster loan. On a one-time basis, owners are provided by FEMA with a 3-year policy with a coverage amount equal to FEMA's Individual and Households Assistance Program maximum (currently $31,400). The policy premium is set according to 44 CFR §61.17 at $600 per year, which is typically subtracted from the insurance adjustment payment received in the event of a loss (Andy Neal, FEMA, personal communication, January 15, 2013). Approximately 42,000 group flood policies were issued in the wake of Hurricane Katrina. These policies will eventually become nondiscounted and will be charged actuarial rates, and so they constitute a short-term imbalance, but new group flood insurance policies will be created as new floods occur (continuing to affect the fiscal soundness of the NFIP).

## Grandfathered Rates

Grandfathered policy rates are applied to certain policies when revisions to FEMA's FIRMs result in increased premiums. Unlike the discounts described above, grandfathering is achieved through cross-subsidies with other policyholders. Grandfathered rates are available to structures that were built in compliance with a particular map or to structures that purchased a policy prior to the revised map's effective date, and whos purchasers have maintained continuous coverage since the map change. Grandfathering can apply to both the flood zone changes, resulting in zone grandfathering, and the one percent flood elevation changes, resulting in elevation grandfathering.

The most common form of zone grandfathering occurs when a policyholder was once outside the SFHA and paying a lower rate, but is now included in the SFHA because of to remapping. In this case, non-SFHA to SFHA zone grandfathered policies do not pay the lower preferred risk policy (PRP) non-SFHA rate. Instead they pay an average rate, called the X zone standard rate that is sufficient for the spread of risk for all non-SFHA to SFHA zone grandfathered structures. Effective October 1, 2010, FEMA introduced a 2-year PRP extension, allowing structures that were recently mapped into the SFHA to use PRP rates for a limited, 2-year period before moving to the higher X zone standard rate. This was achieved through a cross-subsidy by increasing the premium for all PRP policyholders. Approximately 90,000 PRP 2-year extension policies have been issued. There are approximately 1.6 million non-SFHA PRP policyholders (Andy Neal, FEMA, personal communication, August 9, 2012).

Zone grandfathering can also occur when a policy moves from a lower risk zone to a higher risk zone, for example, from an AE zone to a VE zone. In this case, the grandfathered structure pays the lower AE zone rate. Elevation grandfathering applies when new maps increase the elevation of mapped 1 percent flood without chang-

[16] The Biggert-Waters Act defines severe repetitive loss properties as those that have "incurred flood-related damage (i) for which 4 or more separate claims payments have been made under flood insurance coverage under this title, with the amount of each claim exceeding $5,000, and with the cumulative amount of such claims payments exceeding $20,000; or (ii) for which at least 2 separate claims payments have been made under such coverage, with the cumulative amount of such claims exceeding the value of the insured structure."

Copyright National Academy of Sciences. All rights reserved.

ing the zone. For example, a property that was 3 feet above the 1 percent flood elevation according to the previous FIRM and is now only 1 foot above the 1 percent flood elevation according to the revised FIRM would be eligible to use the +3-feet rate. FEMA is currently engaged in a study to quantify the number of zone and elevation grandfathered policies (Andy Neal, FEMA, personal communication, August 9, 2012).

The use of grandfathered rates does allow the grandfathered properties pay a lower rate than they would pay if the property were truly risk rated, and hence grandfathering implies that not all properties having the same NFIP premium are actually of the same risk level. This is a move away from risk-based pricing. Because properties receiving a higher risk classification under the Map Modernization program continue to receive insurance at the lower, pre-Map Modernization rate in spite of their now-recognized higher risk, the effect is similar to subsidization in that some properties are not charged their risk-based price, but rather the price that would have occurred if they had remained in their previous risk classification. Moreover, the grandfathered status continues indefinitely, even upon sale of the property (GAO, 2008).

### Expected Annual Income from Premiums from the NFIP

To ensure an adequate aggregate expected annual income from premiums for the NFIP as a whole, the premiums are adjusted for the discounted risk classes. First, the aggregate expected full-risk premium anticipated to be received using the rating formula for the nondiscounted classes is calculated, the calculated base rates for the subsidized classes is added in, and then this value is subtracted from a calculated target "average historical loss year" value. The resulting difference is then used to determine an upward adjustment of rates among the discounted classes so as to accomplish a balance between the total anticipated income received and the targeted average historical loss year cost set by the NFIP. Note that by this process, some properties will be paying more than their actuarial rate.

There is a problem with this method, however. As noted by the Government Accountability Office (GAO) the"average historical loss year value is calculated using loss data over a limited loss experience time frame coupled with extreme loss values, such as the 2005 loss year (Box 5-3), which are heavily discounted when input into the historical loss year calculation (GAO, 2008).[17] Thus, this historical loss year average value may balance the books in an historically typical year, but this value is neither a reasonable estimate of either actual historical average yearly losses (which now do include catastrophic loss years such as 2005), nor a reasonable long-term estimate of the actual expected future loss because it diminishes the impact of real or anticipated catastrophic loss events that have happened in the past and can be expected to happen again in the future.[18] **The method used to calculate the average historical loss year ensures that in the long run there will be inadequate premiums collected to cover costs in significant flood years.**[19] Even with the mandate in the Biggert-Waters Act that catastrophic loss years be fully incorporated into the NFIP calculation of the "historical loss year average," there is still a potential long-run shortage becausee larger but less frequent catastrophic floods (500-year floods, 1,000-year floods, etc.) may not have been recorded in the flood record at a particular location (although their likelihood might be modeled), yet these events might occur in the future. Hence, the historical average does not reflect the real expected long-term average loss.

### NFIP's Approach to Insurance Compared with Private Insurer Approaches

Insurance companies started to appear in the United States in the mid-1700s but did not expand rapidly, and encountered many bankruptcies at first. Early insurers were small, localized in geographic coverage, and usually

[17] For example, since 2007 the catastrophic losses from the 2005 year were given only a 1 percent weight in the historical loss averaging process in "an attempt to reflect the events of 2005 without allowing them to overwhelm the pre-Katrina experience of the Program" (Hayes and Neal, 2011).

[18] The full-risk class and the risk classes outside the 100-year flood level have premiums calculated using formula (5-2) and already incorporate the possibility of catastrophic risk.

[19] FEMA itself recognized the inadequacy of using the mandated "historical average loss year" goal in premium setting even prior to the dramatic 2005 losses. From the NFIP's 2004 Annual Rate Review, "[t]he underwriting experience period has, to date, included 7 heavy-loss years. Despite these heavy-loss years, the absence of extremely rare but very catastrophic loss years leads to the conclusion that the historical average is less than what can be expected over the long term" Hayes and Sabade (2004).

Copyright National Academy of Sciences. All rights reserved.

Levees and the National Flood Insurance Program: Improving Policies and Practices




**BOX 5-3**
**The 2005 Loss Year**

The record-breaking hurricane season of 2005 included five Category 4 and 5 hurricanes—Dennis, Emily, Katrina, Rita, and Wilma—that battered the Gulf Coast of the United States along with neighboring countries. In addition, the Los Angeles River experienced flooding in January 2005, and there was flooding in New England and the Mid-Atlantic during October 2005 caused by excessive rainfall due to a subtropical depression, Tropical Storm Tammy, and another tropical disturbance. The NFIP experienced an unprecedented amount of paid losses, 212,235 claims, totaling over $17 billion (Figure 5-1).




FIGURE 5-1 Loss dollars paid by the NFIP per calendar year.
SOURCE: http://www.fema.gov/policy-claim-statistics-flood-insurance/policy-claim-statistics-flood-insurance/policy-claim-13/loss.

specialized in a single type of insurance (e.g., fire insurance). Thus, initially, private localized insurers were reluctant to include flood coverage because of potential highly correlated losses and catastrophic total loss payment possibility (floods would simultaneously affect many of their customers, undermining the law of large numbers and central limit theorem for advantageous risk pooling) and because of the lack of ability to calculate appropriate actuarial rates that were protective of the insurer and at the same time affordable to the policyholder. Additionally, moral hazard and adverse selection considerations would imply that in a voluntary market the higher risk properties would disproportionately seek insurance and those that had insurance would be less motivated to take precautionary measures if they had insurance coverage. Nevertheless, in the late 1920s, there were still several dozen insurers willing to sell flood insurance, perhaps in part because USACE had declared in 1926 that improvements had been made to the levee system sufficient that they could now “prevent the destructive effects of floods” (Daniel, 1977; see also Moss, 1999; King, 2005).

The problems with private companies writing flood insurance policies were brought home dramatically by the great Mississippi River flood of 1927 and other riverine flooding in 1928, so that all of these several dozen insurers

Copyright National Academy of Sciences. All rights reserved.

stopped writing flood policies (King, 2005). Private flood insurance has been essentially unavailable in the United States for residential property since then (Browne and Halek 2010). The previously described ideal characteristics needed for a risk to be privately insurable are simply, to a large extent, missing in flood risk (Baranoff et al., 2009). According to William Hoyt and Walter Langbein in 1955, floods "are almost the only natural hazard not now insurable by the home — or factory owner, for the simple reason that the experience of private capital with flood insurance has been decidedly unhappy" (Moss, 1999).

The lack of availability of flood insurance did not stop floods from occurring, nor did it stop development in flood-prone areas.[20] Such flooding motivated the federal government to provide aid to the victims as a humanitarian action. Over time the post-disaster aid moved increasingly away from being primarily provided by private charities (e.g., the Red Cross provided most of the relief in the 1927 Mississippi River flood) to a more central role for federal assistance (Moss, 1999). Indeed, the federal government has had an ever-increasing role in providing disaster relief after floods, and this increased involvement in after-the-fact emergency aid to disaster victims prompted Congress to investigate creation of a federal flood insurance program that could be considered as a form of preloss financing (Moss, 1999). Whereas private insurers feared the catastrophic and highly correlated nature of flood losses to local insurers, a federal program could spread risk nationwide and could make premiums more affordable by not charging (and reserving) for periodic very large disasters. Moreover, the federal government has the ability to mandate purchase, mitigating the adverse selection problem, and enforce building codes, mitigating some of the moral hazard problems. In 1968, Congress passed the National Flood Insurance Act[21] with the goal of creating a preloss (insurance) financing arrangement that would lower post-loss disaster relief, encourage responsible development in floodplain areas, and encourage maintenance of flood control operations (e.g., levees).

Browne and Halek (2010) give a comprehensive review of the developments in the federal flood insurance marketplace since the passage of the 1968 law creating the NFIP. Moreover, the challenges reaching the original legislative goals of the NFIP and the various legislative flood insurance law changes enacted to address the shortcomings are detailed in other sections of this report. It remains true, however, that for the reasons previously stated, the private market for flood insurance is still problematic. Private flood insurance is primarily available to commercial businesses that can demand flood coverage as part of a larger insurance program that includes "all-risk" coverage.[22] The NFIP remains the primary source of flood insurance for almost all homeowners and small businesses. However, there are a limited number of private insurance companies that offer flood insurance coverage for homeowners and small businesses as excess protection above the NFIP coverage limitations.

There have been many criticisms of the NFIP based on the perception that it does not operate like a private insurer, and impressions of how it should operate are based on notions of how private insurance operates. For this reason, and to set expectations of what is and is not possible for the NFIP in perspective, it is useful to compare the NFIP operation with those that occur in a private insurance setting. Toward this end, it is important to note that there are several ways in which the NFIP operates and prices risks that differentiate it from how a commercial insurer would price similar flood risks. These are in part due to the governmental nature of the NFIP which has different goals and constraints than private insurers, and these differences are briefly detailed below.

First, and importantly, commercial insurers must manage their capital reserves to ensure that they are able to honor their commitment to claims payable for policies in force at any one moment and to remain solvent for paying future claims. This is especially a challenge for any peril that has a potential for a major loss aggregation, of which flood is one of the greatest challenges. The private insurance industry is heavily regulated to ensure that policyholders can be confident that insurers will be able to honor claims made for the coverage they have purchased.

Commercial insurers also consider the time value of money and discount losses from the time of occurrence ($T_i$) to the time of premium payment using a discount function, $V(T_i)$ that reflects their cost of capital, per equation (5-1). In the NFIP, the time value of money is not considered, and no adequately large contingency reserve has been set up to pay future claims because FEMA is backed by the U.S. Treasury Department should the premiums

[20] Along this line, Moss (1999) quotes a congressional task force (U.S. Congress, 1966) as recognizing this problem when they observed "Floods are an act of God; flood damages result from acts of men."

[21] Public Law 90-448.

[22] "All-risk" or "all-peril" policies cover any fiscal loss unless it is specifically excluded in the policy.

Copyright National Academy of Sciences. All rights reserved.

collected prove insufficient to pay claims. Indeed, if the NFIP had been able to set up a contingency reserve fund that grew large enough during noncatastrophic loss years to be able to fund the losses in catastrophic loss years, the "perceived excess" might be reclaimed and spent elsewhere in the federal budget. By contrast, private insurers *must* be self-sufficient and hence must consider the time value of money and the cost of capital and set up a reserve to forestall insolvency.[23]

Next, while the NFIP sets premium rates (for the full-risk class) sufficient to pay its own expected claims (including catastrophic claims), the classes of subsidized policyholders paying discounted prices makes no allowance for extreme nonhistorical-average-loss years in the premium calculation for the discounted classes. As noted above, the method used to calculate the average historical loss year for the NFIP ensures that in the long run there will be inadequate premiums collected to cover costs in significant flood years. A private insurer would not use this financially unsound, downwardly biased risk premium method without facing the extreme uncertainty of returns and danger of future insolvency.

Another difference between NFIP and a private insurer is that there is no profit factor loading in the formula for premium setting by FEMA. It can be argued that elimination of the profit loading factor might make sense for governmentally run programs because the objective function of a governmental program is different from that of a for-profit insurance firm. Additionally, NFIP does not need to compete in the capital markets to attract investor funds,[24] and the issue of NFIP loss-induced insolvency and continued survival are not issues for the government-run program because of the financial backing of the government and its taxing authority. Moreover, neither is the profit or return on capital investment an objective of the government-run program, but rather the government has a societal welfare objective function (rather than a "profitability" objective function).

Since its formation the NFIP has had an objective of encouraging participation in the program, motivating community building standards, and making premiums affordable. Affordability of premiums has been and continues to be a prime concern of FEMA and is one important motivation for allowing discounts and subsidies in the program and for not adjusting premiums upward to reflect periodic catastrophic losses. To "load" the pure premium sufficiently to allow the NFIP to withstand reasonably anticipated, low-probability catastrophic losses (such as those in 2005 and worse) would require substantially elevated premiums. Setting aside such catastrophic contingency reserve capital, as would be necessary to endogenously withstand the financial consequences of catastrophic flooding, could undermine the societal welfare objective of encouraging community participation because premiums would necessarily rise, sometimes significantly, making some policyholders drop out of the market.

Moreover, given the parallel involvement of the government in flood disaster relief (separate from insurance), from a governmental perspective there is a natural trade-off between insurance pricing and disaster relief costs. Either way, the government pays (Czajkowski et al., 2012). Suppressing current insurance premiums and not allowing the buildup of large contingency reserves for future claims payments will lower current premium costs, encourage participation in the NFIP, and reduce the amount of disaster relief needed from the government after a flood. On the other hand, such a strategy of suppressed rate setting runs the inevitable consequence of periodic subsidization of the NFIP in catastrophic loss years. This is another issue that makes the NFIP rate-setting methodology differ from private insurers' rate-setting methodology, in part due to the governmental backing and differing objective function.

Further compounding the issue, the dual role of the government in providing both flood insurance and flood disaster relief (even to those who did not purchase insurance) presents what Browne and Hoyt (2000) refer to as "charity hazard" wherein the individual does not have the motivation to take proactive steps (such as risk financing or insurance purchase) when they believe that after an event they can depend on the charity of others (the government, charitable organizations such as the Red Cross, etc.). Although in truth the amount of money received by

---

[23] Under provisions of the Biggert-Waters Act, FEMA is to establish a National Flood Insurance Reserve Fund that contains at least 1 percent of the total potential loss exposure funded by putting in 7.5 percent of the required amount each year until fully funded (Nechamen and Inderfurth, 2012). A reserve level of 1 percent of expected annual losses would still not be considered prudent in private insurance.

[24] It could be cogently argued that the requirement that the NFIP pay back with interest the U.S. Treasury for the funds borrowed after the catastrophic 2005 loss year implies that they do indeed have a cost of capital. Interest rates on this debt are now relatively low (0.25 percent) but have been as high as 4.875 percent (Hayes and Neal, 2011).

Copyright National Academy of Sciences. All rights reserved.

the flood victim is much larger and more rapidly delivered with flood insurance, the perception of many is that if a flood occurs, the government will fully compensate victims.

Arguing in favor of building a catastrophic contingency reserve and/or putting a profit loading factor into the rating formula is the reality that, although FEMA was able to borrow money from the U.S. Treasury to finance the losses experienced by the NFIP in the catastrophic loss year 2005, the program is now being required to repay this "loan" back to the Treasury with interest. This directive could mean raising premium levels on new and current policyholders to pay back the loan and interest, which is again contrary to the objective function of the NFIP to encourage participation and make premiums affordable. Moreover, should interest rates rise from their current very low levels, it may be unlikely for NFIP (i.e., policyholders) to pay the interest on the loans from current revenue.

### Actuarial Soundness Versus Fiscal Soundness of the NFIP

There has been much discussion concerning the actuarial soundness of the NFIP since the NFIP is required by law to promulgate rates that have actuarial soundness (Mathewson 2011). Some, such as the GAO (2008) , specifically state that "[t]he program is not actuarially sound." Even actuaries at the NFIP (Hayes and Neal, 2011) state: "Because the NFIP, as explained above, charges highly discounted premiums for many older buildings, it is currently impractical for the NFIP to be actuarially sound in the aggregate." The notion of actuarial soundness in the context of the NFIP, however, is somewhat subtle and elusive because of the differences described previously between a government-run program with mandated discounts, no profit requirement, no significant interest income, and reliable, significant borrowing power and the private sector from which the notions of actuarial soundness arose and are routinely applied.[25]

Indeed, even within the private insurance market, a precise definition of "actuarial soundness" in the Property and Casualty Insurance industry could not be found by the Actuarial Soundness Task Force of the American Academy of Actuaries,[26] although hints at what might be meant can be gleaned from the use of the term in the context of actuarial statements of principles. These principles include the following:

1. an actuarial rate should reflect the expected value of the insured risk;
2. a rate should be an estimate of the expected value of future costs, accounting for all costs associated with the transfer of risk;
3. a rate should provide for the costs associated with an individual risk transfer; and
4. the rate should be reasonable and not be excessive, inadequate, nor unfairly discriminatory (Mathewson, 2011).

These principles imply, in particular, that revenues collected should be sufficient to pay future losses for the class from whom premiums were collected. Moreover, the rates charged should be determined in such a manner as to be reasonable, and be calculated in a statistically valid manner reflecting the expectation of future loss costs for the classes used as groups for pooled risk underwritten. In the context of private insurers, these statements make good sense, especially since insurance is a future performance-contingent claims contract, with governmental regulations directed especially toward ensuring the ability of the private insurer to remain solvent and pay future claims. This is much less of (or perhaps not even) a consideration in the governmentally backed NFIP where the ultimate payment of the claims is not in question, profit is not a motive, and other objectives dominate.

To achieve actuarial soundness, predictability, and affordable rates, private insurers use risk pooling (over either policyholders such as occurs in automobile insurance or commercial general liability insurance, over space as occurs in property insurance, or over time such as occurs in life insurance, or some combination of these techniques) to hedge, spread, diversify, or pool risk so that in the aggregate the premiums collected would be sufficient to pay

[25] The NFIP can collect interest when there is a surplus in the fund, but its borrowing authority is legislatively set and was significantly raised in the wake of hurricanes Katrina and Sandy.

[26] "Unlike the Health actuarial practice . . . , the Actuarial Standards of Practice applicable to property/casualty practice do not directly define the term actuarially sound or actuarial soundness" (American Academy of Actuaries, 2012).

Copyright National Academy of Sciences. All rights reserved.

expected losses. The NFIP on the other hand operates as a governmental entity in a more political environment. One result of this more political influence is that the NFIP does not adopt any of these approaches. The program does not adopt risk pooling across properties (as some are offered discounted rates and the lost discount dollars are not recovered from other policyholders in the risk pool), and risk is not pooled over time because no sufficient reserve fund is set up using surplus in 1 year to compensate for losses in a subsequent year.[27]

Dictated by legislation, the NFIP created a dual system of rate promulgation that is not adequately pooled over time, space, or policyholder. The NFIP has essentially a rate classification methodology created by statute that creates a "full-risk" rate class (consisting of about 80 percent of the policies) that are charged risk-based (or actuarial) premiums and a "discounted risk" class (about 20 percent of the NFIP policies). Because the discounted policies are charged premiums that are lower than their expected losses and expenses, and because the difference between the full-risk premium for a discounted policy is simply revenue lost to the NFIP (i.e., this lost revenue is not compensated for in any other part of the premium structure), the NFIP is, by legislated mandate, fiscally unsound in the long run. Congress could have appropriated funds to compensate FEMA for the lost revenue dictated by the statutory discounts, and had they done so, the NFIP would be in a stronger fiscal condition.

The statements of actuarial principles do allow actuaries to use differing models with different assumptions, provided they can be reasonably justified and estimate future loss costs in a defensible manner, so the notion of actuarial soundness in the context of legislatively mandated discounts can be defended in a governmental context apart from strict fiscal soundness that is appropriate for private insurers. For catastrophic governmental insurance programs, such as the NFIP, the California Earthquake Authority (CEA), the Texas Windstorm Insurance Association, and others, there are additional mitigating considerations concerning the adequacy of rates since, in the event of insufficient funding via the premium collection mechanism, the program may have recourse to alternative funding mechanisms (e.g., borrowing from the U.S. Treasury or taxpayers in the case of the NFIP). As stated in the *Special Report on Actuarial Soundness* (American Academy of Actuaries, 2012),

> While not all publicly based catastrophe programs rely on outside sources of funding (e.g., taxpayer dollars or assessing a broader policy base), when they do, additional examination is needed to evaluate actuarial soundness.

For example, the setting of discounted rates so as to make the entire NFIP system able to obtain sufficient income that the premiums collected are sufficient to cover the "average historical loss year" value described previously can be construed as a form of directed actuarial soundness appropriate for this government program with significant borrowing power and mandated discounted rate classes. It will not, however, be financially sound, nor was it ever intended to be.

An additional consideration that must be added to general actuarially sound rate-setting principles is that the rates must be set consistent with the law. Even if one class of insureds has a documented higher expected loss cost than another, if the law specifies that the insurance company handle their premium rate setting in a specific manner, then the insurer's rates may not be *able* to legally reflect these expected loss cost differences. The rates obtained following legal dictates and not using this class variable, and the resulting cross-subsidy (mandated by law) would not generally be construed as making the new rates actuarially unsound even as they could result in cross-subsidies and not strictly risk-based premiums. For example, 60-70 years ago, African American males were charged higher rates for life insurance because of having (actuarially or statistically verified) lower life expectancy than white males. This process was legally outlawed in the 1960s, but this does not mean that life insurance premium rates that now follow the dictates of the law and ignore race are actuarially unsound. Overall prices are adjusted so that the entire book of business is balanced, and this is acceptable actuarially.

Thus, the concept of actuarial soundness must be contextualized in the framework of the laws restricting how rates may be set. A system may be fiscally unsound because of the inability of the actuaries to charge rates that reflect risk in an appropriate manner, but this is different from being *actuarially* unsound. This is relevant when

[27] Private insurers that write flood risk coverage for commercial clients often use reinsurance contracts to spread the risk, or use catastrophe derivatives available in the capital markets to hedge the financial impact of flood risk. However, the NFIP does not use reinsurance or capital markets to hedge flood risk.

Copyright National Academy of Sciences. All rights reserved.

discussing the actuarial soundness of the NFIP because, as the *Special Report on Actuarial Soundness* (American Academy of Actuaries, 2012) states:

> State and national catastrophe insurance programs present additional points of discussion regarding what constitutes actuarially sound cost estimates or rates. Rates may be, by design, subsidized. The programs are generally not designed to generate a profit, and large losses may be funded by alternative mechanisms.

Indeed, in the case of the NFIP, legal constraints on the premiums that can be charged to certain groups of policyholders constitute an economic externality on the cash flow such that the program's financial viability would be threatened were it to rely solely on its own generated premium income. Financial soundness and actuarially soundness are coincident in private insurers, but they need not be in governmental insurance programs. In private insurance when regulations on pricing suppress prices so as to constrain the insurer to charge insufficient rates, they have the option to drop out of the market and stop writing business.[28] The NFIP and other governmental programs cannot make this decision on their own. Thus, the NFIP uses a general rate-setting formula given by equation (5-3) that is consistent with standard actuarial models such as equation (5-1), calculates this rate for all properties, but can legally only apply it to the full-risk class. A form of overall balance is targeted via an adjustment of the discounted rates to obtain funding for the average historical loss year discussed previously.

For estimation and actual rate-setting purposes, insured properties are cross-classified according to a smaller but fixed number of characteristics, grouped into a smaller number of hazard zones and property attributes (with basement, multiple story, etc.), and a common nationwide rate determined for each class. According to Hayes and Neal (2011), "[t]here are 30 numbered A Zones for which different sets of *PELV* values may be assigned." However, the risk zones are combined for rating purposes. Combining exposure units according to common underwriting characteristics for rating purposes is an actuarially sound manner for setting premiums, consistent with methodology used in other insurance settings (although there is always the question concerning oversimplification involved in having too few risk classes and consequently too heterogeneous exposure units within a given class, creating induced inequities in premiums). In the case of the NFIP today it is argued that improved and more accurate graduated risk-based premiums could be achieved by further improving estimates of inundation level probabilities (using improved maps or hydrologic studies, incorporating residual risk into the probability of inundation of a property behind a levee, etc.), and that improved estimates of the severity of the loss accuracy may be obtained using Lidar data (or something similar) to obtain better estimates of structure elevation and damage characteristics (Chapter 3). However, these are improvements to an already actuarially sound rating method.

The major structural drawback to the fiscal soundness of the NFIP is *not* actuarial unsoundness due to inappropriate or inadequate rate-setting methodology or inadequacies in using a formula such as equation (5-4), but rather the fiscal unsoundness caused by not being able to apply equation (5-4) uniformly across all classes. The NFIP-mandated "discounted risk" class was anticipated to eventually decrease substantially over time, and this has indeed been the case. Still, there are a substantial number of discounted policies in the NFIP, approximately 20 percent of the 5.6 million policies. The difference between the full-risk premium for a discounted policy and the discounted premium for the policy is revenue lost to the NFIP (this lost revenue is not compensated for in any other part of the premium structure). FEMA is legally unable to raise premiums in a manner sufficient to allow the NFIP to be financially sound or to build a contingency reserve fund sufficient to pay for a catastrophic future loss. Without this ability, the NFIP is destined by law (not by actuarial methodological inadequacy) to run short of money in the long run, with occasional dramatic shortfalls (such as occurred in 2005). Furthermore, repetitive loss properties continue to drain the fiscal soundness of the NFIP.[29]

[28] Examples include restrictions on rates in high-risk coastal areas in Texas and Florida that drove insurers from the market, or in automobile insurance in Massachusetts when it was very heavily regulated.

[29] A 1995 Senate Task Force Report, *Federal Disaster Assistance: Report of the Senate Task Force on Funding Disaster Relief,* noted that in 1993 repetitive loss properties accounted for 2 percent of the properties covered by flood insurance but accounted for 53 percent of the claims filed and 47 percent of the dollars paid from the Flood Insurance Fund (Moss, 1999).

Copyright National Academy of Sciences. All rights reserved.

**The NFIP is constructed using an actuarially sound formulaic approach for the full-risk classes of policies, but is financially unsound in the aggregate because of constraints (i.e. legislative mandates) that go beyond actuarial considerations.** Parts of the Biggert-Waters Act that relate to adjustment of fiscal practices, discussed above, move the program toward a financially sounder approach.

### Improving the NFIP Rate-Setting Process: Incorporating Technological Improvements to Better Obtain Risk-Based Premium Structures

While the mathematical construction used by the NFIP in determining their risk rates is based on actuarially sound principles as applicable to a government program, these processes and procedures could still be enhanced and aligned with a more rigorous and risk-based methodology by using finer graduation of risk propensity at the individual policyholder's structure level. Although the NFIP currently uses a small number of zones for nationwide pricing purposes, the suggested finer graduation would not be foreign to the NFIP. According to GAO (2008):

> NFIP implemented the nationwide class-rating system because of the nature of the program and the desire to make it less complex and easier for agents and customers to understand. In the early years of the program, rates were set on a community-by-community basis. But as the number of communities participating grew, this system became unwieldy and costly to maintain.

The complexity, costliness, and unwieldiness referred to above have been alleviated by technological and computer advancees that could allow agents and customers to interactively obtain structure-specific premium quotes online in real time. Additionally, existing advances in meteorologic and geotechnical modeling can allow the underwriter to model the likelihood and severity of flood damage individually so the complexity of the calculation or the number of zones is no longer a compelling factor at the agent or customer level. These advancements were not available in the 1960s when the core structure of the risk-based pricing framework was originally developed but can be utilized now to improve the system.

Although the general form of the rates given in equation (5-3) is actuarially based, in practice the implementation using a small number of zone categories and homogeneity of premiums within any given zone across the entire nation ignores differences within contiguous zone properties and makes the premium determination cruder and less directly risk-based than they need to be given today's knowledge and technology. Currently, the following zone categories are used:[30]

1. coastal, V Zone, within the 100-year flood frequency zone and subject to wave action or velocity-induced damage;
2. inland, A Zone, within the 100-year flood frequency zone but not subject to wave action or velocity-induced damage; and
3. all other, X Zone, which includes other flood zones and those outside identified 100-year flood zones (considered to be of low or moderate flood risk).

Properties that are located behind levees are placed in one of the last two categories. If the levee is accredited by FEMA to the one percent annual chance flood level, the "all other" or X zone category is applied. If not, the property is considered in the category that would apply without the levee being there. It can be argued that this approach to properties behind levees is appropriate based on the size of flood needed to create damage (over the one percent annual chance flood level). However, when viewed from a risk assessment perspective, it is apparent that the range of potential scenarios behind a levee and the loss corresponding to properties behind 100-year levees is very different from the loss that occurs from floods on the adjacent natural floodplain above the 100-year flood level (Figure 5-2).

[30] There is also a preferred risk policy available to properties in lower-risk areas with a minimal loss history.

Copyright National Academy of Sciences. All rights reserved.




FIGURE 5-2 Notional schematic illustrating the damageability (or vulnerability) curves associated with example properties. The properties in the 100-year zone are prone to initial damage more frequently (the V Zone has increased damage due to wave action which has the potential to cause structural damage). The property in the 500-year zone does not experience loss as frequently, but the impact of flooding results in a similar profile of loss as the water depth increases. The property behind the levee has the advantage of no damage until the levee is overtopped or fails (similar to a property located outside the 100-year flood zone). However, once the water depth increases above the 100-year level, the potential loss to properties could be far more severe than if the levee was not there, and certainly more severe than that to properties located at elevations above the 100-year flood level. This is due to the fact that when the levee is overtaxed, water flow is likely to be rapid (similar to the coastal V zone) and the water level may be significantly deeper if the area behind the levee is at a low elevation compared with the levee.

The current process can sometimes result in dramatic premium changes occurring for rather small perturbations in actual risk (e.g., changing the protection level of a levee from the 100-year level to the 99-year level, or the determined elevation level of a structure from −1 foot to +1 foot above the base flood level). Two houses next door to each other can have one just above the one percent annual chance flood level (and have no mandatory flood insurance mandate, and a low-priced policy if the property owners do decide to buy) while the house next door is just inside the 100-year floodplain and is charged much higher rates (and is required to buy insurance). In reality, both houses are exposed to essentially a similar hazard, but are treated differently. This abrupt change in rates and mandates that corresponds to being inside or outside the one percent annual chance floodplain as specified by the FEMA flood map has created problems as new maps are produced that change a community or set of properties from a moderate-risk zone to a high-risk zone. Even within the full-risk class the actuarial accuracy of the pricing within the program could be improved by incorporating more exact and detailed probability-of-inundation calculations instead of using a small number of rating zones and assuming the flood hazard to be uniform across the entire zone across the entire country. Better estimates of loss at stated water inundation levels is also possible utilizing more detailed economic damage models that are now available (and used in the private risk market). The use of more detailed and better probability models and better damage estimates will result in a more risk-based premium at the structure level.

One problem resulting from the very small number of zones and the special attention given to the 100-year floodplain is that in many respects the pricing mechanism in the NFIP today is based largely upon whether the

Copyright National Academy of Sciences. All rights reserved.

structure's location is inside or outside the SFHA on the NFIP's flood maps. Premiums outside the 100-year floodplain on the map are much less expensive than those inside the 100-year floodplain, even if outside by only a foot. Requirements are different too. In general, if a structure is located inside a 100-year floodplain, there is a mandatory flood insurance purchase requirement associated with being inside the SFHA. On the other hand, if a structure is located outside the 100-year floodplain, mandatory purchase is waived.

For NFIP insurance pricing purposes, an area within a 100-year floodplain that is located behind a 100-year levee is treated riskwise (and premium-wise) as equivalent to being outside the 100-year floodplain area. Thus, the flood insurances premiums are lower (and purchase is voluntary) when behind a certified 100-year levee. If the exact same property were protected by a 99-year levee, it would be treated for NFIP purposes as if the levee did not exist (i.e., that the levee is providing zero protection), and purchase of flood insurance at the higher "without protection and within the 100-year floodplain" rate is mandated. Rates and mandates change dramatically depending upon whether a structure is behind a 99-year levee (the X Zone for pricing purposes) or a 100-year levee (the A Zone for pricing purposes).

An additional problem with the current NFIP structure is that, because of the small number of zones, there can be substantial internal variation in risk and losses within the zone that is not reflected in rates, since all similar properties are charged the same rate within the same zone classification. Structures having similar characteristics located at different locations in a particular designated flood zone (say, the X500 zone of moderate flood risk between 100 years and 500 years) are all given the same NFIP insurance rate nationwide, even though it has been shown that there can be substantial risk differences across the zone within a given geographical area (such as a county) (Czajkowski et al., 2012). Even more expected loss variation exists across similar structures in the same zone classification between counties within the same state (Czajkowski et al., 2012) although the NFIP would charge all of the structures the same rate. Differences in loss ratios for policies within the same NFIP rating zones across states can also vary greatly (GAO, 2008). Thus, the current system oversimplifies the rating structure (by forming a nationwide zone classification) resulting in rates that are not truly individual risk-based, and instead have premiums set that have been aggregated over properties having dissimilar loss structures. This results in imbedded cross-subsidies between properties within the same risk classification. Additionally, the dramatic changes in rates that arise from moving between the few rating zones does not recognize the continuous nature of the flood risk. **Rate setting for properties behind levees, accredited or not accredited, should be improved by using the modern risk analysis method employing advances in hydrology, meteorology, geotechnology, and engineering to more precisely calculate the probability of water inundation levels and the associated damage estimates throughout the area behind the levee in a graduated fashion.** This will replace the current approach and more appropriately reflect the risk. One then gets a gradation of probabilities that can differ from property to property even within the same geographic area or flood zone (the PELV variable in equation (5-2).

Likewise, modern Lidar imaging technology can be used to obtain a property-specific assessment of the elevation of each property rather than using a similar value for all structures in the zone being priced. This Lidar information, together with other currently used underwriting information, such as existence of a basement, material structure of the building, and contents located above the first floor, can be used to obtain a better estimate of the expected loss or damage to the specific property at each location (the DELV variable in equation (5-2)). In this case, the resulting premiums determined for a property behind a 99-year levee could be very similar to the premiums determined for a property behind a 100- or a 101-year levee, and premiums could be allowed to vary continuously across properties within the same zone. In essence, this process moves the premium setting from a binary model (inside or outside the 100-year flood zone) to a graduated model with premiums varying more continuously as risk profiles change continuously. Many of the challenges that occur when new FIRMs are created that are due to the without-levee approach of the rating process could be alleviated by implementing a continuous premium structure of the type described above using modern assessments of probability of water inundation levels at the specific property and modern assessment of the elevation of properties as described in Chapter 3. A graduated and risk-based probability assessment and severity assessment would move the process from a without-levee approach (in the X zone, out of the X zone) to a dial approach with a large array of probabilities and severities that are determined for each property, allowing a property-specific calculation of the expected loss per property by flooding. In this context, not only can floodwater inundation levels be incorporated at the individual property

Copyright National Academy of Sciences. All rights reserved.

level, but also residual risk such as levee failure due to overtopping, seepage, and so forth can be incorporated. This detailed level of probability assessment and damage assessment at the insured-structure level is where NFIP needs to head in the long term.[31]

Probabilistic risk assessment (PRA) involving Monte Carlo–simulated flood result scenarios is being done by private firms such as Swiss Reinsurance and CoreLogic (Czajkowski et al., 2012), and can be adapted to work nationwide to price flood insurance in the NFIP. The state of North Carolina has already demonstrated its ability to estimate inundation-level probabilities at the structure level, using Lidar or similar technology, and estimate structure damage consequences at each water inundation level for any given structure, eliminating the need to treat all properties across the nation in the same zone as having equivalent risk and being charged the same premium. These are the critical inputs into the actuarial rating formula (5-3), which can now be performed even more accurately at the individual-structure level than before, and can provide a more accurate alternative to simply aggregating (or averaging) expected loss costs across disparate entities within a grouped NFIP zone classification. Indeed, Czajkowski et al. (2012) have shown that substantial expected loss differences are discernible even within a single-priced NFIP zone inside a concentrated geographic location (e.g., Travis County, Texas), and this variability is exacerbated when comparing across disparate geographic areas having the same zone classification (e.g., Galveston, Texas). Because the same rate is charged by the NFIP to all entities nationally having the same characteristics and which are classified as being in the same zone, this can lead to substantial over- and undercharging of premiums on a risk basis (GAO, 2008). This can be improved (corrected) using PRA methods, resulting in more accurate risk-based (actuarial) pricing within NFIP. Moreover, not all properties in a similar zone classification pose the same risk, and charging the same premium across these properties encourages adverse selection and does not enhance actuarial soundness of the program.

**To the extent possible to better achieve fiscal soundness, the properties that have been grandfathered into the NFIP or that receive discounts due to statutory considerations should have their pricing moved to the actuarially based prices using the detailed probability-of-inundation estimates and detailed economic damage models.** This would strengthen the program and further the goal of risk-based pricing.

## ROLE AND UTILITY OF MANDATORY INSURANCE BEHIND LEVEES

When the NFIP was created, property owners could purchase flood insurance voluntarily. In 1973, Congress passed the Flood Disaster Protection Act (Public Law 93-234) finding that,

> (1) annual losses throughout the Nation from floods and mudslides are increasing at an alarming rate, largely as a result of the accelerating development of, and concentration of population in, areas of flood and mudslide hazards; (2) the availability of Federal loans, grants, guaranties, insurance, and other forms of financial assistance are often determining factors in the utilization of land and the location and construction of public and of private industrial, commercial, and residential facilities; (3) property acquired or constructed with grants or other Federal assistance may be exposed to risk of loss through floods, thus frustrating the purpose for which such assistance was extended; (4) Federal instrumentalities insure or otherwise provide financial protection to banking and credit institutions whose assets include a substantial number of mortgage loans and other indebtedness secured by property exposed to loss and damage from floods and mudslides . . . .

The purpose of this Act was to

> require State or local communities, as a condition of future Federal financial assistance, to participate in the flood insurance program and to adopt adequate flood plan ordinances with effective enforcement provisions consistent with Federal standards to reduce or avoid future flood losses; and require the purchase of flood insurance by property owners who are being assisted by Federal programs or by federally supervised, regulated, or insured agencies or

[31] In the short or intermediate term the individually assessed expected losses can be used for aggregation to form a smaller set of risk classes, each of which is charged an average price. This is different from what is currently being done.

Copyright National Academy of Sciences. All rights reserved.

institutions in the acquisition or improvement of land or facilities located or to be located in identified areas having special flood hazards.[32]

This requirement is called the Mandatory Purchase Requirement (MPR). Because of the low levels of participation among eligible property owners and the low NFIP financial reserves, enforcement of the MPR in the SFHA was strengthened in the National Flood Insurance Reform Act of 1994 (Public Law 103-325). The National Flood Insurance Reform Act increased the responsibilities of lenders by requiring them to escrow flood insurance payments (if other mortgage-related expenses were required to be escrowed) and notify property owners when their policies lapsed. It also instituted penalties for lenders who failed to carry out these requirements.[33] In 2012, the Biggert-Waters Reform Act strengthened monetary penalties on lenders, including removing the cap on the total amount of penalties imposed on a lender in any calendar year. See Table 5-1 for a summary of legislative changes related to the purchase of flood insurance from 1968 to 1994.

As indicated in Chapter 2, following congressional hearings in 1973 that included discussion of the role of flood control structures in protecting those behind or below them from flooding, the Federal Insurance Administration determined that areas behind levees providing protection from the one percent annual chance flood would be considered outside of the SFHA, and the MPR and associated land-use restrictions would not apply to properties in these areas. This remains true today; property owners living behind an accredited levee (i.e., providing protection from the one percent annual chance flood) are not subject to the MPR. Areas behind a levee are shown on the FIRMs as outside the one percent annual chance floodplain or SFHA, although exceptions do exist (Box 5-4).

Figure 5-3 illustrates the growth in NFIP policies in force over time. Of note, after the 1994 legislation, approximately 1 million new policies were purchased between 1994 and 1997. Also, the great Mississippi and Missouri rivers flood of 1993 heightened awareness of flood risk across the nation and most likely had an impact on the number of policies. However, after the immediate impact of these two events, the growth in policies leveled off from 1999 through 2004, instead of achieving the desired, long-term continuous growth (Figure 5-3).

In 2004, in the aftermath of Hurricanes Charley, Frances, Ivan, and Jeanne, the NFIP experienced the largest claim year in the history of the program at that time, soon to be eclipsed when Hurricanes Katrina, Rita, and Wilma in 2005 resulted in the most significant loss year in the history of the program to that date (Box 5-2). The total policies in force grew through 2008, likely as a result of awareness of flood risk after the 2004 and 2005 events (Figure 5-3).

The number of NFIP policies in force also varies from year to year as a result of the mix of dropped and new policies. A study by Michel-Kerjan et al. (2012) indicates that, based on analysis of policy identification numbers, the NFIP adds new policies each year but also loses policies. The analysis indicates that an immediate drop in policy retention occurs 1 year after purchase, ranging from 20 to 30 percent between 2001 and 2009 (Table 5-2). Cancelations of policies after the first year continue, but are relatively fewer. The average tenure of policies issued between 2001 and 2006 was 2 to 4 years (Table 5-2). Policy retention in the SFHA, where the MRP is in place, and outside the SFHA, is reasonably similar (Table 5-2). Because of shifts in mortgage ownership and reissuance of policies in states such as Florida and Louisiana where there have been significant post-disaster rebuilding and policy migrations, policy identification numbers as opposed to policy addresses may overstate the number of structures for which policies were dropped (e.g., when policies are dropped from one company and shifted to another.) Of interest, between 2001 and 2009, of 8.36 million new policies purchased,[34] 41 percent were outside of the SFHA, with the highest number of purchases taking place after Hurricane Katrina. Since the properties outside the SFHA are not subject to the MPR, it is likely that these purchases represent an awareness of flood risk and the lower cost of policies not in the SFHA.

[32] Two other purposes of the 1973 Act are articled, dealing with increasing the amount of coverage authorized under the NFIP and dissemination of information concerning flood-prone areas.
[33] Section 524.
[34] This number is the summation of all the new flood policies in force according to Figure 5-4.

Copyright National Academy of Sciences. All rights reserved.

TABLE 5-1 Summary of Legislative Changes Related to the Purchase of Flood Insurance, 1968-1994

| Topic | Legislation: National Flood Insurance Act of 1968 | Flood Disaster Protection Act of 1973 | National Flood Insurance Reform Act of 1994 |
|---|---|---|---|
| Availability of flood insurance | Available in participating communities | Available in participating communities | Available in participating communities |
| Purchase of Flood Insurance | Voluntary | Mandatory for certain property owners:<br><br>(a) building or manufactured home in or to be located in an SFHA in a participating community and receiving a loan from a regulated lender;<br><br>(b) building for which any federal financial assistance is used for acquisition or construction of a building or a manufactured home in an SFHA of a community participating in the NFIP | Mandatory for certain property owners:<br><br>(a) building or manufactured home in or to be located in an SFHA in a participating community and receiving a loan from a regulated lender;<br><br>(b) building or manufactured home in or to be located in an SFHA in a participating community and whose loan is purchased by Fannie Mae or Freddie Mac;<br><br>(c) building for which any federal financial assistance is used for acquisition or construction of a building or a manufactured home in an SFHA of a community participating in the NFIP |
| Responsibilities of regulated lenders | Not applicable | Require flood insurance for buildings or manufactured homes located in the SFHA of a participating community<br><br>Ensure that flood insurance is maintained on such structures for the life of the loan | Determine whether the building or manufactured home is, or will be, located in an SFHA<br><br>Complete a hazard determination form<br><br>Provide notice of availability of flood insurance to borrower, lending institution, and loan servicer<br><br>Require flood insurance for structures located in SFHAs of a participating community<br><br>Ensure that flood insurance is maintained for the life of the loan<br><br>Escrow for flood insurance if other mortgage-related expenses are required to be escrowed<br><br>Force place flood insurance in the event of nonrenewal or insufficient coverage |

SOURCE: Tobin and Calfee (2005).

Copyright National Academy of Sciences. All rights reserved.

**BOX 5-4**
**SFHA May Exist in Areas Behind Accredited Levees**

Flooding can occur from sources other than rivers and storm surge, for example, from heavy rainfall or low elevation. A community's interior drainage system, which can consist of storm sewers, pumping stations, and canals, is designed to prevent this type of flooding but can become overwhelmed. Generally, this type of flooding is less of a catastrophic problem than, for example, levee failure.

When FEMA's FIRMs are developed, an assessment of susceptibility to this type of flooding is performed. Areas behind the levee where susceptibility exceeds the one percent annual chance flood level are designated as inside the SFHA even though the area might have an accredited levee. For example, much of New Orleans, Louisiana, is susceptible to flooding from interior drainage despite having accredited levees. The pumping system in New Orleans is one of the largest in the world, boasting nearly 100 pumping stations in the greater New Orleans area designed to handle approximately 9 inches of rainfall in a 24-hour period (ASCE, 2007).




FIGURE 5-3 The total number of NFIP policies in force by calendar year.
SOURCE: Data from http://www.fema.gov/policy-claim-statistics-flood-insurance/policy-claim-statistics-flood-insurance/policy-claim-13-14.

Copyright National Academy of Sciences. All rights reserved.

TABLE 5-2 Number of new policies and duration from 2001 through 2009.

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|
| New flood policies in force (000s) | | | | | | | | | |
| All | **841** | **876** | **1,186** | **986** | **849** | **1,299** | **974** | **894** | **1,051** |
| *SFHA/non-SFHA* | *542 299* | *613 264* | *880 306* | *696 291* | *529 320* | *635 664* | *542 432* | *487 407* | *595 456* |
| Tenure longer than: | | | | | | | | | |
| 1 year | **73%** | **67%** | **77%** | **78%** | **76%** | **73%** | **74%** | **73%** | |
| *SFHA/non-SFHA* | *74% 71%* | *67% 67%* | *78% 76%* | *77% 80%* | *75% 78%* | *74% 72%* | *74% 74%* | *75% 70%* | |
| 2 years | **49%** | **52%** | **65%** | **65%** | **63%** | **59%** | **58%** | | |
| *SFHA/non-SFHA* | *48% 52%* | *52% 50%* | *66% 64%* | *64% 67%* | *62% 64%* | *59% 60%* | *58% 59%* | | |
| 3 years | **39%** | **44%** | **57%** | **55%** | **53%** | **48%** | | | |
| *SFHA/non-SFHA* | *37% 41%* | *44% 43%* | *57% 56%* | *54% 57%* | *53% 54%* | *47% 49%* | | | |
| 4 years | **33%** | **38%** | **50%** | **48%** | **44%** | | | | |
| *SFHA/non-SFHA* | *32% 36%* | *39% 38%* | *50% 48%* | *47% 49%* | *43% 44%* | | | | |
| 5 years | **29%** | **33%** | **44%** | **38%** | | | | | |
| *SFHA/non-SFHA* | *28% 31%* | *34% 33%* | *44% 42%* | *38% 38%* | | | | | |
| 6 years | **25%** | **30%** | **33%** | | | | | | |
| *SFHA/non-SFHA* | *24% 28%* | *30% 29%* | *34% 32%* | | | | | | |
| 7 years | **22%** | **26%** | | | | | | | |
| *SFHA/non-SFHA* | *21% 25%* | *26% 25%* | | | | | | | |
| 8 years | **20%** | | | | | | | | |
| *SFHA/non-SFHA* | *18% 22%* | | | | | | | | |

## Market Penetration and Compliance

Under the NFIP, flood insurance is available to both those subject to the MPR and to any property owner living within the NFIP community, whether in or out of the SFHA or in front of or behind a levee. From a flood risk management perspective, the NFIP encourages all who live in areas subject to any level of flooding to purchase insurance so as to provide loss coverage to them if their covered property is damaged from a flood event and to reduce the cost to the federal government for their recovery. Therefore, FEMA is interested in knowing what percentage of those living in flood-prone areas have insurance, that is the market penetration:[35]

$$\text{Market Penetration} = \frac{\text{Number of buildings in SFHA eligible for insurance purchase that have policies}}{\text{Number of buildings in SFHA eligible for insurance purchase}}$$

Compliance with the NFIP MPR is a subset of the market penetration:

[35] "Insurance may be written on any building eligible for coverage with two or more outside rigid walls and a fully secured roof that is affixed to a permanent site. Buildings must resist flotation, collapse, and lateral movement. The structure must be located in a community that participates in the NFIP . . . . Buildings entirely over water or principally below ground, gas and liquid storage tanks, animals, birds, fish, aircraft, wharves, piers, bulkheads, growing crops, shrubbery, land, livestock, roads, machinery or equipment in the open, and most motor vehicles are not insurable through the NFIP" (FEMA, 2011).

Copyright National Academy of Sciences. All rights reserved.




FIGURE 5-4 National Flood Insurance Program total number of policies in force, by state, as of September 30, 2012. SOURCE: http://www.fema.gov/policy-claim-statistics-flood-insurance/policy-claim-statistics-flood-insurance/policy-claim-13-2, accessed January 11, 2012.

$$\text{Compliance} = \frac{\text{Number of buildings in SFHA eligible for insurance with federal mortgages that have flood insurance}}{\text{Number of buildings in SFHA eligible for insurance with federal mortgages}}$$

In a scenario with full lender application of the regulation, compliance with the MPR would be approximately 100 percent.

There have been several analyses over the last two decades of the market penetration of the NFIP. According to Dixon et al. (2006), a 1999 report by PricewaterhouseCoopers estimated that 28 percent of *residential structures* in the SFHA carried flood insurance. In 2006, RAND estimated that 49 percent of *single-family homes* carried flood insurance (Dixon et al., 2006). Preliminary results from a J. Walter Thompson (JWT) analysis currently under way estimate that nationwide only approximately 30.6 percent of *identified structures* in the SFHA are insured.[36] Because each of the three analyses used a different set of the total structures in the SFHA, it is difficult to compare the results, although the ongoing JWT analysis appears to provide the highest degree of resolution.

Market penetration of flood insurance policies across the country varies with, for example, geography (coastal versus inland communities) and frequency of major flooding events in an area (Figure 5-4). The JWT analysis indicates that South Carolina had the highest penetration rate in the SFHA at 46.69 percent. Other coastal and flood-prone states have high penetration in the SFHA rates, such as Louisiana (43.69 percent), which is consistent with its history of high penetration particularly in the New Orleans area (Box 5-4, Louisiana), Florida (37.75 percent), New Jersey (37.94 percent), and California (33.49 percent).

The development of statistics for compliance with the MPR is confounded by several factors. As indicated, some penetration studies focused on single-family homes whereas others included all residential structures or

[36] A market penetration and mortgage compliance analysis, by state, in preparation for FEMA by J. Walter Thompson (JWT) advertising company. The committee used the version from January 2013, which is heretofore referred to as the "JWT analysis" in the report.

Copyright National Academy of Sciences. All rights reserved.

**BOX 5-5**
**New York's Market Penetration Experience**

Although detailed analyses of market penetration have not been conducted in areas impacted by Hurricane Sandy, preliminary figures indicate that approximately 62,000 of the owners of the 116,000 residential structures damaged by Sandy in New York City held NFIP policies. This equates to approximately a 54 percent market penetration rate. In the devastated Breezy Point area of Queens, New York, owners of 1,394 of the 2,150 structures damaged submitted claims, approximately a 64 percent market penetration rate (Jeffrey Woodward, FEMA, personal communication, February 27, 2013).

addresses, parcels, etc.[37] Many structure owners do not carry mortgages and others do not insure with federally regulated lenders. Both of these groups are exempt from the MPR and, combining the results of several studies, represent somewhere between 15 and 40 percent of the residential structure ownership in the SFHA. Tobin and Calfee (2005) reported that 77 percent or more of the debt in the SFHA was associated with lenders subject to the MPR, whereas Dixon et al. (2006) assumed that 85 percent of the single-family homes in the SFHA were subject to the MPR.

Dixon et al. (2006) also assumed that policies sold by private insurers, in addition to those sold under the NFIP, represented an additional 7 percent in policies, and that 38 percent of those not required to buy polices did purchase them. By applying these assumptions to the probable number of single-family homes with mortgages, by region, Dixon et al. identified compliance rates ranging from 43 percent in the Midwest to 88 percent in the West with a national average of 78 percent. The ongoing JWT analysis indicates, based on a sample of structures in the SFHA, that national compliance may be in the 50-60 percent range, with several states having compliance rates lower than 20 percent and other, high-risk states with compliance higher than 80 percent (Louisiana) (Box 5-5). According to Dixon et al. (2006), a 1999 PricewaterhouseCoopers study of purchase of flood insurance, assuming that 10 percent of homes compliant in 1 year are not compliant in the following year, resulted in MPR compliance rates between 55 to 60 percent. However, more recent retention data by Michel-Kerjan et al. (2012), noted above, found that the drop rate was considerably higher and would thus drive down the compliance rates.

Review of all these studies indicates that estimates of both market penetration in the SFHA and compliance with the MPR have varied considerably and are very sensitive to the assumptions made in the study process. National market penetration most likely lies somewhere between 30 and 50 percent, with the most recent JWT analysis, which is seemingly the most definitive study, indicating that national market penetration is the lower value. National MPR compliance has been estimated to be between 50 and 78 percent. The JWT study, again which appears to be the more definitive study because of a higher degree of resolution, presents the values at the lower end of this range.

For those who live in areas subject to flood risk both in front of (SFHA) and behind levees, insurance provides an effective and efficient means of transferring financial risk and thus reducing the exposure of individuals and businesses to catastrophic consequences and the need to call on the government for assistance. In 1973, the Congress found that for the NFIP to maintain fiscal integrity and protect federal interests, it needed to mandate insurance for those in the SFHA. However, in spite of four decades of effort, the program has yet to achieve high levels of compliance. Given the emphasis that has been placed on market penetration and compliance with the MPR in FEMA's risk communication activities, the efficacy of the mandatory purchase requirement is called into question. **The current policy of mandatory flood insurance purchase appears to be ineffective in achieving widespread purchase of NFIP flood insurance policies.**

[37] Dixon et al. (2006) found that residential structures make up 87percent of parcels in the SFHAs examined, and 57 percent of the total were single-family homes.

Copyright National Academy of Sciences. All rights reserved.

Multiyear policies tied to the property rather than the individual, thus avoiding policy cancellation, have been proposed as one solution (NRC, 2012). FEMA views the fault to rest with the enforcement by those agencies charged with lender oversight as problematic (GAO, 2002). Discussions with personnel in the trade indicate that budget and manpower realities limit the number of oversight inspections. In addition, in the committee's judgment, enforcement does not appear to have high priority within the lender community because it is seen as a tangential aspect of mortgage oversight. However, lenders assert that they are increasing their success (GAO, 2002). Retention statistics would also indicate lack of progress, in either oversight or enforcement. **The rate of compliance with the mandatory purchase requirement indicates challenges with lender enforcement and federal oversight of this lending.** On the other hand, statistics indicate that where residents are able to identify their own risk, some voluntarily acquire insurance. The fact that 41 percent of new policies between 2001 and 2009 were outside the SFHA, and were not mandated, gives support to this view (Table 5-2).

### Mandatory Purchase Behind Levees: The Current Approach Verses a Modern Risk Analysis

Beginning in the early 2000s, FEMA took steps to modernize FIRMs via "Map Mod." During Map Mod, FEMA discovered that because FIRM maps carried forward certification from previous years, many levees previously thought to be able to withstand the one percent annual chance flood were not able to withstand this event. Thus, increased attention was placed on ensuring that the accreditation status for all levee systems in the NFIP was up to date and accurate through Procedure Memorandum 34 and the Provisionally Accredited Levee (PAL)[38] designation (Chapter 2). The process of ensuring that all one percent annual chance levees are properly constructed, certified, and accredited continues today, as affected communities are faced with the possibility of movement into the SFHA and the MPR. Often this is the catalyst for controversy as communities and levee owner/operators repair levees to the one percent annual chance standard to avoid MPR (Box 5-6). Thus, the one percent annual chance flood has become a de facto design standard that promotes the idea that if you live behind a levee you are "safe"—an unintended consequence of the MPR. During Hurricane Sandy, coastal V zone flows along open shorelines resulted in significant losses. Also, many residents and insurers learned that many areas outside the SFHA were subject to catastrophic loss. It is important to realize that overtopping of levees can produce flood flows behind levees whose velocity can match the coastal V zone flows on open shorelines, and results in damages similar to those associated with V zone flows. **Mandatory purchase requirements have led many property owners to perceive that if they are not mandated to have insurance they are not susceptible to damage from floods.**

The committee examined the extension of mandatory purchase to include areas behind levees and took into consideration several factors. In the current NFIP approach to analyzing risk behind levees, areas behind accredited levees are considered to be at a low to moderate risk and insurance rates are priced accordingly. However, this evaluation is an incomplete reflection of flood risk (Chapter 3). Thus, extending the mandatory purchase requirement behind accredited levees would be extending the federal government's exposure without a complete understanding of the risk that exists and the possible consequences. Furthermore, without the benefit of information provided in the modern risk-based analysis, those living behind levees will, like those in the SFHA, find it difficult to understand the reasoning behind the mandatory purchase requirement and the premiums associated with this requirement; a difficulty that is promoted by the idea that when you live behind an accredited levee, you are "safe."

The post-Katrina rise in insurance purchases outside of the SFHA may, if it continues, indicate that public awareness of flood threats is increasing and that given credible risk information, owners may voluntarily move to such purchases, thereby avoiding the necessity to extend the administrative challenge of the mandatory purchase requirement. Experience since Hurricane Katrina indicates that where residents are able to identify their own risk, some voluntarily acquire insurance (Figure 5-3). Furthermore, 41 percent of new policies between 2001 and 2009 were outside the SFHA and thus were not mandated. This gives support to the view that credible risk information

[38] PAL is applied to a previously accredited levee on an effective FIRM for which FEMA is awaiting data or information that will show compliance with NFIP regulations.

Copyright National Academy of Sciences. All rights reserved.

**BOX 5-6**
**Challenges in East St. Louis**

The American Bottom floodplain is home to approximately 156,000 people and businesses that employ 56,000 workers in the St. Louis area. The five levee systems (Figure 5-5) protecting the region were built in the 1940s and 1950s and, at the time of construction, were designed to provide protection against a 500-year flood. The levees were last upgraded in the 1960s. Since the flood of 1993, underseepage and sand boils have been recognized as a problem for these levees (FEMA, n.d.b).

In 2004 and 2005, FEMA began revising and updating FIRMs that include levees in and around the St. Louis area. In 2007 and during the revision process, FEMA notified the impacted communities that five of the levee systems in the eastern suburbs (Metro East St. Louis) could no longer be depicted as accredited on revised flood maps without demonstrated compliance with the design requirements set forth in 44 CFR §65.10 (Chain of Rocks Levee, Fish Lake Drainage and Levee District, Metro East Sanitary District [MESD], Prairie du Pont Levee and Sanitary District, and Wood River Drainage and Levee District). If no longer accredited, the area was to be included by FEMA as in the SFHA (i.e., mapped as without a levee) and the mandatory purchase requirement would apply to the eastern suburbs.

Inclusion in the SFHA and the MPR can have a significant impact on housing cost, economic development, and insurance rates. The East-West Gateway Council of Governments estimated mandatory insurance costs paid by residents and businesses in the American Bottom floodplain as a result of implementation of the MPR to be approximately $50 million dollars per year (East-West Gateway Council of Governments, 2010). Thus, the community faced the question of how best to restore the levee systems to a level that provided adequate protection and FEMA accreditation as well as how to finance this restoration. This was even more challenging given the high poverty rate in the East St. Louis area—an estimated 41 percent of persons in East St. Louis were below the poverty level from 2006 through 2010 (U.S. Census Bureau, n.d.).

In 2009 a local sales tax was passed, to collect the estimated $160 million dollars to repair the levees. As a result of legal action taken by local sponsors, FEMA withdrew issuance of a preliminary FIRM and is awaiting information from the sponsors as to what actions they propose to take to remediate identified deficiencies. The sponsors, using the $160 million dollars raised for the project, have proposed remediating the deficiencies to the point where the levee system can successfully pass the one percent chance flood and meet FEMA's requirements for accreditation. However, because the levee was originally built by USACE and then transferred to the local sponsors as a 500-year system, the sponsors must obtain approval from USACE to carry out any local work on the levee.[1] USACE has indicated that the levee deficiencies should be remediated in a federal–local cost-shared project to meet the standards for a 500-year levee and is taking steps to obtain the federal funding. If the project were to proceed as a local project, the sponsors must assure USACE that any work done to meet the one percent annual chance flood accreditation requirement will not interfere with the ability to eventually repair the levee system to the 500-year level. If federal funding can be obtained, USACE would move ahead in a process that would carry out the required work for a 500-year levee and, as part of this work, obtain accreditation from FEMA for one percent annual chance flood protection (Colonel Christopher Hall, USACE, personal communication, February 7, 2013)

[1] 33 U.S.C. §408 (Section 408) provides that any proposed modification to an existing USACE project must obtain permission from the Secretary of the Army by demonstrating that such proposed alteration or permanent use and occupation of the federal flood control project is "not injurious to the public interest and will not impair the usefulness of such work."

Copyright National Academy of Sciences. All rights reserved.

**BOX 5-6 continued**




FIGURE 5-5 Map of the Metro East Levee System.
SOURCE: USACE (2010).

Copyright National Academy of Sciences. All rights reserved.

will prompt voluntary policy purchase, although retention rates also raise questions about property owner long-term commitment (Table 5-2).

To date, relying on federal supervisory agencies to oversee and lenders to require purchase has only marginally worked in the SFHA where the flood hazard is relatively obvious. There is little to suggest that most property owners in areas behind levees, if mandated to purchase insurance, would move to obtain it. Given the number of people behind levees, this would create an even greater challenge for lenders and oversight agencies.

In summation, instituting this requirement would be imprudent where there is (1) limited and conflicting evidence to support the effectiveness of the enforcement mechanism, (2) a communication impediment to overcome that is associated with the without-levee approach (when you live behind a levee you are "safe"), and (3) an incomplete understanding of risk behind a levee.. **At this time, there is no sound reason to institute mandatory purchase of flood insurance in areas behind accredited levees.** This conclusion is not to be interpreted as the committee not supporting the purchase of flood insurance behind levees and throughout the SFHA—quite the opposite. Other paths to achieve increased insurance purchase are critical: for example, effective communication of the risk behind levees; strong community support for voluntary acquisition of insurance behind levees; meaningful engagement with insurance companies and agents, lenders, and real estate professionals; and a modern risk-based flood risk analysis generating more accurate pricing and flood risk information.

Regardless of location (behind a levee or not behind a levee), because of the catastrophic nature of flooding, it is in a property owner's and, when applicable, lender's best interest to have the financial security provided by flood insurance coverage in the SFHA, assuming the cost of coverage is not an issue. As noted in Chapter 3 and above, a modern risk-based analysis will lead to a better informed, more differentiated assessment of properties' susceptibility to flood damage. If insurance rates are priced accordingly, this would provide for more granular policy pricing that better reflects the actual risk to the property. This includes areas behind nonaccredited levees. For example, an area with a 50-year levee will be given some credit for risk reduction and the insurance rates will be priced accordingly.

A perception exists that if the NFIP simply sold more policies the program's fiscal issues (e.g., debt to the U.S. Treasury resulting from the 2005 loss year) would be solved.[39] However, simply adding new policies doesn't automatically improve the program's fiscal soundness. Adding new polices could lower the program's overall risk *if* the policies increase the program's diversification of risk acquired through those policies. However, adding new policies very well may increase the NFIP's overall risk through concentration of policies in, for example, high-risk areas such as the SFHA. Furthermore, adding new policies would also increase the program's exposure to risk accumulation, or the additive risk of multiple events occurring at the same time. If NFIP policies continue to be concentrated in the same high-risk areas around the country, the diversification of risk and the fiscal soundness of the program will remain relatively unchanged.

Upon implementation of a modern risk analysis, insurance rates will more accurately reflect flood risk behind a levee. If the insurance rate goes up, it indicates that the property is at more peril than previously understood to be; if the insurance rate goes down, it indicates that the property is in less peril than previously understood to be. Thus, FEMA's moving to a modern risk-based analysis and pricing premiums accordingly will have an impact on NFIP policy purchase. More accurate pricing and more information created by a modern risk analysis has the potential to prompt additional policy purchases. Property owners would be more favorably inclined to buy flood insurance if individual risk is well known and insurance rates are priced to match the probability of flooding and the financial impact of flooding events. This includes areas behind levees, both accredited and not accredited, in the SFHA at large, and also non-SFHA areas. It is important to note that the Biggert-Waters Act directs full, risk-

[39] As noted by Baranoff (2009), the assumption that a large number of independent exposure units in a risk pool leads (via the law of large numbers and the central limit theorem) to an increased ability of the insurer to handle more risk at greater profitability. This is because the contingency loading for risk bearing added to the expected loss can decrease as the number of exposure units increase by the central limit theorem. This common perception, which is the mathematical underpinning of private insurance, can lead one to believe that a larger number of policies in the NFIP would lead to a similar result. Major differences, however, are that the NFIP premiums are not set in a fiscally sound manner (because of discounts, subsidies, no contingency reserve, etc.), and so, increasing the scale of an already cash-losing operation will not improve its position. Moreover, if the increase in policies is due to higher risk properties entering the NFIP (termed adverse selection, see Baranoff [2009]), then more policies can actually worsen the fiscal soundness of the NFIP.

Copyright National Academy of Sciences. All rights reserved.

based premiums and the elimination of certain discounts, also promoting a change to the NFIP that will impact policy purchase.

Lenders may choose to protect their portfolio regardless of the role of the NFIP (Buckley, 2010). It is very likely that if a lender has more information through a risk-based analysis, the lender is more aware that requiring flood insurance purchase is in line with their fiduciary responsibility. Regardless of the MPR, lenders currently can require insurance regardless of any regulatory responsibility as a function of their normal underwriting process. Furthermore, the recent NFIP reauthorization includes a provision requiring that lenders provide a disclosure of the availability of flood insurance to all purchasers at loan closing or settlement[40]—real estate agents might realize that disclosure of flood risk and promoting the purchase of a flood insurance policy is in their best interest.

The reasons why residents in flood-prone areas do not buy flood insurance from the NFIP have been studied both theoretically and empirically. Both behavioral and economic reasons for nonpurchase include the availability of aid from FEMA and other sources (i.e., charity hazard), underestimation of the risk probability, lack of knowledge of availability of the product and its price, the feeling that the coverage is not extensive enough, and several other rationales including experience with previous floods that did little damage, leading them to feel safe for the future (Kunreuther 1984, 1996; King, 2009). Effective communication of the risk behind levees is critical, for example, to overcome the impression that when you live behind an accredited levee you are "safe," an impression that is likely linked to policy purchase. Nuances in risk communication confound the premise that greater risk information will prompt additional policy purchases. For example, despite the positive association between risk perception and protective actions, awareness does not necessarily lead to actions to mitigate risk because of reasons judged to be more important, such as personal experience and evaluation of protective actions themselves. (See Chapter 7 for an expanded discussion.)

An increase in the purchase of policies, particularly in non-high-risk areas, will diversify the program's risk and ultimately generate a more fiscally sound NFIP. Thus, the necessity of the MPR in the SFHA may change, along with the decision to waive the MPR behind an accredited levee. **A modern risk-based analysis has the potential to impact the purchase of flood insurance, diversify the NFIP's exposure to flood risk, and generate a fiscally sounder program. Once the risk-based approach has been put in place and matures, FEMA should review and study the necessity of the mandatory purchase requirement, behind levees and throughout the SFHA.**

## REFERENCES

Ai, J., and P. L. Brockett. 2008. Insurance pricing/nonlife. Pp. 922-933 in Encyclopedia of Quantitative Risk Assessment and Analysis, E. Melnick and B. Everitt, eds. Chichester, UK: John Wiley and Sons, Ltd.

American Academy of Actuaries, Actuarial Soundness Task Force. 2012. A Public Policy Special Report: Actuarial Soundness. Available online at http://www.actuary.org/files/publications/Actuarial%20Soundness%20Special%20Report%20FINAL%205%2010%2012.pdf. Accessed September 21, 2012.

ASCE (American Society of Civil Engineers). 2007. The New Orleans Hurricane Protection System: What Went Wrong and Why. Washington, DC: ASCE.

Baranoff, E. G, P. Brockett, and Y. Kahane. 2009. Risk Management for the Enterprise and Individuals. Available online at http://www.flatworldknowledge.com/. Accessed February 27, 2013.

Brockett, P. L., and R. C. Witt. 1982. The underwriting risk and return paradox revisited. Journal of Risk and Insurance 49: 621-627.

Browne, M. J., and M. Halek. 2010. Managing flood risk: The National Flood Insurance Program and alternatives. Chapter 5 in Public Insurance and Private Markets, Jeffrey R. Brown, ed. Washington, DC: American Enterprise Institute for Public Policy Research.

Browne, M. J., and R. Hoyt. 2000. The demand for flood insurance: Empirical evidence. Journal of Risk and Uncertainty 20: 291-306.

[40] Notice of flood insurance availability is required under the Real Estate Settlement Procedures Act (RESPA); see Section 100222 of the Biggert-Waters Flood Insurance Reform and Modernization Act.

Copyright National Academy of Sciences. All rights reserved.

Levees and the National Flood Insurance Program: Improving Policies and Practices
Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 694 of 858



Buckley, M. 2010. The NFIP Outside the Box. Background Reading for the Gilbert F. White National Flood Policy Forum, 2010 Assembly, Managing Risk to Humans and to Floodplain Resources. Available online at http://www.asfpmfoundation.org/pdf_ppt/2010_GFW_Forum_Background_Reading.pdf. Accessed February 21, 2013.

Casualty Actuarial Society. 1990. Foundations of Casualty Actuarial Science. New York: Casualty Actuarial Society.

Czajkowski, J., H. Kunreuther, and E. Michel-Kerjan. 2012. A Methodological Approach for Pricing Flood Insurance and Evaluating Loss Reduction Measures: Application to Texas. Available online at http://opim.wharton.upenn.edu/risk/library/WhartonRiskCenter_TexasFloodInsurancePricingStudy.pdf. Accessed April 4, 2012.

Daniel, P. 1977. Deep'n as It Come: The 1927 Mississippi River Flood. New York: Oxford University Press.

Dixon, L., N. Clancy, S. A. Seabury, and A. Overton. 2006. The National Flood Insurance Program's Market Penetration Rate: Estimates and Policy Implications. Washington, DC: American Institutes for Research.

East-West Gateway Council of Governments. 2010. Additional Flood Insurance Costs Resulting from the Federal Emergency Management Agency Flood Insurance Rate Map Modernization Program in the American Bottom. Available online at http://www.floodpreventiondistrict.org/wpcontent/uploads/2011/03/InsuranceCostsReport.pdf. Accessed February 21, 2013.

FEMA (Federal Emergency Management Agency). 2006. Designing for Flood Levels Above the BFE. Available online at http://www.fema.gov/library/file?type=publishedFile&file=fema549_apndx_e_ra8.pdf&fileid=143da3a0-0316-11dc-a1f1-000bdba87d5b. Accessed September 5, 2012.

FEMA. 2007. Mandatory Purchase of Flood Insurance Guidelines. Washington, DC: FEMA.

FEMA. 2011. National Flood Insurance Program: Answers to Questions About the NFIP. Available online at http://www.fema.gov/library/viewRecord.do?fromSearch=fromsearch&id=1404. Accessed February 15, 2013.

FEMA. n.d.a. National Flood Insurance Program Community Rating System. A Local Official's Guide to Saving Lives, Preventing Property Damage, and Reducing the Cost of Flood Insurance. FEMA 573. Available online at: http://www.fema.gov/library/viewRecord.do?id=3655. Accessed December 7, 2012.

FEMA. n.d.b. Mapping the Risk, Flood Map Modernization, Metro East—Frequently Asked Questions. Available online at https://www.fema.gov/pdf/about/regions/regionv/faq_east_stlouis.pdf. Accessed February 21, 2013.

GAO (Government Accountability Office). 2002. Flood Insurance: Extent of Noncompliance with Purchase Requirements Is Unknown. Washington, DC: GAO.

GAO. 2008. Flood Insurance: FEMA's Rate-Setting Process Warrants Attention. Available online at http://www.gao.gov/products/GAO-09-12. Accessed August 27, 2012.

Hayes, T. L., and D. A. Neal. 2011. National Flood Insurance Program Actuarial Rate Review in Support of Recommended October 1, 2011 Rate and Rule Changes. Available online at http://www.fema.gov/library/viewRecord.do?id=4853. Accessed June 12, 2012.

Hayes, T. L., and S. S. Sabade. 2004. National Flood Insurance Program Actuarial Rate Review. Available online at http://www.fema.gov/library/viewRecord.do?id=2377. Accessed May 28, 2012.

King, R. 2005. Federal Flood Insurance: The Repetitive Loss Problem. Congressional Research Service Report RL32972. Available online at http://www.fas.org/sgp/crs/misc/RL32972.pdf. Accessed February 26, 2013.

King, R. O. 2009. National Flood Insurance Program: Background, Challenges, and Financial Status. Congressional Research Service 7-5700, R40650. Available online at https://opencrs.com/document/R40650/.

Klugman, S. A., H. H. Panjer, and G. E. Willmot. 2008. Loss Models: From Data to Decisions, 3rd Rev. Ed. Chichester, UK: John Wiley and Sons, Ltd.

Kunreuther, H. 1984. Causes of Underinsurance Against Natural Disasters. Geneva Papers on Risk and Insurance 31: 206-220.

Kunreuther, H. 1996. Mitigating Disaster Losses Through Insurance. Journal of Risk and Uncertainty 12: 171-187.

Mathewson, S. B. 2011. Actuarial Rates in the Context of National Flood Insurance Program (NFIP) Hazard Mapping. Available online at http://www.actuary.org/files/publications/NCOIL_Simons_NFIP_Mapping_20110717_final.pdf. Accessed September 5, 2012.

Michel-Kerjan, E. O. 2010. Catastrophe economics: The National Flood Insurance Program. Journal of Economic Perspectives 24: 165-186.

Michel-Kerjan, E., S. L. de Forges, and H. Kunreuther. 2012. Policy tenure under the U.S. National Flood Insurance Program (NFIP). Risk Analysis 32: 644-658.

Moss, D. A. 1999. Courting Disaster? The transformation of federal disaster policy since 1803, Chapter 8 in The Financing of Catastrophe Risk, Kenneth Froot, ed. Chicago: University of Chicago Press.

Mowbray, A. H. 1914. How extensive a payroll exposure is necessary to give a dependable pure premium. Proceedings of the Casualty Actuarial Society 1: 24-30.

Copyright National Academy of Sciences. All rights reserved.

No RR2.0-AR00014552

Nechamen, B., and M. Inderfurth. 2012. Summary of Contents: Biggert-Waters Flood Insurance Reform Act of 2012, H.R. Rep. No. 112-4348, Title III (Pages 521-576). Available online at http://www.floods.org/ace-files/documentlibrary/2012_NFIP_Reform/2012_NFIP_Reform_Act_ASFPM_Summary_of_Contents.pdf. Accessed February 7, 2013.

NRC (National Research Council). 2012. Dam and Levee Safety and Community Resilience: A Vision for Future Practice. Washington, DC: The National Academies Press.

Rodermund, M. 1990. Introduction in Foundations of Casualty Actuarial Science. New York: Casualty Actuarial Society.

Tobin, R. J., and C. Calfee. 2005. The National Flood Insurance Program's Mandatory Purchase Requirement: Policies, Processes, and Stakeholders. Washington, DC: American Institutes for Research.

U.S. Congress, House. 1966. A Unified National Program for Managing Flood Losses. 89th Cong., 2d Sess. H. Doc. 465.

USACE (U.S. Army Corps of Engineers). 2010. Metro East Levee System Maps. Available online at http://www.mvs.usace.army.mil/me_levees/maps.html. Accessed November 14, 2012.

U.S. Census Bureau. n.d. State and County Quick Facts, East St. Louis, Illinois. Available online at http://quickfacts.census.gov/qfd/states/17/1722255.html. Accessed February 27, 2013.

Witt, R. C., and A. M. B. Hogan. 1993. Economic, legal and social factors influencing insurance costs and prices. Journal of Insurance Regulation 11(3):314.

Copyright National Academy of Sciences. All rights reserved.

Copyright National Academy of Sciences. All rights reserved.

# 6

# Implementing Flood Risk Management Strategies

Flood risk management seeks to reduce the risk from flood events to the people who are located in flood-prone areas. As indicated in earlier chapters, there is some level of risk to all locations within the floodplain. The magnitude of that risk is a function of the flood hazard, the characteristics of a particular location (its elevation, proximity to the river or coast, and susceptibility to fast-moving flows and surges, etc.), measures that have been taken to mitigate the potential impact of flooding, the vulnerability of people and property, and the consequences that result from a particular flood event. The initial risk is represented by the area's characteristics without consideration of mitigation and risk transfer measures and the vulnerability of the population. Each mitigation and risk transfer measure reduces the overall risk to some degree, but it is impossible to completely eliminate risk. A flood risk management strategy identifies and implements measures that reduce the overall risk and what remains is the residual risk (Figure 6-1). In developing the strategy, those responsible judge the costs and benefits of each measure taken and their overall impact in reducing the risk. This chapter describes measures that can be used to reduce the risk behind levees.

Levees represent one method of reducing the impacts of flooding on a community or a region. Levees keep the floodwaters away from the area behind the levee until the point at which the levee is overtopped or fails and the area behind the levees is inundated and the people and property are affected. The risk to those behind levees is a function of the characteristics of the levee (height, strength), their location, and the mitigation and risk transfer measures and vulnerability reduction actions that they have taken or have been taken on their behalf. As has been previously discussed, every location within a floodplain, regardless of the presence or absence of a levee and whether or not the levee is accredited, is subject to some level of risk.

It is important for those located in the floodplain and those responsible for activity in the floodplain (public officials, investors, and those relying on activities in the floodplain, etc.) to ensure that those in the floodplain understand the nature of the risks they face and the steps that may be taken to reduce this risk. In communities that are part of the National Flood Insurance Program (NFIP), those portions of the community located in the Special Flood Hazard Area (SFHA) are subject to mandatory insurance purchase and special land-use requirements including minimum first-floor elevations for new construction. FEMA's Community Rating System (CRS) identifies actions that can be taken by the community to reduce their risk and gives insurance premium reductions for communities that take appropriate mitigation actions.

Structure owners and occupants in NFIP communities who are not location in the SFHA, either outside of the one percent annual chance floodplain or behind an accredited levee, have no such federal restrictions even though



Copyright National Academy of Sciences. All rights reserved.




FIGURE 6-1 Examples of tools and measures to reduce and transfer flood risk in flood-prone areas. The remaining risk after these techniques are employed is the residual risk. The bar on the far left indicates the initial, unmitigated risk that is faced by a community. Actions taken through the methods indicated in the subsequent bars, which are illustrative, reduce the unmitigated risk. Some of these actions are taken at the federal, state, and local levels, whereas others are taken by the homeowners and businesses at risk. The risk that remains after these actions are taken (bar on the far right) is the residual risk.
SOURCE: Modified from USACE (2006).

in many cases they face significant risks. As Figure 6-2 illustrates, a structure whose first-floor elevation is at the one percent annual chance level, might suffer only minor consequences should a greater than one percent annual chance flood occur, whereas those behind a one percent annual chance levee might suffer significant consequences. Because there are no federal requirements for land-use restrictions or mitigation in the non-SFHA area, many owners and public officials erroneously assume that the absence of requirements for action can be equated with absence of risk, when in reality, the risk may actually be greater in some areas of the SFHA.

All NFIP communities, because of the land-use regulation provisions for the SFHA, have given some attention to the development of risk management strategies. However, once a levee is accredited, the area behind that levee is considered by most communities to be outside the floodplain and not subject to land-use regulation or requirement for communities to consider the consequences of failure or overtopping. Depending on the topography of the area behind the levee, these strategies consider interior drainage systems to ensure that water "trapped" behind the levee during a storm will not create internal flooding and a SFHA.[1]

One measure of the potential risk behind levees is measured by the number of structures protected by levees. FEMA currently estimates that 8.6 million housing units (6.5 percent of units in the United States) are located in SFHAs (FEMA, 2012a). The U.S. Army Corps of Engineers (USACE) estimates that there are 14 million structures behind the 14,000 miles of levees for which it has oversight; many of these levees are also accredited under the NFIP (Chapter 8) (Bryan Baker, USACE, personal communication, January 10, 2013). USACE is currently

[1] See 44 CFR §65.10 (b)(6).

Copyright National Academy of Sciences. All rights reserved.




**Figure 3-1. Residual Risk. Illustration (A) shows the situation when the water level in the river is below the BFE. The levee protects Home A up to the 100-year level. Illustration (B) shows the situation when the water reaches the 105-year flood level and overtops the levee. Home 1 is submerged and Home 2 is subjected to minimal damage.**

FIGURE 6-2 Scenarios of residual risk. In scenario (*A*), the levee protects the home up to the one percent annual chance flood. In scenario (*B*) the water is higher and the one percent annual chance flood overtops the levee. The consequences to Home 1 are more significant than to Home 2: Home 1 is submerged; Home 2 is flooded.
SOURCE: FEMA (2006).

developing a Levee Safety Action Classification (LSAC) for use in screening the results of its inspection of levees under its oversight. Information from the LSAC will be provided to levee owners (USACE, 2012a).

## MITIGATION AND RISK TRANSFER MEASURES

Mitigation is defined by the Federal Emergency Management Administration (FEMA) as "sustained action taken to reduce or eliminate long-term risks to people and property from hazards" (FEMA, 2010b). Traditionally, mitigation is divided into structural and nonstructural options. USACE, n.d.a defines structural and nonstructural mitigation measures as follows:

> Structural measures such as dams, levees, and floodwalls alter the characteristics of the flood and reduce the probability of flooding in the location of interest. Nonstructural measures alter the impact or consequences of flooding and have little to no impact on the characteristics of the flood.

A portfolio of structural and nonstructural mitigation measures can reduce the likelihood and/or impact of flooding (Table 6-1). For nearly two centuries, the nation relied principally on structural measures to control floods.

TABLE 6-1 Examples of Structural and Nonstructural Flood Mitigation and Risk Transfer Measures

| Structural | Nonstructural |
|---|---|
| Levees | Structure elevation |
| Floodwalls | Natural systems |
| Seawalls | Risk mapping |
| Dams | Hazard forecasting, early warning systems, and emergency plans |
| Floodways and spillways | Dry and wet floodproofing |
| Channels | Land-use planning and zoning |
| Controlled overtopping | Construction standards and building codes |
| Levee armoring | Acquisition and relocation |
| Seepage control | Insurance |

Copyright National Academy of Sciences. All rights reserved.

In the mid-20th century, in recognition that even with significant use of structural approaches, flood damages were still on the rise, governments initiated multifaceted floodplain management and expanded use of nonstructural means and risk transfer (flood insurance) mechanisms (Sayers et al., in press).

## Structural Mitigation Measures

A brief description of the structural measures most often used in flood control follows, along with discussion about how each of these measures relates to levees. This discussion was adapted, in part, from NRC (2012b).

### Levees, Floodwalls, Seawalls, and Other Appurtenant Structures

These structures are designed to prevent floodwaters and storm surges from reaching areas that are at risk. Consequences of failure can be catastrophic because those behind the structure can be subject to rapid inundation and flooding conditions more severe than if the floodwaters had risen gradually.

### Dams

Barriers that impound hydrologic flows, dams retain floodwaters before they reach areas at risk. For example, during high-precipitation periods, dams hold upstream floodwaters that are released gradually to minimize the likelihood of damage to downstream communities. However, during exceptionally large events, the storage capacity of a dam can be exceeded and uncontrolled flood flows are passed downstream. Under these circumstances, downstream levees may not be able to contain floodwaters and will fail. This condition occurred in 2011 during spring floods on the Missouri River (USACE, 2012b). Under exceptional circumstances, dams can fail and send significant quantities of water downstream, resulting in damage or destruction of levees and communities below the dams.

### Floodways, Spillways, and Channels

Floodways, spillways, and channels are constructed to carry floodwaters around a community or region where the capacity of a river to pass a large volume of floodwaters past a critical location is limited. Under some circumstances, river channels can be modified to increase their flood carrying capacity. During the 2011 flooding of the Mississippi River, USACE opened floodways near New Madrid Missouri to take the pressure off upstream and downstream levees in Illinois, Kentucky, and other locations in Missouri, and three floodways in Louisiana to relieve pressure on structures in the New Orleans area. A similar floodway provides relief when needed to relieve pressure on levees surrounding Sacramento, California.

## Structural Mitigation Through Improved Levee Design or Modification

During a flood, levees are under continuous stress that threatens their integrity. The most serious challenges result from wave action against a levee face, the erosion of the land side of a levee as the levee is overtopped or subject to waves breaking over its top, and seepage under the levee that destroys the levee from within. Forms of these occurred during Hurricane Katrina and caused the failure of levees in the New Orleans region in 2005. Use of controlled overtopping, armoring, and underseepage control can greatly reduce the potential for catastrophic failure.

### Controlled Overtopping and Breaching of Levees

During a flood event, the risk of a levee overtopping can be significant and the consequences can be catastrophic. Controlled overtopping of levees or engineered overtopping involves designing a levee to force overtopping in the least hazardous location (USACE, 1986). This can be done by using different levee heights, known as superiority, or notches or openings in a desired location (Figure 6-3).

Copyright National Academy of Sciences. All rights reserved.




FIGURE 6-3 A gated overflow spillway that would control flows into a desired area.
SOURCE: Courtesy of Jae-won Chung.

The advantages of controlled overtopping in a designated area are (1) reducing the impact of overtopping failure in the selected area and in other parts of the levee system, (2) reducing the likelihood of overtopping in less desirable areas (i.e., areas with more development), and (3) reducing levee maintenance and repair costs after the flood event.

Controlled breaching of levees is occasionally carried out during sustained high flow events (floods), when the benefit of the intentional diversion is deemed to be justified, economically, to mitigate more extensive damage that would likely otherwise occur. Controlled breaches are relatively rare, but have been used in most major flood events since 1927 as a last ditch means to lower flood stages threatening high-value areas, such as New Orleans (in 1927), Cairo, Illinois, and the St. Francis Basin in Missouri and Arkansas 1937 and 2011 along the Mississippi River, or historic towns such as Prairie du Rocher, Illinois, during the 1993 Missouri–Middle Mississippi River flood. These are not to be confused with so-called "forced breaches," which are routinely employed during floods, usually to help drain flooded tracts of urban or agricultural land. Forced breaches are necessary if there is no other ready means of draining flooded lands that are ringed by intact levees about their lower, or "downstream" perimeters. Forced breaches are usually made using tracked backhoe excavators and are commonly employed whenever a diked tract of land is compromised by flooding. The natural breaches and forced breaches must then be repaired before the succeeding flood season. Since records began being tabulated within the NFIP in 1969, forced breaches have historically accounted for 40 to 50 percent of the post-flooding repair costs sustained by local agencies (Storesund et al., 2009).

### Levee Armoring

Armoring a levee involves making a levee less susceptible to erosion induced by floodwaters and overtopping. It involves the use of a variety of materials, from concrete to vegetation. Three key factors in determining levee survival in a significant flood event and overtopping are depth and duration of flow, flow velocity (a function of slope inclination, height of the drop, and flow friction), and the erosive resistance of the vegetation mat and underlying soils (Briaud et al., 2008; Storesund et al., 2009).

The earliest methods of armoring employed in the 1800s, involved timbers reinforcing the submerged wall of the levee. Today, particularly after levees failed in Hurricanes Katrina and Rita in 2005, considerable attention is being given to new methods and technologies that might make earthen levees more survivable during short-term overtopping, as occurs during hurricane-whipped storm surges. These concepts include the use of embedded soil reinforcement (high-density polyethylene mesh and fiber reinforcement), turf reinforcement, and paving land-side slopes with soil admixtures, such as clay, soil cement, and other forms of tensile reinforcement (Rogers, 2009; Xu et al., 2012). An example of one such armored levee is shown in Figure 6-4.

### Seepage Berms and Cutoff Walls

Depending on the nature of the material used in the construction of the levee and the foundation of the levee, water may flow through or under a levee creating the potential for collapse of the levee or its foundation (Figure

Copyright National Academy of Sciences. All rights reserved.



FIGUR

SOURCE: Courtesy of Gerald E. Galloway.

6-5, *Top*). Cutoff walls and trenches can be used to stop the flow through and below a levee (Figure 6-5, *Lower Left*). Construction of land-side seepage berms can add sufficient weight to counteract the upward seepage forces (Figure 6-5, *Lower Right*). Pressure relief wells can be placed on the land side of the levee to deal with seepage and are part of the levee repair effort for the East St. Louis, Illinois levees mentioned in Chapter 5.

## Nonstructural Mitigation Measures

Nonstructural measures vary in cost and effectiveness and the physical and political effort required to implement them. The selection of which measure to use is a function of the location in which it will be employed (topography, expected flood levels, etc.), the availability of funds, and public acceptance of use.

### Structure Elevation

By raising a structure above the expected flood level, flood damages can be prevented (Figure 6-6). Behind an accredited levee, if a flood greater than the one percent annual chance flood occurs, there could be some damage to such elevated properties but considerably less than if the structures had been at the base flood elevation (BFE). In the SFHA, buildings are elevated to the BFE in the case of new construction, substantial improvements are made to existing buildings, and repairs are made to substantially damaged buildings to comply with the NFIP (FEMA, 2000). NFIP insurance rates for structures in the SFHA are discounted for elevations above the BFE, providing that supporting documentation (i.e. an elevation certificate) is provided.

Elevation includes moving key or essential equipment from low-lying elevations within a structure to areas that would not be subject to flooding. Having building support systems such as computers, heating and air-conditioning units, and electrical stations located in the basement areas puts the functionality of the entire building

Copyright National Academy of Sciences. All rights reserved.




FIGURE 6-5 Levee seepage and control methods. (*Top* ) Seepage paths under and through a levee. (*Lower Left*) Use of cutoff walls and trenches to block seepage. (*Lower Right*) construction of a land-side seepage berm to provide additional weight and length to counteract upward seepage forces.
SOURCE: USACE Management Measures Digital Library. Available online at http://www.iwr.usace.army.mil/docs/MMDL/FLD/Feature.cfm?ID=5, accessed January 25, 2013.

at risk during a flood event. In 2006, a heavy storm in downtown Washington, D.C. flooded much of the federal triangle including the National Archives, the Federal Bureau of Investigation Headquarters, and the basement of the Internal Revenue Service (IRS), damaging essential mechanical and electrical equipment. The IRS was closed for 6 months to allow for repairs (GAO, 2007; National Capital Planning Commission, 2008).

When building a structure on the floodplain, the cost of incorporating freeboard in a pile or a masonry pier foundation averages approximately 1 to 2 percent of the at-BFE building cost for 4 feet of added freeboard. For a masonry wall with interior pier (crawlspace) foundation, the cost averages 3 to 6 percent of the at-BFE building cost (Jones et al., 2006). Jones and colleagues (2006) concluded that it is financially reasonable to spend between 103 to 106 percent of the at-BFE building cost to elevate a structure, depending on local circumstances.

Challenges in elevating structures do exist. For example, properties that service people with disabilities may require either an elevator or a long ramp, the cost of which could make elevation economically infeasible. In addition, there is growing concern that having an entire community elevated creates the potential for small islands (houses) in a flood sea that cannot be accessed during the flood event. In the case of fire or a medical emergency, first responders would find it very difficult to reach many of these homes. If flooding were to last for an extended period, the elevated homes would rapidly become uninhabitable.

Copyright National Academy of Sciences. All rights reserved.



FIGURE 6-6 Elevated homes behind levees in New Orleans, Louisiana.
SOURCE: Courtesy of Gerald E. Galloway.

## Natural Systems

Naturally existing, restored, or developed wetlands, as well as land in periodic cultivation, can store overflow waters from riverine flooding and help reduce downstream impacts. Wetlands also provide a natural barrier to storm surge inundation. Coastal sand dunes protect structures built behind them and help slow down coastal erosion and also the immediate impact of rising storm surge. Floodways built to relieve flood pressure can also provide ecosystem benefits. These natural systems can be effective in reducing flooding behind levees with interior drainage problems (Galloway et al., 2009; Opperman et al., 2009). Use of natural systems typically requires some form of real estate acquisition (fee simple, easement, payment for use, etc.) because the benefits from such measures normally do not accrue to the individual who may own the property required. In some cases, there will be a need for construction of appropriate inlet and outlet works to permit the entry and exit of stored waters.

## Risk Mapping

Accurate mapping of risks provides those living or working in flood-prone areas, in front of or behind levees, with the information necessary to make rational decisions in developing their personal or corporate flood risk management strategies. Risk mapping is discussed further in Chapter 7.

> Combining the natural hazard risk assessment with quantitative consideration of mitigation measures yields expected outcomes that can be graphically portrayed in a manner that facilitates public understanding of the risk and its implications for them.
>
> NRC (2012b)

Copyright National Academy of Sciences. All rights reserved.

## Hazard Forecasting, Early Warning Systems, and Emergency Plans

Detailed weather forecasts of the path and severity of a tropical storm, and accurate predictions of stages (heights) of flooding rivers enable government officials and the public to make decisions to evacuate or move valuable property from high-hazard areas. Advance information about potential failures of levees or dams can significantly reduce the consequences should failures occur. Preparation of emergency action and evacuation plans can similarly reduce or eliminate casualties and property losses.

## Dry and Wet Floodproofing

Damage to structures in the SFHA and behind levees can be greatly reduced through effective dry and wet floodproofing. Dry floodproofing seals structures to prevent floodwaters from entering; wet floodproofing makes uninhabited portions of a structure resistant to floods by allowing water to enter and flow through the structure during a flood. FEMA defines floodproofing as

> a combination of adjustments and/or additions of features to buildings that eliminate or reduce the potential for flood damage. Examples of such adjustments and additions include anchoring of the building to resist flotation, collapse, and lateral movement; installation of watertight closures for doors and windows; reinforcement of walls to withstand floodwater pressures and impact forces generated by floating debris; use of membranes and other sealants to reduce seepage of floodwater through walls and wall penetrations; installation of pumps to control interior water levels; installation of check valves to prevent the entrance of floodwater or sewage flows through utilities; and the location of electrical, mechanical, utility, and other valuable damageable equipment and contents above the expected flood level (FEMA, n.d.a).

The Federal Alliance for Safe Homes (FLASH) indicates that dry floodproofing can be accomplished by measures such as

- Applying a waterproof coating or membrane to the exterior walls of the building;
- Installing watertight shields over doors, windows and other openings;
- Anchoring the building as necessary so that it can resist floatation;
- Installing backflow valves in sanitary and storm sewer lines;
- Raising utility system components, machinery and other pieces of equipment above the flood level;
- Anchoring fuel tanks and other storage tanks to prevent flotation;
- Installing a sump pump and foundation drain system;
- Strengthening walls so that they can withstand the pressures of floodwaters and the impacts of flood borne debris;
- Construct nonsupporting, break-a-way walls designed to collapse under the force of water without causing damage to the house or its foundation.[2]

Wet floodproofing includes construction of veneers to seal potential water entry into or under a structure, installation of vents to allow water to move through crawl spaces under homes (avoiding different water levels outside and under a home).[3] Floodproofing can also include permanent or temporary installation of barriers such as modular dams and small levees designed to keep floodwaters away from one or more structures for limited periods of time (Figure 6-7).

There is an increasing demand for products and techniques that can be used in existing properties to reduce the potential damage when flooding occurs. To ensure that floodproofing products are well designed and manufac-

[2] See http://www.flash.org/peril_inside.php?id=59.
[3] See http://www.flash.org/peril_inside.php?id=60.

Copyright National Academy of Sciences. All rights reserved.




FIGURE 6-7 Barriers and small levees floodproof a home from low-level flooding.
SOURCE: FEMA (2007).

tured to perform the task for which they are being developed, both the Association of State Floodplain Managers (ASFPM) and FM Global have developed certification standards to support this need (FM Global, 2006, n.d.).[4]

### Land-Use Planning and Zoning

Wise land use is at the center of nonstructural flood mitigation activity and is an effective tool for reducing risk at the community level. Land-use planning implements public policy to direct how land in a given area is used. It is executed through zoning ordinances and takes place on multiple levels of government, from national policy to local policy where there may be designation of parcels for a specific use at the local level. When appropriate, wise land use may mean a lack of investment in a particular area (Box 6-1).

Few issues have gained attention and controversy like land-use planning. The tension between promoting development in order to foster growth in the community and the potential long-term liabilities (i.e., flood risk) is significant. Unfortunately, when individuals or businesses develop an area that may be subject to flooding and are unaware of the potential risk, these individuals suffer when a flood event occurs. Although the NFIP requires regulation of the land within the SFHA, it does not require flood-prone communities to regulate areas beyond the one percent annual chance flood level or areas behind levees even though both areas face flood risks. When a community's land-use plans treat all areas behind a levee the same way even though some areas are substantially below the BFE and would be fully inundated in the event of a major levee failure, these land-use plans ignore the risk in placing occupants of the lower areas at an economic and safety disadvantage.

### Construction Standards and Building Codes

Construction standards and building codes can be developed at any level of government but they are enforced at the local level. While codes provide for public safety, they also prescribe practices and measures that directly address known causes of disaster damages. Damages can be significantly reduced by attention to modern construction standards and building codes. Kunreuther (1996) found that one-third of the damages associated with the 1992 Hurricane Andrew could have been avoided had Florida enforced its building codes.

[4] See http://www.floods.org/index.asp?menuid=421&firstlevelmenuid=183&siteid=1.

Copyright National Academy of Sciences. All rights reserved.

**BOX 6-1**
**The Coastal Barriers Resources Act**

Coastal barriers possess many characteristics that make them attractive building sites. These include their rich biological diversity, their status as popular vacation destinations, and their role as large drivers to local economies. However, these areas pose substantial risks to both developers and homeowners. They are often the location of first landfall by tropical storms, bearing the full force of storm surges and hurricane winds, and are the victim of a constantly fluctuating landscape due to chronic coastal erosion (FWS, 2002). The federal government historically subsidized and encouraged development in these coastal areas until the late 1970s and early 1980s, when it was realized that this subsidization and encouragement had been resulting in the loss of natural resources; presented a threat to human life, health, and property; and cost American taxpayers millions of dollars each year (FWS, 2012).

In an effort to remove any federal incentive to develop on coastal barriers, Congress passed the Coastal Barrier Resources Act (CBRA) in 1982. Reauthorized in 1990, the CBRA designated relatively undeveloped coastal barriers along the Atlantic and Gulf coasts, the Florida Keys, the Great Lakes, Puerto Rico, and the U.S. Virgin Islands as part of the newly created John H. Chafee Coastal Barrier Resources System. This designation renders these coastal barriers ineligible for most new federal expenditures and financial assistance, including, most significantly, access to federal flood insurance through the NFIP (FWS, 2012). Although no longer encouraged by the federal government, development in these hazard-prone areas is not prohibited, provided any work and investment is made by private developers and other nonfederal parties. In return for a lack of restrictions on development, any individual or developer choosing to live and invest in these areas agrees that they will bear the full cost of development and rebuilding (in the case of a flooding event or other natural disaster) instead of relying upon federal funding for roads, wastewater systems, potable water supply, and disaster relief (FWS, 2012). This approach has saved over $1 billion in federal dollars between 1982 and 2010 and is expected to continue saving federal dollars in the future (FWS, 2012).

## Acquisition and Relocation

Acquisition or relocation of properties that are repetitively flooded, substantially damaged, or need flood-related project construction have been supported by FEMA and USACE, allowing many communities to deal with the challenges of these frequent flood losses. When land is not suitable or only marginally suitable for development or agricultural activity, that land can be acquired and placed into public use for either environmental or recreational purposes to enhance the overall quality of life in the community. Buyouts of properties that are repetitively flooded have been supported by FEMA and have allowed many communities to deal with frequent flood losses.

Although a few sections of communities have been relocated, more relocations or removals usually take place where specific parcels are identified as being at risk. When property is acquired for environmental purposes. this land can frequently be used during flood periods for off-river storage of floodwaters. This flood storage reduces the downstream impact of the flood and the area is restored after the flood to its previous condition. During the 2011 Mississippi River floods, over 500,000 acres of land in the lower Mississippi Valley was used for flood storage, which dramatically reduced river stages that otherwise would have affected large communities such as New Orleans and smaller ones such as Cairo, Illinois.

## Insurance

Through the purchase of insurance, some of the financial risk of living on a floodplain in or outside the SFHA or behind a levee is transferred, for a premium, from the individual to the entities that provide insurance. Floodplain managers tend to consider this a mitigation technique, when in fact unlike physical measures that reduce damages,

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 708 of 858



insurance does not reduce damages but simply compensates the affected parties for these losses. In most flood-prone areas in the United States, this insurance is provided to residential properties and small businesses through the NFIP. Commercial flood insurance is available and is issued by numerous major insurers and is issued by a worldwide network of reinsurance organizations, providing coverage for property value in excess of the NFIP maximum of $250,000 for residential property and $500,000 for businesses. However, unlike the NFIP, commercial insurance rates and rates for homeowner coverage in excess of the NFIP cap are based on more detailed analysis of properties as they apply for coverage and may reflect more sophisticated risk analysis and requirements for mitigation measures (Chapter 5).

When property owners take steps to mitigate potential losses through use of mitigation measures, commercial insurers typically will reduce the premiums to reflect the risk mitigation. The NFIP provides premium reductions in the SFHA in two cases, for elevation of property higher than the BFE and some types of commercial property floodproofing. However, the NFIP does not provide premium reductions in areas behind levees (preferred risk policies). When risk-based pricing is implemented, discounts for mitigation measures behind levees need to be considered because it is likely that, in many cases over the life of a mortgage, the premium discounts could exceed the costs of the mitigation and would be beneficial to the mortgage holder and the mortgagee.

The perception exists that flood insurance is unnecessary for individual homeowners in the floodplain because, after a flood event, government and private agencies assist the property owners in getting back on their feet. Media statements and political rhetoric regarding disaster aid imply generous aid to repair and replace property. Analysis has indicated that this is not necessarily the case (Kousky and Shabman, 2012). Possession of an insurance policy provides rapid payment to the owner of claims for property damage and gives those with insurance the ability to recover much faster than those seeking to piece together other forms of assistance, which, in the long run, will not make up the entirety of losses.

## DEVELOPING COMMUNITY STRATEGIES FOR AREAS BEHIND LEVEES

Circumstances produce a variety of flood risk scenarios behind levees. These circumstances can include anything from proximity to the coast or river, local weather patterns, existing infrastructure, and community preparedness. Some risk scenarios are associated with long time horizons, such as flooding associated with climate change, and might be less perceptible to the at-risk community compared with, for example, a design deficiency in a levee discovered during the Map Modernization process. Complicated scenarios arise as communities grapple with unique situations (Box 6-2). A mix of flood risk management measures tailored to the risk of a particular

### BOX 6-2
### Challenges to Mitigation and Flood Management: Norfolk, Virginia

Living in an area that is vulnerable to flooding, the community of Norfolk, Virginia, has spent years wrestling with flood risk. Home to the world's largest naval base and 1.7 million people, even high tides or heavy rains can cause problems for this low-lying port at the mouth of the Chesapeake Bay. Challenging issues such as the combination of sea level rise and subsidence dramatically changing the level of the ocean in Norfolk face this community (Figure 6-8; Boon et al., 2010).

The current flood management system of Norfolk consists of pumping stations and floodwalls. Each year, the city invests in improving drainage and elevating roads. Norfolk has taken additional steps to prepare for flooding, including hiring a Dutch coastal engineering firm to conduct a vulnerability analysis to enhance mitigation and inform development. This new strategy includes, for example, new floodgates, pumping stations, and floodwalls at an estimated cost of $1 billion dollars (NPR, 2012). This strategy also includes something called "managed retreat" by Mayor Paul Fraim, saying that the cost of flood mitigation is sometimes too steep and giving up homes makes more sense (NPR, 2012).

Copyright National Academy of Sciences. All rights reserved.

community paired with an appropriate communication strategy is the most effective flood risk reduction strategy (Burby and Dalton, 1994; Brody et al., 2007; Sayers et al., in press; see also Figure 3-3 in Chapter 3).

### Flood Risk Management Strategy: Goals at the Local Level

To successfully develop a flood risk management strategy, a community, in collaboration with those entities that may be called upon to assist in the implementation of the strategy, needs to first establish the goals of the strategy. This collaboration requires the community to synchronize planning with relevant regional bodies and ensure its conformance with state and federal guidelines and regulations when they exist. A critical part of the goals of the strategy is to define the relative levels of protection both in front of and behind levees and then to lay out the appropriate combination of mitigation measures (structural, nonstructural, or insurance) to achieve those levels.

Today, there is no national standard for level or degree of protection for flood-prone communities, except for those choosing to participate in the NFIP. Under the NFIP, those in the SFHA must take action to mitigate against the one percent annual chance flood. Those behind levees must ensure that the levees protect against the one percent flood. However, this criterion is a standard for participation in the insurance program, not a life-safety or property protection standard. Since the decision was made in the 1970s to use this one percent standard for NFIP accreditation, the predominance of the written reports concerning levees have argued for a minimum standard of 0.2 percent annual chance for levees protecting urban areas (see Chapter 2 and Appendix F).

As indicated in Chapter 2, when the federal government began to build levees under its flood control authorities, it began with relatively high standards. Urban area levees and those protecting the Lower Mississippi Valley were to be built to pass a standard project flood or higher level flood. Agricultural areas were typically protected to near the 2-3 percent annual chance level. Executive Order 11988, March 1977, directed federal agencies supporting activity in the floodplain to require critical facilities to be located outside the 0.2 percent floodplain or be elevated above that level, but few similar requirements were imposed by state governments.

In 1973, the U.S. Water Resources Council issued Principles and Standards (WRC, 1973), which established national and regional economic development, environmental quality, and other social effects as criteria for evaluation of federal water resource projects. These standards permitted a variety of justifications for level of protection to be considered. In 1983, the WRC established, in Principles and Guidelines, national economic development as the single objective (WRC 1983) and it quickly became apparent that the optimum level of protection for a levee given the economic benefits was at or near the one percent level because reaching that level created the "benefit" of not having to buy insurance when located behind such levees. Life safety was not a consideration in the calculus.[5]

In 2007, the State of California legislated that new urban levees would have to be constructed at the 0.5 percent (200-year) level as a result of evaluation of the flood risks facing the state and the lessons learned from Hurricane Katrina. This represents a critical evolution in thinking—that it is appropriate to tailor flood risk management strategies to individual communities, geographic areas, or watersheds by carefully selecting a level of protection that reflects the life safety and economic assets in a given area. This includes recognition that the one percent annual chance flood standard of the NFIP might not serve as an appropriate life safety or property protection standard. Also critical to evaluating flood risk management strategies at the local level is the ability to acquire the resources it will need to carry out the floodplain management strategy.

Development of a flood risk management strategy focused solely on protection of areas behind levees would be neglecting the comprehensive nature of the flood risk challenge. It is critical to coordinate efforts to deal with one part of the floodplain with planning and other areas. Also critical is the consideration of all types of development and activity in local land-use plans, including residential, commercial, industrial, and agricultural needs of the community, placement of these components in a community, and an economic analysis of the costs and benefits of the flood risk management strategies being examined. Do the benefits to be gained merit the commitment of the

[5] In the 2007 Water Resources Development Act, Congress directed the revision of Principles and Guidelines to include "(1) seeking to maximize sustainable economic development; (2) seeking to avoid the unwise use of floodplains and flood-prone areas and minimizing adverse impacts and vulnerabilities in any case in which a floodplain or flood-prone area must be used; and (3) protecting and restoring the functions of natural systems and mitigating any unavoidable damage to natural systems." To date the revision has not occurred.

Copyright National Academy of Sciences. All rights reserved.

resources needed to carry out the floodplain management strategy? However, approval of community participation in the NFIP and accreditation of levees in these communities is not dependent on the cost-effectiveness of the levee or other mitigation measures incorporated in the community flood risk management strategy. Economic decisions are more closely tied to the analyses conducted by federal or state agencies to meet the criteria for participation in or construction of flood-related infrastructure under other government programs.

## Future Conditions and Climate Change

Actions to shape flooding in one location can have impacts on flood stages (i.e., flood risk scenarios) at other locations, a realization that first surfaced in the late 1800s and early 1900s in the Sacramento River Basin, California. At the time, ad hoc levee construction generated significant, unintended hydrologic impacts at both the local and regional levels, driving the state to eventually implement statewide flood control measures through a State Reclamation Board. Today, this issue still plagues the Sacramento–San Joaquin Delta area, and a Central Valley Flood Protection Plan was adopted in June 2012. This plan promotes integrated, systemwide wise flood management, a key implication of which is that flood management investments (e.g., levees) will not result in an increased risk of flooding in other areas (CVFPP, 2012).

Community flood risk scenarios will continue to evolve as change occurs. Climate change will have a variety of regional impacts, and the geographic location of a community will affect how changing conditions affect risk. Some areas will have more droughts, some will have more frequent floods, and others will have more intense floods. Research to understand these hydrologic changes is ongoing (NRC, 2011, 2012a). A recent special report of the Intergovernmental Panel on Climate Change (IPCC, 2012) indicates a likely increase in many regions of the frequency of heavy precipitation events, and when coupled with increasing vulnerability presents a myriad of challenges for coping with climate-related disastersIPCC. Galloway (2009) cites 11 major international studies conducted from 1987 to 2002 that all predict significant climate change–induced hazards, including increased flooding, higher mean atmospheric temperatures, higher global mean sea levels, increased precipitation, increased strength of storms, more energetic waves, storm surges that reach further inland, undercapacity of urban sewerage and drainage systems, increased vulnerability of port cities, and disproportionate impacts on disadvantaged population segments (Galloway, 2009). The rise in sea level and the increase in storm surge due to climate change puts many coastal areas at risk from intensified flooding (NRC, 2010).

Hirsch and Ryberg (2012), in examining trends in annual floods at 200 stream-gauge sites in the United States, found that , while there appeared to be no strong statistical evidence for flood magnitudes increasing with increasing global mean carbon dioxide concentration, there were differences in flood magnitudes among the four quadrants of the conterminous United States (Figure 6-8). They indicate that the attention should be paid to the effects of changes in the relative "importance of the role of snowpack and rain on snow events." Raff (2013) suggests that the increase in magnitude of floods in the northeastern and midwestern United States (Figure 6-9, *Upper Right*), may have consequences in the Upper Mississippi, Ohio, and Missouri watersheds (Hirsch and Ryberg, 2012; Raff, 2013).

The Draft National Climate Assessment, issued in January 2013 by the National Climate Assessment Development Advisory Committee, begins with the statement:

> Climate change is already affecting the American people. Certain types of weather events have become more frequent and/or intense, including heat waves, heavy downpours, and, in some regions, floods and droughts. . . . The largest increases have occurred in the Northeast, Midwest, and Great Plains, where heavy downpours have exceeded the capacity of infrastructure such as storm drains, and have led to flooding events and accelerated erosion.

The report goes on to point out the increasing vulnerability to flooding of those in floodplains and coastal areas (Figure 6-10; NOAA, 2013). For example, prior to Hurricane Sandy, FEMA, as part of its continuous updating of FIRMs had begun revision of FIRMs for the New York Metropolitan Area and had planned to deliver them to state and local officials in mid-2013 for comment. When Hurricane Sandy hit New York, FEMA accelerated the release of information about the BFEs that would be seen on the new maps so that individuals and community officials could plan the recovery and reconstruction accordingly. These advisory BFEs for A and V zones, now in the hands of officials and the public, reflect the anthropogenic and physical changes that have taken place in the

Copyright National Academy of Sciences. All rights reserved.




FIGURE 6-8 Average sea level trend at Seawells Point, Virginia, recording a 4.44-mm/year rise with a 95 percent confidence interval of ±0.27 mm/year based on data from 1927 through 2006. This is equivalent to 1.46 feet in 100 years. Data from NOAA's Seawells Point monitoring station.
SOURCE: http://tidesandcurrents.noaa.gov/sltrends/sltrends_station.shtml?stnid=8638610 Sewells Point, VA.




FIGURE 6-9 Areas of increases and decreases in flood magnitude trends at 200 U.S. Geological Survey stream gauge stations. Upward pointing triangles represent increases in the magnitude; downward pointing triangles, decreases.
SOURCE: Hirsch and Ryberg (2012).

Copyright National Academy of Sciences. All rights reserved.

Levees and the National Flood Insurance Program: Improving Policies and Practices







FIGURE 6-10 The challenge of rising sea level and the expansion of the one percent annual chance floodplain to New York City. The light blue area represents a 2012 depiction of the one percent annual chance floodplain of Lower Manhattan, New York City. With sea-level rise, a far larger area would be flooded in the event of a one percent annual chance flood event. (Note that flooding during Hurricane Sandy (2012) exceeded the one percent annual chance flood.) With sea-level rise, the one percent annual chance flood will inundate a larger area of New York City (not pictured here).
SOURCE: USGCRP (2009).

over 25 years since many of the maps had been developed; the new BFEs range from 2 to more than10 feet higher than previously depicted on FIRMs. Attention to these new elevations will ensure that those who were damaged by Sandy will be able to rebuild or relocate knowing more about the 2013 hazard they face (FEMA, 2013; Jeffrey Woodward, FEMA, personal communication, February 27, 2013).

A soon-to-be-released FEMA study of the impacts of climate change and population growth on the NFIP indicates that the size of the nation's floodplains will grow between 40 and 45 percent over the next 90 years and double the number of needed flood policies by the end of the century (Figure 6-11). It is speculated that this will require FEMA to incorporate the effects of climate change in the operation of the NFIP (Lehmann, 2011). Under current regulations, FEMA does not include consideration of future conditions in development of FIRMs.

The 2012 Biggert-Waters Act established a Technical Mapping Advisory Council to serve as an advisory body dealing with map modernization issues.[6] The legislation directs the Council to:

> consult with scientists and technical experts, other Federal agencies, States, and local communities to (A) develop recommendations on how to (i) ensure that flood insurance rate maps incorporate the best available climate science to assess flood risks; and (ii) ensure that the Federal Emergency Management Agency uses the best available methodology to consider the impact of (I) the rise in the sea level; and (II) future development on flood risk; and (B) not

[6] Section 100215.

Copyright National Academy of Sciences. All rights reserved.




FIGURE 6-11 The average projected percent change in the size of the Special Flood Hazard Area by the year 2100 as a result of climate change and demographic change, in counties across the United States.
SOURCE: Crowell (2010).

> later than 1 year after the date of enactment of this Act, prepare written recommendations in a future conditions risk assessment and modeling report and to submit such recommendations to the Administrator.

The Biggert-Waters Act further charges the Administrator to review and update NFIP rate maps and to incorporate any future risk assessment submitted by the Technical Mapping Advisory Council in any such revision or update.[7]

### Implementing Flood Risk Management

Flood risk management begins with goal and policy development, identification of the hazard, analysis that includes assessment of the hazard's potential impact, and development of flood risk management strategies, representing the amalgamation of the various measures discussed in this chapter and Chapter 7 available to deal with the flood challenge (Figure 3-3). Flood risk management strategies are represented by portfolios of mitigation measures. A structural approach—that is, construction of a levee—is immediately visible and for many flood events provides adequate mitigation of the effects of rising waters. Implementation of nonstructural mitigation approaches is not always well received. Efforts to promote wise development or enhance building codes are sometimes seen as efforts to limit growth and reduce economic vitality in the affected area. Requiring communities to elevate homes can be seen as creating visual blight and similarly reducing the economic utility of the property. Less thought is given to the potential economic consequences should a flood actually occur. Federal project development guidance makes structural projects more feasible and requires less contribution from local governments for their execution

[7] Section 100216.

Copyright National Academy of Sciences. All rights reserved.

than would be expected of nonstructural efforts. Simply looking at an economic balance sheet tilts decision making toward structural approaches.

Successful flood risk management strategies are developed through a bottom-up process that is supported from the top down. Development of flood risk strategies by the community is critical, as is support from and collaboration with FEMA (Box 6-3) and other federal and state agencies. FEMA supports mitigation projects through a variety of hazard mitigation assistance (HMA) grants, administered through several programs that provide funding for eligible activities that reduce disaster loss and protect life and property from future damages. For example, FEMA supports mitigation projects through the Hazard Mitigation Grant Program (HMGP), a program that provides state and local government with grants for projects that reduce or eliminate losses of life and property from future disasters. Projects include elevation of a home, purchase of property subject to repetitive damage, and retrofitting, etc. HMGP grants may address a variety of risks and are not limited to flood risk; grants are only available to those in a presidentially declared disaster area and can be significant. FEMA also issues flood mitigation assistance (FMA) grants, severe repetitive loss (SRL) grants, and repetitive flood claim mitigation (RFC) grants, and pre-disaster mitigation (PDM) grants. FMA, SRL, and RFC grants are designed to, over time, reduce flood losses to the NFIP by mitigating insured properties with particular attention to repetitive loss and severe repetitive loss properties. PDM grants provide support for multihazard mitigation (planning and project implementation) prior to a disaster event (FEMA, n.d.b).

Mitigation projects that are eligible for HMA assistance include, for example, property acquisition, structure elevation, dry floodproofing, and minor flood control projects, such as the installation or modification of culverts, and stormwater management activities such as creating retention and detention basins. Ineligible projects generally include major flood control projects such as "construction, demolition, or repair of dams, dikes, levees, floodwalls, seawalls, groins, jetties, breakwaters, and erosion projects related to beach nourishment or re-nourishment," that is, projects where catastrophic failure is a possibility and the potential for loss of life and property is too great (FEMA, 2010a; Ryan Janda, FEMA, personal communication, January 29, 2013). Collectively, these grant programs become important parts of the risk management portfolio.

Communities behind levees are diverse in their physical and social characteristics. They have different types of flood risk that require a combination of risk management measures targeted at households, neighborhoods, and regions. They face a rapidly changing future, and a one-size-fits-all solution is not sufficient to adequately manage risk for all communities across the nation. The National Research Council report, *Disaster Resilience: A National Imperative* (NRC, 2012b), points out that informed decision making is key to managing risk. The development of information using a modern risk analysis tools will allow communities to utilize specific information in designing risk reduction strategies specific to that community and to visualize the risk throughout the communities over time.

**BOX 6-3**
**Project Impact**

Initiated in 1997, FEMA's Project Impact provided training and funding for disaster mitigation activities (flood, earthquake, fire, etc.) and facilitated the establishment of local partnerships in the community to mitigate the impacts of these disasters. The program established responsibility and authority for disaster mitigation at the community level. The program goals were accomplished by establishing responsibility and authority for mitigation at the community level. The actions were organized into four phases: (1) building partnerships, (2) identifying hazards and community vulnerability, (3) identifying and prioritizing risk reduction actions for the community, and (4) communicating success (FEMA, 1997).

Project Impact was discontinued at the federal level in 2001. However, some communities continued partnerships and mitigation activities where Project Impact was the catalyst for a long-term disaster management approach. Project Impact remains today a good model for encouraging and implementing community resilience.

Copyright National Academy of Sciences. All rights reserved.

Sayers et al. (in press) point out that risk-based methods enable uncertainty to be explicitly recognized and data collection prioritized to address areas where the lack of uncertainty is material to the choices being made. With science as the foundation of flood management measures, "better information leads to better decision-making and better flood management" (Schropp and Soong, 2006). With better knowledge, decisions makers can make land-use and other decisions that lead to reductions in loss of life and property damages (Brody et al., 2011).

Most communities participating in the NFIP focus their attention on those areas within the SFHA and overlook the risk to those outside the SFHA, especially those areas behind levees. **There is a clear need for a comprehensive, tailored approach to risk management behind levees that (1) is designed and implemented at the local level; (2) involves federal and state agencies, communities, and households; (3) takes into account possible future conditions; and (4) relies on an effective portfolio of structural measures, nonstructural measures, and insurance to reduce the risk to those behind levees.**

**To reduce the flood risk to those behind levees, FEMA should encourage communities to develop and implement multimeasure risk management strategies for areas behind accredited levees.** This strategy would contemplate the full range of foreseeable flood scenarios including levee overtopping or failure. The development of new risk management analysis tools will facilitate the identification of risks and suggest feasible approaches to dealing with the risks to those behind levees.

## EFFECTIVE FLOOD RISK MANAGEMENT: ADMINISTRATION OF LEVEES

Development and maintenance of appropriate supporting policies and data affecting the portfolio of mitigation measures are both critical effective floodplain management strategies. For example, managing the inclusion of levees in the NFIP is an important mission of the Federal Insurance and Mitigation Administration and requires the development of policies and procedures as well as regulatory instruments. Furthermore, data on the extent and status of the nation's levees are critical to informing all stakeholders of the extent of flood risk and developing appropriate floodplain management strategies. This section addresses both the current status of and the need for revision to the principal regulatory document establishing procedures for inclusion of levees in the NFIP and efforts to develop and maintain a national inventory of levees.

### Levee-Related Federal Regulations

Title 44 of the *Code of Federal Regulations* (CFR) contains several sections pertaining to levees in the NFIP including:

- 44 CFR §59.1, Definitions;
- 44 CFR §64.3, Flood Insurance Maps; and
- 44 CFR §65.10, Mapping of Areas Protected by Levee Systems.

Section 65.10 describes the "types of information FEMA needs to recognize, on NFIP maps, that a levee system provides protection from the base flood," and serves as the principal guidance document for levee development and certification.

The committee considered the three aforementioned sections of the CFR during the course of deliberations. The committee was asked specifically for advice on "Existing requirements for levee accreditation under 44 CFR §65.10" (Box 1-4). All three sections are relevant to the charge of this committee in the sense that Section 65.10 relies on the information contained in Sections 64.3 and 59.1. As indicated in Chapter 2 and Appendix F, the 2006 Interagency Levee Policy Review Committee (ILPRC) report to FEMA also addressed these three sections of Title 44, and the committee's advice generally supports the recommendations of the ILPRC.[8]

[8] The changes to Title 44 recommended by the ILPRC have yet to be acted upon by FEMA.

Copyright National Academy of Sciences. All rights reserved.

## 44 CFR §59.1, Definitions

In the past, existing roads and railroads, that is, embankments, were assumed to be included in the definition of a levee system and its accreditation even though the information concerning the integrity of the structures was unknown. As defined in 44 CFR §59.1, a levee system is: "a flood protection system which consists of a levee, or levees, and *associated structures*, such as closure and drainage devices, which are constructed and operated in accordance with sound engineering practices" (emphasis added). Although such embankments can provide a degree of flood protection, they can also be the source of catastrophic failures. If embankments are to be included in a levee system, they need to be subject to the same examination as levees designed specifically for flood protection purposes or the definition modified to exclude them because they were not designed to provide risk reduction from flood damages (ILPRC, 2006).

## 44 CFR §64.3 Flood Insurance Maps

Under current procedures, areas behind accredited levees are normally shown as Zone X or a shaded Zone X with the latter frequently indicating the presence of a levee. Section 64.3 identifies Zone X as either an area "of moderate flood hazards or areas of future-conditions flood hazard" or an area "of minimal hazards." FEMA's Map Service Center indicates that a shaded Zone X is an "Area of moderate flood hazard, usually the area between the limits of the 100-year and 500-year floods. Are also used to designate base floodplains of lesser hazards, such as areas protected by levees from 100-year flood, or shallow flooding areas with average depths of less than one foot or drainage areas less than 1 square mile" (Appendix E). Neither of these definitions adequately identifies areas behind accredited levees. Establishing a unique zone designation for areas behind levees would more clearly distinguish areas behind accredited levees from the 0.2 percent annual chance floodplain and the one percent annual chance floodplain and would provide clarity and assist in risk communication (ILPRC, 2006).

## 44 CFR §65.10, Mapping of Areas Protected by Levee Systems

If the definition of a levee system in 44 CFR §59.1 is modified to specifically exclude embankments, such as roads and railroads that were not engineered to provide risk reduction from flooding, similar modification of 44 CFR §65.10 is necessary (ILPRC, 2006). This would ensure that nonengineered levee systems are not certified as providing protection from the base flood.

As part of periodic update of FRIMs (map modernization), all levees are being subjected to analysis as they are mapped. Even though the map modernization program has a high priority, at current resource levels, the period between updates may be lengthy. It is important that, independent of the mapping of levees, FEMA maintain some degree of surveillance over the integrity of levees in the NFIP (ILPRC, 2006). At present, once accredited, a levee maintains this status until the next update. Rather than allowing accreditation to remain in effect until the FIRM is revised, periodic submission of operation and maintenance records as well as a written assessment of the levee systems performance in any flood events that have occurred to FEMA is needed. Furthermore, periodic recertification of the engineering and geotechnical aspects of the levee is critical. These continued actions verifying to FEMA that an accredited levee maintains its integrity would require modification of 44 CFR §65.10.

The design of levee systems is based on conditions at the time of the design including the flow and channel carrying capacity. As a result of upstream activity or normal geomorphic processes, the flow can be increased and the carrying capacity of these channels can be significantly reduced, thereby increasing the elevation of the base flood and reducing or eliminating the capability of an accredited levee to pass the base flood. Attention to the maintenance of these channels is an important part of maintaining the integrity of the levee system. Assurance that the flood carrying capacity of the main river channel is maintained is critical. Channel maintenance preserves the required level of protection, ensures that encroachments are controlled, and that an increased flow does not affect the integrity of the levee or the ability of the levee sponsor to maintain the levee and fight floods, when necessary (ILPRC, 2006).

Copyright National Academy of Sciences. All rights reserved.

To ensure that levees are designed to meet widely recognized standards, FEMA, in the past, has included references to the appropriate USACE manuals.[9] During the establishment of the NFIP and the inclusion of levees in the program, FEMA worked in close coordination with USACE to determine the appropriate design guidance to be used in construction of levees and in their evaluation and ceded to USACE the lead in several areas. The above recommendations reflect the 2006 documents available but need to be adjusted to reflect more recent publications.

## An Inventory of the Nation's Levees

The first step in properly dealing with levee risk and developing flood risk management strategies is to identify the location, condition, and ownership of levees, as well as the extent of the areas protected by the levee and the consequence of failure or overtopping (i.e., assets and lives), if it should occur. Compiling this information and making it readily available is fundamental to ensuring public safety and reducing flood losses. Because levees can alter natural hydrologic flows, knowledge of their location, properties, and conditions is essential to understanding, quantifying, and mitigating flood hazards, including working to increase public awareness of vulnerability during a flood event. Although some responsibilities have been assigned by Congress to FEMA and USACE for developing and maintaining levee information, several states and communities also are working to develop and maintain this information.

### The U.S. Army Corps of Engineer's National Levee Database

The biggest single resource for levee data in the United States is the National Levee Database (NLD). Administered and populated by the USACE, the NLD was authorized by Congress in the 2007 Water Resources Development Act. Congress directed the Secretary of the Army to establish and maintain a database with an inventory of the nation's levees; the database was to include:

> (A) location information of all Federal levees in the Nation (including global information system information) and, for non-Federal levees, such information on levee location as is provided to the Secretary by State and local governmental agencies; (B) utilizing such information as is available, the general condition of each levee; and (C) an estimate of the number of structures and population at risk and protected by each levee that would be adversely impacted if the levee fails or water levels exceed the height of the levee. (WRDA, 2007)

Appropriations for the database since 2007 have been insufficient to carry out the charge (Eric Halpin, USACE, personal communication, November 7, 2011). The NLD currently includes the more than 2,500 levees and associated structures (together known as "levee systems") that total more than 14,500 miles in length, cataloged in digital format. This includes levees that were built by USACE and are still operated and maintained by USACE (2,800 miles), built by USACE and turned over to local sponsors to operate and maintain (9,500 miles), or are under USACE oversight under Public Law 84-99[10] program that permits USACE to provide pre-and post-disaster assistance to nonfederal levees that meet certain standards of performance (2,200 miles) (Bryan Baker, USACE, personal communication, January 13, 2013; USACE, n.d.b). All data except information that could be considered to affect national security are accessible to both official data users and partners such as federal, state, and local governments, sponsors, and the general public (USACE, 2012c).[11] It should be emphasized that levee data are

[9] Reference USACE Engineer Manual EM 1110-2-1413, Engineering and Design, Hydrologic Analysis of Interior Areas as the acceptable/preferred methodology for interior drainage analysis. [65.10(b) (6]. Reference the USACE Levee Owners Manual for Non-Federal Flood Control Works as required for operation, maintenance, and inspection guidance and procedures for non-Federal levees and floodwalls [65.10(c) and 65.10(d)].

[10] Under Public Law 84-99, Flood Control and Coastal Emergency Act, USACE is authorized to undertake activities including disaster preparedness, advance measures, emergency operations (flood response and post-flood response), rehabilitation of flood control works threatened or destroyed by flood, protection or repair of federally authorized shore protective works threatened or damaged by coastal storm, and provisions of emergency water due to drought or contaminated source.

[11] See http://nld.usace.army.mil/egis/f?p=471:1:0::NO for additional information.

Copyright National Academy of Sciences. All rights reserved.

currently being collected from a variety of sources. Based on discussions with FEMA and USACE staff, the committee expects that the accuracy of the NLD and FEMA levee data will improve over time.

Currently, any data provided to USACE for inclusion in the NLD on levees that do not fall under the auspices of USACE and its national portfolio are collected on a voluntary basis. Efforts are under way to integrate the levee data collected on the communities that participate in the NFIP into the NLD, which will improve the information in the levee database (NRC, 2012b). Though USACE is working closely with other federal agencies and nonfederal levee owners to incorporate their data into the NLD on a voluntary basis, this current effort is not likely to yield the desired results (e.g., the building of a comprehensive national levee inventory) because of its voluntary nature (Eric Halpin, USACE, personal communication, 2011). Additionally, information collected and information voluntarily supplied are not likely to be in a format consistent across states, tribes, and local and regional entities, challenging the development of a comprehensive understanding.

### FEMA Mid-Term Levee Inventory

FEMA has long maintained an inventory of NFIP-accredited levees; however, in 2006 the ILPRC reported that "various levee databases have been developed, but for the most part they are not geospatially referenced, are incomplete, and lack usable information concerning the condition of the levees and attendant supporting structures" (ILPRC, 2006). As a result, in FY 2007, FEMA funded and developed the FEMA Mid-Term Levee Inventory (MLI) database, which was designed to complement the NLD and uses a data model extracted from the NLD's database. Whereas the NLD inventories levees of all protection levels, the MLI gathered levee data for structures designed to provide protection from a base (one percent annual chance) flood, to better to support the production of countywide flood insurance studies and Flood Insurance Rate Maps (FIRMs) and any other levees that were located in the area covered by FIRMs (FEMA, 2012b; Figure 6-12).

Maintenance of the MLI data is performed at FEMA's regional level and additional levee data is added as it becomes available (FEMA, 2012b). As of November 2012, the inventory identified approximately 29,800 miles of levees. Of those, approximately 5,100 miles have been or are accredited or in Provisionally Accredited Levee (PAL) status (i.e., NFIP levees) and 22,000 miles are not part of the NFIP but are located on FIRMs and could affect hydraulics in those areas or provide protection at less than the one percent annual chance flood level (FEMA, 2012b). These latter levees were identified by FEMA's Production and Technical Services contractors in counties covered by FIRMs.

### Overlaps

There is currently no method for determining whether a levee in the NLD is also in the FEMA MLI except through a one-by-one comparison of certain levee characteristics. Because some data elements in the two inventories are different, USACE and FEMA have been attempting to manually look for overlaps, but have yet to complete the effort. A preliminary analysis by both agencies indicates that approximately 3,400 miles of accredited or PAL levees (66 percent of NFIP levee miles) may be operating under oversight of both agencies (Figure 6-13). Because the 2012 Flood Insurance Reform and Modernization Act requires the two agencies to synchronize their analytical methodologies where both agencies inspect the same levee, FEMA and USACE have accelerated their efforts to define overlaps (David Bascom, FEMA, personal communication, November 1, 2012; Bryan Baker, USACE, personal communication, December 9, 2012).

### Total Miles of Levees in the United States

The National Committee on Levee Safety (NCLS), a group of federal, state, local, and private-sector members with expertise in representing national interests in levee safety, was convened in 2008 to prepare recommendations and a strategic implementation plan on a National Levee Safety Program with direction from Congress under the Water Resources Development Act of 2007 (NCLS, 2009). The draft NCLS report was issued in 2009 (ASFPM, 2012).

Copyright National Academy of Sciences. All rights reserved.

Acknowledging the fact that little was currently known about the specific size of the national levee portfolio outside efforts at the federal level, the NCLS formulated an estimate of the number of privately owned and state levees by extrapolating data entered by the state of California into their levee inventory database and then applying that ratio of USACE program and other federal levees to private and nonfederally owned levees across the nation. The NCLS estimated that there may be 100,000 or more miles of levees (including thousands of miles of irrigation and water-supply canal embankments) that were built by federal, public, or private entities and operated by nonfederal, public, or private organizations. The current inventories in the NLD and MLI have identified less than 32,000 miles of levees. Mapping under the NFIP covers areas containing 92 percent of the U.S. population and more than 21,000 communities with flood-prone areas, logically the areas in need of levees. Analysis, discussions with members of the NCLS, and site visits by this committee indicate that levees not contained in the NLD and MLI probably represent small individually owned levees, private levees used to protect industrial assets, and roads and railroads that act as levees. It is also likely that the NCLS estimate, based on the California inventory, overestimated the number of levees, given that the California levee population is one of the densest in the nation and is not reflective of the nation as a whole (Figure 6-10). Based on the judgment of the committee, the total mileage of significant levees in the United States, excluding embankments, is estimated to be under 50,000 if not under 40,000 miles.

The NCLS report recommended that Congress grant USACE the authority and appropriation to expand and maintain the National Levee Database by conducting a one-time inventory and assessment of all nonfederal levees and canal embankments[12] in the United States (NCLS, 2009). Such an action would allow for baseline information on levee performance to be collected for the entirety of the nation's levee systems, resulting in an accurate, cost-effective, and efficient decision-making process when it comes to managing the nation's levee portfolio. Upon completion of this one-time inventory, the responsibility for periodic inventory and inspection updates to the NLD would fall to the states where these levees are located. Congressional action has yet to be taken on this recommendation.

### State Levee Inventory Efforts

As of 2006, only Wisconsin and North Dakota had geospatial inventories of levees; Illinois, Mississippi, North Dakota, Ohio, and California had some levee database efforts under way (ILPRC, 2006). Today, the majority of states still do not have levee inventories (Larry Larson, ASFPM, personal communication, September 2012). As an example of what can be accomplished, the California Department of Water Resources (CA DWR) has created the California Levee Database (CLD), a "statewide central repository for levee and flood control structures for use by public agencies for flood risk assessments and emergency response" (Rod Mayer, CA DWR, personal communication, 2012). Using data from sources such as the NLD, FEMA's Mid-Term Levee Inventory, CA DWR, and the California Emergency Management Agency, as well as local agencies and publicly available maps, the CLD includes more than 13,725 miles of levees and levee-like structures within the state. Currently, the inventory includes 92 percent of all state–federal State Plan of Flood Control (SPFC) levees[13] in the state, 85 percent of all non-SPFC levees, and 71 percent of all local levees.

Washington State has also taken steps to create a levee inventory. In the absence of a comprehensive national levee inventory, the state, well aware of its status as being one of the more flood-prone states in the nation, commissioned and conducted the Statewide Levee Inventory and Flood Protection Study to better understand the current status of accredited levees within its borders. This study was divided into two parts: the Washington State Final Report on Levee Certification and Accreditation, which summarized current levee policies and practices, and the development of a statewide inventory that includes the location, level of protection, and certification/

[12] Canal embankments, although not designed to protect areas from flooding, can pose threats to some communities. When embankment walls are aboveground, the water they contain can break through and flood nearby areas. In 2008, over 300 homes in Fernley, Nevada, flooded when the walls of an irrigation canal collapsed. In 2012, the first court settlement of numerous lawsuits awarded $10 million to 600 local residents for damages.

[13] SPFC levees are federally authorized levees located in California's Central Valley for which the state has provided assurances of cooperation with the federal government (CA DWR, 2010).

Copyright National Academy of Sciences. All rights reserved.




A

Copyright National Academy of Sciences. All rights reserved.




FIGURE 6-12 (*A*) National Levee Status Map capturing levees inventoried in the MLI. Roman numerals denote the 10 individual FEMA regions. (*B*) Counties across the nation containing levees captured in the MLI. SOURCE: (A) Modified from FEMA (2011); (B) FEMA (2012b).

Copyright National Academy of Sciences. All rights reserved.




FIGURE 6-13 Overlap between USACE NLD inventory of USACE levees and levees identified in FEMA's MLI. FEMA's MLI includes 29,800 miles of levees, and USACE's NLD identifies 14,500 miles of levees; 17,100 miles of levees in FEMA's MLI are not included in USACE's NLD, approximately 1,700 of which are accredited; 12,700 miles of levees in FEMA's MLI are included in the USACE's NLD, approximately 3,400 of which are accredited or PAL. This represents a 66 percent overlap. All values are approximate.

accreditation status of all currently known levees[14] at the statewide level (Resilience Institute, 2010). Of the 697 miles of identified levees found within the state, 18 percent (approximately 125 miles) were found to currently be accredited, provisionally accredited, or de-accredited. Only 9 percent (approximately 62 miles) of all levee miles were found to be accredited. The long-term goal is that the Washington inventory will be strengthened to the point where it will be a useful tool in developing a prioritized list of levees needing site-specific attention (such as repair, certification and accreditation, and/or removal) and in the prioritization of state support for such levees (Resilience Institute, 2010).

## REFERENCES

ASFPM (Association of State Floodplain Managers). 2012. National Committee on Levee Safety (NCLS). Available online at http://www.floods.org/index.asp?menuID=338. Accessed August 7, 2012.

Boon, J. D., J. M. Brubaker, and D. R. Forrest. 2010. Chesapeake Bay Land Subsidence and Sea Level Change: An Evaluation of Past and Present Trends and Future Outlook. Available online at http://web.vims.edu/GreyLit/VIMS/sramsoe425.pdf?svr=www. Accessed February 21, 2013.

Briaud, J. L., H. C. Chen, A. V. Govindasamy, and R. Storesund. 2008. Levee erosion by overtopping in New Orleans during the Katrina hurricane. Journal of Geotechnical and Geoenvironmental Engineering 134(5): 618-632.

Brody, S. D., S. Zahran, P. Maghelal, H. Grover, and W. E. Highfield. 2007. The rising costs of floods: Examining the impact of planning and development decisions on property damage in Florida. Journal of the American Planning Association 73(5): 330-345.

[14] The State of Washington defines a levee as a "fabricated barrier along rivers, streams, channels, sloughs, and other water courses" (Resilience Institute, 2010).

Copyright National Academy of Sciences. All rights reserved.

Brody, S. D., W. E. Highfield, and J. E. Kang. 2011. Rising Waters: Causes and Consequences of Flooding in the United States. Cambridge, UK: Cambridge University Press.

Burby, R. J., and L. C. Dalton.1994. Plans can matter: The role of land use plans and state planning mandates in limiting the development of hazardous areas. Public Administration Review 54(3): 229-238.

CA DWR (California Department of Water Resources). 2010. Draft State Plan of Flood Control Descriptive Document. Available online at: http://www.water.ca.gov/cvfmp/docs/DRAFT_SPFC_Descriptive_Doc_20100115.pdf. Accessed July 31, 2012.

Crowell, M. 2010. Impact of Climate Change on the NFIP. Presentation to the Coastal Engineering Research Board Meeting, June 22. Vicksburg, MS: USACE. Available online at http://chl.erdc.usace.army.mil/dirs/events/319/08%2087th%20CERB%20Crowell.pdf. Accessed March 3, 2013.

CVFPP (Central Valley Flood Protection Plan). 2012. 2012 Central Valley Flood Protection Plan, a Path for Improving Public Safety, Environmental Stewardship, and Long-Term Economic Stability. Available online at http://www.cvfpb.ca.gov/CVFPP/index.cfm. Accessed January 28, 2013.

FEMA (Federal Emergency Management Agency). 1997. Building a disaster-resistant community: Project Impact. The Project Impact Guidebook. Washington, DC: FEMA.

FEMA. 2000. Above the Flood: Elevating Your Floodprone House. Available online at http://www.fema.gov/library/viewRecord.do?id=1424. Accessed November 28, 2012.

FEMA. 2006. The National Levee Challenge: Levees and the FEMA Flood Map Modernization Initiative. Washington, DC: FEMA.

FEMA. 2007. Selecting Appropriate Mitigation Measures for Floodprone Structures. FEMA 551. Available online at http://www.fema.gov/library/viewRecord.do?id=2737. Accessed January 22, 2013.

FEMA. 2010a. Hazard Mitigation Assistance Unified Guidance on the Hazard Mitigation Program, Pre-Disaster Mitigation Program, Flood Mitigation Assistance Program, Repetitive Flood Claims Program, and Severe Repetitive Loss Program. Available online at http://www.fema.gov/library/viewRecord.do?id=4225. Accessed January 29, 2013.

FEMA. 2010b. Mitigation Planning Fact Sheet on Risk MAP. Available online at http://www.fema.gov/library/viewRecord.do?id=2066. Accessed November 14, 2012.

FEMA. 2011. Midterm Levee Inventory Project Summary Report. Available online at: http://www.r3levees.org/wiki/images/0/03/MLI_Summary_Report_20111130_Final.pdf. Accessed August 8, 2012.

FEMA. 2012a. Analysis and Update of National Flood Hazard Layer Demographics and NFIP Policy and Claims Data. Prepared by Risk Assessment, Mapping, and Planning Partners, project report for task order #HSFEHQ-11-J-002. Washington, DC: FEMA.

FEMA. 2012b. Midterm Levee Inventory Project Summary Report: Standard Operations Task Order 4, November. Washington, DC: FEMA.

FEMA. n.d.a. Non-residential Floodproofing Requirements and Certification for Buildings Located in the Special Flood Hazard Areas in Accordance with the National Flood Insurance Program. Technical Bulletin 3-93. Available online at http://www.fema.gov/library/viewRecord.do?id=1716. Accessed February 15, 2013.

FEMA. n.d.b. The Unified Hazard Mitigation Assistance Grant Programs Factsheet. Available online at http://www.fema.gov/library/viewRecord.do?id=3648. Accessed January 29, 2013.

FEMA. 2013. Hurricane Sandy Advisory Base Flood Elevations (ABFEs) in New Jersey and New York. FEMA Region 2. Available online at http://www.region2coastal.com/sandy/abfe, accessed February 27, 2013.

FM Global. 2006. Approval Standard for Flood Abatement Equipment, Class Number 2510. Available online at http://www.fmglobal.com/assets/pdf/fmapprovals/2510.pdf. Accessed December 6, 2012.

FM Global. n.d. Understanding the Benefit, FM Approved Flood Abatement. Available online at http://www.fmglobal.com/assets/pdf/P11204.pdf. Accessed December 6, 2012.

FWS (U.S. Fish and Wildlife Service). 2002. The Coastal Barrier Resources Act: Harnessing the Power of Market Forces to Conserve America's Coasts and Save Taxpayers Money. Available online at http://www.fws.gov/CBRA/Docs/Taxpayer-SavingsfromCBRA.pdf. Accessed November 28, 2012.

FWS. 2012. Background information on the Coastal Barrier Resource Act. Available online at http://www.fws.gov/CBRA/Act/index.html. Accessed November 28, 2012.

Galloway, G. 2009. Reacting to Climate Change, Floods, and Uncertainty. Available online at http://www.colorado.edu/hazards/. Accessed October 31, 2012.

Galloway, G. E, D. F. Boesch, and R. R. Twilley. 2009. Restoring and protecting coastal Louisiana. Issues in Science and Technology 25(2): 29-38.

GAO (Government Accountability Office). 2007. IRS Emergency Planning, Headquarters Plans Supported Response to 2006 Flooding, but Additional Guidance Could Improve All Hazard Preparedness. GAO-07-579. Washington, DC: GAO.

Copyright National Academy of Sciences. All rights reserved.

Hirsch R. M., and K. R. Ryberg. 2012. Has the magnitude of floods across the USA changed with global CO2 levels? Hydrological Sciences Journal 57(1): 1-9.

ILPRC (Interagency Levee Policy Review Committee). 2006. Sharing the Challenge: Floodplain Management into the 21st Century. Washington, DC: ILPRC.

IPCC (Intergovernmental Panel on Climate Change). 2012. Managing the Risks of Extreme Events and Disasters to Advance Climate Change Adaptation. A Special Report of Working Groups I and II, C. B. Field, V. Barros, T. F. Stocker, D. Qin, D. J. Dokken, K. L. Ebi, M. D. Mastrandrea, K. J. Mach, G.-K. Plattner, S. K. Allen, M. Tignor, and P. M. Midgley, eds. Cambridge, UK, and New York: Cambridge University Press.

Jones, C. P., W. L. Coulbourne, J. Marshall, and S. M. Rogers, Jr. 2006. Evaluation of the National Flood Insurance Program's Building Standards. Washington, DC: American Institutes for Research.

Kousky, C., and L. Shabman. 2012. The Realities of Federal Disaster Aid: The Case of Floods. Issue Brief 12-02. Washington, DC: Resources for the Future.

Kunreuther, H. 1996. Mitigating disaster losses through insurance. Journal of Risk and Uncertainty 12: 171-187.

Lehmann, E. 2011. Flood-Prone Land Likely to Increase by 45%—A Major Challenge to Federal Insurance Program. Available online at http://www.nytimes.com/cwire/2011/07/22/22climatewire-flood-prone-land-likely-to-increase-by-45-a-19117.html?pagewanted=all. Accessed January 28, 2013.

National Capital Planning Commission. 2008. Report of Flooding and Stormwater in Washington, DC. Washington, DC: National Capital Planning Commission.

NCLS (National Committee on Levee Safety). 2009. Draft Report to Congress on Recommendations for a National Levee Safety Program. Available online at http://www.iwr.usace.army.mil/ncls/docs/NCLS-Recommendation-Report_012009_DRAFT.pdf. Accessed August 8, 2012.

NOAA (National Oceanographic and Atmospheric Administration). 2013. 2013 Draft National Climate Assessment Report. Available online at http://ncadac.globalchange.gov/. Accessed January 15, 2013.

NPR (National Public Radio). 2012. Norfolk, Va., Puts Flooding Survival Plan to the Test. November 6, 2012. Available online at: http://www.npr.org/2012/11/06/164362276/norfolk-va-puts-flooding-survival-plan-to-the-test. Accessed November 28, 2012.

NRC (National Research Council). 2010. Adapting to the Impacts of Climate Change. Washington, DC: The National Academies Press.

NRC. 2011. Building Community Disaster Resilience Through Private–Public Collaboration. Washington, DC: The National Academies Press.

NRC. 2012a. Dam and Levee Safety and Community Resilience. Washington, DC: The National Academies Press.

NRC. 2012b. Disaster Resilience: A National Imperative. Washington, DC: The National Academies Press.

Opperman, J. J., G. E. Galloway, J. Fargione, J. F. Mount, B. D. Richter, and S. Secchi. 2009. Sustainable Floodplains Through Large-Scale Reconnection to Rivers. Science 326: 1487-1488.

Raff, D. 2013. The 21st Century River: Changing Hydrology. Presentation to the Lower Mississippi Vision Summit, New Orleans, LA, January 9. Washington, DC: Meridian Institute.

Resilience Institute. 2010. Washington State Statewide Levee Inventory and Flood Protection Study: Report on Certification and Accreditation. Bellingham, WA: Western Washington University.

Rogers, J. D. 2009. We Have to Employ Systems Engineering Concepts in the 21st Century. Presentation at Flood Protection and Ecosystem Restoration Flood Conference, Louisiana State University, January 23. Available online at http://www.laseagrant.org/floodprotection/ppts/3b-Rogers4.pdf. Accessed November 15, 2012.

Sayers, P., G. Galloway, E. Penning-Rowsell, F. Shen, K. Wang, Y. Chen, and T. Le Quesne. In press. Flood Risk Management: A Strategic Approach—Consultation Draft. UNESCO on behalf of World Wildlife Fund—UK/China and the General Institute of Water Design and Planning, China.

Schropp, M. H. E., and T. W. Soong. 2006. Scientific Developments ISFD3. Pp 247-250 in Floods, From Defence to Management, J. van Alphen, E. Van Beek, and M. Taal, eds. London, UK: Taylor and Francis Group.

Storesund, R., R. G. Bea, M. Bernhardt, J.-L. Briaud, D. Franken, A. Govindasamy, S. Gyu, D. Kim, M. Leclair, G. Hempen, N. R. Maerz, J. D. Rogers, and C. M. Watkins. 2009. 2008 Midwest Levee Performance Investigation: Summary of Field Reconnaissance. Arlington, VA: National Science Foundation.

USACE (U.S. Army Corps of Engineers). 1986. Overtopping of Flood Control Levees and Floodwalls. Technical Letter No. 1110-2-299. Washington, DC: USACE.

USACE. 2006. Risk Analysis for Flood Damage Reduction Studies. ER 1105-2-101. Washington, DC: USACE.


Copyright National Academy of Sciences. All rights reserved.

USACE. 2012a. Inspection of Completed Works [Levee Safety Program] Factsheet as of February 2012. Baltimore District. Available online at http://www.nab.usace.army.mil/Factsheets/PDFs/Operations/MD-NY-PA-VA-WV-LeveeSafetyProgram-O&M.pdf. Accessed January 25, 2013.

USACE. 2012b. Northwest Division. Missouri River Flood Task Force (MRFTF). Available at http://www.nwd-mr.usace.army.mil/rcc/MRFTF/default.html. Accessed October 2012.

USACE. 2012c. What We Know About USACE Levees. Washington, DC: USACE.

USACE. n.d.a. National Nonstructural Flood Proofing Committee. Available online at http://www.usace.army.mil/Missions/CivilWorks/ProjectPlanning/nfpc.aspx. Accessed November 15, 2012.

USACE. n.d.b. USACE Disaster Operations Public Law 84-99. Available online at http://www.nfrmp.us/docs/PL84-99factsheet.pdf. Accessed February 18, 2013.

USGCRP (U.S. Global Change Research Program). 2009. Global Climate Chance Impacts in the United States. Regional Climate Impacts, Northeast. Available online at http://nca2009.globalchange.gov/. Accessed February 19, 2013.

WRC (Water Resources Council). 1973. Water and Land Related Resources: Establishment of Principles and Standards for Planning. Washington, DC: WRC.

WRC. 1983. Economic and Environmental Principles and Guidelines for Water and Related Land Resources Implementation Studies. Washington, DC: WRC.

WRDA (Water Resources Development Act). 2007. Public Law 110-114. Available online at http://www.evergladesplan.org/wrda2000/wrda_docs/wrda_2007.pdf. Accessed February 27, 2013.

Xu, Y., L. Li, and F. Amini. 2012. Slope stability analysis of earthen levee strengthened by high performance turf reinforcement mat under hurricane overtopping flow conditions. Geotechnical and Geological Engineering 30(4): 893-905.

Copyright National Academy of Sciences. All rights reserved.

Copyright National Academy of Sciences. All rights reserved.

# 7

# Understanding and Communicating Flood Risk Behind Levees

Inherent to the National Flood Insurance Program's (NFIP's) purpose of providing the opportunity for insurance purchase in flood-prone areas and the need to reduce flood damages across the nation is the need to develop public awareness of flood risk. Risk communication is the purposeful exchange of information about the types of risks and their likely impacts, and alternatives for managing the risks including benefits and costs. It is an iterative and interactive process involving a two-way mode of communication between sources and recipients of the information (Morgan et al., 2001). NRC (1989) defines risk communication as

> an interactive process of exchange of information and opinion among individuals, groups, and institutions. It involves multiple messages about the nature of risk and other messages, not strictly about risk, that express concerns, opinions, or reactions to risk messages or to legal and institutional arrangements for risk management.

Risk communication includes both the risk information itself (messages) and sources of such information (messenger), as well as the channels (media) used in the delivery of the communication (e.g., mass media, social media, text messaging, face-to-face).

The goals of risk communication are to foster a communications environment based on trust and credibility, to provide sufficient information to an audience so that they can make informed decisions about risk-reducing behaviors, and to involve stakeholders in the decision-making process (NRC, 1989). Thus the risk communication process begins with the development of the risk management strategy including the identification of risk, its assessment, and the management of alternatives. Risk can be viewed very differently by sources and recipients. For example, the scientific community prefers to present information in an objective manner generally using statistical information and probabilities. The general public generally looks at risk information from a more subjective perspective and how it relates to their individual experience and self-benefit. In the latter case, perception and trust in and perceived credibility of the messenger are key determinants of the positive receptivity of the message (Fischhoff and Kadvany, 2011).

The challenges associated with communicating levee-related flood risk begin with challenges associated with the public perception of flood risk. Communicating the concept of residual risk behind a levee presents an additional challenge beyond the public perception of flood risk. The variety of levee-related stakeholders, including several federal agencies with different roles and responsibilities who are sources and recipients of



Copyright National Academy of Sciences. All rights reserved.

risk information, add additional complexity. So, rather than one entity confronted with the challenge of communicating risk to the public, levee-related flood risk communication efforts face the challenge of presenting a unified, effective communication among governments at all levels, as well as among agencies, the private sector, and the public.

Risk communication activities include both "regulatory" and "nonregulatory" communication products. Regulatory flood risk communication products are those centered on FEMA's Flood Insurance Rate Maps (FIRMs) and related documents (e.g., flood insurance studies), and nonregulatory products are all other FEMA products that communicate flood- and levee-related flood risk.

## UNDERSTANDING FLOOD RISK PERCEPTION

Communication of flood risks to residents has a number of inherent challenges that affect stakeholders and begin with their perception of flood risk. Risk communication efforts can be enhanced by understanding risk perception.

First, people generally underestimate flood risk (Botzen et al., 2009; Kousky and Kunreuther, 2010; Kousky, 2011; Wood et al., 2012). This is due to misunderstanding about the frequency of flooding. Such underestimates are based on the tendency to recall or remember the most severe, or infrequent flood events, rather than the less severe but more frequent ones. It is also based on misunderstandings of the likely damages from various magnitudes of flooding.

Second, residents often misunderstand the term "100-year flood" and assume that if an event occurs, it will not happen for another 100 years (Pielke, 1999; Kousky and Kunreuther 2010; USGS, 2010; Ludy and Kondolf, 2012). The designation of the one percent annual chance flood is more effective in communicating uncertainty and is being promoted as such (Bell and Tobin, 2007; USGS, 2010). However, this does not necessarily translate into protective actions such as the adoption and/or implementation of risk reduction measures, as illustrated by low insurance penetration rates (Chapter 5).

Third, there is mixed empirical evidence to support the conclusion that increased risk perception translates into actions to reduce flood risk (e.g., mitigation) (Terpstra et al., 2009; Bubeck et al., 2012; Kellens et al., 2012; FEMA's annual national surveys, mentioned later in this chapter). Although there is a positive association between risk perception and protective actions, it is more likely that other factors are more important, such as personal experience, personal attributes, and evaluations of the protective actions themselves.

Fourth, undertaking protective actions against flood risk, such as purchasing insurance and elevating homes, is more likely to be based on their efficacy and cost of implementation (Soane et al., 2010; Harvatt et al., 2011). Residents will evaluate the likely outcomes of protective actions according to varying levels of desirability, and if the outcome is viewed favorably and one that is desirable, it is more likely that a household or resident undertake that protective action (Grothmann and Reusswig, 2006; Bourque et al., 2012; Keller et al., 2012; Lindell and Perry, 2012; Wood et al., 2012).

Fifth, there is considerable trust in flood control structures in preventing flood risks (Ludy and Kondolf, 2012). This is shown by lower insurance purchase rates in areas with levee protection compared with those without the same, for example, in the St. Louis region (Kousky, 2011). Tobin (1995) notes that levees can actually increase the potential for flood loss by generating a false sense of security, the "levee effect," due to perception that the possibility of flooding has been eliminated, the lack of preparation for a flood event, and greater development behind the levee adding to the amount of property placed at risk. Thus, a fallacy that "levees prevent damages" occurs in society (Pielke, 1999), confounding the effective communication of residual risk in leveed areas.

Sixth, people will take the opinions and actions of friends, family, and neighbors into account in behavioral responses, a social exchange that is often termed milling or information seeking. In this regard, social networks are often more important than official sources of information about risks and mitigation options (Harvatt et al., 2011; Bourque et al., 2012).

Seventh, risk perception and behavioral responses are often influenced by experience with flooding. If there is little or no experience with flooding, then the negative effects of floods tend to be underestimated (Siegrist and Gutscher, 2008) and this provides less motivation to residents or households to engage in protective responses (Harvatt et al., 2011).

Copyright National Academy of Sciences. All rights reserved.

Eighth, risk communication tends to focus on the technical or material costs/benefits to trigger mitigation, yet recent research suggests that the emotional and experiential aspects of flooding provide more impetus for undertaking behavioral responses (Siegrist and Gutscher, 2008; Harries, 2012).

Ninth, a number of studies have examined the adoption of flood insurance and a number of their findings are relevant. In particular, if homeowners received information about the risk they will face over a longer time period (e.g., based on a 30-year period or the lifetime of a mortgage), they perceived more potential damage to their house than if they received the same risk information for 1 year (Keller et al., 2006). Also, the median length of time for holding onto flood insurance policies in the United States is 2 to 4 years, with people who have experienced small flood claims holding onto their insurance longer than those who experienced larger flood claims (Michel-Kerjan et al., 2012).

Finally, a number of studies on St. Louis found that insurance purchase was rather low, even with mandatory requirements (Kousky and Kunreuther, 2010; Kousky, 2011). Flood risk was a key determinant of the purchasing decision. As expected, there was more insurance purchase in the one percent annual chance floodplain due to the increased flood risk and mandatory purchase requirement. On the other hand, insurance purchase behind levees was less as residents perceived the area as "safe" (Kousky and Kunreuther, 2010; Kousky, 2011).

Development of appropriate strategies for risk communication is part of the overarching formulation of flood risk management (Chapter 3, Figure 3-3; Chapter 6). In developing risk communication strategies, key challenges identified from a further understanding of risk perception need to be considered:

1. The meaning of the phrase "100-year" floodplain and, to a lesser degree, the one percent annual chance flood is often misunderstood.
2. Awareness of risk does not always lead to actions to reduce or mitigate risk.
3. People assume that flood control structures are "safe" with no need to take additional actions to mitigate risk.
4. Experience with floods matters and influences the actions that residents and communities take to mitigate the impacts.
5. People will seek advice from friends, family, and neighbors on the determination of risk and actions to reduce flood risk.
6. Personalized risk assessment, based on experience and feelings, is more likely to motivate behavioral action than simply providing technical information about risks and consequences.

Understanding the above factors ensures that risk communication messaging is able to overcome the barriers associated with communicating levee-related flood risk.

## BRIEF HISTORY OF RISK COMMUNICATION IN THE NFIP

Early in the NFIP's history, it was thought that risk communication efforts would be largely undertaken by communities participating in the NFIP. FEMA provided guidance for local officials to use in efforts at the local or state level to reduce flood losses in high-risk areas and identified "areas behind unsafe or inadequate levees" as one of nine high-risk areas (FEMA, 1987). A "regular schedule for communication between engineering, planning, and emergency management personnel to provide consideration of levee hazards in land use decisions" was suggested for communities with levees (FEMA, 1987). For the most part, until 2005, FEMA used the term "risk" to describe a "hazard" as a consequence; probabilities other than flood frequencies were not considered.

Early outreach to communities revolved around adoption of the initial mapping products: Flood Hazard Boundary Maps (FHBMs) and Flood Insurance Rate Maps (FIRMs) (Figures 7-1 and 7-2). The FHBM, an official map of a community issued by FEMA, delineated Special Flood Hazard Areas (SFHAs) and was prepared using available data or approximate methods to identify the areas within a community subject to inundation by a one percent annual chance flood (FEMA, 1995). The FIRM, also an official map of the community issued by FEMA, delineates both the special hazard areas and the applicable risk premium zones.[1] The FIRM is developed using the

[1] Title 44, Chapter 1, Code of Federal Regulations (1990), National Flood Insurance Program (Regulations for Floodplain Management and Flood Hazard Identification).

Copyright National Academy of Sciences. All rights reserved.




FIGURE 7-1 Example of a Flood Hazard Boundary Map.
SOURCE: FLOOD MAPS, May 1, 2008. Available online at http://www.fema.gov/pdf/nfip/manual200810/16map.pdf.

hydrologic and hydraulic analyses to develop base flood elevations and designate risk zones during flood insurance studies (FISs) (FEMA, 1995). The Digital Flood Insurance Rate Map (DFIRM) is a digital conversion of the paper FIRM that has been updated and georectified.

The 1968 National Flood Insurance Act intended that all SFHAs be identified and maps published within 5 years, and that these data be used to establish within 15 years the flood risk zones and associated insurance premium rates based on risks involved and accepted actuarial principles (FEMA, 1995). When it became evident that the needed FISs would not be completed in that time frame, Congress took action and authorized an Emergency Program (FEMA, 1995). Until the more detailed FIRMs were available, the FHBMs could be used to expand participation in the NFIP; this Emergency Program could offer insurance at nonactuarial, federally subsidized rates (FEMA, 1995). To further encourage participation in the NFIP, Congress required in the Flood Disaster Protection Act of 1973 that communities with flood-prone areas be notified of their flood hazards; this was also accomplished using the FHBM (FEMA, 1995). These initial risk (or hazard) communication efforts served to advise communities of their flood hazard as early as practicable, and sought to encourage action by communities to address and lessen their vulnerability. In the 1990s, the Mitigation Directorate was established within FEMA, Project Impact was launched (FEMA, 2011a), and the Community Rating System codified in the National Flood Insurance Reform Act of 1994 (H.R. 103-3191), all setting the stage for increased community involvement.

Historically there was little information about levee risk available to local communities other than FHBMs and FIRMs, which are focused on identifying the hazard, or areas flooded by the 0.2 percent and one percent annual chance floods for food insurance rating purposes. Today, the primary nationwide resource for information

Copyright National Academy of Sciences. All rights reserved.



FIGURE 7-2 A Flood Insurance Rate Map for a section of Greenville, Mississippi, along the Mississippi River. The blue areas are within the SFHA (Zone AE) and the gray area (Shaded Zone X) represents areas behind accredited levees.
SOURCE: FEMA Map Service Center. Available at http://map1.msc.fema.gov/idms/IntraView.cgi?KEY=93429510&IFIT=1

on flood-prone areas remains the FIRM. Private insurers assess exposure and offer flood insurance coverage based on FIRMs. To illustrate, preliminary estimates reported private-sector (re)insurance losses as a result of Hurricane Sandy in 2012 that range from $10 billion to $25 billion (BestWire, 2012; Insurance Insider Weekly Newsletter, 2012). However, this creates a challenge in leveed areas because older FIRMs do not explicitly identify areas as being behind accredited levees; thus, levee risk cannot be identified using the map alone.

Newer FIRMs, such as in Figure 7-2, indicate areas behind accredited levees as being Shaded Zone X; however, this zone designation is used to identify hazard areas of moderate to low risk. This lack of clear information promotes the misperception that areas behind levees are not subject to flooding and "safe." This misperception is also promoted by the mandatory purchase requirement (Chapter 5).

Copyright National Academy of Sciences. All rights reserved.

TABLE 7-1: Timeline of Establishment of Programs and Efforts That Communicate Flood Risk Information Behind Levees to and from the National Level

| Program or Activity | Date of Establishment | Flood Risk Communication Efforts Specific to Levees |
|---|---|---|
| So You Live Behind a Levee (ASCE)[a] | 2010 | Public education booklet about risk living behind a levee |
| Silver Jackets (USACE, FEMA, and state agencies)[b] | 2006 | Flooding with some specifics on levees |
| National Flood Risk Management Program (USACE)[c] | 2006 | Reducing overall flood risk including appropriate use of levees |
| FloodSmart (FEMA)[d] | 2003 | Levee simulator<br>Levee toolkit |
| Community Rating System (FEMA)[e] | 1990 | Credits for levee maintenance given to communities to reduce insurance rates |
| Stakeholder organizations (ASFPM and NAFSMA)[f] | 1976, 1978 | State and local flood and levee risk |

[a]See http://www.asce.org/Content.aspx?id=2147488910.
[b]See http://www.nfrmp.us/state/.
[c]See http://www.nfrmp.us/.
[d]See http://www.floodsmart.gov/floodsmart/.
[e]See http://www.fema.gov/national-flood-insurance-program/community-rating-system.
[f]See http://www.floods.org/.

## CURRENT FLOOD RISK COMMUNICATION EFFORTS

Throughout its duration the NFIP and its risk communication strategy continued to evolve toward one that has a more engaged agency working in a shared effort with the many stakeholders that make use of and are impacted by the NFIP. A number of federal agencies, states, local communities, and nongovernmental organizations are actively engaged in flood risk communication efforts that share information about levees directly or indirectly and support the mission of the NFIP in general and risk communication about levees in particular (Table 7-1). A number of the more significant efforts in communicating levee flood risk are briefly described below.

### FloodSmart

FloodSmart began in 2004 as a marketing campaign to increase the number of policies in force (Vrem, 2010). It has evolved into a multifaceted communication tool. Presently, FloodSmart, its website,[2] and its associated activities are the primary communication avenues for information regarding the NFIP and the treatment of levees within the NFIP.[3]

FloodSmart provides Web-based information in five main areas related to flood risk generally and flood risk behind levees specifically. First, flooding and flood risk includes information on causes of flooding, defining flood risk, tutorials on understanding flood maps as well as information regarding map changes and updating flood maps. In addition to this, the website has three multimedia and interactive applications or tools: one on flood risk scenarios, one on the cost of flooding, and a third called the levee simulator, which illustrates how levees work and the causes of levee failures. The second main topical area is the detailed information regarding the NFIP itself. Here the site describes coverage within the NFIP and when insurance is required, and locator information for insurance agents and estimations of premiums. The third area focuses on residential coverage which describes policy options for homeowners, renters, and condo owners/renters, including basic information, rates, what is covered,

[2] See FloodSmart.gov.
[3] FEMA has other Web-based applications and publications for communicating flood risk, for example, the eWatermark publication available online at http://www.nfipiservice.com/watermark/index.html.

Copyright National Academy of Sciences. All rights reserved.




FIGURE 7-3 FEMA's one-step flood risk profile that provides quick information on flood risk, estimated flood insurance premiums, and insurance agents in the area.
SOURCE: www.floodsmart.gov/floodsmart.

questions for the agent, and locations of agents. The fourth area provides similar information for commercial properties. Finally, the last area communicates information on preparation and recovery, especially on what to do after the flood and how to file a claim.

On all of the FloodSmart webpages, there is an interactive one-step flood risk profile where one can insert the property address and the level of risk along with estimated annual premiums, and a list of agents serving the area appear (Figure 7-3). As an aid for communication, the site also has videos, media resources including public announcement scripts, and background information about the NFIP. A Levee Toolkit is available to educate citizens about flood risk associated with living behind a levee and information about flood insurance behind a levee.[4] The toolkit does so by describing three scenarios a community might face: (1) levees are no longer accredited, (2) levees are newly accredited, and (3) levees are under review or provisionally accredited. The website is easy to navigate and filled with informative content for interested parties.

## Risk MAP

Begun in FY 2009, Risk Mapping, Assessing, and Planning (Risk MAP) is the extension of FEMA's map modernization efforts to improve flood hazard mapping through advanced technologies. According to FEMA, "The vision for Risk MAP is to deliver quality data that increases public awareness and leads to action that reduces risk to life and property"[5] (Figure 7-4).

[4] See http://www.floodsmart.gov/toolkits/.
[5] See http://www.fema.gov/rm-main#.

Copyright National Academy of Sciences. All rights reserved.




FIGURE 7-4 The vision for the Risk MAP life cycle, which begins with identifying risk, assessing risk, communicating risk, and mitigating risk.
SOURCE: http://www.fema.gov/rm-main.

The goals for Risk MAP, as identified in the Risk MAP multiyear plan (spanning FY 2010 through FY 2014), are to

> Address gaps in flood hazard data to form a solid foundation for flood risk assessments, floodplain management, and actuarial soundness of the NFIP,
> 1. Ensure that a measurable increase of the public's awareness and understanding of risk management results in a measurable reduction of current and future vulnerability to flooding,
> 2. Lead and support state, local, and tribal communities to effectively engage in risk-based mitigation planning resulting in sustainable actions that reduce or eliminate risk to life and property from natural hazards,
> 3. Provide an enhanced digital platform that improves management of limited Risk MAP resources, stewards information produced by Risk MAP, and improves communication and sharing of risk data and related products to all levels of government and the public,
> 4. Align Risk Analysis programs and develop synergies to enhance decision-making capabilities through effective risk communication and management." (FEMA, 2009)

Thus, Risk MAP is both a program for planning and assessment and a platform for delivering high-quality georeferenced spatial data, initially focused on flood risk but with capabilities for multihazard risk assessments. Moving to a GIS-based platform permits rapid updates of technical data.

Living with Levees is a specific FEMA website within the Risk MAP program, devoted specifically to levee risk rather that a discrete program of activities.[6] This website provides detailed information for a number of stakeholders including home and business owners; community officials; real estate, insurance, and lending professionals; technical partners (e.g. engineers, surveyors, contractors); and the media. Most of the links are to additional informational brochures or tools such as FloodSmart's levee simulator. The website contains general information that is useful, but detailed technical information that could help households understand or mitigate their flood risks is limited. Most of the website features links to FEMA program descriptions, documents, and online tutorials on NFIP, and the use of geospatial information systems (GIS) in flood mapping.

[6] See http://www.fema.gov/living-levees-its-shared-responsibility.

Copyright National Academy of Sciences. All rights reserved.

### Community Rating System

The CRS is a part of the NFIP designed to provide incentives to communities to go beyond the minimum level of requirements of the NFIP. It rewards communities through discounts on flood insurance from 5 to 45 percent based on floodplain management and public information activities. Points are awarded in four broad categories (called a series): public information, mapping and regulations, flood damage reduction, and flood preparedness. Within each of these are a number of activities. For example, the public information category includes making information available on flood insurance rate maps and outreach projects (series 300) (FEMA, n.d.). Each activity has a maximum number of points allotted. In the public information series, for example, the maximum points are awarded for activities related to outreach projects (380). In the flood damage reduction activity series (500), the maximum points are awarded for activities related to acquisition and relocation of properties (3,200). The credit points are cumulative, and for each increment of 500 points earned, a reduction of 5 percent in the premiums for flood insurance is realized (FEMA, n.d.).

Out of the total number of communities in the NFIP (21,881[7]), only 1,211 are in the CRS program (approximately 5.5 percent). However, policies held within CRS communities represent 68 percent of the policies in force and 69 percent of the insurance in force[8] (Bill Blanton, FEMA, personal communication, July 10, 2012). Once points are earned, classifications are awarded and premium reductions are given to the community. The majority of participating communities are in the introductory class (56 percent) with premium reductions of 5-10 percent, followed by the intermediate class (43 percent) with percent premium reductions of 15-25 percent, and then the advanced class (less than 1 percent) with premium reductions of 30 percent or more (FEMA, 2012).

### High Water Mark Initiative

The High Water Mark Initiative (also known as Know Your Line: Be Flood Aware) is a recent initiative involving nine federal agencies,[9] designed to raise flood awareness and motivate actions at the individual level to reduce risk.[10] The initiative began in 2012 by soliciting six pilot communities to showcase the most severe flood that has affected the community by posting high-water-mark signs on prominent buildings. As such, it relies on local implementation to offer a testimony that identifies how high floodwaters have risen in the past. It is unclear as to whether the pilot program will illustrate high water marks behind the levee, pre-levee. This would be an important way to communicate flood risk.

### National Flood Risk Management Program

The National Flood Risk Management Program (NFRMP) established by USACE in 2006 is designed to integrate and synchronize flood risk management programs across USACE, with federal, state, and local partners. The risk communication efforts of this program include providing risk information to the public from flood damage reduction infrastructure, improving public awareness and understanding of flood hazards and risk, and providing accurate floodplain management information to the public and decision makers. These goals are achieved through an inventory and assessment of levees that are under USACE jurisdiction (the National Levee Database, discussed in Chapter 8), and working collaboratively with FEMA to jointly develop risk communication strategies.

An innovative, collaborative initiative, the Silver Jackets Program is designed to bring together state, federal, and local agencies to "learn from each other and apply this knowledge to reduce risk." Part of the larger USACE National Flood Risk Management Program, the goals of the Silver Jackets program are to

[7] As of June 2012.

[8] Insurance in force is the total of the limit of insurance purchased on each policy.

[9] FEMA, National Oceanographic and Atmospheric Administration (NOAA), National Park Service, U.S. Army Corps of Engineers (USACE), U.S. Department of Agriculture, U.S. Department of Housing and Urban Development, U.S. Geological Survey (USGS), and U.S. Small Business Administration.

[10] See http://onlinepubs.trb.org/onlinepubs/conferences/2012/securitysummit/presentations/brown.pdf.

Copyright National Academy of Sciences. All rights reserved.

- Create or supplement a mechanism to collaboratively address risk management issues, prioritize those issues, and implement solutions;
- Increase and improve risk communication through a unified interagency effort;
- Leverage information and resources, including providing access to such national programs as FEMA's Risk MAP program and USACE's Levee Inventory and Assessment Initiative;
- Provide focused, coordinated hazard mitigation assistance in implementing high-priority actions such as those identified by state mitigation plans;
- Identify gaps among the various agency programs and/or barriers to implementation, such as conflicting agency policies or authorities, and provide recommendations for addressing these issues.[11]

The Silver Jackets process is centered at the state level and supported at the federal level primarily by USACE and FEMA. State agencies form federal-state-stakeholder teams that meet regularly to discuss a state's flood risk management priorities among stakeholders. Currently, 33 states have interagency, Silver Jacket teams. With the state in the lead, each team is encouraged to include other federal agencies that could advance flood risk management goals in the Silver Jackets forum, for example, NOAA–National Weather Service, Department of the Interior, and the USGS.

### Living Behind a Levee

The American Society of Civil Engineers (ASCE) is a nonprofit professional society. One of its many roles is to help protect public safety through improved learning within the profession, but also among the general public. One key focus of the ASCE is to addresses disaster preparedness and response. The flood risk communication aspect of the ASCE is best seen in the preparedness guide, *So, You Live Behind a Levee! What You Should Know to Protect Your Home and Loved Ones from Floods*. Written for both the engineering and nonengineering public, the brochure emphasizes four essential levee facts: (1) flooding will happen, (2) risks associated with flooding vary, (3) no levee is floodproof, (4) actions taken now will save lives and property.

## CONTEMPORARY FLOOD RISK MAPPING

Twenty-first century geospatial information technology has opened the door for vastly improved risk identification and communication. The development of GIS has provided decision makers, land-use planners, floodplain managers, and numerous other parties connected with flood hazard to conduct detailed analyses of the multiple flood scenarios that bring together the built environment with the natural environment to create flood risk. Use of GIS in management of communities is ubiquitous, and few communities lack some form of GIS. FEMA's DFIRMs provide an example of the use of GIS to identify flood hazards.

Over the last decade, considerable effort, at the global scale, has been placed on research to improve the representation of flood risks on flood maps and to make the maps both dynamic and interactive. Today, maps are available that permit those living in the floodplain to determine the level of inundation of their property under various flood condition scenarios; to examine the consequences of a particular flood event, taking into account the risk-based analysis that produced the information; and to link real-time weather information with flood potential in a given region (Figure 7-5 and 7-6). New flood maps not only illustrate the floods and their consequences but also can dynamically portray such elements as availability of evacuation routes, shelter status, and threat levels. The future of such approaches is illustrated in the National Research Council report, *Mapping the Zone Improving Flood Map Accuracy* (NRC, 2009).

FEMA's Risk MAP program is carefully examining new tools and, where appropriate, using them to better communicate flood risk under a variety of circumstances (Figure 7-7). Tying risk-based analysis to GIS will enable those living behind levees to gain a true perspective of their flood risk.

[11] Both quotations are from http://www.nfrmp.us/state/.

Copyright National Academy of Sciences. All rights reserved.




FIGURE 7-5 National Oceanic and Atmospheric Administration's National Weather Service (NWS) flood inundation map of a segment of the Neuse River near Goldsboro, North Carolina, showing the extent of flooding when water levels are forecast to rise to a stage of 23 feet (blue) and the location of the one percent annual chance floodplain (blue green) from a FEMA map. The darker the blue, the greater is the depth of inundation. The water depth is 0 to 2 feet near the edge of the Seymour Johnson Air Force Base runway (red arrow). The green circle shows the U.S. Geological Survey (USGS) stream gauge where the NWS provides the river forecast. The topographic data, digital elevation models, and hydraulic models underlying the map were produced by the USGS office in Raleigh and the North Carolina Floodplain Mapping Program.
SOURCE: http://water.weather.gov/ahps/inundation.php. Accessed January 28, 2013.

Copyright National Academy of Sciences. All rights reserved.

Levees and the National Flood Insurance Program: Improving Policies and Practices







FIGURE 7-6 Flood risk maps for New Orleans, illustrating differences in levels of inundation for a 0.2 percent flood event (*A*) before and (*B*) after the completion of the post-Katrina one percent hurricane risk reduction levees. Water surface elevations are mean values, with a sensitivity of ±2 feet. The maps assume that the pumps inside the levees that evacuate interior floodwaters are operating at 50 percent capacity.
SOURCE: USACE, New Orleans District, http://www.mvn.usace.army.mil/hps2/hps_risk_depth_map.asp. Accessed February 17, 2013.

Copyright National Academy of Sciences. All rights reserved.

Levees and the National Flood Insurance Program: Improving Policies and Practices







FIGURE 7-7 A Risk MAP pilot watershed-based flood risk map of "Watershed USA" containing nonregulatory data to aid in risk communication. At the top, the upper portion of Watershed USA is shown, containing detailed information about a variety of items influencing flood risk in the watershed. At the bottom, a closer view of the town of Floodville shows the different levels of flood risk by area.
SOURCE: Maps courtesy of FEMA Risk MAP.

Copyright National Academy of Sciences. All rights reserved.

## EFFECTIVE FLOOD RISK COMMUNICATION

While FEMA, the USACE, and other groups have important roles at the federal level in providing information on flood risk, it is local and state governments that drive behavioral changes to mitigate the risk. This is recognized and built into communication efforts implemented at the national level, described above; these federal agencies maintain a focus on communicating at the local level. Also, organizations with a focus on the state and local levels that facilitate communication of the state and local perspective to the national scale play a particularly important role (Box 7-1).

Some flood-related risk communication efforts are very successful (Box 7-2), but metrics and evaluations of communication efforts are difficult to find. FEMA's annual national surveys are an exception. These surveys were conducted in 2010 and 2011 to evaluate progress toward achieving goal 2 of Risk MAP, above, to "ensure that a measurable increase of the public's awareness and understanding of risk management results in a measurable reduction of current and future vulnerability to flooding."[12] The surveys found that:

- the percentage of community members who believed that their community was at risk from flooding was 31 percent in 2012 and 41 percent in 2011, while fewer than 23 percent of those believing their community to be at risk believed that their home was at risk in 2011;
- 68 percent of local public officials thought their community was at risk for flooding;
- 47 percent of respondents expect to hear about flood risk from the mayor;
- local news, phone calls, and mailings were also preferred methods of communication at 87 percent, 25 percent, and 24 percent, respectively;
- when asked about how frequently people heard from local officials about flood risk, the most common response was "never" in 2010 (41 percent) and in 2011 (45 percent); and
- those in coastal areas were slightly more aware of flood risk to their community (54 percent) or home (19 percent) (FEMA, 2011b).

California, in partnership with FEMA and USACE, recently sent mailed notices to property owners located behind a state-federal project levee as part of their FloodSAFE California Flood Risk Notification Program.[13] The Living with Levees: Know Your Flood Risk mailing campaign was evaluated through a readership survey to determine and improve effectiveness in 2010 and 2011.[14] In 2010, 77 percent of survey respondents said that the mailing raised their awareness of flood risk "a lot" or "somewhat" (31 percent and 46 percent, respectively). This improved in 2011, with 85 percent noting that the mailing raised awareness of flood risk "a lot" or "somewhat" (28 percent and 57 percent, respectively). The mailing encouraged 12 percent and 14 percent of survey respondents to purchase flood insurance in 2010 and 2011, respectively. This corroborates risk awareness key principle 2, above, that although the mailing was effective at raising flood risk awareness, such awareness doesn't necessarily translate into action, that is, buying an insurance policy.

### Information Access and Security: The Impact on Risk Communication

As discussed throughout this chapter, information regarding levee-related flood risk is becoming more sophisticated and accessible with, for example, actions taken to generate levee inventories and improved mapping. Furthermore, a modern risk analysis and better probability models and damage estimates (resulting in risk-based premiums at the structure level) will greatly increase communication of true risk to NFIP policyholders. New and improved information can be paired with development of community flood risk management strategies, including mitigation measures to reduce premiums. Improved mapping can be used to engage the private sector, so that insurance policies that are complimentary to the NFIP are offered to the public. Furthermore, the insurance industry

---

[12] One thousand telephone interviews were conducted at random to households in FEMA's 10 regions; 36 percent of respondents were from Risk MAP project areas, 87 percent of whom were homeowners and 12 percent renters.

[13] See http://www.water.ca.gov/floodmgmt/lrafmo/fmb/fas/risknotification/.

[14] Information included in this discussion was provided by FloodSmart California staff at the second meeting of this committee.

Copyright National Academy of Sciences. All rights reserved.

**BOX 7-1**
**Stakeholder Organizations**

The Association of State Floodplain Managers (ASFPM) is an organization of professionals involved in floodplain management, flood hazard mitigation, and flood preparedness and response. The mission of the organization is to "promote education, policies, and activities that mitigate current and future losses, costs, and human suffering caused by flooding, and to protect the natural and beneficial functions of floodplains—all without causing adverse impacts."[a] The ASFPM is organized into state chapters and, as such, ASFPM supports an avenue of communication between the states and the federal and local levels. ASFPM activities that promote communication include education of floodplain managers, technical conferences to bring together practitioners, and involvement in the establishment of FEMA's Community Rating System to reward communities for floodplain management practices. [b]

Similarly, the National Association of Flood & Stormwater Management Agencies (NAFSMA) "is an organization of public agencies whose function is the protection of lives, property and economic activity from the adverse impacts of storm and flood waters. The mission of the Association is to advocate public policy, encourage technologies and conduct education programs which facilitate and enhance the achievement of the public service function of its members."[c] Self-described as its members' voice in Washington, D.C., NAFSMA represents and communicates the perspective of state and local public agencies at the national level.

[a]See http://www.floods.org/.
[b]See http://www.floods.org/index.asp?menuID=425&firstlevelmenuID=179&siteID=1.
[c]See http://nafsma.org/about.php.

is in a position to support effective risk communication through its policy marketing, when provided with access to flood risk information.

Availability of information regarding the location and status of the nation's levees has a direct impact on successful flood risk communication efforts. Some data elements in the USACE's National Levee Database contain information about the integrity of the levees contained therein. Access to this information is restricted to government officials and is not available to the public. Restricting access to information regarding levees limits the ability of businesses, individuals, and in many cases, first responders to become aware of and properly prepare for possible emergency situations. Three recent reports (NRC, 2012a,b; Galloway et al., 2011) have addressed the need for full access to such information and recommended that this needed information be routinely released.

## A WAY FORWARD

Understanding risk perception and evaluations of risk communication efforts sheds light on the importance of local communication and clear messaging, as well as challenges such as the assumption that flood control structures are "safe." Insight gathered at public meetings of this committee indicates that risk communication efforts surrounding NFIP levees have an advantageous window of attention during three situations: (1) after a flood disaster, (2) through the mapping programs, and (3) when a community participates in FEMA's CRS program. It also appears that during these three situations, particularly situations 1 and 2, considerable confusion and controversy or considerable success in communicating risk can occur.[15]

[15] This assessment is based on information gathering efforts during committee meetings in St. Louis, Missouri, Dallas, Texas, and Sacramento, California.

Copyright National Academy of Sciences. All rights reserved.

**BOX 7-2**
**Flood Insurance Retention in Sacramento, California: A Transitional Community**

The city of Sacramento sits at the confluence of the Sacramento and American rivers. Most of the city lies within the floodplains of these two rivers, around 55,000 acres containing approximately 110,000 damageable structures valued at over 30 billion dollars. More than 300,000 people live in these floodplains. The Sacramento levee system extends for approximately 100 miles around the city.

In 1978, Sacramento joined the NFIP and was mapped out of the one percent annual chance regulatory floodplain because of the levee system. Following a record flood in 1986, the city was mapped back into the SFHA (Zone A-99) in 1989. Improvements to the levee systems resulted in a revised Flood Insurance Rate Map for the American River area in 2004 and removal from the one percent annual chance regulatory floodplain.

Corresponding to the release of the 2004 map for the American River area, the Sacramento Area Flood Control Authority (SAFCA) commenced a 6-month flood insurance outreach campaign targeting approximately 46,000 property owners who were to be released from the mandatory purchase requirement. [a] The outreach campaign had several goals: (1) alert property owners to the risk of levee failure in their community, (2) urge property owners to take responsibility for this risk by maintaining a flood insurance policy, and (3) encourage property owners who are no longer subject to the mandatory purchase requirement to continue to carry a flood insurance policy (a preferred risk policy or PRP), and (4) urge stakeholders to engage in Sacramento's policy retention efforts. The campaign was implemented in five phases targeting the insurance agent, elected officials, lenders, property owners, and the media.

The choice to center part of the outreach plan around PRPs was based on a survey, conducted in March 2003, targeting homeowners in the American River area. Respondents said they were willing to maintain their insurance policies based on two conditions: (1) once the MPR was lifted, they could purchase flood insurance for approximately half what they currently paid;, and (2) if local flood officials communicated flood risk.

Seventy percent of the property owners released from the 2005 mandatory purchase requirement maintained flood insurance. Lessons learned include the effectiveness of an outreach campaign coinciding with a community's release from the flood insurance program and the importance of the more affordable PRP in encouraging policy retention (SAFCA, 2012).

[a]The campaign was jointly funded by NFIP and SAFCA (75 percent and 25 percent, respectively).

To be effective, levee risk communication efforts need to be anchored in several principles:

- delivery at the local level;
- products tailored to individual households, communities, and other stakeholders;
- delivery from a credible and trusted source;
- long-term (meaning efforts should extend over a period of time);
- contain consistent, correct, and nonconflicting content;
- encourage or motivate some behavior change;
- account for the values of target audiences or communities;
- employ multimodal networks; and
- provide repeat messaging (Peters et al., 1997; Mileti and Peek, 2002; Tinker and Galloway, 2008).

**FEMA and others involved in risk communication at all levels should incorporate contemporary risk communication principles in the development of flood risk communication strategies and implementation**

Copyright National Academy of Sciences. All rights reserved.

**efforts.** Seizing key windows of opportunity to communicate levee-related flood risk at the local level is critical to success. Correcting misperceptions, for example, that if you live behind a levee you are "safe," is also critical.

A systematic evaluation of risk communication efforts against measurable outcomes such as increases in insurance purchase, increases in mitigation activities, or a downward trend in damages could yield significant insights regarding levee-related risk communication. Appropriate assessment tools for monitoring the success of risk communication programs are critical, including (1) baseline information on the existing status of flood losses prior to program implementation, if available; and (2) predefined metrics for assessing the effectiveness in reducing risk as measured by increases in flood insurance policies, increases in the number and type of mitigation activities, improvements in the percentage reductions in NFIP premiums, and reductions in overall losses, among others. **FEMA should support evaluation of the success of risk communication efforts, including at the community level when appropriate, that is informed by appropriate assessment tools such as baseline information and predefined metrics.** Agencies and organizations outside of FEMA involved in communicating risk behind levees might find value in evaluating success of efforts as well.

## REFERENCES

Bell, H. M., and G. A. Tobin. 2007. Efficient and effective? The 100-year flood in the communication and perception of flood risk. Environmental Hazards: Human and Policy Dimensions 7(4): 302-311.

BestWire. 2012. Update: Sandy losses by company: Insurance total could reach $25 billion. Available online at http://www.programbusiness.com/News/Sandy-Losses-by-Company-Insurance-Total-Could-Reach-25-Billion. Accessed February 21, 2013.

Botzen, W. J. W., J. Aerts, and J. C. J. M. van den Bergh. 2009. Willingness of homeowners to mitigate climate risk through insurance. Ecological Economics 68(8-9): 2265-2277.

Bourque, L. B., R. Regan, M. M. Kelley, M. M. Wood, M. Kano, and D. S. Mileti. 2012. An examination of the effect of perceived risk on preparedness behavior. Environment and Behavior, doi:10.1177/0013916512437596.

Bubeck, P., W. J. W. Botzen, and J. C. J. H. Aerts. 2012. A review of risk perceptions and other factors that influence flood mitigation behavior. Risk Analysis 32(9): 1481-1495.

FEMA (Federal Emergency Management Agency). 1987. Reducing Losses in High Risk Flood Hazard Areas: A Guidebook for Local Officials, FEMA 116. Available online at http://www.fema.gov/library/viewRecord.do?id=1508. Accessed November 14, 2012.

FEMA. 1995. Managing Floodplain Development in Approximate Zone A Areas: A Guide for Obtaining and Developing Base (100-Year) Flood Elevations, FEMA 265. Available online at http://www.fema.gov/library/viewRecord.do?id=1526. Accessed November 12, 2012.

FEMA. 2009. Risk Mapping, Assessment, and Planning (Risk MAP) Multi-Year Plan: Fiscal Years 2010-2014. Available online at http://www.fema.gov/library/viewRecord.do?id=3587. Accessed December 6, 2012.

FEMA. 2011a. FEMA Mitigation and Insurance Strategic Plan 2012-2014. FEMA P-857. Available online at http://www.fema.gov/library/viewRecord.do?id=4903.

FEMA. 2011b. 2011 Public Survey Findings on Flood Risk. Available online at http://www.fema.gov/library/viewRecord.do?id=6259. Accessed November 20, 2012.

FEMA. 2012. Community Rating System Participation National Map. Available online at http://www.fema.gov/library/viewRecord.do?id=6200. Accessed December 8, 2012.

FEMA. n.d. NFIP: Community Rating System: A Local official's guide to saving lives preventing property damage reducing the cost of flood insurance. Available online at http://www.fema.gov/library/viewRecord.do?id=3655. Accessed November 29, 2012.

Fischhoff, B., and J. Kadvany. 2011. Risk: A Very Short Introduction. Oxford, UK: Oxford University Press.

Galloway, G. E., G. B. Baecher, K. Brubaker, and L. E. Link. 2011. Review and Evaluation of the National Dam Safety Program. College Park, MD: Water Policy Collaborative. Available on line at www.fema.gov/library/viewRecord.do?id=5794. Accessed February 21, 2013.

Grothmann, T., and F. Reusswig. 2006. People at risk of flooding: Why some residents take precautionary action while others do not. Natural Hazards 38(1-2): 101-120.

Harries, T. 2012. The anticipated emotional consequences of adaptive behaviour-impacts on the take-up of household flood-protection measures. Environment and Planning A 44(3): 649-668.

Copyright National Academy of Sciences. All rights reserved.

Harvatt, J., J. Petts, and J. Chilvers. 2011. Understanding householder responses to natural hazards: Flooding and sea-level rise comparisons. Journal of Risk Research 14(1): 63-83.

Insurance Insider Weekly Newsletter. 2012. Reported Sandy losses to $10.4bn. December 17, Issue 506.

Kellens, W., T. Terpstra, and P. De Mayer. 2012. Perception and communication of flood risks: A systematic review of empirical research. Risk Analysis doi:10.1111/j.1539-6924.2012.01844.x.

Keller, C., M. Siegrist, and H. Gutscher. 2006. The role of the affect and availability heuristics in risk communication. Risk Analysis 26(3): 631-639.

Keller, C., A. Bostrom, M. Kuttschreuter, L. Savadori, A. Spence, and M. White. 2012. Bringing appraisal theory to environmental risk perception: A review of conceptual approaches of the past 40 years and suggestions for future research. Journal of Risk Research 15(3): 237-256.

Kousky, C. 2011. Understanding the demand for flood insurance. Natural Hazards Review 12(2): 96-110.

Kousky, C., and H. Kunreuther. 2010. Improving flood insurance and flood-risk management: Insights from St. Louis, Missouri. Natural Hazards Review 11(4): 162-172.

Lindell, M. K., and R. W. Perry. 2012. The protective action decision model: Theoretical modifications and additional evidence. Risk Analysis 32(4): 616-632.

Ludy, J., and G. M. Kondolf. 2012. Flood risk perception in lands "protected" by 100-year levees. Natural Hazards 61(2): 829-842.

Michel-Kerjan, E., S. Lemoyne de Forges, and H. Kunreuther. 2012. Policy tenure under the U.S. National Flood Insurance Program (NFIP). Risk Analysis 32(4): 644-658.

Mileti, D. S., and L. A. Peek, 2002. Understanding individual and social characteristics in the promotion of household disaster preparedness. In New Tools for Environmental Protection: Education, Information, and Voluntary Measures. Washington, DC: The National Academies Press.

Morgan, M. G., B. Fischhoff, A. Bostrom, and C. J. Atman. 2001. Risk Communication: A Mental Models Approach. Cambridge, UK: Cambridge University Press.

NRC (National Research Council). 1989. Improving Risk Communication. Washington, DC: National Academy Press.

NRC. 2009. Mapping the Zone, Improving Flood Map Accuracy. Washington, DC: The National Academies Press.

NRC. 2012a. Dam and Levee Safety and Community Resilience: A Vision for Future Practice. Washington, DC: The National Academies Press.

NRC. 2012b. Disaster Resilience: A National Imperative. Washington, DC: The National Academies Press.

Peters, R. G., V. T. Covello, and D. B. McCallum. 1997. The determinants of trust and credibility in environmental risk communication: An empirical study. Risk Analysis 17(1): 43-54.

Pielke, R. A. 1999. Nine fallacies of floods. Climatic Change 42(2): 413-438.

SAFCA (Sacramento Area Flood Control Agency). 2012. Data on Flood Insurance Purchase and Retention in the City of Sacramento, Memo to the Committee on Levees and the National Flood Insurance Program: Improving Policies and Practices from Tim Washburn, Director of Planning. Sacramento, CA: SAFCA.

Siegrist, M., and H. Gutscher. 2008. Natural hazards and motivation for mitigation behavior: People cannot predict the effect evoked by a severe flood. Risk Analysis 28(3): 771-778.

Soane, E., I. Schubert, P. Challenor, R. Lunn, S. Naredran, and S. Pollard. 2010. Flood perception and mitigation: The role of severity, agency, and experience in the purchase of flood protection, and the communication of flood information. Environment and Planning A 42(12): 3023-3038.

Terpstra, T., M. K. Lindell, and J. M. Gutteling. 2009. Does communicating (flood) risk affect (flood) risk perceptions? Results of a quasi-experimental study. Risk Analysis 29(8): 141-1155.

Tinker, T., and G. E. Galloway. 2008. How Do You Effectively Communicate Flood Risks? Looking to the Future. Available online at: http://www.emforum.org/vforum/BAH/How%20Do%20You%20Effectively%20Communicate%20Flood%20Risks.pdf. Accessed November 14, 2012.

Tobin, G. A. 1995. The levee love-affair—a stormy relationship. Water Resources Bulletin 31(3): 359-367.

Vrem, M. J. 2010. Communicating Risk: Ten key learnings from the FloodSmart campaign. Available online at: http://www.asfpmfoundation.org/pdf_ppt/2010_GFW_Forum_Background_Reading.pdf#page=66. Accessed November 20, 2012.

USGS (U.S. Geological Survey). 2010. Flood of April and Map 2008 in Northern Maine, Fact Sheet 2010-3003. Available online at: http://pubs.usgs.gov/fs/2010/3003/pdf/fs2010-3003.pdf. Accessed October 19, 2012.

Wood, M. M., D. S. Mileti, M. Kano, M. M. Kelley, R. Regan, and L. B. Bourque. 2012. Communicating actionable risk for terrorism and other hazards. Risk Analysis 32(4): 601-605.

Copyright National Academy of Sciences. All rights reserved.

# 8

# Shared Responsibility in Moving to Flood Risk Management

The passage of the National Flood Insurance Act in 1968 and the establishment of the NFIP marked what can be considered the official shift in the United States from a principal focus on flood control to a focus on flood damage reduction with greater consideration of nonstructural measures and insurance, paired with structural measures, to manage flood risk. The movement toward flood risk management continued and was emphasized, for example, in the wake of Hurricane Katrina with the application of tools associated with risk management in other sectors to flood risk management. This movement is changing the manner in which the nation addresses its floodplain management issues and is requiring agencies to make, or begin to make, significant changes in the manner in which they carry out their programs. These changes are seen in FEMA's management of the NFIP and will be affecting their approach in the years immediately ahead. It is not a question of if, but when, the transition to risk-based approaches will be completed across all relevant parties.

The principal responsibility for NFIP-related actions is assigned by the National Flood Insurance Act to the Federal Emergency Management Agency (FEMA) (originally assigned to the Department of Housing and Urban Development or HUD). FEMA also has organic authorities to "lead the Nation's efforts to prepare for, protect against, respond to, recover from, and mitigate the risk of natural disasters, acts of terrorism, and other man-made disasters, including catastrophic incidents" (Post-Katrina Emergency Management Reform Act of 2006). Other federal agencies, states, and local communities are assigned responsibilities by the National Flood Insurance Act and Executive Order 11988 (1977) to support these goals in collaboration with FEMA. The National Flood Insurance Act specifically encourages states and local governments to make appropriate land-use adjustments to reduce the exposure of communities to flooding.

The National Flood Insurance Act also establishes the requirement for the development of a Unified National Program (UNP) for floodplain management. The initial UNP document was created by the Water Resources Council in 1976 and followed by a second in 1979. Updated plans were prepared by an interagency task forces operating under FEMA oversight in 1986 and 1994 and reflected agency consensus. The UNP urged cooperative efforts among the federal government, states, and the private sector as well as within the federal government itself.

Other federal agencies play important roles in managing the nation's flood risk. Since the early part of the 20th century, USACE has been assigned responsibility under various flood control and water resources development acts for the construction and, in some cases, operation of flood control works. In 2006, USACE, in coordination with FEMA, established the National Flood Risk Management Program in support of an effort to move the nation



Copyright National Academy of Sciences. All rights reserved.

from a flood control approach to a flood risk management approach.[1] The National Oceanic and Atmospheric Administration (NOAA), Natural Resources Conservation Service (NRCS), U.S. Geological Survey (USGS), U.S. Forest Service, Bureau of Reclamation, U.S. Fish and Wildlife Service (FWS), the U.S. Environmental Protection Agency, the Tennessee Valley Authority, the Federal Energy Regulatory Commission (FERC), and U.S. Department of Housing and Urban Development (HUD) also have legislated responsibilities that directly or indirectly involve flood risk management.[2]

State, tribal, and local governments have responsibilities that are also critical to managing the nation's flood risk in general and behind levees in particular. For example, local and to a lesser degree, state governments control land use and exposure to risk. Local government plays an important role in levee-related risk communication (Chapter 7).

The various roles and responsibilities at all levels highlight the need for a coordinated, national approach that *shares responsibility* across federal, state, and local government and other entities in managing flood risk. In this chapter, challenges and opportunities related to a shared national strategy for levee-related flood risk and management are explored.

## COORDINATION CHALLENGES AT THE FEDERAL LEVEL

Many federal agencies have responsibilities that involve management of flood risk and levee-related flood risk, in particular. Their roles are dictated by their legislated authorities and responsibilities as well as by presidential guidance. Because of the large number of agencies and complexity of legislation, coordination challenges exist that are manifested in many ways—from ensuring consistency in flood risk communication to compilation of a national levee inventory.

### USACE and FEMA: Different Approaches to Levee-Related Risk Analysis

When HUD and FEMA initially began to develop procedural guidelines for levees in the NFIP, they relied heavily on the resources and advice of the USACE. When Title 44, Section 65.10, of the *Code of Federal Regulations* (44 CFR §65.10) was developed, it included references to USACE technical publications as measures of good practice in engineering. Although the USACE technical approaches have evolved over time, reference to these older documents remain in 44 CFR §65.10.

In 1996, when USACE began to move to a risk-based approach to analysis of flood hydrology and hydraulics and other aspects of flood system integrity determination, FEMA continued with its existing approach. In 2006, the Interagency Levee Policy Review Committee recommended that FEMA shift to a risk-based analysis procedure over the following 10-year period (ILPRC, 2006). In Chapter 3, this report recommends that FEMA move to use of a risk-based levee analysis approach. As noted in Chapter 2, the 2012 Biggert-Waters Act requires coordination between FEMA and USACE in the assessment of levees that exist in both programs: "information and data collected by or for the USACE under the Inspection of Completed Works Program is sufficient to satisfy the flood protection structure accreditation requirements." Since it appears that approximately 65 percent of NFIP-accredited and PAL levees are also in one of the USACE programs and subject to USACE risk-based inspections, it would not be efficient to establish two separate evaluation methodologies for ensuring the integrity of those levees. If FEMA chooses to continue its present approach for the analysis of other NFIP-accredited levees not in the USACE programs, levee owners and their engineers will be faced with two or more different approaches to analysis of levee integrity and risk.

The technical and programmatic differences between FEMA and USACE as they relate to the evaluation of flood hazards and levee systems have been and continue to be an issue that compromises interagency communica-

[1] See http://www.nfrmp.us/.

[2] A Federal Interagency Floodplain Management Task Force, established in 1975, promotes programs and policies that reduce flood losses and protect the environment. See http://www.fema.gov/national-flood-insurance-program-1/federal-interagency-floodplain-management-task-force.

Copyright National Academy of Sciences. All rights reserved.

tion and causes confusion and frustration in the local communities that work with the agencies and the public that is being served. Furthermore, the benefits of a more modern risk-based approach to assessing risk behind levees have been made clear. Both the complexities of coordinating the programs of multiple government entities and the benefits of conducting risk-based analyses and acquisition of the data needed to conduct these analyses are illustrated in recent events involving the City of Dallas, Texas (Box 8-1). **FEMA and USACE should jointly develop a common, risk-based approach to levee assessment in a timely manner and apply this approach to all levees assessed by the two agencies. This includes a joint methodology, procedure, and where feasible, the sharing of models and other risk analysis tools.** To achieve this goal, FEMA and USACE could craft a memorandum of understanding. Furthermore, it would be useful for other federal agencies with interest in risk-based assessment of levees and floodwalls to be invited to participate in the process.

### Other Coordination Challenges Between FEMA and USACE

When accredited levees are found deficient by either FEMA and/or USACE, levee owners in affected communities attempt to take action to remediate the deficiency. Where the level of protection provided by the levee is acknowledged to be the same by both USACE and FEMA, coordination problems are minimized and the com-

#### BOX 8-1
#### Dallas Levees: Working to Determine the True Risk

The Dallas Levee System in Dallas, Texas, includes over 20 miles of levees that protect downtown Dallas and thousands of citizens against a 0.0125 percent (8,800-year) annual chance flood. In 2009, USACE conducted a periodic inspection of the levee system and informed the city and FEMA that the levees would not performed as designed and rated these levees unacceptable. This jeopardized the city's levee system accreditation status and FEMA began to remap the areas behind the levees, designating them as being in the Special Flood Hazard Area.

In response, the City of Dallas spent more than $25 million dollars studying the integrity of the levee system and devising a plan to remediate known deficiencies in the levee system. The city also completed an Emergency Action Plan and identified 150 million dollars of levee improvements and began to correct 198 maintenance deficiencies previously identified in the system and those identified by the city's engineering study.

Given the potential consequences of levee deaccreditation and in keeping with an agencywide effort to conduct risk-based analyses, USACE applied a new risk assessment process to the Dallas levee system. After an intensive study of the levees, made possible in part by the engineering investigations funded by the City of Dallas, USACE concluded that:

- The frequency of major floods was rarer than had been originally determined. A flood event that could overtop the levees was rated at 0.01 to 0.02 percent annual chance (1,000-year to 5,000-year).
- The duration of floods that might occur is much shorter than once thought. Peak flooding lasts hours and days, not months. As a result, the levees would be less likely to become saturated and fail.
- While levee slope slides have occurred over the years, the detailed analysis indicates that "these slides do not represent an unacceptable risk" (USACE, 2012).

The City of Dallas is continuing efforts to remediate levee deficiencies; however, as a result of USACE's modern risk analysis approach, the extent and cost to the city of remediation will be decreased. The City of Dallas expects to complete repairs in 2013 and intends to submit levee certification to FEMA so that the remapping of the area behind the levees reflects the new conditions and supports accreditation. The city plans to work with USACE to remove the unacceptable rating under the USACE periodic inspection program.

Copyright National Academy of Sciences. All rights reserved.

munity can attempt to remediate against a common standard. When, on the other hand, the levee was built by USACE to a higher standard than was necessary for entry into the NFIP, USACE may require the levee owner to remediate the deficiency not to the NFIP base flood elevation but to the original level of protection provided by USACE. When the community can only find resources to accomplish the mitigation to the lower level, USACE may determine that it will not permit work to move forward because that work would not bring the levee into USACE compliance and might make it more difficult to eventually achieve the higher USACE standard (Box 5-7).

Another potential issue arises when an accredited levee (granting the areas behind the levee exemption from the mandatory flood insurance purchase requirement), owned and maintained by USACE, is no longer certified by USACE. USACE may not permit local governments to accomplish the remediation, leaving the local governments with no way to bring the levees back to an accredited status.

In both of these cases, the agencies are operating within their regulatory authorities. However, the community is caught in the middle and faces the consequences. The utility of a joint FEMA-USACE procedure allowing quick attention to levee-related situations where regulatory authority creates intractable situations for the affected community is clear.

## Levee Construction and Repair

The 1994 Interagency Floodplain Management Review Committee (IFMRC) report on the 1993 Mississippi River flood identified that federal agencies other than USACE were providing funds to communities to build or reconstruct damaged levees following flood events (e.g., the HUD and the Department of Commerce's Economic Development Administration). The IFMRC report recommended that having multiple agencies fund the construction or reconstruction of such levees created challenges later. If not built to certification standards, the levee would not be accredited or possibly ineligible for participation in the Flood Control and Coastal Emergency Act (P.L. 84-99) program despite the fact that it was built by a federal agency. As a solution, the IFMRC report recommended that USACE be designated as the federal agency responsible for the oversight and construction of levees by federal agencies. The consolidation of construction responsibility for levees that receive federal funding promotes consistent construction outcomes that align with USACE and FEMA standards.

## A National Levee Inventory

Currently, the location and condition of levees in the United States is unclear—where they are, what they are protecting (assets and lives), and their condition (Chapter 6). This represents a significant gap in addressing the challenge of flood risk management behind levees: How can the problem be addressed if the extent and location of the problem is unclear?

Although the long-term plan of both USACE and FEMA is to develop a single database for covering the levees that operate under the oversight of the two agencies, this consolidation effort, which was initially recommended in the 2006 National Levee Policy Study, is proceeding slowly because of resource constraints (FEMA, 2006). The National Levee Database (NLD) operated by USACE, which will be the eventual single database, is limited in information concerning NFIP and other non-USACE levee systems. Eventually USACE may be able to bring into the database information about state, local, and individually operated levees that do not fall into either of the federal agency programs. However, at present, there is a significant need for completion of the consolidation of the federal levee inventories so that levees in the two federal programs can be identified and overlaps eliminated. The maintenance today of two databases is inefficient and creates a potential for disinformation at times when information about levees is badly needed.

The transfer of information about levees that are not part of the NFIP but are a part of FEMA's MLI database into USACE's National Levee Database is needed. (As indicated in Chapter 7, in areas covered by its Flood Insurance Rate Maps (FIRMs), FEMA has identified approximately 29,800 miles of levees, only 5,100 of which are part of the NFIP.) These non-NFIP levees, along with several thousand other levees may eventually be entered into the database. The addition of these nonfederal program levees will require the close cooperation of the states and local entities.

Copyright National Academy of Sciences. All rights reserved.

### Risk Communication

In 2006 the Association of State Floodplain Managers (ASFPM) and the National Association of Flood and Stormwater Management Agencies (NAFSMA) jointly sponsored a National Flood Risk Summit, convening federal, state, and local flood experts and selected members of the public at Wye Island, Maryland. Flood risk communication was a key topic during discussions. The principal challenge identified regarding risk communication was the multiplicity of uncoordinated messages developed and communicated by federal agencies. The collective opinion of those in the Wye Island meeting was the need for increased coordination of this messaging. Discussion with relevant stakeholders during information-gathering efforts of this committee corroborate this opinion and indicate that the problem continues to exist.

Given the multiple entities that have either regulatory authority or considerable interest in levees, it is no surprise that inconsistent messaging from multiple sources exists and leads to confusion and misunderstanding. Inconsistent messaging is directly related to the lack of collaboration and coordination among entities in communicating risk to local stakeholders. Inconsistent messaging can involve definitions, for example, what defines a levee, what the appropriate definition of risk is, and concepts such as the reality of residual risk behind a levee. Simplicity of messaging is also important in communicating risk ( Paveglio et al., 2009; Ballard et al., 2012) and becomes a challenge in the case of, for example, communicating an explanation of the one percent annual chance flood.

Flood inundation and other specialty maps for flood-prone areas are being prepared by multiple agencies to cover the same land area (FEMA, NRCS, FWS, USGS, USACE, and NOAA). Some of the overlap among these maps is a result of research and development activities being conducted by the agencies. In other cases, the overlap results from the necessity of supporting an agency mission. Furthermore, other messaging products prepared by federal agencies addressing the challenge of floodplain management or flood risk reduction are not always coordinated with a consistent message (Chapter 7). There is no one agency that has the responsibility to provide oversight and coordination of federal flood risk mapping products and other communication products. Similarly, there is little to no coordination of the collection of underlying data, such as with Lidar, by these agencies.

The utility of levee-related flood risk communication developed and presented at the federal level is challenged by uncoordinated messaging. **One federal message using consistent terminology, transparent data, and open discussion and decisions about the determination of flood risk is critical to inform the affected communities who, in turn, communicate and manage risk at the local level. FEMA should assume a leadership role in providing direction for research, development, and release of flood risk communication products and maps.** This role might include FEMA constituting a central leadership group or some type of coordinating body.

**FEMA should communicate flood risk through a collaborative approach that works with and provides strong support to local communities.** This additional emphasis entails local involvement (from individuals, communities, and states) in all phases of the risk communication process. This requires that FEMA interact with preestablished collaborative decision-making networks at the local level. Success lies in providing risk information to the local level where local governments and citizens have the responsibility to drive behavioral changes to reduce risk.

## INCREASING AWARNESS OF SHARED FLOOD RISK RESPONSIBILITIES AT THE FEDERAL, STATE, AND LOCAL LEVELS

USACE and FEMA share responsibility for oversight of the conditions of levees that are part of both programs and ensuring that the integrity of the structures means necessary standards to ensure the safety of those behind levees. It has been difficult for FEMA and USACE to develop a comprehensive approach to reducing flood damages across the nation, and in the case of levees, to ensure that levees are given proper oversight by those responsible for them, the levee owners, and operators. However, promising coordination efforts between the two agencies exist, including three joint "task force" initiatives that promote better interagency cooperation and collaboration, including improving the results of levee-related activities in both agencies, and better aligning data collected in USACE levee inspection with requirements for accreditation purposes (FEMA, 2012a,b). This collaboration permits FEMA and USACE to work together to deal with joint challenges such as development of policies for vegetation on levees (USACE, 2009).

Copyright National Academy of Sciences. All rights reserved.

In most cases, states play a minimal role in dealing with the flood challenges facing communities in their states. Less than five states have inventories of the levees within their boundaries.[3] Few states have permitting or land-use regulations governing the construction of levees. Even though the National Flood Insurance Act strongly encouraged state participation in the program in support of its goals, most states defer action to FEMA and their communities. State-focused nongovernmental organizations such as the ASFPM and NAFSMA play a critical role in promoting the shared responsibility of the states.

Since flooding does not fall neatly into geographical borders, "communities" cannot be defined solely by jurisdictional boundaries (NRC, 2011). Regional bodies conducting risk communication to achieve common commitment to sustainable mitigation, can play an important role. For example, the cooperative decision-making frameworks built by metropolitan planning organizations[4] have been in place for several decades, and many have built networks of trust and credibility in communities.

The last Unified National Program for Floodplain Management was published by the Federal Interagency Floodplain Management Task Force in 1994. It identified, as did the 1994 Sharing the Challenge report on the 1993 Mississippi River floods (IFMRC, 1994), the need for action by the federal government to bring together all parties involved in development and implementation of national floodplain management programs to better define the responsibilities of each group and to develop a roadmap dealing with these challenges in the future. No action has been taken on recommendations of either effort.

**The Federal Interagency Floodplain Management Task Force is a useful vehicle to promote the need for better definition of the shared responsibilities for floodplain management among all the parties.**

Individuals and communities also share in the responsibility for taking those steps necessary to manage flood risks. The deaccreditation of thousands of miles of NFIP and USACE levees in the wake of map modernization indicates that community leaders were not monitoring the condition of the structures protecting their communities and not understanding their responsibility for ensuring that these levee systems were meeting accreditation requirements. However, it is reasonable to conclude that the deaccreditation of levees has countered this notion in NFIP communities around the nation. Use of modern risk methodology will provide more accurate information on risks, especially behind levees, information that will be useful at the community level. Communication of the flood risk behind levees can be most effectively accomplished by local governments (Chapter 7), but will require the active engagement of these officials, not only for the actual communication of the risk messages, but also for the implementation of land-use and building code regulations needed to deal with the residual risks that will be described by the use of new risk-based tools. Once properly informed by local governments of the risks they face behind levees, the property owners are responsible for the actions necessary to physically mitigate potential losses and transfer risk, for example, through the use of risk-based insurance.

## IN CONCLUSION

This report provides advice on the current treatment of levees within the NFIP (Box 8-2). Key to this advice is the transition of FEMA to a modern, risk-based approach to flood risk analysis. This transition will, no doubt, be challenging. New or revised regulations, procedures, and training systems will need to be established, and clear, consistent messaging to those affected by the new procedures is critical. Legal challenges, as there are today, will most likely arise. The appropriate balance between public and private investment will continually be considered.

Despite these challenges, it is clear that a national move toward floodplain management anchored in a modern risk-based analysis is imperative. This is increasingly recognized in the floodplain management community and

[3] This statement is based on information in the Interagency Levee Policy Review Committee report (ILPRC, 2006) and inquiries to states during committee deliberations.

[4] Metro areas with a population of more than 50,000 are required by federal law (23 U.S.C. §134, Metropolitan transportation planning) to establish a metropolitan planning organization (MPO) to represent local, regional, and national interests in the transportation planning process (AMPO, 2009). The nation's 385 MPOs represent areas ranging from 50,000 to 19 million people totaling roughly 84 percent of the population, and with about half administered by a regional council (AMPO, 2009). MPOs are governed by democratically elected officials accountable to local and regional constituencies. These regional leaders and the staffs of the MPOs routinely work with representatives and officials responsible for other planning activities including land use, economic development, environmental protection, and more (AMPO, 2009).

Copyright National Academy of Sciences. All rights reserved.

**BOX 8-2**
**Improving NFIP Policies and Practices: Conclusions and Recommendations**

The committee identified multiple conclusions and recommendations to improve the policies and practices of the treatment of levees within FEMA's NFIP, spanning risk analysis, flood insurance, risk reduction, and risk communication. Advice falls within the central theme of the report—the need for a national move to flood risk management. Conclusions and recommendations are found throughout the report and consolidated here.

Recommendations to improve NFIP's flood risk analysis, the analytical piece of flood risk management, including advice on FEMA's Levee Analysis and Mapping Procedure, include:

- **Recommendation 1: The NFIP should move to a modern risk analysis that makes use of modern methods and computational mapping capacity to produce state-of-the-art risk estimates for all areas that are vulnerable to flooding.**
- **Recommendation 2: FEMA should move directly to a modern risk-based analysis for dealing with areas behind levees and not implement the Levee Analysis and Mapping Procedure (LAMP).**

Should the decision be made not to implement LAMP, Chapter 4 contains recommendations to pursue interim steps pending development and completion of a modern risk-based analysis.

Conclusions and recommendations related to flood insurance including flood insurance pricing behind levees and the mandatory flood insurance purchase requirement, both in the context of a modern-risk based analysis, include:

- **Conclusion 1: The method used to calculate the average historical loss year ensures that in the long run there will be inadequate premiums collected to cover costs in significant flood years.**
- **Conclusion 2: The NFIP is constructed using an actuarially sound formulaic approach for the full-risk classes of policies, but is financially unsound in the aggregate because of constraints (i.e., legislative mandates) that go beyond actuarial considerations.**
- **Recommendation 3: Rate setting for properties behind levees, accredited or not accredited, should be improved by using the modern risk analysis method employing advances in hydrology, meteorology, and geotechnical engineering to more precisely calculate the probability of water inundation levels and the associated damage estimates throughout the area behind the levee in a graduated fashion.**
- **Recommendation 4: To the extent possible to better achieve fiscal soundness, the properties that have been grandfathered into the NFIP or that receive discounts due to statutory considerations should have their pricing moved to the actuarially based prices using the detailed probability-of-inundation estimates and detailed economic damage models.**
- **Conclusion 3: The current policy of mandatory flood insurance purchase appears to be ineffective in achieving widespread purchase of NFIP flood insurance policies.**
- **Conclusion 4: The rate of compliance with the mandatory purchase requirement indicates challenges with lender enforcement and federal oversight of this lending.**
- **Conclusion 5: Mandatory purchase requirements have led many property owners to perceive that if they are not mandated to have insurance, then they are not susceptible to damage from floods.**
- **Conclusion 6: At this time, there is no sound reason to institute mandatory purchase of flood insurance in areas behind accredited levees.**
- **Conclusion 7: A modern risk-based analysis has the potential to impact the purchase of flood insurance, diversify the NFIP's exposure to flood risk, and generate a more fiscally sound program.**

*continued*

Copyright National Academy of Sciences. All rights reserved.

- **Recommendation 5: Once the risk-based approach has been put in place and matures, FEMA should review and study the necessity of the mandatory purchase requirement, behind levees and throughout the Special Flood Hazard Areas.**

Conclusions and recommendations related to implementing flood risk management strategies, exploring all available structural, nonstructural, and risk transfer mechanisms such as insurance, include:

- **Conclusion 8: There is a clear need for a comprehensive, tailored approach to risk management behind levees that (1) is designed and implemented at the local level; (2) involves federal and state agencies, communities, and households; (3) takes into account possible future conditions; and (4) relies on an effective portfolio of structural measures, nonstructural measures, and insurance to reduce the risk to those behind levees.**
- **Recommendation 6: To reduce the flood risk to those behind levees, FEMA should encourage communities to develop and implement multimeasure risk management strategies for areas behind accredited levees.**

Recommendations related to understanding and communicating flood risk behind levees, an integral part of flood risk management, include:

- **Recommendation 7: FEMA and others involved in risk communication at all levels should incorporate contemporary risk communication principles in the development of flood risk communication strategies and implementation efforts.**
- **Recommendation 8: FEMA should support evaluation of the success of risk communication efforts, including at the community level when appropriate, that are informed by appropriate assessment tools such as baseline information and predefined metrics.**

Moving to flood risk management is a shared responsibility at all levels: federal, state, and local government, private citizens, communities, and all other entities dealing with flood risk. Related conclusions and recommendations include:

- **Recommendation 9: FEMA and USACE should jointly develop a common, risk-based approach to levee assessment in a timely manner and apply this approach to all levees assessed by the two agencies. This includes a joint methodology, procedure, and where feasible, the sharing of models and other risk analysis tools.**
- **Conclusion 9: One federal message using consistent terminology, transparent data, and open discussion and decisions about the determination of flood risk is critical to inform the affected communities who, in turn, communicate and manage risk at the local level.**
- **Recommendation 10: FEMA should assume a leadership role in providing direction for research, development, and release of flood risk communication products and maps.**
- **Recommendation 11: FEMA should communicate flood risk through a collaborative approach that works with and provides strong support to local communities.**
- **Conclusion 10: The Federal Interagency Floodplain Management Task Force (FIFMTF) is a useful vehicle to promote the need for better definition of the shared responsibilities for floodplain management among all the parties.**

is well illustrated by USACE. Indeed, FEMA can learn from the experience of USACE in moving to a modern risk-based analytical approach. Specifically, USACE has converted its hydrologic and hydraulic analyses to a risk-based approach and instituted a nationwide risk management program to provide risk-based evaluations of levees as part of USACE's periodic inspection programs. In the NFIP, some analyses will be carried out by private engineering firms, many of which are already involved with USACE implementation of these new approaches.

Copyright National Academy of Sciences. All rights reserved.

The intersection between FEMA and USACE is only one piece of the necessary collaborative and coordinated approach to levee-related flood risk. Currently, these efforts at all levels are not as robust as they could be. Increased coordination and cooperation among and between governmental agencies, state and local entities as well as the public at large, would result in increased effectiveness of the NFIP, improved efficiency within the NFIP, and improve the nation's approach to floodplain management and treatment of levees. Promising developments do exist, as discussed above, but, more progress is necessary. A coordinated, national approach that *shares responsibility* across federal, state, and local entities is necessary to appropriately manage the nation's flood risk behind levees.

## REFERENCES

AMPO (Association of Metropolitan Planning Organizations). 2009. Issue Brief. Washington, DC: AMPO.

Ballard, H. L., E. Evans, V. E. Sturtevant, and P. Jakes. 2012. The Evolution of Smokey Bear: Environmental Education About Wildfire for Youth. Journal of Environmental Education 43(4): 227-240.

FEMA (Federal Emergency Management Agency). 2006. The National Levee Challenge: Levees and the FEMA Flood Map Modernization Initiative. Washington, DC: FEMA.

FEMA. 2012a. Continued Coordination between FEMA and USACE, Fiscal Year 2012. Washington, DC: FEMA.

FEMA. 2012b. FEMA-USACE Levee Task Force. Draft Briefing Sheet, September 25, 2012. Washington, DC: FEMA.

IFMRC (Interagency Floodplain Management Review Committee). 1994. Sharing the Challenge: Floodplain Management into the 21st Century. Report of the Interagency Floodplain Administration Floodplain Management Task Force. Washington, DC: U.S. Government Printing Office.

ILPRC (Interagency Levee Policy Review Committee). 2006. Sharing the Challenge: Floodplain Management into the 21st Century. Washington, DC: ILPRC.

NRC (National Research Council). 2011. Building Community Disaster Resilience Through Private-Public Collaboration. Washington, DC: The National Academies Press.

Paveglio, T., M. S. Carroll, J. D. Absher, and T. Norton. 2009. Just Blowing Smoke? Residents' Social Construction of Communication About Wildfire. Environmental Communication 3(1): 76-94.

USACE (U.S. Army Corps of Engineers). 2009. Guidelines for Landscape Planting and Vegetation Management at Levees, Floodwalls, Embankment Dams, and Appurtenant Structures. ETL 1110-2-571. Washington, DC: USACE.

USACE. 2012. Talking Points on the Dallas Floodway System—DF & DFE, Southwest Division. Washington, DC: USACE.

Copyright National Academy of Sciences. All rights reserved.

Copyright National Academy of Sciences. All rights reserved.

# Appendixes

Copyright National Academy of Sciences. All rights reserved.

Copyright National Academy of Sciences. All rights reserved.

# Appendix A

# Code of Federal Regulations Title 44: Emergency Management and Assistance, Section 65.10 Mapping of areas protected by levee systems or "44 CFR §65.10"[1]

(a) *General.* For purposes of the NFIP, FEMA will only recognize in its flood hazard and risk mapping effort those levee systems that meet, and continue to meet, minimum design, operation, and maintenance standards that are consistent with the level of protection sought through the comprehensive flood plain management criteria established by §60.3 of this subchapter. Accordingly, this section describes the types of information FEMA needs to recognize, on NFIP maps, that a levee system provides protection from the base flood. This information must be supplied to FEMA by the community or other party seeking recognition of such a levee system at the time a flood risk study or restudy is conducted, when a map revision under the provisions of part 65 of this subchapter is sought based on a levee system, and upon request by the Federal Insurance Administrator during the review of previously recognized structures. The FEMA review will be for the sole purpose of establishing appropriate risk zone determinations for NFIP maps and shall not constitute a determination by FEMA as to how a structure or system will perform in a flood event.

(b) *Design criteria.* For levees to be recognized by FEMA, evidence that adequate design and operation and maintenance systems are in place to provide reasonable assurance that protection from the base flood exists must be provided. The following requirements must be met:

(1) *Freeboard.* (i) Riverine levees must provide a minimum freeboard of three feet above the water-surface level of the base flood. An additional one foot above the minimum is required within 100 feet in either side of structures (such as bridges) riverward of the levee or wherever the flow is constricted. An additional one-half foot above the minimum at the upstream end of the levee, tapering to not less than the minimum at the downstream end of the levee, is also required.

(ii) Occasionally, exceptions to the minimum riverine freeboard requirement described in paragraph (b)(1)(i) of this section, may be approved. Appropriate engineering analyses demonstrating adequate protection with a lesser freeboard must be submitted to support a request for such an exception. The material presented must evaluate the uncertainty in the estimated base flood elevation profile and include, but not

[1] From the Electronic Code of Federal Regulations, current as of August 2, 2012, available http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&sid=60d5a4d4887bf9b97092a242096f95a2&rgn=div8&view=text&node=44:1.0.1.2.32.0.17.10&idno=44, accessed August 6, 2012.



Copyright National Academy of Sciences. All rights reserved.

necessarily be limited to an assessment of statistical confidence limits of the 100-year discharge; changes in stage-discharge relationships; and the sources, potential, and magnitude of debris, sediment, and ice accumulation. It must be also shown that the levee will remain structurally stable during the base flood when such additional loading considerations are imposed. Under no circumstances will freeboard of less than two feet be accepted.

(iii) For coastal levees, the freeboard must be established at one foot above the height of the one percent wave or the maximum wave runup (whichever is greater) associated with the 100-year stillwater surge elevation at the site.

(iv) Occasionally, exceptions to the minimum coastal levee freeboard requirement described in paragraph (b)(1)(iii) of this section, may be approved. Appropriate engineering analyses demonstrating adequate protection with a lesser freeboard must be submitted to support a request for such an exception. The material presented must evaluate the uncertainty in the estimated base flood loading conditions. Particular emphasis must be placed on the effects of wave attack and overtopping on the stability of the levee. Under no circumstances, however, will a freeboard of less than two feet above the 100-year stillwater surge elevation be accepted.

(2) *Closures.* All openings must be provided with closure devices that are structural parts of the system during operation and design according to sound engineering practice.

(3) *Embankment protection.* Engineering analyses must be submitted that demonstrate that no appreciable erosion of the levee embankment can be expected during the base flood, as a result of either currents or waves, and that anticipated erosion will not result in failure of the levee embankment or foundation directly or indirectly through reduction of the seepage path and subsequent instability. The factors to be addressed in such analyses include, but are not limited to: Expected flow velocities (especially in constricted areas); expected wind and wave action; ice loading; impact of debris; slope protection techniques; duration of flooding at various stages and velocities; embankment and foundation materials; levee alignment, bends, and transitions; and levee side slopes.

(4) *Embankment and foundation stability.* Engineering analyses that evaluate levee embankment stability must be submitted. The analyses provided shall evaluate expected seepage during loading conditions associated with the base flood and shall demonstrate that seepage into or through the levee foundation and embankment will not jeopardize embankment or foundation stability. An alternative analysis demonstrating that the levee is designed and constructed for stability against loading conditions for Case IV as defined in the U.S. Army Corps of Engineers (COE) manual, "Design and Construction of Levees" (EM 1110–2–1913, Chapter 6, Section II), may be used. The factors that shall be addressed in the analyses include: Depth of flooding, duration of flooding, embankment geometry and length of seepage path at critical locations, embankment and foundation materials, embankment compaction, penetrations, other design factors affecting seepage (such as drainage layers), and other design factors affecting embankment and foundation stability (such as berms).

(5) *Settlement.* Engineering analyses must be submitted that assess the potential and magnitude of future losses of freeboard as a result of levee settlement and demonstrate that freeboard will be maintained within the minimum standards set forth in paragraph (b)(1) of this section. This analysis must address embankment loads, compressibility of embankment soils, compressibility of foundation soils, age of the levee system, and construction compaction methods. In addition, detailed settlement analysis using procedures such as those described in the COE manual, "Soil Mechanics Design—Settlement Analysis" (EM 1100–2–1904) must be submitted.

(6) *Interior drainage.* An analysis must be submitted that identifies the source(s) of such flooding, the extent of the flooded area, and, if the average depth is greater than one foot, the water-surface elevation(s) of the base

Copyright National Academy of Sciences. All rights reserved.

flood. This analysis must be based on the joint probability of interior and exterior flooding and the capacity of facilities (such as drainage lines and pumps) for evacuating interior floodwaters.

(7) *Other design criteria*. In unique situations, such as those where the levee system has relatively high vulnerability, FEMA may require that other design criteria and analyses be submitted to show that the levees provide adequate protection. In such situations, sound engineering practice will be the standard on which FEMA will base its determinations. FEMA will also provide the rationale for requiring this additional information.

(c) *Operation plans and criteria*. For a levee system to be recognized, the operational criteria must be as described below. All closure devices or mechanical systems for internal drainage, whether manual or automatic, must be operated in accordance with an officially adopted operation manual, a copy of which must be provided to FEMA by the operator when levee or drainage system recognition is being sought or when the manual for a previously recognized system is revised in any manner. All operations must be under the jurisdiction of a Federal or State agency, an agency created by Federal or State law, or an agency of a community participating in the NFIP.

(1) *Closures*. Operation plans for closures must include the following:

(i) Documentation of the flood warning system, under the jurisdiction of Federal, State, or community officials, that will be used to trigger emergency operation activities and demonstration that sufficient flood warning time exists for the completed operation of all closure structures, including necessary sealing, before floodwaters reach the base of the closure.

(ii) A formal plan of operation including specific actions and assignments of responsibility by individual name or title.

(iii) Provisions for periodic operation, at not less than one-year intervals, of the closure structure for testing and training purposes.

(2) *Interior drainage systems*. Interior drainage systems associated with levee systems usually include storage areas, gravity outlets, pumping stations, or a combination thereof. These drainage systems will be recognized by FEMA on NFIP maps for flood protection purposes only if the following minimum criteria are included in the operation plan:

(i) Documentation of the flood warning system, under the jurisdiction of Federal, State, or community officials, that will be used to trigger emergency operation activities and demonstration that sufficient flood warning time exists to permit activatizon of mechanized portions of the drainage system.

(ii) A formal plan of operation including specific actions and assignments of responsibility by individual name or title.

(iii) Provision for manual backup for the activation of automatic systems.

(iv) Provisions for periodic inspection of interior drainage systems and periodic operation of any mechanized portions for testing and training purposes. No more than one year shall elapse between either the inspections or the operations.

(3) *Other operation plans and criteria*. Other operating plans and criteria may be required by FEMA to ensure that adequate protection is provided in specific situations. In such cases, sound emergency management practice will be the standard upon which FEMA determinations will be based.

Copyright National Academy of Sciences. All rights reserved.

(d) *Maintenance plans and criteria.* For levee systems to be recognized as providing protection from the base flood, the maintenance criteria must be as described herein. Levee systems must be maintained in accordance with an officially adopted maintenance plan, and a copy of this plan must be provided to FEMA by the owner of the levee system when recognition is being sought or when the plan for a previously recognized system is revised in any manner. All maintenance activities must be under the jurisdiction of a Federal or State agency, an agency created by Federal or State law, or an agency of a community participating in the NFIP that must assume ultimate responsibility for maintenance. This plan must document the formal procedure that ensures that the stability, height, and overall integrity of the levee and its associated structures and systems are maintained. At a minimum, maintenance plans shall specify the maintenance activities to be performed, the frequency of their performance, and the person by name or title responsible for their performance.

(e) *Certification requirements.* Data submitted to support that a given levee system complies with the structural requirements set forth in paragraphs (b)(1) through (7) of this section must be certified by a registered professional engineer. Also, certified as-built plans of the levee must be submitted. Certifications are subject to the definition given at §65.2 of this subchapter. In lieu of these structural requirements, a Federal agency with responsibility for levee design may certify that the levee has been adequately designed and constructed to provide protection against the base flood.

[51 FR 30316, Aug. 25, 1986]

Copyright National Academy of Sciences. All rights reserved.

# Appendix B

# Biographical Information, Committee on Levees and the National Flood Insurance Program: Improving Policies and Practices

**Gerald E. Galloway, Jr. (NAE),** *Chair*, is the Glenn L. Martin Institute Professor of Engineering in the Department of Civil and Environmental Engineering, and an affiliate professor of public policy, at the University of Maryland. Dr. Galloway is a civil engineer, geographer, and public administrator whose research and interests focus on U.S. national water policy, in general, and national floodplain management policy, in particular. Dr. Galloway had a 38-year military career that included positions of commander of the U.S. Army Corps of Engineers District in Vicksburg, Mississippi, and professor and founding head of the Department of Geography and Environmental Engineering at the U.S. Military Academy at West Point. Dr. Galloway was promoted to brigadier general in 1990 and retired from active duty in 1995. He has served on several national and state committees that have reviewed levee and dam safety issues and concerns, including some panels supported by the Federal Emergency Management Agency. He received his B.S. degree (civil engineering) from the U.S. Military Academy, his M.S.E. degree (civil engineering) from Princeton University, and his Ph.D. degree (geography) from the University of North Carolina.

**Patrick L. Brockett** is director of the Risk Management and Insurance Program and holds the Gus S. Wortham Memorial Chair in Risk Management and Insurance at the University of Texas. Dr. Brockett teaches courses and conducts research in a variety of fields including risk management and insurance; financial risk; actuarial science; decision analysis; management science/operations management and research; statistical analysis and business applications, and information theory. Dr. Brockett is the winner of the 2011 "Excellence in Teaching Award" given by the American Risk and Insurance Association. He was elected as a fellow of the Institute for Risk Management (2008), and is a fellow of the American Association for the Advancement of Science, the American Statistical Association, and the Institute of Mathematical Statistics. He also is an elected member of the International Statistical Institute. In 2006, he received the American Risk and Insurance Association Outstanding Achievement Award for furthering the science of risk management through the promotion of education, research, and communication. He served for 9 years as editor of *The Journal of Risk and Insurance*, the premier academic journal in risk management and insurance. Dr. Brockett was a member of the National Research Council Board on Mathematical Sciences and their Applications from 2005 to 2008. Dr. Brockett received his B.S. degree in mathematics from the California State University in Long Beach, and his M.S. and Ph.D. degrees in mathematics from the University of California, Irvine.

**Susan L. Cutter** is a Carolina Distinguished Professor of Geography at the University of South Carolina where she directs the Hazards and Vulnerability Research Institute. Her research interests are in disaster vulnerability/resilience science—what makes people and the places where they live vulnerable to extreme events and how vulnerability and resilience are measured, monitored, and assessed. She led a Hurricane Katrina post-event field



Copyright National Academy of Sciences. All rights reserved.

team to examine the geographic extent of storm surge inundation along the Mississippi and Alabama coastline and its relationship to the social vulnerability of communities. She also provided testimony to Congress on hazards and vulnerability and was a member of the Corps of Engineers Interagency Performance Evaluation Task Force team evaluating the social impacts of the New Orleans and Southeast Louisiana Hurricane Protection System in response to Hurricane Katrina. Dr. Cutter serves on many national advisory boards and committees, including those of National Research Council, the American Association for the Advancement of Science, the National Science Foundation, and the Heinz III Center for Science, Economics, and the Environment. She was a founding member of the Executive Committee of the National Consortium for the Study of Terrorism and Responses to Terrorism (START, a Department of Homeland Security Center of Excellence focused on social and behavioral sciences). Dr. Cutter also holds the MunichRe Foundation Chair (2009-2012) on Social Vulnerability through the United Nations University–Institute for Environment and Human Security, in Bonn, Germany Dr. Cutter received her B.S. degree from the California State University and her M.S. and Ph.D. degrees from the University of Chicago.

**David T. Ford** is president of David Ford Consulting Engineers in Sacramento, California, a firm that specializes in flood and floodplain management. He is an internationally recognized expert in hydrologic engineering, flood risk analysis, and water resources planning and management. He has 40 years of project experience, including 22 as president of David Ford Consulting Engineers, Inc., and 12 as a senior hydraulic engineer at the U.S. Army Corps of Engineers' Hydrologic Engineering Center. He has served as a consultant to federal, state, and local water management agencies and to engineering firms worldwide. Dr. Ford has written and/or revised, in whole or in part, much Corps of Engineers guidance, including the Engineer Manual (EM) on risk-based analysis for flood risk management studies, the EM on hydrologic engineering requirements for flood risk studies, and the EM on hydrologic analysis of interior areas. He also has prior National Research Council committee experience, most recently with the Water Science and Technology Board Committee on Hydrologic Science. Ford has served on the faculty of the University of California and California State University. He received his B.S., M.S., and Ph.D. degrees in civil engineering from the University of Texas. Dr. Ford is a registered professional engineer in 15 states of the United States.

**Clive Q. Goodwin is** assistant vice president and manager, natural hazard peril underwriting, for FM Global Insurance Company, located in Johnston, Rhode Island. In this position, Goodwin manages worldwide underwriting of wind, flood, and collapse perils. This involves developing and maintaining strategies to capitalize on FM Global's engineering knowledge of these hazards to benefit clients in terms of risk improvement and insurance terms and conditions. Recently, Goodwin has been the leader of FM Global's efforts to collaborate with the U.S. Army Corps of Engineers, Federal Emergency Management Agency, and other agencies to highlight the concerns regarding the aging inventory of levees while supporting their efforts to change U.S. national policy concerning the levee risk. Goodwin holds a B.S. in mechanical engineering and metallurgy from the University of Manchester, Manchester, UK, and received a certified diploma in accounting and finance. Additionally, he is a chartered engineer and a member of the Institution of Mechanical Engineers and has served on the Industry Leaders Council of the American Society of Civil Engineers.

**Karin M. Jacoby** is president of Spica Consulting, LLC, a firm she founded in 2009 focused on reducing flood risk through strategic solutions that incorporate economic, human, and environmental considerations. She has more than 25 years of experience in water resources management, much of that in planning, design, and implementation of drainage, stormwater, and flood damage reduction projects and policies. Prior to that she established the Waterways Division at the City of Kansas City, Missouri; as an assistant city engineer/division manager, she provided oversight for a $600 million waterways program. Jacoby has served as the executive director of the Missouri and Associated Rivers Coalition (MOARC) since 2001, a long-standing regional nonprofit focused on beneficial management of water and related land resources. She is an active member of the National Waterways Conference, serving on its Legislative and Policy Committee. In 2008, the Assistant Secretary of the Army (Civil Works) appointed her to the congressionally authorized National Committee on Levee Safety. Jacoby received her B.S. degree in civil engineering from the University of Missouri at Rolla, her M.P.A. and J.D. degrees from the University of Missouri at Kansas City, and is a registered engineer and licensed attorney.

Copyright National Academy of Sciences. All rights reserved.

**David I. Maurstad** is a director and senior vice president with Optimal Solutions and Technologies, Inc., a provider of management consulting, integrated information technology, engineering services, and business process outsourcing in Washington, DC. Mr. Maurstad previously served as director of water policy and planning for a nationally recognized engineering firm specializing in flood mapping and floodplain management. He has more than 30 years of leadership experience with both the private insurance industry and federal, state, and local governments. Mr. Maurstad served as assistant administrator for the U.S. Department of Homeland Security Federal Emergency Management Agency (FEMA). In June 2004, he was appointed by President George W. Bush to provide leadership for some of the nation's leading multihazard risk reduction programs. In this role, he was the federal insurance administrator charged with the overall management of FEMA's National Flood Insurance Program. He previously served as the director of FEMA Region VIII from 2001 to 2004 coordinating federal, state, tribal, and local management of emergencies through planning, preparedness, mitigation, response, and recovery. A native Nebraskan, he served as Mayor of Beatrice, State Senator, and Lieutenant Governor. He received his B.S. degree in business administration and his M.B.A. degree from the University of Nebraska.

**Martin W. McCann** is president of Jack R. Benjamin and Associates, Inc., in Menlo Park, California. Dr. McCann also serves as a consulting professor of civil and environmental engineering at Stanford University. At Stanford, he is the former chairman of the National Performance of Dams Program, which he founded and which has created a national network to report dam safety incidents and archive this information for wide use by the geotechnical and seismic engineering communities. Dr. McCann's professional background and research have focused on probabilistic hazards analysis, including hydrologic events, risk assessment, reliability and uncertainty analysis, and systems analysis. Dr. McCann has served as a consultant to several government and private-sector groups in the United States and abroad. He currently also is serving as a member of the National Research Council Committee on Integrating Dam and Levee Safety and Community Resilience. Dr. McCann received his B.S. degree from Villanova University and his M.S. and Ph.D. degrees from Stanford University.

**Andre D. McDonald** is founder and president of Fort Bend Flood Management Association in Fort Bend County, Texas, a group of 17 flood management agencies and the consultants that service that industry. He has served as an appointed board member of Fort Bend County Levee Improvement District since 2000, and been president of that board since 2004. He has an extensive background in construction, primarily with management and operation of heavy civil construction engineering companies. His more than 30 years of experience include the day-to-day management with full profit and loss responsibilities of a heavy civil contracting company. The company was involved with direct construction and commissioning of underground utilities distribution and collection systems, earthwork, paving, and related infrastructure and other intraurban development. He has been part of the management and direct field operations of airport construction, mass earthworks, industrial plant construction, wastewater treatment plant construction, modernization of oil refineries and grassroots LNG facilities. Mr. McDonald studied engineering and business administration at Mississippi State University.

**Earthea A. Nance** is an assistant professor in the Department of Planning and Urban Studies at the University of New Orleans. Dr. Nance has over 18 years of experience in the areas of environmental planning and management, hazard mitigation, sustainable urban development, environmental remediation, water, wastewater, hazardous waste, and alternative energy. After Hurricane Katrina, Dr. Nance served as a Ford Foundation loaned-executive to the City of New Orleans, where she directed the city's hazard mitigation, environmental, and alternative energy divisions and authored the city's sustainability strategy. She is a consultant to the RAND Corporation on policy adaptation to climate change in New Orleans and advises the U.S. Environmental Protection Agency Science Advisory Board as a member of its environmental engineering committee. She also serves as a consultant to local environmental groups trying to understand the impacts of the Deepwater Horizon oil spill. Her research has examined the impacts of disasters on social and ecological diversity, the development of executive education in resilience and risk management, community-based environmental monitoring in Gulf Coast communities, and participatory water and sanitation systems in developing countries. Dr. Nance received her B.S. and M.S. degrees in civil and environmental engineering from the University of California at Davis and her Ph.D. degree in civil and environmental engineering from Stanford University.

Copyright National Academy of Sciences. All rights reserved.

**Kenneth W. Potter** is a professor in the Department of Civil and Environmental Engineering at the University of Wisconsin. Dr. Potter's areas of research include estimation of hydrologic risk, especially flood risk; adaptation of hydrologic design to climate change; assessment and mitigation of human impacts on aquatic systems; and restoration of aquatic systems. Dr. Potter is a fellow of the American Association for the Advancement of Science , a fellow of the American Geophysical Union, and a Woodrow Wilson fellow. He has extensive National Research Council (NRC) committee experience, as well. He is a former member of the Water Science and Technology Board, chaired the NRC Committee on American River Flood Frequencies and the NRC Committee on Integrated Observations for Hydrologic and Related Sciences, served as vice chair of the NRC Committee on Flood Control Alternatives in the American River Basin and, most recently, served on the NRC Committee on the New Orleans Regional Hurricane Protection Projects. Dr. Potter received his B.S. degree in geology from Louisiana State University and his Ph.D. degree in geography and environmental engineering from Johns Hopkins University.

**J. David Rogers** holds the Karl F. Hasselmann Chair in Geological Engineering at the Missouri University of Science & Technology in Rolla, Missouri. Dr. Rogers has extensive experience in evaluating the stability of natural slopes, embankments, stream channels, highways, and hydraulic structures. He has served as principal investigator for research funded by the National Science Foundation (NSF), U.S. Geological Survey (USGS), National Geospatial Intelligence Agency, Federal Highway Administration, Department of Defense, and several state departments of transportation. Dr. Rogers has served on numerous panels, including the Mississippi Delta Science & Engineering Special Team, the Coastal Louisiana Recovery Panel, the NSF Independent Levee Investigation Team and USGS Investigation Teams evaluating the impacts of Hurricanes Katrina and Rita, the NSF team evaluating the 2008 and 2011 Mississippi River floods, and the Resilient and Sustainable Infrastructure Networks team funded by NSF to make a 5-year examination of the California Bay Delta flood protection systems. Recently, he has also been working on development of computerized algorithms for regional landslide hazard mapping using geographic information systems in the United States, Africa, Asia, and the Hundu-Kush regions. Dr. Rogers received his B.S. degree in geology from Cal Poly Pomona, and his M.S. degree in civil engineering and his Ph.D. in geological and geotechnical engineering from the University of California, Berkeley. He served on the Berkeley faculty for 7 years prior to accepting his current position in 2001.

## STAFF

**Laura J. Helsabeck** is a senior staff officer with the National Research Council's Water Science and Technology Board. Her interests include the use of scientific information to enhance water policy and management decisions pertaining to water quality and quantity. Since joining the National Research Council, she has served as the study director for a variety of studies including Sustainable Management in California's Bay Delta, Challenges and Opportunities in the Hydrologic Sciences, and Global Change and Extreme Hydrology: Testing Conventional Wisdom. Dr. Helsabeck received her B.A. from Clemson University, her M.S. from Vanderbilt University, and Ph.D. from The Ohio State University in environmental chemistry. Her dissertation work, Ibuprofen photolysis: Reaction kinetics, chemical mechanism, and byproduct analysis, was awarded the Ellen C. Gonter Environmental Chemistry Award by the American Chemical Society.

**Michael J. Stoever** is a research associate with the National Research Council's Water Science and Technology Board. He has worked on a number of studies including Desalination: A National Perspective, the Water Implications of Biofuels Production in the United States, and the Louisiana Coastal Protection and Restoration Program. He has also worked on NRC studies on the implementation progress of the Comprehensive Everglades Restoration Plan, the effect of water withdrawals on the St. Johns River, and achieving nutrient and sediment reduction goals in the Chesapeake Bay. Mr. Stoever received his B.A. in political science from the Richard Stockton College of New Jersey in Pomona.

Copyright National Academy of Sciences. All rights reserved.

# Appendix C

# Glossary of Terms

**100-year flood:** See one percent annual chance flood.

**Accreditation and accredited levee system:** A levee system for which evidence has been provided to the Federal Emergency Management Agency (FEMA) that demonstrates adequate design (i.e., certification), operation, and maintenance systems are in place to provide reasonable assurance that protection from the one percent annual chance flood exists. Design criteria, operation plans and criteria, and maintenance plans and criteria are discussed in the Title 44, Section 65.10, of the *Code of Federal Regulations* (44 CFR §65.10). See Appendix G.

**Aleatory uncertainty:** A type of irreducible uncertainty attributed to the inherent randomness of events in nature.

**Base flood:** See one percent annual chance flood.

**Breach:** Formation of a gap in the levee system through which water may flow uncontrolled onto the adjacent floodplain. A breach in the levee system may occur prior to or subsequent to overtopping.

**Certification and certified levee system:** A technical evaluation by a certificated professional engineer or federal agency provided to FEMA that demonstrates that the levee system meets the requirements of 44 CFR §65.10 to reduce risk from at least the one percent annual chance flood.

**Digital Flood Insurance Rate Map (DFIRM):** A Flood Insurance Rate Map that has been made available digitally.

**Efficacy:** The capacity or power for producing a desired outcome or effect.

**Epistemic uncertainty:** A type of uncertainty attributed to the lack of understanding about a physical process or system that must be modeled, referred to as knowledge-based uncertainty.

**Executive Order 11988:** Codified in 1977, the order requires federal agencies to "avoid to the extent possible the long and short term adverse impacts associated with the occupancy and modification of floodplains and to avoid direct or indirect support of floodplain developments wherever there is a practicable alternative." It required each agency to "provide leadership and take action to reduce the risk of flood loss, to minimize the impacts of floods on human safety, health, and welfare, and to restore and preserve the natural and beneficial values served by floodplains in carrying out its responsibilities."



Copyright National Academy of Sciences. All rights reserved.

**FEMA Procedure Memorandum 34, Interim Guidance for Studies Including Levees:** Provides FEMA staff, contactors, and mapping partners with guidance for the evaluation and mapping of levees and levee-affected areas as part of the FEMA Flood Map Modernization effort. See Appendix G.

**FEMA Procedure Memorandum 43, Guidelines for Identifying Provisionally Accredited Levees (PALs):** Provides a 2-year period for affected levee owners to complete those actions necessary to retain their accreditation. See Appendix G.

**FEMA Procedure Memorandum 53, Guidelines for Notification and Mapping of Expiring Provisionally Accredited Levee (PAL) Designation**: Provides guidance to FEMA field units regarding the steps that are to be taken if the required improvements to PALs have not been accomplished in the requisite 24-month period. See Appendix G.

**Flood Hazard Boundary Map (FHBM):** As defined by 44 CFR §59.1: "An official map of a community, issued by the Federal Insurance Administrator, where the boundaries of the flood, mudslide (i.e., mudflow) related erosion areas having special hazards have been designated as Zones A, M, and/or E."

**Flood Insurance Rate Map (FIRM):** As defined by 44 CFR §59.1: "An official map of a community, on which the Federal Insurance Administrator has delineated both the special hazard areas and the risk premium zones applicable to the community."

**Flood insurance study (FIS):** As defined by 44 CFR §59.1, (denoted as a flood elevation study therein): "an examination, evaluation, and determination of flood hazards and, if appropriate, corresponding water surface elevations, or an examination, evaluation and determination of mudslide (i.e., mudflow) and/or flood related erosion hazards."

**Flood or flooding:** As defined by 44 CFR §59.1, flooding is:

(a) A general and temporary condition of partial or complete inundation of normally dry land areas from:

(1) The overflow of inland or tidal waters.

(2) The unusual and rapid accumulation or runoff of surface waters from any source.

(3) Mudslides (i.e., mudflows) which are proximately caused by flooding as defined in paragraph (a)(2) of this definition and are akin to a river of liquid and flowing mud on the surfaces of normally dry land areas, as when earth is carried by a current of water and deposited along the path of the current.

(b) The collapse or subsidence of land along the shore of a lake or other body of water as a result of erosion or undermining caused by waves or currents of water exceeding anticipated cyclical levels or suddenly caused by an unusually high water level in a natural body of water, accompanied by a severe storm, or by an unanticipated force of nature, such as flash flood or an abnormal tidal surge, or by some similarly unusual and unforeseeable event which results in flooding as defined in paragraph (a)(1) of this definition."

**Flood risk analysis:** A subset of a risk analysis, a flood risk analysis is an analytical process that provides information about or quantifies probabilities and consequences of a flood event.[1]

**Flood risk management:** Comprehensive efforts to *continuously carry out analyses, assessments, and related activities to reduce flood risk.*

**Flood risk reduction:** As defined by FEMA,[2] "The goal of flood risk reduction is to reduce the risk to life and property, which includes existing structures and future construction, in the pre- and post-disaster environments. This is achieved through regulations, local ordinances, land use and building practices, and mitigation projects that reduce or eliminate long-term risk from flood hazards and their effects."

**Flood zone:** A geographic area defined by FEMA according to risk and designated by a community's FIRM.

**Floodplain:** As defined in 44 CFR §59.1 (also denoted as flood-prone area therein): "Any land area susceptible to being inundated by water from any source."

[1] Modified from NRC (2010)
[2] See http://www.fema.gov/what-mitigation#4.

Copyright National Academy of Sciences. All rights reserved.

**Freeboard:** As defined in 44 CFR §59.1, freeboard means "a factor of safety usually expressed in feet above a flood level for purposes of floodplain management. 'Freeboard' tends to compensate for the many unknown factors that could contribute to flood heights greater than the height calculated for a selected size flood and floodway conditions, such as wave action, bridge openings, and the hydrological effect of urbanization of the watershed."

**Hazard mitigation:** see Flood risk mitigation

**Interior drainage:** The drainage that is required to evacuate rainwater from areas behind levees. During periods when rivers are high on the levee, any accumulating rainfall must be pumped out of the leveed area or the area becomes subject to flooding.

**Levee:** As defined in 44 CFR §59.1: "A levee is a man-made structure, usually an earthen embankment, designed and constructed to contain, control, or divert the flow of water so as to provide protection from temporary flooding."

**Levee Analysis and Mapping Procedure (LAMP):** A new approach to provide a more precise assessment of flood risk in areas impacted by levees. Developed and circulated for public comment in early 2012, the LAMP was designed to be implementable without statutory or regulatory changes.

**Levee failure:** Poor performance of a levee through a variety of occurrences including breach before or after overtopping and malfunction of system components (e.g., gates, pumping plants, or floodwalls).

**Levee fragility curves:** As defined in Schultz et al. (2010), levee fragility curves are intended to be "functions that describe the conditional probability of system failure over the full range of loads to which that system might be exposed."

**Levee reach:** As defined in USACE (2010a): "A levee reach is a portion of a levee system (usually a length of a levee) that may be considered as a unit taken for analysis purposes to have approximately uniform representative properties. A levee reach will be the unique entity having properties different than other reaches of the levee system that may be used to evaluate the performance of a portion of the levee system. No maximum length is associated with a reach."

**Levee segment:** A levee segment is a discrete portion of a levee system that is operated and maintained by a single entity. A levee segment may comprise one or more levee features.

**Levee system:** As defined in 44 CFR §59.1, a levee system is: "a flood protection system which consists of a levee, or levees, and associated structures, such as closure and drainage devices, which are constructed and operated in accordance with sound engineering practices."

**Leveed area**: The lands from which floodwater is excluded by the levee system.

**Level of protection:** Normally seen as the flood recurrence interval against which a specific structure is designed to withstand.

**Mitigation (structural and nonstructural):** As defined by the U.S. Army Corps of Engineers (USACE, n.d.): "Structural measures such as dams, levees, and floodwalls alter the characteristics of the flood and reduce the probability of flooding in the location of interest. Nonstructural measures alter the impact or consequences of flooding and have little to no impact on the characteristics of the flood."

**One percent annual chance flood:** A term commonly used to describe a hydrologic event that has in any year a 1 in 100 chance of being equaled or exceeded.

**Overtopping:** The condition that occurs when floodwaters reach the crest of the levee and exceed its height. Overtopping might or might not be in conjunction with levee failure.

**Practices:** Methods or techniques used to implement policies.

**Policies:** Rule or principle used to guide decision making, typically defined in guidance documents.

Copyright National Academy of Sciences. All rights reserved.

**Residual risk:** The risk that remains after considering the mitigating effects of structural, nonstructural, and other risk reduction measures is known as residual risk. Residual risk is always present behind a levee, because no levee is failsafe.

**Risk:** The potential for adverse effects from the occurrence of a particular hazardous event, which is derived from the probable combination of physical hazards (physical characteristics), the exposure and vulnerabilities of people and property subject to danger or damage from the hazard, and the consequences (impact or damage) caused by the hazard. In insurance nomenclature, risk is the term used to designate the loss consequence of the realization of the uncertain peril, and it may be financial or nonfinancial in nature (e.g., reputational loss). The causes of loss are called a peril, and a condition or situation that increases either the likelihood or severity of the peril occurring is called a hazard.

**Risk analysis:** A detailed examination to understand the nature of adverse consequences from a particular event to human life, property, or the environmental; an analytical process that provides information about or quantifies probabilities and consequences of an unwanted event. Often, broad definitions of risk analysis include examination of risk communication, risk perception, and risk management alternatives.[3]

**Severe repetitive loss properties:** Section 1361A of the National Flood Insurance Act, as amended, 42 U.S.C. 4102a, defines it as a residential property that is covered under an NFIP insurance policy and has at least four claim payments and for which two of these payments in total have exceeded the market value of the property.

**Special Flood Hazard Area (SFHA):** As defined in 44 CFR §59.1 (denoted as an area of special flood hazard therein), the SFHA is: "the land in the flood plain within a community subject to a 1 percent or greater chance of flooding in any given year."

**Standard project flood:** The standard project flood is a derived discharge estimate that represents a flood that can be expected from the combination of the most severe meteorologic and hydrologic condition that are considered reasonable characteristic of a region (USACE, 1965).

**Tolerable risk guidelines:** As defined in USACE (2010b), tolerable risk guidelines "categorize the nature of risks in ways that can assist in assessing their acceptability or nonacceptability, and in prioritizing actions for reducing risks."

**Uncertainty:** As discussed in NRC (2010), uncertainty is "always present in our ability to predict what might occur in the future, and is present as well in our ability to reconstruct and understand what has happened in the past. This uncertainty arises from missing or incomplete observations and data; imperfect understanding of the physical and behavioral processes that determine the response of natural and built environments and the people within them; and our inability to synthesize data and knowledge into working models able to provide predictions where and when we need them."

**Vulnerability:** As defined in NRC (2012), vulnerability is "the potential for harm to the community and relates to physical assets (building design and strength), social capital (community structure, trust, and family networks), and political access (ability to get government help and affect policies and decisions). Vulnerability also refers to how sensitive a population may be to a hazard or to disruptions caused by the hazard."

## REFERENCES

NRC (National Research Council). 2010. Review of the Department of Homeland Security's Approach to Risk Analysis Washington, DC: The National Academies Press.

NRC. 2012. Disaster Resilience: A National Imperative. Washington, DC: The National Academies Press.

Schultz, M. T., B. P. Gouldby, J. D. Simm, and J. L. Wibowo. 2010. Beyond the Factor of Safety: Developing Fragility Curves to Characterize System Reliability. Washington, DC: U.S. Army Corps of Engineers.

[3] Modified from NRC (2010).

Copyright National Academy of Sciences. All rights reserved.

USACE (U.S. Army Corps of Engineers). 1965. Standard Project Flood Determinations, EM 110-2-14-11. Washington, DC: USACE.

USACE. 2010a. USACE Process for the National Flood Insurance Program (NFIP) Levee System Evaluation. Available online at http://publications.usace.army.mil/publications/eng-circulars/EC_1110-2-6067.pdf. Accessed November 27, 2012.

USACE. 2010b. Proceedings of the Workshop Exploration of Tolerable Risk Guidelines for the USACE Levee Safety Program. Report 10-R-9. Washington, DC: USACE.

USACE. n.d. National Nonstructural Flood Proofing Committee. Available online at http://www.usace.army.mil/Missions/CivilWorks/ProjectPlanning/nfpc.aspx. Accessed November 15, 2012.

Copyright National Academy of Sciences. All rights reserved.

Copyright National Academy of Sciences. All rights reserved.

# Appendix D

# Contributors to the Report, Levees and the National Flood Insurance Program: Improving Policies and Practices

During the course of this study, numerous persons contributed to the development of this report. Some provided material and talks at the request of the committee, some provided unsolicited material, and others provided advice for the committee to consider. The committee would like to thank all of these persons for their interest and support for this effort.

Ray Alexander, Deputy Chief, Office of Homeland Security, U.S. Army Corps of Engineers (USACE)
Bryan Baker, Technical Project Manager, USACE
Mark Baker, Civil Engineer, U.S. National Parks Service
David N. Bascom, Program Specialist, Federal Emergency Management Agency (FEMA)
Perry Beider, Senior Advisor, Congressional Budget Office
Douglas A. Bellomo, Risk Analysis Division Director, FEMA
Michael Bishop, Contractor Lead, Midterm Levee inventory, Michael Baker Corporation William R. Blanton, Jr., Engineering Management Branch Chief, FEMA
Samuel D. Brody, Professor, Texas A&M University, College Station
Kelly Bronowicz, Program Manager, FEMA
Pernille Buch-Pedersen, Program Manager, Michael Baker Corporation
Michael K. Buckley, Vice President for Strategic Initiatives of Management and Consulting Services, Dewberry
Jae-won Chung, Postdoctoral Scholar, Missouri University of Science and Technology
Roger Churchwell, Director of Engineering, San Joaquin Area Flood Control Agency (SJAFCA)
Tammy L. Conforti, Levee Safety Program Manager, HQ, USACE
Dan Delich. National Levee Issues Alliance
Susan Dell'Osso, Project Director, Cambay Group
Siamak Esfandiary, Program Specialist, FEMA
G. Michael Fitzgerald, Galveston County Engineer, Galveston County, Texas
Steve Fitzgerald, Chief Engineer, Harris County Flood Control District
Greg Frank, Vice President, Costello, Inc.
Christopher Gallion, Superintendent, Velasco Drainage District
Sharmae Gambrel, Compliance Review Examiner, Federal Deposit Insurance Corporation (FDIC)
David Greenwood, Vice President, Michael Baker Corporation



Copyright National Academy of Sciences. All rights reserved.

Colonel Christopher Hall, St. Louis District Commander, USACE
Eric Halpin, Special Assistant for Dam and Levee Safety, USACE
Les Harder, Water Resources Technical Advisor, HDR, Inc.
Steve Hazelwood, Director, Dow Chemical Company
Noller Herbert, Conservation Engineering Division Director, Natural Resources Conservation Service (NCRS)
Claudia Hoeft, National Hydraulic Engineer, NCRS
Robert Howell, Engineering Practice Manager, USACE
Paul Huang, Mitigation Directorate Branch Chief, FEMA
Ryan Janda, Program Lead for Flood Mitigation Assistance (FMA), Severe Repetitive Loss (SRL), and Repetitive Flood Claims (RFC) programs, FEMA
Jeffrey Janecek, Assistant Engineer, Fort Bend County Drainage District
R. Donald Janssen, Senior Vice President, Planned Community Developers
Jill A. Jordan, Assistant City Manager, City of Dallas, Texas
Michael Jordan, Civil Engineer, USACE
Jim Keith, Program Analyst, U.S. Bureau of Reclamation
George Kidwell, Chairman, Velasco Drainage District
Sandra K. Knight, Deputy Federal Insurance and Mitigation Administrator for Mitigation, FEMA
Richard W. Krimm, former Associate Director, FEMA
Brian G. Koper, Civil Associate, Michael Baker Jr., Inc.
Christina Kuo, Senior Engineer, California Department of Water Resources
Kent Lang, Director, West Sacramento Area Flood Control Agency
Larry A. Larson, Director Emeritus, Association of State Floodplain Managers
Donna Lee, Technical Specialist, David Ford Consulting Engineers, Inc.
Scott Leimer, Galveston District Levee Safety Program Manager, USACE
Maria Lorenzo-Lee, Senior Engineer, California Department of Water Resources
Guy Lowes, Senior Civil Engineer, FEMA
Jay R. Lund, Director, Center for Watershed Sciences, University of California, Davis
Tim Mantz, Chief, Business Analysis Branch, FEMA
Rod Mayer, Assistant Deputy Director for FloodSAFE, California Department of Water Resources
Dave McMurray, Chairman, Upper Mississippi, Illinois, Missouri Rivers Association (UMIMRA)
Craig McRaney, Levee Safety Program Manager, Vicksburg District, USACE
Erwann Michel-Kerjan, Wharton Risk Center, Wharton School, University of Pennsylvania
Melissa Mullen, Acting Levee Safety Program Manager, Mississippi Valley Division, USACE
Corise Morrison, Executive Director, USAA
Jeffrey F. Mount, Professor, University of California, Davis
Don Natolli, Sacramento County Supervisor, Sacramento County, California
D. Andrew Neal, Actuary, FEMA
Leiann Nelson, Senior Underwriter, Risk Management Agency, U.S. Department of Agriculture (USDA)
Linda Pilgrim, Office of Counsel, FEMA
Ricardo Pineda, Floodplain Risk Management Branch Chief, California Department of Water Resources
Richard G. Reinhardt, Principal, MBK Engineering
Rhonda Robins, Senior Technical Specialist, David Ford Consulting Engineers
Nicholas Pinter, Professor, Southern Illinois University
Robert Quint, Chief of Staff, U.S. Bureau of Reclamation
Kathleen Schafer, Engineer, FEMA
Scott L. Shapiro, Partner, Central Valley Flood Control Association
Jeff Sparrow, Assistant Vice President, Michael Baker Corporation
Dave Stearrett, Chief, Floodplain Management Branch, FEMA
Rune Storesund, Consulting Engineer, Storesund Consulting
Ronald Stork, Policy Director, Friends of the River

Copyright National Academy of Sciences. All rights reserved.

Nancy L. Ward, Regional Director, Region IX, FEMA
Timothy Washburn, Director of Planning, Sacramento Area Flood Control Agency
Douglas P. Whipple, Director, Organizational Effectiveness, Dow Chemical Company
Jeffrey Woodward, Senior Lender Compliance Officer, FEMA
Roy E. Wright, Deputy Director, Risk Analysis Division, FEMA

Copyright National Academy of Sciences. All rights reserved.

Copyright National Academy of Sciences. All rights reserved.

# Appendix E

# Flood Zone Designations

### Moderate to Low Risk Areas

In communities that participate in the NFIP, flood insurance is available to all property owners and renters in these zones:

| ZONE | DESCRIPTION |
|---|---|
| B and X (shaded) | Area of moderate flood hazard, usually the area between the limits of the 100-year and 500-year floods. Are also used to designate base floodplains of lesser hazards, such as areas protected by levees from 100-year flood, or shallow flooding areas with average depths of less than one foot or drainage areas less than 1 square mile. |
| C and X (unshaded) | Area of minimal flood hazard, usually depicted on FIRMs as above the 500-year flood level. |

**High Risk Areas**

In communities that participate in the NFIP, mandatory flood insurance purchase requirements apply to all of these zones:

| ZONE | DESCRIPTION |
|---|---|
| A | Areas with a 1% annual chance of flooding and a 26% chance of flooding over the life of a 30-year mortgage. Because detailed analyses are not performed for such areas; no depths or base flood elevations are shown within these zones. |
| AE | The base floodplain where base flood elevations are provided. AE Zones are now used on new format FIRMs instead of A1-A30 Zones. |
| A1-30 | hese are known as numbered A Zones (e.g., A7 or A14). This is the base floodplain where the FIRM shows a BFE (old format). |
| AH | reas with a 1% annual chance of shallow flooding, usually in the form of a pond, with an average depth ranging from 1 to 3 feet. These areas have a 26% chance of flooding over the life of a 30-year mortgage. Base flood elevations derived from detailed analyses are shown at selected intervals within these zones. |
| AO | River or stream flood hazard areas, and areas with a 1% or greater chance of shallow flooding each year, usually in the form of sheet flow, with an average depth ranging from 1 to 3 feet. These areas have a 26% chance of flooding over the life of a 30-year mortgage. Average flood depths derived from detailed analyses are shown within these zones. |

SOURCE: FEMA's Map Service Center, available online at https://msc.fema.gov/webapp/wcs/stores/servlet/info?storeId=10001&catalogId=10001&langId=-1&content=floodZones&title=FEMA%2520Flood%2520Zone%2520Designations [accessed August 6, 2012].



Copyright National Academy of Sciences. All rights reserved.

| | |
|---|---|
| AR | Areas with a temporarily increased flood risk due to the building or restoration of a flood control system (such as a levee or a dam). Mandatory flood insurance purchase requirements will apply, but rates will not exceed the rates for unnumbered A zones if the structure is built or restored in compliance with Zone AR floodplain management regulations. |
| A99 | Areas with a 1% annual chance of flooding that will be protected by a Federal flood control system where construction has reached specified legal requirements. No depths or base flood elevations are shown within these zones. |

**High Risk - Coastal Areas**

In communities that participate in the NFIP, mandatory flood insurance purchase requirements apply to all of these zones:

| ZONE | DESCRIPTION |
|---|---|
| V | Coastal areas with a 1% or greater chance of flooding and an additional hazard associated with storm waves. These areas have a 26% chance of flooding over the life of a 30-year mortgage. No base flood elevations are shown within these zones. |
| VE, V1 - 30 | Coastal areas with a 1% or greater chance of flooding and an additional hazard associated with storm waves. These areas have a 26% chance of flooding over the life of a 30-year mortgage. Base flood elevations derived from detailed analyses are shown at selected intervals within these zones. |

**Undetermined Risk Areas**

| ZONE | DESCRIPTION |
|---|---|
| D | Areas with possible but undetermined flood hazards. No flood hazard analysis has been conducted. Flood insurance rates are commensurate with the uncertainty of the flood risk. |

Copyright National Academy of Sciences. All rights reserved.

# Appendix F

# Levee-Related Observations, Conclusions, and Recommendations from Previous Reports

Throughout the preparation of this report, the committee came across many previously published reports on the topic of levees and the National Flood Insurance Program that were of use. The observations, conclusions, recommendations put forth by selected works are listed below, in chronological order.

### A Levee Policy for the National Flood Insurance Program (NRC, 1982)

Existing levees should be recognized for the purpose of reducing insurance rates where they provide protection against 25-year or larger floods and where they meet specified structural design criteria, including requisite freeboard.

New levees should be recognized for the purpose of reducing insurance rates where they provide protection against 100-year or larger floods and where they meet specified structural design criteria including, freeboard. A11 levees on which construction begins after a date to be determined by FEMA should be considered new levees.

All levees (existing and new) to be given credit for reducing flood risk in the NFIP must meet standard minimum engineering criteria with respect to geometric parameters, freeboard, soils and foundations, interior drainage, closure devices, and rights of way.

In its administration of design evaluations and construction conformance inspections, FEMA should first pursue the possibility of using the services of federal and state agencies having water resources experience. Where federal participation cannot be arranged, FEMA must use state and private sector capabilities.

Where responsible federal or state agencies have had continuous maintenance responsibilities on levees they designed and constructed, and will attest to their adequacy under FEMA standards, independent evaluations should not usually be required. Evaluations should be required, however, on levees that were designed and constructed by federal agencies but are currently being operated and maintained by others.

Where a federal or state agency does not evaluate a Levee, Levee evaluations should be done by "levee evaluation contractors" (LECs), private consulting firms designated by FEMA.



Copyright National Academy of Sciences. All rights reserved.

While FEMA should designate qualified private consulting firms to be LECs, the firms should work under contract to an applicant interested in having a levee evaluated for recognition by FEMA. All costs of the LECs work should be borne by the applicant.

Since recognition of 25-year levees for the purpose of reducing insurance rates would represent an important change in federal policy, FEMA should publicize the benefits, costs, and procedural details for levee recognition.

FEMA should inventory all levees previously credited as providing projection from the100-year flood, set priorities, and schedule communities for restudy to reevaluate the levees.

FEMA should develop a short and simple checklist that can be used to make a quick assessment of whether a levee meets recommended criteria.

FEMA should confirm its interim policy that does not recognize sand bags on top of levees and other types of human intervention, except for structural closures which are legitimate parts of planned levee systems, as augmenting levee systems design level of protection.

Federal Code 208.10, Title 33, "Local flood protection works; maintenance and operation of facilities should be modified where not well suited, supplemented for interior drainage, and adopted by FEMA as a guideline for operation and maintenance of levee systems.

A specific operation and maintenance plan, tailored to the loca1 needs, must be formally adopted by the levee owner for a levee to be credited and continue to be credited in the NFIP.

The operation and maintenance plan must, provide for periodic inspections. The plan should be completed within a designated time period, meet the requirements of, and be acceptable to FEMA. Each inspection must be by a professional engineer retained by the levee owner and registered in the state in which the levee is located. A written report to the levee owner should be promptly prepared and certified by the professional engineer making the inspection. The report must specifically describe items found deficient and emerging potential future problem areas. Copies of the certified report should be sent, by the certifying professional engineer to the regional FEMA office. Also, a copy should be provided theloca1 political entities which have responsibilities to FEMA for the levee-protected area. FEMA should follow up to assure corrections are made within a reasonable length of time. In instances where corrections are not made to critical deficiencies, FEI4A should withdraw recognition.

FEMA should require the elevation of new residential structures and the flood-proofing of other new buildings in all areas protected by levees unable to contain the 100-year flood.

FEMA should require purchase of flood insurance in all areas where the ground is lower than the unconfined 100-year flood level except where protected by a levee built to contain the 500-year flood.

Communities should regulate the placement of critical facilities (not regulated by some higher level of government) in all leveed areas in accordance with the procedures of Executive Order 11988.

Owners, tenants, and lenders occupying areas designated as protected by levees should be notified periodically by responsible local officials that their land in the levee protected area is still subject to flooding in the event of levee failure.

Local officials of any NFIP participating community protected by a levee, regardless of its size and reliability, should prepare and promulgate an action plan for warning and evacuation in the event of levee failure.

FEMA should help make local governments and special districts aware of the possibility of liability for actions or nonactions that aggravate flood hazards.

Copyright National Academy of Sciences. All rights reserved.

FEMA should, in appropriate cases, seek to recoup federal flood-related costs (including flood insurance payments, disaster assistance, etc.) from levee owners/operators when such costs arise from improper operation and maintenance of levee and associated interior drainage facilities.

Regardless of the level of protection provided, the levee-protected area should be disaggregated into flood risk zones and an actuarial rate be established for each zone that reflects the degree of protection actually provided by the levees.

Consistent with the design levels of protection recommended in Chapter 3, NFIP policyholders in areas behind existing 1evees that offer more than 25-year protection or new levees affording 100-year protection or greater should pay lower rates that reflect the reduced risk of property damage.

The levee flood risk zones should match the existing flood risk zones established for the regular Flood Insurance programs

FEMA should continue its efforts to establish an actuarial rate basis for the Flood insurance program and, as far as practical, convert its present rate schedule to actuarial rates. The actuarial rates as is done by the private insurance industry would be updated annually to reflect experience, claims paid, and the cost of doing business.

FEMA should contract for the development of a list of key categories concerning tire physical condition of a levee that would be used to evaluate the levee's ability to function effectively and concerning use of those factors to estimate geotechnical risk. An unsatisfactory rating would result in increased flood insurance premiums.

All levees, dikes, or floodwalls should be labeled as such on any new or revised FHBM. Also, the areas protected by levees providing100-year or greater protection should be delineated on the new or revised FHBMs as Zone LP. Areas protected by Levees not meeting this standard would continue to be mapped as Zone A.

The location of all levees, dikes, or floodwalls credited as providing 100-yearprotection or more should be clearly denoted on all future FIRMs.

Areas behind recognized 100-year levees that would be flooded (assuming no levee) by a 100-year flood should be designated as Zone ALP. Areas between the 100-year flood boundary and 500-year flood boundary should be designated as Zone BLP.

The locations of all credited levees, dikes, and floodwalls should be clearly denoted on all Floodway Maps. Areas behind credited levees providing 100-year protection that would be flooded during a 500 year flood should be shown on Floodway Maps.

FEMA should create an AL(No. ) Zone that would designate an area protected by a levee with a frequency of protection defined by the (No.). For example, if the levee had an elevation equal to the 4O-year flood (plus required freeboard), then the Zone would be Al(40).

FEMA should not make it a mandatory requirement to include evacuation routes on maps If the information is available when the maps are being prepared and if it makes sense from a community-to-community mapping standpoint, then the evacuation routes could be included on the maps. In other cases, it may be expeditious for communities to develop their own special evacuation route maps.

Interior drainage situations in areas on the landside of levees should be analyzed in conjunction with the riverine flood analysis, and the areas flooded by interior drainage should be shown on FEMA maps in accordance with current practice. Appropriate consideration should be given to correlation of the event on the river and the event causing the interior drainage problem.

Copyright National Academy of Sciences. All rights reserved.

**Assessing the Adequacy of the National Flood Insurance Program's One Percent Flood Standard 2006** (Galloway et al., 2006)

If implementation of the standard can be improved, FEMA should retain the one percent annual chance flood as the Federal standard for regulation of activity in the SFHA. The Nation needs to have a common standard for Federally imposed land use restrictions.

FEMA should take action to improve the implementation of the one percent standard for regulation of land use. Such actions as enhancement of public understanding of hazards, use of future-conditions hydrology to account for urbanization and climate change, reduction in floodway infringements, and greater attention to enforcement of existing NFIP provisions would greatly improve the effectiveness of NFIP related land use decisions.

States and their communities should exercise their responsibility to impose higher standards, where the health and safety of the population merits a higher standard for land use regulation. Concurrently, FEMA should examine the use of incentives, possibly through use of the Community Rating System (CRS), to reward States that exercise these responsibilities. Imposition of higher standards is well within the purview of the States and the communities that lie within the States and receive their land use authority from the States.

FEMA should seek legislative authority to require mandatory purchase of flood insurance by those living in the 0.2 percent floodplain if they hold a Federally insured mortgage or if they are to receive any disaster assistance from the Federal government in the case of a flood. The cost of this insurance should be determined actuarially, based on the reduced risk of living at a specific elevation within the 0.2 percent floodplain.

FEMA should not recognize levees under the NFIP unless they provide protection to the 0.2 percent (500-year flood) level. Levees in non urban areas should protect against the 1 percent or larger flood, depending on the economic costs and benefits of the levee.

FEMA should seek legislative authority to require mandatory purchase of flood insurance by those living behind accredited levees to address the residual risks they face and to ensure they are aware of this risk. Structures behind levees are subject to residual risks and should be insured against that risk.

FEMA should ensure that NFIP guidance and program activities clearly indicate that critical facilities should be located outside the 0.2 percent floodplain.

FEMA should improve the collection of policy and claims data, to assist in ongoing evaluation efforts, and should actively support Federal funding of efforts by NOAA to upgrade precipitation frequency estimates and flood data collection, and the U.S. Geological Survey (USGS) efforts to upgrade its stream gaging program. The accuracy of the Federal flood data is no better than the baseline information from which it is derived.

FEMA should ensure that consideration of natural and beneficial functions is fully integrated into all aspects of FEMA and NFIP actions influencing floodplain activity.

**GAO Hurricane Katrina: Strategic Planning Needed to Guide Future Enhancements Beyond Interim Levee Repairs** (GAO, 2006)

The Army Corps of Engineers should develop (1) a comprehensive strategy that includes an integrated approach for all projects and plans for rebuilding and strengthening the system and (2) an implementation plan that will achieve the specific level of protection in a cost-effective manner, within a reasonable time frame.

The Army Corps of Engineers should establish an evaluative organization like the Interagency Performance Evaluation Task Force, to assist in its efforts in developing a strategic plan, monitoring progress, and providing expert advice for constructing a stronger and well-integrated hurricane protection system.

Copyright National Academy of Sciences. All rights reserved.

**The National Levee Challenge; Levees and the FEMA Map Modernization Initiative – 2006 Interagency Committee** (FEMA, 2006)

FEMA should define a new flood insurance zone (Zone XL) for areas behind levees that provide 100-year protection and meet other requirements for inclusion in the NFIP and, in coordination with other agencies, identify the level of risk to those structures behind those levees. The XL zone would include those areas behind the levee that are subject to inundation by the 100-year flood in the without-levee condition. The area between the 100- and 500-year floodplain lines would be shown as a shaded X zone.

Levees would also be identified under a scientifically based levee risk classification system (e.g., high, medium, or low). This classification system would be based on several factors, including the following:

- Potential depth of flooding in the event of failure or overtopping,
- Type and density of development in protected areas behind the levee,
- Steps taken to ensure that levee failure does not occur during levee capacity exceedance (overtopping),
- Warning times,
- The number and types of egress so that people who may be inundated may move out of harm's way.

This levee risk classification would be designated on the Flood Insurance Rate Map (FIRM) and in the Flood Insurance Study report.

To ensure that levee systems maintain the conditions that qualified them for NFIP accreditation, FEMA should require as a condition of retaining FEMA recognition of levee status that sponsors:

- Conduct annual inspections of the levee system,
- Submit to FEMA biennially the results of the annual inspections, levee system operation and maintenance records, and an assessment of the levee system during any flood events that occurred within the reporting period,
- Submit to FEMA every 10 years a report, prepared by a registered Professional Engineer or Federal agency responsible for levee design, that recertifies the engineering and geotechnical conditions of the levee system,
- Certify levees as systems that include not only levees and floodwalls, but also the pumps, interior drainage systems, closures, penetrations, and transitions that provide systems integrity, and ensure that operation and maintenance plans cover all elements of the system.

To ensure that all components of a levee system meet required standards, FEMA should exclude embankments, such as roads and railroads, from inclusion in accredited levee systems unless those embankments meet the engineering criteria required of levees and are maintained and operated in accordance with the provisions of 44 CFR 65.10.

FEMA should revise 44 CFR 65.10 to incorporate the above recommendations and to deal with other needed changes in the administrative requirements of 44 CFR 65.10 as noted in the appendices to this report.

FEMA and USACE should continue their efforts to develop a joint database structure that will meet the needs of both agencies and other Federal and State organizations to maintain an inventory and assessment of flood damage reduction structures, including levees.

While agency-specific components of such a database will be needed, the management and fiscal benefits that accrue from a common core and adherence to the national spatial data infrastructure (NSDI) will be significant.

Working with its Federal, State, and local partners and with levee sponsors, FEMA should develop and implement a public awareness and outreach strategy that will improve public awareness and understanding of the hazards and risks associated with levees. This audience includes the Administration and Congress, other public officials, and private citizens.

Copyright National Academy of Sciences. All rights reserved.

As part of this public outreach effort, levee sponsors should be required to notify annually property owners in areas behind a levee about the residual risk that exists and the risk classification of the levee.

The relationships among institutions and organizations dealing with levees are not clearly defined and vary by agency and region.

The Federal Government's role in flood damage reduction through USACE, the Natural Resources Conservation Service (NRCS), the Bureau of Reclamation, the National Oceanic and Atmospheric Administration (NOAA), and the U.S. Geological Survey (USGS) is generally understood. FEMA's role in floodplain management is evolving and is less understood by the public. Similarly, the role of State and local organizations in carrying out floodplain-related activities is evolving.

Success in Map Mod as well as flood damage reduction will depend on the development of close working relationships among representatives of the agencies involved.

Efforts should be made to closely coordinate the activities of relevant Federal agencies in floodplain management and related mapping programs.

FEMA and USACE should review existing authorities and funding available to assist communities in performing certification analysis and make recommendations to the Office of Management and Budget (OMB) if the funding and authorities are not available.

FEMA and USACE also should develop expedited processes to assist communities in remediation of publicly-owned levees and seek OMB and Congressional approval of these processes and the need for resource commitments to support them.

FEMA should consider seeking legislative action to permit use of A99 designation and procedures by communities that are able to self-fund levee upgrades

To ensure that the base data used to support the hydraulics and hydrology (H&H) analysis are up to date and reflect 21st-century computation technologies, FEMA, in coordination with other Federal agencies that use these data and techniques, should support funding of NOAA efforts to upgrade precipitation frequency estimates, upgrades to the USGS gaging program, and the Advisory Committee on Water Information Subcommittee on Hydrology revision of Bulletin 17B, which guides flood recurrence interval determinations.

Recognizing the national and international movement toward use of risk analysis in dealing with floods and their consequences, the significant strides that have been made in developing risk assignment techniques, and the current use of these techniques by USACE in levee design, FEMA should modify 44 CFR 65.10 to phase out, over the next 10 years, use of the freeboard-based approach and should substitute the risk analysis methodology for levee-height determination. During the transition period, FEMA should permit either approach to be used in levee design and recertification analysis

Strong consideration should be given to not recognizing, for NFIP purposes, levees that provide protection to highly urbanized areas unless they provide protection against floods greater than 100 years (e.g., the 500-year flood). There is a long history of recommendations and analyses to support protection to 500-year or greater levels. Given the large number of existing levees, the transition would not be quick or easy. Nevertheless, FEMA should take steps to immediately examine this issue in detail and determine if a change in the standard for recognition should take place.

Non-Federal levees exist at the sufferance of the States and counties in which they are located. Federal levees, for the most part, are passed to State and local sponsors following their completion for operation and maintenance.

Copyright National Academy of Sciences. All rights reserved.

State and local agencies must play a significant role in dealing with levee issues as they arise. Federal agencies should recognize the State and local roles and develop incentives and support mechanisms to ensure that State and local agencies can effectively carry out their responsibilities.

Property owners behind levees continue to face the residual risk of flooding, yet they are not required to share in the mitigation of this risk through insuring their property against the dangers of the residual risk. FEMA should address the challenge of the residual risk in the following ways:

- Seeking legislative change to require property owners to purchase some level of flood insurance for structures behind levees (new Zone XL).
- Requiring communities to establish special early warning systems and to develop flood warning – preparedness plans for those areas that are protected by levees.

The current H&H approach for calculation of the BFE ensures that structures being designed to comply with the BFE are out of date by the time they are constructed. Future H&H conditions are not directly addressed. FEMA, working closely with other Federal agencies, States and communities, should examine how best to deal with climate change, sea-level rise, and future development. Such efforts will require the commitment of significant resources. It also represents a conceptual shift from specifying the mapping criteria to reflect present conditions to establishing criteria based on possible, but not fully quantifiable, future conditions.

When communities are not able to document immediately the recertifiability of currently certified levees and the levees are not known to be at risk, FEMA should notify the communities of the need for a more detailed examination of the levees and provide a specific schedule for that activity. Communities should be required to notify all residents who are living in areas behind the levees of the re-examination and identify for them the residual risks and the need for information about the levees. This action would closely parallel ongoing FEMA efforts to permit completion and adoption of new countywide maps that contain levees needing further study.

A major challenge facing those responsible for levee certification is conduct of appropriate and rapid geotechnical assessments of levee integrity. These assessments are critical to providing assurances of levee safety. However, such assessments, depending on the nature of the material and the cross section of the levee, are very costly. The bulk of the costs are related to the number and depth of soil borings. No methods or technologies are currently available to replace soil borings, and little effort is underway in the Research and Development (R&D) community to deal with the challenge. FEMA, USACE and USGS should support R&D efforts focused on improvement of rapid assessment of levee geotechnical integrity and should jointly recommend to the National Science Foundation that attention be given to this area of research.

**ASFPM: National Flood Policy Challenges – Levees: The Double-Edged Sword** (ASFPM, 2007)

The ASFPM urges FEMA and the U.S. Army Corps of Engineers, along with other federal water resources agencies, to revisit and revise the definition of levee so that it includes elements of function, risk, and vulnerability. This effort should include defining a levee, dam, or incidental work that modifies flood flows and the interrelationships among these definitions. The Federal Interagency Task Force on Floodplain Management is one potential vehicle to undertake this task.

The ASFPM believes that the Corps of Engineers should be tasked as the lead agency to develop and maintain a comprehensive inventory of current and future levees. This would start with federal levees and ultimately include non-federal and private levees.

Levees should be used as a structure of last resort and only after other measures, especially nonstructural ones, have been fully considered. Levees should not be used as a means to facilitate the development of currently undeveloped floodprone lands.

Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 784 of 858



Federal investments in levees should not be made for a structure that provides less than 500-year protection, and the Corps of Engineers planning process of maximizing the NED should explicitly incorporate this public safety standard as a lower boundary for federal investment.

Levees should not be constructed in floodways and, to the maximum extent possible, when constructed or reconstructed levees should be set back from rivers to allow the river to function more naturally and to provide for the protection or restoration of riparian and wetland resources between the river bank and the levee.

The ASFPM urges Congress and the Administration to adopt a policy that the 500-year level of protection for levee design is the minimal standard for purposes of flood insurance and other federal investment."

Current levees that provide less than 500-year protection but meet all the requirements for design, maintenance, and operation, and are recognized by federal programs as meeting the standards for 100-year protection, could be provided grandfathered status. Criteria should be developed to determine when and if protection provided by a specific levee would need to be upgraded and how that would be achieved.

Benefit/cost analysis is an appropriate tool with which to evaluate and contrast federal projects, but it should be bounded by a strong public safety design standard, which for federally supported levees should be the 500-year level of protection.

The design of levees should include improved methods of providing resiliency, most notably the inclusion of designed fail-resistant spillways built into many levees so that when the levee design is exceeded, excess flow spills through that area, preventing catastrophic overtopping or failure of the structure.

The impacts of any new, rehabilitated, or reconstructed levee that would result in the transfer of damage or in adverse economic, social, or environmental consequences must be mitigated.

The local sponsor must demonstrate the financial and staffing capability to provide operation and maintenance for the life of the structure—before the project is approved, constructed, re-constructed, or recognized as providing a certain level of flood protection.

Congress should fund the National Research Council to engage experts to evaluate and propose modifications to levee design, operation, and maintenance standards. These efforts should include review of previous National Academies reports, and the extent to which previous recommendations have been addressed.

Written guidance is needed on what constitutes a "proper" inspection, what is needed for certification to enable the NFIP to recognize the levee, and what the actual consequences are to the levee owner if the levee is not properly maintained to meet these requirements. Both the Corps of Engineers and FEMA have guidance for requirements of programs that come into play with these issues, and the guidance from each agency must be consistent and correlated with the other agency's guidance.

A federal policy should be clearly articulated that the periodic certification and inspection of levees, including related operation and maintenance, is the responsibility of the levee owner and that transferring this responsibility to the federal government is inappropriate. Participation in federal programs of repair, insurance, and disaster relief must be contingent on levee owner compliance with these elements.

A federal policy should be clearly articulated that the periodic certification and inspection of levees, including related operation and maintenance, is the responsibility of the levee owner and that transferring this responsibility to the federal government is inappropriate. Participation in federal programs of repair, insurance, and disaster relief must be contingent on levee owner compliance with these elements.

Copyright National Academy of Sciences. All rights reserved.

A state-administered national levee safety program is needed to protect the federal interest in public health, safety, and fiscal responsibility, as well as to protect public safety and costs related to all levees not in the federal system. Such a program must be fully integrated with state and local programs of flood risk management, especially floodplain management and dam safety, and should use a state delegation model similar to that used to implement the Clean Water Act, rather than function as an independent program like the existing National Dam Safety Program. State capability in this area is critical and can be developed most effectively through federal legislation that provides incentives and disincentives for states to accept delegation for the development and implementation of effective state levee safety programs.

FEMA should require that all communities with an NFIP-recognized levee have a multihazard mitigation plan that considers how other hazards affect the safety of their levee (e.g., earthquake, subsidence, river sedimentation, erosion, etc.) and appropriate emergency action plans (EAPs) with action steps to account for any of these factors that affect the safety of the levee. FEMA should require that this plan be updated at least every five years, including accounting for any changes in flood flows caused by increased watershed development. The potential for catastrophic consequences of levee failure or overtopping should be included in levee planning, design, regulations, and insurance considerations.

The area that would be inundated when a levee fails or is overtopped, or when internal drainage systems are overwhelmed or incapacitated should be mapped as a residual risk flood hazard area and depicted on Flood Insurance Rate Maps.

Emergency action plans (EAPs) that address flood warning and evacuation should be required for all residual risk areas behind levees in order to protect lives and minimize property damage. These plans, and the periodic exercise of them, should be a requirement of any federal or state program that recognizes the levee as providing protection.

The purchase of flood insurance and implementation of appropriate development standards should be mandatory for all property protected by levees, to reflect the potential for the catastrophic consequences of levee failure.

Communication of the residual risk behind levees on a regular basis should be an explicit component of all aspects of proposed and current levee activities. It should include notification to all property owners of the risk (e.g., a notice in an annual water bill or tax bill) along with other measures such as posting signs in all land areas at risk behind the levees. All communication should state clearly that the area behind the levee is provided with some level of protection by levees, that the levees may fail or be overtopped, and that the area is a floodplain, with indications of the depth of flooding when the levee fails or is overtopped. Communication to the property owners should provide clear information on their role if an evacuation is ordered.

The liability of owners of structural flood control projects, such as levees and dams should be communicated to the owners of those structures on a periodic basis.

FEMA and the Corps of Engineers should evaluate and eliminate practices that cause increased flood damage or that lead to induced flooding (the transfer of flooding to other property that is primarily open space) unless property owners agree to a permanent flooding easement in return for this intrusion of flooding on their property.

The cumulative impacts of levees within a system or watershed should be evaluated before any levees are permitted, so those impacts are considered and mitigated, including increasing the design height to account for increased flood levels.

Levee construction, repair, and reconstruction should account for the protection of existing natural functions to avoid adverse impacts to the natural system. In addition, during repair or reconstruction of the levee, these natural functions should be restored to the maximum extent that is practical to account for past adverse impacts.

Copyright National Academy of Sciences. All rights reserved.

**A California Challenge—Flooding in the Central Valley** (State of California DWR, 2007)

Provide the highest level of risk reduction feasible to existing urban areas where thousands of people are at unacceptably high risk. The Panel believes that this level of protection should be equivalent to protection against the Standard Project Flood, which represents a flood that can be expected from the most severe combination of meteorologic and hydrologic conditions that are considered reasonably characteristic of the region. Providing this level of protection does not, by itself, prevent the failure of the system or of individual levees; nor does it guarantee that the Standard Project Flood cannot be exceeded in rare circumstances. One hundred year protection is not an acceptable level of protection for urban areas.

Develop an implementation plan for providing this reasonably high level of protection for all urban areas. The needed level of flood protection should be phased in with at least a 200-year level of flood protection to be achieved by 2020, and Standard Project Flood protection by 2030. Priority should be given to urban areas in deep floodplains.

In less populated areas, provide for protection against less severe floods (e.g. less than 200-year protection) as economically and environmentally justified, and maintain that lower level of protection into the future.

Ensure that any flood protection provided is sustainable fiscally and physically over time.

Manage the floodplain by focusing new development outside of the floodplain or in low-risk locations within protected areas of the floodplain, supporting the use of undeveloped and unprotected land for agriculture and other low-intensity land uses.8 Floodplain management should be accompanied by requirements for local governments to adopt and enforce needed land-use controls, financial and technical support to enable them to do so, and appropriate penalties if local governments fail to manage development to reduce flood risk. The state should continue to support the Federal Emergency Management Agency's levee policy and assist them in accelerating completion and adoption of updated flood maps. This would ensure that any new development in areas behind inadequate levees takes place under the land-use provisions mandated by the National Flood Insurance Program, as a minimum.

Site, where feasible, new levees or major rehabilitation of levees at a distance from the river and from existing levees. This would provide a degree of redundancy in the system, increase the land available for habitat and flood storage, reduce operation and maintenance costs, and help to ensure the integrity of the structures. Levees built this decade will be in place for decades to come, and now is the time to begin building structures that will last. Where re-siting is not feasible, the existing flood system should be modified to mitigate the impacts of floods that exceed the design level of the system.

Mitigate potential financial losses to those behind levees and to those in the non-leveed 500-year floodplain shown on Federal Emergency Management Agency flood maps through institution of mandatory purchase of flood insurance, or through inclusion of flood insurance in homeowners' policies of those within these areas.

Share the liability for flood damages among state and local governments. This would ensure that any local governments making land-use decisions that could increase potential flood damages share not only the benefits of that development, but also any liability incurred from potential flood consequences should those decisions prove to have been unwise.

Communicate to the public and each property owner in the floodplain the specific risks of occupying areas at risk of flooding, and provide steps property owners can take to reduce their exposure to flood damages.

Communicate to the public and each property owner in the floodplain the specific risks of occupying areas at risk of flooding, and provide steps property owners can take to reduce their exposure to flood damages.

Supplement the structural protection provided with floodproofing, elevation of homes and businesses, land-use regulations, and other non-structural approaches to reduce the residual risk that will continue to exist. Support

Copyright National Academy of Sciences. All rights reserved.

this with emergency response systems including the development of post-disaster sheltering and redevelopment plans and the exercising of floodplain evacuation plans on a regular basis. Dealing with flooding in the Central Valley will require a close examination of existing governmental institutions and how they work together. The lessons learned from the New Orleans disaster point out the disconnects that develop when too many agencies are involved in the decision-making process and no one agency has overall direction. Large flood events exploit those disconnects. California must address this difficult issue, especially in terms of the large number of overlapping roles, responsibilities and accountabilities of reclamation districts, and state and local governments. Without reforming the institutions that manage flood protection, large investments in infrastructure are likely to be wasted.

**Hurricane Protection System Peer Review** (Battelle, 2007)

USACE should seek Administration support for and Congressional approval to:

- Develop a single authorization for the HPS similar to that provided for the Mississippi River and Tributaries (MR&T) project.
- Authorize flexibility for reprogramming.
- Ensure multi-year or timely appropriations; recognize the consequences of delays.
- Provide expedited review of issues.
- Ensure close cooperation with local governments and understanding of the problems associated with lack of cooperation

Nonstructural elements should become an equal partner in completion of the HPS. USACE should receive increased funding to carry out programs of nonstructural technical assistance for communities and proactively provide technical assistance to FEMA and local authorities with respect to elevating structures, floodproofing, planning for interior drainage, and other flood management considerations. This is especially the case for interior polderization of protected areas which could reduce the spatial extent of flood risk.

TFH should work closely with local officials on full implementation of effective floodplain management and enforce that provision of Section 402 of the Water Resources Development Act (WRDA) of 1986 requiring development of local floodplain management plans. There is a clear opportunity for USACE to provide needed technical assistance, so that rebuilding occurs in a manner that minimizes the potential for future flood dam-age to public buildings and infrastructure and private homes and businesses.

USACE should provide maps of residual risk for early distribution to residents and officials. Risk communication maps should be accompanied with information on personal mitigation measures to include flood avoidance, financial protection, and life-safety concerns. USACE must ensure that residents and officials understand the residual risk and the level of protection that is actually being provided.

Given the experience and the strategies the Japanese and Dutch use for protection, TFH should consider establishment of a centralized planning and inspection capability for O&M. Fragmented planning efforts provide significant opportunities for system disconnects and potential failures.

USACE should include high-tech monitoring systems for key elements of the completed HPS. Technology now makes it possible to remotely sense levees, floodwalls and other protective system problems as they occur. Some systems are currently under consideration by TFH.

Given the tight schedule for completion of the 100-year system, TFH should not divert human and physical resources from the principal task of finishing the HPS to the 100-year level to provide interim improvements. Since the HPS will not be at a 100-year level until the 2011 hurricane season at the earliest, some have expressed concern over the need for interim protection in components of IHNC and West Bank areas. While these concerns are important, completion of the system should have priority.

Copyright National Academy of Sciences. All rights reserved.

USACE should seek an accelerated decision on MRGO to allow early movement forward on dealing with hurricane protection in the area of the MRGO-GIWW and improving protection to the IHNC. Such a decision will save time, eliminate the need to plan against alternatives, and speed completion of the HPS.

TFH, in current construction activities, should take into account the potential footprints of subsequent construction under LaCPR so as to minimize repeat disruptions, multiple right-of-way acquisition, etc. Major long-term cost savings can be generated and significant public push back can be avoided by dealing with real estate issues only once.

Observations:

Provision of risk reduction (protection) against the 100-year annual chance (100-year) event is not sufficient to prevent possible loss of life and social disruption in a major urban area. For example, there is a 26% chance of the occurrence of such an event with the life of a 30-year mortgage. Urban areas need a higher level of protection. Providing 100-year protection may make it difficult to subsequently provide this higher level of protection.

It is not clear that there is agreement that the HPS being built reflects the understanding of all stakeholders and Congress as to what level of protection is supposed to be provided. TFH indicated that its first priority was to provide 100-year certified levees for all areas rather than 100-year or 'as originally authorized,' whichever is higher. This is a sound decision, but USACE should take action to obtain written agreement from stakeholders and the Congress that the 100-year first path it is following is in fact the path expected.

Many USACE technical manuals are badly out of date. Manuals being used in levee design are Dutch, because appropriate USACE manuals did not exist or had not been revised in many years. USACE O&M programs must include adequate funding to support continuous maintenance and upgrade of the documents and the necessary research and development (R&D) that maintains currency.

**The New Orleans Hurricane Protection: What Went Wrong and Why** (ASCE, 2007)

Keep safety at the forefront of public priorities by having all responsible agencies re-evaluate their policies and practices to ensure that protection of public safety, health, and welfare is the top priority for infrequent but potentially devastating impacts from hurricanes and flooding. Also, encourage Congress to establish and fund a mechanism for a nationwide levee safety program, similar to that which is in place for dams.

Quantify and periodically update the assessment of risk. This approach should be extended to all areas in the United States that are vulnerable to major losses from hurricanes and flooding.

Determine the level of acceptable risk in the community through quality interactive public risk communication programs in New Orleans and other areas threatened by hurricanes and flooding. Once determined, manage the risks accordingly.

Correct the system's deficiencies by establishing mechanisms to incorporate changing information, making the levees survivable if overtopped, strengthening the I-walls and levees, and upgrading the pumping stations.

Assign to a single entity or individual (a licensed engineer) the responsibility of managing critical hurricane and flood protection systems such as the one in New Orleans.

Implement more effective mechanisms for coordination and cooperation. (For example, those responsible for maintenance of the system must collaborate with system designers and must upgrade their inspection, repair, and operations processes to ensure that the system is hurricane- and flood-ready.

Upgrade engineering design procedures and practice to place greater emphasis on safety.

Copyright National Academy of Sciences. All rights reserved.

Engage independent experts in high-level reviews of all critical life safety structures, including hurricane and flood-protection systems

**Hurricane Protection Decision Chronology – 2008** (USACE, 2008)

Reflections on Project Decision-Making:

1. Concerns about project cost growth, constrained federal and local budgets, delays in project completion, and the possible need for reauthorization if major changes were proposed, help to explain District decisions to construct the project according to original designs and datum benchmarks.
2. There was no Corps organizational process that required and provided funding for a continuing assessment of project performance capability during the postauthorization implementation period.
3. There is no evidence in the project record indicating that project engineers believed that the decisions made would threaten engineering reliability.
4. The only recurring organizational provision for systematically reporting the expected performance capability of the project was the annual Budget Justification Sheet.

Reflections on the Future:

1. The importance of sharing knowledge
2. Need for flexibility and adaptation in planning, design, and implementation

**National Committee on Levee Safety** (NCLS, 2009)

Establish a National Levee Safety Commission to provide national leadership and comprehensive and consistent approaches to levee safety including standards, research and development, technical materials and assistance, training, public involvement and education, facilitation of the alignment of federal programs and design, delegation and oversight of a delegated program to states.

Expand and Maintain the National Levee Database to include a one-time US Army Corps of Engineers inventory and inspection of all non-federal levees. Baseline information will be included and maintained in an expanded National Levee Database (NLD) in order that critical safety issues, true costs of good levee stewardship, and the state of individual levees can inform priorities and provide data for needed risk-informed assessments and decision-making.

Adopt a Hazard Potential Classification System as a first step in identifying and prioritizing hazard in leveed areas. Due to a lack of data regarding probability of failure, initial classifications should be based solely on consequences in order to assist in setting priorities, criteria, and requirements as the NSLP is being established.

Develop and Adopt National Levee Safety Standards that will assist in ensuring that the best engineering practices are available and implemented throughout the nation at all levels of government.

Develop Tolerable Risk Guidelines in order to facilitate an understanding of the options to reduce identified risks, how uncertainty affects this understanding, and to better inform levee construction/enhancement decisions and weigh nonstructural alternatives to flood risk management in a risk-informed context. Change "Levee Certification" to "Compliance Determination" to better articulate the intent that "certification" under the National Flood Insurance Program (NFIP) requirements does not constitute a safety guarantee or warranty. The purpose of this change is to more clearly communicate residual risks of living and working in leveed areas.

Change "Levee Certification" to "Compliance Determination" to better articulate the intent that "certification" under the National Flood Insurance Program (NFIP) requirements does not constitute a safety guarantee or war-

Copyright National Academy of Sciences. All rights reserved.

ranty. The purpose of this change is to more clearly communicate residual risks of living and working in leveed areas.

Subject Levee Certifications (Compliance Determinations) under FEMA's National Flood Insurance Program to Peer Review in order to increase confidence in technical determinations of compliance.

Swiftly Address Growing Concerns Regarding Liability for Damages Resulting from Levee Failures through exploration of a range of measures aimed at reducing the potential liability of engineering firms and/or government agencies that perform engineering services for levee systems (e.g. inspections, evaluations, design, construction administration, certification, or flood fighting). Congress should address this liability concern as a first priority in order to help ensure state and local interest in developing levee safety programs, and to prevent much needed levee repairs, rehabilitation and certification from coming to a halt.

Develop a Comprehensive National Public Involvement and Education/Awareness Campaign to Communicate Risk and Change Behavior in Leveed Areas as an essential element of levee safety by improving public understanding of the role of levees, associated risks, and individual responsibilities to empower people to make risk-informed choices.

Provide Comprehensive Technical Materials and Direct Technical Assistance crucial to the successful implementation of consistent national standards to states, local communities and owner/operators.

Develop a National Levee Safety Training Program including a combination of courses, materials, curricula, conferences, and direct assistance resulting in an increase in the level of expertise and knowledge in all aspects of levee safety. This would include the development of curricula and certification requirements for a Certified Levee Professional program.

Develop and Implement Measures to More Closely Harmonize Levee Safety Activities with Environmental Protection Requirements to ensure that critical levee operations and maintenance is not delayed and that, where possible without compromising human safety, environmentally-friendly practices and techniques are developed and used.

Conduct a Research and Development Program that will continually advance state-of-the-art technologies and practices for levee safety and conduct critical operations and maintenance activities in as cost-effective and environmentally-friendly manner as possible.

Design and Delegate Program Responsibilities to States to assist states and local governments develop effective levee safety programs focused on continual and periodic inspections, emergency evacuation, mitigation, public involvement and risk communication/awareness, etc.

Establish a Levee Safety Grant Program to assist states and local communities develop and maintain the institutional capacity, necessary expertise, and program framework to quickly initiate and maintain levee safety program activities and requirements.

Establish the National Levee Rehabilitation, Improvement, and Flood Mitigation Fund to aid in the rehabilitation, improvement or removal of aging or deficient national levee infrastructure. Investment (cost-shared) is recommended to be applied to the combination of activities, both structural and non-structural, that combined, would maximize overall risk reduction and initially be focused in areas with the greatest risk to human safety.

Explore Potential Incentives and Disincentives for good levee behavior through alignment of existing federal programs.

Copyright National Academy of Sciences. All rights reserved.

Mandate Purchase of Risk-Based Flood Insurance in Leveed Areas to reduce financial flood damages and increase understanding of communities and individuals that levees do not eliminate risk from flooding.

Augment FEMA's Mapping Program to improve risk identification and communication in leveed areas and consolidate critical information about flood risk.

Align FEMA's Community Rating System (CRS) to Reward Development of State Levee Safety Programs by providing further incentives to communities to exceed minimum program requirements and benefit from lower risk-based flood insurance rates to individuals who live in leveed areas.

**The New Orleans Hurricane Protection System: Assessing Pre-Katrina Vulnerability and Improving Mitigation and Preparedness** (NRC, 2009)

Hydrologic Realities and the Limits of Protective Structures:

- There are many inherent hydrologic vulnerabilities of living in the greater New Orleans metropolitan region, especially in areas below sea level. Post-Katrina repairs and strengthening have reduced some of these vulnerabilities. Nevertheless, because of the possibility of levee/floodwall overtopping—or more importantly, levee/floodwall failure—the risks of inundation and flooding never can be fully eliminated by protective structures no matter how large or sturdy those structures may be.

Future Footprint of the Hurricane Protection System:

- The pre-Katrina footprint of the New Orleans HPS consisted of roughly 350 miles of protective structures including levees, I-walls, and T-walls. There was undue optimism about the ability of this extensive network of protective structures to provide reliable flood protection. Future construction of protective structures for the region should proceed with this point firmly in mind and in the context of a more comprehensive and resilient hurricane protection plan.

Nonstructural Aspects and Options:

- Comprehensive flood planning and risk management for the New Orleans metro region will be based on a combination of structural and nonstructural measures, the latter including relocation options, floodproofing and elevation of structures, and evacuation studies and plans. Better risk communication also must be part of more effective mitigation and an improved state of preparedness. Structural measures such as levees and floodwalls should not be viewed as substitutes or replacements for nonstructural measures, but rather as complementary parts to a multi-tiered hurricane protection solution.
- Relocation: the planning and design for upgrading the current hurricane protection system should discourage settlement in areas that are most vulnerable to flooding due to hurricane storm surge. The voluntary relocation of people and neighborhoods out of particularly vulnerable areas—with adequate resources designed to improve their safety in less vulnerable areas—should be considered as a viable public policy option.

Floodproofing Measures:

- When voluntary relocations are not viable, floodproofing measures will be an essential complement to protective structures—such as levees and floodwalls—in improving public safety in the New Orleans region from hurricanes and induced storm surge. This committee especially endorses the practice of elevating the first floor of buildings to at least the 100-year flood level, and preferably to a more conservative elevation. The more conservative elevation reflects a subsequent finding in this report regarding the inadequacy of the 100-year flood as a flood protection standard for a large urban center such as New Orleans.
- Critical public and private infrastructure—electric power, water, gas, telecommunications, and flood water

Copyright National Academy of Sciences. All rights reserved.

collection and pumping facilities—should be strengthened through reliable construction, and ensuring reliable interdependencies among critical infrastructure systems.

Evacuation:

- The disaster response plan for New Orleans, although extensive and instrumental in successfully evacuating a very large portion of the New Orleans metropolitan area population, was inadequate for the Katrina event. Thus, there is a need for more extensive and systematic evacuation studies, plans, and communication of evacuation plans. A comprehensive evacuation program should include not only well designed and tested evacuation plans, protocols, and criteria for evacuation warnings, but also alternatives such as improved local and regional shelters that could make evacuations less imposing. It also should consider longer-term strategies that can enhance the efficiency of evacuations, such as locating facilities for the ill and elderly away from more vulnerable areas that may be subject to frequent evacuations.

Risk Communication:

- Before Katrina, there was a limited understanding and appreciation of the residual risks of living behind levees. Improvements in future hurricane preparedness and response will depend partly upon improved public understanding of these risks. In order to enhance the communication and appreciation of these risks, it will be important to extend the efforts of the IPET and to refine, simplify, and communicate consistently the risks of hurricanes and storm surge to the region's residents, including how those risks vary across the region. Effective communication of the risk-based findings from the entire IPET report will be enhanced by creating a professional summary and compilation of the entire IPET draft report with layman's terminology (see earlier recommendation in this report).

The 100-Year Level of Flood Protection:

- The 100-year level of flood protection is a crucial flood insurance standard. It has been applied widely across the nation and it is being used in some circumstances in reconstruction and planning activities in the New Orleans region. For areas in which catastrophic levee failure is not a major public safety concern, and where large floods would not imperil evacuation routes, the 100-year standard may be appropriate. For heavily-populated urban areas, where the failure of protective structures would be catastrophic—such as New Orleans—this standard is inadequate.

Independent Review for Engineering and Design:

- It is important to enlist periodic external review in the design, construction and maintenance of large, complex civil engineering projects such as the New Orleans hurricane protection system. A "second opinion" allows an opportunity to ensure that calculations are reliable, methods employed are credible and appropriate, designs are adequate and safe, potential blind spots are minimized, and so on. An outside external review group also may be able to state politically sensitive findings or facts that a government agency may be reluctant to. Such a review team should be adequately independent of the authority that identified.

Periodic Assessments and Updates of Concepts, Methods, and Data:

- Changing environmental conditions can affect the performance and operation of large hurricane and flood protection projects. Advances in scientific and engineering theories and methods may render assumptions on which these projects were based partly or fully obsolete. Because of these changes and the important implications they may have for expected performance of protective structures, a process should be implemented to ensure periodic review of underlying environmental, scientific, and engineering factors that affect New Orleans hurricane protection system performance. The process for incorporating new scientific information into large flood protection projects, like the New Orleans hurricane protection system, can be affected by congressional reauthorization requirements. Changes or clarifications to congressional policies and reauthorizations as they relate to large construction projects may be necessary to effectively implement findings of periodic scientific reviews.

Copyright National Academy of Sciences. All rights reserved.

The Future of Hurricane Risk Analysis for New Orleans and the Gulf Coast Region:

- The IPET has conducted a landmark assessment of the New Orleans HPS that could serve as a platform for future and ongoing assessments of vulnerability, levels of protection, subsidence rates, geological studies, risk assessments, and so on. As the IPET investigations come to an end, many of the external experts that participated in the studies will return to their respective careers outside the Corps of Engineers. Much of the IPET "institutional memory" therefore may not be infused into Corps of Engineers New Orleans District office, the State of Louisiana, or the City of New Orleans. It is essential that these analyses be extended and subsequently built upon by the Corps of Engineers and others, including the FEMA, NOAA, the State of Louisiana, New Orleans regional municipalities, and the region's universities, engineers, and scientists. To facilitate future work that builds on the IPET studies, a publicly accessible archive of all data, models, model results, and model products from the IPET project should be created.

## REFERENCES

ASCE (American Society of Civil Engineers). 2007. The New Orleans Hurricane Protection System: What Went Wrong and Why. Reston, VA: ASCE.

ASFPM (Association of State Floodplain Managers). 2007. National Flood Policy Challenges Levees: The Double-Edged Sword. Madison, WI: ASFPM.

FEMA (Federal Emergency Management Agency). 2006. The National Levee Challenge: Levees and the FEMA Flood Map Modernization Initiative. Washington, DC: FEMA.

Galloway, G. E., G. B. Baecher, D. Plasencia, K. G. Coulton, J. Louthain, M. Bagha, and A. R. Levy. 2006. Assessing the Adequacy of the National Flood Insurance Program's One Percent Flood Standard. Washington, DC: American Institutes for Research. Available online at http://www.fema.gov/library/viewRecord.do?id=2595.

GAO (U.S. Government Accountability Office). 2006. Hurricane Katrina: Strategic Planning Needed to Guide Future Enhancements Beyond Interim Levee Repairs. Washington, DC: GAO.

NCLS (National Committee on Levee Safety). 2009. Recommendations for a National Levee Safety Program. Washington, DC: NCLS.

NRC (National Research Council). 1982. A Levee Policy for the National Flood Insurance Program. Washington, DC: National Academy Press.

NRC. 2009. The New Orleans Hurricane Protection System: Assessing Pre-Katrina Vulnerability and Improving Mitigation and Preparedness. Washington, DC: The National Academies Press.

State of California, Department of Water Resources. 2007. A California Challenge: Flooding in the Central Valley. Sacramento, CA: Department of Water Resources.

USACE (U.S. Army Corps of Engineers). 2008. Decision-Making Chronology for the Lake Pontchartrain and Vicinity Hurricane Protection Project. Washington, DC: USACE.

Copyright National Academy of Sciences. All rights reserved.

Copyright National Academy of Sciences. All rights reserved.

# Appendix G

# FEMA Procedure Memorandums 34, 43, and 53



Copyright National Academy of Sciences. All rights reserved.

Federal Emergency Management Agency
Washington, D.C. 20472

August 22, 2005

**MEMORANDUM FOR:** Regional Directors
Regions I - X

**FROM:** David I. Maurstad, Acting Director
Mitigation Division

**SUBJECT:** Procedure Memorandum 34 — Interim Guidance for Studies Including Levees

**Background**: Throughout the United States, levees protect numerous communities and large expanses of agricultural land from floods. Their importance in mitigating flood hazards and their relevance to the National Flood Insurance Program (NFIP) are indisputable. However, riverine and coastal levees, in the aggregate, stretch for tens of thousands of miles, and information on their location, structural integrity, and certification often is outdated or missing altogether.

**Issue:** To address this challenge, a Levee Coordination Committee—including representatives from FEMA, other Federal agencies, and States—is examining current levee regulations and assisting in the development of a long-term policy that protects citizens and property, while accommodating the needs of the NFIP. This memorandum helps to clarify the entities responsible for providing information on levees identified during a mapping project.

**Action Taken:** Until the new policy is developed, this memo provides interim guidance to minimize delays in near-term mapping studies. The attached flow chart supplements FEMA's procedure memorandums 30 and 32. This information is in conformance with Section 65.10 of the NFIP regulations.

**Supplement to Procedure Memo 30—FEMA Levee Inventory System.**
Mapping partners – CTPs, IDIQs, OFAs, etc. -- should continue providing information about levees located in or adjacent to study areas. Information should be provided via the FEMA Levee Inventory System (FLIS) according to Procedure Memorandum 30 and the instructions available on the FLIS Web site located at http://flis.pbsjdfirm.com. The FLIS will be accessed via the MIP after release 3.0.

Levee coordinates should be gathered at a level of detail consistent with GIS accuracy and digital Flood Insurance Rate Map (FIRM) standards. Mapping partners who do not already have access to the FLIS can contact the National Service Provider at (703) 960-8800.

Copyright National Academy of Sciences. All rights reserved.

August 22, 2005

Page 2 of 2 – Procedure Memorandum 34

**Supplement to Procedure Memo 32—Levee Review Protocol.**

The protocol for levee reviews, particularly the details provided in Table 1 of Procedure Memorandum 32, is revised according to the attached flow chart.

**Identification of Levees**

It is critical that all levees within the scope of the mapping project be identified early in the mapping project, ideally no later than the scoping meeting. The role of all mapping partners, including coordination with the State and other Federal partners (e.g., U.S. Army Corps of Engineers), related to review of levee certification should be clearly identified as part of the scoping process. When levees are identified at the scoping meeting the community must be informed of the data requirements for FEMA to recognize a levee as providing protection from the 1-percent-annual-chance flood (base flood) on the FIRM. In accordance with 44 CFR Section 65.10(a), it is the responsibility of the community or other party seeking recognition of a levee system at the time of a flood risk study or restudy to provide the data outlined in 44 CFR Section 65.10. FEMA will not be conducting detailed examinations of levees to determine how a structure or system will perform in a flood event. In addition, the community or party seeking recognition should be provided with a deadline for submitting the data and informed that if the data are not submitted by the deadline, the levee cannot be recognized as providing protection from the base flood as part of the current mapping effort. However, a revision could be initiated once data are available.

Early identification of levees allows the mapping partner to outline to the community, or party seeking recognition, their responsibilities and FEMA's expectations to minimize study delays. In order to aid our mapping partners in properly assessing how to handle levee mapping issues, we have generated the below flowchart.

cc: See Distribution List

**Distribution List** (electronic distribution only):

Office of the Mitigation Division Director
Risk Assessment Branch
Risk Identification Branch
Flood Insurance and Mitigation Divisions in FEMA Regional Offices
Office of Legislative Affairs
Office of General Counsel
National Service Provider
Systems Engineering and Technical Assistance Contractor
Map Service Center

Copyright National Academy of Sciences. All rights reserved.

Levees and the National Flood Insurance Program: Improving Policies and Practices
Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 798 of 858






Copyright National Academy of Sciences. All rights reserved.

**U.S. Department of Homeland Security**
500 C Street, SW
Washington, DC 20472

FEMA

March 16, 2007
(Originally Issued on September 25, 2006)

**MEMORANDUM FOR:** Mitigation Division Directors
Regions I - X

**FROM:** David I. Maurstad
Director
Mitigation Division

**SUBJECT:** Revised Procedure Memorandum No. 43 - Guidelines for Identifying Provisionally Accredited Levees

**Background:** Early in the implementation of Flood Map Modernization (Map Mod), the Department of Homeland Security's Federal Emergency Management Agency (FEMA) recognized that the role of levees in flood risk reduction would be an important part of the efforts of Map Mod. Further, it was acknowledged that the condition of levees had not been assessed since they were originally mapped as providing base (1-percent-annual-chance) flood protection. Because of this, FEMA initiated a revised process to gain a better understanding of the actual flood risks for those citizens living and working behind levees nationwide.

On August 22, 2005, FEMA issued Procedure Memorandum No. 34 - Interim Guidance for Studies Including Levees. The purpose of the memorandum was to help clarify the responsibility of community officials or other parties seeking recognition of a levee by providing information identified during a study/mapping project. Often, documentation regarding levee design, accreditation, and the impacts on flood hazard mapping is outdated or missing altogether. To remedy this, Procedure Memorandum No. 34 provides interim guidance on procedures to minimize delays in near-term studies/mapping projects, to help our mapping partners properly assess how to handle levee mapping issues.

**Issue:** Levee owners or communities have the responsibility to provide documentation that a levee meets the requirements of Title 44 of the Code of Federal Regulations, Section 65.10 of the National Flood Insurance Program regulations (44 CFR Section 65.10), as part of a study/mapping project. Without the required documentation necessary to comply with 44 CFR Section 65.10, the area behind the levee will be re-delineated and mapped as Special Flood Hazard Area on the Digital Flood Insurance Rate Map (DFIRM). Procedure Memorandum No. 34 allows for the issuance of a deadline to the community for submitting the required documentation.

Copyright National Academy of Sciences. All rights reserved.

While 44 CFR Section 65.10 documentation is being compiled, the release of more up-to-date DFIRM panels for other parts of a community or county may be delayed. To minimize the impact on the Map Mod goals of mapping areas landward of levees, mapping partners should be provided with guidance that will allow preliminary and effective DFIRMs to be issued while the levee owner or community is given a reasonable amount of time to compile and submit data and documentation to show compliance with the requirements of 44 CFR Section 65.10. Guidance should also be provided to the mapping partners that allows, in specific situations, the preliminary DFIRM to be issued while providing the communities and levee owners with a specified timeframe to show compliance with 44 CFR Section 65.10 by correcting any maintenance deficiencies associated with the levee.

**Action Taken:** To minimize the impact of the levee recognition and certification process on Map Mod goals, guidelines have been developed that will allow mapping partners to issue preliminary and effective versions of DFIRMs while the levee owners or communities are compiling the full documentation required to show compliance with 44 CFR Section 65.10. The guidelines also explain that mapping partners can issue preliminary DFIRMs while providing the communities and levee owners with a specified timeframe to correct any maintenance deficiencies associated with a levee to and show compliance with 44 CFR Section 65.10. These guidelines are summarized in the attached document entitled "Guidelines for Identifying Provisionally Accredited Levees (PALs)."

The attached document describes the criteria for five scenarios intended to determine when a levee does or does not qualify for the PAL designation. FEMA has established a specified timeframe in which the community or levee owner may use to fulfill the remaining requirements for 44 CFR Section 65.10 before the levee is shown on the DFIRM as not providing base flood protection. The attached guidance also describes an additional process for maintenance deficient levees that do not currently qualify for the PAL designation. FEMA has established a separate specified timeframe for these levees, which allows the community or levee owner time to correct any maintenance deficiencies associated with a levee. If the levee qualifies for the PAL designation, FEMA will provide the community 90 days to sign and return an agreement indicating that the full documentation for 44 CFR Section 65.10 will be provided within 24 months of the signed agreement. If the signed agreement is not returned to FEMA within 90 days, or if the levee does not meet the PAL requirements (except for the maintenance deficient levees), the community is no longer eligible for the PAL designation, and the area landward of the levee will be remapped as Zone AE or Zone A, depending on the type of study performed for the area.

For levees that are included in the U.S. Army Corps of Engineers (USACE) Federal Program, FEMA will actively coordinate with the appropriate USACE district to determine which projects do not provide protection from the base flood. In a collaborative effort, existing data or project-specific information will be evaluated to identify and validate non-accredited levees in the USACE's inventory. As part of the USACE's recent survey of their levee inventory, levee projects have been identified to be no longer eligible for Public Law (PL) 84-99 rehabilitation assistance, based on the project's last inspection. However, many of these levee projects have been identified to

Copyright National Academy of Sciences. All rights reserved.

Page 3 of 4 Revised Procedure Memorandum No. 43

be eligible for a one-time-only "maintenance deficiency correction period," established to allow public sponsors/levee owners to correct levee maintenance deficiencies before the levee is placed in an inactive status in the USACE Rehabilitation & Inspection Program and becomes ineligible for PL 84-99 rehabilitation assistance. The USACE has developed a written notification process to inform communities or levee owners of this status after it has coordinated with FEMA. Copies of the USACE notification letter will be provided to FEMA. If a community or levee owner receives this notification letter, the area landward of the identified levee will be mapped as Zone AE or Zone A, as appropriate.

Effective on the date of this Procedure Memorandum, levees that meet the PAL requirement (levees presently shown as providing base flood protection on the effective FIRM), for which the community or levee owner cannot readily provide full documentation of 44 CFR Section 65.10, will be identified on the FIRM with a map note. This note, placed landward of the levee, will indicate that the levee is provisionally accredited and any existing Zone X (shaded) area is provisional. If there is no existing Zone X (shaded) area on the effective FIRM, then the mapping partner should define the provisional Zone X (shaded) area using the best available data. Specific procedures and guidance for evaluating and mapping levees is provided in Appendix H of *Guidelines and Specifications for Flood Hazard Mapping Partners*.

The following note must be applied at several locations, point to the levee, and be placed landward of the levee in or near the Zone X (shaded) area:

> WARNING: Provisionally Accredited Levee. For explanation, see the Notes to Users.

The applicable Note to Users would read as follows:

> WARNING: This levee, dike, or other structure has been provisionally accredited and mapped as providing protection from the 1-percent-annual-chance flood. To maintain accreditation, the levee owner or community is required to submit documentation necessary to comply with 44 CFR Section 65.10 by (__________,_____). Because of the risk of overtopping or failure of the structure, communities should take proper precautions to protect lives and minimize damages in these areas, such as issuing an evacuation plan and encouraging property owners to purchase flood insurance.

The five scenarios for determining whether the levee qualifies for the PAL designation are described in the attachment. The document also summarizes the process for coordinating with community officials and others to acquire the appropriate levee documentation, while moving forward with the production of countywide mapping for communities with levees.

**Attachment**
Guidelines for Identifying Provisionally Accredited Levees (PALs)

Copyright National Academy of Sciences. All rights reserved.

Page 4 of 4 Revised Procedure Memorandum No. 43

cc: See Distribution List

**Distribution List** (electronic distribution only):

Directors, Regions I - X

Office of the Mitigation Division Director

Risk Analysis Branch

Risk Reduction Branch

Risk Insurance Branch

Federal Insurance and Mitigation Divisions in FEMA Regional Offices

Office of Legislative Affairs

Office of General Counsel

National Service Provider

Independent Verification and Validation Contractor

Map Service Center

Indefinite Delivery Indefinite Quantity Contractors

Cooperating Technical Partners

Copyright National Academy of Sciences. All rights reserved.

### Guidelines for Identifying Provisionally Accredited Levees (PALs)

**Introduction**

The Federal Emergency Management Agency (FEMA) issued Procedure Memorandum No. 34 (PM 34) on August 22, 2005, to provide interim guidance for processing studies/mapping projects for communities with levees and to define the roles of all FEMA contractors and mapping partners in meeting the regulatory requirements of the National Flood Insurance Program (NFIP) as cited at Title 44, Chapter 1, Section 65.10, of the Code of Federal Regulations, Section 65.10 (44 CFR Section 65.10). PM 34 reiterates that the community or other parties seeking recognition of a levee or levee system are responsible for providing information to demonstrate that the levee provides protection from the base (1-percent-annual-chance) flood. Therefore, when a study/mapping project is initiated under the Flood Map Modernization (Map Mod) program, FEMA will request that the community, levee owner, and/or local project sponsor to provide the data described in 44 CFR Section 65.10.

The requirement for complying with 44 CFR Section 65.10 is the responsibility of the community, levee owner, and/or local project sponsor, and they often find it difficult to provide the full documentation promptly. The lack of readily available data to comply with 44 CFR Section 65.10 has, in some cases, caused studies/ mapping projects to be delayed or placed on hold until the required information can be compiled and provided to FEMA.

Providing communities with up-to-date, accurate, and reliable flood hazard information on Digital Flood Insurance Rate Maps (DFIRMs) is one of the primary goals of Map Mod. Because levees are shown on the currently effective Flood Insurance Rate Maps (FIRMs) for over one-quarter of the counties being mapped under Map Mod, the issue of whether the levee provides 1-percent-annual-chance flood protection must be addressed. While 44 CFR Section 65.10 documentation is being compiled, the existing FIRMs remain in effect, showing the area behind the levee as protected from the 1-percent-annual-chance flood and potentially delaying the release of more up-to-date information for other parts of the community. As a result, communities would potentially be using outdated flood hazard information to regulate floodplain development. In addition, because the existing FIRMs are in effect, there may be no requirements for the purchase of flood insurance in areas that actually are floodprone.

This guidelines document outlines five scenarios that will allow the mapping for selected studies/mapping projects for communities with levees to move forward before the full documentation required in 44 CFR Section 65.10 is available. With this process, the FEMA Regional Offices, FEMA contractors, and mapping partners can issue preliminary and effective DFIRMs while providing the communities and levee owners a specified timeframe for the submittal of the documentation necessary to show compliance with 44 CFR Section 65.10. In addition, for specific situations, the Regional Offices, contractors, and mapping partners can move forward with the study/mapping project until the point where the Letters of Final Determination would be issued, while communities and/or



Copyright National Academy of Sciences. All rights reserved.

levee owners are given a specified timeframe to address maintenance deficiencies identified by the U.S. Army Corps of Engineers (USACE).

The USACE has initiated a national levee inventory and assessment program to identify the condition, location, level of protection, and maintenance activities for all levees within its jurisdiction. This inventory will assist in the assessment of the risk to public safety associated with levees and levee systems across the Nation. The USACE and FEMA are working together throughout the inventory and assessment phase to coordinate this effort with Map Mod activities. The inventory data collected to date will be used by FEMA and the USACE to categorize levees for which the full documentation required by 44 CFR Section 65.10 is NOT readily available into the five scenarios described below.

**Definitions**

A levee is defined as a manmade structure, usually an earthen embankment, designed and constructed in accordance with sound engineering practices to contain, control, or divert the flow of water so as to provide protection from temporary flooding. The term does not include structures that are otherwise defined as dams in the *Federal Guidelines for Dam Safety*.

For the purpose of this guidelines document, levees are identified as being USACE or non-USACE levees. Levees within the USACE program include:

- Levees built by the USACE that were authorized for construction by the U.S. Congress or by USACE continuing authorities (e.g., Section 205);
- Levee projects constructed by non-Federal interests or other (non-USACE) Federal agencies and incorporated into the USACE Federal system by specific congressional action;
- Federal projects that are either operated and maintained by the USACE or turned over to a local sponsor for operation and maintenance; and
- Non-Federal projects within the Rehabilitation and Inspection Program (RIP), Public Law 84-99.

Non-USACE levees are defined to include:

- Levees not authorized by the U.S. Congress or other Federal agency authority;
- Levees built by other Federal agencies and not incorporated into the USACE Federal system;
- Locally built and maintained levees built by a local community; and
- Privately built by a nonpublic organization or individuals and maintained by a local community.

A "levee owner" can be a Federal or State agency, a water management or flood control district, a local community, a levee district, a nonpublic organization, or an individual. The "party responsible for operating and maintaining the levee" must be a Federal or



Copyright National Academy of Sciences. All rights reserved.

State agency, an agency created by Federal or State law, or an agency of a community participating in the NFIP.

This document summarizes an approach for identifying a Provisionally Accredited Levee (PAL) and for provisionally mapping the area behind (landward of) such a levee as Zone X (shaded), pending FEMA's receipt of all data and documentation required to show compliance with 44 CFR Section 65.10. FEMA established this approach to allow the mapping process to move forward when levees meet the criteria for an applicable scenario identified below, and to give communities and levee owners a specified timeframe to submit all the documentation necessary to show compliance with 44 CFR Section 65.10. The PAL requirements are provided below.

**Scenario A – Levees not in the USACE program that are shown as providing base flood protection**

Communication with levee owner and/or community:

The FEMA Regional Office will send a letter (template letter for Scenario A) to the appropriate levee owner or community to identify the levees for which 44 CFR Section 65.10 documentation is needed and will provide a copy of this letter to the appropriate USACE district office. The FEMA letter will describe the PAL option and an opportunity for a one-time-only, 1-year "maintenance deficiency correction period" associated with maintenance-deficient levees. This letter will also request that the community/levee owner submit, within 90 days, one of the following:

- A signed agreement stating that, to the best of the community's/levee owner's knowledge, the levee in question meets 44 CFR Section 65.10 requirements and all requirements for a PAL application package. See criteria for PAL Scenario A1 below.
- A signed letter stating that the community/levee owner has been notified of the one-time-only, 1-year "maintenance deficiency correction period" and agrees to proceed according to the associated process and requirements. See criteria for PAL Scenario A2 below. This one-time-only "maintenance deficiency correction period" will expire 1 year from the 91st day following the date of the initial notification letter. For the purposes this document, this signed letter will be identified as the "maintenance deficiency letter."

Procedures for processing PAL Scenario A1 and A2 levees are described in detail below. To help FEMA contractors and mapping partners properly assess how to handle levee mapping issues, a flowchart has been generated that depicts the possible steps for Scenario A levees. This flowchart is presented as Figure 2 at the end of this guidelines document.

**Scenario A1:** Once the FEMA Regional Office sends the initial notification letter for Scenario A, the community/levee owner will have 90 days to return either the PAL



Copyright National Academy of Sciences. All rights reserved.

application package or the maintenance deficiency letter. If the community/levee owner believes that the levee meets 44 CFR Section 65.10 requirements at that time, then they may qualify for Scenario A1.

If the full documentation required to show compliance with 44 CFR Section 65.10 are readily available when the initial notification letter is sent, FEMA will request that the community/levee owner provide these documents within 30 days. If additional time is required to gather the proper documentation, the community/levee owner will choose to submit the PAL application package. For any community/levee owner that chooses the PAL option, the requirements for 44 CFR Section 65.10 must be submitted within 24 months of the 91st day following the date of the initial notification letter. Certification by a Registered Professional Engineer must accompany the submitted 44 CFR Section 65.10 data in compliance with Paragraph 65.10(e). In addition, the community/levee owner must submit a progress report to FEMA after 12 months to document progress toward obtaining 44 CFR Section 65.10 data and documentation.

Several conditions exist that may require FEMA to take immediate action to rescind the PAL designation and revise the DFIRM for the area landward of the levee. If any of the following conditions apply, FEMA will direct the contractor or mapping partner to remap the area landward of the levee as Zone AE or Zone A, depending on the type of study performed for the area:

- Neither the signed PAL agreement nor a request for a maintenance deficiency correction period is returned to FEMA before the 91st day following the date of the notification letter;
- The full documentation required for compliance with 44 CFR Section 65.10 is not provided within 24 months of the 91st day following the date of the initial notification letter; or
- The 12-month progress report is not provided to FEMA, and the FEMA Regional Office believes the PAL agreement should be rescinded.

When the FEMA Regional Office sends the initial notification letter, the following attachments must be included:

- A description of the requirements to meet 44 CFR Section 65.10, entitled "Mapping of Areas Protected by Levee Systems"; and
- An agreement to accept the PAL option (agreement for Scenario A1), for the community/levee owner to sign and return to FEMA before the 91st day following the date of the initial notification letter.

The PAL application package requirements for Scenario A1, to be submitted by levee owner or community, are:

- An agreement signed by the community/levee owner stating that the PAL designation is warranted because the levee now meets the requirements of 44 CFR Section 65.10;



Copyright National Academy of Sciences. All rights reserved.

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 807 of 858



- A copy of the adopted operation and maintenance plan for the levee; and
- Records of levee maintenance and operation, as well as tests of the mechanized interior drainage systems, if applicable.

**Scenario A2:** Once the FEMA Regional Office sends the initial notification letter for Scenario A, the community and/or levee owner will be given 90 days to return either the PAL application package or the maintenance deficiency letter. If the community/levee owner believes that the levee meets 44 CFR Section 65.10 requirements with the exception of maintenance deficiencies, then they may qualify for Scenario A2.

Once the community/levee owner determines that maintenance deficiencies exist, the community/levee owner will have 90 days from the date of the initial notification letter to submit a signed letter requesting the maintenance deficiency correction period. At a minimum, this letter must clearly state:

- The only grounds for the levee in question not currently meeting the 44 CFR Section 65.10 requirements or PAL requirements are maintenance issues; and
- Within the 1-year "maintenance deficiency correction period," the community/ levee owner can remedy the maintenance deficiencies and submit one of the following:
  - All documentation necessary to comply with the requirements listed in 44 CFR Section 65.10; or
  - A request for a PAL designation and the entire PAL application package (PAL application requirements listed below).

If the community/levee owner submits a response before the 91st day following the date of the initial notification letter, the FEMA Regional Office will notify the community/ levee owner that the current study/mapping project will move forward and that the area landward of the levee will be remapped and shown as Zone AE or Zone A, depending on the type of study performed for the area. The notification will state that the Letter of Final Determination (LFD) and effective DFIRM will be delayed until the 1-year correction period has elapsed. For FEMA to remove the Special Flood Hazard Area (SFHA) designation landward of the levee, the community and/or levee owner must submit the following within the 1-year correction period:

- All the requirements listed in 44 CFR Section 65.10; or
- A request for a PAL designation and the entire PAL application package (PAL application package requirements listed below).

If all the data and documents required to comply with 44 CFR Section 65.10 are submitted before the 1-year correction period has elapsed, FEMA will issue the LFD and show the levee on the effective DFIRM as accredited. However, if a request for a PAL designation and a PAL application package are submitted and approved before the 1-year correction period has elapsed, then FEMA will issue the LFD and show the levee on the effective DFIRM as provisionally accredited. In addition, for the PAL option, the



Copyright National Academy of Sciences. All rights reserved.

No RR2.0-AR00014665

Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 808 of 858



community/levee owner must provide a progress report to the FEMA Regional Office after 12 months to document progress toward obtaining 44 CFR Section 65.10 data
If any of the following alternatives occur, FEMA will issue the LFD and an effective DFIRM that shows the areas landward of the levee will be remapped and shown as Zone AE or Zone A, depending on the type of study performed for the area:

- The community/levee owner does not submit a signed response letter before the 91st day following the date of the initial notification letter.
- The community/levee owner is granted the 1-year correction period, but does not submit the required data within the 1-year correction period.
- The submitted deficiency correction data are determined to be inadequate.
- A request for a PAL designation and the entire PAL application package is not submitted and approved before the 1-year correction period has elapsed.
- The 12-month PAL progress report is not provided to FEMA, and the FEMA Regional Office believes the PAL designation should be rescinded.
- The full documentation necessary to comply with 44 CFR Section 65.10 is not provided within 24 months of the final day of the correction period.
- The data and documentation submitted to meet the requirements of 44 CFR Section 65.10 or the PAL application is determined to be inadequate.

When the FEMA Regional Office sends the initial notification letter, the following attachments must be included:

- A description of the requirements to meet 44 CFR Section 65.10, entitled "Mapping of Areas Protected by Levee Systems;" and
- An agreement to accept the PAL option (agreement for Scenario A2), for the community/levee owner to sign and return to FEMA.

In response to the initial notification letter, the community/levee owner is to submit the following to FEMA to meet the PAL application package requirements for Scenario A2:

- An agreement signed by the community/levee owner stating that the PAL designation is warranted because the levee now meets the requirements of 44 CFR Section 65.10;
- A copy of the adopted operation and maintenance plan for the levee; and
- Records of levee maintenance and operation, as well as tests of the mechanized interior drainage systems, if applicable.

**Scenario B – Levees in the USACE program that are eligible for PAL**

Levees in the USACE program that meet the following criteria are eligible for the PAL designation.

Criteria to meet Scenario B:



Copyright National Academy of Sciences. All rights reserved.

No RR2.0-AR00014666

- The effective FIRM shows the levee as providing protection from the base flood;
- No available information indicates the levee does not provide base flood protection; and
- The project inspection rating is within an acceptable range (as defined by the USACE).

Communication with levee owner, community, and/or local project sponsor:

The FEMA Regional Office will send a letter (template letter for Scenario B) to the appropriate community/levee owner/local project sponsor identifying the levees that meet the above criteria and qualify for the PAL option. This letter will describe the PAL option and request that the community/levee owner/local project sponsor sign an agreement stating that, to the best of their knowledge, the levees in question meet 44 CFR Section 65.10 requirements.

If full documentation to comply with the requirements of 44 CFR Section 65.10 is readily available when the initial notification letter is sent, the FEMA Regional Office will request that the community/levee owner/local project sponsor provide these documents within 30 days. If the community/levee owner/local project sponsor requires time to gather the proper documentation, they will choose to submit the PAL application package. For any community/levee owner/local project sponsor that chooses the PAL, the documentation required to comply with 44 CFR Section 65.10 requirements must be submitted within 24 months of the 91st day following the date of the initial notification letter. Certification by a Registered Professional Engineer must accompany the submitted 44 CFR Section 65.10 data in compliance with Paragraph 65.10(e). As an alternative, USACE may also certify that the levee has been adequately designed and constructed to provide protection against the base flood. In addition, the community/levee owner/local project sponsor must submit a progress report to FEMA after 12 months to document progress toward obtaining data and documentation to comply with 44 CFR Section 65.10

Several conditions could occur that may result in the PAL designation being rescinded and FEMA taking immediate action to revise the DFIRM in the area landward of the levee. If any of the following conditions apply, FEMA will remap the area landward of the levee will be remapped and shown as Zone AE or Zone A, depending on the type of study performed for the area:

- The signed PAL agreement is not returned to FEMA within 90 days of the initial notification letter.
- The full documentation for 44 CFR Section 65.10 is not provided within 24 months of the final day of the 90-day agreement period.
- The 12-month PAL progress report is not provided to FEMA, and the FEMA Regional Office believes rescission is necessary.
- The data submitted to meet the requirements of 44 CFR Section 65.10 or the PAL application are determined to be inadequate.



Copyright National Academy of Sciences. All rights reserved.

When the FEMA Regional Office sends the initial notification letter, the following attachments must be included:

- A description of the requirements to meet 44 CFR Section 65.10, entitled "Mapping of Areas Protected by Levee Systems"; and
- An agreement to accept the PAL option (agreement for Scenario B), for the community/levee owner/local project sponsor to sign and send back to FEMA before the 91st day following the date of the initial notification letter

In response to the initial notification letter, the community/levee owner/local project sponsor is to submit the following to FEMA to meet the PAL application package requirements for Scenario B:

- An agreement signed by the community/levee owner/local project sponsor stating that the PAL designation is warranted because the levee now meets the requirements of 44 CFR Section 65.10;

**Scenario C – Levees in the USACE program with known deficiencies that are shown as providing base flood protection**

For levees in the USACE program that are shown on the effective FIRM as providing 1-percent-annual-chance flood protection but have known deficiencies, the criteria below are to be followed. Two scenarios are possible. To help FEMA contractors and mapping partners properly assess how to handle levee mapping issues, a flowchart has been generated that depicts the possible steps for Scenario C levees. This flowchart is presented as Figure 3 at the end of this guidelines document.

**Scenario C1:**

Criteria to meet Scenario C1:

- The USACE has determined that the levee's recent inspection ratings are listed as fair, poor, or unacceptable;
- The USACE has determined that the project status in the RIP has been switched from active to inactive; and
- The USACE has not provided a 1-year maintenance deficiency correction period for the levee.

Communication with levee owner, community, and/or local project sponsor:

The FEMA Regional Office will coordinate with the appropriate USACE District office regarding levee projects in the USACE inventory that have received an inspection rating of fair, poor, or unacceptable and have been placed in inactive status in the USACE Rehabilitation and Inspection Program (RIP). Once these projects have been identified, the USACE will send a notification letter to the community/levee owner/local project



Copyright National Academy of Sciences. All rights reserved.

sponsor to inform them that the levee status has been switched from active to inactive in the RIP and is no longer eligible for PL 84-99 rehabilitation assistance because of maintenance deficiencies. These deficiencies will not allow the levee to meet the minimum requirements of the 44 CFR Section 65.10; thus, the levee does not provide 1-percent-annual-chance flood protection. The deficiencies will be identified in the USACE letter. The USACE District office will provide a copy of this letter to the FEMA Regional Office. These levee systems will not be eligible for the PAL option.

The FEMA Regional Office then will send a letter (template letter for Scenario C) to the community/levee owner/local project sponsor stating that this is a follow-up to the notification they received from the USACE. The FEMA letter will clearly state that the deficiencies in the levee have been determined in coordination with the USACE, and FEMA will remap the area landward of the levee to show it as Zone AE or Zone A, depending on the type of study performed for the area, if the levee does not provide 1-percent-annual-chance flood protection. The USACE letter will be attached to the FEMA letter as background information.

**Scenario C2:**

<u>Criteria to meet Scenario C2:</u>

- The levee has received an unacceptable, fair, or poor inspection rating;
- The levee was in an active status in the USACE RIP prior to September 30, 2005 (FY06); and
- The USACE has offered a one-time-only, 1-year "maintenance deficiency correction period" to remedy the maintenance deficiencies of the levee.

<u>Communication with levee owner, community, and/or local project sponsor:</u>

Once these projects have been identified, the USACE will send a notification letter to the community/levee owner/local project sponsor to inform them of the levee's specific maintenance deficiencies. This letter will also inform the community/levee owner/local project sponsor that they are eligible for the one-time-only, 1-year "maintenance deficiency correction period," which provides them 1 year to resolve any levee maintenance deficiencies. The USACE District office will provide a copy of this letter to the FEMA Regional Office.

The FEMA Regional Office then will send a letter (template letter for Scenario C2) to the community/levee owner/local project sponsor stating that this is a follow-up to the notification they received from the USACE. The letter will explain the PAL option (Scenario C2) and that FEMA will move forward with the current study/mapping project and will remap the area landward of the levee that will be inundated by the 1-percent-annual-chance flood as Zone AE or Zone A, depending on the type of study performed for the area. The letter also will state that even though FEMA is moving forward with the mapping, the LFD and effective DFIRM will be delayed until the 1-year correction



Copyright National Academy of Sciences. All rights reserved.

period has elapsed. For FEMA to remove the SFHA designation landward of the levee, the following requirements must be met within the 1-year correction period:

- Evidence has been provided to show that the maintenance deficiencies have been remedied. This evidence will be provided to the FEMA Regional Office by the appropriate USACE District office.
- All of the requirements listed in 44 CFR Section 65.10 have been addressed, or a request for a PAL designation and the entire PAL application package has been submitted.

The FEMA Regional Office will coordinate with the appropriate USACE District regarding levee projects to evaluate and determine the adequacy of any data submitted within the 1-year period.

If all the data and documentation required to comply with 44 CFR Section 65.10 are submitted before the 1-year correction period has elapsed, FEMA will issue the LFD and show the levee on the effective DFIRM as accredited. Alternatively, if a request for a PAL designation and a PAL application package are submitted and approved before the 1-year correction period has elapsed, then FEMA will issue the LFD and show the levee on the effective DFIRM as provisionally accredited. In addition, to the community/levee owner/local project sponsor must submit a progress report to FEMA after 12 months to document progress toward obtaining documentation and data to comply with 44 CFR Section 65.10.

If any of the following alternatives occur, FEMA will issue the LFD and an effective DFIRM that shows the areas landward of the levee will be remapped and shown as Zone AE or Zone A, depending on the type of study performed for the area:

- The community/levee owner/local project sponsor is granted the 1-year correction period, but does not submit the required data within the 1-year correction period.
- The submitted deficiency correction data is determined to be inadequate.
- The 12-month PAL progress report is not provided to FEMA, and the FEMA Regional Office believes the PAL designation should be rescinded.
- A request for a PAL designation and the entire PAL application package is not submitted and approved before the 1-year correction period has elapsed.
- The full documentation necessary to comply with 44 CFR Section 65.10 is not provided within 24 months of the final day of the correction period.
- The data submitted to meet the requirements of 44 CFR Section 65.10 or the PAL application is determined to be inadequate.

When the FEMA Regional Office sends the initial notification letter, the following attachments must be included:

- A description of the requirements to meet 44 CFR Section 65.10, entitled “Mapping of Areas Protected by Levee Systems;” and



Copyright National Academy of Sciences. All rights reserved.

- An agreement to accept the PAL option (agreement for Scenario C2), for the community/levee owner/local project sponsor to sign and return to FEMA.

The PAL application package requirements for Scenario C2, to be submitted by levee owner, community, and/or local project sponsor, are:

- An agreement signed by the community/levee owner/local project sponsor stating that the PAL designation is warranted because the levee now meets the requirements of 44 CFR Section 65.10;

**Scenario D – Levees in the USACE program that are shown as not providing base flood protection**

Communication with levee owner, community, and/or local project sponsor:

For levees in the USACE program that are not currently shown as providing 1-percent-annual flood protection, no letter will be sent. In this case, there is no issue with how to map the area behind the levee, because it already has been determined that the levee does not provide 1-percent-annual flood protection or the levee has not gone through the certification process.. The DFIRM will continue to show the levee as not providing 1-percent-annual flood protection unless it is determined that the levee actually does provide this level of protection.

**Scenario E – Levees in the USACE program that do not meet an adequate level of protection, as determined by the USACE in coordination with FEMA, but are shown as providing base flood protection**

For levees in the USACE program that are shown as providing base flood protection but do not meet an adequate level of protection as determined by the USACE in coordination with FEMA, the following criteria will be followed.

Criteria to meet Scenario E:

- The levee is shown as providing protection but does not provide an adequate level (1-percent-annual-chance or greater) of flood protection, as indicated by the USACE levee inventory data and validated through coordination between the USACE district office and the FEMA Regional Office; and
- The levee inspection rating is NOT listed as fair, poor, or unacceptable, but the levee may have failed or experienced overtopping by a flood event less than the 1-percent-annual-chance flood.

The FEMA Regional Office will verify the engineering and mapping data used to produce the effective FIRM and determine whether it is the most up-to-date information, based on the best available data. However, the FEMA Regional Office will also



Copyright National Academy of Sciences. All rights reserved.

determine if better data are available than the data used to produce the effective FIRM. The FEMA Regional Office will coordinate with the USACE district office to either verify the current flood data are the best available or provide the more recent and accurate data. The USACE district office will use the best available data, as identified by the FEMA Regional Office, to determine whether the levee provides an adequate level of protection.

Communication with levee owner, community, and/or local project sponsor:

When the USACE district office in coordination with the FEMA Regional Office, determines that a levee in the USACE program does not provide an adequate level of protection, the community/levee owner/local project sponsor will be notified by letter (template letter for Scenario E) from the FEMA Regional Office that "in coordination with the USACE, it has been determined that your levee no longer provides protection from the base flood." The reasons the levee no longer provides 1-percent-annual-chance flood protection will be identified in this letter. The community/levee owner/local project sponsor will be instructed to contact the FEMA Regional Office if they have any questions or if they can provide the documentation and data necessary to show compliance with 44 CFR Section 65.10. If the community/levee owner/local project sponsor does not provide the required documentation and data, the area landward of the levee will be mapped as Zone AE or Zone A, depending on the type of study performed for the area.

**Mapping of the areas with and without the PAL designation**

Levees and levee systems that meet the 44 CFR Section 65.10 criteria will continue to be mapped as providing protection from the 1-percent-annual-chance flood, and the PAL designation is not applicable. The area landward of the levee will be mapped as a Zone X (shaded) with the following note:

> WARNING! This area is shown as being protected from the 1-percent-annual-chance flood hazard by levee, dike, or other structure. Overtopping or failure of this structure is possible, which could result in destructive flood elevations and high-velocity floodwaters. There is a chance that large floods will occur that are greater than the level of protection provided by the levee. Communities should issue evacuation plans and encourage property owners behind these structures to purchase flood insurance, even if the structure is currently shown as providing protection for the 1-percent-annual-chance flood.

For levees and levee systems that are eligible for the PAL designation, the area landward of levees can still be mapped as Zone X (shaded), with the following note applied at several locations in or near the zone:

> WARNING: Provisionally Accredited Levee. For explanation, see the Notes to Users.

The following accompanying note in the Notes to Users should only be applied to DFIRM panels that depict a levee or levee system with a PAL designation:



Copyright National Academy of Sciences. All rights reserved.

WARNING: This levee, dike, or other structure has been provisionally accredited and mapped as providing protection from the 1-percent–annual-chance flood. To maintain accreditation, the levee owner or community is required to submit documentation necessary to comply with 44 CFR Section 65.10 by (__________, ____). Because of the risk of overtopping or failure of the structure, communities should take proper precautions to protect lives and minimize damages in these areas, such as issuing an evacuation plan and encouraging property owners to purchase flood insurance.

The DFIRM in Figure 1 shows a levee on the east side of the river and Zone X (shaded) landward of the levee, with the warning note pointing to the levee. If a Zone X (shaded) area is already depicted on the effective FIRM/DFIRM, then the revised levee note can be added to the existing Zone X (shaded) area, as shown in Figure 1. If no Zone X (shaded) area exists on the effective FIRM/DFIRM, then the mapping partner should define the provisional Zone X (shaded) area using the best available data.

**Flood Insurance Study Report Requirements**

The Flood Insurance Study report should not be revised to identify those levees and levee systems that are eligible for the PAL designation.



Copyright National Academy of Sciences. All rights reserved.




Figure 1. Example of Zone X (Shaded) for the PAL Option



Copyright National Academy of Sciences. All rights reserved.

LEVEES
IDENTIFYING THE RISK

# Provisionally Accredited Levees

## Answers to Questions About Procedure Memorandum No. 43

Providing communities with up-to-date, accurate, and reliable flood hazard and risk information on Digital Flood Insurance Rate Maps (DFIRMs) is one of the primary goals of the Flood Map Modernization (Map Mod) effort undertaken by the Department of Homeland Security, Federal Emergency Management Agency (FEMA). Levee systems have been identified in over one-fourth of the counties that will receive modernized maps—Digital Flood Insurance Rate Maps (DFIRMs)—as part of Map Mod. Therefore, FEMA has been working, and continues to work with Federal, State, and local professionals and technical partners to determine the flood protection and risk-reduction capabilities of the Nation's levee systems and to accurately reflect the flood hazard and risk in "levee-impacted" areas on the DFIRMs. As part of the Map Mod effort, FEMA reviewed its existing guidance regarding the submittal of data and documentation to meet National Flood Insurance Program (NFIP) requirements for the evaluation and mapping of levee-impacted areas. As a result of this review, FEMA issued three Procedure Memorandums to clarify these requirements. The questions and answers below are provided to further explain these requirements.

**Q: What is a levee system?**

**A:** A levee system is a flood protection system that consists of a levee, or levees, and associated structures, such as closure and drainage devices, which are constructed and operated in accordance with sound engineering practices. A levee is a manmade structure, usually an earthen embankment, designed and constructed in accordance with sound engineering practices to contain, control, or divert the flow of water so as to provide protection from temporary flooding

Levee systems are designed to provide a *specific level of protection*. They can be overtopped or fail in larger flood events. They require regular maintenance and periodic upgrades to retain their level of protection. When levee systems do fail, they often fail catastrophically, and the resulting damage, including loss of life, may be more significant than if the levee system had not been built. Everyone should understand the risk to life and property that exists behind levee systems—risk that even the best flood protection system cannot eliminate completely.

**Q: What regulations apply to the evaluation and mapping of levee systems and levee-impacted areas?**

**A:** The regulatory requirements of the NFIP are cited at Title 44, Chapter 1, Section 65.10 of the Code of Federal Regulations (44 CFR Section 65.10). According to 44 CFR Section 65.10, it is the community, levee owner, and/or local project sponsor's responsibility to submit the data and documentation showing that a levee system complies with these requirements, including the development and maintenance of an operation and maintenance plan. You may access 44 CFR Section 65.10 through the FEMA Web site at www.fema.gov/plan/prevent/fhm/lv_fpm.shtm.

**Q: What are the procedural requirements for evaluating and mapping levee-impacted areas?**

**A:** FEMA has issued three Procedure Memorandums that provide guidance for mapping levee-impacted areas—Procedure Memorandum No. 34 (PM 34) —*Interim Guidance for Studies Including Levees,* Procedure Memorandum No. 43 (PM 43)—*Guidelines for Identifying Provisionally Accredited Levees*, and Procedure Memorandum No.45 (PM 45)—*Revisions to Accredited Levee and Provisionally Accredited Levee Notations* —as clarification to Appendix H of FEMA's *Guidelines and Specifications for Flood Hazard Mapping Partners.* PM 43 describes the various PAL scenarios and how each may be mapped. Information on PM 45, which provides updated information on the map notes that are to appear on DFIRM panels showing accredited and provisionally accredited levee systems, is provided on a separate Fact Sheet. You also may access these three Procedure Memorandums and other related guidance through the FEMA Web site at www.fema.gov/plan/prevent/fhm/lv_fpm.shtm.



Copyright National Academy of Sciences. All rights reserved.

**Q: Who is responsible for complying with the requirements of 44 CFR Section 65.10?**
**A:** Compliance with 44 CFR Section 65.10 requirements rests with communities, levee owners, and/or local project sponsors—not FEMA. A levee system owner can be a Federal or State agency, a water management or flood control district, a local community, a levee district, a non-public organization, or an individual. The party responsible for operating and maintaining the levee system must be a Federal or State agency, an agency created by Federal or State law, or an agency of a community participating in the NFIP. FEMA's responsibility is solely to review the data and documentation provided and either accredit the levee system with providing 1-percent-annual-chance flood protection on the DFIRM or, when the levee system is shown to be inadequate, to reflect the increased risk of flooding to people and structures in the levee-impacted areas on the DFIRM.

**Q: Why did FEMA issue PM 34?**
**A:** Documentation regarding levee design, structural integrity, and other requirements for accrediting a levee system with providing 1-percent-annual-chance flood protection often is outdated or missing altogether. To help clarify the entities responsible for providing data and documentation on levees systems identified during a study/mapping project, FEMA issued PM 34 on August 22, 2005. PM 34 clarifies that it is the levee owner or community's responsibility to provide data and documentation to show that a levee system meets the requirements of 44 CFR Section 65.10 as part of a study/mapping project. In addition, PM 34 provides clarification on procedures to minimize delays in near-term studies/mapping projects and to aid project teams in properly assessing how to handle levee system-related mapping issues.

**Q: When and why did FEMA issue PM 43?**
**A:** FEMA originally issued PM 43 on September 25, 2006. PM 43 provides guidance to FEMA contractors and mapping partners on issuing preliminary and, in some cases, effective DFIRMs, while providing communities and levee owners with additional time to compile and submit the data and documentation necessary to demonstrate compliance with 44 CFR Section 65.10. On March 16, 2007, FEMA issued a revised version of PM 43 to include guidance on evaluating levees systems that the U.S. Army Corps of Engineers has determined to be maintenance deficient and to offer a one-time-only 1-year "maintenance deficiency correction period."

**Q: When is a levee system designated as a Provisionally Accredited Levee, or PAL, system?**
**A:** The PAL designation is used for a levee system when FEMA has previously accredited the system with providing 1-percent-annual-chance flood protection on an effective Flood Insurance Rate Map (FIRM) and FEMA is awaiting data and/or documentation that will demonstrate the levee system's compliance with 44 CFR Section 65.10 of the NFIP regulations. A PAL is shown on a DFIRM as providing 1-percent-annual-chance flood protection, and the area impacted by the PAL system is shown as Zone X (shaded) except for areas of residual flooding, such as ponding areas, which will be shown as a Special Flood Hazard Areas (SFHAs).

**Q: What happens when a levee system meets the PAL requirements of PM 43?**
**A:** For levee systems that meet the PAL requirement (levee systems presently shown as providing 1-percent-annual-chance flood protection on the effective FIRM and for which the community or levee owner cannot readily provide all data and documentation required by 44 CFR Section 65.10), FEMA will place a note on the DFIRM panel landward of the levee system to indicate FEMA has provisionally accredited the levee system and the designation of any existing Zone X (shaded) area is provisional. FEMA will also add an explanatory note to the Notes to Users section of the map frame.

Before FEMA will designate a levee system as a PAL system, the community or levee owner will need to sign and return an agreement. By signing the agreement, the levee owner/community indicates the levee system currently complies with the requirements of 44 CFR Section 65.10 and that the data and documentation required for compliance with 44 CFR Section 65.10 will be provided within a specified timeframe. The timeframe will depending on the levee system's status (i.e., within 24 months of the 91st day following the date of the initial notification letter or within 24 months of the final day of the correction period for levees that have been offered the 1-year maintenance deficiency correction period).



Copyright National Academy of Sciences. All rights reserved.

**Q: How will a PAL be identified on a DFIRM?**

**A:** To identify the PAL, FEMA has been applying and may continue to apply the note below at several locations on DFIRM panels that will become effective before December 1, 2008. The note points to the levee system and is placed on the landward side of the levee system on the affected DFIRM panel(s) in or near the Zone X (shaded) area:

> WARNING: Provisionally Accredited Levee. For explanation, see the Notes to Users.

The following note has been or will be added to the Notes to Users on DFIRM panels that will become effective before December 1, 2008:

> WARNING: This levee, dike, or other structure has been provisionally accredited and mapped as providing protection from the 1-percent-annual-chance flood. To maintain accreditation, the levee owner or community is required to submit documentation necessary to comply with 44 CFR Section 65.10 by (__________,____). Because of the risk of overtopping or failure of the structure, communities should take proper precautions to protect lives and minimize damages in these areas, such as issuing an evacuation plan and encouraging property owners to purchase flood insurance.

The notes that will appear on the DFIRM panels that will become effective after December 1, 2008, are documented in PM No. 45 and in an accompanying Fact Sheet titled "Levee Notes on FEMA Maps: Answers to Questions About Procedure Memorandum No. 45."

**Q: How does FEMA determine if a levee system meets the PAL requirements of PM 43?**

**A:** For a levee system to be eligible for PAL designation, the levee system must be shown as providing protection from the 1-percent-annual-chance flood on the effective FIRM. Additional PAL requirements include the submittal of a PAL application package and a 12-month progress report. If applicable, there are other potential requirements, including a letter requesting a maintenance deficiency correction period and submittal of data demonstrating that maintenance deficiencies have been corrected (as appropriate). Specific timeframes for these requirements vary depending on the levee's status; however, more detailed information can be found in the guidance document, titled "Guidelines for Identifying Provisionally Accredited Levees." that accompanied PM 43. This document contains descriptions of different mapping scenarios and is accessible through the FEMA Web site at www.fema.gov/plan/prevent/fhm/lv_fpm.shtm.

For levee systems in the U.S. Army Corps of Engineers (USACE) Program that are shown on the effective FIRM as providing 1-percent-annual-chance flood protection but have known deficiencies, FEMA will coordinate with the appropriate USACE district to determine if the USACE will offer the one-time-only, 1-year maintenance deficiency period.

**Q: What if a levee system qualifies for the maintenance deficiency correction period as specified in PM 43?**

**A:** For levee systems not in the USACE Program, if the community/levee owner believes that the levee system meets 44 CFR Section 65.10 requirements with the exception of maintenance deficiencies, then the community/levee owner may qualify for a one-time-only 1-year maintenance deficiency correction period. The community/levee owner will have 90 days from the date of the initial notification letter from FEMA to submit a signed letter requesting the maintenance deficiency correction period.

The community/levee owner then has 12 months to submit 44 CFR Section 65.10-compliant data and documentation or a completed PAL application package (if additional time is needed to compile 44 CFR Section 65.10-compliant data and documentation) to show the levee system as accredited. If the community/levee owner does not provide 44 CFR Section 65.10-compliant data and documentation or a completed PAL application within the 12-month period,



Copyright National Academy of Sciences. All rights reserved.

then FEMA will issue an effective DFIRM showing the area landward of the levee as a Special Flood Hazard Area (SFHA), labeled Zone AE or Zone A, depending on the type of engineering study performed for the area.

The USACE determines whether the one-time-only, 1-year maintenance deficiency correction period will be offered for a levee system in the USACE Program. If the USACE does offer the correction period for the levee system, FEMA will de-accredit the levee system and remap the levee-impacted area to show it as a high-risk SFHA, labeled Zone AE or Zone A, depending on the type of engineering study performed for the area. If the USACE does offer the correction period for the levee system, the community/levee owner has 1 year to either submit data and documentation for 44 CFR Section 65.10 compliance or request and be approved for PAL designation (if additional time is needed). If neither is received, then FEMA will de-accredit the levee system and will issue an effective DFIRM showing the levee-impacted area as an SFHA, labeled Zone AE or Zone A, depending on the type of engineering study performed for the area.

**Q: What qualifies as a USACE Program levee system?**
**A:** Levee systems within the USACE Program are defined to include the following:

- Levee systems built by the USACE that were authorized for construction by the U.S. Congress or by USACE continuing authorities (e.g., Section 205);
- Levee system projects constructed by non-Federal interests or other (non-USACE) Federal agencies and incorporated into the USACE Federal system by specific congressional action; and
- Federal projects that are either operated and maintained by the USACE or turned over to a local sponsor for operation and maintenance; and Non-Federal projects within the Rehabilitation and Inspection Program (RIP), Public Law 84-99.

**Q: What qualifies as a Non-USACE Program Levee?**
**A:** Non-Federal levees are defined to include the following:

- Levee systems not authorized by the U.S. Congress or other Federal agency authority;
- Levee systems built by other Federal agencies and not incorporated into the USACE Federal system;
- Locally built and maintained levee systems built by a local community; and
- Levee systems that are privately built by a nonpublic organization or individuals and maintained by a local community.

**Q: Does adhering to PM 43 delay the release of new DFIRMs?**
**A:** The PM 43 process allows FEMA to issue the preliminary and effective DFIRMs while providing communities and levee owners a specified timeframe to submit the data and documentation necessary to show compliance with 44 CFR Section 65.10. For levee systems with maintenance deficiencies (that are otherwise believed to comply with the requirements of 44 CFR Section 65.10), the release of new DFIRMs may be delayed up to 1 year to provide the community/levee owner with additional time to correct these deficiencies.

It is important that community officials and citizens have the most accurate and up-to-date information to make decisions based on the flood risk that exists in areas behind levee systems. PM 43 allows for community officials and the public to have the most current flood hazard and risk information while the community or levee owner is given a reasonable amount of time to compile and submit data and documentation to show compliance with the requirements of 44 CFR Section 65.10.



Copyright National Academy of Sciences. All rights reserved.

FEMA

APR 24 2009

**MEMORANDUM FOR:** Mitigation Division Directors
Regions I - X

**FROM:** Doug Bellomo, Director
Risk Analysis Division

**SUBJECT:** Procedure Memorandum No. 53
Guidance for Notification and Mapping of Existing
Provisionally Accredited Levee Designations

**EFFECTIVE DATE: Effective April 24, 2009, for all current, expiring, and Future Provisionally Accredited Levee Designations**

**Background:** To clarify the guidance for the evaluation and mapping of levee systems provided in Appendix H of *Guidelines and Specifications for Flood Hazard Mapping Partners*, the Department of Homeland Security's (DHS), Federal Emergency Management Agency (FEMA), issued Procedure Memorandum No. 43 (PM 43) on September 25, 2006. PM 43 introduced the concept of the Provisionally Accredited Levee (PAL) system designation and established a reasonable timeframe (24 months) for a community or levee system owner to supply data and documentation demonstrating that a levee system owner to supply data and documentation demonstrating that a levee system meets the requirements of the National Flood Insurance Program (NFIP) regulations cited in the Code of Federal Regulations (CFR) at Title 44, Chapter 1, Section 65.10 (44 CFR Section 65.10). FEMA also implemented certain timeframes (12 months) where communities and/or levee system owners are to submit progress reports during the 24-month PAL data and documentation submittal period. To address subsequent issues and provide further clarification of requirements, FEMA issued a revised version of PM 43 on March 16, 2007. On May 12, 2008, FEMA issued PM 45 to provide updated guidance on the notes that will appear on DFIRM panels on which levee systems and levee-impacted areas are shown.

**Issue:** As the 24-month deadline approaches for communities and/or levee system owners to submit 44 CFR Section 65.10-compliant data and documentation for the PAL systems, FEMA recognized that a plan for mapping levee-impacted areas after the PAL period expiration date needed to be developed in association with a public outreach and awareness strategy for these areas. The plan needs to cover both accredited levee systems and de-accredited levee systems. In developing the plan, FEMA will continue to consider stakeholders' concerns that communities and levee system owners are confronted with serious challenges in providing 44 CFR Section 65.10-compliant data and documentation.

Copyright National Academy of Sciences. All rights reserved.

**Action Taken:**
Guidelines have been produced to address these needs. The attached document, titled "Guidelines for Notification and Mapping of Expiring Provisionally Accredited Levee Designations," summarizes planned activities related to the mapping of levee-impacted areas after the PAL period expires.

The attached guidance document is to be implemented by all Regions, contractors, and mapping partners as PAL expiration dates are reached.

**Attachment:**

"Guidelines for Notification and Mapping of Expiring Provisionally Accredited Levee Designations"

cc: See Distribution List

Copyright National Academy of Sciences. All rights reserved.

**Distribution List** (electronic distribution only):

Office of the Acting Assistant Administrator for Mitigation

Risk Analysis Division

Risk Reduction Division

Risk Insurance Division

Regional Mitigation Division

Legislative Affairs Division

Office of Chief Counsel

Mapping Partners

Program Management Contractor

National Service Provider

Independent Verification and Validation Contractor

Map Service Center Contractor

Indefinite Delivery Indefinite Quantity Contractors

Customer and Data Services Contractor

Production and Technical Services Contractors

Copyright National Academy of Sciences. All rights reserved.

## Guidelines for Notification and Mapping of Expiring Provisionally Accredited Levee Designations

### Notification of Provisionally Accredited Levee (PAL) Period Expiration

In advance of PAL designations expiring, each FEMA Regional Office will remind the levee system owners, communities, and other stakeholders of the impending expiration date. This notification will be accomplished by sending two letters during the 24-month expiration period to all appropriate parties. The Regional Offices will send the first letter 90 days before the PAL period expiration date, and Regional Offices will send the second letter 30 days before the PAL period expiration date. The attached letter templates are provided to support this Regional communication effort.

The Regional Offices will address the letters to each levee system owner signatory of the PAL Agreement, and will send copies of the letters to the following (at a minimum):

- Chief Executive Officers of all affected communities;
- Floodplain Administrators of all affected communities;
- State National Flood Insurance Program (NFIP) Coordinators;
- State levee safety officials, where appropriate;
- District offices of U.S. Senators and U.S. Representatives; and
- U.S. Army Corps of Engineers (USACE) District offices, if the PAL system is in USACE program. A USACE program levee system is defined in the Guidelines for Identifying Provisionally Accredited Levees (PALs), dated March 16, 2007.

It is important that appropriate Congressional offices are aware of this communication effort in advance of the PAL period expiration date. Therefore, in addition to sending copies of the letters, the Regional offices shall notify their Regional Legislative Affairs Division who may coordinate additional outreach efforts, as appropriate.

The Regional Offices may utilize certified mail with return receipts or fax the letters to the levee system owners and affected communities, following up with a telephone call, to confirm receipt of the original or faxes letters. FEMA Regions, or their assigned contractor will file return receipts, fax reports, or phone logs documenting the follow-up telephone calls in the case file for each affected community. FEMA Regions, or their assigned contractor also will assure that the documents are included with other technical and administrative support data in the Technical Support Data Notebook for the mapping project that commences upon the expiration of the PAL period.

### Mapping Process for Expired PAL Designations

Upon expiration of a PAL period, the FEMA Regional Office will determine if the PAL system will be accredited or de-accredited. This determination will be based on several conditions:

Copyright National Academy of Sciences. All rights reserved.

- Receipt of a 44 CFR Section 65.10-compliant data and documentation submittal for the levee system;

- A Regional Office-funded review and approval or denial of the submittal based on completeness when compared with the 44 CFR Section 65.10-compliant levee system checklist; and

- Resolution of conflicting data and documentation that may be submitted by other stakeholders.

FEMA will initiate a mapping project to revise the levee-impacted areas immediately upon determining that the PAL system is to be accredited or de-accredited. Depending on the scope and cost of the mapping project necessary to either accredit or de-accredit the system, the process can take up to 12 months before a Preliminary Digital Flood Insurance Rate Map (DFIRM) can be issued that reflects either the newly designated accredited or de-accredited levee system.

Physical Map Revisions (PMRs) will be used to revise DFIRMs that are impacted by FEMA revising the map notations (Map notes and Notes to Users) and floodplain boundary delineations for levee-impacted areas. There are some possible exceptions to this mapping project format. For example, a countywide study/mapping project may be warranted when the majority of the DFIRM panels are being impacted and another study is being processed concurrently within the County. However, it is not acceptable to delay the issuance of a PMR for the levee-impacted areas, to accommodate an ongoing study/mapping project for the purpose of issuing the revised map and report in Countywide Format. In addition, for a single panel mapping project to accredit a levee system, the Letter of Map Revision (LOMR) process may be appropriate, and the Regional Office should consult with FEMA Headquarters to make this determination.

For a de-accredited levee system, FEMA will not revise the floodplain and map notations associated with a PAL system using the LOMR process. There are too many risks associated with outreach and communication to be handled in a simplified process such as a LOMR. Further, from the start of the mapping project for a de-accredited levee system until the final effective date of the revised flood map, no less than 18 months shall pass to allow for proper outreach and due process. Any exceptions to either of these criteria must be coordinated with FEMA Headquarters.

***Remapping of Area Impacted by an Accredited Levee System***

For communities submitting 44 CFR Section 65.10-compliant data and documentation, the PAL designation will be revised on the DFIRM to identify the levee system as accredited. the notations in the Notes to Users regarding the PAL system must be removed and replaced with the current Notes to Users provided in Procedure Memorandum No. 45, making anything less than a full panel revision potentially confusing to users and, therefore, impractical. Procedures for evaluation and mapping of levee-impacted areas are found in Appendix H of FEMA's *Guidelines and Specifications for Flood Hazard Mapping Partners* (the *Guidelines*) and in Procedure Memorandum No. 52 – *Guidance for Mapping Processes Associated with Levee Systems*. The standard processing and outreach practices that are associated with mapping projects shall be followed.

Copyright National Academy of Sciences. All rights reserved.

***Remapping of Area Impacted by a De-Accredited Levee System***

At the end of 24-month PAL period, if the 44 CFR Section 65.10-compliant data and documentation submittal is not provided to FEMA, or if evidence is received by FEMA that the levee does not meet 65.10, or if the submittal is inadequate as determined by the Regional Office-funded review, FEMA will initiate a mapping project to de-accredit the levee system. Procedures for evaluation and mapping of levee-impacted areas are found in Appendix H of the *Guidelines* and in Procedure Memorandum No. 52. Procedure Memorandum No. 52 provides additional procedures for notification and outreach activities that shall be taken for de-accredited levee systems. This includes establishing a 90-day comment period (if an approximate Zone A area is mapped and no new Base Flood Elevations (BFEs) are proposed) or 90-day appeal period (if new or modified BFEs are proposed) following the issuance of the Preliminary DFIRM.

***Levee Inventory***

During the remapping of the area impacted by an accredited or de-accredited levee system procedures must be followed to ensure proper inventory and documentation occurs. FEMA's Mid-term Levee Inventory (MLI) and DFIRM database should be used as the appropriate systems to capture any updates for these mapping projects.

**PAL Period Extensions Will Not Be Granted**

FEMA will not grant extensions to the 24-month PAL period. Per Procedure Memorandum No. 43 – *Guidelines for Identifying Provisionally Accredited Levees*, in order for a levee to be provisionally accredited, the community or levee owner must commit to FEMA in writing to submit the full 44 CFR Section 65.10-compliant data and documentation for the levee within 24 months of this signed agreement. If the submittal is not received or is determined to be inadequate upon the expiration of the 24-month PAL period, FEMA will conclude that the levee is not 65.10-compliant and initiate a mapping project to publish a DFIRM that fully characterizes the appropriate flood hazard and risk associated with the de-accredited levee.

**Accreditation Opportunities for Communities and Levee System Owners**

FEMA will initiate a map revision immediately after the expiration of the PAL period. However, if a community or levee system owner can provide 44 CFR Section 65.10-compliant data and documentation for a de-accredited levee system, as determined by a Regional Office-funded review and approval based on completeness when compared with the 44 CFR Section 65.10-compliant levee system checklist, the levee system must be accredited and mapped accordingly, either within the current DFIRM update, or as soon as possible after the DFIRM becomes final. Thus, the timing of the submittal will drive the process.

If a community or levee system owner can provide 44 CFR Section 65.10-compliant data and documentation prior to a community adopting the DFIRM or prior to the four month period that would precede the effective date of the mapping project, whichever comes first, FEMA must revise the DFIRM and process it following the accreditation guidance above. While this process does not provide an extension to the PAL period, it allows communities and levee system owners additional time to provide the 44 CFR Section 65.10-compliant data and documentation submittal to FEMA before the DFIRM is finalized and becomes effective. This may cause FEMA to spend funds towards de-accreditation, only to receive the submittal and change direction toward accreditation during the mapping project. However, the need to be consistent nationwide in initiating map

Copyright National Academy of Sciences. All rights reserved.

revisions in a timely manner following the expiration of a PAL period offsets concerns related to costs.

If a community or levee system owner provides the FEMA Regional Office with the 44 CFR Section 65.10-compliant data and documentation submittal after the end of the appeal or comment period and after the community adopts the new DFIRM, FEMA will accredit the levee and map it accordingly as soon as possible after the DFIRM becomes final. There are several mapping options available to FEMA one the DFIRM becomes effective. Consequently, the FEMA Regional Office will consult with FEMA Headquarters staff to choose the mapping process that will accurately reflect the accredited levee on the effective DFIRM in an expeditious manner.

Copyright National Academy of Sciences. All rights reserved.

**(Date)**

**[Mr./Ms.] [Name of Community CEO]**
**[Title]**
**[City/County]**
**[Address]**
**[City, State Zip]**

**[90-Day / 30-Day] Notification of Provisionally Accredited Levee Period Expiration**

Dear **[Mr./Ms.] [Name of Community CEO]**:

This letter is to remind you of the upcoming **(Date Data and Documentation Showing 65.10 Full Compliance is Due)** deadline for **(City/County Name and Levee System owner/operator)** to submit all data and documentation required to demonstrate that **[levee system known as (levee system name)] / [levee systems identified on the enclosed table]** are in full compliance with the National Flood Insurance Program (NFIP) regulations cited in the Code of Federal Regulations (CFR) at Title 44, Chapter 1, Section 65.10 (44 CFR 65.10). On **(Date of FEMA Acknowledgement for Signed PAL Agreement)**, the Federal Emergency Management Agency (FEMA) of the Department of Homeland Security sent your community a letter acknowledging and accepting your signed Provisionally Accredited Levee (PAL) agreement (copy enclosed) for the **[levee system known as (Levee System Name)] / [levee systems identified on the enclosed table]**. That letter informed you that **[this levee system / these levee systems]** would be designated as **[a PAL system / PAL systems]** on the new Digital Flood Insurance Rate Map (DFIRM) for **<<County>>, <<State>>** during a 24-month PAL period that started on **(Date 2-Year PAL Period Started)**. The PAL designation is shown for [this levee / these levees/ on the [Preliminary / Effective] DIRM for **(County Name, State Name)** and Incorporated Areas.

The **[levee system was / the levee systems were]** shown with the PAL designation during the 24-month PAL period to convey to map users that verification of the **[levee system's / levee**

Copyright National Academy of Sciences. All rights reserved.

**systems']** accreditation status was underway. FEMA previously recommended that the levee system owner/operator(s) and the impacted communities implement outreach efforts to inform affected property owners that an assessment of the levee system[s] was underway. FEMA also encouraged the purchase of flood insurance in the areas impacted by the PAL system[s], although property owners are not federally mandated to purchase flood insurance policies in these areas.

In accordance with 44 CFR 65.10, it is the responsibility of the community or other party seeking recognition of a levee system, to provide the data and documentation definite and outlined in 44 CFR 65.10. Specifically, the design and construction data provided must be certified by a Registered Professional Engineer or by a Federal agency with responsibility for levee design.

If you are able to submit the required data and documentation and it is found to be acceptable by FEMA, FEMA will initiate a map revision to accredit the levee system[s]. FEMA will map the areas impacted by the levee system[s] as a moderate-risk area, designated Zone X (shaded). The mandatory flood insurance purchase requirements of the NFIP do not apply to structures in areas designated as Zone X (shaded), nor do the NFIP minimum floodplain management requirements.

If you are unable to submit the required data and documentation by **(Date Data and Documentation Showing 65.10 Full Compliance is Due)** or if the submitted data and documentation are determined to be inadequate, FEMA will initiate a map revision to de-accredit the levee system[s] and map the impacted areas on the landward side of the levee system[s]. These areas will be remapped as Special Flood Hazard Areas (SFHAs), designated **[Zone A / Zone AE]**. The SFHA is the area that is subject to flooding during the 1-percent-annual-chance flood. The mandatory flood insurance purchase and minimum floodplain management requirements of the NFIP apply to structures within the SFHA.

The mapping process from start to finish in situations where a levee system is proposed to be de-accredited will take no less than 18 months. Data showing that the criteria of 44 CFR 65.10 have been met can be submitted at any time during that period or after. Data submitted prior to a community adopting the DFIRM or prior to the four month period that would precede the effective date of the mapping project, whichever comes first, will be incorporated into the maps prior to them becoming final.

Communities are encouraged to increase floodplain management efforts and promote the purchase of flood insurance for all homes and businesses in areas impacted by levee systems, including areas that are impacted by levee systems that have been certified as providing 1-percent-annual-chance flood protection. Risk is dynamic and may not be completely eliminated by any levee system. Levee systems are designed and built to provide a certain level of flood

protection and to reduce the risks associated with flooding events in general. Levee systems can be overtopped or fail during flood events that exceed the design-level storm. Additionally, it is highly recommend that you consider this risk in your local emergency management plans, including creating evacuation plans for this area.

Please send all complete 44 CFR 65.10 data and documentation submissions to my attention on or before **(Date Data and Documentation Due)**. If you have questions or need additional information regarding the flood mapping for your community, please contact me by telephone at **(Regional Contact Telephone Number)**, or by e-mail at **(Regional Contact E-Mail Address)**.

Copyright National Academy of Sciences. All rights reserved.

Sincerely,

**(Regional Contact Name), (Title)**
Mitigation Division

Enclosures: **[PAL Status Table]**
Signed PAL Agreement(s)

cc: **(Name and Title of Floodplain Administrator)**
**(Name and Title of State NFIP Coordinator)**
**(Name and Title of Impacted Community/Communities CEO)**
**(Name and Title of Senators/Congressional)**
**(Name and Title of USACE District Office Contact) (for B levees only)**

Copyright National Academy of Sciences. All rights reserved.

# Appendix H

# USACE System-Wide Improvement Frameworks Program



Copyright National Academy of Sciences. All rights reserved.

**DEPARTMENT OF THE ARMY**
U.S. ARMY CORPS OF ENGINEERS
441 G STREET, NW
WASHINGTON, DC 20314-1000

REPLY TO
ATTENTION OF

CECW-HS NOV 29 2011

MEMORANDUM FOR COMMANDERS, MAJOR SUBORDINATE COMMANDS AND DISTRICTS

SUBJECT: Policy for Development and Implementation of System-Wide Improvement Frameworks (SWIFs)

1. References.

a. Engineer Regulation (ER) 500-1-1, Emergency Employment of Army and Other Resources - Civil Emergency Management Program, 30 Sep 2001.

b. Memorandum, HQ USACE (CECW-HS), 16 Nov 2007, subject: Levee Safety Program Implementation.

c. Memorandum, HQ USACE (CECW-HS), 9 Jan 2009, subject: Temporary extension of P.L. 84-99 Rehabilitation Eligibility for Non-Federal Sponsors Implementing System-wide Improvements.

d. Memorandum, HQ USACE (CECW-CE), not yet released, subject: Policy Guidance Letter (PGL) - Process for Requesting a Variance from Vegetation Standards for Levees and Floodwalls.

2. Definitions.

a. A "levee system" consists of one or more segments of earthen embankment or floodwall, and all appurtenant structures (such as closures, berms, pumping stations, culverts, and interior drainage), which are interconnected and necessary to reasonably reduce the potential of floodwater entering a defined area.

b. An "unacceptable inspection item" is an inspected item on the U.S. Army Corps of Engineers (USACE) levee inspection checklist. An unacceptable item or a combination of unacceptable items may lead to an overall levee-system rating of unacceptable.

c. A SWIF is a plan developed by the levee sponsor(s) and accepted by the USACE to implement system-wide improvements to a levee system (or multiple levee systems within a watershed) to address system-wide issues, including correction of unacceptable inspection items, in a prioritized way to optimize flood risk reduction.

Copyright National Academy of Sciences. All rights reserved.

CECW-HS
SUBJECT: Policy for Development and Implementation of System-Wide Improvement Frameworks (SWIFs)

d. An Interim Risk Reduction Measures (IRRM) plan contains actions to reduce life safety risks posed by a levee system while long-term solutions are being pursued. Example actions may include Emergency Action Plans, special modifications to evacuation plans that account for additional risk and potentially reduced response times, heightened public communication campaigns to inform citizens of the increased flood risk, and/or increased levee monitoring during flood events.

3. Background.

a. The USACE Public Law (P.L.) 84-99 program, pursuant to 33 U.S.C. 701n, is a voluntary program that includes the repair and restoration of participating flood risk reduction projects, such as levee systems. All levee systems that participate in P.L. 84-99 are inspected by USACE and rated against nationally consistent standards that USACE determined to be essential for the reliable performance of the levee system. Levee systems that have received an "Acceptable" or "Minimally Acceptable" overall system rating on the last periodic or routine/continuing eligibility inspection are "Active" in P.L. 84-99 and, consequently, are eligible to receive rehabilitation assistance from USACE to repair or restore levee systems to pre-disaster condition if they are damaged by a flood event. Levee systems that receive an "Unacceptable" overall system rating or that choose to no longer participate in the program are placed in "Inactive" status and are not eligible for rehabilitation assistance under P.L. 84-99.

b. In some cases, the items on a levee system found to be "Unacceptable" or "Minimally Acceptable" might be complex to correct. Developing and implementing solutions to address such deficiencies might require a multi-year effort and coordination between multiple entities. This may be especially true when resources protected under the Endangered Species Act or Tribal treaty rights could be impacted by any changes to the levee system. USACE is making the SWIF process available to levee sponsors facing such challenges as a way to facilitate the development of solutions to satisfy the multiple requirements that apply to their levee systems while allowing levee sponsors participating in the SWIF process to remain eligible for P.L. 84-99 rehabilitation assistance funding while addressing deficiencies.

c. Levee sponsors are responsible for operation, maintenance, repair, replacement, and rehabilitation of the levee system. The SWIF does not alter those responsibilities. The SWIF establishes a process using an interagency approach within which levee sponsors engage with federal, state, local and Tribal agencies and organizations in longer-term system-wide improvement efforts to optimize flood risk reduction by identifying solutions that efficiently use resources, prioritize improvements and corrective actions based on risk, and establish frameworks for coordinating overlapping or complementary programs and requirements.

Copyright National Academy of Sciences. All rights reserved.

CECW-HS
SUBJECT: Policy for Development and Implementation of System-Wide Improvement Frameworks (SWIFs)

d. Environmental compliance and consideration of other requirements, such as those imposed by treaties with Tribes, should be integrated into the SWIF process. USACE is responsible for assuring compliance with all applicable environmental requirements before it makes any decisions that would affect the environment or other resources; however, the levee sponsor involved in the SWIF process may be required to provide background information/documentation, mitigation, or other measures necessary to fulfill environmental compliance responsibilities as a condition of their participation in the P.L. 84-99 rehabilitation assistance program.

e. The SWIF can be used to address deficiencies or issues that cannot be accomplished through routine corrective actions, including:

(1) A levee system that has engineering deficiencies (e.g., change in hydraulic conditions that reduces level of authorized protection) in addition to "Unacceptable" inspection items;

(2) Improvements that involve multiple levee systems;

(3) Complex natural resource considerations that require additional time and coordination to ensure that the imperatives of both levee safety and environmental requirements are adequately served;

(4) Additional time and coordination to protect the rights of Tribes pursuant to treaty and statute; and,

f. This memorandum revises and supersedes the policy in Reference 1.c. above and will be incorporated into the revised Engineer Regulation (ER) 500-1-1, in Reference 1.a.

4. Purpose. The purpose of this policy is threefold and includes:

a. To facilitate interagency collaboration to address complex levee system deficiencies and encourage the establishment of interagency teams to jointly identify and implement regionally appropriate, science based solutions and tools to help reduce risk associated with levees or levee systems while ensuring compliance with other Federal laws, such as the Endangered Species Act, as appropriate;

b. To provide requirements and outline the process for the submittal and acceptance of a SWIF that will assist levee sponsors in attaining compliance with USACE standards; and,

Copyright National Academy of Sciences. All rights reserved.

CECW-HS
SUBJECT: Policy for Development and Implementation of System-Wide Improvement Frameworks (SWIFs)

c. To provide a mechanism for levee sponsors to maintain or regain eligibility for federal rehabilitation assistance under P.L. 84-99 while they are developing and implementing a system-wide improvement framework.

5. Applicability. This policy applies to all Headquarters USACE (HQ USACE) elements, Major Subordinate Commands (MSCs), USACE districts, and field operating activities that are responsible for Civil Works projects.

6. Eligibility for Rehabilitation Assistance Under P.L. 84-99.

a. Initial Eligibility for Rehabilitation of Flood Risk Reduction Projects. Pursuant to 33 U.S.C. 701n (P.L. 84-99) and ER 500-1-1, USACE administers a program for rehabilitation of flood risk reduction projects, such as levee systems, and for federally-authorized hurricane or shore protection projects. Federally-authorized, locally-operated and maintained levee systems are automatically placed in an "Active" status and are eligible for rehabilitation assistance upon construction completion. Non-federal levee systems constructed, operated and maintained by a local public entity may be placed in an "Active" status following an initial eligibility inspection by USACE that determines the levee system meets the minimum eligibility requirements and technical criteria.

b. Maintaining Eligibility.

(1) Eligible levee systems inspected by USACE are rated against nationally consistent standards that USACE determined are essential for the reliable performance of the levee system. Levee systems that receive an "Acceptable" or "Minimally Acceptable" overall inspection rating maintain an "Active" status and are eligible to receive rehabilitation assistance from USACE to repair flood damages. Levee systems that receive an "Unacceptable" overall inspection rating are immediately placed in "Inactive" status and are not eligible for rehabilitation assistance until the "Unacceptable" inspection items have been corrected and the system receives a rating of "Acceptable" or "Minimally Acceptable" through a re-inspection by the responsible USACE district office. Levee systems engaged in the SWIF process or a variance request will continue to be inspected against the standard applied at the time the request was submitted, either the national standard or a variance or other deviation from that standard.

(2) The concepts for developing a SWIF may be useful in situations where a levee sponsor wants to prevent a future "Unacceptable" rating. For these situations, the approval process outlined in paragraph 8 is not required; however, this process cannot be used to extend "Minimally Acceptable" ratings for levees with "Unacceptable" inspection items beyond the current two-year maximum period as specified in the USACE levee inspection checklist.

Copyright National Academy of Sciences. All rights reserved.

CECW-HS
SUBJECT: Policy for Development and Implementation of System-Wide Improvement Frameworks (SWIFs)

c. Transitioning "Acceptable" or "Minimally Acceptable" Levees. Levees sponsors with levees that are "Active" in the rehabilitation assistance program under an existing vegetation variance or deviation from the standard that want to use the SWIF process to transition to a new vegetation inspection standard through the vegetation variance request process, or that would like to systematically improve the condition of participating levees, may maintain their P.L. 84-99 rehabilitation assistance eligibility as long as they continue to meet the milestones set forth in their applicable SWIF.

d. Reinstating Eligibility While Developing and Implementing a SWIF. Levee sponsors that receive an overall levee system inspection rating of "Unacceptable" or have been "Inactive" in the rehabilitation program may regain eligibility for P.L. 84-99 rehabilitation assistance through the SWIF process. Upon approval by USACE of the letter of intent, requirements described below, the levee sponsor will receive an initial of up to two-year reinstatement of eligibility for P.L. 84-99 rehabilitation assistance. Continued eligibility will be determined annually based on milestones described in the subsequent SWIF. Levee sponsors who have never been eligible for rehabilitation assistance under P.L. 84-99 cannot gain P.L. 84-99 rehabilitation assistance eligibility through the SWIF process.

7. Requirements for Development and Submittal of a SWIF. The development of a SWIF is a two-step process consisting of (1) a Letter of Intent from the sponsor briefly describing levee system deficiencies and justification for how a system-wide approach will optimize flood risk reduction, and (2) development of a SWIF for addressing deficiencies and reducing flood risk. Once a Letter of Intent has been approved by USACE, a levee sponsor has up to two years to develop a SWIF plan. Eligibility after this two-year period will be dependent on the levee sponsor's progress in achieving the milestones defined in the SWIF. The SWIF plan is intended to be a specific document that guides sponsor activities, including anticipated milestones, but may also be adaptable and should be revised if conditions or needs change during implementation. The requirements for the Letter of Intent and SWIF are described as follows:

a. Requirements for Submitting a Letter of Intent for a SWIF. A Letter of Intent must be signed by all associated levee sponsors for each levee system involved in developing the SWIF and must include the following:

(1) Identification of levee system or systems to be covered by the SWIF, including system name and system identification number as listed in the National Levee Database;

(2) Brief description of deficiencies or issues that will be included in the SWIF and discussion of how a system-wide approach will improve and optimize overall flood risk reduction. This includes identifying any conditions not within the control of the levee sponsor(s) that prevents them from correcting "Unacceptable" inspection items in a timely manner;

Copyright National Academy of Sciences. All rights reserved.

CECW-HS
SUBJECT: Policy for Development and Implementation of System-Wide Improvement Frameworks (SWIFs)

(3) Demonstration that significant non-federal resources have been, or will be, committed for developing and/or implementing the SWIF (e.g., state legislative action, bond financing);

(4) Anticipated interim risk reduction measures that will be implemented throughout the SWIF process, including overall risk communication approach that addresses the risk to life increased by system-wide deficiencies;

(5) Brief description of existing or planned interagency collaborative efforts that will contribute positively to SWIF development, implementation and oversight; and

(6) List of anticipated state and federal permits and consultation requirements, needed to implement the SWIF.

b. Requirements for Submittal of a SWIF. SWIFs are developed and implemented by levee sponsor(s), reviewed and accepted by USACE, and monitored by a USACE district to address system-wide issues in a prioritized way to optimize system-wide risk reduction. As a minimum for acceptance by USACE, the levee sponsor's SWIF must include the following:

(1) Identification of levee system or systems covered by the system-wide improvement framework, including system name and identification number as listed in the National Levee Database;

(2) Description of proposed levee improvement and justification on how the SWIF optimizes flood risk reduction;

(3) A plan and schedule for interagency collaboration, including environmental and/or Tribal consultation if applicable, in the implementation of the SWIF;

(4) Documentation of specific agreements, such as project specific agreements, between levee sponsors and USACE or other agencies/organizations related to implementation of levee modifications, under Section 408 or other overlapping USACE policies and studies, applicable to the levee systems identified in the system-wide improvement framework;

(5) Documentation of any regional considerations, approaches, and tools to be used during implementation of the system-wide improvement framework;

(6) Description of interim maintenance standards that will be implemented during the SWIF to mitigate conditions of uncorrected "Unacceptable" inspection items;

Copyright National Academy of Sciences. All rights reserved.

CECW-HS
SUBJECT: Policy for Development and Implementation of System-Wide Improvement Frameworks (SWIFs)

(7) IRRM plan, including a risk communication plan that addresses the risk to life increased by system-wide deficiencies;

(8) Schedules and milestones that will be used to monitor progress and to determine continued eligibility for P.L. 84-99 rehabilitation assistance while the SWIF is being implemented; and

(9) For those levee systems shown as accredited on the Federal Emergency Management Agency (FEMA) Flood Insurance Rate Map that are part of the SWIF, demonstration that FEMA has been informed that these levee systems with "Unacceptable" inspection items are being addressed in a system-wide improvement framework. Please note that an extension of eligibility for rehabilitation assistance through the SWIF process by USACE does not constitute an extension of accreditation for FEMA purposes. FEMA determines how a SWIF may or may not impact accreditation.

8. Approval Process. The approval authority for reinstating eligibility for rehabilitation assistance under P.L. 84-99 via a Letter of Intent, and for acceptance of a SWIF is the Director of Contingency Operations and Homeland Security (DCO/HS) under USACE. District Commanders shall evaluate the levee sponsors' request for an extension, based on the criteria outlined in this memorandum. If the District recommends approval of an eligibility reinstatement, the District Commander shall forward this recommendation to the Division Commander for concurrence. The Division Commander will review the request and, if in concurrence, will endorse the recommendation and submit the request to the DCO/HS through the Regional Integration Team. The District and MSC Commanders shall coordinate these requests with their Levee Safety Officers for technical input. Eligibility reinstatement will not be implemented until the request is approved by DCO/HS. District Commanders are also responsible for monitoring levee sponsor milestones in implementing SWIFs, conducting reviews for eligibility extensions following initial reinstatement, submitting an accepted SWIF to the local FEMA regional office, and providing approval recommendations through the approval process described herein.

9. Progress Reporting and Continued P.L. 84-99 Eligibility. Once a Letter of Intent has been approved through the process in paragraph 8, a levee sponsor(s) has up to two years of reinstated rehabilitation assistance eligibility under P.L. 84-99 to develop a system-wide improvement framework. The District Commander shall review the levee sponsor's progress for development of the SWIF after the first year and, if deemed not satisfactory, the District Commander may recommend to the DCO/HS that the levee sponsor no longer be eligible for P.L. 84-99 rehabilitation assistance. Eligibility after the two-year period for SWIF development will then be dependent on the levee sponsor's progress in achieving the milestones defined in the SWIF. Continued P.L. 84-99 rehabilitation assistance eligibility during the implementation of the SWIF

Copyright National Academy of Sciences. All rights reserved.

CECW-HS
SUBJECT: Policy for Development and Implementation of System-Wide Improvement Frameworks (SWIFs)

must be approved by the DCO/HS on a two-year basis following the process in paragraph 8. During implementation of the SWIF, continued P.L. 84-99 rehabilitation assistance eligibility requests should include a copy of the SWIF; description of accomplishments and milestones met; and description of any changes since the last SWIF was submitted. At a minimum, levee sponsors shall submit a memorandum to the District Commander annually that demonstrates system-wide improvement accomplishments.

10. Overlap with Vegetation Variance Policy. The SWIF process may complement the vegetation variance request process, currently set forth in ER 500-1-1 and anticipated to be updated shortly in paragraph 1.d., as a means for a levee sponsor to address levee deficiencies. If required, a vegetation variance request can be part of the SWIF process. The SWIF offers an interagency approach to identify regional solutions and tools that may be useful in development of a vegetation variance request. The end result of the SWIF process will be levees that meet the USACE inspection standards, which may also include an approved vegetation variance. See enclosure for timelines for both the SWIF process and situations with existing vegetation variances or deviations from the standard.

11. Levee Inspections. During implementation of the SWIF, levee systems with P.L. 84-99 rehabilitation assistance eligibility will continue to be inspected, rated, and the results communicated in accordance with USACE inspection processes, paragraph 1.b. and other applicable guidance. Any "Unacceptable" inspection items identified during inspections will be recorded as such and be corrected in accordance with existing policy or noted to be corrected under a system-wide improvement framework. At any time that the condition of a deferred "Unacceptable" inspection item worsens to a point of creating an emergency condition, immediate corrective actions must be taken by the levee sponsor in order to retain eligibility for P.L. 84-99 rehabilitation assistance.

12. Post-Flood Repair Responsibilities Associated with "Unacceptable" Inspection Items. Upon approval of the Letter of Intent by the USACE, levee sponsors who meet milestones will remain eligible for post-flood repair throughout the SWIF development and implementation process; however, levee sponsors will continue to be responsible for the portion of that repair cost associated with "Unacceptable" inspection items in accordance with ER 500-1-1, paragraph 5-2, g.

13. Funding for USACE Participation in the SWIF Process. USACE review of requests submitted by levee sponsors for SWIF implementation and participation of USACE representatives in collaborative frameworks for developing SWIFs may be funded with Inspection of Completed Works funds for federally-authorized levee systems and Flood Control and Coastal Emergency funds for non-federal levee systems. USACE participation in

Copyright National Academy of Sciences. All rights reserved.

CECW-HS
SUBJECT: Policy for Development and Implementation of System-Wide Improvement Frameworks (SWIFs)

collaborative frameworks to address SWIF issues implemented through Silver Jackets (SJ) intergovernmental teams may use SJ funding.

14. Point of Contact. The point of contact for this action is Ms. Germaine Hofbauer, (202) 761-4970.

FOR THE COMMANDER

Encl

KAREN DURHAM-AGUILERA, P.E., SES
Director of Contingency Operations
and Homeland Security

Copyright National Academy of Sciences. All rights reserved.




Copyright National Academy of Sciences. All rights reserved.

Copyright National Academy of Sciences. All rights reserved.

# Appendix I

# Risk Analysis Background

The committee has recommended that the National Flood Insurance Program (NFIP) adopt and implement a modern approach to the analysis of flood risks that will serve as input to the assessment of flood insurance and provide a sound foundation for transitioning to risk-informed floodplain management. The approach recommended is founded on decades of risk analysis experience in the natural hazards and civil infrastructure arena and environmental health and life safety. This experience has evolved in the private and public sectors (USACE, 1996, 2006; USNRC, 2011; AIR, 2012; RMS, 2012; EPA, n.d.) and specifically in the levee–flood risk areas as evidenced by recent studies in Dallas, Texas, New Orleans, Louisiana, Sacramento, California, and in California's Sacramento–San Joaquin Bay Delta (URS/JBA, 2008; IPET, 2009; CA DWR, 2012; USACE, 2012). This appendix provides further background and support for the modern risk analysis recommended in Chapter 3, including continued discussion of elements of a modern flood risk analysis.

## NEW CAPACITY ENABLING A RISK-BASED ANALYSIS

At the initiation of the NFIP in the 1970s, simplified analysis was necessary and appropriate. Hydraulic modeling capabilities were limited. Much of the hydraulic analysis for floodplain delineation, for example, was completed with computer program HEC-2 (USACE, 1991), a one-dimensional (1-D) steady-flow open-channel flow analysis application that was executed on large mainframe computers and for which the channel system was described on IBM punch cards, and the channel system description, which includes the channel cross-section geometry, often was derived from U.S. Geological Survey 7.5-minute quadrangle topographic maps; maps with contour intervals of 10 feet that are accurate to ±5 feet (1.5 meters) of the actual elevation. Furthermore, at the onset of the NFIP, knowledge of performance of levees was limited, and the notion of evaluating the potential for levee failure and describing performance in terms of the probability of failure with a fragility curve had not found its way into flood and floodplain analysis. Although a fundamental description of economic consequences and an associated probability of occurrence did play a limited role in flood insurance rate setting and management planning (e.g., in the computation of expected inundation reduction benefit attributable to a flood management project), a detailed understanding and description of risk were not widespread in the floodplain management community, and procedures and tools for risk analysis were not readily available.

Technological advances in the past 40 years now make risk analyses of large insurance portfolios possible within the context of the NFIP. For example, the NRC (2007) notes that Lidar (light detection and ranging) technol-



Copyright National Academy of Sciences. All rights reserved.

ogy has matured to the point that it "is capable of producing a bare-earth elevation model with 2-foot equivalent contour accuracy in model terrain and land-cover types." With geographic information system tools, overland flow on floodplains can be more accurately modeled from these data in a systematic, automated manner, with minimum human processing and few errors. Further, the state of practice of hydraulic modeling has advanced greatly since the early days of the NFIP, with two-dimensional (2-D) unsteady open channel and overland flow models now widely used. In fact, FEMA's list of acceptable models for hydraulic analysis includes five such models.[1] Data for estimation of consequence of inundation, particularly estimation of inundation damage, are readily available. These include, for example, property values, property type categorization, and property elevation data in FEMA's Hazards–United States (Hazus) databases.[2]

The technical capability now exists for implementing and applying risk analysis as proposed in this report. In fact, other state and federal agencies with responsibilities for flood risk management have recognized the need for complete risk analyses to support their decision making, and have incorporated those analyses in their programs. To varying degrees, those analyses:

- Account for the full range of hazard, going beyond the one percent chance event, considering events as common as the 50 percent chance event and as rare as the 0.1 percent or 0.01 percent chance event.
- Include an explicit assessment of the consequences of inundation. Most analyses consider economic consequences, some life safety, and few environmental consequences.
- Evaluate all potential mechanisms for flooding areas that are protected by a flood protection system, including overtopping (without levee or structural failure), misoperation, breaching, and ponding. In addition, damages that may be caused by breaching itself, such as might be caused by the scour that occurs during the breach process, can be evaluated.
- Account for the performance of flood protection systems throughout the range of possible hazards. The analyses consider, for example, that a levee designed for the 10 percent chance event may reduce adverse economic consequence due to the one percent chance event, even though it will not eliminate all damage due to that event. They also represent the possibility, though unlikely, of failure of a FEMA "certified" levee during events that are smaller or larger than the one percent chance event.
- Acknowledge and evaluate the uncertainties about the various inputs to the analysis, including natural variability and lack of perfect understanding and ability to model the natural processes.

For example, all flood damage reduction studies conducted by the U.S. Army Corps of Engineers are required to analyze risk (USACE, 2006). The requirement applies to USACE studies that lead to feasibility reports, general design memorandums, and general re-evaluation reports. The regulation specifically prohibits traditional deterministic approaches—such as inclusion of freeboard to account for what are described as "hydrologic, hydraulic, and geotechnical uncertainties." Instead, USACE analyses must use technical procedures presented in Engineering Manual 1110-2-1619 (USACE, 1996), Engineering Technical Letter 110-2-556, and companion documents.

In addition to the foregoing public-sector applications, private companies have developed flood risk analysis tools for evaluating insurance portfolios (AIR, 2012; RMS, 2012).

## EXAMPLES OF CURRENT USE OF A RISK ANALYSIS TO EVALUATE FLOOD RISKS

As discussed in Chapter 3, the use of risk analysis methods to evaluate flood risks and specifically to consider the performance of levees has been ongoing and improving for more than a decade. This includes the development of a probabilistic approach by USACE in the 1990s (USACE, 1996). More recently, after the events of Hurricane Katrina, there has been considerable development and application of risk analysis methods to evaluate the flood

[1] See http://www.fema.gov/national-flood-insurance-program-flood-hazard-mapping/numerical-models-meeting-minimum-requirement-0.
[2] See http://www.fema.gov/protecting-our-communities/hazus.

Copyright National Academy of Sciences. All rights reserved.

risks and the performance of levees and flood protection systems in general. As a response to the damage caused by Katrina and the levee failures, the USACE formed a team to conduct a detailed risk and reliability analysis of the New Orleans hurricane protection system, including an assessment of economic consequences as part of the Interagency Performance Evaluation Task Force study (IPET, 2009). During the same period and partly in response to Hurricane Katrina, the California Department of Water Resources carried out a comprehensive risk analysis on the more than 1,200 miles of levees in the Sacramento–San Joaquin Delta (URS/JBA, 2008). This analysis evaluated flood and seismic risks to Delta levees (which are more like dams because they have water against them year round) and the economic risks to the state. Following the Delta risk study, California DWR is conducting flood risk studies in the Central Valley, including the extensive development of levee fragility curves. As part of the California Central Valley Flood Protection Plan, engineers have developed levee fragility curves at approximately 300 locations in approximately 1 year, following an extensive data collection effort (CA DWR, 2012). Similarly, USACE has developed levee fragility curves for use in ongoing planning studies, all of which now employ complete risk analysis (USACE, 2006).

The events of Hurricane Katrina led to significant changes at USACE in terms of their use of risk analysis methods in its levee and dam safety programs. In fact, the IPET evaluation led to USACE making a major paradigm shift, transforming USACE to a risk-informed agency (USACE, 2008). Whereas USACE had been using risk analysis in limited ways prior to Katrina, the impact of failure of USACE-designed structures led to a wholesale move to implementation of risk analysis for the management of the nation's flood risk. As part of these changes, USACE is advancing its risk analysis methods for levees and developing new tools to improve the assessment of flood protection systems (USACE, 2008).

## DETAILED DICUSSION OF A MODERN RISK-BASED ANALYSIS

As described in the report, there are a number of key elements to conducting a modern risk analysis. These include:

- the requirement that uncertainties, specifically epistemic uncertainties, be identified and evaluated as an integral part of the analysis;
- modeling and considering the performance of flood protection systems, including the potential for failure and breaching, misoperation, overtopping, and flooding of areas protected by these systems, in the assessment of the potential for flooding and damage; and
- a systems-based approach for the modeling of the hydrologic and hydraulic systems and the flood protection systems that provide protection to a community.

As it pertains to the NFIP, the purpose of a risk-based approach to the analysis of flood risks, including the performance of flood protection systems, is multifold. It is intended to provide a quantitative measure of the flood damages associated with flood hazards that can be used to support the NFIP determination of flood insurance rates. This assessment needs to consider the performance of levee systems and, given the language in 44 CFR §65.10, all elements of flood protection systems and their role in the potential for flooding. In addition to insurance-motivated needs of the NFIP, the risk analysis and, more specifically, the products of the risk analysis will support other floodplain management aspects of the program (risk communication, planning, etc.).

The analysis of flood risks is a multidisciplinary evaluation that is made on the basis of available information. As such, the recognition and evaluation of these epistemic uncertainties is a key concept in modern risk analysis. As a starting point for the development of an NFIP risk analysis methodology, it is important that a clear definition of uncertainty and risk be established. Furthermore, as procedures for the implementation of an NFIP risk analysis method are developed, clear definitions of the responsibilities of the professionals involved in the study, the evaluations they are expected to perform, and the results they generate are critical. Experience suggests that in complex, multidisciplinary evaluations it is important that responsibilities are clearly defined and the technical interface between different parts of the analysis are laid out.

Copyright National Academy of Sciences. All rights reserved.

## Characterizing Aleatory and Epistemic Uncertainty

As noted above and in Chapter 3, uncertainties are an integral part of the modern risk-based analysis. To evaluate and model aleatory and epistemic uncertainties, a characterization can be made in terms of their effect on models and estimates of model parameters (Table I-1). Modeling epistemic uncertainty represents differences between a physical process (hurricane surge, embankment failure) and prediction models. Modeling epistemic uncertainty can be estimated by comparing model predictions to observed events/performance. Parameter uncertainty is the epistemic uncertainty associated with the estimates of model parameters as derived from available data. Parametric uncertainty is quantified by observing the variation in parameters inferred (either in a direct or an indirect manner).

The distinction between aleatory and epistemic uncertainty is not intuitive and can be difficult to ascertain. Furthermore, the assessment of these uncertainties is model dependent. For example, a simple engineering model of an event (levee performance during a flood) may have higher model aleatory variability than a more complex model that addresses more details of the physical process of a levee dealing with the loads it is exposed to during the flood (i.e., increased hydrostatic loading, wave action, seepage forces, etc.). At the same time, the more complex model may have larger parametric epistemic uncertainty; there are more parameters to estimate and there may be limited data to estimate them. Thus, the characterization of uncertainties is model dependent, making the distinction between different types of uncertainty difficult. Nonetheless, making a distinction between the sources of uncertainty in a logical manner helps ensure that all uncertainties are identified and quantified. In principle, epistemic uncertainties are reducible with the collection of additional data or the use/development of improved models.

## A Conceptual Framework for Flood Risk Analysis

As described in the main report, a starting point for the development of an NFIP flood risk analysis is a conceptual framework for flood risk analysis that can be defined as:

$$R = f(H,V,C) \tag{I-1}$$

where risk (R) is a function of flood hazard (H), vulnerability (V), and consequence (C). In this context, risk is a function of the flood hazard a community is exposed to, the vulnerability of flood protection systems and the potential that their failure will contribute to flooding, and the consequences associated with system failures and the damage to a community exposed to flooding, including economic impact and life safety.

As noted in Chapter 3, this framework can be extended to include the concepts of uncertainty. This extension

TABLE I-1 Characterization of Aleatory and Epistemic Uncertainty on Models and Model Parameters

| | Type of Uncertainty | |
|---|---|---|
| Element | Epistemic | Aleatory |
| Modeling | Uncertainty about a model and the degree to which it can predict events or outcomes (e.g., levee performance), that is, to what extent a model has a tendency to over- or underpredict observations | Aleatory modeling uncertainty is the variability that is not explained by a model. For instance, this variability is attributed to elements of the physical process that are not modeled and therefore represents a variability (random differences) between model predictions and observations. |
| Parametric | Uncertainty associated with the estimates of model parameters, given available data, indirect measurements, etc. | This uncertainty is similar to aleatory modeling uncertainty. This is a variability that may be due to systematic, but random, variations associated with parameters of a model. |

SOURCES: Abrahamson et al. (1990), USR/JBA (2008), IPET (2009).

Copyright National Academy of Sciences. All rights reserved.

provides a quantitative definition of risk (Kaplan and Garrick, 1981; ASME/ANS, 2009; IPET 2009) in probabilistic terms:

$$R = f(H,V,C,\nu,\rho) \tag{I-2}$$

where $\nu$ = frequency of occurrence or exceedance, and is a measure of the aleatory uncertainty (the randomness of events); $\rho$ = probability as a measure of the confidence to which an estimate of $\nu$ is the true value, or the epistemic uncertainty in the estimate of $\nu$. For purposes of a flood risk analysis, the consequences of flooding are measured in terms of the economic damages. Typically, results of risk analysis would be expressed in terms of a frequency distribution on economic damages (dollars). This is denoted

$$R = \nu(\mathrm{c}) \tag{I-3}$$

where $\nu()$ = frequency of occurrence per year; and $c$ = consequences measured in dollars.

Another risk metric is the expected annual losses, which can be estimated by

$$E(c) = \int c*\nu(c)dc \tag{I-4}$$

The estimate of flood consequences and their frequency of occurrence are uncertain, that is $\nu(c)$ cannot be determined with certainty; there is epistemic in estimating the frequency and magnitude of floods, uncertainty in the performance of flood protection systems, and the magnitude of consequences. There is therefore a distribution on the estimate of $\nu(c)$. A formal analysis of the uncertainties in the components of a risk analysis ($H$, $V$, and $C$) produces a probability distribution on the estimate of $\nu(c)$, the estimate of risk. This probability distribution that quantifies the uncertainty in the estimate of $\nu(c)$ can be thought of as a distribution from which confidence intervals on the estimate of risk can be derived.[3] Kaplan and Garrick (1981) provide a quantitative definition of risk that includes the quantification of aleatory and epistemic uncertainties and the estimate of consequences:

$$\{\nu,\mathrm{C},\rho\} \tag{I-5}$$

or, in terms of the risk example above, equation (I-5) can be written,

$$\{\nu(c)_i,\rho_i\} \tag{I-6}$$

where, $\nu$ = frequency of occurrence or exceedence, as is a measure of the aleatory uncertainty; $C$ = a consequence metric (e.g., economic impact, public safety); $\rho$ = probability as a measure of epistemic uncertainty in the estimate; and where,

$$\sum_{i=1}^{n} \rho_i = 1.0 \tag{I-7}$$

The frequency of occurrence is a measure of the aleatory uncertainty of events or outcomes (consequences), their randomness or stochastic character. An example of aleatory uncertainty is the occurrence of flood events in a watershed, or the performance of a levee for a given flood level. Equation (I-6) defines a discrete probability mass function on the frequency distribution of consequences, where probability is a measure of epistemic uncertainty in the estimate of $\nu$.

[3] The notion of confidence intervals is a useful concept for purposes of illustrating the measure of uncertainty in the risk analysis results. In fact, however the assessment of uncertainties is not same as a statistical analysis of a dataset from which confidence intervals on parameter estimates are derived.

Copyright National Academy of Sciences. All rights reserved.

Levees and the National Flood Insurance Program: Improving Policies and Practices
Case 2:23-cv-01839-DJP-EJD Document 230 Filed 11/13/26 Page 848 of 858



## Risk Analysis Methodology

A primary product of a risk analysis for the NFIP is an assessment of the frequency of economic consequences that can occur as a result of flood-related events. For a unit of exposure (a particular property) or for an entire portfolio, the risk analysis will evaluate the potential that a unit may experience flooding and the damage (loss) that will occur as a result of the flooding. For a property behind a levee, the mechanisms that may lead to flooding are

- levee breach, prior to a levee being overtopped;
- inflow to the protected area (behind the levee) due to overtopping that does not result in breaching of the levee;
- flooding that occurs due to failure to close gates or other closures;
- levee breaching as a result of overtopping;
- flooding behind the levee that occurs due to intense rainfall, storm drains getting backed up, etc. that result in flooding/ponding in the protected area behind the levee.

The loss that occurs will vary, depending on

- depth and velocity of flooding associated with the different flooding mechanisms (see above); and
- proximity to the location of the levee breach. For instance, when a levee breaches, the depth of flooding behind the levee might end up at 2 feet above the first-floor elevation. However, a property that is located at or near a breach may be completely destroyed as a result of the depth of water, the high velocities of flow that will occur, and/or the fact the unit is located in the scour zone of the breach which undermines the foundation of the unit, etc.

A primary product of the risk analysis for an individual insured property or for an entire portfolio is an assessment of the frequency of economic consequences, which will vary in scale depending on the size of the flood events and the flooding mechanisms that can occur. This result, repeated from above, can be denoted,

$$\{\lambda(C > c)_i \rho_i\} \tag{I-8}$$

where $\lambda()$ is the frequency of exceedance of the economic consequences and $\rho_i$ is the probability associated with an estimate of the flood risk, $\lambda(C > c)_i$.

To estimate the result in equation (I-8), there are two fundamental components to the risk model. The first can be referred to as the aleatory flood risk model, which estimates the frequency of occurrence (or exceedance as shown in equation (I-8)) of flood damages. For an individual property, this can generally be denoted

$$\lambda(C > c) = \sum_{i=1}^{n_F} v(F_i) \sum_{j=1}^{m_{\text{states}}} \sum_{k=e_o}^{e_{\max}} P(LPS_j \mid F_i) P(e_{ij} \mid F_i, LPS_j) P(C > c \mid e_j) \tag{I-9}$$

where

$v(e_j)$ = frequency of occurrence of flood event $i$;

$P(LPS_j > F_i)$ = probability of levee system performance state $j$, given flood event, $F_i$;

$P(e_{ijk} \mid LPS_j)$ = probability of flood elevation $k$ due to flood event, $F_i$ and levee system performance state, $LPS_j$; and

$P(C > c \mid e_j)$ = probability that consequences of flooding will exceed a level $c$, given the occurrence of a flood elevation $e_j$.

The summations are carried out over (1) the range and type of flood events, (2) the number of different levee system performance states, and (3) the range of flood elevations that may occur given the flood events that may occur and the different levee performance states. The summation over flood events applies to all events that could lead to flooding. These could include local precipitation that might lead to ponding/flooding behind levees in the

Copyright National Academy of Sciences. All rights reserved.

protected area, larger precipitation events that result in high river flows, ice jamming events, etc. The levee performance states can vary considerably depending on the number or type of structures and components that form the levee system. These may include levee breaching at different locations and at different flood elevations (pre- and post-overtopping), failure to close flood gates, structural or stability failure of floodwalls, etc. The performance of the levee system determines the different flooding mechanisms that may occur.

Regarding equation (I-9), first, the use of flood elevation as a metric for the characterization of the flood hazard can be considered a surrogate for the flood threat which may be multidimensional. As noted above, the level of damage that occurs may be a function of the depth and velocity of flooding. It also may be a function of debris content, the scour that may occur near a breach, etc. Second, the flooding that occurs is a function of the occurrence of different flooding mechanisms, some of which may involve levee failures, others of which do not. For purposes of this discussion, the characterization of the hazard is stated in terms of elevation as a surrogate. Equation (I-9) represents the aleatory model for estimating the random chance that flooding will occur and cause property damage.

The second element of the flood risk model is the "model of epistemic uncertainties." If all of the models and parameters that are required to implement equation (I-9) were known with certainty, a single estimate of $(C > c)$ could be determined. This of course is not the case, because there are numerous sources of uncertainty in the assessment of flood hazards, in the estimate of the fragility of levee systems, and in the estimate of the flood damages. As a result, there is uncertainty in the estimate of $(C > c)$. Therefore, as part of the flood risk analysis, an epistemic uncertainty model needs to be developed for the flood hazard analysis, the fragility analysis, and the flood damage model. In addition, a method to propagate these uncertainties to derive the uncertainty in the flood risk needs to be implemented.

Typically, simulation methods are used to carry out this analysis (e.g., Monte Carlo or Latin Hypercube simulation). Other approaches include the use of logic trees to enumerate all of the possible combinations of uncertain models and parameters. Conceptually, the estimate of the uncertainty in the flood risk analysis can be illustrated in a logic tree, as shown in Figure I-1. Across the top of the logic tree are the uncertainty elements of the flood risk model (again, shown here in conceptual form). For elements in the logic tree, there are a series of branches that represent alternative, discrete models are parameter estimates. Collectively, these discrete estimates model the uncertainty in that component of the risk model (e.g., flood hazard model). Associated with each branch is a probability weight, derived from the uncertainty analysis for that part of the flood risk model. The weight corresponds to the degree-of-belief that a particular model or parameter estimate is the true state of nature. Each path through the logic tree represents one, alternative (but uncertain) estimate of the flood risk, based on the uncertain inputs defined along the path and the basis for the risk calculation (equation (I-9).

## COMPONENTS OF THE MODERN RISK-BASED ANALYSIS

The modern risk analysis recommended for NFIP insurance, mitigation, and communication programs requires a complete description of the flood hazard. In Chapter 3, a summary description of the modern risk-based analysis is provided which includes a flood hazard analysis, levee and other hydraulic structure and component and fragility analysis, systems analysis, inundation analysis, consequence assessment, and risk and uncertainty quantification. The discussion of these components is expanded, when relevant, here. Also, new components are discussed.

### Flood Hazard Analysis

In the context of the committee's recommendation, a description of the flood hazard includes a specification of the magnitude (e.g., peak flood elevation) and its frequency of occurrence (or, more commonly, frequency of exceedance). Hazard at a given location in a floodplain is described with a discharge (flow)-frequency or elevation-frequency distribution. For analysis of riverine flood risk, the latter commonly is derived from the former. For coastal risk analysis, the elevation-frequency function is developed directly.

Methods of development of discharge-frequency functions for rivers are well known and well documented. If an adequate record of unregulated discharge at a site is available, an analytical frequency distribution can be

Copyright National Academy of Sciences. All rights reserved.




FIGURE I-1 Illustration of a logic tree, showing the uncertainty in different components of risk analysis.

fitted to the data. FEMA generally follows the standard of practice for this distribution fitting with historical flow observations. In cases for which data available are inadequate for distribution fitting, FEMA guidance suggests regional methods, transfer methods, empirical equations, and watershed modeling methods for estimating discharge of specified probability.[4] While certain refinements to both distribution fitting and alternative methods

[4] See http://training.fema.gov/EMIWeb/edu/docs/fmc/Chapter%204%20-%20Flood%20Risk%20Assessment.pdf.

Copyright National Academy of Sciences. All rights reserved.

will be necessary for the comprehensive risk analysis proposed herein—notably enhancements to evaluating the epistemic uncertainty about the frequency curves—the hazard description required for risk analysis proposed herein is fundamentally the same as that currently required for FEMA studies. The assessment of epistemic uncertainties in hydrologic modeling, frequency analysis, and estimation of flood elevations is an important element of a comprehensive risk analysis and in the stability of the results (climate change and other physical changes aside). The assessment of epistemic uncertainties must consider the parametric uncertainties associated with limited data, correlation of model parameters, and modeling uncertainties which may include alternative modeling interpretations of the analysts (Yankee Atomic, 1984; IPET, 2009). Thus the same hydrologic engineering methods can be used, with enhancements, and the existing technical knowledge base and experience of analysts will be useful and usable for comprehensive risk analysis.

A key to success of the risk analysis proposed herein is the capability to model the behavior of the riverine, coastal, or floodplain system with sufficient detail and sufficient accuracy to predict water surface elevations and velocities throughout the area of interest, given the discharge values estimated with frequency fitting or alternative methods. Capabilities for such modeling are readily available and well understood in the engineering and floodplain management community.

For flood studies such as those conducted by FEMA, channel flow (or flow contained by the levees) is described well in many cases with a 1-D hydraulic model. Such a model predicts the water surface elevation and velocity in the channel for specified flow rates by solving equations that represent the conservation of mass and momentum in the channel as the water moves downstream. In some cases, a 1-D model is not adequate for representing channel flow, because the inherent assumption that flow is predominately in a single direction is violated. In that case, a 2-D model would be used. The products of application are similar, but with variations both longitudinally and laterally in the channel represented.

Software applications with 1-D and 2-D models currently accepted by FEMA for NFIP studies are usable for the risk analysis proposed herein.[5] Again, certain enhancements are necessary to adequately describe the uncertainty about predicted elevations, but the analysis applications and the knowledge and experience of users are directly usable.

## Flood Protection System Performance

The subject of this study and the issues the NFIP is facing are centered around levees, because they are a major component of flood protection systems. However, 44 CFR §65.10 discusses more broadly the fact that flood protection systems that a community relies on are often a composite of many different elements. These include:

- structures of various types, including levees, floodwalls, gates, buildings, etc.;
- natural structures (levee foundations, old streambeds);
- interior drainage systems; pumping systems (pumps, pumphouse), drainage ditches and canals, power supplies, control systems, fuel supplies, etc.; and
- operational requirements for pump system operation, gate closure, etc.

As such, the flood protection that is provided to a community relies on the ability of a "system" to perform as intended during flood events. One of the significant lessons from Hurricane Katrina was the recognition and admission by the Corps of Engineers that the New Orleans Hurricane Protection System (HPS) was a system in name only (IPET, 2009). The post-event evaluations made it clear the HPS was not designed, operated, or maintained as a system and as such did not perform as one during Katrina (IPET, 2009).

Section 65.10 dictates the requirements for elements of the flood protection system, such as an operational plan for the levee system, the installation of gates or other closures, etc. The residual risk in protected areas is a function of the reliability of the flood protection system as a whole, not just of the individual system elements. The

[5] See http://www.fema.gov/national-flood-insurance-program-flood-hazard-mapping/numerical-models-meeting-minimum-requirement-0 and http://www.fema.gov/national-flood-insurance-program-flood-hazard-mapping/numerical-models-meeting-minimum-requirement-3.

Copyright National Academy of Sciences. All rights reserved.

assessment of flood risks requires a system-level analysis where the system includes the watershed (the hydrologic system), the hydraulic system (river channels, floodplain), and the flood protection system.

As part of a risk analysis, a systems modeling approach that considers the physical and operational elements of a flood protection system that are required to prevent flooding needs to be used. The system performance (system reliability) over a wide range of flood events is considered in order to estimate the risk in the floodplain, in the protected as well nonprotected, waterside areas of the system. The performance of the system of structures and other components that make up the system is integral to the hydraulic response – whether the protection system is breached or not.

### Structure, Component, and Operational Reliability

A key element of the risk analysis is the assessment of the reliability of structures as well as other elements of the flood protection system to perform their intended function. This includes the integrity of the structures (levees, floodwalls, interface between structures, etc.) and operational reliability (actions of personnel) to close gates or other closures, operation drainage systems, etc. For purposes of the risk analysis, the reliability of structures is characterized in terms of the conditional probability of failure expressed as a function of an appropriate metric of the flood hazard (i.e., peak flood elevation) (USACE, 1996; URS/JBA, 2008; IPET, 2009; Schultz et al., 2010) (see Figure I-2). In addition to the assessment of fragility for structures in which the reliability depends on the loading level, there are other elements of the flood protection system whose reliability is independent of the level of flooding. Examples include the reliability of mechanical and electrical equipment (e.g., pump systems), actions of personnel (installation of closures, pump system operations, etc.).

A critical part of the reliability assessment is the collection of information about the various system components so that an understanding of system interactions, potential modes of failure (see Figure I-3 for a view of different levee failure modes) and performance can be developed. With respect to the assessment of fragility curves for structures (levees, floodwalls, etc.), various methods are available (URS/JBA, 2008; IPET, 2009; Schultz et al.,




FIGURE I-2 Levee fragility curve.

Copyright National Academy of Sciences. All rights reserved.




FIGURE I-3 Earthen levees are subject to a suite of potential failure modes. Not all failure modes are correlated to river stage. and this are excluded from consideration of levee fragility curves based on a function between river stage and system probability of failure. For example, dredging immediately adjacent to an earthen levee changes the capacity of that system to resist underseepage and piping (failure mode number 8). This activity, however, would not be captured and communicated to the system managers/operators through levee fragility curves defined by river stage.
SOURCE: Courtesy of Zina Deretsky, National Science Foundation.

2010). These range from judgmental approaches that rely on expert evaluations, often in cases where there is limited data, to empirical, and analytical methods (URS/JBA, 2008; IPET, 2009; Schultz et al., 2010). Empirical methods take advantage of observational data documenting the performance of structures under a variety of loads. Observations may be obtained systematically through controlled experiments or may be collected in an opportunistic fashion from flood events. Analytical methods that can be used to develop fragility curves are based on structural models that evaluate the likelihood that performance limits of the structure are exceeded. These methods have the advantage that they are based on physical models, or at least explicit physical relationships between capacity and demand. A limitation of analytical and empirical methods is that there are potential failure modes that may not be readily addressed by either approach. As a consequence, fragility assessments are often a hybrid of different methods, depending on the information that is available to perform the analysis.

There can be considerable epistemic uncertainty in the estimate of the fragility for structures (Figure I-4). A particularly vexing aspect of levees is the uncertainty associated with foundation conditions. The conditions along a levee can be complex and dynamic (Saucier, 1994). These changing subsurface conditions tend to promote preferential seepage beneath levees, often along buried or abandoned channels, as shown in Figure I-5. Underseepage tends to be "spotty," or inconsistent in some areas, and fairly predictable in other areas, depending on the underlying geology (Kolb, 1976). Underseepage can also be exacerbated by infiltration in riverside borrow pits, excavated to construct the adjacent levees (Mansur and Kaufman, 1957). The quantification of uncertainties and

Copyright National Academy of Sciences. All rights reserved.

Levees and the National Flood Insurance Program: Improving Policies and Practices







FIGURE I-4 Uncertainty in the estimate of levee fragility for a levee in New Orleans. Dashed lines correspond to the 0.05 and 0.95 uncertainty levels in the estimate of the conditional probability of failure.
SOURCE: IPET (2009).



FIGURE I-5 Levees are commonly placed on floodplains adjacent to the present course of the river channels. These embankments are usually underlain by older channel deposits, such as the oxbows sketched above. These dynamic conditions often promote the paths or preferential seepage and hasten differential settlement of the levee embankment.
SOURCE: Rogers (2012).

Copyright National Academy of Sciences. All rights reserved.

their potential impact on levee performance will be one of the most challenging aspects of developing fragility curves over the coming decade.

### Inundation Analysis Including Levee Breach and Inundation

If the flow rate in a leveed channel increases, the water surface elevation will increase. At a certain flow rate, the water-surface elevation will exceed the top of levee elevation, and water will flow onto the "protected" floodplain—the interior area on the landside of the levee. This floodplain flow may be simulated with a 1-D or 2-D model. Figure I-6 illustrates conceptually such an integrated model of channel and floodplain flow, as would be required for a complete risk analysis as proposed herein. A 1-D model represents the channel flow regime, and a water-surface elevation is computed for a specified exceedence probability. If that water-surface elevation is greater than the elevation of the top of the levee (which is represented in the figure with the heavy line), water spills from the channel. That process is simulated with an appropriate 1-D or 2-D model for the risk analysis proposed. In the illustration, a 2-D model is illustrated. This uses a fixed grid, with elevation and flow resistance parameters described for each cell of the grid. The equations of fluid motion are solved to account for the flow from each cell to all adjacent cells, thus estimating the depth of inundation for each cell. The 1-D and 2-D models are "coupled" at locations where water spills from the channel onto the floodplain and vice versa, as illustrated by the arrows in the figure.

A levee between the channel and floodplain limits the exchange of water between the channel and floodplain, with flow onto the floodplain occurring only when the channel capacity is exceeded if the levee performs as designed. However, the levee may breach prior to (or after) overtopping. In that case, water flows from the channel through the levee breach and onto the floodplain. Shown in Figure I-7, flow onto the protected floodplain is simulated, again, with an appropriate model. As before, model results include water surface elevations and velocity




FIGURE I-6 A one-dimensional model commonly is used to represent channel flow (*Left*). The A-B transect illustrates a cross section of the channel in the 1-D model of flow that typically would be used to simulate behavior of the river. A two-dimensional model may be used to represent more complex flow patterns on the adjacent floodplain (*Right*).

Copyright National Academy of Sciences. All rights reserved.




FIGURE I-7 A one-dimensional model of flow in the channel (*Left*) can be coupled with a two-dimensional model of flow on the floodplain (*Right*), with flow moving from the channel onto the floodplain through the levee at the breach. The heavy line represents the levee, and the arrow shows the location of the breach or overflow section through which water flows.

for each cell, in this case with water delivered to the floodplain from the channel through the levee. The floodplain elevations may be mapped, as illustrated, with shading to represent depth. Such analysis can be completed for any flow condition in the channel, including the one percent chance event and larger or smaller events.

For risk analysis, properties of the levee breach are described for modeling the breach. The properties are determined from empirical data, or application of geotechnical engineering analyses and standards of practice, as described earlier in this report.

## Consequence Assessment

A modern risk analysis requires the estimation of consequence of inundation for the entire range of hydrologic events and the various states of and levee system performance. This consequence evaluation is commonly accomplished with a model that describes in a quantitative manner the consequences of flooding, given the consequences of the flooding (i.e., depth and velocity of flow), and properties of the exposed floodplain assets (i.e., construction type and material, foundation type and elevation, and content type and value).

A simple elevation-damage function, such as that illustrated by Figure I-8, is typical of models used to characterize the consequence of flooding of the exposed inventory in a floodplain. Such a function may represent economic loss for a single element of the inventory—such as a single residence and its contents—or the function may represent the aggregated loss for groups of items. The function may represent tangible (direct and/or indirect) loss and/or intangible loss. The tangible consequence of flooding may include a broad range of deleterious effects and associated costs, including (a) economic damage to buildings and contents; (b) damage to outbuildings, landscaping, vehicles, boats, and other inventory not within buildings; (c) damage to infrastructure, including transportation facilities, utilities, communications facilities, and so on; (d) damage to vegetation, including crops; (e) emergency response, management, and recovery costs, including flood-fighting costs; security, evacuation,

Copyright National Academy of Sciences. All rights reserved.




FIGURE I-8 Example of an elevation-damage model prediction of consequence (damage), given flood properties (water-surface elevation).

search and rescue costs, debris removal, and others; and (f) other economic impacts, such as displacement costs for temporary quarters, disruption time for affected people, economic impacts of loss of service of transportation and utility functions, loss of business income, loss of public services, and others.

Consequences considered in a flood risk analysis need not be restricted to economic loss. Thus, the elevation-damage function may be interpreted broadly to represent any undesired consequences that can be predicted from knowledge of flood properties.

FEMA has developed consequence models for various structure types, content of structures, infrastructure, vehicles, and other relevant categories. These models, derived from information gathered from insurance claims, are included in FEMA's Hazus software application. With similar analysis of historical inundation damage data, augmented with analysis of building methods, USACE has developed, published, and used generic elevation-damage models (USACE, 2000, 2003). For flood situations or structures not well represented by these readily available models, site-specific models are required. Those are developed from (a) empirical analysis of post-flood damage surveys; (b) detailed engineering analysis of cost of repair, considering various flood depths at a property and using cost estimates from, for example, Marshall & Swift's *Residential and Commercial Estimator*, *Means Square Foot Costs*, and the BNI *Home Builder's Costbook* (2013); or (c) expert elicitation, using professional judgment offered by knowledgeable economists and engineers.

Risk analyses may be completed independently for each property within the floodplain. This will provide the economic information needed for insurance rate setting for individual properties. In addition, or as an alternative, economic values can be aggregated by political boundary, by structure type, and so on as appropriate for decision making for mitigation or for risk communication.

## Risk Quantification

The final step in the risk analysis is the probabilistic combination of the different parts of the risk analysis to estimate the frequency of flooding, performance of the flood protection systems, and flood damages. The quantification also includes the propagation of epistemic uncertainties in the flood hazard, levee system performance and economic damage assessment, to derive the uncertainty in the risk analysis results. With current analytical and computational capabilities the estimation of flood risks can be carried out at the individual property level, the community level, and for the NFIP portfolio. These capabilities make it possible for a modern NFIP risk analysis

Copyright National Academy of Sciences. All rights reserved.

to provide comprehensive support to all aspects of the program: insurance, flood risk communication, floodplain management, etc.

## REFERENCES

Abrahamson, N. A., P. G. Somerville, and C. A. Cornell. 1990. Uncertainty in numerical strong ground motion predictions. Pp 407-416 in Proceedings of the Fourth U.S. National Conference on Earthquake Engineering: May 20-24, 1990, Palm Springs, California, Vol. 1. Oakland, CA: Earthquake Engineering Research Institute.

AIR (American Institutes for Research). 2012. AIR Models Overview. Available online at http://www.air-worldwide.com/Models/Overview/. Accessed November 28, 2012.

ASME/ANS (American Society of Mechanical Engineers and American Nuclear Society). 2009. Standard for Level 1/Large Early Release Frequency Probabilistic Risk Assessment for Nuclear Power Plant Applications, Addenda to ASME/ANS RA-S-2009. LaGrange Park, IL: ANS.

CA DWR (California Department of Water Resources). 2012. 2012 Central Valley Flood Protection Plan: A Path for Improving Public Safety, Environmental Stewardship, and Long-Term Economic Stability. Available online at: http://www.cvfpb.ca.gov/CVFPP/index.cfm.

EPA (U.S. Environmental Protection Agency). n.d. Risk Analysis Guidelines and Tools, Available online at http://www.epa.gov/riskassessment/guidance.htm. Accessed December 10, 2012.

IPET (Interagency Performance Evaluation Task Force). 2009. Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System: Final Report.. Available online at https://ipet.wes.army.mil/. Accessed December 4, 2012.

Kaplan, S., and B. J. Garrick. 1981. On the quantitative definition of risk. Risk Analysis 1(1): 11-27.

Kolb, C. R. 1976. Geologic control of sand boils along Mississippi River levees. Chapter 6 in Geomorphology and Engineering, D. R. Coates, ed. Stroudsburg, PA: Dowden, Hutchinson and Ross.

Mansur, C. I., and R. I. Kaufman. 1957. Underseepage, Mississippi River Levees, St. Louis District. ASCE Transactions 122: 985-1008.

NRC. 2007. Elevation Data for Floodplain Mapping. Washington, DC. The National Academies Press.

RMS (Risk Management Solutions). 2012. RMS Models. Available online at http://www.rms.com/models/. Accessed November 28, 2012.

Rogers, J. D. 2012. Evolution and Development of Flood Control Engineering. GE 301 Lectures. Available online at http://web.mst.edu/~rogersda/umrcourses/ge301/. Accessed November 15, 2012.

Saucier, R. T. 1994. Geomorphology and Quaternary Geological History of the Lower Mississippi Valley. Vicksburg, MS: USACE.

Schultz, M. T., B. P. Gouldby, J. D. Simm, and J. L. Wibowo. 2010. Beyond the Factor of Safety: Developing Fragility Curves to Characterize System Reliability. Washington, DC: USACE.

USACE (U.S. Army Corps of Engineers) 1991. HEC-2 Water Surface Profiles: User's Manual. Davis, CA: Hydrologic Engineering Center.

USACE. 1996. Risk-Based Analysis for Flood Damage Reduction Studies. EM 1110-2-1619. Washington, DC: USACE.

USACE. 2000. Generic Depth Damage Relationships: Economic Guidance Memorandum EGM 01-03. Washington, DC: USACE.

USACE. 2003. Generic Depth Damage Relationships for Residential Structures with Basements: Economic Guidance Memorandum EGM 04-01. Washington, DC: USACE.

USACE. 2006. Risk Analysis for Flood Damage Reduction Studies. ER 1105-2-101. Washington, DC: USACE.

USACE. 2008. Improving Public Safety—From Federal Protection to Shared Risk Reduction. Memo to Honorable Jim Nussle, Director, Office of Management and Budget. Washington, DC: USACE

USACE. 2012. Risk Assessment: Trinity River Corridor, Dallas Floodway Near Dallas, TX. Washington, DC: USACE.

USNRC (U.S. Nuclear Regulatory Commission). 2011. Practical Implementation Guidelines for SSHAC Level 3 and 4 Hazard Studies. NUREG-2117. Rockville, MD: USNRC.

URS/JBA (URS Corporation/Jack R. Benjamin & Associates, Inc.). 2008. Delta Risk Management Strategy (DRMS), Phase 1, Risk Analysis Report (Draft). Sacramento: California Department of Water Resources.

Yankee Atomic Electric Company. 1984. Probability of Extreme Rainfalls. YAEC-1405. Dallas, TX: Yankee Atomic Energy.

Copyright National Academy of Sciences. All rights reserved.